# Exhibit A

# Ethiopian Airlines Flight 302 Related Cases

| Exhibit | Case Name | Case No. | Judge |
|---|---|---|---|
| Exhibit B | KEVIN J. CONWAY, as Special Administrator for the ESTATE OF JULIAH MWASHI INGASIANA,<br><br>v.<br><br>THE BOEING COMPANY, a corporation; ROSEMOUNT AEROSPACE, INC., a corporation; ROCKWELL COLLINS, INC., a corporation; HAMILTON SUNDSTRAND CORPORATION d/b/a UTC AEROSPACE SYSTEMS, a corporation, collectively with ROCKWELL COLLINS, INC d/b/a COLLINS AEROSPACE | 1:19-cv-04074 | Hon. Sharon Johnson Coleman |
| Exhibit C | KEVIN J. CONWAY, as Special Administrator for the ESTATE OF MARHUM HUSSEIN SWALEH M TETU,<br><br>v.<br><br>THE BOEING COMPANY, a corporation; ROSEMOUNT AEROSPACE, INC., a corporation; ROCKWELL COLLINS, INC., a corporation; HAMILTON SUNDSTRAND CORPORATION d/b/a UTC AEROSPACE SYSTEMS, a corporation, collectively with ROCKWELL COLLINS, INC d/b/a COLLINS AEROSPACE | 1:19-cv-04076 | Hon. Thomas M. Durkin |
| Exhibit D | JABOMA BANDA OCHUODHO PHILIP AKEYO, ALLAN ONYANGO JABOMA and GEORGE OMONDI, as personal representatives of the Estate of ISABELLA BERYL ACHIENG JABOMA, deceased, | 1:19-cv-04106 | Hon. Jorge L. Alonso |

| | | | |
|---|---|---|---|
| | v.<br><br>THE BOEING COMPANY | | |
| Exhibit E | KLAUS PHILIPP, Individually as a Surviving Parent, and as the Special Administrator of the Estate of MARIE CHRISTIN PHILIPP, Deceased,<br><br>v.<br><br>THE BOEING COMPANY, a corporation; ROSEMOUNT AEROSPACE, INC., a corporation | 1:19-cv-04107 | Hon. Robert M. Dow Jr. |
| Exhibit F | ASTRID WIGSTROM WESTERLIND, Individually as Surviving Spouse and as Special Administrator of the Estate of MAX THABISO EDKINS, Deceased, and on behalf of all Surviving Beneficiaries,<br><br>v.<br><br>THE BOEING COMPANY, a corporation; ROSEMOUNT AEROSPACE, INC., a corporation | 1:19-cv-4137 | Hon. Sharon Johnson Coleman |
| Exhibit G | ADRIAN PETER TOOLE, Individually as a Surviving Parent, and as the Special Administrator of the Estate of JOANNA HELEN TOOLE, Deceased,<br><br>v.<br><br>THE BOEING COMPANY, a corporation; ROSEMOUNT AEROSPACE, INC., a corporation | 1:19-cv-04140 | Hon. Elaine E. Bucklo |
| Exhibit H | SWALEH MOHAMED ABDALLA, as Special Administrator of the Estate of SIIT ABDALLA MOHAMED, deceased,<br><br>v. | 1:19-cv-04162 | Hon. Joan H. Lefkow |

| | | | |
|---|---|---|---|
| | THE BOEING COMPANY, a corporation; ROSEMOUNT AEROSPACE, INC., a corporation | | |

# Exhibit B

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

KEVIN J. CONWAY as Special Administrator for the ESTATE OF JULIAH MWASHI INGASIANA,

Plaintiff,

v.

THE BOEING COMPANY, a Delaware Corporation; and ROSEMOUNT AEROSPACE, INC, a Delaware Corporation; and ROCKWELL COLLINS, INC., a Delaware corporation and HAMILTON SUNDSTRAND CORPORATION d/b/a UTC AEROSPACE SYSTEMS, a Delaware corporation, collectively with ROCKWELL COLLINS, INC d/b/a COLLINS AREOSPACE,

Defendants.

NO. **1:19-cv-4074**

*Plaintiff Demands Trial by Jury*

**COMPLAINT AT LAW**

Plaintiff KEVIN J. CONWAY, as Special Administrator for the ESTATE OF JULIAH MWASHI INGASIANA, by and through their attorneys, POWER ROGERS & SMITH, LLP, FRIEDMAN RUBIN PLLP, and SHAKESPEAR FEYISSA, files this Complaint pursuant to the Wrongful Death Act of Illinois, 740 ILCS 180/2.1, against the above-named Defendants (hereinafter referred to as "Boeing," "Rosemount" and "Collins"), and states as follows:

**PARTIES**

1. This is an action for damages pursuant to the Illinois Wrongful Death Act, 740 Ill. Comp. Stat. 180/1 *et seq.,* Illinois Product Liability Act, 735 Ill. Comp. Stat. 5/13-213, or any other applicable law, based on the defective design and the inadequate warnings of the Boeing 737 Max.

2. Kevin J. Conway has been appointed as the Special Administrator for the Estate of Juliah Mwashi Ingasiana, pursuant to 740 ILCS 180/2.1. See Exhibit A.

3. Juliah Mwashi Ingasiana died in the crash of Ethiopian Airlines Flight 302 on March 10, 2019.

4. The Decedent's only surviving heirs are: her spouse, Henry Macharia, and their two children, Ivy Nduta Macharia and Joy Ayuma Macharia.

5. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1332(a)(2) based on diversity of citizenship because the matter in controversy exceeds the sum or value of $75,000, inclusive of interest and costs, and arises between citizens of U.S. states and citizens of foreign states.

6. Venue is proper in the Northern District of Illinois: pursuant to 28 U.S.C. §1391(b)(1) because Boeing is and has, at all relevant times, been a citizen and resident of the State of Illinois. Boeing's corporate headquarters and principal place of business are located in this judicial district at 100 North Riverside, Chicago, Cook County, Illinois 60606; At all relevant times, Defendant Boeing Company is a Delaware corporation with its principal place of business and corporate headquarters in Chicago, Illinois. Boeing has been authorized to do business and has been transacting or conducting business within the State of Illinois. *See* 735 Ill. Comp. Stat. 5/2-209(b)(4).

7. At all times relevant to this complaint, Defendant Boeing was engaged in the business of designing, manufacturing, assembling, testing, servicing, marketing, promoting, leasing and selling commercial aircrafts as well as providing information and warnings about such aircrafts, including the aircraft at issue, the Boeing 737 Max.

8. Pursuant to 28 U.S.C. §1391(b)(3) because Rosemount transacted and continues to transact regular and substantial business with Chicago-based Boeing in Cook County, Illinois; and

Case: 1:19-cv-04074 Document #: 2 Filed: 06/18/19 Page 3 of 46 PageID #:4

pursuant to 28 U.S.C. §1391(b)(2) was engaged in the business of designing, manufacturing, assembling, testing, servicing, marketing, promoting, and supplying as well as providing information and warnings about the Angle of Attack sensor ("AOA sensor") which was affixed to the aircraft at issue, the Boeing 737 Max.

9. Pursuant to 28 U.S.C. §1391(b)(3) ROCKWELL COLLINS, INC., a Delaware corporation and HAMILTON SUNDSTRAND CORPORATION d/b/a UTC AEROSPACE SYSTEMS, a Delaware corporation, collectively with ROCKWELL COLLINS, INC d/b/a COLLINS AREOSPACE, (herein referred to as "Collins"), Avionics Division, formerly known as Rockwell Collins, is located in Cedar Rapids, Iowa and may be served with process through any of its directors at its principal office located at 14300 Judicial Road, Burnsville, Minnesota, 55306-4898.

10. At all times relevant to this complaint, Defendant Collins was engaged in the business of designing, programming, manufacturing, assembling, testing, servicing, marketing, promoting, and supplying as well as providing information and warnings about the Maneuvering Characteristics Augmentation System ("MCAS system") which was installed on the aircraft at issue, the Boeing 737 Max.

**FACTS**

11. The facts of this case highlight a series of actions taken by Boeing to put profit over the lives of children, women and men. In an effort to compete with Airbus's new fuel-efficient Neo aircraft, Defendant Boeing rushed an aircraft to market that was not airworthy and then concealed its defects in order to sell more airplanes. That aircraft is the Boeing 737 Max 8 ("Max 8").

12. Boeing opted to build the Max 8 because it would be quicker, easier, and cheaper than starting from scratch, and would provide fuel savings for airlines.[1]

13. Boeing produced sloppy blueprints for the Max 8 and told a technician that instructions would be cleaned up later in the process.

14. Boeing set a ground rule for engineers: Limit changes to hopefully avert a requirement that pilots spend time training in a flight simulator before flying the Max 8.

15. Boeing marketed the Max 8 to airlines telling them that it will also reduce costs on training pilots who already were licensed to fly the Boeing 737.[2]

16. Boeing trained the Max 8 pilots using an iPad.

17. To improve the fuel efficiency of their new jet, Boeing put new engines on the Max 8.

18. The new engines were bigger than the 737 NG engines and Boeing had to change the mounting point of the engine.

19. Boeing put the Max 8 engines further forward and higher on the wings than on the 737 NG.

20. The different mounting point made the Max 8 prone to aerodynamic stall. The engine positions on the wings gives the Max 8 a tendency to pitch up under high power.

21. In order to prevent an aerodynamic stall Boeing and Collins Aerospace developed software which told the flight control system to change its angle of attack downward if a stall risk is perceived. This is known as Maneuvering Characteristics Augmentation System ("MCAS").

[1] https://www.nytimes.com/2019/03/23/business/boeing-737-max-crash.html

[2] https://www.aviationcv.com/aviation-blog/2019/shocking-facts-boeing-737max-crash

22.     On the Max 8, if a stall risk is perceived the computer on the aircraft automatically initiates a downward pitch angle.

23.     Boeing intentionally omitted information about the MCAS system from its Max 8 flight manual and training materials, leaving pilots ignorant of its very existence.

24.     An Angle of Attack (AOA) sensor, designed and manufactured by Rosemount, was affixed to the Max 8 and designed to tell the flight control system if a stall risk is perceived. The Rosemount AOA sensor was prone to failure and to providing false data.

25.     Boeing intentionally designed the flight control system to rely upon data from one single sensor on the Max 8 in order to prevent more in-depth training, making it easier to sell its aircraft to airlines. Boeing's selling point was that the Max 8 would only require "distance learning" using an iPad, with no down time for crew to train on simulators.

26.     Boeing provided some airlines with an "optional" feature allowing the flight control system to obtain information from two different AOA sensors. In this optional configuration if one AOA sensor receives data that does not agree with data received by the other sensor, the MCAS does not command a pitch down of the aircraft.

27.     In a Max 8 configured in the standard manner there are two AOA sensors but the Flight Control System only receives data from one AOA sensor. But if one AOA sensor receives bad data, falsely indicating a stall, the aircraft will pitch nose down and can crash.

28.     The subject aircraft did not contain the optional feature. It relied upon data from one AOA sensor even though it had two AOA sensors.

29.     The angle of attack sensor is depicted below:

1916 100 2016
YEARS OF BOEING
737 MAX

CAUTION
CRITICAL AIRFLOW SENSOR
HANDLE WITH EXTREME CARE

Case: 1:19-cv-04074 Document #: 2 Filed: 06/18/19 Page 7 of 46 PageID #:8

30. The horizontal stabilizer on the Max 8 is positioned by a single electric trim motor controlled through either the stab trim switches on the control wheel, autopilot trim or through the MCAS system. The stabilizer may also be positioned by manually rotating the stabilizer trim wheel.

31. Switches on each control wheel actuate the electric trim motor through the main electric stabilizer trim circuit when the aircraft is flown manually. With the autopilot engaged, stabilizer trim is accomplished through the autopilot stabilizer trim circuit. The main electric and autopilot stabilizer trim have two speed modes: high speed with flaps extended and low speed with flaps retracted. If the autopilot is engaged, actuating either pair of stabilizer trim switches

automatically disengages the autopilot. The stabilizer trim wheels rotate whenever electric stabilizer trim is actuated.

32.     The STAB TRIM PRI cutout switch and the STAB TRIM B/U cutout switch on the Max 8 are located on the control stand. If either switch is positioned to CUTOUT, both the autopilot and main electric trim inputs are disconnected from the stabilizer trim motor.

33.     The control column actuated stabilizer trim cutout switches on the Max 8 stop operation of the main electric and autopilot trim when the control column movement opposes trim direction. This is not true for pitch commands for the MCAS. When the STAB TRIM override switch is positioned to OVRD, electric trim can be used regardless of control column position.

34.     Pitch trim is controlled by changing the pitch of the horizontal stabilizer. Changing pitch of the horizontal stabilizer can place large pitch forces on the aircraft. When applied appropriately, these forces can keep the aircraft in balance. When applied inappropriately, they can make the aircraft difficult to handle.

35.     Forces generated by the horizontal stabilizer from an out of trim condition can exceed the forces that can be generated by the elevator.

36.     It is possible on the Max 8, to have an out of trim condition that when countered by elevator control inputs from the crew, puts enough load on the pitch trim mechanism that it essentially jams the pitch trim control. Manual trim cannot overcome this load on the mechanism.

37.     The elevator is a smaller control surface when compared to the surface area of the controllable horizontal stabilizer.

38.     This scenario is depicted by the illustration below:

Boeing 737
**Jamming A Mistrimmed Horizontal Stabilizer**

To offset the aerodynamic forces created by a combination of the plane's attitude and speed, the horizontal stabilizer is trimmed by rotating around the pivot point. Electric motors or a manual hand-cranked trim wheel make these adjustments and reduce the force needed by the pilots to move the controls. If the stabilizer is tilted too high, this is called a mistrim and can create a dangerous situation that can paralyze manual control.

Pulling the pilot's controls raises the elevator. That creates an aerodynamic force downward on the tail to raise the nose.

Pivot point

Jackscrew (inside the fuselage)

The elevator creates an opposing force against the jackscrew that swivels the stabilizer and makes hand-cranking the trim wheel to raise the nose extremely difficult.

Boeing 737 Next Generation shown for illustrative purposes. Source: Peter Lemme

THE AIR CURRENT

39. Electric trim works in a narrower range of motion than manual trim. If the stabilizer is out of trim and outside the range of electric trim operation, only manual trim can be used.

40. In addition to its failure to warn, create a provide instructions to pilot and train pilots on the MCAS system and how to override the Flight Control System when it is provided with false AOA data, Boeing designed a pitch trim control system that is capable of jamming.

**CRASH OF ETHIOPIAN AIRLINES FLIGHT 302**

41. On March 10, 2019 Juliah Mwashi Ingasiana was a fare paying passenger onboard a Boeing 737-8 (Max) aircraft, ET-AVJ, Serial Number 62450, with an intended destination of Nairobi, Kenya.

42. At 05:38 UTC, Ethiopian Airlines flight 302, Boeing 737-8(Max), ET-AVJ, took off from Addis Ababa Bole Int. Airport bound to Nairobi, Kenya Jomo Kenyatta Int. Airport. Shortly after takeoff, the Angle of Attack sensor that recorded that value became erroneous and the left stick shaker activated and remained active until near the end of the flight. In addition, the

airspeed and altitude values from the left air data system began deviating from the corresponding right side values. The Captain requested to return back to the departure airport. The aircraft crashed at 5:44 UTC 28 NM South East of Addis Ababa near Ejere village. There were 157 passengers and crew on board. All were fatally injured, and the aircraft was destroyed.

43.     Just one minute into the flight the Captain, Yared Getachew, reported that the crew was having flight-control problems. The anti-stall system then kicked in and pushed the nose of the aircraft down for nine seconds. Instead of climbing, the aircraft descended slightly. Audible warnings — "Don't Sink" — sounded in the cockpit. The pilots fought to turn the nose of the plane up, and briefly they were able to resume climbing. The MCAS system pushed the nose down again, triggering more squawks of "Don't Sink" from the plane's ground-proximity warning system. The pilots then flipped two switches and disconnected the anti-stall system, then tried to regain control. They asked to return to the airport but were continuing to struggle getting the aircraft to gain altitude. Power to controls was returned. The MCAS engaged again, pushing the plane into a nose dive. Thirty seconds later the cockpit voice recording ended, the plane crashed, and all 157 people on board were killed. The aircraft's impact created a 30 meter deep crater.

44.     According to a preliminary report issued by the Ethiopian Aircraft Accident Investigation Bureau, the following is what occurred, minute by minute.

45.     At 05:38:44, shortly after liftoff, the left and right recorded AOA values deviated. The left AOA decreased to 11.1 degrees then increased to 35.7 degrees while the value of the right AOA indicated 14.94 degrees. Then the left AOA value reached 74.5 degrees in ¾ seconds while the right AOA reached a maximum value of 15.3 degrees. At this time, the left stick shaker activated and remained active until near the end of the recording. Also, the airspeed, altitude and

flight director pitch bar values from the left side noted deviating from the corresponding right side values. The left side values were lower than the right side values until near the end of the recording.

46. At 05:38:43 and about 50 ft radio altitude, the flight director roll mode changed to LNAV. At 05:38:46 and about 200 ft radio altitude, the Master Caution parameter changed state. The First Officer called out Master Caution Anti-Ice on CVR. Four seconds later, the recorded Left AOA Heat parameter changed state.

47. At 05:38:58 and about 400 ft radio altitude, the flight director pitch mode changed to VNAV SPEED and the Captain called out "Command" (standard call out for autopilot engagement) and an autopilot warning is recorded. At 05:39:00, the Captain called out "Command". At 05:39:01 and about 630 ft radio altitude, a second autopilot warning is recorded.

48. At 05:39:06, the Captain advised the First-Officer to contact radar and the First Officer reported SHALA 2A departure crossing 8400 ft and climbing FL 320. Between liftoff and 1000 ft above ground level (AGL), the pitch trim position moved between 4.9 and 5.9 units in response to manual electric trim inputs. At 1000 ft AGL, the pitch trim position was at 5.6 units. At 05:39:22 and about 1,000 feet the left autopilot (AP) was engaged (it disengaged about 33 seconds later), the flaps were retracted and the pitch trim position decreased to 4.6 units. Six seconds after the autopilot engagement, there were small amplitude roll oscillations accompanied by lateral acceleration, rudder oscillations and slight heading changes. These oscillations continued also after the autopilot was disengaged. At 05:39:29, radar controller identified ET-302 and instructed to climb FL 340 and when able right turns direct to RUDOL and the First-Officer acknowledged.

49. At 05:39:42, Level Change mode was engaged. The selected altitude was 32000 ft. Shortly after the mode change, the selected airspeed was set to 238 kt.

50.     At 05:39:45, the Captain requested flaps up and the First-Officer acknowledged. One second later, the flap handle moved from 5 to 0 degrees and flaps retraction began. At 05:39:50, the selected heading started to change from 072 to 197 degrees and at the same time the Captain asked the First-Officer to request to maintain runway heading.

51.     At 05:39:55, Autopilot disengaged, at 05:39:57, the Captain advised the First-Officer to request to maintain runway heading and that they were having flight control problems. At 05:40:00 shortly after the autopilot disengaged, the FDR recorded an automatic aircraft nose down (AND) activated for 9.0 seconds and pitch trim moved from 4.60 to 2.1 units. The climb was arrested and the aircraft descended slightly.

52.     At 05:40:03 the Ground Proximity Warning System (GPWS) "DON'T SINK" alerts occurred. At 05:40:05, the First-Officer reported to ATC that they were unable to maintain SHALA 1A and requested runway heading which was approved by ATC.

53.     At 05:40:06, left and right flap position reached a recorded value of 0.019 degrees which remained until the end of the recording. The column moved aft and a positive climb was re-established during the automatic AND motion. At 05:40:12, approximately three seconds after AND stabilizer motion ends, electric trim (from pilot activated switches on the yoke) in the Aircraft nose up (ANU) direction is recorded on the DFDR and the stabilizer moved in the ANU direction to 2.4 units. The Aircraft pitch attitude remained about the same as the back pressure on the column increased.

54.     At 05:40:20, approximately five seconds after the end of the ANU stabilizer motion, a second instance of automatic AND stabilizer trim occurred and the stabilizer moved down and reached 0.4 units.

55. From 05:40:23 to 05:40:31, three Ground Proximity Warning System (GPWS) "DON'T SINK" alerts occurred.

56. At 05:40:27, the Captain advised the First-Officer to trim up with him. At 05:40:28 Manual electric trim in the ANU direction was recorded and the stabilizer reversed moving in the ANU direction and then the trim reached 2.3 units.

57. At 05:40:35, the First-Officer called out "stab trim cut-out" two times. The Captain agreed and the First Officer confirmed stab trim cut-out. At 05:40:41, approximately five seconds after the end of the ANU stabilizer motion, a third instance of AND automatic trim command occurred without any corresponding motion of the stabilizer, which is consistent with the stabilizer trim cutout switches were in the ''cutout'' position.

58. At 05:40:44, the Captain called out three times "Pull-up" and the First-Officer acknowledged. At 05:40:50, the Captain instructed the First Officer to advise ATC that they would like to maintain 14,000 ft and they had a flight control problem. At 05:40:56, the First-Officer requested ATC to maintain 14,000 ft and reported that they were having a flight control problem. ATC approved.

59. From 05:40:42 to 05:43:11 (about two and a half minutes), the stabilizer position gradually moved in the AND direction from 2.3 units to 2.1 units. During this time, aft force was applied to the control columns which remained aft of neutral position. The left indicated airspeed increased from approximately 305 kt to approximately 340 kt (VMO). The right indicated airspeed was approximately 20-25 kt higher than the left. The data indicates that aft force was applied to both columns simultaneously several times throughout the remainder of the recording.

60. At 05:41:20, the right overspeed clacker was recorded on Cockpit Voice Recorder. It remained active until the end of the recording. At 05:41:21, the selected altitude was changed

from 32000 ft to 14000 ft. At 05:41:30, the Captain requested the First-Officer to pitch up with him and the First-Officer acknowledged.

61.     At 05:41:32, the left overspeed warning activated and was active intermittently until the end of the recording. At 05:41:46, the Captain asked the First-Officer if the trim was functional. The First-Officer has replied that the trim was not working and asked if he could try it manually. The Captain told him to try.

62.     At 05:41:54, the First-Officer replied that it was not working. At 05:42:10, the Captain asked and the First-Officer requested a vector to return and ATC approved.

63.     At 05:42:30, ATC instructed ET-302 to turn right heading 260 degrees and the First-Officer acknowledged. At 05:42:43, the selected heading was changed to 262 degrees. At 05:42:51, the First-Officer mentioned Master Caution Anti-Ice. The Master Caution is recorded on DFDR.

64.     At 05:42:54, both pilots called out "left alpha vane". At 05:43:04, the Captain asked the First Officer to pitch up together and said that pitch is not enough. At 05:43:11, about 32 seconds before the end of the recording, at approximately 13,4002 ft, two momentary manual electric trim inputs are recorded in the ANU direction. The stabilizer moved in the ANU direction from 2.1 units to 2.3 units.

65.     At 05:43:20, approximately five seconds after the last manual electric trim input, an AND automatic trim command occurred and the stabilizer moved in the AND direction from 2.3 to 1.0 unit in approximately 5 seconds. The aircraft began pitching nose down. Additional simultaneous aft column force was applied, but the nose down pitch continued, eventually reaching 40 degrees nose down. The stabilizer position varied between 1.1 and 0.8 units for the remainder of the recording. The left Indicated Airspeed increased, eventually reaching approximately 458 kts

and the right Indicated Airspeed reached 500 kts at the end of the recording. The last recorded pressure altitude was 5,419 ft on the left and 8,399 ft on the right.

66.    Data from the Flight Data Recorder on the aircraft can be seen below:



## BACKGROUND FACTS

67.    Prior to the loss of all One Hundred and Fifty-Seven (157) lives in the Ethiopian Airlines Crash of March 10, 2019 Boeing was put on notice that its Max 8 aircraft was defective and dangerous and concealed these defects in order to sell more of the Max 8 airplanes.

68.    Boeing was put on notice time and time again that the Max 8 was unreasonably dangerous but failed to rectify the flawed design, failed to provide adequate working sensors or software fixes, failed to provide working warnings or alarms, failed to install, design or retrofit its

Case: 1:19-cv-04074 Document #: 2 Filed: 06/18/19 Page 16 of 46 PageID #:17

aircraft with adequate sensors and failed to provide adequate warnings or training about the danger. For Example:

69. **Max 8 Danger Warning Number 1:** In 2006 the Future Aviation Safety Team ("FAST") published a 50 page study on "Increasing Reliance on Flight Deck Automation," after conducting a pilot survey among more than 190 pilot respondents, with a mean of 10,000 flying hours and 20 years in the business. [3] The top five hazards FAST identified with emerging autonomous flight systems included the following four out of five hazards all of which are applicable to the Max 8 MCAS and AOA sensor system:

a. Failure of the flight crew to remain aware of automation mode and aircraft energy state;

b. Unfamiliar modes of aircraft automation may result in a perfectly normal flying aircraft suddenly taking on characteristics that the pilot has seldom or never previously encountered;

c. Latent flaws in the displays or primary flight control system may go undetected, because not enough human-in-the-loop testing is performed;

d. Pilots may not be adequately trained to understand the philosophy of the automation design when the functionality is being automatically degraded in particular situations for reasons known only to the software.

70. Despite the 2006 FAST report Boeing designed and used an automated flight system that it did not disclose to pilots. It used data from a single sensor that caused the aircraft to take on characteristics that the pilot did not previously encounter. Boeing intentionally did not

[3] https://www.nlr.org/wp-content/uploads/2018/11/FAST-AC13-Hazard-Summary.pdf

train pilots to have notice that the aircraft might take on such characteristics nor what to do about it.

71. Boeing designed an MCAS system with no Human in the Loop. HITL is defined as a model that requires human interaction. In HITL systems a human is always part of the simulation and consequently influences the outcome in such a way that is difficult to reproduce. Boeing failed to adequately train pilots about the existence of MCAS and then failed to inform pilots about how the system worked such that they could interact with it or override it.

72. **Max 8 Safety Notice Number 2:** The crash of Turkish Airlines Flight 1951 in 2009, ten years prior to the Ethiopian Airlines Crash, demonstrated the risks of an automated flight-control system relying on data from a single sensor.[4]

73. Investigators of the 2009 crash of a Turkish Airlines jet identified a faulty altitude sensor that thought the plane was closer to the ground than it was and triggered the engines to idle. The plane's second radio altimeter displayed the correct elevation, but it didn't matter: the automatic throttle was tied to the first gauge. The Amsterdam-bound plane crashed into a field, killing nine people and injuring 120.

74. Boeing ended up changing that throttle system to prevent one erroneous altitude reading from cascading into tragedy, changes the U.S. Federal Aviation Administration subsequently made mandatory.

75. The Turkish Airlines Crash, which injured and killed some of its own Boeing employees who happened to be on the flight, provided clear notice that relying upon one data point to provide information to the flight control system can be fatal.

[4] https://www.bloomberg.com/news/articles/2019-05-07/boeing-max-failed-to-apply-safety-lesson-from-deadly-2009-crash

76. **Max 8 Safety Notice Number 3**: Lion Air 610 Crash of October 29, 2018. One Hundred and Eighty-Nine (189) lives were lost when a Max 8 crashed. Investigators quickly concluded that the MCAS system on the aircraft was activated resulting from erroneous angle of attack (AOA) information and the pilots were without an optional feature that would have alerted them to the error. This is the single biggest notice that Boeing had that its Max 8 aircraft was defective and dangerous yet it concealed these defects in order to sell more of the Max 8 airplanes.

77. Boeing delivered the subject crashed Max 8 to Ethiopian Airlines after the Lion Air Crash. It flew the aircraft from Boeing Field in Seattle, Washington to Dublin, Ireland on November 15, 2018, delivering the aircraft in Addis Ababa on November 17, 2018.

**ET-AVJ Ethiopian Airlines Boeing 737 MAX 8**

| Airframe Details | |
|---|---|
| Manufacturer Serial Number (MSN) | 62450 |
| Line Number | 7243 |
| Aircraft Type | Boeing 737 MAX 8 |
| Age | 0.4 Years |
| Test registration | N1786B |
| Production Site | Renton (RNT) |
| Airframe Status | Written Off |

**EAL 302 Max 8 Delivered AFTER Lion Air Crash**

**OPERATOR HISTORY**

| REG | AIRCRAFT TYPE | AIRLINE | DELIVERED | CONFIG | ENGINES | HEX CODE | REMARKS |
|---|---|---|---|---|---|---|---|
| ET-AVJ | Boeing 737 MAX 8 | Ethiopian Airlines | Nov 2018 | C16Y144 | 2x LEAP | 040152 | Ferried BFI-DUB-ADD 15-17 Nov 2018 on delivery<br>Crashed 10 Mar 2019 en route ADD-NBO near Bishoftu. Flight ET302 lost contact 6 minutes after take-off carrying 149 passengers and 8 crew members. |

78. Only after the Lion Air Crash and the loss of 189 lives did Boeing tell different airlines months apart from one another that cockpit alerts for the AOA sensors did not work on the Max 8 due to a software error.

79. Boeing told Southwest Airlines about the problem in late November 2018 and began installing additional cockpit warning systems by late November.

80. Boeing told United Continental Holdings, Inc. about the software error toward the end of March, four months after Southwest and after the crash of Ethiopian Airlines Flight 302.

81. **Max 8 Safety Notice Number 4:** In 2017 Boeing engineers learned that alerts were not operating as intended on the Max 8 due to a software error.[5] Instead of telling the Federal Aviation Administration or the airlines or pilots, it concealed this problem.

82. **Max 8 Safety Notice Number 5:** During the action design of the Max 8 Boeing intentionally chose to use a single point failure system, without redundancies.[6] In aviation design it is essential to have a fail safe or backup. Boeing violated this simple aviation safety rule. Boeing engineers and managers noticed that this fundamental rule was being violated but did nothing.

83. Boeing chose not to make the MCAS system redundant in order to make the Max 8 cheaper for training purposes, in order to sell more airplanes.

84. Rick Ludtke, a former Boeing engineer who worked on designing the interfaces on the Max 8's flight deck, said managers mandated that any differences from the previous 737 had to be small enough that they wouldn't trigger the need for pilots to undergo new simulator training.

85. According to Mr. Ludtke, if the group had built the MCAS in a way that would depend on two sensors, and would shut the system off if one fails, he thinks the company would have needed to install an alert in the cockpit to make the pilots aware that the safety system was

[5] https://www.wsj.com/articles/boeing-knew-about-safety-alert-problem-for-a-year-before-telling-faa-airlines-11557087129
[6] https://www.seattletimes.com/business/boeing-aerospace/a-lack-of-redundancies-on-737-max-system-has-baffled-even-those-who-worked-on-the-jet/?utm_source=twitter&utm_medium=social&utm_campaign=article_inset_1.1

off. And if that happens, Ludtke said, the pilots would potentially need training on the new alert and the underlying system. That could mean simulator time, which was off the table."

**BOEING FALSIFIED AND OMMITTED INFORMATION FROM PILOTS AND AIRLINES**

86. Boeing concealed information about the MCAS system from its customers and passengers.

87. Boeing purposefully concealed information about the MCAS system in order to sell more aircraft.

88. Boeing affirmatively omitted information about the MCAS system from its Flight Control Manual on the Max 8.

89. Boeing affirmatively chose not to instruct or train pilots on the MCAS system, in order to sell more Max 8 airplanes.

90. After the public and pilots questioned the safety of the Max 8 Boeing continued to conceal and omit information about the safety of the Max 8, in order to sell more aircraft.

91. After the public and pilots questioned the safety of the training for the Max 8, which does not rely upon simulator training, Boeing continued to downplay the need for simulator training, in order to sell more aircraft.

**BOEING CONSPIRED WITH THE FEDERAL AVIATION ADMINISTRATION**

92. Federal Aviation Administration safety engineers worked under constant pressure from their managers to delegate more and more work to Boeing itself, and to speedily approve the Max 8 safety assessments the Boeing designees came up with.[7]

[7] https://www.seattletimes.com/business/boeing-aerospace/engineers-say-boeing-pushed-to-limit-safety-testing-in-race-to-certify-planes-including-737-max/

93. Boeing removed a senior engineer acting as an FAA Authorized Representative who raised questions about the speed with which the FAA was being asked to approve Boeing's changes to the Max 8.

94. Federal Aviation Administration (FAA) engineers in Renton worked in a negative work environment created by FAA managers where safety engineers feared retaliation for attempting to hold Boeing accountable.

95. According to the Seattle Times, the culture at the Renton, Washington aircraft certification office involved delegating more than the FAA technical specialists were comfortable with. When the FAA's safety engineers had an opinion different from Boeing's, FAA management in the office tended to side with Boeing.

96. The current procedure under which aircraft are certified creates a system that is vulnerable to undue pressure and control from the aircraft manufacturer. This diagram from the Seattle Times illustrates the difference between how aircraft used to be certified to be allowed to be sold and flown and the current certification process.

**How the process of certifying an airplane changed**

Under the older DER (Designated Engineering Representative) system, the Boeing employees assigned to work on behalf of the FAA were appointed by the FAA and reported to their FAA counterparts.

Under the current structure, the Boeing employees assigned to work on behalf of the FAA, known as Authorized Representatives (ARs), are appointed by Boeing and report to Boeing managers.

Reporting by DOMINIC GATES, Graphic by MARK NOWLIN / THE SEATTLE TIMES

97. Boeing took advantage of this system in order to rush a dangerous airplane to market in order to compete with Airbus and increase its revenue.

98. The FAA worked with Boeing to assist it in its abuse of this system and allowed a dangerous aircraft to be marketed, sold and flown globally.

**FACTS ABOUT BOEING**

99. Boeing markets itself as “the world's largest aerospace company and leading manufacturer of commercial jetliners” and claims “a long tradition of aerospace leadership and innovation” including “creating advanced technology solutions.”

100. With corporate headquarters in Chicago, Boeing employs more than 165,000 people across the United States and in more than 65 countries.

101. Boeing claims it has “one of the most diverse, talented and innovative workforces anywhere.”

102. In Boeing’s 2018 Annual Report, its reported annual revenue was $101.1 billion in revenue.

103. Despite these resources, the Max 8 aircraft at issue was not equipped with appropriate sensors, warning systems, software, or a trim system to warn or protect the people on board that airplane from a computer initiated crash into terrain that resulted in a crater 30 meters deep.

104. Despite these resources Boeing shifted the cost of Max 8 pilot training to the airlines and designed its aircraft in an unsafe manner to create a selling point- cheap training for flight crews.

Case: 1:19-cv-04074 Document #: 2 Filed: 06/18/19 Page 23 of 46 PageID #:24

105. Despite these resources the subject aircraft's flight crew lacked training on how to mitigate or prevent an MCAS initiated crash from faulty AOA sensor data so that it could save the lives of the One Hundred and Fifty-Seven passengers and crew onboard.

106. Boeing knew that information from a single AOA sensor could cause a fatal crash and knew that safer alternatives were available that were technologically available and economically feasible.

107. Yet Boeing did not design or redesign or retrofit the subject Max 8 aircraft to remove or reduce the occurrence of these hazardous events.

108. Rather than admit the truth about the Max 8, Boeing instead deliberately misrepresented the safety of its aircraft.

109. For instance, after the Lion Air Crash and months prior to the Ethiopian Airlines Crash, pilots from the Allied Pilot's Association complained to Boeing about its concealment of the MCAS system and the danger of hiding information on the Max 8 from pilots. In response Boeing misrepresented the safety of the Max 8.[8]

110. During that meeting a pilot said "We flat out deserve to know what's on our airplane." "I don't disagree," the official from Boeing responded. "[The pilots of Lion Air 610] didn't even know the damn system was on the airplane," another pilot said. "Nor did anybody else." The Boeing official stated "I don't know that understanding this system would have changed the outcome of this, in a million miles you're going to maybe fly this airplane, and maybe once you're going to see this ever." Four months later, Ethiopian Airlines flight 302 crashed minutes after take-off and evidence continues to mount that the MCAS was a major factor in the crashes of the two planes.

---

[8] https://interestingengineering.com/pilots-confronted-boeing-about-risks-before-2nd-737-max-8-crash

111. Due to the danger posed by the Max 8 the Federal Aviation Administration has grounded the aircraft.

112. As described in further detail herein, Boeing knew of the defects in the subject aircraft, knew that because of such defects the Max 8 was not airworthy, was on notice that the defects were likely to cause injury and death yet failed to adequately warn or instruct on the aircraft defects, failed to remedy the known defect in the subject aircraft, failed to discover the dangerous conditions when such could have been discovered and / or failed to take affirmative action to avoid injury to Plaintiffs and others.

113. Because of Boeing's gross, willful, and reckless disregard for human life, families, including the Ingasiana family, have mourned the loss of a loved one whose life should never have been put at risk. Families of the decedents were given soil from the crash site as they could not bury their loved ones because the bodies were burnt beyond recognition. Punitive damages should be awarded in this case to punish and deter Boeing and others from taking these kinds of risks with people's lives again.

**COUNT I**
**Strict Liability: Design Defect, The Boeing Company**

114. **Plaintiffs** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

115. Boeing designed, manufactured, distributed and/or sold the Boeing 737 Max 8, and its components parts, involved in the incident. **Defendants** were in the business of designing, testing, manufacturing, selling, assembling, building, distributing, marketing and/or inspecting aircraft as suitable for passenger transportation, including the subject Boeing 737 Max 8, and its component parts, that crashed in Ethiopia on March 10, 2019.

116.    At all times relevant hereinabove set forth, the subject Boeing 737 Max 8 aircraft, and its component parts, was being operated by **Ethiopian Airlines** and used for the purposes of which it was manufactured, designed, inspected, sold and intended to be used, in a manner reasonably foreseeable to Boeing.

117.    At all times relevant hereinabove set forth, the subject Boeing 737 Max 8, and its component parts, were defective, dangerous, unsafe, and not airworthy by reason of Boeing's defective manufacture, design, warning systems, inspections, testing, service, and/or maintenance of the subject aircraft, and its component parts, as set forth above. The aircraft, and its component parts, were in substantially similar condition to its original condition at delivery to **Ethiopian Airlines**.

118.    As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **Decedent** suffered pre-impact injury and death, including fear of impending and imminent death, and **Plaintiffs** have been damaged by the death of **Decedent**.

119.    As a direct and legal result of the wrongful acts and/or omissions of Defendant Boeing, hereinabove alleged, **Plaintiffs** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **Decedent**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

120.    As a further direct and legal result of the wrongful conduct of Boeing set forth above, **Plaintiffs** incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

121.    As a further direct and legal result of the wrongful conduct of Boeing set forth above, **Plaintiffs** suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

122.    The potential harm to airline passengers, pilots, crews, and the public from the 737 Max 8 was objectively foreseeable both in nature and in scope and were subjectively known to Boeing for all of the aforementioned reasons, including but not limited to: Boeing's own safety assessment of the AOA sensor and MCAS during development of the 737 Max 8 which revealed potential problems with the system; the evidence that flight control issues caused the crash of Lion Air Flight 610 and death of 189 people; complaints lodged by pilots regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; and Boeing's identification of a software upgrade to address problems with the AOA sensors and MCAS in the weeks and months prior to the crash of Flight 302.

123.    As set forth above and as will be shown by proof, there is a high degree of certainty that **Plaintiffs** have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and Boeing's conduct. A high degree of moral blame is attached to Boeing's conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by Boeing to all **Plaintiffs** and the imposition of all damages described above.

124.    Based on the foregoing, Boeing, acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, such that **Plaintiffs** request that the trier of fact, in the exercise of sound discretion, award **Plaintiffs** additional damages for the sake of example and sufficient to punish Boeing, for its despicable conduct, in an amount reasonably related to **Plaintiffs'** actual damages and Boeing financial

condition, yet sufficiently large enough to be an example to others and to deter Boeing and others from engaging in similar conduct in the future.

WHEREFORE, Plaintiff requests judgment against Defendant THE BOEING COMPANY for compensatory damages, punitive damages, costs, fees, and all other awards deemed just. The plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

**COUNT II**
**Strict Liability: Defect in Warnings / Instructions, The Boeing Company**

125. **Plaintiffs** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

126. Defendant Boeing designed, manufactured, distributed and/or sold the Boeing 737 Max 8 involved in the incident. Defendant Boeing was in the business of designing, testing, manufacturing, selling, assembling, building, distributing, marketing and/or inspecting aircraft as suitable for passenger transportation, including the subject Boeing 737 Max 8 that crashed in Ethiopia on March 10, 2019.

127. At all times relevant hereinabove set forth, the subject Boeing 737 Max 8 aircraft was being operated by **Ethiopian Airlines** and used for the purposes of which it was manufactured, designed, inspected, sold and intended to be used, in a manner reasonably foreseeable to Defendant Boeing.

128. At all times relevant hereinabove set forth, the subject Boeing 737 Max 8 was defective, dangerous, unsafe, and not airworthy by reason of Defendant Boeing's defective manufacture, design, warning systems, inspections, testing, service, and/or maintenance of the subject aircraft as set forth above.

129. At all times relevant hereinabove set forth, Boeing had knowledge that the subject Boeing 737 Max 8 was defective, dangerous, unsafe, and not airworthy, and in particular, Boeing

had knowledge of the unreasonably unsafe design of the AOA sensor and automated MCAS, as well as the potential life and death risks of such a failure in these systems.

130.    At all times relevant hereinabove set forth, the risks of failure of the Boeing 737 Max 8 due the aircraft's unreasonably dangerous and defective design presented a substantial danger when the aircraft is used or misused in an intended or reasonably foreseeable way.

131.    Ordinary consumers, including but not limited to airlines, flight crew, and passengers, would not have recognized the potential risks presented by the aircraft's unreasonably dangerous and defective design.

132.    As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **Decedent** suffered pre-impact injury and death, including fear of impending and imminent death, and **Plaintiffs** have been damaged by the death of **Decedent**.

133.    As a direct and legal result of the wrongful acts and/or omissions of Defendant Boeing, hereinabove alleged, **Plaintiffs** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **Decedent**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

134.    As a further direct and legal result of the wrongful conduct of Boeing set forth above, **Plaintiffs** incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

135.    As a further direct and legal result of the wrongful conduct of Boeing set forth above, **Plaintiffs** suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

Case: 1:19-cv-04074 Document #: 2 Filed: 06/18/19 Page 29 of 46 PageID #:30

136. The potential harm to airline passengers, pilots, crews, and the public from the 737 Max 8 was objectively foreseeable both in nature and in scope and were subjectively known to Boeing for all of the aforementioned reasons, including but not limited to: Boeing's own safety assessment of the AOA sensor and MCAS during development of the 737 Max 8 which revealed potential problems with the system; the evidence that flight control issues caused the crash of Lion Air Flight 610 and death of 189 people; complaints lodged by pilots in the regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; and Boeing's identification of a software upgrade to address problems with the AOA sensors and MCAS in the weeks and months prior to the crash of Flight 302.

137. As set forth above and as will be shown by proof, there is a high degree of certainty that **Plaintiffs** have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and Boeing's conduct. A high degree of moral blame is attached to Boeing's conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by Boeing to all **Plaintiffs** and the imposition of all damages described above.

138. Based on the foregoing, Boeing, acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, such that **Plaintiffs** request that the trier of fact, in the exercise of sound discretion, award **Plaintiffs** additional damages for the sake of example and sufficient to punish Boeing, for its despicable conduct, in an amount reasonably related to **Plaintiffs'** actual damages and Boeing's financial condition, yet sufficiently large enough to be an example to others and to deter Boeing and others from engaging in similar conduct in the future.

Case: 1:19-cv-04074 Document #: 2 Filed: 06/18/19 Page 30 of 46 PageID #:31

WHEREFORE, Plaintiffs request judgment against Defendant THE BOEING COMPANY for compensatory damages, punitive damages, costs, fees, and all other awards deemed just. The plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

**COUNT III**
**Breach of Warranty, The Boeing Company**

139. **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

140. **BOEING** was the designer, manufacturer, distributor and/or seller of the Boeing 737 MAX 8, and/or its component parts, involved in the subject crash.

141. Prior to the crash of Flight 302, **BOEING** expressly and/or impliedly warranted and represented that the subject aircraft (the **BOEING** 737 MAX 8) including its component parts and instruments, and in conjunction with the instructions and warnings given by **BOEING**, was airworthy, of merchantable quality, both fit and safe for the purpose of commercial air travel for which it was designed, intended and used. Additionally, **BOEING** further warranted that the subject aircraft, and its component parts, was free from all defects.

142. **BOEING** breached said warranties in that the subject aircraft was not airworthy, of merchantable quality, or fit and safe for the purposes for which it was designed, intended and used, and free from all defects as set forth above. The aircraft, and its component parts, were in substantially similar condition to its original condition at delivery to **ETHOPIAN AIRLINES**.

143. **DECEDENT**, as a passenger of Flight 302, was an intended third-party beneficiary of **BOEING's** warranties that Flight 302 (the **BOEING** 737 MAX 8 and its component parts) was airworthy, of merchantable quality, both fit and safe for the purposes for which it was designed, intended and used, and free from all defects.

144. **DECEDENT** reasonably relied on these warranties to **DECEDENT's** detriment.

145. As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **DECEDENT** suffered pre-impact injury and death, including fear of impending and imminent death, and **PLAINTIFFS** have been damaged by the death of **DECEDENT**.

146. As a direct and legal result of the wrongful acts and/or omissions of Defendant **BOEING**, hereinabove alleged, **PLAINTIFFS** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **DECEDENT**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

147. As a further direct and legal result of the wrongful conduct of **BOEING** set forth above, **PLAINTIFFS** incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

148. As a further direct and legal result of the wrongful conduct of **BOEING** set forth above, **PLAINTIFFS** suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

149. The potential harm to airline passengers, pilots, crews, and the public from the 737 MAX 8 was objectively foreseeable both in nature and in scope and were subjectively known to **BOEING** for all of the aforementioned reasons, including but not limited to: **BOEING's** own safety assessment of the AOA sensor and MCAS during development of the 737 MAX 8 which revealed potential problems with the system; the evidence that flight control issues caused the crash of Lion Air Flight 610 and death of 189 people; complaints lodged by pilots in the ASRS database regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; and **BOEING's** identification

of a software upgrade to address problems with the AOA sensors and MCAS in the weeks and months prior to the crash of Flight 302.

150. As set forth above and as will be shown by proof, there is a high degree of certainty that **PLAINTIFFS** have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and **BOEING's** conduct. A high degree of moral blame is attached to **BOEING's** conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by **BOEING** to all **PLAINTIFFS** and the imposition of all damages described above.

151. Based on the foregoing, **BOEING**, acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, such that **PLAINTIFFS** request that the trier of fact, in the exercise of sound discretion, award **PLAINTIFFS** additional damages for the sake of example and sufficient to punish **BOEING**, for its despicable conduct, in an amount reasonably related to **PLAINTIFFS'** actual damages and **BOEING's** financial condition, yet sufficiently large enough to be an example to others and to deter **BOEING** and others from engaging in similar conduct in the future.

WHEREFORE, Plaintiffs request judgment against Defendant THE BOEING COMPANY for compensatory damages, punitive damages, costs, fees, and all other awards deemed just. The plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

**COUNT IV**
**Negligence, The Boeing Company**

152. **Plaintiffs** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

153.     At all relevant times hereinabove set forth, Defendant Boeing was the designer, manufacturer, distributor and/or seller of the Boeing 737 Max 8 aircraft. Defendant Boeing was, at all times relevant, in the business of designing, testing, manufacturing, selling, assembling, building, distributing, marketing and/or inspecting aircraft as suitable and safe for passenger transportation, including the subject Boeing 737 Max 8 that crashed in Ethiopia on March 10, 2019.

154.     At all relevant times hereinabove set forth, Defendant Boeing operated, supervised, managed and/or oversaw the training and instruction of all Max 8 pilots and knew or should have known that the pilots of Ethiopian Airlines Flight 302 could not safely fly the Max 8.

155.     At all times hereinabove set forth, Boeing breached its duty of care to **Decedent** as a passenger aboard Flight 302 with respect to the design, manufacture, inspection, testing, assembly, certification, distribution, and/or sale of a safe, airworthy aircraft; including the failure to train, instruct, and/or issue advisory warnings necessary to assure the safe operation, control, management and/or maintenance of the aircraft. Boeing's acts and/or omissions include, but are not limited to the following:

   a.  Designing, manufacturing, assembling and/or certifying an aircraft with an anti-stall system controlled by a single AOA sensor instead of two; or

   b.  Designing manufacturing, assembling and/or certifying an aircraft with an anti-stall system which was susceptible to failure without redundant systems; or

   c.  Designing, manufacturing, assembling and/or certifying an aircraft with a flight control system susceptible to bad data from the AOA sensor, and failing to install AOA indicators and/or AOA disagree lights as standard features rather than optional upgrades; or

   d.  Designing, manufacturing, assembling and/or certifying an aircraft with a flight control system that would initiate a dangerous automated dive without any command from a pilot and without a means to promptly override the automated dive; or

   e.  Marketing and selling the 737 Max 8 as an analog to Boeing's 737NG to consciously and intentionally induce airlines to avoid the time-consuming retraining of airline pilots with the knowledge that the Max 8 contained a new and potentially dangerous MCAS automated flight control system; or

    f.  Failing to provide adequate warning with regard to the 737 Max 8's MCAS and the risk of an automated dive without any command from a pilot, or clear instruction to promptly override such an MCAS automated dive; or

    g.  Failing to conduct a thorough and accurate safety assessment of the aircraft, including Boeing's failure in its safety assessment to account for the degree to which the MCAS could move the horizontal stabilizer of the aircraft and failure to account for the resetting of the automated dive after each command from a pilot; or

    h.  Failing to properly train pilots on the new automated MCAS systems on the 737 Max 8; or

    i.  Failing to properly train pilots to identify an AOA sensor failure and MCAS input; or

    j.  Failing to properly train pilots to disengage the stabilizer trim motor on the 737 Max 8 in the event of an AOA sensor failure or unanticipated dive; or

    k.  Designing, assembling, and distributing a flight manual that did not warn of the risks presented by the MCAS, faulty AOA sensors, or automated dives; or

    l.  Designing, manufacturing, assembling and/or certifying an airplane flight manual that failed to provide clear instruction or procedures on how to promptly override an automated MCAS dive; or

    m.  Failing to promptly issue a software patch to address the risk of malfunctioning AOA sensors and automated MCAS dives following the October 29, 2018 crash of Lion Air Flight JT 610; or

    n.  Failing to ground all 737 Max 8 aircraft following the crash of Lion Air Flight JT 610 until such a software patch and/or other safety procedures could be implemented; or

    o.  Failing to properly warn pilots, airlines, and the public of the risk of malfunctioning AOA sensors and automated MCAS dives following the crash of Lion Air Flight JT 610.

156.    As a direct and legal result of Defendant Boeing's negligence, carelessness, gross negligence, recklessness and/or otherwise wrongful acts and/or omissions hereinabove set forth, **Decedent** died in the crash of Flight 302.

157.    As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **Decedent** suffered pre-impact injury and death, including fear of impending and imminent death, and **Plaintiffs** have been damaged by the death of **Decedent**.

158.     As a direct and legal result of the wrongful acts and/or omissions of Defendant Boeing, hereinabove alleged, **Plaintiffs** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **Decedent**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

159.     As a further direct and legal result of the wrongful conduct of Boeing set forth above, **Plaintiffs** incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

160.     As a further direct and legal result of the wrongful conduct of Boeing set forth above, **Plaintiffs** suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

161.     The potential harm to airline passengers, pilots, crews, and the public from the 737 Max 8 was objectively foreseeable both in nature and in scope and were subjectively known to Boeing for all of the aforementioned reasons, including but not limited to: Boeing's own safety assessment of the AOA sensor and MCAS during development of the 737 Max 8 which revealed potential problems with the system; the evidence that flight control issues caused the crash of Lion Air Flight 610 and death of 189 people; complaints lodged by pilots regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; and Boeing's identification of a software upgrade to address problems with the AOA sensors and MCAS in the weeks and months prior to the crash of Flight 302.

162.     As set forth above and as will be shown by proof, there is a high degree of certainty that **Plaintiffs** have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and Boeing's conduct. A high degree of moral

blame is attached to Boeing's conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by Boeing to all **Plaintiffs** and the imposition of all damages described above.

163. Based on the foregoing, Boeing, acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, such that **Plaintiffs** request that the trier of fact, in the exercise of sound discretion, award **Plaintiffs** additional damages for the sake of example and sufficient to punish Boeing, for its despicable conduct, in an amount reasonably related to **Plaintiffs'** actual damages and Boeing's financial condition, yet sufficiently large enough to be an example to others and to deter Boeing and others from engaging in similar conduct in the future.

WHEREFORE, Plaintiffs request judgment against Defendant THE BOEING COMPANY for compensatory damages, punitive damages, costs, fees, and all other awards deemed just. The plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

**COUNT V**
**Civil Conspiracy, The Boeing Company**

164. **Plaintiffs** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

165. Defendant Boeing entered into an agreement with the FAA, and its agents, employees, and/or directors, and/or other persons and/or entities to accomplish by concerted action either an unlawful purpose or a lawful purpose by unlawful means.

166. Boeing and its co-conspirators committed tortious and/or unlawful acts in furtherance of this agreement, including but not limited to, deceiving the public as to the safety of the 737 Max 8 aircraft and its component parts and systems, certifying the aircraft and the MCAS

Case: 1:19-cv-04074 Document #: 2 Filed: 06/18/19 Page 37 of 46 PageID #:38

as safe based upon false and/or inaccurate information, failing to provide clear instruction in flight manuals or informing pilots as to automated systems embedded in the 737 Max 8 aircraft, denying technical experts the necessary time or resources to thoroughly evaluate the 737 Max 8 aircraft, and compelling technical experts to certify the aircraft despite their concerns about the safety of the 737 Max 8, all in violation of applicable laws, regulations, and mandatory duties.

167. As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **Decedent** suffered pre-impact injury and death, including fear of impending and imminent death, and **Plaintiffs** have been damaged by the death of **Decedent**.

168. As a direct and legal result of the wrongful acts and/or omissions of Defendant Boeing, hereinabove alleged, **Plaintiffs** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **Decedent**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

169. As a further direct and legal result of the wrongful conduct of Boeing set forth above, **Plaintiffs** incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

170. As a further direct and legal result of the wrongful conduct of Boeing set forth above, **Plaintiffs** suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

171. The potential harm to airline passengers, pilots, crews, and the public from the 737 Max 8 was objectively foreseeable both in nature and in scope and were subjectively known to Boeing for all of the aforementioned reasons, including but not limited to: Boeing's own safety assessment of the AOA sensor and MCAS during development of the 737 Max 8 which revealed

potential problems with the system; the evidence that flight control issues caused the crash of Lion Air Flight 610 and death of 189 people; complaints lodged by pilots regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; and Boeing's identification of a software upgrade to address problems with the AOA sensors and MCAS in the weeks and months prior to the crash of Flight 302.

172.    As set forth above and as will be shown by proof, there is a high degree of certainty that **Plaintiffs** have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and Boeing's conduct. A high degree of moral blame is attached to Boeing's conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by Boeing to all **Plaintiffs** and the imposition of all damages described above.

173.    Based on the foregoing, Boeing, acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, such that **Plaintiffs** request that the trier of fact, in the exercise of sound discretion, award **Plaintiffs** additional damages for the sake of example and sufficient to punish Boeing, for its despicable conduct, in an amount reasonably related to **Plaintiffs'** actual damages and Boeing's financial condition, yet sufficiently large enough to be an example to others and to deter Boeing and others from engaging in similar conduct in the future.

WHEREFORE, Plaintiffs request judgment against Defendant THE BOEING COMPANY for compensatory damages, punitive damages, costs, fees, and all other awards deemed just. The plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

**COUNT VI**
**Negligence, Rosemount Aerospace**

174. **Plaintiffs** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

175. At all relevant times hereinabove set forth, Defendant **Rosemount** owed a duty to the occupants of Boeing's 737 Max 7 aircraft and the general public, including the **Decedent**, to exercise reasonable care to properly develop, design, engineer, test, manufacture, produce, process, supply, deliver, monitor, market, label, adequately warn, recommend, advertise and/or sell angle of attack sensors, and/or refrain from introducing area of attack sensors into the stream of commerce and for the use in 737 Max aircraft, including the subject aircraft.

176. The defective conditions in the Angle of Attack sensor, as discussed above, and the consequent crash of Flight 302 were legally caused by the negligence, gross negligence, wrongdoing, tortious conduct, careless acts and omissions of Defendant **Rosemount** in the development, design, engineering, testing, manufacturing, production, processing, supplying, delivery, monitoring, marketing, labeling, and selling, and **Rosemount's** failure to warn and failure to take remedial appropriate remedial action with respect to any and all known dangerously defective conditions.

177. As a direct and legal result of Defendant **Rosemount's** negligence, carelessness, gross negligence, recklessness and/or otherwise wrongful acts and/or omissions hereinabove set forth, **Decedent** died in the crash of Flight 302.

178. As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **Decedent** suffered pre-impact injury and death, including fear of impending and imminent death, and **Plaintiffs** have been damaged by the death of **Decedent**.

179. As a direct and legal result of the wrongful acts and/or omissions of Defendant **Rosemount**, hereinabove alleged, **Plaintiffs** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **Decedent**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

180. As a further direct and legal result of the wrongful conduct of **Rosemount** set forth above, **Plaintiffs** incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

181. As a further direct and legal result of the wrongful conduct of **Rosemount** set forth above, **Plaintiffs** suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

WHEREFORE, Plaintiffs request judgment against Defendant ROSEMONT AEROSPACE, INC. for compensatory damages, punitive damages, costs, fees, and all other awards deemed just. The plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

**COUNT VII**
**Strict Liability, Rosemount Aerospace**

182. **Plaintiffs** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

183. At all relevant times hereinabove set forth, Defendant **Rosemount** was the designer, manufacturer, engineer, distributor and/or seller of aerospace products, including Angle of Attack sensors, who hold and have held themselves out to the public as having superior knowledge, skill and expertise in the design, testing, engineering, manufacture, and distribution of aerospace sensors for commercial aircraft and, in the course of its business, Defendant **Rosemount**

Case: 1:19-cv-04074 Document #: 2 Filed: 06/18/19 Page 41 of 46 PageID #:42

designed, tested, manufactured, engineered and caused to be placed into the stream of commerce, a product known as an Angle of Attack sensor for utilization in the Boeing 737 Max 8 aircraft.

184. Defendant **Rosemount** expressly or impliedly warranted that the Angle of Attack sensor was fit for its intended use in commercial aircraft, being free of defects in their design and/or maintenance and, further, Defendant **Rosemount** marketed, sold, distributed, and caused to be introduced into the stream of commerce by sale to Defendant Boeing. The Angle of Attack sensor was in substantially similar condition to its original condition at delivery to Boeing.

185. Defects in the Angle of Attack sensor were a legal cause of the subject air crash, and the defects made the subject aircraft unreasonably dangerous for travel.

186. As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **Decedent** suffered pre-impact injury and death, including fear of impending and imminent death, and **Plaintiffs** have been damaged by the death of **Decedent**.

187. As a direct and legal result of the wrongful acts and/or omissions of Defendant **Rosemount**, hereinabove alleged, **Plaintiffs** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **Decedent**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

188. As a further direct and legal result of the wrongful conduct of **Rosemount** set forth above, **Plaintiffs** incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

189. As a further direct and legal result of the wrongful conduct of **Rosemount** set forth above, **Plaintiffs** suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

WHEREFORE, Plaintiffs request judgment against Defendant ROSEMONT AEROSPACE, INC. for compensatory damages, punitive damages, costs, fees, and all other awards deemed just. The plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

**COUNT VIII**
**Negligence, Collins Aerospace**

190. **Plaintiffs** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

191. At all relevant times hereinabove set forth, Defendant **Collins** owed a duty to the occupants of Boeing's 737 Max 7 aircraft and the general public, including the **Decedent**, to exercise reasonable care to properly develop, design, engineer, test, manufacture, produce, process, supply, deliver, monitor, market, label, adequately warn, recommend, advertise and/or sell the MCAS system and its software and/or refrain from introducing the MCAS system into the stream of commerce and for the use in 737 Max aircraft, including the subject aircraft.

192. The defective conditions in the MCAS system and its software as discussed above, and the consequent crash of Flight 302 were legally caused by the negligence, gross negligence, wrongdoing, tortious conduct, careless acts and omissions of Defendant **Collins** in the development, design, engineering, testing, manufacturing, production, processing, supplying,

Case: 1:19-cv-04074 Document #: 2 Filed: 06/18/19 Page 43 of 46 PageID #:44

delivery, monitoring, marketing, labeling, and selling, and **Collins's** failure to warn and failure to take remedial appropriate remedial action with respect to any and all known dangerously defective conditions.

193. As a direct and legal result of Defendant **Collins's** negligence, carelessness, gross negligence, recklessness and/or otherwise wrongful acts and/or omissions hereinabove set forth, **Decedent** died in the crash of Flight 302.

194. As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **Decedent** suffered pre-impact injury and death, including fear of impending and imminent death, and **Plaintiffs** have been damaged by the death of **Decedent**.

195. As a direct and legal result of the wrongful acts and/or omissions of Defendant **Collins**, hereinabove alleged, **Plaintiffs** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **Decedent**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

196. As a further direct and legal result of the wrongful conduct of **Collins** set forth above, **Plaintiffs** incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

197. As a further direct and legal result of the wrongful conduct of **Collins** set forth above, **Plaintiffs** suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

WHEREFORE, Plaintiffs request judgment against Defendant COLLINS AEROSPACE for compensatory damages, punitive damages, costs, fees, and all other

Case: 1:19-cv-04074 Document #: 2 Filed: 06/18/19 Page 44 of 46 PageID #:45

awards deemed just. The plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

**COUNT IX**
**Strict Liability Collins Aerospace**

198. **Plaintiffs** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

199. At all relevant times hereinabove set forth, Defendant **Collins** was the designer, programmer, manufacturer, engineer, distributor and/or seller of aerospace products, including the MCAS system and its software who hold and have held themselves out to the public as having superior knowledge, skill and expertise in the design, testing, engineering, manufacture, and distribution of MCAS systems and software for commercial aircraft and, in the course of its business, Defendant **Collins** designed, programmed, tested, manufactured, engineered and caused to be placed into the stream of commerce, a product known as the MCAS system and its software for utilization in the Boeing 737 Max 8 aircraft.

200. Defendant **Collins** expressly or impliedly warranted that the MCAS system and its software was fit for its intended use in commercial aircraft, being free of defects in their design and/or maintenance and, further, Defendant **Collins** marketed, sold, distributed, and caused to be introduced into the stream of commerce by sale to Defendant Boeing. The MCAS system and its software was in a substantially similar condition to its original condition at delivery to Boeing.

201. Defects in the MCAS system and its software were a legal cause of the subject air crash, and the defects made the subject aircraft unreasonably dangerous for travel.

202. As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **Decedent** suffered pre-impact injury and death, including fear of impending and imminent death, and **Plaintiffs** have been damaged by the death of **Decedent**.

203. As a direct and legal result of the wrongful acts and/or omissions of Defendant **Collins**, hereinabove alleged, **Plaintiffs** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **Decedent**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

204. As a further direct and legal result of the wrongful conduct of **Collins** set forth above, **Plaintiffs** incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

205. As a further direct and legal result of the wrongful conduct of **Collins** set forth above, **Plaintiffs** suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

WHEREFORE, Plaintiffs request judgment against Defendant COLLINS AEROSPACE for compensatory damages, punitive damages, costs, fees, and all other awards deemed just. The plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

/s/ Joseph A. Power, Jr.
*Attorneys for Plaintiff*
Joseph A. Power, Jr.
Kathryn L. Conway
Jonathan M. Thomas
James I. Power
POWER ROGERS & SMITH, LLP
70 West Madison Street, 55th Floor
Chicago, IL 60602
Tel: (312) 236-9381
Firm No. 31444
JoePower@prslaw.com
KConway@prslaw.com

Case: 1:19-cv-04074 Document #: 2 Filed: 06/18/19 Page 46 of 46 PageID #:47

Rick Friedman
Alisa Brodkowitz
Rachel Luke
FRIEDMAN RUBIN
1126 Highland Ave.
Bremerton, WA 98337
Tel: (206) 501-4446

Shakespear Feyissa
Law Offices of Shakespear Feyissa
1001 4th Ave.
Safeco Plaza Suite 3200
Seattle, WA 98154
*Pro Hac Vice Pending*

# Exhibit C

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| KEVIN J. CONWAY as Special Administrator for the ESTATE OF AL MARHUM HUSSEIN SWALEH M TETU, deceased,<br>Plaintiff, | NO. **1:19-cv-4076** |
| v. | |
| THE BOEING COMPANY, a Delaware Corporation; and ROSEMOUNT AEROSPACE, INC, a Delaware Corporation; and ROCKWELL COLLINS, INC., a Delaware corporation and HAMILTON SUNDSTRAND CORPORATION d/b/a UTC AEROSPACE SYSTEMS, a Delaware corporation, collectively with ROCKWELL COLLINS, INC d/b/a COLLINS AREOSPACE,<br>Defendants. | *Plaintiff Demands Trial by Jury* |

**COMPLAINT AT LAW**

Plaintiff KEVIN J. CONWAY, as Special Administrator for the for the ESTATE OF AL MARHUM HUSSEIN SWALEH M TETU, deceased, by and through their attorneys, POWER ROGERS & SMITH, LLP, FRIEDMAN RUBIN PLLP, and SHAKESPEAR FEYISSA, files this Complaint pursuant to the Wrongful Death Act of Illinois, 740 ILCS 180/2.1, against the above-named Defendants (hereinafter referred to as "Boeing," "Rosemount" and "Collins"), and states as follows:

**PARTIES**

1. This is an action for damages pursuant to the Illinois Wrongful Death Act, 740 Ill. Comp. Stat. 180/1 *et seq.,* Illinois Product Liability Act, 735 Ill. Comp. Stat. 5/13-213, or any other applicable law, based on the defective design and the inadequate warnings of the Boeing 737 Max.

2.      Kevin J. Conway has been appointed as the Special Administrator for the Estate of Al Marhum Hussein Swaleh M Tetu, pursuant to 740 ILCS 180/2.1. See Exhibit A.

3.      Al Marhum Hussein Swaleh M Tetu died in the crash of Ethiopian Airlines Flight 302 on March 10, 2019.

4.      The Decedent's only surviving heirs are: his spouse, Abuda Munira Abdul Karim and his ten children Feisal Husein Swaleh, Ashraf Hussein Swaleh, Ramadhan Hussein Abdi, Mariam Hussein Swaleh, Swaleh Hussein Swaleh, Iqrah Hussein Swaleh, Shufaa Hussein Swaleh, Raniya Hussein Swaleh, Harun Hussein Swaleh, Eshe Hussein Swaleh and his second wife under Islamic law Mwanaisha Wanjira Ramadhan.

5.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1332(a)(2) based on diversity of citizenship because the matter in controversy exceeds the sum or value of $75,000, inclusive of interest and costs, and arises between citizens of U.S. states and citizens of foreign states.

6.      Venue is proper in the Northern District of Illinois: pursuant to 28 U.S.C. §1391(b)(1) because Boeing is and has, at all relevant times, been a citizen and resident of the State of Illinois. Boeing's corporate headquarters and principal place of business are located in this judicial district at 100 North Riverside, Chicago, Cook County, Illinois 60606; At all relevant times, Defendant Boeing Company is a Delaware corporation with its principal place of business and corporate headquarters in Chicago, Illinois. Boeing has been authorized to do business and has been transacting or conducting business within the State of Illinois. *See* 735 Ill. Comp. Stat. 5/2-209(b)(4).

7.      At all times relevant to this complaint, Defendant Boeing was engaged in the business of designing, manufacturing, assembling, testing, servicing, marketing, promoting,

Case: 1:19-cv-04076 Document #: 2 Filed: 06/18/19 Page 3 of 45 PageID #:4

leasing and selling commercial aircrafts as well as providing information and warnings about such aircrafts, including the aircraft at issue, the Boeing 737 Max.

8. Pursuant to 28 U.S.C. §1391(b)(3) because Rosemount transacted and continues to transact regular and substantial business with Chicago-based Boeing in Cook County, Illinois; and pursuant to 28 U.S.C. §1391(b)(2) was engaged in the business of designing, manufacturing, assembling, testing, servicing, marketing, promoting, and supplying as well as providing information and warnings about the Angle of Attack sensor ("AOA sensor") which was affixed to the aircraft at issue, the Boeing 737 Max.

9. Pursuant to 28 U.S.C. §1391(b)(3) ROCKWELL COLLINS, INC., a Delaware corporation and HAMILTON SUNDSTRAND CORPORATION d/b/a UTC AEROSPACE SYSTEMS, a Delaware corporation, collectively with ROCKWELL COLLINS, INC d/b/a COLLINS AREOSPACE, (herein referred to as "Collins"), Avionics Division, formerly known as Rockwell Collins, is located in Cedar Rapids, Iowa and may be served with process through any of its directors at its principal office located at 14300 Judicial Road, Burnsville, Minnesota, 55306-4898.

10. At all times relevant to this complaint, Defendant Collins was engaged in the business of designing, programming, manufacturing, assembling, testing, servicing, marketing, promoting, and supplying as well as providing information and warnings about the Maneuvering Characteristics Augmentation System ("MCAS system") which was installed on the aircraft at issue, the Boeing 737 Max.

**FACTS**

11. The facts of this case highlight a series of actions taken by Boeing to put profit over the lives of children, women and men. In an effort to compete with Airbus's new fuel-efficient Neo aircraft, Defendant Boeing rushed an aircraft to market that was not airworthy and then

Case: 1:19-cv-04076 Document #: 2 Filed: 06/18/19 Page 4 of 45 PageID #:5

concealed its defects in order to sell more airplanes. That aircraft is the Boeing 737 Max 8 ("Max 8").

12. Boeing opted to build the Max 8 because it would be quicker, easier, and cheaper than starting from scratch, and would provide fuel savings for airlines.[1]

13. Boeing produced sloppy blueprints for the Max 8 and told a technician that instructions would be cleaned up later in the process.

14. Boeing set a ground rule for engineers: Limit changes to hopefully avert a requirement that pilots spend time training in a flight simulator before flying the Max 8.

15. Boeing marketed the Max 8 to airlines telling them that it will also reduce costs on training pilots who already were licensed to fly the Boeing 737.[2]

16. Boeing trained the Max 8 pilots using an iPad.

17. To improve the fuel efficiency of their new jet, Boeing put new engines on the Max 8.

18. The new engines were bigger than the 737 NG engines and Boeing had to change the mounting point of the engine.

19. Boeing put the Max 8 engines further forward and higher on the wings than on the 737 NG.

20. The different mounting point made the Max 8 prone to aerodynamic stall. The engine positions on the wings gives the Max 8 a tendency to pitch up under high power.

[1] https://www.nytimes.com/2019/03/23/business/boeing-737-max-crash.html

[2] https://www.aviationcv.com/aviation-blog/2019/shocking-facts-boeing-737max-crash

Case: 1:19-cv-04076 Document #: 2 Filed: 06/18/19 Page 5 of 45 PageID #:6

21. In order to prevent an aerodynamic stall Boeing and Collins Aerospace developed software which told the flight control system to change its angle of attack downward if a stall risk is perceived. This is known as Maneuvering Characteristics Augmentation System ("MCAS").

22. On the Max 8, if a stall risk is perceived the computer on the aircraft automatically initiates a downward pitch angle.

23. Boeing intentionally omitted information about the MCAS system from its Max 8 flight manual and training materials, leaving pilots ignorant of its very existence.

24. An Angle of Attack (AOA) sensor, designed and manufactured by Rosemount, was affixed to the Max 8 and designed to tell the flight control system if a stall risk is perceived. The Rosemount AOA sensor was prone to failure and to providing false data.

25. Boeing intentionally designed the flight control system to rely upon data from one single sensor on the Max 8 in order to prevent more in-depth training, making it easier to sell its aircraft to airlines. Boeing's selling point was that the Max 8 would only require "distance learning" using an iPad, with no down time for crew to train on simulators.

26. Boeing provided some airlines with an "optional" feature allowing the flight control system to obtain information from two different AOA sensors. In this optional configuration if one AOA sensor receives data that does not agree with data received by the other sensor, the MCAS does not command a pitch down of the aircraft.

27. In a Max 8 configured in the standard manner there are two AOA sensors but the Flight Control System only receives data from one AOA sensor. But if one AOA sensor receives bad data, falsely indicating a stall, the aircraft will pitch nose down and can crash.

28. The subject aircraft did not contain the optional feature. It relied upon data from one AOA sensor even though it had two AOA sensors.

29.     The angle of attack sensor is depicted below:







Case: 1:19-cv-04076 Document #: 2 Filed: 06/18/19 Page 7 of 45 PageID #:8

30. The horizontal stabilizer on the Max 8 is positioned by a single electric trim motor controlled through either the stab trim switches on the control wheel, autopilot trim or through the MCAS system. The stabilizer may also be positioned by manually rotating the stabilizer trim wheel.

31. Switches on each control wheel actuate the electric trim motor through the main electric stabilizer trim circuit when the aircraft is flown manually. With the autopilot engaged, stabilizer trim is accomplished through the autopilot stabilizer trim circuit. The main electric and autopilot stabilizer trim have two speed modes: high speed with flaps extended and low speed with flaps retracted. If the autopilot is engaged, actuating either pair of stabilizer trim switches

automatically disengages the autopilot. The stabilizer trim wheels rotate whenever electric stabilizer trim is actuated.

32.     The STAB TRIM PRI cutout switch and the STAB TRIM B/U cutout switch on the Max 8 are located on the control stand. If either switch is positioned to CUTOUT, both the autopilot and main electric trim inputs are disconnected from the stabilizer trim motor.

33.     The control column actuated stabilizer trim cutout switches on the Max 8 stop operation of the main electric and autopilot trim when the control column movement opposes trim direction. This is not true for pitch commands for the MCAS. When the STAB TRIM override switch is positioned to OVRD, electric trim can be used regardless of control column position.

34.     Pitch trim is controlled by changing the pitch of the horizontal stabilizer. Changing pitch of the horizontal stabilizer can place large pitch forces on the aircraft. When applied appropriately, these forces can keep the aircraft in balance. When applied inappropriately, they can make the aircraft difficult to handle.

35.     Forces generated by the horizontal stabilizer from an out of trim condition can exceed the forces that can be generated by the elevator.

36.     It is possible on the Max 8, to have an out of trim condition that when countered by elevator control inputs from the crew, puts enough load on the pitch trim mechanism that it essentially jams the pitch trim control. Manual trim cannot overcome this load on the mechanism.

37.     The elevator is a smaller control surface when compared to the surface area of the controllable horizontal stabilizer.

38.     This scenario is depicted by the illustration below:



Boeing 737
Jamming A Mistrimmed Horizontal Stabilizer
To offset the aerodynamic forces created by a combination of the plane's attitude and speed, the horizontal stabilizer is trimmed by rotating around the pivot point. Electric motors or a manual hand-cranked trim wheel make these adjustments and reduce the force needed by the pilots to move the controls. If the stabilizer is tilted too high, this is called a mistrim and can create a dangerous situation that can paralyze manual control.
Pulling the pilot's controls raises the elevator. That creates an aerodynamic force downward on the tail to raise the nose.
Pivot point
Jackscrew
(inside the fuselage)
The elevator creates an opposing force against the jackscrew that swivels the stabilizer and makes hand-cranking the trim wheel to raise the nose extremely difficult.
THE AIR CURRENT
Boeing 737 Next Generation shown for illustrative purposes. Source: Peter Lemme

39. Electric trim works in a narrower range of motion than manual trim. If the stabilizer is out of trim and outside the range of electric trim operation, only manual trim can be used.

40. In addition to its failure to warn, create a provide instructions to pilot and train pilots on the MCAS system and how to override the Flight Control System when it is provided with false AOA data, Boeing designed a pitch trim control system that is capable of jamming.

**CRASH OF ETHIOPIAN AIRLINES FLIGHT 302**

41. On March 10, 2019 AL MARHUM HUSSEIN SWALEH M TETU was a fare paying passenger onboard a Boeing 737-8 (Max) aircraft, ET-AVJ, Serial Number 62450, with an intended destination of Nairobi, Kenya.

42. At 05:38 UTC, Ethiopian Airlines flight 302, Boeing 737-8(Max), ET-AVJ, took off from Addis Ababa Bole Int. Airport bound to Nairobi, Kenya Jomo Kenyatta Int. Airport. Shortly after takeoff, the Angle of Attack sensor that recorded that value became erroneous and the left stick shaker activated and remained active until near the end of the flight. In addition, the

airspeed and altitude values from the left air data system began deviating from the corresponding right side values. The Captain requested to return back to the departure airport. The aircraft crashed at 5:44 UTC 28 NM South East of Addis Ababa near Ejere village. There were 157 passengers and crew on board. All were fatally injured, and the aircraft was destroyed.

43.     Just one minute into the flight the Captain, Yared Getachew, reported that the crew was having flight-control problems. The anti-stall system then kicked in and pushed the nose of the aircraft down for nine seconds. Instead of climbing, the aircraft descended slightly. Audible warnings — "Don't Sink" — sounded in the cockpit. The pilots fought to turn the nose of the plane up, and briefly they were able to resume climbing. The MCAS system pushed the nose down again, triggering more squawks of "Don't Sink" from the plane's ground-proximity warning system. The pilots then flipped two switches and disconnected the anti-stall system, then tried to regain control. They asked to return to the airport but were continuing to struggle getting the aircraft to gain altitude. Power to controls was returned. The MCAS engaged again, pushing the plane into a nose dive. Thirty seconds later the cockpit voice recording ended, the plane crashed, and all 157 people on board were killed. The aircraft's impact created a 30 meter deep crater.

44.     According to a preliminary report issued by the Ethiopian Aircraft Accident Investigation Bureau, the following is what occurred, minute by minute.

45.     At 05:38:44, shortly after liftoff, the left and right recorded AOA values deviated. The left AOA decreased to 11.1 degrees then increased to 35.7 degrees while the value of the right AOA indicated 14.94 degrees. Then the left AOA value reached 74.5 degrees in ¾ seconds while the right AOA reached a maximum value of 15.3 degrees. At this time, the left stick shaker activated and remained active until near the end of the recording. Also, the airspeed, altitude and

flight director pitch bar values from the left side noted deviating from the corresponding right side values. The left side values were lower than the right side values until near the end of the recording.

46.     At 05:38:43 and about 50 ft radio altitude, the flight director roll mode changed to LNAV. At 05:38:46 and about 200 ft radio altitude, the Master Caution parameter changed state. The First Officer called out Master Caution Anti-Ice on CVR. Four seconds later, the recorded Left AOA Heat parameter changed state.

47.     At 05:38:58 and about 400 ft radio altitude, the flight director pitch mode changed to VNAV SPEED and the Captain called out "Command" (standard call out for autopilot engagement) and an autopilot warning is recorded. At 05:39:00, the Captain called out "Command". At 05:39:01 and about 630 ft radio altitude, a second autopilot warning is recorded.

48.     At 05:39:06, the Captain advised the First-Officer to contact radar and the First Officer reported SHALA 2A departure crossing 8400 ft and climbing FL 320. Between liftoff and 1000 ft above ground level (AGL), the pitch trim position moved between 4.9 and 5.9 units in response to manual electric trim inputs. At 1000 ft AGL, the pitch trim position was at 5.6 units. At 05:39:22 and about 1,000 feet the left autopilot (AP) was engaged (it disengaged about 33 seconds later), the flaps were retracted and the pitch trim position decreased to 4.6 units. Six seconds after the autopilot engagement, there were small amplitude roll oscillations accompanied by lateral acceleration, rudder oscillations and slight heading changes. These oscillations continued also after the autopilot was disengaged. At 05:39:29, radar controller identified ET-302 and instructed to climb FL 340 and when able right turns direct to RUDOL and the First-Officer acknowledged.

49.     At 05:39:42, Level Change mode was engaged. The selected altitude was 32000 ft. Shortly after the mode change, the selected airspeed was set to 238 kt.

50.    At 05:39:45, the Captain requested flaps up and the First-Officer acknowledged. One second later, the flap handle moved from 5 to 0 degrees and flaps retraction began. At 05:39:50, the selected heading started to change from 072 to 197 degrees and at the same time the Captain asked the First-Officer to request to maintain runway heading.

51.    At 05:39:55, Autopilot disengaged, at 05:39:57, the Captain advised the First-Officer to request to maintain runway heading and that they were having flight control problems. At 05:40:00 shortly after the autopilot disengaged, the FDR recorded an automatic aircraft nose down (AND) activated for 9.0 seconds and pitch trim moved from 4.60 to 2.1 units. The climb was arrested and the aircraft descended slightly.

52.    At 05:40:03 the Ground Proximity Warning System (GPWS) "DON'T SINK" alerts occurred. At 05:40:05, the First-Officer reported to ATC that they were unable to maintain SHALA 1A and requested runway heading which was approved by ATC.

53.    At 05:40:06, left and right flap position reached a recorded value of 0.019 degrees which remained until the end of the recording. The column moved aft and a positive climb was re-established during the automatic AND motion. At 05:40:12, approximately three seconds after AND stabilizer motion ends, electric trim (from pilot activated switches on the yoke) in the Aircraft nose up (ANU) direction is recorded on the DFDR and the stabilizer moved in the ANU direction to 2.4 units. The Aircraft pitch attitude remained about the same as the back pressure on the column increased.

54.    At 05:40:20, approximately five seconds after the end of the ANU stabilizer motion, a second instance of automatic AND stabilizer trim occurred and the stabilizer moved down and reached 0.4 units.

55.     From 05:40:23 to 05:40:31, three Ground Proximity Warning System (GPWS) "DON'T SINK" alerts occurred.

56.     At 05:40:27, the Captain advised the First-Officer to trim up with him. At 05:40:28 Manual electric trim in the ANU direction was recorded and the stabilizer reversed moving in the ANU direction and then the trim reached 2.3 units.

57.     At 05:40:35, the First-Officer called out "stab trim cut-out" two times. The Captain agreed and the First Officer confirmed stab trim cut-out. At 05:40:41, approximately five seconds after the end of the ANU stabilizer motion, a third instance of AND automatic trim command occurred without any corresponding motion of the stabilizer, which is consistent with the stabilizer trim cutout switches were in the ''cutout'' position.

58.     At 05:40:44, the Captain called out three times "Pull-up" and the First-Officer acknowledged. At 05:40:50, the Captain instructed the First Officer to advise ATC that they would like to maintain 14,000 ft and they had a flight control problem. At 05:40:56, the First-Officer requested ATC to maintain 14,000 ft and reported that they were having a flight control problem. ATC approved.

59.     From 05:40:42 to 05:43:11 (about two and a half minutes), the stabilizer position gradually moved in the AND direction from 2.3 units to 2.1 units. During this time, aft force was applied to the control columns which remained aft of neutral position. The left indicated airspeed increased from approximately 305 kt to approximately 340 kt (VMO). The right indicated airspeed was approximately 20-25 kt higher than the left. The data indicates that aft force was applied to both columns simultaneously several times throughout the remainder of the recording.

60.     At 05:41:20, the right overspeed clacker was recorded on Cockpit Voice Recorder. It remained active until the end of the recording. At 05:41:21, the selected altitude was changed

from 32000 ft to 14000 ft. At 05:41:30, the Captain requested the First-Officer to pitch up with him and the First-Officer acknowledged.

61.     At 05:41:32, the left overspeed warning activated and was active intermittently until the end of the recording. At 05:41:46, the Captain asked the First-Officer if the trim was functional. The First-Officer has replied that the trim was not working and asked if he could try it manually. The Captain told him to try.

62.     At 05:41:54, the First-Officer replied that it was not working. At 05:42:10, the Captain asked and the First-Officer requested a vector to return and ATC approved.

63.     At 05:42:30, ATC instructed ET-302 to turn right heading 260 degrees and the First-Officer acknowledged. At 05:42:43, the selected heading was changed to 262 degrees. At 05:42:51, the First-Officer mentioned Master Caution Anti-Ice. The Master Caution is recorded on DFDR.

64.     At 05:42:54, both pilots called out "left alpha vane". At 05:43:04, the Captain asked the First Officer to pitch up together and said that pitch is not enough. At 05:43:11, about 32 seconds before the end of the recording, at approximately 13,4002 ft, two momentary manual electric trim inputs are recorded in the ANU direction. The stabilizer moved in the ANU direction from 2.1 units to 2.3 units.

65.     At 05:43:20, approximately five seconds after the last manual electric trim input, an AND automatic trim command occurred and the stabilizer moved in the AND direction from 2.3 to 1.0 unit in approximately 5 seconds. The aircraft began pitching nose down. Additional simultaneous aft column force was applied, but the nose down pitch continued, eventually reaching 40 degrees nose down. The stabilizer position varied between 1.1 and 0.8 units for the remainder of the recording. The left Indicated Airspeed increased, eventually reaching approximately 458 kts

and the right Indicated Airspeed reached 500 kts at the end of the recording. The last recorded pressure altitude was 5,419 ft on the left and 8,399 ft on the right.

66. Data from the Flight Data Recorder on the aircraft can be seen below:

## BACKGROUND FACTS

67. Prior to the loss of all One Hundred and Fifty-Seven (157) lives in the Ethiopian Airlines Crash of March 10, 2019 Boeing was put on notice that its Max 8 aircraft was defective and dangerous and concealed these defects in order to sell more of the Max 8 airplanes.

68. Boeing was put on notice time and time again that the Max 8 was unreasonably dangerous but failed to rectify the flawed design, failed to provide adequate working sensors or software fixes, failed to provide working warnings or alarms, failed to install, design or retrofit its aircraft with adequate sensors and failed to provide adequate warnings or training about the danger. For Example:

Case: 1:19-cv-04070 Document #: 2 Filed: 06/18/19 Page 16 of 45 PageID #:17

69. **Max 8 Danger Warning Number 1:** In 2006 the Future Aviation Safety Team ("FAST") published a 50 page study on "Increasing Reliance on Flight Deck Automation," after conducting a pilot survey among more than 190 pilot respondents, with a mean of 10,000 flying hours and 20 years in the business. [3] The top five hazards FAST identified with emerging autonomous flight systems included the following four out of five hazards all of which are applicable to the Max 8 MCAS and AOA sensor system:

a. Failure of the flight crew to remain aware of automation mode and aircraft energy state;

b. Unfamiliar modes of aircraft automation may result in a perfectly normal flying aircraft suddenly taking on characteristics that the pilot has seldom or never previously encountered;

c. Latent flaws in the displays or primary flight control system may go undetected, because not enough human-in-the-loop testing is performed;

d. Pilots may not be adequately trained to understand the philosophy of the automation design when the functionality is being automatically degraded in particular situations for reasons known only to the software.

70. Despite the 2006 FAST report Boeing designed and used an automated flight system that it did not disclose to pilots. It used data from a single sensor that caused the aircraft to take on characteristics that the pilot did not previously encounter. Boeing intentionally did not train pilots to have notice that the aircraft might take on such characteristics nor what to do about it.

[3] https://www.nlr.org/wp-content/uploads/2018/11/FAST-AC13-Hazard-Summary.pdf

71.     Boeing designed an MCAS system with no Human in the Loop. HITL is defined as a model that requires human interaction. In HITL systems a human is always part of the simulation and consequently influences the outcome in such a way that is difficult to reproduce. Boeing failed to adequately train pilots about the existence of MCAS and then failed to inform pilots about how the system worked such that they could interact with it or override it.

72.     **Max 8 Safety Notice Number 2:** The crash of Turkish Airlines Flight 1951 in 2009, ten years prior to the Ethiopian Airlines Crash, demonstrated the risks of an automated flight-control system relying on data from a single sensor.[4]

73.     Investigators of the 2009 crash of a Turkish Airlines jet identified a faulty altitude sensor that thought the plane was closer to the ground than it was and triggered the engines to idle. The plane's second radio altimeter displayed the correct elevation, but it didn't matter: the automatic throttle was tied to the first gauge. The Amsterdam-bound plane crashed into a field, killing nine people and injuring 120.

74.     Boeing ended up changing that throttle system to prevent one erroneous altitude reading from cascading into tragedy, changes the U.S. Federal Aviation Administration subsequently made mandatory.

75.     The Turkish Airlines Crash, which injured and killed some of its own Boeing employees who happened to be on the flight, provided clear notice that relying upon one data point to provide information to the flight control system can be fatal.

76.     **Max 8 Safety Notice Number 3**: Lion Air 610 Crash of October 29, 2018. One Hundred and Eighty-Nine (189) lives were lost when a Max 8 crashed. Investigators quickly concluded that the MCAS system on the aircraft was activated resulting from erroneous angle of

---

[4] https://www.bloomberg.com/news/articles/2019-05-07/boeing-max-failed-to-apply-safety-lesson-from-deadly-2009-crash

attack (AOA) information and the pilots were without an optional feature that would have alerted them to the error. This is the single biggest notice that Boeing had that its Max 8 aircraft was defective and dangerous yet it concealed these defects in order to sell more of the Max 8 airplanes.

77. Boeing delivered the subject crashed Max 8 to Ethiopian Airlines after the Lion Air Crash. It flew the aircraft from Boeing Field in Seattle, Washington to Dublin, Ireland on November 15, 2018, delivering the aircraft in Addis Ababa on November 17, 2018.

**ET-AVJ Ethiopian Airlines Boeing 737 MAX 8**

| Airframe Details | |
|---|---|
| Manufacturer Serial Number (MSN) | 62450 |
| Line Number | 7243 |
| Aircraft Type | Boeing 737 MAX 8 |
| Age | 0.4 Years |
| Test registration | N1786B |
| Production Site | Renton (RNT) |
| Airframe Status | Written Off |

**EAL 302 Max 8 Delivered AFTER Lion Air Crash**

OPERATOR HISTORY

| REG | AIRCRAFT TYPE | AIRLINE | DELIVERED | CONFIG | ENGINES | HEX CODE | REMARKS |
|---|---|---|---|---|---|---|---|
| ET-AVJ | Boeing 737 MAX 8 | Ethiopian Airlines | Nov 2018 | C16Y144 | 2x LEAP | 040152 | Ferried BFI-DUB-ADD 15-17 Nov 2018 on delivery Crashed 10 Mar 2019 en route ADD-NBO near Bishoftu. Flight ET302 lost contact 6 minutes after take-off carrying 149 passengers and 8 crew members. |

78. Only after the Lion Air Crash and the loss of 189 lives did Boeing tell different airlines months apart from one another that cockpit alerts for the AOA sensors did not work on the Max 8 due to a software error.

79. Boeing told Southwest Airlines about the problem in late November 2018 and began installing additional cockpit warning systems by late November.

80. Boeing told United Continental Holdings, Inc. about the software error toward the end of March, four months after Southwest and after the crash of Ethiopian Airlines Flight 302.

Case: 1:19-cv-04070 Document #: 2 Filed: 06/18/19 Page 19 of 45 PageID #:20

81. **Max 8 Safety Notice Number 4:** In 2017 Boeing engineers learned that alerts were not operating as intended on the Max 8 due to a software error.[5] Instead of telling the Federal Aviation Administration or the airlines or pilots, it concealed this problem.

82. **Max 8 Safety Notice Number 5:** During the action design of the Max 8 Boeing intentionally chose to use a single point failure system, without redundancies.[6] In aviation design it is essential to have a fail safe or backup. Boeing violated this simple aviation safety rule. Boeing engineers and managers noticed that this fundamental rule was being violated but did nothing.

83. Boeing chose not to make the MCAS system redundant in order to make the Max 8 cheaper for training purposes, in order to sell more airplanes.

84. Rick Ludtke, a former Boeing engineer who worked on designing the interfaces on the Max 8's flight deck, said managers mandated that any differences from the previous 737 had to be small enough that they wouldn't trigger the need for pilots to undergo new simulator training.

85. According to Mr. Ludtke, if the group had built the MCAS in a way that would depend on two sensors, and would shut the system off if one fails, he thinks the company would have needed to install an alert in the cockpit to make the pilots aware that the safety system was off. And if that happens, Ludtke said, the pilots would potentially need training on the new alert and the underlying system. That could mean simulator time, which was off the table."

**BOEING FALSIFIED AND OMMITTED INFORMATION FROM PILOTS AND AIRLINES**

86. Boeing concealed information about the MCAS system from its customers and passengers.

[5] https://www.wsj.com/articles/boeing-knew-about-safety-alert-problem-for-a-year-before-telling-faa-airlines-11557087129

[6] https://www.seattletimes.com/business/boeing-aerospace/a-lack-of-redundancies-on-737-max-system-has-baffled-even-those-who-worked-on-the-jet/?utm_source=twitter&utm_medium=social&utm_campaign=article_inset_1.1

87. Boeing purposefully concealed information about the MCAS system in order to sell more aircraft.

88. Boeing affirmatively omitted information about the MCAS system from its Flight Control Manual on the Max 8.

89. Boeing affirmatively chose not to instruct or train pilots on the MCAS system, in order to sell more Max 8 airplanes.

90. After the public and pilots questioned the safety of the Max 8 Boeing continued to conceal and omit information about the safety of the Max 8, in order to sell more aircraft.

91. After the public and pilots questioned the safety of the training for the Max 8, which does not rely upon simulator training, Boeing continued to downplay the need for simulator training, in order to sell more aircraft.

**BOEING CONSPIRED WITH THE FEDERAL AVIATION ADMINISTRATION**

92. Federal Aviation Administration safety engineers worked under constant pressure from their managers to delegate more and more work to Boeing itself, and to speedily approve the Max 8 safety assessments the Boeing designees came up with.[7]

93. Boeing removed a senior engineer acting as an FAA Authorized Representative who raised questions about the speed with which the FAA was being asked to approve Boeing's changes to the Max 8.

94. Federal Aviation Administration (FAA) engineers in Renton worked in a negative work environment created by FAA managers where safety engineers feared retaliation for attempting to hold Boeing accountable.

---

[7] https://www.seattletimes.com/business/boeing-aerospace/engineers-say-boeing-pushed-to-limit-safety-testing-in-race-to-certify-planes-including-737-max/

95. According to the Seattle Times, the culture at the Renton, Washington aircraft certification office involved delegating more than the FAA technical specialists were comfortable with. When the FAA's safety engineers had an opinion different from Boeing's, FAA management in the office tended to side with Boeing.

96. The current procedure under which aircraft are certified creates a system that is vulnerable to undue pressure and control from the aircraft manufacturer. This diagram from the Seattle Times illustrates the difference between how aircraft used to be certified to be allowed to be sold and flown and the current certification process.

**How the process of certifying an airplane changed**

Under the older DER (Designated Engineering Representative) system, the Boeing employees assigned to work on behalf of the FAA were appointed by the FAA and reported to their FAA counterparts.

OLD SYSTEM

FEDERAL AVIATION ADMINISTRATION

BOEING

1. FAA appoints DERs

DERs employed and paid by Boeing

DERs (Designated Engineering Representatives)

FAA technical staff

3. FAA signs off on all certification issues

2. DERs report to FAA

Reporting by DOMINIC GATES, Graphic by MARK NOWLIN / THE SEATTLE TIMES

97. Boeing took advantage of this system in order to rush a dangerous airplane to market in order to compete with Airbus and increase its revenue.

98. The FAA worked with Boeing to assist it in its abuse of this system and allowed a dangerous aircraft to be marketed, sold and flown globally.

Case: 1:19-cv-04070 Document #: 2 Filed: 06/18/19 Page 22 of 45 PageID #:23

**FACTS ABOUT BOEING**

99. Boeing markets itself as "the world's largest aerospace company and leading manufacturer of commercial jetliners" and claims "a long tradition of aerospace leadership and innovation" including "creating advanced technology solutions."

100. With corporate headquarters in Chicago, Boeing employs more than 165,000 people across the United States and in more than 65 countries.

101. Boeing claims it has "one of the most diverse, talented and innovative workforces anywhere."

102. In Boeing's 2018 Annual Report, its reported annual revenue was $101.1 billion in revenue.

103. Despite these resources, the Max 8 aircraft at issue was not equipped with appropriate sensors, warning systems, software, or a trim system to warn or protect the people on board that airplane from a computer initiated crash into terrain that resulted in a crater 30 meters deep.

104. Despite these resources Boeing shifted the cost of Max 8 pilot training to the airlines and designed its aircraft in an unsafe manner to create a selling point- cheap training for flight crews.

105. Despite these resources the subject aircraft's flight crew lacked training on how to mitigate or prevent an MCAS initiated crash from faulty AOA sensor data so that it could save the lives of the One Hundred and Fifty-Seven passengers and crew onboard.

106. Boeing knew that information from a single AOA sensor could cause a fatal crash and knew that safer alternatives were available that were technologically available and economically feasible.

Case: 1:19-cv-04070 Document #: 2 Filed: 06/18/19 Page 23 of 45 PageID #:24

107. Yet Boeing did not design or redesign or retrofit the subject Max 8 aircraft to remove or reduce the occurrence of these hazardous events.

108. Rather than admit the truth about the Max 8, Boeing instead deliberately misrepresented the safety of its aircraft.

109. For instance, after the Lion Air Crash and months prior to the Ethiopian Airlines Crash, pilots from the Allied Pilot's Association complained to Boeing about its concealment of the MCAS system and the danger of hiding information on the Max 8 from pilots. In response Boeing misrepresented the safety of the Max 8.[8]

110. During that meeting a pilot said "We flat out deserve to know what's on our airplane." "I don't disagree," the official from Boeing responded. "[The pilots of Lion Air 610] didn't even know the damn system was on the airplane," another pilot said. "Nor did anybody else." The Boeing official stated "I don't know that understanding this system would have changed the outcome of this, in a million miles you're going to maybe fly this airplane, and maybe once you're going to see this ever." Four months later, Ethiopian Airlines flight 302 crashed minutes after take-off and evidence continues to mount that the MCAS was a major factor in the crashes of the two planes.

111. Due to the danger posed by the Max 8 the Federal Aviation Administration has grounded the aircraft.

112. As described in further detail herein, Boeing knew of the defects in the subject aircraft, knew that because of such defects the Max 8 was not airworthy, was on notice that the defects were likely to cause injury and death yet failed to adequately warn or instruct on the aircraft defects, failed to remedy the known defect in the subject aircraft, failed to discover the dangerous

[8] https://interestingengineering.com/pilots-confronted-boeing-about-risks-before-2nd-737-max-8-crash

conditions when such could have been discovered and / or failed to take affirmative action to avoid injury to Plaintiffs and others.

113. Because of Boeing's gross, willful, and reckless disregard for human life, families, including AL MARHUM HUSSEIN SWALEH M TETU's family, have mourned the loss of a loved one whose life should never have been put at risk. Families of the decedents were given soil from the crash site as they could not bury their loved ones because the bodies were burnt beyond recognition. Punitive damages should be awarded in this case to punish and deter Boeing and others from taking these kinds of risks with people's lives again.

**COUNT I**
**Strict Liability: Design Defect, The Boeing Company**

114. **Plaintiffs** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

115. Boeing designed, manufactured, distributed and/or sold the Boeing 737 Max 8, and its components parts, involved in the incident. **Defendants** were in the business of designing, testing, manufacturing, selling, assembling, building, distributing, marketing and/or inspecting aircraft as suitable for passenger transportation, including the subject Boeing 737 Max 8, and its component parts, that crashed in Ethiopia on March 10, 2019.

116. At all times relevant hereinabove set forth, the subject Boeing 737 Max 8 aircraft, and its component parts, was being operated by **Ethiopian Airlines** and used for the purposes of which it was manufactured, designed, inspected, sold and intended to be used, in a manner reasonably foreseeable to Boeing.

117. At all times relevant hereinabove set forth, the subject Boeing 737 Max 8, and its component parts, were defective, dangerous, unsafe, and not airworthy by reason of Boeing's defective manufacture, design, warning systems, inspections, testing, service, and/or maintenance

of the subject aircraft, and its component parts, as set forth above. The aircraft, and its component parts, were in substantially similar condition to its original condition at delivery to **Ethiopian Airlines**.

118.    As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **Decedent** suffered pre-impact injury and death, including fear of impending and imminent death, and **Plaintiffs** have been damaged by the death of **Decedent**.

119.    As a direct and legal result of the wrongful acts and/or omissions of Defendant Boeing, hereinabove alleged, **Plaintiffs** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **Decedent**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

120.    As a further direct and legal result of the wrongful conduct of Boeing set forth above, **Plaintiffs** incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

121.    As a further direct and legal result of the wrongful conduct of Boeing set forth above, **Plaintiffs** suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

122.    The potential harm to airline passengers, pilots, crews, and the public from the 737 Max 8 was objectively foreseeable both in nature and in scope and were subjectively known to Boeing for all of the aforementioned reasons, including but not limited to: Boeing's own safety assessment of the AOA sensor and MCAS during development of the 737 Max 8 which revealed potential problems with the system; the evidence that flight control issues caused the crash of Lion Air Flight 610 and death of 189 people; complaints lodged by pilots regarding the performance of

the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; and Boeing's identification of a software upgrade to address problems with the AOA sensors and MCAS in the weeks and months prior to the crash of Flight 302.

123. As set forth above and as will be shown by proof, there is a high degree of certainty that **Plaintiffs** have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and Boeing's conduct. A high degree of moral blame is attached to Boeing's conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by Boeing to all **Plaintiffs** and the imposition of all damages described above.

124. Based on the foregoing, Boeing, acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, such that **Plaintiffs** request that the trier of fact, in the exercise of sound discretion, award **Plaintiffs** additional damages for the sake of example and sufficient to punish Boeing, for its despicable conduct, in an amount reasonably related to **Plaintiffs'** actual damages and Boeing financial condition, yet sufficiently large enough to be an example to others and to deter Boeing and others from engaging in similar conduct in the future.

WHEREFORE, Plaintiff requests judgment against Defendant THE BOEING COMPANY for compensatory damages, punitive damages, costs, fees, and all other awards deemed just. The plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

**COUNT II**
**Strict Liability: Defect in Warnings / Instructions, The Boeing Company**

125. **Plaintiffs** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

Case: 1:19-cv-04070 Document #: 1 Filed: 06/18/19 Page 27 of 45 PageID #:28

126. Defendant Boeing designed, manufactured, distributed and/or sold the Boeing 737 Max 8 involved in the incident. Defendant Boeing was in the business of designing, testing, manufacturing, selling, assembling, building, distributing, marketing and/or inspecting aircraft as suitable for passenger transportation, including the subject Boeing 737 Max 8 that crashed in Ethiopia on March 10, 2019.

127. At all times relevant hereinabove set forth, the subject Boeing 737 Max 8 aircraft was being operated by **Ethiopian Airlines** and used for the purposes of which it was manufactured, designed, inspected, sold and intended to be used, in a manner reasonably foreseeable to Defendant Boeing.

128. At all times relevant hereinabove set forth, the subject Boeing 737 Max 8 was defective, dangerous, unsafe, and not airworthy by reason of Defendant Boeing's defective manufacture, design, warning systems, inspections, testing, service, and/or maintenance of the subject aircraft as set forth above.

129. At all times relevant hereinabove set forth, Boeing had knowledge that the subject Boeing 737 Max 8 was defective, dangerous, unsafe, and not airworthy, and in particular, Boeing had knowledge of the unreasonably unsafe design of the AOA sensor and automated MCAS, as well as the potential life and death risks of such a failure in these systems.

130. At all times relevant hereinabove set forth, the risks of failure of the Boeing 737 Max 8 due the aircraft's unreasonably dangerous and defective design presented a substantial danger when the aircraft is used or misused in an intended or reasonably foreseeable way.

131. Ordinary consumers, including but not limited to airlines, flight crew, and passengers, would not have recognized the potential risks presented by the aircraft's unreasonably dangerous and defective design.

132.     As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **Decedent** suffered pre-impact injury and death, including fear of impending and imminent death, and **Plaintiffs** have been damaged by the death of **Decedent**.

133.     As a direct and legal result of the wrongful acts and/or omissions of Defendant Boeing, hereinabove alleged, **Plaintiffs** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **Decedent**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

134.     As a further direct and legal result of the wrongful conduct of Boeing set forth above, **Plaintiffs** incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

135.     As a further direct and legal result of the wrongful conduct of Boeing set forth above, **Plaintiffs** suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

136.     The potential harm to airline passengers, pilots, crews, and the public from the 737 Max 8 was objectively foreseeable both in nature and in scope and were subjectively known to Boeing for all of the aforementioned reasons, including but not limited to: Boeing's own safety assessment of the AOA sensor and MCAS during development of the 737 Max 8 which revealed potential problems with the system; the evidence that flight control issues caused the crash of Lion Air Flight 610 and death of 189 people; complaints lodged by pilots in the regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; and Boeing's identification of a software

upgrade to address problems with the AOA sensors and MCAS in the weeks and months prior to the crash of Flight 302.

137. As set forth above and as will be shown by proof, there is a high degree of certainty that **Plaintiffs** have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and Boeing's conduct. A high degree of moral blame is attached to Boeing's conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by Boeing to all **Plaintiffs** and the imposition of all damages described above.

138. Based on the foregoing, Boeing, acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, such that **Plaintiffs** request that the trier of fact, in the exercise of sound discretion, award **Plaintiffs** additional damages for the sake of example and sufficient to punish Boeing, for its despicable conduct, in an amount reasonably related to **Plaintiffs'** actual damages and Boeing's financial condition, yet sufficiently large enough to be an example to others and to deter Boeing and others from engaging in similar conduct in the future.

WHEREFORE, Plaintiffs request judgment against Defendant THE BOEING COMPANY for compensatory damages, punitive damages, costs, fees, and all other awards deemed just. The plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

**COUNT III**
**Breach of Warranty, The Boeing Company**

139. **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

140. **BOEING** was the designer, manufacturer, distributor and/or seller of the Boeing 737 MAX 8, and/or its component parts, involved in the subject crash.

Case: 1:19-cv-04070 Document #: 2 Filed: 06/18/19 Page 30 of 45 PageID #:31

141. Prior to the crash of Flight 302, **BOEING** expressly and/or impliedly warranted and represented that the subject aircraft (the **BOEING** 737 MAX 8) including its component parts and instruments, and in conjunction with the instructions and warnings given by **BOEING**, was airworthy, of merchantable quality, both fit and safe for the purpose of commercial air travel for which it was designed, intended and used. Additionally, **BOEING** further warranted that the subject aircraft, and its component parts, was free from all defects.

142. **BOEING** breached said warranties in that the subject aircraft was not airworthy, of merchantable quality, or fit and safe for the purposes for which it was designed, intended and used, and free from all defects as set forth above. The aircraft, and its component parts, were in substantially similar condition to its original condition at delivery to **ETHOPIAN AIRLINES**.

143. **DECEDENT**, as a passenger of Flight 302, was an intended third-party beneficiary of **BOEING's** warranties that Flight 302 (the **BOEING** 737 MAX 8 and its component parts) was airworthy, of merchantable quality, both fit and safe for the purposes for which it was designed, intended and used, and free from all defects.

144. **DECEDENT** reasonably relied on these warranties to **DECEDENT's** detriment.

145. As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **DECEDENT** suffered pre-impact injury and death, including fear of impending and imminent death, and **PLAINTIFFS** have been damaged by the death of **DECEDENT**.

146. As a direct and legal result of the wrongful acts and/or omissions of Defendant **BOEING**, hereinabove alleged, **PLAINTIFFS** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **DECEDENT**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

147.    As a further direct and legal result of the wrongful conduct of **BOEING** set forth above, **PLAINTIFFS** incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

148.    As a further direct and legal result of the wrongful conduct of **BOEING** set forth above, **PLAINTIFFS** suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

149.    The potential harm to airline passengers, pilots, crews, and the public from the 737 MAX 8 was objectively foreseeable both in nature and in scope and were subjectively known to **BOEING** for all of the aforementioned reasons, including but not limited to: **BOEING's** own safety assessment of the AOA sensor and MCAS during development of the 737 MAX 8 which revealed potential problems with the system; the evidence that flight control issues caused the crash of Lion Air Flight 610 and death of 189 people; complaints lodged by pilots in the ASRS database regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; and **BOEING's** identification of a software upgrade to address problems with the AOA sensors and MCAS in the weeks and months prior to the crash of Flight 302.

150.    As set forth above and as will be shown by proof, there is a high degree of certainty that **PLAINTIFFS** have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and **BOEING's** conduct. A high degree of moral blame is attached to **BOEING's** conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by **BOEING** to all **PLAINTIFFS** and the imposition of all damages described above.

Case: 1:19-cv-04070 Document #: 2 Filed: 06/18/19 Page 32 of 45 PageID #:33

151. Based on the foregoing, **BOEING**, acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, such that **PLAINTIFFS** request that the trier of fact, in the exercise of sound discretion, award **PLAINTIFFS** additional damages for the sake of example and sufficient to punish **BOEING**, for its despicable conduct, in an amount reasonably related to **PLAINTIFFS'** actual damages and **BOEING's** financial condition, yet sufficiently large enough to be an example to others and to deter **BOEING** and others from engaging in similar conduct in the future.

WHEREFORE, Plaintiffs request judgment against Defendant THE BOEING COMPANY for compensatory damages, punitive damages, costs, fees, and all other awards deemed just. The plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

**COUNT IV**
**Negligence, The Boeing Company**

152. **Plaintiffs** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

153. At all relevant times hereinabove set forth, Defendant Boeing was the designer, manufacturer, distributor and/or seller of the Boeing 737 Max 8 aircraft. Defendant Boeing was, at all times relevant, in the business of designing, testing, manufacturing, selling, assembling, building, distributing, marketing and/or inspecting aircraft as suitable and safe for passenger transportation, including the subject Boeing 737 Max 8 that crashed in Ethiopia on March 10, 2019.

154. At all relevant times hereinabove set forth, Defendant Boeing operated, supervised, managed and/or oversaw the training and instruction of all Max 8 pilots and knew or should have known that the pilots of Ethiopian Airlines Flight 302 could not safely fly the Max 8.

155.    At all times hereinabove set forth, Boeing breached its duty of care to **Decedent** as a passenger aboard Flight 302 with respect to the design, manufacture, inspection, testing, assembly, certification, distribution, and/or sale of a safe, airworthy aircraft; including the failure to train, instruct, and/or issue advisory warnings necessary to assure the safe operation, control, management and/or maintenance of the aircraft. Boeing's acts and/or omissions include, but are not limited to the following:

a. Designing, manufacturing, assembling and/or certifying an aircraft with an anti-stall system controlled by a single AOA sensor instead of two; or

b. Designing manufacturing, assembling and/or certifying an aircraft with an anti-stall system which was susceptible to failure without redundant systems; or

c. Designing, manufacturing, assembling and/or certifying an aircraft with a flight control system susceptible to bad data from the AOA sensor, and failing to install AOA indicators and/or AOA disagree lights as standard features rather than optional upgrades; or

d. Designing, manufacturing, assembling and/or certifying an aircraft with a flight control system that would initiate a dangerous automated dive without any command from a pilot and without a means to promptly override the automated dive; or

e. Marketing and selling the 737 Max 8 as an analog to Boeing's 737NG to consciously and intentionally induce airlines to avoid the time-consuming retraining of airline pilots with the knowledge that the Max 8 contained a new and potentially dangerous MCAS automated flight control system; or

f. Failing to provide adequate warning with regard to the 737 Max 8's MCAS and the risk of an automated dive without any command from a pilot, or clear instruction to promptly override such an MCAS automated dive; or

g. Failing to conduct a thorough and accurate safety assessment of the aircraft, including Boeing's failure in its safety assessment to account for the degree to which the MCAS could move the horizontal stabilizer of the aircraft and failure to account for the resetting of the automated dive after each command from a pilot; or

h. Failing to properly train pilots on the new automated MCAS systems on the 737 Max 8; or

i. Failing to properly train pilots to identify an AOA sensor failure and MCAS input; or

j. Failing to properly train pilots to disengage the stabilizer trim motor on the 737 Max 8 in the event of an AOA sensor failure or unanticipated dive; or

k.  Designing, assembling, and distributing a flight manual that did not warn of the risks presented by the MCAS, faulty AOA sensors, or automated dives; or

l.  Designing, manufacturing, assembling and/or certifying an airplane flight manual that failed to provide clear instruction or procedures on how to promptly override an automated MCAS dive; or

m.  Failing to promptly issue a software patch to address the risk of malfunctioning AOA sensors and automated MCAS dives following the October 29, 2018 crash of Lion Air Flight JT 610; or

n.  Failing to ground all 737 Max 8 aircraft following the crash of Lion Air Flight JT 610 until such a software patch and/or other safety procedures could be implemented; or

o.  Failing to properly warn pilots, airlines, and the public of the risk of malfunctioning AOA sensors and automated MCAS dives following the crash of Lion Air Flight JT 610.

156.    As a direct and legal result of Defendant Boeing's negligence, carelessness, gross negligence, recklessness and/or otherwise wrongful acts and/or omissions hereinabove set forth, **Decedent** died in the crash of Flight 302.

157.    As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **Decedent** suffered pre-impact injury and death, including fear of impending and imminent death, and **Plaintiffs** have been damaged by the death of **Decedent**.

158.    As a direct and legal result of the wrongful acts and/or omissions of Defendant Boeing, hereinabove alleged, **Plaintiffs** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **Decedent**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

159.    As a further direct and legal result of the wrongful conduct of Boeing set forth above, **Plaintiffs** incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

160.     As a further direct and legal result of the wrongful conduct of Boeing set forth above, **Plaintiffs** suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

161.     The potential harm to airline passengers, pilots, crews, and the public from the 737 Max 8 was objectively foreseeable both in nature and in scope and were subjectively known to Boeing for all of the aforementioned reasons, including but not limited to: Boeing's own safety assessment of the AOA sensor and MCAS during development of the 737 Max 8 which revealed potential problems with the system; the evidence that flight control issues caused the crash of Lion Air Flight 610 and death of 189 people; complaints lodged by pilots regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; and Boeing's identification of a software upgrade to address problems with the AOA sensors and MCAS in the weeks and months prior to the crash of Flight 302.

162.     As set forth above and as will be shown by proof, there is a high degree of certainty that **Plaintiffs** have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and Boeing's conduct. A high degree of moral blame is attached to Boeing's conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by Boeing to all **Plaintiffs** and the imposition of all damages described above.

163.     Based on the foregoing, Boeing, acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, such that **Plaintiffs** request that the trier of fact, in the exercise of sound discretion, award **Plaintiffs** additional damages for the sake of example and sufficient to punish Boeing, for its despicable conduct, in an amount reasonably related to **Plaintiffs'** actual damages and Boeing's financial

condition, yet sufficiently large enough to be an example to others and to deter Boeing and others from engaging in similar conduct in the future.

WHEREFORE, Plaintiffs request judgment against Defendant THE BOEING COMPANY for compensatory damages, punitive damages, costs, fees, and all other awards deemed just. The plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

**COUNT V**
**Civil Conspiracy, The Boeing Company**

164. **Plaintiffs** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

165. Defendant Boeing entered into an agreement with the FAA, and its agents, employees, and/or directors, and/or other persons and/or entities to accomplish by concerted action either an unlawful purpose or a lawful purpose by unlawful means.

166. Boeing and its co-conspirators committed tortious and/or unlawful acts in furtherance of this agreement, including but not limited to, deceiving the public as to the safety of the 737 Max 8 aircraft and its component parts and systems, certifying the aircraft and the MCAS as safe based upon false and/or inaccurate information, failing to provide clear instruction in flight manuals or informing pilots as to automated systems embedded in the 737 Max 8 aircraft, denying technical experts the necessary time or resources to thoroughly evaluate the 737 Max 8 aircraft, and compelling technical experts to certify the aircraft despite their concerns about the safety of the 737 Max 8, all in violation of applicable laws, regulations, and mandatory duties.

167. As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **Decedent** suffered pre-impact injury and death, including fear of impending and imminent death, and **Plaintiffs** have been damaged by the death of **Decedent**.

Case: 1:19-cv-04070 Document #: 2 Filed: 06/18/19 Page 37 of 45 PageID #:38

168. As a direct and legal result of the wrongful acts and/or omissions of Defendant Boeing, hereinabove alleged, **Plaintiffs** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **Decedent**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

169. As a further direct and legal result of the wrongful conduct of Boeing set forth above, **Plaintiffs** incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

170. As a further direct and legal result of the wrongful conduct of Boeing set forth above, **Plaintiffs** suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

171. The potential harm to airline passengers, pilots, crews, and the public from the 737 Max 8 was objectively foreseeable both in nature and in scope and were subjectively known to Boeing for all of the aforementioned reasons, including but not limited to: Boeing's own safety assessment of the AOA sensor and MCAS during development of the 737 Max 8 which revealed potential problems with the system; the evidence that flight control issues caused the crash of Lion Air Flight 610 and death of 189 people; complaints lodged by pilots regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; and Boeing's identification of a software upgrade to address problems with the AOA sensors and MCAS in the weeks and months prior to the crash of Flight 302.

172. As set forth above and as will be shown by proof, there is a high degree of certainty that **Plaintiffs** have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and Boeing's conduct. A high degree of moral

blame is attached to Boeing's conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by Boeing to all **Plaintiffs** and the imposition of all damages described above.

173. Based on the foregoing, Boeing, acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, such that **Plaintiffs** request that the trier of fact, in the exercise of sound discretion, award **Plaintiffs** additional damages for the sake of example and sufficient to punish Boeing, for its despicable conduct, in an amount reasonably related to **Plaintiffs'** actual damages and Boeing's financial condition, yet sufficiently large enough to be an example to others and to deter Boeing and others from engaging in similar conduct in the future.

WHEREFORE, Plaintiffs request judgment against Defendant THE BOEING COMPANY for compensatory damages, punitive damages, costs, fees, and all other awards deemed just. The plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

**COUNT VI**
**Negligence, Rosemount Aerospace**

174. **Plaintiffs** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

175. At all relevant times hereinabove set forth, Defendant **Rosemount** owed a duty to the occupants of Boeing's 737 Max 7 aircraft and the general public, including the **Decedent**, to exercise reasonable care to properly develop, design, engineer, test, manufacture, produce, process, supply, deliver, monitor, market, label, adequately warn, recommend, advertise and/or sell angle of attack sensors, and/or refrain from introducing area of attack sensors into the stream of commerce and for the use in 737 Max aircraft, including the subject aircraft.

176.   The defective conditions in the Angle of Attack sensor, as discussed above, and the consequent crash of Flight 302 were legally caused by the negligence, gross negligence, wrongdoing, tortious conduct, careless acts and omissions of Defendant **Rosemount** in the development, design, engineering, testing, manufacturing, production, processing, supplying, delivery, monitoring, marketing, labeling, and selling, and **Rosemount's** failure to warn and failure to take remedial appropriate remedial action with respect to any and all known dangerously defective conditions.

177.   As a direct and legal result of Defendant **Rosemount's** negligence, carelessness, gross negligence, recklessness and/or otherwise wrongful acts and/or omissions hereinabove set forth, **Decedent** died in the crash of Flight 302.

178.   As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **Decedent** suffered pre-impact injury and death, including fear of impending and imminent death, and **Plaintiffs** have been damaged by the death of **Decedent**.

179.   As a direct and legal result of the wrongful acts and/or omissions of Defendant **Rosemount**, hereinabove alleged, **Plaintiffs** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **Decedent**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

180.   As a further direct and legal result of the wrongful conduct of **Rosemount** set forth above, **Plaintiffs** incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

Case: 1:19-cv-04070 Document #: 2 Filed: 06/18/19 Page 40 of 45 PageID #:41

181. As a further direct and legal result of the wrongful conduct of **Rosemount** set forth above, **Plaintiffs** suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

WHEREFORE, Plaintiffs request judgment against Defendant ROSEMONT AEROSPACE, INC. for compensatory damages, punitive damages, costs, fees, and all other awards deemed just. The plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

**COUNT VII**
**Strict Liability, Rosemount Aerospace**

182. **Plaintiffs** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

183. At all relevant times hereinabove set forth, Defendant **Rosemount** was the designer, manufacturer, engineer, distributor and/or seller of aerospace products, including Angle of Attack sensors, who hold and have held themselves out to the public as having superior knowledge, skill and expertise in the design, testing, engineering, manufacture, and distribution of aerospace sensors for commercial aircraft and, in the course of its business, Defendant **Rosemount** designed, tested, manufactured, engineered and caused to be placed into the stream of commerce, a product known as an Angle of Attack sensor for utilization in the Boeing 737 Max 8 aircraft.

184. Defendant **Rosemount** expressly or impliedly warranted that the Angle of Attack sensor was fit for its intended use in commercial aircraft, being free of defects in their design and/or maintenance and, further, Defendant **Rosemount** marketed, sold, distributed, and caused to be introduced into the stream of commerce by sale to Defendant Boeing. The Angle of Attack sensor was in substantially similar condition to its original condition at delivery to Boeing.

185. Defects in the Angle of Attack sensor were a legal cause of the subject air crash, and the defects made the subject aircraft unreasonably dangerous for travel.

186. As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **Decedent** suffered pre-impact injury and death, including fear of impending and imminent death, and **Plaintiffs** have been damaged by the death of **Decedent**.

187. As a direct and legal result of the wrongful acts and/or omissions of Defendant **Rosemount**, hereinabove alleged, **Plaintiffs** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **Decedent**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

188. As a further direct and legal result of the wrongful conduct of **Rosemount** set forth above, **Plaintiffs** incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

189. As a further direct and legal result of the wrongful conduct of **Rosemount** set forth above, **Plaintiffs** suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

WHEREFORE, Plaintiffs request judgment against Defendant ROSEMONT AEROSPACE, INC. for compensatory damages, punitive damages, costs, fees, and all other awards deemed just. The plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

**COUNT VIII**
**Negligence, Collins Aerospace**

190. **Plaintiffs** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

191.    At all relevant times hereinabove set forth, Defendant **Collins** owed a duty to the occupants of Boeing's 737 Max 7 aircraft and the general public, including the **Decedent**, to exercise reasonable care to properly develop, design, engineer, test, manufacture, produce, process, supply, deliver, monitor, market, label, adequately warn, recommend, advertise and/or sell the MCAS system and its software and/or refrain from introducing the MCAS system into the stream of commerce and for the use in 737 Max aircraft, including the subject aircraft.

192.    The defective conditions in the MCAS system and its software as discussed above, and the consequent crash of Flight 302 were legally caused by the negligence, gross negligence, wrongdoing, tortious conduct, careless acts and omissions of Defendant **Collins** in the development, design, engineering, testing, manufacturing, production, processing, supplying, delivery, monitoring, marketing, labeling, and selling, and **Collins's** failure to warn and failure to take remedial appropriate remedial action with respect to any and all known dangerously defective conditions.

193.    As a direct and legal result of Defendant **Collins's** negligence, carelessness, gross negligence, recklessness and/or otherwise wrongful acts and/or omissions hereinabove set forth, **Decedent** died in the crash of Flight 302.

194.    As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **Decedent** suffered pre-impact injury and death, including fear of impending and imminent death, and **Plaintiffs** have been damaged by the death of **Decedent**.

195.    As a direct and legal result of the wrongful acts and/or omissions of Defendant **Collins**, hereinabove alleged, **Plaintiffs** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from

Case: 1:19-cv-04070 Document #: 2 Filed: 06/18/19 Page 43 of 45 PageID #:44

**Decedent**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

196. As a further direct and legal result of the wrongful conduct of **Collins** set forth above, **Plaintiffs** incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

197. As a further direct and legal result of the wrongful conduct of **Collins** set forth above, **Plaintiffs** suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

WHEREFORE, Plaintiffs request judgment against Defendant COLLINS AEROSPACE for compensatory damages, punitive damages, costs, fees, and all other awards deemed just. The plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

**COUNT IX**
**Strict Liability Collins Aerospace**

198. **Plaintiffs** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

199. At all relevant times hereinabove set forth, Defendant **Collins** was the designer, programmer, manufacturer, engineer, distributor and/or seller of aerospace products, including the MCAS system and its software who hold and have held themselves out to the public as having superior knowledge, skill and expertise in the design, testing, engineering, manufacture, and distribution of MCAS systems and software for commercial aircraft and, in the course of its business, Defendant **Collins** designed, programmed, tested, manufactured, engineered and caused to be placed into the stream of commerce, a product known as the MCAS system and its software for utilization in the Boeing 737 Max 8 aircraft.

200.     Defendant **Collins** expressly or impliedly warranted that the MCAS system and its software was fit for its intended use in commercial aircraft, being free of defects in their design and/or maintenance and, further, Defendant **Collins** marketed, sold, distributed, and caused to be introduced into the stream of commerce by sale to Defendant Boeing. The MCAS system and its software was in a substantially similar condition to its original condition at delivery to Boeing.

201.     Defects in the MCAS system and its software were a legal cause of the subject air crash, and the defects made the subject aircraft unreasonably dangerous for travel.

202.     As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **Decedent** suffered pre-impact injury and death, including fear of impending and imminent death, and **Plaintiffs** have been damaged by the death of **Decedent**.

203.     As a direct and legal result of the wrongful acts and/or omissions of Defendant **Collins**, hereinabove alleged, **Plaintiffs** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **Decedent**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

204.     As a further direct and legal result of the wrongful conduct of **Collins** set forth above, **Plaintiffs** incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

205.     As a further direct and legal result of the wrongful conduct of **Collins** set forth above, **Plaintiffs** suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

Case: 1:19-cv-04076 Document #: 1 Filed: 06/18/19 Page 45 of 45 PageID #:45

WHEREFORE, Plaintiffs request judgment against Defendant COLLINS AEROSPACE for compensatory damages, punitive damages, costs, fees, and all other awards deemed just. The plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

/s/ Joseph A. Power, Jr.
*Attorneys for Plaintiff*
Joseph A. Power, Jr.
Kathryn L. Conway
Jonathan M. Thomas
James I. Power
POWER ROGERS AND SMITH, LLP
70 West Madison Street, 55th Floor
Chicago, IL 60602
Tel: (312) 236-9381
JoePower@prslaw.com
KConway@prslaw.com

Rick Friedman
Alisa Brodkowitz
Rachel Luke
FRIEDMAN RUBIN
1126 Highland Ave.
Bremerton, WA 98337
Tel: (206) 501-4446

Shakespear Feyissa
Law Offices of Shakespear Feyissa
1001 4th Ave.
Safeco Plaza Suite 3200
Seattle, WA 98154
*Pro Hac Vice Pending*

# Exhibit D

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

| | |
|---|---|
| JABOMA BANDA OCHUODHO PHILIP AKEYO, ALLAN ONYANGO JABOMA and GEORGE OMONDI, as personal representatives of the Estate of ISABELLA BERYL ACHIENG JABOMA, deceased,<br><br>Plaintiffs,<br><br>v.<br><br>THE BOEING COMPANY, a Delaware corporation,<br><br>Defendant. | No. ________________<br><br>Removed from<br>Circuit Court of Cook County,<br>County Department, Law Division<br>No. 2019 L 04446 |

# NOTICE OF REMOVAL

Defendant The Boeing Company ("Boeing") hereby removes this civil case from the Circuit Court of Cook County, Illinois, to the United States District Court for the Northern District of Illinois, Eastern Division, under 28 U.S.C. §§ 1369, 1441, and 1446. This case arises from the crash of Ethiopian Airlines Flight 302 on March 10, 2019, which resulted in the death of all 157 people on board. This Court has original jurisdiction, and removal is proper, under the Multiparty, Multiforum Trial Jurisdiction Act of 2002, 28 U.S.C. § 1369. Removal is timely, as Boeing was served with the Complaint on May 22, 2019, and this Notice of Removal is being filed within the 30-day period under 28 U.S.C. § 1446.

## I. INTRODUCTION AND BACKGROUND

### A. The Accident

This lawsuit arises from the crash of a Boeing 737-8 aircraft near Ejere, Ethiopia on March 10, 2019, in which 157 passengers and crew died. *See* Compl. ¶¶ 1, 3–4, 6. The aircraft was being operated as a commercial flight by Ethiopian Airlines and departed from Addis Ababa, Ethiopia, bound for Nairobi, Kenya. *Id.* ¶ 2. This crash is the subject of an ongoing investigation by Ethiopia's Aircraft Accident Investigation Bureau ("AIB"), which released its Preliminary Report

on April 4, 2019. A copy of the Preliminary Report is attached as **Exhibit A**. A final report will be issued at the conclusion of the investigation.

**B. The Complaint**

Plaintiffs filed their Complaint on April 25, 2019, in the Circuit Court of Cook County, Illinois, County Department, Law Division, as Case No. 2019L04446. A copy of the Complaint is attached as **Exhibit B**. Plaintiffs bring a wrongful death action against Boeing both on their own behalf and on behalf of the estate of their decedent, Isabella Beryl Achieng Jaboma (the "Decedent"), a passenger on Ethiopian Airlines Flight 302. Compl. ¶¶ 50–53. The Decedent was a resident of Kenya. *Id.* ¶ 46. Plaintiffs assert claims of negligence, wrongful death, breach of warranty, strict products liability, failure to warn, and civil conspiracy against Boeing. *Id.* at pp. 38–51 (Counts I–VI).

## II. GROUNDS FOR REMOVAL

A civil action brought in state court is removable if the district court has original jurisdiction, except in certain diversity cases. 28 U.S.C. § 1441(a). This Court has at least one basis of original jurisdiction here, as this action falls under the original jurisdiction created by the Multiparty, Multiforum Trial Jurisdiction Act of 2002 ("MMTJA"). 28 U.S.C. § 1369. The MMTJA created "a mechanism whereby litigation stemming from one major disaster could easily be consolidated in one federal court for discovery and trial." *Passa v. Derderian*, 308 F. Supp. 2d 43, 53 (D.R.I. 2004); *see also Pettitt v. The Boeing Co.*, 606 F.3d 340, 341 (7th Cir. 2010) ("A primary purpose of the MMTJA was to consolidate multiple cases arising out of a single disaster."). "Major airline disasters" such as Ethiopian Airlines Flight 302 are the very type of accident that were intended to be the subject of original federal jurisdiction under the MMTJA. *Passa*, 308 F. Supp. 2d at 54; *see also Pettitt*, 606 F.3d at 341–42 (the MMTJA provided a basis for Boeing to remove to federal court plaintiffs' wrongful death and survival actions arising out of an aircraft crash in Cameroon).

Case: 1:19-cv-04106 Document #: 1 Filed: 06/19/19 Page 3 of 6 PageID #:3

The MMTJA grants original jurisdiction to district courts where: (1) the claim arises from a single accident in which at least 75 natural persons died; (2) there is minimal diversity between the parties; and (3) one defendant resides in a State other than the location where the accident occurred. 28 U.S.C. § 1369(a). The statute further specifies circumstances in which the court is required to abstain from exercising its jurisdiction. *See id.* § 1369(b). There is no amount in controversy requirement, and a case is removable under the MMTJA even if a defendant is a citizen of the state where the action is brought. *See* 28 U.S.C. §§ 1369, 1441(e)(1). All requirements under the MMTJA are met, and this action is removable. *See* 28 U.S.C. §§ 1369(a), 1441(a), and 1441(e)(1)(A).

First, this action arises from a single accident in which at least 75 persons died at a discrete location. *See* 28 U.S.C. § 1369(a). The crash of Ethiopian Airlines Flight 302 near Ejere, Ethiopia resulted in the deaths of all 157 persons on board. *See* Compl. ¶ 6; *see also* Ex. A at 5, 9.

Second, there is minimal diversity. Minimal diversity exists if "any party is a citizen of a State and any adverse party is a citizen of another State, a citizen or subject of a foreign state, or a foreign state as defined in section 1603(a) of this title." 28 U.S.C. §§ 1369(c)(1). Boeing is a Delaware corporation with its principal place of business in Illinois, Compl. ¶ 54, and thus is a citizen of those two states. *See* 28 U.S.C. § 1369(c)(2). Accordingly, if the plaintiff is not a citizen of Delaware or Illinois, minimal diversity is met. Because this case involves claims asserting the wrongful death of the Plaintiffs' Decedent, the relevant inquiry is the citizenship of the Decedent. 28 U.S.C. § 1332(c)(2); *see generally*, *Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 93–94 (2005). The Decedent is a citizen of Kenya.[1] Minimal diversity thus exists.

[1] The Complaint alleges that the Decedent was a resident of Nairobi, Kenya. Compl. ¶ 46. It further alleges that she received her undergraduate degree from a university in Kenya, *id.*, and that she had been employed with a not-for-profit organization headquartered in Kenya. *Id.* ¶ 48. These allegations provide a sufficient basis to infer that the Decedent—a Kenyan resident educated and employed in that country—was not a citizen of a U.S. state, including of Illinois or Delaware. *See, e.g.*, *Nat'l Farmers Union Prop. & Cas. Co. v. Fisher*, 284 F.2d 421, 422–23 (8th Cir. 1960). Based on the totality of the allegations in the Complaint, coupled with media reports mentioning the Decedent, Boeing alleges that the Decedent was a citizen of Kenya.

Third, a "substantial part of the accident" took place at a location other than where Boeing resides. 28 U.S.C. § 1369(a)(1). The accident occurred in Ethiopia. Compl. at pp. 2–3; *see also* Ex. A at 9, 23–24. Boeing is not incorporated in Ethiopia, nor does it have its principal place of business there. Compl. ¶ 54. Therefore, a "substantial part of the accident" took place at a location other than where Boeing resides. 28 U.S.C. § 1369(a)(1).

Finally, there is no basis for abstention. Under 28 U.S.C. § 1369(b), the district court shall abstain if (1) "the substantial majority of all plaintiffs are citizens of a single State of which the primary defendants are also citizens," and (2) "the claims asserted will be governed primarily by the laws of that State." 28 U.S.C. § 1369(b). The first requirement is not met here. As stated above, the sole Decedent in this case is a Kenyan resident, who is completely diverse from Boeing.

## III. BOEING HAS SATISFIED THE OTHER REQUIREMENTS FOR REMOVAL

The undersigned accepted service of the Complaint on behalf of Boeing on May 22, 2019. This notice is filed within thirty (30) days of such receipt as required by 28 U.S.C. § 1446(b).

In accordance with 28 U.S.C. § 1446(a), copies of all of the papers and pleadings on file with the Circuit Court of Cook County, Illinois are attached at **Exhibit C**.

The venue for this removed action is proper because this Court is the United States District Court for the district and division embracing the place where the removed action was pending. *See* 28 U.S.C. § 1441(a); 28 U.S.C. § 93(a)(1).

In accordance with 28 U.S.C. § 1446(d), Boeing is today serving this Notice of Removal on Plaintiffs and will file a copy of this Notice with the Clerk of the Circuit Court of Cook County, Illinois.

## IV. CONCLUSION

WHEREFORE, Boeing hereby removes this action from the Circuit Court of Cook County, Illinois, to this Court.

Case: 1:19-cv-04106 Document #: 1 Filed: 06/19/19 Page 5 of 6 PageID #:5

DATED: June 19, 2019

**THE BOEING COMPANY**

By: /s/ Jon R. Buck
*One of its Attorneys*

Jon R. Buck
JBuck@perkinscoie.com
**Perkins Coie LLP**
131 S. Dearborn, Suite 1700
Chicago, Illinois 60603-5559
Phone: (312) 324-8400
Fax: (312) 324-9400

Bruce D. Campbell
BCampbell@perkinscoie.com
Michael Scoville
MScoville@perkinscoie.com
Christopher M. Ledford
CLedford@perkinscoie.com
**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000

Case: 1:19-cv-04106 Document #: 1 Filed: 06/19/19 Page 6 of 6 PageID #:6

**CERTIFICATE OF SERVICE**

I, Jon R. Buck, certify that on June 19, 2019, I electronically filed the foregoing ***NOTICE OF REMOVAL*** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to attorneys of record, and served a copy by email on the following counsel of record.

Candice Diah, Esq.
Willie E. Gary, Esq.
Larry A. Strauss, Esq.
LAW OFFICES OF GARY, WILLIAMS, PARENTI, WATSON & GARY, PLLC
221 S.E. Osceola Street
Stuart, FL 34994
T: (772) 283-8260
cad@williegary.com
larry@williegary.com
dpk@williegary.com
vs@williegary.com

Chuck Chionuma, Esq.
CHIONUMA LAW FIRM, LLC
3100 Broadway Blvd., Suite 602
Kansas City, MO 64111
chuck@chionuma.com

I certify under penalty of perjury that the foregoing is true and correct.

DATED this 19th day of June 2019.

/s/ Jon R. Buck
PERKINS COIE LLP
131 South Dearborn Street, Suite No. 1700
Chicago, Illinois 60603-5559
Tel: (312) 324-8400
Fax: (312) 324-9400

12-Person Jury

Civil Action Cover Sheet - Case Initiation (05/27/16) CCL 0520

FILED
4/25/2019 11:27 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2019L004446

FILED DATE: 4/25/2019 11:27 AM 2019L004446

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
# COUNTY DEPARTMENT, LAW DIVISION

JABOMA BANDA OCHUODHO PHILIP AKEYO, ALLAN ONYANGO JABOMA and GEORGE OMONDI, as personal representatives of the Estate of ISABELLA BERYL ACHIENG JABOMA, deceased

v.

THE BOEING COMPANY, a Delaware corporation

4818406

No. 2019L004446

(FILE STAMP)

## CIVIL ACTION COVER SHEET - CASE INITIATION

A Civil Action Cover Sheet - Case Initiation shall be filed with the complaint in all civil actions. The information contained herein is for administrative purposes only and cannot be introduced into evidence. Please check the box in front of the appropriate case type which best characterizes your action. Only one (1) case type may be checked with this cover sheet.

Jury Demand ☒ Yes ☐ No

**PERSONAL INJURY/WRONGFUL DEATH**

CASE TYPES:

- ☐ 027 Motor Vehicle
- ☐ 040 Medical Malpractice
- ☐ 047 Asbestos
- ☐ 048 Dram Shop
- ☐ 049 Product Liability
- ☐ 051 Construction Injuries (including Structural Work Act, Road Construction Injuries Act and negligence)
- ☐ 052 Railroad/FELA
- ☐ 053 Pediatric Lead Exposure
- ☒ 061 Other Personal Injury/Wrongful Death
- ☐ 063 Intentional Tort
- ☐ 064 Miscellaneous Statutory Action (Please Specify Below**)
- ☐ 065 Premises Liability
- ☐ 078 Fen-phen/Redux Litigation
- ☐ 199 Silicone Implant

**TAX & MISCELLANEOUS REMEDIES**

CASE TYPES:

- ☐ 007 Confessions of Judgment
- ☐ 008 Replevin
- ☐ 009 Tax
- ☐ 015 Condemnation
- ☐ 017 Detinue
- ☐ 029 Unemployment Compensation
- ☐ 031 Foreign Transcript
- ☐ 036 Administrative Review Action
- ☐ 085 Petition to Register Foreign Judgment
- ☐ 099 All Other Extraordinary Remedies

By: Candice Diah, Esq.
(Attorney) (Pro Se)

**COMMERCIAL LITIGATION**

CASE TYPES:

- ☐ 002 Breach of Contract
- ☐ 070 Professional Malpractice (other than legal or medical)
- ☐ 071 Fraud (other than legal or medical)
- ☐ 072 Consumer Fraud
- ☐ 073 Breach of Warranty
- ☐ 074 Statutory Action (Please specify below.**)
- ☐ 075 Other Commercial Litigation (Please specify below.**)
- ☐ 076 Retaliatory Discharge

**OTHER ACTIONS**

CASE TYPES:

- ☐ 062 Property Damage
- ☐ 066 Legal Malpractice
- ☐ 077 Libel/Slander
- ☐ 079 Petition for Qualified Orders
- ☐ 084 Petition to Issue Subpoena
- ☐ 100 Petition for Discovery

** ______

Primary Email: cad@williegary.com

Secondary Email: larry@williegary.com

Tertiary Email: dpk@williegary.com

**Pro Se Only:** ☐ I have read and agree to the terms of the *Clerk's Office Electronic Notice Policy* and choose to opt in to electronic notice form the **Clerk's Office** for this case at this email address: ______

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 3 of 55 PageID #:43

FILED DATE: 4/25/2019 11:27 AM 2019L004446

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT - LAW DIVISION

JABOMA BANDA OCHUODHO PHILIP AKEYO, ALLAN ONYANGO JABOMA and GEORGE OMONDI, *as personal representatives of the Estate of* ISABELLA BERYL ACHIENG JABOMA, *deceased*

Plaintiffs,

v.

THE BOEING COMPANY, a Delaware corporation

Defendant.

CASE NO. ____________

Judge ____________

JURY TRIAL DEMANDED

**COMPLAINT**

Plaintiffs JABOMA BANDA OCHUODHO PHILIP AKEYO ("**Akeyo**"), ALLAN ONYANGO JABOMA ("**Jaboma**") and GEORGE OMONDI ("**Omondi**"), as personal representatives of the Estate of ISABELLA BERYL ACHIENG JABOMA, deceased (collectively, "**Plaintiffs**"), bring this action for damages on behalf of their beloved ISABELLA BERYL ACHIENG JABOMA ("**Bella**"), her estate, heirs, and survivors, against Defendant THE BOEING COMPANY ("**Boeing**") and state:

**GENERAL ALLEGATIONS**

**A. Overview**

1. This action arises from the horrific crash of Ethiopian Airlines Flight ET302 ("**Flight 302**") on March 10, 2019 ("**Crash**").

2. Flight 302 was flying from Addis Ababa, Ethiopia, to Nairobi, Kenya.

FILED DATE: 4/25/2019 11:27 AM 2019L004446

3. Flight 302 was a new Boeing 737 Max 8 commercial aircraft ("**737 Max**") delivered to Ethiopian Airlines November 15, 2018.

4. The 737 Max is manufactured by Defendant Boeing.

5. It takes Boeing nine days to build a 737 Max.[1]

6. It took just six minutes for Flight 302 to take off, then crash nose first to the ground, killing all 157 passengers and crew on board.[2]

7. During those six excruciating minutes, the Captain and First Officer fought a losing battle with Flight 302's automatic flight control system to trim Flight 302 and steer the aircraft away from the ground. The pilots repeatedly tried to make Flight 302 climb, while the flight control system repeatedly caused the plane to dive.[3]

8. Despite their efforts, the flight control system ultimately steered the aircraft into the ground at a 40 degree angle.[4]

9. According to witness Gadisa Benti, Flight 302 "was hovering, fire was following its tail, then it tried to lift its nose. When it passed over our house, the nose pointed down and the tail raised up. It went straight to the ground with its nose, it then exploded."[5]

10. The preliminary crash investigation reveals the plane's airspeed indicator read 500 knots – about 575 miles per hour – right before the plane hit the ground.[6]

---

[1] From the day the giant, hollow, tube-like fuselage arrives by train at Boeing's plant in Renton, Washington, following its manufacture in Wichita, Kansas, crews work a giant assembly line which ultimately rolls the plane out for flight testing in nine days. "How Boeing builds a 737 in just 9 days," *Wired*, Sept. 27, 2016 at https://www.wired.com/2016/09/boeing-builds-737-just-nine-days/.

[2] "Aircraft Accident Investigation Bureau Preliminary Report," Federal Democratic Republic of Ethiopia Ministry of Transport Aircraft Accident Investigation Bureau, April 4, 2019 at page 9 (hereinafter, "**Report**," attached hereto and incorporated herein as "**Exhibit A**").

[3] Report at pages 9-12.

[4] Report at page 12.

[5] "Smoke and debris poured from Ethiopian Airlines' Boeing 737, scattering cattle as it plunged to its doom, witnesses say," *South China Morning Post* and Reuters, March 12, 2019, https://www.scmp.com/news/world/africa/article/2189609/smoke-and-debris-poured-ethiopian-airways-737-scattering-cattle-it

[6] Report at page 12.

FILED DATE: 4/25/2019 11:27 AM 2019L004446

11. The Crash pulverized Flight 302, leaving a crater 32 feet deep, 92 feet wide and 131 feet long at the crash site near Ejere, Ethiopia, about 32 miles southeast of Flight 302's takeoff from Addis Ababa Bole International Airport. The engines were buried at the crater's bottom.[7]

The scale of Ethiopian Airlines Flight 302's crash site – and the level of penetration into the ground – can be seen above. Below, workers have been pouring over the site in a bid to locate bodies.[8]

9

[7] Report at pages 18 and 23.

[8] https://www.dailymail.co.uk/news/article-6797727/Holiday-giant-TUI-refuses-ground-fleet-Boeing-737-Max-8-planes.html

[9] https://abcnews.go.com/International/china-ethiopia-cayman-islands-ground-boeing-737-max/story?id=61600532

FILED DATE: 4/25/2019 11:27 AM 2019L004446

11

**BELOW**: An excavator works the Flight 302 crash site near Addis Ababa, capital of Ethiopia, March 10, 2019. (Xinhua/Polaris)[10]

**LEFT**: Pieces of the wreckage of Flight 302 piled at the crash site near Bishoftu, Ethiopia, on March 11, 2019. Photos: Reuters[12]

**RIGHT**: Relatives react March 13, 2019 at the scene where the Ethiopian Airlines Boeing 737 Max 8 crashed shortly after takeoff, killing all 157 on board, near Bishoftu, south of Addis Ababa, in Ethiopia. (Photo: Mulugeta Ayene/AP).[13]

[10] https://abcnews.go.com/International/china-ethiopia-cayman-islands-ground-boeing-737-max/story?id=61600532

[11] https://www.dailymail.co.uk/news/article-6797727/Holiday-giant-TUI-refuses-ground-fleet-Boeing-737-Max-8-planes.html

[12] https://www.reuters.com/news/picture/ethiopian-airlines-flight-crashes-idUSRTX6QKM1

[13] https://news.yahoo.com/photos-ethiopia-plane-crash-112135924.html

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 7 of 55 PageID #:47

FILED DATE: 4/25/2019 11:27 AM 2019L004446

12. The Crash came less than five months after Lion Air Flight JT610 ("**Flight 610**") – another Boeing 737-8 Max – crashed into the Java Sea off the coast of Indonesia on October 29, 2018, killing all 189 passengers and crew onboard.

13. Investigation into both crashes is ongoing, but the preliminary crash reports and corresponding analysis thus far point to what investigators believe is the likely cause: a combination of a defective aircraft flight control system related to flight controllability, inadequate instruction in its use, malfunctioning sensors, and defective software.

14. The defective flight control and other potential systems on the 737 Max arose out of Boeing's desire to boost the fuel efficiency of its existing 737 Next Generation ("**737NG**") model in order to make it more competitive against rival Airbus's A320 model. Production of the 737NG began in 1991, with Southwest Airlines the first carrier to take delivery in 1997.

15. Instead of undertaking the costly and lengthy process of designing and building a new plane from the ground up, in 2011 Boeing announced plans to adapt its 737NG model and equip it with larger and more fuel-efficient engines.

16. The approach is ironic, given a Boeing executive previously scoffed at the viability of such a technique when rival Airbus announced its intent to do the same thing in order to make its planes more competitive against Boeing's 737NG.[14]

17. Adding beefier engines had a domino effect, however: the added weight and new positioning of those engines shifted the plane's center of gravity forward, which increased the potential for the nose to pitch up after takeoff. So additional changes to the 737 Max were needed to compensate for the aircraft's new handling and other characteristics.

---

[14] "Boeing Was 'Go, Go, Go' to Beat Airbus With the 737 Max," *The New York Times*, March 23, 2019 at https://www.nytimes.com/2019/03/23/business/boeing-737-max-crash.html

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 8 of 55 PageID #:48

FILED DATE: 4/25/2019 11:27 AM 2019L004446

18. One of those changes involved a modified automatic flight control system with new software intended to counterbalance the impact the new engines had on the 737's handling and flight dynamics.

19. Boeing dubbed the new system the "Maneuvering Characteristics Augmentation System" ("**MCAS**").

20. The way in which Boeing designed and certified the MCAS flight control system allowed Boeing to deliver a 737 Max 8 to its first customer, Malaysian carrier Malindo Air, on May 6, 2017 – less than six years following the fourth-generation 737's formal launch on August 30, 2011. Malindo Air placed the aircraft into service on May 22, 2017.[15]

21. Boeing maintained the illusion that little to no new pilot training or procedures were necessary because the 737 was essentially the same plane – just in a more fuel-efficient form.

22. The promise that the 737 Max needed no substantive new training was an attractive proposition for airlines, as any time needed to train pilots on a new aircraft was time pilots are not flying passengers – and thus not generating revenue for their airline.

23. When the 737 Max debuted in 2017, flight simulators for it were not even available. In a March 16, 2019 article about the adequacy of pilot training in the use of the 737 Max, *The New York Times* reported many pilots with 737 Max experience actually learned about the plane via a two-hour training course *on an iPad*:

> When United was set to take delivery of the 737 Max in 2017, a group of pilots put together training materials without ever flying the aircraft or a full simulator. James LaRosa, a 737 captain and union official who helped lead the training group, said he flew to a Boeing training center in Seattle to learn about the new plane on a mock cockpit that didn't move like typical simulators.

[15] "Malindo operates world's first 737 Max flight," *Flight Global*, May 22, 2017 at https://www.flightglobal.com/news/articles/malindo-operates-worlds-first-737-max-flight-437454/

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 9 of 55 PageID #:49

FILED DATE: 4/25/2019 11:27 AM 2019L004446

> In addition to a one-hour iPad training course from Boeing, he and colleagues used their experience in the cockpit to create a 13-page handbook on the differences between the Max and its predecessor, including changes to displays and the engines. The training materials did not mention the new software that later became a focus of the Lion Air crash investigation.
>
> "When you find out that there are systems on it that are wildly different that affect the performance of the aircraft, having a simulator is part of a safety culture," said Dennis Tajer, a spokesman for the American Airlines pilot union and a 737 pilot. "It can be the difference between a safe, recoverable flight and one that makes the newspapers."[16]

24. Mr. Tajer's words proved prophetic: Boeing's reckless choice in skimping on pilot training and the resulting deaths of 346 passengers and crew aboard two downed 737 Maxes have certainly proven to each be a flight "that makes the newspapers."

25. Blinded by the focus on sales and profits, Boeing failed to take the time necessary to maximize passenger safety by adequately training pilots in the 737 Max's new MCAS automated flight-control system before bringing the 737 Max to market in 2017 and continuing thereafter.

26. Until the crashes of Flight 302 and Flight 610, Boeing gave little thought to a need for such training, as reported in the March 16, 2019 article in *The New York Times* previously mentioned herein.

27. Boeing was content with its marketing strategy of portraying the 737 Max as causing virtually no downtime because additional pilot training was unnecessary.

28. Boeing's plan took off, and the 737 Max has become its most popular plane. About 5,000 have been sold – substantially increasing Boeing's sales and profits.

[16] "After 2 Crashes of New Boeing Jet, Pilot Training Now a Focus," *The New York Times*, March 16, 2019 at https://www.nytimes.com/2019/03/16/business/boeing-max-flight-simulator-ethiopia-lion-air.html

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 10 of 55 PageID #:50

FILED DATE: 4/25/2019 11:27 AM 2019L004446

29. According to Boeing, there is a 737 Max backlog of 4,648 planes yet to be made.[17] Prior to Boeing's April 5, 2019 announcement that it would be slowing production from 52 to 42 737 Maxes a month, Boeing was on target to eventually reach production of 57 Maxes a month in 2019.[18]

30. Even at 57 Maxes a month, however, it would take nearly seven years for workers at its Renton, Washington, manufacturing plant to build enough 737 Maxes to meet that backlog. Even if orders slow due to the grounding, new orders will eventually continue to be made, which will maintain or potentially increase the backlog.

31. A week after the Crash, Boeing continued its insistence the plane was safe and should not be grounded – despite two deadly crashes in less than five months and the majority of nations around the world having already ordered the 737 Max grounded in their respective countries.[19]

32. The United States was the last country to ground the jets – an order which came from President Donald Trump on March 13, 2019 only after he received a request to do so via a phone call from Boeing CEO Dennis A. Muilenburg earlier that day.[20]

33. The day before, Muilenburg had insisted the 737 Max should remain in service.[21]

34. Boeing also failed to recommend its customers ground their 737 Maxes – or at the very least, disable the subject MCAS flight control system – following the Lion Air crash five

---

[17] *See* https://www.boeing.com/commercial/?cm_re=March_2015-_-Roadblock-_-Orders+%26+Deliveries/#/orders-deliveries

[18] "Boeing Cuts 737 Jet Output 19% as Global Groundings Drain Cash," *Bloomberg News*, April 5, 2019 at https://www.bloomberg.com/news/articles/2019-04-05/boeing-to-cut-737-production-by-19-as-crash-halts-deliveries

[19] "After 2 Crashes of New Boeing Jet, Pilot Training Now a Focus," *Id.* at footnote 6.

[20] *Id.*

[21] *Id.*

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 11 of 55 PageID #:51

FILED DATE: 4/25/2019 11:27 AM 2019L004446

months before the crash of Flight 302.

35. Had Boeing taken such steps, Bella and 156 others would still be alive because they would not have been on a 737 Max.

36. Of course, Boeing had substantial incentive to avoid grounding its 737 Maxes: Analysts forecast Boeing faces about $3.6 billion in quarterly losses as a result of grounding.[22]

37. Grounding also caused Boeing to cut production of its 737 jetliner for the first time since the September 11, 2001 terrorist attacks.[23]

38. Lost confidence in the 737 Max has also lead to cancelled orders. For example, on March 14, 2019, Bloomberg reported Indonesia's Lion Air was moving to drop a $22 billion order for the 737 Max in favor of one for the competing Airbus model.[24]

39. On March 25, 2019, China elected to buy 290 Airbus A320 planes and 10 of the larger A350s rather than go with Boeing's products – a contract worth $35 billion.[25]

40. Delaying grounding of the 737 Max as long as possible was obviously in Boeing's best financial interests. Had Boeing acted five months earlier following the October 2018 Lion Air crash, its financial losses may have been substantially higher – but the loss of 157 people aboard Flight 302 would have been avoided.

---

[22] "Boeing Cuts 737 Jet Output 19% as Global Groundings Drain Cash," *Bloomberg News*, April 5, 2019 at https://www.bloomberg.com/news/articles/2019-04-05/boeing-to-cut-737-production-by-19-as-crash-halts-deliveries

[23] *Id.*

[24] "Boeing counts cost of bestselling jet's global grounding over safety concerns," *South China Morning Post*, March 14, 2019 at https://www.scmp.com/news/world/united-states-canada/article/3001665/737-max-boeing-counts-cost-bestselling-jets-global

[25] "Airbus Secures $35 Billion China Deal in New Blow to Boeing," *Bloomberg News*, March 25, 2019 at https://www.bloomberg.com/news/articles/2019-03-25/airbus-is-said-to-seal-long-awaited-aircraft-order-from-china

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 12 of 55 PageID #:52

FILED DATE: 4/25/2019 11:27 AM 2019L004446

**B. Jurisdiction and venue**

41. Plaintiffs are the personal representatives and/or special administrators of the Estate of Isabella Beryl Achieng Jaboma, deceased, and bring this action pursuant to the Illinois Wrongful Death Act, 740 ILCS 180/1 *et seq.*, or such other law as the Court determines to be applicable under the circumstances of this case.

42. This Court has subject matter jurisdiction over all justiciable controversies.

43. This Court has personal jurisdiction over defendant Boeing because Boeing has its global headquarters in, and is thus a resident corporation of, the judicial district of Cook County ("**District**") and Illinois.

44. Venue is similarly proper within this District because defendant Boeing has its global headquarters in, and is thus a resident corporation of, this District and Illinois.

45. Additionally, a substantial part of the events or omissions giving rise to the claim occurred in this District: Key decisions were made by Boeing's corporate leadership in Chicago, including those decisions regarding the development of the 737 Max, certification of the aircraft, disclosures to airlines, and Boeing's actions and response in the wake of both the Lion Air Flight JT 610 and Flight 302 crashes.

**C. The parties**

46. Decedent BELLA was a passenger on board Flight 302. A resident of Nairobi, Kenya, the 32-year-old graduated *summa cum laude* from the University of Eastern Africa, Baraton.

47. Bella was the primary caregiver to her younger brother, who has Down syndrome and lived with her.

48. After volunteering at Kenya Hope for Cancer Kids for four years, Bella began a

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 13 of 55 PageID #:53

FILED DATE: 4/25/2019 11:27 AM 2019L004446

full-time position with the Rural Agency for Community Development and Assistance (RACIDA) just four months before the Crash2. Headquartered in Kenya, the regional non-profit organization provides humanitarian assistance across the Horn of Africa to communities suffering from the effects of natural and manmade hazards caused by droughts, floods, and conflict.[26]

49. Bella was returning to Nairobi aboard Flight 302 following attendance at a conference in Cairo as part of her new position with RACIDA.

50. Plaintiffs AKEYO and JABOMA are Bella's father and brother, respectively, and are jointly the personal representatives on her behalf and the behalf of her estate, heirs, survivors, and beneficiaries.

51. Bella's parents are residents of Homa-Bay County, Kenya. Bella was their only daughter and sister, respectively.

52. Plaintiff GEORGE OMONDI is Bella's cousin, and a U.S. citizen who lives in Tuckahoe, NY.

53. Plaintiffs also bring this claim on behalf of Bella's mother Abigael Adhiambo Jaboma and two other brothers, Gideon and Felix Jaboma.

54. Defendant BOEING is registered with the Illinois Secretary of State as a Delaware corporation with its principal place of business at its corporate headquarters in Chicago, Illinois. As such, all or substantially all of the relevant decisions and conduct giving rise to this action were made, authorized, ratified and/or approved from and in this District.

55. Boeing is the predominant designer and manufacturer of commercial aircraft in the world. Its products include the 737 Max 8 aircraft flown as Flight 302 and Flight 610.

56. Non-party ETHIOPIAN AIRLINES, is a foreign corporation domiciled in and

---

[26] Learn more about RACIDA or donate in Bella's name at www.racida.org.

FILED DATE: 4/25/2019 11:27 AM 2019L004446

existing under the laws of Ethiopia. It is 100 percent owned by the Ethiopian government. Ethiopian Airlines is, and at all times relevant was, a common carrier for hire in the business of soliciting and/or transporting passengers for regularly-scheduled flights in and out of Chicago, Illinois, and on to Ethiopia.

57. Ethiopian Airlines operates within this District and derives substantial revenue in this District through its own web site, various travel agents acting on its behalf within Illinois, and/or third-party travel web sites which have contacts with Illinois – all of whom are compensated by Ethiopian Airlines.

58. By virtue of its membership in the Star Alliance[27] and corresponding partnership with U.S.-based United Airlines, Ethiopian Airlines operates flights from the Chicago Ohare to Washington Dulles to Addis Ababa international airports. Such travel can be booked directly from Ethiopian Airlines via its web site, www.ethiopianairlines.com, as reflected below:

[27] "Alliance members come together to offer smooth connections across a vast global network." *See* https://www.staralliance.com/en/about

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 15 of 55 PageID #:55

FILED DATE: 4/25/2019 11:27 AM 2019L004446

Sample itinerary from Chicago to Addis Ababa via www.ethiopianairlines.com on April 11, 2019.

59. Ethiopian Airlines' substantial contact with this District and residents of Illinois is sufficient for it to be subjected to the jurisdiction of this District's courts if necessary.

60. Non-party COLLINS AEROSPACE (formerly known as separate entities Rockwell Collins and UTC Aerospace Systems) operates as a subsidiary of United Technologies Corp. Collins Aerospace has a substantial presence in Illinois by virtue of a manufacturing and research facility in Winnebago County, Illinois, which was formerly operated as UTC Aerospace Systems.

61. Upon information and belief, ROSEMOUNT AEROSPACE, INC., is a predecessor entity which was ultimately acquired by UTC Aerospace Systems.

62. Like Collins Aerospace, Rosemount was in the business of designing, manufacturing, assembling, distributing, marketing and supplying various types of aviation electronics.

63. In particular as it relates to Flight 302, upon information and belief, Rosemount manufactured and designed the sensors used in Boeing's 737 Max 8, including the particular angle of attack sensor that failed at the time of the Crash.

## D. Lion Air Flight 610 also crashed after pilots experienced a flight control issue

64. Shortly after Flight 610 departed Jakarta, Indonesia, on October 29, 2018, the pilots complained of flight control issues as the plane repeatedly pitched down despite the pilots' efforts to climb. The pilots reported unreliable airspeed and altitude readings. In the audio recordings from the cockpit, the rattle of a stick shaker can be heard, a device used to alert pilots of a potential stall, which can occur when a plane is ascends too quickly.

FILED DATE: 4/25/2019 11:27 AM 2019L004446

65. The pilots requested permission to return to Jakarta, which was granted, but the plane did not return. Satellite data showed the plane rising and falling repeatedly – more than 20 times – as the pilots struggled to wrest control back from the automated systems. Within just 12 minutes of taking off, Flight 610 crashed into the Java Sea, killing all 189 people onboard.

66. The cockpit voice recording recovered from the wreckage revealed that while the plane danced perilously across the sky, one of the pilots flipped through a technical manual in an attempt to identify the problem while the other pilot prayed.[28] The pilots appeared unaware of the MCAS and its potential role in overriding their manual controls.[29]

67. Preliminary analysis of the crash and data obtained from the plane's flight data recorder ("**FDR**") shows that one of the AOA sensors produced a reading that was at least 20 degrees different from the other AOA sensor as the plane took off and began its climb. This strongly suggests that a malfunction in the AOA sensor feeding information to the MCAS triggered an unwarranted activation of the MCAS system at low altitudes, causing the plane's nose to pitch down.

68. Following the tragic crash of Lion Air Flight 610, Boeing knew or had reason to suspect that a malfunction in the AOA sensor and MCAS may have been responsible.

69. The flight path of Flight 610 suggests that the malfunctioning AOA sensor and nose-down commands were a factor in the crash:

[28] "Ethiopian Airlines Had a Max 8 Simulator, but Pilot on Doomed Flight Didn't Receive Training On It," *The New York Times*, March 20, 2019 at https://www.nytimes.com/2019/03/20/world/africa/ethiopian-airlines-boeing.html

[29] "Confusion, Then Prayer, in Cockpit of Doomed Lion Air Jet," *The New York Times*, March 20, 2019 at https://www.nytimes.com/2019/03/20/world/asia/lion-air-crash-boeing.html

FILED DATE: 4/25/2019 11:27 AM 2019L004446

**E. <u>Crash data for Ethiopian Airlines Flight 302 and Lion Air Flight 610 is similar</u>**

70. The similarity between Flight 302 and Flight 610 crash data released to date suggests that both aircraft had substantially similar experiences prior to crashing:

a. Both had an erroneous angle-of-attack ("**<u>AOA</u>**") reading and corresponding activation of the MCAS;

b. The jack screws from the horizontal tail stabilizer were recovered from both crashes and both showed that the planes had been oriented in a dive with the nose pointing down;

c. Both pilots reported flight control issues and could not maintain a steady altitude or speed; and

d. Both had similarly erratic flight paths before crashing.

71. The following side-by-side comparison reveals the striking similarities between the two doomed aircraft, both in changes in altitude and vertical speed:



FILED DATE: 4/25/2019 11:27 AM 2019L004446

## F. Boeing rushed the 737 Max to production to compete with rival Airbus

72. Boeing's main competitor in the commercial aviation industry is Airbus, a European consortium which had been increasing market share for decades and eating into Boeing's sales.

73. When Airbus launched its more fuel-efficient airliner, the A320neo, Boeing initially dismissed its anticipated appeal with airlines.

74. The chief executive of Boeing's commercial airplanes division, James F. Albaugh, told employees at a meeting in January 2011 that Airbus' decision to redesign its existing aircraft with larger engines would be "a design change that will ripple through the airplane" and present significant challenges.[30]

[30] "Boeing Was 'Go, Go, Go' to Beat Airbus With the 737 Max," *The New York Times*, March 23, 2019 at

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 19 of 55 PageID #:59

FILED DATE: 4/25/2019 11:27 AM 2019L004446

75. Boeing's tune changed when it learned that some of its key customers, notably American Airlines, would be placing orders with Airbus for their fuel-efficient aircraft. This ratcheted up pressure on Boeing to respond with its own fuel-efficient aircraft.

76. Since the design of an entirely new jet would take too long, Boeing decided to create a more fuel-efficient alternative to its 737NG aircraft. Such a plane would ultimately be named the 737 Max.

77. A former senior Boeing official reported that the company opted to build the 737 Max, rather than an entirely new aircraft, because it would be "far quicker, easier and cheaper than starting from scratch, and would provide almost as much fuel savings for airlines."[31]

78. The first completed Max 8 rolled off the Renton, Washington, assembly line in November 2015. Boeing officially launched the 737 Max family of aircraft in August 2017 as the fourth generation of the widely-used 737NG, expressly designed to compete with Airbus' A320neo.

79. In designing the 737 Max, it was vital to Boeing's leadership that it could market the aircraft as simply an upgrade to its already certified 737NG and obtain regulatory approval from the United States Federal Aviation Administration ("**FAA**") permitting pilots to operate the 737 Max aircraft without extensive simulation time or retraining.

80. Upon information and belief, the decision to design an aircraft which would obtain certification from the FAA without the need for pilot retraining, as well as the ambitious timeline for completion of the 737 Max, were made by Boeing's corporate leadership in Chicago.

81. Rick Ludtke, an employee at Boeing for 19 years and an engineer who helped

https://www.nytimes.com/2019/03/23/business/boeing-737-max-crash.html
[31] *Id.*

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 20 of 55 PageID #:60

FILED DATE: 4/25/2019 11:27 AM 2019L004446

design the 737 Max cockpit, explained the first ground rule communicated to engineers designing the Max was any "designs we created could not drive any new training that required a simulator."

82. This created a chaotic environment for engineers. As Ludtke described: "The company was trying to avoid costs and trying to contain the level of change. They wanted the minimum change to simplify the training differences, minimum change to reduce costs, and to get it done quickly."[32]

83. Minimal design changes served an important business need for Boeing: If the 737 Max was viewed as merely an update to the familiar 737NG and thus pilots did not require costly and time-consuming training for a new aircraft, it would make the 737 Max cheaper for airlines to operate. This in turn would make the price for the 737 Max more competitive relative to the Airbus A320neo – and far more profitable for Boeing.

84. Boeing needed the 737 Max aircraft to be more fuel efficient and also handle similarly to the 737NG.

85. Boeing achieved this new fuel efficiency, in part, due to the 737 Max's larger CFM LEAP-1B engines. However, adding the larger engines triggered cascading design and engineering changes for the aircraft – the same ripple of changes Boeing executive James Albaugh predicted back in 2011 when criticizing Airbus for doing the same thing with its A320neo.

86. The larger engines could not be mounted in the same location as the engines on the 737NG, so they had to be moved forward on the plane, which in turn required moving the front landing gear further forward. The more powerful engines, coupled with their new location, caused the 737 Max to handle differently from the 737NG by changing the plane's lift characteristics. A

---

[32] *Id.*

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 21 of 53 PageID #:61

FILED DATE: 4/25/2019 11:27 AM 2019L004446

737NG pilot operating the 737 Max would find that the 737 Max would ascend faster and at a higher angle, increasing the risk of a stall.

87. Boeing now needed to engineer a Band-Aid to fix the aircraft's handling issues created by the larger and more powerful engines – but at the same time, contain the level of engineering changes in order to keep the 737 Max more marketable by avoiding the need for pilot retraining.

## G. Boeing's new flight control system addressed one problem but created another

88. To address the increased risk of a stall and to make the plane handle like prior models of the 737, Boeing included a new automated flight-control system in the Max aircraft, the MCAS.

89. The MCAS collected data from a single sensor on the fuselage called the angle-of-attack sensor ("**AOA sensor**") which measures the angle between the wing of the plane on the oncoming airflow at the front of the plane.[33]

90. If the AOA sensor registers that the angle is too high – the plane is climbing too sharply – then the MCAS activates, automatically swiveling the horizontal tail of the plane to move the plane's nose down, as can be seen in the following graphic:

[33] Upon information and belief, the AOA sensor onboard the Boeing 737 Max involved in both Flight 610 and Flight 302 was designed, tested, engineered, and manufactured by Rosemount.



Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 22 of 55 PageID #:62

FILED DATE: 4/25/2019 11:27 AM 2019L004446

91. The MCAS was not programmed to use data from both of the airplane's AOA sensors to help validate the AOA data and protect against single-point failures. So if the single AOA sensor used as input to the MCAS malfunctioned and erroneously believed the plane was climbing too quickly, there was no means of detecting its erroneous condition and thus excluding that data to prevent the MCAS from improperly intervening and forcing the plane to dive.

92. The MCAS was intended to automatically adjust the pitch of the plane to avoid stalling the Max's more powerful engines when the plane was being controlled manually by the pilot. The pilot would not need to manually activate the MCAS, nor would the aircraft inform the pilot that the MCAS system was making pitch trim inputs.

93. Since the MCAS was intended to operate in the background without pilot knowledge, Boeing did not even inform pilots that the MCAS existed.

94. The MCAS was not disclosed in the aircraft's flight manual, either. Pilots would

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 23 of 55 PageID #:63

FILED DATE: 4/25/2019 11:27 AM 2019L004446

only learn indirectly about the MCAS when the plane began automatically fighting their pitch commands, often at low altitudes with little time to react and resolve the issue – which was the exact scenario with Flight 302.

95. In November 2018 after the Lion Air crash, a Boeing executive met with pilots' union representatives. According to pilot Dennis Tajer who was in attendance, Boeing executives tried to excuse their failure to disclose this system by explaining that they did not wish to "inundate" pilots with too much information about the new plane.[34]

96. Frustrated, pilot unions have described Boeing's actions in failing to disclose the software as a "break of trust."[35]

## H. Keeping pilots in the dark was just one of several bad decisions by Boeing

97. Numerous decisions by Boeing's leadership substantially contributed to the subject crash and demonstrate Boeing's conscious disregard for the lives of others. These decisions include, but are not limited to:

a. designing an aircraft with a powerful MCAS automated flight control system susceptible to catastrophic failure in the event of a single defective sensor;

b. failing to properly inform pilots of the existence of the new flight control system and educate and train them in all aspects of its operation;

c. failing to properly address the new system in the aircraft's flight manual;

d. refusing to include key safety features as standard in the aircraft rather than optional upgrades;

e. delivering 737 Max aircraft with a version of the flight control system that was materially different from the version presented to the FAA during certification;

f. marketing the 737 Max as requiring no significant retraining for pilots familiar with the older generation of 737s, even after Lion Air Flight 610 crashed, in order to

[34] "After 2 Crashes of New Boeing Jet, Pilot Training Now a Focus," *The New York Times*, March 16, 2019 at https://www.nytimes.com/2019/03/16/business/boeing-max-flight-simulator-ethiopia-lion-air.html

[35] *Id.*

FILED DATE: 4/25/2019 11:27 AM 2019L004446

boost sales because airlines would buy fewer Boeing aircraft if pilots needed to be retrained;

g. failing to take appropriate action after Boeing learned that the 737 Max aircraft was not performing as intended or safely, as was made tragically clear with the crash of Lion Air Flight JT 610; and

h. developing and fostering a relationship with the FAA which Boeing intended and knew would yield increasingly lax government oversite, regulation and personnel.

**I. The FAA failed in its regulatory role and shares blame for the Crash**

98. The FAA was culpable in the tragic loss of life caused by the Crash because the FAA approved and/or certified Boeing's design for the 737 Max despite the aircraft's substantial flaws.

99. The FAA negligently supervised, hired and/or trained its employees, and it knew or should have known its employees were unfit to perform their job duties and responsibilities, including implementing and executing inspections and testing of the 737 Max 8; and that a catastrophic plane crash was a foreseeable consequence.

100. Further, after the initial Lion Air Flight 610 crash, the FAA negligently, recklessly, and/or unlawfully provided incomplete and inadequate warnings to pilots, passengers, and the public that severely understated and downplayed the serious known safety risk associated with continued flight of the 737 Max 8.

101. Soon after the October 29, 2018 Lion Air crash, the FAA issued Airworthiness Directive[36] 2018-23-51 on November 8th. AD 2018-23-51 reflected the emergency procedures the FAA and Boeing had determined a flight crew should use to avoid another MCAS-caused crash.

[36] "Airworthiness Directives (ADs) are legally enforceable regulations issued by the FAA in accordance with 14 CFR part 39 to correct an unsafe condition in" an aircraft, engine, propeller, or appliance. *See* https://www.faa.gov/regulations_policies/airworthiness_directives/

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 25 of 55 PageID #:65

FILED DATE: 4/25/2019 11:27 AM 2019L004446

The procedure was dubbed the "MCAS Trim Runaway" emergency checklist.

102. The 33-page "Aircraft Accident Investigation Bureau Preliminary Report" issued by the Federal Democratic Republic of Ethiopia Ministry of Transport Aircraft Accident Investigation Bureau on April 4, 2019 ("**Report**," attached hereto and incorporated herein as "**Exhibit A**") reflects Flight 302's flight crew followed the *737 Airplane Flight Manual* aboard Flight 302 (which contains instructions based on AD 2018-23-51)[37].

103. However, following those steps obviously did not work, because Flight 302 crashed.

104. Experts speculate the flight crew could not trim the 737 Max manually because the trim wheel can't be moved at the speeds Flight 302 flew in the six minutes prior to the Crash.[38]

105. The "MCAS Trim Runaway" emergency checklist seemingly failed to anticipate the 737 Max 8 would be dropping altitude at excessive speed – something which should have readily been deduced would occur in an airplane in a nose-down emergency situation.

106. Moreover, the FAA characterized the airworthiness directive as a "non-emergency" that would address and fix the known problem.

## J. The FAA's failings arose from inadequacies in its technical staff, lack of funding and a relationship which was too close with, and relied too heavily upon, Boeing

107. As one sign of how under-resourced and ill-equipped FAA staff were to evaluate the 737 Max 8's features, the FAA relied heavily on Boeing to validate the safety of its own aircraft.

[37] Report at page 28.

[38] "Bjorn's Corner: ET302 crash report, the first analysis," *Leeham News and Analysis*, April 5, 2019 at https://leehamnews.com/2019/04/05/bjorns-corner-et302-crash-report-the-first-analysis/

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 26 of 55 PageID #:66

FILED DATE: 4/25/2019 11:27 AM 2019L004446

108. In 2005, the FAA adopted the Organization Designation Authorization allowing Boeing to designate its own employees who will approve design work on the FAA's behalf.[39]

109. Even with this delegation of responsibility by the FAA to Boeing, the Department of Transportation auditors in 2012 found that the FAA had not done enough to "hold Boeing accountable," presumably because FAA employees were ill-equipped, under-qualified, and/or insufficiently trained to actually perform this necessary job function and responsibility. This is confirmed by a later 2015 report from the Department of Transportation's inspector general, which faulted the FAA for lacking "an effective staffing model" and "risk-based oversight process."[40]

110. Further, FAA employees reported poor morale and disagreement relating to the FAA's treatment of Boeing, and fear of retaliation if they spoke up.[41]

111. As it was ceding more and more of its regulatory authority to Boeing, the FAA conducted its certification of the 737 Max 8, with the aircraft finally certified on March 9, 2017.

112. However, due to the underfunded FAA and its underqualified and insufficiently trained staff, the certification process was proceeding slower than Boeing desired. FAA technical experts reported receiving pressure from management to speed up certification of the Max aircraft because the development of the Max was nine months behind Airbus' A320neo.[42]

113. Lacking time, resources, proper tools and skilled people to carefully scrutinize the safety of the 737 Max, the FAA knew or should have known would raise serious safety

---

[39] "Boeing Had Too Much Sway in Vetting Own Jets, FAA Was Told," *Bloomberg News*, March 17, 2019 at https://www.bloomberg.com/news/articles/2019-03-18/boeing-had-too-much-sway-checking-own-planes-faa-workers-warned

[40] *Id.*

[41] *Id.*

[42] *Id.*

FILED DATE: 4/25/2019 11:27 AM 2019L004446

implications. Inadequately trained and equipped personnel would clearly be unable to competently perform the critical job of monitoring and inspecting Boeing's work.

114. Surely common sense screams that the post-2005 Organization Designation Authorization program of allowing manufacturers like Boeing to designate employees to approve their own company's design work on the FAA's behalf raises serious concerns about the FAA's autonomy and expertise.

115. Indeed, until the 2013 grounding of Boeing's 787 Dreamliner after two fires from battery packs and the current grounding of the Boeing 737 Max, the last time the FAA grounded a model of plane was 1979.[43]

116. Investigation reflects the FAA management knew or should have known that its technical staff was rushed and ill-equipped to handle inspections, testing and review of the technical specifications of the 737 Max. As recounted to *The Seattle Times* by a former FAA safety engineer who was directly involved in certifying the Max, halfway through the certification process, "we were asked by management to re-evaluate what would be delegated. Management thought we had retained too much at the FAA."[44]

117. While more and more work was being delegated to Boeing for it to evaluate itself in order to speed up the FAA's approval of the 737 Max, the work that was retained by the FAA was still not being done properly because FAA managers, not FAA technical experts, determined what would be delegated to Boeing. In some cases, FAA managers signed off on work rather than waiting for the FAA technical experts to complete their review.[45]

---

[43] *Id.*

[44] "Flawed analysis, failed oversight: How Boeing, FAA certified the suspect 737 MAX flight control system," *The Seattle Times*, March 17, 2019 at https://www.seattletimes.com/business/boeing-aerospace/failed-certification-faa-missed-safety-issues-in-the-737-max-system-implicated-in-the-lion-air-crash/

[45] *Id.*

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 28 of 53 PageID #:68

FILED DATE: 4/25/2019 11:27 AM 2019L004446

118. The former FAA engineer told *The Seattle Times* that "There was constant pressure to re-evaluate our initial decisions. And even after we had reassessed it … there was continued discussion by management about delegating even more items down to the Boeing Company. There wasn't a complete and proper review of the documents. Review was rushed to reach certain certification dates."[46]

119. The FAA approved and/or certified Boeing's design, production and/or manufacturing for its new aircraft despite its substantial flaws because the FAA had negligently hired, trained and/or supervised its employees, allowed managers to be beholden to Boeing and its timelines, and knew or should have known that if adequate oversight and inspections were not performed then a catastrophic plane crash could foreseeably result.

**K. Boeing's leadership created a culture of putting profits over safety**

120. In the mad rush to get the 737 Max certified and orders filled to airlines, Boeing leadership placed enormous pressure on its engineers to produce a finished product. *The New York Times* interviewed several of the engineers and designers working on the Max who described the frantic pace of the Max's development:

a. An engineer working on the Max said that the "timeline was extremely compressed … It was go, go, go."[47]

b. A former designer working on the Max's flight controls described how the design team had at times produced 16 technical drawings a week, double the normal rate. The designer understood the message from management to be: "We need something now."[48]

c. A technician who assembles wiring on the Max said that he received sloppy

[46] *Id.*

[47] "Boeing 737 Max: A jet born of a frantic race to outdo a rival," *The New York Times*, March 24, 2019 at https://economictimes.indiatimes.com/news/international/business/boeing-737-max-a-jet-born-of-a-frantic-race-to-outdo-a-rival/articleshow/68552862.cms

[48] *Id.*

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 29 of 55 PageID #:69

FILED DATE: 4/25/2019 11:27 AM 2019L004446

blueprints in the first few months of development and was told that the instructions for the wiring would be cleaned up later in the process. However, his internal assembly designs for the Max apparently still include omissions today, such as not specifying which tools to use to install a certain wire, a situation that could lead to a faulty connection. This is quite different from standard procedures because normally such blueprints include intricate instructions.[49]

121. Upon information and belief, the unreasonable expectations placed on engineers and designers by Boeing's leadership in Chicago created an environment at Boeing facilities which was ripe for mistakes and in which employees were reluctant to raise concerns that may delay certification and production of the Max.

**L. Boeing conducted a flawed safety assessment of the MCAS and falsified data to the FAA**

122. In addition to the questions about Boeing's design and manufacturing procedures at the time the Max was undergoing design and certification, the protocols for Boeing's safety assessment of the MCAS showed glaring errors.

123. The MCAS was designed to swivel the horizontal tail to push the nose of the plane down to avert a stall. Boeing tested this system, but the safety analysis understated the power of the system.

124. According to the March 17, 2019 article from *The Seattle Times* previously cited herein, Boeing submitted documentation to the FAA indicating that the MCAS could only move the horizontal tail a maximum of 0.6 degrees. However, when the Max 8 was put into service, the MCAS was capable of moving the tail 2.5 degrees, more than four times the 0.6 degrees stated in the initial safety analysis provided to the FAA.[50]

---

[49] *Id.*

[50] "Flawed analysis, failed oversight: How Boeing, FAA certified the suspect 737 MAX flight control system," *The Seattle Times*, March 17, 2019 at https://www.seattletimes.com/business/boeing-aerospace/failed-certification-faa-missed-safety-issues-in-the-737-max-system-implicated-in-the-lion-air-crash/

FILED DATE: 4/25/2019 11:27 AM 2019L004446

125. The version of the MCAS that Boeing embedded in its aircraft and sold all over the world was materially different and far more powerful than what Boeing represented to the FAA and other regulatory agencies. The FAA did not learn that the MCAS would move the horizontal tail 2.5 degrees until after 189 people were killed in the Lion Air crash.[51]

126. The safety analysis also failed to account for how the MCAS could reset itself after each time a pilot responded. This meant that a malfunctioning MCAS would not just cause a single downward movement of 2.5 degrees, but could dip the nose of the aircraft 2.5 degrees lower multiple times as the pilot tries to regain control. Without correction, two cycles of the MCAS at the 2.5 degree limit could cause the aircraft to reach its maximum nose-down trim position. Peter Lemme, a former Boeing flight controls engineer, explained to *The Seattle Times* that, since the MCAS can reset each time it is used, "it effectively has unlimited authority."[52]

127. Based on Boeing's own flawed assumptions – that the MCAS' maximum authority was 0.6 degrees – Boeing's System Safety Analysis classified the MCAS as a "major failure" in normal flight and a "hazardous failure" in the event of an extreme maneuver, such as a banked descending spiral.[53]

128. A "major failure" indicates that the system's failure could cause physical distress to people on the plane, but not death. A "hazardous failure" could cause serious or fatal injuries to a small number of passengers. One level above hazardous failure is "catastrophic failure," which represents the loss of the plane with multiple fatalities.[54]

129. The failure classification system is important because it drives whether a flight

---

[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] *Id.*

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 31 of 55 PageID #:71

FILED DATE: 4/25/2019 11:27 AM 2019L004446

control system can rely on a single sensor input or must have two or three. Systems with a consequence of failure classified as a "major failure" must have a probability of failure less than one in 100,000. Typically, such systems are allowed to rely on a single input sensor.[55]

130. In contrast, systems classified as "hazardous failure" have more severe consequences of failure and therefore must have a probability of failure less than one in 10 million. Systems classified as "hazardous failure" typically must have at least two separate input channels as a backup in the event one sensor fails.[56]

131. With the MCAS being classified as a "hazardous failure," it should have had a redundant back-up system. Instead the MCAS could be triggered by a reading from a single AOA sensor and, once triggered, it had unlimited authority to pitch the nose of the aircraft down.[57]

132. Boeing had a second AOA sensor on the airplane and thus could have designed MCAS to utilize both sensors to provide redundancy and safety – something which it is reportedly now using in its MCAS software "fix" after these two fatal crashes.[58]

133. Despite such an obvious fix – and much safer option – Boeing chose not to use such redundancy initially, presumably to save whatever time and money it could.

134. It unfortunately took the deaths of the collective 346 passengers and crew of Flight 302 and Flight 610 to convince Boeing of something seemingly quite obvious: it makes sense to ensure MCAS uses redundant AOA sensors – especially when the aircraft already has two of them.

**M. <u>Boeing rejected multiple options to make its plane safer</u>**

135. Despite the MCAS' glaring flaws, Boeing had two available safety features that

[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] *Id.*

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 32 of 55 PageID #:72

FILED DATE: 4/25/2019 11:27 AM 2019L004446

could mitigate the risk of the AOA sensor failing and causing an uncontrolled dive.

136. However, Boeing consciously chose to make these safety features optional add-ons for airlines – offering another means of profit.

137. One such feature is an angle of attack indicator, which would display the readings from the AOA sensor.[59] Without this upgrade, pilots do not have a reading of what the AOA is registering, making it more difficult to identify an AOA malfunction.

138. The other safety feature is called a disagree light. The Max 8 comes outfitted with two AOA sensors at the front of the plane, but the MCAS only takes readings from one sensor on any given flight, leaving the system vulnerable to a single point of failure. Upgrades to the MCAS software coupled with the installation of a disagree light in the cockpit would alert pilots if the two AOA sensors register readings at odds with the other.

139. Aviation analyst Bjorn Fehrm told *The New York Times* that these safety features are "critical" and "cost almost nothing for the airlines to install."[60]

140. Upgrades to the MCAS software could also program the system to turn off in the event the two AOA readings are materially out-of-sync.[61]

141. Despite the potential for the AOA sensor failing and wrongfully activating the MCAS to force the plane downward, Boeing did not install the AOA indicator or disagree light as standard. Instead, Boeing charges a premium for these essential safety features.[62]

142. The FAA issued Airworthiness Directive 2018-23-51 November 8, 2018 and Boeing began investigating a software patch to address the issue, but neither insisted on the

---

[59] "Doomed Boeing Jets Lacked 2 Safety Features That Company Sold Only as Extras," *The New York Times*, March 21, 2019 at https://www.nytimes.com/2019/03/21/business/boeing-safety-features-charge.html
[60] *Id.*
[61] *Id.*
[62] *Id.*

FILED DATE: 4/25/2019 11:27 AM 2019L004446

immediate additional training of pilots on how to deal with the defective AOA sensor or MCAS software.

143. Boeing also downplayed the significance of the threat presented by the MCAS, and did not call for any aggressive action to prevent further incidents.

144. Boeing has maintained that the failure of the MCAS could be handled in the same way as a standard "stabilizer runaway," a malfunction which occurs when the Trimmable Horizontal Stabilizer (THS) on the aircraft tail fails to stop at the selected position and continues to deflect up or down.

145. However, pilots and aviation experts have challenged Boeing's characterization, because the MCAS failure does not behave like a standard stabilizer runaway:[63]

a. First, with a stabilizer runaway, there is continuous uncommanded movement of the tail. In contrast, the movement of the tail is not continuous in a MCAS failure: pilots are able to counter the nose down movement, only to have the MCAS move the tail once again; and

b. Second, the MCAS alters the control column response to the stabilizer movement. Pulling back on the column normally interrupts any stabilizer nose-down movement, but with MCAS operating, that control column function is disabled.

146. Boeing's attempts to deflect blame onto purportedly poorly-trained pilots wrongfully minimizes Boeing's responsibility for these crashes. It is foreseeable that pilots would be confused by MCAS' control over the 737 Max 8 as the system's nose-down commands were different from a common stabilizer problem and because pilots were not told the MCAS existed or how it functioned.[64]

147. When seconds matter, the confusion caused by Boeing's defective and unsafe

[63] "Flawed analysis, failed oversight: How Boeing, FAA certified the suspect 737 MAX flight control system," *The Seattle Times*, March 17, 2019 at https://www.seattletimes.com/business/boeing-aerospace/failed-certification-faa-missed-safety-issues-in-the-737-max-system-implicated-in-the-lion-air-crash/
[64] *Id.*

FILED DATE: 4/25/2019 11:27 AM 2019L004446

design, and failure to inform pilots, was the difference between life and death.

148. Both before and after the Lion Air crash, several pilots anonymously submitted on the Aviation Safety Reporting System ("**ASRS**") complaints which described similar flight control issues and unanticipated dives with the 737 Max aircraft. One such report submitted by a pilot in November 2018 – after the Lion Air crash and before the Ethiopian Airlines crash – describes the pilot's reaction to learning of the MCAS system:[65]

> "I think it is unconscionable that a manufacturer, the FAA, and the airlines would have pilots flying an airplane without adequately training, or even providing available resources and sufficient documentation to understand the highly complex systems that differentiate this aircraft from prior models. The fact that this airplane requires such jury rigging to fly is a red flag. Now we know the systems employed are error prone–even if the pilots aren't sure what those systems are, what redundancies are in place, and failure modes."
>
> "How can a Captain not know what switch is meant during a preflight setup?" asked another pilot. "Poor training and even poorer documentation; that is how."

149. Shortly after Flight 610 crashed, and after learning of numerous complaints regarding similar close calls, Boeing knew that hundreds of its 737 Max 8 aircraft were still in use carrying passengers all over the globe, which presented a substantial risk that a similar incident could occur without appropriate and immediate intervention.

150. Despite this knowledge and the gravity of the risks presented to passengers, crew, and the public at large from imperiled airplanes flying overhead, Boeing consciously and intentionally failed to act, and/or acted without the urgency commensurate with the risk of harm presented by its defective and dangerous aircraft.

[65] "At tense meeting with Boeing executives, pilots fumed about being left in dark on plane software," *The Washington Post*, March 13, 2019 at https://www.washingtonpost.com/business/economy/new-software-in-boeing-737-max-planes-under-scrutinty-after-second-crash/2019/03/13/06716fda-45c7-11e9-90f0-0ccfeec87a61_story.html?noredirect=on&utm_term=.02f41a196545

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 35 of 55 PageID #:75

FILED DATE: 4/25/2019 11:27 AM 2019L004446

151. Instead, Boeing kept a keen eye on the record revenue the 737 Max was generating and the backlog of orders it had yet to fill. Just a few months after sharing condolences for the victims of Lion Air Flight 610, Boeing's twitter account posted the following:

152. Upon information and belief, Boeing chose not to respond to the Flight 610 crash with the appropriate degree of urgency or with appropriate safety steps because it feared doing so would result in financial loss to Boeing if airlines grounded their aircraft or had to retrain their pilots.

153. Instead, motivated by profit, Boeing downplayed the danger presented by its defective and dangerous aircraft, creating a false sense of security and ensuring that the 737 Max 8 would still be utilized to carry passengers despite the presence of the defective and dangerous AOA sensor and MCAS.

**N. <u>The FAA downplayed the serious safety risk it knew existed after the Lion Air Flight 610 crash and decedent Bella relied on this to her detriment</u>**

154. The FAA aided and abetted Boeing in this scheme to downplay the clear and

FILED DATE: 4/25/2019 11:27 AM 2019L004445

present danger to the public presented by Boeing's dangerous and defective aircraft because Boeing shared a close relationship with the FAA, and the federal government generally, such that the FAA consciously and intentionally turned a blind eye to Boeing's reckless conduct.

155. On November 7, 2018 at 7:19 AM, the FAA posted the following warning to the public on its Twitter Feed. This warning purposefully omits the word "Emergency" when describing the FAA directive, and it also presents no language indicating any safety risk or hazard associated with continued flight of the 737 Max 8 or with being a passenger on a 737 Max 8.

156. Over five hours later, the FAA posted a different and new warning to the public on its Twitter Feed. Recognizing its negligent, reckless, and/or purposeful omission of the word "emergency" from the first post, this Twitter post made sure to include the term "emergency" twice. This post provided somewhat more information to the public, but still fell severely short of

FILED DATE: 4/25/2019 11:27 AM   2019L004446

informing the public of any serious safety risk and misled the public as to the nature and character of the problem, the level of risk associated with the problem, as well as the action necessary to fully remediate the problem. The post presented the hazard in the 737 Max 8 as if any airline and pilot could easily remediate the hazard by a simple revision to "the airplane flight manual" which all "operators have three days to revise," lulling the public into a false sense of security that all known safety hazards with the 737 Max 8 were insignificant and had been remediated, and that it was safe for passenger transportation.



157.    To make matters worse, the FAA posted a media release to its website seven days later on November 14, 2018, titled "FAA Statement on Boeing Model 737-8 and -9 Airplanes."

158.    The FAA took a step backward and again omitted the word "emergency"

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 38 of 55 PageID #:78

FILED DATE: 4/25/2019 11:27 AM 2019L004446

entirely from the statement. It also failed to inform the public of any serious safety risk and misled the public as to the nature and character of the problem, the level of risk associated with the problem, as well as the action necessary to fully remediate the problem. It also made a further, affirmative statement aimed at inducing the public to believe safety concerns with the 737 Max 8 were insignificant and not serious by concluding the media release in the following manner: "The FAA is *not* doing a safety probe separate from the ongoing Lion Air Accident investigation of which we, the NTSB and Indonesian officials are a part." (emphasis added). Notably, this "FAA Statement" still appears on the "News and Updates" portion of the FAA website.

FAA Home • News • News & Updates

FAA Statement on Boeing Model 737-8 and -9 Airplanes

Search:

News type: News & Updates

Search

The existing FAA Airworthiness Directive (AD) (PDF) identifies existing flight crew procedures to be used in those circumstances. The FAA and Boeing continue to evaluate the need for software and/or other design changes to the aircraft including operating procedures and training as we learn more from the ongoing investigation. The FAA is not doing a safety probe separate from the ongoing Lion Air Accident investigation of which we, the NTSB and Indonesian officials are a part.

Page last modified: November 14, 2018 1:26:38 PM EST

159. Plaintiffs and other passengers on Flight 302 relied on these media posts by the FAA to their detriment, being duped into a false sense of security about riding on a 737 Max 8.

160. The close relationship between the FAA and Boeing is clear from the connections

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 39 of 55 PageID #:79

FILED DATE: 4/25/2019 11:27 AM 2019L004446

present and former Boeing executives have cultivated. After Lion Air Flight 610 crashed and at the very moment that the FAA should have been providing adequate, transparent and sufficient public safety advisories and warnings regarding the 737 Max 8, former Boeing executive Patrick Shanahan was elevated to Acting Secretary of Defense.

161. Following her resignation from the post of United States Ambassador to the United Nations, Nikki Haley is slated to join Boeing's board of directors.

162. Boeing reportedly donated $1 million to the President of the United States' inauguration. It has also been reported Boeing's CEO personally called the President following the deadly Flight 610 and Flight 302 crashes to advocate against grounding of the 737 Max.[66]

163. Regulators finally decided to ground the 737 Max aircraft in the wake of the Flight 302 crash to allow for a MCAS software upgrade and safety assessment to be conducted.

164. The Department of Transportation, with assistance from the FBI, is now investigating the Max's certification process, a federal grand jury probe has been empaneled, and Congressional hearings are underway.

165. Whistleblowers have now come forward reporting that safety inspectors with the FAA, including those in the Aircraft Evaluation Group (AEG) responsible for evaluating the safety of the 737 Max, lacked the proper training and certifications to do their jobs.

166. To make matters worse, information obtained from whistleblowers purportedly indicates that the FAA was aware that its inspectors lacked proper training and certification as early as August 2018, well before the crashes of Flight 610 and Flight 302.

[66] See https://www.vox.com/policy-and-politics/2019/3/13/18263719/boeing-ceo-dennis-muilenburg-trump-tweet-call 3

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 40 of 53 PageID #:80

FILED DATE: 4/25/2019 11:27 AM 2019L004446

## CLAIMS FOR RELIEF

## COUNT I: NEGLIGENCE

167. Plaintiffs incorporate and re-allege each of the General Allegations and all of their subparts as though fully set forth herein.

168. Defendant Boeing was, at all times relevant, in the business of designing, testing, manufacturing, selling, assembling, building, distributing, marketing and/or inspecting aircraft as suitable and safe for passenger air transportation, including the subject Boeing 737 Max 8 that crashed in Ethiopia on March 10, 2019.

169. Boeing operated, supervised, managed and/or oversaw the training facility that trained Ethiopian Airlines' pilots to fly the Boeing 737 Max 8, and knew or should have known of the unfitness of Ethiopian Airlines' pilots to safely operate the Boeing 737 Max 8 for passenger air travel.

170. Boeing breached its duty of care to Bella as a passenger aboard Flight 302 by failing to provide a safe, airworthy aircraft.

171. Boeing also failed to train, instruct, and/or issue advisory warnings necessary to assure the safe operation, control, management and/or maintenance of the aircraft.

172. Boeing's bad acts and/or omissions include, but are not limited to ("**Bad Acts**"):

a. designing, manufacturing, assembling and/or certifying an aircraft with an anti-stall system controlled by a single AOA sensor which was susceptible to failure without redundant systems;

b. designing, manufacturing, assembling and/or certifying an aircraft with a flight control system susceptible to erroneous information from the AOA sensor, and failing to install AOA indicators and/or AOA disagree lights as standard features rather than optional upgrades;

c. designing, manufacturing, assembling and/or certifying an aircraft with a flight control system that would initiate a dangerous automated dive without any command from a pilot and without a means to promptly override the automated dive;

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 41 of 55 PageID #:81

FILED DATE: 4/25/2019 11:27 AM 2019L004446

d. marketing and selling the 737 Max 8 as an analog to Boeing's 737NG to consciously and intentionally induce airlines to avoid the time-consuming retraining of airline pilots with the knowledge that the Max 8 contained a new and potentially dangerous MCAS automated flight control system;

e. failing to provide adequate warning with regard to the 737 Max 8's MCAS and the risk of an automated dive without any command from a pilot, or clear instruction to promptly override such an MCAS automated dive;

f. failing to conduct a thorough and accurate safety assessment of the aircraft, including Boeing's failure in its safety assessment to account for the degree to which the MCAS could move the horizontal stabilizer of the aircraft and failure to account for the resetting of the automated dive after each command from a pilot;

g. failing to properly train pilots on the new automated MCAS systems on the 737 Max 8;

h. failing to properly train pilots to identify an AOA sensor failure and MCAS input;

i. failing to properly train pilots to disengage the stabilizer trim motor on the 737 Max 8 in the event of an AOA sensor failure or unanticipated dive;

j. designing, assembling, and distributing a flight manual that did not warn of the risks presented by the MCAS, faulty AOA sensors, or automated dives;

k. designing, manufacturing, assembling and/or certifying an airplane flight manual that failed to provide clear instruction or procedures on how to promptly override an automated MCAS dive;

l. failing to promptly issue a software patch to address the risk of malfunctioning AOA sensors and automated MCAS dives following the October 29, 2018 crash of Lion Air Flight JT 610;

m. failing to ground all 737 Max 8 aircraft following the crash of Lion Air Flight JT 610 until such a software patch and/or other safety procedures could be implemented;

n. failing to properly warn pilots, airlines, and the public of the risk of malfunctioning AOA sensors and automated MCAS dives following the crash of Lion Air Flight JT 610;

o. failing to recognize Boeing's own safety assessment of the AOA sensor and MCAS during development of the 737 Max 8 which revealed potential problems with the system;

p. failing to recognize the evidence that flight control issues caused the crash of Lion Air Flight 610 and death of 189 people;

q. failing to recognize complaints lodged by pilots in the ASRS database regarding

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 42 of 53 PageID #:82

FILED DATE: 4/25/2019 11:27 AM 2019L004446

the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; and

r. failing to recognize Boeing's identification of a software upgrade to address problems with the AOA sensors and MCAS in the weeks and months prior to the crash of Flight 302.

173. As a direct and legal result of Boeing's negligence, carelessness, gross negligence, recklessness and/or otherwise wrongful acts and/or omissions hereinabove set forth, Bella died in the crash of Flight 302.

174. As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, Bella suffered pre-impact injury and death, including fear of impending and imminent death, and Plaintiffs have been damaged by Bella's death.

175. As a direct and legal result of Boeing's wrongful actions as set forth previously herein, Plaintiffs suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from Bella, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

176. As a further direct and legal result of Boeing's wrongful actions as set forth previously herein, Plaintiffs incurred funeral and/or burial expenses and/or other related expenses in an amount according to proof at trial.

177. As a further direct and legal result of Boeing's wrongful actions as set forth previously herein, Plaintiffs suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

178. The potential harm to airline passengers, pilots, crews, and the public from the 737 Max 8 was objectively foreseeable both in nature and in scope and was subjectively known to Boeing for all of the aforementioned reasons, including but not limited to, those cited in the Bad

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 43 of 55 PageID #:83

FILED DATE: 4/25/2019 11:27 AM 2019L004446

Acts.

179. As set forth above and as will be shown by proof, there is a high degree of certainty that Plaintiffs have suffered these injuries and damages, and that there is an extremely close connection between those injuries and damages and Boeing's conduct.

180. A high degree of moral blame is attached to Boeing's conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by Boeing to all Plaintiffs and the imposition of all damages described herein.

181. Based on the foregoing, Boeing acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, namely herein, Bella.

**COUNT II: Wrongful death pursuant to 740 ILCS 180/1**

182. Plaintiffs incorporate and re-allege each of the General Allegations and all of their subparts as well as the Bad Acts of Count I as though fully set forth herein.

183. Plaintiffs are Bella's personal representatives and are or will be duly appointed Special Administrators of her estate. They bring this action pursuant to the Illinois Wrongful Death Act, 740 ILCS 180/1 *et seq.*, or any such other law the Court deems applicable under the circumstances of this case.

184. Defendant Boeing was, at all times relevant, in the business of designing, testing, manufacturing, selling, assembling, building, distributing, marketing and/or inspecting aircraft as suitable and safe for passenger air transportation, including the subject Boeing 737 Max 8 that crashed in Ethiopia on March 10, 2019.

185. Boeing operated, supervised, managed and/or oversaw the training facility that

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 44 of 53 PageID #:84

FILED DATE: 4/25/2019 11:27 AM 2019L004446

trained Ethiopian Airlines' pilots to fly the Boeing 737 Max 8, and knew or should have known of the unfitness of Ethiopian Airlines' pilots to safely operate the Boeing 737 Max 8 for passenger air travel.

186. As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, Bella suffered pre-impact injury and death, including fear of impending and imminent death, and Plaintiffs have been damaged by Bella's death.

187. As a direct and legal result of Boeing's wrongful actions as set forth previously herein, Plaintiffs suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from Bella, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

188. As a further direct and legal result of Boeing's wrongful actions as set forth previously herein, Plaintiffs incurred funeral and/or burial expenses and/or other related expenses in an amount according to proof at trial.

189. As a further direct and legal result of Boeing's wrongful actions as set forth previously herein, Plaintiffs suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

190. The potential harm to airline passengers, pilots, crews, and the public from the 737 Max 8 was objectively foreseeable both in nature and in scope and were subjectively known to Boeing for all of the aforementioned reasons, including but not limited to, the Bad Acts set forth in Count 1.

191. As set forth above and as will be shown by proof, there is a high degree of certainty that Plaintiffs have suffered these injuries and damages, and that there is an extremely close

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 45 of 55 PageID #:85

FILED DATE: 4/25/2019 11:27 AM 2019L004446

connection between those injuries and damages and Boeing's conduct.

192. A high degree of moral blame is attached to Boeing's conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by Boeing to all Plaintiffs and the imposition of all damages described herein.

193. Based on the foregoing, Boeing acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, namely herein, Bella.

**COUNT III: Breach of warranty as a third-party beneficiary**

194. Plaintiffs incorporate and re-allege each of the General Allegations and all of their subparts as well as the Bad Acts of Count I as though fully set forth herein.

195. Boeing was the designer, manufacturer, distributor and/or seller of the Boeing 737 Max 8, and/or its component parts, involved in the subject crash.

196. Prior to the crash of Flight 302, Boeing expressly and/or impliedly warranted and represented that the subject aircraft (the Boeing 737 Max 8) including its component parts and instruments, and in conjunction with the instructions and warnings given by Boeing, was airworthy, of merchantable quality, both fit and safe for the purpose of commercial air travel for which it was designed, intended and used. Additionally, Boeing further warranted that the subject aircraft, and its component parts, was free from all defects.

197. Boeing breached said warranties in that the subject aircraft was not airworthy, of merchantable quality, or fit and safe for the purposes for which it was designed, intended and used, and free from all defects as set forth above. The aircraft, and its component parts, were in substantially similar condition to its original condition at delivery to Ethopian Airlines.

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 46 of 55 PageID #:86

FILED DATE: 4/25/2019 11:27 AM 2019L004446

198. Bella, as a passenger of Flight 302, was an intended third-party beneficiary of Boeing's warranties that Flight 302 (the Boeing 737 Max 8 and its component parts) was airworthy, of merchantable quality, both fit and safe for the purposes for which it was designed, intended and used, and free from all defects.

199. Bella reasonably relied on these warranties to her detriment.

200. As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, Bella suffered pre-impact injury and death, including fear of impending and imminent death, and Plaintiffs have been damaged by Bella's death.

201. As a direct and legal result of Boeing's wrongful actions as set forth previously herein, Plaintiffs suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from Bella, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

202. As a further direct and legal result of Boeing's wrongful actions as set forth previously herein, Plaintiffs incurred funeral and/or burial expenses and/or other related expenses in an amount according to proof at trial.

203. As a further direct and legal result of Boeing's wrongful actions as set forth previously herein, Plaintiffs suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

204. The potential harm to airline passengers, pilots, crews, and the public from the 737 Max 8 was objectively foreseeable both in nature and in scope and were subjectively known to Boeing for all of the aforementioned reasons, including but not limited to, the Bad Acts set forth in Count 1.

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 47 of 53 PageID #:87

FILED DATE: 4/25/2019 11:27 AM 2019L004446

205. As set forth above and as will be shown by proof, there is a high degree of certainty that Plaintiffs have suffered these injuries and damages, and that there is an extremely close connection between those injuries and damages and Boeing's conduct.

206. A high degree of moral blame is attached to Boeing's conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by Boeing to all Plaintiffs and the imposition of all damages described herein.

207. Based on the foregoing, Boeing acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, namely herein, Bella.

## COUNT IV: Strict products liability

208. Plaintiffs incorporate and re-allege each of the General Allegations and all of their subparts as well as the Bad Acts of Count I as though fully set forth herein.

209. Boeing is in the business of designing, testing, manufacturing, selling, assembling, building, distributing, marketing and/or inspecting aircraft as suitable for passenger air transportation, including the subject Boeing 737 Max 8, and its component parts, that crashed in Ethiopia on March 10, 2019.

210. At all times relevant as set forth herein, the subject Boeing 737 Max 8 aircraft, and its component parts, was being operated by Ethiopian Airlines and used for the purposes of which it was manufactured, designed, inspected, sold and intended to be used, in a manner reasonably foreseeable to Boeing.

211. At all times relevant as set forth herein, the subject Boeing 737 Max 8, and its component parts, were defective, dangerous, unsafe, and not airworthy by reason of Boeing's

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 48 of 55 PageID #:88

FILED DATE: 4/25/2019 11:27 AM 2019L004446

defective manufacture, design, warning systems, inspections, testing, service, and/or maintenance of the subject aircraft, and its component parts, as set forth above. The aircraft, and its component parts, were in substantially similar condition to its original condition at delivery to Ethiopian Airlines.

212. As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, Bella suffered pre-impact injury and death, including fear of impending and imminent death, and Plaintiffs have been damaged by Bella's death.

213. As a direct and legal result of Boeing's wrongful actions as set forth previously herein, Plaintiffs suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from Bella, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

214. As a further direct and legal result of Boeing's wrongful actions as set forth previously herein, Plaintiffs incurred funeral and/or burial expenses and/or other related expenses in an amount according to proof at trial.

215. As a further direct and legal result of Boeing's wrongful actions as set forth previously herein, Plaintiffs suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

216. The potential harm to airline passengers, pilots, crews, and the public from the 737 Max 8 was objectively foreseeable both in nature and in scope and were subjectively known to Boeing for all of the aforementioned reasons, including but not limited to, the Bad Acts set forth in Count 1.

217. As set forth above and as will be shown by proof, there is a high degree of certainty

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 49 of 55 PageID #:89

FILED DATE: 4/25/2019 11:27 AM 2019L004446

that Plaintiffs have suffered these injuries and damages, and that there is an extremely close connection between those injuries and damages and Boeing's conduct.

218. A high degree of moral blame is attached to Boeing's conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by Boeing to all Plaintiffs and the imposition of all damages described herein.

219. Based on the foregoing, Boeing acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, namely herein, Bella.

**COUNT V: Negligence – failure to warn**

220. Plaintiffs incorporate and re-allege each of the General Allegations and all of their subparts as well as the Bad Acts of Count I as though fully set forth herein.

221. Boeing is in the business of designing, testing, manufacturing, selling, assembling, building, distributing, marketing and/or inspecting aircraft as suitable for passenger air transportation, including the subject Boeing 737 Max 8 that crashed in Ethiopia on March 10, 2019.

222. At all times relevant as set forth herein, the subject Boeing 737 Max 8 aircraft was being operated by Ethiopian Airlines and used for the purposes of which it was manufactured, designed, inspected, sold and intended to be used, in a manner reasonably foreseeable to Boeing.

223. At all times relevant as set forth herein, the subject Boeing 737 Max 8 was defective, dangerous, unsafe, and not airworthy by reason of Boeing's defective manufacture, design, warning systems, inspections, testing, service, and/or maintenance of the subject aircraft

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 50 of 53 PageID #:56

FILED DATE: 4/25/2019 11:27 AM 2019L004446

as set forth above.

224. At all times relevant as set forth herein, Boeing had knowledge that the subject Boeing 737 Max 8 was defective, dangerous, unsafe, and not airworthy, and in particular, Boeing had knowledge of the unreasonably unsafe design of the AOA sensor and automated MCAS, as well as the potential life and death risks of such a failure in these systems.

225. At all times relevant as set forth herein, the risks of failure of the Boeing 737 Max 8 due the aircraft's unreasonably dangerous and defective design presented a substantial danger when the aircraft is used or misused in an intended or reasonably foreseeable way.

226. Ordinary consumers, including but not limited to airlines, flight crew, and passengers, would not have recognized the potential risks presented by the aircraft's unreasonably dangerous and defective design.

227. As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, Bella suffered pre-impact injury and death, including fear of impending and imminent death, and Plaintiffs have been damaged by Bella's death.

228. As a direct and legal result of Boeing's wrongful actions as set forth previously herein, Plaintiffs suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from Bella, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

229. As a further direct and legal result of Boeing's wrongful actions as set forth previously herein, Plaintiffs incurred funeral and/or burial expenses and/or other related expenses in an amount according to proof at trial.

230. As a further direct and legal result of Boeing's wrongful actions as set forth

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 51 of 53 PageID #:91

FILED DATE: 4/25/2019 11:27 AM 2019L004446

previously herein, Plaintiffs suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

231. The potential harm to airline passengers, pilots, crews, and the public from the 737 Max 8 was objectively foreseeable both in nature and in scope and were subjectively known to Boeing for all of the aforementioned reasons, including but not limited to, the Bad Acts set forth in Count I.

232. As set forth above and as will be shown by proof, there is a high degree of certainty that Plaintiffs have suffered these injuries and damages, and that there is an extremely close connection between those injuries and damages and Boeing's conduct.

233. A high degree of moral blame is attached to Boeing's conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by Boeing to all Plaintiffs and the imposition of all damages described herein.

234. Based on the foregoing, Boeing acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, namely herein, Bella.

## COUNT VI: Civil conspiracy

235. Plaintiffs incorporate and re-allege each of the General Allegations and all of their subparts as well as the Bad Acts of Count I as though fully set forth herein.

236. Defendant Boeing entered into an agreement with the FAA, and its agents, employees, and/or directors, and/or other persons and/or entities to accomplish by concerted action either an unlawful purpose or a lawful purpose by unlawful means.

237. Boeing and its co-conspirators committed tortious and/or unlawful acts in

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 52 of 53 PageID #:92

FILED DATE: 4/25/2019 11:27 AM 2019L004446

furtherance of this agreement, including but not limited to, deceiving the public as to the safety of the 737 Max 8 aircraft and its component parts and systems, certifying the aircraft and the MCAS as safe based upon false and/or inaccurate information, failing to provide clear instruction in flight manuals or informing pilots as to automated systems embedded in the 737 Max 8 aircraft, denying technical experts the necessary time or resources to thoroughly evaluate the 737 Max 8 aircraft, and compelling technical experts to certify the aircraft despite their concerns about the safety of the 737 Max 8, all in violation of applicable laws, regulations, and mandatory duties.

238. As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, Bella suffered pre-impact injury and death, including fear of impending and imminent death, and Plaintiffs have been damaged by Bella's death.

239. As a direct and legal result of Boeing's wrongful actions as set forth previously herein, Plaintiffs suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from Bella, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

240. As a further direct and legal result of Boeing's wrongful actions as set forth previously herein, Plaintiffs incurred funeral and/or burial expenses and/or other related expenses in an amount according to proof at trial.

241. As a further direct and legal result of Boeing's wrongful actions as set forth previously herein, Plaintiffs suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

242. The potential harm to airline passengers, pilots, crews, and the public from the 737 Max 8 was objectively foreseeable both in nature and in scope and were subjectively known to

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 53 of 55 PageID #:58

FILED DATE: 4/25/2019 11:27 AM 2019L004446

Boeing for all of the aforementioned reasons, including but not limited to the Bad Acts set forth in Count I.

243. As set forth above and as will be shown by proof, there is a high degree of certainty that Plaintiffs have suffered these injuries and damages, and that there is an extremely close connection between those injuries and damages and Boeing's conduct.

244. A high degree of moral blame is attached to Boeing's conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by Boeing to all Plaintiffs and the imposition of all damages described herein.

245. Based on the foregoing, Boeing acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, namely herein, Bella.

**PRAYER FOR RELIEF AS TO ALL MATTERS**

WHEREFORE, Plaintiffs pray for judgment against Boeing and relief as follows:

a. General and non-economic damages in an amount according to proof at trial, and beyond the jurisdictional minimum of this Court;

b. Compensatory damages in the amount of at least ten million dollars ($10,000,000.00), exclusive of attorney fees and the costs of this action

c. Economic and property losses, in an amount according to proof at trial;

d. Damages for the Estate due to pre-impact injuries and losses;

e. Interest upon any judgment entered as provided by law;

f. All fees and costs of suit incurred herein;

g. Exemplary damages in an amount according to proof;

h. Any additional damages which the trier of fact, in the exercise of sound discretion, awards in an amount reasonably related to the harm Plaintiffs' are suffering, horror the decedent suffered before death, and proportionate to Boeing's financial condition such that the award is sufficiently large enough to materially effectuate a

Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 54 of 55 PageID #:94

FILED DATE: 4/25/2019 11:27 AM 2019L004446

change in policies and procedures at Boeing and deter it and others from engaging in similar conduct in the future;

i. For any and all other damages available under the law; and

j. For any such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury as to all claims in this action.

## CERTIFICATE OF SERVICE

I CERTIFY the foregoing will be served upon the defendant together with the Summons by someone duly authorized to effectuate service of process or as otherwise permitted.

**Dated: April 25, 2019**

**Respectfully submitted,**

By: */s/ Candice Diah*
Candice Diah, Esq.
Illinois Attorney No. 6329606; NC Bar No. 52109
Law Offices of Gary, Williams, Parenti, Watson & Gary, PLLC
221 S.E. Osceola Street
Stuart, FL 34994
Phone: (772) 283-8260
cad@williegary.com
*Co-counsel for Plaintiffs*

***Pro hac vice pending per Rule 707 for:***

Willie E. Gary, Esq. (Fla. Bar No. 187843)
Larry A. Strauss, Esq. (Fla. Bar No. 0654671)
Law Offices of Gary, Williams, Parenti, Watson & Gary, PLLC
221 S.E. Osceola Street
Stuart, FL 34994
Phone: (772) 283-8260
larry@williegary.com; dpk@williegary.com; vs@williegary.com
*Co-counsel for Plaintiffs*

Chuck Chionuma, Esq.
Missouri Bar No. 32956
Chionuma Law Firm, LLC
3100 Broadway Blvd., Suite 602
Kansas City, MO 64111
Phone: (816) 421-5544
chuck@chionuma.com
*Co-counsel for Plaintiffs*



Case: 1:19-cv-04106 Document #: 1-2 Filed: 06/19/19 Page 55 of 55 PageID #:95

| | |
|---|---|
| **Case Number:** | 2019L-4446 |
| **Case Name:** | AKEYO JABOMA BANDA OCHUOD v THE BOEING COMPANY |
| **Jurisdiction:** | Law Division [Chicago, IL 60602] |
| **Complaint:** | PERSONAL INJURY (PRODUCT LIABILITY) COMPLAINT FILED (JURY DEMAND) |
| **Filed:** | 04/25/19 |
| **Activity Date:** | 04/25/19 |
| **Activity:** | PERSONAL INJURY (PRODUCT LIABILITY) COMPLAINT FILED (JURY DEMAND) |
| **Participant:** | AKEYO JABOMA BANDA OCHUOD |

.248528.