**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

SINTAYEHU ABEBAW WONDMSIGEGN)
as Special Administrator for the ESTATE )
OF ATO MULUGETA ASFAW, deceased )
                              )
                Plaintiff, )
                              )
        v.                   )
                              )
THE BOEING COMPANY, a Delaware )
Corporation; and ROSEMOUNT )
AEROSPACE, INC, a Delaware )
Corporation; and ROCKWELL COLLINS, )
INC., a Delaware corporation, )
                              )
              Defendants. )
_____ )

In re: Ethiopian Airlines Flight
ET 302 Crash

Lead Case: 1:19-cv-02170

Hon. Jorge L. Alonso

This filing applies to:

Case No. 1:19-cv-4242

*Plaintiff Demands Trial by Jury*

## FIRST AMENDED COMPLAINT AT LAW

Plaintiff SINTAYEHU ABEBAW WONDMSIGEGN, as Special Administrator for the

ESTATE OF ATO MULUGETA ASFAW, by and through their attorneys, POWER ROGERS &

SMITH, LLP, FRIEDMAN RUBIN PLLP, and SHAKESPEAR FEYISSA, files this Complaint

pursuant to the Wrongful Death Act of Illinois, 740 ILCS 180/2.1, against the above-named

Defendants (hereinafter referred to as "Boeing," "Rosemount" and "Collins"), and states as

follows:

## PARTIES

1.      This is an action for damages pursuant to the Illinois Wrongful Death Act, 740 Ill.

Comp. Stat. 180/1 *et seq.,* Illinois Product Liability Act, 735 Ill. Comp. Stat. 5/13-213, or any

other applicable law, based on the defective design and the inadequate warnings of the Boeing

737 Max.

2.      Sintayehu Abebaw Wondmsigegn has been appointed as the Special Administrator for the Estate of Ato Mulugeta Asfaw, pursuant to 740 ILCS 180/2.1. See Exhibit A.

3.      Ato Mulugeta Asfaw died in the crash of Ethiopian Airlines Flight 302 on March 10, 2019.

4.      The Decedent's only surviving heirs are his spouse, Yewubdar Abebaw Wondmsigegn; and their children Muse Mulugeta Asfaw, Yodane Mulugeta Asfaw and Emanuel Mulugeta Asfaw.

5.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1332(a)(2) based on diversity of citizenship because the matter in controversy exceeds the sum or value of $75,000, inclusive of interest and costs, and arises between citizens of U.S. states and citizens of foreign states.

6.      Venue is proper in the Northern District of Illinois: pursuant to 28 U.S.C. §1391(b)(1) because Boeing is and has, at all relevant times, been a citizen and resident of the State of Illinois. Boeing's corporate headquarters and principal place of business are located in this judicial district at 100 North Riverside, Chicago, Cook County, Illinois 60606; At all relevant times, Defendant Boeing Company is a Delaware corporation with its principal place of business and corporate headquarters in Chicago, Illinois. Boeing has been authorized to do business and has been transacting or conducting business within the State of Illinois. *See* 735 Ill. Comp. Stat. 5/2-209(b)(4).

7.      At all times relevant to this complaint, Defendant Boeing was engaged in the business of designing, manufacturing, assembling, testing, servicing, marketing, promoting, leasing and selling commercial aircrafts as well as providing information and warnings about such aircrafts, including the aircraft at issue, the Boeing 737 Max.

2

8.     Pursuant to 28 U.S.C. §1391(b)(3) because Rosemount, located in Burnsville, Minnesota, transacted and continues to transact regular and substantial business with Chicago-based Boeing in Cook County, Illinois; and pursuant to 28 U.S.C. §1391(b)(2) was engaged in the business of designing, manufacturing, assembling, testing, servicing, marketing, promoting, and supplying as well as providing information and warnings about the Angle of Attack sensor ("AOA sensor") which was affixed to the aircraft at issue, the Boeing 737 Max.

9.     Pursuant to 28 U.S.C. §1391(b)(3) ROCKWELL COLLINS, INC., a Delaware corporation, is located in Cedar Rapids, Iowa.

10.     At all times relevant to this complaint, Defendant Collins was engaged in the business of designing, programming, manufacturing, assembling, testing, servicing, marketing, promoting, and supplying as well as providing information and warnings about the Maneuvering Characteristics Augmentation System ("MCAS system") which was installed on the aircraft at issue, the Boeing 737 Max.

## **FACTS**

11.     The facts of this case highlight a series of actions taken by Boeing to put profit over the lives of children, women and men. In an effort to compete with Airbus's new fuel-efficient Neo aircraft, Defendant Boeing rushed an aircraft to market that was not airworthy and then concealed its defects in order to sell more airplanes. That aircraft is the Boeing 737 Max 8 ("Max 8").

12.     Boeing opted to build the Max 8 because it would be quicker, easier, and cheaper than starting from scratch, and would provide fuel savings for airlines.[1]

---

[1] https://www.nytimes.com/2019/03/23/business/boeing-737-max-crash.html

13.     Boeing produced sloppy blueprints for the Max 8 and told a technician that instructions would be cleaned up later in the process.

14.     Boeing set a ground rule for engineers: Limit changes to hopefully avert a requirement that pilots spend time training in a flight simulator before flying the Max 8.

15.     Boeing marketed the Max 8 to airlines telling them that it will also reduce costs on training pilots who already were licensed to fly the Boeing 737.[2]

16.     Boeing trained the Max 8 pilots using an iPad.

17.     To improve the fuel efficiency of their new jet, Boeing put new engines on the Max 8.

18.     The new engines were bigger than the 737 NG engines and Boeing had to change the mounting point of the engine.

19.     Boeing put the Max 8 engines further forward and higher on the wings than on the 737 NG.

20.     The different mounting point made the Max 8 prone to aerodynamic stall. The engine positions on the wings gives the Max 8 a tendency to pitch up under high power.

21.     In order to prevent an aerodynamic stall Boeing and Collins developed software which told the flight control system to change its angle of attack downward if a stall risk is perceived. This is known as Maneuvering Characteristics Augmentation System ("MCAS").

22.     On the Max 8, if a stall risk is perceived the computer on the aircraft automatically initiates a downward pitch angle.

23.     Boeing intentionally omitted information about the MCAS system from its Max 8 flight manual and training materials, leaving pilots ignorant of its very existence.

---

[2] https://www.aviationcv.com/aviation-blog/2019/shocking-facts-boeing-737max-crash

24. An Angle of Attack (AOA) sensor, designed and manufactured by Rosemount, was affixed to the Max 8 and designed to tell the flight control system if a stall risk is perceived. The Rosemount AOA sensor was prone to failure and to providing false data.

25. Boeing intentionally designed the flight control system to rely upon data from one single sensor on the Max 8 in order to prevent more in-depth training, making it easier to sell its aircraft to airlines. Boeing's selling point was that the Max 8 would only require "distance learning" using an iPad, with no down time for crew to train on simulators.

26. Boeing provided some airlines with an "optional" feature allowing the flight control system to obtain information from two different AOA sensors. In this optional configuration if one AOA sensor receives data that does not agree with data received by the other sensor, the MCAS does not command a pitch down of the aircraft.

27. In a Max 8 configured in the standard manner there are two AOA sensors but the Flight Control System only receives data from one AOA sensor. But if one AOA sensor receives bad data, falsely indicating a stall, the aircraft will pitch nose down and can crash.

28. The subject aircraft did not contain the optional feature. It relied upon data from one AOA sensor even though it had two AOA sensors.

29. The angle of attack sensor is depicted below:







30.     The horizontal stabilizer on the Max 8 is positioned by a single electric trim motor controlled through either the stab trim switches on the control wheel, autopilot trim or through the MCAS system. The stabilizer may also be positioned by manually rotating the stabilizer trim wheel.

31.     Switches on each control wheel actuate the electric trim motor through the main electric stabilizer trim circuit when the aircraft is flown manually. With the autopilot engaged, stabilizer trim is accomplished through the autopilot stabilizer trim circuit. The main electric and autopilot stabilizer trim have two speed modes: high speed with flaps extended and low speed with flaps retracted. If the autopilot is engaged, actuating either pair of stabilizer trim switches

automatically disengages the autopilot. The stabilizer trim wheels rotate whenever electric stabilizer trim is actuated.

32.     The STAB TRIM PRI cutout switch and the STAB TRIM B/U cutout switch on the Max 8 are located on the control stand. If either switch is positioned to CUTOUT, both the autopilot and main electric trim inputs are disconnected from the stabilizer trim motor.

33.     The control column actuated stabilizer trim cutout switches on the Max 8 stop operation of the main electric and autopilot trim when the control column movement opposes trim direction. This is not true for pitch commands for the MCAS. When the STAB TRIM override switch is positioned to OVRD, electric trim can be used regardless of control column position.

34.     Pitch trim is controlled by changing the pitch of the horizontal stabilizer. Changing pitch of the horizontal stabilizer can place large pitch forces on the aircraft. When applied appropriately, these forces can keep the aircraft in balance. When applied inappropriately, they can make the aircraft difficult to handle.

35.     Forces generated by the horizontal stabilizer from an out of trim condition can exceed the forces that can be generated by the elevator.

36.     It is possible on the Max 8, to have an out of trim condition that when countered by elevator control inputs from the crew, puts enough load on the pitch trim mechanism that it essentially jams the pitch trim control. Manual trim cannot overcome this load on the mechanism.

37.     The elevator is a smaller control surface when compared to the surface area of the controllable horizontal stabilizer.

38.     This scenario is depicted by the illustration below:

Boeing 737
**Jamming A Mistrimmed Horizontal Stabilizer**
To offset the aerodynamic forces created by a combination of the plane's attitude and speed, the horizontal stabilizer is trimmed by rotating around the pivot point. Electric motors or a manual hand-cranked trim wheel make these adjustments and reduce the force needed by the pilots to move the controls. If the stabilizer is tilted too high, this is called a mistrim and can create a dangerous situation that can paralyze manual control.

Pulling the pilot's controls raises the elevator. That creates an aerodynamic force downward on the tail to raise the nose.

Pivot point

Jackscrew
(inside the fuselage)

The elevator creates an opposing force against the jackscrew that swivels the stabilizer and makes hand-cranking the trim wheel to raise the nose extremely difficult.

Boeing 737 Next Generation shown for illustrative purposes. Source: Peter Lemme

● THE AIR CURRENT

39.     Electric trim works in a narrower range of motion than manual trim. If the stabilizer is out of trim and outside the range of electric trim operation, only manual trim can be used.

40.     In addition to its failure to warn, create a provide instructions to pilot and train pilots on the MCAS system and how to override the Flight Control System when it is provided with false AOA data, Boeing designed a pitch trim control system that is capable of jamming.

**CRASH OF ETHIOPIAN AIRLINES FLIGHT 302**

41.     On March 10, 2019 Ato Mulugeta Asfaw was a fare paying passenger onboard a Boeing 737-8 (Max) aircraft, ET-AVJ, Serial Number 62450, with an intended destination of Nairobi, Kenya.

42.     At 05:38 UTC, Ethiopian Airlines flight 302, Boeing 737-8(Max), ET-AVJ, took off from Addis Ababa Bole Int. Airport bound to Nairobi, Kenya Jomo Kenyatta Int. Airport. Shortly after takeoff, the Angle of Attack sensor that recorded that value became erroneous and

the left stick shaker activated and remained active until near the end of the flight. In addition, the airspeed and altitude values from the left air data system began deviating from the corresponding right side values. The Captain requested to return back to the departure airport. The aircraft crashed at 5:44 UTC 28 NM South East of Addis Ababa near Ejere village. There were 157 passengers and crew on board. All were fatally injured, and the aircraft was destroyed.

43.     Just one minute into the flight the Captain, Yared Getachew, reported that the crew was having flight-control problems. The anti-stall system then kicked in and pushed the nose of the aircraft down for nine seconds. Instead of climbing, the aircraft descended slightly. Audible warnings — "Don't Sink" — sounded in the cockpit. The pilots fought to turn the nose of the plane up, and briefly they were able to resume climbing. The MCAS system pushed the nose down again, triggering more squawks of "Don't Sink" from the plane's ground-proximity warning system. The pilots then flipped two switches and disconnected the anti-stall system, then tried to regain control. They asked to return to the airport but were continuing to struggle getting the aircraft to gain altitude. Power to controls was returned. The MCAS engaged again, pushing the plane into a nose dive. Thirty seconds later the cockpit voice recording ended, the plane crashed, and all 157 people on board were killed. The aircraft's impact created a 30 meter deep crater.

44.     According to a preliminary report issued by the Ethiopian Aircraft Accident Investigation Bureau, the following is what occurred, minute by minute.

45.     At 05:38:44, shortly after liftoff, the left and right recorded AOA values deviated. The left AOA decreased to 11.1 degrees then increased to 35.7 degrees while the value of the right AOA indicated 14.94 degrees. Then the left AOA value reached 74.5 degrees in ¾ seconds while the right AOA reached a maximum value of 15.3 degrees. At this time, the left stick shaker

activated and remained active until near the end of the recording. Also, the airspeed, altitude and flight director pitch bar values from the left side noted deviating from the corresponding right side values. The left side values were lower than the right side values until near the end of the recording.

46.     At 05:38:43 and about 50 ft radio altitude, the flight director roll mode changed to LNAV. At 05:38:46 and about 200 ft radio altitude, the Master Caution parameter changed state. The First Officer called out Master Caution Anti-Ice on CVR. Four seconds later, the recorded Left AOA Heat parameter changed state.

47.     At 05:38:58 and about 400 ft radio altitude, the flight director pitch mode changed to VNAV SPEED and the Captain called out "Command" (standard call out for autopilot engagement) and an autopilot warning is recorded. At 05:39:00, the Captain called out "Command". At 05:39:01 and about 630 ft radio altitude, a second autopilot warning is recorded.

48.     At 05:39:06, the Captain advised the First-Officer to contact radar and the First Officer reported SHALA 2A departure crossing 8400 ft and climbing FL 320. Between liftoff and 1000 ft above ground level (AGL), the pitch trim position moved between 4.9 and 5.9 units in response to manual electric trim inputs. At 1000 ft AGL, the pitch trim position was at 5.6 units. At 05:39:22 and about 1,000 feet the left autopilot (AP) was engaged (it disengaged about 33 seconds later), the flaps were retracted and the pitch trim position decreased to 4.6 units. Six seconds after the autopilot engagement, there were small amplitude roll oscillations accompanied by lateral acceleration, rudder oscillations and slight heading changes. These oscillations continued also after the autopilot was disengaged. At 05:39:29, radar controller identified ET-302 and instructed to climb FL 340 and when able right turns direct to RUDOL and the First-Officer acknowledged.

11

49.     At 05:39:42, Level Change mode was engaged. The selected altitude was 32000 ft. Shortly after the mode change, the selected airspeed was set to 238 kt.

50.     At 05:39:45, the Captain requested flaps up and the First-Officer acknowledged. One second later, the flap handle moved from 5 to 0 degrees and flaps retraction began. At 05:39:50, the selected heading started to change from 072 to 197 degrees and at the same time the Captain asked the First-Officer to request to maintain runway heading.

51.     At 05:39:55, Autopilot disengaged, at 05:39:57, the Captain advised the First-Officer to request to maintain runway heading and that they were having flight control problems. At 05:40:00 shortly after the autopilot disengaged, the FDR recorded an automatic aircraft nose down (AND) activated for 9.0 seconds and pitch trim moved from 4.60 to 2.1 units. The climb was arrested and the aircraft descended slightly.

52.     At 05:40:03 the Ground Proximity Warning System (GPWS) "DON'T SINK" alerts occurred. At 05:40:05, the First-Officer reported to ATC that they were unable to maintain SHALA 1A and requested runway heading which was approved by ATC.

53.     At 05:40:06, left and right flap position reached a recorded value of 0.019 degrees which remained until the end of the recording. The column moved aft and a positive climb was re-established during the automatic AND motion. At 05:40:12, approximately three seconds after AND stabilizer motion ends, electric trim (from pilot activated switches on the yoke) in the Aircraft nose up (ANU) direction is recorded on the DFDR and the stabilizer moved in the ANU direction to 2.4 units. The Aircraft pitch attitude remained about the same as the back pressure on the column increased.

54.     At 05:40:20, approximately five seconds after the end of the ANU stabilizer motion, a second instance of automatic AND stabilizer trim occurred and the stabilizer moved down and reached 0.4 units.

55.     From 05:40:23 to 05:40:31, three Ground Proximity Warning System (GPWS) "DON'T SINK" alerts occurred.

56.     At 05:40:27, the Captain advised the First-Officer to trim up with him. At 05:40:28 Manual electric trim in the ANU direction was recorded and the stabilizer reversed moving in the ANU direction and then the trim reached 2.3 units.

57.     At 05:40:35, the First-Officer called out "stab trim cut-out" two times. The Captain agreed and the First Officer confirmed stab trim cut-out. At 05:40:41, approximately five seconds after the end of the ANU stabilizer motion, a third instance of AND automatic trim command occurred without any corresponding motion of the stabilizer, which is consistent with the stabilizer trim cutout switches were in the ''cutout'' position.

58.     At 05:40:44, the Captain called out three times "Pull-up" and the First-Officer acknowledged. At 05:40:50, the Captain instructed the First Officer to advise ATC that they would like to maintain 14,000 ft and they had a flight control problem. At 05:40:56, the First-Officer requested ATC to maintain 14,000 ft and reported that they were having a flight control problem. ATC approved.

59.     From 05:40:42 to 05:43:11 (about two and a half minutes), the stabilizer position gradually moved in the AND direction from 2.3 units to 2.1 units. During this time, aft force was applied to the control columns which remained aft of neutral position. The left indicated airspeed increased from approximately 305 kt to approximately 340 kt (VMO). The right indicated

airspeed was approximately 20-25 kt higher than the left. The data indicates that aft force was applied to both columns simultaneously several times throughout the remainder of the recording.

60.　　At 05:41:20, the right overspeed clacker was recorded on Cockpit Voice Recorder. It remained active until the end of the recording. At 05:41:21, the selected altitude was changed from 32000 ft to 14000 ft. At 05:41:30, the Captain requested the First-Officer to pitch up with him and the First-Officer acknowledged.

61.　　At 05:41:32, the left overspeed warning activated and was active intermittently until the end of the recording. At 05:41:46, the Captain asked the First-Officer if the trim was functional. The First-Officer has replied that the trim was not working and asked if he could try it manually. The Captain told him to try.

62.　　At 05:41:54, the First-Officer replied that it was not working. At 05:42:10, the Captain asked and the First-Officer requested a vector to return and ATC approved.

63.　　At 05:42:30, ATC instructed ET-302 to turn right heading 260 degrees and the First-Officer acknowledged. At 05:42:43, the selected heading was changed to 262 degrees. At 05:42:51, the First-Officer mentioned Master Caution Anti-Ice. The Master Caution is recorded on DFDR.

64.　　At 05:42:54, both pilots called out "left alpha vane". At 05:43:04, the Captain asked the First Officer to pitch up together and said that pitch is not enough. At 05:43:11, about 32 seconds before the end of the recording, at approximately 13,4002 ft, two momentary manual electric trim inputs are recorded in the ANU direction. The stabilizer moved in the ANU direction from 2.1 units to 2.3 units.

65.　　At 05:43:20, approximately five seconds after the last manual electric trim input, an AND automatic trim command occurred and the stabilizer moved in the AND direction from

2.3 to 1.0 unit in approximately 5 seconds. The aircraft began pitching nose down. Additional

simultaneous aft column force was applied, but the nose down pitch continued, eventually

reaching 40 degrees nose down. The stabilizer position varied between 1.1 and 0.8 units for the

remainder of the recording. The left Indicated Airspeed increased, eventually reaching

approximately 458 kts and the right Indicated Airspeed reached 500 kts at the end of the

recording. The last recorded pressure altitude was 5,419 ft on the left and 8,399 ft on the right.

    66.    Data from the Flight Data Recorder on the aircraft can be seen below:



## BACKGROUND FACTS

    67.    Prior to the loss of all One Hundred and Fifty-Seven (157) lives in the Ethiopian

Airlines Crash of March 10, 2019 Boeing was put on notice that its Max 8 aircraft was defective

and dangerous and concealed these defects in order to sell more of the Max 8 airplanes.

15

68.     Boeing was put on notice time and time again that the Max 8 was unreasonably dangerous but failed to rectify the flawed design, failed to provide adequate working sensors or software fixes, failed to provide working warnings or alarms, failed to install, design or retrofit its aircraft with adequate sensors and failed to provide adequate warnings or training about the danger.  For Example:

69.     **Max 8 Danger Warning Number 1:** In 2006 the Future Aviation Safety Team ("FAST") published a 50 page study on "Increasing Reliance on Flight Deck Automation," after conducting a pilot survey among more than 190 pilot respondents, with a mean of 10,000 flying hours and 20 years in the business. [3] The top five hazards FAST identified with emerging autonomous flight systems included the following four out of five hazards all of which are applicable to the Max 8 MCAS and AOA sensor system:

a.  Failure of the flight crew to remain aware of automation mode and aircraft energy state;

b.  Unfamiliar modes of aircraft automation may result in a perfectly normal flying aircraft suddenly taking on characteristics that the pilot has seldom or never previously encountered;

c.  Latent flaws in the displays or primary flight control system may go undetected, because not enough human-in-the-loop testing is performed;

d.  Pilots may not be adequately trained to understand the philosophy of the automation design when the functionality is being automatically degraded in particular situations for reasons known only to the software.

---

[3] https://www.nlr.org/wp-content/uploads/2018/11/FAST-AC13-Hazard-Summary.pdf

70.     Despite the 2006 FAST report Boeing designed and used an automated flight system that it did not disclose to pilots. It used data from a single sensor that caused the aircraft to take on characteristics that the pilot did not previously encounter. Boeing intentionally did not train pilots to have notice that the aircraft might take on such characteristics nor what to do about it.

71.     Boeing designed an MCAS system with no Human in the Loop. HITL is defined as a model that requires human interaction. In HITL systems a human is always part of the simulation and consequently influences the outcome in such a way that is difficult to reproduce. Boeing failed to adequately train pilots about the existence of MCAS and then failed to inform pilots about how the system worked such that they could interact with it or override it.

72.     **Max 8 Safety Notice Number 2:** The crash of Turkish Airlines Flight 1951 in 2009, ten years prior to the Ethiopian Airlines Crash, demonstrated the risks of an automated flight-control system relying on data from a single sensor.[4]

73.     Investigators of the 2009 crash of a Turkish Airlines jet identified a faulty altitude sensor that thought the plane was closer to the ground than it was and triggered the engines to idle. The plane's second radio altimeter displayed the correct elevation, but it didn't matter: the automatic throttle was tied to the first gauge. The Amsterdam-bound plane crashed into a field, killing nine people and injuring 120.

74.     Boeing ended up changing that throttle system to prevent one erroneous altitude reading from cascading into tragedy, changes the U.S. Federal Aviation Administration subsequently made mandatory.

---

[4] https://www.bloomberg.com/news/articles/2019-05-07/boeing-max-failed-to-apply-safety-lesson-from-deadly-2009-crash

75.     The Turkish Airlines Crash, which injured and killed some of its own Boeing employees who happened to be on the flight, provided clear notice that relying upon one data point to provide information to the flight control system can be fatal.

76.     **Max 8 Safety Notice Number 3**: Lion Air 610 Crash of October 29, 2018. One Hundred and Eighty-Nine (189) lives were lost when a Max 8 crashed. Investigators quickly concluded that the MCAS system on the aircraft was activated resulting from erroneous angle of attack (AOA) information and the pilots were without an optional feature that would have alerted them to the error. This is the single biggest notice that Boeing had that its Max 8 aircraft was defective and dangerous yet it concealed these defects in order to sell more of the Max 8 airplanes.

77.     Boeing delivered the subject crashed Max 8 to Ethiopian Airlines after the Lion Air Crash. It flew the aircraft from Boeing Field in Seattle, Washington to Dublin, Ireland on November 15, 2018, delivering the aircraft in Addis Ababa on November 17, 2018.

**ET-AVJ Ethiopian Airlines Boeing 737 MAX 8**

| Airframe Details | |
|---|---|
| Manufacturer Serial Number (MSN) | 62450 |
| Line Number | 7243 |
| Aircraft Type | Boeing 737 MAX 8 |
| Age | 0.4 Years |
| Test registration | N1786B |
| Production Site | 🇺🇸 Renton (RNT) |
| Airframe Status | Written Off |

**EAL 302 Max 8 Delivered AFTER Lion Air Crash**

**OPERATOR HISTORY**

| REG | AIRCRAFT TYPE | AIRLINE | DELIVERED | CONFIG | ENGINES | HEX CODE | REMARKS |
|---|---|---|---|---|---|---|---|
| ET-AVJ | Boeing 737 MAX 8 | 🇪🇹 Ethiopian Airlines | Nov 2018 | C16Y144 | 2x LEAP | 040152 | Ferried BFI-DUB-ADD 🔵 15-17 Nov 2018 on delivery. Crashed 10 Mar 2019 en route ADD-NBO 🔵 near Bishoftu. Flight ET302 lost contact 6 minutes after take-off carrying 149 passengers and 8 crew members. |

18

78.     Only after the Lion Air Crash and the loss of 189 lives did Boeing tell different airlines months apart from one another that cockpit alerts for the AOA sensors did not work on the Max 8 due to a software error.

79.     Boeing told Southwest Airlines about the problem in late November 2018 and began installing additional cockpit warning systems by late November.

80.     Boeing told United Continental Holdings, Inc. about the software error toward the end of March, four months after Southwest and after the crash of Ethiopian Airlines Flight 302.

81.     **Max 8 Safety Notice Number 4:** In 2017 Boeing engineers learned that alerts were not operating as intended on the Max 8 due to a software error.[5] Instead of telling the Federal Aviation Administration or the airlines or pilots, it concealed this problem.

82.     **Max 8 Safety Notice Number 5:** During the action design of the Max 8 Boeing intentionally chose to use a single point failure system, without redundancies.[6] In aviation design it is essential to have a fail safe or backup. Boeing violated this simple aviation safety rule. Boeing engineers and managers noticed that this fundamental rule was being violated but did nothing.

83.     Boeing chose not to make the MCAS system redundant in order to make the Max 8 cheaper for training purposes, in order to sell more airplanes.

84.     Rick Ludtke, a former Boeing engineer who worked on designing the interfaces on the Max 8's flight deck, said managers mandated that any differences from the previous 737

---

[5] https://www.wsj.com/articles/boeing-knew-about-safety-alert-problem-for-a-year-before-telling-faa-airlines-11557087129
[6] https://www.seattletimes.com/business/boeing-aerospace/a-lack-of-redundancies-on-737-max-system-has-baffled-even-those-who-worked-on-the-jet/?utm_source=twitter&utm_medium=social&utm_campaign=article_inset_1.1

had to be small enough that they wouldn't trigger the need for pilots to undergo new simulator training.

85.     According to Mr. Ludtke, if the group had built the MCAS in a way that would depend on two sensors, and would shut the system off if one fails, he thinks the company would have needed to install an alert in the cockpit to make the pilots aware that the safety system was off. And if that happens, Ludtke said, the pilots would potentially need training on the new alert and the underlying system. That could mean simulator time, which was off the table."

## BOEING FALSIFIED AND OMMITTED INFORMATION FROM PILOTS AND AIRLINES

86.     Boeing concealed information about the MCAS system from its customers and passengers.

87.     Boeing purposefully concealed information about the MCAS system in order to sell more aircraft.

88.     Boeing affirmatively omitted information about the MCAS system from its Flight Control Manual on the Max 8.

89.     Boeing affirmatively chose not to instruct or train pilots on the MCAS system, in order to sell more Max 8 airplanes.

90.     After the public and pilots questioned the safety of the Max 8 Boeing continued to conceal and omit information about the safety of the Max 8, in order to sell more aircraft.

91.     After the public and pilots questioned the safety of the training for the Max 8, which does not rely upon simulator training, Boeing continued to downplay the need for simulator training, in order to sell more aircraft.

## BOEING CONSPIRED WITH THE FEDERAL AVIATION ADMINISTRATION

92.     Federal Aviation Administration safety engineers worked under constant pressure from their managers to delegate more and more work to Boeing itself, and to speedily approve the Max 8 safety assessments the Boeing designees came up with.[7]

93.     Boeing removed a senior engineer acting as an FAA Authorized Representative who raised questions about the speed with which the FAA was being asked to approve Boeing's changes to the Max 8.

94.     Federal Aviation Administration (FAA) engineers in Renton worked in a negative work environment created by FAA managers where safety engineers feared retaliation for attempting to hold Boeing accountable.

95.     According to the Seattle Times, the culture at the Renton, Washington aircraft certification office involved delegating more than the FAA technical specialists were comfortable with. When the FAA's safety engineers had an opinion different from Boeing's, FAA management in the office tended to side with Boeing.

96.     The current procedure under which aircraft are certified creates a system that is vulnerable to undue pressure and control from the aircraft manufacturer. This diagram from the Seattle Times illustrates the difference between how aircraft used to be certified to be allowed to be sold and flown and the current certification process.

---

[7] https://www.seattletimes.com/business/boeing-aerospace/engineers-say-boeing-pushed-to-limit-safety-testing-in-race-to-certify-planes-including-737-max/

## How the process of certifying an airplane changed




Reporting by **DOMINIC GATES**, Graphic by **MARK NOWLIN** / THE SEATTLE TIMES

97.     Boeing took advantage of this system in order to rush a dangerous airplane to market in order to compete with Airbus and increase its revenue.

98.     The FAA worked with Boeing to assist it in its abuse of this system and allowed a dangerous aircraft to be marketed, sold and flown globally.

## **FACTS ABOUT BOEING**

99.     Boeing markets itself as "the world's largest aerospace company and leading manufacturer of commercial jetliners" and claims "a long tradition of aerospace leadership and innovation" including "creating advanced technology solutions."

100.    With corporate headquarters in Chicago, Boeing employs more than 165,000 people across the United States and in more than 65 countries.

101.    Boeing claims it has "one of the most diverse, talented and innovative workforces anywhere."

102.    In Boeing's 2018 Annual Report, its reported annual revenue was $101.1 billion in revenue.

103.     Despite these resources, the Max 8 aircraft at issue was not equipped with appropriate sensors, warning systems, software, or a trim system to warn or protect the people on board that airplane from a computer initiated crash into terrain that resulted in a crater 30 meters deep.

104.     Despite these resources Boeing shifted the cost of Max 8 pilot training to the airlines and designed its aircraft in an unsafe manner to create a selling point- cheap training for flight crews.

105.     Despite these resources the subject aircraft's flight crew lacked training on how to mitigate or prevent an MCAS initiated crash from faulty AOA sensor data so that it could save the lives of the One Hundred and Fifty-Seven passengers and crew onboard.

106.     Boeing knew that information from a single AOA sensor could cause a fatal crash and knew that safer alternatives were available that were technologically available and economically feasible.

107.     Yet Boeing did not design or redesign or retrofit the subject Max 8 aircraft to remove or reduce the occurrence of these hazardous events.

108.     Rather than admit the truth about the Max 8, Boeing instead deliberately misrepresented the safety of its aircraft.

109.     For instance, after the Lion Air Crash and months prior to the Ethiopian Airlines Crash, pilots from the Allied Pilot's Association complained to Boeing about its concealment of the MCAS system and the danger of hiding information on the Max 8 from pilots. In response Boeing misrepresented the safety of the Max 8.[8]

---

[8] https://interestingengineering.com/pilots-confronted-boeing-about-risks-before-2nd-737-max-8-crash

110.     During that meeting a pilot said "We flat out deserve to know what's on our airplane." "I don't disagree," the official from Boeing responded. "[The pilots of Lion Air 610] didn't even know the damn system was on the airplane," another pilot said. "Nor did anybody else." The Boeing official stated "I don't know that understanding this system would have changed the outcome of this, in a million miles you're going to maybe fly this airplane, and maybe once you're going to see this ever." Four months later, Ethiopian Airlines flight 302 crashed minutes after take-off and evidence continues to mount that the MCAS was a major factor in the crashes of the two planes.

111.     Due to the danger posed by the Max 8 the Federal Aviation Administration has grounded the aircraft.

112.     As described in further detail herein, Boeing knew of the defects in the subject aircraft, knew that because of such defects the Max 8 was not airworthy, was on notice that the defects were likely to cause injury and death yet failed to adequately warn or instruct on the aircraft defects, failed to remedy the known defect in the subject aircraft, failed to discover the dangerous conditions when such could have been discovered and / or failed to take affirmative action to avoid injury to Plaintiffs and others.

113.     Because of Boeing's gross, willful, and reckless disregard for human life, families, including the Asfaw family, have mourned the loss of a loved one whose life should never have been put at risk. Families of the decedents were given soil from the crash site as they could not bury their loved ones because the bodies were burnt beyond recognition. Punitive damages should be awarded in this case to punish and deter Boeing and others from taking these kinds of risks with people's lives again.

## COUNT I
## Strict Liability: Design Defect, The Boeing Company

114.     **Plaintiffs** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

115.     Boeing designed, manufactured, distributed and/or sold the Boeing 737 Max 8, and its components parts, involved in the incident. **Defendants** were in the business of designing, testing, manufacturing, selling, assembling, building, distributing, marketing and/or inspecting aircraft as suitable for passenger transportation, including the subject Boeing 737 Max 8, and its component parts, that crashed in Ethiopia on March 10, 2019.

116.     At all times relevant hereinabove set forth, the subject Boeing 737 Max 8 aircraft, and its component parts, was being operated by **Ethiopian Airlines** and used for the purposes of which it was manufactured, designed, inspected, sold and intended to be used, in a manner reasonably foreseeable to Boeing.

117.     At all times relevant hereinabove set forth, the subject Boeing 737 Max 8, and its component parts, were defective, dangerous, unsafe, and not airworthy by reason of Boeing's defective manufacture, design, warning systems, inspections, testing, service, and/or maintenance of the subject aircraft, and its component parts, as set forth above. The aircraft, and its component parts, were in substantially similar condition to its original condition at delivery to **Ethiopian Airlines**.

118.     As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **Decedent** suffered pre-impact injury and death, including fear of impending and imminent death, and **Plaintiffs** have been damaged by the death of **Decedent**.

119.     As a direct and legal result of the wrongful acts and/or omissions of Defendant Boeing, hereinabove alleged, **Plaintiffs** suffered and continue to suffer the loss of love, society,

solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **Decedent**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

120.     As a further direct and legal result of the wrongful conduct of Boeing set forth above, **Plaintiffs** incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

121.     As a further direct and legal result of the wrongful conduct of Boeing set forth above, **Plaintiffs** suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

122.     The potential harm to airline passengers, pilots, crews, and the public from the 737 Max 8 was objectively foreseeable both in nature and in scope and were subjectively known to Boeing for all of the aforementioned reasons, including but not limited to: Boeing's own safety assessment of the AOA sensor and MCAS during development of the 737 Max 8 which revealed potential problems with the system; the evidence that flight control issues caused the crash of Lion Air Flight 610 and death of 189 people; complaints lodged by pilots regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; and Boeing's identification of a software upgrade to address problems with the AOA sensors and MCAS in the weeks and months prior to the crash of Flight 302.

123.     As set forth above and as will be shown by proof, there is a high degree of certainty that **Plaintiffs** have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and Boeing's conduct. A high degree of moral blame is attached to Boeing's conduct, and the policy of preventing future harm justifies both the

recognition of the existence of a duty of care owed by Boeing to all **Plaintiffs** and the imposition of all damages described above.

124.     Based on the foregoing, Boeing, acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, such that **Plaintiffs** request that the trier of fact, in the exercise of sound discretion, award **Plaintiffs** additional damages for the sake of example and sufficient to punish Boeing, for its despicable conduct, in an amount reasonably related to **Plaintiffs'** actual damages and Boeing financial condition, yet sufficiently large enough to be an example to others and to deter Boeing and others from engaging in similar conduct in the future.

WHEREFORE, Plaintiff requests judgment against Defendant THE BOEING COMPANY for compensatory damages, punitive damages, costs, fees, and all other awards deemed just. The plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

## COUNT II
### Strict Liability: Defect in Warnings / Instructions, The Boeing Company

125.     **Plaintiffs** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

126.     Defendant Boeing designed, manufactured, distributed and/or sold the Boeing 737 Max 8 involved in the incident. Defendant Boeing was in the business of designing, testing, manufacturing, selling, assembling, building, distributing, marketing and/or inspecting aircraft as suitable for passenger transportation, including the subject Boeing 737 Max 8 that crashed in Ethiopia on March 10, 2019.

127.     At all times relevant hereinabove set forth, the subject Boeing 737 Max 8 aircraft was being operated by **Ethiopian Airlines** and used for the purposes of which it was

manufactured, designed, inspected, sold and intended to be used, in a manner reasonably foreseeable to Defendant Boeing.

128. At all times relevant hereinabove set forth, the subject Boeing 737 Max 8 was defective, dangerous, unsafe, and not airworthy by reason of Defendant Boeing's defective manufacture, design, warning systems, inspections, testing, service, and/or maintenance of the subject aircraft as set forth above.

129. At all times relevant hereinabove set forth, Boeing had knowledge that the subject Boeing 737 Max 8 was defective, dangerous, unsafe, and not airworthy, and in particular, Boeing had knowledge of the unreasonably unsafe design of the AOA sensor and automated MCAS, as well as the potential life and death risks of such a failure in these systems.

130. At all times relevant hereinabove set forth, the risks of failure of the Boeing 737 Max 8 due the aircraft's unreasonably dangerous and defective design presented a substantial danger when the aircraft is used or misused in an intended or reasonably foreseeable way.

131. Ordinary consumers, including but not limited to airlines, flight crew, and passengers, would not have recognized the potential risks presented by the aircraft's unreasonably dangerous and defective design.

132. As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **Decedent** suffered pre-impact injury and death, including fear of impending and imminent death, and **Plaintiffs** have been damaged by the death of **Decedent**.

133. As a direct and legal result of the wrongful acts and/or omissions of Defendant Boeing, hereinabove alleged, **Plaintiffs** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support

from **Decedent**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

134.    As a further direct and legal result of the wrongful conduct of Boeing set forth above, **Plaintiffs** incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

135.    As a further direct and legal result of the wrongful conduct of Boeing set forth above, **Plaintiffs** suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

136.    The potential harm to airline passengers, pilots, crews, and the public from the 737 Max 8 was objectively foreseeable both in nature and in scope and were subjectively known to Boeing for all of the aforementioned reasons, including but not limited to: Boeing's own safety assessment of the AOA sensor and MCAS during development of the 737 Max 8 which revealed potential problems with the system; the evidence that flight control issues caused the crash of Lion Air Flight 610 and death of 189 people; complaints lodged by pilots in the regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; and Boeing's identification of a software upgrade to address problems with the AOA sensors and MCAS in the weeks and months prior to the crash of Flight 302.

137.    As set forth above and as will be shown by proof, there is a high degree of certainty that **Plaintiffs** have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and Boeing's conduct. A high degree of moral blame is attached to Boeing's conduct, and the policy of preventing future harm justifies both the

recognition of the existence of a duty of care owed by Boeing to all **Plaintiffs** and the imposition of all damages described above.

138.     Based on the foregoing, Boeing, acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights    and/or safety of others, such that **Plaintiffs** request that the trier of fact, in the exercise of sound discretion, award **Plaintiffs** additional damages for the sake of example and sufficient to punish Boeing, for its despicable conduct, in an amount reasonably related to **Plaintiffs'** actual damages and Boeing's financial condition, yet sufficiently large enough to be an example to others and to deter Boeing and others from engaging in similar conduct in the future.

WHEREFORE, Plaintiffs request judgment against Defendant THE BOEING COMPANY for compensatory damages, punitive damages, costs, fees, and all other awards deemed just. The plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

## COUNT III
### Breach of Warranty, The Boeing Company

139.     **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

140.     **BOEING** was the designer, manufacturer, distributor and/or seller of the Boeing 737 MAX 8, and/or its component parts, involved in the subject crash.

141.     Prior to the crash of Flight 302, **BOEING** expressly and/or impliedly warranted and represented that the subject aircraft (the **BOEING** 737 MAX 8) including its component parts and instruments, and in conjunction with the instructions and warnings given by **BOEING**, was airworthy, of merchantable quality, both fit and safe for the purpose of commercial air travel for which it was designed, intended and used. Additionally, **BOEING** further warranted that the subject aircraft, and its component parts, was free from all defects.

30

142.     **BOEING** breached said warranties in that the subject aircraft was not airworthy, of merchantable quality, or fit and safe for the purposes for which it was designed, intended and used, and free from all defects as set forth above. The aircraft, and its component parts, were in substantially similar condition to its original condition at delivery to **ETHOPIAN AIRLINES**.

143.     **DECEDENT**, as a passenger of Flight 302, was an intended third-party beneficiary of **BOEING's** warranties that Flight 302 (the **BOEING** 737 MAX 8 and its component parts) was airworthy, of merchantable quality, both fit and safe for the purposes for which it was designed, intended and used, and free from all defects.

144.     **DECEDENT** reasonably relied on these warranties to **DECEDENT's** detriment.

145.     As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **DECEDENT** suffered pre-impact injury and death, including fear of impending and imminent death, and **PLAINTIFFS** have been damaged by the death of **DECEDENT**.

146.     As a direct and legal result of the wrongful acts and/or omissions of Defendant **BOEING**, hereinabove alleged, **PLAINTIFFS** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **DECEDENT**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

147.     As a further direct and legal result of the wrongful conduct of **BOEING** set forth above, **PLAINTIFFS** incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

148.     As a further direct and legal result of the wrongful conduct of **BOEING** set forth above, **PLAINTIFFS** suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

149.    The potential harm to airline passengers, pilots, crews, and the public from the 737 MAX 8 was objectively foreseeable both in nature and in scope and were subjectively known to **BOEING** for all of the aforementioned reasons, including but not limited to: **BOEING's** own safety assessment of the AOA sensor and MCAS during development of the 737 MAX 8 which revealed potential problems with the system; the evidence that flight control issues caused the crash of Lion Air Flight 610 and death of 189 people; complaints lodged by pilots in the ASRS database regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; and **BOEING's** identification of a software upgrade to address problems with the AOA sensors and MCAS in the weeks and months prior to the crash of Flight 302.

150.    As set forth above and as will be shown by proof, there is a high degree of certainty that **PLAINTIFFS** have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and **BOEING's** conduct. A high degree of moral blame is attached to **BOEING's** conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by **BOEING** to all **PLAINTIFFS** and the imposition of all damages described above.

151.    Based on the foregoing, **BOEING**, acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, such that **PLAINTIFFS** request that the trier of fact, in the exercise of sound discretion, award **PLAINTIFFS** additional damages for the sake of example and sufficient to punish **BOEING**, for its despicable conduct, in an amount reasonably related to **PLAINTIFFS'** actual damages and **BOEING's** financial condition, yet sufficiently large enough to be an example to others and to deter **BOEING** and others from engaging in similar conduct in the future.

WHEREFORE, Plaintiffs request judgment against Defendant THE BOEING COMPANY for compensatory damages, punitive damages, costs, fees, and all other awards deemed just. The plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

## COUNT IV
## Negligence, The Boeing Company

152. **Plaintiffs** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

153. At all relevant times hereinabove set forth, Defendant Boeing was the designer, manufacturer, distributor and/or seller of the Boeing 737 Max 8 aircraft. Defendant Boeing was, at all times relevant, in the business of designing, testing, manufacturing, selling, assembling, building, distributing, marketing and/or inspecting aircraft as suitable and safe for passenger transportation, including the subject Boeing 737 Max 8 that crashed in Ethiopia on March 10, 2019.

154. At all relevant times hereinabove set forth, Defendant Boeing operated, supervised, managed and/or oversaw the training and instruction of all Max 8 pilots and knew or should have known that the pilots of Ethiopian Airlines Flight 302 could not safely fly the Max 8.

155. At all times hereinabove set forth, Boeing breached its duty of care to **Decedent** as a passenger aboard Flight 302 with respect to the design, manufacture, inspection, testing, assembly, certification, distribution, and/or sale of a safe, airworthy aircraft; including the failure to train, instruct, and/or issue advisory warnings necessary to assure the safe operation, control, management and/or maintenance of the aircraft. Boeing's acts and/or omissions include, but are not limited to the following:

33

a. Designing, manufacturing, assembling and/or certifying an aircraft with an anti- stall system controlled by a single AOA sensor instead of two; or

b. Designing manufacturing, assembling and/or certifying an aircraft with an anti-stall system which was susceptible to failure without redundant systems; or

c. Designing, manufacturing, assembling and/or certifying an aircraft with a flight control system susceptible to bad data from the AOA sensor, and failing to install AOA indicators and/or AOA disagree lights as standard features rather than optional upgrades; or

d. Designing, manufacturing, assembling and/or certifying an aircraft with a flight control system that would initiate a dangerous automated dive without any command from a pilot and without a means to promptly override the automated dive; or

e. Marketing and selling the 737 Max 8 as an analog to Boeing's 737NG to consciously and intentionally induce airlines to avoid the time-consuming retraining of airline pilots with the knowledge that the Max 8 contained a new and potentially dangerous MCAS automated flight control system; or

f. Failing to provide adequate warning with regard to the 737 Max 8's MCAS and the risk of an automated dive without any command from a pilot, or clear instruction to promptly override such an MCAS automated dive; or

g. Failing to conduct a thorough and accurate safety assessment of the aircraft, including Boeing's failure in its safety assessment to account for the degree to which the MCAS could move the horizontal stabilizer of the aircraft and failure to account for the resetting of the automated dive after each command from a pilot; or

h. Failing to properly train pilots on the new automated MCAS systems on the 737 Max 8; or

i. Failing to properly train pilots to identify an AOA sensor failure and MCAS input; or

j. Failing to properly train pilots to disengage the stabilizer trim motor on the 737 Max 8 in the event of an AOA sensor failure or unanticipated dive; or

k. Designing, assembling, and distributing a flight manual that did not warn of the risks presented by the MCAS, faulty AOA sensors, or automated dives; or

l. Designing, manufacturing, assembling and/or certifying an airplane flight manual that failed to provide clear instruction or procedures on how to promptly override an automated MCAS dive; or

m. Failing to promptly issue a software patch to address the risk of malfunctioning AOA sensors and automated MCAS dives following the October 29, 2018 crash of Lion Air Flight JT 610; or

n. Failing to ground all 737 Max 8 aircraft following the crash of Lion Air Flight JT 610 until such a software patch and/or other safety procedures could be implemented; or

o. Failing to properly warn pilots, airlines, and the public of the risk of malfunctioning AOA sensors and automated MCAS dives following the crash of Lion Air Flight JT 610.

156. As a direct and legal result of Defendant Boeing's negligence, carelessness, gross negligence, recklessness and/or otherwise wrongful acts and/or omissions hereinabove set forth, **Decedent** died in the crash of Flight 302.

157. As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **Decedent** suffered pre-impact injury and death, including fear of impending and imminent death, and **Plaintiffs** have been damaged by the death of **Decedent**.

158. As a direct and legal result of the wrongful acts and/or omissions of Defendant Boeing, hereinabove alleged, **Plaintiffs** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **Decedent**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

159. As a further direct and legal result of the wrongful conduct of Boeing set forth above, **Plaintiffs** incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

160. As a further direct and legal result of the wrongful conduct of Boeing set forth above, **Plaintiffs** suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

161. The potential harm to airline passengers, pilots, crews, and the public from the 737 Max 8 was objectively foreseeable both in nature and in scope and were subjectively known to Boeing for all of the aforementioned reasons, including but not limited to: Boeing's own safety

assessment of the AOA sensor and MCAS during development of the 737 Max 8 which revealed potential problems with the system; the evidence that flight control issues caused the crash of Lion Air Flight 610 and death of 189 people; complaints lodged by pilots regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; and Boeing's identification of a software upgrade to address problems with the AOA sensors and MCAS in the weeks and months prior to the crash of Flight 302.

162.    As set forth above and as will be shown by proof, there is a high degree of certainty that **Plaintiffs** have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and Boeing's conduct. A high degree of moral blame is attached to Boeing's conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by Boeing to all **Plaintiffs** and the imposition of all damages described above.

163.    Based on the foregoing, Boeing, acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, such that **Plaintiffs** request that the trier of fact, in the exercise of sound discretion, award **Plaintiffs** additional damages for the sake of example and sufficient to punish Boeing, for its despicable conduct, in an amount reasonably related to **Plaintiffs'** actual damages and Boeing's financial condition, yet sufficiently large enough to be an example to others and to deter Boeing and others from engaging in similar conduct in the future.

WHEREFORE, Plaintiffs request judgment against Defendant THE BOEING COMPANY for compensatory damages, punitive damages, costs, fees, and all other

awards deemed just. The plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

## COUNT V
## Civil Conspiracy, The Boeing Company

164.     **Plaintiffs** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

165.     Defendant Boeing entered into an agreement with the FAA, and its agents, employees, and/or directors, and/or other persons and/or entities to accomplish by concerted action either an unlawful purpose or a lawful purpose by unlawful means.

166.     Boeing and its co-conspirators committed tortious and/or unlawful acts in furtherance of this agreement, including but not limited to, deceiving the public as to the safety of the 737 Max 8 aircraft and its component parts and systems, certifying the aircraft and the MCAS as safe based upon false and/or inaccurate information, failing to provide clear instruction in flight manuals or informing pilots as to automated systems embedded in the 737 Max 8 aircraft, denying technical experts the necessary time or resources to thoroughly evaluate the 737 Max 8 aircraft, and compelling technical experts to certify the aircraft despite their concerns about the safety of the 737 Max 8, all in violation of applicable laws, regulations, and mandatory duties.

167.     As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **Decedent** suffered pre-impact injury and death, including fear of impending and imminent death, and **Plaintiffs** have been damaged by the death of **Decedent**.

168.     As a direct and legal result of the wrongful acts and/or omissions of Defendant Boeing, hereinabove alleged, **Plaintiffs** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support

from **Decedent**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

169.    As a further direct and legal result of the wrongful conduct of Boeing set forth above, **Plaintiffs** incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

170.    As a further direct and legal result of the wrongful conduct of Boeing set forth above, **Plaintiffs** suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

171.    The potential harm to airline passengers, pilots, crews, and the public from the 737 Max 8 was objectively foreseeable both in nature and in scope and were subjectively known to Boeing for all of the aforementioned reasons, including but not limited to: Boeing's own safety assessment of the AOA sensor and MCAS during development of the 737 Max 8 which revealed potential problems with the system; the evidence that flight control issues caused the crash of Lion Air Flight 610 and death of 189 people; complaints lodged by pilots regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; and Boeing's identification of a software upgrade to address problems with the AOA sensors and MCAS in the weeks and months prior to the crash of Flight 302.

172.    As set forth above and as will be shown by proof, there is a high degree of certainty that **Plaintiffs** have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and Boeing's conduct. A high degree of moral blame is attached to Boeing's conduct, and the policy of preventing future harm justifies both the

recognition of the existence of a duty of care owed by Boeing to all **Plaintiffs** and the imposition of all damages described above.

173.     Based on the foregoing, Boeing, acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, such that **Plaintiffs** request that the trier of fact, in the exercise of sound discretion, award **Plaintiffs** additional damages for the sake of example and sufficient to punish Boeing, for its despicable conduct, in an amount reasonably related to **Plaintiffs'** actual damages and Boeing's financial condition, yet sufficiently large enough to be an example to others and to deter Boeing and others from engaging in similar conduct in the future.

WHEREFORE, Plaintiffs request judgment against Defendant THE BOEING COMPANY for compensatory damages, punitive damages, costs, fees, and all other awards deemed just. The plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

### COUNT VI
### Negligence, Rosemount Aerospace

174.     **Plaintiffs** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

175.     At all relevant times hereinabove set forth, Defendant **Rosemount** owed a duty to the occupants of Boeing's 737 Max 7 aircraft and the general public, including the **Decedent**, to exercise reasonable care to properly develop, design, engineer, test, manufacture, produce, process, supply, deliver, monitor, market, label, adequately warn, recommend, advertise and/or sell angle of attack sensors, and/or refrain from introducing area of attack sensors into the stream of commerce and for the use in 737 Max aircraft, including the subject aircraft.

176.     The defective conditions in the Angle of Attack sensor, as discussed above, and the consequent crash of Flight 302 were legally caused by the negligence, gross negligence, wrongdoing, tortious conduct, careless acts and omissions of Defendant **Rosemount** in the development, design, engineering, testing, manufacturing, production, processing, supplying, delivery, monitoring, marketing, labeling, and selling, and **Rosemount's** failure to warn and failure to take remedial appropriate remedial action with respect to any and all known dangerously defective conditions.

177.     As a direct and legal result of Defendant **Rosemount's** negligence, carelessness, gross negligence, recklessness and/or otherwise wrongful acts and/or omissions hereinabove set forth, **Decedent** died in the crash of Flight 302.

178.     As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **Decedent** suffered pre-impact injury and death, including fear of impending and imminent death, and **Plaintiffs** have been damaged by the death of **Decedent**.

179.     As a direct and legal result of the wrongful acts and/or omissions of Defendant **Rosemount**, hereinabove alleged, **Plaintiffs** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **Decedent**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

180.     As a further direct and legal result of the wrongful conduct of **Rosemount** set forth above, **Plaintiffs** incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

181.    As a further direct and legal result of the wrongful conduct of **Rosemount** set forth above, **Plaintiffs** suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

WHEREFORE, Plaintiffs request judgment against Defendant ROSEMONT AEROSPACE, INC. for compensatory damages, punitive damages, costs, fees, and all other awards deemed just. The plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

### COUNT VII
### <u>Strict Liability, Rosemount Aerospace</u>

182.    **Plaintiffs** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

183.    At all relevant times hereinabove set forth, Defendant **Rosemount** was the designer, manufacturer, engineer, distributor and/or seller of aerospace products, including Angle of Attack sensors, who hold and have held themselves out to the public as having superior knowledge, skill and expertise in the design, testing, engineering, manufacture, and distribution of aerospace sensors for commercial aircraft and, in the course of its business, Defendant **Rosemount** designed, tested, manufactured, engineered and caused to be placed into the stream of commerce, a product known as an Angle of Attack sensor for utilization in the Boeing 737 Max 8 aircraft.

184.    Defendant **Rosemount** expressly or impliedly warranted that the Angle of Attack sensor was fit for its intended use in commercial aircraft, being free of defects in their design and/or maintenance and, further, Defendant **Rosemount** marketed, sold, distributed, and caused to be introduced into the stream of commerce by sale to Defendant Boeing. The Angle of Attack sensor was in substantially similar condition to its original condition at delivery to Boeing.

41

185. Defects in the Angle of Attack sensor were a legal cause of the subject air crash, and the defects made the subject aircraft unreasonably dangerous for travel.

186. As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **Decedent** suffered pre-impact injury and death, including fear of impending and imminent death, and **Plaintiffs** have been damaged by the death of **Decedent**.

187. As a direct and legal result of the wrongful acts and/or omissions of Defendant **Rosemount**, hereinabove alleged, **Plaintiffs** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **Decedent**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

188. As a further direct and legal result of the wrongful conduct of **Rosemount** set forth above, **Plaintiffs** incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

189. As a further direct and legal result of the wrongful conduct of **Rosemount** set forth above, **Plaintiffs** suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

WHEREFORE, Plaintiffs request judgment against Defendant ROSEMONT AEROSPACE, INC. for compensatory damages, punitive damages, costs, fees, and all other awards deemed just. The plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

## COUNT VIII
## Negligence, Collins

190.     **Plaintiffs** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

191.     At all relevant times hereinabove set forth, Defendant **Collins** owed a duty to the occupants of Boeing's 737 Max 7 aircraft and the general public, including the **Decedent**, to exercise reasonable care to properly develop, design, engineer, test, manufacture, produce, process, supply, deliver, monitor, market, label, adequately warn, recommend, advertise and/or sell the MCAS system and its software and/or refrain from introducing the MCAS system into the stream of commerce and for the use in 737 Max aircraft, including the subject aircraft.

192.     The defective conditions in the MCAS system and its software as discussed above, and the consequent crash of Flight 302 were legally caused by the negligence, gross negligence, wrongdoing, tortious conduct, careless acts and omissions of Defendant **Collins** in the development, design, engineering, testing, manufacturing, production, processing, supplying, delivery, monitoring, marketing, labeling, and selling, and **Collins's** failure to warn and failure to take remedial appropriate remedial action with respect to any and all known dangerously defective conditions.

193.     As a direct and legal result of Defendant **Collins's** negligence, carelessness, gross negligence, recklessness and/or otherwise wrongful acts and/or omissions hereinabove set forth, **Decedent** died in the crash of Flight 302.

194.     As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **Decedent** suffered pre-impact injury and death, including fear of impending and imminent death, and **Plaintiffs** have been damaged by the death of **Decedent**.

195.    As a direct and legal result of the wrongful acts and/or omissions of Defendant **Collins**, hereinabove alleged, **Plaintiffs** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **Decedent**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

196.    As a further direct and legal result of the wrongful conduct of **Collins** set forth above, **Plaintiffs** incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

197.    As a further direct and legal result of the wrongful conduct of **Collins** set forth above, **Plaintiffs** suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

WHEREFORE, Plaintiffs request judgment against Defendant COLLINS for compensatory damages, punitive damages, costs, fees, and all other awards deemed just. The plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

## COUNT IX
## Strict Liability Collins

198.    **Plaintiffs** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

199.    At all relevant times hereinabove set forth, Defendant **Collins** was the designer, programmer, manufacturer, engineer, distributor and/or seller of aerospace products, including the MCAS system and its software who hold and have held themselves out to the public as having superior knowledge, skill and expertise in the design, testing, engineering, manufacture, and distribution of MCAS systems and software for commercial aircraft and, in the course of its business, Defendant **Collins** designed, programmed, tested, manufactured, engineered and

caused to be placed into the stream of commerce, a product known as the MCAS system and its software for utilization in the Boeing 737 Max 8 aircraft.

200.     Defendant **Collins** expressly or impliedly warranted that the MCAS system and its software was fit for its intended use in commercial aircraft, being free of defects in their design and/or maintenance and, further, Defendant **Collins** marketed, sold, distributed, and caused to be introduced into the stream of commerce by sale to Defendant Boeing. The MCAS system and its software was in a substantially similar condition to its original condition at delivery to Boeing.

201.     Defects in the MCAS system and its software were a legal cause of the subject air crash, and the defects made the subject aircraft unreasonably dangerous for travel.

202.     As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **Decedent** suffered pre-impact injury and death, including fear of impending and imminent death, and **Plaintiffs** have been damaged by the death of **Decedent**.

203.     As a direct and legal result of the wrongful acts and/or omissions of Defendant **Collins**, hereinabove alleged, **Plaintiffs** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **Decedent**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

204.     As a further direct and legal result of the wrongful conduct of **Collins** set forth above, **Plaintiffs** incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

205.  As a further direct and legal result of the wrongful conduct of **Collins** set forth above, **Plaintiffs** suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

WHEREFORE, Plaintiffs request judgment against Defendant COLLINS for compensatory damages, punitive damages, costs, fees, and all other awards deemed just. The plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

/s/ Joseph A. Power, Jr.
*Attorneys for Plaintiff*
Joseph A. Power, Jr.
Kathryn L. Conway
Jonathan M. Thomas
James I. Power
POWER ROGERS & SMITH, LLP
70 West Madison Street, 55th Floor
Chicago, IL 60602
Tel: (312) 236-9381
Firm No. 31444
JoePower@prslaw.com
KConway@prslaw.com

Rick Friedman
Alisa Brodkowitz
Rachel Luke
FRIEDMAN RUBIN
1126 Highland Ave.
Bremerton, WA 98337
Tel: (206) 501-4446

Shakespear Feyissa
Law Offices of Shakespear Feyissa
1001 4th Ave.
Safeco Plaza Suite 3200
Seattle, WA 98154
*Pro Hac Vice Pending*