IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF
ILLINOIS EASTERN DIVISION

| | |
|---|---|
| IN RE ETHIOPIAN AIRLINES FLIGHT ET 302 CRASH | Lead Case No.: 19-cv-02170 |
| Plaintiffs, | *This Filing Relates to All Actions* |
| v. | |
| THE BOEING COMPANY, a Delaware corporation; ROSEMOUNT AEROSPACE, INC., a Delaware corporation; ROCKWELL COLLINS, INC., a Delaware corporation, | |
| Defendants. | |

## DEFENDANT ROCKWELL COLLINS, INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' MASTER COMPLAINT

NOW COMES Defendant, ROCKWELL COLLINS, INC. ("ROCKWELL COLLINS"),

by and through its attorneys, FITZPATRICK & HUNT, PAGANO, AUBERT, LLP, and for its

Answer and Affirmative Defenses to Plaintiffs' Master Complaint at Law in this consolidated

matter alleges and shows to the court as follows:

## I.     INTRODUCTION

1.     This action arises from the horrific crash of Ethiopian Airlines Flight ET 302
("Flight 302") on March 10, 2019 in which 157 people lost their lives. The airplane involved in
Flight 302 was a Boeing 737 MAX 8. This crash came less than five months after Lion Air Flight
JT 610 – another Boeing 737 MAX 8 – crashed into the Java Sea on October 29, 2018, killing all
189 onboard.

**ANSWER:** ROCKWELL COLLINS admits that Plaintiffs' Complaint alleges various

claims associated with the March 10, 2019, crash of a Boeing 737 Max 8 aircraft, operated by

Ethiopian Airlines as Flight 302 (the "Aircraft") that resulted in the deaths of all occupants.

ROCKWELL COLLINS also admits that on October 29, 2018, a Boeing 737 MAX 8 aircraft

operated by Lion Air as flight 610, impacted the Java Sea resulting in the deaths of all occupants.

ROCKWELL COLLINS denies all remaining allegations of Paragraph 1.

2.      Investigations are ongoing, but a common cause is behind both crashes. Shortly after takeoff and while attempting to climb, pilots for both airplanes experienced dangerous, confusing, and counter-intuitive warnings and flight control anomalies which caused the planes to pitch up and down erratically through the sky in repeated, extreme maneuvers uncommanded by the pilots. Data obtained from both airplanes show that the pilots were engaged in a terrifying tug-of-war with the planes' Maneuvering Characteristics Augmentation System (MCAS) as the pilots manually tried to pull the airplanes' noses up while MCAS repeatedly caused the plane to dive. Pilots of both Flight 302 and Flight 610 lost their fight with **BOEING's** MCAS, and 346 passengers and flight crew lost their lives. [Graphic Omitted].

**ANSWER:** ROCKWELL COLLINS admits that all occupants onboard Flight 302 and Flight 610 lost their lives. ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 2 and on that basis denies same. Further answering ROCKWELL COLLINS states that, upon information and belief, the official investigation into the loss of Flight 302 is ongoing and that, as of the date of this Answer, the official report regarding this loss has not been released.

3.      The MCAS was a disaster waiting to happen born out of **BOEING's** desperate race with its only true competitor in the commercial aviation market, Airbus SE ("Airbus"). To compete with the latest Airbus airplane, the A320 neo, **BOEING** needed to use larger and more fuel-efficient engines for the 737 MAX 8 airplane, engines which in turn caused aerodynamic and handling problems that made the 737 MAX 8 operate differently than prior 737 airplanes. If the 737 MAX 8 handled differently than its predecessors, then it would require costly and time-consuming training for pilots, which would make the 737 MAX 8 more expensive relative to the A320neo and less profitable for **BOEING**. Rather than fix the airplane's known, design-induced, inherent aerodynamic instability, **BOEING** installed the defective MCAS in a deceptive effort to more closely replicate the handling characteristics of the previous 737 aircraft.

**ANSWER:** The allegations contained in Paragraph 3 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 3 and on that basis denies same.

4.      **BOEING** was able to get the defective MCAS past regulators because, as the

largest aircraft manufacturer in the world and one of the most powerful corporations in the United States, **BOEING** has long had the ability to exercise tremendous influence over the FAA. **BOEING** convinced the FAA to allow it to rely on a 1960's FAA certification of prior 737 airplanes and a flawed self-certification process to get the 737 MAX 8, with the dangerous MCAS, into the hands of pilots quickly and with almost no training.

**ANSWER:** The allegations contained in Paragraph 4 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 4 and on that basis denies same.

5.     Blinded by greed, **BOEING** haphazardly rushed the 737 MAX 8 to market to keep up with Airbus, misleading the FAA, the airlines, their pilots, and the public by actively concealing the dangerous nature of the aircraft as well as the MCAS's defects. At numerous points leading up to the crashes **BOEING** consciously disregarded the lives of others, including by: designing an airplane with the powerful automated MCAS susceptible to catastrophic failure in the event a single defective angle of attack sensor; failing to properly inform pilots about the new system and failing educate and train them in all aspects of its operation; failing to properly address the MCAS in the airplane's flight manual; refusing to include key safety features as standard in the airplane rather than optional upgrades; deceptively seeking and obtaining from the FAA an exemption for the 737 MAX 8 allowing **BOEING** to obtain certification of the airplane without including a robust cockpit alert system as required by FAA regulations; delivering 737 MAX 8 airplanes with a version of the flight control system that was materially different from the flight control system presented to the FAA during certification; and concealing and downplaying the 737 MAX 8's safety issues from the FAA, airlines, pilots, and the public. **BOEING** was warned about the defects in the MCAS system by its own employees—and was aware that it was misleading the FAA—but failed to act for fear that disclosing or properly fixing the defects might delay production of the 737 MAX 8.

**ANSWER:** ROCKWELL COLLINS denies that any software code provided to Boeing by ROCKWELL COLLINS that was present on the accident aircraft was defective or otherwise failed to operate as designed by Boeing due to any act or omission by ROCKWELL COLLINS. The remaining allegations contained in Paragraph 5 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 5 and on that basis denies same.

6.    Even more shocking, **BOEING** failed to take appropriate action after the tragic crash of Lion Air Flight JT 610 in October 2018. After that crash, **BOEING** again deceived the FAA and other government leaders in Washington D.C. about the 737 MAX 8's defects, the MCAS, and causes of the Lion Air crash. **BOEING** convinced the FAA to keep the 737 MAX 8 flying and, even after **BOEING** identified the problems with MCAS, failed to implement immediate corrective action.

**ANSWER:** The allegations contained in Paragraph 6 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 6 and on that basis denies same.

7.    Throughout, **BOEING** again and again put profits over safety with repeated claims that the 737 MAX 8 is so similar to the **BOEING** 737NG that it did not require significant additional training for pilots familiar with the older generation of 737s. Even after Lion Air Flight 610 crashed, **BOEING** falsely insisted and convinced the FAA, pilots, and airlines that pilot retraining was not required because **BOEING** feared airlines would buy fewer **BOEING** airplanes if pilots required extensive training. In so doing, **BOEING** risked people's lives—and ultimately traded hundreds of lives—merely for an improved bottom line.

**ANSWER:** The allegations contained in Paragraph 7 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 7 and on that basis denies same.

8.    **BOEING** knew that the 737 MAX 8 was dangerously defective from the start. It then made an already dangerous airplane even more deadly when it added the recklessly conceived MCAS. **BOEING** concealed these known dangers from the FAA to obtain regulatory approval through a rigged self-certification process. The airplane's flaws and deadly consequences were undeniable after Lion Air Flight JT 610 crashed, yet **BOEING** still refused to ground the airplane. Instead **BOEING** convinced the FAA to keep the airplanes flying across the globe, without additional pilot training or safety precautions. **BOEING** intentionally chose to expose flight crews and passengers to the known risks of another catastrophic accident and, predictably, 157 lives were lost in the Ethiopian Airlines Flight 302 disaster as a result. No company should be allowed to so cavalierly risk lives and undermine government safety regulators; **BOEING** must not only provide full compensation to all of the victims of its reckless and fraudulent misconduct, but must pay punitive damages to punish and deter this reprehensible conduct from ever happening again.

**ANSWER:** The allegations contained in Paragraph 8 are directed at another entity and

require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 8 and on that basis denies same.

## II.     JURISDICTION AND VENUE

9.      The Court has subject matter jurisdiction of this dispute pursuant to 28 U.S.C. § 1332 because this case involves a dispute between Plaintiffs and Defendants from diverse states and the amount in controversy exceeds the jurisdictional minimum of this Court and/or the Court has subject matter jurisdiction pursuant to the Multi-Forum Multi-Jurisdiction Act, 28 U.S.C. § 1369, because there is at least minimal diversity between adverse parties and more than 75 persons died at the same location and as a result of a single accident.

**ANSWER:** The allegations contained in Paragraph 9 state conclusions of law to which no response is required. To the extent that a response is required, ROCKWELL COLLINS admits that this Court has subject matter jurisdiction over this dispute.

10.     This Court has personal jurisdiction over **BOEING** because its principal place of business and corporate headquarters is in Illinois, it is registered to do business with the Illinois Secretary of State, and it does business in the State of Illinois.

**ANSWER:** The allegations contained in Paragraph 10 state conclusions of law to which no response is required. To the extent the allegations contained in Paragraph 10 are directed at another entity, no response is required. To the extent that a response is required, ROCKWELL COLLINS lack sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 10 and on that basis denies same.

11.     This Court has personal jurisdiction over **ROSEMOUNT** because, upon information and belief: **ROSEMOUNT**, pursuant to contracts with **BOEING**, sold the subject defective Angle-of-Attack sensor(s), model 0861FL1 with Serial Numbers 21844 and/or 21860 ("subject AOA sensor"), to Illinois-based **BOEING** intending the sensors to be installed on **BOEING's** MAX 8 airplanes; issues in this action derive from, and are connected with, **ROSEMOUNT's** contacts with this District and its dealings with **BOEING**; **BOEING's** contacts with Illinois are attributed to and/or imputed to **ROSEMOUNT** through its agency, partnership, and/or joint venture relationship with **BOEING**; **BOEING** and **ROSEMOUNT** and each of them, made and performed contract(s) and promise(s) with each other regarding the subject AOA sensor(s) that is, and at all times herein mentioned was, substantially connected with Illinois. **PLAINTIFF** and **PLAINTIFF'S DECEDENT** are third-party beneficiaries of each such

contract; there was and is a regular and anticipated flow of airplane component parts, including sensors, from **ROSEMOUNT** to **BOEING** for distribution and sale in Illinois, including parts that were designed specifically for Illinois based **BOEING's** 737 MAX 8 airplanes. **DEFENDANTS**, and each of them, advertised in Illinois, marketed through distributors in Illinois, and established channels for providing regular advice to customers in Illinois. **ROSEMOUNT** is registered to do business with the Illinois Secretary of State and, indeed, identifies an agent for service of process for Illinois who is located in Chicago.

 **ANSWER:** The allegations contained in Paragraph 11 state conclusions of law to which no response is required. To the extent the allegations contained in Paragraph 11 are directed at another entity, no response is required. To the extent that a response is required, ROCKWELL COLLINS lack sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 11 and on that basis denies same.

 12. This Court has personal jurisdiction over **COLLINS** because, upon information and belief: **COLLINS**, pursuant to contracts with **BOEING**, sold the subject flight-control law, the MCAS and related software, to Illinois-based **BOEING** intending the MCAS and related software to be installed on **BOEING's** MAX 8 airplanes; issues in this action derive from, and are connected with, **COLLINS'** contacts with this District and its dealings with **BOEING**; **BOEING's** contacts with Illinois are attributed to and/or imputed to **COLLINS** through its agency, partnership, and/or joint venture relationship with **BOEING**; **BOEING** and **COLLINS** and each of them, made and performed contract(s) and promise(s) with each other regarding the subject defective MCAS and related software that is, and at all times herein mentioned was, substantially connected with Illinois. **PLAINTIFF** and **PLAINTIFF'S DECEDENT** are third-party beneficiaries of each such contract; there was and is a regular and anticipated flow of airplane component parts, including sensors, from **COLLINS** to **BOEING** for distribution and sale in Illinois, including parts that were designed specifically for Illinois based **BOEING's** 737 MAX 8 airplanes. **DEFENDANTS**, and each of them, advertised in Illinois, marketed through distributors in Illinois, and established channels for providing regular advice to customers in Illinois. **COLLINS** is registered to do business with the Illinois Secretary of State and, indeed, identifies an agent for service of process for Illinois who is located in Chicago.

 **ANSWER:** ROCKWELL COLLINS admits that it provided flight control software code to Boeing in accordance with Boeing's requirements and pursuant to a contract with Boeing. ROCKWELL COLLINS further admits that it is registered to do business in Illinois and that it has identified an agent for service of process located in Chicago, Illinois. ROCKWELL COLLINS denies that any software code provided to Boeing by ROCKWELL COLLINS that was present on

the accident aircraft was defective or otherwise erred due to any act or omission by ROCKWELL

COLLINS and further denies that Plaintiff and/or Plaintiff's Decedent are third party beneficiaries

of any contract between ROCKWELL COLLINS and Boeing. Whether the Court has personal

jurisdiction over ROCKWELL COLLINS is a conclusion of law to which no response is required.

To the extent a response to this allegation is required, ROCKWELL COLLINS denies the

allegation. ROCKWELL COLLINS denies the remaining allegations of Paragraph 12 that are

directed towards it. The remaining allegations contained in Paragraph 12 are directed at another

entity and require no response from ROCKWELL COLLINS. To the extent that a response to

these allegations is required, ROCKWELL COLLINS lacks sufficient knowledge or information

to form a belief as to the truth of the remaining allegation of Paragraph 12 and on that basis denies

same.

13.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C.
§1391(b)(1) because: **BOEING** is and has, at all relevant times, been a citizen and resident of the
State of Illinois; **BOEING's** corporate headquarters and principal place of business are located in
this judicial district at 100 North Riverside, Chicago, Cook County, Illinois 60606; and **BOEING**
has been authorized to do business and has been transacting or conducting business within the
State of Illinois. See 735 Ill. Comp. Stat. 5/2-209(b)(4).

**ANSWER:** Whether venue is proper in the Northern District of Illinois is a conclusion of

law to which no response is required. To the extent a response to this allegation is required,

ROCKWELL COLLINS admits that venue is proper in the Northern District of Illinois, but denies

venue is proper based on ROCKWELL COLLINS's residency within the district. The remaining

allegations contained in Paragraph 13 are directed at another entity and require no response from

ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks

sufficient knowledge or information to form a belief as to the truth of the remaining allegations of

Paragraph 13 and on that basis denies same.

14.     Furthermore, venue is proper in the Northern District of Illinois pursuant to 28

§1391(b)(3) in the Northern District of Illinois because Defendants **BOEING**, **ROSEMOUNT**, and/or **COLLINS** are subject to the court's personal jurisdiction with respect to this action in this District.

      **ANSWER:** Whether venue is proper in the Northern District of Illinois and whether the Court has personal jurisdiction over ROCKWELL COLLINS are conclusions of law to which no response is required. To the extent a response to these allegations is required, ROCKWELL COLLINS admits that venue is proper in the Northern District of Illinois and denies that the Court has personal jurisdiction over ROCKWELL COLLINS. To the extent the remaining allegations contained in Paragraph 14 are directed at other entities, no response is required. To the extent that a response to these allegations is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of these allegations and on that basis denies same. ROCKWELL COLLINS denies all remaining allegations of Paragraph 14.

## III.    THE PARTIES

### A.    PLAINTIFFS

    15.    **DECEDENTS** were passengers and crew on board Ethiopian Flight ET 302 when it crashed on March 10, 2019. **PLAINTIFFS** include the next of kin, heirs, beneficiaries, and survivors of **DECEDENTS**, as well as personal representatives, special representatives, executors, administrators, and/or liquidators of **DECEDENTS'** estates. **PLAINTIFFS** bring this action for their own injuries as well as the injuries of **DECEDENTS'** which accrued and existed before death.

      **ANSWER:** ROCKWELL COLLINS admits only that Plaintiffs' Master Complaint alleges various claims on behalf of occupants of Flight ET 302. ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 15 and on that basis denies same.

### B.    DEFENDANTS

    16.    Defendant **THE BOEING COMPANY** is, and at all relevant times was, a Delaware corporation with its principal place of business in the State of Illinois. **BOEING** is, and at all relevant times was, registered with the Illinois Secretary of State as doing business in Illinois, and it does business in Illinois and in this Judicial District. **BOEING's** headquarters are located in

this District.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 16 and on that basis denies same.

17. Defendant **ROSEMOUNT AEROSPACE, INC.** is, and at all relevant times was, a Delaware corporation with its principal place of business in the State of Minnesota. **ROSEMOUNT** is, and at all relevant times was, in the business of designing, manufacturing, assembling, distributing, marketing and supplying sensors used in **BOEING's** airplanes, including the particular angle of attack sensor that failed at the time of the subject disaster.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 17 and on that basis denies same.

18. Defendant **ROCKWELL COLLINS, INC.** is, and at all relevant times was, a Delaware corporation with its principal place of business in the State of Iowa. **COLLINS** is, and at all relevant times was, in the business of designing, programming, manufacturing, assembling, testing, servicing, marketing, promoting, distributing, and supplying flight control software, including the defective MCAS, which was installed on the airplane at issue, the Boeing 737 MAX 8 airplane, ET-AVJ, Serial Number 62450, and that caused the subject disaster.

**ANSWER:** ROCKWELL COLLINS admits only that it is a Delaware corporation with its principal place of business in Iowa and that it is in the business of providing avionics systems and services for use in the aerospace and defense industry, including flight control software code to Boeing, in accordance with Boeing's requirements. ROCKWELL COLLINS denies that any software code provided to Boeing by ROCKWELL COLLINS that was present on the accident aircraft was defective due to any act or omission by ROCKWELL COLLINS or that such software code caused the subject accident. ROCKWELL COLLINS denies all remaining allegations of Paragraph 18.

C. **AGENCY & CONCERT OF ACTION**

19. At all times herein mentioned herein, **DEFENDANTS**, and/or each of them, hereinabove, as well as other entities and individuals, were the agents, servants, employees, partners, aiders and abettors, co-conspirators, and/or joint venturers of each of the other **DEFENDANTS** named herein and were at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, enterprise, conspiracy, and/or joint

venture, and each **DEFENDANT** has ratified and approved the acts of each of the remaining **DEFENDANTS**. Each of the **DEFENDANTS** aided and abetted, encouraged, and rendered substantial assistance to the other **DEFENDANTS** in breaching their obligations to **PLAINTIFFS** as alleged herein. In taking action to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoings complained of, as alleged herein, each of the **DEFENDANTS** acted with an awareness of his/her/its primary wrongdoing and realized that his/her/its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

      **ANSWER:** ROCKWELL COLLINS denies the allegations of Paragraph 19.

      20.    **DEFENDANTS**, and/or each of them, hereinabove, as well as other entities and individuals, knowingly and voluntarily agreed to engage and did engage in a scheme, plan, and agreement with each other, to deceive, deny, conceal, or otherwise downplay the hazards and safety problems, concerns, and defects in the **BOEING** 737 MAX 8 airplane in violation of the laws and regulations of the United States, in order to obtain and expedite type-certification of the airplane, to market and sell the 737 MAX 8 to unsuspecting airlines, to convince the flying public that the 737 MAX 8 was safe and airworthy for commercial transport, to keep the 737 MAX 8 ungrounded following the crash of Lion Air Flight JT 610 and death of all 189 people onboard, and in furtherance of other wrongful conduct, wrongful goals, and wrongdoing.

      **ANSWER:** ROCKWELL COLLINS denies the allegations of Paragraph 20.

### IV.    STATEMENT OF FACTS

### A.    THE BOEING COMPANY RUSHED THE BOEING 737 MAX 8 TO PRODUCTION

      21.    **BOEING's** main competitor in the commercial aviation industry is Airbus. Airbus has been increasing market share for decades and this has been eroding **BOEING's** sales and profit. When Airbus launched its more fuel-efficient single aisle airliner, the A320neo, **BOEING** initially dismissed its anticipated appeal with airlines. This short-sighted business decision put **BOEING** behind Airbus in developing and marketing a more fuel-efficient single aisle airplane.

      **ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 21 and on that basis denies same.

      22.    The chief executive of **BOEING's** commercial airplanes division, James F. Albaugh, told employees at a meeting in January 2011 that Airbus' decision to redesign its existing airplane with larger engines would be "a design change that will ripple through the airplane" and present significant challenges.

      **ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 22 and on that basis denies same.

23.     **BOEING** changed its attitude regarding the need to develop a new airplane to compete with the Airbus A320neo when it learned that some of its key customers, including American Airlines, were considering placing orders with Airbus for the Airbus A320neo. This ratcheted up pressure on **BOEING** to respond. Fearing that the design of an entirely new airplane would take too long, **BOEING** decided to create a more fuel-efficient alternative to its traditional 737NG airplane – what would become the 737 MAX 8.

**ANSWER:** The allegations contained in Paragraph 23 are directed at another entity and

require no response from ROCKWELL COLLINS. To the extent a response is required,

ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth

of the allegations of Paragraph 23 and on that basis denies same.

24.     A former senior **BOEING** official reported that the company opted to build the 737 MAX 8, rather than an entirely new airplane, because it would be "far quicker, easier and cheaper than starting from scratch, and would provide almost as much fuel savings for airlines."

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 24 and on that basis denies same.

25.     In August 2011, **BOEING** launched the 737 MAX family of airplanes, a new iteration of the widely-used 737NG, designed to compete with Airbus' A320neo. In designing the 737 MAX 8, it was vital to **BOEING's** leadership that in order to compete with Airbus, it could market the airplane as simply an upgrade to its already type certificated 737NG and more easily obtain regulatory approval from the FAA permitting pilots to operate the 737 MAX 8 airplane without any additional and costly simulator time and meaningful retraining. Had **BOEING** provided differences training between the 737 MAX 8 and 737NG, it would have helped reveal the defective nature of the MCAS design and, at a minimum, would have allowed pilots to understand the new systems on the MAX airplane.

**ANSWER:** The allegations contained in Paragraph 25 are directed at another entity and

require no response from ROCKWELL COLLINS. To the extent a response is required,

ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth

of the allegations of Paragraph 25 and on that basis denies same.

26.     **BOEING's** decision, made at the highest levels of the company to use the existing design of the Boeing 737NG as the basis for the 737 MAX 8, rather than design, test, certify and produce an entirely new airplane, was made to evade regulatory scrutiny by the FAA of a new type certified airplane and increase **BOEING's** profits, because it:

a.  Saved **BOEING** significant research, design and development costs and permitted it to produce what appeared to be an updated, fuel-efficient airplane to compete with the Airbus A320neo more quickly and cost effectively than if **BOEING** had developed an entirely new model airplane;

b.  Permitted **BOEING** to rush the design, production and manufacture of the Boeing 737 MAX 8 and get it to market more quickly so that **BOEING** would not lose business and profits to Airbus;

c.  Allowed **BOEING** to offer the **BOEING** 737 MAX 8 to its customers, including Ethiopian Airlines, with the marketing and representations that pilots already qualified to fly the **BOEING** 737NG could transition to the **BOEING** 737 MAX 8 without undergoing any meaningful retraining, and without needing to be trained and tested in flight simulators and/or in the airplane before flying revenue (passenger carrying) flights; and

d.  Permitted **BOEING** to use its Organization Designation Authorization (ODA), which **BOEING** had convinced the FAA to authorize, to streamline and speed the certification, and largely self-certify, the **BOEING** 737 MAX 8 merely with amendments to the **BOEING** 737 type certificate.

**ANSWER:** The allegations contained in Paragraph 26, including sub-parts (a) – (d) thereto, are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 26, including sub-parts (a) – (d) thereto, and on that basis denies same.

27.  Rick Ludtke, an employee at **BOEING** for 19 years and an engineer who helped design the 737 MAX 8 cockpit explained that Boeing required that "[a]ny designs we created could not drive any new training that required a simulator." That was the first ground rule communicated to engineers designing the MAX. This created a chaotic environment for engineers. As Ludtke described: "The company was trying to avoid costs and trying to contain the level of change. They wanted the minimum change to simplify the training differences, minimum change to reduce costs, and to get it done quickly."

**ANSWER:** The allegations contained in Paragraph 27 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 27 and on that basis denies same.

28.     The need to minimize design changes served an important business need for **BOEING** in its race to compete with Airbus. If airline pilots did not require costly and time-consuming training in the new airplane because it was viewed as merely an update to the familiar 737NG, it would make the 737 MAX 8 cheaper for airlines to operate. This in turn would make the price for the 737 MAX 8 more competitive relative to the Airbus A320neo and far more profitable for **BOEING**.

**ANSWER:** The allegations contained in Paragraph 28 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 28 and on that basis denies same.

29.     **BOEING** went so far as to agree with its customer, Southwest Airlines, that it would rebate the airline $1 million for any aircraft that required extra simulator training for cockpit crews.

**ANSWER:** The allegations contained in Paragraph 29 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 29 and on that basis denies same.

30.     Thus, **BOEING** needed the 737 MAX 8 to be more fuel efficient and also have flight handling qualities and characteristics deemed the same as the 737NG. The MAX airplane was able to achieve this new fuel efficiency, in part, due to the model's larger CFM LEAP-1B engines. However, adding the larger engines triggered cascading design and engineering changes for the airplane, the same ripple of changes James Albaugh, **BOEING's** commercial airplanes chief executive, had predicted back in 2011 when criticizing Airbus' A320neo.

**ANSWER:** The allegations contained in Paragraph 30 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 30 and on that basis denies same.

31.     The increased power and relocation of the CFM LEAP-I B engines created an inherent aerodynamic instability in the Boeing 737 MAX 8 that manifested itself in abnormal control forces in the flight axis, and created a propensity to abnormally pitch the airplane nose up under certain flight parameters, creating a risk that the airplane would suffer an aerodynamic stall

and crash.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 31 and on that basis denies same.

32.     This pitching up of the 737 MAX 8 demonstrated that the changes made to the 737
MAX 8 changed its weight and balance, center of gravity, airplane stability and flight
characteristics; simply put, the airplane handled materially differently than the 737NG airplane.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 32 and on that basis denies same.

33.     Furthermore, the airplane's nose-up pitching propensity rendered it unairworthy.
Pursuant to the FAA's Airworthiness Standards for Commercial Aircraft: "No abnormal nose-up
pitching may occur… In addition, it must be possible to promptly prevent stalling and to recover
from a stall by normal use of the controls."

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 33 and on that basis denies same.

34.     The abnormal and dangerous flight handling qualities and characteristics in the 737
MAX 8 airplanes, if properly disclosed to regulatory authorities meant that the FAA would likely
not certify the 737 MAX 8 and certainly not without requiring pilots undergo significant flight
training before flying the airplane with passengers on board.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 34 and on that basis denies same.

35.     As **BOEING's** business leaders required engineers to contain the level of change
to avoid pilot retraining and make the 737 MAX 8 more marketable, **BOEING** now needed to
engineer a Band-Aid to fix the aircraft's handling issues created by the larger and more powerful
engines.

**ANSWER:** The allegations contained in Paragraph 35 are directed at another entity and

require no response from ROCKWELL COLLINS. To the extent a response is required,

ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth

of the allegations of Paragraph 35 and on that basis denies same.

### B. **BOEING INTRODUCED A FLIGHT CONTROL SYSTEM WHICH ADDRESSED ONE PROBLEM BUT CREATED ANOTHER**

36. To address the airplane's aerodynamic handling defects and to obtain the 737-type certification, **BOEING** included in the 737 MAX 8 the MCAS, an automated system that would re-trim the airplane's nose down when it encountered uncommanded nose up pitch due to its inherent aerodynamic instability. But MCAS operated, secretly, in the background, was activated by data obtained from a single sensor susceptible to failure, and could engage over and over again with nearly limitless authority to trim the airplane's nose down. The MCAS rendered the 737 MAX 8 a death trap which could send the airplane into an unrecoverable dive in a matter of seconds.

**ANSWER:** The allegations contained in Paragraph 36 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 36 and on that basis denies same.

37. The software for the MCAS was developed, at least in part, by Defendant **COLLINS**. The MCAS ultimately failed to perform as intended, causing both crashes because it activated inappropriately and issued unintended and repeated automated nose down control commands. **COLLINS** both developed software which was defective and error-prone and also failed to adequately communicate the functionality of this software to the FAA or other regulatory agencies.

**ANSWER:** ROCKWELL COLLINS admits only that it provided flight control software code to Boeing in accordance with Boeing's requirements. ROCKWELL COLLINS denies that any software code provided to Boeing by ROCKWELL COLLINS that was present on the accident aircraft was defective, error-prone, or otherwise failed to operate as designed by Boeing due to any act or omission by ROCKWELL COLLINS. ROCKWELL COLLINS denies all remaining allegations of Paragraph 37.

38. The MCAS operated by collecting data from just one of two available sensors on the fuselage called angle-of-attack (AOA) sensors. AOA sensors measure the angle between the wing of the airplane and the airspeed vector. If the AOA sensor registers that the airplane's angle of attack is too high then the MCAS activates, automatically moving the horizontal stabilizer to direct the aircraft to pitch nose down, as can be seen in the following graphic: [Graphic omitted].

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 38 and on that basis denies same.

39.     The AOA sensors were provided to **BOEING** by defendant **ROSEMOUNT**. At the time it provided these AOA sensors to **BOEING**, **ROSEMOUNT** knew or should have known that its sensors were susceptible to failure and to report erroneous data. The vulnerabilities of the AOA sensors should have been acutely known to **ROSEMOUNT** because since 2004 there were more than 200 incident reports submitted to the FAA for events involving malfunctioning or damage to AOA sensors.

**ANSWER:** The allegations contained in Paragraph 39 are directed at other entities and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 39 and on that basis denies same.

40.     **BOEING** and **COLLINS** did not program the MCAS to use data from both of the airplane's AOA sensors to validate AOA data and protect against single point failures. Compounding this design defect, **BOEING** and **COLLINS** failed to have MCAS consider other flight data available to the Flight Control Computer, including airspeed and altitude, and failed to implement other safety systems, which were available and legally required by 14 CFR Part 25, to mitigate the risk presented by a malfunctioning sensor. **BOEING** should have included as standard in all aircraft equipped with MCAS reference to two AOA indicators, an AOA disagree light, a synthetic airspeed system, and an Engine-Indicating and Crew-Alerting (EICAS) system. Instead, **BOEING** chose not to include any of these available safety systems to avoid the increased costs.

**ANSWER:** ROCKWELL COLLINS admits that it provided flight control software code to Boeing in accordance with Boeing's requirements. ROCKWELL COLLINS denies that it designed MCAS or otherwise determined what data it would utilize. ROCKWELL COLLINS further denies that it failed to abide by any regulatory requirements that may be determined to apply to its provision of software code to Boeing in accordance with Boeing's requirements. ROCKWELL COLLINS denies all remaining allegations of Paragraph 40 directed towards it. The remaining allegations contained in Paragraph 40 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 40 and on that basis denies same.

16

41.     **BOEING**'s failure to integrate these available and/or legally required safety systems meant that if the single AOA sensor used as input to the MCAS malfunctioned and erroneously signaled that the airplane was pitched nose high, there was no means of detecting its erroneous report and excluding that bad data to prevent the MCAS from improperly intervening, rotating the horizontal stabilizer, and forcing the plane into a dive.

**ANSWER:** The allegations contained in Paragraph 41 are directed at another entity and

require no response from ROCKWELL COLLINS. To the extent a response is required,

ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth

of the allegations of Paragraph 41 and on that basis denies same.

42.     The horizontal stabilizer on the 737 MAX 8 is positioned by a single electric trim motor actuated through either the stabilator trim switches located on the pilots' control yokes, by the autopilot or through the MCAS. The stabilizer may also be positioned by the pilots manually rotating the stabilizer trim wheel.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 42 and on that basis denies same.

43.     Switches on each pilot control yoke actuate the electric trim motor through the main electric stabilizer trim circuit when the aircraft is flown manually. With the autopilot engaged, stabilizer trim is accomplished through the autopilot stabilizer trim circuit. The main electric and autopilot stabilizer trim have two speed modes: high speed with flaps extended and low speed with flaps retracted. The stabilizer trim wheels rotate whenever electric stabilizer trim is actuated.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 43 and on that basis denies same.

44.     The STAB TRIM PRI cutout switch and the STAB TRIM B/U cutout switch on the 737 MAX 8 are located on the control stand. If either switch is positioned to CUTOUT, both the autopilot and main electric trim inputs are disconnected from the stabilizer trim motor.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 44 and on that basis denies same.

45.     The control column actuated stabilizer trim cutout switches on the 737 MAX 8 stop operation of the main electric and autopilot trim when the control column movement opposes trim direction. This is not true for pitch commands received from the MCAS. When the STAB TRIM override switch is positioned to OVRD, electric trim can be used regardless of control column position; opposing control column movement does not deactivate MCAS.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 45 and on that basis denies same.

46.     Pitch trim is controlled by changing the pitch angle of the horizontal stabilizer. Changing pitch of the horizontal stabilizer can place large pitch forces on the aircraft. When applied appropriately, these forces can keep the airplane in balance. When applied inappropriately they can make the airplane difficult, if not impossible, to control.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 46 and on that basis denies same.

47.     The elevator is a smaller control surface when compared to the surface area of the controllable horizontal stabilizer. Aerodynamic load forces generated by the horizontal stabilizer from an out of trim condition can quickly exceed the forces that can be generated by the elevator, which is controlled by the pilots by pulling back or pushing forward on the yoke.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 47 and on that basis denies same.

48.     It is possible on the 737 MAX 8, to have an out of trim condition that when countered by elevator control inputs from the crew, places enough aerodynamic load forces on the pitch trim mechanism that it essentially jams the pitch trim control. Manual trim cannot overcome this load on the mechanism; the system is then in an aerodynamic lock because of the extreme load forces on the horizontal stabilizer. This scenario is depicted by the illustration below: [Graphic Omitted].

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 48 and on that basis denies same.

49.     Electric trim works in a narrower range of motion than manual trim. If the stabilizer is out of trim and outside the range of electric trim operation, only manual trim can be used.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 49 and on that basis denies same.

50.     MCAS was designed and intended to operate in the background without pilot knowledge. **BOEING** did not even inform pilots that the MCAS existed. The MCAS was not disclosed in the airplane's flight manual either. Pilots would only learn indirectly about the MCAS – or at least about its effect - when the plane began automatically fighting their pitch commands, often at low altitudes with little time to react and resolve the issue. **BOEING** first informed pilots

about MCAS after the system caused the Lion Air JT 610 disaster and even then it did not provide sufficient information about the system.

**ANSWER:** The allegations contained in Paragraph 50 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 50 and on that basis denies same.

51. In addition to its failure to warn, provide instructions, and train pilots on the MCAS and how to override it when it provided erroneous AOA data, **BOEING** designed a pitch trim control system that is capable of jamming under flight conditions that only **BOEING** knew were foreseeable.

**ANSWER:** The allegations contained in Paragraph 51 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 51 and on that basis denies same.

### C. BOEING PERSUADED THE FAA TO APPROVE A TYPE CERTIFICATE FOR THE 737 MAX 8 BASED UPON THE ORIGINAL 737 DESIGN FROM FIFTY YEARS AGO

52. On December 15, 1967, **BOEING** secured FAA approval for the 737-100, the first-generation model of what became the world's most commercially successful family of jet airliners. The early 737s and all subsequent 737s, including the 737 MAX 8, are all type-certified under Type Certificate No. A16WE.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 52 and on that basis denies same.

53. Type certification is the process by which the aviation authority certifies the safety standards of a type of aircraft. On March 8, 2017, **BOEING** obtained certification for the 737 MAX 8 under Type Certificate No. Al6WE, as amended. Then on March 27, 2017, based on the FAA Type Certificate approval, the 737 MAX 8 also received Type Validation from the European Union Aviation Safety Agency (EASA).

**ANSWER:** ROCKWELL COLLINS admits only that Boeing obtained FAA type certification for the 737 MAX 8 and EASA type validation for the 737 MAX 8 in March 2017.

ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 53 and on that basis denies same.

54.     Rather than following the new type certification process after all of the changes made to the 737 and its documentation over decades, with each successive 737 model **BOEING** largely self-certified the safety of the new edition with pieced-together and modified models and documentation. In spite of its radical changes in engine size, operating characteristics and newly added MCAS, **BOEING** convinced the FAA to allow it to self-certify the MAX 8 as well. This allowed **BOEING** to essentially approve its own plane to get the 737 MAX 8 airplane on the market as soon as possible, all based on the 1967 type certificate.

**ANSWER:** The allegations contained in Paragraph 54 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 54 and on that basis denies same.

55.     When the 737 was type certified in the 1960s, the ability of a plane's computer to override the pilot was not possible and not imagined. Since that time myriad changes have been tacked on that certificate, the 737, and the manuals and other **BOEING** 737 instructional materials. Yet **BOEING** convinced the FAA to approve self-certification for the 737 MAX 8 by fraudulently concealing the dramatic changes of the plane from its 737 predecessors.

**ANSWER:** The allegations contained in Paragraph 55 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 55 and on that basis denies same.

56.     In obtaining FAA approval for the self-certification of the 737 MAX 8, **BOEING** concealed the MCAS and its flaws from the FAA, omitting it entirely from the EASA Type Certificate Data Sheet and the FAA Type Certificate Data Sheet A16WE.

**ANSWER:** The allegations contained in Paragraph 56 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 56 and on that basis denies same.

### D. BOEING'S REGULATORY CAPTURE OF THE FEDERAL AVIATION ADMINSTRATION UNDERMINED THE ADMINISTRATION'S ABILITY TO CARRY OUT ITS MANDATED SAFETY AND ENFORCEMENT DUTIES

57.     **BOEING** is one of the largest and most powerful corporations in the world. It is the largest exporter in the United States by dollar value, and one of the largest defense contractors in the world. About 75% of all the commercial airplanes in the world were manufactured by **BOEING**. Over many years, **BOEING** has used its enormous power and influence to systematically expand its ability to deceive and avoid any real oversight by the FAA. **BOEING's** successes include: deregulation and streamlining of the certification process; prevention of the creation of new rulemaking through **BOEING's** seat on the FAA's Aviation Rulemaking Advisory Committee; the abandonment of enforcement actions or penalties for industry violations of federal safety regulations and orders in lieu of seeking voluntary compliance from the industry; and delegation of review and approval of new features on aircraft to aviation manufacturers. By weakening and then misleading the FAA, **BOEING** gained free reign to hide the MCAS and other problems with the 737 MAX 8 to get it to market as fast as possible.

**ANSWER:** The allegations contained in Paragraph 57 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 57 and on that basis denies same.

58.     **BOEING** has achieved this success in part with its considerable lobbying of the United States federal government. In 2018 alone, **BOEING** invested more than $15,000,000 into efforts to influence federal lawmaking and to push for less regulation and oversight.

**ANSWER:** The allegations contained in Paragraph 58 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 58 and on that basis denies same.

59.     The FAA's top leadership has long been staffed with aviation industry insiders, including many officials who previously worked for **BOEING** and for **BOEING**-backed industry lobbying groups that have successfully advocated for reduced regulation and reduced oversight of aviation manufacturers.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 59 and on that basis denies same.

60.     **BOEING** has a long history of giving well-paid positions to former FAA leaders and FAA's leadership has openly acknowledged it defers almost entirely to **BOEING**, with **BOEING** persuading key FAA members to put aviation industry interests ahead of aviation safety. For example:

    a.    **BOEING's** financial interests overcame aviation safety in its certification of the 737 MAX 8 when the FAA allowed expedited certification based on **BOEING**'s production timelines, when **BOEING** obtained an exception to cockpit display regulation and when **BOEING** was allowed to remove the MCAS from the Flight Crew Operating Manual, among other decisions favoring **BOEING**'s bottom line;

    b.    **BOEING's** financial interests overcame aviation safety when the FAA agreed with **BOEING** not to ground the 737 MAX 8 planes after the Lion Air crash;

    c.    **BOEING** overcame concerns about aviation safety and misled FAA leadership to the point that even after the Lion Air crash the United States was the last country to ground the **BOEING** 737 MAX 8;

    d.    **BOEING** overcame aviation safety and misled FAA leadership to the point that in the Acting FAA Administrator's March 27, 2019 testimony before the Senate Transportation Committee's Subcommittee on Aviation and Space, he downplayed the danger of MCAS and blamed the deceased pilots of the two crashed airplanes for not being able to save their airplanes and the lives of the passengers and crew, despite having actual and/or constructive knowledge to the contrary; and,

    e.    **BOEING** overcame aviation safety to the point that at the May 15, 2019, House Committee on Transportation and Infrastructure Subcommittee on Aviation the FAA followed **BOEING** talking points even while admitting **BOEING** withheld from the FAA information about the MCAS software.

**ANSWER:** The allegations contained in Paragraph 60, including subparts (a)-(e) thereto, are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 60, including subparts (a)-(e) thereto, and on that basis denies same.

61.     **BOEING** has repeatedly sought to reduce the federal regulatory burden on the industry, and to immunize the industry from liability for defects in airplanes that the FAA nominally has "certified," when, in fact, **BOEING** has convinced the FAA to largely outsource certification to the industry.

**ANSWER:** The allegations contained in Paragraph 61 are directed at another entity and

require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 61 and on that basis denies same.

62.     Aviation industry lobbying groups, including the Aerospace Industries Association of America, Inc., on whose Board **BOEING** CEO Dennis Muilenburg serves, including a term as Chairman in 2017, have recently filed amicus briefs in the United States Supreme Court seeking immunity for aviation manufacturers from potential products liability claims concerning airplanes or aviation products that have been "certified" by the FAA.

**ANSWER:** Upon information and belief, Dennis Muilenburg is no longer Boeing's CEO. ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 62 and on that basis denies same.

63.     Since the **BOEING** largely self-certifies, the amicus brief filed by Muilenburg's group in effect seeks to give **BOEING** the ability to create its own legal immunity for the horrific loss of life **BOEING** has caused in plane crashes like the 737 MAX 8.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 63 and on that basis denies same.

64.     As discussed above, in 2005, **BOEING** led the FAA to adopt the ODA program that licensed **BOEING** to designate its own employees who would review and approve **BOEING's** designs on behalf of the FAA.

**ANSWER:** The allegations contained in Paragraph 64 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 64 and on that basis denies same.

65.     Under its ODA, **BOEING** had a duty of integrity in its dealings with the FAA. **BOEING** violated that duty by misrepresenting to the FAA that the **BOEING** 737 MAX 8 was safe to fly when **BOEING** knew that the airplane was not safe.

**ANSWER:** The allegations contained in Paragraph 65 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required,

ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 65 and on that basis denies same.

66. Under its ODA, **BOEING** had a duty to notify the FAA regarding any issue that might create an unsafe flight condition so that the FAA could investigate and remediate the issue. **BOEING** violated that duty when it hid from the FAA (and its operators) information about the instability of the 737 MAX 8 in pitch up, and the hazards of MCAS, among other defects.

**ANSWER:** The allegations contained in Paragraph 66 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 66 and on that basis denies same.

67. Under its ODA, **BOEING** had a duty to use care, diligence, judgment and responsibility, and follow the Federal Aviation Regulations, when performing compliance activities. **BOEING** brazenly violated that duty and instead promoted its profits by rushing the certification of an unsafe airplane.

**ANSWER:** The allegations contained in Paragraph 67 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 67 and on that basis denies same.

68. In 2012, a Department of Transportation Office of Inspector General ("OIG") Audit Report concluded that the FAA was not backing its employees in their efforts to hold **BOEING** accountable and FAA safety inspectors feared retaliation for raising problems regarding **BOEING's** products or its actions.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 68 and on that basis denies same.

69. In 2015, a further OIG report found the FAA lacked effective staffing and was not performing proper oversight of ODA manufacturers.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 69 and on that basis denies same.

70.     **BOEING** took advantage of the FAA's abdication of its oversight responsibilities check on the safety of the **BOEING** 737 MAX 8 and **BOEING** praised the FAA's hands-off approach.

**ANSWER:** The allegations contained in Paragraph 70 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 70 and on that basis denies same.

71.     On a 2017 conference call with Wall Street investors, **BOEING** CEO Dennis Muilenburg praised the FAA's "streamlined" certification process that had helped **BOEING** bring new models, including the 737 MAX series of airplanes, quickly to market.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 71 and on that basis denies same.

72.     **BOEING's** Muilenburg complimented the government's "focus on deregulation and simplifying processes," for which **BOEING** was a "strong proponent."

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 72 and on that basis denies same.

73.     **BOEING's** Muilenburg went on to compliment the FAA: "Things like FAA certification processes is one place that we're seeing some solid progress. That's helping us more efficiently work through certification on some of our new model airplane such as the MAX as it's going through tests and entering into service."

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 73 and on that basis denies same.

74.     The "streamlining" of the 737 MAX 8's certification process meant that **BOEING** was largely able to conduct the certification of its own airplane. The results were benefits to **BOEING's** profits at the unacceptable cost of decrease to the safety of the 737 MAX 8.

**ANSWER:** The allegations contained in Paragraph 74 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth

of the allegations of Paragraph 74 and on that basis denies same.

75. The certification of the 737 MAX 8 was supposed to signify that the airplane met a "minimum level of safety" because its design complied with federal requirements.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 75 and on that basis denies same.

76. The FAA relied on **BOEING's** representations that the 737 MAX 8 met the "minimum level of safety" and complied with all applicable federal requirements. The 737 MAX 8, however, did not meet a "minimum level of safety" and should never have been certified.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 76 and on that basis denies same.

77. Due to the understaffing and limited resources at the FAA, the certification process for the 737 MAX 8 proceeded slower than **BOEING** desired. **BOEING** pressured FAA management to push FAA technical experts to speed up certification of the 737 MAX 8 airplane because the development of the MAX was nine months behind Airbus' A320neo.

**ANSWER:** The allegations contained in Paragraph 77 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 77 and on that basis denies same.

78. FAA employees reported poor morale and disagreement relating to the FAA's lax oversight of **BOEING**, and fear of retaliation if they spoke up.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 78 and on that basis denies same.

79. Under pressure from **BOEING** to further speed-up certification to accommodate **BOEING's** production timeline, FAA management pressured FAA safety engineers to re-evaluate what was delegated to **BOEING** relating to certification of the 737 MAX 8, claiming that the FAA had "retained too much."

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 79 and on that basis denies same.

80.     While **BOEING** claimed more and more certification work to evaluate itself, the FAA did not properly complete the work it retained due the unrealistic time constraints set by **BOEING'S** business priorities and the pressure put on the FAA. A former FAA engineer reported that "[t]here wasn't a complete and proper review of the documents." As **BOEING** was running out of time to deliver the 737 MAX 8 to airlines, FAA managers in some instances signed off on documents themselves without waiting for the FAA technical staff to complete their review.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 80 and on that basis denies same.

81.     Therefore, **BOEING** caused the FAA to approve and/or certify **BOEING'S** design for its new airplane despite its substantial flaws. **BOEING** pushed through the rapid and flawed certification of the MAX to serve **BOEING'S** financial interests at the expense of public safety. The resulting 737 MAX 8 airplane did not meet regulatory standards as a result of **BOEING'S** tortious and wrongful conduct.

**ANSWER:** The allegations contained in Paragraph 81 are directed at another entity and

require no response from ROCKWELL COLLINS. To the extent a response is required,

ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth

of the allegations of Paragraph 81 and on that basis denies same.

82.     This improper pressure exerted by **BOEING** over the FAA, as well as **BOEING'S** misrepresentations to and manipulation of the FAA**,** continued throughout the certification of the 737 MAX 8 and substantially contributed to the crash of Flight 302 on March 10, 2019. The OIG as well as the U.S. Department of Justice with the Federal Bureau of Investigation have launched audits and investigations of **BOEING**, the FAA, and the activities that lead to the certification of the **BOEING** 737 MAX 8.

**ANSWER:** The allegations contained in Paragraph 82 are directed at another entity and

require no response from ROCKWELL COLLINS. To the extent a response is required,

ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth

of the allegations of Paragraph 82 and on that basis denies same.

## E.     BOEING'S LEADERSHIP CREATED A CULTURE THAT SILENCED DISSENT AND PLACED PROFITS OVER SAFETY

83.     In its mad rush to get the 737 MAX 8 certified and orders filled to airlines, **BOEING** leadership placed enormous pressure on its engineers to produce a finished product.

**ANSWER:** The allegations contained in Paragraph 83 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 83 and on that basis denies same.

84.    Several engineers and designers working on the 737 MAX 8 have described this frantic pace of the MAX's development:

    a.    An engineer working on the MAX said that "[t]he timeline was extremely compressed … It was go, go, go."

    b.    A former designer working on the MAX's flight controls described how the design team had at times produced 16 technical drawings a week, double the normal rate. The designer understood the message from management to be: "We need something now."

    c.    A technician who assembles wiring on the MAX said that he received sloppy blueprints in the first few months of development and was told that the instructions for the wiring would be cleaned up later in the process. However, his internal assembly designs for the MAX included omissions after airplanes were delivered to airlines, such as not specifying which tools to use to install a certain wire, a situation that could lead to a faulty connection.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 84, including subparagraphs (a)-(c) thereto, and on that basis denies same.

85.    The unreasonable expectations placed on engineers and designers by the business leadership created an environment at **BOEING's** facilities which was ripe for mistakes and wherein employees were reluctant to raise concerns that may delay certification and production of the MAX.

**ANSWER:** The allegations contained in Paragraph 85 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 85 and on that basis denies same.

86.    A **BOEING** production manager working on the 737 MAX 8 directly raised

28

concerns with the General Manager of the MAX program and CEO Dennis Muilenburg that the production teams were overworked and at risk of making mistakes, and called for a temporary halt to production. Despite this dire warning, **BOEING** leadership chose not to slow production.

**ANSWER:** The allegations contained in Paragraph 86 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 86 and on that basis denies same.

87.     The pressure placed on production teams was also fed by **BOEING's** sales and business personnel who made representations to airlines about the 737 MAX 8's capabilities and production timeline which they knew or should have known were inaccurate or unattainable. This in turn forced **BOEING** engineers to try to make good on the sales team's unrealistic promises, creating an environment where deliverables and deadlines took priority over safety.

**ANSWER:** The allegations contained in Paragraph 87 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 87 and on that basis denies same.

88.     **BOEING** was aware it had a safety culture problem. In BOEING's own 2016 internal survey, 39% of the more than 500 employees who answered reported that they felt "undue pressure" on the job and 29% agreed that they were "concerned about consequences" if they reported the undue pressure.

**ANSWER:** The allegations contained in Paragraph 88 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 88 and on that basis denies same.

89.     Current and former **BOEING** employees have reported shoddy testing and inspection procedures and a corporate culture of fear and retaliation. At **BOEING's** manufacturing plants, **BOEING** agents and/or employees have engaged in improper conduct including:

a.     "Goldplating" which is repeating a test until it is successful and then having the records show that the test was successful on the first attempt;

b.      Knowingly using out of date engineering specifications;

c.      Knowingly using uncertified technicians to perform maintenance and repairs;

d.      Violating the internal **BOEING** policy and procedures that were put in place to achieve final approval of each stage of production and make the airplane immediately saleable;

e.      Disabling the automated system that notified all pertinent employees of mandatory inspections of newly manufactured airplanes; and

f.      Submitting conformities without documented repairs.

**ANSWER:** The allegations contained in Paragraph 89, including subparts (a)-(f) thereto, are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 89, including subparts (a)-(f) thereto, and on that basis denies same.

90.      Curtis Ewbank, a **BOEING** engineer and whistleblower who worked on the MAX has reported that **BOEING's** corporate culture is "more concerned with cost and schedule than safety and quality" and that it has a "suppressive cultural attitude towards criticism of corporate policy" which creates a fear for those that speak up.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 90 and on that basis denies same.

91.      When managers have tried to document non-conforming airplane equipment they have been threatened, retaliated against, subjected to a hostile work environment, and terminated.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 91 and on that basis denies same.

92.      These unlawful and unsafe practices are known, encouraged and/or ratified by **BOEING's** leadership and have contributed to a culture that suppresses voices raising the alarm about safety in furtherance of **BOEING's** profit-driven focus.

**ANSWER:** The allegations contained in Paragraph 92 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required,

ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 92 and on that basis denies same.

**F.** **BOEING CONDUCTED A FLAWED SAFETY ASSESSMENT OF THE MCAS AND SUBMITED ERRONEOUS DATA TO THE FAA**

93.     Prior to certification and sale of the 737 MAX, **BOEING** was aware that the defective flight control system (MCAS) was dangerous and susceptible to erratic performance. Nonetheless, **BOEING** failed to inform the FAA.

**ANSWER:** ROCKWELL COLLINS denies that any software code provided to Boeing by ROCKWELL COLLINS that was present on the accident aircraft was defective or otherwise performed erratically due to any actions or inactions of ROCKWELL COLLINS. The remaining allegations contained in Paragraph 93 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 93 and on that basis denies same.

94.     In addition to the questions about **BOEING's** design and manufacturing procedures at the time the MAX was undergoing design and certification, the protocols for **BOEING's** safety assessment of the MCAS reflected the company's focus on profit over safety – and its systematic avoidance of FAA oversight.

**ANSWER:** The allegations contained in Paragraph 94 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 94 and on that basis denies same.

95.     As a new feature, the design and functioning of MCAS was required to be reviewed and approved by the FAA, but a meaningful review of MCAS was not completed during the compliance activities that preceded the certification of the **BOEING** 737 MAX 8 and was not completed even after the crash of Lion Air Flight JT 610. After the FAA initially retained the direct authority to review the safety of MCAS because it was a new feature, **BOEING** obtained control of the MCAS safety review under **BOEING's** ODA.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 95 and on that basis denies same.

96.     **BOEING** designed the MCAS to swivel the horizontal tail to push the nose of the plane down to counteract the airplane's aerodynamic design defects. The **BOEING** safety analysis understated the power of the system.

**ANSWER:** ROCKWELL COLLINS admits generally that Boeing designed MCAS to move the horizontal stabilizer to direct the aircraft to pitch nose down if prescribed inputs meet stall risk criteria. The remaining allegations contained in Paragraph 96 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 96 and on that basis denies same.

97.     **BOEING** originally submitted documentation to the FAA indicating that the MCAS could only move the horizontal tail a maximum of 0.6 degrees and would only operate in rare, high speed and high Mach scenarios. This information provided the basis for the FAA transferring the safety review of the MCAS to **BOEING**.

**ANSWER:** The allegations contained in Paragraph 97 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 97 and on that basis denies same.

98.     However, **BOEING** subsequently made very significant modifications to the MCAS, including allowing it to operate at lower speeds and preventing it from relying on readings from a G-force sensor, meaning that it would now be activated based only upon readings from a single AOA sensor.

**ANSWER:** The allegations contained in Paragraph 98 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 98 and on that basis denies same.

99.     **BOEING**, including its chief technical pilot, Mark Forkner, knew that **BOEING** had concealed from key personnel at the FAA these changes to the MCAS. Despite its knowledge

that the FAA had inaccurate and/or incomplete information about the functionality and performance of the MCAS, **BOEING** failed to inform the FAA of these critical design changes made during the certification process and failed to update key certification deliverables, such as the preliminary system safety assessment.

**ANSWER:** The allegations contained in Paragraph 99 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 99 and on that basis denies same.

100. When the 737 MAX 8 was put into service, the MCAS was capable of moving the tail 2.5 degrees, more than four times greater movement than the 0.6 degrees stated in the initial safety analysis provided to the FAA. The version of the MCAS that **BOEING** programmed into the 737 MAX 8 and sold all over the world was materially different and far more powerful and dangerous than what **BOEING** represented to the FAA and other regulatory agencies. **BOEING** did not tell key personnel at the FAA that the MCAS would move the horizontal tail 2.5 degrees until after 189 people were killed in the Lion Air crash.

**ANSWER:** The allegations contained in Paragraph 100 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 100 and on that basis denies same.

101. The **BOEING** safety analysis also failed to account for how the MCAS could reset itself after each time a pilot responded. This was another critical error, as it meant that a malfunctioning MCAS would not just cause a single downward movement of 2.5 degrees but could dip the nose of the airplane 2.5 degrees lower multiple times as the pilot tries to regain control. Two cycles of the MCAS at the 2.5 degree limit would cause the airplane to reach its maximum nose-down trim position.

**ANSWER:** The allegations contained in Paragraph 101 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 101 and on that basis denies same.

102. Peter Lemme, a former **BOEING** flight controls engineer, explained that, because the MCAS can reset each time it is used, "it effectively has unlimited authority."

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 102 and on that basis denies same.

103.     **BOEING** failed to account for this dramatic increase of MCAS power when it classified the MCAS as a "major failure" in normal flight and a "hazardous failure" in the event of an extreme maneuver, such as a banked descending spiral. A "major failure" indicates that the system's failure could cause physical distress to people on the plane, but not death. A "hazardous failure" could cause serious or fatal injuries to a small number of passengers. One level above hazardous failure is "catastrophic failure," a classification which represents the potential loss of the plane with multiple fatalities.

**ANSWER:** ROCKWELL COLLINS admits only that various aviation regulations and standards define "major failures," "hazardous failures," and "catastrophic failures." ROCKWELL COLLINS denies that the allegations accurately recite the complete definitions. The remaining allegations contained in Paragraph 103 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 103 and on that basis denies same.

104.     The failure classification system is critically important because it drives whether a flight control system can rely on a single sensor input or must have two or three. Systems with a consequence of failure classified as a "major failure" must have a probability of failure less than one in 100,000. Typically, such systems are allowed to rely on a single input sensor.

**ANSWER:** ROCKWELL COLLINS admits only that various aviation regulations and standards define failure and/or hazard classifications and the corresponding allowable probabilities of failure for a flight control system. ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 104, including whether a "major" failure classification for a flight control system mandates a specific number of sensor inputs, and on that basis denies same.

105.     In contrast, systems classified as "hazardous failure" have more severe consequences of failure and therefore must have a probability of failure less than one in 10 million.

Systems classified as "hazardous failure" typically must have at least two separate input channels as a backup in the event one sensor fails.

**ANSWER:** ROCKWELL COLLINS admits only that various aviation regulations and standards define failure and/or hazard classifications and the corresponding allowable probabilities of failure for aircraft systems. ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 105, including whether a "hazardous" failure classification for "systems" typically mandates a specific number of input channels, and on that basis denies same.

106.    With the MCAS classified as a "hazardous failure," it should have been a fail-safe design with a redundant back-up system. Instead **BOEING** misclassified the MCAS as a "major failure," allowing it to be triggered by a reading from a single AOA sensor and, once triggered, it had unlimited authority to pitch the nose of the airplane down.

**ANSWER:** ROCKWELL COLLINS did not design the MCAS and therefore lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 106. The remaining allegations contained in Paragraph 106 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 106 and on that basis denies same.

107.    As a further result of the misclassification of the MCAS as only a "major failure," **BOEING** did not more rigorously analyze the failure condition in the safety analysis, using Failure Modes and Effects Analysis (FMEA) and Fault Tree Analysis (FTA), as these are only required for Hazardous or Catastrophic failure conditions.

**ANSWER:** The allegations contained in Paragraph 107 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 107 and on that basis denies same.

108.    **BOEING** in fact had a second AOA sensor on the airplane that it could have used

to provide redundancy and safety, and which it is now using in its proposed MCAS software "fix" after these two fatal accidents, but it chose not to do so during design and certification of the 737 MAX 8 in order to save time and money and to avoid any potential pilot training requirements that would have conflicted with **BOEING's** business plans for the airplane. This is the same flawed approach **BOEING** took in its design of the 737 auto-throttle system that led to the 2009 Turkish Airlines Flight 1591 crash in Amsterdam – reliance on a single sensor input instead of two readily available inputs. After an accident killed passengers and crew, **BOEING** quickly issued a software fix to prevent recurrence. **BOEING** should have learned from that accident to never try to save money via single sensor reliance on critical systems, but once again did so on the 737 MAX MCAS design.

      **ANSWER:** ROCKWELL COLLINS admits only that the aircraft was equipped with two AOA sensors. ROCKWELL COLLINS denies that any software code provided to Boeing by ROCKWELL COLLINS that was present on the accident aircraft was defective or otherwise required a "fix" due to any acts or omissions by ROCKWELL COLLINS. The remaining allegations contained in Paragraph 108 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 108 and on that basis denies same.

      109.    As **BOEING's** former flight controls engineer, Peter Lemme explained "A hazardous failure mode depending on a single sensor, I don't think passes muster."

      **ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 109 and on that basis denies same.

      110.    **BOEING** has repeatedly and intentionally violated this system safety design principle and egregiously abused its FAA certification designee position to allow it to pass certification muster, resulting in hundreds of **BOEING** airplane passenger deaths and injuries over the years.

      **ANSWER:** The allegations contained in Paragraph 110 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 110 and on that basis denies same.

111. **BOEING's** system safety analysis was also deficient because it did not replicate the specific failure mode that could lead to uncommanded MCAS activation. The functional hazard assessment validation tests conducted by **BOEING** did not account for MCAS activation due to an erroneously high AOA input. As a result, the testing did not include flight deck effects such as IAS DISAGREE and ALT DISAGREE alerts or stick shaker activation, effects which would influence the flight crew's ability to identify and address uncommanded MCAS activation. These effects were not simulated and were not included in the stabilizer trim safety assessment report. This means that **BOEING** included a flight control system capable of activation by a single sensor failure and did not conduct simulations testing a pilot's response to that single point of failure.

**ANSWER:** The allegations contained in Paragraph 111 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 111 and on that basis denies same.

112. The October 2019 report submitted to the FAA by the Joint Authorities Technical Review ("JATR") faulted **BOEING** for using pilot action as the primary means of mitigating MCAS hazards instead of eliminating the hazards or providing design features or warnings to mitigate them. The JATR found this approach was not in accordance with **BOEING's** process instructions for safe design.

**ANSWER:** ROCKWELL COLLINS admits the JATR submitted a report to the FAA in October 2019, the content of which speaks for itself.

113. To make matters worse, **BOEING** knowingly relied on flawed assumptions about pilot reaction time to a MCAS failure, assuming that pilots would take no more than four seconds to recognize an erroneous activation of the MCAS and know how to counteract it, despite that [sic] the fact that pilots were not even informed of the system's existence. A pilot's quick reaction time was vital to the system's safety because, as **BOEING** has acknowledged, a "slow" reaction time in excess of ten seconds would be "catastrophic." Shockingly, **BOEING** has admitted that it knew as early as June 2018 – months before the crash of Lion Air Flight ET 610 – that some pilots would take greater than 10 seconds to react to a MCAS failure; **BOEING** knew that there were going to be some pilots who could not safely respond to a MCAS failure and that the result would be a catastrophic failure, or a potential loss of the plane with multiple fatalities.

**ANSWER:** The allegations contained in Paragraph 113 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 113 and on that basis denies same.

114.     Despite its knowledge of the catastrophic risk to human life presented by the 737 MAX 8, **BOEING** consciously chose to subject the public to this risk anyways because it was financially expedient for **BOEING**.

**ANSWER:** The allegations contained in Paragraph 114 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 114 and on that basis denies same.

### G.     COLLINS AND BOEING CREATED THE FATALLY FLAWED MCAS IN VIOLATION OF MANDATED SAFETY PROCESSES

115.     **COLLINS** and **BOEING** were required to comply with United States 14 Code of Federal Regulations (CFR) 25.1309 which mandates formal safety processes to be followed. Compliance with CFR 25.1309 is shown by meeting the standards laid out in Society of Aerospace Engineers (SAE) Aerospace Recommended Practice ("ARP") ARP4754A, "Guidelines for Development of Civil Aircraft and Systems". ARP4754A cites to and incorporates SAE ARP4761, "Guidelines and Methods for Conducting the Safety Assessment Process on Civil Airborne Systems and Equipment." Together, ARP4754A and ARP4761 describe foundational aircraft and systems development safety rules which must be followed directly or via an identified equivalent process.

**ANSWER:** The allegations contained in Paragraph 115 state conclusions of law to which no response is required from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS admits only those duties and/or requirements, if any, imposed by the law determined to be applicable to the determination of these actions, the content of which speak for themselves. The remaining allegations of Paragraph 115 contain conclusions of law or are otherwise directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 115 and on that basis denies same.

116.     **COLLINS** received Flight Control Computer ("FCC") and MCAS system requirements from **BOEING** but failed to perform the ARP4754A-required engineering and validation processes for Safety Requirements Review, Functional Hazard Assessment (FHA)

confirmation or Preliminary System Safety Assessment refinement. Performing those activities would have revealed engineering requirement defects in each of the following areas:

    a.    Pilot notification of MCAS activation;

    b.    Update of FCC/MCAS operational procedures including feedback to aircraft and system safety requirements;

    c.    Incorrect usage of redundancy within the dual Angle of Attack (AOA) sensors;

    d.    Incorrect application of Built-In-Test to notify pilots of AOA mismatches upon power-up and also in continuous background mode;

    e.    Non-performance of MCAS disabling upon AOA mismatch;

    f.    Incorrect assignment of Development Assurance Level (DAL) "B" instead of DAL "A" since MCAS operations could contribute to catastrophic failure;

    g.    Insufficient AOA sensor redundancy per the true DAL A;

    h.    Insufficient identification and refinement of FCC/MCAS safety-requirements associated with all of the above;

    i.    Insufficient review of system and software requirements for all of the above per ARP4754A and DO-178;

    j.    Insufficient feedback of safety-related requirement refinements and questions back to **BOEING** aircraft safety and systems engineers per ARP4754A and DO-178;

    k.    Insufficient traceability of safety-requirements to software high-level and software low-level requirements per DO-178;

    l.    Insufficient design review of FCC/MCAS functionality associated with safety requirements;

    m.    Insufficient functional and robustness testing of FCC/MCAS functionality including safety-related requirements; and

    n.    Insufficient Software Quality Assurance audits of **COLLINS'** software requirement definition, traceability, software design, and software testing activities including non-compliance of DO-178 transition criteria.

    **ANSWER:** ROCKWELL COLLINS admits it received Flight Control Computer and

MCAS flight control law requirements from BOEING. ROCKWELL COLLINS denies the

remaining allegations contained in Paragraph 116, including subparts (a)-(n) thereto.

117.    In addition to its failure to conduct federally mandated safety processes, **COLLINS** also outsourced significant work on the MCAS software to India, specifically to Chennai and Bangalore. The standard of work completed in India on the MCAS software did not meet United States aviation avionics software standards.

**ANSWER:** ROCKWELL COLLINS denies the allegations of Paragraph 117.

118.    **COLLINS** and **BOEING's** reckless failure to follow prescribed processes and comply with regulatory requirements resulted in the inclusion of defective and improperly integrated software which were substantial factors in the resulting crashes.

**ANSWER:** ROCKWELL COLLINS denies all allegations of Paragraph 118 directed towards it. The remaining allegations of Paragraph 118 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 118 and on that basis denies same.

## H.    BOEING REJECTED MULTIPLE OPTIONS TO MAKE ITS AIRPLANE SAFER

119.    Despite the MCAS' glaring flaws, **BOEING** had available safety features that could mitigate the risk of the AOA sensor failing and causing an uncontrolled dive, but consciously chose to make these safety features available only as optional add-ons for airlines and at extra charges.

**ANSWER:** The allegations contained in Paragraph 119 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 119 and on that basis denies same.

120.    One such feature is an angle of attack indicator, which would display to the pilots the real-time data from both AOA sensors, providing valuable safety information to the pilots. Without this upgrade, pilots do not have a reading of what the AOA is registering, making it more difficult to identify an AOA malfunction. The information provided by the Angle of Attack Indicator, if purchased and installed, would assist pilots in diagnosing why a **BOEING** 737 MAX 8's MCAS was erroneously pushing the airplane down toward the ground and would speed the pilot's reaction time to a MCAS created flight emergency.

**ANSWER:** Upon information and belief, Boeing offered an angle of attack indicator as operator selectable software on the 737 MAX 8. ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 120 and on that basis denies same.

121.    Another safety feature is called a Disagree Light. The 737 MAX 8 comes outfitted with two AOA sensors on either side of the airplane's nose, but the MCAS only takes readings from one sensor on any given flight, leaving the system vulnerable to a single point of failure. Upgrades to the MCAS software coupled with the installation of a Disagree Light in the cockpit would alert pilots if the two AOA sensors register readings at odds with the other. The Disagree Light had been standard equipment on prior **BOEING** 737 models; **BOEING** could have made it active in every **BOEING** 737 MAX 8 airplane for little or no cost, but it chose not to. The Disagree Light would have provided important information to the pilots of Ethiopian Airlines Flight 302 and may have helped them diagnose the AOA sensor / MCAS problem quicker than they did on the flight.

**ANSWER:** The allegations contained in Paragraph 121 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 121 and on that basis denies same.

122.    These safety features are critical and cost almost nothing for the airlines to install.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 122 and on that basis denies same.

123.    **BOEING** designed the MCAS so that it would force the airplane's nose down even when the two AOA readings are materially out-of-sync and so that the system would even accept a completely implausible AOA reading, like the 74.5° nose up that was the erroneous reading of the AOA sensor on Ethiopian Airlines Flight 302. **BOEING** could and should have programmed MCAS so that it would turn off in the event that the two AOA readings materially conflict with one another.

**ANSWER:** The allegations contained in Paragraph 123 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth

of the allegations of Paragraph 123 and on that basis denies same.

124. Despite the potential for the AOA sensor failing and wrongfully activating the MCAS to force the plane downward, **BOEING** did not install the AOA indicator or disagree light as standard. Instead, **BOEING** charges a premium for these essential safety features as "optional" additions.

**ANSWER:** The allegations contained in Paragraph 124 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 124 and on that basis denies same.

125. To make matters worse, **BOEING** knew as far back as 2017 that the AOA disagree alert on airplanes it delivered to airlines was erroneously non-functioning on airplanes in which the AOA indicator option had not been purchased. In a statement issued by **BOEING** on April 29, 2019, **BOEING** stated that "[t]he disagree alert was intended to be a standard, standalone feature on MAX airplanes. However, the disagree alert was not operable on all airplanes because the feature was not activated as intended." **BOEING** went on to say that "[u]nless an airline opted for the angle of attack indicator, the disagree alert was not operable."

**ANSWER:** The allegations contained in Paragraph 125 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 125 and on that basis denies same.

126. After learning that the disagree alert was not functioning as intended, **BOEING** consciously chose not to immediately fix the problem or alert the airlines. Instead, **BOEING** concluded that "the existing functionality was acceptable until the alert and the indicator could be delinked in the next planned display system software update." **BOEING** decided it would wait until 2020 to fix the problem; again, placing profit over safety.

**ANSWER:** The allegations contained in Paragraph 126 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 126 and on that basis denies same.

127. Thus, the pilots of Flight 302 and 610 did not have the benefit of the disagree alert

to inform them that an AOA sensor was communicating erroneous data to the MCAS and causing the plane to pitch its nose down. This was particularly important as the activation of the aircraft's stick shaker and the non-activation of the disagree alert would send the pilots conflicting messages. Had such an alert been operational, it would have assisted the pilots in identifying and correcting the problem caused by the faulty AOA sensor and MCAS and would have afforded the pilots critical time to avert a crash.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 127 and on that basis denies same.

128.    In the case of the Lion Air Flight JT 610, the two AOA sensor readings were already widely divergent on the ground, prior to takeoff. Had the AOA Disagree Alert been functioning, it would have been immediately activated and it is likely the airplane would never have taken off, saving all onboard.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 128 and on that basis denies same.

129.    **BOEING** reportedly also considered, and rejected, additional safety features which may have helped to prevent both crashes. In his internal ethics complaint filed after the crash of Flight ET 302, **BOEING** engineer Curtis Ewbank detailed how, as far back as 2014, safety upgrades for the MAX were proposed but rejected by management due to cost, the potential impact on pilot training, and production delays.

**ANSWER:** The allegations contained in Paragraph 129 are directed at another entity and

require no response from ROCKWELL COLLINS. To the extent a response is required,

ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth

of the allegations of Paragraph 129 and on that basis denies same.

130.    One of these safety upgrades included a "synthetic airspeed" system, a variant of which was already in use on **BOEING's** 787 Dreamliner. The synthetic airspeed system may have been able to detect the false AOA sensor readings and prevented the MCAS from activating. Implementation of this safety system in the MAX was rejected by management on three separate occasions.

**ANSWER:** The allegations contained in Paragraph 130 are directed at another entity and

require no response from ROCKWELL COLLINS. To the extent a response is required,

ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth

of the allegations of Paragraph 130 and on that basis denies same.

131.     Another safety feature **BOEING** considered including in the 737 MAX 8 was the flight-crew alerting system called Engine-Indicating and Crew-Alerting System ("EICAS"). EICAS integrates all engine and airplane systems indicators and displays them in a clear manner to pilots along with crew alerts organized into an unambiguous hierarchy. If implemented, this system would have been able to assist the pilots of Flight 610 and Flight 302 by more clearly presenting the sensor and systems malfunctions. EICAS would have allowed the embattled pilots more options to turn off distracting and contradictory alarms that added to their workload during their struggle with the MCAS. **BOEING** rejected the inclusion of this safety system due to overall cost despite the fact that EICAS is industry standard and included on all **BOEING** airplane models other than the 737.

**ANSWER:** ROCKWELL COLLINS denies that any software code provided to Boeing by ROCKWELL COLLINS that was present on the accident aircraft was defective or otherwise malfunctioned due to any act or omission by ROCKWELL COLLINS. The remaining allegations contained in Paragraph 131 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 131 and on that basis denies same.

132.     **BOEING's** failure to include adequate cockpit alerts, as required by 14 CFR § 25.1322, was noted by a NTSB report released in September 2019. In this report, the NTSB concluded that during both MAX crashes, when faced with multiple alerts and indications, "the crews lacked tools to identify the most effective response."

**ANSWER:** ROCKWELL COLLINS admits that the NTSB released a Safety Recommendation Report (ASR-19-01) in September 2019, the content of which speaks for itself. The remaining allegations contained in Paragraph 132 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 132 and on that basis denies same.

133.     Due to its widespread acceptance, FAA's regulations on cockpit alerts, detailed in 14 CFR § 25.1322, are closely aligned with the capabilities of the EICAS system. If it did not wish

to include EICAS in the 737 MAX 8, **BOEING** could have applied for an exemption from the regulations. However, such an exemption would have required a public notice in the Federal Register and an opportunity for interested parties or the general public to comment. Instead of an *exemption*, BOEING sought an *exception* from the regulations. This exception did not require the same public noticing, allowing **BOEING** to further conceal its actions in circumventing safety requirements for its airplanes.

**ANSWER:** The allegations contained in Paragraph 133 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 133 and on that basis denies same.

## I. BOEING MISREPRESENTED ITS AIRPLANE TO PILOTS AND AIRLINES, DOWNPLAYING THE NEED FOR ESSENTIAL TRAINING

134. With the 737 MAX 8 certified by the FAA, **BOEING** began delivering airplanes all over the world starting in May 2017. The 737 MAX 8 was an incredibly popular and profitable airplane for **BOEING**.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 134 and on that basis denies same.

135. As **BOEING** had intended, pilots transitioning from the 737NG to the 737 MAX 8 were not required by the FAA to receive extensive training on the 737 MAX 8 because it obtained the same "type rating" as early 737 models. This was a primary selling point for the MAX as it was presented to airlines. On its website, **BOEING** represented to airlines that "as you build your 737 MAX fleet, millions of dollars will be saved because of its commonality with the Next-Generation 737."

**ANSWER:** The allegations contained in Paragraph 135 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 135 and on that basis denies same.

136. **BOEING**'s CEO, Dennis Muilenburg, has admitted that minimizing training was an objective in the design of the 737 MAX 8 to bring it to market faster:

> "Part of what we wanted to accomplish was seamless training and introduction for our customers, so we purposely designed the airplane to behave in the same way. So even

though it's a different airplane design, the control laws that fly the airplane are designed to make the airplane behave the same way in the hands of the pilot."

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 136 and on that basis denies same.

137.    Due to **BOEING's** representations regarding the MAX's commonality with the 737NG, pilots have reported that they were given just 56 minutes of training on an iPad about the differences between the new **BOEING** MAX planes and the older 737s. The MCAS system was not discussed during this training.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 137 and on that basis denies same.

138.    With simulators for the new airplane unavailable at the time 737 MAX 8 was pressed into service, pilots with United Airlines put together their own 13-page guide to the 737 MAX, but relying on **BOEING's** misleading representations, even this guide failed to mention the MCAS, leaving pilots unprepared to deal with a sudden and unexpected dive by the automated systems in the airplane.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 138 and on that basis denies same.

139.    American Airlines pilot union representative and 737 pilot, Dennis Tajer, explained: "When you find out that there are systems on it that are wildly different that affect the performance of the aircraft, having a simulator is part of a safety culture… It can be the difference between a safe, recoverable flight and one that makes the newspapers."

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 139 and on that basis denies same.

140.    The pilots of the 737 MAX 8 were left unaware of the MCAS because **BOEING** persuaded the FAA to remove any mention of the MCAS from the aircraft's flight manual.

**ANSWER:** The allegations contained in Paragraph 140 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 140 and on that basis denies same.

141.    **BOEING's** chief technical pilot, Mark Forkner, wrote to the FAA, stating:

"Are you OK with us removing all reference to MCAS from the FCOM (Flight Crew Operating Manual) and the training as we discussed, as it's completely transparent to the flight crew and only operates WAY outside of the normal operating envelope."

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 141 and on that basis denies same.

142.    **BOEING's** removal of a description of the MCAS' functionality from the FCOM deprived the FAA Flight Standardization Board (FSB) of the opportunity to adequately assess training needs for MAX pilots.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 142 and on that basis denies same.

**J.    LION AIR FLIGHT JT 610 CRASHES AFTER PILOTS EXPERIENCE A FLIGHT CONTROL ISSUE**

143.    On October 29, 2018, Lion Air flight JT 610 ("Flight 610") departed Jakarta, Indonesia. Shortly after takeoff, the pilots complained of flight control issues as the plane repeatedly pitched down despite the pilots' desperate efforts to bring the nose back up. The pilots reported unreliable airspeed and altitude readings. In the audio recordings from the cockpit, the rattle of a stick shaker can be heard, a device used to alert pilots of a potential stall, which can occur when a plane ascends too quickly.

**ANSWER:** ROCKWELL COLLINS admits only that Lion Air flight 610 departed from

Jakarta, Indonesia on October 29, 2018. ROCKWELL COLLINS lacks sufficient knowledge or

information to form a belief as to the truth of the remaining allegations of Paragraph 143 and on

that basis denies same.

144.    The pilots requested permission to return to Jakarta, which was granted, but the plane did not return. Satellite data showed the plane rising and falling repeatedly – more than 20 times – as the pilots struggled to wrest control back from the automated systems. Within just 12 minutes of taking off, Flight 610 crashed into the Java Sea, killing all 189 people onboard.

**ANSWER:** ROCKWELL COLLINS admits only that Lion Air flight 610 impacted the

Java Sea shortly after takeoff resulting in the deaths of all occupants. ROCKWELL COLLINS

lacks sufficient knowledge or information to form a belief as to the truth of the remaining

allegations of Paragraph 144 and on that basis denies same.

145.    The cockpit voice recording recovered from the wreckage revealed that while the plane danced perilously across the sky, one of the pilots flipped through a technical manual in an attempt to identify the problem while the other pilot prayed. The pilots appeared unaware of the MCAS and its potential role in overriding their manual controls. As a result of **BOEING's** purposeful actions there was nothing in the technical manual that would explain to the pilots why the airplane was fighting their efforts to prevent the airplane from crashing.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 145 and on that basis denies same.

146.    Preliminary analysis of the crash and data obtained from the plane's flight data recorder (FDR) show that one of the AOA sensors produced a reading that was at least 20 degrees different from the other AOA sensor when the airplane taxied, took off and began its climb. This strongly suggests that a malfunction in the AOA sensor feed erroneous pitch information to the MCAS triggered an unwarranted activation of the MCAS system at low altitudes, causing the plane's nose to pitch down and the airplane to crash into the Java Sea.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 146 and on that basis denies same.

**K.    DEFENDANTS RECKLESSLY FAILED TO TAKE NECESSARY ACTION IN THE WAKE OF THE LION AIR CRASH**

*i.    Defendants Knew A Faulty AOA Sensor and Defective MCAS Were Responsible for the Crash of Flight 610*

147.    Following the tragic crash of Flight 610, Defendants knew or, at a minimum had every reason to suspect, that malfunctions in the AOA sensor and MCAS may have been responsible. This is clear from the flight path of Flight 610 which suggested that the malfunctioning AOA sensor, MCAS, and nose-down commands were factors in the crash: [Graphic omitted].

**ANSWER:** ROCKWELL COLLINS denies the allegations of Paragraph 147 directed

towards it. The remaining allegations of Paragraph 147 are directed at other entities and require no

response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL

COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the

remaining allegations of Paragraph 147 and on that basis denies same.

148.    On November 6, 2018, **BOEING** issued a Flight Crew Operations Manual

("FCOM") Bulletin referencing "an AOA failure condition" and uncommanded "nose down stabilizer trim movement."

**ANSWER:** ROCKWELL COLLINS admits that Boeing issued a FCOM Bulletin on

November 6, 2018, the content of which speaks for itself.

149.    The FAA issued an Emergency Airworthiness Directive ("AD") on November 7, 2018 identifying the potential danger presented by the flight control system, but not providing clear instruction on what pilots should do in the event of an AOA failure:

> "This AD was prompted by analysis performed by the manufacturer showing that if an erroneously high single angle of attack (AOA) sensor input is received by the flight control system, there is a potential for **repeated nose-down trim commands of the horizontal stabilizer.** We are issuing this AD to address this potential resulting nose-down trim, which could **cause the flight crew to have difficulty controlling the airplane**, and lead to **excessive nose-down altitude, significant altitude loss, and possible impact with terrain**."

**ANSWER:** ROCKWELL COLLINS admits the FAA issued Emergency Airworthiness

Directive 2018-23-51 on November 7, 2018, the content of which speaks for itself.

150.    Neither **BOEING's** FCOM Bulletin nor the FAA's Airworthiness Directive referenced the MCAS or the role it played in the Lion Air crash.

**ANSWER:** ROCKWELL COLLINS admits that Boeing issued a FCOM Bulletin on

November 6, 2018 and the FAA issued Emergency Airworthiness Directive 2018-23-51 on

November 7, 2018, the contents of which speak for themselves.

151.    Compounding this omission, the risk of an AOA sensor failing again and triggering the wrongful activation of the MCAS was a foreseeable event. The FAA received more than 200 incident reports since 2004 of AOA sensors failing or needing to be repaired, many of them in **BOEING** airplanes. These failures included the AOA sensors being frozen, improperly installed, struck by lightning or hit by flying birds.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 151 and on that basis denies same.

152.    **BOEING** issued the Airworthiness Directive and began investigating a software patch to address the issue but did not insist on further training of pilots to deal with the defective AOA sensor or MCAS software. **BOEING** also covered up the significance of the threat presented by the MCAS with the FAA, government regulators, and the public, and did not call for any

aggressive action to prevent further incidents.

**ANSWER:** ROCKWELL COLLINS denies that any software code provided to Boeing by ROCKWELL COLLINS that was present on the accident aircraft was defective due to any act or omission by ROCKWELL COLLINS. The remaining allegations contained in Paragraph 152 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 152 and on that basis denies same.

> ### ii. *BOEING Misrepresented the Nature of the MCAS Failure and How It Would Be Perceived by Pilots*

153.    On November 13, 2018, CEO Dennis Muilenburg was interviewed on Fox Business Network. Muilenburg stated:

> "There are new systems on the airplanes that are designed to take advantage of the capabilities of the airplane and provide control capability and high angle-of-attack conditions and **those systems operate properly**. And again, **in certain failure modes if there's an inaccurate angle-of-attack sensor feeding information to the airplane, there's a procedure to handle that**. And so, again, as part of the investigation process we're going to make sure we fully understand that. **We're going to make sure that we're providing all the information necessary and appropriate training**, and go back to the core value here … that the airplane is safe, we know how to fly it safely, and we're very confident."

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 153 and on that basis denies same.

154.    Despite its CEO's representations, **BOEING**'s MCAS system did not "operate properly" and **BOEING** did not act promptly to ensure that all necessary information and appropriate training was provided. **BOEING** has maintained that the failure of the MCAS could be handled in the same way as a standard "stabilizer runaway," a malfunction which occurs when the Trimmable Horizontal Stabilizer (THS) on the airplane tail fails to stop at the selected position and continues to deflect up or down.

**ANSWER:** The allegations contained in Paragraph 154 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth

of the allegations of Paragraph 154 and on that basis denies same.

155.    **BOEING's** characterization that MCAS as [sic] a "stabilizer runaway" is wrong and misleading because the MCAS failure does not behave like a stabilizer runaway. First, with a stabilizer runaway, there is continuous uncommanded movement of the horizontal stabilizer. In contrast, the movement of the horizontal stabilizer is not continuous in a MCAS created emergency, but rather repeated: pilots are able to counter the nose down movement with the electric stab trim switch, only to have the MCAS move the tail once again. Second, the MCAS alters the control column response to the stabilizer movement. Pulling back on the column normally interrupts any stabilizer nose-down movement, but with MCAS operating that control column function is disabled and the pilots cannot counteract the malfunctioning computer systems.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 155 and on that basis denies same.

156.    **BOEING's** attempts to deflect blame onto purportedly poorly trained pilots wrongfully minimized and covered up **BOEING's** responsibility for these crashes in order to keep the planes flying. It is foreseeable that pilots would be confused by MCAS' control over the 737 MAX 8 as the system's nose-down commands were materially different from a common stabilizer problem and because pilots were not told the MCAS existed or how it functioned. When seconds matter, the confusion caused by **BOEING's** defective and unsafe design, and failure to inform pilots, was the difference between life and death.

**ANSWER:** The allegations contained in Paragraph 156 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 156 and on that basis denies same.

157.    Furthermore, **BOEING** should have anticipated an AOA sensor failure causing several aircraft level effects. Over the last 17 years in the **BOEING** 737 fleet alone, there were 25 events of stick shaker activation during or shortly after takeoff. It was foreseeable that the 737 MAX 8 could experience an AOA sensor failure with stick shaker activation, airspeed and altitude disagreements, and MCAS operation.

**ANSWER:** The allegations contained in Paragraph 157 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 157 and on that basis denies same.

158.    Both before and after the Lion Air crash, several pilots anonymously submitted complaints on the Aviation Safety Reporting System ("ASRS") which described similar flight control issues and unanticipated dives with 737 MAX 8 airplanes. One such report submitted by a pilot in November 2018 – after the Lion Air crash and before the Ethiopian Airlines crash – describes the pilot's reaction to learning of the MCAS system:

> **"I think it is unconscionable that a manufacturer, the FAA, and the airlines would have pilots flying an airplane without adequately training, or even providing available resources and sufficient documentation to understand the highly complex systems that differentiate this aircraft from prior models.** The fact that this airplane requires such jury rigging to fly is a red flag. Now we know the systems employed are error prone– even if the pilots aren't sure what those systems are, what redundancies are in place, and failure modes.

> I am left to wonder: what else don't I know? **The Flight Manual is inadequate and almost criminally insufficient.** All airlines that operate the MAX must insist that Boeing incorporate ALL systems in their manuals."

ANSWER: ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 158 and on that basis denies same.

159.    **BOEING's** reckless representation that pilots merely needed to follow the stabilizer runaway procedure only served to conceal the 737 MAX 8's defects and the true nature of an MCAS failure, deceiving pilots, airlines, and the public into thinking that additional safety processes or training were unnecessary.

**ANSWER:** The allegations contained in Paragraph 159 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 159 and on that basis denies same.

### iii.    *BOEING Misled Airlines and Pilots About the Dangers of the 737 MAX 8*

160.    During a November 27, 2018 meeting between **BOEING** senior management and pilots' union representatives in Texas, **BOEING** disclosed that it was planning to make software changes to the MAX. At this meeting Mike Sinnett, **BOEING's** vice president of product strategy and development, described the updates as "flight-critical software." **BOEING** felt the update was so urgent that they did not want to wait for the normal six-month certification process or the 90-day public comment period. Instead, **BOEING** wanted it done in six weeks. More than sixteen weeks later, at the time of the crash of Flight 302, **BOEING** still had not implemented this software update.

**ANSWER:** The allegations contained in Paragraph 160 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 160 and on that basis denies same.

161. At this same meeting, Mr. Sinnett minimized the problems with the MAX's aerodynamics and the role of the MCAS. Sinnett described the MCAS as a MAX "control law" that helps it behave the same way as the 737NG when "flying a stall." Putting comparisons to the 737NG aside, Sinnett says: "If we had not put the MCAS in, as you get up to the higher angles of attack, you would almost feel like you're pushing because the amount of displacement it took to move the nose at the same rate would be much less. And so the nose would start – you'd get a *perception* of the nose pitching up on you." He later adds: "So if you were going to shoot for, you know, a two-G pullout and we didn't have MCAS in there and angle of attack got high, there's a really good chance the airplane could dig in and go three, three-and-a-half, four G's. Well, the MCAS puts that load in there to prevent you from doing that. So, actually, MCAS is going to help you maneuver."

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 161 and on that basis denies same.

162. However, on September 19, 2019, the NTSB released a report titled: "Assumptions Used in the Safety Assessment Process and the Effects of Multiple Alerts and Indications on Pilot Performance." In its report, the NTSB stated that "the addition of the LEAP-1B engine and associated nacelle changes produced an ANU [Aircraft Nose Up] pitching moment when the airplane was operating at high AOA and mid Mach numbers… the MCAS function was [later] expanded to low Mach numbers." The ANU pitching moment was clearly substantial, based off the extensive stabilizer authority **BOEING** gave to MCAS, yet Mr. Sinnett downplayed it as a mere "perception." Additionally, Sinnett misrepresented even the handling characteristics of a 737 MAX 8 without MCAS activated, emphasizing light control column forces at high AOA, when the NTSB report shows that the ANU pitching moment could occur without any control column command.

**ANSWER:** ROCKWELL COLLINS admits that the NTSB released a Safety Recommendation Report (ASR-19-01) on September 19, 2019, the content of which speaks for itself. The remaining allegations contained in Paragraph 162 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth

of the remaining allegations of Paragraph 162 and on that basis denies same.

163.    In addition to the misleading statements made to the pilots' union, **BOEING** provided assurances to airlines after the crash of Flight 610 that the 737 MAX 8 was safe and that no additional pilot training was necessary. **BOEING** understood that public confidence in the 737 MAX 8 would be shaken if airlines began cancelling flights or grounding the airplane. With that in mind, it was imperative to **BOEING** that it convince airlines that the 737 MAX 8 was safe and that the problems leading to the crash of Flight 610 were being addressed. **BOEING's** representations gave airlines a false sense of security about the airplane's safety and avoided grounding of the 737 MAX 8. This in turn provided a false sense of security to the flying public that the problem had been addressed and that the airplane was safe to fly.

**ANSWER:** The allegations contained in Paragraph 163 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 163 and on that basis denies same.

### iv.    *Defendants Misled the Public Regarding Software Updates and Training*

164.    After the crash of Lion Air, **BOEING** quietly began to make design changes to the 737 MAX 8's automated flight control system, which it planned to implement by way of an MCAS "software update." Following the crash of Flight 302, **BOEING** confirmed that it had for several months, in **BOEING** words, "been developing a flight control software enhancement for the 737 MAX, designed to make an already safe aircraft even safer."

**ANSWER:** The allegations contained in Paragraph 164 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 164 and on that basis denies same.

165.    According to **BOEING**, the MCAS software update was developed "to provide additional layers of protection if the AOA sensors provide erroneous data." This statement is misleading because it suggests that the aircraft already came equipped with layers of protection to prevent erroneous activation of the MCAS based upon erroneous AOA sensor data, and this was not the case.

**ANSWER:** The allegations contained in Paragraph 165 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required,

ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth

of the allegations of Paragraph 165 and on that basis denies same.

166.     The MCAS software update that **BOEING** was working on, even as **BOEING** maintained that the **BOEING** 737 MAX 8 was completely safe, was advertised to include, among others:

   a.  **MCAS AOA Sensor Enhancements** – The flight control system will now compare inputs from both AOA sensors. If the sensors disagree by 5.5 degrees or more with the flaps up, MCAS will not activate and an indicator on the flight deck display (the "disagree alert") will alert the pilots to the discrepancy;

   b.  **MCAS Activation Enhancements** – If MCAS is activated in abnormal conditions it will only provide one input for each elevated AOA event meaning that it will not repeatedly activate and fight the pilots for control of the airplane; and

   c.  **MCAS Command Limit** – MCAS can never command more stabilizer input than can be counteracted by the flight crew pulling back on the control column. The pilots will always have the ability to override MCAS and manually control the airplane.

   **ANSWER:** The allegations contained in Paragraph 166, including subpart (a)-(c) thereto, are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 166, including subpart (a)-(c) thereto, and on that basis denies same.

167.     On January 21, 2019, **BOEING** submitted to the FAA the proposed software enhancement for the MCAS. This software update was not implemented before the crash of Flight 302 a month and a half later.

   **ANSWER:** The allegations contained in Paragraph 167 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 167 and on that basis denies same.

168.     A few days after the "enhancement" was provided to the FAA, on January 25, 2019, **COLLINS** issued a software update to 737 MAX 8 flight-control systems designed to change MCAS functionality to improve its safety "when flap position failures are detected," according to

a notice **BOEING** sent customers about the changes. **COLLINS** failed to advise regulators of the dangers related to the software problem and attempted to represent that the update was a "standard service bulletin" to the 737 MAX 8, further lulling operators into the belief that there was no defect with the MCAS system.

**ANSWER:** ROCKWELL COLLINS denies the allegations of Paragraph 168 directed towards it. The remaining allegations of Paragraph 168 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 168 and on that basis denies same.

169.    In addition to a MCAS software fix, **BOEING** proposed as part of its fix that pilots already rated to fly prior **BOEING** 737 models should be required to undergo additional computer-based training and manual review before being allowed to fly the 737 MAX 8.

**ANSWER:** The allegations contained in Paragraph 169 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 169 and on that basis denies same.

170.    **BOEING** proposed this additional training as part of its eventual fix while, at the very same time, claiming that additional training on the 737 MAX 8 was not necessary in the interim. **BOEING's** rationale was that the training was designed to merely provide pilots with an "enhanced" understanding of the 737 MAX 8 Speed Trim System, including the MCAS function, associated existing crew procedures, and related software changes.

**ANSWER:** The allegations contained in Paragraph 170 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 170 and on that basis denies same.

171.    **BOEING** describes the new training and review program as "enhanced," but failed to acknowledge that the previous self-guided computer training program given to the pilots of 737 MAX 8's did not include sufficient or effective information and training on the MCAS. **BOEING** knew or should have known that the existing procedure **BOEING** identified to deal with a MCAS failure – the stabilizer runaway procedure – was dangerously inadequate to deal with a MCAS

failure caused by an erroneous AOA sensor input and the extreme load forces the MCAS can generate on the horizontal stabilizer.

**ANSWER:** The allegations contained in Paragraph 171 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 171 and on that basis denies same.

172. During this crucial time period after the crash of Flight 610 and before the crash of Flight 302, Defendants knew that 737 MAX 8 was aerodynamically unstable, the MCAS was defective, the training provided to pilots was inadequate, and knew that any updates or fixes would take time to evaluate and implement. With this knowledge, and the knowledge of the deadly risk of harm the 737 MAX 8 presented to passengers, pilots, crew, and the public at large from imperiled airplanes flying overhead, Defendants should have immediately called for grounding of the airplane until software updates and training protocols could be put into place. Failing that, at a minimum, Defendants should have fully and publicly disclosed the functionality of the MCAS so that airlines, pilots, and regulators could assess the danger presented and take appropriate action.

**ANSWER:** ROCKWELL COLLINS specifically denies that any software code provided to Boeing by ROCKWELL COLLINS that was present on the accident aircraft was defective due to any act or omission by ROCKWELL COLLINS and denies all remaining allegations of Paragraph 172 directed towards it. The remaining allegations contained in Paragraph 172 are directed at other entities and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 172 and on that basis denies same.

173. Instead, rather than grounding the **BOEING** 737 MAX 8 until it was fixed and made safe, Defendants consciously chose to prioritize profits over passenger safety, keeping the **BOEING** 737 MAX 8 airplane in service after the Lion Air crash, and intentionally misleading the FAA, airlines, passengers, and the public into believing the airplane was safe and airworthy without these necessary changes.

**ANSWER:** ROCKWELL COLLINS denies all allegations of Paragraph 173 directed towards it. The remaining allegations contained in Paragraph 173 are directed at other entities and require no response from ROCKWELL COLLINS. To the extent a response is required,

ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth

of the remaining allegations of Paragraph 173 and on that basis denies same.

### L. BOEING CONVINCED THE FAA NOT TO ADDRESS THE SERIOUS SAFETY RISK THEY KNEW EXISTED AFTER THE LION AIR FLIGHT 610 CRASH

174. **BOEING** pressured the FAA into going along with **BOEING's** scheme to downplay the clear and present danger to the public presented by **BOEING's** dangerous 737 MAX 8 after the Lion Air crash. **BOEING** manipulated the information given to the FAA, lawmakers, and others to convince the federal government to let the 737 MAX 8 keep flying, only to crash again. The FAA acquiesced in this plan, at least in part, due to **BOEING's** campaign to amass power and influence in Washington D.C. **BOEING** led the FAA to abdicate its oversight responsibilities which enabled **BOEING's** unchecked reckless conduct.

**ANSWER:** The allegations contained in Paragraph 174 are directed at another entity and

require no response from ROCKWELL COLLINS. To the extent a response is required,

ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth

of the allegations of Paragraph 174 and on that basis denies same.

175. The improper relationship between the FAA and **BOEING** had been deliberately cultivated by present and former **BOEING** executives and is evident by the numerous connections **BOEING** shares with the federal government. After Lion Air Flight 610 crashed and at the very moment that the FAA should have been providing adequate, transparent, and sufficient public safety advisories and warnings regarding the 737 MAX 8, former **BOEING** executive, Patrick Shanahan, was elevated to Acting Secretary of Defense. Following her resignation from the post of United States Ambassador to the United Nations, Nikki Haley, joined **BOEING's** board of directors. And **BOEING** reportedly donated $1 million to the President of the United States' 2017 inauguration.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 175 and on that basis denies same.

176. **BOEING's** CEO even personally called the President following the deadly Flight 610 and Flight 302 crashes to advocate against the grounding of the 737 MAX.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 176 and on that basis denies same.

177. Just two days after the crash of Lion Air Flight 610, the FAA completed an internal

analysis of the safety of the 737 MAX 8 called a Transport Airplane Risk Assessment Methodology (TARAM).

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 177 and on that basis denies same.

178. The analysis showed that underlying risks from the MCAS design were unacceptably high without FAA action, that they exceeded internal FAA safety standards, and that the likelihood of another emergency or even accident was over the tolerable threshold. However, instead of mandating immediate equipment changes, inspections, or training, or grounding the airplane, **BOEING** had the FAA merely issue an Emergency Airworthiness Directive that, like **BOEING's** public statement, simply reminded pilots of an existing emergency procedure. Neither **BOEING** nor the FAA explained how the dangerous MCAS design, that exceeded the agency's standards, was allowed to be implemented in the 737 MAX 8.

**ANSWER:** The allegations contained in Paragraph 178 are directed at another entity and

require no response from ROCKWELL COLLINS. To the extent a response is required,

ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth

of the allegations of Paragraph 178 and on that basis denies same.

179. An FAA spokesman acknowledged that the FAA's approach "wasn't removing the risk," but permitted **BOEING** 10 months to implement a software update anyways while letting the airplanes continue to fly. Even after the Lion Air crash, **BOEING** sidelined the FAA, mislead the government, and prevented any effective measures that would address the safety of the 737 MAX 8. **BOEING's** reaction to the first crash proved to be massively fatal.

**ANSWER:** The allegations contained in Paragraph 179 are directed at another entity and

require no response from ROCKWELL COLLINS. To the extent a response is required,

ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth

of the allegations of Paragraph 179 and on that basis denies same.

**M.** **MOTIVATED BY GREED, DEFENDANTS REFUSED TO ACT IN WILLFUL DISREGARD AND RECKLESS INDIFFERENCE TO THE LIVES OF OTHERS**

180. Shortly after Flight 610 crashed, Defendants knew that hundreds of 737 MAX 8 airplanes were still in use carrying passengers all over the globe, which presented a substantial risk that a similar incident could occur without appropriate and immediate intervention.

**ANSWER:** ROCKWELL COLLINS admits only that 737 MAX 8 aircraft were still in use after the loss of Flight 610. ROCKWELL COLLINS denies all remaining allegations of Paragraph 180 directed towards it. The remaining allegations contained in Paragraph 180 are directed at other entities and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 180 and on that basis denies same.

181.     On or about November 15, 2018, **BOEING** delivered the newly manufactured Flight 302 airplane to Ethiopian Airlines with full awareness that it would be used by said airline for commercial operations carrying hundreds of passengers, and the subject flight was one such flight.

**ANSWER:** The allegations contained in Paragraph 181 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 181 and on that basis denies same.

182.     **BOEING** delivered the Flight 302 airplane after Lion Air had crashed, with the knowledge of problems with the MCAS systems and defects in the 737 MAX 8, and when it could have – and should have – elected to ground the 737 MAX 8.

**ANSWER:** The allegations contained in Paragraph 182 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 182 and on that basis denies same.

183.     Instead of taking more aggressive action protect public safety, **BOEING** kept a keen eye on the record revenue the 737 MAX 8 was generating and the backlog of orders it had yet to fill. Just a few months after sharing condolences for the victims of Lion Air Flight 610, **BOEING's** twitter account posted the following: [Graphic omitted].

**ANSWER:** The allegations contained in Paragraph 183 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required,

ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth

of the allegations of Paragraph 183 and on that basis denies same.

184. **BOEING** realized its record-breaking revenue by prioritizing profitability and share price to the detriment of safety throughout the development, certification, and production of the 737 MAX 8:

    a. From the first quarter of 2013 through the first quarter of 2019, **BOEING** paid out $17.4 billion in dividends and spent an additional $43.1 billion on buybacks, equal to a further 104 percent of profits.

    b. The company's revenue in 2018 was $101.1 billion. According to **BOEING's** 10-Q for the quarter ending March 31, 2019, **BOEING** possessed $120.209 billion in assets and only $83.615 billion in liabilities. **BOEING's** market capitalization hit a high of nearly $249 billion in 2019.

    c. **BOEING** made $10.460 billion in profits in 2018, but on December 17, 2018, less than two months after the Lion Air crash, the board authorized another $20 billion for stock buyback program to boost the company's stock price and its executives' compensation through stock options. As a result, **BOEING's** stock price jumped by 31% between December 17 and March 8, 2019, two days before the Ethiopian Airlines crash.

    d. From 2015 through 2018, **BOEING's** chairman and chief executive officer Dennis Muilenburg was paid $95.9 million including salary and stock; in 2018, the year of the Lion Air crash, Mr. Muilenburg received $23,400,000 in compensation, including a $13,000,000 bonus.

    **ANSWER:** The allegations contained in Paragraph 184, including subparts (a)-(d) thereto,

are directed at another entity and require no response from ROCKWELL COLLINS. To the extent

a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form

a belief as to the truth of the allegations of Paragraph 184, including subparts (a)-(d) thereto, and

on that basis denies same.

185. In addition to **BOEING**, following the Lion Air crash defendants **ROSEMOUNT** and **COLLINS** should have been aware that their AOA sensors and MCAS software, respectively, had malfunctioned and caused Flight 610 to crash. Despite having this knowledge, as well as the knowledge of the more than 200 AOA sensor failures since 2004 and the ASRS complaints noting unintended activation of MCAS, neither **ROSEMOUNT** nor **COLLINS** sounded the alarm and alerted the public to danger presented by the 737 MAX 8.

**ANSWER:** ROCKWELL COLLINS specifically denies that any software code provided to Boeing by ROCKWELL COLLINS that was present on the accident aircraft malfunctioned due to any act or omission by ROCKWELL COLLINS and denies all remaining allegations contained in Paragraph 185 directed towards it. The remaining allegations contained in Paragraph 185 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 185 and on that basis denies same.

186. **ROSEMOUNT** and **COLLINS** stayed quiet because, as **BOEING** suppliers, they had a vested financial interest in **BOEING** continuing to roll out 737 MAX 8's at its production facilities unabated. The grounding of the 737 MAX 8 would jeopardize their own bottom line so **ROSEMOUNT** and **COLLINS** remained silent as to the obvious dangers presented by the MAX and its integration of their products.

**ANSWER:** ROCKWELL COLLINS denies all allegations contained in Paragraph 186 directed towards it. The remaining allegations contained in Paragraph 186 are directed at another entity and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 186 and on that basis denies same.

187. Furthermore, at the time of the crash of Flight 610, both **ROSEMOUNT** and **COLLINS** were subsidiaries of United Technologies Corporation ("UTC"), a multinational conglomerate headquartered in Farmington, Connecticut. Due to their common relationship with UTC, **ROSEMOUNT** and **COLLINS** did not want to cause harm to the other's bottom line. **COLLINS** knew **ROSEMOUNT's** AOA sensors were defective and unreliable just as **ROSEMOUNT** knew **COLLINS'** reliance on a single sensor input for the MCAS was dangerously flawed, and yet, neither company could point the finger at the other, or lobby **BOEING** to change suppliers, for fear of harming the financial interests of their common parent company and, by extension, their own financial interests. Thus, **BOEING**, **ROSEMOUNT**, and **COLLINS** shared a common objective in falsely maintaining that the 737 MAX 8 was safe and keeping the aircraft in production.

**ANSWER:** ROCKWELL COLLINS denies all allegations contained in Paragraph 187 directed towards it. The remaining allegations contained in Paragraph 187 are directed at other

entities and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS denies the remaining allegations of Paragraph 187.

188.    Defendants chose not to respond to the Flight 610 crash with the appropriate degree of urgency or with appropriate safety steps because it feared doing so would result in financial loss if airlines grounded the 737 MAX 8, cancelled orders, or had to retrain pilots. Instead, motivated by greed, Defendants downplayed the danger presented by the defective and dangerous airplane, creating a false sense of security, ensuring that the 737 MAX 8 would still fly, and risking the lives of pilots, crews, and passengers.

**ANSWER:** ROCKWELL COLLINS denies all allegations contained in Paragraph 188 directed towards it. The remaining allegations contained in Paragraph 188 are directed at other entities and require no response from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS denies all remaining allegations of Paragraph 188.

### N. **ETHIOPIAN AIRLINES FLIGHT 302 CRASHES KILLING ALL 157 PEOPLE ON BOARD**

189.    At 05:38 UTC, Ethiopian Airlines Flight ET 302, took off from Addis Ababa Bole International Airport bound to Nairobi, Kenya Jomo Kenyatta International Airport. Six minutes later, at 5:44 UTC, the airplane crashed 28 nautical miles southeast of Addis Ababa near Ejere village. There were 157 passengers and crew on board. All were killed, and the airplane was destroyed. [Graphic Omitted].

**ANSWER:** ROCKWELL COLLINS admits that an aircraft being operated by Ethiopian Airlines as Flight 302 departed from Addis Ababa Bole International Airport and was involved in an accident shortly after takeoff resulting in the deaths of all occupants. ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 189 and on that basis denies same.

190.    Just one minute into the flight the Captain, Yared Getachew, reported that the crew was having flight-control problems. The MCAS then kicked in and pushed the nose of the airplane down for nine seconds. Instead of climbing, the airplane descended slightly. Audible warnings — "Don't Sink" — sounded in the cockpit. The pilots fought to turn the nose of the plane up, and briefly they were able to resume climbing. The MCAS system pushed the nose down again, triggering more squawks of "Don't Sink" from the plane's ground-proximity warning system. The pilots then flipped two switches and disconnected the electric trim motor, then tried to regain control. They asked to return to the airport but were continuing to struggle getting the airplane to

gain altitude. Power to controls was returned. The MCAS engaged again, pushing the plane into a nose dive. Thirty seconds later the cockpit voice recording ended, the plane crashed, and all 157 people on board were killed. The airplane's impact created a crater 30 meters deep.

**ANSWER:** ROCKWELL COLLINS admits only that the subject accident resulted in the deaths of all aircraft occupants. ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 190 and on that basis denies same.

191. According to a preliminary report issued by the Ethiopian Aircraft Accident Investigation Bureau, the following is what occurred, minute by minute.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 191 and on that basis denies same. Further answering, ROCKWELL COLLINS states that, upon information and belief, the official investigation into this loss is ongoing.

192. At 05:38:44, shortly after liftoff, the left and right recorded AOA values deviated. The left AOA decreased to 11.1 degrees then increased to 35.7 degrees while the value of the right AOA indicated 14.94 degrees. Then the left AOA value reached 74.5 degrees in ¾ seconds while the right AOA reached a maximum value of 15.3 degrees. At this time, the left stick shaker activated and remained active until near the end of the recording. Also, the airspeed, altitude and flight director pitch bar values from the left side noted deviating from the corresponding right side values. The left side values were lower than the right side values until near the end of the recording.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 192 and on that basis denies same.

193. At 05:38:43 and about 50 ft radio altitude, the flight director roll mode changed to LNAV. At 05:38:46 and about 200 ft radio altitude, the Master Caution parameter changed state. The First Officer called out Master Caution Anti-Ice on CVR. Four seconds later, the recorded Left AOA Heat parameter changed state.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 193 and on that basis denies same.

194. At 05:38:58 and about 400 ft radio altitude, the flight director pitch mode changed to VNAV SPEED and the Captain called out "Command" (standard call out for autopilot

engagement) and an autopilot warning is recorded. At 05:39:00, the Captain called out "Command". At 05:39:01 and about 630 ft radio altitude, a second autopilot warning is recorded.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 194 and on that basis denies same.

195.    At 05:39:06, the Captain advised the First-Officer to contact radar and the First Officer reported SHALA 2A departure crossing 8400 ft and climbing FL 320. Between liftoff and 1000 ft above ground level (AGL), the pitch trim position moved between 4.9 and 5.9 units in response to manual electric trim inputs. At 1000 ft AGL, the pitch trim position was at 5.6 units. At 05:39:22 and about 1,000 feet the left autopilot (AP) was engaged (it disengaged about 33 seconds later), the flaps were retracted and the pitch trim position decreased to 4.6 units. Six seconds after the autopilot engagement, there were small amplitude roll oscillations accompanied by lateral acceleration, rudder oscillations and slight heading changes. These oscillations continued also after the autopilot was disengaged. At 05:39:29, radar controller identified ET-302 and instructed to climb FL 340 and when able right turns direct to RUDOL and the First-Officer acknowledged.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 195 and on that basis denies same.

196.    At 05:39:42, Level Change mode was engaged. The selected altitude was 32000 ft. Shortly after the mode change, the selected airspeed was set to 238 kt.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 196 and on that basis denies same.

197.    At 05:39:45, the Captain requested flaps up and the First-Officer acknowledged. One second later, the flap handle moved from 5 to 0 degrees and flaps retraction began. At 05:39:50, the selected heading started to change from 072 to 197 degrees and at the same time the Captain asked the First-Officer to request to maintain runway heading.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 197 and on that basis denies same.

198.    At 05:39:55, Autopilot disengaged, at 05:39:57, the Captain advised the First-Officer to request to maintain runway heading and that they were having flight control problems. At 05:40:00 shortly after the autopilot disengaged, the FDR recorded an automatic aircraft nose down (AND) activated for 9.0 seconds and pitch trim moved from 4.60 to 2.1 units. The climb was arrested and the airplane descended slightly.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 198 and on that basis denies same.

199.    At 05:40:03 the Ground Proximity Warning System (GPWS) "DON'T SINK" alerts occurred. At 05:40:05, the First-Officer reported to ATC that they were unable to maintain SHALA 1A and requested runway heading which was approved by ATC.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 199 and on that basis denies same.

200.    At 05:40:06, left and right flap position reached a recorded value of 0.019 degrees which remained until the end of the recording. The column moved aft and a positive climb was re-established during the automatic AND motion. At 05:40:12, approximately three seconds after AND stabilizer motion ends, electric trim (from pilot activated switches on the yoke) in the Aircraft nose up (ANU) direction is recorded on the DFDR and the stabilizer moved in the ANU direction to 2.4 units. The Aircraft pitch attitude remained about the same as the back pressure on the column increased.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 200 and on that basis denies same.

201.    At 05:40:20, approximately five seconds after the end of the ANU stabilizer motion, a second instance of automatic AND stabilizer trim occurred and the stabilizer moved down and reached 0.4 units.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 201 and on that basis denies same.

202.    From 05:40:23 to 05:40:31, three Ground Proximity Warning System (GPWS) "DON'T SINK" alerts occurred.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 202 and on that basis denies same.

203.    At 05:40:27, the Captain advised the First-Officer to trim up with him. At 05:40:28 Manual electric trim in the ANU direction was recorded and the stabilizer reversed moving in the ANU direction and then the trim reached 2.3 units.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 203 and on that basis denies same.

204.    At 05:40:35, the First-Officer called out "stab trim cut-out" two times. The Captain

agreed and the First Officer confirmed stab trim cut-out. At 05:40:41, approximately five seconds after the end of the ANU stabilizer motion, a third instance of AND automatic trim command occurred without any corresponding motion of the stabilizer, which is consistent with the stabilizer trim cutout switches were in the "cutout" position.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 204 and on that basis denies same.

205.    At 05:40:44, the Captain called out three times "Pull-up" and the First-Officer acknowledged. At 05:40:50, the Captain instructed the First Officer to advise ATC that they would like to maintain 14,000 ft and they had a flight control problem. At 05:40:56, the First-Officer requested ATC to maintain 14,000 ft and reported that they were having a flight control problem. ATC approved.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 205 and on that basis denies same.

206.    From 05:40:42 to 05:43:11 (about two and a half minutes), the stabilizer position gradually moved in the AND direction from 2.3 units to 2.1 units. During this time, aft force was applied to the control columns which remained aft of neutral position. The left indicated airspeed increased from approximately 305 kts to approximately 340 kts (VMO). The right indicated airspeed was approximately 20-25 kts higher than the left. The data indicates that aft force was applied to both columns simultaneously several times throughout the remainder of the recording.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 206 and on that basis denies same.

207.    At 05:41:20, the right overspeed clacker was recorded on Cockpit Voice Recorder. It remained active until the end of the recording. At 05:41:21, the selected altitude was changed from 32000 ft to 14000 ft. At 05:41:30, the Captain requested the First-Officer to pitch up with him and the First-Officer acknowledged.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 207 and on that basis denies same.

208.    At 05:41:32, the left overspeed warning activated and was active intermittently until the end of the recording. At 05:41:46, the Captain asked the First-Officer if the trim was functional. The First-Officer has replied that the trim was not working and asked if he could try it manually. The Captain told him to try.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 208 and on that basis denies same.

209.    At 05:41:54, the First-Officer replied that it was not working. At 05:42:10, the Captain asked and the First-Officer requested a vector to return and ATC approved.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 209 and on that basis denies same.

210.    At 05:42:30, ATC instructed ET-302 to turn right heading 260 degrees and the First-Officer acknowledged. At 05:42:43, the selected heading was changed to 262 degrees. At 05:42:51, the First-Officer mentioned Master Caution Anti-Ice. The Master Caution is recorded on DFDR.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 210 and on that basis denies same.

211.    At 05:42:54, both pilots called out "left alpha vane". At 05:43:04, the Captain asked the First Officer to pitch up together and said that pitch is not enough. At 05:43:11, about 32 seconds before the end of the recording, at approximately 13,4002 ft, two momentary manual electric trim inputs are recorded in the ANU direction. The stabilizer moved in the ANU direction from 2.1 units to 2.3 units.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 211 and on that basis denies same.

212.    At 05:43:20, approximately five seconds after the last manual electric trim input, an AND automatic trim command occurred and the stabilizer moved in the AND direction from 2.3 to 1.0 unit in approximately 5 seconds. The airplane began pitching nose down. Additional simultaneous aft column force was applied, but the nose down pitch continued, eventually reaching 40 degrees nose down. The stabilizer position varied between 1.1 and 0.8 units for the remainder of the recording. The left Indicated Airspeed increased, eventually reaching approximately 458 kts and the right Indicated Airspeed reached 500 kts at the end of the recording. The last recorded pressure altitude was 5,419 ft on the left and 8,399 ft on the right.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a

belief as to the truth of the allegations of Paragraph 212 and on that basis denies same.

213.    Shortly thereafter, all communication with Flight 302 stopped and the plane violently crashed into a field, killing all 157 people aboard.

**ANSWER:** ROCKWELL COLLINS admits only that Flight 302 impacted terrain after

takeoff, resulting in the death of all occupants. ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 213 and on that basis denies same.

214. The similarity between Flight 302 and the Flight 610 and data released to date suggests that both airplanes experienced an erroneous AOA reading and activation of the MCAS. On Flight 302, the airplane's nose began to pitch down just 450 feet above the ground. The jack screws from the horizontal tail stabilizer were recovered from both crashes and both showed that the planes had been oriented in a dive with the nose pointing down. Both pilots reported flight control issues and could not maintain a steady altitude or speed with similarly erratic flight paths before crashing. The following side-by-side comparison reveals the striking similarities between the two doomed airplane in changes in vertical speed: [Graphic Omitted].

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 214 and on that basis denies same.

215. Initial reports on the crash confirmed that the Flight 302 pilots initially followed the emergency procedures recommended by **BOEING** by flipping a pair of cutoff switches, thereby disabling the electric motor moving the horizontal stabilizer. However, preliminary reports also indicate that the pilots then were unable move the horizontal stabilizer into its proper position because there were unable to manually turn the stabilizer trim wheel. When the pilots still could not regain control of the airplane, they turned the electric motor back on, and the plane entered a dive from which it could not recover.

**ANSWER:** ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 215 and on that basis denies same.

216. Over the objections of **BOEING**, Regulators finally decided to ground the 737 MAX 8 airplanes in the wake of the Flight 302 crash to allow for a MCAS software upgrade and safety assessment to be conducted. The United States Department of Transportation, with assistance from the FBI, are now investigating the MAX's certification process, a federal grand jury probe has been empaneled, and Congressional hearings are underway.

**ANSWER:** ROCKWELL COLLINS admits only that regulatory bodies in various locations have grounded the 737 MAX aircraft and that, upon information and belief, one or more investigations are ongoing. ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 216 and on that basis denies same.

## V.  CLAIMS FOR RELIEF
### COUNT I
### NEGLIGENCE
### (THE BOEING COMPANY)

None of the allegations of Count I (Negligence, The Boeing Company), including Paragraphs 217 – 228 and all subparagraphs thereto, are directed to ROCKWELL COLLINS. As such, no response to Count I, Paragraphs 217 – 228 is required from ROCKWELL COLLINS. To the extent that it is determined that any of those allegations are directed to ROCKWELL COLLINS and/or that responses to those allegations are otherwise required from ROCKWELL COLLINS, ROCKWELL COLLINS denies all such allegations.

### COUNT II
### BREACH OF WARRANTY
### (THE BOEING COMPANY)

None of the allegations of Count II (Breach of Warranty, The Boeing Company), including Paragraphs 229 – 241 and all subparagraphs thereto, are directed to ROCKWELL COLLINS. As such, no response to Count II, Paragraphs 229 – 241 is required from ROCKWELL COLLINS. To the extent that it is determined that any of those allegations are directed to ROCKWELL COLLINS and/or that responses to those allegations are otherwise required from ROCKWELL COLLINS, ROCKWELL COLLINS denies all such allegations.

### COUNT III
### STRICT LIABILITY
### (THE BOEING COMPANY)

None of the allegations of Count III (Strict Liability, The Boeing Company), including Paragraphs 242 – 252 and all subparagraphs thereto, are directed to ROCKWELL COLLINS. As such, no response to Count III, Paragraphs 242 – 252 is required from ROCKWELL COLLINS. To the extent that it is determined that any of those allegations are directed to ROCKWELL COLLINS and/or that responses to those allegations are otherwise required from ROCKWELL

COLLINS, ROCKWELL COLLINS denies all such allegations.

### COUNT IV
### FAILURE TO WARN
### (THE BOEING COMPANY)

None of the allegations of Count IV (Failure to Warn, The Boeing Company), including Paragraphs 253 – 266 and all subparagraphs thereto, are directed to ROCKWELL COLLINS. As such, no response to Count IV, Paragraphs 253 – 266 is required from ROCKWELL COLLINS. To the extent that it is determined that any of those allegations are directed to ROCKWELL COLLINS and/or that responses to those allegations are otherwise required from ROCKWELL COLLINS, ROCKWELL COLLINS denies all such allegations.

### COUNT V
### NEGLIGENCE
### (ROSEMOUNT AEROSPACE, INC.)

None of the allegations of Count V (Negligence, Rosemount Aerospace, Inc.), including Paragraphs 267 – 278 and all subparagraphs thereto, are directed to ROCKWELL COLLINS. As such, no response to Count V, Paragraphs 267 – 278 is required from ROCKWELL COLLINS. To the extent that it is determined that any of those allegations are directed to ROCKWELL COLLINS and/or that responses to those allegations are otherwise required from ROCKWELL COLLINS, ROCKWELL COLLINS denies all such allegations.

### COUNT VI
### STRICT LIABILITY
### (ROSEMOUNT AEROSPACE, INC.)

None of the allegations of Count VI (Strict Liability, Rosemount Aerospace, Inc.), including Paragraphs 279 – 289 and all subparagraphs thereto, are directed to ROCKWELL COLLINS. As such, no response to Count VI, Paragraphs 279 – 289 is required from ROCKWELL COLLINS. To the extent that it is determined that any of those allegations are directed to

ROCKWELL COLLINS and/or that responses to those allegations are otherwise required from ROCKWELL COLLINS, ROCKWELL COLLINS denies all such allegations.

### COUNT VII
### BREACH OF WARRANTY
### (ROSEMOUNT AEROSPACE, INC.)

None of the allegations of Count VII (Strict Liability, Rosemount Aerospace, Inc.), including Paragraphs 290 – 301 and all subparagraphs thereto, are directed to ROCKWELL COLLINS. As such, no response to Count VII, Paragraphs 290 – 301 is required from ROCKWELL COLLINS. To the extent that it is determined that any of those allegations are directed to ROCKWELL COLLINS and/or that responses to those allegations are otherwise required from ROCKWELL COLLINS, ROCKWELL COLLINS denies all such allegations.

### COUNT VIII
### NEGLIGENCE
### (ROCKWELL COLLINS, INC.)

302.    Plaintiffs incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

**ANSWER:** As and for its answer to Count VIII, Paragraph 302, ROCKWELL COLLINS repeats and realleges all of its answers to each of the preceding Paragraphs as if set forth in full herein and incorporates same by reference.

303.    At all relevant times hereinabove set forth, Defendant **COLLINS** owed a duty to the occupants of Boeing's 737 Max 7 [sic] airplanes and the general public, including the **DECEDENTS**, to exercise reasonable care to properly develop, design, engineer, test, manufacture, produce, process, supply, deliver, monitor, market, label, adequately warn, recommend, advertise and/or sell the MCAS system and its software and/or refrain from introducing the MCAS system into the stream of commerce and for the use in 737 Max airplane, including the subject airplane.

**ANSWER:** The allegations contained in Paragraph 303 state conclusions of law to which no response is required from ROCKWELL COLLINS. To the extent a response is required, ROCKWELL COLLINS admits only those duties, if any, imposed by the law determined to be

applicable to the determination of these actions and that it provided flight control software code to Boeing in accordance with Boeing's requirements. ROCKWELL COLLINS denies all remaining allegations of Paragraph 303.

304.    At all relevant times hereinabove set forth, **COLLINS** knew or should have known of the various ASRS reports indicating uncommanded activation of the MCAS prior to the crash of Flight 302. Furthermore, **COLLINS** knew or should have known that the unintended activation of the MCAS was suspected to be the cause of the crash of the Lion Air Flight 610.

**ANSWER:** ROCKWELL COLLINS denies the allegations of Paragraph 304.

305.    The defective conditions in the MCAS system and its software as discussed above, and the consequent crash of Flight 302 were legally caused by the negligence, gross negligence, wrongdoing, tortious conduct, careless acts and omissions of Defendant **COLLINS** in the development, design, engineering, testing, manufacturing, production, processing, supplying, delivery, monitoring, marketing, labeling, and selling, and **COLLINS'S** failure to warn and failure to take remedial [sic] appropriate remedial action with respect to any and all known dangerously defective conditions. **COLLINS'** acts and/or omissions include, but are not limited to, the following:

a.    failing to design and/or program a flight control system that compared inputs from both AOA sensors;

b.    failing to design and/or program a flight control system that only activated in non-normal conditions;

c.    designing a flight control system and MCAS that commanded more stabilizer input than could be counteracted by the flight crew pulling back on the column;

d.    building a system that interfered with the pilots' ability to manually control the airplane;

e.    failing to fully inform the FAA of the implications of the MCAS;

f.    failing to conduct a legally complaint Safety Requirements Review, Functional Hazard Assessment, or Preliminary System Safety Assessment;

g.    failing to ensure the quality of the information coming from the **ROSEMOUNT** AOA sensor and/or designing around known defects with the AOA sensors.

**ANSWER:** ROCKWELL COLLINS denies the allegations of Paragraph 305, including subparagraphs (a)-(g) thereto.

306.     As a direct and legal result of Defendant **COLLINS'** negligence, carelessness, gross negligence, recklessness and/or otherwise wrongful acts and/or omissions hereinabove set forth, **DECEDENT** died in the crash of Flight 302.

**ANSWER:** ROCKWELL COLLINS denies the allegations of Paragraph 306.

307.     As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **DECEDENT** suffered pre-death impact and injury, including fear of impending and imminent death and conscious pain and suffering, and **PLAINTIFF** has been damaged by the death of **DECEDENT**.

**ANSWER:** ROCKWELL COLLINS denies the allegations of Paragraph 307.

308.     As a direct and legal result of the wrongful acts and/or omissions of Defendant **COLLINS**, hereinabove alleged, **PLAINTIFF** suffered and continues to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **DECEDENT**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

**ANSWER:** ROCKWELL COLLINS denies the allegations of Paragraph 308.

309.     As a further direct and legal result of the wrongful conduct of **COLLINS** set forth above, **PLAINTIFF** incurred funeral, burial, estate administration and/or other related expenses in an amount according to proof at trial.

**ANSWER:** ROCKWELL COLLINS denies the allegations of Paragraph 309.

310.     As a further direct and legal result of the wrongful conduct of **COLLINS** set forth above, **PLAINTIFF** suffered further economic losses, including but not limited to the loss of financial support, loss of household services, and/or loss of caregiving services in an amount according to proof of trial.

**ANSWER:** ROCKWELL COLLINS denies the allegations of Paragraph 310.

311.     The potential harm to airline passengers, pilots, crews, and the public from the 737 MAX 8 was objectively foreseeable both in nature and in scope and were subjectively known to **COLLINS** for all of the aforementioned reasons, including but not limited to: **COLLINS'** knowledge that AOA sensors regularly malfunction or are damaged during flight and that its MCAS was reliant on input from a single AOA sensor; the fact that **COLLINS'** MCAS would be operating in the background without pilot knowledge or pilot commands; complaints lodged by pilots in the ASRS database regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; that the erroneous activation of the MCAS caused the crash of Lion Air Flight 610 and death of 189 people; and that a MCAS software update had not been implemented, leaving future flights at risk of catastrophic failure.

**ANSWER:** ROCKWELL COLLINS denies the allegations of Paragraph 311.

312.    As set forth above and as will be shown by proof, there is a high degree of certainty that **PLAINTIFF** has suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and **COLLINS'** conduct. A high degree of moral blame is attached to **COLLINS'** conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by **COLLINS** to **PLAINTIFF** and the imposition of all damages described above.

**ANSWER:** ROCKWELL COLLINS denies the allegations of Paragraph 312.

313.    Based on the foregoing, **COLLINS** acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, such that **PLAINTIFF** requests that the trier of fact, in the exercise of sound discretion, award **PLAINTIFF** additional damages for the sake of example and sufficient to punish **COLLINS** for its despicable conduct, in an amount reasonably related to **PLAINTIFF's** actual damages and **COLLINS'** financial condition, yet sufficiently large enough to be an example to others and to deter **COLLINS** and others from engaging in similar conduct in the future.

**ANSWER:** ROCKWELL COLLINS denies the allegations of Paragraph 313.

WHEREFORE, Defendant ROCKWELL COLLINS, INC. prays that Plaintiffs take nothing by way of their Complaint against ROCKWELL COLLINS and that all claims, allegations, and causes of action against ROCKWELL COLLINS be denied and dismissed with prejudice. ROCKWELL COLLINS requests this relief together with its costs and disbursements in this action, reasonable attorneys' fees associated with this action, and any further relief the Court deems just and equitable.

## COUNT IX
## STRICT LIABILITY
## (ROCKWELL COLLINS, INC.)

314.    Plaintiffs incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

**ANSWER:** As and for its answer to Count IX, Paragraph 314, ROCKWELL COLLINS repeats and realleges all of its answers to each of the preceding Paragraphs as if set forth in full herein and incorporates same by reference.

315.    At all relevant times hereinabove set forth, Defendant Collins was the designer, programmer, manufacturer, engineer, distributor and/or seller of aerospace products, including the MCAS system and its software who hold and have held themselves out to the public as having superior knowledge, skill and expertise in the design, testing, engineering, manufacture, and distribution of MCAS systems and software for commercial airplanes and, in the course of its business, Defendant **COLLINS** designed, programmed, tested, manufactured, engineered and caused to be placed into the stream of commerce, a product known as the MCAS system and its software for utilization in the **BOEING** 737 Max 8 airplane.

**ANSWER:** ROCKWELL COLLINS admits that it is a provider of avionics systems and services for use in the aerospace and defense industry. ROCKWELL COLLINS further admits that it provided flight control software code to Boeing in accordance with Boeing's requirements. ROCKWELL COLLINS denies all remaining allegations of Paragraph 315.

316.    Defendant **COLLINS** expressly or impliedly warranted that the MCAS system and its software was fit for its intended use in commercial airplanes, being free of defects in their design and/or maintenance and, further, Defendant **COLLINS** marketed, sold, distributed, and caused to be introduced into the stream of commerce by sale to Defendant Boeing. The MCAS system and its software was in a substantially similar condition to its original condition at delivery to **BOEING**.

**ANSWER:** ROCKWELL COLLINS admits only that it provided flight control software code to Boeing in accordance with Boeing's requirements. The allegations contained in Paragraph 316 regarding warranties issued by ROCKWELL COLLINS are conclusions of law to which no response is required. To the extent that a response is required, ROCKWELL COLLINS denies that it made any representation to any Plaintiff or any Plaintiff's decedent. ROCKWELL COLLINS denies all remaining allegations of Paragraph 316.

317.    Defects in the MCAS system and its software were a legal cause of the subject air crash, and the defects made the subject airplane unreasonably dangerous for travel.

**ANSWER:** ROCKWELL COLLINS denies that any software code provided to Boeing by ROCKWELL COLLINS that was present on the accident aircraft was defective or otherwise failed to operate as designed by Boeing due to any act or omission by ROCKWELL COLLINS. ROCKWELL COLLINS lacks sufficient knowledge or information to form a belief as to the truth

of the remaining allegations of Paragraph 317 and on that basis denies same.

318.     As a direct and legal result of Defendant **COLLINS'** negligence, carelessness, gross negligence, recklessness and/or otherwise wrongful acts and/or omissions hereinabove set forth, **DECEDENT** died in the crash of Flight 302.

**ANSWER:** ROCKWELL COLLINS denies the allegations of Paragraph 318.

319.     As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **DECEDENT** suffered pre-death impact and injury, including fear of impending and imminent death and conscious pain and suffering, and **PLAINTIFF** has been damaged by the death of **DECEDENT**.

**ANSWER:** ROCKWELL COLLINS denies the allegations of Paragraph 319.

320.     As a direct and legal result of the wrongful acts and/or omissions of Defendant **COLLINS**, hereinabove alleged, **PLAINTIFF** suffered and continues to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **DECEDENT**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

**ANSWER:** ROCKWELL COLLINS denies the allegations of Paragraph 320.

321.     As a further direct and legal result of the wrongful conduct of **COLLINS** set forth above, **PLAINTIFF** incurred funeral, burial, estate administration and/or other related expenses in an amount according to proof at trial.

**ANSWER:** ROCKWELL COLLINS denies the allegations of Paragraph 321.

322.     As a further direct and legal result of the wrongful conduct of **COLLINS** set forth above, **PLAINTIFF** suffered further economic losses, including but not limited to the loss of financial support, loss of household services, and/or loss of caregiving services in an amount according to proof of trial.

**ANSWER:** ROCKWELL COLLINS denies the allegations of Paragraph 322.

323.     The potential harm to airline passengers, pilots, crews, and the public from the 737 MAX 8 was objectively foreseeable both in nature and in scope and were subjectively known to **COLLINS** for all of the aforementioned reasons, including but not limited to: **COLLINS'** knowledge that AOA sensors regularly malfunction or are damaged during flight and that its MCAS was reliant on input from a single AOA sensor; the fact that **COLLINS'** MCAS would be operating in the background without pilot knowledge or pilot commands; complaints lodged by pilots in the ASRS database regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; that the erroneous activation of the MCAS caused the crash of Lion Air Flight 610 and death of 189 people; and that a MCAS software update had not been implemented, leaving future flights at risk of

catastrophic failure.

**ANSWER:** ROCKWELL COLLINS denies the allegations of Paragraph 323.

324.    As set forth above and as will be shown by proof, there is a high degree of certainty that **PLAINTIFF** has suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and **COLLINS'** conduct. A high degree of moral blame is attached to **COLLINS'** conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by **COLLINS** to **PLAINTIFF** and the imposition of all damages described above.

**ANSWER:** ROCKWELL COLLINS denies the allegations of Paragraph 324.

325.    Based on the foregoing, **COLLINS** acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, such that **PLAINTIFF** requests that the trier of fact, in the exercise of sound discretion, award **PLAINTIFF** additional damages for the sake of example and sufficient to punish **COLLINS** for its despicable conduct, in an amount reasonably related to **PLAINTIFF's** actual damages and **COLLINS'** financial condition, yet sufficiently large enough to be an example to others and to deter **COLLINS** and others from engaging in similar conduct in the future.

**ANSWER:** ROCKWELL COLLINS denies the allegations of Paragraph 325.

WHEREFORE, Defendant ROCKWELL COLLINS, INC. prays that Plaintiffs take nothing by way of their Complaint against ROCKWELL COLLINS and that all claims, allegations, and causes of action against ROCKWELL COLLINS be denied and dismissed with prejudice. ROCKWELL COLLINS requests this relief together with its costs and disbursements in this action, reasonable attorneys' fees associated with this action, and any further relief the Court deems just and equitable.

### COUNT X
### BREACH OF WARRANTY
### (ROCKWELL COLLINS, INC.)

326.    **PLAINTIFF** incorporates and re-alleges each of the paragraphs set forth above as though fully set forth herein.

**ANSWER:** As and for its answer to Count X, Paragraph 326, ROCKWELL COLLINS repeats and realleges all of its answers to each of the preceding Paragraphs as if set forth in full

herein and incorporates same by reference.

327.    **COLLINS** was the designer, developer, engineer, tester, manufacturer, producer, processer, supplier, distributor and/or seller of the MCAS system and its software involved in the subject crash.

**ANSWER:**  ROCKWELL COLLINS admits only that it provided flight control software code to Boeing in accordance with Boeing's requirements. ROCKWELL COLLINS denies all remaining allegations of Paragraph 327.

328.    Prior to the crash of Flight 302, **COLLINS** expressly and/or impliedly warranted and represented that the MCAS system and its software it designed, engineered, manufactured, tested, and/or sold for use in **BOEING** 737 MAX 8 airplanes, including the subject airplane with registration number ET-AVJ, were airworthy, of merchantable quality, and safe for the purpose of commercial air travel.

**ANSWER:** The allegations contained in Paragraph 328 state conclusions of law to which no response is required. To the extent that a response is required, ROCKWELL COLLINS denies that it made any representation to any Plaintiff or any Plaintiff's decedent and denies all remaining allegations of Paragraph 328.

329.    **COLLINS** breached its express and/or implied warranties because its MCAS system and its software installed on the subject airplane was not airworthy, was not of merchantable quality, and was not safe to be used for commercial air travel.

**ANSWER:** The allegations contained in Paragraph 329 state conclusions of law to which no response is required. To the extent that a response is required, ROCKWELL COLLINS denies that it made any representation to any Plaintiff or any Plaintiff's decedent and denies all remaining allegations of Paragraph 329.

330.    The crew members and passengers of ET302, including **DECEDENT**, were intended third-party beneficiaries of **COLLINS'** warranties.

**ANSWER:** The allegations contained in Paragraph 330 state conclusions of law to which no response is required. To the extent that a response is required, ROCKWELL COLLINS denies the allegations of Paragraph 330.

331.     **DECEDENT**, as a fare-paying passenger aboard ET302, reasonably relied on **COLLINS'** warranties to **DECEDENT's** detriment.

**ANSWER:** ROCKWELL COLLINS denies the allegations of Paragraph 331.

332.     As a direct and legal result of **COLLINS'** breach of its warranties, **DECEDENT** suffered pre-death impact and injury, including fear of impending and imminent death and conscious pain and suffering, and **PLAINTIFF** has been damaged by the death of **DECEDENT**.

**ANSWER:** ROCKWELL COLLINS denies the allegations of Paragraph 332.

333.     As a direct and legal result of **COLLINS'** breach of its warranties hereinabove alleged, **PLAINTIFF** suffered and continues to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **DECEDENT**, as well as other injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

**ANSWER:** ROCKWELL COLLINS denies the allegations of Paragraph 333.

334.     As a direct and legal result of **COLLINS'** breach of its warranties set forth above, **PLAINTIFF** incurred funeral, burial, estate administration and/or other related expenses in an amount according to proof at trial.

**ANSWER:** ROCKWELL COLLINS denies the allegations of Paragraph 334.

335.     As a direct and legal result of **COLLINS'** breach of its warranties set forth above, **PLAINTIFF** suffered further economic losses, including but not limited to the loss of financial support, loss of household services, and/or loss of caregiving services in an amount according to proof of trial.

**ANSWER:** ROCKWELL COLLINS denies the allegations of Paragraph 335.

336.     The potential harm to airline passengers, pilots, crews, and the public from the 737 MAX 8 was objectively foreseeable both in nature and in scope and were subjectively known to **COLLINS** for all of the aforementioned reasons, including but not limited to: **COLLINS'** knowledge that AOA sensors regularly malfunction or are damaged during flight and that its MCAS was reliant on input from a single AOA sensor; the fact that **COLLINS'** MCAS would be operating in the background without pilot knowledge or pilot commands; complaints lodged by pilots in the ASRS database regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; that the erroneous activation of the MCAS caused the crash of Lion Air Flight 610 and death of 189 people; and that a MCAS software update had not been implemented, leaving future flights at risk of catastrophic failure.

**ANSWER:** ROCKWELL COLLINS denies the allegations of Paragraph 336.

337.    As set forth above and as will be shown by proof, there is a high degree of certainty that **PLAINTIFF** has suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and **COLLINS'** conduct. A high degree of moral blame is attached to **COLLINS'** conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by **COLLINS** to **PLAINTIFF** and the imposition of all damages described above.

> **ANSWER:** ROCKWELL COLLINS denies the allegations of Paragraph 337.

338.    Based on the foregoing, **COLLINS** acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, such that **PLAINTIFF** requests that the trier of fact, in the exercise of sound discretion, award **PLAINTIFF** additional damages for the sake of example and sufficient to punish **COLLINS** for its despicable conduct, in an amount reasonably related to **PLAINTIFF's** actual damages and **COLLINS'** financial condition, yet sufficiently large enough to be an example to others and to deter **COLLINS** and others from engaging in similar conduct in the future.

> **ANSWER:** ROCKWELL COLLINS denies the allegations of Paragraph 338.

WHEREFORE, Defendant ROCKWELL COLLINS, INC. prays that Plaintiffs take nothing by way of their Complaint against ROCKWELL COLLINS and that all claims, allegations, and causes of action against ROCKWELL COLLINS be denied and dismissed with prejudice. ROCKWELL COLLINS requests this relief together with its costs and disbursements in this action, reasonable attorneys' fees associated with this action, and any further relief the Court deems just and equitable.

## **GENERAL DENIAL**

ROCKWELL COLLINS denies all allegations of Plaintiffs' Complaint that are not specifically admitted hereinabove, including but not limited to Plaintiffs' demands and prayers for relief. To the extent that the headings, captions, diagrams, charts, footnotes, or other insertions set forth in Plaintiffs' Complaint are determined to contain any allegation against ROCKWELL COLLINS, all such allegations are denied.

## AFFIRMATIVE AND ADDITIONAL DEFENSES

In further response to the Plaintiffs' Complaint, ROCKWELL COLLINS raises, asserts, and preserves the following affirmative and additional defenses:

### FIRST AFFIRMATIVE DEFENSE

Plaintiffs fail, in whole or in part, to state a cause of action upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiffs and the alleged beneficiaries of the decedent's estate may lack capacity and/or standing to bring this action.

### THIRD AFFIRMATIVE DEFENSE

Plaintiffs' Complaint should be dismissed or transferred under the doctrine of *forum non conveniens*.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiffs' Complaint may be barred, in whole or in part, by the applicable statute of limitations.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiffs' Complaint may be barred, in whole or in part, by the applicable statute of repose, including, but not limited to, by the General Aviation Revitalization Act Statute of Repose and the Illinois Statute of Repose.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiffs' claims may be barred, in whole or in part, and/or preempted by federal law, including, but not limited to, the Federal Aviation Administration Authorization Act, and the aircraft components at issue were certified as safe and airworthy by the Federal Aviation

Administration at the time they were delivered.

**SEVENTH AFFIRMATIVE DEFENSE**

Plaintiffs' action may be governed, in whole or in part, by the laws of jurisdictions other than Illinois.

**EIGHTH AFFIRMATIVE DEFENSE**

ROCKWELL COLLINS denies that its conduct was a cause or proximate cause of the Plaintiffs' alleged injuries and damages. Further, Plaintiffs' alleged damages, if any, were caused, in whole or in part, by the acts and/or omissions, including, but not limited to, unusual negligent acts or willful acts and/or omissions, or the alteration or misuse of any product(s) supplied by ROCKWELL COLLINS, if any such product(s) are implicated in Plaintiffs' complaint and/or exist, by other persons or entities, named or unnamed, over whom ROCKWELL COLLINS had no control or right to control, including, but not limited to, the pilots and operators of the accident aircraft, and/or those responsible for designing and/or integrating software code provided by ROCKWELL COLLINS into systems or components ROCKWELL COLLINS did not design or manufacture, and those acts and/or omissions were the sole proximate cause or an intervening or superseding cause of any injuries or damages sustained by Plaintiffs. At this point, ROCKWELL COLLINS has not had the benefit of discovery and does not specifically know the identity of any such third parties and will amend this defense to identify same when discovered.

**NINTH AFFIRMATIVE DEFENSE**

Plaintiffs' damages, if any, were caused by the acts or omissions of other persons or entities for which ROCKWELL COLLINS is not liable or responsible. In the event ROCKWELL COLLINS is found liable to Plaintiffs, which is expressly denied, ROCKWELL COLLINS may be entitled to indemnification, contribution or apportionment of liability and fault pursuant to

83

applicable law and reserves its right to seek same.

## TENTH AFFIRMATIVE DEFENSE

Plaintiffs' damages, if any, may have been directly and proximately caused by an unavoidable accident for which ROCKWELL COLLINS is not liable.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' Complaint should be dismissed on the ground that Plaintiffs have failed to join necessary and indispensable parties.

## TWELFTH AFFIRMATIVE DEFENSE

Based upon the state of scientific, industrial, technological, and military knowledge existing at the time, the design of any and all ROCKWELL COLLINS products, if any such products are implicated in Plaintiffs' Complaint and/or exist, were reasonably safe for the subject aircraft's normal and foreseeable use and operation at all relevant times, or in light of existing and reasonably available scientific, industrial, and technological knowledge. Accordingly, Plaintiffs' claims are barred, in whole or in part, because ROCKWELL COLLINS's products, if any such products are implicated in Plaintiffs' Complaint and/or exist, were consistent with or exceeded the generally recognized and accepted technological, scientific, industrial, and military state-of-the-art at the time of its design, testing, manufacture, and/or sale.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' damages, if any, may be barred and/or limited under applicable law.

## FOURTEENTH AFFIRMATIVE DEFENSE

The benefits and/or utility of the design of the subject aircraft and any component thereof provided by ROCKWELL COLLINS, if any such component is implicated in Plaintiffs' Complaint and/or exists, outweigh the risks associated therewith, if any.

## FIFTEENTH AFFIRMATIVE DEFENSE

The products allegedly sold by ROCKWELL COLLINS, if any such products are implicated in Plaintiffs' Complaint and/or exist, were intended for and sold to a knowledgeable and/or sophisticated user fully informed with respect to the risks and benefits of the use, operation, and/or capabilities of the subject aircraft at issue in this action and over whom ROCKWELL COLLINS had no control. As such, Plaintiffs' claims are barred, in whole or in part, to the extent that adequate warnings were provided to the pilots, the operator of the aircraft, and/or other intermediaries or third parties regarding the risks and dangers associated with the operation and/or use of the subject aircraft and any ROCKWELL COLLINS component product, if any such component product is implicated in Plaintiffs' Complaint and/or exists. Any duty on the part of ROCKWELL COLLINS to warn Plaintiffs' decedent of the risks and dangers associated with such operation and/or use of the subject aircraft and any ROCKWELL COLLINS component product, if any such component and/or duty exists, was satisfied through the information and warnings available to Plaintiffs' decedent or other intermediaries or third parties.

## SIXTEENTH AFFIRMATIVE DEFENSE

If Plaintiffs were damaged by product(s) originally designed, prepared, tested, and/or sold by ROCKWELL COLLINS, if any such product(s) are implicated in Plaintiffs' Complaint and/or exist, which ROCKWELL COLLINS expressly denies, those products were subsequently installed, removed, exchanged, altered, modified, repaired, retrofitted, damaged, overhauled, remanufactured, improperly maintained, or misused by persons and/or entities other than ROCKWELL COLLINS, and over whom ROCKWELL COLLINS had no control or right of control, and such installation, removal, exchange, alteration, modification, repair, retrofit, damage, overhaul, remanufacturing, improper maintenance, or misuse proximately caused and contributed

to this accident and the resulting damages complained of, if any.

## SEVENTEENTH AFFIRMATIVE DEFENSE

ROCKWELL COLLINS should be dismissed for lack of personal jurisdiction in the State of Illinois.

## EIGHTEENTH AFFIRMATIVE DEFENSE

ROCKWELL COLLINS complied with all applicable federal, state and foreign statutes, codes, standards, and regulations, including, but not limited to, those of the United States and agencies thereof, existing at the time the subject aircraft and all component parts thereof were manufactured including all standards for coding, design, inspection, testing and warning.

## NINETEENTH AFFIRMATIVE DEFENSE

While denying any and all allegations of negligence, wrongdoing, fault, or liability, ROCKWELL COLLINS states that it would be entitled, at its sole election, to a full credit, offset, *pro-rata* reduction, or percentage reduction, based on the percentage of fault attributable to each settling defendant or non-party, in the event Plaintiffs settle with any defendant or non-party.

## TWENTIETH AFFIRMATIVE DEFENSE

Some or all of Plaintiffs' claims may be barred in whole or in part because Plaintiffs may have already received full satisfaction and/or compensation for the injuries and damages, if any, and the claims may be barred by Plaintiffs' prior release of claims and/or accord and satisfaction with any entity. While denying that Plaintiffs are entitled to any relief whatsoever, if ROCKWELL COLLINS is required to pay a monetary award to Plaintiffs, ROCKWELL COLLINS claims a set-off against any monies received by Plaintiffs for their alleged injuries or damages, including, but not limited to, any insurance proceeds.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

An award or judgment rendered in favor of Plaintiffs must be reduced by the amount of benefits Plaintiffs received, or are entitled to receive, from any source as a result of the death of their decedent.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

To the extent that the laws of other jurisdictions apply, ROCKWELL COLLINS invokes each and every constitutional and statutory defense available to it under the constitutions, statutes, civil or other law of each of the other forty-nine states, the District of Columbia, the territories and possessions of the United States, and/or applicable foreign law. These laws specifically include, but are not limited to, provisions relating to due process, access to the courts, statutes of limitations and repose, and limitations on compensatory, non-economic, and punitive damages.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

ROCKWELL COLLINS hereby adopts and incorporates by reference any affirmative defense asserted by any other defendants to this action, to the extent such affirmative defense applies to ROCKWELL COLLINS, as if fully set forth herein.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

Evidence of subsequent remedial measures is not admissible to prove liability. *See* Federal Rule of Evidence 407.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

Plaintiffs' breach of warranty claim is barred, in whole or in part, by the absence of privity between Plaintiffs and ROCKWELL COLLINS and by lack of proper notice to ROCKWELL COLLINS.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

Plaintiffs' breach of warranty claim is barred, in whole or in part, because ROCKWELL COLLINS did not make any warranties to Plaintiffs with respect to the subject flight control software code it provided to Boeing in accordance with Boeing requirements, or any product provided by ROCKWELL COLLINS to the extent any such product is implicated in Plaintiffs' Complaint.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' breach of warranty claim is barred, in whole or in part, because Plaintiffs are not a third-party beneficiaries of any warranties that ROCKWELL COLLINS may have made.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs' right to recovery, if any, is limited to or precluded by the warranty provisions, including limitations and disclaimer provisions, in Boeing's contract of sale for the subject Aircraft and/or documents relating thereto, as well as the warranty provisions, including limitation and disclaimer provisions, in ROCKWELL COLLINS's contract(s) for the provision of software code and/or products to Boeing for use on the subject aircraft.

## TWENTY-NINTH AFFIRMATIVE DEFENSE

Plaintiffs' breach of warranty claim is barred because Plaintiffs did not rely upon any warranty from ROCKWELL COLLINS.

## RESERVATION OF FURTHER DEFENSES

ROCKWELL COLLINS reserves the right to amend its Answer and to assert any and all additional defenses as may be revealed by further investigation, discovery, and determination of the substantive law that will govern this case.

## APPLICABILITY OF FOREIGN LAW

ROCKWELL COLLINS hereby gives notice, pursuant to the provisions of Federal Rule of Civil Procedure 44.1, that it may raise issues concerning the applicability of the law(s) of a foreign country or countries to the claims and defenses raised in this matter and expressly reserves the right to assert such claims and defenses that may be available to it under the application of the substantive laws of such foreign jurisdiction.

WHEREFORE, Defendant ROCKWELL COLLINS, INC. prays that Plaintiffs take nothing by way of their Complaint against ROCKWELL COLLINS and that all claims, allegations, and causes of action against ROCKWELL COLLINS be denied and dismissed with prejudice. ROCKWELL COLLINS requests this relief together with its costs and disbursements in this action, reasonable attorneys' fees associated with this action and any further relief the Court deems just and equitable.

## JURY DEMAND

ROCKWELL COLLINS demands a trial by jury as to all claims and defenses in this action.

Dated: February 3, 2020                    ROCKWELL COLLINS, INC.


                                           By: /s/ Nicholas C. Bart
                                               *One of its Attorneys*



Nicholas C. Bart
Nick.Bart@fitzhunt.com
Shane B. Nichols
Shane.Nichols@fitzhunt.com
**Fitzpatrick & Hunt, Pagano, Aubert, LLP**
20 S. Clark Street, Suite 2620
Chicago, IL 60603
Phone: (312) 728-4901
Fax: (312) 728-4950

Garrett Fitzpatrick
Garrett.Fitzpatrick@fitzhunt.com
**Fitzpatrick & Hunt, Pagano, Aubert, LLP**
Tower 49
Twelve East 49th Street
31st Floor
New York, NY 10017
(212) 937-4000

## <u>CERTIFICATE OF SERVICE</u>

I, Shane B. Nichols, certify that on February 3, 2020 I electronically filed the foregoing

***DEFENDANT ROCKWELL COLLINS, INC.'S ANSWER AND AFFIRMATIVE DEFENSES***

***TO PLAINTIFFS' MASTER COMPLAINT AT LAW*** with the Clerk of the Court using the

CM/ECF system, which will send notification of such filing to attorneys of record.

I certify under penalty of perjury that the foregoing is true and correct.

DATED this 3rd day of February 2020.

By: <u>/s/ Shane B. Nichols</u>
**Fitzpatrick & Hunt, Pagano, Aubert, LLP**
20 S. Clark Street
Suite 2620
Chicago, IL 60603
Phone: (312) 728-4902
Fax: (312) 728-4950