**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **IN RE ETHIOPIAN AIRLINES FLIGHT ET 302 CRASH** | In re: Ethiopian Airlines Flight ET 302 Crash |
| **MOHAMMED OMER CHERCHIR**, as Personal Representative of the Estate of **AHMEDNUR MOHAMMED OMER**, deceased, | Lead Case: 1:19-cv-02170 |
| Plaintiff, | Hon. Jorge L. Alonso |
| v. | This filing applies to: |
| THE **BOEING** COMPANY, a Delaware corporation; **ROSEMOUNT** AEROSPACE, INC., a Delaware corporation; ROCKWELL **COLLINS**, INC., a Delaware corporation, | No. 1:19-cv-07929 |
| Defendants. | |

**DEFENDANT THE BOEING COMPANY'S ANSWER AND
AFFIRMATIVE DEFENSES TO PLAINTIFFS' COMPLAINT**

Defendant The Boeing Company ("Boeing"), by and through its attorneys of record, Perkins Coie LLP, hereby answers the Complaint ("Complaint") of Plaintiff Mohammed Omer Cherchir, as Personal Representative of the Estate of Ahmednur Mohammed Omer, deceased ("Plaintiff"), as follows, in paragraphs numbered to correspond to the paragraph numbers in said Complaint. All facts not specifically admitted are denied.

Boeing also states that the Complaint pertains to an aviation accident that occurred on March 10, 2019 outside of Ejere, Ethiopia, and which is currently the subject of an ongoing investigation by Ethiopia's Aircraft Accident Investigation Bureau ("AIB"). The United States National Transportation Safety Board ("NTSB") is a party to the AIB investigation, and Boeing is providing technical assistance in accordance with Annex 13 to the Convention on International Civil Aviation. The Complaint also contains allegations regarding the Lion Air Flight 610 accident, which occurred off the shore of Jakarta, Indonesia on October 29, 2018. The Lion Air accident

was the subject of an investigation by Indonesia's National Transportation Safety Committee ("KNKT"), to which the NTSB was also a party, and for which Boeing has also provided technical assistance. The KNKT issued its final Aircraft Accident Investigation Report ("KNKT Final Report") in October 2019.

Under international law (Section 5.26 of Annex 13 to the Convention on International Civil Aviation) and federal law (49 C.F.R. § 831.13 and 49 U.S.C. § 1114(f)), Boeing is prohibited at this time from releasing information concerning aviation accidents to any person not a party to the investigations without prior consultation and approval of the NTSB, the KNKT, and/or the AIB. The NTSB has reiterated to Boeing that, though the KNKT investigation has released its final report on the accident, Boeing remains prohibited from releasing documents or information relating to the KNKT investigation at this time.

Accordingly, in responding to this Complaint, Boeing has not relied upon information made known to Boeing personnel by the NTSB that is related to the KNKT or AIB investigations to form beliefs or knowledge as to the truth or falsity of any allegations made in the Complaint.

## **INTRODUCTION**

1.     This is a related case to the consolidated action pending at Case No. 19 C 2170. Pursuant to the Court's May 22, 2019 Order, all cases filed subsequent to the consolidation order are to be administratively closed and consolidated with the lead case No. 19 C 2170.

**ANSWER:**

The allegations contained in Paragraph 1 consist of legal conclusions and do not require a response from Boeing. To the extent a response is required, Boeing agrees that this case is related to the consolidated action pending at Case No. 19 C 2170.

2.     Each condition precedent to maintaining this cause of action has accrued. Jurisdiction and venue are proper as more fully alleged below. This action arises from the crash of Ethiopian Airlines Flight ET 302 ("Flight 302") on March 10, 2019 in which 157 people lost their lives. The airplane operated as Flight 302 was a Boeing 737 MAX 8. The crash occurred less than five months after Lion Air Flight JT 610 – another Boeing 737 MAX 8 – crashed into the Java Sea on October 29, 2018, killing all 189 onboard.

**ANSWER:**

Boeing admits that a Boeing model 737 MAX 8 aircraft, being operated by PT Lion Mentari Airlines Flight 610 ("Flight 610"), crashed into the Java Sea off the coast of Jakarta, Indonesia on October 29, 2018, and that the crash of Flight 610 resulted in the deaths of all 189 persons aboard the airplane. Boeing also admits that a model 737 MAX 8 aircraft, being operated as Ethiopian Airlines Flight 302 ("Flight 302" or the "Subject Aircraft"), crashed into the Ethiopian countryside near the town of Ejere, Ethiopia on March 10, 2019, and that the crash of Flight 302 resulted in the deaths of all 157 persons aboard that airplane. Boeing denies the remaining allegations contained in Paragraph 2.

3.      Due to design and manufacturing changes that Boeing made to its 737 MAX 8 model from earlier 737 aircraft, the airplane that crashed giving rise to this cause of action was inherently aerodynamically unstable. The inherent aerodynamic instability was caused by changes Boeing made to the 737 MAX 8 aircraft geometry, including, but not limited to, repositioning larger engines further inboard on the wings and canted on each wing. Instead of safely redesigning the 737 MAX 8 to eliminate the inherent aerodynamic instability, Boeing created the Maneuvering Characteristics Augmentation System (MCAS) to install as a band-aid over the already aerodynamically unstable airplane. The MCAS was a failed attempt to render the already unsafe 737 MAX 8 airplanes safe for flight. Shortly after takeoff, while attempting to climb, the pilots, including Plaintiff's decedent, experienced dangerous, confusing and counter-intuitive flight control anomalies. The airplane erratically pitched up and down in repeated, extreme maneuvers uncommanded by the pilots. Flight recorder data, recorded cockpit conversations between the flight crew, recorded cockpit-to-air traffic controller radio transmissions and recorded flight path radar data show that the pilots were fighting for control of the airplane with the airplane's MCAS. When the pilots manually commanded the airplane to pitch nose up, the MCAS repeatedly caused the airplane to pitch nose down, accompanied by rapidly increasing automated nose-down electric horizontal stabilizer trim that caused control loading which the pilots' manual control inputs ultimately could not overcome.



**The Wreckage of Ethiopian Airlines Flight 302**

**ANSWER:**

Boeing admits that the placement of the engines on the 737 MAX 8 model differs from the placement of the engines on earlier models of aircraft in Boeing's 737 family. Boeing also admits that the design of the 737 MAX 8 includes the Maneuvering Characteristics Augmentation System control law ("MCAS"), and that the flight crew of the Subject Aircraft experienced activations of MCAS. Boeing denies the remaining allegations contained in Paragraph 2. In further response, Boeing states that the graphic depicted below Paragraph 2 does not consist of properly pled factual allegations and therefore requires no response from Boeing. To the extent a response is required, Boeing lacks knowledge or information to form a belief as to the accuracy of the text and images contained in this conclusory graphic as depicted.

4.      BOEING had actual knowledge that the 737 MAX 8 was dangerous and defective due to design-induced inherent aerodynamic instability in pitch axis under normal and foreseeable flight conditions. BOEING knew that the 737 MAX 8 MCAS failed to redress the dangerous inherent design flaws in the airplanes and that due to design and manufacturing defects, including a lack of redundancy and single point of failure, the MCAS itself was dangerous, defective and unairworthy. BOEING knowingly allowed these multiple dangerous conditions to become stacked one on top of the other solely so it could remain price and sales competitive with the Airbus A320. Boeing placed its commercial interests before airworthiness and safety of passengers and flight crew, and it did so for the sole purpose of profit.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 4.

5.      BOEING rushed the 737 MAX 8 through its design, development and testing phases, intentionally misleading the United States Federal Aviation Administration ("FAA") by actively concealing the dangerous handling qualities and characteristics of the aircraft. Reckless decisions by BOEING management directly and proximately contributed to the subject crash and demonstrate conscious and reckless disregard for the lives of others. The reckless decisions by BOEING management include, but are not limited to, allowing a defectively designed airplane to enter the stream of commerce knowing it was susceptible to catastrophic flight system failure in the event there was a defective angle of attack sensor; knowingly failing to properly instruct, warn and inform pilots, including Plaintiff's decedent, about the single point of failure in the MCAS; recklessly and knowingly failing to properly instruct, educate and train pilots, including Plaintiff's decedent, in the existence and use of the MCAS; recklessly and knowingly failing to properly reference and describe the MCAS in the airplane's flight manual; recklessly and knowingly failing to include key safety features as standard equipment in the airplane; recklessly and knowingly and deceptively seeking a type certification exemption and type certification program for the 737 MAX 8, allowing BOEING to obtain federal type certification of the airplane with a dangerously inadequate cockpit alert system; recklessly placing the 737 MAX 8 airplane into the stream of commerce and delivering it to foreseeable users and consumers knowing that the flight control system was materially different from the flight control system presented to the FAA during the

design, testing and type certification process; and, knowingly and recklessly failing to take immediate, timely and appropriate action after BOEING learned that the 737 MAX 8 airplanes were unairworthy, defective, dangerous and not performing as intended. All of the foregoing was known to BOEING before the crash of Lion Air Flight JT 610 and before the crash of Ethiopian Airlines Flight 302.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 5.

6.      The decision by BOEING to place profit before safety is further evidenced by its repeated claim that the 737 MAX 8 did not require significant retraining of pilots who were already familiar with older generations of 737 airplanes. BOEING falsely insisted that retraining flight crews was not required, and it did so even after the crash of Lion Air Flight JT 610. BOEING continued to conceal the dangerous defects it knew existed because it was concerned that owners and operators would buy fewer 737 MAX 8 airplanes if pilots needed to be retrained. BOEING continuously, knowingly and recklessly caused the death of all aboard Lion Air Flight JT 610 and Ethiopian Airlines Flight 302. BOEING knowingly and recklessly traded safety and life for revenue and profit.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 6.

7.      Despite knowledge that the 737 MAX 8 was dangerously defective (particularly after the crash of Lion Air Flight JT 610), BOEING did not instruct operators to ground the airplanes. BOEING intentionally, recklessly and continuously exposed flight crews and passengers to loss of life, despite actual knowledge of the numerous dangerous defects in the 737 MAX 8. As a proximate result, 157 lives were subsequently lost in Ethiopian Airlines Flight 302, including PLAINTIFF'S DECEDENT.

**ANSWER:**

Boeing admits that the crash of the Subject Aircraft resulted in the deaths of all 157 persons

aboard that airplane. Boeing denies the remaining allegations contained in Paragraph 7.

## JURISDICTION AND VENUE

8.      This Court has original subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1369 and 1332.

**ANSWER:**

The allegations contained in Paragraph 8 consist of legal conclusions to which no response

from Boeing is required. To the extent a response is required, Boeing admits that this Court has

subject matter jurisdiction over this action.

9.      This Court has personal jurisdiction over BOEING because its principle [sic] place of business, including its nerve center of operations, is in Cook County, Illinois.

**ANSWER:**

The allegations contained in Paragraph 9 consist of legal conclusions to which no response from Boeing is required. To the extent a response is required, Boeing admits that its principal place of business and corporate headquarters are located in Cook County, Illinois. Boeing also admits that this Court may exercise personal jurisdiction over it within the limits of due process. Boeing denies the remaining allegations contained in Paragraph 9.

10.    This Court has personal jurisdiction over ROSEMOUNT because it caused a tort to occur in Cook County, Illinois, and pursuant to contracts with BOEING, sold a defective Angle-of-Attack sensor, model 0861FL1 ("Subject AOA Sensor"), to BOEING, intending the sensor to be installed on 737 MAX 8 airplanes. Issues in this cause of action derive from, and are connected with, contacts by ROSEMOUNT within this District and its dealings with BOEING. Contacts with BOEING in Illinois are attributed and imputed to ROSEMOUNT through its agency, partnership and joint venture with BOEING. ROSEMOUNT and BOEING each made and performed contracts and made promises with each other regarding the Subject AOA Sensor that were substantially connected with Illinois. PLAINTIFF and PLAINTIFF'S DECEDENT are third-party beneficiaries of each such contract. There was and is a regular and anticipated flow of airplane component parts, including AOA from ROSEMOUNT to BOEING for distribution and sale in Illinois, including parts that were designed specifically for Illinois based 737 MAX 8 airplanes. DEFENDANTS advertised in Illinois, marketed through distributors in Illinois, and established channels for providing regular advice to customers in Illinois. ROSEMOUNT is registered to do business with the Illinois Secretary of State and maintains an agent for service of process for Illinois who is located in Chicago.

**ANSWER:**

The allegations contained in Paragraph 10 relate to another entity and therefore require no response from Boeing. To the extent a response is required, Boeing denies that it receives airplane component parts in Illinois, that its relationship with Rosemount Aerospace, Inc., if any, is substantially connected with the state of Illinois, and that it distributes and sells products within the state of Illinois. Boeing lacks knowledge or information regarding the remaining allegations contained in Paragraph 10 and therefore denies them.

11.    This Court has specific and personal jurisdiction over COLLINS because it caused a tort to occur in Illinois and pursuant to contracts with BOEING, sold the subject flight-control system and MCAS and related software to Illinois-based BOEING, intending the MCAS and related software to be installed on 737 MAX 8 airplanes. Issues in this action derive from, and are connected with, contacts COLLINS has with this District and its dealings with BOEING. Contacts by BOEING with Illinois are attributed and imputed to COLLINS through its agency, partnership and joint venture relationship with BOEING.  And, COLLINS and BOEING performed contracts and made promises with each other regarding the defective MCAS and related software that are, and at all times were, substantially connected with Illinois. PLAINTIFF and PLAINTIFF'S

DECEDENT are third- party beneficiaries of each such contracts. There was and is a regular and anticipated flow of airplane component parts, including MCAS components and software, from COLLINS to BOEING for distribution and sale in Illinois, including component parts that were designed specifically for Illinois based 737 MAX 8 airplanes. COLLINS advertised in Illinois, marketed through distributors in Illinois, and established channels for providing regular advice to customers in Illinois. COLLINS is registered to do business with the Illinois Secretary of State and maintains an agent for service of process for Illinois who is located in Chicago.

**ANSWER:**

The allegations contained in Paragraph 11 relate to another entity and therefore require no response from Boeing. To the extent a response is required, Boeing denies that it receives airplane component parts in Illinois, that its relationship with Rockwell Collins, Inc., if any, is substantially connected with the state of Illinois, and that it distributes and sells products within the state of Illinois. Boeing lacks knowledge or information regarding the remaining allegations contained in Paragraph 11 and therefore denies them.

12.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. §1391(b)(1) because BOEING is and has been a citizen and resident of the State of Illinois. BOEING corporate headquarters and principal place of business is located in this judicial district at 100 North Riverside, Chicago, Cook County, Illinois, 60606. BOEING is and has been authorized to do business and has been transacting and conducting business within the State of Illinois. See 735 Ill. Comp. Stat. 5/2-209(b)(4).

**ANSWER:**

The allegations in Paragraph 12 consist of legal conclusions to which no response from Boeing is required. To the extent a response is required, Boeing admits that it is domiciled in Illinois because its principal place of business and corporate headquarters are located in Illinois, that it is authorized to do business in Illinois, and that it transacts and conducts business in the state of Illinois.

13.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this District.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 13.

14.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. §1391(b)(3) because Defendants BOEING, ROSEMOUNT and COLLINS are subject to the court's jurisdiction in this District.

**ANSWER:**

The allegations in Paragraph 14 consist of legal conclusions to which no response from Boeing is required. Furthermore, to the extent the allegations in Paragraph 14 relate to other entities, they require no response from Boeing. To the extent a response is required, Boeing admits that this Court may exercise personal jurisdiction over it in this action.

## THE PARTIES

## PLAINTIFF

15.     At all times material to this cause of action, PLAINTIFF, Mohammed Omer Cherchir is the duly appointed executor and personal representative of the estate of Ahmednur Mohammed Omer, deceased. PLAINTIFF'S DECEDENT was the First Officer onboard Ethiopian Airlines Flight ET 302 when it crashed on March 10, 2019. PLAINTIFF'S DECEDENT'S survivors include his mother, Yisresh Badeta Deyu (1971), father, Mohammed Omer Cherchir (1964), brother, Menur Mohammed Omer (May 14, 1988), brother, Harun Mohammed Omer (July 7, 2000), and other next of kin, statutory heirs and beneficiaries in wrongful death and survivorship.

**ANSWER:**

Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 15 and therefore denies them.

## DEFENDANTS

16.     At all times material to this cause of action, THE BOEING COMPANY was and is a corporation for profit with its principle place of business in Illinois, its business being the design, testing, manufacture, warning, marketing, sale and release into the stream of commerce of transport category aircraft, including the 737 MAX 8 aircraft that crashed causing the death of PLAINTIFF'S DECEDENT.

**ANSWER:**

Boeing admits that it is a corporation with its principal place of business in Illinois. Boeing also admits that it designs, manufactures, markets, and sells aircraft, except for those components, parts, and systems that are designed, manufactured, marketed, or sold by others, and the components, parts, and systems that were subsequently removed, installed, exchanged, altered, modified, retrofitted, overhauled, or manufactured by others. Boeing further admits that it designed, manufactured, marketed, and sold the Subject Aircraft, except for those components, parts, and systems of the Subject Aircraft that were designed, manufactured, marketed, or sold by

-8-

others, and the components, parts, and systems that were subsequently removed, installed, exchanged, altered, modified, retrofitted, overhauled, or manufactured by others. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 16 regarding the Plaintiff's decedent and therefore denies them. Boeing denies the remaining allegations contained in Paragraph 16.

17.    At all times material to this cause of action, ROSEMOUNT AEROSPACE, INC. was and is a Delaware corporation for profit with its principal place of business in a state other than Illinois, its business being the design, testing, manufacture, warning, marketing, sale and release into the stream of commerce of angle of attack (AOA) sensors and related component parts incorporated by BOEING into the 737 MAX 8 aircraft, including the aircraft that crashed giving rise to this cause of action.

**ANSWER:**

The allegations in Paragraph 17 relate to another entity and require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 17 and therefore denies them.

18.    At all times material to this cause of action, ROCKWELL COLLINS, INC. (COLLINS) was and is a Delaware corporation with its principal place of business in a state other than Illinois, its business being the design, testing, manufacture, marketing, sale and release into the stream of commerce of flight control systems computer software, including software incorporated into the MCAS installed on the 737 MAX 8 that crashed giving rise to this cause of action.

**ANSWER:**

The allegations in Paragraph 18 relate to another entity and require no response from Boeing. To the extent a response is required, Boeing admits that the MCAS control law is part of the design of the 737 MAX 8 model. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 18 and therefore denies them.

## STATEMENT OF OPERATIVE FACTS

## THE BOEING COMPANY RUSHED THE 737 MAX 8 INTO PRODUCTION

**ANSWER:**

Boeing denies the allegations in the heading to this section of the Complaint.

19.     BOEING competitor Airbus has increased its market share and eroded BOEING sales and profits. When Airbus launched its more fuel-efficient single aisle airliner, the A320neo, BOEING dismissed its anticipated appeal with airlines. This short-sighted business decision placed BOEING behind Airbus in developing a more fuel-efficient single aisle airplane.

**ANSWER:**

Boeing admits that Airbus SE is a manufacturer of commercial aircraft. Boeing denies the

remaining allegations contained in Paragraph 19.

20.     At a meeting in January 2011, the chief executive of the BOEING commercial airplanes division informed employees that the decision to redesign its existing 737 airplanes with larger engines would present significant challenges.

**ANSWER:**

Boeing admits that James F. Albaugh was the President of Boeing Commercial Airplanes

in January 2011. Boeing lacks knowledge or information sufficient to form a belief as to the truth

of the remaining allegations contained in Paragraph 20 and therefore denies them.

21.     BOEING decided to develop an airplane to compete with the Airbus A320neo after it learned that key customers, including American Airlines, were considering placing purchase orders for the A320neo. BOEING determined that the design of an entirely new airplane would take too long, so it decided instead to create a more fuel-efficient alternative to its existing 737NG airplanes. The newly redesigned airplanes would become the 737 MAX 8.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 21.

22.     BOEING created the 737 MAX 8 because it was "far quicker, easier and cheaper than starting from scratch, and would provide almost as much fuel savings for airlines."

**ANSWER:**

Boeing lacks knowledge or information sufficient to form a belief as to the truth of the

allegations contained in Paragraph 22 and therefore denies them.

23.     It was vital to BOEING corporate leadership that it could market the 737 MAX 8 airplane as an upgrade to its already type certificated 737 series aircraft, and thereby more easily obtain regulatory approval from the FAA and permit pilots to operate the 737 MAX 8 airplane without the necessity of undergoing additional and costly simulator time and retraining on aircraft systems.

**ANSWER:**

Boeing admits that it applied for an Amended Type Certification for the 737 MAX 8.
Boeing denies the remaining allegations contained in Paragraph 23.

24.    The decision by BOEING to use the existing 737 type certificate as the basis for certification of the 737 MAX 8 was made by senior managers and corporate directors, who were shortcutting the level of regulatory scrutiny needed for a newly type certificated airplane. This decision was made solely to increase profits, because it:

    a.    saved BOEING significant research, design and development costs and permitted it to produce what appeared to be an updated, fuel-efficient airplane to compete with the Airbus A320neo more quickly and cost effectively than if BOEING developed an entirely new model airplane;

    b.    permitted BOEING to rush the design, testing, certification and manufacture of the Boeing 737 MAX 8 and release it more quickly into the market so that BOEING would not lose business and profits to Airbus;

    c.    allowed BOEING to offer the 737 MAX 8 to customers, including Ethiopian Airlines, with the marketing and representation that pilots already qualified to fly the existing 737NG could transition to the 737 MAX 8 without undergoing re-training, and without needing to be trained and tested in flight simulators or the airplane before flying revenue (passenger carrying) flights; and

    d.    permitted BOEING to use its Organization Designation Authorization (ODA), granted to it by the FAA, to streamline and speed certification, and largely self-certify the 737 MAX 8 merely through amendments to the existing 737 type certificate

**ANSWER:**

Boeing denies the allegations contained in Paragraph 24, including its discrete subparts.

25.    A design engineer employed at BOEING, who helped design the 737 MAX 8 cockpits, explained that by management edict, "[a]ny designs we created could not drive any new training that required a simulator." That ground rule was communicated by BOEING management to its engineers designing the 737 MAX 8. The edict created a chaotic environment for engineers as, "The company was trying to avoid costs and trying to contain the level of change. They wanted the minimum change to simplify the training differences, minimum change to reduce costs, and to get it done quickly."

**ANSWER:**

Boeing admits that the quoted unaltered language contained in Paragraph 25 has been attributed to a former Boeing employee in media articles. Boeing denies the remaining allegations contained in Paragraph 25.

26.    BOEING knew that if airline pilots did not require costly and time-consuming training in a newly designed and certificated airplane, it would make the 737 MAX 8 cheaper for airlines to operate. This in turn would make the price for the 737 MAX 8 more competitive relative to the competing Airbus A320neo, and ultimately more profitable for BOEING.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 26.

27.    BOEING agreed to rebate to Southwest Airlines the sum of one million ($1,000,000.00) dollars for each 737 MAX 8 aircraft that required extra simulator training for its cockpit crews.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 27.

28.    BOEING needed the 737 MAX 8 airplanes more fuel efficient and with flight handling qualities and characteristics deemed the same as the 737NG. The 737 MAX 8 airplanes achieved a new level of fuel efficiency due in part to installation of larger CFM LEAP-1B engines. However, adding larger, more fuel-efficient engines, necessitated substantial design and engineering changes to the existing 737NG model aircraft, exactly as the BOEING commercial airplane division chief executive predicted in 2011, while criticizing the Airbus A320neo.

**ANSWER:**

Boeing admits that the design of the 737 MAX 8 includes CFM LEAP-1B engines, which

are more fuel-efficient and larger than the engines incorporated into the design of 737 NG aircraft

models. Boeing denies the remaining allegations contained in Paragraph 28.

29.    The increased power and re-location of the CFM LEAP-I B engines substantially contributed to an inherent aerodynamic instability in the 737 MAX 8 that manifested itself in abnormal control column forces in pitch axis, and created a propensity for the aircraft to pitch nose up under foreseeable flight maneuvers, creating a risk that the airplane would encounter aerodynamic stall and crash.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 29.

30.    The aerodynamic instability defined in part by the tendency for nose up pitch demonstrated that the changes in airframe geometry and additional power and altered weight created dangerous flight handling qualities and characteristics in the 737 MAX 8. These dangerous anomalies did not exist in earlier model 737 airplanes.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 30.

31.     The aerodynamic instability and nose pitch up propensity rendered the 737 MAX 8 unairworthy. Pursuant to the FAA Airworthiness Standards for Commercial Aircraft: "No abnormal nose-up pitching may occur… In addition, it must be possible to promptly prevent stalling and to recover from a stall by normal use of the controls."

**ANSWER:**

Boeing admits that the quoted language without alteration in Paragraph 31 appears in the

FAA's Airworthiness Standards for Commercial Aircraft. Boeing denies the remaining allegations

contained in this Paragraph.

32.     If properly disclosed to regulatory authorities, abnormal and dangerous flight handling qualities and characteristics in the 737 MAX 8 meant that the FAA would not type certificate the airplane without significant design changes and would require pilots do undergo a substantial amount of simulator flight training and ground school before flying the airplane with passengers onboard.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 32.

33.     In the MCAS, BOEING engineered a band-aid to place over the dangerous handling qualities and characteristics derived from the inherent aerodynamic instability.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 33.

## THE MCAS ADDRESSED ONE PROBLEM AND CREATED ANOTHER PROBLEM

**ANSWER:**

Boeing denies the allegations in the heading to this section of the Complaint.

34.     To address the aerodynamic instability inherent to the 737 MAX 8 and to obtain certification piggy-backed on the original 737 type certificate, BOEING incorporated the MCAS, an automated system that pitched airplanes nose down and simultaneously trimmed the 737 MAX 8 nose down when it perceived or misperceived excessive nose up pitch attitude

**ANSWER:**

Boeing admits that the MCAS control law was implemented in the design of the 737 MAX

8. Boeing denies the remaining allegations contained in Paragraph 34.

35.     The software for the MCAS was developed, at least in part, by Defendant COLLINS. The MCAS failed to perform as intended, proximately causing both 737 MAX 8 crashes because it issued unintended and repeated automated nose down control and trim

commands. COLLINS developed the software that was defective and error-prone and failed to communicate to BOEING and the FAA the lack of functionality of the software.

**ANSWER:**

Boeing admits that Rockwell Collins, Inc. ("Rockwell Collins") developed the software code contained in the flight control computers of the 737 MAX 8, including portions related to the MCAS control law. Boeing also admits that the KNKT Final Report and the AIB's preliminary report say that the MCAS control law activated on Flight 610 and Flight 302 in response to erroneous AOA input. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 35.

36.     The MCAS operated by collecting data from just one of two available angle-of-attack (AOA) sensors installed on the fuselage, and from airspeed. If an AOA sensor registers that aircraft angle of attack is too high, the MCAS activates, automatically moving the horizontal stabilizer to pitch nose down, as can be seen in the following graphic:



**ANSWER:**

Boeing admits that the 737 MAX 8 has two AOA sensors (vanes), which measure and provide angle of attack information. Boeing also admits that the AOA vanes measure the difference between the pitch angle (nose direction) of the airplane and the angle of the oncoming wind. Boeing further admits that the 737 MAX 8's MCAS control law uses inputs from the airplane's AOA vanes. Boeing also admits that when MCAS activates, the flight control computer will actuate a nose-down input to the airplane's horizontal stabilizer. Boeing denies the remaining allegations contained in Paragraph 36. In further response, Boeing states that the graphic depicted below Paragraph 36 does not consist of properly pled factual allegations and therefore requires no

response from Boeing. To the extent a response is required, Boeing denies the accuracy of the text and images contained in this conclusory graphic as depicted.

37.　　The AOA sensors were provided to BOEING by defendant ROSEMOUNT, which knew or should have known that its sensors were susceptible to misperceived and erroneous data. The vulnerabilities of the AOA sensors should have been known to ROSEMOUNT because, since 2004, there were more than 200 incident reports submitted to the FAA for events involving malfunctioning ROSEMOUNT AOA sensors.

**ANSWER:**

The allegations contained in Paragraph 37 that are directed at another entity require no response from Boeing. To the extent a response is required, Boeing admits that Rosemount Aerospace, Inc. ("Rosemount") is a manufacturer of AOA vanes. Boeing further admits that the AOA vanes installed on the Subject Aircraft at the time of delivery were provided by Rosemount. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 37 and therefore denies them.

38.　　BOEING and COLLINS did not design the MCAS to use data from both AOA sensors installed on 737 MAX 8 aircraft. Obtaining and comparing data from both sensors was a feasible alternative design that would have permitted the MCAS to validate data cross-matched from each AOA and protected against a single point failure. Compounding this design defect, BOEING and COLLINS failed to have the MCAS consider other flight data available from the Flight Control Computers (air data computers), including airspeed and altitude. DEFENDANTS failed to implement other feasible alternative safety systems that were available and legally required by 14 CFR Part 25. Feasible alternative designs should have been installed on 737 MAX 8 aircraft to mitigate the risks presented by a single malfunctioning AOA sensor. BOEING should have included reference data from two AOA sensors as standard equipment on all 737 MAX 8 airplanes equipped with MCAS, and included an AOA disagree light, a synthetic airspeed system, and an Engine-Indicating and Crew-Alerting (ICAS) system, all of which were feasible alternative designs. To avoid increased costs, BOEING did not to include these available safety systems.

**ANSWER:**

Boeing admits that, at the time of the crash of Flight 302, MCAS used input from one AOA sensor. Boeing also admits that MCAS operates depending on Mach and AOA value. Boeing admits that altitude is not used to determine when MCAS operates. Boeing also admits that, at the time of the crash of Flight 302, the AOA disagree light was standard on the 737 MAX 8, although it did not function as intended, and the AOA indicator was available as an option to all customers. Boeing denies the remaining allegations contained in Paragraph 38.

39.     Failure by BOEING to integrate available and feasible alternative safety systems meant that if the single AOA sensor connected to the MCAS malfunctioned and erroneously determined the airplane was pitched nose high, there was no means to detect that erroneous data and prevent the MCAS from rotating the horizontal stabilizer to pitch the nose down and force the plane into a dive.

**ANSWER:**

Boeing admits that, at the time of the crash of Flight 302, MCAS could be activated by erroneous angle-of-attack information input from a single AOA vane. Boeing denies the remaining allegations contained in Paragraph 39.

40.     Pitch trim on the horizontal stabilizer on the 737 MAX 8 is activated by a single electric trim motor energized either by stabilator trim thumb switches located on the pilot's control yokes, or by the autopilot, or by the MCAS. Horizontal stabilizer trim can also be accomplished by a pilot manually rotating a stabilizer trim wheel attached to each side of the cockpit center counsel located between the pilot seats.

**ANSWER:**

Boeing admits that the stabilizer trim wheel provides for manual operation of the horizontal stabilizer and will override any other stabilizer trim inputs. Boeing also admits that the horizontal stabilizer is positioned by a single electric trim motor controlled by the stabilizer trim switches on the control wheel, autopilot trim, or the Speed Trim System. Boeing denies the remaining allegations contained in Paragraph 40.

41.     When the airplane is flown manually, the thumb switches located on each pilot control yoke actuate the electric trim motor through the main electric stabilizer trim circuit. With the autopilot engaged, stabilizer trim is actuated through the autopilot stabilizer trim circuit. The main electric and autopilot stabilizer trim have two speed modes: high speed with flaps extended and low speed with flaps retracted. The stabilizer trim wheels rotate whenever electric stabilizer trim is actuated.

**ANSWER:**

Boeing admits that switches on each pilot control yoke actuate the electric trim motor through the main electric stabilizer trim circuit when the aircraft is flown manually. Boeing also admits the allegations contained in the last three sentences in Paragraph 41. Boeing denies the remaining allegations contained in Paragraph 41.

42.     The STAB TRIM PRI cutout switch and the STAB TRIM B/U cutout switch on the 737 MAX 8 are each located on the cockpit center counsel. If either switch is positioned to

CUTOUT, both the autopilot and main electric trim input are disconnected from the stabilizer trim motor.

**ANSWER:**

Boeing admits that the stabilizer trim primary and back-up cutout switches are located on the control stand. Boeing also admits that, if either switch is set to "cutout," the power source for the stabilizer trim motor to rotate is removed, and that the manual trim wheel remains available. Boeing denies the remaining allegations contained in Paragraph 42.

43. The horizontal stabilizer trim cutout switches on the center control counsel on the 737 MAX 8 will override and stop operation of main electric and autopilot trim when control column movement opposes trim direction. This is not true for pitch commands received from the MCAS. When the STAB TRIM override switch is positioned to OVRD, electric trim can be used regardless of control column position. Opposing control column movement does not deactivate the MCAS.

**ANSWER:**

Boeing admits that the control column actuated cutout switches stop operation of the main electric and autopilot trim when the control column movement opposes trim direction. Boeing also admits that when the stabilizer trim override switch is positioned to override, electric trim can be used regardless of control column position. Boeing denies the remaining allegations contained in Paragraph 43.

44. Pitch is controlled by changing the angle of the horizontal stabilizer. Changing the angle of the horizontal stabilizer can create large load forces on the horizontal stabilizer. When applied appropriately, these load forces can keep the airplane in balance, when misapplied they can make the airplane difficult, if not impossible, to control.

**ANSWER:**

Boeing admits that the pitch trim is controlled by the horizontal stabilizer and that the position of the horizonal stabilizer affects the airplane's pitch. Boeing denies the remaining allegations contained in Paragraph 44.

45. Aerodynamic load forces generated by a horizontal stabilizer in an out of trim condition can quickly exceed the forces controllable by pilots pulling back or pushing forward on the control column.

**ANSWER:**

Boeing admits that the airplane's hydraulically powered elevators are controlled by forward or aft movement of the control column. Boeing also admits that the elevators can be mechanically positioned by forward or aft movement of the pilots' control columns if the airplane suffers a loss of hydraulic systems. Boeing denies the remaining allegations contained in Paragraph 45.

46.    The 737 MAX 8 can experience an out of trim condition that when countered by pilot induced stabilizer control inputs places enough aerodynamic load on the pitch trim mechanism such that it jams the pitch trim control. Manual trim cannot overcome this load and pitch trim control is lost.

**ANSWER:**

Boeing admits that the effort required to manually rotate the stabilizer trim wheels may be higher under certain flight conditions. Boeing denies the remaining allegations contained in Paragraph 46.

47.    The elevator is a smaller horizontal tail control surface when compared to the surface area of the controllable horizontal stabilizer.

**ANSWER:**

Boeing admits that the surface area of the elevator is less than the surface area of the horizontal stabilizer. Boeing denies the remaining allegations contained in Paragraph 47.

48.    This is depicted by the illustration below:



**ANSWER:**

Boeing denies the allegations in Paragraph 48. In further response, Boeing states that the graphic depicted below Paragraph 48 does not consist of properly pled factual allegations and therefore requires no response from Boeing; to the extent a response is required, Boeing denies the accuracy of the text and images contained in this conclusory graphic as depicted.

49.     Electric trim works in a narrower range of motion than manual trim. If the stabilizer is out of trim and outside the range of electric trim operation, only manual trim can be used.

**ANSWER:**

Boeing admits that additional trim is available through the use of the manual trim wheels when the stabilizer is trimmed to the end of the limits of electrical trim. Boeing denies the remaining allegations contained in Paragraph 49.

50.     The MCAS was intended to operate without pilots knowing of its existence. BOEING did not inform pilots, including PLAINTIFF'S DECEDENT, that the MCAS existed. The MCAS was not disclosed in the airplane's flight manual. Pilots learned indirectly of the MCAS when a plane began automatically fighting manual pitch commands, often at low altitude, and with little time to react and resolve the control anomalies. BOEING first informed pilots about MCAS after it caused the Lion Air Flight JT 610 disaster and even then it did not provide sufficient information about the system.

**ANSWER:**

Boeing admits that, at the time of the crash of Flight 302, the Subject Aircraft's Airplane Flight Manual ("AFM") did not include a description of the MCAS control law. Boeing also admits that it issued communications to its 737 MAX 8 customers, which reminded operators that repetitive cycles of uncommanded nose down stabilizer can be stopped through use of the primary and backup stabilizer trim cutout switches in accordance with the existing runaway stabilizer non-normal checklist, and that provided a description of MCAS. Boeing denies the remaining allegations contained in Paragraph 50.

51.     In addition to its failure to warn, provide instruction, and train pilots on the MCAS and how to override it if and when there was erroneous AOA data, BOEING designed a pitch trim control system capable of jamming under flight conditions that only BOEING knew were foreseeable.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 51.

### THE FEDERAL AVIATION ADMINISTRATION APPROVED A TYPE CERTIFICATE FOR THE 737 MAX 8 BASED UPON THE ORIGINAL 737 DESIGN FROM FIFTY YEARS AGO

**ANSWER:**

Boeing admits that the FAA issued an Amended Type Certificate that included the 737 MAX 8. Boeing denies the remaining allegations in the heading to this section of Plaintiff's complaint.

52.     On December 15, 1967, the 737-100 was type certificated by the FAA. The original 737 and all subsequent 737 aircraft, including the 737 MAX 8, are certificated under Type Certificate No. A16WE, originally issued in 1967.

**ANSWER:**

Boeing admits that the 737-100 model was certified on December 15, 1967 under Type Certificate No. A16WE. Boeing also admits that the other models in the 737 family are certified under various Amended Type Certificates of the same number. Boeing admits that more 737-model airplanes have been sold than any other commercial passenger jet airplane.

53.     On March 8, 2017, the 737 MAX 8 was added to Type Certificate No. Al6WE, as amended. On March 27, 2017, the 737 MAX 8 received Type Validation from the European Union Aviation Safety Agency (EASA), based on the FAA Type Certificate approval.

**ANSWER:**

Boeing admits that the FAA issued Amended Type Certificate No. A16WE for the 737 MAX 8 on March 8, 2017. Boeing also admits that the 737 MAX 8 received Type Validation from EASA on March 27, 2017. Boeing denies the remaining allegations contained in Paragraph 53.

54.     BOEING largely self-certified each successive model of its 737 series aircraft. Each model of the 737 is grandfathered onto the original type certificate issued in 1967 for the earliest version of the 737, even though later models bear no resemblance to the original 737 aircraft in airframe geometry, length, weight, power and avionics.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 54.

55.     When the 737 was type certificated in 1967, a flight computer could not override pilot control input. Since 1967, myriad changes have been tacked onto that original 737 type certificate and incorporated into flight manuals and instructional materials.

**ANSWER:**

Boeing admits that the technology has evolved over time since the 737-100 was type certified by the FAA and that the design of the 737 model family of airplanes has also evolved over time. Boeing denies the remaining allegations contained in Paragraph 55.

56.     No mention of the MCAS is made in either the EASA Type Certificate Data Sheet or the FAA Type Certificate Data Sheet.

**ANSWER:**

Boeing admits that MCAS is not referenced on the FAA and EASA Amended Type Certificate Data Sheets. Boeing denies the remaining allegations contained in Paragraph 56.

### BOEING'S REGULATORY CAPTURE OF THE FEDERAL AVIATION ADMINISTRATION UNDERMINED THE ADMINISTRATION'S ABILITY TO CARRY OUT ITS MANDATED SAFETY AND ENFORCEMENT DUTIES

**ANSWER:**

Boeing denies the allegations in the heading to this section of the Plaintiff's complaint.

57.     BOEING systematically influenced the FAA to eliminate federal oversight capabilities. BOEING achieved deregulation and streamlining of the federal certification process; prevention of new federal rulemaking (BOEING had a seat on the FAA's Aviation Rulemaking Advisory Committee); abandonment of FAA enforcement actions or penalties for industry violations of federal safety regulations in favor of voluntary compliance from the industry; and delegation to manufacturers of review and approval of new features on aircraft.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 57.

58.     BOEING achieved these goals in part through its considerable lobbying of the U.S. federal government. In 2018, BOEING invested more than fifteen million ($15,000,000.00) dollars into lobbying efforts for less regulation and oversight.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 58.

59.     BOEING successfully advocated for reduced regulation and limited oversight by the FAA.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 59.

60.     BOEING routinely employs former FAA leadership personnel at lucrative salaries. FAA leadership has openly acknowledged that it defers almost entirely to BOEING. For example:

a.     The FAA deferred to BOEING and expedited type certification based on BOEING production timelines;

b.     BOEING convinced the FAA to not ground the 737 MAX 8 after the Lion Air crash;

c.     Due to BOEING, the U.S. was the last country to order the 737 MAX 8 grounded;

**ANSWER:**

Boeing denies the allegations contained in Paragraph 60, including its discrete subparts.

61.     As BOEING continuously and successfully reduced its federal regulatory burden, it simultaneously sought to immunize itself from liability for defects in airplanes it designs and manufactures.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 61.

62.     Aviation industry lobbying groups, including the Aerospace Industries Association of America, Inc., on whose Board BOEING CEO Dennis Muilenburg serves, including a term as Chairman in 2017, filed amicus briefs in the U.S. Supreme Court supporting aviation manufacturers' claims for legal immunity based on federal preemption, where a manufacturer holds a type certificate.

**ANSWER:**

The allegations in Paragraph 62 are directed at another entity and therefore require no response from Boeing. To the extent a response is required, Boeing admits that Dennis Muilenburg ("Mr. Muilenburg") is a former Chief Executive Officer of The Boeing Company. Boeing also admits that Mr. Muilenburg served as the Chairman of the Aerospace Industries Association of American, Inc. ("AIA") in 2017. Boeing further admits, upon information and belief, that the AIA has filed amicus briefs in the United States Supreme Court. Boeing denies the remaining allegations contained in Paragraph 62.

63.    In 2005, BOEING requested, and the FAA adopted, the ODA program which permitted BOEING to self-designate its own employees to review and approve BOEING designs on behalf of the FAA.

**ANSWER:**

Boeing admits that it maintains an Organization Designation Authorization. Boeing denies the remaining allegations contained in Paragraph 63.

64.    Under its ODA, BOEING had a duty of integrity in its dealings with the FAA. BOEING violated that duty by misrepresenting to the FAA that the 737 MAX 8 was safe to fly when BOEING knew the airplanes were unsafe, unairworthy, dangerous and defective.

**ANSWER:**

Boeing admits that it owes the duties imposed by applicable law. Boeing denies the remaining allegations contained in Paragraph 64.

65.    Under its ODA, BOEING had a duty to notify the FAA of any issue that might create an unsafe flight condition so that the FAA could investigate and remediate the issue. BOEING breached its duty by failing to reveal to the FAA the inherent aerodynamic instability in the 737 MAX 8 and the hazards of the MCAS, among other defects. This breach of duty was confirmed on the record before the U.S. Congress on May 15, 2019, as set forth above.

**ANSWER:**

Boeing admits that it owes the duties imposed by applicable law. Boeing also admits that it disclosed the existence and operation of the MCAS control law to the FAA before the FAA issued the Amended Type Certification for the 737 MAX 8. Boeing denies the remaining allegations contained in Paragraph 65.

66.    Under its ODA, BOEING had a duty to use care, diligence, judgment and responsibly follow the Federal Aviation Regulations when performing compliance activities. BOEING breached its duties and instead promoted its profits by rushing certification of a dangerous and defective airplane.

**ANSWER:**

Boeing admits that it owes the duties imposed by applicable law. Boeing denies the remaining allegations contained in Paragraph 66.

67.    A Department of Transportation Office of Inspector General ("OIG") Audit Report published in 2012 concluded that the FAA was not supporting its employees in their efforts to hold BOEING accountable. FAA safety inspectors feared retaliation for raising concerns and identifying problems regarding BOEING actions and products.

**ANSWER:**

Boeing admits that the Office of the Inspector General issued a report on June 22, 2012 numbered I10A000073SINV concerning a referral it had received from the Office's Aviation and Special Program's audit office summarizing its review of that referral. The contents of that report speak for themselves. Boeing denies the remaining allegations contained in Paragraph 67.

68. An OIG report published in 2015 found the FAA lacked effective staffing and was not performing proper oversight of ODA manufacturers.

**ANSWER:**

Boeing admits that the Office of the Inspector General issued report number AV-2016-001 on October 15, 2015. The contents of that report speak for themselves. Boeing denies the remaining allegations contained in Paragraph 68.

69. While taking advantage of the FAA's abdication of oversight responsibilities concerning the safety of the 737 MAX 8, BOEING praised the FAA's hands-off approach.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 69.

70. On a conference call in 2017 with Wall Street investors, BOEING CEO Dennis Muilenburg praised the FAA "streamlined" certification process that helped bring the 737 MAX 8 quickly to market.

**ANSWER:**

Boeing admits that Mr. Muilenburg spoke with investors in 2017. Boeing admits that media articles have reported that Mr. Muilenburg described the FAA Type Certification process as "streamlined" in that conversation. Boeing denies the remaining allegations contained in Paragraph 70.

71. Through CEO Muilenburg, BOEING complimented the government "focus on deregulation and simplifying processes," for which BOEING was a "strong proponent." CEO Muilenburg went on, stating that: "Things like FAA certification processes is one place that we're seeing some solid progress. That's helping us more efficiently work through certification on some of our new model airplane such as the MAX as it's going through tests and entering into service."

**ANSWER:**

Boeing admits that Mr. Muilenburg spoke with investors in 2017. Boeing admits that certain media outlets have attributed the language quoted in Paragraph 71 to Mr. Muilenburg. Boeing denies the remaining allegations contained in Paragraph 71.

72.     The "streamlining" of the 737 MAX 8 certification process meant that BOEING largely conducted federal certification of its own airplane. The benefit was to BOEING profits, not the safety of the 737 MAX 8.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 72.

73.     The certification of the 737 MAX 8 was supposed to signify that the airplane met a "minimum level of safety" because its design complied with federal requirements.

**ANSWER:**

Boeing admits the allegations contained in Paragraph 73.

74.     The FAA relied on BOEING misrepresentations that the 737 MAX 8 met the "minimum level of safety" and complied with all applicable federal requirements. The 737 MAX 8 did not meet a "minimum level of safety" and should never have been certificated.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 74.

75.     Due to chronic understaffing and limited resources at the FAA, the certification process for the 737 MAX 8 proceeded slower than BOEING desired. BOEING pressured FAA management to push federal personnel to accelerate the certification schedule for the 737 MAX 8 because development was nine months behind the Airbus' A320neo.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 75.

76.     BOEING claimed the FAA had "retained too much" responsibility.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 76.

77.     BOEING successfully pressured the FAA to delegate its oversight responsibilities to BOEING. This change in oversight obligations permitted BOEING to meet its objective to ensure certification of the 737 MAX 8 in a manner calculated to serve BOEING financial interests at the expense of public safety. BOEING infected the certification process, resulting in supposed

federal approval of an airplane that did not meet regulatory standards. This was achieved through tortious and wrongful conduct by BOEING.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 77.

**BOEING'S LEADERSHIP CREATED A CULTURE THAT
SILENCED DISSENT AND PLACED PROFIT OVER SAFETY**

**ANSWER:**

Boeing denies the allegations in the heading to this section of the Plaintiff's complaint.

78.     In the rush to certificate the 737 MAX 8 and fill delivery orders to airlines, BOEING corporate leadership pressured its engineers to produce a finished product. BOEING engineers and designers working on the 737 MAX 8 describe a frantic pace of development:

a.      an engineer said that "[t]he timeline was extremely compressed … It was go, go, go."

b.      a former designer working on flight controls described how the design team had at times produced 16 technical drawings a week, double the normal rate. The designer understood the message from management to be: "We need something now."

c.      a technician who assembled wiring said that he received sloppy blueprints in the first few months of development and was told that the instructions for the wiring would be cleaned up later in the process. However, his internal assembly designs apparently still include omissions, such as not specifying which tools to use to install a certain wire, a situation that could lead to a faulty connection. This is quite different from standard procedures because normally such blueprints include intricate instructions.

**ANSWER:**

Boeing admits that the quoted language in the discrete subparts of Paragraph 78 are attributed to former Boeing employees in an article published by the *New York Times*. Boeing denies the remaining allegations contained in Paragraph 78, including its discrete subparts.

79.     Upon information and belief, the unreasonable expectations placed on engineers and designers by the business leadership created an environment at BOEING ripe for mistakes and where employees were reluctant to raise concerns that may have delayed certification and production of the 737 MAX 8. This is corroborated by a 2016 BOEING internal survey that found 29% of more than 500 employees who answered, agreed that they were "concerned about consequences if I report potential undue pressure."

**ANSWER:**

Boeing admits that it conducted an internal survey in November 2016 regarding potential Undue Pressure. Boeing denies the remaining allegations contained in Paragraph 79.

80.     A lawsuit filed in state court in South Carolina on March 16, 2019 by a former BOEING Quality Assurance Conformity Manager, questions the integrity of BOEING testing and inspection procedures. This manager was tasked with inspecting all newly manufactured airplanes for compliance with internal engineering and safety specifications. Incidences of non-conformity that BOEING inspectors encountered were supposed to be documented, along with all repairs and subsequent inspections.

**ANSWER:**

Boeing states that Plaintiffs have not alleged, and that the Master Complaint is devoid of any reference whatsoever to, a manufacturing defect in the Subject Aircraft as a cause of the crash of Flight 302. The allegations in Paragraph 80 related to issues in the production of Boeing aircraft are therefore not pertinent to Plaintiffs' claims. To the extent a response is required, Boeing admits that a former employee filed a lawsuit against it in the Court of Common Pleas for the Ninth Judicial Circuit in and for the County of Charleston, South Carolina on March 18, 2019 (the "*Wallis* Complaint"). Boeing denies the allegations contained in the unverified *Wallis* Complaint and further denies the allegations contained in Paragraph 80, including its discrete subparts. Further, Boeing states that the *Wallis* Complaint was filed by a former employee of Boeing's Charleston, South Carolina plant, where no 737 MAX or other 737 variants are produced or have ever been produced.

81.     At one BOEING manufacturing plant its employees engaged in improper conduct including:

    a.    "Goldplating" which is repeating a test until it is successful and then having the records show that the test was successful on the first attempt;

    b.    Knowingly using out of date engineering specifications;

    c.    Knowingly using uncertified technicians to perform maintenance and repairs;

    d.    Violating internal policies and procedures that were in place to achieve final approval of each stage of production and make the airplane immediately saleable;

    e.    Disabling the automated system that notified all pertinent employees of mandatory inspections of newly manufactured airplanes; and

    f.    Submitting conformities without documented repairs.

**ANSWER:**

Boeing states that Plaintiffs have not alleged, and that the Master Complaint is devoid of any reference whatsoever to, a manufacturing defect in the Subject Aircraft as a cause of the crash of Flight 302. The allegations in Paragraph 81 related to issues in the production of Boeing aircraft are therefore not pertinent to Plaintiffs' claims. Boeing denies the allegations contained in the unverified *Wallis* Complaint, and further denies the allegations contained in Paragraph 81.

82.     The manager also alleges that when he tried to document non-conforming airplane equipment at BOEING he was threatened, retaliated against, subjected to a hostile work environment, and eventually terminated.

**ANSWER:**

Boeing states that Plaintiffs have not alleged, and that the Master Complaint is devoid of any reference whatsoever to, a manufacturing defect in the Subject Aircraft as a cause of the crash of Flight 302. The allegations in Paragraph 82 related to issues in the production of Boeing aircraft are therefore not pertinent to Plaintiffs' claims. Boeing denies the allegations contained in the unverified *Wallis* Complaint, and further denies the allegations contained in Paragraph 82.

83.     Upon information and belief, violations of safety standards, falsified inspection records, and an environment of distrust and retaliation are representative of wrongful conduct and violation of safety protocols at other BOEING manufacturing facilities. These issues were known, encouraged and ratified by BOEING corporate leadership, and contributed to a culture that suppressed raising concerns about safety in furtherance of a profit-driven focus.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 83.

84.     These concerns are echoed in a complaint in April 2019, by a BOEING whistleblower who has been publicly identified. In his complaint, the whistleblower discusses a BOEING corporate culture, "more concerned with cost and schedule than safety and quality." The whistleblower noted his fear of retaliation from BOEING for voicing concerns, due to a "suppressive cultural attitude towards criticism of corporate policy."

**ANSWER:**

Boeing admits that a current Boeing employee and engineer submitted an internal ethics complaint that contains the language quoted in Paragraph 84. Boeing also admits that the

employee's complaint has been publicly reported. Boeing denies the remaining allegations contained in Paragraph 84.

85.     BOEING has problems with suppliers providing nonconforming products. On June 2, 2019, the FAA issued a statement that wing slat track assemblies installed on as many as 312 737NG and 737 MAX 8 airplanes may have been improperly manufactured, leaving them susceptible to premature failure or cracking. Failure by BOEING to provide oversight of its slat track assembly supplier, to ensure that the parts conformed to manufacturing specifications is emblematic of deficient oversight and quality control procedures for faulty AOA sensors and defective MCAS software installed in the 737 MAX 8.

**ANSWER:**

Boeing admits that the FAA published AD 2019-11-03. The contents of that document speak for themselves. Boeing denies the remaining allegations contained in Paragraph 85.

## BOEING CONDUCTED A FLAWED SAFETY ASSESSMENT OF THE MCAS AND FALSIFIED DATA TO THE FAA

**ANSWER:**

Boeing denies the allegations in this heading to this section of the Plaintiff's complaint.

86.     Prior to certification and sale of the 737 MAX 8, Boeing knew that the defective flight control system (MCAS) was dangerous and susceptible to erratic performance, and it failed to inform the FAA.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 86.

87.     In addition to questions about BOEING design and manufacturing procedures at the time the 737 MAX 8 was undergoing certification, the protocols for BOEING safety assessments of the MCAS showed glaring errors.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 87.

88.     As a new feature, the design and functional reliability of the MCAS was required to be reviewed and approved by the FAA. A meaningful review of MCAS was not completed during the compliance activities that preceded the certification of the 737 MAX 8 and was not completed after the crash of Lion Air Flight JT 610. After initially retaining direct authority to review the safety of MCAS because it was a new feature, the FAA released the MCAS safety review to BOEING under its ODA.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 88.

89.     BOEING designed the MCAS to deflect the horizontal tail to pitch the nose of the airplane downward to counteract aerodynamic design defects. The BOEING safety analysis understated the power of the system.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 89.

90.     BOEING originally submitted documentation to the FAA indicating that the MCAS could only deflect the horizontal tail a maximum of 0.6 degrees and would only operate in rare, high speed and high Mach conditions. This information provided the basis for the FAA assigning the safety review of the MCAS to BOEING.

**ANSWER:**

Boeing admits that it provided the FAA documentation describing the MCAS control law,

including initially that it would activate and move the horizontal stabilizer a maximum of 0.6

degrees. Boeing denies the remaining allegations contained in Paragraph 90.

91.     BOEING subsequently made significant changes to the MCAS, by which it could operate at much lower speeds and no longer relied on readings from a G-force sensor, meaning that it would be activated based only upon readings from a single AOA sensor.

**ANSWER:**

Boeing admits that during the design, development, and certification process for the 737

MAX, modified the design of MCAS in certain respects, including the expansion of MCAS to

certain low speed conditions. The expansion of MCAS was disclosed to the FAA. Boeing denies

the remaining allegations contained in Paragraph 91.

92.     BOEING knew that key personnel at the FAA were unaware of these significant design changes to the MCAS. Despite knowledge that the FAA had inaccurate and incomplete information about the functionality and performance of the MCAS, BOEING failed to inform FAA safety engineers of these critical design changes made during the certification process, and failed to update key certification deliverables, such as the preliminary system safety assessment.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 92.

93.     When the 737 MAX 8 was certificated and placed in service, the MCAS was capable of displacing the horizontal tail 2.5 degrees, more than four times the 0.6 degrees stated in the initial safety analysis BOEING provided to the FAA. The version of the MCAS that BOEING programmed into the 737 MAX 8 and sold worldwide was materially different and far more dangerous than what BOEING represented to the FAA. The FAA did not learn that the MCAS would move the horizontal tail 2.5 degrees until after 189 people were killed in the Lion Air crash.

**ANSWER:**

Boeing admits that the version of MCAS implemented in the design of the 737 MAX 8 when it received Amended Type Certification on March 8, 2017 allowed for horizontal stabilizer movement up to 2.5 degrees at certain airspeeds and elevated angles of attack. Boeing denies the remaining allegations contained in Paragraph 93.

94.     The safety analysis failed to account for how the MCAS reset itself each time a pilot responded with nose up pitch. A malfunctioning MCAS would not just cause a single downward pitch trim movement of 2.5 degrees, but would pitch nose down trim of the airplane 2.5 degrees lower multiple times as pilots tried to regain control. Two cycles of the MCAS at the 2.5-degree limit would cause the airplane to reach its maximum nose-down trim position. A former BOEING flight controls engineer stated that because the MCAS can reset each time it is used, "it effectively has unlimited authority."

**ANSWER:**

Boeing admits that, at the time of the crash of Flight 302, it was possible for pilots to reset MCAS. Boeing also admits that the quoted language in Paragraph 94 has been attributed to a former employee in media articles. Boeing denies the remaining allegations contained in Paragraph 94.

95.     Based on the flawed assumption that the MCAS maximum authority was 0.6 degrees, the BOEING System Safety Analysis classified the MCAS as a "major failure" in normal flight and a "hazardous failure" in the event of an extreme maneuver, such as a banked descending spiral. A "major failure" indicates that the system's failure could cause physical distress to people on the plane, but not death. A "hazardous failure" could cause serious or fatal injuries to a small number of passengers. One level above hazardous failure is "catastrophic failure," which represents the potential loss of the plane with multiple fatalities.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 93.

96.     The failure classification system determines whether a flight control system can rely on a single sensor input or must have two or three data inputs that can be compared. Systems classified as capable of "major failure" must have a probability of failure less than one in 100,000. Typically, such systems are allowed to rely on a single input sensor.

**ANSWER:**

Boeing admits that the failure classifications used in its functional hazard assessments inform designs. Boeing also admits that it follows regulatory guidance and industry standards in

conducting hazard and other safety assessments on its products. Boeing denies the remaining allegations contained in Paragraph 96.

97.    Systems classified as "hazardous failure" have more severe consequences and therefore must have a probability of failure less than one in 10 million. Systems classified as "hazardous failure" typically must have at least two separate input channels as backup in the event one fails.

**ANSWER:**

Boeing admits that the failure classifications used in its functional hazard assessments inform designs. Boeing also admits that it follows regulatory guidance and industry standards in conducting hazard and other safety assessments on its products. Boeing denies the allegations contained in Paragraph 97.

98.    With the MCAS classified as a "hazardous failure," it should have had a redundant back-up system taking data from two AOA sensors. Instead BOEING designed the MCAS so that it would activate from data relayed from a single AOA sensor and, once activated, it had unlimited authority to pitch the nose of the airplane down.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 98.

99.    BOEING installed a second AOA sensor on the 737 MAX 8 airplanes as original equipment. The second AOA sensor could have provided redundancy and safety and was a feasible alternative design which is now part of the proposed MCAS software "fix" after the two fatal accidents. The second AOA sensor was not connected to the MCAS during original design and certification of the 737 MAX 8, to save BOEING time and money and avoid pilot training requirements that would have conflicted with its business plan. BOEING did the same thing in its design of the 737 auto-throttle system prior to the 2009 crash of Turkish Airlines Flight 1591 in Amsterdam – reliance on a single sensor input instead of two readily available inputs. After that accident BOEING issued a software fix to prevent a recurrence. BOEING could have learned from that accident to never try and save money using single sensor reliance on critical flight systems.

**ANSWER:**

Boeing admits that the MCAS software enhancements it has developed for the 737 MAX 8 will compare inputs from both AOA vanes. Boeing also admits that a Boeing 737-800 (a Next Generation) model airplane crashed during landing at Amsterdam Schiphol Airport, Netherlands, on February 25, 2009. Boeing denies the remaining allegations contained in Paragraph 99.

100.    As a former BOEING flight controls engineer stated: "A hazardous failure mode depending on a single sensor, I don't think passes muster."

**ANSWER:**

Boeing admits that the quoted language contained in Paragraph 100 has been attributed to a former employee in media articles. Boeing denies the remaining allegations contained in Paragraph 100.

101.     BOEING has repeatedly and intentionally violated this system safety design principle and recklessly abused its FAA certification designee position, resulting in hundreds of BOEING airplane passenger deaths and injuries over the years.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 101.

102.     The BOEING system safety analysis was deficient because it did not replicate the specific failure mode that could and ultimately did lead to repeated uncommanded MCAS activation. A September 2019 NTSB report notes that functional hazard assessment validation tests conducted by BOEING did not account for MCAS activation due to an erroneously high AOA input. As a result, the testing did not include flight deck effects such as IAS DISAGREE and ALT DISAGREE alerts or stick shaker activation, which influence flight crew ability to identify and address uncommanded MCAS activation. These effects were not simulated and were not included in the stabilizer trim safety assessment report. BOEING included a flight control system on the 737 MAX 8 capable of activation by a single sensor failure. BOEING did not conduct simulation testing flight crew response to that single point of failure.

**ANSWER:**

Boeing admits that it evaluated pilot response to and the hazards associated with uncommanded MCAS activation prior to certification of the 737 MAX 8. Boeing denies the remaining allegations contained in Paragraph 102.

103.     The October 2019 report submitted to the FAA by the Joint Authorities Technical Review ("JATR") found that the MCAS used the horizontal stabilizer to change control column force feel as opposed to trimming the aircraft. This represented a new way of using a control surface that the regulations never accounted for and which should have been studied.

**ANSWER:**

Boeing admits that the JATR submitted its observations, findings, and recommendations to the Associate Administrator for Aviation Safety at the FAA on October 11, 2019. The contents of that report speak for themselves. Boeing denies the remaining allegations contained in Paragraph 103.

104.     The JATR also faulted BOEING for using pilot action as the primary mitigation means for MCAS hazards instead of eliminating the hazards or providing design features or warnings to mitigate them. The JATR found this approach was not in accordance with BOEING process instructions for safe design.

**ANSWER:**

Boeing admits that the JATR submitted its observations, findings, and recommendations to the Associate Administrator for Aviation Safety at the FAA on October 11, 2019. The contents of that report speak for themselves. Boeing denies the remaining allegations contained in Paragraph 104.

## BOEING REJECTED MULTIPLE FEASIBLE ALTERNATIVE DESIGNS THAT WOULD HAVE MADE ITS AIRPLANE MORE SAFE

**ANSWER:**

Boeing denies the allegations in the heading to this section of the Plaintiff's complaint.

105.     Despite glaring, dangerous defects in the MCAS, BOEING had available reasonable alternative safety features to mitigate the risk of an AOA sensor failing and causing an uncontrollable dive. BOEING consciously chose to make these safety features optional add-ons for airlines at an extra charge.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 105.

106.     One feature is an indicator that displays to pilots real-time data from both AOA sensors, providing valuable safety information to the pilots. Without this upgrade, pilots do not have a readout of what the AOA is registering, making it more difficult to identify an AOA malfunction. The information provided by the Angle of Attack indicator, if purchased and installed, would assist pilots in diagnosing why a 737 MAX 8 MCAS was erroneously pitching an airplane nose down, and would speed pilot reaction time to an MCAS created flight emergency.

**ANSWER:**

Boeing admits that, at the time of the crash of Flight 302, it offered its 737 MAX 8 customers the option to purchase an AOA indicator in their airplanes' flight displays. Boeing denies the remaining allegations contained in Paragraph 106.

107.     Another safety feature is a Disagree Light. The 737 MAX 8 has two AOA sensors, one located on either side of the airplane's nose, but the MCAS only takes data readings from one sensor, leaving the system vulnerable to a single point of failure. Upgrades to the MCAS software coupled with the installation of a Disagree Light in the cockpit would have alerted pilots if the two AOA sensors register data readings that disagree. An AOA sensor disagree light was standard

equipment on prior 737 models that involve data derived from two sources. BOEING knew that use of a disagree light was a feasible alternative design that could be incorporated in 737 MAX 8 airplanes for little or no cost. A Disagree Light would have provided important information to the pilots of Ethiopian Airlines Flight 302 and could have helped avoid the crash.

**ANSWER:**

Boeing admits that the AOA disagree alert has been a standard feature on the 737 NG since 2006. Boeing also admits that the AOA disagree alert was included in the design of the 737 MAX 8 as a standard, standalone feature. Boeing also admits that, in August 2017, engineers at Boeing identified that the 737 MAX display system software delivered by Boeing's supplier did not function as intended and that the AOA disagree alert activated only if an airline had selected the optional AOA indicator. Boeing denies the remaining allegations contained in Paragraph 107.

108.    These feasible alternative safety features existed before the crash and are critical and cost almost nothing to install.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 108.

109.    BOEING defectively designed the MCAS so that it would force an airplane to pitch nose down even when the two AOA data readings are materially divergent. The MCAS accepted a completely implausible AOA reading, like the 74.5° nose up pitch attitude that was the erroneous reading of the AOA sensor on Ethiopian Airlines Flight 302. BOEING could and should have programmed the MCAS to shut off if the two AOA readings materially conflicted with one another.

**ANSWER:**

Boeing admits that, at the time of the crash of Flight 302, MCAS could be activated by erroneous angle-of-attack information input from a single AOA vane. Boeing denies the remaining allegations contained in Paragraph 109.

110.    Despite knowledge of the potential for the AOA sensor to fail and wrongly activate the MCAS, BOEING did not install the AOA indicator or disagree light as standard equipment. BOEING charged a premium for these essential safety features.

**ANSWER:**

Boeing admits that, at the time of the crash of Flight 302, it offered its 737 MAX 8 customers the option to purchase an AOA indicator light for their airplanes' flight displays. Boeing denies the remaining allegations contained in Paragraph 110.

111.    As far back as 2017, BOEING had actual knowledge that the AOA disagree alert was malfunctioning on airplanes where the AOA indicator option had not been purchased. BOEING issued a statement on April 29, 2019, that "[t]he disagree alert was intended to be a standard, standalone feature on MAX airplanes. However, the disagree alert was not operable on all airplanes because the feature was not activated as intended." BOEING went on to state that "[u]nless an airline opted for the angle of attack indicator, the disagree alert was not operable."

**ANSWER:**

Boeing admits that by August 2017 it had learned that the AOA disagree alert on the 737 MAX 8 airplanes did not activated as was intended. Boeing also admits that it issued a public statement on April 29, 2019 that included, except for the noted alterations, the language quoted in Paragraph 111. Boeing denies the remaining allegations in Paragraph 111.

112.    After learning that the disagree alert system was not functioning as intended, BOEING did not to timely remedy the defect or alert operators. Instead, BOEING concluded that, "the existing functionality was acceptable until the alert and the indicator could be delinked in the next planned display system software update." BOEING decided to wait until 2020 to fix the defect.

**ANSWER:**

Boeing admits that it followed its standard process for determining the appropriate resolution when it identified that the AOA disagree alert did not function as intended. Boeing admits that an internal review by multiple company subject matter experts determined that the absence of the AOA disagree alert did not adversely impact the safety, operation, or certification of the airplane, and thus the existing functionality was acceptable until the alert and the indicator could be delinked in the next planned display system software update, which was scheduled for 2020. Boeing denies the remaining allegations contained in Paragraph 112.

113.    The pilots of Flight 302 and Flight 610 did not have the benefit of a disagree alert system to inform them that an AOA sensor was sending erroneous data to the MCAS and causing the plane to pitch nose down. This was critically important since the activation of the aircraft stick shaker and non-activation of the disagree alert would send pilots conflicting messages. Had an alert been operational, it would have assisted the pilots in identifying and correcting the problem caused by the faulty AOA sensor and MCAS and would have afforded the pilots critical time to avert a crash.

**ANSWER:**

Boeing admits that the AOA disagree alert did not function in the flight deck displays on both the Flight 610 aircraft and the Subject Aircraft. Boeing denies the remaining allegations contained in Paragraph 113.

114.    In the case of Lion Air Flight JT 610, the two AOA sensor readings were widely divergent prior to takeoff. Had the AOA Disagree Alert been functioning, it is likely the airplane would never have taken off, saving all onboard.

**ANSWER:**

Boeing admits that the KNKT Final Report says that the Flight 610 aircraft recorded angles of attack about 21 degrees different between its left and right AOA vanes at around 23:20 UTC on October 28, 2018. Boeing denies the remaining allegations contained in Paragraph 114.

115.    BOEING reportedly considered and rejected additional safety features that were available before the crash as feasible alternatives and would have prevented both crashes. In an internal ethics complaint filed after the crash of Flight 302, a BOEING engineer detailed how, as far back as 2014, safety upgrades for the 737 MAX 8 were proposed and rejected by management due to cost, the potential impact on pilot training, and production delay.

**ANSWER:**

Boeing admits that one of its employees and engineers submitted an internal ethics complaint on April 24, 2019. Boeing admits that the complaint provides the author's opinion regarding his perception of decisions made that related to the development of the 737 MAX 8 prior to receipt of its Amended Type Certificate on March 8, 2017. Boeing denies the remaining allegations contained in Paragraph 115.

116.    Another feasible alternative safety upgrade was use of a "synthetic airspeed" system, a variant of which was already in use on the BOEING 787 Dreamliner. The synthetic airspeed system would have detected the false AOA sensor readings and prevented the MCAS from activating. Upon information and belief, implementation of this safety system in the 737 MAX 8 was rejected by management on three separate occasions.

**ANSWER:**

Boeing admits that one of its employees and engineers submitted an internal ethics complaint on April 24, 2019. Boeing admits that the complaint discusses the author's opinion that the synthetic airspeed system certified on the 787 Dreamliner should have been included on the

-37-

737 MAX 8. Boeing also admits that the synthetic airspeed system implemented in the design of the 787 Dreamliner is not implemented in the design of the 737 MAX 8. Boeing denies the remaining allegations contained in Paragraph 116.

117.    Another feasible alternative safety feature available to BOEING for use in the 737 MAX 8 was a flight-crew alerting system called Engine-Indicating and Crew-Alerting System ("EICAS"). EICAS integrates all engine and airplane system indicators and displays them in a clear manner to pilots, along with crew alerts organized in an unambiguous hierarchy. If implemented, this system would have assisted the pilots of Flight 610 and Flight 302 by more clearly presenting the sensor and systems malfunctions. EICAS would have allowed the embattled pilots more options to turn off distracting and contradictory alarms that added to their workload during their struggle with the MCAS. BOEING rejected the inclusion of this safety system due to overall cost, despite that EICAS is an industry standard and included on all BOEING airplane models other than the 737.

**ANSWER:**

Boeing admits that many of its airplane models are equipped with a flight crew alerting system known as the Engine Indicating and Crew Alerting System ("EICAS"). Boeing further admits that the 737 MAX 8 uses a flight crew alerting system that, while different than EICAS, is safe and airworthy. Boeing denies the remaining allegations contained in Paragraph 117.

118.    BOEING failed to include adequate cockpit alerts, as required by 14 CFR §25.1322. When faced with multiple alerts and indications, the flight crews lacked essential tools to identify the most effective response.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 118.

119.    Due to widespread acceptance, FAA regulations on cockpit alerts, detailed in 14 CFR § 25.1322, are closely aligned with the capabilities of the EICAS system. If it did not want to include EICAS in the 737 MAX 8, BOEING should have applied for an exemption from the regulations. However, such an exemption would have required a public notice in the Federal Register and an opportunity for interested parties and the general public to comment. Instead of an *exemption*, BOEING sought an *exception* from the regulations. This exception did not require the same public notices, further concealing BOEING circumventing safety requirements.

**ANSWER:**

Boeing admits that it applied for and received an "impractical exception" to certain paragraphs of 14 C.F.R. § 25.1322 at amendment 131. Boeing denies the remaining allegations contained in Paragraph 119.

## BOEING MISREPRESENTED ITS AIRPLANE TO PILOTS AND AIRLINES DOWNPLAYING THE NEED FOR ESSENTIAL TRAINING

**ANSWER:**

Boeing denies the allegations in the heading to this section of the Plaintiff's complaint.

120.    With the 737 MAX 8 type certificated, BOEING began delivering airplanes all over the world, starting in May 2017. The 737 MAX 8 was a popular and profitable airplane for BOEING.

**ANSWER:**

Boeing admits that it began delivering 737 MAX 8 airplanes to customers in May 2017 in Renton, Washington. Boeing also admits that its 737 MAX 8 airline customers are located and headquartered all over the world. Boeing denies the remaining allegations contained in Paragraph 120.

121.    As BOEING intended, pilots transitioning from the 737NG to the 737 MAX 8 were not required to receive extensive training on the 737 MAX 8 because it was type certificated on and used the same type rating as earlier 737 models. This was a primary sales point to airlines. On its website, BOEING represented to airlines that "as you build your 737 MAX fleet, millions of dollars will be saved because of its commonality with the Next-Generation 737."

**ANSWER:**

Boeing admits that pilots certified to fly certain 737 NG models were only required to receive NG-to-MAX differences training in order to be certified to fly the 737 MAX 8. Boeing also admits that the NG-to-MAX differences training was certified by the FAA, along with other regulatory agencies. Boeing also admits that the quoted language contained in the last sentence of Paragraph 121 has appeared on its website. Boeing denies the remaining allegations contained in Paragraph 121.

122.    BOEING CEO, Dennis Muilenburg, admitted that minimizing training was an objective in the design of the 737 MAX 8 to bring it to market faster:

> "Part of what we wanted to accomplish was seamless training and introduction for our customers, so we purposely designed the airplane to behave in the same way. So even though it's a different airplane design, the control laws that fly the airplane are designed to make the airplane behave the same way in the hands of the pilot."

**ANSWER:**

Boeing admits that the language block-quoted in Paragraph 122 has been attributed to Mr. Muilenburg in media articles. Boeing denies the remaining allegations contained in Paragraph 122.

123.    Due to BOEING misrepresentations regarding the 737 MAX 8 commonalities with the 737NG, pilots reported just 56 minutes of training on an iPad about differences between the new 737 MAX 8 and older 737 airplanes. The MCAS system was not discussed during training.

**ANSWER:**

Boeing admits that the MCAS control law was not separately discussed in the NG-to-MAX differences training. Boeing lacks knowledge or information sufficient to form a belief as to the amount or type of NG-to-MAX differences training that pilots at every airline received and Boeing therefore denies those allegations. Boeing denies the remaining allegations contained in Paragraph 123.

124.    Simulators were unavailable for the 737 MAX 8 when it entered operational service. Pilots with United Airlines cobbled together a 13-page guide to the 737 MAX 8, but even this guide failed to mention the MCAS, leaving pilots unprepared to deal with a sudden and unexpected dive initiated by undisclosed automated systems in the airplane.

**ANSWER:**

Boeing denies that it made misrepresentations to its customers or their pilots regarding the 737 MAX 8. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 124 regarding the guide created by United Airlines pilots and therefore denies them. Boeing denies the remaining allegations contained in Paragraph 124.

125.    An American Airlines pilot explained, "When you find out that there are systems on it that are wildly different that affect the performance of the aircraft, having a simulator is part of a safety culture… It can be the difference between a safe, recoverable flight and one that makes the newspapers."

**ANSWER:**

Boeing admits, upon information and belief, that Dennis Tajer is a pilot employed by American Airlines, Inc. who has attended meetings of the Allied Pilots Association. Boeing also admits that the language quoted in Paragraph 125 has been attributed to Mr. Tajer in media articles.

126.     Pilots of the 737 MAX 8 were unaware of the MCAS because BOEING expressly requested permission from the FAA to make no reference to the MCAS in the aircraft flight manual.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 140.

127.     BOEING's chief technical pilot wrote the FAA, stating:

> "Are you OK with us removing all reference to MCAS from the FCOM (Flight Crew Operating Manual) and the training as we discussed, as it's completely transparent to the flight crew and only operates WAY outside of the normal operating envelope."

**ANSWER:**

Boeing admits that Mr. Forkner served as the Chief Flight Technical Pilot for the 737 MAX Program from approximately March 2014 through July 2018. Boeing also admits that on March 30, 2016, Mr. Forkner sent an email to an individual in the FAA AEG's office containing the language block-quoted in Paragraph 127. Boeing denies the remaining allegations contained in Paragraph 127.

128.     The October 2019 JATR on the 737 MAX 8 Flight Control System concluded that the removal of a description of the MCAS functionality from the FCOM deprived the FAA Flight Standardization Board (FSB) of the opportunity to adequately assess training needs for 737 MAX 8 pilots.

**ANSWER:**

Boeing admits that the JATR submitted its observations, findings, and recommendations to the Associate Administrator for Aviation Safety at the FAA on October 11, 2019. The contents of that report speak for themselves. Boeing denies the allegations contained in Paragraph 128.

### **LION AIR FLIGHT JT 610 CRASHES AFTER PILOTS EXPERIENCE A FLIGHT CONTROL ANOMALIES**

**ANSWER:**

Boeing admits that the KNKT Final Report says that Lion Air Flight 610's first officer reported what he characterized as a "flight control problem" to the Terminal East Tower controller after the aircraft had become airborne. Boeing further admits that Lion Air Flight 610 crashed.

129.    On October 29, 2018, Lion Air Flight JT 610 ("Flight 610") departed Jakarta, Indonesia. Shortly after takeoff, the pilots complained of flight control anomalies as the plane repeatedly pitched nose down despite the pilots' desperate efforts to pitch the nose back up. The pilots reported unreliable airspeed and altitude readings. In the audio recording from the cockpit, the rattle of a stick shaker is heard, a device used to alert pilots of a potential aerodynamic stall, which can occur when a plane encounters a high nose up pitch angle.

**ANSWER:**

Boeing admits that the KNKT Final Report says that Lion Air Flight 610 took off at around

23:20 UTC on October 28, 2018 from Jakarta's Soekarno-Hatta International Airport. Boeing also

admits that the KNKT Final Report says that Lion Air Flight 610's first officer reported what he

characterized as a "flight control problem" to the Terminal East Tower controller after the aircraft

had become airborne. Boeing further admits that the KNKT Final Report says that the captain's

stick shaker activated. Boeing lacks knowledge or information sufficient to form a belief as to form

a belief as to the truth of the allegations contained in Paragraph 129 and therefore denies them.

130.    Data showed the plane rising and falling repeatedly – more than 20 times – as the pilots struggled to wrest control back from the automated systems. Within 12 minutes after taking off, Flight 610 crashed into the Java Sea, killing all 189 people onboard.

**ANSWER:**

Boeing admits that the KNKT Final Report says that the Arrival Tower controller advised

the flight crew of Lion Air Flight 610 to prepare for landing at Soekarno-Hatta International

Airport around 23:30 UTC on October 28, 2018. Boeing also admits that the Lion Air Flight 610

aircraft did not return to Soekarno-Hatta International Airport, and that the aircraft crashed into

the Java Sea off the coast of Jakarta, Indonesia. Boeing also admits that the crash of Lion Air Flight

610 resulted in the deaths of all 189 persons on board the aircraft. Boeing further admits that the

KNKT Final Report says that the aircraft experienced uncommanded nose down trim

countermanded by pilot-input nose up trim several times after the flight crew raised the flaps.

Boeing denies the remaining allegations contained in Paragraph 130.

131.    The cockpit voice recording recovered from the wreckage revealed that one of the pilots flipped through a technical manual in a vain attempt to identify the problem. The other pilot prayed. The pilots were unaware of the MCAS and its potential role in overriding their manual controls. As a result of BOEING, there was nothing in the FCOM that would have explained to the pilots why the airplane was fighting their efforts to prevent a crash.

**ANSWER:**

Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first two sentences in Paragraph 131 and therefore denies them. Boeing denies the allegations contained in the last sentence in Paragraph 131.

132.    Data from the plane's flight data recorder (FDR) shows that one of the AOA sensors produced a reading at least 20 degrees different than from the other AOA sensor. A malfunction in the AOA sensor caused it to feed erroneous pitch data that triggered an unwarranted activation of the MCAS at low altitude, causing the nose to pitch down and the airplane to crash into the Java Sea.

**ANSWER:**

Boeing admits that the KNKT Final Report says that the AOA vanes on the Lion Air Flight 610 aircraft indicated angle of attack values that differed from one another by about 21 degrees beginning around 23:20 UTC on October 28, 2018 and continuing until the aircraft crashed. Boeing admits that the KNKT Final Report says that the MCAS control law activated on Flight 610 in response to erroneous AOA input. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 132 and therefore denies them.

## DEFENDANTS FAILED TO TAKE NECESSARY ACTION IN THE WAKE OF THE LION AIR CRASH

**ANSWER:**

Boeing denies the allegations in the heading to this section of the Plaintiff's complaint.

133.    Following the crash of Flight 610, BOEING knew or had reason to know that malfunctions in the AOA sensor and MCAS proximately caused the crash. On November 6, 2018, BOEING issued a Flight Crew Operations Manual ("FCOM") Bulletin referencing "an AOA failure condition" and uncommanded "nose down stabilizer trim movement."

**ANSWER:**

Boeing admits the allegations in the second sentence in Paragraph 133. Boeing also admits that following the crash of Lion Air Flight 610, Boeing considered the possibility that erroneous AOA data had resulted in MCAS triggering multiple times during the accident flight. Boeing denies the remaining allegations contained in Paragraph 133.

134.    The FAA issued an Emergency Airworthiness Directive ("AD") on November 7, 2018, identifying the potential danger presented by the flight control system, but not providing clear instruction on what pilots should do in the event of an AOA failure:

> "This AD was prompted by analysis performed by the manufacturer showing that if an erroneously high single angle of attack (AOA) sensor input is received by the flight control system, there is a potential for repeated nose-down trim commands of the horizontal stabilizer. We are issuing this AD to address this potential resulting nose-down trim, which could cause the flight crew to have difficulty controlling the airplane, and lead to excessive nose-down attitude, significant altitude loss, and possible impact with terrain."

**ANSWER:**

Boeing admits that, on November 7, 2018, the FAA issued Emergency Airworthiness Directive No. 2018-23-51, which contained the language quoted in Paragraph 134. Boeing denies the remaining allegations contained in Paragraph 134.

135.    Neither the BOEING FCOM Bulletin nor the FAA Airworthiness Directive referenced the MCAS or the role it played in the Lion Air crash.

**ANSWER:**

Boeing admits that neither the November 6, 2018 OMB nor the November 7, 2018 Airworthiness Directive made specific reference to the MCAS control law. Boeing denies the remaining allegations contained in Paragraph 135.

136.    The flight path of Flight 610 indicates that the malfunctioning AOA sensor and nose-down pitch commands were factors in the crash:



-44-

**ANSWER:**

Boeing denies the allegations contained in Paragraph 136. In further response, Boeing states that the graphic depicted below Paragraph 136 does not consist of properly pled factual allegations and therefore requires no response from Boeing. To the extent a response is required, Boeing denies the accuracy of the text and images contained in this conclusory graphic as depicted.

137.    After the FAA issued the Airworthiness Directive, BOEING began investigating use of a software patch to address the problem but did not insist on further training pilots to cope with a defective AOA sensor or defective MCAS software. BOEING downplayed the significance of the threat presented by the MCAS and did not call for any aggressive action to prevent further accidents.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 137.

138.    On November 13, 2018, CEO Dennis Muilenburg stated:

> "There are new systems on the airplanes that are designed to take advantage of the capabilities of the airplane and provide control capability and high angle-of-attack conditions and those systems operate properly. And again, in certain failure modes if there's an inaccurate angle-of-attack sensor feeding information to the airplane, there's a procedure to handle that. And so, again, as part of the investigation process, we're going to make sure we fully understand that. We're going to make sure that we're providing all the information necessary and appropriate training and go back to the core value here … that the airplane is safe, we know how to fly it safely, and we're very confident."

**ANSWER:**

Boeing admits that Mr. Muilenburg was interviewed by Fox Business Network anchor Maria Bartiromo on November 13, 2018. Boeing admits that Mr. Muilenburg made the statements contained in the block-quoted language in Paragraph 138, without alterations. Boeing denies the remaining allegations contained in Paragraph 138.

139.    Despite the representations from the CEO, the MCAS did not "operate properly." BOEING insisted that no additional training was necessary.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 139.

140.    The probability of an AOA sensor failing was foreseeable. The FAA received more than 200 incident reports since 2004 of AOA sensors failing, many in BOEING airplanes. These failures included AOA sensors being frozen, improperly installed, struck by lightning or hit by birds.

**ANSWER:**

The allegations contained in Paragraph 140 include legal conclusions that require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 140 regarding reports received by the FAA, and therefore denies them. Boeing denies the remaining allegations contained in Paragraph 140.

141.    BOEING maintained that failure of the MCAS could be resolved in the same way as a standard "stabilizer runaway," a malfunction which occurs when the Trimmable Horizontal Stabilizer (THS) on the airplane horizontal tail surface fails to stop at the selected position and continues to deflect up or down.

**ANSWER:**

Boeing admits that uncommanded MCAS activation can be arrested through use of the stabilizer runaway memory procedure. Boeing denies the remaining allegations contained in Paragraph 141.

142.    BOEING's mischaracterization of MCAS failure as a "stabilizer runaway" is misleading because MCAS failure does not behave like a stabilizer trim runaway. First, with a stabilizer runaway, there is continuous uncommanded movement of the horizontal stabilizer. In contrast, the movement of the horizontal stabilizer is not continuous in a MCAS emergency, where pilots counter the nose pitch down movement with the electric stab trim switch, only to have the MCAS move the tail once again. The MCAS alters the control column response to the stabilizer movement. Pulling back on the column normally interrupts any stabilizer nose-down movement, but with MCAS engaged, the control column function is disabled.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 142.

143.    Seeking to deflect blame onto pilots, BOEING wrongfully and falsely attempts to minimize its responsibility for these crashes. It is foreseeable that pilots would be confused by a MCAS seizing control over the 737 MAX 8 as the system's nose-down pitch commands were different from a common stabilizer problem. Pilots were not told the MCAS existed, or how it functioned. The confusion caused by BOEING's defective and unsafe design, and its failure to inform pilots, was the difference between life and death.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 143.

144.    Both before and after the Lion Air crash, several pilots anonymously submitted complaints on the Aviation Safety Reporting System ("ASRS"), which described similar flight control anomalies and unanticipated dives in 737 MAX 8 airplanes. One report submitted by a pilot in November 2018 – after the Lion Air crash and before the Ethiopian Airlines crash – describes the pilot's reaction to learning of the MCAS system:

> "I think it is unconscionable that a manufacturer, the FAA, and the airlines would have pilots flying an airplane without adequately training, or even providing available resources and sufficient documentation to understand the highly complex systems that differentiate this aircraft from prior models. The fact that this airplane requires such jury rigging to fly is a red flag. Now we know the systems employed are error prone–even if the pilots aren't sure what those systems are, what redundancies are in place, and failure modes.
>
> I am left to wonder: what else don't I know? The Flight Manual is inadequate and almost criminally insufficient. All airlines that operate the MAX must insist that Boeing incorporate ALL systems in their manuals."

**ANSWER:**

Boeing admits that the Aviation Safety Reporting System allows pilots to report flight conditions anonymously. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 144, including the block quote contained therein, and therefore denies them.

145.    Shortly after Flight 610 crashed, and after learning of numerous complaints regarding similar close calls, BOEING knew that hundreds of 737 MAX 8 airplanes were still in use carrying passengers throughout the world, presenting a substantial risk that a similar accident would occur absent immediate intervention.

**ANSWER:**

Boeing admits that 737 MAX 8 airplanes were being flown as commercial passenger flights worldwide after the crash of Lion Air Flight 610. Boeing denies the remaining allegations contained in Paragraph 145.

146.    On November 15, 2018, BOEING delivered to Ethiopian Airlines the newly manufactured airplane later used as Flight 302, fully aware that it would be used for commercial operations carrying hundreds of passengers.

-47-

**ANSWER:**

Boeing admits that it delivered the Subject Aircraft to its customer on November 15, 2018.

Boeing also admits that the Subject Aircraft's intended use was for commercial passenger flights.

Boeing denies the remaining allegations contained in Paragraph 146.

147.    BOEING delivered the airplane operated as Ethiopian Airlines Flight 302 after Lion Air Flight JT 610 crashed. BOEING had actual, specific knowledge of problems with the MCAS and it knew of the multiple defects in the 737 MAX 8 before the airplane was delivered to Ethiopian Airlines. BOEING should have grounded the 737 MAX 8 fleet of airplanes.

**ANSWER:**

Boeing admits that the Subject Aircraft was delivered after the crash of Lion Air Flight

610. Boeing denies the remaining allegations contained in Paragraph 147.

148.    Following the Lion Air crash, defendants ROSEMOUNT and COLLINS knew or reasonably should have known that the AOA sensors and MCAS software were defective and had malfunctioned, proximately contributing to the cause of the crash of Flight 610. Despite this knowledge and knowing of more than 200 AOA sensor failures since 2004 and the ASRS complaints of improper MCAS activation, neither ROSEMOUNT nor COLLINS alerted the public to the inherent dangers in the 737 MAX 8.

**ANSWER:**

The allegations contained in Paragraph 148 are directed at another entity and require no

response from Boeing. To the extent a response is required, Boeing lacks knowledge or

information sufficient to form a belief as to the truth of the allegations contained in Paragraph 148

and therefore denies them.

149.    During a November 27, 2018 meeting between BOEING senior management and pilots' union representatives in Texas, BOEING disclosed that it was planning to make software changes to the 737 MAX 8. At that meeting the BOEING vice president of product strategy and development described the updates as "flight-critical software." BOEING considered the MCAS software update so urgent that it did not want to follow the normal six-month certification process nor wait for the 90-day public comment period. Instead, BOEING wanted the update completed in six weeks. More than sixteen weeks later, at the time of the crash of Flight 302, BOEING still had not implemented a software update.

**ANSWER:**

Boeing admits that Michael Sinnett ("Mr. Sinnett") is the current Vice President and

General Manager of the NMA Program, Product Strategy and Future Airplane Development for

Boeing Commercial Airplanes. Boeing also admits that Mr. Sinnett attended a November 27, 2018 meeting with members of the Allied Pilots Association that occurred in Texas. Boeing further admits that Mr. Sinnett discussed MCAS software enhancements. Boeing also admits that the MCAS software enhancements were not released before the crash of Flight 302. Boeing denies the remaining allegations contained in Paragraph 149.

150. BOEING intentionally and recklessly continued to minimize problems with the 737 MAX 8 aerodynamics and the role of the MCAS. BOEING described the MCAS as a "control law" that helps the 737 MAX 8 behave the same way as the 737NG when "flying a stall." BOEING senior management stated that, "If we had not put the MCAS in, as you get up to the higher angles of attack, you would almost feel like you're pushing because the amount of displacement it took to move the nose at the same rate would be much less. And so the nose would start – you'd get a perception of the nose pitching up on you." He later adds, "So if you were going to shoot for, you know, a two-G pullout and we didn't have MCAS in there and angle of attack got high, there's a really good chance the airplane could dig in and go three, three-and-a-half, four G's. Well, the MCAS puts that load in there to prevent you from doing that. So, actually, MCAS is going to help you maneuver."

**ANSWER:**

Boeing admits that it provided attendees of the November 2018 Allied Pilots Association meeting with a description of the MCAS control law. Boeing denies the remaining allegations contained in Paragraph 150.

151. On September 19, 2019, the NTSB released a report titled: "Assumptions Used in the Safety Assessment Process and the Effects of Multiple Alerts and Indications on Pilot Performance." In its report, the NTSB stated that "the addition of the LEAP-1B engine and associated nacelle changes produced an ANU [Aircraft Nose Up] pitching moment when the airplane was operating at high AOA and mid Mach numbers… the MCAS function was [later] expanded to low Mach numbers." The ANU pitching moment was substantial, based on the extensive stabilizer authority BOEING gave to MCAS. BOEING senior management downplayed it as a mere "perception." BOEING misrepresented the handling qualities and characteristics of the 737 MAX 8 without MCAS activated, emphasizing light control column forces at high AOA. The NTSB report shows that the ANU pitching moment could occur without any control column command.

**ANSWER:**

Boeing admits the allegations contained in the first sentence in Paragraph 162. Boeing admits that the quoted language without alteration or ellipsis contained in the second sentence of Paragraph 151 appears in ASR 19-01. Boeing denies the remaining allegations contained in Paragraph 151.

152.     After the crash of Lion Air, BOEING began to make design changes to the 737 MAX 8 automated flight control system, which it planned to implement through an MCAS software update. Following the crash of Flight 302, BOEING confirmed that it had for several months, "been developing a flight control software enhancement for the 737 MAX, designed to make an already safe aircraft even safer."

**ANSWER:**

Boeing admits that it began developing a software enhancement to update the activation logic for the MCAS control law on the 737 MAX models. Boeing also admits the allegations contained in the second sentence of Paragraph 152. Boeing denies the remaining allegations contained in Paragraph 152.

153.     According to BOEING, the MCAS software update was developed "to provide additional layers of protection if the AOA sensors provide erroneous data."

**ANSWER:**

Boeing admits the allegations contained in Paragraph 153.

154.     The MCAS software update that BOEING was working on, even as BOEING maintained that the 737 MAX 8 was safe, advertised to include, among others:

a.     MCAS AOA Sensor Enhancements – The flight control system will now compare inputs from both AOA sensors. If the sensors disagree by 5.5 degrees or more with the flaps up, MCAS will not activate and an indicator on the flight deck display (the "disagree alert") will alert the pilots to the discrepancy;

b.     MCAS Activation Enhancements – If MCAS is activated in abnormal conditions it will only provide one input for each elevated AOA event meaning that it will not repeatedly activate and fight the pilots for control of the airplane; and

c.     MCAS Command Limit – MCAS can never command more stabilizer input than can be counteracted by the flight crew pulling back on the control column. The pilots will always have the ability to override MCAS and manually control the airplane.

**ANSWER:**

Boeing admits the allegations contained in Paragraph 154, including its discrete subparts.

155.     In addition to the MCAS software update, BOEING determined that pilots already rated to fly prior Boeing 737 models should be required to undergo additional computer-based training and manual review before being allowed to fly the 737 MAX 8.

**ANSWER:**

Boeing admits that it has developed pilot training materials related to the MCAS software enhancements intended for implementation on the 737 MAX 8. Boeing denies the remaining allegations contained in Paragraph 155.

156.    The additional training requirements are intended to provide pilots with an "enhanced" understanding of the 737 MAX 8 Speed Trim System, including the MCAS, associated existing crew procedures, and related software changes.

**ANSWER:**

Boeing admits that additional pilot training developed concurrently with the MCAS software enhancements developed after the crash of Lion Air Flight 610 provided 737 MAX 8 pilots with, *inter alia*, an enhanced understanding of the model's speed trim system, including the MCAS control law, as well as crew procedures, and information about the software enhancements developed. Boeing denies the remaining allegations contained in Paragraph 156.

157.    While BOEING describes the new training and review program as "enhanced" it fails to acknowledge that the previous self-guided computer training program provided to pilots of 737 MAX 8 aircraft did not include sufficient or effective information and training on the MCAS. Rather than grounding the 737 MAX 8 until safe, BOEING prioritized profits over passenger safety, keeping its 737 MAX 8 airplanes in service after the Lion Air crash and then after the subject crash. BOEING intentionally misled its customers, including Plaintiff's decedent, the FAA, passengers and the public that the airplane was safe to fly.

**ANSWER:**

Boeing admits that it has used the word "enhanced" to describe the updates to the 737 MAX 8's flight control computer software, which include updates to the MCAS activation logic. Boeing denies the remaining allegations contained in Paragraph 157.

158.    Despite its specific knowledge of dangerous defects with the MCAS and the aerodynamic defects inherent to the 737 MAX 8, as well as the danger presented to passengers, crew, and the public from imperiled airplanes flying overhead, BOEING consciously and intentionally failed to act, and acted without the urgency commensurate with the risk of harm presented by its defective and dangerous airplane.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 158.

159.    BOEING kept its eye focused on the record amounts of revenue the 737 MAX 8 was generating and the backlog of orders it had yet to fill. Just a few months after sharing condolences for the victims of Lion Air Flight 610, the BOEING twitter account posted:



**ANSWER:**

Boeing admits that subsequent to the crash of Lion Air Flight 610, Boeing's Twitter account published comments regarding Boeing's revenue. Boeing denies the remaining allegations contained in Paragraph 159.

160.    BOEING realized its record-breaking revenue by prioritizing profitability and share price to the detriment of safety throughout the development, certification, and production of the 737 MAX 8:

   a.    From the first quarter of 2013 through the first quarter of 2019, BOEING paid $17.4 billion in dividends and spent an additional $43.1 billion on share buybacks, equal to a further 104 percent of profits.

   b.    The company's revenue in 2018 was $101.1 billion. According to BOEING 10-Q for the quarter ending March 31, 2019, BOEING possessed $209 billion in assets and only $83.615 billion in liabilities. BOEING market capitalization hit a high of nearly $249 billion in 2019.

   c.    BOEING made $10.460 billion in profit in 2018, but on December 17, 2018, less than two months after the Lion Air crash, the board authorized another $20 billion for stock buyback program to boost the company's stock price and its executives' compensation through stock options. As a result, BOEING stock price jumped by 31% between December 17 and March 8, 2019, two days before the Ethiopian Airlines crash.

   d.    From 2015 through 2018, BOEING chairman and chief executive officer, Dennis Muilenburg, was paid $95.9 million, including salary and stock; in 2018, the year of the Lion Air crash, Muilenburg received $23,400,000 in compensation, including a $13,000,000 bonus.

**ANSWER:**

Boeing admits that it submitted a Quarterly Report on Form 10-Q on April 24, 2019 for the period ending March 31, 2019 that reflects it possessed total assets, as defined by the Form 10-Q and notes contained therein, of $120.209 Billion, and total liabilities, as defined by the Form 10-Q and notes contained therein, of $83.615 Billion. Boeing denies the remaining allegations contained in Paragraph 160, including its discrete subparts.

161. Upon information and belief, BOEING chose not to respond to the Flight 610 crash with the appropriate degree of urgency and with appropriate safety steps, because doing so would have resulted in financial losses to BOEING if airlines grounded their 737 MAX 8 airplanes or had to retrain their pilots. Instead, BOEING downplayed the danger presented by its defective and dangerous airplane and created a false sense of security, ensuring that the 737 MAX 8 would still fly, risking the lives of pilots, crews and passengers.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 161.

**BOEING REFUSED TO ACT DESPITE THE SERIOUS SAFETY RISK IT KNEW EXISTED AFTER THE LION AIR FLIGHT 610 CRASH**

**ANSWER:**

Boeing denies the allegations in the heading to this section of the Plaintiff's complaint.

162. BOEING intentionally downplayed the clear and present danger to the FAA and public. The FAA delegated its oversight responsibilities to BOEING.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 162.

163. Two days after the crash of Flight 610, the FAA completed an internal analysis of the safety of the 737 MAX 8, titled Transport Airplane Risk Assessment Methodology (TARAM).

**ANSWER:**

Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 163.

164. The analysis showed that underlying risks from the MCAS design were unacceptably high and that the likelihood of another emergency or even accident was over the tolerable threshold. The FAA issued an Emergency Airworthiness Directive that reminded pilots of an existing emergency procedure. BOEING remained silent.

**ANSWER:**

Boeing admits that the FAA issued an Emergency Airworthiness Directive on November 7, 2018. Boeing denies the remaining allegations contained in Paragraph 164.

165.    The FAA permitted BOEING 10 months to implement a software update while the airplanes continued to fly.

**ANSWER:**

Boeing admits that the FAA did not impose operational restrictions on 737 MAX 8 aircraft after the crash of Lion Air Flight 610. Boeing denies the remaining allegations contained in Paragraph 165.

## ETHIOPIAN AIRLINES FLIGHT 302 CRASHES KILLING ALL 157 PEOPLE ON BOARD

**ANSWER:**

Boeing admits the allegations in the heading to this section of the Plaintiff's complaint.

166.    At 05:38 UTC, Ethiopian Airlines Flight 302 took off from Addis Ababa Bole International Airport bound to Nairobi, Kenya Jomo Kenyatta International Airport. Six minutes later, at 5:44 UTC, the airplane crashed 28 nautical miles southeast of Addis Ababa, near Ejere village. There were 157 passengers and crew on board. All aboard the airplane were killed.



**ANSWER:**

Boeing admits that the allegations contained in Paragraph 166 regarding coordinated universal time and miles correspond to what was reported in the AIB's preliminary report. Boeing admits that the Subject Aircraft crashed into the countryside near Ejere, Ethiopia, resulting in the deaths of all 157 persons aboard. Boeing lacks knowledge or information sufficient to form a belief as to the remaining allegations contained in Paragraph 166 and therefore denies them. In further response, Boeing states that the graphic depicted below Paragraph 166 does not consist of properly

pled factual allegations and therefore requires no response from Boeing. To the extent a response is required, Boeing denies the accuracy of the text and images contained in this conclusory graphic as depicted.

167.    One minute into the flight the pilot-in-command, Captain Yared Getachew, reported that the flight crew was experiencing flight-control problems. The MCAS then pitched the nose of the airplane down for nine seconds. The airplane descended slightly. An automated audible warning — "Don't Sink" — issued by the airplane's ground-proximity warning system ("GPWS") sounded in the cockpit. The pilots fought their control columns to pitch the nose of the airplane up and were briefly able to command the airplane to resume climbing. The MCAS system then activated again, and pitched the nose down, triggering more audible warnings of "Don't Sink" from the GPWS. The pilots then disconnected the electric trim motor to try and regain control. The flight crew radioed air traffic control and advised of the need to return to the airport, as they continued struggling to regain altitude. When control was returned to the pilots, the MCAS re-engaged, again pitching the nose down, ultimately placing the airplane into a dive. Thirty seconds later the cockpit voice recording ended as the plane crashed and all on board were killed. The impact created a 30-meter-deep crater.

**ANSWER:**

Boeing admits that the AIB preliminary report says that the MCAS control law activated on Flight 302. Boeing also admits that the AIB preliminary report says that the flight crew of Flight 302 requested clearance to return to Addis Ababa Bole International Airport. Boeing admits that the Subject Aircraft crashed into the countryside near Ejere, Ethiopia, resulting in the deaths of all 157 persons aboard. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 167 and therefore denies them.

168.    According to a report issued by the Ethiopian Aircraft Accident Investigation Bureau, the following occurred, minute by minute.

**ANSWER:**

Boeing admits that the AIB released a preliminary report on April 4, 2019 regarding the crash of Flight 302. The remaining allegations in Paragraph 191 do not require a response from Boeing. To the extent a response is required, Boeing denies the remaining allegations contained in Paragraph 168.

169.    At 05:38:44, shortly after liftoff, the left and right recorded AOA values deviated. The left AOA decreased to 11.1 degrees then increased to 35.7 degrees while the value of the right AOA indicated 14.94 degrees. The left AOA value then reached 74.5 degrees in ¾ of a second, while the right AOA reached a maximum value of 15.3 degrees. At this time, the left control

column stick shaker activated and remained active until near the end of the recording. The airspeed, altitude and flight director pitch bar values from the left-side instrument panel deviated from the corresponding right-side instrument panel values.

**ANSWER:**

Boeing admits that the AIB released a preliminary report on April 4, 2019 regarding the crash of Flight 302. Boeing admits that the AIB preliminary report contains the language provided in the first four sentences of Paragraph 169, with slight alterations. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 169 and therefore denies them.

170.    At 05:38:43 and at about 50 feet radio altimeter recorded altitude, the flight director roll mode changed to LNAV. At 05:38:46 and about 200 feet radio altimeter recorded altitude, the Master Caution parameter changed state. The First Officer called out Master Caution Anti-Ice On. Four seconds later, the recorded Left AOA Heat parameter changed state.

**ANSWER:**

Boeing admits that the AIB released a preliminary report on April 4, 2019 regarding the crash of Flight 302. Boeing admits that the AIB preliminary report contains the language provided in Paragraph 170. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 170 and therefore denies them.

171.    At 05:38:58 and about 400 feet radio altimeter recorded altitude, the flight director pitch mode changed to VNAV SPEED and the Captain called out "Command" (standard call out for autopilot engagement) and an autopilot warning is recorded. At 05:39:00, the Captain called out "Command." At 05:39:01 and about 630 feet of altitude, a second autopilot warning is recorded.

**ANSWER:**

Boeing admits that the AIB released a preliminary report on April 4, 2019 regarding the crash of Flight 302. Boeing admits that the AIB preliminary report contains the language provided in Paragraph 171. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 171 and therefore denies them

172.    At 05:39:06 the Captain instructed the First-Officer to contact the air traffic controller and the First Officer complied and reported the SHALA 2A departure, crossing 8400 ft and climbing FL320. Between liftoff and 1000 ft above ground level (AGL), the pitch trim position moved between 4.9 and 5.9 units in response to manual electric trim inputs. At 1000 ft AGL, the pitch trim position was at 5.6 units. At 05:39:22 and about 1,000 feet the left autopilot was engaged

and it disengaged 33 seconds later, the flaps were retracted, and the pitch trim position decreased to 4.6 units. Six seconds after the autopilot engaged, there were small amplitude roll oscillations accompanied by lateral acceleration, rudder oscillations and slight heading changes. These oscillations continued after the autopilot was disengaged. At 05:39:29 a radar controller identified ET-302 and instructed a climb to FL340 and right turn when able, direct to RUDOL. The First-Officer acknowledged the instruction.

**ANSWER:**

Boeing admits that the AIB released a preliminary report on April 4, 2019 regarding the crash of Flight 302. Boeing admits that the AIB preliminary report contains the language provided in Paragraph 172. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 172 and therefore denies them

173.    At 05:39:42 the aircraft Level Change mode was engaged. The pre-selected altitude was set to 32000 feet. Shortly after the mode change, the selected airspeed was set to 238 kt.

**ANSWER:**

Boeing admits that the AIB released a preliminary report on April 4, 2019 regarding the crash of Flight 302. Boeing admits that the AIB preliminary report contains the language provided in Paragraph 173. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 173 and therefore denies them

174.    At 05:39:45 the Captain requested flaps up and the First-Officer acknowledged. One second later, the flap handle moved from 5 to 0 degrees and flaps retraction began. At 05:39:50, the selected heading started to change from 072 degrees to 197 degrees, and at the same time the Captain asked the First-Officer to request permission from radar control to maintain runway heading.

**ANSWER:**

Boeing admits that the AIB released a preliminary report on April 4, 2019 regarding the crash of Flight 302. Boeing admits that the AIB preliminary report contains the language provided in Paragraph 174. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 174 and therefore denies them.

175.    At 05:39:55 the autopilot disengaged. At 05:39:57 the Captain advised the First-Officer to request permission from radar control to maintain runway heading and advise the radar controller that they were having flight control problems. At 05:40:00, shortly after the autopilot disengaged, the FDR recorded an automatic aircraft nose down (AND) that activated for 9.0 seconds and pitch trim moved from 4.60 to 2.1 units. The climb was arrested. The airplane descended slightly.

**ANSWER:**

Boeing admits that the AIB released a preliminary report on April 4, 2019 regarding the crash of Flight 302. Boeing admits that the AIB preliminary report contains the language provided in Paragraph 175. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 175 and therefore denies them.

176. At 05:40:03 GPWS "DON'T SINK" alerts occurred. At 05:40:05 the First-Officer reported to the air traffic controller (ATC) that they were unable to maintain SHALA 1A and requested runway heading, which was approved by ATC.

**ANSWER:**

Boeing admits that the AIB released a preliminary report on April 4, 2019 regarding the crash of Flight 302. Boeing admits that the AIB preliminary report contains the language provided in Paragraph 176. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 176 and therefore denies them.

177. At 05:40:06 left and right flap position reached a recorded value of 0.019 degrees which remained until the end of the recording. The control column moved aft, and a positive climb was re-established. At 05:40:12, approximately three seconds after AND stabilizer motion ends, electric trim (from pilot activated thumb switches located on the control column yokes) in the Aircraft nose up (ANU) direction is recorded on the FDR. The horizontal stabilizer moved in the ANU direction to 2.4 units. The Aircraft pitch attitude remained about the same as back pressure on the control column increased.

**ANSWER:**

Boeing admits that the AIB released a preliminary report on April 4, 2019 regarding the crash of Flight 302. Boeing admits that the AIB preliminary report contains the language provided in Paragraph 177. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 177 and therefore denies them.

178. At 05:40:20, approximately five seconds after the end of the ANU stabilizer motion, a second instance of automatic AND stabilizer trim occurred, and the stabilizer moved down and reached 0.4 units.

**ANSWER:**

Boeing admits that the AIB released a preliminary report on April 4, 2019 regarding the crash of Flight 302. Boeing admits that the AIB preliminary report contains the language provided

in Paragraph 178. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 178 and therefore denies them.

179.    From 05:40:23 to 05:40:31, three GPWS "DON'T SINK" alerts occurred.

**ANSWER:**

Boeing admits that the AIB released a preliminary report on April 4, 2019 regarding the crash of Flight 302. Boeing admits that the AIB preliminary report contains the language provided in Paragraph 179. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 179 and therefore denies them.

180.    At 05:40:27, the Captain advised the First-Officer to trim up with him. At 05:40:28 Manual electric trim in the ANU direction was recorded and the stabilizer reversed, moving in the ANU and trim reached 2.3 units.

**ANSWER:**

Boeing admits that the AIB released a preliminary report on April 4, 2019 regarding the crash of Flight 302. Boeing admits that the AIB preliminary report contains the language provided in Paragraph 180. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 180 and therefore denies them.

181.    At 05:40:35, the First-Officer called out "stab trim cut-out" two times. The Captain agreed and the First Officer confirmed stab trim cut-out. At 05:40:41, approximately five seconds after the end of the ANU stabilizer motion, a third instance of ANU automatic trim command occurred without any corresponding motion of the stabilizer, which is consistent with the stabilizer trim cutout switches in the ''cutout'' position.

**ANSWER:**

Boeing admits that the AIB released a preliminary report on April 4, 2019 regarding the crash of Flight 302. Boeing admits that the AIB preliminary report contains the language provided in Paragraph 181. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 182 and therefore denies them.

182.    At 05:40:44, the Captain called out three times "Pull-up" and the First-Officer acknowledged. At 05:40:50, the Captain instructed the First Officer to advise ATC that they would like to maintain 14,000 ft and they had a flight control problem. At 05:40:56, the First-Officer requested permission from ATC to maintain 14,000 ft and reported that they were having a flight control problem. ATC approved the request.

**ANSWER:**

Boeing admits that the AIB released a preliminary report on April 4, 2019 regarding the crash of Flight 302. Boeing admits that the AIB preliminary report contains the language provided in Paragraph 182. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 182 and therefore denies them.

183.    From 05:40:42 to 05:43:11 (about two and a half minutes), the stabilizer position gradually moved in the AND direction from 2.3 units to 2.1 units. During this time, aft force was applied to the control columns, which remained aft of neutral position. The left indicated airspeed increased from approximately 305 kts to approximately 340 kts (VMO). The right indicated airspeed was approximately 20-25 kts higher than the left. FDR data indicates that aft force was simultaneously applied to both control columns several times throughout the remainder of the recording. At 05:41:20, the right overspeed audio clacker is recorded on the Cockpit Voice Recorder. It remained active until the end of the recording. At 05:41:21, the pre-selected altitude was changed from 32000 ft to 14000 ft. At 05:41:30, the Captain requested the First-Officer to pitch up with him and the First-Officer acknowledged.

**ANSWER:**

Boeing admits that the AIB released a preliminary report on April 4, 2019 regarding the crash of Flight 302. Boeing admits that the AIB preliminary report contains the language provided in Paragraph 183. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 183 and therefore denies them

184.    At 05:41:32, the left overspeed warning activated and was active intermittently until the end of the recording. At 05:41:46, the Captain asked the First-Officer if the trim was functional? The First-Officer replied that the trim was not working and asked if he could try it manually? The Captain told him to try.

**ANSWER:**

Boeing admits that the AIB released a preliminary report on April 4, 2019 regarding the crash of Flight 302. Boeing admits that the AIB preliminary report contains the language provided in Paragraph 184, with slight alterations. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 184 and therefore denies them

185.    At 05:41:54, the First-Officer replied that it was not working. At 05:42:10, the Captain asked and the First-Officer requested from ATC a vector to return to the airport. ATC approved the request.

**ANSWER:**

Boeing admits that the AIB released a preliminary report on April 4, 2019 regarding the crash of Flight 302. Boeing admits that the AIB preliminary report contains the language provided in Paragraph 185. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 185 and therefore denies them.

186.    At 05:42:30, ATC instructed ET-302 to turn right heading 260 degrees and the First-Officer acknowledged. At 05:42:43, the selected heading was changed to 262 degrees. At 05:42:51, the First-Officer mentioned Master Caution Anti-Ice. The Master Caution is recorded on the FDR.

**ANSWER:**

Boeing admits that the AIB released a preliminary report on April 4, 2019 regarding the crash of Flight 302. Boeing admits that the AIB preliminary report contains the language provided in Paragraph 186. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 186 and therefore denies them.

187.    At 05:42:54, both pilots called out "left alpha vane." At 05:43:04 the Captain asked the First Officer to pitch up together and said that pitch is not enough. At 05:43:11, about 32 seconds before the end of the recording, at approximately 13,4002 feet, two momentary manual electric trim inputs are recorded in the ANU direction. The stabilizer moved in the ANU direction from 2.1 units to 2.3 units.

**ANSWER:**

Boeing admits that the AIB released a preliminary report on April 4, 2019 regarding the crash of Flight 302. Boeing admits that the AIB preliminary report contains the language provided in Paragraph 187. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 187 and therefore denies them

188.    At 05:43:20, approximately five seconds after the last manual electric trim input, an AND automated trim command occurred, and the stabilizer moved in the AND direction from 2.3 to 1.0 unit in approximately 5 seconds. The airplane began pitching nose down. Additional simultaneous aft control column force was applied, but the nose down pitch continued, eventually reaching 40 degrees nose down. The stabilizer position varied between 1.1 and 0.8 units for the remainder of the recording. The left Indicated Airspeed increased, eventually reaching approximately 458 kts and the right Indicated Airspeed reached 500 kts at the end of the recording. The last recorded pressure altitude was 5,419 feet on the left and 8,399 feet on the right.

**ANSWER:**

Boeing admits that the AIB released a preliminary report on April 4, 2019 regarding the crash of Flight 302. Boeing admits that the AIB preliminary report contains the language provided in Paragraph 188. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 188 and therefore denies them.

189.    Shortly thereafter, all communication with Flight 302 stopped and the plane violently crashed into a field, killing all 157 people aboard.

**ANSWER:**

Boeing admits that the Subject Aircraft crashed into a field near Ejere, Ethiopia and that the crash resulted in the deaths of all 157 persons aboard the aircraft. Boeing denies the remaining allegations contained in Paragraph 189.

190.    The similarity between Flight 302 and Flight 610 data released to date clearly indicate that both airplanes experienced erroneous AOA readings and activation of the MCAS. On Flight 302, the airplane's nose began to pitch down just 450 feet above the ground. The jack screws from the horizontal tail stabilizer were recovered from both crashes and both showed that the airplanes had been oriented in a dive, with the nose pointing down. Both pilots reported flight control issues and could not maintain a steady altitude or speed with similarly erratic flight paths before crashing. The following side-by-side comparison reveals the striking similarities between the two doomed airplanes in changes in vertical speed:



**ANSWER:**

Boeing admits that the KNKT Final Report and the AIB's preliminary report say that automatic nose-down inputs were applied on both Flight 610 and Flight 302. Boeing admits that MCAS activated on both Flight 610 and Flight 302 in response to erroneous AOA input. Boeing also admits that the KNKT Final Report and the AIB's preliminary report say that the flight crews

of Flight 610 and Flight 302 reported "flight control problem[s]" to control towers. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 190 and therefore denies them. In further response, Boeing states that the graphic depicted below Paragraph 190 does not consist of properly pled factual allegations and therefore requires no response from Boeing. To the extent a response is required, Boeing denies the accuracy of the text and images contained in this conclusory graphic as depicted.

191.     The pilots of Flight 302 followed the emergency procedures recommended by BOEING, including using cutoff switches that disabled the electric motor used to move the horizontal stabilizer. However, data indicates that the pilots then were unable move the horizontal stabilizer into its proper position because they were unable to manually turn the stabilizer trim wheel. When the pilots still could not regain control of the airplane, they turned the electric motor back on, and the plane entered a dive from which it could not recover. Regulators grounded the 737 MAX 8 after Flight 302 crashed. The grounding was ostensibly to allow for a MCAS software upgrade and safety assessment.

**ANSWER:**

Boeing admits that regulators in the U.S. and other countries have issued operational restrictions on 737 MAX 8 and 9 aircraft. Boeing also admits that certain U.S. federal agencies are investigating the certification of the 737 MAX models. Boeing denies the allegations contained in Paragraph 191.

**CLAIMS FOR RELIEF**

**COUNT I**
**NEGLIGENCE**
**(THE BOEING COMPANY)**

192.     PLAINTIFF incorporates and re-alleges each of the paragraphs set forth above as if specifically restated herein, paragraph for paragraph and word for word.

**ANSWER:**

Boeing incorporates herein by reference its responses to Paragraphs 1–191, *supra*, as if set forth fully herein.

193.     At all times material to this cause of action, Defendant BOEING designed, inspected, tested, manufactured, marketed, sold and distributed into the stream of commerce 737 MAX 8 airplanes. Defendant BOEING represented that each airplane was airworthy and reasonably safe for its intended and foreseeable use and purpose, including as a transport category

aircraft for use by air carriers engaged in common carriage of passengers for hire. This includes the subject 737 MAX 8 that crashed in Ethiopia on March 20, 2019.

**ANSWER:**

Boeing admits that it designs, manufactures, assembles, inspects, tests, markets, and sells the 737 MAX 8 aircraft, except for those components, parts, and systems that are designed, manufactured, assembled, inspected, tested, marketed, or sold by others, and the components, parts, and systems that were subsequently removed, installed, exchanged, altered, modified, retrofitted, overhauled, or manufactured by others. Boeing further admits that it designed, manufactured, assembled, inspected, tested, marketed, and sold the Subject Aircraft, except for those components, parts, and systems of the Subject Aircraft that were designed, manufactured, assembled, inspected, tested, marketed, or sold by others, and the components, parts, and systems that were subsequently removed, installed, exchanged, altered, modified, retrofitted, overhauled, or manufactured by others. Boeing denies the remaining allegations contained in Paragraph 193.

194.    At all times material to this cause of action, Defendant BOEING operated, supervised, managed and directed training facilities and authored the training materials relied upon by Ethiopian Airlines and its pilots for the safe operation of 737 MAX 8 airplanes.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 194.

195.    Defendant BOEING owed PLAINTIFF and his decedent certain duties.

**ANSWER:**

Boeing admits that it owes the duties imposed by applicable law. Boeing denies the remaining allegations contained in Paragraph 195.

196.    Notwithstanding its duties, BOEING breached them in the following particulars:

a.    By negligently designing, manufacturing, testing, inspecting, assembling and certifying as safe and airworthy the 737 MAX 8 aircraft when it knew or reasonably should have known that the airplane had multiple dangerous aerodynamic flaws, including, but not limited to, dangerous handling qualities and characteristics that rendered it susceptible to a catastrophic loss of control;

b.    By negligently designing, manufacturing, inspecting, testing, assembling and certifying the 737 MAX 8 aircraft with a dangerous and defective automated flight control system using a single AOA sensor that was a single point of failure and

lacked adequate redundant systems, rendering the aircraft susceptible to a catastrophic loss of control;

c.      By negligently designing, manufacturing, testing, inspecting, assembling and certifying the 737 MAX 8 aircraft with a flight control system susceptible to erroneous information from a single AOA sensor and failing to install AOA indicators or AOA disagree lights as standard safety features, rendering the aircraft susceptible to a catastrophic loss of control;

d.      By negligently designing, manufacturing, assembling, testing, inspecting and certifying the 737 MAX 8 aircraft without implementing a flight-crew alerting system in compliance with 14 CFR § 25.1322, rendering the airplane susceptible to a catastrophic loss of control;

e.      By negligently designing, manufacturing, assembling, inspecting, testing and certifying the 737 MAX 8 aircraft that would initiate a dangerous MCAS induced dive without a means for the flight crew to promptly override the automated system, rendering the airplane susceptible to a catastrophic loss of control;

f.      By negligently misrepresenting, marketing, selling and releasing into the stream of commerce the 737 MAX 8 aircraft as an analog to the 737NG model aircraft, consciously and intentionally inducing airlines to forgo essential and necessary pilot training, failing to inform them that the 737 MAX 8 contained an otherwise undisclosed defective and dangerous MCAS that rendered the airplane susceptible to a catastrophic loss of control;

g.      By negligently failing to warn and instruct operators and flight crew with regard to the 737 MAX 8 risk of entering an unrecoverable dive uncommanded by a pilot and without clear instruction on how to promptly override an MCAS induced automated dive, rendering the airplane susceptible to a catastrophic loss of control;

h.      By negligently failing to provide the FAA with accurate information necessary to conduct a thorough safety assessment of the 737 MAX 8 aircraft, including failing to accurately report the degree to which the MCAS could move the horizontal stabilizer and the ability of the MCAS to reset and then override pilot induced commands, rendering the airplane susceptible to a catastrophic loss of control;

i.      By negligently failing to properly train and instruct pilots of 737 MAX 8 aircraft on the automated MCAS and its ability to render the airplane susceptible to a catastrophic loss of control;

j.      By negligently failing to properly train and instruct pilots to identify an AOA sensor failure and MCAS activation on the 737 MAX 8 aircraft, rendering it susceptible to a catastrophic loss of control;

k.      By negligently failing to properly train and instruct pilots of 737 MAX 8 aircraft to disengage the stabilizer trim motor in the event of an AOA sensor failure or unanticipated dive, uncommanded by the pilot, rendering the airplane susceptible to a catastrophic loss of control;

l.      By negligently authoring, writing, publishing and distributing an Aircraft Flight Manual (or related and similarly titled documents) for 737 MAX 8 aircraft that failed to warn of the danger presented by the MCAS and by faulty AOA sensors, rendering the airplane susceptible to a catastrophic loss of control;

m. By negligently authoring, writing, publishing, distributing, designing and certifying as accurate and reliable, a 737 MAX 8 airplane flight manual that failed to provide clear instructions and procedures on promptly overriding an automated MCAS induced dive that rendered the airplane susceptible to a catastrophic loss of control;

n. By negligently failing to promptly and timely issue a software patch for 737 MAX 8 aircraft to rectify the risk of malfunctioning AOA sensors and automated MCAS induced dives following the October 29, 2018 crash of Lion Air Flight JT 610, rendering the airplane susceptible to a catastrophic loss of control;

o. By negligently failing to timely ground 737 MAX 8 aircraft following the crash of Lion Air Flight JT 610, until all of the aircraft were safe and airworthy and not susceptible to a catastrophic loss of control;

p. By negligently failing to properly warn pilots, airlines and the public of the risk of malfunctioning AOA sensors and MCAS induced automated dives on 737 MAX 8 aircraft following the crash of Lion Air Flight JT 610, and by otherwise being negligent in the design, manufacture, testing, inspecting, warning, marketing, sale and release into the stream of commerce of 737 MAX 8 airplanes that were susceptible to a catastrophic loss of control.

q. By negligently seeking to have the 737 MAX 8 type certificated on the original 737 type certificate issued in 1967, when the 737 MAX 8 was a different airplane requiring issuance of a new type certificate

**ANSWER:**

Paragraph 198 and its discrete subparts consist of legal conclusions to which no response from Boeing is required. To the extent a response is required, Boeing admits that it owes the duties imposed by applicable law. Boeing denies the remaining allegations contained in Paragraph 198.

197. As a direct and proximate result of breach of duties and negligence, carelessness, gross negligence, recklessness, and wrongful acts, co-missions and omissions, by BOEING, Ethiopian Airlines Flight 302 crashed, killing PLAINTIFF'S DECEDENT.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 197.

198. PLAINTIFF and the statutory heirs in wrongful death and survivorship have suffered injuries and compensatory damages as more fully alleged below.

**ANSWER:**

Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 198 and therefore denies them.

199. BOEING acted willfully, wantonly, with reckless disregard for the safety of others, and with malice and a knowing, conscious disregard for the rights and safety of others, such that

PLAINTIFF requests that the trier of fact, in the exercise of sound discretion, award additional damages for the sake of example and sufficient to punish BOEING, for its grossly negligent and intentional conduct, in an amount reasonably related to PLAINTIFF'S actual damages and BOEING'S financial condition, yet sufficiently large enough to be an example to others and to deter BOEING and others from engaging in similar conduct in the future.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 199.

**COUNT II**
**BREACH OF WARRANTY**
**(THE BOEING COMPANY)**

200.    PLAINTIFF restates and re-alleges each prior allegation contained in each of the paragraphs set forth above as if specifically restated herein, paragraph for paragraph and word for word.

**ANSWER:**

Boeing incorporates herein by reference its responses to Paragraphs 1–199, *supra*, as if set forth fully herein.

201.    BOEING designed, manufactured, tested, marketed, distributed, sold and released into the stream of commerce the 737 MAX 8 airplane and its component parts, which crashed giving rise to this cause of action.

**ANSWER:**

Boeing admits that it designs, manufactures, and sells aircraft, except for those components, parts, and systems that are designed, manufactured, or sold by others, and the components, parts, and systems that were subsequently removed, installed, exchanged, altered, modified, retrofitted, overhauled, or manufactured by others. Boeing further admits that it designed, manufactured, and sold the Subject Aircraft, except for those components, parts, and systems of the Subject Aircraft that were designed, manufactured, or sold by others, and the components, parts, and systems that were subsequently removed, installed, exchanged, altered, modified, retrofitted, overhauled, or manufactured by others. Boeing denies the remaining allegations contained in Paragraph 201.

202.    BOEING expressly and impliedly warranted that the subject 737 MAX 8 airplanes were safe, airworthy, free of defects, of merchantable quality and reasonably fit for their intended and foreseeable use and purpose.

**ANSWER:**

The allegations contained in Paragraph 231 consist of legal conclusions to which no response from Boeing is required. To the extent a response is required, Boeing denies that it made any representations to Plaintiff or to Plaintiff's Decedent. Boeing also denies the remaining allegations contained in Paragraph 202.

203.    BOEING breached its express and implied warranties in that the subject 737 MAX 8 airplanes were unairworthy, defective, dangerous, not of merchantable quality and unfit for their foreseeable use and purpose. At the time of the accident giving rise to this cause of action, the airplane and its component parts were in substantially similar condition to its original condition at delivery from BOEING to ETHIOPIAN AIRLINES.

**ANSWER:**

The allegations contained in Paragraph 231 consist of legal conclusions to which no response from Boeing is required. To the extent a response is required, Boeing denies that it made any representations to Plaintiff or to Plaintiff's Decedent. Boeing also denies the remaining allegations contained in Paragraph 203.

204.    PLAINTIFF'S DECEDENT, as a flight crew member on Flight 302, was an intended beneficiary of BOEING'S express and implied warranties.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 204.

205.    PLAINTIFF'S DECEDENT reasonably relied on the express and implied warranties made by BOEING.

**ANSWER:**

Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 205 and therefore denies them.

206.    As a direct and proximate result of the wrongful acts and omissions and co-missions alleged above, and breach of implied and express warranties made by BOEING, Ethiopian Airlines flight 302 crashed, killing PLAINTIFF'S DECEDENT.

**ANSWER:**

Boeing denies that any action or inaction of Boeing resulted in the death of Plaintiff's decedent. Boeing also denies that Plaintiff is entitled to any relief from Boeing. Boeing lacks

knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 206 and therefore denies them.

207.   PLAINTIFF and his DECEDENT and each of the statutory heirs in wrongful death and survivorship suffered injuries and compensatory damages as more fully alleged below.

**ANSWER:**

Boeing denies that any action or inaction of Boeing resulted in the death of Plaintiff's decedent. Boeing also denies that Plaintiff is entitled to any relief from Boeing. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 207 and therefore denies them.

208.   BOEING acted willfully, wantonly, with oppression, malice, and with a knowing, conscious disregard for the rights and safety of others, such that PLAINTIFF requests that the trier of fact, in the exercise of sound discretion, award PLAINTIFF additional damages for the sake of example and sufficient to punish BOEING for its reckless conduct, in an amount reasonably related to PLAINTIFF'S actual damages and BOEING'S financial condition, yet sufficiently large enough to be an example to others and to deter BOEING and others from engaging in similar conduct in the future.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 208.

**COUNT III**
**STRICT LIABILITY**
**(THE BOEING COMPANY)**

209.   PLAINTIFF re-incorporates and re-alleges each prior allegation as if specifically restated herein, paragraph for paragraph and word for word.

**ANSWER:**

Boeing incorporates herein by reference its responses to Paragraphs 1–208, *supra*, as if set forth fully herein.

210.   BOEING designed, manufactured, tested, marketed, distributed, sold and released into the stream of commerce the 737 MAX 8 that crashed in Ethiopia on March 10, 2019.

**ANSWER:**

Boeing admits that it designed, manufactured, assembled, inspected, tested, marketed, and sold the Subject Aircraft, except for those components, parts, and systems of the Subject Aircraft

that were designed, manufactured, assembled, inspected, tested, marketed, or sold by others, and the components, parts, and systems that were subsequently removed, installed, exchanged, altered, modified, retrofitted, overhauled, or manufactured by others. Boeing denies the remaining allegations contained in Paragraph 210.

211.    The subject BOEING 737 MAX 8 airplane was being operated by Ethiopian Airlines for the purpose for which it was intended, in a manner reasonably foreseeable to BOEING.

**ANSWER:**

Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 211 and therefore denies them.

212.    The subject BOEING 737 MAX 8 was defective, dangerous, unsafe, and unairworthy when released into the stream of commerce and it was in substantially similar condition to its original condition at the time of delivery to Ethiopian Airlines.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 212.

213.    BOEING is strictly liable to PLAINTIFF for releasing into the stream of commerce the 737 MAX 8 aircraft that it knew at the time was defective and dangerous, unairworthy and non-conforming and posing an unreasonable danger to foreseeable users and consumers.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 213.

214.    As a direct and proximate result of the wrongful acts and omissions and commissions of BOEING, PLAINTIFF and the statutory heirs in wrongful death and survivorship suffered injuries and compensatory damages as more fully alleged below.

**ANSWER:**

Boeing denies that any action or inaction of Boeing resulted in the death of Plaintiff's decedent. Boeing also denies that Plaintiff is entitled to any relief from Boeing. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 214 and therefore denies them.

215.    BOEING acted willfully, wantonly, with oppression, malice, and with a knowing, conscious disregard for the rights and safety of others, such that PLAINTIFF requests that the trier of fact, in the exercise of sound discretion, award PLAINTIFF additional damages for the sake of

example and sufficient to punish BOEING for its outrageous conduct, in an amount reasonably related to PLAINTIFF'S actual damages and BOEING'S financial condition, yet sufficiently large enough to be an example to others and to deter BOEING and others from engaging in similar conduct in the future.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 215.

**COUNT IV**
**NEGLIGENCE**
**(ROSEMOUNT AEROSPACE, INC.)**

216.    PLAINTIFF re-avers and re-alleges each prior allegation as if specifically restated herein, paragraph for paragraph and word for word.

**ANSWER:**

Boeing incorporates herein by reference its responses to Paragraphs 1–215, *supra*, as if set

forth fully herein.

217.    Defendant ROSEMOUNT owed PLAINTIFF and his DECEDENT certain duties, including the exercise of reasonable care in the design, testing, manufacture, warning, sale and release into the stream of commerce angle of attack sensors for use in 737 MAX 8 airplanes, including the subject airplane.

**ANSWER:**

The allegations contained in Paragraph 217 are directed at another entity and therefore

require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or

information sufficient to form a belief as to the truth of the allegations contained in Paragraph 217

and therefore denies them.

218.    ROSEMOUNT beached its duties when it negligently developed, designed, engineered, tested, manufactured, marketed, warned, sold and released into the stream of commerce defective and dangerous angle of attack sensors, that it knew or reasonably should have known were intended for use on 737 MAX 8 aircraft and for incorporation into its MCAS, including the aircraft that crashed giving rise to this cause of action.

**ANSWER:**

The allegations contained in Paragraph 218 are directed at another entity and therefore

require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or

information sufficient to form a belief as to the truth of the allegations contained in Paragraph 218

and therefore denies them.

219.    ROSEMOUNT acted with reckless indifference for the rights and safety of others and with gross negligence giving rise to claims for punitive damages.

**ANSWER:**

The allegations contained in Paragraph 219 are directed at another entity and therefore require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 219 and therefore denies them.

220.    ROSEMOUNT knew or should have known of more than 200 reports issued to the FAA noting AOA sensor malfunctions since 2004 as well as the various ASRS reports indicating uncommanded activation of the MCAS prior to the crash of Flight 302. Furthermore, ROSEMOUNT knew or should have known that the unintended activation of the MCAS, based upon erroneous AOA sensor input, caused the crash of the Lion Air Flight JT 610.

**ANSWER:**

The allegations contained in Paragraph 220 are directed at another entity and therefore require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 220 and therefore denies them.

221.    As a proximate result of the defective condition in the Angle of Attack sensor supplied by ROSEMOUNT to BOEING, Flight 302 crashed, causing the death of all onboard, including PLAINTIFF'S DECEDENT.

**ANSWER:**

The allegations contained in Paragraph 221 are directed at another entity and therefore require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 221 and therefore denies them.

222.    As a direct and proximate result of the negligence of ROSEMOUNT, PLAINTIFF and the statutory heirs in wrongful death and survivorship suffered injuries and compensable damages as more fully alleged below.

**ANSWER:**

The allegations contained in Paragraph 222 are directed at another entity and therefore require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or

information sufficient to form a belief as to the truth of the allegations contained in Paragraph 222 and therefore denies them.

**COUNT V**
**STRICT LIABILITY**
**(ROSEMOUNT AEROSPACE, INC.)**

223.    PLAINTIFF re-avers and re-alleges each prior allegation as if specifically restated herein, paragraph for paragraph and word for word.

**ANSWER:**

Boeing incorporates herein by reference its responses to Paragraphs 1–222, *supra*, as if set forth fully herein.

224.    ROSEMOUNT designed, manufactured, engineered, tested, marketed, sold, distributed and released into the stream of commerce angle of attack sensors. ROSEMOUNT sold its angle of attack sensors to Boeing for use on 737 MAX 8 airplanes.

**ANSWER:**

The allegations contained in Paragraph 224 are directed at another entity and therefore require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 224 and therefore denies them.

225.    ROSEMOUNT warranted that the angle of attack sensor installed on the 737 MAX 8 operated as Flight 302 was fit for its intended use and purpose, free of defects and not dangerous. At all times material to this cause of action, the angle of attack sensor installed on the accident aircraft was in substantially similar condition to its original condition at delivery to BOEING and then at delivery to Ethiopian Airlines.

**ANSWER:**

The allegations contained in Paragraph 225 are directed at another entity and therefore require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 225 and therefore denies them.

226.    Notwithstanding its representations, the angle of attack sensor was unfit for its intended and foreseeable use and purpose and was dangerous and defective when sold and released into the stream of commerce.

**ANSWER:**

The allegations contained in Paragraph 226 are directed at another entity and therefore require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 226 and therefore denies them.

227.    ROSEMOUNT is strictly liable because the angle of attack sensor was defective at the time it was sold and released into the stream of commerce.

**ANSWER:**

The allegations contained in Paragraph 227 are directed at another entity and therefore require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 227 and therefore denies them.

228.    Defects in the angle of attack sensor were a proximate cause of the subject crash, and the defects made the subject airplane unreasonably dangerous.

**ANSWER:**

The allegations contained in Paragraph 228 are directed at another entity and therefore require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 228 and therefore denies them.

229.    As a direct and legal result of the strict liability of ROSEMOUNT, PLAINTIFF suffered injuries and compensable damages as more fully alleged below.

**ANSWER:**

The allegations contained in Paragraph 229 are directed at another entity and therefore require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 229 and therefore denies them.

## COUNT VI
## BREACH OF WARRANTY
## (ROSEMOUNT AEROSPACE, INC.)

230.    PLAINTIFF re-alleges and re-avers each prior allegation as if specifically restated herein, paragraph for paragraph and word for word.

**ANSWER:**

Boeing incorporates herein by reference its responses to Paragraphs 1–230, *supra*, as if set forth fully herein.

231.    ROSEMOUNT expressly and impliedly warranted that the angle of attack sensors it designed, manufactured, tested, marketed, sold and released into the stream of commerce for use in 737 MAX 8 airplanes, including the subject airplane that crashed giving rise to this litigation, were airworthy, of merchantable quality, free of defects, safe and fit for its intended use and purpose.

**ANSWER:**

The allegations contained in Paragraph 231 are directed at another entity and therefore require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 231 and therefore denies them.

232.    ROSEMOUNT breached its express and implied warranties because its angle of attack sensor installed on the subject airplane was unairworthy, defective and dangerous and not of merchantable quality, and was unsafe and unfit for its intended use and purpose.

**ANSWER:**

The allegations contained in Paragraph 232 are directed at another entity and therefore require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 232 and therefore denies them.

233.    The crew members and passengers of ET302, including PLAINTIFF'S DECEDENT, were intended beneficiaries of ROSEMOUNT'S warranties.

**ANSWER:**

The allegations contained in Paragraph 233 are directed at another entity and therefore require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or

information sufficient to form a belief as to the truth of the allegations contained in Paragraph 233 and therefore denies them.

234.    As a direct and proximate result of ROSEMOUNT'S breach of express and implied warranties, Ethiopian Airlines flight 302 crashed, killing all onboard, including PLAINTIFF'S DECEDENT.

**ANSWER:**

The allegations contained in Paragraph 234 are directed at another entity and therefore require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 234 and therefore denies them.

235.    PLAINTIFF and the statutory heirs in wrongful death and survivorship suffered injuries and compensable damages as more fully alleged below.

**ANSWER:**

The allegations contained in Paragraph 235 are directed at another entity and therefore require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 235 and therefore denies them.

**COUNT VII**
**NEGLIGENCE**
**(ROCKWELL COLLINS, INC.)**

236.    Plaintiff re-avers and re-alleges each prior allegation as if specifically re-stated herein, paragraph for paragraph and word for word.

**ANSWER:**

Boeing incorporates herein by reference its responses to Paragraphs 1–235, *supra*, as if set forth fully herein.

237.    COLLINS owed certain duties to PLAINTIFF and his DECEDENT.

**ANSWER:**

The allegations contained in Paragraph 237 are directed at another entity and therefore require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or

information sufficient to form a belief as to the truth of the allegations contained in Paragraph 237 and therefore denies them.

238.　Notwithstanding its duties, COLLINS breached them when it negligently designed, programmed, developed, manufactured, tested, warned, marketed, sold and released into the stream of commerce the MCAS and its software, and permitted it to be installed on 737 MAX 8 airplanes, including the subject airplane, when it knew or reasonably should have known that the MCAS and its software rendered the aircraft dangerous and defective by being susceptible to catastrophic loss of control.

**ANSWER:**

The allegations contained in Paragraph 238 are directed at another entity and therefore require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 238 and therefore denies them.

239.　Collins acted with reckless indifference for the safety of others and with gross negligence and wonton disregard and reckless indifference, giving rise to claims founded in punitive damages.

**ANSWER:**

The allegations contained in Paragraph 239 are directed at another entity and therefore require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 239 and therefore denies them.

240.　COLLINS knew or reasonably should have known of the ASRS reports indicating uncommanded activation of the MCAS prior to the crash of Flight 302. COLLINS knew or reasonably should have known that activation of the MCAS was the cause of the crash of Lion Air Flight JT 610.

**ANSWER:**

The allegations contained in Paragraph 240 are directed at another entity and therefore require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 240 and therefore denies them.

241.     The defective and dangerous conditions inherent to the MCAS and its software and the crash of Flight 302 were proximately caused by the negligence, gross negligence, wrongdoing, tortious conduct, careless acts and omissions and commissions of COLLINS, resulting in the death of PLAINTIFF'S DECEDENT.

**ANSWER:**

The allegations contained in Paragraph 241 are directed at another entity and therefore require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 241 and therefore denies them.

242.     PLAINTIFF and his decedent's statutory survivors in wrongful death and survivorship suffered injuries and compensable damages as more fully alleged below.

**ANSWER:**

The allegations contained in Paragraph 242 are directed at another entity and therefore require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 242 and therefore denies them.

**COUNT VIII**
**STRICT LIABILITY**
**(ROCKWELL COLLINS, INC.)**

243.     PLAINTIFF re-avers and re-alleges each prior allegation as if specifically re-stated herein, paragraph for paragraph and word for word.

**ANSWER:**

Boeing incorporates herein by reference its responses to Paragraphs 1–242, *supra*, as if set forth fully herein.

244.     COLLINS designed, programmed, manufactured, engineered, tested, distributed, marketed, sold and released into the stream of commerce the MCAS and its software installed on the 737 MAX 8 that crashed giving rise to this litigation.

**ANSWER:**

The allegations contained in Paragraph 244 are directed at another entity and therefore require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or

information sufficient to form a belief as to the truth of the allegations contained in Paragraph 244 and therefore denies them.

245.    At the time COLLINS released the MCAS into the stream of commerce, it represented that the MCAS and its software was reasonably fit for its intended and foreseeable use and purpose, free of defects and safe. The MCAS and its software installed on the 737 MAX 8 airplanes, including the aircraft used as Ethiopian Airlines Flight 302 was in substantially similar condition to its original condition at delivery to BOEING and then delivery to Ethiopian Airlines.

**ANSWER:**

The allegations contained in Paragraph 245 are directed at another entity and therefore require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 245 and therefore denies them.

246.    Defects in the MCAS and its software were a proximate cause of the subject crash, and the defects made the subject airplane unfits for its intended use and purpose.

**ANSWER:**

The allegations contained in Paragraph 246 are directed at another entity and therefore require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 246 and therefore denies them.

247.    COLLINS is strictly liable to PLAINTIFF because its MCAS was unfit for its intended and foreseeable use and purpose and was unreasonably dangerous and defective at the time it was sold and released into the stream of commerce.

**ANSWER:**

The allegations contained in Paragraph 247 are directed at another entity and therefore require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 247 and therefore denies them.

248.    PLAINTIFF and his decedent's statutory heirs in wrongful death and survivorship suffered injuries and compensable damages as more fully alleged below.

**ANSWER:**

The allegations contained in Paragraph 248 are directed at another entity and therefore require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 248 and therefore denies them.

**COUNT IX**
**BREACH OF WARRANTY**
**(ROCKWELL COLLINS, INC.)**

249.     PLAINTIFF re-avers and re-alleges each allegation as if specifically restated herein, paragraph for paragraph and word for word.

**ANSWER:**

Boeing incorporates herein by reference its responses to Paragraphs 1–248, *supra*, as if set forth fully herein.

250.     COLLINS expressly and impliedly warranted that its MCAS and related software were properly designed, developed, engineered, tested, manufactured, produced, distributed, sold and released into the stream of commerce in a manner that rendered the MCAS reasonably fit for its intended use and purpose, free of defects, safe and reliable. The MCAS was intended for use on the 737 MAX 8, including the airplane that crashed as Ethiopian Airlines Flight 302.

**ANSWER:**

The allegations contained in Paragraph 250 are directed at another entity and therefore require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 250 and therefore denies them.

251.     COLLINS breached its express and implied warranties because the MCAS and related software was defective, dangerous, and unfit for its intended and foreseeable use and purpose when sold and released into the stream of commerce.

**ANSWER:**

The allegations contained in Paragraph 250 are directed at another entity and therefore require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or

information sufficient to form a belief as to the truth of the allegations contained in Paragraph 250 and therefore denies them.

252.    The crew members and passengers of Ethiopian Airlines Flight 302, including PLAINTIFF'S DECEDENT, were intended beneficiaries of COLLINS' warranties.

**ANSWER:**

The allegations contained in Paragraph 252 are directed at another entity and therefore require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 252 and therefore denies them.

253.    PLAINTIFF'S DECEDENT reasonably relied on COLLINS' warranties.

**ANSWER:**

The allegations contained in Paragraph 253 are directed at another entity and therefore require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 253 and therefore denies them.

254.    As a direct and proximate result of COLLINS' breach of its warranties, Ethiopian Airlines Flight 302 crashed, causing the death of PLAINTIFF'S DECEDENT.

**ANSWER:**

The allegations contained in Paragraph 254 are directed at another entity and therefore require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 254 and therefore denies them.

255.    PLAINTIFF and his decedent's statutory heirs in wrongful death and survivorship suffered injuries and compensable damages and more fully alleged below.

**ANSWER:**

The allegations contained in Paragraph 255 are directed at another entity and therefore require no response from Boeing. To the extent a response is required, Boeing lacks knowledge or

information sufficient to form a belief as to the truth of the allegations contained in Paragraph 255 and therefore denies them.

## COMPENSATORY DAMAGES

256.    PLAINTIFF has suffered and claims against each defendant for all compensatory damages allowable by law, including, but not limited to, preimpact conscious pain and suffering of his decedent, mental anguish and grief of the decedent's survivors, loss of consortium, loss of support and services, loss of inheritance, loss of net accumulations and all other losses permitted by law and as more specifically requested in the Prayer For Relief.

**ANSWER:**

Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 256 and therefore denies them.

257.    PLAINTIFF claims punitive damages against each defendant as more fully alleged herein.

**ANSWER:**

Boeing denies that Plaintiff is entitled to recover punitive damages against it. Boeing denies the remaining allegations contained in Paragraph 257.

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFF prays for judgment against the DEFENDANTS as follows:

A.    For all past and future general and compensatory damages in an amount according to proof at trial, and beyond the jurisdictional minimum of this Court;

B.    For all economic and property losses, in an amount according to proof at trial;

C.    For DECEDENT'S conscious and physical pain and suffering, fright and terror, fear of impending and imminent death, mental anguish, and emotional distress, in an amount according to proof at trial;

D.    For past and future loss of support and services in money or in kind, in an amount according to proof at trial;

E.    For past and future loss of consortium, love, companionship, comfort, care, assistance, protection, affection, society, moral support, training, advice, tutelage, and guidance, in an amount according to proof at trial;

F.    For past and future grief, emotional distress, and sorrow, in an amount according to proof at trial;

G.  For funeral expenses, burial expenses, estate administration expenses, and other related expenses in an amount according to proof at trial;

H.  For expenses for the identification and transportation of Decedent's remains, according to proof at trial;

I.  For attorneys fees, costs and other damages as permitted under applicable laws;

J.  For pre- and post-judgment interest on all damages as allowed by the law;

K.  For all costs of suit incurred herein;

L.  For punitive and exemplary damages in an amount according to proof at trial;

M.  For such other and further relief as the court may deem just and proper.

**ANSWER:**

Boeing denies that any action or inaction of Boeing resulted in the death of Plaintiff's decedent. Boeing also denies that Plaintiff is entitled to any relief from Boeing. Boeing denies the remaining allegations contained in the Prayer for Relief, including its discrete subparts.

## AFFIRMATIVE AND ADDITIONAL DEFENSES

1.  Plaintiff's claims may be barred by virtue of failing to properly identify a personal representative qualified to seek relief on behalf of the Decedent.

2.  The benefits of the design of the Subject Aircraft and each component thereof outweigh the risks associated therewith, if any.

3.  Boeing complied with all applicable federal, state, and foreign statutes, codes, and administrative regulations existing at the time the Subject Aircraft was manufactured and all applicable standards for design, inspection, testing, warning and manufacture.

4.  The Subject Aircraft was certified as airworthy by the Federal Aviation Administration and complied with all applicable codes, standards, and regulations of the United States and agencies thereof at the time it was delivered by Boeing.

5.  The Subject Aircraft was intended for and sold to a knowledgeable and sophisticated user over whom Boeing had no control or right of control.

6.  To the extent the *Noerr-Pennington* doctrine is an affirmative defense, Plaintiffs claims may be barred in whole or in part by the *Noerr-Pennington* doctrine.

7. The Complaint and all claims for relief therein should be dismissed on the ground that Plaintiff have failed to join necessary and indispensable parties.

8. Plaintiff may lack standing to bring this action or to bring claims arising out of alleged actions or omissions affecting a third-party.

9. Actions or omissions of third parties over whom Boeing had no control, which may include but are not limited to any entity that altered, modified, overhauled, or repaired any relevant equipment on the Subject Aircraft, were the sole, direct, and proximate cause of the damages, if any, of Plaintiff.

10. Plaintiff's claims may be barred in whole or in part and/or preempted by federal law.

11. If Plaintiff's damages, if any, were proximately caused by the acts or omissions of others over whom Boeing had no control or right of control, those acts or omissions were a superseding and sole, direct, and proximate cause of Plaintiff's damages, if any.

12. If Plaintiff was damaged by products originally designed, manufactured, assembled, inspected, tested, or sold by Boeing, those products were subsequently installed, removed, exchanged, altered, modified, retrofitted, repaired, overhauled, remanufactured, improperly maintained, or misused by persons and/or entities other than Boeing, and over whom Boeing had no control or right of control, and such installation, removal, change, alteration, repair, modification, retrofitting, overhauling, remanufacturing, improper maintenance, or misuse proximately caused or contributed to the events alleged in the Complaint and the resulting damages complained of, if any.

13. Evidence of subsequent remedial measures is not admissible to prove liability. *See* Federal Rule of Evidence 407.

14. An award or judgment rendered in favor of Plaintiff must be reduced by the amount of benefits Plaintiff received, or is entitled to receive, from any source as a result of this accident.

15. Some or all of Plaintiff's claims and available damages may be barred by virtue of prior settlements.

16.     Plaintiff's Complaint fails to state a claim upon which relief can be granted against Boeing and further fails to state facts sufficient to entitle Plaintiff to the relief sought, or to any relief whatsoever, from Boeing.

17.     Boeing places in issue the negligence, fault, and responsibility of all persons and entities, which may include but are not limited to any entity that altered, modified, overhauled, or repaired any relevant equipment on the Subject Aircraft, which have contributed in any degree to the injuries and damages alleged to have been sustained by Plaintiff. Judgment against Boeing, if any, should be diminished to an amount that represents Boeing's degree of negligence, fault, or responsibility, if any.

18.     Plaintiff's breach of warranty claim is barred, in whole or in part, by the absence of privity between Plaintiff and Boeing and/or by lack of proper notice to Boeing.

19.     Plaintiff's breach of warranty claim is barred, in whole or in part, because Boeing did not make any warranties to Plaintiff with respect to the Subject Aircraft or any of its component parts.

20.     Plaintiff's breach of warranty claim is barred, in whole or in part, because Plaintiff is not a third-party beneficiary of any warranties that Boeing may have made.

21.     Plaintiff's right to recovery, if any, is limited to or precluded by the warranty provisions, including limitations and disclaimer provisions, in Boeing's contract of sale for the Subject Aircraft and/or documents relating thereto.

22.     Plaintiff's breach of warranty claim is barred because Plaintiff did not rely upon any warranty from Boeing.

23.     Plaintiff's breach of warranty claim is barred because the Subject Aircraft was not used in a reasonable manner appropriate to the purpose for which it was intended, and any damages allegedly sustained by Plaintiff were solely and proximately caused by such improper use of the produce.

24.     Plaintiff's claim for punitive damages is barred or limited by provisions of the United States Constitution, state constitutions, or other applicable law including, without

-85-

limitation, proscriptions against double jeopardy and excessive fines and provisions assuring due process of law and equal protections of laws.

25.     Plaintiff's Complaint is premature in that it was filed and served before the completion of the investigation arising from the March 10, 2019 accident at issue, including the ongoing investigation of the Ethiopian Transport Ministry. Boeing reserves the right to add those affirmative defenses that it deems necessary to its defense during or upon the conclusion of investigation and discovery. Boeing further reserves the right to assert any additional affirmative defenses asserted by another defendant and/or allowed by the law of the jurisdiction found to apply in this case.

26.     The Complaint and all claims for relief therein should be dismissed on the ground of *forum non conveniens*.

## NOTICE OF THE APPLICABILITY OF THE LAW OF ANOTHER JURISDICTION

Pursuant to Federal Rule of Civil Procedure 44.1, Boeing gives notice that it may raise issues concerning the applicability of the law of another jurisdiction, including but not limited to the laws of other states and/or a foreign country or countries, and reserves the right to assert and plead such other claims and defenses available to it arising out of the application of the substantive laws of another jurisdiction.

## PRAYER FOR RELIEF & DEMAND FOR JUDGMENT

WHEREFORE, Defendant The Boeing Company prays as follows:

That Plaintiff take nothing by the Complaint, that the Complaint be dismissed, and that judgment on the Complaint be entered for Boeing;

That Boeing be awarded its costs of suit and attorneys' fees;

That the Court grant such further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Defendant The Boeing Company hereby demands trial by jury on all claims and defenses before the Court in this litigation.

DATED: February 26, 2020        **THE BOEING COMPANY**

By: /s/ Christopher M. Ledford _____
          *One of its Attorneys*

Dan K. Webb
dwebb@winston.com
Christopher B. Essig
cessig@winston.com
Julia M. Johnson
jmjohnson@winston.com
**Winston & Strawn LLP**
35 W. Wacker Drive
Chicago, Illinois 60601-9703
T: (312) 558-5600

Jonathan R. Buck
JBuck@perkinscoie.com
**Perkins Coie LLP**
131 S. Dearborn, Suite 1700
Chicago, Illinois 60603-5559
T: (312) 324-8400

Michael Scoville
MScoville@perkinscoie.com
Christopher M. Ledford
CLedford@perkinscoie.com
Mack H. Shultz
MShultz@perkinscoie.com
**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
T: (206) 359-8000

## **CERTIFICATE OF SERVICE**

I, Christopher M. Ledford, certify that on February 26, 2020, I electronically filed the foregoing **DEFENDANT THE BOEING COMPANY'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' COMPLAINT** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to attorneys of record.

> Robert D. Tepper
> SATC Law
> 311 South Wacker Drive, Suite 2500
> Chicago, IL 60606-6674
> Tel: (312) 554-3116
> Fax: (312) 554-3115
> rtepper@satclaw.com
>
> David I. Katzman (*pro hac to be applied for*)
> Bradley J. Stoll (*pro hac to be applied for*)
> KATZMAN, LAMPERT & STOLL, PLLC
> 100 West Big Beaver Road, Suite 130
> Troy, Michigan 48084-5283
> Tel: (248) 258-4800
> Fax: (248) 258-2825 Facsimile
> dkatzman@klm-law.com
> bstoll@klm-law.com

I certify under penalty of perjury that the foregoing is true and correct.

DATED this 26th day of February 2020.

> /s/ Christopher M. Ledford
> PERKINS COIE LLP
> 1201 3rd Avenue, Ste 4900
> Seattle, WA 98101
> Tel: (206) 359-8000
> Fax: (206) 359-9000