IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE ETHIOPIAN AIRLINES FLIGHT ET 302 CRASH<br><br>    Plaintiffs,<br><br>    v.<br><br>THE BOEING COMPANY, a Delaware corporation; ROSEMOUNT AREOSPACE, INC., a Delaware corporation; ROCKWELL COLLINS, INC., a Delaware corporation,<br><br>    Defendants.<br><br>───────────<br><br>PLAINTIFFS' EXECUTIVE COMMITTEE,<br><br>    Movant,<br><br>    v.<br><br>MANUEL VON RIBBECK AND MONICA R. KELLY WOOD-PRINCE,<br><br>    Respondents | Lead Case No. 19-cv-02170<br><br>*This Filing Relates to All Actions*<br><br>Hon. Jorge L. Alonso<br><br>Hon. M. David Weisman |

**SUPPLEMENTAL SUBMISSION IN SUPPORT OF PLAINTIFFS' EXECUTIVE COMMITTEE'S MOTION FOR ENTRY OF ORDER TO SHOW CAUSE**

Plaintiffs' Executive Committee, by and through its undersigned attorneys, respectfully submits this Supplemental Submission in Support of Its Motion for Entry of Order to Show Cause. (Dkt. 929.) In support thereof, Plaintiffs' Executive Committee, respectfully states as follows:

1. On February 23, 2021, Plaintiffs' Executive Committee ("Movant") filed a Motion for Entry to Show Cause (the "Motion") why Manuel von Ribbeck and Monica R. Kelly Wood-Prince ("Respondents") should not be sanctioned for their willful and deliberate violations of this Court's Rules of Professional Conduct. The Motion detailed how Respondents repeatedly

1

have violated ABA Model Rule of Professional Conduct 4.2 by communicating, both directly and through intermediaries, with certain individuals in Africa they knew to be represented by Power Rogers LLP and Clifford Law Offices. (Dkt. 929 ¶ 5.) The clear purpose of these communications, Movant alleged, was to encourage already represented individuals "to change attorneys by offering the services of Ribbeck Law." (*Id.*) Movant supported its Motion with two WhatsApp message threads documenting the improper communications (Exs. 1, 4); two cease and desist letters that Power Rogers LLP and Clifford Law Offices sent to Respondents (Exs. 5–6); and a sworn affidavit from attorney Kevin P. Durkin of Clifford Law Offices (Ex. 7).[1]

2. On March 3, 2021, this Court held a hearing to address Movant's serious allegations. A true and correct transcript of the hearing is attached as Exhibit 8. Respondent Manuel von Ribbeck did not attend the hearing, and Respondents' counsel did not dispute the factual allegations in Movant's motion. Rather, Respondents' counsel merely insisted that "there's no solicitation going on" and that the ethical rules always permit a represented person to "talk to another lawyer about changing lawyers, about the representation that they're receiving." (Ex. 8 at 9.) This Court continued the hearing to allow counsel for Movant and Respondents to attempt to "come up with a reasonable agreement" to address Movant's concerns about Respondents' conduct. (*Id.* at 13–15.)

3. Movant's counsel met in good faith with Respondents' counsel to discuss the possibility of whether the entry of some type of agreed order could resolve Movant's concerns. However, Movant respectfully submits that an agreed order for Respondents to cease the conduct

---

[1] For ease of reference, Plaintiffs' Executive Committee continues the numerical exhibit designations from its initial Motion for Entry of Order to Show Cause (Dkt. 929) such that Exhibits 1–7 refer to those exhibits it previously filed and Exhibits 8–12 refer to those exhibits filed contemporaneously with this Supplemental Submission.

alleged in the Motion is not enough. In light of what Movant has learned since the first hearing on this matter, Movant needs to determine the additional extent of Respondents' conduct and what Respondents communicated to Movant's clients to undo any damage caused by Respondents' interference with Movant's attorney-client relationships. Movant therefore files this Supplemental Submission (1) to provide this Court with further documentation of Respondents' improper communications; to (2) to request that this Court initiate a formal investigation against Respondents to determine the extent of Respondents' actions and what communication have been made to Movant's clients; and (3) to request that the this Court impose appropriate sanctions and/or discipline against Respondents for such unethical conduct and violations of both ABA Model Rules of Professional Conduct 4.2 and 7.3.

4. First, to be clear, the two WhatsApp message threads that Movant attached to the Motion are but a small portion of the direct solicitations that Respondents and their agents have sent to the surviving relatives of those who were killed aboard Ethiopian Airlines Flight 302. Movant's investigation into Respondents' conduct remains ongoing, but Movant attaches hereto and discusses below three additional examples of Respondents solicitations that have come to Movant's attention so far. (*See* Exs. 9, 11, 12.) Public reporting about this case suggests that the improper solicitations known to Movant at this time are but a representative sample. *See Katharine Houreld, After Ethiopia crash, victims' relatives say they were hounded by U.S. law firms*, (Dec. 23, 2019), https://www.reuters.com/article/us-boeing-737max-lawyers-insight/after-ethiopia-crash-victims-relatives-say-they-were-hounded-by-u-s-law-firms-idUSKBN1YR0F6 (discussing additional solicitations sent by Respondents).

5. Exhibit 9 contains additional WhatsApp messages that Clifford Law Offices obtained from its client Michael Kabugi, whose father George Gikonyo Kabugi was killed in the

3

plane crash at issue in this litigation. Specifically, Exhibit 9 shows that on December 29, 2020, Mr. Kabugi received unsolicited messages from Caroline Wangari, the same individual who sent Zipporah Kuria articles about Ribbeck Law, *see* Exhibit 1. Ms. Wangari's sales pitch to Mr. Kabugi was nearly identical to the one she used with Ms. Kuria:

> "I have been calling families of the victims of the Ethiopian aircraft to check up on them and to see whether they have been represented or not, for those who are already represented whether they are happy with that representation so far and to offer legal advise [sic] to those who may be looking to get a second opinion."

(Ex. 9 at 1–2.) After Mr. Kabugi said he would "think about it," Ms. Wangari continued to press: "Would you be willing to hear from the lawyers who have already settled the compensation for the Kenyan family? I would be happy to arrange a one on one meeting with them." (*Id.* at 1.) Mr. Kabugi declined the offer. (*Id.*) Two weeks later, when Mr. Kabugi asked which law firm Ms. Wangari represented, she backtracked and claimed "I do not represent any firm." (*Id.* at 2.) Nonetheless, Ms. Wangari again inquired whether Mr. Kabugi was "well represented." (*Id.*)

6. Ms. Wangari's improper solicitations have also included direct phone calls. Attached as Exhibit 12 is a declaration from attorney Justin T. Green of Kreindler & Kreindler LLP, who describes an unsolicited phone call that his client, John Karanja, received from Ms. Wangari. (Ex. 12 ¶¶ 2–6.) Ms. Wangari explicitly urged Mr. Karanja to "switch off [his] USA lawyers." (Ex. 12 ¶ 2.) A week later, Ms. Wangari texted Mr. Karanja and asked him to call her back. (*Id.* ¶ 6.) A copy of the text message is attached as Exhibit 1 to Mr. Green's declaration.

7. Reading Exhibits 1, 9, and 12 together, it is abundantly clear that Ms. Wangari has been acting as an agent of the Ribbeck Law firm and that her offers of "legal aid" amount to nothing more than a poorly disguised subterfuge. But the fact that Ms. Wangari would feel compelled to lie about her obvious association with the Ribbeck Law firm shows that she and Respondents know that their predatory actions are deeply unethical. The targets of Ms. Wangari's

4

solicitations uniformly lack experience with the United States legal system, making them particularly vulnerable to offers of assistance from a fellow countrywoman who falsely claims to be a disinterested party.

8. As disturbing as these exhibits are, the WhatsApp messages contained in Exhibit 11 suggest even deeper misconduct on the part of Respondents. Clifford Law Offices obtained these messages from its client, Amr Lotfy, whose mother Suzan Farag was killed in the plane crash. The messages show Mr. Lotfy's conversation with a solicitor who identified himself only as "doctor Mohamed brother of deceased abdelhamid." Presumably, this is a reference to Respondents' client Mohamed Farrag Mohamed Megali, who served as Special Administrator for the Estate of Abdel Hamid Farrag Mohamed Megli in case number 19-cv-5803. (*See* Dkt. 916.) This Court approved the Parties' Joint Motion to Approve Minor Settlement in that case less than two months ago, on January 29, 2021. (Dkt. 919.)

9. In his first message, Dr. Mohamed told Mr. Lofty that his brother was "with your mom in the ethiopia plan crashed" and said "I ask my god that our be loved be in the paradise." (Exhibit 11 at 1 (mistakes in original here, as well as in subsequent quotations).) He then quickly pivoted to the purpose of his communication, explaining, "I wanna tell you that I already finish my case and if you need my help in any procedures or if you wanna to ask about anything, I will be ready for help as much as possible." (*Id.*) In his second message, Dr. Mohamed revealed that the settlement he obtained "is Very rewarding as for me," and "my lawyers told me it is a double what the other Egyptian family will get." (*Id.* at 2.) Next, Dr. Mohamed forwarded a dozen links to news articles extolling the success of the Ribbeck Law firm in obtaining settlements for victims in this litigation — including all three of the links that Caroline Wangari sent to Zipporah Kuria. (*Compare id.* at 3–5, *with* Exhibit 1 at 3–4.) Dr. Mohamed then asked Mr. Lotfy about his legal

5

representation, sent Mr. Lotfy Respondent Manuel Von Ribbeck's contact card, and confirmed that Respondent Ribbeck was "read[y] to do an online meeting" with Mr. Lotfy. (Exhibit 11 at 6–16.) Dr. Mohamed also revealed that Respondent Ribbeck had taken his case on a 20% contingency fee even though some of the other families had agreed to 33%. (*Id.* at 12.)

10. Mr. Lofty declined the invitation to speak with Mr. Ribbeck, explaining that Mr. Lotfy's brother was handling the case for the family and that the family's choice of representation was not Mr. Lotfy's to make. (*Id.* at 13, 16.) Dr. Mohamed then forwarded to Mr. Lotfy a lengthy message — apparently authored by someone at Ribbeck Law — explaining why that firm, more so than "other lawyers," "has the perfect window of opportunity" to settle cases related to the Ethiopian crash before "Boeing or its insurance company go out of business." (*Id.* at 16–18.) Dr. Mohamed continued to forward Mr. Lotfy messages about the crash through at least January 14, 2021. (*Id*. at 19–23.)

11. Even assuming that Dr. Mohamed had only the best of intentions for randomly contacting other family members of the crash victims, the content of the communications confirms that Respondents used Dr. Mohamed to attempt to set up an online meeting with Mr. Lotfy. Moreover, the messages were strikingly similar to the ones that Ms. Wangari sent to other represented parties on behalf of the Ribbecks. Indeed, some of the messages appear to have be written from the perspective of someone at the Ribbeck Law firm. Even apart from any concerns about solicitation, these messages are particularly disturbing because they show the kind of high-pressure sales tactics Respondents use to recruit Plaintiffs — including the absurd suggestion that Plaintiffs should worry about Boeing going out of business. At a minimum, Exhibit 11 shows precisely why a full investigation into Respondents' misconduct is warranted.

6

12. Moreover, Respondents appear to have a long history of pushing their legal services on grieving family members of those killed in aviation crashes. A simple Google search for the Ribbeck Law firm yields numerous articles describing Respondents' unseemly and unethical efforts to recruit plaintiffs for their aviation suits by any means necessary. *See, e.g.*, Brian Ross, *US Lawyers Aim to Profit in Malaysia Airlines Tragedy*, https://abc7chicago.com/29232/ (accessed Mar. 10, 2021) (describing the Ribbeck Law firm as "high stakes … ambulance chasers"); Cristine Negroni, *Like Mysterious MH 370 Flight, Air Lawyer Disappears* (June 29, 2017), https://www.forbes.com/sites/christinenegroni/2017/06/29/like-mysterious-mh-370-flight-air-lawyer-disappears/?sh=564fad37e98b (describing "a trail of unhappy clients" left behind when Respondent Kelly Wood-Prince left the country in the wake of a malpractice suit); Ryan Boysen, *Boeing Wins $75K In Sanctions Row Against Plane Crash Atty* (Apr. 27, 2017), https://www.law360.com/articles/918157/boeing-wins-75k-in-sanctions-row-against-plane-crash-atty (describing how a Cook County Circuit Court Judge sanctioned Ribbeck Law $75,000 for "repeatedly filing discovery requests ... then misrepresenting them as actual lawsuits to drum up business"); Steve Schmadeke, *Chicago lawyer faces sanctions for suit against Malaysia Airlines* (Aug. 6, 2014), https://www.chicagotribune.com/news/breaking/chi-chicago-lawyer-malaysia-airlines-suit-20140805-story.html (describing various ethical complaints filed against Respondent Kelly Wood-Prince); "); Edward Wong & Kirk Semple, *With Plane Still Missing, Legal Moves for Payouts Start* (Apr. 1, 2014), https://www.nytimes.com/2014/04/02/world/asia/malaysia-airlines-flight-370-compensation.html (describing how Ribbeck Law dispatched twelve employees to directly solicit family members of the passengers of Malaysia Airlines Flight 370); Jason Meisner, *Cook judge throws out Malaysia plane suit filed by Chicago firm* (Mar. 31, 2014),

7

https://www.chicagotribune.com/news/ct-xpm-2014-03-31-chi-cook-judge-throws-out-malaysia-plane-suit-filed-by-chicago-firm-20140331-story.html (describing Ribbeck Law's history of "questionable tactics in the wake of aviation disasters," including filing legal action without the consent of its nominal client).

13. Second, Respondents' aggressive efforts to directly solicit persons they knew to already have legal representation clearly violates ABA Model Rule 4.2. Despite what Respondents' counsel seemed to suggest at the hearing, there is no exception in Rule 4.2 that permits lawyers to offer unsolicited legal advice to their co-counsel's clients. Rather, the opposite is true; the entire purpose of the rule is to protect clients from "possible overreaching by other lawyers who are participating in the matter."[2] *See* RULE 4.2, COMMENT 1. Thus, the rule applies even when the represented person initiates the communication and even when the improper communications occur through an intermediary. *See* RULE 4.2, COMMENT 4; *In re Naquin*, 775 So.2d 1060 (La. 2000) (ordering disbarment of attorney who solicited, both through a third party and in person, a widow who he knew was already represented in a wrongful death action).

14. In addition to Rule 4.2, Respondents conduct plainly violates Rule 7.3(b), which generally prohibits lawyers from "solicit[ing] professional employment by live person-to-person contact when a significant motive for the lawyer's doing so is the lawyer's or law firm's pecuniary gain." In this context, "solicitation" means "communication initiated by or on behalf of a lawyer or law firm that is directed to a specific person the lawyer knows or reasonably should know needs legal services in a particular matter and that offers to provide, or reasonably can be understood as offering to provide, legal services for that matter." RULE 7.3(a). Under Rule 7.3, "a lawyer is also

---

[2] Notably, Rule 4.2 does not "preclude communication with a represented person who is seeking advice from a lawyer *who is not otherwise representing a client in the matter*." RULE 4.2, COMMENT 4 (emphasis added).

prohibited from using another as an intermediary to solicit prospective clients." *In re Universal Bldg. Prod.*, 486 B.R. 650, 658 (Bankr. D. Del. 2010).

15. Here, most of Respondents' improper solicitations appear to have occurred through WhatsApp messages and through intermediaries (or, perhaps, fictitious online personas), but there is also evidence in this case that Respondent Ribbeck personally engaged in live person-to-person solicitation of individuals he knew to have legal representation in this case. (Exhibit 4.) This "knowing solicitation of clients who were already being represented … exposed these persons to potential harm," not to mention the "potential injury to the legal profession as a whole by reducing the public's confidence in attorneys." *In re Broome*, 815 So. 2d 1, 6 (La. 2002) (ordering disbarment of attorney who solicited persons known to be represented by counsel).

16. What is more, Rule 7.3(c) prohibits solicitations that involve "coercion, duress, or harassment" even when those solicitations would not otherwise be prohibited by Rule 7.3(b). These would seem to be apt descriptions of some or all of the unsolicited communications that Respondents and their agents sent to those who lost loved ones on Ethiopian Airlines Flight 302.

17. Respondents' serious ethical violations have caused real, tangible harm to the Plaintiffs in this case. This is not a situation in which Respondents' violations of the Rules of Professional Conduct are merely technical or academic, or in which other lawyers are those most harmed by Respondents' actions. Rather, Respondents, by widely distributing unsolicited legal advice that contradicts the advice of Plaintiffs' attorneys, have clearly interfered with the attorney-client relationship between Plaintiffs and their attorneys. And it happens that the "advice" Respondents have offered is rife with misinformation. To name just one example, contrary to what someone at the Ribbeck Law firm apparently suggested in Exhibit 11, it is obviously not true that a reason Plaintiffs should accept a quick settlement in this case is because Boeing — a Fortune 50

9

company with a market capitalization of over $141 billion dollars[3] — is at serious risk of going out of business before this litigation is resolved. The only possible reason to suggest otherwise is to pressure unsuspecting Plaintiffs into accepting early settlements that would serve primarily to line Respondents' pockets at Plaintiffs' expense, contrary to the advice of Plaintiffs' current attorneys. This predatory conduct must not be allowed to continue.

18. Moreover, merely ordering Respondents to comply with their ethical obligations on a prospective basis will not unwind the serious harm that Respondents' actions have already caused. The full extent of Respondents improper solicitations is not yet known at this time, in part, because Respondents acted through two or more intermediaries who misrepresented their association with the firm. Likewise, Movant only learned about Respondents' improper solicitations because some of the targets of those solicitations decided to bring the solicitations to the attention of their current attorneys. There may be many more instances in which, for whatever reason, an individual who received misinformation from Respondents and their agents may have not felt comfortable bringing the issue to the attention of their current attorneys, perhaps out of fear that they will be perceived of having done something wrong by communicating with a stranger about their case. Movant therefore seeks a full investigation into Respondents' interference with Movant's attorney-client relationships, including the identities of any individuals Respondents solicited in connection of their litigation and the content of what was communicated with them. Only once the full extent of Respondents' malfeasance has been brought to light can the Court craft an appropriate remedy.

---

[3] *See Boeing Co.*, GOOGLE FINANCE, https://www.google.com/finance/quote/BA:NYSE?sa=X&ved=2ahUKEwjkubbCsqbvAhVBHM0KHQpgDXUQ3ecFMAB6BAgDEBI (accessed Mar. 12, 2021)

19. Finally, as for Movant's proposed remedy, Movant respectfully requests that this Court enter an order barring Respondents from having any *ex parte* communication — either directly or indirectly — with any person who is represented by legal counsel in connection with this litigation; (2) appoint a Special Master, similar to what is provided in Local Rule 83.29, to fully investigate the extent of Respondents' misconduct; (3) find that Respondents violated their ethical obligations by engaging in the misconduct alleged herein and in Movant's Motion; and (4) award Plaintiffs' Executive Committee the attorneys' fees they reasonably incurred in bringing Respondents' serious ethical violations to the Court's attention.

Respectfully Submitted,

DATED: March 15, 2021

PLAINTIFFS' EXECUTIVE COMMITTEE

By: /s/ J. Timothy Eaton

J. Timothy Eaton
teaton@taftlaw.com
Andrew S. Murphy
amuprhy@taftlaw.com
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2800
Chicago, Illinois 60601
(312) 527-4000
*Counsel for Plaintiffs' Executive Committee*

Robert A. Clifford
Kevin P. Durkin
Tracy A. Brammeier
John V. Kalantzis
CLIFFORD LAW OFFICES, P.C.
120 N. LaSalle Street, Suite 3100
Chicago, IL 60602
312-899-9090
312-251-1160 facsimile
rac@cliffordlaw.com
kpd@cliffordlaw.com
tab@cliffordlaw.com

jvk@cliffordlaw.com
*Members of Plaintiffs' Executive Committee*

## CERTIFICATE OF SERVICE

    The undersigned hereby certifies that a copy of the foregoing was filed electronically on March 15, 2021. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

                                                         /s/ J. Timothy Eaton
                                                         *Counsel for Plaintiffs' Executive Committee*