## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **IN RE ETHIOPIAN AIRLINES FLIGHT ET 302 CRASH** | **FIRST AMENDED COMPLAINT** |
| **MICHAEL STUMO** and **NADIA MILLERON**, as Personal Representatives of the Estate of **SAMYA STUMO**, deceased, | Lead Case No.: 19-cv-02170 *This Filing Relates to 19-cv-02281[1]* |
| Plaintiffs | |
| v. | |
| **THE BOEING COMPANY**, a Delaware corporation; **ROSEMOUNT AEROSPACE, INC**., a Delaware corporation; **ROCKWELL COLLINS, INC**., a Delaware corporation; **DENNIS MUILENBURG**, an individual, **DAVID CALHOUN**, an individual | |
| Defendants. | |

---

[1] Per the Consolidation Order dated May 22, 2019, all pleadings shall be filed in the consolidated case alone (19 C 2170) (Document #35).

i

**TABLE OF CONTENTS**

**PAGE NO.**

I.  INTRODUCTION ..................................................................................................1

II.  JURISDICTION AND VENUE ..........................................................................8

III.  THE PARTIES ...................................................................................................11

    A.  PLAINTIFF ............................................................................ 11

    B.  DEFENDANTS ....................................................................... 11

    C.  AGENCY & CONCERT OF ACTION .................................................... 12

IV.  STATEMENT OF FACTS .................................................................................13

    A.  THE TWO MAX CRASHES WERE THE PRODUCT OF THE BOEING DEFENDANTS' RELENTLESS PURSUIT OF PROFIT MARGIN..... 13

    B.  THE BOEING DEFENDANTS' COMPETITION WITH AIRBUS AND ORGANIZATIONAL FAILURES CREATED THE UNSAFE 737 MAX 8.................................................................................. 18

    1.  THE BOEING DEFENDANTS Stretched the 737's Design and Created an Aerodynamically Unstable Aircraft ..................................... 18

    2.  THE BOEING DEFENDANTS Utilized A Flight Control System Which Addressed One Problem But Created Another ......................................... 22

    3.  THE BOEING DEFENDANTS Prevented Pilot Simulator Training for the MAX ................................................................... 28

    4.  THE BOEING DEFENDANTS Failed to Promote Safety and Protect Against Reckless Risk-Taking in Response to Their Short-Sighted Business Objectives ................................................... 32

    5.  THE BOEING DEFENDANTS Conducted a Flawed Safety Assessment of the MCAS and Submitted Erroneous Data to the FAA ........................ 36

    6.  THE BOEING DEFENDANTS Rejected Multiple Options to Make its Plane Safer ................................................................ 44

    7.  THE BOEING DEFENDANTS Misrepresented Their Airplane to Pilots and Airlines, Downplaying the Need for Essential Training................... 51

    C.  THE BOEING DEFENDANTS' REGULATORY CAPTURE OF THE FEDERAL AVIATION ADMINISTRATION AND LAX OVERSIGHT LED TO A FLAWED CERTIFICATION OF THE 737 MAX 8 ........... 53

D.     DEFENDANTS CREATED THE FATALLY FLAWED MCAS IN VIOLATION OF MANDATED SAFETY PROCESSES ...................... 60

E.     LION AIR FLIGHT JT 610 CRASHED BECAUSE PILOTS EXPERIENCED A FLIGHT CONTROL ISSUE CAUSED BY THE BOEING DEFENDANTS ....................................................... 65

F.     THE BOEING DEFENDANTS ENGAGED IN A COVER-UP IN THE WAKE OF THE LION AIR CRASH TO KEEP THE MAX IN THE AIR ......................................................................................... 66

    1.     THE BOEING DEFENDANTS Understood the Danger Presented by the MAX After Lion Air ................................................. 66

    2.     THE BOEING DEFENDANTS Concealed the Problems with the MCAS ......................................................................................... 70

    3.     THE BOEING DEFENDANTS Downplayed the MAX's Role in the Crash and Directed Blame onto Others. ..................................... 73

    4.     THE BOEING DEFENDANTS Enlisted the Help of the FAA in its Coverup of the 737 MAX 8's Safety Issues. ............................. 84

G.     ETHIOPIAN AIRLINES FLIGHT 302 CRASHED, KILLING ALL 157 PEOPLE ON BOARD .............................................................. 87

H.     THE BOEING DEFENDANTS' COVERUP CAMPAIGN CONTINUED AFTER ET 302 ...................................................................... 93

V.     CLAIMS FOR RELIEF ................................................................. 101

COUNT I NEGLIGENCE THE BOEING COMPANY ............................................. 101

COUNT II NEGLIGENCE DENNIS MUILENBURG ............................................. 107

COUNT III NEGLIGENCE DAVID CALHOUN .................................................... 113

COUNT IV BREACH OF WARRANTY (THE BOEING DEFENDANTS) ........................... 119

COUNT V STRICT LIABILITY (THE BOEING DEFENDANTS) ................................... 122

COUNT VI FAILURE TO WARN (THE BOEING DEFENDANTS) .................................. 125

COUNT VII NEGLIGENCE  (ROSEMOUNT AEROSPACE, INC.) ................................. 128

COUNT VIII STRICT LIABILITY (ROSEMOUNT AEROSPACE, INC.) ............................ 131

COUNT IX BREACH OF WARRANTY  (ROSEMOUNT AEROSPACE, INC.) .................... 134

COUNT X NEGLIGENCE (ROCKWELL COLLINS, INC.) ......................................... 136

COUNT XI STRICT LIABILITY (ROCKWELL COLLINS, INC.) .........................................139

COUNT XII BREACH OF WARRANTY (ROCKWELL COLLINS, INC.) ...........................142

COUNT XIII CIVIL CONSPIRACY (THE BOEING DEFENDANTS  and ROCKWELL COLLINS, INC.) ....................................................................................................................145

VI.     PRAYER FOR RELIEF .............................................................................................149

VII.    JURY DEMAND ........................................................................................................150

Plaintiffs **NADIA MILLERON** and **MICHAEL STUMO**, as Personal Representatives of the Estate of **SAMYA STUMO**, deceased, bring this action for damages on behalf of the Estate of their daughter, **SAMYA STUMO**, her estate, heirs, and survivors against Defendants **THE BOEING COMPANY ("BOEING"); ROSEMOUNT AEROSPACE, INC. ("ROSEMOUNT"), ROCKWELL COLLINS, INC. ("ROCKWELL"), DENNIS MUILENBURG ("MUILENBURG")**, and **DAVID CALHOUN ("CALHOUN")** as follows:

## I.    INTRODUCTION

1.    This action arises from the horrific crash of Ethiopian Airlines Flight ET 302 ("Flight 302") on March 10, 2019, in which 157 people lost their lives. The airplane involved in Flight 302 was a Boeing 737 MAX 8. This disaster came less than five months after Lion Air Flight JT 610 – another Boeing 737 MAX 8 – crashed into the Java Sea on October 29, 2018, killing all 189 onboard.  It is filed against **THE BOEING COMPANY** and two senior BOEING leaders, **DENNIS MUILENBURG** and **DAVID CALHOUN**, all of whom acted and failed to act individually and through persons they controlled or had a right to control.

2.    A common cause is behind both crashes.  Shortly after takeoff and while attempting to climb, both airplanes and their pilots experienced dangerous, confusing, and counter-intuitive warnings and flight control anomalies due to a defectively designed flight control system, which caused the planes to pitch down erratically through the sky in repeated, extreme maneuvers uncommanded by the pilots. Data obtained from both airplanes show that the pilots were engaged in a terrifying tug-of-war with the planes' Maneuvering Characteristics Augmentation System (MCAS), a flight control software built into the BOEING 737 MAX's flight control computer purportedly intended to correct the differences in stall handling between the MAX and earlier generations of the 737, as the pilots manually tried to pull the airplanes' noses up while MCAS repeatedly caused the plane to dive. Pilots of both Flight 302 and Flight 610 ultimately lost their fight with **BOEING's** MCAS, and 346 passengers and flight crew were killed.



3.     The MCAS was a disaster waiting to happen born out of **MUILENBURG**, **CALHOUN**, and **BOEING's** (hereinafter, "**THE BOEING DEFENDANTS**") desperate race with its major competitor in the commercial aviation market, Airbus SE ("Airbus"). To compete with the latest Airbus airplane, the A320neo, **BOEING** thought they needed a more fuel-efficient airplane of its own. Instead of designing a new state-of-the-art airplane, **THE BOEING DEFENDANTS** made the fateful decision to attach larger and more fuel-efficient engines to the wings of the decades-old 737, creating the 737 MAX 8 via the Federal Aviation Administration's (FAA) Supplemental Type Certification process. The engine's larger nacelle and larger fan diameter caused aerodynamic handling problems and made the 737 MAX 8 operate differently than prior 737 airplane models. Since the 737 MAX 8 handled differently than its predecessors, it would require costly and time-consuming training for pilots, which would make the 737 MAX 8 more expensive relative to the A320neo and less profitable for **BOEING**. This was unacceptable

to **BOEING** leadership. Rather than fix the airplane's known, design-induced, inherent aerodynamic instability, **BOEING** introduced MCAS in a deceptive effort to replicate more closely the handling characteristics of the previous 737 airplanes.

4.      MCAS had not been used on prior 737 airplanes; accordingly, **THE BOEING DEFENDANTS** were concerned its introduction could potentially trigger new pilot training requirements and certification issues. This presented a disastrous and entirely avoidable catch-22 for **THE BOEING DEFENDANTS**: on one hand, without MCAS the MAX could not be certified utilizing the airplane's Supplemental Type Certification process, because the MAX's handling characteristics would not replicate the handling characteristics of previous 737 airplanes, and on the other hand, by introducing a new flight control system, regulators would likely require operators to incorporate additional costly pilot training, and require **BOEING** to conduct additional flight testing and add system safety measures, which could jeopardize **BOEING's** production schedule. Either outcome would hurt the 737 MAX 8's sales and profitability. THE **BOEING DEFENDANTS'** solution was to incorporate MCAS but downplay and conceal its characteristics from the FAA, other worldwide aviation authorities, and its MAX customers. **BOEING** told the FAA that MCAS was just a minor addition to an existing flight control system on the 737NG and that it "only operates WAY outside of the normal operating envelope" so it would rarely, if ever, activate.

5.      **BOEING's** representations to the FAA were fraudulent. **THE BOEING DEFENDANTS** knew that the MCAS was more powerful and had a much broader operational envelope but deliberately withheld this information from the FAA, airlines, and pilots to avoid scrutiny of the MCAS and minimize pilot training requirements. In January 2021, **BOEING** and the Department of Justice entered into a Deferred Prosecution Agreement in which **BOEING**

admitted that it engaged in a Conspiracy to Defraud the FAA and two U.S. airlines and was ordered to pay $2.5 Billion as a criminal monetary penalty.

6. **BOEING's** fraud against the FAA and **BOEING's** customers was one piece in **THE BOEING DEFENDANTS'** conspiracy of silence relating to the MAX. Driven to maintain market share, **THE BOEING DEFENDANTS** made the decision to haphazardly rush the 737 MAX 8 to market to keep up with Airbus without installing safety processes or systems of oversight to ensure that **BOEING** did not cut corners in accomplishing this goal. Fearful that transparency and disclosure would delay certification and airplane delivery, **THE BOEING DEFENDANTS** resorted to misleading the FAA, the airlines, their pilots, and the public by actively concealing the dangerous nature of the aircraft as well as the MCAS's defects. After each MAX crash, **THE BOEING DEFENDANTS** continued the conspiracy of silence, covering up the deadly risk-taking that led to the two crashes and minimizing the role of MCAS, in an attempt to first keep the MAX flying and, after it was grounded, getting it back in the air as quickly as possible.

7. **THE BOEING DEFENDANTS'** strategy to deceive the FAA and sneak the defective MCAS past the regulator was successful in part because, as the largest aircraft manufacturer in the world and one of the most powerful corporations in the United States, **BOEING** has long exercised tremendous influence over the FAA. **BOEING** used its substantial lobbying powers and platform to push for greater deregulation by the FAA, resulting in the granting of an unprecedented degree of authority to **BOEING** to self-certify its airplane through the Organization Designation Authorization (ODA) program. The ODA program allowed **BOEING** to designate its own employees as FAA representatives responsible for evaluating the safety of the airplane. Despite the obvious conflict of interest with **BOEING** employees filling the dual role as **BOEING** employee and regulator, **THE BOEING DEFENDANTS** failed to install

systems of oversight or create walls to protect these FAA agents from undue pressure, leading to these agents rubberstamping **BOEING's** designs, including MCAS, despite clear safety issues. With **BOEING's** own employees acting as agents for **BOEING** and the FAA, **BOEING** successfully obtained type certification for the MAX to get it quickly into the hands of pilots, who would have very little training on the MAX, and no training on MCAS.

8.      Under pressure to reach production targets, **THE BOEING DEFENDANTS** consciously disregarded the lives of others at numerous points leading up to the crashes, including by: designing an airplane with the powerful automated MCAS susceptible to catastrophic failure in the event of a single defective angle of attack sensor; failing to conduct a proper hazard analysis of the new MCAS design; failing to mitigate patent and latent hazards in the new MCAS design; failing to conduct adequate human factor evaluations of pilot reactions to erroneous activation of MCAS; failing to evaluate the aerodynamic loads on the manual stabilizer trim wheel when MCAS is activated; failing to identify MCAS as a safety critical system; failing to properly inform pilots about the new system; failing to educate and train pilots in all aspects of its operation; failing to properly address the MCAS in the airplane's flight manual; failing to include key safety features or redundant systems of protection; deceptively seeking and obtaining from the FAA an exemption for certification of the 737 MAX 8 allowing **BOEING** to obtain certification of the airplane without including a robust cockpit alert system as required by FAA regulations for safety critical systems; delivering 737 MAX 8 airplanes with a version of the flight control system that was materially different from the flight control system presented to the FAA during certification; including a flight control system that was materially different from the NG while representing to the FAA and the public that the changes were disclosed and minor; and concealing and downplaying the 737 MAX 8's safety issues from the FAA, airlines, pilots, and the public.

9.     These failures were not simply engineering mistakes; they were the natural result of intentional deadly trade-offs made by **THE BOEING DEFENDANTS** which wrongly limited its engineers to design an aircraft. **BOEING** engineers had to fix fundamental aerodynamic problems created by the new engines but had to minimize changes in keeping with an overarching program directive dictated by **THE BOEING DEFENDANTS**. In the end, the MCAS was the product of **THE BOEING DEFENDANTS'** financial engineering and short-sighted business interests that limited the design options that the engineers would employ.

10.     **THE BOEING DEFENDANTS** understood the risks it was taking because **THE BOEING DEFENDANTS** were warned about the defects in the MCAS system by its own employees and were aware that they was misleading the public and the FAA, but they failed to act for fear that disclosing or properly fixing the defects might delay certification and production of the 737 MAX 8. **THE BOEING DEFENDANTS** had opportunities time and time again to do the right thing and either abandon the MAX, give engineers the time and flexibility they needed to make the airplane safe, or come clean with the public about its flaws. Undeterred, **THE BOEING DEFENDANTS** refused to deviate from its plan to maximize shareholder profits, leading to the tragic crash of Lion Air Flight JT 610 which plunged into the Java Sea on October 29, 2018.

11.     Shortly after the crash, **THE BOEING DEFENDANTS** learned the MCAS was likely to blame, but again chose to protect its bottom line rather than protect the flying public. **THE BOEING DEFENDANTS** engaged in a concerted coverup campaign to deceive the FAA, pilots, airlines, and the public about the 737 MAX 8's defects, the MCAS, and causes of the Lion Air crash. **THE BOEING DEFENDANTS** proceeded to blame the foreign pilots for the crash of Lion Air while denying the role of its own defective airplane and the responsibility it had for ensuring pilots received no training on MCAS, or knew MCAS was installed on the MAX. As a

result of this cover-up, **THE BOEING DEFENDANTS** convinced the FAA and airlines to permit the 737 MAX 8 to continue flying.

12.     **ROSEMOUNT** and **ROCKWELL**, the suppliers of the sensor and software involved in both crashes, were aware of the risk of unintended MCAS activation because they knew or should have known the system was designed to rely on a single point of failure – an angle of attack sensor with a known history of malfunction. Their financial interest in the MAX's success influenced their assessment of the danger and induced them to stay silent as the MAX, with their integrated part/software, was certified by the FAA. Following the Lion Air crash, they remained silent to conceal the role they played in the certification of the MAX and to ensure that the MAX, with their product, continued to roll out of **BOEING's** production facilities.

13.     Committed to keeping its cash cow in the air, **THE BOEING DEFENDANTS** persisted in trying to keep the 737 MAX 8 flying after the second crash, even calling then-President Donald Trump in a plea to the federal government against grounding. **THE BOEING DEFENDANTS'** efforts were thwarted, however, when the FAA acted to ground the airplane after other aviation authorities around the world saw the danger of the 737 MAX 8 for what it was and grounded the airplane.  The FAA was slow to act in large part because of **THE BOEING DEFENDANTS'** misrepresentations to the FAA.

14.     Throughout, **THE BOEING DEFENDANTS** again and again put profits over safety with repeated claims that the 737 MAX 8 was so similar to the BOEING 737NG that it did not require significant additional training for pilots familiar with the older generation of 737s. Even after Lion Air Flight 610 crashed, **THE BOEING DEFENDANTS** falsely insisted that pilot simulator training was not required while paradoxically blaming "poorly trained" foreign pilots because **THE BOEING DEFENDANTS** feared airlines would buy fewer **BOEING** airplanes if pilots required extensive training. In so doing, **THE BOEING DEFENDANTS** risked people's

lives—and ultimately killed hundreds of people—merely for an improved bottom line and personal enrichment.

15.     **THE BOEING DEFENDANTS** knew that the 737 MAX 8 was defective from the start. It then made an already dangerous airplane even more deadly when it added the recklessly conceived MCAS. **THE BOEING DEFENDANTS** concealed these known dangers from the FAA throughout the program to obtain regulatory approval through a rigged self-certification process. The airplane's flaws and deadly consequences were undeniable after Lion Air Flight JT 610 crashed—and the FAA's own analysis in December 2018 found the MCAS design flaw, if left uncorrected, would result in an additional approximately 15 fatal crashes over the life of the fleet— yet **THE BOEING DEFENDANTS** still fought any effort to ground the airplane. Instead, **THE BOEING DEFENDANTS** engaged in a cover-up and convinced the FAA to keep the airplanes flying across the globe, without additional pilot training or safety precautions. **THE BOEING DEFENDANTS** intentionally chose to expose flight crews and passengers to the known risks of another catastrophic accident and, predictably, a further 157 lives were lost in the Ethiopian Airlines Flight 302 disaster as a result. No corporation or person is allowed to so cavalierly risk lives and undermine government safety regulators; **THE BOEING DEFENDANTS** must pay full compensatory and punitive damages to the Plaintiffs to compensate, punish, and deter this and similar reprehensible conduct.

## II.     JURISDICTION AND VENUE

16.     The Court has subject matter jurisdiction of this dispute pursuant to 28 U.S.C. § 1332 because this case involves a dispute between Plaintiffs and Defendants from diverse states and the amount in controversy exceeds the jurisdictional minimum of this Court.

17.     This Court has personal jurisdiction over **BOEING** because its principal place of business and corporate headquarters is in Illinois, it is registered to do business with the Illinois Secretary of State, and it does business in the State of Illinois.

18.     This Court has personal jurisdiction over **MUILENBURG** because, at all relevant times, he was an officer of Illinois-based **BOEING**, the issues in this action derive from, and are connected with his substantial contacts with this District, and **BOEING's** contacts with Illinois are attributed to and/or imputed to **MUILENBURG** through his agency, partnership, and/or joint venture relationship with **BOEING**.

19.     This Court has personal jurisdiction over **CALHOUN** because, at all relevant times, he was an officer and/or director of Illinois-based **BOEING**, the issues in this action derive from, and are connected with his substantial contacts with this District, and **BOEING's** contacts with Illinois are attributed to and/or imputed to **CALHOUN** through his agency, partnership, and/or joint venture relationship with **BOEING**.

20.     This Court has personal jurisdiction over **ROSEMOUNT** because, upon information and belief: **ROSEMOUNT**, pursuant to contracts with **BOEING**, designed, wrote, and sold the subject defective Angle-of-Attack sensor(s), model 0861FL1 with Serial Numbers 21844 and/or 21860 ("subject AOA sensor"), to Illinois-based **BOEING** intending the sensors to be installed on **BOEING's** MAX 8 airplanes; issues in this action derive from, and are connected with, **ROSEMOUNT's** contacts with this District and its dealings with **BOEING**; **BOEING's** contacts with Illinois are attributed to and/or imputed to **ROSEMOUNT** through its agency, partnership, and/or joint venture relationship with **BOEING**; **BOEING** and **ROSEMOUNT** and each of them, made and performed contract(s) and promise(s) with each other regarding the subject AOA sensor(s) that is, and at all times herein mentioned was, substantially connected with Illinois. **PLAINTIFF** and **PLAINTIFF'S DECEDENT** are third-party beneficiaries of each such

contract; there was and is a regular and anticipated flow of airplane component parts, including sensors, from **ROSEMOUNT** to **BOEING** for distribution and sale in Illinois, including parts that were designed specifically for Illinois based **BOEING's** 737 MAX 8 airplanes. **DEFENDANTS**, and each of them, advertised in Illinois, marketed through distributors in Illinois, and established channels for providing regular advice to customers in Illinois. **ROSEMOUNT** is registered to do business with the Illinois Secretary of State and, indeed, identifies an agent for service of process for Illinois who is located in Chicago.

21. This Court has personal jurisdiction over **ROCKWELL** because, upon information and belief: **ROCKWELL**, pursuant to contracts with **BOEING**, sold the subject flight-control law, MCAS related software, to Illinois-based **BOEING** intending the MCAS-related software to be installed on **BOEING's** MAX 8 airplanes; issues in this action derive from, and are connected with, **ROCKWELL'S** contacts with this District and its dealings with **BOEING**; **BOEING's** contacts with Illinois are attributed to and/or imputed to **ROCKWELL** through its agency, partnership, and/or joint venture relationship with **BOEING**; **BOEING** and **ROCKWELL** and each of them, made and performed contract(s) and promise(s) with each other regarding the subject defective MCAS- related software that is, and at all times herein mentioned was, substantially connected with Illinois. **PLAINTIFF** and **PLAINTIFF'S DECEDENT** are third-party beneficiaries of each such contract; there was and is a regular and anticipated flow of airplane component parts, including sensors, from **ROCKWELL** to **BOEING** for distribution and sale in Illinois, including parts that were designed specifically for Illinois based **BOEING's** 737 MAX 8 airplanes. **DEFENDANTS**, and each of them, advertised in Illinois, marketed through distributors in Illinois, and established channels for providing regular advice to customers in Illinois. **ROCKWELL** is registered to do business with the Illinois Secretary of State and, indeed, identifies an agent for service of process for Illinois who is located in Chicago.

10

22.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. §1391(b)(1) because: **BOEING** is and has, at all relevant times, been a citizen and resident of the State of Illinois; **BOEING's** corporate headquarters and principal place of business are located in this judicial district at 100 North Riverside, Chicago, Cook County, Illinois 60606; and **BOEING** has been authorized to do business and has been transacting or conducting business within the State of Illinois. See 735 Ill. Comp. Stat. 5/2-209(b)(4).

### III.     THE PARTIES

#### A.     PLAINTIFF

23.     Samya Stumo was a passenger on board Ethiopian Flight ET 302 when it crashed on March 10, 2019. Plaintiffs **NADIA MILLERON** and **MICHAEL STUMO** are the mother and father, respectively, of Samya Stumo, are the next of kin for **DECEDENT**, and are jointly the Personal Representatives of the Estate of Samya Stumo, on her behalf and the behalf of her estate, heirs, survivors, and beneficiaries ("**PLAINTIFFS**"). Both **SAMYA STUMO** and **PLAINTIFFS** were/are citizens of the United States with their domicile in the Commonwealth of Massachusetts.

#### B.     DEFENDANTS

24.      Defendant **THE BOEING COMPANY** is, and at all relevant times was, a Delaware corporation with its principal place of business in the State of Illinois.  **BOEING** is, and at all relevant times was, registered with the Illinois Secretary of State as doing business in Illinois, and it does business in Illinois and in this Judicial District. **BOEING's** headquarters are in this District.

25.     Defendant **ROSEMOUNT AEROSPACE, INC.** is, and at all relevant times was, a Delaware corporation with its principal place of business in the State of Minnesota. **ROSEMOUNT** is, and at all relevant times was, in the business of designing, manufacturing,

11

assembling, distributing, marketing and supplying sensors used in **BOEING's** airplanes, including the particular angle of attack sensor that was defective at the time of the subject disaster.

26.     Defendant **ROCKWELL COLLINS, INC.** is, and at all relevant times was, a Delaware corporation with its principal place of business in the State of Iowa. **ROCKWELL** is, and at all relevant times was, in the business of designing, programming, manufacturing, assembling, testing, servicing, marketing, promoting, distributing, and supplying flight control software, including the defective MCAS, which was installed on the airplane at issue, the Boeing 737 MAX 8 airplane, ET-AVJ, Serial Number 62450, and that caused the subject disaster.

27.     Defendant **DENNIS MUILENBURG** served as President of **BOEING** from December 2013 to December 2019, Chief Executive Officer from July 2015 to December 2019, and Lead Director of the board from March 2016 to October 2019.

28.     Defendant **DAVID CALHOUN**, served as member of **BOEING's** board of directors since 2009 and served as Lead Director of the company's board of directors from October to December 2019. As Lead Director of the board of directors, **CALHOUN** provided leadership to the firm's executives and other employees, led the charge on big-picture decisions, and set the tone for the corporate culture of the company.  He currently serves as **BOEING's** President and Chief Executive Officer since January 2020.

## C.     AGENCY & CONCERT OF ACTION

29.     At all times herein mentioned herein, **DEFENDANTS**, and/or each of them, hereinabove, as well as other entities and individuals, were the agents, servants, employees, partners, aiders and abettors, co-conspirators, and/or joint venturers of each of the other **DEFENDANTS** named herein and were at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, enterprise, conspiracy, and/or joint venture, and each **DEFENDANT** has ratified and approved the acts of each of the remaining

12

**DEFENDANTS**. Each of the **DEFENDANTS** aided and abetted, encouraged, and rendered substantial assistance to the other **DEFENDANTS** in breaching their obligations to **PLAINTIFFS** as alleged herein. In taking action to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoings complained of, as alleged herein, each of the **DEFENDANTS** acted with an awareness of his/her/its primary wrongdoing and realized that his/her/its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

30. The defendants acted in concert through their respective agents—their Board of Directors, officers, managing agents, and employees—to wrongfully cause harm to **PLAINTIFFS**, and/or have aided in abetted the tortious and wrongful conduct of each other.

31. **DEFENDANTS**, and/or each of them, hereinabove, as well as other entities and individuals, knowingly and voluntarily agreed to engage and did engage in a scheme, plan, and agreement with each other, to deceive, deny, conceal, or otherwise downplay the hazards and safety problems, concerns, and defects in the **BOEING** 737 MAX 8 airplane in violation of the laws and regulations of the United States and the common law, in order to obtain and expedite type certification of the airplane, to market and sell the 737 MAX 8 to unsuspecting airlines, to convince the flying public, including Samya Stumo, that the 737 MAX 8 was safe and airworthy for commercial transport, and to keep the 737 MAX 8 ungrounded following the crash of Lion Air Flight JT 610 and death of all 189 people onboard, and in furtherance of other wrongful conduct, wrongful goals and wrongdoing.

### IV. STATEMENT OF FACTS

### A. THE TWO MAX CRASHES WERE THE PRODUCT OF THE BOEING DEFENDANTS' RELENTLESS PURSUIT OF PROFIT MARGIN

32.     The fateful decisions surrounding the certification of the 737 MAX 8, its production and the two crashes took place at a time when then-CEO **MUILENBURG**, his predecessor, James McNerney, **CALHOUN** on the Board of Directors, and **BOEING** management were vocally and unabashedly committed to maximizing **BOEING's** profit margin and return to shareholders. Between 2011 and 2016, **BOEING's** operating profit margins averaged 7.6%. **BOEING** was already a profitable company, but the MAX presented an opportunity for **MUILENBURG, CALHOUN** and **BOEING** leadership to grow profits and personal income further. At a conference in 2016, **MUILENBURG** declared that he planned to lift profit margins to double-digits by the end of the following year and wanted to reach mid-teen margins by the end of the decade. The MAX was one of **MUILENBURG's** vehicles to realize these gains.

33.     **MUILENBURG** repeated this again in early 2017. He explained that he would achieve these mid-teen margins, at least in part, by cutting payments to suppliers. One of these cost-cutting efforts was **BOEING's** "Partnering for Success" initiative, which called for 15% price cuts to supplier contracts, increasing the likelihood that suppliers such as **ROSEMOUNT** and **ROCKWELL** would cut costs themselves and deliver a substandard product for **BOEING's** airplanes.

34.     Then again during **BOEING's** second-quarter Earnings Call with financial analysts in 2018, just a matter of months before 189 people would be killed in the Lion Air crash, **MUILENBURG** and CFO Gregory Smith were even more explicit in their focus. Gregory Smith described that **BOEING's** "end objective" is to "grow the business as we've talked about a lot, at the same time grow the bottom-line and expand margin." Smith also described how they "remain focused and on track with our balanced cash deployment strategy" of stock repurchases and dividends and "anticipate completing the remaining $12 billion repurchase authorization over the next 18 months to 24 months." This timetable would overlap with both MAX crashes.

14

35.     On the same call, **MUILENBURG** explained:

"…we're driving towards that mid-teen margin by the end of the decade. That's been our objective. You can see the progress we're making, and as we mentioned before, we expect it to be continuing incremental progress… We are going to be relentless on this focus and it's really about driving out cost, driving productivity, working with our supply chain, and being diligent about our production rates."

36.     **THE BOEING DEFENDANTS'** ability to meet these objectives depended in large part on the success of the MAX, which had already amassed a substantial backlog of orders. Delivering on **MUILENBURG's** promises also meant that **THE BOEING DEFENDANTS** would need to meet its program schedule for the 737 MAX 8 and keep production of the airplane moving at its facilities. **BOEING** was successful in both regards as it managed to get the MAX certified ahead of schedule and production at **BOEING's** facilities proceeded unabated even after **BOEING** employees raised grave concerns about overworked assembly workers making mistakes.

37.     As current CEO **CALHOUN** told the New York Times, then-CEO, **MUILENBURG,** had "turbocharged" **BOEING's** production rates before the supply chain was ready in a move that **CALHOUN** believed compromised quality. Despite these risks, **CALHOUN** as a member of the Board of Directors did not seek to corral **MUILENBURG** since **BOEING** and he were experiencing great financial success.

38.     It was in this context that **THE BOEING DEFENDANTS** crafted their strategy in response to the crash of Lion Air Flight 610. Due to **THE BOEING DEFENDANTS'** singular focus on maximizing shareholder profits and their own compensation, **THE BOEING DEFENDANTS** were unwilling to support grounding the airplane, come clean about the MAX's flaws, or advocate for additional training. **THE BOEING DEFENDANTS** refused to jeopardize its double-digit profit margins, soaring share price, and personal enrichment.

39.     Following the Lion Air crash, **THE BOEING DEFENDANTS** failed to dutifully exercise their oversight responsibilities to ensure the integrity of **BOEING's** safety assessment of the MAX. This allowed **THE BOEING DEFENDANTS'** financial objectives to overwhelm the risk assessment for the continued airworthiness of the MAX, causing **THE BOEING DEFENDANTS** to unreasonably dismiss the risk of further accidents.

40.     In 2018, before the second deadly crash, **MUILENBURG** was awarded a $23.4 million pay package, up 27% from the previous year.

41.     Instead of taking more aggressive action to protect public safety, **THE BOEING DEFENDANTS** kept a keen eye on the record revenue the 737 MAX 8 was generating and the backlog of orders it had yet to fill. Just a few months after expressing condolences for the victims of Lion Air Flight 610, **MUILENBURG** intentionally misrepresented to the media that the 737 MAX was safe. **BOEING's** twitter account posted the following:



42.     **THE BOEING DEFENDANTS** realized **BOEING's** record-breaking revenue by prioritizing profits, share price and their personal income over safety throughout the development, certification, and production of the 737 MAX 8:

16

a. From the first quarter of 2013 through the first quarter of 2019, **BOEING** paid out $17.4 billion in dividends and spent an additional $43.1 billion on buybacks, equal to a 104 percent of profits.

b. The company's revenue in 2018 was $101.1 billion. According to **BOEING's** 10-Q for the quarter ending March 31, 2019, **BOEING** possessed $120.209 billion in assets and only $83.615 billion in liabilities. **BOEING's** market capitalization hit a high of nearly $249 billion in 2019.

c. **BOEING** made $10.460 billion in profits in 2018, but on December 17, 2018, less than two months after the Lion Air crash, **THE BOEING DEFENDANTS** authorized another $20 billion for stock buyback program to boost the company's stock price and its executives' compensation through stock options. As a result, **BOEING's** stock price jumped by 31% between December 17 and March 8, 2019, two days before the Ethiopian Airlines crash.

d. From 2015 through 2018, **BOEING's** chairman and chief executive officer Dennis Muilenburg was paid $95.9 million including salary and stock; in 2018, the year of the Lion Air crash, **MUILENBURG** received $23,400,000 in compensation, including a $13,000,000 bonus.

e. From 2016 through 2019, **BOEING's** member of the Board of Directors, **CALHOUN** made $1,462,842 in total compensation. In 2020, after being appointed **BOEING's** new chief executive officer **CALHOUN** was awarded $21,074,052 in total compensation for his work. **CALHOUN's** total compensation includes awards of about $7 million worth of stock including returning the 737 MAX into service. It also includes $10 million in stock for leaving his job at Blackstone Group and another $3.5 million in long-term incentives that have not yet vested.

f. **BOEING's** revenue from the MAX alone was expected to account for 40% of the company's profits in 2019.

43.  **THE BOEING DEFENDANTS** prioritized enriching shareholders and themselves in the wake of the Lion Air crash despite their duty to fix the defects in the Boeing 737 MAX 8. Shortly after Flight 610 crashed, **THE BOEING DEFENDANTS** knew that hundreds of 737 MAX 8 airplanes were still in use carrying passengers all over the globe and that the FAA's risk assessment predicted further MAX crashes, which presented a substantial risk that a similar incident would soon occur.

44.  On or about November 15, 2018, just weeks after the crash of Lion Air, **BOEING** delivered the newly manufactured Flight 302 airplane to Ethiopian Airlines, with **THE BOEING**

**DEFENDANTS'** full awareness that it would be used for commercial operations carrying hundreds of passengers, as it did on Flight ET 302.

45. When **THE BOEING DEFENDANTS** caused the delivery of the Flight 302 airplane after Lion Air had crashed, it did so with the knowledge of problems with the MCAS systems and defects in the 737 MAX 8, and when it could have, and should have, advocated for the grounding of the 737 MAX 8. **BOEING** delivered the 737 MAX 8 to Ethiopian Airlines with the known defective MCAS, unchanged since the Lion Air crash, and knowing that the AOA Disagree Alert in the airplane was not functional.

46. **THE BOEING DEFENDANTS** chose not to respond to the Flight 610 crash with the appropriate degree of urgency or corrective actions because it feared doing so would result in financial loss to them if airlines grounded the 737 MAX 8, cancelled orders, or had to retrain pilots. Instead, motivated by greed, **THE BOEING DEFENDANTS** downplayed the danger presented by the defective and dangerous airplane, creating a false sense of security, ensuring that the 737 MAX 8 would still fly, and risking the lives of pilots, crews, and passengers.

B.     **THE BOEING DEFENDANTS' COMPETITION WITH AIRBUS AND ORGANIZATIONAL FAILURES CREATED THE UNSAFE 737 MAX 8**

        1.   **THE BOEING DEFENDANTS Stretched the 737's Design and Created an Aerodynamically Unstable Aircraft**

47. **BOEING's** main competitor in the commercial aviation industry is Airbus. Airbus has been increasing market share for decades and this has been eroding **BOEING's** sales and profit. When Airbus launched its more fuel-efficient single aisle airliner, the A320neo, in December 2010, **BOEING** initially dismissed its anticipated appeal with airlines. This short-sighted business decision put **BOEING** behind Airbus in developing and marketing a more fuel-efficient single aisle airplane.

48. The chief executive of **BOEING's** commercial airplanes division, James F. Albaugh, told employees at a meeting in January 2011 that Airbus' decision to redesign its existing airplane with larger engines would be "a design change that will ripple through the airplane" and present significant challenges. Tragically, Albaugh was correct about the problems larger engines would cause and unintentionally predicted the fate of the 737 MAX 8.

49. **THE BOEING DEFENDANTS** changed their attitude regarding the need to develop a new airplane to compete with the Airbus A320neo when they learned in the Spring of 2011 that some of their key customers, including American Airlines, were considering placing orders with Airbus for the A320neo. This ratcheted up pressure on **THE BOEING DEFENDANTS** to respond. Fearing that the design of an entirely new airplane would take too long, **BOEING** decided to create a more fuel-efficient alternative to its traditional 737NG airplane—what would become the 737 MAX 8.

50. As a former senior **BOEING** official reported, the company opted to build the 737 MAX 8, rather than an entirely new airplane, because it would be "far quicker, easier and cheaper than starting from scratch, and would provide almost as much fuel savings for airlines."

51. In August 2011, the **BOEING** Board of Directors, including **CALHOUN**, approved the launch of the 737 MAX family of airplanes, a new iteration of the widely used 737NG, designed to compete with Airbus' A320neo.

52. **THE BOEING DEFENDANTS'** decision to use the existing design of the Boeing 737NG as the basis for the 737 MAX 8, rather than design, test, certify and produce an entirely new airplane, was made to evade regulatory scrutiny by the FAA of a new type certified airplane and increase **THE BOEING DEFENDANTS'** profits and income, because it:

  a. Saved **BOEING** significant research, design and development costs and permitted it to produce what appeared to be an updated, fuel-efficient airplane to compete with the Airbus A320neo more quickly and cost effectively than if **BOEING** had developed an entirely new model airplane;

19

b. Permitted **BOEING** to avoid certification requirements that the FAA would have required from a clean sheet airplane;

c. Permitted **BOEING** to rush the design, production and manufacture of the Boeing 737 MAX 8 and get it to market more quickly so that **BOEING** would not lose business and profits to Airbus;

d. Allowed **BOEING** to offer the **BOEING** 737 MAX 8 to its customers, including Ethiopian Airlines, with the marketing and representations that pilots already qualified to fly the **BOEING** 737NG could transition to the **BOEING** 737 MAX 8 without undergoing any meaningful retraining, and without needing to be trained and tested in flight simulators and/or in the airplane before flying revenue (passenger carrying) flights; and

e. Permitted **BOEING** to use its Organization Designation Authorization (ODA), which **BOEING** had convinced the FAA to authorize, to streamline and speed the certification, and largely self-certify, the **BOEING** 737 MAX 8 merely with amendments to the **BOEING** 737 type certificate.

53. The amended type certificate dated back to 1967, when the FAA approved the 737-100, the first-generation model of what became the world's most commercially successful family of jet airliners. The early 737s and all subsequent 737s, including the 737 MAX 8, are all type-certified under Type Certificate No. A16WE.

54. Type certification is the process by which the aviation authority certifies the design and safety standards of a type of aircraft. When the 737 was type certified in the 1960s, the ability of a plane's flight control computer to override the pilot was not possible or imagined. Since that time myriad changes have been made to the 737, its manuals, and instructional materials. Rather than following the new type certification process, with each successive 737 model **BOEING** presented the new airplane as simply a modified version of its predecessor and then largely self-certified the new model's safety.

55. Despite its radical changes in engine size, operating characteristics, and newly added MCAS, as well as a myriad of other system changes including Fly-by-wire (FBW) spoilers, Direct Lift Control (DLC), Landing Altitude Modifier (LAM), Roll Command Alerting System (RCAS), MAX Display System, Environmental Control System (ECS), **THE BOEING**

**DEFENDANTS** convinced and defrauded the FAA that the 737 MAX 8 was merely a minimally changed version of the Boeing 737NG. This allowed **BOEING** to essentially approve its own airplane to get the 737 MAX 8 to market as soon as possible.

56.     The 737 MAX 8 would eventually obtain certification on March 8, 2017, under Type Certificate No. Al6WE, as amended. Then on March 27, 2017, based on the FAA Type Certificate approval, the 737 MAX 8 also received Type Validation from the European Union Aviation Safety Agency (EASA).  In obtaining FAA approval for the self-certification of the 737 MAX 8, **THE BOEING DEFENDANTS** concealed the MCAS and its flaws from the FAA, omitting it entirely from the EASA Type Certificate Data Sheet and the FAA Type Certificate Data Sheet A16WE.

57.     The type-certification of the 737 MAX 8 would have been jeopardized if it did not have sufficient commonality with its predecessor. Thus, **THE BOEING DEFENDANTS** needed the 737 MAX 8 to be more fuel efficient and also have flight handling qualities and characteristics deemed the same as the 737NG. The MAX airplane was able to achieve this new fuel efficiency, in part, due to the model's larger CFM LEAP-1B engines. However, adding the larger engines triggered cascading design and engineering changes for the airplane, the same ripple of changes James Albaugh, **BOEING's** commercial airplanes chief executive, had predicted back in 2011 when criticizing Airbus' A320neo.

58.     The increased power, relocation, larger nacelle and larger fan diameter of the CFM LEAP-I B engines created an inherent aerodynamic instability in the Boeing 737 MAX 8 that manifested itself in lightening of the control forces in the pitch axis and created a propensity to abnormally pitch the airplane nose up under certain flight parameters, creating a risk that the airplane would suffer an aerodynamic stall and crash.

59. This pitching up of the 737 MAX 8 demonstrated that the changes made to the 737 MAX 8 changed airplane stability and flight characteristics; simply put, the airplane handled materially differently than the 737NG airplane.

60. Furthermore, the airplane's nose-up pitching propensity rendered it unairworthy. Pursuant to the FAA's Airworthiness Standards for Commercial Aircraft14 CFR § 25.203: "No abnormal nose-up pitching may occur… In addition, it must be possible to promptly prevent stalling and to recover from a stall by normal use of the controls." The 737 NG was materially different from the 737 MAX 8 in that it did not require MCAS to satisfy this certification requirement.

61. The abnormal and dangerous flight handling qualities and characteristics in the 737 MAX 8 airplanes, if properly disclosed to regulatory authorities meant that the FAA would likely not certify the 737 MAX 8 without the Design Assurance processes, and redundancy of system architecture associated with a Safety Critical System, and certainly not without requiring pilots undergo significant flight training before flying the airplane with passengers on board. As **BOEING's** management required engineers to contain the level of change to obtain type-certification, **BOEING** now needed to engineer a Band-Aid to fix the aircraft's handling issues created by the larger and more powerful engines.

## 2. THE BOEING DEFENDANTS Utilized A Flight Control System Which Addressed One Problem But Created Another

62. To address the airplane's aerodynamic handling defects and to obtain the 737-type certification, **THE BOEING DEFENDANTS** included in the 737 MAX 8 the MCAS, an automated system that would retrim the airplane's nose down when it encountered uncommanded nose up pitch due to its inherent aerodynamic instability. MCAS operated secretly in the background, was activated by data obtained from a single sensor susceptible to failure or errant data, and could engage over and over with the authority to trim the airplane's nose full down – to

the physical stops on the airplane's horizontal stabilizer. Thus, the MCAS rendered the 737 MAX 8 a death trap which could send the airplane into an unrecoverable dive in a matter of seconds, based on a single point of failure.

63.     The MCAS operated by collecting data from just one of two available sensors on the fuselage called angle-of-attack (AOA) sensors. AOA sensors measure the angle between the chord line of the wing of the airplane and relative wind direction. If the AOA sensor registers that the airplane's angle of attack is too high then the MCAS activates, automatically moving the horizontal stabilizer to direct the aircraft to pitch nose down, as can be seen in the following graphic:



64.     The 737 MAX 8 was not the first time **BOEING** had used something it called "MCAS" on one of its airplanes. In the early 2000s, **BOEING** began developing the KC-46 military tanker (the "Pegasus"). The Pegasus was different from the 737 MAX 8 because the Pegasus was based on the 767 rather than the 737, but both airplanes came equipped with "MCAS." The version of MCAS on the Pegasus, however, had safeguards and limits which were absent from the version of MCAS on 737 MAX 8:

a. On the Pegasus, MCAS was given authority to move the plane's horizontal stabilizer only once per activation, whereas it could repeatedly activate on the 737 MAX 8;

b. MCAS has less authority to push the nose downward on the Pegasus, which made it easier for pilots to counteract MCAS if necessary;

c. The Pegasus has at least two AOA sensors, which have the ability to compare the validly of each other's values before feeding data into MCAS, as opposed to a single AOA sensor like on the 737 MAX 8's version of MCAS;

d. The Pegasus pilots could deactivate MCAS by simply pulling back on the yoke, whereas this function was inhibited on the 737 MAX 8; and

e. On the Pegasus, the pilot thumb trim switch disabled MCAS until the AOA decreased below the MCAS trigger value; whereas, on the MAX, the trim switch only temporarily disabled MCAS for 5 seconds, and then resumed commanding the stabilizer, but with the new stabilizer trim position as the new reference position.

65. **BOEING's** experience designing MCAS for the Pegasus highlighted the need for redundancy and gave **BOEING** tools to make MCAS safer. **THE BOEING DEFENDANTS** chose to forgo these safety measures when designing the MAX, in part, because they would lead to increased costs, would lead to additional pilot training requirements, and **THE BOEING DEFENDANTS** chose money over safety.

66. The AOA sensors used on the 737 MAX 8 were provided to **BOEING** by defendant **ROSEMOUNT**. At the time it provided these AOA sensors to **BOEING**, **ROSEMOUNT** knew or should have known that its sensors were susceptible to failure or miscalibration, including failure caused by bird strikes, and could report erroneous data if incorrectly maintained. Since 2004 there were more than 200 incident reports submitted to the FAA for events involving malfunctioning or damage to AOA sensors. This number likely underrepresents the actual number as not all events are reported to the FAA.

67. The MCAS software was developed, at least in part, by Defendant **ROCKWELL**. The MCAS ultimately failed to perform as intended, causing both crashes because it activated inappropriately, with a level of authority beyond the original design, allowing unintended and

repeated automated nose down control commands. **ROCKWELL** both developed software which was defective, gave the MCAS authority to have catastrophic consequence, and then failed to adequately communicate the functionality and authority of this software to the FAA or other regulatory agencies. By virtue of its position designing software for the MAX, **ROCKWELL** did or should have received details from **BOEING** of how exactly it needed MCAS to operate.

68.     **BOEING** and **ROCKWELL** did not program the MCAS to use data from both of the airplane's AOA sensors to validate AOA data and protect against single point failures. Compounding this design defect, **BOEING** and **ROCKWELL** failed to have MCAS consider other flight data available to the Flight Control Computer, including airspeed and altitude, and failed to implement other safety systems, which were available and legally required by 14 CFR Part 25, to mitigate the risk presented by a malfunctioning sensor. **BOEING** should have included as standard in all aircraft equipped with MCAS reference to two AOA indicators, an AOA disagree alert, a synthetic airspeed system, and an Engine-Indicating and Crew-Alerting (EICAS) system. Instead, **THE BOEING DEFENDANTS** chose not to include any of these available safety systems to avoid the increased costs.

69.     **THE BOEING DEFENDANTS'** failure to integrate these available and/or legally required safety systems for a safety critical system meant that if the single AOA sensor used as input to the MCAS malfunctioned and erroneously signaled that the airplane was pitched nose high, there was no means of detecting if its input was erroneous, or excluding that bad data by means of voting between valid inputs to prevent the MCAS from improperly intervening, rotating the horizontal stabilizer, and forcing the plane into a dive.

70.     The horizontal stabilizer on the 737 MAX 8 is positioned by a single electric trim motor actuated through either the stabilator trim switches located on the pilots' control yokes, by

the autopilot or through the MCAS. The stabilizer may also be positioned by the pilots manually rotating the stabilizer trim wheel.

71.     Switches on each pilot control yoke actuate the electric trim motor through the main electric stabilizer trim circuit when the aircraft is flown manually. With the autopilot engaged, stabilizer trim is accomplished through the autopilot stabilizer trim circuit. The main electric and autopilot stabilizer trim have two speed modes: high speed with flaps extended and low speed with flaps retracted. The stabilizer trim wheels rotate whenever electric stabilizer trim is actuated.

72.     The STAB TRIM PRI cutout switch and the STAB TRIM B/U cutout switch on the 737 MAX 8 are located on the control stand. If either switch is positioned to CUTOUT, both the autopilot and main electric trim inputs are disconnected from the stabilizer trim motor.

73.     The control column actuated stabilizer trim cutout switches on the 737 MAX 8 and the 737NG stops operation of the main electric and autopilot trim when the control column movement opposes trim direction. The purpose of this feature is to permit the pilots to stop a trim runaway by simply pulling back on their control yoke – an important safety feature. This is not true for pitch commands received from the MCAS, which will continue to trim the airplane's nose down when the pilots are pulling back on the control yoke in order to try to bring the nose of the airplane up.

74.     Pitch trim is controlled by changing the pitch angle of the horizontal stabilizer. Changing pitch of the horizontal stabilizer can place large pitch forces on the aircraft. When applied appropriately, these forces keep the control column forces in balance and reduce pilot fatigue. When applied inappropriately they can make the airplane difficult, if not impossible, to control due to large forces imputed into the control column.

75.     The elevator is a smaller control surface when compared to the surface area of the controllable horizontal stabilizer. Aerodynamic load forces generated by the horizontal stabilizer

26

from an out of trim condition can quickly exceed the forces that can be generated by the elevator, which is controlled by the pilots by pulling back or pushing forward on the yoke. This can render the elevator uncontrollable by the pilots.

76.     It is possible on the 737 MAX 8, to have an out of trim condition that when countered by elevator control inputs from the crew, places enough aerodynamic load forces on the pitch trim mechanism that it essentially jams the manual pitch trim control. Attempts to use the manual trim cannot overcome the load on the mechanism; the system is then in an aerodynamic lock because of the extreme load forces on the horizontal stabilizer. This scenario is depicted by the illustration below:



77.     Electric trim works in a narrower range of motion than manual trim. If the stabilizer is out of trim and outside the range of electric trim operation, only manual trim can be used to rectify the trim disparity.

78.    MCAS was designed and intended to operate in the background without pilot knowledge because telling pilots about MCAS would likely have led to additional pilot training requirements and certification delays. **THE BOEING DEFENDANTS** did not even inform pilots that the MCAS existed nor was its purpose or function disclosed in the airplane's flight manual. In the over 1,600-page flight manual, it is only mentioned only once by name—in the glossary of abbreviated terms. Pilots would only learn indirectly about the MCAS—or at least about its effect—when the plane began automatically fighting their pitch commands, often at low altitudes with little time to react and resolve the issue.  **THE BOEING DEFENDANTS** first informed pilots about MCAS after the system caused the Lion Air JT 610 disaster and even then, it did not provide sufficient information about the system, its failure modes or safe pilot actions to recover.

79.    In addition to its failure to warn, provide instructions, and train pilots on the MCAS and how to override it when it provided erroneous AOA data, **THE BOEING DEFENDANTS** utilized a pitch trim control system that is capable of jamming under flight conditions that only **THE BOEING DEFENDANTS** knew or should have known was foreseeable.

### 3.  THE BOEING DEFENDANTS Prevented Pilot Simulator Training for the MAX

80.    In addition to obtaining an amended type certificate, it was imperative to **THE BOEING DEFENDANTS** that the MAX be approved without the need for simulator training for pilots transitioning to the MAX from the 737 NG. Instead, pilots would only need Level B training which is instruction using computers or audio/visual tools. Certification with only Level B training – and no simulators – was a "program directive" communicated to **BOEING** engineers.

81.    Michael Teal, the chief project engineer and deputy program manager of the 737 MAX program, relayed this goal to the MAX program chiefs back in 2013. This program directive served an important business need for **BOEING** in its competition with Airbus. If airline pilots did not require costly and time-consuming simulator training in the new airplane because it was

viewed as merely an update to the familiar 737NG, it would make the 737 MAX 8 cheaper for airlines to operate. This in turn would make the price for the 737 MAX 8 more competitive relative to the Airbus A320neo and far more profitable for **BOEING**.

82.     If simulator training for the 737 MAX 8 was required for those pilots already qualified to the fly the 737NG, not only would airlines have to pay pilots to spend hours training in simulators when they could be flying revenue-producing flights, but the availability and cost of simulator training were also problematic. As of January 2020, there were only a few dozen MAX simulators in service around the world, with each costing millions of dollars. Airlines would be forced to incur substantial expenses in purchasing their own simulators or would have to pay expensive hourly rates for their pilots to use a simulator once one finally became available.

83.     Had **THE BOEING DEFENDANTS** provided meaningful differences training between the 737 MAX 8 and 737NG, including simulator training on the MCAS, it would have helped reveal the defective nature of the MCAS design and would have allowed pilots to understand the new systems on the 737 MAX 8. Instead, pilots who had flown the 737 NG were led to believe they could jump into the cockpit of the 737 MAX 8 with only a couple hours of computer-based training and safely fly the new plane.  As a result of **BOEING's** actions and inactions, the first time the pilots of Ethiopian Airlines Flight 302 faced an MCAS caused emergency was on a revenue flight with 157 souls on board.

84.     **THE BOEING DEFENDANTS** were so committed to avoiding simulator training that it promised its customer, Southwest Airlines, that it would rebate the airline $1 million for any aircraft that required extra simulator training for cockpit crews.

85.     **THE BOEING DEFENDANTS** publicly professed this objective as well. In a July 11, 2014 press release, **BOEING** represented that "[p]ilots already certified on the Next-Generation 737 will not require a simulator course to transition to the 737 MAX." BOEING

publicly released this announcement before the FAA approved **BOEING's** request for only computer-based transition training for Boeing 737NG pilots transitioning to the MAX. Thus, **BOEING** engineers were forced to design an aircraft within the unrealistically narrow constraints recklessly dictated by **THE BOEING DEFENDANTS**. Safer designs, redundancy, cockpit alerts, or describing the system in the flight manuals were prohibited since adding the features risked losing Level B training.

86. As Rick Ludtke, an employee at **BOEING** for 19 years and an engineer who helped design the 737 MAX 8 cockpit explained, **BOEING** required that "[a]ny designs we created could not drive any new training that required a simulator."

87. **BOEING's** chief technical pilot for the MAX, Mark Forkner, was one of the key players in getting the MAX certified without simulator training and fully understood how important it was to maintain only Level B training for transitioning MAX pilots. In an email in 2014, Forkner wrote that it would be "thrown squarely on my shoulders" if "we lose Level B" ("computer-based training") and that he would be in trouble for losing the company tens of millions of dollars. Under this immense pressure to deliver on **BOEING's** program directive, Forkner acted as **THE BOEING DEFENDANTS'** enforcer to eliminate any obstacles standing in the way of Level B differences training. Knowing that he had the full support of **THE BOEING DEFENDANTS** in rejecting any proposal that risked a simulator training requirement, Forkner wielded a rhetorical tool he referred to as his "magic Level B wand."

88. In 2013, when **BOEING** Flight Deck Crew Operations engineer and whistleblower, Curtis Ewbank, raised the idea of implementing synthetic airspeed on the MAX to compare against data from the two AOA sensors, it was Forkner, doing the bidding of **THE BOEING DEFENDANTS**, who initially shot down the idea, explaining that including synthetic airspeed as

standard on the MAX "would likely jeopardize the Program directive to maintain Level B training for our customers."

89.     In 2017, in response to questions regarding regulators potentially requiring simulator training, Forkner explained that "Boeing will not allow that to happen" and that the company would "go face to face with any regulator that tries to make [simulator training] a requirement."

90.     Forkner also bragged about making a foreign airline "feel stupid about trying to require any additional training requirements" and "jedi mind-tricking" airlines into not mandating any such training. Forkner explained that his efforts convincing airlines against training "save this company a sick amount of $$$$."

91.     The program directive was not limited to the MCAS either. The FAA was concerned that a number of additional features of the 737 MAX may require differences training greater than Level B, including the MAX's Fly-by-wire (FBW) Spoilers, Direct Lift Control, Landing Attitude Modifier (LAM), Roll Command Alerting System (RCAS), Max Display System, and Environmental Control System (ECS).

92.     One of these new features, the Roll Command Alerting System (RCAS), was a system designed to alert pilots to an excessive bank angle that the autopilot might not cope with. During negotiations with the FAA about RCAS and the potential for simulator-based training requirements, Forkner stated that **BOEING** would have to "push back very hard" against the FAA, would "likely need support at the highest levels" at **BOEING** in negotiating with the FAA, and that "failure to obtain Level B training for RCAS is a planet-killer for the MAX."

93.     Like with the MCAS, **THE BOEING DEFENDANTS** presented the RCAS to the FAA as a simple change. Internally, **THE BOEING DEFENDANTS** noted that an engine failure may trigger the RCAS alert and that recovery from this scenario would not be intuitive for less

experienced pilots. Nevertheless, **THE BOEING DEFENDANTS** would have to make that argument to the FAA anyway because as Forkner stated, that was "the box" **THE BOEING DEFENDANTS** were "painted into with the (no simulator) requirements." **THE BOEING DEFENDANTS** even introduced the RCAS on a model of the 737 NG so that it could argue that the inclusion of RCAS on the MAX was no change at all from the NG. **THE BOEING DEFENDANTS'** conduct with respect to RCAS highlights how **THE BOEING DEFENDANTS** downplayed pilot training and human factors impacts, sacrificed safety for its own business and personal interests, and gamed the FAA certification process – just as it did with MCAS.

94.     In August 2016, the FAA granted provisional approval for Level B differences training for pilots transitioning to the MAX. For successfully deceiving the FAA and airlines into thinking that simulator training was not necessary, Forkner and the team of **BOEING** technical pilots received **BOEING's** Commercial Aviation Services (CAS) Service Excellence Award.

95.     Since the second crash, **THE BOEING DEFENDANTS** have publicly disavowed knowledge of Forkner's actions. **THE BOEING DEFENDANTS** are responsible for initiating the program directive in the first place and failing to create a system of oversight to ensure that the actions of its agents comported with safety standards: **THE BOEING DEFENDANTS** gave Forkner and others their marching orders and placed no limits on how they could accomplish their goal. To make matters worse, **THE BOEING DEFENDANTS** encouraged reckless risk-taking and ratified its agents' improper conduct by rewarding such behavior with awards, promotions, and stock options.

     **4.**  **THE BOEING DEFENDANTS Failed to Promote Safety and Protect Against Reckless Risk-Taking in Response to Their Short-Sighted Business Objectives**

96.     In their mad rush to get the 737 MAX 8 certified and orders filled to airlines, **THE BOEING DEFENDANTS** placed enormous pressure on its engineers to produce a finished airplane but failed to install safeguards to ensure that airplane was safe and airworthy.

97.     **BOEING** employees faced oppressive time constraints and cost-cutting as they were forced to meet production timetables without adequate staffing. These budgets and staffing cuts had become commonplace at **BOEING** since its merger with McDonnell Douglas in 1997 when McDonnell Douglas' finance-driven culture supplanted **THE BOEING DEFENDANTS'** culture of engineering and safety. **THE BOEINGDEFENDANTS**, newly cost-conscious, now expected engineers to do more with less.

98.     As the House Subcommittee on Aviation found, in 2012, in order to lower costs of the 737 MAX program, **BOEING** reduced the work hours involved in avionics regression testing on the 737 MAX by 2,000 hours, flight test support by 3,000 hours, and the engineering flight deck simulator (E-CAB) by 8,000 hours. This is the equivalent to the reduction of 6.5 full time employees over a one-year period.

99.     To constantly remind employees of their production timetable, **THE BOEING DEFENDANTS** installed "countdown clocks" in conference rooms, with the countdown ending both on the day the 773 MAX 8 was first powered up in the factory and for the first flight of the 737 MAX 8.

100.    The pressure placed on design and production teams was also fed by **THE BOEING DEFENDANTS'** sales and business personnel who made representations to airlines about the 737 MAX 8's capabilities and production timeline which they knew or should have known were inaccurate or unattainable. This in turn forced **BOEING** engineers to try to make good on the sales team's unrealistic promises, creating an environment where deliverables and deadlines took priority over safety.

101. The unreasonable expectations placed on engineers and designers by **THE BOEING DEFENDANTS** created an environment at **BOEING** which was rife with mistakes and wherein employees were reluctant to raise concerns that may delay certification and production of the MAX.

102. As several engineers and designers working on the 737 MAX 8 have accurately described the frantic pace of the MAX's development to the New York Times:

    a. An engineer working on the MAX said that "[t]he timeline was extremely compressed … It was go, go, go."

    b. A former designer working on the MAX's flight controls described how the design team had at times produced 16 technical drawings a week, double the normal rate. The designer understood the message from management to be: "We need something now."

    c. A technician who assembles wiring on the MAX said that he received sloppy blueprints in the first few months of development and was told that the instructions for the wiring would be cleaned up later in the process. However, his internal assembly designs for the MAX included omissions after airplanes were delivered to airlines, such as not specifying which tools to use to install a certain wire, a situation that could lead to a faulty connection.

103. Trying to meet each of management's goals created a chaotic environment for engineers. As Rick Ludtke described: "The company was trying to avoid costs and trying to contain the level of change. They wanted the minimum change to simplify the training differences, minimum change to reduce costs, and to get it done quickly."

104. As Curtis Ewbank, a **BOEING** engineer and whistleblower who worked on the MAX reported, **BOEING's** style of corporate governance was "more concerned with cost and schedule than safety and quality" and it had a "suppressive cultural attitude towards criticism of corporate policy" which created a fear for those that speak up.

105. Even when concerned employees did speak up, their warnings were ignored or rejected by **THE BOEING DEFENDANTS**. In June 2018, a **BOEING** senior plant supervisor, Ed Pierson, working on the 737 MAX 8 raised safety concerns with Scott Campbell, the 737

General Manager. Pierson reported that production and schedule pressures were impacting quality control and safety and called for a temporary halt to production. Pierson candidly shared that "all my internal warning bells are going off" and "for the first time in my life, I'm sorry to say that I'm hesitant about putting my family on a Boeing airplane." Campbell did not halt production. When Pierson confronted Campbell in person and lamented that, as a former officer in the United States Navy, the problems he had seen with the MAX would have halted production in the military, Campbell responded that "the military is not a profit-making enterprise." Rather than slow production to ensure the MAX was assembled correctly in accordance with safety and engineering standards, **THE BOEING DEFENDANTS** ignored Pierson's concerns and decided to ramp-up production.

106. **THE BOEING DEFENDANTS** were aware they had problems of corporate governance with respect to safety. In 2016, **THE BOEING DEFENDANTS** conducted an internal survey of Authorized Representatives – those employees who were tasked with representing the interests of the FAA in certifying **BOEING** aircraft. The survey showed that 39% of respondents reported that they felt "undue pressure" on the job and 29% agreed that they were "concerned about consequences" if they reported the undue pressure.

107. As current and former **BOEING** employees have reported, there was shoddy testing and inspection procedures and a corporate culture of fear and retaliation. At **BOEING's** manufacturing plants, **BOEING** agents and/or employees engaged in improper conduct including:

  i. "Goldplating" which is repeating a test until it is successful and then having the records show that the test was successful on the first attempt;

  ii. Knowingly using out of date engineering specifications;

  iii. Knowingly using uncertified technicians to perform maintenance and repairs;

      iv.   Violating the internal **BOEING** policy and procedures to achieve final approval of each stage of production and make the airplane immediately saleable;

      v.   Disabling the automated system that notified all pertinent employees of mandatory inspections of newly manufactured airplanes; and

      vi.   Submitting conformities without documented repairs.

108.    When managers tried to document non-conforming airplane equipment they were threatened, retaliated against, subjected to a hostile work environment and terminated.

109.    These unlawful and unsafe practices were known, encouraged and/or ratified by **THE BOEING DEFENDANTS'** leadership and contributed to a culture that suppressed voices raising the alarm about safety in furtherance of **THE BOEING DEFENDANTS'** money-driven focus.

110.    This can be seen in **THE BOEING DEFENDANTS'** decision to reward Michael Teal for keeping the 737 MAX 8 program on schedule with a bonus of restricted **BOEING** stock shares even though he oversaw engineers that cut corners, failed to conduct thorough testing, and ignored red flags. **THE BOEING DEFENDANTS'** pattern and practice of creating financial incentives for dangerous and risky behavior undermines a robust safety culture and only encouraged others to take unreasonable risks to grow **THE BOEING DEFENDANTS'** bottom line.

     **5.**   **THE BOEING DEFENDANTS Conducted a Flawed Safety Assessment of the MCAS and Submitted Erroneous Data to the FAA**

111.    **THE BOEING DEFENDANTS'** focus on cost and budget, and abdication of oversight for safety processes, signaled to **BOEING** engineers that they were to get the MAX certified on schedule, on budget, and without a pilot simulator training requirement. These priorities encouraged **BOEING** employees to cut corners, stay silent about potential problems, and avoid discovering new problems that could derail management's plan.

112.    As a new feature, the design and functioning of MCAS should have been reviewed and approved by the FAA prior to certification. However, **THE BOEING DEFENDANTS** successfully managed to avoid FAA oversight by engaging in a scheme to "brand" the MCAS as an addition to the existing Speed Trim system from the 737NG rather than a new system and deliberately withholding information on the scope of MCAS's operational range. This deliberate branding scheme was engineered to avoid the risk of increased costs, certification delays, or increased pilot training requirements if the FAA conducted a robust review of MCAS as a new system. In its communications with the FAA, **BOEING** would continue to characterize MCAS as a function of the speed trim system while internally referring to it as the distinct and separate system that it was. Relying on **BOEING's** representations that the MCAS was a minor update to the Speed Trim System which would only activate in extremely rare circumstances, the FAA delegated control of the MCAS safety review to **THE BOEING DEFENDANTS** under **BOEING's** ODA.

113.    **THE BOEING DEFENDANTS'** safety analysis of MCAS was substantially flawed and failed to accurately evaluate the likelihood or consequences of unintended MCAS activation. From the outset, **THE BOEING DEFENDANTS** should have classified and evaluated MCAS as a safety critical system, failure of which could have catastrophic consequences, which would have driven the design architecture to not rely on single inputs and allow single points of failure. **THE BOEING DEFENDANTS** failed to conduct a proper system safety analysis on MCAS which saved BOEING time and money in fielding the 737 MAX 8 because it avoided the need to design MCAS as a robust two-sensory system that was not capable of commanding so much aircraft nose down trim that the pilots could not overcome using the elevator and manual trim control wheel.

114. The 737 MAX 8 came equipped with two AOA sensors, but MCAS would use data from just one sensor on each flight. In its Single and Multiple Failure Analysis, **THE BOEING DEFENDANTS** evaluated the likelihood of loss of data from one AOA sensor followed by erroneous data from the other sensor and found this scenario to be extremely improbable. But this assessment – a simultaneous lack of reliable AOA data from both sensors – is not an accurate predictor of unintended MCAS activation since MCAS can be triggered by erroneous data from just a single sensor. As a result, **THE BOEING DEFENDANTS** failed to accurately calculate the probability of unintended MCAS activation caused by erroneous AOA data.

115. This error was compounded by the fact that high AOA data also causes numerous confusing flight deck effects – various alerts, lights, and sounds in the cockpit – that can distract, confuse, and overwhelm pilots at the same time MCAS begins commanding aircraft nose down trim. In its System Safety Analysis of MCAS and flight simulations, **THE BOEING DEFENDANTS** never tested unintended MCAS activation caused by erroneous AOA data. This means that **THE BOEING DEFENDANTS** never evaluated from a human factors' perspective how the myriad flight deck effects may impact a pilot's ability to recognize and correct unintended MCAS activation. The pilots during the Lion Air and ET 302 crashes experienced overwhelming, confusing, contradictory, and distressing flight deck effects, but **THE BOEING DEFENDANTS** never tested the impact of these flight deck effects on pilots and how they would impact pilot response and pilot response time to AOA anomalies.

116. **BOEING** engineers raised the issue of erroneous AOA data triggering MCAS but were dismissed. As one engineer asked, "Are we vulnerable to a single AOA sensor failure . . . or is there some checking that occurs?" On another occasion, an engineer asked, "What happens when we have faulty AOA or Mach number?" In response, another **BOEING** engineer said that "if they are faulty then MCAS shuts down immediately." This was not the case during the two

crashes. Had **THE BOEING DEFENDANTS** conducted simulator tests with unintended MCAS activation caused by erroneous AOA it likely would have discovered and appreciated the danger presented by the various flight deck effects.

117.    **BOEING** also failed to evaluate the effects of repeated MCAS activation. As certified MCAS would reengage and command another aircraft nose down trim cycle after a pilot contradicts MCAS by using the electric trim system to pull the nose back up so long as a high AOA condition exists. In the event of erroneously high AOA input from a malfunctioning AOA sensor (as was the case in both crashes), the MCAS will repeatedly push the nose of the plane down in this fashion – fighting against the pilots' efforts to pull the airplane's nose up – until the electric trim motor is turned off.

118.    After a flight test showed MCAS repeatedly fighting a pilot's trim commands, one engineer raised concerns about MCAS' propensity to cause ratcheting of the control services caused by repetitive activations. **BOEING** concluded that multiple activation of MCAS was no worse than a single activation. Despite its knowledge that the MCAS could repeatedly reengage, **THE BOEING DEFENDANTS** never evaluated or tested the cumulative effects associated with repeated activation of MCAS. The pilots during both crashes were overwhelmed by repeated activation of MCAS but **THE BOEING DEFENDANTS** never tested this scenario.

119.    **THE BOEING DEFENDANTS** also failed to conduct a safety analysis on the version of MCAS that existed on Lion Air and ET 302. **THE BOEING DEFENDANTS** originally submitted documentation to the FAA indicating that the MCAS could only move the horizontal tail a maximum of 0.6 degrees per activation and would only operate in rare, high speed (Mach) scenarios. **BOEING** also had a requirement that MCAS would not be active at g-forces less than 1.3gs, which would ensure that MCAS did not activate in the normal flight range no matter what

AOA data was transmitted by the active AOA sensor. This narrow envelope for MCAS activation provided the basis for the FAA transferring the safety review of the MCAS to **BOEING**.

120.    However, **THE BOEING DEFENDANTS** subsequently made very significant modifications to MCAS prior to certification which drastically expanded its operational envelope to much lower speeds and at all load factors. This major change greatly increased the vulnerability of the Boeing 737 MAX 8 to unintended MCAS activation based on erroneous AOA data because the airspeed requirement would be satisfied in the normal flight envelope and there was no longer a load requirement for MCAS activation.   By making this major change, **THE BOEING DEFENDANTS** removed important safeguards from MCAS, making it a certainty that it would unintentionally engage when triggered by faulty readings from a single AOA sensor.

121.    In addition to expanding MCAS' operational envelope very late in the certification process, **THE BOEING DEFENDANTS** also increased MCAS' authority to move the horizontal stabilizer, increasing it from a maximum of 0.6 degrees per activation to 2.5 degrees. With the more powerful version of MCAS, just two cycles at the 2.5-degree limit would cause the airplane to reach its maximum nose-down trim position. Despite this significant expansion of the flight envelope for MCAS, the increased risk of unintended activation, and the increase in MCAS' authority to move the horizontal stabilizer, **THE BOEING DEFENDANTS** did not redo its single and multiple failure analysis to reflect the new and more powerful MCAS prior to certification. **THE BOEING DEFENDANTS** also failed to inform the FAA that it had expanded the operating envelope for MCAS and had increased its authority to move the horizontal stabilizer. The FAA would not learn about this until after the crash of Lion Air.

122.    When evaluating the limited and less-powerful version of MCAS, **BOEING** classified unintended MCAS activation as a "major failure" in normal flight and a "hazardous failure" in the event of an extreme maneuver, such as a banked descending spiral. A "major failure"

is not expected to produce serious injuries or death and is defined more as something that would increase the cockpit crew's workload.

123.    A "hazardous failure" could cause serious or fatal injuries to a small number of passengers. One level above hazardous failure is "catastrophic failure," a classification which represents the potential loss of the plane with multiple fatalities.

124.    The failure classification system is critically important because it drives whether a flight control system can rely on a single sensor input or must have redundancy – two or three. Systems with a consequence of failure classified as a "major" are allowed to rely on a single input sensor.

125.    In contrast, systems classified as "hazardous" have more severe consequences of failure and therefore must have a probability of failure less than one in 10 million. Systems classified as "hazardous" typically must have at least two separate input channels as a backup in the event one sensor fails.

126.    If **BOEING** had classified an unintended MCAS activation as a "hazardous" or "catastrophic" risk, it would have had to redesign it so that it was a fail-safe design with a redundant back-up system. Instead, **THE BOEING DEFENDANTS** misclassified the MCAS as a "major failure," allowing it to be triggered by a reading from a single AOA sensor and once triggered, it had unlimited authority to pitch the nose of the airplane down and had no backstop feature that would have prevented MCAS form overwhelming the pilots' ability to pull the nose of the airplane out of a dive.

127.    As a further result of the misclassification of the MCAS as only a "major" risk, **THE BOEING DEFENDANTS** did not more rigorously analyze the failure condition in the safety analysis, using Failure Modes and Effects Analysis (FMEA) and Fault Tree Analysis (FTA), as these are only required for hazardous or catastrophic failure conditions.

128.    **THE BOEING DEFENDANTS** should have used data from the second AOA sensor in the airplane to provide redundancy and safety—and **BOEING's** MCAS fix following the two crashes uses data from more than one sensor—but **THE BOEING DEFENDANTS** chose not to do so during design and certification of the 737 MAX 8 to save time and money and to avoid any potential pilot training requirements. This is the same reckless approach **THE BOEING DEFENDANTS** took in its design of the 737 auto-throttle system that led to the 2009 Turkish Airlines Flight 1591 crash in Amsterdam – reliance on a single sensor input instead of two readily available inputs. After this crash killed passengers and crew, **BOEING** quickly issued a software fix to prevent a recurrence. **THE BOEING DEFENDANTS** should have learned its lesson from the Turkish Airlines crash about the dangers of single point failures, but **THE BOEING DEFENDANTS** instead repeated the same mistake with the MAX. **THE BOEING DEFENDANTS** disregarded the findings of the Turkish Airlines Flight 1591 investigation, which were released early in the 737 MAX 8 development.

129.    **THE BOEING DEFENDANTS** deny that MCAS was susceptible to a single point of failure, arguing instead that the pilot is the backup, without ever disclosing to the pilots that the system existed or what a failure would look like. As the October 2019 Joint Authorities Technical Review ("JATR") stated, **THE BOEING DEFENDANTS** were at fault for using pilot action as the primary means of mitigating MCAS hazards instead of eliminating the hazards or providing design features or warnings to mitigate them. As the JATR also found, this approach was not in accordance with **BOEING's** process instructions for safe design. The MCAS also violated **BOEING's** own internal design guidelines requiring that systems should "not have any objectionable interaction with the piloting of the airplane" and "not interfere with dive recovery."

130.    While **THE BOEING DEFENDANTS** insisted that pilots were the backup and could safely recover from erroneous MCAS activation, **THE BOEING DEFENDANTS**

knowingly relied on faulty assumptions about pilot reaction time to a MCAS failure in support of its position. **BOEING's** safety assessments assumed that a pilot would identify and respond to erroneous MCAS activation within 4 seconds. And yet, one of **BOEING's** own test pilots during early development of the plane in 2012 took more than 10 seconds to correct erroneous MCAS activation and found the condition to be "catastrophic." **THE BOEING DEFENDANTS** simply ignored their own test pilot's "slow" reaction time and insisted that other commercial pilots—who would not know MCAS even existed—would somehow respond within 4 seconds. In order to avoid additional scrutiny from the FAA, **THE BOEING DEFENDANTS** failed to classify MCAS as a safety-critical system despite its knowledge that MCAS activation could be "catastrophic" if a pilot did identify and correct MCAS activation in time.

131. **BOEING's** safety assessment and evaluation of the risk presented by MCAS was also clearly inadequate because Michael Teal, the 737 MAX program Chief Project Engineer, notes that at the time he approved the expansion of MCAS' operational envelope he was unaware that the MCAS operated from a single AOA sensor, could activate repeatedly, or that **BOEING** had internal test data showing that one of its own test pilots took more than 10 seconds to respond to MCAS activation. This clearly indicates the decision to expand the operational envelope of MCAS was made without the engineering due diligence to evaluate all of the system effects, and implications to the safety analysis.

132. In addition to its failure to conduct necessary safety assessments, **THE BOEING DEFENDANTS** also failed to communicate its findings with the FAA. **THE BOEING DEFENDANTS** knew about its test pilots' catastrophic response time to MCAS in 2012, but **THE BOEING DEFENDANTS** did not tell the FAA about this before the crash of Lion Air. **THE BOEING DEFENDANTS** even documented this pilot's slow response time in multiple iterations

of its internal Coordination Sheets but never provided these documents to the FAA simply because the document was not a required "certification deliverable."

133.    On the same day that **THE BOEING COMPANY** decided to expand MCAS' use and increase its command authority, Mark Forkner requested the FAA's permission to remove references to MCAS from the flight manual since **BOEING** maintained it would only activate in rare circumstances. Forkner did not tell the FAA about the significant change to MCAS. Despite its knowledge that the FAA had inaccurate and/or incomplete information about the functionality and performance of MCAS, **THE BOEING COMPANY** failed to inform the FAA of these critical design changes made during the certification process or the concerns raised by its own engineers. Based on this fraudulent conduct committed in furtherance of **BOEING's** financial and certification goals, the Department of Justice charged **BOEING** with, and **BOEING** admitted to, engaging in a Conspiracy to Defraud the FAA.  Had **BOEING** informed the FAA of the increase to the command authority of MCAS, it is likely that simulator training of MCAS operation as a difference from the 737 NG would have been mandated.

## 6.   THE BOEING DEFENDANTS Rejected Multiple Options to Make its Plane Safer

134.    Despite the MCAS' glaring flaws, there were readily available safety features and alternative designs which **THE BOEING DEFENDANTS** could have implemented to mitigate the risk of a MCAS-induced dive, but **THE BOEING DEFENDANTS** failed or refused to include these features due to cost, certification, and/or pilot training concerns.

135.    One such feature is an angle of attack indicator, which would display to the pilots the real-time data from both AOA sensors, providing valuable diagnostic information to the pilots. Without this feature, pilots do not have a reading of what the AOA is registering, making it more difficult to identify/recognize an AOA malfunction. The information provided by the Angle of Attack Indicator, if purchased and installed, would assist pilots in diagnosing why a **BOEING** 737

44

MAX 8's MCAS was erroneously pushing the airplane down toward the ground and would speed the pilot's reaction time to a MCAS created flight emergency.

136.    Another such safety feature is called an AOA disagree alert. The 737 MAX 8 comes outfitted with two AOA sensors on either side of the airplane's nose, but the MCAS only takes readings from one sensor on any given flight, leaving the system vulnerable to a single point of failure.  Due to the flight critical nature of MCAS and its single point of failure design, **THE BOEING DEFENDANTS** knew or should have recognized the importance of the AOA disagree alert and highlighted this fact to the FAA so that it would be included in the master minimum equipment list (MMEL). **THE BOEING DEFENDANTS'** failure to have the AOA disagree alert included in the MMEL further concealed its importance from airlines.

137.    The disagree alert in the cockpit would alert pilots if the two AOA sensors register readings at odds with the other. The disagree alert was standard equipment on prior **BOEING** 737 models as well as the **BOEING** 737 MAX 8, but a supplier had tied the operation of the disagree alert to the optional AOA indicator such that the alert would not work unless the customer purchased the indicator.  **THE BOEING DEFENDANTS** knew as far back as 2017 that the AOA disagree alert on airplanes it delivered to airlines was erroneously non-functioning on airplanes in which the AOA indicator option had not been purchased.

138.    In a statement issued by **BOEING** on April 29, 2019, after both crashes, **BOEING** admitted that "[t]he disagree alert was intended to be a standard, standalone feature on MAX airplanes. However, the disagree alert was not operable on all airplanes because the feature was not activated as intended." **BOEING** went on to say that "[u]nless an airline opted for the angle of attack indicator, the disagree alert was not operable." This option should have been standard equipment.

45

139.     After learning that the disagree alert was not functioning as intended back in 2017, **BOEING** prepared a "Fleet Team Digest" to inform its customers about the inoperable AOA disagree alert but ultimately never sent out the notice. **THE BOEING DEFENDANTS** consciously chose not to immediately fix the problem or alert the airlines. Instead, **THE BOEING DEFENDANTS** concluded that "the existing functionality was acceptable until the alert and the indicator could be delinked in the next planned display system software update."

140.     **THE BOEING DEFENDANTS'** rationalization for not telling pilots about something as basic as an inoperable alert is like **THE BOEING DEFENDANTS'** excuse for not telling pilots about MCAS – that it did not want to inundate pilots with information. The true reason **BOEING** did not disclose either to airlines or pilots is because it would likely delay certification of the 737 MAX 8 and/or delay sales. Instead, **THE BOEING DEFENDANTS** covered it up.

141.     Thus, the pilots of Flight 302 and 610 did not have the benefit of the disagree alert to inform them that an AOA sensor was communicating erroneous data to the MCAS and causing the plane to pitch its nose down. This was particularly important as the activation of the aircraft's stick shaker and other alerts combined with the non-activation of the disagree alert would send the pilots conflicting messages. Had such an alert been operational, it would have assisted the pilots in identifying and correcting the problem caused by the faulty AOA sensor and MCAS and would have afforded the pilots critical time to avert a crash.

142.     The installation of an AOA indicator and the fix for the AOA disagree alert would have cost almost nothing, but **THE BOEING COMPANY** failed to make the indicator standard on the 737 MAX 8 and failed to timely fix the disagree alert.

143.     **THE BOEING DEFENDANTS** designed MCAS to rely on readings from only one AOA sensor even though the AOA disagree alert, when operational, was programmed to

compare the AOA readings from both sensors. **THE BOEING DEFENDANTS** could and should have programmed MCAS to compare the data from both sensors and turn off if the two AOA readings materially differed. Furthermore, **THE BOEING DEFENDANTS** should have designed MCAS to reject implausible AOA readings, such as the erroneous reading of 74.5° nose up supplied by the AOA sensor on Ethiopian Airlines Flight 302, and then shift control to the other AOA sensor. **THE BOEING DEFENDANTS** failed to include any redundancy or software logic which would evaluate whether an AOA reading was clearly erroneous. **THE BOEING DEFENDANTS** also failed to design MCAS with a backstop feature that would ensure that MCAS could never overwhelm the pilot's ability to control the airplane in pitch using only the airplane's elevator.

144.    **THE BOEING DEFENDANTS** wrongly rejected a recommendation that the MAX use a "synthetic airspeed" system, a variant of which was already in use on **BOEING's** 787 Dreamliner. The synthetic airspeed system would have been able to detect the false AOA sensor readings and prevent the MCAS from activating. Implementation of this safety system in the MAX was rejected by **THE BOEING DEFENDANTS** on three separate occasions due to the risk that including synthetic airspeed on the airplane would potentially jeopardize the program directive prohibiting simulator training.

145.    As EASA suggested, 737 MAX 8 should have 3 AOA Sensors, allowing voting, and thus the ability to discard a single erroneous AOA sensor reading. In the end this was not mandated, it would have been a way to be tolerant of a single erroneous AOA sensor, and not have to rely on pilot recognition and action. If MCAS had been classified as a Safety Critical System from the beginning, this is likely the architecture that would have been adopted.

146.    **BOEING** considered using a Pitch Augmentation Control System (PACS), which would utilize the elevator – rather than the horizontal stabilizer – to augment pitch characteristics.

This would have afforded pilots greater control of the airplane but was rejected by **THE BOEING DEFENDANTS** due to certification risks.

147.    On the 737 NG, a pilot can stop nose down trim by pulling back on the control column, a technique called a "yoke jerk." **THE BOEING DEFENDANTS** deliberately disabled this trim cutout maneuver to prevent pilots from counteracting MCAS-induced stabilizer trim. The yoke jerk procedure would normally disable trim commands issued by the speed trim system or the autopilot, but MAX pilots were never told that the procedure was ineffective to stop MCAS-caused stabilizer trim. **THE BOEING DEFENDANTS'** decision to inhibit this control column cutout technique delays pilots' ability to arrest unintended nose down trim and also make identifying unintended MCAS activation more difficult.

148.    The 737 MAX 8 and its predecessor, the 737 NG, both come equipped with two stabilizer trim cutout switches, but **THE BOEING DEFENDANTS** changed the names and functionality of the cutout switches for the MAX. On the 737 NG, the two cutout switches are labeled "Main Elect" and "Auto Pilot." Placing the "Auto Pilot" switch to Cutout disables automated trim commands coming from the Flight Control Computers, like Speed Trim, but does not disable manual electric trim commands from the pilot; the pilot can still manually trim the airplane using the electric motor trim on the pilot's control yoke. Placing both switches to Cutout disables all electric motor trim commands, leaving the pilot with the only option of manually turning the trim wheel to control the stabilizer and trim the airplane. Whereas on the MAX, there is a "PRI" (Primary) and "B/U" (Back-Up) switch, but the two switches have the same function; placing either switch to Cutout disables all electric motor trim, meaning that the pilot on the MAX cannot disable MCAS without also disabling manual electric trim commands. Had **THE BOEING DEFENDANTS** kept the stabilizer trim cutout switch configuration that existed on the 737 NG, pilots in the MAX could have been instructed to simply place the "Auto Pilot" switch to Cutout,

disabling MCAS, and then still would have been free to trim the airplane using manual electric trim commands via the "Main Elect" trim circuitry.

149.    Leaving the function of the cutout switches unchanged from the 737 NG could have saved ET 302. After MCAS repeatedly engaged, the pilots of ET 302 flipped the stabilizer cutout switches as instructed, disabling MCAS but also depriving pilots of the ability to manually input electric trim commands. Instead, the pilots' only options to trim the airplane was to turn MCAS back on and try to input electric trim commands while battling MCAS or leave MCAS off and manually turn the trim wheel. Due to the MCAS repeatedly activating, the stabilizer was already in a large mistrim by the time the pilots turned the MCAS off. With the pilots pulling back on the control column, the stabilizer was in an aerodynamic lock and the pilots were unable to manually turn the trim wheel to any significant degree. Seeing no other option, the pilots reengaged the electric stabilizer motor, which reactivated MCAS, and sent the plane into a further dive. Had **THE BOEING DEFENDANTS** not changed the functioning of the trim cutout switches, the ET 302 pilots could have used the electric motor to get the plane back into trim without reengaging MCAS.

150.    Another safety feature **THE BOEING DEFENDANTS** should have included in the 737 MAX 8 was the flight-crew alerting system called Engine-Indicating and Crew-Alerting System ("EICAS"). EICAS integrates all engine and airplane systems indicators and displays them in a clear manner to pilots along with crew alerts organized into an unambiguous hierarchy. If implemented, this system would have been able to assist the pilots of Flight 610 and Flight 302 by more clearly presenting the sensor and systems malfunctions. EICAS would have allowed the embattled pilots more options to turn off distracting and contradictory alarms that added to their workload during their struggle with the MCAS.

151.    Due to its widespread acceptance, FAA's regulations on cockpit alerts, detailed in 14 CFR § 25.1322, are closely aligned with the capabilities of the EICAS system. **THE BOEING**

**DEFENDANTS'** failure to include adequate cockpit alerts, as required by 14 CFR § 25.1322, was noted by a NTSB report released in September 2019. As stated in this report, during both MAX crashes, when faced with multiple alerts and indications, "the crews lacked tools to identify the most effective response."

152.    **THE BOEING DEFENDANTS** rejected the inclusion of this safety system despite the fact that EICAS is industry standard and included on all **BOEING** airplane models other than the 737. Since EICAS is not in place on the 737 NG – or any version of the 737 – including it on the 737 MAX 8 would have required additional training for transitioning pilots in violation of the program directive.

153.    **THE BOEING DEFENDANTS'** crew alerting system planned for the 737 MAX 8 did not comply with current regulation. **BOEING** would have to obtain an exception to the regulations under the changed product rule in order to avoid additional pilot training. To qualify, **THE BOEING DEFENDANTS'** finance personnel crafted a "cost story" to argue that compliance with the current regulations would be "impractical" because the cost of compliance would not be "commensurate with the degree of safety improvement."

154.    Rather than apply for an *exception* to the crew alerting regulations, **BOEING** could have applied for an *exemption* from the regulations. However, such an exemption would have required a public notice in the Federal Register and an opportunity for interested parties or the general public to comment. The exception **BOEING** requested did not require the same public noticing, allowing **THE BOEING DEFENDANTS** to further conceal its actions in circumventing safety requirements for its airplanes.

155.    By seeking Amended Type Certification for the MAX under the 737's original 1967 certification, **THE BOEING DEFENDANTS** were able to avoid installing many other modern safety features and avoid the same rigorous human factors assessments that a new airplane

would receive. As a result, the MAX did not meet current regulatory standards or a modern concept of aviation safety.

**7. THE BOEING DEFENDANTS Misrepresented Their Airplane to Pilots and Airlines, Downplaying the Need for Essential Training**

156. With the 737 MAX 8 certified by the FAA, **BOEING** began delivering airplanes all over the world starting in May 2017. The 737 MAX 8 was a very popular and profitable airplane for **BOEING**.

157. As **THE BOEING DEFENDANTS** had intended, pilots transitioning from the 737NG to the 737 MAX 8 were not required by the FAA to receive extensive training on the 737 MAX 8 because it obtained the same "type rating" as early 737 models. This was a primary selling point for the MAX as it was presented to airlines. On its website, **BOEING** represented to airlines that "as you build your 737 MAX fleet, millions of dollars will be saved because of its commonality with the Next-Generation 737."

158. **MUILENBURG** admitted in December 2018 that minimizing training was an objective in the design of the 737 MAX 8 to bring it to market faster and that control laws like MCAS were essential parts of the strategy:

> "Part of what we wanted to accomplish was seamless training and introduction for our customers, so we purposely designed the airplane to behave in the same way. So even though it's a different airplane design, the control laws that fly the airplane are designed to make the airplane behave the same way in the hands of the pilot."

159. Due to **BOEING's** representations regarding the MAX's commonality with the 737NG, some pilots were given just 56 minutes of training on an iPad about the differences between the new **BOEING** MAX planes and the older 737s. The MCAS system was not discussed during this training.

160. The ET 302 Pilots did not have any additional training based upon **THE BOEING DEFENDANTS'** misrepresentation that pilots who had flown earlier models did not need additional training.

161. With simulators for the new airplane unavailable at the time 737 MAX 8 was pressed into service, pilots with United Airlines put together their own 13-page guide to the 737 MAX but relying on **THE BOEING DEFENDANTS'** misleading representations, even this guide failed to mention the MCAS, leaving pilots unprepared to deal with a sudden and unexpected dive by the automated systems in the airplane.

162. As American Airlines pilot union representative and 737 pilot, Dennis Tajer, explained, "When you find out that there are systems on it that are wildly different that affect the performance of the aircraft, having a simulator is part of a safety culture . . . It can be the difference between a safe, recoverable flight and one that makes the newspapers."

163. The pilots of the 737 MAX 8 were left unaware of the MCAS because **THE BOEING DEFENDANTS** persuaded the FAA to remove any mention of the MCAS from the aircraft's flight manual. As **BOEING's** chief technical pilot, Mark Forkner wrote to the FAA on March 30, 2016:

> "Are you OK with us removing all reference to MCAS from the FCOM [Flight Crew Operating Manual] and the training as we discussed, as it's completely transparent to the flight crew and only operates WAY outside of the normal operating envelope."

164. As he was making this request, **THE BOEING DEFENDANTS** were making an overhaul of the MCAS, removing the G-Force readings as a condition for MCAS activation, expanding its operation to low-speed maneuvers, and increasing its authority to move the horizontal stabilizer from 0.6 degrees to 2.5 degrees.

165. In a September 20, 2016 text message to a **BOEING** employee, Forkner commented that the MCAS is "running rampant" in the simulator and that he "basically lied to the

regulators (unknowingly)." Neither Forkner nor anyone else at **BOEING** corrected the misrepresentations made to the FAA about MCAS. Forkner did not want to call attention to anything that would jeopardize Level B training because he knew it could cost **BOEING** tens of millions of dollars and draw the ire of management which had tasked him with securing Level B training.

166.     **THE BOEING DEFENDANTS'** removal of a description of the MCAS' functionality from the FCOM, and misleading statements to the FAA, deprived the FAA Flight Standardization Board (FSB) of the opportunity to adequately assess training needs for MAX pilots in light of the new, stronger version of MCAS.

167.     Forkner's deception, committed in conjunction with other co-conspirators and in accordance with **THE BOEING DEFENDANTS'** business objectives, materially changed the level of training that Ethiopian Airlines' pilots would receive and left them unequipped to identify and respond to the uncommanded MCAS activation which doomed flight ET 302. Forkner and fellow **BOEING** test pilot, Patrik Gustavsson, engaged in a conspiracy to defraud the FAA as detailed in the Deferred Prosecution Agreement.

### C.     THE BOEING DEFENDANTS' REGULATORY CAPTURE OF THE FEDERAL AVIATION ADMINISTRATION AND LAX OVERSIGHT LED TO A FLAWED CERTIFICATION OF THE 737 MAX 8

168.     **BOEING** is one of the largest and most powerful corporations in the world. It is the largest exporter in the United States by dollar value and one of the largest defense contractors in the world. About 75% of all the commercial airplanes in the world were manufactured by **BOEING**. Over many years, **THE BOEING DEFENDANTS** have used its enormous power and influence to systematically expand its ability to deceive and avoid any real oversight by the FAA. **THE BOEING DEFENDANTS'** conduct includes: deregulation and streamlining of the certification process; prevention of new rulemaking through **THE BOEING DEFENDANTS'**

seat on the FAA's Aviation Rulemaking Advisory Committee; the abandonment of enforcement actions or penalties for industry violations of federal safety regulations and orders in lieu of seeking voluntary compliance from the industry; and delegation of review and approval of new features on aircraft to aviation manufacturers. By weakening and then misleading the FAA, **THE BOEING DEFENDANTS** gained free reign to hide the MCAS and other problems with the 737 MAX 8 to get it to market as fast as possible.

169.     The FAA's top leadership has long been staffed with aviation industry insiders, including many officials who previously worked for **BOEING** and for **BOEING**-backed industry lobbying groups that have successfully advocated for reduced regulation and reduced oversight of aviation manufacturers. **THE BOEING DEFENDANTS** also have a long history of giving well-paid positions to former FAA leaders, creating a revolving door between industry and regulator.

170.     **THE BOEING DEFENDANTS** have repeatedly sought to reduce the federal regulatory burden on the industry, and to immunize the industry from liability for defects in airplanes that the FAA nominally has "certified," when, in fact, **THE BOEING DEFENDANTS** have convinced the FAA to largely outsource certification to the industry.

171.     **THE BOEING DEFENDANTS'** regulatory capture of the FAA can be seen in various instances where the FAA put aviation industry interests ahead of aviation safety. For example:

    a.   **THE BOEING DEFENDANTS'** financial interests took precedence over aviation safety in its certification of the 737 MAX 8 when the FAA allowed expedited certification based on **BOEING**'s production timelines, when **THE BOEING DEFENDANTS** obtained an exception to cockpit display regulation and when **BOEING** was allowed to remove the MCAS from the Flight Crew Operating Manual, among other decisions favoring **BOEING**'s bottom line;

    b.   **THE BOEING DEFENDANTS'** financial interests overcame aviation safety when the FAA agreed with **BOEING** not to ground the 737 MAX 8 planes after the Lion Air crash;

    c. **THE BOEING DEFENDANTS** overcame concerns about aviation safety and misled FAA leadership to the point that even after the Lion Air crash the United States was the last country to ground the **BOEING** 737 MAX 8;

    d. **THE BOEING DEFENDANTS** overcame aviation safety and misled FAA leadership to the point that in the Acting FAA Administrator's March 27, 2019 testimony before the Senate Transportation Committee's Subcommittee on Aviation and Space, he downplayed the danger of MCAS and blamed the deceased pilots of the two crashed airplanes for not being able to save their airplanes and the lives of the passengers and crew; and,

    e. **THE BOEING DEFENDANTS** undermined aviation safety to the point that at the May 15, 2019 House Committee on Transportation and Infrastructure Subcommittee on Aviation meeting, the FAA followed **BOEING** talking points even while admitting **BOEING** withheld from the FAA information about the MCAS software.

172. **THE BOEING DEFENDANTS'** efforts in pushing the FAA towards deregulation resulted in the FAA adopting the ODA program in 2005 wherein **BOEING** could designate its own employees as "Authorized Representatives" (ARs) who would review and approve **BOEING's** work on behalf of the FAA while receiving a paycheck from **BOEING**. The **BOEING** engineers union went on strike and this kept **BOEING** from delivering a completed aircraft. To preclude this from happening in the future, **BOEING** lobbied to allow managers to make the necessary sign-offs if the front-line engineers refused.

173. By accepting its role as an ODA and in effect agreeing to act as a public regulator, **THE BOEING DEFENDANTS** assumed certain responsibilities to the FAA and the public:

- **THE BOEING DEFENDANTS** had a duty of integrity in its dealings with the FAA. **THE BOEING DEFENDANTS** violated that duty by misrepresenting to the FAA that the **THE BOEING DEFENDANTS'** 737 MAX 8 was safe to fly when **THE BOEING DEFENDANTS** knew or should have known that the airplane was not safe.

- **THE BOEING DEFENDANTS** had a duty to notify the FAA regarding any issue that might create an unsafe flight condition so that the FAA could investigate and remediate the issue. **THE BOEING DEFENDANTS** violated that duty when it hid from the FAA (and its operators) information about the instability of the 737 MAX 8 in pitch up, and the hazards of MCAS, among other defects.

- **THE BOEING DEFENDANTS** had a duty to use care, diligence, judgment, and responsibility, and follow the Federal Aviation Regulations, when performing

compliance activities. **THE BOEING DEFENDANTS** brazenly violated that duty and instead promoted its profits by rushing the certification of an unsafe airplane. In accepting its ODA designation, **THE BOEING DEFENDANTS** knew that essentially it would be the final approving entity for various systems and components on commercial airplanes. As such, **THE BOEING DEFENDANTS** had a responsibility to create systems of oversight and safety to ensure that the Authorized Representatives could dutifully and competently serve in their dual roles without undue influence or pressure. As an ODA, **BOEING** also had affirmative obligations to ensure that the MAX was safe and could not merely rely on the FAA's certification of the airplane as "airworthy" since this was a regulatory determination arrived at, at least in part, by **BOEING** itself.

174.     At all times relevant to this action, **THE BOEING DEFENDANTS** knew that the integrity of the certification process was flawed and vulnerable to certain pressures:

- In 2012, a Department of Transportation Office of Inspector General ("OIG") Audit Report concluded that the FAA was not backing its employees in their efforts to hold **BOEING** accountable and FAA safety inspectors feared retaliation for raising problems regarding **BOEING's** products or its actions.

- In 2015, a further OIG report found the FAA lacked effective staffing and was not performing proper oversight of ODA manufacturers.

- **THE BOEING DEFENDANTS** pressured FAA management to push FAA technical experts to speed up certification of the 737 MAX 8 airplane because the development of the MAX was nine months behind Airbus' A320neo. This included pressuring FAA safety engineers to re-evaluate what was delegated to **BOEING**, claiming that the FAA "retained too much," in order to allow **THE BOEING DEFENDANTS** to self-certify more aspects of the 737 MAX 8 and accommodate **THE BOEING DEFENDANTS**' production timeline.

- To meet **THE BOEING DEFENDANTS**' production goals, some FAA managers signed off on documents themselves without waiting for the FAA technical staff to complete their review.

- **BOEING's** 2016 internal survey, discussed above, found that large numbers of **BOEING** Authorized Representatives perceived potential "undue pressure" and were concerned about reporting potential undue pressure.

- **THE BOEING DEFENDANTS** evaluated its Authorized Representatives, at least in part, on whether they were "completing their duties in a timely and cooperative manner." This further contributed to ARs working on behalf of **BOEING** rather than as FAA representatives.

175.     **THE BOEING DEFENDANTS** were also particularly aware of the company's systemic safety problems because **BOEING** and the FAA entered into a settlement agreement in 2015 which resolved two civil enforcement cases against **BOEING** and 11 other enforcement investigations. As part of the settlement agreement, **BOEING** was fined $12 million and was required "to implement improvements in its design, planning, production and maintenance planning processes," including the implementation of a Safety Management Systems (SMS) plan. This settlement agreement noted the existence of conflicts of interest in the ODA program wherein **BOEING** ARs were representing the interests of **BOEING** rather than the interests of the FAA for which they were tasked. **BOEING** was also faulted for failing to maintain required documentation of its processes—a similar problem **THE BOEING DEFENDANTS** encountered with the certification of the MAX.

176.     Rather than improve the systems of oversight that **THE BOEING DEFENDANTS** knew was flawed and which **THE BOEING DEFENDANTS** were required to address as a result of the 2015 settlement agreement, **THE BOEING DEFENDANTS** instead decided to take advantage of the FAA's delegation of its oversight responsibilities to advance its own business objectives.

177.     **THE BOEING DEFENDANTS** praised the FAA's hands-off approach. On a 2017 conference call with Wall Street investors, **MUILENBURG** lauded the FAA's "streamlined" certification process that had helped **THE BOEING DEFENDANTS** bring new models, including the 737 MAX series of airplanes, quickly to market.  **MUILENBURG** complimented the government's "focus on deregulation and simplifying processes," for which **THE BOEING DEFENDANTS** was a "strong proponent."

178.     **MUILENBURG** went on to say: "Things like FAA certification processes is one place that we're seeing some solid progress. That's helping us more efficiently work through

certification on some of our new model airplane such as the MAX as it's going through tests and entering into service."

179.     The "streamlining" of the 737 MAX 8's certification process meant that **THE BOEING DEFENDANTS** were largely able to conduct the certification of its own airplane and obtain approval of only Level B training in furtherance of **THE BOEING DEFENDANTS'** financial objectives. The results benefited **THE BOEING DEFENDANTS'** bottom line at the expense of the safety of the 737 MAX 8.

180.     Despite its knowledge of systemic problems and affirmative obligations to create systems of oversight, **THE BOEING DEFENDANTS** failed to implement meaningful safety practices and/or failed to audit its safety practices to ensure compliance, constituting an abdication of its oversight responsibilities. In the void left by management, there was no one to hold employees accountable for taking reckless risks or even engaging in criminal conduct, such as the conspiracy to defraud the FAA detailed in the Deferred Prosecution Agreement between BOEING and the Department of Justice.

181.     As a result of **THE BOEING DEFENDANTS'** failure to manage its ODA program, **BOEING** Authorized Representatives did not report important safety issues to the FAA, leaving the regulator in the dark about problems with the MAX, including:

  a.  In 2013, a **BOEING** AR approved a decision to describe MCAS externally as an addition to the "speed trim" system as opposed to a "new function" due to **BOEING's** fears that emphasizing MCAS "as a new function" would impact certification and training.

  b.  In 2016, a **BOEING** AR questioned the impact of repeated MCAS activation on the ability of pilots to counteract MCAS after a **BOEING** test pilot had trouble trimming the aircraft due to repeated MCAS activation during a test flight. **BOEING** reviewed this concern and determined there was "no real requirement violation," but made minor adjustments to MCAS in response. These issues were never shared with the FAA.

  c.  From 2015-2018, multiple **BOEING** ARs failed to inform the FAA that **BOEING** discovered it took one of its test pilots more than 10 seconds to respond to an uncommanded activation of MCAS in a flight simulator, a condition the pilot found

to be "catastrophic." BOEING polluted these simulator tests by reminding the pilots to immediately get on the pickle (trim cut off) switch.

    d.    In 2017, a **BOEING** AR failed to inform the FAA that the AOA Disagree Alert feature was inoperative on a majority of the MAX fleet and that **BOEING** was aware of this condition. **BOEING** continued to manufacture and deliver airplanes with the nonfunctioning alert to customers without informing them or the FAA that the alert was not operating. This feature was required to be functional on all delivered 737 MAX aircraft in order to conform to the aircraft's FAA type certification requirements.

182.    Certification of the 737 MAX 8 was also flawed due to disjointed communications and varied interpretations of FAA policies and procedures among different **BOEING** technical groups. As a result, as one AR noted, "there is no confidence that the FAA is understanding what they are accepting (or rejecting)." This is a failure on the part of **THE BOEING DEFENDANTS** to dutifully fulfill its responsibilities as an ODA.

183.    The FAA relied on **BOEING's** representations that the 737 MAX 8 met the "minimum level of safety" and complied with all applicable federal requirements. The 737 MAX 8, however, did not meet a "minimum level of safety" and should never have been certified.

184.    Therefore, **THE BOEING DEFENDANTS** caused the FAA to approve and/or certify **THE BOEING DEFENDANTS'** design for its new airplane despite its substantial flaws. **THE BOEING DEFENDANTS** pushed through the rapid and flawed certification of the MAX to serve **THE BOEING DEFENDANTS'** financial interests at the expense of public safety. The resulting 737 MAX 8 airplane did not meet regulatory standards because of **THE BOEING DEFENDANTS'** tortious and wrongful conduct.

185.    This improper pressure exerted by **THE BOEING DEFENDANTS** over the FAA, **THE BOEING DEFENDANTS'** misrepresentations to and manipulation of the FAA**,** and **THE BOEING DEFENDANTS'** failure to conduct a proper self-certification of the 737 MAX 8 all substantially contributed to the crash of Flight 302 on March 10, 2019. The OIG as well as the U.S. Department of Justice with the Federal Bureau of Investigation have launched audits and

investigations of **BOEING**, the FAA, and the activities that lead to the certification of the **BOEING** 737 MAX 8.

### D.    DEFENDANTS CREATED THE FATALLY FLAWED MCAS IN VIOLATION OF MANDATED SAFETY PROCESSES

186.    As integrated parts suppliers for a commercial aircraft, **ROSEMOUNT** and **ROCKWELL** had a duty to ensure that the product they were providing to **BOEING** could be safely incorporated into **BOEING's** airplane, including a duty to conduct appropriate hazard assessments to evaluate the likelihood and risk of product failure. Following the Lion Air crash defendants **ROSEMOUNT** and **ROCKWELL** knew or should have been aware that their AOA sensors and MCAS software, respectively, had malfunctioned and caused Flight 610 to crash. Despite having this knowledge, as well as the knowledge that there were more than 200 AOA sensor failures since 2004 and other pilot complaints noting unintended activation of MCAS, neither **ROSEMOUNT** nor **ROCKWELL** sounded the alarm and alerted the public and the FAA to the danger presented by the 737 MAX 8.

187.    **ROSEMOUNT** and **ROCKWELL** stayed quiet because, as **BOEING** suppliers, they had a vested financial interest in **BOEING** continuing to roll out 737 MAX 8's at its production facilities unabated. The grounding of the 737 MAX 8 would have jeopardized their own bottom line so **ROSEMOUNT** and **ROCKWELL,** remained silent as to the obvious dangers presented by the MAX and the integration of their products.

188.    Within a month of the crash of Flight 610, **ROCKWELL** was acquired by United Technologies Corporation ("UTC"), a multinational conglomerate headquartered in Farmington, Connecticut. **ROSEMOUNT** was already a UTC subsidiary at the time. Due to their common relationship with UTC, **ROSEMOUNT** and **ROCKWELL** did not want to cause harm to the other's bottom line. **ROCKWELL** knew **ROSEMOUNT's** AOA sensors were defective and

unreliable just as **ROSEMOUNT** knew **ROCKWELL'S** reliance on a single sensor input for the MCAS was dangerously flawed, and yet, neither company could point the finger at the other, or lobby **BOEING** to change suppliers, for fear of harming the financial interests of their common parent company and, by extension, their own financial interests. Thus, **THE BOEING DEFENDANTS**, **ROSEMOUNT**, and **ROCKWELL** shared a common objective in falsely maintaining that the 737 MAX 8 was safe, minimizing each other's role in the Lion Air crash, and keeping the MAX in production.

189.   **ROCKWELL** and **BOEING** were required to comply with United States 14 Code of Federal Regulations (CFR) 25.1309 which mandates formal safety processes to be followed. Compliance with CFR 25.1309 is shown by meeting the standards laid out in Society of Aerospace Engineers (SAE) Aerospace Recommended Practice ("ARP") ARP4754A, "Guidelines for Development of Civil Aircraft and Systems" or its equivalent. ARP4754A cites to and incorporates SAE ARP4761, "Guidelines and Methods for Conducting the Safety Assessment Process on Civil Airborne Systems and Equipment." Together, ARP4754A and ARP4761 describe foundational aircraft and systems development safety rules which must be followed directly or via an identified equivalent process.

190.   **ROCKWELL** received Flight Control Computer ("FCC") and MCAS system requirements from **BOEING** but failed to perform the ARP4754A-required engineering and validation processes for Safety Requirements Review, Functional Hazard Assessment (FHA) confirmation or Preliminary System Safety Assessment refinement. Performing those activities would have revealed engineering requirement defects in each of the following areas:

   a.   Pilot notification of MCAS activation;

   b.   Update of FCC/MCAS operational procedures including feedback to aircraft and system safety requirements;

   c.   Incorrect usage of redundancy within the dual Angle of Attack (AOA) sensors;

    d. Incorrect application of Built-In-Test to notify pilots of AOA mismatches upon power-up and also in continuous background mode;

    e. Non-performance of MCAS disabling upon AOA mismatch;

    f. Incorrect assignment of Development Assurance Level (DAL) "B" instead of DAL "A" since MCAS operations could contribute to catastrophic failure;

    g. Insufficient AOA sensor redundancy per the true DAL A;

    h. Insufficient identification and refinement of FCC/MCAS safety-requirements associated with all of the above;

    i. Insufficient review of system and software requirements for all of the above per ARP4754A and DO-178;

    j. Insufficient feedback of safety-related requirement refinements and questions back to **BOEING** aircraft safety and systems engineers per ARP4754A and DO-178;

    k. Insufficient traceability of safety-requirements to software high-level and software low-level requirements per DO-178;

    l. Insufficient design review of FCC/MCAS functionality associated with safety requirements;

    m. Insufficient functional and robustness testing of FCC/MCAS functionality including safety-related requirements; and

    n. Insufficient Software Quality Assurance audits of **ROCKWELL'S** software requirement definition, traceability, software design, and software testing activities including non-compliance of DO-178 transition criteria.

191. In addition to its failure to conduct federally mandated safety processes, **ROCKWELL** also outsourced significant work on the MCAS software to India, specifically to Chennai and Bangalore. The standard of work completed in India on the MCAS software did not meet United States aviation avionics software standards.

192. **ROCKWELL** and **THE BOEING DEFENDANTS'** reckless failure to follow prescribed processes and comply with regulatory requirements resulted in the inclusion of defective and improperly integrated software which were substantial factors in the resulting crashes.

193.    **ROCKWELL** was aware of the MCAS' vulnerabilities and concealed these from regulators. In order to write the MCAS software code for **BOEING** and program the FCC to use this code, **ROCKWELL** knew how its product was integrated with the flight control systems on the MAX. For the original version of MCAS designed for the MAX, **ROCKWELL** would have programed the MCAS to activate only with flaps up, autopilot disengaged, and with sensor data placing the airplane within the relevant thresholds for load factor, air speed, and angle of attack. **ROCKWELL** knew that the MCAS was relying on AOA data from a single sensor and that the MCAS could activate with wildly erroneous AOA data if the other conditions were met. **ROCKWELL** was involved in programing the amount of stabilizer movement triggered by MCAS activation. As an integrated parts supplier, **ROCKWELL** was obligated to conduct its own safety analysis to evaluate the risks of failure and probability of failure for its own software, and how that failure may affect the operation and safety of the airplane. These safety assessments, if properly conducted, should have alerted **ROCKWELL** that, with this original configuration of MCAS, there was an unacceptably high risk of failure and that the consequences of failure were catastrophic.

194.    The danger of MCAS was alarmingly clearer once **BOEING** determined that it needed to greatly expand the operational envelope for MCAS to low speeds and increase its authority to move the horizontal stabilizer from 0.6 to 2.5 degrees per activation. Again, **ROCKWELL** was intimately involved in this process as the coder for the MCAS and control law within the FCC. In order to expand MCAS to fit **BOEING's** requirements, **ROCKWELL** removed the load factor limitation and altered the conditions for airplane speed to encompass low speed maneuvers. With the autopilot, flaps, and speed conditions likely met on nearly every commercial flight, **ROCKWELL** knew or should have known that the entire linchpin governing MCAS activation was now a single AOA sensor. In addition to the expanded operational envelope

and increased authority, **ROCKWELL** also programmed MCAS to re-engage after manual electric trim inputs by the pilot, which allowed MCAS to re-activate multiple times with a single high-AOA event, and inhibited pilot control-column cutout.

195. With such a substantial redesign late in the certification process, **ROCKWELL** should have fully reviewed  safety assessments to again evaluate the consequences of failure and probability of failure for MCAS. With the expanded envelope and redesign of MCAS on the MAX, it would have been undeniably evident that the system was unacceptably vulnerable to a single point failure and that the consequences of that failure could be catastrophic. **ROCKWELL** should have advised **BOEING** and the FAA of this danger.

196. Furthermore, when **BOEING** defrauded the FAA by making materially untrue representations that the MCAS only operated way outside the normal operating envelope, **BOEING** knew that **ROCKWELL** could easily disprove these fraudulent representations. **BOEING** relied on **ROCKWELL's** silence to prevent this fraud from being discovered.

197. Like **BOEING**, **ROCKWELL** willfully ignored and/or concealed many red flags and defects with MCAS. **ROCKWELL** did not do the necessary safety assessments, ignored the results, abdicated its responsibility for these assessments to **BOEING**, and/or put its thumb on the scale to achieve a predetermined result. **ROCKWELL** also, along with **BOEING**, stayed quiet about the faulty and non-operational AOA disagree alert required to be on every airplane as certified, as well as the other known vulnerabilities and defects with the MCAS.

198. **ROCKWELL** did not alert the FAA or other regulatory agencies and/or concealed material information, in violation of its regulatory obligations and other duties, because it did not want to raise issues which may have delayed certification and production of the MAX. **ROCKWELL** shared a common interest with **BOEING's** Program Directive for **BOEING** to obtain type certification of the MAX with minimal pilot differences-training requirements.

ROCKWELL agreed with this plan and conspired with **THE BOEING DEFENDANTS** because it wanted **THE BOEING DEFENDANTS** to sell as many of its MAX airplanes as possible, as quickly as possible, for their mutual financial benefit.

199.   After the Lion Air crash, **THE BOEING DEFENDANTS** and **ROCKWELL** realized they were in trouble—they did not do the necessary tests on MCAS to demonstrate all failure modes and effects, did not include redundant features to avoid the consequence of single points of failure and hid all these problems from the FAA. They did not come clean at that time because that would increase their exposure in the inevitable litigation arising out of the Lion Air crash and they did not want the FAA to ground the MAX because that would harm both companies' bottom lines.

200.   Thus, **BOEING** and **ROCKWELL** conspired to violate their regulatory disclosure requirements obligations and other duties in agreeing that they would coverup their mistakes in the design, testing, and certification of the MAX and point to the Lion Air pilots and maintenance crew as the cause of the crash. By not coming clean and reporting to the FAA, other regulatory organizations, and the public about the shortcomings of the MAX after Lion Air and the ways in which the MAX had not been correctly evaluated and certified, **ROCKWELL** and **BOEING** deprived the FAA of necessary information it needed to implement appropriate corrective action, increasing the risk that the FAA would take insufficient action and increasing the chances of another crash.

**E.     LION AIR FLIGHT JT 610 CRASHED BECAUSE PILOTS EXPERIENCED A FLIGHT CONTROL ISSUE CAUSED BY THE BOEING DEFENDANTS**

201.   On October 29, 2018, Lion Air flight JT 610 ("Flight 610") departed Jakarta, Indonesia. Shortly after takeoff, the pilots complained of flight control issues as the plane repeatedly pitched down despite the pilots' desperate efforts to bring the nose back up. The pilots

reported unreliable airspeed and altitude readings. In the audio recordings from the cockpit, the rattle of a stick shaker can be heard, a device used to alert pilots of a potential stall, which can occur when a plane ascends too quickly.

202. The pilots requested permission to return to Jakarta, which was granted, but the plane did not return. Satellite data showed the plane rising and falling repeatedly – more than 24 times – as the pilots struggled to wrest control back from the automated systems. Within just 12 minutes of taking off, Flight 610 crashed into the Java Sea, killing all 189 people onboard.

203. The cockpit voice recording recovered from the wreckage revealed that while the plane oscillated perilously across the sky, one of the pilots flipped through a technical manual attempting to identify the problem while the other pilot prayed. The pilots appeared unaware of the MCAS and its potential harm since its existence was removed from the flight operations manual and the wholly inadequate training they received. As a result of **THE BOEING DEFENDANTS'** fraud on the FAA, there was nothing in the technical manual that would explain to the pilots why the airplane was fighting their efforts to prevent the airplane from crashing.

204. Shortly after the crash, preliminary analysis and data obtained from the plane's flight data recorder (FDR) showed that one of the AOA sensors produced a reading that was at least 20 degrees different from the other AOA sensor when the airplane taxied, took off and began its climb. This indicates that a malfunction in the AOA sensor fed erroneous pitch information to the MCAS and triggered an unwarranted activation of the MCAS system at low altitudes, causing the plane's nose to pitch down and the airplane to crash into the Java Sea.

F. **THE BOEING DEFENDANTS ENGAGED IN A COVER-UP IN THE WAKE OF THE LION AIR CRASH TO KEEP THE MAX IN THE AIR**

1. **THE BOEING DEFENDANTS Understood the Danger Presented by the MAX After Lion Air**

205.     Following the tragic crash of Flight 610, **THE BOEING DEFENDANTS** knew or, at a minimum had every reason to suspect, that malfunctions in the AOA sensor and MCAS may have been responsible.

206.     Notwithstanding the foregoing, **THE BOEING DEFENDANTS** did not bring the Lion Air Crash to the Board's attention for over a week.

207.     **MUILENBURG** first contacted the Board, including **CALHOUN**, regarding the Lion Air Crash on November 5, 2018.

208.     The release of the black box data by the Indonesian authorities shortly after the crash showed that the airplane's nose was pushed down by an automated system more than 24 times during the short flight, providing further confirmation of the erroneous activation of the MCAS.

209.     In early November, **BOEING** engineers were discussing, internally, how the MCAS took over the airplane and how to fix it. These candid internal communications stood in stark contrast to **THE BOEING DEFENDANTS'** public pronouncements that the MAX was safe.

210.     As early as November 6, 2018, the FAA had conducted a safety assessment that concluded that an unsafe condition – the erroneous AOA data causing repeated nose down trim – was a "likely significant contributing factor" in the Lion Air crash.

211.     The risk of another AOA sensor failing and triggering the wrongful activation of the MCAS was a foreseeable event. The FAA received more than 200 incident reports since 2004 of AOA sensors failing or needing to be repaired, many of them in **BOEING** airplanes. These failures included the AOA sensors being frozen, improperly installed, struck by lightning or hit by flying birds.

212.     Furthermore, **THE BOEING DEFENDANTS** knew or should have known about the risk of an AOA sensor failure causing several aircraft level effects. Over the last 17 years in

67

the **BOEING** 737 fleet alone, there were 25 events of stick shaker activation during or shortly after takeoff. It was foreseeable that the 737 MAX 8 could experience an AOA sensor failure with stick shaker activation, airspeed and altitude disagreements, and MCAS operation.

213.    Both before and after the Lion Air crash, several pilots anonymously submitted complaints on the Aviation Safety Reporting System ("ASRS") which described similar flight control issues and unanticipated dives with 737 MAX 8 airplanes. One such report submitted by a pilot in November 2018—after the Lion Air crash and before the Ethiopian Airlines crash—describes the pilot's reaction to learning of the MCAS system:

> **"I think it is unconscionable that a manufacturer, the FAA, and the airlines would have pilots flying an airplane without adequately training, or even providing available resources and sufficient documentation to understand the highly complex systems that differentiate this aircraft from prior models.** The fact that this airplane requires such jury rigging to fly is a red flag. Now we know the systems employed are error prone–even if the pilots aren't sure what those systems are, what redundancies are in place, and failure modes.
>
> I am left to wonder: what else don't I know? **The Flight Manual is inadequate and almost criminally insufficient.** All airlines that operate the MAX must insist that Boeing incorporate ALL systems in their manuals."

214.    On November 6, 2018, the FAA had found that an "unsafe condition" was a likely significant contributing factor in the Lion Air crash.

215.    On November 14, 2018, **MUILENBURG** intentionally misrepresented to FOX Business that the MCAS was "part of the training manual, it's an existing procedure."  He further misrepresented that "[t]he relevant function is described in the Flight Crew Operations Manual, and we routinely engage customers about how to operate our airplanes safely."

216.    On November 28, 2018, the FAA completed its initial Continued Operational Safety risk analysis and Corrective Action Review Board review. The Board found that the uncorrected risk of continued flight of the MAX was 2.68 fatalities per 1 million flight hours. The

Corrective Action Review Board ultimately concluded that the 737 MAX had an unsafe condition which was "a significant contributing factor in a catastrophic event."

217.    Then on December 11, 2018, the FAA's Transport Airplane Risk Assessment Methodology (TARAM) analysis regarding the risk of continued operations of the 737 MAX fleet was reviewed by the Corrective Action Review Board. The Board found that without a fix to MCAS, there would be approximately 15 fatal 737 MAX crashes over the aircraft's lifetime, resulting in over 2,900 deaths. Despite this, **THE BOEING DEFENDANTS** maintained that the MAX was safe.

218.    **THE BOEING DEFENDANTS** also clearly appreciated the problems with the MCAS because after the Lion Air crash **BOEING** engineers feverishly worked through weekends and holidays to make design changes to the 737 MAX 8's automated flight control system, which it planned to implement by way of an MCAS "software update."  Following the crash of Flight 302, **THE BOEING DEFENDANTS** confirmed in a March 11, 2019 statement that it had for several months, in **THE BOEING DEFENDANTS'** words, "been developing a flight control software enhancement for the 737 MAX, designed to make an already safe aircraft even safer."

219.    The MCAS software update that **BOEING** was working on, even as **THE BOEING DEFENDANTS** maintained that the **BOEING** 737 MAX 8 was completely safe, was advertised to include, among others:

      a.    **MCAS AOA Sensor Enhancements** – The flight control system will now compare inputs from both AOA sensors. If the sensors disagree by 5.5 degrees or more with the flaps up, MCAS will not activate and an indicator on the flight deck display (the "disagree alert") will alert the pilots to the discrepancy;

      b.    **MCAS Activation Enhancements** – If MCAS is activated in abnormal conditions it will only provide one input for each elevated AOA event meaning that it will not repeatedly activate and fight the pilots for control of the airplane; and

      c.    **MCAS Command Limit** – MCAS can never command more stabilizer input than can be counteracted by the flight crew pulling back on the control column. The

pilots will always have the ability to override MCAS and manually control the airplane.

220. No software updates to the MAX were actually implemented prior to the crash of ET 302.

### 2. THE BOEING DEFENDANTS Concealed the Problems with the MCAS

221. **THE BOEING DEFENDANTS** had been hiding the MCAS and its problems from the FAA and airlines for years before the Lion Air crash: **THE BOEING DEFENDANTS** consciously engaged in a strategy to brand the MCAS as an addition to the existing Speed Trim System rather than the new system to avoid FAA oversight; **THE BOEING DEFENDANTS** did not disclose to the FAA that one of its pilots took more than 10 seconds to respond to unintended MCAS activation and found the condition to be catastrophic along with other test pilots after the crash of Lion Air Flight 610; **THE BOEING DEFENDANTS** engaged in a conspiracy to defraud the FAA when it expanded the operational envelope and authority of the MCAS but intentionally concealed this fact from the FAA; **THE BOEING DEFENDANTS** had the FAA remove mention of the MCAS from the FCOM; and **THE BOEING DEFENDANTS** did not tell airlines about the inoperable AOA disagree alert on the majority of its airplanes worldwide. With the crash of Lion Air Flight 610, **THE BOEING DEFENDANTS** opted to double-down on its past deception rather than come clean about the problems with its airplane.

222. The stakes were high. **THE BOEING DEFENDANTS** understood that public confidence in the 737 MAX 8 would be shaken if airlines began cancelling flights or grounding the airplane. With that in mind, **THE BOEING DEFENDANTS** worked to convince airlines and the FAA that the 737 MAX 8 was safe and that the problems leading to the crash of Flight 610 were being addressed.

223. During this crucial time period after the crash of Flight 610 and before the crash of Flight 302, **ALL DEFENDANTS** knew that 737 MAX 8 was aerodynamically unstable, the MCAS was defective, the training provided to pilots was inadequate, and knew that any updates or fixes would take time to evaluate and implement. With this knowledge, and the knowledge of the deadly risk of harm the 737 MAX 8 presented to passengers, pilots, crew, and the public at large from imperiled airplanes flying overhead, **ALL DEFENDANTS** should have immediately called for grounding of the airplane until software updates and training protocols could be put into place. Failing that, at a minimum, **ALL DEFENDANTS** should have fully and publicly disclosed all details of the MCAS so that airlines, pilots, and regulators could assess the danger presented and take appropriate action.

224. Instead, rather than grounding the **BOEING** 737 MAX 8 until it was fixed and made safe, **THE BOEING DEFENDANTS** consciously chose to prioritize profits over passenger safety, keeping the **BOEING** 737 MAX 8 airplane in service after the Lion Air crash, and intentionally misleading the FAA, airlines, passengers, and the public into believing the airplane was safe and airworthy without these necessary changes.

225. **THE BOEING DEFENDANTS'** misrepresentations gave airlines a false sense of security about the airplane's safety and avoided grounding of the 737 MAX 8. This in turn provided a false sense of security to the flying public that the problem had been addressed and that the airplane was safe to fly.

226. This cover-up was led by **MUILENBURG** who took the reins of **BOEING's** response to the Lion Air crash. Shortly after the crash, **MUILENBURG** was contacted at his Chicago-area home and informed about the incident. His first decision was opting not to ground the immensely profitable 737 MAX 8. **THE BOEING DEFENDANTS** knew the risks they were

taking but were already committed to providing regular returns for investors and grounding the airplane would endanger **THE BOEING DEFENDANTS'** goal of mid-teen profit margins.

227.    In furtherance of this financial objectives, in December 2018, less than two months after the Lion Air crash, and at a time that **MUILENBURG** was assuring everyone that the MAX was safe, **BOEING** authorized a huge cash dividend to investors and $25 billion stock buyback, as well as a $13 million bonus for **MUILENBURG**. In making this decision, **THE BOEING DEFENDANTS** knew the financial consequences of the 737 MAX 8 being grounded and aggressively pursued a reckless strategy to avoid those consequences.

228.    Instead of showing caution, **MUILENBURG** initiated a coverup campaign aimed at professing the safety of the airplane while concealing its problems, pointing the finger at Lion Air's pilots and maintenance practices, and pressuring the FAA not to take corrective action.

229.    This was the same playbook that **BOEING** had used back in 2009 when a single malfunctioning sensor contributed to the crash of a Turkish Airlines flight near Amsterdam, that time a **BOEING** 737 NG. In Turkish Airlines, a radio altimeter sensor caused a computer to cut the plane's speed just before landing. Like the AOA sensors on the MAX, the Turkish Airlines airplane came equipped with two sensors, but the computer relied on data from just one. Also, like the MAX crashes, **BOEING** knew about the dangers presented by the single sensor but claimed that the crew in the Turkish Airlines flight should have quickly recognized the problem caused by the malfunctioning sensor. Worse yet, in both cases, **BOEING** had not included information in the operations manual that could have helped the pilots respond to the sensor failures. Despite its clear role in the crash in failing to correct a known danger, **BOEING** successfully managed to scrub most of the criticism of its airplane from the final investigative report and instead pointed the finger at the pilots for failing to monitor their airspeed. **THE BOEING DEFENDANTS** engaged in a similar campaign after the Lion Air crash.

### 3. THE BOEING DEFENDANTS Downplayed the MAX's Role in the Crash and Directed Blame onto Others.

230. On November 6, 2018, **BOEING** issued a Flight Crew Operations Manual ("FCOM") Bulletin referencing "an AOA failure condition" and uncommanded "nose down stabilizer trim movement."

231. The following day, the FAA issued an Emergency Airworthiness Directive ("AD") identifying the potential danger presented by the flight control system, but not providing clear instruction on what pilots should do in the event of an AOA failure:

> "This AD was prompted by analysis performed by the manufacturer showing that if an erroneously high single angle of attack (AOA) sensor input is received by the flight control system, there is a potential for repeated nose-down trim commands of the horizontal stabilizer. We are issuing this AD to address this potential resulting nose-down trim, which could cause the flight crew to have difficulty controlling the airplane, and lead to excessive nose-down altitude, significant altitude loss, and possible impact with terrain."

232. In response, **MUILENBURG** emailed Greg Smith warning the mandate might harm productivity: "[w]e need to be careful that the [airplane flight manual] doesn't turn into a compliance item that restricts near-term deliveries."

233. Neither the FCOM Bulletin nor the AD referenced the MCAS or the role it played in the Lion Air crash. The FAA originally included a description of MCAS in the AD but removed it from the final draft.

234. The AD was also deficient because it did not disclose that the control column cutout function was disabled when MCAS was operational, that MCAS is only active in flaps up manual flight, that MCAS would reactive within 5 seconds of pilot trim input, or that a pilot would have less than 10 seconds to follow the runaway stabilizer procedure to avoid a catastrophic risk to the airplane.

235. On November 7, 2018, **THE BOEING DEFENDANTS** issued an official statement on the Operations Manual Bulletin in which again referenced "existing flight crew

procedures" for pilots to address circumstances where there is "erroneous input from an AOA sensor." This press release did not reference MCAS or the inoperable AOA disagree alert.

236.  On November 13, 2018, the *Wall Street Journal* published an article criticizing **BOEING** for adding new "flight-control systems" on the 737 MAX which were involved in the crash of Lion Air but were not disclosed in training materials. **MUILENBURG** wrote to the **BOEING** Board that day, indicating that the article was "categorically false," and claiming that MCAS is included in the manual because the FCOM references "trim down" behavior that pilots would experience under certain circumstances. Even after the crash of ET 302, **THE BOEING DEFENDANTS** repeated this misleading claim that the MCAS function was described in the manual even if it was not identified by name. In an internal message sent to **BOEING** employees in November 2018, **MUILENBURG** stated: "The relevant function is described in the Flight Crew Operations Manual and we routinely engage with our customers about how to operate our airplanes safely." The claim that MCAS' "relevant function" was already described in the FCOM is false. **THE BOEING DEFENDANTS** finally admitted in the DOJ Deferred Prosecution Agreement that the flight manuals were "materially false, inaccurate, and incomplete."

237.  On November 13, 2018, **MUILENBURG** was interviewed on Fox Business Network. **MUILENBURG** stated:

> "There are new systems on the airplanes that are designed to take advantage of the capabilities of the airplane and provide control capability and high angle-of-attack conditions and **those systems operate properly**. And again, in certain failure modes **if there's an inaccurate angle-of-attack sensor feeding information to the airplane, there's a procedure to handle that**. And so, again, as part of the investigation process we're going to make sure we fully understand that. **We're going to make sure that we're providing all the information necessary and appropriate training**, and go back to the core value here … that the airplane is safe, we know how to fly it safely, and we're very confident in that."

238.    These statements were materially false. **MUILENBURG** failed to possess sufficient information to support the representations he was making, knew that his representations were false or misleading, and/or acted with reckless disregard as to the truth or falsity of his claims.

239.    **MUILENBURG** did not explain that Boeing knew MCAS was vulnerable and susceptible to failure, nor that pilots were not informed about or trained on MCAS.

240.    On November 14, 2018, **MUILENBURG** wrote to Kenneth Duberstein, the **BOEING** Board Lead Director, describing how he was "working all angles" to promote the MAX while attempting to discredit its critics:

> FAA came out with a helpful public statement today clarifying they are not doing a separate 'probe.' We also released a more detailed backgrounder this morning and are doing individual media target engagements today to get the facts and truth out. Also working airline operations leaders to get messages out and counter pilot union comments (who are motivated to get separate type rating for MAX – equals more pay). Tim [Keating, Executive Vice President of Government Operations] engaged on political side too. In parallel, doubling down with media and investors on 737 production health – helpful note from UBS published last night.

241.    On November 15, 2018, **THE BOEING DEFENDANTS** issued a statement in response to the release of the Lion Air Flight 610 Preliminary Report. In the statement, **THE BOEING DEFENDANTS** asserted that passengers "have our assurance that the 737 MAX is as safe as any airplane that has ever flown the skies." The press release goes on to criticize the actions of the airline and pilots for the Lion Air crash. **THE BOEING DEFENDANTS** discussed how the pilots on the October 28 flight survived after performing the runaway stabilizer procedure, which **THE BOEING DEFENDANTS** pointed out "is a memory item prescribed by the 737 MAX Flight Crew Operations Manual," but implicitly suggests that the pilots of October 29th died because he did not perform the runaway stabilizer procedure. Notably absent from **BOEING's** press release is any reference to MCAS or explanation on how exactly the system failed.

242.    On November 16, 2018, the *New York Times* published an article discussing how MCAS may have caused the crash. Despite **THE BOEING DEFENDANTS'** greater knowledge of this cause, and despite the specific knowledge that MCAS continued to pose a risk to the flying public, **MUILENBURG** handled the *New York Times* article as a public-relations problem. In an email to **BOEING** communications staff, he responded to the article by explain that he could not "wait for the gloves to come off[.]"

243.    Despite their CEO's representations, **THE BOEING DEFENDANTS'** MCAS system did not "operate properly" and **THE BOEING DEFENDANTS** did not act promptly to ensure that all necessary information and appropriate training was provided. **THE BOEING DEFENDANTS** actively concealed information from the FAA, airlines, and the public, before and after the Lion Air crash, to avoid scrutiny of its airplane.  **THE BOEING DEFENDANTS** recklessly and falsely claimed that the failure of the MCAS could be handled in the same way as a standard "stabilizer runaway," a malfunction which occurs when the horizontal stabilizer fails to stop at the selected position and continues to deflect up or down.

244.    **THE BOEING DEFENDANTS'** characterization of unintended MCAS activation as a "stabilizer runaway" is wrong and misleading because the MCAS failure does not behave like a stabilizer runaway. First, with a stabilizer runaway, there is continuous uncommanded movement of the horizontal stabilizer. In contrast, the movement of the horizontal stabilizer is not continuous in a MCAS created emergency, but rather repeated: pilots are able to counter the nose down movement with the electric stab trim switch, only to have the MCAS move the tail once again. Second, the MCAS alters the control column response to the stabilizer movement. Pulling back on the column normally interrupts any stabilizer nose-down movement, but with MCAS operating that control column function is disabled and the pilots cannot counteract the malfunctioning computer systems. Lastly, **THE BOEING DEFENDANTS** never conducted a robust human

factors analysis involving MCAS activation caused by erroneous AOA data with its accompanying flight deck effects so **THE BOEING DEFENDANTS** had insufficient information to support its assumption that a pilot would quickly identify MCAS activation and follow the runaway stabilizer procedure, and in fact had evidence to the contrary.

245.    **THE BOEING DEFENDANTS'** attempts to direct blame onto purportedly poorly trained pilots wrongfully minimized and covered-up **THE BOEING DEFENDANTS'** responsibility for these crashes to keep the planes flying. It was foreseeable that pilots would be confused by MCAS' control over the 737 MAX 8 as the system's nose-down commands were materially different from a common stabilizer problem and because pilots were not told the MCAS existed or how it functioned. When seconds matter, the confusion caused by **THE BOEING DEFENDANTS'** defective and unsafe design, and failure to inform pilots, was the difference between life and death.

246.    Furthermore, **THE BOEING DEFENDANTS'** reckless and false representation that pilots merely needed to follow the stabilizer runaway procedure only served to conceal the 737 MAX 8's defects and the true nature of an MCAS failure, deceiving pilots, airlines, the FAA, and the public into thinking that additional safety processes or training were unnecessary.

247.    **THE BOEING DEFENDANTS'** statements regarding the safety of the MAX were reckless as they were made at a time when they knew that **THE BOEING DEFENDANTS'** risk assessments were inadequate and incomplete, including **THE BOEING DEFENDANTS'** failure to test MCAS activation caused by erroneous data from an AOA sensor, **THE BOEING DEFENDANTS'** reckless assumptions that a pilot would correct unintended MCAS activation within 4 seconds and that multiple activation of MCAS was no worse than a single activation, and **THE BOEING DEFENDANTS'** failure to conduct a valid human factors' analysis of the multiple flight deck effects associated with unintended MCAS activation.

248. According to **THE BOEING DEFENDANTS**, the MCAS software update was developed "to provide additional layers of protection if the AOA sensors provide erroneous data." This statement is misleading because it suggests that the aircraft already came equipped with layers of protection to prevent erroneous activation of the MCAS based upon erroneous AOA sensor data when it was a single point of failure.

249. In various calls and meetings with airlines and pilots, **THE BOEING DEFENDANTS** continued to spread the misleading narrative that the Lion Air crash was the result of pilot error. On November 20, 2018, **BOEING** took part in a call with airline operators, insisting that the 737 MAX 8 was safe, the existing procedures were adequate to address any erroneous AOA data, and that the Lion Air pilots failed to follow the runaway stabilizer procedure.

250. On November 21, 2018, **MUILENBURG** emailed the Board to invite them to an "optional" November 23 Board call for an update on the Lion Air Crash.

251. This was the first time the Board convened after the crash and there are no minutes.

252. **CALHOUN** falsely represented that the Board had been "notified immediately, as a board broadly," after the Lion Air crash and met "very, very quickly" thereafter; and considered grounding the 737 MAX after the Lion Air Crash but concluded the crash "was an anomaly" that did not warrant grounding the airplane.

253. "Each of **CALHOUN's** representations were knowingly false" and "[t]he Board publicly lied about if and how it monitored the 737 MAX's safety."

254. On November 23, 2018, Michael Sinnett, Craig Bottom, and John Maloney from **BOEING** met with representatives from the Southwest Airlines Pilots Association ("SWAPA"). **BOEING** again reiterated that the 737 MAX 8 was safe.

255. After the November 23rd optional update, the Board did not formally convene and address the Lion Air Crash until its regularly scheduled Board meetings on December 16 and 17.

256. Consistent with the fact that safety was not a regular topic of Board discussion, the minutes reflect that the Board's primary focus relating to the 737 MAX and Lion Air Crash was on restoring profitability and efficiency in light of longstanding supply chain issues.

257. The Audit Committee met as well during this timeframe with an "Ethics and Compliance Update," but it did not contain any meaningful information about the 737 MAX's safety or safety generally.

258. Then on November 27, 2018, **BOEING** senior management met in Texas with the pilots' union from American Airlines. **BOEING** disclosed that it was planning to make software changes to the MAX. Mike Sinnett, **BOEING**'s vice president of product strategy and development, described the updates as "flight-critical software." **BOEING** said they felt the update was so urgent that they did not want to wait for the normal six-month certification process or the 90-day public comment period. Instead, **BOEING** said they wanted it done in six weeks. More than sixteen weeks later, at the time of the crash of Flight 302, **THE BOEING DEFENDANTS** still had not implemented this software update.

259. At this same meeting, Mr. Sinnett minimized the problems with the MAX's aerodynamics and the role of the MCAS. Sinnet rejected the characterization of the MCAS and Lion Air crash as a "single point failure" because the pilots were the backup, and referred to MCAS as "just a little bit of software in the flight control system."

260. Sinnett also described the MCAS as a MAX "control law" that helps it behave the same way as the 737NG when "flying a stall." Sinnet described how, without MCAS, "you'd get a *perception* of the nose pitching up on you." This minimized the significance of the MAX's aerodynamic instability, which could cause an Airplane Nose Up pitching moment without any control column command.

261.    In addition to the misleading statements made to the pilots' unions, **THE BOEING DEFENDANTS** provided assurances to airlines after the crash of Flight 610 that the 737 MAX 8 was safe and that no additional pilot training was necessary.

262.    In the months between the crashes, **THE BOEING DEFENDANTS** received various inquiries from airlines with questions and concerns about the MCAS, the airplane's single point failure, and pilots' ability to respond to multiple simultaneous alerts. **THE BOEING DEFENDANTS** assured airlines that the plane was safe but did not provide specifics in response to direct questions, denying airlines and pilots vital information needed to prepare pilots to prevent another crash.

263.    On December 6, 2018, a couple of unfavorable articles were published in the *Wall Street Journal* regarding the Lion Air crash. **MUILENBURG** instructed the **BOEING** senior vice president of Communications, Anne Toulouse, to "[k]eep pushing back on the WSJ MCAS article" and dismissed the Journal's criticism as a "pseudo problem fabricated by the WSJ!"

264.    On December 14, 2018, a Norwegian 737 MAX 8 airplane made an emergency landing in Iran reportedly due to engine problems. This grabbed the attention of whistleblower Ed Pierson who was concerned that the rushed production of the 737 MAX 8 may have resulted in manufacturing defects during the airplanes' assembly. On December 19, 2018, Ed Pierson wrote directly to **MUILENBURG**, sharing his concerns and requesting a dialogue. Despite the warnings issued from a former manager on the MAX's assembly line, **THE BOEING DEFENDANTS** did not investigate these concerns or take appropriate precautions.

265.    On January 21, 2019, **BOEING** submitted to the FAA the proposed software enhancement for the MCAS. This software update was not implemented before the crash of Flight 302 a month and a half later.

266.     A few days after the "enhancement" was provided to the FAA, on January 25, 2019, **ROCKWELL** issued a software update to 737 MAX 8 flight-control systems designed to change MCAS functionality to improve its safety "when flap position failures are detected," according to a notice **BOEING** sent customers about the changes. **ROCKWELL** failed to advise regulators of the dangers related to the software problem and attempted to represent that the update was a "standard service bulletin" to the 737 MAX 8, further lulling operators and the FAA into the belief that there was no defect with the MCAS system.

267.     **THE BOEING DEFENDANTS** proposed additional pilot training as part of its eventual fix while, at the very same time, claiming that additional training on the 737 MAX 8 was not necessary in the interim. **THE BOEING DEFENDANTS'** rationale was that the training was designed to merely provide pilots with an "enhanced" understanding of the 737 MAX 8 Speed Trim System, including the MCAS function, associated existing crew procedures, and related software changes. In fact, in January 2019 and prior to the crash of ET 302, **BOEING** recommended that the FAA approve just Level A training for MCAS. This is the lowest level of training only requiring that pilots review printed materials.

268.     **THE BOEING DEFENDANTS** described the new training and review program as "enhanced," but failed to acknowledge that the previous self-guided computer training program given to the pilots of 737 MAX 8's did not include any information or training on the MCAS. **THE BOEING DEFENDANTS** knew or should have known that the existing procedure **THE BOEING DEFENDANTS** identified to deal with a MCAS failure—the stabilizer runaway procedure—was dangerously inadequate to deal with a MCAS failure caused by an erroneous AOA sensor input and the extreme load forces the MCAS can generate on the horizontal stabilizer.

269.     During the time after the Lion Air crash and prior to the crash of ET 302, whenever **THE BOEING DEFENDANTS** promoted the existing stabilizer runaway procedure as the

solution for unintended MCAS activation, implied the Lion Air pilots were responsible for the crash, or otherwise touted the safety of the 737 MAX 8, **THE BOEING DEFENDANTS** knew or should have known that **BOEING** had not tested the risk of MCAS activation caused by erroneous AOA data with its various flight deck alerts, had not tested the risk of multiple MCAS activations, **BOEING's** test pilots took too long to perform the runaway stabilizer procedure, and **BOEING** had not conducted a robust human factors analysis of unintended MCAS activation. **THE BOEING DEFENDANTS'** representations were uninformed, misleading, false and reckless.

270. On February 13, 2019, the FAA and **BOEING** came to an agreement on the scheduled fix for AOA disagree alert which was disabled in an estimated 80% of the 737 MAX 8 airplanes worldwide. The agreement called for the disagree alerts to be operational by June 18, 2020, more than 16 months later.

271. On February 19, 2019, less than three weeks before the 737 MAX suffered its second fatal crash in less than five months, Ed Pierson wrote yet another letter regarding his concerns about the MAX's safety. This time he sent the letter to everyone on the twelve members of the **BOEING** Board of Directors, including **CALHOUN**.

272. **CALHOUN** had already been aware that there were substantial safety issues with the 737 MAX 8 prior to this time. He admitted after the crash that "[f]airly early on, that assumption, that deadly assumption around what a pilot would do in that circumstance when that boundary condition was tested started to come to light."

273. Ed Pierson's four-page letter included several attachments summarizing his concerns and requesting that the Board, including **CALHOUN**, look into them. He also asked them to share his concerns with the accident investigators at the National Transportation Safety

Board (NTSB), with the Federal Aviation Administration (FAA), and the Indonesian civil aviation authorities.

274. **THE BOEING DEFENDANTS** did not take any corrective action in response, nor did they even respond to him. Despite the warnings issued from a former manager on the MAX's assembly line and his prior knowledge of the "deadly assumption", **THE BOEING DEFENDANTS** did not investigate these concerns or take appropriate precautions.

### 4. Despite knowing the Risks Posed by the 737 MAX, THE BOEING DEFENDANTS Allowed and/or Participated in and/or Authorized an Internal Response Designed to Coverup the Risks

275. Not only did **BOEING** and **MUILENBURG** *publicly* downplay the MAX's role in the crash, but **BOEING** and its leadership, including **MUILENBURG** and **CALHOUN**, allowed, authorized and/or participated in an *internal* response designed to ignore, cover up, and downplay the risks posed by the MAX.

276. For example, on December 16 and 17 2018, **BOEING**'s Board, with **CALHOUN** as Lead Director, held its first regular meeting after the Lion Air Crash. Despite the fact that the crash was dominating headlines about **BOEING** and raising doubts about the safety of **BOEING**'s most important product, the Board apparently did not discuss safety, the MCAS, or the AOA sensors at all. Indeed, there is no recorded mention of these issues having been discussed in that Board meeting.

277. The lack of discussion of MCAS and what, if anything, to do about it is a reckless omission, because the Board knew about the problems with MCAS. As **CALHOUN** later told the *New York Times*, "it was fairly quick [after the Lion Air crash] that I think we knew that MCAS was involved and had been activated in the crash." In other words, **CALHOUN** and the Board knew that MCAS was dangerous, and continued to pose a danger to the flying public.

278.     In stark contrast to the total absence of discussion of safety issues related to the MAX, the Board meeting minutes contain a discussion of increasing production of MAX aircraft. The Board also discussed a disaster entirely unrelated to the MAX, namely, the Woolsey fire in California, which was posing challenge for "storm water management systems" at a **BOEING** facility in that region.

279.     The same reckless omissions and money over safety played out at the Board meeting on February 24 and 25, 2019. Again, the minutes from the open session of the meeting contain no mention of the safety of the 737 MAX. There was, however, a discussion of the productivity and profitability of the 737 MAX product line. An addendum to the meeting minutes indicates that the Board "decided to delay any investigation until the conclusion of the regulatory investigations or until such time as the Board determines that an internal investigation would be appropriate."

280.     It is apparent that **CALHOUN** and the **BOEING** Board accepted **MUILENBURG's** deflection and denials at face value without conducting any type of investigation despite public information to the contrary.

### 5.   THE BOEING DEFENDANTS Manipulated and Deceived the FAA in its Coverup of the 737 MAX 8's Safety Issues.

281.     **THE BOEING DEFENDANTS** needed the support of the FAA if its coverup of the Lion Air crash was going to be successful. To do this, **THE BOEING DEFENDANTS** used its connections with the FAA and lawmakers to buy itself time to engineer a fix. This can also be seen in the telephone call between CEO **MUILENBURG** and President Trump following the crash of ET 302. Although he was not successful, **MUILENBURG** was able to get on the phone with the President of the United States to personally lobby against the grounding of the MAX.

282.     The entire board, outside of the **BOEING CEO**, was devoid of any commercial aviation experience and was selected for other reasons, including their political connections.

283. **THE BOEING DEFENDANTS** used their relationship with the FAA to assist in **BOEING's** cover-up and downplay the problem, with great success. The commonality between **BOEING's** FCOM Bulletin and the FAA's AD shows that they were united in their messaging. An FAA manager even removed reference to the MCAS from the Airworthiness Directive, likely at **BOEING's** request.

284. After the Lion Air crash, the FAA learned for the first time about the inoperable disagree alert on the majority of **BOEING's** 737 MAX airplanes. The FAA agreed to give **BOEING** 16 months to fix a serious emergency safety problem. As the House Subcommittee on Aviation concluded in its Preliminary Investigative Findings, this "should have raised concerns about Boeing's transparency with the FAA."

285. As admitted in the Deferred Prosecution Agreement, **THE BOEING DEFENDANTS** continued to mislead the FAA and the public about their prior knowledge of the change to the MCAS.

286. In November 2018, the FAA completed an internal analysis of the safety of the 737 MAX 8 called a Transport Airplane Risk Assessment Methodology (TARAM). The analysis showed that underlying risks from the MCAS design were unacceptably high without FAA action, that they exceeded internal FAA safety standards, and that the likelihood of another emergency or even accident was over the tolerable threshold. Based on the FAA's projections, there would be approximately 15 catastrophic plane crashes over the life of the 737MAX 8 without necessary changes. However, instead of mandating immediate equipment changes, inspections, or training, or grounding the airplane, **THE BOEING DEFENDANTS** had the FAA merely issue an Emergency Airworthiness Directive that, like **THE BOEING DEFENDANTS'** public statement, simply reminded pilots of an existing emergency procedure. Neither **THE BOEING**

**DEFENDANTS** nor the FAA explained how the dangerous MCAS design which exceeded the agency's standards was allowed to be implemented in the 737 MAX 8.

287. An FAA spokesman acknowledged that the FAA's approach "wasn't removing the risk," but permitted **BOEING** 10 months to implement a software update anyways while letting the airplanes continue to fly. Even after the Lion Air crash, **THE BOEING DEFENDANTS** sidelined the FAA, mislead the government, and prevented any effective measures that would address the safety of the 737 MAX 8. **THE BOEING DEFENDANTS'** reaction to the first crash proved to be massively fatal.

288. In its rush to engineer a fix for MCAS, **THE BOEING DEFENDANTS** ignored and/or dismissed concerns from the FAA regarding safety and requests for evidence to support **THE BOEING DEFENDANTS'** representations about MCAS and resisted the FAA's request for a human factors' analysis.

289. **THE BOEING DEFENDANTS** made clear that it wanted the MCAS fix certified right away even if that meant rushing safety evaluations and testing.

290. In January 2019, three months after the Lion Air crash, the FAA initiated its own internal review of MCAS.

291. At that time, there was a private telephone conference with Elizabeth Pasztor and Ali Bahrami. There is no record of the call, but shortly thereafter, there was a request from Pasztor for Level A training on MCAS, which was granted.

292. In order to complete that internal review, the FAA was requesting a full, clear picture from **THE BOEING DEFENDANTS** regarding how MCAS worked.

293. The FAA's review resulted in a draft report that was never completed. The FAA noted that **THE BOEING DEFENDANTS'** traceability and clarity of explanations were lacking in its revisions to MCAS and other system certification documents.

294.    The visibility that FAA was requesting would jeopardize **THE BOEING DEFENDANTS'** timeline for recertification of the 737 MAX 8 and certification of the other MAX variants.

295.    Just days later, Ethiopian Airlines Flight ET 302 crashed.

### G.    ETHIOPIAN AIRLINES FLIGHT 302 CRASHED, KILLING ALL 157 PEOPLE ON BOARD

296.    At 05:38 UTC, Ethiopian Airlines Flight ET 302, took off from Addis Ababa Bole International Airport bound to Nairobi, Kenya Jomo Kenyatta International Airport. Six minutes later, at 5:44 UTC, the airplane crashed 28 nautical miles southeast of Addis Ababa near Ejere village. There were 157 passengers and crew on board. All were killed, and the airplane was destroyed.



297.    Just one minute into the flight the Captain, Yared Getachew, reported that the crew was having flight-control problems. The MCAS then kicked in and pushed the nose of the airplane down for nine seconds. Instead of climbing, the airplane descended slightly. Audible warnings — "Don't Sink" — sounded in the cockpit. The pilots fought to turn the nose of the plane up, and briefly they were able to resume climbing. The MCAS system pushed the nose down again, triggering more squawks of "Don't Sink" from the plane's ground-proximity warning system. The pilots then flipped two switches and disconnected the electric trim motor, then tried to regain control. They asked to return to the airport but were continuing to struggle getting the airplane to

gain altitude. Power to controls was returned. The MCAS engaged again, pushing the plane into a nosedive. Thirty seconds later the cockpit voice recording ended, the plane crashed, and all 157 people on board were killed. The airplane's impact created a crater 30 meters deep.

298.     According to a preliminary report issued by the Ethiopian Aircraft Accident Investigation Bureau, the following is what occurred, minute by minute.

299.     At 05:38:44, shortly after liftoff, the left and right recorded AOA values deviated. The left AOA decreased to 11.1 degrees then increased to 35.7 degrees while the value of the right AOA indicated 14.94 degrees. Then the left AOA value reached 74.5 degrees in ¾ seconds while the right AOA reached a maximum value of 15.3 degrees. At this time, the left stick shaker activated and remained active until near the end of the recording. Also, the airspeed, altitude and flight director pitch bar values from the left side noted deviating from the corresponding right side values. The left side values were lower than the right side values until near the end of the recording.

300.     At 05:38:43 and about 50 ft radio altitude, the flight director roll mode changed to LNAV. At 05:38:46 and about 200 ft radio altitude, the Master Caution parameter changed state. The First Officer called out Master Caution Anti-Ice on CVR. Four seconds later, the recorded Left AOA Heat parameter changed state.

301.     At 05:38:58 and about 400 ft radio altitude, the flight director pitch mode changed to VNAV SPEED and the Captain called out "Command" (standard call out for autopilot engagement) and an autopilot warning is recorded. At 05:39:00, the Captain called out "Command". At 05:39:01 and about 630 ft radio altitude, a second autopilot warning is recorded.

302.     At 05:39:06, the Captain advised the First-Officer to contact radar and the First Officer reported SHALA 2A departure crossing 8400 ft and climbing FL 320. Between liftoff and 1000 ft above ground level (AGL), the pitch trim position moved between 4.9 and 5.9 units in response to manual electric trim inputs. At 1000 ft AGL, the pitch trim position was at 5.6 units.

At 05:39:22 and about 1,000 feet the left autopilot (AP) was engaged (it disengaged about 33 seconds later), the flaps were retracted and the pitch trim position decreased to 4.6 units. Six seconds after the autopilot engagement, there were small amplitude roll oscillations accompanied by lateral acceleration, rudder oscillations and slight heading changes. These oscillations continued also after the autopilot was disengaged. At 05:39:29, radar controller identified ET-302 and instructed to climb FL 340 and when able right turns direct to RUDOL and the First-Officer acknowledged.

303.    At 05:39:42, Level Change mode was engaged. The selected altitude was 32000 ft. Shortly after the mode change, the selected airspeed was set to 238 kt.

304.    At 05:39:45, the Captain requested flaps up and the First-Officer acknowledged. One second later, the flap handle moved from 5 to 0 degrees and flaps retraction began. At 05:39:50, the selected heading started to change from 072 to 197 degrees and at the same time the Captain asked the First-Officer to request to maintain runway heading.

305.    At 05:39:55, Autopilot disengaged, at 05:39:57, the Captain advised the First-Officer to request to maintain runway heading and that they were having flight control problems. At 05:40:00 shortly after the autopilot disengaged, the FDR recorded an automatic aircraft nose down (AND) activated for 9.0 seconds and pitch trim moved from 4.60 to 2.1 units. The climb was arrested and the airplane descended slightly.

306.    At 05:40:03 the Ground Proximity Warning System (GPWS) "DON'T SINK" alerts occurred. At 05:40:05, the First-Officer reported to ATC that they were unable to maintain SHALA 1A and requested runway heading which was approved by ATC.

307.    At 05:40:06, left and right flap position reached a recorded value of 0.019 degrees which remained until the end of the recording. The column moved aft and a positive climb was re-established during the automatic AND motion. At 05:40:12, approximately three seconds after

AND stabilizer motion ends, electric trim (from pilot activated switches on the yoke) in the Aircraft nose up (ANU) direction is recorded on the DFDR and the stabilizer moved in the ANU direction to 2.4 units. The Aircraft pitch attitude remained about the same as the back pressure on the column increased.

308.    At 05:40:20, approximately five seconds after the end of the ANU stabilizer motion, a second instance of automatic AND stabilizer trim occurred and the stabilizer moved down and reached 0.4 units.

309.    From 05:40:23 to 05:40:31, three Ground Proximity Warning System (GPWS) "DON'T SINK" alerts occurred.

310.    At 05:40:27, the Captain advised the First-Officer to trim up with him. At 05:40:28 Manual electric trim in the ANU direction was recorded and the stabilizer reversed moving in the ANU direction and then the trim reached 2.3 units.

311.    At 05:40:35, the First-Officer called out "stab trim cut-out" two times. The Captain agreed and the First Officer confirmed stab trim cut-out. At 05:40:41, approximately five seconds after the end of the ANU stabilizer motion, a third instance of AND automatic trim command occurred without any corresponding motion of the stabilizer, which is consistent with the stabilizer trim cutout switches were in the "cutout" position.

312.    At 05:40:44, the Captain called out three times "Pull-up" and the First-Officer acknowledged. At 05:40:50, the Captain instructed the First Officer to advise ATC that they would like to maintain 14,000 ft and they had a flight control problem. At 05:40:56, the First-Officer requested ATC to maintain 14,000 ft and reported that they were having a flight control problem. ATC approved.

313.    From 05:40:42 to 05:43:11 (about two and a half minutes), the stabilizer position gradually moved in the AND direction from 2.3 units to 2.1 units. During this time, aft force was

applied to the control columns which remained aft of neutral position. The left indicated airspeed increased from approximately 305 kts to approximately 340 kts (VMO). The right indicated airspeed was approximately 20-25 kts higher than the left. The data indicates that aft force was applied to both columns simultaneously several times throughout the remainder of the recording.

314.    At 05:41:20, the right overspeed clacker was recorded on Cockpit Voice Recorder. It remained active until the end of the recording. At 05:41:21, the selected altitude was changed from 32000 ft to 14000 ft. At 05:41:30, the Captain requested the First-Officer to pitch up with him and the First-Officer acknowledged.

315.    At 05:41:32, the left overspeed warning activated and was active intermittently until the end of the recording. At 05:41:46, the Captain asked the First-Officer if the trim was functional. The First-Officer has replied that the trim was not working and asked if he could try it manually. The Captain told him to try.

316.    At 05:41:54, the First-Officer replied that it was not working. At 05:42:10, the Captain asked and the First-Officer requested a vector to return and ATC approved.

317.    At 05:42:30, ATC instructed ET-302 to turn right heading 260 degrees and the First-Officer acknowledged. At 05:42:43, the selected heading was changed to 262 degrees. At 05:42:51, the First-Officer mentioned Master Caution Anti-Ice. The Master Caution is recorded on DFDR.

318.    At 05:42:54, both pilots called out "left alpha vane". At 05:43:04, the Captain asked the First Officer to pitch up together and said that pitch is not enough. At 05:43:11, about 32 seconds before the end of the recording, at approximately 13,4002 ft, two momentary manual electric trim inputs are recorded in the ANU direction. The stabilizer moved in the ANU direction from 2.1 units to 2.3 units.

319. At 05:43:20, approximately five seconds after the last manual electric trim input, an AND automatic trim command occurred and the stabilizer moved in the AND direction from 2.3 to 1.0 unit in approximately 5 seconds. The airplane began pitching nose down. Additional simultaneous aft column force was applied, but the nose down pitch continued, eventually reaching 40 degrees nose down. The stabilizer position varied between 1.1 and 0.8 units for the remainder of the recording. The left Indicated Airspeed increased, eventually reaching approximately 458 kts and the right Indicated Airspeed reached 500 kts at the end of the recording. The last recorded pressure altitude was 5,419 ft on the left and 8,399 ft on the right.

320. Shortly thereafter, all communication with Flight 302 stopped and the plane violently crashed into a field, killing all 157 people aboard.

321. Initial reports on the crash confirmed that the Flight 302 pilots initially followed the emergency procedures recommended by **BOEING** by flipping a pair of cutoff switches, thereby disabling the electric motor moving the horizontal stabilizer. However, preliminary reports also indicate that the pilots then were unable move the horizontal stabilizer into its proper position because there were unable to manually turn the stabilizer trim wheel. When the pilots still could not regain control of the airplane, they turned the electric motor back on, and the plane entered a dive from which it could not recover.

322. Former 737 pilot and union safety representative, John Cox, replicated the ET 302 flight in a simulator and reported to Congress that, with the AOA sensor failure, the pilots were bombarded with a "cacophony of alarms and warnings." These multiple warnings, some of the contradictory, would create what Captain Cox described as "a breeding ground for confusion and task saturation." The test that John Cox did was one that **THE BOEING DEFENDANTS** never did during MCAS development.

323. **THE BOEING DEFENDANTS'** failure to disclose details about the MCAS deprived the pilots of necessary information needed to understand and manage the multiple alerts. As the NTSB Safety Recommendation Report stated, "the erroneous AOA output experienced during the two accident flights resulted in multiple alerts and indications to the flight crews, yet the crews lacked tools to identify the most effective response."

324. Two of the tools that would have helped the pilots were an operational AOA disagree alert and EICAS system. The AOA disagree alert would have informed the pilots that the AOA readings were out of sync and an EICAS system would have allowed the pilots to better manage the multiple alerts. The time that could have been saved with the proper tools was vital as **BOEING's** own analysis showed that taking up to 10 seconds to identify and respond to a "stabilizer runaway" condition caused by uncommanded MCAS activation would be catastrophic.

325. As Captain Chesley Sullenberger told Congress, "[e]ven knowing what was going to happen, I could see how crews would have run out of time and altitude before they could have solved the problems." The ET 302 pilots, unaware of what exactly they were fighting, never had a chance, because of **THE BOEING DEFENDANTS'** wrongful conduct.

## H. THE BOEING DEFENDANTS' COVERUP CAMPAIGN CONTINUED AFTER ET 302

326. Even after **THE BOEING DEFENDANTS'** reckless campaign for profit resulted in the death of 346 people in less than five months, **THE BOEING DEFENDANTS** still refused to ground the MAX and continued its coverup to portray the MAX as a safe airplane in order to avoid regulatory action from the FAA.

327. On March 11, 2019, **BOEING** officials met with Daniel Elwell, the acting FAA administrator, "to discuss the situation and reinforce our confidence in the 737 MAX."

328.    Later that day, **MUILENBURG** sent the **BOEING** Board an email, writing "[p]aramount among our priorities is continuing to deliver on our commitment to get airplanes to our customers on time and with superior quality."

329.    On March 12, 2019, **MUILENBURG** called President Trump to express his confidence in the safety of the MAX and to lobby against its grounding. **THE BOEING DEFENDANTS** also dissembled to members of the Senate Commerce Committee in Washington DC, telling Senator Richard Blumenthal that the crashes were the result of pilot error even though the pilots followed the procedures prescribed by **BOEING** and the FAA.

330.    In light of news that other regulatory agencies and airlines were grounding the MAX, **THE BOEING DEFENDANTS** refused to give in and devised a strategy to use the company's political and business ties to resist grounding.

331.    That same day, **BOEING** released an official statement reiterating that the company has "full confidence in the safety of the 737 MAX" and that "based on the information currently available, we do not have any basis to issue new guidance to operators."

332.    **MUILENBURG** was aware of the text messages in the first couple of months of 2019 but did not provide those text messages to the FAA until October 2019.

333.    Despite **THE BOEING DEFENDANTS'** objections, regulators decided to ground the 737 MAX 8 airplanes in the wake of the Flight 302 crash to allow for a MCAS software upgrade and safety assessment to be conducted.

334.    Once the 737 MAX was grounded, **THE BOEING DEFENDANTS** began a new phase of its misinformation campaign to rehabilitate its image, minimize the scope of wrongdoing at **THE BOEING DEFENDANTS**, and get the 737 MAX 8 flying again. This conduct is probative of the facts and wrongfulness of **THE BOEING DEFENDANTS'** conduct that led to the subject crash.

335. In the weeks and months following the second crash, journalists and industry insiders friendly to **BOEING,** and likely in conjunction with **BOEING**, penned favorable articles blaming pilot error for the crashes and touting the safety of the 737 MAX 8.

336. While **MUILENBURG** eventually conceded that **BOEING** "made mistakes" in the design of MCAS, he has also attempted to coverup **THE BOEING DEFENDANTS'** wrongdoing and rewrite history when he provided misleading and inaccurate testimony to Congress about why **BOEING** did not include reference to MCAS in its FCOM manual, claiming that **BOEING** wanted to "optimize what is in the training manual, so we don't add more information than what is useful to pilots." This explanation is at odds with the rationale **BOEING** discussed internally back in 2013 in deciding not to refer to MCAS outside **BOEING** because it feared doing so would increase certification scrutiny, lead to greater pilot training requirements, and increase costs to **BOEING** and its customers.

337. To give the impression that it is making meaningful changes to its corporate culture and leadership, **BOEING** parted ways with a number of former executives: Kevin McAllister, head of the **BOEING** commercial airplanes division, resigned; John Hamilton, the **BOEING** Chief Engineer, retired; and, once his usefulness had run its course, **MUILENBURG** was fired in December 2019, but not before he received approximately $60 Million. The changes do not represent a change in culture as the same group of people responsible for the crashes remain in positions of leadership.

338. Taking over as CEO for **MUILENBURG** was **CALHOUN**, a member of the **BOEING** board since 2009 and a strong defender of **MUILENBURG** up until a month before his departure. Once he became CEO, however, **CALHOUN** began distancing himself from the decisions made by **MUILENBURG** and criticizing his reckless pursuit of financial targets, stating to the New York Times, in reference to **MUILENBURG**, "[i]f anybody ran over the rainbow for

the pot of gold on stock, it would have been him." Despite having stated this view of **MUILENBURG** and his oversight role as a member of the Board, **CALHOUN** was complicit with **MUILENBURG's** risk-taking since it was immensely profitable for **THE BOEING DEFENDANTS**. **CALHOUN** has admitted that he and Board may have grown complacent in overseeing **BOEING** and excused his failure to curb **MUILENBURG's** recklessness with the reasoning that, as a former engineer, **MUILENBURG** "might be really good at taking a few more risks." **CALHOUN'S** admissions reveal that **THE BOEING DEFENDANTS** abdicated their responsibility to oversee the risky behavior they knew that **MUILENBURG** was engaging in because that risk-taking was immensely profitable for **THE BOEING DEFENDANTS**.

339. Like **MUILENBURG**, when talking about the crashes, **CALHOUN** speaks out of both sides of his mouth, appearing to accept some responsibility while redirecting blame for the crashes from **BOEING** onto others. **CALHOUN** stated that **BOEING** made a "fatal mistake" in assuming that pilots would immediately counteract a failure of new software, implying that the pilots and the **ROCKWELL** – the designer of the software – were responsible. **CALHOUN** has attacked their lack of training and indicated that pilots in the United States would be able to recover from unintended MCAS activation. This criticism makes no sense given that **BOEING** designs, sells, and profits from airplanes to airlines all over the world.

340. **CALHOUN** has also attempted to rewrite history with respect to the Board's motivations for approving the MAX and involvement in the certification process. **CALHOUN** denied that "competitive pressure[s]" played a role in the Board's decision to re-engine the 737 NG and create the 737 MAX. However, Board minutes and materials demonstrate that the primary motivation for the re-design was to "restore" the "competitive advantage" over Airbus's 320neo.

341. With respect to oversight of the certification process, **CALHOUN** told the *Washington Post*: "Do we ask questions about what the difficult spots are in the certification

process? Of course we do." Yet, years of Board minutes and materials show the Board had little concern for collaboratively working through "difficult spots" and instead focused on sales figures and revenue projections

342. On March 6, 2020, just four days before the ET 302 anniversary event, **CALHOUN** gave an interview to the New York Times, wherein he blamed **BOEING's** troubles on **MUILENBURG**, whom he had previously defended. "It's more than I imagined it would be honestly," he said. "And it speaks to the weaknesses of our leadership."

343. **CALHOUN**, also a multi-millionaire who chose money over the safety of the public, including **SAMYA STUMO**, ironically stated later "If anybody ran over the rainbow for the pot of gold on stock, it would have been him [**MUILENBURG**]."

344. **CALHOUN** stated that the Board "never seriously questioned [**MUILENBURG's**] strategy, in part because before the first MAX crash off the coast of Indonesia in October 2018, the company was enjoying its best run in years," and painted **MUILENBURG** as a money-hungry leader that was willing to prioritize profits over quality and safety.

345. In **CALHOUN's** words, "If [the Board] w[as] complacent in any way, maybe, maybe not, I don't know. . . . We supported a C.E.O. who was willing and whose history would suggest that he might be really good at taking a few more risks."

346. The **BOEING** Board continued with its financial incentives following the ET 302 crash. The **BOEING** Board offered **CALHOUN** a $7 Million bonus if he could get the ungrounding order rescinded and the MAX flying again. In creating this incentive, **BOEING** was once again encouraging dangerous risk taking and jeopardizing safety. In November 2020, **CALHOUN** succeeded in getting the 737 MAX 8 ungrounding order rescinded by the FAA, allowing the airplane to return to the skies in the United States. The 20-month grounding further revealed problems with **BOEING's** safety oversight and quality control processes as regulators

discovered several new defects in addition to MCAS, including the MAX's problems with nonconforming slat tracks, outdated flight control computers, vulnerable electrical wire bundles, foreign debris in fuel tanks, defectively manufactured engine panel electrical bonding, and its use of untested and unapproved head-up guidance system sensors. These other safety issues speak to **BOEING's** failure of leadership and show just how hollow **BOEING** and **MUILENBURG's** statements were when championing the safety of the 737 MAX 8 after the second crash in Ethiopia. **MUILENBURG** insisted that the MAX was safe without doing the necessary due diligence to determine whether his representation was accurate because keeping MAX orders moving was more important to him than the actual safety of the airplane.

347. The Department of Justice conducted its own investigation into the certification of the MAX and ultimately brought criminal charges against **BOEING** in connection with a conspiracy to defraud the FAA in the state of Texas. The conspiracy related to intentional misrepresentations made by two of **BOEING's** test pilots—Mark Forkner and Patrik Gustavsson—to the FAA's Aircraft Evaluation Group (AEG).[2] The AEG is responsible for making determinations on differences training for pilot's transitioning to fly the 737 MAX 8. The differences-training determination, as well as descriptions of the systems on the plane, are then published in the 737 MAX Flight Standardization Board Report which is then provided to airlines.

348. **BOEING's** test pilots, acting in accordance with **BOEING's** program directive that there be no pilot training beyond Level-B, requested that the AEG delete reference to MCAS from the 737 MAX FSB Report because the MCAS would only activate "way outside the normal operating envelope," such as "during the limited operational scope of a high-speed, wind-up turn."

---

[2] The Deferred Prosecution Agreement ("DPA") refers to Forkner and Gustavsson as "Employee 1" and "Employee 2", respectively. From multiple publicly available sources, it is obvious that this is in reference to Forkner and Gustavsson.

However, once **BOEING** expanded the operational scope and authority given to the MCAS, these statements were no longer accurate. The **BOEING** test pilots, aware that the AEG was relying on outdated and inaccurate information, consciously and intentionally failed to correct the AEG's misunderstanding. **THE BOEING DEFENDANTS** doubled down and repeated its request for removal of reference to MCAS after it knew the original basis for removal was no longer accurate. Based on **THE BOEING DEFENDANTS'** fraudulent representations, the AEG deleted reference to MCAS from the 737 MAX FSB Report and provisionally determined that pilots would only need Level-B, computer-based training. Finally, **THE BOEING DEFENDANTS** provided the inaccurate FSB Report to airlines when **THE BOEING DEFENDANTS** knew the report's conclusions and pilot-training schedules were the product of fraud.

349. **BOEING** and the Department of Justice entered into a Deferred Prosecution Agreement ("DPA") in which **BOEING** admitted to the charges and other malicious and wrongful conduct levied against it, including the following:

> At all times during the conspiracy, [Mark Forkner] and [Patrik Gustavsson] were acting within the scope of their employment and with the intention, at least in part, to benefit Boeing. The purpose of the conspiracy was to defraud the FAA AEG by impairing, obstructing, defeating, and interfering with the lawful function of the FAA AEG by dishonest means in connection with its publication of the 737 MAX FSB Report and its differences-training determination for the Boeing 737 MAX, in order to bring about a financial gain to Boeing…

350. **THE BOEING DEFENDANTS'** cover-up extended to this criminal investigation as well. **MUILENBURG** admitted in congressional testimony that he was aware of Mark Forkner's improper and illegal conduct prior to the crash of ET 302. However, the DPA notes that **BOEING** did not receive credit for voluntary disclosure because it "did not timely and voluntarily disclose" the fraudulent conduct. **THE BOEING DEFENDANTS** concealed this conduct from investigators even after the second crash. Similarly, **BOEING** only received partial credit for

cooperating with investigators because, according to the DPA, **BOEING** "frustrated" the investigation and delayed its cooperation for six months.

351.    **THE BOEING DEFENDANTS'** fraudulent communications to the AEG, as detailed in the DPA, were intended to reach and did reach FAA leadership in Washington, DC. This fraudulent information materially influenced the FAA's determination with respect to flight differences training and certification of the 737 MAX 8. Without the fraud described in the DPA, the FAA would likely have required additional pilot training and certification deliverables to ensure the safety of the airplane. But for **THE BOEING DEFENDANTS'** fraud, the danger of MCAS would have been discovered, airlines and their pilots would have received the information and training needed to respond to MCAS activation, and both crashes would have been prevented.

352.    The DPA relates to incidents in which **THE BOEING DEFENDANTS** gamed the certification process, misleading the FAA to obtain the result they desired. **THE BOEING DEFENDANTS** have continued this abuse of the certification process to get the grounding order rescinded.

353.    Following the second crash, the Senate Committee on Commerce, Science, and Transportation began investigating the MAX crashes and the role the FAA played in providing regulatory oversight. In its report released in December 2020, the Committee notes how an FAA whistleblower conducted ad hoc simulator tests to evaluate **BOEING's** long-standing claim that a pilot would react to a runaway stabilizer procedure in under four seconds. **BOEING** officials were present for the test and, immediately prior to the exercise, coached the test pilots on what to expect, telling them: "remember, get right on that pickle switch." The "pickle switch" refers to the stabilizer trim control switches which are used to quickly counteract unintended MCAS-induced stabilizer trim. Despite **BOEING** officials improperly signaling to the test pilots about what action to take, putting a thumb on the scale of the tests and tainting their accuracy, one of the test pilots

still responded in 16 seconds, more than 4 times longer than **THE BOEING DEFENDANTS'** assumed reaction time of four seconds.

354.    The Senate Committee report concluded that **BOEING** "had established a pre-determined outcome to reaffirm a long-held human factor assumption related to pilot reaction time" and that **BOEING** inappropriately influenced FAA human factor simulator testing relating to recertification of the 737 MAX 8 by coaching test pilots and telling them what to expect. These statements are accurate.

355.    When looking into these claims and others, investigators were denied answers to certain questions, leading the Senate Committee to conclude that the "FAA and Boeing were attempting to cover up important information that may have contributed to the 737 MAX tragedies." **THE BOEING DEFENDANTS'** lack of transparency, lack of cooperation, and intent to defraud the FAA in connection with the ungrounding of the MAX is alarmingly similar to behavior that led to the fraudulent and malicious conduct articulated in the DPA.

356.    On October 14, 2021, Forkner was indicted and charged with six counts of fraud, in providing the FAA with "false, inaccurate and incomplete information" about the MCAS.

**V.    CLAIMS FOR RELIEF**
**COUNT I**
**NEGLIGENCE**
**THE BOEING COMPANY**

357.    **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

358.    At all relevant times hereinabove set forth, Defendant **BOEING** was the designer, manufacturer, distributor and/or seller of the **BOEING** 737 MAX 8 airplane. Defendant **BOEING** was, at all times relevant, in the business of designing, testing, manufacturing, selling, assembling, building, distributing, marketing, and/or inspecting airplane as suitable and safe for passenger air

transportation, including the subject **BOEING** 737 MAX 8 that crashed in Ethiopia on March 20, 2019.

359. At all relevant times hereinabove set forth, Defendant **BOEING** operated, supervised, managed, and/or oversaw the training facility and training materials that trained Ethiopian Airlines' pilots to fly the **BOEING** 737 MAX 8, and knew or should have known that the training, instruction, simulators, and manuals provided to Ethiopian Airlines pilots' was inadequate for them to safely operate the **BOEING** 737 MAX 8 for passenger air travel.

360. At all times hereinabove set forth, **BOEING** breached its duty of care to **SAMYA STUMO** as a passenger aboard Flight 302 with respect to the design, manufacture, inspection, testing, assembly, certification, distribution, and/or sale of a safe, airworthy airplane; including the failure to train, instruct, and/or issue advisory warnings necessary to assure the safe operation, control, management, and/or maintenance of the airplane. **BOEING'S** breaches of the duty of care include and were enabled by its persistent campaign to conceal information from, manipulate, and mislead FAA leadership and other federal government officials to cover up the safety problems with the 737 MAX 8 all the way through the crash of Flight 302 and thereafter. **BOEING'S** acts and/or omissions include, but are not limited to, the following:

    a.    creating and disseminating company business objectives without corresponding systems of oversight to ensure that such business objectives could be accomplished safely;

    b.    deciding to reengine the 737 NG with larger engines creating inherent aerodynamic instability and pursuing type certification for this airplane based on a decades-old design;

    c.    designing, manufacturing, assembling, and/or certifying an airplane with aerodynamic flaws and extremely poor handling which required correction by a haphazardly designed automated system in order to appear similar in handling to the 737 so that it could obtain certification under the 737 type rating;

    d.    failing to implement Board-level review directed to the safety of the 737 MAX;

e.      failing to appoint Board members with sufficient aviation safety and engineering knowledge and experience;

f.      failure of the Board to oversee safety contrary to other Board-level safety committees in the industry;

g.      failure of the Board to monitor, discuss, or address airplane safety on a regular basis;

h.      failing to have a means of receiving internal complaints about airplane safety;

i.      failure of the Board to implement any reporting or information systems or controls or to have any committee charged with direct responsibility to monitor airplane safety;

j.      failure of the Board to have no regular process or protocols requiring management to apprise the Board of airplane safety; instead, the Board only received ad hoc management reports that conveyed only favorable or strategic information;

k.      failure to communicate yellow and red flags to the Board;

l.      imposing rushed certification and production objectives for the MAX without providing sufficient time, personnel, and resources to safely meet these goals, and failing to conduct oversight to ensure that safety protocols were followed and corners were not cut in meeting these goals;

m.      imposing a program directive which prioritized minimal pilot training requirements at the expense of safety and abdicating responsibility to oversee that this goal was accomplished safely;

n.      creating financial incentives and rewards for achieving production and certification goals without regard for safety;

o.      designing, manufacturing, assembling, and/or certifying an airplane with an automated flight control system controlled by a single AOA sensor which was susceptible to failure without redundant systems;

p.      designing, manufacturing, assembling, and/or certifying an airplane with a flight control system susceptible to erroneous information from a single AOA sensor, and failing to provide AOA indicators as standard features and/or a functioning AOA disagree alert;

q.      designing, manufacturing, assembling, and/or certifying an airplane without implementing a flight-crew alerting system in compliance with 14 CFR § 25.1322;

r.      designing, manufacturing, assembling, and/or certifying an airplane with a flight control system that would initiate a dangerous automated dive without any

command from a pilot and without a means to promptly override the automated dive;

s.    marketing and selling the 737 MAX 8 as an analog to **BOEING's** 737NG to consciously and intentionally induce airlines to avoid the time-consuming retraining of airline pilots with the knowledge that the MAX 8 contained a new and potentially dangerous MCAS automated flight control system;

t.    failing to provide adequate warning with regard to the 737 MAX 8's MCAS and the risk of an automated dive without any command from a pilot, or clear instruction to promptly override such an MCAS automated dive;

u.    failing to provide the FAA with accurate information necessary to conduct a thorough safety assessment of the airplane, including **BOEING's** failure to accurately report the degree to which the MCAS could move the horizontal stabilizer of the airplane, the ability of the MCAS to reset after each command from a pilot, and test pilots' reaction time to unintended MCAS activation;

v.    exerting undue influence over Authorized Representatives and FAA tasked with reviewing the safety and airworthiness of the 737 MAX 8;

w.    Allowing a Project Engineer to change to the command authority of the MCAS just before Certification that made the system safety critical, without due diligence to investigate and document all the effects, revisit safety analysis, or inform the FAA;

x.    failing to properly train pilots on the new automated MCAS systems on the 737 MAX 8;

y.    failing to properly train pilots to identify an AOA sensor failure and MCAS input;

z.    failing to properly train pilots to disengage the stabilizer trim motor on the 737 MAX 8 in the event of an AOA sensor failure or unanticipated dive;

aa.    designing, assembling, and distributing a flight manual that did not warn of the risks presented by the MCAS, faulty AOA sensors, or automated dives;

bb.    designing, manufacturing, assembling, and/or certifying an airplane flight manual that failed to provide clear instruction or procedures on how to promptly override an automated MCAS dive;

cc.    failing to promptly issue a software patch to address the risk of malfunctioning AOA sensors and automated MCAS dives following the October 29, 2018 crash of Lion Air Flight JT 610;

dd.    failing to ground all 737 MAX 8 airplane following the crash of Lion Air Flight JT 610 until such a software patch and/or other safety procedures could be implemented;

    ee.    failing to properly warn pilots, airlines, and the public of the risk of malfunctioning AOA sensors and automated MCAS dives following the crash of Lion Air Flight JT 610;

    ff.    making misleading, incomplete, and/or inaccurate representations regarding the cause of the crash of Lion Air Flight JT 610, the safety of the 737 MAX 8, and the need for additional pilot training.

361.    As a direct and legal result of Defendant **BOEING's** negligence, carelessness, gross negligence, recklessness, and/or otherwise wrongful acts and/or omissions hereinabove set forth, **SAMYA STUMO** died in the crash of Flight 302.

362.    As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **SAMYA STUMO** suffered pre-death impact and injury, including fear of impending and imminent death and conscious pain and suffering, and **PLAINTIFFS** have been damaged by the death of **SAMYA STUMO**.

363.    As a direct and legal result of the wrongful acts and/or omissions hereinabove alleged, **PLAINTIFFS** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **SAMYA STUMO**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

364.    As a further direct and legal result of the wrongful conduct set forth above, **PLAINTIFF** incurred funeral, burial, estate administration and/or other related expenses in an amount according to proof at trial.

365.    As a further direct and legal result of the wrongful conduct set forth above, **PLAINTIFFS** suffered further economic losses, including but not limited to the loss of financial support, loss of household services, loss of caregiving services, and/or loss of net accumulations in an amount according to proof of trial.

366.    The potential harm to airline passengers, pilots, crews, and the public from the 737 MAX 8 was objectively foreseeable both in nature and in scope and were subjectively known to **BOEING** for all of the aforementioned reasons, including but not limited to: **BOEING's** admitted intentional fraud designed to obtain a pilot differences-training determination which **BOEING** knew was not appropriate for the novel systems on the 737 MAX 8; **BOEING's** own safety assessment of the AOA sensor and MCAS during development of the 737 MAX 8 which revealed potential problems with the system; the evidence that flight control issues caused the crash of Lion Air Flight 610 and death of 189 people; complaints lodged by pilots in the ASRS database regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; **BOEING's** knowledge that a some pilots would have a slow reaction time to a MCAS failure and that such a slow reaction time could result in a catastrophic failure and loss of life; internal whistleblower complaints raising concerns about the safety of the 737 MAX 8; **BOEING's** knowledge that human factors analysis was not conducted to validate the safety of the 737 MAX 8 after the Lion Air crash; and **BOEING's** identification of a software upgrade to address problems with the AOA sensors and MCAS in the weeks and months prior to the crash of Flight 302, and as otherwise detailed above.

367.    As set forth above and as will be shown by proof, there is a high degree of certainty that **PLAINTIFFS** have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and **BOEING's** conduct. A high degree of moral blame is attached to **BOEING's** conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by **BOEING** to **PLAINTIFFS** and the imposition of all damages described above.

368.    Based on the foregoing, **BOEING** acted intentionally, willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety

of others, and in concealing and covering up its misconduct, such that **PLAINTIFFS** request that the trier of fact, in the exercise of sound discretion, award **PLAINTIFFS** punitive damages for the sake of example and sufficient to punish **BOEING** for its despicable conduct, sufficiently large enough to be an example to **BOEING** and others and to deter **BOEING** and others from engaging in similar conduct in the future.

### COUNT II
### NEGLIGENCE
### DENNIS MUILENBURG

369. **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

370. As an officer of **BOEING, MUILENBURG** had a duty to act in good faith and consider all of the available information relevant to business decisions, including the information from experts and employees. **MUILENBURG** failed in that duty.

371. As an employee of **BOEING, MUILENBURG** had a duty to act non-negligently.

372. At all times hereinabove set forth, **MUILENBURG** allowed and/or actively participated in and/or authorized and/or wrongfully failed to prevent the aforementioned and below bad faith, fraud, improper motive, negligence and wrongful conduct giving rise to **BOEING's** liability, including the decision to re-engine the 737 with larger engines, setting reckless certification and production timetables, setting reckless goals for **BOEING's** profit-margins, mandating minimal pilot training, creating and failing to correct flawed risk identification and risk management systems, and abdication of responsibility and oversight for all of the above.

373. Following the crash of Lion Air JT 610, **MUILENBURG** allowed and/or actively participated in and/or authorized and/or wrongfully failed to prevent further bad faith, fraud, improper motive, negligence and wrongful conduct giving rise to **BOEING's** liability in the coverup of the cause of the crash, including the making of inaccurate and misleading

representations about the safety of the MAX, blaming pilots for the Lion Air crash and advocating against further pilot training, warnings, and/or remedial action.

374.     **MUILENBURG** defrauded the public, including **SAMYA STUMO**, its employees, its shareholders and the FAA for the aforementioned reasons and reasons stated below.

375.     **MUILENBURG** breached his duty of trust to the public, including **SAMYA STUMO**, its employees, its shareholders and the FAA for the aforementioned reasons and reasons stated below.

376.     **MUILENBURG** acted and failed to act with an improper motive and chose prioritizing profits, share price and his personal income over the safety of the public throughout the development, certification, production and utilization of the 737 MAX 8.

377.     **MUILENBURG** also acted in bad faith and failed to act with due diligence in the supervision of **BOEING** agents in connection with the various acts and omissions outlined above and below:

   a.  causing the creation and dissemination of company business objectives without corresponding systems of oversight to ensure that such business objectives could be accomplished safely;

   b.  allowing and/or actively participating in and/or authorizing and/or failing to act relating to the decision to reengine the 737 NG with larger engines creating inherent aerodynamic instability and pursuing type certification for this airplane based on a decades-old design;

   c.  allowing and/or actively participating in and/or authorizing and/or failing to act relating to the design, manufacture, assembly and/or certification of an airplane with aerodynamic flaws and extremely poor handling which required correction by a haphazardly designed automated system in order to appear similar in handling to the 737 so that it could obtain certification under the 737 type rating;

   d.  failing to cause Board-level review directed to the safety of the 737 MAX;

   e.  failing to cause the appointment of Board members with sufficient aviation safety and engineering knowledge and experience;

   f.  failing to cause the Board to oversee safety contrary to other Board-level safety committees in the industry;

g. failing to cause the Board to monitor, discuss, or address airplane safety on a regular basis;

h. failing to have a means of receiving internal complaints about airplane safety;

i. failing to cause the Board to have any reporting or information systems or controls or to have any committee charged with direct responsibility to monitor airplane safety;

j. failing to cause the Board to have regular process or protocols requiring management to apprise the Board of airplane safety; instead, the Board only received ad hoc management reports that conveyed only favorable or strategic information;

k. failing to communicate yellow and red flags to the Board;

l. allowing and/or actively participating in and/or authorizing and/or failing to prevent rushed certification and production objectives for the MAX without providing sufficient time, personnel and resources to safely meet these goals and failing to conduct oversight to ensure that safety protocols were followed and corners were not cut in meeting these goals;

m. allowing and/or actively participating in and/or authorizing and/or failing to prevent a program directive which prioritized minimal pilot training requirements at the expense of safety and abdicating responsibility to oversee that this goal was accomplished safely;

n. causing the creation of financial incentives and rewards for achieving production and certification goals without regard for safety;

o. allowing and/or actively participating in and/or authorizing and/or failing to prevent the design, manufacture, assembly and/or certification of an airplane with an automated flight control system controlled by a single AOA sensor which was susceptible to failure without redundant systems;

p. allowing and/or actively participating in and/or authorizing and/or failing to prevent the design, manufacture, assembly and/or certification of an airplane with a flight control system susceptible to erroneous information from a single AOA sensor and failing to provide AOA indicators as standard features and/or a functioning AOA disagree alert;

q. allowing and/or actively participating in and/or authorizing and/or failing to prevent the design, manufacture, assembly and/or certification of an airplane without implementing a flight-crew alerting system in compliance with 14 CFR § 25.1322;

r. allowing and/or actively participating in and/or authorizing the design, manufacture, assembly and/or certification of an airplane with a flight control system that would initiate a dangerous automated dive without any command from a pilot and without a means to promptly override the automated dive;

s.  causing the marketing and selling of the 737 MAX 8 as an analog to **BOEING's**
737NG to consciously and intentionally induce airlines to avoid the time-consuming
retraining of airline pilots with the knowledge that the MAX 8 contained a new and
potentially dangerous MCAS automated flight control system;

t.  allowing and/or actively participating in and/or authorizing and/or failing to prevent
inadequate warning with regard to the 737 MAX 8's MCAS and the risk of an
automated dive without any command from a pilot, or clear instruction to promptly
override such an MCAS automated dive;

u.  allowing and/or actively participating in and/or authorizing and/or failing to provide
the FAA with accurate information necessary to conduct a thorough safety
assessment of the airplane, including **BOEING's** failure to accurately report the
degree to which the MCAS could move the horizontal stabilizer of the airplane, the
ability of the MCAS to reset after each command from a pilot and test pilots' reaction
time to unintended MCAS activation;

v.  causing the exertion of undue influence over Authorized Representatives and FAA
tasked with reviewing the safety and airworthiness of the 737 MAX 8;

w.  allowing and/or actively participating in and/or authorizing and/or failing to provide a
Project Engineer to change to the command authority of the MCAS just before
Certification that made the system safety critical, without due diligence to investigate
and document all the effects, revisit safety analysis, or inform the FAA;

x.  allowing and/or actively participating in and/or authorizing **BOEING** to fail to
properly train pilots on the new automated MCAS systems on the 737 MAX 8;

y.  allowing and/or actively participating in and/or authorizing **BOEING** to fail to
properly train pilots to identify an AOA sensor failure and MCAS input;

z.  allowing and/or actively participating in and/or authorizing **BOEING** to fail to
properly train pilots to disengage the stabilizer trim motor on the 737 MAX 8 in the
event of an AOA sensor failure or unanticipated dive;

aa. allowing and/or actively participating in and/or authorizing the design, assembly and
distribution of a flight manual that did not warn of the risks presented by the MCAS,
faulty AOA sensors, or automated dives;

bb. allowing and/or actively participating in and/or authorizing the design, manufacture,
assembly and/or certification of an airplane flight manual that failed to provide clear
instruction or procedures on how to promptly override an automated MCAS dive;

cc. causing to have **BOEING** fail to promptly issue a software patch to address the risk
of malfunctioning AOA sensors and automated MCAS dives following the October
29, 2018 crash of Lion Air Flight JT 610;

dd. causing **BOEING** to fail to ground all 737 MAX 8 airplane following the crash of Lion Air Flight JT 610 until such a software patch and/or other safety procedures could be implemented;

ee. causing **BOEING** to fail to warn pilots, airlines and the public of the risk of malfunctioning AOA sensors and automated MCAS dives following the crash of Lion Air Flight JT 610;

ff. making misleading, incomplete and/or inaccurate representations regarding the cause of the crash of Lion Air Flight JT 610, the safety of the 737 MAX 8 and the need for additional pilot training.

378.    As a direct and legal result of Defendant **MUILENBURG's** negligence, carelessness, gross negligence, recklessness and/or otherwise wrongful acts and/or omissions hereinabove set forth, **SAMYA STUMO** died in the crash of Flight 302.

379.    As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **SAMYA STUMO** suffered pre-death impact and injury, including fear of impending and imminent death and conscious pain and suffering, and **PLAINTIFFS** have been damaged by the death of **SAMYA STUMO**.

380.    As a direct and legal result of the wrongful acts and/or omissions hereinabove alleged, **PLAINTIFFS** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection and/or moral support from **SAMYA STUMO**, as well as other pecuniary injuries including grief, sorrow and mental suffering in an amount to be determined at trial.

381.    As a further direct and legal result of the wrongful conduct set forth above, **PLAINTIFF** incurred funeral, burial, estate administration and/or other related expenses in an amount according to proof at trial.

382.    As a further direct and legal result of the wrongful conduct set forth above, **PLAINTIFFS** suffered further economic losses, including but not limited to the loss of financial

support, loss of household services, loss of caregiving services and/or loss of net accumulations in an amount according to proof of trial.

383.    The potential harm to airline passengers, pilots, crews and the public from the 737 MAX 8 was objectively foreseeable both in nature and in scope and were subjectively known to **MUILENBURG** for all of the aforementioned reasons, including but not limited to: **BOEING's** admitted intentional fraud designed to obtain a pilot differences-training determination which **BOEING** knew was not appropriate for the novel systems on the 737 MAX 8; **BOEING's** own safety assessment of the AOA sensor and MCAS during development of the 737 MAX 8 which revealed potential problems with the system; the evidence that flight control issues caused the crash of Lion Air Flight 610 and death of 189 people; complaints lodged by pilots in the ASRS database regarding the performance of the MCAS, the lack of clear instruction and training and the incidence of unexpected MCAS dives and flight control issues; **MUILENBERG's** knowledge that a some pilots would have a slow reaction time to a MCAS failure and that such a slow reaction time could result in a catastrophic failure and loss of life; internal whistleblower complaints raising concerns about the safety of the 737 MAX 8; **MUILENBURG's** knowledge that human factors analysis was not conducted to validate the safety of the 737 MAX 8 after the Lion Air crash; and **MUILENBURG's** identification of a software upgrade to address problems with the AOA sensors and MCAS in the weeks and months prior to the crash of Flight 302, and as otherwise detailed above.

384.    As set forth above and as will be shown by proof, there is a high degree of certainty that **PLAINTIFFS** have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and **MUILENBURG's** conduct. A high degree of moral blame is attached to **MUILENBURG's** conduct, and the policy of preventing future harm

justifies both the recognition of the existence of a duty of care owed by **MUILENBURG** to **PLAINTIFFS** and the imposition of all damages described above.

385.    Based on the foregoing, **MUILENBURG** acted intentionally, willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, and in concealing and covering up its misconduct, such that **PLAINTIFFS** request that the trier of fact, in the exercise of sound discretion, award **PLAINTIFFS** punitive damages for the sake of example and sufficient to punish **MUILENBURG** for its despicable conduct, sufficiently large enough to be an example to **MUILENBURG** and others and to deter **MUILENBURG** and others from engaging in similar conduct in the future.

**COUNT III**
**NEGLIGENCE**
**DAVID CALHOUN**

386.    **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

387.    As Lead Director of the board of directors, **CALHOUN** had a duty to act in good faith and provide leadership to the firm's executives and other employees, lead the charge on big-picture decision-making, and set the tone for the corporate culture of the company. **CALHOUN** failed in those duties.

388.    At all times hereinabove set forth, **CALHOUN** allowed and/or actively participated in and/or authorized and/or failed to prevent the aforementioned and below bad faith, fraud, improper motive, negligence and wrongful conduct giving rise to **BOEING's** liability, including the decision to re-engine the 737 with larger engines, setting reckless certification and production timetables, setting reckless goals for **BOEING's** profit-margins, mandating minimal pilot training, creating and failing to correct flawed risk identification and risk management systems, and abdication of responsibility and oversight for all of the above.

389. Following the crash of Lion Air JT 610, as Lead Director of the board, **CALHOUN** actively allowed and/or authorized further bad faith, fraud, improper motive, negligence and wrongful conduct giving rise to **BOEING's** liability in the coverup of the cause of the crash, including the making of inaccurate and misleading representations about the safety of the MAX, blaming pilots for the Lion Air crash, and advocating against further pilot training, warnings and/or remedial action.

390. **CALHOUN** defrauded the public, including **SAMYA STUMO**, its employees, its shareholders and the FAA for the aforementioned reasons and reasons stated below.

391. **CALHOUN** breached his duty of trust to the public, including **SAMYA STUMO**, its employees, its shareholders and the FAA for the aforementioned reasons and reasons stated below.

392. **CALHOUN** acted and failed to act with an improper motive and chose prioritizing profits, share price and his personal income over the safety of the public throughout the development, certification and production of the 737 MAX 8.

393. **CALHOUN** also acted in bad faith and failed to act with due diligence in the role as Lead Director of the board of directors in connection with the various acts and omissions outlined above and below:

    a. causing the creation and dissemination of company business objectives without corresponding systems of oversight to ensure that such business objectives could be accomplished safely;

    b. allowing and/or actively participating in and/or authorizing and/or failing to act relating to the decision to reengine the 737 NG with larger engines creating inherent aerodynamic instability and pursuing type certification for this airplane based on a decades-old design;

    c. allowing and/or actively participating in and/or authorizing and/or failing to act relating to the design, manufacture, assembly and/or certification of an airplane with aerodynamic flaws and extremely poor handling which required correction by a haphazardly designed automated system in order to appear similar in handling to the 737 so that it could obtain certification under the 737 type rating;

d.  failing to cause Board-level review directed to the safety of the 737 MAX;

e.  failing to cause the appointment of Board members with sufficient aviation safety and engineering knowledge and experience;

f.  failing to cause the Board to oversee safety contrary to other Board-level safety committees in the industry;

g.  failing to cause the Board to monitor, discuss, or address airplane safety on a regular basis;

h.  failing to have a means of receiving internal complaints about airplane safety;

i.  failing to cause the Board to have any reporting or information systems or controls or to have any committee charged with direct responsibility to monitor airplane safety;

j.  failing to cause the Board to have regular process or protocols requiring management to apprise the Board of airplane safety; instead, the Board only received ad hoc management reports that conveyed only favorable or strategic information;

k.  failing to communicate yellow and red flags to the Board;

l.  allowing and/or actively participating in and/or authorizing and/or failing to prevent rushed certification and production objectives for the MAX without providing sufficient time, personnel and resources to safely meet these goals and failing to conduct oversight to ensure that safety protocols were followed and corners were not cut in meeting these goals;

m.  allowing and/or actively participating in and/or authorizing and/or failing to prevent a program directive which prioritized minimal pilot training requirements at the expense of safety and abdicating responsibility to oversee that this goal was accomplished safely;

n.  causing the creation of financial incentives and rewards for achieving production and certification goals without regard for safety;

o.  allowing and/or actively participating in and/or authorizing and/or failing to prevent the design, manufacture, assembly and/or certification of an airplane with an automated flight control system controlled by a single AOA sensor which was susceptible to failure without redundant systems;

p.  allowing and/or actively participating in and/or authorizing and/or failing to prevent the design, manufacture, assembly and/or certification of an airplane with a flight control system susceptible to erroneous information from a single AOA sensor and failing to provide AOA indicators as standard features and/or a functioning AOA disagree alert;

115

q. allowing and/or actively participating in and/or authorizing and/or failing to prevent the design, manufacture, assembly and/or certification of an airplane without implementing a flight-crew alerting system in compliance with 14 CFR § 25.1322;

r. allowing and/or actively participating in and/or authorizing the design, manufacture, assembly and/or certification of an airplane with a flight control system that would initiate a dangerous automated dive without any command from a pilot and without a means to promptly override the automated dive;

s. causing the marketing and selling of the 737 MAX 8 as an analog to **BOEING's** 737NG to consciously and intentionally induce airlines to avoid the time-consuming retraining of airline pilots with the knowledge that the MAX 8 contained a new and potentially dangerous MCAS automated flight control system;

t. allowing and/or actively participating in and/or authorizing and/or failing to prevent inadequate warning with regard to the 737 MAX 8's MCAS and the risk of an automated dive without any command from a pilot, or clear instruction to promptly override such an MCAS automated dive;

u. allowing and/or actively participating in and/or authorizing and/or failing to provide the FAA with accurate information necessary to conduct a thorough safety assessment of the airplane, including **BOEING's** failure to accurately report the degree to which the MCAS could move the horizontal stabilizer of the airplane, the ability of the MCAS to reset after each command from a pilot and test pilots' reaction time to unintended MCAS activation;

v. causing the exertion of undue influence over Authorized Representatives and FAA tasked with reviewing the safety and airworthiness of the 737 MAX 8;

w. allowing and/or actively participating in and/or authorizing and/or failing to provide a Project Engineer to change to the command authority of the MCAS just before Certification that made the system safety critical, without due diligence to investigate and document all the effects, revisit safety analysis, or inform the FAA;

x. allowing and/or actively participating in and/or authorizing **BOEING** to fail to properly train pilots on the new automated MCAS systems on the 737 MAX 8;

y. allowing and/or actively participating in and/or authorizing **BOEING** to fail to properly train pilots to identify an AOA sensor failure and MCAS input;

z. allowing and/or actively participating in and/or authorizing **BOEING** to fail to properly train pilots to disengage the stabilizer trim motor on the 737 MAX 8 in the event of an AOA sensor failure or unanticipated dive;

116

aa. allowing and/or actively participating in and/or authorizing the design, assembly and distribution of a flight manual that did not warn of the risks presented by the MCAS, faulty AOA sensors, or automated dives;

bb. allowing and/or actively participating in and/or authorizing the design, manufacture, assembly and/or certification of an airplane flight manual that failed to provide clear instruction or procedures on how to promptly override an automated MCAS dive;

cc. causing to have **BOEING** fail to promptly issue a software patch to address the risk of malfunctioning AOA sensors and automated MCAS dives following the October 29, 2018 crash of Lion Air Flight JT 610;

dd. causing **BOEING** to fail to ground all 737 MAX 8 airplane following the crash of Lion Air Flight JT 610 until such a software patch and/or other safety procedures could be implemented;

ee. causing **BOEING** to fail to warn pilots, airlines and the public of the risk of malfunctioning AOA sensors and automated MCAS dives following the crash of Lion Air Flight JT 610;

ff. making misleading, incomplete and/or inaccurate representations regarding the cause of the crash of Lion Air Flight JT 610, the safety of the 737 MAX 8, and the need for additional pilot training.

394. As a direct and legal result of Defendant **CALHOUN's** fraud, bad faith, improper motive, negligence, carelessness, gross negligence, recklessness and/or otherwise wrongful acts and/or omissions hereinabove set forth, **SAMYA STUMO** died in the crash of Flight 302.

395. As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **SAMYA STUMO** suffered pre-death impact and injury, including fear of impending and imminent death and conscious pain and suffering and **PLAINTIFFS** have been damaged by the death of **SAMYA STUMO**.

396. As a direct and legal result of the wrongful acts and/or omissions hereinabove alleged, **PLAINTIFFS** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection and/or moral support from **SAMYA STUMO**, as well as other pecuniary injuries including grief, sorrow and mental suffering in an amount to be determined at trial.

397.    As a further direct and legal result of the wrongful conduct set forth above, **PLAINTIFF** incurred funeral, burial, estate administration and/or other related expenses in an amount according to proof at trial.

398.    As a further direct and legal result of the wrongful conduct set forth above, **PLAINTIFFS** suffered further economic losses, including but not limited to the loss of financial support, loss of household services, loss of caregiving services and/or loss of net accumulations in an amount according to proof of trial.

399.    The potential harm to airline passengers, pilots, crews and the public from the 737 MAX 8 was objectively foreseeable both in nature and in scope and were subjectively known to **CALHOUN** for all of the aforementioned reasons, including but not limited to: **BOEING's** admitted intentional fraud designed to obtain a pilot differences-training determination which **BOEING** knew was not appropriate for the novel systems on the 737 MAX 8; **BOEING's** own safety assessment of the AOA sensor and MCAS during development of the 737 MAX 8 which revealed potential problems with the system; the evidence that flight control issues caused the crash of Lion Air Flight 610 and death of 189 people; complaints lodged by pilots in the ASRS database regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; **CALHOUN's** knowledge that a some pilots would have a slow reaction time to a MCAS failure and that such a slow reaction time could result in a catastrophic failure and loss of life; internal whistleblower complaints raising concerns about the safety of the 737 MAX 8; **CALHOUN's** knowledge that human factors analysis was not conducted to validate the safety of the 737 MAX 8 after the Lion Air crash; and **CALHOUN's** identification of a software upgrade to address problems with the AOA sensors and MCAS in the weeks and months prior to the crash of Flight 302, and as otherwise detailed above.

400.    As set forth above and as will be shown by proof, there is a high degree of certainty that **PLAINTIFFS** have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and **CALHOUN's** conduct. A high degree of moral blame is attached to **CALHOUN's** conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by **CALHOUN** to **PLAINTIFFS** and the imposition of all damages described above.

401.    Based on the foregoing, **CALHOUN** acted intentionally, willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, and in concealing and covering up its misconduct, such that **PLAINTIFFS** request that the trier of fact, in the exercise of sound discretion, award **PLAINTIFFS** punitive damages for the sake of example and sufficient to punish **CALHOUN** for its despicable conduct, sufficiently large enough to be an example to **CALHOUN** and others and to deter **CALHOUN** and others from engaging in similar conduct in the future.

## COUNT IV
## BREACH OF WARRANTY
## (THE BOEING DEFENDANTS)

402.    **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

403.    **BOEING** was the designer, manufacturer, distributor and/or seller of the Boeing 737 MAX 8, and/or its component parts, involved in the subject crash.

404.    Prior to the crash of Flight 302, **BOEING** expressly and/or impliedly warranted and represented that the subject **BOEING** 737 MAX 8 airplane, including its component parts and instruments, and in conjunction with the instructions and warnings given by **BOEING**, was airworthy, of merchantable quality, both fit and safe for the purpose of commercial air travel for

which it was designed, intended and used. Additionally, **BOEING** further warranted that the subject airplane, and its component parts, was free from all defects.

405.     **BOEING** breached said warranties in that the subject airplane was not airworthy, of merchantable quality, or fit and safe for the purposes for which it was designed, intended and used, and free from all defects as set forth above. The airplane, and its component parts, were in substantially similar condition to its original condition at delivery to Ethiopian Airlines. **BOEING's** breach of warranty was enabled and covered up by its persistent campaign to conceal information from, manipulate, and mislead FAA leadership and other federal government officials to cover up the safety problems with the 737 MAX 8 all the way through the crash of Flight 302.

406.     **SAMYA STUMO**, as a passenger of Flight 302, was an intended third-party beneficiary of **BOEING's** warranties that Flight 302 (the **BOEING** 737 MAX 8 and its component parts) was airworthy, of merchantable quality, both fit and safe for the purposes for which it was designed, intended and used, and free from all defects.

407.     **SAMYA STUMO** reasonably relied on these warranties to **DECEDENT's** detriment.

408.     As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **SAMYA STUMO** suffered pre-death impact and injury, including fear of impending and imminent death and conscious pain and suffering, and **PLAINTIFF** has been damaged by the death of **SAMYA STUMO**.

409.     As a direct and legal result of the wrongful acts and/or omissions of Defendant **BOEING**, hereinabove alleged, **PLAINTIFFS** suffered and continues to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **SAMYA STUMO**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

410.    As a further direct and legal result of the wrongful conduct of **BOEING** set forth above, **PLAINTIFFS** incurred funeral, burial, estate administration and/or other related expenses in an amount according to proof at trial.

411.    As a further direct and legal result of the wrongful conduct of **BOEING** set forth above, **PLAINTIFFS** suffered further economic losses, including but not limited to the loss of financial support, loss of household services, and/or loss of caregiving services, and/or loss of net accumulations in an amount according to proof of trial.

412.    The potential harm to airline passengers, pilots, crews, and the public from the 737 MAX 8 was objectively foreseeable both in nature and in scope and were subjectively known to **BOEING** for all of the aforementioned reasons, including but not limited to: **BOEING's** intentional fraud designed to obtain a pilot differences-training determination which **BOEING** knew was not appropriate for the novel systems on the 737 MAX 8; **BOEING's** own safety assessment of the AOA sensor and MCAS during development of the 737 MAX 8 which revealed potential problems with the system; the evidence that flight control issues caused the crash of Lion Air Flight 610 and death of 189 people; complaints lodged by pilots in the ASRS database regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; **BOEING's** knowledge that a some pilots would have a slow reaction time to a MCAS failure and that such a slow reaction time could result in a catastrophic failure and loss of life; internal whistleblower complaints raising concerns about the safety of the 737 MAX 8; **BOEING's** knowledge that human factors analysis was not conducted to validate the safety of the 737 MAX 8 after the Lion Air crash; and **BOEING's** identification of a software upgrade to address problems with the AOA sensors and MCAS in the weeks and months prior to the crash of Flight 302.

413.     As set forth above and as will be shown by proof, there is a high degree of certainty that **PLAINTIFFS** have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and **BOEING's** conduct.  A high degree of moral blame is attached to **BOEING's** conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by **BOEING** to all **PLAINTIFFS** and the imposition of all damages described above.

414.     Based on the foregoing, **THE BOEING DEFENDANTS** acted intentionally, willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, and in concealing and covering up its misconduct, such that **PLAINTIFFS** request that the trier of fact, in the exercise of sound discretion, award **PLAINTIFFS** punitive damages for the sake of example and sufficient to punish **THE BOEING DEFENDANTS** for its despicable conduct, sufficiently large enough to be an example to **THE BOEING DEFENDANTS** and others and to deter **THE BOEING DEFENDANTS** and others from engaging in similar conduct in the future.

## COUNT V
## STRICT LIABILITY
## (THE BOEING DEFENDANTS)

415.     **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

416.     **BOEING** designed, manufactured, distributed and/or sold the **BOEING** 737 MAX 8, and its components parts, involved in the incident. **BOEING** was in the business of designing, testing, manufacturing, selling, assembling, building, distributing, marketing, and/or inspecting airplane as suitable for passenger air transportation, including the subject **BOEING** 737 MAX 8, and its component parts, that crashed in Ethiopia on March 10, 2019.

417. At all times relevant hereinabove set forth, the subject **BOEING** 737 MAX 8 airplane, and its component parts, was being operated by Ethiopian Airlines and used for the purposes of which it was manufactured, designed, inspected, sold and intended to be used, in a manner reasonably foreseeable to **BOEING**.

418. At all times relevant hereinabove set forth, the subject **BOEING** 737 MAX 8, and its component parts, were defective, dangerous, unsafe, and not airworthy by reason of **BOEING's** defective manufacture, design, warning systems, inspections, testing, service, and/or maintenance of the subject airplane and its component parts, as set forth above. The airplane, and its component parts, were in substantially similar condition to its original condition at delivery to Ethiopian Airlines. The use and crash of the defective **BOEING** 737 MAX 8 aircraft was enabled and covered up by **BOEING's** persistent campaign to conceal information from, manipulate, and mislead FAA leadership and other federal government officials to cover up the safety problems with the 737 MAX 8 all the way through the crash of Flight 302.

419. As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **SAMYA STUMO** suffered pre-death impact and injury, including fear of impending and imminent death and conscious pain and suffering, and **PLAINTIFFS** have been damaged by the death of **SAMYA STUMO**.

420. As a direct and legal result of the wrongful acts and/or omissions of Defendant **BOEING**, hereinabove alleged, **PLAINTIFFS** suffered and continues to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **SAMYA STUMO**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

421.    As a further direct and legal result of the wrongful conduct of **BOEING** set forth above, **PLAINTIFFS** incurred funeral, burial, estate administration and/or other related expenses in an amount according to proof at trial.

422.    As a further direct and legal result of the wrongful conduct of **BOEING** set forth above, **PLAINTIFFS** suffered further economic losses, including but not limited to the loss of financial support, loss of household services, and/or loss of caregiving, and/or loss of net accumulations services in an amount according to proof of trial.

423.    The potential harm to airline passengers, pilots, crews, and the public from the 737 MAX 8 was objectively foreseeable both in nature and in scope and were subjectively known to **BOEING** for all of the aforementioned reasons, including but not limited to: **BOEING's** intentional fraud designed to obtain a pilot differences-training determination which **BOEING** knew was not appropriate for the novel systems on the 737 MAX 8; **BOEING's** own safety assessment of the AOA sensor and MCAS during development of the 737 MAX 8 which revealed potential problems with the system; the evidence that flight control issues caused the crash of Lion Air Flight 610 and death of 189 people; complaints lodged by pilots in the ASRS database regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; **BOEING's** knowledge that a some pilots would have a slow reaction time to a MCAS failure and that such a slow reaction time could result in a catastrophic failure and loss of life; internal whistleblower complaints raising concerns about the safety of the 737 MAX 8; **BOEING's** knowledge that human factors analysis was not conducted to validate the safety of the 737 MAX 8 after the Lion Air crash; and **BOEING's** identification of a software upgrade to address problems with the AOA sensors and MCAS in the weeks and months prior to the crash of Flight 302.

424.    As set forth above and as will be shown by proof, there is a high degree of certainty that **PLAINTIFFS** have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and **BOEING's** conduct.  A high degree of moral blame is attached to **BOEING's** conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by **BOEING** to **PLAINTIFFS** and the imposition of all damages described above.

425.    Based on the foregoing, **THE BOEING DEFENDANTS** acted intentionally, willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, and in concealing and covering up its misconduct, such that **PLAINTIFFS** request that the trier of fact, in the exercise of sound discretion, award **PLAINTIFFS** punitive damages for the sake of example and sufficient to punish **THE BOEING DEFENDANTS** for its despicable conduct, sufficiently large enough to be an example to **THE BOEING DEFENDANTS** and others and to deter **THE BOEING DEFENDANTS** and others from engaging in similar conduct in the future.

## COUNT VI
## FAILURE TO WARN
## (THE BOEING DEFENDANTS)

426.    **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

427.    Defendant **BOEING** designed, manufactured, distributed, and/or sold the **BOEING** 737 MAX 8 involved in the incident. Defendant **BOEING** was in the business of designing, testing, manufacturing, selling, assembling, building, distributing, marketing, and/or inspecting airplane as suitable for passenger air transportation, including the subject **BOEING** 737 MAX 8 that crashed in Ethiopia on March 10, 2019.

428.     At all times relevant hereinabove set forth, the subject **BOEING** 737 MAX 8 airplane was being operated by Ethiopian Airlines and used for the purposes of which it was manufactured, designed, inspected, sold, and intended to be used, in a manner reasonably foreseeable to Defendant **BOEING**.

429.     At all times relevant hereinabove set forth, the subject **BOEING** 737 MAX 8 was defective, dangerous, unsafe, and not airworthy by reason of Defendant **BOEING's** defective manufacture, design, warning systems, inspections, testing, service, and/or maintenance of the subject airplane as set forth above.

430.     At all times relevant hereinabove set forth, **BOEING** had knowledge that the subject **BOEING** 737 MAX 8 was defective, dangerous, unsafe, and not airworthy, and in particular, **BOEING** had knowledge of the unreasonably unsafe design of the AOA sensor and automated MCAS, as well as the potential life and death risks of such a failure in these systems.

431.     At all times relevant hereinabove set forth, the risks of failure of the **BOEING** 737 MAX 8 due the airplane's unreasonably dangerous and defective design presented a substantial danger when the airplane is used or misused in an intended or reasonably foreseeable way.

432.     Ordinary consumers, including but not limited to airlines, flight crew, and passengers, would not have recognized the potential risks presented by the airplane's unreasonably dangerous and defective design. **BOEING** in fact covered up and concealed the defects of the 737 MAX 8 from the public and the government through a persistent campaign to conceal information from, manipulate, and mislead FAA leadership and other federal government officials to cover up the safety problems with the 737 MAX 8 all the way through the crash of Flight 302.

433.     As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **SAMYA STUMO** suffered pre-death impact and injury, including fear of impending and

imminent death and conscious pain and suffering, and **PLAINTIFFS** have been damaged by the death of **SAMYA STUMO**.

434.    As a direct and legal result of the wrongful acts and/or omissions of Defendant **BOEING**, hereinabove alleged, **PLAINTIFFS** suffered and continues to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **SAMYA STUMO**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

435.    As a further direct and legal result of the wrongful conduct of **BOEING** set forth above, **PLAINTIFFS** incurred funeral, burial, estate administration and/or other related expenses in an amount according to proof at trial.

436.    As a further direct and legal result of the wrongful conduct of **BOEING** set forth above, **PLAINTIFFS** suffered further economic losses, including but not limited to the loss of financial support, loss of household services, and/or loss of caregiving, and/or loss of net accumulations services in an amount according to proof of trial.

437.    The potential harm to airline passengers, pilots, crews, and the public from the 737 MAX 8 was objectively foreseeable both in nature and in scope and were subjectively known to **BOEING** for all of the aforementioned reasons, including but not limited to: **BOEING's** intentional fraud designed to obtain a pilot differences-training determination which **BOEING** knew was not appropriate for the novel systems on the 737 MAX 8; **BOEING's** own safety assessment of the AOA sensor and MCAS during development of the 737 MAX 8 which revealed potential problems with the system; the evidence that flight control issues caused the crash of Lion Air Flight 610 and death of 189 people; complaints lodged by pilots in the ASRS database regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; **BOEING's** knowledge that a some

pilots would have a slow reaction time to a MCAS failure and that such a slow reaction time could result in a catastrophic failure and loss of life; internal whistleblower complaints raising concerns about the safety of the 737 MAX 8; **BOEING's** knowledge that human factors analysis was not conducted to validate the safety of the 737 MAX 8 after the Lion Air crash; and **BOEING's** identification of a software upgrade to address problems with the AOA sensors and MCAS in the weeks and months prior to the crash of Flight 302.

438. As set forth above and as will be shown by proof, there is a high degree of certainty that **PLAINTIFFS** have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and **BOEING's** conduct. A high degree of moral blame is attached to **BOEING's** conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by **BOEING** to **PLAINTIFFS** and the imposition of all damages described above.

439. Based on the foregoing, **THE BOEING DEFENDANTS** acted intentionally, willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, and in concealing and covering up its misconduct, such that **PLAINTIFFS** request that the trier of fact, in the exercise of sound discretion, award **PLAINTIFFS** punitive damages for the sake of example and sufficient to punish **THE BOEING DEFENDANTS** for its despicable conduct, sufficiently large enough to be an example to **THE BOEING DEFENDANTS** and others and to deter **THE BOEING DEFENDANTS** and others from engaging in similar conduct in the future.

### COUNT VII
### NEGLIGENCE
### (ROSEMOUNT AEROSPACE, INC.)

440. **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

441. At all relevant times hereinabove set forth, Defendant **ROSEMOUNT** owed a duty to the occupants of **BOEING's** 737 MAX 8 airplane and the general public, including the **SAMYA STUMO**, to exercise reasonable care to properly develop, design, engineer, test, manufacture, produce, process, supply, deliver, monitor, market, label, adequately warn, recommend, advertise and/or sell angle of attack sensors, and/or refrain from introducing area of attack sensors into the stream of commerce and for the use in 737 MAX airplane, including the subject airplane.

442. At all relevant times hereinabove set forth, **ROSEMOUNT** knew or should have known of the more than 200 reports issued to the FAA noting AOA sensor malfunctions since 2004 as well as the various ASRS reports indicating uncommanded activation of the MCAS prior to the crash of Flight 302. Furthermore, **ROSEMOUNT** knew or should have known that the unintended activation of the MCAS, based upon erroneous AOA sensor input, was suspected to be the cause of the crash of the Lion Air Flight 610.

443. The defective conditions in the Angle of Attack sensor, as discussed above, and the consequent crash of Flight 302 were legally caused by the negligence, gross negligence, wrongdoing, tortious conduct, careless acts and omissions of Defendant **ROSEMOUNT** in the development, design, engineering, testing, manufacturing, production, processing, supplying, delivery, monitoring, marketing, labeling, and selling, maintaining, repairing and overhauling and **ROSEMOUNT's** failure to warn and failure to take remedial appropriate remedial action with respect to any and all known dangerously defective conditions.

444. As a direct and legal result of Defendant **ROSEMOUNT's** negligence, carelessness, gross negligence, recklessness and/or otherwise wrongful acts and/or omissions hereinabove set forth, **SAMYA STUMO** died in the crash of Flight 302.

445. As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **SAMYA STUMO** suffered pre-death impact and injury, including fear of impending and

imminent death and conscious pain and suffering, and **PLAINTIFFS** have been damaged by the death of **SAMYA STUMO**.

446.     As a direct and legal result of the wrongful acts and/or omissions of Defendant **ROSEMOUNT**, hereinabove alleged, **PLAINTIFFS** suffered and continues to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **SAMYA STUMO**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

447.     As a further direct and legal result of the wrongful conduct of **ROSEMOUNT** set forth above, **PLAINTIFFS** incurred funeral, burial, estate administration and/or other related expenses in an amount according to proof at trial.

448.     As a further direct and legal result of the wrongful conduct of **ROSEMOUNT** set forth above, **PLAINTIFFS** suffered further economic losses, including but not limited to the loss of financial support, loss of household services, and/or loss of caregiving, and/or loss of net accumulations services in an amount according to proof of trial.

449.     The potential harm to airline passengers, pilots, crews, and the public from the 737 MAX 8 was objectively foreseeable both in nature and in scope and were subjectively known to **ROSEMOUNT** for all of the aforementioned reasons, including but not limited to: **ROSEMOUNT's** knowledge that AOA sensors regularly malfunction or are damaged during flight; the fact that **BOEING** was relying on a single **ROSEMOUNT** to provide data to **BOEING's** MCAS; complaints lodged by pilots in the ASRS database regarding erroneous activation of the MCAS based upon inaccurate AOA sensor data; that a defective or malfunctioning **ROSEMOUNT** AOA sensor triggered the erroneous activation of the MCAS and caused the crash of Lion Air Flight 610 and death of 189 people; and that a MCAS software update

to take and evaluate data from both AOA sensors had not been implemented, leaving future flights at risk of catastrophic failure.

450.    As set forth above and as will be shown by proof, there is a high degree of certainty that **PLAINTIFFS** have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and **ROSEMOUNT's** conduct.  A high degree of moral blame is attached to **ROSEMOUNT's** conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by **ROSEMOUNT** to **PLAINTIFFS** and the imposition of all damages described above.

451.    Based on the foregoing, **ROSEMOUNT** acted intentionally, willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, deliberate, and conscious disregard for the rights and/or safety of others, such that **PLAINTIFFS** request that the trier of fact, in the exercise of sound discretion, award **PLAINTIFFS** punitive damages for the sake of example and sufficient to punish **ROSEMOUNT** for its despicable conduct sufficiently large enough to be an example to **ROSEMOUNT** and others and to deter **ROSEMOUNT** and others from engaging in similar conduct in the future.

**COUNT VIII**
**STRICT LIABILITY**
**(ROSEMOUNT AEROSPACE, INC.)**

452.    **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

453.    At all relevant times hereinabove set forth, Defendant **ROSEMOUNT** was the designer, manufacturer, engineer, distributor and/or seller of aerospace products, including Angle of Attack sensors, who hold and have held themselves out to the public as having superior knowledge, skill and expertise in the design, testing, engineering, manufacture, repairing and distribution of aerospace sensors for commercial airplanes and, in the course of its business,

131

Defendant **ROSEMOUNT** designed, tested, manufactured, engineered and repaired caused to be placed into the stream of commerce, a product known as an Angle of Attack sensor for utilization in the **BOEING** 737 MAX 8 airplane.

454.    Defendant **ROSEMOUNT** expressly or impliedly warranted that the Angle of Attack sensor was fit for its intended use in commercial airplanes, being free of defects in their design and/or maintenance and, further, Defendant **ROSEMOUNT** marketed, sold, distributed, and caused to be introduced into the stream of commerce by sale to Defendant **BOEING**. The Angle of Attack sensor was in substantially similar condition to its original condition at delivery to **BOEING**.

455.    Defects in the Angle of Attack sensor were a legal cause of the subject air crash, and the defects made the subject airplane unreasonably dangerous for travel.

456.    As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **SAMYA STUMO** suffered pre-death impact and injury, including fear of impending and imminent death and conscious pain and suffering, and **PLAINTIFFS** have been damaged by the death of **SAMYA STUMO**.

457.    As a direct and legal result of the wrongful acts and/or omissions of Defendant **ROSEMOUNT**, hereinabove alleged, **PLAINTIFFS** suffered and continues to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **SAMYA STUMO**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

458.    As a further direct and legal result of the wrongful conduct of **ROSEMOUNT** set forth above, **PLAINTIFFS** incurred funeral, burial, estate administration and/or other related expenses in an amount according to proof at trial.

459.     As a further direct and legal result of the wrongful conduct of **ROSEMOUNT** set forth above, **PLAINTIFFS** suffered further economic losses, including but not limited to the loss of financial support, loss of household services, and/or loss of caregiving, and/or loss of net accumulations services in an amount according to proof of trial.

460.     The potential harm to airline passengers, pilots, crews, and the public from the 737 MAX 8 was objectively foreseeable both in nature and in scope and were subjectively known to **ROSEMOUNT** for all of the aforementioned reasons, including but not limited to: **ROSEMOUNT's** knowledge that AOA sensors regularly malfunction or are damaged during flight; the fact that **BOEING** was relying on a single **ROSEMOUNT** sensor to provide data to **BOEING's** MCAS; complaints lodged by pilots in the ASRS database regarding erroneous activation of the MCAS based upon inaccurate AOA sensor data; that a defective or malfunctioning **ROSEMOUNT** AOA sensor triggered the erroneous activation of the MCAS and caused the crash of Lion Air Flight 610 and death of 189 people; and that a MCAS software update to take and evaluate data from both AOA sensors had not been implemented, leaving future flights at risk of catastrophic failure.

461.     As set forth above and as will be shown by proof, there is a high degree of certainty that **PLAINTIFFS** have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and **ROSEMOUNT's** conduct.  A high degree of moral blame is attached to **ROSEMOUNT's** conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by **ROSEMOUNT** to **PLAINTIFFS** and the imposition of all damages described above.

462.     Based on the foregoing, **ROSEMOUNT** acted intentionally, willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, deliberate, and conscious disregard for the rights and/or safety of others, such that **PLAINTIFFS** request that the trier of fact, in the exercise

of sound discretion, award **PLAINTIFFS** punitive damages for the sake of example and sufficient to punish **ROSEMOUNT** for its despicable conduct, sufficiently large enough to be an example to **ROSEMOUNT** and others and to deter **ROSEMOUNT** and others from engaging in similar conduct in the future.

<u>**COUNT IX**</u>
<u>**BREACH OF WARRANTY**</u>
<u>**(ROSEMOUNT AEROSPACE, INC.)**</u>

463.    **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

464.    **ROSEMOUNT** expressly and/or impliedly warranted and represented that the AOA sensors it designed, manufactured, tested and sold for use in Boeing 737 MAX 8 airplanes, including the subject airplane with registration number ET-AVJ, were airworthy, of merchantable quality, and safe for the purpose of commercial air travel.

465.    **ROSEMOUNT** breached its express and/or implied warranties because its AOA sensors installed on the subject airplane were not airworthy, were not of merchantable quality, and were not safe to be used for commercial air travel; in particular, their high rate of failure made them unsafe to be used as a single-point trigger for automated systems like MCAS.

466.    The crew members and passengers of ET302, including **SAMYA STUMO**, were intended third-party beneficiaries of **ROSEMOUNT's** warranties.

467.    **SAMYA STUMO**, as a fare-paying passenger aboard ET302, reasonably relied on **ROSEMOUNT's** warranties to **SAMYA STUMO's** detriment.

468.    As a direct and legal result of **ROSEMOUNT's** breach of its warranties, **SAMYA STUMO** suffered pre-death impact and injury, including fear of impending and imminent death and conscious pain and suffering, and **PLAINTIFFS** have been damaged by the death of **SAMYA STUMO**.

469. As a further direct and legal result of **ROSEMOUNT's** breach of its warranties, **PLAINTIFFS** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **SAMYA STUMO**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

470. As a further direct and legal result of **ROSEMOUNT's** breach of its warranties, **PLAINTIFFS** incurred funeral, burial, estate administration and/or other related expenses in an amount according to proof at trial.

471. As a further direct and legal result of **ROSEMOUNT's** breach of its warranties, **PLAINTIFFS** suffered further economic losses, including but not limited to the loss of financial support, loss of household services, and/or loss of caregiving services in an amount according to proof of trial.

472. The potential harm to airline passengers, pilots, crews, and the public from the 737 MAX 8 was objectively foreseeable both in nature and in scope and were subjectively known to **ROSEMOUNT** for all of the aforementioned reasons, including but not limited to: **ROSEMOUNT's** knowledge that AOA sensors regularly malfunction or are damaged during ground operations and flight; the fact that **BOEING** was relying on a single **ROSEMOUNT** to provide data to **BOEING's** MCAS; complaints lodged by pilots in the ASRS database regarding erroneous activation of the MCAS based upon inaccurate AOA sensor data; that a defective or malfunctioning **ROSEMOUNT** AOA sensor triggered the erroneous activation of the MCAS and caused the crash of Lion Air Flight 610 and death of 189 people; and that a MCAS software update to take and evaluate data from both AOA sensors had not been implemented, leaving future flights at risk of catastrophic failure.

473. As set forth above and as will be shown by proof, there is a high degree of certainty that **PLAINTIFFS** have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and **ROSEMOUNT's** conduct. A high degree of moral blame is attached to **ROSEMOUNT's** conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by **ROSEMOUNT** to **PLAINTIFFS** and the imposition of all damages described above.

474. Based on the foregoing, **ROSEMOUNT** acted intentionally, willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, deliberate, and conscious disregard for the rights and/or safety of others, such that **PLAINTIFFS** request that the trier of fact, in the exercise of sound discretion, award **PLAINTIFFS** punitive damages for the sake of example and sufficient to punish **ROSEMOUNT** for its despicable conduct, sufficiently large enough to be an example to **ROSEMOUNT** and others and to deter **ROSEMOUNT** and others from engaging in similar conduct in the future.

## COUNT X
## NEGLIGENCE
## (ROCKWELL COLLINS, INC.)

475. Plaintiffs incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

476. At all relevant times hereinabove set forth, Defendant **ROCKWELL** owed a duty to the occupants of Boeing's 737 MAX 8 airplanes and the general public, including the **SAMYA STUMO**, to exercise reasonable care to properly develop, design, engineer, test, manufacture, produce, process, supply, deliver, monitor, market, label, adequately warn, recommend, advertise and/or sell the MCAS system and its software and the AOA disagree alert software and/or refrain from introducing the MCAS system and AOA disagree alert software into the stream of commerce and for the use in 737 MAX 8 airplane, including the subject airplane.

477.    At all relevant times hereinabove set forth, **ROCKWELL** knew or should have known of the various ASRS reports indicating uncommanded activation of the MCAS prior to the crash of Flight 302. Furthermore, **ROCKWELL** knew or should have known that the unintended activation of the MCAS with repeated nose down trim caused by failure of a single sensor was a cause of the crash of the Lion Air Flight 610.

478.    The defective conditions in the MCAS system and its software as discussed above, and the consequent crash of Flight 302 were legally caused by the negligence, gross negligence, wrongdoing, tortious conduct, careless acts and omissions of Defendant **ROCKWELL** in the development, design, engineering, testing, manufacturing, production, processing, supplying, delivery, monitoring, marketing, labeling, and selling, and **ROCKWELL'S** failure to warn and failure to take remedial appropriate remedial action with respect to any and all known dangerously defective conditions.  **ROCKWELL'S** acts and/or omissions include, but are not limited to, the following:

a.    failing to design and/or program a flight control system that compared inputs from 2 or more AOA sensors;

b.    failing to design and/or program a flight control system that only activated in non-normal flight conditions;

c.    designing a flight control system and MCAS that commanded more stabilizer input than could be counteracted by the flight crew pulling back on the column;

d.    building a system that interfered with the pilots' ability to manually control the airplane;

e.    failing to fully inform the FAA of the implications of the MCAS;

f.    failing to conduct a legally compliant Safety Requirements Review, Functional Hazard Assessment, or Preliminary / Final System Safety Assessment;

g.    failing to ensure the quality of the information coming from the **ROSEMOUNT** AOA sensor and/or designing around known defects with the AOA sensors.

479. As a direct and legal result of Defendant **ROCKWELL'S** negligence, carelessness, gross negligence, recklessness and/or otherwise wrongful acts and/or omissions hereinabove set forth, **SAMYA STUMO** died in the crash of Flight 302.

480. As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **SAMYA STUMO** suffered pre-death impact and injury, including fear of impending and imminent death and conscious pain and suffering, and **PLAINTIFF** has been damaged by the death of **SAMYA STUMO**.

481. As a direct and legal result of the wrongful acts and/or omissions of Defendant **ROCKWELL**, hereinabove alleged, **PLAINTIFFS** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **SAMYA STUMO**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

482. As a further direct and legal result of the wrongful conduct of **ROCKWELL** set forth above, **PLAINTIFFS** incurred funeral, burial, estate administration and/or other related expenses in an amount according to proof at trial.

483. As a further direct and legal result of the wrongful conduct of **ROCKWELL** set forth above, **PLAINTIFFS** suffered further economic losses, including but not limited to the loss of financial support, loss of household services, and/or loss of caregiving services in an amount according to proof of trial.

484. The potential harm to airline passengers, pilots, crews, and the public from the 737 MAX 8 was objectively foreseeable both in nature and in scope and were subjectively known to **ROCKWELL** for all of the aforementioned reasons, including but not limited to: **ROCKWELL'S** knowledge that AOA sensors regularly malfunction or are damaged during flight and that its MCAS was reliant on input from a single AOA sensor; knowledge that the AOA

disagree alert was not operational on the majority of 737 MAX 8 airplanes; the fact that **ROCKWELL'S** MCAS would be operating in the background without pilot knowledge or pilot commands; complaints lodged by pilots in the ASRS database regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; that the erroneous activation of the MCAS caused the crash of Lion Air Flight 610 and death of 189 people; and that a MCAS software update had not been implemented, leaving future flights at risk of catastrophic failure.

485.    As set forth above and as will be shown by proof, there is a high degree of certainty that **PLAINTIFFS** have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and **ROCKWELL'S** conduct.  A high degree of moral blame is attached to **ROCKWELL'S** conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by **ROCKWELL** to **PLAINTIFFS** and the imposition of all damages described above.

486.    Based on the foregoing, **ROCKWELL** acted intentionally, willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, such that **PLAINTIFFS** request that the trier of fact, in the exercise of sound discretion, award **PLAINTIFFS** punitive damages for the sake of example and sufficient to punish **ROCKWELL** for its despicable conduct, sufficiently large enough to be an example to **ROCKWELL** and others and to deter **ROCKWELL** and others from engaging in similar conduct in the future.

### COUNT XI
### STRICT LIABILITY
### (ROCKWELL COLLINS, INC.)

487.    Plaintiffs incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

488.     At all relevant times hereinabove set forth, Defendant **ROCKWELL** was the designer, programmer, manufacturer, engineer, distributor and/or seller of aerospace products, including the MCAS system and its software and the AOA disagree alert software, who hold and have held themselves out to the public as having superior knowledge, skill and expertise in the design, testing, engineering, manufacture, and distribution of MCAS systems and software and AOA disagree alert software for commercial airplanes and, in the course of its business, Defendant **ROCKWELL** designed, programmed, tested, manufactured, engineered and caused to be placed into the stream of commerce, a product known as the MCAS system and its software and the AOA disagree alert software for utilization in the **BOEING** 737 MAX 8 airplane.

489.     Defendant **ROCKWELL** expressly or impliedly warranted that the MCAS system and its software was fit for its intended use in commercial airplanes, being free of defects in their design and/or maintenance and, further, Defendant **ROCKWELL** marketed, sold, distributed, and caused to be introduced into the stream of commerce by sale to Defendant Boeing. The MCAS system and its software and AOA disagree alert software was in a substantially similar condition to its original condition at delivery to **BOEING**.

490.     Defects in the MCAS system and its software and AOA disagree alert software were a legal cause of the subject air crash, and the defects made the subject airplane unreasonably dangerous for travel.

491.     As a direct and legal result of Defendant **ROCKWELL'S** negligence, carelessness, gross negligence, recklessness and/or otherwise wrongful acts and/or omissions hereinabove set forth, **SAMYA STUMO** died in the crash of Flight 302.

492.     As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **SAMYA STUMO** suffered pre-death impact and injury, including fear of impending and

imminent death and conscious pain and suffering, and **PLAINTIFFS** have been damaged by the death of **SAMYA STUMO**.

493. As a direct and legal result of the wrongful acts and/or omissions of Defendant **ROCKWELL**, hereinabove alleged, **PLAINTIFFS** suffered and continues to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **SAMYA STUMO**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

494. As a further direct and legal result of the wrongful conduct of **ROCKWELL** set forth above, **PLAINTIFFS** incurred funeral, burial, estate administration and/or other related expenses in an amount according to proof at trial.

495. As a further direct and legal result of the wrongful conduct of **ROCKWELL** set forth above, **PLAINTIFFS** suffered further economic losses, including but not limited to the loss of financial support, loss of household services, and/or loss of caregiving services in an amount according to proof of trial.

496. The potential harm to airline passengers, pilots, crews, and the public from the 737 MAX 8 was objectively foreseeable both in nature and in scope and were subjectively known to **ROCKWELL** for all of the aforementioned reasons, including but not limited to: **ROCKWELL'S** knowledge that AOA sensors regularly malfunction or are damaged during flight and that its MCAS was reliant on input from a single AOA sensor; knowledge that the AOA disagree alert was not operational on the majority of 737 MAX 8 airplanes; the fact that **ROCKWELL'S** MCAS would be operating in the background without pilot knowledge or pilot commands; complaints lodged by pilots in the ASRS database regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; that the erroneous activation of the MCAS caused the crash of Lion Air

Flight 610 and death of 189 people; and that a MCAS software update had not been implemented, leaving future flights at risk of catastrophic failure.

497.    As set forth above and as will be shown by proof, there is a high degree of certainty that **PLAINTIFFS** have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and **ROCKWELL'S** conduct.  A high degree of moral blame is attached to **ROCKWELL'S** conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by **ROCKWELL** to **PLAINTIFFS** and the imposition of all damages described above.

498.    Based on the foregoing, **ROCKWELL** acted intentionally, willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, such that **PLAINTIFFS** request that the trier of fact, in the exercise of sound discretion, award **PLAINTIFFS** punitive damages for the sake of example and sufficient to punish **ROCKWELL** for its despicable conduct, sufficiently large enough to be an example to **ROCKWELL** and others and to deter **ROCKWELL** and others from engaging in similar conduct in the future.

### COUNT XII
### BREACH OF WARRANTY
### (ROCKWELL COLLINS, INC.)

499.    **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

500.    **ROCKWELL** was the designer, developer, engineer, tester, manufacturer, producer, processer, supplier, distributor and/or seller of the MCAS system and its software and the AOA disagree alert software involved in the subject crash.

501.    Prior to the crash of Flight 302, **ROCKWELL** expressly and/or impliedly warranted and represented that the MCAS system and its software and the AOA disagree alert

software it designed, engineered, manufactured, tested, and/or sold for use in **BOEING** 737 MAX 8 airplanes, including the subject airplane with registration number ET-AVJ, were airworthy, of merchantable quality, and safe for the purpose of commercial air travel.

502. **ROCKWELL** breached its express and/or implied warranties because its MCAS system and its software and the AOA disagree alert software installed on the subject airplane was not airworthy, was not of merchantable quality, and was not safe to be used for commercial air travel.

503. The crew members and passengers of ET302, including **SAMYA STUMO**, were intended third-party beneficiaries of **ROCKWELL'S** warranties.

504. **SAMYA STUMO**, as a fare-paying passenger aboard ET302, reasonably relied on **ROCKWELL'S** warranties to **SAMYA STUMO's** detriment.

505. As a direct and legal result of **ROCKWELL'S** breach of its warranties, **SAMYA STUMO** suffered pre-death impact and injury, including fear of impending and imminent death and conscious pain and suffering, and **PLAINTIFF** has been damaged by the death of **SAMYA STUMO**.

506. As a direct and legal result of **ROCKWELL'S** breach of its warranties hereinabove alleged, **PLAINTIFFS** suffered and continues to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **SAMYA STUMO**, as well as other injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

507. As a direct and legal result of **ROCKWELL'S** breach of its warranties set forth above, **PLAINTIFFS** incurred funeral, burial, estate administration and/or other related expenses in an amount according to proof at trial.

508.     As a direct and legal result of **ROCKWELL'S** breach of its warranties set forth above, **PLAINTIFFS** suffered further economic losses, including but not limited to the loss of financial support, loss of household services, and/or loss of caregiving services, and/or loss of net accumulations in an amount according to proof of trial.

509.     The potential harm to airline passengers, pilots, crews, and the public from the 737 MAX 8 was objectively foreseeable both in nature and in scope and were subjectively known to **ROCKWELL** for all of the aforementioned reasons, including but not limited to: **ROCKWELL'S** knowledge that AOA sensors regularly malfunction or are damaged during ground operations and flight and that its MCAS was reliant on input from a single AOA sensor; knowledge that the AOA disagree alert was not operational on the majority of 737 MAX 8 airplanes; the fact that **ROCKWELL'S** MCAS would be operating in the background without pilot knowledge or pilot commands; complaints lodged by pilots in the ASRS database regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; that the erroneous activation of the MCAS caused the crash of Lion Air Flight 610 and death of 189 people; and that a MCAS software update had not been implemented, leaving future flights at risk of catastrophic failure.

510.     As set forth above and as will be shown by proof, there is a high degree of certainty that **PLAINTIFFS** have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and **ROCKWELL'S** conduct.  A high degree of moral blame is attached to **ROCKWELL'S** conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by **ROCKWELL** to **PLAINTIFFS** and the imposition of all damages described above.

511.     Based on the foregoing, **ROCKWELL** acted intentionally, willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or

safety of others, such that **PLAINTIFFS** request that the trier of fact, in the exercise of sound discretion, award **PLAINTIFFS** punitive damages for the sake of example and sufficient to punish **ROCKWELL** for its despicable conduct, sufficiently large enough to be an example to **ROCKWELL** and others and to deter **ROCKWELL** and others from engaging in similar conduct in the future.

### COUNT XIII
### CIVIL CONSPIRACY
### (THE BOEING DEFENDANTS
### and ROCKWELL COLLINS, INC.)

512.    **PLAINTIFFS** incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

513.    **THE BOEING DEFENDANTS**, **ROCKWELL**, and other unknown co-conspirators, conspired with, acted in concert, and/or consented to a scheme, device, plan, and agreement to deceive, deny, conceal, or otherwise downplay the hazards and safety problems and defects in the **BOEING** 737 MAX 8 from regulators, airlines, and the public in violation of the laws and regulations of the United States.

514.    **THE BOEING DEFENDANTS, ROCKWELL**, and other unknown co-conspirators, knowingly and voluntarily agreed to engage and did engage in concerted actions to deceive, deny, conceal, and/or otherwise downplay the hazards and safety problems, concerns and defects in the **BOEING** 737 MAX 8, including the MCAS' expanded operational envelope, its susceptibility to a single point of failure, the probability of failure and unintended activation of MCAS, the consequences of unintended MCAS operation, the non-operational AOA disagree alert on a majority of the 737 MAX 8 airplanes in service, and many other defects all in violation of federal regulations. The characteristics of MCAS were known to **BOEING** and **ROCKWELL** because they worked together to design the requirements and/or write the software code for MCAS.

515. **THE BOEING DEFENDANTS**, **ROCKWELL**, and other unknown co-conspirators, engaged in unlawful concerted activity for the purpose of obtaining type-certification of the 737 MAX 8 on an expedited basis and/or without delay, obtaining type-certification for the 737 MAX 8 with minimal differences training for pilots, avoiding an FAA order grounding the 737 MAX 8 and/or other FAA remedial action after the Lion Air crash, and/or getting the 737 MAX 8 grounding order rescinded as quickly as possible following the Ethiopian Airlines crash.

516. **THE BOEING DEFENDANTS, ROCKWELL**, and other unknown co-conspirators, committed tortious and/or unlawful actions in furtherance of the conspiracy, including by failing to correctly classify the safety concerns presented by the MCAS; failing to adhere to industry standards and regulations in designing and testing the 737 MAX; defrauding the FAA by concealing and/or misrepresenting the operational envelope of MCAS and its characteristics; by applying pressure, whether directly or indirectly, to Authorized Representatives and other agents of the FAA and other regulatory organizations; failing to affirmatively report or call attention to the non-operational AOA disagree alert which was required on the 737 MAX 8 as certified; and by deceiving, denying, concealing, or otherwise downplaying the role of MCAS in the crash of Lion Air Flight JT 610 and Ethiopian Airlines Flight ET 302, among other tortious and/or unlawful actions.

517. **THE BOEING DEFENDANTS**, **ROCKWELL**, and other unknown co-conspirators, engaged in this conspiracy for mutual financial benefit from the production and success of the 737 MAX 8 and to conceal their responsibility and liability for the crash of Lion Air Flight JT 610 and later Ethiopian Airlines Flight ET 302, and as well as other wrongful, tortious, and/or unlawful purposes.

518. As a direct and legal result of the conspiracy, and the multiple overt acts taken in furtherance of that conspiracy, **SAMYA STUMO** suffered pre-death impact and injury, including

fear of impending and imminent death and conscious pain and suffering, and **PLAINTIFFS** have been damaged by the death of **SAMYA STUMO**.

519. As a direct and legal result of the conspiracy, and the multiple overt acts taken in furtherance of that conspiracy, **PLAINTIFFS** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **SAMYA STUMO**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

520. As a direct and legal result of the conspiracy, and the multiple overt acts taken in furtherance of that conspiracy, **PLAINTIFFS** incurred funeral, burial, estate administration and/or other related expenses in an amount according to proof at trial.

521. As a direct and legal result of the conspiracy, and the multiple overt acts taken in furtherance of that conspiracy, **PLAINTIFFS** suffered further economic losses, including but not limited to the loss of financial support, loss of household services, and/or loss of caregiving services, and/or loss of net accumulations in an amount according to proof of trial.

522. The potential harm to airline passengers, pilots, crews, and the public from the 737 MAX 8 was objectively foreseeable both in nature and in scope and were subjectively known to **THE BOEING DEFENDANTS** and **ROCKWELL** for all of the aforementioned reasons, including, but not limited to: **THE BOEING DEFENDANTS** and **ROCKWELL** for all of the aforementioned reasons, including but not limited to: **THE BOEING DEFENDANTS' and ROCKWELL's** knowledge that AOA sensors regularly malfunction or are damaged during flight and that MCAS was reliant on input from a single AOA sensor; safety assessments of the AOA sensor and MCAS during development of the 737 MAX 8 which revealed potential problems with the system; knowledge that some pilots would have a slow reaction time to a MCAS failure and that such a slow reaction time could result in a catastrophic failure and loss of life; internal

whistleblower complaints raising concerns about the safety of the 737 MAX 8; **THE BOEING DEFENDANTS' and ROCKWELL's** knowledge that human factors analysis was not conducted to validate the safety of the 737 MAX 8 after the Lion Air crash; knowledge that the AOA disagree alert was not operational on the majority of 737 MAX 8 airplanes; the fact that the MCAS would be operating in the background without pilot knowledge or pilot commands; complaints lodged by pilots in the ASRS database regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; that the erroneous activation of the MCAS caused the crash of Lion Air Flight 610 and death of 189 people; and that a MCAS software update had not been implemented prior to the crash of ET 302, leaving future flights at risk of catastrophic failure.

523.     As set forth above and as will be shown by proof, there is a high degree of certainty that **PLAINTIFFS** have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and defendants' conduct. A high degree of moral blame is attached to defendants' conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by defendants to **PLAINTIFFS** and the imposition of all damages described above.

524.     Based on the foregoing, **THE BOEING DEFENDANTS AND ROCKWELL** acted intentionally, willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, such that **PLAINTIFFS** request that the trier of fact, in the exercise of sound discretion, award **PLAINTIFFS** punitive damages for the sake of example and sufficient to punish defendants for their despicable conduct and in concealing and covering up their misconduct, sufficiently large enough to be an example to **THE BOEING DEFENDANTS AND ROCKWELL** and others and to deter **THE BOEING DEFENDANTS AND ROCKWELL** and others from engaging in similar conduct in the future.

## VI.     PRAYER FOR RELIEF

WHEREFORE, **PLAINTIFFS** pray for judgment against the **DEFENDANTS** as follows:

A.     For all past and future general and compensatory damages in an amount according to proof at trial, and beyond the jurisdictional minimum of this Court;

B.     For all economic and property losses, in an amount according to proof at trial;

C.     For **SAMYA STUMO**'s conscious and physical pain and suffering, fright and terror, fear of impending and imminent death, mental anguish, and emotional distress, in an amount according to proof at trial;

D.     For past and future loss of support and services in money or in kind, and loss of net accumulations, in an amount according to proof at trial;

E.     For past and future loss of consortium, love, companionship, comfort, care, assistance, protection, affection, society, moral support, training, advice, tutelage, and guidance, in an amount according to proof at trial;

F.     For past and future grief, emotional distress, and sorrow, in an amount according to proof at trial;

G.     For past and future medical expenses;

H.     For funeral expenses, burial expenses, estate administration expenses, and other related expenses in an amount according to proof at trial;

I.     For repayment for the expenses for the identification and/or transportation of **SAMYA STUMO's** remains, according to proof at trial;

J.     For attorneys' fees, costs and other damages as permitted under applicable laws;

K.     For pre- and post-judgment interest on all damages as allowed by the law;

L.     For all costs of suit incurred herein;

M.     For punitive damages;

For such other and further relief as the court may deem just and proper.

## VII.    <u>JURY DEMAND</u>

**PLAINTIFFS** demand a trial by jury as to all claims in this action.

Dated: June 16, 2022

*s/ Shanin Specter*
SHANIN SPECTER
ELIZABETH CRAWFORD
Kline & Specter PC
1525 Locust Street
Philadelphia, PA 19102
Tel: (215) 772-0516
Shanin.Specter@klinespecter.com
Elizabeth.Crawford@klinespecter.com
*Lead Counsel for Michael Stumo and Nadia Milleron, as Personal Representatives of the Estate of Samya Stumo, deceased*

*s/ Joseph Power*
JOSEPH POWER
JONATHAN THOMAS
**POWER ROGERS LLP**
70 West Madison Street
Suite 5500
Chicago, IL 60602
Tel: (312)313-0202
joepower@powerrodgers.com
jthomas@powerrogers.com
*Local Counsel for Michael Stumo and Nadia Milleron, as Personal Representatives of the Estate of Samya Stumo, deceased*