**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

| | |
|---|---|
| IN RE: ETHIOPIAN AIRLINES FLIGHT ET 302 CRASH | Lead Case: 1:19-cv-02170 (Consolidated)<br><br>Honorable Jorge L. Alonso<br><br>Magistrate Judge Weisman |

# BOEING'S MOTION TO EXCLUDE OPINIONS OF PLAINTIFFS' BIOMECHANICS EXPERT THOMAS JENKYN

Boeing moves under FRE 702 to exclude the opinion of Plaintiffs' expert Thomas Jenkyn that "every passenger" on Flight ET 302 was injured and experienced pain before impact.

## INTRODUCTION

Jenkyn is a biomechanical engineer. But rather than limit himself to describing the forces that passengers on ET 302 might have experienced and the types of injuries that might be consistent with such forces, Jenkyn goes further, opining that, in fact, "every passenger" sustained injuries and experienced pain in the flight's final seconds. But Jenkyn has no medical training or experience that qualifies him to give quintessentially medical testimony about the existence of specific injuries and their specific causes in specific persons.

Moreover, Jenkyn's opinions regarding injuries actually suffered and pain actually experienced are unreliable. Jenkyn relies on a lone study of a single individual to generalize data that the study itself warns cannot be generalized, and he draws conclusions that the study does not support. As for his theories about other injuries and pain supposedly suffered by the ET 302 passengers, Jenkyn all but admits that there is no basis for his opinions other than his say-so. His opinions, in short, are beyond his expertise, lack a reliable basis, and must be excluded.

## BACKGROUND

Plaintiffs offer Jenkyn as an expert in biomechanical engineering, which involves "the application of physics and engineering principles to the study of the motion and loading of biological tissues, body segments and bodies overall." Ex. A (Jenkyn Report) at 3. Plaintiffs retained Jenkyn to, among other things, "determine whether the passengers would have left their seats, struck the interior of the aircraft or struck one another due to the accelerations induced in their body segments or had any other injurious forces applied to their bodies." *Id.*

Jenkyn ran two series of computer simulations of the flight. According to his report, the simulations showed that in two instances "[t]he vertical acceleration experienced by the aircraft"

during the final 24 seconds of recorded flight "went negative with a significant magnitude below zero g's." *Id.* at 18. Jenkyn says this means that "the passengers would be forced out of their seats as the aircraft dropped away below them." *Id.* at 21. As that happened, Jenkyn says, the seatbelts "would have applied significant force onto each passenger as the seatbelt dug into and impinged on their hips and pelvis." *Id.* Jenkyn states that the "maximum recorded value" of negative vertical acceleration was "-1.91 g's," at which point "[t]he tension in the seatbelt would have been significant" and "[e]ach passenger would almost certainly have experienced a painful compression of their hips and pelvis from the seatbelt." *Id.*

According to Jenkyn's report, his simulation established that "the range of force from the seatbelt acting on the hips and pelvis ... is more than sufficient to cause contusion to the skin and the underlying tissues and to cause the rupture of the superficial blood vessels within these tissues in each and every passenger." *Id.* at 27. From this, he concludes "every passenger on the aircraft … sustained contusion injury and ruptured superficial blood vessels in the anatomy in contact with the lap belt during the last 24 seconds of the … flight" (*id.* at 27, 29) even though he is not a medical doctor and has never diagnosed anyone (Ex. B. (Jenkyn Dep. Tr.) at 61:8–62:6). He also concludes that the same "seatbelt forces ... will cause pain in every passenger." Ex. A. at 28.

To reach these conclusions, Jenkyn extrapolated from *one* paper whose results, based on the study of a *single* individual, were not statistically significant and, according to the paper's authors, cannot be generalized to other individuals. *See* G.T. Desmoulin & G.S. Anderson, *Method to Investigate Contusion Mechanics in Living Humans*, 2 J. FORENSIC BIOMECHANICS 9–10 (2011) (Ex. C) (cited at Ex. A at 27). Jenkyn admits that the paper rests on "incomplete data" and is "statistically underpowered." Ex. B at 272:12–19. Moreover, although the paper's purpose is to describe how forensic investigators could use a particular mechanical device to "experimentally

determine" the force required to cause a known bruise in "a particular individual" (Ex. C at 10), Jenkyn admits that he conducted no such experiments. Ex. B at 268:14–25.

At his deposition, Jenkyn went further: he offered the previously undisclosed opinion that "[h]ad" the passengers "been bracing, ... they would have sustained muscle strain." *Id.* at 181:10–12. But Jenkyn admits that he does not "know how many passengers were bracing" or "how long" or "how hard they were bracing." *Id.* at 205:6–24. He also admits that he "didn't model" muscle strain in his simulation and that he has no "idea at what minimum level of force … muscle strain … would occur." *Id.* at 182:10, 208:23–209:2. Jenkyn concedes that he cites "no literature" or "quantifiable data" to support his opinion regarding muscle strain from bracing. *Id.* at 182:1–10.

Jenkyn also opines that "the chance of [an] object striking a passenger or the interior of the aircraft is almost certain," with "a significant risk of contusion" or "laceration to the passenger [if] struck." Ex. A at 12. He admits, however, that he neither simulated nor quantified interactions between passengers and loose objects. Ex. B at 59:22–60:2, 288:9–15.

Despite stating in his report that "it is more probable than not that restrained passengers would also have struck their arms and hands on the interior of the aircraft, on the seat or armrests within which they were seated, or on an adjacent passenger" (Ex. A. at 35), Jenkyn now admits that he reached no "firm conclusions" on the subject because his simulation "couldn't predict exactly where [passengers'] arms would go." Ex. B at 113:16–19, 114:18–25. Jenkyn likewise admits that his simulation did not "model whether or not the hands or arms contacted the other passengers or the surfaces of the airplane sufficiently hard enough to cause injury," and ultimately conceded that he is "not offering any opinion that the passengers were injured due to the arms striking each other or the structures in the airplane." *Id.* at 115:2–7, 121:25–122:6.

As for his opinion that everyone on ET 302 felt pain, Jenkyn admits that he is not "an

expert in pain," that pain is "subjective" and felt by each individual at "a different threshold," and that he did not rely on "validated or statistically significant research" in reaching his opinion. *Id.* at 62:15–17; 64:17–19, 65:24–66:15.

## LEGAL STANDARD

For expert testimony to be admissible under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), "the witness must be qualified as an expert by knowledge, skill, experience, training, or education; the expert's reasoning or methodology underlying the testimony must be scientifically reliable; and the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue." *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007) (quotations and citations omitted). Plaintiffs "bear[] the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petrol. Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

The Seventh Circuit has "underscored that '[e]ven [a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method.'" *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 873–74 (7th Cir. 2021) (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)). "An expert must substantiate his opinion" (*Clark v. Takata Corp.*, 192 F.3d 750, 757 (7th Cir. 1999)), which "must be grounded in the methods and procedures of science, and must consist of more than simply subjective belief or unsupported speculation," *Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996) (quotations omitted). "[E]very aspect of the expert's analysis—including his methodology, the combination of facts and scientific evidence on which he relies, and the links between the evidence and his conclusions—must be shown to satisfy Rule 702 and *Daubert*." *In re Zantac (Ranitidine) Prod. Liab. Litig.*, 2022 WL 17480906, at *65 (S.D. Fla. 2022) (citations and quotations omitted). Thus, when evaluating the admissibility of expert testimony, the Court may consider "the reliability of

the individual studies" underlying the expert's opinion, "as well as" the expert's "processes for evaluating and weighing the studies, to determine whether the studies reliably support the conclusions reached by" the expert. *Id.* at *66 (citations omitted).

## ARGUMENT

### I. Jenkyn's opinion that every passenger suffered a contusion injury is inadmissible.

The Court should not permit Jenkyn to testify that every passenger sustained a contusion injury in the final minutes of Flight ET 302. Jenkyn, a biomechanical engineer, is not qualified to opine about the cause or existence of specific injuries. And even if he were, his opinion that every passenger received a contusion injury rests on an unreliable foundation.

#### A. Jenkyn is not qualified to testify about specific injuries.

Determining the existence and cause of specific injuries in particular people requires medical expertise. Jenkyn, a biomechanical engineer, does not have medical training or expertise. Ex. B at 61:8–15. Because Jenkyn lacks the expertise to diagnose specific injuries and identify their specific causes in specific individuals, the Court should not permit him to testify that "every passenger on the aircraft … sustained contusion injury and ruptured superficial blood vessels … during the last 24 seconds of the … flight," and that those injuries are attributable to "the seatbelt restraint force acting on [each passenger's] pelvis." Ex. A at 29.

Recognizing that biomechanical engineers are not doctors, courts have repeatedly prevented them from opining on the existence or extent of a plaintiff's injury. As one court succinctly put it: because a biomechanical expert "lacks any medical background or relevant training, he may not testify as to the existence, extent, or severity of" a plaintiff's "injuries." *deWit v. UPS Ground Freight, Inc.*, 2017 WL 3597514, at *3 (N.D. Fla. 2017); *accord, e.g.*, *Rodriguez v. United States*, 2022 WL 2309892, at *1 (S.D. Tex. 2022); *Snyder v. Harrington*, 2010 WL 4723483, at *3 (N.D. Ohio 2010); *Berner v. Carnival Corp.*, 632 F. Supp. 2d 1208, 1213 (S.D.

Fla. 2009); *Burke v. TransAm Trucking, Inc.*, 617 F. Supp. 2d 327, 334 (M.D. Pa. 2009).

Indeed, commentators and courts alike have recognized that "[u]nless a biomechanical engineer has medical expertise, courts should limit biomechanical expert testimony to general causation opinions because biomechanical engineers do not possess the expertise to make individual assessments or adapt generalized data to unique individuals." Loren Peck, *How Sound Is the Science? Applying Daubert to Biomechanical Experts' Injury Causation Opinions*, 73 Wash. & Lee L. Rev. 1063, 1113 (2016). As one court has explained:

> Biomechanical engineers are qualified to determine what injury causation forces are in general and can tell how a hypothetical person's body will respond to those forces, but are not qualified to render medical opinions regarding the precise cause of a specific injury because each individual person has his own tolerance level, and therefore, biomechanical engineers could testify only in general terms, *i.e.*, that "X" forces would generally lead to "Y" injuries and "Y" injuries are consistent with those the plaintiff claims to have suffered. Accordingly, biome[chan]ical engineers are qualified to render opinions as to the forces generated in a particular event and the general types of injuries those forces may generate. However, biomechanical engineers are not ordinarily permitted to offer opinions about the precise cause of a specific injury.

*Roth v. Sentry Ins. Co.*, 2021 WL 3809090, at *3 (E.D. La. 2021) (quoting *Ramirez v. Escajeda*, 2021 WL 1131721, at *10 (W.D. Tex. 2021)). So while Jenkyn may opine on "how a person *might* be injured" during the flight (*Phillips v. Raymond Corp.*, 364 F. Supp. 2d 730, 740 (N.D. Ill. 2005) (emphasis added)), he may not opine on "whether the forces in the accident did or did not cause … specific injuries." *Kelham v. CSX Transp., Inc.*, 2015 WL 4426027, at *6 (N.D. Ind. 2015); *accord Okey v. United States*, 2022 WL 266800, at *2 (W.D. La. 2022); *Bowers v. Norfolk S. Corp.*, 537 F. Supp. 2d 1343, 1377 (M.D. Ga. 2007), *aff'd*, 300 F. App'x 700 (11th Cir. 2008).

*Smelser v. Norfolk S. Ry. Co.* is illustrative. 105 F.3d 299 (6th Cir. 1997), *abrogated on other grounds by Morales v. Am. Honda Motor Co.*, 151 F.3d 500 (6th Cir. 1998). The district court had permitted a biomechanics expert to testify that "the failure of [a] seat belt ... led to the [plaintiff's] injuries." *Id.* at 305. The Sixth Circuit reversed, holding that the proffered opinion

went "beyond [the expert's] expertise in biomechanics." *Id.* Although "qualified to render an opinion that made use of his discipline's general principles, described the forces generated in the ... collision, and spoke in general about the types of injuries those forces would generate," his "expertise in biomechanics did not qualify him to testify about the cause of [the plaintiff's] specific injuries." *Id.*; *see also Laski v. Bellwood*, 2000 WL712502, at *3–4 (6th Cir. 2000) (same).

Many courts, including in this circuit, have excluded specific causation testimony by biomechanics experts, holding that they may not "testify about the specific cause" of a plaintiff's injury or "whether the forces in the accident did or did not cause" a plaintiff's "specific injuries." *Hopey v. Spear*, 2016 WL 4443205, at *13 (C.D. Ill. 2016); *accord Kelham*, 2015 WL 4426027, at *6; *Wilcox v. CSX Trans., Inc.*, 2007 WL 1576708, at *13 (N.D. Ind. 2007); *see also, e.g.*, *Johnson v. ABF Freight Sys., Inc.*, 2020 WL 7320994, at *2 (N.D. Ala. 2020); *Rodriguez v. Athenium House Corp.*, 2013 WL 796321, at *4 (S.D.N.Y. 2013). Prohibited from testifying that a plaintiff was injured or injured by a particular force, biomechanics experts may only opine on whether "the forces in the accident" are or "are not consistent with the [plaintiff's] injuries." *Pike v. Premier Transp. & Warehousing, Inc.*, 2016 WL 6599940, at *4 (N.D. Ill. 2016).[1]

[1] Twice courts in this district have arguably allowed biomechanics experts to opine on the cause of a plaintiff's injury, but neither case supports allowing Jenkyn to opine that everyone on ET 302 suffered contusions from the force acting on their pelvises. In *McKeon v. City of Morris*, 2016 WL 5373068, at *2 (N.D. Ill. 2016), the court agreed that the biomechanics expert was "not qualified to diagnose [the plaintiff's] injuries," but allowed him to "interpret the diagnoses of [the plaintiff's] treating physicians … to opine on the likely mechanisms of [the plaintiff's] injuries." Here, by contrast, no physician has diagnosed an injury to any passenger. In *Phillips v. Raymond Corp.*, 364 F. Supp. 2d 730 (N.D. Ill. 2005), it is not clear what the biomechanics expert was allowed to testify to. At one point, the court said that he could testify to "how a person might be injured" if events transpired as the plaintiff claimed; at another, it said that he could testify to "how [the plaintiff] sustained his … injuries." *Id.* at 740–41. Regardless, as in *McKeon* and unlike here, the biomechanical expert was not called upon to diagnose an injury to the plaintiff, whose leg was amputated as a result of the accident in question. Moreover, and again unlike here, the defendant who moved to exclude the expert did not challenge his qualification to opine on specific causation as such, questioning instead only his expertise with the type of machinery at issue. *See id.* at 739.

That limitation tracks Seventh Circuit precedent, which rejects attempts to admit medical testimony through non-medical experts. *See Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 723–24 (7th Cir. 1999) (court abused its discretion in allowing metallurgist to testify as to the toxicity of certain fumes and the lungs' ability to absorb them); *Stutzman v. CRST, Inc.*, 997 F.2d 291, 298 (7th Cir. 1993) (affirming exclusion of testimony "because it offered a medical prognosis that a physical therapist was not qualified to render").

In sum, although Jenkyn might be qualified to opine on what forces *could* cause certain injuries in a *hypothetical person*, he is not qualified to opine that anyone—much less "every passenger on the aircraft"—was in fact injured. Ex. A at 29.

**B. Jenkyn's contusion opinion is unreliable.**

Even if Jenkyn were qualified to opine on the existence and cause of specific injuries in specific individuals, his opinion that every passenger on ET 302 sustained a contusion injury would still have to be excluded as unreliable.

To start, Jenkyn misunderstands—and, accordingly, misuses—the Desmoulin paper, which is the sole basis for his opinion. Ex. B at 262:13–16. Its goal was not, as Jenkyn claimed, "to measure the contact force required to cause superficial contusion and rupture of the superficial blood vessels that leads to the formation of bruises in the skin and underlying tissues." Ex. A at 27. Rather, it was to describe "a relatively easy-to-use *method to investigate* contusion mechanics." Ex. C at 1 (emphasis added). Specifically, the paper describes how criminal investigators could use a certain device to "*experimentally* determine" the force required to cause a known bruise in "a *particular individual*." *Id.* at 10 (emphases added). Thus, the paper offers researchers a "technique" for conducting their own "experiment[s]," not data that can be generalized for use elsewhere. *Id.* Jenkyn admits that he conducted no such experiments. Ex. B at 268:14–25.

Consistent with its limited purpose, the paper emphasizes that the measurements yielded

by the authors' own experiments are only "valid for the person and circumstances tested" and "cannot be generalized to a population" because the "method is designed to be used to investigate a crime inflicted on a single person." Ex. C at 9. Moreover, the paper warns that it is "highly improbable" that the experimental method it describes could ever yield generalizable data "due to the plethora of anatomical, medical and physiological variables that affect contusion formation." *Id.* at 10. The paper explained that, at minimum, "larger sample sizes" would be "required to assess the technique[']s ability to be generalized" before it could reliably be used for that purpose. *Id.* But Jenkyn did not use larger sample sizes to test the method's ability to produce generalizable results, nor did he identify any studies that did. *See Clark*, 192 F.3d at 759 (affirming exclusion of biomechanics expert). Indeed, Jenkyn's reliance on the paper's limited measurements to generalize about all ET 302 passengers is especially unreliable because the paper's measurements were derived from experiments on *one* subject. A paper based on a single test subject rarely if ever "constitute[s] sufficient facts or data for general causation," let alone specific causation for hundreds of individuals. *In re Viagra Prod. Liab. Litig.*, 572 F. Supp. 2d 1071, 1087 (D. Minn. 2008). An opinion that relies on such a paper to make sweeping generalizations must be excluded because it "is not the product of reliable principles and methods or a result of intellectual rigor." *Id.* (quotation marks omitted).

Jenkyn admits that the Desmoulin paper must be read "with caution" because it is based on "sparse" and "incomplete data" and is therefore "statistically underpowered." Ex. B at 272:12–19. Nevertheless, Jenkyn used the paper's measurements from the study's lone participant to generalize about specific causation as to all ET 302 passengers because the paper is, in his view, "the only game in town." *Id.* at 272:16–17. Even if true, that does not justify Jenkyn's use of the paper's data in this way.

Nor does it justify Jenkyn extrapolating the Desmoulin data—which was derived from experiments on the test subject's legs (Ex. C at 4)—to opine as to effects on the passengers' "hips and pelvis[es]." Ex. A at 21, 27. To the contrary, the paper warns that the data it reports *cannot* be extrapolated to other body parts, stating that, "[f]or example, taking measurements off of the lower limb to determine mechanics at the shoulder or buttocks would not be transferrable [sic]." Ex. C at 8. Jenkyn relied in particular on measurements from experiments conducted on the test subject's shins, stating that because "the bone is superficial to the skin" in the area of "the anterior superior ilia of the pelvis," "the closest comparison between the lap belt restraint force and the Desmoulin study is the result for the shin," where "the tibia is superficial to the skin." Ex. A at 27. Even if true, the paper itself makes clear that the comparison is not close enough to be a reliable basis for extrapolation to the passengers' hips and pelvises. The paper emphasizes that "there must be a critical threshold of capillary density levels present in the tissue in order for a contusion to form." Ex. C at 9. Jenkyn offers no data on the capillary density level of anterior pelvic tissue or how it compares to that of the shin. Under all these circumstances, the reliability of Jenkyn's extrapolation from shin to pelvis rests on "nothing more than [his] say-so." *Echo, Inc. v. Timberland Machs. & Irr., Inc.*, 661 F.3d 959, 965 (7th Cir. 2011) (quotation marks omitted).

Unreliable generalization and extrapolation aside, Jenkyn misreads the data reported in the Desmoulin paper. Jenkyn says that the paper "showed that the minimum force required (i.e. the threshold force) for contusion and rupture to superficial blood vessel in the legs is 342 [newtons] where the bone is superficial to the skin (i.e. on the shin)." Ex. A at 27.[2] That understanding of the Desmoulin paper, on which his opinion depends, is incorrect.

First, the paper, which never uses the phrase "threshold force," defines "threshold" as "the

[2] Force is measured in newtons. One newton is the force required to give a one-kilogram mass an acceleration of one meter per second per second.

magnitude of the impact characteristic in which 50% of the time a bruise would occur." Ex. C at 5–6. Thus, a particular threshold reflects the level at which a certain impact characteristic—such as "pressure impulse" or "impact velocity" (*id.* at 1)—will cause bruising in a particular person half the time, not "the minimum force required" to cause a bruise either generally or in a particular person. Ex. A at 27. The data reported in the Desmoulin paper reflect this fact: Across six tests, the levels of force that caused a bruise on the test subject's shins ranged from 342 to 871 newtons, but in one of those tests a force of 542 newtons did not cause a bruise. Ex. C at 6. Given this variation, the paper provides no basis for concluding that any particular passenger—let alone "every passenger"—on ET 302 would have been bruised by a certain force level.

Regardless, the Desmoulin paper found no statistically significant relationship between force and bruising. It examined the relationship between bruising and "peak force, peak pressure, impact displacement, tissue stiffness, impact velocity, pressure impulse, force impulse, kinetic energy[,] and the energy transmitted through the limb." *Id.* at 1. But the only statistically significant relationship it found was between bruising and "energy transmitted though the limb." *Id.* at 9; *see also id.* at 6. Jenkyn, however, did not analyze energy transmitted through the limb. In his simulations, he analyzed only "peak force." Ex. B at 275:22–276:2, 277:2–4. But, as Jenkyn concedes, the Desmoulin paper found *no* statistically significant relationship between bruising and peak force. Ex. B at 277:2–278:7; Ex. C at 6; *see also id.* at 9.

Thus, the Desmoulin paper in fact *undermines* Jenkyn's opinion that the forces experienced on the flight caused "every passenger on the aircraft" to "sustain[] contusion injury and ruptured superficial blood vessels." Ex. A at 29. Jenkyn "analyzed data that was not his own and reinterpreted it in a manner inconsistent with the conclusions of those who originally generated it." *Carnegie Mellon Univ. v. Hoffmann-LaRoche, Inc.*, 55 F. Supp. 2d 1024, 1040 (N.D. Cal.

1999). That renders his opinion inadmissible. "[W]hen an expert relies on the studies of others, he must not exceed the limitations the authors themselves place on the study" (*In re Accutane Prod. Liab.*, 2009 WL 2496444, at *2 (M.D. Fla. 2009), *aff'd*, 378 F. App'x 929 (11th Cir. 2010)), or "go beyond what the [authors] had concluded." *In re Mirena Ius Levonorgestrel-Related Prod. Liab. Litig.*, 341 F. Supp. 3d 213, 260–61 (S.D.N.Y. 2018), *aff'd*, 982 F.3d 113 (2d Cir. 2020). But "extrapolat[ing] conclusions beyond the scope of [his] source[]" is precisely what Jenkyn did here. *Rodman v. Otsuka Am. Pharm., Inc.*, 564 F. Supp. 3d 879, 891 (N.D. Cal. 2020). His opinion that every passenger suffered contusions is simply "subjective speculation that masquerades as scientific knowledge." *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001). The Court should exclude it.

### C. Jenkyn cannot rest his contusion opinion on his experience.

Jenkyn defended his use of the Desmoulin paper as merely "confirmatory" of what he supposedly knew from "experience" was "the force required ... to cause a contusion." Ex. B at 261:19–262:6. But Jenkyn's "experience" does not form a reliable basis for his contusion opinion.

The *Daubert* factors apply "where an expert eschews reliance on any rigorous methodology and instead purports to base his opinion merely on 'experience' or 'training.'" *Clark*, 192 F.3d at 758. While "an expert may rely on his experience as the basis for his opinion, that expert must explain how that experience leads to his proffered conclusion and why it provides a sufficient basis for it." *Faryniarz v. Nike, Inc.*, 2002 WL 1968351, at *3 (S.D.N.Y. 2002). Thus, courts have excluded the opinions of experts who relied on experience where the expert did not explain "how he used his expertise to generate his conclusion" (*Sanders v. City of Chi. Heights*, 2016 WL 4417257, at *8 (N.D. Ill. 2016)); did not explain why his experience was a sufficient basis for the opinion and how it was reliably applied to the facts of the case (*Paramount Media Grp., Inc. v. Vill. of Bellwood*, 2015 WL 7008132, at *3 (N.D. Ill. 2015)); or otherwise "failed to connect his

conclusion to his experience" (*Levin v. Grecian*, 2013 WL 3669742, at *6 (N.D. Ill. 2013)).

Here, Jenkyn has not explained how his experience supports his opinion, why his experience is a sufficient basis for it, or how he applied his experience to the facts of the case. Nor has he given any reason, other than his say-so, to believe that the threshold force required to cause a contusion to "the anterior superior ilia of the pelvis" (Ex. A at 27) is "in the ballpark of about 300 newtons." Ex. B at 261:19–262:6. Jenkyn "provides no explanation [of] how his work experience factors into his conclusion[]," so his contusion opinion fails "to clear the bar of admissibility imposed by Rule 702 and *Daubert*." *Ventriloscope v. MT Tool & Mfg.*, 2019 WL 12528939, at *6 (N.D. Ill. 2019).

## II. The Court should also exclude Jenkyn's other opinions about passenger injuries.

Jenkyn opines or implies that every passenger was injured by bracing, flying objects, or flailing limbs. None of these opinions was disclosed in Jenkyn's report, and all should be excluded for that, alone.[3] Moreover, none rests on a reliable foundation.

Jenkyn testified that "[h]ad [the passengers] been bracing, ... they would have sustained muscle strain." Ex. B at 181:10–12. But he admits that he does not "know how many passengers were bracing," "how long they were bracing," or "how hard they were bracing." *Id.* at 205:6–24; *see also id.* at 177:16–17, 179:19–22, 197:11–13. He also admits that he does not "have any idea at what minimum level of force … muscle strain … would occur." *Id.* at 208:23–209:2. In addition, Jenkyn admits that he "didn't simulate how somebody might have braced … against the forces experienced on the flight" (131:2–6; *see also id.* at 135:8–11, 192:13–16), and that he "didn't analyze" muscle strain "at all." *Id.* at 179:19–22. The sole basis for his opinion that passengers

[3] An opinion not disclosed in an expert's report is subject to exclusion under Federal Rules of Civil Procedure 26(a)(2)(B) and 37(c)(1). *Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1287 (Fed. Cir. 2011); *Dairy Farmers of Am., Inc. v. Travelers Ins. Co.*, 391 F.3d 936, 943–44 (8th Cir. 2004).

would have suffered muscle strain from bracing was his "having a look at the vertical accelerations in the flight data recorder." *Id.* at 181:13–20. He concedes, however, that he cites "no literature" or "quantifiable data" to support his opinion. *Id.* at 182:1–10.

A bare "review" of information "is simply not enough to establish that [an expert's] conclusion[s] are based on a sufficiently reliable methodology." *Dhillon v. Crown Controls Corp.*, 2000 WL 420747, at *3 (N.D. Ill. 2000), *aff'd*, 269 F.3d 865 (7th Cir. 2001). Given the "absence of any stated methodology" in Jenkyn's report and deposition, the Court cannot determine whether Jenkyn's undisclosed "methods are consistent with the generally accepted method for garnering and evaluating evidence in the field of biomechanics," which is reason enough to exclude his opinion, apart from the lack of supporting data. *Clark*, 192 F.3d at 759.

Regarding flying objects, Jenkyn opined that a long list of objects "could be expected to [have been] loose" upon takeoff and then "mobile within the cabin space" if the plane "accelerat[ed] downward at more than -1 g's." Ex. A at 11–12. Were that to occur, Jenkyn said, "the chance of [an] object striking a passenger or interior of aircraft is almost certain," with "a significant risk of contusion" or "laceration to the passenger [if] struck." *Id.* at 12. But Jenkyn admits that he neither simulated nor quantified the interactions between passengers and potential loose objects. Ex. B at 59:22–60:2, 288:9–15.

As for flailing limbs, Jenkyn originally opined that "it is more probable than not that restrained passengers would also have struck their arms and hands on the interior of the aircraft, on the seat or armrests within which they were seated, or on an adjacent passenger." Ex. A. at 35. But Jenkyn admits that he reached no "firm conclusions" on this because his simulation "couldn't predict exactly where [passengers'] arms would go" and because the simulated passengers weren't always "hit … hard enough" to even bruise. Ex. B at 113:16–19, 114:18–25. Jenkyn also admits

that his simulation did not "model whether or not the hands or arms contacted the other passengers or the surfaces of the airplane sufficiently hard enough to cause injury." *Id.* at 115:2–7. Given these admissions, he ultimately conceded that he is not "offering any opinion that the passengers were injured due to the arms striking each other or the structures in the airplane." *Id.* at 121:25–122:6.

Thus, Jenkyn's opinions regarding possible injuries from bracing, flying objects, or flailing limbs are untimely and unreliable and should be excluded as such.

## III. The Court should exclude Jenkyn's opinion that all passengers experienced pain.

Jenkyn opines that the "seatbelt forces" generated in his simulations "will cause pain in *every* passenger." Ex. A at 28 (emphasis added). But he admits that pain is "subjective" and that "everybody feels pain at a different threshold." Ex. B at 62:15–17, 64:17–19, 66:10–19. Indeed, "[p]ain is a completely subjective phenomenon and cannot be objectively verified or measured." *Bunnell v. Sullivan*, 947 F.2d 341, 347 (9th Cir. 1991) (quotation marks omitted).

Jenkyn cites no studies to support his conclusion that the forces experienced on the airplane would cause pain in every passenger on Flight ET 302. Ex. B at 65:24–66:8, 220:21–221:23. His opinion is exclusively "[b]ased on [his] experience and [] training" (Ex. A at 28), but he admits that he is not "an expert in pain" (Ex. B at 62:15–17) and he does not explain how his experience and training support his opinion. "A court should not 'admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.'" *Rowe v. Gibson*, 798 F.3d 622, 627 (7th Cir. 2015) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Because Jenkyn's sweeping opinion that "every passenger" would have experienced pain is "unsupported speculation," it must be excluded. *Cummins*, 93 F.3d at 368.

## CONCLUSION

The Court should exclude Jenkyn's opinion that every passenger suffered injury and experienced pain before impact.

DATED: February 8, 2023

**THE BOEING COMPANY**

By: /s/ *Dan K. Webb*
*One of Its Attorneys*

Dan K. Webb
dwebb@winston.com
Christopher B. Essig
cessig@winston.com
Julia M. Johnson
jmjohnson@winston.com
Samuel M. Zuidema
szuidema@winston.com
**Winston & Strawn LLP**
35 West Wacker Drive
Chicago, Illinois 60601-9703
Phone: (312) 558-5600

Andrew E. Tauber
atauber@winston.com
**Winston & Strawn LLP**
1901 L St. NW
Washington, D.C. 20036
Phone: (202) 282-5000

Michael Scoville
MScoville@perkinscoie.com
Mack Shultz
MShultz@perkinscoie.com
Christopher M. Ledford
CLedford@perkinscoie.com
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000

Jon R. Buck
JBuck@perkinscoie.com
**PERKINS COIE LLP**
110 N. Wacker Dr., Suite 3400
Chicago, Illinois 60606-1511
Phone: (312) 324-8400
Fax: (312) 324-9400

## CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ ECF system, which will send notification of such filing to all attorneys of record.

/s/ *Dan K. Webb*
**WINSTON & STRAWN LLP**
35 West Wacker Drive
Chicago, Illinois 60601-9703
Phone: (312) 558-5600