# EXHIBIT B

# In The Matter Of:
# ETHIOPIAN AIRLINES FLIGHT ET 302

# CRASH - DAMAGES

---

## THOMAS RICHARD JENKYN, Ph.D.

December 15, 2022

---

***TC REPORTING, INC.***
***1 DEERFIELD EAST - 1850***
***QUOGUE, NY. 11959***

THOMAS RICHARD JENKYN, Ph.D. - Vol. I

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

-----------------------------------------------------x

IN RE: ETHIOPIAN AIRLINES
FLIGHT ET 302 CRASH - Damages
This Document Relates To: All Actions

-----------------------------------------------------x

Lead Case: 1:19-cv-02170 (Consolidated)
Honorable Jorge L. Alonso
Magistrate Judge M. David Weisman

-----------------------------------------------------x

December 15, 2022
8:37 a.m. Eastern Standard Time

* * *

CONFIDENTIAL PURSUANT TO AMENDED PROTECTIVE ORDER

* * *

Remote video conference deposition of THOMAS RICHARD JENKYN, Ph.D., P.Eng., taken by Defendant The Boeing Company, pursuant to Notice, dated November 6, 2022, before Brandon Rainoff, a Federal Certified Realtime Reporter and Notary Public of the State of New York.

Page 2

A P P E A R A N C E S:

KREINDLER & KREINDLER LLP
Attorneys for Plaintiffs' Executive Committee
750 Third Avenue
New York, New York 10017
212.687.8181
BY: BRIAN J. ALEXANDER, ESQ.
balexander@kreindler.com
212.973.3411
JUSTIN T. GREEN, ESQ.
212.973.3403
jgreen@kreindler.com
DANIEL O. ROSE, ESQ.
212.973.3414
drose@kreindler.com

Page 3

A P P E A R A N C E S (continued):

CLIFFORD LAW OFFICES PC
Attorneys for Plaintiffs' Executive Committee
120 North LaSalle Street
Chicago, Illinois 60602
312.625.6192
BY: KEVIN P. DURKIN, ESQ.
kpd@cliffordlaw.com
TRACY A. BRAMMEIER, ESQ.
tab@cliffordlaw.com
JOHN V. KALANTZIS, ESQ.
jvk@cliffordlaw.com
SANJA PETREVSKA, ESQ.
sp@cliffordlaw.com

Page 4

A P P E A R A N C E S (continued):

COTCHETT, PITRE & McCARTHY, LLP
Attorneys for Plaintiffs
840 Malcolm Road
Suite 200
Burlingame, California 94010
650.697.6000
BY: FRANK M. PITRE, ESQ.
fpitre@cpmlegal.com
JOHN PAUL THYKEN, ESQ.
jthyken@cpmlegal.com

POWER ROGERS, LLP
Attorneys for Plaintiffs
70 West Madison Street
Suite 5500
Chicago, Illinois 60602
312.313.0202
BY: JONATHAN M. THOMAS, ESQ.
jthomas@powerrogers.com

A P P E A R A N C E S (continued):

SMITH LaCIEN LLP
Attorneys for Plaintiffs
Three First National Plaza
70 West Madison
Suite 2250
Chicago, Illinois 60602
312.509.8900
BY: TODD A. SMITH, ESQ.
ALLYSON CHRISTINE COX, ESQ.

ROMANUCCI & BLANDIN LLC
Attorneys for Plaintiffs
321 North Clark Street
Suite 900
Chicago, Illinois 60654
312.458.1000
BY: DAVID NEIMAN, ESQ.
312.253.8810
dneiman@rblaw.net



A P P E A R A N C E S (continued):

WINSTON & STRAWN LLP
Attorneys for Defendant The Boeing Company and the Witness
35 West Wacker Drive
Chicago, Illinois 60601-9703
312.558.5600
BY: CHRISTOPHER B. ESSIG, ESQ.
312.558.6229
cessig@winston.com
KARALENA M. GUERRIERI, ESQ.
312.558.8079
kguerrieri@winston.com
NATHAN R. GILBERT, ESQ.
312.558.8907
ngilbert@winston.com



A P P E A R A N C E S (continued):

PERKINS COIE LLP
Attorneys for Defendant The Boeing Company and the Witness
1201 Third Avenue
Suite 4900
Seattle, Washington 98101-3099
206.359.8000
BY: CHRISTOPHER LEDFORD, ESQ.
206.359.6642
cledford@perkinscoie.com

ALSO PRESENT:
JENNIFER GORDON, Clifford Law Offices PC
RONALD ECKSTEIN, Videographer
CHELSEA GILCHRIST, Technical Support, TC Reporting, Inc.
THERESA WINTER, TC Reporting, Inc.
VICTORIA SUSKO, TC Reporting, Inc.



S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing, sealing and certification be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

- o0o -

* * *
PROCEEDING
Thursday, December 15, 2022
Remote/Hybrid Deposition
8:37 a.m. Eastern Standard Time
* * *

THE VIDEOGRAPHER: Good morning. This is the videoconference monitor, Chelsea Gilchrist of TC Reporting, and we are here for the deposition of Thomas R. Jenkyn, being taken In the Matter of Ethiopian Airlines Flight ET 302 Crash, Case Number 1:19-cv-02170, Consolidated.

Today's date is Thursday, December 15th, 2022, and the time is approximately 8:37 a.m.

There is an in-person videographer also present recording these proceedings.

The witness and counsel are attending in-person for today's deposition at Bay Adelaide Centre West, 333 Bay Street, Suite 900, Toronto, Ontario M5H 2R2.

Other counsel will also be appearing remotely via videoconference.



Before we proceed, I would like to do a roll call. I have a list of law firms appearing today. When I announce each firm, if counsel can please state your full name on the record so we may note your appearance accordingly.

Winston & Strawn.

MR. ESSIG: Chris Essig, Karalena Guerrieri.

And I believe Nathan Gilbert is online.

THE VIDEOGRAPHER: Perkins Coie?

MR. LEDFORD: Christopher Ledford.

THE VIDEOGRAPHER: Kreindler & Kreindler?

MR. ALEXANDER: Brian Alexander, Daniel Rose for Kreindler & Kreindler.

THE VIDEOGRAPHER: Clifford Law?

MR. DURKIN: Kevin Durkin in the room.

MS. BRAMMEIER: Tracy Brammeier.

MR. KALANTZIS: John Kalantzis.

MS. PETREVSKA: Sanja Petrevska.

And Jennifer Gordon, remote.

THE VIDEOGRAPHER: Podhurst Orseck?



Nurenberg, Paris?

Schroeter Goldmark & Bender?

Kline & Specter, PC?

Romanucci & Blandin?

I believe we had a David Neiman logged in?

MR. NEIMAN: Sorry. I just stepped away for a second. Yes, David Neiman from Romanucci & Blandin is present. Thank you.

THE VIDEOGRAPHER: Thank you.

Beasley Allen?

Smith LaCien?

MS. COX: Allyson Cox and Todd Smith.

THE VIDEOGRAPHER: Motley Rice.

Cotchett, Pitre & McCarthy.

MR. PITRE: Good morning. Frank Pitre appearing remotely from California, where the rooster continues to sleep.

MR. THYKEN: And John Thyken.

THE VIDEOGRAPHER: Power Rogers law.

I believe we have a Jonathan Thomas logged in.

MR. THOMAS: Sorry. Yeah, Jonathan Thomas from Power Rogers.



THE VIDEOGRAPHER: Thank you.

Is there anyone appearing who has not stated their appearance?

I will certify that I will also be appearing for tech support and videoconference services for all remote participants.

Before we proceed, I will ask that lead counsel for plaintiffs and lead counsel for defendants for today's deposition to stipulate on the record that we are proceeding according to the Federal Rules of Civil Procedure and that this deposition officer may swear in the deponent even though he is not in the physical presence of the deponent, and that there is no objection at this time, nor will there be an objection to it at any future indicate.

Plaintiffs' lead counsel, are you in agreement?

MR. DURKIN: In agreement.

THE VIDEOGRAPHER: Defendant's lead counsel, are you in agreement?

MR. ESSIG: In agreement.

THE VIDEOGRAPHER: Thank you.

Brad, you can swear in the witness.

Page 13

THE COURT REPORTER: Good morning. My name is Brad Rainoff. I am a certified Shorthand Reporter and notary Public. I am also a Registered Merit Reporter and a Federal Certified Realtime Reporter. I am the deposition officer for today's deposition --
THOMAS RICHARD JENKYN, Ph.D., P.Eng., having been duly sworn, was examined and testified as follows:
EXAMINATION
BY MR. ESSIG:
Q. Good morning.
Do you go by Dr. Jenkyn?
Or Mr. Jenkyn?
A. Dr. Jenkyn.
Q. That's what I thought. Good morning, Dr. Jenkyn. I know you are a Ph.D.
Have you been deposed before?
A. Once -- once in United States court, yes.
Q. Have you been deposed in Canada?
Or -- are there depositions in Canada?
A. Not really done that way. I have testified in court in Canada, but we don't

Page 14

really do the deposition process.
Q. Okay.
So only one deposition in the United States?
A. That's right.
Q. Do you remember what matter it was in?
A. I don't remember it was state or federal court, but the case took place in Connecticut.
Q. Okay.
What type of a case was it?
A. It was civil litigation involving a fatality between a young man and a snow plow. And I was on the side of the defense for the municipality.
Q. Because you haven't been deposed too many times in the United States, there are a few ground rules, but not too many.
Maybe the most important ones allow the court reporter to take down your answers -- which are the most important thing -- and my questions as well. And so we need to be careful together not to talk over each other.
When I ask a question, I'll try to ask

Page 15

it clearly.
And when I -- can you wait until I finish speaking before you answer?
A. Certainly.
Q. And I'll do my best to listen to your full answer and not speak over you either.
Is that okay?
A. Agreed, yeah.
Q. All of your answers have to be verbal. So if you shake your head, or nod your head -- I know there is a camera kind of staring you in the face right now -- that video will be taken down, but the court reporter can't write down nonverbal answers.
So do your best to answer verbally.
Is that okay?
A. Understood, yes.
Q. And I know you were sworn in today to today tell the truth.
Any reason you can't tell the full and complete truth today?
A. There is no reason.
Q. Also, I'm going to ask you some questions. If you can do your best to give,

Page 16

sort of, direct, clear complete answers, that will help the deposition go faster.
And it's possible that your counsel will ask you questions afterwards. And so if there are additional points you want to make, you can always do that.
If I ask any question that's unclear, please ask me to clarify.
Is that okay?
A. Yes.
Q. And if you don't ask to clarify, I'll assume you understood what I was talking about.
A. Got it.
MR. ESSIG: Let's mark as -- I guess it's Exhibit 290. Is that the first Exhibit?
THE VIDEOGRAPHER: Yes, the first Exhibit will be Exhibit 290.
MR. ESSIG: It will be tab 1, I believe, in AgileLaw.
(Exhibit 290, Multipage document entitled: Plaintiffs' Rule 26(a)(2)(B) Disclosure of Thomas R. Jenkyn, Ph.D, P.Eng., dated September 22, 2022 (no Bates Nos.), marked for identification)

Page 17

(Pause)
MR. ESSIG: So I have marked Exhibit 290.
BY MR. ESSIG:
Q. Do you recognize that document?
A. Yes, I do.
Q. Is this a copy of your expert report -- expert disclosure -- in this case?
A. Yes.
Q. Okay.
MR. ESSIG: If we turn to page 49 --
(Pause)
MR. ESSIG: I think it is entitled: Appendix C: Depositions and appearance in court.
BY MR. ESSIG:
Q. Do you see that?
A. Yes, I do.
Q. Is this the complete list of the depositions and testimony you've ever provided in court?
A. Yes.
Q. I see there is a --
MR. DURKIN: You are talking about the

Page 18

last four years?
MR. ESSIG: I asked him: Ever.
MR. DURKIN: Oh, okay. Because we asked him for the last four years.
MR. ESSIG: I understand.
MR. DURKIN: Thank you. Okay.
THE WITNESS: There is one thing that isn't on here where I testified only at the voir dire --
MR. ESSIG: Okay.
THE WITNESS: -- part. But then in that case, the ruling was the judge didn't allow any expert testimony on either side, so it didn't go beyond voir dire.
BY MR. ESSIG:
Q. Do you remember the name of that case?
A. It was Hadzic v. Crocksford.
Q. In the United States?
Or Canada?
A. Ontario Superior Court.
Q. What was the subject of the case?
A. It was a low-speed auto collision.
Q. When was it?
A. I don't recall. More than five years

Page 19

ago. I don't specifically remember.
Q. Fair enough.
The third case down on your list is Walsh v City of Torrington, Connecticut.
Is that right?
A. That's right.
Q. Is that the case you were talking about?
A. That's right.
Q. And the rest of the cases are in -- two of the cases are in Ontario Superior Court.
You see that?
A. That's right.
Q. What was the subject matter of the Hummel case?
A. That was -- I was appearing for plaintiff.
And that was a higher-speed auto collision, where the driver was under the influence of drugs and alcohol, and the plaintiff was front-seat passenger who was not seat belted. And -- I was asked to determine -- he suffered -- he sustained serious injuries.
I was asked to opine on whether, had

Page 20

he been wearing his seat belt, the severity of his injuries would have been similar.
Q. Did you create an expert report?
A. Yes, I did.
Q. Did you do a simulation?
A. Yes, I did.
Q. And did you use the same software package and program that you used in this case?
A. Yes.
Q. The HVE/GATB?
A. Correct, yeah.
Q. Did you calculate the amount of g-forces that the -- it was a decedent?
Or was he injured?
A. Just injured.
Q. Okay.
-- that the plaintiff suffered?
A. Yes.
Q. How many g-forces in that accident?
A. I don't recall. It was -- it was significant.
There was a very large deceleration when the car hit a tree, in a linear sense. And then the case was complicated by the fact the

car rotated rapidly as well, and that's really the crux of the case. So I was calculating both linear forces and accelerations, and rotational ones as well.
Q. Okay.
Do you remember how fast the car was going?
A. No. But it was -- and I am going to give you my answers in metric.
My understanding was, on a residential street, they were going more than 90 kilometers an hour, but I don't specifically recall. But they were going faster than they should have been.
Q. Do you have any recollection about the magnitude of g-forces?
A. I don't.
Q. More than 50 g's? -- positive?
A. Again, I don't know.
Q. Okay.
More than 10?
A. I would expect -- you know what? It's hard to answer because he didn't have his seat belt on, so that changes everything.



Q. Okay.
What about the Rogers versus Testa case?
What was the subject matter of that case?
A. So that, again -- in that case, I was appearing for the defense.
The plaintiff was in the custody of the London Police Service in the back of a paddy wagon. And while he was being transported -- I believe to jail -- he sustained an injury while he was in the back of the van. He stated that the van was driving dangerously and caused his injury.
And I opined that he had been kicking the back door in an attempt to get out and injured himself.
Q. Do you do simulation in that case?
A. Yes.
Q. Same software package?
A. No.
Q. Which software package did you use in that?
A. So I did hand calculations. And I



believe it was just hand calculations.
Q. Did you calculate any g-forces in that case?
A. No. That was impact forces.
Q. Okay.
And then the last one, I think, is this top one, Zheng Ziyang. It was in the State Court of the Republic of Singapore.
Do you see that?
A. That's correct, yes.
Q. What was the subject matter of that case?
A. You had two young boys who were running across the playground at their school. One fell and injured himself.
And I was representing the plaintiff.
Plaintiff claimed that the other boy pushed him. The defendant claimed that the boy just tripped.
Now, in that case, that was a kinematic analysis, so I didn't calculate g-forces or forces.
We serendipitously had CCTV footage of the event, and so I recreated the event in three



dimensions using -- HVE/GATB.
Q. Okay.
And you were testifying for the plaintiff in that case?
A. That's right.
Q. Okay.
In the Hummel case -- I know I've tried to ask you different ways if you could recall the amount of g-forces.
Do you remember -- and you are kind of murky on that. I understand.
Do you remember if the g-forces in that car accident were higher than the g-forces that are at issue in our case?
A. Do I specifically remember? No. I don't. I don't want to speculate.
Q. Based on your experience and your expertise as a biomechanical engineer, would you expect that the g-forces in a 90-kilometer auto accident where a car just hits a tree would be higher than the g-forces that are subject to the passengers in this case?
A. If you are wearing a seat belt.
Q. Okay.

A. So, yes, if you are wearing a seat belt.
When you are not wearing a seat belt and you become mobile within the car, then the g-forces tend to be lower.
Doesn't mean it's less injurious though, because you then strike other things.
That case was also complicated by the fact that the car rotated. And so the motion of the occupant within the vehicle was complex. And so the direction of the linear and rotational accelerations were not what you'd usually get in a car crash.
Q. Okay.
Sounds like they were more complicated than the forces at issue in this matter?
A. Yes.
Q. Have you ever had your expert opinion excluded by a court that you are aware of?
A. No.
Q. So you've prepared a report in this litigation.
MR. ESSIG: If we turn back to the first page of it, start at the beginning --



(Pause)
BY MR. ESSIG:
Q. You see the very first sentence of the cover page, there is a -- the very first page of that report, the cover page -- you know, the pleading on top of it --
A. Got it.
Q. -- see that?
A. Yes.
Q. The case caption and the title of the case -- do you see that?
A. Yes.
Q. It says: Plaintiffs' Rule 26(a)(2)(B) Disclosure of Thomas Jenkyn, Ph.D., P.Eng.
Do you see that?
A. Yes.
Q. Then it says: The disclosures made pursuant to FRCP 26(a)(2)(B)?
A. Yes.
Q. Do you know what that rule is?
A. No, not specifically.
Q. Do you understand that, according to that rule, the disclosure that you made is a complete statement of all your opinions that you



intend to express, and the basis and the reasons for them?
MR. DURKIN: Objection, form of the question, foundation.
A. I understand it's an expert report.
And the way it works in Canada is you -- when you provide an opinion, you have to provide the background, and reasoning, and citations for that.
So I filed this report in that spirit.
Q. Okay.
So we are, sort of, in the United States and operating under the federal rules.
Is it your testimony that your disclosure is a complete statement of all your opinions that you will express?
MR. DURKIN: Objection, foundation, form.
A. So it's a foundation for all the opinions I've expressed so far, and any logical sequelae that come out of those opinions and those findings.
Q. So is it a complete statement of all the opinions you intend to express?



Or not?
MR. DURKIN: Objection, asked and answered.
BY MR. ESSIG:
Q. And I don't mean to be argumentative I'm just trying to understand --
A. I understand.
Q. -- what the intent was.
A. Based on the questions I have been asked, I did the simulation. I pulled citations. I provided an opinion to the best of my ability, and gave reasons for that.
Now, in the course of the discussion today, if we get into individual questions where additional opinions logically come out of that, then I reserve the right to give you those.
But to the best of my ability, this is my current state of opinions and my reasoning for them.
Q. So I understand the qualifications.
But when you signed the report September 22, you believed it was your best attempt at a complete recitation of your opinions in the case, right?

A. Yes.
Q. And it was a complete summation of the basis and the reasons for the opinions, too.
Is that right?
A. Yes.
Q. Okay.
And it discloses all the facts or data that you considered in forming your opinions.
Is that right?
A. It should, yes.
Q. And it also includes any exhibits that will be used to summarize or support your opinions.
Is that true, too?
A. For the purposes of this deposition, yes.
Q. And for the purposes of your disclosure of your expert testimony in this case, right?
A. So far, yes.
Q. So sitting here today, do you believe your report meets the requirements?
A. Yeah.
MR. DURKIN: Objection, calls for a



legal conclusion, and asked and answered.
And I think he said he didn't know the exact requirements of 26, if I recall, Chris, just a few minutes ago. I think I recall that --
MR. ESSIG: -- yeah, that's what we covered --
MR. DURKIN: Okay, okay, okay. So you want him to have a legal opinion on the rule? Okay.
MR. ESSIG: No --
MR. DURKIN: Okay --
MR. ESSIG: -- I just want to understand he --
MR. DURKIN: -- just want to make sure.
MR. ESSIG: -- followed the statement that is submitted --
MR. DURKIN: Okay --
MR. ESSIG: -- in his report.
Okay, so let's turn to page 2 of the report.
MR. DURKIN: Is that the service list?
MR. ESSIG: It is page 2, section 1.0:



Qualifications.
MR. DURKIN: Oh. Okay.
MR. ESSIG: It has a 2 at the bottom of it.
THE WITNESS: Got it.
BY MR. ESSIG:
Q. The first sentence there says: I, Thomas R. Jenkyn, Ph.D., P.Eng., am responsible for the contents of this report.
Do you see that?
A. Yes.
Q. Is that correct? -- you are fully responsible for the contents of the report?
A. Yes.
Q. And then on page 36 of the report, you signed and dated it September 22, right?
A. That's correct.
Q. Since September 22, you've never submitted a supplemental report, have you?
A. No.
Q. And you never submitted a correction to this report at all, did you?
A. No.
Q. Since disclosing your report on



September 22, have you reviewed any new materials in connection with this case?
A. I've re-reviewed the -- what was in here -- not to my knowledge.
MR. DURKIN: You are not excluding expert reports -- defense expert reports. You are talking about new materials? Or --
MR. ESSIG: Is that an objection? --
MR. DURKIN: Well, I'm not sure what you mean by "new materials" that are involved in the case, or -- that's what I'm wondering -- what you are --
MR. ESSIG: No, it's fine.
BY MR. ESSIG:
Q. Since disclosing your report, have you reviewed any new materials at all? --
A. Okay. I understand the question.
Q. -- in connection with the report?
And I'm not trying to trick you.
If you do --
A. Yeah, so --
Q. -- I have some questions --
A. -- I did receive expert reports from your side, and I did review those, yes.

Page 33

Q. Okay.
Have you conducted any new analyses?
A. No.
Q. Has anything about the review of the expert reports from our side changed your opinions?
Or --
A. No.
Q. No reason to change or correct anything in here?
A. That's right.
Q. Okay.
If we turn to page 40 of the report, this is a copy of your CV?
A. Yes, it is.
Q. And is it current still?
A. Let me check.
(Pause)
A. In the peer-reviewed publications section, since then, I've had a couple papers submitted for peer review that aren't listed.
Q. Have they been published?
A. No.
Q. Are they on aviation accidents?

Page 34

A. No.
Q. What's the subject matter?
A. There is one that is on motion of the bones within the foot during walking.
And the second one is on vibration modes of the skull after impact.
Q. Anything in those papers that you are going to use for the purpose of this case?
A. No.
Q. Okay.
So it states at the top here under, "Engineering Position" that you are a professional engineer.
Is that right?
A. That's right.
Q. And it says you your expertise is in mechanical engineering, biomechanical engineering, and aerospace engineering?
A. That's correct.
Q. And those are your fields of expertise?
A. Yes.
Q. According to your CV, you've prepared 95 -- more than 95 forensic biomechanic --

Page 35

biomechanics reports since 2009.
Is that right?
A. Yes.
Q. And what's a forensic biomechanics report?
A. You have an example of it in front of you, so -- it takes that form.
Q. Okay.
So these are essentially expert reports for the purpose of litigation?
A. Yes.
Q. How long have you been serving as an expert in litigation?
A. Since 2009.
Q. Is 95 -- do you have any idea if that number of reports there -- 95-plus -- is still current?
A. That should be current as of September of this year.
Q. It says under there, 61 of the reports that you have tendered involve accident reconstructions.
Do you see that?
A. Yes.

Page 36

Q. How many of those accident reconstructions involved automobile accidents?
A. The majority of them.
Q. Do you have any sense of the total?
A. Fifty-eight or 59.
Q. Okay.
So that means two or three didn't involve auto accidents?
A. That's right.
Q. And what did they involve?
A. They would have involved bicycles or -- like, one was a bicycle -- two were bicycles. So two involved bicycles.
Q. Is there any other that you can think of?
A. No, I take that back.
I have done two other cases -- no, this is accident reconstruction -- so, no.
Involving a vehicle, it was either cars or bicycles.
Q. Okay.
Have you ever done an accident reconstruction of an aviation accident?
A. Yes, but it hasn't gone to a full

Page 37

report.
Q. What does that mean?
A. So the way --
MR. DURKIN: I just want to make sure we are clear, if he's consulting with somebody on it and -- you know, it could be the consulting.
It's not our firm, but it might be consulting. If you're asking him to disclose something he's working on currently, that might be --
MR. ESSIG: I'm just trying --
MR. DURKIN: -- improper --
MR. ESSIG: -- to understand his testimony --
MR. DURKIN: -- yeah, I just think --
MR. ESSIG: -- so under this category of 95 --
MR. DURKIN: -- I don't know, I'm just --
MR. ESSIG: -- expert reports since 2009 --
MR. DURKIN: -- I just want to be careful he doesn't disclose information as a

Page 38

consulting expert on a case for some person we don't know.
MR. ESSIG: Okay.
MR. DURKIN: -- it could be --
BY MR. ESSIG:
Q. And I'm not intending to have you divulge any confidential information.
A. I understand that.
Q. So if it's confidential, just let me know.
But have you prepared an expert report for litigation involving an aviation accident?
A. Not prepared a report.
Q. Okay.
Prior to this case, have you ever done a reconstruction or simulation of an aviation accident?
A. So done an initial calculation that has led to a verbal opinion, that then did not proceed to a full report.
Q. Did you do an HVE simulation?
A. For one, I did an initial simulation.
For the other, it was a hand calculation.

Page 39

Q. So there is two aviation accidents that you have provided expert reports for?
Or not?
A. Not -- didn't provide expert report.
It's a three-step process, generally, with my company.
There is an initial consultation where I review the material and discuss it with the lawyer.
If they want to then go to a report, I prepare a report.
And then if it goes to litigation, then I go to court.
Q. Okay.
So we're in a consultation phase.
It's not something covered under this --
A. That's right --
Q. -- aspect of your CV --
A. -- yeah, it's --
Q. -- right? --
A. -- and that will happen -- it is more than I like -- but it will happen a lot, where you discuss the case; this is what I think; and then they, for whatever reason, decide not to go

Page 40

to a report.
Q. Understood.
Did you do an HVE simulation like the simulation you did in this case for those aviation accident assessments?
A. In the one case, I wasn't lucky enough to have flight data recorder data. So it involved an occupant in a seat and a seat belt, but we didn't have the flight data recorder data.
Q. Is the answer "no"?
No --
A. The answer is "no."
Q. Okay.
So you had never done an HVE/GATB simulation before this case for an aviation accident?
A. Yes.
Q. Did any of the aviation accidents that you provided, sort of, initial opinions for involve commercial airplanes?
A. No, they were -- they were Cessnas.
Q. Have you ever been retained as an expert in a commercial airplane accident?

A. No -- apart from this.
Q. And I assume you've never testified or given an opinion in an accident involving a commercial airplane before?
A. That's correct.
(Pause)
Q. And I know you said you have done defense work and plaintiff's side work?
Is that right?
A. Yes.
Q. Do you have an estimate about the percentage of time you worked for a plaintiff?
Or the percentage of time you worked for a defendant?
A. It is about 50-50.
Q. Okay.
It says that you are a senior engineer at TLS Forensic Biomechanics.
Do you see that?
A. Yes.
Q. Are you still a senior engineer at TLS?
A. Yes, I am.
Q. And did you found TLS?



A. Yes, I did.
Q. And when did you found it?
A. 2008.
Q. Are you the owner of the company?
A. Yes, I am.
Q. Are there any other owners?
A. I have shareholders, but I'm the primary decision maker, yeah.
Q. How many experts work at TLS besides you?
A. Currently zero, apart from me.
Q. You are the only expert at the company?
A. Right now, yes.
Q. What does the company do, just at a broad level?
A. We provide opinions for litigation that involves primarily biomechanics. So our niche market is focusing on the biomechanics that may or may not involve a vehicle.
In about a third of the cases, it doesn't involve a vehicle.
But we concentrate on the biomechanics and provide objective ways of determining



causation of injury.
Q. I think I looked at your website and it says on the front page: We put the math in aftermath.
A. That's pretty good, eh?
Q. Yeah.
Did you come up with that?
A. I did.
Q. What did it mean?
What do you mean by that?
A. Well, aftermath -- after you have had an accident or an injury, we put the mathematics and the physics into explaining how the injury occurred.
Q. Okay.
So it's fair to say your focus is on personal injury litigation?
A. Yes.
Q. Any other type of litigation that's a focus?
A. No.
Q. Are your clients law firms?
Or individual people?
A. Either law firms or insurance firms.



Q. Okay.
Do you have any sense of whether or not more of your client base is plaintiff law firms or defense law firms?
A. It's about 50-50.
Q. Let's talk about your education.
In 1994, you earned a BASc in engineering science?
Is that right?
A. That's right.
Q. What is a BASc?
A. It's a Bachelor of Applied Science.
Q. Is that an undergrad degree?
A. Undergrad in engineering, yeah.
Q. And in 1996, you received an MASc in aerospace engineering.
Is that right?
A. Yes.
Q. Is that a Master's?
A. Master's of Applied Science, yes.
Q. And what's aerospace engineering?
A. So it's applying engineering principles to building vehicles that are either in the atmosphere and undergoing aerodynamic

forces, or in space outside of the atmosphere and undergoing the forces you would expect from parabolic or orbital flight.
Q. So that education helps engineers build aerospace vehicles?
A. Yes.
Q. How is that different than biomechanical engineering?
A. So biomechanical is applying engineering principles in physics to the motion and forces on the body -- whether it's the entire body, body segments, tissues, or portions of the body.
Q. And in 2001, you received your Ph.D. in biomechanical engineering.
Is that right?
A. Yes.
Q. You went on to do postdoc work?
A. That's right.
Q. And you did that with the Mayo Clinic?
A. Yes.
Q. What was the focus of your research there from 2000 to 2002 at the Mayo Clinic?
A. So while at the Mayo, I was very



fortunate to have a position in three labs at the same time.
The first one was an optical motion capture lab. So that's looking at biomechanics of living people -- so whether they are healthy volunteers, or patients with different mobility issues from the Mayo Clinic clinical population. Put markers on the body. The person walks through the lab. And we confer with orthopedic surgeons, and physical therapists, and occupational therapists as to what the biomechanics is in the living people.
The second lab was cadaver-based lab where we would do surgical simulations on cadaver portions; work on novel surgeries; look at thresholds of injury, whether it's ripping up soft tissue, or muscle, or breaking of bones. And in that case, I worked closely with the orthopedic surgeons.
And then the third lab was in diagnostic radiology, specifically MRI. And so that lab was working on new -- new modalities for using an MRI machine. In that specific one, we were using something called phase-contrast



MRI to look at the stiffness of muscle tissue.
Q. Okay.
None of the postdoc research focused on aviation research or aerospace issues, did it?
A. Specifically? No.
But it was foundational in understanding both how in vivo the body moves when it has different accelerations applied to it, and how tissues can be damaged, and what their thresholds of injury are.
Q. So some general principles that might be applicable in an aviation context, but no specific focus?
A. Right.
So foundations -- it's forming a foundation of knowledge on biomechanics, but nothing specific to commercial aircraft.
Q. Okay.
After you finished your postdoc research, you became a professor of human biomechanics at the University of Western Ontario?
A. That's right.



Q. What was your -- what's your area of primary research at the University of Western Ontario?
A. So at Western, I run two labs.
I used to run three, but one has been folded into the other.
So just describing those three labs, they are my three main areas.
So I have an optical motion capture lab, similar to at Mayo. Put markers on the body. That's located at the Fowler Kennedy Sport Medicine Clinic. It is on campus. So again, we are looking at healthy volunteers, and student athletes, and people from the general public who are patients.
I had fluoroscopic radiostereometric lab, which uses X-rays to look at the bones while people are moving.
And my third lab is cadaver-based. And in that lab, we look at fractures to the face, impacts to the skull, as well as impacts to the feet.
Q. In your work at the university, do you ever do HVE simulations?

A. No.
Q. Do you ever compare the results of research on actual human beings in the real world to simulations to see if the simulations are accurate or not?
A. Do I do that? No.
Q. You teach courses in biomechanics, kinesiology, and orthopedic biomechanics.
Is that right?
A. That's correct.
Q. Do you teach any courses on aerospace engineering?
A. Not so far.
Q. Do you teach any courses on issues involving commercial airplanes, or flight, or biomechanics of a person in an airplane?
A. So do I teach courses on aviation? No.
But in the courses on biomechanics, we will have examples from time to time that involve exposure of occupants of aircraft to different accelerations.
Aircraft is a -- an aircraft is a great example, because now you've got



accelerations in all three axes.
Whereas if you just do cars, generally -- unless things are going really badly for the car -- you are only having accelerations in two axes.
So aviation cases -- at least in terms of what somebody would be experiencing sitting in a seat on an aircraft -- is just a useful example.
Q. Okay.
Aside from examples potentially that you use in some of your classes, there is no actual class focused on aviation, is there?
A. That's right.
Q. You've -- according to page 43 of your expert report -- you have been an author on 57 published articles.
Is that right?
A. That's right.
Q. Is it fair to say that none of those articles focus on aerospace engineering?
A. That's fair.
Q. Or aviation accident injury?
A. That's fair.



Q. Any on aviation at all?
A. No.
Q. Would you say that after you received your Master's in aerospace engineering in 1996 that aerospace engineering has not been a focus of your career?
A. That's fair.
MR. ESSIG: So let's go back to the --
(Pause)
MR. ESSIG: -- cover page of the report, which you have in front of you --
MR. DURKIN: Is it --
MR. ESSIG: -- the cover page with the caption on it.
MR. DURKIN: Oh.
BY MR. ESSIG:
It says on the cover page there that: Mr. Jenkyn is expected to testify consistent with his expert report, based on the reasonable degree of engineering certainty.
Do you see that?
A. Yes, I do.
Q. It's, kind of, a second little paragraph under the disclosure of your name?



A. Hm-hmm.
Q. What does it mean to testify to a "reasonable degree of engineering certainty"?
A. So in the academic field generally, we consider a statistical p-value of 5%. So that would be if something is going to happen 19 times out of 20, I would consider that reasonable degree of engineering certainty.
Q. Okay.
So there is a quantitative element to the definition of "a reasonable degree of engineering certainty"?
A. Yes.
Q. Did you calculate any p-values in this case?
A. I did not.
Q. Does "engineering certainty" mean that you prove that results are true?
A. To the best of our judgment, yes.
Q. If you testify or you talk about something to a reasonable degree of engineering certainty, does that mean that the conclusion that you have stated has been validated in some objective way?

A. Directly in that exact case, you can't do that.
But individual aspects where validation is possible for certain aspects of it, then the validation has been done.
Q. So you can't validate opinions that you might give in a litigation context?
A. Apart from recreating the exact situation? No, you can't do that.
Q. Could you do -- there is a concept called "direct validation," right?
A. Yes.
Q. And that's where you are validating that -- directly the results of the opinion you are giving, right?
A. You can attempt that.
But the problem is, you are always -- there are always caveats to that.
So for instance in this case, if you want to know how did the occupants move in a specific seat, can I know enough factors to recreate that exact situation? No.
So you've got to validate or be sure about certain things that you, in your judgment,



know to be important, and make your decision based on that.
Q. So in this case, you can't directly validate the opinions you are giving?
MR. DURKIN: Objection, argumentative.
MR. ESSIG: I'm not trying to be -- sorry about that --
BY MR. ESSIG:
Q. Is that true?
A. Short of -- if you -- if your definition of "validation" is "do I know exactly what happened to somebody sitting in seat 35A, whether their hands went exactly up or down," and that sort of thing? No, I can't know that.
Can I have a reasonable degree of certainty that their body overall moved in a certain way as the accelerations were acting on the body? Yes, I can make a confident judgment on that.
Q. And an example of direct validation -- just so I don't -- I'm the novice here, so I just want to make sure I have it right -- is if you run a simulation, let's say, on -- that simulates what a crash test dummy would do under



a certain conditions, you could then get in a lab and put a crash test dummy in a sled and put it under the exact same situations, and see if your simulation is replicating what happens in the real world, right?
A. You can certainly do that.
But that's not going to be the level of certainty you are looking for.
Because then the question comes up: Well, it's a crash test dummy. It's not a human. The crash test dummy isn't applying torques at its joints. It's not reacting. You don't know if the arms move exactly the same.
So that direct validation -- again, you choose the aspects that are important, and you be sure about the aspects that in your judgment you think are important, and then draw your conclusions.
Q. Is there a concept called "indirect validation"?
A. That's sort of what I'm talking about -- is if you are sure about the important aspects -- and, again, to know what the important aspects are requires engineering



judgment --
If you are sure about the important aspects, and it can get you to the point where you are sure that 19 times out of 20 you are right, then that's what I consider my reasonable degree of engineering certainty. And it's --
Q. And that's what you were talking about applying statistics to -- like a p-value -- to understand if you are --
A. Right.
Q. -- truly right 19 out of 20 times?
A. Right.
Q. Okay.
MR. ESSIG: If we look at the first -- let's turn to page 3 of your report.
THE WITNESS: Hm-hmm.
MR. ESSIG: And do you see section 3.0: Purpose and scope?
THE WITNESS: Hm-hmm.
MR. ESSIG: Okay.
BY MR. ESSIG:
Q. The first sentence says: TLS Forensics Biomechanics and Engineering Limited was retained to perform a biomechanical

simulation of the motion induced in the bodies and body segments of the passengers of the aircraft due to the accelerations of the aircraft in the final minutes before the crash --
A. Yes.
Q. -- do you see that?
Why did you only look at the final minutes before the crash?
A. So I had the entire flight data recorder data, which started before the plane rolled out. I looked at all that data.
And what you can see is, right after takeoff when things start going abnormally, the accelerations -- at least in the vertical direction, certainly in the vertical direction -- became more and more abnormal and larger and larger.
And so when we say the last -- "the final minutes," I analyzed final 24, 25 seconds. That was where the focus was.
But I also looked at the two minutes and four seconds prior to that.
And I did look at the two minutes and



36 seconds before that.
So it's the majority of the flight.
But the flight got progressively worse. And so biomechanically, it was most significant closer to the end.
Q. Did you make the judgment to only look at the final minutes of the crash?
A. I looked at the entire crash.
And then when you see the motions of the bodies and you are looking for what seems to be biomechanically significant, then, yeah, I would make some judgments.
Of course, as I'm coming up with the results, I'm discussing it with my own counsel.
But in my judgment, it's the last portion of the crash that was most biomechanically significant.
Q. Okay.
So that second-to-last sentence in that paragraph reads: TLS was also asked to quantify the interactions between the passengers and their seat belts, seats, armrests, seatback trays, loose objects, loose personal items, electronics, loose luggage, contents of the seat



pockets, and other components of the aircraft.
Do you see that?
A. Yes.
Q. What does it mean? -- "to quantify the interactions"?
A. So to simulate their motion. And whenever two things came into contact, to calculate the contact --
Q. It's a numerical analysis?
A. That's right.
Q. Did you quantify the interactions between passengers and their seat belts?
A. Yes.
Q. What about passengers and their seats?
A. Yes.
Q. Armrests?
A. Yes.
Q. Seatback trays?
A. In the end, I did not include that in the report.
Q. Did you quantify the interaction between passengers and loose objects?
A. Same answer.
Q. No?



A. No. Sorry.
Q. Did you quantify the interaction between passengers and loose personal items and electronics?
A. That didn't go into the report.
Q. Did you quantify the interaction between passengers and loose luggage?
A. That didn't go into the report.
Q. What about the contents of seat pockets and other components of the --
A. That didn't go into the reports.
Q. Sorry I have to break all those things down --
A. I understand.
Q. -- I'm just trying to get -- get things clear.
A. Yeah.
Q. The last sentence at the end of that paragraph says: Biomechanics is the application of physics and engineering principles to the study of motion and loading of biological tissues, body segments, and bodies overall.
Correct?
A. Yes.

Page 61

Q. That's essentially meaning that your area of expertise is using physics and engineering principles to predict or simulate how body might move when it's subject to certain forces?
A. Yes.
Q. You are not a medical doctor, are you?
A. That's right.
Q. And you are not a flight surgeon?
A. That's right.
Q. Are you an expert in human psychology?
A. No.
Q. Have you ever treated a patient?
A. Never.
Q. Ever treated or taken care of anybody that was injured in an accident?
A. Like, first aid?
Q. Have you ever -- I assume you haven't, since you are not an M.D., but --
A. I am -- not as an M.D. --
Q. Okay.
Maybe as a --
A. -- I have applied BAND-AID®s --
Q. -- husband or father? --

Page 62

A. -- I have applied BAND-AID®s.
(Pause)
Q. Have you ever diagnosed anybody with an injury?
A. Not as an M.D.
Q. I'm asking you these questions in the context of an expertise.
A. And I will answer them in that spirit.
Q. Understood.
Do you have any experience diagnosing or treating any psychological or emotional condition?
A. No.
Q. What about pain?
Are you an expert in pain?
A. No.
Q. Have you ever studied pain threshold in human beings?
A. I have read the biomechanics literature on pain threshold.
Q. Have you done your own direct research in that area?
A. That would be unethical.
Q. Okay.

Page 63

But other people have done research on pain --
A. There is limited research on pain, yes.
Q. Why is it ethical for other people to do it and you couldn't?
A. I don't know. I don't know.
It's -- it is, in some jurisdictions, possible to put a study together that does that.
Or it's possible to word it in such a way, with certain limitations on the study, that pain studies -- where pain is induced in living, healthy volunteers -- has been done.
Q. Do you cite any of that research in your report?
A. Not in this specific --
MR. DURKIN: Did he finish? Oh, I'm sorry --
MR. ESSIG: I'm sorry, I was just trying to --
MR. DURKIN: -- I know you are trying to move it along, but I don't believe he finished his answer.
MR. ESSIG: Apologies.

Page 64

A. Yeah, would I like to do it? It would be very interesting.
Can I get it through my ethics board at my university or in the province of Ontario? No. So --
Q. Do you think it's ethical?
A. It depends. I would be happy to do it on myself, so I think it would be ethical for me to volunteer to do it, because that data is so useful and so interesting.
But -- yet there is a reason why pain -- the biomechanics of pain and pain threshold data is so sparse in the literature is because you've got to get over that ethics hurdle.
Q. Fair to say the experience of pain is a subjective matter?
A. Yes.
Q. And it's not something that could be objectively characterized by principles of biomechanics or engineering.
Is that right?
A. No, I would disagree with that.
You -- in individual subjects, you can

Page 65

measure whether or not they have pain.
The trouble comes in statistically when you try to predict, as a population, who is going to get pain -- so trying to tease those two questions apart.
Can you do a study where objectively you know you are inducing pain in people? Yes.
Can you then take that body of data and predict when every single person will experience pain? That's trickier.
Q. Can you do it? -- that last part?
Or not?
A. Statistically, you are going to have some unknown.
So usually, you do what's known as a sigmoid-type risk of injury, but in this case, risk of pain. And you sort of establish where the bottom threshold is and -- within a population context.
When you do have those subjective inputs, then you are going to get a spread in terms of who gets pain and who doesn't.
Q. Are you aware of any validated or statistically significant research on pain that

Page 66

applies the results to a population level?
A. Yes, it is in the literature.
Q. But it's not cited in this? --
A. That's right.
Q. And you don't rely on that in this case?
A. No.
(Pause)
Q. Is one of the challenges of looking at the issue of pain the fact that everybody feels pain at a different threshold?
A. You bet.
Q. It is subjective?
A. Yes.
Q. Is there a lot of variability in the way people experience pain?
A. That's my understanding that there is, yes.
Q. What about being injured?
Have you done any research on whether or not somebody is injured or not?
A. So not in vivo.
But in cadaver work, one of my current pursuits is looking at injury in the foot and

Page 67

craniofacial facial fracture.
Q. In your field as an engineer -- a biomechanical engineer -- what's your definition of "injury"?
A. So whether you have disrupted the tissue; whether that disruption causes discomfort or pain; and whether it requires a recovery period.
Q. So what do you mean by "disruption of tissue"?
A. So it can be something as profound as a fractured bone or a cracked bone.
It could be something a little more subtle, such as micro-tears within a muscle. When you have strained the muscle, it can be micro-tears and disruption at the microscopic level in soft tissue, or connective tissue when you have sprained it.
Q. Do all three of the elements that you have just described have to be present in order to have an injury?
A. Well, again, the second one is problematic. Because, as you said, pain is subjective.

Page 68

So the two most objective ones are: Is there disruption to the tissue? -- which can be measured; and number three: Is there a recovery time?
The middle one is more subjective.
But generally -- it's not required to be there, but one would certainly be looking for it to be there.
Q. The first element -- disruption of tissue -- is there a great deal of variability in whether or not a person's tissue is disrupted when you look at a population level of folks?
A. No, that's more predictable.
Q. What about the pain issue?
A. The pain, like we said, is more subjective, yes.
Q. You are not offering any opinions in this case about the emotional or psychological state of passengers on ET 302, right?
A. No.
Q. You are not an aerospace physiologist?
A. No.
Q. You are not a pilot?
A. No.

Q. Have you ever personally experienced negative g-forces?
A. No.
Q. Okay.
Have you ever personally experienced -- well, never mind.
What about positive g-forces?
Have you personally experienced positive g-forces?
A. Every day.
Q. What level of magnitude?
A. Well, usually about 1.
But just getting into the elevator today, as the elevator started, it dropped below 1 and as it stopped, it went above 1. I've been on rollercoasters. I have been in cars. I've been on aircraft.
Q. And I'm assuming you did not have some kind of device that was measuring the g-forces when you were doing those things?
A. You know what? You have an accelerometer in your iPhone --
Q. Do you?
A. -- and I am an engineering professor,



and I am a geek -- so, yes, from time to time, I will measure g-forces just for fun.
Q. What's the highest number of positive g's you have ever experienced that you are aware of?
A. That I'm aware of, not measuring with my iPhone -- again, on a rollercoaster, probably about 1.6, something like that, 1.5.
Q. Rollercoasters, kind of, tap out at that level of g-forces?
Or --
A. Yeah, yeah.
Q. Okay.
Were you injured when you experienced those g-forces?
A. Sorry?
Q. Were you injured when you experienced those g-forces?
A. I was not.
Q. Do you have any experience with air safety investigation?
A. No, I don't.
Q. And you are not offering any opinion about the investigation of the ET 302 accident



in this case, are you?
A. That's right.
MR. ESSIG: So if we look on page 3 here --
THE WITNESS: Hm-hmm-
MR. ESSIG: -- item (ii) -- it is under 1: Receipt and review of the following background documents?
THE WITNESS: I have got it.
BY MR. ESSIG:
Q. It says: Flight Data Recorder outputs for the entire flight of ET 302 on March 10, 2019?
A. Yes.
Q. What are FDR outputs?
A. So the flight data recorder is recording -- well, it's got an accelerometer in three directions. Also got inputs from various systems within the aircraft, positions of control surfaces, positioning of the characteristic, inputs -- things like that.
Q. When you list here in item (ii) "Flight Data Recorder outputs," is that data directly from the FDR in this case?



A. So I received that data in Excel spreadsheet format.
Q. And who did you receive that data from?
A. Charley Pereira.
Q. Did you only receive data on FDR accelerations from Pereira?
A. I had access to some documents as well from Charley. But he provided the Excel spreadsheet for the FDR data.
Q. What documents are you talking about?
A. So I looked at a few graphs that he produced of the vertical acceleration.
I looked at some animations that he created.
I don't believe I saw a draft of his report, but I did see graphs out of that report.
Q. Did you consider the animations that he provided you in creating your report?
A. No.
Q. So you didn't rely on them in any way for the purpose of your opinions in this case?
A. No.
Q. Did you receive data from anybody else

Page 73

for the purpose of your report?
A. Well, I severed technical documents from Boeing in terms of geometry of the interior of the aircraft, and that sort of thing.
But I believe that's it.
Q. So under this category 1: Receipt and review of the following background documents, this is the full list of background documents you looked at?
A. Yes.
Q. And who provided you the documents?
A. That came through my counsel.
Q. Did you ever ask for any documents to review for the purpose of your report that you weren't given?
A. No.
(Pause)
Q. You are not an expert on the extraction of flight data from a flight data recorder, are you?
A. I'm not.
Q. So you defer to Charley Pereira on the flight data?
A. Yes.

Page 74

Q. Did you ever review the CVR -- the cockpit voice recorder -- transcript in this case?
A. No.
Q. Any reason you could think that it might have been relevant to your report?
A. No.
Now I will say that the transcript of the flight -- of the cockpit voice recorder -- was on Charley Pereira's video. But I was watching other aspects of that video, and I didn't rely on it.
Q. Understood.
So if we look at item 2 on page 4, it says you conducted simulations of portions of the crash flight.
Right?
A. That's right.
Q. And that simulation you did was just on the last 150 seconds of the flight?
A. So we did the last 24 to 25 seconds. That was the majority of the simulations and various, sort of, it iterations of it.
But I also modeled the two minutes and

Page 75

four seconds prior to that with a generic -- three economy-class passengers -- so -- two minutes and four seconds, plus the final 24 or 25 seconds.
Q. Okay.
Did you ever do a -- and you never did a simulation of the whole flight?
A. That's right.
Q. Why not?
A. It was -- doing simulations over that amount of time with GATB is computationally costly.
And for the -- so if we divide it up into sections -- so you get the final 24, 25 seconds. The vertical accelerations are extreme, both in positive and negative, especially in the negative. That's biomechanically very interesting.
The two minutes and four seconds before that, the accelerations are always positive. I mean, they drop below normal, always positive when they go above. In that case, biomechanically interesting things happen, but not as interesting as the final 24, 25

Page 76

seconds. So we ran through that just to, sort of, confirm what I was thinking what's going on.
The previous two minutes and 36 seconds -- again, the vertical accelerations were abnormal, and they were larger than you would usually expect. But biomechanically, the motions induced in the body just wasn't interesting enough to justify the computational cost of simulating all that time.
Q. Understood.
So it was -- it was too expensive to do the simulation on the entire plane because portion of the flight wasn't biomechanically interesting.
Is that right?
A. It didn't -- it didn't require a full simulation.
So you can look at the flight data recorder. And using my biomechanical background, I can infer based on my judgment what I believe would have been going on in the passengers.
It just didn't justify doing a full simulation to show that.

Q. When you say "biomechanically interesting," does that mean injury?
A. If you are talking muscular exertion, muscle strain, soft tissue sprain, yes -- but again, a more subtle injury early on compared to the more biomechanically interesting loading that occurs later in the flight.
Q. Is there a definition of "biomechanically interesting" in the field?
A. No. That is subjective.
(Pause)
Q. On item 3, it says you prepared your report with your findings.
Correct?
A. Yes.
Q. Are you relying on the output of the simulations you ran as the basis of your findings in this case?
A. No.
My initial opinions were based on my background, and looking at the flight data recorder data, and having an idea what I think happened.
And then I used the simulations to



confirm those opinions.
So it's not the entirety. It's certainly an important portion of it, but it's not the entirety.
Q. Fair to say the basis of your opinions in this case are the -- include the simulation, the literature that you cite in your report, and then your training and experience?
A. Yes --
Q. Anything else?
A. -- and the flight data recorder data.
Q. And the flight data recorder data that you got from Charley Pereira.
Anything else?
A. Possibly, but I can't think of what it is at this moment.
Q. Okay.
You are not an expert in audiology, are you?
A. No, I'm not.
Q. Or --
MR. DURKIN: Sorry, I didn't hear that.
MR. ESSIG: Audiology?



MR. DURKIN: Okay. Thank you.
BY MR. ESSIG:
Q. What about psychoacoustics?
A. Psychoacoustics? No. Sounds cool, though.
Q. It is the study of how humans perceive various sounds.
You are not offering any opinion in this case about the sounds the occupants of Flight ET 302 might have heard, are you?
A. No.
(Pause)
MR. ESSIG: Will you look at page 36? Are you with me? Sorry, I am jumping around.
THE WITNESS: Okay.
BY MR. ESSIG:
Q. It says: This report will be supplemented at a later date when data on specific plaintiffs and seating locations becomes available, and the individual cases are set for trial.
Do you see that?
A. Yes.
MR. DURKIN: Where is this at?



MR. ESSIG: Top of the page on 36, first sentence.
MR. DURKIN: Yeah, thanks.
MR. ESSIG: Sure.
BY MR. ESSIG:
Q. And we mentioned there September 22, right?
A. Yes.
Q. Are you aware that, as of September 22, the specific individual cases that are currently set for trial were known?
A. No, I don't believe they were.
Q. You don't know if they were?
Or you weren't aware? --
A. I don't recall.
Q. Okay.
Do you know as of September 22 whether the specific seating locations of the decedents in the individual cases were known?
A. I don't recall.
Q. Were you ever told the individual seat locations?
A. Since September 22?
Or --

Q. When you signed your report?
A. I don't remember if I had them at that point.
Q. Did you ever ask for them?
A. No.
Q. Do you need data on specific plaintiffs, other than the seat location, to conduct analysis that you describe in that paragraph?
A. Sorry, I don't understand the question.
Q. It's not a great question.
Did you need any other data on specific plaintiffs, other than the seat location -- because you are saying that that might be provided at a later date -- in order to conduct your analysis on the --
A. Oh, I understand.
Yes, you do.
Q. Okay.
What kind of data did you need about specific plaintiffs?
A. Height and weight.
Q. Did you ever receive the height and



weight for the specific plaintiffs in this case?
A. Yes.
Q. And so you know the range of height and weight of all the passengers on the plane?
A. That's right.
Q. Did you know that at the time that you disclosed your report?
A. No, I don't believe so. I don't think so, but I don't recall specifically.
Q. I'll represent: I don't see it ever listed or cited in your report.
Is that right?
A. That's right.
Q. So you were given that after you gave your conclusions in the case?
A. That seems reasonable, yeah.
Q. So in terms of "size," you mean height, weight, BMI?
A. BMI is dependent on those two other variables, so I don't need a BMI.
Q. Okay.
What about gender?
A. Yeah, gender.
Q. So now you know about the gender, the



height, and the weight of the specific passengers.
But then you did not?
A. That's right.
Q. Do you know any reason why the information wasn't given to you at the time of your report?
A. I don't know.
Q. Do you know if it was available at that time?
A. I don't know.
Q. And you are aware there was a deadline to submit expert reports in this case?
A. Yes.
Q. And obviously, that was September 22?
A. That's my understanding, yes.
Q. Do you intend to offer any supplemental opinions before trial?
A. I don't know.
Q. When were you first retained to work on this matter?
A. Retained the beginning of January of this year.
Q. So you have been working on this case



since January?
A. That's right.
Q. Who contacted you?
A. I was initially interviewed -- I don't actually know who called me first.
But I did do a Zoom interview with Kevin Durkin.
I'm not sure who else was present at that time.
And then the final retention e-mail was sent by Jennifer Gordon from Clifford Law.
Q. So are you retained by Clifford Law in this case?
A. That's right.
Q. Do you know if you've had contact with any other law firms?
A. I have.
Q. Which ones?
A. A number of them that are present here on Zoom calls.
Q. Okay.
Have you had any -- and I know you have, because we talked a little bit about it -- but what other experts for the plaintiffs have

Page 85

you had communications with in this case?
A. So, I've talked with Charley Pereira, Jack Suchocki of Eyewitness Animation.
Q. Is he an expert in this case?
A. I don't know what his role is. I know he produced animation. I don't know if he's being called as an expert.
Q. Understood.
A. And I talked with Troy -- what's his last name? --
Q. Faaborg?
A. Thank you.
Q. I can help with that.
A. Yeah, I briefly talked to Troy -- again over the phone.
Q. When did you talk to him?
A. This was early on. This would have been March -- March or April. Again, I don't totally remember, but I know it was early in the process.
Q. What did you all talk about?
A. I think it was just getting every -- all the experts together on the phone.
I know at that point, I didn't have a

Page 86

lot of the data. And I certainly hadn't really started the simulations yet. Sort of an introduction and talking about what each of us were going to do.
Q. What was the purpose of getting all the experts on the phone?
A. Not my call. I don't know.
Q. Did you rely on the communications you had with Dr. Faaborg?
A. No.
Q. What about Charley Pereira?
Did you rely on his expert work?
A. No.
Like I said, I used one of his graphs, and he provided me with the flight data recorder data.
Q. Okay.
And Jack Suchocki?
A. Suchocki.
Q. Suchocki --
A. -- yeah --
Q. I keep mispronouncing that.
He works at Eyewitness Animations?
A. Yes.

Page 87

Q. Did you talk to anybody else at Eyewitness Animations?
A. No.
Q. You are being compensated for your time in this case?
A. I am.
Q. And your fee includes a $5,000 initial charge to look at documents.
Is that right?
A. That's right.
Q. And then you give a confidential verbal opinion?
A. That's right.
Q. Why do you give a confidential verbal opinion?
A. Well, it's like when we were talking earlier about the process.
If I review the entire file, often when people are contacting me that -- they don't each know biomechanics exists as a thing. So I'll -- often, if there is an educational process, I'll explain what biomechanics is.
And then -- after I've reviewed all the data, I will, sort of, explain what the

Page 88

biomechanics says about the case.
I do that confidentially.
I'm not sure what the rules are in the U.S., but if I provide an verbal opinion and it's confidential for the lawyer, and they don't want to use it, they take it under advisement, and they don't ever have to disclose it.
So quite often -- and this often happens in insurance work -- the lawyer or the insurance company will contact me. I'll tell them what I think happens. They don't like it. And then I collect my very small fee, and they go on and settle.
So that's why I do it confidentially. So anything I say can be taken under advisement and not hurt their case.
Q. Understood.
And that's why you do it verbally?
A. That's right.
Q. Did you do that in this case?
A. Yes.
Q. And you told hem what your initial view of the case was at that time?
A. Yes.

Page 89

Q. What about the rate for your work and testimony in this case?
A. Hm-hmm.
Q. Is it $870 an hour?
A. That's right.
Q. Is that Canadian or U.S. dollars?
A. That's U.S.
Q. How many hours would you estimate you worked on this matter so far?
A. I don't know. I don't have that number to hand.
Q. Any idea how much you've invoiced the law firms for?
A. I don't have that number at hand.
Q. Do you have a sense of the proportion of the total time from your expert work that comes from this case?
A. So, to give you context, I would say it takes up at least half my time in terms of consulting.
Now, I've had multiple cases since January of this year. They have gone through faster, and require less of my time.
But this has taken up, I would say,

Page 90

half of my time.
Q. So for the purpose of this year since you have been retained, half of the time you spend professionally as an expert witness is on this case?
A. Yeah.
Q. It says on page 40 of your -- CV --
(Pause)
Q. -- that your client includes Clifford LLP.
Do you see that?
A. Yes.
Q. Is that the same Clifford Law Firm that's in this case?
A. Yes.
Q. Do you list this -- is this CV a standard CV you use in all cases?
A. Yes.
Q. So you list Clifford LLP first on your list of clients for every case?
A. I do after this case, yes.
Q. Okay.
Besides this matter, have you worked on other matters for Clifford Law?

Page 91

A. No. This is the first time I have been retained by them.
Q. So the first time you were ever retained by Clifford was in January this month -- this year?
A. This year, yes.
Q. The other law firms that you list here -- are those all personal injury litigation law firms?
A. Yes.
Q. Is Williams Walsh & O'Connor a plaintiff firm?
Do you know?
A. That was a defense case. That was the Connecticut case.
I'm not sure if they only take defense, or only take plaintiff, but that was a defense case.
(Pause)
Q. To be clear, you've produced all the biomechanical simulations that you were retained to perform in this case.
Is that right?
A. Yes.

Page 92

Q. And have you produced all the input files you had for each of the biomechanical simulations you performed?
A. Yes. It's all contained within the simulation files.
Q. Did you produce all the output files associated with the biomechanical simulations that you prepared?
A. Again, the outputs are contained within the simulation file. So the knowledgeable user with a simulation file can pull every single output that -- that that simulation can provide.
Q. Did you provide your simulation to -- the data from your simulations -- to any other disclosed experts to plaintiffs in this case?
A. Yes, I did.
Q. Who did you provide your simulation data?
A. So I provided it to Jack Suchocki and Charley Pereira -- my understanding was, for the purposes of forming the basis for that -- those animations.
Q. And when you provided it to them, what

format did you provide it?
A. So I had to take the output from the simulation and turn it into an AVI video file.
I also outputted -- at great pains and tedium -- individual joint angles for each time step in the form of an Excel spreadsheet.
Q. So you prepared, sort of, the quantitative data from the simulation -- the output of it -- in a spreadsheet?
A. I've -- I believe -- trying to think if I actually did that in the end, because it was such a pain.
And Jack said: No, all he needs is the video file.
So I take that back. I started to produce it.
There was a lot of discussion back-and-forth. We found it very technically difficult to provide the simulation output in a format that was useful to the animation folks. So a lot of the phone calls I had with them were dealing with technical issues.
I think in the end, the Excel wasn't going to work, so I provided AVI files.



Now -- yeah, I think it was just AVI video file that they required. And he needed it from a number of different angles.
Q. So AVI is video?
A. It's a video. It is like an MP4 format. So AVI is just digital video files.
Q. How many AVI video files did you prepare?
A. I don't know. I don't remember.
Q. More than 10?
A. More than 10.
Q. And you provided all of them to Jack Suchocki? --
A. That's right.
Q. -- and Charley Pereira?
A. Yes.
Q. Did you produce them with respect to your report in this case?
A. I may not have, simply because you can recreate -- within the simulation file -- you can -- you can run the exact video within the simulation file, so wasn't necessary.
Q. Okay.
Did you provide your simulation data



or AVI files to anybody else besides Jack and Charley?
A. I mean, we produced it for your discovery.
Did I send it to any other experts on our side? No.
Q. And to be clear, you didn't produce for purposes of this case the AVI files that you prepared and gave to Suchocki and Charley Pereira, right?
MR. DURKIN: Objection, just answered.
A. I don't believe I did.
Q. I think your testimony was somebody could look at the output and run them or create them.
But you didn't actually prepare -- you didn't actually produce the AVI file itself?
A. I think that's fair.
(Pause)
Q. Let's jump ahead a little bit.
MR. ESSIG: If we look at page 13 of the report -- sorry.
Got one more question on the AVI files.



BY MR. ESSIG:
Q. Did you prepare an AVI file for every run of the simulation that you did?
A. No. It was only for the generic -- so if you see in my report, there is a figure where you have three passengers sitting in economy seats: One is wearing pink, one wearing blue, and one wearing gold. And that was sort of my generic for --
Q. Okay.
So if you go to page 31 of the report, is that what you are talking about?
A. No, everybody had their seat belt on.
Q. Okay.
A. So if you go earlier to page -- well any one of these, page 24 for instance -- you have three generic passengers, different heights and weights. The window and aisle seats are female; the one in the middle seat is male.
I provided -- so I ran the entire simulation with those three economy seat occupants, and then provided those AVIs.
MR. ESSIG: Then the one I had flagged, Figure 13 on page 31.

BY MR. ESSIG:
Q. Did you prepare an AVI file for that?
A. I did, yes.
Q. Did you provide that to Suchocki and Pereira?
A. I believe I did, yes.
Q. So I guess back to my original question: Did you prepare or provide an AVI file for every run of the simulation you did?
A. Not every run of the simulation, no.
Q. Which ones didn't you do?
A. Well, so, after I did this in and initial generic run, to make sure everything was working and things were moving the way it was expected, the next question then came up.
We need to model a range of heights and weights. Because at the time, I didn't know the heights and weights of individual passengers, and I wanted to try different combinations of passengers' heights and weights sitting next to each other.
So I then ran a large series of combinations of -- sort of, repeating the simulation, but changing heights, and weights,



and who is sitting where.
That data I did not provide to Jack.
Q. How many series of simulations did you run?
A. I don't recall at this point, but they were all provided.
Q. Understood.
So just to confirm, did you provide the AVI for unrestrained passengers to Jack and Charley?
A. Yes.
MR. ESSIG: If we look at page 13.
BY MR. ESSIG:
Q. You say that: All simulations were performed with a software package called the Human Vehicle Environment.
That's in the last sentence on the top paragraph?
A. Hm-hmm.
Q. What is the HVE platform?
A. So the HVE platform allows you to create individual occupants using body models, individual vehicles, and environments.
And then within the HVE setup, that's



where you would reconstruct vehicle motion and vehicle collisions.
So you put -- it's usually cars. You put the cars on the road. You crash them into each other. You iterate the inputs and -- the driver inputs -- and reactions until you match the physical evidence.
That's the HVE platform.
Q. Yeah.
And "software package platform" -- we are using that word synonymously?
A. Yeah.
Q. Was the HVE software package designed to be used for automobile accident reconstruction?
A. So HVE was originally for automobiles.
But the version that I have -- which is full, three-dimensional HVE -- is capable of doing motions in all three axis directions, with rotations on all three axis directions. So it's well within in its capability to do aircraft.
Q. Okay. Understood.
It's -- your opinions in this case -- it's within its capability to do aircraft, but



it's original design was for automobiles, right?
A. HVE.
GATB, though, is a different matter.
So GATB is a module that's run now within HVE.
So HVE is very useful because you've got the -- you've set up the environment. You've got the physics engines to get the vehicles moving.
But GATB is specific software that models the motion of the occupants of the body, whether it's occupants of a vehicle, or a pedestrian, or somebody riding a bicycle.
Now, that data -- that software was originally created by the U.S. Air Force in the late '60s in the form of ATB to specifically study the motion of air crew, pilots within aircraft as it is undergoing different accelerations specifically -- my understanding is -- it was originally created to simulate air crashes, so that you can redesign aircraft interiors and restraint systems to improve survivability.
Q. It was looking at simulating the

Page 101

effects of a crash, or an accident on the cockpit of an airplane and whether a pilot would be ejected?
A. Whether the pilot would hit different parts of the interior of the aircraft; whether the restraint system would cause injuries; again, how -- during an air crash or during an adverse event, how would the occupants of an aircraft move?
Q. Why did you select the HVE platform using the GATB for purposes of this case?
A. I have been using it since 2009 and I find it quite versatile.
It's also been accepted at court. It has an extensive list of being accepted at court.
And I find with the ellipsoid model of GATB, it's robust; it models things very realistically; and it's not computationally heavy.
Q. Did you consider using any other platform?
A. I've used MADYMO in the past.
And an interesting thing, I like

Page 102

MADYMO. I have actually used MADYMO academically.
Now, MADYMO has three modes.
The first mode is an ellipsoid model, similar to GATB. And it behaves pretty much the same way.
Then there is the second mode where you can -- they have got virtual models of actual crash test dummies -- like the Hybrid III and that sort of thing -- so you can virtually do crash test simulations.
Then the third mode is much more computationally heavy. That's where you use a finite element approach using LS-DYNA.
And that's -- I've used a little bit in my academic work.
Then you can actually model individual tissues, skin, muscle, epidermis, bone -- that sort of thing. You can put seat belts on and whatnot.
The problem is you can only do short little snippets of time. And you can't have the whole body, sort of, riding up and looking at things over, you know, tens of seconds.

Page 103

So MADYMO -- if I would have used MADYMO, I would have used the ellipsoid model.
And if I'm going to use the ellipsoid model, I'm just going to use the GATB model, because in my opinion they are pretty much synonymous.
Q. MADYMO is a finite element analysis?
A. One of the modes that it runs, yes.
Q. A finite element might be like a seat belt or something like that?
A. No.
So with finite elements, you take, for instance -- well, let's say I take my forearm and I divide that up into, say, 100,000 little bricks. And each brick can represent -- you know, I've got a whole lot of bricks that represent skin. And then underneath, I've got bricks that represent the dermis. I've got bricks that represent bones. And they each have different material properties, and they connect to each other.
And then you apply a load, or an acceleration, or a contact. And then you calculate how the shearing or how the stress

Page 104

loading of different types goes through the individual tissues.
Q. Does that greater level of detail allow for a more robust ability to conclude if there was an injury or not?
A. The problem is this: There is always a tradeoff in engineering. So some tools are good for answering one question, but not very good at answering another.
So if the question is how does an overall body move when it's experiencing a large vertical acceleration, it's not going to be able to do it because you can't model the entire body. And you can't do it over the time frame that the accelerations are being applied.
Q. Understood.
So you used GATB as the model for the purpose of this exercise?
A. That's right.
Q. Is it important to pick a model of the human body that best represents all the variation that might occur in a given accident?
A. Well, it's the way Einstein said it: You need to choose a model that's complex enough

to answer the questions you've got, but it shouldn't be any more complex than that.
Q. What do you think the key characteristics of a model are in terms of evaluating its appropriateness of use in a specific accident reconstruction?
A. So if we are looking at bodies undergoing vertical accelerations when they are sitting in a seat, you are going to need the bodies who have enough rigid segments to represent each of the body parts. They are going to have to meet at joints that are reasonably representative of the joints.
Each segment has to have a reasonable length, a reasonable mass, and a reasonable mass moment of inertia in terms of rotational resistance, so that now you get the interaction between the linked rigid segments. As the entire body undergoes those accelerations, there are interactions between each of those segments and their neighbors, and those segments and any contact surface they are in contact with.
MR. ESSIG: Should we take a quick break?



MR. DURKIN: Yeah, we have been going about an hour 25, whenever you are ready.
MR. ESSIG: Do it.
MR. DURKIN: Ready? Okay.
MR. ESSIG: Sounds good to me.
THE VIDEOGRAPHER: All right. We are going off the record. The time is 10:02 a.m.
(Recess from 10:02 a.m. to 10:20 a.m. Eastern Standard Time)
THE VIDEOGRAPHER: We are going back on the record. The time is 10:20 a.m.
BY MR. ESSIG:
MR. ESSIG: We have been told by the court reporter to do less talking over each other and try to talk a little slower, so I'll do my best to do both those things.
THE COURT REPORTER: Thank you.
MR. ESSIG: Again, I just want to be clear -- well, let's turn to page 13 of the report.
That's where we were?
THE WITNESS: Okay.
MR. ESSIG: If you go down to the second-to-last paragraph, it starts: In the



series of simulations?
THE WITNESS: Hm-hmm.
BY MR. ESSIG:
Q. The third sentence there says: The simulation calculates how each of the body models were biomechanically loaded during the last 150 seconds of the crash flight, with focus on the last 24 seconds.
Do you see that?
A. Yes.
Q. Is it -- just to be clear, because we talked about this a little bit before -- is it true that the simulation that you performed only calculates how the body models were biomechanically loaded during the last 150 seconds of the crash?
Or a greater time period than that?
A. As a part of the initial work, I think I did more than that.
But for the purposes of this report, 150.
Q. Okay.
If you go down to the bottom paragraph there, it says: Each human body model consists



of 15 linked segments that are connected at 14 discrete joints.
Do you see that?
A. Yes.
Q. How many body segments and discrete joints can the GATB model actually incorporate?
A. That's it.
Q. You don't believe that they could do 17 segments and 16 joints?
A. With some tweaks, you can do that.
But the program is usually used in this default mode.
Q. Okay.
Did you consider whether or not you should use all the joints and body segments in your model --
A. Yes --
Q. -- that the program was capable of simulating?
A. -- again, that was as complex as it needed to be to be able to answer my questions.
Q. And the links that you left off of your model that the program could actually model are the hands and wrists.

Is that right?
A. That's right.
Q. Why did you leave the hands and wrists off the models that you utilized for the purpose of this report?
A. A, it's more computationally efficient.
B, once I had done the initial series of -- started doing the simulations, it became clear that I couldn't draw any firm conclusions about where hand and arms went and what they hit.
The initial thinking was: We can draw some firm conclusions to this person would always hit the person next to them, or they'd always hit the bin bottom.
That turned out not to be the case.
So arms would sort of stochastically go in different directions with each simulation.
And so since I wasn't going to draw any firm conclusions on what the arms were going to do, I may as well make the simulation more computationally efficient.
Q. So to be clear, just to understand



your testimony, you couldn't determine through your simulation whether the hands or wrists or forearms of a passenger was striking any object on the airplane.
Is that right?
A. It wasn't predictive.
Now, if you run a series of simulations, a hand would hit something.
But could I always say that if you have a 50th percentile female sitting next to a 50th percentile male, that she always catches him in the face with the elbow? No, I can't say that.
Q. And you left the hand and wrists off the model in your simulation, so you actually don't have any data on that at all, right?
A. Well, the hand is included in the forearm.
So what we really have -- so if you look at the forearm segment, or final segment on the arms, it's long enough to incorporate the hand.
We just don't have a wrist segment -- or a wrist joint.



Q. So you don't have a wrist joint or a hand segment on your model.
Is that right?
A. Well, your final segment -- forearm plus hand.
Q. Okay.
And then I think your testimony also was that, when you ran the simulation and you looked at the movement of the arms -- forearms -- the aspect -- the body segments that you did include in your model -- they didn't always touch the person next to them or the surface of airplane.
Is that right?
A. That's right.
Q. So there is variability in the model about whether or not people would have made contact with their arms or hands?
A. I think the model was accurately modeling of physics.
I think the physics had a stochastic element to it.
So once those arms start moving, it's difficult to predict, population-wide, where



exactly an arm is going to go for those same accelerations.
So the model is repeatable.
If I reran the simulation with all the same conditions, it would give me the same answer.
It's just in the different combinations, as you put different size people, male and female, next to each other, sometimes an arm goes up this way, sometimes it goes up that way.
Q. So did your model show that somebody always made contact with a passenger or the contact surfaces of the airplane when the simulation was done?
Or not?
MR. DURKIN: Objection, calls for a legal conclusion.
Go ahead.
MR. ESSIG: It is not a legal question.
MR. DURKIN: Yeah -- well --
MR. ESSIG: I am just asking --
MR. DURKIN: -- form of the question.

You are correct. It is not.
Form of the question. I --
MR. ESSIG: No problem.
A. So I ran a lot of simulations with a lot of different combinations. Sometimes arms would hit elbows. Sometimes arms would hit faces. Sometimes different things would hit different things.
What I was trying to get at with the simulations is: What always happens?
And so I couldn't draw any firm conclusions as to where the hands would go if, a priori, I didn't know who the person sitting in the aisle seat was, and what height and weight they were. I couldn't predict exactly where their arms would go.
So I didn't draw any firm conclusions on that.
Q. My question was: Did they always contact a person or a contact surface in the airplane? --
A. Did every --
Q. -- in your simulation?
MR. DURKIN: Objection, once again,



form of question.
A. Yes. But often that contact was on -- so if you are talking about an arm, it would contact their own chest; so less interesting compared to, say, an elbow going up and catching the person next to them, or forcefully putting their forearm and hand segment into the bin bottom.
So it always contacted something.
Certainly the armrests, because you are in close proximity. Obviously, the chest and abdomen and pelvis segments were always in contact with the seat, at least at some portion of the simulation, so the arms would go up and come down and hit the armrests.
What I was really getting at is as the plane is undergoing these accelerations, could you always say that somebody would always do something like this? Maybe hit the person next to them, maybe hit them hard enough to fracture a cheek, or bruise them, or that sort of thing?
I couldn't -- that didn't always happen, so I didn't draw any firm conclusions about that.



Q. Did the simulation model whether or not the hands or arms contacted the other passengers or the surfaces of the airplane sufficiently hard enough to cause injury in every run that you made?
A. No.
MR. DURKIN: Object.
Q. Did you assess statistically what the variation was in the instruction of results for hands and arms and the contact points in the airplane?
A. I didn't.
Q. So you don't know if they are statistically significant results that you found?
Or not?
A. I don't think that -- I don't think you are asking that question right.
Q. And yeah, I might not be. I'm not an expert. So just --
A. No. In that case, I wouldn't be looking at statistical significance.
What I would be looking at is: What are the proportions for a certain person hitting



a certain thing out of all the simulations?
So did I do that analysis? I could have run trends for -- you take a -- say, females between 25 and 5 percentile height and weight, and say: What proportion will always hit the person next to them, so long as they are in -- sitting in the aisle seat, and that sort of thing? I didn't do that analysis. Could have.
The problem is you have so many variables. The question is: What's the question we are really trying to answer?
And the main question was: If the arms are flailing around and moving around during the crash flight, will they always injure their arms? And the answer to that is: No.
Q. Your GATB simulations don't model whether passengers could have done things affirmatively with their hands, such as hold on to their laps or their armrests.
Is that right?
A. Yes and no. Well, we don't have hands.
But even if we did have hands, can the

hand segments grip the armrests? Again, yes and no.

You can apply constraints where the hands won't lift -- leave the armrests. And then you can calculate reaction forces required for that --

Q. Do you do that calculation?
A. I didn't do that.

And, sort of, more to your point: Did I model stiffness in the shoulders and the elbows? No. Could I have? Yes.

And that would have modeled whether the person is physically holding their arms down.

So I didn't model that --

Q. Okay --
A. -- why not? So, why not?

Here is the question. So we have incomplete information. If you look at seat 35A, maybe I can know their height and weight, but I don't know -- I don't know if they held the armrest. I don't know if they were completely relaxed. I don't know if they were initially holding the armrest, then let go.



So as the engineer who is modeling this, I have to make a judgment call. I have to say: How can I make this model the most conservative, where I make as few assumptions as possible? Because as soon as I make an assumption, I am adding something of myself to it.

So how can I make as few assumptions as possible? And the way you do that most conservatively is you keep the shoulders relaxed.

Could they have held on to the armrest during this? Certainly that seems to be a reasonable thing. But, again, I'm not drawing any firm conclusions about the arms.

So if the shoulders are completely loose and the arms move just up and down with the accelerations, do I know for sure that everybody did that? No. Do I know a bunch of people did that? Yes. But a bunch of other people might have held on to the armrest.

Again, it's a conservative simulation.

And I'm not drawing any firm conclusions on what the arms did in terms of



injury causation.

Q. Okay.

How do you know that some of the -- that some people on the airplane would have moved their arms up and down, or not braced at all, not reflexively grabbed anything?

A. Okay. Can you know that every single person? -- you can't know that. Unless you have got video within -- within the aircraft, and you are watching what everybody does, we don't know --

Q. Okay.
A. -- nobody knows.

But couple reactions for people in that situation: Grip your armrest, you brace yourself back into your seat, or you don't and your arms are moving around.

And then you've got variations on the theme between you started off gripping and you then -- for whatever reason, you let go; or if your arm is released; or your arms were initially like that, and you gripped your seat -- armrest.

We don't know.



So you to have make the most conservative assumption -- the least number of assumptions -- to say: All right, the arms are going to be moving up and down.

But then it means you didn't with confidence predict what the causation of injury are in the arms, because you can't know that.

And so I didn't.

Q. So if you were to -- it sounds like you are describing a situation in the airplane where the movement of the arms, whether somebody grabbed the -- and held the seat rest, put them under their lap, braced in some way, or whether they let their arms go up and down would be variable in the airplane --

A. That's right --
Q. -- during the accident flight, right?
A. -- yes.
Q. So if you were to put together a demonstrative or animation about the accident flight, you would expect that some of the passengers would have their arms up moving around potentially, and some of the passengers -- some proportion of the passengers

would have their arms down and grabbing the seats, or bracing to try to prevent that.
Is that right?
MR. DURKIN: Objection to the form of the question.
A. Possible.
Q. It would be inaccurate to show either way -- right? -- everybody arms going up?
Or nobody's arms going up?
MR. DURKIN: Objection, form of the question.
A. I wouldn't say inaccurate, because you don't know what the actual answer is.
I would say: You can't with confidence.
I wouldn't say: It's inaccurate.
Accuracy requires you knowing the answer.
Q. So not only is there variability in the response, but you don't even have any idea if it was everybody's arms up, or everybody's arms down?
You just don't know at all?
A. I can't know that.
Q. So just to be clear, you are not



offering any opinion that the passengers were injured due to the arms striking each other or the structures in the airplane.
Is that right?
A. That's right.
(Pause)
MR. ESSIG: Can we get tab 6?
(Pause)
MR. ESSIG: I think this is Exhibit 291?
THE VIDEOGRAPHER: That is correct.
(Exhibit 291, Multipage document entitled: United States Air Force Research laboratory Articulated Total Body Model Version V User's Manual, dated February 1998 (no Bates Nos.), marked for identification)
MR. ESSIG: And Dr. Jenkyn, do you have Exhibit 291 in front of you?
THE WITNESS: I do.
BY MR. ESSIG:
Q. And this is entitled: United States Air Force Research Laboratory Articulated Total Body Model Version V User's Manual?
Is that right?



A. Yes.
Q. Is this the user's manual you used for the purposes of this case?
A. No. I have an updated version of this that comes with GATB.
Q. Okay.
So the manual that we are marking as an exhibit here -- it's something you cite in your report, correct?
A. Yes.
Q. So it's still an accurate representation of what the model does?
A. It was at the time that this was published --
Q. Okay.
A. -- which I believe is '98.
Q. Okay.
MR. ESSIG: So if we look at page 19, there is a description of a belt restraint system that's provided in the ATB model.
BY MR. ESSIG:
Q. Do you see that?
A. Yes.
Q. Is that an accurate description of the



current belt restraint system?
A. It still works that way.
Q. So this -- the document we are looking at -- this particular section is accurate with respect to your model, right?
A. Just with a brief perusal, it looks that way.
Q. Okay.
And so I want to look at the -- the first sentence says: The ATB Model provides two options for modeling of a belt restraint system: The simple belt and the harness belt.
Do you see that?
A. Yes.
Q. And you used the simple belt system?
A. I did.
Q. And it says: In a simple belt system, each restraint belt is assumed to lie in a plane defined by two anchor points attached to a segment (usually the vehicle) and by a fixed point on a contact ellipsoid rigidly attached to some other segment (see Figure 16).
Do you see that?
A. Yes.

Q. Is that is a correct description about how the simple belt system worked in your ATB model?
A. Yes.
Q. The model then explains some limitations about the seat belt simulation?
A. Hm-hmm.
Q. So the sentence says -- right after the one we just read: Therefore, the belt is restricted to pass around a single segment.
Do you see that?
A. Yes.
Q. Did you restrict the simple belt in your model to pass around a single segment?
A. Yes.
Q. So if the seat belt was higher or lower on somebody, you never modeled that?
A. That's right.
Q. And you have no conclusion about whether there was injury caused by the placement of the seat belt differently on a segment.
Is that right?
A. The assumption for every simulation was that the seat belt was properly fitted on



the pelvis.
Q. And the next sentence says: The main limitation of the simple belt model is that the point at which the belt contacts a segment is fixed to the segment and moves with it.
Right?
A. Yes.
Q. Can you describe what that limitation means?
A. It means you can't have relative sliding motion between the belt and the segment.
So, for instance, if you are wearing your seat belt and you kind of shift your weight, the set belt would move relatively to that segment. That can't be modeled here.
Q. Do you agree that was a limitation of the model you used?
A. I mean, it's how it modeled it. Whether or not it misses out important features of the biomechanics, I don't think so.
Q. Did you confirm whether or not it does?
A. No, I didn't.
Q. So you don't know whether or not it



actually misses out on an important characteristic of the biomechanics in the accident, do you?
A. Well, no. I have good reason for making that judgment.
In a properly-fitted seat belt -- so we have limited ourselves to the assumption that every set belt is properly fitted. And that actually means something quite specific. It means the seat belt is the right tension; that it fits evenly over the two anterior superior iliac spines.
And so your contact force for a properly-fitted seat belt only goes through the ASISs on either side.
So if I shift, the seat belt is still on my ASISs. It's just a different part of the belt.
And if I shift back, the seat belt is still impinging on my ASISs. It is still loaded biomechanically the same way.
Q. The seat belt model --
MR. DURKIN: You were done? You were done with your answer?



THE WITNESS: Yes.
MR. DURKIN: I wasn't sure if he was done.
MR. ESSIG: I think he was done.
MR. DURKIN: You are pretty quick --
MR. ESSIG: Sorry --
MR. DURKIN: -- today --
MR. ESSIG: -- just trying to get through this --
MR. DURKIN: -- I know that. I just want to make sure he gets all his answers out --
MR. ESSIG: -- I think he is --
MR. DURKIN: -- well --
MR. ESSIG: Any way -- you can object if you want.
MR. DURKIN: Yeah, I just want to make sure he got it out. That's all, Chris. I --
MR. ESSIG: He did.
MR. DURKIN: -- okay, thanks. I got that now.
BY MR. ESSIG:
Q. So on the Figure 16, it has a single contact point, correct?
A. Right.

Q. So it isn't modeling the seat belt oriented on two points of contact on the hip.
It is just a single point of an ellipsoid segment, right?
A. No.
So you've got two segments for seat belt. There is one on the left-hand side and the right-hand side.
And that goes from an anchor point to a contact point on the pelvis -- or at least in my model.
And then you've got one on the other side going from a different anchor point to a second contact point on the pelvis.
So those two contact points are modeling where the ASIS is on the pelvis for each occupant body model. And so the loading is always applied at the ASIS.
Q. In real life, if you have a seat belt fixed appropriately on your pelvis, the force that is applied to the seat belt would be diffused across the whole belt, right?
A. No.
Q. No?



A. No, that is actually very dangerous.
Q. Okay.
A. The whole design of a seat belt is to provide biomechanical restraint loads, which can be quite large, into your bones.
And where your bones stick out on your pelvis is your ASIS. And so you really -- when you tighten up the belt, yes, it's lying across all the soft tissue of your abdomen as well. But when you actually apply the load to the seat belt, you do not want the biomechanical load going through your abdomen.
Q. And that's slightly different than what I asked.
The force on the seat belt wouldn't be focused on a single point of contact with two anchor points.
It would be diffused across the entire seat belt, right?
A. No, that's the question I answered.
And no, that's not the case.
Q. Okay.
We talked about bracing and gripping the surfaces in the airplane, right?



And you'd agree the simulation that you used in this case didn't simulate how somebody might have braced or held on against the forces experienced on the flight?
A. That's right.
Q. Is it true that the software that you used -- the GATB model -- only models passive representations of humans?
A. What do you mean by that?
Q. It only models a passive occupant or an inert occupant.
It doesn't model the reflexive nature of a person to grip or brace during a simulation?
A. I'll put some physics words to it.
Can I predict the forward dynamics of the body doing something that isn't just a reaction to its environment? You are correct.
So if I -- for instance, if I wanted the body model to flex its elbow, I can't do that.
But what I can do is I can stiffen the elbow so that when an external load is applied to it, it moves with some resistance.



Q. Okay.
You didn't do that in this exercise, correct?
A. I did.
So a number of the joints were stiffened.
And, again, you want to make this body as conservative as possible. So, yes, I have to make a decision a priori as to stiffening the joints.
So I stiffened the two knees, the two hips, the joint between the pelvis and the abdomen, and the abdomen and the chest, bottom of the neck, and the top of the neck.
And I did that because if you place -- if you place your body model in a seat and 1 g of gravity acts on it, the thing is going to slump forward.
So you stiffen up those joints just enough so that the body model sits up in a seat the way a person would sit up in a seat. No more than that, but just enough so that it sits without slumping forward.
Q. Did you stiffen it up enough to

replicate how a person might resist g-forces?
A. No.
Q. So when a g-force is applied to the stiffened model that you used, it reacts passively?
A. It does.
(Pause)
MR. ESSIG: Let's look at this tab again, which is Exhibit 291, on page 5.
(Pause)
BY MR. ESSIG:
Q. Okay. If you look at the first paragraph, it says: The Articulated Total Body Model is primarily designed to evaluate the three-dimensional dynamic response of a system of bodies where the -- when subjected to a dynamic environment consisting of applied forces and interactive contact forces.
Do you see that?
A. Yes.
Q. Although the ATB model was originally developed to model the dynamic response of crash dummies and, with later modification, response of a human, the ATB Model is quite general in



nature and can be used to simulate a wide range of physical problems that can be approximated as a system of connected or free bodies.
Do you see that?
A. Yes.
Q. Do you agree with that last statement?
A. Yes.
Q. It was originally developed to the -- model the dynamic response of crash dummy?
A. It was.
Q. Okay.
And there, they mean an actual model of, like, a crash dummy.
Is that right?
Like, the Hybrid III dummy?
Or something like that?
A. Well, it wasn't -- not with the same geometry that MADYMO had of an actual dummy.
But the idea was you have got a linked series of rigid segments. And that when originally ATB was validated, they validated it against crash test dummies.
Q. And you stiffened the joints at certain segments of the model that you used.



But the human models in your simulation still are passive like a crash test dummy, right?
They move when there is force applied to them?
A. That's right.
Q. And they can't simulate resisting forces, or bracing, or holding on beyond this original stiffness that you added?
A. You are right.
MR. ESSIG: If you look at -- it's marked tab 39.
(Pause)
MR. ESSIG: I think this is Exhibit 292 -- or 3.
(Exhibit 292, Four-page document entitled: TLS Forensic Engineering Collision Reconstructi (no Bates Nos.), marked for identification)
THE WITNESS: Hm-hmm.
(Pause)
BY MR. ESSIG:
Q. So do you recognize this document?
And to orient you, I'll represent this



is a printout of several pages of your website.
A. Okay.
Q. Do you recognize that as an accurate printout of a part of your website?
A. I recognize you probably got it from my website -- yeah hopefully, my website doesn't like this.
Q. It doesn't look like this when you go to the World Wide Web and look at it, but this is the way it printed out.
A. Okay.
Q. And so we are talking about the virtual human models in the GATB software for the HVE package.
MR. ESSIG: If you go to the last page of this website printout --
THE WITNESS: Hm-hmm.
MR. ESSIG: -- are you with me?
THE WITNESS: Yes.
BY MS. BRENNER:
Q. The first paragraph says: TLS uses state-of-the-art-science software packages Human Vehicle Environment (HVE; Engineering Dynamics Corporation) and Graphical Articulated Total

Body (GATB; Collision Engineering Associates) to simulate collisions, occupant biometrics, and pedestrian mechanics -- biomechanics.
Do you see that?
A. Yes.
Q. That's what you did in this case?
A. Yes.
Q. It says that: HVE is industry standard in collision & accident reconstruction and simulation has been validated against staged and real-world collisions.
Correct?
A. Yes.
Q. That's what we were talking about the validation against real-world scenarios?
A. Hm-hmm.
Q. They are saying that the software platform has been validated against staged and real-world collisions.
But that doesn't mean that any particular model that somebody develops using that software is actually validated against real-world situations, correct?
A. Not unless you do that direct



validation we were talking about.
Q. All right.
And you didn't do that in this case?
A. I did not.
Q. And the second paragraph there says: The biomechanics acting on people in the collision, the vehicle occupants and pedestrians, are simulated with GATB software module within the HVE package.
Do you see that?
A. Yes.
Q. And you cite Grimes and Cheng, et al.?
A. Yes.
Q. Add those are -- those are cited in your report, too?
A. Yes.
Q. Then it says: Virtual human models -- (really, virtual crash test dummies) represent each person involved in the collision to simulate the physics induced on their body segment.
Is that right?
A. Yes.
Q. Is that a fair statement of what you



did in this case?
You modeled a virtual crash test dummy?
A. So you are reading marketing material. This is not a scientific report. So --
Q. But they are your words.
Is that right?
A. They are my marketing people's report.
Now, did I approve it? Yes.
The purpose there is when you are talking to a general public, everybody knows what a crash test dummy is. And so that's the reason we use that wording.
Now, I would say it's a bit more powerful than that.
But you are right, a linked series of ellipsoids is a representation of a human; it's a representation of a crash test dummy; but it's not exactly either of those things.
Q. You are not saying that anything in your website is incorrect, are you?
A. I'm just saying, for the purposes of marketing, we are using a vernacular term that would be more likely to resonate with somebody



reading it --
Q. Okay.
A. -- so it's not a scientific -- it's not a scientific document.
Q. And you are talking to a jury in this case potentially, and they are not scientists either, right?
A. That's right.
Q. So you would use words -- plain words like this -- to explain some basic concept.
Is that right?
A. I would.
(Pause)
MR. ESSIG: Let's look at tab 30. I think we are on 293.
(Exhibit 293, Multipage document entitled: Head Injury Criterion and the ATB (no Bates Nos.), marked for identification)
(Pause)
MR. DURKIN: Is this in his report?
MR. ESSIG: No.
MR. DURKIN: This is new one.
MR. ESSIG: This is a new one.
MR. DURKIN: Okay.

MR. ESSIG: I'll ask you to take a look at this document.
It's titled: Head Injury Criterion and the ATB.
BY MR. ESSIG:
Q. Do you see that?
A. Yes.
Q. It's by Brian G. McHenry --
A. Hm-hmm.
Q. -- McHenry Software, Inc.?
Have you ever seen this document before?
A. Not recently but --
Q. You have seen it?
A. Yeah, in the past years.
Q. Okay.
Do you know who Brian McHenry is?
A. Not specifically.
Q. Is he an expert in this field?
A. I couldn't say.
Q. Do you know anything about McHenry Software?
A. No, I don't.
MR. ESSIG: If you turn the second



page, down there at the footer --
THE WITNESS: Hm-hmm.
BY MR. ESSIG:
Q. -- it says: ATP Users' group -- ATB Users' Group 2004?
A. Hm-hmm.
Q. Do you know what that "ATB Users' Group 2004" is?
A. I don't. It predates me.
Q. All right.
So Mr. McHenry says in the third paragraph here at the top: One of the mathematical models used to complement full scale mechanical testing is the Articulated Total Body Model.
Do you see that?
A. Yes.
MR. DURKIN: Before you have a question, he should have an opportunity to familiarize himself with the document.
MR. ESSIG: I think he said he saw it before --
MR. DURKIN: No, he says he thinks he saw it many years ago --



MR. ESSIG: Okay --
MR. DURKIN: -- like, you recall the depths of Seattle. Let the witness read the whole document, and then you can ask questions, okay? You remember. You were there.
MR. ESSIG: Sure.
MR. DURKIN: Okay. So why don't you give him an opportunity to familiarize himself with the document before you ask questions of him?
MR. ESSIG: And if you ever need to take a moment to look, just let me know. And I --
MR. DURKIN: Well, let's presume he does. Let's presume that's the case.
MR. ESSIG: Let's let the witness testify.
MR. DURKIN: I'm doing it. This is -- I'm citing the case of the goose versus the gander, okay? --
MR. ESSIG: Yeah.
MR. DURKIN: -- the Supreme Court case.
MR. ESSIG: We can proceed.



MR. DURKIN: Okay.
MR. ESSIG: Okay.
BY MR. ESSIG:
Q. So that -- the mathematical model -- the ATB Model -- that's the model you used, right?
A. Yeah, the latest version of it.
Q. Okay.
MR. ESSIG: And on page 13 of your report --
MR. DURKIN: Are we back to 290?
MR. ESSIG: Yes.
MR. DURKIN: Okay.
(Pause)
BY MR. ESSIG:
Q. It says in that middle paragraph: The GATB software is based on the Articulated Total Body Model.
Right?
A. That's right.
Q. And it's been used since the 70's to simulate occupants of motor vehicles --
A. Yes.
Q. -- and aircraft during events?

Page 145

A. Yes.
Q. And it says: The GATB software is the same as the original ATB software in terms of its physics.
A. In terms of its physics, yes.
Q. The only difference is the computer interface by which the user uses the model, right?
A. Yes.
MR. ESSIG: And on this first page -- going back to 293, sorry --
BY MR. ESSIG:
Q. McHenry is citing Cheng there in footnote 2 for the articulated total body model user manual.
Is that right?
A. Cheng.
Q. Yeah.
A. Yes.
Q. And that's something you cited to in your disclosure?
A. Yes.
Q. Okay.
So we are talking about the same

Page 146

model?
A. Yes.
(Pause)
MR. ESSIG: All right. So let's turn to page 6 of 8.
MR. DURKIN: Which document are we in now?
MR. ESSIG: McHenry.
MR. DURKIN: Okay. Sorry. Got it.
BY MR. ESSIG:
Q. And the title on there is: Background on ATB and HIC.
Do you see that?
A. Yeah.
Q. If you go to the second paragraph, it says: Every simulation model, particularly occupant simulation models like the ATB, is a -- quote -- "an approximation of the physical system it represents and, of necessity, is based on simplifying assumptions concerning the various aspects of the nature and behavior of the real system. For this reason, differences between a predicted and observed responses of an actual system are to be expected, and the -- the

Page 147

disparities, depending on -- in part on the adequacy of the assumptions and approximations for the particular operating environment of the system."
Do you see that?
A. I do.
Q. Do you agree with that statement?
A. That's what we deal with every day in engineering, yes.
Q. Okay.
So you agree that differences between the predicted or simulated outcome and the observed responses of an actual system are to be expected?
A. Yes.
Q. Do you know how big the differences -- do you agree that how big the differences are depend on the adequacy of assumptions and the approximations that you make on a particular operating environment?
A. Obviously.
Q. So essentially, the baseline assumptions you make in your model are critical to determining whether or not it's an accurate

Page 148

representation of what happened?
A. And that's why you should always strive as an engineer to be as conservative as you possibly can.
Q. Okay.
So if we look at the third paragraph, it says: Parametric studies of ATB for a limited number of model parameters have been performed in which some parameters were altered from their baseline values to investigate the effects on the occupant kinematics.
A. Yes.
Q. What is a parametric analysis?
A. If you have -- let's say, you have four parameters that you can change -- so four variables that you can tweak in the model.
A parametric analysis is you go through each and every combination, and then you look at the output. So you change the first one, then you go through its range -- every single combination. And you look at the output for a single variable.
So that's your basis for parametric analysis.

Q. It's essentially a sensitivity analysis?
A. Yes.
Q. And people run sensitivity analysis to determine whether or not the model they created is accurate?
A. Whether it's sensitive to certain variables.
Because some parameters, you can vary quite a bit and the output doesn't change; and then it is insensitive, and you don't need to worry about that.
Some parameters, it's going to be very sensitive to. And you need to very carefully figure out what that value should be set to.
Q. It's a way to look at your simulation to determine the potential for error that might occur.
A. Yeah.
Q. Did you run any sensitivity analysis on your simulation of the data you generated in this case?
A. So that's why we ran the series of -- why we ran the large series of different



heights, and weights, and positioning within the seats.
And that's exactly what I was trying to do.
And initially, when we were looking to draw firm conclusions about where the arms would go and whether you get injury from hitting arms, we ran through pretty much a parametric or sensitivity analysis with all -- with the parameters being height, and weight, sex, and position to see how it affected the trends.
Q. What do you mean by "position"?
A. Whether you are aisle, middle, or window seat.
Q. Did you run any other type of sensitivity analysis besides the ones on those particular variables?
A. Yeah, so when I was setting the stiffness for the joints to make the body stand up, I would set it at a value. And if it didn't slump, then I would reduce the value and I would keep reducing the value until the body slumped.
And so in that way, I'm seeing -- I want the stiffness to be as little as possible



in order for the body to sit up in a realistic manner, but not add too much stiffness so that other motions would not be modeled.
Q. So that would allow for the body to move as much as possible when the force is exhibited on it?
A. Right.
Q. And therefore that movement of the body would create the greatest amount of force when it comes in contact with another surface right?
A. No, it's the opposite.
So if you have the body moving around -- it's a tradeoff.
If you are moving around a lot, you can contact something and you have an impact load.
But if you have it very stiff, that force has to come from somewhere, and it comes internal to the body. So now if you start stiffening up in between the segments now you have internal reaction forces that are now going to be a lot larger.
And those reaction forces -- although



not a perfect analogy -- are a proxy for things like muscle strain and soft tissue strain within the body.
Q. What about force applied to, like, something like a seat belt?
Would it heighten the force that would apply to a seat belt?
Or lessen that?
A. It was insensitive to that.
Q. And you did an analysis to determine whether it was sensitive?
A. I did.
Q. Did you produce the analysis in this case?
A. No, that was a part of the initial work.
So as I'm setting the values for whether or not the body slumps forward, you run the simulation, and you see that the seat belt tension that's output isn't sensitive to that.
And it makes sense, because you've got -- the seat belt tension is really coming from the acceleration of all the body together.
Also with the way the legs were

Page 153

stiffened, when the arms would go up, the legs would not go up.
And so really what's mostly causing the tension in the seat belt is the mass of the chest, abdomen, pelvis, and the legs lifting up out of the seat.
And so if the legs aren't moving anyway, we found that the tension in the seat belt wasn't sensitive to how you stiffen those joints.
Q. So to be clear, you ran a sensitive analysis on the stiffness of the joints.
You didn't produce it in this litigation.
Is that right?
A. That was part of my initial work. So as I'm development the model and developing a number of aspects of the simulation, I want to demonstrate to myself that that variable isn't sensitive.
If it had been, then I would have had a couple sections in my report saying why I made a certain assumption as to why that joint stiffness should be set the way it is.

Page 154

Q. Understood.
If you can -- I know we are trying to answer questions and ask questions to the best of our ability.
But if you can listen to my question and just answer that, it will go a lot faster.
A. Okay.
Q. You didn't produce that sensitivity analysis in this litigation, right?
A. No.
Q. You didn't disclose it in the report you signed September 22, correct?
A. No.
Q. Okay.
MR. ESSIG: So we are back on paragraph three there, talking about parametric studies.
THE WITNESS: Hm-hmm.
BY MR. ESSIG:
Q. The second sentence says: They -- the parametric studies -- demonstrated the sensitivity of various responses of ATB to some parameters.
Right?

Page 155

A. Yes.
Q. And parameters investigated include shoulder belt stiffness, lap belt stiffness, knee bolster stiffness, the guide loop location, guide loop coefficient of friction.
Do you see that?
A. Yes.
Q. Did you investigate the sensitivity of those -- of any of those elements in your model?
A. That's not included in the simple seat belt model.
Q. Understood.
MR. ESSIG: And then the last sentence is one I want to look at.
BY MR. ESSIG:
Q. It says: It should be noted that for an accident reconstruction, there are few if any known baseline values, and therefore any conclusions or results may be subject to variations of 50% or greater.
Do you see that?
A. I do.
Q. Do you agree with that statement?
A. That was probably true back in 2004.

Page 156

Q. Is it true now?
A. I think we have a lot more literature now as to -- to the validation and setting of limits on those parameters.
Q. Okay.
Did you have known baseline values that you used in your report here?
A. Beyond -- well, for what parameters?
Q. I guess any of the parameters that you studied in order to come to a conclusion in the case.
A. So as I said, I used the simple seat belt model, because it has far fewer variables.
So you listed a number there.
By using the simple seat belt model, you don't need to make a decision about those variables. And so, again, that speaks to having the simulation being conservative.
I explained to you the process by which I decided on the stiffness of the joints of the legs and the torso, and also my decision to keep the shoulders completely loose. Again, that speaks to a conservative simulation.
Q. And you agree that those -- those

Page 157

assumptions and judgments that you made in terms of the baseline design of the model -- they affect the variation in the outcome of the simulations you ran, right?
A. They will.
But it was my opinion that the output of the model was not significantly sensitive to those -- those -- any changes there.
Q. Okay.
Did you calculate any error rate of your data?
A. I did not.
Q. Do you know how much variability there was in the data?
A. Which parameter?
Q. I guess, any of the outcome parameters, the force -- force application of body to a contact surface?
A. There was a great variation. That's why I didn't draw any firm conclusions on that.
Q. What about the force applied to the seat belt?
A. There was -- like I said, the seat belt tension was insensitive to things like

Page 158

joint stiffness and was -- the strongest correlation for seat belt tension was with overall body weight.
Q. Did you do any statistical analysis of variability there?
A. No.
Q. Did you calculate a standard deviation?
Or anything like that?
A. No, but that can be done because it's all contained within a series of simulations that are provided.
Q. In terms of the output of the force application on the seat belt -- and I know I asked this question --
MR. DURKIN: Well, then I am going to say: Asked and answered.
BY MR. ESSIG:
Q. In terms of the output of a force in newtons from the body on the seat belt, do you know whether or not the results that you achieved in your simulation were statistically significant?
A. That's my understanding.

Page 159

Now, did I calculate significance? No.
But, again, subjectively, after -- so when you are setting up the simulation initially, you run it in an iterative way where you work with certain parameters to see whether or not they are sensitive.
So, for instance, setting the stiffness between the pelvis and the -- the pelvis and the abdomen. As you increase that stiffness, you then go back and have a look at the seat belt force.
And if it's not changing, then with confidence, you can say: Okay, it's insensitive to that.
Now did I document all that? No.
But that would be a very long report if I documented every single subjective sensitivity analysis I did in the development of this simulation.
Q. And you didn't actually ever conduct -- calculate a p-value.
That's right?
A. That's right.

Page 160

Q. So you don't know if P was less than .05 -- or 0.5?
A. Based on my judgment, I was pretty confident it was probably lower than that.
Q. But you don't know?
A. I didn't calculate it.
MR. ESSIG: So if you turn to page 7 of 8 -- are you with me?
THE WITNESS: It's --
MR. ESSIG: Yeah, it's right on top there?
THE WITNESS: Yes.
BY MR. ESSIG:
Q. It says in the text: When the ATB is used in accident reconstruction or applied to individual accidents, there are inherent limitations on the predictability and the veracity of the results of ATB.
Do you see that?
A. Yes.
Q. Then it says: The following lists some of the limitations for ATB for individual accident reconstruction.
A. Hm-hmm.

Q. Do you agree that there are inherent limitations?
A. Yes.
Q. The first limitation says: Limitations of any mathematical model of occupant kinematics.
Do you see that?
A. Yes.
Q. It says: First, no two humans are alike in their physical properties or lifetime experiences.
Do you agree?
A. That's true.
Q. And: The physical condition and inherent response of individuals (reflexes) affect what occurs during any potential injury-producing event.
Do you see that?
A. Yes.
Q. Do you agree that's a limitation of the model that you produced?
A. Yes.
Q. So your model doesn't capture the inherent response of individuals, like their



reflexes?
A. Because it's a passive model.
Q. Okay.
Then it says: The GEBOD program is generally used to create occupant inputs for ATB.
Do you see that?
A. Yes.
Q. GEBOD creates a "percentile" representation of an occupant, which only represents the actual occupant in but a few measurements or properties.
Do you see that?
A. Yes.
Q. Is that essentially what you did?
You looked at a percentile ranking of the different heights and weights of the population?
And then you simulated average, or small, or large versions of those?
A. It actually means something slightly different, but along the same lines.
So -- it's called anthropometrics. So if I wanted to model an individual person, I



would measure the length of every single segment on that person. Okay?
But if we are going to study a population, then you are going to look at a range of overall heights and weights, and then also population averages for -- so for instance, if you are 5'10", the average length of your upper arm for somebody who is 5'10" would also be a certain length.
So I relied on those averages through the population in the absence of specific information about individual passengers.
Q. So you didn't calculate your simulation using any specific information about the heights or weights of certain passengers, right?
A. That's right.
MR. ESSIG: If we go to page 13 on 290 -- it is your report.
MR. DURKIN: We're back to the report now?
MR. ESSIG: Yeah.
MR. DURKIN: Okay.
THE WITNESS: Thirteen?



MR. ESSIG: Yeah.
(Pause)
Q. The very bottom of that page says: The height and weight of each human body model ranged from the 5th to the 95th percentile.
Do you see that?
A. Yes.
Q. What do you mean by "the 5th or 95th percentile"?
Percentile of what?
A. So you take the overall population. And there is -- you have measured height and weights through a large sample. You can't do everything -- everybody in the population, but you do it for a large sample.
Fiftieth percentile is the person who weighs the average, and is the average height, and then you divide it up into percentiles.
And so it's just a statistical analysis to say: 95th percentile male is this height and this weight. 5th percentile male is this height and this weight.
Q. What population were you using -- what population data were you using that -- like, is

Page 165

it a global population?
The United States?
Or what --
A. So it's the anthrometric charts within GATB, which -- my understanding -- is for mainland United States.
Q. So you used -- the distribution of heights and weights in terms of percentile rank for the United States in terms of the model you ran in this case?
A. Yes.
Q. And do you have any idea about how that distribution compares to the actual heights and weights of the passengers on the plane?
A. I don't.
Q. So if we look at the third bullet, it says: The ATB occupant is a passive occupant.
Do you see that?
MR. DURKIN: Wait, what document are we in now?
MR. ESSIG: We are going back to the paper --
MR. DURKIN: Okay --
MR. ESSIG: -- sorry about that.

Page 166

MR. DURKIN: -- okay --
(Pause)
MR. DURKIN: What page are we on now?
MR. ESSIG: Seven of 8. We are still going through the bullets.
MR. DURKIN: Got it. All right. Thanks.
BY MR. ESSIG:
Q. Third bullet: ATB occupant is a "passive" occupant.
Do you see that?
A. Yes.
Q. Do agree with that?
A. Yes.
Q. And then the sub-bullet says: Active muscles and reflexes can play a substantial role in the responses of the occupant, particularly at lower speeds.
Do you see that?
A. Yes.
Q. And do you agree with that sub-bullet?
A. I do.
Q. It says: Particularly -- a particularly substantial role at lower impact

Page 167

speeds.
Would you say that the g-forces that were experienced on the flight were lower-impact speeds in the context of this article?
A. They weren't in impact.
Q. Okay.
But for the duration of the flight, because you -- you simulated pretty much everything up to impact, right?
A. With the ground, yes --
Q. Yeah.
A. -- well, to when the flight data recorder ended.
Q. Right.
Would you say that those forces -- that ranged from maybe 2 g's positive on the high end to 2 g's on the low end approximately -- are lower-impact speeds in the context of this --
A. They are not impacts --
Q. Okay.
A. -- it's an apples and oranges comparisons.
So an impact, by definition, is a

Page 168

large force occurring over a short amount of time.
And in a car crash, that's less than a quarter of a second.
This is not an impact.
So these loads while -- and again, with an impact in a car crash, you get large g's over a very short amount of time.
These g's are smaller than the g's in a car crash, but they occur over a much longer time.
This is not an impact. And so you can't model -- you can't infer behavior in the biomechanics from impact data into a simulation that is not an impact.
Q. But the concept of this being a limitation on the model remains the same, right?
If you are dealing with g-forces that are plus or minus 1 or 2, human beings have the strength -- an average person -- has the strength to resist that level of force, right?
A. Certainly.
Q. And if you were dealing with g-forces that were 15, 20, 50, a human being might not be

able to brace -- or hold on against a force like that.
They would be moved involuntarily, or against their will, right?
A. During an impact, yes.
Q. And so the ATB model was developed originally for the use of analysis in car accidents, right?
A. Well, it was developed for air crashes --
Q. Originally, it was done for car accidents?
A. It's used by car accidents mostly, yeah.
Q. And you've used it for car accidents in every case you've worked on, right?
A. Yes.
Q. And you have never testified using it in an airplane accident, right?
A. That's right.
Q. And so, if you use that ATB model in a car accident where the -- you know, a car is going 50 miles an hour, 40 miles an hour, and hits something, the forces that are exhibited on



that body are very significant; much more significant than the forces exhibited on the passengers in this airplane prior to impact.
Is that right?
A. Well, you have got to be careful.
So what's the mechanism of injury?
So the forces during an impact are large. The duration of time over which those forces are applied is very, very small.
So the way you connect the two is you look at the amount of energy that goes into the tissue.
And I didn't specifically use that measure, but I think it's informative here so that we understand the physics.
So if you imagine during a car crash, you are looking at the force coming from the seat belt going into the body. And as I go along -- so horizontal axis is time, and then vertical axis is force -- the force going from the seat belt into me is going to go up very quickly, quite high, and then come down very quickly. And the amount of energy put into the tissue is the area under that curve.



And so you can have a very large force, but in a very short amount of time. You don't have a lot of energy going into the tissue.
What we have here, though -- time is going along like so, so not -- unlike a car crash which takes place over, say, 0.1 to 0.2 seconds, this is tens of seconds; or certainly when you have got the maximum negative g's, it's over several seconds.
Now we look at: The force doesn't go as high, but it's applied for a much longer time -- meaning the amount of energy, the area under that curve -- is much larger.
And so it's a different mechanism. You can't draw conclusions on impact in car crashes to the situation we are dealing with here. It's just not biomechanically correct.
Q. And I'm talking about something slightly different, right?
I'm not drawing conclusions about the impact.
I'm talking about the limitation of not being able to model reflexes or bracing,



correct?
A. Well, we talked about this before.
Like, I can't -- I can a -- so reflexes? No, because that's an active motion.
Bracing? Yes, I can model, in that I can apply passive stiffness to joints.
But we already talked about it. You can't have them hold on to the armrests.
Q. So at g-forces of 1 or 2, somebody's ability to hold on to armrests or resist that force is material.
It means something, right?
They can resist those kind of forces?
A. Well, I don't know. Because when we are dealing -- it depends on the direction of those g-forces. So --
Q. What about the vertical axis?
A. -- and here's what I'd say --
MR. DURKIN: And here's what I'd say: He didn't finish.
MR. ESSIG: I'm trying to get answers to my questions --
MR. DURKIN: I know. I know --
MR. ESSIG: -- long --

MR. DURKIN: -- but you can't cut him off --
MR. ESSIG: -- cut him off --
MR. DURKIN: -- well, you can't cut him off, okay? So he needs to finish his answer --
MR. ESSIG: Okay --
MR. DURKIN: -- and, quite frankly, Chris, I bet you the court reporter is having a rough time right now. I want to make sure, because I think --
MR. ESSIG: He hasn't said anything, Kevin.
MR. DURKIN: Okay, if they're not, fine.
MR. ESSIG: Just if you have an objection, make it. If not --
MR. DURKIN: Objection, objection, the witness is allowed --
MR. ESSIG: -- I will let him answer --
MR. DURKIN: -- you cut me off --
MR. ESSIG: -- I know I am cutting you off --



MR. DURKIN: -- okay, this what you are doing. This is what you are doing --
MR. ESSIG: -- I'm not meaning to, but --
MR. DURKIN: -- I know you are not meaning to, but --
MR. ESSIG: -- I just want to -- you are supposed to give a short objection.
And I agree I will not cut --
MR. DURKIN: Okay.
Objection --
MR. ESSIG: -- move one --
MR. DURKIN: -- let him answer the question --
MR. ESSIG: Okay.
MR. DURKIN: -- and fully answer the question. Then another question. Okay?
MR. ESSIG: Okay.
A. So let's make we are talking -- the vertical acceleration.
The two directions are different. So if you have got positive g's, those positive g's are forcing you down into your seat. Can you withstand those? Yes. And certainly within the



range that we've got, you are being forced down into your seat, yes, the occupants can withstand those.
It's the negative ones that are interesting, for two reasons.
One, when you have got those negative g's, it's as though you are hanging upside down from your seat belt. So, yes, you could hold on, but, remember, you are hanging upside down, and you have got a whole bunch of other things occurring, like blood rushing to your head, and whatnot. But you are in a very unusual situation that you are not accustomed to.
Minus 1 g hanging upside down, could some people brace? Yes. Could everybody? I don't know. I don't think so.
The other situation you've got is when you look at the traces, certainly the last four seconds when it goes from a positive vertical g to a very large negative g, and then the flight delta recorder shuts off, not only do you have negative g's that you are bracing against, but those negative g's are increasing. That's a situation nobody has ever encountered. Like,



you are really not encountering that unless you are, say, a fighter pilot.
So I would expect in that case -- I think bracing against that would be very, very difficult. But can they? Sure. I think a few people would be able to. But it's a very unusual situation.
Q. Okay.
So they could brace, you are saying.
That's true, right?
A. Hm-hmm.
Q. You don't know how many people could brace or couldn't brace.
Is that right?
A. Yes.
Q. You have no opinion about the proportion of the people on the flight that were able to brace or weren't able to brace, right?
A. Yes.
Q. This bracing issue is more pronounced at the end of the flight when the g-forces are higher, right? -- negative different g-forces are higher, right?
In the last four-second period that

you have just said?
A. Well -- why are they bracing? That's really it.
Like, would they be bracing earlier on when you have got the vertical acceleration stays positive the whole way through, but the plane is undulating?
I think we talked about that before.
Would they brace there? Yeah, I think that's a reasonable response for somebody.
But, again, I wanted the simulation to be conservative. Because the other thing is, there is another mechanism of injury that arises with bracing.
Now, do I know if they brace or not? No, you are right.
But if I assume that they do brace, they now have another mechanism of injury, whereby you are gripping the seat, you are bracing against the floor, you are pushing yourself back into your seat, you are now firing your muscles. And you are firing your muscles in a way that stops the joints from moving, because you don't -- you don't want your body



moving around uncontrollably.
You have no warning as to when accelerations are even going to come at you, so you fire your muscles. But you do it on both sides of your joints. So you stiffen up the joints, but you are doing it actively in this case.
Okay. What happens? Well, now, you are firing those muscles in an inefficient way because you have no warning as to what the next change in the acceleration is going to be. Your -- your mechanism of injury now is muscle strain. And it fits those criterias I talk about -- at least the first and third.
Again, I don't want to -- I know pain is subjective.
But in terms of, as you are co-contracting muscles on either side of the joint to brace yourself against -- and to keep your body from moving, that causes muscle strain because you get micro-tears within the muscle as you are isometrically contracting.
And if these people had survived this crash miraculously, would there have been a



recovery process for muscle strain? Yes. It's called delayed onset muscle soreness. And athletes get it after they've been bracing or doing different activities with their muscles.
So if I am going to have a conservative simulation, I don't talk about muscle strain and I don't talk about bracing.
But there is that mechanism of injury. If they are bracing, that's perfectly reasonable to assume that would have happened.
Q. You can listen just to my question and answer that. It's going to help things move along.
MR. DURKIN: Objection.
He's doing exactly -- he's answering all your questions.
BY MR. ESSIG:
Q. So to be clear in terms of muscle strain and how muscle strained or whether people braced, you didn't analyze that at all, right?
A. That's right.
Q. You have no opinion about whether or not anybody was injured due to muscle strain based on any objective data that you calculated,



correct?
MR. DURKIN: Objection, asked and answered.
A. Two questions there, I think --
Q. You don't have any opinion about muscle strain and whether there was an injury or not based on the objective data that you calculated, correct?
MR. DURKIN: Objection, asked and answered.
A. When you say "objective data that I calculated," do you mean the simulation? --
Q. The output of your simulation.
A. Okay.
That's right. Based on the output of my simulation, I don't have an opinion on that.
Q. Okay.
A. However, I do in my report say that during the lead-up to the final 24 seconds that the passengers would have undergone something that was physically taxing, and physically agonizing, and physically exhausting.
Q. Are those injuries?
A. Within that -- again, I didn't want to

make a firm conclusion -- those would have been injuries such as muscle strain and muscle sprain because they are co-contracting.
Q. Do you have an opinion that anybody on the flight experienced muscle strain or muscle sprain?
MR. DURKIN: Objection, asked and answered.
A. Had they been bracing, it's my opinion that they would have sustained muscle strain or connective tissue strain -- sprain.
Q. Do you have any data or literature that you cite in the context of your report that stands for the proposition that under these g-forces -- plus or minus 2 -- that people experienced muscle strain or -- muscle strain?
A. No, that's based on my -- having a look at the vertical accelerations in the flight data recorder.
But, again, to get muscle strain from bracing doesn't require external loading. It requires the person to actively react to a situation.
Q. Okay.



So there is no literature that supports that disclosure in your report, correct?
A. I'm looking for one specific paper, and I didn't cite it.
Q. And there is no quantifiable data that captures that -- that supports that opinion, either, right?
A. I didn't model that.
Q. The last bullet here says: The initial position and posture of the occupants are not known and minor changes can have a dramatic effect on the ATB results.
Do you agree with that?
MR. DURKIN: We're back in -- I'm really sorry. I'm trying to get between the reports here, and I'm --
MR. ESSIG: I have never moved off this --
MR. DURKIN: Which one you are on now? Are you one the --
MR. ESSIG: -- the same bullets we have been covering.
MR. DURKIN: All right. We can go



back and forth. It's okay. I just -- just gotta know where I am going --
MR. ESSIG: At this point, like, the amount of speaking objections and asking all this stuff, and to give long-winded answers is really running the clock.
MR. DURKIN: Yeah, and it's okay. We are going between exhibits and --
MR. ESSIG: We are not. I'm still on same bullets I just asked about a second ago.
MR. DURKIN: All right. We keep going back and forth between two exhibits. I want to make sure I'm on the correct exhibit --
MR. ESSIG: Come on, Kevin --
MR. DURKIN: -- that's all. I didn't know which one we were doing. I really --
MR. ESSIG: Yeah, but we just took 30 seconds for you to just ask me.
And I said: Yes, McHenry, the last bullet.
MR. DURKIN: I know. You said it real fast. And I'm not as sharp as you. I got to catch up with you. You are moving fast.
Go ahead. I got it now. I'm all --



ready to go.
THE WITNESS: Okay, short answer.
BY MR. ESSIG:
Q. The last bullet: The initial position and posture of occupants not known and minor changes can have a dramatic effect on ATB results.
Do you agree with that statement?
A. They can, but they didn't in my simulation.
Q. Did you model the initial position and posture of the occupants?
A. I sat them in their seats in a realistic manner.
Q. Okay.
Did you adjust that model for the fact that some people sit differently?
A. No.
Q. Is it true that, looking across the entire spectrum of the passengers on the airplane, that probably most people were seated in various different kinds of positions --
A. But we're --
Q. -- around the flight --

Page 185

A. -- we're --
Q. -- is that true?
A. -- we're limited by the fact that each of them have their seat belt properly fitted. So that narrows the range and variety by which they can be sitting in their seat.
Q. You controlled for one initial posture, one orientation of the seat belt.
You did not account for any of the variability that might exist otherwise.
Is that --
A. As what? --
Q. -- right?
Different positions of the seat belt, different ways they were sitting, different initial postures.
A. Well, we said the seat belt has to be properly fitted. That limits you.
Q. That's what I'm saying.
You did one assessment of one posture in one position, correct?
A. I made the assumption that the seat belts were fitted properly, and so that limits the number of different postures you can have.

Page 186

Q. And the reality is that there, on the airplane in the real world, there were lots of different postures?
A. Yes, people could have been wearing their seat belts incorrectly.
Q. And they could have been wearing it incorrectly, but positioned differently, right?
A. We discussed this before.
But even if you tilted your body slightly, the loading is still going to go through the ASIS.
Q. Do you have any idea about whether changes in the initial positioning of the passengers would have had dramatic affects on your simulation?
A. As I said, with my initial subjective and iterative sensitivity analysis, I didn't see a strong sensitivity in seat belt tension to positioning of the pelvis.
Q. That is an analysis you did not provide in your report, correct?
A. That's right.
Q. And that is an analysis you did not produce before this deposition, correct?

Page 187

A. That's right. It was a part of process of developing the simulation, but I didn't report on it.
Q. Then it's undisclosed?
MR. DURKIN: Objection, asked and answered --
MR. ESSIG: Okay.
MR. DURKIN: -- three times.
(Pause)
MR. ESSIG: So let's go back to your report.
Kevin, we are going back to the report -- 290. You okay? --
MR. DURKIN: Thank you --
(Pause)
BY MR. ESSIG:
Q. So what I want to do here, if we can, Dr. Jenkyn, is walk through the description of the accident flight in detail and understand exactly at what time point you believe it was more likely than not that the passengers were injured on Flight ET 302.
Understand?
A. Understand.

Page 188

Q. So, first, in your field of study as a biomechanical engineer -- well, I guess we talked about this -- you define injury at one point as disruption of the tissue, right?
A. Yes.
Q. And what do you mean by "disruption"?
A. The tissue isn't in its normal, healthy state.
Q. Is there any literature cited or an objective standard that's described as to what disruption of the tissue is in your report?
A. No.
Q. Is there any place I can go look to see in the field of biomechanics what "disruption of the tissue" means that's an accepted definition in the field?
A. Yes, there is, but you are going to find how it's characterized different in different tissues.
Q. Would disruption of the tissue include a bruise or contusion?
A. Yes.
Q. And you have an opinion about whether or not people might have had a bruise or

contusion, right?
A. Yes.
Q. That's the main opinion you have about the injury that they might have suffered?
MR. DURKIN: Objection, argumentative, and improper --
MR. ESSIG: Asking if that's the main opinion he has is argumentative? --
MR. DURKIN: -- he's not ranking opinions. He's got lots of opinions --
MR. ESSIG: -- you are testifying --
MR. DURKIN: -- okay, he didn't rank opinions in his report.
Argumentative.
MR. ESSIG: He can answer the question, Kevin. He's --
MR. DURKIN: No, but -- okay --
MR. ESSIG: -- he's a doctor. He's an expert.
MR. DURKIN: -- all right, all right. It's an argumentative question --
MR. ESSIG: -- it's not. I --
MR. DURKIN: -- that's all. It is. It is.



MR. ESSIG: I'm not arguing --
MR. DURKIN: -- I want an answer --
MR. ESSIG: -- I'm only asking you a question.
BY MR. ESSIG:
Q. Is it the main disruption of tissue that you opine about in your report? A --
MR. DURKIN: That's a different question.
Go ahead and answer.
A. Yes.
Q. What about just pressure on the pelvis?
Is that disruption of tissue?
A. If it disrupts the tissue.
So you can apply pressure, but if the tissue rebounds to its healthy state, then, no.
Q. What about the sensation of pain?
Did people have to feel pain in order to be injured?
A. No.
Q. So you could have no pain at all but be injured?
A. Yes.



Q. Before we kind of walk through things, I want to know if we can kind of agree about one point -- which is that it's not more likely than not that passengers would have been injured before the last 24 seconds of the flight.
Do you agree with that?
A. If we are talking about contusion, then I'd agree.
Q. What about your definition of "injury" that you opine in this case?
A. If we are going back to talking about muscle strain and muscle sprain due to bracing, that could have occurred in the minutes before the last 24 seconds.
Q. But you don't actually -- you didn't actually study that question in terms of data or literature, right?
A. That's right.
Q. Do you have an opinion that it's more likely than not that every passenger was injured due to muscle strain prior to the last 24 seconds?
A. I would say that's a reasonable thing to opine, but I didn't specifically include that



in my report.
Q. So that's an opinion you did not include in your report, right?
A. I covered it in terms of the situation prior to the final 24 seconds being physically taxing, physically exhausting. That's the phrase I was using to generally refer to that.
Q. And when you used that phrase that you just described, you didn't use the word "injury" right?
A. That's right.
Q. And you didn't model in your simulation anybody bracing, or anything like that?
A. That's right.
MR. ESSIG: Okay. So if we go to page 16, and we go to the bottom paragraph.
(Pause)
BY MR. ESSIG:
Q. It says: For the first 42 seconds from the start of runway roll around 8:37:56 local time until takeoff at around 8:38:38, the vertical accelerations ranged from 0.876 to 1.146 g's, which can be considered normal for a

Page 193

takeoff since the flight at that point was proceeding normally.
Do you see that?
A. Yes.
Q. Safe to say you don't have an opinion that anybody was injured in that portion of the flight, correct?
A. Correct.
MR. ESSIG: So if we go to Figure 5, which is on the next page there --
(Pause)
THE WITNESS: On page 19?
MR. ESSIG: Correct.
THE WITNESS: I'm there.
BY MR. ESSIG:
Q. If you were going to draw a line for the first 42 seconds on that figure -- I'll ask you to do it -- could you show me where that would appear?
A. So based on that previous sentence?
Q. Yes, based on the sentence in your report.
A. I give you numbers --
Q. And I know that this may be hard with

Page 194

the scale to -- you may have to draw a line that's approximate, but --
A. Yeah.
Q. -- do your best.
A. I'm getting there. I'm just looking at the number.
So 32 seconds until 8:38:38, so trying to estimate where that is here. Right there.
Q. So we can write: Everything to the left of that line, there was no injury, right?
A. Yes.
Q. And so the line for a great deal of the time there is flat.
Do you see that?
A. One g yes.
Q. That's because the plane was on runway, right?
A. That's right.
Q. And the vertical accelerations start to fluctuate a little bit up until the line.
And that's the takeoff, right?
A. That's right.
Q. Okay.
MR. ESSIG: So for the next segment,

Page 195

if we go back to page 16.
(Pause)
BY MR. ESSIG:
Q. We are at that bottom paragraph on 16 that says: Then for the next 2 minutes and 36 seconds from 8:38:38 until 8:41:14, the vertical acceleration ranged from 0.681 to 1.4 g's.
Do you see that?
A. Yes.
Q. Can you draw a line on Figure 5 for that segment?
A. 41:14.
MR. DURKIN: We are making this approximate --
MR. ESSIG: Yeah. I'm not going to hold -- yes --
MR. DURKIN: -- not going to be possible to --
MR. ESSIG: -- not going to hold -- perfect -- right. Okay.
BY MR. ESSIG:
Q. So for that segment of time -- and let's -- can you -- let's mark this in one segment 1 just so we -- we know what we are

Page 196

doing.
Okay, this is segment 2.
For segment 2 of the flight, where the g-forces ranged from 0.681 to 1.4, do you have any opinion that people were injured during that part of the flight?
A. They could have been.
Q. Do you think it's more likely than not all the people were injured at that point?
A. All the people were injured? No.
Q. Do you think it is more likely than not anybody was injured at that point?
A. More likely than not, some people would have been injured at that point.
Q. How do you know who was injured and who wasn't?
A. I don't.
Q. Why do you think that some people would have been injured during that point in the flight --
A. Because it reason -- sorry.
It's too quick.
It's reasonable to assume, as we have been discussing, that some people would have

braced during that -- that situation. And it's my judgment that had they braced, they would have sustained muscle strain.
Q. So feeling forces from 0.68 to 1.4 g's, vertical acceleration would cause muscle strain biomechanically in passengers on Flight ET 302?
A. That's not what's causing the muscle strain. It's the bracing.
Q. But you don't actually have data on bracing, right?
A. That's right.
Q. Do you know what the normal range of g-forces are on a typical commercial airplane flight?
A. With -- I have a ballpark idea.
Q. What are they?
A. So based on measurements during turbulence, I know the FAA and the NTSB describe turbulence as having a number of different severities, although it's frustrating biomechanically, as they don't usually put g-forces. They put subjective descriptions.
But number 2, from the one piece of



data I was able to -- again, and I'm not citing it because, again, it's very frustrating, they don't quote actual g-forces -- but number 2 is, in my opinion, unusually large for a normal takeoff. It's not what you would expect 19 times out of 20.
If you went right into a cloud bank and got some moderate turbulence, yes, number 2 is probably what you would experience.
Q. And so if you went through a cloud bank with moderate turbulence, it's your opinion that passengers on the airplane like that would all be injured? -- or that some passengers would be injured? --
MR. DURKIN: Objection, argumentative --
MR. ESSIG: Sorry.
MR. DURKIN: -- form of the question.
BY MR. ESSIG:
Q. -- that some passengers would be injured?
A. I would suspect so, with muscle strain.
Q. Did you ever look at the data on the



flight data recorder for this particular aircraft and determine what the range of g-forces were on prior takeoffs?
A. No, I didn't have access to that data.
Q. If I represented to you that they were between 0.6 positive g's and 1.3 positive g's, do you think that might sound accurate?
A. If it was going through a period of turbulence, that would be reasonable.
Q. Do you think that the people on the prior flights that were subjected to g-forces from 0.6 to 1.3 --
MR. DURKIN: Objection, form --
BY MR. ESSIG:
Q. -- were injured?
MR. DURKIN: -- of the question. Assume -- makes assumptions not in evidence or --
BY MR. ESSIG:
Q. You are an expert --
MR. DURKIN: -- reasonable --
BY MR. ESSIG:
Q. -- you can make assumptions.
A. It's not the g-forces that are causing



it. It's the reaction to the g-forces.
So the person is causing their own injury by bracing and reactively co-contracting their muscles, and that's where the muscle strain comes from.
Q. So this period 2 that we are looking at -- did you prepare -- you didn't simulate this at all, right?
A. I would have -- no. No, I didn't.
Q. So your simulation doesn't cover this period of time at all?
A. Correct.
MR. ESSIG: Why don't we take a quick break? We have been going about an hour.
MR. DURKIN: Yeah, I think so.
THE VIDEOGRAPHER: We are going off the record at 11:38 a.m.
(Recess from 11:38 a.m. to 11:55 a.m. Eastern Standard Time)
THE VIDEOGRAPHER: We are going back on the record at 11:55 a.m. Please proceed.
MR. ESSIG: I talk over everybody and anybody without prejudice.
BY MR. ESSIG:

Q. Okay. So we are back, Dr. Jenkyn.
(Pause)
We are on what we labeled on your chart at Figure 5, segment 2 of the flight, correct? --
A. Yes.
Q. -- that's what we were discussing before the break?
A. Hm-hmm.
MR. ESSIG: If we go to your report, page 16, the bottom paragraph, second-to-last sentence from the bottom.
BY MR. ESSIG:
Q. You write: Then for the next 2 minutes and 36 seconds from 8:38:38 until 8:41:14 the vertical acceleration ranged from 0.681 to 1.4 g's.
Right?
A. Yes.
Q. And that's what we have marked on the report?
A. Yes.
Q. You don't say anything else at all about that segment of the flight right here in



your report, do you?
A. Well, I'd have to review my report, but, without --
MR. DURKIN: You mean in that paragraph of the report? --
BY MR. ESSIG:
Q. In that paragraph, you don't, right?
MR. DURKIN: Oh, okay.
A. Oh, in that paragraph. That's right.
Q. Can you point to me any other place in your report that discloses an injury -- an actual injury -- in that segment of the flight?
A. So I talk about the situation being physically taxing, physically exhausting. That's what I referred to.
Q. Okay.
So the next sentence, though -- just so we are clear on what the report says --
A. Yes.
Q. -- the next sentence, you say: After that, the undulations in the vertical acceleration increased in magnitude.
Right?
And now we are talking about a



different section of the flight?
A. Correct.
Q. So we are saying during the 2 minutes and 4 seconds from 8:41:14 until 8:43:18, the vertical accelerations ranged from 0.439 to 1.691 g's.
Do you see that?
A. I do.
Q. And that is the segment of flight that you are talking about where you talk about the physically taxing, physically excruciating, exhausting condition of the passengers, correct?
A. I agree, yes.
Q. So if we go back to this second section of the flight -- number 2 -- we can agree you don't disclose any injury during that portion of the flight in your report, right?
MR. DURKIN: Objection, asked and answered.
MR. ESSIG: I agree.
I just want him to confirm --
BY MR. ESSIG:
Q. We can -- there wasn't an injury at that point.



We are going to talk about the next section of the flight where you do say there was an injury, right?
MR. DURKIN: Objection, asked, answered, argumentative --
MR. ESSIG: All right. So we can agree, point 2, no injury.
So let's move to the third section of the flight. That's what we are doing. We are going right through this thing, just the way you do.
BY MR. ESSIG:
Q. So this section starts at 8:41:14 -- right? -- that's the end of the line at the end of number 2 --
A. Hm-hmm.
Q. And we go to 8:43:18, correct?
A. Yes.
Q. All right.
(Pause)
THE WITNESS: Want me to draw a line? Or --
MR. ESSIG: Yeah, let's draw a line and label it number 3. Sorry about that.

BY MR. ESSIG:
Q. We know that the forces ranged there from 0.439 g's to 10.691 g's, correct?
A. Yes.
Q. Do you have an opinion whether or not it is more likely than not that passengers were injured during that portion of the flight?
A. If they were bracing -- but I have no information as to whether or not they were bracing -- if they were bracing, I would expect that passengers more likely than not to sustain muscle strain, or muscle sprain, or soft tissue strain.
Q. You don't know how many passengers were bracing, if they were bracing at all, right?
A. Correct.
Q. You don't know how long they were bracing, do you?
A. Correct.
Q. You don't know how hard they were bracing, do you?
A. Correct.
Q. So you could brace really hard and



maybe that would be a chance to have greater muscle strain?
Or you could brace less hard and not have a muscle strain at all, right?
A. Yes.
Q. It's possible to brace and not have a muscle strain.
They are not -- it is not required that every time you brace, you have a muscle strain, correct?
A. Correct.
Q. Do people experience muscle strains in daily life whenever they brace?
A. So it's known as delayed onset muscle soreness. And it can happen when you do athletic activity, or when you brace, or when you are loading isometrically, or when you are standing for a long time.
The recovery process known as delayed onset muscle soreness and usually takes a day or two.
Q. So the kind of muscle strain that you are talking about is muscle soreness, right?
A. Yes.



Q. And the way we know if somebody's muscles are sore is -- it's a subjective reaction, right?
A. Yes.
Q. After the physical exertion -- whatever it was -- or whenever the forces are exerted on a person, then they can say after that, "whatever that was that happened, I was sore"?
A. Yes.
Q. And you are saying that is injury?
A. Because that delayed onset muscle soreness is accompanied by micro-tears within the muscle.
Now, this is also how you hypertrophy your muscle and get stronger.
Q. So that is exactly where I was going.
I know Kevin works out a lot. I work out.
If you are doing pushups or something like that and you have sore muscles, would you say you are injured?
A. Technically, you are.
But it's an injury that you want for



the purpose of hypertrophying the muscle.
Q. So if I lift a heavy suitcase, or I go work out, or I do some sort of physical exertion, and I have sore muscles, you think technically I'm injured under your definition?
A. Yes.
Q. And even if I don't say that it was subjectively painful, I was injured.
Is that right?
A. Because microscopically, your muscle tissue has been disrupted.
Q. And if I never went to a doctor, I never go seek any treatment, I'm still injured.
Is that right?
A. Yes.
Q. And even if it's something that I wanted, in terms of the physical benefit of -- you know, to the muscle in terms of a workout, I'm still injured.
Is that right?
A. Yes.
Q. Do you have any idea at what minimum level of force that this sort of a muscle strain that you are terming an "injury" would occur?

Page 209

A. No.
Q. Do you have any opinion as to what level of vertical acceleration, and g-force specifically, would need to be happening on the plane for somebody to brace and have this particular injury?
A. Well, the problem is the g-forces themselves are not direct causes of the muscle strain. It's the reaction of the passenger.
Q. The g-forces might be an indirect cause of the muscle strain, though, right?
A. Because you are in a stressful situation.
Q. And the higher the g-forces, the greater the requirement for bracing, right?
A. If you are physically going to restrain your body, yes.
Q. So if -- we talked about the prior data on flights of this particular airplane ranging from 0.6 to 1.31 g's.
Are you aware of any evidence that anybody on any of those particular flights reported an injury?
A. I don't have that data.

Page 210

Q. And you don't have any understanding about whether or not anyone on those flights had muscle strain?
A. Right.
(Pause)
MR. ESSIG: If we turn over here to the bottom of page 17, we are talking about this section 3 of the flight.
And the last couple of sentences say -- I'm starting here where it says: This range of undulation above plus 1 g by more than 60% and below by about 50% is biomechanically significant since each passenger would be experiencing inertial loading on their bodies and would not usually -- that they would not usually experience, nor expect to experience on a commercial flight, and which would be highly unusual during a normal and safe commercial flight.
Do you see that?
A. Yes.
Q. What do you mean by "biomechanically significant"?
A. Having at significant effect on the

Page 211

biomechanics of the body -- so beyond what would be considered a normal situation.
Q. And you were telling me before, whether or not there is an injury doesn't necessarily turn on the level of g-force at this point?
A. Right.
Q. But you are saying that whether or not there is a biomechanically significant impact on the passenger does depend on the level of g-force.
Is that right?
A. For moving the body, yes.
Q. What's the difference?
What -- can you explain why it matters in one context and not in the other?
A. Well, when you are talking about the g-forces moving the body, that is just straight physics. So an acceleration has been applied on the mass of each of your segments and it moves.
Whereas with the muscle strain and the bracing, that is your reaction as an individual to the stressful situation.
So you are going to have somebody who

Page 212

is a very nervous flier already gripping as soon as the plane starts taking off, gripping the armrests early on, and getting muscle strain then; versus somebody who is a frequent flier and doesn't realize that this flight is in trouble until right at the end.
Q. Understood.
So if my wife is definitely afraid of flying. She won't get on an airplane without me, which is good and bad.
But so, if you are a very anxious flier and you are sitting in the departure lounge just holding on to the chair there getting ready to get on the plane because you are very nervous and bracing, under your definition, you could suffer an injury, right?
A. Yes.
Q. In terms of this -- setting aside the strain injury and focusing just on the second part of this -- the actual impact of the g-forces loading on the body -- is it your opinion that under these conditions that a g-force above 1 -- plus 1 g by more than 60% or below by about 50% that g-forces of that level

cause injuries in terms of just loading on to the body?
A. No.
Q. No injury at that point based on that loading?
A. Based on that alone.
Q. Again, you are characterizing what would be usually experienced or experienced on a commercial airplane -- commercial airplane flight in this sentence, right?
A. Yes.
Q. And you testified that you did or didn't know what the typical vertical accelerations are during normal commercial flight?
A. I found some sources that actually quote g-forces, but they are not reliable. They are in odd places.
When you go to the NTSB and FAA, from what I was able to find, it's all subjective, but sort of within the range of moderate to severe turbulence.
Q. You didn't cite any of those sources in your report?



A. That's right.
Q. You didn't disclose that they exist, right?
A. I didn't find any good ones.
Q. So none of the sources that you looked at that talk about the range of normal g-forces experienced on a commercial flight you feel are good sources --
A. At least I haven't --
Q. -- or reliable?
A. -- I haven't been able to find one yet.
Q. Okay.
And so how did you then make the leap to discerning what is the normal g-force on a commercial flight?
And whether or not this is normal or not?
A. Well, the thing is, 19 times out of 20 when you are taking off and going on a flight, do you expect to encounter severe turbulence? I don't.
Maybe one time out of 20.
But usual commercial flight, I would



not expect to encounter severe, or even moderate, turbulence.
And the numbers I saw for moderate turbulence, there is nothing moderate about it. It's really a big shake.
I would expect maybe a little light turbulence when you cross the cloud layer; maybe some clear air turbulence of a low level -- so you spill your drink -- or less than that.
So when I'm saying larger than what you would expect on a normal commercial flight, I would not expect moderate or severe turbulence on a normal commercial flight.
That's the point I'm making.
Q. Okay.
And we -- we talked about the fact that the experts for Boeing that disclosed their reports that looked at the prior flight data on previous takeoffs from this airplane said the g-forces on though prior takeoff ranged from 0.6 to 1.3 g's, right?
MR. DURKIN: Objection, argumentative.
BY MR. ESSIG:
Q. That's what they said, right?



A. That's what they said.
Q. Okay.
Do you have any reason --
MR. DURKIN: That's what you said they said. You didn't show him any report --
MR. ESSIG: He said he reviewed the Boeing reports.
A. To the best of my recollection.
If it's slightly inaccurate, I don't have the report in front of me, so that's the best I can do.
MR. DURKIN: -- foundation.
MR. ESSIG: That's fair. And if it's wrong, it's on me.
MR. DURKIN: Yeah.
MR. ESSIG: That's fine.
BY MR. ESSIG:
Q. And you said you didn't have any evidence that the people on those flights were injured under those forces, right?
A. I don't know one way or the other.
Q. Okay.
Do you have any idea about whether those seven takeoffs were normal takeoffs?

Or not?
A. I don't have that data.
Q. Okay.
In terms of the difference between the g-forces experienced on those prior takeoffs and the g-forces experienced during this segment of flight -- segment 3 -- we are talking about a difference of maybe 0.2 g's on the low end, right?
So that in this segment of flight, it was 0.439 g's.
And in the previous seven flights there was a low of 0.6 g's, right?
A. Sure.
Q. On the high end in this segment of flight, the positive g's were 1.69.
And on the prior flights, they got up to about 1.3, right?
A. I don't have the data, so I don't -- I'm trusting that that's what the data says.
Q. So are you saying there was injury during this period of flight due to straining based on be those couple of tenths of g's greater or lesser than the type of flight that



this exact plane encountered in previous takeoffs?
MR. DURKIN: Objection, answered, argumentative.
A. It would depend on the response of the passengers. I have no idea.
Q. Okay.
Do you have any understanding in your field in terms of biomechanical expertise or your opinions in this case about whether a person is able to discern the difference of something like 0.3 or 0.4 g's?
A. Yes.
Q. Can they discern the difference between two tenths of a g?
A. That's probably about the limit.
Q. Okay.
But you think they could discern the difference of three tenths of a g?
A. Yes.
Q. What's your support for that opinion?
A. Just the -- that is about the acceleration you get in an elevator, and you feel the elevator.



Q. So not necessarily any literature or any disclosure in this report.
This is just your subjective sensation of riding an elevator and knowing that's what the g-forces are?
A. I'm sure the literature is out there.
But that's -- that's the range of accelerations you get in an elevator, and you feel it.
Q. You are saying it's those tenths of a g on either end which would have caused this portion of the flight to seem highly unusual to all the passengers on night ET 302?
A. Well, I think it was a bit larger than that.
In the section we are talking about, we are going 0.439 to 1.691? That's what we are talking about, right?
Q. Hm-hmm.
A. That's quite a bit bigger than riding an elevator.
This is -- and remember -- are we still talking muscle strain?
Or, like, how the passengers are



reacting?
Because --
Q. We are talking injuries.
A. Injuries.
So I've already said, with those accelerations, they are not going to get a direct injury directly due to the acceleration. So if you are getting -- talking muscle strain or muscle sprain, that is the response of the individual to the situation.
Q. Okay.
MR. ESSIG: If we look back at -- I just want to close this section out.
So if we look at page 18 of your report -- turn the page --
THE WITNESS: Hm-hmm.
MR. ESSIG: -- the end of that middle paragraph.
BY MR. ESSIG:
Q. That's where you say: The fact of this state of undulating vertical accelerations at irregular and unpredictable moments lasted for more than two minutes would have more likely than not been physically taxing, physically

agonizing, physically excruciating, and physically exhausting to every passenger on the aircraft.
Do you see that?
A. Yes.
MR. DURKIN: Apologies, could give me the page again --
MR. ESSIG: 18.
MR. DURKIN: Okay, thank you.
(Pause)
BY MR. ESSIG:
Q. Just to be clear, I just want to look at since -- this is we are -- we've been talking about this, sort of, conceptually, but this is what the sentence is.
There is no citation to any authority for that conclusion in your report right there, right?
A. That's correct.
Q. Do you have any specific citation of literature or support for that opinion?
A. Not to hand.
Q. Are the terms "physically taxing, physically agonizing, physically excruciating,



and physically exhausting" subjective?
A. Well, with the word "physical" there, the severity of them is subjective.
The binary -- is it there, or not? -- that's objective.
Q. So it's fair to say that looking across the population of folks that were on the airplane, the severity of whether it was taxing, or agonizing, or excruciating would vary a great deal depending on the person, right?
A. That's fair.
Q. For some people, it would be much more on the low end, and for some people it would be much more on the high end?
A. Yes.
Q. And I don't know if I asked this before or not.
But in the field of biomechanics, are those terms that are defined in terms of to biomechanical engineering?
A. No, those aren't terms of art.
Q. Okay.
Better way of --
A. You like that?



Q. Yeah.
Okay, so for ending segment 3, we can say there was no -- no injury other than the potential for this -- the physically taxing or exhaustion due to bracing, right?
A. Sure, in its various forms.
MR. ESSIG: Okay, so let's move on to the last 24 seconds.
So on your chart there can you mark what the section 4 is for the last 24 seconds?
THE WITNESS: Hm-hmm.
BY MR. ESSIG:
Q. Is it your opinion that injury occurred in the final 24 seconds for everybody on the airplane?
A. Yes.
Q. And this is the first time that you had that opinion -- that everybody was injured in that portion of the flight, right?
MR. DURKIN: Objection --
MR. ESSIG: It is true.
MR. DURKIN: Okay, objection, misleading, argumentative -- whatever.
BY MR. ESSIG:



Q. This is the first time you say everybody on the plane was injured?
A. Yes.
Q. Okay.
Is it your opinion that everybody during this portion of the flight would have gotten a contusion injury from the forces applied by their seat belts?
A. Yes.
Q. And you don't identify any other time period during the time horizon of the flight where everybody would have received a bruise in their seat belts, right?
A. A contusion from their seat belts.
Q. A contusion.
A. They didn't live long enough to get the bruise.
Q. Okay. Okay. Fair enough.
A contusion -- what is the difference between a contusion and a bruise?
A. So a contusion is damage to the dermis and the superficial blood vessels.
And then the bruise occurs as the blood leaks out of those blood vessels and

Page 225

forms -- and pools and forms discoloration.
Q. Is it your belief nobody actually had a bruise on the plane?
They only had contusions because the portion of the flight where they could have gotten one just didn't last long enough?
A. That's right.
Q. Did you also agree that the injuries in terms of the force of the seat belt on their pelvis -- the contusions -- those couldn't have occurred until the passengers experienced negative g's?
Is that right?
A. That's right.
Q. It has to be something lower than zero g's?
A. Yes.
Q. So at the bottom of page 18, the last sentence of your paragraph says: What made the final 24 seconds -- recorded seconds -- worse than the previous period was that the vertical acceleration in two instances went negative with a significant magnitude below zero g's (points 2 and 4).

Page 226

Do you see that?
A. Yes.
Q. And then it is in Figures 5 and 6.
So those are the two instances that made the final 24 seconds the worse than the part of the flight before?
A. That's right.
MR. ESSIG: And then on 21 --
(Pause)
MR. ESSIG: -- I am bouncing around here, but I'm trying to find the time stamps so I get this right.
BY MR. ESSIG:
Q. You write that: At 8:43:26, the passengers would have been forced out of their seats as the aircraft dropped away below them, right?
A. That's right.
Q. So that's the first time -- 8:43:26 -- when the passengers encountered g-forces below zero?
A. That's the peak negative, so it would have gone negative just before that.
Q. Okay.

Page 227

So maybe if we -- you know, a way to short-circuit this is if look at Figure 6, which I understand is sort of -- it's a blown-up segment of what we were just talking about what we labeled portion 4 on Figure 5, right?
A. That's right.
Q. But part of the -- this first time they went below zero is you have a 0.2 and an arrow to it, right?
A. That's right.
Q. And it's all of that curve -- the bottom part of that curve that goes below zero, right?
A. That's right.
Q. Do you have -- do you know how many seconds that portion of the curve lasted?
A. I don't.
Q. Okay.
Based only the time scale below, can you make an estimate?
Do you think it's something like four seconds?
(Pause)
A. Yeah, four or five seconds. That's

Page 228

fair.
MR. ESSIG: So, then, back on page 21, I guess it's forward now in that same paragraph we were just talking about.
BY MR. ESSIG:
Q. You say: At 8:43:30 -- point 3 -- do you see that?
A. Yeah.
Q. -- the passengers were pushed down into their seats again.
Right?
A. Yes.
Q. Is that the -- if we go to Figure 6, is that the portion of the flight that starts with the blue shading?
A. No, the blue shading is just -- so I got this chart originally from Charley Pereira, and I modified it. I kept the curve the same, but that blue shading meant something previously that doesn't mean anything now.
Now, it's awful close, so it's probably convenient to use it that way. I think that's reasonable.
But I didn't put that in there to

indicate that.
Q. Understood.
I think I'm actually confusing this more than it needs to be.
I think we agreed that first little trough below zero is about three or four seconds, right?
A. About four seconds, yeah.
Q. Four seconds.
So then in this period that we are talking about -- point 3 -- that's the beginning of this positive g that we are talking about?
A. Hm-hmm. Goes positive again, yeah.
Q. Okay.
MR. ESSIG: If we look at page 24, the middle paragraph there, do you see that?
THE WITNESS: Yes.
BY MR. ESSIG:
Q. You are describing Figure 9, which is a depiction of point 2?
Is that right?
A. That's right.
Q. And you say there that at point 2, the seat belts are taut with the tension between 181



and 261 newtons.
Do you see that?
A. Hm-hmm, yes.
Q. I know you disclose a threshold for bruising or contusion that -- based on that Desmoulin research?
A. Yes.
Q. And that threshold -- do you recall it 342 newtons?
A. That's right.
Q. So for this period of time below zero g's, that threshold is not met, correct?
A. For those three people.
Q. Okay.
Do you believe that 181 to 261 newtons of force is enough force to cause a contusion?
A. I don't have any data on that, so I can't give a pronouncement.
Q. And the threshold number for Desmoulin -- that was 342?
A. 342.
Q. And that threshold number -- when he calculated that threshold, that was the point where it actually was 50% of the people had a



bruise and 50% of the people didn't have a bruise, right?
A. No.
So that was where bruises -- that's the lowest value where bruises occurred, in a bony area, if you go to the raw data in Table 1 of that paper.
Q. Okay.
So everybody in a bony area at that point had a bruise?
A. Yes.
Q. And at least for this first inflection point below zero G -- around point 2 on Figure 6 -- there is no bruise at that point, right?
A. For those three people.
Q. Okay.
And it didn't meet the threshold for the population, based on your opinion?
A. Well, it -- we did it from 5th percentile female, which are the lightest, to 95th percentile male. So the heaviest person here is a 50th percentile male in the center seat. He didn't rise to the threshold, but heavier males did; well, heavier females did as



well.
Q. Do you disclose anybody in your report that would have received a contusion based on their body weight or type?
A. I didn't quantify that in the report.
Q. So in your report, you didn't quantify or conclude that anybody at that particular time point -- that first excursion below zero g's -- received a contusion?
A. I know from the simulations that a portion did.
Q. But it's not in your report?
A. That's right.
(Pause)
MR. ESSIG: So if we are looking -- there is reference to Figure 9 there in that sentence that we just read?
It's on page 25?
THE WITNESS: I'm there.
BY MR. ESSIG:
Q. That picture is a capture of your simulation at point 2, right?
A. That's right.
Q. And that's the first time we went

through negative g's where it got to about negative 0.44, right?
A. That's right.
Q. In your simulation, all the model arms are up.
Is that right?
A. Yes --
Q. Do you have --
A. -- except for the window seat. She's kind of stuck on the wall there.
Q. Yeah.
It's not below her shoulder.
It's at least at her shoulder?
A. Yes.
Q. Do you have any evidence that passengers would not have been able to hold their arms down at point -- at negative 0.44 g?
A. No.
Q. There is in literature that you point to that stand for that proposition?
A. I pointed to no literature.
Q. At negative 0.44 g, your arms would be accelerated upward at about a little less than half their normal weight.



Is that right?
A. That's right.
Q. Do you think it's likely that most people could keep their arms down with that amount of force being exerted on them?
A. I couldn't say.
Q. You don't know whether or not people of average strength or size can hold their arm down in the face of a force about half the weight of their arm?
A. Yeah, it's not just the force, though.
It's the fact that you are now experiencing gravity going in the wrong direction. So can you maintain your orientation, and your awareness, and your wherewithal to actually do that to your arm? So there is a number of things going on right now.
Can you produce that force in your arm? Yes. Can you do it while you are hanging upside down? That's a different question.
Q. Understood.
So the answer is: You didn't model whether or not they could because you didn't include resistance or bracing in your



simulation?
A. As we discussed before, because I wanted to conservative model and didn't want to make those assumptions.
Q. And your opinion as an expert in biomechanics is that we don't know if all their arms would be up at that point?
A. That's right.
Q. Do you believe that at least some people's arms might have been down?
A. Yes.
Q. But you don't have any idea about what the proportion of the people --
A. No.
MR. ESSIG: So if we turn back to 21, this is towards the middle of the first paragraph.
BY MR. ESSIG:
Q. It says: During period of more than 12 seconds.
Do you see that?
THE WITNESS: That's a big paragraph. That's my own fault. How many lines down, sorry? Help me out here.



MR. DURKIN: About two thirds of the way down.
THE WITNESS: Okay. Yes, I'm there.
BY MR. ESSIG:
Q. During the period of more than 12 seconds after 8:43:30, passengers would have been thrust out of their seats with a force equal to nearly twice their body weight.
Do you see that?
A. Yes.
Q. And here passengers would have been only thrust out of their seats when the vertical acceleration was less than zero g's, right?
A. Yes.
Q. And the force would only be equal to nearly twice their body weight when the force approaches negative 2 g's, right?
A. Yes.
Q. So if we turn back to Figure 6, 8:43:30 is at point, right?
(Pause)
A. Yes.
Q. And the forces there are actually positive, right?

A. Right. They're on their way down. You are right.
Q. So they -- on page 21 you state they are actually 0.798 positive g's, right?
A. Hm-hmm.
Q. And so that point, the passengers are being forced into their seats, not thrust out of their seats?
A. Right.
Q. And if we look at Figure 6, the forces stay positive until the blue shaded area, right?
A. Yes.
Q. And that's where the second period of negative g's starts?
A. That's right.
Q. Okay.
So the period from 3 to 4 is 12 seconds long?
A. Yes --
Q. And I know --
A. -- roundabout --
Q. -- we are doing -- kind of an inaccurate --
A. -- yeah, yeah --



Q. -- but as close as we can do kind of estimate about how long this period lasts.
Is it -- would you agree that the period in the blue shaded area to the right of it is probably about five or six seconds?
A. I'd agree.
Q. So if we look at this chart on Figure 6 where it's blown up, can you look to see where the forces actually went below negative 1 g?
A. So you got this blip; you got a shelf there where it looks like it, kind of, holds at about minus 1 --
Q. Yeah.
A. -- so the start of that, again, just before 6:17.
Q. And you can mark that on your chart?
A. I have marked that, yeah.
Q. Okay.
So that's when we get to negative 1 g's?
A. That's right.
Q. Do you know how many seconds then are recorded there in the flight where passengers experienced forces less than negative 1 g?



A. That would be three seconds, or slightly more, but close to three.
Q. So we can agree the whole blue-shaded area is five to six seconds.
The portion of time below negative 1 g's is three seconds.
Right?
A. That's fair.
MR. ESSIG: If we go to the next increment here -- 1.5 g's -- can you mark on there where that is?
THE WITNESS: Yes.
BY MR. ESSIG:
Q. How long do you think that they felt forces that were at least negative 1.5 g's or more?
A. About two seconds.
Q. Okay.
One and a half, two seconds seems fair?
A. Yeah.
MR. ESSIG: So if we look at figure 11 on page 26 --
BY MR. ESSIG:



Q. That figure is characterizing what your simulation was showing graphically at point 4, right?
A. That's right.
Q. 8:43:43?
A. Correct.
Q. And that's the end of the recorded data for the flight?
A. That's right.
Q. At point 4, you calculate that the force of the seat belt tension would apply -- you calculated the force of the seat belt tension that would apply to the passengers you modeled, right?
A. That's right.
Q. And, again, that's the force when the g's are at negative 1.91, which is the maximum negative g's recorded on the flight --
A. Right.
Q. -- correct?
And so the results that you are recording there in newtons -- that represents the maximum tension of force on the belt?
A. Actually, no.

Page 241

So what I -- I took -- so when you look at the output for the simulation -- quite right, I can see where you are going --
Q. Yeah.
A. -- the seat belt tension is changing. And it's changing pretty much with those accelerations.
So, so long as you are positive, seat belt tension is just whatever you have tightened it up to, and that's not causing a contusion.
As soon as you go negative, now the seat belt tension is going to go up. And it's monotonic with -- pretty much with the seat belt tension --
Q. What is that -- I don't mean to interrupt, I just don't know what monotonic is --
A. One to one. So as the acceleration goes up, the seat belt goes up --
Q. Proportionally?
A. -- and it -- because the seat belt tension was highly sensitive to the mass of the subject and to the acceleration you apply, which makes sense.

Page 242

So -- yeah, so for each of the subjects, you would see that seat belt tension going up.
There were some -- now when you look at the data, when you look at the output, there seemed to be -- it was also affected a bit by, once the person came out of their seat and they were held only by the seat belt, now you are allowed a little bit of motion one way or the other --
Q. Proportional forces?
A. -- yeah -- and so people would kind of react and you would get seat belt force, you know, was affected a little bit by that.
So what you would find is often the maximum was right at that final data point, but not always. And sometimes it would, kind of, plateau because you have these other factors.
So where -- so after -- I can see the point you are going to make --
Q. What do you think it is?
A. When did everybody absolutely have a contusion? --
Q. Yes.

Page 243

A. -- am I right? Okay --
Q. That's the discussion I'm trying to have?
A. It's a fair question. It is a fair question.
And so I went back and had a look at that. I said: Well, that's an interesting question --
Q. And just --
MR. DURKIN: I do want him to finish his answer.
MR. ESSIG: I know. I'm going to let him finish.
Just when you say you "went back and had a look at that," you were about to tell me something that's not in your report, right? --
MR. DURKIN: No, he -- but let him finish the question, then you can go back to it, okay? --
MR. ESSIG: -- I --
MR. DURKIN: -- go on and finish the question.
And then you can ask him another question --

Page 244

MR. ESSIG: I'll do it. Sorry --
MR. DURKIN: -- go ahead and finish --
MR. ESSIG: -- sorry about that.
A. So in the report, it definitely shows I gave the forces, and when they -- so I gave the forces and showed conclusively everybody exceeded the threshold.
What I didn't put in my report is when.
And so I went back to have a look at when.
And -- as I said before, with that first downturn, the heavier people exceeded it early on, just because they are heavier.
Q. When you said "that first downturn" what do you mean?
A. So at point 2, that section where we got four to five seconds.
There was a portion -- now, they had to be heavier than a 50th percentile male, right? -- I don't have it to hand, but I think it was about, you know, 65th percentile weight -- they exceeded it that first time.
But then you go to the second one, and

the first thing you look at is to say: Okay, who is going to have the smallest seat belt tensions? It's going to be your lightest females, because we know it's a monotonic connection between seat belt tension and the weight of the person.

Every single 5th percentile female exceeded it at about two seconds before the end of the flight data recorder.

And then it's a scale beyond that. So everybody who is heavier than that, which is everybody else, exceeded that threshold before the 2.4 seconds.

Q. And so this is analysis that's not in your report, correct?
A. No, it's contained within the simulations, but I didn't report it directly in my report.
Q. And you didn't report the calculations that you just described to come to those conclusions, correct?
A. It's all in the simulation.
Q. But you didn't disclose the calculations that you just described to come to



that conclusion in your report?

MR. DURKIN: He gave you the simulation. What are you talking about? Objection.

BY MR. ESSIG:
Q. There is no word --
MR. DURKIN: Ah, fair question --
BY MR. ESSIG:
Q. -- in your report that says these things, right?
A. No, I don't talk about the timing of when the threshold is exceeded.

I only report that the threshold is exceeded.
Q. And you report that it is exceeded at the end of the -- at point 4, at the end of the recorded flight, right? -- maximum g's?
A. Or -- well, again for the lightest person on the plane that I tested, they exceeded it 2.4 second before the end, and then it maintained that -- maintained exceeding it until the end of the flight data recorder.
Q. Enough time to have a contusion, but not a bruise?



A. That's right.
Q. A disruption of the skin?
A. So the thing about a -- possibly you could have aberrations.

But a bruise is usually characterized by the skin being intact and the dermis underneath being crushed and the blood vessels being disrupted and bleeding.
Q. So the surface of the skin -- you don't actually have an opinion that even the surface of the skin of the passengers that you simulated was disrupted?
A. That's right.
Q. When is the -- if the lightest female was 2.4 seconds -- and I'm trying to catch up with you because I don't know -- what was the time point for a heavier person?

I mean, how many other people did you compute this time horizon for?
A. So I didn't do a full sensitivity analysis. I just wanted to make sure the 5th percentile female did.

And I looked at a few others.

So if we go back to that chart -- I



think it's handy --
Q. Which chart?
A. -- the way we have labeled it up -- that one you are looking at --
Q. Sixty --
A. -- thank you.

So if we have a look, the last line I drew was around about 1.5 to two seconds --
Q. Hm-hmm.
A. -- I think we said.

So earlier than that, the lightest female would have, at that point, sustained a contusion, but everybody else before that has already done it.

Now, did I then look at when everybody else did? No. That would -- that would have been quite the undertaking because I've got to go through each of the simulations in terms of time and pick it out.
Q. And for this particular analysis, you didn't calculate an error rate?
A. No.
Q. And you didn't calculate any kind of statistical certainty around whether or not it's

accurate, did you?
A. No, I -- no.
Q. No sensitivity analysis?
A. Sensitivity analysis is not appropriate, and it's not really what we are doing --
Q. Okay.
A. -- I'm just seeing -- I already knew that the threshold had been exceeded. All I was doing was going back and seeing, in each case, when.
Q. Okay.
And that's not an analysis you can validate, is it?
A. It's as valid as the rest of the simulation.
All I'm saying is with a simulation like this, there is a lot of output. And it's up to you to go and pull the output out of the simulation.
But the output is already there. So when I go back and look of the time when the threshold is exceeded, I'm not running anything new. That data is there, I just haven't



interrogated it yet.
Q. Okay.
Do you plan on supplementing your report or disclosing a new report to disclose this opinion?
MR. DURKIN: Wait, wait --
MR. ESSIG: I'm just asking --
MR. DURKIN: -- which? -- objection, argumentative.
A. I'm just planning on getting through this depo.
Q. Got it.
So it's -- if we were going to try to put a time stamp on this, the first time that a simulated passenger exceeded the Desmoulin threshold for a bruise was 8:43:26?
Is that -- something like that?
A. All right. Where is 8:43:26?
Q. It's all right. We have --
A. Okay.
(Pause)
MR. ESSIG: You guys want to break for lunch?
MR. DURKIN: You got a while longer to



go?
MR. ESSIG: I have a little bit, but I have gotten -- I made some pretty good --
MR. DURKIN: You are getting -- okay. Well --
MR. ESSIG: -- I don't have -- let's go off the record.
MR. DURKIN: -- you got a couple hours --
MR. ESSIG: Yeah.
THE VIDEOGRAPHER: All right. I'll take us off.
We are going off the record at 12:39 p.m.

* * *
L U N C H R E C E S S
Time noted 12:39 p.m. Eastern Standard Time
* * *



* * *
A F T E R N O O N S E S S I O N
Time noted 1:22 p.m. Eastern Standard Time
* * *

THE VIDEOGRAPHER: We are going back on the record. The time is 1:22 p.m.
BY MR. ESSIG:
Q. Good afternoon, Dr. Jenkyn.
A. How are you?
Q. We are back.
I want to talk about something called head injury criteria.
Have you heard of that?
A. Yes.
Q. They call it HIC?
A. Or the H-I-C, yeah.
Q. H-I-C? I never know how that -- goes.
What do you understand HIC to be?
A. So you take the time-changing acceleration that the head is exposed to and you take an integral of it. So in a way you are, sort of, measuring the area under the curve and coming up with a single number. And that number -- the larger it is represents the

greater amount of disruptive energy that's put into the head.
Q. So it's a metric that's used to assess head injury potential in an accident simulation?
A. That's right.
Q. Are you aware that the National Highway Traffic Safety Administration has set a standard for the acceptable HIC levels in automobile crashes?
A. Yes.
Q. Do you know what that level is?
A. No the off the top of my head, but --
MR. ESSIG: I guess we can mark an exhibit, just so we can all see exactly what it is. It's tab 32.
MR. DURKIN: Is this a new one?
MR. ESSIG: New one.
(Pause)
MR. ESSIG: So I'm handing you a document that is Exhibit 294.



(Exhibit 294, Multipage document entitled: Supplement: Development of Improved Injury Criteria for the Assessment of Advanced Automotive Restraint Systems - II, dated March 2000 (no Bates Nos.), marked for identification)
BY MR. ESSIG:
Q. It's titled: Supplement: Developed -- Development of Improved Injury Criteria for the Assessment of Advanced Automotive Restraint Systems - II.
Do you see that?
A. I do.
Q. And it's dated March 2000?
A. Yes.
Q. At the bottom there, it says: NHTSA?
A. Yeah.
Q. That's the National Highway Traffic Safety Administration?
A. That's right.
Q. Have you seen that document before?
A. No.
MR. ESSIG: I just want to direct your attention to one table. It's at page SES-5, and it's Table SES-1.



Do you see that?
THE WITNESS: I'm there.
BY MR. ESSIG:
Q. So it says: Summary of Recommended Injury Criteria for the Final Rule.
Do you see that?
A. Yes.
Q. Then it has "Recommended Criteria" at the top.
And then there are columns for "Large Sized Male, Mid-Sized Male, Small Sized Female," then children with different ages.
Do you see that?
A. Yeah.
Q. The head injury criteria -- HIC -- is 700 for the large, mid- and small sized adult?
A. Yes.
Q. And it's 700 for the six-year-old child?
MR. DURKIN: Objection.
If he needs an opportunity to read through this document, he's never seen it before, and you are showing him a chart. I want to make sure it's in context.



Do you need to look through the document?
THE WITNESS: If we keep going through it slowly, we should be fine.
MR. ESSIG: I'm not going to ask any other questions about the document other than this is the head injury criteria that was acceptable for the National Highway Traffic Safety Administration.
A. Yes, that's what it says there.
Q. Okay.
Are you aware that the HVE/GATB software platform generated an HIC report for each of the simulations that you ran?
A. Yes.
Q. Did you look at the HIC reports?
A. Yes.
Q. Did you consider them in your analysis?
A. I did look at them because one of the possibilities was with the head going back and forth, there could have been sufficient biomechanical loading to the head that would have resulted in a head injury, as determined by

Page 257

the HIC. So I did look at that.
Q. Okay.
You didn't disclose the HIC metric in your original report, did you?
A. No.
Q. And when you looked at that -- at the results for your simulation on HIC -- what was your conclusion?
A. It wasn't sufficient to cause a head injury.
Q. Okay.
Do you have any opinion then, based on that metric, whether head injury was caused by the movements of the plane in ET 302?
A. I would say it's highly unlikely.
Q. Okay.
And just to be clear --
MR. ESSIG: Can we mark tab 33?
(Pause)
MR. ESSIG: This is a new one, Exhibit 295, to be clear.

Page 258

(Exhibit 295, Two-page document bearing heading: ET302 Injury Data-GATB, 414, 416-424s, dated November 21, 2022 (no Bates Nos.), marked for identification)
(Pause)
MR. ESSIG: 295 in front of you?
THE WITNESS: Yes.
BY MR. ESSIG:
Q. Do you recognize this document?
A. I do.
Q. What is it?
A. So it's an injury data output report from GATB -- HVE.
Q. And this is an output from your simulation?
A. It's -- at the top, it says the crash pulse was 414 416 to 424 seconds -- that's one of my crash pulses.
Q. At the very top there on the left, it says: ET302?
A. That's right.
Q. And that's yours?
A. That's right.
Q. I'll represent this is one of the HIC

Page 259

reports that was automatically generated that we printed out.
If you look at, sort of, the top-left, kind of the first -- the second blurb of information down, it says: Body Number 1 HIC Results.
Do you see that?
A. Yes.
Q. What's body number 1?
A. That would be the first body model that -- that was created for that simulation.
Q. Okay.
And I'm just -- I'm not going to go through all the HIC results. I'm just going to do this one, just so you can see --
A. Yeah.
Q. -- what the printout was.
But it says first there, at the top: HIC equals 0.9824.
Right?
A. Right.
Q. That's for a specific time duration?
A. Yes, but it will take it for the peak --

Page 260

Q. Okay.
A. -- so that's the biggest the HIC got during that simulation.
Q. Okay.
And then in a different time horizon below, it says: Head Injury Criterion HIC was 4.5589.
Right?
A. Yeah.
Q. And then there is a last time horizon, sort of, toward the very end of the page where it says "Head Injury Criterion" again HIC equals 2.1440, right?
A. Hm-hmm.
Q. So those are emblematic of the HIC metrics you looked at?
A. Yes.
Q. And the National Highway Safety Transportation agency said the threshold was 700 and the HIC criterias that are coming out for -- are between 0.9 and 4-1/2?
A. Yeah.
Q. So before the lunch break, we were talking about your opinion about whether or not

there was -- the threshold for a contusion was met, correct?
A. Hm-hmm.
Q. And your opinion was that, at some point in the last few seconds, that threshold number was met even for the lightest passenger, right?
A. Right.
Q. And you based that conclusion on the evidence from the Desmoulin study?
A. The Desmoulin study was --
Q. So am I saying it wrong?
A. Sorry. I take French.
Q. That's okay. Say it again so I say it right?
A. Desmoulin.
Q. Okay.
A. So it was my opinion that the force required, based on my experience, to cause a contusion would have been in the ballpark of about 300 newtons, maybe --
Q. Okay.
A. -- seventy to 80 pounds force applied to the skin.



The Desmoulin study was confirmatory. It, sort of -- it was the right ballpark.
Whether it's exactly 342, that's the best available data, but it certainly was the right ballpark.
Q. Okay.
You don't have any other study that you cite in your report for the threshold of newtons of force required to cause a contusion, right?
A. There isn't one.
Q. So the only paper you cite, and the only one maybe that exists that is you could find, was the Desmoulin paper?
A. That's right.
Q. Okay.
MR. ESSIG: On page 27 of your report, that's Exhibit 290 --
(Pause)
MR. ESSIG: -- the third paragraph.
BY MR. ESSIG:
Q. It says: A study of healthy volunteers was conducted by Desmoulin and Anderson (2011) to measure the contact force



required to cause superficial contusion and rupture of the superficial blood vessels that leads to the formation of bruises in the skin and underlying tissues.
Do you see that?
A. Yes.
MR. ESSIG: Let's mark tab 9 as Exhibit 296, I think.
(Exhibit 296, Multipage document entitled: Method to Investigate Contusion Mechanics in Living Humans, dated January 16, 2011 (no Bates Nos.), marked for identification)
MR. DURKIN: Is this the paper?
MR. ESSIG: This is the paper.
(Pause)
BY MR. ESSIG:
Q. So this is the Desmoulin paper that you cited in your report.
Is that right?
A. That's right.
MR. ESSIG: If you look at page 2 under 2.1: Epics and subjects --
THE WITNESS: I am already there, because I know what you are going to ask.



Q. It says -- I still got to ask it: This study was performed on a single living human (GD). The single subject was a 34-year-old Caucasian male who was in good medical condition and had no history of contusions over the test areas prior to the experiment.
Do you see that?
A. Yes.
Q. So the statement in your report is not accurate, right?
It wasn't a study of healthy volunteers. It was a study of one person.
A. A healthy volunteer, yes, that's right.
Q. Do you have any idea who that 34-year-old was?
A. He doesn't say, but I about bet you it's Geoff Desmoulin.
Q. We kind of talked about that ethical issue about pain, and so forth?
A. Right.
Q. That might be why?
A. Right.

Now, to my defense, where it says it's a single person, it is in section 2.1: Ethics and subjects. So maybe -- I don't know -- he was still delusional from the testing, but --
Q. I don't know --
A. -- yes, you are right. It was an N of one study.
Q. Got it.
MR. ESSIG: In the next -- so if we go to the first page, and we go down to the bottom of the left-hand column, there is a sentence there that starts: While we show.
Do you see that?
THE WITNESS: Left-hand column --
MR. ESSIG: Left-hand column --
MR. DURKIN: Right here? --
MR. ESSIG: Maybe seven lines down --
MR. DURKIN: It's right there --
MR. ESSIG: Yeah, exactly.
BY MR. ESSIG:
Q. So that sentence says: While we show that the experimental design methods can be used to investigate various impact factors that affect contusion formation in a single subject,



larger sample sizes are required to assess the technique's ability to be generalized if such a goal exists.
Do you see that?
A. Yes.
Q. And what the author is saying there is that: Do you want to generalize the result of the study? Then you need a larger sample size.
A. Yes.
Q. Do you agree that's true?
A. Yeah, you do.
Q. The next sentence says: However, due to the plethora of anatomical, medical, and physiological variables that affect contusion formation, we think it is highly improbable that this technique shall or could be used to compare data across the masses.
Do you see that?
A. Yes.
Q. So this is a further warning that you shouldn't use this data from a single person to compare how contusions might form in a bigger population?
A. I think he's signaling caution, which



I would agree with.
Q. So you agree with that statement?
A. Yeah.
MR. ESSIG: So if we turn to page 9 of Desmoulin --
(Pause)
MR. ESSIG: -- it's under the left-hand column under "Discussion" and there is a section that starts, "It is important."
THE WITNESS: Hm-hmm.
BY MR. ESSIG:
Q. It says: It is important to note that the statistical significance found in Figure 9 is valid for the person and circumstances tested.
Right?
A. Yes.
Q. So he's saying that even if there was statistical significance found on any particular outcome of the study, it's only valid for that person and those circumstances, right?
A. That's right.
Q. And then he says: While this cannot be generalized to a population, this is likely



unnecessary -- while this cannot be generalized to a population, this is likely unnecessary as this method is designed to be used to investigate a crime inflicted on a single person.
Do you see that?
A. Yes.
Q. So the purpose of the report -- of the paper -- was to do an experiment to -- designed to determine if a crime was inflicted on a single person, right?
A. That was his intent.
Q. Okay.
And then he says: Should a researcher wish to investigate a particular contusion variable, it is possible to use this method using multiple subjects being impacted in a specific region once, so that a generalization can be made to the population.
Do you agree with that statement?
A. Yes.
Q. And you didn't do any other research that he's talking about, right?
A. Wish I could have -- but, no.

Q. Okay.
(Pause)
MR. ESSIG: So if we go back to 290 in your report, right after that study, a study -- right after the sentence: A study of healthy volunteers?
THE WITNESS: Hm-hmm.
MR. DURKIN: What page are we on now?
MR. ESSIG: Twenty-seven.
MR. DURKIN: Okay.
BY MR. ESSIG:
Q. It says: This study showed that the minimum force required (i.e. the threshold force) for contusion and rupture to superficial blood vessels in the legs is 342 newtons. That's where the bone is superficial to the skin (i.e. shin).
Do you see that?
A. Yes.
Q. And that 342-newton metric -- that's the threshold that you have been using when you have looked at the simulation to determine whether or not there was a contusion potentially on any passenger, right?



A. That's right.
MR. ESSIG: If we look at Table 1 in the paper that --
THE WITNESS: Hm-hmm.
MR. ESSIG: -- we are going back to Exhibit 296, the Desmoulin paper --
MR. DURKIN: -- what page now? --
MR. ESSIG: Page 6, Table 1 at the top.
THE WITNESS: Hm-hmm.
BY MR. ESSIG:
Q. That's where that 342 Newton threshold comes from?
A. That's right.
Q. So in Table 1, you have a couple of different columns. But if we look at it -- the first column is "Trial number," so this is the number of times he's dropping the subject, right?
A. Hm-hmm.
Q. The second column is "Location," so that's where on his body he is dropping it?
A. Hm-hmm.
Q. And then he has "Low, Mid, and High



shin."
Do you see that?
A. Yeah.
Q. There is a "Peak force" in newtons, right?
A. Right.
Q. And so he reports what the peak force in newtons was for those particular places?
A. Mm-hmm.
Q. And the lowest number there is "High shin 342."
Right?
A. Yeah.
Q. And the low shin and mid shin actually have higher numbers, right?
A. That's right.
Q. And your bones are superficial to the skin, you know, throughout the shin, right?
Even at the mid and low shin?
A. Yeah.
Q. So even for a kick or a place on the body that has a bone that's superficial to the skin, can you have a great deal of variation in the amount of force that's required to cause a



bruise?
A. Well, be careful, because that's not what this shows.
And I want to put my professor hat on.
Q. Okay.
A. It shows that a bruise occurred when you hit it with that force.
The experiment didn't then hit it for 1 -- with 1 newton less than that, and 1 newton less than that, and titrate out the exact thing.
So -- so you -- again, caution. I agree. This is an N of one study, and it's a unicorn. It's the only one out there, and it's incomplete data. It's statistically underpowered. It's sparse, but it's the only game in town.
So I agree that you need to read these data with caution.
Q. Earlier when we were talking about car accidents, you stated that comparing impact forces to the force on a flight -- you said that can't be compared -- those two things?
A. Hm-hmm.
Q. Because the one involves a force for a

short period. It's an impact.
And the other one is a longer, prolonged series of forces that might not have an impact?
A. Right.
Q. But here, what we are looking at is a paper that's really looking at the first type of force -- right? -- a direct impact for a very short period of time?
A. Right.
What's neat about this --
Q. Do you think that -- sorry.
A. No, no, no --
Q. Do you think that, therefore, the forces we are talking about on the plane and the forces that are being described in the Desmoulin paper are, kind of, apples and oranges?
A. No.
Q. Why not?
A. Because in this case -- so my concern before about comparing an impact with what's happening in the aircraft is it was a high force and a short amount of time during the impact.
And in the aircraft it was a low force



and a large amount of time.
So that's apples and oranges.
But what we have here: Same force.
Same force, short amount of time; same force, long amount of time. You can compare those.
In fact, this is going to be conservative.
So you have less chance of getting a bruise during the Desmoulin study because you are only doing an impact; rather than if you apply 342 newtons over a several seconds, you are putting way more energy into the tissue.
So you can compare it -- again with caution -- but you can compare it because it's the same force.
Q. All right.
MR. ESSIG: If we look at page 2 of the Desmoulin paper --
THE WITNESS: Hm-hmm.
(Pause)
MR. ESSIG: -- Figure 2.
BY MR. ESSIG:
Q. Do you see at the top?
A. I do.



Q. That's the impactor?
A. Yes.
Q. So this is the thing he's dropping on himself, right?
A. Yes.
Q. And the force is being transmitted to him, kind of, at an apex of whatever that ball -- that wooden ball is on the bottom of the weight, right?
A. Yes.
Q. And so the force that you are getting from that impact, or being dropped from whatever height he's dropping it -- is that a more acute force than you would get from a seat belt being put across you appropriately?
A. Same magnitude of force. The loading rate would be different. So in that case, you are right. The force is coming on quickly and then going off quickly.
It's the same force, though.
Q. Okay.
And then peak force -- this newton peak force -- that's the -- that is the number you are using as your threshold, right?



A. That's right.
MR. ESSIG: If you look at -- go back down to page 6 of the article. That's where we were looking at Table 1.
THE WITNESS: Hm-hmm.
MR. ESSIG: On the right-hand column in the text, the first full paragraph there starts with: The results.
THE WITNESS: Yeah.
BY MR. ESSIG:
Q. The results of the single continuous (impact characteristic) by two outcomes (bruise or no bruise) binary logistic regression showed that only one of the calculated impact characteristics varied significantly under the two categories.
Right?
A. Yes, he says that.
Q. Okay.
So this is this idea of threshold -- bruise or no bruise -- in --
A. Right --
Q. -- his study?
A. -- yeah.

Q. He says "peak force" -- that's what you looked at, right? --
A. Hm-hmm.
Q. -- peak pressure, displacement, tissue stiffness, impact velocity, force impulse, pressure impulse, and energy density all did not -- did not -- vary significantly under the two categories.
Correct?
A. That's what he says.
Q. And he's using that same statistical significance -- threshold for statistical significance that you do.
And it's common in the field P is greater than 0.05?
A. Yeah.
Q. Then he does say: However energy absorbed by the limb did vary significantly according to our two criteria.
Right?
A. That's what he says, yes.
Q. And so there is only one -- one of the outcomes that he looked at -- only one of them he reaches statistical significance for his



sample of one person and one individual circumstance.
And it was not the one that you looked at -- peak force -- correct?
A. That's the only one he could find with his available data.
Q. The bottom of that -- you didn't disclose in your September 22 report here any opinions about the energy absorbed by the passengers in your simulation?
A. No.
MR. ESSIG: Let's look at page 11 in your report, back to Exhibit 290.
We are done with that paper --
(Pause)
THE WITNESS: What page?
MR. ESSIG: Eleven.
THE WITNESS: Okay.
MR. ESSIG: So it's the last full paragraph on page 11. It starts: It is assumed.
Do you see that?
THE WITNESS: Yes.



BY MR. ESSIG:
Q. So it reads: It is assumed that all passengers and crew aboard Flight ET302 were wearing their -- were wearing seat belts properly and were restrained within their seats.
Do you see that?
A. Yes.
Q. And you agree that's the assumption you made?
A. Yes.
Q. And then you say: This is a conservative assumption and I have not seen any indications to the contrary in any of the material that I've reviewed for this report.
Do you agree?
A. Yes.
Q. The opinions in your report are all based on this assumption, correct?
A. That's right.
Q. Is it your opinion then that it's more likely than not that all the passengers were belted on the flight?
MR. DURKIN: Objection. Objection --
A. I don't know --



MR. DURKIN: -- that's speculative --
A. -- I can't answer that.
MR. DURKIN: -- yeah --
MR. ESSIG: Fair enough.
BY MR. ESSIG:
Q. You go on in the paragraph then to say -- this is another -- maybe just skip one more sentence or so.
It says: I have described the affects of the inertial forces acting on the bodies of unrestrained passengers for illustrative purposes only.
Do you see that?
A. Yes.
Q. What do you mean by "illustrative purposes only"?
A. When you apply the same loading to the same passengers, but you undo one seat belt, the results -- the resulting body motion is remarkable. It's large. The person rockets out of the seat.
What I'm illustrating is not what I think happened -- that people had no seat belts on.

It helps understand the magnitude of the forces and accelerations that the passengers were undergoing when you see what would have happened, had that are seat belt not been on. They are large.
Q. Okay.
It's a pretty dramatic way to illustrate a point showing -- a body going up.
Are there other ways you could have illustrated the point?
A. Well, I could have -- again, do it with a briefcase. You do it with, like, a bag of sugar or something.
But there is one other thing you want to show -- is with, say, a suitcase, it's a single segment.
And there are interactions between the segments. So even as the person comes up and out of their seat, there is interactions with how the arms are moving, the legs are moving that also affect how the overall body moves.
So it was a demonstration and illustration of the magnitude of the forces acting on a human body. That was the -- that



was the closest available proxy.
Q. And you say on page 11: If the passenger had been accelerated out their seat at negative 1 g, then they would have been traveling very quickly at the point of contact with the ceiling. The reaction from the force from the ceiling in that situation would have been large and likely injurious.
A. Yes.
Q. What's the basis for that statement?
A. Well, you can do the thought experiment.
So if you are sitting in your seat with your seat belt on experiencing minus 1 g, it's the same as if I took you in your seat with your seat belt on and turned you upside down.
And now, if you are that person -- imagine you are that person sitting in that airline -- think of how far away the ceiling of the aircraft is.
And now if I say, "I'll give you a hundred bucks. You are going to undo your seat belt," are you going to take that money?
I wouldn't, because you are going to



really hurt yourself, because you are falling straight out of your seat and you are landing on your head on that ceiling.
So that's -- that is my subjective understanding of the physics in that case.
Q. Okay.
Did you conduct any quantitative analysis on this point?
A. The simulation.
Q. Okay.
Your opinion is based on the subjective description that you have --
MR. DURKIN: Objection-
MR. ESSIG: -- is that what you said? --
MR. DURKIN: --
MR. ESSIG: I am just trying to understand the testimony --
A. Based on my understanding of the physics.
Q. What did you call it? -- a thought --
A. Thought experiment.
Q. -- thought experiment?
Are you aware of any literature that



supports the claim that you are making? -- specific literature?
A. That if I put you upside down in a seat, and you undid your seat belt, you'd hurt your head? Seems kind of obvious.
Q. Okay.
There is no study that you are citing or anything like that about people that are unrestrained, and that at negative 1 or 2 g's -- or any g level below zero -- how they might be injured?
A. There very well could be. At this moment, I'm not aware of it.
Q. Would you agree that the only time a passenger could have been injured from being unrestrained in their seat belt in the way you are describing is at the point in time in the flight where the vertical accelerations were less than zero g?
MR. DURKIN: Objection, speculative.
Q. If the g's were positive, they were being pushed down into their seat, right?
A. Yeah, I think that's reasonable.
Q. So the only times they are going up

towards the ceiling would be if the g's are less than zero?
A. Yeah.
MR. ESSIG: If you look --
(Pause)
MR. ESSIG: I guess look at Figure 13 on page 31 of your report?
THE WITNESS: Okay.
BY MR. ESSIG:
Q. This is a simulation with one of the passengers that wasn't fastened in with their seat belt?
A. That's correct.
Q. And it was the pink passenger? Right -- the one in the aisle seat?
A. Yes.
Q. And she goes up to the ceiling under the conditions at point 2 or point -- or point 4?
A. So this is the exact acceleration pulse that you saw in Figure 6.
Q. Okay.
So you are saying at 8:43:25 -- 75 -- she strikes her head on the ceiling and rotates



backwards, right?
A. That's right.
Q. Did you simulate whether -- what the impact forces are or what it looks like when a passenger is not fastened for any of the other passengers?
One in the middle seat or the window seat?
A. Yes. I believe I ran that simulation -- those simulations as well.
Q. Okay.
Did you describe or disclose those in your report?
A. No.
Q. Are you aware about the aerospace standard for restraints in civil aircraft?
A. Is that the paper I cited about the seat belts?
Q. It is about seat belts. It's about, like, the breaking strength of a seat belt.
A. Yes.
Q. Do you know what the webbing in a restraint system for the lap belt -- what the breaking strength needs to be?



A. Off the top of my head, I don't.
Q. If I represented to you it was 22.2 kilonewtons, would you agree?
A. Sounds about right.
Q. It was in a -- in one of the materials in your reliance disclosure.
How many newtons is 220.2 kilonewtons?
A. 22,200.
Q. Okay.
And so the forces that you are simulating on the seat belts in Flight 302 -- they ranged from around 530 newtons to 1509 newtons in your report?
A. That's right.
Q. So the maximum forces we are talking about are about 2 to 7% of the braking strength requirements for the seat belt?
A. I'll trust your math.
Q. And no opinion that the seat belts broke?
A. No, I -- I think it's extremely unlikely the seat belts broke.
MR. ESSIG: So let's turn back to page 11.



BY MR. ESSIG:
Q. Just under the paragraph we looked at about unrestrained passengers and seat belts, you have a discussion about the loose items that might be expected, and how they might be expected to behave during the flight?
A. Hm-hmm.
Q. You didn't perform a simulation on loose objects within the passenger cabin, right?
A. No.
Q. And you generated no data on the way loose objects might have moved during the flight?
A. Nothing that went in the report.
Q. Are you giving these opinions as well in this paragraph for illustrative purposes?
A. Also based on my understanding and reading of the flight data recorder data.
Q. Your report says -- this is kind of going to carry over to 12: Loose items would be expected to include, but are not limited to -- then it lists a whole bunch of different things -- I won't read them all -- through the end of that paragraph.

Do you see that?
A. Yes.
Q. Did you review any evidence that establishes that all of these items were present on the flight?
A. No.
Q. Do you have any idea if any or all of these items were present --
MR. DURKIN: Objection, calls for speculation --
MR. ESSIG: That's what I'm --
MR. DURKIN: -- there was no recovery. Everything was destroyed --
MR. ESSIG: Okay --
MR. DURKIN: -- I am not testifying, but come on.
BY MR. ESSIG:
Q. You don't have any evidence that any of those items were on the flight, right?
A. I have no data to answer that.
Q. You don't know if any one -- any one of them was?
A. That's right.
Q. You can't say for certain whether or



not -- where they might have been located, right?
A. That's right.
Q. And you can't say how many loose items were potentially in the cabin?
A. No, I can't.
Q. Do you have any evidence that you are aware of that luggage was improperly stowed under the seats?
A. No.
Q. Would you expect that if folks were instructed to properly stow things in the -- under their seat or in the overhead bins that they would have done that?
MR. DURKIN: Objection, calls for speculation.
A. I can't answer that.
Q. Okay.
On page 12, you say: Once airborne, the chance of an object striking a passenger or the interior of the aircraft is almost certain.
Do you see that?
A. Yes.
Q. You don't say that it's almost certain



that one of these objects would strike a passenger, though, right?
A. So -- where is that sentence again? What am I commenting on here?
MR. DURKIN: We are going -- fast. We are just down to the third -- second full paragraph in the middle.
MR. ESSIG: Yeah.
BY MR. ESSIG:
Q. It says: Once -- it's almost right in the middle there. Once is on the right-hand side.
Once airborne, chance of the object striking a passenger or the interior of the aircraft is almost certain.
A. Right.
Q. I'm just trying to understand what you meant when you wrote that sentence.
You are not saying that, once airborne, the chance of an object striking a passenger is almost certain?
A. That's right.
Q. You are including either the passenger or the aircraft?



A. Right.
Q. Okay.
Do you have any idea about the level of certainty that an object might have struck a passenger?
A. I would say more likely than not. And that comes down to the available surface area provided by the surface of a passenger compared to the available surface area provided by the interior of the cabin. It seems more likely than not that somebody is going to get hit.
Q. Did you quantify either of those two --
A. I did not.
Q. So you don't know the available surface area constituted by the passengers?
A. That's based on my engineering judgment.
Q. Okay.
And you don't know the surface area on the inside of the --
A. That's right.
Q. And you didn't calculate in terms of a quantified measurement the likelihood that an

object would strike a passenger, right?
A. That's right.
Q. If passengers were struck, do you have any idea about how many would have been struck?
A. I can't answer that.
Q. Or when in the flight it might have happened?
A. For the articles to become airborne, you have to have that period of negative g's. So the earliest they could have become airborne is during that first period of negative g's.
Q. So just like when we were talking about the unrestrained passengers, the only time points possible for these loose objects that might have struck a passenger would have been the two times it tips below zero g?
A. That's right.
(Pause)
MR. ESSIG: Page 25.
(Pause)
MR. ESSIG: I marked up this report so much I can't even read it.
Page 23 of your report.
THE WITNESS: Hm-hmm.



BY MR. ESSIG:
Q. You say: Several -- this is under section 5.3: Several biomechanical simulations were run for three passengers seated in an economy seat for the last 150 seconds of the flight.
Do you see that?
A. Yes.
Q. The outputs --
MR. DURKIN: I didn't get there yet.
MR. ESSIG: Oh, sorry.
MR. DURKIN: You went --
MR. ESSIG: Twenty-three.
MR. DURKIN: -- okay, because you started 25. Now we are ad 23, and we are --
MR. ESSIG: Right under section 5.3 --
MR. DURKIN: Got it.
MR. ESSIG: Yeah, first sentence.
BY MR. ESSIG:
Q. The second sentence is: The outputs of the simulation included, but were not limited to, the joint angles between each of the body segments in all three directions with respect to time.



Right?
A. Yes.
Q. And then you say: These values were provided in spreadsheet form to the experts producing the animation of the crash flight.
A. Hm-hmm.
Q. Who were you referring to when you said "the experts"?
A. That would have been Jack Suchocki.
Q. Anybody else?
A. Perhaps Charley Pereira, but I don't think he needed it.
Q. So your testimony is Jack Suchocki is the expert?
A. Jack Suchocki is the one who is doing the animation. And I called him an expert there but -- this is earlier on in the process. I didn't -- I just used the wrong word --
Q. I think we talked about this before.
But to your knowledge, all of the information you provided to Jack Suchocki hasn't necessarily been provided to the defense in this case, including the AVI files.
Is that right?



MR. DURKIN: Hold on a second --
MS. GUERRIERI: Well, I --
MR. DURKIN: -- can we repeat that question?
MR. ESSIG: Yeah. Just to be --
MR. DURKIN: You really are talking fast -- but we got to keep up with you.
MS. GUERRIERI: We gave you in that --
(Pause)
MS. GUERRIERI: -- files, and I'm just a little bit confused when you are asking the questions if you are referencing the same AVI files I gave you, or if you talking about -- I don't --
(Pause)
MR. ESSIG: We can talk about it offline. I'm not trying to make big deal out of anything --
(Pause)
MR. DURKIN: He doesn't know what we gave you.
MR. ESSIG: We'll have a discussion about whether we got all AVI files or not.
I understand you don't know exactly

what was produced to us and what wasn't.
But I don't know what you've had, so I don't --
(Pause)
BY MR. ESSIG:
Q. Did you have any communications with Jack Suchocki after you provided your simulation outputs to him?
A. Let me think back. It was quite some time ago.
If I did, it might have been in the form of a phone call, if he was having trouble opening files, or running the AVIs, or if they weren't of sufficient resolution.
I know we went back and forth a couple times where the first AVIs I sent were too low resolution, so I just made bigger files.
Then we had to talk about how you set up a One Drive to get them to him -- something like that.
But in terms of me telling them how to do the animation? No.
Q. Okay.
So the only conversations you had were



essentially logistical, trying to open the files, make sure they had the right thing.
But you didn't have any conversations about how to do the animations?
A. That's fair.
Q. Did you ever review any animations that were produced by Charles Pereira?
A. I had access to a couple animations that I did have a look at.
Q. What were those animations of?
A. It's the two -- sort of composite ones where you got the planer, plus inputs, plus transcript of the cockpit voice recorder -- a lot of things going on.
I got two of those, and I watched portions of them, if not all.
Q. Did you look at those animations before you did your work on the biomechanical simulation you did?
A. The simulations had mostly been finished at that point.
Q. And the animations that you saw from Charles Pereira just showed the outside of the airplane?



A. That's right.
Q. Nothing about the inside of the airplane?
A. That's right.
Q. Did you do anything to apply what the animation of inside of the aircraft looks like to the analysis you did in your report?
A. No.
Q. You did your report all before the animation was ever created, right?
A. That's right.
Q. After you provided your simulation outputs, did you ever review any animations created by Eyewitness Animations?
A. I had access to the initial draft copies, and had a look at them. But I didn't provide any input as to whether they were right or wrong.
(Pause)
MR. ESSIG: Let's look at the animation. I think we have talked about it. I think Ms. Guerrieri can put an animation up here, and then we will just --
MS. GUERRIERI: I can share my screen.



I'm not sure I can share the audio, though, because I think it will create a feedback --
(Pause)
THE VIDEOGRAPHER: With screen sharing, there is an option when you select what window or screen to share, you can check a box in the bottom-left that says "share audio" over the Zoom, if you are logged into the zoom.
(Pause)
MR. ESSIG: Is there a way to mark this as an exhibit?
THE VIDEOGRAPHER: Within AgileLaw, if the file is not present, I can't mark it there. But if you mark it verbally on the record, that might be the best we can do for now.
MR. ESSIG: Okay. So I'll just do the best we can for now.
This is I think Exhibit 2 -- I think this is going to be Exhibit 297.
Is that right?
THE VIDEOGRAPHER: That is correct.
MS. WINTER: Chris, just for one moment -- so you could just mark it that way, since it's an electronic copy, and then we can

have it in AgileLaw as well.
MR. ESSIG: Yes.
So we are going to mark it 297. It's going to be the animation that was produced with the expert reports.
(Exhibit 297, Video animation share screen by Winston and Strawn (no Bates No.), marked for identification)
MR. ESSIG: And we are going to play it here just so we can see it.
(Animation played)
BY MR. ESSIG:
Q. Had you seen that before?
A. Yes.
Q. I just want to ask you a couple questions about some of the elements of the animation.
There appears to be items of luggage that came out from under the seats.
Did you see that?
A. Yes.
Q. You didn't direct anybody to include those items?
A. I did not.



Q. And you didn't provide any data on to Eyewitness Animation about how loose items would move?
A. That's right.
Q. We heard noises from the passengers screaming and so forth.
Were you involved in the decision to add a soundtrack of any of the noises, including screaming or anything else, on the animation?
A. No.
Q. When you look at the animation, the camera shakes somewhat during the cabin animation.
Were you involved in the decision to make that camera shake?
A. I was not.
Q. The g meter in the animation reaches at the end approximately negative 2.4 g's.
In your report, you say the maximum negative g's reported were negative 1.91.
Is that correct?
A. That's what I had in my flight data recorder data.
Q. Okay.



You didn't tell to Eyewitness Animation to put a particular level of g's on this?
A. I did not.
Q. And we've talked at length that you assumed that all the passengers were belted, right?
A. Yes.
Q. This animation does show one passenger who is unbelted, right?
A. Yes.
Q. You didn't direct them to include that unbelted passenger?
A. No, but I did provide them with a simulation where the window seat passenger was unbelted, so I assume the motion is based on that.
Q. Okay. Fair enough.
MR. ESSIG: Go to page 32 of your report. Just look at that bottom paragraph.
(Pause)
BY MR. ESSIG:
Q. It says: From the instant that the nose of the aircraft struck the ground, the



inertia of the aircraft would have continued to drive itself downward into the ground. The ground would have provided an extremely large reaction force in response that would have rapidly and progressively destroyed the structure of the aircraft nose to tail. This process of destruction from initial contact to complete destruction would have occurred over a very short period of time.
Do you see that?
A. Yes.
Q. The short period of time you are talking about is milliseconds, right?
A. Milliseconds, yes.
Q. That means the destruction of the airplane happens almost instantaneously?
A. No. Milliseconds is a long time. It's about the length of a car crash.
Q. The passengers would have perished in milliseconds, though, right?
A. Yeah, and you do a back-of-envelope calculation, somewhere between seven and 10 milliseconds.
Q. Are you offering any opinion about

whether the passengers had enough time to experience pain in the milliseconds it took for the plane to be destroyed when it impacted the ground?
A. I'm not, on their perception, no.
MR. ESSIG: I don't think I have any further questions.
MR. DURKIN: All right. Take a break and we'll see where we are --
MR. ESSIG: Okay.
THE VIDEOGRAPHER: All right. We are going off the record. The time is 2:09 p.m.
(Recess from 2:09 p.m. to 2:39 p.m. Eastern Standard Time)
THE VIDEOGRAPHER: We are going back on the record. The time is 2:39 p.m., and you may proceed.
EXAMINATION
BY MR. DURKIN:
Q. Doctor, just a few follow-up questions from the examination by counsel.
Early on, you were talking about -- somehow a rollercoaster came into the discussion?



A. Hm-hmm.
Q. Is there a difference between what these people went through and a rollercoaster ride?
A. There is, yeah.
Q. Explain what that is.
A. Well, generally with a rollercoaster, when you are going down the bottom of a curve, you are going to experience greater than 1 g that's pushing you down into the seat.
When you come up and over the top, you might get a very brief moment of weightlessness or slightly negative g's, but it's a very short-lived.
And then you go into close to free fall, close to zero g, as you are coming down the slope. You don't get the large negative g's that we saw during the two portions of the last 24 seconds.
The other thing with a rollercoaster is you know you are doing a rollercoaster. You can see what's coming, and the restraint system is designed specifically that it spreads the load over your body in a way that's not



injurious as you go on the rollercoaster and experience those accelerations.
Q. And you are not heading towards the ground either without some type of safety device?
A. Of course.
Q. Okay.
We talked about -- you did get the data from Charles Pereira from the -- from Boeing?
A. That's right.
Q. But you also relied on the data from the Ethiopian government?
A. So in the preliminary and interim reports from the Ethiopian government, they also had traces of the three directions of acceleration acting on the aircraft.
I think I included one of -- that as one of the graphs in my report.
And the data I got from Charles Pereira was consistent with what was in the reports from the Ethiopian government.
Q. I see.
And you actually put a chart in there



with the -- one of your charts came from the government in your report?
A. That's correct.
Q. Okay.
There was a couple questions about the initial work you did here about stiffness and all that.
Is that a preliminary -- is that preliminary work to set up a test?
A. That's right. So as you are setting up the simulation in the first place, before you are ready to start a large series of runs and testing different parameters, you have got to set up the simulation and get things working right.
One of those things is you establish the minimum stiffness required for the body models to sit or stand in a physiological manner.
Q. That's a preliminary aspect?
A. That's right.
Q. Okay.
You were asked questions about you weren't able to compare arm length and things

like that.
Do you recall that?
A. Yes, I do.
MR. ESSIG: Object to form.
BY MR. DURKIN:
Q. And that -- what's that about?
Is that because someone 5'9', 160 might have larger forearms than another person that age? -- size?
A. Exactly. There is variance in lengths of body segments that you can only get when you actually measure the individual person. Obviously, you are unable to measure the individuals in this plane crash because they are no longer with us.
Q. They were annihilated?
A. Right.
Q. Okay.
This -- I'm going to tack up it.
But the paper by the French gentleman named Desmoulin --
A. Desmoulin?
Q. Desmoulin? Okay.
Was that the basis for your opinion



on -- the basis for your opinion on contusions?
A. I think what I said in my testimony was I had an idea of what the ballpark figure would have been in terms of force to cause contusion.
And the Desmoulin data was confirmatory of that; showed me I was in the right ballpark.
Q. So you used your engineering judgment in coming to a threshold or a number that you thought it would, and this confirmed it?
A. That's right.
MR. ESSIG: Object to form.
Q. Now I understand it's one person.
But what was important about this study for you, actually? -- as opposed -- what was -- the data?
Or what?
MR. ESSIG: Object to form.
A. So what's important about that study is it's one-of-a-kind. And it's -- so, yes, it's a statistically-underpowered study with sparse data, and it does need to be treated with care.



However, it's the only data of its kind. And so to ignore that data means you are not reviewing all the available data to you.
So it's imperfect, but ignoring it would be much worse. Then I wouldn't be doing my duty as a biomechanical engineer.
Q. Okay.
And they came to this number that you had yourself had determined in the range and it was 342 --
A. For a bony part of the body, that's correct.
Q. -- for a bony part of the body.
Does it turn out that the actual force -- the newtons -- was multiples of that on these folks?
A. Yeah -- so when you are treating a threshold like this with caution, it means you then -- there is an amount of uncertainty around that number.
So when you run your simulation -- series of simulations -- as conservatively as possible -- and I think the lowest seat belt tension I got in my simulation series I think



was 530 -- you can then say: Okay, well, there is daylight between the threshold 342 and that minimum value of 530.
And then you can say: Even if there is some uncertainty in that value of 342, it is not so large that it would overcome that minimum value of 530.
Now, the situation would be different if I had done a simulation and got a minimum value of 350, and the Desmoulin study is saying 342.
Then you would say: Okay, I can't be certain there that the uncertainty wouldn't overlap.
But we are up at 530. That's 180% of the threshold.
Q. A minimum. We were actually over 1,200 -- or 1,500 --
A. For larger individuals, yes, who were heavier, you are many multiples of that.
Q. Durkin would be four times newtons, right?
A. And so your body size scales upwards, but the strength of your tissues --

Page 313

Q. Okay.
And so I think -- so jurors can kind of understand it, they hear "margin of error" -- election season.
They are way outside the margin of error here?
MR. ESSIG: Object to the form, leading.
BY MR. DURKIN:
Q. Is that right?
A. That's right.
Q. You did review the report of Mr. -- he's a Ph.D., so I'll call him Dr. Wobrock, okay? -- I checked on that -- to give him the respect.
MR. DURKIN: Maybe we can pull that up, okay?
(Pause)
MR. ESSIG: I'll just object that this line is outside of the scope of his direct as well.
MR. DURKIN: -- okay -- he did tell you he reviewed the report on direct.
(Pause)

Page 314

MR. ESSIG: I thought he said "would," but -- I made the objection.
Go ahead.
(Pause)
MR. DURKIN: Okay. So let's go to -- we are going to mark it as exhibit -- and we'll supplement it. What exhibit number is this?
MS. GORDON: 298.
(Exhibit 298, Multipage document entitled: Boeing's Rule 26(a)(2)(B) Disclosure of Dr. Jesse L. Wobrock, dated November 22, 2022 (no Bates Nos.), marked for identification)
MR. DURKIN: Let's go to the first page of the report --
(Pause)
BY MR. DURKIN:
Q. First paragraph says: Based on a review -- he's talking about you -- I conclude that the opinions and conclusions reached by Dr. Jenkyn in this case are speculative, unscientific, and unreliable.
Agree or disagree with that statement?
A. I disagree.
Q. You agree that you are actually

Page 315

scientific?
A. Yes, I am -- I am scientific.
Q. And you believe the methods of engineering and your judgments were reliable that you make?
A. Yes.
Q. Okay.
MR. DURKIN: Then we go to his criticisms of you on page 5.
MR. ESSIG: I don't think his AgileLaw is moving, so he can't even see what you are talking about.
(Pause)
MR. ESSIG: Again, I'll object this is as outside the scope of the direct.
MR. DURKIN: Actually, go to page 6.
(Pause)
MR. DURKIN: You see second paragraph?
(Pause)
THE WITNESS: Right underneath the heading?
MR. DURKIN: Under: Biomechanical simulations.
THE WITNESS: Oh, there we are. Okay.

Page 316

BY MR. DURKIN:
Q. One of his criticisms of you is stated here.
It says: Biomechanical simulations, including the one utilized by Dr. Jenkyn, generally assume that passengers are "ragdolls" -- in quotes -- or crash test dummies that will not or cannot resist any of the forces acting upon their body.
Do you agree or disagree with that?
A. Disagree.
Q. Why do you disagree with that?
A. Because we can set the stiffness of individual joints, in which case those joints will act to resist forces acting upon the body.
Q. Then he says: But, as relevant here, it is highly likely that passengers, in response to some of the airplane movements summarized by Dr. Jenkyn in his report, would engage in a defensive position by grasping the armrests of their chair and pushing themselves into their seat backs.
Okay.
Would that be the thing that we were

talking about -- bracing?
A. Yes.
MR. ESSIG: Object to the form.
A. That's my understanding.
Q. Counsel was talking about bracing with you?
A. That's my understanding. That's what he meant by bracing.
Q. And is it your opinion, I believe, from what you said this morning that, to a reasonable degree of certainty, it's more likely than not that each and every person who braced suffered some injury?
A. Yes.
MR. ESSIG: Object to form, misstates the evidence, leading.
BY MR. DURKIN:
Q. And that would be a muscle strain?
A. That's correct.
Q. Okay.
And that goes -- that's certainly in segment 3.
Remember we went through the segments?
Segment 3, which is the two minutes



and -- how many seconds? -- two minutes and 4 seconds before the last 24 seconds?
A. Yes.
Q. Okay.
That's in that period?
A. That's during that period.
Q. Okay.
MR. ESSIG: Object to form, leading, misstates the testimony.
BY MR. DURKIN:
Q. Okay.
So if you are to assume Dr. Wobrock is true and accurate that -- about the passengers all bracing, then can you say -- we're going to get to the babies in a second -- can you say that each passenger and crew would have sustained a muscle strain in that section 3 that Mr. Essig talked to you about, which is the two minutes and four seconds before the final free fall to the earth?
MR. ESSIG: Object to form, misstates the testimony.
A. So, yes, if everybody is bracing, it's reasonably -- reasonable to conclude, more



likely than not, that everybody would have sustained a muscle strain injury.
Q. Okay. Okay.
And you didn't do bracing because you weren't in the plane and you don't have any cellphone or video of what occurred in there?
A. That's right.
MR. ESSIG: Object to the form, leading.
BY MR. DURKIN:
Q. But that's not unreasonable to think people would brace?
MR. ESSIG: Same objection.
A. That's right.
MR. DURKIN: We can let the jury decide that, I guess, okay?
But -- well -- I'll take that back, okay.
BY MR. DURKIN:
Q. I brought up baby -- okay? -- because I'm not sure the baby would be able to brace.
So I represent Mr. Nur Mohammed. And he's on a window seat. And to the right of him is Carol Karanja with 25-pound Rubi Pauls in



arm.
Tell us about the forces that would have been exerted on Rubi Pauls in front of Mr. Nur Mohammed?
MR. ESSIG: Objection to form, outside the scope of the direct, outside the scope of the report.
A. So you have a baby, I think in that case was about 25 pounds.
Q. Right.
A. So to determine the inertial forces acting on that baby, you multiply by the vertical acceleration acting on the baby.
So if you have got minus 1 g, that baby is being pulled upwards with a force of 25 newtons -- or 25 pounds straight up.
So the forces acting on the baby come from the inertial forces from the acceleration.
But then you also have forces on the baby from the mother.
So I don't have any data specifically about how the mother held the baby. But it's reasonable to assume the mother has her arms around the baby, holding the baby on her lap.

And that's going to require a sufficient amount of force to overcome the inertial forces acting on the baby.
And so there is a chance of injuring the baby by the mother clamping down on the baby perhaps too much in a stressful situation; or if the force from the mother is insufficient to hold the baby in place, then the inertial forces will pull the baby out of her arms.
Q. Would the baby be just like any of the other objects you talk about?
A. That's right.
Q. When you say "pulled out of the arms," can you describe the motion the baby would -- of the baby?
A. Very similar to what we saw with an unrestrained passenger. So during a period of negative g's, the baby would be accelerated straight up out of the mother's arms until it impacted with -- probably the ceiling, or the bin bottom.
Q. Then what would happen when it impacts the seat, or the bin bottom, or --
A. Then you -- they would incur an impact



with whatever part of the body struck that structure, and then they would rebound off that structure.
MR. ESSIG: Again, object to the form, outside the scope of the direct --
BY MR. DURKIN:
Q. And then when the g's went positive -- remember how I showed you that they went positive? -- what would happen then?
A. Then the baby is going to come back down.
Q. So the baby gets thrust up to the top of the cabin, then down to the floor?
A. That's right.
MR. ESSIG: Same objections to the whole line of that.
MR. DURKIN: Okay.
BY MR. DURKIN:
Q. Baby is no different than -- in terms of Newton's law -- no different than any of the other objects we talked about?
A. That's right.
Q. Okay.
Oh, there was some question about you



reviewing -- you revisiting the 5% -- the 5% -- you said you went back and calculated the time at which seat belt tension would exceed the contusion threshold.
Why did you do that?
A. So after reviewing Dr. Wood's expert report, where he does, sort of, a simplified calculation of a seat belt tension and showed that each and every passenger on the aircraft, according to his simulation, also exceeded the threshold that I set, he brought up the issue of timing.
And I honestly hadn't thought of it before reading that. So that's what induced me to go back to the data.
So the data was already in there. I didn't rerun any of the simulations. All I did was interrogate the simulation to pull out that data that was already there to look at the timing at which each and every person exceeded the threshold.
And I started with the 5th percentile female because they were the lightest and had the least mass, and therefore would have had the



smallest seat belt tension.
Q. You were asked questions by counsel about the simulation and the vibration that appeared in there?
A. Yes.
MR. ESSIG: Object to the form.
MR. DURKIN: I think he was, wasn't he?
Do you remember? -- I remember that.
BY MR. DURKIN:
Q. Do you remember that? -- the question about vibration showed with the camera and the -- they were asking questions about shaking of the aircraft in the simulation?
MS. GUERRIERI: Do you mean the animation?
MR. DURKIN: Yes.
(Pause)
A. -- the animation, yes.
Q. Okay.
When the plane was heading down to the earth in that last 23 seconds, would you expect vibrations in the aircraft?
MR. ESSIG: Object to the form, asked

and answered.
A. I think you would expect vibrations.
But, in fact, we actually have data to show that there were vibrations in the longitudinal and lateral accelerations that came out of the flight data recorder. So there were accelerations in those two other axes that would have represented vibrations to the aircraft.
Q. It would be misleading to show the aircraft heading to the earth in that last 23 seconds without vibrations.
Is that correct?
A. Again, I'm not an expert in animation, so I don't think I can answer that.
Q. But you do believe there would have been vibrations?
A. I saw -- the vibrations that I saw in the animations seem reasonable, based on the flight data recorder.
Q. Okay.
MR. DURKIN: I want to go through briefly your report, the we can get back to -- that is number 290? -- 290 -- and go to your "Conclusions" section, okay?



THE WITNESS: Page 34?
MR. DURKIN: That's correct.
BY MR. DURKIN:
Q. Now, your opinions start in there with that time frame -- you can see the first sentence -- at 8:41:14 to 8:43:18?
Do you see that?
A. Yes.
Q. Is that what counsel has called segment 3?
A. That's correct.
Q. Okay.
That's the two minutes and four seconds before the 23 -- I've said 23, but you say it's 24 seconds?
A. Twenty-four and a half --
Q. Twenty-four and a half.
And by the way, you didn't -- you are aware Mr. Pereira calculated more seconds after that, and so did actually the defense, that weren't necessarily reported by the government?
A. It's my understanding that that's the case, yes.
Q. You didn't rely on any of that.



You relied on just what came from the digital flight data recorder and the output you received?
A. That's right.
Q. Okay -- and the government of Ethiopia?
A. Yes, correct.
Q. You say that the -- in that last two minute and 4 seconds -- above that -- that the passengers had unusually large, physically taxing, physically agonizing, and physically exhausting acceleration of forces biomechanically induced on their body during the two minutes and four seconds between that time frame?
A. Yes.
Q. What do you mean by "biomechanically induced on their bodies"?
A. It means that loading is involuntary. So they didn't ask for it, but they have got it.
Q. When you say "loading," what do you mean by that?
A. So the accelerations are induced by the motion of the aircraft going upwards and



downwards. But when you induce accelerations in masses -- for instance, the mass of your upper arm, the mass of your forearm, the mass of your chest, the mass of your head -- that creates inertial forces that act to move that segment, and the two are part and parcel of each other.
So if you have these vertical accelerations forced on you by the motion of the aircraft, you have inertial forces induced in your body involuntarily.
Q. And so -- you gave an example before -- a 200-pound passenger at 1.691 g's would actually weigh 338 pounds?
A. That's right.
Q. What's the physical impact of that 338 pounds on that 200-pound person?
A. So we have been talking a lot about how these accelerations and inertial forces raise the arms, lower the arms --
Q. Right.
A. -- cause the torso to move forward and back.
But it also has an effect on the inside of the body. So each of the organs

within your abdomen and chest are also being pulled up and pulled down with those inertial forces. And so you have got your intestines moving relative to the stomach, moving relative to the liver, being accelerated up and accelerated down with inertial forces.
You've also got the blood which, even though it's a liquid, it has mass. And so that blood is mobile. So it's pulled up and it's pulled down, and these are having an effect on the body as well involuntarily.
Q. Would that be the -- would the organs be being physically pushed against each other?
A. Yes.
Q. What organs are we talking about?
All?
A. So every part of your body that has mass is going to be acted upon by the inertial forces.
But I think the primary ones that are most vulnerable are the ones in your abdomen where they are discrete from each other and held in place by connective tissue, but they can individually accelerate up and down causing



strains in between each of them.
Q. And you go further in that paragraph and say: This is a highly -- after you -- you go through the 0.439 to 1.691 g's.
You say: This is a highly irregular undulation of vertical acceleration where the passenger would have gone from being 60% heavier than normal to 50% lighter over and over again.
Why is that highly irregular?
A. Well, it's -- the situation we are dealing with -- I think before in my testimony, we made a comparison to turbulence. And I think that's -- that's misleading in the fact that what we are not talking -- turbulence is the aircraft is reacting to aerodynamic forces that are irregular. And so the aerodynamic forces acting on the plane are changing and the plane moves around.
The situation we have here is the plane's operating system is trying to do one thing -- go nose down -- and the pilots are trying to do the opposite -- which is go nose up. And you have a battle -- a fight -- between the pilots and the aircraft as they are fighting



to control the aircraft.
And so, yes, we do have positive negative g's that may be similar in magnitude to severe turbulence. But the rate at which they change, the rate of the oscillations, the irregularity of the oscillations is a different set of physics because you have pilots fighting the airplane, rather than aerodynamic forces just moving the airplane.
Q. So you got a part of the aircraft called MCAS pushing the aircraft to the earth, and then the pilots are trying to keep it from hitting the earth?
A. That's my understanding, yes.
Q. And that's different than what -- turbulence?
A. Right. Because the period of oscillation is going to be different and it's going to be based on what the pilots are doing.
MR. ESSIG: Objection, beyond the scope of the direct examination, and beyond the scope of the report.
MR. DURKIN: Okay. Well, I am just reading from the report.



BY MR. DURKIN:
Q. Now: This happened almost at random -- next sentence: This happened --
MR. DURKIN: I mean, I just want to make sure you are aware I am just reading from the report .
BY MR. DURKIN:
Q. -- this happened almost at random and without any visual warning to the passengers.
Why was that important for you to put in your report?
A. Well, when you know what's coming -- for instance, when you are on a rollercoaster -- you can be ready for what's coming, and you can fire your muscles efficiently to overcome the inertial forces because you know what those initial forces are going to be in terms magnitude and direction.
But in this case, you have no idea. You have no warning as to whether or not you are going to be accelerating upward or downwards, and by how much.
So when you do brace yourself, or when you do try to control the motion of your body

with muscular contraction, it's going to be inefficient -- probably too much because you don't know what's coming, and you've got to prepare for the worst; or if you do too little, then you have an uncontrolled flailing motion of your limbs.
But the chance that you get the exact right amount of muscle contraction at any moment without any warning of what's coming next is highly unlikely.
Q. Okay.
And you say: This is biomechanically significant and highly unusual during the normal, safe commercial flight.
I think you answered that with Mr. Essig before.
Then you go on: The impact of the change in vertical acceleration would have caused each passenger and flight crew to be jostled, thrown, and thrust involuntarily within the aircraft.
What do you mean by "involuntary"?
And what do you mean by that sentence?
A. They have no control over what the



acceleration of the aircraft is.
But, like I said, so long as you have got that vertical and positive acceleration on the aircraft, it causes inertial forces in their bodies, whether they like it or not. They have no control over it.
That's what I mean by "involuntarily."
Q. So their bodies being jostled, thrown, and thrust involuntarily within the aircraft?
A. Correct.
Q. Their arms, legs, torso, and neck, and head -- let me start over.
Their arms, legs, torso, neck, and head would have been induced to move involuntarily and without warning in different directions, primarily up and down.
What do you mean by that?
A. So, again, you don't know when the inertial forces are going to change, and in what direction, and with what magnitude.
So as the aircraft is accelerated upwards, your head is going to be thrust downwards; as the aircraft accelerates downwards, your head is thrust upwards. Same



with your arms.
You don't have any warning, any visual warning or -- to know what's going to happen next.
And so you either try to brace yourself, or control the motion of your limbs; or you don't control the motion of your limbs and they will flail around involuntarily.
Q. Okay.
And then we go on where you are talking about the weight heavier. That's pretty clear in your report. You talked about that --
A. Hm-hmm.
Q. -- the different weights.
And I just want to make sure -- it's just not feeling -- if the 200-pounder sitting in the seat experienced the 1.691 g's and got on a scale, what would be the weight?
A. Right. So you are being pulled towards the earth downwards with that actual new weight. So it's not a feeling. It's what your actual weight is at that moment.
Q. A physical effect and impact on your body?



A. Yes.
Q. Okay.
MR. ESSIG: Object to the form, leading.
(Pause)
BY MR. DURKIN:
Q. Then we go through that.
Then you say -- if you go down -- we'll go -- you talk about the 200-pound person would have weighed 338, like wearing a backpack of 130-pounds on their back?
A. Yes.
Q. Okay.
Is that a lot for someone to carry on their back from a biomechanical standpoint?
A. I would have thought so.
Q. Okay.
Each segment of their body would be pulled down toward the floor.
When you say "each segment of their body," what are you talking about? -- "each segment"?
A. So upper arms, forearms, head, neck, chest, abdomen, pelvis, everything is being

pulled down towards --
Q. Liver, everything?
A. Internal organs, blood within the body, everything is being inertially pulled towards the ground.
Q. Okay.
Every organ in the body?
A. That's right.
Q. Okay.
That include the brain?
A. The brain. Now the brain is pretty tightly packed in there, so it's not going to move around as much, but it is feeling an inertial force, yes.
Q. All the fluid that their body also would have been pulled downward toward the floor.
You talked about that -- blood, right?
A. Right.
Q. Then you say: Each passenger would have strained with their muscles against this unusual downward pull on their neck, arms, torso, and legs.
Now we were talking about 2 minutes



and four seconds still -- segment 3?
A. Right.
Q. What did you mean by that?
A. So you're -- you are having these inertial forces involuntarily placed on your body.
So we've talked before about whether or not people brace, or whether or not they allow their limbs to move. And again I can't say which they do.
But you really only have three options as far as I can see, reasonable to say.
One, you brace into your seat and hold the armrests.
Or, two, that you do opposite and you are completely relaxed and your limbs are flailing around.
But then in between the two, there is a third option where your arm or arms may be free, but you are firing your muscles to slow down the motion, and you are trying to participate what's coming next. You are not fully flailing like a rag doll, but you are trying to control your motion.



In the cases of controlling your motion and bracing, you are firing your muscles inefficiently. You are trying to stabilize the joints against forces that are changing in an unpredictable way. You have -- more likely than not, going to get muscle strain.
Q. Okay.
A. If you leave your arms totally flailing around, then you are going to hit something.
Q. So I just want to make sure we have -- while you can't say -- no one can with say -- what any individual passenger did, right?
A. I can't say that.
Q. We don't have any cellphones from the cabin.
You weren't given any cell phones, were you?
A. No.
Q. Have you have seen cell phone video in different -- if you have, if you have -- in different aircraft events?
A. Not that I recall.
Q. Okay.



But we don't have anything -- so but we can assume that -- can you assume one of three things was the case for each and every passenger?
A. Seems reasonable.
Q. The first one is bracing that we talked about, and you talked about with Mr. Essig at length, right?
A. That's right.
Q. You've clearly told us your opinion about each -- it was more likely than not, each and every person that braced would have had muscle strain injury?
A. Yes.
Q. Okay --
MR. ESSIG: Object to the form, leading.
BY MR. DURKIN:
Q. -- now, the second one is the -- not bracing -- but what you put in your report -- straining their muscles without bracing.
That's what you have in the report?
A. Yes.
Q. Okay.

And is it more likely than not that each person that fit in that second category also would in that two minute and four -- two-minute, four-second period also had muscle strain injury?
A. Yes.
MR. ESSIG: Object to form, leading, misstates the testimony.
BY MR. DURKIN:
Q. Okay.
Now, the third one is people just act like a rag doll?
A. Right.
Q. By the way, is that really -- except for maybe the babies -- okay? -- I think there is two lap babies with their mothers or -- is that really likely? -- that the people would just be -- or if that's not in engineering, if that's more a question for the jury, you let me know.
But is it really likely someone is just going to be a rag doll in this circumstance?
A. Do I have specific data as to whether



that occurs in aircraft? I don't know.
But it does happen in car crashes.
Q. Okay.
So let's talk about the rag doll -- the third one -- okay?
What would happen to the rag doll person that doesn't brace and have a strain injury, doesn't react and strain their muscles and have a strain injury -- what would happen to the rag doll?
A. So now your arms, certainly, your head, neck, and torso are going to be reacting and moving with respect -- and under the influence of those involuntary inertial forces.
And so, as you go back and forth, you are going to have your head and torso striking the seat back. You'll have the arms flailing around and striking either yourself, your own seat, the person next to you, or the interior of the aircraft.
Q. Okay.
So for that third category that we have now in that last two minutes and four second segment -- segment 3, that -- on your



chart -- is it more likely than not that each person who took no type of defensive action -- bracing or tightening their body -- would have struck an object -- physically struck and had impact -- with an object or person, including themselves?
A. I would agree, yes, more likely than not.
Q. Okay. So we have covered those three.
Now, we take those in that segment.
Now let's go to the last 43 seconds.
That's all the same? -- bracing? --
A. Yes --
Q. -- not --
A. -- so you still have that three -- still have the three options.
But again, you now have periods of negative g's, so the flailing would be much worse -- arms above the head, striking the bin bottoms. The inertial forces are larger and in two directions with large magnitude.
Q. Okay. Okay. All right.
All the opinions you have -- let me check --



(Pause)
Q. Everything you have testified today, to the best of your knowledge, has been to a reasonable degree of engineering and biomechanical certainty?
A. Yes.
Q. Okay.
MR. DURKIN: We are done.
MR. ESSIG: Let's take a break, and we'll think if we have anything else.
MR. DURKIN: Okay.
THE VIDEOGRAPHER: We are going off the record. The time is 3:15 p.m.
(Recess from 3:15 p.m. to 3:26 p.m. Eastern Standard Time)
THE VIDEOGRAPHER: We are going back on the record. Time is 3:26 p.m.
EXAMINATION
BY MR. ESSIG:
Q. Hi, Dr. Jenkyn.
A. How are you?
Q. I'm going to ask you just a couple extra questions here.
The first one -- and I don't want to

Page 345

know what you discussed -- but in about the -- there was about 30 minutes between the end of my examination and the examination by Mr. Durkin.
Did you discuss the substance of your testimony during that time?
And you don't have to tell me what you discussed.
But yes or no -- did you discuss the substance?
A. We discussed some of the -- some of the testimony, yes.
Q. Okay.
Have you ever looked at an FDR trace for a turbulence event?
A. No.
Q. You omitted longitudinal and lateral forces from your simulation.
Is that correct?
A. That's correct.
Q. And so you never provided longitudinal or lateral force data to Eyewitness Animations.
Is that correct?
A. That's right.
Q. And you never checked whether that

Page 346

animation is consistent with those forces or not?
A. I didn't check the numbers that they input into their animation, no.
Q. And so you also -- just to be clear, there is no sentence in your report anywhere that you signed on September 22 where you disclosure your personal opinion about the threshold to reach a contusion injury, right?
A. That's right.
Q. And then I guess the last thing I wanted to know is when we -- we talked earlier about the analysis that wasn't in your report, but that you did where you look back, based on what Dr. Wood said about when the contusion injury might have occurred, to determine what that time point might have been.
Was the threshold that you looked back to determine whether it was crossed or not 342 newtons?
A. Yes.
MR. ESSIG: I don't think I have anything further.
MR. DURKIN: We're done.

Page 347

THE VIDEOGRAPHER: Anything further before I take us off the record for the day?
MR. ESSIG: Nothing from me.
THE VIDEOGRAPHER: All right. In that case, we are going off the record at 3:28 p.m., and this concludes today's testimony given by Thomas R. Jenkyn.
* * *
END OF PROCEEDING
Time noted 3:28 p.m. Eastern Standard Time
* * *

Page 348

ACKNOWLEDGMENT

I, THOMAS RICHARD JENKYN, Ph.D., P.Eng., hereby certify that I have read the transcript of my testimony taken under oath in my deposition of December 15, 2022; that the transcript is a true and complete record of my testimony; and that the answers on the record as given by me are true and correct.

______________________________
THOMAS RICHARD JENKYN, Ph.D., P.Eng.

Signed and subscribed to before me,
this _______ day of __________________, 2022.

____________________________________
(NOTARY PUBLIC)

My Commission expires:

INDEX OF EXAMINATION

Witness:
Thomas Richard Jenkyn, Ph.D., P.Eng.

Examination:

By Mr. Essig..................................Page 13
By Mr. Durkin...............................Page 305
By Mr. Essig..................................Page 344

Index of Exhibits..........................Page 350



INDEX OF EXHIBITS

290 Multipage document entitled: Plaintiffs' ......17 Rule 26(a)(2)(B) Disclosure of Thomas R. Jenkyn, Ph.D, P.Eng., dated September 22, 2022 (no Bates Nos.)

291 Multipage document entitled: United States ...122 Air Force Research laboratory Articulated Total Body Model Version V User's Manual, dated February 1998 (no Bates Nos.)

292 Four-page document entitled: TLS Forensic ....135 Engineering Collision Reconstructi (no Bates Nos.)

293 Multipage document entitled: Head Injury .....140 Criterion and the ATB (no Bates Nos.)

294 Multipage document entitled: Supplement: .....254 Development of Improved Injury Criteria for the Assessment of Advanced Automotive Restraint Systems - II, dated March 2000 (no Bates Nos.)



295 Two-page document bearing heading: ET302 .....258 Injury Data-GATB, 414, 416-424s, dated November 21, 2022 (no Bates Nos.)

296 Multipage document entitled: Method to .......263 Investigate Contusion Mechanics in Living Humans, dated January 16, 2011 (no Bates Nos.)

297 Video animation share screen by Winston ......301 and Strawn (no Bates No.)

298 Multipage document entitled: Boeing's Rule ...314 26(a)(2)(B) Disclosure of Dr. Jesse L. Wobrock, dated November 22, 2022 (no Bates Nos.)

(All exhibits were provided electronically to the reporter.)



CERTIFICATE

I certify that in response to the COVID-19 pandemic, I, BRANDON RAINOFF, have collected everyone's agreement at the commencement of this deposition that I would be the swearing officer and court reporter remotely out of state and that I may record the testimony stenographically and swear in the deponent even though I am not in the physical presence of the deponent, and that there is no objection to that at this time, nor will there be an objection to it at a future date.

IN WITNESS WHEREOF, I have hereunto set my hand this 15th day of December, 2022.

________________________________
BRANDON RAINOFF, RPR, FCRR, RMR, CRR

C E R T I F I C A T E

I, BRANDON RAINOFF, a Federal Certified Realtime Reporter and Notary Public within and for the State of New York, do hereby certify:

That THOMAS RICHARD JENKYN, Ph.D., P.Eng., the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 15th day of December, 2022.

___________________________________
BRANDON RAINOFF, RPR, FCRR, RMR, CRR



ERRATA SHEET FOR THE TRANSCRIPT OF:
Case Name: Ethiopian Airlines Flight ET-302 Crash
Deposition Date: 12-15-2022
Deponent: Thomas Richard Jenkyn, Ph.D., P.Eng.
Place: Remote/Hybrid Deposition

CORRECTIONS

| PAGE | LINE | FROM | TO | REASON |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

_____________________________________
Date THOMAS RICHARD JENKYN, Ph.D., P.Eng.

Subscribed and sworn before me
this________day of ____________________, 2022.
_____________________________________
(Notary Public)
My Commission expires: