# EXHIBIT A

# In The Matter Of:
# ETHIOPIAN AIRLINES FLIGHT ET 302

# CRASH - DAMAGES

_____

# CRAIG THOMAS MALLAK, J.D., M.D.

January 10, 2023

_____

# *TC REPORTING, INC.*
## *1 DEERFIELD EAST - 1850*
## *QUOGUE, NY. 11959*

CRAIG THOMAS MALLAK, J.D., M.D. - Vol. I

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

-----------------------------------------------------x
IN RE: ETHIOPIAN AIRLINES
FLIGHT ET 302 CRASH

This Document Relates To: All Actions
-----------------------------------------------------x
Lead Case: 1:19-cv-02170 (Consolidated)
Honorable Jorge L. Alonso
Magistrate Judge M. David Weisman
-----------------------------------------------------x

January 10, 2023
9:02 a.m. Eastern Standard Time

*       *       *

CONFIDENTIAL PURSUANT TO AMENDED PROTECTIVE ORDER

*       *       *

Remote video conference deposition of CRAIG THOMAS MALLAK, J.D., M.D., taken by Defendant The Boeing Company, pursuant to Amended Notice, dated January, 3, 2023, before Brandon Rainoff, a Federal Certified Realtime Reporter and Notary Public of the State of New York.

CRAIG THOMAS MALLAK, J.D., M.D.

2

A P P E A R A N C E S:

KREINDLER & KREINDLER LLP

Attorneys for Plaintiffs' Executive Committee

750 Third Avenue

New York, New York  10017

212.687.8181

BY:    DANIEL O. ROSE, ESQ.

212.973.3414

drose@kreindler.com

JUSTIN T. GREEN, ESQ.

212.973.3403

jgreen@kreindler.com

BRIAN J. ALEXANDER, ESQ.

balexander@kreindler.com

212.973.3411

- and -

855 Boylston Street

Suite 1101

Boston, Massachusetts  02116

617.424.9100

BY:    ANTHONY TARRICONE, ESQ.

atarricone@kreindler.com

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

3

A P P E A R A N C E S (continued):

CLIFFORD LAW OFFICES PC

Attorneys for Plaintiffs' Executive Committee

      120 North LaSalle Street

      Chicago, Illinois   60602

      312.625.6192

BY:   ROBERT A. CLIFFORD, ESQ.

      312.899.9090

      rac@cliffordlaw.com

      KEVIN P. DURKIN, ESQ.

      kpd@cliffordlaw.com

      JOHN V. KALANTZIS, ESQ.

      jvk@cliffordlaw.com

      SANJA PETREVSKA, ESQ.

      sp@cliffordlaw.com

CRAIG THOMAS MALLAK, J.D., M.D.

4

A P P E A R A N C E S (continued):

COTCHETT, PITRE & McCARTHY, LLP

Attorneys for Plaintiffs

840 Malcolm Road

Suite 200

Burlingame, California  94010

650.697.6000

BY:    FRANK M. PITRE, ESQ.

fpitre@cpmlegal.com

JOHN PAUL THYKEN, ESQ.

jthyken@cpmlegal.com

NABILAH A. HOSSAIN, ESQ.

nhossain@cpmlegal.com

PODHURST ORSECK, P.A.

Attorneys for Plaintiffs

SunTrust International Center

One Southeast 3rd Avenue

Suite 3200

Miami, Florida  33131

305.358.2800

BY:    STEVEN C. MARKS, ESQ.

smarks@podhurst.com

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

A P P E A R A N C E S (continued):

WINSTON & STRAWN LLP

Attorneys for Defendant The Boeing Company and the

Witness

       35 West Wacker Drive

       Chicago, Illinois  60601-9703

       312.558.5600

BY:   CHRISTOPHER B. ESSIG, ESQ.

       312.558.6229

       cessig@winston.com

CRAIG THOMAS MALLAK, J.D., M.D.

6

APPEARANCES (continued):

PERKINS COIE LLP

Attorneys for Defendant The Boeing Company and the

Witness

        1201 Third Avenue

        Suite 4900

        Seattle, Washington  98101-3099

        206.359.8000

BY:   CHRISTOPHER LEDFORD, ESQ.

        206.359.6642

        cledford@perkinscoie.com

        JEFFERY SHANE CLACKLEY, ESQ.

        206.359.3124

        jclackley@perkinscoie.com

            - and -

        110 North Wacker Drive

        34th Floor

        Chicago, Illinois  60606

        312.324.8400

BY:   KARISHMA SHAH, ESQ.

        312.673.6492

        kshah@perkinscoie.com

CRAIG THOMAS MALLAK, J.D., M.D.

7

ALSO PRESENT:

JENNIFER GORDON, Clifford Law Offices PC

JACKIE GRIBBON, Clifford Law Offices PC

THERESA WINTER, TC Reporting, Inc.

CRAIG JONES, Technical Support, TC Reporting, Inc.

BRIAN ROSENTHAL, Videographer

CRAIG THOMAS MALLAK, J.D., M.D.

8

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing, sealing and certification be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

- oOo -

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

9

*     *     *

P R O C E E D I N G

Tuesday, January 10, 2023

Remote Deposition

9:02 a.m. Eastern Standard Time

*     *     *

THE VIDEOGRAPHER:  Good morning.  This is the video conference monitor, Craig Jones of TC Reporting, and we are here for the deposition of Dr. Craig Mallak, being taken In the Matter: Ethiopian Airlines Flight ET 302 Crash, Case Number 1:19-cv-02170 (Consolidated).

Today's date is Tuesday, January 10th, 2023, and the time is approximately 9:04 a.m., EST.

There is an in-person videographer also present recording these proceedings.

The witness and counsel are attending in-person for today's deposition at Podhurst Orseck, P.A., 1 Southeast Third Avenue, Suite 2300, Miami, Florida, 33131.

Other counsel will also be appearing remotely via video conference.

Before we proceed, I would like to do

CRAIG THOMAS MALLAK, J.D., M.D.

10

a roll call.  I have a list of law firms appearing today.  When I announce each firm, if counsel can please state your full name on the record so we may note your appearance accordingly.

Perkins Coie?

MR. LEDFORD:  Good morning. Christopher Ledford and Karishma Shah in the room.

Jeffery Shane Clackley appearing remotely.

THE VIDEOGRAPHER:  Thank you.

Kreindler & Kreindler?

MR. ROSE:  Dan Rose and Brian Alexander in the room.

And I assume others on the video.

MR. GREEN:  Justin Green remotely.

THE VIDEOGRAPHER:  Clifford Law?

(Pause)

MR. CLIFFORD:  Clifford Law -- you have Robert Clifford and Kevin Durkin in the room.

And I believe on the screen, you have Jackie Gribbon, Jennifer Gordon, Sanja

CRAIG THOMAS MALLAK, J.D., M.D.

11

Petrevska, John Kalantzis.

Maybe one or two more.  They can speak up if I missed someone.

THE VIDEOGRAPHER:  I think you got them.

Cotchett, Pitre & McCarthy.

MR. PITRE:  Good morning, Frank Pitre appearing remotely for plaintiffs from California where the chickens, the roosters, the fox, and the watchdog are still sleeping.

MS. HOSSAIN:  Nabilah Hossian from Cotchett, Pitre & McCarthy.

(Pause)

MR. THYKEN:  John Thyken, also appearing remotely.

THE VIDEOGRAPHER:  Thank you.

Is there anyone else appearing that has not stated their appearance?

MR. ESSIG:  Chris Essig from Winston & Strawn.

THE VIDEOGRAPHER:  I will certify that I will be appearing for tech support and video conference services for all remote participants.

Before we proceed, I'll ask that lead

CRAIG THOMAS MALLAK, J.D., M.D.

12

that counsel for plaintiffs and lead counsel for defendants for today's deposition to stipulate on the record that we are proceeding according to the Federal Rules of Civil Procedure and that this deposition officer may swear in the deponent even though he is not in the physical presence of the deponent, and there is no objection to this at this time, nor will there be an objection to this at any future date.

Plaintiffs' lead counsel, are you in agreement?

MR. LEDFORD: Yes.

THE VIDEOGRAPHER: Defendant's lead counsel, are you in agreement?

MR. LEDFORD: Yes.

THE VIDEOGRAPHER: Thank you.

This is the deposition of Dr. Craig Mallak.

At this time, will the court reporter please swear in the witness?

THE COURT REPORTER: Good morning. My name is Brad Rainoff. I am a Certified Shorthand Reporter and a Notary Public. I am also a Registered Merit Reporter and Federal

CRAIG THOMAS MALLAK, J.D., M.D.

13

Certified Realtime Reporter. I am the deposition officer for today's deposition.

CRAIG THOMAS MALLAK, J.D., M.D.,

having been duly sworn, was examined and testified as follows:

(Pause)

EXAMINATION

BY MR. LEDFORD:

MR. LEDFORD:  Dr. Mallak, before you is an exhibit that is going to be marked 323.

(Exhibit 323, Multipage document entitled: Plaintiffs' Rule 26(a)(2)(B) Disclosure of Craig Mallak, M.D., dated September 21, 2022 (no Bates Nos.), marked for identification)

THE WITNESS:  Thank you.

MR. LEDFORD:  Ask you to take a look at it.

BY MR. LEDFORD:

Q.   Tell me, Dr. Mallak, is Exhibit 323 a copy of the report you prepared in this litigation?

A.   Yes, with supporting documents.

MR. LEDFORD:  So let's look at page 3

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

14

of your report, specifically the last sentence of the second-to-last paragraph.

MR. DURKIN:  What page?

MR. LEDFORD:  Page 3, second-to-last paragraph, last sentence.

It says:  In sum, the forces experienced by the passengers, combined with the likelihood of impact with other persons, the cabin interior, or moving objections during each of the upset events described by Troy Faaborg to a reasonable degree of medical certainty caused some degree of injury to all of the passengers.

BY MR. LEDFORD:

Q.  Dr. Mallak, please give the jury your definition of the word "injury" as you use it in your report.

MR. ROSE:  Objection to form.

A.  The word "injury" is an amorphous term when it is taken out of context.  And as we have all learned as we have researched it, it has a number of definitions.

Q.  Dr. Mallak, please give the jury your definition of the word "injury" as you use it in that sentence of your report that I just read?

CRAIG THOMAS MALLAK, J.D., M.D.

15

MR. DURKIN:  Same objection.

A.    The word cannot be -- the word alone cannot be defined without the context of what occurred.

Q.    Sir, this could be a long day.  I'll move on if you are telling me that you can't give me a definition or a meaning of the word "injury" as you yourself are using it in your report.

MR. CLIFFORD:  Excuse me.

Objection.

Number one, I think it's -- with all due respect, I think it's early in the morning. It's improper to say to the witness it might be a long day.  I think that's threatening and it's improper.

And I don't think you meant it that way.  Maybe it's a just a slip of the tongue, but we are not going to put up with that today. That's number one.

Number two, the gentleman is giving you his answer.  Your comments are argumentative.

So ask your next question.

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

16

Or, Doctor, you are free to answer if you can.

MR. LEDFORD: Your objections are duly noted.

MR. CLIFFORD: Thank you.

BY MR. LEDFORD:

Q. Sir, are you able to provide me a definition of the word "injury" as you use it in your report?

MR. ROSE: Same objection.

A. As I use it in my -- in the -- I am a forensic pathologist. In forensic pathology, you don't use the term "injury" without context.

Q. Okay.

Within the context of your report -- just to be clear, you drafted this document? Or no?

A. Yes.

Q. Okay.

So did you write the sentence -- and I'm not seeking to inquire into any privileged conversations -- but are you responsible for the sentence in your report that I just read?

A. Yes.

CRAIG THOMAS MALLAK, J.D., M.D.

17

Q.    Do you agree with the sentence in your report that I just read?

A.    Yes.

Q.    In that sentence, what do you mean by the word "injury"?

A.    Cannot be defined without the context of the remainder of the report.

Q.    I'm not seeking to restrict you from providing me context.

Within the context of your report, please tell me what the word "injury" means as you use it.

A.    The word "injury" alone does not have a definitive definition.

You must speak about:  What injuries.

(Pause)

A.    In the forensic literature, you don't use the term "injury."  You call it a blunt force injury, a sharp force injury, a physiologic injury.  It never stands by itself.

(Pause)

Q.    We'll come back.  We are going to talk about that some more.  We are going to provide some more context, and hopefully you can give me

CRAIG THOMAS MALLAK, J.D., M.D.

18

a definition at that time.

MR. CLIFFORD: That's objection, improper, argumentative.

The gentleman has answered your question.

So your remark is also misleading.

Ask the man a question.

MR. LEDFORD: Is that a form objection?

MR. CLIFFORD: It's the objection I made, sir.

Please continue.

MR. LEDFORD: Okay.

BY MR. LEDFORD:

Q. Dr. Mallak, you obtained a law degree before going to medical school, right?

A. Well, partially concurrent.

Q. And you worked as an associate general counsel for Godfather's Pizza while you attended medical school?

Is that right?

A. That's correct.

Q. And on page 1 of your report, the first sentence of your background section says:

CRAIG THOMAS MALLAK, J.D., M.D.

19

I'm a board certified Anatomic, Clinical, and Forensic Pathologist and a lawyer.

Right?

A.   That is correct.

Q.   What year did you first obtain your license to practice law?

A.   1985.

Q.   And in which state?

A.   Nebraska.

Q.   Have you ever been licensed in any state other than Nebraska at the practice law?

A.   No.  Medical school, residency, fellowship -- my subsequent duties consumed all my time.  Never gave me the opportunity to take another bar exam.

Q.   And so only ever have been licensed in Nebraska, right?

A.   That's correct.

Q.   Are you still licensed as an attorney in Nebraska?

A.   No.

Q.   And when did you stop being licensed as an attorney in Nebraska?

A.   Well, I made my license inactive

CRAIG THOMAS MALLAK, J.D., M.D.

20

several years ago.

And recently I surrendered it, as I have no plans to ever return to Nebraska and practice law.

Q. And is that known as resigning your bar license?

A. Yes.

Q. Do you remember what year you resigned?

A. Within the last year.

Q. So you are aware that this case is pending in federal court in the Northern District of Illinois, right?

A. Correct.

Q. Even though you are no longer licensed, I understand that you are familiar with the Federal Rules of Civil Procedure?

MR. ROSE: Objection, form.

A. That has not been the point of my practice over the years. I have kept up to the best of my ability, but been a little busy with wars in Afghanistan, Iraq, opioid crises, and other forensic pathology issues that have been very consuming.

CRAIG THOMAS MALLAK, J.D., M.D.

21

There are only 450 to 500 forensic pathologists in the United States, and we are all extremely busy.

Q.   I'm not asking you to recite the Federal Rules of Civil Procedure.

Let me ask you this:  You are aware that the Federal Rules of Civil Procedure exist?

A.   Yes.

Q.   Right.

And you understand that the Federal Rules of Civil Procedure, as the name suggests, govern the procedure in a case in federal court like this one, right?

MR. ROSE:  Objection to form.

A.   Yes.

Q.   So is it fair to say that as an attorney, or somebody who has been licensed for, you know, more than three decades, you understand that an expert report disclosed under the Federal Rules of Civil Procedure has to contain a complete statement of all the opinions the witness will express, and the basis and the reasons for them, the facts or data considered by the witness informing them, and any exhibits

CRAIG THOMAS MALLAK, J.D., M.D.

22

that will be used to summarize or support them, right?

MR. CLIFFORD: Objection, form, argumentative, beyond the scope of this gentleman's opinions, as stated in his report.

And whether his report -- he is not here to talk about what he does or does not understand about the Federal Rules of Civil Procedure, or the Federal Rules of Evidence, or any other such thing.

So your argumentative -- principally -- question is improper.

MR. LEDFORD: Okay.

Sir, you should make sure that you listen to your counsel's objections because these speaking objections are trying to help you understand how to answer.

MR. DURKIN: Oh, my goodness.

MR. CLIFFORD: And that, too, sir, is improper.

You cannot --

(Pause)

MR. CLIFFORD: -- you cannot possibly think it's proper procedure to give a speech

CRAIG THOMAS MALLAK, J.D., M.D.

23

during a question that you know is beyond the scope of the gentleman's reason for being here and think that it will suffice to stop you to simply say "Objection, form."

If you want we can stop right now, get on the phone with Magistrate Weisman, and seek a specific ruling and ask him to be available to us all day long, because that's what we will do.

MR. LEDFORD: Okay. We can do that right now, if you would like.

MR. CLIFFORD: That's fine. This is your deposition. You are the examiner.

We will proceed as you dictate.

You can either ask him a question, or you can do something else.

MR. LEDFORD: Well, are you --

MR. CLIFFORD: -- or you can ask for an answer. I'm not instructing him -- by the way, I'm not instructing --

MR. LEDFORD: Oh, okay --

MR. CLIFFORD: -- him not to answer.

But if think that you are just going to be to do this stuff, run ripshod over everybody, and say that, "Oh, wait, you can't

CRAIG THOMAS MALLAK, J.D., M.D.

24

say anything more than 'objection, form,'" you are wrong.

So, Chris, proceed as you wish.

If --

MR. LEDFORD: I --

MR. CLIFFORD: -- the gentleman will answer the question. I'm sure the reporter, because of this lengthy discourse, will be happy to read it back.

And if you wish, let's proceed that way.

MR. LEDFORD: Okay.

And I will. And I do proceed as I wish --

MR. CLIFFORD: There you go --

MR. LEDFORD: -- if you would like to talk to Magistrate Judge Weisman, we certainly can.

MR. CLIFFORD: I have no reason to talk to him right now.

But at the moment, you know, we are finding the way to define the turf and the proper procedure here.

So please proceed as you wish.

CRAIG THOMAS MALLAK, J.D., M.D.

25

You are the -- this is your deposition.  We are on your nickel.

MR. LEDFORD:  Yeah.

MR. CLIFFORD:  Yeah.

MR. LEDFORD:  Yeah.  Yes.

Court reporter, please read back my question.

(Pause)

MR. ROSE:  I'll just stipulate you read Rule 26 to him.

MR. LEDFORD:  Court reporter, hold on for just one minute.

Certainly that is what I read to the witness.

MR. ROSE:  And that is objectionable --

MR. LEDFORD:  Reading a Federal Rule of Civil Procedure is objectionable?  I -- that's --

MR. ROSE:  Yeah.  He's -- I mean, we just went over this.  He's not here as a lawyer. If you want to ask him about his report and what his expertise is, that's fine.

MR. LEDFORD:  Okay.  I mean, if it is

CRAIG THOMAS MALLAK, J.D., M.D.

26

a scope objection, that's fine.

MR. ROSE: It is a scope objection --

MR. LEDFORD: I understand.

But yes, please go ahead and read that back.

And for the record, my attempt was to read off the relevant section of Rule 26.

MR. ROSE: We understand that. But it's objectionable, it's beyond the scope, and it's argumentative in that context.

MR. LEDFORD: I appreciate your views --

MR. ROSE: What's the point? I mean, he's got his report. If you want to make a point about whether it satisfies Rule 26, you are going to have to do it anyway, later, with the judge. So --

But it's objectionable, it's beyond the scope, and it is argumentative in that context.

(Pause)

MR. CLIFFORD: Dan, let him proceed as he wishes.

Mr. Reporter, kindly read back Mr.

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

27

Ledford's question. Thank you.

(Pause)

(Question read)

MR. ROSE: Same objections.

MR. LEDFORD: Please, go ahead and answer.

A. I'm not here as a lawyer.

I am here as a forensic pathologist, and my other pathology training.

Q. Let me revise the question.

This actually, despite all the fireworks here, is not intended to be a trick question.

It's simply to establish -- and I'm not asking you this because I'm seeking an expert legal advice.

Okay?

What I'm trying to find out is: Do you understand as an expert in this case that your expert report was required to contain a complete statement of all opinions the witness will express, and the basis and the reasons for them, the facts or data considered by the witness informing them, and any exhibits that

CRAIG THOMAS MALLAK, J.D., M.D.

28

will be used to summarize or support?

MR. ROSE:  Same objections.

Go ahead.

A.    I wrote the report.  I believe in the first sentence states what I was asked to provide.

Q.    The requirements that I just read -- do you believe your report satisfies those requirements?

MR. ROSE:  Objection to form.

A.    I believe I answered the question I was asked by the plaintiffs' attorneys to provide.

Q.    Okay.

Do you believe --

MR. ROSE:  Chris, what is -- whether he believes his report comports with the Rule 26 obligation have anything to do with anything?  They either do, or they don't.  If you want to ask him, "Are these all your opinions?," ask him that.  "Are these all your exhibits?," ask him that.

MR. LEDFORD:  Do you want to switch sides of the table?  Or can I ask my questions?

CRAIG THOMAS MALLAK, J.D., M.D.

29

MR. ROSE: If it's -- move things along, I'm happy to. What's the hourly rate I get?

MR. LEDFORD: I don't know what your hourly rate is.

MR. ROSE: No, on that side of the will table.

MR. LEDFORD: That's a good question. I'm actually not sure.

All right --

MR. ROSE: Let's just go.

MR. LEDFORD: Okay.

BY MR. LEDFORD:

Q. So sir, do you believe your report includes a complete statement of all the opinions you intend to express and the basis and reasons for them?

MR. CLIFFORD: Objection, assumes facts not in evidence.

Because certainly during the course of your examination, he may touch upon other things that are not addressed in his opinions, for which he might have an opinion, and he'll give it to you.

CRAIG THOMAS MALLAK, J.D., M.D.

30

And that's true for any expert witness, as you know.

So object to the assumption of facts not in evidence at the moment.

Thank you.

BY MR. LEDFORD:

Q.   You can go ahead and answer.

A.   My answer would have been very similar if you asked me questions that are within my expertise or my report.  I will do my best to answer them.

Q.   Let me back up just a little bit.

Sir, do you understand that the purpose of the report is to disclose --

(Pause)

Q.   -- your opinions in this case?

And then today, I'm going to ask you about your opinions in the case, right?

A.   My understanding.

Q.   So in your understanding, does your report constitute a complete statement of the basis for your opinions that you intend to express in this case?

MR. ROSE:  Objection, form, same

CRAIG THOMAS MALLAK, J.D., M.D.

31

objection.

A.   It may or may not, depending on the questions that you ask me.

Q.   How about the facts or data considered by you in forming your opinions?

Does this report list all of those?

(Pause)

A.   These cases are not static.  And you may have questions that go beyond my report.

Q.   What if I just ask you questions about your report?

In that case, does your report contain the facts and data considered by you in forming your opinions?

A.   You are asking the questions.  However you decide to proceed, I am here to answer your questions.

MR. ROSE:  Why don't you just ask questions, Chris?  I mean, this is hypothetical --

BY MR. LEDFORD:

Q.   You haven't submitted a --

MR. ROSE:  -- this is like, "Are you going to answer, depending what I do, this way

CRAIG THOMAS MALLAK, J.D., M.D.

32

or that way?"

Just ask questions and let's get answers.

BY MR. LEDFORD:

Q.   You haven't' submitted a supplemental report, right?

A.   No.

Q.   And you haven't revised or corrected your report, right?

A.   No.  I haven't updated this since the date on it.

Q.   Is there anything that's changed in the report?

MR. ROSE:  Objection to form.

A.   Cases such as this, you continually think about them.

But I haven't felt the need to submit a supplemental report.

Q.   And why is that?

MR. ROSE:  Objection to form.

A.   Forensic pathology is a very wide area of medicine.  And you may very well come up with questions that are outside the scope of this report.

CRAIG THOMAS MALLAK, J.D., M.D.

33

(Pause)

Q.    Are there terms you as a forensic pathologist would use to describe a living patient, as distinct from somebody who is deceased?

A.    There are multiple definitions of "death."

Q.    Okay.

I just want to make sure that as we go through the deposition, I'm using terminology that you are comfortable with and you think is accurate.

So if I'm going to distinguish between somebody who is living and who might be treated by medical personnel, and somebody who is deceased, who might be examined by a forensic pathologist, are there specific terms that you would use to differentiate between those two?

A.    No.

There are many definitions about brain death, cardiac death, and others.

And there is state law, federal law across the country, and around the world about when death occurs.

CRAIG THOMAS MALLAK, J.D., M.D.

34

Q.    And this actually gets to why I want to get the right terminology.

So if I'm talking about somebody who is entirely deceased, how would I refer to that person?

MR. ROSE:  Objection to form.

A.    It's a legal definition.

Q.    Okay.

I'm not asking you for a definition.

I just want to know, if I refer to somebody as "deceased," are you going to understand that I mean somebody who is entirely deceased, and not -- I think you said -- brain dead, or one of the other things you mentioned?

A.    Correct.

Q.    Okay.

So if I say "deceased," you'll know that I'm talking about somebody who is entirely deceased?

A.    I sign death certificates.  And I make the decision that they are entirely deceased, yes.

Q.    Okay.

So is it okay with you -- can we

CRAIG THOMAS MALLAK, J.D., M.D.

35

degree that when I say the word -- when I refer to somebody as "deceased," what I mean is somebody for whom a death certificate would have been signed?

A.     Under the jurisdiction in which they are -- the definition of death has been met, yes.

Q.     Could you tell me what you mean by that?

Or maybe just tell me:  Are you agreeing with me that that's a term we can use?

Or not?

I just want to make sure that I'm not confusing you, because I understand you have a lot of knowledge about the medical examiner field, and obviously there is many complications.

So if I use the word "deceased," are you going to understand that that means I'm talking about somebody who is entirely dead?

MR. ROSE:  Objection, asked and answered.

A.     I never heard the term "entirely dead" before.

CRAIG THOMAS MALLAK, J.D., M.D.

36

MR. CLIFFORD: You know, counsel, with all due respect, I believe it's improper to laugh at the witness, to make fun of the witness.

I think he's properly answered your question.

I would ask you to conduct yourself as is required under the rules.

If you don't like the answer, that's one thing.

But don't laugh at the gentleman, because that's improper. No, no --

MR. LEDFORD: You can make any kind of speeches you want --

MR. CLIFFORD: -- no, no --

MR. LEDFORD: -- don't tell me what's improper.

MR. CLIFFORD: -- hey, you can conduct the dep any way you want --

MR. LEDFORD: I am.

MR. CLIFFORD: -- but you know that it's improper to look this man in the eye, as you just did, and laugh as his response. That is not tolerable anywhere.

CRAIG THOMAS MALLAK, J.D., M.D.

37

MR. LEDFORD:  Bob, you know I wasn't looking him in the eye and laughing at his response --

MR. CLIFFORD:  That's not what I just saw --

MR. LEDFORD:  -- why don't you look across the table? --

MR. CLIFFORD:  -- that's what I just saw --

MR. LEDFORD:  -- you obviously weren't looking.

MR. CLIFFORD:  Fine.  Please proceed.

MR. LEDFORD:  I was not laughing at the witness --

MR. CLIFFORD:  Thank you.  Then please proceed --

MR. LEDFORD:  -- just to let the record reflect, I was not laughing at the witness.

MR. CLIFFORD:  Please proceed, sir.

BY MR. LEDFORD:

Q.    Sir, I'm going to use the word "deceased" to mean somebody -- as I phrased it -- as being "entirely dead."

CRAIG THOMAS MALLAK, J.D., M.D.

38

I'm not sure of another way to put it. I'm an attorney. I'm not a medical examiner.

I'm trying to refer to someone who is no longer living, has no signs of life, and would commonly be referred to as "deceased."

That's how I'm going to use the term.

If you don't understand what I mean by that term during the course of the deposition, I will ask you to let me know so that I can rephrase it.

Can we agree on that?

A. The term "deceased" is a very complicated term, much like "injury." It has been a concept that has been argued for decades. And if you put it in context, much like "injury," then we can have the discussion.

(Pause)

Q. Okay.

Let me put it in context, then.

So when I refer to somebody as "deceased," I am referring to individuals such as the occupants of Flight ET 302. It is a tragic accident. As I understand it, all of the individuals who were onboard that plane are

CRAIG THOMAS MALLAK, J.D., M.D.

39

deceased.

And that is the context in which I'm using that term.

And it is -- is that which I am referring to as being deceased.

MR. ROSE:  Object to the form, asked and answered.

A.    Now, it is put in context, and I understand what your definition of "deceased" is, I will use that to answer your questions.

Q.    Thank you.

As part of your work in this case, you did not examine the remains of any of the occupants of the accident flight, correct?

A.    That is correct.

Q.    And your CV says that your current position is as a medico-legal consultant for Retnav Forensics.

Right?

A.    And I also perform autopsies.

Q.    And describe for me the medical consultant services that you provide in your current role?

A.    Contacted by different parties who are

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

40

seeking expertise within my field of study.

And if I can assist them and I feel it's appropriate, I do so.

Q. And what kind of services are those?

A. Again, it's -- can be very wide, from medical cases, trauma cases, poisoning cases. It goes on. There are lots of ways to die. They all don't fall within the forensic field.

Q. Can you tell me any more about the types of services you typically provide in your current role at Retnav Forensics?

If you could -- maybe an example?

A. This case.

Q. Okay.

Can you give me another example?

A. I go back to Broward County on the homicide cases and testify on the cases that I perform there if we go to trial. I recently testified in the Parkland case -- the high school shooting.

Q. And what is the subject of your testimony in, for example, the Parkland case?

A. I was asked to describe the cases that I was involved with based on my autopsy report

CRAIG THOMAS MALLAK, J.D., M.D.

41

and other supporting documents.

Q.   And that was work similar to your work as a medical examiner?

A.   It was within the realm of what medical examiners do in their practice of medicine.

Q.   And what do medical examiners do in their practice of medicine?

A.   They, at times, will examine living for injuries, but the vast majority is those that have died under the legal definition of the state.

State of Florida, for example has a lot of -- it sets out exactly what types of cases fall within your jurisdiction.

Q.   What kind of cases fall within your jurisdiction?

A.   I don't have the Florida law right in front of me.

But it would include such things as undetermined deaths, violent deaths.  It's a list of about 14 different types of circumstances that fall within our jurisdiction.

Q.   Okay.

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

42

Can you tell me more about -- okay, so a case -- when you were the Broward County medical examiner.

So if a case came within your jurisdiction, you know, walk me through what you would do as a medical examiner.

MR. ROSE: Objection to form.

A. Do you want a day in the life?

Is that basically --

MR. LEDFORD: Mr. Clifford, your colleague is laughing at the witness's answer.

MR. ROSE: I am not.

MR. LEDFORD: Okay.

BY MR. LEDFORD:

Q. Sir, on the day of --

MR. CLIFFORD: I think he was laughing at your question --

MR. ROSE: That's right --

MR. CLIFFORD: -- that's okay --

MR. LEDFORD: No --

MR. CLIFFORD: -- let's go on. He's -- please. You --

BY MR. LEDFORD:

Q. Sir, a day in the life would be --

CRAIG THOMAS MALLAK, J.D., M.D.

43

A.    Would that be appropriate?

Q.    -- that would being very helpful, actually, yeah.  Thank you.

A.    We have -- in Broward, it was not like in the military.  We had -- investigators would take the initial call.  They would gather information.  And that was 24 hours a day, seven days a week, 365 days a year.

And based on that information -- they were board certified medical/legal death investigators.  Most of the cases they could decide whether they fell within our jurisdiction or not.

If not, they would call the pathologist on duty and decide whether it was a case within our jurisdiction; and what type of response needed to be made:  Go to the scene, not go to the scene.

Pathologists go out.

And then the cases that did fall within our jurisdiction would come to the office.  And they would go through a series of examinations:  We'd X-ray, external examination, internal examination, microscopic examination,

CRAIG THOMAS MALLAK, J.D., M.D.

44

toxicology, sometimes special studies with other sub-specialists in the field of pathology, say a brain -- a brain or a heart.

And we would gather all the information.  And at -- we would often gather at conference in the afternoon and discuss the findings and come to a conclusion as to the cause and manner of death.

That would be codified within the various reports that would be published by the office.

(Pause)

Q.    When you talked about gathering information and the type of testing that was an analysis that was just being done, is that on the remains of a deceased person?

A.    The remains.  Sometimes other items were submitted; say a needle would be given to toxicology.  And they would try to decide what was inside of it for a case of a poisoning or a drug.

(Pause)

Q.    What if the remains of the deceased weren't available?

CRAIG THOMAS MALLAK, J.D., M.D.

45

MR. ROSE:   Objection to form.

A.    They would be in a missing status.

Or there were times when remains would be removed from the state before they called us; and we at times would have to bring them back.

(Pause)

Q.    So if the remains were in a missing status, in other words, that means you didn't have an opportunity to examine the remains, right?

A.    Well, we don't know if they are alive or dead.  They just -- they didn't recover them by.

Q.    Okay.

You talked earlier about the various testing that you might do in your office.

A.    Yes.

Q.    I assume if the person is in a missing status, you aren't able to do any of that testing, right?

A.    Well, not in this office, not in the Broward County -- not in the county office.

In the military, we look for proof of life throughout the world with the far-advanced

CRAIG THOMAS MALLAK, J.D., M.D.

46

technologies we have there.

Q.    Okay.

And the -- let's -- I want to come back and talk about your work as the Armed Forces Medical Examiner.

While you were at Broward County, I think you talked about -- once you -- some of these remains had come into your office.  You had done the testing.

Then you would, I think, categorize them within the different types of death -- is that correct? -- for the purposes of the death certificate?

A.    It has a cause and a manner.

Q.    Okay.

So you would write out, I assume, something like a report identifying --

A.    Yes --

Q.    -- and would that report identify injuries that the person had received in connection with their death?

A.    Yes, along with natural disease and any other findings we felt that were pertinent, positive or negative.

CRAIG THOMAS MALLAK, J.D., M.D.

47

Q.    Okay.

Pertinent findings regarding the remains in terms of injuries they may have received?

Or conditions they may have had at the time of their death?

A.    Or lack thereof.

Q.    Or lack thereof.

And at Broward County, did you ever make pertinent findings, such as you just described, about an individual who was missing?

(Pause)

MR. ROSE:  Objection to form.

THE WITNESS:  Can you -- I don't understand the question.

MR. LEDFORD:  Sure.

BY MR. LEDFORD:

Q.    You described, I think, a series of tests and analysis.

And then reports that would be written about an individual whose remains you were able to examine.

Do I have that right?

A.    Yes.

CRAIG THOMAS MALLAK, J.D., M.D.

48

Q.   Were you able to do the same process for somebody who was missing?

A.   We maintained files on those that were missing.  And any information that any agency would discover would become part of that file; and look -- continue to look for them.

And there is also a national database that we would place that information in.

Q.   Did you ever reach conclusions regarding injuries suffered by a missing person without ever having an opportunity to examine their remains?

MR. ROSE:  Objection to the form.

(Pause)

A.   The course at Broward, it was the county medical examiner's office.

We never had -- it was simple, day-to-day doing cases, trying to find -- assist in any way we could anybody that was might missing.  Families would call.  We would take the information.

There is a -- like I said, there is a database at NamUs.  And all the information about that person would be put in there.

CRAIG THOMAS MALLAK, J.D., M.D.

49

That may include any injuries that they had previously suffered as -- you may find a set of remains and then be able to match it up to that missing person.

Q. What about situations where a person went missing?

Did you ever perform an analysis or determine injuries had been suffered to somebody between the time they went missing and whenever you took the case?

MR. ROSE: Objection to form.

A. Based on outside information that was provided to us at times.

Q. Can you give me an example of that?

A. That we would get out reports that they had been sighted somewhere, or somebody had seen them, and they may describe something.

And that would go in the file, but it wouldn't be confirmed until body was recovered and able to -- hopefully, those injuries are still there.

Q. Okay.

What about situations where you were not able to recover the body, you weren't able

CRAIG THOMAS MALLAK, J.D., M.D.

50

to examine the body at any point?

Were you ever able to diagnosis an injury that had occurred to that person after --

MR. ROSE:  Objection -- sorry.

BY MR. LEDFORD:

Q.     -- after the time they went missing?

MR. ROSE:  Objection to form.

A.     That gets into a very vague area of person that is being sought, and any information that came in was analyzed.

Q.     What I'm really trying to get at is: Did you ever diagnosis injury to a person without having the opportunity to examine their remains?

A.     Wouldn't be diagnosed.  It would be noted as you built the file; and placed it in what is called NamUs.

Q.     When you say "noting" an injury, what do you mean by you would "note" an injury in that situation?

A.     If it had been reported to us:  I have seen somebody and they appeared to have bruises, cuts, abrasions.

Q.     So if somebody else identified a

CRAIG THOMAS MALLAK, J.D., M.D.

51

person as having injury, like you say, a bruise, cuts, abrasions, you then would note that as part of the file.

Do I have that right?

A.    As part of the national file, yes.

Q.    Without that, kind of, separate statement of bruises, cuts, injuries, did you ever determine that somebody was missing had been injured in a particular fashion before death?

MR. ROSE:  Objection to form.

A.    It was part of the investigation.

It wasn't something that we were going to put down on -- into our report other than the missing file.  It's not going to go into an autopsy report or an injury report.

It's going to be:  This was reported to us.

Q.    So do I understand correctly then that you'd only make those kinds of notes if it had been -- "it" being the injury, the bruise, the cut, the abrasion -- had been reported to you?

MR. ROSE:  Objection to form.

A.    How else would we find out?

CRAIG THOMAS MALLAK, J.D., M.D.

52

Q.   Just describe for me the legal consultant services that you provide in your current role as a medico-legal consultant for Retnav Forensics?

A.   I believe I've already done that.

I'm contacted and provided with a preliminary outline of the case.  And from that point, I consider whether I can provide assistance based on my training, expertise.

Q.   Okay.

So just to be clear, when you say "medico-legal consultant," you are not saying that you are providing legal services.  You are just providing medical services in the legal context.

Is that fair?

A.   Right.  That's what forensic pathology is.

"Forensics" comes from the word "work" from Latin, "forum," the legal forum.

(Pause)

Q.   Any other services you provide in your current role?

A.   No.

CRAIG THOMAS MALLAK, J.D., M.D.

53

(Pause)

Q. What's your hourly rate for your work on this case?

A. $600 an hour.

Q. And when were you first hired as an expert in this case?

A. I believe it was in October, October -- last year.

Q. Of 2022?

A. Yes, maybe August.

I remember it was like -- it was rather -- it wasn't years ago.

Q. So sometime in the summer of 2022?

A. Yes.

Q. Roughly how many hours have you worked on this case to date?

A. Probably 20.

Q. That includes drafting your report?

A. Yes.

Q. Other than your work for the Broward County, have you ever worked as an expert for a defendant?

A. Yes. Multiple times.

Q. Can you tell me about that?

CRAIG THOMAS MALLAK, J.D., M.D.

54

A.    If I can assist someone in the defense, I have helped out many defense attorneys.

Q.    Can you give me a recent example of a defendant who you have been retained by?

A.    Not going to disclose the names of the other cases that I'm currently working on that are in active litigation.

Q.    Okay.

Anything that you can disclose where you have already been disclosed in a filing as an expert, other than in this case?

A.    As a child abuse case in the state of Florida here.  We were consulted in the child's death.

Q.    And who was the defendant there?

A.    The defendant is Reese.

Q.    Reese is the person accused of child sex abuse?

A.    No.

Q.    Who is Reese?

A.    Reese is the person who is accused of abusing and causing the death of this child.

(Pause)

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

55

Q.    Other than this case, have you ever worked with any of the plaintiffs' counsel in this case?

A.    Yes.

Q.    Who is that?

A.    Kreindler & Kreindler.

Q.    Okay.

Anything -- any cases that you can disclose to me? -- that you are -- actually, I'll withdraw that.

About how many cases have you worked with Kreindler & Kreindler?

A.    I think it's four or five.

Q.    And when did you first begin working with them?

A.    While I was still in Broward.

Q.    Do you remember about what year that would be?

A.    It was towards the end of my tenure -- '18, '19, '20.

Q.    And four or five cases?

A.    Yes.

Q.    And in those cases -- are any of those cases ones that are listed on your testimony

CRAIG THOMAS MALLAK, J.D., M.D.

56

list that is appended to your report?

A. Possibly there is one that's not on there.

Q. I assume is that because you didn't provide testimony in that case?

A. There was a deposition.

Q. Did it occur between when you submitted this report and now?

A. It was an omission that I didn't put it on there.

Q. What case was that?

A. It was Glazer.

Q. Could you tell me the subject matter of the Glazer case?

A. The case of hypoxia with an aircraft.

Q. And what kind of aircraft?

A. A Socata.

(Pause)

Q. Did Mr. Glazer ultimately crash into the ocean?

Is it that case?

A. I believe so.

MR. LEDFORD: On -- excuse me.

Turn to your list of testimony.

CRAIG THOMAS MALLAK, J.D., M.D.

57

BY MR. LEDFORD:

Q.     Can you tell me which other ones, if any of these, are cases in which you are working for the Kreindler firm?

A.     I don't believe I have any other open cases with the Kreindler firm.

Q.     Just can be clear, I'm not asking about open cases.

Are any of the cases in which you have testified as a -- for a trial or a deposition -- cases in which you were retained by the Kreindler firm?

A.     I don't believe so.

I believe the -- one -- some of the cases are as simple as helping them interpret toxicology results.

They were just phone conversations, never even opened a file.

Q.     So the Glazer case -- was that Glazer versus Honeywell?

A.     There were a lot of parties to that case.

Q.     Okay.

And -- so you identified there is four

CRAIG THOMAS MALLAK, J.D., M.D.

58

or five cases you worked with Kreindler in the last four to five years?

A.    Yes.

Q.    -- a rough estimates of the amount you've billed on those cases?

A.    I would have to have my cron files in front of me to give you an exact number.  It's not a huge amount.

Q.    Okay.

Are you able to give me an estimate?

A.    It would just be -- it would be a guess.

Q.    Other than the Kreindler firm, have you worked with any of the other plaintiffs' attorneys or plaintiffs' firms involved in the case?

A.    I don't believe so.

Q.    So before you became a medico-legal consultant at Retnav, your CV says that your previous position was as the Chief of the Broward County Office of Medical Examiner and Trauma Services.

And that was from 2012 to 2021.

Is that right?

CRAIG THOMAS MALLAK, J.D., M.D.

59

A.    Correct.

Q.    Tell me what your duties were in that position.

A.    I was the chief medical examiner.

In addition to doing medico-legal investigations, I was in charge of oversight of the entire office dealing with a myriad of administrative issues.

And I was also head of the trauma committee.

I didn't -- I'm obviously not a trauma surgeon, but we organized trauma services for the county.

(Pause)

MR. LEDFORD:  We have been going for about an hour.  Should we take a short break?

MR. CLIFFORD:  Of course, whatever you would like.

THE VIDEOGRAPHER:  We are off the record.  The time is 10:04 a.m.

(Recess from 10:04 a.m. to 10:19 a.m. Eastern Standard Time)

THE VIDEOGRAPHER:  We are back on the record.  The time is 10:19 a.m.

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

60

BY MR. LEDFORD:

Q. Dr. Mallak, so we have talked about your work as the Chief of the Broward County Office of Medical Examiner.

The next previous job, it looks like from your CV, was from 2002 to 2012, you served as the Armed Forces Medical Examiner and the director of the Armed Force Medical Examiner System.

Are those distinct positions?

Or did they overlap?

A. Well, there is nothing in federal law that talks about a chief position. They just call it the Armed Forces Medical Examiner.

Part of the duties of the Armed Forces Medical Examiner is to have oversight of the entire system.

And forensic -- you are used to seeing the term "chief" in front of the title.

Q. Okay.

And so tell me what your duties were as the Armed Forces Medical Examiner.

A. Again, doing medico-legal investigations, both the dead and the living.

CRAIG THOMAS MALLAK, J.D., M.D.

61

And then we had a very large toxicology lab that oversaw the toxicologic testing of the entire force.

We were tested on a random basis.

Those that have been in the military know that you just come to work, and they say, "Time for you to be tested."

And we oversaw several labs; plus we provided the testimony in cases where they were positive and they went to trial and court marshal.

And then also had the Armed Forces DNA Identification Lab, which included up to 250 DNA scientists; plus the repository of all the bloodstain cards -- and it's now over 10 million bloodstain cards for everybody -- close to everybody -- in the military.  A few people have slipped there -- slipped through.

But that is all stored right there in the epidemiology section that collected all the data and analyzed it.

So it was wide-ranging.

We had forensic anthropologists who would look at bones.  That was their area of

CRAIG THOMAS MALLAK, J.D., M.D.

62

specialty.

And then we had the Armed Forces Institute of Pathology until it closed, which was the ivory tower of pathology for years and years.

And each section -- there would be a section that only looks at hearts; only looks at brains; and only looks at gastrointestinal issues -- and on, and on -- even a veterinary pathology section that we had access to for consultation.

Q. And what would those different divisions -- when you called them "the ivory tower" -- what were they doing with respect to those different bodily systems?

A. They were making diagnoses of different diseases. And many of their diseases that are out there today -- the names on them come from those scientists. They started in their twenties or thirties, and many of them died at their desks. They never left.

(Pause)

Q. Anything else?

I don't want to cut you off.

CRAIG THOMAS MALLAK, J.D., M.D.

63

But anything else that were part of your duties as the Armed Forces Medical Examiner?

A.    I also worked closely with the National Museum of Health and Medicine, different displays and educational activities that they provided.

It was part of the Armed Forces Institute of Pathology until it was BRAC -- base realignment and closure -- in 2011.

Q.    Did you have any additional or different duties as director of the Armed Forces Medical Examiner System?

A.    I served on numerous committees at the Pentagon, such as the Mortuary Affairs committee, casualty committees. I was called down to testify multiple times before various committees of Congress.

MR. LEDFORD:  At the top of page 2 of your report, you say:  Injury pattern recognition and analysis is a major element of the --

MR. DURKIN:  I'm sorry. I didn't get caught up yet. Can you give me one second? I

CRAIG THOMAS MALLAK, J.D., M.D.

64

apologize.

MR. LEDFORD: No problem. Let me know when you are ready. Page 2, very top.

MR. DURKIN: Got it. Got it. Thank you. I'm all good now. Thank you.

MR. LEDFORD: You bet.

BY MR. LEDFORD:

Q. So at the top of page 2 of your report, you say: Injury pattern recognition and analysis is a major element of the mission of the AFMES -- Armed Forces Medical Examiner System.

Right?

A. Correct.

Q. While the primary mission was to determine the cause of death, injuries of all types were evaluated.

You know, I apologize. I skipped a sentence there.

So injury pattern recognition and analysis is a major element of the mission of the AFMES. While such evaluation was occasionally performed on the living, the majority were deceased.

CRAIG THOMAS MALLAK, J.D., M.D.

65

Describe for me the injury pattern recognition and analysis that was performed by the Armed Forces Medical Examiner System?

A.    You would look at an injury, and instead of being, say, a round bruise, it actually appeared to reflect an impact with some object that had an outline.  And then you would investigate, or have your investigators go back, and look at the vehicles, the situation, and see if it matched up with anything in that vehicle or in that area.

Q.    So you mentioned vehicles.

Would an example be if there was a car accident and a person had a bruise on their arm, you might go and look at the vehicle to determine if there was a particular part of the vehicle that they had struck with their arm?

A.    Correct.

Q.    Did the Armed Forces Medical Examiner System perform injury pattern recognition and analysis where the remains of a deceased could not be examined?

MR. ROSE:  Objection to form.

A.    What do you mean -- "cannot be

CRAIG THOMAS MALLAK, J.D., M.D.

66

examined"?

Q.   So, for example, if you weren't able to examine the remains of a deceased.

In that situation, did the Armed Forces Medical Examiner System perform injury pattern recognition and analysis?

MR. CLIFFORD:  Objection to the form of the question.

That's an incomplete hypothetical.

A.   It would mean we would look at -- not everybody was intact, and we would examine whatever we could for those that weren't.

Q.   And what if you weren't able to examine remains at all?

In those situations, would you -- or would the Armed Forces Medical Examiner System perform injury pattern recognition and analysis?

MR. ROSE:  Objection to form.

A.   If possible.

This is the first two major conflicts where every single military person was recovered and identified.  So we had something from everyone.

Q.   And that's a truly impressive and

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

67

important achievement.

In other contexts where remains are not available -- perhaps previous conflicts -- did the Armed Forces Medical Examiner System perform injury pattern recognition and analysis?

MR. ROSE: Objection to form, incomplete.

A. Part of our duty is the recovery and identification from previous conflicts.

In fact, the group that did it was originally anthropologists, and has now been switched over to pathologists to do those examinations from Vietnam, Korea, World War II, World War I, even back to the Civil War --

Q. Yes --

A. -- and have made identifications and identified injuries.

Q. Once the -- once remains of a serviceman or servicewomen have been recovered?

A. Yes.

Q. And I take it, then, that there are certain numbers of servicemen and servicewomen whose remains have not yet been discovered, but are being actively searched for.

CRAIG THOMAS MALLAK, J.D., M.D.

68

Is that right?

A.    Yes.  We have teams in the field -- noncareer right now because of political forces beyond our control.  But we are doing extensive work on World War II, especially at Pearl Harbor.

Q.    And for those servicemen and servicewomen whose remains have not yet been identified, does the Armed Forces Medical Examiner System perform injury pattern recognition and analysis?

MR. ROSE:  Objection, form, incomplete.

A.    If we don't have them, we can't examine them.

Q.    And when you say "you can't examine them" -- so if you can't examine them, does that mean you can't perform the injury pattern recognition analysis?

MR. ROSE:  Objection to form.

A.    I believe one would lead to the other.

Q.    So do we agree, then, that if you don't have the remains, you can't perform an injury pattern recognition analysis?

CRAIG THOMAS MALLAK, J.D., M.D.

69

MR. ROSE: Objection to form, incomplete hypothetical.

A. You know, depends on what other documentation may be available. There may be pictures. There may be other -- a lot of these people died off now -- but that provided us with information that we used in our search for them.

(Pause)

Q. So are you aware of any instance in which the Armed Forces Medical Examiner System performed injury pattern recognition and analysis where the remains of a deceased was not available to be examined?

MR. ROSE: Objection, form, incomplete hypothetical, asked and answered.

A. Again, it's a -- it's a group of people at Hickam Field in Hawaii that are in the field. And they have genealogists. They have investigators. There are pattern information on every single missing person.

I have not had a chance to look at all those. There are 78,000 people missing from World War II. There are 1,700 left in Vietnam. There are almost 8,000 from Korea.

CRAIG THOMAS MALLAK, J.D., M.D.

70

I have not examined every file to see what information they have, but they are continually getting additional information.

Q.   Yeah and I understand that work is ongoing, and I understand it's important.

I'm just trying to find out if you personally are aware of any instance in which injury pattern recognition and analysis was performed by the Armed Forces Medical Examiner System before having access to any remains?

MR. ROSE:  For the purpose of identifying cause of death?  Is that your question?

MR. LEDFORD:  No.

Reporter, could you please read the question back?

(Pause)

(Question read)

MR. CLIFFORD:  Objection to not only the form of the question, but it is now argumentative because the witness has answered the question.

You may proceed.

MR. ROSE:  And incomplete

CRAIG THOMAS MALLAK, J.D., M.D.

71

hypothetical.

MR. LEDFORD: Did you hear the question?

Or do you need it read back again?

THE WITNESS: Can I hear it one more time, please?

MR. LEDFORD: Absolutely.

Please go ahead and read the question back again.

And I'll agree to the same objections.

MR. CLIFFORD: Mr. Reporter, please read back the question.

(Pause)

(Question reread)

A.   The injury patterns based on descriptions: So and so, "I saw this happen to them."

And when they are searching for them, the investigators in the field, the anthropologists, the archeologists are going to be looking. There may be multiple bodies in a field.

Now they are looking for something with this injury pattern based on firsthand

CRAIG THOMAS MALLAK, J.D., M.D.

72

accounts.

(Pause)

Q.   Without such a firsthand account, are you aware of the Armed Forces Medical Examiner System performing injury pattern recognition and analysis where the remains of a deceased had not yet been examined?

MR. CLIFFORD:  Objection.

Now asked for, I believe, the third time.

MR. ROSE:  Incomplete.

A.   There is information available to our investigators which is not public knowledge that comes from other sources in the intelligence field and elsewhere.  It is used to find a specific individual.  And that may include a pattern of an injury.

I cannot go further into that.

MR. CLIFFORD:  So then let me first inject on behalf of the witness a security sensitive information -- SSI -- objection.

(Pause)

BY MR. LEDFORD:

Q.   Sir, just to be clear, I'm not asking

CRAIG THOMAS MALLAK, J.D., M.D.

73

you for any SSI or classified information, or otherwise protected government information that you learned in the course of your duties as a naval officer.

How about in the situation of a naval aviator during World War II?  Lost during a mission, has not been recovered yet, on the list of individuals for whom the U.S. government is still actively searching, but no reports, classified or otherwise, about the nature of the disappearance or the reason for the disappearance.  They just knew that this individual took off from a carrier and was not ever heard from again.

In a situation like that where you don't have specific reports -- classified, or SSI, or otherwise -- about particular injuries the individual may have experienced, and the remains cannot yet be examined, are you aware of any instance where the Armed Forces Medical Examiner System performed injury pattern recognition and analysis?

MR. ROSE:  Objection to form, incomplete hypothetical, argumentative.

CRAIG THOMAS MALLAK, J.D., M.D.

74

A.    I am not going to parse out, in any way release any information on any cases that are out there.

Q.    I understand and respect that, sir.

That hypothetical was truly a hypothetical.

I am not specifically referring to any naval aviator and -- nor am I asking you to identify any SSI classified or otherwise government-protected information.

So with that context, and with that understanding, can you answer the question?

And if you would like to have it read back, we can do so.

A.    No.

Outside a secure information facility, I'm not going to talk about -- not going any further into this.

(Pause)

Q.    Okay.  And I understand that, and I'm not trying to force you to answer the question.

But for the record to be clear, you are declining to answer my question based on the reasons you articulated.

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

75

MR. ROSE: But -- you are asking him a hypothetical, but -- and it's triggering a response that may require divulging confidential information, which he says he cannot do.

MR. LEDFORD: Okay.

BY MR. LEDFORD:

Q. And just to be clear, your -- strike that.

Sir, as I am sure you understand because you have testified many times before, the purpose of this expert deposition is for me to understand what you might say at trial.

So as I understand it, you feel like you can't answer my question without divulging protected government information.

And I don't know whether it's SSI, or classified -- what the nature is.

But am I safe in assuming that you are going to take the same position at trial?

MR. CLIFFORD: Objection to that, because that's not for him to decide.

A. I would have to have the security officers give me permission to go any further.

Q. U.S. Navy security officers?

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

76

A.    Could be any agency you can imagine.

Q.    How about when you worked at Broward County? -- the work you were describing earlier?

Did your office there perform a similar type of injury pattern recognition and analysis on deceased persons?

A.    Yes.  It wasn't to the degree we did in the military.

Q.    And at Broward County, did the Office of the Medical Examiner perform injury pattern recognition analysis where the remains of its deceased could not be examined?

MR. ROSE:  Objection, form, asked and answered, incomplete hypothetical.

A.    We have been there before.

There is information out there that's placed -- you are welcome to look up NamUs on your computer and you can see.  The people put down different information.

So in some cases, there is; and some cases, there isn't.

Q.    And in situations where you don't have a first-person report of a particular injury suffered by someone, did --

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

77

A.    How can I -- one?

MR. ROSE:  There is no question pending.

Go ahead.

BY MR. LEDFORD:

Q.    So just so I understand, so you are saying without that type of firsthand report, or information, or the remains, you wouldn't be able to do the injury pattern recognition and analysis, right?

MR. ROSE:  Objection, form, asked and answered, incomplete hypothetical.

You are talking, again, about the context of the determination cause of death?

MR. LEDFORD:  No.

MR. ROSE:  Well, that's what they do there.  So -- that's what -- right?  That's what you are asking him about?

MR. LEDFORD:  No.

MR. ROSE:  Oh, okay.

Then objection, vague, on top of that.

MR. LEDFORD:  Do you need the question read back?

THE WITNESS:  Please.

CRAIG THOMAS MALLAK, J.D., M.D.

78

MR. LEDFORD: No problem.

(Pause)

(Question read)

A. NamUs is a civilian system. It's incomplete. And at times there may be information out there that we don't have.

And in those cases, no, we can't.

Q. Since 2002, have you ever treated living patients as part of your medical practice?

A. I have evaluated them; testified in their cases.

Q. So I understand the distinction here, when you -- as a medical examiner, you would call it "evaluating" someone as opposed to "treating" them?

A. Correct. I'm not a treating physician. I don't write prescriptions.

Q. And about how many living individuals do you evaluate -- or did you evaluate per year, let's call it, since 2012?

A. A few. It wasn't that many.

Q. Would you say it's 10 per year?

A. Less than that.

CRAIG THOMAS MALLAK, J.D., M.D.

79

Q. So just to short-circuit a long line of questions, as you go back through your career, at any point, have you treated as part of some clinical practice patients, as opposed to evaluating them as a medical examiner?

A. I might get my wife some Motrin.

Q. Other than that -- so maybe during your residency, I don't know whether you maybe treated patients.

But after that point as an -- have you ever had a practice where you treated patients, as opposed to evaluating a handful a year as a medical examiner?

A. Clinical internship.

Then I spent a year with the Marine Corps as a battalion surgeon where I was in charge of the medical care of a battalion of Marines. And the Navy requires to you maintain certain clinical skills, such as cardiac life support and others, so that you can be deployed at a moment's notice, if needed.

Q. So the year that you were talking about when you were serving as the surgeon for the battalion of Marines -- I take it that is

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

80

the 1990 through 1991 tour that you spent at Okinawa, Japan and the Philippines?

A.    Yes.

(Pause)

MR. LEDFORD:  It is not bothering me.

Sir, is it -- you are the one who needs to be able to really focus here.

Are you able to focus with the sounds next door?

THE WITNESS:  Yes.

MR. LEDFORD:  Okay.  If it becomes a problem, just let us know and Mr. Clifford will work his magic.

(Pause)

BY MR. LEDFORD:

Q.    Are you a psychologist?

A.    Part of my internship, I had rotations in psychology, but I am not a psychologist.

Q.    You wouldn't describe yourself as a practicing psychologist.

Is that fair?

A.    Well, it's areas of psychology that I have been asked and qualified to comment on, but it's in a very limited scope.

CRAIG THOMAS MALLAK, J.D., M.D.

81

Q.    What areas are those?

A.    Pain and suffering.

Q.    That relates to your work as a medical examiner?

A.    Yes.

Q.    So can you tell me what kind of training after the internship that you have received regarding psychology?

A.    It would be injuries that aren't immediately fatal, and the physiological insults that would continue and increase until the time of death.  I would be asked if that would be considered pain and suffering.

And that has been allowed into court.

Q.    And outside of the pain and suffering context, have you -- are you offering an opinion on psychological or emotional injuries?

MR. ROSE:  In this case? --

MR. LEDFORD:  Yes.  To be clear, in this case.

So let me rephrase this.

BY MR. LEDFORD:

Q.    In this case, are you offering an opinion on psychological or emotional injuries

CRAIG THOMAS MALLAK, J.D., M.D.

82

other than pain and suffering?

A.    Depends on the context of the question.

Q.    Okay.

And I understand.  Maybe I ask you the question out of left field.

Just looking at your report, and assuming that I don't ask you a question that goes outside the scope of that, which I understand does address pain and suffering, are you offering any other opinions on psychological or emotional injuries?

A.    No.  I stick to pain and suffering.

Q.    You are not an engineer, right?

A.    No, but we -- based on the injury patterns we have seen, we work very closely with engineers in redesigning such things as the Bradley fighting vehicle, and medical equipment, and -- so I'm not an engineer.  But it is part -- to take what we provide them and they make changes -- engineering changes -- to --

Q.    Does your work -- sorry.  Didn't mean to cut you off.

A.    -- because they didn't understand

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

83

exactly what was happening, and they could make improvements to help save lives.

Q. So to be clear, you work at times closely with engineers, but you are personally not an engineer? --

A. Correct --

Q. -- is that right?

A. -- correct.

Q. And same thing for biomechanical engineering.

Is it fair to say that you may work closely with biomechanical engineers at times, but you, yourself, are not a biomechanical engineer?

A. Well, we know the different types of forces that cause injuries.

Based on -- again, much of it is a pattern analysis of the way a bone breaks. And we know where the force is applied and how it broke.

But I'm not a biomechanical engineer.

Q. And so fair to say, then, that you are not calculating the biomechanical forces or movements experienced by the occupants of the

CRAIG THOMAS MALLAK, J.D., M.D.

84

airplane during the accident flight?

MR. ROSE: Objection to form, beyond the scope.

A. I relied on Faaborg's report.

Q. So, I mean, if it's beyond the scope, that's fine.

I'm trying to actually determine what the scope is.

So if you are saying you are not providing those calculations --

A. No, not providing the calculations.

Just work closely with them and provide the input that they need.

Q. Okay.

A. Does that make sense?

Q. It does. Thank you.

MR. ROSE: Don't ask him questions.

BY MR. LEDFORD:

Q. Sir, normal gravitational forces are positive 1 G.

Is that right?

A. I am not going to go into --

MR. ROSE: Objection, beyond the scope.

CRAIG THOMAS MALLAK, J.D., M.D.

85

Go ahead.

A.    For this case, I relied on the other report.

Q.    Understand that.  And I also understand that I'm not asking you to provide those biomechanical calculations because I understand you've already said you are not doing those calculations.

I just want to make sure that I understand your understanding of some terms.

And so say agree or disagree that normal gravitational forces are positive 1 G?

A.    In this case, I'm not going to talk about gravitational forces.

I'm here as a forensic pathologist.

Q.    You served in the U.S. Navy for 26 years.

Is that right?

A.    Yes, three years while at medical school and 23 years on active duty.

Q.    Retired as of '06, captain?

A.    Yes.

Q.    Safe to assume that you did pushups at various times while you were in the Navy?

CRAIG THOMAS MALLAK, J.D., M.D.

86

A.    Twice a year, we had to do physical fitness test.

Q.    Do you remember the largest number of pushups you ever did?

A.    The max -- I did the max for -- it was based on your age.  There was a max amount.  And I did the max amount at every --

Q.    Do you remember how many that was?

A.    Well, it fell throughout the years. It started in the seventies and then fell down into the sixties by the time I retired.

MR. CLIFFORD:  That you would do 70 and then 60?

THE WITNESS:  Well, we had to do --

MR. CLIFFORD:  I'm trying to understand --

THE WITNESS:  You had --

MR. LEDFORD:  No, go ahead --

MR. CLIFFORD:  I probably shouldn't have -- I didn't mean  -- if you said 70 years old or 70 pushups.

THE WITNESS:  Seventy pushups --

MR. CLIFFORD:  -- okay --

THE WITNESS:  -- within two minutes.

CRAIG THOMAS MALLAK, J.D., M.D.

87

MR. CLIFFORD: Thank you. That's -- okay --

MR. DURKIN: Two minutes?

MR. CLIFFORD: Yeah.

MR. ROSE: And that's the max --

THE WITNESS: Well, that was to get a hundred points. Because you also had to do situps and you had to do a run. So you didn't want to use your energy on one of the --

MR. LEDFORD: Any other questions, guys?

(Pause)

MR. CLIFFORD: No person in this room who can do what he just said --

MR. LEDFORD: Certainly not me.

(Pause)

BY MR. LEDFORD:

Q. So, sir, we have consensus in the room that 70 pushups has -- is impressive, especially if you could have kept going.

A. I don't know if it's impressive or not. That was just my goal.

MR. ROSE: Update your CV. Put that in there.

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

88

Q.    I'm going to say for the record that's an impressive number of pushups.  Let's assume that for the remainder of the deposition.

Probably had to practice doing pushups, right?

A.    Yes.

Q.    Okay.

And so was the muscle soreness you experienced from doing pushups an injury?

MR. ROSE:  Objection to form.

A.    Yes, you break down the muscle every time you exercise, and then the body builds back up.

Q.    So that muscle soreness you'd get from exercising -- like doing practice pushups -- that in your view qualifies as an injury.

Do I have that correct?

MR. ROSE:  Objection to form.

A.    Yes, you are injuring muscles to induce an increase in your tolerance.

Q.    What's the specific injury in that context?

A.    -- you are pushing your muscles beyond what -- you would start practicing a couple

CRAIG THOMAS MALLAK, J.D., M.D.

89

months before, and you would do X number; and then you'd try to increase it every day.

(Pause)

Q.    So understand that you would try to increase it every day.

And that's how you would go about increasing your physical fitness.

MR. ROSE:  Objection to form.

MR. LEDFORD:  Wait for me to ask a question.

BY MR. LEDFORD:

Q.    So, sir, I understand that the practice you are describing is how you might become better at doing more pushups.

Can you describe for me the specific bodily injury that you believe occurs from doing those practice pushups?

MR. ROSE:  Objection, asked and answered.

A.    The muscles are being pushed to their -- as far as you can go at that point. And it results in micro-tears, micro-bleeding within that area.  And the muscles respond by healing and increasing in their ability to

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

90

function.

Q.    And in your view that qualifies as an injury, right?

MR. ROSE:  Objection to form, asked and answered.

A.    Yes.

Q.    Have you ever diagnosed or evaluated that a deceased person suffered an injury based on the definition you just gave?

MR. ROSE:  Objection, incomplete hypothetical.

A.    That they were doing pushups?

Q.    That they had experienced micro-tears from exercise?

MR. ROSE:  Objection to form, incomplete hypothetical.

Go ahead.

A.    You can look under the microscope at the muscle and tell whether the injuries occurred while they had a blood pressure or not by the blood.  You can see the blood going in between the bundles of muscle, where after death if you have a tear, you are just going to see puddle of blood.  And I know it's not a very

CRAIG THOMAS MALLAK, J.D., M.D.

91

scientific term, but --

Q. So have you ever evaluated a deceased person's remains and determined that they suffered an injury based on, kind of, micro-tears you are talking about from doing a pushup?

MR. ROSE: Objection, form, asked and answered, incomplete hypothetical.

Go ahead.

A. When there was a question of injury prior to death, that's one of the techniques we would use.

Q. Understand it's a technique that you can use.

Did you ever, to the best of your recollection, make such an evaluation?

A. Oh, yes. Many times.

Q. Can you give me an example of that?

A. There are cordal things people do to each other that don't kill them right away. And when -- often in a legal proceeding, they want to know what happened while they were alive and what happened while they were dead; postmortem mutilation versus torture -- versus inflicted

CRAIG THOMAS MALLAK, J.D., M.D.

92

injury of the living.

Q.    Sir, I hesitate to inquire further because this is obviously a very sensitive subject and --

A.    You have no idea.

Q.    I'm sure I don't.

And -- but I do have an understanding that it is -- that you have observed tragic situations and terrible situations.

Not talking about torture or mutilation.

What I'm trying to get at is the kind of micro-tears that somebody would get from exercise, like a pushup.

Is that something that would be determined as part of your evaluation of the remains of a deceased individual?

MR. ROSE:  Objection, form, incomplete hypothetical.

A.    I think I've answered that.  You would look and see injuries prior to death -- is what you are trying to parse out.

Q.    And is it your testimony that those kind of micro-tears from exercise would be an

CRAIG THOMAS MALLAK, J.D., M.D.

93

injury that you would parse out as part of an examination?

MR. ROSE: Objection to form, asked and answered, incomplete hypothetical.

Go ahead.

A. We didn't cut pieces of tissue out of each other after they did pushups.

(Pause)

Q. Is that a "no"?

MR. ROSE: Objection, asked and answered, form.

Is that a question?

A. It can be a family just wanting to know, "Did my loved one suffer for any given period?" And you are able to look at the injuries.

And hemorrhage is one of the major things you look at, and the pattern of it -- both at grossly and at the microscopic level.

Q. Okay.

So it is detectable, it sounds like, as part of your post-death examination?

A. There are other things we look at, too.

CRAIG THOMAS MALLAK, J.D., M.D.

94

(Pause)

Q.    And I understand that you might make that examination to shed light on the nature of how the person died.

Would you have described those kinds of exercise-induced muscle tears as an injury?

MR. ROSE:  Objection, form, asked and answered, incomplete hypothetical.

Go ahead.

A.    It's not just -- what's your definition of "exercise"?

Q.    By "exercise" I mean muscular exertion.

A.    Muscular exertion can happen in a lot of different situations beyond exercise.

Q.    Let me put a finer point on it, then.

How about intentional muscular exertion for the purposes of developing fitness?

MR. ROSE:  Objection, form.

Is that a question?

MR. LEDFORD:  I think he actually asked me a question about how I defined "exercise" in my last question.  So now I have provided my definition.

CRAIG THOMAS MALLAK, J.D., M.D.

95

Tell you what. Why don't we -- why don't we move on because I think it might become more clear?

And I don't want to belabor the pushup point, but it may -- may shed some more light on this as we go along. Okay?

MR. ROSE: Objection to form.

BY MR. LEDFORD:

Q. How about if I lifted a heavy suitcase, and from lifting that heavy suitcases I get those micro-tears?

Is that an injury?

MR. ROSE: Objection to form.

A. Again, the context: How heavy is the suitcase? Who is the person? What shape are they in?

Q. How about if a person who is in moderate shape lifts a suit case that weighs 75 pounds and carries it a quarter mile and they say, "Oh my arm is sore"?

Is that an injury?

MR. ROSE: Objection to form, incomplete hypothetical.

You can answer.

CRAIG THOMAS MALLAK, J.D., M.D.

96

A.     If they have soreness, it an injury.

Q.     Do I understand correctly that, in your view, it's an injury because they have those micro-tears in their muscle fibers?

A.     Well, there is multiple structures in your arm.  You could have strains on tendons, ligaments, joints, cartilage.

Q.     How about if it's just in the muscle?

And so if I wait a couple days, it may be a little bit stronger and maybe it will be a little bit easier.

But my arm is sore.  No tendons, no ligament problems.

Is that an injury as you'd define it?

A.     A muscle does not work without all those other structures.

Q.     Understood.

Assuming that your tendons and your ligaments and all your connective tissue are not broken down.

But you do have muscle soreness, some micro-tears from carrying that suitcase.

Does that constitute an injury as you define it?

CRAIG THOMAS MALLAK, J.D., M.D.

97

A.    Yes, that may be the only focus that you have.

But you may have pulling of tendons and ligaments and others that you just aren't focused on.  Your brain is not focused on the pain there.

Q.    And what if even you were able to examine that person's connective tissue and there was no visible damage or micro-tears to the connective tissue, but there was to the muscle, that still qualifies as an injury in your view?

MR. ROSE:  Objection, form.

A.    Now we are talking about pain fibers and the central nervous system.  Now we are expanding throughout further parts of the body.

Q.    So if the only detectable change in my body after carrying that suitcase is that my -- my arm muscles have some micro-tears in them because I wasn't quite strong enough to carry it, in your view, is that an injury?

MR. ROSE:  Objection, form, asked and answered, incomplete hypothetical.

Go ahead.

CRAIG THOMAS MALLAK, J.D., M.D.

98

A.   Yes.

Q.   How about if I run a race of 400 meters -- so one lap around the track -- as fast as I can, and my heart rate rises above 175 beats per minute.

Is that an injury?

MR. ROSE:   Objection, form, incomplete hypothetical.

A.   Depends on your age.  Depends on what the charts say your expected maximum pulse rate should be.  And as you age, it goes down.

Q.   High school athlete; they run a race of one lap around the track just a normal track meet.  And their heart rate goes up to 175 beats per minute.

Is that an injury?

MR. ROSE:   Objection, form, incomplete hypothetical.

A.   To what?

Q.   Well, would you say that that increased heart rate that that person has experienced from running that lap is an injury?

A.   Again, an injury to what?

Q.   To their body.

CRAIG THOMAS MALLAK, J.D., M.D.

99

MR. ROSE: Objection, form.

A. What part of the body?

Q. Any part of their body.

A. That's too vague for me to answer.

Q. Their heart.

Is it an injury to their heart?

MR. ROSE: Objection to form.

A. Again, depending on the maximum heart rate for some young people, 175 is not.

Q. So I take your point.

Is it fair to say, then, that merely because your heart rat e is fairly high, doesn't necessarily mean you've sustained an injury?

Is that true?

MR. ROSE: Objection to form, incomplete hypothetical.

A. I would need more circumstances. I would need to know more about what is going on. You are giving me bits and pieces here.

Q. How about it's a 20-year-old male track athlete? They run a one-lap race, 400 meters. And during that time, their heart rate rises to 175 beats per minute.

Has that person's heart sustained an

CRAIG THOMAS MALLAK, J.D., M.D.

100

injury? -- at least based on the facts that I've given you?

MR. ROSE: Objection, form, incomplete hypothetical.

Go ahead.

A. Again, you are not giving me all the information I need.

Q. What other additional information do you need?

A. I'm not an exercise physiologist.

Q. So is it fair to say, then, that you don't know exactly which additional information you'd need?

A. I would know some of what -- but I'm sure that I have not been trained in everything about exercise physiology, or exercise training, or sports medicine.

I would call them and talk to those experts.

Q. How about if I run the 400-meter race?

Or we've got this 20-year-old track athlete. They run their 400-meter race. They get some muscle tears, those micro-tears. They have really exerted themselves, so they have

CRAIG THOMAS MALLAK, J.D., M.D.

101

muscle soreness.  Their heart rate went up to 175.

Has that person been injured, as you define it?

MR. ROSE:  Objection, form, incomplete hypothetical, asked and answered.

Go ahead.

A.     What muscles are you talking about?

Q.     Leg muscles.

A.     Yes, those are injuries to the legs.

Q.     Can you recall ever evaluating a deceased person and determining that they experienced that kind of injury due to physical exertion like what I'm describing?

MR. ROSE:  Objection, form, asked and answered, incomplete hypothetical.

Go ahead.

A.     You are now saying they dropped dead at the end of this one lap?

Q.     A day afterwards, they passed away.

A.     If it's a day afterwards, I'm going to be looking at a lot of different things.

Q.     Let me ask you this because -- I just may be misunderstanding what the medical

CRAIG THOMAS MALLAK, J.D., M.D.

102

examiner does.

When you examine the remains of a deceased individual, are you looking at -- are you just trying to determine the physical characteristics of the individual's remains?

Or are you trying to then determine what exactly happened to cause a particular injury?

MR. ROSE: Objection, form.

A. We do a wide range of testing: Genetic testing, toxicog testing. We'll look at -- blood is not very good after death for, kind of, clinical testing, so we use the fluid in the eye. We will look in there and see if there is an issue. We will take that fluid and we'll have it analyzed.

There is a whole series of tests that we can look through. And there are a number of genetic diseases every day that are coming out that I cannot keep up with that you could send off for these panels of hundreds of genetic changes that can cause sudden death.

Q. How about if you do have a situation where you've got an individual who is deceased

CRAIG THOMAS MALLAK, J.D., M.D.

103

and you don't know why.

And I think you have said you do have the ability to look at their tissue and determine that they have experienced micro-tears.

Is that right so far?

A.   We could, but that's not going to be the focus a day later.

Q.   Okay.

So assuming, though, that you do have the ability to look at the tissue of a deceased individual and see that they have experienced micro-tears, is that true?

A.   I could.

I can't remember the last time that was -- we are looking at other things.

(Pause)

Q.   So if you did look at the individual and determine that their tissue -- their muscle tissue had experienced micro-tears -- actually, you know, strike that question.

MR. ROSE:  Going to object anyway.

(Pause)

CRAIG THOMAS MALLAK, J.D., M.D.

104

BY MR. LEDFORD:

Q. How about if I'm driving my car on the freeway, and a semi truck swerves over into my lane, and I have to slam on my breaks to avoid getting hit -- so my car didn't get hit, but my heart starts beating faster and I feel adrenaline and I didn't anticipate or expect either of those responses?

I didn't want my heart rate to go up and I didn't want to feel that adrenaline.

Have I been injured?

MR. CLIFFORD: Objection to form of the question, incomplete hypothetical.

BY MR. LEDFORD:

Q. Do you understand the question?

A. Yes. You have no control over that. That's part of your autonomic systems.

Q. And under those circumstances, have I been injured, as you would define it?

MR. ROSE: Objection, form, incomplete hypothetical.

You can answer.

A. Depends what else you did. If I've got a semi truck coming at me, I'm not going to

CRAIG THOMAS MALLAK, J.D., M.D.

105

just keep driving.  There is other things I'm going to do.

Q.    So driving next to a semi down the freeway, one of these nice Florida freeways; he starts drifting over.  I have to swerve out of the way, but I make it.  Keeps going.  I get back on the road I'm driving on the freeway. Didn't get hit, no impact, but heart rate is going, because I think I just got almost hit by a semi truck.

Feeling the adrenaline, right?

Have I been injured?

MR. ROSE:  Objection, form, asked and answered, incomplete hypothetical.

A.    You have to tell me exactly what happened to your body.

Q.    What else do you need to know other than the heart rate and the adrenaline?

MR. ROSE:  Form.

A.    I would need to know the status of your different organ systems, your underlying disease processes, your genetic makeup.  There is -- I can could go on, and on, and on.  There is everything.

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

106

That's why you would -- if you felt bad, you would go see your physician and they would ask you all these questions, and they would know about all your history.

Q.    Okay.

And what about having that additional information would help you determine whether I have been injured when I swerve to avoid that semi?

MR. ROSE:  Objection, form, incomplete hypothetical, asked and answered.

A.    Again, you are alive.  They can do testing.  They can do an EKG on your heart. They can do a chest x-ray.  They can take a look at your head.  There is all types of modalities we have available today.

Q.    So is it fair to say, then, that just because my heart rate went up, or just because I had this autonomic response doesn't mean I'm injured.

But if I went to my doctor and got examined and got the EKG or some of the other testing you are speaking of, they might determine I was injured?

CRAIG THOMAS MALLAK, J.D., M.D.

107

MR. ROSE:  Objection, form.

BY MR. LEDFORD:

Q.    Is that fair?

MR. ROSE:  Objection, form, incomplete hypothetical, misstates testimony.

A.    What else did you do during the accident -- or during the near-accident?

Q.    I just swerved over to avoid the truck.

A.    All you did was turn the wheel on your car?

Q.    Yes.

A.    That's it.

Q.    But I thought I was going to get run over, and my heart rate is going, and I'm feeling the adrenaline.

MR. ROSE:  Objection, form, incomplete hypothetical.

MR. CLIFFORD:  Now I'll add also argumentative, given counsel's animated addition to the question.

BY MR. LEDFORD:

Q.    Sir, do you need the question read back?

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

108

Or do you recall it?

A.    I recall it.  I just don't believe you would only turn your steering wheel.

Q.    What else do you believe would happen?

A.    There is any number of things you would do.

Q.    Can you give me one?

A.    Once your adrenaline fires, lots of things happen in your body.  It's not just your heart.

Q.    So what other things happen?

A.    There is parts of your brain that are activated for you to do other actions.

Q.    Okay.

What else?

A.    Could be any number of things to protect yourself that could result in an injury.

Q.    Okay.

If you take some further action.

So what I'm trying to get at is:  I don't take those further actions, have I been injured?

MR. ROSE:  Objection, form, asked and answered, incomplete hypothetical.

CRAIG THOMAS MALLAK, J.D., M.D.

109

A.   I'm going to have to see you do this before I answer that question because it's all autonomic, and it's going to happen whether you think you are doing it or not.

Q.   So can you tell me, though, what are the further actions or events that would have to occur before you would be comfortable saying I had been injured in that circumstance?

A.   I would have to --

MR. ROSE:  Form, asked and answered, incomplete --

A.   -- I would have to have a complete -- I would have to know your background, all about your health history, everything about you.

And I -- I just know that other things happen besides your heart rate going up.

Q.   So what are those things that could happen other than my heart rate going up? --

MR. ROSE:  Objection, form, incomplete hypothetical.

BY MR. LEDFORD:

Q.   -- in that situation?

A.   Could be any of a number of things to protect yourself.

CRAIG THOMAS MALLAK, J.D., M.D.

110

Q. I'm trying to figure out: What things would I need to protect myself? -- or might I do to protect myself?

A. The list is endless.

Q. Can we start the list?

Can you give me one or two?

A. No, because I'm not going to get trapped on three and four.

Q. Okay.

Let's assume there is a list which you are declining to provide. That's okay. We can move on, put the list to the side.

MR. CLIFFORD: Object to that comment, because you have heard the objection "incomplete hypothetical" and now you have pivoted and switched it to being something that the witness is not providing.

We object to that form.

That is improper.

MR. LEDFORD: Okay.

BY MR. LEDFORD:

Q. So we have a list of potential things that I might do. Let's put that list to the side.

CRAIG THOMAS MALLAK, J.D., M.D.

111

Just based on what I was describing to you about swerving to avoid the truck -- having my heart rate elevated, having the adrenaline -- do I understand correctly that you are saying that in itself is not an injury, but if some of the things on this list of other actions happen that could result in an injury?

MR. ROSE: Objection to form --

MR. DURKIN: The misstates his testimony.

MR. ROSE: -- incomplete hypothetical, misstates testimony.

A. You haven't even told me your heart rate.

Q. One hundred beats per minute.

A. Is that within your physiologic zone?

Q. Yes.

MR. ROSE: Objection to form.

What's the question?

I heard a "yes." I didn't hear a question.

MR. LEDFORD: Court reporter, could you read back my last question?

(Pause)

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

112

(Record read)

BY MR. LEDFORD:

Q. So, again, returning to my question: Driving down the freeway, swerve to avoid a truck, heart rate to 100 beats per minute, adrenaline is going through me.

Is that by itself sufficient to cause an injury in your view?

MR. ROSE: Objection, form, asked and answered several times now, incomplete hypothetical --

A. Based on --

MR. ROSE: -- lack of context.

A. -- based on my knowledge of everything that's going to happen, yes, there are going to be some degree of injury.

Q. Is the injury from the physiological responses I have already described?

Or some, sort of, follow-on physiological response?

MR. ROSE: Form, incomplete hypothetical.

A. It's going to occur during the autonomic nervous system responding to the

CRAIG THOMAS MALLAK, J.D., M.D.

113

adrenals and other organs releasing the epinephrine or adrenaline.

Q.   And what is the body's response to the autonomic system releasing those chemicals?

A.   Like I said, a lot of it comes from your brain sending signals to multiple systems throughout your body.

(Pause)

Q.   And when your brain sends those signals to the multiple systems around your body, does that constitute an injury?

A.   As a result of what happens, yes.

Q.   Okay.

Can you give me an example of the type of injury that would occur from your brain sending those signals or the autonomic system to parts of your body?

MR. ROSE:  Objection, form.

A.   I already answered that.  There is a myriad of things.

Q.   I won't hold you to this being an exclusive list.

Can you give me an example?

A.   Throughout your body, things are going

CRAIG THOMAS MALLAK, J.D., M.D.

114

to happen.

Q.    I understand that.

Can you give me an example specifically of one of those things that might happen?

A.    It's a complex group of things.

It's not one that I pick out.

Q.    I understand it's a complex group of things.

Can you give me any sort of description of what might occur as an example when your autonomic nervous system sends these signals to the body?

A.    One to the exclusion of the rest is not appropriate to do.

Q.    And are you at this point able to tell me all of the different events that might occur?

Or all the different responses that might occur?

MR. ROSE:    Objection, form, incomplete hypothetical.

A.    Sitting right here, probably not.

Q.    Sir, this is my one chance to depose you.

CRAIG THOMAS MALLAK, J.D., M.D.

115

It can be yes or no, but are you able to provide me that list or no?

MR. ROSE: Objection, form, asked and answered.

A. In the medical literature, there are disagreements about exactly what happens throughout the body. There are some things that are agreed on and others that aren't, and it's highly varied. It's something that's studied continually.

Q. So in order to understand a particular response that would have occurred in a particular person, you would need to know about that individual's health history and makeup.

Is that fair?

MR. ROSE: Objection, form, incomplete hypothetical, misstates testimony.

A. That would be helpful.

Q. Is there anything else that you would need to know before assessing whether or not the autonomic response did cause an injury?

MR. ROSE: Objection to form.

A. I would like to know about exactly the circumstances.

CRAIG THOMAS MALLAK, J.D., M.D.

116

The circumstances you have given me are very vague. They don't tell me speed, velocity, direction.

The forensic pathologist -- that's why we have investigators. They go out and get all that information for us -- or as much as possible.

Sometimes you just can't get everything you need. That's why sometimes on death certificates, the cause and manner are unknown.

Q. What are the circumstances where you would say the causes of the injuries are unknown?

MR. ROSE: Objection to form, vague, incomplete hypothetical.

A. It's not usually the cause.

It's that you haven't found anything that's definitively fatal.

(Pause)

Q. How about if I'm a nervous flier, and I'm sitting in a departure lounge holding on to the chair really tightly and gripping it just very, very tightly, and my heart is racing and,

CRAIG THOMAS MALLAK, J.D., M.D.

117

again, I've got adrenaline because I'm nervous about flying.

Have I suffered an injury?

MR. ROSE: Objection, form, incomplete hypothetical.

A. You may have, yeah.

Q. How would you determine whether I have?

A. I would never determine it. In my line of work I would never determine that.

Q. Why is that?

A. I don't go through airport terminals evaluating people.

Q. And what is it about that particular situation that makes it so that you are not able to determine whether or not that person has suffered an injury?

MR. ROSE: Objection, form, misstates testimony.

A. It's not something I do.

Q. Help me understand that.

MR. ROSE: Objection --

BY MR. LEDFORD:

Q. Why --

CRAIG THOMAS MALLAK, J.D., M.D.

118

            MR. ROSE:  -- form.

            Sorry.

    Q.    In what way is it not something you do?

    A.    Have you ever seen is a forensic pathologist in an airport terminal asking people if their afraid they are going to fly?

    Q.    No, but you are actually the first forensic pathologist I have ever met.

    A.    Well, I feel very honored.

    Q.    The feeling runs both ways, sir.

            MR. ROSE:  It's good you met under these circumstances.

BY MR. LEDFORD:

    Q.    So what I'm trying to get at is:  I understand that that's not a normal part of your practice.

            But --

    A.    It's not any part of my practice.

    Q.    So taking the other situation -- where somebody is nervous, and they are gripping a chair, and their heart rate is kind of going.

            It doesn't have to be about flying. It can be about anything.  They are just nervous

                    TC REPORTING
                    (516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

119

about what's about to come up.  Maybe it's a really stressful or an important job interview. And they are sitting there in the waiting room and they are gripping their chair.

And their heart is going and they got the adrenaline, feeling nervous.

Would you be able to determine whether or not that person has suffered an injury?

MR. ROSE:  Objection, form, incomplete hypothetical.

A.    This is out of the realm of anything that I'm an expert in.

Q.    Tell me why that is.

Help me understand why is it out of the realm of something you are an expert in.

MR. ROSE:  Objection.

A.    Because I don't go around taking biopsies from people sitting in chairs.

Q.    And so sounds like you'd need a biopsy of the person sitting there nervously in the chair in order to determine if they were injured.

Is that fair?

MR. ROSE:  Objection, form, misstates

CRAIG THOMAS MALLAK, J.D., M.D.

120

testimony.

You can answer.

A.   I don't -- I don't know exactly how nervous they are.  I don't know exactly how tight they are gripping.

Q.   So the biopsy would help you determine those facts.

Is that true?

MR. ROSE:  Objection, form, incomplete hypothetical, misstates testimony.

A.   It would end me in jail.

Q.   Assuming that you had authorization --

(Pause)

MR. CLIFFORD:  Objection to the form.

We really are now approaching, with all due respect, the absurd.

You have made your point comical.  This is not at all productive.

Objection.

MR. DURKIN:  We have been going about an hour and 20 almost.  Do you want to take a break?

MR. LEDFORD:  Sure.

(Pause)

CRAIG THOMAS MALLAK, J.D., M.D.

121

THE VIDEOGRAPHER:  We are off the record, the time is 11:40 a.m.

(Recess from 11:40 a.m. to 11:59 a.m. Eastern Standard Time)

THE VIDEOGRAPHER:  We are back on the record.  The time is 11:59 a.m.

BY MR. LEDFORD:

Q.    Sir, before the break I was asking you some questions about various scenarios where there might or might not have been injury, and asking about those.

So I'm going to continue on that path.

MR. LEDFORD:  Let the record reflect that Dan just growled.

MR. ROSE:  Sighed.  Would have been a collective sigh.

BY MR. LEDFORD:

Q.    So, for example, I understand that you don't make it a practice to go through airport terminals and assess whether or not potentially nervous fliers have suffered an injury.

But say the next time you are in an airport, you see somebody who is sitting there in their chair, appear to be kind of flushed,

CRAIG THOMAS MALLAK, J.D., M.D.

122

maybe look a little bit nervous, kind of gripping, look like their heart rate is going, maybe have some adrenaline.

What else in terms of context would you need to know in order to assess whether or not they suffered an injury?

MR. ROSE: Objection, form, incomplete hypothetical, asked and answered.

A.    If they look nervous, flushed and -- I'll tell you, you know, flushing is one of the adrenaline things. They probably do have those muscle micro-tears.

It's just not something I -- ever thought about doing. I've never thought about doing a study on this.

Q.    Okay.

So to determine whether or not they did have the micro-tears or any other kind of injury, what would you want to know in terms of information about that person?

MR. ROSE: Objection, form, incomplete hypothetical, asked and answered.

A.    The micro-tears are a diagnosis I make under the microscope.

CRAIG THOMAS MALLAK, J.D., M.D.

123

Q.    Okay.

How about beyond, or in addition to, any diagnosis you might make under a microscope?

MR. CLIFFORD:  Doctor, hold on one second before you answer.  We'll read it back to you.

But let's take a momentary pause and let them bring this lunch in and set it up, okay?

MR. LEDFORD:  That's all right.  Lunch is important.

(Pause)

THE VIDEOGRAPHER:  Off the record. The time is 12:02 p.m.

(Recess from 12:02 p.m. to 12:04 p.m. Eastern Standard Time)

THE VIDEOGRAPHER:  We are back on the record.  The time is 12:04 p.m.

BY MR. LEDFORD:

MR. LEDFORD:  Court reporter, could you read back the last question and answer?

(Pause)

(Question read)

MR. ROSE:  Objection to the form,

CRAIG THOMAS MALLAK, J.D., M.D.

124

incomplete hypo.

A. Well, in the living, I am also a clinical and anatomic pathologist. I mean, we can do certain blood tests.

Q. Are you able to diagnosis micro-tears without having access to tissue samples?

MR. ROSE: Objection to form.

A. That's a question for my radiology colleagues how -- I mean, how -- MRI has been increasing in resolution in leaps and bounds. I don't know if they can see micro-tears yet, but they can see much more than they could 10 years ago.

Q. So in order for -- possibly -- your radiology colleagues to assess that to the extent they are able, they would still need the actual remains of the deceased, but not necessarily a tissue sample from the deceased.

Do I have that right?

MR. ROSE: Objection, form, incomplete hypothetical, misstates testimony.

Go ahead.

A. Very few radiologists participate in forensics.

CRAIG THOMAS MALLAK, J.D., M.D.

125

We have radiologists at Dover that were interested in this area. In fact, we had one that had been on active duty 50 years, which is unheard of. But he stayed on active duty just for this project because we had one of the first CT scanners in the United States that was used for postmortem cases.

(Pause)

Q. So what I'm trying to get at is: Do you need access to an individual's remains in order to assess whether or not they have suffered micro-tears?

MR. ROSE: Objection, form, incomplete hypothetical.

A. No.

Q. How would you do that without access to a person's remains?

A. Based on the circumstances of what happen. And I relied on Troy's report.

Q. And to be clear, I'm not asking you about Mr. Faaborg's report specifically.

I'm talking about your general practice as a medical examiner.

MR. ROSE: Objection, form, incomplete

CRAIG THOMAS MALLAK, J.D., M.D.

126

hypothetical.

Go ahead.

THE WITNESS:  Can you give me the question again, please?

MR. LEDFORD:  Yeah.

Could you please, court reporter, read that back?

(Question read)

BY MR. LEDFORD:

Q.    So outside the context of Mr. Faaborg's report in this litigation, what would you need in order to determine that muscle or tissue micro-tears had occurred without access to the remains?

MR. ROSE:  Objection, form, asked and answered.

A.    An autopsy is a laboratory test.  You look at all the other information.  It is just as important -- everything that you can get your hands on.

And that's why you have these highly-trained investigators to go out and get all kinds of information for you.  And you put it all together.

CRAIG THOMAS MALLAK, J.D., M.D.

127

Q.    What kind of information?

A.    It could be anything that applies to the death.

Q.    Can you give me an example of the kind of information that you would need to obtain from an investigator in order to determine that somebody had experienced micro-tears prior to death if you didn't have also access to the remains?

MR. ROSE:  Objection, form, incomplete hypothetical.

I mean -- it doesn't even begin to go into any kind of scenario at all.

But -- very generally, vague and overbroad.

Go ahead.

A.    My investigators go out and they start with official reports.  They -- you know, official agencies.  We may talk to other doctors.  We may talk to other people involved.

It's -- over the years, I've used just about everything I can get my hands on that even tangentially has anything to do with the incident to make the best call that I can when I

CRAIG THOMAS MALLAK, J.D., M.D.

128

make -- when I sign that death certificate.

(Pause)

Q.    Fair to say that when you are gathering all that information, you are looking for objective evidence about those circumstances of a potential injury?

MR. ROSE:  Objection to the form.

A.    Well, we want objective and probative, but sometimes you use circumstantial evidence. It's used in court.  So sometimes we have to use circumstantial evidence.

Q.    So in terms of the types of evidence that you would look to, I think you talked about, you know, possible diagnosis through tissue samples or maybe radiology.  You talked about blood tests.

Is there any other type of evidence or type of context that you would want for assessing whether or not somebody had experienced micro-tears?

MR. ROSE:  Objection, form, incomplete hypothetical.

A.    Are we talking about in the living or the dead now?

CRAIG THOMAS MALLAK, J.D., M.D.

129

Q.   Deceased.

A.   Deceased?

MR. ROSE:  Fully deceased?

A.   For fully deceased, we -- we may talk to somebody else.  We involve whoever we think can be helpful.  It's a multitude.  It's so wide-ranging:  Law enforcement, all types of experts, medical, nonmedical.

(Pause)

Q.   Any other specific types of evidence that you can think of that you would rely on?

MR. ROSE:  Objection, form, vague, incomplete hypothetical.

MR. LEDFORD:  Sorry, let me just finish that.

BY MR. LEDFORD:

Q.   Is there any other type of evidence that you would want access to when trying to determine whether or not a deceased person had suffered micro-tears if you weren't able to have access to their remains?

MR. ROSE:  Objection, form, incomplete hypothetical, asked and answered -- five, six times now.

CRAIG THOMAS MALLAK, J.D., M.D.

130

A.   Remember, after I got through four years of medical school, I spent six years in residency and fellowship.  They don't let you go out and do this right out of medical school.  You have to do the same number of years as a neurosurgeon.  You have to take a lot of tests, and you have to demonstrate a lot of knowledge, and you have to have that knowledge questioned continually.

So I don't have to go on these searches all the time because I have been well taught.  I have been board certified.  And I continue to increase my knowledge through required CME, going to meetings, reading articles, taking online quizzes that are provided by our professional association every week.  I know a lot of this.

I'm not simply walking in off the street like a coroner who has no -- who may have absolutely no training at all and just making some of the most ridiculous conclusions you have ever heard of.

(Pause)

Q.   Sir, going back to the individual

CRAIG THOMAS MALLAK, J.D., M.D.

131

sitting in the departure lounge.

Other than micro-tears, what other evidence would you look at to determine whether or not that person had suffered an injury as a result of gripping their arm tightly, and a racing heart, and adrenaline?

MR. ROSE: Objection, form, incomplete hypothetical, asked and answered.

A. What type of injury? Are we talking about physical injuries? Are we talking about -- I saw a person get their blood drawn and have a heart attack and die. So --

Q. That's a physical injury, right?

A. Right, because their adrenaline went up and they had a terrible heart.

Q. Okay.

And you have seen people have their blood drawn without having a heart attack and die, right?

A. I have only seen that once in my life.

Q. But that particular person had some other condition --

A. Yes.

Q. ,that combined with the situation,

CRAIG THOMAS MALLAK, J.D., M.D.

132

resulted in their having a heart attack, presumably.

Is that fair?

MR. ROSE: Objection, form, relevance.

A. Well, the case went to the state medical examiner and I never looked at the case, I don't know if they had drugs onboard or what; also things that potentiate problems wouldn't be unusual today.

Q. What would you want to know in terms of evidence in order to determine whether or not somebody was likely to have experienced the same outcome as a result of their stress response?

MR. ROSE: Objection, form, incomplete hypothetical, asked and answered.

A. Sometimes you don't need to know anything, depending on the situation.

Q. Why is that?

A. Because I have other experts like Troy, and they give me enough information for me to make conclusions.

Q. So in that situation, for example, where you have one individual who, when they get their blood drawn have a stress response and

suffer a heart attack; and then you have the rest of your career people like myself who similarly have stress responses but fortunately, to date, I have not experienced a heart attack from the needle, despite being absolutely terrified of them --

A.      Hm-hmm, okay.

Q.      -- are you able as a medical examiner to look at those two situations and determine ahead of time which person is more -- is likely to suffer that physical injury like a heart attack as a result of that stress response?

MR. ROSE:  Objection, form, incomplete hypothetical, misstates testimony.

A.      I don't know.

Q.      Is that something you've done as part of your career? -- in other words, predicting whether or not somebody is going to suffer a physical injury arising from a stress response?

A.      My career --

MR. ROSE:  Objection, form.

A.      -- is made up of things that aren't predicted to happen.  That's what we do as forensic pathologists.

CRAIG THOMAS MALLAK, J.D., M.D.

134

Q.    I understand that as a forensic pathologist, you know, you would go and look at somebody's remains and you would assess those remains for potential injury.

What I'm asking is:  Have you also evaluated an individual at any point to determine whether or not they are likely to suffer injury as a result of a stress response?

MR. ROSE:  Objection, form.

A.    I don't evaluate the living except for injuries.

Q.    So have you ever -- strike that.

When you say you evaluate the living for injuries, you mean injuries that have occurred?

A.    Yes, blunt force injuries, others.

Q.    So is it fair to say, then, that you don't evaluate people for what injuries they might sustain as a result of a stress response, for example?

MR. ROSE:  Objection, form, incomplete hypothetical.

A.    That is not what a forensic pathologist does.

CRAIG THOMAS MALLAK, J.D., M.D.

135

Q.   So not what you would do?

MR. ROSE:  Objection, form, incomplete hypothetical.

A.   No.  Not what I do.

(Pause)

MR. LEDFORD:  Sir, I think you should still have your copy of your report.

On page 3 in the fourth paragraph.

(Pause)

MR. LEDFORD:  Fourth paragraph says: I have reviewed the Physiological Evaluation of passengers and crew by Troy P. Faaborg, M.S., M.S.A., CAsp, and agree, to a medical degree of certainty, based on more than 25 years of experience as a Medical Examiner and having conducted thousands of forensic medical exams and/or autopsies, with the physiologic insults, effects, impacts, and/or injuries identified and described on pages 18 to 19 of his report.

Did I read that correctly?

A.   I believe so.

Q.   Okay.

(Pause)

MR. LEDFORD:  So, sir, I'm going to

CRAIG THOMAS MALLAK, J.D., M.D.

136

show you a copy of the report of Troy Faaborg in this matter which was previously marked at his deposition as Exhibit 313.

(Previously-marked Exhibit 313, Multipage document entitled: Plaintiffs' Rule 26(a)(2)(B) Disclosure of Troy Faaborg, dated September 20, 2022 (no Bates Nos.), introduced)

(Pause)

BY MR. LEDFORD:

Q.    Do you recognize this as Mr. Faaborg's report?

A.    I haven't read through the whole thing here, but -- today, or within the last two minutes -- but it looks like what I reviewed.

Q.    And is this the same report of Mr. Faaborg that you list in your "Materials Reviewed" section on page 2 of your report?

A.    I believe -- I believe it is.  Again, I haven't reviewed the whole document that you provided me.

Q.    I'll represent to you that this is my understanding of Mr. Faaborg's report.

MR. LEDFORD:  Let's look at pages 18 through 19 of Mr. Faaborg's report.

CRAIG THOMAS MALLAK, J.D., M.D.

137

BY MR. LEDFORD:

Q.    You said in your report that you agreed with pages 18 through 19 of Mr. Faaborg's report, right?

A.    Yes.

Q.    Do you have any disagreements with what Mr. Faaborg states on pages 18 to 19 of his report?

A.    No.

Q.    How about any differences of opinion?

A.    He is approaching from a physiologic point of view.  I approach from a -- and then leads to an injury.

I look at the injury and go the other way and consider what the physiologic consequences that caused or resulted from this injury.

Q.    When you say you look at the physiologic causes that resulted from the injury, tell me what you mean by that.

A.    That --

MR. ROSE:  Objection to form.

A.    -- someone is shot through a major blood vessel, the body is going to

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

138

physiologically try to stop or slow the blood flow to that area.

But -- in the first six months of the Irag war, we had six people shot through the extremities and they died. So I'm considering physiologically they bled to death, but physiologically what happened with the gunshot wound, what physiologic responses followed.

(Pause)

MR. LEDFORD: Let the record reflect that was not something occurring in this room that's a fistfight, but the room next door, just to be clear.

MR. CLIFFORD: Just to be clear. So stipulated.

(Pause)

MR. LEDFORD: I'm sorry. Court reporter, could you read back Dr. Mallak's last response?

(Answer read)

BY MR. LEDFORD:

Q. So, then, do I understand it correctly that you -- you looked at the physiological responses that Mr. Faaborg identified in his

CRAIG THOMAS MALLAK, J.D., M.D.

139

report on page 18 through 19.

Tell me -- strike that.

Sir, you looked at the physiological responses that Mr. Faaborg identified on pages 18 through 19 of his report, right?

A.     Yes.

Q.     Did you independently assess whether those physiological responses were likely to have occurred on the accident flight?

A.     Yes.

Q.     We are going to come back to that.

When looking at the physiological responses provided by Mr. Faaborg, what did you then do with that information?

A.     I agreed with it.

Q.     Anything beyond that?

A.     He starts at the physiologic end.  I start at the injury end, and we meet in the middle.

And I agreed in that -- where he describes the injury as a result of the physiological insults.

Q.     So that's what I am not fully understanding.

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

140

When you say you "started at the injury end," what do you mean by that?

A.    Is that I'm a forensic pathologist.  I evaluate injuries and then work towards what led to the death due to that injury.

(Pause)

Q.    Are you -- is it your -- is it your opinion that the -- any of the physiologic injuries identified by Mr. Faaborg on pages 18 through 19 of his report resulted in the death of any of the occupants of the accident flight?

A.    Can you repeat that, please?

Q.    Sure.

MR. LEDFORD:  Court reporter, could you read that back?

(Pause)

(Question read)

MR. ROSE:  Objection, form.

A.    Again, he is talking about what happens physiologically leading to these -- this list here.

Is there somebody so weak and feeble that they can't withstand that insult?

(Pause)

TC REPORTING
(516) 795-7444

A.    It -- it could be.

Q.    Are you offering an opinion --

A.    I'm not saying --

Q.    -- about that?

A.    -- it did happen, no.

Q.    I apologize.  I still don't quite follow when you are talking about you are starting from the injury.

Which specific injuries are you starting from in your analysis?

MR. ROSE:  Objection, form.

A.    The changes to the normal actions of the body, as described.

Q.    Described by Mr. Faaborg?

A.    Yes, in his report.

Q.    So you started with the physiological changes described by Mr. Faaborg on pages 18 to 19 of his report.

Do I have that right?

A.    Yes.

Q.    I believe you also said that you independently determined that you agreed with the conclusions.

Describe for me your analysis between

CRAIG THOMAS MALLAK, J.D., M.D.

142

when you started with Mr. Faaborg's physiological responses to when you reached a point where you agreed with what he includes in his report.

MR. ROSE: Objection, form, misstates testimony.

You can answer.

A.    Not sure what you are asking.

Again, I'm looking at it differently. I'm not a -- physiology is not what I do, so -- it is not my primary responsibility.

Q.    And so let me ask it this way: Did you separately determine that all of these physiological responses would occur?

Or did you rely on Mr. Faaborg for that?

MR. ROSE: Objection, form.

A.    I looked at them and said, "yes, this is what happens based on what he described happened during the course of this flight."

Q.    What did you do with that information?

A.    I agreed with it.

Q.    So you agreed that these were likely physiological responses?

CRAIG THOMAS MALLAK, J.D., M.D.

143

A.    Leading to the different things that happened.

Q.    Okay.

Is it your understanding that all of these physiological responses described by Mr. Faaborg, or injuries -- are injuries?

Or some subset?

MR. ROSE:   Form.

A.    Each in their own way, they are an injury.

Q.    So everything on pages 18 through 19 in terms of a physiological response described by Mr. Faaborg is in your view an injury.

Is that right?

MR. ROSE:   Asked and answered.

A.    Yes.

Q.    What did you do to determine that all of these physiological responses were likely to have occurred during the accident flight?

MR. ROSE:   Objection, form, misstates testimony.

A.    Mr. Faaborg goes through in painstaking detail what happened during the course of this flight.

CRAIG THOMAS MALLAK, J.D., M.D.

144

Q.    Okay.

In your report, I don't see indication that you also went through in painstaking detail.

So what I'm trying to get at is:  Did you separately look at the G forces and the flight path?

Or did you rely on Mr. Faaborg's assessment of whether or not those inflight forces would have triggered these physiological responses?

A.    I relied on Mr. Faaborg, the expert -- he's an aerospace physiologist.  This is what he does every day.

Q.    So what did you do differently or -- if anything, to Mr. Faaborg to determine that these would have likely occurred during the accident flight?

MR. ROSE:  Objection, form.

He just said he agreed with it.

Go ahead.

A.    I didn't do anything to Mr. Faaborg.

I read his report.

THE VIDEOGRAPHER:  Dr., I apologize.

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

145

Can I have you raise your microphone a couple inches?

(Pause)

A.    And, much as I have explained before, I reached out to other experts in the course of death investigation.

In this case, we've got somebody who is the expert in this area.

Q.    And so understanding that Mr. Faaborg is the former Air Force physiologist, you are agreeing with his statements on pages 18 through 19.

What analysis did you do as a medical examiner to assess the likelihood that any of these physiological responses occurred? --

MR. ROSE:  Objection, form --

BY MR. LEDFORD:

Q.    -- if any?

MR. ROSE:  -- you may answer.

A.    My education, and again how we look at injury -- injury patterns, whether they be physiological, physical.

Q.    Okay.

But again, Mr. Faaborg is the one who

CRAIG THOMAS MALLAK, J.D., M.D.

146

looked if he flight path, looked at the G forces and made the determination about whether or not these physiological responses likely occurred --

A.   Right.

Q.   And you relied on that?

A.   I relied on it.

There are times I get reports that make no sense at all.

And his is logical and leads to the conclusions, to my limited knowledge compared to his.

Q.   Okay.

MR. LEDFORD:  So it's looking at pages 18 and 19 of Mr. Faaborg's report.

BY MR. LEDFORD:

Q.   Sounds like it's fair to say that you agree with all of his statements on those two pages, at least?

A.   Yes.

Q.   Fair to say, then, that your testimony about those subjects will be, you know, fundamentally the same as Mr. Faaborg?

A.   No, I will refer to him and say that I read them and I agree with them.

CRAIG THOMAS MALLAK, J.D., M.D.

147

Q.    Okay.

MR. LEDFORD:  So let's go through pages 18 through 19 to make sure I understand your testimony.

In the first bullet point on page 18 -- by the way, this is going to take a little while.  Do people want to stop for lunch?

MR. CLIFFORD:  We can.  And then maybe it's a very good idea.  You want to take a -- the food is out here.  It's 20 to 1:00 local. You want to, maybe, take a 30-minute break?

MR. LEDFORD:  Let's do that.  And we'll go off the record.

(Pause)

THE VIDEOGRAPHER:  We are off the record.  The time is 12:41 p.m.

                    *       *       *

            L U N C H   R E C E S S

    Time noted 12:41 p.m. Eastern Standard Time

                    *       *       *

CRAIG THOMAS MALLAK, J.D., M.D.

148

* * *

A F T E R N O O N   S E S S I O N

Time noted 1:17 p.m. Eastern Standard Time

* * *

THE VIDEOGRAPHER:  We are back on the record.  The time is 1:17 p.m.

BY MR. LEDFORD:

Q.    Good afternoon, Dr. Mallak.

A.    Good afternoon.

Q.    So before the break, we had been talking about Mr. Faaborg's report.  And we are going to continue talking about his report and your opinions related to that for a while, just to give you a little preview.

I think you said that you had not done independent analysis of the G forces, but had relied on Mr. Faaborg for determining what physiological responses would have occurred from the forces experienced by the passengers on the accident flight.

Is that fair?

A.    Well, I'm reading it, you know as a scientist, and seeing if it makes sense to my degree of understanding.  And it's not the

CRAIG THOMAS MALLAK, J.D., M.D.

149

in-depth -- that he -- he goes through it in-depth.

And when I read articles somebody writes, I don't do an analysis of their article.

I read it and -- whether I think it makes sense to their conclusions in a medical journal.

So it not like I'm just reading Reader's Digest. I am looking at it with an analytical and critical eye.

And -- but it's somebody who has a specialty and spent years learning and practicing and outside of the area that I normally work in.

Q. And so understanding that you -- you said you read Mr. Faaborg's report with a critical eye.

Is it the case that you didn't necessarily, though, go through, for example, the flight data recorder files and do an independent analysis of the forces experienced by the passengers?

A. No. I looked at it. I'm no expert at it, but -- I certainly looked at it. I don't

CRAIG THOMAS MALLAK, J.D., M.D.

150

understand all of it.

Q.   What I'm trying to get at is:  Did you specifically look at the flight data recorder spreadsheets provided by Mr. Pereira as part of assessing whether or not Mr. Faaborg had come to the correct conclusions?

A.   I had a copy of that.  He uses a lot of terminology that I'm not familiar with.

Q.   Mr. Pereira?

And do you have any experience in the past in analyzing flight data recorder data?

A.   Only what's explained to me at safety boards and collateral boards when I was in the military.

Q.   So just to be clear, you didn't assess the files provided by Mr. Pereira as part of determining whether or not you agreed with Mr. Faaborg's conclusions.

Do I have that correct?

A.   I didn't put a lot of time and effort into his.  I was just provided it.

He provided another -- he provided a timeline.  I read through the timeline.

But the graphs are beyond my level of

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

151

expertise.

Q.    And how about the preliminary report that you also identify as item number two of your "Materials Reviewed?"

Did you use that in a similar fashion where maybe you looked at it, but you weren't using to it make an independent assessment of the conclusions Mr. Faaborg had reached?

A.    No.  I have read many FAA reports.  It was similar to those.

Again, there is small pieces I can glean out of it.

But a lot of it uses terminology that I have to flip back-and-forth just to -- with all the abbreviations.

Q.    Okay.

So it sounds like you primarily looked to Mr. Faaborg as the expert --

A.    He's my investigator.

Q.    Did you look at any of the other expert reports that have been produced in this case? -- either other experts produced by the plaintiffs?

Or after your report had been

CRAIG THOMAS MALLAK, J.D., M.D.

152

submitted, reports submitted by experts for the defendants?

A. Yes.

Q. Whose report did you look at?

A. I have read a supplemental Ethiopian report that was provided to me.

Q. And is that the accident report?

A. Yes. It came out a little later.

Q. And is that the one that just -- and the final report that came out, I think, just a few days ago?

A. Yes. I haven't had time to spend, you know, hours reading it. So --

Q. And it sounds like you've, kind of, glanced at that one in a similar fashion to what you looked at the preliminary Ethiopian authority's report of the accident?

A. Yes.

Q. Any other expert reports that you have reviewed in connection with this case?

A. No expert report -- no other expert reports.

Q. Okay.

Are you aware that other -- or are you

CRAIG THOMAS MALLAK, J.D., M.D.

153

aware whether or not other experts have opined on similar subjects to Mr. Faaborg?

MR. ROSE:  Objection to form.

You can answer.

A.    I know the defense has their own set of experts.

Q.    Do you think those reports would be valuable to you or relevant to your opinion?

A.    I did thumb through Mr. -- or Dr. Wood's report as a fellow physician.

Q.    How did you -- well, let me strike that.

I think earlier you said you weren't going to testify about G forces, for example?

A.    Correct.

Q.    And you said you looked at Dr. -- and obviously you looked at Dr. -- sorry -- Mr. Faaborg's report, and you determined that you agreed with it.

Did you also assess whether or not you agreed with Dr. Wood's report?

A.    I didn't come to any conclusions on his report.  Those are his opinions.

Q.    How about any other experts, whether

CRAIG THOMAS MALLAK, J.D., M.D.

154

for plaintiffs or on behalf of defendants?

Did you look at any other expert reports?

A.    I heard there were a couple of other physiologists, but I haven't looked at the reports.

Q.    Do you think the opinions of the different physiologists would be helpful in determining whether or not Mr. Faaborg is correct in his assessments?

A.    I believe Mr. Faaborg's are logical and straightforward, and I agreed with them.

Q.    And if another expert differed or disagreed with Mr. Faaborg, would that be something that you would want to see as part of your opinion?

(Pause)

A.    I don't think it would really add anything to this --

Q.    And you say --

A.    -- I read defense reports all the time and seldom, if ever, change my opinion.

Q.    So you saw Mr. Faaborg's.  Seemed to make sense.

CRAIG THOMAS MALLAK, J.D., M.D.

155

So you didn't believe reading the defense reports on the similar subjects would assist you?

MR. ROSE:  Objection to form, misstates testimony.

You can answer.

(Pause)

MR. LEDFORD:  I think there was a question pending.

Court reporter, could you read that question back?

(Pause)

(Question read)

A.    Well, I agreed with Mr. Faaborg.  And if I didn't, I wouldn't have stated that.

(Pause)

Q.    I know you said you glanced over Dr. Wood's report.

But did you review any of the cites or the literature that Dr. Wood pointed to?

A.    No.  A lot of the -- I have read a lot of studies.  I don't believe that those studies are necessarily applicable.

Q.    Which studies?

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

156

A.    When you take healthy, young pilot in training and come to these sweeping conclusions, you can't apply that.

Q.    Are you aware of any data or studies assessing how more elderly individuals might react to G forces?

A.    Not for this case.

Q.    Are you aware of it for any case?

A.    In the Glazer case, I've read several documents dealing with the older pilot.

Q.    Is that specific to the pilots in that case?

Or is that a study that deals with G force tolerances of the general aged population?

A.    It was a compilation of numerous studies and conclusions based on all these studies on older pilots and what happens to them.

Q.    Specifically relating to G forces?

A.    To any number of forces.

It was primarily looking at hypoxia, but they were looking at any impacts to older pilots and found that they are really -- do pretty well.  There is very little derogation.

CRAIG THOMAS MALLAK, J.D., M.D.

157

Q.    Okay.

So the physical ability of older pilots, or presumably older passengers, to withstand G forces may be slightly derogated, but not to an excessive amount, based on at least the studies that you are talking about that you saw in the other case?

A.    It was --

MR. ROSE:  Objection to form.

A.    -- it was pilots.  They were looking at pilots.

Q.    Okay.

And did you make any effort to analyze what differences there might be between populations in terms of their reaction to G forces?

A.    As the body ages, there is less ability to withstand these forces.  Blood vessels aren't as strong, muscles, all parts -- I mean, we all start breaking down as we get older, and things don't work quite as well as they did when we were younger.

Q.    Did you make any effort to assess the exact degree to which an aged or elderly

CRAIG THOMAS MALLAK, J.D., M.D.

158

population might react to G forces differently than a younger population?

MR. ROSE: Objection, form, asked and answered.

A. There are -- let's take the bones, for example, or, say, your chest. It calcifies as you get older. You can actually tell the sex difference the way it calcifies in a skeleton. But that's why ribs break much easier, get more brittle as you get older.

So there are changes as we age.

(Pause)

Q. Was that report that you were referencing something prepared by another plaintiffs' expert in the other litigation?

A. No, some -- I found it. I found this -- I think it is put out by the FAA or NTSB, or they had done this big study on all these older individuals that were pilots.

And found out -- they checked the reaction time, reaction forces, just this myriad of things.

It was in response to when they were talking about changing the age of airline pilots

CRAIG THOMAS MALLAK, J.D., M.D.

159

from 60 to 65 through retirement.

Q.     And as best as you can remember, what was the conclusion of the report?

A.     That they do pretty well; that there is very little loss of ability to withstand various forces, and reaction times, and -- it was quite a comprehensive set of articles.

(Pause)

Q.     And you said that you believe that was relevant information when looking at Dr. Wood's report?

MR. ROSE:  Objection to form, misstates testimony.

Go ahead.

A.     No, I just said that -- that -- taking a look at young people and the conclusions they reach and just comparing it to other studies at another age group.

Q.     Fair to say that you didn't go through Dr. Wood's report in the same detail that you went through Mr. Faaborg's report to assess whether or not his conclusions were correct?

MR. ROSE:  Objection to form.

A.     I believe he was approaching it as an

CRAIG THOMAS MALLAK, J.D., M.D.

160

M.D., not as a physiologist.

Q.    And do you believe that that rendered his conclusions incorrect?

A.    I didn't even -- I didn't spend that much time with it.  I looked at the pictures he put in there -- kind of put it away.

Q.    And that's because it's a defense report, and you haven't found value from reading defense expert reports in the past.

Fair?

MR. ROSE:  Objection to form.

MR. CLIFFORD:  Argumentative.

A.    At times.

But in this case, I found one that I agreed with.  And I -- and he's an M.D.  I'm an M.D., with different specialties.

But I used Mr. Faaborg as my investigator in this case and I agreed with what his conclusions were.

(Pause)

MR. LEDFORD:  Why don't we go off the record for just one moment?

THE VIDEOGRAPHER:  We are off the record.  The time is 1:37 p.m.

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

161

(Recess from 1:37 p.m. to 1:39 p.m. Eastern Standard Time)

THE VIDEOGRAPHER: We are back on the record. The time is 1:39 p.m.

MR. LEDFORD: Court reporter, could you read back the last question and answer so I could reorient myself?

(Pause)

(Record read)

BY MR. LEDFORD:

Q. So let's go to Mr. Faaborg's report, pages 18 through 19. We are just going to walk through and talk about his various conclusions, make sure I understand your views on them.

I believe earlier you testified that you believe these physiological responses identified by Mr. Faaborg were all injuries.

Is that correct?

A. Leading to injuries, yes.

Q. Sorry.

Did you say "leading to injuries"?

A. Leading to injuries. He describes them as physiologic responses and they were leading -- definitely leading to injuries.

CRAIG THOMAS MALLAK, J.D., M.D.

162

Q. How do you distinguish between a physiological response and an injury?

MR. ROSE: Objection to form.

You can answer.

A. Physiologic response is something your body does, but -- it may or may not lead to an injury.

These would lead to injuries.

Q. And how do you know when you have crossed over from just having a physiological response to having an injury?

MR. ROSE: Objection, form.

A. That's what I'm trained to do -- is the point at which there is a change that is detrimental to the body.

Q. So an injury is a change that is detrimental to the body? --

MR. ROSE: Objection to form.

BY MR. LEDFORD:

Q. -- is that correct?

A. When we are talking physiology -- in context of physiology.

Not talking about physical-type impacts.

CRAIG THOMAS MALLAK, J.D., M.D.

163

Here we have been spending hours talking about physiology.

So we are not talking about any physical.

Q. So physiological change that is detrimental to the body in your view constitutes an injury.

Do I have that correct?

MR. ROSE: Objection, form, asked and answered.

A. Yes.

(Pause)

MR. LEDFORD: So looking at the first bullet point on page 18 of Mr. Faaborg's report, it talks about passengers experiencing a fight-or-flight response to sustained negative G forces.

BY MR. LEDFORD:

Q. What is your understanding of what a negative G force is?

A. Again, I'm not --

MR. ROSE: Objection to form, beyond the scope. You can answer.

A. -- I'm not here to talk about G

CRAIG THOMAS MALLAK, J.D., M.D.

164

forces.  It's not my area of expertise.

Q.    Do you know what a negative G force is?

MR. ROSE:  Objection to form, asked and answered.

A.    Not going to go there.  I'm here as a forensic pathologist.

Q.    Is a fight-or-flight response described by Mr. Faaborg a physiological change that is detrimental to the body?

MR. ROSE:  Objection, form.

A.    In and of itself, no.

But what happens to the body as a result of it, yes.

Q.    What happens as the body -- to the body as a result of the fight-or-flight response?

A.    We have already been over that.  It's a huge list of things.

Q.    Are they all detrimental?

MR. ROSE:  Objection to form.

A.    To a degree.

Q.    So the fight-or-flight response triggers responses that are all, to a degree,

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

165

detrimental to the human body?

MR. ROSE: Objection, form, incomplete hypothetical, asked and answered.

A. It's a, "Oh my gosh, there is a threat. Is an injury to my body worth saving my life?"

And I think the answer to that would be a definite "yes."

Q. So the body's fight-or-flight response necessarily triggers an injury to some degree in your view.

Is that right?

MR. ROSE: Objection, form, misstates testimony, incomplete hypothetical.

A. There are going to be injuries in the fight-or-flight response in the body, yes.

Q. Is the fight-or-flight response experienced when we're facing danger different than the response when we are under other stressful situations, such as being extremely nervous about public speaking?

MR. ROSE: Objection, form, incomplete hypothetical, beyond the scope.

You can answer.

CRAIG THOMAS MALLAK, J.D., M.D.

166

A.    I don't believe the two are equivalent.

Q.    In what respect?

MR. ROSE:  Objection.

A.    A lot of people have a fear of public speaking.  I don't think they squeeze their adrenals to the point -- most people don't -- to where it's an injury.

There may be some that are just so terrified that they do.

Q.    What I'm wondering is:  Is the physiological response different between people who are very, very nervous about public speaking or somebody -- and somebody who is experiencing what you are terming a fight-or-flight response?

MR. ROSE:  Objection, form, asked and answered, incomplete hypothetical, beyond the scope.

A.    Mr. Faaborg goes over this in very -- in-depth.  We all use epinephrine or -- you know, all day long for different things.

Talking a large amount, we are talking your fear for your life.

I don't think you fear for your life

CRAIG THOMAS MALLAK, J.D., M.D.

167

when you go up in front -- of public speaking. You just don't want to do it.

This is completely different.

(Pause)

Q.    When you say "it's completely different," can you explain to me how it is completely different?

A.    It's contextual --

MR. ROSE:  Asked and answered.

BY MR. LEDFORD:

Q.    What context is required to determine the difference? -- or to assess the difference?

MR. ROSE:  Objection, form.

A.    The context of what is happening.

Q.    How does the context of what is happening affect the physical response?

MR. ROSE:  Objection, form, asked and answered.

A.    There is a gradient here.

Q.    Does that gradient also depend on the particular individual?

MR. ROSE:  Objection, form, asked and answered, beyond the scope.

A.    Please go back and refer to Mr.

CRAIG THOMAS MALLAK, J.D., M.D.

168

Faaborg's report.  It just -- he talks about it in-depth here.

And many -- when you talk about what a fear of public speaking, okay.

Not in fear of injury or death, which is at a whole different level.

Q.   A different level of what?

MR. ROSE:  Objection, form, asked and answered.

A.   I can't -- I mean, we can spin this for hours.

Some are afraid of walking across the street.  Some people are afraid of who knows what.  There is all kinds of phobias.

Q.   So what I'm trying to understand, though, is:  How are you able to determine when an injury is going to occur in response to the fight-or-flight?

MR. ROSE:  Objection, form, asked and answered, beyond the scope.

A.   This is a -- it depends on the circumstances of what is going on.

Q.   Can you tell me the circumstances that you believe would be necessary in order to

CRAIG THOMAS MALLAK, J.D., M.D.

169

establish that an injury would occur from the activation of the fight-or-flight response?

MR. ROSE: Objection, form, asked and answered, incomplete hypothetical.

A. Again, refer back to Mr. Faaborg's report on this.

I'm not here to talk for hours about physiology.

Here to talk about the injuries.

(Pause)

Q. Other than Mr. Faaborg's report, do you have a basis for believing these physiological responses on pages 18 and 19 constitute an injury?

MR. ROSE: Objection, form, asked and answered.

A. As I said, let's talk about the injuries.

You need to go back and talk to Mr. Faaborg --

Q. Okay --

A. -- just keep rolling back to physiology.

Let's stay in my lane of expertise.

CRAIG THOMAS MALLAK, J.D., M.D.

170

(Pause)

Q.    So you are looking at the injuries as defined by Mr. Faaborg.

Is that right?

A.    Yes.

Q.    And sounds like you have not, and do not plan to do a separate analysis of whether something actually constitutes an injury?

MR. CLIFFORD:  Objection to the form of the question, grossly misstates his testimony to this point, improper in form, asked and answered on multiple occasions.

A.    If you want to start talking about injuries and how they occur, I am more than willing to answer those questions.

I think I've tried to stay out of his lane -- Mr. Faaborg's lane -- and talk about medical issues, not physiology issues.  I'm an M.D.

Q.    What's the difference between medical issues and physiology issues?

MR. ROSE:  Objection, form, asked and answered.

A.    He has spent years -- that's what he

CRAIG THOMAS MALLAK, J.D., M.D.

171

does day in and day out -- is physiology.

I incorporate physiology into the injury patterns I observe.

I don't look at -- I don't parse out physiology to this level.

Q. Okay.

So you said, I think, that you want to focus on injury, not the physiology that gets you to the injury.

Is that correct?

MR. ROSE: Objection to form, misstates testimony.

You can answer.

A. I said I'm a medical examiner. I examine injuries. We figure them out, how they happened. That slides in slightly into the physiology area. That's it.

I don't go down the road that he does of in-depth in physiology of the body.

I study diseases. I study injuries.

Q. Have you ever determined that a deceased person was injured by activation of the fight-or-flight response?

MR. ROSE: Objection, form, misstates

CRAIG THOMAS MALLAK, J.D., M.D.

172

testimony, incomplete hypothetical.

A.    I know about the fight-or-flight response, obviously; and that it may have played a part.

But I'm going to look at the injury. I'm going to look at how the body reacted. And I'm going to see why the person died or -- that makes sense based on other factors -- a whole host of factors -- that are presented to me through our investigations and just the basic knowledge that an M.D. has on physiology.

(Pause)

Q.    Sir, I understand you have to do an assessment to make a determination.

What I'm trying to figure out is -- you personally -- have you ever determined that a deceased person was injured by the activation of the fight-or-flight response?

MR. ROSE:    Objection, form, asked and answered, incomplete hypothetical.

A.    I've seen cases where the body was able to do certain things due to the fight-or-flight response that you wouldn't think otherwise.

For example, somebody shot right through the heart, and they run 200 yards before they collapse. And you think, "There is no way that they could have done that."

Somehow the physiology of the body kept it going that far before it went down.

That's how I think of it.

I don't think about: How much? I don't think about any of this in-depth analysis that was presented by Mr. Faaborg.

But you would never think that somebody with a shredded heart would be able to run 200 yards. So something happened to the body that allowed it to continue much further than you would ever -- and continue living much longer than you'd ever thought it possible.

Q. So in that situation, was the fight-or-flight response the injury?

Or was the bullet through the heart the injury?

A. Remember, I'm --

MR. ROSE: Objection, form, incomplete hypothetical.

Go ahead.

CRAIG THOMAS MALLAK, J.D., M.D.

174

A.     -- I'm coming -- I'm coming from the other way.  You have a shredded heart.  You should have gone down right there.

But your body somehow kept enough blood going to your muscles, and epinephrine and other substances secreted into the body that allowed it to perform what would appear to be a super-human feat.

Q.     Okay.

So is it fair to say, then, that you have not diagnosed the deceased person was injured just by activation of the fight-or-flight response?

MR. ROSE:  Objection, form --

MR. CLIFFORD:  And it's argumentative.

A.     I have seen injuries where there has been physiologic responses that have resulted in heart attacks and other problems.

However you scare -- you are the lawyer.  You scare somebody, and they drop dead from a heart attack.  That means they activated -- might have activated a fight-or-flight response and drove up their blood pressure to a point that their heart could

CRAIG THOMAS MALLAK, J.D., M.D.

175

no longer function; and down they go.

Q.    I understand that hypothetical.

Have you ever --

A.    It's not a hypothetical.  We see it all the time.

Q.    Okay.

Have you ever determined, without the opportunity to examine somebody's remains, that a deceased person was injured by activation of the fight-or-flight response?

MR. ROSE:  Objection, form.

A.    Fight-or-flight response -- you read about it in the literature.  You read about it in the books.  And you can see things that you would -- that are very unusual.  That's what ends up in our journals.  That's what ends up at our meetings.  A lot of that probably involves the fight-or-flight response.

Q.    And I'm not asking about journals, or meetings, or anything like that.

I'm asking you about personally.  You were the Armed Forces Medical Examiner.  You were the Chief of the Broward County Medical Examiner's Department.

CRAIG THOMAS MALLAK, J.D., M.D.

176

Have you ever evaluated, without -- or evaluated to determine, without the opportunity to examine the remains, that a deceased person was injured by the activation of a fight-or-flight response?

MR. ROSE: Objection, form, asked and answered, incomplete hypothetical.

A.    I just said if I -- the only way that I if hadn't examined them, I would hear about it from other people.

I may think about it in the cases I see.

But cases that I don't see -- but it also builds on my knowledge base of what can happen.

Q.    I apologize. I truly don't understand what you are telling me.

A.    Well, come to the morgue --

MR. ROSE: Objection, form --

A.    -- at the end of the day --

MR. ROSE:  -- that's not a question.

MR. LEDFORD:  I'm going to get to my question.

CRAIG THOMAS MALLAK, J.D., M.D.

177

BY MR. LEDFORD:

Q.    I am just trying to determine:  In your work, have you ever assessed a situation -- say, a missing person -- and determined without having the opportunity to examine that person that that person was injured by the activation of the fight-or-flight response?

MR. ROSE:  Objection, form, asked and answered --

A.    How would I do that? --

MR. ROSE:  -- argumentative.

BY MR. LEDFORD:

Q.    I don't know.

If your answer is "no," that's fine.

I'm just trying to understand --

A.    No, but --

Q.    -- what your answer is.

MR. ROSE:  Objection to form, incomplete hypothetical, asked and answered.

A.    I can look at other cases and I can understand what happens and the injuries that result.

Q.    But you would want to look at the actual remains in order to make that assessment.

CRAIG THOMAS MALLAK, J.D., M.D.

178

Is that fair?

A.    No --

MR. ROSE:  Objection to form, misstates testimony.

A.    -- no.  There is all kinds of insults to the body that you never get to see that you know exactly what happened.

Q.    What's an insult to the body?

MR. ROSE:  Objection to form.

A.    Let's go back a week to the Buffalo Bills football player.  He suffered an injury. He suffered a blunt force injury to the chest.

Never going to see his heart.  Nobody is going to see his heart for years.

But I know exactly what happened to him.  The electrical activity in his heart was disrupted.

So you don't have to see it.  You can still make the diagnosis based on your training and your knowledge.

Q.    I think I see.

So you -- in that example, you saw the injury to that Buffalo Bills player.  And you feel comfortable based on your experience in

CRAIG THOMAS MALLAK, J.D., M.D.

179

backing up and saying, "the electrolytes, the other factors -- all of that" --

A.    No, the electrical activity.

MR. ROSE:  Let him finish the question, please.

Go ahead.

BY MR. LEDFORD:

Q.    I'm just trying to understand what you are saying.

And I think I do understand what you are saying.

But you -- in that case of the Buffalo Bills player -- right? -- anybody who is watching national media understands that he suffered a heart stoppage of some sort, right?

MR. ROSE:  Objection to form.

Go ahead.

A.    His heart did not stop.

Q.    Okay.

So tell me what the actual --

A.    It was no longer --

Q.    -- injury was --

A.    -- in rhythm.

Q.    Okay.

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

180

So he suffered a --

A.    Dysrhythmia.

Q.    Dysrhythmia of the heart, right?

A.    Correct.

Q.    You were able to take that information and do what with it?

MR. ROSE:  Objection to form, asked and answered.

Go ahead.

A.    Based on -- I had a case very similar to this a couple years prior to this.  And I have read about it -- in all the basic forensic books.

A case where a 17-year-old was holding a Roman candle in front of him, and set off to the side.  And the bottom blew out and hit him in the chest, and down he went.  Nobody there knew how to do CPR.  And it was over 15 minutes before the paramedics arrived, and he died.

And I have had other cases throughout my career.

It doesn't happen that often.  I haven't had hundreds of them.

But I've had three or four of them;

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

181

plus they get described to me by other people;
and studying; keeping up with what happens.

(Pause)

Q.    But as a medical examiner, you were
able to look at those situations and say, "This
person has experienced a dysrhythmia of the
heart."

Which is an injury or insult, right?

MR. ROSE:  Objection, form.

A.    It was a blunt force injury.

Q.    Blunt force injury that triggered a
dysrhythmia of the heart.

Do I have that right?

A.    Yes.

Q.    And then you were able to take that
information based on your training and
essentially trace backward to think about or
determine some of the physiological states that
ultimately led to the dysrhythmia.

Is that fair?

MR. ROSE:  Objection, form.

You can answer.

A.    The force that was applied at the very
rare -- as you've seen an electrocardiogram, all

CRAIG THOMAS MALLAK, J.D., M.D.

182

those squiggly lines.  There is a point right there, thousands -- I don't exactly what the numbers are -- but it's tens of thousands to one that it would happen.  It happened.

Q.  Would you have been able to look around the NFL that Sunday before game time and say, "This player is going to suffer a dysrhythmia"?

MR. ROSE:  Objection, form, incomplete hypothetical.

You can answer.

A.  It can happen to anyone.  Usually happens to younger people.

Q.  Would you have been able to identify the specific player that was going to experience that dysrhythmia?

MR. ROSE:  Asked and answered.

A.  I -- no, it's based on seeing the injury.

Again, that's my specialty -- is injuries; and -- and in the physiological response, what happens.

Q.  I think I understand.

So you -- you are saying really you

CRAIG THOMAS MALLAK, J.D., M.D.

183

start with the injury -- what has occurred -- right?

MR. ROSE: Objection.

BY MR. LEDFORD:

Q. And then you trace backwards from there?

MR. ROSE: Objection, form, misstates testimony.

You can answer.

A. If I get all the -- if I have -- get on TV like I saw it there, yes.

I may have to dig to get all that information; and send my team out to find out exactly; have the police go out; have EMS; go get their reports -- anything I can get my hands on.

Q. So you basically -- you start at the time of injury.

And you go backward in time essentially from that to look at what led up to the injury; as opposed to starting earlier in time and predicting that an injury would occur --

MR. ROSE: Hold on --

CRAIG THOMAS MALLAK, J.D., M.D.

184

BY MR. LEDFORD:

Q.    -- is that fair?

MR. ROSE:  -- objection, form, asked and answered.

You just asked him -- he just told you that he looks at -- he gets the information from whatever source -- investigatory; considers that; and then looks at the injury.

How many times does he have to say that?

MR. LEDFORD:  Do you want to say it again for the record?  Or --

MR. ROSE:  He just said it, and you flipped it exactly backwards.

Misstates testimony.

Go ahead.

A.    Or it can go the other way, too.

Some -- I get medical records in front of me, and they tell me what they found.  And then I find out the -- so sometimes I start making -- putting together a differential diagnosis before I even examine the body.

And sometimes I don't even need the body.

CRAIG THOMAS MALLAK, J.D., M.D.

185

Q.    When would you not need the body?

MR. ROSE:   Objection to form.

Just gave you an example.

Go ahead.

A.    You observe somebody going out to sea, going under the water, and they don't recover the body.  And they are a young, healthy person.

And I would put down most like that they drown.

They were seen flailing in the water, where somebody just automatically -- just goes right under and they are elderly; and then I get all that history; and it may have been a heart attack.

And you can say:  Arteriosclerotic cardiovascular disease complicated by drowning.

Some of our death certificates are -- include multiple contributing factors.

(Pause)

Q.    In that type of situation, have you diagnosed somebody who disappeared at sea with a specific predeath condition?

A.    Sure.

Q.    Can you give me an example of that?

CRAIG THOMAS MALLAK, J.D., M.D.

186

A.    I live in Ft. Lauderdale.  They have cruise ships.  They have people -- every Saturday, we'd go out and get all the people that died on the cruise during the week.

And sometimes we have video of people jumping overboard.

But I don't just jump straight to drowning.  I want to know everything about that person before I'm going to make the call.

Q.    Why is that?

A.    To be complete --

MR. ROSE:  Objection to form.

BY MR. LEDFORD:

Q.    What do you mean by being "complete"?

A.    To provide the family and society with the best explanation for the cause and manner of death.

Q.    So what do you need in order to be complete?

MR. ROSE:  Objection, form, incomplete hypothetical, asked and answered.

A.    That's my professional opinion, as any physician.

Q.    What information do you need about the

CRAIG THOMAS MALLAK, J.D., M.D.

187

individual in order to be complete in your determination about any injuries they may have suffered?

MR. ROSE: Objection, form, incomplete hypothetical, asked and answered.

A. It's highly variable.

Q. Can you give me an example?

MR. ROSE: Objection, form, incomplete hypothetical, asked and answered.

A. It's the complete investigation of the doctors, the toxicologists, the investigators, any other resource that I may contact until I feel comfortable that I can stand before a family and tell them what happened to their loved one.

(Pause)

Q. Is the release of stress hormones like epinephrine a physiological change that is detrimental to the body?

MR. ROSE: Objection, form.

A. We are going right back down that road.

Q. Is the answer that you don't know without more information?

CRAIG THOMAS MALLAK, J.D., M.D.

188

MR. ROSE:  Objection, form, incomplete hypothetical, asked and answered, beyond the scope.

A.    Again, I'm not the physiologist.  I want to be looking at what's wrong with the body and the circumstances surrounding their death.

(Pause)

Q.    So what do you need to know about the circumstances surrounding their death in order to determine whether or not an injury occurred?

MR. ROSE:  Objection, form, incomplete hypothetical, asked and answered.

A.    I need the information until I reach the level of comfort to come to the defensible conclusion.

Q.    I understand that you need enough information for that.

But what I'm trying to get at is: What type of information you need to be comfortable with that conclusion?

MR. ROSE:  Objection, form, asked and answered, incomplete hypothetical.

A.    I surprise myself throughout my career, some of the information that I've

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

189

needed.

As I said, there are lots of ways to die.

Q.   Sir, what I'm getting at is that, you know, we talked about pages 18 and 19 are what I believe you described as injuries.

So I am trying to determine how you reach the conclusion that Mr. Faaborg was correct -- that these are injuries.

MR. CLIFFORD:  Objection to the form of the question --

MR. LEDFORD:  That wasn't a question.

MR. CLIFFORD:  Well, then, objection to your statement, because it's an inaccurate prelude into a question that supplies an incorrect factual basis for what you are about to ask the man.

It's misleading.

MR. LEDFORD:  Now you are saying that I'm making misleading statements about my own intent?

MR. CLIFFORD:  Yes -- no, no.  You are making a misleading statement about the question that you are about to ask.  You kept saying --

CRAIG THOMAS MALLAK, J.D., M.D.

190

you know, it's an improper hypothetical.

Mr. Reporter?

(Pause)

THE COURT REPORTER:  Yes, sir?

MR. CLIFFORD:  I want you to read back Mr. Ledford's statement.

THE COURT REPORTER:  One moment, please.

(Pause)

(Statement read)

MR. ROSE:  Objection.

MR. CLIFFORD:  You have conflated the doctor's discussion about injuries with Mr. Faaborg's discussion about injuries; and that's improper.

That's my objection.

Ask a question.

MR. LEDFORD:  Thanks.

MR. CLIFFORD:  You're welcome.

BY MR. LEDFORD:

Q.    Sir, is a restriction of mobility an injury?

MR. ROSE:  Objection, form, incomplete hypothetical.

CRAIG THOMAS MALLAK, J.D., M.D.

191

Go ahead.

A.      Yes.

MR. ROSE:  Are you saying here?  Here? In this case?

MR. LEDFORD:  Have you read your expert's reports?

MR. ROSE:  Yeah.  It's right in front of you.  You can go down the list and you can -- "tell me why you think this is an injury in this case."  That's it --

MR. LEDFORD:  That's why I'm asking.

MR. ROSE:  That's not what you are asking.  You are asking -- all right.  What's your last question?

We are going to have to get the reporter back on that.

MR. LEDFORD:  I tell you, I can just ask the question again.

BY MR. LEDFORD:

Q.      Sir --

MR. ROSE:  Is restriction of mobility an injury?

MR. LEDFORD:  Yeah --

MR. ROSE:  -- in a vacuum?  That's

CRAIG THOMAS MALLAK, J.D., M.D.

192

your question?

If it's related to this case, in this case, then say so -- or ask him that.

But if are you asking, "As a general proposition, is restriction of mobility an injury?," then the objection is: No context, incomplete hypothetical, form.

MR. LEDFORD: Could you have more of a speaking objection? I mean, is that --

(Pause)

MR. LEDFORD: Let me clarify. I'll clarify.

BY MR. LEDFORD:

Q. In this case, in relation to Mr. Faaborg's report --

MR. ROSE: Oh --

BY MR. LEDFORD:

Q. -- is restriction of mobility an injury?

A. Yes.

Q. Okay.

Explain to me how restriction of mobility is an injury.

MR. ROSE: There we go.

CRAIG THOMAS MALLAK, J.D., M.D.

193

Go ahead.

No objection.

A.    If you can't move -- in this context, reading Mr. Faaborg's report -- was due to the increased weight of the body which is holding you in place, number one.

Number two, placing pressure on subcutaneous tissues, causing rupture of blood vessels, injury of connective tissue and other -- I don't -- that I read in his report where their weights went up from 200 to over 300 pounds.

That places more force against your body than you are used to; and can injury, and will injure, the underlying structures and perhaps the skin itself.

Q.    At what point does such injury occur?

MR. ROSE:  Objection, form, incomplete hypothetical.

A.    He states that that restricts mobility, and he explains why.  So you can't move, which means there is a pressure in the opposite direction.  And that pressure is sufficient to cause an injury to the body.

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

194

Q.   So do you know what the maximum positive G forces were experienced during the accident flight?

MR. ROSE:  Objection, form, asked and answered, beyond the scope.

A.   Again, I'm not talking about G forces.

I'm talking about his conclusions here.

Q.   So if you had a 200-pound individual -- are you with me so far? --

A.   Yes.

Q.   -- and that person experienced 1.5 G's.  That would make them have the sensation of weighing 300 pounds.

Am I right?

MR. CLIFFORD:  Objection to the form of that substantively incorrect statement.

Misleading.

MR. LEDFORD:  Did I do the math wrong?

MR. CLIFFORD:  No, you didn't do the math wrong.

What did you say?  You said, "Make them feel like."

Mr. Reporter, please read back the

CRAIG THOMAS MALLAK, J.D., M.D.

195

question.

MR. ROSE: "Make them have the sensation of weighing" --

(Pause)

(Question read)

MR. CLIFFORD: And my objection is that it is scientifically correct and unassailable that that person is 300 pounds, not having the sensation of feeling 300 pounds.

MR. LEDFORD: Okay --

MR. CLIFFORD: You can proceed.

MR. LEDFORD: -- okay. Thanks.

BY MR. LEDFORD:

Q. If in a 200-pound individual experience 1.5 G's and therefore did weigh 300 pounds, would that cause injury?

MR. ROSE: Objection, form, asked and answered.

A. Yes.

Q. What type of injury?

A. I went over that. Any part of the body that is -- that can't move was being forced downward against the other -- the inability to move. And you could have injuries to the skin,

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

196

soft tissues underneath, small bones, because this happened.

And this isn't over months where your body has time to adapt; or you just eat a lot for months and months and gain 100 pounds.

This happens in a very, very short period of time and your body is not adapted to being 100 pounds heavier. So it's going to place forces on your body that you are not adapted to.

Q. Have you ever determined that somebody suffered an injury as a result of experiencing 1.5 G's?

MR. ROSE: Objection, form, incomplete hypothetical and asked and answered.

Go ahead.

THE WITNESS: Can I have the question again, please?

MR. LEDFORD: Okay.

MR. CLIFFORD: Mr. Reporter, would you be kind enough to read the question back?

(Pause)

(Question read)

A. I have experienced injuries where they

CRAIG THOMAS MALLAK, J.D., M.D.

197

have had increased mass due to G forces.  And I believe 100 pounds extra is enough to cause injury to soft tissue.

(Pause)

A.    Please continue.

MR. CLIFFORD:  Is your answer complete, sir?

THE WITNESS:  I was just going to say it doesn't necessarily have to be in an airplane -- all types of situations.

BY MR. LEDFORD:

Q.    Tell me about the instances in which you've determined that somebody suffered an injury as a result of exposure to 1.5 G's?

A.    This would be classified as a crushing injury -- crush injury.

Q.    Was the crushing by their own body?

Or some external object?

A.    It's being crushed by the force being applied to the body.

Q.    By gravity?

Or by an external object?

MR. ROSE:  Objection, form.

A.    I have seen both.

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

198

Q.    Again, I just want to hear about instances in which you have determined that someone suffered an injury as a result of exposure to 1.5 G's.

A.    In my opinion --

MR. ROSE:  Objection, form, incomplete hypothetical and asked and answered.

Go ahead.

A.    In my opinion, increasing your body weight by 50% would result in a crushing injury to a degree of medical certainty.

Q.    Can you point to any data or literature supporting that view?

MR. ROSE:  Objection, form.

A.    We don't go out and measure.  But I've seen minor crushing injuries where there is significant changes to the body.

Q.    What is a crushing injury, as you just used it?

A.    It's where there is an application of force to the body instead of a -- of a narrow area, over a larger area, where the body is compressed.

Q.    And is that compression by an external

CRAIG THOMAS MALLAK, J.D., M.D.

199

object on to a body? -- in the situation you are describing?

A.    An external force.

Q.    Okay.

What is the external force?

A.    It can be anything.

Q.    What I'm trying to get at is:  Is it a physical object that is exerting that force?

Or are we talking about gravitational accelerations?

A.    Can be both, or maybe things we are not even thinking of.

(Pause)

Q.    The situations where you personally have determined that there was an injury -- did those all involve the application of external force through an object of some kind?

A.    No.

Q.    Tell me about the situations that did not involve the application of force through an external object.

A.    My extensive work with aircraft where what appeared to be relatively minor impact and I found crushing injuries to the spine, to the

CRAIG THOMAS MALLAK, J.D., M.D.

200

extremities.

Q.    What were the G forces in those instances which you just described?

MR. ROSE:  Form.

A.    I was able to view the incident.  And I knew that the rates of descent were minimal, and they still had injuries due to the increased G forces.

Q.    You used the word "minimal" in describing rates of descent.

So what were the specific values of the G forces, if you can remember?

A.    I can't remember all those cases. Remember, it's been 10 years since I was -- I can remember some cases where helicopters came in -- I'd come in -- and bruise.

(Pause)_

Q.    Can you tell me the G forces for any of those incidents you are talking about in a numerical value?

A.    I would have to go back and pull out all the safety reports.

Q.    Okay.

Sitting here today, are you able to --

CRAIG THOMAS MALLAK, J.D., M.D.

201

A.    No.

Q.    Okay.

When you were drafting your report, was there a specific G force value you were thinking of that would produce an injury?

MR. ROSE:  Objection to form.

A.    I read Mr. Faaborg's report.  He told me that the weight went up 50%.

I believe and increase in weight 50%, it's enough to cause an injury in my medical opinion.

Q.    Do you know how often 1.5 G's are experienced during commercial passenger flight?

MR. ROSE:  Objection, form, beyond the scope.

A.    No.  I defer to Mr. Faaborg.

Q.    Do you have any idea whether it's common to experience 1.5 G's during a commercial passenger flight?

MR. ROSE:  Objection, form, asked and answered, beyond the scope.

A.    It's beyond the scope of my expertise.

Again, I told you, if you want to talk about injuries, talk about injuries.

CRAIG THOMAS MALLAK, J.D., M.D.

202

(Pause)

MR. LEDFORD:  Do you want to take a break?

MR. DURKIN:  If you would like to.

MR. LEDFORD:  Ten minutes?

THE VIDEOGRAPHER:  We are off the record.  The time is 2:36 p.m.

(Recess from 2:36 p.m. to 2:50 p.m. Eastern Standard Time)

THE VIDEOGRAPHER:  We are back on the record.  The time is 2:50 p.m.

BY MR. LEDFORD:

Q.    Good afternoon, Dr. Mallak.

A.    Good afternoon, again.

Q.    Again.

So before the break, we were talking about -- or at least I was asking questions about restriction of mobility and potential injury effects.

I mean, I think that I had asked a series of questions about G forces.  I don't want to revisit all of that.

Just want to ask about one particular part.

CRAIG THOMAS MALLAK, J.D., M.D.

203

I think you had mentioned that during your time specifically in the Air Force you had looked at various accident reports and associated injuries from G force exposure.

Do I have that right?

A. Well, we all had an element of G force, yes. And I read -- American public doesn't realize that we have a Class A accident every single week in the military, which is either $1 million of damage or death.

And so in the course of my -- I became a forensic pathologist in 1997 through 2012, I reviewed hundreds and hundreds of reports and participated in a vast majority of the incidents.

Q. When you say you "participated in the incidents," do you mean you participated in the investigation or assessment of the incidents?

A. At all phases.

Sometimes I wouldn't go to the scene; sometimes I would.

We had trainees that had to get experience out there; had other very senior forensic pathologists.

CRAIG THOMAS MALLAK, J.D., M.D.

204

And so I was ultimately responsible for the conclusions reached by our office.

Q.   Do I understand correctly that in connection with some of those events, you or your office determined that G force exposure had resulted in an injury of some kind?

A.   We provided the injuries to the safety board where there was a physiologist.  And they would work on that part.

And our interaction together, we learned from them, but we were never the experts they were.

Q.   Can you tell me what you mean by "you provided the injuries"?

A.   We provided our reports, our pictures, our x-rays, our CT scans, the directions of force that were applied.

Q.   And all those materials you are talking about that were provided to the physiologists -- those were from your office's examination of either injured or deceased servicemen and women.

Is that correct?

A.   And injured.

CRAIG THOMAS MALLAK, J.D., M.D.

205

Safety board looked at everyone. We would sit with them for hours.

And there was a collateral board, which also went through all these to see if there was any -- anything that was done wrong that rose to the level of a violation of the UC -- you know, the Uniform Code of Military Justice.

Q. So you had the responsibility to identify the injuries experienced by servicemen and servicewomen who either had been injured or deceased?

A. And a lot of civilians. Because the Air Force Medical Examiner is the only medical examiner in the federal government. And so we were essentially with the NTSB and the FAA and every other agency that you can think of.

Q. So whether it's civilians, servicemen, servicewomen, your office was responsible for identifying the injuries suffered by either injured or deceased --

A. Right.

Q. -- individuals?

A. And forces applied, to the extent that

CRAIG THOMAS MALLAK, J.D., M.D.

206

we were comfortable with.

Q.    How would you determine the forces applied?

A.    In a helicopter crash, often the rotors come off and go right through the cabin. So those injuries were most likely caused by a fractured rotor.

Q.    And specifically with respect to the injuries arising from G forces, do I understand correctly that during your tenure in the armed forces, your office identified G force related injuries for servicemen and servicewomen or civilians?

A.    We would -- based on the type of injury, we would tell the physiologist from which direction the forces were applied.  We could tell based on the injury.

Q.    Were you able to quantify the amount of G forces based on the injury suffered?

A.    No.  We would -- we were more on the vector than the exact amount of force.

Q.    In your opinion, is it possible to quantify the G forces experienced based on the nature of the injuries?

CRAIG THOMAS MALLAK, J.D., M.D.

207

MR. ROSE:  Objection.

A.    Again, I would read the safety report and see what the physiologists and what the rest of the experts on the board were able to come to an objective conclusion about.

(Pause)

Q.    Were you aware of any instance in which in your office identified G force related injuries without the remains of the individual being available?

MR. ROSE:  Objection, form, asked and answered, incomplete hypothetical.

A.    Depends how much information we had.

But, again, I'm not going to talk about whether the G forces -- I'm going to talk about what happened.

I had a space shuttle blowup on my watch, and the G forces at 210,000 feet are completely different than what's at earth.  I had no idea what they are.

But there are people that know.

And numerous crashes -- everything from AWACS down to the smallest training aircraft.

CRAIG THOMAS MALLAK, J.D., M.D.

208

(Pause)

Q. I apologize. I'm really -- just want to make sure I understand this.

Thinking back right now, are you able to point to a specific instance in which your office identified G force related injuries without having the individual's remains available to examine?

MR. CLIFFORD: Objection, asked and answered.

A. There was lots of information that was provided to us; in some cases it was provided to a safety board -- whether they recovered or not -- remains were recovered or not.

At times, the physiologists were able to come up with objective answers; and other times, they weren't.

Q. Do you recall any instance where the remains weren't available and the physiologists determined that the G force injuries had occurred at the levels that were experienced on the ET 302 accident flight?

MR. ROSE: Objection, form, asked and answered.

CRAIG THOMAS MALLAK, J.D., M.D.

209

A.     I don't understand that question.

Q.     Let me back up a little bit.

Do you know what the G forces were that were experienced on the ET 302 accident flight until the moment of impact?

MR. ROSE:  Objection, form, asked and answered, beyond the scope.

MR. CLIFFORD:  And incomplete hypothetical.

He's testified about this multiple times, In re:  Mr. Faaborg.

A.     I have read his report.

(Pause)

Q.     So having read his report, do you know what the G forces were that were experienced during the accident flight?

MR. CLIFFORD:  Same objection.

A.     I know what his conclusions were.  And in my scientific and medical opinion, they are based on solid data and analysis.

Q.     I understand that's your view of Mr. Faaborg, and I'm not going to argue with you about that.

I just want to know whether you

CRAIG THOMAS MALLAK, J.D., M.D.

210

personally know the numbers of the G forces that were experienced on the accident flight until the moment of impact?

MR. CLIFFORD: Objection, asked and answered on multiple occasions to the point where this is getting to be abusive.

If the witness can answer your question one last time, for as many times as he has, he will now do so.

He will not do it again.

MR. ROSE: Also beyond the scope.

MR. CLIFFORD: Go ahead, please. Answer the question, if you can.

If you want, we will have the question read back to you.

A.     If you would like to, we can go we page by page and read every number that he published.

(Pause)

MR. ROSE: What are we doing now? Are we putting --

(Pause)

MR. ROSE: -- stand now?

MR. LEDFORD: No, I want to know, yes

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

211

or no.

MR. CLIFFORD:  Hey, wait a minute. Well, then why don't you say, sir, "I've listened to your answer.  Is that a 'yes'?  Or is that a 'no'?"

MR. ROSE:  Instead of --

MR. LEDFORD:  Clean question.

BY MR. LEDFORD:

Q.    Sir, I have listened to your answer.

Is that a "yes"?

Or is that a "no"?

A.    I have read this report repeatedly.

I cannot regurgitate the whole thing at this point.

MR. DURKIN:  I think what he said is he can read it back to you if you would like. That's what he said.

You know, and then you were staring at him.

I mean, if you want him to read it back, we'll --

MR. CLIFFORD:  Chris, what's the disconnect here?  The man didn't independently determine G force.  He's told you that.  He's

CRAIG THOMAS MALLAK, J.D., M.D.

212

relying on this report.  He's told you that multiple times.

What's the problem here?

MR. LEDFORD:  Dan, would you tell me why you believe my question was outside of the scope?

MR. ROSE:  Just what Bob articulated to you.

He doesn't have expertise in the area of G analysis.  That's what you are asking him repeatedly.

He's told you he's deferred to Faaborg on that analysis, and has accepted it.

And he's based his opinions, to a medical degree of certainty, regarding the injuries -- which is what I thought we were here to discuss -- on the analysis of Faaborg, which is just like any other investigator that he would rely on in the course of his work to determine an injury pattern.

That's the deposition.  We can go around and around for six hours.

MR. CLIFFORD:  And add to that the scope is he has his own expertise.  And it's

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

213

fair inquiry to ask him questions within the bounds of that experience, and expertise, and training.

He's readily admitted to you that he doesn't make independent calculations about G forces and the like. He's assuming as true the information provided in the Faaborg report.

That's been made very clear throughout his report and his testimony today. And he's giving you his conclusions based upon the facts he's assuming.

And we just don't get why you try badgering him to get him to say that he's made conclusions about G forces.

So if you have a question, ask it.

Otherwise, let's go on.

(Pause)

BY MR. LEDFORD:

Q. Sir, on page 18 of Mr. Faaborg's report, one of the physiological responses that is noted is: Increased heart rate.

MR. DURKIN: You said page 15?

MR. LEDFORD: Eighteen.

MR. DURKIN: I apologize.

CRAIG THOMAS MALLAK, J.D., M.D.

214

BY MR. LEDFORD:

    Q.    Sir, are cardiovascular effects such as increased heart rate, in your view, an injury?

    A.    Again, it's contextual question. Yes, they can be.

    Q.    In the context of Mr. Faaborg's report where he's talking about increased heart rate of occupants of the ET 302 flight, is that an injury?

    A.    Well, in this paragraph, he states they experienced these physiologic responses, which can lead to injury.

    Q.    Can you look at that list of sub-bullets starting with "Fluid," going down through "Stimulation of the vestibular apparatus in the inner ear?"

    Understand those are all described as physiological responses.

    Are any of those physiological responses, in and of themselves, an injury in your view?

    A.    In the right context, yes.

    Q.    In the context, again, of the ET 302

CRAIG THOMAS MALLAK, J.D., M.D.

215

accident flight, is it your opinion that any of those sub-bullets -- from "Fluid" down to "Stimulation of the vestibular apparatus in the inner ear" -- were injuries?

A.    The context involves more than being on the flight.

Q.    Tell me what the other context is.

A.    That we are all different.

Q.    Do you mean different people respond differently to stimuli?

A.    And are injured differently to stimuli.

Q.    What would you need to know to determine whether any of these physiological responses would lead to injury?

A.    My knowledge is that all of these can lead to injury.

Q.    Do you have an opinion specifically about whether or not any of these did lead to injury for the passengers on the ET 302 flight?

A.    These can lead to injury.

Q.    I understand that's your view.

Do you -- is it your opinion that any of these sub-bullets -- from "Fluid" down to

CRAIG THOMAS MALLAK, J.D., M.D.

216

"Stimulation of the vestibular apparatus in the inner ear" -- did, in fact, lead to injury during the ET 302 accident flight?

A.    These are, in any situation -- would -- I'm not going to limit this to this flight.

These are all things that I see happen.  And then you end up with injury of varying degrees and seriousness.

Q.    I understand that things can happen outside of the flight.

I'm specifically trying to find out, though, whether you are going to come to trial and testify whether any of these sub-bullets specifically led to injury to passengers on the ET 302 accident flight.

MR. CLIFFORD:  Objection, asked and answered repeatedly.  And --

A.    Again, I'm not going to limit this to this flight.  These things happened on this flight, but they don't only happen on this flight.

Q.    Do they necessarily lead to injury?

A.    They can lead to injury.

CRAIG THOMAS MALLAK, J.D., M.D.

217

Q.   Is it your belief that they did lead to injury on the accident flight?

A.   I'm not limiting this to the flight. These are very general things -- insults to the body.  It can happen in any number of situations.

Q.   Yes.

The subject of this litigation is the accident flight and what passengers experienced during that flight.

So what I'm trying to figure out is: Do you believe that any of these physiological responses in the sub-bullets -- from "Fluid" down to "Stimulation of the vestibular apparatus in the inner ear" -- did, in fact, lead to injuries of the passengers on ET 302?

(Pause)

MR. ROSE:  Objection, form, asked and answered.

Reviewed and discussed in his report, as you questioned him about.

Go ahead and answer again.

A.   These are very general.  And if they happened on the flight, they led to injury.

CRAIG THOMAS MALLAK, J.D., M.D.

218

But they could lead to injury in any situation.

Q. So let's take "Increased heart rate," for example.

What would it take to go from increased heart rate to injury?

You say: It can lead to injury in any situation.

To -- what leads to injury from increased heart rate?

MR. ROSE: Objection, form, misstates testimony.

A. Increased heart rate can lead to a number of cardiac problems.

(Pause)

Q. So do I understand correctly that you are identifying these physiological responses as things that can lead to injury, but not necessarily saying that each one specifically did lead to injury?

MR. ROSE: Objection, mischaracterizes testimony, asked and answered.

A. These are precursors I see every day.

And on the airplane, they can easily

CRAIG THOMAS MALLAK, J.D., M.D.

219

lead to injury.

Q.    You say you see these precursors every day?

A.    Well, I read about them.

Q.    Okay.

Do these precursors necessarily lead to injuries?

MR. ROSE:  Objection, asked and answered.

A.    When I see them, yes, they have.

Q.    Is that because you are examining people who are already deceased?

A.    Yes.

Q.    Looking at the nondeceased population, if somebody is still living and experiences one of these symptoms -- one of these physiological responses -- do you believe --

(Pause)

MR. LEDFORD:  Court reporter, could you read back the last question?

(Pause)

(Question read)

BY MR. LEDFORD:

Q.    So, sir, talking about living

CRAIG THOMAS MALLAK, J.D., M.D.

220

individuals --

A.    Okay.

Q.    -- somebody experiences one of these physiological responses identified in the sub-bullets on page 18.

Do you believe that would necessarily lead to injury?

MR. ROSE:  Objection, form.

MR. CLIFFORD:  Objection to the form of the question, incomplete hypothetical, asked and answered.

A.    Mr. Faaborg said that the negative G forces led to these.

And I read that before in my various books.  And I trust that he knows what he's talking about the same ways that I, as a forensic pathologist, know my area of expertise.

Q.    I'm not asking you whether or not these are physiological responses that can occur.

I'm asking you as a medical examiner, to the extent you know, would these physiological responses in a living individual necessarily result in injury?

CRAIG THOMAS MALLAK, J.D., M.D.

221

MR. ROSE: Objection, form, incomplete hypothetical.

You can answer.

A. We talked about this earlier about you running a lap.

Q. So is the answer that: No, these physiological responses do not necessarily result in injury?

MR. CLIFFORD: Objection --

MR. ROSE: Objection, form.

MR. CLIFFORD: -- misstates the witness testimony.

A. We have been around this. I don't know how many people suffered an injury from these.

My conclusion: Everybody on this flight was injured prior to impact to a degree of medical certainty.

Q. What are you basing that conclusion on?

MR. ROSE: Objection to form, asked and answered.

MR. CLIFFORD: Objection, asked and answered repeatedly, many times today.

CRAIG THOMAS MALLAK, J.D., M.D.

222

BY MR. LEDFORD:

Q.    Go ahead.

A.    I just -- I base it on the -- everything that I've read; everything that I've learned; number of aircraft crashes that I've investigated; and a whole host of life experiences in the Navy; outside the Navy.

Q.    Sir, are you able to be any more specific about the analysis that you did to reach that conclusion?

MR. ROSE:  Objection.

MR. CLIFFORD:  Objection, argumentative.

A.    I have stated my opinion.

Q.    Do you have an opinion about the first moment in the flight when you believe passengers would have experienced an injury?

MR. ROSE:  Objection, form, beyond the scope.

A.    That is well laid out in Mr. Faaborg's report.

Q.    I understand that.

Do you separately have an opinion?

Or do you point to just Mr. Faaborg

CRAIG THOMAS MALLAK, J.D., M.D.

223

for that?

A.    I point to him.  He points to a specific time in his report.

Q.    You are relying on Mr. Faaborg to identify that time?

A.    As I do all of my investigators and people -- other experts that assist me in the course of my practice.

Q.    So looking at Mr. Faaborg's report on page 18, there is a couple of bullet points and sub-bullets.

Paragraph starting with:  Because all passengers and crew onboard ET 302 experienced the same physical and physiological effects of the forces on the aircraft, there are injuries and outcomes that were likely experienced by all passengers.  It is more likely than not that all passengers and crew experienced most of the following to varying degrees.

Are the items listed in that bullet list -- from "Fear and panic" down to "Visual degradation" -- injuries?

A.    It's a question?

Q.    Yeah.

CRAIG THOMAS MALLAK, J.D., M.D.

224

So are all of the items in that bullet-pointed list -- from "Fear and panic" down to "Visual degradation" -- injuries?

(Pause)

A.    Yes, they are.

(Pause)

Q.    And what makes them injuries?

MR. ROSE:  Objection to form.

Are you asking him to go through all the --

MR. LEDFORD:  Well, I'll tell you what, that's a fair point.  Let me start with: Fear and panic.

BY MR. LEDFORD:

Q.    I believe earlier you described an injury as a physiological change that is detrimental to the body.

So tell me how, in your opinion, fear and panic constitutes a physiological change that is detrimental to the body.

MR. ROSE:  Objection to form, misstates testimony.

You can answer.

A.    Again, it's a physiologic response

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

225

much like fight-and-flight.  Comes from your
brain.

If you want to talk about
neuropathology, we can go through that.

(Pause)

Q.    Are those responses in and of
themselves injury?

Or did they lead to injury?

MR. ROSE:  Objection, form.

He just testified they were injuries.

But go ahead.

A.    They are injuries.  And they may also
lead to further injury.

Q.    Is the fight-or-flight response -- you
believe is an injury, in and of itself?

A.    I believe the response -- the brain's
response to that produces that phenomenon; leads
to injuries.  This is a continuum.

(Pause)

Q.    Is it possible to have a little bit of
fear -- slightly afraid -- and not be injured?

MR. ROSE:  Objection, form, incomplete
hypothetical.

A.    The brain chemistry changes

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

226

abnormally, which is an injury.

Q.     When you experience any type of fear or panic?

Is that your opinion?

A.     Yes.

Q.     Do you have an opinion about whether any particular passenger on the accident flight experienced one or more of these symptoms?

MR. ROSE:  Objection, form, beyond the scope.

A.     Mr. Faaborg states when he believes that started in his report.

Q.     For purposes of me understanding what you are going to testify to, do I understand that you are not going to offer an opinion about whether any particular passenger experienced any particular one of these items in the bullet points?

MR. CLIFFORD:  Objection to the form of that question.

It misstates his testimony that he's been asked and answered, and is an incomplete hypothetical as well.

MR. LEDFORD:  Do you know the

CRAIG THOMAS MALLAK, J.D., M.D.

227

question?  Or do you want it read back?

A.   I am going to rely on the report because that is addressed in the report.

BY MR. LEDFORD:

Q.   So your report references pages 18 and 19.

Just to make sure I understand -- and maybe close this out -- is it true for all of the items listed on pages 18 and 19 that you are relying on Mr. Faaborg's assessment of whether they occurred, and when they would have occurred during the accident flight?

MR. CLIFFORD:  Objection to the form of the question, and it misstates his testimony.

A.   I agreed with his findings.  I don't. He has the expertise to tell when it happened.

Q.   And you are not offering a separate opinion on that subject.

Is that correct?

A.   This is something he does.

This isn't something in my world we do, other than trying to determine the time of death.  And we know that.

(Pause)

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

228

Q.    Could you state your full name for the record?

A.    Craig Thomas Mallak.

Q.    I think earlier you indicated that there was one deposition which you inadvertently omitted from your testimony list.

Is there any other testimony, at deposition or trial, other than as listed in your report or as you identified earlier?

MR. ROSE:  Objection, asked and answered.

You can answer.

A.    I have attempted to keep as complete a list as possible.

If you have found another one, it wouldn't surprise me because I testify all the time.

Q.    I don't have another one.  This isn't me try to catch you out.

I really am just asking if there is anything else you want --

A.    No --

Q.    -- to supplement it with.

A.    -- if I thought of something, I would

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

229

tell you.

Q. Okay. Thank you.

Have you ever had your expert opinion excluded by a court?

A. No.

Q. On page 2 of your report, I see three items under the "Materials Reviewed" category.

And I believe you mentioned that subsequent to submitting your report you also reviewed the final Ethiopian accident investigation report.

Is that correct?

A. I believe the final just came out a few days ago.

Q. Yes.

Is that the report that you looked at?

A. I haven't -- it's very thick and long. It's hundreds of pages. I haven't been able to read the whole thing.

Q. And I'm not going to quiz you about the contents of that report.

A. Thank you.

Q. I just want to make sure that I understand a complete list of your "Materials

CRAIG THOMAS MALLAK, J.D., M.D.

230

Reviewed."

So am I right that, subsequent to you submitting this report, there was a final accident report that was published just a few days ago.

And you've taken a look at it, but haven't studied it in depth?

A.    That's correct.

Q.    Okay.

And I think you mentioned that you also briefly glanced at the expert report of Dr. Wood.

Any other materials that you have reviewed in connection with preparing your report?

Or is this an otherwise accurate list?

A.    I believe it's an accurate list.

Q.    Anything you wanted to review or asked to review, but could not?

A.    I reviewed the materials that were provided to me.

And I believe they were sufficient to come to a defensible medical opinion.

Q.    And the materials provided to you

CRAIG THOMAS MALLAK, J.D., M.D.

231

would be these three items listed in "Materials Reviewed" in your report?

A. Yes. They were.

MR. ROSE: Well, he also just said the other report.

And I think you talked about some expert reports -- but, yeah.

THE WITNESS: Right.

BY MR. LEDFORD:

Q. Having reviewed the additional materials since drafting your report and submitting your report, are there any changes to your report based on your subsequent review?

A. Not at that time.

But I've put -- at the end of my report, I always put down that if new, probative information becomes available, I want to see it.

Q. Understood.

So I understand that you've glanced over the final accident report and you've looked at Dr. Wood's report.

Sitting here today, are there any changes based on that additional review that you would make to your report?

CRAIG THOMAS MALLAK, J.D., M.D.

232

A.    No.

Q.    So I don't see any reference in your report to animations.

Safe to say that you are not offering opinions in this litigation about animated reconstructions of the ET 302 accident?

A.    There are lines showing the flight of the aircraft, but I don't believe those are animations -- but those are in the report.

Q.    When I talk about animations, I'm talking about moving pictures demonstrating passengers.

Are you offering any opinions about an animation of that nature?

A.    I have not seen an animation of that -- to the best of my knowledge, I have not seen any animation of that nature.

Q.    Okay.

And staying on page 2 and the last paragraph at the very bottom, it starts off with:  The entire flight time for this crash was approximately 5 minutes from takeoff until impact, with problems readily apparent within seconds after takeoff.

CRAIG THOMAS MALLAK, J.D., M.D.

233

From what you testified earlier, I understand that you are not offering an opinion on when exactly problems would have been readily apparent to the passengers.

Am I right about that?

MR. CLIFFORD:  Objection, asked and answered, misstates his testimony.

A.    Again, Mr. Faaborg goes through that.

Q.    Okay.

Do you have an opinion -- independent of Mr. Faaborg -- about when exactly problems would have been readily apparent to the passengers?

A.    No.

(Pause)

Q.    Okay.

On page 3 of your report, second paragraph, you say:  According to my review of the documents and factual information listed above, the aircraft was subject to continuous extreme maneuvering, including unexpected rolling, and sudden changes in pitch and altitude in both directions which resulted in force accelerations on the passenger bodies.

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

234

When you say "documents and factual information listed above," you are referring to the items listed in the "Materials Reviewed" section of your report, right?

A.    Correct.  Plus the ones we've subsequently talked about.

(Pause)

Q.    Do I understand correctly from your earlier testimony that you don't have a specific value in mind for the phrase "extreme maneuvering" in terms of G forces experienced?

A.    No.  I just looked at the FAA reports and read Mr. Faaborg's report.  And he reports problems from the beginning of the flight.

(Pause)

Q.    Looking at the third paragraph of your report on page -- sorry -- page 3 of your report, the third paragraph? --

A.    Yes.

Q.    -- you say:  Causation of injury would be from numerous sources including the forces imparted on the passengers; the passengers striking a stationary structure, such as a seat armrest, or from an object in motion striking a

CRAIG THOMAS MALLAK, J.D., M.D.

235

passenger such as a phone or iPad.

Right?

A.    Correct.

Q.    I just want to break that down a little bit to make sure I understand, starting with injury from the forces imparted on the passengers.

Do I understand correctly that when we are talking about those sort of G force assessments that you haven't done an independent assessment, but you looked to Mr. Faaborg's description of those G forces?

MR. CLIFFORD:  Objection, asked and answered repeatedly.

And I'm about to tell him:  Objection, instruct him not to answer.

Because you know doggone well how many times he's answered that question.

MR. LEDFORD:  You can --

MR. CLIFFORD:  -- so please answer -- excuse me, sir.  I'm talking --

MR. LEDFORD:  -- okay, I was in the middle of asking my question, Bob, so --

MR. CLIFFORD:  -- and an improper

CRAIG THOMAS MALLAK, J.D., M.D.

236

question.

And forgive me, I thought you were complete.

So why don't you finish your question, and then I'll start over again.

MR. LEDFORD:  Bob, you can instruct him not to answer any time you would like --

MR. CLIFFORD:  -- I know -- and I know exactly what I can do --

MR. LEDFORD:  -- you just go right ahead --

MR. CLIFFORD:  Please continue.

MR. LEDFORD:  Could you read the question back, please?

(Pause)

(Question read)

MR. CLIFFORD:  And now, I will object further that, if that's not the completion of a question, I don't know what is.

You just represented on this record that your question was incomplete.

So if you are mistaken, then I'll continue with my objection.

If I'm mistaken, then please finish

CRAIG THOMAS MALLAK, J.D., M.D.

237

your question.

MR. LEDFORD: I think I'd probably have to have the question read back to me again.

Why don't we just -- let's leave the question as it was. That will be sufficient.

So, court reporter, please read back the question -- that question one more time.

And then you can answer that as the complete question.

(Pause)

(Question reread)

MR. CLIFFORD: A question to which I object.

That question has been asked and answered many, many times today.

I'm going to instruct the witness to answer the question.

He will not do it again, if you repeat this same question again.

Please answer the question, Doctor.

A. Yes, I relied on Mr. Faaborg.

(Pause)

BY MR. LEDFORD:

Q. Beyond what you've already

CRAIG THOMAS MALLAK, J.D., M.D.

238

testified --

(Pause)

Q.      -- can you tell me anything more about the injury mechanism that in your opinion resulted in the injuries?

MR. ROSE:  Objection to form, vague.

But go ahead.

A.      I'm talking about blunt force injuries causing a myriad of types of insults -- injuries to the body.

(Pause)

Q.      So, Mr. Faaborg's report on page 18 and 19 -- do you see anywhere where it discusses blunt force injuries?

A.      No.

Q.      Can you tell me the basis for your statement regarding whether or not passengers would have experienced blunt force injuries prior to impact?

MR. ROSE:  Objection to form, misstates testimony, incomplete hypothetical, mischaracterizes testimony.

Go ahead.

A.      I'm a forensic pathologist.  I'm

CRAIG THOMAS MALLAK, J.D., M.D.

239

looking for physical injuries.  That's one of my main duties -- is physical injury.

And based on the fact that in Mr. Faaborg's report he talks about objects being loose inside the cabin, I believe that the movement of the bodies and movement of different materials would result in abrasions, contusions, lacerations, cuts -- a number of different types of injuries.

Q.    Tell me what kind of analysis or calculations you did to determine that those sorts of injuries would have occurred.

MR. ROSE:  Objection, form, asked and answered.

A.    He discusses the changes that resulted in the different forces.  Those forces don't just apply to people.  They apply to everything around them.

Q.    So did you do any analysis to determine the mass of those objects, or the speed at which they would have been traveling at any particular point in the accident flight?

A.    Listen, if they caused the minorest bruise -- tiny little bruise -- that's an

CRAIG THOMAS MALLAK, J.D., M.D.

240

injury.

Q.    Earlier you said that with respect to Mr. Faaborg's report and the physiological responses, you didn't have an opinion about when injury first would have occurred as a result of these.

Do you have an opinion about when injury would have occurred during the accident flight from the forces imparted on the passengers, as described in this third paragraph on page 3 of your report?

MR. ROSE:  Objection, form, asked and answered, beyond the scope.

Go ahead.

MR. DURKIN:  Okay, his report, right? We're looking at his report?  Okay.  Just trying to move back and forth.  Third page of the medical report.  Thank you.

A.    Any time there is force on the passengers, there is force on everything else.

Q.    And I accept that.

I'm asking:  Did you do any sort of the calculation to determine, for example, if there was a loose object, at what point in the

CRAIG THOMAS MALLAK, J.D., M.D.

241

flight it would have been moving towards the ceiling?

MR. ROSE: Objection, form, asked and answered, beyond the scope.

A. It can be moving up or down. I don't know which -- the vectors and the velocity of these objects are sufficient to cause an injury, no matter how slight.

Q. Do you have an opinion when the first such injury would have occurred on the accident flight?

MR. ROSE: Objection, form, asked and answered, beyond the scope.

A. Any time there was a force to passengers, I believe there was a force to the rest of the materials in the plane that aren't secured.

Q. So sir, we can proceed like this.

You don't have to answer this "yes" or "no," but it might help streamline things.

Do you have an opinion about the first time in which a passenger would have been injured as a result of these forces imparted on them and the objects in the cabin?

CRAIG THOMAS MALLAK, J.D., M.D.

242

MR. ROSE: Objection, asked and answered, beyond the scope.

A. Any time there is force on a passenger, there is force on these, and they may impact the passengers.

Q. So there is always forces imparted on the passengers, right?

MR. ROSE: Objection, form.

A. Abnormal forces, as described in Mr. Faaborg.

Q. Okay.

What is the first time when there was an abnormal force that would have caused these kinds of injuries to the passengers that you are talking about?

A. Would defer to Mr. Faaborg and his timeline what happened to the plane throughout the course of this flight.

Q. So am I correct that you don't have a separate opinion about the time in which -- or at which the first injury would have occurred from these forces imparted on the passengers?

MR. CLIFFORD: Objection, asked and answered, abusive.

CRAIG THOMAS MALLAK, J.D., M.D.

243

Because he just told you he's deferred to Mr. Faaborg, and now you just asked him another way.

So, Doctor, go ahead and answer this question if you can.

Beyond that, he's not answering it again.

A.      I have said that when the abnormal forces, as described in the physiology report, would have been part of forces on those objects; and on the people, resulting in various types of blunt force injuries.

Q.      What do you mean by the word "abnormal"?

And if you would like to refer to Mr. Faaborg's report, you can.

A.      He talks about a problem on takeoff. I don't understand it, but it was something wrong at that point -- shortly after takeoff.

Q.      Do you have an opinion about -- at that time, when you believe there were abnormal forces based on Mr. Faaborg's report -- that any particular passengers would have suffered a blunt force injury?

CRAIG THOMAS MALLAK, J.D., M.D.

244

A.    In my medical opinion, I would not be surprised to see an injury to one or more passenger.

Q.    Do you have an opinion about a particular passenger and whether they would have experienced a blunt force injury?

A.    No.

(Pause)

Q.    Are you aware of any evidence showing how many phones or iPads were on the accident flight?

A.    Those are just examples of things that might be on that flight.

(Pause)

Q.    Are you aware of any evidence showing whether or not there were unsecured objects in the cabin on the accident flight?

A.    I believe there were unsecured objects.

Q.    Tell me why you believe that.

A.    Because people carry things, or have things with them.

(Pause)

Q.    Anything more?

CRAIG THOMAS MALLAK, J.D., M.D.

245

Is that the basis?

A.   I mean, the basis is you fly a lot. You see all the different things that people bring on an airplane.

(Pause)

Q.   So other than what we have already discussed, are there any other injury mechanisms that in your opinion caused injury before impact of the accident flight?

A.   I believe most of them are blunt force of different degrees.

Q.   Is that for the reasons that you've already talked about?

A.   There may have been something that was -- sharp edge that caused a sharp force injury.

But I believe the majority were blunt force.

(Pause)

MR. LEDFORD:  Want to take a break? We may be done, or very close.

MR. CLIFFORD:  Are you done?

MR. LEDFORD:  I might be.

MR. CLIFFORD:  Why don't you take a

CRAIG THOMAS MALLAK, J.D., M.D.

246

look at your notes?

MR. LEDFORD:  Let me take 10 minutes and I'll either be very close to being done, or we're done.

THE VIDEOGRAPHER:  We are off the record.  The time is 3:53 p.m.

(Recess from 3:53 p.m. to 4:12 p.m. Eastern Standard Time)

THE VIDEOGRAPHER:  We are back on the record.  The time is 4:12 p.m.

BY MR. LEDFORD:

MR. LEDFORD:  Dr. Mallak, good afternoon again.  Thank you for your time this afternoon.

And no further questions at this time.

MR. ROSE:  Okay.

Just a couple questions, shouldn't be long.

EXAMINATION

BY MR. ROSE:

Q.    Dr. Mallak, Exhibit 313 -- that's Mr. Faaborg's disclosure and report.

Do you have that in front of you?

A.    Yes, I do.

CRAIG THOMAS MALLAK, J.D., M.D.

247

Q. Do you recall -- if you can turn to page 18 of that report -- do you recall Mr. Ledford was asking you questions about the cardiovascular effects? --

A. Yes.

Q. -- do you recall that?

And he asked you whether that was an injury.

And your testimony was: It can be --

A. Correct.

Q. -- can lead to.

Something like that?

A. Yes.

Q. What about these other physiological responses that were not asked of you by Mr. Ledford?

Fluid shifting downward and upward -- is that considered an injury to a medical degree of certainty?

A. Yes. Any time the blood is taken out of the brain is a hypoxic event and the brain is not very well suited to withstand that.

And opposite direction with it going up, you are increasing the pressure, which the

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

248

capillaries are not designed to withstand; and result in shear, and tear, and just stress on them. And it happening repeatedly is and additive effect to the problem.

Q. Okay.

And by "happening repeatedly," you are, in fact, referring to this flight, correct?

A. Right -- to Mr. Faaborg talking about the changes --

Q. Okay.

So just to be clear, it's your opinion that fluid shifting up and down in this context of ET 302 flight would be considered an injury to a medical degree of certainty, correct?

A. Yes.

Q. What about -- let's go to "shifting and compression/elongation of internal organs" in the context, again, of the ET 302 flight.

What is your opinion to a degree of medical certainty whether that is an injury?

A. There are very few organs in the body that are designed to stretch or elongate and compress.

The lungs are, as we breath.

CRAIG THOMAS MALLAK, J.D., M.D.

249

But certainly not the liver, not the spleen, not the kidneys, not the brain, definitely.

The stomach is not very tightly attached, as are the intestines.

But the other organs, such as the bladder, are firmly attached to the pelvis, but other organs are loosely attached.

And one of the major organs that you worry about is the aorta because it's only attached at one spot, and that's due to an embryologic remnant. It's a scar.

Q.    So is it your opinion to a degree of medical certainty that "shifting and compression/elongation of internal organs" constitutes an injury?

A.    Yes. You can't elongate the liver without tearing it.

Q.    What about "compression/elongation of the spine" again, in the context of the ET 302 flight?

To a degree of medical certainty, do you -- reasonable degree of medical certainty -- do you believe that that constitutes an injury

CRAIG THOMAS MALLAK, J.D., M.D.

250

in this case?

A.    Most people don't realize that the brain and the spinal cord have -- the pathologists use food analogies.  This is just -- I don't know why, but we do.

It is like saltwater taffy.  And so it can -- abnormal force is applied to it, can pull, and tear, and cause bleeding around it. It can be a very minor injury.  But you can get what is called subarachnoid, subdural -- there is various coverings around the spinal cord -- where you end up with bleeding.

Q.    So is it your opinion to a reasonable degree of medical certainty that "compression/elongation of the spine" constitutes an injury in this case?

A.    Yes.  That's why we have the huge bones around it to protect it.

Q.    "Restriction to mobility" -- I think we talked about it, but I'll just ask you again.

In the context again of the ET 302 case, to a reasonable degree of medical certainty, do you -- is it your opinion that "restriction of mobility" constitutes an injury?

CRAIG THOMAS MALLAK, J.D., M.D.

251

A.    Yes.  We talked about the increased weight.

Q.    Okay.

How about the next one? -- "impaired respiration and difficulty in the physical act of breathing"?

Does that, in the context of the ET 302 flight, constitute an injury to a medical degree of certainty -- reasonable degree of certainty?

A.    Yes.  Well, the lungs are designed to expand and contract.

If they are pulled in abnormal ways, they can actually tear the very -- the very small air sacs.  You remember, they are only one cell thick, so that your oxygen and carbon dioxide can diffuse across it.  So they are very delicate.

Q.    So that's a "yes"?

A.    Yes.

Q.    We -- Mr. Ledford addressed "cardiovascular" with you.

How about "reduction in visual acuity due to changes in oxygen delivery to the

CRAIG THOMAS MALLAK, J.D., M.D.

252

retina?"

Does that, in the context of the ET 302 case here, constitute an injury to a reasonable degree of medical certainty?

A.   I think that goes back to the fluid shifts and removing the oxygen-carrying blood from the upper part of the body.

Q.   Okay.

And last one -- "stimulation of the vestibular apparatus in the inner ear" -- again, in the context of the ET 302 flight, does that, in your opinion, to a reasonable degree of medical certainty constitute an injury?

A.   Yes.  And that can lead to nausea, vomiting, and actually injury to your ability to hear.

Q.   Okay?

MR. ROSE:  All right.

No further questions.

Thanks.

MR. LEDFORD:  Just a couple followups.

MR. ROSE:  Sure.

CRAIG THOMAS MALLAK, J.D., M.D.

253

EXAMINATION

BY MR. LEDFORD:

Q.    On the subjects Mr. Rose just addressed, looking --

(Pause)

MR. ROSE:  Addressing your subjects.

Go ahead.

MR. LEDFORD:  Yes.

BY MR. LEDFORD:

Q.    So looking still at page 18 of Exhibit 313, Mr. Faaborg's report.

You said, I think, that the shifting of fluids, blood, downward under positive G's can result in a hypoxic event.

Is that right?

A.    Correct.

Q.    Did you do any analysis about how much positive G forces are necessary to cause an hypoxic event?

A.    It's not --

MR. ROSE:  Object to the form of that question.

Sorry.

Misstates his testimony, too.

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

254

A.   Any -- you are decreasing in the blood pressure to the brain.  The brain is very sensitive to hypoxia.  It has very little reserve capacity and can be injured.

And there are parts of the brain called the watershed areas which are even more sensitive.  And they are in some of the very -- most sensitive areas of the brain.

Q.   Is there a threshold for positive G exposure in terms of amount and duration that is required before injury occurs, in your opinion?

MR. ROSE:  Objection to form, asked and answered, and outside the scope.

Go ahead.

A.   No.  We can go back and look at Mr. Faaborg's report.  But --

THE WITNESS:  Can you repeat the question?  I want to get it just right for you.

MR. LEDFORD:  Yeah, you bet.

Court reporter, could you please read that back?

(Pause)

(Question read)

A.   It may just cause you to be

CRAIG THOMAS MALLAK, J.D., M.D.

255

lightheaded.

But some of these periods were for an extended time. And personally I don't want my blood pressure in my brain to ever be lowered due to a gravitational force.

(Pause)

Q. Well, are you planning to testify that there is a particular threshold at --

A. --

Q. -- sorry, let me just make sure I finish, so can you answer.

My question is: Are you planning on testifying that there is a particular threshold in terms of duration and amount of positive G exposure that will result in an injury?

A. Some people would be more sensitive than others. The way the blood vessels are set up at the base of the brain can be highly variable.

Also, it's not only your heart where you build up and have atherosclerosis. It builds up in those vessels of the brain.

And they can take very little, some of them, and can result in a stroke.

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

256

Q.   Understood, sir.

So what I'm trying to get at is:  Are you going to offer an opinion that a particular G force exposure -- in other words, the amount of the G forces over a certain duration -- causes injury?

MR. ROSE:  Objection, form, asked and answered, outside the scope.

A.   It is variable between all of us sitting here at this table.

I don't know exactly where it starts.

But I don't see people with bad heart disease, or after they have had a stroke, undergoing any type of situation that would -- in any way significantly drop the amount of blood pressure to the brain.

Q.   Are you planning to offer an opinion that any particular passenger on ET 32 experienced a hypoxic event?

MR. ROSE:  Objection, form, asked and answered.

Go ahead.  You can answer.

A.   I would -- I have no doubt that somebody did.

CRAIG THOMAS MALLAK, J.D., M.D.

257

Q.    Are you planning to offer an opinion that any particular passenger experienced a hypoxic event due to G force exposure?

A.    No.

And I'm often surprised.  Somebody 28 years old -- I'll look at their brain and they will have a terrible disease in their blood vessels.

(Pause)

Q.    So, in other words, you would need to look at them after the fact to --

A.    No --

Q.    -- assess that --

A.    -- but I know in general population, I have seen a number of people that shouldn't have it, but do have it.

Q.    So there is variability among the population.

Is that fair?

MR. ROSE:  Objection to form.

A.    Yes.  Definitely.

Q.    And is the same true talking about the fluid shift due to negative G exposures -- that there is variability in the population?

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

258

First of all, is that something you'd agree with?

MR. ROSE:  Objection to form.

A.    Of course.

Q.    When I say "variability in the population," I mean variability in the response to negative G forces within a population.

Is that fair?

MR. ROSE:  Same objection.

A.    Yes.

Q.    And as with positive G forces, are you planning to offer a -- an opinion at trial about the effect of negative G forces on any particular passenger?

A.    No.

(Pause)

MR. LEDFORD:  I may be able to short-circuit the rest of this.

Mr. Rose talked about several other items on this list of sub-bullets on page 18.

Are you planning to offer an opinion at trial that any particular passenger experienced an injury due to these physiological responses?

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

259

MR. ROSE: Objection --

MR. CLIFFORD: Objection, form of the question, misleading regarding the entirety of his testimony all day.

That's fine.

MR. ROSE: And misstates his testimony.

A. I really wish you could spend a few days with me and see the things that you would never imagine would be there.

And I look at the population on this airplane as a cross-section of society, no different than I deal with every day.

(Pause)

Q. So, sir, do you understand my question?

A. Yes.

Q. Okay.

MR. CLIFFORD: Add he's given you an answer. Whether you accept it is entirely your prerogative, but he's given you an answer.

MR. LEDFORD: All very true.

BY MR. LEDFORD:

Q. Sir, I'm afraid I don't understand

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

260

your answer.

A.    My answer is that:  In my world, I learn something new every day that I didn't think I would ever see.  It shouldn't be happening in this given population, or that given population.

And these -- what's described here by Mr. Faaborg could result in any number of the people on the plane.

I don't know how many of them.

But it doesn't have to be a certain population or certain person.

Q.    Okay.

And this goes back to the variability point that I think you were making earlier?

A.    Yes.

Q.    So you are dealing with the population.

You are not going to testify though about any particular person suffering that injury?

MR. CLIFFORD:  Objection to the form of that question.  It's repetitive.

He's just told you.

CRAIG THOMAS MALLAK, J.D., M.D.

261

He certainly has the right to supplement his answers. He certainly has the right, when on the witness stand at a given trial, to be asked about a given witness -- or, pardon me -- a given party, assuming certain facts that will be in evidence as to that party.

And so your question misstates what the testimony has been all day long.

BY MR. LEDFORD:

Q. You can answer.

A. Again, it's -- it's not -- this is a general flight. People from all walks of life are on it.

And despite what all the textbooks say, things happen; at certain times, they don't.

And how they react to different forces and at what level are going to be different.

(Pause)

MR. LEDFORD: No further questions.

Thank you, Dr. Faaborg -- or, sorry -- Dr. Mallak.

MR. ROSE: Nothing further.

(Pause)

CRAIG THOMAS MALLAK, J.D., M.D.

262

THE VIDEOGRAPHER:  Anyone else?  Or we are all done?

MR. CLIFFORD:  No, we are done.

THE VIDEOGRAPHER:  Then we are off the record.  The time is 4:29 p.m., and this concludes today's testimony.

*     *     *

E N D  O F  P R O C E E D I N G

Time noted 4:29 p.m. Eastern Standard Time

*     *     *

CRAIG THOMAS MALLAK, J.D., M.D.

263

A C K N O W L E D G M E N T

I, CRAIG THOMAS MALLAK, J.D., M.D., hereby certify that I have read the transcript of my testimony taken under oath in my deposition of Tuesday, January 10, 2023; that the transcript is a true and complete record of my testimony; and that the answers on the record as given by me are true and correct.

_____

CRAIG THOMAS MALLAK, J.D., M.D.

Signed and subscribed to before me,

this _____ day of _____, 2023.

_____

(NOTARY PUBLIC)

My Commission expires:

CRAIG THOMAS MALLAK, J.D., M.D.

264

I N D E X   O F   E X A M I N A T I O N

Witness:

Craig Thomas Mallak, J.D., M.D.

Examination:

By Mr. Ledford.............................Page 13

By Mr. Rose...............................Page 246

By Mr. Ledford............................Page 253

Index of Exhibits.........................Page 265

Previously-Marked Exhibits.........Page 265

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

265

I N D E X   O F   E X H I B I T S

323   Multipage document entitled: Plaintiffs' ......13
      Rule 26(a)(2)(B) Disclosure of Craig
      Mallak, M.D., dated September 21, 2022 (no
      Bates Nos.)


P R E V I O U S L Y - M A R K E D   E X H I B I T S

313   Multipage document entitled: Plaintiffs' .....136
      Rule 26(a)(2)(B) Disclosure of Troy
      Faaborg, dated September 20, 2022 (no
      Bates Nos.)




            (All exhibits were provided
         electronically to the reporter.)




                    TC REPORTING
                   (516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

266

C E R T I F I C A T E

I certify that in response to the COVID-19 pandemic, I, BRANDON RAINOFF, have collected everyone's agreement at the commencement of this deposition that I would be the swearing officer and court reporter remotely out of state and that I may record the testimony stenographically and swear in the deponent even though I am not in the physical presence of the deponent, and that there is no objection to that at this time, nor will there be an objection to it at a future date.

IN WITNESS WHEREOF, I have hereunto set my hand this 10th day of January, 2023.

_____
BRANDON RAINOFF, RPR, FCRR, RMR, CRR

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

267

C E R T I F I C A T E

I, BRANDON RAINOFF, a Federal Certified Realtime Reporter and Notary Public within and for the State of New York, do hereby certify:

That CRAIG THOMAS MALLAK, J.D., M.D., the witness whose  deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 10th day of January, 2023.

_____
BRANDON RAINOFF, RPR, FCRR, RMR, CRR

TC REPORTING
(516) 795-7444

CRAIG THOMAS MALLAK, J.D., M.D.

268

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: In re: Ethiopian Airlines Flight ET 302 Crash

Deposition Date:  1-10-2023

Deponent:  Craig Thomas Mallak, J.D., M.D.

Place: Remote Deposition

CORRECTIONS

PAGE  LINE    FROM            TO              REASON

____|___|_____|_____|_____

____|___|_____|_____|_____

____|___|_____|_____|_____

____|___|_____|_____|_____

____|___|_____|_____|_____

____|___|_____|_____|_____

____|___|_____|_____|_____

____|___|_____|_____|_____

____|___|_____|_____|_____

____|___|_____|_____|_____

_____
Date                    CRAIG THOMAS MALLAK, J.D., M.D.

Subscribed and sworn before me

this_____day of _____, 2023.

_____
(Notary Public)

My Commission expires:

TC REPORTING
(516) 795-7444