**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

IN RE: ETHIOPIAN AIRLINES
FLIGHT ET 302 CRASH

Lead Case: 1:19-cv-02170 (Consolidated)

Honorable Jorge L. Alonso

Magistrate Judge Weisman

**BOEING'S MOTION TO EXCLUDE OPINIONS OF
PLAINTIFFS' EXPERT VICKIE NORTON**

Boeing moves under Federal Rule of Evidence 702 to exclude the opinions of Plaintiffs' expert Captain Vickie Norton.

## INTRODUCTION

| | |
|---|---|
| Q. | You just have no personal experience ever hearing that autopilot disconnect horn with the engines at takeoff thrust? |
| A. | That's correct. |
| Q: | And you haven't done any analysis of whether or not it would be possible for a human to detect the sound sitting in the cabin, correct? |
| | [Objections Omitted] |
| A. | I have not done any analysis, no. |

Ex. A (Vickie Norton Dep. Tr.), 123:21–124:7.[1]

This admission from Plaintiffs' expert Captain Vickie Norton is at the core of why the jury should not hear her speculation about the audibility and intelligibility of certain cockpit alerts and sounds. Captain Norton is a commercial airline pilot, but she is not an acoustical engineer, she is not knowledgeable about psychoacoustics (the study of how people comprehend what they hear), and she has performed no analysis to support her opinion that some passengers on Flight ET 302 heard alerts and sounds emanating from the cockpit while in their seats during takeoff. Captain Norton is similarly unqualified to opine about the mental states of passengers during the flight. Boeing respectfully moves this Court under Federal Rule of Evidence 702 to exclude Captain Norton's testimony (1) that sounds and alerts originating from the cockpit were audible, heard, or understood by passengers on Flight ET 302; and (2) regarding passengers' mental states during the flight. Her testimony is too speculative and unscientific to be admissible.

---

[1] Exhibits A and B are to the Declaration of Christopher Ledford in support of Boeing's Motion to Exclude Opinions of Plaintiffs' Expert Vickie Norton.

## BACKGROUND

Plaintiffs' expert Captain Vickie Norton is a current United Airlines pilot with more than 16,000 flight hours as either a pilot or co-pilot, and nearly 4,000 flight hours in the cockpit of various models of the Boeing 737. Ex. A at 16:13–16, 22:16–17. According to her Rule 26 report, Captain Norton is expected to testify that it is her opinion some unknown portion of the passengers on Flight ET 302 heard certain sounds (such as verbal exchanges between the pilot and co-pilot) and certain aircraft alerts and warnings from the cockpit, including (1) the autopilot disconnect wailer/horn; (2) the overspeed clacker; and (3) two different spoken-word alerts from the Ground Proximity Warning System (GPWS). She is also expected to testify that upon hearing these alerts some passengers would have become alarmed. Finally, Captain Norton is expected to testify about passengers' mental states during the accident flight—for example, that passengers "clinging to hopes of survival would have realized that the situation was beyond dire."

During her deposition, Captain Norton testified about her extensive training and experience with the 737's warnings and alerts, which she is trained to easily identify and understand. *See, e.g.*, *id.* at 26:3–29:12, 31:12–21, 33:22–34:3, 45:22–48:13. But she admitted that she herself has heard only one of these sounds (the autopilot disconnect wailer) from within the *cabin* of the airplane, (*id.* at 94:10–14, 101:14–23), and none at all while the engines are at takeoff thrust, as the accident airplane was, (*id.* at 123:21–24). Captain Norton confirmed that she took no measurements of the alerts she opines on. *Id.* at 52:22–25, 53:1–15. She testified that she performed no acoustic analysis to determine how the distance between the cockpit and the cabin would have attenuated the sound, (*id.* at 53:20–23); how obstacles like the flight deck door would have absorbed the sound, (*id.* at 53:16–19, 53:24–54:4); how loud the engine would have been at takeoff while the alerts were sounding, (*id.* at 54:8–12); or how that ambient noise would have masked sounds from the cockpit, (*id.* at 54:5–7). And she admitted that she performed no analysis at all of the audibility of sounds

or alerts emanating from the cockpit to a passenger seated in the cabin during takeoff, (*id.* at 54:19–22), much less a study of whether any such sound would have been intelligible to a non-pilot passenger (*id.* at 54:23–55:8).

## LEGAL STANDARD

An expert's testimony should be excluded unless "it is reasoned, uses the methods of the discipline, and is founded on data." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000). Expert testimony "must also utilize the methods of the *relevant* discipline." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011) (emphasis added). This Court will only admit testimony from experts who are qualified, and only if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of this case." Fed. R. Evid. 702; *see also United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)). The proponent (here, Plaintiffs) has the burden of establishing that the expert meets the requirements of Rule 702. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 782 (7th Cir. 2017).

Courts apply a three-factor test of qualifications and methods: (1) an analysis of the proposed expert's qualifications; (2) an analysis of the proposed expert's methodology; and (3) a determination that the expected testimony will help the trier of fact. *Gopalratnam*, 877 F.3d at 779. When looking at the second prong (methodology), this Court evaluates whether the expert's technique or theory can be or has been tested; whether the technique or theory has been subject to peer review and publication; the known or potential rate of error of the technique or theory when applied; the existence and maintenance of standards and controls; and whether the technique or

theory has been generally accepted in the scientific community. *See Daubert*, 509 U.S. at 593–94; *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 873 (7th Cir. 2021).

Because liability is not at issue and this is a trial solely on compensatory damages, testimony that does not bear on recoverable damages is irrelevant, potentially prejudicial, and should be excluded. *See Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 16 (2d Cir. 1996) (citation omitted); *Martinez v. Dart Trans, Inc.*, 548 F. Supp. 3d 1107, 1115-16 (D.N.M. 2021).

## ARGUMENT

I.  **Captain Norton is not qualified to opine that alerts and other sounds in the cockpit were heard by passengers in the cabin, nor did she perform any analysis to support such an opinion.**

Captain Norton intends to testify that certain cockpit alerts and other sounds in the cockpit were heard by at least some passengers in the aircraft cabin. For example, she opines that the autopilot disconnect alert "would have been heard by the front business class passengers"; that the Ground Proximity Warning System warnings "would have been audible, especially for the business class passengers, and perhaps others, depending on cabin noise"; and that "heated commands" by the captain "as well as subsequent verbal cockpit exchanges … would have also been heard by the front passengers, at a minimum." Ex. B (Vickie Norton Report), 7, 8.[2] None of her opinions regarding what the passengers may have heard emanating from the cockpit is admissible.

A.  **Captain Norton is not qualified to opine that sounds from the cockpit were audible, that passengers heard them, and that those sounds were intelligible or alarming such that passengers would have been distressed by them.**

The first step in the Court's three-factor test is an analysis of the proffered expert's qualifications. Here, Captain Norton repeatedly confirmed in her deposition that she is not

---

[2] Page numbers refer to the page numbers of Captain Norton's report, not pdf page numbers.

qualified to provide an opinion regarding the audibility or intelligibility of alerts by passengers in the aircraft cabin. Captain Norton was asked if acoustics was a science; she testified, "I believe that it is, yes." Ex. A at 119:11–13. She testified that she was unaware of the field of psychoacoustics. *Id.* at 120:23–25. And she also confirmed that she is neither an acoustical engineer nor has training or experience in psychoacoustics. *Id.* at 52:13–21. By her own admission, therefore, Captain Norton is not qualified to opine on the acoustic and psychoacoustic subjects in this case. *See Jones v. Union Pac. R.R. Co.*, 2015 WL 5252958, at *5 (N.D. Ill. 2015) (excluding expert testifying on accident reconstruction who "admitted at his deposition that he is not an accident reconstructionist or engineer and that he does not have the qualifications to perform an accident reconstruction analysis").

Plaintiffs will argue that Captain Norton is qualified by her experience as a 737 pilot, but that experience fails to supply her with the qualifications necessary to opine on acoustics and psychoacoustics during the accident flight. Although she personally has spent a significant number of flight hours (nearly 4,000) as a pilot or copilot on 737 model aircraft, that time was spent in the *cockpit*, not the passenger cabin. Simply being an experienced pilot is insufficient to make Captain Norton qualified to opine on the narrow acoustic topics to which she seeks to testify in this case. *See, e.g.*, *Graves v. City of Waterloo, Iowa*, 2011 WL 4007324, a *5 (N.D. Iowa 2011) ("Simply watching lots of videotape does not make one an expert in video analysis."); *Jones*, 2015 WL 5252958, at *5 (excluding expert whose sole qualification was "experience running these types of trains.")

Similarly, she is not qualified to opine whether passengers would have perceived and understood these sounds (intelligibility), even if they could be heard in the cabin. By her own admission she is a highly experienced pilot trained to know almost immediately what a cockpit

warning means. Ex. A at 32:23–33:5, 33:22–34:3. She claims to have heard some of these alerts—which she says occur on every flight—thousands of times while piloting a 737. *Id.* at 41:18–42:10. But her personal experience as a 737 pilot does not bestow on her the qualifications to opine about how the average 737 passenger would perceive and understand those alerts, let alone the specific passengers on Flight ET 302. And as will be discussed further below with respect to methodology, her personal recollections of hearing one alert a handful of times while seated in the cabin, which she did as a highly trained pilot under completely different circumstances, cannot be a credible basis for her to opine as to what any specific Flight ET 302 passenger heard, understood, and reacted to during the accident flight. *See Jones*, 2015 WL 5252958, at *5 (excluding expert as unqualified where "[t]here is no indication, however, that [expert] has had sufficiently similar experiences that would allow him to opine on this issue."). Her opinion is pure baseless speculation and must be excluded.

**B. Captain Norton's opinion is unsupported by any analysis or methodology.**

Captain Norton's expected testimony also fails to satisfy the second prong of the Court's analysis—methodology. In the attached declaration, Boeing's expert Dr. Durand Begault, an acoustical engineer and former NASA research scientist, describes (consistent with his Rule 26 report) the methodology, criteria, and factors necessary to make a scientifically grounded determination of whether sounds originating in the cockpit could be heard and understood by passengers in the cabin. Dr. Begault explains that for such an opinion to be based on a reasonable degree of scientific certainty, one would need to take acoustical measurements of the alerts and background noise, and factor into the analysis considerations of the signal-to-noise ratio, auditory masking, attenuation due to distance, transmission loss and acoustic absorption due to obstructions

(like the cockpit door), signal frequency, audibility, and intelligibility. Ex. C (Durand Begault Decl.), ¶¶ 6–17.

Captain Norton analyzed none of these criteria and applied none of the "methods of the relevant discipline," here, acoustical engineering. *See, e.g.*, *Bielskis*, 663 F.3d at 894. She testified that she did not take any acoustical measurements, including of the alerts that she claims passengers could have heard from the cabin. Ex. A at 52:22–25; 53:2–11. She did not calculate the signal-to-noise ratio, the effects of transmission loss, the attenuation due to distance, or the effect of auditory masking. *Id.* at 53:12–54:12. She did not analyze the audibility or intelligibility of any of the alerts to the passengers. *Id.* 54:18–55:8. She performed no analysis whatsoever and has no data to support her supposition that certain cockpit alerts and sounds were heard by passengers in the cabin. She therefore has no admissible basis for her testimony.

Captain Norton's expected testimony fails to satisfy the methodology prong because it is based on no methodology at all. The Seventh Circuit has "emphasized that experts' work is admissible only to the extent it is reasoned, uses the methods of the discipline, and *is founded on data*." *Lang*, 217 F.3d at 924 (emphasis added); *see also Bielskis*, 663 F.3d at 894 ("An expert's opinion must be reasoned and founded on data."). Courts often exclude experts who fail to collect data or test their own hypothesis when it is possible to do. *See id.* at 894–95 (expert's theory was "certainly capable of being tested" but expert admitted he had made no effort to do so). Captain Norton offered no data, no measurement, no analysis—no methodology at all besides her own subjective experience. *See* Ex. A at 120:14–15 ("It's my—it's my experience—repetitive experience. I am the measurement."); *id.* at 98:4–5 ("I am the analysis."). Such testimony is unreliable because it is not possible to assess the known or potential rate of error behind the methodology or subject it to peer review, as there is no methodology. *See Bielskis*, 663 F.3d at

895. Because Captain Norton performed no analysis, her technique cannot be tested or subjected to peer review, nor can its potential error rate be assessed. "Talking off the cuff—deploying neither data nor analysis—is not an acceptable methodology." *Lang*, 217 F.3d at 924.

Plaintiffs will argue that Captain Norton should be able to testify that alerts and sounds in the cockpit were heard by the Flight ET 302 passengers because Captain Norton testified that she herself has heard the autopilot disconnect wailer (also called the autopilot disengage warning or horn) while flying as a passenger four to six times in a 737 MAX, and an unspecified "dozens" of times on a 737 NG. Ex. A at 96:6–8; 110:6–9. Notably, however, she also testified that while flying as a passenger she has *never* heard the other alerts she alleges the Flight ET 302 passengers heard: stick shaker, overspeed clacker, and GPWS alerts. *Id.* at 101:11–23. Thus, Plaintiffs tacitly admit that she has *no basis* for opining that the other alerts could be heard by the Flight ET 302 passengers, because she herself has never heard them as a passenger.

As for the autopilot disconnect wailer, which Captain Norton claims to have heard as a passenger, her personal experience provides neither the qualifications nor a reliable basis for concluding that any Flight ET 302 passengers heard the same alert and understood it, let alone any specific passenger in this litigation. Captain Norton testified that she has nearly 4,000 flight hours in the cockpit of the 737, (*id.* at 22:6–17), and that because of her extensive training as a 737 pilot, cockpit warnings and alerts are easily intelligible to her, (*id.* at 33:22–34:3). She is trained, and her ear is attuned, to listen for these types of alerts. She is, in other words, the very opposite of a typical 737 passenger. Thus, Captain Norton's expertise as a pilot affirmatively undermines Plaintiffs' ability to use her experience to prove what ordinary passengers would have heard and understood.

Moreover, Captain Norton testified that the autopilot disconnect wailer sounds on nearly *every* 737 flight. *Id.* at 41:14–17. She has spent "roughly … 5,000 to 6,000 hours of riding around in the back of the aircraft," (*id.* 121:20–22), which must equate to hundreds—but more likely thousands—of individual flights, but has only heard the wailer "dozens" of times while flying as a passenger despite having a good sense of when it would occur. Insofar as her personal experience stands in for her "methodology," hearing an alert that sounds on nearly every flight only an unspecified "dozens" of times in thousands of hours of flight is a "rate of error" that itself makes Captain Norton's personal recollection an unreliable methodology under Rule 702. And to the extent that the basis of Captain Norton's expert opinion is derived from her experience as a passenger and not a pilot, she is offering nothing more than what is "obvious to [a] layperson," which should be excluded because her "expert" testimony is of no additional or "particular assistance to the jury." *Ancho v. Pentek Corp.*, 157 F.3d 512, 519 (7th Cir. 1998). To the contrary, her expertise as a pilot who is trained to hear and interpret cockpit alerts renders her testimony of even less value than a layperson's would be.

Finally, Captain Norton testified that the phase of flight during which she heard the autopilot disconnect wailer on the 737 was "exclusively descent and preparation for approach and landing," (*id.* at 96:9–12; 117:19-25), when "the noise from the engines is less than on takeoff," (*id.* at 97:14–16). It is undisputed, however, that the accident aircraft was set to takeoff thrust the entire time the alerts were sounding, meaning the engine noise would have been louder than during descent and preparation for approach.[3] Captain Norton testified that she has no personal experience hearing the autopilot disconnect wailer when the engines are at the louder takeoff thrust level (let

---

[3] It is also undisputed that the overspeed clacker sounded during the accident flight. This alert signifies "that the aircraft has exceeded either VMO—which is its maximum operating airspeed—or MMO—its maximum operating Mach speed—depending on the altitude of the aircraft." Ex. A at 47:24–48:6.

alone when an aircraft exceeded its maximum operating speed), (*id.* at 123:21–24), and therefore her personal experience is not a reliable basis for what passengers may have experienced during the accident flight. *See Paramount Media Grp., Inc. v. Village of Bellwood*, 2015 WL 5307483, *5 (N.D. Ill. 2015) ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.") (quoting Fed. R. Evid. 702 advisory committee's notes (2000)) (internal citations and quotations omitted)). Instead, her speculation that some unspecified passengers in the front rows of Flight ET 302 heard and comprehended certain alerts, and then communicated the import of those alerts to passengers throughout the cabin, is unfounded speculation built upon speculation. It is pure *ipse dixit* that fails to meet the standards of Rule 702. *See Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999) ("[Q]ualifications alone do not suffice. A supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert*.").

## II. Captain Norton has no basis for opining about passengers' mental states.

Captain Norton opines in her report about the mental states and anxiety that passengers felt during the accident flight. For example, she opines that at one point during the flight "any experienced passengers would immediately discern this uncommon movement." Ex. B at 8. Later she opines that certain flight movements "would certainly have been noticeable and disconcerting to the passengers," that experienced passengers "likely then relayed their concerns to other passengers in their proximity," and that certain motions later in the flight "would have certainly created great anxiety for the passengers as it persisted." *Id.* She describes one flight phase as one "that would unquestionably be not only be *felt* by passengers but would be *terror-inducing*." *Id.* at 9 (emphasis in original). And she opines that "anyone still clinging to hopes of survival would

-10-

have realized that the situation was beyond dire, and passengers and crew alike could do nothing but anticipate the horror of their impeding fate." *Id.*

Captain Norton has no basis for any of these opinions beyond pure speculation. First, she is unqualified to render such opinions; she's an airline pilot, not a mental health professional or psychologist. An expert is not entitled to offer opinions outside of her area of expertise. *See United States v. Pree*, 408 F.3d 855, 871 (7th Cir. 2005). To the extent Plaintiffs argue that her experience as an airline pilot supplies her qualifications, Captain Norton's 16,000 flight hours makes her "experience" on an aircraft categorically different from that of the passengers on Flight ET 302, and can in no way be considered a reliable proxy for them.

Second, Captain Norton has no basis for her opinions regarding the passengers' mental states. Her report contains no data, questionnaires, research articles, studies, or methodology describing how passengers generally react to certain phases or movements in flight. She posits a category of "experienced passengers," but does not define its scope or explain how or why they differ from other passengers. Although she explicitly considers passenger "experience" to be an important factor in whether certain flight movements would induce alarm or terror in a particular individual, she has no knowledge as to the "experience" of any particular passenger on Flight ET 302 and makes no attempt to evaluate it. And to the extent her experience qualifies her to opine on the mental states or understanding of the Flight ET 302 pilots, such an opinion does not help the trier of fact here because the Flight ET 302 pilots are not plaintiffs in this case. *See* Fed. R. Evid. 702(a). In sum, Captain Norton's opinion regarding the passengers' mental states is pure speculation that not only lacks the reliability required under Rule 702, but contains language (*e.g.*, "terror-inducing" and "horror of their impending fate") that lacks any probative value and is unfairly prejudicial. *See* Fed. R. Evid. 403.

### III. Captain Norton's opinion is irrelevant to damages.

Finally, Captain Norton's opinion regarding the passengers' mental states would not help the jury determine an issue in this case because damages for pre-impact anxiety and fear are not recoverable under Illinois law. Under Illinois law, a plaintiff can only recover for the "fright and terror" of the decedent if it is caused by a preceding physical injury. *In re Air Crash Disaster Near Chicago, Illinois on May 25, 1979*, 507 F. Supp. 21, 23 (N.D. Ill. 1980). Captain Norton does not (and cannot) opine that any particular passenger was physically injured before impact; all she can do is speculate that some flight movements before impact were "potentially injurious." Ex. B at 9. That is not a reliable or helpful opinion.[4] Because Captain Norton is not qualified to testify that the passengers sustained an injury before impact, and because courts have repeatedly held that the fear of an impending impact alone is not recoverable, the Court should exclude Captain Norton from opining on the passengers' mental states. *See In re Air Crash Disaster Near Chicago*, 507 F. Supp. at 24 ("Given the Illinois courts' previous refusal to recognize claims for damages based on the plaintiff's fear or apprehension of danger … we believe that at present Illinois would not allow the plaintiff to maintain a claim for her daughter's alleged fright and terror prior to the crash.").

### CONCLUSION

For the reasons stated above, Boeing respectfully asks this Court to enter an order excluding Plaintiffs' expert Captain Vickie Norton from testifying (1) that sounds and alerts originating from the cockpit were audible, heard, or understood by passengers on Flight ET 302; and (2) regarding passengers' mental states during Flight ET 302.

---

[4] Moreover, none of Plaintiffs' other experts can opine that the passengers sustained an injury before impact, for reasons explained in the Fed. R. Evid. 702 motions challenging their opinions.

DATED: February 8, 2023

THE BOEING COMPANY

By: /s/ *Dan K. Webb*
*One of Its Attorneys*

Dan K. Webb
dwebb@winston.com
Christopher B. Essig
cessig@winston.com
Julia M. Johnson
jmjohnson@winston.com
Samuel M. Zuidema
szuidema@winston.com
**Winston & Strawn LLP**
35 West Wacker Drive
Chicago, Illinois 60601-9703
Phone: (312) 558-5600

Andrew E. Tauber
atauber@winston.com
**Winston & Strawn LLP**
1901 L St. NW
Washington, D.C. 20036
Phone: (202) 282-5000

Michael Scoville
MScoville@perkinscoie.com
Mack Shultz
MShultz@perkinscoie.com
Christopher M. Ledford
CLedford@perkinscoie.com
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000

Jon R. Buck
JBuck@perkinscoie.com
**PERKINS COIE LLP**
110 N. Wacker Dr., Suite 3400
Chicago, Illinois 60606-1511
Phone: (312) 324-8000
Fax: (312) 324-940

-13-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 8, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ ECF system, which will send notification of such filing to all attorneys of record.

<u>/s/ *Dan K. Webb*</u>
**WINSTON & STRAWN LLP**
35 West Wacker Drive
Chicago, Illinois 60601-9703
Phone: (312) 558-5600