# EXHIBIT A

# In The Matter Of:
# ETHIOPIAN AIRLINES FLIGHT ET 302

# CRASH - DAMAGES

_____

# CAPTAIN VICKIE RENEE NORTON
December 9, 2022

_____

# *TC REPORTING, INC.*
### *1 DEERFIELD EAST - 1850*
### *QUOGUE, NY.  11959*

CAPTAIN VICKIE RENEE NORTON - Vol. I

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

------------------------------------------------------x
IN RE: ETHIOPIAN AIRLINES
FLIGHT ET 302 CRASH - Damages

This Document Relates To: All Actions
------------------------------------------------------x
Lead Case: 1:19-cv-02170 (Consolidated)
Honorable Jorge L. Alonso
Magistrate Judge M. David Weisman
------------------------------------------------------x

December 9, 2022
12:07 p.m. Eastern Standard Time

\*       \*       \*

CONFIDENTIAL PURSUANT TO AMENDED PROTECTIVE ORDER

\*       \*       \*

Remote/hybrid video conference

deposition of CAPTAIN VICKIE RENEE NORTON, taken

by Defendant The Boeing Company, pursuant to

Notice, dated November, 30, 2022, before Brandon

Rainoff, a Federal Certified Realtime Reporter

and Notary Public of the State of New York.

CAPTAIN VICKIE RENEE NORTON

A P P E A R A N C E S:

KREINDLER & KREINDLER LLP

Attorneys for Plaintiffs' Executive Committee

750 Third Avenue

New York, New York  10017

212.687.8181

BY:    JUSTIN T. GREEN, ESQ.

212.973.3403

jgreen@kreindler.com

DANIEL O. ROSE, ESQ.

212.973.3414

drose@kreindler.com

ERIN R. APPLEBAUM, ESQ.

eapplebaum@kreindler.com

212.973.3430

VINCENT C. LESCH, ESQ.

212.973.3482

vlesch@kreindler.com

TC REPORTING
(516) 795-7444

CAPTAIN VICKIE RENEE NORTON

3

A P P E A R A N C E S (continued):

CLIFFORD LAW OFFICES PC

Attorneys for Plaintiffs' Executive Committee

120 North LaSalle Street

Chicago, Illinois  60602

312.625.6192

BY:    KEVIN P. DURKIN, ESQ.

kpd@cliffordlaw.com

TRACY A. BRAMMEIER, ESQ.

tab@cliffordlaw.com

SANJA PETREVSKA, ESQ.

sp@cliffordlaw.com

CAPTAIN VICKIE RENEE NORTON

4

A P P E A R A N C E S (continued):

COTCHETT, PITRE & McCARTHY, LLP

Attorneys for Plaintiffs

840 Malcolm Road

Suite 200

Burlingame, California  94010

650.697.6000

BY:    FRANK M. PITRE, ESQ.

fpitre@cpmlegal.com

JOHN PAUL THYKEN, ESQ.

jthyken@cpmlegal.com

NABILAH A. HOSSAIN, ESQ.

nhossain@cpmlegal.com

ANDREW BRITTON, ESQ.

abritton@cpmlegal.com

CAPTAIN VICKIE RENEE NORTON

5

A P P E A R A N C E S (continued):

ROMANUCCI & BLANDIN LLC

Attorneys for Plaintiffs

       321 North Clark Street

       Suite 900

       Chicago, Illinois  60654

       312.458.1000

BY:   DAVID NEIMAN, ESQ.

       312.253.8810

       dneiman@rblaw.net

CAPTAIN VICKIE RENEE NORTON

6

A P P E A R A N C E S (continued):

WINSTON & STRAWN LLP

Attorneys for Defendant The Boeing Company and the

Witness

        35 West Wacker Drive

        Chicago, Illinois  60601-9703

        312.558.5600

BY:    CHRISTOPHER B. ESSIG, ESQ.

        312.558.6229

        cessig@winston.com

THE BOEING COMPANY

In-House Counsel

        ALLISON KENDRICK, ESQ.

CAPTAIN VICKIE RENEE NORTON

7

A P P E A R A N C E S (continued):

PERKINS COIE LLP

Attorneys for Defendant The Boeing Company and the

Witness

        1201 Third Avenue

        Suite 4900

        Seattle, Washington  98101-3099

        206.359.8000

BY:   CHRISTOPHER LEDFORD, ESQ.

        206.359.6642

        cledford@perkinscoie.com

        JEFFERY SHANE CLACKLEY, ESQ.

        206.359.3124

        jclackley@perkinscoie.com

ALSO PRESENT:

JENNIFER GORDON, Clifford Law Offices PC

KELLY HOFFMAN, Cotchett, Pitre & McCarthy, LLP

OLIVIA STONE, Cotchett, Pitre & McCarthy, LLP

ANA CORDES

THERESA WINTER, TC Reporting, Inc.

CRAIG JONES, Technical Support, TC Reporting, Inc.

MICHAEL KELLY, Videographer

CAPTAIN VICKIE RENEE NORTON

8

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing, sealing and certification be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

- o0o -

TC REPORTING
(516) 795-7444

CAPTAIN VICKIE RENEE NORTON

9

&ast;  &ast;  &ast;

P R O C E E D I N G

Friday, December 9, 2022

Remote/Hybrid Deposition

12:07 p.m. Eastern Standard Time

&ast;  &ast;  &ast;

THE VIDEOGRAPHER:  Good morning, my name is Michael Kelly, your videographer, and I represent TC Reporting.

Today's date is December 9, 2022, and the time now is approximately 9:07 a.m. Pacific Standard Time.

This is the start of media labeled number 1 of videotape deposition of Vickie Norton, In Re:  Ethiopian Airlines Flight ET 302 Crash, filed in the United States District Court for the Northern District of Illinois, Eastern Division, taking place at 23281 Vista Grande Drive, Laguna Hills, California.

This is taken on behalf of the defendant.

Counsel, will you a please identify yourselves, starting with the questioning attorney, after which the court reporter will

CAPTAIN VICKIE RENEE NORTON

10

swear in the witness.

MR. LEDFORD: Good morning, Christopher Ledford from Perkins Coie on behalf of Boeing.

Also joining remotely is Jeffery Shane Clackley of Perkins Coie; Allison Kendrick of the Boeing law department, as well.

MR. GREEN: Justin Green on behalf of the Plaintiffs' Executive Committee.

MR. THYKEN: John Thyken on behalf of plaintiffs.

MR. PITRE: Good morning, Frank Pitre on behalf of plaintiffs.

MR. DURKIN: Kevin Durkin on behalf of the plaintiffs, remotely.

MS. BRAMMEIER: Tracy Brammeier, plaintiffs.

MS. HOSSAIN: Nabilah Hossian.

MS. PETREVSKA: Sanja Petrevska.

MR. BRITTON: Andrew Britton on behalf of the plaintiffs.

(Pause)

MS. GORDON: Jennifer Gordon, remote, plaintiffs.

CAPTAIN VICKIE RENEE NORTON

11

THE VIDEOGRAPHER: I'll help with clean-up.

From Kreindler & Kreindler, we also have Daniel Rose.

And then from Romanucci & Blandin -- would you like to identify yourselves? -- I can do it for you -- Dave Neiman from Romanucci & Blandin.

Then we have a few from Cotchett, Pitre & McCarthy besides Mr. Thyken.

MS. HOSSAIN: Nabilah Hossain from Cotchett, Pitre & McCarthy on behalf of the plaintiffs.

THE VIDEOGRAPHER: A few others?

Olivia Stone also.

(Pause)

THE VIDEOGRAPHER: Kelly Hoffman, and Ana Cordes.

And I believe that -- has anyone else not identified themselves for the record?

MR. ESSIG: Chris Essig for Winston & Strawn and The Boeing Company.

THE VIDEOGRAPHER: Thank you.

I'll just continue helping out.

TC REPORTING
(516) 795-7444

CAPTAIN VICKIE RENEE NORTON

12

Before we proceed, I will ask that lead counsel for plaintiffs and lead counsel for defendants for today's deposition to stipulate on the record that we are proceeding according to the Federal Rules of Civil Procedure that this deposition officer will swear in the deponent even though is he not in the physical presence of the deponent, and there is no objection to this at this time, nor will there be an objection to this at any future date.

Plaintiffs' lead counsel, are you in agreement?

MR. GREEN:  In agreement.

THE VIDEOGRAPHER:  Thank you.

Defense lead counsel, are you in agreement?

MR. LEDFORD:  Yes, in agreement.

THE VIDEOGRAPHER:  Thank you.

This is the deposition of Vickie Norton.

At this time, will the court reporter please swear in the witness?

THE COURT REPORTER:  Good morning. My name is Brad Rainoff. I am a Certified Shorthand

CAPTAIN VICKIE RENEE NORTON

13

Reporter and Notary Public. I am also a Registered Merit Reporter and Federal Certified Realtime Reporter. I am the deposition officer for today's deposition.

CAPTAIN VICKIE RENEE NORTON,

      having been duly sworn, was examined and

      testified as follows:

EXAMINATION

BY MR. LEDFORD:

    Q.    Good morning.  We spoke earlier and I think you mentioned that me referring to you as "Ms. Norton" was your preference.

      Does that still work?

    A.    That's fine.  Thank you.

    Q.    Okay.

      Well, Ms. Norton, I see from your report and your CV that you have about 34 years of experience in the aviation industry, so I wanted to start with that background.

      It appears that your first job after graduating in Michigan Tech was for McDonnell Douglas.

      Tell me about what kind of work it was that you did for McDonnell Douglas?

CAPTAIN VICKIE RENEE NORTON

14

A.    I worked for the hydromechanical systems department in McDonnell Douglas.

And we -- I was immediately thrust into flight testing the MD-11 which was experimental at the time, particularly with regard to the carbon brake, which was new to the aircraft.

All prior versions of, like, DC-10, for example, had steel brakes -- the anti-skid autobrake systems.

The MD-11 had a brake temperature monitoring tire pressure indicating system.  All of those systems had to be developed, integrated, and flight tested.  So that was my first job for the first couple years I was there.

Q.    I see that the next item in the professional experience category is a position as a first officer for Reno Air Express, so I want to talk about that.

But could you first tell me -- or describe for me -- the pilot training that was required before you were able to become a first officer?

CAPTAIN VICKIE RENEE NORTON

15

A.    Well, I did all of my pilot training on a -- none of it was military.  I was all civilian.

So my experience started by getting my own private pilot's license, my instrument rating, my commercial rating, my multi-engine rating, my multi-engine instrument rating -- all while I was working as an engineer.  So I did it all on the side, if you will, until I had enough hours and experience to actually apply for a first officer position at the regional.

So -- is that -- does that answer your question?

Q.    It does.

About how many hours did you have logged as a pilot at the time you applied for your job at Reno Air?

A.    To the best of my recollection, less than 1,000, but somewhere between probably 750 and 850 hours.  I remember it was less than 1,000 because I was worried that that might be -- might be an issue, but it wasn't for a first officer.

Q.    So sounds like, before you were able

CAPTAIN VICKIE RENEE NORTON

16

to be hired as a first officer, you had to go -- undergo a fairly extensive training.

Is that right?

A.    I did.

Q.    Then the next professional experience item on your CV is as a captain for United Airlines.  It looks like you have been flying for united for about 27 years.

Is that right?

A.    Yes, that's correct -- June 26 of 1995.

Q.    And you've logged more than 15,000 hours of flight time, right?

A.    I'm in low-to-mid 16,000s now, as we sit here today.

Q.    It looks like you have flown a variety of aircraft for United.

So do I understand correctly that you've either been a pilot, a first officer, or a flight engineer for the Boeing 737, 747, 757, 767, as well as the Airbus A320?

A.    That's correct.

Q.    And you say you are type rated for the 737, 757, 767, and A320.

CAPTAIN VICKIE RENEE NORTON

17

Tell us what being type rated means.

A.    It means that you undergo formal training to -- a type rating is something that gets put on your professional -- my ATP license -- that I have fully qualified in that type of aircraft.

At United, to be employed in either the right seat -- first officer seat -- or the captain's seat you must possess a type rating for that particular aircraft.

So you go through the entire curriculum -- both, you know, the bookwork, if you will, and all of the numbers, memory items associated with the aircraft, and then a series of flight tests culminating in your formal checkride.

And if you are successful, then you are issued a type rating.

Q.    So you mentioned that there was -- sounds like a book portion and an actual flight check portion.

So for each one of those, can you tell us what kind of manuals you would have to learn or be familiar with in order to become type

CAPTAIN VICKIE RENEE NORTON

18

rated?

A.    With -- specifically for a type rating on a certain type of aircraft -- of course, just to give some context, you must, as a pilot, be familiar with all of the Federal Aviation Regulations, or very familiar with the Aeronautical Information Manual.

We get all of that as a precursor to moving up in the ranks and flying for -- you know, professionally.

Specifically for a type rating, we are -- we must become familiar with the aircraft flight manual, which is specific to that aircraft type.

And then at your airline, you must also be familiar with, and be compliant with, everything in the flight operations manual, which is administrative in nature versus specific to the aircraft.

Q.    So fair to say that to become type rated on any of these types of aircraft, you have to do an extensive amount of training?

A.    That's fair.

Q.    And you've done that for, I see, four

CAPTAIN VICKIE RENEE NORTON

19

different types of aircraft: The 737, 757, 767, and A320.

Is that right?

A. When I was first hired in 1995, I was a flight engineer on the old 747s. That did not -- the flight engineer position did not require a type rating. So I did operate as a flight engineer for the first year that I was with United, but that didn't require a type rating.

But I do -- that was my first position.

And then subsequent to that, I was type rated as a first officer on the 737s. At the time, we only had the 300 and 500 series. So it was my first type rating at United.

And then the 757 and 767 as a first officer; and then back to the 737-300 and -500 as a captain.

However, I was already type rated, so that wasn't a new type rating. It was just an upgrade.

And then I was in that seat for 9/11. And then everything, sort of, backtracked.

CAPTAIN VICKIE RENEE NORTON

20

So I went back to the right seat of the 757/767 until I could once again hold the captain's seat.

And that was on the Airbus A320, A319. And that was a subsequent type rating, but in the captain's seat.

Q. So for all of these aircraft where you are type rated, you are required by the FAA -- and presumably by United as well -- to have essentially mastery of the aircraft systems in order to be flying the airplanes.

Is that fair?

A. I think "mastery" might lend itself to interpretation.

But there is a threshold by which we are evalu-- a standard to which we are evaluated that we must demonstrate at or better that standard.

Q. And I appreciate your modesty in not saying -- agreeing with "mastery."

But what I'm trying to get at is, in order to become type rated, in order to become a captain for United, you have to understand the systems at a fairly detailed level for these

CAPTAIN VICKIE RENEE NORTON

21

aircraft.

Is that fair?

A.   That's fair.

Q.   And you are currently working as a 737 captain.

Is that right?

A.   That's correct.

Q.   Based out of Los Angeles, I think?

A.   Yes, sir.

Q.   Do you fly the 737 MAX variant?

A.   I do.

When it -- so the way United structures the 737 series is we have 700s, 800s, 900s, 900ERs, and the MAX.

And we -- we basically -- it's where United chooses to put a particular aircraft on a particular route.

So a lot of times for a trip pairing, I'm not sure which one is going to show up. They will advertise this might be an 800, but when I get to the gate, someone that's paid more than I am changes their mind and it's a MAX or it is a 900.

Q.   And so you -- you essentially -- you

TC REPORTING
(516) 795-7444

CAPTAIN VICKIE RENEE NORTON

22

fly the next generation models of 737 and the MAX currently?

Is that right?

A.   That's correct.

Q.   About how many hours do you have as either captain or first officer of the 737?

A.   You know, I can give you with specificity a number on a break.  I'd be hazarding a guess at this point.

I mean, thousands.

But on a break, I can log in and tell from you each seat what I have exactly.

Q.   I don't need the exact number.

Thousands is close enough.

A.   I mean, over 3,000-plus; combination, probably closer to 4,000 combining both seats.

Q.   So thousands of hours of flight time in the 737 in different model -- or in different variants, it sound like?

A.   Sure.

Q.   And when did you first start flying the 737?

A.   I was hired in June of '96.  I did that for about a year -- fall -- roughly fall of

CAPTAIN VICKIE RENEE NORTON

23

1996.

Q.   So tell me a little bit more about the training that you had to complete before becoming type rated on the 737.

You mentioned a book portion where you were studying manuals.

About how long did that course of study take?

A.   Well, the book portion, if you will, is done concurrently with, you know, when you are in school.  It's about a two-month program, the best of my recollection.

It's easier -- courses get shorter once you are type rated, if you go back for it.

So initially when I was type rated on the 737, 300, and 500, it was about two months.

And the book portion, if you will, runs concurrent to the actual flight training portion.

So you do it a period of time in a classroom, or what-have-you; demonstrate knowledge.

And then you go into a -- we initially start in what we used to call a "paper trainer."

CAPTAIN VICKIE RENEE NORTON

24

We would sit in a chair with cardboard; an overhead panel up on a ceiling; two seats. And it would allow, respectively, the captain and first officer in training to go through their flows: Identify the locations of system's components, switches, what-have-you.

And then it progresses into a fixed base simulator, which is not a hydraulic simulator; but it does allow you to -- quote-unquote -- "fly the aircraft," actuate the switches, see the effects of, let's say, turning on hydraulic pumps -- that type of thing.

And then ultimately -- and during that whole course, you are still doing the bookwork. And then -- and being tested at various stages for your knowledge.

And ultimately, it -- you are in the simulate -- the full motion level -- the simulator for the balance of your training.

And then at the end, you take a very strenuous three-to-four hour oral exam that can be also witnessed by the FAA, if they so choose.

And then after that, you go into the simulator for about four hours as well.

CAPTAIN VICKIE RENEE NORTON

25

And that's when you pass or fail your checkride -- hopefully pass.

Q.   Yes.

And during that training, are cockpit warnings part of that course of study?

A.   Could you be more specific?  I mean, do we hear them?

Q.   Sure, yeah.  No, that's a fair question.

So what I am wondering is:  During the time when you are receiving that training -- you know, when you start in the paper trainer or -- and moved to the fixed base trainer, and so on and so forth -- are you trained on the meaning of the various cockpit warnings, alerts, cautions that may be present --

A.   Yes.

Q.   -- on is a 737 cockpit?

A.   Yes.

Q.   And as part of the training, do you hear those warnings?

A.   In the full motion simulator, you do, yes.  That's the only -- that's the only venue -- or the only medium that you can

actually hear them.

Q.    Okay.

So part of becoming type rated in a 737 is hearing those warnings and knowing how to identify what those warnings are, right?

A.    That is part of the training, certainly.

Q.    And understanding what the context is for a particular warning sounds like it's part of the training?

A.    I agree with that.

Q.    Another way to put that is: Understanding what the warning is trying to tell you is part of the training?

A.    Agreed.

Q.    So after you become type rated, you are required to complete ongoing training, right?

A.    Yes, sir.

Q.    And how often to you receive that ongoing training?

A.    Every nine months.

Q.    Tell me:  What kind of ongoing training do you receive?

CAPTAIN VICKIE RENEE NORTON

27

A.     Every other nine months, there is a -- for instance, in January, I was notified that my upcoming nine-month training is called a "continuing training," but it's essentially a maneuvers validation.  It's a little bit less strenuous and less involved than the alternate nine months, but it is a checking and evaluating -- there is -- there is testing of your book knowledge; and then there is also going into the simulator and flying a number of profiles that are unsafe to demonstrate in the actual aircraft:  Single engine work, responses to fires, etc. -- to name a few -- hydraulic failures.

So it is to maintain your proficiency so that you see these things, you know, at least every nine months.  You'll see them in the alternate nine months.

The second -- the second alternate next nine month is an actual checkride, which is done as a partnership with a captain and first officer.  They call it a "loft."  It's a line-oriented flight training.  So we essentially -- it's a three-day event.  But it

CAPTAIN VICKIE RENEE NORTON

28

culminates in a checkride that represents an actual flight where things go wrong.

Q. During the training that you are describing, do you also hear various cockpit warnings and alerts?

A. You certainly can, depending on the failure scenarios you are presented with.

Q. So failure scenarios -- sounds like as part of that recurring training, you are presented with various failure scenarios in the aircraft that would trigger various cockpit warnings. And you are required to identify what's going on and address the issue.

Is that fair?

A. That's fair.

Q. And that cadence that you were describing of getting that continuing training -- has that been in place since you first became type rated on the 737?

A. It has. The frequency has.

The nature of the training has changed a little bit.

When I was new in the '90s, we were evaluated independently. So even that alternate

CAPTAIN VICKIE RENEE NORTON

29

nine months, which is the checkride, you were not operating as a team.

That -- I can't tell you when that changed -- but early 2000s.

So you went into the simulator and you were essentially evaluated independently of your first officer or captain.

But it's been decades since it's been a team concept.

But the every nine months has been throughout my -- my entire career.

Q. And the type of subjects covered during that recurrent training, though, stayed roughly similar?

A. Not necessarily.

Could you be more specific? I mean, the bookwork, yes, but not the failure scenarios.

Q. Understood.

During the course of those various recurrent trainings, has it been consistent that you are presented with failure scenarios that activate various cockpit warnings that you are required to identify and address?

CAPTAIN VICKIE RENEE NORTON

30

A.      In some cases.

And sometimes the failure scenarios are more subtle and do not have an associated oral or visual alert.  They are something you have to identify that's more, you know, subtle, I guess, depending on -- and in your checkride, you are also -- it's a full flight, so you are called from -- the flight attendants may call and say there are misbehaving passengers.

So it's a comprehensive flight that can have both things going wrong up front, and in the back, or all of the above.

Q.      Is it fair to say that part of the goal of the -- that recurrent training is presenting you with scenarios of potential failure modes that you wouldn't often see in line flight, and making sure that if you hear a warning or alert that you are able to recognize, understand, and address that?

A.      That can certainly be a component of the training, yes.

Q.      Has it been over time a component of your training?

A.      Again, you know, depending on the year

CAPTAIN VICKIE RENEE NORTON

31

and -- you know, the flight department is tasked with creating different scenarios that are not predictable.

And often -- my understanding -- as well is that they might represent things that have actually happened over the course of the year that have been experienced on the fleet to make sure that you are exposed to them.

So, you know, the answer is: It depends on the scenario.

Q. Understood.

So as you are doing this training it sounds like one of the goals is you are not just reading about specific types of failure scenarios, or warnings, or alerts, but you are actually experiencing them so that you can then better recognize them if they were to occur during line operation.

Is that fair?

A. That's fair.

Q. And at this stage in your career, would you say -- and given your training and experience -- would you agree that when you hear a warning, you recognize it almost immediately?

CAPTAIN VICKIE RENEE NORTON

32

A.    Specifically what -- are you talking about a cockpit warning?  Are you --

Q.    That's a good clarification.  Let me reask that to be more clear.

So given your training and experience, would you agree that when you hear a cockpit warning in a 737, you recognize it almost immediately?

MR. GREEN:  Just objection to the form of the question.

A.    I would certainly hope -- if it's clear and it's operating as it should -- I would recognize it and be familiar with what it is, yes.

Q.    And because of your training and experience, you also know almost immediately what that cockpit warning means and how to respond to it, right?

MR. GREEN:  Objection to the form.

A.    Would you reask that, please?

Q.    Sure.

My question is:  Because of your training and experience as a United 737 captain with 16,000-plus hours of experience, you know

CAPTAIN VICKIE RENEE NORTON

33

almost immediately what a cockpit warning means and how to respond to that warning, right?

MR. GREEN: Object to the form.

A.     I think that's fair, yes.

Q.     And so, in other words, the cockpit warnings on a 737 are easily intelligible to you because you are a highly-trained pilot, right?

MR. GREEN: Objection to the form.

A.     I would be -- "highly trained" -- that seems subjective to comparing to various levels of training -- that I'm not sure what we are comparing it to.

But I would say I have been -- any aircraft for which I'm type rated, I have been extensively trained on multiple failure scenarios -- if that answers your question.

Q.     Close.

What I'm getting at is that -- and let me try re-asking that, because I appreciate what you are saying there.

What I'm asking is: Cockpit warnings are easily intelligible to you because you are a trained 737 pilot, right?

MR. GREEN: Objection to form.

TC REPORTING
(516) 795-7444

CAPTAIN VICKIE RENEE NORTON

34

A.    I think that's fair.  I mean, I would -- yeah, that's fair.

Q.    Let's talk about a specific warning on a 737.

But first, what is the Flight Crew Operations Manual?

A.    Well, we don't -- we at United use -- I mean, that's an FCOM.

We don't -- we use -- as I mentioned earlier, we use a flight manual -- an Aircraft Flight Manual, or an AFM; or -- and/or -- and we use a Flight Operations Manual.  That's the administrative part.

So I'm -- I'm familiar with the "FCOM" term or -- but at United, we use flight manual -- FOM.

Q.    And tell me what the difference is between those documents?

A.    So as I previously stated, the flight manual is specific just to the aircraft type, so I have a 737 flight manual.  It has all -- all specific to procedures, memory items, systems, etc., about that specific aircraft.

Everyone at United also has a Flight

CAPTAIN VICKIE RENEE NORTON

35

Operations Manual, irrespective of what aircraft they are currently flying. And that's administrative items: How we do business, what the rules and regulations are specific to United.

Q. And the flight manual that you mentioned -- I just want to make sure I'm understanding fully here, because I understand that there is an FAA-approved document that is called the Aircraft Flight Manual.

Is this separate from that document?

Or is it the same thing?

A. Oh, that is -- our Aircraft Flight Manuals are -- we abbreviated it to "FM" -- is FAA approved. Revisions that are posted to that manual are FAA approved. It is an FAA-approved document.

Q. And which one of those manuals describes the operation of the 737?

A. The flight manual -- Aircraft Flight Manual.

(Pause)

Q. You mentioned that, notwithstanding that it sounds like United has a set of manuals,

CAPTAIN VICKIE RENEE NORTON

36

you are also familiar with something called a Flight Crew Operations Manual -- or -- right?

A.    I have heard the term.  It's not something that I use in my daily -- in my daily operation.  So I am familiar with it.

I couldn't -- I'd be speculating to tell you nuances or what it specifically contains.

Q.    As part of your expert work in this case, you reviewed the FCOM for Ethiopian Airlines, right?

A.    For the work in this case?

Q.    Yes.

A.    I don't -- if you will allow, I have a --

Q.    We can mark a copy of your report if that would help?

A.    Sure.

Q.    And we can turn to the page of the materials considered.

MR. LEDFORD:  So let's mark as 286 a copy of the expert disclosure of Vickie R. Norton.

CAPTAIN VICKIE RENEE NORTON

37

(Exhibit 286, Multipage document entitled: Plaintiffs' Rule 26(a)(2)(B) Disclosure of Vickie R. Norton, dated September 19, 2022 (no Bates Nos.), marked for identification)

THE WITNESS:  Yes, I see it, Mr. Ledford.

MR. LEDFORD:  And can I have you write the number 286 at the top?

THE WITNESS:  All right.

MR. LEDFORD:  Or Mr. Green can. Thank you.

THE WITNESS:  All right.

(Pause)

MR. LEDFORD:  And so I'll direct your attention to Appendix B:  List of Materials and Data Considered.

THE WITNESS:  Yes.

BY MR. LEDFORD:

Q.    Then first, just for housekeeping, do you recognize this document as the report that you submitted in this case?

A.    Yes, sir.

Q.    Okay.  Thank you.

And so looking at Appendix B, number 7: Boeing 737-8 Flight Crew Operations Manual - Ethiopian Airlines?

A. I see that, yes.

Q. So as part of the materials you considered, that FCOM for Ethiopian was one of them?

A. It was provided to me, yes.

Q. And I understand it's a lengthy document.

So understand that you may not have looked at every single page, but you've considered it?

A. Yeah -- I -- in fairness, I -- the idea was to receive it; see what guidance; how it compared to -- how Ethiopian Airlines' flight crew manual might compare to my flight manual, if it's similar in nature.

But that was -- to my recollection, that was the extent of the review, really.

Q. Did you notice any differences between the Ethiopian Flight Crew Operations Manual and the United Flight Manual with respect to the nature and meaning of cockpit warnings?

CAPTAIN VICKIE RENEE NORTON

39

A.    I don't recall that I was -- that I reviewed the FCOM with that specifically in mind.

Q.    All right.

MR. LEDFORD:  Next I'm going to mark as Exhibit 287 an excerpt of pages from the Ethiopian Flight Crew Operations Manual.

(Exhibit 287, Document Bates stamped BOE_ETH_02263887 through 02263890, 02264589 through 02264593, multipage document entitled: Boeing 737-8 Flight Crew Operations Manual: Ethiopian Airlines, Revision Date: February 21, 2019, marked for identification)

(Pause)

MR. LEDFORD:  And I'll represent to that this is an excerpt of that lengthy document, but we don't need to look at the whole thing.

THE WITNESS:  Sure.

MR. LEDFORD:  So I wanted to point your attention to a certain part of it.

THE WITNESS:  Okay.

MR. LEDFORD:  If you could turn to page 4.10.17, which is Bates number

CAPTAIN VICKIE RENEE NORTON

40

BOE_ETH_02264591.

THE WITNESS:  591?

MR. LEDFORD:  Yes.

THE WITNESS:  Okay.  I have it.

BY MR. LEDFORD:

Q.    And this is a section regarding the autopilot and autothrottle controls, right?

A.    It appears to be so, yes.

Q.    There is a diagram of the control column showing the autopilot disengage switch, right?

A.    Yes, sir.

Q.    And below that, there is a description of the operation of the autopilot disengage switch, right?

A.    Yes, there is.

Q.    And part of that description says that when the autopilot is disengaged -- whether intentionally by the pilots or automatically by the airplane -- the:  Autopilot disengage warning tone sounds for a minimum of two seconds.

Right?

A.    That is how it reads, yes.

CAPTAIN VICKIE RENEE NORTON

41

Q.    Is that consistent with your understanding of how the autopilot disengage switch operates?

A.    It is.

Q.    And I assume that if United's materials aren't exactly the same, best of your recollection, that's the information you've learned as a 737 captain?

A.    That is -- it's the information I know to be accurate, just based primarily upon, not what's in the manual, but operating the aircraft.

Q.    And so that means you hear the autopilot disengage warning tone on nearly every 737 flight, right?

A.    At some point, yes.

Q.    And that's because on most 737 flights -- or possibly every 737 commercial flight -- the autopilot is used at some point.

And when you disengage it, the warning tone sounds, right?

A.    That's correct.

Q.    And fair to say that you have heard that warning tone at least hundreds, and maybe

CAPTAIN VICKIE RENEE NORTON

42

even thousands, of times?

A.    I would go with thousands.

Q.    And when you hear that autopilot disengage warning tone, you immediately know what it is and what it means, right?

A.    I do.

Q.    Because you've heard it thousands of times during operation, right?

A.    That's correct.

Q.    There is other warning tones that you may not hear frequently during operation, but you do hear them during training, right?

A.    That's true.

Q.    So, again, even though you perhaps haven't heard them thousands of times in line operation, you still immediately know what they mean, right?

A.    It would be more helpful to talk about them specifically.

But generally I'd agree with that.

Q.    Sure.

And we will talk with them specifically in just one moment.

And is it fair to say that you are

CAPTAIN VICKIE RENEE NORTON

43

actually required to know almost immediately what they mean in order to work as a 737 captain?

MR. GREEN:  Objection to the form.

A.    I think that's fair.

Q.    So why don't we talk about some of those specific warnings?

The acronym GPWS stands for Ground Proximity Warning System?

Is that right?

A.    That's correct.

Q.    And the GPWS provides aural warnings to the pilots to help them avoid collisions with terrain, right?

A.    That's correct -- terrain and obstacles.

Q.    And there is a number of different aural GPWS warnings that tell the pilot of different potential issues related to obstacles or terrain, right?

A.    Correct.

Q.    So essentially, different flight scenarios create or trigger certain different GPWS aural warnings, right?

CAPTAIN VICKIE RENEE NORTON

44

A.    It's a little more complicated than that, but that's the 30,000-foot view, yes.

Q.    Is there amendment to that you'd like to offer?

I want to make sure that we're getting your understanding down correctly.

So maybe from a 10,000-foot level, what would your understanding be?

A.    That there is an associated time component to some of the warnings is really just what I was thinking.

And there is, you know, enhanced ground proximity warnings that are also associated with the system as it was modified and upgraded, if you will.

Q.    When you say, "there is a time component," does that mean there is essentially different levels of urgency or need for action depending on the warning?

A.    Yes, sir.

Q.    And the system will give you a different spoken warning, depending on that different level of urgency, correct?

MR. GREEN:  Objection to the form.

CAPTAIN VICKIE RENEE NORTON

45

A.     That's correct; and in addition to whether the -- whether you are taking corrective action in a timely manner or not.

Q.     And to be clear, when we are talking about GPWS aural warnings, those are spoken warnings, correct?

A.     Well, by virtue of your question, if it's an aural warning, then, yes, it's spoken. I mean, it's audible.

Q.     And to be clear -- for you and for the court reporter, since I'm probably not enunciating properly -- I'm trying to say aural warnings?

A.     Yes, A-U-R-A-L.

Q.     Yes.

A.     Yes, we agree.

Q.     Okay.

       And those aural warnings are spoken language, correct?

A.     That's correct.

Q.     So when you hear a specific GPWS aural warning, you know the specific condition that exists and how you need to respond to that condition, right?

CAPTAIN VICKIE RENEE NORTON

46

A.     That's correct.

Q.     And that's because you have been trained to know that through your initial type rating and then onward through your recurrent training, right?

A.     That's correct.

Q.     How about the stick shaker?

That warning is provided by the vibration of the control column, right?

A.     Yeah -- and I would say it's definitely shaking, as opposed to mild vibration.

Q.     So it's literally the control column that you use to pilot the airplane is vibrating quickly, correct?

A.     It's shaking.

Q.     Shaking.  Stick shaker.

A.     That's right.

Q.     And very noticeable, I assume?

A.     Very noticeable.

Q.     And something that, again, you immediately recognize the meaning of stick shaker, right?

A.     Yes, sir.

CAPTAIN VICKIE RENEE NORTON

47

Q.    And tell us:  What is the meaning of stick shaker?

What does that tell you about the condition of the airplane?

A.    That there is an impending stall condition.

Q.    And you are trained to recognize that immediately, right?

A.    That's correct.

Q.    Just to be clear, any noise from the stick shaker is just from that shaking, right?

Not from a separate aural alert?

A.    That's correct.  At the point -- yes, that's correct.

If you are just talking about the stick shaker activation, it has a noise associated with it because the shaking is very loud.  But there is no associated aural warning with the stick shaker.

Q.    Have you heard the overspeed clacker in training?

A.    I have.

Q.    Tell us:  What does the overspeed clacker mean?

CAPTAIN VICKIE RENEE NORTON

48

A.    It means that the aircraft has exceeded either VMO -- which is its maximum operating airspeed -- or MMO -- its maximum operating Mach speed -- depending on the altitude of the aircraft.

Q.    Again, that's a warning that you are trained to recognize essentially immediately, right?

A.    That's true.

Q.    And really, you are required to know what that means as a pilot, right?

A.    I would -- I would agree.

(Pause)

Q.    Would you please state and spell your full name for the record?

A.    Vickie -- V-I-C-K-I-E -- Renee -- R-E-N-E-E -- Norton -- N-O-R-T-O-N.

Q.    And you have been deposed before, right?

A.    Yes, sir.

Q.    So you are generally familiar with the ground rules, I take it.

We need to talk one at a time so that the court reporter can take down what we say and

CAPTAIN VICKIE RENEE NORTON

49

the transcript is clear.

All your answers must be verbal -- meaning if you agree, you need to say "yes," not just nod your head.

I'm going to try and ask clear questions, but if you don't understand what I'm asking, just ask me to clarify.

Appreciate you have already been doing that today, so thank you.

Otherwise, I'll just assume you understand.

Agree to all that?

A.     Agree.

MR. LEDFORD:  So I'm going to ask some questions.  Then plaintiffs counsel may ask some questions, and we'll go forward.

BY MR. LEDFORD:

Q.     You've -- or strike that.

Have you ever testified at deposition or trial other than as listed in your report?

A.     I think my report just covered -- we asked for the last -- it's a Rule 26 report so, to my understanding, I think we list the prior four years of testimony.

CAPTAIN VICKIE RENEE NORTON

50

Q.    Correct.

And so what I'm asking is:  Other than the -- it appears that you go farther back than four years.

So what I'm wondering is --

A.    Yeah.

Q.    -- are there other trial or deposition testimonies that you've provided going back, other than what's on this list?

A.    No, sir.

Q.    Have you ever had your expert opinion excluded by a court?

A.    I have not.

Q.    You were just mentioning Rule 26.

From your work as an expert over the years that -- you are well familiar with the disclosure requirements for expert witnesses?

A.    I believe so, yes.

Q.    Gone through it a few times, at least?

A.    A few times.

(Pause)

Q.    You are not a medical doctor, right?

A.    No, sir.

(Pause)

CAPTAIN VICKIE RENEE NORTON

51

MR. LEDFORD: So just to make sure that's all clearly reflected in the record, let me start that one over.

BY MR. LEDFORD:

Q. You are not a medical doctor, right?

A. That's correct.

Q. And you are not a biomechanical expert, right?

A. I am not.

Q. And I assume you have never used software to simulate the effect of acceleration forces on the human body, right?

A. I have not.

Q. And in this case, you were not tasked, I take it, with analyzing how the g-forces experienced during the flight would have affected the movement of passengers' bodies, right?

A. I was not asked to do that.

Q. And so you are not offering -- or strike that.

I take it, then, you did not do any analysis of how the g-forces experienced during the flight would have affected the movement of

CAPTAIN VICKIE RENEE NORTON

52

the passengers' bodies, right?

A.    I did not.

Q.    So you are not offering an opinion in this case about pre-impact injury to passengers or cabin crew, right?

A.    I am not.

Q.    So looking at your CV and your report, it appears you are not an acoustical engineer, right?

A.    I'm sorry.  Could you repeat that?

Q.    Sure.

So looking at your CV and your report, it appears that you are not an acoustical engineer.

Is that correct?

A.    That is correct.

Q.    And it does not appear that you have training or experience in psychoacoustics.

Is that also correct?

A.    That is correct.

Q.    And your report doesn't indicate that you took any acoustical measurements before preparing your report?

A.    That is correct.

CAPTAIN VICKIE RENEE NORTON

53

Q.   And so just to confirm -- so you did not take any acoustical measurements then before preparing your report, right?

A.   I did not.  That is correct.

Q.   And so, for example, to be more specific, you didn't take any acoustical measurements of the autopilot disengage warnings, or the stick shaker, or the overspeed clacker, or the GPWS warnings, right?

A.   That is correct.

Q.   And you didn't calculate the level of the noise signal on the flight deck at the pilots' ears, right?

A.   That is correct.

Q.   And you didn't calculate the effects of transmission loss of the intervening flight deck door, right?

A.   That is correct.

Q.   And so you also didn't calculate the effects of attenuation as a function of distance, right?

A.   That's correct.

Q.   And you didn't calculate the effects of acoustic absorption from intervening objects

CAPTAIN VICKIE RENEE NORTON

54

between the sound source and the sound receiver, right?

A.   That's correct.

Q.   And you didn't perform any analysis of auditory masking, right?

A.   Correct.

Q.   And you didn't calculate ambient noise levels in the cabin at the engine thrust levels and air speeds seen on the accident flight, right?

A.   Correct.

Q.   And you didn't perform any analysis of the audibility of aural warnings to the passengers, right?

MR. GREEN:  Objection to the form.

A.   Would you please repeat that?

Q.   Sure.

You didn't perform an analysis of the audibility of the aural warnings to passengers, right?

A.   That's correct.

Q.   And you didn't perform any analysis of the intelligibility to the passengers of any of the aural warnings that sounded in the cockpit,

CAPTAIN VICKIE RENEE NORTON

55

right?

A.    Correct.

Q.    And your report doesn't cite any data regarding the intelligibility to the passengers of any of the aural warnings that sounded in the cockpit, right?

A.    That's correct.  It does not.

Q.    So no acoustical engineering analysis, to sum up, right?

A.    I performed no acoustical engineering analysis?  That's the question?

Q.    Yes.

A.    I did not.

Q.    The CVR is the cockpit voice recorder, right?

A.    Yes.

Q.    And it records sounds from a number of microphones within the cockpit, right?

A.    That's correct.

Q.    And we don't have a copy of the CVR recording, right?

A.    That's not correct.  We -- and --

MR. GREEN:  The aural recording --

A.    -- the aural recording, that -- we

TC REPORTING
(516) 795-7444

have a copy of the CVR transcript, but not the actual aural recording.

Q.   And have you reviewed the CVR transcript?

A.   Just recently, yes.

Q.   When did you review it for the first time?

A.   Yesterday.

Q.   Are you aware of any noises from the cabin that were noted on the CVR transcript?

A.   Quite honestly, sir, in my cursory review of the transcript, I think that there is some reference to that.  I'd have to go through it to be able to answer it.

Q.   Do you have a copy of the CVR transcript with you?

A.   I do, sir.

Q.   Why don't you take a look at it?

And specifically what we're interested in -- or what I'm asking about are any noises from the cabin that were noted on the CVR transcript.

A.   Okay.  Give me a second, please.

(Pause)

CAPTAIN VICKIE RENEE NORTON

57

A.    In the format that I have -- and I'll just -- I have it as Exhibit 224 -- the -- there is a column E that is entitled:  ATC, Ground Staff, Cabin Crew, Others.

And it's chronological.

And I don't -- I don't see anything in that column in the entirety of the document that comports with what you are asking.

Q.    Just to be clear, you are reviewing a document that is Exhibit 224, did you say?

A.    Yes, sir.

Q.    And can you tell me what the Bates number is at the bottom?

A.    It's BOE_ETH_02194031, sheet 1.

Q.    May I see that copy?  Thanks.

MR. LEDFORD:  To be clear for the record, it's an exhibit previously marked in this case Exhibit 224.

CAPTAIN VICKIE RENEE NORTON

58

(Previously-marked Exhibit 224, Document Bates stamped BOE_ETH_01457362, 1458081, two-page document bearing heading on first page: Federal Aviation Administration Technical Familiarization Meeting, Type Validation of Boeing 7 737-8 Model Airplane, Agenda, dated April 3, 2017, introduced)

MR. GREEN: Do you want to take a break and make a copy of it?

MR. LEDFORD: No, that's okay. I've got one.

Although would you like a copy of it for -- I am going to ask some questions about it, so if you want to take a quick break and we can make a copy?

MR. GREEN: Yeah, why don't we take a break? We've been going almost an hour.

MR. LEDFORD: Yeah, let's go off the record.

THE VIDEOGRAPHER: This is the end of media file number 1. We are going off the record. The time is 10:01 a.m.

(Recess from 1:01 p.m. to 1:15 p.m. Eastern Standard Time)

TC REPORTING
(516) 795-7444

CAPTAIN VICKIE RENEE NORTON

59

THE VIDEOGRAPHER:  This is the beginning of media file number 2.  We are now going on the record.  The time is 10:15 a.m.

BY MR. LEDFORD:

MR. LEDFORD:  Ms. Norton, I would like you to look at the third full paragraph of page 8 of your report, which, again, is Exhibit 286.

(Pause)

THE WITNESS:  I am ready.

BY MR. LEDFORD:

Q.    And this is the paragraph that begins:  At 8:40:43 a.m., the captain and first officer.

But I want to direct your attention to -- about halfway through the paragraph, it reads:  It is critical to note that both crew members had to work together just to keep the aircraft climbing, directed by the captain who loudly yelled -- quote -- "PULL UP" -- unquote -- to the first officer three times. These heated commands, as well as subsequent verbal cockpit exchanges that had occurred as the pilots struggled for control for the duration of the flight would have also been heard by the front passengers, at a minimum.

CAPTAIN VICKIE RENEE NORTON

60

Did I read that correctly?

A.    Yes, sir.

Q.    So you say that the captain -- quote --"loudly yelled," and that these were -- quot4 -- "heated comments," right?

A.    That is how it reads, yes.

MR. LEDFORD:  I would like you to look at the copy of the transcript that is Exhibit 224.

And I believe on page 3 of that transcript, you will find the relevant time entry.

BY MR. LEDFORD:

Q.    So, again, you had not had an opportunity to, or had not looked at that transcript before drafting your report, right?

A.    That's correct.

Q.    And have you been able to locate the relevant time entry on the CVR transcript that corresponds to the section that I just read from your report?

A.    I have.  It looks like there is a one-second discrepancy, but I think we are in the same -- we are on the same literal page.

CAPTAIN VICKIE RENEE NORTON

61

Q.   And that one-second discrepancy is that, in your report, it's described as 8:40:43 a.m.

And on the CVR transcript, it is 5:40:44, which I think accounts for the time difference plus that one second.

Is that right?

A.   Right.  That's UTC versus local time, correct.

Q.   So that -- 43 seconds in the report and 44 seconds on the transcript, so at the same time period that we are talking about, right?

A.   I agree.

Q.   And what is the -- what is the statement in the transcript?

Can you read that for us?

A.   The captain -- the captain's statement is, "Pull up, pull up, pull up."

And the first officer replies, "Pull up."

Q.   And the first letter of each of those entries, the "Pull" is capitalized, right?

So capital "P," lowercase "ull," then the rest is in lowercase, right?

TC REPORTING
(516) 795-7444

CAPTAIN VICKIE RENEE NORTON

62

A.    That is how it appears on the cockpit -- on Exhibit 224, yes.

Q.    No -- no statements, or no note about yelling, right?

A.    That's correct.

Q.    And nothing about the comments being heated, right?

A.    That's correct.

Q.    So in your report, Appendix B, you list materials and data considered, right?

A.    Correct.

Q.    And in that list you, have number 2: Federal Republic of Ethiopia Ministry of Transport Aircraft Accident Investigation Preliminary Report.

      And number 8:  Ethiopian Civil Activation Authority Aircraft Accident Investigation Interim Report.

      Right?

A.    Correct.

Q.    And so is your understanding that those are essentially both a preliminary report that was issued shortly after the accident, and then an interim report that was issued about a

CAPTAIN VICKIE RENEE NORTON

63

year after the accident?

    A.    That's my understanding, yes.

    Q.    And you've reviewed both of those?

    A.    I have.

    MR. LEDFORD:  I'm going to have my colleague pull up first the document number 2, the preliminary report.

    And this will be Exhibit 288, I believe.

    (Exhibit 288, Document Bates stamped BOE_ETH_03284280 through 03284312, multipage document entitled: Federal Democratic Republic of Ethiopia Ministry of Transport Aircraft Accident Investigation Preliminary Report, marked for identification)

    (Pause)

BY MR. LEDFORD:

    Q.    And is this the preliminary report?

    Or does it appear to be the preliminary report that you reviewed?

    A.    Yes, sir.

    Q.    Okay.

    MR. LEDFORD:  I'm going to have my colleagues go to page --

CAPTAIN VICKIE RENEE NORTON

64

(Pause)

MR. LEDFORD: -- page 11, yes. Thank you.

BY MR. LEDFORD:

Q. And in roughly the middle of the page, there is a paragraph that says: At 5:40:44, the Captain called out three times -- quote -- "Pull-up" -- unquote -- and the First-Officer acknowledged.

Did I read that correctly?

A. You did.

Q. And there is no indication about a loud yell in this paragraph, right?

A. Well, I believe that the verbiage said the captain called out three times, "Pull up," and the first officer acknowledged.

I -- that's how I read it.

Q. It doesn't say "loudly yell," right?

A. It does not use the adjective "loudly."

Q. And your interpretation of "called out" is that the captain was yelling?

A. Quite honestly, sir, in context, I think it's far more likely than not that the

CAPTAIN VICKIE RENEE NORTON

65

captain was yelling that command, yes.

Q.   So that's something from context.
That's not in the report, right?

A.   The verbiage is not -- it doesn't
reference yelling.  That is correct.

Q.   And that is -- so that's your
interpretation.
But it does not specifically state in
the report that the captain was yelling,
correct?

A.   That's correct.

Q.   If the captain was yelling, would you
expect it to be noted in the CVR transcript?

A.   Not necessarily.

Q.   Are you aware if the CVR transcript,
in fact, notes instances where the captain was
yelling?

A.   If you will give me one moment, I will
answer that.
There are some editorial comments,
especially toward the end of the transcript,
that make notations of sounds that are being
heard -- if that answers your question.

Q.   Does it specifically note when there

CAPTAIN VICKIE RENEE NORTON

66

is yelling or other apparently louder noises?

(Pause)

A.    Well, I think it leaves -- it lends itself to some interpretation with regard to when capitalization was being used; when exclamation points are being used; when there are clarifying remarks in parenthesis, etc.

But I didn't draft this document, so I -- that's about all I can is tell you what -- what's on it.

Q.    And you hadn't heard the CVR recording itself, right?

A.    I have not.

Q.    Would you agree that it makes sense that on the CVR transcript where the letters are capitalized, that likely indicates a more forceful statement?

Or a louder statement?

A.    Again, I --

MR. GREEN:   I need to object:   Beyond the scope and calls for speculation in terms of her experience --

A.    Yeah, I would have to -- again, as I didn't draft this document, I would have to

understand what was in the mind of the person who did with regard to how we should interpret the use of capitalization, and exclamation points, and the like.

Q. Have you ever participated in an accident investigation CVR working group?

MR. GREEN: Objection to the form.

A. I would have to -- I believe in my time at McDonnell Douglas, I sat in the room while they were participants.

But I didn't -- I wasn't an active participant, but I was allowed to observe.

Q. So you mentioned earlier that you were interpreting the statements in context.

Is it your understanding or your belief that, where the CVR transcript uses all upper-case letters, that likely indicates a louder voice than lower-case letters?

MR. GREEN: Object to the form, calls for speculation.

A. Again, sir, since I didn't draft it, I don't -- I don't know what the meaning of uppercase versus lowercase is, so I really can't answer.

CAPTAIN VICKIE RENEE NORTON

68

Q.   So just to be clear, I'm not asking you to speculate about what the working group actually did.

I'm just wondering about your interpretation of the CVR transcript.

A.   Well, I think I have a unique interpretation of the transcript because I put myself in the captain's seat as I read it.

A mere 17 seconds before the 5:40:44 entry, the captain is pleading for the first officer to:  Trim, trim, trim with me, trim with me, trim with me, trim, trim up.

I think it's more likely than not; and unrealistic to think that those pleadings weren't done in a -- in a tone of voice and a volume that suggested that the captain knew that -- that he was in trouble, that the aircraft was in trouble.

And I don't believe that it's reasonable to assume that those comments -- those pleadings -- would be made in a low volume.

Q.   And how did you determine that it would have been loud yelling?

CAPTAIN VICKIE RENEE NORTON

69

A.    Exactly what I just -- exactly what I just said.

In addition, there -- there were alerts that had been going off in the cockpit.

My understanding is the stick shaker continued for the duration of the flight.  My own personal knowledge is that's very loud.  I think you would have to yell to be heard over the stick shaker.

But my interpretation of this document is that they were in peril.  And I believe it's more reasonable than not to assume that once again, the volume was quite elevated.  And I think "yelling" is a fair description of my interpretation of what would have been going on.

Q.    In your interpretation, is there a difference between using lowercase letters and uppercase letters to indicate speech?

MR. GREEN:  Objection to the form, calls for speculation.

A.    I don't -- I don't have an opinion other than the one I've already offered.

Q.    When you are describing speech, if you put something in all caps, does that indicate a

CAPTAIN VICKIE RENEE NORTON

70

louder tone than if it's not in all caps?

A.    I -- I don't -- we would have to be more specific with regard to the document I was -- if I was writing a document, if I was writing a -- I mean, it's typically not how I -- if I needed a descriptor, I think I personally might do it differently.

But, you know, once again, this is not my document.  So --

Q.    Fair enough.

So -- and what I'm -- let's take a specific example.

The phrase "pull up" in lowercase letters -- do you consider -- so putting the transcript aside -- if you were describing it, would a lowercase "pull up" be different than an uppercase "PULL UP"?

MR. GREEN:  Objection to the form.

A.    Again, I think I've testified that I wouldn't necessarily used lowercase versus uppercase to make a distinction if it -- if it were me.

But, I mean, it's sort of an abject hypothetical because I didn't -- you know, I

don't actually create documents that are transcripts of cockpit voice recordings, so I -- yeah.

Q. You'd agree from your review of that CVR transcript, though, that the team that put that together was capable -- and, in fact, did -- indicate where there was a certain tone to the voice --

A. In --

Q. -- right?

MR. PITRE: Objection, speculation.

MR. GREEN: I'm going to join that objection.

A. In some instances, it appears that they did.

I don't necessarily -- I would have to speculate that in other cases where it may have been appropriate, they may have either omitted doing so, or for whatever reason didn't do so.

Again, my interpretation of the document comports with my understanding and belief of sitting in that seat and experiencing the absolute chaos that was occurring in the cockpit.

And I don't believe it would have been a -- I don't believe they would have been speaking to one another the way you and I are right now.

MR. LEDFORD: Let's look at the interim report as well. So I'll ask Mr. Clackley to pull that up.

(Exhibit 289, Document Bates stamped BOE_ETH_02311317 through 02311454, multipage document entitled: The International Civil Aviation Organization, National Transportation Safety Board (United States of America), and Bureau of Enquiry and Analysis for Civil Aviation Safety (France) Interim Investigation Report of Accident 737-8 MAX ET-AVJ, ET-302, dated March 9, 2020, marked for identification)

(Pause)

MR. LEDFORD: We are going to look at the same time period. I believe that is on page 18 of the interim report.

(Pause)

BY MR. LEDFORD:

Q. At the paragraph beginning at 5:40:45 --

CAPTAIN VICKIE RENEE NORTON

73

A.    I see it, yes.

Q.    -- it says:  At 5:40:45 the captain requested the first officer to pull up with him ("Pull with me").  Both pilots applied force on the control column.

Did I read that correctly?

A.    You read that correctly.

Q.    Again, it looks like there is a second differential.  Now it reads "5:40:45" instead of "5:40:44."

Does that appear to be still the same time period that we are talking about?

A.    It does appear to be the same time period.

Q.    And no notation here that the pilot was loudly yelling, correct?

A.    Well, sir, quite honestly, there is a discrepancy as well with -- I don't see in the -- in what we've labeled Exhibit 224, it doesn't read -- it doesn't comport with the -- "Pull with me" is in the interim report.

However, that is not what is stated that the captain said in the CVR transcript.

So it appears that there is some

CAPTAIN VICKIE RENEE NORTON

74

discrepancies throughout.

Q.    Since you had not seen the CVR transcript until yesterday, which document did you base your report on? -- specifically discussing this exchange?

A.    I believe my report says that I based it on the preliminary report, versus the interim report.

Q.    And that was the first electronic document we looked at, the one that says:  The captain called out three times -- quote -- "Pull up" -- unquote -- and the first officer acknowledged.

Right?

A.    Correct.

Q.    Okay.

So you weren't on the CVR working group, right?

A.    That's correct.

Q.    So -- and you've never heard the CVR recording itself, right?

A.    I have not.

Q.    And looking at your list of materials reviewed, it also appears you did not review the

CAPTAIN VICKIE RENEE NORTON

75

transcript of the person who was deposed in this case who was on the CVR working group, and did listen to the CVR, right?

A.    I have not.

Q.    And so you are not aware of how he described that working group performed its transcription task?

A.    That's correct.

Q.    And so you are not aware of how he described how they would make these notations in the CVR transcript, right?

A.    That's correct.

Q.    And you are not aware how that CVR working group created the documents that were then used in the preliminary and interim reports, right?

A.    I am not aware specifically.

I am aware of the general process, but in this case, I am not aware of specific documents that were used.  That's correct.

(Pause)

Q.    So I want to circle back around to this -- I still don't fully understand the question -- sorry.

CAPTAIN VICKIE RENEE NORTON

76

I still don't fully understand the answer, and so I'm going to try and ask a better question -- a more clear question.

Would you personally, if you are writing something -- I'm not asking about what the CVR working group did -- I'm asking about if you were writing something, would you take a document where a phrase is in lowercase and would you put it into uppercase in your document?

MR. GREEN:  Object to the form.

A.    I just think it's too generic a question to answer.  I don't know what the document is.

You are saying that I'm authoring a document, but I'm also taking something from another document and changing it.

I mean, you would have to be more specific for me to be able to answer.

Q.    Sure.  Let me be more specific, then.

So looking at the preliminary report, which you said was the source for the "loudly yelling" interpretation, right?

In that section we read, the -- quote

CAPTAIN VICKIE RENEE NORTON

77

-- "Pull-up" is uppercase "P," lowercase "ull," lowercase "-up," right?

A.     Are you saying that that's how it is typed in the preliminary report?  Yes.

Q.     Exactly.

A.     Yes.

Q.     Okay.

So looking at page 8 of your report, you've used a -- quote -- "PULL UP," and it's all in caps, right?

A.     That's correct.

Q.     So would you say it's not appropriately all in caps in your report and that was a mistaken transcription?

A.     No, I wouldn't say that.

I would say that I was attempting to differentiate -- to make the verbiage stand out, if you would -- as compared to what's in the rest of the paragraph.

I also -- the preceding first part of that -- the first part of that sentence also -- I noted that it -- I felt it was critical that both crew members -- the captain by himself could not keep this aircraft climbing.  That

CAPTAIN VICKIE RENEE NORTON

78

is -- not only is that unusual, it's -- would have been so far out of the norm and, quite honestly, it would have been terrifying, had I been the captain.

So to -- to think that he is pleading for help from his first officer to help him get this aircraft climbing again, and that it would be said in a monotone or, again, the way you and I are speaking to one another, is just -- I find it quite unfathomable.

I -- the tension and stress in that cockpit during that time would have been overwhelming.

And if -- I have never had to ask in over 32 years of flying any aircraft someone else to assist me to stop the aircraft from diving into the ground.

So I don't put -- I understand your question.

I don't put much emphasis on the fact that I used all caps. I put emphasis on the fact that I'm trying to explain how critical and how dire the situation was in the cockpit at that moment; to differentiate the verbiage from

CAPTAIN VICKIE RENEE NORTON

79

the font that's in the rest of the paragraph.

Q.    The all caps is used to differentiate and essentially reflect your interpretation that there was loud yelling.

Is that fair to say?

A.    I think that's fair.

Q.    And that's different than what's in the preliminary report, though, right?

MR. GREEN:  Object to the form.

MR. PITRE:  Objection --

MR. LEDFORD:  I'll withdraw it. That's fine.

(Pause)

BY MR. LEDFORD:

Q.    We've already talked a little bit about the CVR transcript and also the preliminary and interim reports.

Am I correct that there is no indication in the CVR transcript or the preliminary or interim reports of sounds that were heard in the cabin, right?

MR. GREEN:  Objection to the form.

MR. LEDFORD:  Let me rephrase that, because I do want to make sure that --

CAPTAIN VICKIE RENEE NORTON

80

BY MR. LEDFORD:

Q.     I understand that you have opinions about -- you've expressed opinions about what the passengers would have heard.

What I'm -- I'm not trying to ask you about those.

I'm just trying to make sure we are all on the same page that you are not aware of any specific evidence about what passengers heard?

A.     With regard --

MR. GREEN:  Just objection to the form.

Go ahead.

A.     -- with regard to what's in the CVR transcript specifically?

Q.     Hm-hmm.

A.     Yeah -- it's little difficult because in column E here, they lump several things together.  There is:  ATC, Ground Staff, Cabin Crew, Others.

And then there is verbiage in that that goes along with -- and I can tell, obviously, what's ATC and what's not just by my

CAPTAIN VICKIE RENEE NORTON

81

experience.

The only other things that show up on the CVR transcript in that column are two different areas where there is an asterisk with no associated verbiage.

So I -- I mean, obviously speculating as to those: 5:39:10 is the UTC time of the first, and then 5:42:41 is the UTC time of the second.

I -- because there are multiple -- you know, ATC, ground staff, cabin crew, others is combined -- I can't speculate as to whether that was something heard in the cabin or something else, because it doesn't -- it's not explained.

Q. Okay.

But is it your belief that any of those -- well, let me strike that.

So you reviewed that for the first time yesterday.

In drafting your report, you -- I take it -- were not -- or did not believe there is any specific evidence or specific documentation of noises heard by passengers in the cabin, right?

CAPTAIN VICKIE RENEE NORTON

82

A.    I reviewed no such evidence in preparation for my report.

(Pause)

Q.    And so when we look through your report, starting on page 6, you provide a description of the accident flight.

And its section 4.0 Sequence of Events.

Is that right?

A.    That's correct.

Q.    And then that goes on through page 9 where you lay out the various events that occurred during the flight.

Is that correct?

A.    I mean, certainly some components of the flight, not -- not in its entirety.  It's not all-encapsulating -- but, yes, that's what I attempted to do.

Q.    Not an exhaustive list, but you are -- as the heading suggests -- describing the sequence of events during the accident flight as you understand it?

A.    Correct.

Q.    And that's based, I think you say, on

CAPTAIN VICKIE RENEE NORTON

83

the Ethiopian accident investigation board's preliminary report, right?

A.    Yes.  The time -- and I make note that the time references are used, so that this is from the preliminary report, yes.

Q.    And in that sequence of events, you identify a number of events that occurred in the cockpit, right?

So, for example, warning sounds? --

A.    Sure.

Q.    -- alerts?

Any lights or visual -- in the cockpit would not have been perceived by anybody in the passenger cabin, right?

A.    Would you repeat that? --

Q.    Sure.

And I'm try to be very specific here --

A.    Okay.

Q.    -- because I know we have separately talked about aural alerts.

A.    Okay.

Q.    I'm just talking about any lights or other types of visual annunciations in the

CAPTAIN VICKIE RENEE NORTON

84

cockpit.

Those would not have been perceived -- and could not have been perceived -- by anybody in the cabin, right?

A.    That's correct.

Q.    And that's because there is a door between the cockpit and the cabin that's required to be shut during takeoff, right?

A.    And most other phases of flight, yes, that's correct.

Q.    So while the effect of movement of the flight controls may have been perceived by the passengers in the cabin, the actual physical movement of those flight controls by the pilots could not have been perceived by anybody in the cabin, right?

MR. GREEN:  Objection to form.

A.    Yeah -- I would say I don't agree with "perceived."

They wouldn't be directly observable.

Q.    Understood.

So -- and like I said, I'm not trying to get at whether or not they would have felt the effects of the movement of the flight

CAPTAIN VICKIE RENEE NORTON

85

controls.

What I'm getting at is trying to see whether you agree that they would not have been able to watch the flight controls be moved.

Is that fair?

A. I agree. That's fair.

Q. And same for the operation of any flight control system, right?

The effect might be perceived, but not the actual operation in the cockpit?

A. Would not be able to be observed.

Q. Observed by the passenger cabin?

A. I agree.

Q. And so do I understand your report correctly then as saying that certain sounds from the cockpit would have been heard in the cabin, but otherwise passengers would not have been able to observe what was occurring in the cockpit?

A. I agree, yes.

(Pause)

MR. LEDFORD: So I want to look again at Exhibit B to your report. It is the List of Materials and Data Considered.

TC REPORTING
(516) 795-7444

CAPTAIN VICKIE RENEE NORTON

86

THE WITNESS:  Okay.  All right.

(Pause)

BY MR. LEDFORD:

Q.    And so earlier in your report, I believe you indicated that you were aware that Mr. Charles Pereira had looked at specific FDR data, but I don't see Mr. Pereira's materials actually listed in Appendix B.

Is it fair to say that you didn't actually review the specific FDR data in its raw or Excel format as part of your work?

A.    That is -- that is exactly right, nor did I consider it.

Q.    I see under document 4 in Appendix B, it says:  Ethiopian Airlines Flight 302 Accident Animations/Recreations.

So which animations or recreations are those?

A.    That is the Boeing -- the actual Boeing animation, if you will.

Quite honestly, I think I made it plural because there were multiple things going on.

But really the intent is that it -- it

CAPTAIN VICKIE RENEE NORTON

87

was just the Boeing-provided animation.

Q.    I see.

And that is the one that was produced by Boeing in this case?

A.    That is my understanding, yes, sir.

Q.    And that is the animation that illustrates the primary flight displays and various other flight parameters? --

A.    It overlays the cockpit visuals, the -- with the power settings, and some other things off to the side.  There is a lot going on at once.  But --

Q.    Have you reviewed any other animations or recreations as part of your work?

A.    I have not.

Q.    Have you participated in the creation of any animations or recreations as part of your expert work in this matter?

A.    I have not.

(Pause)

Q.    Number 6 says:  Playback of Flight ET302.

Can you tell me what that is?

(Pause)

CAPTAIN VICKIE RENEE NORTON

88

A.    You know, I'm just going to say it:  I may have misspoken about number 4.

I -- there are -- well, there are videos.  But I feel like as I sit here, the Playback of Flight ET302 is the same -- it's the Boeing animation, if you will, or recreation if you will.

I'm having a hard time making a distinction between 4 and 6 as I sit here.  So --

Q.    Well, let me try -- just to make sure that I understand and maybe close out this line of questioning, are you offering expert testimony regarding the accuracy or the appropriateness of any animations in this case?

A.    I am not.

(Pause)

Q.    We talked earlier about Rule 26.

I take it you are aware, since you do know the rule, that your report has to contain a complete statement of all opinions that you are going to express, and the basis and the reasons for them, right?

A.    I'm aware of that.

CAPTAIN VICKIE RENEE NORTON

89

Q.    And you are also aware that the report must contain the facts or data considered by you in forming those opinions, right?

A.    I would say:  With the caveat that if I become -- if I receive any information that I haven't previously reviewed, that would impact my opinions in some form.

Other than that, I agree.

Q.    Understood.

And also that the disclosure has to include any exhibits that would be used to summarize or support your opinions.

Do you understand that as well?

A.    I do.

Q.    And it's your understanding, I take it, that you have complied with that rule in your report?

A.    I believe I have, yes.

MR. LEDFORD:  I may be done.  If I do have any more questions, they are going to be very brief.  So I if could -- maybe if we could go off the record?

THE VIDEOGRAPHER:  This is the end of media file number 2.  We are now going off the

CAPTAIN VICKIE RENEE NORTON

90

record.  The time is 10:55 a.m.

(Recess from 1:55 p.m. to 2:12 p.m. Eastern Standard Time)

THE VIDEOGRAPHER:  This is the beginning have media file number 3.  We are now going on the record.  The time is 11:12 a.m.

BY MR. LEDFORD:

Q.    Ms. Norton, I'm nearly finished, I have just a couple of questions I want to ask to make sure that I understand your earlier testimony.

So I think we talked earlier about the fact that things like visual annunciations in the cockpit would not have been observable to the passengers in the cabin, right?

A.    We did talk about that.

Q.    So you recall that.

MR. LEDFORD:  I want to ask you about a couple specific examples from your report to make sure that we are talking about the same sorts of things --

THE WITNESS:  Okay.

MR. LEDFORD:  -- so, for example, page 7, second full paragraph of your report.

CAPTAIN VICKIE RENEE NORTON

91

(Pause)

THE WITNESS:  Okay.

BY MR. LEDFORD:

Q.    So -- and this is the paragraph that begins:  At 8:37:51 a.m., the pilots were cleared for takeoff.  The captain pushed forward on the throttles, increasing the engine power to the required takeoff setting.

So, for example, the captain's action in pushing forward on the throttles would not have been directly observable by the passengers, correct?

A.    Correct.

Q.    They would have felt the resulting thrust as the airplane accelerated, but they would not have been able to observe the captain actually advancing the throttles, right?

A.    That's correct.

(Pause)

MR. LEDFORD:  Direct your attention down to the paragraph beginning with:  At 8:39:23 a.m.

THE WITNESS:  Okay.

CAPTAIN VICKIE RENEE NORTON

92

BY MR. LEDFORD:

Q.   It says:  At 8:39:23 a.m. the crew was finally able to successfully engage the autopilot and also retracted the flaps.

So let me ask you this:  How do you engage the autopilot on a 737 MAX?

A.   On the -- what we call the mode control panel, closer to the first officer's side, there is an autopilot A and an autopilot B.

The captain, as flying pilot, would have reached up and pushed forward on the A under the autopilot 2.

And then if it takes -- if the autopilot connects -- then we subsequently check for our -- CC CMD in green -- and a green bar meaning the autopilot A is in command.

So we push.  If the autopilot does engage, then we just verify.  So we call it the rumor and then the fact; you know, push the button and it lights up.

But we have to look for the presence of command and a green box to know that, in fact, the autopilot engaged.

TC REPORTING
(516) 795-7444

CAPTAIN VICKIE RENEE NORTON

93

Q.    The action the pilot took to push the button, and then the visual indication that the autopilot had engaged -- those are the types of things that would not be directly observable to a passenger or a flight crew member sitting in the cabin, correct?

A.    That's correct.

(Pause)

Q.    Then one more example.

In the paragraph we've looked at previously -- this is on page 8, the one beginning:  At 8:40:43 a.m. the captain and first officer pulled back on the yoke simultaneously with enough force to pitch the aircraft up to continue to climb.

So, again, the passengers would have been able to feel the pitch up -- right? -- that resulted from pulling on the yoke, or the control column?

But the passengers would not have been able to observe pilots actually pulling on the control column, right?

A.    I agree with that.

(Pause)

CAPTAIN VICKIE RENEE NORTON

94

Q.    You discuss in your report sounds that, in your opinion, would have been heard in the passenger cabin during the accident flight, right?

A.    Correct.

Q.    Do you have personal experience sitting in the passenger cabin and hearing -- let me strike that.

Do you have personal experience sitting in the passenger cabin of a 737-8 MAX aircraft hearing the autopilot disconnect sound?

(Pause)

A.    I do.

Q.    Tell me about that experience.

A.    I have been seated both closer to the cockpit -- first, second row.

If I'm using the term "deadheading," are you familiar with traveling in the back for work, being repositioned to from one city to another --

Q.    Yes.

A.    -- so I can operate the aircraft out of destination?

First class is an anomaly for us now.

CAPTAIN VICKIE RENEE NORTON

95

But occasionally, we still are seated up there if passenger loads accommodate.

And I have, on multiple occasions, heard the autopilot disconnect horn from both -- in various seats in first class in the United configuration, as well as the first row or two of the passenger cabin, depending on ambient noise, etc.

Q. Specifically on a 737-8 MAX airplane?

A. Yes.

Q. And so that has all been within what time period?

A. Well, the aircraft was grounded, as you know, for quite some period of time.

But for the -- and I can't -- I'm speculating the period of time that United had the aircraft in use prior to the grounding, and then subsequent to its -- I was an Airbus captain at that time prior to the grounding.

But I had ridden in the back on the MAX as well as the more extensive experience has been since the grounding was lifted and I have been operating the aircraft, as well as deadheading around in the back.

CAPTAIN VICKIE RENEE NORTON

96

Q. So I'm -- just to be clear, I'm specifically asking about your experience being in the passenger cabin, hearing the autopilot disconnect sound.

How many times would you say you have heard that on a 737 MAX as a passenger?

A. Four to six times.

Q. What phases of flight did those events occur?

A. I would say exclusively descent and preparation for approach and landing.

At some point during the descent -- flying pilot's discretion -- but as we discussed earlier, autopilot was successfully engaged, being used. And at some point during the descent and/or approach phase, it's disconnected intentionally so the flying pilot can hand fly.

(Pause)

BY MR. LEDFORD:

Q. So this is probably going to seem like the world's most obvious question to somebody who has been a United pilot for the last 27 years.

But for the rest of us who are not

CAPTAIN VICKIE RENEE NORTON

97

pilots, I assume that the engine thrust levels are generally much less on descent than they are on climb?

A.    That's -- it's not -- that's a good question.

Of course, we pull the throttles.  And the most efficient way to descend is an idle thrust descent -- having them all the way back, which is the most fuel efficient.

But at some point in every descent and approach, we level off again, which means we add a little power.

But typically on descent, the thrust -- the noise from the engines is less than on takeoff.  That's a true statement.

Q.    And so I think we talked about earlier how you hadn't done an acoustical analysis.

Fair to say you have not done an acoustical analysis assessing the different ambient noise levels of a descent power setting and speed versus a takeoff power and speed?

A.    I think we have to be clear when we use the word "analysis."

I get to analyze it on every flight --

TC REPORTING
(516) 795-7444

CAPTAIN VICKIE RENEE NORTON

98

right? -- every time I either sit in the front or the back, and various places throughout the passenger cabin, so in some regard I am the analysis.

If you are talking about a specific -- did I get a -- did I take measurements at various phases using equipment? No, I have not.

But I have extensive experience sitting from the nose of an aircraft all the way to the back. So I think I've -- I think I've done analysis, depending on how we are going to define it.

Q. It's a fair question.

My intent in asking about the analysis is: Have you done any measurement or calculation of the differences in the ambient noise levels as compared between an idle descent setting versus the takeoff power settings?

A. I have not.

Q. And to the best of your recollection, those events where you heard the autopilot disconnect warning were during an idle descent.

Is that right?

MR. GREEN: Objection to form.

CAPTAIN VICKIE RENEE NORTON

99

A.    No, I believe that misstates what I said.

It's during the approach -- descent and approach phase of flight.

If -- I think I understand your question.

I'm not saying that it's solely when the thrust is at idle.

Oftentimes, in fact, I would say that it's probably more rare for a flying pilot -- in my experience, and it would be more rare for me to do it -- to disconnect the autopilot during that idle descent.

I would have already done it, probably; or it's more likely that when I level off at some interim altitude on the descent or approach, I announce to the other pilot.

You know, we say things: "I have the aircraft," or "This is autopilot autothrottle coming off," but there is some power in when that happens -- I would say more often than not.

Q.    I think I understand.

So in that case, is it fair to say that the times when you have heard the autopilot

CAPTAIN VICKIE RENEE NORTON

100

disconnect, the engine power settings were lower than during takeoff?

A. Well, considering that, you know, takeoff power -- whether it's a maximum thrust takeoff, or even a reduced thrust takeoff -- is -- is -- still -- I mean, the nuance is certainly than a maximum thrust takeoff.

If I'm -- if I have commenced a descent, and I'm asked to level off at 12,000 feet, but yet maintain 320 knots -- which Chicago will routinely ask us to do if we are behind, or to close up gaps -- there is a fair amount of engine power in there.

Can I quote you numbers? Is it 84.8% N1? I can't do that.

But there is still some substantial thrust being demanded from the engines to maintain that airspeed at that altitude.

Q. Is it takeoff thrust?

A. No, it's not.

But as I just said, I can't -- I'm not going to give you an estimate of a percentage difference from takeoff thrust, but it's a substantial amount of thrust.

TC REPORTING
(516) 795-7444

CAPTAIN VICKIE RENEE NORTON

101

People are -- slightly aft of the engines and to the back of the airplane are going to be much more impacted by thrust settings in general than are people forward of the engines as well.

Q. You haven't done any measurement or calculations, though, of exactly how much they would be impacted, right?

A. I have not.

Q. So we have talked about autopilot disconnect.

How about stick shaker?

Have you ever heard stick shaker in the passenger cabin of a 737-8 MAX?

A. Blessedly no, I have not.

Q. Have you ever heard the overspeed clacker while in the passenger cabin of a 737-8 MAX?

A. I have not.

Q. Have you ever heard a GPWS warning during flight from the cabin of a 737-8 MAX?

A. I have not.

(Pause)

MR. LEDFORD: I think my last

TC REPORTING
(516) 795-7444

CAPTAIN VICKIE RENEE NORTON

102

questions are just returning briefly to the --
that same paragraph that we talked about
earlier, the one beginning "At 8:40:43 a.m." on
page 8 of your report with regard to the "Pull
up" callout by the captain.

BY MR. LEDFORD:

Q.    So you'd agree that the preliminary
report which you based this description on
states that -- quote -- "the captain called out
three times" -- quote -- 'Pull up' -- unquote --
and the first officer acknowledged" -- close
quote.

Right?

A.    I agree that's what the preliminary
report says, yes.

Q.    And before yesterday, you had not
reviewed the CVR transcript from the accident
flight, right?

A.    That's correct.

Q.    And you have not reviewed the
deposition transcript of the individual who was
deposed in this action who participated in the
creation of a CVR transcript, right?

A.    That's correct.

TC REPORTING
(516) 795-7444

CAPTAIN VICKIE RENEE NORTON

103

Q.    And you are not one of the people who themselves participated in the creation of the CVR transcript?

A.    I am not.

Q.    And so you don't know the standards by which the CVR transcript working group created the transcript, right?

A.    Well, I agree with that.

I would take it one step further.  I don't know that -- that "standards" -- quote-unquote -- were used in the creation of this transcript.

If they are, I'm not -- the convention seems odd to me, because it's fairly inconsistent.

Q.    So you don't know one way or another.

You'd have to ask somebody who participated in the CVR working group, right?

MR. GREEN:  Objection to form.

A.    That's correct.

Q.    And so when you put the word "PULL UP" in quotes, but capitalized, even though the preliminary report is not capitalized, that's your interpretation of what was said, right?

CAPTAIN VICKIE RENEE NORTON

104

MR. GREEN:  Object to the form.

A.    As we previously discussed, I intended to differentiate the verbiage from the rest of the font in the paragraph.

Moreover, I think it was -- as the report says -- critical to note that it took two -- two crew members.  And one was communicating to the other in what I can only imagine was in distress and extreme urgency the notion that he needed to be assisted in pulling up the nose of the aircraft.

So just that.  That was my -- my attempt to make that differentiation in my own report.

Q.    So the -- because capitalizing it differentiates it and provides some emphasis, right?

A.    Well, it's the only reference to verbiage in that paragraph, so, yes, it -- it does so.

Q.    And I think you said that you could only imagine that that was loudly yelling.

And so that's your interpretation of what was being said, right?

CAPTAIN VICKIE RENEE NORTON

105

MR. GREEN:  Object to the form.

A.    I think, sir, in fairness, it's my very strong opinion that that's what was happening in the cockpit.

Q.    So -- but because we don't have direct evidence saying anybody was loudly yelling, you are taking the evidence and -- that you do have from the preliminary report -- and speculating that that is likely what happened, right?

MR. GREEN:  Objection to form.

A.    But, again, it is my opinion that, to a reasonable degree of certainty, it is far more likely than not that they wouldn't have been speaking in the volume or the tones of voice you and I are using right now, due to the severity of the situation.

Q.    And I think you said you could only imagine that's what they were doing and you are trying to imagine yourself in that -- that position.

Have you looked at all at literature or data regarding speech patterns during emergency flight situations?

A.    Well, it's a fairly broad question.

CAPTAIN VICKIE RENEE NORTON

106

To the best of my -- I think I understand what you are -- I have read countless transcripts; as well as I have heard actual CVR recordings over my years of accident investigation for -- that counter -- that cover the time that something starts to go wrong in the cockpit unfortunately up to the time the aircraft is actually lost.

I don't know if that answers your question.

I have been exposed to hearing numerous unfortunate communications like that by "studying it" -- quote-unquote -- or analyzing it. I have certainly heard them, unfortunately, over a number of years.

Q. What I'm getting at: Is there any particular source you would point me that talks about how often pilots who are in distress or having difficulty managing a situation do raise their voices?

Or conversely remain calm, or at least use a calm voice?

A. There is no source I could direct you to, no.

CAPTAIN VICKIE RENEE NORTON

107

MR. LEDFORD: That's all my questions for today.

Your counsel may have -- or plaintiffs' counsel, I should say, may have some follow-up questions.

So thank you.

MR. GREEN: We are going to take a break and decide on that. And maybe we can reconfigure the room if we do have questions. So -- if that would make sense.

MR. LEDFORD: Sure. Go off the record.

THE VIDEOGRAPHER: This is the end of media file number 3. We are now going off the record. The time is 11:35 a.m.

(Recess from 2:35 p.m. to 2:48 p.m. Eastern Standard Time)

THE VIDEOGRAPHER: This is the beginning of media file number 4. We are now going on the record. The time is 11:48 a.m.

EXAMINATION

BY MR. GREEN:

Q. Capt. Norton, do you have Exhibit 224 in front of you? It's the transcript?

CAPTAIN VICKIE RENEE NORTON

108

A.    I do.

Q.    Can you tell me when the stick shaker first activated on ET 302?

A.    At 5:38:43 UTC.

Q.    What is your understanding of how long the stick shaker continued to activate after that time?

A.    My understanding is it never -- it never ceased.

Q.    Can you just tell me what sound the stick shaker makes in the 737 MAX airplane?

A.    I know we've -- this isn't a description of sound.

But the entire control column, including the vertical column and then the yoke, shakes.

And -- I'm trying to think of a comparable sound.  It would be akin to putting a bunch of pennies, or BBs, or something possibly in a glass jar, and just continuing to shake it back and forth -- I think would be a reasonable description.

Q.    You were asked a number of questions about whether you thought that -- I guess, the

CAPTAIN VICKIE RENEE NORTON

109

tone of voice that the captain was using when he was asking the first officer to try to help him pitch up the airplane.

Do you remember those questions?

A. I do.

Q. What, if any, impact did the fact that the stick shaker was activated during that time affect your opinion?

A. It would have -- it would have certainly exacerbated the need to speak loudly and increase volume of speech if. In fact, that wasn't the intention, it would be a necessity.

Q. You were asked some questions about the autopilot disconnect.

Do you remember those questions?

A. I do.

Q. And I think you testified that you've actually heard the autopilot disconnect while serving as a passenger -- or being a passenger in a 737 MAX airplane.

Is that correct?

A. It is correct.

Q. Does the 737 Next Gen have exactly the same autopilot disconnect as a 737 MAX?

CAPTAIN VICKIE RENEE NORTON

110

A.    It does.

Q.    And are the 737 Next Gen's doors essentially the same as the 737 MAX?

A.    They are.

Q.    How many times would you say you've heard the autopilot disconnect in a 737 Next Gen?

A.    Dozens.

Q.    And can you compare the sound that the autopilot disconnect makes?


Is that a fair description of the sound that the 737 MAX autopilot disconnect makes?

A.    I've not really heard it referred to that before, but I think that's a fair characterization of the sound it makes.

Q.    Can you compare the sound that the autopilot disconnect makes -- at least the volume of the sound -- with the volume of the sound that the stick shaker makes in the cockpit?

CAPTAIN VICKIE RENEE NORTON

111

A.    I would say that the stick shaker is at least as loud as the autopilot disconnect, if not -- if not slightly louder.

Q.    And then we talked about a clacker. I think it's the overspeed clacker?

A.    That's correct.

Q.    And looking at Exhibit 224, can you tell me when the overspeed clacker first began activating?

A.    The overspeed clacker -- continued until the end of the flight. It started at 5:41 and 20 seconds.

Q.    And can you just tell me what sound the clacker is?

A.    Clack, clack, clack, clack, clack, clack, clack -- very loud. I mean, that sounds ridiculous, but that's why they call it that. That is what it sounds like.

Q.    So after 5:41:20 seconds, is it -- according to the CVR transcript, in the cockpit are both the stall warning -- the stick shaker -- going off, and also the overspeed clacker that you just described for us?

A.    That is my understanding -- that the

TC REPORTING
(516) 795-7444

CAPTAIN VICKIE RENEE NORTON

112

stick shaker and the overspeed clacker after 5:40:20 were both -- were both going off and continued through the end of the flight.

Q. So there were a number of questions about the use of lowercase or capitalized letters or capitalized words in your testimony before.

Do you remember those questions?

A. I do.

Q. So looking at 5:41:30, it has as captain -- it says "ishi," which, I think, is Amharic for "okay" -- speed -- it looks like another Amharic word -- "with me, pitch up, pitch up, pitch up, pitch up, pitch up, yes, yes, pitch up."

Do you see those?

A. Yes.

Q. They are all lowercase?

A. They are.

Q. At the time that that communication was made, both the stall warning and the overspeed clacker were going on in the cockpit?

A. The stick shaker and the overspeed clacker, yes.

CAPTAIN VICKIE RENEE NORTON

113

Q.    Even though the transcript doesn't say shouting, or yelling, or one doesn't use capitalized letters, do you have an opinion as to tone of voice that the captain would have been using in this communication?

A.    I do.

I think pursuant to my prior testimony, I think it would have been the same volume, if not -- if not even louder by this point as the situation continued and they were unable to regain control of the aircraft.

I -- it is my strong opinion that there -- that would have been a very loud, desperate communication.

Q.    Just give me the basis -- all the bases for that opinion?

A.    Well, it's a follow-on to the fact that I previously testified at the top of that page that I -- I -- it is my opinion that as far back as 540 and 27 seconds when the captain was imploring the first officer to "trim, trim, trim with me," etc., repetitively -- at that time, only the stick shaker was going off, which would have exacerbated the need.

CAPTAIN VICKIE RENEE NORTON

114

But the same opinion that I offered Mr. Ledford was that it was a dire, irregular situation. And it would have been far more likely than not that urgency and distress would have been being communicated by the captain to the first officer in very loud volume.

Q. So we have talked about the stall warning stick shaker, the overspeed clacker, and the autopilot disconnect.

Can you compare for me the sound levels that those alerts make compared to the sound levels that the aural alerts -- like "don't sink" -- make in the cockpit?

A. Any of the aural alerts that have verbiage -- "don't sync, terrain terrain, pull up," types of things we discussed before -- are at least as loud as the nonverbal ones we have just been discussing, if not louder; the intent being to command the attention of the pilots to the impending situation; so loud, in fact, that when we test them before every flight in the cockpit, I either wear earplugs or disable the speaker on my side of the cockpit on the ground because they are so loud as to be almost

CAPTAIN VICKIE RENEE NORTON

115

painful.

Q.    There were some questions about when you have heard the autopilot disconnect, and a lot of times that occurs on approach.

Have you ever heard the autopilot disconnect as a passenger during takeoff and climb-out?

A.    I have not.

Q.    Is there reason why you don't think you have ever heard that?

A.    Because that would be highly irregular.

Q.    Why is that?

A.    If, in fact the autopilot was engaged at a low altitude -- it's permissible, at least by our FOM, to engage it on climb-out at 500 feet AGL -- if it were, in fact, engaged that early, it would be highly unusual for it to be disengaged shortly thereafter, unless the autopilot wouldn't engage for some reason due to a malfunction or -- there is typically no realm in which a -- the flying pilot would want the autopilot engaged and then shortly thereafter disengage it.  So that would be very rare.

CAPTAIN VICKIE RENEE NORTON

116

Q.    Okay.

And so I think I understand your -- in the normal course, the captain or first officer may disengage the autopilot in order to hand fly the approach.

Is it normal and expected that could happen on descent, but would be unusual for that to happen on climb-out?

A.    That's correct.

MR. GREEN:  Let's go off the record.

THE VIDEOGRAPHER:  Going off the record.  The time is 11:58 a.m.

(Recess from 2:58 p.m. to 3:00 p.m. Eastern Standard Time)

THE VIDEOGRAPHER:  This is the beginning of media file number 5.  We are now going on the record.  The time is 12:00 p.m.

EXAMINATION

BY MR. LEDFORD:

Q.    Ms. Norton, just a few additional questions following up on what you just talked to Mr. Green about.

I believe you said that the door on the 737 MAX is essentially the same as on the

CAPTAIN VICKIE RENEE NORTON

117

Next Generation models of the 737?

A.    To my understanding.  I mean, I don't have any differentiate -- I haven't noticed that there -- they should be different.

Q.    From what you are saying, I take it you haven't undertaken to compare the material composition of the doors on the different variants, right?

A.    I have not.

Q.    And haven't undertaken an assessment of the sealing capabilities of the doors on the NG versus the MAX, right?

A.    With regard to how well they seal?  Is that what you --

Q.    Exactly.

A.    -- I have not done a comparison.

(Pause)

Q.    And am I correct in understanding your testimony about the autopilot disconnect warning that the times that you have heard it while as a passenger in a Next Generation 737 -- those were all during the descent phase like the ones you have experienced in the MAX, right?

A.    That's correct.

CAPTAIN VICKIE RENEE NORTON

118

Q.    And I understand that, as you testified earlier, you can't give an exact percentage difference between the engine speeds when -- during the events where you heard the disconnect warning versus the engine speed that you'd expect and the thrust levels that you'd expect on takeoff, right?

A.    So you mean to say "thrust levels" -- right? -- not fan speed?  Or -- you are saying "engine speed," but you mean "thrust levels"?

Q.    That's a better way of putting it.

So what I'm getting at is:  If I am understanding your testimony correctly, you generally believe that the instances where you heard the autopilot disconnect warning while riding as a passenger on the 737 -- that in those instances, the engine thrust levels were lower than takeoff thrust?

MR. PITRE:  Objection --

A.    That's correct.

Q.    And have you done -- I'll rephrase that.

I don't see in your report any assessment of, or analysis, calculations,

CAPTAIN VICKIE RENEE NORTON

119

measurements that would tell us what the ambient noise levels are during a descent like what you are describing versus on takeoff, right?

A.    Calculations, measurements?  No.

Analysis with regard to the way I answered previously about sitting in the back and being the analysis, if you will.

No specific scientific methodology, just thousands of hours of flight time.

Q.    Acoustics is a science, right?

MR. GREEN:  Object to the form.

A.    I believe that it is, yes.

Q.    And decibel levels, at least, are physically measurable by some sort of instrumentation, right?

A.    I agree.

Q.    And you'd expect that if you were going to do a rigorous comparison of sound levels, you would want to have properly calibrated equipment and you would actually measure different sound levels and compare the decibel levels, right?

MR. GREEN:  Objection to the form.

MR. PITRE:  Argumentative, incomplete

CAPTAIN VICKIE RENEE NORTON

120

hypothetical.

A. I mean, that would be the 30,000-foot view of how I would assume as an engineer -- not an acoustical engineer -- but as an engineer how you would purport to go about it, sure.

Q. When you say stick shaker is at least as loud as the autopilot disconnect, I take it that's your -- that's -- again, that's your personal assessment; not based on a measurement of the sound levels of an autopilot disconnect versus a measurement of the sound levels from a stick shaker, right?

A. It's my -- it's my experience -- repetitive experience. I am the measurement.

I don't feel the -- I don't feel the need to cover my ears or -- when the autopilot disconnect horn goes off in the cockpit.

Quick stick shaker test, same.

But if it were to go on and on repetitively, I would certainly want some relief from that.

Q. Are you familiar with -- or are you aware of the field called psychoacoustics?

A. No, I'm not.

TC REPORTING
(516) 795-7444

CAPTAIN VICKIE RENEE NORTON

121

Q.    Are you aware that there is a field of study that looks at perception and understanding of sounds?

A.    Separate and apart from the question you just asked me previously -- separate field? I'll just say "no."

Q.    And so just to be clear, that is not the kind of expertise you are offering, right?

You are offering expertise as a pilot and somebody who has heard the sounds, but not somebody who is familiar with the measurement and calculation of sounds, or the assessment of psychological response to sounds, right?

A.    Well, it's rather compound.

But the first part, I'll answer.

I'm offering an opinion based on over 16,000 hours of flight time experiencing those sounds, testing for them every time I get into the jet, as well as roughly, by my calculation, 5,000 to 6,000 hours of riding around in the back of the aircraft.

So the second part was perception on humans?  Is that -- was that --

Q.    Yes.

CAPTAIN VICKIE RENEE NORTON

122

A.    I offer specialized expertise in terms of my experience in opining that it would be very difficult to continue and stressful to continue to operate in an environment where a stick shaker was continually going off, where a stick shaker and an overspeed clacker combined were continually going off, even if the airplane was flying normally, which it was not.

The stress on a human being of just trying to work over those sounds -- in my opinion, for operating these aircraft for years -- would be -- I think I can opine as to how stressful and what the impact would be.

I think it would be very impactful.

Q.    I do understand that you are offering that pilot's perspective.

What I'm trying to get at is, though, that you are not offering expertise on the intelligibility of sounds to nonexperts?

MR. GREEN:  Objection to the form.

MR. LEDFORD:  Let me withdraw that.

That probably didn't make a whole lot of sense.

CAPTAIN VICKIE RENEE NORTON

123

BY MR. LEDFORD:

Q.    You talked about how you had not heard the autopilot disconnect on climb-out, right?

A.    In the takeoff phase, I think is what Mr. Green asked, yes.

That is correct, I have not -- I have not.

Q.    And the takeoff phase, again, is when the engines are at a high thrust level, right?

A.    Yes.

Q.    And the -- which is the thrust level that the accident airplane was set at during the accident flight, right?

A.    That is correct.

That is not to say that I wouldn't -- it is my opinion that, even at takeoff thrust settings -- even max takeoff thrust settings -- you would hear an autopilot disconnect horn if, in fact, it went off.

Q.    You just have no personal experience ever hearing that autopilot disconnect horn with the engines at takeoff thrust?

A.    That's correct.

Q.    And you haven't done any analysis of

TC REPORTING
(516) 795-7444

CAPTAIN VICKIE RENEE NORTON

124

whether or not it would be possible for a human to detect the sound sitting in the cabin, correct?

MR. GREEN:  Objection to the form.

MR. PITRE:  Objection, argumentative.

A.  I have not done any analysis, no.

MR. LEDFORD:  Nothing further.

MR. GREEN:  I think we are done.

Done, Mr. Pitre?

Mr. Thyken?

MR. PITRE:  You are a wonderful counsel, Mr. Green.

MR. GREEN:  We are done.

THE VIDEOGRAPHER:  This is the end of media file number 5, and concludes today's videotaped deposition of Vickie Norton.  We are now going off the record.  The time is 12:10 p.m.

*     *     *

E N D   O F   P R O C E E D I N G

Time noted 3:10 p.m. Eastern Standard Time

*     *     *

CAPTAIN VICKIE RENEE NORTON

125

A C K N O W L E D G M E N T

I, CAPTAIN VICKIE RENEE NORTON, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of Friday, December 9, 2022; that the transcript is a true and complete record of my testimony; and that the answers on the record as given by me are true and correct.

_____
                    CAPTAIN VICKIE RENEE NORTON

Signed and subscribed to before me, this _____ day of _____, 2022.

_____
                (NOTARY PUBLIC)

My Commission expires:

TC REPORTING
(516) 795-7444

CAPTAIN VICKIE RENEE NORTON

126

I N D E X   O F   E X A M I N A T I O N

Witness:

Captain Vickie Renee Norton

Examination:

By Mr. Ledford................................Page 13

By Mr. Green.................................Page 107

By Mr. Ledford..............................Page 116

Index of Exhibits.........................Page 127

Previously-Marked Exhibits..........Page 128

CAPTAIN VICKIE RENEE NORTON

127

I N D E X   O F   E X H I B I T S

286   Multipage document entitled: Plaintiffs' ......37 Rule 26(a)(2)(B) Disclosure of Vickie R. Norton, dated September 19, 2022 (no Bates Nos.)

287   Document Bates stamped BOE_ETH_02263887 .......39 through 02263890, 02264589 through 02264593, multipage document entitled: Boeing 737-8 Flight Crew Operations Manual: Ethiopian Airlines, Revision Date: February 21, 2019

288   Document Bates stamped BOE_ETH_03284280 .......63 through 03284312, multipage document entitled: Federal Democratic Republic of Ethiopia Ministry of Transport Aircraft Accident Investigation Preliminary Report

CAPTAIN VICKIE RENEE NORTON

128

289    Document Bates stamped BOE_ETH_02311317 .......72 through 02311454, multipage document entitled: The International Civil Aviation Organization, National Transportation Safety Board (United States of America), and Bureau of Enquiry and Analysis for Civil Aviation Safety (France) Interim Investigation Report of Accident 737-8 MAX ET-AVJ, ET-302, dated March 9, 2020

P R E V I O U S L Y - M A R K E D   E X H I B I T S

224    Document Bates stamped BOE_ETH_01457362, ......58 1458081, two-page document bearing heading on first page:  Federal Aviation Administration Technical Familiarization Meeting, Type Validation of Boeing 7 737-8 Model Airplane, Agenda, dated April 3, 2017

(All exhibits were provided electronically to the reporter.)

CAPTAIN VICKIE RENEE NORTON

129

C E R T I F I C A T E

I certify that in response to the COVID-19 pandemic, I, BRANDON RAINOFF, have collected everyone's agreement at the commencement of this deposition that I would be the swearing officer and court reporter remotely out of state and that I may record the testimony stenographically and swear in the deponent even though I am not in the physical presence of the deponent, and that there is no objection to that at this time, nor will there be an objection to it at a future date.

IN WITNESS WHEREOF, I have hereunto set my hand this 9th day of December, 2022.

_____
BRANDON RAINOFF, RPR, FCRR, RMR, CRR

TC REPORTING
(516) 795-7444

CAPTAIN VICKIE RENEE NORTON

130

C E R T I F I C A T E

I, BRANDON RAINOFF, a Federal Certified Realtime Reporter and Notary Public within and for the State of New York, do hereby certify:

That CAPTAIN VICKIE RENEE NORTON, the witness whose  deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 9th day of December, 2022.

_____
BRANDON RAINOFF, RPR, FCRR, RMR, CRR

TC REPORTING
(516) 795-7444

CAPTAIN VICKIE RENEE NORTON

131

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: In re: Ethiopian Airlines Flight ET 302
Crash
Deposition Date:  12-9-2022
Deponent:  Captain Vickie Renee Norton
Place: Remote/Hybrid Deposition

CORRECTIONS

PAGE   LINE    FROM              TO                    REASON

____|___|_____|_____|_____

____|___|_____|_____|_____

____|___|_____|_____|_____

____|___|_____|_____|_____

____|___|_____|_____|_____

____|___|_____|_____|_____

____|___|_____|_____|_____

____|___|_____|_____|_____

____|___|_____|_____|_____

____|___|_____|_____|_____

_____
Date                          CAPTAIN VICKIE RENEE NORTON

Subscribed and sworn before me

this_____day of _____, 2022.

_____
(Notary Public)
My Commission expires:

TC REPORTING
(516) 795-7444