# EXHIBIT B



**Los Angeles** ⚬ **Vancouver** ⚬ **Toronto**

September 19, 2022

**MEA File Number: 514596**

Kreindler & Kreindler LLP
485 Lexington Avenue, 28th Floor
New York, NY 10017

**Attention: Mr. Justin T. Green**

**Re: Ethiopian Air Flight 302**
**Accident Date: March 10, 2019**
**Your Case No. 19-cv-2170**

Attached please find our expert report for the above-captioned matter, prepared in accordance with the Federal Rules of Civil Procedure, Rule 26(a) (2). The conclusions can be found on page 10. The analyses behind these conclusions are described in earlier sections of the report.

If you have any questions or additional requirements, please call. Thank you for asking us to assist you in this matter.

Yours very truly,
**MEA Forensic Engineers & Scientists Inc**

Vickie R. Norton, BSME, MSc, ATP
Project Engineer/Airline Transport Pilot

Enclosure: Expert Witness Rule 26 Report

www.meaforensic.com    23281 Vista Grande Drive, Suite A    T: 949 855 4632
                        Laguna Hills, CA 92653                  877 855 5322
                        USA                                    F: 949 855 3340



**Los Angeles** ⚛ Vancouver ⚛ Toronto

# Expert Witness Rule 26 Report

Re:              Ethiopian Air Flight 302
Accident Date:   March 10, 2019
Case No:         19-cv-2170

**Prepared for:**

Mr. Justin T. Green
Kreindler & Kreindler LLP
485 Lexington Avenue, 28th Floor
New York, NY 10017

**Principal Author:**

Vickie R. Norton, BSME, MSc, ATP
Project Engineer

Report Date:        September 19, 2022

MEA File Number:    514596

www.meaforensic.com     23281 Vista Grande Drive, Suite A   T: 949 855 4632
Laguna Hills, CA 92653          877 855 5322
USA                     F: 949 855 3340

## TABLE OF CONTENTS

1.0  QUALIFICATIONS.................................................................................... 1

2.0  INSTRUCTIONS .................................................................................... 1

3.0  BACKGROUND ...................................................................................... 1

    3.1  Airplane Description ........................................................................ 1

    3.2  Description of Aviation Terms ........................................................... 2

    3.3  Basic Pilot Controls ........................................................................ 5

    3.4  Automated Systems ....................................................................... 6

4.0  SEQUENCE OF EVENTS ........................................................................ 6

5.0  CONCLUSIONS ...................................................................................10

APPENDIX A - CURRICULUM VITAE OF VICKIE R. NORTON, BSME, MSC, ATP

APPENDIX B - LIST OF MATERIALS AND DATA CONSIDERED

APPENDIX C - COMPENSATION

APPENDIX D - PUBLICATIONS

APPENDIX E – DEPOSITION AND TRIAL TESTIMONY



## 1.0  QUALIFICATIONS

I, Vickie R. Norton, BSME, MSc, ATP, am responsible for the contents of this report. I am a project engineer with MEA Forensic, leading the Aviation Division for our Los Angeles office since January 2009. I am also a current, full-time captain for a major U.S. airline for the last 26 years with 15,000+ hours of flight time and over 8,000 hours as Pilot-in-Command (PIC) in Federal Aviation Regulations (FAR) Part 121 commercial scheduled service. I have been involved in the investigation of a wide variety of aircraft accidents and incidents for MEA since 2009, relying on my advanced degrees in Mechanical Engineering (BS) and Aviation/Aviation Safety (MSc), as well as my 34+ years of experience in the aviation sector. My curriculum vitae is attached in Appendix A.

## 2.0  INSTRUCTIONS

I was asked to review the materials listed in Appendix B and provide a summary on the motion of Ethiopian Air Flight 302 (ET 302) in the minutes from take-off until the crash. In particular, I was asked to discuss the experience from a passenger's perspective.

I am aware that my duty as an expert witness is to assist the Court and not act as an advocate for any party. This report has been prepared in accordance with that duty. If called upon to give oral or additional written testimony, I will provide said testimony in accordance with that duty.

## 3.0  BACKGROUND

On Sunday, March 10th, 2019 at 8:38 local time, ET 302 departed from Bole International Airport in Addas Ababa, Ethiopia bound to Jomo Kenyatta International Airport in Nairobi, Kenya. ET 302 was a Boeing 737-8 MAX commercial airplane with 149 passengers, two flight crew, five cabin crew, and one in-flight security officer (IFSO) on-board. Approximately five minutes after take-off, the airplane impacted terrain 28 nautical miles (NM) southeast of Addis Ababa near Ejere, Ethiopia. All 157 persons on-board were fatally injured.

### 3.1  Airplane Description

I did not examine the accident aircraft, nor did any of my colleagues at MEA. The following is based on my review of the materials and data provided.

The accident aircraft was a 2018 Boeing 737-8 MAX commercial airplane bearing registration ET-AVJ, owned and operated by Ethiopian Air. The aircraft was approximately four months old at the time of the accident.

The aircraft was a low wing, narrow body, single aisle jet transport powered by two turbofan CFM Leap 1-B engines. The engines were mounted to the underside of the left and right wing. The engines are rated to provide 29,317 pounds of maximum take-off thrust and 28,690 pounds of continuous thrust. The image in Figure 1 shows an exterior view of the incident Boeing 737-8 MAX taken approximately one month before the crash.

The multi-class seating configuration for this aircraft was eight rows of business-class seating (two aisles of two seats side-by-side) and 26 rows of economy-class seating (two aisles of three seats side-by-side). The image in Figure 2 shows the interior seating configuration inside a similar Boeing 737-8 MAX.





Figure 1. Image of the exterior of the accident airplane (Wikipedia, 2022).



Figure 2. Image showing the approximate seating configuration of the accident aircraft.

### 3.2  Description of Aviation Terms

The following glossary contains common terms used throughout the aviation industry to describe an aircraft's components and its movement in lay-person terms:

**Nose** is the front ("pointy end") of the aircraft.

**Tail** is the back of the aircraft. There are two small 'wings' (called the 'horizontal stabilizer') and one large fin (called the 'vertical stabilizer') on the tail of the aircraft.

**Cockpit** is the space at the front of the aircraft where the pilot and first officer sit while flying the aircraft.

**Horizontal Stabilizer** is the rear 'wing' on the aircraft at the tail section. The elevators are attached to the horizontal stabilizer and control up and down movement.

**Vertical Stabilizer** is the upright fin on the tail of the aircraft. The rudder is attached to the vertical stabilizer and it controls side-to-side movement.





Figure 3. Image showing locations of the aircraft cockpit and exterior components.

**Ailerons** are flaps on each wing controlled by the turning the yoke left or right. The movement of the aileron causes the aircraft to roll left or right to prompt a turn.

**Elevators** are flaps on each small wing on the tail controlled by pulling back or pushing forward on the yoke causing the aircraft to pitch up (climb) or pitch down (descend).

**Rudder** is a long flap on the vertical stabilizer on the tail controlled by depressing the rudder pedals which in turn controls aircraft yaw by moving left and right.

**Flaps** are control surfaces on each wing that alter the aerodynamics of the plane to allow flight at lower speeds. Flaps are typically used only during takeoff and landing.



Figure 4. Close-up image of aircraft control surfaces.



**Yoke** is one of the primary control devices used to pilot an aircraft. It looks similar to a steering wheel on a lever column. Turning the 'wheel' left or right controls the ailerons, causing the aircraft to roll left or right and turn in that direction. Pulling back on the yoke controls the elevators causing the aircraft to pitch upwards, and pushing forward on the yoke causes the aircraft to pitch down.

**Rudder Pedals** are two pedals on the floor in front of the pilot and co-pilot that control the rudder on the tail causing the aircraft to yaw to the left and right.

**Throttles** are a set of levers on the center console that control the amount of power to the engines. Each engine has its own lever so that power to the engines can be controlled separately or together.



Figure 5. Image showing the interior of the Boeing 737-8 MAX cockpit with primary controls highlighted. Yokes are in red, throttles are in yellow, and rudder pedals are in orange.

**Altitude** is the height of the aircraft above the ground.

**Vertical Speed** is a measure of the rate at which the aircraft is climbing or descending.

**Thrust** is the amount of air being pushed through the engines to propel the aircraft forward. Higher thrust settings result in higher aircraft speeds.

**Ground Speed** is aircraft speed measured from an observer on the ground, typically reflected in knots (kts). One knot is equivalent to about 1.15 miles-per-hour (mph).



**Pitch** is up-and-down movement along the aircraft's length. When climbing, the aircraft has a positive (upward) pitch, and when descending it has a negative (downward) pitch.

**Roll** is the side-to-side turning movement of the aircraft, but from a view in front of the aircraft. The sharper or more aggressively a plane turns, the greater its roll angle.

**Yaw** is the side-to-side turning movement of the aircraft, but from an overhead view. A car sliding on ice that begins moving sideways is said to be in yaw.

**Trim** is an adjustment of the aircraft's control surfaces to make it easier for a pilot to fly the aircraft. Trim adjustments are typically minor and help limit the amount of physical effort required by the pilot.



### 3.3   Basic Pilot Controls

In simple terms, the plane's movement is controlled by the pilot using three devices: the yoke, the throttle, and the rudder pedals. The yoke is similar to a car's steering wheel.



When the pilot turns the yoke left or right, flaps on the back of the wings move up and down and the aircraft rolls to the left or right to turn in that direction. However, unlike a steering wheel, the yoke can also move forward and back. When the yoke is pulled back (toward the pilot), the elevators on the back wing of the plane (horizontal stabilizer) move up and the aircraft climbs. When the yoke is pushed forward (away from the pilot), the elevators move down and the aircraft descends.

The throttles control the engine output, or thrust. There are two separate levers (one for each engine) that can be pushed forward to increase thrust (which increases speed) or can be pulled back to decrease thrust (which decreases speed). The throttle levers can be moved together in tandem or can be moved separately so that each engine is being given a different amount of thrust. As thrust and speed increase, the noise from the engines also increases.

The rudder pedals control the yaw of the aircraft, or "side-to-side" movement. This is particularly important for passenger comfort during take-off or landing, as increased yaw can be perceived as the aircraft "sliding sideways" as it moves forward. Increased yaw is necessary for pilots to maintain controlled, coordinated flight in moderate to strong crosswinds; however, it is also significant for passenger comfort.

### 3.4   Automated Systems

The Boeing 737-8 MAX is a complex aircraft with numerous automated systems. The two most important of these are the autopilot and autothrottles. When engaged, these systems automatically adjust the pitch, roll, yaw and thrust of the aircraft in order to match the desired course, speed and altitude. For instance, if the pilot directs the autopilot to head due east at 300 kts and climb to an altitude of 33,000 ft, the aircraft will maintain that speed and climb at a prescribed rate while turning toward and then maintaining the correct heading. Once at altitude, the plane will level off and continue to maintain the desired heading, speed, and altitude until instructed otherwise.

An additional automated system on the Boeing 737-8 MAX is the Maneuvering Characteristics Augmentation System (MCAS). In simple terms, this system is designed to trim the airplane to reduce the tendency of the plane to pitch up in certain circumstances, such that it feels and flies like other Boeing 737 series aircraft.

### 4.0   Sequence of Events

This section of the report focuses on the movement of the aircraft in the six minutes from take-off to impact, particularly as experienced by the passengers.

(Note: The time references used in my report are based upon the March 2019 Aircraft Accident Investigation Board Preliminary Report #AI-01/19 published by the Ethiopian Airlines Group, which Boeing has agreed is acceptable and reliable. However, it is my understanding that Charley Pereira, who is a former NTSB official, performed a much more thorough review of the Digital Flight Data Recorder (DFDR) data. Accordingly, to the extent that there are any minor time discrepancies which are inconsequential to my conclusions and opinions, I defer to Mr. Pereira's more detailed analysis.)

ET 302 boarded on the morning of March 10, 2019. The flight was departing Addis Ababa Bole International Airport bound for Nairobi, Kenya. It was a warm, clear spring day with the local weather reported as 55°F with a few clouds, good visibility, and light winds.



The following highlights the experience inside the aircraft, outlined in chronological order.

ET 302 boarded with 157 persons, departed the gate and taxied to the west end of runway 07R, (designated as "Seven Right," the runway is oriented primarily eastbound, facing 070 degrees). At 8:36 am, ET 302 was holding at the west end of the runway awaiting Air Traffic Control (ATC) take-off clearance. With the engines at idle, it would have been quiet on board, save any conversations among the passengers.

At 8:37:51 am the pilots were cleared for take-off. The captain pushed forward on the throttles increasing the engine power to the required take-off setting. The aircraft began to accelerate eastbound down the runway. The passengers would have felt the acceleration by being gently pushed back into their seats. The engine noise increased significantly and rapidly with the increased engine power and reached a level of about 80-85 dB (about the noise level of a vacuum cleaner or a very loud restaurant).

At 8:38:34 am the aircraft was approaching the east end of the runway and had accelerated to approximately 148 kts. At this time the captain gently pulled back on the yoke and the aircraft started to pitch upward as it climbed away from the ground. The passengers would have felt the pitch of the aircraft increase as it lifted off and began to climb out, feeling as though they were 'going up-hill'.

Shortly after becoming airborne, the captain attempted to engage the autopilot; however, the left angle-of-attack (AOA) sensor had failed. This prevented the autopilot from engaging while simultaneously causing the autopilot disconnect warning horn to sound for two seconds. Additionally, the AOA failure caused the left stick-shaker to activate, literally "shaking" the red control column (or "yoke") shown in red in Figure 5 to warn the pilots of an impending stall condition. As per his training, the pilot responded to the stick shaker by manually pushing the nose over to avoid stalling. The loud warning horn would have been heard by the front business class passengers; however, due to the relatively high level of engine noise during takeoff, other passengers may not have heard the warning. Regardless, the nose-over would have been very disconcerting right after takeoff when the aircraft should have been climbing, and likely alarming to any passengers for which the warning horn was also audible. After about five seconds, the captain again tried to engage the autopilot; however, this attempt was also unsuccessful and the autopilot disconnect warning horn sounded once again.

At 8:39:23 am the crew was finally able to successfully engage the autopilot, and also retracted the flaps. At this time, the aircraft had been airborne for about 30 seconds and was roughly 1000 ft about the ground and climbing. The speed of the aircraft was approximately 220 kts.

In the first minute of the flight, there were also small amplitude roll oscillations along with minor side-to-side movements. These oscillations would have been perceived by the passengers as a slight yet distinctive rocking motion.

At 8:39:56 am the autopilot disengaged. Around this time, the captain turned the yoke to the right to initiate a turn in the same direction. Almost four seconds later, the aircraft was in a right bank angle of approximately 25°. During this turn, the passengers would have felt the aircraft leaning to the right as the right wing lowered; however, a turn of this magnitude is normal in commercial flights and would not have seemed unusual.

At 8:40:00 am as the aircraft was initially banking to the right, MCAS activated automatic nose down trim for nine seconds. Due to this input, the aircraft stopped climbing and subsequently began to descend for a nine second period while it would normally still be



climbing. At this time, the aircraft was approximately 1,500 ft above the ground, still relatively low. This sequence of events is most unusual, and any experienced passengers would immediately discern this uncommon movement. In other words, at this altitude, the plane should still be climbing, _not_ descending. In conjunction with the descent, a very loud Ground Proximity Warning System (GPWS) "DON'T SINK" aural warning repeated for three seconds in the cockpit. Again, this loud – and new - warning would have been audible, especially to the business class passengers, and perhaps others, depending on cabin noise. Once the captain pulled back on the yoke to overcome the unexpected descent and the aircraft began to climb again, the GPWS warning ceased.

Approximately 20 seconds later, MCAS again activated automatic nose down trim, this time for seven seconds, followed by a second GPWS "DON'T SINK" aural warning. This second unexpected nose down event, followed by the pilot pulling back on the yoke to regain the climb, would have certainly been noticeable and disconcerting to the passengers. During the normal climbing phase of flight, an aircraft typically climbs at a relatively steady rate for approximately 10 - 15 minutes until reaching cruising altitude. The unusual up-and-down motion of ET 302 in this early phase of flight would have been obvious and alarming to experienced passengers, (who likely then relayed their concerns to other passengers in their proximity).

At 8:40:38 am the aircraft's altitude was approximately still 1,500 ft, where it had been approximately 38 seconds earlier. For reference, this altitude is very low for a commercial aircraft nearly two minutes after take-off. A passenger looking out of the window would easily be able to discern human structures, roads, and individual vehicles at this altitude. Moreover, experienced fliers would realize that the aircraft is not gaining altitude as expected, and that they might be in peril.

At 8:40:43 am the captain and first officer pulled back on the yoke simultaneously with enough force to pitch the aircraft up to continue the climb. The vertical speed increased to a rate of approximately 1,800 feet per minute, which would be considered normal during this phase of flight. It is critical to note that both crew members had to work together just to keep the aircraft climbing, directed by the captain who loudly yelled "PULL UP" to the first officer three times. These heated commands, as well as subsequent verbal cockpit exchanges that occurred as the pilots struggled for control for the duration of the flight would have also been heard by the front passengers, at a minimum.

For the next two minutes and thirty seconds, only when both the captain and first officer were pulling back on the control column would the aircraft climb. When only one pilot was pulling back, the aircraft would pitch down and descend. The aircraft pitched up and down during this time period from -2 degrees nose down to +7° nose up. These up-and-down motions would be perceived as _very_ unusual when occurring back-to-back within seconds, and would have certainly created great anxiety for the passengers as it persisted.

It should be noted that the aircraft was flying at nearly full take-off thrust during this entire sequence of events. As such, with the aircraft's pitch fluctuating up and down with essentially no increase in altitude over approximately one minute, the speed of the aircraft increased significantly. By 8:41:20 am, the airspeed had reached 340 kts, causing the overspeed clacker to sound. The overspeed clacker is a warning device in the cockpit to alert the pilot that the aircraft has reached and/or exceeded its maximum design speed. This alarm would have also definitely been heard by the business class passengers, at a minimum.



With the increasing speed and continuing pitch fluctuations, the flight was becoming more turbulent, (or "bumpier"). For instance, at 8:41:33 am, there was a peak vertical acceleration of about 1.5g. This means the passengers would have felt upward movement in their seats sufficient to have put strain on their seatbelts in an amount of 1.5 times their individual weights, (e.g., a 200-pound person would feel as if he weighed 300 pounds.) and unbelted passengers would have likely been dislodged from their seats. This additional turbulence also occurred while the aircraft continued banking to the right, further exacerbating the unstable condition and the impact of the g-forces on the passengers.

For the next minute and a half, the aircraft was able to climb sporadically despite remaining relatively turbulent. At 8:43:11 am the plane was 6,200 ft above the ground with an airspeed of 387 kts. The bank angle to the right had decreased and the aircraft was flying nearly level. The crew again attempted to engage the autopilot but were unsuccessful, and the autopilot disconnect warning horn again sounded for three seconds.

About 10 seconds later (about 25 seconds before the crash), MCAS prompted another automatic nose-down trim for approximately five seconds. The pitch angle of the aircraft went from +0.5 degrees nose up to -7.8 degrees nose down, and the descent rate increased to over 5,000 feet per minute. This is a significant, potentially injurious change in pitch, one would that would unquestionably be not only *felt* by passengers but would be *terror-inducing*. From this point until the crash, the g-forces experienced inside the aircraft fluctuated dramatically. The passengers' experience transitioned from a turbulent or "bumpy" flight into extreme negative g's, meaning they would feel as though they were 'falling' up towards the ceiling. The belted passengers would feel as though they were hanging upside-down by their belt while still being upright, while any unbelted passengers would strike the ceiling. The aircraft also began to roll to the right again, although at a much higher rate than it did earlier in the flight. By now, anyone still clinging to hopes of survival would have realized that the situation was beyond dire, and passengers and crew alike could do nothing but anticipate the horror of their impending fate.

At 8:43:36 am, roughly 10 seconds before impact, the Enhanced Ground Proximity Warning System (EGPWS) warning repeatedly sounded, "TERRAIN, TERRAIN, PULL UP, PULL UP" as the aircraft rapidly approached the ground. A passenger looking out the window at this time would clearly see the aircraft pitched down and continuing to descend, with the ground only about 4,000 ft below and approaching rapidly. The aircraft's vertical speed was approaching *30,000 feet per minute* and continued to increase, while the airspeed was approximately 400 kts and increasing. These are *extreme* values far in excess of the aircraft's normal operating and design envelope, and certainly well outside what the passengers had ever experienced on prior commercial flights.

Flight Data Recorder (FDR) information was terminated at 8:43:44 am. The last recorded airspeed was 500 kts, and the last recorded downward pitch angle was in excess of 40 degrees. The last vertical speed recorded was 33,000 feet per minute, and the last recorded altitude was approximately 1,000 ft above the ground. This means impact occurred about two seconds after this last record.

The aircraft was destroyed on impact, leaving a large, deep crater in the ground on a farmer's field. All 157 souls on board perished in the crash.



## 5.0  CONCLUSIONS

Ethiopian Air Flight 302 was a commercial flight that departed in excellent weather conditions from Addis Ababa airport destined for Nairobi, Kenya. The 737-8 MAX aircraft encountered significant control issues immediately after takeoff; these issues persisted until control was ultimately lost and the aircraft crashed only six minutes later. Thus, from the passengers' perspective, the flight started out unsettled, yet became even more turbulent and erratic as it progressed. The passengers experienced excessive airspeed and pitch fluctuations caused by MCAS' repeated nose down inputs and the pilots' subsequent attempts to regain control. Additionally, some passengers toward the front of the aircraft would have heard various cockpit alarms as well as the pilots' shouting verbal instructions while trying desperately to save the aircraft. By the end of the flight, the aircraft was traveling at extremely high speeds and was pitching in excess of 40 degrees nose down toward the ground until final impact. In my opinion, even the early fluctuations in aircraft control would have been initially disconcerting to the majority of passengers; however, it wasn't long before the progressive loss of control and ultimate dive to the ground would have been not only distressing but *terror-inducing* to all passengers onboard.

I may use portions or all of the documents and data listed in Appendix B, as well as any photographs, video, computer-generated animations and/or any exhibit prepared or used by other experts in this matter to support or supplement my conclusions.

The basis for all of my conclusions is the following: A thorough and complete analysis of the materials listed in Appendix B; my independent research; my education and training as an engineer in airframe certification and Flight Test; my qualifications as a former FAA Designated Engineering Representative (DER); and my education and training for over 34 years as a commercial pilot; in particular, as a qualified, current and active 737 MAX captain.

Further, the above conclusions are stated to a reasonable degree of scientific and aeronautical certainty based upon my afore-mentioned training, education and experience.

My conclusions are subject to supplementation depending upon the receipt of any additional information relevant to this case and not previously reviewed.



## Appendix A - Curriculum Vitae of Vickie R. Norton, BSME, MSc, ATP

**VICKIE R NORTON,** BSME MSc ATP
**PROJECT ENGINEER/AIRLINE TRANSPORT PILOT**

### EDUCATION

Masters of Science Aviation/Aviation Safety, Florida Institute of Technology, 2014.
Bachelor of Science Mechanical Engineering, Michigan Technological University, 1988.

### PROFESSIONAL ASSOCIATIONS

Human Factors and Ergonomics Society, 2015
National Association of Professional Women, 2015
The Honor Society of Phi Kappa Phi, 2014
Lawyer-Pilots Bar Association, 2010
Airline Pilots Association, since 1995
Aircraft Owners and Pilots Association, since 1994
Southern California Professional Engineers Association, 1989 to 1994

### PROFESSIONAL EXPERIENCE

### MEA FORENSIC ENGINEERS & SCIENTISTS

Project Engineer, 2009 to Present

Responsible for technical investigations involving aircraft accident/incident reconstruction, system/powerplant malfunctions and failure analysis, operational, maintenance, regulatory and human factors effects.  Case analysis includes NTSB report review; aircraft design/operating envelope, component design, assembly and installation; compliance with and adequacy of maintenance manuals and required inspection, repair and overhaul schedules, Service Bulletins and Airworthiness Directives; pilot-in-command training, licenses, ratings, proficiency and recency of experience; preflight planning and prevailing weather conditions, and the potential effects of "third party" (non-pilot) error, e.g. Air Traffic Control, flight dispatch, aircraft fueling/loading, airfield lighting/signage defects, etc.

### UNITED AIRLINES

Captain, 1995 to Present

Responsible for the safe operation and the final authority of commercial flights operated under FAA Part 121

Scheduled Air Carriers for United Airlines, 15,000+ flight hours with over 8,000 hours as Pilot–in-Command at UAL. Type rated in the B767, B757, B737 and A-320; B747 Flight Engineer qualified.  Experienced in operations in the domestic U.S., Alaska, Hawaii and Canada; Latin America, including Mexico City and San Salvador, and the Pacific Rim, including Narita, Osaka, Beijing, Shanghai, Seoul, Guam and Saipan.  Currently qualified and operating as a Los Angeles–based Boeing 737 Captain.

### RENO AIR EXPRESS

First Officer, 1994-1995

Operated British Aerospace Jetstream 31/32 twin turboprop aircraft as Second-in-Command for commercial flights under FAA Part 135 rules for commuter flights.  Experienced in operations including no-autopilot, winter ops/icing, mountain flying and short-field takeoff and landing procedures.

### MCDONNELL DOUGLAS CORPORATION/DOUGLAS AIRCRAFT COMPANY, (DAC)

Project Engineer/Team Leader, 1989-1994

Mechanical engineering applications ranging from product development through flight test, certification and product support engineering.  Managed in-house design teams and commercial vendors from initial RFP through FAA certification.  Authored technical information for airline training and maintenance manuals. Performed Failure Mode Analysis of both pre-certification as well as failed in-service components, including stress, strain, vibration and



metallurgical analysis. Participated in multiple Twinjet and Trijet on-site flight test programs in locations ranging from Edwards AFB, CA to Yuma, AZ to Roswell, N.M. Oversaw and certified vendor design and dynamometer testing through company FAA Designated Engineering Representative (DER) status. Member of joint FAA/DAC Weekly Accident/Incident Investigations Board, including failure sequences through analysis and overlay of digital flight data and cockpit voice recorders. Primary FAA/NTSB contact for DAC Brake Systems and Engineering Department. Presented various DAC engineering reports and accident/incident summaries at annual Team Conference and industry events, as well as FAA/NTSB hearings.

## MAJOR PROJECTS

Commercial aircraft steel brake performance/certification through FAR Part 25 aircraft flight testing and laboratory dynamometer testing. All testing was full-spectrum to include light weight and speed configurations up to and including maximum kinetic energy rejected takeoffs, (RTO's).

Re-established commercial aircraft industry steel brake wear limits as a result of investigation of major U.S. airline runway overrun. Affected aircraft were DC-8/DC-9/DC-10 and MD-80 series; brake wear limits were adjusted downward to reflect operation in a field-worn condition. Deposition given in U.S. District Court, Southern District of New York case of Goodyear Tire and Rubber Co. vs. McDonnell Douglas Corp., 1993.

MD-80 series aircraft landing gear vibration induced by brake and antiskid systems, resulting in multiple landing gear failures on touchdown. Investigation included detailed systems analysis of hydraulic response, hydraulic cross-talk and servo control valves integrated with MD-80 landing gear, braking system and antiskid control unit logic.

MD-80 series aircraft foreign object debris (FOD) investigation into the aft-mounted engines "fodding" when operating on non-grooved runways or those otherwise contaminated by standing water, snow or slush. Resulted in design and installation of nose landing gear-mounted spray deflectors.

MD-11 initial carbon brake development, full spectrum FAR Part 25 flight testing and integration with upgraded (from DC-10) antiskid, autobrake and brake temperature–monitoring/tire pressure–indicating systems and their associated software.

## PUBLICATIONS

Norton VR, Bailey MN (2011). Aircraft Accident Investigation: Eight Tips for Deploying an Aviation Expert. The Advocate, pp 82-86.

Norton VR (2015). Pilot Duty of Care and the Role of the Human Factors Expert. MEA Forensic Publications, Aviation Series.

## LECTURES AND PRESENTATIONS

March 2016 – Introduction to Aerospace Engineering, Long Beach State University, Long Beach, CA.

May 2015 - Introduction to Aerospace Engineering, Long Beach State University, Long Beach, CA.

November 2014 – Human Factors Considerations in General Aviation Accident Investigations, 2014 International Air and Transportation Safety Bar annual conference in New York, NY.

July 2014 – Pilot Duty of Care and the Role of the Human Factors Expert, 2014 American Association for Justice annual convention in Baltimore, MD.

April 2014 – Introduction to Aerospace Engineering, Long Beach State University, Long Beach, CA.

April 2013 – Introduction to Aerospace Engineering, Long Beach State University, Long Beach, CA.

May 2012 – Introduction to Aerospace Engineering, Long Beach State University, Long Beach, CA.

July 2011 – Court Reporting Tips from an Expert Witness, Sage College School of Court Reporting, Moreno Valley, CA.

May 2011 – Introduction to Aerospace Engineering, guest speaker at Long Beach State University, Long Beach, CA.

July 2010 – Top Three Things a Commercial Airline Pilot Would Change to Improve Aviation Safety. Aviation Section, American Association for Justice 2010 Annual Convention, Vancouver, BC.

May 2010 – Introduction to Aerospace Engineering, guest speaker at Long Beach State University, Long Beach, CA



February 2010 – Captain/Dispatcher Joint Authority under Part 121. Lawyer-Pilots Bar Association Winter Meeting, Hawks Cay Resort, FL.

**PROFESSIONAL DEVELOPMENT/TRAINING**

2016 – 50th Annual SMU Air Law Symposium, Dallas, TX.

2014 – Fatigue Risk Management Systems (FRMS), Capstone Project, Florida Institute of Technology.

2014 – Aviation Security, Florida Institute of Technology.

2014 – 48th Annual SMU Air Law Symposium, Dallas, TX.

2013 - Aircraft Accident Investigation, Florida Institute of Technology.

2013 – 47th Annual SMU Air Law Symposium, Dallas, TX.

2013 – Safety Management Systems, Florida Institute of Technology.

2013 – Advanced Aviation Physiology, Florida Institute of Technology.

2012 – Complex Aviation Systems, Florida Institute of Technology.

2012 – Human Factors in Man-Machine Systems, Florida Institute of Technology.

2012 – 46th Annual SMU Air Law Symposium, Dallas, TX.

2011 – Lawyer Pilots Bar Association, Carlsbad, CA.

2011 – 45th Annual SMU Air Law Symposium, Dallas, TX.

2010 – American Association for Justice 2010 Annual Convention, Vancouver, BC.

2010 – 44th Annual SMU Air Law Symposium, Dallas, TX.

2010 – Lawyer-Pilots Bar Association (LPBA) Winter Meeting, Hawks Cay Resort, FL.

2009 – USC Viterbi School of Engineering, Aviation Safety & Security: "Legal Aspects of Aviation Safety" Course.

2008 – FAA/United Airlines Runway Incursion/Operational Safety Course.

2005 – Private Rotorcraft - Helicopter license.

2004 – A-320 Type Rating.

2002 – United Airlines/FAA Advanced Security Training. (Domestic and International Operations)

2001 – 737 Type Rating.

1998-2001 – FAA Part 121 Extended Twin-Engine Over Water Operations (ETOPS)

1998 – 757/767 Type Rating.

1995 – Present - Annual Recurrent Qualification Training, United Airlines.

1995 – Present - FAA/UAL Security Training.

1995 – Present - Emergency Evacuation Training.

1995 – Present - Hazardous Materials Training.

1995 – Present - Takeoff and Landing Performance Calculations, (i.e. cluttered runway, bleeds-off, thrust-reverser inoperative, etc.)

1995 – Present - Windshear/Microburst Training and Recovery.

1995 – Present - Aircraft Unusual Attitude/Upset and Recovery.

1995 – Present - Winter Operations Training and Procedures.

1995 – Present - Proficiency Training/Proficiency Checks on currently qualified fleet in 9-18 month intervals.



1995 - 747 Flight Engineer License.

1995 - United Airlines "Actual Fire" Course. (Identification by fire type, location; methods of fighting)

1994-Present – Emergency Procedures Training for Commercial and Transport Category Aircraft Systems Failures/Engine Failures/Fires/Shutdowns.

1994-1996 - Consultant FAA DER with "Systems and Equipment" designation by FAA authorizing office ANM-130L.

1994 - Certified Flight Instructor (CFI) Airplane Single Engine Land, Ground Instructor. (non-current)

1992-Present – FAA Air Traffic Control Procedures/Airspace Requirements.

1991 - Awarded Company (Douglas Aircraft Co.) FAA Designated Engineering Representative (DER) with "Systems and Equipment" designation by FAA authorizing office ANM-130L.

1990-1994 – NTSB Probable Cause Report review/analysis.

1990-1994 - Presenter at annual Douglas Aircraft Company/Industry "Team Conference" Meetings.

1990-1992 – MD-11 FAR Part 25 Certification/Flight Test.

1990 - Accident Investigation Assistance Seminar. (Douglas Aircraft Company)

1989-1991 – Major Air Carrier Brake Overhaul/Maintenance Compliance Analysis.

1989 – Failure Mode Effects Analysis (FMEA) and Fault Tree Analysis (FTA) of Transport Category Aircraft Brake, Antiskid and Autobrake Systems.



### Appendix B - List of Materials and Data Considered

- Documents:
    1. Joint Authorities Technical Review dated 10/11/19
    2. Federal Republic of Ethiopia Ministry of Transport Aircraft Accident Investigation Preliminary Report
    3. Photos taken at the Accident Scene
    4. Ethiopian Airlines Flight 302 Accident Animations/Recreations
    5. Videos taken at the Accident Scene
    6. Playback of Flight ET302
    7. Boeing 737-8 Flight Crew Operations Manual- Ethiopian Airlines
    8. Ethiopian Civil Aviation Authority Aircraft Accident Investigation Interim Report
    9. Boeing Flight Crew Operations Manual Bulletin Number TBC-19
    10. FAA Emergency Airworthiness Directive AD # 2018-23-51
    11. Aerial photo of airport
    12. Angle of Attack document
    13. Boeing 737 Max Final Committee Report



**<u>Appendix C – Compensation</u>**

The compensation to be paid to my employer, MEA Forensic, for my review, analysis, expert report, travel, depositions and trial testimony for this case is at the rate of $475.00 per hour, and is in no way predicated upon the outcome of the case.



**Appendix D – Publications**

Norton VR, Bailey MN (2011). Aircraft Accident Investigation: Eight Tips for Deploying an Aviation Expert. The Advocate, PP 82-86.

Norton, VR (2015). Pilot Duty of Care and the Role of the Human Factors Expert. MEA Forensic Publications, Aviation Series.



## Appendix E – Deposition and Trial Testimony

### TRIALS

| Date | Case Name | Law Office | Venue |
| --- | --- | --- | --- |
| May 1, 2013 | Jaspers vs. Bonde | Law Offices of Frank W. Mitchell | Las Vegas, NV |
| June 15, 2015 | IARDC vs. In Re Ribbick Law | Illinois Attorney Registration & Disciplinary Commission | Chicago, IL |
| July 8, 2019 | Ilczyszyn vs. SWA | Balaban & Spielberger | Oakland, CA |
| June 22, 2022 | Walker vs. Messina | Lane Powell | Seattle, WA. |
| August 26, 2022 | Boeing/USDOJ DPA | Paul Cassell, Professor of Law | Fort Worth, TX. |

### ARBITRATIONS

| Date | Case Name | Law Office |
| --- | --- | --- |
| December 12, 2016 | Walker vs. Messina | Lane Powell |

### DEPOSITIONS

| Date | Case Name | Law Office |
| --- | --- | --- |
| September 1, 1993 | Goodyear Tire & Rubber vs. McDonnell Douglas | Bryan Cave & Associates |
| May 9, 2012 | Jaspers vs. Bonde | Jaspers vs. Bonde |
| July 10, 2012 | Crews/Becker vs. Forward Technologies | Law Office of Cozen O'Connor |
| June 24, 2014 | Rohera vs. Raytheon Aircraft Company | Greene Broillet & Wheeler |
| November 15, 2016 | Pamir Airways vs. Honeywell | Kreindler & Kreindler |
| July 31, 2018 | Ilczyszyn vs. SWA | Balaban & Spielberger |
| July 26, 2019 | Woods vs. Boeing | Friedman & Rubin |
| August 15, 2019 | Ward vs. USA | United States Dept of Justice |
| March 17, 2021 | Mijac vs. USA | United States Dept of Justice |
| July 21, 2021 | Bohnel, Martinez, Hill, Pollack, Lynam vs. Jet Blue | Friedman Rubin |
| September 28, 2021 | Woods/Weiland vs. Boeing | Littlepage Booth & Leckman |
| October 14, 2021 | Foster/Whitaker vs. United States | United States Dept of Justice |
| September 14, 2022 | Banjeree/Kumar vs. United States | United States Dept of Justice |

