**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE: ETHIOPIAN AIRLINES FLIGHT ET 302 CRASH | Lead Case: 1:19-cv-02170 (Consolidated)<br><br>Honorable Jorge L. Alonso<br><br>Magistrate Judge Weisman |

**BOEING'S MOTION TO EXCLUDE OPINIONS OF
PLAINTIFFS' EXPERT CHARLES PEREIRA**

Boeing moves under Federal Rule of Evidence 702 to exclude the opinions of Plaintiffs' expert Charles Pereira that the cabin animations produced by Plaintiffs accurately depict the passenger movements and cabin environment during Flight ET 302.

## INTRODUCTION

The Court should exclude the testimony of Plaintiffs' expert Charles Pereira regarding the interior cabin animations under Rule 702 because he is not qualified to give the opinions he offers and, even if he were, his opinions are unreliable.

*First*, Mr. Pereira is not qualified to testify about the interior cabin animations and the movements of the passengers on Flight ET 302. He is an aeronautical engineer and aviation accident investigator. Those qualifications might enable him to testify about the flight path of the aircraft or about his own reconstructive analysis of Flight ET 302. But Mr. Pereira's opinions stretch far beyond his field of expertise when he attempts to validate biomechanical computer animations of passengers in the cabin that were created by other, undisclosed persons based on undisclosed data and methodology. Mr. Pereira is not a biomechanical engineer, has no biomechanical engineering training or experience, is not qualified to opine on passenger movements, and is not qualified to authenticate animations presumably meant to depict such movements. Biomechanics is a complicated field of study, and the movements of human beings are far different than the types of objects that Mr. Pereira might be qualified to opine about.

Second, even if Mr. Pereira were qualified to validate a biomechanical animation, his attempt to do so here has no reliable basis. Mr. Pereira did not review or validate the inputs that were used to create the cabin animations and does not know how the animations were created. Mr. Pereira's testimony that the cabin animations "accurately depict" what occurred inside the airplane—including a passenger and luggage floating up to the ceiling, the simulated camera-shake

1

effect,[1] and audio of people screaming—is supported by nothing but Mr. Pereira's say-so. A conclusion like Mr. Pereira's, that rests only on his *ipse dixit*, is not admissible.

Boeing respectfully moves this Court to enter an order excluding Mr. Pereira from testifying that the cabin animations accurately depict the passenger movements and cabin environment during the accident flight.

## BACKGROUND

Mr. Pereira is an aeronautical engineer who previously worked as an accident investigator at the National Transportation Safety Board ("NTSB"), and later became a private consultant. Ex. A (Charles Pereira Dep. Tr.), 35:12–14, 263:13–267:2, 269:14–278:23; Ex. B (Charles Pereira Report), 1.[2] He is not a biomechanical engineer and does not have specialized experience in biomechanics. Ex. A at 144:20–145:6. He disclaims the relevant expertise, instead relying on his belief that "all engineers" understand "basic physics" and "basically learn how everything in the world works." *Id.* at 145:16–24.

Mr. Pereira sent the Flight Data Recorder ("FDR") data from the accident aircraft to Plane Sciences—the company founded and run by Boeing's expert Mike Poole—to be processed. *Id.* at 39:2–24. The FDR records parameters related to the aircraft during flight, like airspeed; altitude; pitch; vertical, horizontal, and lateral acceleration; engine power; whether and when certain alerts or warnings have activated; and the position of aircraft components (for example, whether the landing gear has been retracted).

---

[1] The "camera-shake effect" refers to the cinematic technique that simulates the cabin environment shaking by "shaking" the camera's viewpoint.

[2] Exhibits are to the Declaration of Christopher Ledford in support of Boeing's Motion to Exclude Opinions of Charles Pereira. Page numbers refer to the page numbers of the referenced report, not pdf page numbers.

Mr. Pereira later shared the FDR data with Plaintiffs' bioengineering expert (Thomas Jenkyn) and undisclosed animation consultants from a company called Eyewitness Animations (later identified during Mr. Pereira's deposition as Jack Suchocki and Martin Merryman) with the following guidance for creating the flight path and cabin animations: "take off from this airport and this runway, crash into these site coordinates, and follow the FDR data in between." *Id.* at 156:3–157:8, 188:23–189:13, 191:2–19.

Eyewitness Animations then apparently created computer-generated cabin animations that purport to show what happened to passengers on Flight ET 302. *See* Exs. E, F (Cabin Animations). The animations show passengers being jostled around as their seatbelts hold them into their seats; an unbelted passenger floating up and colliding with the overhead luggage compartment; luggage traveling throughout the cabin; and passengers' arms flailing. The "camera" shakes throughout—sometimes violently—in order to simulate movement in the cabin, and audio is heard of people screaming.

Much of what the cabin animations show is not based on the FDR, which does not record most things that occur in the passenger cabin, including whether passengers are buckled, whether the overhead bins are closed, or the sounds made in the cabin. In fact, Mr. Pereira testified that there is no actual evidence regarding anything that occurred inside the cabin during the accident flight—*i.e.*, no FDR or other evidence that any passenger was unbelted, collided with the overhead bin, shook, or screamed. *See, e.g.*, Ex. A at 177:14–18 (no evidence of sounds); 222:18–223:2 (no evidence anyone was unbuckled); 253:9–19 (no evidence of oscillation). Notably, Plaintiffs' other experts assume that the passengers were wearing seatbelts during takeoff. *Id.* at 205:25–213:17.

Mr. Pereira offers two opinions in his report.

3

The first opinion, which comprises the majority of his report, focuses on his analysis of the FDR data and his recreation of the airplane's flight and ground path. Ex. B (Pereira Report), at 3. Boeing does not seek to exclude this opinion.

Mr. Pereira devotes a single conclusory paragraph to his second opinion, which characterizes Eyewitness Animations' cabin animations as "fair and accurate animations of ET302 and the passenger environment and movements within the seating area." *Id.* His report does not describe how the cabin animations were created, because he did not create them or attempt to reconstruct the events inside the cabin during the flight. Ex. A at 184:6–8. He nevertheless states that the animations "to a reasonable degree of engineering certainty … fairly and accurately depict the transference of the FDR, CVR, and accident site data into visual reconstructions of the events leading to and including the crash of ET302." Ex. B at 3–4.

Mr. Pereira testified that he did not provide Dr. Jenkyn or Eyewitness Animations with any data on which to base a simulation depicting the plane's cabin environment. Ex. A at 240:21–241:2, 295:6–296:6. Mr. Pereira also confirmed that he does not know what tools Eyewitness Animations used to create the animations. *Id.* at 194:25–195:7. Mr. Pereira admits that he "didn't validate" Dr. Jenkyn's biomechanical simulations and "ha[s]n't" even "seen any" of the data they generated, although he claims Eyewitness Animations relied on it when creating the cabin animation. *Id.* at 192:18–193:25, 202:5–9, 203:3–8; Ex. B at 3. (That claim is contradicted by Dr. Jenkyn, who says that the only work product of his that Eyewitness Animations relied on were a few video clips, not any quantitative data. Ex. C (Jenkyn Dep. Tr.), 92:19–94:7.) Beyond providing the FDR data and participating in a handful of Zoom calls discussing drafts, Mr. Pereira admitted that he had no role in creating the cabin animations. Ex. A at 188:23–189:13, 205:16–24.

4

Nevertheless, Mr. Pereira intends to testify that the cabin animations fairly and accurately depict the cabin environment during Flight ET 302. Ex. B at 3–4.

## LEGAL STANDARD

The Court should exclude expert testimony unless "it is reasoned, uses the methods of the discipline, and is founded on data." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000). Federal Rule of Evidence 702 requires an expert to be "qualified as an expert by knowledge, skill, experience, training, or education," and expert testimony is only admissible if it (a) "will help the trier of fact to understand the evidence or to determine a fact in issue;" (b) "is based on sufficient facts or data;" (c) "is the product of reliable principles and methods"; and (d) reliably applies "the principles and methods to the facts of the case." An expert's proponent bears the burden of demonstrating that his or her testimony satisfies Federal Rule of Evidence 702. *See Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 782 (7th Cir. 2017).

In making this determination, courts analyze a proffered expert's qualifications, the reliability of his or her methodology, and the relevance of the proposed testimony. *Id.* at 779. When evaluating the methodology underlying an opinion, the Court may consider, among other things, (1) whether the expert's technique or theory can be or has been tested; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593–94 (1993) (noting that the above considerations do not constitute "a definitive checklist or test"). But "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

5

A computer simulation offered as substantive evidence (as opposed to a demonstrative) "must be authenticated as an accurate result of a system or process, pursuant to Federal Rule 901(b)." McCormick on Evidence § 218 (8th ed.). To do so, the proponent of the simulation must establish the "(1) sufficiency of the factual basis that serves as input, and its substantial similarity to the real event; (2) reliability of the underlying technical or scientific principles; (3) accuracy of the specific computer operating system; and (4) appropriateness and accuracy of the mathematical formulae creating the model that is programmed into the computer." *Id.* (collecting cases and secondary sources); *see also, e.g.*, *Ortiz v. Yale Materials Handling Corp.*, 2005 WL 2044923, at *9 (D.N.J. Aug. 24, 2005). "Simulations which are not properly authenticated are excluded." *Bullock v. Daimler Trucks N. Am., LLC*, 819 F. Supp. 2d 1172, 1176 (D. Colo. 2011) (quoting 5 Federal Evidence § 9:26 (3d ed. 2010)).

When assessing the second authentication requirement—proof that the simulation satisfies the reliability demanded by Rule 702—courts must consider "factors such as (1) whether the scientific theory or technique" used to generate the animation "can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether a particular technique has a known potential rate of error; and (4) whether the theory or technique is generally accepted in the relevant scientific community." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013) (citing *Daubert*, 509 U.S. at 593–94); *see also Valente v. Textron, Inc.* 931 F. Supp. 2d 409, 420–25 (E.D.N.Y. 2013) *aff'd*, 559 F. App'x 11 (2d Cir. 2014) (excluding unvalidated and untested computer-generated simulation under Rule 702). Because the animation and the data underlying it are interdependent, two experts, "both a subject matter expert and a computer expert," are often necessary to authenticate an animation as substantive evidence. 57 American Jurisprudence Proof of Facts 3d 455. The subject matter expert must establish the

6

reliability of the underlying data while the computer expert must establish the reliability of the simulation derived from that data. *Id.*

## ARGUMENT

I. **Mr. Pereira is not qualified to vouch that Plaintiffs' biomechanical cabin animations "fairly and accurately" depict what occurred in the cabin during the accident flight.**

As Boeing explains in its motion *in limine* to exclude the cabin animations, it is not clear whether Plaintiffs intend to offer the cabin animations as substantive evidence or mere demonstratives.[3] But assuming the cabin animations are offered as reliable simulations of what occurred in the cabin of Flight ET 302, Mr. Pereira is not qualified to authenticate them.

The cabin animations depict several rows of passengers inside the cabin and represent their supposed movements in response to the forces allegedly experienced on the airplane. *See* Exs. E, F. The passengers are pulled out of their seats and against their seatbelts. Their arms get pulled up into the air above their heads. An unbelted passenger collides with the luggage compartment and is pinned to the ceiling. The cabin animations are clearly intended to show the biomechanical movements of the passengers during the flight—unlike other animations prepared by Eyewitness Animations, which show, for example, the flight path of the airplane itself.

Mr. Pereira is qualified to (and purports to) testify to the accuracy of animations representing the flight path and movements *of the aircraft*. *See* Ex. B at 3–4. But two of the four animations Plaintiffs produced purport to show the movement of human beings within the cabin. *See* Exs. E, F. Mr. Pereira is not qualified to provide opinions on those movements or those cabin animations. He is not a biomechanical engineer and has neither the training nor the experience to

---

[3] Even if offered as demonstratives, the cabin animations should be excluded under Rule 403 as unduly prejudicial.

7

opine on biomechanical issues or the movements of the human beings within an aircraft. *See* Ex. A at 144:20–145:11.[4]

Nevertheless, Mr. Pereira argues that he *would be* qualified to testify about biomechanics and to vouch for the reliability of a biomechanical simulation because he has training in the effects of acceleration on any object and does not believe there is any meaningful difference between an object like a book or laptop and a human body. *Id.* at 145:2–6. Disclaiming the existence of specialized biomechanics expertise, Pereira asserts that "[i]t's basic physics" that "applies to all engineering" and that "all engineers" "basically learn how everything in the world works." *Id.* at 145:16–24. Building on that premise, he claims that he is no less qualified to discuss "the effect of" gravitational forces on "a human hand" than he is to discuss their effect on "a Ping-Pong ball." *Id.* at 149:23–150:5.

Mr. Pereira is incorrect. As Plaintiffs' own biomechanics expert explained, "biomechanical [engineering] is applying engineering principles in physics to the motion and forces on the body— whether it's the entire body, body segments, tissues, or portions of the body." Ex. C at 45:10–14. The "bio" in "biomechanics" distinguishes it from other areas of mechanics; it considers not just the effect of forces on "a body" but on *the human body* or other living organisms. Human beings are not "Ping-Pong balls" (Ex. A at 149:23–150:5), and a reliable biomechanical analysis in this case requires evaluation of how the joints, muscles, tissue, and the full range of human response

---

[4] When asked if he was going to offer "an opinion about the actual effects on the human body caused by" the forces experienced during the flight, Mr. Pereira appropriately conceded that "I'm leaving that expertise to Tom Jenkyn and Troy [Faaborg]." Ex. A at 146:7–13. But neither Dr. Jenkyn nor Mr. Faaborg are able to, or intend to, discuss the cabin animations. Dr. Jenkyn admitted that he also did not substantively review Eyewitness Animations' cabin simulations. Ex. C at 299:13–19 ("I had access to the initial draft copies, and had a look at them. But I didn't provide any input as to whether they were right or wrong."). And Mr. Faaborg testified that he was not offering any opinions based on an animated reconstruction of the flight, and disclaimed being an expert on accident reconstruction animation. Ex. D (Faaborg Dep. Tr.) at 42:11–19. Each are subject to separate Rule 702 motions regarding the opinions they did offer.

8

affected the passengers' movements during the flight. After all, "[c]ontemporary biomechanics is a multidisciplinary field that combines physical and engineering expertise with *knowledge from the biological and medical sciences*."[5] Aeronautical (or "aerospace") engineering, on the other hand, applies "engineering principles to building vehicles that are either in the atmosphere … or in space outside of the atmosphere."[6] Ex. C at 44:22–45:4. As a field of study, it is not concerned with the biomechanical function of the human body except insofar as it might "help[] engineers build aerospace vehicles." *Id.* at 45:5–7. These are vastly different specializations within the same broad category. So putting aside the obvious question of why Plaintiffs bothered hiring a separate biomechanics expert if "all engineers" who know "basic physics" are qualified to opine about the biomechanical simulation of the passengers on the airplane, (Ex. A at 145:16–24), the Court cannot simply take Mr. Pereira's word for it that he and any other engineer is qualified to opine on the biomechanical movements of the human body and to authenticate biomechanical animations.

"[A]n expert witness may not offer an opinion where the subject matter goes beyond the witness's area of expertise." *Ruark v. BMW of N. Am., LLC*, 2014 WL 351640, at *3 (D. Md. Jan. 30, 2014). Thus, "an expert who is a mechanical engineer," for example, "is not necessarily qualified to testify as an expert on any issue within the vast field of mechanical engineering"; he must possess "some *special* skill, knowledge or experience concerning the *particular* issue before the court." *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 392 (D. Md. 2001) (emphases added) (citations and internal quotation marks omitted). Similarly, "expertise in the broad field of

---

[5] *Biomechanics*, ENCYCLOPEDIA BRITANNICA (March 7, 2019), https://www.britannica.com/science/biomechanics-science (emphasis added).

[6] *See also Aerospace Engineering*, ENCYCLOPEDIA BRITANNICA (Sep. 29, 2022), https://www.britannica.com/technology/aerospace-engineering ("[A]erospace engineering, also called aeronautical engineering, or astronautical engineering," is the "field of engineering concerned with the design, development, construction, testing, and operation of vehicles operating in the Earth's atmosphere or in outer space.").

chemical engineering does not qualify [a chemical engineering expert] to opine and offer testimony in all areas of the chemical engineering field." *Everlight Elecs. Co. v. Nichia Corp.*, 2014 WL 4707053, at *9 (E.D. Mich. Sept. 22, 2014). If experts in a field are not qualified to opine on specialized issues within that field, as these (and other cases) hold, then surely an expert in one field (aeronautical engineering) is not qualified to opine on specialized issues (human body movements) in an entirely different field (biomechanics), even though both might start with the application of "basic physics." Ex. A at 145:17.

The specialized issue here is the biomechanical movement of human bodies and tissue in response to gravitational forces. Mr. Pereira was not retained to do that work; Dr. Jenkyn was. And Mr. Pereira discloses *no* experience with or training in biomechanics nor any familiarity with the biological or medical sciences that must merge with mechanics for it to become "biomechanics." Engineers are routinely excluded from testifying about specific engineering subspecialties other than their own, and Mr. Pereira should not be an exception.[7]

Because Mr. Pereira is not qualified to opine on biomechanics, he is not qualified to authenticate a biomechanical simulation. He cannot authenticate the cabin animations because he is not qualified to establish, for example, the "sufficiency of the factual basis that serves as input"

---

[7] *See, e.g.*, *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 247 (4th Cir. 1999) (excluding mechanical engineer with no specialized experience or expertise from testifying about automobile manufacturing processes or the strength of plastic automobile component parts); *Ancho v. Pentek Corp.*, 157 F.3d 512, 517–18 (7th Cir. 1998) (excluding mechanical engineer with no experience designing or evaluating factories from testifying about industrial plant configuration); *Bogosian v. Mercedes-Benz of N. Am., Inc.*, 104 F.3d 472, 477 (1st Cir. 1997) (excluding master auto mechanic from testifying about car design); *Stratton v. Thompson/Ctr. Arms, Inc.*, 601 F. Supp. 3d 1139, 1151 (D. Utah 2022) (excluding engineer with experience with firearms explosions from testifying about external or terminal ballistics); *Trumps v. Toastmaster, Inc.*, 969 F. Supp. 247, 252 (S.D.N.Y. 1997) (excluding board certified safety professional and mechanical engineer from testifying about malfunction of electric grill); *Silva v. Am. Airlines, Inc.*, 960 F. Supp. 528, 531 (D.P.R. 1997) (excluding civil engineer from testifying about safety aspects of aircraft design); *Diviero v. Uniroyal Goodrich Tire Co.*, 919 F. Supp. 1353, 1356–57 (D. Ariz. 1996), *aff'd*, 114 F.3d 851 (9th Cir. 1997) (excluding engineer with experience working with bias belted tires from testifying about steel belted tires).

for the biomechanical animation, its "substantial similarity to the real event," or the "reliability of the underlying [biomechanical] principles" used in creating the cabin animation. McCormick on Evidence § 218 (8th ed.).[8] Nor has Mr. Pereira explained how he is qualified to testify about "(1) whether the scientific theory or technique" used to generate the biomechanical animations "can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether a particular technique has a known potential rate of error; and (4) whether the theory or technique is generally accepted in the relevant scientific [that is, biomechanics] community." *Schultz*, 721 F.3d at 431 (citing *Daubert*, 509 U.S. at 593–94).

These are questions that must be answered by "a subject matter expert" in biomechanics and "a computer expert" who is experienced with the relevant software. 57 Am. Jur. Proof of Facts 3d 455. Mr. Pereira is neither.

II. **Mr. Pereira's purported validation of the biomechanical cabin animations is not reliable because he has no data or methodology upon which to conclude the cabin animations are accurate.**

Even if Mr. Pereira and "all [other] engineers" really know "how everything in the world works" and are therefore qualified to authenticate biomechanical simulations because they reflect only "basic physics," (Ex. A at 145:16–24), the Court should exclude Mr. Pereira from vouching for the accuracy of the cabin animations because he offers no data and discloses no methodological basis for concluding that those animations are accurate. Expert opinion must be "founded on data." *Lang*, 217 F.3d at 924; *see Bielskis v. Louisville Ladder Inc.*, 663 F.3d 887, 894 (7th Cir. 2011) ("An expert's opinion must be reasoned and founded on data."). "Talking off the cuff—deploying neither data nor analysis—is not an acceptable methodology." *Lang*, 217 F.3d at 924.

---

[8] And even if he were qualified on biomechanics, which he is not, there is no evidence he is qualified to discuss the other two elements required to authenticate this type of animation, namely: the accuracy of the specific computer operating system; and the appropriateness and accuracy of the mathematical formulae creating the model that is programmed into the computer. *See supra* at 5–6.

11

**Mr. Pereira does not rely on data.** Mr. Pereira admits there is *no* data to show what occurred inside the cabin during the accident flight—no evidence of sounds in the cabin, (Ex. A at 177:14–18); no evidence of shaking or jostling, (*id.* at 252:10–20, 253:9–19); no evidence that passengers were unbuckled, (*id.* at 222:18–223:2). At best, all Mr. Pereira can do is speculate about what occurred. Mr. Pereira's opinion regarding the cabin animations thus is not "founded on data" and should be excluded on that basis alone. *See Lang*, 217 F.3d at 924.

**Mr. Pereira has no methodology.** Mr. Pereira cannot articulate what methodology was used to create the cabin animations for the simple reason that he had virtually no involvement in their creation. Ex. A at 201:12–21, 203:25–205:24. Mr. Pereira admits that he does not know what tools and data were used to create the animations. *Id.* at 195:14–16, 201:22–202:9. He testified that his participation was limited to providing spreadsheets with the FDR data, (*id.* at 189:7–190:3); browsing the internet and YouTube for videos depicting turbulence events, (*id.* at 242:2–8); sharing his personal experiences with dynamic pressure while flying in another model of airplane and driving cars at high speeds, (*id.* at 250:2–251:14, 253:20–255:14); and possibly providing comments on drafts of the animations, although he "can't recall specifically," (*id.* at 186:20–25).

Mr. Pereira cannot explain the methodology that was followed in deciding what data to include in the animation. For example, he does not know the source of the audio that plays during the cabin animations; nor does he know why those specific sounds were selected or if they represent the cabin environment on flight ET 302. *Id.* at 241:3–25. All he says about the fictitious audio is that not including it "would be a disservice to the viewer," in his opinion. *Id.* at 242:4–16. Nor does Mr. Pereira know whether passengers would be gripping something, or their limbs would

12

be floating upwards; he is only left to speculate: "Yeah, that one—that's probably the biggest one to speculate on." *Id.* at 233:18–19.

Mr. Pereira fails to provide any meaningful explanation as to what methodology he used—if any—to reach his conclusion that to a "reasonable degree of engineering certainty" the cabin animations accurately reflect Flight ET 302's cabin environment. Mr. Pereira states only that he "feel[s]" that the cabin animation is reasonable. Ex. A at 168:24–169:7. But his *feeling* does not satisfy the test for admissible expert testimony. *See, e.g.*, *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) (affirming exclusion of an expert whose "method, 'expert intuition,' is neither normal among social scientists nor testable").

While Mr. Pereira recited the phrase "engineering certainty" in his report, he conducted no actual engineering analysis of the data used to create the animation. Opinion based merely on an expert's own assertion of validity is inadmissible guesswork. *See Timm v. Goodyear Dunlop Tires North America, Ltd.*, 932 F.3d 986, 995 (7th Cir. 2019) ("In the absence of anything to support his conclusions, the district court acted within its discretion in excluding" the opinions of plaintiffs' accident reconstructionist.); *see also Bielskis*, 663 F.3d at 894–95 (engineering expert's opinions not admissible because they were not based on any methodology nor supported by sufficient facts or data); *Navarro v. Fuji Heavy Industries, Ltd.*, 117 F.3d 1027, 1030–31 (7th Cir. 1997) (accident reconstructionist's opinion offered "without any support is not one based on expert knowledge and entitled to the dignity of evidence"). The Seventh Circuit has repeatedly held such testimony unreliable and inadmissible: "A witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term. . . . As we so often reiterate: 'An expert who supplies nothing but a bottom line supplies nothing of value to the

judicial process.'" *Zenith Elecs. Corp.*, 395 F.3d at 419 (quoting *Mid-State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989)).

**Mr. Pereira is merely the mouthpiece for undisclosed experts whose work he does not understand.** Mr. Pereira cannot save his own opinion by relying on the substantive work of others, especially when he does not know the basis for that work. Courts routinely exclude such testimony. In *Dura*, for example, a party proffered an expert hydrogeologist (Valkenburg) whose conclusion was based on mathematical models created by others. *Dura Auto Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 611–12 (7th Cir. 2002). The creation of these mathematical simulations was performed by undisclosed individuals, who engaged in an "iterative process" to tinker with the simulations until they yielded satisfactory results. *Id.* at 614–15. Valkenburg, however, did not oversee the creation of these simulations, nor could he explain how they were created. *Id.* The Seventh Circuit affirmed Valkenburg's exclusion, noting that the creative discretion employed to fine tune the model "was exercised not by Valkenburg but by Rumbaugh and the other affiants, for it was they who constructed the model, and the 'iterative process' by which they did so is beyond the scope of Valkenburg's expertise." *Id.* at 615.

The same reasoning applies here. Mr. Pereira relied upon Eyewitness Animations—who were not disclosed as experts—to create the cabin animations. He described the creation of these cabin animations as the result of an "iterative process." Ex. A at 202:8–18, 253:16–19. But Mr. Pereira could not explain how Eyewitness Animations created the simulation. For example, he does not know how Eyewitness Animations determined how much vibration would be appropriate or when it would be phased in. *Id*. at 256:12–257:21. He "left that to them." *Id*. at 256:18. Eyewitness Animations also apparently selected the animation sounds (screaming) from a "catalog" of real events, but Mr. Pereira does not know what event Eyewitness Animations

selected. *Id.* at 241:3–13. He may have provided general suggestions based on his "belief[s]," but Eyewitness Animations was tasked with creating the animations and decided what specifically would occur in the animation. *See id.* at 254:16–255:14; 257:16–21. And, as explained above, Mr. Pereira is not a biomechanical engineer and left analysis of the effect physical forces have on the human body to other experts. *See id.* at 144:20–146:13.

By purporting to validate the accuracy of the cabin animations that he did not create and that rely on data he did not collect or verify, Mr. Pereira would "merely serve as a spokesman for the absent expert, vouching for the truth of his statements." *U.S. Gypsum Co. v. Lafarge N. Am. Inc.*, 670 F. Supp. 2d 748, 758 (N.D. Ill. 2009) (citing *In re James Wilson Associates*, 965 F.2d 160, 172–73 (7th Cir. 1992)). Mr. Pereira has no basis for opining that the cabin animations are accurate. According to his own testimony, Mr. Pereira's is the sort of "opinion connected to existing data only by the *ipse dixit* of the expert that is properly excluded under Rule 702." *Gopalratnam*, 877 F.3d at 781 (citations and internal quotations omitted); *see also Joiner*, 522 U.S. at 146 ("nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert"); *Ashley v. Schneider National Carriers, Inc.*, 2016 WL 3125056, *14 (N.D. Ill. June 3, 2016) (accident reconstructionist's opinion not based on "any particular methodology … is nothing more than the *ipse dixit* of the expert and therefore must be excluded."). The Court should not permit Plaintiffs to introduce expert testimony that "is [not] reasoned, [does not] use[] the methods of the discipline, and is [not] founded on data." *Lang*, 217 F.3d at 924.

## CONCLUSION

For the reasons stated above, Boeing respectfully moves this Court to enter an order excluding Mr. Pereira from testifying that Plaintiffs' cabin animations accurately depict the Flight ET 302 passenger movements and cabin environment during the accident flight.

15

| | |
|---|---|
| DATED: February 8, 2023 | **THE BOEING COMPANY** |
| | By: /s/ *Dan K. Webb*<br>*One of Its Attorneys* |

Dan K. Webb
dwebb@winston.com
Christopher B. Essig
cessig@winston.com
Julia M. Johnson
jmjohnson@winston.com
Samuel M. Zuidema
szuidema@winston.com
**Winston & Strawn LLP**
35 West Wacker Drive
Chicago, Illinois 60601-9703
Phone: (312) 558-5600

Andrew E. Tauber
atauber@winston.com
**Winston & Strawn LLP**
1901 L St. NW
Washington, D.C. 20036
Phone: (202) 282-5000

Michael Scoville
MScoville@perkinscoie.com
Mack Shultz
MShultz@perkinscoie.com
Christopher M. Ledford
CLedford@perkinscoie.com
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000

Jon R. Buck
JBuck@perkinscoie.com
**PERKINS COIE LLP**
110 N. Wacker Dr., Suite 3400
Chicago, Illinois 60606-1511
Phone: (312) 324-8400
Fax: (312) 324-940

-17-

**CERTIFICATE OF SERVICE**

I hereby certify that on February 8, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record.

/s/ *Dan K. Webb*
**WINSTON & STRAWN LLP**
35 West Wacker Drive
Chicago, Illinois 60601-9703
Phone: (312) 558-5600