# EXHIBIT A

# In The Matter Of:
# ETHIOPIAN AIRLINES FLIGHT ET 302

# CRASH - DAMAGES

_____

# CHARLES M. PEREIRA
December 6, 2022

_____

# TC REPORTING, INC.
### 1 DEERFIELD EAST - 1850
### QUOGUE, NY.  11959

CHARLES M. PEREIRA - Vol. I

1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

- - -

IN RE:

ETHIOPIAN AIRLINES FLIGHT ET 302 CRASH


Civil Action No.
1:19-CV-02170 (Consolidated)

- - -

CONFIDENTIAL

PURSUANT TO AMENDED PROTECTIVE ORDER

- - -

December 6, 2022

- - -

Videotaped deposition of
CHARLES M. PEREIRA, conducted at the
location of the witness at 485 Lexington
Avenue, New York, New York, commencing at
9:00 a.m. EST, on the above date, before
Marie Foley, a Registered Merit Reporter,
Certified Realtime Reporter and Notary
Public.

CHARLES M. PEREIRA

2

```
 1
 2    APPEARANCES:
 3
 4    Attorneys for Plaintiffs' Executive Committee
 5    CLIFFORD LAW OFFICES PC
 6    BY: KEVIN P. DURKIN, ESQUIRE
 7        120 N. LaSalle Street
 8        Chicago, Illinois  60602
 9        312.899.9090
10        kpd@cliffordlaw.com
11
12
13    Attorneys for Plaintiffs' Executive Committee
14    KREINDLER & KREINDLER LLP
15    BY: VINCENT C. LESCH, ESQUIRE
16        485 Lexington Avenue
17        New York, New York  10017
18        212.687.8181
19        vlesch@kreindler.com
20
21
22
23
24
25
```

CHARLES M. PEREIRA

3

 1

 2    APPEARANCES:   (Continued)

 3

 4    Attorneys for Plaintiffs

 5    NURENBERG, PARIS, HELLER & McCARTHY, LPA

 6    BY: JAMIE R. LEBOVITZ, ESQUIRE (remote)

 7        600 Superior Avenue East

 8        Suite 1200

 9        Cleveland, Ohio  44114

10        216.230.6834

11        jlebovitz@nphm.com

12

13

14    Attorneys for Plaintiffs

15    ROMANUCCI & BLANDIN LLC

16    BY: DAVID NEIMAN, ESQUIRE (remote)

17        321 North Clark Street

18        Suite 900

19        Chicago, Illinois  60654

20        312.458.1000

21        dneiman@rblaw.com

22

23

24

25

CHARLES M. PEREIRA

4

1

2   APPEARANCES:  (Continued)

3

4   Attorneys for Plaintiffs

5   COTCHETT PITRE & McCARTHY LLP

6   BY: FRANK M. PITRE, ESQUIRE (remote)

7       JOHN PAUL THYKEN, ESQUIRE (remote)

8       ANDREW BRITTON, ESQUIRE (remote)

9       840 Malcolm Road

10      Suite 200

11      Burlingame, California  94010

12      650.697.6000

13      fmpitre@cpmlegal.com

14

15  Attorneys for Plaintiffs

16  HUGHES SOCOL PIERS RESNICK & DYM, LTD.

17  BY: CHARLIE WYSONG, ESQUIRE

18      70 West Madison Street

19      Suite 4000

20      Chicago, Illinois  60602

21      312.580.0100

22      cwysong@hsplegal.com

23

24

25

CHARLES M. PEREIRA

5

1

2    APPEARANCES:   (Continued)

3

4    Attorneys for Plaintiffs

5    POWER ROGERS, LLP

6    BY: JONATHAN M. THOMAS, ESQUIRE (remote)

7        70 West Madison Street

8        Suite 5500

9        Chicago, Illinois  60602

10       312.313.0202

11       jthomas@powerrogers.com

12

13

14   Attorneys for Defendant The Boeing Company

15   WINSTON & STRAWN LLP

16   BY: CHRISTOPHER B. ESSIG, ESQUIRE

17       35 West Wacker Drive

18       Chicago, Illinois  60601

19       312.558.5600

20       cessig@winston.com

21

22

23

24

25

CHARLES M. PEREIRA

6

1

2  APPEARANCES:  (Continued)

3

4  Attorneys for Defendant The Boeing Company

5  PERKINS COIE LLP

6  BY: CHRISTOPHER LEDFORD, ESQUIRE

7       JEFFERY S. CLACKLEY, ESQUIRE

8       1201 Third Avenue, Suite 4900

9       Seattle, Washington  98101

10      206.359.8000

11      cledford@perkinscoie.com

12

13  THE BOEING COMPANY

14    In-house Counsel

15      ALLISON KENDRICK, ESQUIRE (remote)

16

17  ALSO PRESENT REMOTELY:

18      Tracy A. Brammeier, Clifford Law

19      Sanja Petrevska, Clifford Law

20      Jennifer Gordon, Clifford Law

21      Jackie Gribbon, Clifford Law

22      Nabilah Hossain, Cotchett Pitre

23                      & McCarthy

24      Theresa Winter, TC Reporting

25

CHARLES M. PEREIRA

1

2   VIDEOGRAPHER:

3       Joseph Raguso, TC Reporting

4

5

6   VIDEOCONFERENCE MONITOR:

7       Craig Jones, TC Reporting

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CHARLES M. PEREIRA

8

1

2                          -   -   -

3                  TRANSCRIPT INDEX

4                                    PAGE

5   APPEARANCES...................... 2 - 7

6   INDEX OF EXHIBITS................ 9

7   EXAMINATION OF CHARLES M. PEREIRA:

8   BY:  MR. LEDFORD.................. 16

9   BY:  MR. DURKIN................... 293

10  BY:  MR. LEDFORD.................. 308

11  AFTERNOON SESSION................ 196

12  SIGNATURE PAGE................... 316

13  ERRATA........................... 317

14  REPORTER'S CERTIFICATE........... 318

15

16  EXHIBITS WITH ORIGINAL TRANSCRIPT

17

18                       -   -   -

19

20

21

22

23

24

25

CHARLES M. PEREIRA

9

1

2                          -   -   -

3                      E X H I B I T S

4                          -   -   -

5       NO.          DESCRIPTION                    PAGE

6    Exhibit 280    Plaintiffs' Rule                 17

7                   26(a)(2)(B) Disclosure of

8                   Charles M. Pereira

9

10   Exhibit 281    Excel spreadsheet                45

11

12   Exhibit 282    Boeing's Revised Rule           135

13                  26(a)(2)(B) Disclosure of

14                  Mike Poole

15

16   Exhibit 283    Animation video                 200

17

18   Exhibit 284    Plaintiffs' Rule                206

19                  26(a)(2)(B) Disclosure of

20                  Thomas R. Jenkyn, Ph.D.,

21                  PEng

22

23   Exhibit 285    Report of Craig T. Mallak       208

24                  September 21, 2022

25

CHARLES M. PEREIRA

10

1

2                           -   -   -

3                    9:08 a.m. EST

4                           -   -   -

5          THE VIDEOGRAPHER:  Good morning.

6     This is the videographer Joe Raguso of

7     TC Reporting.  This is the deposition

8     of Charles M. Pereira being taken in

9     the matter of In Re: Ethiopian

10    Airlines Flight ET 302 Crash, Case

11    1:19-CV-02170 (Consolidated.)

12          Today's date is Tuesday,

13    December 6th, 2022, and the

14    approximate time is 9:08 a.m. Eastern

15    Time.

16          Witness and counsel are

17    attending in person for today's

18    deposition at Kreindler and Kreindler

19    at 485 Lexington Avenue, 28th floor,

20    New York, New York  10017.  Other

21    counsel will also be appearing

22    remotely via video conference.

23          Before we proceed, I would like

24    to do a roll call.  I have a list of

25    law firms appearing today.  When I

CHARLES M. PEREIRA

1

2     announce each firm, if counsel can

3     please state your full name on the

4     record so we may note your appearance

5     accordingly.

6          It is Kreindler and Kreindler,

7     LLP.

8          MR. LESCH:  Vincent Lesch,

9     Kreindler and Kreindler, and I'll be

10    the one from Kreindler today, unless

11    there's anyone on remote.

12          THE VIDEOGRAPHER:  Okay.

13          Clifford Law Office.

14          MR. DURKIN:  Kevin Durkin

15    present in the room and probably some

16    other people.

17          THE VIDEOGRAPHER:  Podhurst

18    Orseck.

19          (Pause.)

20          VIDEOCONFERENCE MONITOR:  There

21    are a few online Clifford Law Office

22    folks.

23          MS. BRAMMEIER:  Tracy Brammeier.

24          MS. GORDON:  Jennifer Gordon,

25    remote.

CHARLES M. PEREIRA

12

1

2              MS. GRIBBON:  Jackie Gribbon,

3       remote.

4              THE VIDEOGRAPHER:  Podhurst

5       Orseck.

6              MR. LEDFORD:  Podhurst?

7              THE VIDEOGRAPHER:  Going once,

8       going twice.

9              Okay.  Nurenberg Paris.

10             MS. WINTER:  Jamie Lebovitz will

11      be joining us a little bit later

12      today, and when he joins, we'll let

13      everyone know.

14             THE VIDEOGRAPHER:  Kline and

15      Specter, P.C.

16             (Pause.)

17             MR. DURKIN:  Nobody here from

18      Kline and Specter.  I don't think -- I

19      don't see anybody in the room.

20             THE VIDEOGRAPHER:  Romanucci and

21      Blandin.

22             (Pause.)

23             THE VIDEOGRAPHER:  Beasley

24      Allen.

25             (Pause.)

CHARLES M. PEREIRA

13

1
2          THE VIDEOGRAPHER:   Smith LaCien.
3          (Pause.)
4          THE VIDEOGRAPHER:   Motley Rice.
5          (Pause.)
6          THE VIDEOGRAPHER:   Cotchett
7     Pitre and McCarthy.
8          MR. PITRE:   Good morning,
9     everybody.   From California at 6:11
10    a.m. Frank Pitre appearing for the
11    plaintiff.
12         MR. THYKEN:   John Thyken.
13         MR. BRITTON:   Andrew Britton.
14         THE VIDEOGRAPHER:   Hughes Socol
15    Piers Resnick and Dym.
16         MR. WYSONG:   Charlie Wysong on
17    from Chicago.
18         THE VIDEOGRAPHER:   Power Rogers
19    Law.
20         (Pause.)
21         THE VIDEOGRAPHER:   Is there
22    anyone appearing that has not stated
23    their appearance?
24         MS. KENDRICK:   Allison Kendrick
25    from The Boeing Company.

CHARLES M. PEREIRA

14

1

2          MS. WINTER:  I'm sorry.  Can you

3     repeat that?

4          MS. KENDRICK:  Yeah, Allison

5     Kendrick from The Boeing Company,

6     where it's also 6:11 -- actually, 6:12

7     right now.

8          THE VIDEOGRAPHER:  I will

9     certify that I will be appearing --

10    Craig Jones will be appearing for tech

11    support and video conferences services

12    for all participants in the call.

13          Before we proceed, I will ask

14    that lead counsel for plaintiffs and

15    lead counsel for defendants of today's

16    deposition to stipulate on the record

17    that we are proceeding according to

18    the Federal Rules of Civil Procedure

19    and that this deposition officer may

20    swear in the deponent even though she

21    is not in the physical presence of the

22    deponent and that there is no

23    objection to this at this time, nor

24    will there be an objection to it at

25    any future date.

CHARLES M. PEREIRA

15

1

2           Plaintiff for lead counsel, are

3    you in agreement?

4           MR. DURKIN:  I'm in agreement.

5           MS. WINTER:  Defense lead

6    counsel, are you in agreement?

7           MR. LEDFORD:  I'm in agreement.

8           Do you want us, the defense

9    counsel in the room, to identify

10   ourselves before we proceed?

11          MS. WINTER:  Yes, please.

12          MR. LEDFORD:  So, appearing in

13   person for Perkins Coie, Christopher

14   Ledford and Jeffery Shane Clackley.

15          MR. ESSIG:  Chris Essig for

16   Winston and Strawn.

17          THE VIDEOGRAPHER:  Okay.  This

18   is the deposition of Charles M.

19   Pereira.

20          Marie, you can swear in the

21   witness.

22          THE STENOGRAPHER:  Good morning.

23   My name is Marie Foley.  I am a

24   Certified Shorthand Reporter in the

25   state of New York.  I am also a

CHARLES M. PEREIRA

16

1

2      Registered Merit Reporter and

3      Certified Real-Time Reporter in the

4      United States with NCRA.  I am the

5      deposition officer for today's

6      deposition.

7              Sir, if I could ask you to raise

8      your right hand, please.

9              Do you swear or affirm the

10     testimony you give will be the truth,

11     the whole truth, and nothing but the

12     truth today?

13             THE WITNESS:  I do.

14             THE STENOGRAPHER:  Thank you,

15     sir.

16                     -   -   -

17  CHARLES M. PEREIRA, the Witness herein,

18     having been first duly sworn by a

19     Notary Public in and of the State of

20     New York, was examined and testified

21      as follows:

22  EXAMINATION BY

23  MR. LEDFORD:

24     Q.    Good morning.

25             Mr. Pereira, you prepared a

CHARLES M. PEREIRA

17

1

2      report in this litigation, right?

3           A.    Yes, sir.

4                 MR. LEDFORD:  Okay.  I'm going

5           to mark as Exhibit 280 a copy of that

6           report.

7                 (Exhibit 280, Plaintiffs' Rule

8           26(a)(2)(B) Disclosure of Charles M.

9           Pereira, was marked for

10          identification, as of this date.)

11                MR. LEDFORD:  Do you want to see

12          that?  We'll pass you a copy, but this

13          is --

14                MR. DURKIN:  You know what, I'll

15          keep -- I'll keep my own.

16                MR. LEDFORD:  Okay.

17                MR. DURKIN:  I've got -- save

18          some paper.  You guys take it back to

19          Seattle.

20                (Pause.)

21          A.    That looks like it.

22          Q.    Okay.  So, just to confirm, is

23     Exhibit 280 a copy of the report you

24     prepared?

25          A.    Yes, sir.

CHARLES M. PEREIRA

18

1

2          Q.     I'm going to hand you a pen, and

3     if you could just write "Exhibit 280" on

4     the top.   Thank you.

5          A.     2-8-0?

6          Q.     2-8-0.

7          A.     (Complying.)

8          Q.     So, your report does not mention

9     pre-impact injuries to passengers or crew,

10    right?

11         A.     Not that I recall.

12         Q.     Okay.  So you're not offering an

13    opinion in this litigation about

14    pre-impact injury to passengers or crew,

15    right?

16         A.     To the extent that it's not

17    mentioned in my report, no.

18         Q.     Can you identify any place in

19    your report where pre-impact injury to

20    passengers or crew are mentioned?

21         A.     I recall discussing what the

22    passengers experienced and what the

23    airplane experienced.  I'd have to go

24    through the report line-by-line to see if

25    I have any reference whatsoever to -- to

CHARLES M. PEREIRA

19

1

2      anything passengers might have

3      experienced.

4          Q.    So just to be clear, I'm not

5      asking you about what passengers

6      experienced.  I understand that your

7      report deals with physical forces that

8      you've identified through evaluation of

9      the FDR.  That's not my question.

10             My question is does your report

11     discuss pre-impact injury to passengers or

12     crew?

13         A.    I don't believe so.

14             You're talking medical injury,

15     physical injury, certain types, you know,

16     lacerations, impacts, that type of stuff.

17         Q.    However you would define

18     "injury," but I would include all of

19     those.

20         A.    Okay.

21             Yeah, I don't recall discussing

22     physical injuries of individual

23     passengers, no.

24         Q.    Okay.  So, it's your report.  So

25     I'm just trying to confirm --

CHARLES M. PEREIRA

20

1

2          A.     That's correct, yeah.

3          Q.     In your understanding, your

4    report does not discuss pre-impact injury

5    to passengers or crew, correct?

6                 MR. PITRE:  Objection; asked and

7          answered.

8    BY MR. LEDFORD:

9          Q.     You can go ahead and answer.

10         A.     I believe I've answered it.

11                Yeah, some people may define

12   "injury" differently or certain ways, but

13   I discuss what I discuss in the report and

14   the language speaks for itself.

15         Q.     How do you define "injury"?

16         A.     There is a variety of injury

17   mechanisms, physical, emotional, you know,

18   so.

19         Q.     I didn't ask you about injury

20   mechanisms.  I said how do you define

21   "injury."

22                MR. DURKIN:  The word "injury"?

23                Okay.

24                MR. PITRE:  Objection; asked and

25         answered.

CHARLES M. PEREIRA

21

1

2      A.     The word "injury" I would, to

3   get an exact definition, want to look it

4   up in a dictionary, but basically some

5   form of physical or emotional injury, type

6   of pain, biological or biomechanical

7   injury.  You know, there's a variety --

8   these days there's a variety of

9   definitions of injury, and that's really,

10  you know, beyond the scope of my -- my

11  report.

12      Q.     Okay.  So injury is beyond the

13  scope of your report.

14            I just want to confirm you are

15  not offering an opinion in this litigation

16  about pre-impact injury to passengers; is

17  that right?

18            MR. DURKIN:  Objection.

19            MR. PITRE:  Objection; asked and

20      answered.

21      A.     Beyond what I've written in my

22  report, no.

23      Q.     So here I'm not asking you about

24  just what's written in your report.

25            As you sit here today, do you

CHARLES M. PEREIRA

22

1

2      intend to offer an opinion about

3      pre-impact injury to passengers or crew?

4           A.     Only to the --

5                  MR. PITRE:  Objection; asked and

6           answered.

7           A.     Only to the extent mentioned in

8      my report.  I don't want to provide an

9      answer that would exclude me from having

10     any opinion related to what I've written

11     in my report.  You know, you guys could,

12     at some future time, ask me some question

13     that you may then deem my answer to be

14     related to injury and say that, Well, in

15     the past you testified that you're not

16     here to offer any opinion about injury,

17     and I consider that to be an injury, so

18     therefore you can't answer that way.

19                  My report and the language

20     speaks for itself.  If you want to say

21     that a certain G loading or a certain

22     airplane movement doesn't constitute

23     injury or doesn't result in injury, that's

24     your opinion and your expert's opinion,

25     and I may have my own opinion about that.

CHARLES M. PEREIRA

23

1

2      Q.    You've worked as an expert

3    before, right?

4      A.    Yes, sir.

5      Q.    How many times in the last ten

6    years?

7      A.    Dozens.

8      Q.    Okay.

9            Dozens meaning a hundred times;

10   dozens meaning 24?

11     A.    I don't keep a count.

12     Q.    What's your best estimate?

13     A.    Including all the times I've

14   been retained and not actually had to do

15   anything, probably a hundred.

16     Q.    In the last ten years?

17     A.    Yes, sir.

18     Q.    And when were you first retained

19   as an expert in this matter?

20     A.    I believe it was within a couple

21   days of the accident having happened, if

22   not that same day.

23     Q.    Okay.

24           So you -- you have been working

25   as an expert on this case for nearly four

CHARLES M. PEREIRA

24

1

2    years, right?

3         A.    Yes, sir.

4         Q.    And sounds like you're an

5    experienced expert in litigation.  Is that

6    fair?

7         A.    My CV stipulates my experience

8    and what I'm expert at.

9              Basically I have an aeronautical

10   engineering degree and 15-plus years with

11   the NTSB and 17-plus years since then

12   operating a private entity offering expert

13   assistance to clients.

14        Q.    All right.  But I'm just saying

15   you've been an expert, you say, a hundred

16   times in the last ten years.  So you have

17   experience working as an expert in

18   litigation?

19        A.    Yes, sir.

20        Q.    And you understand, as somebody

21   who is experienced in being an expert,

22   right, that your report is supposed to

23   contain a complete statement of your

24   opinions, right?

25        A.    I believe so, yes, sir.

CHARLES M. PEREIRA

25

1

2      Q.    And it's supposed to express the

3   basis and reason for those opinions,

4   right?

5      A.    Yes, sir.  But as you know,

6   every now and then you guys ask questions

7   that result in answers that go beyond

8   what's stated in the report.  So, to the

9   extent that you guys ask me questions that

10   call for answers that go beyond the scope

11   of the report and if my clients want me to

12   answer a question, then I'm going to

13   answer it.  It depends what you ask.  I've

14   had lawyers ask me from the defense side

15   questions in trials and depositions that

16   go beyond the scope of my report and it

17   surprised me and they asked a question and

18   I gave them an answer, so.

19      Q.    That doesn't seem, actually,

20   responsive to what I was asking.  But

21   let -- let's move on.

22          I'm just trying to confirm, sir,

23   that you understand that your report was

24   supposed to state a complete, or was

25   supposed to include a complete statement

CHARLES M. PEREIRA

26

1

2    of your opinions --

3         A.    Yes.

4         Q.    -- right?

5         A.    And hopefully you'll stay within

6    the bounds of that report and my opinions.

7         Q.    Okay.  So, my questions here,

8    I'm not trying to expand the bounds of

9    your report.  I'm trying to understand

10   what you said in your report.

11        A.    Okay.

12        Q.    And we're going to talk about

13   the substance of your opinions in just a

14   moment.

15        A.    Okay.

16        Q.    So, as you're sitting here

17   today, sounds like you are not able to

18   identify any specific opinions in your

19   report about pre-impact injury; is that

20   right?

21             MR. PITRE:  Objection; asked and

22        answered.

23        A.    My report contains a

24   considerable amount of data that

25   ultimately go to evaluation of injury for

CHARLES M. PEREIRA

27

1

2      passengers.  So, I'm not offering any

3      opinions in my report, that I recall, that

4      say "these accelerations or these

5      attitudes caused the following injuries."

6      I don't recall saying that, but somebody

7      else could potentially use the report for

8      that purpose.

9          Q.    Would you state and spell your

10     full name for the record.

11         A.    Charles Manuel Pereira,

12     C-H-A-R-L-E-S M-A-N-U-E-L P-E-R-E-I-R-A.

13         Q.    And you've been, obviously,

14     deposed before, right?

15         A.    Yes, sir.

16         Q.    So you're generally familiar

17     with the ground rules.  We do need to talk

18     one at a time so that the court reporter

19     can take down what we say and the

20     transcript is clear.

21             All your answers must be verbal.

22     Meaning if you agree, you need to say

23     "yes," not just nod your head.

24             I'm going to try to ask clear

25     questions, but if you don't understand

CHARLES M. PEREIRA

28

1

2      what I'm asking, just ask me to clarify.

3      Otherwise I'll assume you understand.

4           A.    Yes, sir.

5           Q.    Agree with all that?

6           A.    Yes, sir.

7           Q.    Okay.

8                 So, I'm going to ask some

9      questions.  Plaintiff's counsel may ask

10     some questions.  You should provide

11     whatever information you feel is necessary

12     to answer my questions, but the deposition

13     will go much faster and we can get out of

14     here sooner if you just answer the

15     questions I'm asking.  And if you want to

16     address additional topics, then do so

17     question -- when you're questioned by

18     counsel for plaintiffs.

19                Does that make sense?

20          A.    Yes, sir.

21          Q.    Okay.

22                Ever testify at a deposition or

23     trial other than as listed in your report?

24          A.    My report, I believe, required

25     four years?

CHARLES M. PEREIRA

29

1

2          MR. DURKIN:  I think the federal

3      rule requires four years, right?

4          MR. LEDFORD:  It does, yes.

5          MR. DURKIN:  Okay.

6   BY MR. LEDFORD:

7      Q.   And so I'm asking other than the

8   ones that you identified, I assumed that

9   in the last four years, what you listed

10  are all of the --

11     A.   That's correct.

12     Q.   -- times you've testified.

13          In the last ten years, have

14  there been other occasions when you have

15  testified in a deposition?

16     A.   Yes.

17     Q.   Okay.

18          Can you tell me what those are?

19     A.   No, I would have to review all

20  my records to document those.  But I've

21  been providing depositions since I left

22  the Board in litigation cases since two

23  thousand -- 2006, probably.  2006, 2007

24  were probably the first ones.

25     Q.   Okay.

CHARLES M. PEREIRA

1

2          You understand that ten years

3   ago would be 2012, right?

4      A.    Yes.

5      Q.    Okay.

6          So I'm asking you since 2012,

7   can you identify any other cases, even

8   just by the accident, in which you have

9   testified at deposition?

10     A.    Again, I'd have to go through my

11  records to try to generate a list.  But I

12  know I've been deposed in aviation, rail,

13  and possibly even marine accidents.  I

14  can't remember which ones I ended up going

15  to deposition.  You know, quite a few of

16  them settled prior to deposition or trial.

17  And -- but I -- I've worked a lot of cases

18  for all modes of transportation and even

19  some non-transportation related ones, and

20  I can't recall exactly at this time.

21     Q.    Do you recall any of them?

22     A.    2012.  Let's see.

23          I probably had deposition and

24  trial on the last bits of Colgan in

25  Buffalo in the matter of the man who was

CHARLES M. PEREIRA

31

1

2    killed in the house up in Buffalo.  That

3    was the last case.  And I believe that

4    pushed into 2012 maybe.  I can't recall

5    exactly.

6              Railroad cases in North Carolina

7    involving Amtrak.

8              Aviation cases involving King

9    Airs, helicopters, the French A330 that

10   crashed out in the middle of the ocean.

11   Alitalia airplane on a flight to Rome.

12   There's been a lot of cases.  I can't

13   recall exactly.  I run seven different

14   businesses and this is one of them and I

15   work 100 to 120 hours a week, and it's

16   hard, and I have children and family, and

17   it's hard to recall exactly what I do from

18   year to year without actually going

19   through my DayTimer records and seeing.

20        Q.    You work 17 hours a day?

21        A.    Sometimes 24.  But usually at

22   least, I would say at least 7 p.m. to 10 p.m.

23   most days seven days a week.

24        Q.    Have you ever had your expert

25   opinion excluded by a court?

CHARLES M. PEREIRA

1

2      A.     Not that I recall.

3      Q.     Do you recall testifying in

4  trial in the last ten years other than as

5  listed in your report?

6      A.     The first one I testified in

7  trial was in the matter of a 747 that

8  crashed on takeoff in Bagram.  I'm not

9  sure if that's listed in my report or not.

10  But that was the first one that actually

11  went -- actually went to trial and

12  actually had to testify.  The Colgan one

13  went to trial on the matter of the man in

14  Buffalo that died and they put me on the

15  stand at the trial and the defense stood

16  up and said, "Your Honor, we want to

17  settle."  And so the judge took me off the

18  stand, told me to go in the room and wait

19  for a couple hours, and they actually

20  decided to settle and told me I could go

21  home and apologized for making me go to

22  Buffalo.

23      Q.     Okay.

24      A.     But I did --

25      Q.     So did you testify --

CHARLES M. PEREIRA

1
2      A.    I was --
3      Q.    -- or did you --
4      A.    I was on the stand in front of
5   the judge and jury and got sworn in, and
6   defense counsel like yourself stood up and
7   said they wanted to settle and could they
8   please put me in a room while they had
9   discussions to try to settle, and the
10  judge flipped out and said, "Really?  Are
11  you kidding me?"  And so, and two hours
12  later, they came in and said, "Mr.
13  Pereira, you can go to the airport.
14  You're done."
15           MR. LEDFORD:  So, move to strike
16      as non-responsive.
17      Q.    Sir, if you answer --
18      A.    I don't know if that's
19  testifying at trial or not.  I got sworn
20  in on the stand in front of everybody.
21  And I'm not a lawyer that specializes in
22  defining testimony in trial, but it was a
23  trial and there was a judge and jurors and
24  I was sworn in.  But I didn't actually
25  give any testimony because they decided to

CHARLES M. PEREIRA

34

1

2      settle.

3          Q.    Okay.  So you didn't give

4      testimony.

5               Sir, this day is going to go a

6      lot quicker if you answer my questions and

7      tell -- instead of tell stories.

8          A.    I'm trying to answer as

9      factually as I can.  You asked me -- I

10     don't want to be accused of lying because

11     I was sworn in on a stand in a trial and I

12     perceived that to not be testifying at a

13     trial and you in turn perceived that that

14     was testifying at a trial and moved to

15     sanction me for some reason because of

16     that.  So I'm telling you what the facts

17     are, and you can decide whether or not

18     that's testifying in a trial or not.

19         Q.    You can tell me the facts, but

20     like I said, it's going to go much quicker

21     if you tell me facts that are responsive

22     to my questions instead of other stories.

23              So, other than the incident you

24     just mentioned --

25         A.    Yes.

CHARLES M. PEREIRA

35

1

2      Q.     -- do you recall any other

3   instances when you were in a courtroom to

4   testify in the last ten years?

5          MR. DURKIN:  Objection; asked

6      and answered.  He already told you

7      another case, but that's okay.

8      A.     Other than -- other than what I

9   have put in my report, I don't believe so,

10  no.

11     Q.     Okay.

12         You were an NTSB investigator

13  for about 15 years, right?

14     A.     Yes, sir.

15     Q.     Okay.  So, I don't -- now,

16  looking at your report, obviously you do

17  data analysis and you also lay out at a

18  high level the timeline of the accident

19  flight.

20         Is that fair?

21     A.     Yes, sir.  Basically I call it a

22  history of flight.  That's what it's

23  called in the NTSB reports, and I try to

24  mimic that for the tort side.

25     Q.     Understood.

CHARLES M. PEREIRA

36

1
2              So, you're setting out, like I
3     said, that timeline, what you said, the
4     history of the flight.  But I don't see
5     any opinions in your report regarding the
6     conduct of the accident investigation.
7              So, am I correct that you're not
8     offering any opinions in this litigation
9     about how the accident investigation was
10    conducted?
11       A.    I did not write about that in my
12    report.  However, I have reviewed the
13    Miller expert report from your side and
14    provided opinions to my counsel about it
15    verbally, and I do have opinions thereto
16    since I was -- but that was after I wrote
17    my report.  Of course your experts didn't
18    provide that -- that opinion or that set
19    of opinions until after I wrote my report,
20    so I do have opinions with regard to Mr.
21    Miller's report.
22       Q.    Okay.  Well, we'll come back to
23    that.  We'll look at Mr. Miller's report.
24       A.    Yes, sir.
25       Q.    So, you reviewed data from the

CHARLES M. PEREIRA

1

2    flight data recorder from the accident

3    aircraft, right?

4        A.    Yes.

5        Q.    And FDR is the acronym for

6    flight data recorder?

7        A.    Yes, sir.

8        Q.    Okay if I just refer to it as

9    the FDR?

10       A.    Yes, sir.

11       Q.    And just to be clear, the FDR,

12   that's the physical box that's installed

13   on the airplane, right?

14       A.    Yes, sir.

15       Q.    So we're talking about FDR data,

16   we're talking about data that was recorded

17   by that FDR itself during the accident

18   flight, correct?

19       A.    Yes, sir.

20       Q.    Okay.

21             Do you know who manufactured the

22   FDR that was in the accident airplane?

23       A.    I'd have to look at it again in

24   my report.  I believe it was L3.

25       Q.    Okay.

CHARLES M. PEREIRA

38

1

2           And do you recall what model FDR

3    it was?

4       A.    You know, I'd have to look at my

5    report.

6           FA2100 perhaps.

7           MR. DURKIN:  Could he look at

8       his report?

9           MR. LEDFORD:  Please.

10          MR. DURKIN:  Yeah, yeah.  I just

11      want to make sure.

12   BY MR. LEDFORD:

13      Q.    And, sir, by the way, this is

14   not a memory test.  So if you need to

15   consult your report at any point, I'd ask

16   you to do so.  I'm just trying to

17   understand what's in your report and what

18   opinions you'll be offering.

19      A.    Yeah, since I can't actually do

20   an extraction or -- like I typically do.

21   You know, we weren't provided the actual

22   recorders themselves in this case.  So I

23   didn't document the make and model and

24   serial number and everything in my report

25   like I normally would.

CHARLES M. PEREIRA

39

1

2      Q.      Okay.  So let's look again at

3  your report, Exhibit 280.  On page 3.

4      A.      Yes, sir.

5      Q.      In the third full paragraph.

6      A.      Yes, sir.

7      Q.      It says:  I acquired the raw

8  electronic flight data from the accident

9  airplane's FDR via my client via Boeing.

10  I used Boeing and Plane Sciences'

11  parameter configuration and software to

12  process the recorded data into engineering

13  units.

14          Did I read that correctly?

15      A.      Yes, sir.

16      Q.      Mike Poole is the owner of Plane

17  Sciences, right?

18      A.      Yes, sir.

19      Q.      And you used Plane Sciences

20  Insight software --

21      A.      Yes, sir.

22      Q.      -- to process the FDR data into

23  engineering units, right?

24      A.      Yes, sir.

25      Q.      And I understand that often you

CHARLES M. PEREIRA

40

1

2    may correctly think you know where I'm

3    going to go with the question or what my

4    question is going to be, but it will make

5    it easier for the reporter if you can wait

6    until after I finish, and that way we have

7    a nice clean transcript.

8           Okay?

9    A.     Yes, sir.

10   Q.     So, again, you used Mike -- or,

11   you used --

12          MR. LEDFORD:  Sorry.  Strike

13      that.

14   Q.     You used Plane Sciences' Insight

15   software to process the FDR data into

16   engineering units, right?

17   A.     Yes, sir.

18   Q.     And since you used that

19   software, am I correct that, in your

20   opinion, the Plane Sciences' Insight

21   software is reliable?

22   A.     Yes, sir.

23   Q.     And that Insight software is

24   accepted within the aviation accident

25   investigation community as a reliable

CHARLES M. PEREIRA

1

2    method of processing FDR data, right?

3        A.    Yes, sir.

4        Q.    And so, I want to make sure I

5    understand this correctly.

6        A.    Go ahead.

7        Q.    No problem.

8            And by the way, if at any point

9    you need to pause, I appreciate you being

10    here.  I understand you've had the sinus

11    infection, so just let me know.

12            So, do I understand correctly

13    that plotting something into engineering

14    units means that you're taking the raw FDR

15    data, the 1s and 0s and converting that

16    data into measurements for parameters like

17    altitude, airspeed, and accelerations?

18        A.    Yes, sir.

19        Q.    And you actually spoke to Mike

20    Poole on several occasions about

21    processing the FDR data from the accident

22    flight, right?

23        A.    Actually, one of his employees,

24    Bob Hoyle.

25        Q.    Okay.  So, modify that to say

CHARLES M. PEREIRA

42

1

2      you spoke to somebody from Plane Sciences

3      about processing the FDR data from the

4      accident flight, right?

5           A.    Yes, sir.

6           Q.    And who was that employee, did

7      you say?

8           A.    Bob Hoyle.

9           Q.    And you did that to confirm that

10     you had been using the Plane Sciences

11     Insight software correctly, right?

12               MR. LESCH:   Objection to form.

13          A.    I used it -- Mr. Hoyle starting

14     in July of 2021, and through Mr. --

15     through Mr. Poole, got permission to do

16     that, to use Mr. Hoyle in evaluating

17     the -- the data that Boeing was sending

18     and claiming contained the accident data,

19     which I did not believe to be the case.

20     And Mr. Hoyle confirmed that, and we

21     subsequently advised you guys, or Boeing,

22     or somebody, that no, in fact, you had not

23     provided the data for the accident, and

24     you guys eventually came around and said,

25     Oh, okay, you're right, we didn't, and

CHARLES M. PEREIRA

43

1

2   here's some more additional files that

3   might contain the accident data, and that

4   second delivery of data did, in fact,

5   contain the accident data, and Mr. Hoyle

6   assisted me in the confirmation of that.

7       Q.    And you reached out to Plane

8   Sciences and through Mr. Poole to talk to

9   Mr. Hoyle because Mike Poole is an expert

10  in the use of his own Insight software,

11  right?

12      A.    Not to the extent that Mr. Hoyle

13  is.

14      Q.    Is Mr. Poole an expert in the

15  use of Plane Sciences Insight software?

16      A.    I leave that to him to claim.

17  Mr. Poole certainly has decades of

18  experience using and managing the use of

19  readout and analysis software.  Insight is

20  the -- one of the latest names of it.

21  It's been through a variety of different

22  names in the last 30-plus years, but it's

23  currently called Insight.

24          And yes, Mr. Poole has expertise

25  in the use and management of that

CHARLES M. PEREIRA

44

1
2    software.
3        Q.    And Plane Sciences sent you
4    dot-bit and dot-frame files with the
5    process data from the accident flight,
6    right?
7        A.    Yes, sir.
8        Q.    Okay.
9            Did you use those dot-bit and
10   dot-frame files from Plane Sciences when
11   you did your analysis that's shown in your
12   report, or did you create your own dot-bit
13   and dot-frame files?
14       A.    I used the --
15       Q.    You used the dot-bit and
16   dot-frame files from Plane Sciences,
17   right?
18       A.    Yes, sir.
19           MR. LEDFORD:  Okay.
20           So, we're going to look at one
21       of the files that was produced by
22       plaintiffs as part of your expert
23       file.  It's an Excel file with the
24       name "ET 302 Trend."  And that will be
25       marked as Exhibit 281.

CHARLES M. PEREIRA

45

1

2              (Exhibit 281, Excel spreadsheet,

3         was marked for identification, as of

4         this date.)

5              (The above mentioned exhibit was

6         published.)

7              MR. LEDFORD:  I think you should

8         be able to view it on this screen.

9              (Pause.)

10             MR. LEDFORD:  Are we able to get

11        that "Got It" to take the --

12             (Pause.)

13   BY MR. LEDFORD:

14        Q.    Okay.

15             This Excel file ET 302_Trends,

16   was this one that you created?

17        A.    Yes, sir.

18        Q.    And did you use the dot-bit and

19   dot-frame files you received from Mike

20   Poole in order to create this Excel file?

21        A.    Data from it and the data are

22   processed into engineering units, and then

23   you can export those engineering units

24   into Microsoft Excel-type formats and do

25   other work using Excel and other software.

CHARLES M. PEREIRA

46

1

2      Q.    Just so make sure I understand

3   that, you took the dot-bit and dot-frame

4   files that you had received from Plane

5   Sciences and exported some of that data

6   into this Excel file.  Is that right?

7   Or -- and if not, please explain to me how

8   you got from the dot-bit and dot-frame to

9   this Excel file.

10      A.    You can create workspace files.

11  You can create a number of flavors of data

12  and engineering units from those files

13  and -- and then export them in a variety

14  of export formats and CSVs and import

15  those into Excel and process them and do

16  calculations using Excel, using other

17  software that accepts CSV and other

18  formats as input.

19      Q.    Okay.  So, within this Excel

20  file.

21      A.    Yes, sir.

22      Q.    There's different -- different

23  tabs.  So I want to look at the one called

24  "Vertical Accel."

25           I assume that's vertical

CHARLES M. PEREIRA

47

1

2      acceleration data?

3          A.    Yes, sir.

4          Q.    Remember, just wait until I

5      finish asking and then answer, please.

6                I want to look at the headers.

7      So, you've got time and vertical

8      acceleration in G's in A and B, right?

9          A.    Yes, sir.

10         Q.    And the time, it looks like it's

11     a six-digit number.

12               MR. LEDFORD:  And can you expand

13          that column because I do think there

14          is a decimal on time?

15               (Pause.)

16         Q.    Okay.

17               So, in the "Time" column, it

18     looks like there's a six-digit number and

19     three decimal places, correct?

20         A.    Yes, sir.

21         Q.    Okay.

22               Can you tell me what a frame and

23     a subframe are in the context of FDR data?

24         A.    Yes, sir.

25               A frame is a four-second period

CHARLES M. PEREIRA

48

1

2      of data that has four subframes within it,

3      each one second.

4          Q.    So, looking at the header to

5      column A where it says "Time," are the

6      numbers in column A subframe numbers?

7          A.    Those are -- that's basically an

8      elapsed time and subframe reference

9      number.

10         Q.    So, the time in column A, those

11     are subframe reference numbers?

12         A.    Yes, sir.

13         Q.    And each whole subframe

14     reference number corresponds to a second

15     of time; is that right?

16         A.    Yes, from one -- one second is

17     just prior to the decimal place.  So for

18     example, you know, from 96 to 97 would be

19     one second.  Those are, essentially,

20     numbers of seconds so that you can plot.

21     You can't really plot versus hours,

22     minutes, seconds and you can't do

23     calculations on hours, minutes, seconds.

24     You need to have it in decimal seconds or

25     whole seconds in order to do time-based

CHARLES M. PEREIRA

49

1

2    calculations and plots.

3        Q.    Right.

4              And if you wanted to, you could

5    match those subframe reference numbers in

6    column A with universe -- or, Coordinated

7    Universal Time, or UTC time, right?

8        A.    Yes, sir.

9        Q.    Looking at column A, it appears

10   that there's 24 seconds of vertical

11   acceleration data on this spreadsheet.  Is

12   that right?

13             And we can scroll down to the

14   bottom.  So 264 -- sorry, at the very top.

15   So --

16       A.    So you've got 96 up there, so.

17       Q.    Yeah, 96.  264596.

18       A.    24 would go to -- there you go.

19       Q.    So, now that you've looked at

20   the top and the bottom subframe reference

21   numbers, do you agree that in column A,

22   there's --

23             MR. LEDFORD:  Strike that.

24       Q.    So, in looking at column A, are

25   there 24 seconds of vertical acceleration

CHARLES M. PEREIRA

50

1
2    data on this spreadsheet?

3        A.    Approximately, yes, sir.

4        Q.    And when you say

5    "approximately," are you saying that

6    because it goes to --

7        A.    There's decimal places involved.

8    24 is an integer number and there's

9    decimal places there.  So I'd have to

10   subtract the first one from the last one

11   and do the math.

12       Q.    Okay.  But approximately 24 --

13       A.    Approximately 24 seconds.

14       Q.    Okay.

15            So, looking at the bottom of the

16   chart, looking at cell E 385, and it says

17   "Standard Dev," does that stand for

18   "Standard Deviation"?

19       A.    Yes, sir.

20       Q.    In laymen's terms, standard

21   deviation, is that a measure of, kind of,

22   the amount of variation within a set of

23   numbers?

24       A.    Yes, sir.

25       Q.    Okay.

CHARLES M. PEREIRA

51

1

2                And you can determine the

3      standard deviation of a number of data

4      points from a particular line, right?

5           A.    Yes, sir.

6           Q.    And -- and that would be asking,

7      essentially, how closely do those

8      individual data points match the line,

9      right?

10          A.    Yes, sir.

11          Q.    And a smaller standard deviation

12     from the line would indicate that the

13     individual data points are closer to the

14     line, whereas a larger standard deviation

15     would indicate that the individual data

16     points are farther away from the line.  Is

17     that right?

18          A.    I believe so.  You have to allow

19     me time to go through the whole -- I'm not

20     a statistics expert, per se.  But I can

21     perform the calculation based on certain

22     formulas.

23          Q.    Understood.  And I'm just trying

24     to get at right now your -- your

25     understanding of -- of what the -- these

CHARLES M. PEREIRA

52

1

2      terms mean.

3          A.      Yes, sir.

4          Q.      I want to make sure we're on the

5      same page there.

6                  So, when you're creating

7      something like a trendline, you'd prefer

8      to have a smaller standard deviation,

9      right?

10         A.      Not -- I guess if you're trying

11     to get the best -- the best accuracy, per

12     se, or the least spread in the deviation,

13     yes, sir.

14         Q.      Okay.  So if you're looking for,

15     essentially, the line that passes closest

16     to all the individual data points, that

17     would correspond to the -- the smallest

18     standard deviation, right?

19         A.      Yeah.  There's a variety of

20     reasons for doing calculations like that.

21     In this case, I just happen to, for the

22     sake of ease and quickness, just use this

23     particular standard deviation calculation

24     just to provide some knowledge of the

25     potential standard deviation spread for

CHARLES M. PEREIRA

53

1

2    that parameter where we -- where we didn't

3    have all of the data from that point to

4    the impact.

5         Q.    The standard deviation of these

6    vertical acceleration points from -- from

7    a line, and we're going to get to that in

8    a minute.

9         A.    Yeah.

10        Q.    Over these 24 seconds, right?

11        A.    Yes, sir.

12             I don't think that the

13   calculation was over the full 24 seconds,

14   but --

15        Q.    You're right, and I apologize.

16   I think it's over the green shaded area,

17   which I believe is the last three.  And so

18   we're going to get to that.

19        A.    Okay.

20        Q.    But again, so just again

21   circling back to make sure we're on the

22   same page in more laymen's terms because

23   I'm not a statistician.  Having a smaller

24   standard deviation means the -- the

25   trendlines more closely follows the data,

CHARLES M. PEREIRA

54

1

2      right?

3          A.    Yes, sir.

4          Q.    Okay.  So, let's look at your

5      standard deviation calculation.  I think

6      if you actually click on that, it's a

7      little hard to see, but maybe you can see

8      it on your screen there.

9          A.     Yeah, there's an equation up

10     there.

11         Q.     Okay.

12                And so, it looks like you

13     calculated the standard deviation for the

14     data shaded green on this spreadsheet; in

15     other words, from rows 338 to 385.

16                Is that right?

17         A.    Yes, sir.

18         Q.    And that green shaded area from

19     rows 338 to 385 comprises three seconds of

20     vertical acceleration data, right?

21         A.     I believe so, approximately.

22         Q.    And when you say "approximately,"

23     you're talking about the fact that

24     there's -- it goes out to the

25     thousandths --

CHARLES M. PEREIRA

55

 1

 2         A.     There's decimal places.

 3         Q.     The closest full second is 3

 4    seconds, right?

 5         A.     Yes, sir, I believe so.

 6         Q.     Okay.  And so, I see some of

 7    your calculations include up to six

 8    decimal places.

 9              Would you agree, can we just

10    confine our discussions to two decimal

11    places?  Is that sufficiently accurate?

12         A.     Sure.

13         Q.     Okay.  And if there -- as we go

14    along, if there's some reason you need to

15    be more precise to answer a question, just

16    let me know.

17         A.     Right.

18         Q.     I just don't want to have to

19    read out six digits every time I ask a

20    question.

21         A.     Yes, sir.

22         Q.     So, I just want to go through

23    the -- the standard deviation calculations

24    step-by-step to make sure I understand it.

25              So -- so, it looks like you

CHARLES M. PEREIRA

56

1
2    calculated, first of all, the -- the
3    average vertical acceleration of negative
4    1.47 G's during that three seconds, right?
5         A.    Can you repeat the question
6    again?
7         Q.    Sure.
8               So, you calculated the average
9    vertical acceleration of negative 1.47 G's
10    during those three seconds, right?
11        A.    I believe so.
12        Q.    Okay.  And that's the value --
13        A.    The third column.
14        Q.    Column C?
15        A.    Yes, sir.
16        Q.    Negative 1.47?
17        A.    I believe so, yes, sir.
18        Q.    But your understanding you took
19    the vertical acceleration values in the
20    green shaded area and averaged those and
21    got negative 1.47, right?
22        A.    I believe so.  I'd have to look
23    at the equation for those cells, but --
24            MR. DURKIN:  Is there a
25        particular cell you'd like me to

CHARLES M. PEREIRA

57

 1
 2      click?
 3             THE WITNESS:  Click on any of
 4      those.
 5             Yeah, that's just a number.  If
 6      you go to the column all the way to
 7      the top of column C and look at the
 8      number.
 9             MR. LEDFORD:  The top of the
10      green shaded.
11             THE WITNESS:  There you go.
12      A.    Yes, sir.
13      Q.    Okay.  So it says average there,
14  right?
15      A.    Yes, sir.
16      Q.    Okay.
17             So your understanding that's the
18  average vertical acceleration during
19  the -- those approximately three
20  seconds --
21      A.    Yes, sir.
22      Q.    -- right?
23      A.    Yes, sir.
24      Q.    Okay.  So let's turn back to
25  your report for a moment at page 22.  It's

CHARLES M. PEREIRA

58

1
2   the one you have in front of you,

3   Exhibit 280.

4        A.    Yes, sir.

5        Q.    There's a chart labeled

6   "Estimated Trends to Impact" on page 22.

7   And it looks like it shows certain FDR

8   data, including vertical acceleration for

9   approximately the last five seconds before

10  impact.

11            Is that right?

12            THE WITNESS:  Can you pause for

13       just one second?

14            MR. LEDFORD:  Sure.

15            THE WITNESS:  Can I ask you to

16       ask them to turn the temperature in

17       the room up just a little bit?  I grew

18       up in Miami, Florida. I don't like the

19       cold, so.

20            MR. LEDFORD:  Sure.  Do you want

21       to -- should we pause?  Why don't we

22       go off the record for just a moment if

23       you want a break?

24            THE WITNESS:  I'm good.

25            I just feel cold air blowing

CHARLES M. PEREIRA

1

2          directly on me, and with my sinus

3          infection and everything else that

4          I've had for the last week, I'd prefer

5          to not have that.  My legs are getting

6          cold.

7               (Pause.)

8               THE WITNESS:  Ready when you

9          are.

10    BY MR. LEDFORD:

11         Q.    Okay.  So you're at page 22 of

12    your report?

13         A.    Yes, sir.

14         Q.    All right.  And that's a chart

15    labeled "Estimated Trends to Impact"?

16         A.    Yes, sir.

17         Q.    And it looks like it shows

18    certain FDR data, including vertical

19    acceleration for approximately the last

20    five seconds before impact.

21               Is that right?

22         A.    Yes, sir.

23         Q.    And if we wanted to show the

24    average vertical acceleration that you

25    calculated, we'd draw a straight

CHARLES M. PEREIRA

60

1

2    horizontal line across the chart at

3    negative 1.47 G's, right?

4         A.    For that analysis period, yes,

5    sir.

6         Q.    Yeah.

7              I've got a ruler and I've got a

8    pen.  I'll ask you to do your best to draw

9    a line at negative 1.47 G's and to label

10   that line as "Line A."

11             MR. DURKIN:  Do you want to take

12        a -- just a straight line across.

13             MR. LEDFORD:  Just a straight

14        line across.

15             MR. DURKIN:  Okay.  Got it.

16   BY MR. LEDFORD:

17        Q.    Assuming you would agree that

18   that would reflect the average vertical

19   acceleration during that time period that

20   you calculated.

21        A.    May I please be allowed to go

22   get my reading glasses?

23        Q.    Absolutely.  Why don't we go off

24   the record and you can do that.

25             THE WITNESS:  Okay.

CHARLES M. PEREIRA

61

1

2              THE VIDEOGRAPHER:  We are off

3       the record.

4              The time is 9:57 a.m.

5              (Recess taken.)

6              THE VIDEOGRAPHER:  We are back

7       on the record.

8              The time is 10:10 a.m.

9    BY MR. LEDFORD:

10      Q.    Mr. Pereira, so right now we're

11   looking at your report at page 22, the

12   chart labeled "Estimated Trends to

13   Impact."

14           Right?

15      A.    Yes, sir.

16      Q.    Okay.  And as I think we had

17   discussed before, that shows certain FDR

18   data, including vertical accelerations for

19   approximately the last five seconds before

20   impact, right?

21      A.    Yes, sir.

22      Q.    Okay.  And I had asked you to

23   draw a line on that chart reflecting the

24   average of vertical acceleration of

25   negative 1.47 G's, right?

CHARLES M. PEREIRA

62

1

2      A.     Yes, sir.

3      Q.     And have you done so?

4      A.     Approximately.

5      Q.     Approximately.  Understanding

6   you can't get exactly down to the

7   hundredth decimal place on that chart, but

8   you've made an effort to draw a horizontal

9   line at negative 1.47 G's, right?

10     A.     Just a hair less than minus

11  1.475.

12     Q.     Perfect.  And can you label

13  that, just so we can keep track of it, can

14  you draw an "A" and a little arrow to the

15  side?

16     A.     (Complying.)

17     Q.     Perfect.  Okay.

18            So, then returning to your

19  calculation in the Excel spreadsheet,

20  which is Exhibit 281.  So, you subtracted

21  the average vertical acceleration of

22  negative 1.47 G's from the specific values

23  for vertical acceleration recorded on the

24  FDR which are shown in column B and then

25  squared the resulting number.

CHARLES M. PEREIRA

63

1

2          Do I have that right?

3     A.    You'd have to look at the

4     equations.

5     Q.    Sure.  Let's click on one of the

6     cells in column D.

7          So, it looks like you have taken

8     the actual values in column B, subtracted

9     the average of 1.47 in column C, and then

10    squared the result.

11         Am I reading that equation

12    correctly?

13    A.    I believe so.

14    Q.    And the resulting number is

15    shown in column D, right?

16    A.    Yes, sir.

17    Q.    Okay.

18         So, you then took the values in

19    column D and calculated the standard

20    deviation, and that's shown in cell E 386,

21    right?

22    A.    Yes, sir.

23    Q.    Right under the label "Standard

24    Dev."

25         And that's the standard

CHARLES M. PEREIRA

64

1

2      deviation of the actual vertical

3      accelerations during those three seconds

4      from the average vertical accelerations

5      during those three seconds, right?

6          A.     Yes, sir.

7          Q.     And the standard deviation,

8      again just going to the hundredth decimal

9      place, is 0.36, right?

10         A.     Yes, sir.

11         Q.     Okay.

12              So, returning to the chart on

13     page 22 of your report, that solid red

14     line is the actual vertical accelerations

15     regarded by the FDR, right?

16         A.     Yes, sir.

17         Q.     So, when you calculated in cell

18     386, that's the standard deviations of the

19     actual vertical accelerations from line A

20     that you drew, right?

21         A.     Yes, sir.

22         Q.     So another way of saying that is

23     you calculated the standard deviations of

24     the solid red line from line A, right?

25         A.     Yes.  Yeah.

CHARLES M. PEREIRA

1

2        Q.    So, none of what we just talked

3    about for how you calculated the standard

4    deviation is in your report, right?

5        A.    Other than presented in this

6    graphic on page 22.

7        Q.    Other than the graphic on page

8    22 and, in fairness, also --

9        A.    The supporting spreadsheet.

10       Q.    -- the spreadsheet?

11       A.    Yes, sir.

12       Q.    So, let's talk about the slope

13    you calculated.  And I'm looking on the

14    spreadsheet again cell G 385 says "SLOPE"

15    and underneath it there's a number, right?

16       A.    Yes, sir.

17       Q.    So, it looks like you used the

18    slope function in Excel.

19            Explain to me what that function

20    does.

21       A.    Calculates slope.

22       Q.    Can you be any more specific

23    about what that function does?

24       A.    I'd have to look at the equation

25    in there.  It -- I can't really read

CHARLES M. PEREIRA

66

1

2     'cause it's too far away, but I think the

3     slope is the function name and then you

4     input the -- you know, I read to refresh

5     my memory somewhere on how to properly

6     input the arguments for the slope function

7     in Excel and input the arguments and out

8     comes the number.

9          Q.     And why did you choose the slope

10    function in Excel?

11         A.     Because that's what the -- the

12    method that I was using required.

13         Q.     What --

14         A.     The method for calculating the

15    standard deviation and performing the --

16    the -- the max and the min estimates that

17    I was attempting to do.

18         Q.     When you say it required that,

19    what -- what specifically required it?  Is

20    there a formula?

21         A.     Yeah, there's a formula and I

22    went online and looked at the various ways

23    for calculating standard deviation, and

24    this was the method that I chose.

25         Q.     That's not in your report,

CHARLES M. PEREIRA

67

1

2      right?

3          A.    No.

4          Q.    There's no explanation of why

5      you chose this method of calculating --

6          A.    No.

7          Q.    -- the standard deviation?

8                And when you say you went

9      online, are you saying you -- you Google'd

10     how to --

11         A.    Go to Google how to calculate

12     standard deviation and refreshed my memory

13     on the different methods and used this

14     approach to do so.

15         Q.    When is the last time you took a

16     statistics class?

17         A.    I don't think ever.

18         Q.    Have you ever had any training

19     on statistical analysis?

20         A.    No.  Other than what was, you

21     know, included in my mathematics courses

22     over the decades, which was a long time

23     ago.

24         Q.    When you say "over the decades,"

25     which year did you graduate from

CHARLES M. PEREIRA

68

1

2      Embry-Riddle?

3          A.     1989.

4          Q.     1989.  So, in the intervening 33

5      years, you haven't had any courses or

6      training in statistical modeling --

7          A.     No.

8          Q.     -- right?

9          A.     No, sir.

10         Q.     Okay.  So, you did some

11     Googling, determined that the slope

12     function would be the way to calculate the

13     standard deviation.

14             Do I have that right?

15         A.     This whole process.  Yeah, the

16     whole equation and process.

17         Q.     Okay.

18             Do you recall what webpage you

19     found that information on?

20         A.     No.

21         Q.     Was it -- was it Wikipedia?  Was

22     it --

23         A.     It might have been -- I'm sure

24     Wikipedia was probably one of the ones I

25     referenced and read some things to.

CHARLES M. PEREIRA

69

1

2      That's usually one of my standard choices.

3          Q.    Okay.  But there's not -- is

4      there a specific website you could point

5      us to and say, "This is the method that I

6      followed"?

7          A.    No, sir.

8                It's documented in the

9      equations, and you can Google how to

10     calculate standard deviation and I'm sure

11     you'll find this process there.

12         Q.    Okay.

13               So, I'll represent to you that

14     with the slope function, Microsoft or one

15     of its help pages, says:  Return the slope

16     of the linear regression line through data

17     points in known Ys and known Xs.

18               Does that sound right?

19         A.    Yes, sir.

20         Q.    And can you interpret what that

21     sentence means?

22         A.    Calculate slope DY, DX gives you

23     the rate of change of something,

24     basically.

25         Q.    Essentially the angle of the --

CHARLES M. PEREIRA

70

 1
 2    the line?
 3        A.    That's what you end up getting,
 4    yes, sir.
 5        Q.    Okay.
 6              And it -- is the intent here to
 7    get the slope of the line that best fits
 8    the data?
 9        A.    Yes, sir.
10        Q.    Okay.  So here we're talking
11    about a slope of a line that best fits the
12    vertical acceleration data points over the
13    three seconds in the green shaded data,
14    right?
15        A.    Approximately, yes, sir.
16        Q.    So, another way of thinking
17    about that, right, is that you're
18    calculating the slope of the line from
19    which the vertical acceleration data would
20    have the smallest possible standard
21    deviation, right?
22        A.    Yes, sir.
23        Q.    And the slope of the line you
24    calculated looks like it's negative .4014,
25    right?

CHARLES M. PEREIRA

1

2          A.     Yes, sir.

3          Q.     And so that corresponds to a

4   line that is sloping downward as you move

5   from left to right.  Is that right?

6          A.     Yes, sir.

7          Q.     Okay.  And that -- that roughly

8   corresponds to vertical accelerations

9   becoming more negative over time.

10         A.     Yes, sir.

11         Q.     Right.

12                Just to make sure that we're

13  using the same terminology, because I

14  sometimes get things upside down here,

15  when I'm talking about an increase of a

16  negative G, what I mean by that is that

17  the -- the negative G is moving farther

18  away from zero.

19                Does that make sense, or do you

20  prefer to discuss it in a different way?

21         A.     The parameter's becoming more

22  negative as a function of time.

23         Q.     Okay.  More negative?

24         A.     Yes, sir.

25         Q.     Okay.  Okay.

CHARLES M. PEREIRA

72

1

2              So, you've calculated that slope

3   showing that this green shaded data

4   establishes a general trend of the

5   vertical accelerations becoming more

6   negative over time, right?

7       A.    Yes, sir.

8       Q.    Okay.

9              So, if -- and you did that over

10  the -- the last three seconds of data that

11  was used by you, right?

12      A.    Yes, sir.

13      Q.    And just to be clear, if you'd

14  selected a different time range, you'd

15  have a different slope, right?

16      A.    Possibly.

17      Q.    So, for example, if -- if you'd

18  calculated a slope based on the last two

19  seconds of data, you -- you'd have a

20  different slope than what you calculated,

21  right?

22      A.    Yes, sir.

23      Q.    And possibly the slope would be

24  less, meaning the vertical acceleration

25  would change more slowly, right?

CHARLES M. PEREIRA

73

1

2      A.    Yes, sir.

3      Q.    Right.  And -- and that change

4  in slope as you look at different times is

5  because the vertical acceleration is

6  fluctuating up and down, right?

7      A.    Yes, sir.

8      Q.    So, if you look at a different

9  chunk, it's a dynamic parameter, right?

10     A.    Yes, sir.

11     Q.    So any different chunk of data

12  is going to produce a different slope,

13  right?

14     A.    Yes, sir.

15     Q.    Is there any literature or any

16  industry standard setting three seconds as

17  the appropriate period to consider when

18  calculating a slope like this?

19     A.    No.  You choose it at your own

20  volition, you're at your own -- your own

21  decision-making.

22           Again, this is not a -- this is

23  not a -- there's nothing about this that's

24  really a standardized process.  When you

25  are -- you know, the whole attempt here is

CHARLES M. PEREIRA

74

1

2      that we know where the airplane crashed.

3      We know where the data end on this plot as

4      far as being recorded is concerned, and I

5      could have just left -- left it at that,

6      but I'm attempting to -- I know for a fact

7      where the latitude has to go because I

8      know the latitude of the crash site and I

9      know that the airplane was traveling

10     principally in the southerly direction.

11     So almost all of my variation is going to

12     be on latitude with almost zero variation

13     in lat -- in longitude.  And so my

14     principal parameters are in pinning the

15     tail on the donkey for the impact time are

16     elevation and latitude.  And so, if I can

17     establish a vertical line and horizontal

18     lines for those respectively, then I can

19     attempt to provide some form of

20     quantitative evaluation of where the

21     parameters might go during that missing

22     time period, and that's why I call it

23     "Estimated Trends to Impact."

24          Q.    Okay.  So, it sounds like, if I

25     can unpack that and understand it a little

CHARLES M. PEREIRA

1

2      bit more, it sounds like you're saying

3      there's no actual, you know, industry

4      standard or accepted method of doing this,

5      and what I'm talking about when I say

6      "doing this," of calculating changes in

7      vertical acceleration over time, right?

8          A.     Well, anybody can -- the

9      question how did vertical acceleration

10     behave in the missing time period where we

11     don't have data.  You can embark on a

12     variety of statistical analyses and, as

13     you mentioned, you can choose three-second

14     analysis period; you can choose this

15     method of calculating standard deviation;

16     you can choose a different method of

17     calculating standard deviation; you can

18     choose a different time window.  So, and

19     some of those analyses, you know, are

20     going to have different bases for them,

21     but in this case, I just wanted to do a

22     quick estimation to show some potential

23     bounding on the parameters, you know, what

24     could it have been, and, you know, what

25     would you actually expect it to be.

CHARLES M. PEREIRA

76

1

2          There are other -- other ways of

3     going about this, but with the time that I

4     had and with the -- the budget that I felt

5     was appropriate for my clients, this is

6     what I did.

7     Q.    And you just did the three

8     seconds?

9     A.    Yes, sir.

10    Q.    All right.

11          So you -- I don't see anything

12    in your report or in your materials about

13    looking at what a two second chunk of

14    data --

15    A.    No.

16    Q.    -- would look like or a four

17    second chunk of data, right?

18    A.    No.

19          Excuse me.

20    Q.    No problem.  Do you need to

21    pause?

22    A.    No, I'm good.

23    Q.    Okay.

24    A.    Just battling through it.

25    Q.    I appreciate it.

CHARLES M. PEREIRA

77

1

2          So -- so, again -- so, if we

3    were to show this to, for example, to an

4    aeronautical engineer, what I'm hearing

5    you say is they're not going to say this

6    is an accepted method.  They're just going

7    to --

8          A.    This is one method.

9          Q.    This is a method, but is there a

10   reason why you selected this particular

11   method?

12         A.    It seemed like a rational thing

13   to do after researching methods of

14   calculating standard deviation.  And the

15   results that I got, to my engineering

16   judgment, seemed appropriate.

17         Q.    And when you talk about the

18   research you did, you're talking about

19   the -- the Googling that you did, call it

20   Internet research if you want --

21         A.    Yes.

22         Q.    -- of different types of

23   calculating standard deviations?

24         A.    Yes, sir.

25         Q.    And those -- those are the

CHARLES M. PEREIRA

78

1

2      methods you're talking about?

3          A.     Yes, sir.

4          Q.     But it does not include any sort

5      of assessment of, for example, airplane

6      performance, right?

7          A.     Not yet.

8          Q.     So, your report's been

9      disclosed?

10         A.     Yes, sir.

11         Q.     So that is your opinion?

12         A.     But you guys have also produced

13     your own report with additional data, and,

14     as my report says, I reserve the right to

15     perform additional work as additional --

16     additionally tasked and as additional data

17     are provided to me.

18         Q.     Well, and that's something for

19     the lawyers to discuss as we get farther

20     along.

21             And so just to close this out, I

22     don't see any analysis in your report

23     regarding the variability of vertical

24     acceleration data and how that would

25     affect the time period for slope

CHARLES M. PEREIRA

79

1
2    calculation.  Fair to say that's not part
3    of your opinion?
4         A.    Yes, sir.
5         Q.    The slope function just tells us
6    the angle of the line, right?
7         A.    Yes, sir, approximately.
8         Q.    Right.
9               So to actually -- actually plot
10   this, you have to have a y-axis intercept,
11   right?
12        A.    Yeah.  I mean, Y is equal to MX
13   plus B.
14        Q.    Right.
15              So if we want to not just know
16   how much a line is moving up or down but
17   where the line is on the graph --
18        A.    Yes, sir.
19        Q.    -- right, we need to know where
20   it intercepts the y-axis, right?
21        A.    Yes, sir.
22        Q.    Because otherwise you just know
23   the angle of the line, right?  You don't
24   know where it is on the graph?
25        A.    Correct.

CHARLES M. PEREIRA

80

1
2      Q.     Right.
3             Did you calculate a y-axis
4      intercept?
5      A.     I believe I did.  I mean, you
6      can see the line drawn on my graph, so.
7      Q.     I do see that line.
8             Can you tell me where in your
9      report or in any of your Excel
10     spreadsheets that you've calculated the
11     y-axis intercept?
12     A.     I'd have to review it again.
13     It's a multi-tabbed spreadsheet and I'd
14     have -- I'm not sure where I put what now.
15     That was months ago.
16     Q.     Okay.
17            Is it your understanding you did
18     do that work?
19     A.     I did, yes.  I may or may not
20     have captured it on the spreadsheet.
21            Again, this is kind of like
22     notes, kind of like scratch pad.  You do
23     your calculations and, you know, sometimes
24     I document them more than others.
25     Q.     Well, tell you what, at the

CHARLES M. PEREIRA

81

1

2    break, we can have you try and find that

3    information.

4         A.    Okay.

5         Q.    Because I do want to know before

6    we leave today --

7         A.    Yes, sir.

8         Q.    -- if it's in your report

9    materials, I just want to see where you

10   calculated that.

11        A.    Okay.

12        Q.    But just to be clear, as you're

13   sitting here right now, do you recall

14   calculating it?

15        A.    I'm sure I did.  I don't recall.

16             Again, I'm working a lot of

17   cases right now and doing a lot of other

18   jobs at my various businesses.  So it's

19   hard to remember.

20             And I'm 57 years old now, so

21   memory is not a -- it's a diminishing

22   thing with age.

23        Q.    Is it fair to describe the slope

24   line as your effort to calculate a

25   trendline?

CHARLES M. PEREIRA

82

1

2      A.     Part of the trend, yes, sir.

3      Q.     Part of it.

4             The trend over that three

5      seconds of data, right?

6      A.     Yes, sir.

7      Q.     Okay.  So your -- your slope

8      calculation, that's giving you something

9      that you can use on this graph as a -- a

10     trendline --

11     A.     Yes, sir.

12     Q.     -- extended out from that three

13     seconds of data, right?

14     A.     Yes, sir.

15     Q.     Okay.

16            And the trendline, that's the

17     dotted red line on the graph on page 22 of

18     your report?

19     A.     Yes, sir.

20     Q.     Okay.

21            Could you label that dotted red

22     line "B" in the same manner that you did

23     line A?

24     A.     (Complying.)

25            Done.

CHARLES M. PEREIRA

83

1

2        Q.    Okay.

3              And that's a straight line,

4    right?

5        A.    Yes, sir.

6        Q.    And that's a -- something -- you

7    could also call it a linear trendline,

8    right?

9        A.    Yes, sir.

10       Q.    There's other ways to calculate

11   trendlines though, aren't there?

12       A.    Yes.

13       Q.    Like you could use a polynomial

14   trendline to more closely match a curved

15   line, right?

16       A.    If desired, yes, you can -- I

17   was looking for a linear in this case just

18   to be a simplified version.

19       Q.    Okay.

20             When you say -- so, looking at

21   the graph on page 22 of your report, the

22   vertical acceleration in those three

23   seconds does include what appears to be a

24   curve.

25             Did you consider using a

CHARLES M. PEREIRA

84

1

2    polynomial trendline --

3        A.    No.

4        Q.    -- to describe the vertical

5    acceleration data?

6        A.    No, sir.

7        Q.    Okay.  Putting aside any

8    limitations of a linear trendline for the

9    moment.

10            I think you testified earlier

11   that in creating the trendline, you were

12   attempting to create a line that fit the

13   vertical acceleration data as closely as

14   possible, right?

15       A.    Yes, sir.

16       Q.    So in other words, you'd expect

17   that the standard deviation from the

18   trendline would be small, right?

19       A.    Whatever is the results of the

20   equation are.

21       Q.    Well, I guess that -- the

22   line -- the trendline would end up having

23   the smallest standard deviation --

24       A.    Yes, sir.

25       Q.    -- possible, right?

CHARLES M. PEREIRA

85

1

2          A.      Mathematically.

3          Q.      Mathematically speaking.

4                  So in other words, it's going to

5     have the best fit for the data that you're

6     looking at?

7          A.      Yes.  And again, there's a lot

8     of variables that come into play here.

9     This is an actively controlled aircraft

10    that is coming down with two pilots

11    presumably with their hands on the control

12    column and feet on the rudder pedals.  And

13    so there's a -- a variety of potential

14    things that could occur between this last

15    recorded point on this plot and the impact

16    point.  And so, I felt it -- you know, I

17    was just looking for a linear

18    approximation to provide some guidance for

19    my reporting and for my client's

20    subsequent use.

21         Q.      So, we're going to talk in a few

22    minutes about the Mike Poole report, but

23    for the moment, I just want to talk about

24    the data and opinions that you've included

25    in -- in your report.

CHARLES M. PEREIRA

1

2          A.     Yes, sir.

3          Q.     Do I understand correctly that

4    you determined that the FDR data ended

5    before impact?

6          A.     Yes.

7          Q.     And the last subframe you

8    included in your Excel sheet marked as

9    Exhibit 281 is cell A 385 and that value

10   is 264619.9, right?

11         A.     I believe so, yes, sir.

12         Q.     So, describe for me how you

13   estimated the length of time between the

14   FDR data that ends at subframe 264619.9

15   and the impact of the accident flight.

16         A.     I know the latitude, the

17   longitude, and the elevation of the crash

18   site.  I know the last recorded position

19   of the airplane in the air by the flight

20   data recorder and I plot those as a

21   function of time and I put latitude and

22   elevation on the plot here.  I didn't put

23   longitude in this final product because,

24   again, the airplane was flying almost due

25   south, so the variability in longitude is

CHARLES M. PEREIRA

87

1

2    not something that's very useful in that

3    regard because he's flying almost due

4    south.  So I know for a fact from my 33

5    years of accident investigation experience

6    that if I have boundary conditions, and in

7    this case my boundary conditions that are

8    of primary use are latitude and elevation

9    of the crash site, and I know that I have

10   a -- a large mass traveling at a very high

11   speed with a whole lot of inertia and I

12   know that I have to have approximately

13   linear relationship between the -- the

14   last recorded latitude and the known

15   impact latitude and same thing for

16   elevation for my -- my best estimate of

17   the elevation of the airplane at the last

18   recorded time has to be linear from there

19   to the impact elevation.

20       Q.    Again, the calculations you're

21   talking about, are those reflected --

22       A.    Those aren't calculations.

23   Those are strictly plotting of data.

24       Q.    When you say "plotting of data,"

25   are you --

CHARLES M. PEREIRA

88

1

2          A.     This is called a plot right

3     here.  The time is on the x-axis and

4     parameter values are on the y-axis, and

5     this is called a otherwise known as a time

6     history plot.  And I know for an absolute

7     fact where the airplane crashed because of

8     reporting and also Google Earth images

9     that show a huge crater right there at

10    that point, and so I can zoom in on Google

11    Earth and get the exact known center of

12    that crater and that establishes my known

13    elevation of 7,875 feet at the crater, and

14    that establishes my exact known latitude

15    value as shown in the mustard colored

16    values over there to the right which, if I

17    put on my reading glasses, 8.8769 is the

18    degree value for the impact latitude.  And

19    so I know for an absolute fact that is

20    where the parameter trends have to go for

21    impact.

22         Q.     Okay.  And can you tell me

23    what -- what program did you use when you

24    were creating this chart?

25         A.     Insight.

CHARLES M. PEREIRA

89

1

2      Q.     Insight.  And that's the Plane

3   Sciences Insight software --

4      A.     Yes, sir.

5      Q.     -- that we talked about earlier?

6             And so you're saying, if I

7   understand you correctly, that you have

8   this chart with the FDR data and you were

9   plotting these various parameters down to

10   the impact point, the altitude and other

11   parameters down to the impact point.

12             And were you doing that using

13   some sort of ruler tool or something else?

14   I'm trying to understand --

15      A.     There's a plot -- there's a

16   plotting routine within Insight and it

17   says what do you want on the x-axis.  I

18   want time and I want it to come from this

19   FDR file.  And what do you want on the

20   y-axis.  Well, let's see.  I want baro

21   corrected altitude 4R and I want to place

22   the range of that from 7,875 feet to

23   13,875 feet and I want to put 7,875 on the

24   zero axis and I want 10, 20, 30, 40, 50,

25   60, I want to extend up to the 60 percent

CHARLES M. PEREIRA

90

1

2    mark on the y-axis, and therefore I will

3    have approximately 1,000 feet per major

4    tick mark on my y-axis for baro corrected

5    altitude 4R, and then I do the same thing

6    for all the other parameters.  I set up

7    the position that I want them on the plot.

8    I say the range that I want them plotted

9    on the plot.  Same thing with latitude and

10   then out comes the data, plots it on here,

11   and I can do my post-processing and

12   shading colors and stuff in the Adobe

13   suite, you know, after, 'cause basically

14   Insight doesn't have the tools to put my

15   TSC logo, the shading and some of that

16   kind of stuff.  I have to do via

17   post-processing using Adobe Creative Suite

18   products.

19        Q.    So, for parameters like the baro

20   corrected altitude, what I'm trying to get

21   at is did you draw this line, or did you

22   input data into the Insight software that

23   then generated this line?

24        A.    There's a project in Insight and

25   part of that project is the -- the bit

CHARLES M. PEREIRA

1

2      file and the frame file and everything and

3      then the FFD file that converts dots from

4      0s to 1s to engineering units and then --

5      and then you just say -- you know, it

6      knows, because it's an integrated software

7      suite, it knows that when I go into the

8      plotting function, it knows what files I'm

9      using within that project, and I say

10     within that file I want to plot barometric

11     corrected altitude 4R from zero to 60.  I

12     want to plot vertical G's from zero to 50

13     and here's the range that I want to use;

14     here's the title that I want to use; I

15     want to orient 90 degrees.  I'm going to

16     click on it, slide it over here, make sure

17     that lines up there, gets out of the way,

18     make sure everything looks nice and pretty

19     like I want it to, and then, boom, save to

20     pdf and, you know, whatever else I want to

21     do with it.  It's a integrated software

22     suite that was developed for safety board

23     labs to process and analyze flight data

24     recorder, or for that matter any -- any --

25     any data recorder, I can take cruise ship

CHARLES M. PEREIRA

92

1

2    data and I can put it into a format that's

3    usable by Insight and do the same type of

4    thing for a cruise ship that crashes into

5    a reef, like I've done.  I use this for

6    trains, any -- I can use this for any

7    dataset.  I can use this for a pig inside

8    of a pipeline.  Pig is a data recording

9    device that they send down pipelines.

10        Q.    I want to get back to the

11   question I was trying to ask though, which

12   is these trendlines are not in the FDR

13   data, right?

14        A.    That's correct.  Those are other

15   data that I can import as a -- a file and

16   plot it on here.

17        Q.    So, did you generate these

18   trendlines in the Insight software?

19        A.    I -- yes, I placed those --

20   well, they're -- you can import a CSV file

21   from Excel into Insight and plot it on the

22   same plot.

23        Q.    And is that how you created

24   these trendlines?

25        A.    Yes, sir.

CHARLES M. PEREIRA

93

1

2      Q.    Which CSV file did you import

3    into Insight to create these trendlines?

4      A.    I believe this one.

5      Q.    So, describe that process for

6    me, specifically with regard to vertical

7    accelerations.

8            How did you take this file and

9    this sheet within the ET 302 trends Excel

10   file and import that into Insight to

11   create that trendline?

12     A.    Again, that was done a couple

13   months ago, but I'd go into the -- the

14   file and I select within Insight what I

15   want to plot and how I want to plot it,

16   make all the selections interactively with

17   the software up and running.

18     Q.    What selections did you make?

19     A.    The ones that resulted in these

20   curves.

21     Q.    I mean, sir, you understand why

22   I'm asking you this, right?  It's not

23   described anywhere in your report.

24     A.    Yes, sir.

25     Q.    So I have no way of knowing what

CHARLES M. PEREIRA

94

1

2    you actually did to create these

3    trendlines in the Insight software.  And

4    it sounds like you're telling me you don't

5    recall how you did it exactly.

6              MR. DURKIN:  Objection.

7    BY MR. LEDFORD:

8        Q.    You can answer.

9              MR. DURKIN:  Asked and answered.

10       A.    I recall doing it.  I just --

11   I -- I -- you know, this is not the -- you

12   know, I'd have to have time to -- to study

13   my plots and the various spreadsheets that

14   are there to refresh my memory on exactly

15   what I did.

16       Q.    You knew you were going to be

17   deposed today, right?

18       A.    Yes, sir.

19       Q.    Did you look at any of your

20   materials before the deposition?

21       A.    Yeah.

22       Q.    But sitting here right now

23   though, you can't tell me how exactly you

24   generated the trendlines?

25       A.    There's hundreds of hours of

CHARLES M. PEREIRA

95

1

2      work that go into doing this stuff, and

3      remembering every single selection in a

4      particular interactive software window is

5      not something that I could recall without

6      considerable re-study of all the data.

7                They speak for themselves.  You

8      can see the slope.  You can see the

9      intercepts.

10          Q.     We can see approximately, right?

11          A.     Yes, sir.

12          Q.     Can't see in great detail.  You

13     know, for example, you've got measurements

14     on there for vertical accelerations

15     extending out to the thousandths, right?

16          A.     Yes, sir.  And if you look at

17     that spreadsheet, you see the column down

18     there around E 388 where it says minus

19     2.76858 and right next to that is minus

20     2.04871, you see how I have labeled minus

21     2.049 G and minus 2.769 G on this plot,

22     those are those figures rounded up to

23     three decimal places for purposes of

24     illustration on this plot.

25          Q.     So, here's the issue.

CHARLES M. PEREIRA

96

1

2      A.    The same thing with minus 2.408

3   that you see underneath Crash G, that

4   lines up with the dashed line.

5      Q.    So, I understand that you've got

6   an Excel spreadsheet and you've got a

7   chart, but what you're not telling me is

8   how you got from one to the other.

9            Let's look at the chart, the

10  purple shaded area.  It says that's the

11  trend analysis section, right?

12     A.    Yes, sir.

13     Q.    So, look at the time scale on

14  the bottom.  Doesn't appear that it

15  actually extends for three seconds, right?

16     A.    Yeah, it's a little bit -- a

17  little bit less.

18     Q.    I mean, it's actually 2.8

19  seconds, right, if you look at the

20  hashmarks on the bottom?

21     A.    Yes, sir.  And I -- I'd have to

22  look -- you know, that was done in

23  post-processing, so I may have -- I may

24  have put the line for the trend analysis

25  section, when I manually shaded it, I may

CHARLES M. PEREIRA

97

1

2      have put it off slightly.  I'd have to go

3      back and look.  Again, I'd have to go back

4      and look in all the cells and do all the

5      calculations and do all the comparisons.

6          Q.    Do you have a calculator on your

7      phone?

8          A.    Yeah.  Well, I mean, I have it

9      in my head, so.

10         Q.    All right.  Well, tell you what,

11     let's go up to the top of the green shaded

12     area, because I think we can do this

13     pretty easily.  Figure out exactly how

14     much time is on the chart and how much

15     time is on the spreadsheet, okay.

16         A.    My time is 17 on the top.  Go

17     down to the bottom.

18             2.9 seconds, approximately, and

19     change.

20         Q.    Right.  And so -- so, the purple

21     shaded area doesn't actually correspond

22     to --

23         A.    Pretty closely.  Pretty closely.

24             I've got 2. -- 40.5 plus 2.9

25     would be 43.4 and I -- looks like I might

CHARLES M. PEREIRA

98

1
2      be 0.5 second off.
3            I've a got 10.  Let's see.  I've
4      got 1 -- 1, 2, 3, 4, 5, 6, 7, 8, 9, 10.
5      That puts me at 0.5.  So yeah, looks like
6      I might be 0.5 seconds off in my graphic
7      illustration.
8          Q.    Right.  And another way to look
9      at it is you've actually got FDR data --
10         A.    For acceleration.
11         Q.    -- for acceleration that extends
12     past the edge of the trend analysis
13     section, right?
14         A.    Yes, sir.
15         Q.    Right.  So, trend analysis
16     section, it's really part of the trend
17     analysis section on the chart, right?
18         A.    I may have grabbed a little bit
19     too much extra at the beginning and not
20     quite enough at the end when I did my
21     post-processing in Adobe.  I may have
22     placed the shaded window a little bit too
23     far to the left.  So the whole thing would
24     slide to the right a little bit.
25         Q.    Okay.  But it --

CHARLES M. PEREIRA

99

1

2        A.    It wouldn't change -- it
3    wouldn't change -- the actual numbers are
4    not changed by the placement of that
5    shaded area.
6        Q.    All right.
7            I mean, you agree it's important
8    to be precise when we're doing these
9    calculations, right?
10        A.    It -- it is and the shaded
11    section in here is -- was strictly a
12    post-processing graphics shading.  It
13    didn't have anything to do with what's in
14    the spreadsheet or any of the numbers that
15    are in there.
16        Q.    Okay.  So, the shaded area that
17    says "Trend Analysis" section isn't
18    actually the section you looked at when
19    you're doing your trend analysis, right?
20        A.    Again, I'd have to go back and
21    look at everything again and convert the
22    times from something numbered to clock
23    time.
24        Q.    Well, the right edge of the
25    trend analysis section doesn't match up

CHARLES M. PEREIRA

100

1
2    with your last bit of vertical
3    acceleration data.  Is that right?
4              Just look at your own chart.
5         A.   Yeah, that's -- the shade does
6    not line up with the last -- the last
7    vertical acceleration parameter value.
8         Q.   Right.
9              So, the shaded area is not, in
10   fact, the exact area you looked at when
11   doing your trend analysis, right?
12        A.   It might not be by approximately
13   .1 second.  I might be off in my shading
14   by .1 second.
15        Q.   But you don't really know
16   because, like you said, this is
17   post-processing --
18        A.   Yes.
19        Q.   -- that was not based on the
20   other data, right?
21        A.   The shaded section.
22        Q.   The shaded section, okay.
23        A.   Yeah.
24        Q.   I see the dotted red line and
25   that's line B, that's the trendline and

CHARLES M. PEREIRA

1

2      the dashed lines representing the possible

3      deviation from the trendline from the

4      moment when your data ends and the

5      estimated time of impact, right?

6          A.    Repeat that one more time.

7          Q.    Sure.

8                So, the dotted red lines --

9          A.    Yes, sir.

10         Q.    -- look like they're branching

11     out from --

12               MR. LEDFORD:   Sorry.  Let me

13         strike that.

14         Q.    The dashed red lines appear to

15     be branching out from the -- the dotted

16     red line up to the point of impact, right?

17         A.    Approximately, yes, sir.

18         Q.    Did you hand draw or using a

19     ruler tool these dashed red lines?

20         A.    No, they were drawn using

21     Insight.

22         Q.    Okay.

23               They don't deviate from the

24     dotted line in the same spot, right?

25         A.    Yes, sir.

CHARLES M. PEREIRA

102

1

2      Q.     And they also, if you look at
3   the values at impact, don't actually match
4   up with the scale, right?
5             Just take a look at them and I
6   think you can see that they, in fact, do
7   not match the scale.
8      A.     Well, the dash doesn't continue
9   completely, so I would disagree with you
10   there.  You'd have to -- you'd have to
11   extend it out as a solid line.  But
12   they -- they do coincide approximately.
13      Q.     How did you instruct the Insight
14   software to draw those lines?
15      A.     I can't recall right now.  I
16   have to look at -- I mean, I've got the
17   values in the spreadsheet there and the --
18      Q.     You've got which values?
19             I see that you have the endpoint
20   values, but what I don't see is any
21   indication of where those would be
22   branching off from the trendline.
23      A.     I'm sure there was some basis
24   that I used with respect to the standard
25   deviation analysis calculations as to

CHARLES M. PEREIRA

103

1

2    where I placed them.

3        Q.    You say you're sure there's a

4    basis.

5        A.    Yeah.

6        Q.    Can you point me to where that

7    basis is?

8        A.    No, sir.  Again, that was months

9    ago and I don't recall exactly, and I

10   don't even know if I made notes to that

11   effect.

12       Q.    Let's look at line B.  That's

13   the dotted trendline, right?

14       A.    Yes, sir.

15       Q.    So, granted this is just a

16   visual look at that, but it doesn't appear

17   that it's actually going through, sort of,

18   the center of the data.

19            Do you agree with that?  It

20   looks like it's touching the top points of

21   the data.

22       A.    Yeah, I mean, it's touching the

23   top point of the curve at one point right

24   around 41 seconds.

25       Q.    Yep.  And then it touches the

CHARLES M. PEREIRA

104

1

2      top point of the curve essentially right

3      at the moment of when the --

4            A.      Data end.

5            Q.      -- the data ends.

6            A.      Yes, sir.

7            Q.      Right?

8            A.      Yes, sir.

9            Q.      Okay.

10                   So, I mean, would you agree that

11     a line that is just touching the top two

12     points is not a line of best fit?

13           A.      It depends on the -- the

14     standard deviation calculating --

15     calculation method.  And so I'd have to go

16     through that whole process again to try

17     to -- I tried to be conservative.  I tried

18     not to bias it in our favor or your favor;

19     you know, plaintiffs versus defense.  I

20     tried to be -- my recollection was I tried

21     to be conservative, you know, in doing so.

22                   So, that was my intent was to

23     not offer it in any biased format to

24     benefit one party or the other.  I was

25     just trying to give my clients and the

CHARLES M. PEREIRA

105

 1

 2    subsequent users of my product something

 3    that was an approximation.  That was the

 4    intent here.

 5            And again, this was done months

 6    ago -- months ago.

 7    Q.    Well, sir, I'm -- I'm really

 8    just looking to understand what the data

 9    says, right.  This is FDR data, so I'm

10    trying to understand mathematical

11    calculations that you did.  So --

12    A.    Yes, sir.  And what we're

13    talking about a statistical analysis of

14    the FDR data.

15    Q.    So, can you tell me how you

16    calculated --

17            MR. LEDFORD:  I'll strike that

18        last partial question.

19        (Pause.)

20    Q.    Okay.  Let's -- so, what I'm

21    trying to understand is how you -- you

22    calculated that negative 2.4 G's.  Let's

23    go to cell B 388.  And I'm not sure, can

24    you see it on this screen?  Because it's a

25    little hard to see probably up there.

CHARLES M. PEREIRA

106

1

2          A.     I can see it better up there

3     than I can here.

4          Q.     Whatever works best.  You've got

5     good eyes.

6                 So, it looks like the equation

7     that you used there is I 386 minus A 385

8     times G 386 plus B 385.

9                 So, if I can recall my order of

10    operations here, first I 386 minus A 385.

11                So, I 386 is crash time.

12         A.     Yep.

13         Q.     Minus the last data point that

14    you used in A 385, right?

15         A.     Yes.

16         Q.     So you --

17         A.     So that's a delta T.

18         Q.     So you then estimated the amount

19    of time between the crash and --

20         A.     The last vertical G point.

21         Q.     -- the last vertical G point on

22    this chart, right, and that is

23    approximately how many seconds?

24                Just hold on for just one second

25    because I don't want to -- because the way

CHARLES M. PEREIRA

107

1
2    this chart is.
3              MR. LEDFORD:  Jeff, can you
4         expand column I because there are
5         decimal places?
6              THE WITNESS:  Thank you.
7              (Pause.)
8         A.    So, it's about a little less
9    than 1.5 seconds.
10        Q.    Okay.
11             So you've, through the other
12   work you were talking about earlier,
13   you've determined the crash time was
14   likely at around 21.4?
15        A.    Yes, sir.
16        Q.    And that's --
17        A.    19.9.
18        Q.    -- 19.9, so you're about 1.5
19   seconds of data that is not included on
20   this chart.
21        A.    Yes, sir.
22        Q.    All right.  So that's -- that's
23   I 386 minus A 385, the formula in that
24   cell B 388.
25             So next you would multiply that

CHARLES M. PEREIRA

1

2      time differential times --

3            A.     Slope.

4            Q.     -- G 386 and that's the slope,

5      right?

6            A.     Yeah.

7            Q.     And so that's essentially

8      telling you over this amount of time, the

9      slope is going to -- the slope is --

10           A.     That many G's per second.

11           Q.     -- negative .4014 and it tells

12     us what the ending value is, right?

13                  So essentially what you've done

14     is you've taken a line and extended it

15     down --

16           A.     Y is MX plus --

17                  (Pause.)

18           Q.     Tell you what, why don't we

19     start that over and we'll try to not speak

20     over each other.

21                  Okay.  So, in multiplying that

22     approximately 1.5 seconds times the slope

23     which is in cell G 386, you've essentially

24     determined that the line will drop some

25     set amount, the results of that

CHARLES M. PEREIRA

109

1

2      calculation, over that 1.5 seconds.

3               Is that correct?

4      A.    Yes, sir.

5      Q.    Okay.  And then the last

6      operation is plus B 385 and --

7      A.    That's the last G value.

8      Q.    That's the last G value, okay.

9               So, what you didn't do is you

10     didn't -- you didn't base -- you didn't

11     continue the line based on --

12              MR. LEDFORD:  Actually, strike

13          that.  I think I do understand.  Okay.

14     Q.    So, you have -- you've drawn

15     your slope.  You've extended it out to

16     where you have approximated the -- the

17     time of impact.

18     A.    That's the -- that's the dotted

19     line.

20     Q.    That's the dotted line, okay.

21              Okay.  So I want to return back

22     to something we were talking about

23     earlier.

24              So, do I understand correctly

25     that you continued the vertical

CHARLES M. PEREIRA

110

1

2      acceleration line that you determined

3      using Excel's slope function to the

4      estimated time of impact; is that right?

5           A.    Yes, sir.

6           Q.    Okay.

7                 So your extrapolation of the

8      trendline is line B on the graph, right?

9           A.    Yes, sir.

10          Q.    And that produced a vertical

11     acceleration at impact of negative 2.41

12     G's, right?

13          A.    Yes, sir.

14          Q.    So, you then took the standard

15     deviation of 0.36 that you calculated and

16     used that to arrive at a range of

17     potential G values at impact of negative

18     2.05 to negative 2.77, right?

19          A.    Yes, sir.

20          Q.    And that's just subtracting

21     0.36 --

22          A.    Yes, sir.

23          Q.    -- from negative 2.41 and -- or

24     adding 0.36 to negative 2.41, right?

25          A.    Yes, sir.

CHARLES M. PEREIRA

111

1

2          Q.     And that's that range of

3     negative 2.05 to negative 2.77.

4                 And so, how about if we assume

5     the impact was ten seconds past the last

6     data point on your chart.  I mean, using

7     your method, wouldn't that still produce a

8     vertical acceleration range of negative

9     2.05 to negative 2.77?

10         A.     No.

11         Q.     And why is that?

12         A.     Because the -- you would apply

13    the standard deviation to the intercept at

14    the new crash point and it would be -- you

15    said -- you said ten seconds instead of

16    1.5.  So that gives me 8.5.  8.5 times .4

17    is giving me --

18         Q.     So, just to be clear, I'm not

19    asking --

20                MR. DURKIN:  Okay.  Can you let

21         him answer the question first?  Thank

22         you.

23                MR. LEDFORD:  No problem.

24                MR. DURKIN:  That's all.

25         A.     That would give me around minus

CHARLES M. PEREIRA

112

1

2      point 5 G's at impact, and -- and then I

3      would add my standard deviation, so I

4      would be around 5.4 to 6-point something

5      G's at impact, if I extended it out the

6      additional 8-and-a-half seconds that

7      you've suppositioned.

8              MR. LEDFORD:  So, I'm going to

9         move to strike as non-responsive.

10       Q.    The reason, or what I'm actually

11     asking is not what the negative G's would

12     extrapolate out to be.  I'm trying to

13     figure out the range, right, because you

14     have calculated a range --

15       A.    Based off a certain impact time.

16       Q.    Based off a certain impact time,

17     right.  You have decided, or you've looked

18     and you've estimated what the final impact

19     point was, and you've said at that time,

20     there's a potential range of 0.36 up or

21     down.

22       A.    Yes, sir.

23       Q.    And you've based that on a

24     standard deviation, right?

25       A.    Yes, sir.

CHARLES M. PEREIRA

113

1

2      Q.    So, my question is if you

3  extended it out to ten seconds, the

4  standard deviation of the line is still

5  the same, right?

6      A.    That's correct.

7      Q.    So, under your approach --

8      A.    Not knowing any additional data.

9  You don't have any additional data by

10  which to calculate, further calculate

11  standard deviation over the next

12  8-and-a-half seconds.  So absent any data,

13  you, you know, if you -- if I had an

14  additional 8.5 seconds of data, then the

15  standard deviation would probably be

16  different.

17      Q.    What I'm getting at though is

18  that at that 10 second, or you could say

19  20 seconds out, the standard deviation

20  that you're using to calculate the range

21  is still the exact same, right?

22      A.    Because you're basing it on a

23  certain time period.  I mean, your

24  argument is kind of, you know, in my

25  opinion, non-pertinent.

CHARLES M. PEREIRA

114

1

2      Q.    Was there any literature or

3   industry standards that described the

4   creation of a range like you did where you

5   used the standard deviation to predict a

6   range of possibilities for some

7   extrapolated FDR parameter?

8      A.    Yeah, the -- the history and the

9   logic behind the standard deviation

10  calculation which speak for itself.

11     Q.    If the standard deviation was

12  smaller, the final range you determined

13  would be smaller, right?

14     A.    Yes, sir.

15     Q.    So, just hypothetically, right.

16  If you determined that the standard

17  deviation was 0.1 rather than 0.36, you'd

18  have a final range of about 2.3 to 2.5

19  negative G's, right?

20     A.    Say that one more time.

21     Q.    Sure.

22           So, starting at -- you know,

23  your estimation was negative 2.4 G's at

24  the time of impact, right?

25     A.    Approximately.

CHARLES M. PEREIRA

115

 1

 2        Q.    Approximately 2.4.  And again,

 3    this is just a hypothetical.

 4        A.    Yeah.

 5        Q.    So, I'm not going out to the

 6    thousandths.  So, say it's approximately

 7    2.4 G's, negative 2.4 G's at the time of

 8    impact.

 9             Under the method that you

10    followed, if the standard deviation was

11    0.1, right, and we're using the standard

12    deviation to provide the range at the end,

13    then you'd have a range --

14        A.    2.3  to 2.5.

15        Q.    A range of 2.3 to 2.5, okay.

16             And you used the trendline

17    labeled line "B" to estimate vertical

18    accelerations at the time of impact,

19    right?

20        A.    Yes, sir.

21        Q.    It would be possible to

22    calculate a standard deviation of vertical

23    acceleration from line B, right?

24        A.    It would be what?

25        Q.    You could calculate a standard

CHARLES M. PEREIRA

116

1

2    deviation --

3        A.    Yes, sir.

4        Q.    -- of the vertical acceleration

5    data from line B, right?

6        A.    Yes.  I would think it might be

7    zero.

8        Q.    Would be very small whatever it

9    is, right?

10        A.    If it's exactly linear, it

11    should be zero.

12        Q.    No, sorry.  The standard

13    deviation of the vertical acceleration

14    data from line B.  It's not going to be

15    zero.

16        A.    If you were to say that line B

17    was the vertical acceleration, that was my

18    assumption is what you were saying.

19        Q.    Okay.  Line B is just the trend

20    of the vertical acceleration, isn't it?

21        A.    Yes, but I took it to mean, you

22    know, that you -- you were hypoth --

23    hypothesizing that line B was the new

24    vertical acceleration is what I thought

25    you were saying.

CHARLES M. PEREIRA

117

1
2          Q.    Let me be clear there.  I don't
3    want to be confusing.
4                What I'm saying is you have line
5    B and that's the -- the trendline,
6    correct?
7          A.    Yes.
8          Q.    For vertical acceleration.
9          A.    Yes.
10         Q.    And then you have the actual
11   vertical acceleration data, right?
12         A.    Yes.
13         Q.    And line B, that dotted red
14   line, is an attempt to essentially draw a
15   line of best fit through the vertical
16   acceleration data over those three
17   seconds, right?
18         A.    Starting at the final vertical
19   acceleration point, yes.  Applying the
20   slope at that point.
21         Q.    Right.  But it also goes
22   backwards to, you know, on your chart
23   times 084340.5, right?
24         A.    Yeah, but it all fixates around
25   the last point.

CHARLES M. PEREIRA

118

1

2      Q.    Okay.  So --

3      A.    If you take a line of that slope

4  of there and make it intercept that last

5  point, that's the line.

6      Q.    Okay.  But let's talk about,

7  just to be clear what we're talking about,

8  you took three seconds of data and

9  generated a line of best fit through that,

10  correct?

11      A.    Yes, sir.

12      Q.    And then you extended that out

13  to the time when you estimated the crash

14  occurred, right?

15      A.    Yes, sir.

16      Q.    So, in the purple shaded area,

17  right, that you could calculate within

18  that purple shaded area what the standard

19  deviation of the actual FDR data for

20  vertical acceleration is from that line of

21  best fit, right?

22      A.    Yeah, it's not really a line of

23  best fit, per se.  It's applying the

24  standard deviation -- it's applying the

25  slope to that final point.  If -- if you

CHARLES M. PEREIRA

119

1

2      wanted to just curve fit and then apply

3      the slope to curve fit, you could put it

4      considerably lower, which would result in

5      consider -- considerably more negative

6      G's.  I didn't -- I didn't do that.  It

7      would have been beneficial to our

8      analysis, but that's not the technique

9      that I -- I chose.

10              MR. LEDFORD:  Move to strike as

11          non-responsive.

12      Q.    Sir, I'm really just trying to

13      figure out, and I think this is just a

14      math question, could you calculate the

15      standard deviation of the acceleration

16      data in the purple shaded area from the

17      dotted red line?

18      A.    Could I assume that the dotted

19      red line is actually the vertical

20      acceleration and calculate standard

21      deviation based off of that instead of the

22      actual G's?  Is that what you're asking?

23      Q.    No.

24      A.    Okay.

25      Q.    You see a dotted red line on

CHARLES M. PEREIRA

120

1
2    that chart, right?

3        A.    Yes, sir.

4        Q.    And that dotted red line was
5    generated using the slope function in
6    Excel, right?

7        A.    Yes.  And -- and attaching it to
8    the last value of acceleration.

9        Q.    Right.  And that, you mentioned
10   earlier, that's a linear regression line
11   through the data points for vertical
12   acceleration within that purple shaded
13   area, right?

14       A.    It's a slope applied to the
15   final vertical acceleration data point
16   with a -- with a -- an end of the line at
17   that impact point.  So, you know, it
18   speaks for itself.

19       Q.    Apologies.  I'm having trouble
20   understanding whether you're agreeing with
21   me or not.

22            And again, I'm just trying to
23   ask a math question here.

24            MR. DURKIN:  I think he just
25       answered the question, that's all.

CHARLES M. PEREIRA

121

1

2      He's -- you know, so.

3          MR. LEDFORD:  I don't think so,

4      but I'm --

5          MR. DURKIN:  I think he's trying

6      to, but I'm not -- I don't want to --

7          MR. LEDFORD:  I think he's

8      trying to.  I agree.

9          MR. DURKIN:  I think he's

10     doing -- he's doing -- what he -- he's

11     answering the question.

12         MR. LEDFORD:  Let me -- let me

13     try again and see if I can get at

14     this, okay.

15  BY MR. LEDFORD:

16     Q.   This is intended just to be a

17  math question.

18         Is it possible to calculate the

19  standard deviation of the vertical

20  acceleration data from the dotted red

21  line?

22     A.   Yes.

23     Q.   Okay.  And that dotted red line

24  is line B, right?

25     A.   Yes.

CHARLES M. PEREIRA

122

 1

 2      Q.    But the standard deviation you

 3   used was the standard deviation from line

 4   A, right?

 5      A.    That's the -- the average of the

 6   solid red line in the shaded green area.

 7      Q.    I'm not sure if that's a yes or

 8   no.

 9            You used in your calculation up

10   there the standard deviation from line A,

11   right?

12      A.    The standard deviation of the

13   vertical acceleration values from the

14   value in C, yes, sir.

15      Q.    Right.  Which on that chart that

16   you've drawn is line A, correct?

17      A.    Yes, sir.  I'd have to go

18   through all the -- the standard deviation

19   calculation methods there, but I went

20   through the process of calculating

21   standard deviation as shown on -- on that

22   spreadsheet using the vertical

23   acceleration red data and I -- I got a

24   standard deviation using that method and

25   then my method of presenting it was to

CHARLES M. PEREIRA

123

1

2      take the slope and attach that slope to

3      the final vertical acceleration value and

4      project that slope in both directions from

5      that value.

6              MR. LEDFORD:  Move to strike as

7          non-responsive.

8          Q.    I'm trying to ask you very

9      simple questions.

10         A.    That's my -- that's my

11     understanding and interpretation, and

12     that's the answer you're going to get.

13         Q.    So, just to be clear, you

14     calculated the standard deviation from the

15     line labeled "A" on your chart, right?

16         A.    The line labeled "A" on my chart

17     is column C in that spreadsheet.

18         Q.    Yes.

19              And you did not calculate the

20     standard deviation from line B on that

21     chart, even though you could theoretically

22     do so, right?

23         A.    Line B is not an average of the

24     red line, so that would be inappropriate.

25         Q.    Why is it inappropriate?

CHARLES M. PEREIRA

124

1

2      A.    Because you're taking the

3   deviation from the average line, not

4   from -- not from a -- an actual curve that

5   represents a linear approximation of G's

6   over that time period.

7      Q.    So it would be inappropriate to

8   use the standard deviation from the

9   average G's.  Is that what you're saying?

10      A.    No, that's what I'm doing.  I'm

11   using the -- you're -- I don't know what

12   you're getting at, but, you know, you're

13   trying to come up with something in your

14   own head and make me answer it a certain

15   way, and I'm going to answer based off

16   what I know to be the facts.

17      Q.    I want you to answer based on

18   the facts.  I'm just trying to understand

19   what you did.

20      A.    And you're pushing awfully hard

21   to get an answer that you want, so.

22      Q.    What I'm trying to get at is you

23   used a standard deviation that you

24   calculated from line A to then estimate a

25   range of possibilities from line B, right?

CHARLES M. PEREIRA

125

1

2      A.    That is correct.

3      Q.    Are you aware of any literature

4  or industry standards that says that

5  approach is a reliable way to predict

6  future outcomes?

7      A.    It is one of the methods that

8  can be used per the -- the research that I

9  did, and that's what I used.

10     Q.    But you can't tell me which

11  webpage it is that you looked at that

12  would support using that kind of method,

13  right?

14     A.    It was -- again, I've answered

15  the question already.

16          MR. LEDFORD:  Why don't we take

17     a break?

18          MR. DURKIN:  Sounds good.

19          THE VIDEOGRAPHER:  Off the

20     record.

21          The time is 11:17 a.m.

22          (Recess taken.)

23          THE VIDEOGRAPHER:  We are back

24     on the record.

25          The time is 11:37 a.m.

CHARLES M. PEREIRA

126

1

2      BY MR. LEDFORD:

3          Q.    Mr. Pereira, I want to talk

4      about the additional FDR data that Mike

5      Poole recovered.

6                First of all, you're aware there

7      are several utilities that can be used as

8      part of the Plane Sciences Insight

9      software, right, including the analysis

10     utility?

11         A.    Yes, sir.

12         Q.    And is the analysis utility what

13     you used for the work you did in this

14     case?

15         A.    One portion of it.

16         Q.    And when you say "one portion of

17     it," so, the work you did was inside the

18     analysis utility?

19         A.    And animation as well.

20         Q.    And animations, okay.

21         A.    There's a utility called Insight

22     Animation and there's Insight Analysis,

23     so.

24         Q.    And do you know if there's other

25     utilities, or do you know what other

CHARLES M. PEREIRA

127

1

2      utilities are available other than Insight

3      Analysis and Insight Animation?

4           A.    I'm not exactly sure how they

5      packaged all their tools now.  When it was

6      a government set of software that we

7      helped develop with the NTSB and helped

8      fund them when they were part of the

9      Canadian Transportation Safety Board, it

10     was basically all one package, and once

11     they privatized it and they broke out and

12     started making millions of dollars for

13     Mike Poole, Bob Hoyle, I'm not exactly

14     sure.  I don't try to keep track of Mike's

15     privatization and financial maximization

16     efforts.  So I don't really know where

17     Mike's got his unsynchronized data

18     recovery tools now.

19          I -- I don't -- I don't -- I

20     don't use those.  I typically leave those

21     to the -- to the state of manufacture or

22     to Bob Hoyle to perform for me if needed.

23          Q.    So, are you aware of an Insight

24     recovery utility?

25          A.    Yes.

CHARLES M. PEREIRA

128

1

2      Q.    When did you first learn about

3  the Insight recovery utility?

4      A.    Back in the late 1990s.  I mean,

5  there was -- they had a recovery utility

6  that they had been working on ever since

7  they were first developing the -- the

8  software, but back in the days when I used

9  it, it was mostly magnetic tape and we had

10  our own magnetic tape recovery utility at

11  the NTSB that was outside of the Canadian

12  version.  And so the -- the Canadian

13  version that's currently in the Insight

14  product for solid state recorder data, I

15  probably never used that one.

16      Q.    Okay.  And including to the

17  present day you've never used it?

18      A.    Not for the solid state data --

19  data recorder recovery, no.

20      Q.    Okay.

21            So, just to be clear, you've

22  never used the Plane Sciences Insight

23  software's recovery utility?

24      A.    To recover -- to recover solid

25  state data.

CHARLES M. PEREIRA

129

1

2          I probably have used it to

3    recover magnetic tape-based data back in

4    the day using a variety of analog tools,

5    along with the software tools, but it's a

6    different day these days and we're 33

7    years down the road from when I first

8    started using it and things are materially

9    different these days.

10        Q.    So, in drafting your report, you

11   analyzed data that ends exactly at a

12   subframe, right?

13        A.    Yes, sir.

14        Q.    And so you -- do I understand

15   correctly you didn't attempt to analyze

16   data from a partial subframe at the end of

17   the recording?

18        A.    No, sir.  Neither did the

19   Ethiopians or the French BEA lab that they

20   used.

21        Q.    It's fair to say that you

22   weren't aware of the partial subframe

23   until you saw Mike Poole's report?

24        A.    I was aware that there could be

25   data there, but I didn't make any efforts

CHARLES M. PEREIRA

130

1

2    to recover it, nor did I make any efforts

3    to enlist Mr. Hoyle to help me do so.  I

4    didn't think it was necessary.

5        Q.    So, it sounds like if you had

6    thought it was necessary, you would have

7    gone to Plane Sciences?

8        A.    I paid them to help me do what

9    they did, and had I thought it would have

10   been necessary to search for any

11   additional data, I probably would have.

12           And frankly, I assumed that the

13   French BEA had already attempted and

14   wasn't successful.  Since our data, you

15   know, our data matched what they produced

16   for the Ethiopians, I just assumed that

17   that exercise had already been performed

18   and was unsuccessful, and so I used what I

19   used and was surprised and thankful that

20   Bob was able to recover additional data.

21           MR. DURKIN:  What was it,

22       surprised and thankful?  I didn't

23       hear.

24           THE WITNESS:  Yeah, I said I was

25       surprised and thankful to -- to see

CHARLES M. PEREIRA

131

1

2          that they were able to recover

3          additional data.

4                    MR. DURKIN:  I missed it.

5     BY MR. LEDFORD:

6          Q.    So, just to be clear, I want to

7     make sure I understand here.  So, you've

8     looked at the additional data and it

9     sounds like you don't dispute that there

10    is additional data comprising a partial

11    subframe at the end of the FDR data?

12         A.    I'm not surprised by it at all.

13         Q.    Okay.  And are -- and this

14    will -- I'm trying to cut out as many

15    questions as I can here.

16                    Do you dispute the existence of

17    a partial subframe of data at the end of

18    the FDR recording?

19         A.    No, sir.

20         Q.    And are you disputing the

21    accuracy of the additional data that Mr.

22    Poole recovered?

23         A.    I would like to be a part of the

24    process of analyzing those to see which

25    bits he added or subtracted or shifted to

CHARLES M. PEREIRA

132

1

2       get the data to appear to be accurate

3       because it's a process of adding and

4       shifting 0s and 1s in the dataset, perhaps

5       only in one location or perhaps in

6       multiple locations depending on the -- how

7       messy the last portion ended up being.

8              I don't -- I wasn't a

9       participant in those efforts, and so I'm

10      not exactly sure how many liberties they

11      took in adding 0s and 1s and shifting

12      things left and right to try to get the

13      data to look like it's accurate because in

14      the process of recovering unsynchronized

15      data is -- is not a 100 percent

16      one-size-fits-all type of shoe.  You can

17      shift things left and right and add 0s and

18      1s here and there and get different

19      results.

20             I -- I trust that presumably Bob

21      Hoyle did that and got the results that

22      were presented, and I have no reason to

23      believe that they are inaccurate, but then

24      again, I wasn't participant to the

25      process, so my level of understanding and

CHARLES M. PEREIRA

133

1

2      confidence is not as high as it would be

3      had I done so.

4          Q.    Understood.  So -- and I want to

5      draw a distinction there just to be very

6      clear.  I understand that you're not

7      yourself asserting the accuracy of the

8      data because, like you say, you weren't

9      involved in that process.

10         A.    That is correct.

11         Q.    And I -- do I also understand

12     correctly that you're not actively

13     disputing the accuracy of that data?  So

14     in other words, you're not offering an

15     opinion that the -- the data is

16     inaccurate, right?

17         A.    At this time, that's correct.

18         Q.    So, the additional data Mr.

19     Poole recovered shows that negative

20     vertical accelerations didn't simply

21     continue to increase as your -- your

22     trendline suggested, right?

23         A.    It's not a -- a linear

24     progression along that line, no.  It

25     got -- they actually got significantly

CHARLES M. PEREIRA

134

1
2    more negative and then they went
3    significantly less negative and then they
4    went significantly more negative again.
5        Q.    When you say "got significantly
6    more negative," what do you mean by that?
7        A.    They recovered an additional 0.8
8    seconds of data.  And if you like, you can
9    put up that plot of that data and -- from
10   Mr. -- if you could put up the plot of the
11   data from Mr. Poole, his report on the --
12   on the Zoom window.
13           MR. LEDFORD:  Why don't we mark
14       as --
15           MR. DURKIN:  Is it figure 1 of
16       the Poole report?
17           THE WITNESS:  Yes, sir.
18           MR. DURKIN:  I think that's what
19       he's talking about, if you want.
20           MR. LEDFORD:  Why don't we mark
21       this as Exhibit 282?
22           MR. DURKIN:  Is that the Poole
23       report?
24           MR. LEDFORD:  And it's the Poole
25       report.

CHARLES M. PEREIRA

135

1

2          MR. DURKIN:  Great.  Thank you.

3          MR. LEDFORD:  And I'll give you

4     a hard copy.

5          MR. LESCH:  The revised Poole

6     report.

7          MR. DURKIN:  Yeah, that's

8     revised.

9          (Exhibit 282, Boeing's Revised

10    Rule 26(a)(2)(B) Disclosure of Mike

11    Poole, was marked for identification,

12    as of this date.)

13         (The above mentioned exhibit was

14    published.)

15         THE WITNESS:  Is this the

16    additional one, or is this the revised

17    one?

18         MR. LEDFORD:  This is the

19    revised.

20         (Pause.)

21         THE WITNESS:  Okay.

22         Are you operating the Zoom?

23         MR. LESCH:  I am.

24         THE WITNESS:  Will you please

25    move your cursor to the vertical

CHARLES M. PEREIRA

136

1

2          acceleration parameter just past the

3          white vertical line?

4                    MR. LESCH:  That's not my

5          cursor.

6                    THE WITNESS:  Okay.  Who's got

7          that?

8                    MR. LEDFORD:  Well, Jeff can

9          move the little white cross hair.

10                   THE WITNESS:  All right.

11    BY MR. LEDFORD:

12         Q.    All right.  So what you're

13    saying is that it's --

14         A.    Right there.

15         Q.    Yeah.

16         A.    You see the additional, our

17    recovered data stops -- our data stop --

18    the synchronized subframe data ends right

19    there.

20         Q.    Yeah.

21         A.    Which matches what's on the

22    estimated trends plot that we've been

23    debating the last hour.  And then it goes

24    negative.

25                   There are two samples around

CHARLES M. PEREIRA

137

1

2    2-point -- minus 2.02 G's down here, and

3    then it goes back up for two-tenths of a

4    second to 1.62.  Mr. Poole's report states

5    that it did so for half a second.  That's

6    inaccurate.  The time period of decrease

7    of negative G's this period right here,

8    that positive slope right there, that's

9    approximately 0.2 seconds, not 0.5 seconds

10   as stipulated in Mr. Poole's report.  And

11   then it comes right back down very rapidly

12   to minus 1.99 G's at the end.

13       Q.    So, looking at the data, so what

14   we're talking about is --

15       A.    Instead of -- instead of being a

16   straight line to right here, that's about

17   the end of my data right there.  Instead

18   of being a -- a straight line right around

19   here, it -- it takes a more circuitous

20   path.  But as you can see, pitch attitude

21   continues to decrease in the recovered

22   area which tracks.  In fact it's even more

23   negative slope than what I projected.  And

24   so by basic physics, like on a roller

25   coaster, if the track for the roller

CHARLES M. PEREIRA

138

1

2    coaster is continuing to go more negative

3    and, in fact, takes a more negative slope

4    than what it previously had, the

5    consequences on the negative G's are

6    relatively simple to understand.  They

7    get -- they get greater.

8         Q.    Well, I suppose we don't have

9    to --

10              MR. LESCH:  I don't mean to

11         interrupt.  I just want to point out

12         that where he's moving the cursor on

13         the screen I don't believe is being

14         recorded, okay.  Just for

15         everyone's --

16              MR. DURKIN:  Well, he moved the

17         cursor to the yellow line.  Is that --

18              MR. LESCH:  I mean, yeah.

19              THE WITNESS:  Yeah, I moved the

20         cursor from vertical G's to pitch

21         attitude.

22              MR. DURKIN:  To pitch attitude.

23         But, yeah, but anything for the record

24         so it's clear on the record where it

25         is.

CHARLES M. PEREIRA

139

1

2          MR. LESCH:  If you want to do

3      more of that, and I didn't mean to

4      take us down that path, but if you

5      want to do more of it where you're

6      really illustrating like that, we

7      should make sure it's being recorded.

8      That's all I wanted to say.

9          THE WITNESS:  Okay.

10          MR. LEDFORD:  Fair enough.

11          MR. DURKIN:  Good idea.

12          THE WITNESS:  So the Zoom window

13      is not being recorded?

14  BY MR. LEDFORD:

15      Q.    The Zoom window is not going to

16  be recorded.  So you're being recorded on

17  video and we've got the hard copy

18  exhibits.

19      A.    Yes, sir.

20      Q.    But yeah, so let's just keep in

21  mind that you moving the cursor isn't

22  going to -- so, I understand, but we don't

23  have to extrapolate anything, right,

24  because we actually have the vertical G

25  numbers for that time period, right?

CHARLES M. PEREIRA

140

1
2      A.    For that 0.8 seconds.

3      Q.    So we can talk about it, but the
4  pitch attitude, but we know what effect
5  the pitch attitude had on the vertical
6  G's, right?

7      A.    In that 0.8 second period, yes,
8  sir.

9      Q.    Right.

10     A.    There's still an additional 0.7
11 seconds, approximately, out here that is
12 not available and still requires
13 estimation and extrapolation.

14     Q.    Right.  And so if you did a -- a
15 new trendline of the last three seconds,
16 that would show that there was less of a
17 slope, right?  So in other words, it would
18 not be decreasing at the rate that you
19 originally calculated, right?

20     A.    I've done an initial calculation
21 using the exact same methodology I did
22 before and it does make the -- the final
23 estimated value using the exact same
24 method as before being extrapolated an
25 additional 8 seconds, it brings it from

CHARLES M. PEREIRA

141

1

2       minus 2.4 to about minus 2.2 on the -- on

3       the nominal.  It does bring it down to

4       about minus 2.6 on the negative side.  So,

5       and there's -- it -- again, it depends on

6       which analysis sample window you look at

7       and how you do it, but if you do the exact

8       same approximate methodology that I used

9       previously that we've debated this

10      morning, that would make the median value

11      about minus 2.2 using the same

12      methodology.

13          Q.    So, looking at the chart.

14          A.    Yeah.

15          Q.    And one thing that seems pretty

16      obvious is that it's a dynamic parameter,

17      right?

18          A.    It is -- it is a dynamic

19      parameter, but in this case, we have an

20      airplane going almost 600 miles an hour

21      and it has a very considerable mass and

22      the -- this -- there's a possibility that

23      I've worked a number of cases where pilots

24      on the cockpit voice recorder and in my

25      reconstruction very clearly have seen and

CHARLES M. PEREIRA

142

1

2    commented about what they're about to

3    experience in terms of impact, and they

4    make a last ditch effort, like on Roselawn

5    in 1994, to avoid that impending impact

6    and pull up with one last mighty heave on

7    the control column with everything that

8    they have in their body physically, and

9    that can result in some momentary G

10   excursions that are induced by the

11   elevator motion, and it doesn't change the

12   inertia of the -- the mass of inertia that

13   you have that's hurdling down that pitch

14   attitude and the barometric descend rate

15   that we've got and -- but it does show up

16   in the G's as a little spike.

17            So, if the two of them or one of

18   them applied additional hundred or two

19   hundred or three hundred pounds of force

20   to the control column which then moved the

21   elevator, and I haven't had the

22   opportunity to go through yet and plot

23   elevator position and control forces and

24   everything off this to try to analyze

25   exactly what caused that last-second G

CHARLES M. PEREIRA

143

1

2    spike there in the positive direction, but

3    my engineering judgment and my experience

4    tells me that there's a probability that

5    that was a pilot-induced and -- but as you

6    can see from the pitch attitude and the

7    other parameters, although it momentarily

8    changed the G's for two-tenths of a

9    second, it didn't have any material effect

10   on the trajectory of the -- the vehicle.

11       Q.    And just to be clear, I'm not

12   asking about the trajectory of the

13   vehicle.  I'm really just focused on the

14   vertical G's.

15            And so what I'm asking is would

16   you agree that given those excursions and

17   whatever the cause of the excursions, but

18   that it is a dynamic parameter and it is

19   not following the trendline that you had

20   identified based on the -- the three

21   seconds of data in your report?

22       A.    No, it does not.  The -- the

23   nominal departure from that trendline is

24   not very significant.  If you do an

25   additional trend analysis.  And in fact,

CHARLES M. PEREIRA

144

1

2    from a damages standpoint for our clients,

3    it's a very significant vertical

4    acceleration excursion once again that in

5    the biomechanical simulation calculations

6    and -- and animations thereof would result

7    in additional significant forces and --

8    and in a oscillatory manner being imparted

9    to those body and body parts and would

10   more than likely result in significant

11   additional consideration by the human

12   factors people.  So it's nice -- it's --

13   it's good to have factual data.  I like

14   factual data.  And my experience tells me

15   that that would result in significant

16   additional oscillatory motion on the

17   occupants.

18        Q.    Are you offering --

19              MR. LEDFORD:  Strike that.

20        Q.    Are you a biomechanical

21   engineer?

22        A.    No.  I'm an aeronautical

23   engineer.

24        Q.    Do you have training in

25   biomechanical engineering?

CHARLES M. PEREIRA

1

2      A.     I have training in the effects

3  of acceleration on bodies, whether it's

4  the human body or a book or a laptop or a

5  mouse.  Newton's laws apply to all bodies

6  equally.

7      Q.     Are you offering an opinion in

8  this litigation about biomechanics?

9      A.     I'm offering an opinion about

10  accelerations, and I have knowledge of the

11  effect of accelerations on mass bodies.

12      Q.     So, I understand that you -- you

13  know the science of accelerations, right?

14  You've got the aeronautical engineering

15  degree.

16      A.     Yes, sir, and physics.  It's

17  basic physics.  It applies to all

18  engineering.  You basically learn how

19  everything in the world works, and then

20  you depart in your senior year on a --

21  junior and senior years on areas of

22  specialization, but all engineers are

23  forced to endure the -- all the same

24  underlying physics courses.

25      Q.     Right.  So I -- and to be clear,

CHARLES M. PEREIRA

146

1

2      I'm not -- I'm not asking about are you --
3      you know, the physics aspect because I
4      understand there -- there is an element of
5      physics in looking at the FDR plots and
6      the data that we're talking about.
7              What I'm asking about is are you
8      purporting to offer an opinion about the
9      actual effects on the human body caused by
10     those forces?  Because I don't see that in
11     your report.
12     A.    I'm leaving that expertise to
13     Tom Jenkyns and Troy.  I'm just providing
14     you with additional insight that is within
15     the realm of my expertise about the
16     potential effects.
17             You're commenting about how this
18     additional data is resulting in not
19     following my estimated trends, and
20     therefore, there is -- you know, that's
21     going to the notion of less effect on the
22     damages portion of this case, and I don't
23     think that's necessarily true.  I think a
24     big G oscillation like this is necessarily
25     by physical law going to result in a big

CHARLES M. PEREIRA

147

1

2      force and motion oscillation on the

3      occupants of that vehicle.

4          Q.    Sir, what I'm really trying to

5      discover is are you going to appear at

6      trial and offer an opinion about the

7      biomechanical effect of these physical

8      forces on the human body?  And if the

9      answer is no, you're just going to comment

10     on the FDR data, then we can -- I think we

11     can move on.  But right now you're

12     suggesting that you might actually be

13     testifying about injury to the human body.

14             MR. DURKIN:  Objection.  This

15         has been asked and answered.  I think

16         he answered the question.

17             You presented him with

18         additional data that your expert, Mr.,

19         is it Poole, did he find it?  Mr.

20         Poole found it.

21             MR. LEDFORD:  Mr. Poole.

22             MR. DURKIN:  And you're asking

23         him questions about it.  He's just

24         giving answers to your questions.

25             MR. LEDFORD:  No, he hasn't

CHARLES M. PEREIRA

1
2          answered the question.  I am asking --
3          I'm trying to figure out if he's going
4          to show up at trial and testify about
5          injury to the human body.
6                 I understand that he's going to
7          testify about FDR data.
8   BY MR. LEDFORD:
9       Q.    So the question that I'm asking,
10  which has not been answered, is are you
11  going to offer an opinion about the
12  effects of these forces on the human body?
13              MR. DURKIN:  Other than what
14          he's already stated.
15              MR. LEDFORD:  I'm -- no.  My
16          question --
17              MR. DURKIN:  I don't want to --
18          I really don't want to do a speaking
19          objection, but he did say things -- he
20          did say what would happen to the
21          people based upon Mr. Poole's new
22          data.
23              MR. LEDFORD:  So, Kevin, are
24          you --
25              MR. DURKIN:  I'm staying away

CHARLES M. PEREIRA

149

1
2          from -- I'm staying away from stating
3          what he said.  But he's already stated
4          that and, you know, if you want to go
5          there --
6                THE WITNESS:  I'll even --
7                MR. LEDFORD:  Hold on for just
8          one -
9                THE WITNESS:  Okay.
10               MR. LEDFORD:  Hold on for just
11         one second.
12  BY MR. LEDFORD:
13       Q.    I am not asking you to expand
14  your opinion.  I don't see anything in
15  your report about injury.  I'm not asking
16  you to comment on the injury causing
17  effects of the data.
18             I am just trying to figure out
19  are you going to offer testimony about
20  injury to the human body at trial?
21       A.    No.
22       Q.    Okay.
23       A.    If somebody asks me about the
24  effect of G's on a body, whether it's a
25  Ping-Pong ball or a human hand, I can

CHARLES M. PEREIRA

150

1
2      offer up an opinion in my regard and still
3      have it be within my area of expertise as
4      to the general Newtonian physics effects
5      of that.
6              MR. DURKIN:  Chris, I think he's
7         answering your question.  I think
8         he's -- I think it's very clear what
9         he's stating, okay.
10             MR. LEDFORD:  What is -- what
11        is -- is he going to testify about it?
12             MR. DURKIN:  He could testify --
13        he -- he test -- well, here, he said
14        what the effect, without talking about
15        specific injury, what the effect of
16        Mr. Poole's new calculation would have
17        on any object, any object, right,
18        within -- I think that's what he said.
19             THE WITNESS:  Any object
20        within -- within that airplane.
21             MR. DURKIN:  Yeah, you know,
22        that's Newton's, right.  Newton's,
23        something like that.
24             THE WITNESS:  F equals ma.
25             MR. DURKIN:  Force equals mass

CHARLES M. PEREIRA

151

1

2       times acceleration.

3               MR. LESCH:  Maybe we could

4       Google it.

5               THE WITNESS:  You'll find a

6       whole lot of information on it.

7               MR. DURKIN:  Yeah.

8  BY MR. LEDFORD:

9       Q.    So, sir, we can move on because

10  as I understand it, you are not offering

11  testimony about injury.  You're offering

12  testimony about the physics.

13      A.    Yes, sir.

14      Q.    Right?  That's -- okay.

15              MR. DURKIN:  You got it.

16  BY MR. LEDFORD:

17      Q.    I don't see anything in your

18  report about analysis that you did of FDR

19  parameters from other flights by the

20  accident aircraft.

21              So, do I understand correctly

22  you're not offering an opinion about the

23  forces experienced on other flights,

24  right?

25      A.    I provided -- I reviewed all of

CHARLES M. PEREIRA

1

2      the flights, and I provided copies of the

3      data for the previous takeoff from Addis

4      to engineering animations for the purposes

5      of -- of their animation.

6            Q.     Okay.

7                   Other than providing that data

8      to, is it Eyewitness Animations?

9            A.     Yes, sir.

10           Q.     Okay.

11                  So, other than that providing

12     that data to Eyewitness Animations, you're

13     not providing any other testimony then

14     about other flights; is that right?

15           A.     I have reviewed Mr. Poole's

16     report and may be called upon to provide

17     opinion as to my knowledge of the data in

18     those other flights and with respect to

19     critiquing Mr. Poole's characterizations

20     of those in his report and the relative --

21     the relative g-forces that Mr. Poole

22     documents between the two in his table in

23     his report.

24           Q.     So, I'm focused on your report

25     right now.

CHARLES M. PEREIRA

153

1
2           You didn't do any analysis of
3    the other flights in your report, right?
4           If you need to look at your
5    report, please go ahead and do so.
6           (Pause.)
7    A.     No, sir.  I think -- I believe I
8    just, again, provided and reviewed and
9    discussed those data during the course of
10   the development of the EA animation.
11   Q.     You had all that data when you
12   originally drafted your report, right?
13   A.     Yes, sir.
14   Q.     Because it's on the FDR data
15   that you looked at, right?
16   A.     Yes, sir.
17   Q.     Let's look at page 3 of your
18   report.  So, on page 3 you say:  I created
19   animations during this process to --
20           MR. DURKIN:  Can you point to
21       the paragraph, would you mind?  I'm
22       sorry.
23           I got it.  The fourth -- the
24       fifth paragraph from the top, middle
25       of the paragraph.

CHARLES M. PEREIRA

154

1

2          MR. LEDFORD:  Yeah.

3          MR. DURKIN:  Okay.  Got it.

4   BY MR. LEDFORD:

5      Q.    Okay.  So, yeah, in page 3 of

6   your report you write:  I created

7   animations during this process to visually

8   depict, correlate, and confirm the FDR/CVR

9   path and accident site data.

10     A.    Yes, sir.

11     Q.    So, do I understand then that

12  you personally created those animations?

13     A.    Yes, sir.

14     Q.    And what program did you use to

15  create those animations?

16     A.    Insight Animation, along with

17  various post-processing tools.

18     Q.    Do you know if those animations

19  were disclosed as part of your file?

20     A.    I don't believe they were.

21     Q.    And why is that?

22         MR. DURKIN:  Well, that was a

23     legal objection that -- that we made,

24     I believe.

25     A.    I believe it was their work

CHARLES M. PEREIRA

155

1

2     product.

3               MR. DURKIN:  Yeah.

4     BY MR. LEDFORD:

5        Q.    So, the following sentence is,

6     in that same paragraph:  To a reasonable

7     degree of engineering certainty, my

8     animations fairly and accurately depict

9     the transference of the FDR/CVR and

10    accident site data into visual

11    reconstructions of the events leading to

12    and including the crash of ET 302.

13              Next paragraph:  I subsequently

14    provided my animations and time correlated

15    FDR/CVR data, as well as instructions

16    regarding correlation points and boundary

17    conditions, to the biomechanical

18    engineering staff at TLS Forensic

19    Engineering (TLS) and the animation firm

20    Eyewitness Animations Inc. (EA).

21              Did I read that correctly?

22       A.    Yes, sir.

23       Q.    Okay.

24              So, the animations that you

25    created you then provided to these other

CHARLES M. PEREIRA

156

1

2    experts, right?

3        A.    I believe that the animations

4    were actually shown during Zoom meetings

5    and weren't actually physically e-mailed

6    or otherwise provided to them.

7            The FDR data were, in fact,

8    provided to them I believe by e-mail.  But

9    the animations on this case, we did

10   everything review-wise by Zoom meeting.

11       Q.    So, when you say "I have

12   subsequently provided my animations to TLS

13   and Eyewitness Animations," you just mean

14   you showed them to them over a Zoom

15   meeting?

16       A.    I believe it was all done over

17   Zoom meeting, yes, sir.

18       Q.    Okay.  But you did show it to

19   them?

20       A.    I believe so, yes, sir.

21       Q.    Okay.

22       A.    I can't recall exactly.  It was

23   months ago, but I can't recall whether

24   they were on -- you know, whether they

25   were on those -- I believe they were.  But

CHARLES M. PEREIRA

157

1

2      the basics of it was they were told they

3      had to takeoff from Addis, from this

4      airport and this runway and you had the

5      crash at this point and those were the --

6      the boundary conditions and -- and they

7      had to follow the FDR data from point A to

8      point B.

9           Q.    So, I just want to talk about

10     the animations that you did create.

11          A.    Sure.

12          Q.    Describe for me the process that

13     you used when you're creating those

14     animations.

15          A.    You generate a path using the

16     recorded data and the known boundary

17     conditions for the takeoff airport and

18     runway and the impact location, and once

19     you have a -- a ground path and flight

20     path, you apply that to the model, and in

21     this case an Ethiopian 737 MAX that's

22     draped with imagery that matches the

23     images that I found online for that

24     particular airplane, and -- and then

25     Insight Animation, you use the FDR data to

CHARLES M. PEREIRA

158

1

2    drive everything else that you want to

3    show that's recorded, whether it be

4    cockpit instruments or, you know, you have

5    to build all of it and, you know, whatever

6    gauge you want to depict for angle of

7    attack, you build all of that as graphic

8    elements and -- and then those graphic

9    elements are driven by the data and -- and

10   then once you're satisfied with it and

11   then you output it into whatever MPEG or

12   whatever Kodak format you want and out it

13   comes, and then -- and then if you want to

14   do post-processing to make it prettier,

15   you can use a variety of Adobe Creative

16   Suite products and other software to add

17   inset videos.  Depending on the accident,

18   you can dress up the animation with

19   whatever additional supporting data.

20            A lot of accidents that I do

21   have cockpit audio and video from

22   passenger cell phones and other devices.

23   I just finished one for an Aeromexico

24   crash that had beautiful supporting audio

25   and video from the cabin environment

CHARLES M. PEREIRA

159

1

2      showing all of the oscillations, all of

3      the audio.  And I do those as -- in

4      post-processing as inset videos to the --

5      to the animation.  And so there's a

6      variety.

7              Unfortunately, in this case, we

8      didn't have any passenger personal device

9      audio or video.  So, and we didn't have

10     the cockpit voice recorder, as I mentioned

11     in my report, yet.  I'm still working on

12     getting that and reserve the right to

13     append my report if we do get the cockpit

14     voice recorder audio, so.

15     Q.    Are you finished?

16     A.    I'm done, yeah.

17            MR. LEDFORD:  Okay.  I move to

18     strike as --

19            THE WITNESS:  Okay.

20            MR. LEDFORD:  -- non-responsive.

21     Q.    Sir, let me ask a different

22     question.

23            You created the animations.  Why

24     did you do so?

25     A.    As I mentioned here, to provide

CHARLES M. PEREIRA

160

1
2      a degree of engineering certainty.  And it
3      helped me -- it helps me confirm that the
4      data that we've converted to engineering
5      units are behaving properly and
6      accurately.  They -- they help my clients
7      understand what demonstrative exhibits
8      might be beneficial for their case.
9          Q.     Okay.
10             And you -- it sounds like you --
11     you do the animation, in part, for your
12     own -- or, for purposes of your own
13     reports.  Is that fair?
14         A.     Yes, my own work in general.  I
15     like doing animations because it helps me
16     understand the accident.  It helps me
17     understand safety issues and causal issues
18     in the accident typically.  It helps me
19     make sure that there aren't any parameters
20     that are invalid, behaving
21     inappropriately.  The human eye is an
22     extremely good judge of motion and
23     behavior, and animations afford you that.
24             I'm an engineer, so I've looked
25     at plots of data and spreadsheets of data

CHARLES M. PEREIRA

161

1

2    my entire life, and while I might be able

3    to pick out things through extensive

4    analysis of plots and spreadsheets, it's

5    easier for me to do so in a -- in a

6    thorough fashion using an animation

7    alongside those other datasets, and it

8    helps me make sure that I'm not missing

9    anything.

10        Q.    So it's useful to you in

11   creating your report to look at the

12   animations that you created?

13             MR. LESCH:  Objection to form;

14        asked and answered.

15        A.    It's useful.  It's not

16   necessary.  It's useful.

17        Q.    Okay.

18             In this particular instance, it

19   sounds like it was useful for you; is that

20   right?

21        A.    I did -- I did it.  I created

22   animations, as I stated.  So it's

23   something that I like to do if I feel like

24   the client will afford me the opportunity

25   to do so financially.

CHARLES M. PEREIRA

162

1

2          MR. DURKIN:  And I do want to

3     make an objection that, you know,

4     we're talking about things that were

5     done for the attorney and in a time

6     frame when before Boeing had admitted

7     their airplane was defective, okay.

8     So we're talking -- we're getting a

9     little bit into work product, and I

10    want to be careful, okay.

11         MR. LEDFORD:  Okay.

12         MR. DURKIN:  We had to

13    strategize before you admitted your

14    airplane was defective, you know, we

15    had different legal strategies we were

16    going over because of that, okay.

17         MR. LEDFORD:  First of all,

18    that's not the content of the

19    admission.  We don't need to argue

20    about that.

21         MR. DURKIN:  Okay.

22         MR. LEDFORD:  But I understand

23    the stipulation.

24         MR. DURKIN:  Yeah.

25         MR. LEDFORD:  That doesn't

CHARLES M. PEREIRA

1

2          change the fact that this report says

3          that he's creating animations that are

4          then provided to another expert.  So I

5          think I get to inquire about that.

6               MR. DURKIN:  Sure.  You can,

7          Chris.  You can, for sure.

8               I just want you to understand

9          that their animations, I mean, unless

10         you want to show the stick shaker,

11         maybe something with the stick shaker,

12         you know, from the cabin, you know

13         what I mean, that were done for

14         purposes of -- different purposes that

15         post-dep.  Okay.

16              MR. LEDFORD:  Well, if -- so,

17         they're mentioned in a report that has

18         been submitted for a compensatory

19         damages trial.  So I don't know --

20              MR. DURKIN:  You can ask

21         questions, Chris.  I'm not limiting

22         it.  I just want to make sure we don't

23         get too much into that.  Okay.

24              MR. LEDFORD:  Okay.

25              MR. DURKIN:  I'm sure we'll have

CHARLES M. PEREIRA

164

1

2          the opportunity we'll be asking -- we

3          won't get too much into it.

4                  MR. LEDFORD:  Okay.  Sounds

5          good.

6                  In any event, sir, move to

7          strike your last response.

8     BY MR. LEDFORD:

9          Q.    I understand that you did the

10    animations.  I'm just asking were they

11    useful to you as part of your expert -- as

12    part of you forming your expert opinion?

13                MR. DURKIN:  And that one has

14          been asked and answered.

15                But go ahead.

16         A.    To the extent that I state they

17    were performed and used in my report, I

18    think that answers the question.

19         Q.    Is it a yes or a no?

20                MR. DURKIN:  Objection; asked

21          and answered.

22         A.    A large portion of my doing them

23    was based off of my understanding that I

24    was to go after the Boeing liability as

25    hard as I could with the failed

CHARLES M. PEREIRA

165

1

2     angle-of-attack sensor and the resulting

3     responses of the airplane and the actions

4     of the pilots.

5              And once I was advised that --

6     that liability had been admitted and

7     Boeing had admitted that it was

8     responsible for the -- for the injuries

9     and the deaths, then I was told that we

10    didn't need to pursue that any further and

11    that we were primarily interested in

12    focusing on the engineering animations --

13    animation that they had decided were going

14    to be most useful and to spend no further

15    money on my part doing the other animation

16    that I was working on.  They were more

17    related to liability.

18         Q.    How many animations relating to

19    liability did you do?

20         A.    I did several -- well, it's all

21    the same data, but I did several different

22    views: cockpit view, exterior view, change

23    plane, left side of the airplane, right

24    side of the airplane.  You know, so in the

25    delivery process of determining what the

CHARLES M. PEREIRA

166

1

2    demonstrative exhibits to develop, you

3    know, give them choices, see what they

4    liked best.

5         Q.    Can you tell me a number or

6    approximately how many animations you did

7    regarding what you describe as liability?

8         A.    Three or four maybe.

9         Q.    Okay.

10             And as I understood it, you

11   distinguished between those and animations

12   that you did for compensatory damages; is

13   that right?

14        A.    I didn't do any animations for

15   compensatory damages.  I expressed what

16   was done in -- in this report.

17        Q.    Okay.

18             So, the an -- all of the

19   animations we're talking about were done

20   in connection with liability issues; is

21   that right?

22        A.    Yes, sir.

23        Q.    And you said there's three or

24   four of them?

25        A.    I believe so, yes, sir.

CHARLES M. PEREIRA

167

1

2      Q.     Do you still have them?

3      A.     They were provided to the

4  clients, I believe.  So, via Zoom I showed

5  them.  So I'm not sure.  I'd have to go

6  through my computer systems to see if I

7  still have them, but I stopped working on

8  those once liability was admitted by

9  Boeing.

10             That was a long time ago, I

11  believe.  I don't remember.

12             MR. DURKIN:  I can't answer.

13       Sorry.

14             He's looking at me.  I said I

15       can't answer when.  He was looking at

16       me, and I didn't want to -- make sure

17       he knew I can't answer for him.

18             MR. LEDFORD:  We can put you

19       under.

20             MR. DURKIN:  I'm just trying to

21       do proper.

22             MR. LEDFORD:  Yeah.  No, I

23       understand.  No, I appreciate it.

24             MR. DURKIN:  That's all.

25

CHARLES M. PEREIRA

168

1

2    BY MR. LEDFORD:

3        Q.    So, you've got three or four

4    animations that sounds like were done at

5    some point in the past.

6             Do you remember about when you

7    did them?

8        A.    I started doing them as soon as

9    the Ethiopian government produced its

10   first preliminary report with graphs of

11   the data, and I digitized the data and --

12   from those graphs and produced preliminary

13   animations based off them.

14       Q.    So, do I understand correctly

15   then that you're not planning on offering

16   any testimony about those animations in

17   this case?  You're noting that they exist,

18   but telling me that they're purely

19   liability and you're not offering --

20       A.    That's my --

21       Q.    -- an opinion?

22       A.    That is my understanding, yes,

23   sir.

24       Q.    What does "reasonable degree of

25   engineering certainty" mean?

CHARLES M. PEREIRA

169

1

2          A.     It means that using my

3    engineering judgment, I feel that they are

4    reasonable and offer a reasonable degree

5    of engineering certainty.  So that goes to

6    my education and experience that

7    constitutes my engineering judgment.

8          Q.     Okay.

9               When you say that your

10   animations depict the transferences of the

11   FDR/CVR and accident site data into visual

12   reconstructions, tell me what it is that

13   you mean by that.

14         A.     Exactly that.  It takes those

15   data and transfers them into -- from their

16   native digital format into a visual

17   reconstruction that the human mind can

18   evaluate and -- and perceive as to the --

19   the motion and the events that occurred

20   leading to and including the crash of this

21   flight.

22         Q.     Okay.

23               And so, you mentioned the CVR.

24   I take it that for purposes of your

25   testimony regarding compensatory damages,

CHARLES M. PEREIRA

1

2      since we don't -- we're not dealing with

3      the events in the cockpit, there's nothing

4      from the CVR that correlates to your --

5      your animations, right?

6          A.    I don't know that because I

7      don't have it.  I would very much like to

8      have it.  There's a possibility that the

9      audio content from the cabin environment

10     could have been captured on the cockpit

11     voice recorder, and that would go directly

12     towards our case.

13         Q.    When you -- when you use the

14     term -- sorry, to just return to

15     engineering certainty.  Is there -- is it

16     a more likelier than not --

17         A.    Yes.

18         Q.    -- standard that you're

19     applying?

20         A.    So that -- that would be one

21     gross method of description.

22         Q.    Okay.  So more likely than not.

23              How about, I mean, more than 75

24     percent likely?

25         A.    Yes.  It's a high probability.

CHARLES M. PEREIRA

171

 1

 2     Q.    90 percent?

 3           I'm asking what does "reasonable

 4     degree of engineering certainty" mean?

 5     A.    That's a highly speculative

 6     evaluation, but I would say in general

 7     from a percentage standpoint, if you

 8     grouped all of the data and were to

 9     attempt to pick apart and find individual

10     flaws, there would probably be less than

11     one percent likely flaw.

12     Q.    Okay.  So I guess coming at it

13     from the other direction then, sort of 99

14     percent sure that something occurred, if

15     you say "I believe this occurred based on

16     my" --

17     A.    The overall collective dataset I

18     would say is highly, high accurate.

19     Q.    Okay.

20           So, the phrase "to a reasonable

21     degree of engineering certainty" means the

22     data --

23           MR. DURKIN:  I'm going to object

24       what that means to the extent it calls

25       for a legal conclusion that the court

CHARLES M. PEREIRA

 1

 2          has to determine, not us.  Okay.

 3    BY MR. LEDFORD:

 4          Q.    Sir, just to be clear, I'm

 5    asking about a phrase that you have used

 6    in your report.  I'm asking -- I'm not

 7    asking you to cite me caselaw.  I'm asking

 8    what you believe the phrase means as you

 9    used it in your report.  And what I'm

10    hearing you say is that "to a reasonable

11    degree of engineering certainty" means

12    that the data supports essentially a 99

13    percent chance that something is true?

14          A.    The overall preponderance of

15    data that we have, I believe a very high

16    percentage of that is accurate.

17          Q.    Is what I said wrong?

18                MR. DURKIN:  Object; asked and

19          answered.

20          A.    Repeat the entire basis for your

21    last question.

22          Q.    Sure.

23                So, when I say -- or, sorry.

24    When you write that something is "to a

25    reasonable degree of engineering

CHARLES M. PEREIRA

173

1

2      certainty," does that mean that the data

3      supports that something is 99 percent

4      accurate, or 99 percent likely to be true?

5          A.    I'd have to review each

6      individual piece of information that you

7      might be construing that to.

8              But take, for example, the FDR

9      data, I would say there's a high

10     probability that the data were properly

11     converted to engineering units.  Say, for

12     example, I would say that there's a

13     reasonably high degree of certainty that

14     the CVR transcript contents have been

15     accurately depicted and vice versa

16     throughout the review here, that to a

17     reasonable degree of engineering

18     certainty, the transference of these

19     elements into the visual reconstruction of

20     the events has a very reasonable degree of

21     engineering certainty.

22             It's a human evaluation, and by

23     its nature, it has some level of

24     subjectivity to it.  It's not a 100

25     percent objective evaluation that you can

CHARLES M. PEREIRA

174

1

2      go and Google on and find a -- a resource

3      that defines it with an equation.  It's

4      a -- it's a -- it's a statement that has

5      some level of speculation to it, but that

6      is generally the case for all engineering

7      judgments and analyses.  There's -- that's

8      why it's called an analysis; it's not

9      entirely factual.

10             Just like at the NTSB we have a

11     factual section and a analysis section.

12     It's the same general reasoning.

13        Q.    And I understand it sounds like

14     you're not wanting to put a specific

15     percentage on it, and I understand that.

16     But what I'm hearing you say is that when

17     you talk about having a reasonable degree

18     of engineering certainty, it's actually a

19     high level of engineering certainty while

20     acknowledging that it's not necessarily a

21     hundred percent because it is a human

22     evaluation.

23             Is that fair?

24        A.    Yes, sir.  And there are some

25     missing data, as we've discussed earlier

CHARLES M. PEREIRA

175

 1

 2    today.

 3       Q.    So, you mentioned the CVR

 4    earlier.  That's the cockpit voice

 5    recorder, right?

 6       A.    Yes, sir.

 7       Q.    And it records sounds from a

 8    certain number of microphones within the

 9    cockpit, right?

10       A.    Yes, sir.

11       Q.    And we don't have a copy of the

12    CVR recording, right?

13       A.    No, sir, that I'm aware of.

14       Q.    We do have a copy of the

15    transcript of the recording that was

16    prepared as part of the investigation

17    though, right?

18       A.    Yes, sir.

19       Q.    Are you aware of any noises from

20    the cabin that were noted on the CVR

21    transcript?

22       A.    No, sir.

23            MR. DURKIN:  You don't mean --

24       you mean noises or you mean like --

25       wait.  Can you repeat the question?  I

CHARLES M. PEREIRA

176

1

2          missed what you said.

3                He answered "no," but I -- can

4          you just read the question?

5                MR. LEDFORD:  Sure.  I had just

6          asked him if he's aware of any noises

7          from the cabin that were recorded on

8          the CVR transcript.

9                And you said no.  So you don't

10         have to answer again.

11               MR. DURKIN:  I thought you said

12         cockpit, and I said what.

13               Okay.  Got it.

14               MR. LEDFORD:  No.  Understood.

15    BY MR. LEDFORD:

16         Q.    So you're not aware of any

17    evidence of what sounds may have been

18    heard in the cabin, right?

19         A.    No, I'm not.

20               I am very familiar with the

21    analysis process, and I'm not aware of

22    that any sound spectrum analysis was done

23    or that any attempt to characterize or

24    transcribe any sounds that may have come

25    from the cabin were done.

CHARLES M. PEREIRA

177

1

2          I have a long history of

3   involvement in cockpit voice recorder

4   analysis and transcript preparation, and

5   unfortunately, oftentimes they're not done

6   very thoroughly, and so I very

7   aggressively am pursuing obtaining that

8   and am in the process right now of

9   continuing to write letters to try and

10  obtain the cockpit voice recorder

11  recording itself.

12          MR. LEDFORD:  Move to strike

13      that answer as non-responsive.

14      Q.   Are you -- sir, my question is

15  just are you aware of any evidence of

16  sounds heard in the cabin during the

17  accident flight?

18      A.   No, sir.

19      Q.   Okay.  So, on page 3, I think

20  I've already read that portion where you

21  say you "provided my animations and time

22  correlated FDR/CVR data as well as

23  instructions regarding the correlation

24  points and boundary conditions to the

25  biomechanical engineer staff at TLS

CHARLES M. PEREIRA

178

 1

 2    Forensic Engineering and the animation

 3    firm Eyewitness Animations, Inc.

 4              Is that correct?

 5         A.   Yes, sir.

 6         Q.   And I think you've also

 7    testified that when you say "provided my

 8    animations" you mean you showed them to

 9    TLS and Eyewitness Animations via Zoom?

10         A.   That's my understanding, yes,

11    sir.

12         Q.   Is that your recollection as

13    well?

14         A.   Yes, that's my recollection.

15         Q.   When was that Zoom meeting?

16         A.   There were numerous Zoom

17    meetings.  I --

18         Q.   Well, let me ask this then.

19              How many times have you shown

20    your animations to either TLS or

21    Eyewitness Animations?

22         A.   I believe it was maybe just once

23    for the purpose of getting that started.

24    I don't believe that I was involved in any

25    Zoom meetings with them until I was told

CHARLES M. PEREIRA

1

2      that we had transitioned over to damages

3      only and that they were going to be doing

4      the biomechanical and damages animation.

5          Q.    Okay.

6                So, you -- you recall one

7      meeting where you showed your animation to

8      TLS and Eyewitness Animations, right?

9          A.    I showed the animation on the

10     Zoom meeting.  My recollection is they

11     were present and, therefore, hopefully

12     they observed it.

13         Q.    And so, both TLS and Eyewitness

14     Animations?

15         A.    I believe so.  I think so, sir.

16         Q.    Do you recall who from TLS was

17     there?

18         A.    Tom Jenkyns.

19         Q.    Okay.

20         A.    Tom Jenkyn.

21         Q.    Jenkyn?

22         A.    I think it's no S.  I can't

23     recall.

24         Q.    Anybody else from TLS?

25         A.    Not that I know of.

CHARLES M. PEREIRA

180

1

2      Q.    How about from Eyewitness

3   Animations, do you remember who attended

4   from Eyewitness Animations?

5      A.    I think it was just Jack

6   Suchocki, I think you pronounce his name.

7      Q.    Okay.

8           Do you remember when that

9   meeting was?

10     A.    Not off the top of my head, no,

11  sir.  Some time 2021, I believe.

12     Q.    About how long was that meeting?

13     A.    I have no recollection.  I'm

14  sure it was at least one hour.

15     Q.    Okay.

16          I don't want to get into the --

17  your specific communications with

18  plaintiffs' counsel on that, but were --

19  were there counsel for plaintiffs

20  attending that meeting as well?

21     A.    Lots of them.

22     Q.    When you say "lots of them"?

23     A.    All the counsels that were

24  involved early on as of early 2021.

25  Jamie, who I've done a lot of work for.

CHARLES M. PEREIRA

1

2    The Clifford Law Office staff, who I've

3    done a lot of work for.  The Kreindler

4    staff, who I've done a lot of work for.

5    Podhurst.  And the list goes on and on.  I

6    didn't take a roll call of the attorneys

7    who were on, but there was a lot.

8         Q.    Okay.

9               Other than Tom Jenkyn, Jack

10   Suchocki, and you, were there any other

11   experts who attended that call?

12        A.    Not that I recall.

13        Q.    And you think that was some time

14   in 2021 after the liability stipulation

15   had been entered?

16        A.    Yes, sir.

17        Q.    Okay.

18              And you said you had three or

19   four animations, right?

20        A.    Yes, sir.  Views.  It's the same

21   basic animation, you just choose where you

22   want to put the camera.

23        Q.    Okay.  And so --

24        A.    And then you record that and

25   that becomes an animation.

CHARLES M. PEREIRA

182

1
2          Q.     Got it.
3                 Were any of those animations
4     inside the cockpit?
5          A.     Yes.
6          Q.     Were any of those animation --
7     do you remember how many?
8          A.     One.
9          Q.     Okay.  So --
10         A.     Possibly two.
11         Q.     Okay.
12                And how about outside the
13    aircraft?
14         A.     One, two.
15         Q.     Were there different views
16    within the cockpit?
17         A.     The cockpit is generally just
18    straight out from a certain position.  The
19    exterior views depends how they look and
20    what my client -- what my client's
21    preferences are; you like it from the
22    right, you like it from the left, you want
23    above, under.
24         Q.     So, the outside view, were there
25    multiple views?

CHARLES M. PEREIRA

183

1

2       A.    I think I showed them different

3    views, and I don't know -- I don't -- now,

4    when I say that, I mean during my

5    development of those, not that those were

6    shown to EA, but that over the course of

7    my two- to three-year development of the

8    liability-related animations, that there

9    were various views developed during that

10   liability period.

11      Q.    Okay.

12            How about -- and -- but you just

13   can't recall exactly how many?

14      A.    No.

15      Q.    And you can't recall, sounds

16   like, exactly which view; you know, was it

17   from the left, was it from the right?

18      A.    No.  Some of them you can do

19   live within Insight and not even record or

20   output, just pick a camera and play it

21   back for this time period and see what it

22   looks like and then when you close the

23   program, it's all gone.  Nothing's

24   actually retained.

25      Q.    The one that you showed to TLS

CHARLES M. PEREIRA

184

1

2     and Eyewitness Animations, were those

3     recorded animations, or were those

4     animations that were live?

5          A.     I believe they were recorded.

6          Q.     And how about were there any

7     animations of inside the passenger cabin?

8          A.     No.

9          Q.     During that call, was most of

10    that, say, hour that you were on the -- or

11    maybe it was more that you were on the

12    Zoom call, was that mostly looking at the

13    animations?

14         A.     No.  That was a couple minutes

15    and done.  Takeoff from this runway,

16    crashed into this impact point with -- at

17    these coordinates, and follow the FDR data

18    that I'll send you subsequently in Excel

19    spreadsheets, and the rest is all yours.

20    It was to familiarize yourself -- them

21    with the general sequence of events.

22         Q.     Had you spoken to Tom Jenkyn

23    before that, that call?

24         A.     Not that I recall.

25         Q.     And have you spoken to Tom

CHARLES M. PEREIRA

185

1
2      Jenkyn since that call?
3          A.    I may have called him to -- I
4      don't know if it was a phone call or what,
5      but make sure he got the -- he got --
6      received the data.  That's about it.  And
7      if he had any questions about the data
8      and, you know, this was my contact info.
9          Q.    Okay.
10              And so I take it and so he has
11     not contacted you about the --
12         A.    I don't recall Tom contacting me
13     for anything beyond that.
14              We heard each other in Zoom
15     meetings that we both participated in
16     subsequent to that, but that's the extent
17     of our communication.
18         Q.    Okay.  So you've spoken to him
19     on subsequent Zoom calls?
20         A.    He was present on other Zoom
21     calls, and I recall him talking and
22     participating in those, yeah.
23         Q.    Okay.
24              And how many times have you
25     spoken to or been in the same meeting with

CHARLES M. PEREIRA

186

1

2      Tom Jenkyn?

3          A.    Four, five times.

4          Q.    And were those all Zoom

5      meetings, or were any of those in person?

6          A.    All Zoom.

7                I've never met him in person.  I

8      have no idea what he looks like.

9          Q.    So, you've had, in addition to

10     the meeting where you showed the

11     animations, four to five times when you've

12     spoken to Tom Jenkyn in a Zoom meeting of

13     some kind?

14         A.    Yes, sir.

15         Q.    Did you show animations or other

16     kinds of data in those other meetings?

17         A.    I did not, no.

18         Q.    Okay.

19               Did somebody else?

20         A.    They were showing progress on

21     their biomechanical simulations and

22     engineering animation depiction thereof.

23         Q.    Did you offer comments on those?

24         A.    I may have.  I can't recall

25     specifically.

CHARLES M. PEREIRA

 1

 2     Q.    Okay.

 3           Anybody other than Tom Jenkyn

 4  participate in those -- those Zoom

 5  meetings -- sorry.  Anybody other --

 6  anybody --

 7           MR. LEDFORD:  Strike that.

 8     Q.    Did anybody from TLS, other than

 9  Tom Jenkyn, participate in the four to

10  five Zoom meetings you're talking about?

11     A.    No, sir, not that I recall.

12     Q.    Okay.

13           And how about Jack Surocki [sic]

14  from --

15           MR. DURKIN:  It's Suchocki.

16           MR. LEDFORD:  Suchocki.

17       Apologize.

18           MR. LESCH:  Suchocki (different

19       pronunciation.)

20           MR. LEDFORD:  Suchocki?

21           THE WITNESS:  Suchocki.  Okay.

22           MR. DURKIN:  It's spelled

23       Suchocki.

24           THE WITNESS:  Yeah, it's

25       S-U-C-H.  Maybe it's silent.  I don't

CHARLES M. PEREIRA

188

1
2      know.
3              I've never asked Jack how --
4      I've never asked Jack how you
5      pronounce his name, unfortunately.
6              MR. LEDFORD:  Okay.  I will go
7      with Suchocki and --
8              MR. DURKIN:  That's fine.
9              MR. LEDFORD:  -- apologies to
10     Jack if I'm incorrect.
11  BY MR. LEDFORD:
12     Q.   So, was Mr. Suchocki on any of
13  those Zoom meetings, any of those four to
14  five Zoom meetings where you also spoke to
15  Tom Jenkyn?
16     A.   I believe all of them.
17     Q.   Okay.
18              Was there anybody else from
19  Eyewitness Animations other than Mr.
20  Suchocki who attended those meetings?
21     A.   Not that I recall.
22     Q.   Okay.
23              And have you spoken to Mr.
24  Suchocki or anybody else from Eyewitness
25  Animations other than on those four or

CHARLES M. PEREIRA

189

1

2       five Zoom calls?

3            A.      Yes, sir.

4            Q.      And how many times?

5            A.      Once, twice.

6            Q.      Okay.

7                    And who did you speak to?

8            A.      Martin Merryman, is his name.

9            Q.      What does Mr. Merryman do?

10           A.      He is an animator.

11           Q.      Okay.

12           A.      And he's the one I actually sent

13      the data to, I believe.

14           Q.      Have you ever spoken to Mr.

15      Suchocki other than on those calls?

16           A.      No.  No.

17           Q.      And when were those calls?

18           A.      Would have been probably early

19      2021, early to mid 2021.  I can't recall.

20           Q.      Anything in 2022?

21           A.      No, not that I recall.

22           Q.      Can you tell me what data you

23      provided to TLS, if any?

24           A.      I believe I provided the same

25      FDR data spreadsheets to TLS and

CHARLES M. PEREIRA

190

1
2     Engineering Animation -- Eyewitness
3     Animation.    Excuse me.
4          Q.    Okay.  And are those the Excel
5     spreadsheets that were in the materials
6     you produced --
7          A.    Yes.
8          Q.    -- or that were produced as part
9     of your file?
10         A.    Yes, sir.
11         Q.    Okay.
12               Was there anything --
13               MR. LEDFORD:  Strike that.
14         Q.    Have you -- are you aware of
15    what materials were produced as your file?
16         A.    I think we went over it just to
17    make sure, but that was couple months ago
18    when I was first advised to prepare for
19    this and make sure that my submission met
20    the rules.
21         Q.    Other than the material that was
22    in your file, or that was produced as your
23    file, did you provide any data to TLS or
24    to Eyewitness Animation?
25         A.    Not that I recall, no.

CHARLES M. PEREIRA

191

1

2      Q.    You said you provided TLS and
3  Eyewitness Animation with instructions
4  regarding correlation points and boundary
5  conditions.
6            What instructions were those?
7      A.    I think I've stated them twice
8  so far.  But once again, takeoff from this
9  airport and this runway, crash into these
10  crash site coordinates, and follow the FDR
11  data in between.
12      Q.    Are those instructions --
13      A.    Verbal.
14      Q.    Okay.  Verbal just means in
15  language.
16            You mean oral?
17      A.    Yes, in speech just like I've
18  provided to you just like that to them
19  during the Zoom meeting.
20      Q.    Okay.
21            So, the instructions were
22  provided orally during a Zoom meeting?
23      A.    Yes, during the initial Zoom
24  meeting, yes.
25      Q.    The one that was some time in

CHARLES M. PEREIRA

192

1

2      2021?

3          A.    Yes, sir.

4          Q.    Any other instructions about

5      correlation points and boundary conditions

6      that you provided TLS or Eyewitness

7      Animations?

8          A.    Not that I recall.

9          Q.    Did you participate at all in

10     the simulations that --

11              MR. LEDFORD:   Strike that.

12         Q.    Did you participate at all in

13     the biomechanical simulations that were

14     performed by other experts in this case?

15         A.    No, sir.  Other than the review

16     in the Zoom meetings, that form of

17     participation, but that was it.

18         Q.    Okay.

19              Do you know if you've seen the

20     final versions of the simulations that

21     they did?

22         A.    I have seen the final versions

23     of the animation that was produced, but

24     not the -- I haven't seen Mr. Jenkyn's

25     report or his individual -- anything that

CHARLES M. PEREIRA

1

2    he produced as part of his report and his

3    submission, dataset, whatever.  I haven't

4    seen any of that.

5        Q.    Okay.

6              So, fair to say then that

7    your -- you didn't do any work to validate

8    the work done by Dr. Jenkyn?

9        A.    Other than review of the product

10   during the development on the Zoom

11   meetings.  I would provide maybe a couple

12   comments during those about, you know, I

13   think that's appropriate, I think that's

14   what I expected, that's what I would

15   expect from the data.  That type of, you

16   know, generalist review.

17       Q.    But you didn't, for example,

18   validate his data input?

19       A.    No.

20       Q.    Data inputs?

21       A.    No, sir.

22       Q.    And you didn't validate the

23   simulation conditions that would have been

24   put into whatever simulation software --

25       A.    No, I just know that, you know --

CHARLES M. PEREIRA

194

1

2      Q.      -- Dr. Jenkyn was using?

3      A.      -- for example, there's G meter

4  shown and I see the bodies doing certain

5  things and all of that seems to follow

6  appropriately for those various G levels

7  on the effects on the masses shown.

8      Q.      Have you ever worked with TLS

9  before?

10     A.      No, sir.  Not that I recall.

11     Q.      Ever worked with Eyewitness

12  Animations before?

13     A.      Yes, sir.

14     Q.      How many times?

15     A.      At least three.

16     Q.      And the approximate dates for

17  when that was?

18     A.      Comair took off from the wrong

19  runway in Lexington, killed everybody

20  except for the first officer.

21             Colgan, Buffalo.  You know that

22  one, presumably.

23     Q.      Yes.

24     A.      And this one.

25     Q.      Do you know what kind of

CHARLES M. PEREIRA

1

2      software they used for creating their

3      animations?

4          A.    I don't know now.  I know in the

5      past I've asked them and -- 'cause we,

6      sort of, compete with each other, you

7      know.

8               On Comair, we did a dog and pony

9      show to see who's going to get the job,

10     and I got the foundational part and they

11     got the pretty part.  So, you know, in the

12     past, they used to use 3D Studio Max and

13     other tools, which I've used as well in

14     the past.  I didn't in this case.  But I'm

15     not sure exactly what tools they're using

16     now, and I'm not so sure Jack would like

17     me inquiring since he's a competitor of

18     sorts.

19         Q.    Do you know whether either TLS,

20     I suppose specifically Dr. Jenkyn,

21     actually used the materials that you

22     provided in creating his simulations?

23         A.    I was told that he used the data

24     that I provided.

25         Q.    Okay.

CHARLES M. PEREIRA

196

1
2          Did he tell you that?
3     A.    Yes.
4     Q.    When did he do that?
5     A.    On those Zoom calls.
6     Q.    And that's one of the four to
7  five Zoom calls you talked about?
8     A.    Yes, sir.
9     Q.    And those are the ones where you
10 were looking at work that he had done and
11 giving, I think you described as sort of,
12 a generalist view of that appears to be
13 roughly accurate?
14    A.    Yes, sir.
15    Q.    Okay.
16         And so, during those calls, Dr.
17 Jenkyn said he had looked at the data you
18 sent, or relied on the data that you had
19 provided?
20    A.    And put it into various formats
21 that his software uses, and, you know.
22         MR. DURKIN:  I think we were
23    talking about lunch at 12:30.  It's
24    12:50.
25         MR. LEDFORD:  We can pause here.

CHARLES M. PEREIRA

197

1
2          THE WITNESS:  If he's -- I mean,
3      if you're only half an hour away from
4      being done or an hour, then let's
5      finish it.  I don't need lunch.
6          MR. DURKIN:  Well, I always ask
7      for the court reporter's sake.  You
8      know that.
9          MR. LEDFORD:  Yeah, no, I agree.
10     Why don't we go off.  Should we do --
11     well, let's go off the record.
12         MR. DURKIN:  Go off the record
13     for a second.  Then we'll ask --
14         THE VIDEOGRAPHER:  Going off the
15     record.
16         The time is 12:51 p.m.
17         (Luncheon recess taken.)
18              -  -  -
19      A F T E R N O O N   S E S S I O N
20              -  -  -
21         THE VIDEOGRAPHER:  We are back
22     on the record.
23         The time is 1:30 p.m.
24  BY MR. LEDFORD:
25     Q.   Good afternoon, Mr. Pereira.  I

CHARLES M. PEREIRA

198

1

2    want to talk a little bit about some of

3    the animations that were produced as part

4    of your expert file.  And so, based on our

5    earlier discussion, I understand those are

6    not animations you produced, right?

7        A.    Animations that were produced as

8    part of my expert file?

9        Q.    Yes.

10            Tell you what, it sounds like

11   you're uncertain about what those

12   animations are.  Let's actually, let's

13   look at one of them.

14       A.    Okay.

15            MR. DURKIN:  We're talking about

16       animations that he produced.

17            MR. LEDFORD:  They're in his

18       expert file.

19            MR. DURKIN:  Okay.

20            MR. LEDFORD:  The first one is

21       described as animation, I mean, I

22       think it's A.

23            MR. DURKIN:  Yeah.

24            MR. LEDFORD:  Let's show --

25       let's show C first.  And this was,

CHARLES M. PEREIRA

1

2          again, produced as part of your expert

3          file.  We don't have to watch the

4          whole thing, unless you want to, but I

5          just want to make sure that you are

6          familiar with it.

7                THE WITNESS:  Okay.

8                MR. LESCH:  So, just a

9          logistical point, and maybe we go off

10         the record and figure it out, but if

11         you screen share it on the Zoom, it's

12         not part of the record.  Okay.

13               VIDEOCONFERENCE MONITOR:  I'm

14         sorry to correct you.  I can record

15         it.

16               MR. LESCH:  Okay.

17               VIDEOCONFERENCE MONITOR:  We can

18         record it on the back end.

19               MR. LESCH:  Okay.  Well, that's

20         why.  I just want to make sure if

21         we're going to mark it as an exhibit

22         or something like that and we're going

23         to go through it, just tell them so

24         they can mark it and record that feed

25         because it's not automatically.

CHARLES M. PEREIRA

1

2          MR. LEDFORD:  Okay.  I am going
3     to mark it as an exhibit.
4          I don't know if you need to
5     record the feed, but we'll provide the
6     actual files and they can be marked as
7     exhibits.  But however you want it to
8     make sure that we're all clear.
9     Whatever works best.
10          MR. LESCH:  That's fine.  Just
11     if we start telestrating or things
12     like that again, let's record it just
13     so it's part of the record.
14          MR. LEDFORD:  Okay.
15          So I believe this will be
16     Exhibit 180 -- or, sorry.  282 or 283?
17          VIDEOCONFERENCE MONITOR:  283.
18          MR. LEDFORD:  283.  Okay.
19          So this will be Exhibit 283.
20          (Exhibit 283, animation video,
21     was marked for identification, as of
22     this date.)
23          MR. CLACKLEY:  Should I press
24     play?
25          MR. LEDFORD:  Yeah, go ahead and

CHARLES M. PEREIRA

201

1

2        press play.

3                (Video played.)

4                MR. LEDFORD:  Okay.  You can

5        pause it.

6    BY MR. LEDFORD:

7        Q.    Okay.

8              So, are you familiar with this

9    video?

10       A.    Yes, sir.

11       Q.    Okay.

12             And am I correct that this is

13   not one of the animations that we were

14   talking about earlier that you created?

15       A.    That's correct.  This was

16   produced by Engineering Animations.

17       Q.    Okay.

18             Do you know if --

19       A.    Excuse me.  Eyewitness

20   Animations.

21       Q.    Eyewitness Animations.

22             Do you know if Dr. Jenkyn had a

23   role in preparing this?

24       A.    Yes.

25       Q.    Do you know what that role was?

CHARLES M. PEREIRA

202

1

2      A.     To provide the biomechanical

3  engineering data to support the forces on

4  and movements of the occupants.

5      Q.     Okay.

6             And did you ever see that

7  underlying biomechanical data?

8      A.     Not in spreadsheet or plot

9  format.

10             Some of the Zoom meetings he may

11  have -- he may have shown that briefly.  I

12  just can't recall.  There was a lot of

13  those, and I -- I just recall an iterative

14  review process, and this -- this is more

15  on the later version.  This is not stick

16  figures.  These are actual renderings of

17  human bodies that are not just linear

18  elements.

19     Q.     And the iterative process you're

20  describing, is that over those four to

21  five Zoom meetings or something else?

22     A.     Four to -- all Zoom meeting.

23     Q.     Okay.

24             And was there anything --

25             MR. LEDFORD:  Actually, strike

CHARLES M. PEREIRA

203

1

2          that.

3          Q.     So -- so you haven't seen the

4    underlying data, but you just understand

5    that Dr. Jenkyn provided certain

6    information to Eyewitness Animations to

7    create these?

8          A.     Yes.

9          Q.     Is that fair?

10         A.     Yes.

11         Q.     Okay.

12                And did you specifically provide

13   any information or data that went into the

14   making of this animation, to your

15   knowledge?

16         A.     The FDR data.

17         Q.     Okay.

18         A.     The FDR data is what drives the

19   motions of the occupants after it's

20   processed into a force solution that acts

21   on the elements that are modeled on the

22   biomechanical side.

23         Q.     Okay.  So just to trace that

24   through.

25                So, you provided FDR data to

CHARLES M. PEREIRA

204

1

2    Dr. Jenkyn who then ran that data through

3    his simulation software, which then was

4    output in some fashion to this animation;

5    is that right?

6       A.    It's directly analogous to what

7    I produced for a vehicle animation.  I

8    model the vehicle and then I use the FDR

9    data to drive the vehicle, and sometimes

10    in addition to FDR data, sometimes we have

11    simulation data that is derived from the

12    FDR data that then drives the vehicle and

13    its constituent parts and systems and

14    everything else 'cause sometimes you don't

15    record certain system functions, but they

16    can be derived from the FDR data knowing

17    the control laws that make up that control

18    system.  And same thing with this, you

19    take FDR data and you model the human

20    bodies and their mass properties and the

21    lengths of their joints and stuff like

22    that, and once he has that model, he

23    applies the underlying FDR data to that

24    model through the simulation software that

25    he uses and that produces the motion

CHARLES M. PEREIRA

1

2      results on those model elements for the

3      human beings and then that is provided to

4      Eyewitness Animations and they go through

5      the process of like with, you know,

6      Hollywood, you take the model and you use

7      various software tools to make the models

8      look realistic and then move their

9      elements according to the -- the data.

10         Q.    So, other than providing the

11     underlying FDR data, did you have any

12     other involvement in the direct creation

13     of the window --

14              MR. LEDFORD:  And actually, let

15         me strike that and try again.

16         Q.    So, I understand that you were

17     involved in calls, Zoom calls

18     specifically, where iterative models of

19     this animation were created.

20              Other than those calls and

21     having provided the FDR data to Dr.

22     Jenkyn, did you have any other role in

23     creating this animation?

24         A.    No, sir.

25              MR. LEDFORD:  So, I'm going to

CHARLES M. PEREIRA

206

1

2          mark next as Exhibit 283 -- or, sorry,

3          284 the report of plaintiffs' expert

4          Thomas Jenkyn.

5                  (Exhibit 284, Plaintiffs' Rule

6          26(a)(2)(B) Disclosure of Thomas R.

7          Jenkyn, Ph.D., PEng, was marked for

8          identification, as of this date.)

9    BY MR. LEDFORD:

10      Q.      And, sir, have you ever seen

11   that report before?

12      A.      No, sir.

13      Q.      Okay.  If you -- and I can give

14   you a copy.

15              MR. DURKIN:  I have a copy here.

16              MR. LEDFORD:  Okay.

17   BY MR. LEDFORD:

18      Q.      So, sir, and I -- you don't --

19   obviously it's a lengthy report.  I think

20   you said you haven't reviewed it before.

21   I'm really just wanting to look at one

22   part of it which is page 11 of Dr.

23   Jenkyn's report, beginning of the last

24   full paragraph.

25              MR. DURKIN:  Starts with "any

CHARLES M. PEREIRA

207

1

2      loss objects"?

3              MR. LEDFORD:  The last full

4      paragraph.

5              MR. DURKIN:  "It is assumed."

6              MR. LEDFORD:  "It is assumed."

7      Yes.

8              MR. DURKIN:  Okay.  Thank you.

9      BY MR. LEDFORD:

10     Q.    Okay.  Let me know when you get

11     there.

12     A.    When I get there or when I've

13     read it?

14     Q.    When you get there and we'll

15     read it along together for the --

16     A.    I'm there.

17     Q.    Okay.

18              So, in the beginning of the last

19     full paragraph says:  It is assumed that

20     all the passengers and crew aboard Flight

21     ET 302 were wearing their seat belts

22     properly and were restrained within their

23     seats.  This is a conservative assumption

24     that I have not seen any indication to the

25     contrary in any of the materials that I

CHARLES M. PEREIRA

208

1

2    have reviewed for this report.

3              Did I read that correctly?

4    A.    Yes, sir.

5              MR. LEDFORD:  Okay.

6              I'm going to now mark the expert

7        report of Mallak.

8              (Exhibit 285, Report of Craig T.

9        Mallak September 21, 2022, was marked

10       for identification, as of this date.)

11   BY MR. LEDFORD:

12   Q.    And, sir, just for recordkeeping

13   purposes, you can close that one for the

14   moment, and I'd ask you to write on the

15   front of it Exhibit 284.

16             MR. DURKIN:  Is this Mallak is

17       284?

18             MR. LEDFORD:  Mallak is 284.

19             MR. LESCH:  No.  Jenkyn's 284.

20       Mallak's 285.

21             MR. LEDFORD:  I'm sorry.  Mallak

22       is 285.  Yeah, Jenkyn, this one is 284

23       and this is 285.

24             So if you just want to write

25       that up there, just so we don't lose

CHARLES M. PEREIRA

209

1
2          track.
3                    MR. DURKIN:  Got it.
4                    THE WITNESS:  Okay.
5                    MR. LEDFORD:  And if you want to
6          close up the report of Dr. Jenkyn for
7          the moment, you can.
8                    THE WITNESS:  So, 284 is
9          clipped.
10                   MR. LEDFORD:  Okay.
11      BY MR. LEDFORD:
12          Q.    And then I'm going to turn your
13      attention to the last paragraph on page 2
14      of Dr. Mallak's report.
15          A.    Starting with "the entire"?
16          Q.    Yes.
17          A.    Okay.
18          Q.    And that reads:  The entire
19      flight time for this crash was
20      approximately five minutes from takeoff
21      until impact with problems readily
22      apparent within seconds after takeoff.
23      Upon impact with the ground --
24                   MR. LEDFORD:  Excuse me.  Let me
25          strike that and start this question

CHARLES M. PEREIRA

210

1

2         over.

3         Q.    So, I am going to read from an

4    excerpt in that -- within that paragraph,

5    and he is talking about the accident

6    sequence.  So it's actually the third

7    sentence which reads:  The passengers

8    would likely have been belted throughout

9    the entire sequence.  The belt provides a

10   single point of restraint with varying

11   protection to a single point to the body

12   under certain circumstances.

13              Okay.  So, when he says "the

14   belt provides a single point of restraint

15   with varying protection to a single point

16   of the body under certain circumstances,"

17   I believe that refers to the -- the seat

18   belt.  And so he's saying the passengers

19   would likely have been belted throughout

20   the entire sequence.

21              Is that -- am I characterizing

22   that sentence at least --

23       A.    Yes, sir.

24       Q.    -- accurately?

25              Okay.  So -- so, we have Dr.

CHARLES M. PEREIRA

211

1

2     Jenkyn and Dr. Mallak who are saying that

3     it's either assumed that all the

4     passengers and crew were wearing their

5     seat belts, or in the case of Dr. Mallak

6     saying the passengers would likely have

7     been belted throughout the entire

8     sequence.

9            Do you agree with Dr. Jenkyn and

10    Dr. Mallak that the passengers and crew of

11    the Flight ET 302 should be assumed to

12    have been wearing their seat belts and

13    that there's no evidence to the contrary?

14            MR. DURKIN:  Objection;

15        speculation.

16            And I think in fairness, Dr.

17        Jenkyn assumed it for purposes of his

18        discussion, right.  He assumed for

19        purposes of discussion that.  He

20        didn't -- he didn't have --

21            MR. LEDFORD:  Kevin --

22            MR. DURKIN:  I'm just wondering

23        how anyone could have an opinion

24        about --

25            MR. LEDFORD:  I'm going to ask

CHARLES M. PEREIRA

212

1

2          you to stop.

3                  So, we can talk about this

4          later.  I'm talking about his opinion

5          whether or not he agrees with the

6          statements Dr. Jenkyn says there is no

7          evidence to the contrary.  So I'm

8          not --

9                  MR. DURKIN:  Got it.  Got it.

10         Okay.

11                 MR. LEDFORD:  Okay.

12                 MR. DURKIN:  Got it.  All right.

13         A.    I agree that they stated what

14     they stated in their reports.  That is not

15     my personal opinion based on my thousands

16     of revenue flights that I've taken where

17     I've sitting -- sat in the passenger seats

18     and observed others, especially since I

19     left the NTSB and have observed occupant

20     restraint use and non-use for my

21     observational purposes, shall we say.  I'm

22     a very inquisitive person and this subject

23     has come up before and I always, even on

24     the flight coming up here, make efforts to

25     make observations of that regard,

CHARLES M. PEREIRA

213

1

2  including when I'm walking down the

3  hallway to use the restroom.

4          I think it's improbable that all

5  of the passengers were properly restrained

6  from an engineering standpoint and from a,

7  perhaps, a certification assumption

8  standpoint.  I think it's human nature to

9  have a -- a variety of preferences for

10 belt use with respect to use and non-use,

11 as well as with respect to the location on

12 the pelvis and the tension which is

13 applied to the belt.  That's -- that's my

14 personal opinion is that there -- we

15 should expect some variation in those

16 parameters amongst the population in the

17 cabin.

18      Q.    And your personal opinion is not

19 in the text of your report anywhere,

20 right?

21      A.    No.  But you asked the question.

22      Q.    I did.  I asked whether or not

23 you agreed with Dr. Jenkyn and Dr. Mallak

24 and their -- their views that, for example

25 Dr. Mallak, the passengers would likely

CHARLES M. PEREIRA

214

1

2    have been belted throughout the entire

3    sequence, right.

4              And so your testimony is you

5    disagree with Dr. Mallak and his statement

6    that the passengers would likely have been

7    belted during this takeoff sequence?

8              MR. DURKIN:  Objection; asked

9        and answered.

10             MR. LESCH:  Mischaracterizes.

11    A.    I answered it pretty thoroughly,

12    but I do not believe that 100 percent of

13    the passengers would be belted, number

14    one.

15             And I certainly don't agree that

16    100 percent of them would be perfectly

17    belted with respect to position and -- and

18    tension levels that the manufacturers

19    would -- would like them to, or the

20    operators would like them to.  It's just

21    human nature.

22    Q.    So, I didn't ask about seat belt

23    position.  I'm just asking about whether

24    or not they were belted and whether or

25    not, as Dr. Mallak says, the passengers

CHARLES M. PEREIRA

215

1

2    would likely have been belted throughout

3    the entire sequence.

4              So, is it your opinion that Dr.

5    Mallak is incorrect?

6        A.    Yes.  And I stated so not

7    specifically with respect to him, but

8    during the Zoom meeting review processes,

9    I stated that what I just explained to

10   you, that in my opinion, the animation

11   should show the -- the spectrum, the full

12   spectrum of potential restraint

13   combinations or lack thereof.

14       Q.    So -- okay.  So, you -- the

15   explanation you just gave me of your views

16   about seat belt use, that's something that

17   sounds like you raised with Dr. Jenkyn

18   during those Zoom calls, right?

19       A.    The group.

20       Q.    The group.  Including Dr.

21   Jenkyn?

22       A.    Yes, sir.

23       Q.    Okay.

24              Was Dr. Mallak on any of those

25   calls?

CHARLES M. PEREIRA

216

1

2          A.     Not that I recall.

3          Q.     Have you ever spoken to Dr.

4      Mallak?

5          A.     No, sir.

6          Q.     Have you ever communicated in

7      writing with Mr. Mallak?

8          A.     No, sir.  Never heard of him.

9              MR. DURKIN:  Jimmy Kreindler

10         just made an appearance.

11             Jimmy's sweet.

12             MR. LEDFORD:  I'm glad we have

13         that on the record.

14             MR. DURKIN:  Yeah.

15             THE WITNESS:  Now he can bill

16         for it.

17             MR. LEDFORD:  Also on the

18         record.

19             MR. DURKIN:  On the record,

20         plaintiffs' lawyers don't bill.

21     BY MR. LEDFORD:

22         Q.     So, you -- you said that your --

23     your view about seat belt use is based on

24     your personal observation, right?

25         A.     Yes, sir.

CHARLES M. PEREIRA

217

1

2      Q.    And that -- that's you as an
3  airline passenger?
4      A.    And friend and acquaintance of
5  some of the others.  I have actually asked
6  passengers why, why they choose what they
7  choose to do and told them what my
8  occupation is and why I was asking.
9      Q.    Do they buckle their seat belt
10  afterwards?
11      A.    No.  Some of them have told me
12  to go you-know-what myself.
13      Q.    We don't need that on the
14  record.
15      A.    Okay.
16      Q.    But I think I understand what
17  you mean.
18      A.    Yep.
19      Q.    So, just to be clear, your
20  discussions of the seat belt use, that's
21  something that would -- that you've done
22  over the years as a passenger on
23  commercial aircraft flights?
24      A.    Yes, sir.
25      Q.    And it sounds like you're saying

CHARLES M. PEREIRA

218

1
2    that you've seen people who weren't
3    wearing their seat belts; is that right?
4        A.    Yes, sir.
5        Q.    Okay.
6              Do you --
7        A.    And I've been in accident
8    investigations at the NTSB where we came
9    to find out the passengers were not
10   buckled and there was a whole analysis as
11   to why and what we could do about it.
12       Q.    And have you done an analysis of
13   the number of or the percentage of
14   passengers who are buckled on takeoff?
15       A.    No, sir.
16       Q.    Are you aware of any literature
17   or study about the number or percentage of
18   passengers who are belted on takeoff?
19       A.    Not specifically, no.
20       Q.    Are you aware of any data about
21   the percentage of passengers in -- on
22   Ethiopian Airlines flights?
23       A.    No.
24       Q.    Okay.  So it's really it's just
25   your personal observations as a passenger

CHARLES M. PEREIRA

219

1
2    on commercial flights?

3         A.    Yes, sir.

4               MR. LESCH:  Objection to form.

5         A.    It's not just a -- let me add to

6    that.  It's not just passenger airplane

7    flights.  It's in vehicle -- other vehicle

8    environments as well, like highway

9    vehicles where some of my friends don't

10   and they refuse to wear it and they have

11   their rationales why, and they say they

12   apply that rationale to the airplane

13   environment also.  They may occasionally

14   buckle up, they tell me, to get past the

15   scrutiny of the flight attendants to

16   enable takeoff and then they immediately

17   take them off, and very aggressive about

18   their non-use.

19        Q.    How many friends have told you

20   that?

21        A.    At least three.

22        Q.    So, you've got -- you've got the

23   three friends.  You've got some

24   observations that you've made over the

25   years.  But what I'm hearing is that

CHARLES M. PEREIRA

220

1
2     there's -- there's not a study out there
3     from when you were in the NTSB or
4     afterwards that quantifies and says this
5     number of passengers can be expected, you
6     know, per takeoff to not be belted, right?
7          A.    It hasn't risen to that level
8     yet.  And at the Board, my recollection of
9     the discussion was that -- well, it
10    wouldn't have mattered in this case,
11    they're all going to die anyway.  So
12    whether they had their belt on or not,
13    they're all going to be tiny fragments
14    about the size of a quarter by the time we
15    get there, so.
16         Q.    Sir, would you expect during,
17    for example, a turbulence event for
18    passengers who are currently unbuckled to
19    buckle themselves into their seat belt?
20         A.    Repeat that one more time.
21         Q.    Sure.
22               Would you expect that, for
23    example during a turbulence event, that
24    passengers who are unbuckled would buckle
25    their seat belts?

CHARLES M. PEREIRA

221

1
2        A.     It depends on their personal
3    thought process.  I would certainly hope
4    they would, but some of the ones I have
5    spoken to about it, probably not.
6        Q.     So, in terms of, and again this
7    is just your -- your sense because I
8    understand you don't have specific studies
9    or data, is it fair to say that more
10   passengers than not are buckled on an
11   airplane during takeoff?
12       A.     Yes, sir.
13       Q.     And would you characterize it as
14   nearly all passengers on takeoff are --
15   are buckled?
16       A.     I don't have an exact
17   percentage, but from a qualitative
18   standpoint and subjective standpoint,
19   yeah, the majority are going to be belted
20   in one fashion or another.
21       Q.     And so, if you were to look
22   around the cabin and you didn't know for
23   sure, you hadn't had a chance to check,
24   I'd be safe to say then that any
25   particular passenger is more likely than

CHARLES M. PEREIRA

222

1

2    not to be belted?

3         A.    Yes, sir.

4              For example, on the AT20 flight

5    that I came up here on I made specific

6    observation to that effect, and everyone

7    that I could perceive from my seating

8    position appeared to have the buckle on.

9    You can't see the clasp in most of them,

10   but I could see going from the seat up

11   over the edge of their hip into their lap

12   area.  Whether it was actually buckled and

13   to the extent that it was tight, I have

14   no -- no means, nor did -- I found that my

15   inquiries in the past were oftentimes met

16   with unpleasant responses.  It was none of

17   my business.

18        Q.    Are you aware of any evidence

19   that any particular passenger was unbelted

20   or unrestrained during the accident

21   flight?

22        A.    No, sir.

23        Q.    And are you aware of any

24   evidence that any passenger on the

25   airplane was unrestrained --

CHARLES M. PEREIRA

223

1
2      A.      No.
3      Q.      -- during the accident flight?
4      A.      No, sir.
5      Q.      Sir, you were at the NTSB for 15
6   years --
7      A.      Yes, sir.
8      Q.      -- approximately?
9      A.      Yes, sir.
10      Q.      When you were at the NTSB, did
11   you create animations of -- of accident
12   flights?
13      A.      Yes, sir.
14      Q.      Okay.
15              And in those animations, I take
16   it you took observable evidence from the
17   investigation, whether that was FDR data
18   or maybe physical inspection, and then
19   transformed that into an animation.
20              Is that fair?
21      A.      Yes, sir.
22      Q.      And is it fair to say that at
23   the NTSB, you -- you wouldn't have
24   included an event in an animation where
25   you didn't have any evidence saying that

CHARLES M. PEREIRA

224

1

2      it had occurred?

3          A.     We had -- we have done some

4      hypothetical animations based off of

5      hypothetical simulations.  Boeing 737

6      rudder accidents in Aliquippa,

7      Pennsylvania and related thereto,

8      incidents and accidents.

9                 We've done numerical simulations

10     and then animations thereof to demonstrate

11     to the human factors people and other

12     people what these things would look like

13     and both in the cockpit environment and in

14     the exterior view.  We -- we would do that

15     stuff.  We generally, you know, the

16     decision is to -- it's a very similar

17     process as to decide whether or not we're

18     going to show that at the Board meeting or

19     not 'cause we have family members and the

20     Board doesn't want to upset any of the

21     family members and make them relive their

22     loved one's suffering right in front of

23     them and being paid for by their tax

24     dollars to suffer, you know, through that.

25     That generally was frowned upon.  But for

CHARLES M. PEREIRA

225

1

2    our engineering and analytics purposes and

3    deliberations by staff, yeah, we would do

4    that.

5        Q.    You -- you would create

6    animations that did not reflect the

7    evidence of what occurred during the

8    crash?

9        A.    I stated it pretty clearly, but

10   yes, we would go beyond the FDR dataset

11   available and use simulation and

12   analytical evidence to evaluate

13   hypothetical situations and other

14   analytical purposes.

15       Q.    How about when it was more

16   likely than not something didn't occur,

17   would you -- would you still --

18       A.    We would still do it as a

19   process.  It's part of the engineering

20   judgment and analysis process that you

21   embark upon to do a thorough investigation

22   and come up with thorough findings and

23   safety recommendations.

24       Q.    So, I think I understand.

25   You're saying as part of the investigation

CHARLES M. PEREIRA

226

1

2      process, you might create these animations

3      based on hypotheticals, right?

4           A.    Yes.

5           Q.    And so you might say while I

6      don't have any evidence, but I'm going to

7      create this animation as part of the

8      process.

9           A.    It's not -- it's not that I

10     don't have any evidence.  It might be that

11     I don't have any evidence that it

12     factually occurred on this case, but

13     there's a possibility that it could have

14     occurred and this is one of the

15     hypothetical situations and we need to

16     evaluate based on human factors and

17     piloting and everybody else within our

18     party system at the Board and, you know,

19     analogous process what we do on the tort

20     side and just for different purposes and

21     different, you know, organizational

22     structure, you do engineering analyses

23     using these tools.  And as part of -- in

24     the overall investigative function on the

25     Board side and, frankly, the same function

CHARLES M. PEREIRA

227

1

2    on our tort side, we still embark to do

3    investigative processes to determine what

4    the issues are and what the potential --

5    potentially useful demonstrative tools

6    could be on the tort side.

7            You know, for example, when we

8    transition from a liability and damages

9    case to a damages only case.  You know, as

10   I get more experience with that, I'm

11   learning, you know, there's different

12   processes and functions as well.

13           So that's -- there are -- and

14   there are countries that have differences

15   of opinion on that.  The -- there are some

16   countries that don't believe there should

17   be any probable cause statement or

18   investigation as to who was at fault,

19   which is completely different than the way

20   the U.S. investigates.  You know, and

21   there are differences among countries

22   about how and why to embark on animations

23   and simulations.  And every country has

24   their own philosophy and their right to

25   their own opinions.

CHARLES M. PEREIRA

228

1

2       Q.    Understanding that as part of

3   the analytical process you might create an

4   animation, do I understand what you're

5   saying correctly that you wouldn't then

6   put the hypothetical animation out as a

7   factual representation of what occurred

8   during the accident, right?

9       A.    What could have occurred, yes.

10      Q.    Right.  But you wouldn't

11  describe it as "this is what occurred

12  during the accident"?

13      A.    Say "this is what could have.

14  Here is the spectrum of responses."

15              And -- and in this case, since I

16  know or have a feeling where we're going

17  with it, I feel it's appropriate to

18  demonstrate the spectrum of potential

19  responses to the applied forces.

20      Q.    Okay.  Even though, as you said

21  earlier, more likely than not, everyone

22  was -- or any individual passenger was, in

23  fact, belted in, right?

24      A.    True.  But you cannot rule out,

25  which is my point.

CHARLES M. PEREIRA

229

 1

 2      Q.    Okay.  So, if for example --

 3    well, you know in the animation --

 4      A.    Right.

 5      Q.     -- somebody is shown becoming

 6    un -- or maybe not becoming unbelted, but

 7    somebody is shown as being unbelted and

 8    moving towards the cabin ceiling, right?

 9      A.    Yes, sir.

10      Q.    Okay.  So you've seen that

11    animation?  Right?

12      A.    And I believe it's a fair and

13    accurate rendition of a unrestrained

14    response to the FDR accelerations.

15      Q.    Okay.  And I understand that,

16    that you're saying if a passenger was

17    unbelted, you believe that animation shows

18    what would -- what would occur.

19      A.    Yes, sir.

20      Q.    But it sounds like you're also

21    saying it's more likely than not that that

22    passenger was, in fact, belted, but if she

23    wasn't belted, this is what happened?

24      A.    Yes.  And an analogy to that

25    would be, in my opinion, if you show the

CHARLES M. PEREIRA

230

1

2      entire fuselage too with all 149 people,

3      it would be my opinion that it would only

4      be fair and accurate to show a small

5      percentage of them responding as an

6      unrestrained occupant.

7          Q.    Okay.  But you don't know what

8      percentage, right?

9          A.    No.

10          Q.    And again, for any particular

11      passenger, it's more likely than not that

12      they were actually just restrained in

13      their seat, right?

14          A.    Just from a statistical

15      standpoint, since we were talking stats

16      before, yes, the majority of the

17      passengers would likely have been

18      restrained to some extent.

19          Q.    But again, even when you're

20      talking about the manner of their

21      restraining, it sounds like you -- there's

22      no data that you're pointing to that says

23      these are -- this is the, you know, the

24      percentage of folks who have correct

25      belted -- are correctly belted versus

CHARLES M. PEREIRA

231

1

2    maybe more loosely belted or anything of

3    that nature, right?

4         A.    No, sir.  I just -- I think that

5    to be factual and to be accurate, you need

6    to portray all of the different options,

7    and then it would be up to somebody else

8    to decide how to apply those

9    quantitatively to the overall 149

10   passenger load to say, you know, what

11   percentage experienced this, what

12   percentage experienced that.

13            But, you know, there's other

14   factors that go into it.  As I would -- as

15   we discussed in the Zoom meetings, and as

16   I assume is portrayed in Mr. Jenkyn's and

17   Mr. Troy -- Troy's reports, I would assume

18   that they mention also the fact that the

19   responses for the appendages will also be

20   different based on the fitness and

21   strength and mental -- mental response of

22   the individual passengers to their

23   muscular force applications at the joints

24   because there was debate about, you know,

25   what level of force input would the

CHARLES M. PEREIRA

1

2      passengers have imparted to their own

3      joints.  Like if I'm going through that

4      and I really want to be a tough guy when I

5      feel it coming, you know, I've been

6      through five minutes of this roller

7      coaster ride already, am I going to grip

8      the seat and not allow anything to move or

9      happen to try to prevent myself from

10     experiencing neck strains, you know, upon

11     impact?  You know, some of them, you know,

12     you know, 'cause a lot of injuries occur

13     because of translation of your head and

14     things like that and hitting the seat --

15     the back of the seat.

16              So after hearing Dr. Jenkyn

17     discuss that kind of stuff, you know, I

18     thought, again as with the -- as with the

19     belt restraint thing, that we should

20     probably show a combination of all the

21     different responses.  So there's a -- a

22     wide array of -- I would assume in his

23     solution that is animated, there's a wide

24     array of restraint from seat belt

25     mechanism and a wide array -- a wide array

CHARLES M. PEREIRA

233

1

2    of muscle and joint movements in response

3    to the human condition, so.

4        Q.    So, if -- so, you would expect

5    then that some folks would be gripping

6    tightly and --

7        A.    Death grip on the part of some

8    people and other people might have been in

9    such a state of shock that they were just

10   letting whatever happen and may in fact

11   have been in shock and unable to --

12       Q.    So their limbs might be floating

13   upwards, but would you expect that most

14   people are going to be gripping something

15   and trying to keep their limbs in place?

16             MR. DURKIN:  Objection; calls

17        for speculation.

18        A.    Yeah, that one -- that's

19   probably the biggest one to speculate on.

20   That goes into emotional and

21   psychological, you know --

22             MR. DURKIN:  Objection.

23             Yeah, okay.  Go ahead.  Over

24        objection.

25

CHARLES M. PEREIRA

1

2    BY MR. LEDFORD:

3        Q.    And so I understand that you're

4    not offering testimony on that, and I'm

5    not urging you to speculate.

6        A.    Okay.

7        Q.    So, what I'm -- I guess what I'm

8    trying to get at though is you would

9    expect, like in order for a video to be

10   accurate, you'd expect some portion of the

11   passengers to be holding themselves in

12   place, right?

13       A.    Yeah.

14            MR. DURKIN:   Objection to

15        foundation and speculation and as to

16        what some other individual would do in

17        animation.

18   BY MR. LEDFORD:

19       Q.    I mean, you've seen the

20   animation.  So I'm just asking you your --

21   your view.  And I think I'm, or what I'm

22   trying to do is I'm trying to understand

23   what you have already testified to, which

24   I believe is that you think that some

25   portion of the passengers would have been

CHARLES M. PEREIRA

1

2      gripping their seats and some portion may

3      have had their limbs moving more freely.

4             Is that a fair characterization?

5      A.    I think that a --

6             MR. DURKIN:  Objection; calls

7      for speculation.

8      A.    You know, I think -- I think --

9      there's some random, you know, set of

10     solutions that exist out there that only

11     God knows the truth to, and I don't -- I

12     believe that we can and have a duty to

13     know and understand the potential spectrum

14     of those, but I don't -- I don't know that

15     I would want to place a quantitative

16     figure on it unless I embarked on some

17     statistical study, which I haven't.

18     Q.    And so -- so, you're not aware

19     of any data saying one way or another how

20     many people would be holding themselves in

21     place versus their limbs floating free.

22     Is that --

23            MR. DURKIN:  Same objection;

24     asked and answered; speculation;

25     outside the scope of his -- his

CHARLES M. PEREIRA

236

1

2      expertise.

3              Keep going, you know.

4      A.      I would agree with Kevin that it

5      is, you know, it's outside of my assigned

6      scope.

7              I have my opinions.  I provided

8      them to you.

9              MR. DURKIN:  I mean, if you're

10             agreeing today that all his personal

11             opinions that you're going to -- if

12             evoked today are admissible, we can do

13             this, okay.  But if you want to -- we

14             can keep doing it, but you have to

15             have a foundation, in my view.  Okay.

16             That's good, Chris.

17             MR. LEDFORD:  Okay.

18             MR. DURKIN:  If you want to

19             stipulate that all his personal

20             opinions come in, we can do that right

21             now, if you want.

22             MR. LEDFORD:  We will not be

23             stipulating to that, no.

24             MR. DURKIN:  Okay.  Well, just

25             then -- then you're wasting our time,

CHARLES M. PEREIRA

237

 1

 2      okay, by asking things that are -- go

 3      ahead.

 4              MR. LEDFORD:  Is there anything

 5      else you'd like to say, or are you --

 6              MR. DURKIN:  I said enough.

 7              MR. LEDFORD:  Okay.

 8   BY MR. LEDFORD:

 9      Q.    So, returning to the belted

10   point.

11              Would you, and I understand you

12   can't put an exact figure on this, right.

13   We've been through all that.  I'm not

14   trying to --

15              MR. DURKIN:  The number of

16      people belted or unbelted in his

17      personal opinion, is that what we're

18      talking about?

19              MR. LEDFORD:  Yes.

20              MR. DURKIN:  The belted.

21              MR. LEDFORD:  Belted.

22              MR. DURKIN:  Passengers, okay.

23              MR. LEDFORD:  Yes.

24              MR. DURKIN:  Okay.  Go ahead.

25              MR. LEDFORD:  I mean, actually,

CHARLES M. PEREIRA

238

1
2        that's a good clarification,
3        Mr. Durkin.
4    BY MR. LEDFORD:
5        Q.    Would you believe -- would you
6    believe that all of the crew would be
7    properly belted during the takeoff?
8        A.    The crew or the passengers?
9        Q.    The crew.  Including cabin crew.
10       A.    I would suspect a higher
11   probability that more cabin crew would be
12   appropriately restrained than passengers.
13       Q.    In your personal experience,
14   have you seen is it one person in every
15   row that's unbelted, one person in every
16   three rows, ten rows?
17       A.    My recollection is that I --
18   depending on the phase of the flight, you
19   know, I'm not doing much walking around on
20   the takeoff and initial climb-out phase,
21   but during -- during the cruise phase when
22   we are allowed to walk around, I think
23   it's as high as 50 percent are unbuckled.
24       Q.    Okay.  But on takeoff you're
25   belted.  I take it you follow your own

CHARLES M. PEREIRA

239

1

2    advice, you're belted on takeoff, right?

3        A.    Every second that I'm sitting in

4    the seat, unless I have a biomechanical

5    reason, reaching in my pocket to get

6    something or whatever like that, or

7    reaching underneath to get my laptop or

8    whatever, I'm belted and I'm tight because

9    I know what the -- I know what the

10   biomechanics and the physics of

11   unrestrained occupants are and I've seen

12   from minimal consequences to fatal

13   consequences.

14       Q.    And that's -- so you're --

15   you're always belted on takeoff, right?

16       A.    Yes, sir.

17       Q.    And so, you can maybe see what's

18   in your row?

19       A.    Yes, sir.  And surrounding rows

20   within the -- if I'm on the aisle seat,

21   which I prefer to be because nobody's

22   restricting my movement in the aisle.  In

23   case I need to evacuate and take action, I

24   like to be in the aisle seat.  And there's

25   fight or flight response type people.  I'm

CHARLES M. PEREIRA

240

1

2     the fight type person.  I take immediate

3     action and whatever.

4              You know, I was on the 9/11

5     Commission and helped on terrorist

6     investigations and very familiar with

7     those kinds of situations, and I consider

8     myself to be a very competent male human

9     being that can help secure the security of

10    the flight.  So I like to be in the aisle

11    and I like to be buckled.  But from that

12    position, I can see numerous rows around

13    me.  Especially the aisle seats, I can

14    gauge at least a portion of their belted

15    status.  And on takeoff phase, the

16    majority of the ones that I can see show

17    evidence of being belted.

18    Q.    I'll move to the next topic.

19              First I'll note that there's a

20    whole lot of real tough women too.

21              So, you've already testified

22    that there -- there's no recorded evidence

23    of sounds that occurred in the cabin

24    during the flight, right?  Because you

25    don't have the CVR.

CHARLES M. PEREIRA

241

1

2      A.      That's correct.

3      Q.      So, we heard a clip earlier and
4  it sounded like there were screaming
5  sounds depicted in the animation.

6              And so, do you know where those
7  screaming sounds came from?

8      A.      Jack said he had a catalog of
9  those from real events that he could use,
10 and my understanding is he selected that.

11     Q.      Do you know what event he
12 selected it from?

13     A.      Not precisely, no.

14     Q.      And your understanding that's a
15 real event?

16     A.      It's my understanding, yes, sir.

17     Q.      And when did you learn that?

18     A.      During one of our Zoom calls.

19     Q.      Okay.

20             And a real aviation event?

21     A.      Yes, sir, my understanding.

22     Q.      Do you have any -- do you know
23 any further details about the source of
24 those sounds?

25     A.      No.

CHARLES M. PEREIRA

242

1

2      Q.      Okay.  So not what flight it

3   was?

4      A.      During the Zoom meetings, I

5   offered up some of my own observations

6   from turbulence videos that I had seen on

7   YouTube and other open source Internet

8   searches and -- because I felt it was more

9   appropriate from an engineering judgment

10   standpoint that a frightened passenger

11   environment, audio environment, was far

12   more probable than zero noise environment,

13   and so it would be a disservice to the

14   viewer, in my opinion, to provide a silent

15   audio environment than it would be to

16   provide some realistic approximation of

17   how passengers screamed during a, for

18   example, an inflight turbulence event.

19           This decision was largely made,

20   in my opinion, because we didn't have a

21   cockpit voice recorder to present any

22   ambient audio environment, which we

23   normally do and which I hope to have

24   accomplished within the coming months of

25   when I hopefully acquire, by whatever

CHARLES M. PEREIRA

243

1

2    means necessary, the Ethiopian cockpit

3    voice recorder audio.

4        Q.    You're still actively working

5    towards that?

6        A.    I'll never stop.

7        Q.    Okay.

8             So, and -- but you'd agree right

9    now there's no -- there's no existing

10   evidence that -- of sounds made by

11   passengers in the cabin?

12       A.    That is correct.

13       Q.    Right.

14            And so, those sounds are added

15   onto the animation from some other flight

16   and we can --

17       A.    That's --

18       Q.    It sounds like other folks would

19   have the details of that, but you're not

20   familiar with exactly what flight, exactly

21   what the circumstances were that generated

22   that cockpit noise -- or, that cabin

23   noise, right?

24       A.    No, sir.  But every turbulence

25   video that I have seen and every

CHARLES M. PEREIRA

244

1

2      turbulence encounter of any significance

3      that I have personally been involved in as

4      a member of the -- the passenger load,

5      every single one of those has involved

6      screaming and fear and praying and crying.

7          Q.    You've referred several times to

8      a turbulence event.

9              Did you do any assessment of the

10     g-forces on the accident flight?  And

11     let's leave aside the last approximately

12     24 seconds after the last MCAS activation.

13         A.    From takeoff all the way to the

14     end, yes, sir.

15         Q.    Well, let's say the takeoff all

16     the way until that last 24 seconds.

17         A.    Yes, sir.  And my report

18     chronicles that.

19         Q.    Right.  And so let's talk about

20     that, that section.

21              Did you do any analysis of the

22     vertical acceleration or lateral or

23     longitudinal lacerations compared to a

24     turbulence event?

25         A.    Yes, I -- yeah, I did just

CHARLES M. PEREIRA

245

1

2   because I know in general from having done

3   dozens, if not more than a hundred of them

4   myself at the NTSB and since.  You know,

5   we readout a lot of data recorders at the

6   NTSB and the majority of them are from

7   turbulence events.

8           And, you know, there's a series

9   of Green Books at the NTSB lab where we

10  document every incoming flight data

11  recorder, and my personal recollection

12  from having filled out hundreds of entries

13  in those Green Books myself as a member of

14  the flight recorder lab staff was that the

15  majority were from turbulence encounters,

16  and we would usually write down in our

17  remarks, comment when we were done, in the

18  Green Book the peak G's that were

19  experienced, and we would certainly

20  chronicle them in detail in our reports.

21  We would produce a flight data factual

22  report, and that would chronicle the time

23  history and -- and -- of the acceleration

24  events and what caused them as well.  Some

25  of them didn't end up being actual

CHARLES M. PEREIRA

246

1

2    turbulence cause.  Some of them ended up,

3    like MD 11's would be inadvertent inflight

4    slat deployment that manifested itself to

5    the passengers as a turbulence event, but

6    it was actually a flight control event

7    that, similar to this, that manifested

8    itself to the passengers, you know, as a

9    acceleration subjection event regardless

10   of the source of that acceleration.

11        Q.    To clarify, I'm not talking

12   about just the peak G's, positive or

13   negative that may have been felt.

14             You'd agree that you could have

15   positive G's, say for example, let's take

16   it outside the commercial aviation

17   context.

18             Are you a pilot yourself?

19        A.    Student pilot.

20        Q.    Student pilot, okay.

21             You -- I'm guessing you

22   understand, though, that you can -- you

23   could pull, say, a 2 or 3 G's in say you

24   had a plane that was equipped for

25   aerobatic flying.

CHARLES M. PEREIRA

247

1

2      A.    Yes, sir.

3      Q.    Okay.  You could -- you could

4   maneuver that aircraft and you could

5   experience, say, 3 G's, right?

6      A.    Positive.

7      Q.    Positive 3 G's.

8      A.    Yes.

9      Q.    Okay.

10          And that might be, sort of, the

11   onset of that would be -- would maybe be

12   relatively smooth and your peak G's, say

13   you got up to 3 positive G's, right.  That

14   would not be experienced as turbulence,

15   right?

16      A.    It would be an expected

17   condition based on your control inputs.

18      Q.    Right.  So, the -- and that

19   would be based on -- that would be

20   g-forces based on control inputs, right?

21      A.    Yes.  And something that you

22   would prepare yourself for very well in

23   advance of doing so.

24      Q.    Right.  And so you wouldn't be

25   shaking.  You -- but you -- you would be

CHARLES M. PEREIRA

248

1

2    subject to a gradually increasing G's and

3    maybe it takes you up to that peak of 3

4    G's?

5        A.    It would depend on the

6    characteristics of the input made to

7    achieve that peak G.

8        Q.    Okay.  In what way?

9        A.    If I input over the course of

10   two-tenths of a second 200 pounds of

11   nose-up force, I might get a 3 G response

12   within half a second or three-quarters of

13   a second.

14       Q.    Okay.  And would you get the

15   same -- so, that's a small aerobatic

16   plane.

17           How about in a 737, it's a lot

18   bigger aircraft, right?

19       A.    You would go to jail for having

20   done so with passengers on board if the

21   airplane survived.  I'm not sure a 737

22   could survive a 3 G event without

23   structural failure of some kind.

24       Q.    Okay.

25           How about let's -- how about 2

CHARLES M. PEREIRA

249

1
2    G's, is that within the certification
3    limit, do you know?
4         A.    There's a VM diagram, and I'm
5    not sure what it is for the -- for that
6    particular airplane, but it will give you
7    the velocity and G limits -- limits of
8    that airframe.
9         Q.    Okay.
10        A.    It's called a VM diagram.
11        Q.    And I don't know what the G
12   limits are, so I'm -- I'm just trying to
13   understand what those forces would feel
14   like.
15        A.    Generally an airplane can take a
16   lot more positive G than it can negative G.
17   Same with people.
18        Q.    Okay.
19              So, you've talked about
20   turbulence events and I understand that,
21   okay, those peaks can be higher than you'd
22   experience in normal operation and I
23   understand you've read out FDR data from a
24   bunch of turbulence events in your time at
25   the NTSB.

CHARLES M. PEREIRA

250

1
2            What I'm trying to get at though
3    is would -- did you do any analysis,
4    'cause I don't see it in your report, of
5    whether or not there would have been the
6    kind of turbulence-style shaking on the
7    accident aircraft?
8       A.    Yes, sir.   And if you go to my
9    background, you'll see that I had
10   two-and-a-half years of engineering intern
11   on the Gulfstream G4 flight test program
12   where I rode in the back of the airplane
13   as the, quote/unquote, data boy and
14   changed all the data tapes and once we got
15   on ground processed all the data and I
16   would monitor the data in flight and do
17   callouts for the pilots to make sure we
18   were adhering to the flight test plan
19   and -- and then processed all the data on
20   the ground and do reports where I
21   calculated all kinds of slopes like we
22   discussed earlier to see whether or not
23   the various slopes met the certification
24   requirements for various control
25   regulations and that sort of stuff.   And

CHARLES M. PEREIRA

251

1

2      during that process, we flew the airplane

3      well above its VMO, as is called, and MMO

4      up into the mid -- I believe we stopped at

5      about .96 Mach number, which is a

6      tremendous -- tremendously high airspeed

7      for a transport category airplane and --

8      and we had sample rates on our data

9      recording system of 40 to 80 hertz, far in

10     excess of what we had on this flight data

11     recorder and that was primarily to capture

12     those types of oscillations which you

13     can't capture with a low frequency flight

14     data recorder.

15             But at very high speeds like

16     that and which are directly analogous to

17     the far in excess of VMO and MMO that this

18     airplane experienced, you would have a --

19     a very high frequency oscillation in the

20     cabin environment that was reflective of

21     that high -- extremely high dynamic

22     pressure that the airplane is not designed

23     for.  And so, there was debate about that

24     because Jack is a pilot and he's familiar

25     with that personally experiencing that,

CHARLES M. PEREIRA

252

1

2    and I have as well, and so there was

3    debate about how do we -- how do we

4    potentially characterize that, and a high

5    frequency low amplitude oscillation was

6    what was decided would be most

7    representative of that and once we got to

8    the very high speed endgame, shall we say,

9    of this dataset, so.

10        Q.    And it sounds like you're saying

11   that the FDR on the accident airplane

12   doesn't have the sample rate that would

13   show the kind of oscillations that you had

14   previously experienced in, was it the

15   Gulfstream?

16        A.    G4.

17        Q.    The G4?

18        A.    That's correct.

19        Q.    Is that right?

20        A.    That's correct.

21        Q.    So they don't -- those

22   oscillations don't show up in the FDR, but

23   you decided in consultation, it sounds

24   like, with Jack Suchocki?

25        A.    Yeah, not only would it be

CHARLES M. PEREIRA

253

1

2    visibly oscillatory, but there would be an

3    accompanying audio spectrum that would

4    manifest itself to the passengers through

5    their ears.

6         Q.    But that's --

7         A.    A howling, whining through the

8    fuselage noise.

9         Q.    And again, that -- but that --

10   that oscillatory level is not something

11   that's visible on the FDR.  You're saying

12   that's something that you and -- and Jack

13   decided on -- Jack from Eyewitness

14   Animations --

15        A.    Yes.

16        Q.    -- decided on in the -- in the

17   iterative process of creating the

18   animations?

19        A.    Yes, sir.

20              And -- and it's not just pilots

21   that have experienced that sort of stuff.

22   People who race automobiles and

23   motorcycles have dealt with that as well.

24   I -- I raced for about 15 years of my life

25   up to 160, 170 miles per hour, and my --

CHARLES M. PEREIRA

1

2  my cars that I embarked upon those races

3  in, as I got up to those speeds, exhibited

4  the same oscillatory feel and aural

5  signature.  I could tell by my ears, I

6  could hear when I was doing 160 miles an

7  hour and if somebody were to put me in the

8  backseat and blindfold me, I could hear

9  the -- the dynamic pressure variation and

10  I could tell the police that found me

11  afterwards that, This guy got on the

12  highway, I don't know where we went, but

13  we were going fast.  How do you know we

14  were going fast?  Because I could hear it.

15  The dynamic pressure was high, so.

16      Q.    And so -- so, since you had to

17  base that not on the FDR data, but it

18  sounds like more in your, kind of,

19  personal experience, what did you and Jack

20  decide about when specifically that would

21  happen during the flight?

22      A.    Towards the end.  And it was

23  more or less, you know, Jack felt very

24  comfortable, and told me so, that he had

25  done that before and he had it.  I said,

CHARLES M. PEREIRA

255

1

2      Okay, this is my -- my experience and my

3      input and I'm glad you got it 'cause

4      you're the one assigned to do it.

5          Q.      And when you say your experience

6      and your input, what was the experience

7      and input that you provided to him?

8          A.      Just in general that I, you

9      know, I agree that it's representative.

10     Is it -- you have the two option A and

11     option B: show nothing, hear nothing, or

12     show something that would be generally

13     consistent with what you could expect to

14     experience.

15              And it goes to engineering

16     judgment once again.  Charlie Pereira as

17     an engineer with your education, 38 years

18     of education and experience in accident

19     investigation, plus another three years of

20     racing experience prior to my having gone

21     to college, I started racing when I was

22     16, all of that experience goes into my

23     current engineering judgment.  And is it

24     more factually representative to show some

25     sound that indicates the high dynamic

CHARLES M. PEREIRA

256

1

2      pressure situation along with some

3      vibration that represents that as well, or

4      would it be more factually appropriate to

5      show the judge and the jury absolute

6      silence and no vibration?  Any engineer

7      that has my background, there's 99.9

8      percent probability they would make the

9      decision to provide some form of exemplar

10     audio and vibratory environment as opposed

11     to none.

12          Q.    How do you decide -- how did you

13     and Jack decide how much of a vibratory

14     environment to provide?  Because obviously

15     there's different amounts that you could

16     show.  So, how did you decide how much to

17     make that camera shake?

18          A.    I left that to them.

19          Q.    To Jack?

20          A.    Yes.

21          Q.    And Eyewitness Animations?

22          A.    Yes, sir.

23          Q.    Do you have any knowledge or any

24     data to show when any of that vibratory

25     type event would occur?

CHARLES M. PEREIRA

257

1

2      A.     I was told it would be phased in

3  on a time and speed basis.

4      Q.     And so --

5      A.     It's directly related to dynamic

6  pressure and dynamic pressure is V squared.

7  So it's a function of the square of the

8  velocity.

9      Q.     So it sounds like you didn't

10  make that decision or you didn't do an

11  analysis that says this is how this

12  vibration is going to be built in, but

13  you've talked to Jack about --

14      A.     I recall --

15      Q.     -- what he was doing?

16      A.     I recall telling him, you know,

17  what I believe my belief was it was a

18  function of and Jack concurred, and they

19  said that they had the tools and the means

20  and the experience to do that and that

21  they had done it before.

22      Q.     What did Dr. Jenkyn say about

23  the adding the vibratory element?

24          MR. DURKIN:  Objection;

25          foundation.

CHARLES M. PEREIRA

258

1

2     A.    I don't recall.  I know he was

3  on the Zoom meetings when it was

4  discussed.

5     Q.    Do you remember if he had a view

6  about the -- whether or not passengers

7  would be holding on or limbs floating?

8           MR. DURKIN:  Objection;

9      foundation.

10     A.    My recollection was that he was

11  in complete agreement that there would be

12  a spectrum of solutions and, you know,

13  range of possibilities.

14     Q.    Right.

15           So, I mean, would -- fair to say

16  then --

17     A.    And realities.

18     Q.    Sure.

19           Fair to say then that if you had

20  a video where nobody was grabbing, then

21  that's not accurate?  You just --

22           MR. DURKIN:  Objection;

23      foundation.

24           MR. LEDFORD:  Kevin, can you let

25      me finish my question?

CHARLES M. PEREIRA

259

1

2          MR. DURKIN:  Okay.  Foundation.

3          Got it.

4     A.    Go.

5     Q.    So, is it fair to say that if

6   you had a video where everybody's arms are

7   going up, that's not accurate.  You'd just

8   expect that there would be some -- some

9   proportion, right?  And we don't have to

10   nail down exactly what that proportion is.

11   I'm just saying that in your view, it

12   sounds like at least somebody is going to

13   be grabbing on?

14     A.    If your goal is for the what's

15   visible in the animation to model the

16   spectrum of possibilities along with a

17   representative percentage of the

18   possibilities, then you would -- you would

19   do so accordingly.

20          If you -- if the proximity of

21   the camera to the seats was such that in

22   order to model the spectrum you didn't

23   necessarily model the percentages, that

24   would be understandable because to model

25   the percentages fairly, you would have to

CHARLES M. PEREIRA

260

1

2    be at the back of the tube with a view

3    looking down the whole tube and you might

4    not be able to see very much.  So, from

5    a -- from a fairness standpoint for the

6    illustrative purposes, you might not be

7    able to represent the percentage

8    accurately, but I don't -- I think that

9    would be asking too much of your

10   capabilities from the illustrative and

11   demonstrative standpoint.

12       Q.    And so, I'm asking for a

13   particular percentage because I -- I

14   understand you're saying you can't provide

15   one.  There's no data that's going to

16   provide that exact percentage.

17            What I'm trying to say is say

18   you have a view that's seven passengers,

19   would you expect at least one of those

20   passengers, if you were going to fairly

21   represent a possibility, to include

22   somebody who was holding on to their seat?

23            MR. DURKIN:  Objection;

24       foundation; speculation.

25       A.    I would have to be a part of the

CHARLES M. PEREIRA

261

1
2      deliberative process that goes into
3      deciding who to show.  I may not be, as I
4      stand here today, privy to all of the
5      deliberations and rationale that went into
6      what was decided.
7          Q.    Were you part of the
8      deliberations?
9          A.    On that particular quantitative
10     decision, no, I was not.
11         Q.    So, just from your view, would
12     you, and what you've said today, would you
13     expect that at least one passenger would
14     be gripping on to their seat if you
15     were --
16             MR. DURKIN:  Objection.
17             Sorry.  I didn't mean to.
18         Q.    If you were going to fairly
19     represent what may have occurred?
20             MR. DURKIN:  Objection;
21         speculation; beyond the scope of
22         his -- his expertise.
23             MR. LESCH:  Asked and answered.
24         A.    If I was Tom Jenkyn --
25             MR. DURKIN:  And asked and

CHARLES M. PEREIRA

262

1
2       answered.
3       A.     If I was Tom Jenkyn and I was
4    tasked to do that, then I would try to do
5    that, but I wasn't, and so it's really
6    beyond the scope of my knowledge and
7    testimony.
8              MR. DURKIN:  We've been going
9         quite a while now.  We're about 2:35.
10             Do you want to take a break at
11        this stage?
12             MR. LEDFORD:  Sure.  Want to
13        come back at 15 'til?
14             MR. DURKIN:  Sure.
15             THE WITNESS:  My -- my water
16        meter is pegged, so that's good
17        timing.
18             MR. DURKIN:  Okay.
19             THE VIDEOGRAPHER:  We are off
20        the record.
21             The time is 2:36 p.m.
22             (Recess taken.)
23             THE VIDEOGRAPHER:  We are back
24        on the record.
25             The time is 2:55 p.m.

TC REPORTING
(516) 795-7444

CHARLES M. PEREIRA

263

1

2    BY MR. LEDFORD:

3        Q.    Mr. Pereira, your report on page

4    9 says your fees in this case are $330 per

5    hour plus expenses and -- for non-trial

6    deposition time and then on a daily like

7    today $495 per hour plus expenses, right?

8        A.    Yes, sir.

9        Q.    You've been -- you've been

10    working on this case since, it sounds

11    like, within days of the accident, right?

12        A.    Yes, sir.

13        Q.    And were you -- who were you

14    originally retained by in this matter?

15        A.    Clifford.

16        Q.    And so, have you done work for

17    Mr. Clifford in the past?

18        A.    Probably the majority of my

19    major aviation accident cases have been

20    for Mr. Clifford.

21        Q.    And how long have you been

22    working for Mr. Clifford?

23        A.    Since 2006, the Comair accident.

24        Q.    And that was the year after

25    you --

CHARLES M. PEREIRA

264

1

2      A.      Yes.

3      Q.      -- left the NTSB, right?

4      A.      Yes, sir.

5      Q.      Okay.

6              And so you, at that time, had a

7      consulting business and you started

8      working with -- with Mr. Clifford?

9      A.      I had no consulting business,

10     but Greg Feith had done some work for Mr.

11     Clifford before, who I used to work with

12     at the NTSB and who I went to school with

13     at Embry-Riddle, and he had found out that

14     I left and called me and said, We want you

15     on this accident and I'll put Bob in touch

16     with you if you're interested.  I said

17     sure.  And that was the beginning of my

18     consulting career, and I formed my

19     corporation shortly thereafter and here we

20     are.

21     Q.      Do you have a sense for

22     approximately how many matters you've

23     worked for Mr. Clifford or anybody else in

24     the Clifford Law Firm?

25     A.      Aviation, rail, highway, marine,

CHARLES M. PEREIRA

265

1

2    everything, including a lot of my work for

3    them is initial work where I --

4              MR. DURKIN:   What was the

5    question?

6              THE WITNESS:   How many cases

7    have I done.

8              MR. DURKIN:   How many cases,

9    okay.

10             THE WITNESS:   Yeah.

11             MR. DURKIN:   Okay.   I forget.

12             Was the question how many cases

13   he's done?

14             THE WITNESS:   With Clifford.

15             MR. DURKIN:   Okay.   Go ahead.

16             MR. LEDFORD:   It was.

17             MR. DURKIN:   Yeah, okay.   I just

18   wanted to make sure I knew the

19   question.

20             MR. LEDFORD:   Okay.

21             MR. DURKIN:   How many cases.

22   You asked him how many cases he work.

23             MR. LEDFORD:   Yeah, you can

24   continue --

25             MR. DURKIN:   I didn't pay

CHARLES M. PEREIRA

266

1

2    attention real quick, so I had to

3    catch up.  How many cases, he asked, I

4    guess.

5         MR. LEDFORD:  Yeah, no -- yeah,

6    that's --

7         MR. DURKIN:  What?

8  BY MR. LEDFORD:

9    Q.    You can go ahead and continue

10 answering as before.

11   A.    Since 2006 I would probably say

12 somewhere around 30 to 40 cases.

13   Q.    30 to 40 cases?

14   A.    Yes, sir.

15   Q.    And so it sounds like, and you

16 said that's aviation, rail, marine, and

17 highway, right?

18   A.    And kids getting eaten by

19 alligators in Florida and things like

20 that.

21   Q.    Okay.  So a wide variety of --

22 of accidents?

23   A.    Anything that's required that he

24 thinks is appropriate to retain me.  I

25 also help him write op-eds and you know,

CHARLES M. PEREIRA

267

 1
 2    other support services.
 3              I provide a variety of support
 4    services to manufacturers, Boeing, Airbus.
 5    You know, a variety of people use me for
 6    certain things related to flight data
 7    recorders.  They want to get certain new
 8    technologies required on airplanes and
 9    want my assistance.  Deloitte has hired me
10    for that kind of stuff on, you know,
11    projects with manufacturers and militaries
12    and stuff like that.  Countries have hired
13    me.  Militaries have hired me.  Other
14    agencies have hired me.  So, at one time,
15    I had a top secret security clearance for
16    that, and so I imagine that's expired by
17    now.
18         Q.    About 30 to 40 cases, were those
19    just aviation, or is that all types of
20    cases that you've worked --
21         A.    All -- that's every --
22              MR. DURKIN:  Asked and answered.
23         With all due respect.  He'll do rail,
24         remember?  It just was a few minutes
25         ago.

CHARLES M. PEREIRA

268

1

2          MR. LEDFORD:  Gosh, my memory.

3          MR. DURKIN:  It was just a few

4     minutes ago.  He told you he's worked

5     on rail and marine too.  I mean, I

6     just -- okay.  I want to get this

7     done, but I just -- you got to kind of

8     remember your last question within

9     five minutes.

10          Asked and answered.

11          MR. LEDFORD:  Kevin, if you have

12     an objection, make the objection.

13          MR. DURKIN:  Asked and answered.

14          And if I was Webb, I would be

15     instructing him not to answer at this

16     stage, but I'm not going to be --

17          MR. LEDFORD:  Well, you're

18     definitely not Dan Webb.

19          MR. DURKIN:  I'm not going to be

20     Webb.

21          MR. LEDFORD:  So --

22          MR. DURKIN:  No, I'm not him,

23     but I'm not going to -- but on the

24     other hand, he answered the question,

25     and you heard it.  There's no reason

CHARLES M. PEREIRA

269

1
2      to answer it again.
3             But go ahead and answer.  And he
4      wants to know did you work on any
5      cases other than aviation.  I know
6      you've answered already, but let's do
7      it one more time.
8             MR. LEDFORD:  So --
9             MR. DURKIN:  Is that okay?
10            MR. LEDFORD:  No, it's not okay.
11     I'll actually ask the questions.
12            MR. DURKIN:  Okay.  Sounds good.
13     BY MR. LEDFORD:
14        Q.    So, you mentioned some other
15     support services that you provide for Mr.
16     Clifford.
17            Can you tell me what kinds of
18     services those are?
19        A.    Again, writing op-eds, news
20     media pieces, all of which are on support
21     services on a technical, you know.
22     They're not experts on, you know, when a
23     certain accident happens, they want my
24     assistance in writing pieces on Bob's
25     behalf for news media, for website type

CHARLES M. PEREIRA

1

2      stuff.  That -- that's it.

3          Q.    Okay.

4                Now, are you on a retainer for

5      the Clifford Law Firm?

6          A.    No, sir.

7          Q.    Are you on a retainer for any

8      other law firms?

9          A.    No.

10         Q.    In the last ten years, have you

11     been retained by a manufacturer in

12     aviation litigation?

13         A.    Yes.

14         Q.    Who is that?

15         A.    Cessna, for one.

16         Q.    In one matter?

17         A.    Multiple matters.

18         Q.    Anybody else?

19         A.    Airbus.  I don't know if that's

20     ten years or might be longer than ten

21     years since Airbus has retained me.

22                Airlines, multiple airlines.

23         Q.    And again, I asked for

24     manufacturers.

25         A.    Yeah, parts manufacturers,

CHARLES M. PEREIRA

271

1

2    recorder -- recorder manufacturers.

3              Yeah, there's a lot of people

4    that contact me asking for support, and I

5    provide whatever.  They want me to review

6    documents, technical standards and things

7    like that.

8        Q.    How about some of the other

9    plaintiffs' firms.  I think earlier you

10   mentioned that you're -- you're familiar

11   with, for example, Jamie Lebovitz.

12       A.    Yes, sir.

13       Q.    And I think you mentioned him in

14   the context of that --

15       A.    Yes, sir.

16       Q.    -- one of those early calls that

17   you had in this case.

18       A.    I've done four or five cases for

19   Jamie.

20       Q.    And how long --

21       A.    Ten years, twelve years.

22             MR. DURKIN:  You need him to get

23   the -- okay, go ahead.

24             I guess he understood what you

25   were going to ask.

CHARLES M. PEREIRA

272

```
 1
 2              MR. LESCH:  Let him finish for
 3       the court reporter.
 4              MR. DURKIN:  Yeah, I just -- I
 5       didn't know the question.  There was
 6       an answer I didn't quite hear the end.
 7    BY MR. LEDFORD:
 8       Q.    Did I understand correctly,
 9    you're saying you've done four to five
10    cases for Jamie Lebovitz, and what was the
11    time range, again?
12       A.    Over the course of the last ten
13    to twelve years.
14       Q.    Okay.  And --
15       A.    That's just my recollection
16    without looking at the hard data.
17       Q.    Okay.  And right now we're in
18    the Kreindler and Kreindler firm here in
19    New York.
20       A.    Yes, sir.
21       Q.    Have you ever worked with that
22    firm?
23       A.    Yes, sir.
24       Q.    And about how many times?
25              MR. LESCH:  Over the last ten
```

CHARLES M. PEREIRA

273

1
2        years again?
3        Q.    No, just since you left the
4   NTSB.
5        A.    At least a half-dozen.
6        Q.    And how many times in the last
7   ten years?
8        A.    Three, four.
9        Q.    And just to be clear, have you
10  done work for Jamie Lebovitz before, or
11  earlier than ten years ago, or were you
12  saying that just all of your work occurred
13  within the last --
14       A.    Ten years, 2012.
15       Q.    -- ten years or so?
16       A.    I don't know.  I've known Jamie
17  for a long time.  It's hard to remember
18  exactly when I -- you know, my -- my
19  memory gets worse as I get older, and I'm
20  surprised sometimes when I actually look
21  at the data relative to my recollection.
22       Q.    So, again, it's not intended to
23  be a memory test.  I understand you work
24  on a lot of matters.
25              So, fair to say then that you

CHARLES M. PEREIRA

274

1
2      have worked for Jamie four to five times
3      since you retired from the NTSB?
4          A.    Directly.
5          Q.    Directly.
6          A.    Yes.
7          Q.    And what do you mean by
8      "directly"?  Do you also work for him
9      indirectly?
10         A.    As opposed to, for example, a
11     plaintiffs' committee like on this case,
12     and the big ones generally involve a
13     plaintiffs' committee where I'm working
14     for as many as 50 lawyers.  In reality I
15     may only be managed by three or four, you
16     know, that take me under their wing as
17     their responsibility on the case.
18         Q.    How about the Podhurst firm?
19         A.    Not directly.  I've worked with
20     them on this case and possibly against
21     them in at least one case.
22         Q.    And any other plaintiffs' firms
23     that you work with on a consistent basis?
24     So let's say more --
25         A.    Speiser Kraus, Doug Latto.

CHARLES M. PEREIRA

275

1

2      Q.      Okay.

3              And about how many times --

4      A.      Dan Barks.

5              MR. LESCH:   Let him finish the

6      question, please.

7              THE WITNESS:   Yes, sir.

8  BY MR. LEDFORD:

9      Q.      So, for Speiser Kraus, about how

10  many times since you left the NTSB?

11     A.      Four, five.

12     Q.      Are those aviation cases?

13     A.      Yes, sir.

14     Q.      And I'm sorry, what was the next

15  name you gave?

16     A.      And some of those may have been

17  when Doug was with Bauemeister Latto prior

18  to Speiser Kraus.   So I'm primarily

19  attaching myself to Doug Latto in his

20  various places of employment.

21     Q.      Do you know about how much you

22  have invoiced the Clifford Law Firm on

23  matters other than this in the last five

24  years?

25              MR. DURKIN:   Objection;

CHARLES M. PEREIRA

276

1

2          relevance; foundation.

3          A.      In the last five years?

4          Q.      Yes.

5          A.      Like two to 300,000.

6          Q.      And how about during the entire

7     time period since you left the NTSB, do

8     you have a --

9                  MR. DURKIN:  Objection.

10         Q.      -- estimation?

11                 MR. DURKIN:  Foundation,

12         relevance.  Everything, all of the

13         above.

14                 THE WITNESS:  Do you want me to

15         answer it?

16                 MR. DURKIN:  Well, I can't tell

17         you not to answer.  But if you've got

18         a foundation to answer, I guess you

19         can do it, okay.

20         A.      That would be 16 years,

21     approximately.

22                 MR. DURKIN:  Speculation.

23         Objection; speculation.

24         A.      It's going to be, you know,

25     probably 400, 500,000.

CHARLES M. PEREIRA

1

2      Q.    Does that include this matter?

3            MR. DURKIN:  Objection;

4      speculation.

5      A.    Yes, sir.

6            MR. DURKIN:  I'm telling the

7      witness not to speculate, please.

8            THE WITNESS:  Okay.

9      A.    I would --

10            MR. DURKIN:  I think you'd have

11      to go look at your records, wouldn't

12      you?

13            MR. LEDFORD:  So, enough of

14      these speaking objections.  He's not

15      speculating about his own billing and

16      it's not -- foundation for his own

17      billing, are you kidding?

18            MR. DURKIN:  You got the

19      objections.

20            MR. LEDFORD:  Yeah.

21      BY MR. LEDFORD:

22      Q.    We know what your counsel

23      thinks.  Sir, we're just asking you, if

24      you know.

25      A.    I've never embarked on a

CHARLES M. PEREIRA

278

1

2    calculation of how much each attorney has

3    paid me even on an annual basis versus my

4    career.

5              I know that I'm repeatedly told

6    that my billing rates are considerably

7    less than the going rates and I'm

8    encouraged to raise my rates, and for the

9    most part I don't.  Sometimes I'll go up

10   25, $30 a year.  I started out in 2006 at

11   175 an hour, so.

12             MR. DURKIN:   Okay.

13   BY MR. LEDFORD:

14      Q.    Okay.

15             And the work that you do, the

16   support work that you do for the Clifford

17   firm, do you bill for that as well?

18      A.    Well, yeah, it's -- that's my

19   work.  If they want my time, I have to get

20   paid.

21      Q.    Understandable.

22      A.    I have children to support and

23   everyone.

24      Q.    Understandable.

25             I want to turn back to your --

CHARLES M. PEREIRA

279

1
2     your report.  On page 8, so, and that
3     should be the first exhibit.
4          A.    My report?
5          Q.    Yeah, sorry.  Your report.
6          A.    Yes, sir.
7          Q.    Which would be the very first
8     exhibit that we looked at.
9          A.    Yes, sir.
10              MR. DURKIN:  We're at page 8?
11              MR. LEDFORD:  Page 8.
12    BY MR. LEDFORD:
13         Q.    Third paragraph from the bottom.
14         A.    "The elapsed time"?
15         Q.    "The elapsed time," yes.
16              Okay.  It says:  The elapsed
17    time from the beginning of the last
18    MCAS-induced pitchover to impact was about
19    23.9 seconds during which the flight crew
20    and passengers were subjected to extreme
21    acceleration and attitude changes before
22    impact, bodily disintegration, and death.
23              I want to make sure that I
24    understand what you mean in that -- that
25    sentence.  So, and I specifically want to

CHARLES M. PEREIRA

1

2    talk about acceleration.

3          When -- when you're talking

4    about the accelerations in that paragraph,

5    are you talking about just vertical

6    acceleration, or are you also talking

7    about other accelerations?

8      A.    The extreme was in the vertical

9    axis.

10     Q.    Okay.

11          So you're not -- you're not

12   characterizing lateral or longitudinal

13   accelerations as extreme?

14     A.    No.  I'd have to look at the

15   FAA's definitions thereof, but it's my

16   recollection that I didn't embark on an

17   effort in this, to my recollection, to

18   consider lateral or longitudinal to have

19   been extreme.  I think it's primarily on

20   the extreme acceleration, it would be

21   the -- the -- in the vertical axis.

22     Q.    Okay.  So, you talked about an

23   FAA standard.

24          When you're saying the words

25   "extreme acceleration," is that based off

CHARLES M. PEREIRA

281

1

2      an FAA standard that you consulted?

3          A.    I consider them to be extreme,

4      but there's also an FAA standard for that

5      and it's primarily turbulence associated.

6      But nevertheless, anything less than --

7      than 0 G falls into the FAA's extreme

8      category, is my recollection.

9          Q.    So, I'm sorry, did you say

10     anything less than 0 G?

11         A.    That's my recollection, yeah.

12         Q.    And the FAA standard you're

13     talking about, is that in an advisory

14     circular or some other document?

15         A.    I think part of it is the AIM

16     and it's not in a regulation, per se, but

17     it's in their advisory type material.  For

18     example, an Airman's Information Manual

19     might be one of the locations for it.

20     It's been a while since I worked a case

21     where I was required to make judgments in

22     that vein, so, you know, and do research

23     associated thereto.

24         Q.    So, it sounds like you're

25     familiar with the FAA having some

CHARLES M. PEREIRA

282

1

2      standards on these, but it sounds like you

3      didn't consult that particular FAA

4      document in connection with this

5      litigation?

6          A.    Those are typically used in

7      turbulence cases where, okay, well --

8              MR. DURKIN:  So, is it --

9          whatever.  Objection.

10              I'll withdraw the objection.  I

11          just missed what the question was.

12          The question was was -- because I'm

13          getting confused here.

14              MR. LEDFORD:  Sure.

15              MR. DURKIN:  Can you repeat your

16          question?  I just want to --

17              MR. LEDFORD:  Sure.  I can do --

18              MR. DURKIN:  Do you mind doing

19          that?

20              MR. LEDFORD:  Yeah, I don't

21          mind.

22              MR. DURKIN:  I missed it.

23      BY MR. LEDFORD:

24          Q.    So, you mentioned some FAA

25      standards earlier, right, for extreme

CHARLES M. PEREIRA

283

1

2   accelerations?

3       A.    Yes, sir.

4       Q.    And I don't see mention in your

5   report of an FAA standard, and it sounds

6   like, from what you're saying, that you

7   didn't consult that particular FAA

8   standard in drafting your report.

9       A.    I -- it's not a -- it's related

10  to turbulence.  So there might be some

11  stipulation as to the applicability of a

12  turbulence categorization standard.

13          So for example, pilots and

14  airlines are required to provide certain

15  incident and accident reports and ride

16  reports and stuff like that to Air Traffic

17  Control, and they generally provide

18  guidance with respect to those reporting

19  requirements.

20          And so in this case, that's not

21  what we have, and so for me to embark on

22  an analogous characterization trying to

23  compare this to a -- a turbulence

24  reporting requirement is beyond the scope

25  of what I was asked to do and what I think

CHARLES M. PEREIRA

1

2    is appropriate.  I think the data speak

3    for themselves when I say subjected to

4    extreme acceleration.  Any time passengers

5    are subjected to negative vertical

6    accelerations, especially down in the 2 or

7    less, negative 2 or more in the negative

8    direction, I don't think there's anybody

9    in the world on the accident investigation

10   and aeronautical engineering side that

11   would not categorize that as extreme.

12       Q.    Okay.  So, I just want to make

13   sure that I understand your -- your

14   definition of "extreme," as you used it in

15   your report and specifically in that

16   sentence.

17       A.    Yes, sir.

18       Q.    So, anything that's more

19   negative than negative 2 G's qualifies as

20   an extreme acceleration?

21          MR. DURKIN:  Objection; asked

22       and answered.

23       A.    That's not -- that's not what I

24   said.

25       Q.    I may have misunderstood you.

CHARLES M. PEREIRA

285

 1
 2          MR. DURKIN:  Objection; asked
 3      and answered and misconstruing his
 4      previous testimony.
 5  BY MR. LEDFORD:
 6      Q.    Okay.  Can you define for me
 7  again what you mean in your report by the
 8  phrase "extreme acceleration"?
 9      A.    In my opinion, anything less
10  than 0 G relative to 1 nominal.
11      Q.    Okay.  Less than 0 G?
12      A.    Yes.
13      Q.    Okay.
14          How about in the positive
15  direction?
16      A.    In my opinion, anything more
17  than 2 G's relative to nominal 1 would be
18  extreme.
19      Q.    Okay.
20      A.    From an absolute value
21  standpoint --
22          (Pause.)
23          MR. DURKIN:  Is there a
24      clarification?
25      A.    I would clarify that.

CHARLES M. PEREIRA

286

1

2            From an absolute value

3    standpoint, there may be other

4    characteristics of an event, in my

5    opinion, that would go to the definition

6    of "extreme," such as duration and

7    associated parameters.

8        Q.    Okay.  I'm going to have you

9    look at page 21 of your report.  It's a

10   chart titled "Last 30 Seconds of Flight."

11   And in particular, look at the -- the

12   vertical acceleration line which in my

13   copy is sort of a orange-ish color and

14   it's labeled "Vertical Acceleration G's"

15   and it's basically in the center of the

16   chart.

17       A.    Yes, sir.

18       Q.    Okay.

19            So, would you agree that the

20   passengers were not subject to G's below 0

21   for the entire 23.9 last seconds of the

22   flight?

23            (Pause.)

24       Q.    And there is a ruler right

25   there, if it would be helpful.

CHARLES M. PEREIRA

287

1

2          (Pause.)

3          MR. PITRE:  For the record, can

4      we get a particular page of the report

5      so we can follow along, those of us

6      who are remote?

7          MR. LEDFORD:  Yeah, it's page

8      21, Frank.

9          MR. PITRE:  Thank you.

10          MR. LEDFORD:  You bet.

11     A.     What's your question again?

12     Q.     Yeah.

13          Would you agree that in that

14     last 23.9 seconds, vertical accelerations

15     were below 0 for only a part of that time?

16     A.     Yes, during the last

17     approximately 24 seconds, there was only a

18     portion of the time period during which

19     G's were below zero.

20     Q.     Did you make any effort to

21     determine how much time the G's were below

22     zero in the last 23.9 seconds?

23     A.     There's two periods where it

24     drops below zero, one starting around 25

25     seconds and change and ending around

CHARLES M. PEREIRA

288

 1

 2    29-and-a-half seconds and then another one

 3    starting around 39 seconds and going to

 4    the end.

 5            But during that time period, G's

 6    and banking and everything were varying,

 7    as well as vertical speed and other

 8    parameters to the extent that the entire

 9    combination of parameters would result in

10    an extreme environment for the passengers.

11        Q.    With respect to vertical

12    accelerations though, were --

13        A.    Well, the combination of the

14    versions in all three axes, as well as the

15    attitude changes, constitute a very

16    unusual and extreme situation for any

17    passenger on a revenue flight.  Anybody on

18    the airplane at this point in time knows

19    that they're going to die with a high

20    probability.  I certainly would.

21        Q.    Your report doesn't discuss

22    passengers' subjective beliefs, right?

23        A.    No, sir.

24            You're asking me questions that

25    essentially go beyond that and beg my

CHARLES M. PEREIRA

1

2      comment in that respect.

3          Q.    Sir, I'm literally asking you

4      about your words in your reports and what

5      you mean by them.  That's -- that's all

6      I'm trying to find out is what you --

7                  MR. DURKIN:  Is there a question

8          now?

9                  MR. LEDFORD:  Did you hear a

10         question?

11                 MR. DURKIN:  We're arguing.

12         This would be what we call

13         argumentative, okay.  We're arguing.

14                 If you have a question, ask a

15         question.

16                 Please answer the question.

17                 THE WITNESS:  Yes, sir.

18                 MR. DURKIN:  I'll make

19         objections if you don't -- aren't

20         supposed to answer, okay.

21                 THE WITNESS:  Yes, sir.

22                 MR. DURKIN:  And I haven't done

23         that.  And I don't intend on doing it.

24                 So, right now we're just

25         schooling the witness about what

CHARLES M. PEREIRA

290

1

2         you're doing.  So I don't think that's

3         proper.

4              But go ahead and ask a question,

5         Mr. Ledford.  It's all good.

6              MR. LEDFORD:  It is.

7    BY MR. LEDFORD:

8         Q.   Sir, so, returning to the

9    language of your report, you say:  The

10   elapsed time from the beginning of the

11   last MCAS.

12             And this is again on page 8:

13   The elapsed time from the beginning of the

14   last MCAS-induced pitchover to impact was

15   about 23.9 seconds, during which the

16   flight crew and passengers were subjected

17   to extreme acceleration and attitude

18   changes before impact, bodily

19   disintegration and death.

20             So, as I understand what you're

21   saying, they were not subject to extreme

22   acceleration during that entire time

23   period, but just during the time period

24   when the vertical accelerations were below

25   0 G's.

CHARLES M. PEREIRA

291

1

2              Do I have that right?

3       A.     Yes, sir.  And my comment in the

4    23 seconds, as I mentioned, is from the

5    beginning of the MCAS-induced pitchover,

6    and you can see that on the pitch trim

7    position parameter on this plot that

8    you've asked me to look at on page 21, and

9    you can see the departure of the various

10   parameters starting with that event.  And

11   as you likely well know, that was the

12   beginning of the final departure when they

13   lost control and the pilots were subjected

14   to, as I mentioned in here, extreme

15   acceleration, attitude changes before

16   impact, bodily disintegration, and death.

17      Q.     And if we wanted to know the

18   exact time period when the vertical G's

19   were less than zero, we could just go to

20   the Excel spreadsheet we were looking at

21   earlier, right, and we could go down the

22   chart and match up what each subframe

23   number and we could look at the G's and we

24   would be able to tell exactly when in

25   those last 23.9 seconds the G's, vertical

CHARLES M. PEREIRA

292

1
2     G's were less than zero, right?
3          A.     Yes, sir.
4          Q.     And that would be the most
5     accurate way to do it, fair?
6          A.     Just for the G parameter, yes,
7     sir.
8          Q.     Just for the G parameter?
9          A.     Yes, sir.
10              MR. LEDFORD:  Could we go off
11         the record for just one moment?  I may
12         be done.  And then --
13              MR. DURKIN:  Why don't we take a
14         few minutes?
15              MR. LEDFORD:  Yeah, we can do
16         that.
17              But and anything else is going
18         to be very quick.
19              MR. DURKIN:  Okay.
20              THE VIDEOGRAPHER:  We are off
21         the record.
22              The time is 3:24 p.m.
23              (Recess taken.)
24              THE VIDEOGRAPHER:  We are back
25         on the record.

CHARLES M. PEREIRA

293

1

2              The time is 3:36 p.m.

3     BY MR. LEDFORD:

4          Q.    Sir, earlier we were discussing

5     an animation, and in particular we were

6     discussing a vibration that was seen in

7     the animation.

8              Do you recall that discussion?

9          A.    Yes, sir.

10         Q.    And I believe you testified that

11    the vibration, in your view, was

12    reasonable because once you get to a

13    certain speed, that that kind of vibration

14    would be present, and you based it off,

15    for example, your experience in, I

16    believe, car racing and other pursuits of

17    that nature.

18         A.    And flight tests and in flight

19    test aircraft.

20         Q.    Right.  And I think you

21    referenced the Gulfstream, the G4 testing

22    that you'd done near Mach 1, right?

23         A.    Yes, sir.

24         Q.    So, in the 737, did you -- or

25    with respect to the 737 MAX, did you do

CHARLES M. PEREIRA

294

1

2    any analysis to determine the point at

3    which that kind of vibration would begin

4    occurring?

5        A.    In a -- in this particular

6    airframe?

7        Q.    Yes.

8        A.    No, sir.

9        Q.    So, I take it since you didn't

10   do that analysis, while you're comfortable

11   saying that there would have been that

12   vibration at the end of the flight, you're

13   not going to offer an opinion about when

14   exactly it would have started?

15       A.    No, sir.

16            MR. LEDFORD:  Nothing further.

17            MR. DURKIN:  I just got a few

18   questions.

19   EXAMINATION BY

20   MR. DURKIN:

21       Q.    You were asked questions

22   about -- by Mr. Ledford about whether

23   there was evidence that anyone had -- did

24   not have their seat belt on.

25            Do you remember that?

CHARLES M. PEREIRA

295

```
 1
 2        A.    Yes, sir.
 3        Q.    And you agree you didn't have
 4   such evidence?
 5        A.    Yes, sir.
 6        Q.    But do you have any evidence
 7   that everyone had their seat belt on?
 8        A.    No, sir.
 9        Q.    You've worked with cell phones
10   before, as you stated.
11              Has that given you really a
12   truly and accurate depiction of what's
13   going on in the cabin?
14        A.    Yes, sir.
15        Q.    If you had recovered a cell
16   phone in this case --
17              MR. LEDFORD:  Objection to
18        scope.
19   BY MR. DURKIN:
20        Q.    If you had --
21              MR. DURKIN:  You asked about
22        cell phones.
23        Q.    If you had a cell phone, would
24   that -- that someone had on during the
25   course of the event, would that aid in
```

CHARLES M. PEREIRA

1

2     assist you in explaining what took place

3     in the cabin?

4               MR. LEDFORD:  Objection to

5     scope.

6     A.     Yes, sir.

7     Q.     Okay.

8               On Exhibit 22, that's the --

9               MR. LESCH:  Page 22 of

10    Exhibit --

11    Q.     Yeah, page 22 of Exhibit --

12              MR. LESCH:  His report is 283.

13              MR. DURKIN:  283.

14              MR. LEDFORD:  No.

15              It should be -- you should look

16    at the front page.

17              MR. DURKIN:  Sorry about that.

18              THE WITNESS:  No problem.

19              MR. DURKIN:  I should have it

20    over here.  Hold on.

21              MR. LEDFORD:  It is 280.

22              MR. DURKIN:  280.  It's 280,

23    yeah.  Okay.

24    BY MR. DURKIN:

25    Q.     Is that the page that counsel

CHARLES M. PEREIRA

1
2    had you draw some lines on?

3         A.    Yes.

4         Q.    Okay.  Could I just see it for a

5    second?  I just want to look at it real

6    quick.

7              (Pause.)

8         Q.    Okay.  So, this is called

9    "Estimated Trends to Impact."

10        A.    Yes, sir.

11        Q.    And is that done because the

12   digital flight data recorder doesn't

13   always capture all the data until the

14   plane crashes into the earth?

15        A.    Yes, sir.

16        Q.    Okay.

17              And when you were with the

18   National Transportation Safety Board, did

19   you do estimated trends to impact analysis

20   on a regular basis?

21        A.    Yes, sir.

22        Q.    Okay.

23              And it was -- it was accepted?

24        A.    Yes.

25        Q.    Okay.

CHARLES M. PEREIRA

298

1
2          And you believe it's -- you used
3     your good engineering judgment to do what
4     you did in this case?
5          A.    Yes, sir.
6          Q.    Now, you were provided an
7     additional -- Boeing provided an
8     additional eight-tenths of a second?
9          A.    Plane Sciences did.
10         Q.    Plane Sciences, okay.
11         A.    Yes.
12         Q.    Plane Sciences through Boeing --
13    Boeing through Plane Sciences gave an
14    additional .08 second?
15         A.    0.8.
16         Q.    0.8 second, okay.  Eight-tenths
17    of a second.
18          And did that data that they give
19    you detract from your opinion or enhance
20    your opinion?
21         A.    It enhanced my opinion because
22    it gave me -- it eliminated more than half
23    of the time uncertainty from 1.5 seconds
24    of uncertainty to about 0.7 seconds of
25    uncertainty.

CHARLES M. PEREIRA

299

1

2              I haven't had a chance to fully

3     review all the parameters and do all the

4     calculations that I intend to do with

5     those new data, but I will.

6          Q.    Little bit of a hypothetical.

7     If any of their expert witnesses, their

8     being Boeing, said that the passengers

9     never experienced below negative 2 G's,

10    would that be accurate or inaccurate?

11         A.    Inaccurate.

12         Q.    Okay.  Misleading to the jury

13    too, wouldn't it be?

14         A.    Yes, sir.

15         Q.    Okay.

16         A.    We already have two recorded

17    data points of around minus 2.0 through --

18    2.02 to 2.03 G's.

19         Q.    Yeah, you've told us that.  So

20    that's why --

21         A.    And the direction the G's are

22    heading at the time of the last

23    approximately three- to four-tenths of a

24    second of data that was recovered indicate

25    the G's heading rapidly below negative 2.

CHARLES M. PEREIRA

300

1

2      Q.      Okay.

3              You've been involved in many

4      invest -- foreign investigations as part

5      of the NTSB?

6      A.      Yes, sir.

7      Q.      Have you ever --

8              MR. LEDFORD:  Objection to

9         scope.

10             MR. DURKIN:  Well, you asked him

11        about this, remember?  You asked him

12        about Boeing.

13     BY MR. DURKIN:

14     Q.      Have you ever been -- have you

15     ever ever been in an investigation where

16     you were told to shut up if you wanted

17     evidence preserved and don't -- just don't

18     bring it up and you can't bring it up?

19             MR. LEDFORD:  Objection to

20        scope.

21     A.      No, sir.

22             And I find the Miller report

23     findings in that regard to be

24     preposterous.

25     Q.      You've been at many NTSB

CHARLES M. PEREIRA

301

1
2      investigations, and have you ever seen
3      the -- someone thrown off the
4      investigation because they asked to
5      preserve evidence as opposed to hide
6      evidence or do something else?
7                MR. LEDFORD:  Objection to
8          scope.  This entire line of
9          questioning is outside his disclosed
10         report.
11               MR. DURKIN:  Got it.
12     BY MR. DURKIN:
13         Q.    Go ahead.
14         A.    No, sir.
15               And in fact, I consulted with
16     one of my --
17         Q.    Your answer is you've never --
18     I'm asking you directly --
19               MR. LEDFORD:  So if he is
20         answering the question, why don't you
21         let him finish.
22               MR. DURKIN:  Okay.
23     BY MR. DURKIN:
24         Q.    I want to make sure you
25     understand my question.

CHARLES M. PEREIRA

302

1

2          You personally, have you ever
3     been out at a scene where you've seen
4     someone thrown off for making a suggestion
5     about preserving evidence?
6          A.    No, sir.
7          Q.    Okay.  That was my question.
8               Like you say, in that
9     Exhibit 22, you used your good engineering
10    judgment to give the trier of fact a range
11    of the negative G's after the digital
12    flight data recorder was providing data?
13         A.    Yes, sir.
14         Q.    And there's two lines in there,
15    just so it's clear in the record, line A,
16    can you tell us what that means, what line
17    A was?
18         A.    Line A was associated with a
19    statistical analysis that I had performed
20    on the data.
21         Q.    And how about B?
22         A.    Same thing.
23         Q.    Okay.
24               You've correctly -- you've told
25    Mr. Ledford that you had no data from the

CHARLES M. PEREIRA

303

1
2      digital flight data recorder that would
3      tell the sounds that were in the cabin?
4          A.    That's correct.
5          Q.    Okay.
6                Now, a cell phone, you've used
7      cell phones to have that before, to put
8      that in a animation, have you not?
9                MR. LEDFORD:  Objection to
10         scope.
11         A.    I believe his actual question
12     was related to the cockpit voice recorder,
13     and we don't have cockpit voice recorder
14     audio as opposed to the FDR.
15         Q.    Okay.  Okay.
16               But I also -- you in the past
17     have been able to put in sounds in a cabin
18     in animations because they've been
19     recorded by cell phones?
20               MR. LEDFORD:  Objection to the
21         scope.
22         A.    Yes, sir.
23         Q.    Okay.
24               Is that common in the industry?
25               MR. LEDFORD:  Objection to

CHARLES M. PEREIRA

304

1

2      scope.

3      A.     Where available, always, sir.

4      Q.     Is it common to throw out cell

5   phones and bury them and not extract data

6   from them?  Is that common in --

7           MR. LEDFORD:  Objection to form

8        as misstating the evidence.

9      Q.     Is it common in the industry --

10           MR. LEDFORD:  And objection to

11        form and scope.

12      Q.     Is it common in the industry

13   to -- is it common in your industry to not

14   extract data from cell phones?

15           MR. LEDFORD:  Objection to

16        scope.

17      A.     In my opinion, as I wrote the

18   NTSB handbooks for cockpit voice recorder

19   or flight data recorder use in policies at

20   the NTSB and I have written the NTSB

21   accident investigation training manual

22   segments in related to that and protection

23   and retention of data, and it would be

24   absolute malpractice, malfeasance, and a

25   shameful practice to not attempt to

CHARLES M. PEREIRA

305

1
2    recover and protect all data sources
3    related to an accident, especially
4    electronically recorded, non-volatile
5    memory sources such as that.
6        Q.    Okay.
7              Now, you were asked about the
8    sounds that were on the animation of
9    people screaming, et cetera.
10       A.    Yes, sir.
11       Q.    Okay.
12             You can't say those are exactly
13   what happened on ET 302?
14       A.    No, sir.
15       Q.    But do you have any doubt there
16   were people screaming?
17       A.    No, sir, none whatsoever.
18       Q.    And would it be more unfair to
19   play that to the jury without the screams
20   than with the screams?
21       A.    As I've stated before --
22             MR. LEDFORD:  Objection to form.
23       A.    -- in my opinion, you know, when
24   we deliberated that, I had very strong
25   opinions that it would be inappropriate to

1

2    mislead any form of audience to believing

3    that there was no audio associated with

4    that cabin environment and the fear and

5    the terror that was go -- ongoing.

6         Q.    And do you have any doubt this

7    airplane plummeting to the Earth at 600

8    mile -- this defective airplane plummeting

9    to the earth at 600 miles an hour, there

10   were vibrations?

11             MR. LEDFORD:   Objection to form.

12        A.    I have 100 percent certainty

13   that there were extreme vibrations going

14   on that were increasing in magnitude with

15   airspeed.

16        Q.    Are those -- are those quiet?

17        A.    No.   It's a -- even in a flight

18   test environment where it's relatively

19   controlled, any excursion beyond maximum

20   design operating speed presents not only

21   an extreme audio and vibratory

22   environment, but also extreme risk to life

23   and limb.

24        Q.    You also told us that you do

25   consulting for manufacturers, law firms.

CHARLES M. PEREIRA

307

1

2          A.    Yes, sir.  You -- my CV lays out

3     my experience, and there's a diverse range

4     of clients that use my services.

5          Q.    Have you consulted for Plane

6     Sciences?

7          A.    Yes, sir.

8          Q.    In fact --

9          A.    On a regular basis.

10         Q.    And have you actually been asked

11    to consult on this case by Plane Sciences?

12         A.    Yes, sir.  When Boeing reps

13    called Mike Poole to do so, his first call

14    was to me, asked me if I wanted to do the

15    work 'cause he had forgot that I was

16    already representing plaintiffs.

17         Q.    And you didn't then talk to them

18    any further?

19         A.    I told him, If you recall, Mike,

20    I'm already representing plaintiffs on

21    this case.  I can't do it.

22         Q.    Okay.

23               And that was within the last six

24    weeks?

25         A.    Yes, sir.

CHARLES M. PEREIRA

308

1
2          MR. DURKIN:  Okay.
3               Vince might have a few.  I think
4     I'm done, but maybe Vince wants to
5     chime in a few here.  And maybe Frank.
6     Frank might have a few.
7          MR. LESCH:  Yeah, maybe take a
8     five minute break for that, if you
9     wouldn't mind.
10         MR. DURKIN:  You want to do it,
11    okay.
12              Would you like to go off the
13    record?
14         MR. LESCH:  Yes, please.
15         THE VIDEOGRAPHER:  We are off
16    the record.
17              The time is 3:48 p.m.
18              (Recess taken.)
19         THE VIDEOGRAPHER:  We're back on
20    the record.
21              The time is 3:54 p.m.
22         MR. LESCH:  I think this is on
23    me, and I have no additional questions
24    to add to Mr. Durkin.
25         MR. PITRE:  No questions on my

CHARLES M. PEREIRA

309

1

2    behalf.  Mr. Durkin did a fine job.

3          MR. LEDFORD:  I have just a

4    couple of redirect questions.

5          MR. DURKIN:  You're kidding.

6          MR. LEDFORD:  No, I'm not

7    kidding.

8          MR. DURKIN:  Okay.

9          MR. LEDFORD:  But it literally

10   is just a couple.

11         MR. DURKIN:  Thank you.  Take

12   your time, Chris, please.

13         MR. LEDFORD:  And they are --

14   they are true redirect.  They are on

15   subjects that you just covered.

16         MR. DURKIN:  Okay.

17   FURTHER EXAMINATION BY

18   MR. LEDFORD:

19   Q.    Sir, Mr. Durkin was asking you

20   about some of the seat belt issues.

21         Have you ever looked at the

22   Ethiopian regulations regarding the use of

23   seat belts?

24   A.    No, sir.

25   Q.    And I believe you talked to

CHARLES M. PEREIRA

310

1

2    Mr. Durkin about the methods you used when

3    conducting the -- the -- the trend

4    analysis, right?

5        A.    Yes, sir.

6        Q.    And you said that you had done

7    trend analysis while at the NTSB?

8        A.    Yes, sir.

9        Q.    Did you ever use the trend

10   analysis you employed in this case while

11   you were at the NTSB?

12       A.    I used to use a software package

13   called Stanford Graphics that had built-in

14   subroutines for statistical analysis and

15   smoothing, a variety of routines that were

16   automated, and you would select the data

17   region that you wanted to apply those

18   functions to and it would output the --

19   the data and you could plot it and overlay

20   it and see the shapes and choose to output

21   in that particular treatment of the data

22   to a file that you could then later use

23   for various analytical and simulation

24   purposes.  So, to a large extent when I

25   was at the Board, I had automated

CHARLES M. PEREIRA

311

1
2    subroutines to do that.
3            Stanford Graphics,
4    unfortunately, didn't mature with the rest
5    of Windows and everything and died, and I
6    haven't acquired any additional software
7    that performs those functions
8    automatically for me.
9            So in this case, I -- I had a
10   couple of options.  I could just VerAlign
11   what I visually thought was a fair curve
12   to the data to intersect my impact time,
13   or I could have tried the standard
14   deviation approach, and I chose the latter
15   on this one for no particular reason other
16   than just to try it and see -- see how I
17   liked it.  And the results are evident and
18   you've questioned me on them in detail and
19   I stand by my answers.
20   Q.    Understood that you stand by
21   your answers.
22           Just so I make sure I understand
23   that last answer, I believe what you're
24   saying is that the specific method that
25   you used in performing the trend analysis

CHARLES M. PEREIRA

312

1

2    in this case --

3        A.    Yes, sir.

4        Q.    -- is different than the trend

5    analysis you used while at the NTSB?

6        A.    In the strictest sense that I

7    did it by hand and with Excel spreadsheet

8    as opposed to an integrative function in a

9    piece of software, yes, sir.

10       Q.    Okay.

11            And are you able to tell me

12   exactly what functions the Stanford

13   Graphics software performed when you were

14   using that software at the NTSB?

15       A.    It had statistical analysis

16   package within it that did standard

17   deviation, and I had done that in the past

18   and observed the results, and I would

19   apply a variety of techniques to each --

20   to each accident and see which one my

21   engineering judgment led me to use for my

22   further analyses.

23            So I've used -- I'm sure I've

24   used -- my recollection is I've used the

25   standard deviation tools within Stanford

CHARLES M. PEREIRA

313

1

2     Graphics at the time, and I also used a

3     variety of smoothing and other functions

4     within it and extrapolation to -- to get

5     the curve shapes that I thought were most

6     representative and useful for that

7     particular exercise.

8          Q.    So, standard deviation is really

9     just a mathematical tool.

10               What I'm trying to figure out is

11    have you used standard -- when you were at

12    the NTSB, did you ever use standard

13    deviations to make future projections of

14    FDR parameters such as you did in this

15    case?

16         A.    Yes, sir.

17         Q.    And specifically you've used

18    standard deviations as setting ranges on

19    FDR parameters out into the future?

20         A.    Yes, sir.

21         Q.    In the way that you did in this

22    case?

23         A.    Not by hand, not with an Excel

24    spreadsheet, but using Stanford Graphics

25    as a -- and its automated versions of

CHARLES M. PEREIRA

314

 1

 2    standard deviation calculation using

 3    whatever math they had programmed into it.

 4         Q.    Okay.

 5               When you say "whatever math," do

 6    you know what that math was?  I'm just

 7    trying to understand.

 8         A.    I don't -- Stanford Graphics

 9    doesn't provide its source code for its

10    subroutines.  It provides general

11    explanations as to how they work, but

12    they, like most software packages, they

13    don't divulge their exact subroutine

14    algorithms.

15         Q.    Can you say that they were the

16    same method of analysis other than that in

17    each case you were using standard

18    deviations?

19         A.    That was at least 15 to 20 years

20    ago, so I can't say with any certainty

21    what Stanford Graphics did back then.  I

22    just recall using it.

23               MR. LEDFORD:  Thank you.  No

24         further questions.

25               MR. DURKIN:  Nothing from me.

CHARLES M. PEREIRA

315

1

2          Anybody?

3          I think we're done.

4          MR. LEDFORD:  All right.

5          THE VIDEOGRAPHER:  If nobody has

6     anything else, I'll close out the

7     video record.

8          We are off the record at 4:01

9     p.m. on Tuesday, December 6th, 2022,

10    and this concludes today's testimony

11    given by Charles M. Pereira.

12         (Deposition adjourned at

13    approximately 4:01 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

CHARLES M. PEREIRA

316

1

2                    INSTRUCTIONS TO WITNESS

3

4           Please read your deposition over

5      carefully and make any necessary

6      corrections.  You should state the

7      reason in the appropriate space on the

8      errata sheet for any corrections that

9      are made.

10          After doing so, please sign the

11     errata sheet and date it.  It will be

12     attached to your deposition.

13          It is imperative that you return

14     the original errata sheet to the

15     deposing attorney within thirty (30)

16     days of receipt of the deposition

17     transcript by you.  If you fail to do

18     so, the deposition transcript may be

19     deemed to be accurate and may be used

20     in court.

21

22

23

24

25

CHARLES M. PEREIRA

317

1
2              A C K N O W L E D G M E N T
3
4      STATE OF              )
5                                      :ss
6      COUNTY OF             )
7
8              I, CHARLES M. PEREIRA, hereby
9      certify that I have read the transcript of
10     my testimony taken under oath in my
11     deposition of December 6, 2022; that the
12     transcript is a true and complete record
13     of my testimony, and that the answers on
14     the record as given by me are true and
15     correct.
16
17
18             _____
                        CHARLES M. PEREIRA
19
20     Signed and subscribed to before me this
21     _____ day of _____, 20__.
22
23     _____
24     Notary Public, State of
25

CHARLES M. PEREIRA

318

```
 1
 2                    E R R A T A
 3   PAGE / LINE / CHANGE   /    REASON
 4   _____
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____
```

CHARLES M. PEREIRA

319

1

2                    C E R T I F I C A T E

3            I, MARIE FOLEY, Registered Merit

4    Reporter, Certified Realtime Reporter, and

5    Notary Public for the State of New York,

6    do hereby certify that prior to the

7    commencement of the examination, CHARLES

8    M. PEREIRA, was duly remotely sworn by me

9    to testify to the truth, the whole truth

10   and nothing but the truth.

11        I DO FURTHER CERTIFY that the foregoing

12   is a verbatim transcript of the testimony

13   as taken stenographically by me at the time,

14   place and on the date hereinbefore set forth,

15   to the best of my ability.

16        I DO FURTHER CERTIFY that I am neither

17   a relative nor employee nor attorney nor

18   counsel of any of the parties to this action,

19   and that I am neither a relative nor employee

20   of such attorney or counsel, and that I am

21   not financially interested in the action.

22   _____
     COURT REPORTER
23   Registered Merit Reporter
     Certified Realtime Reporter
24   Notary Public
     Dated: December 7, 2022

25