# EXHIBIT C

# In The Matter Of:
# ETHIOPIAN AIRLINES FLIGHT ET 302

# CRASH - DAMAGES

———————————————————————————

# THOMAS RICHARD JENKYN, Ph.D.

December 15, 2022

———————————————————————————

# *TC REPORTING, INC.*
## *1 DEERFIELD EAST - 1850*
## *QUOGUE, NY.  11959*

THOMAS RICHARD JENKYN, Ph.D. - Vol. I

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

------------------------------------------------x
IN RE: ETHIOPIAN AIRLINES
FLIGHT ET 302 CRASH - Damages

This Document Relates To: All Actions
------------------------------------------------x
Lead Case: 1:19-cv-02170 (Consolidated)
Honorable Jorge L. Alonso
Magistrate Judge M. David Weisman
------------------------------------------------x


                    December 15, 2022
                    8:37 a.m. Eastern Standard Time



          *      *      *

   CONFIDENTIAL PURSUANT TO AMENDED PROTECTIVE ORDER

                *      *      *



          Remote video conference deposition of

   THOMAS RICHARD JENKYN, Ph.D., P.Eng., taken by

   Defendant The Boeing Company, pursuant to

   Notice, dated November 6, 2022, before Brandon

   Rainoff, a Federal Certified Realtime Reporter

   and Notary Public of the State of New York.

THOMAS RICHARD JENKYN, Ph.D.

2

1

2    A P P E A R A N C E S:

3

4    KREINDLER & KREINDLER LLP

5    Attorneys for Plaintiffs' Executive Committee

6            750 Third Avenue

7            New York, New York  10017

8            212.687.8181

9    BY:    BRIAN J. ALEXANDER, ESQ.

10            balexander@kreindler.com

11            212.973.3411

12            JUSTIN T. GREEN, ESQ.

13            212.973.3403

14            jgreen@kreindler.com

15            DANIEL O. ROSE, ESQ.

16            212.973.3414

17            drose@kreindler.com

18

19

20

21

22

23

24

25

THOMAS RICHARD JENKYN, Ph.D.

3

```
 1
 2   A P P E A R A N C E S (continued):
 3
 4   CLIFFORD LAW OFFICES PC
 5   Attorneys for Plaintiffs' Executive Committee
 6            120 North LaSalle Street
 7            Chicago, Illinois  60602
 8            312.625.6192
 9   BY:    KEVIN P. DURKIN, ESQ.
10            kpd@cliffordlaw.com
11            TRACY A. BRAMMEIER, ESQ.
12            tab@cliffordlaw.com
13            JOHN V. KALANTZIS, ESQ.
14            jvk@cliffordlaw.com
15            SANJA PETREVSKA, ESQ.
16            sp@cliffordlaw.com
17
18
19
20
21
22
23
24
25
```

THOMAS RICHARD JENKYN, Ph.D.

4

1

2    A P P E A R A N C E S (continued):

3

4    COTCHETT, PITRE & McCARTHY, LLP

5    Attorneys for Plaintiffs

6            840 Malcolm Road

7            Suite 200

8            Burlingame, California  94010

9            650.697.6000

10   BY:    FRANK M. PITRE, ESQ.

11           fpitre@cpmlegal.com

12           JOHN PAUL THYKEN, ESQ.

13           jthyken@cpmlegal.com

14

15   POWER ROGERS, LLP

16   Attorneys for Plaintiffs

17           70 West Madison Street

18           Suite 5500

19           Chicago, Illinois  60602

20           312.313.0202

21   BY:    JONATHAN M. THOMAS, ESQ.

22           jthomas@powerrogers.com

23

24

25

THOMAS RICHARD JENKYN, Ph.D.

5

```
 1
 2    A P P E A R A N C E S (continued):
 3
 4    SMITH LaCIEN LLP
 5    Attorneys for Plaintiffs
 6              Three First National Plaza
 7              70 West Madison
 8              Suite 2250
 9              Chicago, Illinois  60602
10              312.509.8900
11    BY:   TODD A. SMITH, ESQ.
12              ALLYSON CHRISTINE COX, ESQ.
13
14    ROMANUCCI & BLANDIN LLC
15    Attorneys for Plaintiffs
16              321 North Clark Street
17              Suite 900
18              Chicago, Illinois  60654
19              312.458.1000
20    BY:   DAVID NEIMAN, ESQ.
21              312.253.8810
22              dneiman@rblaw.net
23
24
25
```

THOMAS RICHARD JENKYN, Ph.D.

6

1

2  A P P E A R A N C E S (continued):

3

4  WINSTON & STRAWN LLP

5  Attorneys for Defendant The Boeing Company and the

6  Witness

7          35 West Wacker Drive

8          Chicago, Illinois  60601-9703

9          312.558.5600

10  BY:    CHRISTOPHER B. ESSIG, ESQ.

11          312.558.6229

12          cessig@winston.com

13          KARALENA M. GUERRIERI, ESQ.

14          312.558.8079

15          kguerrieri@winston.com

16          NATHAN R. GILBERT, ESQ.

17          312.558.8907

18          ngilbert@winston.com

19

20

21

22

23

24

25

THOMAS RICHARD JENKYN, Ph.D.

1

2   A P P E A R A N C E S (continued):

3

4   PERKINS COIE LLP

5   Attorneys for Defendant The Boeing Company and the

6   Witness

7             1201 Third Avenue

8             Suite 4900

9             Seattle, Washington  98101-3099

10            206.359.8000

11  BY:    CHRISTOPHER LEDFORD, ESQ.

12            206.359.6642

13            cledford@perkinscoie.com

14

15  ALSO PRESENT:

16  JENNIFER GORDON, Clifford Law Offices PC

17  RONALD ECKSTEIN, Videographer

18  CHELSEA GILCHRIST, Technical Support, TC Reporting,

19  Inc.

20  THERESA WINTER, TC Reporting, Inc.

21  VICTORIA SUSKO, TC Reporting, Inc.

22

23

24

25

THOMAS RICHARD JENKYN, Ph.D.

8

1

2                    S T I P U L A T I O N S

3

4

5              IT IS HEREBY STIPULATED AND AGREED by

6    and between the attorneys for the respective

7    parties herein, that filing, sealing and

8    certification be and the same are hereby waived.

9              IT IS FURTHER STIPULATED AND AGREED

10   that all objections, except as to the form of

11   the question, shall be reserved to the time of

12   the trial.

13             IT IS FURTHER STIPULATED AND AGREED

14   that the within deposition may be signed and

15   sworn to before any officer authorized to

16   administer an oath, with the same force and

17   effect as if signed and sworn to before the

18   Court.

19

20

21

22

23

24

25                        - o0o -

THOMAS RICHARD JENKYN, Ph.D.

9

1
2                          *      *      *
3                     P R O C E E D I N G
4                   Thursday, December 15, 2022
5                    Remote/Hybrid Deposition
6                 8:37 a.m. Eastern Standard Time
7                          *      *      *
8            THE VIDEOGRAPHER:  Good morning.  This
9    is the videoconference monitor, Chelsea
10   Gilchrist of TC Reporting, and we are here for
11   the deposition of Thomas R. Jenkyn, being taken
12   In the Matter of Ethiopian Airlines Flight ET
13   302 Crash, Case Number 1:19-cv-02170,
14   Consolidated.
15           Today's date is Thursday, December
16   15th, 2022, and the time is approximately 8:37
17   a.m.
18           There is an in-person videographer
19   also present recording these proceedings.
20           The witness and counsel are attending
21   in-person for today's deposition at Bay Adelaide
22   Centre West, 333 Bay Street, Suite 900, Toronto,
23   Ontario M5H 2R2.
24           Other counsel will also be appearing
25   remotely via videoconference.

THOMAS RICHARD JENKYN, Ph.D.

10

1
2              Before we proceed, I would like to do
3      a roll call.  I have a list of law firms
4      appearing today.  When I announce each firm, if
5      counsel can please state your full name on the
6      record so we may note your appearance
7      accordingly.
8              Winston & Strawn.
9              MR. ESSIG:  Chris Essig, Karalena
10     Guerrieri.
11             And I believe Nathan Gilbert is
12     online.
13             THE VIDEOGRAPHER:  Perkins Coie?
14             MR. LEDFORD:  Christopher Ledford.
15             THE VIDEOGRAPHER:  Kreindler &
16     Kreindler?
17             MR. ALEXANDER:  Brian Alexander,
18     Daniel Rose for Kreindler & Kreindler.
19             THE VIDEOGRAPHER:  Clifford Law?
20             MR. DURKIN:  Kevin Durkin in the room.
21             MS. BRAMMEIER:  Tracy Brammeier.
22             MR. KALANTZIS:  John Kalantzis.
23             MS. PETREVSKA:  Sanja Petrevska.
24             And Jennifer Gordon, remote.
25             THE VIDEOGRAPHER:  Podhurst Orseck?

THOMAS RICHARD JENKYN, Ph.D.

11

1

2          Nurenberg, Paris?

3          Schroeter Goldmark & Bender?

4          Kline & Specter, PC?

5          Romanucci & Blandin?

6          I believe we had a David Neiman logged

7     in?

8          MR. NEIMAN:  Sorry.  I just stepped

9     away for a second.  Yes, David Neiman from

10    Romanucci & Blandin is present.  Thank you.

11         THE VIDEOGRAPHER:  Thank you.

12         Beasley Allen?

13         Smith LaCien?

14         MS. COX:  Allyson Cox and Todd Smith.

15         THE VIDEOGRAPHER:  Motley Rice.

16         Cotchett, Pitre & McCarthy.

17         MR. PITRE:  Good morning.  Frank Pitre

18    appearing remotely from California, where the

19    rooster continues to sleep.

20         MR. THYKEN:  And John Thyken.

21         THE VIDEOGRAPHER:  Power Rogers law.

22         I believe we have a Jonathan Thomas

23    logged in.

24         MR. THOMAS:  Sorry.  Yeah, Jonathan

25    Thomas from Power Rogers.

THOMAS RICHARD JENKYN, Ph.D.

12

1

2           THE VIDEOGRAPHER:  Thank you.

3           Is there anyone appearing who has not

4     stated their appearance?

5           I will certify that I will also be

6     appearing for tech support and videoconference

7     services for all remote participants.

8           Before we proceed, I will ask that

9     lead counsel for plaintiffs and lead counsel for

10    defendants for today's deposition to stipulate

11    on the record that we are proceeding according

12    to the Federal Rules of Civil Procedure and that

13    this deposition officer may swear in the

14    deponent even though he is not in the physical

15    presence of the deponent, and that there is no

16    objection at this time, nor will there be an

17    objection to it at any future indicate.

18           Plaintiffs' lead counsel, are you in

19    agreement?

20           MR. DURKIN:  In agreement.

21           THE VIDEOGRAPHER:  Defendant's lead

22    counsel, are you in agreement?

23           MR. ESSIG:  In agreement.

24           THE VIDEOGRAPHER:  Thank you.

25           Brad, you can swear in the witness.

THOMAS RICHARD JENKYN, Ph.D.

13

1
2          THE COURT REPORTER:  Good morning. My
3   name is Brad Rainoff.  I am a certified
4   Shorthand Reporter and notary Public. I am also
5   a Registered Merit Reporter and a Federal
6   Certified Realtime Reporter. I am the deposition
7   officer for today's deposition --
8   THOMAS RICHARD JENKYN, Ph.D., P.Eng.,
9   having been duly sworn, was examined and
10          testified as follows:
11  EXAMINATION
12  BY MR. ESSIG:
13       Q.   Good morning.
14            Do you go by Dr. Jenkyn?
15            Or Mr. Jenkyn?
16       A.   Dr. Jenkyn.
17       Q.   That's what I thought.  Good morning,
18  Dr. Jenkyn.  I know you are a Ph.D.
19            Have you been deposed before?
20       A.   Once -- once in United States court,
21  yes.
22       Q.   Have you been deposed in Canada?
23            Or -- are there depositions in Canada?
24       A.   Not really done that way.  I have
25  testified in court in Canada, but we don't

THOMAS RICHARD JENKYN, Ph.D.

14

1
2    really do the deposition process.
3          Q.    Okay.
4                So only one deposition in the United
5    States?
6          A.    That's right.
7          Q.    Do you remember what matter it was in?
8          A.    I don't remember it was state or
9    federal court, but the case took place in
10   Connecticut.
11         Q.    Okay.
12               What type of a case was it?
13         A.    It was civil litigation involving a
14   fatality between a young man and a snow plow.
15   And I was on the side of the defense for the
16   municipality.
17         Q.    Because you haven't been deposed too
18   many times in the United States, there are a few
19   ground rules, but not too many.
20               Maybe the most important ones allow
21   the court reporter to take down your answers --
22   which are the most important thing -- and my
23   questions as well.  And so we need to be careful
24   together not to talk over each other.
25               When I ask a question, I'll try to ask

THOMAS RICHARD JENKYN, Ph.D.

15

1
2       it clearly.
3               And when I -- can you wait until I
4       finish speaking before you answer?
5       A.      Certainly.
6       Q.      And I'll do my best to listen to your
7       full answer and not speak over you either.
8               Is that okay?
9       A.      Agreed, yeah.
10      Q.      All of your answers have to be verbal.
11      So if you shake your head, or nod your head -- I
12      know there is a camera kind of staring you in
13      the face right now -- that video will be taken
14      down, but the court reporter can't write down
15      nonverbal answers.
16              So do your best to answer verbally.
17              Is that okay?
18      A.      Understood, yes.
19      Q.      And I know you were sworn in today to
20      today tell the truth.
21              Any reason you can't tell the full and
22      complete truth today?
23      A.      There is no reason.
24      Q.      Also, I'm going to ask you some
25      questions.  If you can do your best to give,

THOMAS RICHARD JENKYN, Ph.D.

16

1

2      sort of, direct, clear complete answers, that

3      will help the deposition go faster.

4             And it's possible that your counsel

5      will ask you questions afterwards.  And so if

6      there are additional points you want to make,

7      you can always do that.

8             If I ask any question that's unclear,

9      please ask me to clarify.

10             Is that okay?

11      A.    Yes.

12      Q.    And if you don't ask to clarify, I'll

13      assume you understood what I was talking about.

14      A.    Got it.

15             MR. ESSIG:  Let's mark as -- I guess

16      it's Exhibit 290.  Is that the first Exhibit?

17             THE VIDEOGRAPHER:  Yes, the first

18      Exhibit will be Exhibit 290.

19             MR. ESSIG:  It will be tab 1, I

20      believe, in AgileLaw.

21             (Exhibit 290, Multipage document

22      entitled: Plaintiffs' Rule 26(a)(2)(B)

23      Disclosure of Thomas R. Jenkyn, Ph.D, P.Eng.,

24      dated September 22, 2022 (no Bates Nos.), marked

25      for identification)

THOMAS RICHARD JENKYN, Ph.D.

17

1

2              (Pause)

3              MR. ESSIG:  So I have marked Exhibit

4     290.

5  BY MR. ESSIG:

6        Q.    Do you recognize that document?

7        A.    Yes, I do.

8        Q.    Is this a copy of your expert

9     report -- expert disclosure -- in this case?

10       A.    Yes.

11       Q.    Okay.

12             MR. ESSIG:  If we turn to page 49 --

13             (Pause)

14             MR. ESSIG:  I think it is entitled:

15     Appendix C:  Depositions and appearance in

16     court.

17  BY MR. ESSIG:

18       Q.    Do you see that?

19       A.    Yes, I do.

20       Q.    Is this the complete list of the

21     depositions and testimony you've ever provided

22     in court?

23       A.    Yes.

24       Q.    I see there is a --

25             MR. DURKIN:  You are talking about the

THOMAS RICHARD JENKYN, Ph.D.

18

 1

 2   last four years?

 3           MR. ESSIG:  I asked him:  Ever.

 4           MR. DURKIN:  Oh, okay.  Because we

 5   asked him for the last four years.

 6           MR. ESSIG:  I understand.

 7           MR. DURKIN:  Thank you.  Okay.

 8           THE WITNESS:  There is one thing that

 9   isn't on here where I testified only at the voir

10   dire --

11           MR. ESSIG:  Okay.

12           THE WITNESS:  -- part.  But then in

13   that case, the ruling was the judge didn't allow

14   any expert testimony on either side, so it

15   didn't go beyond voir dire.

16   BY MR. ESSIG:

17       Q.    Do you remember the name of that case?

18       A.    It was Hadzic v. Crocksford.

19       Q.    In the United States?

20             Or Canada?

21       A.    Ontario Superior Court.

22       Q.    What was the subject of the case?

23       A.    It was a low-speed auto collision.

24       Q.    When was it?

25       A.    I don't recall.  More than five years

THOMAS RICHARD JENKYN, Ph.D.

19

1

2      ago.  I don't specifically remember.

3           Q.    Fair enough.

4                 The third case down on your list is

5      Walsh v City of Torrington, Connecticut.

6                 Is that right?

7           A.    That's right.

8           Q.    Is that the case you were talking

9      about?

10          A.    That's right.

11          Q.    And the rest of the cases are in --

12     two of the cases are in Ontario Superior Court.

13                You see that?

14          A.    That's right.

15          Q.    What was the subject matter of the

16     Hummel case?

17          A.    That was -- I was appearing for

18     plaintiff.

19                And that was a higher-speed auto

20     collision, where the driver was under the

21     influence of drugs and alcohol, and the

22     plaintiff was front-seat passenger who was not

23     seat belted.  And -- I was asked to determine --

24     he suffered -- he sustained serious injuries.

25                I was asked to opine on whether, had

THOMAS RICHARD JENKYN, Ph.D.

20

1

2       he been wearing his seat belt, the severity of

3       his injuries would have been similar.

4               Q.      Did you create an expert report?

5               A.      Yes, I did.

6               Q.      Did you do a simulation?

7               A.      Yes, I did.

8               Q.      And did you use the same software

9       package and program that you used in this case?

10              A.      Yes.

11              Q.      The HVE/GATB?

12              A.      Correct, yeah.

13              Q.      Did you calculate the amount of

14      g-forces that the -- it was a decedent?

15                      Or was he injured?

16              A.      Just injured.

17              Q.      Okay.

18                      -- that the plaintiff suffered?

19              A.      Yes.

20              Q.      How many g-forces in that accident?

21              A.      I don't recall.  It was -- it was

22      significant.

23                      There was a very large deceleration

24      when the car hit a tree, in a linear sense.  And

25      then the case was complicated by the fact the

THOMAS RICHARD JENKYN, Ph.D.

21

1

2      car rotated rapidly as well, and that's really

3      the crux of the case.  So I was calculating both

4      linear forces and accelerations, and rotational

5      ones as well.

6          Q.    Okay.

7               Do you remember how fast the car was

8      going?

9          A.    No.  But it was -- and I am going to

10     give you my answers in metric.

11              My understanding was, on a residential

12     street, they were going more than 90 kilometers

13     an hour, but I don't specifically recall.  But

14     they were going faster than they should have

15     been.

16         Q.    Do you have any recollection about the

17     magnitude of g-forces?

18         A.    I don't.

19         Q.    More than 50 g's? -- positive?

20         A.    Again, I don't know.

21         Q.    Okay.

22              More than 10?

23         A.    I would expect -- you know what?  It's

24     hard to answer because he didn't have his seat

25     belt on, so that changes everything.

THOMAS RICHARD JENKYN, Ph.D.

22

1

2      Q.    Okay.

3            What about the Rogers versus Testa

4      case?

5            What was the subject matter of that

6      case?

7      A.    So that, again -- in that case, I was

8      appearing for the defense.

9            The plaintiff was in the custody of

10     the London Police Service in the back of a paddy

11     wagon.  And while he was being transported -- I

12     believe to jail -- he sustained an injury while

13     he was in the back of the van.  He stated that

14     the van was driving dangerously and caused his

15     injury.

16           And I opined that he had been kicking

17     the back door in an attempt to get out and

18     injured himself.

19     Q.    Do you do simulation in that case?

20     A.    Yes.

21     Q.    Same software package?

22     A.    No.

23     Q.    Which software package did you use in

24     that?

25     A.    So I did hand calculations.  And I

THOMAS RICHARD JENKYN, Ph.D.

23

1
2    believe it was just hand calculations.
3        Q.    Did you calculate any g-forces in that
4    case?
5        A.    No.  That was impact forces.
6        Q.    Okay.
7              And then the last one, I think, is
8    this top one, Zheng Ziyang.  It was in the State
9    Court of the Republic of Singapore.
10             Do you see that?
11       A.    That's correct, yes.
12       Q.    What was the subject matter of that
13   case?
14       A.    You had two young boys who were
15   running across the playground at their school.
16   One fell and injured himself.
17             And I was representing the plaintiff.
18             Plaintiff claimed that the other boy
19   pushed him.  The defendant claimed that the boy
20   just tripped.
21             Now, in that case, that was a
22   kinematic analysis, so I didn't calculate
23   g-forces or forces.
24             We serendipitously had CCTV footage of
25   the event, and so I recreated the event in three

THOMAS RICHARD JENKYN, Ph.D.

24

1
2     dimensions using -- HVE/GATB.
3          Q.    Okay.
4               And you were testifying for the
5     plaintiff in that case?
6          A.    That's right.
7          Q.    Okay.
8               In the Hummel case -- I know I've
9     tried to ask you different ways if you could
10    recall the amount of g-forces.
11              Do you remember -- and you are kind of
12    murky on that.  I understand.
13              Do you remember if the g-forces in
14    that car accident were higher than the g-forces
15    that are at issue in our case?
16         A.    Do I specifically remember?  No.  I
17    don't.  I don't want to speculate.
18         Q.    Based on your experience and your
19    expertise as a biomechanical engineer, would you
20    expect that the g-forces in a 90-kilometer auto
21    accident where a car just hits a tree would be
22    higher than the g-forces that are subject to the
23    passengers in this case?
24         A.    If you are wearing a seat belt.
25         Q.    Okay.

THOMAS RICHARD JENKYN, Ph.D.

25

1

2          A.     So, yes, if you are wearing a seat

3     belt.

4                 When you are not wearing a seat belt

5     and you become mobile within the car, then the

6     g-forces tend to be lower.

7                 Doesn't mean it's less injurious

8     though, because you then strike other things.

9                 That case was also complicated by the

10    fact that the car rotated.  And so the motion of

11    the occupant within the vehicle was complex.

12    And so the direction of the linear and

13    rotational accelerations were not what you'd

14    usually get in a car crash.

15         Q.     Okay.

16                Sounds like they were more complicated

17    than the forces at issue in this matter?

18         A.     Yes.

19         Q.     Have you ever had your expert opinion

20    excluded by a court that you are aware of?

21         A.     No.

22         Q.     So you've prepared a report in this

23    litigation.

24                MR. ESSIG:  If we turn back to the

25    first page of it, start at the beginning --

THOMAS RICHARD JENKYN, Ph.D.

26

1
2              (Pause)
3    BY MR. ESSIG:
4         Q.    You see the very first sentence of the
5    cover page, there is a -- the very first page of
6    that report, the cover page -- you know, the
7    pleading on top of it --
8         A.    Got it.
9         Q.    -- see that?
10        A.    Yes.
11        Q.    The case caption and the title of the
12   case -- do you see that?
13        A.    Yes.
14        Q.    It says:  Plaintiffs' Rule 26(a)(2)(B)
15   Disclosure of Thomas Jenkyn, Ph.D., P.Eng.
16             Do you see that?
17        A.    Yes.
18        Q.    Then it says:  The disclosures made
19   pursuant to FRCP 26(a)(2)(B)?
20        A.    Yes.
21        Q.    Do you know what that rule is?
22        A.    No, not specifically.
23        Q.    Do you understand that, according to
24   that rule, the disclosure that you made is a
25   complete statement of all your opinions that you

THOMAS RICHARD JENKYN, Ph.D.

27

1

2    intend to express, and the basis and the reasons

3    for them?

4            MR. DURKIN:   Objection, form of the

5    question, foundation.

6        A.    I understand it's an expert report.

7            And the way it works in Canada is

8    you -- when you provide an opinion, you have to

9    provide the background, and reasoning, and

10   citations for that.

11           So I filed this report in that spirit.

12       Q.    Okay.

13           So we are, sort of, in the United

14   States and operating under the federal rules.

15           Is it your testimony that your

16   disclosure is a complete statement of all your

17   opinions that you will express?

18           MR. DURKIN:   Objection, foundation,

19   form.

20       A.    So it's a foundation for all the

21   opinions I've expressed so far, and any logical

22   sequelae that come out of those opinions and

23   those findings.

24       Q.    So is it a complete statement of all

25   the opinions you intend to express?

THOMAS RICHARD JENKYN, Ph.D.

28

1

2          Or not?

3          MR. DURKIN:  Objection, asked and

4     answered.

5  BY MR. ESSIG:

6     Q.    And I don't mean to be argumentative

7     I'm just trying to understand --

8     A.    I understand.

9     Q.    -- what the intent was.

10     A.    Based on the questions I have been

11     asked, I did the simulation.  I pulled

12     citations.  I provided an opinion to the best of

13     my ability, and gave reasons for that.

14          Now, in the course of the discussion

15     today, if we get into individual questions where

16     additional opinions logically come out of that,

17     then I reserve the right to give you those.

18          But to the best of my ability, this is

19     my current state of opinions and my reasoning

20     for them.

21     Q.    So I understand the qualifications.

22          But when you signed the report

23     September 22, you believed it was your best

24     attempt at a complete recitation of your

25     opinions in the case, right?

THOMAS RICHARD JENKYN, Ph.D.

29

1
2          A.    Yes.
3          Q.    And it was a complete summation of the
4     basis and the reasons for the opinions, too.
5                Is that right?
6          A.    Yes.
7          Q.    Okay.
8                And it discloses all the facts or data
9     that you considered in forming your opinions.
10               Is that right?
11         A.    It should, yes.
12         Q.    And it also includes any exhibits that
13    will be used to summarize or support your
14    opinions.
15               Is that true, too?
16         A.    For the purposes of this deposition,
17    yes.
18         Q.    And for the purposes of your
19    disclosure of your expert testimony in this
20    case, right?
21         A.    So far, yes.
22         Q.    So sitting here today, do you believe
23    your report meets the requirements?
24         A.    Yeah.
25               MR. DURKIN:  Objection, calls for a

THOMAS RICHARD JENKYN, Ph.D.

30

1

2    legal conclusion, and asked and answered.

3              And I think he said he didn't know the

4    exact requirements of 26, if I recall, Chris,

5    just a few minutes ago.  I think I recall

6    that --

7              MR. ESSIG:  -- yeah, that's what we

8    covered --

9              MR. DURKIN:  Okay, okay, okay.  So you

10   want him to have a legal opinion on the rule?

11   Okay.

12             MR. ESSIG:  No --

13             MR. DURKIN:  Okay --

14             MR. ESSIG:  -- I just want to

15   understand he --

16             MR. DURKIN:  -- just want to make

17   sure.

18             MR. ESSIG:  -- followed the statement

19   that is submitted --

20             MR. DURKIN:  Okay --

21             MR. ESSIG:  -- in his report.

22             Okay, so let's turn to page 2 of the

23   report.

24             MR. DURKIN:  Is that the service list?

25             MR. ESSIG:  It is page 2, section 1.0:

THOMAS RICHARD JENKYN, Ph.D.

 1

 2     Qualifications.

 3              MR. DURKIN:  Oh.  Okay.

 4              MR. ESSIG:  It has a 2 at the bottom

 5     of it.

 6              THE WITNESS:  Got it.

 7   BY MR. ESSIG:

 8       Q.   The first sentence there says:  I,

 9     Thomas R. Jenkyn, Ph.D., P.Eng., am responsible

10     for the contents of this report.

11              Do you see that?

12       A.   Yes.

13       Q.   Is that correct? -- you are fully

14     responsible for the contents of the report?

15       A.   Yes.

16       Q.   And then on page 36 of the report, you

17     signed and dated it September 22, right?

18       A.   That's correct.

19       Q.   Since September 22, you've never

20     submitted a supplemental report, have you?

21       A.   No.

22       Q.   And you never submitted a correction

23     to this report at all, did you?

24       A.   No.

25       Q.   Since disclosing your report on

THOMAS RICHARD JENKYN, Ph.D.

32

1

2    September 22, have you reviewed any new

3    materials in connection with this case?

4        A.    I've re-reviewed the -- what was in

5    here -- not to my knowledge.

6            MR. DURKIN:  You are not excluding

7    expert reports -- defense expert reports.  You

8    are talking about new materials?  Or --

9            MR. ESSIG:  Is that an objection? --

10            MR. DURKIN:  Well, I'm not sure what

11   you mean by "new materials" that are involved in

12   the case, or -- that's what I'm wondering --

13   what you are --

14            MR. ESSIG:  No, it's fine.

15   BY MR. ESSIG:

16       Q.    Since disclosing your report, have you

17   reviewed any new materials at all? --

18       A.    Okay.  I understand the question.

19       Q.    -- in connection with the report?

20            And I'm not trying to trick you.

21            If you do --

22       A.    Yeah, so --

23       Q.    -- I have some questions --

24       A.    -- I did receive expert reports from

25   your side, and I did review those, yes.

THOMAS RICHARD JENKYN, Ph.D.

33

1
2      Q.     Okay.
3             Have you conducted any new analyses?
4      A.     No.
5      Q.     Has anything about the review of the
6      expert reports from our side changed your
7      opinions?
8             Or --
9      A.     No.
10     Q.     No reason to change or correct
11     anything in here?
12     A.     That's right.
13     Q.     Okay.
14            If we turn to page 40 of the report,
15     this is a copy of your CV?
16     A.     Yes, it is.
17     Q.     And is it current still?
18     A.     Let me check.
19            (Pause)
20     A.     In the peer-reviewed publications
21     section, since then, I've had a couple papers
22     submitted for peer review that aren't listed.
23     Q.     Have they been published?
24     A.     No.
25     Q.     Are they on aviation accidents?

THOMAS RICHARD JENKYN, Ph.D.

34

1

2      A.    No.

3      Q.    What's the subject matter?

4      A.    There is one that is on motion of the

5  bones within the foot during walking.

6            And the second one is on vibration

7  modes of the skull after impact.

8      Q.    Anything in those papers that you are

9  going to use for the purpose of this case?

10     A.    No.

11     Q.    Okay.

12           So it states at the top here under,

13  "Engineering Position" that you are a

14  professional engineer.

15           Is that right?

16     A.    That's right.

17     Q.    And it says you your expertise is in

18  mechanical engineering, biomechanical

19  engineering, and aerospace engineering?

20     A.    That's correct.

21     Q.    And those are your fields of

22  expertise?

23     A.    Yes.

24     Q.    According to your CV, you've prepared

25  95 -- more than 95 forensic biomechanic --

THOMAS RICHARD JENKYN, Ph.D.

35

1

2     biomechanics reports since 2009.

3          Is that right?

4     A.    Yes.

5     Q.    And what's a forensic biomechanics

6     report?

7     A.    You have an example of it in front of

8     you, so -- it takes that form.

9     Q.    Okay.

10          So these are essentially expert

11    reports for the purpose of litigation?

12    A.    Yes.

13    Q.    How long have you been serving as an

14    expert in litigation?

15    A.    Since 2009.

16    Q.    Is 95 -- do you have any idea if that

17    number of reports there -- 95-plus -- is still

18    current?

19    A.    That should be current as of September

20    of this year.

21    Q.    It says under there, 61 of the reports

22    that you have tendered involve accident

23    reconstructions.

24          Do you see that?

25    A.    Yes.

THOMAS RICHARD JENKYN, Ph.D.

36

1

2      Q.    How many of those accident

3   reconstructions involved automobile accidents?

4      A.    The majority of them.

5      Q.    Do you have any sense of the total?

6      A.    Fifty-eight or 59.

7      Q.    Okay.

8            So that means two or three didn't

9   involve auto accidents?

10     A.    That's right.

11     Q.    And what did they involve?

12     A.    They would have involved bicycles

13   or -- like, one was a bicycle -- two were

14   bicycles.  So two involved bicycles.

15     Q.    Is there any other that you can think

16   of?

17     A.    No, I take that back.

18           I have done two other cases -- no,

19   this is accident reconstruction -- so, no.

20           Involving a vehicle, it was either

21   cars or bicycles.

22     Q.    Okay.

23           Have you ever done an accident

24   reconstruction of an aviation accident?

25     A.    Yes, but it hasn't gone to a full

THOMAS RICHARD JENKYN, Ph.D.

37

1
2      report.
3          Q.     What does that mean?
4          A.     So the way --
5                 MR. DURKIN:  I just want to make sure
6      we are clear, if he's consulting with somebody
7      on it and -- you know, it could be the
8      consulting.
9                 It's not our firm, but it might be
10     consulting.  If you're asking him to disclose
11     something he's working on currently, that might
12     be --
13                MR. ESSIG:  I'm just trying --
14                MR. DURKIN:  -- improper --
15                MR. ESSIG:  -- to understand his
16     testimony --
17                MR. DURKIN:  -- yeah, I just think --
18                MR. ESSIG:  -- so under this category
19     of 95 --
20                MR. DURKIN:  -- I don't know, I'm
21     just --
22                MR. ESSIG:  -- expert reports since
23     2009 --
24                MR. DURKIN:  -- I just want to be
25     careful he doesn't disclose information as a

THOMAS RICHARD JENKYN, Ph.D.

38

1
2    consulting expert on a case for some person we
3    don't know.
4              MR. ESSIG:  Okay.
5              MR. DURKIN:  -- it could be --
6    BY MR. ESSIG:
7         Q.    And I'm not intending to have you
8    divulge any confidential information.
9         A.    I understand that.
10        Q.    So if it's confidential, just let me
11   know.
12             But have you prepared an expert report
13   for litigation involving an aviation accident?
14        A.    Not prepared a report.
15        Q.    Okay.
16             Prior to this case, have you ever done
17   a reconstruction or simulation of an aviation
18   accident?
19        A.    So done an initial calculation that
20   has led to a verbal opinion, that then did not
21   proceed to a full report.
22        Q.    Did you do an HVE simulation?
23        A.    For one, I did an initial simulation.
24             For the other, it was a hand
25   calculation.

THOMAS RICHARD JENKYN, Ph.D.

39

1

2          Q.     So there is two aviation accidents

3     that you have provided expert reports for?

4                Or not?

5          A.     Not -- didn't provide expert report.

6                It's a three-step process, generally,

7     with my company.

8                There is an initial consultation where

9     I review the material and discuss it with the

10    lawyer.

11               If they want to then go to a report, I

12    prepare a report.

13               And then if it goes to litigation,

14    then I go to court.

15         Q.    Okay.

16               So we're in a consultation phase.

17    It's not something covered under this --

18         A.    That's right --

19         Q.    -- aspect of your CV --

20         A.    -- yeah, it's --

21         Q.    -- right? --

22         A.     -- and that will happen -- it is more

23    than I like -- but it will happen a lot, where

24    you discuss the case; this is what I think; and

25    then they, for whatever reason, decide not to go

THOMAS RICHARD JENKYN, Ph.D.

40

1

2      to a report.

3          Q.     Understood.

4                 Did you do an HVE simulation like the

5      simulation you did in this case for those

6      aviation accident assessments?

7          A.     In the one case, I wasn't lucky enough

8      to have flight data recorder data.  So it

9      involved an occupant in a seat and a seat belt,

10     but we didn't have the flight data recorder

11     data.

12         Q.     Is the answer "no"?

13                No --

14         A.     The answer is "no."

15         Q.     Okay.

16                So you had never done an HVE/GATB

17     simulation before this case for an aviation

18     accident?

19         A.     Yes.

20         Q.     Did any of the aviation accidents that

21     you provided, sort of, initial opinions for

22     involve commercial airplanes?

23         A.     No, they were -- they were Cessnas.

24         Q.     Have you ever been retained as an

25     expert in a commercial airplane accident?

THOMAS RICHARD JENKYN, Ph.D.

41

1
2      A.     No -- apart from this.
3      Q.     And I assume you've never testified or
4  given an opinion in an accident involving a
5  commercial airplane before?
6      A.     That's correct.
7             (Pause)
8      Q.     And I know you said you have done
9  defense work and plaintiff's side work?
10            Is that right?
11     A.     Yes.
12     Q.     Do you have an estimate about the
13 percentage of time you worked for a plaintiff?
14            Or the percentage of time you worked
15 for a defendant?
16     A.     It is about 50-50.
17     Q.     Okay.
18            It says that you are a senior engineer
19 at TLS Forensic Biomechanics.
20            Do you see that?
21     A.     Yes.
22     Q.     Are you still a senior engineer at
23 TLS?
24     A.     Yes, I am.
25     Q.     And did you found TLS?

THOMAS RICHARD JENKYN, Ph.D.

42

1
2      A.    Yes, I did.
3      Q.    And when did you found it?
4      A.    2008.
5      Q.    Are you the owner of the company?
6      A.    Yes, I am.
7      Q.    Are there any other owners?
8      A.    I have shareholders, but I'm the
9   primary decision maker, yeah.
10      Q.    How many experts work at TLS besides
11   you?
12      A.    Currently zero, apart from me.
13      Q.    You are the only expert at the
14   company?
15      A.    Right now, yes.
16      Q.    What does the company do, just at a
17   broad level?
18      A.    We provide opinions for litigation
19   that involves primarily biomechanics.  So our
20   niche market is focusing on the biomechanics
21   that may or may not involve a vehicle.
22           In about a third of the cases, it
23   doesn't involve a vehicle.
24           But we concentrate on the biomechanics
25   and provide objective ways of determining

THOMAS RICHARD JENKYN, Ph.D.

43

1

2      causation of injury.

3           Q.     I think I looked at your website and

4      it says on the front page:  We put the math in

5      aftermath.

6           A.     That's pretty good, eh?

7           Q.     Yeah.

8                  Did you come up with that?

9           A.     I did.

10          Q.     What did it mean?

11                 What do you mean by that?

12          A.     Well, aftermath -- after you have had

13     an accident or an injury, we put the mathematics

14     and the physics into explaining how the injury

15     occurred.

16          Q.     Okay.

17                 So it's fair to say your focus is on

18     personal injury litigation?

19          A.     Yes.

20          Q.     Any other type of litigation that's a

21     focus?

22          A.     No.

23          Q.     Are your clients law firms?

24                 Or individual people?

25          A.     Either law firms or insurance firms.

THOMAS RICHARD JENKYN, Ph.D.

44

1

2          Q.      Okay.

3                  Do you have any sense of whether or

4     not more of your client base is plaintiff law

5     firms or defense law firms?

6          A.      It's about 50-50.

7          Q.      Let's talk about your education.

8                  In 1994, you earned a BASc in

9     engineering science?

10                 Is that right?

11         A.      That's right.

12         Q.      What is a BASc?

13         A.      It's a Bachelor of Applied Science.

14         Q.      Is that an undergrad degree?

15         A.      Undergrad in engineering, yeah.

16         Q.      And in 1996, you received an MASc in

17    aerospace engineering.

18                 Is that right?

19         A.      Yes.

20         Q.      Is that a Master's?

21         A.      Master's of Applied Science, yes.

22         Q.      And what's aerospace engineering?

23         A.      So it's applying engineering

24    principles to building vehicles that are either

25    in the atmosphere and undergoing aerodynamic

THOMAS RICHARD JENKYN, Ph.D.

45

1

2      forces, or in space outside of the atmosphere

3      and undergoing the forces you would expect from

4      parabolic or orbital flight.

5          Q.     So that education helps engineers

6      build aerospace vehicles?

7          A.     Yes.

8          Q.     How is that different than

9      biomechanical engineering?

10         A.     So biomechanical is applying

11     engineering principles in physics to the motion

12     and forces on the body -- whether it's the

13     entire body, body segments, tissues, or portions

14     of the body.

15         Q.     And in 2001, you received your Ph.D.

16     in biomechanical engineering.

17                Is that right?

18         A.     Yes.

19         Q.     You went on to do postdoc work?

20         A.     That's right.

21         Q.     And you did that with the Mayo Clinic?

22         A.     Yes.

23         Q.     What was the focus of your research

24     there from 2000 to 2002 at the Mayo Clinic?

25         A.     So while at the Mayo, I was very

THOMAS RICHARD JENKYN, Ph.D.

46

1

2       fortunate to have a position in three labs at

3       the same time.

4               The first one was an optical motion

5       capture lab.  So that's looking at biomechanics

6       of living people -- so whether they are healthy

7       volunteers, or patients with different mobility

8       issues from the Mayo Clinic clinical population.

9       Put markers on the body.  The person walks

10      through the lab.  And we confer with orthopedic

11      surgeons, and physical therapists, and

12      occupational therapists as to what the

13      biomechanics is in the living people.

14              The second lab was cadaver-based lab

15      where we would do surgical simulations on

16      cadaver portions; work on novel surgeries; look

17      at thresholds of injury, whether it's ripping up

18      soft tissue, or muscle, or breaking of bones.

19      And in that case, I worked closely with the

20      orthopedic surgeons.

21              And then the third lab was in

22      diagnostic radiology, specifically MRI.  And so

23      that lab was working on new -- new modalities

24      for using an MRI machine.  In that specific one,

25      we were using something called phase-contrast

THOMAS RICHARD JENKYN, Ph.D.

47

1

2      MRI to look at the stiffness of muscle tissue.

3           Q.    Okay.

4                 None of the postdoc research focused

5      on aviation research or aerospace issues, did

6      it?

7           A.    Specifically?  No.

8                 But it was foundational in

9      understanding both how in vivo the body moves

10     when it has different accelerations applied to

11     it, and how tissues can be damaged, and what

12     their thresholds of injury are.

13          Q.    So some general principles that might

14     be applicable in an aviation context, but no

15     specific focus?

16          A.    Right.

17                So foundations -- it's forming a

18     foundation of knowledge on biomechanics, but

19     nothing specific to commercial aircraft.

20          Q.    Okay.

21                After you finished your postdoc

22     research, you became a professor of human

23     biomechanics at the University of Western

24     Ontario?

25          A.    That's right.

THOMAS RICHARD JENKYN, Ph.D.

48

1
2      Q.    What was your -- what's your area of
3   primary research at the University of Western
4   Ontario?
5      A.    So at Western, I run two labs.
6            I used to run three, but one has been
7   folded into the other.
8            So just describing those three labs,
9   they are my three main areas.
10            So I have an optical motion capture
11   lab, similar to at Mayo.  Put markers on the
12   body.  That's located at the Fowler Kennedy
13   Sport Medicine Clinic.  It is on campus.  So
14   again, we are looking at healthy volunteers, and
15   student athletes, and people from the general
16   public who are patients.
17            I had fluoroscopic radiostereometric
18   lab, which uses X-rays to look at the bones
19   while people are moving.
20            And my third lab is cadaver-based.
21   And in that lab, we look at fractures to the
22   face, impacts to the skull, as well as impacts
23   to the feet.
24      Q.    In your work at the university, do you
25   ever do HVE simulations?

THOMAS RICHARD JENKYN, Ph.D.

49

1
2          A.    No.
3          Q.    Do you ever compare the results of
4     research on actual human beings in the real
5     world to simulations to see if the simulations
6     are accurate or not?
7          A.    Do I do that?  No.
8          Q.    You teach courses in biomechanics,
9     kinesiology, and orthopedic biomechanics.
10               Is that right?
11         A.    That's correct.
12         Q.    Do you teach any courses on aerospace
13    engineering?
14         A.    Not so far.
15         Q.    Do you teach any courses on issues
16    involving commercial airplanes, or flight, or
17    biomechanics of a person in an airplane?
18         A.    So do I teach courses on aviation?
19    No.
20               But in the courses on biomechanics, we
21    will have examples from time to time that
22    involve exposure of occupants of aircraft to
23    different accelerations.
24               Aircraft is a -- an aircraft is a
25    great example, because now you've got

THOMAS RICHARD JENKYN, Ph.D.

50

1

2    accelerations in all three axes.

3            Whereas if you just do cars,

4    generally -- unless things are going really

5    badly for the car -- you are only having

6    accelerations in two axes.

7            So aviation cases -- at least in terms

8    of what somebody would be experiencing sitting

9    in a seat on an aircraft -- is just a useful

10   example.

11       Q.   Okay.

12           Aside from examples potentially that

13   you use in some of your classes, there is no

14   actual class focused on aviation, is there?

15       A.   That's right.

16       Q.   You've -- according to page 43 of your

17   expert report -- you have been an author on 57

18   published articles.

19           Is that right?

20       A.   That's right.

21       Q.   Is it fair to say that none of those

22   articles focus on aerospace engineering?

23       A.   That's fair.

24       Q.   Or aviation accident injury?

25       A.   That's fair.

THOMAS RICHARD JENKYN, Ph.D.

51

1

2          Q.     Any on aviation at all?

3          A.     No.

4          Q.     Would you say that after you received

5     your Master's in aerospace engineering in 1996

6     that aerospace engineering has not been a focus

7     of your career?

8          A.     That's fair.

9                 MR. ESSIG:  So let's go back to the --

10                (Pause)

11                MR. ESSIG:  -- cover page of the

12    report, which you have in front of you --

13                MR. DURKIN:  Is it --

14                MR. ESSIG:  -- the cover page with the

15    caption on it.

16                MR. DURKIN:  Oh.

17    BY MR. ESSIG:

18                It says on the cover page there that:

19    Mr. Jenkyn is expected to testify consistent

20    with his expert report, based on the reasonable

21    degree of engineering certainty.

22                Do you see that?

23         A.     Yes, I do.

24         Q.     It's, kind of, a second little

25    paragraph under the disclosure of your name?

THOMAS RICHARD JENKYN, Ph.D.

52

1
2          A.      Hm-hmm.
3          Q.      What does it mean to testify to a
4    "reasonable degree of engineering certainty"?
5          A.      So in the academic field generally, we
6    consider a statistical p-value of 5%.  So that
7    would be if something is going to happen 19
8    times out of 20, I would consider that
9    reasonable degree of engineering certainty.
10         Q.      Okay.
11                 So there is a quantitative element to
12   the definition of "a reasonable degree of
13   engineering certainty"?
14         A.      Yes.
15         Q.      Did you calculate any p-values in this
16   case?
17         A.      I did not.
18         Q.      Does "engineering certainty" mean that
19   you prove that results are true?
20         A.      To the best of our judgment, yes.
21         Q.      If you testify or you talk about
22   something to a reasonable degree of engineering
23   certainty, does that mean that the conclusion
24   that you have stated has been validated in some
25   objective way?

THOMAS RICHARD JENKYN, Ph.D.

53

1

2      A.     Directly in that exact case, you can't

3    do that.

4             But individual aspects where

5    validation is possible for certain aspects of

6    it, then the validation has been done.

7      Q.     So you can't validate opinions that

8    you might give in a litigation context?

9      A.     Apart from recreating the exact

10   situation?  No, you can't do that.

11     Q.     Could you do -- there is a concept

12   called "direct validation," right?

13     A.     Yes.

14     Q.     And that's where you are validating

15   that -- directly the results of the opinion you

16   are giving, right?

17     A.     You can attempt that.

18            But the problem is, you are always --

19   there are always caveats to that.

20            So for instance in this case, if you

21   want to know how did the occupants move in a

22   specific seat, can I know enough factors to

23   recreate that exact situation?  No.

24            So you've got to validate or be sure

25   about certain things that you, in your judgment,

THOMAS RICHARD JENKYN, Ph.D.

54

1

2     know to be important, and make your decision

3     based on that.

4          Q.     So in this case, you can't directly

5     validate the opinions you are giving?

6                 MR. DURKIN:  Objection, argumentative.

7                 MR. ESSIG:  I'm not trying to be --

8     sorry about that --

9  BY MR. ESSIG:

10         Q.     Is that true?

11         A.     Short of -- if you -- if your

12    definition of "validation" is "do I know exactly

13    what happened to somebody sitting in seat 35A,

14    whether their hands went exactly up or down,"

15    and that sort of thing?  No, I can't know that.

16                Can I have a reasonable degree of

17    certainty that their body overall moved in a

18    certain way as the accelerations were acting on

19    the body?  Yes, I can make a confident judgment

20    on that.

21         Q.     And an example of direct validation --

22    just so I don't -- I'm the novice here, so I

23    just want to make sure I have it right -- is if

24    you run a simulation, let's say, on -- that

25    simulates what a crash test dummy would do under

THOMAS RICHARD JENKYN, Ph.D.

55

1
2      a certain conditions, you could then get in a
3      lab and put a crash test dummy in a sled and put
4      it under the exact same situations, and see if
5      your simulation is replicating what happens in
6      the real world, right?
7          A.    You can certainly do that.
8                But that's not going to be the level
9      of certainty you are looking for.
10               Because then the question comes up:
11     Well, it's a crash test dummy.  It's not a
12     human.  The crash test dummy isn't applying
13     torques at its joints.  It's not reacting.  You
14     don't know if the arms move exactly the same.
15               So that direct validation -- again,
16     you choose the aspects that are important, and
17     you be sure about the aspects that in your
18     judgment you think are important, and then draw
19     your conclusions.
20         Q.    Is there a concept called "indirect
21     validation"?
22         A.    That's sort of what I'm talking
23     about -- is if you are sure about the important
24     aspects -- and, again, to know what the
25     important aspects are requires engineering

THOMAS RICHARD JENKYN, Ph.D.

56

1

2     judgment --

3              If you are sure about the important

4     aspects, and it can get you to the point where

5     you are sure that 19 times out of 20 you are

6     right, then that's what I consider my reasonable

7     degree of engineering certainty.  And it's --

8          Q.    And that's what you were talking about

9     applying statistics to -- like a p-value -- to

10    understand if you are --

11         A.    Right.

12         Q.    -- truly right 19 out of 20 times?

13         A.    Right.

14         Q.    Okay.

15              MR. ESSIG:  If we look at the first --

16    let's turn to page 3 of your report.

17              THE WITNESS:  Hm-hmm.

18              MR. ESSIG:  And do you see section

19    3.0:  Purpose and scope?

20              THE WITNESS:  Hm-hmm.

21              MR. ESSIG:  Okay.

22    BY MR. ESSIG:

23         Q.    The first sentence says:  TLS

24    Forensics Biomechanics and Engineering Limited

25    was retained to perform a biomechanical

THOMAS RICHARD JENKYN, Ph.D.

57

1
2       simulation of the motion induced in the bodies
3       and body segments of the passengers of the
4       aircraft due to the accelerations of the
5       aircraft in the final minutes before the
6       crash --
7              A.     Yes.
8              Q.     -- do you see that?
9                     Why did you only look at the final
10      minutes before the crash?
11             A.     So I had the entire flight data
12      recorder data, which started before the plane
13      rolled out.  I looked at all that data.
14                    And what you can see is, right after
15      takeoff when things start going abnormally, the
16      accelerations -- at least in the vertical
17      direction, certainly in the vertical
18      direction -- became more and more abnormal and
19      larger and larger.
20                    And so when we say the last -- "the
21      final minutes," I analyzed final 24, 25 seconds.
22      That was where the focus was.
23                    But I also looked at the two minutes
24      and four seconds prior to that.
25                    And I did look at the two minutes and

THOMAS RICHARD JENKYN, Ph.D.

58

1
2    36 seconds before that.
3              So it's the majority of the flight.
4              But the flight got progressively
5    worse.  And so biomechanically, it was most
6    significant closer to the end.
7         Q.    Did you make the judgment to only look
8    at the final minutes of the crash?
9         A.    I looked at the entire crash.
10             And then when you see the motions of
11   the bodies and you are looking for what seems to
12   be biomechanically significant, then, yeah, I
13   would make some judgments.
14             Of course, as I'm coming up with the
15   results, I'm discussing it with my own counsel.
16             But in my judgment, it's the last
17   portion of the crash that was most
18   biomechanically significant.
19        Q.    Okay.
20             So that second-to-last sentence in
21   that paragraph reads:  TLS was also asked to
22   quantify the interactions between the passengers
23   and their seat belts, seats, armrests, seatback
24   trays, loose objects, loose personal items,
25   electronics, loose luggage, contents of the seat

THOMAS RICHARD JENKYN, Ph.D.

59

1

2      pockets, and other components of the aircraft.

3              Do you see that?

4      A.      Yes.

5      Q.      What does it mean? -- "to quantify the

6      interactions"?

7      A.      So to simulate their motion.  And

8      whenever two things came into contact, to

9      calculate the contact --

10     Q.      It's a numerical analysis?

11     A.      That's right.

12     Q.      Did you quantify the interactions

13     between passengers and their seat belts?

14     A.      Yes.

15     Q.      What about passengers and their seats?

16     A.      Yes.

17     Q.      Armrests?

18     A.      Yes.

19     Q.      Seatback trays?

20     A.      In the end, I did not include that in

21     the report.

22     Q.      Did you quantify the interaction

23     between passengers and loose objects?

24     A.      Same answer.

25     Q.      No?

THOMAS RICHARD JENKYN, Ph.D.

60

1

2          A.     No.  Sorry.

3          Q.     Did you quantify the interaction

4     between passengers and loose personal items and

5     electronics?

6          A.     That didn't go into the report.

7          Q.     Did you quantify the interaction

8     between passengers and loose luggage?

9          A.     That didn't go into the report.

10         Q.     What about the contents of seat

11    pockets and other components of the --

12         A.     That didn't go into the reports.

13         Q.     Sorry I have to break all those things

14    down --

15         A.     I understand.

16         Q.     -- I'm just trying to get -- get

17    things clear.

18         A.     Yeah.

19         Q.     The last sentence at the end of that

20    paragraph says:  Biomechanics is the application

21    of physics and engineering principles to the

22    study of motion and loading of biological

23    tissues, body segments, and bodies overall.

24              Correct?

25         A.     Yes.

THOMAS RICHARD JENKYN, Ph.D.

61

1
2      Q.    That's essentially meaning that your
3  area of expertise is using physics and
4  engineering principles to predict or simulate
5  how body might move when it's subject to certain
6  forces?
7      A.    Yes.
8      Q.    You are not a medical doctor, are you?
9      A.    That's right.
10      Q.    And you are not a flight surgeon?
11      A.    That's right.
12      Q.    Are you an expert in human psychology?
13      A.    No.
14      Q.    Have you ever treated a patient?
15      A.    Never.
16      Q.    Ever treated or taken care of anybody
17  that was injured in an accident?
18      A.    Like, first aid?
19      Q.    Have you ever -- I assume you haven't,
20  since you are not an M.D., but --
21      A.    I am -- not as an M.D. --
22      Q.    Okay.
23            Maybe as a --
24      A.    -- I have applied BAND-AID®s --
25      Q.    -- husband or father? --

THOMAS RICHARD JENKYN, Ph.D.

62

1
2        A.        -- I have applied BAND-AID®s.
3                  (Pause)
4        Q.        Have you ever diagnosed anybody with
5    an injury?
6        A.        Not as an M.D.
7        Q.        I'm asking you these questions in the
8    context of an expertise.
9        A.        And I will answer them in that spirit.
10       Q.        Understood.
11                 Do you have any experience diagnosing
12   or treating any psychological or emotional
13   condition?
14       A.        No.
15       Q.        What about pain?
16                 Are you an expert in pain?
17       A.        No.
18       Q.        Have you ever studied pain threshold
19   in human beings?
20       A.        I have read the biomechanics
21   literature on pain threshold.
22       Q.        Have you done your own direct research
23   in that area?
24       A.        That would be unethical.
25       Q.        Okay.

THOMAS RICHARD JENKYN, Ph.D.

63

1
2              But other people have done research on
3    pain --
4         A.    There is limited research on pain,
5    yes.
6         Q.    Why is it ethical for other people to
7    do it and you couldn't?
8         A.    I don't know.  I don't know.
9              It's -- it is, in some jurisdictions,
10   possible to put a study together that does that.
11             Or it's possible to word it in such a
12   way, with certain limitations on the study, that
13   pain studies -- where pain is induced in living,
14   healthy volunteers -- has been done.
15        Q.    Do you cite any of that research in
16   your report?
17        A.    Not in this specific --
18             MR. DURKIN:  Did he finish?  Oh, I'm
19   sorry --
20             MR. ESSIG:  I'm sorry, I was
21   just trying to --
22             MR. DURKIN:  -- I know you are trying
23   to move it along, but I don't believe he
24   finished his answer.
25             MR. ESSIG:  Apologies.

THOMAS RICHARD JENKYN, Ph.D.

64

1

2          A.    Yeah, would I like to do it?  It would

3     be very interesting.

4                Can I get it through my ethics board

5     at my university or in the province of Ontario?

6     No.  So --

7          Q.    Do you think it's ethical?

8          A.    It depends.  I would be happy to do it

9     on myself, so I think it would be ethical for me

10    to volunteer to do it, because that data is so

11    useful and so interesting.

12               But -- yet there is a reason why

13    pain -- the biomechanics of pain and pain

14    threshold data is so sparse in the literature is

15    because you've got to get over that ethics

16    hurdle.

17         Q.    Fair to say the experience of pain is

18    a subjective matter?

19         A.    Yes.

20         Q.    And it's not something that could be

21    objectively characterized by principles of

22    biomechanics or engineering.

23               Is that right?

24         A.    No, I would disagree with that.

25               You -- in individual subjects, you can

THOMAS RICHARD JENKYN, Ph.D.

65

1

2     measure whether or not they have pain.

3               The trouble comes in statistically

4     when you try to predict, as a population, who is

5     going to get pain -- so trying to tease those

6     two questions apart.

7               Can you do a study where objectively

8     you know you are inducing pain in people?  Yes.

9               Can you then take that body of data

10    and predict when every single person will

11    experience pain?  That's trickier.

12    Q.    Can you do it? -- that last part?

13          Or not?

14    A.    Statistically, you are going to have

15    some unknown.

16               So usually, you do what's known as a

17    sigmoid-type risk of injury, but in this case,

18    risk of pain.  And you sort of establish where

19    the bottom threshold is and -- within a

20    population context.

21               When you do have those subjective

22    inputs, then you are going to get a spread in

23    terms of who gets pain and who doesn't.

24    Q.    Are you aware of any validated or

25    statistically significant research on pain that

THOMAS RICHARD JENKYN, Ph.D.

66

1

2      applies the results to a population level?

3           A.    Yes, it is in the literature.

4           Q.    But it's not cited in this? --

5           A.    That's right.

6           Q.    And you don't rely on that in this

7      case?

8           A.    No.

9                 (Pause)

10          Q.    Is one of the challenges of looking at

11     the issue of pain the fact that everybody feels

12     pain at a different threshold?

13          A.    You bet.

14          Q.    It is subjective?

15          A.    Yes.

16          Q.    Is there a lot of variability in the

17     way people experience pain?

18          A.    That's my understanding that there is,

19     yes.

20          Q.    What about being injured?

21                Have you done any research on whether

22     or not somebody is injured or not?

23          A.    So not in vivo.

24                But in cadaver work, one of my current

25     pursuits is looking at injury in the foot and

THOMAS RICHARD JENKYN, Ph.D.

67

1

2    craniofacial facial fracture.

3         Q.    In your field as an engineer -- a

4    biomechanical engineer -- what's your definition

5    of "injury"?

6         A.    So whether you have disrupted the

7    tissue; whether that disruption causes

8    discomfort or pain; and whether it requires a

9    recovery period.

10        Q.    So what do you mean by "disruption of

11   tissue"?

12        A.    So it can be something as profound as

13   a fractured bone or a cracked bone.

14              It could be something a little more

15   subtle, such as micro-tears within a muscle.

16   When you have strained the muscle, it can be

17   micro-tears and disruption at the microscopic

18   level in soft tissue, or connective tissue when

19   you have sprained it.

20        Q.    Do all three of the elements that you

21   have just described have to be present in order

22   to have an injury?

23        A.    Well, again, the second one is

24   problematic.  Because, as you said, pain is

25   subjective.

THOMAS RICHARD JENKYN, Ph.D.

68

1
2            So the two most objective ones are:
3    Is there disruption to the tissue? -- which can
4    be measured; and number three:  Is there a
5    recovery time?
6            The middle one is more subjective.
7            But generally -- it's not required to
8    be there, but one would certainly be looking for
9    it to be there.
10      Q.    The first element -- disruption of
11   tissue -- is there a great deal of variability
12   in whether or not a person's tissue is disrupted
13   when you look at a population level of folks?
14      A.    No, that's more predictable.
15      Q.    What about the pain issue?
16      A.    The pain, like we said, is more
17   subjective, yes.
18      Q.    You are not offering any opinions in
19   this case about the emotional or psychological
20   state of passengers on ET 302, right?
21      A.    No.
22      Q.    You are not an aerospace physiologist?
23      A.    No.
24      Q.    You are not a pilot?
25      A.    No.

THOMAS RICHARD JENKYN, Ph.D.

69

1

2     Q.     Have you ever personally experienced

3     negative g-forces?

4     A.     No.

5     Q.     Okay.

6            Have you ever personally

7     experienced -- well, never mind.

8            What about positive g-forces?

9            Have you personally experienced

10    positive g-forces?

11    A.     Every day.

12    Q.     What level of magnitude?

13    A.     Well, usually about 1.

14           But just getting into the elevator

15    today, as the elevator started, it dropped below

16    1 and as it stopped, it went above 1.  I've been

17    on rollercoasters.  I have been in cars.  I've

18    been on aircraft.

19    Q.     And I'm assuming you did not have some

20    kind of device that was measuring the g-forces

21    when you were doing those things?

22    A.     You know what?  You have an

23    accelerometer in your iPhone --

24    Q.     Do you?

25    A.     -- and I am an engineering professor,

THOMAS RICHARD JENKYN, Ph.D.

70

1
2    and I am a geek -- so, yes, from time to time, I
3    will measure g-forces just for fun.
4         Q.    What's the highest number of positive
5    g's you have ever experienced that you are aware
6    of?
7         A.    That I'm aware of, not measuring with
8    my iPhone -- again, on a rollercoaster, probably
9    about 1.6, something like that, 1.5.
10        Q.    Rollercoasters, kind of, tap out at
11   that level of g-forces?
12              Or --
13        A.    Yeah, yeah.
14        Q.    Okay.
15              Were you injured when you experienced
16   those g-forces?
17        A.    Sorry?
18        Q.    Were you injured when you experienced
19   those g-forces?
20        A.    I was not.
21        Q.    Do you have any experience with air
22   safety investigation?
23        A.    No, I don't.
24        Q.    And you are not offering any opinion
25   about the investigation of the ET 302 accident

THOMAS RICHARD JENKYN, Ph.D.

71

1
2    in this case, are you?

3        A.    That's right.

4            MR. ESSIG:  So if we look on page 3

5    here --

6            THE WITNESS:  Hm-hmm-

7            MR. ESSIG:  -- item (ii) -- it is

8    under 1:  Receipt and review of the following

9    background documents?

10            THE WITNESS:  I have got it.

11   BY MR. ESSIG:

12       Q.    It says:  Flight Data Recorder outputs

13   for the entire flight of ET 302 on March 10,

14   2019?

15       A.    Yes.

16       Q.    What are FDR outputs?

17       A.    So the flight data recorder is

18   recording -- well, it's got an accelerometer in

19   three directions.  Also got inputs from various

20   systems within the aircraft, positions of

21   control surfaces, positioning of the

22   characteristic, inputs -- things like that.

23       Q.    When you list here in item (ii)

24   "Flight Data Recorder outputs," is that data

25   directly from the FDR in this case?

THOMAS RICHARD JENKYN, Ph.D.

72

1

2      A.    So I received that data in Excel

3    spreadsheet format.

4      Q.    And who did you receive that data

5    from?

6      A.    Charley Pereira.

7      Q.    Did you only receive data on FDR

8    accelerations from Pereira?

9      A.    I had access to some documents as well

10    from Charley.  But he provided the Excel

11    spreadsheet for the FDR data.

12      Q.    What documents are you talking about?

13      A.    So I looked at a few graphs that he

14    produced of the vertical acceleration.

15            I looked at some animations that he

16    created.

17            I don't believe I saw a draft of his

18    report, but I did see graphs out of that report.

19      Q.    Did you consider the animations that

20    he provided you in creating your report?

21      A.    No.

22      Q.    So you didn't rely on them in any way

23    for the purpose of your opinions in this case?

24      A.    No.

25      Q.    Did you receive data from anybody else

THOMAS RICHARD JENKYN, Ph.D.

73

1

2      for the purpose of your report?

3          A.     Well, I severed technical documents

4      from Boeing in terms of geometry of the interior

5      of the aircraft, and that sort of thing.

6              But I believe that's it.

7          Q.     So under this category 1:  Receipt and

8      review of the following background documents,

9      this is the full list of background documents

10     you looked at?

11         A.     Yes.

12         Q.     And who provided you the documents?

13         A.     That came through my counsel.

14         Q.     Did you ever ask for any documents to

15     review for the purpose of your report that you

16     weren't given?

17         A.     No.

18             (Pause)

19         Q.     You are not an expert on the

20     extraction of flight data from a flight data

21     recorder, are you?

22         A.     I'm not.

23         Q.     So you defer to Charley Pereira on the

24     flight data?

25         A.     Yes.

THOMAS RICHARD JENKYN, Ph.D.

74

1

2      Q.    Did you ever review the CVR -- the

3    cockpit voice recorder -- transcript in this

4    case?

5      A.    No.

6      Q.    Any reason you could think that it

7    might have been relevant to your report?

8      A.    No.

9            Now I will say that the transcript of

10   the flight -- of the cockpit voice recorder --

11   was on Charley Pereira's video.  But I was

12   watching other aspects of that video, and I

13   didn't rely on it.

14     Q.    Understood.

15           So if we look at item 2 on page 4, it

16   says you conducted simulations of portions of

17   the crash flight.

18           Right?

19     A.    That's right.

20     Q.    And that simulation you did was just

21   on the last 150 seconds of the flight?

22     A.    So we did the last 24 to 25 seconds.

23   That was the majority of the simulations and

24   various, sort of, it iterations of it.

25           But I also modeled the two minutes and

THOMAS RICHARD JENKYN, Ph.D.

75

1
2    four seconds prior to that with a generic --
3    three economy-class passengers -- so -- two
4    minutes and four seconds, plus the final 24 or
5    25 seconds.
6        Q.    Okay.
7        Did you ever do a -- and you never did
8    a simulation of the whole flight?
9        A.    That's right.
10       Q.    Why not?
11       A.    It was -- doing simulations over that
12   amount of time with GATB is computationally
13   costly.
14       And for the -- so if we divide it up
15   into sections -- so you get the final 24, 25
16   seconds.  The vertical accelerations are
17   extreme, both in positive and negative,
18   especially in the negative.  That's
19   biomechanically very interesting.
20       The two minutes and four seconds
21   before that, the accelerations are always
22   positive.  I mean, they drop below normal,
23   always positive when they go above.  In that
24   case, biomechanically interesting things happen,
25   but not as interesting as the final 24, 25

THOMAS RICHARD JENKYN, Ph.D.

76

1

2      seconds.  So we ran through that just to, sort

3      of, confirm what I was thinking what's going on.

4              The previous two minutes and 36

5      seconds -- again, the vertical accelerations

6      were abnormal, and they were larger than you

7      would usually expect.  But biomechanically, the

8      motions induced in the body just wasn't

9      interesting enough to justify the computational

10     cost of simulating all that time.

11     Q.    Understood.

12             So it was -- it was too expensive to

13     do the simulation on the entire plane because

14     portion of the flight wasn't biomechanically

15     interesting.

16             Is that right?

17     A.    It didn't -- it didn't require a full

18     simulation.

19             So you can look at the flight data

20     recorder.  And using my biomechanical

21     background, I can infer based on my judgment

22     what I believe would have been going on in the

23     passengers.

24             It just didn't justify doing a full

25     simulation to show that.

THOMAS RICHARD JENKYN, Ph.D.

77

1

2      Q.    When you say "biomechanically

3  interesting," does that mean injury?

4      A.    If you are talking muscular exertion,

5  muscle strain, soft tissue sprain, yes -- but

6  again, a more subtle injury early on compared to

7  the more biomechanically interesting loading

8  that occurs later in the flight.

9      Q.    Is there a definition of

10 "biomechanically interesting" in the field?

11     A.    No.  That is subjective.

12          (Pause)

13     Q.    On item 3, it says you prepared your

14 report with your findings.

15          Correct?

16     A.    Yes.

17     Q.    Are you relying on the output of the

18 simulations you ran as the basis of your

19 findings in this case?

20     A.    No.

21          My initial opinions were based on my

22 background, and looking at the flight data

23 recorder data, and having an idea what I think

24 happened.

25          And then I used the simulations to

THOMAS RICHARD JENKYN, Ph.D.

78

1

2      confirm those opinions.

3                So it's not the entirety.  It's

4      certainly an important portion of it, but it's

5      not the entirety.

6      Q.    Fair to say the basis of your opinions

7      in this case are the -- include the simulation,

8      the literature that you cite in your report, and

9      then your training and experience?

10     A.    Yes --

11     Q.    Anything else?

12     A.    -- and the flight data recorder data.

13     Q.    And the flight data recorder data that

14     you got from Charley Pereira.

15              Anything else?

16     A.    Possibly, but I can't think of what it

17     is at this moment.

18     Q.    Okay.

19              You are not an expert in audiology,

20     are you?

21     A.    No, I'm not.

22     Q.    Or --

23              MR. DURKIN:  Sorry, I didn't hear

24     that.

25              MR. ESSIG:  Audiology?

THOMAS RICHARD JENKYN, Ph.D.

79

1
2              MR. DURKIN:  Okay.  Thank you.
3    BY MR. ESSIG:
4         Q.    What about psychoacoustics?
5         A.    Psychoacoustics?  No.  Sounds cool,
6    though.
7         Q.    It is the study of how humans perceive
8    various sounds.
9              You are not offering any opinion in
10   this case about the sounds the occupants of
11   Flight ET 302 might have heard, are you?
12        A.    No.
13             (Pause)
14             MR. ESSIG:  Will you look at page 36?
15   Are you with me?  Sorry, I am jumping around.
16             THE WITNESS:  Okay.
17   BY MR. ESSIG:
18        Q.    It says:  This report will be
19   supplemented at a later date when data on
20   specific plaintiffs and seating locations
21   becomes available, and the individual cases are
22   set for trial.
23             Do you see that?
24        A.    Yes.
25             MR. DURKIN:  Where is this at?

THOMAS RICHARD JENKYN, Ph.D.

80

1
2                     MR. ESSIG:  Top of the page on 36,
3       first sentence.
4                     MR. DURKIN:  Yeah, thanks.
5                     MR. ESSIG:  Sure.
6       BY MR. ESSIG:
7            Q.    And we mentioned there September 22,
8       right?
9            A.    Yes.
10           Q.    Are you aware that, as of September
11      22, the specific individual cases that are
12      currently set for trial were known?
13           A.    No, I don't believe they were.
14           Q.    You don't know if they were?
15                 Or you weren't aware? --
16           A.    I don't recall.
17           Q.    Okay.
18                 Do you know as of September 22 whether
19      the specific seating locations of the decedents
20      in the individual cases were known?
21           A.    I don't recall.
22           Q.    Were you ever told the individual seat
23      locations?
24           A.    Since September 22?
25                 Or --

THOMAS RICHARD JENKYN, Ph.D.

81

1

2          Q.     When you signed your report?

3          A.     I don't remember if I had them at that

4     point.

5          Q.     Did you ever ask for them?

6          A.     No.

7          Q.     Do you need data on specific

8     plaintiffs, other than the seat location, to

9     conduct analysis that you describe in that

10    paragraph?

11         A.     Sorry, I don't understand the

12    question.

13         Q.     It's not a great question.

14                Did you need any other data on

15    specific plaintiffs, other than the seat

16    location -- because you are saying that that

17    might be provided at a later date -- in order to

18    conduct your analysis on the --

19         A.     Oh, I understand.

20                Yes, you do.

21         Q.     Okay.

22                What kind of data did you need about

23    specific plaintiffs?

24         A.     Height and weight.

25         Q.     Did you ever receive the height and

THOMAS RICHARD JENKYN, Ph.D.

82

1
2      weight for the specific plaintiffs in this case?
3          A.    Yes.
4          Q.    And so you know the range of height
5      and weight of all the passengers on the plane?
6          A.    That's right.
7          Q.    Did you know that at the time that you
8      disclosed your report?
9          A.    No, I don't believe so.  I don't think
10     so, but I don't recall specifically.
11         Q.    I'll represent:  I don't see it ever
12     listed or cited in your report.
13               Is that right?
14         A.    That's right.
15         Q.    So you were given that after you gave
16     your conclusions in the case?
17         A.    That seems reasonable, yeah.
18         Q.    So in terms of "size," you mean
19     height, weight, BMI?
20         A.    BMI is dependent on those two other
21     variables, so I don't need a BMI.
22         Q.    Okay.
23               What about gender?
24         A.    Yeah, gender.
25         Q.    So now you know about the gender, the

THOMAS RICHARD JENKYN, Ph.D.

83

1
2      height, and the weight of the specific
3      passengers.
4              But then you did not?
5      A.      That's right.
6      Q.      Do you know any reason why the
7      information wasn't given to you at the time of
8      your report?
9      A.      I don't know.
10     Q.      Do you know if it was available at
11     that time?
12     A.      I don't know.
13     Q.      And you are aware there was a deadline
14     to submit expert reports in this case?
15     A.      Yes.
16     Q.      And obviously, that was September 22?
17     A.      That's my understanding, yes.
18     Q.      Do you intend to offer any
19     supplemental opinions before trial?
20     A.      I don't know.
21     Q.      When were you first retained to work
22     on this matter?
23     A.      Retained the beginning of January of
24     this year.
25     Q.      So you have been working on this case

THOMAS RICHARD JENKYN, Ph.D.

84

1
2      since January?
3           A.     That's right.
4           Q.     Who contacted you?
5           A.     I was initially interviewed -- I don't
6      actually know who called me first.
7                  But I did do a Zoom interview with
8      Kevin Durkin.
9                  I'm not sure who else was present at
10     that time.
11                 And then the final retention e-mail
12     was sent by Jennifer Gordon from Clifford Law.
13          Q.     So are you retained by Clifford Law in
14     this case?
15          A.     That's right.
16          Q.     Do you know if you've had contact with
17     any other law firms?
18          A.     I have.
19          Q.     Which ones?
20          A.     A number of them that are present here
21     on Zoom calls.
22          Q.     Okay.
23                 Have you had any -- and I know you
24     have, because we talked a little bit about it --
25     but what other experts for the plaintiffs have

THOMAS RICHARD JENKYN, Ph.D.

85

1

2    you had communications with in this case?

3         A.    So, I've talked with Charley Pereira,

4    Jack Suchocki of Eyewitness Animation.

5         Q.    Is he an expert in this case?

6         A.    I don't know what his role is.  I know

7    he produced animation.  I don't know if he's

8    being called as an expert.

9         Q.    Understood.

10        A.    And I talked with Troy -- what's his

11   last name? --

12        Q.    Faaborg?

13        A.    Thank you.

14        Q.    I can help with that.

15        A.    Yeah, I briefly talked to Troy --

16   again over the phone.

17        Q.    When did you talk to him?

18        A.    This was early on.  This would have

19   been March -- March or April.  Again, I don't

20   totally remember, but I know it was early in the

21   process.

22        Q.    What did you all talk about?

23        A.    I think it was just getting every --

24   all the experts together on the phone.

25             I know at that point, I didn't have a

THOMAS RICHARD JENKYN, Ph.D.

86

1
2    lot of the data.  And I certainly hadn't really
3    started the simulations yet.  Sort of an
4    introduction and talking about what each of us
5    were going to do.
6         Q.    What was the purpose of getting all
7    the experts on the phone?
8         A.    Not my call.  I don't know.
9         Q.    Did you rely on the communications you
10   had with Dr. Faaborg?
11        A.    No.
12        Q.    What about Charley Pereira?
13              Did you rely on his expert work?
14        A.    No.
15              Like I said, I used one of his graphs,
16   and he provided me with the flight data recorder
17   data.
18        Q.    Okay.
19              And Jack Suchocki?
20        A.    Suchocki.
21        Q.    Suchocki --
22        A.    -- yeah --
23        Q.    I keep mispronouncing that.
24              He works at Eyewitness Animations?
25        A.    Yes.

THOMAS RICHARD JENKYN, Ph.D.

87

1

2          Q.     Did you talk to anybody else at

3    Eyewitness Animations?

4          A.     No.

5          Q.     You are being compensated for your

6    time in this case?

7          A.     I am.

8          Q.     And your fee includes a $5,000 initial

9    charge to look at documents.

10                Is that right?

11         A.     That's right.

12         Q.     And then you give a confidential

13   verbal opinion?

14         A.     That's right.

15         Q.     Why do you give a confidential verbal

16   opinion?

17         A.     Well, it's like when we were talking

18   earlier about the process.

19                If I review the entire file, often

20   when people are contacting me that -- they don't

21   each know biomechanics exists as a thing.

22   So I'll -- often, if there is an educational

23   process, I'll explain what biomechanics is.

24                And then -- after I've reviewed all

25   the data, I will, sort of, explain what the

THOMAS RICHARD JENKYN, Ph.D.

88

1
2     biomechanics says about the case.
3             I do that confidentially.
4             I'm not sure what the rules are in the
5     U.S., but if I provide an verbal opinion and
6     it's confidential for the lawyer, and they don't
7     want to use it, they take it under advisement,
8     and they don't ever have to disclose it.
9             So quite often -- and this often
10    happens in insurance work -- the lawyer or the
11    insurance company will contact me.  I'll tell
12    them what I think happens.  They don't like it.
13    And then I collect my very small fee, and they
14    go on and settle.
15            So that's why I do it confidentially.
16    So anything I say can be taken under advisement
17    and not hurt their case.
18        Q.    Understood.
19            And that's why you do it verbally?
20        A.    That's right.
21        Q.    Did you do that in this case?
22        A.    Yes.
23        Q.    And you told hem what your initial
24    view of the case was at that time?
25        A.    Yes.

TC REPORTING
(516) 795-7444

THOMAS RICHARD JENKYN, Ph.D.

89

1
2      Q.    What about the rate for your work and
3   testimony in this case?
4      A.    Hm-hmm.
5      Q.    Is it $870 an hour?
6      A.    That's right.
7      Q.    Is that Canadian or U.S. dollars?
8      A.    That's U.S.
9      Q.    How many hours would you estimate you
10  worked on this matter so far?
11     A.    I don't know.  I don't have that
12  number to hand.
13     Q.    Any idea how much you've invoiced the
14  law firms for?
15     A.    I don't have that number at hand.
16     Q.    Do you have a sense of the proportion
17  of the total time from your expert work that
18  comes from this case?
19     A.    So, to give you context, I would say
20  it takes up at least half my time in terms of
21  consulting.
22           Now, I've had multiple cases since
23  January of this year.  They have gone through
24  faster, and require less of my time.
25           But this has taken up, I would say,

THOMAS RICHARD JENKYN, Ph.D.

90

1

2      half of my time.

3          Q.    So for the purpose of this year since

4      you have been retained, half of the time you

5      spend professionally as an expert witness is on

6      this case?

7          A.    Yeah.

8          Q.    It says on page 40 of your -- CV --

9                (Pause)

10         Q.    -- that your client includes Clifford

11     LLP.

12               Do you see that?

13         A.    Yes.

14         Q.    Is that the same Clifford Law Firm

15     that's in this case?

16         A.    Yes.

17         Q.    Do you list this -- is this CV a

18     standard CV you use in all cases?

19         A.    Yes.

20         Q.    So you list Clifford LLP first on your

21     list of clients for every case?

22         A.    I do after this case, yes.

23         Q.    Okay.

24               Besides this matter, have you worked

25     on other matters for Clifford Law?

THOMAS RICHARD JENKYN, Ph.D.

91

1

2      A.      No.    This is the first time I have
3   been retained by them.
4      Q.      So the first time you were ever
5   retained by Clifford was in January this
6   month -- this year?
7      A.      This year, yes.
8      Q.      The other law firms that you list
9   here -- are those all personal injury litigation
10   law firms?
11      A.      Yes.
12      Q.      Is Williams Walsh & O'Connor a
13   plaintiff firm?
14              Do you know?
15      A.      That was a defense case.   That was the
16   Connecticut case.
17              I'm not sure if they only take
18   defense, or only take plaintiff, but that was a
19   defense case.
20              (Pause)
21      Q.      To be clear, you've produced all the
22   biomechanical simulations that you were retained
23   to perform in this case.
24              Is that right?
25      A.      Yes.

THOMAS RICHARD JENKYN, Ph.D.

92

1

2      Q.    And have you produced all the input

3  files you had for each of the biomechanical

4  simulations you performed?

5      A.    Yes.  It's all contained within the

6  simulation files.

7      Q.    Did you produce all the output files

8  associated with the biomechanical simulations

9  that you prepared?

10      A.    Again, the outputs are contained

11  within the simulation file.  So the

12  knowledgeable user with a simulation file can

13  pull every single output that -- that that

14  simulation can provide.

15      Q.    Did you provide your simulation to --

16  the data from your simulations -- to any other

17  disclosed experts to plaintiffs in this case?

18      A.    Yes, I did.

19      Q.    Who did you provide your simulation

20  data?

21      A.    So I provided it to Jack Suchocki and

22  Charley Pereira -- my understanding was, for the

23  purposes of forming the basis for that -- those

24  animations.

25      Q.    And when you provided it to them, what

THOMAS RICHARD JENKYN, Ph.D.

93

1

2      format did you provide it?

3          A.    So I had to take the output from the

4      simulation and turn it into an AVI video file.

5                I also outputted -- at great pains and

6      tedium -- individual joint angles for each time

7      step in the form of an Excel spreadsheet.

8          Q.    So you prepared, sort of, the

9      quantitative data from the simulation -- the

10     output of it -- in a spreadsheet?

11         A.    I've -- I believe -- trying to think

12     if I actually did that in the end, because it

13     was such a pain.

14               And Jack said:  No, all he needs is

15     the video file.

16               So I take that back.  I started to

17     produce it.

18               There was a lot of discussion

19     back-and-forth.  We found it very technically

20     difficult to provide the simulation output in a

21     format that was useful to the animation folks.

22     So a lot of the phone calls I had with them were

23     dealing with technical issues.

24               I think in the end, the Excel wasn't

25     going to work, so I provided AVI files.

THOMAS RICHARD JENKYN, Ph.D.

94

1
2              Now -- yeah, I think it was just AVI
3     video file that they required.  And he needed it
4     from a number of different angles.
5         Q.    So AVI is video?
6         A.    It's a video.  It is like an MP4
7     format.  So AVI is just digital video files.
8         Q.    How many AVI video files did you
9     prepare?
10        A.    I don't know.  I don't remember.
11        Q.    More than 10?
12        A.    More than 10.
13        Q.    And you provided all of them to Jack
14    Suchocki? --
15        A.    That's right.
16        Q.    -- and Charley Pereira?
17        A.    Yes.
18        Q.    Did you produce them with respect to
19    your report in this case?
20        A.    I may not have, simply because you can
21    recreate -- within the simulation file -- you
22    can -- you can run the exact video within the
23    simulation file, so wasn't necessary.
24        Q.    Okay.
25              Did you provide your simulation data

THOMAS RICHARD JENKYN, Ph.D.

95

1

2      or AVI files to anybody else besides Jack and

3      Charley?

4            A.    I mean, we produced it for your

5      discovery.

6                  Did I send it to any other experts on

7      our side?  No.

8            Q.    And to be clear, you didn't produce

9      for purposes of this case the AVI files that you

10     prepared and gave to Suchocki and Charley

11     Pereira, right?

12                 MR. DURKIN:  Objection, just answered.

13           A.    I don't believe I did.

14           Q.    I think your testimony was somebody

15     could look at the output and run them or create

16     them.

17                 But you didn't actually prepare -- you

18     didn't actually produce the AVI file itself?

19           A.    I think that's fair.

20                 (Pause)

21           Q.    Let's jump ahead a little bit.

22                 MR. ESSIG:  If we look at page 13 of

23     the report -- sorry.

24                 Got one more question on the AVI

25     files.

THOMAS RICHARD JENKYN, Ph.D.

96

1

2      BY MR. ESSIG:

3          Q.    Did you prepare an AVI file for every

4      run of the simulation that you did?

5          A.    No.  It was only for the generic -- so

6      if you see in my report, there is a figure where

7      you have three passengers sitting in economy

8      seats:  One is wearing pink, one wearing blue,

9      and one wearing gold.  And that was sort of my

10     generic for --

11         Q.    Okay.

12               So if you go to page 31 of the report,

13     is that what you are talking about?

14         A.    No, everybody had their seat belt on.

15         Q.    Okay.

16         A.    So if you go earlier to page -- well

17     any one of these, page 24 for instance -- you

18     have three generic passengers, different heights

19     and weights.  The window and aisle seats are

20     female; the one in the middle seat is male.

21               I provided -- so I ran the entire

22     simulation with those three economy seat

23     occupants, and then provided those AVIs.

24               MR. ESSIG:  Then the one I had

25     flagged, Figure 13 on page 31.

THOMAS RICHARD JENKYN, Ph.D.

97

1

2    BY MR. ESSIG:

3         Q.    Did you prepare an AVI file for that?

4         A.    I did, yes.

5         Q.    Did you provide that to Suchocki and

6    Pereira?

7         A.    I believe I did, yes.

8         Q.    So I guess back to my original

9    question:  Did you prepare or provide an AVI

10   file for every run of the simulation you did?

11        A.    Not every run of the simulation, no.

12        Q.    Which ones didn't you do?

13        A.    Well, so, after I did this in and

14   initial generic run, to make sure everything was

15   working and things were moving the way it was

16   expected, the next question then came up.

17             We need to model a range of heights

18   and weights.  Because at the time, I didn't know

19   the heights and weights of individual

20   passengers, and I wanted to try different

21   combinations of passengers' heights and weights

22   sitting next to each other.

23             So I then ran a large series of

24   combinations of -- sort of, repeating the

25   simulation, but changing heights, and weights,

THOMAS RICHARD JENKYN, Ph.D.

98

1

2    and who is sitting where.

3            That data I did not provide to Jack.

4    Q.    How many series of simulations did you

5    run?

6    A.    I don't recall at this point, but they

7    were all provided.

8    Q.    Understood.

9            So just to confirm, did you provide

10   the AVI for unrestrained passengers to Jack and

11   Charley?

12   A.    Yes.

13           MR. ESSIG:  If we look at page 13.

14   BY MR. ESSIG:

15   Q.    You say that:  All simulations were

16   performed with a software package called the

17   Human Vehicle Environment.

18           That's in the last sentence on the top

19   paragraph?

20   A.    Hm-hmm.

21   Q.    What is the HVE platform?

22   A.    So the HVE platform allows you to

23   create individual occupants using body models,

24   individual vehicles, and environments.

25           And then within the HVE setup, that's

THOMAS RICHARD JENKYN, Ph.D.

99

1
2      where you would reconstruct vehicle motion and
3      vehicle collisions.
4             So you put -- it's usually cars.  You
5      put the cars on the road.  You crash them into
6      each other.  You iterate the inputs and -- the
7      driver inputs -- and reactions until you match
8      the physical evidence.
9             That's the HVE platform.
10     Q.    Yeah.
11            And "software package platform" -- we
12     are using that word synonymously?
13     A.    Yeah.
14     Q.    Was the HVE software package designed
15     to be used for automobile accident
16     reconstruction?
17     A.    So HVE was originally for automobiles.
18            But the version that I have -- which
19     is full, three-dimensional HVE -- is capable of
20     doing motions in all three axis directions, with
21     rotations on all three axis directions.  So it's
22     well within in its capability to do aircraft.
23     Q.    Okay.  Understood.
24            It's -- your opinions in this case --
25     it's within its capability to do aircraft, but

THOMAS RICHARD JENKYN, Ph.D.

100

1

2      it's original design was for automobiles, right?

3          A.      HVE.

4                  GATB, though, is a different matter.

5                  So GATB is a module that's run now

6      within HVE.

7                  So HVE is very useful because you've

8      got the -- you've set up the environment.

9      You've got the physics engines to get the

10     vehicles moving.

11                 But GATB is specific software that

12     models the motion of the occupants of the body,

13     whether it's occupants of a vehicle, or a

14     pedestrian, or somebody riding a bicycle.

15                 Now, that data -- that software was

16     originally created by the U.S. Air Force in the

17     late '60s in the form of ATB to specifically

18     study the motion of air crew, pilots within

19     aircraft as it is undergoing different

20     accelerations specifically -- my

21     understanding is -- it was originally created to

22     simulate air crashes, so that you can redesign

23     aircraft interiors and restraint systems to

24     improve survivability.

25         Q.      It was looking at simulating the

THOMAS RICHARD JENKYN, Ph.D.

101

1

2      effects of a crash, or an accident on the

3      cockpit of an airplane and whether a pilot would

4      be ejected?

5          A.    Whether the pilot would hit different

6      parts of the interior of the aircraft; whether

7      the restraint system would cause injuries;

8      again, how -- during an air crash or during an

9      adverse event, how would the occupants of an

10     aircraft move?

11         Q.    Why did you select the HVE platform

12     using the GATB for purposes of this case?

13         A.    I have been using it since 2009 and I

14     find it quite versatile.

15              It's also been accepted at court.  It

16     has an extensive list of being accepted at

17     court.

18              And I find with the ellipsoid model of

19     GATB, it's robust; it models things very

20     realistically; and it's not computationally

21     heavy.

22         Q.    Did you consider using any other

23     platform?

24         A.    I've used MADYMO in the past.

25              And an interesting thing, I like

THOMAS RICHARD JENKYN, Ph.D.

102

1

2      MADYMO.  I have actually used MADYMO

3      academically.

4                Now, MADYMO has three modes.

5                The first mode is an ellipsoid model,

6      similar to GATB.  And it behaves pretty much the

7      same way.

8                Then there is the second mode where

9      you can -- they have got virtual models of

10     actual crash test dummies -- like the Hybrid III

11     and that sort of thing -- so you can virtually

12     do crash test simulations.

13               Then the third mode is much more

14     computationally heavy.  That's where you use a

15     finite element approach using LS-DYNA.

16               And that's -- I've used a little bit

17     in my academic work.

18               Then you can actually model individual

19     tissues, skin, muscle, epidermis, bone -- that

20     sort of thing.  You can put seat belts on and

21     whatnot.

22               The problem is you can only do short

23     little snippets of time.  And you can't have the

24     whole body, sort of, riding up and looking at

25     things over, you know, tens of seconds.

THOMAS RICHARD JENKYN, Ph.D.

103

1

2          So MADYMO -- if I would have used

3     MADYMO, I would have used the ellipsoid model.

4          And if I'm going to use the ellipsoid

5     model, I'm just going to use the GATB model,

6     because in my opinion they are pretty much

7     synonymous.

8          Q.    MADYMO is a finite element analysis?

9          A.    One of the modes that it runs, yes.

10         Q.    A finite element might be like a seat

11    belt or something like that?

12         A.    No.

13              So with finite elements, you take, for

14    instance -- well, let's say I take my forearm

15    and I divide that up into, say, 100,000 little

16    bricks.  And each brick can represent -- you

17    know, I've got a whole lot of bricks that

18    represent skin.  And then underneath, I've got

19    bricks that represent the dermis.  I've got

20    bricks that represent bones.  And they each have

21    different material properties, and they connect

22    to each other.

23              And then you apply a load, or an

24    acceleration, or a contact.  And then you

25    calculate how the shearing or how the stress

THOMAS RICHARD JENKYN, Ph.D.

104

1

2      loading of different types goes through the

3      individual tissues.

4          Q.    Does that greater level of detail

5      allow for a more robust ability to conclude if

6      there was an injury or not?

7          A.    The problem is this:  There is always

8      a tradeoff in engineering.  So some tools are

9      good for answering one question, but not very

10     good at answering another.

11              So if the question is how does an

12     overall body move when it's experiencing a large

13     vertical acceleration, it's not going to be able

14     to do it because you can't model the entire

15     body.  And you can't do it over the time frame

16     that the accelerations are being applied.

17         Q.    Understood.

18              So you used GATB as the model for the

19     purpose of this exercise?

20         A.    That's right.

21         Q.    Is it important to pick a model of the

22     human body that best represents all the

23     variation that might occur in a given accident?

24         A.    Well, it's the way Einstein said it:

25     You need to choose a model that's complex enough

THOMAS RICHARD JENKYN, Ph.D.

105

1

2       to answer the questions you've got, but it

3       shouldn't be any more complex than that.

4           Q.     What do you think the key

5       characteristics of a model are in terms of

6       evaluating its appropriateness of use in a

7       specific accident reconstruction?

8           A.     So if we are looking at bodies

9       undergoing vertical accelerations when they are

10      sitting in a seat, you are going to need the

11      bodies who have enough rigid segments to

12      represent each of the body parts.  They are

13      going to have to meet at joints that are

14      reasonably representative of the joints.

15              Each segment has to have a reasonable

16      length, a reasonable mass, and a reasonable mass

17      moment of inertia in terms of rotational

18      resistance, so that now you get the interaction

19      between the linked rigid segments.  As the

20      entire body undergoes those accelerations, there

21      are interactions between each of those segments

22      and their neighbors, and those segments and any

23      contact surface they are in contact with.

24              MR. ESSIG:  Should we take a quick

25      break?

THOMAS RICHARD JENKYN, Ph.D.

106

 1
 2                    MR. DURKIN:  Yeah, we have been going
 3      about an hour 25, whenever you are ready.
 4                    MR. ESSIG:  Do it.
 5                    MR. DURKIN:  Ready?  Okay.
 6                    MR. ESSIG:  Sounds good to me.
 7                    THE VIDEOGRAPHER:  All right.  We are
 8      going off the record.  The time is 10:02 a.m.
 9                    (Recess from 10:02 a.m. to 10:20 a.m.
10      Eastern Standard Time)
11                    THE VIDEOGRAPHER:  We are going back
12      on the record.  The time is 10:20 a.m.
13   BY MR. ESSIG:
14                    MR. ESSIG:  We have been told by the
15      court reporter to do less talking over each
16      other and try to talk a little slower, so I'll
17      do my best to do both those things.
18                    THE COURT REPORTER:  Thank you.
19                    MR. ESSIG:  Again, I just want to be
20      clear -- well, let's turn to page 13 of the
21      report.
22                    That's where we were?
23                    THE WITNESS:  Okay.
24                    MR. ESSIG:  If you go down to the
25      second-to-last paragraph, it starts:  In the

THOMAS RICHARD JENKYN, Ph.D.

107

1
2    series of simulations?
3                THE WITNESS:  Hm-hmm.
4    BY MR. ESSIG:
5        Q.    The third sentence there says:  The
6    simulation calculates how each of the body
7    models were biomechanically loaded during the
8    last 150 seconds of the crash flight, with focus
9    on the last 24 seconds.
10               Do you see that?
11       A.    Yes.
12       Q.    Is it -- just to be clear, because we
13   talked about this a little bit before -- is it
14   true that the simulation that you performed only
15   calculates how the body models were
16   biomechanically loaded during the last 150
17   seconds of the crash?
18               Or a greater time period than that?
19       A.    As a part of the initial work, I think
20   I did more than that.
21               But for the purposes of this report,
22   150.
23       Q.    Okay.
24               If you go down to the bottom paragraph
25   there, it says:  Each human body model consists

THOMAS RICHARD JENKYN, Ph.D.

108

1

2    of 15 linked segments that are connected at 14

3    discrete joints.

4              Do you see that?

5        A.    Yes.

6        Q.    How many body segments and discrete

7    joints can the GATB model actually incorporate?

8        A.    That's it.

9        Q.    You don't believe that they could do

10   17 segments and 16 joints?

11       A.    With some tweaks, you can do that.

12             But the program is usually used in

13   this default mode.

14       Q.    Okay.

15             Did you consider whether or not you

16   should use all the joints and body segments in

17   your model --

18       A.    Yes --

19       Q.    -- that the program was capable of

20   simulating?

21       A.    -- again, that was as complex as it

22   needed to be to be able to answer my questions.

23       Q.    And the links that you left off of

24   your model that the program could actually model

25   are the hands and wrists.

THOMAS RICHARD JENKYN, Ph.D.

109

1

2          Is that right?

3     A.    That's right.

4     Q.    Why did you leave the hands and wrists

5   off the models that you utilized for the purpose

6   of this report?

7     A.    A, it's more computationally

8   efficient.

9          B, once I had done the initial series

10  of -- started doing the simulations, it became

11  clear that I couldn't draw any firm conclusions

12  about where hand and arms went and what they

13  hit.

14         The initial thinking was:  We can draw

15  some firm conclusions to this person would

16  always hit the person next to them, or they'd

17  always hit the bin bottom.

18         That turned out not to be the case.

19         So arms would sort of stochastically

20  go in different directions with each simulation.

21         And so since I wasn't going to draw

22  any firm conclusions on what the arms were going

23  to do, I may as well make the simulation more

24  computationally efficient.

25    Q.    So to be clear, just to understand

THOMAS RICHARD JENKYN, Ph.D.

110

1
2    your testimony, you couldn't determine through
3    your simulation whether the hands or wrists or
4    forearms of a passenger was striking any object
5    on the airplane.
6              Is that right?
7         A.    It wasn't predictive.
8              Now, if you run a series of
9    simulations, a hand would hit something.
10             But could I always say that if you
11   have a 50th percentile female sitting next to a
12   50th percentile male, that she always catches
13   him in the face with the elbow?  No, I can't say
14   that.
15        Q.    And you left the hand and wrists off
16   the model in your simulation, so you actually
17   don't have any data on that at all, right?
18        A.    Well, the hand is included in the
19   forearm.
20             So what we really have -- so if you
21   look at the forearm segment, or final segment on
22   the arms, it's long enough to incorporate the
23   hand.
24             We just don't have a wrist segment --
25   or a wrist joint.

THOMAS RICHARD JENKYN, Ph.D.

111

1

2      Q.    So you don't have a wrist joint or a

3   hand segment on your model.

4            Is that right?

5      A.    Well, your final segment -- forearm

6   plus hand.

7      Q.    Okay.

8            And then I think your testimony also

9   was that, when you ran the simulation and you

10   looked at the movement of the arms --

11   forearms -- the aspect -- the body segments that

12   you did include in your model -- they didn't

13   always touch the person next to them or the

14   surface of airplane.

15            Is that right?

16      A.    That's right.

17      Q.    So there is variability in the model

18   about whether or not people would have made

19   contact with their arms or hands?

20      A.    I think the model was accurately

21   modeling of physics.

22            I think the physics had a stochastic

23   element to it.

24            So once those arms start moving, it's

25   difficult to predict, population-wide, where

THOMAS RICHARD JENKYN, Ph.D.

112

1

2    exactly an arm is going to go for those same

3    accelerations.

4              So the model is repeatable.

5              If I reran the simulation with all the

6    same conditions, it would give me the same

7    answer.

8              It's just in the different

9    combinations, as you put different size people,

10   male and female, next to each other, sometimes

11   an arm goes up this way, sometimes it goes up

12   that way.

13        Q.   So did your model show that somebody

14   always made contact with a passenger or the

15   contact surfaces of the airplane when the

16   simulation was done?

17             Or not?

18             MR. DURKIN:   Objection, calls for a

19   legal conclusion.

20             Go ahead.

21             MR. ESSIG:   It is not a legal

22   question.

23             MR. DURKIN:   Yeah -- well --

24             MR. ESSIG:   I am just asking --

25             MR. DURKIN:   -- form of the question.

THOMAS RICHARD JENKYN, Ph.D.

113

1

2          You are correct.  It is not.

3          Form of the question.  I --

4          MR. ESSIG:  No problem.

5     A.    So I ran a lot of simulations with a

6     lot of different combinations.  Sometimes arms

7     would hit elbows.  Sometimes arms would hit

8     faces.  Sometimes different things would hit

9     different things.

10          What I was trying to get at with the

11     simulations is:  What always happens?

12          And so I couldn't draw any firm

13     conclusions as to where the hands would go if, a

14     priori, I didn't know who the person sitting in

15     the aisle seat was, and what height and weight

16     they were.  I couldn't predict exactly where

17     their arms would go.

18          So I didn't draw any firm conclusions

19     on that.

20     Q.    My question was:  Did they always

21     contact a person or a contact surface in the

22     airplane? --

23     A.    Did every --

24     Q.    -- in your simulation?

25          MR. DURKIN:  Objection, once again,

THOMAS RICHARD JENKYN, Ph.D.

114

1

2    form of question.

3        A.    Yes.  But often that contact was on --

4    so if you are talking about an arm, it would

5    contact their own chest; so less interesting

6    compared to, say, an elbow going up and catching

7    the person next to them, or forcefully putting

8    their forearm and hand segment into the bin

9    bottom.

10            So it always contacted something.

11            Certainly the armrests, because you

12    are in close proximity.  Obviously, the chest

13    and abdomen and pelvis segments were always in

14    contact with the seat, at least at some portion

15    of the simulation, so the arms would go up and

16    come down and hit the armrests.

17            What I was really getting at is as the

18    plane is undergoing these accelerations, could

19    you always say that somebody would always do

20    something like this?  Maybe hit the person next

21    to them, maybe hit them hard enough to fracture

22    a cheek, or bruise them, or that sort of thing?

23            I couldn't -- that didn't always

24    happen, so I didn't draw any firm conclusions

25    about that.

THOMAS RICHARD JENKYN, Ph.D.

115

1

2      Q.    Did the simulation model whether or

3   not the hands or arms contacted the other

4   passengers or the surfaces of the airplane

5   sufficiently hard enough to cause injury in

6   every run that you made?

7      A.    No.

8            MR. DURKIN:   Object.

9      Q.    Did you assess statistically what the

10   variation was in the instruction of results for

11   hands and arms and the contact points in the

12   airplane?

13      A.    I didn't.

14      Q.    So you don't know if they are

15   statistically significant results that you

16   found?

17            Or not?

18      A.    I don't think that -- I don't think

19   you are asking that question right.

20      Q.    And yeah, I might not be.  I'm not an

21   expert.  So just --

22      A.    No.  In that case, I wouldn't be

23   looking at statistical significance.

24            What I would be looking at is:  What

25   are the proportions for a certain person hitting

THOMAS RICHARD JENKYN, Ph.D.

116

1

2      a certain thing out of all the simulations?

3              So did I do that analysis?  I could

4      have run trends for -- you take a -- say,

5      females between 25 and 5 percentile height and

6      weight, and say:  What proportion will always

7      hit the person next to them, so long as they are

8      in -- sitting in the aisle seat, and that sort

9      of thing?  I didn't do that analysis.  Could

10     have.

11             The problem is you have so many

12     variables.  The question is:  What's the

13     question we are really trying to answer?

14             And the main question was:  If the

15     arms are flailing around and moving around

16     during the crash flight, will they always injure

17     their arms?  And the answer to that is:  No.

18     Q.    Your GATB simulations don't model

19     whether passengers could have done things

20     affirmatively with their hands, such as hold on

21     to their laps or their armrests.

22             Is that right?

23     A.    Yes and no.  Well, we don't have

24     hands.

25             But even if we did have hands, can the

THOMAS RICHARD JENKYN, Ph.D.

117

1

2      hand segments grip the armrests?  Again, yes and

3      no.

4                  You can apply constraints where the

5      hands won't lift -- leave the armrests.  And

6      then you can calculate reaction forces required

7      for that --

8          Q.    Do you do that calculation?

9          A.    I didn't do that.

10                 And, sort of, more to your point:  Did

11     I model stiffness in the shoulders and the

12     elbows?  No.  Could I have?  Yes.

13                 And that would have modeled whether

14     the person is physically holding their arms

15     down.

16                 So I didn't model that --

17         Q.    Okay --

18         A.    -- why not?  So, why not?

19                 Here is the question.  So we have

20     incomplete information.  If you look at seat

21     35A, maybe I can know their height and weight,

22     but I don't know -- I don't know if they held

23     the armrest.  I don't know if they were

24     completely relaxed.  I don't know if they were

25     initially holding the armrest, then let go.

THOMAS RICHARD JENKYN, Ph.D.

118

1

2          So as the engineer who is modeling

3    this, I have to make a judgment call.  I have to

4    say:  How can I make this model the most

5    conservative, where I make as few assumptions as

6    possible?  Because as soon as I make an

7    assumption, I am adding something of myself to

8    it.

9          So how can I make as few assumptions

10   as possible?  And the way you do that most

11   conservatively is you keep the shoulders

12   relaxed.

13          Could they have held on to the armrest

14   during this?  Certainly that seems to be a

15   reasonable thing.  But, again, I'm not drawing

16   any firm conclusions about the arms.

17          So if the shoulders are completely

18   loose and the arms move just up and down with

19   the accelerations, do I know for sure that

20   everybody did that?  No.  Do I know a bunch of

21   people did that?  Yes.  But a bunch of other

22   people might have held on to the armrest.

23          Again, it's a conservative simulation.

24          And I'm not drawing any firm

25   conclusions on what the arms did in terms of

THOMAS RICHARD JENKYN, Ph.D.

119

1

2    injury causation.

3        Q.    Okay.

4              How do you know that some of the --

5    that some people on the airplane would have

6    moved their arms up and down, or not braced at

7    all, not reflexively grabbed anything?

8        A.    Okay.  Can you know that every single

9    person? -- you can't know that.  Unless you have

10   got video within -- within the aircraft, and you

11   are watching what everybody does, we don't

12   know --

13       Q.    Okay.

14       A.    -- nobody knows.

15             But couple reactions for people in

16   that situation:  Grip your armrest, you brace

17   yourself back into your seat, or you don't and

18   your arms are moving around.

19             And then you've got variations on the

20   theme between you started off gripping and you

21   then -- for whatever reason, you let go; or if

22   your arm is released; or your arms were

23   initially like that, and you gripped your

24   seat -- armrest.

25             We don't know.

THOMAS RICHARD JENKYN, Ph.D.

120

1

2          So you to have make the most

3    conservative assumption -- the least number of

4    assumptions -- to say:  All right, the arms are

5    going to be moving up and down.

6          But then it means you didn't with

7    confidence predict what the causation of injury

8    are in the arms, because you can't know that.

9          And so I didn't.

10    Q.    So if you were to -- it sounds like

11    you are describing a situation in the airplane

12    where the movement of the arms, whether somebody

13    grabbed the -- and held the seat rest, put them

14    under their lap, braced in some way, or whether

15    they let their arms go up and down would be

16    variable in the airplane --

17    A.    That's right --

18    Q.    -- during the accident flight, right?

19    A.    -- yes.

20    Q.    So if you were to put together a

21    demonstrative or animation about the accident

22    flight, you would expect that some of the

23    passengers would have their arms up moving

24    around potentially, and some of the

25    passengers -- some proportion of the passengers

THOMAS RICHARD JENKYN, Ph.D.

121

1
2    would have their arms down and grabbing the
3    seats, or bracing to try to prevent that.
4              Is that right?
5              MR. DURKIN:  Objection to the form of
6    the question.
7         A.   Possible.
8         Q.   It would be inaccurate to show either
9    way -- right? -- everybody arms going up?
10             Or nobody's arms going up?
11             MR. DURKIN:  Objection, form of the
12   question.
13        A.   I wouldn't say inaccurate, because you
14   don't know what the actual answer is.
15             I would say:  You can't with
16   confidence.
17             I wouldn't say:  It's inaccurate.
18   Accuracy requires you knowing the answer.
19        Q.   So not only is there variability in
20   the response, but you don't even have any idea
21   if it was everybody's arms up, or everybody's
22   arms down?
23             You just don't know at all?
24        A.   I can't know that.
25        Q.   So just to be clear, you are not

THOMAS RICHARD JENKYN, Ph.D.

122

1
2       offering any opinion that the passengers were
3       injured due to the arms striking each other or
4       the structures in the airplane.
5                   Is that right?
6       A.      That's right.
7               (Pause)
8                   MR. ESSIG:  Can we get tab 6?
9               (Pause)
10                  MR. ESSIG:  I think this is Exhibit
11      291?
12                  THE VIDEOGRAPHER:  That is correct.
13                  (Exhibit 291, Multipage document
14      entitled: United States Air Force Research
15      laboratory Articulated Total Body Model Version
16      V User's Manual, dated February 1998 (no Bates
17      Nos.), marked for identification)
18                  MR. ESSIG:  And Dr. Jenkyn, do you
19      have Exhibit 291 in front of you?
20                  THE WITNESS:  I do.
21      BY MR. ESSIG:
22      Q.      And this is entitled:  United States
23      Air Force Research Laboratory Articulated Total
24      Body Model Version V User's Manual?
25                  Is that right?

THOMAS RICHARD JENKYN, Ph.D.

123

1

2          A.     Yes.

3          Q.     Is this the user's manual you used for

4     the purposes of this case?

5          A.     No.  I have an updated version of this

6     that comes with GATB.

7          Q.     Okay.

8                 So the manual that we are marking as

9     an exhibit here -- it's something you cite in

10    your report, correct?

11         A.     Yes.

12         Q.     So it's still an accurate

13    representation of what the model does?

14         A.     It was at the time that this was

15    published --

16         Q.     Okay.

17         A.     -- which I believe is '98.

18         Q.     Okay.

19                MR. ESSIG:  So if we look at page 19,

20    there is a description of a belt restraint

21    system that's provided in the ATB model.

22    BY MR. ESSIG:

23         Q.     Do you see that?

24         A.     Yes.

25         Q.     Is that an accurate description of the

THOMAS RICHARD JENKYN, Ph.D.

124

1

2      current belt restraint system?

3           A.    It still works that way.

4           Q.    So this -- the document we are looking

5      at -- this particular section is accurate with

6      respect to your model, right?

7           A.    Just with a brief perusal, it looks

8      that way.

9           Q.    Okay.

10               And so I want to look at the -- the

11     first sentence says:  The ATB Model provides two

12     options for modeling of a belt restraint system:

13     The simple belt and the harness belt.

14               Do you see that?

15          A.    Yes.

16          Q.    And you used the simple belt system?

17          A.    I did.

18          Q.    And it says:  In a simple belt system,

19     each restraint belt is assumed to lie in a plane

20     defined by two anchor points attached to a

21     segment (usually the vehicle) and by a fixed

22     point on a contact ellipsoid rigidly attached to

23     some other segment (see Figure 16).

24               Do you see that?

25          A.    Yes.

THOMAS RICHARD JENKYN, Ph.D.

125

1

2      Q.      Is that is a correct description about

3    how the simple belt system worked in your ATB

4    model?

5      A.      Yes.

6      Q.      The model then explains some

7    limitations about the seat belt simulation?

8      A.      Hm-hmm.

9      Q.      So the sentence says -- right after

10   the one we just read:  Therefore, the belt is

11   restricted to pass around a single segment.

12           Do you see that?

13     A.      Yes.

14     Q.      Did you restrict the simple belt in

15   your model to pass around a single segment?

16     A.      Yes.

17     Q.      So if the seat belt was higher or

18   lower on somebody, you never modeled that?

19     A.      That's right.

20     Q.      And you have no conclusion about

21   whether there was injury caused by the placement

22   of the seat belt differently on a segment.

23           Is that right?

24     A.      The assumption for every simulation

25   was that the seat belt was properly fitted on

THOMAS RICHARD JENKYN, Ph.D.

126

1

2      the pelvis.

3          Q.     And the next sentence says:   The main

4      limitation of the simple belt model is that the

5      point at which the belt contacts a segment is

6      fixed to the segment and moves with it.

7                 Right?

8          A.     Yes.

9          Q.     Can you describe what that limitation

10     means?

11         A.     It means you can't have relative

12     sliding motion between the belt and the segment.

13                So, for instance, if you are wearing

14     your seat belt and you kind of shift your

15     weight, the set belt would move relatively to

16     that segment.   That can't be modeled here.

17         Q.     Do you agree that was a limitation of

18     the model you used?

19         A.     I mean, it's how it modeled it.

20     Whether or not it misses out important features

21     of the biomechanics, I don't think so.

22         Q.     Did you confirm whether or not it

23     does?

24         A.     No, I didn't.

25         Q.     So you don't know whether or not it

THOMAS RICHARD JENKYN, Ph.D.

127

1

2      actually misses out on an important

3      characteristic of the biomechanics in the

4      accident, do you?

5           A.    Well, no.  I have good reason for

6      making that judgment.

7                 In a properly-fitted seat belt -- so

8      we have limited ourselves to the assumption that

9      every set belt is properly fitted.  And that

10     actually means something quite specific.  It

11     means the seat belt is the right tension; that

12     it fits evenly over the two anterior superior

13     iliac spines.

14                And so your contact force for a

15     properly-fitted seat belt only goes through the

16     ASISs on either side.

17                So if I shift, the seat belt is still

18     on my ASISs.  It's just a different part of the

19     belt.

20                And if I shift back, the seat belt is

21     still impinging on my ASISs.  It is still loaded

22     biomechanically the same way.

23          Q.    The seat belt model --

24                MR. DURKIN:  You were done?  You were

25     done with your answer?

THOMAS RICHARD JENKYN, Ph.D.

128

1

2                    THE WITNESS:  Yes.

3                    MR. DURKIN:  I wasn't sure if he was

4        done.

5                    MR. ESSIG:  I think he was done.

6                    MR. DURKIN:  You are pretty quick --

7                    MR. ESSIG:  Sorry --

8                    MR. DURKIN:  -- today --

9                    MR. ESSIG:  -- just trying to get

10       through this --

11                   MR. DURKIN:  -- I know that.  I just

12       want to make sure he gets all his answers out --

13                   MR. ESSIG:  -- I think he is --

14                   MR. DURKIN:  -- well --

15                   MR. ESSIG:  Any way -- you can object

16       if you want.

17                   MR. DURKIN:  Yeah, I just want to make

18       sure he got it out.  That's all, Chris.  I --

19                   MR. ESSIG:  He did.

20                   MR. DURKIN:  -- okay, thanks.  I got

21       that now.

22       BY MR. ESSIG:

23           Q.    So on the Figure 16, it has a single

24       contact point, correct?

25           A.    Right.

THOMAS RICHARD JENKYN, Ph.D.

129

1

2      Q.    So it isn't modeling the seat belt

3  oriented on two points of contact on the hip.

4            It is just a single point of an

5  ellipsoid segment, right?

6      A.    No.

7            So you've got two segments for seat

8  belt.  There is one on the left-hand side and

9  the right-hand side.

10           And that goes from an anchor point to

11 a contact point on the pelvis -- or at least in

12 my model.

13           And then you've got one on the other

14 side going from a different anchor point to a

15 second contact point on the pelvis.

16           So those two contact points are

17 modeling where the ASIS is on the pelvis for

18 each occupant body model.  And so the loading is

19 always applied at the ASIS.

20     Q.    In real life, if you have a seat belt

21 fixed appropriately on your pelvis, the force

22 that is applied to the seat belt would be

23 diffused across the whole belt, right?

24     A.    No.

25     Q.    No?

THOMAS RICHARD JENKYN, Ph.D.

130

1

2          A.     No, that is actually very dangerous.

3          Q.     Okay.

4          A.     The whole design of a seat belt is to

5      provide biomechanical restraint loads, which can

6      be quite large, into your bones.

7               And where your bones stick out on your

8      pelvis is your ASIS.  And so you really -- when

9      you tighten up the belt, yes, it's lying across

10     all the soft tissue of your abdomen as well.

11     But when you actually apply the load to the seat

12     belt, you do not want the biomechanical load

13     going through your abdomen.

14         Q.     And that's slightly different than

15     what I asked.

16              The force on the seat belt wouldn't be

17     focused on a single point of contact with two

18     anchor points.

19              It would be diffused across the entire

20     seat belt, right?

21         A.     No, that's the question I answered.

22              And no, that's not the case.

23         Q.     Okay.

24              We talked about bracing and gripping

25     the surfaces in the airplane, right?

THOMAS RICHARD JENKYN, Ph.D.

131

1

2          And you'd agree the simulation that

3   you used in this case didn't simulate how

4   somebody might have braced or held on against

5   the forces experienced on the flight?

6          A.     That's right.

7          Q.     Is it true that the software that you

8   used -- the GATB model -- only models passive

9   representations of humans?

10         A.     What do you mean by that?

11         Q.     It only models a passive occupant or

12  an inert occupant.

13         It doesn't model the reflexive nature

14  of a person to grip or brace during a

15  simulation?

16         A.     I'll put some physics words to it.

17         Can I predict the forward dynamics of

18  the body doing something that isn't just a

19  reaction to its environment?  You are correct.

20         So if I -- for instance, if I wanted

21  the body model to flex its elbow, I can't do

22  that.

23         But what I can do is I can stiffen the

24  elbow so that when an external load is applied

25  to it, it moves with some resistance.

THOMAS RICHARD JENKYN, Ph.D.

132

1

2      Q.     Okay.

3             You didn't do that in this exercise,

4      correct?

5      A.     I did.

6             So a number of the joints were

7      stiffened.

8             And, again, you want to make this body

9      as conservative as possible.  So, yes, I have to

10     make a decision a priori as to stiffening the

11     joints.

12            So I stiffened the two knees, the two

13     hips, the joint between the pelvis and the

14     abdomen, and the abdomen and the chest, bottom

15     of the neck, and the top of the neck.

16            And I did that because if you place --

17     if you place your body model in a seat and 1 g

18     of gravity acts on it, the thing is going to

19     slump forward.

20            So you stiffen up those joints just

21     enough so that the body model sits up in a seat

22     the way a person would sit up in a seat.  No

23     more than that, but just enough so that it sits

24     without slumping forward.

25     Q.     Did you stiffen it up enough to

THOMAS RICHARD JENKYN, Ph.D.

133

1

2      replicate how a person might resist g-forces?

3          A.    No.

4          Q.    So when a g-force is applied to the

5      stiffened model that you used, it reacts

6      passively?

7          A.    It does.

8              (Pause)

9              MR. ESSIG:  Let's look at this tab

10     again, which is Exhibit 291, on page 5.

11             (Pause)

12     BY MR. ESSIG:

13         Q.    Okay.  If you look at the first

14     paragraph, it says:  The Articulated Total Body

15     Model is primarily designed to evaluate the

16     three-dimensional dynamic response of a system

17     of bodies where the -- when subjected to a

18     dynamic environment consisting of applied forces

19     and interactive contact forces.

20             Do you see that?

21         A.    Yes.

22         Q.    Although the ATB model was originally

23     developed to model the dynamic response of crash

24     dummies and, with later modification, response

25     of a human, the ATB Model is quite general in

THOMAS RICHARD JENKYN, Ph.D.

134

1

2      nature and can be used to simulate a wide range

3      of physical problems that can be approximated as

4      a system of connected or free bodies.

5              Do you see that?

6      A.    Yes.

7      Q.    Do you agree with that last statement?

8      A.    Yes.

9      Q.    It was originally developed to the --

10     model the dynamic response of crash dummy?

11     A.    It was.

12     Q.    Okay.

13             And there, they mean an actual model

14     of, like, a crash dummy.

15             Is that right?

16             Like, the Hybrid III dummy?

17             Or something like that?

18     A.    Well, it wasn't -- not with the same

19     geometry that MADYMO had of an actual dummy.

20             But the idea was you have got a linked

21     series of rigid segments.  And that when

22     originally ATB was validated, they validated it

23     against crash test dummies.

24     Q.    And you stiffened the joints at

25     certain segments of the model that you used.

THOMAS RICHARD JENKYN, Ph.D.

135

1

2               But the human models in your

3    simulation still are passive like a crash test

4    dummy, right?

5               They move when there is force applied

6    to them?

7        A.    That's right.

8        Q.    And they can't simulate resisting

9    forces, or bracing, or holding on beyond this

10   original stiffness that you added?

11       A.    You are right.

12              MR. ESSIG:  If you look at -- it's

13   marked tab 39.

14              (Pause)

15              MR. ESSIG:  I think this is Exhibit

16   292 -- or 3.

17              (Exhibit 292, Four-page document

18   entitled: TLS Forensic Engineering Collision

19   Reconstructi (no Bates Nos.), marked for

20   identification)

21              THE WITNESS:  Hm-hmm.

22              (Pause)

23   BY MR. ESSIG:

24       Q.    So do you recognize this document?

25              And to orient you, I'll represent this

THOMAS RICHARD JENKYN, Ph.D.

136

1

2    is a printout of several pages of your website.

3         A.   Okay.

4         Q.   Do you recognize that as an accurate

5    printout of a part of your website?

6         A.   I recognize you probably got it

7    from my website -- yeah hopefully, my website

8    doesn't like this.

9         Q.   It doesn't look like this when you go

10   to the World Wide Web and look at it, but this

11   is the way it printed out.

12        A.   Okay.

13        Q.   And so we are talking about the

14   virtual human models in the GATB software for

15   the HVE package.

16             MR. ESSIG:  If you go to the last page

17   of this website printout --

18             THE WITNESS:  Hm-hmm.

19             MR. ESSIG:  -- are you with me?

20             THE WITNESS:  Yes.

21   BY MS. BRENNER:

22        Q.   The first paragraph says:  TLS uses

23   state-of-the-art-science software packages Human

24   Vehicle Environment (HVE; Engineering Dynamics

25   Corporation) and Graphical Articulated Total

THOMAS RICHARD JENKYN, Ph.D.

137

1

2          Body (GATB; Collision Engineering Associates) to

3          simulate collisions, occupant biometrics, and

4          pedestrian mechanics -- biomechanics.

5                    Do you see that?

6          A.    Yes.

7          Q.    That's what you did in this case?

8          A.    Yes.

9          Q.    It says that:  HVE is industry

10         standard in collision & accident reconstruction

11         and simulation has been validated against staged

12         and real-world collisions.

13                   Correct?

14         A.    Yes.

15         Q.    That's what we were talking about the

16         validation against real-world scenarios?

17         A.    Hm-hmm.

18         Q.    They are saying that the software

19         platform has been validated against staged and

20         real-world collisions.

21                   But that doesn't mean that any

22         particular model that somebody develops using

23         that software is actually validated against

24         real-world situations, correct?

25         A.    Not unless you do that direct

THOMAS RICHARD JENKYN, Ph.D.

138

1
2      validation we were talking about.
3          Q.    All right.
4               And you didn't do that in this case?
5          A.    I did not.
6          Q.    And the second paragraph there says:
7      The biomechanics acting on people in the
8      collision, the vehicle occupants and
9      pedestrians, are simulated with GATB software
10     module within the HVE package.
11              Do you see that?
12         A.    Yes.
13         Q.    And you cite Grimes and Cheng, et al.?
14         A.    Yes.
15         Q.    Add those are -- those are cited in
16     your report, too?
17         A.    Yes.
18         Q.    Then it says:  Virtual human models --
19     (really, virtual crash test dummies) represent
20     each person involved in the collision to
21     simulate the physics induced on their body
22     segment.
23              Is that right?
24         A.    Yes.
25         Q.    Is that a fair statement of what you

THOMAS RICHARD JENKYN, Ph.D.

139

```
 1
 2    did in this case?
 3            You modeled a virtual crash test
 4    dummy?
 5        A.    So you are reading marketing material.
 6    This is not a scientific report.  So --
 7        Q.    But they are your words.
 8            Is that right?
 9        A.    They are my marketing people's report.
10            Now, did I approve it?  Yes.
11            The purpose there is when you are
12    talking to a general public, everybody knows
13    what a crash test dummy is.  And so that's the
14    reason we use that wording.
15            Now, I would say it's a bit more
16    powerful than that.
17            But you are right, a linked series of
18    ellipsoids is a representation of a human; it's
19    a representation of a crash test dummy; but it's
20    not exactly either of those things.
21        Q.    You are not saying that anything in
22    your website is incorrect, are you?
23        A.    I'm just saying, for the purposes of
24    marketing, we are using a vernacular term that
25    would be more likely to resonate with somebody
```

THOMAS RICHARD JENKYN, Ph.D.

140

1

2      reading it --

3           Q.    Okay.

4           A.    -- so it's not a scientific -- it's

5      not a scientific document.

6           Q.    And you are talking to a jury in this

7      case potentially, and they are not scientists

8      either, right?

9           A.    That's right.

10          Q.    So you would use words -- plain words

11     like this -- to explain some basic concept.

12                Is that right?

13          A.    I would.

14                (Pause)

15                MR. ESSIG:  Let's look at tab 30.  I

16     think we are on 293.

17                (Exhibit 293, Multipage document

18     entitled: Head Injury Criterion and the ATB (no

19     Bates Nos.), marked for identification)

20                (Pause)

21                MR. DURKIN:  Is this in his report?

22                MR. ESSIG:  No.

23                MR. DURKIN:  This is new one.

24                MR. ESSIG:  This is a new one.

25                MR. DURKIN:  Okay.

THOMAS RICHARD JENKYN, Ph.D.

141

1
2              MR. ESSIG:  I'll ask you to take a
3      look at this document.
4              It's titled:  Head Injury Criterion
5      and the ATB.
6   BY MR. ESSIG:
7        Q.    Do you see that?
8        A.    Yes.
9        Q.    It's by Brian G. McHenry --
10       A.    Hm-hmm.
11       Q.    -- McHenry Software, Inc.?
12             Have you ever seen this document
13     before?
14       A.    Not recently but --
15       Q.    You have seen it?
16       A.    Yeah, in the past years.
17       Q.    Okay.
18             Do you know who Brian McHenry is?
19       A.    Not specifically.
20       Q.    Is he an expert in this field?
21       A.    I couldn't say.
22       Q.    Do you know anything about McHenry
23     Software?
24       A.    No, I don't.
25             MR. ESSIG:  If you turn the second

THOMAS RICHARD JENKYN, Ph.D.

142

1

2     page, down there at the footer --

3              THE WITNESS:  Hm-hmm.

4   BY MR. ESSIG:

5        Q.     -- it says:  ATP Users' group -- ATB

6   Users' Group 2004?

7        A.     Hm-hmm.

8        Q.     Do you know what that "ATB Users'

9   Group 2004" is?

10       A.     I don't.  It predates me.

11       Q.     All right.

12              So Mr. McHenry says in the third

13   paragraph here at the top:  One of the

14   mathematical models used to complement full

15   scale mechanical testing is the Articulated

16   Total Body Model.

17              Do you see that?

18       A.     Yes.

19              MR. DURKIN:  Before you have a

20   question, he should have an opportunity to

21   familiarize himself with the document.

22              MR. ESSIG:  I think he said he saw it

23   before --

24              MR. DURKIN:  No, he says he thinks he

25   saw it many years ago --

THOMAS RICHARD JENKYN, Ph.D.

143

 1

 2              MR. ESSIG:  Okay --

 3              MR. DURKIN:  -- like, you recall the

 4     depths of Seattle.  Let the witness read the

 5     whole document, and then you can ask questions,

 6     okay?  You remember.  You were there.

 7              MR. ESSIG:  Sure.

 8              MR. DURKIN:  Okay.  So why don't you

 9     give him an opportunity to familiarize himself

10     with the document before you ask questions of

11     him?

12              MR. ESSIG:  And if you ever need to

13     take a moment to look, just let me know.  And

14     I --

15              MR. DURKIN:  Well, let's presume he

16     does.  Let's presume that's the case.

17              MR. ESSIG:  Let's let the witness

18     testify.

19              MR. DURKIN:  I'm doing it.  This is --

20     I'm citing the case of the goose versus the

21     gander, okay? --

22              MR. ESSIG:  Yeah.

23              MR. DURKIN:  -- the Supreme Court

24     case.

25              MR. ESSIG:  We can proceed.

THOMAS RICHARD JENKYN, Ph.D.

144

```
 1
 2                MR. DURKIN:  Okay.
 3                MR. ESSIG:  Okay.
 4   BY MR. ESSIG:
 5        Q.    So that -- the mathematical model --
 6   the ATB Model -- that's the model you used,
 7   right?
 8        A.    Yeah, the latest version of it.
 9        Q.    Okay.
10                MR. ESSIG:  And on page 13 of your
11   report --
12                MR. DURKIN:  Are we back to 290?
13                MR. ESSIG:  Yes.
14                MR. DURKIN:  Okay.
15                (Pause)
16   BY MR. ESSIG:
17        Q.    It says in that middle paragraph:  The
18   GATB software is based on the Articulated Total
19   Body Model.
20                Right?
21        A.    That's right.
22        Q.    And it's been used since the 70's to
23   simulate occupants of motor vehicles --
24        A.    Yes.
25        Q.    -- and aircraft during events?
```

THOMAS RICHARD JENKYN, Ph.D.

145

1

2          A.      Yes.

3          Q.      And it says:  The GATB software is the

4     same as the original ATB software in terms of

5     its physics.

6          A.      In terms of its physics, yes.

7          Q.      The only difference is the computer

8     interface by which the user uses the model,

9     right?

10         A.      Yes.

11                 MR. ESSIG:  And on this first page --

12     going back to 293, sorry --

13     BY MR. ESSIG:

14         Q.      McHenry is citing Cheng there in

15     footnote 2 for the articulated total body model

16     user manual.

17                 Is that right?

18         A.      Cheng.

19         Q.      Yeah.

20         A.      Yes.

21         Q.      And that's something you cited to in

22     your disclosure?

23         A.      Yes.

24         Q.      Okay.

25                 So we are talking about the same

THOMAS RICHARD JENKYN, Ph.D.

146

1

2      model?

3           A.     Yes.

4                  (Pause)

5                  MR. ESSIG:  All right.  So let's turn

6      to page 6 of 8.

7                  MR. DURKIN:  Which document are we in

8      now?

9                  MR. ESSIG:  McHenry.

10                 MR. DURKIN:  Okay.  Sorry.  Got it.

11     BY MR. ESSIG:

12          Q.     And the title on there is:  Background

13     on ATB and HIC.

14                 Do you see that?

15          A.     Yeah.

16          Q.     If you go to the second paragraph, it

17     says:  Every simulation model, particularly

18     occupant simulation models like the ATB, is a --

19     quote -- "an approximation of the physical

20     system it represents and, of necessity, is based

21     on simplifying assumptions concerning the

22     various aspects of the nature and behavior of

23     the real system.  For this reason, differences

24     between a predicted and observed responses of an

25     actual system are to be expected, and the -- the

THOMAS RICHARD JENKYN, Ph.D.

147

1

2    disparities, depending on -- in part on the

3    adequacy of the assumptions and approximations

4    for the particular operating environment of the

5    system."

6          Do you see that?

7    A.    I do.

8    Q.    Do you agree with that statement?

9    A.    That's what we deal with every day in

10   engineering, yes.

11   Q.    Okay.

12         So you agree that differences between

13   the predicted or simulated outcome and the

14   observed responses of an actual system are to be

15   expected?

16   A.    Yes.

17   Q.    Do you know how big the differences --

18   do you agree that how big the differences are

19   depend on the adequacy of assumptions and the

20   approximations that you make on a particular

21   operating environment?

22   A.    Obviously.

23   Q.    So essentially, the baseline

24   assumptions you make in your model are critical

25   to determining whether or not it's an accurate

THOMAS RICHARD JENKYN, Ph.D.

148

1

2      representation of what happened?

3          A.    And that's why you should always

4      strive as an engineer to be as conservative as

5      you possibly can.

6          Q.    Okay.

7                So if we look at the third paragraph,

8      it says:  Parametric studies of ATB for a

9      limited number of model parameters have been

10     performed in which some parameters were altered

11     from their baseline values to investigate the

12     effects on the occupant kinematics.

13         A.    Yes.

14         Q.    What is a parametric analysis?

15         A.    If you have -- let's say, you have

16     four parameters that you can change -- so four

17     variables that you can tweak in the model.

18               A parametric analysis is you go

19     through each and every combination, and then you

20     look at the output.  So you change the first

21     one, then you go through its range -- every

22     single combination.  And you look at the output

23     for a single variable.

24               So that's your basis for parametric

25     analysis.

THOMAS RICHARD JENKYN, Ph.D.

149

1

2      Q.    It's essentially a sensitivity

3   analysis?

4      A.    Yes.

5      Q.    And people run sensitivity analysis to

6   determine whether or not the model they created

7   is accurate?

8      A.    Whether it's sensitive to certain

9   variables.

10          Because some parameters, you can vary

11   quite a bit and the output doesn't change; and

12   then it is insensitive, and you don't need to

13   worry about that.

14          Some parameters, it's going to be very

15   sensitive to.  And you need to very carefully

16   figure out what that value should be set to.

17      Q.    It's a way to look at your simulation

18   to determine the potential for error that might

19   occur.

20      A.    Yeah.

21      Q.    Did you run any sensitivity analysis

22   on your simulation of the data you generated in

23   this case?

24      A.    So that's why we ran the series of --

25   why we ran the large series of different

THOMAS RICHARD JENKYN, Ph.D.

150

1

2      heights, and weights, and positioning within the

3      seats.

4                    And that's exactly what I was trying

5      to do.

6                    And initially, when we were looking to

7      draw firm conclusions about where the arms would

8      go and whether you get injury from hitting arms,

9      we ran through pretty much a parametric or

10     sensitivity analysis with all -- with the

11     parameters being height, and weight, sex, and

12     position to see how it affected the trends.

13         Q.    What do you mean by "position"?

14         A.    Whether you are aisle, middle, or

15     window seat.

16         Q.    Did you run any other type of

17     sensitivity analysis besides the ones on those

18     particular variables?

19         A.    Yeah, so when I was setting the

20     stiffness for the joints to make the body stand

21     up, I would set it at a value.  And if it didn't

22     slump, then I would reduce the value and I would

23     keep reducing the value until the body slumped.

24                    And so in that way, I'm seeing -- I

25     want the stiffness to be as little as possible

THOMAS RICHARD JENKYN, Ph.D.

151

1

2          in order for the body to sit up in a realistic

3          manner, but not add too much stiffness so that

4          other motions would not be modeled.

5              Q.     So that would allow for the body to

6          move as much as possible when the force is

7          exhibited on it?

8              A.     Right.

9              Q.     And therefore that movement of the

10         body would create the greatest amount of force

11         when it comes in contact with another surface

12         right?

13             A.     No, it's the opposite.

14                   So if you have the body moving

15         around -- it's a tradeoff.

16                   If you are moving around a lot, you

17         can contact something and you have an impact

18         load.

19                   But if you have it very stiff, that

20         force has to come from somewhere, and it comes

21         internal to the body.  So now if you start

22         stiffening up in between the segments now you

23         have internal reaction forces that are now going

24         to be a lot larger.

25                   And those reaction forces -- although

THOMAS RICHARD JENKYN, Ph.D.

152

1

2      not a perfect analogy -- are a proxy for things

3      like muscle strain and soft tissue strain within

4      the body.

5          Q.    What about force applied to, like,

6      something like a seat belt?

7                Would it heighten the force that would

8      apply to a seat belt?

9                Or lessen that?

10         A.    It was insensitive to that.

11         Q.    And you did an analysis to determine

12     whether it was sensitive?

13         A.    I did.

14         Q.    Did you produce the analysis in this

15     case?

16         A.    No, that was a part of the initial

17     work.

18               So as I'm setting the values for

19     whether or not the body slumps forward, you run

20     the simulation, and you see that the seat belt

21     tension that's output isn't sensitive to that.

22               And it makes sense, because you've

23     got -- the seat belt tension is really coming

24     from the acceleration of all the body together.

25               Also with the way the legs were

THOMAS RICHARD JENKYN, Ph.D.

153

1

2      stiffened, when the arms would go up, the legs

3      would not go up.

4               And so really what's mostly causing

5      the tension in the seat belt is the mass of the

6      chest, abdomen, pelvis, and the legs lifting up

7      out of the seat.

8               And so if the legs aren't moving

9      anyway, we found that the tension in the seat

10     belt wasn't sensitive to how you stiffen those

11     joints.

12     Q.    So to be clear, you ran a sensitive

13     analysis on the stiffness of the joints.

14               You didn't produce it in this

15     litigation.

16               Is that right?

17     A.    That was part of my initial work.  So

18     as I'm development the model and developing a

19     number of aspects of the simulation, I want to

20     demonstrate to myself that that variable isn't

21     sensitive.

22               If it had been, then I would have had

23     a couple sections in my report saying why I made

24     a certain assumption as to why that joint

25     stiffness should be set the way it is.

THOMAS RICHARD JENKYN, Ph.D.

154

1

2       Q.      Understood.

3               If you can -- I know we are trying to

4       answer questions and ask questions to the best

5       of our ability.

6               But if you can listen to my question

7       and just answer that, it will go a lot faster.

8       A.      Okay.

9       Q.      You didn't produce that sensitivity

10      analysis in this litigation, right?

11      A.      No.

12      Q.      You didn't disclose it in the report

13      you signed September 22, correct?

14      A.      No.

15      Q.      Okay.

16              MR. ESSIG:  So we are back on

17      paragraph three there, talking about parametric

18      studies.

19              THE WITNESS:  Hm-hmm.

20  BY MR. ESSIG:

21      Q.      The second sentence says:  They -- the

22      parametric studies -- demonstrated the

23      sensitivity of various responses of ATB to some

24      parameters.

25              Right?

THOMAS RICHARD JENKYN, Ph.D.

155

1

2          A.     Yes.

3          Q.     And parameters investigated include

4     shoulder belt stiffness, lap belt stiffness,

5     knee bolster stiffness, the guide loop location,

6     guide loop coefficient of friction.

7                 Do you see that?

8          A.     Yes.

9          Q.     Did you investigate the sensitivity of

10    those -- of any of those elements in your model?

11         A.     That's not included in the simple seat

12    belt model.

13         Q.     Understood.

14                MR. ESSIG:  And then the last sentence

15    is one I want to look at.

16    BY MR. ESSIG:

17         Q.     It says:  It should be noted that for

18    an accident reconstruction, there are few if any

19    known baseline values, and therefore any

20    conclusions or results may be subject to

21    variations of 50% or greater.

22                Do you see that?

23         A.     I do.

24         Q.     Do you agree with that statement?

25         A.     That was probably true back in 2004.

THOMAS RICHARD JENKYN, Ph.D.

156

1

2      Q.    Is it true now?

3      A.    I think we have a lot more literature

4   now as to -- to the validation and setting of

5   limits on those parameters.

6      Q.    Okay.

7            Did you have known baseline values

8   that you used in your report here?

9      A.    Beyond -- well, for what parameters?

10     Q.    I guess any of the parameters that you

11  studied in order to come to a conclusion in the

12  case.

13     A.    So as I said, I used the simple seat

14  belt model, because it has far fewer variables.

15           So you listed a number there.

16           By using the simple seat belt model,

17  you don't need to make a decision about those

18  variables.  And so, again, that speaks to having

19  the simulation being conservative.

20           I explained to you the process by

21  which I decided on the stiffness of the joints

22  of the legs and the torso, and also my decision

23  to keep the shoulders completely loose.  Again,

24  that speaks to a conservative simulation.

25     Q.    And you agree that those -- those

THOMAS RICHARD JENKYN, Ph.D.

157

1

2      assumptions and judgments that you made in terms

3      of the baseline design of the model -- they

4      affect the variation in the outcome of the

5      simulations you ran, right?

6           A.    They will.

7                 But it was my opinion that the output

8      of the model was not significantly sensitive to

9      those -- those -- any changes there.

10          Q.    Okay.

11                Did you calculate any error rate of

12     your data?

13          A.    I did not.

14          Q.    Do you know how much variability there

15     was in the data?

16          A.    Which parameter?

17          Q.    I guess, any of the outcome

18     parameters, the force -- force application of

19     body to a contact surface?

20          A.    There was a great variation.  That's

21     why I didn't draw any firm conclusions on that.

22          Q.    What about the force applied to the

23     seat belt?

24          A.    There was -- like I said, the seat

25     belt tension was insensitive to things like

THOMAS RICHARD JENKYN, Ph.D.

158

1

2    joint stiffness and was -- the strongest

3    correlation for seat belt tension was with

4    overall body weight.

5        Q.    Did you do any statistical analysis of

6    variability there?

7        A.    No.

8        Q.    Did you calculate a standard

9    deviation?

10            Or anything like that?

11        A.    No, but that can be done because it's

12    all contained within a series of simulations

13    that are provided.

14        Q.    In terms of the output of the force

15    application on the seat belt -- and I know I

16    asked this question --

17            MR. DURKIN:  Well, then I am going to

18    say:  Asked and answered.

19    BY MR. ESSIG:

20        Q.    In terms of the output of a force in

21    newtons from the body on the seat belt, do you

22    know whether or not the results that you

23    achieved in your simulation were statistically

24    significant?

25        A.    That's my understanding.

THOMAS RICHARD JENKYN, Ph.D.

159

1

2              Now, did I calculate significance?

3     No.

4              But, again, subjectively, after -- so

5     when you are setting up the simulation

6     initially, you run it in an iterative way where

7     you work with certain parameters to see whether

8     or not they are sensitive.

9              So, for instance, setting the

10    stiffness between the pelvis and the -- the

11    pelvis and the abdomen.  As you increase that

12    stiffness, you then go back and have a look at

13    the seat belt force.

14             And if it's not changing, then with

15    confidence, you can say:  Okay, it's insensitive

16    to that.

17             Now did I document all that?  No.

18             But that would be a very long report

19    if I documented every single subjective

20    sensitivity analysis I did in the development of

21    this simulation.

22        Q.    And you didn't actually ever

23    conduct -- calculate a p-value.

24             That's right?

25        A.    That's right.

THOMAS RICHARD JENKYN, Ph.D.

160

1

2      Q.    So you don't know if P was less than

3    .05 -- or 0.5?

4      A.    Based on my judgment, I was pretty

5    confident it was probably lower than that.

6      Q.    But you don't know?

7      A.    I didn't calculate it.

8            MR. ESSIG:  So if you turn to page 7

9    of 8 -- are you with me?

10           THE WITNESS:  It's --

11           MR. ESSIG:  Yeah, it's right on top

12    there?

13           THE WITNESS:  Yes.

14  BY MR. ESSIG:

15      Q.    It says in the text:  When the ATB is

16    used in accident reconstruction or applied to

17    individual accidents, there are inherent

18    limitations on the predictability and the

19    veracity of the results of ATB.

20           Do you see that?

21      A.    Yes.

22      Q.    Then it says:  The following lists

23    some of the limitations for ATB for individual

24    accident reconstruction.

25      A.    Hm-hmm.

THOMAS RICHARD JENKYN, Ph.D.

161

1

2      Q.    Do you agree that there are inherent

3   limitations?

4      A.    Yes.

5      Q.    The first limitation says:

6   Limitations of any mathematical model of

7   occupant kinematics.

8            Do you see that?

9      A.    Yes.

10     Q.    It says:  First, no two humans are

11   alike in their physical properties or lifetime

12   experiences.

13           Do you agree?

14     A.    That's true.

15     Q.    And:  The physical condition and

16   inherent response of individuals (reflexes)

17   affect what occurs during any potential

18   injury-producing event.

19           Do you see that?

20     A.    Yes.

21     Q.    Do you agree that's a limitation of

22   the model that you produced?

23     A.    Yes.

24     Q.    So your model doesn't capture the

25   inherent response of individuals, like their

THOMAS RICHARD JENKYN, Ph.D.

162

1
2      reflexes?
3           A.     Because it's a passive model.
4           Q.     Okay.
5                  Then it says:   The GEBOD program is
6      generally used to create occupant inputs for
7      ATB.
8                  Do you see that?
9           A.     Yes.
10          Q.     GEBOD creates a "percentile"
11     representation of an occupant, which only
12     represents the actual occupant in but a few
13     measurements or properties.
14                 Do you see that?
15          A.     Yes.
16          Q.     Is that essentially what you did?
17                 You looked at a percentile ranking of
18     the different heights and weights of the
19     population?
20                 And then you simulated average, or
21     small, or large versions of those?
22          A.     It actually means something slightly
23     different, but along the same lines.
24                 So -- it's called anthropometrics.  So
25     if I wanted to model an individual person, I

THOMAS RICHARD JENKYN, Ph.D.

163

1

2          would measure the length of every single segment

3          on that person.  Okay?

4                    But if we are going to study a

5          population, then you are going to look at a

6          range of overall heights and weights, and then

7          also population averages for -- so for instance,

8          if you are 5'10", the average length of your

9          upper arm for somebody who is 5'10" would also

10         be a certain length.

11                   So I relied on those averages through

12         the population in the absence of specific

13         information about individual passengers.

14         Q.    So you didn't calculate your

15         simulation using any specific information about

16         the heights or weights of certain passengers,

17         right?

18         A.    That's right.

19                   MR. ESSIG:  If we go to page 13 on

20         290 -- it is your report.

21                   MR. DURKIN:  We're back to the report

22         now?

23                   MR. ESSIG:  Yeah.

24                   MR. DURKIN:  Okay.

25                   THE WITNESS:  Thirteen?

THOMAS RICHARD JENKYN, Ph.D.

164

1
2          MR. ESSIG:  Yeah.
3          (Pause)
4     Q.    The very bottom of that page says:
5     The height and weight of each human body model
6     ranged from the 5th to the 95th percentile.
7          Do you see that?
8     A.    Yes.
9     Q.    What do you mean by "the 5th or 95th
10    percentile"?
11         Percentile of what?
12    A.    So you take the overall population.
13    And there is -- you have measured height and
14    weights through a large sample.  You can't do
15    everything -- everybody in the population, but
16    you do it for a large sample.
17         Fiftieth percentile is the person who
18    weighs the average, and is the average height,
19    and then you divide it up into percentiles.
20         And so it's just a statistical
21    analysis to say:  95th percentile male is this
22    height and this weight.  5th percentile male is
23    this height and this weight.
24    Q.    What population were you using -- what
25    population data were you using that -- like, is

THOMAS RICHARD JENKYN, Ph.D.

165

1

2      it a global population?

3              The United States?

4              Or what --

5      A.    So it's the anthrometric charts within

6      GATB, which -- my understanding -- is for

7      mainland United States.

8      Q.    So you used -- the distribution of

9      heights and weights in terms of percentile rank

10     for the United States in terms of the model you

11     ran in this case?

12     A.    Yes.

13     Q.    And do you have any idea about how

14     that distribution compares to the actual heights

15     and weights of the passengers on the plane?

16     A.    I don't.

17     Q.    So if we look at the third bullet, it

18     says:  The ATB occupant is a passive occupant.

19             Do you see that?

20             MR. DURKIN:  Wait, what document are

21     we in now?

22             MR. ESSIG:  We are going back to the

23     paper --

24             MR. DURKIN:  Okay --

25             MR. ESSIG:  -- sorry about that.

THOMAS RICHARD JENKYN, Ph.D.

166

1
2          MR. DURKIN:  -- okay --
3          (Pause)
4          MR. DURKIN:  What page are we on now?
5          MR. ESSIG:  Seven of 8.  We are still
6     going through the bullets.
7          MR. DURKIN:  Got it.  All right.
8     Thanks.
9  BY MR. ESSIG:
10     Q.    Third bullet:  ATB occupant is a
11    "passive" occupant.
12          Do you see that?
13     A.    Yes.
14     Q.    Do agree with that?
15     A.    Yes.
16     Q.    And then the sub-bullet says:  Active
17    muscles and reflexes can play a substantial role
18    in the responses of the occupant, particularly
19    at lower speeds.
20          Do you see that?
21     A.    Yes.
22     Q.    And do you agree with that sub-bullet?
23     A.    I do.
24     Q.    It says:  Particularly -- a
25    particularly substantial role at lower impact

THOMAS RICHARD JENKYN, Ph.D.

167

1
2     speeds.
3              Would you say that the g-forces that
4     were experienced on the flight were lower-impact
5     speeds in the context of this article?
6         A.    They weren't in impact.
7         Q.    Okay.
8              But for the duration of the flight,
9     because you -- you simulated pretty much
10    everything up to impact, right?
11        A.    With the ground, yes --
12        Q.    Yeah.
13        A.    -- well, to when the flight data
14    recorder ended.
15        Q.    Right.
16             Would you say that those forces --
17    that ranged from maybe 2 g's positive on the
18    high end to 2 g's on the low end
19    approximately -- are lower-impact speeds in the
20    context of this --
21        A.    They are not impacts --
22        Q.    Okay.
23        A.    -- it's an apples and oranges
24    comparisons.
25             So an impact, by definition, is a

THOMAS RICHARD JENKYN, Ph.D.

168

1
2      large force occurring over a short amount of
3      time.
4              And in a car crash, that's less than a
5      quarter of a second.
6              This is not an impact.
7              So these loads while -- and again,
8      with an impact in a car crash, you get large g's
9      over a very short amount of time.
10             These g's are smaller than the g's in
11     a car crash, but they occur over a much longer
12     time.
13             This is not an impact.  And so you
14     can't model -- you can't infer behavior in the
15     biomechanics from impact data into a simulation
16     that is not an impact.
17     Q.    But the concept of this being a
18     limitation on the model remains the same, right?
19             If you are dealing with g-forces that
20     are plus or minus 1 or 2, human beings have the
21     strength -- an average person -- has the
22     strength to resist that level of force, right?
23     A.    Certainly.
24     Q.    And if you were dealing with g-forces
25     that were 15, 20, 50, a human being might not be

THOMAS RICHARD JENKYN, Ph.D.

169

1

2    able to brace -- or hold on against a force like

3    that.

4              They would be moved involuntarily, or

5    against their will, right?

6         A.    During an impact, yes.

7         Q.    And so the ATB model was developed

8    originally for the use of analysis in car

9    accidents, right?

10        A.    Well, it was developed for air

11   crashes --

12        Q.    Originally, it was done for car

13   accidents?

14        A.    It's used by car accidents mostly,

15   yeah.

16        Q.    And you've used it for car accidents

17   in every case you've worked on, right?

18        A.    Yes.

19        Q.    And you have never testified using it

20   in an airplane accident, right?

21        A.    That's right.

22        Q.    And so, if you use that ATB model in a

23   car accident where the -- you know, a car is

24   going 50 miles an hour, 40 miles an hour, and

25   hits something, the forces that are exhibited on

THOMAS RICHARD JENKYN, Ph.D.

170

1

2     that body are very significant; much more

3     significant than the forces exhibited on the

4     passengers in this airplane prior to impact.

5          Is that right?

6     A.   Well, you have got to be careful.

7          So what's the mechanism of injury?

8          So the forces during an impact are

9     large.  The duration of time over which those

10    forces are applied is very, very small.

11         So the way you connect the two is you

12    look at the amount of energy that goes into the

13    tissue.

14         And I didn't specifically use that

15    measure, but I think it's informative here so

16    that we understand the physics.

17         So if you imagine during a car crash,

18    you are looking at the force coming from the

19    seat belt going into the body.  And as I go

20    along -- so horizontal axis is time, and then

21    vertical axis is force -- the force going from

22    the seat belt into me is going to go up very

23    quickly, quite high, and then come down very

24    quickly.  And the amount of energy put into the

25    tissue is the area under that curve.

THOMAS RICHARD JENKYN, Ph.D.

171

1

2              And so you can have a very large

3      force, but in a very short amount of time.  You

4      don't have a lot of energy going into the

5      tissue.

6              What we have here, though -- time is

7      going along like so, so not -- unlike a car

8      crash which takes place over, say, 0.1 to 0.2

9      seconds, this is tens of seconds; or certainly

10     when you have got the maximum negative g's, it's

11     over several seconds.

12             Now we look at:  The force doesn't go

13     as high, but it's applied for a much longer

14     time -- meaning the amount of energy, the area

15     under that curve -- is much larger.

16             And so it's a different mechanism.

17     You can't draw conclusions on impact in car

18     crashes to the situation we are dealing with

19     here.  It's just not biomechanically correct.

20     Q.    And I'm talking about something

21     slightly different, right?

22             I'm not drawing conclusions about the

23     impact.

24             I'm talking about the limitation of

25     not being able to model reflexes or bracing,

THOMAS RICHARD JENKYN, Ph.D.

172

1

2      correct?

3          A.     Well, we talked about this before.

4                 Like, I can't -- I can a -- so

5      reflexes?  No, because that's an active motion.

6                 Bracing?  Yes, I can model, in that I

7      can apply passive stiffness to joints.

8                 But we already talked about it.  You

9      can't have them hold on to the armrests.

10         Q.     So at g-forces of 1 or 2, somebody's

11     ability to hold on to armrests or resist that

12     force is material.

13                It means something, right?

14                They can resist those kind of forces?

15         A.     Well, I don't know.  Because when we

16     are dealing -- it depends on the direction of

17     those g-forces.  So --

18         Q.     What about the vertical axis?

19         A.     -- and here's what I'd say --

20                MR. DURKIN:  And here's what I'd say:

21     He didn't finish.

22                MR. ESSIG:  I'm trying to get answers

23     to my questions --

24                MR. DURKIN:  I know.  I know --

25                MR. ESSIG:  -- long --

THOMAS RICHARD JENKYN, Ph.D.

173

1

2          MR. DURKIN:  -- but you can't cut him

3     off --

4          MR. ESSIG:  -- cut him off --

5          MR. DURKIN:  -- well, you can't cut

6     him off, okay?  So he needs to finish his

7     answer --

8          MR. ESSIG:  Okay --

9          MR. DURKIN:  -- and, quite frankly,

10    Chris, I bet you the court reporter is having a

11    rough time right now.  I want to make sure,

12    because I think --

13         MR. ESSIG:  He hasn't said anything,

14    Kevin.

15         MR. DURKIN:  Okay, if they're not,

16    fine.

17         MR. ESSIG:  Just if you have an

18    objection, make it.  If not --

19         MR. DURKIN:  Objection, objection, the

20    witness is allowed --

21         MR. ESSIG:  -- I will let him

22    answer --

23         MR. DURKIN:  -- you cut me off --

24         MR. ESSIG:  -- I know I am cutting you

25    off --

THOMAS RICHARD JENKYN, Ph.D.

174

1

2          MR. DURKIN:  -- okay, this what you

3     are doing.  This is what you are doing --

4          MR. ESSIG:  -- I'm not meaning to,

5     but --

6          MR. DURKIN:  -- I know you are not

7     meaning to, but --

8          MR. ESSIG:  -- I just want to -- you

9     are supposed to give a short objection.

10          And I agree I will not cut --

11          MR. DURKIN:  Okay.

12          Objection --

13          MR. ESSIG:  -- move one --

14          MR. DURKIN:  -- let him answer the

15     question --

16          MR. ESSIG:  Okay.

17          MR. DURKIN:  -- and fully answer the

18     question.  Then another question.  Okay?

19          MR. ESSIG:  Okay.

20     A.    So let's make we are talking -- the

21     vertical acceleration.

22          The two directions are different.  So

23     if you have got positive g's, those positive g's

24     are forcing you down into your seat.  Can you

25     withstand those?  Yes.  And certainly within the

THOMAS RICHARD JENKYN, Ph.D.

175

1

2          range that we've got, you are being forced down

3          into your seat, yes, the occupants can withstand

4          those.

5                    It's the negative ones that are

6          interesting, for two reasons.

7                    One, when you have got those negative

8          g's, it's as though you are hanging upside down

9          from your seat belt.  So, yes, you could hold

10         on, but, remember, you are hanging upside down,

11         and you have got a whole bunch of other things

12         occurring, like blood rushing to your head, and

13         whatnot.  But you are in a very unusual

14         situation that you are not accustomed to.

15                   Minus 1 g hanging upside down, could

16         some people brace?  Yes.  Could everybody?  I

17         don't know.  I don't think so.

18                   The other situation you've got is when

19         you look at the traces, certainly the last four

20         seconds when it goes from a positive vertical g

21         to a very large negative g, and then the flight

22         delta recorder shuts off, not only do you have

23         negative g's that you are bracing against, but

24         those negative g's are increasing.  That's a

25         situation nobody has ever encountered.  Like,

THOMAS RICHARD JENKYN, Ph.D.

176

1

2     you are really not encountering that unless you

3     are, say, a fighter pilot.

4             So I would expect in that case -- I

5     think bracing against that would be very, very

6     difficult.  But can they?  Sure.  I think a few

7     people would be able to.  But it's a very

8     unusual situation.

9         Q.    Okay.

10            So they could brace, you are saying.

11            That's true, right?

12        A.    Hm-hmm.

13        Q.    You don't know how many people could

14    brace or couldn't brace.

15            Is that right?

16        A.    Yes.

17        Q.    You have no opinion about the

18    proportion of the people on the flight that were

19    able to brace or weren't able to brace, right?

20        A.    Yes.

21        Q.    This bracing issue is more pronounced

22    at the end of the flight when the g-forces are

23    higher, right? -- negative different g-forces

24    are higher, right?

25            In the last four-second period that

THOMAS RICHARD JENKYN, Ph.D.

177

1

2    you have just said?

3         A.    Well -- why are they bracing?  That's

4    really it.

5              Like, would they be bracing earlier on

6    when you have got the vertical acceleration

7    stays positive the whole way through, but the

8    plane is undulating?

9              I think we talked about that before.

10             Would they brace there?  Yeah, I think

11   that's a reasonable response for somebody.

12             But, again, I wanted the simulation to

13   be conservative.  Because the other thing is,

14   there is another mechanism of injury that arises

15   with bracing.

16             Now, do I know if they brace or not?

17   No, you are right.

18             But if I assume that they do brace,

19   they now have another mechanism of injury,

20   whereby you are gripping the seat, you are

21   bracing against the floor, you are pushing

22   yourself back into your seat, you are now firing

23   your muscles.  And you are firing your muscles

24   in a way that stops the joints from moving,

25   because you don't -- you don't want your body

THOMAS RICHARD JENKYN, Ph.D.

178

1

2    moving around uncontrollably.

3            You have no warning as to when

4    accelerations are even going to come at you, so

5    you fire your muscles.  But you do it on both

6    sides of your joints.  So you stiffen up the

7    joints, but you are doing it actively in this

8    case.

9            Okay.  What happens?  Well, now, you

10   are firing those muscles in an inefficient way

11   because you have no warning as to what the next

12   change in the acceleration is going to be.

13   Your -- your mechanism of injury now is muscle

14   strain.  And it fits those criterias I talk

15   about -- at least the first and third.

16           Again, I don't want to -- I know pain

17   is subjective.

18           But in terms of, as you are

19   co-contracting muscles on either side of the

20   joint to brace yourself against -- and to keep

21   your body from moving, that causes muscle strain

22   because you get micro-tears within the muscle as

23   you are isometrically contracting.

24           And if these people had survived this

25   crash miraculously, would there have been a

THOMAS RICHARD JENKYN, Ph.D.

179

1

2    recovery process for muscle strain?  Yes.  It's

3    called delayed onset muscle soreness.  And

4    athletes get it after they've been bracing or

5    doing different activities with their muscles.

6              So if I am going to have a

7    conservative simulation, I don't talk about

8    muscle strain and I don't talk about bracing.

9              But there is that mechanism of injury.

10   If they are bracing, that's perfectly reasonable

11   to assume that would have happened.

12        Q.   You can listen just to my question and

13   answer that.  It's going to help things move

14   along.

15             MR. DURKIN:  Objection.

16             He's doing exactly -- he's answering

17   all your questions.

18   BY MR. ESSIG:

19        Q.   So to be clear in terms of muscle

20   strain and how muscle strained or whether people

21   braced, you didn't analyze that at all, right?

22        A.   That's right.

23        Q.   You have no opinion about whether or

24   not anybody was injured due to muscle strain

25   based on any objective data that you calculated,

THOMAS RICHARD JENKYN, Ph.D.

180

1

2    correct?

3         MR. DURKIN:  Objection, asked and

4    answered.

5         A.    Two questions there, I think --

6         Q.    You don't have any opinion about

7    muscle strain and whether there was an injury or

8    not based on the objective data that you

9    calculated, correct?

10        MR. DURKIN:  Objection, asked and

11   answered.

12        A.    When you say "objective data that I

13   calculated," do you mean the simulation? --

14        Q.    The output of your simulation.

15        A.    Okay.

16             That's right.  Based on the output of

17   my simulation, I don't have an opinion on that.

18        Q.    Okay.

19        A.    However, I do in my report say that

20   during the lead-up to the final 24 seconds that

21   the passengers would have undergone something

22   that was physically taxing, and physically

23   agonizing, and physically exhausting.

24        Q.    Are those injuries?

25        A.    Within that -- again, I didn't want to

THOMAS RICHARD JENKYN, Ph.D.

181

1

2      make a firm conclusion -- those would have been

3      injuries such as muscle strain and muscle sprain

4      because they are co-contracting.

5           Q.    Do you have an opinion that anybody on

6      the flight experienced muscle strain or muscle

7      sprain?

8                MR. DURKIN:   Objection, asked and

9      answered.

10          A.    Had they been bracing, it's my opinion

11     that they would have sustained muscle strain or

12     connective tissue strain -- sprain.

13          Q.    Do you have any data or literature

14     that you cite in the context of your report that

15     stands for the proposition that under these

16     g-forces -- plus or minus 2 -- that people

17     experienced muscle strain or -- muscle strain?

18          A.    No, that's based on my -- having a

19     look at the vertical accelerations in the flight

20     data recorder.

21               But, again, to get muscle strain from

22     bracing doesn't require external loading.  It

23     requires the person to actively react to a

24     situation.

25          Q.    Okay.

THOMAS RICHARD JENKYN, Ph.D.

182

1
2              So there is no literature that
3    supports that disclosure in your report,
4    correct?
5         A.    I'm looking for one specific paper,
6    and I didn't cite it.
7         Q.    And there is no quantifiable data that
8    captures that -- that supports that opinion,
9    either, right?
10        A.    I didn't model that.
11        Q.    The last bullet here says:  The
12   initial position and posture of the occupants
13   are not known and minor changes can have a
14   dramatic effect on the ATB results.
15             Do you agree with that?
16             MR. DURKIN:  We're back in -- I'm
17   really sorry.  I'm trying to get between the
18   reports here, and I'm --
19             MR. ESSIG:  I have never moved off
20   this --
21             MR. DURKIN:  Which one you are on now?
22   Are you one the --
23             MR. ESSIG:  -- the same bullets we
24   have been covering.
25             MR. DURKIN:  All right.  We can go

THOMAS RICHARD JENKYN, Ph.D.

183

1

2    back and forth.  It's okay.  I just --

3    just gotta know where I am going --

4              MR. ESSIG:  At this point, like, the

5    amount of speaking objections and asking all

6    this stuff, and to give long-winded answers is

7    really running the clock.

8              MR. DURKIN:  Yeah, and it's okay.  We

9    are going between exhibits and --

10             MR. ESSIG:  We are not.  I'm still on

11   same bullets I just asked about a second ago.

12             MR. DURKIN:  All right.  We keep going

13   back and forth between two exhibits.  I want to

14   make sure I'm on the correct exhibit --

15             MR. ESSIG:  Come on, Kevin --

16             MR. DURKIN:  -- that's all.  I didn't

17   know which one we were doing.  I really --

18             MR. ESSIG:  Yeah, but we just took 30

19   seconds for you to just ask me.

20             And I said:  Yes, McHenry, the last

21   bullet.

22             MR. DURKIN:  I know.  You said it real

23   fast.  And I'm not as sharp as you.  I got to

24   catch up with you.  You are moving fast.

25             Go ahead.  I got it now.  I'm all --

THOMAS RICHARD JENKYN, Ph.D.

184

1
2      ready to go.
3              THE WITNESS:  Okay, short answer.
4      BY MR. ESSIG:
5          Q.    The last bullet:  The initial position
6      and posture of occupants not known and minor
7      changes can have a dramatic effect on ATB
8      results.
9              Do you agree with that statement?
10         A.    They can, but they didn't in my
11     simulation.
12         Q.    Did you model the initial position and
13     posture of the occupants?
14         A.    I sat them in their seats in a
15     realistic manner.
16         Q.    Okay.
17             Did you adjust that model for the fact
18     that some people sit differently?
19         A.    No.
20         Q.    Is it true that, looking across the
21     entire spectrum of the passengers on the
22     airplane, that probably most people were seated
23     in various different kinds of positions --
24         A.    But we're --
25         Q.    -- around the flight --

THOMAS RICHARD JENKYN, Ph.D.

185

1
2          A.      -- we're --
3          Q.      -- is that true?
4          A.      -- we're limited by the fact that each
5     of them have their seat belt properly fitted.
6     So that narrows the range and variety by which
7     they can be sitting in their seat.
8          Q.      You controlled for one initial
9     posture, one orientation of the seat belt.
10              You did not account for any of the
11    variability that might exist otherwise.
12              Is that --
13         A.      As what? --
14         Q.      -- right?
15              Different positions of the seat belt,
16    different ways they were sitting, different
17    initial postures.
18         A.      Well, we said the seat belt has to be
19    properly fitted.  That limits you.
20         Q.      That's what I'm saying.
21              You did one assessment of one posture
22    in one position, correct?
23         A.      I made the assumption that the seat
24    belts were fitted properly, and so that limits
25    the number of different postures you can have.

THOMAS RICHARD JENKYN, Ph.D.

186

1

2          Q.    And the reality is that there, on the

3     airplane in the real world, there were lots of

4     different postures?

5          A.    Yes, people could have been wearing

6     their seat belts incorrectly.

7          Q.    And they could have been wearing it

8     incorrectly, but positioned differently, right?

9          A.    We discussed this before.

10               But even if you tilted your body

11    slightly, the loading is still going to go

12    through the ASIS.

13         Q.    Do you have any idea about whether

14    changes in the initial positioning of the

15    passengers would have had dramatic affects on

16    your simulation?

17         A.    As I said, with my initial subjective

18    and iterative sensitivity analysis, I didn't see

19    a strong sensitivity in seat belt tension to

20    positioning of the pelvis.

21         Q.    That is an analysis you did not

22    provide in your report, correct?

23         A.    That's right.

24         Q.    And that is an analysis you did not

25    produce before this deposition, correct?

THOMAS RICHARD JENKYN, Ph.D.

187

1

2          A.     That's right.  It was a part of

3     process of developing the simulation, but I

4     didn't report on it.

5          Q.     Then it's undisclosed?

6               MR. DURKIN:  Objection, asked and

7     answered --

8               MR. ESSIG:  Okay.

9               MR. DURKIN:  -- three times.

10              (Pause)

11              MR. ESSIG:  So let's go back to your

12     report.

13              Kevin, we are going back to the

14     report -- 290.  You okay? --

15              MR. DURKIN:  Thank you --

16              (Pause)

17     BY MR. ESSIG:

18          Q.     So what I want to do here, if we can,

19     Dr. Jenkyn, is walk through the description of

20     the accident flight in detail and understand

21     exactly at what time point you believe it was

22     more likely than not that the passengers were

23     injured on Flight ET 302.

24              Understand?

25          A.     Understand.

THOMAS RICHARD JENKYN, Ph.D.

188

1

2      Q.    So, first, in your field of study as a

3  biomechanical engineer -- well, I guess we

4  talked about this -- you define injury at one

5  point as disruption of the tissue, right?

6      A.    Yes.

7      Q.    And what do you mean by "disruption"?

8      A.    The tissue isn't in its normal,

9  healthy state.

10      Q.    Is there any literature cited or an

11  objective standard that's described as to what

12  disruption of the tissue is in your report?

13      A.    No.

14      Q.    Is there any place I can go look to

15  see in the field of biomechanics what

16  "disruption of the tissue" means that's an

17  accepted definition in the field?

18      A.    Yes, there is, but you are going to

19  find how it's characterized different in

20  different tissues.

21      Q.    Would disruption of the tissue include

22  a bruise or contusion?

23      A.    Yes.

24      Q.    And you have an opinion about whether

25  or not people might have had a bruise or

THOMAS RICHARD JENKYN, Ph.D.

189

1

2     contusion, right?

3         A.     Yes.

4         Q.     That's the main opinion you have about

5     the injury that they might have suffered?

6             MR. DURKIN:  Objection, argumentative,

7     and improper --

8             MR. ESSIG:  Asking if that's the main

9     opinion he has is argumentative? --

10            MR. DURKIN:  -- he's not ranking

11    opinions.  He's got lots of opinions --

12            MR. ESSIG:  -- you are testifying --

13            MR. DURKIN:  -- okay, he didn't rank

14    opinions in his report.

15            Argumentative.

16            MR. ESSIG:  He can answer the

17    question, Kevin.  He's --

18            MR. DURKIN:  No, but -- okay --

19            MR. ESSIG:  -- he's a doctor.  He's an

20    expert.

21            MR. DURKIN:  -- all right, all right.

22    It's an argumentative question --

23            MR. ESSIG:  -- it's not.  I --

24            MR. DURKIN:  -- that's all.  It is.

25    It is.

THOMAS RICHARD JENKYN, Ph.D.

190

1
2                  MR. ESSIG:  I'm not arguing --
3                  MR. DURKIN:  -- I want an answer --
4                  MR. ESSIG:  -- I'm only asking you a
5       question.
6       BY MR. ESSIG:
7            Q.    Is it the main disruption of tissue
8       that you opine about in your report?  A --
9                  MR. DURKIN:  That's a different
10      question.
11                 Go ahead and answer.
12           A.    Yes.
13           Q.    What about just pressure on the
14      pelvis?
15                 Is that disruption of tissue?
16           A.    If it disrupts the tissue.
17                 So you can apply pressure, but if the
18      tissue rebounds to its healthy state, then, no.
19           Q.    What about the sensation of pain?
20                 Did people have to feel pain in order
21      to be injured?
22           A.    No.
23           Q.    So you could have no pain at all but
24      be injured?
25           A.    Yes.

THOMAS RICHARD JENKYN, Ph.D.

191

1

2          Q.     Before we kind of walk through things,

3     I want to know if we can kind of agree about one

4     point -- which is that it's not more likely than

5     not that passengers would have been injured

6     before the last 24 seconds of the flight.

7               Do you agree with that?

8          A.     If we are talking about contusion,

9     then I'd agree.

10         Q.     What about your definition of "injury"

11    that you opine in this case?

12         A.     If we are going back to talking about

13    muscle strain and muscle sprain due to bracing,

14    that could have occurred in the minutes before

15    the last 24 seconds.

16         Q.     But you don't actually -- you didn't

17    actually study that question in terms of data or

18    literature, right?

19         A.     That's right.

20         Q.     Do you have an opinion that it's more

21    likely than not that every passenger was injured

22    due to muscle strain prior to the last 24

23    seconds?

24         A.     I would say that's a reasonable thing

25    to opine, but I didn't specifically include that

THOMAS RICHARD JENKYN, Ph.D.

192

1

2      in my report.

3          Q.    So that's an opinion you did not

4      include in your report, right?

5          A.    I covered it in terms of the situation

6      prior to the final 24 seconds being physically

7      taxing, physically exhausting.  That's the

8      phrase I was using to generally refer to that.

9          Q.    And when you used that phrase that you

10     just described, you didn't use the word "injury"

11     right?

12         A.    That's right.

13         Q.    And you didn't model in your

14     simulation anybody bracing, or anything like

15     that?

16         A.    That's right.

17             MR. ESSIG:  Okay.  So if we go to page

18     16, and we go to the bottom paragraph.

19             (Pause)

20     BY MR. ESSIG:

21         Q.    It says:  For the first 42 seconds

22     from the start of runway roll around 8:37:56

23     local time until takeoff at around 8:38:38, the

24     vertical accelerations ranged from 0.876 to

25     1.146 g's, which can be considered normal for a

THOMAS RICHARD JENKYN, Ph.D.

193

1
2       takeoff since the flight at that point was
3       proceeding normally.
4               Do you see that?
5       A.      Yes.
6       Q.      Safe to say you don't have an opinion
7       that anybody was injured in that portion of the
8       flight, correct?
9       A.      Correct.
10              MR. ESSIG:  So if we go to Figure 5,
11      which is on the next page there --
12              (Pause)
13              THE WITNESS:  On page 19?
14              MR. ESSIG:  Correct.
15              THE WITNESS:  I'm there.
16  BY MR. ESSIG:
17      Q.      If you were going to draw a line for
18      the first 42 seconds on that figure -- I'll ask
19      you to do it -- could you show me where that
20      would appear?
21      A.      So based on that previous sentence?
22      Q.      Yes, based on the sentence in your
23      report.
24      A.      I give you numbers --
25      Q.      And I know that this may be hard with

THOMAS RICHARD JENKYN, Ph.D.

194

1

2     the scale to -- you may have to draw a line

3     that's approximate, but --

4          A.     Yeah.

5          Q.     -- do your best.

6          A.     I'm getting there.  I'm just looking

7     at the number.

8               So 32 seconds until 8:38:38, so trying

9     to estimate where that is here.  Right there.

10         Q.     So we can write:  Everything to the

11    left of that line, there was no injury, right?

12         A.     Yes.

13         Q.     And so the line for a great deal of

14    the time there is flat.

15              Do you see that?

16         A.     One g yes.

17         Q.     That's because the plane was on

18    runway, right?

19         A.     That's right.

20         Q.     And the vertical accelerations start

21    to fluctuate a little bit up until the line.

22              And that's the takeoff, right?

23         A.     That's right.

24         Q.     Okay.

25              MR. ESSIG:  So for the next segment,

THOMAS RICHARD JENKYN, Ph.D.

195

1
2      if we go back to page 16.
3              (Pause)
4    BY MR. ESSIG:
5         Q.    We are at that bottom paragraph on 16
6    that says:  Then for the next 2 minutes and 36
7    seconds from 8:38:38 until 8:41:14, the vertical
8    acceleration ranged from 0.681 to 1.4 g's.
9              Do you see that?
10        A.    Yes.
11        Q.    Can you draw a line on Figure 5 for
12   that segment?
13        A.    41:14.
14              MR. DURKIN:  We are making this
15   approximate --
16              MR. ESSIG:  Yeah.  I'm not going to
17   hold -- yes --
18              MR. DURKIN:  -- not going to be
19   possible to --
20              MR. ESSIG:  -- not going to hold --
21   perfect -- right.  Okay.
22   BY MR. ESSIG:
23        Q.    So for that segment of time -- and
24   let's -- can you -- let's mark this in one
25   segment 1 just so we -- we know what we are

THOMAS RICHARD JENKYN, Ph.D.

196

1
2      doing.
3              Okay, this is segment 2.
4              For segment 2 of the flight, where the
5      g-forces ranged from 0.681 to 1.4, do you have
6      any opinion that people were injured during that
7      part of the flight?
8          A.    They could have been.
9          Q.    Do you think it's more likely than not
10     all the people were injured at that point?
11         A.    All the people were injured?  No.
12         Q.    Do you think it is more likely than
13     not anybody was injured at that point?
14         A.    More likely than not, some people
15     would have been injured at that point.
16         Q.    How do you know who was injured and
17     who wasn't?
18         A.    I don't.
19         Q.    Why do you think that some people
20     would have been injured during that point in the
21     flight --
22         A.    Because it reason -- sorry.
23              It's too quick.
24              It's reasonable to assume, as we have
25     been discussing, that some people would have

THOMAS RICHARD JENKYN, Ph.D.

197

1

2  braced during that -- that situation.  And it's

3  my judgment that had they braced, they would

4  have sustained muscle strain.

5  Q.  So feeling forces from 0.68 to 1.4

6  g's, vertical acceleration would cause muscle

7  strain biomechanically in passengers on Flight

8  ET 302?

9  A.  That's not what's causing the muscle

10  strain.  It's the bracing.

11  Q.  But you don't actually have data on

12  bracing, right?

13  A.  That's right.

14  Q.  Do you know what the normal range of

15  g-forces are on a typical commercial airplane

16  flight?

17  A.  With -- I have a ballpark idea.

18  Q.  What are they?

19  A.  So based on measurements during

20  turbulence, I know the FAA and the NTSB describe

21  turbulence as having a number of different

22  severities, although it's frustrating

23  biomechanically, as they don't usually put

24  g-forces.  They put subjective descriptions.

25          But number 2, from the one piece of

THOMAS RICHARD JENKYN, Ph.D.

198

1

2    data I was able to -- again, and I'm not citing

3    it because, again, it's very frustrating, they

4    don't quote actual g-forces -- but number 2 is,

5    in my opinion, unusually large for a normal

6    takeoff.  It's not what you would expect 19

7    times out of 20.

8              If you went right into a cloud bank

9    and got some moderate turbulence, yes, number 2

10   is probably what you would experience.

11        Q.    And so if you went through a cloud

12   bank with moderate turbulence, it's your opinion

13   that passengers on the airplane like that would

14   all be injured? -- or that some passengers would

15   be injured? --

16              MR. DURKIN:  Objection,

17   argumentative --

18              MR. ESSIG:  Sorry.

19              MR. DURKIN:  -- form of the question.

20   BY MR. ESSIG:

21        Q.    -- that some passengers would be

22   injured?

23        A.    I would suspect so, with muscle

24   strain.

25        Q.    Did you ever look at the data on the

THOMAS RICHARD JENKYN, Ph.D.

199

1

2      flight data recorder for this particular

3      aircraft and determine what the range of

4      g-forces were on prior takeoffs?

5          A.    No, I didn't have access to that data.

6          Q.    If I represented to you that they were

7      between 0.6 positive g's and 1.3 positive g's,

8      do you think that might sound accurate?

9          A.    If it was going through a period of

10     turbulence, that would be reasonable.

11         Q.    Do you think that the people on the

12     prior flights that were subjected to g-forces

13     from 0.6 to 1.3 --

14              MR. DURKIN:  Objection, form --

15     BY MR. ESSIG:

16         Q.    -- were injured?

17              MR. DURKIN:  -- of the question.

18     Assume -- makes assumptions not in

19     evidence or --

20     BY MR. ESSIG:

21         Q.    You are an expert --

22              MR. DURKIN:  -- reasonable --

23     BY MR. ESSIG:

24         Q.    -- you can make assumptions.

25         A.    It's not the g-forces that are causing

THOMAS RICHARD JENKYN, Ph.D.

200

1

2    it.  It's the reaction to the g-forces.

3              So the person is causing their own

4    injury by bracing and reactively co-contracting

5    their muscles, and that's where the muscle

6    strain comes from.

7         Q.    So this period 2 that we are looking

8    at -- did you prepare -- you didn't simulate

9    this at all, right?

10        A.    I would have -- no.  No, I didn't.

11        Q.    So your simulation doesn't cover this

12   period of time at all?

13        A.    Correct.

14             MR. ESSIG:  Why don't we take a quick

15   break?  We have been going about an hour.

16             MR. DURKIN:  Yeah, I think so.

17             THE VIDEOGRAPHER:  We are going off

18   the record at 11:38 a.m.

19             (Recess from 11:38 a.m. to 11:55 a.m.

20   Eastern Standard Time)

21             THE VIDEOGRAPHER:  We are going back

22   on the record at 11:55 a.m.  Please proceed.

23             MR. ESSIG:  I talk over everybody and

24   anybody without prejudice.

25   BY MR. ESSIG:

THOMAS RICHARD JENKYN, Ph.D.

201

1

2      Q.    Okay.  So we are back, Dr. Jenkyn.

3            (Pause)

4            We are on what we labeled on your

5      chart at Figure 5, segment 2 of the flight,

6      correct? --

7      A.    Yes.

8      Q.    -- that's what we were discussing

9      before the break?

10     A.    Hm-hmm.

11           MR. ESSIG:  If we go to your report,

12     page 16, the bottom paragraph, second-to-last

13     sentence from the bottom.

14   BY MR. ESSIG:

15     Q.    You write:  Then for the next 2

16     minutes and 36 seconds from 8:38:38 until

17     8:41:14 the vertical acceleration ranged from

18     0.681 to 1.4 g's.

19           Right?

20     A.    Yes.

21     Q.    And that's what we have marked on the

22     report?

23     A.    Yes.

24     Q.    You don't say anything else at all

25     about that segment of the flight right here in

THOMAS RICHARD JENKYN, Ph.D.

202

1

2      your report, do you?

3          A.    Well, I'd have to review my report,

4      but, without --

5                MR. DURKIN:  You mean in that

6      paragraph of the report? --

7    BY MR. ESSIG:

8          Q.    In that paragraph, you don't, right?

9                MR. DURKIN:  Oh, okay.

10         A.    Oh, in that paragraph.  That's right.

11         Q.    Can you point to me any other place in

12     your report that discloses an injury -- an

13     actual injury -- in that segment of the flight?

14         A.    So I talk about the situation being

15     physically taxing, physically exhausting.

16     That's what I referred to.

17         Q.    Okay.

18               So the next sentence, though -- just

19     so we are clear on what the report says --

20         A.    Yes.

21         Q.    -- the next sentence, you say:  After

22     that, the undulations in the vertical

23     acceleration increased in magnitude.

24               Right?

25               And now we are talking about a

THOMAS RICHARD JENKYN, Ph.D.

203

1

2     different section of the flight?

3          A.     Correct.

4          Q.     So we are saying during the 2 minutes

5     and 4 seconds from 8:41:14 until 8:43:18, the

6     vertical accelerations ranged from 0.439 to

7     1.691 g's.

8                Do you see that?

9          A.     I do.

10         Q.     And that is the segment of flight that

11    you are talking about where you talk about the

12    physically taxing, physically excruciating,

13    exhausting condition of the passengers, correct?

14         A.     I agree, yes.

15         Q.     So if we go back to this second

16    section of the flight -- number 2 -- we can

17    agree you don't disclose any injury during that

18    portion of the flight in your report, right?

19                MR. DURKIN:  Objection, asked and

20    answered.

21                MR. ESSIG:  I agree.

22                I just want him to confirm --

23    BY MR. ESSIG:

24         Q.     We can -- there wasn't an injury at

25    that point.

THOMAS RICHARD JENKYN, Ph.D.

204

1

2            We are going to talk about the next

3    section of the flight where you do say there was

4    an injury, right?

5                MR. DURKIN:  Objection, asked,

6    answered, argumentative --

7                MR. ESSIG:  All right.  So we can

8    agree, point 2, no injury.

9                So let's move to the third section of

10   the flight.  That's what we are doing.  We are

11   going right through this thing, just the way you

12   do.

13   BY MR. ESSIG:

14       Q.    So this section starts at 8:41:14 --

15   right? -- that's the end of the line at the end

16   of number 2 --

17       A.    Hm-hmm.

18       Q.    And we go to 8:43:18, correct?

19       A.    Yes.

20       Q.    All right.

21             (Pause)

22                THE WITNESS:  Want me to draw a line?

23   Or --

24                MR. ESSIG:  Yeah, let's draw a line

25   and label it number 3.  Sorry about that.

THOMAS RICHARD JENKYN, Ph.D.

205

1

2    BY MR. ESSIG:

3         Q.    We know that the forces ranged there

4    from 0.439 g's to 10.691 g's, correct?

5         A.    Yes.

6         Q.    Do you have an opinion whether or not

7    it is more likely than not that passengers were

8    injured during that portion of the flight?

9         A.    If they were bracing -- but I have no

10   information as to whether or not they were

11   bracing -- if they were bracing, I would expect

12   that passengers more likely than not to sustain

13   muscle strain, or muscle sprain, or soft tissue

14   strain.

15        Q.    You don't know how many passengers

16   were bracing, if they were bracing at all,

17   right?

18        A.    Correct.

19        Q.    You don't know how long they were

20   bracing, do you?

21        A.    Correct.

22        Q.    You don't know how hard they were

23   bracing, do you?

24        A.    Correct.

25        Q.    So you could brace really hard and

THOMAS RICHARD JENKYN, Ph.D.

206

1

2      maybe that would be a chance to have greater

3      muscle strain?

4              Or you could brace less hard and not

5      have a muscle strain at all, right?

6      A.    Yes.

7      Q.    It's possible to brace and not have a

8      muscle strain.

9              They are not -- it is not required

10     that every time you brace, you have a muscle

11     strain, correct?

12     A.    Correct.

13     Q.    Do people experience muscle strains in

14     daily life whenever they brace?

15     A.    So it's known as delayed onset muscle

16     soreness.  And it can happen when you do

17     athletic activity, or when you brace, or when

18     you are loading isometrically, or when you are

19     standing for a long time.

20             The recovery process known as delayed

21     onset muscle soreness and usually takes a day or

22     two.

23     Q.    So the kind of muscle strain that you

24     are talking about is muscle soreness, right?

25     A.    Yes.

THOMAS RICHARD JENKYN, Ph.D.

207

1

2          Q.     And the way we know if somebody's

3     muscles are sore is -- it's a subjective

4     reaction, right?

5          A.     Yes.

6          Q.     After the physical exertion --

7     whatever it was -- or whenever the forces are

8     exerted on a person, then they can say after

9     that, "whatever that was that happened, I was

10    sore"?

11         A.     Yes.

12         Q.     And you are saying that is injury?

13         A.     Because that delayed onset muscle

14    soreness is accompanied by micro-tears within

15    the muscle.

16                Now, this is also how you hypertrophy

17    your muscle and get stronger.

18         Q.     So that is exactly where I was going.

19                I know Kevin works out a lot.  I work

20    out.

21                If you are doing pushups or something

22    like that and you have sore muscles, would you

23    say you are injured?

24         A.     Technically, you are.

25                But it's an injury that you want for

THOMAS RICHARD JENKYN, Ph.D.

208

1
2      the purpose of hypertrophying the muscle.
3          Q.     So if I lift a heavy suitcase, or I go
4      work out, or I do some sort of physical
5      exertion, and I have sore muscles, you think
6      technically I'm injured under your definition?
7          A.     Yes.
8          Q.     And even if I don't say that it was
9      subjectively painful, I was injured.
10                 Is that right?
11         A.     Because microscopically, your muscle
12     tissue has been disrupted.
13         Q.     And if I never went to a doctor, I
14     never go seek any treatment, I'm still injured.
15                 Is that right?
16         A.     Yes.
17         Q.     And even if it's something that I
18     wanted, in terms of the physical benefit of --
19     you know, to the muscle in terms of a workout,
20     I'm still injured.
21                 Is that right?
22         A.     Yes.
23         Q.     Do you have any idea at what minimum
24     level of force that this sort of a muscle strain
25     that you are terming an "injury" would occur?

THOMAS RICHARD JENKYN, Ph.D.

209

1

2      A.    No.

3      Q.    Do you have any opinion as to what

4   level of vertical acceleration, and g-force

5   specifically, would need to be happening on the

6   plane for somebody to brace and have this

7   particular injury?

8      A.    Well, the problem is the g-forces

9   themselves are not direct causes of the muscle

10  strain.  It's the reaction of the passenger.

11     Q.    The g-forces might be an indirect

12  cause of the muscle strain, though, right?

13     A.    Because you are in a stressful

14  situation.

15     Q.    And the higher the g-forces, the

16  greater the requirement for bracing, right?

17     A.    If you are physically going to

18  restrain your body, yes.

19     Q.    So if -- we talked about the prior

20  data on flights of this particular airplane

21  ranging from 0.6 to 1.31 g's.

22           Are you aware of any evidence that

23  anybody on any of those particular flights

24  reported an injury?

25     A.    I don't have that data.

THOMAS RICHARD JENKYN, Ph.D.

210

1

2          Q.     And you don't have any understanding

3     about whether or not anyone on those flights had

4     muscle strain?

5          A.     Right.

6                 (Pause)

7                 MR. ESSIG:  If we turn over here to

8     the bottom of page 17, we are talking about this

9     section 3 of the flight.

10                And the last couple of sentences

11    say -- I'm starting here where it says:  This

12    range of undulation above plus 1 g by more than

13    60% and below by about 50% is biomechanically

14    significant since each passenger would be

15    experiencing inertial loading on their bodies

16    and would not usually -- that they would not

17    usually experience, nor expect to experience on

18    a commercial flight, and which would be highly

19    unusual during a normal and safe commercial

20    flight.

21                Do you see that?

22         A.     Yes.

23         Q.     What do you mean by "biomechanically

24    significant"?

25         A.     Having at significant effect on the

THOMAS RICHARD JENKYN, Ph.D.

211

1

2      biomechanics of the body -- so beyond what would

3      be considered a normal situation.

4          Q.    And you were telling me before,

5      whether or not there is an injury doesn't

6      necessarily turn on the level of g-force at this

7      point?

8          A.    Right.

9          Q.    But you are saying that whether or not

10     there is a biomechanically significant impact on

11     the passenger does depend on the level of

12     g-force.

13              Is that right?

14         A.    For moving the body, yes.

15         Q.    What's the difference?

16              What -- can you explain why it matters

17     in one context and not in the other?

18         A.    Well, when you are talking about the

19     g-forces moving the body, that is just straight

20     physics.  So an acceleration has been applied on

21     the mass of each of your segments and it moves.

22              Whereas with the muscle strain and the

23     bracing, that is your reaction as an individual

24     to the stressful situation.

25              So you are going to have somebody who

THOMAS RICHARD JENKYN, Ph.D.

212

1
2       is a very nervous flier already gripping as soon
3       as the plane starts taking off, gripping the
4       armrests early on, and getting muscle strain
5       then; versus somebody who is a frequent flier
6       and doesn't realize that this flight is in
7       trouble until right at the end.
8               Q.      Understood.
9                       So if my wife is definitely afraid of
10      flying.  She won't get on an airplane without
11      me, which is good and bad.
12                      But so, if you are a very anxious
13      flier and you are sitting in the departure
14      lounge just holding on to the chair there
15      getting ready to get on the plane because you
16      are very nervous and bracing, under your
17      definition, you could suffer an injury, right?
18              A.      Yes.
19              Q.      In terms of this -- setting aside the
20      strain injury and focusing just on the second
21      part of this -- the actual impact of the
22      g-forces loading on the body -- is it your
23      opinion that under these conditions that a
24      g-force above 1 -- plus 1 g by more than 60% or
25      below by about 50% that g-forces of that level

THOMAS RICHARD JENKYN, Ph.D.

213

1
2       cause injuries in terms of just loading on to
3       the body?
4           A.    No.
5           Q.    No injury at that point based on that
6       loading?
7           A.    Based on that alone.
8           Q.    Again, you are characterizing what
9       would be usually experienced or experienced on a
10      commercial airplane -- commercial airplane
11      flight in this sentence, right?
12          A.    Yes.
13          Q.    And you testified that you did or
14      didn't know what the typical vertical
15      accelerations are during normal commercial
16      flight?
17          A.    I found some sources that actually
18      quote g-forces, but they are not reliable.  They
19      are in odd places.
20              When you go to the NTSB and FAA, from
21      what I was able to find, it's all subjective,
22      but sort of within the range of moderate to
23      severe turbulence.
24          Q.    You didn't cite any of those sources
25      in your report?

THOMAS RICHARD JENKYN, Ph.D.

214

1
2          A.      That's right.
3          Q.      You didn't disclose that they exist,
4     right?
5          A.      I didn't find any good ones.
6          Q.      So none of the sources that you looked
7     at that talk about the range of normal g-forces
8     experienced on a commercial flight you feel are
9     good sources --
10         A.      At least I haven't --
11         Q.      -- or reliable?
12         A.      -- I haven't been able to find one
13    yet.
14         Q.      Okay.
15                 And so how did you then make the leap
16    to discerning what is the normal g-force on a
17    commercial flight?
18                 And whether or not this is normal or
19    not?
20         A.      Well, the thing is, 19 times out of 20
21    when you are taking off and going on a flight,
22    do you expect to encounter severe turbulence?  I
23    don't.
24                 Maybe one time out of 20.
25                 But usual commercial flight, I would

THOMAS RICHARD JENKYN, Ph.D.

215

1
2    not expect to encounter severe, or even
3    moderate, turbulence.
4              And the numbers I saw for moderate
5    turbulence, there is nothing moderate about it.
6    It's really a big shake.
7              I would expect maybe a little light
8    turbulence when you cross the cloud layer; maybe
9    some clear air turbulence of a low level -- so
10   you spill your drink -- or less than that.
11             So when I'm saying larger than what
12   you would expect on a normal commercial flight,
13   I would not expect moderate or severe turbulence
14   on a normal commercial flight.
15             That's the point I'm making.
16        Q.   Okay.
17             And we -- we talked about the fact
18   that the experts for Boeing that disclosed their
19   reports that looked at the prior flight data on
20   previous takeoffs from this airplane said the
21   g-forces on though prior takeoff ranged from 0.6
22   to 1.3 g's, right?
23             MR. DURKIN:   Objection, argumentative.
24   BY MR. ESSIG:
25        Q.   That's what they said, right?

THOMAS RICHARD JENKYN, Ph.D.

216

1
2      A.      That's what they said.

3      Q.      Okay.

4              Do you have any reason --

5              MR. DURKIN:  That's what you said they

6      said.  You didn't show him any report --

7              MR. ESSIG:  He said he reviewed the

8      Boeing reports.

9      A.      To the best of my recollection.

10             If it's slightly inaccurate, I don't

11     have the report in front of me, so that's the

12     best I can do.

13             MR. DURKIN:  -- foundation.

14             MR. ESSIG:  That's fair.  And if it's

15     wrong, it's on me.

16             MR. DURKIN:  Yeah.

17             MR. ESSIG:  That's fine.

18     BY MR. ESSIG:

19     Q.      And you said you didn't have any

20     evidence that the people on those flights were

21     injured under those forces, right?

22     A.      I don't know one way or the other.

23     Q.      Okay.

24             Do you have any idea about whether

25     those seven takeoffs were normal takeoffs?

THOMAS RICHARD JENKYN, Ph.D.

217

1
2        Or not?
3    A.    I don't have that data.
4    Q.    Okay.
5        In terms of the difference between the
6    g-forces experienced on those prior takeoffs and
7    the g-forces experienced during this segment of
8    flight -- segment 3 -- we are talking about a
9    difference of maybe 0.2 g's on the low end,
10   right?
11       So that in this segment of flight, it
12   was 0.439 g's.
13       And in the previous seven flights
14   there was a low of 0.6 g's, right?
15   A.    Sure.
16   Q.    On the high end in this segment of
17   flight, the positive g's were 1.69.
18       And on the prior flights, they got up
19   to about 1.3, right?
20   A.    I don't have the data, so I don't --
21   I'm trusting that that's what the data says.
22   Q.    So are you saying there was injury
23   during this period of flight due to straining
24   based on be those couple of tenths of g's
25   greater or lesser than the type of flight that

THOMAS RICHARD JENKYN, Ph.D.

218

1
2    this exact plane encountered in previous
3    takeoffs?
4              MR. DURKIN:   Objection, answered,
5    argumentative.
6         A.    It would depend on the response of the
7    passengers.  I have no idea.
8         Q.    Okay.
9              Do you have any understanding in your
10   field in terms of biomechanical expertise or
11   your opinions in this case about whether a
12   person is able to discern the difference of
13   something like 0.3 or 0.4 g's?
14        A.    Yes.
15        Q.    Can they discern the difference
16   between two tenths of a g?
17        A.    That's probably about the limit.
18        Q.    Okay.
19              But you think they could discern the
20   difference of three tenths of a g?
21        A.    Yes.
22        Q.    What's your support for that opinion?
23        A.    Just the -- that is about the
24   acceleration you get in an elevator, and you
25   feel the elevator.

THOMAS RICHARD JENKYN, Ph.D.

219

1

2      Q.    So not necessarily any literature or

3   any disclosure in this report.

4            This is just your subjective sensation

5   of riding an elevator and knowing that's what

6   the g-forces are?

7      A.    I'm sure the literature is out there.

8            But that's -- that's the range of

9   accelerations you get in an elevator, and you

10  feel it.

11     Q.    You are saying it's those tenths of a

12  g on either end which would have caused this

13  portion of the flight to seem highly unusual to

14  all the passengers on night ET 302?

15     A.    Well, I think it was a bit larger than

16  that.

17           In the section we are talking about,

18  we are going 0.439 to 1.691?  That's what we are

19  talking about, right?

20     Q.    Hm-hmm.

21     A.    That's quite a bit bigger than riding

22  an elevator.

23           This is -- and remember -- are we

24  still talking muscle strain?

25           Or, like, how the passengers are

THOMAS RICHARD JENKYN, Ph.D.

220

1

2      reacting?

3              Because --

4       Q.     We are talking injuries.

5       A.     Injuries.

6              So I've already said, with those

7      accelerations, they are not going to get a

8      direct injury directly due to the acceleration.

9      So if you are getting -- talking muscle strain

10     or muscle sprain, that is the response of the

11     individual to the situation.

12      Q.     Okay.

13             MR. ESSIG:  If we look back at -- I

14     just want to close this section out.

15             So if we look at page 18 of your

16     report -- turn the page --

17             THE WITNESS:  Hm-hmm.

18             MR. ESSIG:  -- the end of that middle

19     paragraph.

20     BY MR. ESSIG:

21      Q.     That's where you say:  The fact of

22     this state of undulating vertical accelerations

23     at irregular and unpredictable moments lasted

24     for more than two minutes would have more likely

25     than not been physically taxing, physically

THOMAS RICHARD JENKYN, Ph.D.

221

1
2    agonizing, physically excruciating, and
3    physically exhausting to every passenger on the
4    aircraft.
5             Do you see that?
6    A.    Yes.
7             MR. DURKIN:  Apologies, could give me
8    the page again --
9             MR. ESSIG:  18.
10            MR. DURKIN:  Okay, thank you.
11            (Pause)
12   BY MR. ESSIG:
13   Q.    Just to be clear, I just want to
14   look at since -- this is we are -- we've been
15   talking about this, sort of, conceptually, but
16   this is what the sentence is.
17            There is no citation to any authority
18   for that conclusion in your report right there,
19   right?
20   A.    That's correct.
21   Q.    Do you have any specific citation of
22   literature or support for that opinion?
23   A.    Not to hand.
24   Q.    Are the terms "physically taxing,
25   physically agonizing, physically excruciating,

THOMAS RICHARD JENKYN, Ph.D.

222

1

2      and physically exhausting" subjective?

3          A.    Well, with the word "physical" there,

4      the severity of them is subjective.

5                The binary -- is it there, or not? --

6      that's objective.

7          Q.    So it's fair to say that looking

8      across the population of folks that were on the

9      airplane, the severity of whether it was taxing,

10     or agonizing, or excruciating would vary a great

11     deal depending on the person, right?

12         A.    That's fair.

13         Q.    For some people, it would be much more

14     on the low end, and for some people it would be

15     much more on the high end?

16         A.    Yes.

17         Q.    And I don't know if I asked this

18     before or not.

19               But in the field of biomechanics, are

20     those terms that are defined in terms of to

21     biomechanical engineering?

22         A.    No, those aren't terms of art.

23         Q.    Okay.

24               Better way of --

25         A.    You like that?

THOMAS RICHARD JENKYN, Ph.D.

223

1

2      Q.     Yeah.

3             Okay, so for ending segment 3, we can

4      say there was no -- no injury other than the

5      potential for this -- the physically taxing or

6      exhaustion due to bracing, right?

7      A.     Sure, in its various forms.

8             MR. ESSIG:  Okay, so let's move on to

9      the last 24 seconds.

10            So on your chart there can you mark

11     what the section 4 is for the last 24 seconds?

12            THE WITNESS:  Hm-hmm.

13     BY MR. ESSIG:

14     Q.     Is it your opinion that injury

15     occurred in the final 24 seconds for everybody

16     on the airplane?

17     A.     Yes.

18     Q.     And this is the first time that you

19     had that opinion -- that everybody was injured

20     in that portion of the flight, right?

21            MR. DURKIN:  Objection --

22            MR. ESSIG:  It is true.

23            MR. DURKIN:  Okay, objection,

24     misleading, argumentative -- whatever.

25     BY MR. ESSIG:

THOMAS RICHARD JENKYN, Ph.D.

224

1

2      Q.    This is the first time you say

3   everybody on the plane was injured?

4      A.    Yes.

5      Q.    Okay.

6            Is it your opinion that everybody

7   during this portion of the flight would have

8   gotten a contusion injury from the forces

9   applied by their seat belts?

10     A.    Yes.

11     Q.    And you don't identify any other time

12  period during the time horizon of the flight

13  where everybody would have received a bruise in

14  their seat belts, right?

15     A.    A contusion from their seat belts.

16     Q.    A contusion.

17     A.    They didn't live long enough to get

18  the bruise.

19     Q.    Okay.  Okay.  Fair enough.

20           A contusion -- what is the difference

21  between a contusion and a bruise?

22     A.    So a contusion is damage to the dermis

23  and the superficial blood vessels.

24           And then the bruise occurs as the

25  blood leaks out of those blood vessels and

THOMAS RICHARD JENKYN, Ph.D.

225

1

2       forms -- and pools and forms discoloration.

3            Q.     Is it your belief nobody actually had

4       a bruise on the plane?

5                   They only had contusions because the

6       portion of the flight where they could have

7       gotten one just didn't last long enough?

8            A.     That's right.

9            Q.     Did you also agree that the injuries

10      in terms of the force of the seat belt on their

11      pelvis -- the contusions -- those couldn't have

12      occurred until the passengers experienced

13      negative g's?

14                  Is that right?

15           A.     That's right.

16           Q.     It has to be something lower than zero

17      g's?

18           A.     Yes.

19           Q.     So at the bottom of page 18, the last

20      sentence of your paragraph says:  What made the

21      final 24 seconds -- recorded seconds -- worse

22      than the previous period was that the vertical

23      acceleration in two instances went negative with

24      a significant magnitude below zero g's (points 2

25      and 4).

THOMAS RICHARD JENKYN, Ph.D.

226

1
2          Do you see that?
3     A.    Yes.
4     Q.    And then it is in Figures 5 and 6.
5          So those are the two instances that
6     made the final 24 seconds the worse than the
7     part of the flight before?
8     A.    That's right.
9          MR. ESSIG:  And then on 21 --
10         (Pause)
11         MR. ESSIG:  -- I am bouncing around
12    here, but I'm trying to find the time stamps so
13    I get this right.
14  BY MR. ESSIG:
15    Q.    You write that:  At 8:43:26, the
16    passengers would have been forced out of their
17    seats as the aircraft dropped away below them,
18    right?
19    A.    That's right.
20    Q.    So that's the first time -- 8:43:26 --
21    when the passengers encountered g-forces below
22    zero?
23    A.    That's the peak negative, so it would
24    have gone negative just before that.
25    Q.    Okay.

THOMAS RICHARD JENKYN, Ph.D.

227

1

2          So maybe if we -- you know, a way to

3      short-circuit this is if look at Figure 6, which

4      I understand is sort of -- it's a blown-up

5      segment of what we were just talking about what

6      we labeled portion 4 on Figure 5, right?

7          A.    That's right.

8          Q.    But part of the -- this first time

9      they went below zero is you have a 0.2 and an

10     arrow to it, right?

11         A.    That's right.

12         Q.    And it's all of that curve -- the

13     bottom part of that curve that goes below zero,

14     right?

15         A.    That's right.

16         Q.    Do you have -- do you know how many

17     seconds that portion of the curve lasted?

18         A.    I don't.

19         Q.    Okay.

20               Based only the time scale below, can

21     you make an estimate?

22               Do you think it's something like four

23     seconds?

24               (Pause)

25         A.    Yeah, four or five seconds.  That's

THOMAS RICHARD JENKYN, Ph.D.

228

1
2    fair.
3              MR. ESSIG:  So, then, back on page 21,
4    I guess it's forward now in that same paragraph
5    we were just talking about.
6    BY MR. ESSIG:
7         Q.    You say:  At 8:43:30 -- point 3 -- do
8    you see that?
9         A.    Yeah.
10        Q.    -- the passengers were pushed down
11   into their seats again.
12             Right?
13        A.    Yes.
14        Q.    Is that the -- if we go to Figure 6,
15   is that the portion of the flight that starts
16   with the blue shading?
17        A.    No, the blue shading is just -- so I
18   got this chart originally from Charley Pereira,
19   and I modified it.  I kept the curve the same,
20   but that blue shading meant something previously
21   that doesn't mean anything now.
22             Now, it's awful close, so it's
23   probably convenient to use it that way.  I think
24   that's reasonable.
25             But I didn't put that in there to

THOMAS RICHARD JENKYN, Ph.D.

229

1

2     indicate that.

3          Q.     Understood.

4                 I think I'm actually confusing this

5     more than it needs to be.

6                 I think we agreed that first little

7     trough below zero is about three or four

8     seconds, right?

9          A.     About four seconds, yeah.

10         Q.     Four seconds.

11                So then in this period that we are

12    talking about -- point 3 -- that's the beginning

13    of this positive g that we are talking about?

14         A.     Hm-hmm.  Goes positive again, yeah.

15         Q.     Okay.

16                MR. ESSIG:  If we look at page 24, the

17    middle paragraph there, do you see that?

18                THE WITNESS:  Yes.

19    BY MR. ESSIG:

20         Q.     You are describing Figure 9, which is

21    a depiction of point 2?

22                Is that right?

23         A.     That's right.

24         Q.     And you say there that at point 2, the

25    seat belts are taut with the tension between 181

THOMAS RICHARD JENKYN, Ph.D.

230

1

2      and 261 newtons.

3            Do you see that?

4      A.    Hm-hmm, yes.

5      Q.    I know you disclose a threshold for

6      bruising or contusion that -- based on that

7      Desmoulin research?

8      A.    Yes.

9      Q.    And that threshold -- do you recall it

10     342 newtons?

11     A.    That's right.

12     Q.    So for this period of time below zero

13     g's, that threshold is not met, correct?

14     A.    For those three people.

15     Q.    Okay.

16            Do you believe that 181 to 261 newtons

17     of force is enough force to cause a contusion?

18     A.    I don't have any data on that, so I

19     can't give a pronouncement.

20     Q.    And the threshold number for

21     Desmoulin -- that was 342?

22     A.    342.

23     Q.    And that threshold number -- when he

24     calculated that threshold, that was the point

25     where it actually was 50% of the people had a

THOMAS RICHARD JENKYN, Ph.D.

231

 1
 2    bruise and 50% of the people didn't have a
 3    bruise, right?
 4        A.    No.
 5            So that was where bruises -- that's
 6    the lowest value where bruises occurred, in a
 7    bony area, if you go to the raw data in Table 1
 8    of that paper.
 9        Q.    Okay.
10            So everybody in a bony area at that
11    point had a bruise?
12        A.    Yes.
13        Q.    And at least for this first inflection
14    point below zero G -- around point 2 on Figure
15    6 -- there is no bruise at that point, right?
16        A.    For those three people.
17        Q.    Okay.
18            And it didn't meet the threshold for
19    the population, based on your opinion?
20        A.    Well, it -- we did it from 5th
21    percentile female, which are the lightest, to
22    95th percentile male.  So the heaviest person
23    here is a 50th percentile male in the center
24    seat.  He didn't rise to the threshold, but
25    heavier males did; well, heavier females did as

THOMAS RICHARD JENKYN, Ph.D.

232

1
2      well.
3          Q.    Do you disclose anybody in your report
4      that would have received a contusion based on
5      their body weight or type?
6          A.    I didn't quantify that in the report.
7          Q.    So in your report, you didn't quantify
8      or conclude that anybody at that particular time
9      point -- that first excursion below zero g's --
10     received a contusion?
11         A.    I know from the simulations that a
12     portion did.
13         Q.    But it's not in your report?
14         A.    That's right.
15              (Pause)
16              MR. ESSIG:  So if we are looking --
17     there is reference to Figure 9 there in that
18     sentence that we just read?
19              It's on page 25?
20              THE WITNESS:  I'm there.
21     BY MR. ESSIG:
22         Q.    That picture is a capture of your
23     simulation at point 2, right?
24         A.    That's right.
25         Q.    And that's the first time we went

THOMAS RICHARD JENKYN, Ph.D.

233

1
2    through negative g's where it got to about
3    negative 0.44, right?
4         A.    That's right.
5         Q.    In your simulation, all the model arms
6    are up.
7               Is that right?
8         A.    Yes --
9         Q.    Do you have --
10        A.    -- except for the window seat.  She's
11   kind of stuck on the wall there.
12        Q.    Yeah.
13              It's not below her shoulder.
14              It's at least at her shoulder?
15        A.    Yes.
16        Q.    Do you have any evidence that
17   passengers would not have been able to hold
18   their arms down at point -- at negative 0.44 g?
19        A.    No.
20        Q.    There is in literature that you point
21   to that stand for that proposition?
22        A.    I pointed to no literature.
23        Q.    At negative 0.44 g, your arms would be
24   accelerated upward at about a little less than
25   half their normal weight.

THOMAS RICHARD JENKYN, Ph.D.

234

1
2           Is that right?
3      A.    That's right.
4      Q.    Do you think it's likely that most
5  people could keep their arms down with that
6  amount of force being exerted on them?
7      A.    I couldn't say.
8      Q.    You don't know whether or not people
9  of average strength or size can hold their arm
10  down in the face of a force about half the
11  weight of their arm?
12      A.    Yeah, it's not just the force, though.
13           It's the fact that you are now
14  experiencing gravity going in the wrong
15  direction.  So can you maintain your
16  orientation, and your awareness, and your
17  wherewithal to actually do that to your arm?  So
18  there is a number of things going on right now.
19           Can you produce that force in your
20  arm?  Yes.  Can you do it while you are hanging
21  upside down?  That's a different question.
22      Q.    Understood.
23           So the answer is:  You didn't model
24  whether or not they could because you didn't
25  include resistance or bracing in your

THOMAS RICHARD JENKYN, Ph.D.

235

1

2     simulation?

3          A.     As we discussed before, because I

4     wanted to conservative model and didn't want to

5     make those assumptions.

6          Q.     And your opinion as an expert in

7     biomechanics is that we don't know if all their

8     arms would be up at that point?

9          A.     That's right.

10         Q.     Do you believe that at least some

11    people's arms might have been down?

12         A.     Yes.

13         Q.     But you don't have any idea about what

14    the proportion of the people --

15         A.     No.

16              MR. ESSIG:  So if we turn back to 21,

17    this is towards the middle of the first

18    paragraph.

19    BY MR. ESSIG:

20         Q.     It says:  During period of more than

21    12 seconds.

22              Do you see that?

23              THE WITNESS:  That's a big paragraph.

24    That's my own fault.  How many lines down,

25    sorry?  Help me out here.

THOMAS RICHARD JENKYN, Ph.D.

236

1

2           MR. DURKIN:  About two thirds of the

3    way down.

4           THE WITNESS:  Okay.  Yes, I'm there.

5    BY MR. ESSIG:

6       Q.    During the period of more than 12

7    seconds after 8:43:30, passengers would have

8    been thrust out of their seats with a force

9    equal to nearly twice their body weight.

10          Do you see that?

11      A.    Yes.

12      Q.    And here passengers would have been

13   only thrust out of their seats when the vertical

14   acceleration was less than zero g's, right?

15      A.    Yes.

16      Q.    And the force would only be equal to

17   nearly twice their body weight when the force

18   approaches negative 2 g's, right?

19      A.    Yes.

20      Q.    So if we turn back to Figure 6,

21   8:43:30 is at point, right?

22          (Pause)

23      A.    Yes.

24      Q.    And the forces there are actually

25   positive, right?

THOMAS RICHARD JENKYN, Ph.D.

237

1

2      A.     Right.  They're on their way down.
3  You are right.
4      Q.     So they -- on page 21 you state they
5  are actually 0.798 positive g's, right?
6      A.     Hm-hmm.
7      Q.     And so that point, the passengers are
8  being forced into their seats, not thrust out of
9  their seats?
10      A.     Right.
11      Q.     And if we look at Figure 6, the forces
12  stay positive until the blue shaded area, right?
13      A.     Yes.
14      Q.     And that's where the second period of
15  negative g's starts?
16      A.     That's right.
17      Q.     Okay.
18             So the period from 3 to 4 is 12
19  seconds long?
20      A.     Yes --
21      Q.     And I know --
22      A.     -- roundabout --
23      Q.     -- we are doing -- kind of an
24  inaccurate --
25      A.     -- yeah, yeah --

THOMAS RICHARD JENKYN, Ph.D.

238

1

2          Q.     -- but as close as we can do kind of
3     estimate about how long this period lasts.
4               Is it -- would you agree that the
5     period in the blue shaded area to the right of
6     it is probably about five or six seconds?
7          A.     I'd agree.
8          Q.     So if we look at this chart on Figure
9     6 where it's blown up, can you look to see where
10    the forces actually went below negative 1 g?
11         A.     So you got this blip; you got a shelf
12    there where it looks like it, kind of, holds at
13    about minus 1 --
14         Q.     Yeah.
15         A.     -- so the start of that, again, just
16    before 6:17.
17         Q.     And you can mark that on your chart?
18         A.     I have marked that, yeah.
19         Q.     Okay.
20              So that's when we get to negative 1
21    g's?
22         A.     That's right.
23         Q.     Do you know how many seconds then are
24    recorded there in the flight where passengers
25    experienced forces less than negative 1 g?

THOMAS RICHARD JENKYN, Ph.D.

239

1

2          A.    That would be three seconds, or

3    slightly more, but close to three.

4          Q.    So we can agree the whole blue-shaded

5    area is five to six seconds.

6                The portion of time below negative 1

7    g's is three seconds.

8                Right?

9          A.    That's fair.

10               MR. ESSIG:  If we go to the next

11   increment here -- 1.5 g's -- can you mark on

12   there where that is?

13               THE WITNESS:  Yes.

14   BY MR. ESSIG:

15         Q.    How long do you think that they felt

16   forces that were at least negative 1.5 g's or

17   more?

18         A.    About two seconds.

19         Q.    Okay.

20               One and a half, two seconds seems

21   fair?

22         A.    Yeah.

23               MR. ESSIG:  So if we look at figure 11

24   on page 26 --

25   BY MR. ESSIG:

THOMAS RICHARD JENKYN, Ph.D.

240

1

2      Q.      That figure is characterizing what

3    your simulation was showing graphically at point

4    4, right?

5      A.      That's right.

6      Q.      8:43:43?

7      A.      Correct.

8      Q.      And that's the end of the recorded

9    data for the flight?

10     A.      That's right.

11     Q.      At point 4, you calculate that the

12   force of the seat belt tension would apply --

13   you calculated the force of the seat belt

14   tension that would apply to the passengers you

15   modeled, right?

16     A.      That's right.

17     Q.      And, again, that's the force when the

18   g's are at negative 1.91, which is the maximum

19   negative g's recorded on the flight --

20     A.      Right.

21     Q.      -- correct?

22             And so the results that you are

23   recording there in newtons -- that represents

24   the maximum tension of force on the belt?

25     A.      Actually, no.

THOMAS RICHARD JENKYN, Ph.D.

241

1

2          So what I -- I took -- so when you
3     look at the output for the simulation -- quite
4     right, I can see where you are going --
5          Q.    Yeah.
6          A.    -- the seat belt tension is changing.
7     And it's changing pretty much with those
8     accelerations.
9          So, so long as you are positive, seat
10    belt tension is just whatever you have tightened
11    it up to, and that's not causing a contusion.
12         As soon as you go negative, now the
13    seat belt tension is going to go up.  And it's
14    monotonic with -- pretty much with the seat belt
15    tension --
16         Q.    What is that -- I don't mean to
17    interrupt, I just don't know what monotonic
18    is --
19         A.    One to one.  So as the acceleration
20    goes up, the seat belt goes up --
21         Q.    Proportionally?
22         A.    -- and it -- because the seat belt
23    tension was highly sensitive to the mass of the
24    subject and to the acceleration you apply, which
25    makes sense.

THOMAS RICHARD JENKYN, Ph.D.

242

1

2              So -- yeah, so for each of the

3      subjects, you would see that seat belt tension

4      going up.

5              There were some -- now when you look

6      at the data, when you look at the output, there

7      seemed to be -- it was also affected a bit by,

8      once the person came out of their seat and they

9      were held only by the seat belt, now you are

10     allowed a little bit of motion one way or the

11     other --

12        Q.     Proportional forces?

13        A.     -- yeah -- and so people would kind of

14     react and you would get seat belt force, you

15     know, was affected a little bit by that.

16              So what you would find is often the

17     maximum was right at that final data point, but

18     not always.  And sometimes it would, kind of,

19     plateau because you have these other factors.

20              So where -- so after -- I can see the

21     point you are going to make --

22        Q.     What do you think it is?

23        A.     When did everybody absolutely have a

24     contusion? --

25        Q.     Yes.

THOMAS RICHARD JENKYN, Ph.D.

243

1
2       A.     -- am I right?  Okay --
3       Q.     That's the discussion I'm trying to
4    have?
5       A.     It's a fair question.  It is a fair
6    question.
7              And so I went back and had a look at
8    that.  I said:  Well, that's an interesting
9    question --
10      Q.     And just --
11             MR. DURKIN:  I do want him to finish
12   his answer.
13             MR. ESSIG:  I know.  I'm going to let
14   him finish.
15             Just when you say you "went back and
16   had a look at that," you were about to tell me
17   something that's not in your report, right? --
18             MR. DURKIN:  No, he -- but let him
19   finish the question, then you can go back to it,
20   okay? --
21             MR. ESSIG:  -- I --
22             MR. DURKIN:  -- go on and finish the
23   question.
24             And then you can ask him another
25   question --

THOMAS RICHARD JENKYN, Ph.D.

244

1
2              MR. ESSIG:  I'll do it.  Sorry --
3              MR. DURKIN:  -- go ahead and finish --
4              MR. ESSIG:  -- sorry about that.
5      A.     So in the report, it definitely shows
6   I gave the forces, and when they -- so I gave
7   the forces and showed conclusively everybody
8   exceeded the threshold.
9              What I didn't put in my report is
10  when.
11             And so I went back to have a look at
12  when.
13             And -- as I said before, with that
14  first downturn, the heavier people exceeded it
15  early on, just because they are heavier.
16     Q.     When you said "that first downturn"
17  what do you mean?
18     A.     So at point 2, that section where we
19  got four to five seconds.
20             There was a portion -- now, they had
21  to be heavier than a 50th percentile male,
22  right? -- I don't have it to hand, but I think
23  it was about, you know, 65th percentile
24  weight -- they exceeded it that first time.
25             But then you go to the second one, and

THOMAS RICHARD JENKYN, Ph.D.

245

1
2       the first thing you look at is to say:  Okay,
3       who is going to have the smallest seat belt
4       tensions?  It's going to be your lightest
5       females, because we know it's a monotonic
6       connection between seat belt tension and the
7       weight of the person.
8               Every single 5th percentile female
9       exceeded it at about two seconds before the end
10      of the flight data recorder.
11              And then it's a scale beyond that.  So
12      everybody who is heavier than that, which is
13      everybody else, exceeded that threshold before
14      the 2.4 seconds.
15      Q.    And so this is analysis that's not in
16      your report, correct?
17      A.    No, it's contained within the
18      simulations, but I didn't report it directly in
19      my report.
20      Q.    And you didn't report the calculations
21      that you just described to come to those
22      conclusions, correct?
23      A.    It's all in the simulation.
24      Q.    But you didn't disclose the
25      calculations that you just described to come to

THOMAS RICHARD JENKYN, Ph.D.

246

1
2     that conclusion in your report?
3             MR. DURKIN:  He gave you the
4     simulation.  What are you talking about?
5             Objection.
6   BY MR. ESSIG:
7        Q.    There is no word --
8             MR. DURKIN:  Ah, fair question --
9   BY MR. ESSIG:
10       Q.    -- in your report that says these
11    things, right?
12       A.    No, I don't talk about the timing of
13    when the threshold is exceeded.
14            I only report that the threshold is
15    exceeded.
16       Q.    And you report that it is exceeded at
17    the end of the -- at point 4, at the end of the
18    recorded flight, right? -- maximum g's?
19       A.    Or -- well, again for the lightest
20    person on the plane that I tested, they exceeded
21    it 2.4 second before the end, and then it
22    maintained that -- maintained exceeding it until
23    the end of the flight data recorder.
24       Q.    Enough time to have a contusion, but
25    not a bruise?

THOMAS RICHARD JENKYN, Ph.D.

247

1

2      A.    That's right.

3      Q.    A disruption of the skin?

4      A.    So the thing about a -- possibly you

5    could have aberrations.

6           But a bruise is usually characterized

7    by the skin being intact and the dermis

8    underneath being crushed and the blood vessels

9    being disrupted and bleeding.

10      Q.    So the surface of the skin -- you

11    don't actually have an opinion that even the

12    surface of the skin of the passengers that you

13    simulated was disrupted?

14      A.    That's right.

15      Q.    When is the -- if the lightest female

16    was 2.4 seconds -- and I'm trying to catch up

17    with you because I don't know -- what was the

18    time point for a heavier person?

19           I mean, how many other people did you

20    compute this time horizon for?

21      A.    So I didn't do a full sensitivity

22    analysis.  I just wanted to make sure the 5th

23    percentile female did.

24           And I looked at a few others.

25           So if we go back to that chart -- I

THOMAS RICHARD JENKYN, Ph.D.

248

1
2    think it's handy --
3         Q.    Which chart?
4         A.    -- the way we have labeled it up --
5    that one you are looking at --
6         Q.    Sixty --
7         A.    -- thank you.
8              So if we have a look, the last line I
9    drew was around about 1.5 to two seconds --
10        Q.    Hm-hmm.
11        A.    -- I think we said.
12             So earlier than that, the lightest
13   female would have, at that point, sustained a
14   contusion, but everybody else before that has
15   already done it.
16             Now, did I then look at when everybody
17   else did?  No.  That would -- that would have
18   been quite the undertaking because I've got to
19   go through each of the simulations in terms of
20   time and pick it out.
21        Q.    And for this particular analysis, you
22   didn't calculate an error rate?
23        A.    No.
24        Q.    And you didn't calculate any kind of
25   statistical certainty around whether or not it's

THOMAS RICHARD JENKYN, Ph.D.

249

1
2    accurate, did you?

3        A.    No, I -- no.

4        Q.    No sensitivity analysis?

5        A.    Sensitivity analysis is not

6    appropriate, and it's not really what we are

7    doing --

8        Q.    Okay.

9        A.    -- I'm just seeing -- I already knew

10   that the threshold had been exceeded.  All I was

11   doing was going back and seeing, in each case,

12   when.

13       Q.    Okay.

14            And that's not an analysis you can

15   validate, is it?

16       A.    It's as valid as the rest of the

17   simulation.

18            All I'm saying is with a simulation

19   like this, there is a lot of output.  And it's

20   up to you to go and pull the output out of the

21   simulation.

22            But the output is already there.  So

23   when I go back and look of the time when the

24   threshold is exceeded, I'm not running anything

25   new.  That data is there, I just haven't

THOMAS RICHARD JENKYN, Ph.D.

250

1
2    interrogated it yet.
3         Q.    Okay.
4              Do you plan on supplementing your
5    report or disclosing a new report to disclose
6    this opinion?
7              MR. DURKIN:  Wait, wait --
8              MR. ESSIG:  I'm just asking --
9              MR. DURKIN:  -- which? -- objection,
10   argumentative.
11        A.    I'm just planning on getting through
12   this depo.
13        Q.    Got it.
14              So it's -- if we were going to try to
15   put a time stamp on this, the first time that a
16   simulated passenger exceeded the Desmoulin
17   threshold for a bruise was 8:43:26?
18              Is that -- something like that?
19        A.    All right.  Where is 8:43:26?
20        Q.    It's all right.  We have --
21        A.    Okay.
22              (Pause)
23              MR. ESSIG:  You guys want to break for
24   lunch?
25              MR. DURKIN:  You got a while longer to

THOMAS RICHARD JENKYN, Ph.D.

251

1

2      go?

3                  MR. ESSIG:  I have a little bit, but I

4      have gotten -- I made some pretty good --

5                  MR. DURKIN:  You are getting -- okay.

6      Well --

7                  MR. ESSIG:  -- I don't have -- let's

8      go off the record.

9                  MR. DURKIN:  -- you got a couple

10      hours --

11                  MR. ESSIG:  Yeah.

12                  THE VIDEOGRAPHER:  All right.  I'll

13      take us off.

14                  We are going off the record at 12:39

15      p.m.

16                        *      *      *

17                   L U N C H   R E C E S S

18       Time noted 12:39 p.m. Eastern Standard Time

19                        *      *      *

20

21

22

23

24

25

THOMAS RICHARD JENKYN, Ph.D.

252

1

2                          *      *      *

3              A F T E R N O O N   S E S S I O N

4        Time noted 1:22 p.m. Eastern Standard Time

5                          *      *      *

6              THE VIDEOGRAPHER:  We are going back

7     on the record.  The time is 1:22 p.m.

8     BY MR. ESSIG:

9        Q.    Good afternoon, Dr. Jenkyn.

10       A.    How are you?

11       Q.    We are back.

12             I want to talk about something called

13     head injury criteria.

14             Have you heard of that?

15       A.    Yes.

16       Q.    They call it HIC?

17       A.    Or the H-I-C, yeah.

18       Q.    H-I-C?  I never know how that -- goes.

19             What do you understand HIC to be?

20       A.    So you take the time-changing

21     acceleration that the head is exposed to and you

22     take an integral of it.  So in a way you are,

23     sort of, measuring the area under the curve and

24     coming up with a single number.  And that

25     number -- the larger it is represents the

THOMAS RICHARD JENKYN, Ph.D.

253

1

2    greater amount of disruptive energy that's put

3    into the head.

4        Q.    So it's a metric that's used to assess

5    head injury potential in an accident simulation?

6        A.    That's right.

7        Q.    Are you aware that the National

8    Highway Traffic Safety Administration has set a

9    standard for the acceptable HIC levels in

10   automobile crashes?

11       A.    Yes.

12       Q.    Do you know what that level is?

13       A.    No the off the top of my head, but --

14             MR. ESSIG:  I guess we can mark an

15   exhibit, just so we can all see exactly what it

16   is.  It's tab 32.

17             MR. DURKIN:  Is this a new one?

18             MR. ESSIG:  New one.

19             (Pause)

20             MR. ESSIG:  So I'm handing you a

21   document that is Exhibit 294.

22

23

24

25

THOMAS RICHARD JENKYN, Ph.D.

254

1

2                    (Exhibit 294, Multipage document

3      entitled: Supplement: Development of Improved

4      Injury Criteria for the Assessment of Advanced

5      Automotive Restraint Systems - II, dated March

6      2000 (no Bates Nos.), marked for identification)

7      BY MR. ESSIG:

8           Q.    It's titled:  Supplement:

9      Developed -- Development of Improved Injury

10     Criteria for the Assessment of Advanced

11     Automotive Restraint Systems - II.

12                   Do you see that?

13          A.    I do.

14          Q.    And it's dated March 2000?

15          A.    Yes.

16          Q.    At the bottom there, it says:  NHTSA?

17          A.    Yeah.

18          Q.    That's the National Highway Traffic

19     Safety Administration?

20          A.    That's right.

21          Q.    Have you seen that document before?

22          A.    No.

23                   MR. ESSIG:  I just want to direct your

24     attention to one table.  It's at page SES-5, and

25     it's Table SES-1.

THOMAS RICHARD JENKYN, Ph.D.

255

1
2              Do you see that?
3              THE WITNESS:  I'm there.
4    BY MR. ESSIG:
5         Q.    So it says:  Summary of Recommended
6    Injury Criteria for the Final Rule.
7              Do you see that?
8         A.    Yes.
9         Q.    Then it has "Recommended Criteria" at
10   the top.
11             And then there are columns for "Large
12   Sized Male, Mid-Sized Male, Small Sized Female,"
13   then children with different ages.
14             Do you see that?
15        A.    Yeah.
16        Q.    The head injury criteria -- HIC -- is
17   700 for the large, mid- and small sized adult?
18        A.    Yes.
19        Q.    And it's 700 for the six-year-old
20   child?
21             MR. DURKIN:  Objection.
22             If he needs an opportunity to read
23   through this document, he's never seen it
24   before, and you are showing him a chart.  I want
25   to make sure it's in context.

THOMAS RICHARD JENKYN, Ph.D.

256

1

2          Do you need to look through the

3   document?

4          THE WITNESS:  If we keep going through

5   it slowly, we should be fine.

6          MR. ESSIG:  I'm not going to ask any

7   other questions about the document other than

8   this is the head injury criteria that was

9   acceptable for the National Highway Traffic

10  Safety Administration.

11     A.    Yes, that's what it says there.

12     Q.    Okay.

13          Are you aware that the HVE/GATB

14  software platform generated an HIC report for

15  each of the simulations that you ran?

16     A.    Yes.

17     Q.    Did you look at the HIC reports?

18     A.    Yes.

19     Q.    Did you consider them in your

20  analysis?

21     A.    I did look at them because one of the

22  possibilities was with the head going back and

23  forth, there could have been sufficient

24  biomechanical loading to the head that would

25  have resulted in a head injury, as determined by

THOMAS RICHARD JENKYN, Ph.D.

257

1

2     the HIC.  So I did look at that.

3          Q.    Okay.

4                You didn't disclose the HIC metric in

5     your original report, did you?

6          A.    No.

7          Q.    And when you looked at that -- at the

8     results for your simulation on HIC -- what was

9     your conclusion?

10         A.    It wasn't sufficient to cause a head

11    injury.

12         Q.    Okay.

13               Do you have any opinion then, based on

14    that metric, whether head injury was caused by

15    the movements of the plane in ET 302?

16         A.    I would say it's highly unlikely.

17         Q.    Okay.

18               And just to be clear --

19               MR. ESSIG:  Can we mark tab 33?

20               (Pause)

21               MR. ESSIG:  This is a new one, Exhibit

22    295, to be clear.

23

24

25

THOMAS RICHARD JENKYN, Ph.D.

258

1

2                    (Exhibit 295, Two-page document

3       bearing heading: ET302 Injury Data-GATB, 414,

4       416-424s, dated November 21, 2022 (no Bates

5       Nos.), marked for identification)

6                    (Pause)

7                    MR. ESSIG:  295 in front of you?

8                    THE WITNESS:  Yes.

9       BY MR. ESSIG:

10           Q.    Do you recognize this document?

11           A.    I do.

12           Q.    What is it?

13           A.    So it's an injury data output report

14       from GATB -- HVE.

15           Q.    And this is an output from your

16       simulation?

17           A.    It's -- at the top, it says the crash

18       pulse was 414 416 to 424 seconds -- that's one

19       of my crash pulses.

20           Q.    At the very top there on the left, it

21       says:  ET302?

22           A.    That's right.

23           Q.    And that's yours?

24           A.    That's right.

25           Q.    I'll represent this is one of the HIC

THOMAS RICHARD JENKYN, Ph.D.

259

1
2      reports that was automatically generated that we
3      printed out.
4              If you look at, sort of, the top-left,
5      kind of the first -- the second blurb of
6      information down, it says:  Body Number 1 HIC
7      Results.
8              Do you see that?
9      A.     Yes.
10     Q.     What's body number 1?
11     A.     That would be the first body model
12     that -- that was created for that simulation.
13     Q.     Okay.
14             And I'm just -- I'm not going to go
15     through all the HIC results.  I'm just going to
16     do this one, just so you can see --
17     A.     Yeah.
18     Q.     -- what the printout was.
19             But it says first there, at the top:
20     HIC equals 0.9824.
21             Right?
22     A.     Right.
23     Q.     That's for a specific time duration?
24     A.     Yes, but it will take it for the
25     peak --

THOMAS RICHARD JENKYN, Ph.D.

260

1

2          Q.      Okay.

3          A.      -- so that's the biggest the HIC got

4     during that simulation.

5          Q.      Okay.

6                  And then in a different time horizon

7     below, it says:  Head Injury Criterion HIC was

8     4.5589.

9                  Right?

10         A.      Yeah.

11         Q.      And then there is a last time horizon,

12    sort of, toward the very end of the page where

13    it says "Head Injury Criterion" again HIC equals

14    2.1440, right?

15         A.      Hm-hmm.

16         Q.      So those are emblematic of the HIC

17    metrics you looked at?

18         A.      Yes.

19         Q.      And the National Highway Safety

20    Transportation agency said the threshold was 700

21    and the HIC criterias that are coming out for --

22    are between 0.9 and 4-1/2?

23         A.      Yeah.

24         Q.      So before the lunch break, we were

25    talking about your opinion about whether or not

THOMAS RICHARD JENKYN, Ph.D.

261

1

2      there was -- the threshold for a contusion was

3      met, correct?

4          A.    Hm-hmm.

5          Q.    And your opinion was that, at some

6      point in the last few seconds, that threshold

7      number was met even for the lightest passenger,

8      right?

9          A.    Right.

10         Q.    And you based that conclusion on the

11     evidence from the Desmoulin study?

12         A.    The Desmoulin study was --

13         Q.    So am I saying it wrong?

14         A.    Sorry.  I take French.

15         Q.    That's okay.  Say it again so I say it

16     right?

17         A.    Desmoulin.

18         Q.    Okay.

19         A.    So it was my opinion that the force

20     required, based on my experience, to cause a

21     contusion would have been in the ballpark of

22     about 300 newtons, maybe --

23         Q.    Okay.

24         A.    -- seventy to 80 pounds force applied

25     to the skin.

THOMAS RICHARD JENKYN, Ph.D.

262

1

2          The Desmoulin study was confirmatory.

3     It, sort of -- it was the right ballpark.

4          Whether it's exactly 342, that's the

5     best available data, but it certainly was the

6     right ballpark.

7          Q.    Okay.

8          You don't have any other study that

9     you cite in your report for the threshold of

10    newtons of force required to cause a contusion,

11    right?

12         A.    There isn't one.

13         Q.    So the only paper you cite, and the

14    only one maybe that exists that is you could

15    find, was the Desmoulin paper?

16         A.    That's right.

17         Q.    Okay.

18         MR. ESSIG:  On page 27 of your report,

19    that's Exhibit 290 --

20         (Pause)

21         MR. ESSIG:  -- the third paragraph.

22    BY MR. ESSIG:

23         Q.    It says:  A study of healthy

24    volunteers was conducted by Desmoulin and

25    Anderson (2011) to measure the contact force

THOMAS RICHARD JENKYN, Ph.D.

263

```
 1
 2    required to cause superficial contusion and
 3    rupture of the superficial blood vessels that
 4    leads to the formation of bruises in the skin
 5    and underlying tissues.
 6             Do you see that?
 7    A.    Yes.
 8             MR. ESSIG:  Let's mark tab 9 as
 9    Exhibit 296, I think.
10             (Exhibit 296, Multipage document
11    entitled: Method to Investigate Contusion
12    Mechanics in Living Humans, dated January 16,
13    2011 (no Bates Nos.), marked for identification)
14             MR. DURKIN:  Is this the paper?
15             MR. ESSIG:  This is the paper.
16             (Pause)
17 BY MR. ESSIG:
18    Q.    So this is the Desmoulin paper that
19    you cited in your report.
20             Is that right?
21    A.    That's right.
22             MR. ESSIG:  If you look at page 2
23    under 2.1:  Epics and subjects --
24             THE WITNESS:  I am already there,
25    because I know what you are going to ask.
```

THOMAS RICHARD JENKYN, Ph.D.

264

1

2     Q.    It says -- I still got to ask it:

3  This study was performed on a single living

4  human (GD).  The single subject was a

5  34-year-old Caucasian male who was in good

6  medical condition and had no history of

7  contusions over the test areas prior to the

8  experiment.

9          Do you see that?

10    A.    Yes.

11    Q.    So the statement in your report is not

12 accurate, right?

13          It wasn't a study of healthy

14 volunteers.  It was a study of one person.

15    A.    A healthy volunteer, yes, that's

16 right.

17    Q.    Do you have any idea who that

18 34-year-old was?

19    A.    He doesn't say, but I about bet you

20 it's Geoff Desmoulin.

21    Q.    We kind of talked about that ethical

22 issue about pain, and so forth?

23    A.    Right.

24    Q.    That might be why?

25    A.    Right.

THOMAS RICHARD JENKYN, Ph.D.

265

1

2          Now, to my defense, where it says it's
3    a single person, it is in section 2.1:  Ethics
4    and subjects.  So maybe -- I don't know -- he
5    was still delusional from the testing, but --
6          Q.    I don't know --
7          A.    -- yes, you are right.  It was an N of
8    one study.
9          Q.    Got it.
10          MR. ESSIG:  In the next -- so if we go
11    to the first page, and we go down to the bottom
12    of the left-hand column, there is a sentence
13    there that starts:  While we show.
14          Do you see that?
15          THE WITNESS:  Left-hand column --
16          MR. ESSIG:  Left-hand column --
17          MR. DURKIN:  Right here? --
18          MR. ESSIG:  Maybe seven lines down --
19          MR. DURKIN:  It's right there --
20          MR. ESSIG:  Yeah, exactly.
21    BY MR. ESSIG:
22          Q.    So that sentence says:  While we show
23    that the experimental design methods can be used
24    to investigate various impact factors that
25    affect contusion formation in a single subject,

THOMAS RICHARD JENKYN, Ph.D.

266

1

2      larger sample sizes are required to assess the

3      technique's ability to be generalized if such a

4      goal exists.

5              Do you see that?

6      A.      Yes.

7      Q.      And what the author is saying there is

8      that:  Do you want to generalize the result of

9      the study?  Then you need a larger sample size.

10     A.      Yes.

11     Q.      Do you agree that's true?

12     A.      Yeah, you do.

13     Q.      The next sentence says:  However, due

14     to the plethora of anatomical, medical, and

15     physiological variables that affect contusion

16     formation, we think it is highly improbable that

17     this technique shall or could be used to compare

18     data across the masses.

19             Do you see that?

20     A.      Yes.

21     Q.      So this is a further warning that you

22     shouldn't use this data from a single person to

23     compare how contusions might form in a bigger

24     population?

25     A.      I think he's signaling caution, which

THOMAS RICHARD JENKYN, Ph.D.

267

1

2      I would agree with.

3          Q.      So you agree with that statement?

4          A.      Yeah.

5                  MR. ESSIG:  So if we turn to page 9 of

6      Desmoulin --

7                  (Pause)

8                  MR. ESSIG:  -- it's under the

9      left-hand column under "Discussion" and there is

10     a section that starts, "It is important."

11                 THE WITNESS:  Hm-hmm.

12     BY MR. ESSIG:

13         Q.      It says:  It is important to note that

14     the statistical significance found in Figure 9

15     is valid for the person and circumstances

16     tested.

17                 Right?

18         A.      Yes.

19         Q.      So he's saying that even if there was

20     statistical significance found on any particular

21     outcome of the study, it's only valid for that

22     person and those circumstances, right?

23         A.      That's right.

24         Q.      And then he says:  While this cannot

25     be generalized to a population, this is likely

THOMAS RICHARD JENKYN, Ph.D.

268

1

2    unnecessary -- while this cannot be generalized

3    to a population, this is likely unnecessary as

4    this method is designed to be used to

5    investigate a crime inflicted on a single

6    person.

7            Do you see that?

8        A.    Yes.

9        Q.    So the purpose of the report -- of the

10   paper -- was to do an experiment to -- designed

11   to determine if a crime was inflicted on a

12   single person, right?

13       A.    That was his intent.

14       Q.    Okay.

15            And then he says:  Should a researcher

16   wish to investigate a particular contusion

17   variable, it is possible to use this method

18   using multiple subjects being impacted in a

19   specific region once, so that a generalization

20   can be made to the population.

21            Do you agree with that statement?

22       A.    Yes.

23       Q.    And you didn't do any other research

24   that he's talking about, right?

25       A.    Wish I could have -- but, no.

THOMAS RICHARD JENKYN, Ph.D.

269

1

2          Q.      Okay.

3                  (Pause)

4                  MR. ESSIG:  So if we go back to 290 in

5          your report, right after that study, a study --

6          right after the sentence:  A study of healthy

7          volunteers?

8                  THE WITNESS:  Hm-hmm.

9                  MR. DURKIN:  What page are we on now?

10                 MR. ESSIG:  Twenty-seven.

11                 MR. DURKIN:  Okay.

12     BY MR. ESSIG:

13         Q.      It says:  This study showed that the

14     minimum force required (i.e. the threshold

15     force) for contusion and rupture to superficial

16     blood vessels in the legs is 342 newtons.

17     That's where the bone is superficial to the skin

18     (i.e. shin).

19                 Do you see that?

20         A.      Yes.

21         Q.      And that 342-newton metric -- that's

22     the threshold that you have been using when you

23     have looked at the simulation to determine

24     whether or not there was a contusion potentially

25     on any passenger, right?

THOMAS RICHARD JENKYN, Ph.D.

270

1
2          A.     That's right.
3                 MR. ESSIG:  If we look at Table 1 in
4     the paper that --
5                 THE WITNESS:  Hm-hmm.
6                 MR. ESSIG:  -- we are going back to
7     Exhibit 296, the Desmoulin paper --
8                 MR. DURKIN:  -- what page now? --
9                 MR. ESSIG:  Page 6, Table 1 at the
10    top.
11                THE WITNESS:  Hm-hmm.
12    BY MR. ESSIG:
13         Q.     That's where that 342 Newton threshold
14    comes from?
15         A.     That's right.
16         Q.     So in Table 1, you have a couple of
17    different columns.  But if we look at it -- the
18    first column is "Trial number," so this is the
19    number of times he's dropping the subject,
20    right?
21         A.     Hm-hmm.
22         Q.     The second column is "Location," so
23    that's where on his body he is dropping it?
24         A.     Hm-hmm.
25         Q.     And then he has "Low, Mid, and High

THOMAS RICHARD JENKYN, Ph.D.

271

1

2      shin."

3              Do you see that?

4      A.      Yeah.

5      Q.      There is a "Peak force" in newtons,

6      right?

7      A.      Right.

8      Q.      And so he reports what the peak force

9      in newtons was for those particular places?

10     A.      Mm-hmm.

11     Q.      And the lowest number there is "High

12     shin 342."

13             Right?

14     A.      Yeah.

15     Q.      And the low shin and mid shin actually

16     have higher numbers, right?

17     A.      That's right.

18     Q.      And your bones are superficial to the

19     skin, you know, throughout the shin, right?

20             Even at the mid and low shin?

21     A.      Yeah.

22     Q.      So even for a kick or a place on the

23     body that has a bone that's superficial to the

24     skin, can you have a great deal of variation in

25     the amount of force that's required to cause a

THOMAS RICHARD JENKYN, Ph.D.

272

1

2      bruise?

3          A.    Well, be careful, because that's not

4      what this shows.

5              And I want to put my professor hat on.

6          Q.    Okay.

7          A.    It shows that a bruise occurred when

8      you hit it with that force.

9              The experiment didn't then hit it for

10     1 -- with 1 newton less than that, and 1 newton

11     less than that, and titrate out the exact thing.

12             So -- so you -- again, caution.  I

13     agree.  This is an N of one study, and it's a

14     unicorn.  It's the only one out there, and it's

15     incomplete data.  It's statistically

16     underpowered.  It's sparse, but it's the only

17     game in town.

18             So I agree that you need to read these

19     data with caution.

20         Q.    Earlier when we were talking about car

21     accidents, you stated that comparing impact

22     forces to the force on a flight -- you said that

23     can't be compared -- those two things?

24         A.    Hm-hmm.

25         Q.    Because the one involves a force for a

THOMAS RICHARD JENKYN, Ph.D.

273

1

2    short period.  It's an impact.

3               And the other one is a longer,

4    prolonged series of forces that might not have

5    an impact?

6        A.    Right.

7        Q.    But here, what we are looking at is a

8    paper that's really looking at the first type of

9    force -- right? -- a direct impact for a very

10   short period of time?

11       A.    Right.

12             What's neat about this --

13       Q.    Do you think that -- sorry.

14       A.    No, no, no --

15       Q.    Do you think that, therefore, the

16   forces we are talking about on the plane and the

17   forces that are being described in the Desmoulin

18   paper are, kind of, apples and oranges?

19       A.    No.

20       Q.    Why not?

21       A.    Because in this case -- so my concern

22   before about comparing an impact with what's

23   happening in the aircraft is it was a high force

24   and a short amount of time during the impact.

25             And in the aircraft it was a low force

THOMAS RICHARD JENKYN, Ph.D.

274

1

2    and a large amount of time.

3              So that's apples and oranges.

4              But what we have here:  Same force.

5    Same force, short amount of time; same force,

6    long amount of time.  You can compare those.

7              In fact, this is going to be

8    conservative.

9              So you have less chance of getting a

10   bruise during the Desmoulin study because you

11   are only doing an impact; rather than if you

12   apply 342 newtons over a several seconds, you

13   are putting way more energy into the tissue.

14             So you can compare it -- again with

15   caution -- but you can compare it because it's

16   the same force.

17        Q.    All right.

18             MR. ESSIG:  If we look at page 2 of

19   the Desmoulin paper --

20             THE WITNESS:  Hm-hmm.

21             (Pause)

22             MR. ESSIG:  -- Figure 2.

23   BY MR. ESSIG:

24        Q.    Do you see at the top?

25        A.    I do.

THOMAS RICHARD JENKYN, Ph.D.

275

1

2      Q.     That's the impactor?

3      A.     Yes.

4      Q.     So this is the thing he's dropping on

5  himself, right?

6      A.     Yes.

7      Q.     And the force is being transmitted to

8  him, kind of, at an apex of whatever that

9  ball -- that wooden ball is on the bottom of the

10 weight, right?

11     A.     Yes.

12     Q.     And so the force that you are getting

13 from that impact, or being dropped from whatever

14 height he's dropping it -- is that a more acute

15 force than you would get from a seat belt being

16 put across you appropriately?

17     A.     Same magnitude of force.  The loading

18 rate would be different.  So in that case, you

19 are right.  The force is coming on quickly and

20 then going off quickly.

21            It's the same force, though.

22     Q.     Okay.

23            And then peak force -- this newton

24 peak force -- that's the -- that is the number

25 you are using as your threshold, right?

THOMAS RICHARD JENKYN, Ph.D.

276

1
2          A.    That's right.
3                MR. ESSIG:  If you look at -- go back
4     down to page 6 of the article.  That's where we
5     were looking at Table 1.
6                THE WITNESS:  Hm-hmm.
7                MR. ESSIG:  On the right-hand column
8     in the text, the first full paragraph there
9     starts with:  The results.
10                THE WITNESS:  Yeah.
11    BY MR. ESSIG:
12          Q.    The results of the single continuous
13    (impact characteristic) by two outcomes (bruise
14    or no bruise) binary logistic regression showed
15    that only one of the calculated impact
16    characteristics varied significantly under the
17    two categories.
18                Right?
19          A.    Yes, he says that.
20          Q.    Okay.
21                So this is this idea of threshold --
22    bruise or no bruise -- in --
23          A.    Right --
24          Q.    -- his study?
25          A.    -- yeah.

THOMAS RICHARD JENKYN, Ph.D.

277

1
2          Q.     He says "peak force" -- that's what
3     you looked at, right? --
4          A.     Hm-hmm.
5          Q.     -- peak pressure, displacement, tissue
6     stiffness, impact velocity, force impulse,
7     pressure impulse, and energy density all did
8     not -- did not -- vary significantly under the
9     two categories.
10                Correct?
11         A.     That's what he says.
12         Q.     And he's using that same statistical
13    significance -- threshold for statistical
14    significance that you do.
15                And it's common in the field P is
16    greater than 0.05?
17         A.     Yeah.
18         Q.     Then he does say:  However energy
19    absorbed by the limb did vary significantly
20    according to our two criteria.
21                Right?
22         A.     That's what he says, yes.
23         Q.     And so there is only one -- one of the
24    outcomes that he looked at -- only one of them
25    he reaches statistical significance for his

THOMAS RICHARD JENKYN, Ph.D.

278

1

2      sample of one person and one individual

3      circumstance.

4               And it was not the one that you looked

5      at -- peak force -- correct?

6         A.    That's the only one he could find with

7      his available data.

8         Q.    The bottom of that -- you didn't

9      disclose in your September 22 report here any

10     opinions about the energy absorbed by the

11     passengers in your simulation?

12        A.    No.

13              MR. ESSIG:  Let's look at page 11 in

14     your report, back to Exhibit 290.

15              We are done with that paper --

16              (Pause)

17              THE WITNESS:  What page?

18              MR. ESSIG:  Eleven.

19              THE WITNESS:  Okay.

20              MR. ESSIG:  So it's the last full

21     paragraph on page 11.  It starts:  It is

22     assumed.

23              Do you see that?

24              THE WITNESS:  Yes.

25

THOMAS RICHARD JENKYN, Ph.D.

279

1

2  BY MR. ESSIG:

3      Q.    So it reads:  It is assumed that all

4  passengers and crew aboard Flight ET302 were

5  wearing their -- were wearing seat belts

6  properly and were restrained within their seats.

7              Do you see that?

8      A.    Yes.

9      Q.    And you agree that's the assumption

10 you made?

11     A.    Yes.

12     Q.    And then you say:  This is a

13 conservative assumption and I have not seen any

14 indications to the contrary in any of the

15 material that I've reviewed for this report.

16              Do you agree?

17     A.    Yes.

18     Q.    The opinions in your report are all

19 based on this assumption, correct?

20     A.    That's right.

21     Q.    Is it your opinion then that it's more

22 likely than not that all the passengers were

23 belted on the flight?

24              MR. DURKIN:  Objection.  Objection --

25     A.    I don't know --

THOMAS RICHARD JENKYN, Ph.D.

280

1

2          MR. DURKIN:  -- that's speculative --

3     A.     -- I can't answer that.

4          MR. DURKIN:  -- yeah --

5          MR. ESSIG:  Fair enough.

6  BY MR. ESSIG:

7     Q.     You go on in the paragraph then to

8  say -- this is another -- maybe just skip one

9  more sentence or so.

10          It says:  I have described the affects

11  of the inertial forces acting on the bodies of

12  unrestrained passengers for illustrative

13  purposes only.

14          Do you see that?

15     A.     Yes.

16     Q.     What do you mean by "illustrative

17  purposes only"?

18     A.     When you apply the same loading to the

19  same passengers, but you undo one seat belt, the

20  results -- the resulting body motion is

21  remarkable.  It's large.  The person rockets out

22  of the seat.

23          What I'm illustrating is not what I

24  think happened -- that people had no seat belts

25  on.

THOMAS RICHARD JENKYN, Ph.D.

281

1

2          It helps understand the magnitude of

3     the forces and accelerations that the passengers

4     were undergoing when you see what would have

5     happened, had that are seat belt not been on.

6     They are large.

7          Q.     Okay.

8               It's a pretty dramatic way to

9     illustrate a point showing -- a body going up.

10              Are there other ways you could have

11    illustrated the point?

12         A.     Well, I could have -- again, do it

13    with a briefcase.  You do it with, like, a bag

14    of sugar or something.

15              But there is one other thing you want

16    to show -- is with, say, a suitcase, it's a

17    single segment.

18              And there are interactions between the

19    segments.  So even as the person comes up and

20    out of their seat, there is interactions with

21    how the arms are moving, the legs are moving

22    that also affect how the overall body moves.

23              So it was a demonstration and

24    illustration of the magnitude of the forces

25    acting on a human body.  That was the -- that

THOMAS RICHARD JENKYN, Ph.D.

282

1

2    was the closest available proxy.

3        Q.    And you say on page 11:  If the

4    passenger had been accelerated out their seat at

5    negative 1 g, then they would have been

6    traveling very quickly at the point of contact

7    with the ceiling.  The reaction from the force

8    from the ceiling in that situation would have

9    been large and likely injurious.

10        A.    Yes.

11        Q.    What's the basis for that statement?

12        A.    Well, you can do the thought

13    experiment.

14            So if you are sitting in your seat

15    with your seat belt on experiencing minus 1 g,

16    it's the same as if I took you in your seat with

17    your seat belt on and turned you upside down.

18            And now, if you are that person --

19    imagine you are that person sitting in that

20    airline -- think of how far away the ceiling of

21    the aircraft is.

22            And now if I say, "I'll give you a

23    hundred bucks.  You are going to undo your seat

24    belt," are you going to take that money?

25            I wouldn't, because you are going to

THOMAS RICHARD JENKYN, Ph.D.

283

1
2     really hurt yourself, because you are falling
3     straight out of your seat and you are landing on
4     your head on that ceiling.
5             So that's -- that is my subjective
6     understanding of the physics in that case.
7        Q.   Okay.
8             Did you conduct any quantitative
9     analysis on this point?
10       A.   The simulation.
11       Q.   Okay.
12            Your opinion is based on the
13    subjective description that you have --
14            MR. DURKIN:  Objection-
15            MR. ESSIG:  -- is that what you
16    said? --
17            MR. DURKIN:    --
18            MR. ESSIG:  I am just trying to
19    understand the testimony --
20       A.   Based on my understanding of the
21    physics.
22       Q.   What did you call it? -- a thought --
23       A.   Thought experiment.
24       Q.   -- thought experiment?
25            Are you aware of any literature that

THOMAS RICHARD JENKYN, Ph.D.

284

```
 1
 2    supports the claim that you are making? --
 3    specific literature?
 4        A.    That if I put you upside down in a
 5    seat, and you undid your seat belt, you'd hurt
 6    your head?  Seems kind of obvious.
 7        Q.    Okay.
 8              There is no study that you are citing
 9    or anything like that about people that are
10    unrestrained, and that at negative 1 or 2 g's --
11    or any g level below zero -- how they might be
12    injured?
13        A.    There very well could be.  At this
14    moment, I'm not aware of it.
15        Q.    Would you agree that the only time a
16    passenger could have been injured from being
17    unrestrained in their seat belt in the way you
18    are describing is at the point in time in the
19    flight where the vertical accelerations were
20    less than zero g?
21              MR. DURKIN:  Objection, speculative.
22        Q.    If the g's were positive, they were
23    being pushed down into their seat, right?
24        A.    Yeah, I think that's reasonable.
25        Q.    So the only times they are going up
```

THOMAS RICHARD JENKYN, Ph.D.

285

1
2      towards the ceiling would be if the g's are less
3      than zero?
4            A.    Yeah.
5                  MR. ESSIG:  If you look --
6                  (Pause)
7                  MR. ESSIG:  I guess look at Figure 13
8      on page 31 of your report?
9                  THE WITNESS:  Okay.
10     BY MR. ESSIG:
11           Q.    This is a simulation with one of the
12     passengers that wasn't fastened in with their
13     seat belt?
14           A.    That's correct.
15           Q.    And it was the pink passenger?
16     Right -- the one in the aisle seat?
17           A.    Yes.
18           Q.    And she goes up to the ceiling under
19     the conditions at point 2 or point -- or point
20     4?
21           A.    So this is the exact acceleration
22     pulse that you saw in Figure 6.
23           Q.    Okay.
24                 So you are saying at 8:43:25 -- 75 --
25     she strikes her head on the ceiling and rotates

THOMAS RICHARD JENKYN, Ph.D.

286

1

2      backwards, right?

3           A.    That's right.

4           Q.    Did you simulate whether -- what the

5      impact forces are or what it looks like when a

6      passenger is not fastened for any of the other

7      passengers?

8                 One in the middle seat or the window

9      seat?

10          A.    Yes.  I believe I ran that

11     simulation -- those simulations as well.

12          Q.    Okay.

13                Did you describe or disclose those in

14     your report?

15          A.    No.

16          Q.    Are you aware about the aerospace

17     standard for restraints in civil aircraft?

18          A.    Is that the paper I cited about the

19     seat belts?

20          Q.    It is about seat belts.  It's about,

21     like, the breaking strength of a seat belt.

22          A.    Yes.

23          Q.    Do you know what the webbing in a

24     restraint system for the lap belt -- what the

25     breaking strength needs to be?

THOMAS RICHARD JENKYN, Ph.D.

287

1
2          A.    Off the top of my head, I don't.
3          Q.    If I represented to you it was 22.2
4     kilonewtons, would you agree?
5          A.    Sounds about right.
6          Q.    It was in a -- in one of the materials
7     in your reliance disclosure.
8                How many newtons is 220.2 kilonewtons?
9          A.    22,200.
10         Q.    Okay.
11               And so the forces that you are
12    simulating on the seat belts in Flight 302 --
13    they ranged from around 530 newtons to 1509
14    newtons in your report?
15         A.    That's right.
16         Q.    So the maximum forces we are talking
17    about are about 2 to 7% of the braking strength
18    requirements for the seat belt?
19         A.    I'll trust your math.
20         Q.    And no opinion that the seat belts
21    broke?
22         A.    No, I -- I think it's extremely
23    unlikely the seat belts broke.
24               MR. ESSIG:  So let's turn back to page
25    11.

THOMAS RICHARD JENKYN, Ph.D.

288

1

2    BY MR. ESSIG:

3         Q.    Just under the paragraph we looked at

4    about unrestrained passengers and seat belts,

5    you have a discussion about the loose items that

6    might be expected, and how they might be

7    expected to behave during the flight?

8         A.    Hm-hmm.

9         Q.    You didn't perform a simulation on

10   loose objects within the passenger cabin, right?

11        A.    No.

12        Q.    And you generated no data on the way

13   loose objects might have moved during the

14   flight?

15        A.    Nothing that went in the report.

16        Q.    Are you giving these opinions as well

17   in this paragraph for illustrative purposes?

18        A.    Also based on my understanding and

19   reading of the flight data recorder data.

20        Q.    Your report says -- this is kind of

21   going to carry over to 12:  Loose items would be

22   expected to include, but are not limited to --

23   then it lists a whole bunch of different

24   things -- I won't read them all -- through the

25   end of that paragraph.

THOMAS RICHARD JENKYN, Ph.D.

289

1
2          Do you see that?
3     A.    Yes.
4     Q.    Did you review any evidence that
5  establishes that all of these items were present
6  on the flight?
7     A.    No.
8     Q.    Do you have any idea if any or all of
9  these items were present --
10         MR. DURKIN:  Objection, calls for
11  speculation --
12         MR. ESSIG:  That's what I'm --
13         MR. DURKIN:  -- there was no recovery.
14  Everything was destroyed --
15         MR. ESSIG:  Okay --
16         MR. DURKIN:  -- I am not testifying,
17  but come on.
18  BY MR. ESSIG:
19     Q.    You don't have any evidence that any
20  of those items were on the flight, right?
21     A.    I have no data to answer that.
22     Q.    You don't know if any one -- any one
23  of them was?
24     A.    That's right.
25     Q.    You can't say for certain whether or

THOMAS RICHARD JENKYN, Ph.D.

290

1

2     not -- where they might have been located,

3     right?

4          A.    That's right.

5          Q.    And you can't say how many loose items

6     were potentially in the cabin?

7          A.    No, I can't.

8          Q.    Do you have any evidence that you are

9     aware of that luggage was improperly stowed

10    under the seats?

11         A.    No.

12         Q.    Would you expect that if folks were

13    instructed to properly stow things in the --

14    under their seat or in the overhead bins that

15    they would have done that?

16              MR. DURKIN:  Objection, calls for

17    speculation.

18         A.    I can't answer that.

19         Q.    Okay.

20              On page 12, you say:  Once airborne,

21    the chance of an object striking a passenger or

22    the interior of the aircraft is almost certain.

23              Do you see that?

24         A.    Yes.

25         Q.    You don't say that it's almost certain

THOMAS RICHARD JENKYN, Ph.D.

291

1

2     that one of these objects would strike a

3     passenger, though, right?

4          A.     So -- where is that sentence again?

5     What am I commenting on here?

6               MR. DURKIN:  We are going -- fast.  We

7     are just down to the third -- second full

8     paragraph in the middle.

9               MR. ESSIG:  Yeah.

10   BY MR. ESSIG:

11        Q.     It says:  Once -- it's almost right in

12   the middle there.  Once is on the right-hand

13   side.

14               Once airborne, chance of the object

15   striking a passenger or the interior of the

16   aircraft is almost certain.

17        A.     Right.

18        Q.     I'm just trying to understand what you

19   meant when you wrote that sentence.

20               You are not saying that, once

21   airborne, the chance of an object striking a

22   passenger is almost certain?

23        A.     That's right.

24        Q.     You are including either the passenger

25   or the aircraft?

THOMAS RICHARD JENKYN, Ph.D.

292

1

2     A.     Right.

3     Q.     Okay.

4            Do you have any idea about the level

5     of certainty that an object might have struck a

6     passenger?

7     A.     I would say more likely than not.  And

8     that comes down to the available surface area

9     provided by the surface of a passenger compared

10    to the available surface area provided by the

11    interior of the cabin.  It seems more likely

12    than not that somebody is going to get hit.

13    Q.     Did you quantify either of those

14    two --

15    A.     I did not.

16    Q.     So you don't know the available

17    surface area constituted by the passengers?

18    A.     That's based on my engineering

19    judgment.

20    Q.     Okay.

21           And you don't know the surface area on

22    the inside of the --

23    A.     That's right.

24    Q.     And you didn't calculate in terms of a

25    quantified measurement the likelihood that an

THOMAS RICHARD JENKYN, Ph.D.

293

1
2      object would strike a passenger, right?
3          A.    That's right.
4          Q.    If passengers were struck, do you have
5      any idea about how many would have been struck?
6          A.    I can't answer that.
7          Q.    Or when in the flight it might have
8      happened?
9          A.    For the articles to become airborne,
10     you have to have that period of negative g's.
11     So the earliest they could have become airborne
12     is during that first period of negative g's.
13         Q.    So just like when we were talking
14     about the unrestrained passengers, the only time
15     points possible for these loose objects that
16     might have struck a passenger would have been
17     the two times it tips below zero g?
18         A.    That's right.
19             (Pause)
20             MR. ESSIG:  Page 25.
21             (Pause)
22             MR. ESSIG:  I marked up this report so
23     much I can't even read it.
24             Page 23 of your report.
25             THE WITNESS:  Hm-hmm.

THOMAS RICHARD JENKYN, Ph.D.

294

1

2    BY MR. ESSIG:

3        Q.    You say:  Several -- this is under

4    section 5.3:  Several biomechanical simulations

5    were run for three passengers seated in an

6    economy seat for the last 150 seconds of the

7    flight.

8              Do you see that?

9        A.    Yes.

10       Q.    The outputs --

11             MR. DURKIN:  I didn't get there yet.

12             MR. ESSIG:  Oh, sorry.

13             MR. DURKIN:  You went --

14             MR. ESSIG:  Twenty-three.

15             MR. DURKIN:  -- okay, because you

16   started 25.  Now we are ad 23, and we are --

17             MR. ESSIG:  Right under section 5.3 --

18             MR. DURKIN:  Got it.

19             MR. ESSIG:  Yeah, first sentence.

20   BY MR. ESSIG:

21       Q.    The second sentence is:  The outputs

22   of the simulation included, but were not limited

23   to, the joint angles between each of the body

24   segments in all three directions with respect to

25   time.

THOMAS RICHARD JENKYN, Ph.D.

295

1
2                Right?
3       A.      Yes.
4       Q.      And then you say:  These values were
5    provided in spreadsheet form to the experts
6    producing the animation of the crash flight.
7       A.      Hm-hmm.
8       Q.      Who were you referring to when you
9    said "the experts"?
10      A.      That would have been Jack Suchocki.
11      Q.      Anybody else?
12      A.      Perhaps Charley Pereira, but I don't
13   think he needed it.
14      Q.      So your testimony is Jack Suchocki is
15   the expert?
16      A.      Jack Suchocki is the one who is doing
17   the animation.  And I called him an expert there
18   but -- this is earlier on in the process.  I
19   didn't -- I just used the wrong word --
20      Q.      I think we talked about this before.
21              But to your knowledge, all of the
22   information you provided to Jack Suchocki hasn't
23   necessarily been provided to the defense in this
24   case, including the AVI files.
25              Is that right?

THOMAS RICHARD JENKYN, Ph.D.

296

1
2               MR. DURKIN:  Hold on a second --
3               MS. GUERRIERI:  Well, I --
4               MR. DURKIN:  -- can we repeat that
5       question?
6               MR. ESSIG:  Yeah.  Just to be --
7               MR. DURKIN:  You really are talking
8       fast -- but we got to keep up with you.
9               MS. GUERRIERI:  We gave you in that --
10              (Pause)
11              MS. GUERRIERI:  -- files, and I'm just
12      a little bit confused when you are asking the
13      questions if you are referencing the same AVI
14      files I gave you, or if you talking about -- I
15      don't --
16              (Pause)
17              MR. ESSIG:  We can talk about it
18      offline.  I'm not trying to make big deal out of
19      anything --
20              (Pause)
21              MR. DURKIN:  He doesn't know what we
22      gave you.
23              MR. ESSIG:  We'll have a discussion
24      about whether we got all AVI files or not.
25              I understand you don't know exactly

THOMAS RICHARD JENKYN, Ph.D.

297

1

2    what was produced to us and what wasn't.

3            But I don't know what you've had, so I

4    don't --

5            (Pause)

6  BY MR. ESSIG:

7    Q.    Did you have any communications with

8    Jack Suchocki after you provided your simulation

9    outputs to him?

10    A.    Let me think back.  It was quite some

11    time ago.

12            If I did, it might have been in the

13    form of a phone call, if he was having trouble

14    opening files, or running the AVIs, or if they

15    weren't of sufficient resolution.

16            I know we went back and forth a couple

17    times where the first AVIs I sent were too low

18    resolution, so I just made bigger files.

19            Then we had to talk about how you set

20    up a One Drive to get them to him -- something

21    like that.

22            But in terms of me telling them how to

23    do the animation?  No.

24    Q.    Okay.

25            So the only conversations you had were

THOMAS RICHARD JENKYN, Ph.D.

298

1
2     essentially logistical, trying to open the
3     files, make sure they had the right thing.
4             But you didn't have any conversations
5     about how to do the animations?
6     A.    That's fair.
7     Q.    Did you ever review any animations
8     that were produced by Charles Pereira?
9     A.    I had access to a couple animations
10    that I did have a look at.
11    Q.    What were those animations of?
12    A.    It's the two -- sort of composite ones
13    where you got the planer, plus inputs, plus
14    transcript of the cockpit voice recorder -- a
15    lot of things going on.
16            I got two of those, and I watched
17    portions of them, if not all.
18    Q.    Did you look at those animations
19    before you did your work on the biomechanical
20    simulation you did?
21    A.    The simulations had mostly been
22    finished at that point.
23    Q.    And the animations that you saw from
24    Charles Pereira just showed the outside of the
25    airplane?

THOMAS RICHARD JENKYN, Ph.D.

299

1

2          A.     That's right.

3          Q.     Nothing about the inside of the

4     airplane?

5          A.     That's right.

6          Q.     Did you do anything to apply what the

7     animation of inside of the aircraft looks like

8     to the analysis you did in your report?

9          A.     No.

10         Q.     You did your report all before the

11    animation was ever created, right?

12         A.     That's right.

13         Q.     After you provided your simulation

14    outputs, did you ever review any animations

15    created by Eyewitness Animations?

16         A.     I had access to the initial draft

17    copies, and had a look at them.  But I didn't

18    provide any input as to whether they were right

19    or wrong.

20                (Pause)

21                MR. ESSIG:  Let's look at the

22    animation.  I think we have talked about it.  I

23    think Ms. Guerrieri can put an animation up

24    here, and then we will just --

25                MS. GUERRIERI:  I can share my screen.

THOMAS RICHARD JENKYN, Ph.D.

300

1

2      I'm not sure I can share the audio, though,

3      because I think it will create a feedback --

4              (Pause)

5              THE VIDEOGRAPHER:  With screen

6      sharing, there is an option when you select what

7      window or screen to share, you can check a box

8      in the bottom-left that says "share audio" over

9      the Zoom, if you are logged into the zoom.

10             (Pause)

11             MR. ESSIG:  Is there a way to mark

12     this as an exhibit?

13             THE VIDEOGRAPHER:  Within AgileLaw, if

14     the file is not present, I can't mark it there.

15     But if you mark it verbally on the record, that

16     might be the best we can do for now.

17             MR. ESSIG:  Okay.  So I'll just do the

18     best we can for now.

19             This is I think Exhibit 2 -- I think

20     this is going to be Exhibit 297.

21             Is that right?

22             THE VIDEOGRAPHER:  That is correct.

23             MS. WINTER:  Chris, just for one

24     moment -- so you could just mark it that way,

25     since it's an electronic copy, and then we can

THOMAS RICHARD JENKYN, Ph.D.

301

1

2    have it in AgileLaw as well.

3                    MR. ESSIG:  Yes.

4                    So we are going to mark it 297.  It's

5    going to be the animation that was produced with

6    the expert reports.

7                    (Exhibit 297, Video animation share

8    screen by Winston and Strawn (no Bates No.),

9    marked for identification)

10                   MR. ESSIG:  And we are going to play

11   it here just so we can see it.

12                   (Animation played)

13   BY MR. ESSIG:

14       Q.    Had you seen that before?

15       A.    Yes.

16       Q.    I just want to ask you a couple

17   questions about some of the elements of the

18   animation.

19                   There appears to be items of luggage

20   that came out from under the seats.

21                   Did you see that?

22       A.    Yes.

23       Q.    You didn't direct anybody to include

24   those items?

25       A.    I did not.

THOMAS RICHARD JENKYN, Ph.D.

302

1

2          Q.     And you didn't provide any data on to

3    Eyewitness Animation about how loose items would

4    move?

5          A.     That's right.

6          Q.     We heard noises from the passengers

7    screaming and so forth.

8                 Were you involved in the decision to

9    add a soundtrack of any of the noises, including

10   screaming or anything else, on the animation?

11         A.     No.

12         Q.     When you look at the animation, the

13   camera shakes somewhat during the cabin

14   animation.

15                Were you involved in the decision to

16   make that camera shake?

17         A.     I was not.

18         Q.     The g meter in the animation reaches

19   at the end approximately negative 2.4 g's.

20                In your report, you say the maximum

21   negative g's reported were negative 1.91.

22                Is that correct?

23         A.     That's what I had in my flight data

24   recorder data.

25         Q.     Okay.

THOMAS RICHARD JENKYN, Ph.D.

303

1
2          You didn't tell to Eyewitness
3   Animation to put a particular level of g's on
4   this?
5          A.    I did not.
6          Q.    And we've talked at length that you
7   assumed that all the passengers were belted,
8   right?
9          A.    Yes.
10         Q.    This animation does show one passenger
11  who is unbelted, right?
12         A.    Yes.
13         Q.    You didn't direct them to include that
14  unbelted passenger?
15         A.    No, but I did provide them with a
16  simulation where the window seat passenger was
17  unbelted, so I assume the motion is based on
18  that.
19         Q.    Okay.  Fair enough.
20              MR. ESSIG:  Go to page 32 of your
21  report.  Just look at that bottom paragraph.
22              (Pause)
23  BY MR. ESSIG:
24         Q.    It says:  From the instant that the
25  nose of the aircraft struck the ground, the

THOMAS RICHARD JENKYN, Ph.D.

304

1

2      inertia of the aircraft would have continued to

3      drive itself downward into the ground.  The

4      ground would have provided an extremely large

5      reaction force in response that would have

6      rapidly and progressively destroyed the

7      structure of the aircraft nose to tail.  This

8      process of destruction from initial contact to

9      complete destruction would have occurred over a

10     very short period of time.

11              Do you see that?

12     A.      Yes.

13     Q.      The short period of time you are

14     talking about is milliseconds, right?

15     A.      Milliseconds, yes.

16     Q.      That means the destruction of the

17     airplane happens almost instantaneously?

18     A.      No.  Milliseconds is a long time.

19     It's about the length of a car crash.

20     Q.      The passengers would have perished in

21     milliseconds, though, right?

22     A.      Yeah, and you do a back-of-envelope

23     calculation, somewhere between seven and 10

24     milliseconds.

25     Q.      Are you offering any opinion about

THOMAS RICHARD JENKYN, Ph.D.

305

1

2       whether the passengers had enough time to

3       experience pain in the milliseconds it took for

4       the plane to be destroyed when it impacted the

5       ground?

6           A.    I'm not, on their perception, no.

7               MR. ESSIG:  I don't think I have any

8       further questions.

9               MR. DURKIN:  All right.  Take a break

10      and we'll see where we are --

11              MR. ESSIG:  Okay.

12              THE VIDEOGRAPHER:  All right.  We are

13      going off the record.  The time is 2:09 p.m.

14              (Recess from 2:09 p.m. to 2:39 p.m.

15      Eastern Standard Time)

16              THE VIDEOGRAPHER:  We are going back

17      on the record.  The time is 2:39 p.m., and you

18      may proceed.

19      EXAMINATION

20      BY MR. DURKIN:

21          Q.    Doctor, just a few follow-up questions

22      from the examination by counsel.

23              Early on, you were talking about --

24      somehow a rollercoaster came into the

25      discussion?

THOMAS RICHARD JENKYN, Ph.D.

306

1

2          A.      Hm-hmm.

3          Q.      Is there a difference between what

4     these people went through and a rollercoaster

5     ride?

6          A.      There is, yeah.

7          Q.      Explain what that is.

8          A.      Well, generally with a rollercoaster,

9     when you are going down the bottom of a curve,

10    you are going to experience greater than 1 g

11    that's pushing you down into the seat.

12               When you come up and over the top, you

13    might get a very brief moment of weightlessness

14    or slightly negative g's, but it's a very

15    short-lived.

16               And then you go into close to free

17    fall, close to zero g, as you are coming down

18    the slope.  You don't get the large negative g's

19    that we saw during the two portions of the last

20    24 seconds.

21               The other thing with a rollercoaster

22    is you know you are doing a rollercoaster.  You

23    can see what's coming, and the restraint system

24    is designed specifically that it spreads the

25    load over your body in a way that's not

THOMAS RICHARD JENKYN, Ph.D.

307

1

2       injurious as you go on the rollercoaster and

3       experience those accelerations.

4            Q.    And you are not heading towards the

5       ground either without some type of safety

6       device?

7            A.    Of course.

8            Q.    Okay.

9                  We talked about -- you did get the

10      data from Charles Pereira from the -- from

11      Boeing?

12           A.    That's right.

13           Q.    But you also relied on the data from

14      the Ethiopian government?

15           A.    So in the preliminary and interim

16      reports from the Ethiopian government, they also

17      had traces of the three directions of

18      acceleration acting on the aircraft.

19                 I think I included one of -- that as

20      one of the graphs in my report.

21                 And the data I got from Charles

22      Pereira was consistent with what was in the

23      reports from the Ethiopian government.

24           Q.    I see.

25                 And you actually put a chart in there

THOMAS RICHARD JENKYN, Ph.D.

308

1

2     with the -- one of your charts came from the

3     government in your report?

4          A.    That's correct.

5          Q.    Okay.

6               There was a couple questions about the

7     initial work you did here about stiffness and

8     all that.

9               Is that a preliminary -- is that

10    preliminary work to set up a test?

11         A.    That's right.  So as you are setting

12    up the simulation in the first place, before you

13    are ready to start a large series of runs and

14    testing different parameters, you have got to

15    set up the simulation and get things working

16    right.

17              One of those things is you establish

18    the minimum stiffness required for the body

19    models to sit or stand in a physiological

20    manner.

21         Q.    That's a preliminary aspect?

22         A.    That's right.

23         Q.    Okay.

24              You were asked questions about you

25    weren't able to compare arm length and things

THOMAS RICHARD JENKYN, Ph.D.

309

1
2      like that.
3                  Do you recall that?
4          A.     Yes, I do.
5                  MR. ESSIG:   Object to form.
6      BY MR. DURKIN:
7          Q.     And that -- what's that about?
8                  Is that because someone 5'9', 160
9      might have larger forearms than another person
10     that age? -- size?
11         A.     Exactly.  There is variance in lengths
12     of body segments that you can only get when you
13     actually measure the individual person.
14     Obviously, you are unable to measure the
15     individuals in this plane crash because they are
16     no longer with us.
17         Q.     They were annihilated?
18         A.     Right.
19         Q.     Okay.
20                 This -- I'm going to tack up it.
21                 But the paper by the French gentleman
22     named Desmoulin --
23         A.     Desmoulin?
24         Q.     Desmoulin?  Okay.
25                 Was that the basis for your opinion

THOMAS RICHARD JENKYN, Ph.D.

310

1
2      on -- the basis for your opinion on contusions?
3          A.    I think what I said in my testimony
4      was I had an idea of what the ballpark figure
5      would have been in terms of force to cause
6      contusion.
7               And the Desmoulin data was
8      confirmatory of that; showed me I was in the
9      right ballpark.
10         Q.    So you used your engineering judgment
11     in coming to a threshold or a number that you
12     thought it would, and this confirmed it?
13         A.    That's right.
14              MR. ESSIG:  Object to form.
15         Q.    Now I understand it's one person.
16              But what was important about this
17     study for you, actually? -- as opposed -- what
18     was -- the data?
19              Or what?
20              MR. ESSIG:  Object to form.
21         A.    So what's important about that study
22     is it's one-of-a-kind.  And it's -- so, yes,
23     it's a statistically-underpowered study with
24     sparse data, and it does need to be treated with
25     care.

THOMAS RICHARD JENKYN, Ph.D.

311

1

2          However, it's the only data of its

3    kind.  And so to ignore that data means you are

4    not reviewing all the available data to you.

5          So it's imperfect, but ignoring it

6    would be much worse.  Then I wouldn't be doing

7    my duty as a biomechanical engineer.

8          Q.    Okay.

9          And they came to this number that you

10   had yourself had determined in the range and it

11   was 342 --

12         A.    For a bony part of the body, that's

13   correct.

14         Q.    -- for a bony part of the body.

15         Does it turn out that the actual

16   force -- the newtons -- was multiples of that on

17   these folks?

18         A.    Yeah -- so when you are treating a

19   threshold like this with caution, it means you

20   then -- there is an amount of uncertainty around

21   that number.

22         So when you run your simulation --

23   series of simulations -- as conservatively as

24   possible -- and I think the lowest seat belt

25   tension I got in my simulation series I think

THOMAS RICHARD JENKYN, Ph.D.

312

1

2     was 530 -- you can then say:  Okay, well, there

3     is daylight between the threshold 342 and that

4     minimum value of 530.

5            And then you can say:  Even if there

6     is some uncertainty in that value of 342, it is

7     not so large that it would overcome that minimum

8     value of 530.

9            Now, the situation would be different

10    if I had done a simulation and got a minimum

11    value of 350, and the Desmoulin study is saying

12    342.

13           Then you would say:  Okay, I can't be

14    certain there that the uncertainty wouldn't

15    overlap.

16           But we are up at 530.  That's 180% of

17    the threshold.

18        Q.    A minimum.  We were actually over

19    1,200 -- or 1,500 --

20        A.    For larger individuals, yes, who were

21    heavier, you are many multiples of that.

22        Q.    Durkin would be four times newtons,

23    right?

24        A.    And so your body size scales upwards,

25    but the strength of your tissues --

THOMAS RICHARD JENKYN, Ph.D.

313

1

2      Q.    Okay.

3            And so I think -- so jurors can kind

4      of understand it, they hear "margin of error" --

5      election season.

6            They are way outside the margin of

7      error here?

8            MR. ESSIG:  Object to the form,

9      leading.

10   BY MR. DURKIN:

11     Q.    Is that right?

12     A.    That's right.

13     Q.    You did review the report of Mr. --

14     he's a Ph.D., so I'll call him Dr. Wobrock,

15     okay? -- I checked on that -- to give him the

16     respect.

17           MR. DURKIN:  Maybe we can pull that

18     up, okay?

19           (Pause)

20           MR. ESSIG:  I'll just object that this

21     line is outside of the scope of his direct as

22     well.

23           MR. DURKIN:  -- okay -- he did tell

24     you he reviewed the report on direct.

25           (Pause)

THOMAS RICHARD JENKYN, Ph.D.

314

1

2          MR. ESSIG:  I thought he said "would,"
3    but -- I made the objection.

4          Go ahead.

5          (Pause)

6          MR. DURKIN:  Okay.  So let's go to --
7    we are going to mark it as exhibit -- and we'll
8    supplement it.  What exhibit number is this?

9          MS. GORDON:  298.

10         (Exhibit 298, Multipage document
11    entitled: Boeing's Rule 26(a)(2)(B) Disclosure
12    of Dr. Jesse L. Wobrock, dated November 22, 2022
13    (no Bates Nos.), marked for identification)

14         MR. DURKIN:  Let's go to the first
15    page of the report --

16         (Pause)

17   BY MR. DURKIN:

18       Q.    First paragraph says:  Based on a
19    review -- he's talking about you -- I conclude
20    that the opinions and conclusions reached by Dr.
21    Jenkyn in this case are speculative,
22    unscientific, and unreliable.

23         Agree or disagree with that statement?

24       A.    I disagree.

25       Q.    You agree that you are actually

THOMAS RICHARD JENKYN, Ph.D.

315

1
2      scientific?
3          A.    Yes, I am -- I am scientific.
4          Q.    And you believe the methods of
5      engineering and your judgments were reliable
6      that you make?
7          A.    Yes.
8          Q.    Okay.
9                MR. DURKIN:  Then we go to his
10     criticisms of you on page 5.
11               MR. ESSIG:  I don't think his AgileLaw
12     is moving, so he can't even see what you are
13     talking about.
14               (Pause)
15               MR. ESSIG:  Again, I'll object this is
16     as outside the scope of the direct.
17               MR. DURKIN:  Actually, go to page 6.
18               (Pause)
19               MR. DURKIN:  You see second paragraph?
20               (Pause)
21               THE WITNESS:  Right underneath the
22     heading?
23               MR. DURKIN:  Under:  Biomechanical
24     simulations.
25               THE WITNESS:  Oh, there we are.  Okay.

THOMAS RICHARD JENKYN, Ph.D.

316

1

2    BY MR. DURKIN:

3        Q.    One of his criticisms of you is stated

4    here.

5              It says:  Biomechanical simulations,

6    including the one utilized by Dr. Jenkyn,

7    generally assume that passengers are

8    "ragdolls" -- in quotes -- or crash test dummies

9    that will not or cannot resist any of the forces

10   acting upon their body.

11             Do you agree or disagree with that?

12       A.    Disagree.

13       Q.    Why do you disagree with that?

14       A.    Because we can set the stiffness of

15   individual joints, in which case those joints

16   will act to resist forces acting upon the body.

17       Q.    Then he says:  But, as relevant here,

18   it is highly likely that passengers, in response

19   to some of the airplane movements summarized by

20   Dr. Jenkyn in his report, would engage in a

21   defensive position by grasping the armrests of

22   their chair and pushing themselves into their

23   seat backs.

24             Okay.

25             Would that be the thing that we were

THOMAS RICHARD JENKYN, Ph.D.

317

1

2    talking about -- bracing?

3         A.    Yes.

4              MR. ESSIG:  Object to the form.

5         A.    That's my understanding.

6         Q.    Counsel was talking about bracing with

7    you?

8         A.    That's my understanding.  That's what

9    he meant by bracing.

10        Q.    And is it your opinion, I believe,

11   from what you said this morning that, to a

12   reasonable degree of certainty, it's more likely

13   than not that each and every person who braced

14   suffered some injury?

15        A.    Yes.

16             MR. ESSIG:  Object to form, misstates

17   the evidence, leading.

18   BY MR. DURKIN:

19        Q.    And that would be a muscle strain?

20        A.    That's correct.

21        Q.    Okay.

22             And that goes -- that's certainly in

23   segment 3.

24             Remember we went through the segments?

25             Segment 3, which is the two minutes

1

2    and -- how many seconds? -- two minutes and 4

3    seconds before the last 24 seconds?

4    A.    Yes.

5    Q.    Okay.

6          That's in that period?

7    A.    That's during that period.

8    Q.    Okay.

9          MR. ESSIG:  Object to form, leading,

10   misstates the testimony.

11  BY MR. DURKIN:

12    Q.    Okay.

13         So if you are to assume Dr. Wobrock is

14   true and accurate that -- about the passengers

15   all bracing, then can you say -- we're going to

16   get to the babies in a second -- can you say

17   that each passenger and crew would have

18   sustained a muscle strain in that section 3 that

19   Mr. Essig talked to you about, which is the two

20   minutes and four seconds before the final free

21   fall to the earth?

22         MR. ESSIG:  Object to form, misstates

23   the testimony.

24    A.    So, yes, if everybody is bracing, it's

25   reasonably -- reasonable to conclude, more

THOMAS RICHARD JENKYN, Ph.D.

319

1

2      likely than not, that everybody would have

3      sustained a muscle strain injury.

4             Q.    Okay.  Okay.

5                   And you didn't do bracing because you

6      weren't in the plane and you don't have any

7      cellphone or video of what occurred in there?

8             A.    That's right.

9                   MR. ESSIG:  Object to the form,

10     leading.

11  BY MR. DURKIN:

12            Q.    But that's not unreasonable to think

13     people would brace?

14                  MR. ESSIG:  Same objection.

15            A.    That's right.

16                  MR. DURKIN:  We can let the jury

17     decide that, I guess, okay?

18                  But -- well -- I'll take that back,

19     okay.

20  BY MR. DURKIN:

21            Q.    I brought up baby -- okay? -- because

22     I'm not sure the baby would be able to brace.

23                  So I represent Mr. Nur Mohammed.  And

24     he's on a window seat.  And to the right of him

25     is Carol Karanja with 25-pound Rubi Pauls in

THOMAS RICHARD JENKYN, Ph.D.

320

1

2      arm.

3              Tell us about the forces that would

4      have been exerted on Rubi Pauls in front of Mr.

5      Nur Mohammed?

6              MR. ESSIG:  Objection to form, outside

7      the scope of the direct, outside the scope of

8      the report.

9      A.     So you have a baby, I think in that

10     case was about 25 pounds.

11     Q.     Right.

12     A.     So to determine the inertial forces

13     acting on that baby, you multiply by the

14     vertical acceleration acting on the baby.

15             So if you have got minus 1 g, that

16     baby is being pulled upwards with a force of 25

17     newtons -- or 25 pounds straight up.

18             So the forces acting on the baby come

19     from the inertial forces from the acceleration.

20             But then you also have forces on the

21     baby from the mother.

22             So I don't have any data specifically

23     about how the mother held the baby.  But it's

24     reasonable to assume the mother has her arms

25     around the baby, holding the baby on her lap.

THOMAS RICHARD JENKYN, Ph.D.

321

1

2      And that's going to require a sufficient amount

3      of force to overcome the inertial forces acting

4      on the baby.

5             And so there is a chance of injuring

6      the baby by the mother clamping down on the baby

7      perhaps too much in a stressful situation; or if

8      the force from the mother is insufficient to

9      hold the baby in place, then the inertial forces

10     will pull the baby out of her arms.

11     Q.    Would the baby be just like any of the

12     other objects you talk about?

13     A.    That's right.

14     Q.    When you say "pulled out of the arms,"

15     can you describe the motion the baby would -- of

16     the baby?

17     A.    Very similar to what we saw with an

18     unrestrained passenger.  So during a period of

19     negative g's, the baby would be accelerated

20     straight up out of the mother's arms until it

21     impacted with -- probably the ceiling, or the

22     bin bottom.

23     Q.    Then what would happen when it impacts

24     the seat, or the bin bottom, or --

25     A.    Then you -- they would incur an impact

THOMAS RICHARD JENKYN, Ph.D.

322

1

2     with whatever part of the body struck that

3     structure, and then they would rebound off that

4     structure.

5               MR. ESSIG:  Again, object to the form,

6     outside the scope of the direct --

7   BY MR. DURKIN:

8        Q.    And then when the g's went positive --

9     remember how I showed you that they went

10    positive? -- what would happen then?

11       A.    Then the baby is going to come back

12    down.

13       Q.    So the baby gets thrust up to the top

14    of the cabin, then down to the floor?

15       A.    That's right.

16               MR. ESSIG:  Same objections to the

17    whole line of that.

18               MR. DURKIN:  Okay.

19   BY MR. DURKIN:

20       Q.    Baby is no different than -- in terms

21    of Newton's law -- no different than any of the

22    other objects we talked about?

23       A.    That's right.

24       Q.    Okay.

25               Oh, there was some question about you

THOMAS RICHARD JENKYN, Ph.D.

323

1

2       reviewing -- you revisiting the 5% -- the 5% --

3       you said you went back and calculated the time

4       at which seat belt tension would exceed the

5       contusion threshold.

6              Why did you do that?

7       A.    So after reviewing Dr. Wood's expert

8       report, where he does, sort of, a simplified

9       calculation of a seat belt tension and showed

10      that each and every passenger on the aircraft,

11      according to his simulation, also exceeded the

12      threshold that I set, he brought up the issue of

13      timing.

14             And I honestly hadn't thought of it

15      before reading that.  So that's what induced me

16      to go back to the data.

17             So the data was already in there.  I

18      didn't rerun any of the simulations.  All I did

19      was interrogate the simulation to pull out that

20      data that was already there to look at the

21      timing at which each and every person exceeded

22      the threshold.

23             And I started with the 5th percentile

24      female because they were the lightest and had

25      the least mass, and therefore would have had the

THOMAS RICHARD JENKYN, Ph.D.

324

1
2     smallest seat belt tension.
3          Q.    You were asked questions by counsel
4     about the simulation and the vibration that
5     appeared in there?
6          A.    Yes.
7               MR. ESSIG:  Object to the form.
8               MR. DURKIN:  I think he was, wasn't
9     he?
10              Do you remember? -- I remember that.
11    BY MR. DURKIN:
12         Q.    Do you remember that? -- the question
13    about vibration showed with the camera and
14    the -- they were asking questions about shaking
15    of the aircraft in the simulation?
16              MS. GUERRIERI:  Do you mean the
17    animation?
18              MR. DURKIN:  Yes.
19              (Pause)
20         A.    -- the animation, yes.
21         Q.    Okay.
22              When the plane was heading down to the
23    earth in that last 23 seconds, would you expect
24    vibrations in the aircraft?
25              MR. ESSIG:  Object to the form, asked

THOMAS RICHARD JENKYN, Ph.D.

325

1
2    and answered.
3        A.    I think you would expect vibrations.
4              But, in fact, we actually have data to
5    show that there were vibrations in the
6    longitudinal and lateral accelerations that came
7    out of the flight data recorder.  So there were
8    accelerations in those two other axes that would
9    have represented vibrations to the aircraft.
10       Q.    It would be misleading to show the
11   aircraft heading to the earth in that last 23
12   seconds without vibrations.
13             Is that correct?
14       A.    Again, I'm not an expert in animation,
15   so I don't think I can answer that.
16       Q.    But you do believe there would have
17   been vibrations?
18       A.    I saw -- the vibrations that I saw in
19   the animations seem reasonable, based on the
20   flight data recorder.
21       Q.    Okay.
22             MR. DURKIN:  I want to go through
23   briefly your report, the we can get back to --
24   that is number 290? -- 290 -- and go to your
25   "Conclusions" section, okay?

THOMAS RICHARD JENKYN, Ph.D.

326

1
2                    THE WITNESS:  Page 34?
3                    MR. DURKIN:  That's correct.
4     BY MR. DURKIN:
5          Q.    Now, your opinions start in there with
6     that time frame -- you can see the first
7     sentence -- at 8:41:14 to 8:43:18?
8                Do you see that?
9          A.    Yes.
10         Q.    Is that what counsel has called
11    segment 3?
12         A.    That's correct.
13         Q.    Okay.
14               That's the two minutes and four
15    seconds before the 23 -- I've said 23, but you
16    say it's 24 seconds?
17         A.    Twenty-four and a half --
18         Q.    Twenty-four and a half.
19               And by the way, you didn't -- you are
20    aware Mr. Pereira calculated more seconds after
21    that, and so did actually the defense, that
22    weren't necessarily reported by the government?
23         A.    It's my understanding that that's the
24    case, yes.
25         Q.    You didn't rely on any of that.

THOMAS RICHARD JENKYN, Ph.D.

327

```
 1
 2              You relied on just what came from the
 3    digital flight data recorder and the output you
 4    received?
 5         A.    That's right.
 6         Q.    Okay -- and the government of
 7    Ethiopia?
 8         A.    Yes, correct.
 9         Q.    You say that the -- in that last two
10    minute and 4 seconds -- above that -- that the
11    passengers had unusually large, physically
12    taxing, physically agonizing, and physically
13    exhausting acceleration of forces
14    biomechanically induced on their body during the
15    two minutes and four seconds between that time
16    frame?
17         A.    Yes.
18         Q.    What do you mean by "biomechanically
19    induced on their bodies"?
20         A.    It means that loading is involuntary.
21    So they didn't ask for it, but they have got it.
22         Q.    When you say "loading," what do you
23    mean by that?
24         A.    So the accelerations are induced by
25    the motion of the aircraft going upwards and
```

THOMAS RICHARD JENKYN, Ph.D.

328

1

2      downwards.  But when you induce accelerations in

3      masses -- for instance, the mass of your upper

4      arm, the mass of your forearm, the mass of your

5      chest, the mass of your head -- that creates

6      inertial forces that act to move that segment,

7      and the two are part and parcel of each other.

8                So if you have these vertical

9      accelerations forced on you by the motion of the

10     aircraft, you have inertial forces induced in

11     your body involuntarily.

12         Q.    And so -- you gave an example

13     before -- a 200-pound passenger at 1.691 g's

14     would actually weigh 338 pounds?

15         A.    That's right.

16         Q.    What's the physical impact of that 338

17     pounds on that 200-pound person?

18         A.    So we have been talking a lot about

19     how these accelerations and inertial forces

20     raise the arms, lower the arms --

21         Q.    Right.

22         A.    -- cause the torso to move forward and

23     back.

24                But it also has an effect on the

25     inside of the body.  So each of the organs

THOMAS RICHARD JENKYN, Ph.D.

329

1

2    within your abdomen and chest are also being

3    pulled up and pulled down with those inertial

4    forces.  And so you have got your intestines

5    moving relative to the stomach, moving relative

6    to the liver, being accelerated up and

7    accelerated down with inertial forces.

8              You've also got the blood which, even

9    though it's a liquid, it has mass.  And so that

10   blood is mobile.  So it's pulled up and it's

11   pulled down, and these are having an effect on

12   the body as well involuntarily.

13   Q.    Would that be the -- would the organs

14   be being physically pushed against each other?

15   A.    Yes.

16   Q.    What organs are we talking about?

17         All?

18   A.    So every part of your body that has

19   mass is going to be acted upon by the inertial

20   forces.

21             But I think the primary ones that are

22   most vulnerable are the ones in your abdomen

23   where they are discrete from each other and held

24   in place by connective tissue, but they can

25   individually accelerate up and down causing

THOMAS RICHARD JENKYN, Ph.D.

330

1

2    strains in between each of them.

3        Q.    And you go further in that paragraph

4    and say:  This is a highly -- after you -- you

5    go through the 0.439 to 1.691 g's.

6             You say:  This is a highly irregular

7    undulation of vertical acceleration where the

8    passenger would have gone from being 60% heavier

9    than normal to 50% lighter over and over again.

10            Why is that highly irregular?

11       A.    Well, it's -- the situation we are

12   dealing with -- I think before in my testimony,

13   we made a comparison to turbulence.  And I think

14   that's -- that's misleading in the fact that

15   what we are not talking -- turbulence is the

16   aircraft is reacting to aerodynamic forces that

17   are irregular.  And so the aerodynamic forces

18   acting on the plane are changing and the plane

19   moves around.

20            The situation we have here is the

21   plane's operating system is trying to do one

22   thing -- go nose down -- and the pilots are

23   trying to do the opposite -- which is go nose

24   up.  And you have a battle -- a fight -- between

25   the pilots and the aircraft as they are fighting

THOMAS RICHARD JENKYN, Ph.D.

331

1

2      to control the aircraft.

3              And so, yes, we do have positive

4      negative g's that may be similar in magnitude to

5      severe turbulence.  But the rate at which they

6      change, the rate of the oscillations, the

7      irregularity of the oscillations is a different

8      set of physics because you have pilots fighting

9      the airplane, rather than aerodynamic forces

10      just moving the airplane.

11      Q.    So you got a part of the aircraft

12      called MCAS pushing the aircraft to the earth,

13      and then the pilots are trying to keep it from

14      hitting the earth?

15      A.    That's my understanding, yes.

16      Q.    And that's different than what --

17      turbulence?

18      A.    Right.  Because the period of

19      oscillation is going to be different and it's

20      going to be based on what the pilots are doing.

21              MR. ESSIG:  Objection, beyond the

22      scope of the direct examination, and beyond the

23      scope of the report.

24              MR. DURKIN:  Okay.  Well, I am just

25      reading from the report.

THOMAS RICHARD JENKYN, Ph.D.

332

1

2   BY MR. DURKIN:

3       Q.    Now:  This happened almost at

4   random -- next sentence:  This happened --

5            MR. DURKIN:  I mean, I just want to

6   make sure you are aware I am just reading from

7   the report .

8   BY MR. DURKIN:

9       Q.    -- this happened almost at random and

10  without any visual warning to the passengers.

11           Why was that important for you to put

12  in your report?

13      A.    Well, when you know what's coming --

14  for instance, when you are on a rollercoaster --

15  you can be ready for what's coming, and you can

16  fire your muscles efficiently to overcome the

17  inertial forces because you know what those

18  initial forces are going to be in terms

19  magnitude and direction.

20           But in this case, you have no idea.

21  You have no warning as to whether or not you are

22  going to be accelerating upward or downwards,

23  and by how much.

24           So when you do brace yourself, or when

25  you do try to control the motion of your body

THOMAS RICHARD JENKYN, Ph.D.

333

1

2    with muscular contraction, it's going to be

3    inefficient -- probably too much because you

4    don't know what's coming, and you've got to

5    prepare for the worst; or if you do too little,

6    then you have an uncontrolled flailing motion of

7    your limbs.

8         But the chance that you get the exact

9    right amount of muscle contraction at any moment

10   without any warning of what's coming next is

11   highly unlikely.

12   Q.    Okay.

13        And you say:  This is biomechanically

14   significant and highly unusual during the

15   normal, safe commercial flight.

16        I think you answered that with Mr.

17   Essig before.

18        Then you go on:  The impact of the

19   change in vertical acceleration would have

20   caused each passenger and flight crew to be

21   jostled, thrown, and thrust involuntarily within

22   the aircraft.

23        What do you mean by "involuntary"?

24        And what do you mean by that sentence?

25   A.    They have no control over what the

THOMAS RICHARD JENKYN, Ph.D.

334

1
2    acceleration of the aircraft is.
3              But, like I said, so long as you have
4    got that vertical and positive acceleration on
5    the aircraft, it causes inertial forces in their
6    bodies, whether they like it or not.  They have
7    no control over it.
8              That's what I mean by "involuntarily."
9    Q.     So their bodies being jostled, thrown,
10   and thrust involuntarily within the aircraft?
11   A.     Correct.
12   Q.     Their arms, legs, torso, and neck, and
13   head -- let me start over.
14             Their arms, legs, torso, neck, and
15   head would have been induced to move
16   involuntarily and without warning in different
17   directions, primarily up and down.
18             What do you mean by that?
19   A.     So, again, you don't know when the
20   inertial forces are going to change, and in what
21   direction, and with what magnitude.
22             So as the aircraft is accelerated
23   upwards, your head is going to be thrust
24   downwards; as the aircraft accelerates
25   downwards, your head is thrust upwards.  Same

THOMAS RICHARD JENKYN, Ph.D.

335

1
2    with your arms.
3              You don't have any warning, any visual
4    warning or -- to know what's going to happen
5    next.
6              And so you either try to brace
7    yourself, or control the motion of your limbs;
8    or you don't control the motion of your limbs
9    and they will flail around involuntarily.
10        Q.    Okay.
11             And then we go on where you are
12   talking about the weight heavier.  That's pretty
13   clear in your report.  You talked about that --
14        A.    Hm-hmm.
15        Q.    -- the different weights.
16             And I just want to make sure -- it's
17   just not feeling -- if the 200-pounder sitting
18   in the seat experienced the 1.691 g's and got on
19   a scale, what would be the weight?
20        A.    Right.  So you are being pulled
21   towards the earth downwards with that actual new
22   weight.  So it's not a feeling.  It's what your
23   actual weight is at that moment.
24        Q.    A physical effect and impact on your
25   body?

THOMAS RICHARD JENKYN, Ph.D.

336

1

2          A.      Yes.

3          Q.      Okay.

4                  MR. ESSIG:  Object to the form,

5     leading.

6                  (Pause)

7     BY MR. DURKIN:

8          Q.      Then we go through that.

9                  Then you say -- if you go down --

10    we'll go -- you talk about the 200-pound person

11    would have weighed 338, like wearing a backpack

12    of 130-pounds on their back?

13         A.      Yes.

14         Q.      Okay.

15                 Is that a lot for someone to carry on

16    their back from a biomechanical standpoint?

17         A.      I would have thought so.

18         Q.      Okay.

19                 Each segment of their body would be

20    pulled down toward the floor.

21                 When you say "each segment of their

22    body," what are you talking about? -- "each

23    segment"?

24         A.      So upper arms, forearms, head, neck,

25    chest, abdomen, pelvis, everything is being

THOMAS RICHARD JENKYN, Ph.D.

337

1

2      pulled down towards --

3          Q.      Liver, everything?

4          A.      Internal organs, blood within the

5      body, everything is being inertially pulled

6      towards the ground.

7          Q.      Okay.

8                  Every organ in the body?

9          A.      That's right.

10         Q.      Okay.

11                 That include the brain?

12         A.      The brain.  Now the brain is pretty

13     tightly packed in there, so it's not going to

14     move around as much, but it is feeling an

15     inertial force, yes.

16         Q.      All the fluid that their body also

17     would have been pulled downward toward the

18     floor.

19                 You talked about that -- blood, right?

20         A.      Right.

21         Q.      Then you say:  Each passenger would

22     have strained with their muscles against this

23     unusual downward pull on their neck, arms,

24     torso, and legs.

25                 Now we were talking about 2 minutes

THOMAS RICHARD JENKYN, Ph.D.

338

1

2      and four seconds still -- segment 3?

3          A.      Right.

4          Q.      What did you mean by that?

5          A.      So you're -- you are having these

6      inertial forces involuntarily placed on your

7      body.

8              So we've talked before about whether

9      or not people brace, or whether or not they

10     allow their limbs to move.  And again I can't

11     say which they do.

12             But you really only have three options

13     as far as I can see, reasonable to say.

14             One, you brace into your seat and hold

15     the armrests.

16             Or, two, that you do opposite and you

17     are completely relaxed and your limbs are

18     flailing around.

19             But then in between the two, there is

20     a third option where your arm or arms may be

21     free, but you are firing your muscles to slow

22     down the motion, and you are trying to

23     participate what's coming next.  You are not

24     fully flailing like a rag doll, but you are

25     trying to control your motion.

THOMAS RICHARD JENKYN, Ph.D.

339

1

2          In the cases of controlling your

3    motion and bracing, you are firing your muscles

4    inefficiently.  You are trying to stabilize the

5    joints against forces that are changing in an

6    unpredictable way.  You have -- more likely than

7    not, going to get muscle strain.

8          Q.   Okay.

9          A.   If you leave your arms totally

10   flailing around, then you are going to hit

11   something.

12         Q.   So I just want to make sure we have --

13   while you can't say -- no one can with say --

14   what any individual passenger did, right?

15         A.   I can't say that.

16         Q.   We don't have any cellphones from the

17   cabin.

18          You weren't given any cell phones,

19   were you?

20         A.   No.

21         Q.   Have you have seen cell phone video

22   in different -- if you have, if you have -- in

23   different aircraft events?

24         A.   Not that I recall.

25         Q.   Okay.

THOMAS RICHARD JENKYN, Ph.D.

340

```
 1
 2              But we don't have anything -- so but
 3      we can assume that -- can you assume one of
 4      three things was the case for each and every
 5      passenger?
 6         A.    Seems reasonable.
 7         Q.    The first one is bracing that we
 8      talked about, and you talked about with Mr.
 9      Essig at length, right?
10         A.    That's right.
11         Q.    You've clearly told us your opinion
12      about each -- it was more likely than not, each
13      and every person that braced would have had
14      muscle strain injury?
15         A.    Yes.
16         Q.    Okay --
17              MR. ESSIG:  Object to the form,
18      leading.
19   BY MR. DURKIN:
20         Q.    -- now, the second one is the -- not
21      bracing -- but what you put in your report --
22      straining their muscles without bracing.
23              That's what you have in the report?
24         A.    Yes.
25         Q.    Okay.
```

THOMAS RICHARD JENKYN, Ph.D.

341

1

2              And is it more likely than not that

3     each person that fit in that second category

4     also would in that two minute and four --

5     two-minute, four-second period also had muscle

6     strain injury?

7          A.    Yes.

8              MR. ESSIG:  Object to form, leading,

9     misstates the testimony.

10    BY MR. DURKIN:

11         Q.    Okay.

12             Now, the third one is people just act

13    like a rag doll?

14         A.    Right.

15         Q.    By the way, is that really -- except

16    for maybe the babies -- okay? -- I think there

17    is two lap babies with their mothers or -- is

18    that really likely? -- that the people would

19    just be -- or if that's not in engineering, if

20    that's more a question for the jury, you let me

21    know.

22             But is it really likely someone is

23    just going to be a rag doll in this

24    circumstance?

25         A.    Do I have specific data as to whether

THOMAS RICHARD JENKYN, Ph.D.

342

1

2      that occurs in aircraft?  I don't know.

3              But it does happen in car crashes.

4      Q.     Okay.

5              So let's talk about the rag doll --

6      the third one -- okay?

7              What would happen to the rag doll

8      person that doesn't brace and have a strain

9      injury, doesn't react and strain their muscles

10     and have a strain injury -- what would happen to

11     the rag doll?

12     A.     So now your arms, certainly, your

13     head, neck, and torso are going to be reacting

14     and moving with respect -- and under the

15     influence of those involuntary inertial forces.

16             And so, as you go back and forth, you

17     are going to have your head and torso striking

18     the seat back.  You'll have the arms flailing

19     around and striking either yourself, your own

20     seat, the person next to you, or the interior of

21     the aircraft.

22     Q.     Okay.

23             So for that third category that we

24     have now in that last two minutes and four

25     second segment -- segment 3, that -- on your

THOMAS RICHARD JENKYN, Ph.D.

343

1

2      chart -- is it more likely than not that each

3      person who took no type of defensive action --

4      bracing or tightening their body -- would have

5      struck an object -- physically struck and had

6      impact -- with an object or person, including

7      themselves?

8          A.     I would agree, yes, more likely than

9      not.

10         Q.     Okay.  So we have covered those three.

11                Now, we take those in that segment.

12                Now let's go to the last 43 seconds.

13                That's all the same? -- bracing? --

14         A.     Yes --

15         Q.     -- not --

16         A.     -- so you still have that three --

17     still have the three options.

18                But again, you now have periods of

19     negative g's, so the flailing would be much

20     worse -- arms above the head, striking the bin

21     bottoms.  The inertial forces are larger and in

22     two directions with large magnitude.

23         Q.     Okay.  Okay.  All right.

24                All the opinions you have -- let

25     me check --

THOMAS RICHARD JENKYN, Ph.D.

344

1
2          (Pause)
3     Q.    Everything you have testified today,
4     to the best of your knowledge, has been to a
5     reasonable degree of engineering and
6     biomechanical certainty?
7     A.    Yes.
8     Q.    Okay.
9          MR. DURKIN:  We are done.
10         MR. ESSIG:  Let's take a break, and
11    we'll think if we have anything else.
12         MR. DURKIN:  Okay.
13         THE VIDEOGRAPHER:  We are going off
14    the record.  The time is 3:15 p.m.
15         (Recess from 3:15 p.m. to 3:26 p.m.
16    Eastern Standard Time)
17         THE VIDEOGRAPHER:  We are going back
18    on the record.  Time is 3:26 p.m.
19    EXAMINATION
20    BY MR. ESSIG:
21    Q.    Hi, Dr. Jenkyn.
22    A.    How are you?
23    Q.    I'm going to ask you just a couple
24    extra questions here.
25         The first one -- and I don't want to

THOMAS RICHARD JENKYN, Ph.D.

345

1

2      know what you discussed -- but in about the --

3      there was about 30 minutes between the end of my

4      examination and the examination by Mr. Durkin.

5              Did you discuss the substance of your

6      testimony during that time?

7              And you don't have to tell me what you

8      discussed.

9              But yes or no -- did you discuss the

10     substance?

11     A.      We discussed some of the -- some of

12     the testimony, yes.

13     Q.      Okay.

14             Have you ever looked at an FDR trace

15     for a turbulence event?

16     A.      No.

17     Q.      You omitted longitudinal and lateral

18     forces from your simulation.

19             Is that correct?

20     A.      That's correct.

21     Q.      And so you never provided longitudinal

22     or lateral force data to Eyewitness Animations.

23             Is that correct?

24     A.      That's right.

25     Q.      And you never checked whether that

THOMAS RICHARD JENKYN, Ph.D.

346

1

2      animation is consistent with those forces or

3      not?

4            A.      I didn't check the numbers that they

5      input into their animation, no.

6            Q.      And so you also -- just to be clear,

7      there is no sentence in your report anywhere

8      that you signed on September 22 where you

9      disclosure your personal opinion about the

10     threshold to reach a contusion injury, right?

11           A.      That's right.

12           Q.      And then I guess the last thing I

13     wanted to know is when we -- we talked earlier

14     about the analysis that wasn't in your report,

15     but that you did where you look back, based on

16     what Dr. Wood said about when the contusion

17     injury might have occurred, to determine what

18     that time point might have been.

19                   Was the threshold that you looked back

20     to determine whether it was crossed or not 342

21     newtons?

22           A.      Yes.

23                   MR. ESSIG:  I don't think I have

24     anything further.

25                   MR. DURKIN:  We're done.

THOMAS RICHARD JENKYN, Ph.D.

347

1

2            THE VIDEOGRAPHER:  Anything further

3    before I take us off the record for the day?

4            MR. ESSIG:  Nothing from me.

5            THE VIDEOGRAPHER:  All right.  In that

6    case, we are going off the record at 3:28 p.m.,

7    and this concludes today's testimony given by

8    Thomas R. Jenkyn.

9                    *    *    *

10        E N D   O F   P R O C E E D I N G

11    Time noted 3:28 p.m. Eastern Standard Time

12                    *    *    *

13

14

15

16

17

18

19

20

21

22

23

24

25

THOMAS RICHARD JENKYN, Ph.D.

348

1

2

3                    A C K N O W L E D G M E N T

4

5

6    I, THOMAS RICHARD JENKYN, Ph.D., P.Eng., hereby

7    certify that I have read the transcript of my

8    testimony taken under oath in my deposition of

9    December 15, 2022; that the transcript is a true and

10   complete record of my testimony; and that the answers

11   on the record as given by me are true and correct.

12

13              _____

14                    THOMAS RICHARD JENKYN, Ph.D., P.Eng.

15

16

17   Signed and subscribed to before me,

18   this _____ day of _____, 2022.

19

20
     _____
21                    (NOTARY PUBLIC)

22

23   My Commission expires:

24

25

THOMAS RICHARD JENKYN, Ph.D.

349

1

2

3    I N D E X   O F   E X A M I N A T I O N

4

5

6    Witness:

7    Thomas Richard Jenkyn, Ph.D., P.Eng.

8

9

10   Examination:

11   By Mr. Essig.................................Page 13

12   By Mr. Durkin..............................Page 305

13   By Mr. Essig................................Page 344

14

15

16   Index of Exhibits.........................Page 350

17

18

19

20

21

22

23

24

25

THOMAS RICHARD JENKYN, Ph.D.

350

1

2                    I N D E X   O F   E X H I B I T S

3

4     290   Multipage document entitled: Plaintiffs' ......17

5           Rule 26(a)(2)(B) Disclosure of Thomas R.

6           Jenkyn, Ph.D, P.Eng., dated September 22,

7           2022 (no Bates Nos.)

8

9     291   Multipage document entitled: United States ...122

10          Air Force Research laboratory Articulated

11          Total Body Model Version V User's Manual,

12          dated February 1998 (no Bates Nos.)

13

14    292   Four-page document entitled: TLS Forensic ....135

15          Engineering Collision Reconstructi (no

16          Bates Nos.)

17

18    293   Multipage document entitled: Head Injury .....140

19          Criterion and the ATB (no Bates Nos.)

20

21    294   Multipage document entitled: Supplement: .....254

22          Development of Improved Injury Criteria

23          for the Assessment of Advanced Automotive

24          Restraint Systems - II, dated March 2000

25          (no Bates Nos.)

THOMAS RICHARD JENKYN, Ph.D.

351

1

2   295   Two-page document bearing heading: ET302 .....258

3         Injury Data-GATB, 414, 416-424s, dated

4         November 21, 2022 (no Bates Nos.)

5

6   296   Multipage document entitled: Method to .......263

7         Investigate Contusion Mechanics in Living

8         Humans, dated January 16, 2011 (no Bates

9         Nos.)

10

11  297   Video animation share screen by Winston ......301

12        and Strawn (no Bates No.)

13

14  298   Multipage document entitled: Boeing's Rule ...314

15        26(a)(2)(B) Disclosure of Dr. Jesse L.

16        Wobrock, dated November 22, 2022 (no Bates

17        Nos.)

18

19

20             (All exhibits were provided

21          electronically to the reporter.)

22

23

24

25

THOMAS RICHARD JENKYN, Ph.D.

352

1

2                    C E R T I F I C A T E

3

4              I certify that in response to the

5    COVID-19 pandemic, I, BRANDON RAINOFF, have

6    collected everyone's agreement at the

7    commencement of this deposition that I would be

8    the swearing officer and court reporter remotely

9    out of state and that I may record the testimony

10   stenographically and swear in the deponent even

11   though I am not in the physical presence of the

12   deponent, and that there is no objection to that

13   at this time, nor will there be an objection to

14   it at a future date.

15              IN WITNESS WHEREOF, I have hereunto

16   set my hand this 15th day of December, 2022.

17

18

19   _____

          BRANDON RAINOFF, RPR, FCRR, RMR, CRR

20

21

22

23

24

25

THOMAS RICHARD JENKYN, Ph.D.

353

1

2                    C E R T I F I C A T E

3

4          I, BRANDON RAINOFF, a Federal Certified

5   Realtime Reporter and Notary Public within and for the

6   State of New York, do hereby certify:

7               That THOMAS RICHARD JENKYN, Ph.D.,

8   P.Eng., the witness whose  deposition is hereinbefore

9   set forth, was duly sworn by me and that such

10  deposition is a true record of the testimony given by

11  the witness.

12              I further certify that I am not related to

13  any of the parties to this action by blood or

14  marriage, and that I am in no way interested in the

15  outcome of this matter.

16              IN WITNESS WHEREOF, I have hereunto set my

17  hand this 15th day of December, 2022.

18

19

20   _____

          BRANDON RAINOFF, RPR, FCRR, RMR, CRR

21

22

23

24

25

THOMAS RICHARD JENKYN, Ph.D.

354

1

2        ERRATA SHEET FOR THE TRANSCRIPT OF:

3   Case Name: Ethiopian Airlines Flight ET-302 Crash
    Deposition Date:  12-15-2022
4   Deponent:  Thomas Richard Jenkyn, Ph.D., P.Eng.
    Place: Remote/Hybrid Deposition

5

6                    CORRECTIONS

7

8   PAGE  LINE   FROM          TO              REASON

9   ____|___|_____|_____|_____

10  ____|___|_____|_____|_____

11  ____|___|_____|_____|_____

12  ____|___|_____|_____|_____

13  ____|___|_____|_____|_____

14  ____|___|_____|_____|_____

15  ____|___|_____|_____|_____

16  ____|___|_____|_____|_____

17  ____|___|_____|_____|_____

18  ____|___|_____|_____|_____

19

20  _____
    Date              THOMAS RICHARD JENKYN, Ph.D., P.Eng.
21

22  Subscribed and sworn before me

23  this_____day of _____, 2022.

24  _____
    (Notary Public)
25  My Commission expires:

TC REPORTING
(516) 795-7444