# EXHIBIT D

# In The Matter Of:
# ETHIOPIAN AIRLINES FLIGHT ET 302

# CRASH - DAMAGES

_____

# TROY FAABORG
January 4, 2023

_____

# TC REPORTING, INC.
## 1 DEERFIELD EAST - 1850
## QUOGUE, NY.  11959

TROY FAABORG - Vol. I

1

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

------------------------------------------------x
IN RE: ETHIOPIAN AIRLINES
FLIGHT ET 302 CRASH

This Document Relates To: All Actions
------------------------------------------------x
Lead Case: 1:19-cv-02170 (Consolidated)
Honorable Jorge L. Alonso
Magistrate Judge M. David Weisman
------------------------------------------------x


                        January 4, 2023
                        9:10 a.m. Eastern Standard Time


                   *       *       *

     CONFIDENTIAL PURSUANT TO AMENDED PROTECTIVE ORDER

                   *       *       *



               Remote video conference deposition of

     TROY FAABORG, taken by Defendant The Boeing

     Company, pursuant to Notice, dated December, 13,

     2022, before Brandon Rainoff, a Federal

     Certified Realtime Reporter and Notary Public of

     the State of New York.

TROY FAABORG

2

1

2    A P P E A R A N C E S:

3

4    KREINDLER & KREINDLER LLP

5    Attorneys for Plaintiffs' Executive Committee

6              750 Third Avenue

7              New York, New York  10017

8              212.687.8181

9    BY:    JUSTIN T. GREEN, ESQ.

10              212.973.3403

11              jgreen@kreindler.com

12              DANIEL O. ROSE, ESQ.

13              212.973.3414

14              drose@kreindler.com

15              BRIAN J. ALEXANDER, ESQ.

16              balexander@kreindler.com

17              212.973.3411

18              ERIN R. APPLEBAUM, ESQ.

19              eapplebaum@kreindler.com

20              212.973.3430

21

22

23

24

25

TROY FAABORG

3

```
 1
 2    A P P E A R A N C E S (continued):
 3
 4    CLIFFORD LAW OFFICES PC
 5    Attorneys for Plaintiffs' Executive Committee
 6            120 North LaSalle Street
 7            Chicago, Illinois  60602
 8            312.625.6192
 9    BY:    ROBERT A. CLIFFORD, ESQ.
10            312.899.9090
11            rac@cliffordlaw.com
12            KEVIN P. DURKIN, ESQ.
13            kpd@cliffordlaw.com
14            TRACY A. BRAMMEIER, ESQ.
15            tab@cliffordlaw.com
16            JOHN V. KALANTZIS, ESQ.
17            jvk@cliffordlaw.com
18            SANJA PETREVSKA, ESQ.
19            sp@cliffordlaw.com
20
21
22
23
24
25
```

TROY FAABORG

4

```
 1
 2    A P P E A R A N C E S (continued):
 3
 4    NURENBERG, PARIS, HELLER & McCARTHY, LPA
 5    Attorneys for Plaintiffs
 6             600 Superior Avenue East
 7             Suite 1200
 8             Cleveland, Ohio  44114
 9             216.230.6834
10    BY:    JAMIE R. LEBOVITZ, ESQ.
11             216.694.5220 office
12             jlebovitz@nphm.com
13
14    COTCHETT, PITRE & McCARTHY, LLP
15    Attorneys for Plaintiffs
16             840 Malcolm Road
17             Suite 200
18             Burlingame, California  94010
19             650.697.6000
20    BY:    FRANK M. PITRE, ESQ.
21             fpitre@cpmlegal.com
22             JOHN PAUL THYKEN, ESQ.
23             jthyken@cpmlegal.com
24
25
```

TROY FAABORG

5

```
 1
 2    A P P E A R A N C E S (continued):
 3
 4    POWER ROGERS, LLP
 5    Attorneys for Plaintiffs
 6              70 West Madison Street
 7              Suite 5500
 8              Chicago, Illinois  60602
 9              312.313.0202
10    BY:     JONATHAN M. THOMAS, ESQ.
11              jthomas@powerrogers.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

TROY FAABORG

6

```
 1
 2   A P P E A R A N C E S (continued):
 3
 4   WINSTON & STRAWN LLP
 5   Attorneys for Defendant The Boeing Company and the
 6   Witness
 7             35 West Wacker Drive
 8             Chicago, Illinois  60601-9703
 9             312.558.5600
10   BY:    CHRISTOPHER B. ESSIG, ESQ.
11             312.558.6229
12             cessig@winston.com
13             KARALENA M. GUERRIERI, ESQ.
14             312.558.8079
15             kguerrieri@winston.com
16             MICHAEL J. STERN, ESQ.
17             312.558.6069
18             mjstern@winston.com
19
20
21
22
23
24
25
```

TROY FAABORG

7

1

2   A P P E A R A N C E S (continued):

3

4   PERKINS COIE LLP

5   Attorneys for Defendant The Boeing Company and the

6   Witness

7           1201 Third Avenue

8           Suite 4900

9           Seattle, Washington  98101-3099

10          206.359.8000

11  BY:    CHRISTOPHER LEDFORD, ESQ.

12          206.359.6642

13          cledford@perkinscoie.com

14

15  ALSO PRESENT:

16  JENNIFER GORDON, Clifford Law Offices PC

17  JACKIE GRIBBON, Clifford Law Offices PC

18  THERESA WINTER, TC Reporting, Inc.

19  CRAIG JONES, Technical Support, TC Reporting, Inc.

20  DANNY HOLGUIN, Videographer

21

22

23

24

25

TROY FAABORG

8

          1

          2                    S T I P U L A T I O N S

          3

          4

          5              IT IS HEREBY STIPULATED AND AGREED by

          6       and between the attorneys for the respective

          7       parties herein, that filing, sealing and

          8       certification be and the same are hereby waived.

          9              IT IS FURTHER STIPULATED AND AGREED

         10       that all objections, except as to the form of

         11       the question, shall be reserved to the time of

         12       the trial.

         13              IT IS FURTHER STIPULATED AND AGREED

         14       that the within deposition may be signed and

         15       sworn to before any officer authorized to

         16       administer an oath, with the same force and

         17       effect as if signed and sworn to before the

         18       Court.

         19

         20

         21

         22

         23

         24

         25                        - o0o -

TROY FAABORG

9

1

2                         *       *       *

3                     P R O C E E D I N G

4                 Wednesday, January 4, 2023

5                   Remote/Hybrid Deposition

6                9:10 a.m. Eastern Standard Time

7                         *       *       *

8               THE VIDEOGRAPHER:  Good morning.  This

9       is the video conference monitor, Craig Jones of

10      TC Reporting, and we are here for the deposition

11      of Troy Faaborg, being taken in the matter --

12      sorry, Mr. Rose is joining us -- being taken In

13      the Matter of Ethiopian Airlines Flight ET 302

14      Crash, Case Number 1:19-cv-02170 (Consolidated).

15              Today's date is Wednesday, January

16      4th, 2023, and the time is approximately 9:10

17      a.m. Eastern Time.

18              There is an in-person videographer

19      also present recording these proceedings.

20              The witness and counsel are attending

21      in-person for today's deposition at the

22      Ritz-Carlton Tiburón, 2600 Tiburon Drive,

23      Naples, Florida, 34109.

24              Other counsel will be appearing

25      remotely via video conference.

TROY FAABORG

10

1

2              Before we proceed, I would like to do
3      a roll call.  I have a list of law firms
4      appearing today.  When I announce each firm if
5      counsel can please state their full name on the
6      record so we may note your appearance
7      accordingly, beginning with Winston & Strawn.
8              MR. ESSIG:  Christopher Essig and
9      Karalena Guerrieri.
10             THE VIDEOGRAPHER:  Thank you.
11             Is Mr. Stern online?
12             MR. ESSIG:  Yes, Michael Stern as
13     well.
14             THE VIDEOGRAPHER:  Thank you.
15             Kreindler & Kreindler?
16             MR. GREEN:  Justin Green in the
17     deposition room.
18             MR. ALEXANDER:  Brian Alexander remote
19     from New York.
20             MS. APPLEBAUM:  Erin Applebaum remote.
21             THE VIDEOGRAPHER:  Thank you.
22             Clifford Law Office.
23             MR. CLIFFORD:  Kevin Durkin and Robert
24     Clifford in the deposition room.
25             MS. BRAMMEIER:  Tracy Brammeier.

TROY FAABORG

11

```
 1
 2              MR. CLIFFORD:  Along with our
 3    co-counsel Jamie Lebovitz from Cleveland.
 4              MR. KALANTZIS:  John Kalantzis remote.
 5              MS. PETREVSKA:  Sanja Petrevska.
 6              MS. GORDON:  Jennifer Gordon remote.
 7              MS. GRIBBON:  Jackie Gribbon remote.
 8              THE VIDEOGRAPHER:  Thank you.
 9              Cotchett, Pitre & McCarthy.
10              MR. PITRE:  Good morning.  Frank Pitre
11    from California, where the rooster still sleeps.
12              MR. THYKEN:  John Thyken.
13              (Pause)
14              THE VIDEOGRAPHER:  Is there anyone
15    else appearing that has not stated their
16    appearance?
17              MR. LEDFORD:  Christopher Ledford from
18    Perkins Coie.
19              THE VIDEOGRAPHER:  Oh, I'm sorry.
20    Thank you.
21              MR. ROSE:  Dan Rose from Kreindler &
22    Kreindler, New York.  Rooster is still sleeping.
23              MR. THOMAS:  Jonathan Thomas from
24    Power Rogers.
25              THE VIDEOGRAPHER:  Thank you.
```

TROY FAABORG

12

1

2          I will certify that I will also be

3    appearing for tech support and video conference

4    services for all remote participants.

5          Before we proceed, I will ask that

6    lead counsel for plaintiffs and lead counsel for

7    defendant for today's deposition stipulate on

8    the record that we are proceeding according to

9    the Federal Rules of Civil Procedure, and that

10   this deposition officer may swear in the

11   deponent even though he is not in the physical

12   presence of the deponent, and there is no

13   objection to this at this time, nor will there

14   be an objection to this at any future date.

15         Plaintiffs' lead counsel, are you in

16   agreement?

17         MR. DURKIN:  In agreement.

18         THE VIDEOGRAPHER:  Defendant's lead

19   counsel, are you in agreement?

20         MR. ESSIG:  Yes, in agreement.

21         THE VIDEOGRAPHER:  Thank you.

22         At this time will the court reporter

23   please swear in the witness?

24         THE COURT REPORTER:  Good morning.  My

25   name is Brad Rainoff.  I am a Certified

TROY FAABORG

13

1
2    Shorthand Reporter and a Notary Public. I am
3    also a Registered Merit Reporter and Federal
4    Certified Realtime Reporter. I am the deposition
5    officer for today's deposition.
6    TROY FAABORG,
7                    having been duly sworn, was examined and
8                    testified as follows:
9    EXAMINATION
10   BY MR. ESSIG:
11        Q.    Good morning, sir.
12        A.    Good morning.
13        Q.    How would you like to be addressed?
14              Mr. Faaborg?
15              Lieutenant or Colonel Faaborg?
16        A.    "Mr. Faaborg" is fine.
17        Q.    Sure.  I just want to make sure I get
18   that right.
19              Have you ever been deposed before?
20        A.    I have not.
21        Q.    Have you ever been an expert in
22   litigation?
23        A.    I have not.
24        Q.    There are just a couple of ground
25   rules -- I like to do this up front, unlike some

TROY FAABORG

14

1

2     of my compatriots -- but the ground rules really

3     don't exist for any other reason except to help

4     the court reporter take down the answers that

5     you give to my questions, and take down my

6     questions as well.  So it's important we get a

7     clear record.

8              And essentially, that means that we

9     have to do kind of two things.

10             One is I'll be very careful to make

11    sure that once I finish asking my question, I

12    stop talking -- which I have a bad habit of

13    sometimes -- but I'll stop talking and wait for

14    you to answer.

15             Does that make sense?

16    A.     Yes.

17    Q.     And so if we talk one at a time, the

18    court reporter can take those things down.

19             The other thing is that we need to

20    make sure we give verbal -- we communicate

21    verbally.  So nodding your head, or shaking your

22    hands or fists, or anything like that -- the

23    court reporter can't take that town.

24    A.     Right.

25    Q.     But she is can take down your words --

TROY FAABORG

15

1
2      or he can take down your words.

3              I'm also going to do my best to ask

4      clear questions.  Sometimes I won't.  And if you

5      think a question is unclear, or you need some

6      more information, or don't understand what I'm

7      saying, just please ask me.  I'll rephrase the

8      question.

9              But if I don't hear that, I assume you

10     understood my question.

11             Is that fair?

12     A.     Okay, yes.

13     Q.     Plaintiffs' counsel may ask some

14     questions at the end of the day, which is

15     perfectly fine.

16             And so in light of that, if you could

17     just listen to the question that I ask and give,

18     kind of, the most direct, clear answer to that

19     question, the dep will go much faster.

20             And if there are other points you want

21     to make and they want to ask those questions at

22     the end, that's fine.

23             Understood?

24     A.     Yes.

25     Q.     You understand that you are under oath

TROY FAABORG

16

1
2    today, right?
3        A.    Yes.
4        Q.    And any reason you can't give true and
5    complete statements -- complete answers to my
6    question?
7        A.    No.
8        Q.    Without telling me any of the
9    substance of the conversations that you had,
10   what did you do to prepare, essentially, for
11   this deposition?
12       A.    There were two preparatory sessions:
13   One on Zoom, I don't remember what date last
14   week; and then another Zoom session with the
15   larger team yesterday.
16       Q.    Okay.
17             And when you say "team," are you
18   talking about plaintiffs' lawyers?
19       A.    Correct.
20       Q.    Do you know how many plaintiffs'
21   lawyers were on the Zooms?
22       A.    I don't know specifically how many,
23   no.
24       Q.    Do you remember any of the folks that
25   were on?

TROY FAABORG

17

```
 1
 2          A.      Mostly those who are on today.
 3          Q.      Okay.
 4                  Any other meetings besides the two
 5    Zoom sessions and then today?
 6          A.      No.
 7          Q.      And how long were the Zoom sessions?
 8          A.      The first was one hour; then
 9    yesterday's, approximately five, perhaps with
10    some breaks.
11          Q.      Did you have any other meetings, or
12    calls, or Zooms to discuss your deposition?
13          A.      No.
14          Q.      Did you discuss your deposition with
15    anybody else besides the plaintiffs' lawyers?
16          A.      No.
17          Q.      Have you ever testified at trial?
18          A.      I have not.
19          Q.      Prior to this case, have you ever been
20    retained in litigation to give an expert
21    opinion?
22                  -- answer that question --
23          A.      Correct, no.
24          Q.      I assume then you have never given an
25    opinion in a lawsuit about whether somebody or a
```

TROY FAABORG

18

1

2      group of people were injured and what happened

3      to them?

4              A.      No, that's correct.

5              Q.      And you've never given an expert

6      opinion in a lawsuit about an airplane accident?

7              A.      Correct.

8              Q.      When were you retained as an expert in

9      this litigation?

10             A.      Approximately the fall of 2019.

11                     I don't remember exactly the date.

12                     That's when I was first -- the first

13     discussions about whether or not my experience

14     and background would be the right fit for what

15     they were looking for.

16             Q.      Okay.

17                     So it's been a number of years you

18     have been working on this case?

19             A.      It was number of years because we had

20     very little information initially.  And quite a

21     bit of time passed really without any work until

22     we finally had further information to be able to

23     add.

24             Q.      Okay.

25                     What was the further information that

TROY FAABORG

19

1

2    changed your work rate?

3        A.    Initially, all I had to review was the

4    preliminary report from the Ethiopian

5    transportation bureau -- whatever they are

6    called; and then the additional information,

7    primarily the digital flight data recorder raw

8    data, shall other technical reports that really

9    weren't germane to my analysis, primarily the

10   DFDR data.

11       Q.    So you looked at the preliminary

12   report from the EAIB?

13       A.    Correct.

14       Q.    And you looked at the interim report

15   from the EAIB?

16       A.    Correct.

17       Q.    I understand there was a final report

18   that just came out?

19       A.    Correct.

20       Q.    Have you look at that as well?

21       A.    I briefly reviewed it, yes, to see

22   what was different from the previous that

23   applied to me.

24       Q.    That makes sense.

25             Anything that was new or different in

TROY FAABORG

1
2      that report that changes your opinion?
3          A.    No.
4          Q.    Did you look at the -- it's my
5      understanding that there were some comments or
6      responses to that report from the NTSB or the
7      BEA?
8                Did you look at any of those?
9          A.    Not that I recall, no.
10         Q.    Who retained you in the fall of 2019?
11         A.    The first person that I dealt with --
12     or spoke with -- was Jamie Lebovitz.  And he was
13     any primary contact until I began talking with
14     the Clifford team and those others who were on
15     the line, just to understand the process and
16     such.
17         Q.    That makes sense.
18               And understanding that you have never
19     testified and never been an expert before, do
20     you market yourself as a potential expert
21     witness in litigation?
22         A.    I didn't, because I was active duty in
23     the Air Force.  And therefore, I don't know if
24     it's expressly prohibited to serve in that
25     capacity.

TROY FAABORG

21

1

2          But hadn't -- hadn't considered that

3     or entertained that until after I left the

4     service.

5          Q.    Do you know how plaintiffs' lawyers

6     found you or located you to contact?

7          A.    Not specifically.  I know from my

8     perspective how it went.  I don't know -- I

9     don't know the process they used to try to find

10    them -- or find me.

11         Q.    That makes sense.

12         You are being compensated for your

13    time on this case, correct?

14         A.    I am.

15         MR. ESSIG:  Mark tab 3 as the next

16    exhibit.

17         (Pause)

18         THE VIDEOGRAPHER:  This will be

19    Exhibit 312.

20         (Exhibit 312, Single-page document

21    entitled: Safety Science Consulting 2022 Fee

22    Schedule (no Bates No.), marked for

23    identification)

24         (Pause)

25         MR. ESSIG:  All right.  I'm handing

TROY FAABORG

22

1
2      you exhibit 312.
3                THE WITNESS:  Thank you.
4                MR. ESSIG:  We have a hard copy in the
5      room for all the exhibits we will use, so I'll
6      do my best to hand those to you as we go.
7                And always, you know, totally fine to
8      take -- I know you haven't been deposed -- so
9      totally fine to take a minute and orient
10     yourself.  You know, when I hand you a document,
11     take a look at it.  And then I'll ask you some
12     questions --
13               THE WITNESS:  You bet.
14               MR. ESSIG:  -- usually that's, kind
15     of, the drill.
16   BY MR. ESSIG:
17       Q.    This is your 2022 fee schedule.
18             Is that right?
19       A.    That's correct.
20       Q.    And are these the fees that you have
21     been using for the work on this case for the
22     whole time?
23       A.    That's correct, yes.
24       Q.    Your rate is $275 an hour for document
25     review, research, and report writing.

TROY FAABORG

23

1

2              Is that right?

3       A.      Correct.

4       Q.      You bill for travel $175 an hour, plus

5    $150 per diem?

6       A.      Correct.

7       Q.      You have rates then for trial and for

8    deposition testimony, right?

9       A.      Correct.

10      Q.      And for a deposition like today, if it

11   goes the full day -- probably will -- the rate

12   is $4,440, right?

13      A.      Correct.

14      Q.      And trial testimony -- your rate is

15   $6,600 per day?

16      A.      Correct.

17      Q.      What rate did you charge in preparing

18   for your deposition?

19      A.      The -- for the -- the deposition prep

20   just falls under the research category.  Really

21   it's -- anything that's not travel time, or

22   deposition, or testimony falls under that 275.

23      Q.      Makes sense.

24              Do you have any estimate about the

25   total number of hours you have put in on this

TROY FAABORG

24

1

2      case so far?

3          A.      I don't have a specific estimate, no.

4      I would have to look at my notes.  I don't know.

5          Q.      Hundreds of hours?

6          A.      Not hundreds, no.  To hazard a guess,

7      over the course of the full time, 60 to 75,

8      perhaps.  That's a very much a guess.  I don't

9      know.

10         Q.      Can you -- do you have any estimate of

11     the total number of fees that you have charged

12     the plaintiffs for your time?

13         A.      Not -- not specifically.  I could

14     certainly look that up.  Because I don't know

15     what teases out as direct travel reimbursement

16     as opposed to fees that were charged.  So I'm

17     not sure specifically.  But --

18         Q.      No problem --

19         A.      -- it would be 275 times that number

20     of hours --

21         Q.      -- yeah --

22         A.      -- so somewhere in that neighborhood.

23         Q.      -- that makes sense.

24                 You prepared a report in this

25     litigation, right?

TROY FAABORG

25

1

2          A.    I did.

3                MR. ESSIG:  Can we mark the report as

4    the next exhibit?

5                Is this 313?

6                THE VIDEOGRAPHER:  It will be.  Do you

7    know which number?

8                MR. ESSIG:  It's tab 1.

9                THE VIDEOGRAPHER:  Tab 1.

10               (Exhibit 313, Multipage document

11   entitled: Plaintiffs' Rule 26(a)(2)(B)

12   Disclosure of Troy Faaborg, dated September 20,

13   2022 (no Bates Nos.), marked for identification)

14               MR. ESSIG:  I will put the a number on

15   there, just in case --

16               THE WITNESS:  Thank you.

17               MR. ESSIG:  -- we need it.

18   BY MR. ESSIG::

19          Q.    All right.  So this is Exhibit 313.

20               Is this -- take a look at it.

21               Is this the report that you tendered

22   in the case?

23          A.    I believe it to be, yes.

24          Q.    So we'll use this report generally as,

25   kind of, our roadmap for today.  And I'll walk

TROY FAABORG

26

1
2      through it with you and ask you questions about
3      what you wrote, essentially in the order that
4      you wrote it.
5          A.    Okay.
6          Q.    But we'll be going back and forth
7      between this one and then maybe some citations
8      and things like that as we go.
9                There is a cover page on the report
10     that has a case caption that says:  United
11     States District Court, Northern District of
12     Illinois, Eastern Division.
13               Do you see that?
14         A.    Yes.
15         Q.    Then it says there at the top:  On
16     behalf of all Plaintiffs in this consolidated
17     action, the PEC makes the following disclosures
18     pursuant to a Federal Rule of Civil Procedure
19     26(a)(2)(B).
20               Do you see that?
21         A.    Yes.
22         Q.    And then it has your name and address,
23     correct?
24         A.    Correct.
25         Q.    And are you aware that your report is

TROY FAABORG

27

1

2      being prepared in this case as required by the

3      federal rules?

4           A.    Yes.

5           Q.    Do you have any idea what those rules

6      say?

7           A.    Not specifically, no.

8           Q.    Essentially, they say three things:

9      One is that this report is a complete statement

10     of all opinions the witness will express and the

11     basis and the reasons for them.

12          A.    Right.

13          Q.    Do you agree that this is a complete

14     statement of all the opinions that you are going

15     to express and the basis and reasons for them?

16          A.    Yes.

17          Q.    And two, it says it will disclose the

18     facts or data considered by the witness in

19     forming those opinions.

20          A.    Yes.

21          Q.    You agree that's an accurate --

22          A.    I agree --

23          Q.    -- characterization of your report?

24          A.    -- yes.

25          Q.    Then three, any exhibits that will be

TROY FAABORG

28

1

2      used to summarize or support the opinions.

3                  Is that right?

4          A.     Correct.

5          Q.     And so that's, again, fairly disclosed

6      in your report that we just marked as Exhibit

7      313.

8                  Is that right?

9          A.     Yes.

10         Q.     Looking at page 1 of your report, it's

11     dated September 20, 2022.

12                 Do you see that?

13         A.     Yes.

14         Q.     Is that the date you completed your

15     report?

16         A.      It's the date that I submitted the

17     final report to Mr. Lebovitz, yes.

18         Q.     And then on page 19 of your report

19     you --

20                 MR. ESSIG:  Sorry about that.

21                 THE WITNESS:  Okay.

22     BY MR. ESSIG:

23         Q.     That's your signature -- correct? --

24     at the bottom?

25         A.     That's correct.

TROY FAABORG

29

1

2      Q.     And you are fully responsible for the

3  contents of your report?

4      A.     Yes.

5      Q.     And stand by the contents of your

6  report today, right?

7      A.     I do.

8      Q.     Since September 22, 2022, we have

9  never received any supplement or revision to

10  this report.

11         Have you ever made any supplementary

12  disclosure or revised any of these opinions?

13      A.     No.

14      Q.     Have you reviewed any new materials in

15  connection with your work on this case since

16  September 22, 2022?

17      A.     Only the final report that you

18  mentioned earlier.

19      Q.     Okay.

20         And I take it nothing you have

21  reviewed has changed the opinions that you

22  disclose in this report?

23      A.     That's correct.  That's why I didn't

24  add the final report to my "literature

25  reviewed," because it didn't change any of the

TROY FAABORG

30

1
2      content.
3              And no other materials, no.
4      Q.      Makes sense.
5              Did you -- you are aware that Boeing
6      has some experts witnesses in this case, too,
7      right?
8      A.      Yes.
9      Q.      Did you review any of their reports?
10     A.      I reviewed two reports.
11             Received a couple of others -- but two
12     reports that I reviewed.
13     Q.      And what are the two reports you
14     reviewed?
15     A.      French and Wood --
16     Q.      Okay.
17     A.      -- were the two.
18     Q.      And did you look at the -- just the
19     report themselves?
20             Did you look at the materials cited in
21     those reports?
22             Or anything else?
23     A.      I saw the "materials cited" list.  I
24     did not -- didn't review any of the specific
25     materials, no.

TROY FAABORG

1
2          Q.    So you didn't pull any of the papers
3     that were cited in those reports?
4          A.    I did not.
5          Q.    Anything in those reports change your
6     opinions?
7          A.    No.
8          Q.    Nothing else that you can think of
9     that you reviewed between the submission of this
10    report and today, is there?
11         A.    Not -- not that I can recall, no.
12               (Pause)
13         Q.    If we go back to that cover page with
14    the case caption, it says -- the first paragraph
15    there under your name and address:  Troy Faaborg
16    is a board certified aerospace physiologist --
17         A.    Correct.
18         Q.    -- with additional expertise in human
19    factors in aviation safety.
20               Is that right?
21         A.    That's correct.
22         Q.    What is aerospace physiology?
23         A.    Aerospace physiology is the
24    understanding of human body function, the
25    structure and function of the body specifically

TROY FAABORG

32

1

2      within the aerospace domain -- so at high

3      altitude, under the forces of flight, so

4      flight-related physiology.

5          Q.    Are you an expert in human physiology

6      outside the context of aerospace?

7          A.    I think they overlap, and so I don't

8      think that you can tease the two apart directly.

9      I'm an expert within a very specific domain of

10     physiology -- of human physiology.

11         Q.    What's human factors in aviation

12     safety?

13         A.    Human factors is the understanding of

14     the interactions between the person and their

15     hardware environment, software, and other

16     people.

17              So the physical engineering

18     interactions with things that you touch, the

19     communications, the decision making -- so very

20     much an amalgam of the physiology; and then

21     cognitive behavioral science, cognitive

22     psychology, ergonomics -- all of those

23     interactions as they relate to the operator or

24     human who is taking action.

25         Q.    Okay.

TROY FAABORG

33

1

2           There is an acronym at the end of

3    the -- sort of, a sentence there with your name

4    at the top there.

5           It's CAsP?

6    A.    Yes.

7    Q.    What does CAsP stand for?

8    A.    That is the formal designator for a

9    board certified aerospace physiologist.

10   Q.    And what does it mean to be board

11   certified in aerospace physiology?

12   A.    I was accepted -- applied and accepted

13   to stand for the board certification exam

14   administered by the Aerospace Medical

15   Association, and was certified by examination --

16   in other words, passing the certification exam.

17   Q.    Is that like being board certified in

18   an area of medicine?

19   A.    It is similar, yes.

20   Q.    But you are not board certified in any

21   area of medicine itself?

22         You don't have an M.D. or anything?

23   A.    Those are two separate questions.

24   So --

25   Q.    Thank you.

TROY FAABORG

34

1
2          A.      -- yes, I am certified by the
3    Aerospace Medical Association -- as the name
4    implies, is medical -- not as an M.D. or a
5    credentialed healthcare provider.  That's
6    correct.
7          Q.      Thank you for clarifying that.
8                  The certification that was provided is
9    by the Aerospace Physiology Society.
10                 Is that right?
11         A.      No, the Aerospace Medical Association.
12                 The Aerospace Physiology Society is a
13   constituent organization that is not responsible
14   for the physiology board certification --
15         Q.      Okay.
16         A.      -- the certification committee is a
17   standing committee under the Aerospace Medical
18   Association.
19                 Very closely related, but that's how
20   they are organized.
21         Q.      Understood.  And it's good to be
22   clear.
23                 Obviously, you considered the
24   Aerospace Physiology Society and the Aerospace
25   Medical Association to be reputable

TROY FAABORG

1

2      organizations within this field, right?

3           A.    Yes, yes.

4           Q.    Do you know of any other organizations

5      that offer board certification in aerospace

6      physiology?

7           A.    There are none.

8           Q.    And you said you had to pass a test to

9      be board certified?

10          A.    That's correct.

11          Q.    When did you take the test?

12                I think it was 2007?

13          A.    I believe May of 2007 --

14          Q.    Okay --

15          A.    -- yes.

16          Q.    Can you just tell me a little bit

17     about the test?

18                You go to a certain location.

19                Is it done with the board there

20     interviewing you?

21                Or is it a written test?

22          A.    It's a written examination.

23                As I said, there is an application

24     process first to be reviewed to be qualified to

25     stand for the exam.

TROY FAABORG

36

1

 2          Then the exam itself is held in

 3   conjunction with the annual meeting of the

 4   Aerospace Medical Association.  So the day

 5   before the annual meeting starts, there is a

 6   proctored exam where the examination committee

 7   is proctoring the in-person exam.

 8          I don't know if that's changed with

 9   COVID, but that's how it has been is a -- that's

10   the only opportunity is an in-person proctored

11   exam.

12       Q.    Okay.

13          After passing the exam, have you had

14   to do anything since 2007 to maintain your

15   status as a board certified aerospace

16   physiologist?

17       A.    Other than to maintain membership in

18   good standing in the Aerospace Medical

19   Association, there is no continuing medical

20   education required.

21       Q.    And if you look at the second

22   paragraph there on that cover page, it states

23   that:  Mr. Faaborg is expected to testify

24   consistent with his attached report, based on a

25   reasonable degree of aerospace physiological

TROY FAABORG

37

1

2    certainty.

3             Do you see that?

4    A.    Yes.

5    Q.    Do you agree that's the standard that

6    you are going to testify to?

7    A.    I do agree.

8    Q.    What do you understand it to mean --

9    that you'll testify based on a reasonable degree

10    of airspace physiological certainty?

11    A.    I take that to mean, based on my

12    expertise, my education, and my personal

13    experience that what I will testify to is my

14    opinion -- my expert opinion -- about the

15    effects within this case and specifically the

16    flight forces -- what the aircraft did, the

17    effect on the passengers; and that I will

18    present that as substantiated opinion, not just

19    speculation.

20    Q.    Is that the same as testifying to a

21    reasonable degree of medical certainty?

22    A.    I believe so.

23    Q.    Is there a quantitative description

24    about how certain that is?

25             Like a percentage or anything like

TROY FAABORG

38

1
2      that you could ascribe to it?
3            A.     No to my knowledge, no.
4            Q.     More than 50%?
5            A.     More than 50%.
6            Q.     More than 90%?
7            A.     It depends.  Depends on the context.
8                   There are some of the things that are
9      in my report that I believe 100% occurred;
10     others to a reasonable degree is very likely or
11     highly likely.
12                  It just depends on specifically what
13     you are asking.
14           Q.     Fair enough.
15                  Are you aware of any sort of
16     literature that defines what a reasonable degree
17     of aerospace physiological certainty is?
18           A.     No.
19           Q.     You are not testifying to a degree of
20     certainty in any other field other than
21     aerospace physiology.
22                  Is that right?
23           A.     And the related human factors, that's
24     correct.  Nothing outside of the scope of what's
25     in my report.

TROY FAABORG

39

1

2      Q.    Okay.

3            You are not a medical doctor, correct?

4      A.    That is correct.

5      Q.    And you are not a flight surgeon.

6            Is that correct?

7      A.    That is correct.

8      Q.    And you've never treated a patient for

9      symptoms associated with G force exposure.

10           Is that correct?

11     A.    As a patient?  No.

12     Q.    And you have no clinical experience

13     with G force exposure?

14     A.    That's correct.

15     Q.    Have you ever professionally diagnosed

16     anybody with an injury?

17     A.    I have not.

18     Q.    You are not a psychologist, are you?

19     A.    I have a psychology degree.

20           I am not a clinical psychologist.

21     Q.    Okay.

22           What degree do you have?

23     A.    I have -- the diploma says

24     "psychology."

25           Specifically it was in the vision,

TROY FAABORG

40

1
2      cognition, and human performance -- division, I
3      guess, is what its -- the name is -- as a
4      cognitive and behavioral psychologist,
5      specifically aviation human factors.
6          Q.     Would you consider yourself a
7      practicing psychologist?
8          A.     I would.
9          Q.     Do you treat patients?
10         A.     I do not.
11                There are many kinds of
12     physiologists -- excuse me -- psychologists,
13     among them clinical, of which I am not.
14                So I am a practicing -- I consider
15     myself a practicing cognitive and behavioral
16     psychologist applied specifically within the
17     domain of aviation psychology.
18         Q.     Okay.
19                So you do research in psychology?
20         A.     I teach.
21         Q.     You teach.  Okay.
22                In terms of -- you are not a
23     psychiatrist, are you?
24         A.     No, I am not.
25         Q.     And you have never diagnosed or

TROY FAABORG

41

1
2      treated anybody with a psychological or
3      emotional condition, correct?
4           A.    I have not.
5           Q.    And you are also not an engineer, are
6      you?
7           A.    Define your term.
8                 I would consider myself an aviation
9      human factors engineer --
10          Q.    Okay.
11          A.    -- that's informally the degree
12     program under psychology that I participated in
13     at University of Illinois -- is applied human
14     factors engineering.  So in that respect, yes.
15                But not -- if you mean electrical, or
16     mechanical engineer, or biomechanical engineer,
17     then no.
18          Q.    You are not a biomechanical engineer?
19          A.    That is correct.
20          Q.    Do you have any experience using
21     software to simulate accidents or simulate
22     biomechanical movements of people?
23          A.    No.
24          Q.    And you were never asked to perform a
25     biomechanical simulation of passengers'

TROY FAABORG

42

1

2     movements about this flight, have you? --

3          A.    That's correct.  I was not.

4          Q.    Have you prepared a computer animation

5     or any portion of a computer animation for an

6     aviation mishap before?

7          A.    No.

8          Q.    Did you prepare a computer animation

9     in this case?

10         A.    No.

11         Q.    You are not an expert in accident

12    reconstruction animation, are you?

13         A.    That's correct.  I'm not.

14         Q.    And you are not offering any opinions

15    based on -- an animated reconstruction of the ET

16    302 accident in this case --

17         A.    No --

18         Q.    -- are you?

19         A.    -- I am not.

20         Q.    Are you a pilot?

21         A.    I am not.

22         Q.    So you have never flown a plane?

23         A.    That is incorrect.  I have, but not as

24    pilot.

25              (Pause)

TROY FAABORG

43

1
2          Q.     When did you fly a plane?
3          A.     I have quite a bit of flying time.  As
4    an aerospace physiologist, we are considered
5    non-rated air crew -- meaning that we have a lot
6    of opportunities to fly various military
7    aircraft.
8                 Part of that included, as they call
9    it, "stick time" as the pilot in command as a
10   trainee -- so as a student pilot.
11                So I have experience there flying
12   aircraft, yes.
13         Q.     Okay.
14                What airplanes have you flown?
15         A.     The -- actually controlled?  The T-37,
16   the T-38, the F-16.
17                I believe that's it.
18         Q.     Only military aircraft.
19                Is that fair?
20         A.     Sorry.
21                And Cessna 172 as part of initial
22   training.
23         Q.     No commercial airliners?
24         A.     No.
25         Q.     Never flown a Boeing 737 MAX?

TROY FAABORG

44

1
2          A.     I have not.
3          Q.     Your role in the Air Force primarily
4     involved training pilots and flight crews.
5                 Is that right?
6          A.     That's the primary mission, yes.
7          Q.     And you said you have been in Air
8     Force planes doing extreme maneuvers as part of
9     your work, right?
10         A.     Correct.
11         Q.     You also said that you had hundreds of
12    hours of flying experience.
13                Do you mean as a passenger?
14                Or as both the passenger and the
15    trainee in a type pilot --
16         A.     That statement specifically applied to
17    either, as a -- I wouldn't call it a
18    "passenger."
19                When I -- when you say "passenger," I
20    think "commercial passenger," not just -- you
21    know, self-loading baggage.
22                So as a participating flying crew
23    member -- whether that's controlling the
24    aircraft, or as an observer, or familiarization
25    purposes -- not just to get from here to

TROY FAABORG

45

1
2      there --
3          Q.    Understood.
4                I --
5          A.    -- had hundreds of hours --
6          Q.    -- I didn't mean in any way to be
7      disrespectful about --
8          A.    No, no.  It would be --
9          Q.    -- my nontechnical --
10         A.    -- that was --
11         Q.    -- labeling of --
12         A.    -- differentiating between commercial
13     passenger, just to clarify the term --
14         Q.    -- yeah --
15         A.    -- right.
16         Q.    When did you retire from the Air
17     Force?
18         A.    In 2019 -- 1st of August of 2019 was
19     my official date.
20         Q.    Then you were hired, maybe a month
21     later, or something like, that for this case?
22         A.    Approximately, yes.  That's right.
23         Q.    You are not an expert in audiology or
24     acoustics, are you?
25         A.    I am not.

TROY FAABORG

46

1

2        Q.      And you are not offering any opinions

3    in this case about the sounds that the occupants

4    of Flight ET 302 may have heard during the

5    flight, are you?

6        A.      No.

7        Q.      You are not offering any opinions in

8    this case about how the investigation in the

9    ET -- into the ET 302 accident was conducted,

10   are you?

11       A.      No.

12       Q.      Is this the first time that you -- you

13   have reviewed cockpit voice recorder or flight

14   data recorder data to give an opinion as to

15   whether or not people were injured in an

16   airplane crash?

17       A.      Related to injury?  This is the first

18   time.

19              MR. ESSIG:  If you would turn to page

20   1 of your report.

21   BY MR. ESSIG:

22       Q.      The first item there states, under

23   "Documents, Materials, and Related Literature

24   Reviewed": Ethiopian Airlines Flight ET 302

25   Digital Flight Data Recorder.  Converted Files

TROY FAABORG

47

1
2      provided by Mr. Charles Pereira, 10 January 22.
3              Do you see that?
4      A.     Yes.
5      Q.     Is that something you considered in
6      forming your opinions in this case?
7      A.     Yes.
8      Q.     And can you describe what that is? --
9      what that item is?
10     A.     The digital flight data recorder
11     records hundreds of different parameters of
12     aircraft performance -- engines, instruments,
13     that sort of thing.
14             That data has to be converted into a
15     readable source file -- and so basically putting
16     it into an Excel or similar sort of format.
17             And so that's the information that I
18     reviewed -- was DFDR data that was in CSV file
19     that -- I can't remember if he or I put into an
20     Excel spreadsheet to be able to analyze further.
21     Q.     So the format of the files you
22     received from Mr. Pereira were spreadsheets?
23     A.     Or -- spreadsheets, or CSV files, yes.
24             (Pause)
25     Q.     And did you review any graphs of FDR

TROY FAABORG

48

1

2       data provided by Mr. Pereira?

3           A.     Later -- later in the review process,

4       but everything that was produced for my report,

5       I produced.

6           Q.     Okay.

7                  Did you discuss the files with him?

8           A.     Only to the degree that I had not

9       worked with him at all previously.  So he told

10      me what some of the different parameters were,

11      some of the abbreviations, and things like that.

12      So we discussed how to interpret what the times

13      were, and then I could do my analysis from

14      there.

15          Q.     So you relied on his converted files

16      of FDR data in order to form your opinion?

17          A.     Correct.

18          Q.     Are you aware of a Boeing expert named

19      Mr. Poole?

20          A.     I saw the name on a report, yes.

21          Q.     Did you read the report?

22          A.     I skimmed the report, yes, but it --

23      since it didn't directly relate to my analysis,

24      I didn't review it significantly.  So skimmed

25      it, yes, just out of curiosity more than for

TROY FAABORG

49

1

2    analysis.

3        Q.    Fair enough.

4             So you didn't rely on or consider

5    anything in his report in forming your opinion?

6        A.    I did not.

7        Q.    Did you review FDR data from ET 302

8    from any other source beside the files from Mr.

9    Pereira?

10       A.    Not raw data, no.

11            I compared some of that data to what

12   was presented in the preliminary and interim

13   Ethiopian reports.

14            But not as raw data, no.  No other

15   source.

16       Q.    Got it.

17            Have you ever extracted data from a

18   flight data recorder?

19       A.    I have not, no.

20       Q.    And I take it you are you not an

21   expert on the extraction of flight data --

22       A.    That's correct --

23       Q.    -- from the FDR? --

24       A.    -- no.

25       Q.    Are you deferring to other experts on

TROY FAABORG

50

```
 1
 2    the validity of the FDR data in the case?
 3         A.    Yes.
 4         Q.    Mr. Pereira?
 5         A.    Yes.
 6         Q.    Are you offering any opinions of your
 7    own on the accuracy or the completeness of the
 8    FDR data in the matter?
 9         A.    No.
10         Q.    Did you review the cockpit voice
11    recorder transcript?
12         A.    I don't believe so.  If I -- I can't
13    remember if I did.  It didn't form any opinions,
14    so I don't think that I did, no.
15         Q.    Fair to say that's not relevant to the
16    opinions you are giving?
17         A.    Correct.  Correct.
18         Q.    On pages 1 to 2 there -- I won't go
19    through them all -- you list the documents and
20    materials and related literature reviewed.
21              Is that a complete list of all the
22    documents you reviewed to prepare your report as
23    it was disclosed on September 22nd?
24         A.    Yes, it is.
25         Q.    Do you recall who selected the
```

TROY FAABORG

51

1

2     documents for review?

3          A.     I did.

4          Q.     Ever asked to review anything that you

5     weren't given in your work for this report?

6          A.     I'm not sure that I understand the

7     question.

8          Q.     Did you ever ask for a document, or

9     some information, or data that you wanted to

10    review for your report but couldn't get access

11    to?

12         A.     No, that did not happen.

13                (Pause)

14                MR. ESSIG:  If you turn to page 19.

15    BY MR. ESSIG:

16         Q.     You write there, under "Summary of

17    Basis/Opinions and Conclusion":  Based on my

18    review of the facts of the case, the relevant

19    literature referenced above, my academic

20    understanding and application of that knowledge,

21    the years of professional experience as a

22    biomedical trained scientist and accident

23    investigator, and my review of the documents and

24    reports associated with this accident.

25                Do you see that?

TROY FAABORG

52

1
2          A.     Hm-hmm.
3          Q.     Is that a -- that's a complete list of
4     all the sources of information and everything
5     you relied on in forming your opinion?
6          A.     I believe so, yes.
7               MR. ESSIG:  So if we go back to page
8     2, there is a section on your "Professional
9     Background."
10    BY MR. ESSIG:
11         Q.     Do you see that?
12         A.     Yes.
13         Q.     In the third paragraph there, you
14    wrote:  While on active duty in the United
15    States Air Force, I was formally trained in
16    aviation accident investigation through the Air
17    Force Safety Center and served as a human
18    factors subject matter expert on more than a
19    dozen formal Safety Investigation Boards.
20              Do you see that?
21         A.     Correct, yes.
22         Q.     What's the formal training you
23    received on accident investigation?
24         A.     I was trained at the Air Force Safety
25    Center on how to be a flight safety officer,

TROY FAABORG

53

1
2       which included initial response to mishaps -- so
3       thinking of the on-scene go team immediately
4       responding to preserve evidence and initiate the
5       investigation process.
6               I was also then formally trained as an
7       accident investigator.  There is a separate
8       training that deals specifically with the
9       investigation process.
10              There is -- medical service has its
11      own training on mishap investigations,
12      specifically for flight surgeons and
13      physiologists who will be subject matter experts
14      in mishap investigation boards.
15              And I was also trained as an accident
16      and safety board president -- so how to oversee
17      and execute the full process of an
18      investigation, whether it be a legal
19      investigation or a safety investigation.
20      Q.      I forgot to ask you.
21              Your comments about the other, sort
22      of, subject matter experts that you work with in
23      a context like that -- are you aware personally
24      of any of the Boeing experts in this case?
25      A.      Aware of them --

TROY FAABORG

54

1

2          Q.    Did you know them personally?

3                Or are aware of them at all?

4          A.    I have met Mr. French -- Dr. French, I

5     suppose -- but I've not worked with him.  I

6     would say we've met.  That's about the extent.

7          Q.    No understanding or review of his work

8     or professional reputation?

9                Or anything like that?

10         A.    Not at all, no.

11         Q.    Okay.

12               What is a formal safety investigation

13    board in this context?

14         A.    In this context -- within the Air

15    Force context?

16         Q.    Yes, in the context that you worked

17    with.

18         A.    You bet.

19               Any time that there is a mishap that

20    meets the criteria to be either a Class A, which

21    is the most severe, B, C, or D event, there is a

22    formal investigation process.

23               The degree -- they are all formal.

24               The degree of the investigation and

25    the scope is largely based on how severe the

TROY FAABORG

55

1

2    mishap was.

3              So for crash like Ethiopian 302, that

4    would be considered a Class A serious event.

5    And so there would be a full, formal

6    investigation process where the major command

7    commander identifies and appoints investigators

8    in various roles, to include a subject matter

9    expert in human factors -- which is what I was

10   servings as, and as the medical member in one or

11   two cases as well.

12             And so that process then is overseen

13   by the Air Force Safety Center.  It's a very

14   specific process -- very specific deliverables,

15   reports -- technical reports and that sort of

16   thing -- to be able to deliberately go through

17   that investigation process and determine

18   corrective actions for prevention.

19        Q.   And so that -- the last part of your

20   answer there was to address prevention.

21             Is that the goal of these accident

22   safety investigations? -- is prevent future

23   accidents?

24        A.   For the safety investigation, that is

25   the purpose -- is to prevent future occurrence,

TROY FAABORG

56

1
2      yes.
3          Q.     Is part of the goal of the accident
4      investigations that you worked on to determine
5      whether or not passengers were injured on an
6      aviation -- in an aviation mishap?
7          A.     Not specifically, no.
8                 In order to determine the level of
9      severity or classification of the mishap, there
10     is a determination related to injury, but it's
11     not applicable because it's more related to OSHA
12     reporting than it is to determining injury.
13         Q.     So not applicable to the work in this
14     case?
15         A.     The injury part is not applicable to
16     this case, right.  Fair.
17         Q.     You said that there are, sort of,
18     technical reports and, kind of, work product
19     that is an output of this -- of the work with
20     the safety investigation board.
21                Would there -- were there reports and
22     technical documents prepared for all the
23     accident safety investigation boards you worked
24     on?
25         A.     Yes.

TROY FAABORG

57

```
1
2          Q.    Do you have a list of the accidents
3     that you investigated?
4          A.    Somewhere, probably.  I could -- I
5     could produce a list.  But no, I don't have a
6     list that exists right now, no.
7          Q.    I assume all the aviation accidents
8     that you -- all the accidents you investigated
9     were aviation accidents, correct?
10         A.    Yes, and then -- as an investigator,
11    yes.  That's correct.
12               Because there are different -- what's
13    the word? -- different categories:  Aviation
14    being one, weapons and explosives being another,
15    ground and industrial being a third.
16               I had interactions related to some of
17    those others, more as an overseer of the
18    process, not as an investigator -- is one.
19               Clarifying --
20         Q.    Yeah, no -- fair to clarify and be
21    complete.
22               But as an investigator, your role was
23    on the aviation --
24         A.    That's correct --
25         Q.    -- accident investigation?
```

TROY FAABORG

58

1

2        A.      -- yes.

3        Q.      And the report and technical documents

4    that you were involved with all involved

5    aviation accidents, right?

6        A.      All aviation, yes.

7        Q.      In the military context?

8        A.      Correct.

9        Q.      In that context of investigating

10   military accidents, were you investigating only

11   the effects of the accident or the mishap on

12   military pilots and flight crews?

13           Or did any of the accidents that you

14   worked on involve civilian?

15       A.      I'm not aware that any involved

16   civilians.

17       Q.      What type of aircraft do you remember

18   that you were investigating?

19       A.      Yes.  I've investigated F-16, B-2,

20   C-130, I believe C-17, T-38.

21           I think that's -- I think that's the

22   list.

23       Q.      You know what all those planes are

24   much better than I do.

25           Are any of them similar to a Boeing

TROY FAABORG

59

1

2      737 MAX?

3          A.      The two that would be similar are the

4      C-130 and the C-17, both of which are cargo

5      aircraft.

6          Q.      But they are not a -- like, a

7      large-scale passenger transport type of --

8          A.      Oh, they can be --

9          Q.      Okay --

10         A.      -- the C-17 can be, if it's configured

11     for passengers.

12         Q.      Were the configurations of those

13     planes that you investigated configured for

14     passengers?

15         A.      I don't believe that they were, no.

16         Q.      You have never been an investigator in

17     a commercial aviation accident?

18         A.      That's correct.  I have not.

19         Q.      As a human factors subject matter

20     expert, you are primarily, in your investigatory

21     role, looking at the behavior of the pilots and

22     flight crew?

23         A.      And as a physiologist, the

24     physiological effects largely as they relate to

25     the interactions of the flight crew, and that

TROY FAABORG

60

1
2    sort of thing.
3              MR. ESSIG:  So on the bottom of page 2
4    there.
5    BY MR. ESSIG:
6        Q.    You write:  As a human factors and
7    aerospace physiology subject matter expert, my
8    responsibility during the investigation analysis
9    was three-fold.
10             Right?
11       A.    Correct.
12       Q.    And the first topic there is:
13   Understand the movement of the aircraft and
14   forces of flight as recorded by the flight data
15   recorder and determine physiological effects of
16   those forces on the people on the aircraft.
17             Right?
18       A.    Correct.
19       Q.    So that -- to the extent you are
20   determining the physiological effects of the
21   forces on the people, you are looking at the
22   pilots and the flight crew?
23       A.    Largely in that case, yes.
24       Q.    Then you say -- in that work, did you
25   use FDR data?

TROY FAABORG

61

1

2          A.     We did, hm-hmm.

3          Q.     Similar to the way you are using it in

4     this case?

5          A.     Yes, FDR data and other -- other

6     flight information, whether that be data -- data

7     from -- what's the -- the traffic control

8     facilities, or other flight data.

9               But, yes, flight data recorder data.

10         Q.     Okay.

11              In the more than dozen instances you

12    were a subject matter expert for a safety

13    investigation board, did you ever conclude the

14    people on the aircraft were injured based on the

15    movement of the aircraft and the forces of

16    flight?

17         A.     That was not the objective for the

18    investigation, no.

19         Q.     So, no?

20         A.     No.

21         Q.     So you never made a conclusion about

22    the type of injuries that occurred on the

23    airplane?

24         A.     That's correct.

25         Q.     Do you remember the range of forces in

TROY FAABORG

62

```
 1
 2    the accidents that you investigated?
 3         A.    Not to a degree of certainty, no.  Not
 4    specifically, no.
 5         Q.    Do you remember if they were greater
 6    or less than the range of forces at issue in
 7    this --
 8         A.    Generally greater.  Given the high
 9    performance specifically T-38 and F 16, both had
10    greater forces than what we are talking about
11    today.
12         Q.    Do you remember the maximum level of G
13    force?
14         A.    Within an accident investigation?  No.
15    No.
16         Q.    More than 5 or 6 G's?
17         A.    I don't remember.  It could have been,
18    but I don't remember.
19         Q.    Any of those accidents involve
20    negative G force?
21         A.    Not -- not as a causal factor, no.
22               Involved?  Yes.  They existed and were
23    part of that process, but not that we were
24    specifically investigating.
25         Q.    Okay.
```

TROY FAABORG

63

1

2              So there were negative G forces

3    involved in the accidents that you investigated,

4    but they weren't causally related to whatever

5    happened on the plane to the pilots and flight

6    crew?

7         A.    I believe that to be true.  I would

8    have to review each of those cases to confirm

9    that, but I believe that's true, yes.

10        Q.    And you don't remember the magnitude

11   of those negative G forces?

12        A.    Not specifically, no.

13        Q.    More than negative 2 G's?

14        A.    I don't believe that I saw any more

15   than negative 2 G's, no.

16        Q.    All less than negative 2 G's?

17              Or is that --

18        A.    I --

19        Q.    -- I am asking you to speculate.  I

20   don't mean to --

21        A.    -- yeah --

22        Q.    -- push --

23        A.    -- and I'm not comfortable

24   speculating --

25        Q.    -- Okay --

TROY FAABORG

64

1
2          A.      -- because I don't remember.
3          Q.      You have not been asked to offer an
4     opinion on the probable cause of the ET 302
5     accident?
6          A.      That's correct.  I have not.
7                  MR. ESSIG:  If you look at the bottom
8     right-hand corner of page 2 there, there is a
9     logo and on the words:  Safety Science
10    Consulting.
11    BY MR. ESSIG:
12         Q.      Do you see that?
13         A.      Yes.
14         Q.      It appears on the cover page, then
15    every page of the report.
16                 Is that right?
17         A.      Correct.
18         Q.      Safety Science Consulting is a
19    consulting company that you founded.
20                 Is that right?
21         A.      That's correct.
22         Q.      And does Safety Science Consulting
23    have any other employees besides yourself?
24         A.      It does not.
25                 MR. ESSIG:  Let's mark tab 28.

TROY FAABORG

65

1

2              (Pause)

3              MR. ESSIG:  That's 314.

4              (Exhibit 314, Two-page document

5    bearing heading: Safety Science Consulting (no

6    Bates Nos.), marked for identification)

7              MR. ESSIG:  So I'm showing you what

8    has been marked Exhibit 314.  And this is a

9    printout of your LinkedIn -- of the LinkedIn

10   profile for Safety Science Consulting.

11   BY MR. ESSIG:

12        Q.    Do you see that?

13        A.    Yes.

14        Q.    Are you familiar generally with this?

15        A.    Yes.

16        Q.    Under the name "Safety Science

17   Consulting," the next line reads:

18   Revolutionizing Patient Safety through Applied

19   Safety Science, Human Factors, and Proactive

20   Safety Program Management.

21              Do you see that?

22        A.    Yes.

23        Q.    And the next line indicates the field

24   of your business is:  Hospitals and Health Care.

25              Do you see that?

TROY FAABORG

66

1

2          A.     Yes.

3          Q.     Is that an accurate description of the

4     work Safety Science Consulting does?

5          A.     It is not.

6                 When I started the company, my intent

7     was to specifically focus on consulting the

8     human factors and safety science applications

9     within the patient safety community that is far

10    behind aviation and high reliability.  So that

11    was my initial -- my initial push.  That's what

12    I was trying to do with the business.

13                I then got a job that is not me as a

14    sole proprietor.  And so the work that I'm doing

15    as a consultant, just broadly, falls under that

16    umbrella, not as much with that emphasis or that

17    focus.

18         Q.     So you got another job that you do

19    besides this?

20                Is that what you are saying?

21         A.     That is correct.

22         Q.     And what is the other job?

23         A.     I'm a vice-president and program

24    manager for a government contract company.

25         Q.     What's the name of that company?

TROY FAABORG

67

1

2          A.      R&K Enterprise Solutions.

3                  MR. ESSIG:  If we are staying with the

4     LinkedIn page here --

5                  THE WITNESS:  Yes.

6                  MR. ESSIG:  -- and you go down to:

7     Overview.

8     BY MR. ESSIG:

9          Q.      It says:  The purpose of any patient

10    safety program is to prevent events that result

11    in harm to our patients.

12                 Right?

13         A.      Correct.

14         Q.      And then if you go down to the next

15    paragraph, it says:  At Safety Science, we help

16    teach the science of safety so that patient

17    safety managers, directors, nurse managers, and

18    executive leaders can share a system view of

19    adverse events and focus on preventative actions

20    that will truly make a difference.

21                 Do you see that?

22         A.      Yes.

23         Q.      So is it fair is say, at least when

24    you were putting this together, the primary

25    purpose of Safety Science Consulting was to help

TROY FAABORG

68

```
 1
 2    medical providers provide safer care?
 3         A.    Correct.
 4         Q.    Does Safety Science Consulting have
 5    clients?
 6         A.    Not currently -- well, one.  We are
 7    here today.  None other than in this case right
 8    now.
 9         Q.    Okay.
10               And it's -- today, we are not here for
11    a hospital, or medical provider, or anything?
12         A.    Correct.
13         Q.    So you don't have a separate business
14    as consulting in expert litigation, or anything
15    like that?
16         A.    Not -- not distinctly, no.  It is ad
17    hoc as opportunities arise.  It is not a primary
18    business stream.
19         Q.    I assume when you founded Safety
20    Science Consulting, it wasn't your intent to
21    make it a -- or to go into expert work in
22    litigation?
23         A.    It was -- it allowed the opportunity
24    but it wasn't the emphasis.  It was not -- it
25    wasn't the business plan to be a full-time
```

TROY FAABORG

69

1
2    subject matter expert for litigation.
3            Q.    Okay.
4            MR. ESSIG:  Let's turn to page 3 of
5    your report.
6            You guys want to take a break?  Or are
7    you --
8            MR. DURKIN:  No, no, no, no.  We are
9    just thinking when --
10           (Pause)
11           MR. ESSIG:  Okay.
12           (Pause)
13           MR. ESSIG:  I can take a break now if
14   you want.  I'm kind of starting something new,
15   so if you want to --
16           MR. DURKIN:  Whenever you -- he needs
17   one, but otherwise, let's do about 10:15.
18           MR. ESSIG:  Okay, that works.
19   BY MR. ESSIG:
20           Q.    So I want to make sure that we are on
21   the same page with some of the language that's
22   used in your report.
23           A.    Okay.
24           Q.    And I'm going to ask you some
25   questions about the way that you use the term

TROY FAABORG

70

1
2      "negative G forces," which I'm sure you are
3      expecting.
4            A.     Of course.
5            Q.     In the second full paragraph there,
6      you write:  Acceleration forces are described in
7      terms of relative -- in terms relative to the
8      pull of gravity, measured in units of
9      gravitational force equivalent known as G
10     forces.  When standing on the ground or sitting
11     in a chair, we experience gravity pulling us
12     toward the earth.  That's defined as 1 G.
13                 Correct?
14           A.     Correct.
15           Q.     So that's the normal force of gravity
16     that we feel every day in our life?
17           A.     Correct.
18           Q.     And that's pulling us down to the
19     earth?
20           A.     Correct.
21           Q.     And that's a positive number.
22           A.     It is.
23           Q.     Forces greater than 1 G pull you down
24     towards the earth and makes you feel heavier - a
25     force of 2 G is twice --

TROY FAABORG

71

1
2          MR. DURKIN:  It says "makes you
3    heavier."  It doesn't say "makes you feel
4    heavier" --
5          MR. ESSIG:  Oh, I'm sorry --
6          (Pause)
7          MR. ESSIG:  -- this is in small
8    print --
9          (Pause)
10   BY MR. ESSIG:
11        Q.    Makes you heavier - a force of 2 G is
12   twice the force of gravity and makes your body
13   all of its part weigh twice as much.
14        A.    Correct.
15        Q.    Anything less than 1 G doesn't pull
16   you down as much as gravity does, and therefore
17   makes you feel lighter.
18          At zero-G, you will feel weightless,
19   and at less than zero-G, you are actually being
20   pulled away from the earth.
21          See that?
22        A.    Yes.
23        Q.    Negative G exposures are not common in
24   aviation, particularly on airliners.
25          So again, normal gravitational forces

TC REPORTING
(516) 795-7444

TROY FAABORG

72

1

2    are positive 1 G, right?

3          A.     Correct.

4          Q.     Anything more than 1 G makes you feel

5    heavier? -- makes you heavier? --

6          A.     Makes you heavier, hm-hmm.

7          Q.     Anything between 1 G and zero-G is

8    still pulling a person down toward the earth,

9    correct?

10         A.     It is.

11         Q.     That's the normal direction of

12   gravity?

13         A.     Correct.

14         Q.     And a person would feel lighter than

15   normal, but they are still pulled down toward

16   the earth in its normal direction?

17         A.     Correct.

18         Q.     They are not floating, right?

19         A.     That is correct.

20         Q.     And they are not weightless, right?

21         A.     At above zero?

22         Q.     Above zero.

23         A.     That's correct.

24         Q.     And they are not being pulled up

25   against a restraint or a seatbelt, correct?

TROY FAABORG

73

1
2          A.     Correct.
3          Q.     In your field, numbers above zero-G
4     are denoted as a positive G force, correct?
5          A.     Above zero?
6          Q.     Yes.
7          A.     No.  Above 1 is considered positive.
8                 Physiologically, anything less than 1
9     is considered negative, because it's not -- it
10    is less than the equivalent of gravity that's
11    affecting your body.
12         Q.     I guess this is what I'm trying to get
13    at.
14                There is a term called "relative
15    negative G."
16                Are you familiar with that?
17         A.     Not by definition.  So just to be
18    clear what -- can you define that?
19         Q.     I'm not the expert.
20                My understanding of how that might be
21    defined is that -- it's that -- it's that range
22    of G forces between 1 and zero that are positive
23    numbers, right?
24                That is not is a negative number.
25                There is not a minus sign in front of

TROY FAABORG

74

1
2    numbers like that, right?
3         A.    As an integer, it is not a negative.
4    That is correct.
5         Q.    And so you would feel less than the
6    full force of gravity, but still a positive G.
7               And you might -- I've seen it referred
8    to as "relative negative G" because you feel
9    that you -- that you weigh less than you
10   actually do.
11        A.    Okay.
12        Q.    In the literature that you cite in
13   your report, when they denote G forces that are
14   above zero, they don't put a negative sign in
15   front of those things, do they?
16        A.    No, because 1 is where it starts, not
17   zero.
18              Technically, zero would be the more
19   appropriate place to start, because anything
20   above zero is positive; anything below zero is
21   negative.
22              So by starting at 1, it makes things
23   very confusing for that zero-to-1 range.
24              Physiologically, it is a negative G
25   exposure because your body is designed for a 1 G

TROY FAABORG

75

1
2          environment; and has compensatory mechanisms to
3          overcome that 1 G.
4                    At anything less than 1 G, it
5          physiologically operates differently.
6                    So the negative or positive between
7          zero and 1, if you are talking integers, it's
8          one thing.
9                    If you are talking physiology, it's
10         very much different.
11            Q.    It's your view that in the
12         literature -- such as the U.S. Air Force
13         handbook that you cite, or that Moisseiev paper,
14         some of the other papers that you cite -- when
15         they use a term "negative G," they include every
16         G force below 1.
17                   Is that right?
18            A.    If they used the term "negative G," I
19         believe the Handbook of Aerospace and
20         Operational Physiology intends anyone less than
21         1 is considered a negative G exposure.
22            Q.    Okay.
23                   But to be clear, so the -- the only
24         time when forces -- it's only when forces are
25         less than zero-G that a person feels themselves

TROY FAABORG

76

1
2       pulled away in the opposite direction of the
3       earth though, right?
4            A.    That's correct.
5            Q.    Do you think it's inaccurate to talk
6       about forces above zero-G as positive G forces?
7            A.    Above zero?
8            Q.    Between zero and 1?
9            A.    It -- you have to define your scale.
10                 I think it could be appropriate or it
11      could be inappropriate.  It just depends on your
12      frame of reference.
13                 If you are talking about integers,
14      yes, 0.5 -- that is a positive number.
15                 If you talking about the physiological
16      effects, it is a negative G exposure.
17           Q.    So focusing on your report, you use
18      the term "negative G" and "maximum negative G"
19      in your report.
20                 And you don't mean G forces below
21      zero, correct? --
22           A.    I used --
23           Q.    -- only G forces below zero?
24           A.    Any time I talk about negative G
25      exposure, it's anything less than 1.

TROY FAABORG

77

```
 1
 2        Q.     Got it.
 3               So you call forces between 1 and
 4     zero-G "negative G"?
 5        A.     Correct, because they are
 6     non-positive.
 7        Q.     All right.
 8               But you also agree that the forces
 9     between 1 and zero-G and the forces below zero-G
10     affect human physiology differently?
11        A.     I wouldn't say "differently."
12               It's a range, a continuum.
13               And so, in that you are not being
14     pulled up, or weightless or, you know, pulled
15     away from your seat -- that occurs beyond zero.
16               There are still physiological
17     differences that occur anything less than 1, and
18     on a scale as far as you choose to go.
19               So again, it's a tricky definition.
20               But to be clear, those physiological
21     mechanisms begin happening at anything less than
22     1.
23        Q.     You'd agree the direction of
24     acceleration doesn't change until forces go
25     below zero-G though, right? --
```

TROY FAABORG

78

```
 1
 2          A.     The direction of acceleration? --
 3          Q.     -- the direction of acceleration when
 4     we were talking about being pulled up or pulled
 5     down.
 6          A.     I think that's exactly contrary to the
 7     definition.
 8                 I think any change in acceleration
 9     that is different from the force of gravity is
10     an accelerative force, whether -- the vector,
11     whatever direction.
12                 And so within the aviation
13     environment, anything less than that 1 G force
14     is a change in acceleration in that downward or
15     negative vector.
16                 So I think any time you say that it's
17     a change, then it's a change in the magnitude of
18     the acceleration.
19          Q.     So if you went from positive 5 G's to
20     positive 4 G, you would say that's a negative
21     G? --
22          A.     It's a reduction --
23          Q.     -- so that --
24          A.     -- that -- I would have to have a
25     context of the example.
```

TROY FAABORG

79

1

2            It is a reduction in the G force.

3     It's not necessarily a negative exposure, just

4     because you reduce, you know, 1 G.

5            It depends on the context of the

6     example.

7       Q.    Okay.

8            I guess the point of my original

9     question was just that -- that zero-G line of

10    demarcation is that that is the line where the

11    force -- the accelerative force changes.

12           Because when it's above zero, you are

13    being pulled down to the earth, still -- maybe

14    at less than your body weight -- but you are

15    being pulled down to the earth.

16           And below zero, you are weightless,

17    being pulled up.

18           Right?

19      A.    If you are asking -- if at zero-G the

20    direction of the pull changes, then my answer

21    would be:  Yes.

22      Q.    Got it.

23           You asked that better than I did.

24           (Pause)

25      Q.    Do you think there is any reason

TROY FAABORG

1

2      then -- and mostly I'm thinking about the jury

3      in this case, or people that are trying to, sort

4      of, understand the forces we are talking about.

5              Do you think there is any reason to

6      qualify the difference between the forces that a

7      person would experience between 1 and zero and

8      the forces that somebody would experience below

9      zero?

10             Or do you think we should just call it

11     all negative g because it's all the same?

12         A.    Both.

13             I think it should all be considered

14     negative G through the lens of physiology.

15             And that, I think, is where this gets

16     very tricky -- is that everything that I talk

17     about is as a certified aerospace physiologist,

18     and the way that it affects the person, and the

19     physiology and physiological response.

20             So through that lens, everything less

21     than 1 is negative, because it is less than the

22     force of gravity, not necessarily pulling you up

23     out of your set.  That's not physiology.  That's

24     physical.

25             So primarily through the physiology

TROY FAABORG

81

1

2    lens, anything less than 1 is negative.

3              I think it's extremely important for

4    people to understand that between zero and 1 is

5    a very -- very confusing area because -- and

6    reviewing the literature, having to be very

7    careful about:  What do they mean when they say

8    "a negative 1.5" or "a negative 1.9"?  Is that

9    relative to zero?  Or is that relative to 1?

10             So that's where I think it becomes so

11   important for the jury to understand, and for

12   everyone who is talking to be talking on the

13   same terms.  Otherwise, it becomes very

14   confusing.

15        Q.    Totally agree.

16             Because -- I am not an expert in this

17   field, but I read your report -- just very well

18   done.  And I read the literature that you cite,

19   and so forth.

20             And I never saw a place where somebody

21   called a negative -- called positive -- a

22   positive number -- you know, like, 0.5 or

23   something -- a negative G --

24        A.    Right --

25        Q.    -- all I saw was when they wrote

TROY FAABORG

82

1
2      "negative Gz" or said "negative G," they were
3      talking about, like, a truly negative number,
4      like an integer with a minus sign in front of
5      it.
6           A.    I don't think that I agree --
7           Q.    Okay --
8           A.    -- I think that within the Handbook of
9      Aerospace Physiology when they talk about
10     negative G, anything that's a negative Gz would
11     be less than 1.
12               So if you are talking about the
13     numbers --
14          Q.    Yeah --
15          A.    -- if it's at 0.5, I'm not going to
16     call that "negative 0.5," because that's one
17     whole G more -- well, less.
18               Right?
19               It's very confusing.
20               So again, I think within aerospace
21     physiology literature, any time that they talk
22     about a negative, they are a talking about
23     anything less than 1.
24          Q.    Understood.
25               Is it a fair statement to say that

TROY FAABORG

83

1

2     people experience G forces between land zero

3     frequently?

4          A.     Yes.

5          Q.     When would somebody experience a G

6     force between 1 and zero?

7          A.     For example, the initial descent of a

8     very fast elevator, or a rollercoaster descent,

9     or things of that nature.

10               There are -- to clarify, one of the

11    statements where I talk about negative G not

12    being common in commercial aviation, I should

13    clarify that as "sustained higher negative G."

14               There are slight negative G

15    exposures -- for example, leveling off after a

16    rapid climb, things of that nature -- where you

17    could get slight negative G exposures or --

18    excuse me -- between zero and 1 G exposure.

19         Q.     Do you know what the -- if you work in

20    a big building or something like that and you go

21    to a big -- you know, an office in a big

22    building, you go down on an elevator, do you

23    know what the G forces are that a person's --

24         A.     I don't.  No, I am not --

25         Q.     -- experiencing?

TROY FAABORG

84

1
2          A.      -- I am not familiar with the specific
3      numbers, no.
4          Q.      Do you know what the -- how typical is
5      it on a commercial flight for passengers to
6      experience G forces below 1 and above zero?
7          A.      It's very common, again, at specific
8      phases, positive and negative, minor
9      fluctuations between -- just above and just
10     below 1 are very common.  It's physics.
11             You can't stop an acceleration without
12     having a deceleration.  And so you get those
13     minor variations frequently.
14             Again, leveling off after climb, any
15     time that you would rapidly descend in altitude
16     more than just a coordinated descent, you could
17     have very slight less than 1 G exposure.
18         Q.      So pretty much every time you get on
19     an airplane, any person experiences G forces
20     between 1 and zero, right?
21         A.      Correct.
22         Q.      And you would call those slight
23     negative G's?
24         A.      That's a layman -- that's not any kind
25     of a specific classification.

TROY FAABORG

85

1
2              But, yes, there are going to be
3     variations hovering above and below 1 that are
4     common and expected.
5          Q.    And everybody that gets on an airplane
6     and experiences G forces between 1 and zero you
7     are calling negative, but maybe are slight --
8     they are not injured by those forces, right?
9          A.    It depends on how you define
10    "injured."
11             They are not hurt.
12             They don't -- there are physiological
13    effects.  And certainly there is a change to the
14    body that occurs with that exposure.
15             So it depends on how you classify
16    "injury."
17         Q.    Would you classify experiencing
18    between -- G forces between 1 and zero -- the
19    physiological effects that are imparted on a
20    human body at that level of G force -- would you
21    classify that as injury?
22         A.    It absolutely depends on the context.
23             I think outside of a specific context,
24    I wouldn't say.
25             That absolutely could be the case --

TROY FAABORG

86

1
2      that there is physiological, physical, or
3      psychological effect that I would define as
4      injury or harm within those ranges.
5          Q.    Right.
6                So, I mean, the context we are talking
7      about is your expert report in this case.  So
8      I'm just trying to understand --
9          A.    Sure --
10         Q.    -- your opinions --
11         A.    -- sure --
12         Q.    -- in this context --
13               MR. DURKIN:  -- whatever -- well,
14     finish your question --
15               MR. ESSIG:  Thanks.
16   BY MR. ESSIG:
17         Q.    -- no other context.
18               Is it your opinion in this case that
19     every person that experiences G forces between 1
20     and zero is injured?
21               MR. DURKIN:  "In this case" with all
22     the passengers and crew on ET 302? --
23               MR. ESSIG:  In this case.
24               MR. DURKIN:  -- okay, okay, because
25     you said he's --

TROY FAABORG

87

1

2              Objection to form of the question.

3              But please answer.

4       A.    And to understand exactly what you are

5    asking:  Within those ranges, do I believe there

6    was injury at -- between zero and 1 G for the

7    people on ET 302?

8              There were absolutely physiological,

9    psychological, and physical effects within those

10   ranges, within the context of the flight

11   profile, the time of the flight, and what was

12   going on on that flight at the time that I would

13   characterize as harm, and therefore as injury.

14      Q.    Okay.

15            And so in a slightly different

16   context, every time you get on an airplane, we

17   discussed that you feel these forces between 1

18   and zero-G.

19            Is every time that somebody gets on a

20   airplane and is subject to those -- that range

21   of forces -- are they injured in your expert

22   opinion?

23      A.    Not necessarily.  But again, it

24   depends on the context.

25            If you are talking about what is

TROY FAABORG

88

1
2      expected and what is routine, then that likely
3      would not classify as injury or harm.
4              If you are talking about, for example,
5      unexpected turbulence that's still within that
6      range, there is a physical -- psychological and
7      physical response that I would characterize as
8      harm or as injury.
9      Q.    So every time that somebody
10     experiences turbulence on a commercial flight
11     that ranges between 1 and zero-G's, your expert
12     opinion is they are injured?
13             MR. DURKIN:  Objection, asked and
14     answered, asks for speculation, and assumes
15     facts not in evidence.
16             Go ahead.
17     A.    Not necessarily.
18             I think the potential certainly
19     exists -- again, depending on the context.  And
20     there are personal factors.
21             But certainly there are -- there is
22     the opportunity for either a physical,
23     physiological, or psychological effect that
24     would be an adverse effect that I would classify
25     or define as harm.

TROY FAABORG

89

```
 1
 2      Q.    If you descend in an elevator in a
 3   large building and you are subject to 1 -- you
 4   know, G forces that are positive, but between 1
 5   and zero, are you injured? -- in your opinion?
 6            MR. DURKIN:  Objection, form of the
 7   question, calls for speculation, assumes facts
 8   not relevant, that in this case are relevant.
 9      A.    Again, not necessarily.  The context
10   is very important.
11            Again, if -- whether it's expected,
12   whether -- you know, normal operations of an
13   elevator?  I would not classify that as harm.
14            Are there conditions that you could be
15   exposed to in an elevator within that range that
16   are not expected? -- the elevator dropping
17   suddenly or, you know, again, external force
18   that you don't expect -- that changes the
19   context; and could certainly then be classified
20   as harm.
21            Context is everything.
22      Q.    You'd agree that every time you get on
23   an elevator and you descend, you are subjected
24   to forces between 1 and zero-G, right?
25      A.    Correct, yes.
```

TROY FAABORG

90

1

2      Q.     And the numbers of times you are

3      injured in an elevator that just descends and

4      you are subjected to those forces -- it's

5      microscopic the number of times somebody would

6      be considered injured, right?

7      A.     I'd --

8             MR. DURKIN:  Objection to form and --

9      A.     -- right, I'd only speculate --

10     Q.     You are think they are injured most of

11     the time?

12            MR. DURKIN:  Objection, asked and

13     answered, argumentative, and form of the

14     question, and speculative.

15            And even more, but I'll stop there.

16            MR. ESSIG:  Thanks.

17            THE WITNESS:  Can you repeat the

18     question, please?

19     BY MR. ESSIG:

20     Q.     I think I asked something along the

21     lines of:  Every time you set foot in an

22     elevator and it goes down in a relatively large

23     building, you are subjected to G forces between

24     1 and zero, right?

25     A.     Yes --

TROY FAABORG

1
2          MR. DURKIN:  Can I have the same
3   objections to that? --
4          MR. ESSIG:  You can have those
5   objections -- yeah.
6          MR. DURKIN:  -- same objections.
7          And I don't want to interrupt your
8   question --
9          MR. ESSIG:  You are doing it --
10          MR. DURKIN:  -- and your flow of the
11   questioning.  So I --
12          (Pause)
13          MR. DURKIN:  -- okay, I just want to
14   make sure I didn't interrupt you --
15          MR. ESSIG:  You did, but I -- got it.
16          MR. DURKIN:  Because you were doing
17   rapid fire now.  I'm okay.  It is okay.  Rapid
18   fire is fine.  But --
19          MR. ESSIG:  All right.
20          MR. DURKIN:  -- we are 10:20.
21          MR. ESSIG:  Can I get my answer?
22   Or -- I'm just trying to get to the last couple
23   questions --
24          MR. DURKIN:  He --
25          MR. ESSIG:  -- I'd like to get --

TROY FAABORG

92

1

2                    MR. DURKIN:  I thought he didn't

3      answer.

4                    But go ahead --

5                    MR. CLIFFORD:  There is a question

6      pending --

7                    MR. ESSIG:  Oh, my God --

8                    MR. DURKIN:  No, no -- I thought he

9      answered it.  That's why I threw the objection

10     in before --

11                   MR. ESSIG:  You can have a running

12     line of those objections.  If I can ask them --

13                   MR. CLIFFORD:  You will have the

14     running line.  We'll take it one at a time.

15                   MR. DURKIN:  -- I don't --

16                   MR. ESSIG:  We can do that, too --

17                   MR. DURKIN:  -- you can --

18                   MR. ESSIG:  -- I just want a couple

19     more questions, and we can take a break.  I

20     just --

21                   MR. CLIFFORD:  -- like to reframe your

22     question, that's fine --

23                   MR. DURKIN:  -- you go ahead and --

24                   MR. ESSIG:  I can just ask the

25     question --

TROY FAABORG

93

1
2              MR. CLIFFORD:  Yeah, ask it again --
3              MR. DURKIN:  -- ask the question,
4      please do.  We'll take the break when you are
5      done.  Please ask it.
6              You go ahead and answer.  Just give me
7      an opportunity to object or -- to those whatever
8      it is in between.  That's all.  That's all I'm
9      asking.  I'm just asking for the opportunity to
10     object, which is, like, you know, basic law
11     school 101, right?  That's all.  All right?
12             MR. ESSIG:  Do you feel like I'm not
13     giving you the opportunity to object?
14             MR. DURKIN:  I want to make sure --
15             MR. CLIFFORD:  -- fast talker --
16             MR. DURKIN:  -- you are --
17             (Pause)
18             MR. ESSIG:  We understand each other,
19     I think --
20             (Pause)
21             MR. DURKIN:  -- make sure we have the
22     opportunity on behalf of the 158 souls that were
23     killed in this -- [inaudible] --
24             Objection.
25             MR. ESSIG:  And I want to make you are

TROY FAABORG

94

1
2    absolutely have the opportunity.
3            And I --
4            MR. DURKIN:  Okay --
5            MR. ESSIG:  -- haven't interrupted you
6    once, have I?
7            MR. DURKIN:  -- joking around a little
8    bit, no.
9            I just want to make sure -- we are
10   good, Chris, please.  I really mean it.
11           MR. ESSIG:  Great.
12   BY MR. ESSIG:
13       Q.    Every time you descend in an elevator,
14   a relatively large building, human beings
15   subjected to forces between 1 and zero-G's,
16   right?
17       A.    Yes.
18       Q.    A portion of people that are injured
19   that descend in elevators every day -- what do
20   you think that is?
21           MR. DURKIN:  Will you accept all of
22   my --
23           MR. ESSIG:  Yes --
24           MR. DURKIN:  -- series of objections I
25   made the first time?

TROY FAABORG

1

2              MR. ESSIG:   -- yes.

3              MR. DURKIN:   -- go ahead.

4              Speculation -- all those things.

5        A.    If I am being asked to speculate, I

6    would say very few --

7        Q.    Understood --

8        A.    -- again, it depends on the context --

9        Q.    -- understood.

10       A.    -- and so what is classified as

11   non-harmful in one text can be classified as

12   harmful in another at exactly the same force,

13   exactly the same situation.

14             Context is what makes the difference.

15       Q.    Okay.

16             Same answer then for normal commercial

17   flight?

18             Every time you get on an airplane, you

19   are subjected to G forces between 1 and zero,

20   correct? --

21       A.    That is correct.

22       Q.    -- every human being?

23       A.    Every time, every human being.

24       Q.    Billions of people?

25       A.    Correct.

TROY FAABORG

96

1
2          Q.     And the vast majority of those people
3     are not injured, correct?
4                 MR. DURKIN:  Objection, argumentative,
5     asked and answered, incomplete hypothetical,
6     speculative.
7     BY MR. ESSIG:
8          Q.     The vast majority of the people that
9     get on an airplane are not --
10                MR. DURKIN:  Do you accept that?  Did
11    you accept those objections? --
12                MR. ESSIG:  You are inter -- I don't
13    have to accept the objections.  Make your
14    record.  You --
15                MR. DURKIN:  Well, you are asking the
16    question again, so if I don't --
17                MR. ESSIG:  I can ask the question
18    again.  I don't have to stop asking it.
19                MR. DURKIN:  So it just -- you asked
20    the question again, so I have to make the
21    objection for the record.  I --
22                MR. ESSIG:  I can't --
23                MR. DURKIN:  -- the same objections --
24                MR. ESSIG:  -- talk to him.  If you
25    speak this much and you make these objections

TROY FAABORG

97

1
2      this often, I can't even remember what I asked.
3      So then I have to reask it, which you asked me
4      to do --
5              MR. DURKIN:  So, so --
6              MR. ESSIG:  -- and then you
7      reassert --
8              MR. DURKIN:  -- so if you ask --
9              MR. ESSIG:  -- the long objections.
10     We are going around in circles.
11             MR. DURKIN:  So if you ask the same
12     question again, you'll accept the prior
13     objection to the last question --
14             MR. ESSIG:  Yes --
15             MR. DURKIN:  -- that's all I need --
16             MR. ESSIG:  -- I don't object to any
17     objection you make in this deposition.
18             MR. DURKIN:  I don't have to waive
19     anything --
20             MR. ESSIG:  Okay, you are not waiving
21     it.
22             MR. DURKIN:  Okay.  Thank you.
23     BY MR. ESSIG:
24         Q.   You'd agree the vast majority of
25     people -- the billions of people who get on an

TROY FAABORG

98

1

2     airplane every day and are subjected to G forces

3     between 1 and zero are not injured, correct?

4                 MR. LEBOVITZ:  Objection.

5                 MR. DURKIN:  Well, he's accepted all

6     the --

7                 MR. ESSIG:  "Object to form."  Just

8     say "object to form."  That's all you need to

9     say --

10                MR. DURKIN:  -- one for the day --

11                MR. ESSIG:  -- it preserves it all.

12                MR. DURKIN:  -- I've done it all.  We

13    have objected to all of it.

14                Go ahead and answer, please.

15        A.    I would agree under the majority of

16    those cases, that would not be a harm event or

17    injurious.

18                But it depends on the context.

19    Depends on other factors.

20                But I would agree, most of the time,

21    it does not result in injury.

22        Q.    And more than most of the time.

23                Virtually every time, correct?

24        A.    I can't quantify --

25                MR. CLIFFORD:  Now that one --

TROY FAABORG

99

```
1
2              MR. ESSIG:  He can disagree with
3      request it.  He can tell me "no" --
4              (Pause)
5              MR. CLIFFORD:  -- that last one is
6      very argumentative, repetitive --
7              MR. ESSIG:  I think Mr. Katzman told
8      me that I can -- that arguing with the witness
9      is not against the rules.  I think he made that
10     objection -- on your behalf --
11             (Pause)
12             MR. CLIFFORD:  -- Katzman is not
13     here -- and that isn't the rule --
14             MR. ESSIG:  -- all right.
15             MR. DURKIN:  All right.  Let's
16     take that break --
17             MR. ESSIG:  Okay.  Let's take a break.
18             THE VIDEOGRAPHER:  We are off the
19     record.  The time is 10:24 a.m.
20             (Recess from 10:24 a.m. to 10:45 a.m.
21     Eastern Standard Time)
22             THE VIDEOGRAPHER:  We are back on the
23     record.  The time is 10:45 a.m.
24     BY MR. ESSIG:
25         Q.   Good morning, Mr. Faaborg, we are
```

TROY FAABORG

100

1

2      back.

3           A.    Good morning.

4           Q.    A couple -- one quick question before

5      we go, kind of, back into the realm we were

6      talking about.

7                 I know we had a back and forth and

8      tried to come to some kind of understanding

9      about what is a negative G and what is not a

10     negative G.

11                And I know you were active duty in the

12     Air Force, right?

13          A.    Correct.

14          Q.    And you flew hundreds of hours in Air

15     Force military aircraft, right?

16          A.    Correct.

17          Q.    If you were speaking to others in the

18     Air Force -- pilots, you know, folks that you

19     run the plane with -- and the plane experienced

20     a force between 1 and zero and 0.5 G's, would

21     you in that conversation tell them you had just

22     experienced a negative G maneuver?

23          A.    It would depend on the context of the

24     conversation.

25                And so if we are talking about

TROY FAABORG

1

2      physiological effect, that's how I would

3      describe it as a physiologist.

4                When you talk about negative G,

5      sustained negative G, that's an area you just

6      have to be sure you are talking in the same

7      terms.

8                So it could go either way.

9      Q.      When we were talking about the

10     experience from a physiological standpoint for a

11     human being that's subjected to G forces between

12     1 and zero, and whether or not they were

13     injured, you said it matters a great deal how I

14     define "injury," right?

15     A.      Correct.

16     Q.      How did you define "injury" in this

17     case?

18     A.      I define "injury" as a physical,

19     psychological, or physiological adverse effect

20     that causes harm or -- excuse me -- and is

21     unexpected or unanticipated.

22               There are a lot of different

23     definitions.  I think mine aligns with those

24     definitions.

25               But at its heart, physiological,

TROY FAABORG

102

1

2      physical, or psychological adverse effect that

3      is unanticipated or unexpected.

4          Q.     So in terms -- there were -- before

5      get to the unanticipated and adverse, you know,

6      aspect of the definition, there were three

7      components:  Physical, psychological, and

8      physiological.

9               Right?

10         A.     Correct.

11         Q.     Do all three components need to be

12     present for an injury to exist?

13         A.     No.

14         Q.     Any one of them?

15         A.     Any one of them.

16         Q.     And in terms of the definition of

17     "injury" that you are applying in this case,

18     that's from the standpoint of an aerospace

19     physiologist?

20         A.     That is how I as a physiologist would

21     think about injury or harm.  That's how I would

22     think about it.

23         Q.     Do you have literature, or a treatise,

24     any objective written support for that

25     particular definition of "injury"?

TROY FAABORG

103

1

2      A.      Not for that particular definition,

3      just mine as a reasonable physiologist.

4           Q.      Okay.

5                   So you don't have a textbook that

6      reads:  This is the definition of "injury"?

7                   And it says that?

8           A.      No.

9           Q.      And you don't have a paper?

10                  A peer-reviewed publication?

11                  Anything like that?

12          A.      No.

13          Q.      Then you said:  If any one of those

14     three effects are present -- physical,

15     psychological, or physiological -- and that

16     effect causes harm.

17                  Correct?

18                  That's the next --

19          A.      Correct --

20          Q.      -- of the definition? --

21          A.      -- correct.

22          Q.      What do you mean by "harm"?

23          A.      Harm is harm.  There are 100 different

24     things that could cause harm.  Some call tissue

25     damage as harm, or a physical injury as harm.

TROY FAABORG

104

1

2                I would add psychological, you know,

3      trauma as harm, a harmful effect.

4                I'm not sure how to more -- you know,

5      further define "harm" -- as an adverse outcome.

6           Q.    Would you say cell damage?

7                Or tissue damage?

8           A.    That would be included.  It certainly

9      is not limited to cell damage or tissue damage.

10          Q.    So something even short of cell damage

11     or tissue damage could be harmful?

12          A.    Absolutely, absolutely.

13          Q.    So any -- like a hangnail?

14                If you stub your toe, that's an

15     injury?

16          A.    It's harm.  It could be classified as

17     an injury.

18          Q.    Okay.

19                When you -- one component was physical

20     and another component was physiological.

21                What's the difference between

22     those two things?

23          A.    Physical does not necessarily disrupt

24     function.

25                So, for example, if I break my arm, I

TROY FAABORG

105

1

2    would consider that a physical, not

3    physiological effect.

4              Physiological -- something that

5    disrupts function.

6              So, for example, hypoxia, lack of

7    oxygen availability that causes an impairment of

8    function -- that I would classify as harm

9    because it impairs physiological function.

10   Q.    Okay.

11             So -- I'm -- forgive me, I'm not an

12   expert in this field so I -- if the questions

13   don't make sense, let me know.

14             So I go sprinting around the hotel

15   here and come back to this point and I'm out of

16   breath.

17             Is that -- I would assume that there

18   has been a physiological change -- a physical

19   change, right?

20             I exerted myself.  My blood pressure

21   is probably up.  My fluids have moved around,

22   maybe my organs.  I have to catch my breath

23   because maybe I'm not in as good a shape as I

24   should be --

25   A.    Right.

TROY FAABORG

106

1

2          Q.      -- is that harm?

3          A.      Not necessarily, because it doesn't

4      meet the unexpected, unanticipated condition.

5              That was the expected result of the

6      activity that you took -- took place in, or

7      participated in.  So in that respect, it would

8      not meet my personal definition of a harm event.

9              Again, the context is everything.

10         Q.      Understood.

11             So in that context, I was not injured

12     and there was not harm, correct?

13         A.      Correct.

14         Q.      If I had not -- for some reason, I

15     have never run around before or something like

16     that, or I had been running all my life and I

17     didn't think I would be out of breath and it was

18     unexpected that I got today -- I'm out of

19     breath, but I didn't think I would be, then I

20     would be injured under your definition?

21         A.      It depends.

22             In your example, if you are still the

23     one who is directing the action then again it's

24     not unanticipated.  It's not unwanted.

25             If I'm holding you at gunpoint and

TROY FAABORG

107

1

2      forcing you to run, then that same result --

3      that same physiological and physical result -- I

4      would consider a harm event because it is now an

5      external -- now you didn't anticipate that

6      activity or having to do that -- that action.

7             So exactly the same result, one is

8      harm, the other is not.

9             It again, depends on the context.

10     Q.    No physical or physiological

11     difference in those two things.

12            It's all about whether it was

13     anticipated or not, according to you?

14     A.    As a harm event, part of this goes to

15     my experience in the patient safety realm where

16     exactly the same action, if it's done, let's

17     say, on the wrong body part -- you get an X-ray

18     on your left leg when the order is placed for

19     the right leg -- it's exactly the same thing.

20            One is considered a harm event; the

21     other is considered the appropriate clinical

22     outcome.

23            And that's how it's classified.

24            So exactly the same, one is harm, the

25     other is not.

TROY FAABORG

108

1

2          Q.     Because the physical context of both

3     these examples are exactly the same -- right? --

4     the only difference is anticipation or not

5     anticipation -- is the only -- the harm that you

6     are talking about, or the injury -- is that

7     purely then psychological?

8               Or emotional?

9               Because the body is doing zero

10    differences -- right? --

11         A.     Hm-hmm.

12         Q.     -- between the runaround example, or

13    the being forced to run type of a thing?

14         A.     Right.

15         Q.     And the only difference, then, would

16    be the idea that, in your mind, emotionally, you

17    either anticipated that or not.

18               Is that -- it's a longer-winded

19    question.

20               But is that -- does that mean that the

21    only harm that's being exerted on the -- or

22    experienced by a person is emotional or

23    psychological?

24         A.     Within that example -- I believe I

25    understand the example --

TROY FAABORG

109

```
 1
 2        Q.    Thanks --
 3        A.    -- that, yes, under those same
 4   conditions, it is primarily a psychological
 5   harm.
 6              There is still a physical --
 7   physiological effect, and so those two don't
 8   disconnect completely.
 9              But, yes, primarily in that case, if
10   you are short of a physical injury or physical
11   harm, then you have psychological or emotional
12   as the precipitating factor.
13        Q.    Okay.
14              Would you say that a typical airline
15   passenger if they get on an airplane that they
16   would -- it would be -- and they experienced
17   turbulence, for example -- because we brought up
18   turbulence before -- would that be an unexpected
19   or an expected event?
20              MR. DURKIN:  Objection, calls for a
21   hypothetical, and speculative, and form.
22        A.    Turbulence is an interesting idea
23   because it is un-- it is possible but not
24   anticipated.  So it -- there is a foot in each
25   of those, right?
```

TROY FAABORG

110

 1

 2          Some it is not a planned event.  It is

 3     not an expected event.

 4          Leveling off after takeoff, that's an

 5     expected event.  Turning base final before you

 6     land, that's an expected event.

 7          Turbulence would not be expected.

 8          So that makes it more likely to fall

 9     into that category.

10     Q.   Some of that depends, though, on the

11     person, right?

12          The individual -- discerning whether

13     or not something is expected or unexpected --

14     that is completely subjective?

15     A.   It is completely subjective, very

16     subjective.

17     Q.   And so it would be different nor every

18     single person that you are examining or

19     encountering, right?

20     A.   For an inexperienced flier, leveling

21     off after takeoff would be unexpected and

22     potentially -- not traumatic, but emotional --

23     Q.   Yep --

24     A.   -- so, yes.  Lots of differences from

25     person to person.

TROY FAABORG

111

1
2                    The context, again, very important.
3         Q.    Okay.
4                    So that kind of a harm event, whether
5    it's anticipated or not, figuring that sort of
6    thing out isn't -- that's a determination that
7    somebody, an expert in your field, has to make
8    on an individual basis?
9         A.    Can you repeat? --
10        Q.    You are saying individuality matters
11   here, right?
12                   If it's a first-time flier,
13   experienced flier, somebody expects that, or
14   doesn't expect it -- it's a subjective
15   understanding that they hold themselves --
16        A.    Right --
17        Q.    -- so in your field of expertise when
18   you are discerning whether or not there was a
19   harm event --
20        A.     hm-hmm-
21        Q.    -- it would turn on your individual
22   assessment of that person, right?
23        A.    Part of it would, yes.
24                   There are other parts that would not
25   require individual assessment because it's

TROY FAABORG

112

1

2      reasonable to agree that that was an

3      unanticipated event.

4                  So, again, there is a spectrum, a

5      continuum, some of which does depend on the

6      individual.

7                  To a greater extent -- for example,

8      zero-G on a commercial aircraft -- that is, I

9      think, reasonable to agree no one would ever

10     expect that --

11         Q.     I see.

12                So you are --

13         A.     -- so that would not require an

14     individual determination.

15         Q.     Totally agree.

16                I don't think anyone would expect

17     zero-G on a commercial airplane.

18                But we did -- you know, Mr. Poole -- I

19     don't know if you looked at his report very

20     closely.

21                He did go back and look at the G --

22                MR. DURKIN:  Objection.  He said he

23     didn't.

24                Asked and answered.

25                Remember you asked that?

TROY FAABORG

113

```
 1
 2              MR. ESSIG:  I know.  I'm giving him
 3     context --
 4              MR. DURKIN:  -- but you said --
 5              MR. ESSIG:  You interrupted my
 6     question, first of all --
 7              MR. DURKIN:  -- objection,
 8     argumentative.
 9              He has already answered the
10     question about --
11              MR. ESSIG:  -- you have got to let me
12     ask the question --
13              MR. DURKIN:  -- yeah, but you --
14              MR. ESSIG:  -- you can't possibly --
15              MR. DURKIN:  -- I did, because I don't
16     know how -- you said, "I don't know how
17     carefully you reviewed it."  He already told you
18     he skimmed it.  That's why.
19              Asked and answered.
20              Go ahead.
21              MR. ESSIG:  Thanks.
22     BY MR. ESSIG:
23        Q.    Mr. Poole looked at the flight data
24     for the previous flights of the same aircraft.
25              Are you aware of that?
```

TROY FAABORG

114

1

2      A.    I'm aware that he reviewed prior data,

3  yes.

4      Q.    And the prior data showed generally

5  that there were G forces experienced on those

6  prior seven flights of something along the lines

7  of 0.6 G's -- positive 0.6 G's and 1.3 G's.

8          Correct?

9      A.    I don't know.  I didn't look at the

10  specific values in the report.

11     Q.    Would you agree that G forces between

12  something like 0.6 or 0.5 and 1.3 or so is the

13  normal range of G forces that a passenger on a

14  commercial airline would expect to encounter?

15          MR. DURKIN:  Objection, speculation --

16  calls for speculation, form of the question.

17     A.    I'm not -- I don't know what the

18  specific, for example, airline policies or

19  practices are, what exactly that range would be.

20          I think 0.5 -- just my professional

21  opinion -- seems a little bit lower than what I

22  would consider a normal range; that 0.6, 0.7, up

23  to 1.3 -- somewhere in there -- I think is a

24  reasonable range.

25     Q.    Okay.

TROY FAABORG

115

 1

 2              So a person that is a commercial

 3    airline passenger gets on a commercial airline

 4    flight -- in your professional opinion, in your

 5    judgment, they would expect to encounter G

 6    forces between something like 0.6, 0.7, and

 7    1.3? --

 8              MR. DURKIN:  Objection, asked and

 9    answered, calls for speculation.

10         A.    I believe that to be reasonable, yes.

11         Q.    And therefore, if they expected those

12    G forces, by definition then not unexpected,

13    right?

14         A.    Again, I think the context matters.

15              If we are talking about within normal

16    aircraft operation, then, yes, that's

17    reasonable -- so takeoff, increasing/decreasing

18    altitude, landing, within a normal flight

19    profile, yes.

20              But not if it's an -- you know,

21    abnormal, repeating exposure, prolonged

22    exposures.  That changes the context.

23         Q.    Understood.

24              You talked about harm -- used the word

25    "harm" and then you were also talking about the

TROY FAABORG

116

1

2    concept of "injury."

3            Do you differentiate between harm and

4    injury?

5        A.    Not specifically, no.  Just -- that is

6    not intended to be a formal distinction.  It is

7    the words that -- the words that I'm using.

8        Q.    Okay.

9            MR. ESSIG:  If we turn to page 6 of

10   your report.

11   BY MR. ESSIG:

12       Q.    You write there in the second

13   paragraph:  The U.S. Air Force Handbook of

14   Aerospace and Operational Physiology notes that

15   it is generally accepted that exposure to

16   acceleration is classified as "impact

17   acceleration" when the duration of the force is

18   less than one second.  Forces longer than one

19   second in duration are considered "prolonged

20   exposures" because of the physical and

21   physiological effects that result.

22           Do you see that?

23       A.    Yes.

24       Q.    Would you agree that accelerations

25   lasting less than one second are impact

TROY FAABORG

117

1
2      accelerations?

3          A.      That is how they are defined by that
4      handbook, yes.

5          Q.      Do you agree with that?

6          A.      Yes.

7          Q.      And accelerations lasting more than
8      one second are prolonged exposures.

9                  You agree with that?

10         A.      That is how I would define it, based
11     on that definition, yes.

12         Q.      That statement, again, is based on
13     this chapter 7.1 of the U.S. Air Force Handbook
14     of Aerospace Physiology?

15         A.      Yes, I believe that's true.

16         Q.      Would you agree that everyone is -- as
17     a general matter, everybody that experiences
18     something different than normal 1 G accelerating
19     forces -- they are not injured, right?

20         A.      It depends on the context.

21         Q.      Yeah -- and I'm just trying to say --
22     in day-to-day life -- we talked about this a
23     little bit -- people experience G forces
24     different than 1 G exactly, right?

25         A.      Correct.

TROY FAABORG

118

1

2      Q.     And everybody that experiences forces

3   different than 1 G is not necessarily injured?

4      A.     I will agree with that.

5      Q.     Okay.

6             Again, it depends on the person,

7   depends on their expectations, depends on the

8   context?

9      A.     Correct.

10     Q.     Does it depends on how large the G

11  force is -- the difference between the G force

12  they experience and the 1 G normal gravitational

13  force they are used to?

14     A.     Of course, yes.

15     Q.     And also matters how long the duration

16  of that experience is of that particular force,

17  right?

18     A.     Correct.

19            MR. ESSIG:  Let's mark tab 16.  I

20  think it's Exhibit 315.

21            (Exhibit 315, Multipage document

22  entitled: Handbook of Aerospace and Operational

23  Physiology, 2nd Edition, dated October 2016 (no

24  Bates Nos.), marked for identification)

25            MR. DURKIN:  That is the handbook?

TROY FAABORG

119

1
2                    MR. ESSIG:  This is the handbook.
3                    (Pause)
4       BY MR. ESSIG:
5            Q.    If we look at the cover page of the
6       exhibit, it says:  Handbook of Aerospace
7       Operational Physiology, 2nd Edition, October
8       2016.
9                    Correct?
10           A.    Correct.
11           Q.    Is that the version of the Handbook of
12      Aerospace and Operational Physiology you cited
13      in your report?
14           A.    I believe that it is.  I would have to
15      confirm that I have the same edition.  I believe
16      it was the second edition.
17           Q.    Okay.
18                    This particular exhibit is just
19      chapter 7 as Mr. Durkin pointed out?
20           A.    Correct.
21           Q.    So if you want to flip through it,
22      does that look like chapter 7 to you?
23           A.    Does, yes.
24           Q.    And obviously, the handbook is much
25      bigger, but it saves the trees.  We just printed

TROY FAABORG

120

1

2     chapter 7.

3              I'm only going to ask questions about

4     chapter 7.

5              MR. ESSIG:  If we turn to page 7-6.

6              THE WITNESS:  Hm-hmm.

7              MR. ESSIG:  Well, let's turn to 7-4

8     first.

9   BY MR. ESSIG:

10     Q.    There is a chart there with an upward

11   curve.

12              And then underneath that chart, it

13   says:  -Gz acceleration (negative G) occurs when

14   the inertial forces act toward the head of the

15   body is lifted up out of the seat.  This occurs

16   during abrupt dives or flying out an outside

17   loop.

18              Do you see that?

19     A.    Yes.

20     Q.    Is that definition talking about G

21   forces that are at zero and below zero?

22     A.    I believe it's talking about any less

23   than 1.

24     Q.    Do you have any -- can you point to --

25   at least in this chapter, can you point me to

TROY FAABORG

121

1
2      the sentence that you told me about earlier
3      where you think this Air Force handbook defines
4      negative G's as anything below 1?
5          A.    I don't have a specific -- specific
6      citation.   I would have to review to see.
7              (Pause)
8          Q.    In the definition that I pointed you
9      to that on 7-4, you see where it says:   The body
10     is lifted up out of the seat?
11         A.    Yes.
12         Q.    Would you agree that a body is only
13     going to be lifted up out of the seat with G
14     forces less than zero -- zero and below?
15         A.    I would agree with that, yes.
16             I think to your previous question, the
17     first sentence in the second paragraph on page
18     7-2 doesn't specifically reference "below 1."
19     But it talks about how:   The units of
20     acceleration are defined relative to the force
21     of gravity.
22             Therefore anything greater than 1, in
23     their vernacular, is positive -- or anything
24     less than 1, because it's, again, relative to
25     the force of gravity, not relative to zero.

TROY FAABORG

122

1

2          Q.     Got it.

3                 It's an inference you are making.

4                 But you don't see a sentence in here

5     that says, "Negative G's are defined as anything

6     below 1"?

7          A.     I don't know if there is a sentence in

8     there that specifically spells that out in that

9     manner.

10         Q.     Got it.

11                (Pause)

12                MR. ESSIG:  All right, so we were

13    turning to 7-6, I think, and I derailed us a

14    bit.

15                So this is under 7.1.3.  Basic

16    Physiological Effects of Acceleration.

17   BY MR. ESSIG:

18         Q.     Do you see that?

19         A.     Yes.

20         Q.     In the first paragraph there, it says:

21    In general, the general -- the greater the

22    magnitude of the accelerative force, the greater

23    effect on body.

24                Do you see that?

25         A.     Yes.

TROY FAABORG

123

1

2      Q.    Do you agree with that statement?

3      A.    I do.

4      Q.    And then, it says:  Generally, the

5  structural system of the body can withstand

6  short-duration forces up to approximately

7  positive 25 G, with little or no permanent

8  damage, depending on the axis of exposure.

9             Do you see that?

10     A.    Yes.

11     Q.    Do you agree with that statement?

12     A.    As presented, yes.

13     Q.    You think in general, the structural

14  system the body can withstand short-duration

15  forces of approximately 25 G?

16     A.    The structural --

17             MR. DURKIN:  Objection -- incomplete.

18             You didn't finish the sentence.

19             MR. ESSIG:  I didn't need to finish

20  the sentence.  I --

21             MR. DURKIN:  Okay, you just read the

22  sentence --

23             MR. ESSIG:  I read the sentence first,

24  and asked if he agreed with that --

25             MR. DURKIN:  Yes --

TROY FAABORG

124

1

2          MR. ESSIG:  -- and then I asked him a

3    second question.

4          MR. DURKIN:  Ah -- okay.  You are

5    cutting ought the last part.  I got it.  I get

6    it.

7          MR. ESSIG:  Thanks.

8      A.    I agree the structural system

9    generally, yes, can withstand short-duration

10   forces up to approximately 25 G.

11     Q.    With little or no permanent damage?

12     A.    With little or no permanent damage,

13   depending on the axis of exposure --

14     Q.    Okay --

15     A.    -- correct --

16     Q.    -- if that axis of exposure is

17   vertical G's, would you agree with that

18   statement?

19     A.    Seldom are G forces isolated to one

20   particular axis, and so it's a difficult

21   assertion to make.

22          It depends on posture, body position,

23   a lot of factors.

24          And so I take the statement at its

25   face value -- that approximately 25 G.

TROY FAABORG

125

1

2          But again, that's under very specific

3      research conditions.

4          And so anything further, I would be

5      speculating.

6      Q.    I understand the reason you are

7      cautious about that statement is in order to

8      determine if there was injury, there is a lot of

9      specific things you'd have to know, right?

10          You said body posture was one?

11     A.    I'm not talking about injury.

12          I'm talking about structural system --

13     what it can withstand.

14          And so I don't think that -- because

15     aerospace physiologists generally are not

16     looking to make an injury determination, but to

17     be -- to prevent injury by not getting into

18     forces that may cause an injury -- I think this

19     statement is not necessarily as a -- for the

20     purpose of injury determination.

21          Does that make sense?  I think I

22     talked in a circle.

23     Q.    Let me try to ask it with different

24     way.

25          The way the sentence is written to me

TROY FAABORG

126

1
2      is that it says "generally" -- so we are not
3      being super specific.
4                  But it says:  Generally, the
5      structural system the body can withstand this
6      kind of force.
7                  Then it says:  With little or no
8      permanent damage, depending on the axis of
9      exposure.
10                 Right?
11     A.    Yes.
12     Q.    So when it's saying the body can
13     withstand this kind of force with little or no
14     permanent damage, as a regular guy when I'm
15     reading it, that sounds to me like no injury --
16     A.    I --
17     Q.    -- would you agree?
18                 MR. DURKIN:  Objection --
19     A.    -- I don't agree.
20                 MR. CLIFFORD:  Excuse me.  You said:
21     That, to me, sounds like no injury --
22                 MR. ESSIG:  I'm asking him --
23                 MR. CLIFFORD:  -- that was the
24     question.
25                 And I'm objecting to the question as

TROY FAABORG

127

 1

 2     being argumentative and an incomplete

 3     hypothetical, based on the very thing you are

 4     reading.

 5              So I have made my objection.

 6              The man can give you an answer --

 7              MR. ESSIG:  Okay --

 8              MR. CLIFFORD:  -- but I'm making a

 9     record, and I'm not wrong on this one --

10              MR. ESSIG:  -- no --

11              MR. CLIFFORD:  -- so let him answer

12     now --

13              MR. ESSIG:  With all due respect, I

14     have no problem with making any objections.  I'm

15     not trying to argue with him.  I'm trying to ask

16     him his view.  And --

17              MR. CLIFFORD:  Well, I know you are --

18              MR. ESSIG:  -- so that's --

19              MR. CLIFFORD:  -- not trying to argue,

20     but the effect is the same.

21              MR. ESSIG:  I am allowed to ask him

22     about his opinions --

23              MR. CLIFFORD:  Yes, you are.  But you

24     are not allowed --

25              MR. ESSIG:  -- and this is a --

TROY FAABORG

128

1

2              MR. CLIFFORD:  -- to argue --

3              MR. ESSIG:  -- this is a textbook he

4     cited.

5   BY MR. ESSIG:

6        Q.    So again, that's just my -- I'm not

7     asking -- you don't have to agree with it.

8              You are free to disagree.  I just want

9     to understand.

10              The way this is written to me, it says

11     the structural system the body can withstand,

12     for short duration, forces up to 25 G with

13     little or no permanent damage.

14              You see that?

15              MR. DURKIN:  Objection.  You didn't

16     read the whole sentence.

17   BY MR. ESSIG::

18        Q.    Depending on the axis of exposure?

19              MR. DURKIN:  There you go.  Okay.

20        A.    I do not disagree that injury cannot

21     occur, or does not occur, at less than 25 G of

22     short-duration exposure.

23              I do not agree with that --

24        Q.    Okay --

25        A.    -- injury, I believe, certainly

TROY FAABORG

129

 1
 2    occurs, or can occur, at less than 25 G.
 3        Q.    Is whether or not damage is very small
 4    or permanent relevant to your definition of
 5    "injury"?
 6        A.    Not if you are talking about the
 7    threshold of what I consider harm, which goes
 8    back to the definition that I gave previously.
 9    It is not permanent damage.  It is just simply a
10    harm event.
11        Q.    Understood.
12              So whether or not the damage is very
13    tiny is not relevant to your definition of
14    injury, right?
15              MR. DURKIN:  Objection, argumentative.
16        A.    Not specifically relevant, no.
17        Q.    And whether or not the damage is
18    permanent or transitory doesn't matter either?
19        A.    Not in my definition, no.
20              MR. ESSIG:  If we look down to the
21    third paragraph on this page.
22    BY MR. ESSIG:
23        Q.    It says:  The time duration of force
24    is -- the time duration a force is applied will
25    determine the effect of the acceleration on the

TROY FAABORG

1
2      body.
3              See that sentence?
4      A.      Yes.
5      Q.      You agree with that?
6      A.      I do.
7      Q.      These effects will vary depending on
8      whether the body is exposed to impact
9      acceleration or prolonged acceleration.
10             Do you agree with that?
11     A.      I do.
12     Q.      And I think you were telling me before
13     that the reason you were qualifying that -- the
14     sentence we were looking at about the positive
15     25 G's was because the effects of a given force
16     will vary potentially, depending on the
17     particular person, the position of that person,
18     how that person is oriented.
19             Is that right?
20     A.      Those all play a role, yes.
21     Q.      Are there other elements that would
22     vary the effect of a given force on a human
23     being?
24     A.      Of course.  There are other
25     physiological mechanisms, underlying medical

TROY FAABORG

131

```
1
2    conditions.
3              As we talk about the effects of G, the
4    primary effect is the -- what we refer to as the
5    fluid shift -- the fluid -- the primary fluid
6    that we talked about being blood and
7    oxygen-carrying ability.
8              So anything that affects the way that
9    the body circulates -- so respiration,
10   circulation, the transportation of oxygen --
11   could have an adverse effect.
12             So hypertension, low blood -- lower
13   blood pressure than normal, even the physical
14   anatomy, things like the heart-to-brain
15   distance -- those all have an effect.
16        Q.    So when we are evaluating the effect
17   of a force on a human being, we have to look at
18   the magnitude of the force, correct?
19             We have to look at the duration of
20   forces imposed on the person, correct?
21        A.    Correct.
22        Q.    And then the third part is to look at
23   the individual nature of that person.
24             Is that correct?
25        A.    The individual nature of the person
```

TROY FAABORG

132

1

2    will have some minor effect.

3             I think we can make -- as I do -- a

4    physiological determination of what the likely

5    result is.  Then the competence interval is

6    what's defined by those personal effects.

7        Q.    Understood.

8        A.    So I agree to an extent.

9             But without the personal factors, you

10   can still make a physiological effect

11   determination.

12       Q.    Understood.

13             So the first two components -- the

14   duration and the magnitude of the effect -- they

15   probably have a greater degree of influence on

16   whether or not a person is injured, right?

17       A.    Yes.

18       Q.    And then there are -- their particular

19   individual makeup -- whether they are male or

20   female, big or small, have high or low blood

21   pressure, all the things you were talking

22   about -- that has an influence.

23             But you think it's less?

24       A.    I agree, yes.

25       Q.    Would you also agree that when the

TROY FAABORG

133

1

2    force is greater -- so as we get higher in G

3    forces, we are at 5, 6, 10, whatever it is --

4    and the duration is longer -- a minute, 30

5    seconds, something like that -- that those

6    differences in individual makeup matter even

7    less than they would when forces are smaller and

8    durations are shorter?

9              MR. DURKIN:  Objection, calls for

10   speculation.

11             MR. ESSIG:  He's an expert in

12   aerospace physiology.

13             MR. DURKIN:  Yeah, but you are

14   talking about -- you don't even say "positive

15   and negative G's."  You say all sorts of

16   things --

17             MR. ESSIG:  I don't --

18             MR. DURKIN:  -- and you don't identify

19   an individual.  You got --

20   BY MR. ESSIG::

21       Q.    Do you understand that question?

22             MR. DURKIN:  -- you have got a lot of

23   incomplete hypothetical.

24             Incomplete hypothetical --

25             MR. ESSIG:  Understood --

TROY FAABORG

1
2            MR. DURKIN:  -- better objection.
3            MR. ESSIG:  -- that's fine.
4    BY MR. ESSIG:
5        Q.    Do you understand the question?
6        A.    Let me -- I believe I do.  Let me give
7    my response pointing back to that first
8    paragraph.
9            If a force is greater than 25 G, for
10   example, the individual differences don't mean
11   very much at that point because that higher
12   force, as it says, is likely to have, you know,
13   structural impact, that sort of thing.  So
14   individual differences wouldn't make much
15   difference there.
16       Q.    Okay.
17           If the force is much less -- so we are
18   talking about 2 G's, or negative 2 G's -- would
19   individual differences more than if the force
20   was greater and the duration was longer?
21       A.    They would therefore matter more,
22   yes --
23       Q.    Okay --
24       A.    -- but still be relatively
25   insignificant -- not insignificant -- relatively

TROY FAABORG

135

1
2     slight compared to the duration and magnitude
3     issue.
4          Q.     Okay.
5               If you go on in this paragraph,
6     it says -- the next sentence after the first two
7     that we read says:  It has been generally
8     accepted that the acceleration for a time
9     greater than a one-second --
10              MR. DURKIN:  I didn't get there.
11              We're on the same -- okay, thanks.
12    Got it.
13    BY MR. ESSIG::
14         Q.    It has been generally accepted that
15    acceleration for a time greater than one second
16    exposure should be called prolonged acceleration
17    and an exposure duration less than one second
18    should be called impact acceleration.
19              Right?
20         A.    Correct.
21         Q.    That's what you said in your report?
22         A.    Correct.
23         Q.    For example, jumping from a table 3
24    feet (0.9 meters) high would produce an impact G
25    force of 12 to 15 positive G, or +Gz --

TROY FAABORG

136

```
 1
 2    right? -- for a fraction of a second with no ill
 3    effects.
 4            Right?
 5    A.    That's what it says, yes.
 6    Q.    And when they say "with no ill
 7    effects," do you think that means "no injury"?
 8    A.    I think that means no physiological
 9    effect.
10            Certainly you could get injured
11    jumping off a three-foot table, so it doesn't
12    preclude injury.
13            I think what they are -- what they are
14    trying to say is there will not be an adverse
15    physiological effect as a result of that
16    short-duration moderate G exposure.
17    Q.    Okay.
18            If a -- the next sentence:  If a
19    subject is exposed to 12 to 15 positive Gz for
20    two seconds or longer, severe, physiological
21    changes are produced.
22            Do you see that?
23    A.    I do.
24    Q.    Do you agree with that statement?
25    A.    I do.
```

TROY FAABORG

137

1

2      Q.      They use a range of G forces there --

3      12 to 15.

4                Is that right?

5      A.      That's right.

6      Q.      Is that -- is the reason they use a

7      range there because there isn't a bright line

8      where everyone reacts to the same to a given

9      acceleration of force?

10     A.      The physics are exactly the same.  An

11     object with a certain mass decelerating over a

12     certain time is exactly the same force.

13                This has an individual variance

14     because people are not going to decelerate at

15     the same rate jumping off of a table, because

16     some people can't absorb an impact and they

17     don't bend they are knees, and there you go.

18                So that, I believe, is the reasoning

19     for that range -- is that depending on how you

20     land, what you do physically, that's going to

21     have an impact or have an effect on that range

22     of G's.

23     Q.      Makes sense.

24                So to put it more in laymen's terms,

25     my five-year-old jumps off tables all day long.

TROY FAABORG

138

1
2      He never gets hurt -- so far, thank goodness.
3              If I was 90 years old and I jumped off
4      a table, I might get hurt because my body would
5      react differently though to G force?
6      A.      Now we are talking about two different
7      issues:  One being a physical injury, and this
8      that's really talking about physiological
9      effect.
10             And that's what it points to with the
11     example of the very last sentence:  Severe,
12     physiological changes are produced.
13             That's not talking about the
14     likelihood of injury because your bones are
15     brittle.  It's the physiological response that
16     they are specifically alluding to.
17     Q.      Okay.
18             And so not only is there
19     inter-individual variability -- where, like, you
20     are having the 90-year-old person jump off the
21     table or a five-year-old jump off the table --
22     different types of people jump off the table and
23     whether or not they experience injury, depending
24     on their makeup, right?
25             There is some variability along those

TROY FAABORG

139

1
2     lines, correct? -- in terms of impact of those
3     forces on that person?
4          A.     Qualified, yes.
5                 So let me change the example.
6                 If you strap someone into a chair
7     where they don't have any motion and drop them
8     from 0.9 meters, whether they are 2 or 92, the
9     forces will be exactly the same.  And the
10    physiological -- the effect on the physiology
11    will be exactly the same.
12                The physical differences between the
13    people may slightly change, again, that
14    confidence interval of how does that
15    physiological effect manifest or, you know, have
16    an effect -- so, again, lower blood pressure,
17    that sort of thing.
18                That becomes more evident in more
19    prolonged exposure.
20                But again, the physics are the
21    physics.  If you remove the way the person lands
22    or things of that nature, the forces are exactly
23    the same.
24         Q.     Okay.
25                And so I guess the other end of that

TROY FAABORG

140

1

2    spectrum is maybe you drop the same person --
3    same person jumps off the table five times, 20
4    times, whatever it is.  All the times they jump,
5    they don't get hurt.
6              But the last time, they land funny.
7    They land awkward, they -- whatever, and they do
8    get hurt.
9              So an individual person may be
10   subjected to the same force and the same
11   duration, but be injured some of the time and
12   not be injured others, depending on that
13   particular interaction.
14             Is that right?
15   A.    I think that is reasonable to say.
16   Q.    Okay.
17             It talks about exposure in terms of
18   duration more than a second or less than a
19   second.
20             Would you agree that the exposure for
21   positive G forces for less than two seconds is
22   much less likely to cause harm than exposure
23   that lasts two seconds or more?
24   A.    I don't think there is anything
25   particularly relevant about two seconds.

TROY FAABORG

141

1
2          The longer of exposure, the more
3   physiological response, or the more significant
4   the effect.
5          That's not to say there is not an
6   effect or a response less than two seconds.
7          But as this says, the longer the
8   duration of the exposure, the greater the risk
9   of harm.
10      Q.    Understood.
11          I didn't pick two seconds out of thin
12   air.  I was reading the last sentence here.
13          They say "two seconds."  That's why I
14   said it.
15      A.    Right.
16          And just to be -- just to clarify that
17   the delineation for impact versus prolonged
18   exposure being at one second -- there is not
19   anything remarkably magical about one second
20   physiologically either.  It's just a somewhat
21   arbitrary delineation, because impact and
22   prolonged exposure have a different effect.
23   So -- that's all.
24          MR. ESSIG:  If we go to page 15 of
25   your report --

TROY FAABORG

142

 1
 2              (Pause)
 3              MR. ESSIG:  -- with a chart there in
 4     the middle?
 5              THE WITNESS:  Yes.
 6              MR. ESSIG:  Do we want to mark the
 7     blown-up version?  Or --
 8              (Pause)
 9              MR. ESSIG:  Okay, we are marking tab
10     34 as Exhibit 316.
11              (Exhibit 316, Single-page document
12     entitled: ET 302: Vertical Acceleration (Gz):
13     Takeoff Roll to End of DFDR Recording, bearing a
14     graph (no Bates No.), marked for identification)
15              (Pause)
16              MR. ESSIG:  So we are marking Exhibit
17     316.  This is the chart on page 15 of your
18     report, just put on one page so that we can read
19     it together.
20              THE WITNESS:  Correct.
21     BY MR. ESSIG:
22         Q.   Would you agree that there is no point
23     in the ET 302 flight, according to the flight
24     data, that a passenger was subjected to more
25     than positive 1.5 G's for two seconds?

TROY FAABORG

143

1
2          A.     I believe that's accurate, yes.
3          Q.     If you look at your chart, it
4    looks like there is -- to me, it looks like --
5    you tell me whether you agree -- that there is
6    essentially three blips or top points of the
7    curves that get -- that approach 1.5 G's.
8                 Do you see that?
9          A.     Yes, I do.
10         Q.     And for each have those points, do you
11   have an estimate of how long that G force was
12   experienced?
13         A.     Not without referring back to my data,
14   no.
15         Q.     Would you agree it's fractions of a
16   second, looking at this?
17                MR. DURKIN:  Objection, argumentative,
18   calls for speculation.
19         A.     I would have to look -- it appears
20   that they are not longer than a couple of
21   seconds.
22         Q.     You think each one of those spikes is
23   a couple of seconds?
24         A.     I don't know.  I'd to have look.  I
25   don't want to speak out of turn.  I'm not sure

TROY FAABORG

144

1
2    without looking back at the data.

3        Q.    Fair enough.

4             As part of your analysis in this case,

5    did you identify the maximum positive Gz

6    recorded by the flight data recorder?

7        A.    I identified it.  I don't know if I

8    made particular note, because the positive Gz

9    was not nearly as much of an effect as the

10   negative.

11            So I noted it, in that as part of the

12   analysis, I took all of the G load data and

13   sorted high to low and low to high.  So in that

14   respect, I identified the point that was the

15   highest.

16            I don't -- I think 1.67 if memory

17   serves --

18            MR. ESSIG:  If look on page 14 --

19            THE WITNESS:  Hm-hmm.

20            MR. ESSIG:  -- at the bottom of your

21   report.

22   BY MR. ESSIG:

23       Q.    I think you say 1.69?

24       A.    That -- okay.

25       Q.    So to be clear, I think you are saying

TROY FAABORG

145

1

2    the highest positive G force I saw in your

3    report was 1.69?

4        A.    As long as there was not a higher G

5    force outside of that two minutes, because this

6    is specifically focusing --

7        Q.    Right.

8        A.    -- on that two minutes.

9             I don't recall there being one larger

10   than 1.69 and so I believe that 1.69 is likely

11   the highest G force -- positive G force.

12            MR. ESSIG:  If you look at the chart

13   that I marked as 316 --

14            THE WITNESS:  Hm-hmm.

15   BY MR. ESSIG:

16       Q.    That bullet was talking about the

17   period of two minutes between continued

18   digressions from normal flight?

19       A.    That's correct.

20       Q.    I don't see any spike that is that

21   high in the rest of the flight.

22            Would you agree?

23       A.    I would agree with that.

24       Q.    Did do any analysis do determine how

25   long the airplane and the passengers were

TROY FAABORG

146

1

2      exposed to that maximum G force?

3          A.    Not specifically, no.

4                (Pause)

5          Q.    Would you agree that positive 1.69 G's

6      is not an extreme positive G force, as a general

7      matter?

8          A.    As an isolated event and as a general

9      matter, I would agree with that.

10         Q.    It's much less than the 12 to 15 G's

11     that we were looking at in the chapter -- of the

12     Air Force handbook -- right?

13         A.    It's still high for a commercial

14     airline exposure.  So in that context, it's a

15     little bit extreme in the isolated context of

16     physiological or physical -- you know, what's

17     the impact to the body or what's -- can you

18     handle that, or -- it is -- it is not as high.

19               So I don't know if that answers the

20     question.

21         Q.    Yeah, no, that's -- okay.

22               When we were talking about, sort of,

23     the normal range of G forces experienced on a

24     commercial airplane, we were talking about -- I

25     think you said -- 0.6, 0.7 to 1.3, right?

TROY FAABORG

147

1

2          A.     In that neighborhood, right.

3          Q.     So 1.69 is four-tenths higher than

4    what you would think the normal range of G force

5    is --

6          A.     Twice as high than -- 1.6 is twice as

7    much as 1.3 --

8          Q.     In other words --

9          A.     -- in terms of the G exposure --

10         Q.     -- correct, correct --

11         A.     -- right?

12         Q.     -- another way to say it would be it

13   is four-tenths of a G more?

14         A.     True.

15                MR. ESSIG:  Let's turn to page 6 of

16   your report.  What was the exhibit number on the

17   report?

18                (Pause)

19                MR. ESSIG:  All right.  So we are back

20   in 313.

21                MR. DURKIN:  Page 6?

22                MR. ESSIG:  Page 6.

23                We'll probably keep going back to the

24   chapter in the handbook.  So --

25

TROY FAABORG

148

1

2    BY MR. ESSIG:

3        Q.    In the paragraph spanning pages 6 and

4    7 of your report at the bottom there, you

5    describe Anti-G Straining Maneuvers, correct?

6        A.    Correct.

7        Q.    AGSM?

8        A.    Hm-hmm.

9        Q.    That's a maneuver that the military

10   pilot is taught to help them with exposure to

11   sustained, high positive G's, right?

12       A.    That's correct.

13       Q.    And they use that maneuver to make

14   sure they don't experience greyout or blackout

15   and to remain conscious?

16       A.    Correct.

17       Q.    The passengers of ET 302 were exposed

18   to very short periods of positive Gz greater

19   than 1 G, but didn't exceed 1.69 G's.

20            Do you agree?

21       A.    I agree.

22       Q.    AGSM wouldn't be necessary to avoid

23   greyout, or blackout, or loss of consciousness,

24   given the brief duration and the relatively low

25   positive G's on the ET 302.

TROY FAABORG

149

1

2              Is that right?

3        A.     That's correct.

4        Q.     Do you cite any literature in your

5   report that -- greyout or loss of consciousness

6   occurs at forces as low as positive 1.69 G?

7        A.     Do I cite any literature?  No.

8        Q.     Do you believe that they do?

9        A.     Yes.

10       Q.     On what basis?

11       A.     Well, experience investigating a

12   physiological event where a student

13   pilot lost --

14              (Lost audio)

15       Q.     -- greyout prior to loss of

16   consciousness ? --

17       A.     As a physio --

18              (Lost audio)

19       A.     -- generally precede a loss of

20   consciousness unless it is a high density, high

21   G, rapid onset.

22              And in that case, it was not high G

23   nor rapid onset.  And so the expectation is that

24   they would have those symptoms leading into that

25   unconsciousness.

TROY FAABORG

150

1

2      Q.    Do you have any idea what particular G

3  force level they experienced greyout or

4  blackout?

5      A.    No.

6           THE VIDEOGRAPHER:  Counsel -- pause

7  for one moment.  We have lost video for the

8  room.

9           (Pause)

10          THE VIDEOGRAPHER:  We are off the

11  record.  The time is 11:31 a.m.

12          (Recess from 11:31 a.m. to 11:40 a.m.

13  Eastern Standard Time)

14          THE VIDEOGRAPHER:  We are back on the

15  record.  The time is 11:40 a.m.

16  BY MR. ESSIG:

17     Q.    We're back.  Sorry about that.

18     A.    No worries.

19     Q.    We were talking about greyout and

20  blackout -- right? -- and at what level of G

21  force that a person might experience that

22  condition, correct?

23     A.    Correct.

24     Q.    And you said that you did have at

25  least one person you are aware of experience

TROY FAABORG

151

1

2     unconsciousness at 2 -- positive 2 G's?

3               Is that right?

4          A.     In the 2 G range, less than 3, more

5     than 2.  I don't know the specific -- I don't

6     remember the specific number, but in that 2 G

7     range.

8          Q.     And you said that you didn't know --

9     you didn't determine based on that experience at

10    what level of positive G's they experienced

11    greyout or blackout, correct?

12         A.     Correct, not specifically.

13         Q.     Before the 2 or 3 positive G's, but

14    particularly you didn't know exactly?

15         A.     Not -- not exactly.

16         Q.     Okay.

17               Did you have any other experience with

18    anybody else having greyout or blackout at a

19    level of G force like 1.69?

20         A.     Not at 1.69 that was specifically

21    discussed.

22               Anecdotally, through training and

23    talking about acceleration forces within the

24    physiology training that we provide, we had

25    quite a few student pilot, experienced aviators,

TROY FAABORG

152

1
2       talking about their experience with G forces --
3       particularly if they were tired, dehydrated, it
4       was their third flight on a day in the summer --
5       talking about how they would experience visual
6       changes, very, very low G because their
7       physiological state was different than normal.
8               And we used that as an example of how
9       those things -- you can't make that prediction
10      just based on how you feel normally, because
11      it's not always normal --
12      Q.      Understood.
13      A.      -- I think the other thing to keep in
14      mind is there is also the effect of the things
15      that happen before that exposure.  I don't
16      reference it here in my report because it's --
17      it's not a significant affect.
18              But there exists what's called a
19      push-pull effect where tolerance to positive G
20      is compromised after an exposure to negative G
21      because the physiological compensatory
22      mechanisms are working to overcome a lower blood
23      pressure or vice versa.  And so what you are
24      exposed to initially can have an effect on how
25      that affects you consequently.

TROY FAABORG

153

```
 1
 2              So again, the context is very
 3      important of repeat exposures, rather than just
 4      teasing out this, you know, 1.69 as being
 5      significant or insignificant.
 6          Q.    And you don't mention push-pull effect
 7      in your report, right?
 8          A.    Not specifically, no.
 9          Q.    In terms of the first part -- that
10      context matters and the individuality matters --
11      you are talking about -- you had the experience
12      with the one student pilot who had
13      unconsciousness at 2 or 3 positive G's; and that
14      you've had other conversations with other
15      student pilots who said they experienced
16      different levels of consciousness, or visual
17      disruption, greyout, blackout, at different
18      levels of G's for themselves, depending on their
19      physical condition of that day -- whether they
20      were hydrated, and so forth.
21              Right?
22          A.    Correct.
23          Q.    Would you agree then at levels of G
24      force like this -- 1.69, 2, 3, you know, the
25      range we are talking about, you and I right
```

TROY FAABORG

154

1
2      now -- that then those individual differences do
3      matter in terms of whether or not somebody has a
4      greyout or a blackout experience?
5           A.   I think the individual differences
6      have an effect.  Just like the -- I believe it's
7      the FAA -- one of the FAA publications that I
8      cite makes the comment that the people's
9      physiology effects differently.
10                It doesn't mean that some people are
11     affected and others aren't.  It's the at what
12     point does it onset, or, you know, things of
13     that nature.
14                So, yes, there are physiological
15     differences that are important to account for.
16          Q.   Okay.
17                And they are more important to account
18     for at these lower levels of G force than when
19     they get higher, when everybody tends to black
20     out at, like, 10 G's, or something like that?
21          A.   In that context, yes, that's correct.
22          Q.   Would you -- do you have any
23     literature that you cite in the report that
24     stands for the proposition that greyout or
25     blackout are experienced at 1.69 G's or 2 G's?

TROY FAABORG

155

1

2          A.     Not directly.

3                 I would have to look at the handbook

4     again to see if they make reference of this idea

5     that, while there is a generally accepted

6     resting G tolerance, the individual factors can

7     certainly make that very, very different --

8     whether that be slightly higher, or

9     significantly lower, as we've already discussed.

10         Q.     Okay.  So let's do that.

11         A.     Sure.

12                MR. ESSIG:  I think the handbook

13    chapter is 315? -- Exhibit 315?

14                THE WITNESS:  That's correct.

15                MR. ESSIG:  And if you turn to page

16    7-12, the bottom section of page 712 is 7.1.9.

17                Do you see that?

18                THE WITNESS:  I do.

19                MR. DURKIN:  Apologize, which section

20    are we in now? -- we are in the 3.15?

21                MR. ESSIG:  315.

22                MR. DURKIN:  Okay --

23                MR. ESSIG:  7-12.

24                MR. DURKIN:  -- 7-12.  Got it.  I'm at

25    7-12, okay.  And now section --

TROY FAABORG

156

1
2                    MR. ESSIG:  7.1.9.
3                    MR. DURKIN:  Got it.  Thank you.
4        BY MR. ESSIG::
5            Q.    It says:  For a -- it's midway through
6        the paragraph there:  For a subject in relaxed
7        condition and unprotected by an anti-G suit,
8        loss of peripheral vision and reduction of
9        visual acuity (grayout) occurs at levels of
10       positive 3 to positive 4 G's.
11                   Correct?
12           A.    Correct.
13           Q.    And there is no -- on the positive G--
14       when they write in this -- in this handbook
15       "positive 3" or "positive 4 G's," that's not 3
16       or 4 G's above 1, right?
17                   That's 3 or 4 G's above zero?
18           A.    This is -- the number on the reading
19       of the gauge.  So 1 G is 1.  Plus 2 is 2.
20                   So 3 to 4 G would be 2 to 3 G above
21       normal.
22           Q.    Okay.
23                   So do you agree with that statement in
24       the handbook -- that loss of peripheral vision
25       and reduction of visual acuity (grayout) occurs

TROY FAABORG

157

```
 1
 2    generally -- as a matter of the literature -- at
 3    levels of 3 to 4 G?
 4         A.    Under the assumption of a healthy
 5    individual with a normal resting blood pressure,
 6    yes, that's accurate.
 7         Q.    Okay.
 8               Do you know whether or not any of the
 9    passengers on Flight ET 302 had normal resting
10    blood pressures?
11         A.    I do not.
12         Q.    Do you know anything about the medical
13    conditions of any people on Flight ET 302?
14         A.    I do not.
15         Q.    It says:  When G forces reach positive
16    3.5 to positive 4.5 Gz, vision is lost and
17    blackout occurs.
18               Do you see that?
19         A.    I do.
20         Q.    And did you agree that's the general
21    consensus in the literature -- that when G
22    forces reach that level, that's when vision is
23    lost and blackout occurs?
24         A.    Again, with the assumption of the --
25    the assumption of normal resting blood pressure,
```

TROY FAABORG

158

1

2      yes, correct.

3           Q.      You would agree that those level of G

4      forces were never reached on Flight ET 302,

5      correct?

6           A.      That's accurate.

7                   (Pause)

8           Q.      Would you say that, based on these G

9      force levels and observed visual effects, that

10     it's unlikely, based on the Air Force handbook,

11     that passengers of ET 302 experienced those

12     effects?

13                  MR. DURKIN:   Objection, incomplete

14     hypothetical, calls for speculation.

15                  THE WITNESS:   I'm sorry.  Can you

16     repeat the --

17     BY MR. ESSIG:

18          Q.      Based on what the --

19                  MR. DURKIN:  Same objection --

20                  MR. ESSIG:  I understand.

21     BY MR. ESSIG:

22          Q.      This U.S. Air force handbook -- this

23     is the handbook you cited in your report?

24          A.      Right.

25          Q.      And it says that:  These visual

TROY FAABORG

159

1

2      effects, greyout and blackout, occurs at 3 and 4

3      G's, or 3-1/2 and 4-1/2 G's.

4              Right?

5      A.      Correct.

6      Q.      And we agreed that those G forces were

7      not reached on ET 302, correct?

8      A.      Correct.

9      Q.      Would you agree then that -- at least

10     according to this handbook -- it's unlikely that

11     passengers on ET 302 suffered from greyout or

12     blackout?

13             MR. DURKIN:   That one I will make an

14     objection to:  Incomplete hypothetical.

15             Go ahead.

16     A.      Not without understanding the medical

17     or physiological condition of the passengers, I

18     would not patently agree.

19             I think -- now I will speculate that

20     with a population that size, the odds are very

21     good that there were people who had visual

22     indicators, visual symptoms, because they don't

23     fall into that normal range that the handbook

24     assumes.

25             Again, the Aerospace and Operational

TROY FAABORG

160

1

2    Physiology Handbook is young, healthy

3    individuals who can pass a medical flying class

4    through a physical, not just, you know, any

5    average person in the population that's in a

6    much wider age range, etc.

7              So it's -- I would not agree with

8    that, as it was stated.

9         Q.    Understood.

10             Do you -- is there a sentence in there

11   or some place in the handbook that it says that

12   all the data only applies to young, healthy

13   individuals?

14        A.    I don't believe so, no.

15        Q.    There is nowhere I can go to check to

16   see in the handbook that the data that they are

17   talking about is limited to that population of

18   people?

19        A.    I don't believe that it is patently

20   explained that way, no.

21        Q.    And you testified that you don't know

22   anything about the medical history or the

23   current medical condition of any particular

24   passenger on ET 302, right?

25        A.    Correct.

TROY FAABORG

161

1
2          MR. ESSIG:  So if we go to page 7 on
3     your report?
4          MR. DURKIN:  Got it.  There.
5          (Pause)
6          MR. ESSIG:  The report is 313.
7     BY MR. ESSIG:
8          Q.    The bottom of page 7 says:  To
9     demonstrate the effect of negative G, consider
10     the physiological implications of hanging
11     upside-down.
12          Do you see that?
13          A.    Yes.
14          Q.    And there when you say "to demonstrate
15     the effect of negative G," if you are hanging
16     upside-down, you are actually experiencing
17     negative G's with a minus sign in front of it,
18     right?
19          A.    Correct --
20          Q.    So this isn't --
21          A.    -- physiologically.
22          Q.    -- right.
23          So the G force that you are
24     experiencing when you are hanging upside-down,
25     or standing on your head, is equivalent to

TROY FAABORG

162

1
2     negative 1 G -- is 1 G below zero?
3          A.     Correct --
4          Q.     Okay --
5          A.     -- again, physiologically, right.
6          Q.     And you write:  Hanging upside-down
7     subjects the body to one force of gravity, or 1
8     Gz, but in the opposite direction, and is
9     therefore the physiological equivalent of
10    negative 1 Gz.
11               Right?
12         A.     Correct.
13         Q.     And you italicize size and bold
14    "negative," right?
15         A.     Correct.
16         Q.     That's because you don't mean -- you
17    actually mean negative -- minus sign -- 1 below
18    zero, right?
19         A.     Correct.
20               MR. ESSIG:  And then, if you turn the
21    page.
22    BY MR. ESSIG:
23         Q.     You say:  If you have ever hung
24    upside-down, you have experienced the discomfort
25     of the headward shift of blood and other fluids

TROY FAABORG

163

1

2      resulting in greater-than-normal pressures in

3      the head and upper extremities and associated

4      discomfort in the eye -- head and eyes.  Again

5      hanging upside-down subjects the body to -1 Gz.

6             Right?

7      A.     Correct.

8      Q.     Is it your testimony that hanging

9      upside-down immediately causes injury to a

10     person?

11            MR. DURKIN:  Objection, incomplete

12     hypothetical, calls for speculation.

13     A.     It depends on the context.

14            If I were to hang upside-down, first,

15     yes, it could cause injury.

16            It also depends on the context.

17            If I was hung upside-down as, for

18     example, you know, torture, I would consider

19     that a harm event, because now again, it's an

20     external force, not a voluntary action -- so

21     adding in a couple layers of my personal

22     definition of harm or injury.

23     Q.     And in your definition -- I mean

24     "torture" is a strong word.

25            But if you were being -- in that

TROY FAABORG

164

1

2      context, anything that the person is being told

3      to do, a person has to do because it is not at

4      their will, and it's unexpected -- that is an

5      injury, according to your definition?

6           A.    To constitute harm.

7                 Let me step that back and take --

8      let's look outside the context of torture.  It

9      is slightly extreme.

10                So if I'm hanging upside-down, because

11     of the fluid shift and the fact that there is

12     now a 1 G force in the opposite direction as

13     normal, I will feel that pressure in my head, in

14     my face, which could certainly meet the criteria

15     of being considered harm if discomfort adds into

16     that because it is a physical -- physiological

17     in this case -- adverse effect because it's

18     discomfort, right?

19                So where that line of what is the

20     difference between discomfort and harm?

21     That's -- that's a fantastic question.

22          Q.    Nobody knows where that line is,

23     right?

24          A.    So I would classify it as harm, based

25     on my definition.

TROY FAABORG

165

1

2          Q.     Okay.

3                 So if my -- back to my son -- if my

4     five-year-old hangs upside-down from the monkey

5     bars -- which he does -- or he stands on his

6     head -- which he also does -- is he injured?

7                 MR. DURKIN:  Objection, incomplete

8     hypothetical, calls for speculation.

9          A.     That depends on the context and his

10    perspective.

11         Q.     Okay.

12         A.     If it -- does it cause discomfort?

13    That could classify as harm.

14                If it's, again, his choice and he

15    expects that outcome, it's like going to a

16    haunted house and being scared, as opposed to

17    being scared by something you don't expect --

18         Q.     Understood.

19         A.     -- same physiological response.

20                I would not classify one as harm.  I

21    would classify the other.  So --

22         Q.     So if he's hanging upside-down, he's

23    experiencing negative 1 G.  Physiologically it

24    is exactly the same as anybody else experiencing

25    negative 1 G, because of the application of the

TROY FAABORG

166

1
2      force, right?
3           A.    Hm-hmm.   Hm-hmm.
4           Q.    The question of whether or not he's
5      harmed, according to you, is whether or not he
6      expected that or didn't?
7           A.    That's part of -- that's part of the
8      determination, based on my definition.
9           Q.    What's the other part?
10          A.    Unexpected, unanticipated; again, the
11     degree of the physical effect; the physiological
12     effect, even pain tolerance.
13               So an individual difference that some
14     people would consider that painful, others would
15     not.
16               So it could meet the definition.
17               It just depends in that case more on
18     the individual.
19          Q.    Got it.
20               Unexpected and unanticipated -- that's
21     essentially the same thing?
22          A.    Yes, yes.  Same thing, different
23     words.
24          Q.    So there is this subjective intent
25     element -- whether you expected it or didn't.

TROY FAABORG

1

2          Then there is an individual element

3     about what it does to your body in terms of your

4     pain.

5          And that's also subjective, right?

6     A.    Right.

7     Q.    And there is an element of the kid's

8     five years old.

9          And if I hung up upside-down and I'm

10    50, I might feel that pretty differently than he

11    would?

12    A.    Correct.

13    Q.    Okay.

14         You would agree, though, that as a

15    general matter, everybody that is subjected to

16    negative 1 Gz hangs upside-down, they are not

17    all injured, right?

18    A.    Again, it depends on the context.

19    It --

20    Q.    Right.

21         I don't mean to cut you off.

22         But, like, I completely accept that

23    there are some portion of those people that are,

24    depending on the context.

25         But of course, because when you say

TROY FAABORG

168

1

2      "depends on the context," it means you can

3      answer my question that:  Yes, there are some

4      people that are subjected to negative 1 Gz that

5      aren't injured?

6          A.     Speaking outside of any context,

7      that's accurate, yes.

8                 So if you hang at negative 1 Gz, there

9      is -- it could be considered non-injurious or

10     non-harmful.  Again, we have to specify context

11     to be able to say one way or the other.

12         Q.     Got it.

13                There is approximately 405 total

14     seconds in Flight ET 302.

15                Did you do an analysis to determine

16     how long passengers were subjected to G forces

17     less than negative 1 Gz?

18         A.     The total time?

19         Q.     The total time?

20         A.     I didn't add up the total time, no.

21         Q.     Okay.

22                MR. ESSIG:  If we look at page 16 of

23     Exhibit 313 -- and I guess we could mark that.

24                (Pause)

25                MR. ESSIG:  We are going to mark tab

TROY FAABORG

169

1

2    35 as Exhibit 317.

3            (Exhibit 317, Single-page document

4    entitled: ET 302: Vertical Acceleration (Gz):

5    Final 21 Seconds of DFDR Recording, bearing a

6    graph (no Bates Nos.), marked for

7    identification)

8            THE WITNESS:  And what page number

9    again, please?

10           MR. ESSIG:  Sixteen.

11           MR. DURKIN:  And we are just taking

12   the same thing, a new page, right?  Okay, thank

13   you.

14           (Pause)

15           MR. ESSIG:  I directed you to page 16

16   of your report, which is Exhibit --

17           THE WITNESS:  Yeah --

18           MR. ESSIG:  -- there is a chart you

19   made at the bottom of that page that I just put

20   on one page so we could see it.

21           Looks like a -- and this is Exhibit

22   317, right?

23   BY MR. ESSIG:

24       Q.   And so to see my -- if I was trying to

25   calculate the amount of time that the passengers

TROY FAABORG

170

1
2       on ET 302 were subjected to G forces less than
3       negative 1 Gz, I would looks at the time scale
4       on the bottom and I would, kind of, go across
5       that line at negative 1 and try to determine how
6       many seconds that was, right?
7                   That's how I would do the analysis? --
8       roughly?
9           A.      Yes.  Yes.
10          Q.      And it looks like the line of the G
11      forces crosses the line of negative 1 Gz at
12      about 08:43:41 to me.
13          A.      That's -- that's about right.
14          Q.      Okay.
15                  MR. LEBOVITZ:  Could he just be clear?
16                  Chris, just for the record, you are
17      taking the exhibit, I think, a little bit out of
18      context.
19                  Because the way this exhibit had been
20      put together is in negative G environment below
21      1.0 G's, which he has already testified to -- is
22      that anything below 1.0 is a negative G.  So are
23      you --
24                  MR. ESSIG:  I'm asking --
25                  MR. LEBOVITZ:  -- are you just

TROY FAABORG

171

1
2    narrowing the --
3              MR. DURKIN:  -- that's all we are
4    looking for --
5              MR. ESSIG:  No, that's fine.  And
6    we'll talk about that later.  But all I'm asking
7    him specifically -- because we have had a long
8    conversation about hanging up upside-down, and
9    that's negative 1 G, which means -- we have all
10   agreed -- negative 1 means below zero --
11   negative 1 -- I'm just drawing a line where that
12   G force plot crosses that line.
13             And I asked him to look.
14   BY MR. ESSIG:
15        Q.   And to me, it looks roughly around
16   08:43:41, right?
17             MR. LEBOVITZ:  Got it.  Just so it's
18   clear, anything below 1.0 is a negative G
19   environment.  That's all -- which is what his
20   chart says.
21             MR. ESSIG:  I under -- yeah, I'm not
22   asking him that --
23             MR. LEBOVITZ:  Okay.
24             MR. ESSIG:  -- I understand what his
25   chart says --

TROY FAABORG

172

 1
 2              MR. DURKIN:  Okay --
 3              MR. ESSIG:  -- but --
 4              MR. DURKIN:  -- got it.
 5              MR. ESSIG:  -- that's the confusing
 6     part, because I'm actually asking about a number
 7     with a negative sign -- minus 1.
 8     BY MR. ESSIG::
 9         Q.    Would you agree that's the time point
10     it crosses that line?
11         A.    I would agree with that, yes.
12         Q.    And then the last time point on your
13     chart is 98:43:44.
14              Do you see that?
15         A.    Correct.
16         Q.    So at least on this chart, it looks
17     like roughly three seconds --
18         A.    Of --
19         Q.    -- of time below negative 1 G.
20         A.    -- of recorded time --
21         Q.    Yes.
22         A.    -- yes.
23         Q.    On that chart.  I'm only --
24         A.    Right.  Right.  I agree with that
25     related to this chart.

TROY FAABORG

173

```
1
2        Q.     Okay.
3               (Pause)
4               MR. ESSIG:  So if we go back to 313,
5        which is your report, we are talking about the
6        paragraph on the top of page 8.
7               (Pause)
8               MR. ESSIG:  So it says -- that was the
9        paragraph started:  If you ever hung
10       upside-down.
11              We were talking about that.
12              THE WITNESS:  Right.
13  BY MR. ESSIG:
14       Q.     Beyond the -- and I don't know how to
15       pronounce it -- Moisseiev --
16       A.     That works.
17       Q.     -- we'll say that -- Moisseiev paper,
18       from 2013, do you cite any other literature on
19       the effects of negative 1 Gz and whether it
20       causes injury?
21       A.     No --
22       Q.     Okay --
23       A.     -- excuse me, other than -- other than
24       some of the effects -- the physiological and
25       physical effects that I list later in the report
```

TROY FAABORG

1
2    are noted within the handbook, for example, as

3    potential physical and physiological effects

4    negative G, which I think meet the definition

5    that we have said of "harm" or "injury," as I

6    use it.

7         Q.    Got it.

8              So the handbook -- the U.S. Air Force

9    handbook -- and the Moisseiev paper -- those are

10   the two sources of literature you cite? --

11        A.    I --

12        Q.    -- on this issue?

13             MR. DURKIN:  I mean, you were going

14   too fast for me -- I apologize.  I didn't even

15   understand the question.  Can you read it again?

16   It was really too fast --

17   BY MR. ESSIG::

18        Q.    Did you understand?

19             MR. DURKIN:  I'm not -- I need to

20   understand it, too, so I can make an objection.

21   It was really fast.  If you can repeat the

22   question --

23   BY MR. ESSIG:

24        Q.    The only cite you have in this

25   paragraph for the effect of negative 1 Gz on the

TROY FAABORG

1

2      body is the Moisseiev paper, correct?

3              MR. DURKIN:  Are we pointing at

4      paragraph -- what paragraph?  I just want --

5      Chris, you are -- and I apologize.  You are just

6      ripping too fast for me.  And I got to keep my

7      mind so I can make a proper objection --

8              MR. ESSIG:  We haven't --

9              MR. DURKIN:  -- on behalf of my

10     clients.  I really need to do that.  I'm just

11     trying to get you to -- you are really talking

12     fast.  And that's okay, but as long as you give

13     me time to make sure I understand.

14             MR. ESSIG:  I'm going let go and let

15     you, but there is going to be a point where it

16     just -- it adds up, like --

17             MR. DURKIN:  If I can't --

18             MR. ESSIG:  -- you can't --

19             MR. DURKIN:  -- understand your

20     question because you are talking too fast --

21             MR. ESSIG:  -- you can understand my

22     question --

23             MR. DURKIN:  -- but I have to make an

24     objection on behalf of all the people that died

25     in this crash, okay?  So I have a right to

TROY FAABORG

176

1
2      understand.  And if you are talking too fast,
3      and pointing to something, and doing something,
4      I need to focus, too, okay?  That's all.  I just
5      need to make objections on behalf of my clients.
6      I'm not trying to hassle you at all.  I promise
7      I'm not.
8              Go ahead.
9  BY MR. ESSIG:
10     Q.    On the top paragraph of page 8, where
11     you talk about the effects of the force of
12     gravity equal to negative 1 G -- it is negative
13     1 G, not the table, the text -- you cite one
14     paper, correct?
15     A.    Correct.
16     Q.    The Moisseiev paper?
17     A.    Correct.
18     Q.    Your testimony is that that paper,
19     along with the U.S. Air Force handbook that we
20     have been talking about, are the two sources of
21     literature that you cite for the effects of
22     negative 1 G or negative G's on human bodies.
23             Correct?
24     A.    I believe the two FAA papers also
25     discuss the effects to a lesser degree.

TROY FAABORG

177

1
2                    The handbook is a more hands-on,
3     operational application.
4                    And the Moisseiev example I thought an
5     interesting clinical example related to injury
6     due to negative G.
7                    So that's the clinical example that I
8     cite.
9                    The handbook, and I believe the two
10    FAA papers to a lesser extent, also discuss the
11    effects.
12         Q.    Okay.
13                    In the paragraph that we are talking
14    about, it says -- middle of the paragraph:
15    Under negative G conditions, ophthalmologists
16    note that ocular discomfort occurs almost
17    immediately.
18                    You see that?
19         A.    Yes.
20         Q.    Is that immediate discomfort, in your
21    mind, an injury?
22                    MR. DURKIN:  Objection, form of the
23    question, speculation.
24         A.    Following my definition, I would
25    consider that injury if we are talking about

TROY FAABORG

178

1

2     discomfort -- again, contextual, if it is -- if

3     it is externally driven, particularly, or not

4     expected.

5              I would consider that to be

6     unexpected, and therefore in the "harm" or

7     "injury" definition.

8         Q.    Understood.

9              Then you say with -- in the next

10    sentence -- the next portion of that sentence:

11    With subconjunctival hemorrhages occurring at

12    negative 2 to 3 Gz -- and there, you mean

13    negative 2 to 3 Gz being 2 to 3 with a minus

14    sign in front of them -- 2 or 3 G's below zero.

15              Is that correct?

16        A.    I believe that that's used in the

17    Moisseiev article as negative 2 as an integer,

18    right.

19        Q.    So we are not talking about negative 1

20    G's in an absolute manner.

21              We are talking about negative 2 to

22    negative 3 G's? -- I believe?

23        A.    And this is a difficulty interpreting

24    that work because they don't specify in the

25    manner that I do to make it very clear:  This

TROY FAABORG

179

1
2    means this much less than normal.
3          So I believe that their intent -- I'm
4    speculating, because it doesn't say otherwise in
5    the article -- that they are talking about
6    negative 2 to negative 3 as an integer.
7    Q.    In the article, do you remember if
8    they said how long a person needs to be
9    subjected to negative 2 to negative 3 Gz to
10   suffer a subconjunctival hemorrhage?
11   A.    I don't remember them specifying a
12   duration.
13   Q.    But the paper that you are citing says
14   that it happens at negative 2 to negative 3 Gz,
15   right?
16   A.    Yes.
17   Q.    And then you say:  In the final
18   seconds of the flight of ET 302, the passengers
19   and the aircraft sustained forces equivalent to
20   negative 3 Gz.
21          See that?
22   A.    Yes.
23   Q.    When you say "negative 3 Gz" there,
24   what do you mean?
25   A.    That is less -- three less than

TROY FAABORG

1
2    normal.
3          Q.    Three less than 1.
4          A.    Three less than 1, correct -- so
5    1.9 -- negative 1.9-something.
6          Q.    Okay.
7                So if we were converting it to the --
8    what we think the Moisseiev paper was talking
9    about, it might be negative 2 G's, with a
10   negative sign in front of it?
11         A.    That's a fair comparison, yes.
12         Q.    Do you know how long that the
13   passengers on Flight ET 302 were subjected to G
14   forces of negative 2 G's or more?
15         A.    As --
16         Q.    -- in terms of duration?
17         A.    -- which -- negative 2 G in which
18   terms?
19         Q.    Negative -- this is the hard part.
20   And this is why you can see I was asking,
21   because I don't understand --
22               MR. DURKIN:   Integers or Moisseiev? --
23               (Pause)
24   BY MR. ESSIG:
25         Q.    So in terms of -- if we are looking at

TROY FAABORG

1
2      the Moisseiev paper --
3          A.      Hm-hmm.
4          Q.      -- and we are saying that that is the
5      literature that you cited in your report as the
6      line of demarcation for subconjunctival
7      hemorrhages; and that the lower end of that
8      bound is negative 2 G's; and they are using that
9      negative 2 G's in terms of an integer.
10             If we go and then apply exhibit 317 --
11     317 is your blown-up chart --
12         A.      Hm-hmm --
13         Q.      -- 317 shows the final 21 seconds of
14     the flight, correct?
15         A.      Correct.
16         Q.      And there is two places in the flight
17     where the forces on the airplane got below zero,
18     right?
19         A.      Yes, two sustained instances, correct.
20         Q.      Yeah -- I don't mean two single points
21     but two periods of time.
22             And if we look on this chart that you
23     did, you have negative 2.0 on the Y axis.
24             And you put a negative sign in front
25     of it, so that's the integer, right?

TROY FAABORG

182

1

2          A.     Correct, yes.

3          Q.     So we are talking about the same

4     number that the Moisseiev paper is talking

5     about.  That's where that --

6          A.     Correct --

7          Q.     -- which range would begin.

8                 Do you know how much time the

9     passengers on Flight ET 302 were subjected to

10    forces of negative 2 G's as an absolute

11    number -- an integer -- or more?

12         A.     There was not any time in the digital

13    flight data recorder data that indicated that.

14         Q.     Okay.

15                MR. ESSIG:  So if we turn to page 8

16    guess we are still on page 8.  Sorry.

17                (Pause)

18                MR. ESSIG:  Next paragraph here, third

19    sentence.  Trying to be precise.  It starts:  As

20    a matter of fact.

21    BY MR. ESSIG:

22         Q.     Do you see that?

23         A.     I do.

24         Q.     It says:  As a matter of fact,

25    negative G exposure is see rare that the FAA

TROY FAABORG

183

1

2      does not even address the effects of negative G

3      in their Introduction to Aviation Physiology.

4              Do you see that?

5      A.    Yes.

6      Q.    When you use the word "negative G" in

7      that sentence, are you talking about negative

8      G's as an absolute number -- an integer -- G's

9      below zero?

10             Or are you talking about G's below 1?

11     A.    I use that term below 1.

12             I believe that's -- that's the intent,

13     speaking as a physiologist.

14             And as a physiologist wrote that FAA

15     citation, I believe the intent is anything below

16     1.

17     Q.    Can you point to me anything in those

18     FAA documents that says that's where the line

19     starts?

20     A.    No.

21     Q.    Do you think that it's possible that

22     even somebody in your field of aerospace

23     physiology might read that and think:  Negative

24     G's is below zero --

25             MR. DURKIN:  Objection, form.

TROY FAABORG

184

1

2    BY MR. ESSIG:

3         Q.    -- is what they mean?

4              MR. DURKIN:  -- objection, calls for

5    speculation --

6              MR. ESSIG:  Yeah, I'm --

7              MR. DURKIN:  -- form of the question.

8         A.    I think -- I think it doesn't matter

9    too significantly because the effect -- whether

10   we are talking about less than 1 or less than

11   zero -- is still -- it's the continuum of the

12   physiological effect.  And so anything is

13   possible, I suppose.

14             That is my interpretation, though.

15        Q.    So the next sentence says:  Similarly,

16   the USAF Handbook of Aerospace and Operational

17   Physiology -- that's the one we were looking at,

18   right? --

19        A.    Hm-hmm.

20        Q.    -- devotes many pages to understanding

21   the nature of positive Gz and how to counter the

22   physiological effects.

23             Right?

24        A.    Right.

25        Q.    Is it possible to counter the

TROY FAABORG

185

1
2    physiological effects of G's between zero and 1?
3            Like a 0.5 G?
4        A.    There are physiological mechanisms
5    that will drive to compensate for that change.
6            There is not anything that you can
7    deliberately do to overcome that affect.
8        Q.    So, like, AGSM, or that kind of
9    thing -- you can't do to overcome the effect of
10   0.5 G's?
11       A.    That's correct.
12       Q.    Okay.
13            And it says:  There is less than one
14   page on the effects of negative G exposure
15   because it's so rare, even in high-performance
16   military fighter aircraft operations.
17            Do you see that?
18       A.    Yes.
19       Q.    And you are saying, in that context,
20   there is less than one page of the effects of
21   negative Gz exposure because it is so rare.
22            Your terminology, negative Gz is G
23   forces below 1, right?
24       A.    That is my terminology simply making
25   the differentiation at 1.

TROY FAABORG

186

1

2              We talked either positive or negative.

3              There is that 1 G, like we talked

4       about previously, that's relative.

5              I think when you are talking about the

6       physiological response, that's somewhat

7       inconsequential.

8              I think this -- when they are talking

9       about -- and when I talked about the amount of

10      time that's devoted towards negative versus

11      positive, that relative 1 G really is not of

12      significance.

13             We are talking it's either positive or

14      its negative.

15             How we classify that 1, there is room

16      for -- I think -- misinterpretation, as we've

17      highlighted quite a bit this morning.

18      Q.    I am not trying to -- but it is -- you

19      can see what -- just because, lots of times the

20      same term is used -- "negative G" -- but --

21      A.    Right.

22      Q.    -- it means different things in

23      different contexts.

24             So I'm not trying to be argumentative

25      or get in a debate on, like, a tiny issue.

TROY FAABORG

187

1
2          But I'm trying to understand what you
3      mean in particular paragraphs.
4          Is it your opinion as an aerospace
5      physiologist and a person with a long career in
6      the Air Force that it is exceedingly rare, even
7      in high-performance military fighter aircraft
8      operations, for pilots or crew members to be
9      subject to forces between 1 G and zero-G's?
10         A.    Between 1 G and zero-G is --
11         Q.    This interim part we are having this
12     debate about of --
13         A.    Right --
14         Q.    -- I don't know if it's negative or
15     not.
16         A.    -- I think my answer is the same as
17     the similar question related to commercial
18     aviation.
19         Whether it's a high-performance
20     aircraft or not, there is going to be some
21     exposure to forces slightly less than 1.
22         In larger aircraft platforms that are
23     more similar to commercial airline, I think,
24     again, those ranges that we talked about before
25     would -- 0.6, 0.7 -- zero is very uncommon for a

TROY FAABORG

188

1
2      large cargo aircraft.
3              So again context -- it depends.
4              Yes, exposure between zero and 1, or
5      between 0.6 and 1, or 0.7 and 1, is common.
6          Q.    Okay.
7              MR. ESSIG:  And then you have an
8      italicized, sort of, block quote from the USAF
9      handbook there at the bottom of page 8.
10     BY MR. ESSIG:
11         Q.    Do you see that?
12         A.    Yes.
13         Q.    It says:  No satisfactory methods have
14     been devised for overcoming or reducing the
15     effects of negative Gz's.
16              Right?
17         A.    Correct.
18         Q.    The limit of human tolerance remains
19     in the range of negative 2.5 to negative 3 Gz
20     for seven to 10 seconds.
21              Do you see that?
22         A.    Yes.
23         Q.    And you are quoting Exhibit -- 315,
24     which is the USAF handbook?
25         A.    Correct.

TROY FAABORG

189

1

2              MR. ESSIG:  So if we look at 7-22 in

3      the handbook -- are you with me? --

4              THE WITNESS:  Yes.

5              MR. ESSIG:  -- that section of the

6      chapter is 7.1.13.  -Gz Effects.

7              Right?

8              THE WITNESS:  Hm-hmm.

9  BY MR. ESSIG:

10      Q.    And the first sentence says:  When you

11      stand on your head a force of negative 1 G is

12      experienced, and it becomes uncomfortable after

13      several seconds.

14              Right?

15      A.    Correct.

16      Q.    They are -- the handbook is saying

17      negative 1 Gz.

18              It means 1 G below zero, right?

19      A.    Correct.

20      Q.    And then it says:  During negative Gz,

21      the blood is forced towards the head, causing

22      congestion and swelling of tissues above the

23      level of the heart.

24              Right?

25      A.    Correct.

TROY FAABORG

190

1

2      Q.     Does that effect on the body only

3  happen at negative Gz below zero?

4      A.     The blood being forced toward the head

5  increases slightly at anything less than 1.

6             So we need to understand some of the

7  basic flight physiology of:  Under 1 G, we have

8  this column of fluid that is our body.  And the

9  body has to work to compensate gravity pulling

10  that fluid down to maintain blood pressure to

11  the eyes and to the brain.

12             At anything less than 1 G, that same

13  physiological mechanism now produces more than

14  what is necessary -- excessive pressure.

15             And so that process begins at anything

16  less than 1; and is then exacerbated by the

17  physics of that greater 1 G force negatively,

18  actively pulling that fluid, not just the

19  physiological mechanisms pushing that fluid to

20  the brain or to the eyes.

21      Q.     Okay.

22             So gravity is still pulling the blood

23  down at G forces between zero and 1, though,

24  right?

25      A.     It is still pull the blood down, not

TROY FAABORG

1

2      to the same degree, of course.

3          Q.    Okay.

4              It only pulls in the opposite

5      direction if G force is less than zero -- right?

6      -- up?

7              It only would pull the blood up at G

8      forces less than zero?

9          A.    Correct --

10         Q.    Okay.

11         A.    -- correct.

12             MR. ESSIG:  So if you look at the last

13     part of -- well, let me finish that part.

14   BY MR. ESSIG:

15         Q.    Forces of negative 2 to negative 3 Gz

16     cause extreme congestion the deficiency in the

17     tissues of the head and neck and produce the

18     sensation that the eyes are bulging.

19             Do you see that?

20         A.    Yes.

21         Q.    When they say "negative 2 to negative

22     3 Gz," are they talking about the -- I guess we

23     have been calling it the interval?

24         A.    The integer.

25         Q.    Integer.

TROY FAABORG

192

1
2          Sorry.
3     A.     I would interpret that as the integer
4     negative 2, negative 3.
5     Q.     Okay.
6          So not negative 1 to negative 2?
7     A.     Correct.
8     Q.     Yeah.
9          And then:  The threshold limit of Gz
10    in the range of negative 2.5 to negative 3 G for
11    seven to 10 seconds, correct?
12    A.     As written, yes.
13    Q.     And that is talking about negative 2.5
14    to negative 3 as an integer?
15    A.     That's my interpretation.
16    Q.     Okay.
17         MR. ESSIG:  And then there is a
18    sentence here if we look at the -- at the -- the
19    excerpt in your report, there is an extra
20    sentence here that says -- after the threshold
21    sentence.
22         Maybe we do it this way.
23         If we look at the -- if we look at the
24    chapter that we have printed out --
25         MR. DURKIN:  Are we back at the report

TROY FAABORG

1

2    now?

3              MR. ESSIG:  I'm getting

4    confused myself.  What's the number?  315.

5    Okay, so we are in 315.

6              (Pause)

7              MR. ESSIG:  Chapter 7.

8              We talked about the census of the

9    threshold limit of negative Gz in the range

10   of -- oh, okay.

11             Where am I?  Oh.

12             Okay.  I got it now.  All right.  I've

13   even been confusing myself.

14   BY MR. ESSIG:

15       Q.    So if we look at the italicized

16   paragraph in your report, it starts:  No

17   satisfactory methods have been devised.

18             Do you see that?

19       A.    Yes.

20             MR. ESSIG:  If we go on 7-22, we see

21   that paragraph is at the very bottom of 7-22.

22   BY MR. ESSIG:

23       Q.    It says:  No satisfactory methods have

24   been devised for overcoming or reducing the

25   effects of negative Gz.

TROY FAABORG

194

1

2               Right?

3       A.      Hm-hmm.

4       Q.      And then we have the same --

5   essentially the same conversation.  That's why I

6   got all confused.

7               It says:  The limit of the tolerance

8   remains in the range of negative 2.5 to negative

9   3 Gz for seven to 10 seconds.

10              Right?

11      A.      Correct.

12      Q.      And we are talking about negative 2.5

13  to negative 3 as an integer, right?

14      A.      Correct.

15      Q.      Okay.

16              And then, it says:  Normally, the

17  endpoint for the tolerance is the onset of a

18  severe headache.

19              Do you see that?

20      A.      Yes.

21      Q.      And recovery follows within 24 hours

22  of exposure.

23              Do you see that?

24      A.      Yes.

25      Q.      You don't cite that second sentence --

TROY FAABORG

195

1

2      that next sentence that I just read in your

3      report, correct?

4            A.      Correct.

5                  (Pause)

6            Q.      So the sentence here in the USAF

7      handbook that is talking about the limit of

8      human tolerance is referring to when -- means --

9      is when that limit is reached, the subject has

10     got a headache, and that it cleared up or

11     resolved after 24 hours, right?

12           A.      I'm not sure if that's what -- if

13     that's how they define the limit of tolerance.

14     I don't know if that's the author's intent --

15     that those two are tied together.  I don't know.

16           Q.      It looks -- I mean, reading the words,

17     it says:  Normally the endpoint for tolerance is

18     the onset of severe headache.

19                  Right?

20           A.      Right.

21           Q.      So they are saying -- and when they

22     say "the limit of human tolerance is negative

23     2.5 to negative 3 Gz" is terms of an integer,

24     that's the magnitude of the force, for seven to

25     10 seconds, they are saying that -- the way they

TROY FAABORG

196

1
2    are defining "tolerance" -- the endpoint of
3    that -- is onset of severe headache, right?
4         A.    Yes, yes --
5         Q.    So the USAF handbook is saying:  A
6    person that's subjected to negative 2.5 to
7    negative 3 Gz -- and that's an integer -- for
8    seven to 10 seconds could receive a severe
9    headache, right?
10        A.    Yes.
11        Q.    And then they are saying:  And a
12   recovery follows within a 24 hours of exposure.
13            Right?
14        A.    That's what it says, yes.
15        Q.    So do you agree that it's -- when they
16   are talking about recovery, they must be talking
17   about the onset of a severe headache right?
18        A.    I believe that's appropriate.
19        Q.    Okay.
20            And again, based on the Exhibit 317
21   and the flight data that you looked at, there
22   were never G forces on Flight ET 302 that
23   reached negative 2.5 to negative 3 Gz, as a
24   matter of an integer, right?
25        A.    As discussed previously, that's

TROY FAABORG

197

1
2    correct.
3        Q.    And they never reached those forces
4    for seven to 10 seconds, right?
5        A.    That's correct.
6              (Pause)
7              MR. ESSIG:  So if we flip to page 9.
8              MR. DURKIN:  We are back to the
9    report?
10              MR. ESSIG:  Back to the report.
11              MR. DURKIN:  Okay.
12              MR. ESSIG:  Sorry about that.
13              Exhibit 313 -- I'm never going to
14    remember that -- 313 is your report.  We are
15    back to the report, page 9.
16              Are you with me?
17              THE WITNESS:  Yes.
18    BY MR. ESSIG:
19        Q.    If you look at the second paragraph
20    there, it says:  Excessive horizontal
21    acceleration and deceleration forces (Gx and Gy)
22    are extremely rare in aviation.
23              Correct?
24        A.    Correct.
25        Q.    What is an excessive horizontal

TROY FAABORG

198

1

2          acceleration or deceleration force?

3               A.     It's extremely subjective.

4                      The point there -- again, speaking

5          from a physiological perspective -- forward and

6          backward and side-to-side forces are not

7          remarkably common.  That's not the way an

8          aircraft flies for a fixed-wing aircraft.

9                      And so "excessive" -- I'm not sure if

10         I borrowed that word from a reference or if

11         that's just my descriptor.  I don't have a

12         specific value in mind for the word "excessive."

13              Q.     If you look at the second sentence

14         there, it says:  In the case of ET 302, lateral

15         acceleration (side-to-side Gy) reached 0.1 G, as

16         recorded by the digital -- flight digital

17         recorder (baseline is zero side-to-side

18         force) --

19              A.     Right --

20              Q.     -- do you see that?

21              A.     -- yes.

22              Q.     I'm going to pause right there.  I'll

23         come back to the sentence.

24                     But for -- taking that first part --

25         lateral acceleration reaching 0.1 G -- would you

TROY FAABORG

199

1
2      term that an excessive force?
3          A.    No.
4          Q.    Would you say that that level of
5      force -- a tenth of a G more than zero -- caused
6      injury to any passenger on the flight?
7          A.    It is, in my opinion, not likely that
8      a 0.1 G lateral acceleration would cause injury.
9          Q.    Okay.
10               And then the same for the transverse
11     forces.
12               It says:  (forward and backward, Gx_
13     reached 0.38 Gx (forward acceleration, pushed
14     back into the seat) and negative 0.22 Gx
15     (forward deceleration, pulled away from the back
16     of the seat), both of which were reported
17     largely in the final seconds of the flight.
18               Do you see that?
19         A.    Yes.
20         Q.    Would you say those transverse
21     forces -- forward and backward Gx -- were
22     excessive?
23               MR. DURKIN:  Objection, calls for
24     speculation, incomplete hypothetical.
25         A.    I don't consider those excessive for a

TROY FAABORG

200

1

2    routine flight, no.

3        Q.    So in and of themselves, no injury

4    caused by those particular forces of the flight?

5        A.    By those forces alone and out of

6    context of any other forces?  Likely not.

7        Q.    So that your opinion is that the

8    injuries that were caused on ET 302 were caused

9    by the Gz forces the vertical accelerations and

10   decelerations experienced by the passengers,

11   correct?

12       A.    Primarily, yes, with the asterisk of

13   noting the last sentence of the paragraph we

14   were just talking about:  Both of which were

15   largely recorded in the final seconds of the

16   flight.

17           There is not a time where we can look

18   just specifically at one without considering the

19   effects of the others, because you have the

20   multiple planes of motion.

21           So if these were the only forces being

22   experienced, it's not likely an injury would

23   result.

24           But the fact of the matter is that

25   these occurred in the midst of everything else

TROY FAABORG

201

1
2      that was happening.  And so to say they didn't
3      contribute, I think would not be appropriate.
4           Q.    Did you do any analysis to calculate
5      the contribution of these transverse forces on a
6      passenger in the final seconds of the flight?
7           A.    I did not, no.
8           Q.    So you can't quantify one you way or
9      another how much they contributed or didn't
10     contribute to their injury?
11          A.    I cannot quantify that, no.
12               (Pause)
13               MR. ESSIG:  If you go further down on
14     page 9 here, this is the:  FAA Turbulence
15     Reporting Criteria with Aircraft Reactions.
16     BY MR. ESSIG:
17          Q.    Do you see that?
18          A.    Yes.
19          Q.    Where did you get that FAA turbulence
20     reporting criteria from?
21          A.    From, I believe, one of the cited FAA
22     references, if I'm not mistaken.
23          Q.    Okay.
24               Above that paragraph -- or above that
25     chart -- I guess it's really the sentence above

TROY FAABORG

202

```
 1
 2    it in the preceding paragraph -- you say:  Since
 3    nearly all who have flown as passengers on a
 4    commercial airplane have experienced turbulence.
 5         Do you see that?
 6    A.    Yes.
 7    Q.    When you are talking about everybody
 8    that's flown, you are talking about billions of
 9    people, right?
10    A.    Yes.
11    Q.    So nearly all -- all people who have
12    flown, that's -- we are talking about that kind
13    of a number, right?
14    A.    I think that's safe to assume.
15    Q.    Is it your opinion that everybody who
16    has experienced turbulence and Gz forces beyond
17    the normal range on a commercial airliner were
18    injured?
19         MR. DURKIN:  Objection, calls for
20    speculation, argumentative, incomplete
21    hypothetical.
22    A.    It depends on the context --
23    Q.    Got it.
24    A.    -- as, I think, we have defined
25    previously.
```

TROY FAABORG

203

1

2          Q.     Yeah.

3                 If you look at the table -- you are

4     saying you got from the FAA document -- it has

5     three columns on it, right?

6          A.     It does.

7          Q.     One -- on the left-hand side

8     "Intensity," and "Aircraft Reaction," then

9     "Reaction Inside the Aircraft."

10                Do you see that?

11         A.     Yes.

12         Q.     For intensity, there are rows:  Light,

13    Moderate, Severe, and Extreme.

14                Do you see that?

15         A.     Yes.

16         Q.     Do you know if there is a level of Gz

17    vertical acceleration forces that could be

18    ascribed to those categories of intensity?

19         A.     I do not know that there is a specific

20    Gz that's assigned to those.

21         Q.     Do you have any opinion in your -- as

22    an expert about the level of G forces that would

23    being ascribed to light, moderate, severe,

24    extreme turbulence?

25         A.     I don't.

TROY FAABORG

204

1

2                And my interpretation for this chart

3     is that it's less about the specific force and

4     it's more about the resultant effect, which is

5     captured in the aircraft reaction and the

6     passenger reaction.

7                And so not being a pilot, or a

8     commercial pilot, I'm not sure specifically how

9     those are assigned in turbulence-related events.

10               But I don't believe -- since I've not

11    seen in the literature -- a specific G load --

12    that that's what's used to assign any of those

13    intensities.

14    Q.    Understood.

15               You wrote:  Since nearly all who have

16    flown on a commercial airline have experienced

17    turbulence.

18               Do you know what level of intensity

19    nearly everybody has experienced who has flown

20    on a commercial airline?

21    A.    My intent was not to classify, but

22    just to broadly use the term "turbulence" as

23    something people can relate to as a

24    frequently-occurring yet unexpected action or

25    activity.

TROY FAABORG

205

1

2          Q.    Understood.

3                So in that -- in that vein, trying to

4     understand, I guess we are trying to orient, you

5     know, regular people as to what is the, kind of,

6     level of turbulence that would be frequently

7     occurring but unexpected.

8                Would that be -- where on the

9     intensity spectrum would that fall?

10               Is that light, moderate turbulence?

11               Is that your opinion?

12         A.    It is my opinion that it is -- and

13    based on the FAA literature, I believe it's

14    within this same literature talking about severe

15    and extreme turbulence are extremely rare -- so

16    light and moderate being what normally we would

17    be talking about.

18         Q.    Okay.

19               And you don't know -- but you don't

20    know the Gz -- the level of Gz forces for light

21    and moderate turbulence and when it would become

22    severe?

23         A.    I have not seen anything published

24    that aligns those to Gz, no.

25         Q.    And again, I guess I have to ask it:

TROY FAABORG

206

1

2     Is it your opinion that everybody that

3     experiences light and moderate turbulence is

4     necessarily injured?

5               MR. DURKIN:   Objection, asked and

6     answered, incomplete hypothetical, calls for

7     speculation.

8     A.     Can you -- "necessarily" throws me off

9     on this one.  Can you rephrase that?

10    Q.     Yeah.

11             And the reason I'm asking it that way

12    is because when we get later to your report, you

13    say -- you can make -- you reach the conclusion

14    that everybody is injured based on the objective

15    forces that are applied to the airplane, right?

16             So if the forces that are applied to

17    the airplane are the same, then everybody on the

18    plane experiences an injury, right?

19    A.     With the difference in that case being

20    the context of the forces.

21             So I think back to our definition, it

22    depends.  So not necessarily, but it certainly

23    is possible --

24    Q.     Okay.

25    A.     -- depending on the circumstance.

TROY FAABORG

207

1

2       Q.     So we can agree, though, that when we

3    are talking about turbulence -- even light and

4    moderate turbulence -- that can be unexpected,

5    right?

6       A.     Correct.

7       Q.     And not -- it depends -- not everybody

8    would be injured by light and moderate

9    turbulence, but they might be, depending on

10   context.

11             Is that correct?

12      A.     I will agree with that, yes.

13      Q.     How would you determine who was

14   injured if somebody -- if an airplane went

15   through light and moderate turbulence?

16             How would you set about determining if

17   somebody was injured or not?

18             MR. DURKIN:  Objection, calls for

19   speculation.

20      A.     That's outside of the scope of the

21   analysis that I provided, and outside the scope

22   of my report, so I really don't have a good

23   answer for that.

24      Q.     Okay.

25             (Pause)

TROY FAABORG

208

1

2          Q.     When you say in the sentence

3    underneath the FAA turbulence reporting

4    criteria -- you say:  While the horizontal

5    forces experienced during the flight of ET 302

6    would certainly have jostled the passengers and

7    crew similar to moderate to severe turbulence,

8    they were relatively insignificant compared to

9    the vertical G forces experienced during the

10   flight.

11          Do you see that?

12          A.     Yes.

13          Q.     We talked about that -- the relation

14   of the horizontal forces to the vertical forces.

15          How do you know the horizontal forces

16   experienced during the flight were similar to

17   moderate to severe turbulence?

18          A.     Based on the descriptions of the

19   aircraft reaction and the reaction inside the

20   aircraft, looking at the flight data recorder

21   information within the analysis, that is what I

22   interpreted that level to be -- greater than

23   moderate; and so in the severe, at the end to

24   extreme, based on the aircraft reaction

25   definition.

TROY FAABORG

209

1

2                    That's how I came up with that.

3      Q.    So then you characterized the vertical

4   G force fluctuations as extreme.

5                    Do you mean extreme like it's used in

6   the reporting criteria?

7      A.    No.

8      Q.    That's just your term -- "extreme"?

9      A.    It is my term "extreme."

10                   And the reporting criteria -- those

11  are measured and deliberate words with specific

12  definitions.

13                   And my word is not intended to align

14  with the FAA word.

15                   MR. ESSIG:  Want to take a quick

16  break?

17                   (Pause)

18                   MR. CLIFFORD:  How much time do you

19  have?

20                   MR. ESSIG:  On the whole thing?

21                   (Pause)

22

23

24

25

TROY FAABORG

210

1

2                   THE VIDEOGRAPHER:  You want to off the

3      record?  We are off the record.  The time is

4      12:33 p.m.

5                       *     *     *

6                   L U N C H   R E C E S S

7         Time noted 12:33 p.m. Eastern Standard Time

8                       *     *     *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TROY FAABORG

211

1

2                              *       *       *

3                A F T E R N O O N   S E S S I O N

4        Time noted 1:19 p.m. Eastern Standard Time

5                              *       *       *

6                 THE VIDEOGRAPHER:  We are back on the

7        record.  The time is 1:19 p.m.

8     BY MR. ESSIG::

9        Q.    Mr. Faaborg, good to see you.  Good

10       afternoon.  Hope you had a good lunch.

11       A.    Indeed.

12       Q.    I wanted to ask you a couple more

13       questions about turbulence, sort of in that

14       vein.

15                 And you and I were, kind of,

16       discussing turbulence events, and FAA criteria,

17       and so forth.

18                 Before that, we had agreed that

19       generally, in your view, normal flight G forces

20       range between 0.6 and 0.7 to 1.3 G's, correct?

21       A.    Agreed.

22       Q.    And turbulence -- light or moderate

23       turbulence is -- essentially would be G forces a

24       little bit outside that range?

25                 Is that correct?

TROY FAABORG

212

1

2      A.    I'm not sure if there are specific G

3   forces that they align to those definitions.   I

4   don't know.

5      Q.    Would you expect that G force -- G

6   forces in a turbulence event would be outside

7   the normal range of G forces?

8           MR. DURKIN:  Objection, asked and

9   answered.  It's asked and answered.

10     A.    I can't say.

11     Q.    Okay.

12           You did say that a turbulence event is

13   an unexpected event, correct?

14     A.    Generally I believe that to be true,

15   yes.

16     Q.    So when a passenger is on an aircraft,

17   they might expect that they might be on an

18   airplane at some point that has turbulence, but

19   they don't know when it would happen.

20           So whenever it occurs, it is

21   unexpected or unanticipated.

22           Is that right?

23     A.    I would agree with that.

24     Q.    Under your -- in trying to understand

25   your definition of "injury" and how it would

TROY FAABORG

213

1
2      apply to a situation like that, if a passenger
3      is experiencing a turbulence event, and the G
4      forces, I assume, are within that range of
5      normal flight, maybe slightly outside of that
6      range of normal flight, and the event is
7      unexpected or unanticipated, would that mean
8      that, by definition -- your definition of "harm"
9      or "injury" -- that everybody is injured in a
10     turbulence event?
11              MR. DURKIN:  Objection, incomplete
12     hypothetical, argumentative, form of the
13     question -- and speculative, by the way.
14         A.    Not necessarily.
15              I think, as we have said quite a few
16     times, the context is critically important to
17     understand that determination.  Without
18     additional context, it really -- I can't say.
19         Q.    And I know that you have said that,
20     for sure -- that context matters.
21              What is the context that matters
22     there?
23              What do you need to know additionally
24     to understand and determine if somebody was
25     injured in an unexpected event of fluctuation of

TROY FAABORG

214

```
 1
 2     G forces outside the normal flight --
 3          A.     Sure.
 4                 I think the conditions of the flight,
 5     the other things that are going on -- were there
 6     injuries to other passengers, or was there panic
 7     by other passengers -- all of that, and much
 8     more, I think collectively goes to not only
 9     the -- we've got the physiological and the
10     physical that the G forces themselves effect;
11     but then the psychological that has quite a few
12     external factors that can influence.
13                 So I think without knowing within this
14     context, within this example, what those factors
15     are, it's really not possible to make a blanket
16     statement for all of them.
17          Q.     So if we -- if we look at that context
18     and we apply it to the ET 302 situation, do you
19     know anything about the psychological condition
20     of any particular passenger on ET 302?
21          A.     I can speak to, in my expert opinion,
22     the psychological response to the physiological
23     and physical movements and that sort of thing;
24     for example, with the fight-or-flight response
25     as a psychologically -- a psychological
```

TROY FAABORG

215

1
2    manifestation of is a physiological response.
3              So to that degree, yes.
4              As far as psychological state?  Not
5    specifically, no.
6         Q.    You don't have any specific
7    information or evidence about what any passenger
8    on ET 302 would expect or not expect,
9    correct? -- in terms of a flight?
10             MR. DURKIN:  Objection, incomplete
11   hypothetical speculative.
12        A.    Not beyond a reasonable person's
13   expectation or a reasonable person's view of
14   what is or is not expected, just generally for a
15   flight.
16        Q.    And you don't know -- you don't have
17   any particular information about anybody's
18   psychological condition, correct?
19        A.    That's correct.  I don't.
20        Q.    And do you have any information about
21   whether or not anybody -- any portion of the
22   passengers experienced panic or not?
23        A.    Any objective evidence?  Or --
24        Q.    Any objective evidence about whether
25   or not any other passengers experienced

TROY FAABORG

216

1
2    panicking on ET 302?

3        A.    Not beyond my expert opinion, given

4    the parameters of the flight and what was

5    happening -- the extremity of the maneuvering,

6    the motion of the aircraft.  Nothing outside of

7    my expert opinion based on my analysis.

8            But I think my analysis suggests that,

9    certainly.

10       Q.    That feeling of panic -- that would be

11   a subjective feeling, right?

12       A.    I suppose it's subjective, yes.

13       Q.    And when you might feel panic in this

14   case, or when I might feel panic, might be at

15   different times.

16           Context would matter, right?

17       A.    Yes, the context would matter, right.

18       Q.    Is there any literature, or any

19   treatise, any written source that -- in your

20   field -- that describes when it is that an

21   expert could assume that everybody feels panic

22   in terms of a flight -- commercial flight?

23       A.    Not anything in literature, no, not

24   that I've reviewed.

25       Q.    Have you ever studied when a

TROY FAABORG

217

1
2    population of people becomes panicked or doesn't
3    become panicked?
4        A.    No.
5        Q.    Any other context that you need to
6    know in order to determine injury in the
7    hypothetical I talked about with the -- a
8    turbulence event that wasn't expected?
9        A.    Not that I can immediately think of at
10   this time, no.
11       Q.    Okay.
12             Any context in ET 302 that you feel
13   that you needed to know in order to determine if
14   everybody was injured?
15       A.    Beyond the information that was made
16   available to me? --
17       Q.    Beyond the information that you have.
18       A.    No.
19       Q.    Do you have any information about any
20   passenger on the flight in terms of whether or
21   not they were an experienced or inexperienced
22   flier?
23       A.    I do not.
24       Q.    Do you have any sense or any
25   information about whether or not any passenger

TROY FAABORG

218

```
 1
 2    on the flight had experienced severe turbulence
 3    or not before?
 4         A.    I do not.
 5               MR. ESSIG:  If we turned to page 12 of
 6    Exhibit 313.  It's your report.
 7               And we look under:  Application to
 8    Flight ET 302.
 9  BY MR. ESSIG:
10         Q.    See that?
11         A.    Yes.
12         Q.    The last sentence says:  The final
13    minutes of the flight of ET 302 were extremely
14    abnormal, such that even the most inexperienced
15    passengers would know something was wrong.
16               Do you see that?
17         A.    Yes.
18         Q.    When you say "the final minutes of the
19    flight were extremely abnormal," what period of
20    time are you talking about?
21         A.    It's difficult to pinpoint one
22    particular time, in that none of the flight
23    profile really from just a few seconds after the
24    initial takeoff rotation were what we would
25    consider -- what I would consider a normal
```

TROY FAABORG

219

1
2      flight profile.
3              And so there were a couple of times
4      early on -- that I'm sure we'll talk about --
5      where that could have started that process.
6      There is certainly evidence to suggest that it
7      could have started then.
8              What I refer to when I talk about "the
9      final minutes" largely is from looking at 316.
10             You have the 12-second negative G
11     experience on the chart in the neighborhood of
12     08:39:55.  From that point on, the flight
13     profile gets more erratic.
14             Certainly from what I mark as the
15     nine-second drop neighborhood on this chart of
16     08:41:15 -- from that point on, any of those
17     points along the way, just given the erratic
18     nature of the flight profile.
19     Q.     So looking at this sentence -- that
20     the final minutes of Flight ET 302 were
21     extremely abnormal -- are you saying that -- you
22     are talking at least about the point after
23     08:39:55, the 12-second negative G experience?
24     A.     At least, if not before that -- just,
25     again, that it's abnormal prior to then.

TROY FAABORG

220

1
2          So this is very subjective.
3          When you are talking about abnormal,
4   the entire profile from the first handful of
5   seconds in, and from that point on, was
6   abnormal.
7          At what point it becomes extreme, it
8   is very much subjective.
9          I think -- from that 12-second point
10  on, I think that qualifies as extremely abnormal
11  in my opinion.
12      Q.    And how did you determine that from
13  the 12-second point on that it was extremely
14  abnormal?
15      A.    Just my subjective view and expert
16  opinion having analyzed the flight data recorder
17  data, and having a little bit of an
18  understanding what the profile would normally
19  look like.  That's how I came up to that
20  sentence.
21      Q.    Did you look at any prior FDR traces
22  for any commercial flight and compare those
23  traces to this trace?
24      A.    Not in a direct comparison.
25          I have seen them before, just, for

TROY FAABORG

221

1

2     example, through -- through -- not

3     commercially -- military aviation examples.

4              I've seen FDR data from other

5     flights -- not in the context of this analysis,

6     but I have at least some background knowledge of

7     what it normally would look like.

8        Q.   But you had never seen any traces of a

9     commercial airline flight before this point,

10    correct?

11       A.   I believe that I have -- again, not --

12    not within the context of this analysis.

13             But just through my experience with

14    teaching human factors; with dealing with these

15    type of investigations; and teaching nonmilitary

16    mishap or accident investigation, I've seen the

17    data, but not directly to compare with this, or

18    as an analysis.

19       Q.   Okay.

20             In that sentence, you say:  The

21    passengers would know something was wrong.

22             Right?

23             See that?

24       A.   Correct.

25       Q.   Can you identify the point at which

TROY FAABORG

222

1

2       every single passenger would know something was

3       wrong?

4           A.      I can identify -- to the question if

5       there is a particular point where everyone knew

6       something was wrong, it, again, is a continuum.

7                   That very well could have been at that

8       12-second negative G exposure.

9                   In my opinion, the de-rotation during

10      takeoff was nonstandard.

11                  I don't know that that would rise to

12      the level of knowing something was wrong.

13                  I think -- I very much believe it

14      startled everyone.  Everyone noticed.  There was

15      a response.

16                  The 12-second negative G experience is

17      extremely uncharacteristic -- to have that long

18      of a sustained negative G maneuver.

19                  And so if I'm answering that question

20      specifically, I would say at that point.

21          Q.      The 12-second negative G experience?

22          A.      I believe everyone knew that the

23      flight profile was very different and that

24      something was wrong from that point on.

25          Q.      Okay.

TROY FAABORG

223

1

2                  And when passengers experience a

3      turbulence event, is the oscillation of G's on

4      turbulence events within the range of that

5      12-second negative G experience?

6                  MR. DURKIN:  Objection, speculation,

7      calls for -- and -- incomplete hypothetical.

8                  THE WITNESS:  I'm sorry.  Can you --

9                  MR. ESSIG:  I know that wasn't the

10     greatest question I have ever asked, I'm sure.

11     BY MR. ESSIG:

12          Q.   But if I look at that -- the bracket

13     there, the 12-second negative G experience in

14     Exhibit 316 -- that's the one we are talking

15     about?

16          A.   Hm-hmm.

17          Q.   The peak there seems about halfway

18     between 1 and 1.5?

19                  Is that right?

20          A.   I'd have to confirm.  But that --

21     that's in the ballpark, hm-hmm.

22          Q.   And then the trough there probably

23     seems between 1 and 0.5, right?

24          A.   I think that's about right.

25          Q.   Maybe 0.75, something like that?

TROY FAABORG

224

1

2          A.      Hm-hmm.

3          Q.      I won't hold you to the exact

4     number --

5          A.      Sure.

6          Q.      So it's an oscillation between 1.5 G

7     and 0.75 G's?

8          A.      I believe that's about right.

9          Q.      In your experience in aviation

10    physiology and understanding of, sort of, common

11    flight profiles, is that range of G forces the

12    kind of range of G forces you might see in a

13    turbulence event?

14                 MR. DURKIN:   Objection --

15         A.      I think that it -- I don't know how

16    they classify the turbulence as far as a G

17    indication.

18                 What I can tell you is remarkably

19    uncharacteristic was the 12-second duration that

20    was sustained.

21                 So whether or not it was in a normal

22    range, it was definitely an abnormal duration.

23                 And so that, more than the G range,

24    the change in G's, the duration is what puts

25    that into the context of being a very abnormal

TROY FAABORG

225

1

2      event.

3              Q.      Okay.

4                      MR. ESSIG:  And so if we go down to

5      the next paragraph, it starts with:  The

6      passengers felt the extreme swings in

7      acceleration forces and a resulting pushing into

8      and pulling out of seat.

9                      MR. DURKIN:  Are we still on page --

10                     MR. ESSIG:  We are just going to the

11     paragraph right below.

12                     (Pause)

13                     MR. ESSIG:  You see that beginning

14     sentence?

15                     THE WITNESS:  Yes.

16                     MR. ESSIG:  Then the last sentence of

17     that -- well, I can just finish the paragraph.

18                     It says:  Resulting pushing into and

19     pulling out of the seat, saw the earth and sky

20     out of the window in unnatural positions, and

21     felt the unexpected and extreme pitching and

22     rolling of the aircraft.

23     BY MR. ESSIG:

24             Q.      Do you see that?

25             A.      Yes.

TROY FAABORG

226

```
 1
 2        Q.     Is that description that you write
 3   there similar to the description that somebody
 4   would experience in a turbulence event?
 5               MR. DURKIN:   Objection, calls for
 6   speculation.
 7        A.     What is written here I believe to be
 8   far more extreme than a turbulence event.
 9        Q.     Okay.
10               These intense forces resulted in
11   strain against the seatbelts and harnesses and
12   flailing limbs, moderately at first, and
13   violently in the final seconds, as unsecured
14   objects were tossed about the cabin.
15               You see that?
16        A.     Yes.
17        Q.     What do you mean by "final seconds"
18   there?
19               The final seconds of the flight?
20        A.     Correct.  The final seconds of
21   recorded digital flight data recording.
22        Q.     Okay.
23               Is that the only time period in which
24   unsecured objects were tossed about the cabin,
25   in your opinion?
```

TROY FAABORG

227

1

2      A.     Not necessarily, no.

3      Q.     And then the last sentence says:   This

4   surely triggered the flight-or-flight response.

5             Do you see that?

6      A.     Yes.

7      Q.     What is this -- in that last sentence,

8   you say "this."

9             What do you mean by "this"?

10     A.     All of those factors that were

11  mentioned previously.  Not specifically to a

12  particular time, but the sum of all of those

13  events as described.

14     Q.     What is a fight-or-flight response?

15     A.     Sure.  The fight-or-flight response is

16  the body's physiological response to any unknown

17  or perceived threat, for lack of a better word.

18     Q.     Literally any unknown threat to a

19  person or unperceived -- is it "unperceived" you

20  said?

21     A.     An unknown, unexpected stress or

22  threat, right.

23     Q.     So does it matter how severe the

24  unexpected or unknown threat or stress is in

25  order to trigger the fight-or-flight response?

TROY FAABORG

228

1

2      A.      In order to trigger, not necessarily,

3    no.

4              The magnitude of the response, yes.

5      Q.      Did all of the things that you need --

6    that you described in that paragraph above need

7    to occur to trigger the fight-or-flight

8    response?

9      A.      No.

10     Q.      When do you think that the -- all the

11   passengers on Flight ET 302 had a

12   fight-or-flight response triggered?

13     A.      To varying degrees, starting with what

14   I call the de-rotation during takeoff as an

15   unexpected feeling at that portion of the

16   flight -- that phase of the flight -- that would

17   have been something that you didn't expect to

18   feel.

19              And so for -- just speaking for myself

20   as an experienced flier, for example -- that

21   would startle me.  And the physiological

22   fight-or-flight mechanism would increase the

23   heart rate, dilate the pupils -- those things

24   that I described later in the report.

25              I believe that as early as the takeoff

TROY FAABORG

229

1

2    rotation, there could have been that experience.

3            There would have been an attempt to

4    return to homeostasis to that return back to

5    normal.

6            Already, though, after that first

7    event, you are already a little on edge.

8            That second -- that 12-second

9    experience that I noted would also absolutely

10   trigger that fight-or-flight response to varying

11   degrees for everyone on the aircraft.

12           And then from that point on, I

13   wouldn't expect that the body would return to

14   normal, because we are continuing to be

15   subjected to abnormal events, and stresses, and

16   potential threats that the body is going to try

17   to prepare to deal with.

18       Q.    Understood.

19           Going back to a turbulence event

20   that's an unexpected, unknown movement of the

21   airplane when you are a commercial passenger,

22   does that cause a fight-or-flight response in

23   everybody who experiences it?

24       A.    Physiologically, yes.

25       Q.    Is it your testimony that the

TROY FAABORG

230

1
2    initiation of a fight-or-flight response -- the
3    triggering of a fight-or-flight response --
4    causes an injury in every person that
5    experiences it?
6               MR. DURKIN:  Objection, calls for
7    speculation, incomplete hypothetical, form of
8    the question.
9         A.    If you are asking if the
10   fight-or-flight response itself is classified as
11   injury, it depends on the context.
12              And so in and of itself, no.
13              In that it is a physical physiological
14   and psychological response to something that you
15   don't expect and could then be classified as
16   harm, it could be classified.
17              I'm not saying that it always is,
18   again, because sometimes you expect the
19   fight-or-flight response, like going to a
20   haunted house.
21              So I wouldn't classify that as harm
22   because we are seeking that out.  We expect it.
23   Even though it's unexpected, it's still
24   expected.
25              So I think I've talked around that.

TROY FAABORG

231

1

2          Not necessarily, I think, is the

3    answer.

4       Q.    So triggering the fight-or-flight

5    response in people does not necessarily mean

6    that they are injured, correct?

7            That's what you are saying?

8       A.    Looking at it outside of any other

9    context, that is what I'm saying -- that, in and

10   of itself, the fight-or-flight response alone is

11   not meeting the definition of "harm."

12           Within the context, for example, of

13   this flight profile, then it does meet that

14   definition.

15      Q.    Okay.

16           So is it your testimony in this case

17   that the very first time the fight-or-flight

18   response is triggered -- that that meets the

19   definition of "harm" or "injury" in your

20   definition of "harm" or "injury"?

21           (Pause)

22      A.    That's -- it -- let me -- let me think

23   about -- as the definition that we talked about,

24   it depends, again, on the person and within that

25   context.

TROY FAABORG

1

2                It certainly could, because that was

3      an unexpected event that then had a

4      physiological influence.  It had a physical

5      response.

6                Since it was unexpected, it could meet

7      that definition of a harm event -- again,

8      because there is a physical or physiological

9      response to an unexpected or unanticipated

10     event.

11          Q.    I guess going back to that same -- we

12     keep going back-and-forth between this -- but

13     if -- and I'm just trying to understand your

14     opinion.

15                If in a turbulence event -- that's an

16     unexpected event, unanticipated -- and it is a

17     movement of the plane that's outside this normal

18     range of expected movement, and it triggers a

19     fight-or-flight response, in a passenger who is

20     on a commercial flight then are they injured in

21     the way you are saying?

22                MR. DURKIN:  Objection, asked and

23     answered now, I think, four times.

24                And the same objections:  Speculation,

25     incomplete hypothetical, and form of the

TROY FAABORG

233

1
2      question.
3                (Pause)
4                MR. ESSIG:  Can I just get the answer?
5      There is a question pending.  So I just want --
6                MR. DURKIN:  Yeah, let's get an answer
7      to the question.
8                (Pause)
9      BY MR. ESSIG:
10        Q.    All right.  So my question was --
11               MR. DURKIN:  So I don't break you up,
12     I made the four objections:  Asked and
13     answered --
14               MR. ESSIG:  Got it, got it, got it --
15               MR. DURKIN:  -- speculation -- they
16     all apply.  I won't break up your question, so
17     he can answer it and you can get it done.  Okay?
18               MR. ESSIG:  Do you remember the
19     question?
20               Or you want me to ask it?
21               THE WITNESS:  Do it one more time,
22     please.
23               MR. ESSIG:  Okay.
24     BY MR. ESSIG:
25        Q.    The question is -- we were talking

TROY FAABORG

234

1
2      about in the context of ET 302 when you have an
3      unexpected or unanticipated event that triggers
4      the fight-or-flight response -- so the movement
5      of the airplane, the forces of the airplane,
6      move in an unexpected way, unanticipated way --
7      that triggers the fight-or-flight response, you
8      said, in every person?
9          A.    Yes.
10         Q.    And that causes an injury.
11               Is that right?
12         A.    It, I believe, can be classified as
13     harm in that case.
14         Q.    Okay.
15               So if this was a turbulence event, is
16     it the same analysis in your opinion, applying
17     your expert framework and opinion to that event?
18               There would be an unanticipated or
19     unknown movement of the airplane.  It would move
20     outside the range of normal G's.  And people
21     would have a fight-or-flight response.  We agree
22     with that.
23               Would that mean that they were injured
24     by your definition?
25         A.    I think within that context that you

TROY FAABORG

235

1
2      just provided, a solitary, light to -- what did
3      we say? -- light to moderate? -- no, what was
4      the? -- one second -- let me make sure I'm not
5      speaking out of turn -- yeah, light to moderate,
6      isolated turbulence event would not necessarily
7      qualify as harm by that definition.
8             Again, it's the totality of the full
9      flight profile and the repeat exposures that, in
10     my mind, meets that definition of "harm."
11        Q.    So if the turbulence event lasted 10
12     seconds and there were repeated movements, would
13     that be enough to meet your definition?
14            MR. DURKIN:  Objection, calls for
15     speculation, asked and answered, and --
16     incomplete hypothetical.
17  BY MR. ESSIG::
18        Q.    Even just to make -- we'll use 12
19     seconds because that's the number you used in
20     your chart.
21            If it lasted 12 seconds, would that be
22     enough to trigger fight-or-flight, such that it
23     would be an injury under your --
24            MR. DURKIN:  Objection, calls for
25     speculation, and form of the question --

TROY FAABORG

236

1

2      A.      In this case, given the duration and

3   the extremity, and the fact that it's the second

4   significant event that occurred within just a

5   short time on this profile, on the continuum of

6   is it or isn't it harm, that certainly moves the

7   needle, if not beyond the threshold, certainly

8   closer to it.

9           That's not as direct an answer.

10          But yes, I believe in this case within

11  the context of ET 302, because it's not the

12  first thing that occurred and we've had an

13  erratic flight profile up until that point, that

14  that to me meets now our definition, as we've

15  described it.

16      Q.      Okay.

17          So that -- just so we are 100% clear,

18  then, are you saying that it's your opinion --

19  your expert opinion -- as an aerospace

20  physiologist that everybody on the flight

21  suffered an injury as of the 12-second negative

22  G experience?

23      A.      At least at that point, if not before.

24          And based on the definitions that we

25  are using, yes.

TROY FAABORG

237

```
 1
 2        Q.     Okay.
 3               Can you say for certain if they were
 4    injured before that point?
 5        A.     I cannot say for certain that they
 6    were injured before that point.
 7               Certain -- the possibility certainly
 8    exists, and it's, I think, very likely.
 9               This now gets to personal factors, as
10    we said, but there is certainly likelihood.
11        Q.     More than 50% likelihood they were
12    injured before the 12-second negative
13    experience?
14               MR. DURKIN:  The passengers and crew?
15        A.     I think it's hard to say.  I don't
16    know that I've got an answer one way or the
17    other.
18        Q.     Okay.
19               MR. ESSIG:  So if we turn the page to
20    the top of page 13 --
21               MR. DURKIN:  Before you go, did you
22    want to --
23               MR. ESSIG:  -- oh, sure.  Yeah, let's
24    take a break.  That's fine.
25               (Pause)
```

TROY FAABORG

238

1

2                    THE VIDEOGRAPHER:  We are off the
3      record.  The time is 1:46 p.m.
4                    (Recess from 1:46 p.m. to 1:53 p.m.
5      Eastern Standard Time)
6                    THE VIDEOGRAPHER:  We are back on the
7      record.  The time is 1:53 p.m.
8      BY MR. ESSIG:
9                    MR. ESSIG:  Okay.  I think I remember
10     where we were.
11                   We turned to Exhibit 313 again.
12     That's your report.  We will go to the top of
13     page 13, top paragraph.
14     BY MR. ESSIG:
15          Q.    Do you see that?
16          A.    Yes.
17          Q.    The first sentence says:  Because the
18     pilots of Flight 302 were fighting to control
19     the aircraft, the airplane went up and down
20     rapidly many times.
21                   Do you see that?
22          A.    Yes.
23          Q.    Then you say:  As a result, the
24     passengers experienced numerous exposures to
25     negative G's, similar to moderate to severe

TROY FAABORG

239

1
2    turbulence.

3            Correct?

4        A.    Yes.

5        Q.    The forces that make you feel like

6    your stomach is floating up inside you as you

7    are pulled away from the earth.

8            Correct?

9        A.    Yes.

10        Q.    So you are analogizing the forces that

11    were experienced on Flight ET 302 to turbulence,

12    right?

13        A.    Yes.

14        Q.    So when I'm asking questions about

15    whether or not a certain point of the flight and

16    those G force oscillations are similar or

17    dissimilar from turbulence, and what people

18    might feel, that's in the scope of your report,

19    right?

20        A.    Yes.

21        Q.    When you say "negative G's similar to

22    moderate to receive turbulence," are you talking

23    about G forces below zero?

24            Or G forces between 1 and zero?

25        A.    In that case, anything less than 1.

TROY FAABORG

240

```
 1

 2              And in that sentence, talking about

 3     the oscillations, not just the negative but the

 4     negative to positive to negative something --

 5     about eight different times.

 6              Making a layman's comparison to a

 7     similar degree of turbulence, just to put it in

 8     context to have something to compare to, since

 9     as we have discussed most people who have flown

10     have experienced turbulence.

11              Most people who have flown have not

12     experienced something like the profile for ET

13     302.  So just trying to make that a

14     visualization or a comparison.

15          Q.    Okay.

16              You said:  As a result, the passengers

17     experienced numerous exposures to negative G's

18     similar to moderate to severe turbulence.

19              Right?

20          A.    Correct.

21          Q.    You believe most people -- nearly all

22     the flying public -- has been subject to

23     moderate to severe turbulence in their flying --

24          A.    No, moderate perhaps; severe, probably

25     not.
```

TC REPORTING
(516) 795-7444

TROY FAABORG

241

1

2             It is very uncommon given the FAA

3      definitions from the table.

4             I would say light to moderate, but not

5      severe or beyond.

6      Q.    Okay.

7             I was reading it moderate to severe

8      meaning up and to severe, not including severe.

9             But -- fair?

10     A.    Sure.

11     Q.    We understand each other.

12            So most -- passengers that have been

13     experiencing light through moderate but not

14     severe turbulence --

15     A.    Hm-hmm.

16     Q.    -- do those passengers experience

17     negative G's the way you define it?

18            MR. DURKIN:  Objection, asked and

19     answered.

20     A.    Yes.  As defined, yes.

21     Q.    Okay.

22            And to be -- I guess, just to be clear

23     and close loop on in negative G issue, on

24     Exhibit 316 --

25     A.    Yes.

TROY FAABORG

242

1
2       Q.    -- you can see the G forces plotted
3    there that on the chart you created, right?
4       A.    Yes.
5       Q.    And there are only two periods of time
6    that the G forces go below zero, right?
7       A.    On the entire 316, there is actually
8    one more that we didn't identify previously --
9    so three that occur.
10      Q.    Okay.
11            MR. ESSIG:  What -- if we -- is it
12   better to look at 317?
13            THE WITNESS:  It is --
14            MR. ESSIG:  Okay.  So --
15            THE WITNESS:  -- for this question,
16   yes.
17   BY MR. ESSIG:
18      Q.    If we look at Exhibit 317, which is
19   just the final 21 seconds of the DFDR recording
20   according to your label, right? --
21      A.    Yes.
22      Q.    -- is there more than two periods of
23   time where passengers are subjected to G forces
24   below zero?
25      A.    Yes, there is one more at

TROY FAABORG

243

1
2     approximately 08:43:35 that we go beyond zero
3     that I failed to identify previously.
4               (Pause)
5          Q.    And that at 08:43:35, how far below
6     zero is that --
7          A.    I would have to refer back to the
8     data.  It's not much.  I don't know the specific
9     number, but it's beyond zero on the graph.
10         Q.    Do you have -- did you calculate how
11    long a duration of that exposure was?
12         A.    Not specifically, no.
13         Q.    Did you calculate the duration of
14    exposure below zero-G's of the two that you
15    labeled less than zero-Gz?
16         A.    I did -- I did for those two, yes.
17         Q.    And what are those durations?
18         A.    I would have to refer back to my note,
19    or back to the report so I don't misspeak, if
20    you would give me just a moment.
21              (Pause)
22         A.    I may not have included it on this --
23    in this section.
24              I have it noted, but I don't think
25    that I call it out specifically.

TROY FAABORG

244

1

2          So I could refer back to my data.

3          But given -- again, on 317,

4    approximately -- it looks to be approximately

5    four seconds below zero-G with that first

6    exposure very brief; or this new exposure that

7    we just discussed.

8          And then I think I refer to the last

9    more than five but less than six seconds of

10   recorded time where the DFDR remains below

11   zero-G until the end of the recording.

12        Q.    Okay.

13             So if we look at the -- if we drew a

14   line across zero, 08:43:20 -- the first

15   excursion below zero-G happens right before

16   8:43:26?

17             Is that fair?

18        A.    Sounds right, just before 26.

19        Q.    And it comes up back over zero at

20   about 08:43:29?

21        A.    Just after 29, it seems.

22        Q.    Okay.

23             There is that oscillation on 08:43:35

24   that we looked at, right?

25        A.    Hm-hmm.

TROY FAABORG

245

 1

 2      Q.    And then the last one, it looks like
 3   it dips below zero around 08:43:38? --
 4      A.    About --
 5      Q.    -- or 43:39, in-between?
 6      A.    -- yes.
 7      Q.    And then goes through the rest?
 8      A.    Correct.
 9      Q.    In that paragraph that we are looking
10   at on 313, you say:  The passengers would
11   have -- this is the next sentence:  The
12   passengers would be violently pulled out of
13   their seats against their seatbelts and their
14   arms would flail upwards.
15           Do you see that?
16      A.    Yes.
17      Q.    When do you think that was happening
18   on the flight? -- first happening on the flight?
19      A.    There would be a degree of when we
20   just read, the arms coming upwards, that could
21   happen early on.
22           What I'm describing here was within
23   the digressions that I refer to on 316, the
24   continued digressions.
25           And then very much so in the last 21

TROY FAABORG

246

1
2      seconds.
3              Q.      Okay.
4                      So from about 08:41 -- between
5      08:41:26 and 08:41:15 on your Exhibit 316
6      chart? --
7              A.      Yes.
8              Q.      -- to the end of the flight?
9              A.      Correct.
10             Q.      And in this paragraph that we are
11     looking at, the next sentence says:  The hair
12     would fly up and any loose objects, like cell
13     phones, iPads, and headsets, would be flying
14     throughout the cabin.
15                     Do you see that?
16             A.      Yes.
17             Q.      Do you know for certain if any of
18     those items were present on the flight?
19             A.      I do not know for certain, no.
20             Q.      Can you say for certain, if any of the
21     items were present, where they were located?
22             A.      No.
23             Q.      And you -- do you have any opinion
24     about how many loose items would be in the cabin
25     or wouldn't be in the cabin?

TROY FAABORG

247

1

2      A.      Not specifically, no.

3      Q.      When you would form your opinion about

4      loose objects, do you consider whether items

5      would be stowed before takeoff?

6      A.      Yes.

7              And personal experience from flying

8      would indicate that not all are stowed, even

9      though there is direction to stow.

10     Q.      So you agree that Ethiopia has

11     regulations that concern the stowing of items

12     before takeoff.

13             Is that right?

14             MR. DURKIN:  Objection, calls for

15     speculation.

16     A.      I can only speculate -- but, yes.

17     Q.      Okay.

18             Is it your opinion that most people

19     then would have stowed those items in accordance

20     with the regulation?

21             Or not?

22             MR. DURKIN:  Objection, calls for

23     speculation.

24     A.      I don't know.

25     Q.      You don't know.

TROY FAABORG

248

1

2          Based on your experience flying in the

3   United States, as a general matter do most

4   people try to follow the rule? --

5          MR. DURKIN:  Objection --

6   BY MR. ESSIG:

7      Q.   -- and regulation?

8          MR. DURKIN:  -- objection, calls for

9   speculation, argumentative, form.

10  BY MR. ESSIG:

11     Q.   You can answer just based on your

12  experience.

13     A.   I think --

14         MR. DURKIN:  If you can --

15     A.   Right.  I -- that's very subjective.

16         And I think from my personal

17  experience or opinion, it's hard to say.

18         I know there are always people who

19  don't.

20         What the quantity is, or how to

21  quantify that, I don't think there is value in

22  that opinion.

23     Q.   Okay.

24         MR. ESSIG:  Let's mark tab 11.

25

TROY FAABORG

249

```
 1
 2              (Exhibit 318, Multipage document
 3      entitled: Civil Aviation Rules and Standards:
 4      Federal Democratic Republic of Ethiopia, Part 8
 5      - Operations, dated November 2019 (no Bates
 6      Nos.), marked for identification)
 7              (Pause)
 8              MR. ESSIG:  All right.
 9              What I've handed you is -- the front
10      page of it says:  Civil Aviation Rules and
11      Standards, Federal Democratic Republic of
12      Ethiopia, Part 8 - Operations, November 2019.
13   BY MR. ESSIG:
14        Q.    Do you see that?
15        A.    Yes.
16        Q.    Have you ever seen that document
17      before?
18        A.    I have not.
19              MR. ESSIG:  So if we turn to page --
20              MR. DURKIN:  What number is this
21      marked as?  Did we mark this? -- I don't think
22      we did.
23              (Pause)
24              MR. DURKIN:  I need as exhibit number
25      just for the record --
```

TROY FAABORG

250

1

2              MR. ESSIG:  Is this Exhibit 318?

3              MR. DURKIN:  -- we want to make

4      sure --

5              THE VIDEOGRAPHER:  We just marked it

6      as 318.

7              (Pause)

8              MR. ESSIG:  So this is Exhibit 318.

9      And we turn in this voluminous booklet to 8-111.

10             (Pause)

11             MR. DURKIN:  You want him to read the

12     entire book first?

13             MR. ESSIG:  No, I'll just read the

14     passages on carry-on baggage and --

15             All right.  So page 80.1.11 at

16     8.9.2.14:  Carry-On Baggage.

17  BY MR. ESSIG:

18         Q.   Do you see that?

19         A.   Yes.

20         Q.   And then 8(a) says:  No person may

21     allow the boarding of carry-on baggage unless it

22     can be adequately and securely stowed in

23     accordance with the AOC holder's approved

24     Operations Manual and procedures.

25             Do you see that?

TROY FAABORG

251

1

2          A.     Yes.

3          Q.     Any reason to dispute that that was a

4     regulation in place in ET 302?

5          A.     No reason, no.

6          Q.     (b) says:  No person may allow

7     aircraft passenger entry doors to be closed in

8     preparation for taxi or pushback unless at least

9     one required crew member has verified that each

10     article of baggage has been properly stowed in

11     overhead racks with approved restraining devices

12     or doors, or in approved locations.

13              Do you see that?

14          A.     Yes.

15          Q.     No reason to agree that that was not

16     the regulation in place in Flight ET 302?

17          A.     No reason, no.

18              MR. ESSIG:  And at 8-115, 8.9.2.22:

19     Securing of Items and Mass in Passenger

20     Compartment.

21     BY MR. ESSIG:

22          Q.     Do you see that?

23          A.     Yes.

24          Q.     Section (a) says:  No person may allow

25     the takeoff or landing of an aircraft unless

TROY FAABORG

252

1
2     each item of mass in the passenger cabin is
3     properly secured to prevent it from becoming an
4     hazard during taxi, takeoff, and landing and
5     during turbulent weather conditions.
6              Do you see that?
7     A.    Yes.
8     Q.    No reason to dispute that was not the
9     regulation in place at the time of ET 302?
10    A.    No reason.
11             MR. ESSIG:  You can put that one away.
12             MR. CLIFFORD:  -- objection to
13    foundation --
14             (Pause)
15             MR. ESSIG:  All right.  So if we look
16    back to page 13 -- and Exhibit 313 is your
17    report -- it says, paragraph two:  Moderate to
18    severe turbulence presents a significant safety
19    risk on commercial airline flights.
20             Do you see that?
21    A.    Yes.
22    Q.    Do you agree with that statement?
23    A.    Yes.
24    Q.    And then it says:  The FAA and NTSB
25    have published numerous circulars and

TROY FAABORG

253

1

2      publications related to the risk of crew and

3      passenger injury and even death due to

4      turbulence.

5              You see that?

6      A.      Yes.

7      Q.      In a recent FAA Safety Alert, it was

8      noted that injuries caused by turbulence are

9      so -- quote -- "relatively common" -- end

10     quote -- and that they -- quote -- "continue to

11     be a challenge" -- end quote.

12             Right?

13     A.      Right.

14     Q.      So you are obviously -- in this

15     paragraph, you are referencing the FAA document

16     and the NTSB document as well, right?

17     A.      Correct.

18     Q.      That next sentence talks about the

19     NTSB recently reporting that turbulence-related

20     events accounted for more than one-third of

21     reportable accidents from 2009 too 2018?

22     A.      Correct.

23             MR. ESSIG:  If we look at page --

24     let's mark tab 9.

25             (Pause)

TROY FAABORG

254

1

2          MR. ESSIG:  This is tab 9, which we
3    are marking as Exhibit 319.
4              (Exhibit 319, Multipage document
5    entitled: Advisory Circular No. 120-88, Subject:
6    Preventing Injuries Caused by Turbulence, dated
7    November 19, 2007 (no Bates Nos.), marked for
8    identification)
9          MR. DURKIN:  Thank you very much.
10   BY MR. ESSIG::
11       Q.   Is this one of the FAA documents that
12   you are citing to in that paragraph?
13       A.   I believe so.  Just confirm with my
14   reference list.
15              (Pause)
16       A.   I believe that it is, yes.
17       Q.   So the cover of this document --
18   319 -- says:  Advisory Circular.
19              Do you see that?
20       A.   Yes.
21       Q.   Then it says:  U.S. Department of
22   Transportation Federal Aviation Administration.
23              Do you see that?
24       A.   Yes.
25       Q.   And the subject is:  Preventing

TROY FAABORG

255

1
2      Injuries Caused by Turbulence.
3              And it's date is 2007?
4      A.      Yes.
5      Q.      And the AC number is 120-88A, correct?
6      A.      Correct.
7              MR. ESSIG:  If you look at page 2 of
8      the document.
9              It's a little deceptive because it
10     says "Page 2" in the left-lower corner, but it
11     says "Par 3."
12             THE WITNESS:  Got it.
13             MR. ESSIG:  I think you are with me.
14             Under the heading 7:  Data Analysis by
15     the FAA.
16     BY MR. ESSIG:
17     Q.      Do you see that?
18     A.      Yes.
19     Q.      That section says:  Data Analysis by
20     the FAA:  Sit Down and Buckle Up.  The data
21     strongly suggests that having passengers and
22     F/As -- what are F/As? --
23     A.      I assume flight attendants.
24     Q.      -- seated with seat belts fastened in
25     an effective measure during a turbulence

TROY FAABORG

256

1
2    encounter.

3              Do you see that?

4        A.    Yes.

5        Q.    I did not read that accurately.  My

6    eyes are not good.  I will read it again.

7              The data strongly suggests that having

8    passengers and F/As seated with seatbelts

9    fastened is an effective measure during a

10   turbulence encounter.

11             Do you see that?

12       A.    Yes.

13       Q.    Do you agree with that statement?

14       A.    I do.

15       Q.    It says:  From 1980 to 2003, only four

16   people who were seated with seatbelts fastened

17   received serious injuries during turbulence.

18             Do you see that?

19       A.    Yes.

20       Q.    Any reason to dispute that data?

21       A.    No.

22       Q.    Excluding cases of other people

23   falling onto and injuring properly-secured

24   occupant.

25             That's the end of the sentence?

TROY FAABORG

257

1
2          A.     Yes.

3          Q.     Okay.

4                 Would you agree that the data from the

5    FAA suggests that belted passengers are unlikely

6    to be injured in a turbulence event?

7                 MR. DURKIN:  Objection, calls for

8    speculation, beyond the scope of his

9    expertise --

10                MR. CLIFFORD:  And foundation.

11                MR. DURKIN:  -- and foundation.

12                MR. ESSIG:  He cited this in his

13   report.

14                MR. DURKIN:  That's fine.  That's

15   fine --

16                MR. CLIFFORD:  -- he cited it for a

17   specific purpose on a specific point --

18                MR. DURKIN:  Yeah --

19                MR. CLIFFORD:  -- he didn't adopt

20   everything in it.

21                MR. ESSIG:  Well, I'm not asking you

22   that you have to adopt it.

23                I'm just asking if you agree.

24                MR. DURKIN:  Agree that it's

25   written --

TROY FAABORG

258

1

2          MR. ESSIG:  Agree that the data

3     suggests -- from the FAA -- that belted

4     passengers are unlikely to be injured in a

5     turbulence event --

6          MR. DURKIN:  Over objection.

7          And if you can answer, great.

8     A.    That, I think, is -- that's a

9     reasonable interpretation.  I have no reason to

10    doubt what they are saying.

11    Q.    Did you consider regulations in

12    Ethiopia about whether passengers or crew would

13    have been belted in Flight ET 302?

14    A.    I did not specifically, but made

15    assumptions based on regulations that we've

16    experienced here.

17    Q.    Okay.

18          Was the assumption that you made that

19    most passenger and crew were belted during the

20    flight?

21    A.    The assumption that I made was that

22    there was a rule that items would be stowed and

23    passengers would be belted.

24          And I further assumed that not

25    everyone would follow that rule, just based on

TROY FAABORG

259

1

2     my personal experience with commercial aviation.

3         Q.    So that's why I asked you earlier

4     about your personal experience, if people follow

5     rules or not.

6              I think I was roundly mocked for that

7     question.

8              But now your opinion is that, based on

9     your personal experience flying, that people --

10    not all people follow the rules.

11             Is that what you are saying?

12        A.    Correct.

13        Q.    Do you have any opinion in this case

14    about the proportion of the passengers who would

15    have been belted or not belted?

16        A.    I do not.

17        Q.    More than 50% were belted?

18             MR. DURKIN:   Objection, asked and

19    answered.

20    BY MR. ESSIG:

21        Q.    Do you believe that more than 50% were

22    belted?

23        A.    I would speculate more than 50% were

24    belted.

25        Q.    75%?

TROY FAABORG

1
2              MR. DURKIN:  Same objection.
3      A.      I don't know.  I don't know.
4      Q.      Okay.
5              (Pause)
6      Q.      All right.
7              (Pause)
8      Q.      Did you read Thomas Jenkyn's report in
9   this case?
10     A.      I did not.
11     Q.      Do you know who Thomas Jenkyn is?
12     A.      Yes, I believe he's the biomechanics
13  expert witness, I believe.
14     Q.      Okay.
15             Do you recall if he wrote:  It was
16  assumed that all passengers --
17             MR. DURKIN:  Objection.
18             He said he didn't read it.  How can he
19  recall if he read it?  How can he recall
20  reading -- you are asking, "Do you recall he
21  said this?" when he just told you he didn't read
22  the report.  I mean, with all due respect, okay?
23  BY MR. ESSIG:
24     Q.      So you didn't read the report at all?
25             MR. DURKIN:  That's what he just

TROY FAABORG

261

 1
 2    said --
 3         A.    I did not receive -- the report, no --
 4              MR. DURKIN:  -- you asked him, "Do you
 5    recall him saying this?"  That's all.  That's
 6    why I object.
 7              MR. ESSIG:  Okay.
 8              MR. DURKIN:  Okay.
 9    BY MR. ESSIG:
10         Q.    Do you have any knowledge about
11    whether or not other experts that plaintiffs
12    hired and who tendered reports in this case made
13    assumptions about whether or not all passengers
14    were belted or not?
15         A.    I don't have any information.
16         Q.    Does it matter to you either way?
17              If they assume that passengers were
18    belted, does that cause you to question your
19    assumption?
20         A.    No.
21         Q.    All right.
22              MR. ESSIG:  So on paragraph 13 --
23    sorry, sorry page 13, Exhibit 313 --
24              (Pause)
25    BY MR. ESSIG:

TROY FAABORG

262

1

2          Q.     It says the last paragraph there in

3     that section that we are talking about at the

4     top half of 13 says:  The extreme and sustained

5     nature of the negative G's experienced in final

6     21 sections recorded by the DFDR during the

7     flight would also have been a clear indicator of

8     impending catastrophe for all passengers.

9               Do you see that?

10          A.     Yes.

11          Q.     When you say "the extreme nature --

12     "the extreme and sustained nature of the

13     negative G's experienced final 21 seconds," are

14     you talking about the G's below zero?

15               Or G's below 1?

16          A.     I'm talking about in that case the

17     fact that, by my physiological definition, there

18     was a negative G exposure the entire duration of

19     the 21 seconds -- so not just -- the extremity

20     is both sustained duration and the extreme

21     nature in terms of absolute G load experience;

22     so in both of those respects.

23          Q.     But this paragraph, you are drawing a

24     line here on this paragraph between the prior

25     time period of the flight and the last 21

TROY FAABORG

263

1

2    seconds, right?

3        A.    I'm sorry.  Repeat that please?

4        Q.    The paragraph -- the first sentence

5    says:  The extreme and sustained nature of the

6    negative G's experienced in the final 21 seconds

7    recorded by the DFDR during the flight would

8    also have been a clear indicator of some

9    catastrophe for all passengers.

10            Right?

11       A.    Yes.

12       Q.    So this paragraph is about the final

13   21 seconds, correct?

14       A.    That's correct.

15       Q.    And then you say:  The forces would

16   have resulted in a strong emotional response of

17   fear.

18            Do you see that?

19       A.    Yes.

20       Q.    Do you have any literature, or data,

21   or textbook that says those forces would elicit

22   a strong emotional response of fear in a

23   passenger?

24       A.    No literature; just be on my personal

25   understanding of those mechanisms and my

TROY FAABORG

264

1

2      experience as a physiologist.

3          Q.    Okay.

4                You say that, in the final sentence

5      there:  The passengers and crew surely knew of

6      their impending and inevitable death in the

7      final seconds of the flight.

8                Do you see that?

9          A.    Yes.

10         Q.    Do you know at what point within the

11     21 seconds that people would have known of their

12     impending and inevitable death?

13         A.    No.

14         Q.    Is there any way that you would know

15     that any single person might have held out hope

16     that they might have survived the flight at any

17     point?

18         A.    No.

19         Q.    Did you consider whether all

20     passengers would have understood the physics of

21     flight?

22               Or would have understood the plane was

23     in an unrecoverable position?

24               MR. DURKIN:  Objection, calls for

25     speculation -- form of the question.

TROY FAABORG

265

1
2                    THE WITNESS:  Can you repeat the --
3        sorry.  Can you repeat the --
4                    MR. ESSIG:  Yeah.
5                    MR. DURKIN:  Repeat the objection, and
6        I won't interrupt you.
7                    MR. ESSIG:  No -- and this might be
8        speculative.
9                    (Pause)
10       BY MR. ESSIG:
11           Q.    No, that's the point I'm making --
12                   MR. DURKIN:  Okay -- objection --
13       BY MR. ESSIG:
14           Q.    The point is that it would be
15       speculative to -- for you to give an opinion
16       that all passengers at that point knew the plane
17       was in an unrecoverable position, right?
18           A.    It would be speculative, yes.
19           Q.    Okay.
20                   (Pause)
21           Q.    Did you do any analysis of whether or
22       not there was a different likelihood of injury
23       on Flight ET 302 based on where someone was
24       sitting on the airplane?
25           A.    I did not, no.

TROY FAABORG

266

1
2      Q.    So you don't have any opinion as to
3   whether or not the seating position of any one
4   person caused a greater or lesser chance of
5   injury?
6      A.    No.
7            MR. ESSIG:  Turn to page 15 of your
8   report.
9            I think we should look at Exhibit 316
10  as well.
11           That's the chart that's on page 15,
12  right?
13           THE WITNESS:  That's correct.
14           MR. ESSIG:  If we go back to page 14
15  of the report, Exhibit 313.
16  BY MR. ESSIG:
17     Q.    This is where you use words to explain
18  these different periods of time on your chart,
19  right?
20     A.    Correct.
21     Q.    Okay.
22           (Pause)
23     Q.    The first section on the chart 316,
24  you call:  "De-Rotation" at Takeoff.
25           Do you see that?

TROY FAABORG

267

```
 1
 2         A.    Yes.
 3         Q.    And that begins at roughly 08:38:34
 4    and goes to about 08:38:36, right?
 5         A.    That's about right, yeah.
 6         Q.    In the first full paragraph of page
 7    14, you state:  De-rotation resulted in negative
 8    G force on the aircraft and occupants.
 9              Correct?
10         A.    Correct.
11         Q.    And that de-rotation negative G force
12    you are talking about is a G force between about
13    positive 1.4 and positive 0.7 or so?
14         A.    I don't see where that number is
15    coming from.
16              MR. ESSIG:  So if you go on your
17    chart -- on your report, page 14?
18              THE WITNESS:  Yes.
19    BY MR. ESSIG:
20         Q.    A couple sentences down, it says:
21    This "de-rotation" resulted in a negative G
22    force in the aircraft and occupants that lasted
23    approximately seven seconds.  The DFDR showed
24    that the maximum negative G force experienced
25    during this maneuver was 0.63 G.
```

TROY FAABORG

268

1
2          Do you see that?
3     A.    Yes.
4     Q.    So that maximum negative force in that
5     period of time was a positive 0.63 G, right?
6     A.    By integer, yes --
7     Q.    Okay --
8     A.    -- right.
9     Q.    Your opinion is that it would just
10    feel like the airplane had stopped climbing,
11    correct?
12    A.    Correct.
13    Q.    Do you know what the pitch angle of
14    the airplane was at that point in time?
15    A.    That's slightly beyond the scope of my
16    analysis.
17          My understanding from brief
18    discussions with -- oh, help me with his name --
19    who I got the -- Mr. Pereira, was that there
20    were some discrepancies between what was
21    recorded and what was actual for some of the
22    values other than those that I was looking at
23    for G.
24          And so I didn't look at those because
25    I didn't want to make any mistakes and present

TROY FAABORG

269

1

2    any wrong data.

3              So I don't know what the pitch angle

4    was specifically at that time.

5         Q.    Okay.

6              So you don't know whether the nose

7    during the specific time of de-rotation was

8    pitched up and down.

9              Is that correct?

10        A.    That's correct.

11             I know that there was a nose down

12   control input but I don't know if that stopped

13   the climb-out and actually resulted in a nose

14   down attitude or not.

15        Q.    Did you look at the altitude data to

16   see if the plane was ascending or descending?

17        A.    I did -- but again, didn't want to

18   mischaracterize.

19             On this particular de-rotation, I

20   looked solely at the -- or primarily at the G

21   meter.

22        Q.    Okay.

23             So in this paragraph where you talk

24   about the de-rotation, you don't make any

25   statement about whether the plane was ascending

TROY FAABORG

270

1

2    or descending, right?

3         A.    I do not make any statement in that

4    paragraph.   That's correct.

5         Q.    Okay.

6               So what is the basis for you to say

7    that at that point in the de-rotation that the

8    passengers and crew would have felt like the

9    plane was descending?

10        A.    Because they went from a positive G

11   climb-out to a negative G during climb-out.   And

12   so that change from a positive -- as you said --

13   approximately 1.4, approaching 1.5 during a

14   normal climb-out in the -- just a few seconds

15   after that rotation, to go to below 1 G would be

16   a -- a fairly substantial change in that G

17   force.   And so that feeling of, all of the

18   sudden, not climbing the way you should would

19   feel like you were descending, even though you

20   weren't.

21        Q.    Okay.

22              If the data show the plane was still

23   ascending goes but at a slightly less steep

24   angle or upward pitch, would that change your

25   opinion about how passengers would feel in that

TROY FAABORG

271

1

2      moment?

3          A.     No, because of the G -- basing my

4      analysis and assumptions off of the G forces

5      felt at that time, not the other orientation of

6      the aircraft.

7          Q.     Okay.

8              So the next period you have labeled on

9      your chart -- Exhibit 316 -- is the:  12-second

10     Negative G Experience.

11             Do you see that?

12         A.     Yes.

13         Q.     And that begins at approximately

14     39:47, right?

15         A.     Correct.

16             MR. ESSIG:  And that's the first

17     sentence of the second full paragraph here on

18     page 14?

19             THE WITNESS:  I agree.

20     BY MR. ESSIG:

21         Q.     You describe this period in the second

22     full paragraph:  According to the DFDR data, the

23     average G force -- sorry -- was about 0.05 --

24     0.85 G (0.15 G less than gravity) with a maximum

25     negative G force of 0.70 G (0.3 G less than

TROY FAABORG

272

1

2      gravity).

3              Right?

4      A.      Correct.

5      Q.      So during this period the passengers

6      would have felt like they weighed, on average,

7      about 85% of their body weight?

8      A.      Correct.

9      Q.      And they would have felt like they

10     weighed at least 70% of their body weight?

11             Right?

12     A.      Correct.

13     Q.      Then further down in the paragraph,

14     you wrote:  The magnitude of G force was not

15     extreme.

16             Right?

17     A.      Correct.

18     Q.      So you agree that forces --

19             MR. DURKIN:  -- objection, incomplete

20     reading of the sentence.

21             You only read half the -- you only

22     read part of the sentence.  You wrote --

23             MR. ESSIG:  I wasn't even reading the

24     sentence.  I just said --

25             MR. DURKIN:  -- you said:  Later down

TROY FAABORG

273

1
2    there, you said this --
3              MR. ESSIG:  -- I didn't --
4              MR. DURKIN:  -- I object to the
5    giving --
6              MR. ESSIG:  -- okay --
7              MR. DURKIN:  -- one-third of the
8    answer --
9              MR. ESSIG:  -- okay --
10             MR. DURKIN:  -- you did say it.
11             (Pause)
12             MR. ESSIG:  I did --
13             (Pause)
14             MR. ESSIG:  All I said was that:  You
15   used the words later in the sentence that the
16   magnitude of the negative G force was not
17   extreme.
18             But I'll read the rest of the sentence
19   that's in there --
20   BY MR. ESSIG:
21        Q.   Later in the paragraph, you say:
22   While the magnitude of the negative G force was
23   not extreme, the 12-second duration of the
24   exposure would have felt like it lasted an
25   extremely long time, particularly because it

TROY FAABORG

274

1

2      felt as if the aircraft was descending toward

3      the ground.

4                Do you see that?

5           A.    Yes.

6           Q.    Would you agree that forces -- at

7      least down to 0.7 G -- are not extreme in terms

8      of G forces? -- vertical G forces?

9           A.    Considering solely the magnitude of

10     the G force, and no other contextual factors, if

11     that's the question you are asking, then, yes,

12     it is not extreme on its own just in the

13     magnitude of the force.

14          Q.    Okay.

15                And this -- when we talked before,

16     this is the period you believe that -- at least

17     starting during this 12-second negative

18     different G experience -- that, according to

19     your definition of "injury," most passengers

20     suffered an injury?

21          A.    That is correct.

22          Q.    Okay.

23                Is it your opinion that all passengers

24     at this moment suffered an injury?

25          A.    I believe that all passengers in this

TROY FAABORG

275

1
2    moment had the same physiological, and physical,
3    and psychological effect brought on by an
4    unexpected outcome, which to my definition meets
5    that definition of "harm."
6        Q.    Okay.
7            The next sentence after the one I read
8    with "the negative G force was not extreme,"
9    followed by many other words, was:  Aircraft
10   movement of this nature, this early in the
11   flight profile, coupled with clear visual
12   indications of the aircraft's relative proximity
13   to the ground surely alarmed the passengers.
14           Do you see that?
15       A.    Yes.
16       Q.    Do you have any opinion as to how many
17   passengers could see out of the airplane at that
18   moment?
19       A.    I do not have any opinion on that.
20       Q.    Do you know if any passengers other
21   than passengers at the window seat would have a
22   clear visual indication about the airplane's
23   relative proximity to the ground?
24       A.    In my experience as a passenger in a
25   non-window seat, I would say many, more than

TROY FAABORG

276

```
 1
 2    half, would.
 3         Q.    Okay.
 4               No -- it is just your experience,
 5    right?
 6         A.    Just my personal experience.
 7         Q.    All right.
 8               If we go back to the chart, we have
 9    the "9-second Drop" as the next part, right?
10         A.    The next indicated --
11         Q.    The next indicated --
12         A.    -- right.  Hm-hmm.
13         Q.    -- yeah.
14               So if we look in -- the text of page
15    14 says:  The next clear indicator of the
16    extreme abnormality of the flight profile
17    occurred at 8:41:15 local time when the aircraft
18    suddenly pitched down and lost approximately 370
19    feet of altitude.
20               Do you see that?
21         A.    Yes.
22         Q.    It says:  And the passengers
23    experienced negative G's during a nine-second
24    drop.
25         A.    Yes.
```

TROY FAABORG

277

1

2          Q.      During this period based on the G

3     forces that you are reporting here, you say:

4     They would have -- the average G force was,

5     during this time, 0.67 G.

6                  Right?

7     A.      Yes.

8          Q.      And a maximum negative G of 0.44.

9                  Right?

10    A.      Yes.

11         Q.      This period of time, passengers would

12    have felt like they weighed on average about

13    two-thirds of their normal body weight, right?

14    A.      On average, yes.

15         Q.      And at least a little less than half

16    their normal body weight, right?

17    A.      Correct.

18         Q.      So gravity is still pulling the

19    passengers down in their seat during this

20    period, right?

21    A.      Correct.

22         Q.      In the direction that gravity normally

23    pulls you?

24    A.      Yes.

25         Q.      At the end of the paragraph, you wrote

TROY FAABORG

278

1

2      that:  During this period, passengers would have

3      felt some strain against their seatbelts and

4      harness.

5              Do you see that?

6      A.    Yes.

7      Q.    Why do you think they would have felt

8      strain against their seatbelt and harness if

9      they were still being pulled down to the ground

10     by the force of gravity?

11     A.    Because the forces were not to the

12     same degree; and there were other -- other

13     motions at the time as that descent was

14     occurring -- so not that they were being pulled

15     from their seat, but it would be a different

16     sensation because it's not under the same G

17     condition.

18     Q.    Okay.

19             At this point in the flight, are there

20     any -- you considered during this 9-second drop

21     that you've highlighted on Exhibit 316 to also

22     be significant enough to cause injury to all the

23     passengers on the flight.

24             Is that true?

25     A.    Yes, that's true.

TROY FAABORG

279

1

2          Q.     Is the injury that's happening during

3     the 9-second drop a physical injury?

4               Or a psychological injury?

5          A.     Yes.

6               So I think meeting the definitions

7     both of a physical and physiological response

8     that was unwanted or unexpected, in addition a

9     psychological response, so I would say:  Both.

10         Q.     Do you think the G forces in either

11    the 12-second negative G experience or the

12    9-second drop were sufficient enough to cause

13    physical harm to the passengers?

14               MR. DURKIN:  Objection, asked and

15    answered.

16               MR. ESSIG:  I don't -- not

17    psychologically.

18               I'm just talking:  Purely structurally

19    to their body, physically, was it enough --

20    would the G forces in those two experiences that

21    you highlight on your chart -- were those G

22    forces significant enough to cause physical

23    injury to those people?

24         A.     I feel like that's outside of my

25    scope, since that's not directly what I was

TROY FAABORG

280

```
 1
 2     analyzing for, you know, biomechanics of the
 3     event.
 4          Q.    Okay.
 5                To be clear, the three paragraphs that
 6     we just covered, you don't actually use the word
 7     "injury" in any of those paragraphs, right?
 8                MR. DURKIN:   In these three
 9     paragraphs?
10                MR. ESSIG:  Yes.
11                MR. DURKIN:  Let me look through.
12                Can he look through?
13                MR. ESSIG:  Please take a look --
14                THE WITNESS:  Not the --
15                MR. ESSIG:  -- we covered the first
16     paragraph on the de-rotation, the second
17     paragraph on 12-second negative G, and the third
18     paragraph on 9-second drop.
19                And in your report, there isn't the
20     word "injury" anywhere in those paragraphs.
21                That's my question.
22          A.    I agree with that.  That's correct.
23          Q.    During the 9-second drop -- the
24     paragraph on the 9-second drop -- the third one
25     that we are talking about here? --
```

TROY FAABORG

281

1

2          A.     Yes.

3          Q.     -- you say:  To the passengers, this

4     drop felt like an extreme roller coaster's

5     initial descent that lasted even longer and

6     would have felt -- and they would have felt some

7     strain against the seatbelts and harnesses.

8               Do you see that?

9          A.     Yes.

10         Q.     What's your basis for saying:  The

11    drop would have felt like an extreme

12    rollercoaster's descent?

13         A.     The basis is as a personal experience,

14    having ridden roller coasters, and comparing

15    that less than 1 but more than zero-G initial

16    drop on a rollercoaster.

17              I don't know what the specific numbers

18    are, but it's not a free-fall kind of condition.

19              So making that parallel, again, just

20    to put this into a context of something that

21    many people could understand or have had an

22    experience to be able to relate to.

23         Q.     Did you look at the G forces

24    experienced on an extreme rollercoaster's

25    initial descent?

TROY FAABORG

282

1
2      A.     I -- very early on Googled a few
3   things, but not anything that I would consider
4   to be real research, just out of curiosity, to
5   see if there was anything of interest or
6   anything published that might be helpful -- so
7   informal, but formal.
8      Q.     So you didn't make a direct comparison
9   about the particular G forces experienced on an
10  extreme roller coaster's descent and G forces in
11  this 9-second drop, did you?
12     A.     Not directly, no.
13     Q.     And it says in the paragraph that they
14  lost approximately 370 feet of altitude over
15  nine seconds, correct?
16     A.     Yes.
17     Q.     Do you have any sense about whether or
18  not a rollercoaster would go up or down 300 feet
19  in nine seconds?
20     A.     I could make a speculation as a
21  rollercoaster enthusiast -- but, no, not
22  formally.
23     Q.     All right.
24          The next part is -- the bottom of page
25  14 says:  Over the next two minutes, there were

TROY FAABORG

283

1

2    many more rapid changes in G forces, including

3    eight more digressions from normal flight into

4    negative G.

5              Right?

6        A.    Yes.

7        Q.    This is the "Continued Digression from

8    Normal Flight"? --

9        A.    That's correct --

10       Q.    -- on Exhibit 316?

11       A.    -- yes.

12       Q.    And you have that highlighted in red,

13   right?

14       A.    I do.

15       Q.    You describe in this section of the

16   flight at the bottom of page 14 on to 15.

17             And you talk about the peak force for

18   each digression, which you call "negative G,"

19   right?

20       A.    Correct.

21       Q.    And those range from -- you can take a

22   look at the bullets there -- 0.85 G's to 0.5

23   G's, right?

24       A.    I will take your word for that, yes.

25       Q.    Those are all, from an integer

TROY FAABORG

284

1
2     perspective, positive numbers, right?
3          A.     Positive numbers, negative G, correct.
4          Q.     So if these peaks of the digression
5     that we are talking about here -- the two-minute
6     digression -- passengers would have felt like
7     they weighed between 85 and 50% of their body
8     weight, right?
9          A.     Yes.
10         Q.     Would you agree that those are not
11    extreme G forces -- 0.85 G to 0.5 G?
12         A.     I would not agree with that, no.  For
13    a commercial aircraft, 0.5 I think is extremely
14    uncommon -- so no, I don't agree with that.
15         Q.     Okay.
16                Any data -- I think we have talked
17    about this before -- but you don't have any
18    particular data that describes exactly how
19    common or uncommon 0.5 G's are in a commercial
20    aircraft, right?
21         A.     I do not, no.
22         Q.     So the only basis you have for that is
23    just your own personal opinion, right?
24         A.     Informed personal opinion, I think,
25    based on, again, experience with this sort of

TROY FAABORG

1

2      information, other discussions informally about

3      what is normal for a commercial aircraft.

4             So nothing published or cited, no.

5             But certainly informed, I think expert

6      opinion.

7      Q.    Are there -- is there any additional

8      type of injury that passengers are experiencing

9      during this portion of the flight that you have

10     labeled "Continued Digressions from Normal

11     Flight (Negative G)" that are different than the

12     injuries that they were experiencing in the

13     "9-second Drop" or the "12-second Negative G

14     Experience"?

15     A.    I would say not anything different.

16     All of the things that I discuss later in the

17     report -- which I'm sure we are getting to --

18     are more and more likely the further along the

19     event goes.

20            So I wouldn't characterize anything

21     new or different, not at this point, no.

22     Q.    Okay.

23            MR. ESSIG:  Okay, let's take a break.

24            THE VIDEOGRAPHER:  We are off the

25     record.  The time is 2:36 p.m.

TROY FAABORG

286

 1
 2                (Recess from 2:36 p.m. to 2:52 p.m.
 3      Eastern Standard Time)
 4                THE VIDEOGRAPHER:  We are back on the
 5      record.  The time is 2:52 p.m.
 6    BY MR. ESSIG:
 7        Q.    Good to see, you Mr. Faaborg.  Welcome
 8      back.
 9                We are getting there.  We are getting
10      there.  Not too many pages left in your report.
11        A.    All right.
12        Q.    Before the break, we were talking
13      about the range of G forces in one of the
14      periods of time being between 0.85 G and 0.5 G.
15                And you said 0.5 G was extremely rare
16      during commercial flight, right?
17        A.    Correct.
18        Q.    Okay.
19                I don't want to mischaracterize --
20        A.    Correct.
21        Q.    -- your opinion.
22                And I asked you if whether or not you
23      had ever looked at data or a dataset on
24      commercial airline flight to determine just how
25      rare it was, or if it, in fact, was rare.

TROY FAABORG

287

1

2          And you said you had not.

3          Correct?

4     A.   That is correct.

5     Q.   But you said it was your informed

6     opinion that it was rare?

7     A.   Correct.

8     Q.   What is the basis for your informed

9     opinion?

10         What's the information there that you

11    are relying on?

12    A.   My informed opinion is based on my

13    experience flying on -- granted -- military but

14    cargo, large, you know, heavy aircraft; informal

15    conversations with fliers about what normal

16    ranges are; and just my own personal experience

17    flying in those airframes.

18    Q.   And so when you are -- in military

19    aircraft, you are experienced -- just let's take

20    those in pieces --

21    A.   Sure.

22    Q.   -- in the military aircraft -- your

23    experience flying in those -- do you have, like,

24    a G meter or something like that, so you can see

25    the actual amount of G's?

TROY FAABORG

288

1

2           And did you calculate what the range

3    of normal was for those flights?

4           Or not?

5    A.    I have been able to see G meters on

6    the flight deck during flight operations.

7           I did not -- that wasn't the purpose

8    of the flight, so I didn't take specific note.

9           But just that I think background

10   knowledge and understanding of how flight

11   operations generally go.  And that to me is --

12   that informs that opinion.

13   Q.    Okay.

14           And so when you just are looking at

15   those G meters, is that just you happen to be

16   looking at themselves sometimes?

17           Sometimes you are not?

18   A.    Correct.

19   Q.    You just don't recall seeing 0.5 G's

20   very often?

21           Is that the basis of your opinion?

22   A.    Along with everything else that I

23   said, yes.  So of that part, yes, that's

24   correct.

25   Q.    Okay.

TROY FAABORG

289

1
2                    And then you said the next part of
3        your basis was talking to pilots, right?
4            A.    Correct.
5            Q.    And military pilots were who you were
6        talking to?
7            A.    And commercial pilots.
8            Q.    You have talked to commercial pilots
9        as well?
10           A.    I have.
11           Q.    Did you ask them directly:  How often
12       do you experience 0.5 G's?
13           A.    Not in those words, no.
14           Q.    What words did you use?
15           A.    More along the effect of:  What is a
16       normal G range that you would experience on a
17       normal flight?
18           Q.    Okay.
19                 What did they say?
20           A.    What we have said before:
21       Neighborhood of 0.7-ish if there is turbulence
22       to 1.3 neighborhood -- that ballpark.
23           Q.    Right.
24                 And so when -- I'm just trying to
25       understand the opinion here.

TROY FAABORG

1

2          When you talking about "neighborhood

3   0.7, neighborhood 0.1 -- 1.3" -- when you say

4   the word "neighborhood," do you mean it could be

5   a little lower, could be a little higher?

6        A.    I say that because I don't

7   specifically remember the number, and don't want

8   to mischaracterize that it's a set range that I

9   was given of 0.7 to 1.3.

10          I believe those were the numbers.  If

11   not, it was very, very close to that.  It was

12   not 0.5.

13        Q.    Okay.

14          So it might have been 0.6?

15          You don't know?

16        A.    I don't know.

17        Q.    It was not 0.5?

18        A.    It was not.

19        Q.    But just because 0.5 is a tenth of a G

20   or so outside of normal, they didn't give you

21   information about how rare or frequent that was.

22          It just isn't normal.

23          That's the only thing you know?

24        A.    That's correct.

25        Q.    Then the last part is talking about

TROY FAABORG

291

1

2    either your own personal flying experience or --

3    did you talk to passengers?

4              Is that what you are saying?

5    A.    Air crew, other -- just having flown

6    before -- all of that.

7    Q.    In that bucket of experience, did you

8    have a G meter with you?

9              What's the basis of your

10   understanding?

11   A.    No.

12             Coupling with what I've experienced,

13   what -- you know, turbulent events that I

14   believe were within the normal range -- that's

15   the basis of my personal opinion.

16   Q.    You think turbulence events are within

17   the normal range of flight?

18             Or outside?

19   A.    Experiencing turbulence that I believe

20   to have been within what we have characterized

21   as the normal range.

22   Q.    Okay.

23             So no quantitative basis in that

24   bucket of experience about talking to passengers

25   or your own personal experience about exactly

TROY FAABORG

292

```
1
2     the number -- the amount of G forces you have
3     experienced on a plane, or that they have,
4     right?
5          A.    Correct.
6          Q.    And no direct conversation with
7     anybody, saying "I experience 0.5 G's X or Y
8     amount of times" or anything like that?
9          A.    Not to that degree, no.
10         Q.    Okay.
11               MR. ESSIG:  So if we go -- I think we
12    should switch to Exhibit 317.
13    BY MR. ESSIG:
14         Q.    This is the final 21 seconds of the
15    flight, correct?
16         A.    The final 21 seconds of the recorder
17    data, yes.
18         Q.    So we've covered this before.
19               You have the "Negative Gz Sustained
20    Until Crash" at the top there, the red line that
21    covers the full 21 seconds.
22               Correct?
23         A.    Correct.
24         Q.    And to be clear -- I think it was Mr.
25    Lebovitz had pointed out -- you don't mean it
```

TROY FAABORG

293

1

2      there from an integer perspective, there were

3      negative G's this entire time -- right? -- in 21

4      seconds?

5          A.    Correct.  I mean that from 21 seconds

6      prior to the end of the recording until the

7      recording ended, the G load was less than 1 for

8      the duration of that time.

9          Q.    Okay.

10              And in this period of the flight -- we

11      talked about whether or not there were injuries

12      in prior periods.

13              If we look at this particular period

14      of the flight, are there additional new injuries

15      that occurred during this 21-second period that

16      weren't occurring before for all passengers?

17          A.    If we -- if we review the specific

18      list of what can characterize as harm or injury,

19      there are many that I believe are absolutely

20      occurring for every person during this period,

21      if not before.

22              So I'm not -- I'm not saying that we

23      are adding anything new during this period.

24              It's the degree of likelihood, the

25      number of passengers, that's the part that

TROY FAABORG

294

```
1
2      changes.  There are a couple of the more extreme
3      physiological and physical effects that would be
4      in the final very high G ranges -- the last six
5      seconds or so -- that are most likely during
6      that period.
7             So those are the only exceptions, I
8      think, as far as anything new with those that
9      are related to the extremely high negative G
10     load.
11     Q.    You said that the two things that you
12     were -- in your analysis on injury were the
13     degree of likelihood that they sustained the
14     injury?
15     A.    Yes.  If we want to talk about that,
16     as I describe later in the report, in
17     physiological and psychological effects, yes,
18     the degree of likelihood was one of the criteria
19     that I was looking at.
20     Q.    Okay.
21            And then you also -- you have anything
22     about the number of passengers that experienced
23     any effects?
24            Is that true?
25     A.    Yes, not by -- not by discrete number,
```

TROY FAABORG

295

1
2      but just as -- as I was getting advice from the
3      team related to the structure of the report and
4      how to characterize the physiological effects;
5      just understanding, saying, "This is the effect"
6      was not enough.
7              But to say, as an expert, "all of the
8      people, all of the time, some of the people some
9      of the time," and classifying those
10     appropriately.
11             So that's how I structured that
12     portion of the report in:  I believe, all of
13     these happened to everyone on the aircraft; I
14     believe most of these happened to everyone on
15     the aircraft; I believe some of these happened
16     to most of the people -- in that manner.
17     Q.     Who do you mean by "the team"?
18     A.     The -- the legal team -- the legal --
19     the plaintiffs' attorneys, as they were
20     providing my initial -- the initial instruction,
21     having not done a Rule 26 report before.
22     Q.     And are you -- I'm just trying to
23     understand what you said there.
24             The team told you how to structure
25     part of the report?

TROY FAABORG

296

1
2           MR. DURKIN:  Object -- but go ahead.
3           MR. ESSIG:  That's just what he said.
4           MR. DURKIN:  Yeah, I know but -- go
5      ahead --
6           (Pause)
7           MR. ESSIG:  Okay.  I'm going to ask my
8      question.  You can level your objections.
9           MR. DURKIN:  You bet --
10          MR. ESSIG:  Got it.
11   BY MR. ESSIG:
12      Q.   You said the team instructed you about
13      how to structure the part of your report where
14      you talked about the likelihood of injury.
15           Am I mischaracterizing what you are
16      saying?
17      A.   Yes.
18           MR. DURKIN:  I am objecting to this to
19      be work product and a privilege -- that you
20      should not be able to get into in that type of
21      conversation.
22           MR. ESSIG:  So instructing him not to
23      answer that question?
24           MR. DURKIN:  Right.  I mean, I --
25           MR. ESSIG:  You can do whatever you

TROY FAABORG

1

2      want.  I just don't want to -- asked and

3      answered --

4                MR. DURKIN:  -- I think you do an

5      explanation based on his prior question.

6                So I'm going to allow this one --

7      okay? -- so you can get the explanation, okay?

8                MR. ESSIG:  -- okay.  I'm not trying

9      to get into that --

10               MR. DURKIN:  -- without waiving it.

11     But I know he answered, so go ahead --

12               MR. ESSIG:  Yes --

13               MR. DURKIN:  -- and I'm going to be

14     fair and open minded to you.

15               MR. ESSIG:  Thank you.

16               MR. DURKIN:  Let's go then.

17        A.    So I believe the way that you just

18     asked it does mischaracterize.

19               I have never written, until now, a

20     Rule 26 report.  And so very early in the

21     process, guidance was given on the structure of

22     a Rule 26 report, not how to structure or how

23     to -- how to organize my report.

24               Similarly, as I -- as we initially

25     spoke on what I do as a physiologist in the

TROY FAABORG

1
2      analysis of the effects in an aviation crash
3      like this, I explain; I look at the data; make
4      the inferences, and analysis, and results of
5      what happened to who, when -- not to who -- what
6      happened to the passengers when.
7                  And from a legal perspective, the
8      clarification on -- it's not enough to, for
9      example, say, "This is what happened."
10                 But we have to present with reasonable
11     certainty as a subject matter expert these
12     various categories.
13                 It was not in reference specifically
14     to my analysis or result, but general guidance
15     on how a subject matter expert report is put
16     together.
17         Q.    You were given general guidance on the
18     level of certainty that you needed to reach in
19     your expert report.
20                 Is that what you are saying?
21         A.    Yes, because I had never done that
22     before, and that was out of my -- out of my
23     normal lane.
24                 And so that general guidance to help
25     craft this in the way that it was required --

TROY FAABORG

299

1
2          Q.     Is that level of certainty -- that
3    general guidance you were given -- different or
4    the same as the level of certainty you would
5    apply in your field?
6          A.     It's the same, but -- it's the same
7    and different.
8                 It's the same process, the same
9    conclusions.
10                But within a safety investigation, I
11   don't have a burden of proof I need to meet.
12   The way the Air Force regulations are written is
13   our conclusions as a safety investigation board
14   are solely based on the weight of the evidence
15   and the subject matter expert's opinion.  That's
16   the end.
17                And so there is no "to a reasonable
18   degree" or even the NTSB, their "most probable
19   cause."  We don't have that burden.
20                So that was the shift that I had not
21   had to make previously.  So that's what that
22   guidance was for.
23         Q.     Understood.
24                This type of opinion is just not one
25   you have ever done before?

TROY FAABORG

300

1
2          A.     A Rule 26 report?
3          Q.     Making this kind of opinion with this
4     kind of a degree of certainty about whether or
5     not people were injured.
6          A.     I have never had to use those words.
7                 We have had to do the same process
8     and, again, meet the burden of weight of the
9     evidence in subject matter opinion -- expert
10    opinion, but just not within those words --
11         Q.     Okay --
12         A.     -- so the reports that we provided for
13    Air Force safety investigations were exactly the
14    same process, exactly the same opinion, just
15    written with different words.
16                And that's the part I have not done
17    before.
18         Q.     So just going back to this portion of
19    the flight, then, is it your opinion that there
20    are new and different injuries that are
21    occurring to the passengers on the flight? --
22    some or all of them?
23                Or is it just that the degree of
24    likelihood of the injuries that were occurring
25    and the number of passengers that were injured

TROY FAABORG

301

1
2       is higher during this period of the flight?
3            A.     In which period specifically?
4            Q.     The final 21 seconds --
5            A.     Yes --
6            Q.     -- on Exhibit 317.
7            A.     -- yes.  As I point out on page 19 of
8       my report, there are -- the final group of
9       experiences are relegated to the final 21
10      seconds.
11                  (Pause)
12                  MR. ESSIG:  So just looking at that --
13      just so we are clear, we are in Exhibit 313, we
14      are at page 19.
15      BY MR. ESSIG:
16           Q.     Correct?
17           A.     Correct.
18           Q.     And then you are talking about the --
19      before the Summary and Basis of Conclusions, the
20      little section of the report above that.
21                  And it says:  Given the extreme nature
22      of the flight forces in the final 21 seconds of
23      flight, some passengers could or might have
24      experienced the following to the varying
25      degrees.

TROY FAABORG

302

1

2              Do you see that?

3       A.     Yes.

4       Q.     This is the portion of the report you

5    were talking about?

6       A.     Correct.

7       Q.     And you are saying here there are

8    some -- passengers may have experienced the

9    things in these three bullets in the final 21

10   seconds that they didn't experience before.

11             Is that true?

12      A.     That is possible, yes -- that in the

13   final 21 seconds, as I'm saying, some passengers

14   could or might have experienced these to varying

15   degrees.

16             Now, let me use cardiac arrest as an

17   example.

18             Is there the potential that someone

19   could have had a cardiac arrest during this

20   before the final 21 seconds?  That -- there is

21   certainly that possibility, because of the

22   effects of the forces being as extreme as they

23   were in this time.  That's why I list those as

24   being most likely during that 21 seconds.

25             They could have happened before that.

TROY FAABORG

303

1

2      But those would -- to your previous question, am

3      I bringing anything new into this period for

4      injury? -- those three -- I would say:  Yes.

5           Q.    When you say "some passengers could or

6      might have experienced," what degree of

7      certainty are you talking about there?

8           A.    I don't have a quantifiable number.

9                 Given the physiological extremes, and

10     the physical extremes as that -- especially at

11     the very end, very extreme flight profile, as a

12     physiologist I can't take those off of the table

13     saying, "No, they would not have occurred."

14                So I don't have a specific degree of

15     certainty.

16          Q.    And I'm going to ask you whether or

17     not certain degrees of certainty were met, just

18     because I need to understand --

19          A.    Sure --

20          Q.    -- the -- that level of certainty that

21     you did reach in this.

22                But feel free to tell me that you

23     didn't know, or you don't know -- that kind of

24     thing.

25                So you think it's more than 50% likely

TROY FAABORG

304

1

2      that some passengers could or might have

3      experienced those following issues?

4                 MR. DURKIN:  Which following ones --

5                 MR. ESSIG:  Momentary --

6                 MR. DURKIN:  The question is:  Is it

7      more likely that some could have, might have,

8      experienced the following?

9                 Is that your question?

10                MR. ESSIG:  Yeah, we can start

11     there --

12                (Pause)

13   BY MR. ESSIG:

14     Q.    So that the three things you list

15     under here in the last 21 seconds, just to be

16     clear:  Momentary stopping of the heart (10 to

17     15 seconds) -- does that mean stopping of the

18     heart for less than 10 to 15 seconds is not

19     something you considered?

20                Or -- what's the parenthetical there

21     for?

22     A.    Because that aligns with one of the

23     sources that I cited previously -- that that's

24     how they defined "momentary."

25     Q.    Okay.

TROY FAABORG

305

         1

         2              The other is:  Subconjunctival

         3    hemorrhages.

         4              Right?

         5       A.     Correct.

         6       Q.     And the other is cardiac arrest?

         7       A.     Correct.

         8       Q.     So is it your opinion that it's more

         9    than likely than not some passengers experienced

        10    one of those three things?

        11       A.     In this case, I would not say "more

        12    likely than not" for those three --

        13       Q.     Okay --

        14       A.     -- and that's what differentiates it

        15    from the previous section that I do classify as

        16    more likely than not.

        17       Q.     When you say "more likely than not,"

        18    is your understanding what that standard is more

        19    than 50% likely?

        20       A.     Based on the discussion today, yes.

        21       Q.     You used the standard here "could or

        22    might," right?

        23       A.     Right.

        24       Q.     Those are different words than "more

        25    likely than not," right?

TROY FAABORG

306

1
2          A.    Correct.
3          Q.    Is there a percent certainty you could
4     ascribe to "could or might"?
5          A.    There is not, no.
6          Q.    Is it less than 10%?
7                MR. DURKIN:  -- objection --
8          A.    I don't know --
9                MR. DURKIN:  -- asked and answered,
10    asked and answered --
11               MR. ESSIG:  I can ask questions to try
12    to understand his testimony.  If he -- he can
13    say no, no, no --
14               MR. DURKIN:  You asked him if there
15    was a percentage, and he said "no" --
16               MR. ESSIG:  And so I am going to ask
17    him to --
18               MR. DURKIN:  -- and now you ask him a
19    percentage -- maybe I just don't understand.
20    Maybe I'm just --
21               MR. ESSIG:  Are you saying I can't ask
22    the question?  Are you -- or that --
23               MR. DURKIN:  -- I think it becomes
24    argumentative because --
25               MR. ESSIG:  -- it is not

TROY FAABORG

307

1

2    argumentative.  This happens in every

3    deposition --

4              MR. CLIFFORD:  "Asked and answered" is

5    a -- fair and proper --

6              MR. DURKIN:  -- right --

7              MR. CLIFFORD:  -- objection --

8              MR. ESSIG:  It's fine --

9              MR. CLIFFORD:  -- you want to say "no"

10   to that by saying, "I want to keep asking

11   because I need to understand him."  And we are

12   quarreling with that.  We are --

13             MR. ESSIG:  Got it --

14             MR. CLIFFORD:  -- we take exception to

15   that.

16             MR. ESSIG:  -- objection recognized.

17             MR. CLIFFORD:  Well, at some point, we

18   will -- we will go further in our instruction to

19   the witness.

20             You just cannot repeatedly ask the

21   witness the same question.

22             (Pause)

23   BY MR. ESSIG:

24        Q.   Can you answer the pending question?

25             MR. DURKIN:  Can we have the court

TROY FAABORG

308

1

2       reporter read --

3                   MR. ESSIG:  Please.

4                   (Pause)

5                   (Whereupon the following was read

6       back:

7                   "Q.   Is there a percent certainty you

8       could ascribe to "could or might"?

9                   "A.   There is not, no.

10                  "Q.   Is it less than 10%?

11                  "A.   I don't know.")

12          A.    Correct.  I don't know.  I don't have

13      a number.

14          Q.    So you can't ascribe any percent from

15      zero to 50 as to whether or not these three

16      things that you list here in the bullets we are

17      talking about occurred in some of the

18      passengers.

19                  Is that right?

20                  MR. CLIFFORD:  Objection to form.

21      Zero to 50?  Zero to 100?  You can't limit it

22      that way.

23                  MR. ESSIG:  Zero to 100 is all the

24      percentage, right?  So there can't be any

25      more percentages --

TROY FAABORG

309

1
2              MR. CLIFFORD:  -- all --
3  BY MR. ESSIG:
4       Q.    You can't ascribe any level of percent
5  likelihood at all to whether or not these things
6  happen.
7              Is that correct?
8       A.    I cannot ascribe any percent.  That's
9  correct.
10      Q.    Fine.
11             (Pause)
12             MR. ESSIG:  We are getting there.
13             (Pause)
14             MR. ESSIG:  So we are going to be --
15  we actually kind of jumped ahead and cut off one
16  part of this.
17             But all I'm going to do is the last
18  part of the report here on page 17 to 19.  It's
19  a tiny part of 17 to the first top part of 19.
20             And then -- you title this -- this
21  part of the report:  Physiological and
22  Psychological Effects on Passengers.
23  BY MR. ESSIG:
24      Q.    Do you see that?
25      A.    Yes.

TROY FAABORG

310

1

2          Q.    At the bottom of page 17, you write:

3    Because the forces of flight apply to the entire

4    aircraft and all people on board, the physical

5    effects and initial physiological effects of

6    these forces were experienced by every person on

7    the aircraft.  As such, it is reasonable to

8    conclude that every passenger and crew member of

9    the flight ET 302 experienced the following

10   physiological effects to the fluctuations of the

11   G forces.

12          Do you see that?

13          A.    Yes.

14          Q.    Are you saying it's more likely than

15   not -- that that is true for this portion?

16          A.    That which part is true?

17          Q.    You say:  It's reasonable to conclude

18   that every passenger and crew member of Flight

19   ET 302 experienced the following physiological

20   effects and -- to the fluctuations of the G

21   forces.

22          And I'm asking:  When you say "it's

23   reasonable to conclude," are you saying -- do

24   those words mean "it's more likely than not"?

25          A.    No, they mean:  It occurred for every

TROY FAABORG

311

1

2    person, all of those following effects --

3         Q.    Okay --

4         A.    -- 100%.

5         Q.    Okay.

6              So for this area of the report, we are

7    saying:  It's 100% certain it occurred in every

8    single person.

9              Correct?

10        A.    And to clarify "this portion of the

11   report," we are referring to the bullet list

12   that begins the top of page 18, following that

13   introductory paragraph.

14        Q.    Down to "because all passengers"?

15        A.    Correct.  That is correct.

16             So to be clear, all of those listed on

17   the top half of page 18 -- two bullets and eight

18   sub-bullets --

19        Q.    Yeah --

20        A.    -- my opinion is that every passenger

21   experienced every one of those that are listed.

22        Q.    Fair enough.

23             What's the difference between a

24   physical effect and a physiological effect, as

25   you use it in this part of the report?

TROY FAABORG

312

1

2          A.     They are part and parcel.  As we

3     described earlier, some -- there is significant

4     overlap.  Some could be considered physical.

5               If you are looking simply at -- for

6     example, the changing in shape of an organ may

7     be just a physical difference, or it can have a

8     physiological effect.  If function is affected,

9     it's physiological.

10              So I put those together because they

11    are similar, not to delineate them because they

12    are two different things necessarily.

13         Q.    So it's a physical effect if any of

14    these things in the hollow bullets there

15    occurred?

16              And it's a physiological effect if it

17    occurred, and it impaired function.

18              Is that -- am I understanding that

19    correctly?

20         A.    I think that that's an accurate

21    characterization.

22              So as you would also say anatomical or

23    physiological -- one referring to structure, the

24    other function -- you can't necessarily always

25    pull those apart to say one doesn't affect the

TROY FAABORG

313

1
2    other, or to say, "It's this, or this, but not
3    both."
4              So it's not as much a distinction as
5    physical and physiological as opposed to
6    psychological.  That's -- that's the tease-out.
7         Q.    Okay.
8              Are you saying that it's 100% certain
9    that every passenger on Flight ET 302
10   experienced those physical effects to the point
11   that they impaired function?
12             MR. DURKIN:  Are we talking about --
13             MR. ESSIG:  The same bullets here, the
14   hollow bullets we were just talking about.
15             MR. DURKIN:  -- you kept saying
16   "hollow bullets" -- okay.  I didn't know what
17   those were --
18             MR. ESSIG:  Top of the page --
19             MR. DURKIN:  -- now I see what you are
20   talking about --
21             MR. ESSIG:  -- sorry about that.
22             MR. DURKIN:  -- they are the ones that
23   aren't filled in, therefore hollow --
24             MR. ESSIG:  There is -- hollow,
25   hollow, hollow --

TROY FAABORG

314

```
1
2              (Pause)
3              MR. DURKIN:  Okay, now I know.  I'm
4     just not --
5              MR. ESSIG:  -- no it's good.  I want
6     to be clear.  I think you know what I'm talking
7     about, but let's just be clear.
8  BY MR. ESSIG:
9        Q.   It's -- at the top page 18, there is a
10    set of these physiological responses that you
11    set out.
12             And these are the ones you are talking
13    about that everybody experienced 100%, right?
14       A.    Correct.
15       Q.    And so you said there is a difference
16    between a physical effect and a physiological
17    effect? --
18       A.    It -- to answer the question of, "is
19    there a difference between those within the
20    title of the section?," yes.
21       Q.    Okay.
22             So what I'm asking is -- I think --
23    you have answered it -- it's 100% certain that
24    the things in those bullets -- the hollow
25    bullets here on 18 -- all happened 100%
```

TROY FAABORG

315

1

2      physically; that that effect occurred on all

3      passengers of ET 302, right?

4           A.    Yes.

5           Q.    And the distinction you draw in terms

6      of physiological effect is that that thing

7      happens, but it impairs function, correct?

8           A.    No, that when we are distinguishing

9      between physical and physiological, that we are

10     simply talking structure and function --

11          Q.    Okay --

12          A.    -- so these are physiological changes.

13     All of these are physical and physiological,

14     because the structure changes -- for example,

15     the compression and elongation of the spine, the

16     organs, the shape of the organs -- that also has

17     an effect on function.

18               And so I -- again, I don't tease those

19     apart to differentiate "is it a physical or

20     physiological effect?  Largely it is both for

21     all of these.

22          Q.    Okay.

23               So the testimony is 100% certain every

24     passenger experienced these as a physical and a

25     physiological effect.

TROY FAABORG

316

1
2              Is that true?
3      A.     I believe that classifies it more
4    correctly.
5      Q.     Okay, thank you.
6              And that doesn't matter -- it doesn't
7    matter how old are young the person was?
8      A.     That's correct.
9      Q.     It doesn't matter how strong or in
10   shape they were?
11     A.     To say "it doesn't matter" -- to my
12   expert opinion that 100% experienced this, it
13   does not matter.
14             The degree to which they occurred, it
15   does matter.
16             And so as we spoke quite a bit ago,
17   that will have an effect on the degree or
18   severity, but not on the fact that 100%
19   experienced it.
20     Q.     So the degree to which they
21   experienced this, and severity to which it
22   affects them -- the magnitude of the harm --
23   would depend on certain demographic differences
24   between people, right?
25             Is that a fair statement?

TROY FAABORG

317

```
 1
 2         A.    There can be personal differences.
 3         Q.    Okay.
 4               And that might matter how old or young
 5    you were?
 6         A.    Correct.
 7         Q.    Or how in shape you are?
 8         A.    Correct.
 9         Q.    Or how physically strong you are?
10         A.    I agree.
11         Q.    Or the position you were sitting in
12    during the flight?
13         A.    That I believe to be negligible, based
14    on -- the very first -- I think the only
15    question that I asked of the biomechanics expert
16    before any of the analysis was done -- before
17    any of my analysis was done -- was:  Is there
18    a -- or:  Is there a significant difference in
19    seating position?  Before I saw any of the FDR
20    data asking that question, because I knew that
21    there could be a difference.
22               Then when I saw the magnitude of the
23    data, knew that it comes out in a wash and it
24    didn't matter seating position.
25               So technically, are there negligible
```

TROY FAABORG

318

```
 1
 2    differences?  Maybe.
 3             I didn't -- I didn't look at that.
 4    That's not in my scope --
 5        Q.    Okay --
 6        A.    -- so that?  No, no difference for
 7    seating position for these that I talked about.
 8        Q.    Would there emotional state affect the
 9    degree to which they experienced these physical
10    and physiological effects -- like how afraid
11    they were, or how experienced flying they were?
12        A.    None of the eight sub-bullets -- the
13    hollow bullets -- no.
14        Q.    Okay.
15        A.    I'll use "sub-bullets" if that's okay.
16        Q.    That's fine.
17        A.    The first, because we are talking
18    about more of a psychological response -- I was
19    trying to stay away from the psychological since
20    it's under the physical and physiological --
21    that could have more of an effect for an
22    inexperienced person who is more afraid because
23    we are talking about the psychological
24    fight-or-flight and fear response.
25        Q.    Okay?
```

TROY FAABORG

319

1

2                    MR. ESSIG:  So can is we mark tab 12?

3                    (Pause)

4                    MR. ESSIG:  Is this 320? -- Exhibit

5        320?

6                    (Pause)

7                    THE VIDEOGRAPHER:  Yes.

8                    (Exhibit 320, Multipage document

9        entitled: Introduction to Aviation Physiology,

10       bearing heading on first page: Foreward (no

11       Bates Nos.), marked for identification)

12                   (Pause)

13       BY MR. ESSIG:

14            Q.    Do you recognize this document?

15            A.    I think so, yes.

16            Q.    This is the FAA Introduction to

17       Aviation Physiology you cite in your report?

18            A.    I believe it is, yes.

19            Q.    If you turn the page there under the

20       "Introduction to Aviation Physiology" -- do you

21       see that?

22            A.    Yes.

23            Q.    I think you actually referenced this

24       in one of my answers earlier today.

25            A.    I did.  That's right.

TROY FAABORG

320

```
 1
 2        Q.    I was listening.
 3              It says:  Human beings have a
 4    remarkable ability to adapt to their
 5    environment.
 6              Do you see that?
 7        A.    Yes.
 8        Q.    The human body makes adjustments for
 9    changes in external temperature, acclimates to
10    barometric pressure variations and -- from one
11    habitat to another, compensates for motion in
12    space and postural changes in relation to
13    gravity, and performs all these adjustments
14    while meeting the -- changing energy
15    requirements for varying amounts of physical and
16    mental activity.
17              Do you see that?
18        A.    Yes.
19        Q.    Do you agree with that?
20        A.    Yes.
21        Q.    And it says:  The human body can
22    adjust to acute and chronic reductions in its
23    oxygen supply by increasing respiratory rate,
24    chemical changes in the blood, and by increasing
25    the production of red blood cells.
```

TROY FAABORG

321

1

2          Do you see that?

3     A.    Yes, I do.

4     Q.    Do you agree with that?

5     A.    I do.

6     Q.    And:  As efficient as it is, a

7  complete absence of -- well, I don't need to

8  read that sentence --

9          (Pause)

10          MR. ESSIG:  If we turn back to the

11  Forward here, on the first page of the document,

12  the very front of it.

13          THE WITNESS:  Hm-hmm.

14  BY MR. ESSIG:

15     Q.    The third paragraph there, it says --

16  it starts with:  This booklet?

17     A.    Yes.

18     Q.    It says:  This booklet should be used

19  as a reference during your flying career.

20          And it says:  Remember, every human is

21  physiologically different and can react

22  differently in any given situation.

23          Do you agree with that statement?

24     A.    I do.

25     Q.    And that is again saying essentially

TROY FAABORG

322

1
2      that there is not a one-size-fits-all approach
3      to evaluating whether or not a human will react
4      the same or different under certain conditions.
5              Is that correct?
6      A.     Not necessarily.
7              So there are some physiological
8      responses that I can say with absolute certainty
9      will occur.  The individual differences may have
10     an effect on the degree to which they occur, how
11     rapidly they occur.  But the fact of the matter
12     is that they will occur.
13             And so that -- that is what that
14     specific statement refers to.
15             Example being:  How long can you
16     maintain consciousness at a reduced oxygen
17     capacity?  It depends on where you live,
18     Colorado Springs versus New Orleans.  It depends
19     on age, fitness factors.
20             The bottom line is it's going to
21     occur, so in that respect it's a certainty.
22             The individual differences are talking
23     onset rate, how quickly -- that sort of thing.
24             So, yes and no, for those reasons.
25     Q.     Understood.

TROY FAABORG

323

1

2              But in order to understand when

3    something would happen under certain set of

4    forces for a certain duration, there is

5    variability in that in terms of the human

6    condition, right?

7              Different humans will have that thing

8    occur -- is what you are saying -- have that

9    thing occur at different points in time because

10   of their own individual differences, right?

11        A.    That's correct.

12        Q.    And you don't have, again, any

13   information about the individual demographic or

14   health conditions of any passenger on ET 302,

15   right?

16        A.    That's correct.

17             (Pause)

18             MR. ESSIG:  Can we mark tab 7?

19             (Pause)

20             MR. ESSIG:  We are going to mark tab 7

21   as Exhibit 321.

22             (Exhibit 321, Multipage document

23   entitled: Federal Aviation Administration:

24   Acceleration in Aviation: G-Force (no Bates

25   Nos.), marked for identification)

TROY FAABORG

324

1
2              (Pause)
3              MR. ESSIG:  So this is Exhibit 321
4     that I have handed you.
5              It's titled:  Federal Aviation
6     Administration:  Acceleration in Aviation:
7     G-Force.
8  BY MR. ESSIG:
9        Q.    Do you see that?
10       A.    Yes.
11       Q.    Is that a document you relied on?
12       A.    It is.
13       Q.    If you turn to the fourth page of the
14    document under "OK … What Does This Mean to
15    Me? -- do you see that? --
16       A.    Yes.
17       Q.    -- that paragraph -- it says
18    subsequently:  All aviators need to
19    understand --
20             MR. DURKIN:  What's this paragraph?
21    I'm on page 4.  Is this page 4?
22             MR. ESSIG:  Yes.
23             MR. DURKIN:  And what paragraph?
24             MR. ESSIG:  It's under:  OK … What
25    Does This Mean to Me?

TROY FAABORG

325

1

2          MR. DURKIN:  Oh, got it, okay.  Oh, I

3    was reading the first part of that.  That wasn't

4    what you were reading.  You are going down to

5    the middle of the paragraph --

6          MR. ESSIG:  Right.

7          MR. DURKIN:  -- I got it --

8          MR. ESSIG:  Okay --

9          MR. DURKIN:  -- can you read the

10   beginning of it, too, before you --

11         MR. ESSIG:  Sure.

12         MR. DURKIN:  -- would you mind,

13   because it's -- I'm sure it's --

14         MR. ESSIG:  Yeah --

15         MR. DURKIN:  -- when it says

16   "subsequently," it's referring to the prior

17   statement.

18         MR. ESSIG:  "OK … What Does This Mean

19   to Me?"  That's the title of this little

20   segment.

21         Any aircraft, civilian or military --

22         MR. DURKIN:  You don't have to read --

23   I just wanted to make sure you gave him an

24   opportunity --

25         MR. ESSIG:  Well, I'm going to,

TROY FAABORG

326

1
2     because it's a good point.
3  BY MR. ESSIG:
4        Q.    Any aircraft, civilian or military,
5     can expose a pilot, crew, and passengers to
6     forces in excess of 1 G.
7              Do you agree with that?
8        A.    Yes.
9        Q.    During steep turns and unusual
10    attitude recovery, civil aviation pilots can
11    experience high G forces that may take them by
12    surprise unless they are prepared.
13             See that?
14       A.    Yes.
15       Q.    If it takes them by surprise, under
16    your definition of "injury," are they injured?
17             MR. DURKIN:   Objection, calls for
18    speculation -- hypothetical, form of the
19    question, and otherwise improper.
20             That's it.
21             (Pause)
22       A.    I would need to think through if that
23    meets the definition, because in this case, it's
24    an intended action but an unexpected or
25    unintended effect.

TROY FAABORG

327

1

2            And so this gets into an even more
3    gray area related to harm or injury.

4            So I feel that on first review, yes,
5    it would meet that definition because the effect
6    as a surprise was unexpected and could then be
7    classified as harm.

8        Q.    Okay.

9            So if a civil aviation pilot
10    experiences a high G force, it takes them by
11    surprise that they are not prepared for, under
12    your definition, at least to the best of your
13    ability right now, that would constitute injury?

14        A.    And I'm reading into this that when
15    they say "takes them by surprise," they are
16    inferring physiological compromise of
17    function -- whether it's greyout, blackout, that
18    sort of thing.

19            "Taking them by surprise" is not just
20    the, "I didn't -- "I wasn't ready for that," but
21    the physiological implication that I think is
22    inferred by that statement.

23        Q.    Why do you think "surprise" inferred
24    greyout and blackout?

25            MR. DURKIN:  Objection, misstates the

TROY FAABORG

328

1

2      testimony, calls for speculation.

3   BY MR. ESSIG:

4          Q.    If you don't think that, you can say:

5      It doesn't.

6          A.    When we train pilots on dealing with G

7      forces, for example, with centrifuge training

8      and other high performance, when we say "not

9      being taken by surprise by G," what we are

10     saying is not being behind the curve to where

11     your function is impaired because you didn't

12     prepare effectively for that exposure.

13             And so I read this, from my experience

14     as a physiologist and someone who has trained

15     air crew on acceleration forces and how to deal

16     with them -- "taking them by surprise" -- I read

17     that as preventing an impairment of function

18     because of the effects of that maneuver.

19             That's my interpretation as a

20     physiologist.

21         Q.    Okay.

22             So if it takes them by surprise and

23     that it causes -- did you say:  Greyout?

24         A.    The first stages toward -- the

25     physiological effects of G.

TROY FAABORG

1

2          Q.     Okay.

3                 So is it -- your interpretation of

4     whether or not injury occurred under these

5     circumstances is whether or not it takes them by

6     surprise and causes those physiological effects:

7     Greyout, red out, blackout.

8                 Is that true?

9                 MR. DURKIN:  Objection, misstates the

10    testimony, calls for speculation, incomplete

11    hypothetical.

12         A.     I think it depends on the degree of

13    the physical, physiological, and psychological

14    response.  It could certainly constitute a harm

15    event based on that definition.

16                That's a difficult -- a difficult

17    call.

18         Q.     If it doesn't mean that -- so if it's

19    just takes them by surprise, it was

20    unanticipated, unknown, unpredicted, you know,

21    things that we talked about before -- and they

22    experience high G forces that they are not

23    prepared for, is that an injury under your

24    definition?

25                MR. DURKIN:  Once again, incomplete

TROY FAABORG

1

2      hypothetical, calls for speculation, and --

3          A.    And let's -- so we are not inferring,

4      when we are saying "high G forces," what are you

5      interpreting "high G forces" to mean?

6          Q.    Unfortunately, I didn't -- you cited

7      this paper in your report.  I didn't.  So all I

8      know is --

9                MR. DURKIN:  Well, I'm going to object

10     to that, because -- because that's why I'm

11     saying -- one of the many reasons -- "incomplete

12     hypothetical," right?  You are giving him one

13     statement -- a vague statement -- that's all --

14               MR. ESSIG:  Okay --

15               MR. DURKIN:  -- it's an incomplete

16     hypothetical.

17               MR. ESSIG:  I'm trying to ask him

18     questions about his own reliance material.

19               And so -- he's asking me if I have a

20     definition of "high G forces."  I don't.  It's

21     not my area of expertise, and it wasn't a

22     document I cited.

23     BY MR. ESSIG:

24         Q.    So I don't -- I see in the first

25     sentence, it says "in excess of 1 G," but I

TROY FAABORG

1

2      don't know, to you, that means "high G force" or

3      not.

4           A.    There is not enough information to

5      know if that's high G or not.

6                So when they say "experience high G

7      forces," there is a physiological risk of high G

8      forces.  And so that "taken by surprise" to me

9      means putting yourself at risk for an impairment

10     of function because of those high G forces,

11     which would potentially classify as harm or

12     injury by that definition.

13               That is not the portion of this that I

14     was using to reference in my report.

15               It was the negative G portion that it

16     goes into, because I'm not concerned as much

17     about injury from high G as I am from the low G

18     exposure in the case.

19          Q.    All right.

20               But we did -- so is your testimony

21     that there is no injury due to high G in this

22     case?

23          A.    No --

24               MR. DURKIN:  What case?

25               MR. ESSIG:  This case.

TROY FAABORG

332

1

2          MR. DURKIN:  Which case?  The case in

3     the paper?  ET 302?  I'm totally confused.  It

4     is a very confused by the question.  I'm going

5     to -- first of all, it's argumentative.

6              Second of all, it's an incomplete

7     hypothetical.

8              And it's really vague -- for me at

9     least -- and maybe -- maybe it's just me, but

10    I'm not sure what case you are talking about.

11         MR. LEBOVITZ:  Let me just --

12         MR. ESSIG:  Oh, Lord --

13         MR. LEBOVITZ:  -- got to -- the term

14    that you are referencing here about what --

15         MR. ESSIG:  Are you testifying.  Or is

16    he testifying? --

17         MR. LEBOVITZ:  -- no --

18         (Pause)

19         MR. ESSIG:  -- what is the

20    objection? --

21         MR. LEBOVITZ:  -- the objection is

22    that you are -- your question is taking this

23    paragraph out of context because if you read the

24    entire section that you refer to --

25         MR. ESSIG:  He can say that --

TROY FAABORG

333

1

2                    MR. LEBOVITZ:  -- yeah, but that's --
3      you are framing your questions that --
4                    MR. ESSIG:  -- then say it's
5      misleading -- go on --
6                    MR. LEBOVITZ:  -- out of context
7      because this refers to warmups taken by aviators
8      who are exposed to a high positive G's.  If you
9      read the entire paragraph --
10                   MR. ESSIG:  This is one of the
11     reasons.  It doesn't say it only refers to that.
12                   MR. LEBOVITZ:  If you read the whole
13     paragraph, it refers to "aviators" which are
14     pilots who do --
15                   MR. ESSIG:  I asked him:  Civil
16     aviation pilots can experience high G forces.  I
17     limited the question to that.
18                   Correct?
19                   (Pause)
20                   MR. CLIFFORD:  Let's go on.
21                   MR. ESSIG:  The application of his
22     definition of "injury" to certain conditions is
23     a million percent relevant to understanding his
24     opinion in this case.
25                   MR. CLIFFORD:  And we will give you

TROY FAABORG

334

1
2       that.
3               But what we will not give you is
4       taking matters so out of context and away from
5       this case.  That's all --
6               MR. ESSIG:  Okay --
7               MR. CLIFFORD:  -- ask your next
8       question.  We've got an airplane to catch.
9               (Pause)
10              MR. ESSIG:  We would like to finish.
11      Oh, my God.
12  BY MR. ESSIG:
13      Q.    In order -- we'll go back to the high
14      G forces point that was unclear -- right? -- to
15      you?
16              It says:  Civil aviation pilots can
17      experience high G forces that may take them by
18      surprise unless they are prepared.
19              Correct?
20      A.    Correct.
21      Q.    In determining whether or not they
22      were injured under your definition of "injury,"
23      does it matter if the G forces are high or not?
24              MR. DURKIN:  Objection, calls for
25      speculation, incomplete hypothetical, and taken

TROY FAABORG

1
2      out of context, and, I think, asked and
3      answered, actually.
4              Go ahead.
5      A.     What is considered high is extremely
6      subjective.
7              And without a specific value given, I
8      really don't have -- well, no.
9              My answer would be:  No, I don't agree
10     with that; that there can be injury at very low
11     G, whether negative or positive, that would fit
12     the definition of "harm" or "injury," as we have
13     classified it.
14     Q.     And that's because it is and
15     unanticipated or unpredicted injury that caught
16     them by surprise?
17     A.     That's part of the definition, yes.
18     Q.     What's the other part?
19     A.     That causes physiological, physical,
20     or psychological adverse effect.
21     Q.     Okay.
22             Is -- if there is no physiological or
23     physical adverse effect, but it is merely they
24     are surprised -- caught them by surprise that
25     they are unprepared for -- is that an injury

TROY FAABORG

336

1

2     under your definition?

3         A.    If you are asking if solely the fact

4     that it caught them by surprise with zero

5     physical or physiological effect, then it would

6     not meet my definition of "harm" that we have

7     used today.

8         Q.    Okay.

9               It says:  Subsequently, all aviators

10    need to understand what makes their body more

11    resistant to the effects of G acceleration.

12              Do you agree there are things that

13    make a body more or less resistant to the effect

14    of G acceleration?

15        A.    Yes, I do.

16        Q.    Conversely, aviators need to

17    understand those conditions that will make their

18    bodies more susceptible to the effects of G

19    forces.  The bottom line is that G tolerance for

20    each individual aviator may fluctuate from day

21    to day, and this can lead to disastrous

22    consequences in flight.

23              Do you agree with that statement?

24        A.    I do.

25        Q.    Not only is there individual variation

TROY FAABORG

337

1

2          in a body's ability to tolerate G forces between

3          me and you, or between individual people, but

4          there is a day-to-day fluctuation in the body's

5          ability to tolerate G forces in the same person.

6                    Is that correct?

7          A.    That is correct.

8          Q.    Okay.

9                    It says:  The Bad Things:  G tolerance

10         is degraded as a result of dehydration, fatigue,

11         hunger, and medications, which are often

12         associated with a social event.

13                   Do you see that?

14         A.    Yes.

15         Q.    Did you agree that that's true?

16         A.    I do.

17         Q.    Do you know anything about the level

18         of dehydration, fatigue, hunger, or medications

19         for the passengers on ET 302?

20         A.    I do not.

21                   MR. DURKIN:  I'm going to object to --

22         well, okay, go ahead.  Go ahead, I won't -- I'll

23         let -- go ahead.

24                   MR. ESSIG:  Okay.

25    BY MR. ESSIG:

TROY FAABORG

338

```
 1
 2         Q.    With the "Big Four" above, the aviator
 3    may experience severe symptoms of G exposure at
 4    much less than customary level.
 5              Do you agree with that?
 6         A.    I do.
 7         Q.    So it matters a great deal if those
 8    big four are present or not in the ability to
 9    experience severe symptoms of G exposure.
10              Is that correct?
11         A.    Within the context of this article, we
12    are talking about high G exposure which, as we
13    are looking, talking about the anti-G straining
14    maneuver and G suits, none of which apply to
15    this particular case.
16              So, yes, those have an effect.
17              What we are talking about is the
18    effect on greyout, blackout, unconsciousness, as
19    a result of higher G exposure than what we are
20    talking about within the 302 case.
21         Q.    Okay.
22              It does say there that:  The aviator
23    may experience severe symptoms of G exposure at
24    much less than customary level.
25              Right?
```

TROY FAABORG

339

1

2          A.     Absolutely.

3          Q.     So that's referring to less than high

4    G exposure, correct?

5                 MR. DURKIN:  Objection, calls for

6    speculation.

7          A.     I assume so.

8          Q.     Okay.

9                 It says the lack of physical

10   conditioning and a sedentary lifestyle can also

11   degrade G tolerance and increase the aviator's

12   susceptibility.

13                Do you agree with that?

14         A.     I do.

15         Q.     Once again, smoking and flying don't

16   mix.  Individuals who smoke have diminished

17   performance at high altitude and high-G

18   environments.

19                Do you agree with that?

20         A.     I do.

21         Q.     Do you think that individuals who

22   smoke have a change in the G tolerance at the

23   range of normal commercial flight?

24                MR. DURKIN:  Objection, calls for

25   speculation.

TROY FAABORG

340

1

2              Are you talking about passengers?

3    Or --

4              MR. ESSIG:  Passengers in a normal

5    commercial flight or pilots who are --

6    BY MR. ESSIG:

7         Q.    The forces are the same in the

8    airplane, right?

9         A.    Right.

10             Yes, there will be an effect.  There

11   is an effect on oxygen carrying capacity, effect

12   on other physiological mechanisms.  Yes, smoking

13   would have an effect.

14        Q.    Under "The Good Things" -- do you see

15   that part? --

16        A.    Hm-hmm, yes.

17        Q.    -- it says:  Most civilian aircraft

18   are not equipped to handle G protective

19   clothing.

20             And -- right?

21        A.    Correct.

22        Q.    So we are talking about an environment

23   that doesn't have to do with G protective or

24   anti-G suit, right?

25        A.    Correct.

TROY FAABORG

341

1

2      Q.    And we are talking about civilian
3  aircraft, right?

4      A.    Yes.

5      Q.    There are other things that can be
6  done to enhance aviator performance in a high G
7  environment.  A well-rested, hydrated, and fit
8  aviator will physically be able to withstand
9  higher G forces.

10           Do you agree with that?

11     A.    I do.

12     Q.    Do you agree that's true in the
13  passenger context as well?

14     A.    Yes.

15     Q.    When an aviator is well-hydrated there
16  is more circulated volume in the blood stream,
17  it's easier for the heart to keep the brain
18  perfused with oxygenated blood.

19           Do you agree with that?

20     A.    I do.

21     Q.    A regular program of conditioning that
22  includes a mix of aerobic exercise coupled with
23  resistance weight training will increase an
24  aviator's resistance to the effect of G's.

25           Do you agree with that statement?

TROY FAABORG

342

 1

 2          A.     I do.

 3          Q.     Do you agree that that's a relevant

 4     consideration in whether a person could sustain

 5     exposure to G forces that might cause an adverse

 6     effect?

 7          A.     I believe that all of those things as

 8     written have an effect on G tolerance which, as

 9     we talk about G tolerance, is generally a much

10     higher G load than what we are talking about

11     with this case --

12          Q.     Okay --

13          A.     -- so at the levels that we are

14     talking about, it would have less of an effect

15     than at the high G levels that the article is

16     talking about.

17          Q.     Okay.

18                 MR. ESSIG:  So if we are back on top

19     of page 18.

20     BY MR. ESSIG:

21          Q.     Just so that I understand, we call

22     those things physiological effects, right?

23          A.     Physical and physiological effect.

24          Q.     Physical and physiological effects.

25                 Are they -- do you consider them also

TROY FAABORG

343

1

2    to be injuries?

3              MR. DURKIN:  Objection, asked and

4    answered.

5         A.    Within the context of this flight

6    profile, yes, they meet my definition of "harm"

7    or "injury."

8         Q.    Okay.

9              (Pause)

10   BY MR. ESSIG:

11        Q.    In terms of the effects that we are

12   looking at in the sub-bullets here on the top of

13   18 -- so we'll start with:  Fluid shifts

14   downward and upward.

15             Do you see that?

16        A.    Yes.

17        Q.    The fluid in your body shifts upward

18   and downward just in terms of normal, everyday

19   life, right?

20        A.    Not in the manner that I'm describing

21   here, no.

22        Q.    What's different?

23        A.    We are talking about the hydrostatic

24   column shifting as a result of greater or lower

25   G forces; and so the shift upward under negative

TROY FAABORG

344

```
 1
 2      G force of fluid, and downward under positive G,
 3      not just the circulation under normal
 4      situations.
 5           Q.    Okay.
 6                 But if I'm in a car and I go around a
 7      turn, or I jump down off at table, or I move
 8      around, the fluid in my body is going to move
 9      with that force, right?
10           A.    I would consider those slightly
11      outside of normal situations.  Yes, there would
12      be some fluid shift as a result.
13           Q.    Okay.
14                 So fluid shift in and of itself is not
15      an injury?
16           A.    Depending on the context.
17                 In and of itself, outside of any other
18      context, I can't really answer to that.
19                 The shifting of fluids has a
20      physiological response.  It affects the work
21      needed to be done to circulate the blood.  So an
22      increased workload and increased stress -- that
23      can meet the definition of "harm" as we've
24      described it.
25           Q.    Okay.
```

TROY FAABORG

345

1

2          Shifting and compression/elongation of

3    internal organs -- your internal organs are

4    designed to shift, and move, and elongate.

5          Is that right?

6    A.    They are capable, yes, as a protective

7    mechanism.  Yes, that's true.

8    Q.    And so in everyday life, your body

9    adapts and your organs can move.

10         That doesn't necessarily cause an

11   injury, correct?

12   A.    It does not necessarily.  Under those

13   normal circumstances, that's correct.

14   Q.    Okay.

15         Compression and elongation of the

16   spine -- do you see that?

17   A.    Yes.

18   Q.    Your -- the spine is designed to be

19   compressed or elongated, correct?

20   A.    Not -- not generally under conditions

21   like that under strong positive and negative G.

22   I would consider that a -- outside of design for

23   what the body is designed for.

24   Q.    When you say "strong positive or

25   negative G," what do you mean?

TROY FAABORG

346

```
 1
 2        A.    The forces of flight rather than the
 3    forces of everyday life.
 4              We are not subjected to the same
 5    forces that we are talking about here just
 6    through everyday life that the spine would be
 7    expected to accommodate.
 8        Q.    And so on the fourth bullet, you have:
 9    Restriction of mobility.
10              Is that right?
11        A.    Yes.
12        Q.    And are you saying that on the -- in
13    the accident flight that the movement was
14    impossible for the passengers? --
15        A.    That's not what --
16        Q.    -- that their mobility was restricted
17    that they couldn't move?
18        A.    No, that's not what I mean by;
19    "restriction."
20              A lesser degree of the capability to
21    move, or increased effort required to be able to
22    move.
23        Q.    Okay.
24              At positive 1.69 G -- which I think is
25    the max positive number we have talked about --
```

TROY FAABORG

347

1

2       could most people still move their bodies under

3       those conditions?

4           A.    Yes, most people could.  It would

5       require greater effort because their body parts

6       weigh 67% more.  So therefore, much more effort

7       is required, to include the act of breathing or

8       movement.

9           Q.    Did you look at any literature about

10      the restriction of mobility on human beings

11      under certain G force conditions in your

12      analysis for this case?

13          A.    Not specifically, no, beyond what's

14      included in the references like the Handbook of

15      Operational Physiology that we have noted

16      before.

17          Q.    Okay.

18                MR. ESSIG:  Let's look at that one.  I

19      think that's Exhibit 315.

20                MR. DURKIN:  Is 315 the -- got it.

21      Thank you.

22                MR. ESSIG:  If we turn to page 7-5,

23      there is some data on here about the ability of

24      people to move under certain G force conditions.

25                It's -- the second, sort of, large

TROY FAABORG

348

1
2      paragraph, there is a sentence there in the
3      middle that starts:  Experiments were conducted
4      in the Wright-Patterson Air Force base?
5                  THE WITNESS:  Yes.  Got it.
6                  MR. ESSIG:  Yeah.
7      BY MR. ESSIG:
8         Q.    That's in Dayton, Ohio, right? --
9         A.    Correct.
10        Q.    -- the great state of Ohio.
11              It says:  Experiments were conducted
12     in the Wright-Patterson Air Force Base dynamic
13     environment simulator (DES) centrifuge where
14     subjects arose from a seated position and
15     performed a whole body jump at Gz levels up to
16     1.8 Gz.
17              Do you see that?
18        A.    Yes.
19        Q.    Do you agree that that data is valid?
20              A person could be subjected to 1.8
21     positive Gz and perform a whole body jump, or
22     arise from their seat up to that level?
23        A.    I have no reason to doubt their
24     conclusion.
25        Q.    Okay.

TROY FAABORG

349

1

2          It says:  Although most subjects had
3  no problem standing up at 1.8 Gz, jumping and
4  leaving one's feet was very difficult.
5          Do you see that?
6     A.    Yes.
7     Q.    Agree with that?
8     A.    I do.
9     Q.    Above positive 3 to positive 4 Gz,
10  controlled motions require greater effort,
11  accommodation, and learning to offset loss of
12  fine motor control.
13          Do you see that?
14     A.    Yes.
15     Q.    Is it fair to infer from that that
16  below positive 3 to positive 4 G, controlled
17  motions don't require greater effort or
18  accommodation?
19     A.    I do not belief that that is a fair
20  inference.
21     Q.    Okay.
22          So you don't view that sentence as
23  saying, "Above 3 to 4 G is the threshold for
24  impaired greater movement, accommodation, and
25  learning to offset fine motor control"?

TROY FAABORG

350

1

2          A.     I think there are two different

3     statements within that same sentence.

4              So as we are seeing, above 3 to 4 G,

5     controlled motions require greater effort.

6     True.

7              They also require greater effort at

8     anything greater than 1, because the limbs weigh

9     more; therefore more effort is required, more

10    physical work is required -- again, physics.

11             The point here, I believe they are

12    making, is:  At those higher levels because of

13    the degree of greater effort required, learning

14    and accommodation must be taking place because

15    it's more than just, "My arms weigh more" or,

16    "My legs weigh more."

17             It's the accommodation and the

18    learning that is the point of that sentence, in

19    my opinion.

20        Q.     Understood.

21             So below that level, it takes greater

22    effort to move up because of -- matter of

23    physics.

24             But above that level, there is this

25    accommodation and learning that needs to occur

TROY FAABORG

351

1
2    in order to move?
3        A.    It's even worse at that level,
4    correct.
5        Q.    It says:  One typically cannot raise
6    the arm at greater than positive 8 G's -- Gz or
7    legs at greater than positive 3 Gz, right?
8        A.    Yes.
9        Q.    At no point during the flight in ET
10   302 were there G forces above 3 to 4 Gz or
11   positive 8 Gz.
12            Is that right?
13       A.    That's correct.
14       Q.    Head pitching is difficult at greater
15   than positive 4 Gz.
16            Right?
17       A.    Yes.
18       Q.    And that's a greater force than was
19   ever exerted on the flight?
20       A.    That's accurate.
21       Q.    On your report here, page 18, the next
22   bullet is:  Impaired respiration and difficulty
23   in the physical act of the breathing.
24            Do you see that?
25       A.    Yes.

TROY FAABORG

352

1

2      Q.     Is that a symptom that happens at

3   positive or negative G?

4      A.     It can be both; more under positive G

5   but there is -- there is a change in the

6   function.  The physiological function is

7   different under negative, but that is more under

8   positive G.

9      Q.     Do you have an opinion as to when in

10  the flight everybody could have been impaired in

11  terms of their respiration, or had difficulty in

12  the physical act of breathing?

13     A.     The work of breathing is going to be

14  more difficult, particularly any time you are

15  under positive G, anything more than 1 G.

16          When we add the context in the

17  entirety of all of the factors that are being

18  lumped together as we go and accumulating as we

19  go, I can't point to a specific time that it

20  would onset, or for any particular person when

21  it would start.

22          But the physical act of breathing

23  would be difficult, given the fluctuations, for

24  example, during the eight deviations or

25  oscillations -- can't remember the word we

TROY FAABORG

353

1
2    used -- or that I used, excuse me -- that we
3    have discussed previously -- the digressions --
4        Q.    Yes --
5        A.    -- there we go.
6              The work of breathing would become
7    more difficult under those positive to negative
8    to positive to negative cycles.
9        Q.    All right.
10             In the sixth bullet, you list:
11   Cardiovascular effects?
12       A.    Yes.
13       Q.    Such as increased heart rate,
14   increased blood pressure, and increased rate and
15   depth of breathing.
16             Do you see that?
17       A.    Yes.
18       Q.    Those are generally the same -- those
19   are effects in anybody could experience, even
20   through exercise, right?
21       A.    Sure.
22       Q.    So if I run around the block here, I
23   run up and down the stairs outside, I would have
24   increased heart rate, increased blood pressure,
25   and increased rate and depth of breathing,

TROY FAABORG

354

1

2    right?

3        A.    That's correct.

4        Q.    In and of themselves, they are not an

5    injury?

6        A.    As you describe them in that context,

7    no.

8              Within the context of the definition

9    that we have used for "harm" and "injury," then,

10    yes.

11        Q.    All right.

12              MR. ESSIG:  And if we look at page --

13    if we go back to the -- our favorite textbook --

14    the Air Force Handbook, Exhibit 315, chapter 7,

15    and you turn to 7-14 --

16              (Pause)

17              MR. ESSIG:  7.1.11.1 -- the very

18    bottom there -- Blood Pressure.

19    BY MR. ESSIG:

20        Q.    Do you see that?

21        A.    Yes.

22        Q.    It says:  No correlation is found

23    between chronic high blood pressure and high

24    G-tolerance, although higher blood systolic

25    and/or diastolic blood pressure appears to aid

TROY FAABORG

355

1
2      G-tolerance.
3              Do you see that?
4      A.     Yes.
5      Q.     Do you agree?
6              Is that true? -- that somebody with a
7      higher blood -- systolic or diastolic blood
8      pressure could have greater G-tolerance than
9      somebody else?
10     A.     Tolerance?  Yes.
11             Endurance?  No.
12     Q.     Then it says:  When fear or excitement
13     cause blood pressure or heart rate to be
14     elevated -- see that? --
15     A.     Yes.
16     Q.     That's like the fight-or-flight
17     response you are talking about, right?
18     A.     It could be.
19     Q.     -- improved G-tolerance results.
20             Do you see that?
21     A.     Yes.
22     Q.     Do you agree with that? -- that under
23     the fight-or-flight response when you have fear
24     or excitement that your G-tolerance actually
25     improves?

TROY FAABORG

356

1
2      A.    Yes.  And we have to define
3    "tolerance," again, to put this into the
4    appropriate context.
5      Q.    It says the reason is that a greater G
6    force is necessary to reduce the blood pressure
7    to the point where cerebral blood flow ceases.
8            Do you see that?
9      A.    Yes.
10     Q.    Do you agree with that statement?
11     A.    I do.
12           MR. ESSIG:  Then if we look at your --
13   go back to page 18, next bullet:  Reduction in
14   visual acuity due to changes in oxygen delivered
15   to retina.
16   BY MR. ESSIG:
17     Q.    Do you see that?
18     A.    Yes.
19     Q.    Are you talking there about greyout
20   and blackout?
21     A.    Those are -- those are included in
22   visual acuity changes.  Those are two ways to
23   describe the reduction, but not necessarily to
24   the point of greyout or blackout.
25     Q.    Do those symptoms occur just to

TROY FAABORG

357

1
2    positive G's?
3         A.    No.  As a result of the fluctuation
4    from negative to positive to negative to
5    positive, as we said during the digressions
6    specifically, that is -- that is going to occur.
7         Q.    What about red out?
8               Has that occurred positive G?
9         A.    Negative G.
10        Q.    So it only occurs at negative g?
11        A.    Red out only occurs at negative g.
12        Q.    Do you have an opinion to whether or
13   not any passengers experienced red out on Flight
14   ET 302?
15        A.    I don't have an opinion, no.
16        Q.    Okay.
17              Did you look at any literature on G
18   levels at which greyout and blackout occur?
19        A.    Yes.
20        Q.    What literature did you look at?
21        A.    Primarily the handbook.
22              MR. ESSIG:  So if we go back to the
23   handbook, we'll look at page 7-12.  We are at
24   page 7-12 in Exhibit 315, 7.1.9:  Visual
25   Effects.

TROY FAABORG

358

1

2    BY MR. ESSIG:

3         Q.    Do you see that?

4         A.    Yes.

5         Q.    It says:   Impairment of vision is one

6    of the consequences of exposed positive G.

7              Do you see that?

8         A.    Yes.

9         Q.    And then a little bit farther down, it

10   talks about the level of G forces that could be

11   reached here to cause vision reduction.

12             It says -- I'm looking at the sentence

13   here:  For a subject in relaxed condition and

14   unprotected by an anti-G suit -- do you see

15   that?

16        A.    Yes.

17        Q.    -- loss of peripheral vision and

18   reduction of visual acuity (grayout) occurs at

19   levels of positive 3 to positive 4 G.

20             Do you see that?

21        A.    Yes, I do.

22        Q.    Do you agree with that statement?

23        A.    As a standalone statement, yes.

24        Q.    Okay.

25             So in terms of typical human being, it

TROY FAABORG

359

1
2      needs to be a positive 3 to positive 4 G to see
3      loss of peripheral vision with reduction of
4      visual acuity (grayout).
5              Do you agree with that?
6      A.      If it's typical human being under
7      typical circumstances, as an isolated event,
8      yes.
9      Q.      What do you mean by "isolated event"?
10     A.      Not a repeat exposure of negative to
11     positive to negative to positive, accumulating.
12             Standalone, me versus the centrifuge,
13     if I'm in good shape, and not tired and
14     dehydrated, yes, that's an accurate statement
15     based on the general averages for the
16     population.
17             When you put someone in, again, a
18     negative to positive G as the body is trying to
19     compensate for one and overcompensate, this can
20     occur at much lower levels.
21             Similar to what we talked about
22     previously, I think, as we were talking about
23     this same paragraph, that individual variances
24     will also account where that could happen far
25     lower than 3 to 4 G.

TROY FAABORG

360

1

2          Q.    Do you have any literature to describe

3     the effect you are talking about? -- about the

4     difference between positive and -- the

5     fluctuation in G forces cause greyout or

6     blackout at much lower levels of G force than 3

7     or 4?

8          A.    There is discussion -- I don't know if

9     it's in this chapter -- related to the push-pull

10    effect that we mentioned earlier where the body

11    will attempt to compensate.  And then when

12    followed by a change in the G load, you are now

13    behind because the body is trying to compensate

14    the wrong direction.

15              That push-pull effect is in

16    literature.

17              I didn't cite it here specifically.

18         Q.    And you told me before the push-pull

19    effect was not an effect that was found on ET

20    302?

21              MR. DURKIN:  Objection --

22              MR. ESSIG:  I'm asking him a question.

23              MR. DURKIN:  No.

24              Objection, asked and answered,

25    misleading --

TROY FAABORG

361

1

2                MR. ESSIG:  Okay --

3                MR. DURKIN:   -- actually misleading

4     and misconstrues his testimony --

5                MR. ESSIG:  Okay.

6                MR. DURKIN:   -- go ahead.

7          A.    I believe I would need to see how it

8     was presented.  And within the context that we

9     discussed previously -- that the push-pull

10    effect as a specific effect was not the focus of

11    the analysis.

12               The physiological responses would

13    similarly apply as the body is trying to

14    compensate for -- the push being a negative G

15    exposure, the pull being a positive G

16    exposure -- the body trying to compensate for

17    the negative would be less than prepared to deal

18    with the positive G exposure that follows.

19               So I'll -- the push-pull effect

20    specifically doesn't come into play as an

21    effect.

22               The physiological response is

23    similarly going to be compromised.

24         Q.    Okay.

25               So as a technical matter, the

TROY FAABORG

362

1
2     push-pull effect is not in play in the Flight ET
3     302.
4               Is that correct?
5               MR. DURKIN:   Objection, asked and
6     answered.
7          A.    The same physiological -- we'll call
8     it -- challenges, the compensatory mechanisms,
9     the same issues are at play.
10              I don't refer to the push-pull effect
11    because that largely focuses on just one
12    maneuver, not the collection of experiences that
13    the passengers had here.
14         Q.    Okay.
15              So is there any literature that you
16    can point me to that explains that at the ebb
17    and flow of the G forces experienced on Flight
18    ET 302 -- at that level of G force -- that
19    passengers would likely suffer loss of
20    peripheral vision, reduction of visual acuity,
21    greyout, or blackout?
22         A.    Not that is as specific to this
23    exposure, no.
24         Q.    All right.
25              When G force is reached positive 35 to

TROY FAABORG

363

1

2     45 Gz, vision is lost and blackout occurs.

3          Do you agree with that statement?

4     A.     Yes.

5     Q.     And I think this is where we talked

6     about your -- the student that you had talked to

7     that had suffered some of these things at lower

8     G forces.

9          Is that right?

10    A.     Correct.

11    Q.     Do you put greater weight on a

12    statement made in a treatise or textbook like

13    this versus, sort of, an anecdotal case

14    experience that you are aware of?

15         If I'm trying to sort of -- we have

16    talked about the weight of the evidence, right?

17         So there is a weight of the evidence

18    approach in this field where we are look and

19    weigh the importance and the credence of each,

20    kind of, type of evidence.

21         Would you put more weight of evidence

22    on a textbook like this from the U.S. Air Force?

23         Or more weight of evidence on an

24    instance you can recall with a student? --

25         (Pause)

TROY FAABORG

364

```
 1
 2        A.    I would say --
 3              MR. CLIFFORD:  Excuse me.
 4              Objection, calling for legal
 5    conclusions, argumentative.
 6              Go ahead.
 7        A.    It depends on the situation.
 8              I spent my career teaching the
 9    textbook, and teaching what the literature says,
10    and investigating accidents that were the
11    exception to that where people died.
12              And so I put credence on both.
13        Q.    Okay.
14              MR. ESSIG:  All right.  Can we mark
15    tab 14?
16              (Pause)
17              MR. ESSIG:  I'm marking this as
18    Exhibit 322.
19              (Exhibit 322, Four-page document
20    entitled: Negative g-Force Ocular Trauma Caused
21    by a Rapidly Spinning Carousel (no Bates Nos.),
22    marked for identification)
23              (Pause)
24    BY MR. ESSIG:
25        Q.    Do you recognize this document, Mr.
```

TROY FAABORG

365

1

2      Faaborg?

3          A.    Yes.

4          Q.    This is the Moisseiev paper we talked

5      about?

6          A.    Yes.

7          Q.    And this was a case report made in

8      Case Reports in Ophthalmology.

9                Is that correct?

10         A.    Yes.

11         Q.    And a case report is an individual

12     case report, like we talked about your

13     experience with a particular student pilot.

14               This is a case report about a

15     ten-year-old boy, right?

16         A.    Correct.

17         Q.    All right.

18               MR. ESSIG:  So if we look at the

19     bottom there of the introduction on the first

20     page, it says:  We report a patient who suffered

21     ocular injury caused by radial acceleration on a

22     carousel.

23     BY MR. ESSIG:

24         Q.    Do you see that?

25         A.    Yes.

TROY FAABORG

366

1

2          Q.      This is about a single patient, right?

3          A.      That is correct.

4          Q.      And they had an accident on a

5      carousel?

6          A.      Yes.

7                  MR. ESSIG:  The next page under the

8      "Case Report" definition, it talks a little bit

9      more about the facts here.

10                 It says it's a healthy, ten-year-old

11     boy.

12                 And then the second sentence there

13     says:  He had mounted a carousel that was

14     attached to an electrical scooter and spun

15     around very rapidly.

16     BY MR. ESSIG:

17         Q.      Do you see that?

18         A.      Yes.

19         Q.      Then a sentence after that, it says:

20     The rapid spinning lasted for about one minute.

21                 Do you see that?

22         A.      Yes.

23                 MR. ESSIG:  Under the "Discussion"

24     here, toward the very bottom, second-to-last

25     paragraph -- are you with me? --

TROY FAABORG

1

2               THE WITNESS:  Yes.

3    BY MR. ESSIG:

4        Q.    It says:  Acceleration forces may be

5    expressed as G forces?

6        A.    Hm-hmm.

7        Q.    It says:  The force to which our

8    patient was subjected to was 2.61 G.

9               Right?

10       A.    Yes.

11       Q.    In this context, because he's being

12   spun around in this carousel -- which is a

13   terrible case here -- it's a negative 2.61 G,

14   right?  --

15       A.    Correct --

16       Q.    -- that's what he is experiencing?

17       A.    -- by integer and absolute in this

18   case --

19       Q.    Yes.

20       A.    -- right.

21       Q.    So under all the definitions, it's

22   negative 2.61 G's and experiences it for a

23   minute.

24              Is that correct?

25       A.    Yes.

TROY FAABORG

368

```
 1
 2         Q.    Is that -- that level of negative G
 3    force is not -- is a higher level of negative G
 4    force than the passengers on ET 302 experienced.
 5              Is that right?
 6         A.    That's correct, yes.
 7         Q.    And that duration for one minute --
 8    that's a much longer duration than passengers
 9    experienced negative G forces on Flight ET 302.
10              Is that right?
11         A.    For any single, sustained exposure,
12    yes, that's correct.
13         Q.    Okay.
14              It says at the very bottom here:  The
15    human body is much more tolerant to positive G
16    forces as a typical person can withstand 4 to
17    5 G --
18              MR. DURKIN:  I'm sorry.  Can you --
19              MR. ESSIG:  I'm sorry, I am at the
20    very bottom there where I was.
21              So the next paragraph under where it
22    says, "Our patient was subjected to 2.61 G," it
23    starts, "Along the vertical axis."
24              Are you with me?
25              THE WITNESS:  Right.
```

TROY FAABORG

1

2    BY MR. ESSIG:

3        Q.    That second sentence in that paragraph

4    says:  The human body is much more tolerant to

5    positive G forces, as a typical person can

6    withstand 4 to 5 G.

7                Do you see that?

8        A.    Yes.

9        Q.    Do you agree with that statement?

10       A.    Yes, with my understanding of what the

11   word "withstand" means as a physiologist, yes, I

12   agree that's 4 to 5 G.

13       Q.    What does that mean -- "withstand"?

14       A.    That the limit of human tolerance to

15   sustained G exposure can be defined in quite a

16   few different ways.

17                One of them is the onset of visual

18   symptoms; another is to unconsciousness.

19                So we just need to be specific.

20                I don't know what these authors mean

21   when they say "withstand," but that is a

22   generally-accepted number, when people say:

23   What is G tolerance?

24                So just to be clear -- that there is a

25   little bit of "I don't know what the authors

TROY FAABORG

1

2      mean exactly."

3           Q.    Fair enough.

4                 You are saying there is a

5      generally-accepted number of about 4 to 5 G when

6      we talk about G tolerance for a typical person?

7           A.    Correct.

8           Q.    And it says:  Pilots who undergo

9      high-G training can even withstand 9 G.

10                Do you see that?

11          A.    Yes, I do.

12          Q.    Do you agree with that statement?

13          A.    Yes, because I've done it.

14          Q.    And then we talked about this before.

15                The body -- conversely, the body

16     cannot be trained to tolerate negative G forces.

17                Right?

18          A.    That's true.

19          Q.    Ocular discomfort occurs almost

20     immediately.  Subconjunctival hemorrhages occur

21     negative 2 to 3 G.

22                Right?

23          A.    Correct.

24          Q.    Confusion and loss of consciousness

25     occur at 4 to 5 G?

TROY FAABORG

371

 1

 2          A.    Correct.

 3          Q.    Are they talking about negative G's

 4     there?

 5          A.    Yes, that's right.

 6          Q.    And from an integer standpoint?

 7          A.    I think so, because that's the

 8     nomenclature they have used to this point.   I

 9     believe that's reasonable.

10          Q.    Okay.

11                And then it says:   Previous reports of

12     pilot subjected to 3 to 4 G -- negative G force

13     include complaints of severe headache, a

14     sensation that "the eyes are popping out of the

15     head," red vision, facial swelling, petechiae --

16          A.    Petechiae.

17          Q.    -- petechiae, and diffuse,

18     subconjunctival hemorrhages.

19                Do you see that?

20          A.    I do.

21          Q.    Do you agree that at 3 to -- the level

22     of 3 to 4 negative G force is where complaints

23     of severe headache and these other symptoms

24     appear, according to the literature?

25          A.    According to the literature, there

TROY FAABORG

372

1
2      were complaints of those being subjected to 3 to
3      4 negative G.
4                I believe the physiological mechanism
5      of that injury would begin to occur before that
6      point, so it doesn't rule out that they would
7      begin to occur, or occur, at less than 3 to 4 G
8      as well.
9           Q.    This paper reports that pilots
10     subjected to that force give these complaints,
11     though, right?
12          A.    Yes, that's what this says.
13          Q.    And it doesn't say that pilots
14     subjected to some lesser force -- like 2 to 3 or
15     1 to 2 -- are giving these complaints.
16               Is that correct?
17          A.    That is correct.
18          Q.    Do you have any data or literature --
19     this is a paper you cited.
20               Do you have any other data or
21     literature that shows subjects being exposed to
22     negative G forces that are less than negative 3
23     to 4 G that are complaining of these sensations
24     or effects? -- severe headache, sensation that
25     the eyes are popping out of the head, red

TROY FAABORG

373

 1

 2    vision, facial swelling, petechiae, and diffuse,

 3    subconjunctival hemorrhages?

 4        A.    I do not, no.

 5              MR. ESSIG:  Want to take a break?  I'm

 6    almost done.  Twenty minutes?

 7              THE VIDEOGRAPHER:  We are off the

 8    record.  The time is 4:08 p.m.

 9              (Recess from 4:08 p.m. to 4:25 p.m.

10    Eastern Standard Time)

11              THE VIDEOGRAPHER:  We are back on the

12    record.  The time is 4:25 p.m.

13    BY MR. ESSIG:

14        Q.    Mr. Faaborg, we are back hopefully for

15    the last bit of this.

16              We are on page 18 of your report,

17    which is the second-to-last page.

18              And we are going to move down here to

19    the second section?

20        A.    Yes.

21        Q.    It starts:  Because all passengers and

22    crew onboard ET 302 experienced the same

23    physical and physiological effects of the forces

24    of the aircraft, there are injuries and outcomes

25    that were likely experienced by all passengers.

TROY FAABORG

374

1

2                   Is that correct?

3        A.    Yes.

4        Q.    So this is the first time you actually

5   used the word "injury" in your report.

6                   Is that true?

7        A.    I --

8        Q.    In this section of your report under

9   "Physiological and Psychological Effects on

10  Passengers" --

11                  (Pause)

12       A.    I believe that's accurate, yes.

13       Q.    Okay.

14                  So you are distinguishing between the

15  section preceding it by using the word "injury

16  and outcome."

17                  Is that correct?

18       A.    Only -- only as a choice of words, not

19  intended to distinctly differentiate.

20       Q.    I guess, what does that mean?

21       A.    I'm not -- I use the word "injury and

22  outcome" just as a -- as a choice of words, not

23  as a statement of, "These are therefore not

24  injuries" because I recognize these as -- I --

25  as a layman, more injurious than the previous

TROY FAABORG

375

1
2      that we talked about.
3           Q.    Okay.
4                 Is it your opinion here in this
5      section also that every person likely
6      experienced the same injuries and outcomes on
7      the flight that you list below?
8           A.    That -- to clarify, that every
9      passenger experienced all of those?
10          Q.    Hm-hmm.
11          A.    No.
12          Q.    Okay.
13          A.    I believe every passenger experienced
14     a few of those.
15                And that -- that all passengers
16     experienced most of these to varying degrees.
17                So there are a couple of these -- for
18     example, fear and panic -- I feel very
19     comfortable saying, "Every person on the
20     aircraft experienced fear and panic."
21                Hyperventilation, as it's described as
22     an abnormal increase in the rate of depth or
23     breathing -- I believe everyone on the aircraft
24     experienced that to a varying degrees.
25                Changes in cardiac heart rate, in that

TROY FAABORG

376

1
2        case, is what the -- dysrhythmias is simply a
3        higher or lower heart rate -- in this case
4        higher.  Everyone experienced that.
5                 Circulatory effects, everyone
6        experienced.
7                 Dizziness and vertigo, I believe all,
8        to a varying degree.
9                 As we talked about visual degradation,
10       that's most.
11                I can't stomp my foot on "all" just
12       because, again, the physiological differences.
13       Someone with high blood pressure may actually be
14       doing better.
15                So that's -- that's my initial look at
16       that list.
17           Q.   Okay.
18                Can you say when any particular
19       passenger experienced these different injuries
20       or outcomes?
21           A.   Are you asking if I can point to a
22       time where those started?
23           Q.   Hm-hmm.
24           A.   Not a discrete time when they
25       absolutely started, no.

TROY FAABORG

377

```
 1

 2          Q.     And for the injuries and outcomes you

 3    list that weren't experienced by all

 4    passengers -- you ticked off a bunch that

 5    were -- can you tell me how many passengers

 6    experienced those other injuries or outcomes?

 7          A.     Most, so the vast majority.

 8                 I don't know a percentage.  I wouldn't

 9    quantify a percentage.

10                 But the vast majority.

11          Q.     So there are some of the injuries or

12    outcomes listed here on the bottom of 18 that

13    everybody experienced.

14                 But for every one of the bullets, your

15    opinion as an expert in your field is that

16    most -- the vast -- most people on the flight

17    experienced all of those things?

18          A.     Correct.

19                 And the only reason that I wouldn't

20    say, "All experienced all of them" is that I

21    leave the door open for some of the people with

22    different physiological or medical underlying

23    conditions like we talked about -- let's say,

24    high blood pressure -- that could potentially

25    make the visual degradation not as much a factor
```

TROY FAABORG

378

1

2      for the reasons that we've discussed previously.

3              So I can almost say, "All experienced

4      all of them to varying degrees," but not -- not

5      in good conscience because there are some minor

6      exceptions like that.

7          Q.     Okay.

8              Under your definition, is fear and

9      panic an outcome?

10             Or an injury?

11         A.     I believe it is both, based on my

12     definition that we've talked about previously as

13     a -- an abnormal or unwanted, in this case,

14     psychological response.

15         Q.     Same for nausea and vomiting?

16         A.     Less -- less psychological, more

17     physical or physiological.

18         Q.     But injuries?

19         A.     Yes.

20         Q.     Okay.

21             The next bullet you have there is:

22     Cardiac dysrhythmia?

23             Is that right?

24         A.     Hyperventilation is next.

25         Q.     Oh, sorry.  I was kind of putting

TROY FAABORG

1
2       those things together.

3                   Skip hyperventilation.

4                   So we are talking about a bullet

5       that's cardiac dysrhythmia, such as tachycardia

6       and bradycardia.

7                   Do you see that?

8       A.      Yes.

9       Q.      What's tachycardia?

10      A.      Increased heart rate.

11      Q.      And what's bradycardia?

12      A.      Decreased heart rate.

13      Q.      Those are injuries?

14              Or outcomes?

15      A.      I would classify them as both.

16      Q.      Are those effects associated with

17      positive or negative G?

18      A.      Either --

19      Q.      And --

20      A.      -- or both, excuse me.

21      Q.      And when I say "negative G," I mean

22      integer negative G?

23      A.      Of course.

24      Q.      If these things are injuries under

25      your definition, are they injuries -- these

TROY FAABORG

380

1
2      dysrhythmias -- are they injuries even if they
3      are asymptomatic?
4          A.    Yes, I believe that they are.
5              I don't believe that an injury has to
6      have symptoms -- visible symptoms -- to be
7      classified as harm or injury.
8          Q.    Or even detectable symptoms?
9          A.    Correct, no.
10             MR. ESSIG:  So if we look at our
11     favorite handbook, Exhibit 13?
12             MR. DURKIN:  315?
13             MR. ESSIG:  315, you are right.
14             Let's turn to page 7-9.
15             On the bottom -- very bottom of it --
16     it says:  Numerous cardiovascular symptoms have
17     been noted under G stress.
18     BY MR. ESSIG:
19         Q.    Do you see that?
20         A.    Yes.
21         Q.    These symptoms include grayout,
22     blackout, loss of consciousness with
23     accompanying seizures, convulsions, amnesia,
24     confusion, cardiac dysrhythmias (tachycardia and
25     bradycardia), heart blocks, and stress

TROY FAABORG

381

1

2     cardiomyopathy.

3              Do you see that?

4         A.    Yes.

5         Q.    Those are -- did the dysrhythmias in

6     this list of bullet there -- that appears on

7     this list, right?

8         A.    Yes.

9         Q.    It says:  The rhythm disturbances of

10    those were dysrhythmias? --

11        A.    Cardiac rhythm disturbances?

12        Q.    Yes.

13        A.    Yes.

14        Q.    The next sentence says the rhythm

15    disturbances seen under positive G have been of

16    great aeromedical interest.  There has been and

17    continues to be debate on the significance of

18    these observations.

19              Do you see that?

20        A.    Yes.

21        Q.    Do you agree there is debate about the

22    significance of the observations on rhythm

23    disturbances?

24        A.    As written, yes.

25        Q.    Okay.

TROY FAABORG

382

```
1
2              It says:  In asymptomatic and
3      otherwise healthy individuals, these
4      dysrhythmias are probably benign.
5              Do you see that statement?
6      A.   Yes.
7      Q.   What does it mean -- "probably
8      benign"?
9      A.   My interpretation of that statement is
10     benign, inferring no long-term adverse medical
11     concern.
12     Q.   Okay.
13             And if -- again, if a dysrhythmia is
14     asymptomatic and it is benign, do you consider
15     it to be an injury?
16     A.    If under these conditions where it was
17     imparted on the individual, even if
18     asymptomatic, it has potential, yes, to be --
19     or, excuse me -- yes, I would consider it to
20     meet my definition of "harm" or "injury."
21     Q.    Is there any literature that you can
22     point me to that supports your statement that
23     these dysrhythmias would be experienced to occur
24     at the G forces in Flight ET 302?
25     A.    Yes, in -- when we look at
```

TROY FAABORG

383

1

2      specifically the increased heart rate -- just

3      talking about, for example, tachycardia --

4      excuse me.

5                    For increased heart rate, yes.

6                    For specific dysrhythmias and going

7      into more depth than what the handbook goes

8      into, no, no additional literature.

9           Q.    Okay.

10                   Is there a difference -- just so I

11     understand, is there a difference between just

12     having an increased heart rate and a

13     dysrhythmia?

14          A.    It depends on the context of the

15     definition, whether we are talking about

16     tachycardia -- you can consider tachycardia as

17     being an elevated heart rate.

18                   I believe that there may be a clinical

19     threshold for a diagnosis, but that's outside of

20     my scope.  I don't know.

21          Q.    You've never diagnosed anybody with a

22     cardiac dysrhythmia?

23          A.    I have not, no.

24          Q.    And you don't have any literature that

25     says when tachycardia or bradycardia occur in a

TROY FAABORG

384

1

2    person subject to G forces in an airplane, do

3    you?

4        A.    Not beyond what we have already

5    discussed.

6        Q.    And what we have discussed, there was

7    no number of G forces that connects with those

8    particular disturbances?

9        A.    That's correct.  Yes, that's correct,

10   yes.

11       Q.    Do you think it's possible that many

12   occupants doesn't experience a dysrhythmia?

13           MR. CLIFFORD:  Object to the form.

14           MR. DURKIN:  Objection, asked and

15   answered, too.

16           THE WITNESS:  Can you -- sorry.  Can

17   you repeat the question?

18   BY MR. ESSIG:

19       Q.    In your evaluation of this particular

20   injury or outcome on the passengers of Flight ET

21   302 -- that's kind of the purpose of your

22   report? --

23       A.    Right.

24       Q.    -- would you agree it's possible that

25   many occupants on the flight didn't experience a

TROY FAABORG

385

 1

 2    dysrhythmia at all?

 3              MR. DURKIN:  Same objection.

 4        A.    Again, I go back to how we define

 5    "dysrhythmia" and what we mean.

 6              If we mean an abnormal or altered

 7    rhythm, I think -- my opinion -- certainly all

 8    had increased heart rates.

 9              I don't know -- I can't make a

10    diagnosis related to a clinical diagnosis.

11              I don't know -- did you ask for a

12    number?  Or a yes or a no?

13              Sorry.  Now I can remember the --

14        Q.    No, it's totally fine the way you did

15    it.

16              And I'll --

17        A.    Okay --

18        Q.    -- ask it a little bit differently.

19              But your opinion is that everybody on

20    the flight, without question, experienced an

21    increased heart rate, right?

22        A.    That -- no, that's not necessarily

23    what I have said.

24              Given what we have written here, more

25    likely be not that all of them experienced most

TROY FAABORG

386

1
2      of these.
3              So that's one leaving the door open
4      that some may not have.
5          Q.    Okay.
6              So that's just what I was trying to
7      clarify.
8          A.    Got it.
9          Q.    That door-opening qualification -- is
10     that door open on cardiac dysrhythmias?
11             Is it your opinion that it's possible
12     that many people on the flight didn't experience
13     a cardiac dysrhythmia, such as tachycardia or
14     bradycardia?
15         A.    I will say:  Some may have not.
16             I wouldn't say "most" because I don't
17     know a number.  So I wouldn't say most, just
18     because I don't want to qualify -- make it seem
19     like I do know a number.
20         Q.    So your testimony is you don't know a
21     number on cardiac dysrhythmia.
22             Is that right?
23         A.    I agree with that.  That's correct.
24         Q.    And even if some people did experience
25     a dysrhythmia such as tachycardia or

TROY FAABORG

387

1

2    bradycardia, those dysrhythmias may have been

3    entirely benign, correct?

4         A.    "Benign" using a medical definition --

5         Q.    And the definition used in the

6    handbook you cite.

7         A.    Again, based on what you said was my

8    interpretation of what that meant, I see that as

9    being a medical diagnosis -- benign -- so

10   outside of my scope.

11           Again, regardless of whether it's

12   symptomatic, whether it causes long-term effect,

13   it can still classify as "injury" or "harm"

14   under the definition that we have been

15   discussing.

16        Q.    Your definition --

17        A.    Correct, yes.

18        Q.    -- that you apply.

19           The next affect there is circulatory

20   effects such as stagnant hypoxia and pooling of

21   the blood in the extremities.

22           Do you see that?

23        A.    Yes.

24        Q.    What's stagnant hypoxia?

25        A.    Stagnant hypoxia is a reduction -- or,

TROY FAABORG

388

1

2    excuse me -- an effect on function as a result

3    of impaired blood flow or the impairment of

4    delivery of oxygen to a tissue at that level.

5        Q.    Is that a condition that's associated

6    only with exposure to positive G's?

7        A.    No.

8        Q.    So negative G's can also cause

9    stagnant hypoxia?

10       A.    Yes.

11       Q.    Do you have an opinion as to whether

12   or not everybody on the flight suffered from

13   stagnant hypoxia?

14       A.    Without doubt, all had circulatory

15   effects.

16            And included in that list of

17   circulatory effects or -- is stagnant hypoxia,

18   pooling of the blood, which is the same --

19   similar words for the same thing -- so

20   circulatory effects, yes.

21            To call it that everyone had a

22   stagnant hypoxia, maybe not stagnant hypoxia

23   specifically.

24       Q.    Do you have any number or proportion

25   about the number of passengers on ET 302 that

TROY FAABORG

1

2      had stagnant hypoxia?

3          A.      No.

4          Q.      Do you have any literature that

5      suggests that stagnant hypoxia is likely to

6      occur at the G forces and the duration of those

7      forces during Flight ET 302?

8          A.      No specific literature, no.

9                  MR. ESSIG:  Turn to 7-19 in our

10     handbook.  70.1.12.

11                 (Pause)

12                 THE WITNESS:  Yes.

13                 MR. ESSIG:  G-Induced Loss of

14     Consciousness.

15     BY MR. ESSIG:

16         Q.      Do you see that?

17         A.      Correct.

18         Q.      Is that GLOC?

19         A.      Correct, GLOC.

20         Q.      Getting good with my terminology.

21     You'll teach me at some point.

22                 It says:  Unconsciousness occurs at G

23     levels slightly higher than those that produce

24     blackout and is produced in most unprotected

25     individuals when plus 4.5 to plus 6 Gz is

TROY FAABORG

390

1
2      exerted for more than six seconds.
3              Do you see that?
4      A.      Yes.
5      Q.      Do you agree with that statement?
6      A.      With the qualifier "most," yes, I do.
7      Q.      Do you believe that unconsciousness
8      could -- or blackout could occur in unprotected
9      individuals at lower than 4-1/2 to 6 G's exerted
10     for six seconds?
11     A.      Absolutely.
12     Q.      But you don't have -- again, you don't
13     have any literature that states that --
14     A.      Anecdotal evidence, not literature,
15     no.
16     Q.      Understood.
17             And to be clear, 4-1/2 to 6 positive
18     G's is a much higher level of G force than was
19     exerted in the ET 302 flight?
20     A.      That's true.
21     Q.      And those forces were never reached
22     for anything near six seconds, correct? -- that
23     level of force?
24     A.      No, that level of force was not
25     reached at all, let alone for six seconds.

TROY FAABORG

391

 1

 2    That's true.

 3            (Pause)

 4            MR. ESSIG:  Let's move to the top of

 5    19 -- almost done here.

 6            It says:  Other injuries and outcomes

 7    were likely to have occurred as a result of the

 8    intense forces of flight.

 9            Do you see that?

10    A.    Yes.

11    Q.    So by "likely to have occurred," do

12    you mean greater than 50% likelihood in every

13    passenger?

14    A.    Yes.

15    Q.    You say:  Every occupant more likely

16    than not experienced one or more of the

17    following to varying degrees.

18            That's the answer to my question, I

19    guess.

20            All right.

21            Can you walk me through those four

22    things?

23            That's:  Loss of bladder or bowel

24    control, stress cardiomyopathy and heart blocks,

25    capillary rupture in the neck, face, and head

TROY FAABORG

392

1
2      and -- I can't say it --
3           A.     Petechiae.
4           Q.     -- petechiae.
5                  Which of those things do you think
6      it's more likely than not that passengers
7      experienced?
8                  It says:  One or more of those
9      things --
10          A.     Right, right.
11                 I believe that there is a very good
12     likelihood all of them.  All of them are on the
13     table to varying degrees for most of the
14     passengers, as we have said, which
15     specifically -- all of them meet that criteria,
16     I guess is the answer.
17          Q.     Okay.
18                 Can you walk me through your basis for
19     the -- let's just go one-by-one.
20                 Loss of bladder or bowel control.
21                 Do you see that?
22          A.     Yes.
23          Q.     Do you have any literature or basis --
24     some objective citation I can look at -- to see
25     when loss of bladder or bowel control occurs in

TROY FAABORG

393

1

2      terms of an aviation accident?

3          A.      Not any specific literature, no.

4          Q.      Do you have any literature, text, or

5      treatise that says at what level of G force a

6      person would typically lose control of their

7      bladder or bowel?

8          A.      No.

9          Q.      Why do you believe that more likely

10     than not every passenger on ET 302 lost

11     controlling of their bladder or bowels?

12         A.      I believe that that is a likely

13     outcome, given the emotional response and how

14     severe the emotional response would be in that

15     type of situation -- in that extreme situation.

16         Q.      Do you have any idea about the

17     severity of the emotional response in that

18     situation?

19         A.      I don't understand.

20         Q.      Do you have any research or

21     information literature that tells you what the

22     severity of the emotional response would be in

23     that situation?

24         A.      Not specifically, no.

25         Q.      Do you have any literature or research

TROY FAABORG

394

1

2      that ties any type of severe emotional reaction

3      to loss of bladder or bowel control?

4          A.    Not that I have cited.

5              But given that it's a relatively

6      common response to a very strong emotional fear

7      and panic situation, it likely exists.

8              I don't have it cited here.

9          Q.    Does everybody that encounters a

10     strong emotional or panic type situation lose

11     control of their bladder or bowl?

12         A.    I would say:  No.

13         Q.    What about stress cardiomyopathy and

14     heart blocks?

15             Why do you say it's more likely than

16     not that everybody experienced those things on

17     Flight ET 302?

18         A.    Again, given the extremity of the

19     physiological response and the forces --

20     particularly in the later portion of the

21     flight -- that makes it likely.

22         Q.    Have you ever diagnosed anybody with

23     cardiomyopathy?

24         A.    I have not.

25         Q.    What is cardiomyopathy?

TROY FAABORG

1

2      A.      Cardiomyopathy -- I don't have a good

3   definition other than heart blocks and, again,

4   dealing with the cardiac rhythm.

5            I'm not an expert in that area,

6   though.

7      Q.      It says:  And heart block.

8            So cardiomyopathy is something

9   different than heart blocks, right?

10      A.      Yes.

11            And again, I don't have a specific

12   definition --

13      Q.      Okay.

14            What about --

15      A.      -- I'm not familiar.

16      Q.      -- what about heart block?

17            What's the definition of heart block?

18      A.      I believe a heart block is the

19   temporary stopping of the heart, as we

20   previously discussed, that short period of time;

21   not a cardiac arrest, but a temporary stopping

22   of the heart.

23      Q.      Is it a full stopping of the heart?

24            Or is it just a block on the -- in the

25   circulatory system of a muscle in the heart

TROY FAABORG

396

1
2      where those arteries or veins are blocked so
3      there is not blood circulating there?
4          A.    I don't know specifically.
5          Q.    Okay.
6                So you don't know exactly what the
7      definition of a "heart block" is?
8          A.    Not by definition, no.
9          Q.    Okay.
10               Do you have any literature that says
11     at what level of G force a person on an airplane
12     would suffer from stress cardiomyopathy or heart
13     blocks?
14         A.    No.
15         Q.    What about capillary rupture in the
16     neck, face, and head?
17               When would that have occurred on the
18     flight?
19         A.    I believe that to be likely
20     particularly in the last 21 seconds under the
21     higher negative G exposures.
22         Q.    Are those symptoms associated with
23     exposures to forces below zero-G only?
24         A.    Not necessarily.  They are more likely
25     with exposures greater -- stronger than that

TROY FAABORG

1

2      from zero-G.

3             But the -- I believe the physiological

4      mechanism begins before that, but is more

5      likely -- which again, getting into the more

6      likely than not -- more likely at the higher G

7      levels experienced at the end.

8             Q.    Okay.

9                   So it's not likely that capillary

10     rupture in the neck, face, and head occurred due

11     to the positive G forces experienced on ET 302,

12     right?

13            A.    Correct.

14            Q.    So 1 -- positive 1.69 was the maximum

15     level of G force that passengers experienced.

16                  And that is a level of G force that's

17     not commensurate with the observation of

18     capillary rupture in the neck, face, and head,

19     right?

20            A.    Correct.

21            Q.    But the negative G forces -- and by

22     "negative" in this instance, you mean below

23     zero -- you believe those G forces are

24     significant enough to cause capillary rupture?

25            A.    It is more likely less than zero,

TROY FAABORG

398

1
2    because of the pressures in the upper body with
3    the negative G force.  Yes, that's accurate.
4         Q.    Okay.
5               But you don't have an actual piece of
6    literature, or a treatise, or anything that says
7    the negative level of G force that's required?
8         A.    I believe the handbook may make
9    reference to a range, but not a specific "above
10   this or below this," no.
11        Q.    Okay.
12              Is there any information in the
13   literature or the treatises you cited about the
14   duration of the negative G forces that are
15   required to cause capillary rupture?
16        A.    We had discussion about that a little
17   bit, talking about the subconjunctival
18   hemorrhages with the carousel article.
19              Other than what we have previously
20   discussed, no additional references, no.
21        Q.    Okay.
22              And the petechiae?
23        A.    Got it.
24        Q.    Got it.
25              Those are ruptured blood vessels in

TROY FAABORG

399

1
2      the ear canals, eyes, and soft palate?
3          A.    Correct.
4          Q.    And the literature that I saw that is
5      cited in your rote is the Moisseiev article that
6      talks about experiencing petechiae.
7                Is that correct?
8          A.    That is referenced in that article,
9      yes.
10               That's not the context that I
11     referenced the article in, specifically.
12               But it does mention it in that
13     article.
14         Q.    And the mention of it in that article
15     is that pilots complained of petechiae at
16     negative 3 to negative 4 G's, right?
17         A.    Correct.
18         Q.    And there is no statement in that
19     article that says they experienced petechiae at
20     a lower degree of negative G force, right?
21         A.    That's correct.  There is not a
22     statement to that nature in that article.
23               (Pause)
24         Q.    All right.
25               So in your conclusions, you have a

TROY FAABORG

400

 1

 2     paragraph here under "Summary of Basis/Opinions

 3     and Conclusions."

 4              Do you see that?

 5     A.    Yes.

 6     Q.    I think we asked about the beginning

 7     part of that before, so I won't retread the

 8     ground.

 9              But you say, sort of, midway through

10     the paragraph:  The passengers of Ethiopian

11     Airlines Flight 302 suffered extraordinary

12     physical, physiological, and psychological

13     injuries resulting in extreme pain and terror

14     associated with anticipation of horrific loss of

15     loved ones and personal annihilation.

16              Do you see that?

17     A.    Yes.

18     Q.    What was your definition of

19     "extraordinary physical, physiological, and

20     psychological injuries"?

21     A.    I don't -- I don't have a particular

22     definition, other than that it was

23     extraordinary.  This was not an ordinary

24     experience for anyone on the aircraft.

25              So it was not just things, kind of,

TROY FAABORG

401

1
2      went south.
3             It was -- it was -- it was
4      extraordinarily terrifying, in my opinion.
5      Q.    And yet under your definition of
6      "injury," none of these things need to be
7      extraordinary in order to be an injury, right?
8      A.    That's correct.
9      Q.    And those things actually don't even
10     need to necessarily have occurred to be an
11     injury, right?
12            You just have to be subjected to an
13     unanticipated or unpredicted surprising event?
14     A.    With adverse physiological, physical,
15     or psychological effect, yes.
16     Q.    Okay.
17            What's the definition of
18     "psychological injury" that you applied in this
19     case?
20            Is it any different?
21     A.    Consider things like traumatic stress,
22     posttraumatic stress.  I think that's probably
23     the best example -- so nothing -- nothing
24     specific further than that, I suppose.
25     Q.    Do you know the definition of

TROY FAABORG

402

1

2     "posttraumatic stress"?

3          A.     I know a general definition -- not

4     from a medical book or a diagnosis, no.

5          Q.     So you've never looked in a medical

6     book for the definition of "posttraumatic

7     stress"?

8          A.     Not specifically, no.

9          Q.     Never diagnosed anybody with

10    posttraumatic stress?

11         A.     No.

12         Q.     Is posttraumatic stress or

13    psychological injury something that an aerospace

14    physiologist is an expert in assessing?

15         A.     Not in assessing, no.

16              (Pause)

17         Q.     Before this case, have you ever been

18    asked to evaluate whether an individual suffered

19    a psychological injury because of their

20    involvement in an aviation accident?

21         A.     Not specifically, no.

22              MR. ESSIG:  I think I don't have any

23    more questions at this point.

24              Want to take a break?

25              MR. DURKIN:  I'll ask a few questions,

TROY FAABORG

403

1

2      then I want to check with counsel.  Might as

3      well get some -- we'll go right to it, okay?

4   EXAMINATION

5   BY MR. DURKIN:

6        Q.    Let's keep this page open -- 18 and 19

7      of exhibit 13 -- 313.

8              You were asked a lot of questions by

9      Mr. Essig about whether you had treatises, or

10     articles, or -- that support something.

11             Did you actually in your writing the

12     report use your many years of professional,

13     practical experience with dealing with these

14     matters?

15       A.    Yes.

16             MR. ESSIG:  Object to the form.

17  BY MR. DURKIN:

18       Q.    So there's more to the literature.

19             You actually saw these things in real

20     life that you put on 18 and 19?

21       A.    Yes, that's correct.

22       Q.    Okay.

23             (Pause)

24             MR. ESSIG:  Object to form.

25             (Pause)

TROY FAABORG

1

2    BY MR. DURKIN:

3        Q.    That was your job?

4        A.    It was my job.

5        Q.    Yes.

6              A little bit -- when we got to -- I

7    know you didn't evaluate anybody specific.  You

8    weren't given information.

9              But if you were told Mr. Nur Mohammed

10   weighed 220 pounds as a result of the 1.69

11   positive G forces that he was exposed to, what

12   would his weight have actually been at that

13   point?

14             MR. ESSIG:  Object to form, incomplete

15   hypothetical, calls for speculation.

16             MR. DURKIN:  Okay.

17   BY MR. DURKIN:

18       Q.    You can answer over objection.

19             It's mathematical?

20       A.    It's math, right.

21       Q.    And can you do it real quick?

22       A.    I can.  Give me a moment.

23       Q.    So if he was to weigh 220 pounds at

24   the maximum positive G force of 1.69 they have

25   talked to you about --

TROY FAABORG

405

1
2          A.     Right.   371.8 pounds.
3          Q.     So in the course of this -- these
4     oscillations and these G forces, he weighed that
5     much? -- his body did?
6                 MR. ESSIG:  Object to form, vague.
7     BY MR. DURKIN:
8          Q.     And would that be -- would that cause
9     physical stress on the body?
10         A.     It would, yes.
11         Q.     All these things that Mr. Essig was
12    calling up -- hollow points -- fluid shifting,
13    compression restriction -- are those all things
14    that had physical impact on the body of each and
15    every passenger and crew member on Ethiopian
16    Airlines Flight 302?
17                MR. ESSIG:  Object to the form, asked
18    and answered.
19         A.     My opinion is yes, it had a
20    physiological and physical effect or impact, as
21    defined in our "harm" definition today.
22         Q.     And I want to make sure -- in the next
23    paragraph, which is the filled-in ones, many of
24    this is occurred early in the flight, some
25    occurred different times.

TC REPORTING
(516) 795-7444

TROY FAABORG

406

1

2                    Is that correct?

3         A.    That's correct.

4         Q.    Okay.

5                    And so some of those occurred as early

6    as the 8:39:47.

7                    Some may be in the -- at different

8    points?

9                    MR. ESSIG:  Object to the form,

10   leading, vague, compound.

11   BY MR. DURKIN:

12        Q.    Is there a way you can put like when

13   they all were -- when they all came?

14                   Is there a way to do that?

15                   Or just it varies?

16                   MR. ESSIG:  Object to the form, vague,

17   compound, misstates the testimony.

18                   THE WITNESS:  Can you repeat that?

19   I'm sorry.

20                   MR. DURKIN:  Yeah.

21   BY MR. DURKIN:

22        Q.    I mean, for instance, the nausea and

23   vomiting -- the nausea -- is there a way to --

24   do you have an opinion as to when in the course

25   of events that occurred?

TROY FAABORG

407

1
2      A.      Not specifically, no.
3      Q.      But in the course of the last -- in
4    other words, was it at 8:39:47 or -- then by a
5    certain point, such as the area when you get
6    to -- where you call the digressions?
7              MR. ESSIG:  Object to the form, vague,
8    leading, asked and answered.
9      A.      For -- we'd have to go point-by-point
10   because some of these very early on were highly
11   likely to occur; others, like nausea and
12   vomiting -- that's -- those are two that we said
13   among this list there are some that some may not
14   have experienced, if they experienced it, the
15   likelihood later in the flight --
16     Q.      Okay --
17     A.      -- others, I can say fear and panic,
18   very likely, could have -- could have started at
19   the de-rotation.  Without doubt, it would have
20   been scary at the 12-second -- if that answers
21   your question.
22     Q.      Yeah.
23             How about the hyperventilation, and
24   the cardiac dysrhythmias, and those? --
25             MR. ESSIG:  Object to form, asked and

TROY FAABORG

408

1

2    answered.

3        A.    Hyperventilation as defined as an

4    increased rate of respiration, the breathing

5    rate, tied again to the fear and panic could

6    have started as early as the de-rotation.

7    Certainly would have occurred at the 12-second,

8    9-second, and continued deviations.

9        Q.    Okay.

10            Early on, you -- I believe you said --

11   you were asked questions about relying on the

12   data that was given to you by Mr. Pereira?

13       A.    Yes.

14       Q.    And I understand also that you said

15   you relied on the charts and the numbers that

16   were in the Ethiopian Airlines preliminary

17   report --

18       A.    Correct.

19            I compared the data that I was given

20   to the two -- the preliminary and interim

21   reports -- more to make sure that my analysis

22   was not doing something weird; make sure they

23   aligned.

24       Q.    You on many occasions used the word

25   "recorded data."

TROY FAABORG

409

1

2            Was there a reason you used recorded

3    data?

4      A.    My understanding is that there is

5    other data.

6            And I -- I mention in the report, just

7    to be clear of what I was looking at and what I

8    wasn't.

9            There is a lag from the time the

10   information is sent to the time that it's

11   recorded.  And so recording ends slightly before

12   the aircraft crashes.

13           My understanding is that there are

14   some extrapolations that were made.  I didn't

15   take any of those into account.

16           I restricted this analysis only to

17   what was recorded, not to any speculation or

18   extrapolation.

19     Q.    Okay.  Thank you.

20           MR. DURKIN:  There is a document --

21   let me see if I got one more here --

22           (Pause)

23           MR. DURKIN:  You were shown Exhibit

24   322.

25           This is the Case Reports in

TROY FAABORG

410

```
 1
 2     Ophthalmology.
 3              THE WITNESS:  I got it.  There we go.
 4     It was upside-down.
 5              MR. DURKIN:  I just wanted to go to --
 6     there was a paragraph that was read to you, but
 7     there was some sentences not read to you, okay?
 8              I'm on the top of the page.
 9              Conversely, the body cannot be trained
10     to tolerate negative G forces.
11     BY MR. DURKIN:
12         Q.    Is that something you agree with?
13         A.    I agree.
14         Q.    And it says --
15              MR. ESSIG:  Where are you?
16              MR. DURKIN:  The top of the page --
17              MR. ESSIG:  182? --
18              MR. DURKIN:  -- okay.
19     BY MR. DURKIN:
20         Q.    Ocular discomfort occurs almost
21     immediately.
22              What's ocular discomfort?
23         A.    I would -- I would assume as simply as
24     they are stating pain in the eye.
25         Q.    And then it says:  And subconjunctival
```

TROY FAABORG

411

1

2      hemorrhages occur at 2 to 3 G.

3              You agree with that?

4      A.    Yes.

5      Q.    But you also made a statement earlier

6      about -- that the processes start on some of

7      these earlier.

8              What do you mean by that?

9      A.    That in my experience, based on my,

10     again, nonmedical perspective, the injury

11     mechanisms begin on the continuum and then

12     manifest in this case, as they say, between 2

13     and 3 G.

14             And so a visible --

15             MR. ESSIG:  This is negative 2 to 3,

16     right? --

17     A.    Sorry -- at 2 to 3 negative G, or

18     negative 2 to 3 G, yes, to be clear.

19             So the mechanism for that begins not

20     just at that level.  But the initial -- the

21     initial stages of that harm, or damage, or what

22     ever you want to define the hemorrhage as, could

23     occur less than that level.

24     Q.    I understand now.  Okay.

25             MR. DURKIN:  And I want to go -- what

TROY FAABORG

412

1
2      do you call it? -- the 315, the handbook at
3      7.1.13:  Negative G Effects --
4                MR. ESSIG:  What page?
5                MR. DURKIN:  Page 7-22, paragraph
6      7.13.
7                MR. ESSIG:  What's the page at the
8      bottom?
9                MR. DURKIN:  7-22.
10               MR. ESSIG:  I got it.
11               (Pause)
12     BY MR. DURKIN:
13         Q.   You went over this first paragraph
14     with Mr. Essig.
15               It says:  Forces of negative 2 to 3 G
16     cause extreme congestion in the tissues of head
17     and neck, and produce a sensation that the eyes
18     are bulging.
19               When -- in areas between zero and --
20     between 1 and 2 G, would you expect there still
21     would be congestion in the tissues of the head
22     and neck?
23         A.   Yes.  And I think the discussion
24     previously about the effects of hanging
25     upside-down under what would be negative 1,

TROY FAABORG

413

1
2      negative 1 G, physiologically, we already start
3      to hear -- hear of and experience the beginning
4      of those effects, the feeling of pressure, the
5      initial feeling -- not necessarily that the eyes
6      are popping out of your head, but definitely
7      that there is pressure behind the eyes, because
8      of that fluid shift before negative 2 to
9      negative 3 --
10         Q.    And the reason I say that is:  Would
11     it be true that -- it says:  Forces of negative
12     2 to negative 3 G cause extreme congestion of
13     tissues head and neck.
14             It just -- the congestion -- the
15     extreme congestion -- or the congestion just
16     doesn't start at negative 2 to negative 3.
17             The extreme congestion starts there?
18         A.    I would -- I agree with that, yes.
19         Q.    And everybody on this aircraft was
20     subjected to forces on the recorded data between
21     1 -- negative 1 and negative 2 -- to be frank,
22     1.95 or 1.96 negative G's, to be accurate --
23     somewhere close to that?
24         A.    That's correct.
25         Q.    Okay.

TROY FAABORG

414

1

2                MR. DURKIN:  Can we take a break, see

3      if anyone has any more questions?

4                THE VIDEOGRAPHER:  Off the record.

5      The time is 5:04 p.m.

6                (Recess from 5:04 p.m. to 5:12 p.m.

7      Eastern Standard Time)

8                THE VIDEOGRAPHER:  We are back on the

9      record.  The time is 5:12 p.m.

10                MR. DURKIN:  After conferring with

11      counsel, we have no further questions.

12                MR. ESSIG:  Boeing has no further

13      questions.

14                THE VIDEOGRAPHER:  Then we are off the

15      record.  The time is 5:13 p.m., and this

16      concludes today's testimony.

17                     *      *      *

18           E N D   O F   P R O C E E D I N G

19        Time noted 5:13 p.m. Eastern Standard Time

20                     *      *      *

21

22

23

24

25

TROY FAABORG

415

1

2              A C K N O W L E D G M E N T

3

4

5    I, TROY FAABORG, hereby certify that I have read the

6    transcript of my testimony taken under oath in my

7    deposition of Wednesday, January 4, 2023; that the

8    transcript is a true and complete record of my

9    testimony; and that the answers on the record as given

10   by me are true and correct.

11

12              _____

                                    TROY FAABORG

13

14

15

16   Signed and subscribed to before me,

17   this _____ day of _____, 2023.

18

19

     _____

20                   (NOTARY PUBLIC)

21

22   My Commission expires:

23

24

25

TROY FAABORG

416

1

2          I N D E X   O F   E X A M I N A T I O N

3

4

5     Witness:

6     Troy Faaborg

7

8

9     Examination:

10    By Mr. Essig.................................Page 13

11    By Mr. Durkin...............................Page 403

12

13

14    Index of Exhibits..........................Page 417

15

16

17

18

19

20

21

22

23

24

25

TROY FAABORG

417

1

2                    I N D E X   O F   E X H I B I T S

3

4    312   Single-page document entitled: Safety .........21

5          Science Consulting 2022 Fee Schedule (no

6          Bates No.)

7

8    313   Multipage document entitled: Plaintiffs' ......25

9          Rule 26(a)(2)(B) Disclosure of Troy

10         Faaborg, dated September 20, 2022 (no

11         Bates Nos.)

12

13   314   Two-page document bearing heading: Safety .....65

14         Science Consulting (no Bates Nos.)

15

16   315   Multipage document entitled: Handbook of .....118

17         Aerospace and Operational Physiology, 2nd

18         Edition, dated October 2016 (no Bates

19         Nos.)

20

21   316   Single-page document entitled: ET 302: .......142

22         Vertical Acceleration (Gz): Takeoff Roll

23         to End of DFDR Recording, bearing a graph

24         (no Bates No.)

25

TROY FAABORG

418

1

2  317  Single-page document entitled: ET 302: .......169

3       Vertical Acceleration (Gz): Final 21

4       Seconds of DFDR Recording, bearing a graph

5       (no Bates Nos.)

6

7  318  Multipage document entitled: Civil ..........249

8       Aviation Rules and Standards: Federal

9       Democratic Republic of Ethiopia, Part 8 -

10      Operations, dated November 2019 (no Bates

11      Nos.)

12

13 319  Multipage document entitled: Advisory ........254

14      Circular No. 120-88, Subject: Preventing

15      Injuries Caused by Turbulence, dated

16      November 19, 2007 (no Bates Nos.)

17

18 320  Multipage document entitled: Introduction ....319

19      to Aviation Physiology, bearing heading on

20      first page: Foreward (no Bates Nos.)

21

22 321  Multipage document entitled: Federal ........324

23      Aviation Administration: Acceleration in

24      Aviation: G-Force (no Bates Nos.)

25

TROY FAABORG

419

1

2    322    Four-page document entitled: Negative ........364

3            g-Force Ocular Trauma Caused by a Rapidly

4            Spinning Carousel (no Bates Nos.)

5

6

7

8

9

10

11

12

13

14                    (All exhibits were provided

15            electronically to the reporter.)

16

17

18

19

20

21

22

23

24

25

TROY FAABORG

420

1

2                    C E R T I F I C A T E

3

4            I certify that in response to the

5    COVID-19 pandemic, I, BRANDON RAINOFF, have

6    collected everyone's agreement at the

7    commencement of this deposition that I would be

8    the swearing officer and court reporter remotely

9    out of state and that I may record the testimony

10   stenographically and swear in the deponent even

11   though I am not in the physical presence of the

12   deponent, and that there is no objection to that

13   at this time, nor will there be an objection to

14   it at a future date.

15           IN WITNESS WHEREOF, I have hereunto

16   set my hand this 4th day of January, 2023.

17

18

19   _____

20           BRANDON RAINOFF, RPR, FCRR, RMR, CRR

21

22

23

24

25

TROY FAABORG

421

 1

 2                    C E R T I F I C A T E

 3

 4          I, BRANDON RAINOFF, a Federal Certified

 5    Realtime Reporter and Notary Public within and for the

 6    State of New York, do hereby certify:

 7              That TROY FAABORG, the witness whose

 8    deposition is hereinbefore set forth, was duly sworn

 9    by me and that such deposition is a true record of the

10    testimony given by the witness.

11              I further certify that I am not related to

12    any of the parties to this action by blood or

13    marriage, and that I am in no way interested in the

14    outcome of this matter.

15              IN WITNESS WHEREOF, I have hereunto set my

16    hand this 4th day of January, 2023.

17

18

19    _____

20          BRANDON RAINOFF, RPR, FCRR, RMR, CRR

21

22

23

24

25

TROY FAABORG

422

1

2          ERRATA SHEET FOR THE TRANSCRIPT OF:

3    Case Name: In re: Ethiopian Airlines Flight ET 302
     Crash
4    Deposition Date:  1-4-2023
     Deponent:  Troy Faaborg
5    Place: Remote/Hybrid Deposition

6                  CORRECTIONS

7

8    PAGE  LINE   FROM              TO                REASON

9    ____|___|_____|_____|_____

10   ____|___|_____|_____|_____

11   ____|___|_____|_____|_____

12   ____|___|_____|_____|_____

13   ____|___|_____|_____|_____

14   ____|___|_____|_____|_____

15   ____|___|_____|_____|_____

16   ____|___|_____|_____|_____

17   ____|___|_____|_____|_____

18   ____|___|_____|_____|_____

19

20   _____        _____
     Date                              TROY FAABORG
21

22   Subscribed and sworn before me

23   this_____day of _____, 2023.

24   _____
     (Notary Public)
25   My Commission expires:

TC REPORTING
(516) 795-7444