**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE: ETHIOPIAN AIRLINES FLIGHT ET 302 CRASH<br><br>This Document Relates To: 21 cv 0058 and 20 cv 1955 | Lead Case:    1:19-cv-02170 (Consolidated)<br><br>District Judge:    Hon. Jorge L. Alonso<br>Magistrate Judge:    Hon. M. David Weisman |

**PLAINTIFFS' CONSOLIDATED OPPOSITION TO BOEING'S *MOTIONS IN LIMINE* (A) TO EXCLUDE EVIDENCE AND ARGUMENT ABOUT PASSENGERS' PAIN AND SUFFERING BEFORE IMPACT, (B) TO EXCLUDE SPECULATIVE TESTIMONY REGARDING WHETHER PASSENGERS EXPERIENCED CONSCIOUS PAIN AND SUFFERING CAUSED BY INJURIES RECEIVED ON IMPACT, AND (C) TO EXCLUDE PLAINTIFFS' DEFINITIONS OF "INJURY"**

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

I.          INTRODUCTION ........................................................................................ 1

II.         STATEMENT OF RELEVANT FACTS ................................................... 4

III.       LEGAL STANDARD ............................................................................... 11

IV.      ARGUMENT ............................................................................................ 12

        A.  Pursuant to the Clear Terms of the Stipulation, Boeing Has Agreed to the Viability of Plaintiffs' Survival Action ....................................................... 13

        B.  Regardless of the Stipulation, Decedents' Pain, Suffering, and Emotional Distress are Compensable Under Illinois Law. ............................ 14

        C.  Even if Plaintiffs Were Required to Prove Contemporaneous Physical Impact and Injury Prior to Death In Order To Present Evidence of Decedent's Pain, Suffering, and Emotional Distress Damages to the Jury, Plaintiffs Can Meet that Requirement. .................................................. 19

        D.  Plaintiffs Are Permitted to Present Evidence of the Continuum of Pain, Suffering, and Emotional Distress, and Physical Impact/Injury Experienced by Decedents Under the Survival Count. ................................... 28

        E.  Boeing's Motion *in Limine* Seeking to Exclude Plaintiffs' Experts' Definitions of Injury Should Be Denied Because Plaintiffs Are Not Required to Prove a Physical Impact or Injury and the Meaning of "Injury" is a Question of Fact for the Jury. (*Response to Boeing's Motion C*). 30

        F.  The Law Allows Plaintiffs to Present Evidence Regarding the Circumstances of the Decedents' Deaths to Support Their Wrongful Death Claims ............................................................................................... 32

        G.  Boeing's Rule 403 Argument Must Be Rejected Because That Rule Is Not Intended to Prevent the Jury from Hearing the Facts of the Case. ......... 33

V.         CONCLUSION ........................................................................................ 34

TABLE OF AUTHORITIES

**Cases**

*Aguirre v. City of Chicago*, 382 Ill App. 3d 89 (1st Dist. 2008) ............................................. 32, 33

*Allen v. Otis Elevator Co.*, 206 Ill. App. 3d 173 (1st Dist. 1990) ........................................... 21, 26

*Analytical Engineering, Inc. v. Baldwin Filters, Inc.*, 425 F. 3d 443 (7th Cir. 2005) .................... 14

*Arpin v. United States*, 521 F.3d 769 (7th Cir. 2008) .............................................................. 11

*Babikian v. Mruz*, 2011 IL App (1st) 102579 .................................................................... 17, 18

*Benton v. Little League Baseball, Inc.*, 2020 IL App (1st) 190549 ........................................... 24

*Braun v. Craven*, 175 Ill. 401 (1898) ................................................................................. 20

*Casares v. Bernal*, 790 F. Supp. 2d 769 (N.D. Ill. 2011) ....................................................... 12

*Clark v. Children's Memorial Hospital*, 2011 IL 108656 ..................................................... 16, 18

*Cochran v. Securitas Security Services USA, Inc.*, 2017 IL 121200 (2017) ............... 15, 16, 18, 31

*Corgan v. Muehling*, 143 Ill.2d 296 (1991) ..................................................................... 24, 27

*DeYoung v. McDonnell, Douglas Corp.*, 1985 WL 1834 (N.D. Ill. 1985) ................................. 28

*Doe by and Through G.S. v. Johnson*, 52 F. 3d 1448 (1995) .............................................. 32, 33

*Doe v. Surgicare of Joliet, Inc.*, 268 Ill. App. 3d 793 (3rd Dist. 1994) ..................................... 21

*Dougherty v. Cole*, 401 Ill. App. 3d 341 (2010) ................................................................... 12

*Est. of Love v. Rassmussen*, 2018 WL 10613262 (C.D. Ill 2018), ...................................... 19, 25

*Garton v. Pfeifer*, 2019 IL App (1st) 180872 ...................................................................... 18

*Ginn v Consolidation Coal Co.*, 107 Ill. App. 3d 564 (5th Dist. 1982) .................................... 11

*Glover v. City of Chicago*, 106 Ill. App. 3d 1066 (1982) ....................................................... 26

*Haley v. Pan American World Airways*, 746 F.2d 311 (5th Cir.1984) ...................................... 22

*Hall v. Nat'l Freight, Inc.*, 264 Ill. App. 3d 412 (1st Dist. 1994) ............................................. 28

*Hankins v. Alpha Kappa Alpha Sorority, Inc.*, 447 F. Supp. 3d 672 (N.D. Ill. 2020) ................. 27

*Hayes v. Illinois Power Co.*, 225 Ill. App. 3d 819 (1992) ...................................................... 20

*Holston v. Sisters of the Third Order of St. Francis*, 165 Ill. 2d 150 (1995) ............................. 29

In *Hammond v. System Transport, Inc.*, 942 F. Supp. 2d 867 (2013) ....................................... 12

*In re Aircrash Disaster Near Chicago on May 25, 1979*, 480 F.Supp. 1280 (N.D. Ill. 1979) ...... 19

*In re Jacoby Airplane Crash Litigation*, Civ. No. 99–6073 (HAA), 2006 WL 3511162 (D.N.J.
    Dec. 5, 2006) ............................................................................................................. 22

*Jarka v. Yellow Cab Co.*, 265 Ill. App. 3d 366 (1st Dist. 1994) .......................................... 25, 27

*Kapoulas v. Williams Ins. Agency, Inc.*, 11 F.3d 1380 (7th Cir. 1993) .................................. 20, 21

*Lawler v. MacDuff*, 335 Ill. App. 3d 144 (2nd Dist. 2002) ................................................. 20, 31

*Lewis v. CITGO Petroleum Corp.* 561 F.3d 698 (7th Cir. 2009) ............................................ 28

*McDaniel v. Bullard*, 34 Ill.2d 487 (1966) ......................................................................... 13

*Metavante Corp. v. Emigrant Sav. Bank*, 619 F. 3d 748 (7th Cir. 2010) ................................. 31

*Mike Young, Adm'r of the Est. of Rebecca R. Young, Claimant, v. State of Illinois, Respondent*, 71
    Ill. Ct. Cl. 154 (2018) ................................................................................................. 25

*Murphy v. Martin Oil Co*, 56 Ill. 2d 423 (1974) .............................................................. 14, 24

*National Bank of Bloomington v. Norfolk & Western Railway Co.*, 73 Ill.2d 160 (1978) ........... 13

*Oshana v. Aer Lingus Limited*, 2022 WL 138140 (N.D. Ill. Jan. 12, 2022) ........................ passim

*Patch v. Glover*, 248 Ill. App. 3d 562 (1st Dist. 1993) .......................................................... 13

*Platt v. McDonnell Douglas Corp.*, 554 F. Supp. 360 (E.D. Mich.1983) ................................. 22

*Quill v. Trans World Airlines, Inc.*, 361 N.W.2d 438 (Minn. App. 1985) ................................. 22

*Rickey v. Chicago Transit Authority*, 98 Ill. 2d 546 (1983) ....................................... 15, 16, 23, 24

*Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940 (7th Cir. 2005) ....................................... 19

*Schweihs v. Chase Home Finance*, LLC, 2016 IL 120041 ......................................... 17, 18, 19, 24
*Shu–Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45 (2d Cir.1984)..................................... 22
*Solomon v. Warren*, 540 F.2d 777 (5th Cir 1976)................................................................ 22
*Sutton v. Washington Metropolitan Area Transit Authority*, 2008 WL 8822521 (D.D.C. 2008).. 33
*U.S. v. DiSantis*, 565 F. 3d 354 (7th Cir. 2009)................................................................ 32
*U.S. v. Johnson*, 396 F. 3d. 902 (7th Cir. 2005) ............................................................. 14
*Van Patten v. Washington Cnty.,* 2017 WL 2616888 (D. Or. 2017) ...................................... 33
*Victim A v. Song*, 2021 IL App (1st) 200826 ................................................................ 23
*Washington Hospital v. White*, 899 F. 2d 1294 (3rd Cir. 1989)....................................... 14
*Yowell v. Piper Aircraft*, 703 S.W.2d 630 (Tex.1986) .................................................... 22

**Statutes**
735 ILCS 5/2-1117.................................................................................................. 27, 28
755 ILCS 5/27-6 ..................................................................................................... 4, 16

**Rules**
Federal Rule of Evidence 403 ................................................................................. 16, 37

**Treatises**
38 Am. Jur. 2d Fright, Shock, Etc. § 12 ...................................................................... 27

The Plaintiffs' Executive Committee, through undersigned counsel, move this Court to enter an order denying Boeing's Motions *in Limine* (Dkts. 1597 (A), 1593 (B), 1594 (C)) that collectively seek to preclude Plaintiffs from presenting evidence of the damages to which Plaintiffs are entitled under the Survival Act, 755 ILCS 5/27-6, in contradiction of the Stipulation entered into by the parties and the related Order entered by this Court.[1]

## I.  INTRODUCTION

On March 10, 2019, Boeing's admittedly defective commercial aircraft plummeted to the ground minutes after takeoff, killing all 157 passengers and crew aboard flight ET 302. There is no dispute that passengers and crew members were conscious and fully aware that the plane was plummeting before it actually crashed at nearly 600 mph, resulting in total body fragmentation of the people inside.  After months of negotiations between the parties, a Stipulation was executed on November 10, 2021, and approved by this Court's order on November 15, 2021, (Dkt. 1219, 1220).  Boeing specifically stipulated to the following:

- "it is liable to the estates, survivors, dependents, and beneficiaries of the victims of the Ethiopian Airlines Flight 302 accident for **all compensatory damages** resulting from the deaths of Plaintiffs' decedents;" (Dkt 1219, at 2, A1)

-  "[t]he terms of the stipulation are a bargained-for resolution to this litigation;" (Dkt 1219, at 2, fn1)

-  "in the event of any compensatory damages trial, they will not object to instructing the jury by reference to Illinois Pattern Jury Instructions as long as those instructions are given in accordance with the terms of this stipulation and the statements made herein on liability;" (Dkt 1219, 2-3, A 3)

"each and every Plaintiff is entitled to recover \*\*\***the full measure of damages** permitted under Illinois law and pursuant to the elements of

---

[1] Plaintiffs note that this Opposition collectively responds to each of Boeing's Motions set forth above, Dkts. 1597, 1593, 1594, and all overlapping should be considered responsive to all three of these motions.

1

recoverable damages under Illinois law—**including but not limited to** ***pain and suffering and **emotional distress of the decedent**;" (Dkt 1219, at 3, B 1)

- "the Court shall instruct the jury accordingly pursuant to Illinois law, and as to each Plaintiff's wrongful death and survival damages, shall specifically instruct the jury pursuant to Chapters 30 and 31 of the Illinois Pattern Jury Instructions;" (Dkt 1219, at 3, B 1)

- the jury would be instructed pursuant to I.P.I. (Civil) 1.03B and 23.01B that "[t]he defendant, Boeing, has admitted that it produced an airplane that had an unsafe condition that was a proximate cause of Plaintiff's compensatory damages caused by the Ethiopian Airlines Flight 302 accident;" (Dkt 1219, at 5, D 3)

- "[i]t is agreed and stipulated that the parties **will be permitted to introduce all relevant and admissible evidence at trial** regarding the decedents and their beneficiaries' alleged compensatory damages. This may include evidence of ***pre-impact, pre-death pain and suffering and **emotional distress of the decedent** as permitted under Illinois law." (Dkt 1219, at 5, D 4). (Emphasis added).

The plain language of the Stipulation binds Boeing in the following relevant ways:

1. Boeing has admitted liability in tort in that it breached its duty to Plaintiffs by producing an airplane that had an unsafe condition and that breach of duty was the proximate cause of Plaintiffs' injuries such that Boeing is responsible for compensatory damages. (Dkt 1219, at 2, A1).

2. Boeing has agreed that the jury should be instructed pursuant to the Illinois Pattern (Civil) Jury Instructions for wrongful death and survival actions in Chapters 30 and 31, which are necessarily governed by Illinois state court precedent. (Dkt 1219, at 3, B 1)

3. Boeing agrees that the jury should consider evidence related to all compensatory damages, including pain and suffering and emotional distress damages. (Dkt 1219, at 3, B 1)

At the outset, it must be noted that "[e]xcluding evidence before trial is generally disfavored. The court will grant a motion *in limine* to bar evidence only where that evidence is clearly not admissible for any purpose. The moving party carries the burden of meeting this high

2

standard." *Oshana v. Aer Lingus Limited*, 2022 WL 138140, at 1 (N.D. Ill. Jan. 12, 2022) (internal citations omitted). Boeing cannot meet that high burden here for many reasons, not the least of which being the fact that in seeking to bar evidence of pain, suffering, and emotional distress damages, it is defying the agreement it freely and knowingly entered.

Boeing does not even mention the Stipulation in its motions, but instead asks this Court to utilize federal precedent to determine whether evidence of the Decedents' emotional distress is admissible, in direct contravention of the Stipulation. It further negates the Stipulation by asking this Court to preclude Plaintiffs from presenting pain, suffering, and emotional distress damages to the jury, arguing there is no evidence that Decedents experienced "conscious pain and suffering from the time of injury," which Boeing defines as the instant the airplane actually made impact with the ground, decimating the Decedents' bodies. This assertion is contrary to Illinois law and defies common sense and fundamental fairness. Boeing argues that it should be permitted to avoid these damages it has previously agreed to because its wrongful conduct killed the ET302 victims, who undeniably suffered horrific emotional distress, pain, and suffering, and physical impact/injury while they endured extreme G-forces, braced for impact, knew the airplane was malfunctioning, and ultimately plummeted nose-down to the ground at terrifying speed.

Fortunately, Illinois law does not countenance this attempt to escape the terms of the stipulation, which would be absurd and unjust. There is no requirement under Illinois state law that contemporaneous impact or injury is required to allow emotional distress and pain and suffering damages in this case when Boeing admitted its liability in tort, and even if that requirement applied, there is no question that Decedents experienced pain, suffering and physical impact or injury combined with extreme emotional distress up to the time of their deaths. Boeing's argument that evidence of the circumstances leading up to the Decedents' deaths is more

3

prejudicial then probative should be flatly rejected under Federal Rule of Evidence 403. That Rule is intended to protect against the admission of unduly prejudicial evidence. But Boeing cannot use Rule 403 to exclude the damages caused by its egregious and admitted misconduct in this case, particularly when it has stipulated otherwise. Accordingly, Boeing's motions *in limine* must be denied.

## II.  STATEMENT OF RELEVANT FACTS

Captain Vickie Norton, SME, MSc, ATP, has been a full-time captain for a major United States airline for 26 years. She has over 15,000 hours of flight time, over 8,000 hours as a Pilot-in-Command, is type-certified in flying the 737 Max aircraft, and has been involved in numerous aircraft accident and incident investigations. Captain Norton will explain that flight ET302 was cleared for take-off at 8:37:51, and at 8:38:34, the captain was prohibited from engaging the autopilot due to an angle-of-attack (AOA) sensor failure, which would have caused the left stick-shaker to activate, warning pilots of an impending stall condition. The pilot manually pushed the nose over, which "would have been very disconcerting right after takeoff when the airplane should have been climbing, and likely alarming to any passengers for which the warning horn was also audible." (Ex. A, Norton Report, at 7).

At 8:40:00, the passengers and crew experienced a "most unusual" sequence of events, and Captain Norton opined that any experienced passenger would have realized the plane was descending when it should have been climbing. Additionally, "a very loud Ground Proximity Warning System (GPWS) 'DON'T SINK' aural warning" would have been repeating in the cockpit at a volume that would have been audible to passengers in business class and potentially beyond that area. (Ex. A, at 8). About 20 seconds later, MCAS activated "automatic nose down trim" which prompted a second GPWS aural warning of "DON'T SINK."

4

Captain Norton opined that the "unusual up-and-down motion of ET 302 in this early phase of flight would have been obvious and alarming to experienced passengers." (Ex. A, at 8). At 8:40:38, the airplane's altitude had not risen and passengers and crew looking out the window would have been able to discern structures, roads, and individual vehicles which would have signaled that they might be in peril because the aircraft was not gaining altitude. (Ex. A, at 8).

Captain Norton explained that the ET302 captain and first officer worked together for the next two-plus minutes to pull back on the control column to get the airplane to climb, but when only one of them pulled back, the aircraft would pitch down and descend. "These up-and-down motions would be perceived as **very** unusual when occurring back-to-back within seconds, and would have certainly created great anxiety for the passengers as it persisted." (Ex. A, at 8) (emphasis in original). By 8:41:20, the overspeed clacker warning device was sounding to alert the pilot that the aircraft had reached maximum design speed, and this warning alert would have been heard by business class passengers at a minimum. (Ex. A, at 8).

About 25 seconds before the crash, MCAS prompted another nose-down pitch that would have been "potentially injurious" and "terror-inducing." Captain Norton opined that passengers would have felt as if they were "falling up" toward the ceiling and hanging upside down if belted. "[A]nyone still clinging to hopes of survival would have realized that the situation was beyond dire, and passengers and crew alike could do nothing but anticipate the horror of their impending fate." With 10 seconds remaining before ground impact, a "TERRAIN, TERRAIN, PULL UP, PULL UP" warning would have sounded and passengers looking out the window would have seen that the airplane was rapidly approaching the ground at speeds far exceeding any that anyone had ever experienced on a commercial flight. (Ex. A, at 9). The aircraft's vertical speed was approaching 30,000 feet per minute, it continued to increase to 33,000 feet per minute, and before

crashing, the downward pitch angle was in excess of 40 degrees. The aircraft was destroyed on impact, and it left a deep crater in the ground. (Ex. A, at 9).

Lt. Col. Troy Faaborg is an aerospace physiologist who possesses a Masters' Degree in Psychology with a specialization in Human Factors Engineering. He has been on active duty in the United States Air Force for 21 years in the Biomedical Science Corps of the Medical Service and is board-certified in Aerospace Physiology by the Aerospace Medical Association. He is an adjunct professor at the prestigious Embry-Riddle Aeronautical University where he has taught both graduate and undergraduate courses in flight physiology, human factors in aviation safety, aviation psychology, and aircraft accident investigation. He received formal training in aviation accident investigation through the Air Force Safety Center. (Ex. B, Faaborg Report at 2, 20).

Lt. Col. Faaborg provided opinions regarding the impact of G-forces on the human body, stating that "[f]orces longer than one second in duration are considered 'prolonged exposures' because of the physical and physiological effects that result." (Ex. B, at 6). He explained some of the physiological experiences of Decedents, highlighting:

> "The next clear indicator of the extreme abnormality of the flight profile occurred at 8:41:15 local time when the aircraft suddenly pitched down and lost approximately 370 feet of altitude, and the passengers experienced negative Gs during a nine-second drop. According to the DFDR data, the average G force during this time was 0.67 G (0.33 G less than gravity) with a maximum negative G force of 0.44 G (0.56 G less than gravity). To the passengers this drop felt like an extreme roller coaster's initial descent but lasted even longer, and they would have felt some strain against seatbelts and harnesses. Over the next two minutes there were many more rapid changes in G forces including eight more digressions from normal flight into negative G (all times local). *** While the negative G forces may appear to be relatively small, it is important to note that any force less than the force of gravity (1 G) is unusual, particularly when combined with the negative-to-positive-to-negative G cycles. Not less than eight of these extreme oscillations occurred repeatedly over the next two and a half minutes. These forces are dramatic and unusual for a commercial aircraft; the drops would feel like an elevator quickly dropping down, or in freefall like on the 'Tower of Terror' ride - something that no commercial aircraft passenger expects to experience on a normal flight at this phase of flight. Each negative G drop was followed by a positive G pull that pushed the

6

passengers down into their seats. Coupled with the repeated and sustained nature of these forces, this was a clear indicator of the irregularity of the situation." (Ex. B, at 14-15).

Lt. Col. Faaborg also discussed the "psychological response" to flight forces which "begins as a physiological function," including the "fight or flight response," a "sympathetic nervous system function." (Ex. B, at 10). He explained:

"During this sympathetic nervous system response, epinephrine, norepinephrine, and cortisol are released into the bloodstream, and almost immediately have a physical impact as the heart rate increases, rate and depth of breathing increases, pupils dilate, airways in the lungs open, and blood pressure increases. More oxygen is delivered to the brain and the senses become sharper so that the person may be hyper-focused on the potential danger, and to better prepare for how to deal with the potential threat. *** When this alarm response is unexpected or more profound, such as following more extreme sensations or perceptions (e.g., loud noises, bright lights, extreme temperatures, or movements such as turbulence or earthquakes), the outward actions exhibited are classic to being startled: gasping, crying out in alarm, "jumping" or raising the arms. *** In those with the cognitive capacity to process and interpret a situation, the fight or flight response heightens the senses so that the full danger of the situation can be realized, resulting in anxiety, distress, dread, or fear." (Ex. B, at 10).

Lt. Col. Faaborg explained that it was an "understatement" to characterize the experiences of the passengers and crew on flight ET 302 as "uncommon or even extreme," noting that they "encountered forces beyond even what seasoned military fighter pilots may ever experience" and that "[f]rom the most experienced to the least experienced flyers, the situation presented was extremely grim." (Ex. B, at 11-12). Lt. Col. Faaborg opined that:

"The passengers felt the extreme swings in acceleration forces and the resulting pushing into and pulling out of the seat, saw the earth and sky out the window in unnatural positions, and felt the unexpected and extreme pitching and rolling of the aircraft. These intense forces resulted in strain against seatbelts and harnesses and flailing of limbs – moderately at first, and violently in the final seconds – as unsecured objects were tossed about the cabin. This surely triggered the fight or flight response. From the time of the initial takeoff rotation there were clear indicators that the flight profile was not normal: the initial nose-over and negative G forces experienced during takeoff, 12-second negative G experience at 08:39:47 local time, and the significant drop at 8:41:15 local time followed by a series of repeated and sustained digressions from a normal flight path between

7

8:41:30 and 8:43:11 local time. All on board were not only startled and afraid, but their senses were heightened and on edge well before the aircraft made its final plunge." (Ex. B, at 12-13).

With respect to the last seconds of the flight, Lt. Col. Faaborg explained:

"The extreme and sustained nature of the negative Gs experienced in the final 21 seconds recorded by the DFDR during the flight would also have been a clear indicator of impending catastrophe for all passengers. These forces would have resulted in a strong emotional response of fear, as senses were already heightened by the extreme flightpath up to that point. The passengers and crew surely knew of their impending and inevitable death in the final seconds of the flight." (Ex. B, at 13).

Lt. Col. Faaborg opined that **"every passenger and crewmember"** psychologically experienced activation of the fight or flight response, releasing stress hormones, that were exacerbated by "repeated and sustained digressions from normal flight that followed over the next two and half minutes." (Ex. B, at 18, emphasis added). Further, **"every passenger and crewmember"** physiologically experienced:

- Fluid/blood shifts downward under positive Gz and upward under negative Gz
- Shifting and compression/elongation of internal organs
- Compression/elongation of the spine
- Restriction of mobility
- Impaired respiration and difficulty breathing
- Increased heart rate
- Increased blood pressure
- Increased rate and depth of breath
- Reduction of visual acuity due to changes in oxygen delivery to the retina
- Stimulation of the vestibular apparatus in the inner ear. (Ex. B, at 18).

It is more likely than not that **"all passengers and crew"** experienced **most** of the following to varying degrees:

- Fear and panic
- Nausea
- Vomiting
- Hyperventilation
- Cardiac dysrhythmias such as tachycardia and bradycardia

8

- Circulatory effects such as stagnant hypoxia and pooling of blood in extremities
- Severe headache
- Feeling that eyes are "popping out" of the head
- Facial swelling
- Dizziness and vertigo
  Tunneling of vision, greyout or blackout (positive Gz) or redout (negative Gz) (Ex. B, at 18).

Additionally, **"[e]very occupant" more likely that not**, experienced one or more of the

following:

- Loss of bladder or bowel control
- Stress cardiomyopathy and heart blocks
- Capillary rupture in the neck, face, and head
- Petechiae (ruptured blood vessels) in the ear canals, eyes, and soft palate (Ex. B, at 18).

Dr. Thomas Jenkyn, PhD, PEng. a biomedical engineer with a specialty in biomedical

engineering and a Masters' degree in aerospace engineering, will opine:

"that due to the vertical acceleration of the aircraft the passengers experienced unusually large, physically taxing, physically agonizing and physically exhausting accelerations and forces biomechanically induced on their bodies during the 2 minutes and 4 seconds. *** The impact of the change in vertical acceleration would have caused each passenger and flight crew to be jostled, thrown and thrust involuntarily within the aircraft. Their arms, legs, torso, neck and head would have been induced to move involuntarily and without warning in different directions, primarily up and down. When the passengers were experiencing larger than normal vertical acceleration, i.e. greater than +1 g, every one of their body segments would have become heavier and would have been pulled down with more force than normal. *** Every segment of their body would be pulled downward toward the floor. All the fluid in their body, every organ in their body, would have been pulled downward toward the floor. Each passenger would have strained with their muscles against this unusual downward pull in their necks, arms, torso and legs. ***Everyone sustained at least a contusion injury. Those who were restrained, which is assumed to be everyone on the aircraft, would have sustained contusion injury from the seatbelt compressing the soft tissue around their hips and pelvis.***The tension in the seatbelt would have been significant and painful. Their arms would have been thrown upwards involuntarily with a high chance of striking the storage bin above them, or the passenger next to them. The last period of the crash flight, over two minutes of abnormal flight, would have been excruciating. But the final period ***(24 seconds at a minimum) would have been the worst experience of the crash flight." (Ex. C, Jenkyn Report, at 35).

9

In his deposition, Dr. Jenkyn described the last 2 minutes and 4 seconds before the final 24-second dive as "physically taxing, agonizing and exhausting" for all passengers and crewmembers on the flight, with an unusually large acceleration of forces being biomechanically induced on their bodies, which he described as "loading." Dr. Jenkyn explained that the individuals on the plane would have been thrust out of their seats with force equal to nearly twice their body weight for a period of more than 12 seconds and then slammed back into their seats as the plane changed pitch repeatedly. (Ex. D, Jenkyn Deposition, at 236). Dr. Jenkyn explained that the airplane reached 1.691 Gz, and in that state, a person who was 200 pounds would feel as if he or she actually weighed 338 pounds, which is physically taxing. "This is a highly irregular undulation of vertical acceleration where the passengers would have gone from being 60% heavier than normal to 50% lighter, over and over again." (Ex. D, at 34).

Dr. Jenkyn opined that each person, at a minimum, experienced injury due to muscle strain, primarily due to bracing. (Ex. D, at 180, 188-90). However, he noted that with higher G-forces, a passenger would react by greater bracing because, "that is your reaction as an individual to the stressful situation." (Ex. D, at 211). Boeing's experts, Poole, Wobruck, and Wood, all agreed that it would be reasonable to expect that passengers would have braced themselves or resisted the G-forces against their body in response to the airplane's movements and certainly before the final dive. Wood even admitted that in other cases, he testified under oath that a muscle strain is, in fact, an injury. (Ex. E, Poole Report, at 13; Ex. F, Wobrock Report at 6, 12; Ex. G, Wood Deposition, at 235, 239, 249, 251, 253, 286, 291, 294, 308).

Dr. Mallak, a board-certified anatomic, clinical, and forensic pathologist who served in the Navy for 26 years and was the Armed Forces Medical Examiner and the Director of the Armed Forces Medical Examiner System, will opine that the passengers and crew on flight ET 302

10

experienced "continuous extreme maneuvering, including unexpected rolling, and sudden changes in pitch and altitude in both directions which resulted in force accelerations on the passenger bodies." (Ex. H, Mallak Report at 5). Dr. Mallak will testify to a reasonable degree of medical certainty that Decedents "would, more likely than not, have experienced physical, emotional, physiological effects or impacts, including stress, which caused injury, damage, or harm to their bodies." (Ex. H, at 5). Dr. Mallak concluded:

> "I have reviewed the Physiological Evaluation of the passengers and crew by Troy P. Faaborg, M.S., M.S.A. CAsp, and agree, to a medical degree of certainty, based on more than 25 years of experience as a Medical Examiner and having conducted thousands of forensic medical exams and/or autopsies, with the physiological insults, effects, impacts, and/or injuries identified and described on pages 18-19 of his report. To a degree of medical certainty based on my training, extensive experience with injury analysis, and the forces applied, **all of the passengers would, more likely than not, have experienced physical, emotional, physiological effects or impacts, including physical stress, which caused injury, damage, or harm to their bodies**. In sum, the forces experienced by the passengers combined with the likelihood of impact with other persons, the cabin interior or moving objections, during each of the upset events described by Troy Faaborg to a reasonable degree of medical certainty, caused some degree of injury to all of the passengers." (Ex. H, at 5, emphasis added).

## III.   LEGAL STANDARD

There are two issues before this Court:  first, whether Plaintiffs may present evidence of Decedents' pain, suffering, and emotional distress to the jury in support of their survival claim and pursuant to the terms of the Stipulation; and second, whether evidence that outlines the pain, suffering, and emotional distress Plaintiffs have experienced as a result of the loss of their loved ones is admissible in support of their Wrongful Death claims.

Damages issues related to the survival action involve questions of state law. It is long-settled that  federal courts apply state substantive law using  federal  procedural  rules.   The "damages rules  of  the  state  whose law governs  the  substantive  issues  in  the  case  bind the federal court; damages law is substantive law." *Arpin v. United States,* 521 F.3d 769, 776 (7th

Cir. 2008); *Ginn v Consolidation Coal Co.*, 107 Ill. App. 3d 564, 566 (5th Dist. 1982) (tort liability is traditionally a function of state law and not subject to federal preemption). Accordingly, this Court should assess the admissibility of damages under the Survival Act pursuant to state court precedent.

Boeing's claims regarding the admission of certain testimony in support of Plaintiffs' wrongful death claims is subject to the terms of the Stipulation and is a procedural matter governed by Federal Rule of Evidence 403. In *Hammond v. System Transport, Inc*., 942 F. Supp. 2d 867 (2013), the Seventh Circuit decided this evidentiary question when it determined that "the manner of death" was relevant to the fixing of damages for grief, sorrow and mental suffering under the Wrongful Death Act. *Id*. at 875, citing *Dougherty v. Cole*, 401 Ill. App. 3d 341 (2010), (finding wrongful death award was warranted because of the claimant's "close relationship with her mother and the manner in which she died").

When seeking to preclude the admission of evidence before trial, the moving party bears the heavy burden of establishing that the evidence is "clearly not admissible for any purpose." *Oshana*, *supra*, at 1. Evidentiary issues are best considered at trial where the court has the benefit of "'the context, foundation, and relevance of the contested evidence within the framework of the trial as whole.'" *Id*., quoting *Casares v. Bernal*, 790 F. Supp. 2d 769, 775 (N.D. Ill. 2011).

## IV.   <u>ARGUMENT</u>

The Illinois Survival Act states:

Actions which survive. In addition to the actions which survive by the common law, the following also survive: actions of replevin, actions to recover damages for an injury to the person (except slander and libel), actions to recover damages for an injury to real or personal property or for the detention or conversion of personal property, actions against officers for misfeasance, malfeasance, nonfeasance of themselves or their deputies, actions for fraud or deceit, and actions provided in Section 6-21 of "An Act relating to alcoholic liquors."

12

755 ILCS 5/27-6 (West 2020). The Act is remedial, is to be liberally construed, and is designed to compensate the estate of the decedent for injuries and damages he or she suffered prior to death. *National Bank of Bloomington v. Norfolk & Western Railway Co.,* 73 Ill.2d 160 (1978); *McDaniel v. Bullard*, 34 Ill.2d 487, 492 (1966). The Act permits an estate to assert any personal injury claim for compensatory damages the decedent could have asserted if he had not died, including claims for pain, suffering, emotional distress and mental anguish. *See Patch v. Glover*, 248 Ill. App. 3d 562, 573 (1st Dist. 1993).

**A. Pursuant to the Clear Terms of the Stipulation, Boeing Has Agreed to the Viability of Plaintiffs' Survival Action.**

This Court should deny these Motions *in Limine* outright as they pertain to Plaintiffs' Survival actions because, as previously noted, Boeing is bound by the plain language of the Stipulation to which it willingly agreed. Boeing's challenges to evidence related to Plaintiffs' Survival claims constitutes an improper refutation of the Stipulation and this Court's order approving it. Boeing should not be permitted to revisit this Stipulation only weeks before trial by attempting to back out of its agreement. Boeing's tactics are prohibited, unfair, and prejudicial. Plaintiffs would have never agreed to forego their opportunity to introduce evidence of Boeing's wrongful conduct and to seek choices of law that allow punitive damages if they were aware that Boeing would attempt to avoid fully compensating them under the Survival Act for their loved ones' suffering.

In further support of this response, Plaintiffs incorporate by reference the arguments raised in their "Motion to Enjoin Boeing from Challenging the Legal Viability of Plaintiffs' Recovery for Emotional Distress Damages in the Survival Action as Violative of the Stipulation Executed by the Parties and Contrary to Illinois Law" filed on February 16, 2023. (Dkt. 1565). Plaintiffs now ask this Court to enforce the terms of the Stipulation.

Enforcement is a proper remedy because stipulations are construed as "nothing more than a contract," and since Boeing agreed, it "is bound by that contract and all the legal ramifications of that contract." *Analytical Engineering, Inc. v. Baldwin Filters, Inc.*, 425 F. 3d 443, 453 (7th Cir. 2005). When construing a stipulation, courts "do not look beyond the four corners of the agreement unless the stipulation was reasonably subject to more than one interpretation" and interpret the stipulation "according to the objective intentions of the parties." *U.S. v. Johnson*, 396 F. 3d. 902, 905 (7th Cir. 2005), citing *Washington Hospital v. White*, 899 F. 2d 1294, 1299-30 (3rd Cir. 1989). The Stipulation in this case is not subject to more than one interpretation. Furthermore, it was negotiated and drafted by highly experienced and savvy attorneys on both sides with hundreds of years of combined litigation experience. The objective intentions of the parties are crystal clear, and there is no ambiguity. Accordingly, the Stipulation should be enforced to permit Plaintiffs to present evidence of Decedents' survival damages, including pain, suffering, and emotional distress as all parties intended when the Stipulation was executed and approved by this Court.

**B. Regardless of the Stipulation, Decedents' Pain, Suffering, and Emotional Distress are Compensable Under Illinois Law.**

Boeing asserts that the Survival Act only allows Plaintiffs to recover damages for the conscious pain and suffering of Decedents from the time of injury to the time of death, and that damages cannot be obtained under the Survival Act because Decedents' pain, suffering, and emotional distress were simultaneous with the aircraft crashing into the ground and decimating everyone inside. Boeing adds that pain and suffering in a survival action have to be caused by bodily injury under Illinois law, and as a result, pre-impact fright and terror has been held to be non-actionable. Notably, in support of these positions, Boeing relies on one readily distinguishable

case, *Murphy v. Martin Oil Co.*, 56 Ill. 2d 423, 430-31 (1974), and federal district court cases that are not binding with respect to interpretations of Illinois law.

Illinois jurisprudence has evolved and has recognized that mental suffering, like physical harm, warrants legal protection. See *Murphy, supra,* at 431-32 ("when it appears that public policy and social need require a departure from prior decisions, it is our duty as a court of last resort to overrule those decisions and establish a rule consonant with our present day concepts of right and justice"). *Cochran v. Securitas Security Services USA, Inc.*, 2017 IL 121200 (2017) is highly instructive and negates the arguments Boeing raises with respect to recovery for emotional distress damages. In *Cochran*, the plaintiff filed a complaint alleging one count of tortious interference with the right to possess a corpse after her son's remains were mistaken for the remains of another individual, tendered to the wrong person, and cremated without the plaintiff's knowledge or consent. Illinois law recognizes that emotional distress damages are recoverable for this tort. *Id.*, at ¶ 12. The defendant sought dismissal of the plaintiff's claim. The Illinois Supreme Court rejected the defendant's argument and provided clarity regarding the plaintiff's right to assert claims sounding in tort to obtain emotional damages **in all negligence cases**.

The court provided a history of emotional distress damage recovery in Illinois jurisprudence and noted that for more than a century, "the settled rule in Illinois was that, absent a contemporaneous physical impact or injury to the plaintiff, there could be no recovery for negligently caused emotional distress" and the rule "applied with equal force to both the direct victims of a defendant's negligence and to bystanders." *Id.*, at ¶ 15. Then, in *Rickey v. Chicago Transit Authority*, 98 Ill. 2d 546, 550 (1983), the court "abandoned the so-called 'impact rule' in favor of the zone-of-danger rule for cases involving bystanders. ***Although some confusion subsequently ensued as to whether *Rickey* eliminated the impact rule for direct victims as well as

for bystanders, this court has since clarified that the impact rule remains the law for direct victims of a defendant's negligence." *Cochran*, at ¶ 15.

Following *Rickey*, "the law in Illinois was that, in order to recover damages for negligent infliction of emotional distress [NIED] a direct victim of the defendant's negligence must allege and prove a contemporaneous physical injury or impact. ***In time, however, these rules came to be understood not just as the rules governing the recovery of damages in NIED cases, but also as the rules governing recovery of emotional distress damages in *all* negligence cases." *Id*., at ¶ 16; (emphasis in original). "The result was that the recovery of emotional distress damages effectively was barred for any negligence plaintiff who neither suffered a contemporaneous injury nor satisfied the zone-of-danger rule, regardless of the tort that was actually pleaded." *Id*., at ¶ 21; (emphasis in original).

The court's decision in *Clark v. Children's Memorial Hospital*, 2011 IL 108656 recognized that this law was unfair and needed to be changed. There, the court found that a plaintiff could recover emotional distress damages in a wrongful birth case when the plaintiff was neither in the zone of danger nor suffered a contemporaneous impact or injury. The court stated:

> "This is because 'wrongful-birth plaintiffs do not assert a freestanding emotional distress claim, but merely assert **emotional distress as elements of damages for a personal tort**. ***To drive then drive this point home, the court pointed out that 'damages for emotional distress are available to prevailing plaintiffs in cases involving other personal torts' including defamation, conversion, and misappropriation of identity.' This, of course, could not be the case if *** emotional distress damages were recoverable only in cases where the plaintiff either suffered a contemporaneous injury or satisfied the zone-of-danger rule." *Id*., at ¶ 22, (emphasis added).

The *Cochran* court declared, *apropos* to this issue, that "the critical question is whether the theory of liability set forth in the complaint is ***some other tort for which emotional distress damages is **simply an element of plaintiff's damages**." If a plaintiff's claim falls into this

16

category "there is no principled reason to disallow the recovery of emotional distress damages upon proof of ordinary negligence." *Id*., at ¶ 23. The court made clear that plaintiffs are entitled to recover emotional distress damages "for the mental suffering that is proximately caused by the defendant's misconduct" and "the actionable wrong" in those cases is the actual tort—in *Cochran*, the interference with the plaintiff's right to possess her son's remains—"*not* the infliction of the resulting mental distress." *Id*., at ¶ 24. Indeed, *Cochran* makes clear that a plaintiff can recover from emotional distress resulting from liability in tort "**where the infliction of emotional distress is not *itself* the wrong** that was committed but rather is **part and parcel of the damage *that results from* the wrong** that was committed." *Id*., at ¶ 24; (emphasis both in original and added).

*Cochran* stated that its holding is not limited to claims involving the negligent disposal of remains. As was made clear in *Babikian v. Mruz*, 2011 IL App (1st) 102579, ¶ 19, which specifically followed *Clark*, the defendant's argument that emotional distress damages are allowed only in causes of action for intentional or negligent infliction of emotional distress (therefore requiring contemporaneous physical injury or impact evidence) is incorrect. The court held: "**the rule in Illinois is just the opposite. Damages for emotional distress are available to plaintiffs in cases involving personal torts**."

This rule of law was poignantly crystalized in Justice Garman's special concurrence in *Schweihs v. Chase Home Finance*, LLC, 2016 IL 120041, at ¶ 80, where she stated: "In light of our reasoning in *Clark* and the majority opinion in the present case, it should be clear that when a plaintiff claims NIED, she must allege a contemporaneous physical impact or injury as a direct result of the defendant's conduct or else that she was a bystander in the zone of physical danger. **If, however, she states a claim for a tort other than NIED, no such additional pleading requirement applies.**" Justice Garman noted that she was writing to "make a clear distinction

17

between a claim of NIED and a claim of liability for '**negligence** or other personal tort'." Her concurrence is fully supported by the fact that the Illinois Pattern (Civil) Jury Instructions provide a separate line for emotional distress damages accompanying a personal tort. *Babikian, surpa,* at ¶ 19.

*Garton v. Pfeifer*, 2019 IL App (1st) 180872, at ¶ 43 is also instructive. There, the plaintiff filed a claim under the Mental Health and Developmental Disabilities Confidentiality Act for unlawful dissemination of mental health records. The defendants sought summary dismissal arguing that there were no genuine issues of material fact relating to emotional damages. The court rejected the defendant's argument and stated:

> "Furthermore, **our supreme court has recognized a distinction between freestanding claims based on emotional distress, such as intentional or negligent infliction of emotional distress, and "a claim of liability for negligence or other personal tort in which the act or omission of the defendant caused emotional distress for which damages may be recovered**." *Schweihs*, 2016 IL 120041, ¶ 67, 412 Ill.Dec. 882, 77 N.E.3d 50 (Garmin, J., concurring) (discussing *Clark v. Children's Memorial Hospital*, 2011 IL 108656, 353 Ill.Dec. 254, 955 N.E.2d 1065); see also *Cochran v. Securitas Security Services USA, Inc.*, 2017 IL 121200, ¶ 24, 419 Ill.Dec. 374, 93 N.E.3d 493 (distinguishing between freestanding infliction of emotional distress claims and the assertion of emotional distress as an element of damages for a personal tort, such as tortious interference with the right to possess a corpse). **We therefore reject North Shore's argument that Ryan was required to allege a contemporaneous physical injury or impact, as the physical impact rule applies to freestanding claims of negligent infliction of emotional distress, but the physical impact rule does not apply here where the plaintiff seeks damages for emotional distress that is "part and parcel of the damage *that results from* the wrong that was committed."** (Emphasis added.)

Boeing has admitted liability for the crash of ET 302 and the deaths of the 157 passengers and crew onboard. Its admission of liability establishes its negligence: "Boeing has admitted that it produced an airplane that had an unsafe condition that was a proximate cause of Plaintiff's compensatory damages." (Dkt 1219, at 5, D 3). Under *Clark*, *Cochran*, and their progeny, Plaintiffs are entitled to recover for any emotional distress the Decedents experienced prior to their

18

death as "part and parcel of the damage *that results from* the wrong" that was committed by Boeing.  There is no requirement that Plaintiffs present evidence of any contemporaneous impact or injury before the jury hears evidence of emotional distress.

This Court should not be swayed by Boeing's reliance on the district court's opinion in *Est. of Love v. Rassmussen*, 2018 WL 10613262, at 6-7 (C.D. Ill 2018), the only case it cites that was decided after *Clark* and *Cochran*.  This order is obviously nonbinding.  Moreover, it did not even address the Illinois Supreme Court's analysis in *Clark* or *Cochran*.  In fact, the entirety of the Court's analysis of issues related to "Pre-Impact Mental Distress" is contained in one, short paragraph which states:

> "Defendants argue Dr. Jentzen's testimony on any pre-impact impending sense of doom Love experienced should be excluded as irrelevant and therefore unhelpful to the trier of fact because Illinois law does not permit recovery for pre-impact terror. Although federal law governs the admissibility of evidence in diversity cases, "state law affects relevancy determinations." *Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 943 (7th Cir. 2005). "Under Illinois law, actionable mental anguish must be caused by bodily injury; accordingly, pre-impact fright and terror has been held to be non-actionable ...." *In re Aircrash Disaster Near Roselawn on Oct. 31, 1994*, 926 F. Supp. 736, 742 (N.D. Ill. 1996); *Schweihs v. Chase Home Fin., LLC*, 77 N.E.3d 50, 59–60 (Ill. 2016) (reaffirming same).

*Rassmussen's* analysis is deficient and is superseded by Illinois' current and relevant damages jurisprudence, and clearly misstates the Illinois Supreme Court's decision in *Schweihs*.  Therefore, it should not be followed by this Court.

### C. Even if Plaintiffs Were Required to Prove Contemporaneous Physical Impact and Injury Prior to Death In Order To Present Evidence of Decedent's Pain, Suffering, and Emotional Distress Damages to the Jury, Plaintiffs Can Meet that Requirement.

Boeing asserts that Plaintiffs are required to prove a "contemporaneous physical injury or impact" prior to death to be permitted to seek survival damages from the jury, relying entirely on negligent infliction of emotional distress jurisprudence despite unnecessarily criticizing Plaintiffs

19

for failing to adequately raise that claim in their complaint.[2]  *Schweihs, supra.*  In making this argument, Boeing turns a blind eye to the Stipulation in which it admitted that Decedents sustained pre-death injuries and admitted that it was liable for compensatory damages owed to Decedents' estates. See *Lawler v. MacDuff*, 335 Ill. App. 3d 144 (2nd Dist. 2002) (the trial court properly declined to tender a proposed jury instruction submitted by defendant that raised the question of whether plaintiffs were injured because "**by admitting liability, defendants admitted that an injury occurred**) (Emphasis added.).  Boeing stipulated that it is liable for the estates' compensatory damages and cannot now be allowed to reverse its position to argue that there are no damages because no injury occurred.

Boeing nevertheless attempts to support its "impact rule" argument (see *Braun v. Craven*, 175 Ill. 401 (1898)) with the outdated interpretation of Illinois law set forth in *In re Air Crash Near Chicago* (see Plaintiffs' "Motion to Enjoin," Dkt 1565) and other cases involving clearly distinct facts. Notably, since *In Re Air Crash*, Illinois courts and federal courts applying Illinois law have adopted a much broader view of "contemporaneous impact/injury" in the context of NIED—one that does not require a particular temporal ordering or causal nexus between the impact/injury and emotional distress.  "[W]e conclude that Illinois law does not require a causal nexus between emotional distress and a physical injury…." *Kapoulas v. Williams Ins. Agency, Inc.*, 11 F.3d 1380 (7th Cir. 1993); see also *Allen v. Otis Elevator Co.,* 206 Ill. App. 3d 173, 180-

---

[2] Boeing suggests that Plaintiffs' NIED arguments cannot be considered because Plaintiffs' Complaint did not assert a "freestanding" claim for NIED. But Boeing's argument is meritless because Plaintiffs' Master Complaint contains all the elements of NIED. *See e.g.,* Dkt. 571 at ¶¶ 222, 235, 246, 260; *see Hayes v. Illinois Power Co.,* 225 Ill. App. 3d 819, 825 (1992) (holding that plaintiff "need only plead the elements of negligence, and any emotional distress caused by the allegedly negligent conduct of defendant would be compensable under the 'pain and suffering' allegations in [the Negligence count] of the complaint.")

81 (1ˢᵗ Dist. 1990) (holding that there need not be a causal connection between impact or injury and emotional distress).

In *Allen*, the impact suffered by plaintiff was the rising and dropping of a malfunctioning elevator, (a bit like the Ethiopian Airlines flight) and the plaintiff being jostled against other passengers. However, the Allen court did not require any showing that the emotional distress was caused by these impacts beyond plaintiff's fear that the elevator would plummet to plaintiff's death. Similarly, in *Doe v. Surgicare of Joliet, Inc*., 268 Ill. App 3d 793 (3ʳᵈ Dist. 1994), the court found that sexual relations with plaintiff's wife who had been pricked with a needle exposed to HIV were sufficient impact to allow recovery for emotional distress damages—but the court did not require plaintiff to show that it was the sexual relations, as opposed to the fear of ultimate death by HIV, that caused plaintiff's emotional distress damages. And very recently, in *Oshana*, *supra*, at 9, Chief Judge Pallmeyer, in interpreting the bodily injury requirement in Article 17, "decline[d] to decide that, as a matter of law, Oshana's allegations of pain and bruising after being roughly thrown into her seat are no more significant than *de minimus* physical contact." Significantly, Judge Pallmeyer noted in *Oshana* that **"the parties' dispute over the legitimacy and severity of Oshana's claimed bodily injuries are issues for the jury to decide, not an issue for the court to rule on *in limine*."** *Id*. (emphasis added).

The contemporaneous impact/injury requirement attached to NIED cases serves as a rough guarantee that the proximate relationship between impact and the alleged emotional distress is sufficient to guarantee that the emotional distress is not feigned. This purpose is served whether the emotional distress was in anticipation of impact/injury, or whether it resulted from or merely followed an impact/injury. *See Kapoulas*, *supra*, at 1384 (explaining that "[a]lthough 'contemporaneous' could have several meanings, we interpret 'contemporaneous' in this context

21

to mean that [plaintiff's] emotional distress must have been proximately related either to his injury or the impact of the accident"). Here, while Decedents' emotional distress was not caused by the plane crashing into the ground, there can be no question that it was proximately related to their fear of the impending crash, as well as the other distressing physical and physiological impacts decedents experienced in the terrifying minutes before their death.

A majority of other jurisdictions that addressed this issue have allowed recovery of damages for pre-crash fright in airplane crash cases. In *Quill v. Trans World Airlines, Inc.*, 361 N.W.2d 438, 443 (Minn. App. 1985), the court upheld an emotional distress claim brought by the passenger in an airplane that fell in an uncontrolled tailspin for 34,000 feet before the pilots regained control. The plane continued to shake for another forty minutes before landing. In upholding liability, the court emphasized the horror of the plaintiff's experience: "There can be few experiences as terrifying as being pinned to a seat by gravity forces as an airplane twists and screams towards earth at just under the speed of sound." *Id.* It is notable that in *Quill*, the Court did not even consider whether the plaintiff ever suffered physical injury.[3]

### 1. There Will Be Evidence at Trial That Decedents All Experienced a Physical "Impact" Prior to the Crash.

---

[3] Some jurisdictions reach this result by abrogating the impact/injury requirement altogether; others merely define contemporaneous impact/injury to include the crash itself. *See Solomon v. Warren*, 540 F.2d 777 (5th Cir 1976) (applying Florida law to conclude that airline passenger may recover for fear before death in crash); *Haley v. Pan American World Airways,* 746 F.2d 311 (5th Cir.1984) (concluding that Louisiana would recognize a survival action for preimpact fear of impending death experienced by an airline passenger killed in a crash); *Shu–Tao Lin v. McDonnell Douglas Corp.,* 742 F.2d 45 (2d Cir.1984) (same, applying New York law); *In re Jacoby Airplane Crash Litigation*, Civ. No. 99–6073 (HAA), 2006 WL 3511162 (D.N.J. Dec. 5, 2006) (same, interpreting New Jersey law); *Platt v. McDonnell Douglas Corp.,* 554 F. Supp. 360 (E.D. Mich.1983) (same applying Michigan law); *Yowell v. Piper Aircraft,* 703 S.W.2d 630, 634 (Tex.1986) (affirming Texas judgment for "mental anguish the decedents suffered from the time of the plane's break-up until it hit the ground").

22

The Illinois Supreme Court has recognized that the impact rule's contemporaneous-physical-injury-or-impact requirement is a low standard to meet. See *Rickey*, *supra*, at 553 ("The requirement of 'impact' often became purely formal, and it was satisfied by a slight jolt or jar; or 'any degree of physical impact, however slight;' or even dust in the eye") (internal citations omitted).[4] In fact, the *Rickey* court acknowledged that many jurisdictions had abandoned the impact rule because it "had been met through minor physical contacts which in reality were insignificant and played trivial or no part in causing harm to the plaintiff." *Rickey*, *supra*, at 553.

Boeing suggests that Illinois law has one standard for what constitutes "physical injury or impact," and cites *Victim A v. Song*, 2021 IL App (1st) 200826, ¶ 10, for the definition of "bodily injury" as being "physical damage to a person."  Boeing's claim is refuted entirely by the court's own statement in *Victim A* that there was **no definition** of bodily injury in the specific statute, 735 ILCS 5/2-1117, that was at issue in the case, and the court, accordingly, considered its "ordinary and popularly understood meaning" within the context of Section 2-1117.  The court took great pains to ensure that the definition it crafted in *Victim A* was appropriately limited, stating with specificity that "Victim A's negligence action did not concern 'bodily injury' **as that phrase was used in section 2-1117**." *Id.* at ¶ 4, (emphasis added).  Additionally, the court was careful to note that since Victim A "did not testify that her emotional suffering led to physical problems such as dizziness, nausea, or headaches, **there is no reason for Song to cite authority about those physical symptoms**." *Id.* at ¶12.  Moreover, the discussion of "injury" in *Victim A*

---

[4] See also 38 Am. Jur. 2d Fright, Shock, Etc. § 12, Impact rule for negligent infliction of emotional distress, ("While recovery for negligent infliction of emotional distress requires direct physical impact, the impact does not need to cause physical injury to the plaintiff, **and the emotional trauma suffered by the plaintiff does not need to result from a physical injury caused by the impact.** The direct physical impact is sufficient to satisfy the modified impact rule where the facts are such that the alleged mental anguish is not likely speculative, exaggerated, fictitious, or unforeseeable even if the physical impact is slight or evidence of physical impact seems rather tenuous").

23

bears no influence on this case because the evidence of physical impact, as detailed by the Illinois Supreme Court in *Rickey*, is overwhelming.

And, as Judge Pallmeyer cogently stated in *Oshana*, *supra*, at 9, disputes over the "legitimacy and severity" of bodily injuries, which would include the manner in which injury is defined in a given circumstance, are issues for the jury rather than issues that should be decided as a matter of law. Accordingly, the definitions Plaintiffs' experts have offered are sufficient to permit a reasonable jury to infer that each passenger of the Ethiopian Airlines flight suffered physical damage to their person. See *Rickey*, 98 Ill. 2d at 553. In addition, recovery of emotional distress is not limited to cases involving physical harm. Impact alone is sufficient, and Plaintiffs' experts' reports contain undeniable evidence that passengers suffered impacts with their seats, seatbelts, neighboring passengers, and any loose objects in the plane's cabin.

Boeing also cites *Murphy*, *supra*, for the definition of bodily injury: severe burns that resulted in decedent dying a week after sustaining them. But the injuries alleged in *Murphy* do not set the limits of compensable suffering. Boeing again neglects to acknowledge that in *Rickey*, the Illinois Supreme Court stated that the impact rule can be "satisfied by a slight jolt or jar; or 'any degree of physical impact, however slight;' or even dust in the eye." *Rickey*, 98 Ill. 2d at 553; see also *Schweihs*, 2015 IL App (1st) 140683, at ¶ 22, *aff'd,* 2016 IL 120041, ¶ 22, *Benton v. Little League Baseball, Inc.*, 2020 IL App (1st) 190549, ¶ 77 (stating that "[u]nder the 'impact rule,' a direct victim can recover damages if he suffered emotional distress and a contemporaneous physical injury or impact, *requiring actual physical contact of some sort*") (emphasis added). And the Illinois Supreme Court's decision in *Corgan v. Muehling*, 143 Ill.2d 296 (1991) confirms that physically painful contact or damage is not necessary to satisfy that rule. See *Schweihs*, *supra*, at ¶ 42 (finding there was "no question" in *Corgan* that the plaintiff had

suffered a physical impact, as her claim rested on allegations of sexual relations with her therapist); see also *Jarka v. Yellow Cab Co*., 265 Ill. App. 3d 366 (1st Dist. 1994) (upholding the jury's conclusion that the plaintiffs suffered a "direct impact" when their cab driver ordered them out of the cab, pushed out their luggage, and then started moving while the woman was still extricating herself from the car). To the extent that physical injury is even a requirement, the law is clear that *contact* will suffice.

     *Estate of Love v. Rassmussen*, *supra*, relied on by Boeing, is inapposite. There, the plaintiff was in a parked car immediately before being rear-ended by a truck and killed. There was no evidence the decedent suffered any injuries or impact before being rear-ended by the defendant. *Id*., at 2. The facts in *Rassmussen* stand in stark contrast to the facts here in which there can be no question that every passenger on flight ET 302 experienced an "impact" before the flight crashed to the earth. Just seconds into the flight, Boeing's negligence resulted in the nose of the plane pitching down and passengers experiencing approximately seven seconds of relative negative Gz, which physically impacted each and every person on flight ET 302, placed them in harm's way, and was "very disconcerting" given that the "aircraft should have been climbing." (Ex A, at 7; Ex. B, at 14.) *See Mike Young, Adm'r of the Est. of Rebecca R. Young, Claimant, v. State of Illinois, Respondent*, 71 Ill. Ct. Cl. 154, 167 (2018) (holding that plaintiff driving through standing water—a condition negligently created by defendant—satisfied the impact rule and allowed recovery for pre-death emotional distress when she lost control of her car.)

     Those on board the flight also experienced myriad other physical impacts, including those resulting from drops of 225 feet, four minutes before the crash, 370 feet, two and a half minutes before the crash, and 6000 feet, 24 seconds before the crash. These drops in a malfunctioning and

defective airplane satisfy the impact rule under Illinois law because "it is evident that plaintiff's presence within the vehicle producing the accident obviates any plausible argument of the absence of a contemporaneous physical impact." *Allen, supra,* at 180 (holding that plaintiff established a contemporaneous impact when the malfunctioning elevator stopped and dropped eight feet).

In addition, these drops were interspersed with sharp climbs and banks, in which all passengers were repeatedly lifted from their seats into their seatbelts, and then slammed back down again into their seats. (Ex. C, at 21; Ex. B, at 13, 17.) All passengers' arms and legs struck, respectively, some portion of their seat and the floor and had a high chance of striking fellow passengers and the storage bins above their seats. (Ex. C, at 21; Ex. B, at 13.) All passengers' heads also repeatedly struck the headrests of their own seats. (Ex. C, at 18.) At a minimum, the final seconds[5] of the flight constitute a compensable impact as passengers would be experiencing significant pain and distress as they were being thrown towards the ceiling at more than negative 2 Gz: "This is biomechanically equivalent to the passengers hanging upside down from their seatbelts while also weighing nearly twice their normal bodyweight. The tension in the seatbelt would have been significant. Each passenger would almost certainly have experienced a painful compression of their hips and pelvis from the seatbelt at this point." (Ex. C, at 21.) Although there is no video explicitly showing what these passengers experienced, the cited experiences are factual nonetheless. Indeed, in light of the forces involved, there is no possibility these impacts did not occur. Boeing characterizes the experts' testimony explaining these conditions as speculative, even though all are based entirely on scientific knowledge, training, experience, and the experts'

---

[5] Even though the absolute negative Gz at the end of the flight lasted for only a matter of seconds, it is still compensable under Illinois law. *See Glover v. City of Chicago*, 106 Ill. App. 3d 1066, 1072 (1982) (holding that the fact that a decedent has suffered for only a short period of time is not a bar to a claim for emotional distress damages).

own studies of the crash. That characterization is baseless given the qualifications and methodology of each expert witness, and certainly insufficient to preclude the jury from hearing this evidence. Boeing should not be able to prevent Plaintiffs from presenting evidence of the pain, suffering, and mental distress of Decedents because they all perished in a crash caused by Boeing's misconduct.

A final impact/injury suffered by each passenger was the catastrophic collision with the ground at nearly 600 miles per hour and at a 50-degree nose-down angle. *See Hankins v. Alpha Kappa Alpha Sorority, Inc.*, 447 F. Supp. 3d 672 (N.D. Ill. 2020) (upholding survival claim for pre-suicide negligent infliction of emotional distress in the form of hazing inflicted by defendant sorority members, focusing on the decedent's suicide--which obviously occurred after decedent's emotional distress—as the anchoring physical impact/injury); *Jarka*, *supra*, (holding that decedent's death itself was, a *fortiorari*, a contemporaneous injury sufficient to allow recovery for pre-death emotional harm). The harrowing circumstances of the flight itself in which every passenger surely understood that death was imminent serve as a guarantee of the genuineness of Decedents' emotional distress.

### 2. There Is Substantial Evidence to Support a Jury's Finding that Decedents Suffered Pre-Death Emotional Distress, Pain, and Suffering.

Boeing further argues that Plaintiffs cannot present evidence that the physical injuries caused any alleged emotional distress, pain, and suffering —an argument that is wholly belied by the facts of this disaster. This argument once again assumes that Plaintiffs must establish that Decedents suffered pre-death physical impact or injury and erroneously assumes the physical impact/injury must cause the emotional distress, arguments Plaintiffs have already negated. Direct victims do not need to suffer physical manifestations resulting from the emotional distress as a prerequisite to recovery in Illinois; emotional injuries alone will suffice. *See Corgan*, *supra,* at

311. Circumstantial evidence is sufficient to establish emotional distress. See *Hall v. Nat'l Freight, Inc.,* 264 Ill. App. 3d 412, 427 (1st Dist. 1994).

The ultimate question of whether decedents suffered emotional distress, pain, and suffering needs to be resolved by the jury. Courts applying Illinois law have frequently reiterated their faith in a jury's ability to assess the severity of emotional distress without more specific guidance. See, e.g., *Lewis v. CITGO Petroleum Corp.* 561 F.3d 698, 707-709 (7th Cir. 2009) (stating that "any claims of even arguable merit must be given to the jury to consider" and that only when "a claim for negligent infliction of emotional distress so clearly falls below the threshold requirement of a severe emotional injury" should summary judgment for defendant be granted); *Corgan*, *supra*, (stating that the court had "not lost its faith in the ability of jurors to fairly determine what is, and is not, [severe] emotional distress"); *DeYoung v. McDonnell, Douglas Corp.*, 1985 WL 1834, 3-4 (N.D. Ill. 1985), (defendant's motion to exclude plaintiff's expert who would testify "about the physiological manifestations of terror" was denied because "plaintiff should be allowed to present evidence at trial to prove" damages for "the internal operation of fright or other emotional disturbance").

Even if it was required that Plaintiffs establish contemporaneous injury or impact preceding death, they have met their burden and should be allowed to present evidence from which a reasonable jury may conclude that Decedents experienced pain, suffering, and emotional distress.

**D. Plaintiffs Are Permitted to Present Evidence of the Continuum of Pain, Suffering, and Emotional Distress, and Physical Impact/Injury Experienced by Decedents Under the Survival Count.**

Boeing seeks, *in limine*, to bar Plaintiffs from presenting evidence to the jury of Decedents' conscious pain, suffering, and emotional distress between the time of impact and the time of death. Boeing has maintained throughout its *in limine* motions that Plaintiffs are unable to establish any

28

physical impact/injury to Decedents until ET 302 actually crashed, and under that theory, Plaintiffs cannot obtain survival damages because the necessary impact/injury occurred simultaneously with death. Here, that will include all distress up to and including the time that the airplane crashed and fragmented the bodies of the people inside of it.

This Court's consideration of the extent of pain, suffering, and emotional distress evidence that can be admitted at trial should be guided by *Holston v. Sisters of the Third Order of St. Francis*, 165 Ill. 2d 150 (1995). In that case, the decedent underwent gastric bypass surgery at a hospital. A doctor inserted a catheter to monitor the decedent's fluids and central venous pressure, but it punctured the decedent's heart, causing cardiac tamponade and cardiac arrest. *Id*. at 155. During the period of tamponade, the decedent seemed agitated and expressed concern about her condition. A nurse testified that she was concerned about the decedent's low urinary output, her climbing pulse rate, and her high central venous pressure. The decedent's pulse reached 150 and her blood pressure started falling. She had an emergency surgery but was suffering from internal bleeding and brain damage and never regained consciousness until she died a week later. *Id*. at 156-57.

On appeal, the defendant asserted that the jury's award for the decedent's pain, suffering, and emotional damages under the survival action was based on speculation because the decedent could not feel pain after she lost consciousness. The court stated:

> "The issue of Holston's physical pain and accompanying mental anguish **was not limited to the period of time in which she may have lapsed into unconsciousness** while she was receiving open heart surgery without an anesthetic. The evidence of her pain and suffering includes the time preceding the emergency surgery, when the pressure on her heart and respiratory system caused by the cardiac tamponade was building. *** The patient had a misplaced catheter piercing her heart. She suffered an accelerating heart rate and dropping blood pressure as a direct result of the fluids leaking into her pericardial sac. The jury could infer that the cardiac tamponade aggravated her pain and suffering. The extra burden placed on her heart because of the tamponade built over a period of hours, until at 6:20 p.m. her heart was pumping at the rate of 166 beats per minute. Even at this pace, her heart could not overcome the crushing pressure of the fluid which was

29

compressing it. ***We conclude that the jury properly considered Holston's pain and suffering in assessing damages. *Id.* at 173-75 (internal citations omitted) (emphasis added).

The court made clear that in assessing damages for a decedent's pain and suffering and emotional distress, the jury is free to consider the entire continuum of that suffering, including while the decedent was unconscious, up to the time of her death. The court discussed at length the internal injuries the decedent was experiencing during that time continuum, many of which bear a striking similarity to the impacts and injuries Decedents here experienced during the time the pilot and co-pilot on ET 302 desperately fought to get the airplane to ascend until the aircraft went nose-down. During that time frame, up until death, the passengers were in both physical and emotional distress, as evidenced by the testimony of Boeing's own expert who admitted that the passengers' bodies would have been "interacting with the lap belt during the collision sequence" right up until the point when the plane drove into the ground, killing everyone aboard. (Ex. G, at 108).

Boeing attempts to distract this Court from the more than five minutes of unbearable pain, suffering, and emotional distress experienced by Decedents that were compounded by physical impact/injury prior to death by maintaining that Plaintiffs cannot establish damages when physical impact/injury and death are simultaneous. *Holston* demonstrates that Boeing's argument is baseless. This Court's assessment of the period of pain, suffering, and emotional distress that give rise to Plaintiffs' survival claims should not be limited to the time frame Boeing chooses. As *Holston* demonstrates, internal impact and injury, such as those suffered by the decedent in that case and those suffered by Decedents here, are sufficient to allow consideration of pain, suffering, and emotional distress damages in a continuum of time that may have occurred prior to unconsciousness and even death.

**E. Boeing's Motion *in Limine* Seeking to Exclude Plaintiffs' Experts' Definitions of Injury Should Be Denied Because Plaintiffs Are Not Required to Prove a Physical**

**Impact or Injury and the Meaning of "Injury" is a Question of Fact for the Jury. (*Response to Boeing's Motion C*).**

Plaintiffs incorporate their analysis as set forth herein on pages 24-25, and further maintain that Boeing's assertions related to explanations of the meaning of "injury" should be denied. Boeing cannot meet the high burden of establishing that the explanations of physiological injury provided by Plaintiffs' experts "are clearly not admissible for any purpose." *Oshana*, *supra*, at 1. Plaintiffs' experts' testimony will assist the trier of fact in understanding the nature and extent of the physical impact/injury experienced by the passengers during the ET 302 disaster, and this evidence is highly relevant.

Notably, in bringing this motion in *limine*, Boeing ignores the fact that evidence of physical injury in this case is relevant to assist the jury in understanding the degree of the Decedents' pain, suffering, and emotional distress while on flight ET 302, and it should be admitted, especially because, "**by admitting liability, defendants admitted that an injury occurred**." *Lawler*, supra; see also *Cochran*, *supra* (holding that plaintiffs need not prove physical injury to obtain emotional damages).

Boeing takes issue with the definitions provided by Plaintiffs' experts and goes to great pains to explain the error in each of the experts' explanation of injury. But, the fact that Boeing disagrees with the experts' opinions does not translate to a requirement that this Court exclude them from being presented at trial. The opinions of Plaintiffs' experts will be subject to rigorous cross-examination by Boeing in the presence of the jury, and Boeing's arguments related to the "quality" of the experts' testimony go to weight, and not admissibility. See e.g., *Metavante Corp. v. Emigrant Sav. Bank*, 619 F. 3d 748 (7th Cir. 2010).

Boeing asserts that Plaintiffs' experts' testimony explaining the injuries experienced by Decedents will be confusing to the jury. Boeing argues that the jury may not know whether to

believe the judge's instructions concerning the law, or the expert definition, and may not be able to reconcile the two. This argument is meritless. As noted, the issue of "injury" involves a question of fact for the jury to consider, and is not a matter of law. Moreover, the jury will receive no instruction on a contrary definition of injury, and to the extent that they will receive instructions that will require them to assess the experts' definitions, Illinois law is clear that this Court should presume that the jury will follow the instructions given to them and apply the law accordingly. *Doe by and Through G.S. v. Johnson*, 52 F. 3d 1448, 1458 (1995); *Aguirre v. City of Chicago*, 382 Ill App. 3d 89, 100 (1st Dist. 2008). Notably, both Illinois and federal precedent is replete with caselaw that sets forth different definitions of bodily injury, (see *Victim A*, *supra*, at ¶ 10; but see *U.S. v. DiSantis*, 565 F. 3d 354, 360 (7th Cir. 2009) (approving a definition of "bodily injury" to include "any injury that is painful and obvious, even if the victim does not seek medical attention. Bodily injury includes a cut, abrasion, bruise, physical pain, or any other injury to the body no matter how temporary") but ultimately it is the jury that decides what actually constitutes bodily injury based on the evidence and their collective common sense. The jury should be given that same opportunity here.

### F. The Law Allows Plaintiffs to Present Evidence Regarding the Circumstances of the Decedents' Deaths to Support Their Wrongful Death Claims.

Boeing seeks to preclude Plaintiffs from presenting relevant evidence in support of their survival actions on the basis that it will prejudice the jury in making determinations related to wrongful death. Plaintiffs fully addressed these arguments in their Response to Boeing's Motion in *Limine* to Exclude Evidence Pertaining to Liability and Punitive Damages and incorporate that Response by reference herein as responsive to the claims raised.

In addition, Plaintiffs note that they do not intend to urge the jury to award damages for wrongful death based on the pain and suffering or emotional distress endured by Decedents.

However, Plaintiffs are free to present all admissible evidence to prove their survival claims, and the admission of that evidence should not be hampered by fears that the jury will misinterpret the evidentiary value of that evidence. It is well-settled that jurors are presumed to follow their instructions and apply the law accordingly. *Doe, supra*; *Aguirre, supra*.

### G. Boeing's Rule 403 Argument Must Be Rejected Because That Rule Is Not Intended to Prevent the Jury from Hearing the Facts of the Case.

Federal Rule of Evidence 403 permits the introduction of relevant and probative evidence. Plaintiffs intend to present the jury with evidence through expert testimony that comports with the requirements of Rule 403. Boeing asserts that courts routinely exclude evidence like that involving the pain, suffering, and emotional distress experienced by decedents, due to its high potential for unfair prejudice. But all evidence that negatively impacts the defense is prejudicial, and the question for this court is whether its prejudicial impact is outweighed by its probative value. Evidence of the experience of Decedents on ET 302 before its devastating crash is certainly probative of the damages issues the jury is tasked with deciding.

The cases cited by Boeing to support its position are inapposite and do not support the relief Boeing requests. In *Sutton*, the court excluded a recording of "largely the very emotional" description by a lay witness of the decedent's pain and suffering. The evidence in Plaintiffs' experts' reports in the present case is scientific and unemotional. In *Van Patten*, the testimony of a decedent's last moments was excluded because, according to defendants' brief, "plaintiff failed to provide evidence of the decedent's conscious pain and suffering." In other words, plaintiffs simply failed to offer a sustainable case—but this is not the case here. And as noted, evidence of the final moments of Decedents' lives does not have the potential to confuse the jury—if that argument were valid, no jury could ever hear a case involving claims for wrongful death and

33

survival at the same time.  Clearly, Boeing is asking this Court to render a ruling that would not

be procedurally or legally appropriate.

**V.**     <u>**CONCLUSION**</u>

For the reasons set forth above, Plaintiffs respectfully request that this Court deny Boeing's

Motions *in Limine* and for all other relief this Court deems just and appropriate.


DATED: March 1, 2023

Respectfully Submitted,

<u>/s/ Robert A. Clifford</u>
Robert A. Clifford
rac@cliffordlaw.com
Kevin P. Durkin
kpd@cliffordlaw.com
Tracy A. Brammeier
tab@cliffordlaw.com
John V. Kalantzis
jvk@cliffordlaw.com
CLIFFORD LAW OFFICES, P.C.
120 N. LaSalle Street Suite 3600
Chicago, Illinois 60602

Steven C. Marks
smarks@podhurst.com
Ricardo M. Martinez-Cid
Rmartinez-cid@podhurst.com
Kristina M. Infante
kinfante@podhurst.com
Pablo Rojas
projas@podhurst.com
PODHURST ORSECK, P.A.
Suntrust International Center, Suite 2300
One S.E. Third Avenue
Miami, Florida 33131

Justin T. Green
jgreen@kreindler.com
Brian J. Alexander
balexander@kreindler.com
Daniel O. Rose
drose@kreindler.com
Megan W. Bennett
mbenett@kreindler.com
Andrew J. Maloney III
amaloney@kreindler.com
Erin R. Applebaum
eapplebaum@kreindler.com
Vincent C. Lesch
vlesch@kreindler.com
KREINDLER & KREINDLER LLP
485 Lexington Avenue, 28th Floor
New York, New York 10017

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 1, 2023, I electronically filed the foregoing **PLAINTIFFS' CONSOLIDATED OPPOSITION TO BOEING'S** *MOTIONS IN LIMINE* **(A) TO EXCLUDE EVIDENCE AND ARGUMENT ABOUT PASSENGERS' PAIN AND SUFFERING BEFORE IMPACT, (B) TO EXCLUDE SPECULATIVE TESTIMONY REGARDING WHETHER PASSENGERS EXPERIENCED CONSCIOUS PAIN AND SUFFERING CAUSED BY INJURIES RECEIVED ON IMPACT, AND (C) TO EXCLUDE PLAINTIFFS' DEFINITIONS OF "INJURY"** with the Court using the CM/ ECF system, which will send notification of such filing to all attorneys of record.

/s/ Robert A. Clifford
Robert A. Clifford
RAC@CliffordLaw.com
CLIFFORD LAW OFFICES, P.C.
120 North LaSalle Street, 36th Floor
Chicago, IL 60602
 312-899-9090

35