# EXHIBIT B

# In The Matter Of:
# ETHIOPIAN AIRLINES FLIGHT ET 302 CRASH-
# DAMAGES

_____

# JONATHAN GURYAN, PH.D.
February 7, 2025

_____

# TC REPORTING, INC.
## 1 DEERFIELD EAST - 1850
## QUOGUE, NY. 11959

JONATHAN GURYAN, PH.D. - Vol. I

# JONATHAN GURYAN, PH.D.

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
-------------------------------------------------x
IN RE: ETHIOPIAN AIRLINES
FLIGHT ET 302 CRASH - Damages
-------------------------------------------------x
Lead Case: 1:19-cv-02170 (Consolidated)
District Judge: Honorable Jorge L. Alonso
Magistrate Judge:  Honorable M. David Weisman
-------------------------------------------------x
This Document Relates to:
NADEGE DUBOIS-SEEX, Individually,
Co-Personal Representative of the heirs of
JONATHAN SEEX, deceased,
and as Next Friend of A.S. (a minor),
A.S. (a minor), and A.S. (a minor),
NISHANT LAKHANI, Co-Personal Representative
of the heirs of JONATHAN SEEX, deceased, and
BRITT-MARIE SEEX, Individually,

       Plaintiffs,

       v.

THE BOEING COMPANY,
A DELAWARE CORPORATION,

       Defendant.
-------------------------------------------------x
Case No. 1:19-cv-03392
-------------------------------------------------x

REMOTE VIDEOCONFERENCE DEPOSITION
OF
JONATHAN GURYAN, Ph.D.
Friday, February 7, 2025

## Page 2

```
 1
 2
 3
 4
 5
 6
 7              February 3, 2025
 8              10:09 a.m. Eastern Standard Time
 9
10
11
12          Remote video deposition of JONATHAN
13      GURYAN, Ph.D., taken by Plaintiffs, pursuant to
14      Notice, dated February, 3, 2025, before Brandon
15      Rainoff, a Federal Certified Realtime Reporter
16      and Notary Public of the State of New York.
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1
 2      A P P E A R A N C E S:
 3
 4      WISNER LAW FIRM
 5      Attorneys for Plaintiffs
 6          514 West State Street
 7          Suite 200
 8          Geneva, Illinois  606134
 9          603.262.9434
10      BY:   FLOYD WISNER, ESQ.
11          faw.@wisner-law.com
12
13      WINSTON & STRAWN LLP
14      Attorneys for Defendant The Boeing Company
15          35 West Wacker Drive
16          Chicago, Illinois  60601-9703
17          312.558.5600
18      BY:   JULIA MANO JOHNSON, ESQ.
19          312.558.7243
20          jmjohnson@winston.com
21          BAILEY BRANDON, ESQ.
22          312.558.7963
23          bbrandon@winston.com
24
25
```

## Page 4

```
 1
 2      ALSO PRESENT:
 3      CHELSEA GILCHRIST, Videoconference Monitor
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1 (Pages 1 to 4)

JONATHAN GURYAN, PH.D.

Page 5

1
2        S T I P U L A T I O N S
3
4
5        IT IS HEREBY STIPULATED AND AGREED by
6    and between the attorneys for the respective
7    parties herein, that filing, sealing and
8    certification be and the same are hereby waived.
9        IT IS FURTHER STIPULATED AND AGREED
10   that all objections, except as to the form of
11   the question, shall be reserved to the time of
12   the trial.
13       IT IS FURTHER STIPULATED AND AGREED
14   that the within deposition may be signed and
15   sworn to before any officer authorized to
16   administer an oath, with the same force and
17   effect as if signed and sworn to before the
18   Court.
19
20
21
22
23
24
25            - o0o -

Page 7

1    that we may note your appearance accordingly.
2        Wisner Law Firm.
3        MR. WISNER:  Floyd Wisner.
4        THE VIDEOGRAPHER:  Winston & Strawn
5    LLP.
6        MS. JOHNSON:  Julia Johnson and Bailey
7    Brandon.
8        THE VIDEOGRAPHER:  Is there anyone
9    appearing that has not previously stated their
10   appearance?
11       I will certify that I will be
12   appearing for tech support and videoconference
13   services for all remote participants.
14       Before we proceed I will ask that lead
15   counsel for today's deposition stipulate on the
16   record that we are proceeding according to the
17   Federal Rules of Civil Procedure, and that this
18   deposition officer may swear in the deponent
19   even though he is not in the physical presence
20   of the deponent, and that there is no objection
21   to this at this time, nor will there be an
22   objection to it at any future date.
23       Plaintiffs' lead counsel, are you in
24   agreement?
25

Page 6

1
2             *   *   *
3        P R O C E E D I N G
4        Friday, February 7, 2025
5    Remote Videoconference Deposition
6        10:09 a.m. Eastern Standard Time
7             *   *   *
8        THE VIDEOGRAPHER:  Good morning.  This
9    is videoconference monitor, Chelsea Gilchrist,
10   speaking.
11       We are going on the record at 9:09
12   a.m. Central Time on Friday, February 7, 2025.
13       This is the deposition of Dr. Jonathan
14   Guryan In the Matter of:  ET 302 damages, filed
15   in the United States District Court for the
16   Northern District of Illinois, Eastern Division,
17   Case Number 1:19-cv-3392.
18       The court reporter is Brad Rainoff.
19   He will be participating remotely from his own
20   location via videoconference.
21       We are from TC Reporting, Inc.
22       I would like to do a roll call from
23   the list of law firms appearing remotely today.
24   After I announce each firm, members of counsel,
25   please state your full name on the record so

Page 8

1
2        MR. WISNER:  Yes.
3        THE VIDEOGRAPHER:  Defendant's lead
4    counsel, are you in agreement?
5        MS. JOHNSON:  Agreed.
6        THE VIDEOGRAPHER:  Brad Rainoff, can
7    you swear in the witness.
8        THE COURT REPORTER:  Good morning.  My
9    name is Brad Rainoff.  I am the deposition
10   officer for today's deposition.  I am a
11   Registered Professional Reporter and Certified
12   Realtime Reporter.  I am also a notary public,
13   and will be swearing in the witness today.
14   JONATHAN GURYAN, Ph.D.,
15       having been duly sworn, was examined and
16       testified as follows:
17   EXAMINATION
18   BY MR. WISNER:
19       Q.   Dr. Guryan, my name is Floyd Wisner.
20   I represent the family of Jonathan Seex in this
21   matter.
22       Can you tell me your business address?
23       A.   Well, for consulting work, my business
24   address is the same as my home address, which is
25   302 Lawndale Street in Wilmette, Illinois.

JONATHAN GURYAN, PH.D.

Page 9

1
2  Q.  Okay.
3     You are a North Shore guy?  All right.
4  I understand you have your report in
5  this matter before you.
6  A.  I have a copy of it, yes.
7  Q.  Okay.
8     And that is a -- entitled:  Report in
9  the matter of Ethiopian Airlines Flight ET 302
10  crash - Jonathan Seex, Case Number
11  1:19-cv-03392.
12     Right?
13  A.  That's correct.
14  Q.  And it's dated January 16, 2025.
15     Right?
16  A.  Yes.
17  Q.  And this is the one that you prepared?
18  A.  That's correct.
19     MR. WISNER:  Would you look at page 2
20  of that report, Dr. Guryan?
21     I'm looking at number 3:  Materials
22  Considered.
23     THE WITNESS:  Yes.
24  BY MR. WISNER:
25  Q.  Is this a complete list of all the

Page 10

1
2  materials you considered in doing your report?
3  A.  I believe it is.  Some of these refer
4  to, you know, lists of documents that were
5  provided in a group --
6  Q.  Is that -- I'm sorry.  Continue --
7  A.  -- so, for instance, "Response to
8  Damages Requests for Production" --
9  Q.  Okay.
10  A.  -- and "Response to Damages
11  Interrogatories."
12     But this is a list of the materials I
13  considered in addition to my own, you know,
14  expertise and other studies I'm aware of as a
15  labor economist --
16  Q.  Okay.
17  A.  -- many of what I cited throughout.
18  Q.  As we go through this, if you think of
19  any other materials you considered as a labor
20  economist, would you state those, please?
21  A.  If you ask me about this -- them
22  specifically, I would be happy to.
23  Q.  Great.
24     Is it fair to say you did not consider
25  any materials other than those listed here on

Page 11

1
2  page 2 and 3 of your report?
3  A.  Other than what I just said in my last
4  answer, I think that's fair.
5  Q.  Okay.
6     I see that you considered in bullet
7  number 2, the "Lifetime Earnings Expert Report
8  of Oded Shenkar Ph.D."
9     Right?
10  A.  Yes.
11  Q.  "And supporting materials," right?
12  A.  Yes.
13  Q.  Did you consider all the citations
14  that Dr. Shenkar referred to in his report?
15  A.  I did review the citations that he
16  referred to.
17  Q.  Okay.
18     Now, are you aware that Dr. Shenkar
19  actually did a response to your report, to which
20  counsel for Boeing has objected?
21     Are you aware of that?
22  A.  I am aware of that.
23     MS. JOHNSON:  And I'll just interject
24  that we maintain our objection to that report.
25     MR. WISNER:  Understood.

Page 12

1
2  BY MR. WISNER:
3  Q.  Have you referred -- have you reviewed
4  that response to your report?
5  A.  I have reviewed it, yes.
6  Q.  Have you reviewed all the citations
7  that Dr. Shenkar used in his response to your
8  report?
9  A.  I definitely reviewed some of them.
10  I'm not sure I reviewed every -- all of them.
11  But I've looked at some of them, maybe all of
12  them.
13  Q.  As we go through this, I will ask you
14  questions about which ones you referred to.
15     You will be able to answer that, you
16  think?
17     MS. JOHNSON:  Objection.
18  A.  I'll do my best.
19  Q.  Now, are you aware that Dr. Shenkar
20  did an expert report on the valuation of
21  Tamarind Management Limited?
22  A.  I'm aware of that.
23  Q.  Did you review that report?
24  A.  I have seen it and read it.
25  Q.  Okay.

TC Reporting, Inc.
(516) 795-7444

JONATHAN GURYAN, PH.D.

Page 13

1
2         As part of your work here, are you
3     prepared to respond to those opinions set forth
4     in that report of Dr. Shenkar?
5         A.   I was not asked to provide an opinion
6     about that, so I won't be offering an opinion
7     about it.
8         Q.   Okay.
9         Then are you aware that Dr. Shenkar
10    also did a third report on:  CEO/Founder Death
11    and Impact on a Company?
12        Are you aware of that report?
13        A.   I have seen it and read it.
14        Q.   Okay.
15        Are you here today to provide any
16    opinion in response to that report?
17        A.   I was not asked to provide an opinion
18    in response to that, and I do not plan to
19    provide an opinion in response to that report.
20        Q.   Okay.
21        Looking at the "Materials Considered"
22    in your report again, Dr. Guryan, where it says
23    in the third bullet point:  Response to Damages
24    Interrogatories.
25        Do you see that?

Page 14

1
2         A.   I do.
3         Q.   Does that refer to any answers to
4     interrogatories served upon Boeing before the
5     date of your report on January 16, 2025?
6         A.   I believe so.  I'm not sure whether it
7     refers to all of them, but it definitely refers
8     to some of them.
9         Q.   Well, that's what I'm getting at, sir.
10        I would like to know whether you look
11    at any answers to interrogatories that were
12    served upon the defendant after the date of your
13    report?
14        A.   I certainly am not referring to those
15    in this report.
16        This report was written on the day of
17    my report.  And anything that happened after,
18    I'm not referring to that.
19        I'm trying to remember.  I don't -- I
20    don't believe I've seen answers to
21    interrogatories that were served after -- that
22    were produced after my -- the date of my report,
23    but I'm not 100% sure of that.
24        Q.   Okay.
25        Same question regarding the fourth

Page 15

1
2     bullet point, Dr. Guryan, where it says:
3     Response to Damages Requests for Production.
4         Is it correct that you were referring
5     to documents produced by plaintiff to Boeing
6     before the date of your report?
7         A.   In this report, that's correct, yes.
8         Q.   Did you refer or have you referred to
9     any documents produced by plaintiff to Boeing
10    since the date of your report?
11        A.   Are you asking if I have seen any?
12        Or if I'm relying on them for the
13    opinions that I have written in this report?
14        Q.   Let's go with the second one.
15        Are you relying on any documents for
16    your opinions that were produced to you after
17    the date of your report?
18        A.   Well, not for anything that's written
19    in the report, because I wouldn't have known
20    those -- known about those at the time I wrote
21    the report.
22        I have seen some of the materials that
23    were produced by Dr. Shenkar that show details
24    of some of the calculations he did in his later
25    report.  I obviously wasn't writing about those

Page 16

1
2     at the time that I wrote this report because
3     that hadn't happened yet.
4         But I have seen those.
5         Q.   Now, I'm going to refer to documents
6     that plaintiff -- not Dr. Shenkar, but
7     plaintiff -- produced to Boeing after the date
8     of your report.
9         Have you seen any such documents?
10        A.   I can't think of anything
11    specifically.  But if you show me something, I
12    can tell you -- I can try to tell you whether
13    I've seen it.
14        Q.   Okay.  We'll go through that, then.
15        Thank you, sir.
16        Did you -- strike that.
17        Have you seen Jonathan Seex's contract
18    with Atlantis, The Palm resort?
19        A.   I don't believe that was in the set of
20    materials that I reviewed at the time I wrote
21    this report.
22        But if you showed it to me, I can tell
23    whether it looked familiar.
24        Q.   Okay.
25        Have you seen Jonathan Seex's contract

4 (Pages 13 to 16)

JONATHAN GURYAN, PH.D.

Page 17

```
1
2    with Tamarind Management Limited for position of
3    director of strategic planning?
4         A.   I have seen employment documents
5    related to Tamarind Management.
6         You'd have to show me the specific
7    document for me to be sure whether I've seen
8    that one you are referring to.
9         Q.   Okay.  I'll do that.
10         The one that you are referring to --
11   and I'll show it to you in a moment -- but is it
12   in regard to his position as CEO?
13        A.   I believe so, yes.
14        Q.   Okay.
15         My question was about an earlier
16   employment agreement with Tamarind Management
17   for position of director of strategic planning.
18         Have you seen that contract?
19        A.   I'm not sure.  I don't believe so, but
20   if you showed it to me, I might be able to --
21        Q.   Okay.
22         Have you seen -- sorry, sir.  I don't
23   mean to talk over you.
24         Have you seen any documents regarding
25   Jonathan Seex' real estate, banking, or
```

Page 18

```
1
2    investment income or interests?
3         A.   I don't believe so.
4         Q.   Have you seen any records of Jonathan
5    Seex' personal expenses?
6         A.   I don't believe so.
7         Q.   Have you seen any documents regarding
8    the nature and extent of Tamarind Management
9    Limited's business?
10         MS. JOHNSON:  Object to form.
11        A.   There were some documents in the
12   materials that I reviewed that were about
13   Tamarind Management and some aspects of their
14   business, yes.
15        Q.   Can you point to "Materials
16   Considered" and show me where that's at?
17        A.   I don't recall which of the bullet
18   points it is referred to in, but it's in one of
19   these sets of documents that's referred to in
20   the bullet points.
21        Q.   And it would necessarily have to be
22   documents that plaintiff produced to Boeing
23   before the date of your report on January 16,
24   2025, right?
25        A.   That is correct.
```

Page 19

```
1
2         Q.   Have you seen any Tamarind Management
3    management contracts or plans?
4         A.   I'm not sure what you are referring
5    to.
6         Q.   Management contracts for Tamarind
7    Management Limited to manage hotels or
8    restaurants owned by others?
9         A.   I don't believe I have.
10        Q.   Have you seen any Tamarind Management
11   Limited tax returns?
12        A.   I don't believe so.
13        Q.   Have you seen any Tamarind Management
14   Limited audited financial statements?
15        A.   I don't believe so.
16        Q.   Have you seen any Jonathan Seex share
17   certificates or shareholder documents?
18        A.   I believe in the documents that I've
19   seen, it had information about ownership shares
20   that he had.
21         But I'm not sure whether I've seen the
22   certificates themselves.
23        Q.   Okay.
24         Have you seen any documents concerning
25   Jonathan Seex' percentage ownership interest in
```

Page 20

```
1
2    Tamarind Management?
3         A.   I believe so, yes.
4         Q.   What -- among the -- if you could look
5    at the "Materials Considered" on page 2 and 3 of
6    your report, where is that indicated?
7         A.   I believe that would be in the
8    "supporting materials" part of the second bullet
9    point.
10        Q.   I see.
11         And that would be from Dr. Shenkar's
12   report, right?
13        A.   I believe so -- though it might have
14   been in the bullet point that says:  Response to
15   Damages Requests for Production.
16        Q.   And the bullet point "Response to
17   Damages Requests for Production" -- that would
18   necessarily be documents that plaintiff produced
19   to Boeing before the date of your report on
20   January 16, 2025, right?
21        A.   That's correct.  It may also be -- it
22   may also have been in what is listed as:
23   Initial Damages Disclosures.
24        Q.   And that, again, would be necessarily
25   those initial damages disclosures provided by
```

5 (Pages 17 to 20)

JONATHAN GURYAN, PH.D.

Page 21

```
 1
 2    plaintiff to Boeing before the date of your
 3    report on January 16, 2025?
 4        A.   It would.
 5        Q.   Okay.
 6             Have you seen any documents regarding
 7    Jonathan Seex' plans for growth of Tamarind
 8    Management Limited?
 9        MS. JOHNSON:   Objection.
10        A.   I have seen that referred to in some
11    of the documents that I've read.
12             I'm not sure exactly what you are
13    referring to.
14        Q.   I'm referring -- let me get more
15    specific.
16             Have you seen any documents regarding
17    a planned investment by an equity firm known as
18    Ascent Capital in Tamarind Management Limited?
19        A.   I can't remember if I have or I
20    haven't.
21        Q.   Have you seen any documents regarding
22    Jonathan Seex' plans to construct a convention
23    center -- Nairobi's largest convention center --
24    known as The Dome on property of the Carnivore
25    restaurant?
```

Page 22

```
 1
 2             See any documents about that?
 3        A.   It may have been referred to in some
 4    of the documents I have read, but I don't
 5    remember a specific document about that.
 6        Q.   If it has -- if it's not referred to
 7    in any of the documents listed in the "Materials
 8    Considered" on page 2 and 3 of your report then
 9    you haven't' seen it.
10             Is that fair?
11        A.   I believe what you just said is
12    correct.
13        Q.   And moving on, have you seen any
14    documents regarding plans of Jonathan Seex to
15    introduce new restaurants known as Kengele's --
16    K-E-N-G-A-L-E-S -- and the Roast?
17             See anything about that?
18        A.   I have seen that referred to in some
19    of the documents that I have read.
20        Q.   And if it's not in those documents
21    under "Materials Considered" on page 2 and 3 of
22    your report, then you haven't seen it, right?
23        A.   I believe the thing that you just
24    asked me about, I have seen, but -- so I'm not
25    sure how to answer that question.
```

Page 23

```
 1
 2        Q.   Okay.  I guess what I'm -- well, let
 3    me go on one more.
 4             Have you seen any documents regarding
 5    Jonathan Seex plans to introduce Roast
 6    restaurants in 500 locations and 15 countries
 7    across Africa?
 8             See any documents about that?
 9        A.   I'm not sure about those specific
10    numbers.
11        Q.   What I'm getting at, Dr. Guryan, is
12    I'd like to know whether you have seen any
13    documents subsequent to the date of your report,
14    January 16, 2025, regarding the subjects I just
15    mentioned.
16        MS. JOHNSON:   Objection.
17        A.   I'm not sure.
18             But I -- the documents that I have
19    seen subsequent to my having submitted my report
20    are -- would be the later response report that
21    Dr. Shenkar submitted and the supporting
22    materials; and then I believe I have seen some
23    deposition transcripts that took place after I
24    wrote my report.
25             I don't believe there are other
```

Page 24

```
 1
 2    documents that I have seen.
 3        Q.   All right.  That's what I'm getting
 4    at, sir.
 5             Have you talked to anyone from
 6    Tamarind Management Limited?
 7        A.   I don't believe so, no.
 8        Q.   How about from Ascent Capital?
 9        A.   I don't believe so.
10        Q.   Or anyone else -- other than your
11    attorneys -- or other than Boeing's attorneys --
12    regarding this case?
13        A.   There is staff that work at my
14    direction who help me out.  I talk to them about
15    it.
16             But other than that, no.
17        Q.   Have you read Nadege Seex' deposition
18    transcript?
19        A.   I have.
20        Q.   Have you read any other deposition
21    transcripts?
22        A.   I don't believe so, related to this
23    case.
24        Q.   Her three children were deposed, to
25    I'll represent that to you.
```

6 (Pages 21 to 24)

JONATHAN GURYAN, PH.D.

Page 25

1
2        Have you read their deposition
3   transcripts?
4        A.   I have not.
5        Q.   Okay.
6        Dr. Guryan, in considering the amount
7   of Jonathan Seex' annual earnings, you didn't
8   consider his ownership interest in Tamarind
9   Management Limited, did you?
10       A.   I was asked to provide an opinion in
11  response to Dr. Shenkar's lifetime earnings
12  calculations.  So I'm focused for my opinion on
13  earnings, not on ownership shares, and what he
14  would have gotten as a result of that.
15       Q.   Isn't a return on an ownership
16  interest part of earnings?
17       A.   It's separate from what I was asked to
18  provide an opinion about.
19       And I was asked to provide an opinion
20  about his projected future labor earnings.
21       And any capital gains that he gets
22  from some other source would be separate from
23  what I was asked to provide an opinion about.
24       Q.   Okay.
25       But you will agree with me, wouldn't

Page 26

1
2   you, that ownership interest is a part of
3   earnings normally, correct?
4        MS. JOHNSON:  Objection.
5        A.   It's a separate income stream.  And I
6   was not asked to provide an opinion about it, so
7   my calculations would not include that.
8        Q.   Let me ask it a different way, then.
9        Is a return on an ownership interest
10  part of income?
11       MS. JOHNSON:  Objection.
12       A.   It depends on what form it comes in.
13  If it's a -- it could be a -- it could
14  be a capital gain.  It could be an income.
15       But that was not the stream of
16  earnings that I was asked to provide an opinion
17  about --
18       Q.   And --
19       A.   -- so --
20       Q.   -- I'm sorry --
21       A.   -- my opinion is separate from that
22  and would not include losses that come as a
23  result of what you are talking about.
24       Q.   Okay.
25       You didn't consider what the

Page 27

1
2   possibility of there being an IPO in the future,
3   and an income of Jonathan Seex from such an IPO
4   or from dividends, right?
5        A.   I am providing an opinion about
6   earnings that would be reported on a tax form as
7   taxable income.
8        And any other sources of income are
9   outside the scope of what I was asked to provide
10  an opinion about.
11       Q.   All right.
12       So you didn't consider an increase in
13  the value of Jonathan Seex' shares with an
14  increase in the value of Tamarind Management,
15  did you?
16       A.   Again, to the extent that that would
17  or would not have happened, that is not what I
18  was asked to provide an opinion about.  So it's
19  not relevant to what I was asked to provide an
20  opinion on.
21       Q.   Okay.
22       And you didn't consider an increase in
23  the percentage ownership of Jonathan Seex in
24  Tamarind Management as compensation for an
25  increase in value of Tamarind Management or as

Page 28

1
2   part of an employee stock ownership program, did
3   you?
4        A.   If any of that was included in taxable
5   earnings, then it would be what I'm providing an
6   opinion about.
7        But to the extent it's separate from
8   that and another source of income or damages,
9   that is separate from what I was asked to
10  provide an opinion about.
11       Q.   Let me ask you, then.
12       Did you consider an increase in
13  Jonathan's percentage ownership of Tamarind
14  Management as compensation for an increase in
15  value of Tamarind Management?
16       Or as part of an ESOP?
17       You didn't consider that, did you?
18       A.   That would be separate from -- that
19  would be a source of income or damages that is
20  separate from the damages that I was asked to
21  provide an opinion about.
22       Q.   Okay.
23       Now, I think you just said -- correct
24  me if I'm wrong -- that the only thing you
25  considered was the taxable income on Jonathan

7 (Pages 25 to 28)

JONATHAN GURYAN, PH.D.

Page 29

1
2    Seex' tax returns, correct?
3        A.    Anything that would be included on --
4    as taxable income on Mr. Seex' tax returns was
5    the starting point basis for my projection of
6    future lost earnings.
7        Q.    Well, it's more than just a starting
8    point for you.
9            It was the end point for you, too,
10   wasn't it?
11          That's the only thing you
12   considered -- was taxable income as reported on
13   his tax returns, correct?
14       A.    No, it's the starting point for a
15   projection of what would have happened in the
16   future, that was lost in the future as a result
17   of his death.
18       Q.    I see.
19          What I'm getting at, sir -- we
20   misunderstood each other -- I'm getting at your
21   starting point of annual earnings -- that was
22   only based upon his taxable income, as shown on
23   his tax returns, correct?
24       A.    That is correct.  As I explain in my
25   report, any sources of income that would not be

Page 30

1
2    included as taxable income is outside the scope
3    of what I was asked to provide an opinion about.
4            Anything that would be included in
5    taxable income -- that is what I'm projecting as
6    future --
7        Q.    Okay.
8        A.    -- for losses.
9        Q.    Thanks.
10          MR. WISNER:  If you look at page 7 of
11   your report and note 11 -- tell me when you are
12   ready.
13          THE WITNESS:  I'm ready.
14   BY MR. WISNER:
15       Q.    Just tell me if I read this correctly,
16   Dr. Guryan:  Since I am using earnings from a
17   tax return, and responding to Dr. Shenkar's
18   calculations, my calculations implicitly only
19   count earnings losses and do not capture damages
20   from other potential sources such as benefits or
21   lost household services.
22          See that, sir?
23          Did I read that correctly?
24       A.    You did, yes.
25       Q.    And that's what you did, right?

Page 31

1
2            You calculated earnings based solely
3    upon taxable income as shown in the tax returns,
4    correct?
5        A.    That's correct.  I was asked to
6    provide a rebuttal opinion to Dr. Shenkar's
7    report that's titled:  Lifetime Earnings.
8            And so I am providing an opinion on
9    the lost earnings in the future that resulted
10   from Mr. Seex' death.
11          As I explained in this footnote, I am
12   responding to Dr. Shenkar's calculations on that
13   one particular document, and relying -- as Dr.
14   Shenkar did -- on earnings from what is reported
15   on the tax return.
16          Any type of income that is reported
17   on -- as taxable income on the tax return would
18   be included.
19          And any other sources of income that
20   are not taxable or not -- in the taxable income
21   is a separate -- separate from my opinion and
22   would not be included in my opinion.
23       Q.    Are you interpreting Dr. Shenkar's
24   reports -- two reports, the one on loss of
25   earnings, and the one on reduction in TML

Page 32

1
2    value -- to only be based upon Jonathan Seex'
3    taxable income as shown on the tax return?
4            Is that how you read Dr. Shenkar's
5    reports?
6        A.    No.  I'm not responding to both of
7    those reports.
8            I'm only responding to one of them --
9        Q.    Okay.
10       A.    -- I understand that Dr. Shenkar is
11   offering an opinion about some topics to which I
12   am not responding.
13          I'm only responding to Dr. Shenkar's
14   calculation of lost earnings.
15       Q.    Do you understand that Dr. Shenkar
16   calculates Jonathan Seex' loss returns including
17   benefits and including his ownership interest in
18   Tamarind Management?
19          Do you understand that?
20       A.    I understand that he says that he's
21   doing that.
22          The portion of that that is -- that
23   Dr. Shenkar is providing an opinion that's about
24   losses in the value that he alleges of Tamarind
25   and his ownership of Tamarind -- I am not

8 (Pages 29 to 32)

JONATHAN GURYAN, PH.D.

Page 33

1
2    responding to that --
3        Q.   Okay.
4        But you understand that Dr. Shenkar --
5        A.   -- but -- sorry.  Can I just finish my
6    answer?
7        Q.   Sure.  Sure.  I'm sorry.  My fault.
8        A.   The part about benefits, whether
9    that's included or not -- some benefits, I
10   believe, are included in the taxable income as
11   reported on the -- one of the tax forms that Dr.
12   Shenkar included.
13       Other benefits would not be included.
14       I am including only the taxable income
15   that is reported, which would include any
16   benefits that are taxable but not include any
17   benefits that are not taxable.
18       Q.   And in responding to Dr. Shenkar's
19   calculations, are you aware that Dr. Shenkar
20   does include a value of Jonathan Seex' loss of
21   earnings based upon his -- in part, his
22   ownership interest in Tamarind Management?
23       Are you aware of that?
24       A.   I believe in a separate report that
25   I'm not responding to that he does some of that.

Page 34

1
2        But that is not part of Dr. Shenkar's
3    opinion that I was asked to provide an opinion
4    about.
5        Q.   And are you aware that Dr. Shenkar in
6    calculating his opinion as to Jonathan Seex'
7    loss of earnings is including benefits not
8    included as taxable income on Jonathan Seex' tax
9    returns?
10       Are you aware of that?
11       A.   I'm aware that he claims to do that.
12       But he does not provide any basis for
13   those numbers, so it's not clear to me how he
14   came up with those numbers.
15       Q.   All right.
16       MR. WISNER:  Would you look again at
17   page 7, note 11 of your report?
18       THE WITNESS:  Yes.
19   BY MR. WISNER:
20       Q.   Tell me if I read this correctly:  The
21   evidence I have reviewed does not contain enough
22   information to appropriately estimate losses
23   beyond the lost earning calculations I present
24   here.  Should additional information be
25   provided, I can reassess my calculations.

Page 35

1
2        Did I read that correctly?
3        A.   Yes.
4        Q.   You do -- you did have before you at
5    the time of your report -- as you mention on
6    page 2, the last bullet point -- "Seex'
7    Appointment Letter to Tamarind?
8        A.   Yes.
9        Q.   And that is Jonathan Seex' contract to
10   become CEO of Tamarind Management Limited,
11   correct?
12       A.   I believe that's correct.
13       Q.   Okay.
14       MR. WISNER:  Chelsea, can you put that
15   up on the screen for us, please?  It's Jonathan
16   Seex' contract as CEO with Tamarind Management.
17       THE VIDEOGRAPHER:  Yes, I am just
18   confirming which document that is.  I have seven
19   documents.
20       MR. WISNER:  Okay.  Tell me the ones
21   that I -- tell me -- it should say something
22   about CEO, or contract, or letter of
23   appointment.
24       THE VIDEOGRAPHER:  I am looking.
25       (Pause)

Page 36

1
2        THE VIDEOGRAPHER:  Yes, I see a letter
3    of appointment.  Would you like me -- I can mark
4    that as an exhibit?
5        What exhibit number would you like me
6    to mark it as?
7        MR. WISNER:  Julia, can we just do
8    this as Guryan Exhibit number 1?
9        MS. JOHNSON:  Sure.  But should it be
10   Guryan Exhibit number 2?
11       Are you marking his report as number
12   1?
13       MR. WISNER:  Excellent point.
14       Let's make the report as Guryan
15   Exhibit number 1, and his letter of appointment
16   as Guryan Exhibit number 2.
17       (Exhibit 1, Multipage document
18   entitled: Report in the matter of Ethiopian
19   Airlines Flight ET 302 Crash - Jonathan Seex,
20   Case No. 1:19-cv-03392, Prepared By: Jonathan
21   Guryan, Ph.D., Date: January 16, 2025 (no Bates
22   Nos.), marked for identification)
23
24
25

JONATHAN GURYAN, PH.D.

Page 37

```
1
2          (Exhibit 2, Document Bates stamped
3     Seex_000490 through 495, multipage letter from
4     Martin H. Dunford to Jonathan Seex, dated June
5     1, 2007, marked for identification)
6          (Pause)
7          THE VIDEOGRAPHER: The second Exhibit
8     should be available to view in AgileLaw. It is
9     coming up with my ability to stamp it.
10    Apologies for the delay.
11         (Pause)
12         THE VIDEOGRAPHER: It is still taking
13    its time. Counsel, I'm not sure if you would
14    like to go off the record just to see if I can
15    get this done quicker for you, or just carry on
16    at the moment.
17         MR. WISNER: Well, let's just wait a
18    minute. It will come up, won't it?
19         THE VIDEOGRAPHER: It should. It is
20    not allowing me to stamp it.
21         MR. WISNER: If I send something to
22    you, would that make it easier?
23         THE VIDEOGRAPHER: It looks like it
24    has just popped up. So I am now marking that
25    document as Exhibit 2. Let's see if that --
```

Page 39

```
1
2     which states on the letterhead of Tamarind
3     Management Limited: RE: Letter of Appointment,
4     01 January 2018?
5          Do you have that, sir?
6     A.   Yes, except that the date is 01 June
7     2007.
8     Q.   Oh, no, that's a different one, sir.
9          That's -- but let's ask you about that
10    one. We'll keep that as Exhibit number 2.
11         This is that contract for Jonathan
12    Seex for the position of director of strategic
13    planning.
14         Do you see that, sir?
15    A.   I do.
16    Q.   Have you seen that document before?
17    A.   I'm not sure if I have or I haven't.
18    Q.   Okay.
19         MR. WISNER: Now, Chelsea, can you
20    find the other one, which is the letter of
21    appointment dated January 1st, 2018?
22         THE VIDEOGRAPHER: I am looking.
23         MR. WISNER: You tried so hard to find
24    that, then we don't have right one.
25         THE VIDEOGRAPHER: I apologize. It
```

Page 38

```
1
2     that might take its time as well.
3          I really do apologize for the delay.
4          MR. WISNER: No need.
5          MS. JOHNSON: We can see it on our
6     end.
7          MR. WISNER: Okay. I can't see it
8     yet.
9          THE VIDEOGRAPHER: Okay. I see it on
10    my end as well. I'm also going to mark that
11    report as Exhibit 1.
12         (Pause)
13         MR. WISNER: Can't get it for me yet?
14         THE VIDEOGRAPHER: Sir, are you logged
15    in to AgileLaw with the pin? It does sound like
16    Ms. Johnson can see it --
17         MR. WISNER: I'm not --
18         MS. JOHNSON: Yes --
19         MR. WISNER: -- I'll find it another
20    way. Hold on a second.
21         (Pause)
22         MR. WISNER: All right.
23    BY MR. WISNER:
24    Q.   Dr. Guryan, do you have before you a
25    document we marked as Dr. Guryan Exhibit number
```

Page 40

```
1
2     does say: Letter of appointment.
3          MR. WISNER: That's okay.
4          THE VIDEOGRAPHER: As it's loading,
5     sir, I'm not certain I have that one available
6     to me in AgileLaw.
7          MR. WISNER: Julia, do you happen to
8     have that one?
9          MS. JOHNSON: No, I don't.
10         MR. WISNER: If I -- let's see how we
11    can do that. I thought I sent you that one,
12    Chelsea --
13         THE VIDEOGRAPHER: I am just --
14         MR. WISNER: -- in my email, I sent
15    several documents that I'd to be considered.
16    I'm sure that was one of them, no?
17         THE VIDEOGRAPHER: That may have gone
18    to a different individual than me. I see what's
19    in the folder in AgileLaw. I'm just skimming --
20         MR. WISNER: Can I send that document
21    to you by email right now? And you can put it
22    in AgileLaw and show Dr. Guryan?
23         THE VIDEOGRAPHER: You can send it me,
24    certainly. I will need to get it into AgileLaw
25    by other means. I don't have the ability to add
```

10 (Pages 37 to 40)

JONATHAN GURYAN, PH.D.

Page 41

1    them myself.
2         So what I can suggest is we go off the
3    record for a moment and I reach out to TC to get
4    that document in there for you, if that works.
5         MR. WISNER:  Or Julia, are you
6    physically with Dr. Guryan?  Or no?
7         MS. JOHNSON:  I am.
8         MR. WISNER:  Can I send it to you and
9    you can show it to him?
10        MS. JOHNSON:  If we were going to do
11   that, we would need to go off the record so I
12   could --
13        MR. WISNER:  Okay --
14        MS. JOHNSON:  -- print it and bring
15   him a copy.  I can do that if you prefer.
16        MR. WISNER:  All right.  Let's go off
17   the record and I'll send it to you right now,
18   Julia.
19        THE VIDEOGRAPHER:  All right.  I'll
20   just take us off so we have it noted.
21        We are going off the record.  The time
22   is 9:44 a.m.
23        (Recess from 10:44 a.m. to 10:54 a.m.
24   Eastern Standard Time)
25

Page 42

1
2         (Exhibit 3, Multipage document bearing
3    heading on first page: Exhibit 9, containing
4    multipage letter from Gerson Misumi to Jonathan
5    Seex, dated January 1, 2018 (no Bates Nos.),
6    marked for identification)
7         THE VIDEOGRAPHER:  We are going back
8    on the record.  The time is 9:54 a.m.
9    BY MR. WISNER:
10        Q.   Dr. Guryan, do you now have in front
11   of you what we have marked as Guryan Exhibit
12   number 4 for identification?
13        And can you identify it as a
14   correspondence of January 1st, 2018 stating
15   "Letter of Appointment" from Tamarind Management
16   Limited.
17        Do you see that, sir?
18        MS. JOHNSON:  Can I just ask? -- is
19   this Exhibit 4?  Or is this Exhibit 3?
20        MR. WISNER:  Now you got me confused.
21   Let's see.  One was his report.  Two was the --
22        MS. JOHNSON:  The 2007 letter.
23        MR. WISNER:  Oh, okay.  Then this is
24   3.  Thank you.
25        MS. JOHNSON:  Okay.

Page 43

1
2         MR. WISNER:  Three.  Make that
3    correction, please.
4    BY MR. WISNER:
5         Q.   Can you identify this as the document
6    I just described, Dr. Guryan?
7         A.   I do.  I have a document that's dated
8    January 1st, 2018, and it is a letter of
9    appointment.
10        Q.   And you had this at the time that you
11   did your report, right?
12        A.   Yes.
13        Q.   In fact, it's listed on page 2 at the
14   last bullet point as:  Seex Appointment Letter
15   to Tamarind.
16        Right?
17        A.   The last bullet point on page 2.
18   There are additional bullet points --
19        Q.   Yeah --
20        A.   -- on page 3 --
21        Q.   -- but I'm talking about this
22   particular document.
23        That's the last bullet point on page
24   2, right?
25        A.   That's correct.

Page 44

1
2         Q.   All right.
3         So you had it at the time of your
4    report, right?
5         A.   I did.
6         MR. WISNER:  Now, will you look down
7    in that document, Dr. Guryan?
8    BY MR. WISNER:
9         Q.   Number 4 says:  Balanced Score Card
10   Incentive Programme.
11        Right?
12        A.   Yes.
13        Q.   And it talks about a company incentive
14   scheme for senior management staff which would
15   include Jonathan Seex as CEO, right?
16        A.   Yes.
17        Q.   And it refers to a potential incentive
18   calculated at 30% of his annual gross salary.
19        Do you see that, sir?
20        A.   I do.
21        Q.   Now, did you consider that bonus or
22   incentive scheme in doing your calculations as
23   to the earning -- loss of earnings -- of
24   Jonathan Seex?
25        A.   Yes.

TC Reporting, Inc.
(516) 795-7444

JONATHAN GURYAN, PH.D.

Page 45

1
2    Q.   Okay.  Okay.  We'll get back to that.
3         Can you show me in your report where
4  you considered that?
5    A.   I believe this is income that would be
6  included on a tax return.
7    Q.   Okay.
8         MR. WISNER:  Chelsea, please tell me
9  you have Jonathan Seex' tax return for 2019.
10        THE VIDEOGRAPHER:  I do.  I will mark
11 that as Exhibit 4.
12        (Exhibit 4, Single-page document
13 entitled: e-Return Acknowledgment Receipt for
14 Jonathan Bjorn Seex, Return Period: January 1,
15 2019 - December 31, 2019 (no Bates No.), marked
16 for identification)
17        MR. WISNER:  Okay.
18        THE VIDEOGRAPHER:  One moment.
19        (Pause)
20        THE VIDEOGRAPHER:  That should be
21 available in AgileLaw now.
22        MR. WISNER:  Do you have in front of
23 you, Dr. Guryan, Jonathan Seex' tax return for
24 2019?
25        THE WITNESS:  I do.

Page 46

1
2         MR. WISNER:  We've marked that
3  document as Guryan Exhibit number 4.
4  BY MR. WISNER:
5    Q.   Now, I wanted you to show me,
6  please -- because I just may not be seeing it --
7  where it has that bonus or incentive scheme as
8  listed as income on this tax return?
9    A.   I believe it would be included in
10 "Employment Income."
11   Q.   How do you know that?
12        Where do you see that, sir?
13        I don't see it here.  I'm probably
14 just missing it.
15   A.   Well, it doesn't report it on this
16 document.
17        But on the 2014 tax document that was
18 provided, it has a little more detail about what
19 is included in each category.
20        And income from earnings would be
21 included in employment income.
22        MR. WISNER:  Chelsea, did I include
23 the 2014 return among the documents?
24        THE VIDEOGRAPHER:  I don't have one
25 for that year, no.

Page 47

1
2         MR. WISNER:  Okay.
3  BY MR. WISNER:
4    Q.   Dr. Guryan, do you know whether that's
5  included in any of the other tax returns? --
6  that information that you are talking about? --
7  like 2015 through '18?
8    A.   I believe for 2015 through '18, the
9  form that is included doesn't include as much
10 detail as the 2014 one -- but it does refer to
11 employment income.
12        And the -- what you just described on
13 his employment contract would be included in
14 "Employment Income."
15   Q.   Okay.
16        Do you know whether for every year
17 subsequent to 2014, taxable income included this
18 bonus or incentive scheme, even though it not
19 stated in that document?
20   A.   Based on my understanding of what
21 employment income, is yes, I would expect that
22 it is.
23   Q.   All right.
24        MR. WISNER:  Would you go back now,
25 sir, to Exhibit number 3, which is that letter

Page 48

1
2  of appointment?
3         MS. JOHNSON:  The January 2018 letter?
4         MR. WISNER:  Yes.
5         THE WITNESS:  Yes.
6         MR. WISNER:  Can you scroll down to
7  number "5:  Pension, life cover and personal
8  accident"?
9         Do you see that?
10        THE WITNESS:  Yes.
11 BY MR. WISNER:
12   Q.   Do you see where it says:  You --
13 meaning Jonathan Seex -- will be entitled to
14 join the Group Management Pension, Life Cover
15 and Personal Accident Scheme, an amount
16 equivalent to 5% of his gross salary will be
17 paid by the company?
18        Do you see that, sir?
19   A.   I do.
20   Q.   Now, was that included in his taxable
21 income for 2019?
22   A.   I could refresh my recollection if I
23 looked at the 2014 tax form.
24        But to the extent that pension
25 benefits are not included, then that would be an

12 (Pages 45 to 48)

JONATHAN GURYAN, PH.D.

Page 49

```
 1
 2    additional -- in addition to the damages that I
 3    calculated.
 4         But to the extent that pension income
 5    is included, then --
 6    Q.  Okay.
 7         So just so I understand you, sir, we
 8    need to look at the 2014 return.
 9         And it's your testimony that if
10    pension, life cover, and personal accident
11    benefits as set forth in paragraph 5 of his
12    letter of appointment are included as taxable
13    income, then it's your opinion that that would
14    be included as taxable income for 2019 also.
15         Correct?
16    A.  I think that's a reasonable assumption
17    to make.
18         But as I explain in my report, any
19    benefits that are not included in taxable income
20    are not included in my calculation and they
21    would be in addition.
22    Q.  Yeah, that's what I'm getting at, sir,
23    I want to know what benefits are included in
24    your calculation.
25         Now, conversely, if the 2014 return
```

Page 50

```
 1    does not show the pension, life cover, and
 2    personal accident benefits are included in
 3    taxable income, then it's your opinion that you
 4    did not include that in your calculation of John
 5    Seex' earnings, correct?
 6    MS. JOHNSON:  Objection.
 7    BY MR. WISNER:
 8    Q.  Is that correct, sir?
 9    A.  Any income that is included in taxable
10    income would be included.
11         And any other sources of income that
12    are not included in taxable income would be
13    separate and be in a different type of damage.
14    Q.  Okay.
15         When you are doing your report, you
16    had this information number 5 about the pension,
17    life cover, and personal accident, correct?
18    A.  That's correct.
19    Q.  So if you wanted to include it in your
20    valuation, you could have done so.
21         You just chose not to.
22         Correct?
23    MS. JOHNSON:  Objection.
24    A.  As I explained, I was writing a
```

Page 51

```
 1    rebuttal to Dr. Shenkar.  Dr. Shenkar did not
 2    provide a calculation of benefits in addition to
 3    income, and so I'm not providing an opinion
 4    about that.
 5         And I don't believe there is enough
 6    information to -- in the record -- to come up
 7    with an assumption of what percentage of income
 8    is -- would be in addition for benefits --
 9    Q.  Well --
10    A.  -- Dr. Shenkar did not provide that
11    opinion, and so I'm not responding to that.  I'm
12    only responding to lifetime earnings.
13    Q.  Whether or not Dr. Shenkar provided
14    that information, you had the information in
15    this letter of appointment in paragraph 5, did
16    you not?
17         You had that at the time you did your
18    report.
19    A.  I did have this document, as did Dr.
20    Shenkar.  And Dr. Shenkar also did not provide a
21    calculation of lost benefits.
22         I was writing a rebuttal to him, so
23    I'm providing an opinion about his calculation
24    of lost earnings and providing an alternative
```

Page 52

```
 1    calculation based on what I believe are more
 2    reasonable conclusions.
 3    Q.  Respectfully, sir, I'm asking about
 4    you and your report, not Dr. Shenkar's report.
 5         I'm asking you that you did not
 6    include this paragraph 5 about pension, life
 7    cover, and personal accident benefits in your
 8    opinion -- in your evaluation of Jonathan Seex'
 9    earnings, even though you had that information
10    available to you through this letter of
11    appointment, correct?
12    A.  I had this information.  I considered
13    it.  I included income to the extent it was
14    taxable income because that is the income
15    information that I had a basis for.
16         I did not have a basis for un-taxable
17    or -- benefits to provide a calculation for it.
18         And so I made it clear that that was
19    not included in my damage calculation.
20    Q.  What I'm getting at, Dr. Guryan --
21    let's assume for a moment that the 2014 return
22    does not show pension, life cover, and personal
23    accident benefits as part of taxable income.
24         That means you did not include it in
```

13 (Pages 49 to 52)

JONATHAN GURYAN, PH.D.

Page 53

1
2    your report, even though you had this
3    information available to you at the time you did
4    your report, correct?
5            MS. JOHNSON:  Objection, asked and
6    answered.
7        A.   I don't believe the premise of your
8    question is correct.
9        Q.   Assume for me that it is.  Assume for
10   me that the 2014 return does not show pension,
11   life cover, and personal accident benefits as
12   taxable come.  Just assume that for me for a
13   moment.
14           MS. JOHNSON:  Objection.
15   BY MR. WISNER:
16       Q.   You did not include pension, life
17   cover, and personal accident benefits in your
18   calculation, even though you had that
19   information available to you through this
20   contract, correct?
21           MS. JOHNSON:  Objection.
22       A.   You are asking me to assume something
23   that I believe is not correct.  And I have --
24       Q.   Just go with me.
25       A.   Can I just finish my answer, please?

Page 54

1
2        Q.   Sure.
3        A.   And I have asked to see a copy of the
4    document to refresh my recollection, and you
5    haven't provided it to me.
6            But I'll just say that I am writing a
7    rebuttal report to Dr. Shenkar's opinion on
8    lifetime earnings losses, and so I'm responding
9    to what he did.
10           And I have made it clear that I am
11   providing an opinion about lifetime earnings
12   losses, and not providing an opinion about lost
13   benefits that would not be included on taxable
14   income.
15           If there are other losses related to
16   that, that's not part of the opinion that I'm
17   providing a calculation of.
18       Q.   What are those other losses?
19       A.   I don't know what they are, so I'm not
20   providing an opinion of them.
21           MR. WISNER:  Would you look at this
22   letter of appointment, then -- which is I think
23   is Exhibit number 3 -- number 6:  Food and
24   beverage?
25           Do you see that, sir?

Page 55

1
2            THE WITNESS:  Yes.
3    BY MR. WISNER:
4        Q.   Was that, to your recollection,
5    included in taxable income on Jonathan Seex' tax
6    returns?
7        A.   I don't know whether this specific
8    input was or was not.  And so I provided an
9    opinion that's based on his taxable income and
10   projected out losses based on that.
11       Q.   You did not include food and beverage
12   under number 6 in this letter of appointment in
13   your opinion, did you?
14       A.   I don't believe that's a correct
15   characterization of what I have done.
16           As I have explained, to the extent
17   that amounts that he's received in the form of
18   food and beverage is taxable income, it would be
19   included; but to the extent it's not, it would
20   not.
21           Some of what's described in number 6
22   is food and beverage that he would get himself;
23   and some of it is food and beverage that he's
24   allowed to give to guests which wouldn't be
25   income, regardless.

Page 56

1
2        Q.   To the extent that food and beverage
3    is not included in taxable income on his tax
4    returns, then you did not include it in your
5    valuation, did you?
6        A.   As I explained, I have made that clear
7    in my report.  And I am not including any form
8    of income that's not -- that wouldn't be
9    included on taxable income.
10       Q.   Even though you had that information
11   available to you at the time you did your report
12   through this letter of appointment, paragraph 6,
13   correct?
14       A.   There isn't enough information in
15   paragraph 6 to make a projection of it based on
16   that --
17       Q.   Okay.
18           MR. WISNER:  Let's look at paragraph
19   7, "Expenses," in this letter of appointment,
20   Exhibit No. 3.
21           It says he is entitled to a maximum
22   expense allowance per month.
23           Do you see that, sir?
24       A.   I do.
25           And it also says that "will form a

14 (Pages 53 to 56)

JONATHAN GURYAN, PH.D.

Page 57

1
2      part of your gross taxable pay," so that would
3      be included.
4          Q.   Okay.
5              So you did include that amount in your
6      valuation, you believe?
7          A.   To the extent any of those expenses
8      were allowed and were included on his taxable
9      income, then, yes, that would be included.
10             MR. WISNER:  Moving on to number 8:
11     Telephone Allowance.
12     BY MR. WISNER:
13         Q.   Do you see that he's provided a mobile
14     telephone allowance?
15             Do you see that, sir?
16         A.   I do.
17         Q.   Was that included in taxable income?
18         A.   If it was included in taxable income,
19     then it would be included in my calculations.
20     If it was not, then it would not be.
21         Q.   Okay.
22             Then "motor vehicle," number 9 -- it
23     says he's provided with a fuel card.
24             Do you see that, sir?
25         A.   Yes.

Page 58

1
2          Q.   And with a car fully insured,
3      maintained, and fueled.
4              Do you see that, sir?
5          A.   Yes.
6          Q.   Did you include that in your
7      valuation?
8          A.   Again, if this is included in taxable
9      income, it would be included in my damage
10     calculation.
11             If it's not included in taxable
12     income, it would be a benefit that is not
13     included and would be separate from the damages
14     that I'm offering an opinion on.
15         Q.   Then it says -- in paragraph 10, it
16     refers to:  Medical aid.
17             Did you include that in your
18     valuation?
19         A.   Again, I don't -- I don't believe
20     medical benefits are included in taxable income,
21     so I don't believe this is included.
22             But to the extent it is in taxable
23     income, it would be included.  To the extent it
24     is not, it would be a separate form of damages
25     that I am not providing an opinion on.

Page 59

1
2              (Pause)
3          Q.   Do you know whether medical benefits
4      are taxable under Kenya law?
5          A.   I don't believe they are, but I'm not
6      sure of that.  So I do not -- I do not think
7      this is included.
8              But it would be helpful to look at
9      that tax return from 2014 to refresh my
10     recollection.
11         Q.   Okay.  Maybe we can pull that up for
12     you.
13             Do you know whether TML's contribution
14     to its pension plan on behalf of Jonathan Seex
15     is taxable under Kenya law?
16         A.   Again it would be helpful to look at
17     the 2014 tax return to refresh my recollection.
18     I don't -- I don't know for sure, but I believe
19     it's not.
20         Q.   What about Kenya's social security
21     system?
22             Are any such benefits taxable under
23     Kenya law?
24         A.   I don't believe Mr. Seex was receiving
25     social security benefits at the time of his

Page 60

1
2      death, but I don't believe they are taxable.
3              (Pause)
4          Q.   You are not familiar, are you Dr.
5      Guryan, with the Kenya businesses, particularly
6      the Kenya hospitality sector?
7              MS. JOHNSON:  Object to form.
8      BY MR. WISNER:
9          Q.   You can answer.
10         A.   I'm aware of them.
11             I'm not sure what you mean by
12     "familiar with."
13         Q.   Well, now, have you ever done an
14     evaluation of the loss of earnings of any Kenya
15     executive?
16         A.   I don't believe so.
17         Q.   Or any African executive?
18         A.   Executive, I don't believe so.
19         Q.   How about any Kenya employee of any
20     type?
21         A.   Have done lost earnings for workers
22     who worked in Kenya.
23         Q.   In what position?
24         A.   Not an executive position, but as a
25     professional.

TC Reporting, Inc.
(516) 795-7444

JONATHAN GURYAN, PH.D.

Page 61

```
1
2          Q.   When did you do that?
3          A.   Last year -- sorry, earlier this
4   year -- no, sorry.
5               It would have been last year.
6          Q.   Was that as an expert witness?
7          A.   Yes.
8          Q.   What was the case?
9          A.   It was another case in this -- related
10  to the same matter.
11         Q.   Okay.
12              Was it the gentleman who said he was
13  going to start an oil business?
14         A.   I did write a report in that case,
15  yes.
16         Q.   But are you referring to another one
17  when you said you did one for a Kenyan
18  individual?
19         A.   Yes.
20         Q.   Do you remember the name of that
21  individual?
22         A.   I believe that was Ms. Musyoki.
23         Q.   Okay.
24              And was that person -- what was that
25  person's position? -- former position?
```

Page 62

```
1
2          A.   They were information technology
3   professional.
4          Q.   Did you apply U.S. data to that --
5   your valuation of that person?
6               MS. JOHNSON:  Objection.
7          A.   I did use U.S. data as part of the
8   calculation for that individual; and also
9   information specific to her employment history
10  as well.
11         Q.   But you didn't use information
12  particular to Jonathan Seex' employment in your
13  valuation here, did you?
14         A.   No, I did.  I disagree with you on
15  that.
16         Q.   Okay.  We'll get into that a little
17  bit later.
18              In doing the valuation for this other
19  gentleman I was referring to who was going to
20  start an oil business, did you use U.S. data in
21  doing your valuation for that?
22         A.   There were several inputs into that --
23  that calculation.  Some of the data was from the
24  U.S.
25         Q.   Okay.
```

Page 63

```
1
2               Do you recall any of the data being
3   from any other country?
4               MS. JOHNSON:  Objection.
5          A.   Yes, some of the data was specific to
6   his specific earnings history.
7          Q.   In what country?
8          A.   The U.A.E.
9          Q.   Okay.
10              And the other person you talked about
11  where you did an earnings calculation -- what
12  other country did you consult data about that
13  one?
14         A.   The country in which they had
15  earned -- you know, I did not look back at the
16  details of that to prepare for this deposition,
17  so I'm not sure I remember all the specifics.
18         Q.   Do you remember the name of the
19  country?
20         A.   I believe it was Kenya.
21         Q.   Okay.
22              (Pause)
23         Q.   Did you do an analysis for Jonathan
24  Seex for wealth to wage income?
25         A.   I'm not sure I understand that
```

Page 64

```
1
2   question.
3          Q.   All right.
4               Well, let me ask you this.
5               Do you believe that Jonathan Seex as a
6   CEO would have accumulated some wealth during
7   his career?
8          A.   I would expect that he had accumulated
9   some wealth over the course of his career, yes.
10         Q.   And he would have continued -- and
11  would you expect he would have continued to have
12  accumulated some wealth over the course of his
13  career?
14         A.   As I project in my calculation, I
15  assumed that he would have continued to have
16  earnings.  Some of that earnings, he would have
17  spent; some of that earnings he would have saved
18  and invested; but I would have expected that.
19         Q.   Did you include that in your
20  calculations?
21         A.   Yes.  The calculations are projected
22  future earnings.
23              I created a net present value which he
24  paid, I assume, in the present.  And whenever
25  the -- damage is made, that same money could
```

16 (Pages 61 to 64)

JONATHAN GURYAN, PH.D.

Page 65

1
2   then be invested.
3       It would be double-counting to include
4   both the income and the investments that are
5   made with that income.  That would be
6   double-counting of damages, so I didn't do
7   that --
8       Q.   Okay --
9       A.   -- but I did make a -- as a value
10  calculation which would allow for investments to
11  be made with that money.
12      Q.   Again, you haven't seen any documents
13  regarding John Seex' investments in real estate
14  or anything else, right?
15      A.   I haven't.  It's not relevant to my
16  calculation of lost future earnings.
17      Q.   Okay.
18          MR. WISNER:  Julia, want to take a
19  quick break?
20          MS. JOHNSON:  Sure.
21          MR. WISNER:  Let's take about 10
22  minutes.
23          MS. JOHNSON:  Okay.
24          THE VIDEOGRAPHER:  We are going off
25  the record.  The time is 10:17 a.m.

Page 66

1
2           (Recess from 11:17 a.m. to 11:28 a.m.
3   Eastern Standard Time)
4           THE VIDEOGRAPHER:  We are going back
5   on the record.  The time is 10:28 a.m.
6   BY MR. WISNER:
7       Q.   Okay.  Dr. Guryan, are you ready
8   again?
9       A.   I am.
10      Q.   Okay.
11          MR. WISNER:  Would you look at a
12  document I'm going to show you?
13          Chelsea, would you pull up that 2014
14  tax return, please?
15          We are going to mark this as Guryan
16  Exhibit number 4.
17          THE VIDEOGRAPHER:  This will be 5, I
18  believe, in sequence, counsel.
19          MR. WISNER:  Okay.  Five.  Thank you.
20
21
22
23
24
25

Page 67

1
2           (Exhibit 5, Document Bates stamped
3   Seex_000031-35, missing Bates No.,
4   Seex_000028-30, first page bearing heading:
5   e-Return Acknowledgment Receipt for Jonathan
6   Bjorn Seex, Return Period: January 1, 2015 -
7   December 31, 2015, with cover page bearing
8   heading: Exhibit 8 (no Bates No.), marked for
9   identification)
10          THE VIDEOGRAPHER:  One moment.  That
11  should be available in AgileLaw.
12          MR. WISNER:  Okay.
13          Let me know if you have it in front of
14  you, Dr. Guryan.
15          THE WITNESS:  I have a document that I
16  think includes other years, but I think it does
17  include 2015, 2016, 2017, 2018, 2019, and the
18  2014.
19          MR. WISNER:  Okay.  I just need you to
20  look at 2014.
21          And that's the one, Chelsea and Brad,
22  that I want to mark as Exhibit number 5, not the
23  others.
24          Okay.  Now, Dr. Guryan, will you look
25  down to -- let's see where it's at.

Page 68

1
2           Looks like it's Bates numbered at the
3   bottom Seex_00028.
4       Q.   Do you see that, sir?
5       A.   THE WITNESS:  I do.
6          MR. WISNER:  Okay.
7   BY MR. WISNER:
8       Q.   Do you see where it says:  Gross pay?
9       Right?
10      A.   Yes.
11      Q.   Then underneath that, it says:
12  Benefits from employment - other than car and
13  housing.
14          Do you know what's included other than
15  car and housing?
16      A.   Not as I sit here, based on what you
17  are showing me, no.
18      Q.   Then underneath that, it says:  Value
19  of car: 312,000.
20          Right?
21      A.   Yes.
22      Q.   And by the way, that 54,000, in U.S.
23  value at the time, was about, maybe, $500,
24  right?
25          MS. JOHNSON:  Objection.

JONATHAN GURYAN, PH.D.

Page 69

```
1
2        A.   Trying to multiply the exchange rate
3   in my head.  That sounds about right.
4        Q.   Okay. we can look it up.  I'm just
5   asking about.
6        And one for value of car -- 312,000 --
7   that's about $3,000, right?
8        A.   About right.
9        Q.   And then if you see, it says under
10  item 33:  Pension in excess of Kenyan shillings
11  $300,000.
12       So there is no income for that, right?
13       A.   I don't believe he was collecting
14  pension --
15       Q.   Oh, I see.
16       A.   -- at the time of his death.
17       Q.   All right.
18       If you look under number 37, it says:
19  Pension contribution.
20       It does look like it says 1,400,
21  right?
22       A.   Yes, I can't tell if that's a one or a
23  two.
24       Q.   All right.
25       So it's either about $100 or $200 in
```

Page 70

```
1   additional income, right?
2        A.   Yeah, I'm not sure -- I'd have to look
3   at the formulas to know whether that is included
4   or netted out.
5        Q.   Okay.
6        And at any rate, Dr. Guryan, that does
7   show that a contribution was being made to a
8   pension plan for Jonathan Seex, correct?
9        A.   I believe that that's correct, yes.
10       Q.   And it was in this amount -- either
11  1,400 or 2,400 -- right?
12       A.   I believe that's what's saying in
13  2014, yes.
14       Q.   Okay.
15       Do you see any notation on this
16  return, or any information on this return, Dr.
17  Guryan, about a bonus or incentive being
18  included in Jonathan Seex' income for 2014?
19       A.   It is included in gross pay under
20  line -- sorry.  I'm going back to where we were
21  looking at gross pay --
22       Q.   I see number 29, right?
23       A.   Yeah.
24       It says:  Includes salaries, wages,
```

Page 71

```
1   bonus, etc.
2        Q.   Do you know what amount in that line
3   29 is for bonus?
4        A.   It doesn't mark it out separately.
5        But you can -- if you look at the
6   numbers that I used in my calculation and
7   compare it to what was in the employment
8   document that you were looking at before, there
9   is a substantial amount that is included in the
10  taxable earnings in 2019 that is not included
11  in -- that is not just accounted for by the
12  salary and bonus scheme.
13       So the salary that's listed on the
14  employment letter is 1.1 million Kenyan
15  shillings per month.
16       So you multiply that by 12, and then
17  take an additional 30% in the bonus amount,
18  which gets you up to about $17 million --
19  sorry -- 17 million Kenyan shillings.
20       And my calculation for his annualized
21  2019 earnings from the taxable -- based on his
22  tax document was 24 million Kenyan shillings, a
23  little bit more than that.
24       So there is about 7 million -- or
```

Page 72

```
1   about 40% -- additional amounts in the taxable
2   earnings beyond just the salary and the bonus.
3   And so there are other things that are included
4   that I'm including in my calculation.
5        Q.   Understood.
6        You don't know what those amounts are,
7   for what expenses, and what amount for each?
8        A.   I don't.  The information that I was
9   provided was his taxable earnings, and that's
10  what I based my calculation on.
11       And it's more than what is reported
12  just as salary and bonus in his letter of
13  appointment, so it is including an additional
14  sources of income, and it would be anything that
15  is reported as taxable income on his taxes.
16       Like I said, it's about 40% more than
17  what is included in just his salary and his
18  bonus, and that is what I'm including.
19       Q.   Do you know whether medical benefits
20  are included in Jonathan Seex' employment income
21  for 2014?
22       A.   I don't believe so, but I don't know
23  that for sure.
24       Q.   Did you include medical benefits in
```

18 (Pages 69 to 72)

JONATHAN GURYAN, PH.D.

Page 73

```
1
2     your valuation?
3         A.   I did not include them as a separate
4     amount.
5             I would only have included them if
6     they were included in taxable income.
7             I don't believe they are included in
8     taxable income, but I'm not sure.
9         Q.   How about for his telephone, Dr.
10    Guryan?
11            Did you -- was that included in
12    employment income for 2014 for Jonathan Seex?
13        A.   I don't know for sure.  I believe that
14    would be included in benefits from employment,
15    so I believe that is part of additional 40%, but
16    I can't be 100% sure of that.
17        Q.   Did you include that information from
18    his employment letter in your calculation of his
19    loss of earnings?
20        A.   Again, I believe it's included in the
21    additional 40% that is in the taxable income but
22    I didn't include it as a separate amount beyond
23    that.
24        Q.   Did you include Jonathan Seex' expense
25    account -- or strike that.
```

Page 74

```
1
2             Is Jonathan Seex' expense account
3     included in employment income on the 2014
4     return?
5         A.   Are you referring to the item number 6
6     that we referred to as "Food and beverage," or
7     the "Expenses" under number 7?
8         Q.   "Expenses" under number 7.
9         A.   "Expenses" under number 7 -- the
10    letter explicitly says it's "part of your gross
11    taxable pay," so that would be included.
12        Q.   Okay.
13            Then how about food and beverage?
14        A.   As I said earlier, I don't know
15    specifically whether food and beverage amount
16    would be included.
17            I don't believe the part about how
18    he's able to comp guests meals would be
19    included.  That wouldn't be an income to him.
20            To the extent that he got free meals
21    while he was working, I'm not sure whether
22    that's included in the additional 40% that is a
23    part of my calculation or not.
24        Q.   Have you ever heard that TML's
25    chairman of the board says that the food and
```

Page 75

```
1
2     beverage benefit for Jonathan Seex has a retail
3     value of $100,000?
4         A.   I don't recall if I have seen that or
5     not.
6             If you show me a document, I'd be
7     happy to tell you if I reviewed it.
8         Q.   Sitting here today, you don't recall
9     that?
10        A.   I don't recall that.
11        Q.   Now, just wondering about this.
12            You will see on the 2014 return, it
13    says on line 34:  Total employment income.
14            Do you see that?
15        A.   Yes.
16        Q.   And then -- well, strike that.
17            (Pause)
18        Q.   Dr. Guryan, I think we have
19    established that the later returns, from 2015
20    and 2016, '17, '18, '19 -- none of those set out
21    what's included in taxable income, correct?
22        A.   The documents that were provided are
23    different because I believe the taxes were
24    submitted electronically instead of in paper
25    form, so that information is not on those
```

Page 76

```
1
2     documents.
3             But assuming that the nature of what
4     is taxable and not taxable in Kenya has not
5     changed between 2014 and 2019, it's the same.
6         Q.   You are making that assumption,
7     correct?
8         A.   No, I'm not making that assumption.
9     I'm trying to answer your questions.
10            The only assumption that I made is
11    that whatever is included in his taxable income
12    in 2019, that is the basis for my
13    projection forward of what is included in his --
14    his lost earnings.
15        Q.   And my question, Dr. Guryan, is:  Do
16    you know what is included in taxable income in
17    2019? -- what benefits are included in taxable
18    income for 2019?
19            We've discussed 2014.
20            I'd like to know if you know what's
21    included among benefits in taxable income for
22    2019.
23        A.   I've not seen anything to tell me that
24    what is included in taxable income in 2019 is
25    different than what it was in 2014.
```

19 (Pages 73 to 76)

JONATHAN GURYAN, PH.D.

Page 77

1
2         If you show me something that
3    changes -- that is in contrast with that, I'd be
4    happy to consider it.
5         Q.   I'm going to ask you the converse
6    question.
7         Have you seen anything that shows that
8    it's remained the same?
9         A.   I haven't seen anything that says it's
10   different, and I haven't seen anything specific
11   that tells me anything other than that.
12        Q.   You haven't seen anything that says
13   it's the same either, have you?
14        A.   I have not.
15        Q.   Okay.
16        (Pause)
17        A.   Sorry.  Let me just finish.
18        What I can tell you is that the
19   calculation that I did to show you that there is
20   an additional 40% included in taxable income in
21   2019 beyond what is listed as his monthly salary
22   and bonus is consistent with the idea that there
23   are additional sources of income that are
24   included besides just salary and bonus.
25        That has not changed between 2014 and

Page 78

1
2    2019.
3         Q.   Dr. Guryan, I would like to ask you
4    about your discussion of rate of earnings
5    growth.
6         Okay?
7         I understand you use an age-earnings
8    profile to determine the rate at which Jonathan
9    Seex' earnings would have grown over his work
10   life, right?
11        A.   That is part of the calculation.
12        I also, in addition to that, assumed a
13   1% growth rate.
14        Q.   Okay.
15        MR. WISNER:  And on page 5 of your
16   report, sir --
17        (Pause)
18   BY MR. WISNER:
19        Q.   At the top, you say:  Workers'
20   earnings tend to increase early in their career,
21   flatten out in the middle of their working
22   years, and decline somewhat in the final years
23   of working.
24        Right?
25        Did I read that correctly?

Page 79

1
2         A.   You did.
3         Q.   And you rely upon American Community
4    Service -- or ACS -- data, right?
5         A.   That's American Community Survey.
6    That's correct.
7         Q.   Survey, sorry.
8         That's U.S. data, right?
9         A.   That is.
10        Q.   Have you heard that data referred to
11   as -- quote -- "so imprecise that they are
12   difficult to use"?
13        That's a comment by Speilman, Volch,
14   and Nagel from 2014.
15        Have you heard that?
16        A.   I have not heard that, no.
17        Q.   You also rely upon an article by
18   Murphy and Welch as to the methodology applying
19   this ACS data, right, Dr. Guryan?
20        A.   Well, at the time they were using a
21   different dataset because the ACS didn't exist
22   at the time that they were writing this paper.
23        But American Community Survey is
24   widely used by both academics and nonacademics.
25   It's rated by the U.S. Bureau of the Census.

Page 80

1
2    It's nationally-representative data that's used
3    for all sorts of purposes.
4         Q.   Talking about that Murphy and Welch
5    article -- that article is based on U.S. data,
6    right?
7         A.   That's correct.
8         Q.   Not Kenya data, right?
9         A.   It's not.
10        But as I explained, there are many
11   studies that have been done over decades by
12   economists -- labor economists -- studying labor
13   market estimating age-earnings profiles both in
14   the U.S. and in countries around the world.
15        And the basic pattern that I described
16   in the sentence that you quoted has been found
17   to be in countries -- consistently in different
18   economies, in different labor markets, in
19   different countries.
20        Q.   Including emerging markets?
21        Emerging economies?
22        A.   Including emerging economies, yes.
23        Q.   Including Kenya?
24        A.   I have not seen a study specific to
25   Kenya, which is why I did not rely on Kenyan

20 (Pages 77 to 80)

JONATHAN GURYAN, PH.D.

Page 81

1
2      data. I haven't seen anybody estimate that.
3            But both low-income and high-income
4      countries, emerging economies -- the studies
5      tend to find this same basic pattern of steeper
6      increases in earnings in the early part of a --
7      worker's career; a smaller decrease during the
8      later part of their career, and then a decline
9      towards the end.
10           That's a staple pattern that's been
11     found by decades and decades of labor economics
12     research.
13        Q.   Labor economics research.
14           Does that include business contexts,
15     such as the particular sector of hospitality?
16        A.   It's been done in all sorts of sectors
17     using nationally-representative data that would
18     include the hospitality sector.
19           And in other sectors, it's been done
20     for different occupations.
21           I estimated it myself using data on
22     chief executives.
23           I have seen this estimated in all
24     sorts of contexts, and the pattern is very
25     stable.

Page 82

1
2        Q.   All right.
3            The Murphy and Welch article again --
4      does that break down its article by sector of
5      business, such as hospitality?
6        A.   I don't believe that particular study
7      does. That's not the purpose that they were
8      after in that particular study.
9            They are describing the general
10     methodology. It was then -- the original
11     methodology was actually developed by -- in this
12     Mincer book from 1974.
13           Murphy and Welch are building on that
14     research and developing the methodology further.
15           That methodology has been applied, as
16     I described, in many, many different settings.
17           But the original Murphy and Welch
18     paper was not trying to estimate how the pattern
19     varies across different industries. That was
20     not the purpose of that study.
21        Q.   Was the Murphy and Welch article
22     considering the particular phase of a business,
23     such as a phase on the cusp of rapid
24     development?
25        A.   The Murphy and Welch paper and the

Page 83

1
2      Mincer paper are about earnings of workers.
3      Those workers work at different types of
4      companies and have different jobs. This is --
5      describes the pattern that workers' earnings
6      experience.
7            And so it would account for, you know,
8      variation across workers in terms of which
9      companies they work at over different periods of
10     their career.
11        Q.   But I'm talking about a particular
12     business, a business that's kind of moribund
13     versus a business that's on the cusp of taking
14     off.
15           Does that Murphy and Welch article
16     discuss that at all?
17           MS. JOHNSON: Objection.
18        A.   That's not the research question that
19     they are asking in that paper.
20        Q.   Did the Murphy and Welch paper discuss
21     the competitiveness of a particular business,
22     such in Kenya, the number of hotels opening?
23        A.   I mean, Murphy and Welch in other
24     settings have certainly talked about
25     competitiveness in both, you know -- in markets.

Page 84

1
2      Competitiveness is an area that both of those
3      economists have studied.
4            That's not what this particular paper
5      is about.
6            Not sure what you mean by
7      "competitiveness."
8            You might mean something different
9      than what I think of competitiveness in markets.
10        Q.   Okay.
11           Well, I'm asking you about the Murphy
12     and Welch article that you referred to in your
13     report.
14           And when I say "competitiveness," I
15     mean, specifically assume that there were 31 new
16     hotels opening up in Kenya at the same time --
17     approximately the same time.
18           Did the Murphy and Welch article that
19     you rely upon consider such competitiveness in
20     an industry sector?
21        A.   Sorry. That's a very different
22     meaning of -- I mean, I guess I understand that
23     that's part of competition.
24           I'm a little confused by the use of
25     that as "competitiveness."

21 (Pages 81 to 84)

JONATHAN GURYAN, PH.D.

---

Page 85

1
2      But the Murphy and Welch paper is
3  about developing a methodology for estimating
4  age-earnings profiles.
5      Q.   It's about methodology.
6      It's really not about results, is it?
7      A.   No, no.  They do estimate this
8  pattern.  And they show -- they test, you know,
9  what's the best way to estimate this pattern.
10  And they show that it fits their methodology
11  very well.
12      Q.   Dr. Guryan, do you understand that
13  TML -- Tamarind Management -- has never replaced
14  Jonathan Seex as CEO?
15      A.   I believe I have seen that referred
16  to.  I can't confirm that for sure.  But I think
17  that that -- I think -- I believe I've seen
18  that -- I've seen that referred to in some of
19  the documents.  I think that that's correct, but
20  I can't be 100% sure.
21      Q.   Does the Murphy and Welch article upon
22  which you rely on in your report consider at all
23  the particular individual involved, such as
24  Jonathan Seex and his importance to Tamarind
25  Management?

---

Page 86

1
2      MS. JOHNSON:  Objection.
3      A.   The Murphy and Welch paper certainly
4  does not consider Jonathan Seex in particular.
5  It was written in 1990 with data from earlier
6  than that, which is before Mr. Seex started
7  working.
8      Q.   Fair response.
9      What I'm getting at, sir -- does the
10  Murphy and Welch paper upon which you rely
11  consider the particular individual involved? --
12  the importance of that individual to his
13  company, or the hospitality sector?
14      A.   I mean, it does in the sense that it
15  shows how the age-earnings profile depends on
16  different levels of education.
17      Other studies have shown how it varies
18  by different, you know, occupations or other
19  things that are specific to workers.
20      People have estimated them in
21  different countries, so that it's also things
22  that would vary by individual.
23      They have certainly not -- you know,
24  these studies are not estimated particularly
25  from data on one individual.

---

Page 87

1
2      They are using representative data on
3  many, many workers and looking at patterns that
4  are typical of workers.
5      Q.   Okay.
6      I'm talking about the Murphy and Welch
7  article that you relied upon.
8      Does it consider the individual
9  capabilities of a particular employee in
10  determining loss of earnings?
11      A.   It does.  Yes, it does.  I mean, it --
12  again, as I said at the beginning of the
13  deposition, I'm relying on the particular papers
14  that I cited and using that particular
15  methodology.
16      But I also -- as a labor economist who
17  studies the labor market and studies economic
18  literature, I have read many, many other studies
19  on similar topics.  And I didn't cite every
20  single one of those that I'm aware of.
21      But, yes, the Murphy and Welch paper
22  shows how those age-earnings profiles vary by
23  different, for instance, levels of education,
24  which would be related to different levels of
25  skills of a worker.

---

Page 88

1
2      (Pause)
3      MR. WISNER:  Going back to page 7 of
4  your report, Dr. Guryan, and the last paragraph.
5  BY MR. WISNER:
6      Q.   You say -- tell me if I read this
7  correctly -- I think it's the third sentence:
8  Using the methodology described in Murphy and
9  Welch (1990), I estimated the age-earnings
10  profile for the average Chief Executive in the
11  U.S.
12      Correct?
13      A.   That's correct.
14      Q.   Jonathan Seex was not a chief
15  executive in the U.S., was he?
16      A.   He was a chief executive -- that's
17  correct, not in the U.S.
18      Q.   And would you characterize him as
19  average in Kenya?
20      A.   I was not characterizing him as
21  average, and I'm not assuming that he's average.
22      I am basing the level of his starting
23  point on his specific earnings amount, which is
24  very specific to him, and based on his talents.
25      The age-earnings profile is only used

---

JONATHAN GURYAN, PH.D.

Page 89

```
1
2    to estimate growth rates as percentage of that
3    starting base.
4         So in every year, I'm using
5    information from growth rates that come from
6    these age-earnings profiles, and the additional
7    1% real growth rate that I add on to that.
8         But that is applied to a number that
9    is based specifically on Mr. Seex and his
10   earnings, which are based on his own specific
11   skills, and abilities, and experience, which
12   contributed to the reason why he earned what he
13   did before his death.
14   Q.    Well, assuming that Mr. Seex has never
15   been replaced as CEO by Tamarind Management,
16   does that indicate to you that he was anything
17   but average in Kenya in the hospitality
18   industry?
19        MS. JOHNSON:  Objection.
20   A.    Again, I'm not assuming that he was
21   average at all.
22        I'm assuming that he was who he was;
23   and that I'm basing his earnings starting point
24   on his specific earnings --
25   Q.    Okay.
```

Page 90

```
1
2    A.    -- highest amount that he had earned
3    in his career, and that's based on his specific
4    skills and abilities and experience.
5         And then I'm growing that -- my
6    projection -- based on standard methods from
7    labor economics.
8         And because I'm growing that as a
9    percentage, in each year the projection I make
10   of his earnings are based on his specific
11   earnings starting point.
12   Q.    Why are growth rates from the U.S.
13   relevant to growth rates in Kenya?
14   A.    As I explained in -- I think it's in
15   one of the footnotes -- the age-earnings profile
16   that has been estimated in the U.S. has also
17   been estimated in countries around the world.
18        And that shape -- the shape of
19   age-earnings profile has been found to be very
20   stable, similar in different countries,
21   different types of economies.
22        So I make the assumption that -- not
23   that the level of his earnings is the same as it
24   would have been in the United States, but that
25   the growth rates would have been the same.
```

Page 91

```
1
2         And I believe that that's a reasonable
3    assumption, given the information that's
4    available.
5    Q.    Well even so, even in the U.S. to
6    which you refer, are you aware that CEO
7    compensation rate grew from 1978 to 2023 by
8    1,000%?
9         Are you aware of that?
10   A.    I have seen that from Dr. Shenkar's --
11   I forget what he called it -- his response
12   document.
13        I can't confirm whether that's --
14   whether that specific number is correct.
15   Q.    Dr. Guryan, I think you also say --
16        MR. WISNER:  If you look at your
17   report, page 8, in note 16 --
18   BY MR. WISNER:
19   Q.    In part, you say:  Real wages in Kenya
20   have decreased in recent years while U.S. real
21   wages have increased.
22        Right?
23   A.    That's correct.
24   Q.    Are you aware that a recent report
25   revealed that in Kenya, the wage gap between
```

Page 92

```
1
2    CEOs and the average worker in listed local
3    companies expanded 23% in one year alone from
4    2022 to 2023?
5         Are you aware of that?
6    A.    I don't know that I've seen that
7    specific study.
8         But you are -- that's one year of
9    data.
10        Based on national statistics from
11   Kenya, wage growth has been very high in some
12   years; been very low and negative in other
13   years.  In recent years, it's been negative in
14   real terms.
15        So I believe I'm making the
16   conservative assumption that real wage growth
17   would have been -- in addition to the growth
18   that comes from the age-earnings profile, would
19   have been an additional 1% based on U.S. data.
20        If I had used Kenyan data, I believe
21   the estimate would have been lower.
22        But I think it's reasonable to assume
23   1% real wage growth.
24   Q.    Well, this report showing a gap of 23%
25   in the one year -- isn't this indicative of a
```

23 (Pages 89 to 92)

JONATHAN GURYAN, PH.D.

Page 93

1
2  trend of substantial increase in Kenya's CEO
3  compensation?
4      A.  I don't know.  It's one year of data.
5  I don't know if that will continue or not.
6      In the U.S., for instance, while wage
7  inequality had increased for several decades, in
8  the last five years, income inequality has
9  decreased dramatically.
10     So making projections about what will
11 happen to income inequality in Kenya or the U.S.
12 in the next several decades is difficult.
13     Q.  We are talking about Kenya, not the
14 U.S., aren't we?
15     A.  I just said in Kenya or the U.S.
16     Q.  I heard you say that.
17     But we are not talking about or the
18 U.S.
19     We are talking about Kenya, aren't we?
20     A.  I'm just saying that income inequality
21 can go both up and down.  And what happens in
22 one year is not necessarily predictive of what's
23 going happen in the future.
24     Q.  Well, a rapidly-growing discrepancy
25 between high- and lower-wage earners means that

Page 94

1
2  Jonathan Seex as the CEO -- his wages would
3  likely grow much faster than the average worker
4  in Kenya, wouldn't it?
5      A.  I'm not sure I agree with the premise
6  of your question.
7      I don't know whether there will be
8  increased discrepancy, increased wage inequality
9  over time.
10     As I pointed out, it's reversed course
11 in the United States.  It might reverse course
12 in other countries.
13     I'm not making a projection about
14 changes in income inequality over time.
15     Q.  You have no information about any
16 reverse course or the rate of growth in Kenya
17 itself, do you?
18     You are basing it completely on the
19 U.S.?
20     A.  No, that's not true.
21     Q.  All right.
22     Well, let me ask you.
23     You've seen, Dr., Jonathan Seex' tax
24 returns from 2015 to 2019, right?
25     A.  Yes.

Page 95

1
2      Q.  His income has never gone down over
3  those last five years, has it?
4      A.  No, it increased over those five
5  years.  That's correct.
6      Q.  And he had been working in his
7  profession in the hospitality industry for about
8  21 years at the time of his death, right?
9      A.  I believe that math is correct, yes.
10     Q.  So according to your age-earnings
11 profile, what stage was his career at the time
12 of his death?
13     Early?
14     Middle?
15     Late?
16     A.  Based on his age, he was -- he was in
17 the -- entering into the middle part of his
18 career.
19     Q.  Okay.
20     According to your age-earning profile,
21 then, his earnings should have flattened, right?
22     A.  It projects that it would have
23 continued to increase, but at a lower rate into
24 the future, and then flat.
25     Q.  Well, where is your evidence that his

Page 96

1
2  earnings had flattened at this time?
3      Because he's in the middle phase of
4  your earnings age profile.
5      A.  Again, I'm -- rather than use, say,
6  the average of his earnings over the last five
7  years -- which, you know, some experts have
8  done -- I'm using the highest earnings of the
9  past five years as the starting point, which
10 tends to lead to higher damages numbers.
11     And then I have to project out into
12 the future what his earnings would have been
13 into the future.  It's future.
14     So I used standard methods based on
15 widely-accepted studies of the typical pattern
16 of earnings.
17     I base it specifically on the earnings
18 patterns of chief executives.
19     And that's the -- those are the
20 assumptions that I made.  I believe those are
21 reasonable.
22     Q.  Chief executives in the U.S., right?
23     A.  As I explained, I'm using data from
24 the United States to estimate age-earnings
25 profiles.

24 (Pages 93 to 96)

JONATHAN GURYAN, PH.D.

Page 97

1
2        But as I have also explained, based on
3  my expertise and understanding of labor economic
4  studies, those patterns tend to be similar
5  across different economies.
6       Q.   Okay.
7            Dr. Guryan, I want to get back to this
8  idea of the age-earnings profile.
9            You said that Jonathan Seex was in the
10 middle phase.
11           So where is your evidence that his
12 income had flattened from 2017, 2018, 2019?
13 That's the middle phase.  It should have
14 flattened, according to your age-earnings
15 profile.
16           Do you have any evidence that it did?
17      A.   It had not yet.
18           Sometimes when earnings go up very
19 fast, they decline afterwards.  That's called
20 mean reversion.
21           Other times when earnings are
22 increasing, they continue to increase.
23           And so rather than make an assumption
24 about whether his steep increase would have been
25 followed by a decrease, or something specific

Page 98

1
2  like that, I relied on systematic data about
3  what is typical for a chief executive.
4       Q.   Did you look at Jonathan Seex' income
5  from 2017 and compare it to 2018?
6       A.   I have looked at that, yes.
7       Q.   Do you recall it was a 96% increase
8  between those two years?
9       A.   He got a promotion.  And often,
10 promotions are associated with large increases
11 in earnings.
12           And I did see that, yes.
13      Q.   And then from 2018 to 2019 when he
14 died, when he was working as CEO, do you
15 recall -- did you take a look at those two
16 years' taxable income?
17      A.   I did.
18      Q.   And do you recall that that was
19 another 3% increase in income, correct?
20      A.   I know it was higher.
21           I don't recall the exact percentage
22 increase, but I'll take what you said at face
23 value.
24      Q.   Okay.
25           Again, where is the flattening?

Page 99

1
2       A.   As I said, his income had increased
3  with a -- five years before his death.
4           Sometimes sharp increases in earnings
5  are followed by decreases as people -- people's
6  earnings revert back to their mean.  That's a
7  standard statistical pattern that is seen
8  sometimes.
9           I didn't make that assumption.
10          I used systematic data to see what is
11 typical of chief executives in the United States
12 to make projections about what would happen to
13 his earnings over the future.
14      Q.   We're talking about Jonathan Seex, not
15 an executive in the U.S.
16          And I want to ask you:  How many CEOs
17 in Kenya do you know who have gone into middle
18 management, and then further went into even a
19 lower position?
20          Do you know any?
21          MS. JOHNSON:  Objection.
22      A.   I don't.  But I certainly am not
23 making the assumption that that would have
24 happened.
25      Q.   So -- well, that's another question I

Page 100

1
2  was going to ask you.
3           Do you have anything to base any
4  opinion that, after 2019 -- even after that --
5  Jonathan Seex' income would have flattened,
6  other than your age-earning profile that you
7  refer to?
8       A.   Sorry.  I feel like I have answered
9  this question several times --
10      Q.   And I'm trying to get an answer out of
11 you.
12          And I am doing my job.  You are doing
13 yours, so let's bear with each other.
14          Just tell me:  Where is the evidence
15 to support any finding by you that -- well,
16 strike that.
17          You have already told me that his
18 income has gone up in the last five years.
19          Now you are saying -- because I think
20 you are saying -- is that:  Yeah, but my studies
21 show that it would have flattened.
22          Where is the basis for that?
23      A.   Well, you are saying:  Flattened.
24          I understand that that is --
25      Q.   The word you used.

TC Reporting, Inc.
(516) 795-7444

JONATHAN GURYAN, PH.D.

Page 101

```
1
2          A.   -- that is a typical -- when I say
3    "flattened," I don't mean it would have stopped
4    growing.  I assume that his earnings would have
5    continued to increase.
6          It would have increased at a rate that
7    is lower than it had increased in the past five
8    years.  That's a projection that I made.
9          I'm not assuming that it would have
10   gone down, which is an assumption that one might
11   have made based on a sharp increase in
12   earnings -- that that would be temporary.
13         I'm not making that assumption.
14         I'm making what I believe is a
15   reasonable and conservative assumption that his
16   earnings would have continued to increase, but
17   would have increased at the rate that is typical
18   of other chief executives.
19         Q.   Which is what?
20         A.   I don't understand the question,
21   sorry.
22         Q.   You said, "would have continued at the
23   rate typical of other chief executives," in the
24   U.S., I guess.
25         And I'm asking:  What is that rate?
```

Page 102

```
1
2          A.   Those rates are different each year
3    based on the age-earnings profile plus 1% real
4    increase.
5          Q.   Okay.
6          Can you show me each year from 2019
7    all the way to the end of what you say is Mr.
8    Seex' work life?
9          You don't have to tell me right now.
10         But is that something that you could
11   point me to that shows me that increase every
12   year?
13         A.   It's in the backup material that I
14   provided.
15         I don't have it sitting in front of
16   me right now.
17         Q.   No, that's fine. that's
18   understandable.
19         But you can point me to that and show
20   me for 2021, it would have been about this; 2022
21   this; all the way up to another 20 years, which
22   would be 2039.
23         You could show me that?
24         A.   I could.  I can.
25         It would be in what are called "real
```

Page 103

```
1
2    dollars," so it would be the increases over and
3    above inflation.
4          So in nominal terms, that would
5    increase more than what it shows in that table.
6          But all of the calculations are done
7    in real terms.
8          Q.   Okay.
9          Now, we've talked before about -- and
10   I think you have answered me this -- but you
11   don't know about what Tamarind Management was
12   going through just before Jonathan Seex died in
13   terms of its plans for expansion, do you?
14         A.   Sorry.  Can I just -- there was a part
15   of an answer I didn't quite finish --
16         Q.   Sure, sure --
17         A.   -- about the difference between "real"
18   and "nominal."
19         Q.   Sure --
20         A.   I wanted to point out that the
21   increase in his earnings from 2015 to 2017 --
22   those are in nominal terms -- that increase
23   could be from inflation.
24         And so if you compare that increase to
25   the real increases that are in the table that is
```

Page 104

```
1
2    in the backup, just have to be careful when you
3    make the comparison that one is a nominal
4    increase and the other one is real increase.
5          Q.   What do you mean by "nominal" versus
6    "real," Dr. Guryan?
7          A.   Nominal increases are dollar amounts
8    that -- you know, so if my income goes up from
9    $50,000 in one year to 55,000 in the next year,
10   that's a $5,000 increase.  Those are the amounts
11   that I got paid.  That's 10% increase in nominal
12   terms.
13         If in that -- if over the course of
14   that year, inflation was, say, 3%, then if I
15   turned it into constant year dollars, the 10%
16   increase in nominal terms would really be a 7%
17   increase in my purchasing power -- so 7% real --
18         Q.   Okay --
19         A.   -- so all the calculations are done in
20   real terms, and then discounted with a real
21   discount rate, which is the proper way to do
22   present discounted value.
23         Q.   What in your opinion would be the
24   impact on your valuation of the loss of earnings
25   of Jonathan Seex, had he lived and had Tamarind
```

TC Reporting, Inc.
(516) 795-7444

JONATHAN GURYAN, PH.D.

Page 105

1
2    Management constructed and opened Nairobi's
3    largest convention center at The Dome on the
4    property of Carnivore Restaurant, and had opened
5    up new restaurants -- Kengele's and Roast?
6        What, if anything, would be the impact
7    on your assessment of Jonathan Seex' loss of
8    earnings?
9        MS. JOHNSON:  Objection.
10    A.   I don't know specifically.
11        I understand that that was part of a
12    plan.
13        I assumed that that was, you know,
14    part of the reason why they paid him the amount
15    that they did -- was to -- because they believed
16    that he could implement that.
17        So that's -- it's in the income amount
18    that I am basing my calculations on.
19    Q.   Do you account for an increase in
20    Jonathan Seex' earnings based upon the growth of
21    Tamarind Management?
22    A.   It is accounted for by the idea that
23    part of the reason why chief executives earnings
24    might increase faster than other workers
25    earnings has to do with growth in the businesses

Page 106

1
2    that they are -- that they are running.  And so
3    that would be in the age-earnings profile.
4    Q.   And similarly, what would be the
5    impact, if any, in your assessment of Jonathan
6    Seex' loss of earnings if he had indeed placed
7    restaurants in 500 service stations across 15
8    countries in Africa?
9        Would that have an impact on your
10    valuation of his earnings?
11        MS. JOHNSON:  Objection.
12    A.   Again, I would expect that those plans
13    are part of the reason why he was hired to be
14    the CEO, part of the reason why they offered him
15    the pay that they did, and what he earned in
16    2019.  So that would be incorporated into that.
17        Other than that, I can't make a
18    projection about what would have happened.
19    Q.   Well, we've talked about his income
20    growing from 2017 to 2018 in the approximate
21    amount of 96%; and again from 2018 to 2019 in
22    the approximate amount of 38%.
23        This was all before the expected
24    growth from these projects I've talked about
25    with The Dome, Kengele's Restaurant, Roast, and

Page 107

1
2    these service stations in 500 outlets across 15
3    countries.
4        That's all before that, right?
5    A.   Well, the increase from 2017 to 2018
6    is when he -- was when he was promoted to be the
7    CEO.  So that's when he got a large increase in
8    earnings as a result of that.
9        And I would expect that when he was
10    hired and during 2019, there was -- part of the
11    reason he was paid the amount he was was because
12    there was a belief that he had the ability to
13    help grow the business.
14        And the specific ways that he would
15    have had -- you know, that that might have been
16    part of a -- you know, a reason that he was
17    hired, I don't know.
18        But, you know -- his expected skills
19    at the time that he was hired would be included
20    into his earnings.  That's the baseline for what
21    I'm making my projection.
22    Q.   My question is a little bit different.
23        Let's assume that his goals became a
24    reality and that he did all what he planned.
25        Wouldn't that have an impact on his

Page 108

1
2    salary in the future?
3        His earnings in the future?
4    A.   It may have, it may not have.
5        You know, what people are paid in
6    labor markets are based on you know
7    competition.  And, you know, sometimes plans
8    work out, sometimes they don't.
9        I'm not making a projection about
10    whether he would have or not have been
11    successful in that endeavor.
12        I'm just basing it on what is
13    typically the path of earnings for a chief
14    executive.
15    Q.   In the U.S.?
16    A.   That's correct.
17        And we've talked about why I believe
18    that applies to other economies.
19    Q.   Okay.
20        I'm asking you, Dr. Guryan, to assume
21    with me for a moment that these plans did work
22    out -- not that they may or may not, but they
23    did work out.
24        Wouldn't that result in an increase in
25    earnings for Jonathan Seex?

27 (Pages 105 to 108)

JONATHAN GURYAN, PH.D.

Page 109

1
2          MS. JOHNSON: Objection.
3          A.   I don't know, so I can't -- I can't
4    base a projection on that.
5          It's possible, but I don't have
6    specific information to say that where a
7    particular --
8          Q.   And I think I asked you this earlier.
9          But are you aware that according to
10   the Kenyan Tourism Board, 31 new hotels were
11   opening in Kenya in 2024 alone?
12         Are you aware of that?
13         A.   I believe I have seen that quoted.
14         Q.   And are you aware that at least part
15   of that -- maybe a majority of that -- was
16   through foreign investors?
17         A.   I believe I've seen that, too.
18         Q.   Are you aware that foreign investors
19   typically pay more than their domestic
20   counterparts in Kenya?
21         MS. JOHNSON: Objection.
22         A.   Do you mean -- sorry.  More for what?
23         Q.   More for salaries for a CEO.
24         MS. JOHNSON: Again, objection.
25         A.   That -- I can't confirm that.  But

Page 110

1    that is consistent with what I -- that seems
2    possible.
3          To the extent that that's true, it
4    would be incorporated into my calculation
5    because I'm basing the level of my projection of
6    Mr. Seex earnings based on what he was actually
7    earning, and so that would be incorporated.
8          Q.   Would you agree that Jonathan Seex
9    either would have gotten more money from
10   Tamarind Management?
11         Or he could have gone to a foreign
12   competitor?
13         A.   I don't know.  I -- I don't know
14   whether that's true or not.
15         I think the reason why his earnings
16   were at the level that they were in 2019 is
17   partly because he could have worked other
18   places.  That's how labor markets work.  And so
19   the competition that you are talking about for
20   an employee -- for a CEO -- is part of the
21   reason why the level of his pay in 2019 was at
22   the level that it was.
23         (Pause)
24         Q.   Would you agree with me that the U.S.
25

Page 111

1
2    is a mature economy, while Kenya is an emerging
3    economy?
4          MS. JOHNSON: Objection.
5          A.   I've heard Kenya referred to as an
6    emerging economy.  That's seems like a
7    reasonable characterization.
8          I'm not sure I've ever heard "mature"
9    applied to an economy in that particular way,
10   but I understand what you are getting at.  I
11   wouldn't dispute it.
12         Q.   Would you agree that emerging
13   economist are characterized by rapid growth?
14         MS. JOHNSON: Objection.
15         A.   They can be characterized by rapid
16   growth.  Sometimes they reverse and have high
17   fluctuations in their growth rate that go both
18   positive and negative -- so some periods of
19   rapid growth, other periods of slowdown and
20   shrinkage, as has happened to Kenya over the
21   last several decades.
22         Q.   Well, are you aware that by 2030,
23   Kenya is projected to become a
24   newly-industrialized nation which show wage
25   growth rates much higher than in mature

Page 112

1
2    economies?
3          Are you aware of that?
4          MS. JOHNSON: Objection --
5          A.   You'd have to show me the study that
6    makes that projection.
7          Q.   Okay.
8          (Pause)
9          MR. WISNER: If you look at Dr.
10   Shenkar's response -- do you have that in front
11   of you?
12         THE WITNESS: I do have a hard copy of
13   it.
14         MR. WISNER: Okay.
15         If you look at page 5, footnote 5,
16   that's what I'm referring to.
17         And I would ask if you have seen that
18   before.
19         MS. JOHNSON: I'm sorry, which
20   footnote?
21         MR. WISNER: Five.
22         MS. JOHNSON: Okay.  That's not on
23   page 5.  It's on page --
24         MR. WISNER: Maybe I have a
25   different -- let me make sure I have this right,

28 (Pages 109 to 112)

TC Reporting, Inc.
(516) 795-7444

JONATHAN GURYAN, PH.D.

Page 113

1
2  Julia.
3        (Pause)
4        THE VIDEOGRAPHER: Counsel, I do
5  believe I have a document labeled the response.
6  I'm happy to mark it if you would like.
7        MR. WISNER: Put that up, please,
8  Chelsea.
9        THE VIDEOGRAPHER: Okay. I'll mark it
10 as Exhibit 6.
11        MR. WISNER: Yes, please.
12        THE VIDEOGRAPHER: Thank you.
13        (Exhibit 6, Multipage document
14 entitled: Response to Mr. Guryan (no Bates
15 Nos.), marked for identification)
16        MR. WISNER: I'm looking at the wrong
17 one, I think.
18        (Pause)
19        MR. WISNER: Let me -- you have this
20 front of you, Dr. Guryan?
21        THE WITNESS: I have it in front of
22 me.
23        MR. WISNER: I'm sorry. I was looking
24 at the wrong footnote. It is on page 5, but
25 it's footnote 11.

Page 114

1
2  BY MR. WISNER:
3        Q.   Have you seen that before?
4        A.   I have seen this document, and I have
5  seen footnote 11 before.
6        Q.   Do you agree or disagree with that?
7        A.   I can't --
8        MS. JOHNSON: Objection.
9  BY MR. WISNER:
10        Q.   Go ahead, sir.
11        A.   I can't confirm their
12 characterization. I understand -- I don't doubt
13 that they made this projection. I can't confirm
14 it.
15        I will also point out that in this
16 paragraph, Dr. Shenkar says, "For example,
17 it" -- referring to Kenya -- "has had success
18 reducing inequality," which is inconsistent with
19 his argument that inequality would be increased.
20        So at one point he's saying it's
21 increasing; now he's saying it's decreasing.
22        Q.   Well, let me ask you, Dr. Guryan: Do
23 you agree with the statement that reducing
24 inequality in the international economies
25 literature is correlated with structural change

Page 115

1
2  and rise in real wages?
3        Do you agree with that?
4        A.   I'm not sure that that's true.
5        Q.   Okay.
6        Do you have a basis for disputing
7  that?
8        Some other literature, perhaps?
9        Or anything?
10        A.   I don't know what is meant by
11 "structural change" in this sentence. That
12 could have many different meanings, so I can't
13 support this.
14        And I'm not sure that there is
15 correlation that is described here between
16 reducing inequality and a rise in real wages.
17        I'd have to see the data that that was
18 based on to confirm it.
19        Q.   Okay.
20        Dr. Guryan, you state in your
21 report -- I think it's at page 8 -- that you are
22 unable to find data for Kenya, so you assume
23 changes in earnings for workers would be the
24 same as the U.S.
25        Do you remember that?

Page 116

1
2        A.   That's not exactly what I said.
3        Q.   Let's see if I can find it in here.
4        At the very top, sir, it shows:
5  Unable to find detailed enough data for Kenya to
6  estimate an age-earnings profile that was
7  specific to that country.
8        Right?
9        A.   You are talking about the top of page
10 8?
11        Q.   Yes, sir.
12        A.   Yes, you read that sentence correctly.
13        Q.   And then continue on.
14        You say: "Since I'm using U.S. data
15 to estimate the changes," etc.
16        Right?
17        So you are using U.S. data because you
18 couldn't find enough detailed data for Kenya,
19 right?
20        A.   I couldn't find detailed-enough data
21 to be able to estimate an age-earnings profile.
22        To estimate an age-earnings profile,
23 you need individual-level data of different
24 workers who are different ages.
25        And I don't believe that data is

JONATHAN GURYAN, PH.D.

Page 117

1
2      available for Kenya.
3          Q.   Wouldn't a better comparison other
4      than Kenya and the U.S. be for Kenya to other
5      emerging economies, like China?
6          Or --
7          MS. JOHNSON:  Objection --
8      BY MR. WISNER:
9          Q.   -- Indonesia?
10         Or India?
11         MS. JOHNSON:  Objection.
12         A.   Well, when you refer to those
13     countries, I know how Dr. Shenkar used those
14     countries in his response document.  And there,
15     he's talking about average real -- or average
16     wage growth.
17             That's not what I'm talking about in
18     this paragraph.  So you are sort of comparing
19     apples to oranges.
20         Q.   Well, would you agree with me that the
21     average growth rate in China is 12.1%?
22         Right?
23         MS. JOHNSON:  Objection.
24         A.   I can't confirm --
25         Q.   Putting it -- okay, go ahead.  I'm

Page 118

1
2      sorry.
3          A.   I can't confirm that.  I saw that in
4      Dr. Shenkar's report.  I can't confirm that that
5      is correct.
6          Q.   Can you confirm that the average
7      growth rate for Indonesia is 6.43%?
8          MS. JOHNSON:  Objection.
9          A.   I can't confirm those calculations.  I
10     know I've seen that in the document that Dr.
11     Shenkar provided, but I can't confirm that
12     that's correct.
13         Q.   Can you confirm that the average
14     growth rate for India is 5.6%?
15         MS. JOHNSON:  Objection.
16         A.   Again, I did see that in Dr. Shenkar's
17     response document, but I couldn't confirm that
18     that's correct.
19         Q.   Have you done any calculations using
20     these countries' growth rates? -- China,
21     Indonesia, or India?
22         A.   No.
23         Q.   Let's talk about work life expectancy
24     for a second, Dr. Guryan -- more than a second.
25             You state that Jonathan Seex' work

Page 119

1
2      life expectancy is 65, right?
3          A.   Based on standard work life expectancy
4      tables that are used typically in estimating
5      damages in lost future pay, his work life
6      expectancy for him, based on his age, and his
7      working experience, and his education is about
8      19-point -- about 20 years or so, which would go
9      out to about 65, yes.
10         Q.   And that's based upon the median
11     mandatory retirement age for board members in
12     the hospitality industry in the U.S., right?
13         A.   No.
14         Q.   No?
15             It's a -- that figure of -- maybe I
16     got you wrong, Dr. Guryan.  Let me look at that.
17             (Pause)
18         MR. WISNER:  On page 5 under paragraph
19     7, Dr. Guryan.
20     BY MR. WISNER:
21         Q.   Did I read this correctly, talking
22     about the work life expectancies?
23             You say:  These assumptions are based
24     on the median mandatory retirement age of U.S.
25     board members in the hospitality sector.

Page 120

1
2             Read that correctly?
3          A.   You did.
4             But these are the assumptions that Dr.
5      Shenkar made, not the assumptions that I made.
6          Q.   Okay.
7             Well, it was your assumption of the
8      retirements age of 65.
9             What's that based on?
10         U.S.?
11         Or Kenya?
12         A.   That is based on a study by Skoog,
13     Ciecka, and Krueger, which is cited in footnote
14     10.  And it is based on U.S. data.
15         Q.   All right.
16             And is that based upon a median
17     mandatory retirement age?
18         A.   It is not.  No.
19         Q.   Okay.
20             Is it based upon a median?
21         A.   I report both the median and an
22     average.
23         Q.   Okay.
24             Do you understand that Tamarind
25     Management does not have a mandatory retirement

TC Reporting, Inc.
(516) 795-7444

JONATHAN GURYAN, PH.D.

Page 121

1
2  age?
3      A.   I'm not aware of a mandatory
4  retirement age in Tamarind Management.
5      Q.   Are you aware of a Spencer Stewart
6  report from 2023 that, among S&P 500 boards in
7  the U.S. with a mandatory retirement policy,
8  close to one-third do not have mandatory
9  retirement at all?
10     But in those that do, 97% have set
11 retirement age at 72 or higher; with 50% -- 57%
12 setting it at 75 or higher?
13     Are you aware of that?
14     A.   I have seen that.  I know you are
15 reading from one of Dr. Shenkar's documents.  I
16 have seen that quoted.
17     But I am not relying on a mandatory
18 retirement age at all.
19     Dr. Shenkar is.
20     Q.   Oh, okay.
21     Do you understand that at least
22 one-third of U.S. S&P 500 boards do not have a
23 mandatory retirement age?
24     A.   I can't confirm whether that's true or
25 not.

Page 123

1
2      Do you know who among those board
3  members at Tamarind Management or Tamarind
4  Limited, the parent company, when Jonathan Seex
5  started with the company in 2007, are still
6  working for Tamarind Management Limited or
7  Tamarind Limited?
8      MS. JOHNSON:  Objection.
9      A.   Talking about board members?
10     Q.   Yeah.
11     A.   I do not.  I'm not aware of that.
12     Q.   Okay.
13     Let's broaden that question to
14 executives.
15     Are you aware of any of them who are
16 still working now and they were working in 2007
17 when Jonathan started there?
18     MS. JOHNSON:  Objection.
19     A.   No, I'm not.
20     Q.   Are you aware of any retirements of
21 any of those executives or board members?
22     MS. JOHNSON:  Objection.
23     A.   I don't know one way or the other.
24     Q.   Do you know that the chairman of the
25 board of Tamarind Limited is almost 80?

Page 122

1
2      Q.   Is your work life expectancy of --
3  well, strike that.
4      Are you aware that Tamarind Management
5  is a business co-founded by Jonathan Seex'
6  father?
7      A.   I am aware of that.
8      Q.   Do you believe that Tamarind
9  Management was ever going to force Jonathan Seex
10 to retire at a set age?
11     MS. JOHNSON:  Objection.
12     A.   Certainly not making that assumption
13 in my calculation, no.
14     Q.   Are you aware of the ages of the
15 current members of the Tamarind Management or
16 Tamarind Limited board members?
17     MS. JOHNSON:  Objection.
18     A.   I'm not.
19     Q.   Are you aware of those who, when
20 Jonathan Seex started with the company in 2007,
21 are still serving?
22     MS. JOHNSON:  Objection.
23     A.   Sorry.  I didn't understand that
24 question.
25     Q.   Yeah.

Page 124

1
2      MS. JOHNSON:  Objection.
3  BY MR. WISNER:
4      Q.   Do you know that?
5      A.   I don't know.
6      Q.   Do you know that other executives
7  currently serving and still serving at Tamarind
8  Management or Tamarind Limited are in their
9  upper 70s?
10     MS. JOHNSON:  Objection.
11     A.   I don't.
12     Q.   Do you know how long Jonathan Seex
13 planned to work?
14     MS. JOHNSON:  Objection.
15     A.   I don't.
16     Q.   Are you aware of a Harvard Medical
17 School report on life expectancy where it says
18 live expectancy is increasing?
19     Specifically -- quote -- "For well
20 over a hundred years, men had been retiring at
21 earlier and earlier ages.  Something shifted in
22 the 1990s and they began working longer.  Life
23 expectancy has improved.  In the 1970s, life
24 expectancy for people who reach age 65 was 78
25 for men and 82 for women.  Today, men and women

31 (Pages 121 to 124)

JONATHAN GURYAN, PH.D.

Page 125

1
2 who have reached 65 will on average live to ages
3 84 and 86 respectively. If you expect to live
4 into your 80s or beyond, it's natural you might
5 still be working in your 60s and 70s."
6          And that's pursuant -- that's in a --
7 a quote from an article, "Working Later in Life
8 Can Pay Off in More Than Just Income" from the
9 Harvard Health Publishing, Harvard Medical
10 School, June 1st, 2018.
11          Are you aware of that study?
12          MS. JOHNSON: Objection.
13     A.   I have seen it because it was in one
14 of the reports that Dr. Shenkar included.
15          But the trends that are referred to in
16 that report -- which I'm not sure they are all
17 cited correctly or explained correctly in that
18 one quote -- but they would all be accounted for
19 in the Skoog, Ciecka, and Krueger study because
20 it uses data that's more recent than that.
21     Q.   Would you agree that employment,
22 not -- strike that.
23          Not just that life expectancy is
24 increasing, but more older people are working
25 now than earlier?

Page 126

1
2          MS. JOHNSON: Objection.
3     A.   Depends on what period you are
4 comparing. There are fluctuations over time in
5 share of older workers in the economy. There is
6 also a lot of retirements happening right now.
7          So this is -- I'm relying on the
8 Skoog, Ciecka, and Krueger study, which is very
9 standard and used by experts doing similar work
10 all the time. They are relying on data
11 that's -- you know, that study is from 2019, so
12 it's using recent -- more-recent data than what
13 you are referring to, so those changes in
14 patterns would be incorporated in.
15     Q.   The Skoog, Ciecka, and Krueger study
16 does not concern CEOs of family companies, does
17 it?
18     A.   They would be included in the data.
19 That would be part of the data that they would
20 be relying.
21          MS. JOHNSON: We have been going about
22 another hour. Do you want to go off the record
23 and we can talk about schedule?
24          MR. WISNER: Sure.
25          THE VIDEOGRAPHER: I'll take us off.

Page 127

1
2          We are going off the record. The time is 11:33
3 a.m.
4          (Recess from 12:33 p.m. to 12:41 p.m.
5 Eastern Standard Time)
6          THE VIDEOGRAPHER: We are going back
7 on the record. The time is 11:41 a.m.
8 BY MR. WISNER:
9     Q.   Are you ready, Dr. Guryan?
10    A.   Yes.
11    Q.   Are you aware that Jonathan Seex was
12 the largest single shareholder in Tamarind
13 Management?
14    A.   I've seen information about his
15 percentage ownership. I'm not sure whether I
16 know if he was the largest single shareholder.
17 That might have been in the documents I
18 reviewed. I'm not sure.
19    Q.   Okay.
20         Are you aware that, according to the
21 Social Security administration, about 14% of
22 self-employed people in the U.S. have reached
23 the age of 67, up from 9% ten years ago?
24         Are you aware of that?
25         MS. JOHNSON: Objection.

Page 128

1
2    A.   I believe I've seen that quoted in Dr.
3 Shenkar's document.
4    Q.   Assuming that trend continues, and
5 extrapolating that into the future by three
6 decades, wouldn't that yield a significantly
7 higher percentage?
8         MS. JOHNSON: Objection.
9    A.   Sorry. I have to look at the -- can
10 you tell me where you are reading from?
11    Q.   Yeah.
12         What makes you think I don't have this
13 memorized?
14         What makes you think I'm reading from
15 something?
16    A.   Because it sounds familiar, and I
17 think I have read it before myself.
18    Q.   Okay.
19         I'm looking at Dr. Guryan's response
20 on page 3.
21         I think it's page 3, I hope I don't
22 have the wrong page again.
23         Look under: Employment Status
24 Matters.
25         Do you see that, sir?

32 (Pages 125 to 128)

JONATHAN GURYAN, PH.D.

Page 129

1
2      A.  I do.
3      Q.  And I'm asking you first the
4  question -- where it says:  According to the
5  Social Security administration, about 14% of the
6  self-employed people in the U.S. have reach the
7  age of 67, up from 9% ten years ago.
8      First of all, are you aware of that?
9      A.  I'm not aware of that.  I haven't seen
10  that statistic, so I can't vouch for it.
11     Q.  And then further, it says:  Assuming
12  the trend continues, as it is forecasted to do,
13  extrapolating that into the future (close to
14  three decades) would yield a significantly
15  higher percentage.
16     Do you agree with that, assuming that
17  that first statement is true?
18     A.  I mean, that sentence is a tautology.
19  It assumes it's conclusion.
20     I don't know if it's really the case
21  that the statistic is forecasted to increase.
22  Mr. -- or Dr. Shenkar doesn't provide a citation
23  for where that -- where he is getting that
24  forecast, so I can't vouch for it.
25     Q.  Well, in this response of Dr. Shenkar,

Page 130

1
2  you'll notice that in footnotes 3 and 4, he
3  refers to certain articles.
4      Have you seen those articles before?
5      A.  I've seen -- I'm not sure if I've
6  looked at these articles or not.
7      Q.  Okay.
8      Continuing on in that response, Dr.
9  Guryan, Dr. Shenkar says:  Back in May of 2017,
10  the Bureau of Labor Statistics reported that --
11  quote -- "labor participation rate is expected
12  to increase fastest for the oldest segments of
13  the population - most notably, people ages 65 to
14  74 and older - through 2024" -- end quote.
15     Are you familiar with that Bureau of
16  Labor Statistics report?
17     MS. JOHNSON:  I'm just going to
18  interpose a standing objection.
19     As you know, we object to this
20  response report.  So rather than objecting every
21  time you are questioning him about it, can I
22  just have a standing objection on that?
23     MR. WISNER:  Sure.
24  BY MR. WISNER:
25     Q.  Can you answer that for me, Dr.

Page 131

1
2  Guryan?
3      Are you aware of that?
4      A.  I can't remember if I went and looked
5  at this particular document.  I looked at some
6  of the things that Dr. Shenkar cited, so I can't
7  vouch for this static.
8      Q.  Okay.
9      Continuing on, Dr. Shenkar says:  The
10  projected growth 2014 to 2024 was 55% for the 65
11  to 75 age group and 86% from the 75+ group,
12  versus 5% from the labor force as a whole.
13     Are you familiar with that footnote
14  number 3 as his support for that?
15     Are you familiar with that?
16     MS. JOHNSON:  Objection.
17     A.  Again, I can't vouch for that
18  particular statistic, so I can't -- I just can't
19  support it or not.
20     It's -- you know, again, some of that
21  time period would be already accounted for in
22  the Skoog, Ciecka study because it's using data
23  that is in the middle of that time period.
24     So it's -- some of this would have
25  been accounted for by that.

Page 132

1
2      I'm not sure whether this particular
3  statistic is -- what the context is, what it was
4  calculated based on, and whether something
5  that's projected to go on into the future or
6  reverse course.  It depends on whether the
7  causes were temporary or permanent.
8      I just don't know how to --
9      Q.  Okay.
10     How about Dr. Shenkar's next
11  statement?
12     In other words, employment for 75+ was
13  rising almost 20 times faster than that of the
14  labor force as a whole.
15     Do you agree with that?
16     MS. JOHNSON:  Objection.
17     A.  I can't vouch for that statistic.
18     Q.  Then the next sentence:  All
19  indications are that this trend will continue.
20  Therefore, presenting data averaging across the
21  entire population at present is nothing short of
22  misleading.
23     I assume you disagree with that?
24     MS. JOHNSON:  Objection.
25     A.  I disagree with that very strongly.

33 (Pages 129 to 132)

JONATHAN GURYAN, PH.D.

Page 133

1
2        I don't appreciate the suggestion that
3   I'm trying to mislead because I'm very much not
4   trying to do that.
5        I didn't appreciate the tone of Dr.
6   Shenkar's response.
7        He says many things in here that he
8   doesn't support or back up.
9        And the innuendos are, I think,
10  inappropriate.
11      Q.   Okay.
12      I think in all fairness, he felt the
13  same about your report.  So we'll leave it at
14  that.
15      I mean, he was not happy about many of
16  the things you said about him in his report.
17      So I -- we'll leave it at that.  I
18  understand what you are saying.
19      Looking -- continuing on in this
20  document, Dr. Guryan, under:  Employment Status
21  Matters.
22      Do you see that, sir?
23      A.   I do.
24      Q.   And it says:  The Bureau of Labor
25  Statistics (2017) report notes that -- quote --

Page 134

1
2   "workers in older age groups have higher rates
3   of self-employment than do workers in younger
4   groups" (the rate is almost double), adding
5   that -- quote -- "knowledge and resources gained
6   through years of experience may put older
7   workers in good position to work for
8   themselves."  The anticipated retirement age of
9   small business owners was 72.6, compared to 68.4
10  amongst self-employed; furthermore, "the age at
11  which small business owners are retiring is
12  rising, not dropping."
13      And then it quotes, in footnote 4, the
14  source for that.
15      Do you have -- are you aware of this
16  article in support of those statements?
17      MS. JOHNSON:  Objection.
18      A.   I can't support this statistic the way
19  you -- you know, the details of how it's
20  calculated would matter.  I -- you know, the
21  fact that -- I mean, the fact that workers in
22  older age groups have higher rates of
23  self-employment -- if that's true, that could
24  indicate that people switch from -- to
25  self-employment as they get older, not something

Page 135

1
2   about retiring at different ages.  I don't --
3   I'm not sure you can draw the conclusions that
4   he -- that Dr. Shenkar is from this --
5      Q.   Okay.
6      A.   -- that's even if it were true, and I
7   can't confirm independently that it is.
8      Q.   The next paragraph, Dr. Shenkar states
9   that -- about the retirement of entrepreneurs --
10  quote -- "retirement of entrepreneurs has a
11  number of unique characteristics, most often as
12  something that they often resist or avoid.
13  Negative beliefs about retirement are fostered
14  by a strong entrepreneurial identity.  The
15  venture's experience and the associated
16  entrepreneurial career are fostered by a strong
17  entrepreneurial identity, serving as an object
18  of the entrepreneur's purpose and self-meaning.
19  A type of dependency exists, making it difficult
20  to imagine life without the venture, even if
21  this means never retiring, or some sort of
22  partial retirement where the individual always
23  contains a level of involvement in the
24  business."
25      And then he -- Dr. Shenkar -- has a

Page 136

1
2   source for that at footnote 5.
3      Have you reviewed that footnote 5?
4      Or the source there?
5      MS. JOHNSON:  Objection.
6      A.   I may have taken a quick look at it,
7   but I can't vouch for the -- for that.
8      I mean, the -- you know, there is --
9   this is something that the labor economists
10  study and have studied for the a long time.
11  Labor supply is a standard topic in labor
12  economics.  It would be taught in any labor
13  economics course.
14      One of the key insights from the study
15  of labor supply is that as income and pay or
16  wages goes up, there are opposing forces.
17      Some of them are pushing people to
18  work more, you get paid more.  That's called a
19  substitution effect.
20      It's also the case that when people
21  earn more -- get paid more -- there is something
22  called an income effect, which would push them
23  to stop working because they have -- they have
24  earned money foster.
25      So just as there are very successful

34 (Pages 133 to 136)

JONATHAN GURYAN, PH.D.

Page 137

1
2    entrepreneurs who work a long amount, there is
3    also lots of successful entrepreneurs who
4    retired very early because they earned a lot of
5    money.
6          So it's not clear that it goes in this
7    direction on average.
8          And so I think this is, like, part of
9    the story, but not the whole story.
10         Q.   You know what I'm concerned about, Dr.
11   Guryan, is you keep talking about averages.
12         I wants to talk about Jonathan Seex.
13         I mean, do you know which of those two
14   scenarios you just described applies to him? --
15   whether he'd want to take his money, retire
16   early, or whether he would want to keep working?
17         Do you know?
18         A.   I don't.
19         But I have to make a projection of the
20   future based on information that's available.
21         Some of it is -- I relied on
22   information that is very specific to Mr. Seex.
23   And some of the information I have to rely on is
24   about typical patterns in the labor market.
25         And I've explained the sources and the

Page 138

1
2    bases for those assumptions that I have made.
3          If Dr. Shenkar disagrees with those
4    assumptions and wants to support other
5    assumptions and make a different calculation, he
6    was -- was able to do that.
7          If he disagrees with my assumptions, I
8    am happy to, you know, support mine and consider
9    alternatives.
10         But I've explained the basis for the
11   assumptions that I have made.
12         Q.   Okay.
13         But wouldn't it be better to talk to
14   his widow, Nadege Seex?
15         Or to talk to his colleagues at
16   Tamarind Management and find out what were his
17   plans?
18         How long did he expect to live?
19         Wouldn't it -- wouldn't that be better
20   for your analysis than looking at general
21   studies?
22         MS. JOHNSON:  Objection.
23   BY MR. WISNER:
24         Q.   You can answer.
25         A.   I don't know that that would have been

Page 139

1
2    better for what I was asked to do.
3          I base my opinion on the information
4    that I was provided, that was in the record.
5    And I based it on specific things about Mr. Seex
6    to the extent that that information was
7    available; and then used other information to
8    make projections into the future.
9          Q.   Do you now know, since your report,
10   that his widow, Nadege Seex, said he would have
11   worked to at least 75?
12         Do you now know that?
13         MS. JOHNSON:  Objection.
14         A.   I have read her deposition transcript.
15   If you show me the deposition transcript, I
16   could confirm that specific answer, but that
17   sounds -- something like that sounds familiar.
18         Q.   Do you have any reason to doubt her?
19         MS. JOHNSON:  Objection.
20         A.   No.
21         Q.   Do you have any reason to doubt the
22   ages right now of the current executives at
23   Tamarind Management?
24         MS. JOHNSON:  Objection.
25         A.   No.

Page 140

1
2          Q.   Wouldn't that type of information be
3    more relevant to your determination of work life
4    expectancy than this -- these general studies
5    you rely upon?
6          MS. JOHNSON:  Objection.
7          A.   I don't know that it would be more
8    relevant.
9          But I was not aware of, you know, Ms.
10   Seex' deposition at the time I wrote my report
11   because it had not happened yet.  And so it
12   wasn't something I could incorporate into my
13   calculation.
14         Q.   But you are a professional and you
15   want to do a good job, I assume.
16         And giving an honest opinion as to the
17   loss of earnings of Jonathan Seex, wouldn't you
18   want to have all the information, particularly
19   about his ownership interest in the company and
20   about how long he intended to work?
21         Those are important factors, aren't
22   they for him?
23         We are talking about him, not the
24   average CEO in the U.S.
25         Wouldn't you want that information?

TC Reporting, Inc.
(516) 795-7444

JONATHAN GURYAN, PH.D.

Page 141

1
2          MS. JOHNSON:  Objection.
3          And I'm going to note for the record
4    we made many, many requests of plaintiffs'
5    counsel for documents in discovery and for
6    depositions, which were not responded to, and
7    information that was not provided until after
8    Dr. Guryan's report was due.
9          MR. WISNER:  Okay.  We can argue about
10   that, and I guess we will.
11         MS. JOHNSON:  Well, that's just a
12   fact.  There is nothing to argue about there.
13         MR. WISNER:  Well, sure, there is.
14   You could have taken her deposition any time.
15   You could have presented Dr. Guryan's report
16   after that.  I mean, we could have taken
17   Nadege's deposition earlier --
18         MS. JOHNSON:  We sent --
19         MR. WISNER:  -- that's up to you.
20         MS. JOHNSON:  -- many, many emails to
21   you requesting her deposition.  The record is
22   extremely clear on that.
23         MR. WISNER:  Emails, Julia, in all
24   honesty that went to the wrong address, right?
25   I never saw them.

Page 142

1
2          MS. JOHNSON:  You haven't responded to
3    the court reporter.  You haven't responded to
4    me.  You are producing documents late.
5          MR. WISNER:  You know, we are wasting
6    time.  I must be touching a nerve here.
7          Let's just get on with this
8    deposition.  You and I can argue later.
9          MS. JOHNSON:  I'm happy to argue with
10   you about this later.
11         But you are misrepresenting what has
12   happened.  And you are suggesting that Dr.
13   Guryan did not -- did something improper by not
14   reviewing --
15         MR. WISNER:  No, no, no --
16         MS. JOHNSON:  -- information that you
17   had not provided to us.
18         MR. WISNER:  -- no, no, no.  I'm not
19   accusing Dr. Guryan of anything.
20         I'm just saying my position about what
21   he did or did not consider, that's all.
22   BY MR. WISNER:
23    Q.  Dr. Guryan, would you agree that
24   people with higher education like Jonathan Seex
25   are more likely to work at any age according to

Page 143

1
2    this Harvard report that we discussed?
3          MS. JOHNSON:  Objection.
4     A.  That -- I don't dispute that that's
5    true, but that is accounted for in the age
6    earnings -- the work life expectancy tables that
7    I relied on.  It's based on his education.
8     Q.  Okay.
9          Are you aware that -- well, look
10   again.  I won't -- let's just do it this way.
11         MR. WISNER:  Look, please, at Dr.
12   Shenkar's response that we have marked as an
13   exhibit under E: Position and Sector Matter.
14         Do you see that, Dr. Guryan?
15         THE WITNESS:  Yes.
16   BY MR. WISNER:
17    Q.  It says:  The Bureau of Labor
18   Statistics show that the older workers presence
19   in management and professional opinions is by
20   far the highest, for instance, is three-fold
21   larger than in production and transportation.
22         Are you aware of this? -- that Bureau
23   of Labor Statistics?
24         MS. JOHNSON:  Objection.
25    A.  I know what the Bureau of Labor

Page 144

1
2    Statistics is.
3          I don't know what statistic Dr.
4    Shenkar is referring to.
5          That is not a particular analysis,
6    he's just saying that this is -- that this is
7    true.
8          If it is true -- which I'm not
9    disputing that it is true -- but if it is true,
10   that doesn't mean that people in management and
11   professional necessarily retire later.
12         It could be that it takes experience
13   to be promoted into those jobs.  So then you
14   would see older workers more likely to be in
15   those jobs, even if everyone retired at the same
16   time.
17    Q.  You do see that in footnote 6 here on
18   this page of his response he does cite to the
19   Spencer Stewart Board Index, right?
20    A.  I do see that.
21         But that's not a cite for the
22   statement about the Bureau of Labor Statistics.
23    Q.  Understood.
24         Have you read this Spencer Stewart
25   Board Index?

36 (Pages 141 to 144)

JONATHAN GURYAN, PH.D.

Page 145

1
2       A.   I have not.
3       Q.   Are you aware that Jonathan Seex was
4   in good health at the time of his death?
5       A.   That's my understanding.
6       Q.   Do you see under paragraph F of Dr.
7   Shenkar's response, he states:  The scholarly
8   literature shows that people with good health
9   and psychological commitment to work, as well as
10  those who were self-employed, were likely to
11  shun retirement.  Kenya was no exception.
12       And he cites in footnote 7 his support
13  for those statements.
14       Have you read those citation -- have
15  you read those sources in footnotes 7 and 8
16  there?
17       MS. JOHNSON:  Objection.
18       A.   I have.  The study in footnote 8
19  doesn't actually support what Dr. Shenkar says
20  in that sentence.  In fact, it -- the study in
21  footnote 8 actually makes the point that I was
22  talking about earlier about income effects, and
23  when people have higher earnings, they tend
24  to -- that that tends to push them to retire
25  early -- that that's a force.

Page 146

1
2       (Pause)
3       MR. WISNER:  Would you go on Dr.
4   Shenkar's response, Dr. Guryan, that next page,
5   page 5, where it says:  At the firm level?
6       Do you see that, sir?
7       THE WITNESS:  I do.
8   BY MR. WISNER:
9       Q.   It says about midway down:  Now the
10  correlation between company size and
11  compensation is one of the most established in
12  the scholarly and practitioner literature, so
13  growth would have meant significantly higher
14  pay.
15       Do you agree with that statement?
16       MS. JOHNSON:  Objection.
17       A.   I don't -- I don't agree with it
18  completely.
19       There is a literature about firm size
20  effects and wages that, on average, workers work
21  at larger firms earn more.
22       I don't think the rest of the extent
23  necessarily follows.
24       Q.   Did you take that into
25  consideration -- and by that I mean the growth

Page 147

1
2   or potential growth in TML -- did you take that
3   into consideration in your analysis?
4       MS. JOHNSON:  Objection.
5       A.   Yes, I'm basing my calculation based
6   on Mr. Seex' specific earnings at the time of
7   his death.  Some of that was based on
8   projections of growth.
9       Q.   Of TML?
10      A.   Yes.
11      Q.   And by that, did you take into
12  consideration -- I'm sorry if I'm asking you
13  this again -- did you take into consideration in
14  your analysis the growth in TML from these
15  different projects that we've talked about that
16  Jonathan Seex had planned?
17      MS. JOHNSON:  Objection.
18      A.   That's information that I considered.
19  My calculation takes that into consideration to
20  the extent that his pay in 2019 was, in part,
21  based on expectations of what he would be able
22  to accomplish.
23      MR. WISNER:  Going on, Dr. Guryan, to
24  page 6 of Dr. Shenkar's response.
25      First paragraph there, sir?

Page 148

1
2       THE WITNESS:  Yes.
3   BY MR. WISNER:
4       Q.   Do you agree that China is Kenya's
5   largest trade partner, first of all?
6       MS. JOHNSON:  Objection.
7   BY MR. WISNER:
8       Q.   Do you know that?
9       MS. JOHNSON:  Objection, beyond the
10  scope.
11      A.   I don't doubt that that's true.
12      Q.   Do you agree that China is the largest
13  emerging market economy?
14      MS. JOHNSON:  Objection.
15      A.   That seemed a fair characterization.
16      Q.   Do you agree that Kenya is a key link
17  in China's Belt and Road Initiative?
18      MS. JOHNSON:  Objection.
19      A.   I don't know whether that's true or
20  not.
21      Q.   Have you done any of the calculations
22  that Dr. Shenkar does here about China and other
23  emerging -- Indonesia and India?
24      MS. JOHNSON:  Objection.
25      A.   I have not done the calculations that

37 (Pages 145 to 148)

JONATHAN GURYAN, PH.D.

Page 149

1
2    Dr. Shenkar did described in this paragraph.
3        Q.  Do you disagree with his calculations?
4        MS. JOHNSON:  Objection.
5    BY MR. WISNER:
6        Q.  And I'm not asking you -- you may
7    disagree with doing them, or the reason for
8    doing them.
9        But do you disagree with the
10   calculations themselves?
11       A.  I don't know whether they are correct
12   or not.
13       Q.  Do you see anything that jumps out at
14   you that says they are not?
15       MS. JOHNSON:  Objection.
16       A.  I don't know whether they are correct
17   or not.  I just don't know.
18       Q.  All right.
19       (Pause)
20       Q.  Dr. Guryan, what's your opinion as to
21   Jonathan Seex' life expectancy?
22       A.  It's in the report.  I believe his
23   life expectancy in my calculations is 82, but I
24   would have to look at the report to be -- to
25   confirm that.

Page 150

1
2        Q.  Okay.
3        A.  Yeah, on page -- the top of page 9, I
4    think, it says:  Personal consumption is
5    calculated to the end of Mr. Seex' life
6    expectancy, and in parentheses it says 82, and
7    there is a footnote.
8        Q.  And that life expectancy is based upon
9    data from Sweden, right?
10       A.  It is.
11       Q.  But your calculation of his work life
12   expectancy is based upon U.S. data, right?
13       A.  That's correct.  I believe his life
14   expectancy based on U.S. data would be very
15   similar.
16       Q.  What discount to present value do you
17   believe is correct?
18       A.  I discount based on the Treasury --
19   U.S. Treasury TIPS securities, which are
20   inflation-protected securities that account for
21   inflation risk, which at the time of the report
22   was 2.61%.
23       So it's a real discount rate that
24   accounts for inflation to match the growth rates
25   that I use in the report that are also real.

Page 151

1
2        Q.  Okay.
3        Let me ask you about personal
4    consumption a minute, Dr. Guryan.
5        Do you have any knowledge of the
6    actual personal expenditures of Jonathan Seex?
7        A.  I don't have specific data on Mr.
8    Seex' personal consumption.
9        Q.  What is your estimate of the
10   percentage of -- for personal consumption by
11   which Jonathan Seex' earnings should be reduced?
12       A.  So in order to do that, I relied on
13   what are called the Patton-Nelson tables, which
14   is also a standard thing that's done by experts
15   who are calculating lost earnings from -- as a
16   result of death.
17       Those tables are based on estimates of
18   personal consumption and how it varies depending
19   on family size, number of children in the
20   family.
21       So the answer to your question is that
22   it depends on -- at different times -- on
23   what -- how many of the children would have been
24   in the house, how old they were when they left.
25       So it's different percentages.

Page 152

1
2        Q.  Okay.
3        And does your report -- perhaps your
4    backup data -- set that out per year?
5        A.  It does, yes.
6        Q.  What does it range from, Dr.
7    Guryan? -- from and to?
8        A.  I believe it ranges from about 7% to
9    about 13%, but I'd have to look at the backup
10   data to be sure of those numbers.
11       Q.  And do you have any personal
12   knowledge -- or knowledge from any source -- as
13   to how long his three children intended to live
14   in the family home?
15       A.  No.  I make the assumption that they
16   would have lived in the home until age 22, and
17   then would have left.
18       Q.  And the study you mention -- that's
19   based upon U.S. data, right?
20       A.  It is.  It's based on the Consumer
21   Expenditure survey, which is a U.S. -- national
22   representative U.S. data source.
23       Q.  You didn't have any data from Kenya
24   about personal consumption, do you?
25       A.  I didn't.

TC Reporting, Inc.
(516) 795-7444

JONATHAN GURYAN, PH.D.

Page 153

1
2      But I made what's called a purchasing
3  power parity adjustment to adjust his income to
4  the Kenyan setting to get -- to apply it to the
5  Patton-Nelson tables.
6      Q.   How did you make that adjustment if
7  you didn't have Kenyan data?
8      A.   There are standard purchasing power
9  parity conversions that have been done by
10  experts who study differences in prices, in
11  purchasing power, across countries, and I used
12  those standard amounts.
13      Q.   But those did not include the country
14  of Kenya, did they?
15      A.   They do.
16      Q.   Okay.
17          Did you include that in your report?
18          Do we have that in your backup data?
19          Shows Kenya this, this, and this for
20  different years?
21      A.   Yes.  It's described in footnote 18
22  talking about the purchasing power differences
23  between the U.S. and Kenya.  And that data comes
24  from the International Monetary Fund.
25          (Pause)

Page 154

1
2      Q.   Thank you.
3          Now, are you aware that many of
4  Jonathan Seex' personal expenses were paid for
5  under his contract with Tamarind Management,
6  right?
7      A.   There are some.  Those would not be
8  included.
9      Q.   But I'm talking about personal
10  consumption.
11          He didn't have to spend money on some
12  things because some things were paid for by his
13  employer, correct?
14      A.   I believe that that's true.
15          Some of those would have been
16  accounted for as lost benefits.  That's part of
17  the 40% I talked about earlier because they
18  would have been taxable.
19      Q.   But what I'm getting at is personal
20  consumption.
21          If you are going to reduce by personal
22  consumption, he's already getting his automobile
23  paid for, right?
24      A.   That's correct.  And that is part of
25  the loss and --

Page 155

1
2      Q.   And he's already getting -- I'm sorry.
3  Go ahead, sir.
4      A.   -- included in his taxable income.
5      Q.   Yeah, but I'm not talking about
6  taxable income.  Maybe we're talking about two
7  different things.
8          I'm talking about reducing your
9  estimate of his lost earnings by personal
10  consumption, when he's not intending this amount
11  for personal consumption.  He's getting it paid.
12          Food is another one, right?
13          MS. JOHNSON:  Objection.
14      A.   There is some food, although I think
15  it's overstated by the thing you showed me in
16  the document before.
17          But, again, this is -- this is
18  accounting for expenditures on personal things
19  that would not be left over for his -- rest of
20  his family.
21          And it's based on studies of
22  consumption patterns and how that varies with
23  family size and -- and -- as described in my
24  report.
25      Q.   Well, but in calculating personal

Page 156

1
2  consumption, you are looking at general figures
3  from the U.S.
4          And you are not looking at Jonathan
5  Seex and his personal consumption based upon
6  items that are paid for him by his employer,
7  correct?
8          MS. JOHNSON:  Objection.
9      A.   I took that into account.  And that --
10  where that gets accounted for is in the lost
11  earnings part of the calculation.
12          And we didn't have full information of
13  Mr. Seex' expenditures over many years to be
14  able to do it only based on specific information
15  about him.
16          So it's necessary to look at data like
17  the data from the Patton-Nelson tables to make
18  an assumption to do the calculation because
19  there isn't -- we don't have information on all
20  of his expenditures from over many years.
21      Q.   You have his contract with Tamarind
22  Management, which says what he gets as benefit,
23  right?
24      A.   I did.
25          And that would -- you know, you are

TC Reporting, Inc.
(516) 795-7444

JONATHAN GURYAN, PH.D.

Page 157

1
2 pointing out a couple of types of expenditures
3 that might have been compensated -- he might
4 have been compensated for.
5        Again, those are counted as losses to
6 the extent they are taxable, so I'm not ignoring
7 that. I am incorporating that into the damage
8 calculation.
9        But the contract does not describe all
10 of his expenditures on everything that would
11 have been spent on for him.
12    Q.   But, sir, does your analysis account
13 for the fact that many of his personal
14 expenses -- the ones we do know about -- were
15 paid for by his employer?
16        MS. JOHNSON:  Objection.
17    A.   I think I've answered that a couple of
18 times.
19        Yes.  To the extent those are taxable,
20 yes, it is accounted for.
21    Q.   Are you aware of any of Jonathan Seex'
22 personal expenditures?
23        MS. JOHNSON:  Objection.
24 BY MR. WISNER:
25    Q.   You can answer, sir.

Page 158

1
2    A.   Like I said, I don't have full
3 information on all of his personal
4 expenditures --
5    Q.   Well, are you -- I'm sorry.
6        Are you aware that he did not have any
7 expensive hobbies?
8        MS. JOHNSON:  Objection.
9    A.   I don't know if that's true or not.
10    Q.   You are not aware of him collecting
11 Ferraris or anything, right?
12        MS. JOHNSON:  Objection.
13    A.   I have not seen that in any of the
14 documents that I have reviewed.
15    Q.   Are you aware that he spent almost all
16 of his income on the support of his family?
17        MS. JOHNSON:  Objection.
18    A.   I'm not aware of that one way or the
19 other. I don't know.
20    Q.   Are you aware that the cost of living
21 is almost 60% lower in Kenya than in the U.S.?
22        And more than 50% lower than in France
23 where his family now lives?
24    A.   I can't confirm those exact numbers,
25 but I'm aware of the difference that there

Page 159

1
2 are -- differences in cost of living, yes.
3    Q.   And you didn't calculate in your
4 assessment the value of Jonathan Seex' household
5 services, did you?
6    A.   I did not.  That would not be included
7 in the damage calculation because, again, I was
8 responding to Dr. Shenkar's calculation of
9 lifetime earnings.  And he didn't include that
10 in his calculation, and so that's not part of
11 the damages that I'm calculating.
12        If one were to include that, it would
13 be separate.
14    Q.   Okay.
15        Am I correct, Dr. Guryan, that
16 oftentimes the amount of household services
17 offsets any amount for personal consumption,
18 correct?
19        MS. JOHNSON:  Objection.
20    A.   Those are two separate things.
21 Whether they happen to be equal to each other
22 would be by accident.  They are not -- they are
23 not logically connected to each other.
24    Q.   I agree with you on that.
25        I'm just saying:  As far as amounts

Page 160

1
2 go, if we were to calculate the services that
3 Jonathan Seex provided to his household and his
4 children, do you believe that would offset the
5 amount that you are talking about for personal
6 consumption?
7        MS. JOHNSON:  Objection.
8    A.   I haven't done that calculation, so I
9 can't tell you how much it is.
10        But if -- someone could do that
11 calculation.
12        I haven't seen anyone do that
13 calculation, so I can't tell you the amount.
14    Q.   Dr. Guryan, in your report -- one part
15 of your report -- you criticize, or you try to
16 rebut, Dr. Shenkar, correct?
17    A.   I was asked to provide any opinion
18 about the methods that he used.  And I provided
19 criticisms of the methods that I saw in his
20 original report -- the lifetime report.
21    Q.   Okay.
22        And then -- but another part of your
23 report, you actually calculated Jonathan Seex'
24 lost earnings yourself, correct?
25    A.   I provided a calculation, yes, of lost

TC Reporting, Inc.
(516) 795-7444

JONATHAN GURYAN, PH.D.

Page 161

1
2    earnings that were suffered by Jonathan Seex --
3        Q.   Okay.
4            And you started with his income for
5    2019, right, sir?
6        A.   That's correct.
7            MR. WISNER:  Let's see where that's
8    at.
9            I think that's on page 7 of your
10   report, Dr. Guryan?
11           THE WITNESS:  Okay.
12   BY MR. WISNER:
13       Q.   Do you see where it says in the third
14   paragraph:  According to the tax documents from
15   2019, Mr. Seex had earned 4,566,879.89 Kenyan
16   shillings ($35,164 in 2019 dollars) in 2019
17   prior to his death on March 10, 2019.
18           Right?
19       A.   I see where you are reading, yes.
20       Q.   What conversion rate did you use in
21   coming up with that number?
22       A.   I believe it's, like, 0.0077.  It was
23   whatever the currency exchange rate was on the
24   day of the report.
25       Q.   Yeah.

Page 162

1
2            Are you aware that on the date of
3    March 10, 2019, the currency rate was
4    actually -- the conversion rate was actually
5    0.010, not 0.007?
6            MS. JOHNSON:  Objection.
7        A.   I'm not aware of that.
8        Q.   Are you aware of the difference that
9    makes?
10       A.   I'm aware of the difference it would
11   make in doing an exchange rate --
12       Q.   Yeah.
13           Wouldn't that --
14       A.   -- sorry.  Can I just answer? --
15       Q.   Sorry.
16       A.   -- but what I'm trying to do is
17   project out into the future what earnings would
18   have been --
19       Q.   Right.
20           I'm --
21       A.   -- and so --
22       Q.   -- sorry.
23       A.   -- so you need to make a projection
24   about what exchange rates are going to be in the
25   future.  And best projection I can make about

Page 163

1
2    what it will be in the future is what it is
3    today.
4        Q.   Right.
5            And your projection of what it is
6    today is not accurate, if my statement about
7    that currency rate conversion rate is accurate.
8            Let me point out --
9        A.   I -- sorry.  I disagree with that.
10   You are talking about something that was true in
11   the past.
12       Q.   Yeah.  Let me just say this and ask
13   you this, Dr. Guryan.
14           We start, as you say, from an
15   employment income in 2019, and that's all I'm
16   asking about.
17           And in 2019, it wasn't 35,164.
18           It was 45,668.18 cents, correct?
19           MS. JOHNSON:  Objection.
20       A.   I disagree with the way you are doing
21   that calculation.
22           So I provide my damage calculations
23   both in Kenyan shillings and in U.S. dollars.  I
24   did all the calculations in Kenyan shillings.
25           I then provided the amount that is --

Page 164

1
2    that that would be in U.S. dollars at current
3    exchange rates.
4            If you wanted to do a calculation at a
5    different exchange rate, somebody could do that.
6            But the damage calculation in my Table
7    1 for lost -- potential lost earnings are
8    presented in Kenyan shillings, which is not --
9    that number is not sensitive to whatever you
10   think people believe the correct exchange rate
11   is.
12       Q.   I'm just looking at your report here
13   Dr. Guryan where you say:  I estimate that Mr.
14   Seex' total earnings for 2019 would have been
15   24,157,804 Kenyan shillings ($186,015) as of the
16   day of this report.
17           Do you see that, sir?
18       A.   Yeah, and that statement is correct.
19   As of the date of this report, that is the
20   amount of that payment in U.S. dollars.
21       Q.   Will you agree with me that, as of the
22   date of March 10, 2019, it was not that amount
23   in U.S. dollars?
24           MS. JOHNSON:  Objection.
25       A.   That is also correct.

TC Reporting, Inc.
(516) 795-7444

JONATHAN GURYAN, PH.D.

## Page 165

1
2       But that does not affect my damage
3   calculation at all.
4       Q.   But in doing your damage calculation,
5   we have agreed that you didn't place a value on
6   Jonathan Seex' ownership interest in Tamarind
7   Management, did you?
8       MS. JOHNSON:  Objection.
9       A.   Any potential damages that would
10  relate -- that would result from Mr. Seex'
11  ownership interest would be separate from what I
12  was asked to provide an opinion about.  So they
13  are not included in what I'm doing.
14      (Pause)
15      Q.   What percentage of your income is
16  based upon expert witness work or consultancy
17  work like this?
18      A.   From this case?
19      Q.   No, from your work as an expert
20  witness or consultant versus your work in other
21  things you do.
22      What percentage is your work as an
23  expert witness?
24      A.   It varies year to year.
25      Q.   How about this year?

## Page 166

1
2       A.   It's somewhere in the range of about
3   half.
4       Q.   And how much have you been paid by
5   counsel in this case to date?
6       MS. JOHNSON:  I'm going to just
7   object.  That's a pretty broad and vague
8   question.
9       MR. WISNER:  Wait a minute, Julia.  I
10  asked you about this in an email.
11      And you said I can ask him about this
12  in a deposition.
13      So I'm asking.
14      MS. JOHNSON:  Right.  Is your question
15  specific to the Seex case?
16      MR. WISNER:  Seex case, sure.
17      MS. JOHNSON:  Yeah, okay.
18      A.   I don't believe I have been paid
19  anything yet --
20      Q.   Really?
21      A.   -- I have submitted invoices, but --
22      Q.   They don't pay your invoices?
23      A.   They do pay my invoices.  It's just
24  the work on this report has been recent, and I
25  don't believe I have actually been paid yet.

## Page 167

1
2       Q.   Okay.  I'm being facetious, obviously.
3       But how much are your invoices to date
4   in this case?
5       A.   I believe it's in the vicinity --
6   somewhere between $25,000 and $30,000.
7       Q.   What's your hourly rate for this work?
8       A.   $675 an hour.
9       Q.   And how many other cases are you
10  working for Boeing in the Ethiopian Air
11  litigation?
12      A.   Currently just one other.
13      Q.   How much have you billed in that case?
14      A.   A similar amount.
15      Q.   How often have -- how many times have
16  you worked as an expert witness in the last five
17  years, let's say?
18      A.   It's all listed on my CV -- of every
19  time I have written a report, or been deposed,
20  or testified.  I'm not sure how to count over
21  the last five years.
22      Q.   Can you give me an estimate?
23      A.   Are you asking me how many different
24  cases?
25      Q.   Yeah.

## Page 168

1
2       A.   I'd guess, maybe, 15 to 20.
3       Q.   And how many for defendant?
4       How many for plaintiff?
5       A.   I work more for defendant than
6   plaintiff, but I have worked on plaintiff's side
7   a smaller number of times.  I don't know the
8   percentage.
9       Q.   More than once?
10      A.   More than once.
11      Q.   How many times have you worked in a
12  wrongful death case like this?
13      A.   I don't know the exact number.
14      I've worked on several in this related
15  to this same matter.
16      And then I've worked on other cases
17  sometimes when -- as a consultant where I was
18  not asked to write a report, but just to review
19  another expert's calculations; and other times
20  as a rebuttal witness to another expert's
21  calculations.
22      Q.   In death cases?
23      A.   In death cases, yes.
24      Q.   How many of those?
25      A.   I don't know the exact number, but

TC Reporting, Inc.
(516) 795-7444

JONATHAN GURYAN, PH.D.

Page 169

1
2    less than 10, probably, maybe, 5 -- between 5
3    and 10.
4        Q.   How many times have you worked as an
5    expert witness in a case involving a CEO?
6        A.   Several times.  I don't know the exact
7    number, but several times involving top
8    executives, CEOs of companies, yeah.
9        Q.   How many from outside the U.S.?
10           (Pause)
11       A.   I don't recall -- other CEOs of
12   companies outside the U.S. I'm not sure there
13   have been others.
14       Q.   How many from Africa?
15       A.   Never.
16       Q.   So Kenya never, then, too, right?
17       A.   Correct.
18       Q.   And how many of those where you acted
19   on behalf of for -- or evaluating it -- loss of
20   earnings for a CEO involved, the CEO having an
21   ownership interest in the company?
22       A.   I don't know.  I don't remember the
23   specifics of those cases to know whether they
24   had ownership interests or not.
25           It was typical that the would have

Page 170

1
2    some ownership interest in the form of stock
3    that they had received as compensation in the
4    past.
5        So that's common, if that's what you
6    mean.
7        Q.   Well, I mean, somebody like Jonathan
8    Seex who is still working, has an ownership
9    interest in the company.
10           Do you have any of those? --
11   experience in doing that before?
12       A.   Yes.
13       Q.   Where you evaluated the ownership
14   interest as part of your analysis of that CEO's
15   loss of earnings?
16       A.   No.  Not in the way that you are
17   asking.
18           I -- sometimes the compensation
19   includes, say, stock options, so that would be a
20   form of compensation.
21           But that's separate from a loss from
22   the valuation of the company, which is not
23   something that I have been asked to do.
24       Q.   And you've never done that before?
25       A.   I don't believe I've, as an expert,

Page 171

1
2    done a calculation of a valuation of a company.
3        Q.   Would you characterize yourself, Dr.
4    Guryan, as a labor economist?
5        A.   Yes.
6        Q.   Would it be fair -- no disrespect
7    intended -- that you are not an expert in the
8    business world?
9            MS. JOHNSON:  Objection.
10           MR. WISNER:  Bad question?
11       A.   I'm sorry.  I spent 10 years as a
12   business school professor teaching about
13   business and the economics of business.
14       Q.   Yeah, that's a professor.  That's
15   education.
16           I'm asking:  Have you ever worked in
17   the business sector?
18       A.   That wasn't the question you asked.
19           You asked --
20       Q.   Yeah, yeah --
21       A.   -- whether I was an expert on it.
22       Q.   Yeah, you are right.
23           Now I'm asking about have you ever
24   worked in that area?
25       A.   No, other than the consulting that I

Page 172

1
2    do, I have not.  My employment has been at
3    universities.
4        Q.   But you don't -- have you ever
5    consulted in international business?
6            MS. JOHNSON:  Objection.
7        A.   I certainly have had -- I have been
8    retained by clients who are in international
9    business, yes.
10       Q.   Including in Africa?
11       A.   I don't believe I've been retained by
12   companies headquartered in Africa.
13           But I have been retained by large
14   companies who have multinational presences, some
15   of which -- I'd have to go through the list to
16   think of whether of them were in Africa.
17       Q.   Well, what I'd like to know is:  Have
18   you ever been consulted by international
19   businesses regarding their operations in Africa,
20   whether or not their headquarters was in Africa?
21       A.   No.
22       Q.   And so I assume the same is true for
23   Kenya, then since it's in Africa, correct?
24       A.   Correct.
25       Q.   Now, you have -- I've looked at your

TC Reporting, Inc.
(516) 795-7444

JONATHAN GURYAN, PH.D.

Page 173

```
 1
 2    publications.  You have an impressive list of
 3    publications, but they look like they mainly
 4    concern education.
 5            Would that be fair to say?
 6       A.   No.  I certainly have written a number
 7    of papers on the economics of education.  I have
 8    also written a number of papers on labor
 9    markets; number of papers about health --
10    economics of health; some other topics that
11    wouldn't fall into any of those categories.
12       Q.   I didn't see in your CV -- and please
13    correct me if I'm wrong -- a single journal
14    publication about business or finance.
15            Is that accurate?
16       A.   Well, I've written about school
17    finance, so finance --
18       Q.   Okay --
19       A.   -- and --
20       Q.   -- other than school finance?
21       A.   -- I mean, I guess I wouldn't agree
22    that the labor market is separate from
23    business -- people who -- labor market is --
24    includes all sorts of people who are employed by
25    businesses.
```

Page 174

```
 1
 2            And so they are -- my studies of the
 3    labor market is about decisions that employers
 4    and businesses make, and also about decisions
 5    that workers and employees make.
 6       Q.   Well, have you written any single
 7    journal publication, or book, or article, or
 8    anything about the hospitality business?
 9       A.   Not specifically about the hospitality
10    business, but they would be included in some of
11    the data that I used to do national estimates of
12    labor markets.
13       Q.   I'm not asking about estimates or
14    data.
15            I'm asking about publications.
16            And I am asking --
17       A.   -- sorry.  Just to be clear, when I'm
18    talking about estimates, I mean estimates that
19    are part of studies that I have written about
20    and published.
21       Q.   Okay.
22            I want to know whether you have
23    written a single publication about the
24    hospitality business, or the financing of the
25    hospitality business.
```

Page 175

```
 1
 2            Anything?
 3       A.   No, not specifically, no.
 4            MR. WISNER:  Julia, would you give me
 5    a few minutes?  I think I'm almost finished.  I
 6    want to look through my notes.
 7            MS. JOHNSON:  Yes, of course.
 8            THE VIDEOGRAPHER:  I'll take us off
 9    the record.
10            MR. WISNER:  Okay.
11            THE VIDEOGRAPHER:  We are going off
12    the record.  The time is 12:33 p.m.
13            (Recess from 1:33 p.m. to 1:38 p.m.
14    Eastern Standard Time)
15            THE VIDEOGRAPHER:  We are going back
16    on the record.  The time is 12:38 p.m.
17    BY MR. WISNER:
18       Q.   Dr. Guryan, are you ready?
19       A.   I'm ready.
20       Q.   Just one brief question about work
21    life expectancy again.
22            Do you agree that the median mandatory
23    retirement age of U.S. board members in the
24    hospitality sector is age 73.5?
25       A.   I have seen that cited by Dr. Shenkar.
```

Page 176

```
 1
 2            I can't confirm it, but I don't have
 3    reason to dispute it.
 4       Q.   And that's a median?
 5       A.   That's the way he reported it.
 6            I can't confirm that.
 7       Q.   And that's U.S. board members, right?
 8       A.   Again, I believe that's what Dr.
 9    Shenkar said.
10       Q.   And that's where there is a mandatory
11    retirement age, right?
12            MS. JOHNSON:  Objection.
13       A.   That's how I understood the sentence.
14       Q.   Okay.
15            MR. WISNER:  Julia, that's all I have.
16            MS. JOHNSON:  Okay.  I have just a
17    couple of questions for you, Doctor.
18    EXAMINATION
19    BY MS. JOHNSON:
20       Q.   So looking at your report -- which is
21    Exhibit 1 to this deposition -- that report is
22    dated January 16, 2025?
23            Is that right?
24       A.   That's correct.
25       Q.   Okay.
```

TC Reporting, Inc.
(516) 795-7444

JONATHAN GURYAN, PH.D.

Page 177

```
1
2              And then on page 2 of your report in
3    section 3, you list the materials that you
4    considered in arriving at your opinion in your
5    report?
6              Is that right?
7         A.   That's correct.
8         Q.   Okay.
9              And were those the materials that were
10   available to you at the time that you finished
11   and signed your report?
12        A.   Yes.
13        Q.   Okay.
14             Do you have any understanding as to
15   whether plaintiffs produced additional documents
16   after the time that you prepared your report?
17        A.   I believe that is true.
18        Q.   Okay.
19             And did you review documents that were
20   produced by plaintiffs' counsel after the time
21   that you finalized and signed this report?
22        A.   I have reviewed them.
23             MR. WISNER:  Asked and answered.
24             MS. JOHNSON:  Okay.
25
```

Page 178

```
1
2    BY MS. JOHNSON:
3         Q.   Did any of those documents change your
4    opinion?
5         A.   No.
6         Q.   Okay.
7              MS. JOHNSON:  Thank you, Doctor.  I
8    have no further questions.
9              MR. WISNER:  That's all I have.
10             Julia, can I talk to you for a moment
11   after this off the record?
12             MS. JOHNSON:  Sure do you want to just
13   talk on the phone?  Or stay on the Zoom?
14             MR. WISNER:  Oh, we can stay on the
15   Zoom.
16             MS. JOHNSON:  Okay.
17             (Pause)
18             THE VIDEOGRAPHER:  We are going off
19   the record at 12:40 p.m. Central Time, and this
20   concludes today's testimony given by Dr. Guryan.
21             *     *     *
22          E N D   O F   P R O C E E D I N G
23        Time noted 1:40 p.m. Eastern Standard Time
24             *     *     *
25
```

Page 179

```
1
2              A C K N O W L E D G M E N T
3
4    I, JONATHAN GURYAN, Ph.D.., hereby certify that I have
5    read the transcript of my testimony taken under oath
6    in my deposition of February 7, 2025; that the
7    transcript is a true and complete record of my
8    testimony; and that the answers on the record as given
9    by me are true and correct.
10
11   _____
                 JONATHAN GURYAN, Ph.D.
12
13
14
15   Signed and subscribed to before me,
16   this _____ day of _____, 2025.
17
18
19   _____
              (NOTARY PUBLIC)
20
21   My Commission expires:
22
23
24
25
```

Page 180

```
1
2          I N D E X   O F   E X A M I N A T I O N
3
4
5    Witness:
6    Jonathan Guryan, Ph.D.
7
8
9    Examination:
10   By Mr. Wisner................................Page 8
11   By Ms. Johnson............................Page 176
12
13
14   Index of Exhibits............................Page 181
15
16
17
18
19
20
21
22
23
24
25
```

45 (Pages 177 to 180)

JONATHAN GURYAN, PH.D.

Page 181

INDEX OF EXHIBITS

1   Multipage document entitled: Report in the ....36
    matter of Ethiopian Airlines Flight ET 302
    Crash - Jonathan Seex, Case No.
    1:19-cv-03392, Prepared By: Jonathan
    Guryan, Ph.D., Date: January 16, 2025 (no
    Bates Nos.)

2   Document Bates stamped Seex_000490 through ....37
    495, multipage letter from Martin H.
    Dunford to Jonathan Seex, dated June 1,
    2007

3   Multipage document bearing heading on .........42
    first page: Exhibit 9, containing
    multipage letter from Gerson Misumi to
    Jonathan Seex, dated January 1, 2018 (no
    Bates Nos.)

4   Single-page document entitled: e-Return .......45
    Acknowledgment Receipt for Jonathan Bjorn
    Seex, Return Period: January 1, 2019 -
    December 31, 2019 (no Bates No.)

Page 183

CERTIFICATE

STATE OF NEW YORK        )
                         :ss
COUNTY OF ORANGE         )

        I certify that, I, BRANDON RAINOFF,
have collected everyone's agreement at the
commencement of this deposition that I would be
the swearing officer and court reporter remotely
out of state and that I may record the testimony
stenographically and swear in the deponent even
though I am not in the physical presence of the
deponent, and that there is no objection to that
at this time, nor will there be an objection to
it at a future date.
        IN WITNESS WHEREOF, I have hereunto
set my hand this 7th day of February, 2025.


        _____
        BRANDON RAINOFF, RPR, FCRR, RMR, CRR

Page 182

5   Document Bates stamped Seex_000031-35, .........67
    missing Bates No., Seex_000028-30, first
    page bearing heading: e-Return
    Acknowledgment Receipt for Jonathan Bjorn
    Seex, Return Period: January 1, 2015 -
    December 31, 2015, with cover page bearing
    heading: Exhibit 8 (no Bates No.)

6   Multipage document entitled: Response to .....113
    Mr. Guryan (no Bates Nos.)

        (All exhibits were provided
        electronically to the reporter.)

Page 184

CERTIFICATE

STATE OF NEW YORK        )
                         :ss
COUNTY OF ORANGE         )

        I, BRANDON RAINOFF, a Federal Certified
Realtime Reporter and Notary Public within and for the
State of New York, do hereby certify:
        That JONATHAN GURYAN, Ph.D.., the witness
whose deposition is hereinbefore set forth, was duly
sworn by me and that such deposition is a true record
of the testimony given by the witness.
        I further certify that I am not related to
any of the parties to this action by blood or
marriage, and that I am in no way interested in the
outcome of this matter.
        IN WITNESS WHEREOF, I have hereunto set my
hand this 7th day of February, 2025.


        _____
        BRANDON RAINOFF, RPR, FCRR, RMR, CRR

JONATHAN GURYAN, PH.D.

Page 185

```
 1
 2          ERRATA SHEET FOR THE TRANSCRIPT OF:
 3   Case Name: In re: Ethiopian Airlines Flight ET 302
     Crash, relating to Case No. 1:19-cv-03392
 4   Deposition Date:  2-7-2025
     Deponent:  Jonathan Guryan, Ph.D.
 5   Place: Remote Videoconference Deposition
 6
 7               CORRECTIONS
 8   PAGE  LINE  FROM      TO        REASON
 9   |    |    |         |
10   |    |    |         |
11   |    |    |         |
12   |    |    |         |
13   |    |    |         |
14   |    |    |         |
15   |    |    |         |
16   |    |    |         |
17   |    |    |         |
18   |    |    |         |
19
20   _____
     Date        JONATHAN GURYAN, Ph.D.
21
22   Subscribed and sworn before me
23   this_____day of _____, 2025.
24   _____
     (Notary Public)
25   My Commission expires:
```

TC Reporting, Inc.
(516) 795-7444