# EXHIBIT C

# In The Matter Of:
# ETHIOPIAN AIRLINES FLIGHT ET 302 CRASH-
# DAMAGES

_____

# ODED SHENKAR, PH.D.
February 11, 2025

_____

# TC REPORTING, INC.
## 1 DEERFIELD EAST - 1850
## QUOGUE, NY.  11959

ODED SHENKAR, PH.D. - Vol. I

ODED SHENKAR, PH.D.

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
------------------------------------------x
IN RE: ETHIOPIAN AIRLINES
FLIGHT ET 302 CRASH - Damages
------------------------------------------x
Lead Case: 1:19-cv-02170 (Consolidated)
District Judge: Honorable Jorge L. Alonso
Magistrate Judge: Honorable M. David Weisman

This Document Relates to:
NADEGE DUBOIS-SEEX, Individually,
Co-Personal Representative of the heirs of
JONATHAN SEEX, deceased,
and as Next Friend of A.S. (a minor),
A.S. (a minor), and A.S. (a minor),
NISHANT LAKHANI, Co-Personal Representative
of the heirs of JONATHAN SEEX, deceased, and
BRITT-MARIE SEEX, Individually,

    Plaintiffs,

    v.

THE BOEING COMPANY,
A DELAWARE CORPORATION,

    Defendant.
------------------------------------------x
Case No. 1:19-cv-03392
------------------------------------------x

REMOTE VIDEOCONFERENCE DEPOSITION
OF
ODED SHENKAR, Ph.D.
Tuesday, February 11, 2025

## Page 2

```
 1
 2
 3
 4
 5
 6
 7              February 11, 2025
 8           12:05 p.m. Eastern Standard Time
 9
10
11
12           Remote video deposition of ODED
13   SHENKAR, Ph.D., taken by Defendant The Boeing
14   Company, pursuant to Notice, dated January, 24,
15   2025, before Brandon Rainoff, a Federal
16   Certified Realtime Reporter and Notary Public of
17   the State of New York.
18
19
20
21
22
23
24
25
```

## Page 3

```
 1
 2   A P P E A R A N C E S:
 3
 4   PERKINS COIE LLP
 5   Attorneys for Defendant The Boeing Company
 6        1120 N.W. Couch Street
 7        10th Floor
 8        Portland, Oregon  97209-4128
 9        503.727.2000
10   BY:  ALLETTA BRENNER, ESQ.
11        503.727.2076
12        abrenner@perkinscoie.com
13          - and -
14        1201 Third Avenue
15        Suite 4900
16        Seattle, Washington  98101-3099
17        206.359.8000
18   BY:  IRENE MOTLES, ESQ.
19        206.359.8185
20        imotles@perkinscoie.com
21        YURI HAN, ESQ.
22        206.359.6386
23        yhan@perkinscoie.com
24          - and -
25
```

## Page 4

```
 1
 2   A P P E A R A N C E S (continued):
 3
 4   PERKINS COIE LLP
 5   Attorneys for Defendant The Boeing Company
 6        110 North Wacker Drive
 7        Suite 3400
 8        Chicago, Illinois  60606
 9        312.324.8400
10   BY:  KARISHMA SHAH, ESQ.
11        312.673.6492
12        kshah@perkinscoie.com
13
14   WINSTON & STRAWN LLP
15   Attorneys for Defendant The Boeing Company
16        35 West Wacker Drive
17        Chicago, Illinois  60601-9703
18        312.558.5600
19   BY:  ANNIE R. STEINER, ESQ.
20        312.558.6092
21        asteiner@winston.com
22        BAILEY BRANDON, ESQ.
23        312.558.7963
24        bbrandon@winston.com
25
```

1 (Pages 1 to 4)

ODED SHENKAR, PH.D.

## Page 5

1
2    A P P E A R A N C E S (continued):
3
4    WISNER LAW FIRM
5    Attorneys for Plaintiffs
6        514 West State Street
7        Suite 200
8        Geneva, Illinois  606134
9        603.262.9434
10   BY:   FLOYD WISNER, ESQ.
11          faw.@wisner-law.com
12
13
14   ALSO PRESENT:
15   DAN ACOSTA, Videographer and Videoconference Monitor
16
17
18
19
20
21
22
23
24
25

## Page 7

1
2                    *   *   *
3              P R O C E E D I N G
4         Tuesday, February 11, 2025
5       Remote Videoconference Deposition
6        12:05 p.m. Eastern Standard Time
7                    *   *   *
8         THE VIDEOGRAPHER:  Good afternoon.
9    This is videoconference monitor, Dan Acosta,
10   speaking.
11         We are going on the record at 12:05
12   p.m. Eastern, on Tuesday, February 11, 2025.
13         Audio and video recording will
14   continue to take place unless all parties agree
15   to go off the record.
16         This is media unit 1 of the video
17   recorded deposition of Dr. Oded Shenkar In the
18   Matter of:  ET 302 Damages, filed in the United
19   States District Court for the Northern District
20   of Illinois, Eastern Division, Case Number
21   1:19-cv-03392.
22         The court reporter is Brad Rainoff.
23   He will be participating remotely from his own
24   location via videoconference.
25         We are from TC Reporting.

## Page 6

1
2            S T I P U L A T I O N S
3
4
5         IT IS HEREBY STIPULATED AND AGREED by
6    and between the attorneys for the respective
7    parties herein, that filing, sealing and
8    certification be and the same are hereby waived.
9         IT IS FURTHER STIPULATED AND AGREED
10   that all objections, except as to the form of
11   the question, shall be reserved to the time of
12   the trial.
13         IT IS FURTHER STIPULATED AND AGREED
14   that the within deposition may be signed and
15   sworn to before any officer authorized to
16   administer an oath, with the same force and
17   effect as if signed and sworn to before the
18   Court.
19
20
21
22
23
24
25               - o0o -

## Page 8

1
2         I would like to do a roll call from
3    the list of law firms appearing remotely today.
4    After I announce each firm, members of counsel,
5    please state your full name on the record so we
6    may note your appearance accordingly.
7         Wisner Law Firm?
8         MR. WISNER:  Floyd Wisner.
9         THE VIDEOGRAPHER:  Perkins Coie?
10        MS. BRENNER:  Alletta Brenner.
11        And with me I have Karishma Shah and
12   Irene Motles.
13        THE VIDEOGRAPHER:  Winston & Strawn?
14        MS. STEINER:  Annie Steiner.
15        THE VIDEOGRAPHER:  Is anyone appearing
16   who has not previously stated their appearance
17   today?
18        Hearing none, I will certify that I
19   will be appearing for tech support, video
20   recording and videoconference services for all
21   remote participants.
22        Before we proceed, I will ask that
23   lead counsel for today's deposition to stipulate
24   on the record that we are proceeding according
25   to the Federal Rules of Civil Procedure and that

2 (Pages 5 to 8)

ODED SHENKAR, PH.D.

Page 9

1
2      this deposition officer may swear in the
3      deponent even though he is not in the physical
4      presence of the deponent, and that there is no
5      objection to this at this time, nor will there
6      be an objection to it at any future date.
7              Plaintiffs' lead counsel, are you in
8      agreement?
9              MR. WISNER:  Yes.
10             THE VIDEOGRAPHER:  Defendant's lead
11     counsel, are you in agreement?
12             MS. BRENNER:  Yes.
13             THE VIDEOGRAPHER:  Very well.
14             Brad Rainoff, you can swear in the
15     witness.
16             THE COURT REPORTER:  Good morning --
17     or good afternoon, as the case may be.  My name
18     is Brad Rainoff.  I am the deposition officer
19     for today's deposition.  I am a Registered
20     Professional Reporter and a Certified Realtime
21     Reporter.  I am also a notary public, and will
22     be swearing in the witness today.
23     ODED SHENKAR, Ph.D.,
24             having been duly sworn, was examined and
25             testified as follows:

Page 10

1
2      EXAMINATION
3      BY MS. BRENNER:
4          Q.   Thank you.
5          So I'll introduce myself properly.  My
6      name is Alletta, and I'm an attorney for The
7      Boeing Company.  Thank you for being here, Dr.
8      Shenkar.
9          A.   I am happy to be here.  Thank you very
10     much.
11         Q.   All right.
12         So as you know, we are here to talk
13     about the Seex case for which you have produced
14     some reports.  I don't know whether to call the
15     reports in plural or singular, but you've got
16     several things that you have written regarding
17     your opinions in the case.
18         Fair to say?
19         A.   Yes, ma'am.
20         Q.   Okay.
21         So I'm here to ask you about your
22     analysis in those written reports and the
23     opinions that you are offering in this case.
24     And we'll talk about some of your methodology,
25     and your assumptions, and calculations.

Page 11

1
2              Before we get started, however, I'd
3      like to cover just a few housekeeping items.
4      Hopefully these are things you have perhaps
5      heard before, so we can go through them quickly.
6              The first item is that, you know,
7      clearly we are here virtually on Zoom.  And
8      we've got a court reporter who is also virtual.
9      And so one of the challenges, of course, with
10     that is sometimes there is a video lag and it
11     makes things even more difficult for the court
12     reporter to take down the transcript.
13             And so to try to minimize the
14     difficulty, I'm going to do my best to try to
15     have pauses and not interrupt you and let you
16     finish your answers.
17             And I'd ask that you try to do the
18     same for me and make sure I've finished my
19     long-winded question so that way we don't talk
20     over each other.
21             Can you do that for me?
22         A.   I hope that the whole thing will be
23     efficient and also civilized.
24         Q.   Wonderful.  Okay.  Thank you.
25             Obviously, you know, these depositions

Page 12

1
2      can take a while.  We'll be taking breaks.  I
3      recognize there is a time difference, so, you
4      know, there may be, kind of, different times
5      when you would want to break than natural for
6      me.
7              But all I would ask is just that, you
8      know, if you let me know when you want to break,
9      I think with can generally accommodate that.
10             The only rule, of course, is that, if
11     there is a question pending, we've got to answer
12     the question before we can take a break.
13             Does that sound good do you?
14         A.   Sounds good to me.
15         Q.   Okay.
16             The next one is that I try my best to
17     ask good questions, but sometimes they get
18     pretty convoluted.  So if you don't understand
19     something I'm asking, I would just ask you to
20     please let me know and I will try to do better.
21             Otherwise, I'll just assume, you know,
22     that you understood the question the way it was
23     intended.
24             And so that would be great if you
25     could just let me know if something doesn't make

3 (Pages 9 to 12)

ODED SHENKAR, PH.D.

Page 13

```
 1
 2   sense.
 3        A.   I promise not to be shy about it.
 4        Q.   Good.  All right.
 5             Last few little housekeeping items
 6   here.
 7             Is there anything at all that could
 8   prevent you from giving you most complete and
 9   accurate testimony as you sit here today?
10        A.   No.
11        Q.   Okay.
12             So just to confirm, no medications or
13   medical issues that might impact your testimony?
14        A.   Thankfully not.
15        Q.   Of course, you realize that your
16   testimony today in this deposition is just the
17   same as if you were giving testimony in court
18   under penalty of perjury?
19        A.   I do.
20        Q.   Okay.
21             I don't know if you've got a virtual
22   background there or not.
23             Is there anyone in the room with you
24   today?
25        A.   No.
```

Page 14

```
 1
 2        Q.   And do you have any physical documents
 3   with you today?
 4        A.   Any documents?
 5        Q.   Yes, physical papers and --
 6        A.   Yes, yes, I do.
 7        Q.   Okay.
 8             Could you just tell me real briefly
 9   what you have with you?
10        A.   I basically have the -- my original
11   report.
12             I have the reports of Messieurs Guryan
13   Dolgoff.
14             I have a couple of notes, article, and
15   so forth that are part of what I have been doing
16   here.
17        Q.   And so let just break that down really
18   quickly.
19             The notes -- are those, sort of, your
20   handwritten working notes that are in your
21   expert file?
22        A.   Yes.
23        Q.   Okay.
24             And then when you say "articles," are
25   those articles that are cited in your report?
```

Page 15

```
 1
 2        A.   Yes.
 3        Q.   Okay.
 4             Do you have any articles with you that
 5   were not cited in your report?
 6        A.   Not that I can think of.
 7        Q.   Okay.
 8             And then the notes -- the working
 9   notes that are part of your preparation of your
10   analysis -- do you know whether those materials
11   have been produced?
12        A.   Did you ask where?  Or when?
13        Q.   Whether.
14        A.   What do you mean?  Of course, if I
15   have a note, they have been produced.
16             I don't understand whether you are
17   asking where they have been produced, or when
18   they have been produced.
19        Q.   Sorry.  I'll clarify.
20             Do you know whether they have been
21   provided to counsel as part of your expert file?
22        A.   You mean in my own notes?
23        Q.   Yes.
24        A.   Not -- I mean, not that I can think
25   of.
```

Page 16

```
 1
 2        Q.   Okay.
 3   ----------------------
     DISCOVERY REQUEST
 4   ----------------------
 5             MS. BRENNER:  So I'll just make a
 6   request on the record for any notes that relate
 7   to the calculations and the opinions in the
 8   report --
 9             MR. WISNER:  Yes --
10             MS. BRENNER:  -- okay.
11             MR. WISNER:  -- we can do that,
12   Alletta.
13             MS. BRENNER:  Okay.  Thanks.
14   BY MS. BRENNER:
15        Q.   So let's go ahead.
16             So that's great if you have to the a
17   copy of your report with you.
18             As you know, we've got the AgileLaw up
19   here, and there may be documents that we mark as
20   exhibits that will be up on the AgileLaw.
21             So far as it is easier for you to look
22   at your hand -- not your handwritten report --
23   your physical printed report that you have, that
24   is fine with me.
25             We'll just need to make sure that we
```

4 (Pages 13 to 16)

ODED SHENKAR, PH.D.

## Page 17

```
1
2     are checking that we are, in fact, looking at
3     the same document and that --
4         A.  Absolutely.  Yeah, it may be easier
5     for me.  And again, we can definitely check that
6     we are looking at the same thing.
7         Q.  Okay.  Fantastic.
8         MR. WISNER:  And Alletta, sorry to
9     interrupt you, but you also agree that he can
10    look at his notes in answering his questions,
11    because they might have things like citations to
12    articles and that that he's never going to
13    remember off the top of his head, but he can
14    look at them and tell you.
15        Is that fair?
16        MS. BRENNER:  That's fair, so long as
17    we get the notes produced.  And we might need to
18    talk a little bit about what he's got in his
19    notes, depending on --
20        MR. WISNER:  Sure --
21        MS. BRENNER:  -- what the question and
22    answer is.
23        MR. WISNER:  -- sure, because I think
24    there may be some citations to publications that
25    are not in his reports themselves that he might
```

## Page 18

```
1
2     have before him.  So we will get you those --
3         MS. BRENNER:  Yes and --
4         MR. WISNER:  -- I'm not sure about
5     that, but there may be.
6         MS. BRENNER:  Okay.  Yeah, I
7     appreciate your alerting me to that.  And
8     definitely we want to make sure that we're all
9     operating from the same information.  Okay.
10    BY MS. BRENNER:
11        Q.  So moving on to a few more just kind
12    of preliminaries here.
13        You understand that you have been
14    retained as an expert witness by the plaintiffs
15    in the Seex case?
16        A.  I do.
17        Q.  Okay.
18        And you've prepared an expert report
19    dated November 30, 2024 setting forth the
20    opinions that you intend to offer to the jury if
21    you testified?
22        A.  I produced, as you are saying, report
23    or reports.
24        Q.  Okay.  So let's try to break those
25    down a little bit and understand a little bit
```

## Page 19

```
1
2     better the opinions that you plan to give in
3     this case.
4         So kind of at a high level, the
5     opinions -- fair to say that the opinions you
6     intend to offer are about the economic loss to
7     Mr. Seex' family resulting from his death?
8         A.  That is correct.
9         I should add that I'm looking at this
10    case as I would look at any such case from a
11    business perspective, which includes not only
12    economics, but also related fields.
13        Q.  Got it.  Okay.
14        And so drilling down a little bit
15    more, fair to say that that loss that you are
16    offering an opinion on comprised of impacts both
17    on the value of stock that was owned by Mr. Seex
18    as well as lost compensation that he may have
19    received from his working? -- from his job?
20        A.  I would again divide it into two that
21    correspond to the two experts that you have
22    brought forward.
23        So we have Mr. Guryan -- or Dr. Guryan
24    looking at earnings.  Right?  And that's what,
25    you know, would be indeed one part.
```

## Page 20

```
1
2         And then you have Mr. Dolgoff that
3     provided an opinion on any losses pertaining to
4     the equity that Mr. Seex had in the enterprise.
5         Q.  Okay.  Thank you for that
6     clarification.
7         A.  Sure.
8         Q.  So just to confirm, then, you are not
9     offering an opinion on lost income or economic
10    loss from any other sources, apart from these
11    two you've just identified?
12        A.  I am not sure what you mean by "other
13    sources."
14        Q.  So you've identified two components to
15    your opinion.
16        It looks like the first one is looking
17    at earnings?
18        A.  Right.
19        Q.  The second one is losses pertaining to
20    equity that Mr. Seex had in the business?
21        A.  That is correct, Alletta.
22        I presume -- I don't know what else
23    you would be looking at, but I presume if you
24    are looking at such things as, you know,
25    suffering and so forth, no, that's not something
```

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 21

```
1
2     that I have been asked to do, and it is not
3     something that I'm an expert on.
4        Q.   Okay.
5             Setting aside those sorts of what we
6     call noneconomic damages --
7        A.   Right, right.
8        Q.   -- are there any other economic
9     damages apart from the two categories you just
10    identified that you are also offering an opinion
11    on?
12       A.   I think that these two categories, you
13    know, would basically cover it, unless there is
14    something that, maybe, relates on the interface
15    between them, and so forth.  But I would say,
16    you know, kind of thinking about it, I think
17    these were the two main issues.
18       Q.   Okay.
19            MS. BRENNER:  So let's go ahead and
20    mark an exhibit.  This first one, I guess, we
21    can call it for shorthand, maybe, "the TML
22    report."  And --
23            THE WITNESS:  Just again -- sorry to
24    interrupt, Alletta.
25            It will help me if you say -- if you
```

Page 22

```
1
2     are going to start with the -- now that we
3     divided it into earnings and equity, which one
4     do you want to start with?
5             MS. BRENNER:  Yes.  So I've got
6     several documents here in front of me --
7             THE WITNESS:  Okay --
8             MS. BRENNER:  -- I want to start with
9     the business --
10            THE WITNESS:  -- okay, okay --
11            MS. BRENNER:  -- and the title on this
12    document is:  Evaluating Tamarind Management
13    Limited (TML) & the Impact of Mr. Seex' Death.
14            And I believe it should be popping up
15    on the AgileLaw here so you can compare and see
16    what document I'm referring to.
17            THE WITNESS:  Yes, yes --
18            MR. WISNER:  Alletta, are you going to
19    mark this.  And if so, how should we mark it?
20    Should we mark it as Shenkar number 1?
21            MS. BRENNER:  Yeah, so we are going to
22    mark it.  And I think that -- yeah, that's what
23    we are -- it says on there -- it's small:
24    Seex_Shenkar number 1.
25
```

Page 23

```
1
2             (Exhibit Defendant's Seex_Shenkar 1,
3     Multipage document entitled: Evaluating Tamarind
4     Management Limited (TML) & the Impact of Mr.
5     Seex' Death, dated November 30, 2024 (no Bates
6     Nos.), marked for identification)
7             MR. WISNER:  Sounds good.
8             THE WITNESS:  Let me just clarify that
9     the things to what you have asked before about
10    report or reports --
11            MS. BRENNER:  Sure.
12            THE WITNESS:  -- these two reports go
13    together -- that is, the one that is titled
14    "CEO/Founder's Death and Company Value" and the
15    actual evaluation of the impact.
16            MS. BRENNER:  Okay.  So this --
17            THE WITNESS:  Just want to emphasize
18    that.
19            MS. BRENNER:  Okay.  So the document
20    we have just marked goes together with the
21    document that's titled:  CEO/Founder's Death and
22    Company Value?
23            THE WITNESS:  That is correct --
24            MS. BRENNER:  Okay, got it --
25            THE WITNESS:  -- the two obviously are
```

Page 24

```
1
2     closely related, except --
3             MS. BRENNER:  Understood --
4             THE WITNESS:  -- except that the
5     "CEO/Founder Death" is more of a summary of what
6     we know in the field about that relationship.
7             And then the other is specific to the
8     case.
9             But there is a relationship, of
10    course, between the two.
11            MS. BRENNER:  Okay.  Thank you for the
12    clarification.
13            I think we are going to mark them as
14    separate exhibits here just because they have
15    separate pagination and we got them as two --
16            THE WITNESS:  No problem --
17            MS. BRENNER:  -- documents --
18            THE WITNESS:  -- no problem.  I'm just
19    saying, you know, for us, it's very important to
20    see that relationship.
21            MS. BRENNER:  Okay.  Thank you.
22            All right.  So let's now go to page 7
23    of this document we have just marked.
24            And I'll draw your attention to the
25    "Summary" that you have at the very bottom --
```

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 25

1
2          THE WITNESS: Yeah --
3          MS. BRENNER: -- at the top of the
4    page, at the end of page 7.
5          (Pause)
6    BY MS. BRENNER:
7          Q.   So is it your opinion that based on a
8    discounted cash flow valuation of TML that the
9    Seex family experienced a loss of approximately
10   $4.5 million in the value of their TML equity
11   due to Mr. Seex' death?
12         MR. WISNER: Objection, just for a
13   second, Alletta. You might have misread that.
14   I have 4.9. Do you have 4-point --
15         MS. BRENNER: Yeah, I said 4.9.
16         MR. WISNER: Oh, I thought you said
17   4.5. Sorry to interrupt you.
18         MS. BRENNER: Yeah, no worries.
19         MR. WISNER: My hearing is bad.
20         A.   As I say, based on the analysis and
21   the particulars of the case -- okay? -- that has
22   been my opinion, yes.
23         Q.   Okay.
24         And does that remain your opinion
25   today?

Page 26

1
2          A.   That remains my opinion.
3          I should add that this is a
4    conservative estimate. And the reason that I
5    say that is that there were some additional
6    material that have been provided in between my
7    writing of this opinion and today.
8          MS. BRENNER: So let's move on now.
9          I'm going to go ahead and mark another
10   document. And this one will be Exhibit 2.
11         And the title on this document is:
12   Lifetime Earnings Analysis for Jonathan Seex.
13         (Exhibit Defendant's Seex_Shenkar 2,
14   Three-page document entitled: Lifetime Earnings
15   Analysis for Jonathan Seex, dated November 30,
16   2024 (no Bates Nos.), marked for identification)
17         THE WITNESS: Okay. So we are moving
18   now to Dr. Guryan, correct?
19         MS. BRENNER: No, we are moving to
20   your analysis on lifetime earnings for Jonathan
21   Seex.
22         THE WITNESS: Yeah, but that's
23   basically what he was referring to. If --
24   again, to clarify -- if I understand correctly,
25   you have had two experts, right? One of them

Page 27

1
2    focusing on the earnings, right? And the other
3    focusing on the equity. Okay?
4          Am I right?
5          MS. BRENNER: That's correct.
6          THE WITNESS: Okay. So I -- just
7    again, for looking at and seeking the right
8    report on my part, that helps.
9          So now you are talking about earnings,
10   right?
11         MS. BRENNER: Yes.
12         THE WITNESS: Okay. That helps me.
13   Thank you.
14         MS. BRENNER: And it is up on the
15   AgileLaw for you if you want to see which report
16   we are talking about --
17         THE WITNESS: No, no, it's okay. It's
18   okay. No, no, no, I have it. I mean, so long
19   as you clarify, it's even easier for me to look
20   at the files. Thank you.
21         (Pause)
22         THE WITNESS: So have you asked me
23   anything about it? Or are you going to ask me
24   about it? I'm just --
25         MS. BRENNER: Sorry. I was waiting

Page 28

1
2    for you to get your --
3          THE WITNESS: No, I got them. I got
4    them.
5          MS. BRENNER: Okay. Okay. Sorry.
6          THE WITNESS: Okay, okay.
7          MS. BRENNER: I'll ask you next time
8    right away whether you --
9          THE WITNESS: No, no, no, we are not
10   in a rush here. I just wanted to clarify. We
11   are all good --
12         MS. BRENNER: Okay --
13         THE WITNESS: -- yes, please.
14   BY MS. BRENNER:
15         Q.   So my first question with regards to
16   this part of your analysis is: Is it also your
17   opinion that the Seex family suffered economic
18   losses in the form of lost earnings from Mr.
19   Seex?
20         A.   Yes.
21         Q.   Okay.
22         And are you also offering an opinion
23   within that on the loss of support that the Seex
24   family would have received, but for Mr. Seex'
25   death?

7 (Pages 25 to 28)

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 29

1
2      A.  I have not specifically looked at the
3  impact -- or I should say the direct impact --
4  on the family.  I did not calculate it --
5  okay? -- even though I was shown, kind of, a
6  life expectancy table for the children and so
7  forth.
8      But it is obvious that any loss to the
9  late Mr. Seex would have impact -- or would
10  impact and will impact his family.
11     Q.  Okay.
12     So this is important, because I want
13  to make sure I'm understanding --
14     A.  No, no, please, please.  I just want
15  to make sure that we understand each other.
16  Please go ahead.
17     Q.  Yeah -- the scope of the opinion that
18  you are offering --
19     A.  Of course.
20     Q.  -- so I think you just said that you
21  have not specifically calculated, or looked at,
22  the direct impact on the family.
23     So what is it, then, that this
24  analysis measures?
25     MR. WISNER:  Let me make a quick

Page 30

1
2  objection, please, Alletta.  I think there may
3  be a difficulty with calling for a legal
4  conclusion about what is included within loss of
5  economic -- or economic damages.
6      So subject to that, Dr. Shenkar, if
7  you can answer, please do so.
8      A.  Yeah.  Again, I mean, I am looking --
9  I mean, asked to look, at least was my
10  interpretation or my understanding -- at any
11  loss of earnings that would have accrued to Mr.
12  Seex, had he stayed with us.  Okay?
13     Obviously these earnings would also
14  go, you know, to support his family.
15     Q.  Okay.
16     So when you say "loss of earnings that
17  would have accrued to Mr. Seex, had he stayed
18  with us," are you referring to earnings that he
19  would have earned in the time period between
20  when he passed and when he ultimately would have
21  retired?
22     A.  That is correct.
23     Q.  Okay.
24     And what is your opinion as to the
25  amount of earnings that he would have earned in

Page 31

1  that time period?
2      A.  I think it is listed right at the end
3  of this document.
4      (Pause)
5      Q.  Are you referring to page 3 of the
6  document --
7      A.  Yes, yes.  Just prior to my signature.
8      Q.  So I see two scenarios here:  Scenario
9  1 and Scenario 2.
10     So could you point me to which of
11  these -- or explain, kind of, which numbers you
12  are referring to?
13     A.  I'm referring -- this indeed has been
14  highlighted -- I mean, to Scenario 2.
15     And Scenario 2, as you can see, has
16  three sub-scenarios that are based on, you know,
17  assumptions vis-à-vis retirement age for Mr.
18  Seex.
19     Q.  Okay.
20     And so the values in Scenario 2 --
21  that is the opinion that you are offering as to
22  what Mr. Seex would have earned in that time
23  period between the accident and his retirement,
24  depending on these working ages?

Page 32

1
2      A.  That is correct.
3      Q.  Okay.
4      And do these values in your chart here
5  include only the income that he would have
6  gained during that time period from the accident
7  to retirement?
8      A.  What do you mean by "only"?  What --
9  I'm not sure what else -- what you would exclude
10  from that.  So if you don't mind clarifying.
11     Q.  So, sure.
12     My question is just clarifying the
13  time period.  I want to make sure that these
14  numbers that you have here in Scenario 2 are
15  only earnings, from whatever source, that he
16  would have earned during the time period
17  following the accident.
18     In other words --
19     A.  That is correct.
20     Q.  Okay.
21     So it does not include any, you know,
22  preaccident earnings?
23     A.  No, no.  Preaccident earnings are
24  already considered as a way -- as a proxy to
25  estimate other earnings that were not able -- we

8 (Pages 29 to 32)

ODED SHENKAR, PH.D.

Page 33

1
2 were not able to obtain at the time because
3 these details were not available to us.
4    Q.   And what other earnings are these
5 preaccident earnings a proxy for?
6    A.   They are a proxy for earnings from two
7 sources, the main one being the business --
8 which is why I said before that the two -- the
9 earnings and the business -- are separate
10 reports, but obviously are linked.  They are
11 related.
12    So typically, when we look at
13 earnings, we look at wages, we look at business
14 earning, and we look at wealth.
15    And I have used as a very, very
16 conservative proxy for the pre -- for the
17 business and wealth, I have used prior earning,
18 which actually are pretty low.  And I think this
19 is an overly-conservative estimate, or a very
20 conservative estimate.
21    Q.   Okay.  So I'd like to drill down just
22 a little bit into that.
23    But first I have just a couple
24 follow-ups based on something you said a second
25 ago.

Page 34

1
2    So first you said there were some
3 additional material that was received between
4 your original report that you've now
5 incorporated.
6    Could you identify what that
7 additional material was that you were referring
8 to a moment ago?
9    A.   We initially -- or I did not initially
10 have information on a variety of benefits,
11 including but not limited to, you know, a
12 pension plan -- for example, you know, Social
13 Security and the like.
14    I can explain also why it was not
15 possible to have this information at the time,
16 but we were able to obtain it later.
17    Q.   Is there any other information that
18 you -- or "additional material," I'll use your
19 words -- that you received that also -- that you
20 are referring to there a minute ago, apart from
21 the benefits information you just referenced?
22    A.   We received information, yes, for, I
23 would say, the three very -- I mean, important
24 pieces that were not initially available.
25    And again, I can explain to you why.

Page 35

1
2    We did not initially have information
3 from Martin Dunford, who is the chairman of TML,
4 who obviously has very pertinent information
5 because Mr. Dunford was lying in a hospital bed
6 in the United Kingdom -- okay? -- for an
7 operation.
8    We did not have information from the
9 principal from Ascent Capital.  Okay?
10    And we did not have information from
11 the widow, Mrs. Seex, that was also, you know,
12 pertinent.
13    And I think you can understand why
14 information that came from Jonathan's last text,
15 or items that have been found in -- on -- around
16 the crash site were a very sensitive thing to
17 ask and to eventually obtain.
18    Q.   Any other evidence from Mrs. Seex
19 apart from the text messages and notebook that
20 was provided?
21    A.   No, except that whenever you look at
22 this information, you kind of link it with the
23 overall situation of the business or anything
24 else that we know about business and global
25 business in this country in Kenya.

Page 36

1
2    Q.   Any other additional materials that
3 you did not have before, apart from the
4 information you've just shared?
5    A.   This is what I can think of.  Again,
6 this was more recent.  I hope I did not forget
7 anything, but these are the main things that I
8 can think of for now.
9    Q.   Okay.
10    And when you said "not available to
11 us," who are you referring to there?
12    A.   I'm saying not to me, and -- to my
13 understanding -- not to Mr. Wisner.
14    Q.   So you don't know whether those items
15 were available to plaintiffs?
16    MR. WISNER:  Objection.
17    You mean me as plaintiffs' attorney?
18 Or Mrs. Seex as plaintiff?  Or both?
19    MS. BRENNER:  I suppose the question
20 is both, but I'm primarily asking about Mrs.
21 Seex.
22    MR. WISNER:  Okay.
23    A.   The -- again, the communication with
24 Mrs. Seex was via Mr. Wisner, even the -- you
25 know, the sensitivity of it again.  But the

ODED SHENKAR, PH.D.

Page 37

1
2    information was provided to me.
3            The discussion with Mr. Dunford -- I
4    was also on part of the discussion at least
5    once.
6        Q.    Okay.
7            When you say "the discussion with Mr.
8    Dunford," are you referring to a phone call that
9    you had with Mr. Dunford?
10       A.    That is correct.
11           Once Mr. Dunford recovered from his
12   operation and went back home, and kind of -- you
13   know, following some recovery period, yes, I was
14   part of a conversation with him at least once.
15       Q.    When was that?
16       A.    I don't have the date in front of me,
17   I mean, but I can -- I can look for it, but I
18   don't have it in front of me.
19       Q.    Was it this year?
20       A.    I believe it was this year, yes,
21   because the whole thing -- the whole process
22   started, I think, in December.
23           And as I said, initially this
24   information was not available.
25           So I assume it was already 2025.

Page 38

1
2            But, again, I do not have the exact
3    date. I assume Mr. Wisner might have it.
4        Q.    Well, let's see if we can narrow it
5    down a little bit.
6            Do you know whether it was before or
7    after the holidays?
8        A.    Again, I believe it was after, but
9    maybe even during, or so forth.
10           As I said, I think Mr. Wisner might
11   have exact information.
12           And I could, but again, I will have to
13   do a search.
14       Q.    Did you take any notes of your phone
15   call with Mr. Dunford?
16       A.    I might have taken some hand notes --
17   handwritten notes.
18       Q.    Would those be the notes in your file
19   that you have with you?
20       A.    As I said, I might have taken them.
21           And if not, these are definitely
22   points that I recall -- remember -- so
23   registered in my brain.
24       Q.    What do you recall about the phone
25   call with Mr. Dunford?

Page 39

1
2        A.    I recall what I have sent you.
3            We have obtained information about a
4    couple of things that definitely included, as I
5    said, many benefits. I mentioned only a few.
6    There were actually more that we were unaware
7    of. That's -- obviously was important to be
8    able to come up with an understanding of also
9    his level of compensation.
10           And also information vis-à-vis, again,
11   what I call the other party equity part that
12   pertained to the letter of intent that was
13   submitted by Ascent Capital.
14       Q.    What did he tell you about the letter
15   of intent?
16       A.    He told us that -- about the letter of
17   intent that obviously in negotiation before,
18   but it was actually submitted just a few days
19   before the crash. And he said that the
20   letter -- that basically the offer after the
21   crash was withdrawn in the sense that a
22   contingency has been added. And the contingency
23   was to find a replacement for Mr. Seex at his
24   caliber, something that they were unable to
25   provide.

Page 40

1
2        Q.    Okay.
3            I would like to ask you a little bit
4    more about that later.
5            But right now I want to make sure that
6    we, kind of, stay on track here.
7        A.    Absolutely, no problem.
8        Q.    And so let's talk here really quick
9    about -- we have been going through a variety of
10   different sources of additional information that
11   you say were provided.
12           Are there any further sources of
13   additional information, apart from everything
14   that we've just been discussing?
15       A.    As I mentioned before, following your
16   questions, I mentioned in particular the
17   information that we received from these three
18   individuals. Okay?
19           And of course, I continue throughout
20   to follow, you know, any relevant information.
21           I read this literature regularly
22   anyway. So from time to time, there would be
23   additional item that would be of relevance.
24       Q.    Okay.
25           So of all this additional material

10 (Pages 37 to 40)

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 41

1
2    that you reviewed -- did any of it change these
3    final calculations in your report that we were
4    looking at here on page 3?
5        A.   It actually has highlighted the fact
6    that my calculation was very conservative,
7    because there were only items that have been
8    added.
9        And I'm saying items pertaining to the
10   compensation value, or the value of earnings,
11   that Mr. Seex was making, or was supposed to be
12   making.
13       Q.   Did you perform any new calculations
14   based on the information you received?
15       A.   What I did was to -- again, once more
16   information became available, I looked at --
17   conducted another calculation, which came up
18   with, I would say, somewhat similar result.
19       It basically removed pre-2019 that's
20   used as a proxy and replace it with additional
21   facts, additional numbers -- which is, by the
22   way, precisely the scientific process that one
23   follows when you, you know, estimate a trend.
24       (Pause)
25       MS. BRENNER:  So let's go ahead,

Page 42

1
2    actually and mark a document just so we
3    understand which additional calculations you are
4    referring to.  Karishma --
5        THE WITNESS:  I did not, again --
6    okay.  I did not provide -- I mean, you are
7    saying "additional calculation" for a very
8    simple reason.
9        I mean, I have initially submitted
10   basically a response which was not really a
11   response.  It's just kind of clarification and
12   supplemental material based on, you know, Mr.
13   Guryan -- Dr. Guryan's -- initial, you know,
14   response.
15       But then I have been told that you
16   guys objected to it.
17       MS. BRENNER:  Okay.
18       So let me -- let's back up here and
19   try to clarify things.
20       THE WITNESS:  Please.
21   BY MS. BRENNER:
22       Q.   So right now we've got a document
23   that's marked that's in front of you which is
24   your report on lifetime earnings.
25       A.   Yes.

Page 43

1
2        Q.   And I'm looking at the numbers that we
3    were previously discussing at the bottom of page
4    3.
5        A.   Okay.
6        Q.   So have these numbers changed since
7    you prepared this report?
8        A.   No.  They have been, I would say,
9    reinforced, maybe not to the last dollar, but,
10   very much, you know, within range.
11       Q.   So this is still the opinion that you
12   are offering -- what's set forth here?
13       A.   That is correct.
14       Q.   Okay.
15       And -- however, you did perform
16   additional calculations based on information
17   that was provided to you?
18       A.   Yes.
19       Q.   Okay.
20       So we'll talk about those further, I
21   think, in a minute, but I want to keep moving
22   forward here --
23       A.   Please.
24       Q.   -- at a high level.
25       MS. BRENNER:  So let's go ahead and

Page 44

1
2    mark another document.
3        And Karishma, this should be G.
4        You can let me know when you have it
5    up on your screen in front of you.
6        MR. WISNER:  This will be Seex_Shenkar
7    number 3.
8        (Exhibit Defendant's Seex_Shenkar 3,
9    Multipage document entitled: CEO/Founder's Death
10   and Company Value, dated November 30, 2024 (no
11   Bates Nos.), marked for identification)
12       THE WITNESS:  Yeah, yeah, yeah.  I --
13   hold on just a second, because again I have
14   different memory -- from that.
15       Yeah, I have it in front of me.  Thank
16   you.
17       MS. BRENNER:  Okay.
18   BY MS. BRENNER:
19       Q.   So this is a report, it looks like,
20   titled "CEO/Founder's Death and Company Value."
21       And I think you testified a minute ago
22   that this analysis relates to your analysis of
23   equity in TML?
24       A.   Well, let me clarify, Alletta.
25       This is one of two documents that

11 (Pages 41 to 44)

ODED SHENKAR, PH.D.

Page 45

1
2      obviously are linked, but are separate.
3           This particular document that you have
4      there is a summary of the literature -- of what
5      we know from the scholarly literature as it
6      relates to the case.
7           So I'm really trying to kind of, you
8      know, clarify it, because I think it is
9      important.
10          In other words, it's not an actual
11     calculation.  You will find that in the other
12     document.
13          But it summarizes the literature as it
14     pertains to that particular text -- to that
15     particular case -- I'm sorry -- to that
16     particular case.  Okay?
17          That means, for example -- and I am
18     very important to clarify -- that it includes,
19     for instance, what the professional literature
20     says about variables that are especially
21     relevant to this particular case -- for example,
22     whether a CEO was also an owner or not.
23          Did I clarify myself?  Please feel
24     free to ask anything, because I think it's a
25     really important point that is, kind of, the

Page 46

1
2      heart of what we see here, and something that
3      may have gone amiss in, you know, Mr. Dolgoff's
4      report --
5           Q.   Okay.
6           MS. BRENNER:  So let's go --
7           A.   -- if you are not clear, please ask me
8      and I'll be happy to clarify better.
9           Q.   Sure.
10          MS. BRENNER:  So let's go to page 8 --
11          THE WITNESS:  Okay --
12          MS. BRENNER:  -- of this document.
13          And I'll draw your attention to the
14     paragraph that is titled:  The Bottom Line.
15          THE WITNESS:  Yeah.
16     BY MS. BRENNER:
17          Q.   So I guess, big picture question:  Are
18     you also offering an opinion more generally on
19     the impact of Mr. Seex' sudden death on TML?
20          A.   Absolutely.
21          Q.   Okay.
22          And what is your opinion regarding
23     that impact?
24          A.   Now, again, when I'm looking at the
25     impact -- and this is something that, you know,

Page 47

1
2      is often lost, maybe, in the other report, not
3      in my report -- I'm looking at whether there was
4      a destroyal of value for TML connected with Mr.
5      Seex' death.
6           This is, again, a very important
7      because we are talking about the causal
8      relationship that is something that often gets
9      lost, not only in academia, but I know that in
10     law, you have your own, you know, provisions on
11     that.  So causality here is very important.
12          So, yes, to answer your question, it
13     is my opinion that Mr. Seex' death had a
14     significantly detrimental impact on the value of
15     TML.
16          Did I answer your question?
17          Q.   Yes.
18          And fair to say that your analysis of
19     that impact is based on the variables discussed
20     in this paper that we have marked here?
21          A.   My analysis is based, again, on two
22     things.
23          First of all, on the general view of
24     the literature, and -- and especially on -- or
25     as it pertains to the case of Mr. Seex.

Page 48

1
2           Again, I hope I made myself clear.
3           I know that Mr. Dolgoff had a
4      different opinion on that, and we can go through
5      that, too, if you wish.
6           Q.   So I guess my question is -- you have
7      spoken about the literature several times.
8           What I want to understand is:  Are
9      there any other -- what you call -- variables
10     that you considered relevant to that analysis
11     that are not captured in your summary of the
12     literature here?
13          In other words, is there other
14     literature that you are relying on in reaching
15     your opinion that you have not discussed in this
16     document?
17          MR. WISNER:  Or in his other report,
18     Alletta?
19          MS. BRENNER:  Correct.
20          MR. WISNER:  I'm sorry.  Or in his
21     notes that we will look at and see if there is
22     something else and send to you?
23          MS. BRENNER:  Well, I don't want to go
24     there yet right now --
25          MR. WISNER:  Okay, okay --

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 49

1
2          MS. BRENNER: -- I'm just asking about
3     the reports.
4          MR. WISNER: -- okay. I just want to
5     make sure that it's not misleading.
6          I think he said he's discussed
7     literature in this one -- which is Seex_Shenkar
8     number 3.
9          He's discussed literature in his other
10    report about the TML value.
11         And he may have in his notes citations
12    to other literature, which we will look for and
13    provide to you if there is.
14         That's all I'm saying.
15         THE WITNESS: Right. And I would add
16    to that, there is obviously this is part of, I
17    guess, my expertise. A lot of scholarly
18    literature is kind of, you know, in my head on
19    causality; on, you know, global business and
20    other things that may pertain.
21         But, you know, this -- you know, you
22    are asking me about overall knowledge, I hope
23    you are not expecting me to start providing
24    everything from my doctoral dissertation or
25    otherwise.

Page 50

1
2          So I'm trying to be very well defined
3     here.
4          But, again, feel free, Alletta, to ask
5     anything if I did not make myself clear.
6     BY MS. BRENNER:
7     Q.   So my question is pretty specific.
8          What I want to understand is what
9     literature you relied on in arriving at your
10    opinion that you just described for me.
11         And you've described this document
12    here as summarizing the literature.
13         So what I want to understand is: Are
14    there any other articles or sources that you
15    have not discussed in this document, or perhaps
16    in the footnotes, or in the narrative of your
17    other report that we marked first, that you
18    relied on?
19    A.   Not that I can think of, except --
20    except that I did look, having seen -- having
21    read Mr. Dolgoff's opinion, at some of the
22    literature -- actually, most of the
23    literature -- that he pointed out.
24         And I must tell you that it actually
25    reinforced my view further.

Page 51

1
2     Q.   Okay.
3          So we can talk about that separately.
4          But what I'm trying to understand is
5     what you have relied on.
6          So fair to say that these two reports
7     that we've marked here as Exhibit 1 and Exhibit
8     3 contain all of the literature that you relied
9     on in reaching your opinion regarding the impact
10    of Mr. Seex' death on TML?
11    A.   By and large, to the best of my
12    recollection, yes.
13    Q.   So let's now move on to some more,
14    kind of, big-picture stuff.
15    A.   Please.
16    Q.   Okay.
17         So I think we already established that
18    you have been retained as an expert for the
19    plaintiffs.
20         Do you plan to testify at trial?
21    A.   Yes. I've -- that was my
22    understanding -- that, should there be a trial,
23    I may be summoned to testify. And, yes, I'm
24    fully aware of it. I actually asked for the
25    date so I could, you know, plan my schedule

Page 52

1
2     accordingly.
3     Q.   Do you recall when you were first
4     retained for this case?
5     A.   The exact date?
6     Q.   I don't need an exact date, just a
7     ballpark.
8     A.   I would say that it was probably late
9     November, early December, something like that.
10    Q.   And late November, early December
11    2024?
12    A.   Yeah, that's correct.
13    Q.   Okay.
14    A.   And, you know, I don't have exact
15    date. I mean, I can look back at last year
16    calendar if it's important to you and then look
17    for it, but I don't have it offhand.
18    Q.   And do you recall when you drafted
19    these reports that are dated November 30?
20    A.   I would say -- again, Mr. Wisner would
21    have that, because I remember there was a
22    deadline to provide those. And I assume that I
23    did it before the deadline, but not much before
24    the deadline -- because, again, I needed time to
25    write it.

13 (Pages 49 to 52)

ODED SHENKAR, PH.D.

Page 53

1
2        So that would be my -- my recollection
3   of the dates.
4        Q.   Do you have any staff or anyone who
5   assists you in drafting your reports, setting
6   aside anybody, you know, on counsel team?
7        A.   No. I have a research assistant that
8   I sometime use for some of the calculations.
9        Q.   Was there anyone who assisted you in
10  the preparation of your reports for this case?
11       A.   Again, as I said, for some of the
12  calculation.
13       Q.   Okay.
14            And who was that?
15       A.   I can give you the name. I mean, they
16  are a research associate at one of the Ivy
17  League school. I can forward you the name, if
18  you will.
19       Q.   Do you know the name off the top of
20  your head?
21       A.   It's a Chinese name. So I call him
22  Shai Yang.
23            But, you know, but I can, again, give
24  you full information, should you need.
25            (Pause)

Page 54

1
2        A.   We were familiar with the, you know,
3   cash flow techniques. He's a research
4   associate, as I said, in an Ivy League school.
5            And again, if you will need more
6   information, I'm happy to provide it.
7        Q.   So more specifically, what education
8   credentials does your associate have?
9        A.   He has, obviously, an academic degree;
10  a lot of, you know, research credentials. As I
11  said, he's just an assistant doing some
12  calculation. I oversee everything. I instruct
13  him on everything and I write everything.
14       Q.   What degree does he have?
15       A.   He has a B.A. and I believe also a
16  Master's.
17       Q.   And a Master's in what?
18       A.   Economics.
19       Q.   And a B.A. in what?
20       A.   I believe economics and statistics.
21            Again, I have to look at the exact
22  information that I have.
23            But, again, I want to emphasize, I
24  oversee everything. I give him instruction. So
25  it's like giving someone -- you know: Add up

Page 55

1
2   the numbers.
3        Q.   And how many hours did your assistant
4   spend on this case?
5        A.   I don't have a count at this point.
6        Q.   Can you give me a rough ballpark
7   compared to your hours?
8        A.   Oh, way, way less than my hours.
9   That's for sure.
10       Q.   So let start with you.
11            How many hours did you spend working
12  on this case so far?
13       A.   I actually don't have an exact count.
14  You know, things have been pretty busy. So I
15  take notes, but I don't have an exact number of
16  hours. What I can tell you that it has been a
17  lot of hours.
18       Q.   Okay.
19            So let's try to narrow it down, then.
20            Less than 100 hours?
21            Or more than 100 hours?
22       A.   Are you talking about what point?
23  Until now? Or are you talking about up to
24  preparing my original opinion?
25       Q.   Good point.

Page 56

1
2        Let's start with preparing your
3   original opinion.
4        A.   Okay. I would say in preparing my
5   original opinion, probably less, but not much
6   less.
7        Q.   Okay.
8            So somewhere between 50 and 100 hours?
9        A.   Maybe.
10       Q.   Relative to you, how much time did
11  your assistant spend?
12            So if you spent 100 hours, what
13  percentage would he have spent?
14       A.   I would say, maybe, 10%.
15       Q.   Okay.
16            Are there specific parts of your
17  analysis that your assistant helped with?
18       A.   As I said, with the calculation.
19       Q.   So calculations for both the lifetime
20  earnings and for the business valuation?
21            Or just one --
22       A.   -- no, no, for both.
23            But again, let me emphasize, the
24  important thing, you know, when you do those
25  calculation -- and we may get to it when we talk

14 (Pages 53 to 56)

ODED SHENKAR, PH.D.

Page 57

1
2  about what Mr. Guryan and Mr. Dolgoff did -- the
3  calculation is fairly standard.  The key are
4  really the assumption.  The assumption are all
5  made by me.  Okay?
6     Q.   So your assistant didn't provide any
7  input on what those assumptions should be?
8     A.   Absolutely not.
9     Q.   Okay.
10        So now let's talk about the amount of
11  time you've spent since your reports were
12  finalized on November 30.
13        How much time would you roughly
14  estimate spent you have spent working on this
15  case since then?
16     A.   Possibly the same as before, since,
17  you know, I have been provided with, as I said,
18  the opinions of Dr. Guryan and Mr. Dolgoff.
19        I've also mentioned that we had --
20  we're able to finally talk with a number of
21  people, you know, such as Martin Dunford, and so
22  forth.
23        So, again, I did not telling them, but
24  possibly in the same range that before -- 50 to
25  100.

Page 58

1
2     Q.   Okay.
3        And then how about your assistant?
4        Has he spent further time on this case
5  since November 30?
6     A.   No, maybe, again, I would put it at
7  10% at most.
8     Q.   So he has spent some time, but only
9  about -- what would you say? -- 10 hours or
10  less?
11     A.   Yeah.
12     Q.   Okay.
13        MS. BRENNER:  So let's go ahead and
14  mark another document.
15        This one, Karishma, should be under
16  tab C.
17        (Exhibit Defendant's Seex_Shenkar 4,
18  Single-page document entitled: Federal Rule 26
19  Statement Re Report of Dr. Oded Shenkar (no
20  Bates No.), marked for identification)
21        MS. BRENNER:  And you can please let
22  me know once you see it.
23        MR. WISNER:  By the way, Alletta, do
24  you usually break about an hour?  Or what would
25  you like to do?

Page 59

1
2        MS. BRENNER:  I don't have much more
3  on this preliminary stuff, so I'd like to, kind
4  of, get through, and then maybe we can take a
5  quick break.  But, yeah, roughly, an hour, hour
6  and a half, depending on how --
7        MR. WISNER:  Yeah, I was looking for a
8  good time, so --
9        MS. BRENNER:  Yeah --
10        MR. WISNER:  -- that's fine.
11        THE WITNESS:  That's basically, as you
12  can see, more or less within the range.
13        Keep in mind that from that I had to
14  pay the, you know, the assistant, even though at
15  a way, way lower rate, you know.
16        MS. BRENNER:  Okay.  So let's clarify
17  here what we are talking about for the record.
18        So this is a document we have just
19  marked, I believe, as Exhibit 4 --
20        THE WITNESS:  Okay --
21        MS. BRENNER:  -- and this is titled --
22        MR. WISNER:  What is -- yeah, I'm
23  sorry.  Go ahead.
24        MS. BRENNER:  -- yeah -- and this is
25  titled:  Federal Rule 26 Statement Re Report of

Page 60

1
2  Dr. Oded Shenkar.
3        MR. WISNER:  Thanks.
4  BY MS. BRENNER:
5     Q.   And it looks like this is a document
6  that summarizes some information about your
7  prior testimony, and your compensation in this
8  matter.
9        Is that fair?
10     A.   Yeah.
11     Q.   And so I think you were referring here
12  to some of the content in this report where it
13  references your rate and the amount that you
14  have been paid to date.
15        So let's just break it down here.
16        You have been paid at your usual rate
17  of $1,000 per hour?
18     A.   Yeah.  This was what I agree with,
19  again, as an estimate.
20        I had to tell you of the hours, but I
21  don't like getting into -- you know, having done
22  it quite a few times before -- into a situation
23  where you, you know, log in, I mean, you know,
24  every phone call that you make, or every time
25  you looked at a paper, and so forth.

15 (Pages 57 to 60)

ODED SHENKAR, PH.D.

Page 61

1
2      So this is kind of an approximation
3  and -- you know, so we rounded it up.
4      I have to say that also, again, at the
5  time, it was not clear -- even now it is not
6  clear -- what else will need to be done.
7      Because, you know, I wrote an opinion.
8      Then there was -- you know, the
9  opinion of Dr. Guryan and Mr. Dolgoff. Wasn't
10 clear to me whether I'm supposed to write an
11 official rebuttal, and so forth.
12     I understood not.
13     But at the time, again, that we
14 discussed the rate, I did not know that.
15     I did not know then -- and I still
16 don't know -- if there will be a trial. I mean,
17 there is different rates that I listed for
18 deposition, for trial, and so forth.
19     So, you know --
20  Q.  Okay --
21  A.  -- that's where we are.
22  Q.  So let's break that down, then.
23     What is your rate for deposition?
24  A.  I don't even remember it by heart.
25 It's listed on the website of the Expert

Page 62

1
2  Institute with which I work often.
3      What I do recall is that, again,
4  hourly rate is $1,000, a deposition is somewhat
5  higher, and a trial is a bit higher than that --
6  Q.  Okay --
7  A.  -- again, if you are interested, you
8  can go on the website, or I can myself do it
9  later, and give you the exact amount.
10     But this is where we are. So 1,000
11 basic.
12     I believe that deposition is, maybe,
13 1,100 to 1,150; and a trial would be, maybe,
14 1,200 or 1,250 an hour.
15  Q.  Okay.
16 --------------------------
   DISCOVERY REQUEST
17 --------------------------
18     MS. BRENNER: So I'll just make a
19 request on the record if we could supplement
20 this disclosure --
21     THE WITNESS: Sure, absolutely --
22     MS. BRENNER: -- with the rates -- all
23 the applicable rates --
24     THE WITNESS: -- absolutely.
25     MS. BRENNER: Okay.

Page 63

1
2  BY MS. BRENNER:
3  Q.  And I understand here it says you
4  received $100,000 for services provided to date.
5      Is that date as of November 30?
6  A.  Again, I don't remember the exact
7  date, but probably until then, or December, or
8  something at that point in time.
9  Q.  Okay.
10     Then I think you said a minute ago
11 that you basically spent an equal amount of time
12 since your reports were initially finalized --
13  A.  I believe, again, in the range that
14 you have mentioned before, probably 50 to 100
15 hours.
16  Q.  Okay.
17     And so fair to say if you have been --
18 if you were compensated about $100,000 by the
19 time your reports were finalized that you have
20 then since then been compensated another $50,000
21 to $100,000?
22  A.  I think that's fair enough, Alletta.
23     MR. WISNER: Well, hold on just a
24 second. I think you mischaracterized --
25     THE WITNESS: I don't want to --

Page 64

1
2      MR. WISNER: Hold a second, Doctor.
3      It mischaracterizes testimony.
4      He didn't say he has been compensated.
5  He might be -- he might owe it. But he hasn't
6  said yet he has been paid.
7      So I want to make sure we have that
8  clarification.
9      THE WITNESS: No, that is absolutely
10 true. That is absolutely true.
11  A.  I have not received any
12 compensation -- any money -- since then.
13  Q.  Okay.
14     So you have received $100,000.
15     And then you have outstanding invoices
16 for your other time?
17  A.  I did not even submit an invoice, or
18 so forth. I did not think there is point to
19 even prepare an invoice.
20     I typically do it -- and again, I have
21 done it several times -- once I know where, you
22 know, things go -- and where things go, not in
23 the sense of result, but in the sense of, you
24 know: What else I will need to be doing.
25     I mean, as we just discussed, for

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 65

```
1
2    instance, you asked me whether I'm going to come
3    to the trial.  If there is one, my plan is yes.
4    But I don't know if there will be a trial.  I
5    don't know if they are going to decide to summon
6    me.  I mean, it's not up to me to decide that.
7        Q.   Okay.
8        But just to be clear, you have spent
9    the time.  And at some point you will bill the
10   time and your expertise --
11       A.   That is correct.  That is correct.
12       Q.   And your expectation is that you will
13   be paid?
14       A.   I expect to be paid, yes --
15       Q.   Okay.
16       A.   -- this is not volunteering.  As
17   interesting as this case is, this is not a
18   volunteer -- an entirely volunteer activity --
19       Q.   Okay --
20       A.   -- you are correct.
21       Q.   And so we have been talking about
22   these ballpark numbers with regards to what you
23   have been paid so far and the time that you have
24   spent that maybe you haven't yet submitted the
25   bill for, but you intend to submit the bill.
```

Page 66

```
1
2        Overall, are your billings -- both
3    completed and expected -- on this matter typical
4    for what you would earn on an expert engagement?
5        A.   I can tell you as an example --
6    because, you know, I cannot disclose unless your
7    client will agree -- that my last expert
8    assignment -- or for my last expert
9    assignment -- that involved by the way, way
10   higher sums than we are talking about in this
11   case -- were significantly higher, yes.
12       So there is nothing exceptional about
13   it.
14       Q.   Okay.
15       And I understand that you don't know
16   what all you are going to be asked to do, but --
17       A.   That is correct.
18       Q.   -- assuming that this case goes to
19   trial, and that you do the kind of normal trial
20   preparation that you would do for this case, do
21   you have a sense of how much more you would be
22   billing beyond what we have already spoken about
23   up through trial?
24       A.   Not -- not really, not really.
25   Because, you know, a lot depends on what happens
```

Page 67

```
1
2    between now and then.
3        I mean, I must share with you.  I
4    mean, I was, for instance, stunned to get an
5    additional opinion last night -- which, of
6    course, I could not -- you know, did not have
7    time or ability to review.
8        But that fell out of the sky.  So what
9    have landed, you never know.
10       So I trust that at the end of the day
11   I will be paid, so I'm not worried about it.
12       Q.   Okay.
13       Based on our discussion so far, would
14   it be fair to assume that the total amount that
15   you anticipate billing on this case is north of
16   $200,000?
17       A.   I don't know yet.  But it could be
18   close to that, but I don't know yet.
19       Q.   Okay.
20       So that's all the questions I have on
21   this document.
22       MS. BRENNER:  It sounds like counsel
23   would like to take a quick break, so let's go
24   off the record briefly.
25       MR. WISNER:  Okay.
```

Page 68

```
1
2        THE VIDEOGRAPHER:  We are now going
3    off the record.  The time is 1:12 p.m. Eastern.
4    This ends media unit 1.
5        (Recess from 1:12 p.m. to 1:21 p.m.
6    Eastern Standard Time)
7        THE VIDEOGRAPHER:  We are now going
8    back on the record.  The time is 1:21 p.m.
9    Eastern.  This begins media unit 2.
10       THE WITNESS:  So Alletta, if I can
11   mention quickly two things, if you don't mind.
12       One of them -- you know, you asked
13   earlier about, you know, citation and so forth.
14   And I did prepare a similar document to the one
15   that we provided, kind of, in response to -- you
16   know, to Dr. Guryan report.
17       I did not submit it, but -- because,
18   again, I have been told that it's not part of
19   the process.
20       But my counsel reminded me that, yeah,
21   there are some citation there.
22       So I stand corrected on that.
23       The second point that I wanted to
24   mention, if it is important to you to know
25   exactly the extent of my compensation, or what I
```

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 69

```
1
2    did for it, and so forth, I'm happy to ask the
3    law firm involved if it's okay with them and
4    release this information for you; or ask them to
5    be in direct touch with you, and so forth.
6         But I'll be more comfortable asking
7    them for approval, because, you know, I kind of
8    signed confidentiality -- I hope
9    understandably -- in all of those cases.
10        So you just let me know, okay?
11        MS. BRENNER: So regarding the
12   compensation, I think I already made a request
13   on the record to update the Rule 26 disclosure.
14   So I think counsel will handle that --
15        THE WITNESS: Okay.
16        MS. BRENNER: -- and provide whatever
17   information is required under the rules --
18        THE WITNESS: Hm-hmm.
19        MS. BRENNER: -- and then with regards
20   to the information that you said that you had
21   cited in this report, I guess I have two
22   questions on that.
23   BY MS. BRENNER:
24        Q.   First, the additional information that
25   you referenced -- is that something that you are
```

Page 70

```
1
2    relying on for your opinions in this case?
3         A.   It's -- it's more for the sake of
4    clarification and response. And again, it was
5    done under the understanding that this is
6    something that, you know, will be shared.
7         After the experience with the Guryan
8    report where I was told that you -- your side
9    object to it, and so forth, I just held on to
10   it. I didn't submit it.
11        Q.   What is the additional -- I'm assuming
12   you have it with you today?
13        A.   Yeah, probably.
14        Q.   What is the additional source that you
15   are referring to?
16        Can you just tell me what it is?
17        MR. WISNER: If I may, just for a
18   second, Alletta.
19        I think what I was trying to explain
20   earlier, there is going to be -- they are
21   citations to articles.
22        So, yeah, he could go through and tell
23   you; or I can probably give them to you, you
24   know, so you can read them -- whatever you like.
25   I mean, he'll --
```

Page 71

```
1
2         THE WITNESS: I -- I --
3         MR. WISNER: -- it will take time
4    to do the --
5         THE WITNESS: -- I --
6         MR. WISNER: -- hold for a sec --
7         THE WITNESS: -- oh, yeah. Oh, yeah.
8    I think that unless you want to spend -- I mean,
9    you said that you -- you want to finish at some
10   point? You know, this response has a total
11   of -- I mean, response or potential response --
12   call it, a total of 32 citations. So if you
13   want to do it now, I assume that they are going
14   to take a long time.
15        So again, it's not for me. It's for
16   you to decide between you, and Mr. Wisner, and
17   maybe the court as to, you know, what you want
18   to do with such a document -- which, again, I
19   don't know what to say.
20        MS. BRENNER: Okay. So the only --
21   let's -- let's back this up.
22        The citations today I'm asking you for
23   are ones that you have relied on.
24        It sounds as though you have all of
25   those citations in the notes here in your file
```

Page 72

```
1
2    that we referred to earlier, and that we have a
3    standing request for production.
4         So I don't need you to go through and
5    read to me the contents of those papers and the
6    citations.
7         But if there is a specific article or
8    source that is contained in your notes that you
9    are relying on for your opinion that you want to
10   share with me that you feel is important, I
11   would invite you to do that now.
12        But I don't want to go through and
13   just read --
14        THE WITNESS: Yeah --
15        MS. BRENNER: -- the notes that you
16   have.
17        THE WITNESS: -- yeah, I wouldn't do
18   it right now because, again, I would have to go
19   through all of them and tell you which one is
20   important.
21        MS. BRENNER: Okay.
22        So I want to be really clear, then.
23   BY MS. BRENNER:
24        Q.   Sitting here today, are you saying
25   that the sources that you relied on are all of
```

18 (Pages 69 to 72)

ODED SHENKAR, PH.D.

Page 73

1
2   those that are already cited in your November 30
3   reports?
4       Or are you saying there are additional
5   sources that you have relied on that are not
6   disclosed in those reports?
7       A.  The additional sources were mostly --
8   and again, I'm trying to be careful here --
9   mostly for purpose of clarification, or possibly
10  reinforcing the argument.
11      But there is nothing there that
12  radically change -- or in any way change -- the
13  underlying conclusion that I have drawn.
14      Q.  Okay.
15      So --
16      A.  Okay? --
17      Q.  -- let's go ahead and --
18      A.  -- fair enough?
19      Q.  -- let's go ahead and move on, then.
20      A.  Please.
21      MS. BRENNER:  I'd like to go ahead and
22  mark another document here --
23      THE WITNESS:  Hm-hmm --
24      MS. BRENNER:  -- which, Karishma,
25  should be under tab D.

Page 74

1
2       And this one, I believe, is going to
3   be Exhibit 5.
4       (Exhibit Defendant's Seex_Shenkar 5,
5   Multipage document bearing heading on first
6   page: Oded Shenkar (no Bates Nos.), marked for
7   identification)
8       THE WITNESS:  My CV.  Okay.
9       MS. BRENNER:  Okay.
10      So this is also a long document, so
11  I'm not going to go through the entire thing
12  with you.
13  BY MS. BRENNER:
14      Q.  Fair to say that you are pretty
15  familiar with the contents of your CV?
16      A.  Yes.
17      Q.  Okay.
18      So first question:  Do you know when
19  this CV was generated?
20      A.  Probably -- I update it regularly.  So
21  the version that you see here, probably the one
22  that I provided Mr. Wisner, maybe, as I said,
23  late November, or something around that time.
24      Q.  Okay.
25      So given that you update it regularly

Page 75

1
2   and this is one that you recently provided --
3       A.  Yeah.
4       Q.  -- does it contain a complete and
5   accurate list of your degrees and
6   qualifications?
7       A.  It does, but -- but -- they, to a
8   considerable extent, yes.
9       But do remember that there are issues
10  here -- a few points -- that are not listed on
11  the vitae, mostly because they are confidential.
12  Okay?
13      You will see, for instance, a list of
14  clients for consulting services.  But it says:
15  Sample.  It's not everyone.  There are those
16  that I did not list.
17      I have had -- and am having -- regular
18  discussion that are sometimes very sensitive
19  that I'm not going to disclose in here.
20      That includes, just as an example over
21  the last few years, the president's chief trade
22  advisor.  That includes the chairman of the
23  U.S.-China Security and Economic Review
24  Commission.  That includes two governors, and so
25  forth.

Page 76

1
2       I'm not going to disclose any of that
3   in here because I'm not supposed to.  Okay?
4       So there are things that are not
5   listed here that, yes, are relevant.
6       But other than that, I think that's
7   reasonable summary of my record.
8       Q.  Okay.
9       Setting aside confidential clients, is
10  there other information that is not contained in
11  your CV here that pertains to your degrees and
12  qualifications?
13      A.  Other than that, I don't think so.
14      I mean, you have degree.  You have
15  qualifications.  I can disclose what is relevant
16  to the case in here.
17      But, again, I cannot disclose who it
18  was.
19      I can disclose that I worked with the
20  -- as a young person in the hospitality
21  industry.
22      I can tell you without giving the name
23  that I have advised a major hotel chain.
24      I can tell you that I lived in Africa,
25  and that I provided a consulting to investors in

ODED SHENKAR, PH.D.

Page 77

```
1
2      Africa.
3              All of that is not listed on the
4      vitae, but you could say that these are relevant
5      details.
6      Q.   All right.  So let's walk through some
7      of that, then.
8      A.   Please.
9      Q.   So you said that you worked as a young
10     person in the hospitality industry?
11     A.   Hm-hmm.
12     Q.   What did you do?
13     A.   I worked as a student at the
14     reception, doing other things.
15     Q.   For how long?
16     A.   This was, I think, for several months,
17     or maybe more than that.  You are going back
18     many years.
19     Q.   When was that?
20     A.   That was during my -- my B.A.
21     Q.   So that would have been back in the
22     early 1970s?
23     A.   Yeah, that does bring in memories.
24     Q.   And what country was that in?
25     A.   That was -- yeah, that was in Israel.
```

Page 78

```
1
2      Q.   And that's the only job you've had in
3      hospitality?
4      A.   No.  As I said, I have had advised a
5      major hotel chain.
6      Q.   Okay, so we'll talk about that next.
7              But I just want to say that's the only
8      job that you've had where you actually worked in
9      hospitality?
10     A.   Hm-hmm, hm-hmm.
11     Q.   Okay.
12             And then let's talk next about
13     advising the hotel chain.
14             What were you advising the chain on?
15     A.   That, you might call it international
16     business, basically on adaptation that needs --
17     needed to be made in serving guests from
18     different countries, and in operation in
19     different countries.
20             And by the way, that does remind you
21     that I have also consulted -- in quality of
22     manufacturing conglomerate about their expansion
23     into Africa.
24     Q.   So the hotel chain that you were
25     advising -- you said that you were advising them
```

Page 79

```
1
2      with regards to international business?
3      A.   Yeah, I would say.  Broadly defined,
4      yes.
5      Q.   So -- and I believe you said:  On
6      adaptation needs that needed to be made in
7      serving guests from different countries and
8      operation in different countries.
9              Can you expand on that a little bit?
10     A.   Well, this is what international
11     business -- one of the main thing we do in
12     international business, you know.
13             We are based on, call it, comparative
14     and international management.
15             So, for example, that definitely
16     includes adaptation in strategy, operation,
17     anything that is relevant to either serving
18     guests from different countries or from
19     expanding into foreign countries.
20     Q.   Okay.
21             And what types of analysis did you
22     prepare for advising your client in that matter?
23     A.   Basically having brainstorming section
24     with them about what they do and how they do
25     that.
```

Page 80

```
1
2              And again, beyond hospitality, you've
3      seen some of the names that are listed there.
4      Most of the company that you see there is client
5      that were okay with listing the names -- are --
6      you know, were advised on matters relating to
7      things international --
8      Q.   Okay.
9      A.   -- and that can be strategy.  That can
10     be operation that can be human resource
11     management, cultural adaptation, you name it.
12     Q.   As part of your advice that you were
13     providing to your client in that matter, did you
14     perform any valuation analysis?
15     A.   I not only performed valuation
16     analysis, I was involved in that.
17             I served -- that's, again, maybe
18     mentioned there, I don't even remember -- but I
19     served for roughly four years on The Conference
20     Board -- I don't know if you are familiar with
21     this organization -- council of
22     integrating executive.  Basically there is a
23     group of mostly senior VPs who are doing merger
24     and acquisition for large companies.  And the
25     valuation was one of the main things that we
```

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 81

1
2    discussed then.
3        Q.   So I guess I want to put a finer point
4    on that.
5            What valuations did you, yourself,
6    perform in the course of that engagement?
7        A.   Well, we talked about, you know, how
8    you do valuation.  We talked about -- this
9    actually became one of the major issues -- how
10   do you adapt the valuation that you do in
11   different countries and in different sectors.
12       But aside from conversations that you
13   were involved in with others, did you personally
14   perform those types of valuations?
15       A.   I performed valuation for companies --
16   many are not listed here -- that wanted to
17   either invest in a particular operation; wanted
18   to establish a joint venture with a particular
19   operation; in some cases, wanted to buy out a
20   joint venture partner -- which is, again, very
21   much a valuation issue, you know, valuing the
22   stake.
23       And actually, what we did there is --
24   and that is more challenging valuation of
25   in-kind.  In other words, you had to do

Page 82

1
2    valuation not only of, you know, financial asset
3    which is relatively easy, actually, but
4    valuation of in-kind, such as know-how,
5    experience, technology, and so forth.
6        Q.   And did you perform valuations like
7    that for the hotel chain?
8        A.   The hotel chain -- no, the hotel chain
9    were not a valuation case.
10       Q.   Okay.
11       Now aside from that one hotel chain
12   that you referenced a minute ago, have you
13   advised any other companies in the hospitality
14   industry?
15       A.   I'm trying to think.  Because, again,
16   I have been working with very diverse
17   businesses.
18       In one case, maybe -- well, again,
19   indirectly.  I did do some work for the
20   financial industry, and then that typically was
21   kind of a multi-sector.
22       So the question would be, for
23   instance: Which sector is it better to invest
24   in.
25           So, in other words, in that -- in such

Page 83

1
2    a case -- hospitality may be one of multiple
3    sectors that you are going to look at.  And you
4    are going to look at the attractiveness of that
5    particular sector.
6        Q.   Okay.
7            So let's go back to the hotel chain
8    engagement real quick.
9            When was that?
10       A.   This was in, I would say, late --
11   well, 1990s, I would say.  So not recently, but
12   1990s.
13       But, again, I cannot provide more
14   information than that.
15       Q.   Can you say at least what region of
16   the world it was in?
17       A.   No.  I could say it was in North
18   America.  I have been based in North America.
19   I'm not going to say anything further than that.
20       Again, I've signed a confidentiality
21   agreement.
22       Q.   That's okay.  North America is good
23   enough.
24       A.   Okay.
25       Q.   Okay.

Page 84

1
2            So -- and then and you just mentioned
3    the work for -- let me go back here, make sure I
4    don't put words in your mouth.
5        A.   No, that's okay.  Feel free.  I'll
6    correct you if you do.
7        Q.   You said you did some work for the
8    financial industry --
9        A.   Yeah.
10       Q.   -- where you were helping clients
11   determine which sector to invest in.
12           When was that?
13       A.   That was -- I would say, we are
14   looking at, maybe -- I mean, more than once --
15   but mostly somewhere between 2005 and 2015,
16   something like that.
17       Q.   Okay.
18           And were those clients in North
19   America?
20           Or elsewhere?
21       A.   North America.
22       But, again, the discussion was about
23   other regions.
24       Q.   What other regions of the world?
25       A.   That include Asia.  For some of these

21 (Pages 81 to 84)

ODED SHENKAR, PH.D.

Page 85

1
2    companies the -- you know, Asia and Africa are
3    together, you know, as a particular region.  So
4    the discussion would involve both.
5        Q.   And when you say "financial industry,"
6    are you talking about private equity firms?
7        A.   I'm talking both about investment
8    banks and private equity.
9        Q.   Got it.  Okay.
10       So now I'm just moving down the list
11   here of some things you had identified.
12       You -- aside from what you have just
13   provided there -- so providing advice to the
14   hotel chain, providing advice to these entities
15   in the financial industry, and the other board
16   that you sat on -- any other contexts in which
17   you have provided consulting services relating
18   to the hospitality industry?
19       A.   Not hospitality.
20       Let me add one more thing.
21       I mean, you know, when we talk about
22   valuation.  I mean, you know, it's one thing
23   that I did.  I mean, I would involve
24   valuation -- not -- I would say a different
25   level.

Page 86

1
2        Because you are talking about a
3    zooming out, so you -- right? -- you are talking
4    about particular company, as I said, for
5    instance, if you do a joint venture -- you are
6    buying out a joint venture partner.  I have done
7    that.
8        You have looked at sector where it's
9    not valuation per se, but it's, for instance,
10   you know, what would be the attractiveness
11   during a particular time; and even a country.
12       I can tell you, for instance, that
13   years ago -- that was actually uncompensated,
14   unfortunately -- I spent, maybe, a week with the
15   Wall Street Journal Europe head discussing, or
16   trying to come up with, an evaluation of the
17   size of the Chinese economy.  So sometimes it
18   was even on a national level.
19       Q.   So let's talk -- let's jump to that,
20   then, really quickly.
21       You said, I think, a minute ago that
22   you had consulted with a conglomerate that was
23   considering an expansion in Africa.
24       Which countries in Africa?
25       A.   Well, that was the question, actually.

Page 87

1
2    One what part of the question is:  Where in
3    Africa?
4        Q.   So what countries in Africa were being
5    considered as part of that?
6        A.   In that particular case -- and please
7    understand that this is the -- how the nature of
8    these assignment goes -- if I have to, kind of,
9    in the ballpark divide them very roughly into
10   two, a typical assignment would be -- and I've
11   done those vis-à-vis Africa and other countries,
12   and other continent, or sometimes beyond -- is
13   where to go.
14       So basically the company will tell
15   you:  Here is Africa.  We are considering
16   getting into it.  Where should we be going?
17       Okay?
18       Other cases they may identify a
19   country or a region.  You know, could be East
20   Africa -- okay? -- or could be a particular
21   country, you know.
22       And then ask you:  What do you think
23   are the merits of getting into that country?
24       Q.   Okay.
25       So what I'd like to do, then, is drill

Page 88

1
2    down a little bit more on what parts of Africa
3    were relevant in that particular engagement.
4        So I understand, you know, there is
5    different regions in Africa.
6        Can you narrow down for me the part of
7    the continent that you were analyzing?
8        A.   Well, as I said, there were more than
9    one particular engagement.
10       In -- as I said, in one case -- or at
11   least one case -- the assignment was to identify
12   where to make a recommendation, where in Africa,
13   you know, one should go.
14       There was another that was specific to
15   East Africa.
16       There was one on South Africa.
17       So --
18       Q.   And so the engagement -- the portion
19   of the engagement that you worked on specific to
20   East Africa -- what countries did that include?
21       A.   That included Kenya.
22       Q.   Okay.
23       Any other countries?
24       A.   That was main -- the main one.
25       There was something that started, but

22 (Pages 85 to 88)

ODED SHENKAR, PH.D.

Page 89

1
2    did not -- I mean, was aborted because of,
3    ironically, the death of the entrepreneur
4    that look in Nigeria.
5        Q.   Okay.
6            And when did you perform this
7    consulting job?
8        A.   That's -- these are several.
9            I mean, you are looking at -- most
10   recent one, I would say, probably four or five
11   years ago.
12       Q.   And how many of these have you done?
13       A.   Again, I never counted it that way.
14           But now that you mention it -- I don't
15   know -- maybe three to five, something like
16   that.
17       Q.   And how many of those considered
18   Kenya?
19           Just the one in east Africa?
20       A.   That is correct.
21           But the thing is, we looked at then --
22   it was not only Kenya, but, you know, East
23   Africa.
24           One of the question was, indeed, where
25   to base -- say, if you are going to open a

Page 90

1
2    African division, where are you going to base a
3    regional headquarters -- which is again a
4    question that we often get in international
5    business.
6        Q.   And what industry was this business
7    in?
8        A.   This particular business was mostly in
9    logistics.
10           I'm saying "mostly" because they have
11   multiple also startup, and so forth.
12       Q.   Not hospitality?
13       A.   I'm trying to think if one of them
14   was, maybe, indirectly related to hospitality in
15   the sense that it involved booking, and so
16   forth.
17           But -- so it was more kind of a
18   reservation system, so forth.
19       Q.   So as part of that engagement, though,
20   you weren't analyzing the hospitality industry
21   in Kenya?
22       A.   I have looked closely.
23           I mean, again, I was being familiar
24   with Kenya already -- with the Kenyan economy,
25   so forth.  Definitely when I got the assignment,

Page 91

1
2    I looked closely at the hospitality industry in
3    Kenya, and continued to follow up since.
4        Q.   Okay.
5            But just to be clear, I'm not talking
6    about your assignment for this present case.
7            I'm talking about the assignment that
8    you did four to five years --
9        A.   In the past, that is correct.  Again,
10   I have looked -- yeah, I have looked at Kenya.
11           But again, part of looking at Kenya,
12   you are looking at a different sector.
13           When people ask you -- in many --
14   different countries, I mean, China for others --
15   people ask you:  What are the economic
16   prospects, say, of a country.
17           You are definitely looking at
18   different sectors, by definition.  Because
19   different sectors have different -- you know,
20   different prospect.
21           Countries have different comparative
22   analysis, comparative edge, comparative area
23   advantage when it comes to a particular sector,
24   or so forth.
25       Q.   So just to be clear, your assignment

Page 92

1
2    for this case -- for the Seex case -- is the
3    first time you've ever done a consulting job
4    where you were analyzing the hospitality sector
5    in Kenya?
6        A.   That is correct.
7        Q.   Okay.
8            Now you mentioned you lived in Africa.
9            What country in Africa did you live
10   in?
11       A.   I lived, mostly as a kid, in
12   Burkina -- a country that is now called Burkina
13   Faso --
14       Q.   Okay --
15       A.   -- that's West Africa.
16       Q.   Yes.
17           And when you say when you were a kid,
18   about when was that?
19       A.   What age I was?  Or what were the
20   years?
21       Q.   What decade --
22       A.   I'm not in an age trying to look
23   younger, okay?  I have passed that threshold.
24           I was, I would say, somewhere between
25   11 and 13, or 10 and 13, and so forth, yes.

23 (Pages 89 to 92)

ODED SHENKAR, PH.D.

Page 93

1
2        But, you know, I lived there. I
3  experienced the country. I went to a French
4  school there in Africa. I remained in touch
5  with people from -- you know, from Africa, and
6  so forth.
7        Q.   Okay.
8        So just to be clear, you know, you
9  lived in Burkina Faso when you were a child.
10        How long did you live there?
11        A.   I would say about two years, maybe a
12  bit more.
13        Q.   Okay.
14        And that was -- I'm not going to try
15  to, sort of, guess how old you are --
16        A.   You can, you can --
17        Q.   -- that was before 1960?
18        A.   That would be -- so I would say just
19  in the beginning, I think, and so forth --
20        Q.   Okay.
21        A.   -- I'm trying to think -- to, kind of,
22  remember that when we worked -- when we have
23  heard of -- it's kind of -- it's not funny. I
24  mean, it's obviously another tragic death when
25  President Kennedy was assassinated. I kind of

Page 94

1
2  recall hearing about it when we were there.
3  So --
4        Q.   Okay.
5        So it was in the 1960s you lived for a
6  couple of years in Burkina Faso?
7        A.   Hm-hmm. And since then, I have been
8  following up what's been happening in Africa,
9  partly of personal interest, but also because
10  that's what I do. I mean, I do comparative and
11  international business.
12        Q.   And you agree that Burkina Faso is on
13  the other side of the continent --
14        A.   Oh, of course, of course. I agree, of
15  course. And I'm fully aware of the differences.
16        As I said, I mean, I have had the
17  famine where we have been asked: Where in
18  Africa we should be going.
19        And then we look closely at sector,
20  and so forth. Of course.
21        Q.   Have you ever been to Kenya?
22        A.   I have not been to Kenya, no.
23        Q.   All right.
24        Let's -- I just have a couple more
25  questions on this --

Page 95

1
2        A.   Please, please --
3        Q.   -- so --
4        A.   -- feel free, please.
5        Q.   -- have you ever -- well, here is a
6  bigger picture.
7        Strike that.
8        Your CV contains a complete and
9  accurate list of your publications?
10        A.   I hope so.
11        Q.   Okay.
12        How --
13        A.   Except --
14        Q.   -- many --
15        A.   -- except as I said, not going to have
16  any consultant report; not going to have any
17  report to the government, or to U.S. Congress,
18  and so forth.
19        But other than that, yes.
20        Q.   Okay.
21        So fair to say you have never
22  published an article on the Kenyan hospitality
23  industry?
24        A.   That's correct.
25        Q.   Okay.

Page 96

1
2        Or published an article on business
3  conditions in Kenya?
4        A.   No --
5        Q.   Okay.
6        And --
7        A.   But again, I have looked at it very
8  closely when I looked at this assignment, but,
9  no, I have not published on that.
10        Q.   Okay.
11        So let's talk more generally now about
12  your role.
13        You are currently a professor at Ohio
14  State University?
15        A.   I am a professor at the Fisher College
16  of Business at The Ohio State University where I
17  hold a chair in global business management
18  endowed by the Ford Motor company.
19        Q.   Do you teach courses?
20        A.   Yes.
21        Q.   Okay.
22        What courses do you teach?
23        A.   Well, I teach -- I mean, I have the
24  Ph.D. seminar to do research.
25        My February course -- that I have been

ODED SHENKAR, PH.D.

Page 97

1
2    teaching for years that I developed myself and
3    continue to teach -- is actually very much in
4    line with what we are discussing here, in the
5    sense that this is a project course.  So I --
6    either identify myself, or they come to me, or
7    are referred to me by the U.S. Department of
8    Commerce.  We have companies that want to expand
9    into international market, or solidify their
10   position in international market.  And then, I
11   have teams of student working with those
12   companies.
13          So in other words, that's, kind of,
14   teaching them how to consult, while at the same
15   time providing service to U.S. companies --
16   mostly, I would say, small, mid-size.
17          I should also say that I have been,
18   for a number of years, academic director for the
19   National Center for the Middle Market, which is
20   a center that we house here at the Fisher
21   College, and that was initially initiated and
22   endowed by GE Capital when they were more into
23   capital than -- before they split off into other
24   things.
25      Q.   Okay.

Page 98

1
2      A.   Apologies for the long title, but
3    that's what --
4      Q.   No, that's okay.
5          Aside from the course that you just
6    identified -- or the courses that you just
7    identified -- any other courses that you
8    normally teach?
9      A.   I have taught -- I mean, I think there
10   is at least a partial list on the CV.
11          But, yeah, I regular teach a Ph.D.
12   seminar.
13          I have taught, you know, various
14   iteration of international business, of
15   strategy.
16          I should add that I have taught in
17   different universities around the world in all
18   different countries.
19          I was, for instance, senior fellow --
20   actually, the first senior fellow -- at the
21   University of Cambridge endowed by what was then
22   Andersen Consulting.
23          Taught in the U.K., in Japan, in
24   China.
25      Q.   And what courses have you taught at

Page 99

1
2    those other universities you just mentioned?
3      A.   Strategy, for example; international
4    business.  I would say various iteration of
5    that.
6          For instance, I usually teach global
7    strategy.
8      Q.   Okay.
9          Have you ever taught a class on
10   business valuation?
11      A.   Not a class.  But, again, it
12   definitely came across and was part of classes
13   that I taught, for instance, on strategic
14   alliances, on joint ventures.
15          And I have often done also workshops
16   on that that involve valuation.  That's with
17   major companies.
18          I won't mention the names.  One of
19   them, you probably know.
20          I have advised on that issue, again,
21   on a strategic alliances to international labor
22   office -- okay? -- in Geneva.
23          So different iteration.
24      Q.   How about corporate finance?
25          Have you ever taught corporate

Page 100

1
2    finance?
3      A.   No, I have not taught corporate
4    finance.
5          But I did publish -- most of my
6    publications, as you can see, are in
7    international business.
8          I have to emphasize that international
9    business is an interdisciplinary area.  It's a
10   integrative area where we borrow from -- and
11   borrow, rely, and use different functions.
12          We are closer, you might say, to
13   strategy.  But we definitely deal with finance,
14   accounting, marketing, and so forth.  I think
15   this is really part of our strength because to
16   understand a case, I think this is really what
17   you need.
18          But I did publish, for instance, in
19   finance -- okay? -- at least one article that
20   may be somewhat close to values.  But, yeah,
21   actually, two of them.
22          One of them had to do with the -- with
23   valuation, with the impact of cultural
24   differences on valuation in the Journal of
25   Corporate, you know, Finance.

25 (Pages 97 to 100)

ODED SHENKAR, PH.D.

Page 101

1
2         And some of the tools that I
3  developed, say, on cultural variance were used
4  by the accounting literature, the finance
5  literature, by consulting firms that deal with
6  this, and so forth.
7      Q.   Okay.
8           How about financial accounting?
9           Is that a course you've ever taught?
10     A.   No. No. No.
11          But, again, as I said, you know, we
12 deal with this. You cannot -- if you teach --
13 I, say, teach joint venture, of course,
14 valuation is one of the topics.
15     Q.   Okay.
16          And so we talked about financial
17 accounting.
18          How about asset pricing?
19          Is that a course you've ever taught?
20     A.   No. I as I said, I do not -- I'm not
21 part of the finance department, even though I am
22 often asked to, you know, give lectures on that.
23          But in the same way, I have been
24 asked -- and actually did -- give lectures in
25 the school of engineering; surprisingly, maybe

Page 102

1
2  to you, the school of law on issues that are,
3  you know, related to what I do.
4           Again, I'm in an integrative,
5  interdisciplinary field that relies on multiple
6  disciplines.
7      Q.   And so what part -- so when you say
8  it's interdisciplinary, and you've had
9  involvement in publications or in courses that
10 touch on these subjects, what area of expertise
11 are you bringing to that discussion?
12     A.   As I said, my expertise is in
13 international business. Okay?
14          So I'm able to bring into the
15 discussion an understanding of how you can
16 look -- or you should look -- at any particular
17 topic, such as M&A, for instance -- mergers and
18 acquisitions -- from more than one perspective.
19          I can give you many example. Okay?
20          As you saw, I, for instance, published
21 a paper on a contingency payout. Contingency
22 payout -- these are situations where the -- when
23 a company is acquired, the owner -- typically it
24 would be the owner/CEO -- receives part of his
25 compensation based on the performance of the

Page 103

1
2  company, once the acquisition has been
3  completed. I published on that.
4           And of course, that has to do with --
5  to do it, you have to do strategy. You have to
6  do finance. You have to do HR -- okay? --
7  because you have to understand what is the value
8  of retaining the CEO.
9           So, yes, I have dealt directly with
10 those issues that I think are relevant to this
11 case.
12     Q.   Do you consider yourself a
13 sociologist?
14     A.   No. I have an interdisciplinary
15 degree that included degrees in both area
16 studies and sociology as a base; but included
17 multiple classes on -- in the business school,
18 including, by the way, business law, an
19 interesting subject.
20          And I had a Ph.D. committee comprised
21 of people from the business school, from
22 sociology, and from the East Asian Institute.
23          I must tell you -- I know because
24 maybe this has to do with my age -- that at the
25 time when I was doing my Ph.D. at Colombia,

Page 104

1
2  the -- most of the knowledge on our organization
3  operate was at the time -- this is no longer the
4  case -- but at the time was in sociology, not in
5  the business school.
6           So working across the aisle,
7  therefore, was extremely important, and I found
8  out, extremely valuable.
9           But I have always, always taught in a
10 business school. So I have been teaching in a
11 business school, would say, starting -- what? --
12 '83, maybe around.
13          Since then, as I said, I have been
14 asked also to teach from time to time. I have
15 taught once as school of engineering. I taught
16 a class -- actually, kind of, you know -- they
17 support a class in a school of law on topics,
18 again, that were at the interface of law and
19 business.
20          So, yeah, I don't define -- define
21 myself as an international business scholar --
22     Q.   Okay --
23     A.   -- and as such, I -- that's where
24 my -- that's where I do many of my publication.
25 This is where my reputation as one of the

26 (Pages 101 to 104)

ODED SHENKAR, PH.D.

Page 105

1
2    leading people, if I may say so, in that field.
3         Q.   So going back to your CV, then, it
4    also accurately states all of the certifications
5    that you have?
6         A.   What do you mean by "certification,"
7    Alletta? I'm not sure.
8         Q.   Any certificates that you hold.
9         A.   The certificates that I hold -- I
10   mean, if you want a paper certificate in the
11   same way that I once had a, you know, paper
12   share certificate, are for a B.A. degree --
13   okay? -- from the Hebrew University of Jerusalem
14   in East Asian studies and in sociology.
15        I have an M.Sc. Soc. -- this is how
16   they call it, kind of an M.A. -- but, you know,
17   M.Sc. Soc. in sociology from the Hebrew
18   University of Jerusalem as well.
19        And both are cum laude.
20        And I have a Ph.D. certificate -- so
21   certificate from Columbia University --
22   involving, indeed, as I say, sociology, the East
23   Asian Institute, and so forth, which came
24   under -- at least at that time -- all degrees,
25   including in business, at the time were under

Page 106

1
2    the Graduate School of Arts and Sciences.
3         So in terms of paper certificate, this
4    is it.
5         Q.   Okay.  So -- thank you for that.
6         A.   Yeah, sure.
7         Q.   My question is not what's in your CV,
8    which I can read.
9         But my question is whether there is
10   anything that's not in there.
11        So I just want to make sure --
12        A.   Oh, I understand.  What --
13        Q.   -- when I meant "certificate," for
14   example, you are not a certified public
15   accountant?
16        A.   No, no, no, no.  That's --
17        Q.   Okay --
18        A.   -- no, you are right, and thanks for
19   clarifying.  No.
20        What I listed are the actual, if you
21   will, certificate.
22        No, I'm not a certified financial
23   analyst.
24        Q.   And so now let's talk just really
25   briefly about your consulting work.

Page 107

1
2         You have already spoken a little bit
3    about some of the topics on which you have
4    provided consulting work that weren't
5    necessarily reflected in your CV.
6         Can you provide me just a general ball
7    park of what percentage of your time is spent
8    teaching versus consulting?
9         A.   It's a very good question.  I mean, we
10   are allowed consulting, and -- so we are allowed
11   consulting, I mean, during the regular schooling
12   year, and so forth.  But we are also in a
13   nine-month appointment formally.  Okay?  So, you
14   know, we have other time.
15        But it really varies a lot.  I never
16   really fully quantified it.
17        What I can say -- that I have actually
18   made a motion, based on my experience in my own
19   school, to adopt the medical school formula
20   where all professors must also practice --
21   okay? -- at least once or twice a week -- it
22   depends on the specialty, and so forth --
23   because I think it is so important.
24        And I always try to live up to that.
25        In other words, I don't look at

Page 108

1
2    consulting just as a way to make extra income.
3    I mean, nice as it may be, but we are teaching
4    practitioners.  And therefore, I think it is
5    essential that -- you know, that we do that.
6         We probably will take it further.
7         There is now a discussion -- I
8    actually advise more than one school about
9    developing a consulting specialty.  And probably
10   at Fisher, we will be doing that as well.
11        Q.   I'd like to drill down specifically on
12   your expert consulting for litigation.
13        A.   Okay.
14        Q.   How many cases total have you served
15   as an expert consultant for a litigation matter?
16        A.   Again, I never counted.
17        I think that, at the time, what of
18   listing institute -- maybe 7 or something like
19   that.
20        There are also cases of international
21   arbitration that are, kind of, run like a court
22   process even though they are outside the system,
23   as you know.
24        Q.   Okay.
25        So roughly how many cases or matters

27 (Pages 105 to 108)

ODED SHENKAR, PH.D.

Page 109

1
2    total have you provided expert --
3        A.  If you encounter --
4        Q.  -- consulting services on --
5        A.  -- arbitrations and so forth, I would
6    say 10.
7        Q.  Okay.
8            And how many of those were in the last
9    five years?
10       A.  The last five years -- I'm just trying
11   to think.  Probably -- I mean, including the one
12   that we are doing now?
13       Q.  Yes.
14       A.  My guess would be, maybe, four --
15       Q.  Okay.
16       A.  -- three or four, somewhere between
17   three and five -- somewhere in that ballpark.
18       Q.  And without, sort of, going and
19   reading through everything that is on your CV --
20       A.  Right.
21       Q.  -- does it accurately describe the
22   scope of topics on which you have provided that
23   type of expert testimony in the past?
24       A.  No, it does not.
25           I mean, definitely what you see there,

Page 110

1
2    I have done.
3            There are issues that I -- I cannot
4    disclose.
5            Again, it's not only that I signed
6    confidentiality.  There is at least something,
7    you know, I think that involved the commission
8    of Congress that, you know, involved some
9    security clearance.  So, no, I will not expand
10   on that.
11       Q.  All right.
12           I'm not asking you about the specific
13   engagements.
14           I just want to know the topics
15   generally on which you have provided expert
16   testimony.
17       A.  Okay.  So the topic -- I'll try to be
18   very, kind of, again, broad, because definitely
19   the last case is very famous.
20           Okay.  So there is one case that
21   involved presentation made by a company
22   vis-à-vis its expanding in a particular foreign
23   market.  Okay?
24           Is that fair enough?  I mean, good
25   enough for -- yeah? --

Page 111

1
2        Q.  Yeah.
3            So I --
4        A.  -- and I cannot be more specific than
5    that before asking the company.
6            If it's important to you, I will ask
7    the law firm and -- you know, if they are
8    willing to disclose or so forth.
9            But generally speaking, this was --
10   that was one.
11           There was one that involved what seems
12   like an HR case of a person that was -- let's
13   say, had a contract from a foreign firm to work
14   actually in the U.S., but it was of a foreign
15   firm.  And it had to do with possible
16   misinterpretation of what was the intention
17   there based on the differences not only in
18   culture, but in economic political system, you
19   know, and so forth.
20       Q.  Okay.
21           Can we stop there?
22       A.  Okay.
23           MS. BRENNER:  Let's go to page 9 --
24           THE WITNESS:  I'm sorry.  I didn't
25   hear you, Aletta.

Page 112

1
2            MS. BRENNER:  If you could please go
3    to page 9 of your CV, and we'll move it up
4    here --
5            THE WITNESS:  Do you mind scrolling
6    down, since I don't have it in front of me?
7            MS. BRENNER:  Yes.  So it should be on
8    your screen now.
9            THE WITNESS:  Yeah, yeah, I see it.
10   Yeah.
11   BY MS. BRENNER:
12       Q.  So my question, going back to my
13   original question, is:  You've got several
14   topics listed here --
15       A.  Right.
16       Q.  -- in your CV as matters -- types of
17   subjects on which you have rendered expert
18   opinions.
19           Now, you just gave me a couple
20   other -- a little bit more specific examples of
21   opinions that you've worked on.
22           And my question is:  Apart from those
23   two, and apart from the items listed here, are
24   there any other types of expert opinions that
25   you have rendered in litigation?

ODED SHENKAR, PH.D.

Page 113

1
2      A.   I'm trying to think, Alletta.
3          There was one case where -- I think
4  it's maybe less relevant here -- of -- where the
5  plaintiff sued a company -- it was actually a
6  very large, multinational -- for not reimbursing
7  them for an introduction to a foreign partner.
8          As I said, I dealt a lot with these
9  joint ventures, and so forth.
10          And as is the case here, I was not
11  asked about whether there was an agreement or
12  not because there was a lot of, you know, verbal
13  versus this, because that is not my area.  That
14  is not my specialty, and I'm not qualified well
15  on that.
16          But the question to me was the value
17  of the introduction.
18          So, again, yes, absolutely that was
19  valuation.
20          But you can see that, you know, you
21  get to it from kind of, you know, different
22  angle.
23      Q.   Aside from this case, have you ever
24  before rendered an expert opinion in a matter
25  that involves a wrongful death?

Page 114

1
2      A.   Not in my recollection.
3      Q.   Okay.
4          MS. BRENNER:  So we have been going
5  for about an hour, so I just want to check here
6  with counsel.
7          Do you want to take another brief
8  break?  Or do you want to continue on?
9          MR. WISNER:  From my purpose, I'll
10  leave it up to you, guys, Alletta and Dr.
11  Shenkar.
12          THE WITNESS:  If it's okay with our
13  esteemed host here, Alletta, I would like to
14  continue because, again, I'm sure both you,
15  Floyd, and her, and me would like to be done at
16  some point -- but only if it's okay with you.
17          But I'm okay proceeding as is, but I'm
18  also okay with taking a break if you, Alletta,
19  or Brad, maybe, you know, feel like they want to
20  take a break.
21          MS. BRENNER:  Okay.  Let's continue
22  on.
23  BY MS. BRENNER:
24      Q.   So I'd like to ask you just a few
25  big-picture questions now about the types of

Page 115

1
2  expert opinions that you have just described,
3  and the types of things that you review as part
4  of that work.
5      A.   Okay.
6      Q.   So I think you have indicated a few
7  times that you have performed business
8  valuations before.
9          Can you describe for me the types of
10  documents and information that you would
11  typically rely on when you are valuing a
12  business?
13      A.   It's really a variety.  It's based
14  also on what is available.  Okay?
15          And this is, again, the reason why I
16  am a strong believer in looking at things for,
17  let's say, just a broad angle, from multiple
18  angle.
19          Give you an example.  There were cases
20  where valuation was difficult because it was in
21  nonmarket economy.  Right?  How do you value an
22  asset where no prior transactions have taken
23  place -- right? -- as an example.
24          So in this case, basically used proxy.
25  We actually looked at similar transaction in,

Page 116

1
2  kind of, comparable market, you know.  There was
3  no way to otherwise do it because we were
4  talking about valuing a company -- I don't know
5  if you can even call it a company -- that was
6  partially state owned, again in nonmarket
7  economy.
8          So it varies a lot.  It depends on
9  what is available.
10      Q.   Just to clarify, you said:  So in this
11  case.
12          Are you talking about the Seex case?
13      A.   No, no, no, no.  I'm giving you an
14  example because you asked what type of document
15  or information I would need.
16          And the example that I gave you is I
17  was saying that it can vary dramatically, and I
18  gave you an example.
19          This is not the Seex case.
20          I gave you an example.
21      Q.   Okay.  Thanks for clarifying.
22      A.   Sure.
23      Q.   So with regards to, you know,
24  documents being available, are there types of
25  documents or information that you requested for

29 (Pages 113 to 116)

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 117

1
2    the Seex case that was not available?
3        A.   There was information that was not, at
4    least initially, available, yes, as I said; for
5    example, you know, full listing of all the
6    benefits.
7            And partly, this is -- I think, may
8    have been because they are -- you know, when you
9    talk, say, and at the interview -- I mean, you
10   interview an executive, people have a tendency
11   to take for granted what they have in their
12   particular company, in their particular country,
13   such as a pension plan.  Okay?
14           But you don't know it until you ask
15   for it.
16           I wanted, for instance, to see
17   documents pertaining to the future development.
18   I mean, because I think that, again, strategy is
19   a big part of it:  Where is the company going;
20   where was the company going.
21           And all that, for example -- this is
22   an example -- we receive very important
23   information after I am -- after I wrote the
24   original opinion.
25           I can specify if you are interested.

Page 118

1
2        Q.   Are you referring to business plans?
3        A.   Yeah, but I would title it, Alletta,
4    not just business plans.
5        But I will call it:  Plan for
6    business.
7            Here is why:  Because sometime plan do
8    not crystalize into a specific or detailed
9    formal business plan.
10           And what I found out, for instance,
11   from the widow, once we got an opportunity, was
12   really very material information, except it was
13   not in the format of an official business
14   plan -- the one that we teach in business school
15   how to do.
16       Q.   Okay.
17           So I have a couple follow-up questions
18   on that.
19       A.   Please, please, please.
20       Q.   The first question I have is:  Did you
21   speak to Ms. Seex?
22       A.   To Mrs. Seex?
23       Q.   Yes.
24       A.   No, I did not speak to her directly.
25           I consider it, and then judged that it

Page 119

1
2    would be better, given the prior contact, that
3    Mr. Wisner will talk to her and give -- provide
4    me with the information that I have asked him to
5    ask her.
6        Q.   Okay.
7            What questions did you have for Mrs.
8    Seex?
9        A.   I specifically wanted to know about
10   plans for business.  Okay?
11           What had happened, in my
12   understanding, Alletta, is that TML, under the
13   late Mr. Seex, was in the midst of, call it, you
14   know, relaunch; were on the cusp of very
15   significant expansion, and so forth.
16           Understandably, poor Mr. Seex did not
17   think that he will -- he will be gone.  And, you
18   know, what would have become a formal business
19   plan, I'm sure later on, was not yet there.
20           I mean, there was some indications.
21   But the information that we got from the widow
22   is, I would say, of great significance.
23       Q.   Okay.
24           And what information did you get from
25   Mrs. Seex in response to your inquiry through

Page 120

1
2    counsel?
3        A.   Okay.  The information was that
4    Jonathan was in the midst of negotiation with
5    Shell -- okay? -- on opening restaurant in 500
6    Shell location throughout 15 African countries.
7            So, again, I have been thinking about
8    it when you asked about what region, this, and
9    that.
10           But that was the plan.  And this is a
11   plan that, if it were to materialize, would have
12   made TML the leading restaurant, definitely in
13   East Africa, the number one.
14           So I believe this to be very material
15   information.
16       Q.   And have you reviewed Mrs. Seex'
17   deposition transcript?
18       A.   Mr. Seex?
19       Q.   Mrs. Seex.
20       A.   Mrs. Seex?  No.
21       Q.   Is that something you plan to review?
22       A.   Sure.
23       Q.   So as you sit here today, you don't
24   know whether the information that was conveyed
25   to you through counsel is consistent with Mrs.

30 (Pages 117 to 120)

ODED SHENKAR, PH.D.

---

Page 121

```
1
2     Seex' deposition testimony?
3         A.   Again, I have not read her deposition.
4         But I have absolutely no reason to
5     question the information that I -- that I
6     received.
7         Q.   So apart from this information that
8     you received regarding the restaurants -- and
9     how did you receive that?
10        Was it written notes?
11        Or was it conveyed to you verbally?
12        A.   My understanding -- it was conveyed to
13    me from Mr. Wisner.
14        My understanding is that that was in
15    the text and in the paper that were found after
16    the tragic crash on the site.
17        Q.   Were those documents provided to you?
18        A.   No, I have not seen it, no.  Again, I
19    have no reason to question it.  But, no, I have
20    not seen it firsthand, no.
21        Q.   So if you have not seen the documents
22    firsthand, I will go back to my question a
23    minute ago.
24        How was that information conveyed to
25    you?
```

---

Page 122

```
1
2         Was it conveyed to you verbally?
3         Or did you receive some writing that
4     provided these facts?
5         A.   Either -- again, I mean, you know, I
6     wouldn't remember now, or I can go and check it.
7         I believe that I received it in an
8     email from Mr. Wisner --
9         Q.   Okay.
10        And --
11        A.   -- that's my best recollection.
12        Q.   And you have saved all of the
13    communications in which you received factual
14    information as part of your expert file?
15        A.   Factual information, yeah, I should
16    have it.
17        Q.   Okay.
18    --------------------------
      DISCOVERY REQUEST
19    --------------------------
20        MS. BRENNER:  So to the extent that's
21    not contained within my prior request on the
22    record, any documents in the file that contained
23    underlying facts that were relied on are being
24    requested.
25        MR. WISNER:  Okay.  Let me just
```

---

Page 123

```
1
2     respond after a minute, Alletta --
3         MS. BRENNER:  Yeah.
4         MR. WISNER:  I think if Dr. Shenkar
5     looks at his email, he will see that I sent him
6     those text messages and the documents from the
7     ledger found at the crash site.
8         And those are included in the list of
9     documents that he relied upon in doing his
10    updated reports.
11        He did get those documents.  I think
12    if he checks, he'll see that.
13        THE WITNESS:  Yeah, yeah.  As I said,
14    I don't recall every detail.
15        I focus -- I mean, you as a lawyer, I
16    guess, focus on that.
17        I focus on the underlying business
18    information, and that was my focus.
19        And when I received this information,
20    yes, that immediately raised important question,
21    and it was an important indication that -- and
22    again, whenever I see an indication, I go and I
23    follow up.
24        I mean, I look at more closely, again,
25    at the sector in Kenya, and in other countries.
```

---

Page 124

```
1
2     I'm looking at what, you know, the sector
3     situation is in Kenya, and other countries, and
4     so forth.
5         So I focus on that.
6         MR. WISNER:  Alletta --
7         MS. BRENNER:  Okay --
8         MR. WISNER:  -- Alletta, in response
9     to your request, without waiving the rule that
10    we normally don't have to disclose
11    communications with an expert, I will send you
12    my email to Dr. Shenkar where I also direct him
13    and show him the documents we're talking
14    about -- the text messages and the ledger.  I'll
15    send that to you.
16        MS. BRENNER:  Okay.  Thank you.
17    BY MS. BRENNER:
18        Q.   And so -- just to be clear, Dr.
19    Shenkar, until counsel spoke up here on the
20    record regarding what information he believes he
21    sent you, you didn't have any recollection of
22    actually reviewing the text messages or
23    notebook?
24        A.   That is not correct.
25        I review -- I reviewed the message, as
```

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 125

1
2    I said, as a summary.
3        I cannot look at, you know, or recall
4    every particular detail.
5        But I recall receiving this
6    information, so I guess I may have glanced at
7    the actual document.
8        But please understand, when I look at
9    that, I will look closely at the document, which
10   I very often do when I have a reason to question
11   whether it is accurate or not.
12       That was not the case here.
13       Q.   And just to be clear, you have never
14   spoken with Mrs. Seex directly?
15       A.   That is correct.
16       Q.   Now, apart from this information about
17   the future development of the business that
18   you've spoken about at length, are there any
19   other types of information that you had
20   requested for your analysis in this case that
21   you had not received?
22       A.   Not that I can think of offhand.
23       Q.   Okay.
24       And you referenced benefits
25   information and future development information.

Page 126

1
2        Is all of that information that you
3    had requested and didn't initially receive
4    information that you have now received?
5        A.   I believe so.
6        Again, let me emphasize that when I
7    start such a search, sometime I don't even know
8    what may be missing.  Okay?
9        A company, a sector, you know, can
10   have something that is very peculiar, for
11   example -- okay? -- and that initially you may
12   not, you know, even think about it.
13       As I said, I officially -- I was not
14   sure if the company even have a pension plan
15   and, you know, and so forth.
16       So I requested it.
17       I believe that I have most, if not
18   all, the pertinent information.
19       Have I missed something?  Possibly.
20       Q.   Okay.
21       Of all of the documents that you've --
22   were provided in this case, did you review all
23   of them as part of your analysis?
24       A.   I am not sure what document you were
25   provided.

Page 127

1
2        As I said, I'm doing my best to look
3    at document that I received.
4        Understandably, I focus more and spend
5    more time on those that I judge to be pertinent,
6    or I have a reason to question, you know, their
7    authenticity, so forth.
8        Q.   So let's drill down on that, then.
9        Are there documents that you were
10   provided for this case that you didn't consider
11   pertinent to your analysis?
12       A.   I'm trying to think.  There are -- I'm
13   not sure what document you would, you know, be,
14   you know, referring to.
15       There could be some that were
16   repetitive, for instance, vis-à-vis, you know,
17   benefits that have been mentioned already and
18   think things of that sort.
19       So, yes, if something were repetitive,
20   I already knew it, I did not consider it
21   pertinent.
22       Q.   Okay.
23       I think we can drill down further on
24   that as we talk more about the particulars of
25   your analysis.

Page 128

1
2        A.   Please.
3        Q.   Moving on really quickly a little bit
4    further.
5        So I understand that this is the first
6    case in which you have offered an expert opinion
7    in a wrongful death case.
8        Have you ever performed a calculation
9    of lost lifetime earnings in the context of
10   where someone died before this case?
11       A.   I have done of calculation of earnings
12   for someone who argued that his contract has
13   been abrogated, and that would continue for a
14   long time.  It was not wrongful death, no, but
15   it was, call it, wrongful termination with
16   somewhat similar consequences, which meant the
17   loss of earnings for a long period.
18       (Pause)
19       Q.   And in that other case, though, the
20   individual had not died?
21       A.   That is correct.
22       Q.   Okay.
23       And in that other case, did the loss
24   of earnings include both earnings from wages and
25   from business income?

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 129

```
 1
 2       A.  It include -- it's difficult to answer
 3   because earning, yes.
 4       There was a profit-sharing issue, and
 5   there was a lot of issues.
 6       Again, I cannot mention the country --
 7   particularities of the country where
 8   compensation was in-kind.
 9       Q.  Okay.
10       And that is the one other case where
11   you have done this type of analysis?
12       A.  This is one case where I've done this
13   analysis.  This is not the only case.
14       Again, let me reiterate, Alletta,
15   without getting, again, too much into detail.
16       I mentioned to you, for example,
17   earlier that I had a case where a company wanted
18   to buy out the stake of its joint venture
19   partnership.
20       As I said, I deal a lot with joint
21   venture, M&A, and so forth.
22       Now, the issue in this case was --
23   there was more than one issue, indeed.
24       The first issue was:  Okay, what is
25   the value of the stake that the target
```

Page 130

```
 1
 2   company -- that is the joint venture partner --
 3   is worth; keeping in mind that what is involved
 4   is not easily counted because it includes
 5   in-kind, such as business knowledge, such as
 6   connection, and so forth.
 7       In that context, there was an issue of
 8   buying out the -- a main staple there in the
 9   target company that was otherwise guaranteed to
10   stay in the company forever.
11       So basically, yes, I needed to do the
12   analysis of how much was this worth.
13       So if you want to buy this person
14   out -- again, it's not wrongful death, but you
15   want to push him out to be able to control the
16   company -- how much are -- is earnings until
17   retirement worth.
18       So in this respect, yes, it's very
19   similar to what we are looking at in here,
20   except that, again, it was an offshoot, if you
21   want, part of a bigger case that, if you want,
22   included earnings embedded in equity -- if I am
23   making myself clear enough.
24       Q.  Any other analyses you have done of
25   lost earnings, apart from those two cases and
```

Page 131

```
 1
 2   this one?
 3       A.  The case that involved, as I said,
 4   introduction also included that because it would
 5   involve the termination of certain people.
 6       So, again, not wrongful death, but,
 7   kind of, call it premature termination --
 8       Q.  Okay.
 9       I --
10       A.  -- but I think, in this respect, it's
11   pretty similar.
12       Q.  Okay.
13       So I'm getting a little bit lost here.
14       Can you just tell me the number of
15   cases where you have offered an opinion on
16   someone's lost earnings?
17       A.  I would say, maybe, three.
18       Q.  Okay.
19       So let's go ahead and move on.
20       MS. BRENNER:  I am about to get into a
21   more extensive kind of section here.  So I think
22   that we should take a quick break here so that
23   we --
24       THE WITNESS:  Sure.
25       MS. BRENNER:  -- can regroup.
```

Page 132

```
 1
 2       Let's go off the record.
 3       THE VIDEOGRAPHER:  We are now going
 4   off the record.  The time is 2:40 p.m. Eastern.
 5   This ends media unit 2.
 6       (Recess from 2:40 p.m. to 2:53 p.m.
 7   Eastern Standard Time)
 8       THE VIDEOGRAPHER:  We are now going
 9   back on the record.  The time is 2:53 p.m.
10   Eastern.  This begins media unit 3.
11   BY MS. BRENNER:
12       Q.  Okay.  So before we took a break, we
13   talked a bit about information and documents
14   that you had requested and reviewed.
15       I'd like to circle back and close the
16   loop on individuals you may have spoken with --
17       A.  Hm-hmm.
18       Q.  -- so I understand that you spoke with
19   Mr. Dunford.
20       Is there anyone else affiliated with
21   TML who you have spoken with?
22       A.  We spoke with Muizz, with I believe
23   their CFO, the financial guy.
24       Q.  And who is that?
25       A.  We call him Muizz.  And I'm just
```

33 (Pages 129 to 132)

ODED SHENKAR, PH.D.

## Page 133

1
2  trying to think what was his last name, but we
3  spoke to him.
4      Floyd would have the last name. I can
5  find it.
6      But we just called him Muizz because
7  that's how he calls himself.
8      MR. WISNER: Do you want me to tell
9  you, Alletta?
10      MS. BRENNER: Yeah, if you have the
11  name.
12      MR. WISNER: I think it's Khalid --
13  K-H-A-L-I-D.
14      And I think his full name is -- ah,
15  shoot, I better not say. I think it's Ayub
16  Muizz Khalid.
17      THE WITNESS: Right.
18      MR. WISNER: Yeah.
19      THE WITNESS: We call him Muizz, okay,
20  but -- yeah.
21  BY MS. BRENNER:
22      Q.  So, Muizz -- when did you speak with
23  him?
24      A.  I would say sometimes probably in
25  December.

## Page 134

1
2      Q.  Was it before or after your initial
3  reports were finalized?
4      A.  Possibly once before, and once after.
5      But, again, I don't have exact
6  recollection.
7      Q.  So you spoke to him twice?
8      A.  Possibly.
9      Q.  And who was involved in that
10  conversation aside from you and him?
11      A.  Mr. Wisner.
12      Q.  Okay.
13      Anyone else?
14      A.  Not that I can recall.
15      Q.  Okay.
16      So let's talk about the first phone
17  call.
18      Do you recall what the substance of
19  that discussion was?
20      A.  Again, I don't keep a record of
21  details, and so forth.
22      What we wanted -- what I wanted to
23  know in particular was mostly information about
24  the business plans. Okay? What were the plans
25  in terms of expansion; in terms of, maybe,

## Page 135

1
2  future acquisitions; getting into different
3  segment of market; and so forth.
4      That was basically the essence of it.
5      Q.  What information did he share with you
6  about TML's business plan?
7      A.  Apparently, there were a lot of plans.
8      Some of them he basically said were
9  kind of -- you know, died, I think with -- you
10  know -- with Jonathan's death, and so forth.
11      But essentially the plans were, you
12  know, of growth and expansion.
13      That included -- and I think that was
14  maybe in a bit more advanced stage -- getting
15  into different segments of the restaurant
16  business.
17      What I mean by different segments --
18  you know, we divide them in -- in restaurant
19  into, you know, kind of, call it high class, and
20  so forth, fast food, casual, and things of that
21  sort.
22      Q.  And did you rely on information that
23  Mr. Muizz provided for you in that phone call?
24      A.  To the extent -- and again, I don't
25  recall all the detail. I don't keep record -- I

## Page 136

1
2  mean, of -- full record of each and every one.
3      To the extent that he said something
4  important in the first call, yes.
5      But I doubt, because then probably we
6  wouldn't need a second call.
7      Q.  Do you keep notes of your phone calls
8  that you have with witnesses?
9      A.  No. I do not.
10      I mean, I have -- you know, I can tell
11  by dates to which have an email and arrange for
12  that, and this and that.
13      But I don't keep a detailed record of
14  every phone call that I am making. I'm not a
15  lawyer.
16      Q.  So you don't have any notes or any
17  other records where you took down the
18  information that --
19      A.  I might have known --
20      Q.  -- phone call --
21      A.  -- I would have to go back and look
22  for it if I have.
23      Q.  Okay.
24      MS. BRENNER: And just as a friendly
25  reminder, please let me finish my questions

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 137

1
2  before you start to answer because it's very
3  difficult for the court reporter.
4        THE WITNESS:  Whatever you say.
5        MS. BRENNER:  Okay.
6  BY MS. BRENNER:
7    Q.   So I am going to try to go back to --
8  okay.
9        So I'll go back to my questions.
10       You don't have any notes or other
11  records where you took down the information that
12  Mr. Wise -- I'll call him that -- conveyed to
13  you on that first phone call?
14   A.   Are you talking about Muizz now?  I
15  don't understand.
16   Q.   Yes.
17   A.   Okay.
18       As I said, I don't recall.  I would
19  have to go and look for it.
20   Q.   Now let's talk about the second call.
21       So I think you just testified a minute
22  ago that you are not sure whether you relied on
23  the information that he shared during the first
24  call?
25   A.   You asked me whether I relied on it.

Page 138

1
2        I assumed that that was in reference
3  to the report that I have submitted, my initial
4  report.
5        And I've answered that.
6        I said:  I do not recall.
7        My assumption is that not, because
8  otherwise it wouldn't need a second call.
9        But I'm happy to dig -- it will take
10  time -- on my file and see if I took any notes
11  pertaining to it and when I took it.
12   Q.   Well, how about let's put it this way?
13       Generally speaking in your reports, if
14  there is information that is important that you
15  rely on, do you typically note that in a
16  footnote?
17       Or some way in your report?
18   A.   I would typically note it, yes.
19   Q.   Okay.
20       So now let's talk about the second
21  call.
22       Your recollection is that there was a
23  second call.
24       Do you recall whether that was before
25  or after your reports were finalized?

Page 139

1
2    A.   I am pretty sure it was after.
3    Q.   Okay.
4        And do you have any recollection
5  whether it was before the end of the year?
6        Or was it since 2025?
7    A.   Probably somewhat in January.
8    Q.   Okay.
9        And so your phone call that then was
10  much more recently in January -- do you recall
11  what was discussed that second time?
12   A.   No.  As I said, I will have to look
13  through my notes.
14       What I can only guess is that there
15  were detail that were not clear, and I was
16  hoping to get more information.
17       And all of this pertains to the future
18  plans of the business.
19   Q.   Were there any particular documents
20  that the CFO -- I'll just call him that because
21  I can't get his name right --
22   A.   No, no, that's fine.  That's fine.
23   Q.   -- that the CFO directed you to during
24  either of those conversations?
25   A.   I believe there was information

Page 140

1
2  basically on the company revenues over the last
3  several years, and so forth.  I mean -- and
4  that's something that I think, you know, you
5  have seen, and your expert has seen as well.
6    Q.   And when you say "company revenues,"
7  are you speaking of the audited financial --
8    A.   Correct --
9    Q.   -- statement report?
10   A.   -- yes, yes.  Yes.
11   Q.   Okay.
12       Any other documents that he directed
13  your attention to as relevant to that issue?
14   A.   Not really.  Not really.
15       And again, I mean, the issue is
16  here -- I think it's important to keep in
17  mind -- that you are talking about plans that
18  were, you know, at various stages.  And that it
19  appeared that some of it was, you know, just
20  handled by Jonathan, you know, and other people
21  were not completely privy to it, and so forth.
22       You do have to keep in mind that you
23  are not talking about a large, publicly-traded
24  company, or something.  I mean, you are talking
25  about a smaller privately held firm.  And, you

35 (Pages 137 to 140)

ODED SHENKAR, PH.D.

Page 141

```
1
2     know, the processes are not always that
3     formalized and transparent as they would be in a
4     large company.
5         Q.   Okay.
6             So do you know whether this CFO was in
7     that role in the company back at the time when
8     Jonathan was still alive in early 2019?
9         A.   I believe he was in that role, or a
10    similar role.
11        Q.   Okay.
12            So he would be knowledgeable about the
13    company's business plans and projections --
14        A.   No, no, no, no --
15            MR. WISNER:  Objection.
16        A.    -- now you are putting words in my
17    mouth.
18            I just said that, given that we are
19    talking about a small, privately-held company,
20    there may well have been business plan that he
21    was unaware of.
22            And as an example, I mean, we didn't
23    hear that -- I can tell you for sure -- we
24    didn't hear a word from him about the plan with
25    Shell -- the 500, you know, Shell station plan.
```

Page 142

```
1
2     We did not hear it from him.
3             So I guess that he was not privy to a
4     lot of other things.
5             Again, keep in mind that Jonathan
6     before becoming CEO was the head of business
7     development.  This was his area.
8             This was not the CFO area.
9             And you are not talking about, again,
10    a formal board meeting where everything is being
11    discussed and laid about.
12            (Pause)
13        Q.   Is it your understanding that as CFO,
14    Mr. Khalid would have been knowledgeable about
15    the company's finances?
16            MR. WISNER:  Objection, asked and
17    answered, mischaracterizes testimony.
18            You can answer, Dr. Shenkar.
19        A.   Can you repeat it?  If he was aware of
20    finances?
21        Q.   I'll repeat the question.
22        A.   Please.
23        Q.   Is it your understanding that as CFO,
24    Mr. Khalid would have been knowledgeable about
25    the company's finances?
```

Page 143

```
1
2             MR. WISNER:  Same objection.
3         A.   In general terms, I believe so.
4             Not necessarily every detail.
5         Q.   Okay.
6             Is he one of the individuals who would
7     have, for example, reviewed and approved of
8     those audited financial statements and reports
9     that you referred to a minute ago?
10        A.   I assume so.
11        Q.   Okay.
12            So aside from those two phone calls
13    with the CFO, is there any other information
14    that you learned from him?
15        A.   No.
16        Q.   Okay.
17            And no other conversations with him
18    since -- or communications, rather -- with him
19    since this last phone call in January?
20        A.   Not that I can recall.
21        Q.   Okay.
22            Did you speak with anyone else
23    affiliated with TML?
24        A.   As I said, we spoke to Martin Dunford.
25            (Pause)
```

Page 144

```
1
2         Q.   Okay.
3             Aside from the CFO, and aside from Mr.
4     Dunford -- Mr. Dunford's role -- is he chairman
5     of the board of the company?
6         A.   Yeah --
7         Q.   Okay --
8         A.    -- and he's a co-founder also.
9         Q.   He's a co-founder.
10        A.   I believe that he's also a co-founder.
11        Q.   Okay.
12            So aside from the conversation that
13    you had with the CFO and with the co-founder,
14    Mr. Dunford, did you have conversations with
15    anyone else affiliated with TML?
16        A.   No.
17            As I mentioned before, I received
18    information from Mr. Wisner based on his
19    conversation with Lucas Krank of Ascent Capital.
20            So, again, it's not TML itself, but
21    it's obviously a player in -- if you will, in
22    that space.
23        Q.   So I want to ask you about that in a
24    second.
25            Going back to the folks that are
```

ODED SHENKAR, PH.D.

Page 145

```
 1
 2  affiliated with TML, setting aside any phone
 3  conversations, did you receive information from
 4  such persons through counsel?
 5        Or via email?
 6        Or any other way?
 7     A.   Not that I can recall.
 8     Q.   So there is no other information that
 9  you received directly from TML, apart from the
10  information you received in the phone calls that
11  we've already been discussing?
12     A.   To the best of my knowledge --
13     Q.   Okay.
14     A.   -- recollection.
15     Q.   Okay.
16        So now let's talk about this
17  information that was received from Mr. Krank.
18  Is that his name?
19     A.   I know that it doesn't sound good, but
20  K-R-A-N-C-K, I believe.
21     Q.   Okay.
22     A.   -- Lucas, Lucas.  Call him Lucas.
23        MR. WISNER:  I think it's Krank.
24     A.   Krank, Krank.
25     Q.   Okay.
```

Page 146

```
 1
 2        And your understanding is that he is
 3  affiliated with Ascent Capital?
 4     A.   He is a principal in Ascent Capital.
 5     Q.   Okay.
 6        And just to be clear, you didn't speak
 7  to him directly?
 8     A.   That is correct.
 9     Q.   Okay.
10        So did you provide him with a list of
11  questions via counsel?
12     A.   No.  I think it was clear what we
13  wanted to know from him.
14        So, yeah, may have discussed it with
15  Mr. Wisner before because -- again, because of
16  the sensitivity and so forth, we judged it was
17  better if he talks to him.
18        But definitely I mention what I wanted
19  to hear.
20     Q.   Would you have preferred to talk to
21  him directly?
22     A.   Not necessarily.
23        Listen, I mean, you know, it's a very
24  sensitive matter.  I mean, you know, and as I
25  mentioned, we were able -- my understanding, to
```

Page 147

```
 1
 2  talk to him only after Nadege's introduction
 3  because if -- in the case of Nadege, the widow,
 4  that would be emotionally sensitive.
 5        In the case of -- I'll call him
 6  Lucas -- it was business sensitive because, you
 7  know, why give us information where, you know,
 8  they -- be considered business confidential, you
 9  know?  Why give it to us?
10        So my understanding is he was ready to
11  talk only after a request was made by Nadege --
12  by the widow.
13        And the judgment was:  Yeah, maybe it
14  would be less sensitive if, you know, Mr. Wisner
15  talked to him directly without my presence.
16        But, again, I was pretty clear about
17  what I wanted to know.
18        And I got an answer on that, and I
19  have no reason to question his answer.
20     Q.   What is it that you wanted to know?
21     A.   Well, I wanted to know two things that
22  are pertinent to the case.
23        One of them is -- has to do with the
24  letter of intent -- the intent that -- letter of
25  intent that was submitted shortly before the
```

Page 148

```
 1
 2  crash.  And I wanted to know, or to confirm, why
 3  it has been withdrawn.
 4        You want me to continue?  Or you want
 5  to react to that before I get to the second
 6  issue?
 7     Q.   Why don't you go ahead and continue?
 8     A.   Okay.
 9        The second issue was that I wanted to
10  know what was their expected return on the
11  investment, which I can tell you is 100%
12  business confidential.
13        And I thought maybe it would be more
14  comfortable for him to talk to the counsel than
15  to talk to someone like me, who has -- okay --
16  is the expert witness.
17        But who knows?  May pass this
18  information to somebody else.  I don't know.
19        So these were the two things that I
20  wanted to know from -- again, from Lucas.
21     Q.   And when did you receive this
22  information from Lucas?
23     A.   This information was received after I
24  submitted my initial opinion.
25     Q.   And when did you request that
```

ODED SHENKAR, PH.D.

Page 149

1
2    information?
3         A.   I wanted this information for myself.
4         But again, I understood that it was
5    very difficult, if not impossible, to reach him.
6         Actually, my understanding is Mr.
7    Wisner tried and there was no response.  Okay?
8         So we had to wait.  We had to go
9    through Nadege.  We had to ask Nadege to talk to
10   him, and so forth.
11        And only when he agreed to talk, then,
12   you know, we proceeded, and Mr. Wisner, you
13   know, talked to him.
14        Q.   Did the information that you received
15   through counsel from Lucas change your opinions
16   in this case?
17        A.   No.  It just confirmed and reinforced
18   it.
19        Q.   How was that information conveyed to
20   you?
21        A.   The information was conveyed to me --
22   I think, again, could be partly in an email,
23   partly verbally.
24        Again, I would have to go back and
25   look at it.

Page 150

1
2         Q.   So do you have any notes or documents
3    where you wrote down, for example, the
4    expectation on the return on investment?
5         A.   I don't think so.  I think it just
6    stuck in my hand because this is really not a
7    lot -- a lot to remember.  It was very explicit
8    and very clear.
9         Q.   So what was the expected return on the
10   investment?
11        A.   The expected investments were 20%
12   annually --
13        Q.   The expected return on investment was
14   20% annually? --
15        A.   Expected return.  Ascent expected
16   return on its investment -- okay? -- which was,
17   if you read the letter of intent initially,
18   scheduled to last for five years, could have
19   been extended, but it was supposed to go for
20   last year -- was that the return would be 20%
21   annually.
22        This was why it reinforced my opinion
23   because I knew -- and that was also actually
24   reinforced by Mr. Dolgoff, who almost treat this
25   investment as kind of a charity -- that I can

Page 151

1
2    tell you that this is above the common
3    parameters for private equity investment that we
4    know, not only from literature but also from
5    practice.
6         Q.   Okay.
7         And I want to be clear about the LOIs
8    that we are talking about here.
9         So there were two LOI letters in March
10   of 2019 --
11        A.   Okay --
12        Q.   -- and so when you say "the return on
13   investment," are you referring to the return on
14   investment that was expected at that point in
15   time in March 2019?
16        A.   That is correct.  Not 2019 -- yeah,
17   2019, yes, that's correct, yeah.
18        Q.   When you say 20%, do you mean 20%
19   every year, so including the first year?
20        Or are you referring to --
21        A.   Including the first year, annually --
22        Q.   Okay.
23        So my question was, though, 20% every
24   year?
25        Or are you referring to an average

Page 152

1
2    over a longer period of time?
3         A.   Whenever a company tell you that this
4    is the expected thing, I mean, that's -- they
5    expect it to be every year compounded.
6         And can it vary?  Of course it can
7    vary.  I mean, nobody believes it's going to
8    be -- be exactly 20% a year.  This is averaging
9    20% a year.
10        Q.   And did he convey what the basis was
11   for their assessment that that was the
12   reasonable rate of return?
13        A.   No.  No.  No.
14        And then -- listen, I mean, if -- then
15   you really get -- I mean, I was -- even, I mean,
16   satisfied to get -- to get the number.
17        You are talking about
18   business-sensitive issues that people are not
19   going to be too happy to share with you.  It's
20   proprietary knowledge.
21        Q.   So you would agree that in the LOI
22   letters that have been provided, there is a
23   valuation summary that have been provided, which
24   states that they are using a multiple of six
25   times the 2018 normalized sustainable earnings

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 153

1
2  before interest, tax, depreciation, and
3  amortization?
4      A.  No, I think you are confusing two
5  things, here, with all due respect.
6      I mean, there is the calculation of
7  what is, you know, the present value based, you
8  know, on, you know, really also the past; and
9  how much money they expect to make over this
10 five-year horizon.
11     Q.  So that's the question I'm trying to
12 ask, I guess.
13     Because my understanding is that the
14 letters of intent do include a valuation and
15 some discussion of the investment.
16     And so when you are saying they were
17 expecting a 20% return on investment, is it your
18 understanding that that was based on the
19 analysis that's stated in these letters of
20 intent?
21     Or is there a further analysis --
22     A.  Of course --
23     Q.  -- beyond the --
24     A.  -- of course, further analysis.  This
25 is where you get the proprietary stuff.  This is

Page 154

1
2  where they look at the business.
3      A private equity player will only make
4  an investment when they think that a company is
5  undervalued and/or will be undervalued in a few
6  years.  Okay?
7      And that can take a couple of routes.
8      One of them is if they think that the
9  company is badly managed, so forth.  They
10 replace the management, and so forth.
11     Here this is the exact opposite of
12 that.  Okay?
13     So they're looking at the market.
14 They are looking at the environment.  They are
15 looking at the CEO.
16     And they are saying:  Yes, this is our
17 expectation.
18     And on that basis, you know, they make
19 their investment.
20     Q.  Do you know what information Lucas was
21 relying on in arriving at that assessment about
22 what the return on investment would be?
23     A.  You have asked that before, ma'am, and
24 the answer is still:  No.
25     Q.  So, for example, earlier you spoke

Page 155

1
2  about the expansion plans that Mr. Seex was
3  working on.
4      Is it your understanding that Mr. --
5  that Lucas had any information about those
6  expansion plans?
7      A.  Let it very clear, okay?
8      I have no knowledge of that.
9      My assumption is that these people are
10 not dumb; that they are doing their homework;
11 and they have information that lead them to make
12 the investment.
13     Whether he was familiar with this 500
14 Shell set?  Possibly.  I don't have an answer to
15 that.
16     I'm sure he was familiar at the least
17 with other expansion plans, for instance,
18 entering into kind of casual, you know, you
19 know, fast food, and things of that sort.
20     I'm sure that he was familiar with the
21 franchise that existed in South Africa that
22 possibly could be a model for much bigger
23 expansion.
24     But, again, Alletta, I do not have
25 knowledge of that.

Page 156

1
2      It is my very, I would say, solid
3  assumption that they know at least about some of
4  those.  Otherwise why would they make the
5  investment?  I mean, obviously you make an
6  investment because you think you will get a nice
7  return.
8      Before talking to him, I didn't know
9  what was their exact number.  And I was actually
10 somewhat surprised that he shared it with us.
11     I can tell you that the average -- and
12 unfortunately, you are not going to find it in
13 your expert report, the report on your side --
14 but the average return for private equity --
15 okay? -- overall ranges from about 10-1/2 to
16 13%.  This is -- I'm not discovering anything
17 here.  It's very common knowledge in the
18 industry.
19     So obviously, if somebody had an even
20 higher expectation, they were pretty confident
21 that they have a good investment in here.
22     Q.  So I just want to put a fine point on
23 that, then, and make sure I'm understanding your
24 testimony.
25     A.  Please, please.

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 157

1
2     Q.   So you don't know what information
3  regarding the future performance or forecast of
4  the business performance that Ascent was relying
5  on in projecting that 20% rate of return?
6     A.   Of course not.
7         And I would say nobody else other than
8  a principal of Ascent would have known that or
9  would have revealed that.  I mean, they would
10 have known, but they would not have revealed
11 their analysis.
12    Q.   Okay.
13        So you had this information that was
14 conveyed to you from counsel from Ascent
15 Capital.
16        Any other information that you
17 received in any form from Ascent Capital beyond
18 what we have already discussed?
19    A.   Not --
20    MR. WISNER:  Objection.
21    A.   -- no, with the exception of the
22 letters that -- of intent that I did see, yeah.
23    Q.   Okay.
24    A.   But nothing else from Lucas beyond
25 what I mentioned.

Page 158

1
2     MR. WISNER:  Well, let me object,
3  quickly.  This mischaracterizes his testimony
4  because he did say there were two points and
5  you've only asked him about the one.
6         But you can answer it if there is
7  another question.
8     THE WITNESS:  You mean the intent?
9     MR. WISNER:  Yeah, that's what I'm
10 getting at.
11    A.   No, no.  Of course, that is true --
12    MR. WISNER:  -- that's the letter --
13    A.   -- I answered, actually, about the
14 second one.
15        I put it the first one was the intent
16 because what we wanted to know, and actually to
17 confirm -- I mean, there was strong implication
18 of that also from Martin.
19        But we wanted to confirm whether the
20 letter of intent was withdrawn because of the
21 crash.
22        And the answer -- the answer very
23 clearly was "yes" that Ascent gave TML an
24 opportunity to find somebody -- a replacement of
25 his caliber, and they could not find one.

Page 159

1
2         So they -- I'm not sure even -- I
3  mean, the way they might have said something
4  about the jockey rather than the horse, and so
5  forth.
6         But it was crystal clear that they saw
7  Jonathan as such an important asset to TML that
8  they did not -- they did not continue with the
9  offer because of his unfortunate death.
10        So these were really the two points of
11 information.
12        I actually put the intent as first,
13 but you were asking about the second point which
14 was the expectation in -- of increase in value.
15        (Pause)
16    Q.   Okay.
17        So that was the next thing I was about
18 to ask you about, so let's talk a little bit
19 more about it.
20        So you've referred to the information
21 that was provided to you in response to your
22 question about the LOI.
23        What specifically did you ask?
24    A.   My question -- the question that I,
25 again, forward, you know, Mr. Wisner to ask --

Page 160

1
2  was specifically:  Why was the letter of intent
3  withdrawn.
4         Keep in mind exactly the timeline.  It
5  just so happened that the letter of intent was
6  submitted days actually before the crash.  Okay?
7         And it seemed to me just by following
8  the sequence of events, you have a letter of
9  intent before the crash, and suddenly it's
10 withdrawn right after the crash.
11        I mean, it seems obvious to me why,
12 but I wanted a confirmation.  And we did receive
13 a confirmation.  The death was the reason.
14    Q.   Okay.
15        And so -- and when you say "we
16 received a confirmation that that was the
17 reason," what exactly was conveyed?
18    A.   What was conveyed was that they saw
19 Mr. Seex as, call it again, the jockey as a very
20 important part and parcel of the company; so
21 much so that once he passed away, they were not
22 willing to proceed except if TML were to find
23 somebody equivalent.
24        They did not find somebody
25 equivalent -- which, by the way, should also

ODED SHENKAR, PH.D.

Page 161

1
2    tell you something about the earnings.  Right?
3        I mean, you have here someone with
4    what we call in the field scarce and valuable
5    capabilities that are very difficult to
6    replicate.
7        So we got a confirmation of that.
8    Q.   How was this information conveyed to
9    you?
10   A.   You have asked me -- as I said, it was
11   conveyed to me by Mr. Wisner after he talked to
12   him.
13       Whether it was in the form of an
14   email, or a phone call, or both, I do not
15   recall.
16       I can look for it, but it will take
17   time.
18   Q.   Okay.
19   -------------
     DISCOVERY
20   -------------
21       MS. BRENNER:  So sort of standing
22   request that we've already made:  Insofar as
23   there was any written information provided to
24   you providing underlying facts for your
25   analysis, we're requesting those.

Page 162

1
2    BY MS. BRENNER:
3    Q.   Fair to say based on your prior
4    testimony that you don't have written notes of
5    this information that was provided to you about
6    what was shared by Mr. -- by Lucas?
7    A.   Yeah.
8    Q.   Okay.
9        Now --
10       MR. WISNER:  Alletta, if I may
11   interject, I will -- if we agree on not waiving
12   the privilege between a lawyer and an expert,
13   I'll be happy to send you the information that
14   Mr. Kranck gave me.
15       MS. BRENNER:  Thank you.
16       MR. WISNER:  May be some redactions,
17   but otherwise I'll give that to you.
18       MS. BRENNER:  Okay.  Thank you.
19   BY MS. BRENNER:
20   Q.   All right.  So I have a couple
21   follow-up questions here.
22       First question:  When is it your
23   understanding that that 2019 offer and letter of
24   intent was withdrawn?
25   A.   I don't have the exact day, but it was

Page 163

1
2    shortly after the crash.
3    Q.   So you are referring to a condition
4    that was referenced in the second letter of
5    intent, in March 30, 2019?
6    A.   In March 2019?
7    Q.   March 30 of 2019?
8        MR. WISNER:  Can you show him the
9    letter of intent?  And point him --
10       MS. BRENNER:  Let's go ahead and mark
11   it.
12       (Pause)
13       MR. WISNER:  Okay.  It is going to be
14   exhibit 6 I think?
15       MS. BRENNER:  Exhibit 6.
16       (Exhibit Defendant's Seex_Shenkar 6,
17   Four-page letter from Ascent Capital MGT Africa
18   Ltd. to Phil N. Gutsche, dated March 30, 2019
19   (no Bates Nos.), marked for identification)
20       MS. BRENNER:  Okay.  What I want to
21   draw your attention to --
22       THE WITNESS:  Okay.
23       MS. BRENNER:  -- are the discussion in
24   this document about the requirements.
25       And so if you go -- I'm afraid there

Page 164

1
2    is no page numbers here.
3        But on the second page --
4        THE WITNESS:  So --
5        MR. WISNER:  Alletta, can you identify
6    for the record that's the March 30 form?
7        MS. BRENNER:  Yes, that is the March
8    30, 2019 letter of intent, and we've just marked
9    it as Exhibit 6.
10       MR. WISNER:  Okay.
11       MS. BRENNER:  And I would like to draw
12   your attention to the second-to-the-last
13   paragraph on page 2 of the letter.
14       THE WITNESS:  Second-to-last.  Can you
15   scroll down and -- the parties agree?
16       MS. BRENNER:  Yes.
17   BY MS. BRENNER:
18   Q.   And I'll just read this into the
19   record really quick.
20       The parties agree to work closely
21   together during the Due Diligence phase to
22   identify and agree on a suitable CEO to be
23   appointed latest on signing of the transaction
24   documents.
25       Did I read that correctly?

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 165

1
2     A.   Okay.
3          So I don't understand what your
4    question is.
5     Q.   So my question is:  Is that the
6    condition regarding the appointment of a CEO
7    that you were referring to as a requirement?
8     A.   No, because it's -- they know who the
9    CEO is.
10         I'm referring to what happened, you
11   know, after the crash.
12    Q.   So you would agree that after the
13   crash when Mr. Seex was no longer alive, there
14   was no CEO in place at the company?
15    A.   After the crash, there was no CEO.
16   That is correct --
17    Q.   Okay.
18         And --
19    A.   -- that's my understanding.
20    Q.   Okay.
21         And the date on this LOI that we've
22   just marked is March 30, 2019?
23    A.   You are looking at -- right? -- you
24   are talking about a March 10 crash, right?
25    Q.   Correct.

Page 166

1
2     A.   Correct.  Okay.
3          So obviously, we are talking about the
4    -- the revised, if you will, letter after the
5    crash.  Right?
6     Q.   Yes.
7     A.   Okay.
8          What -- again, what we have heard both
9    from Martin and from Lucas is that the letter
10   was -- or the offer was withdrawn following the
11   crash, subject, again, to finding a suitable
12   CEO, which they were unable to do.
13    Q.   Okay.
14         So I just want to be clear.
15         Because what we have here is a letter
16   of intent that is dated after the crash.
17         And the portion of the letter of
18   intent that I just read into the record
19   references that the parties are agreeing to work
20   closely together to identify and agree on a
21   suitable CEO to be appointed.
22         So is that the condition that you are
23   speaking about as a condition precedent to the
24   deal going forward?
25    A.   The condition was explained to us very

Page 167

1
2    clearly by Martin and then later confirmed by
3    Lucas.  Okay?
4          What you are reading to me here -- it
5    basically says:  Yeah, we are going to work
6    together in finding a suitable CEO.
7          We know that to this day they are
8    unable to find a suitable CEO.
9          And this is exactly has been my point.
10   That also will come in handy when you are
11   talking about earnings, and so forth, that you
12   are talking about somebody who has what we call
13   not only valuable but also rare capabilities.
14         I will --
15    Q.   Do you know --
16    A.   Yeah, go ahead.
17    Q.   Do you know what steps they took to
18   identify a replacement CEO?
19    A.   I do not know.
20         But I can definitely guess that if
21   they wanted -- assuming they wanted, and I think
22   they wanted -- the deal to go through, that they
23   have spared no effort trying to find one, but
24   they were unable to.
25    Q.   Well, I don't want you to guess.

Page 168

1
2          So without speculating, do you know
3    what steps they undertook to identify a new CEO?
4     A.   I do not.
5     Q.   So your understanding is that this
6    second LOI -- dated March 30, 2019 -- was at
7    some point then also withdrawn?
8     A.   Yes.  That's my understanding -- that
9    it was no longer in play.
10    Q.   Have you seen this letter of intent
11   that we are looking at right now before today?
12    A.   Yes.
13    Q.   Okay.
14         So you considered this in preparing
15   your analysis?
16    A.   Yeah.
17    Q.   And did you have this letter of intent
18   prior to November 30, 2024?
19    A.   I do not recall the exact date.
20         But, again, everything that I relied
21   on will appear in my -- will be referenced in my
22   opinion.
23    Q.   Okay.
24         MS. BRENNER:  And I'd like to then
25   draw your attention to another letter of intent.

42 (Pages 165 to 168)

ODED SHENKAR, PH.D.

Page 169

1
2      And let's go ahead and just mark it.
3   Karishma, it should be under K.
4   BY MS. BRENNER:
5      Q.   While we are getting that up, I just
6   have one more question on the letter of intent
7   that we marked as Exhibit 6, the March 30, 2019
8   one.
9      Are you aware of any written
10  communication from anyone at Ascent Capital to
11  anyone at TML formally withdrawing the second
12  letter of intent?
13     A.   If I have a correspondence between
14  them?  No, I don't have any direct
15  correspondence between them.
16     Q.   Did you request whether there were any
17  documents showing that?
18     A.   No, no, I did not.
19     Again, I mean, I was satisfied with
20  what we heard from -- you know, from Martin and
21  later from what we have heard from Lucas.
22     Q.   Okay.  So let's now move on.
23     MS. BRENNER:  We've just marked
24  another document, and I believe this one should
25  be Exhibit 7.

Page 170

1
2      (Exhibit Defendant's Seex_Shenkar 7,
3   Document Bates stamped Seex_Shenkar 000496
4   through 498, three-page letter from Ascent
5   Capital Africa II Ltd. to Tamarind Management
6   Ltd., dated July 2, 2020, marked for
7   identification)
8      MS. BRENNER:  And you can let me know
9   when you have it.
10     THE WITNESS:  You are talking about
11  July 2nd?
12     Or there is another one?
13     MS. BRENNER:  Apologies.  This is not
14  the -- this is not the -- this one has a
15  different date on it.
16     THE WITNESS:  Okay.
17     MS. BRENNER:  Karishma, I'm looking
18  for the document that is dated June 20, 2020.
19     (Pause)
20     THE WITNESS:  This is July 2nd.
21     MS. BRENNER:  Yeah.
22     THE WITNESS:  I don't mind.  I mean,
23  Alletta, if you prefer that we continue with
24  something else and revisit that later after the
25  break if you have problem finding the right

Page 171

1
2   documents.
3      MS. BRENNER:  Hold on a second.
4   This --
5      THE WITNESS:  Yeah, that's March 30
6   that you already showed us.
7      MS. BRENNER:  Okay.  So, Karishma, you
8   can go ahead and go back to the one that we have
9   already marked as number 7.
10     All right.  So it looks like we have
11  got one here that's dated July 2nd, 2020.
12     And let's go ahead and --
13     THE WITNESS:  You say that was not the
14  one that you were looking for, so I --
15     MS. BRENNER:  I know.  It's already
16  been marked, though, so I'd like to go ahead and
17  ask you about that one.
18     THE WITNESS:  Okay, okay, okay.
19     MS. BRENNER:  Okay.
20  BY MS. BRENNER:
21     Q.   So is this a document that you've seen
22  before?
23     THE WITNESS:  Possibly.  I mean, I am
24  struggling to read it.  It's really tiny, tiny
25  type.

Page 172

1
2      MS. BRENNER:  So there should be a
3   button that you can press there on your screen
4   to make it larger.
5      THE WITNESS:  Okay, yeah, yeah.  Now
6   it is larger.
7      MS. BRENNER:  Okay.
8   BY MS. BRENNER:
9      Q.   So you would agree that this appears
10  to be an additional letter of intent that was
11  sent in 2020 to TML from Ascent?
12     A.   It appears so, yes.  Yes.
13     Q.   Okay.
14     MR. WISNER:  Sorry about this, but now
15  I'm confused.  Are we looking at the June one or
16  the July?
17     MS. BRENNER:  We are looking at the
18  July within that we marked into the record.
19     MR. WISNER:  Okay.  Thank you.
20  BY MS. BRENNER:
21     Q.   Okay.
22     So is this a document that you've seen
23  before?
24     A.   I believe so.  I mean, I believe so.
25     Q.   Okay.

ODED SHENKAR, PH.D.

Page 173

1
2          So --
3          A.   I don't remember everything by heart,
4    but I believe so.
5          But go ahead, ask me the question.
6          Q.   And we've also referenced a June 2020
7    letter.
8          And I'll just represent on the record
9    that there is also a version of a letter of
10   intent that was dated for the month prior.
11         My question isn't specific to the
12   content of either of the letters.
13         But more generally, is it your
14   understanding that there were also letters of
15   intent that were sent from Ascent in 2020?
16         A.   I am aware, again, of the letters of
17   intent precrash. I'm aware of a letter of
18   intent that was sent after the crash.
19         Whether I've seen both June and July,
20   I'll have to look at both closely and see
21   whether I've seen both, or just one, and which
22   one it is.
23         Q.   Okay.
24         So you recall -- I guess I want to put
25   a finer point on that.

Page 174

1
2          Have you only seen one from 2020?
3          Or do you recall seeing more than one
4    from 2020?
5          A.   I do not remember whether I've seen
6    one or two.
7          Q.   Okay.
8          MS. BRENNER:  So let's go ahead and
9    scroll down a little bit more on this one, since
10   either way it seems this is the later of the
11   two.
12         THE WITNESS:  Okay.
13         MS. BRENNER:  And I would like to draw
14   your attention to the second page where it
15   references "Conditions Precedent" under
16   paragraph 4.
17         Do you see that?
18         THE WITNESS:  Yeah.
19   BY MS. BRENNER:
20         Q.   So is it your recollection that there
21   was any condition precedent for this 2020 LOI
22   that related to the appointment of a CEO?
23         A.   Again, I relied on the information
24   that we received from Martin and later from
25   Lucas.  Both have been explicit that it did not

Page 175

1
2    proceed because the company -- TML -- was unable
3    to find a CEO replacement that will meet the
4    qualification expected by Ascent.
5          Q.   So I understand your prior testimony
6    regarding the March 2019 letter of intent, but
7    my question is relating to a further letter of
8    intent in 2020.
9          Did either Mr. Khalid or Mr. Dunford
10   share anything with you regarding this 2020
11   letter of intent?
12         MR. WISNER:  Asked and answered.
13         Go ahead.
14         THE WITNESS:  No, no, Floyd, it's
15   fine.  I mean, I can answer.
16         A.   We did not discuss it with Muizz.
17   Okay?
18         This was discussed, you know, with
19   Martin, who was, again, the chairman.  And it
20   was discussed with Lucas from Ascent.  Okay?
21         Having heard from both, it was
22   extremely clear that that was a condition; and
23   that the condition could not -- has not been
24   met, which is why this -- the transaction did
25   not proceed at the time.

Page 176

1
2          Q.   So I want to be really clear, though,
3    because it appears that there is multiple
4    letters of intent here.
5          And so is it your testimony that Mr.
6    Dunford and then also Lucas -- the individual
7    you had information from Ascent -- both
8    conveyed that this 2020 letter of intent also
9    did not go forward due to the lack of a CEO?
10         A.   Let me repeat -- okay? -- myself
11   again.
12         I do not recall if I have seen one or
13   two letters from after the crash.
14         I am relying, again, on the
15   information received from Martin Dunford --
16   okay? -- as chairman, and from Lucas Krank, who
17   is a principal at Ascent.
18         Hearing it from both sides, as a
19   business person and scholar, that absolutely
20   satisfies me.
21         I understand that as a lawyer, you
22   want to find, you know, what is exactly the
23   right wording and so forth.
24         But I have been satisfied that this is
25   exactly what had happened.

44 (Pages 173 to 176)

ODED SHENKAR, PH.D.

Page 177

```
1
2        Q.   So in your questions to them, did you
3   specify which letters of intent you were asking
4   about?
5        A.   Again, ma'am, for the fourth time, let
6   me repeat myself in case I have not been clear.
7        I have asked them why the letter of
8   intent -- let -- was placed before the crash has
9   not been acted upon, and why the transaction
10  overall has not been completed.  That's what I
11  have asked them.
12       And I told you the answer that I got
13  from them:  An unequivocal that that was the
14  reason why the transaction did not proceed.
15       Q.   Okay.
16       So -- and I'm not trying to be
17  difficult here, but I'm trying to be clear
18  because I want to make sure what transaction we
19  are talking about.
20       And so when you asked that question
21  regarding why the transaction did not go
22  forward, was there any clarification as to
23  whether you were discussing a transaction in
24  2019, the original transaction that was
25  contemplated that we've spoken about at length?
```

Page 178

```
1
2        Or were you asking about any
3   subsequent transactions that may have been
4   contemplated by the parties?
5        MR. WISNER:  Objection, asked and
6   answered.
7        A.   I have asked why this transaction did
8   not proceed following the crash, and if the
9   crash had anything to do with it.
10       Q.   Okay.
11       A.   More explicitly again, if I recall, I
12  didn't even mention the crash.
13       I asked them why wasn't this letter of
14  intent and the proposed transaction consummated.
15       We know that it has not been
16  consummated, whether you are referring to this
17  or that letter.  We know that there was an
18  intent -- and that's what both of us -- both of
19  them told her -- that there was an intention to
20  complete a transaction, basically at the time as
21  being agreed upon; and that transaction was
22  withdrawn because of the crash and the inability
23  of TML to find a replacement.
24       Q.   Okay.
25       So I'm going to move on for now.
```

Page 179

```
1
2        I think that we may circle back to
3   this in another context and perhaps we can make
4   it more clear.
5        Is there anyone else that we haven't
6   already discussed who you have either spoken
7   with, or who you have requested information
8   from, or who has provided information to you
9   through counsel?
10       A.   I have already answered, no, other
11  than the person that I've already mentioned to
12  you.
13       Q.   Okay.
14       MS. BRENNER:  Let's go ahead off the
15  record.
16       THE VIDEOGRAPHER:  Very well.  We are
17  now going off the record.  The time is 3:51 p.m.
18  p.m. Eastern, and this ends media unit 3.
19            *   *   *
20       L U N C H   R E C E S S
21  Time noted 3:51 p.m. Eastern Standard Time
22            *   *   *
23
24
25
```

Page 180

```
1
2            *   *   *
3       A F T E R N O O N   S E S S I O N
4   Time noted 4:23 p.m. Eastern Standard Time
5            *   *   *
6       THE VIDEOGRAPHER:  We are now going
7   back on the record.  The time is 4:23 p.m.
8   Eastern, and this begins media unit 4.
9   BY MS. BRENNER:
10       Q.   Okay.
11       MS. BRENNER:  So first item of
12  business, now that we are back on the record, I
13  would like to go ahead and mark a document as
14  Exhibit 8.
15       (Exhibit Defendant's Seex_Shenkar 8,
16  Document Bates stamped Seex_000282 through 284,
17  three-page letter fro Ascent Capital Africa II
18  Ltd. to Tamarind Management Ltd., dated June 20,
19  2020, marked for identification.)
20       MS. BRENNER:  You can let me know, Dr.
21  Shenkar, when you are able to see it.
22       THE WITNESS:  Yes.
23       MS. BRENNER:  So this is a June 20,
24  2020 letter of intent to Tamarind Management
25  Limited from the Ascent Rift Valley Fund.
```

45 (Pages 177 to 180)

ODED SHENKAR, PH.D.

Page 181

1
2      And so I just want to mark this and
3  get this in the record because before the break,
4  we had a discussion about the June 20, 2020
5  letter of intent, and so I wanted to go ahead
6  and mark this.
7  BY MS. BRENNER:
8      Q.   Dr. Shenkar, do you recall seeing this
9  June 20, 2020 letter of intent now that we have
10 got it marked for you?
11     A.   No.  I repeat it again:  I do not
12 recall ever seeing one or both of these letters.
13     I relied on the very explicit
14 statement by Mr. Dunford and Mr. Krank that the
15 transaction has been withdrawn because of the
16 death of Jonathan, and inability to find
17 suitable replacement.
18     Q.   So insofar as there was information
19 not included in these letters of intent that was
20 provided to you via counsel from those
21 individuals, it was the information provided to
22 you via counsel that you relied on, as opposed
23 to the information in the document?
24     A.   I'll correct you.  With Mr. Dunford, I
25 was also part of the conversation.

Page 182

1
2      Q.   Got it.
3      But apart from whether or not you were
4  on the call or not, my question is whether you
5  relied on that information that was conveyed to
6  you as opposed to the information contained in
7  these documents.
8      A.   Not in opposed to anything.
9      I relied on the information that I
10 received from these two individuals that you
11 just mentioned.  Thank you.
12     Q.   Okay.
13     So now let's move off of this
14 particular letter of intent.
15     And more globally, I understand that
16 you had specific questions that you had posed.
17     Did you ask anyone -- at either TML or
18 Ascent -- about the impact of COVID on the
19 company or any of these potential transactions?
20     A.   No.
21     I have asked why the transaction has
22 been withdrawn and not consummated.
23     And I repeat again, this is the answer
24 that I received:  That the issue was Jonathan's
25 death and the inability to find a replacement.

Page 183

1
2      Q.   Okay.
3      MS. BRENNER:  So I'd like to now go to
4  a different exhibit that we, in fact, previously
5  marked.
6      And this should be the exhibit, I
7  believe, that we marked as 1.
8      You can let me know when you have it.
9      THE WITNESS:  Yeah, yeah.  Let me
10 just --
11     Yeah, I got it.
12 BY MS. BRENNER:
13     Q.   So what was the assignment that was
14 given to you in preparing this report here?
15     A.   The assignment was to determine the
16 change in value of TML following the death of
17 Jonathan Seex.
18     Q.   Okay.
19     To drill down on that, then, a little
20 bit more, because I really want to understand
21 what it is that you are measuring -- can you
22 clarify what damage to Mr. Seex' estate that you
23 were evaluating in this part of your opinion
24 some?
25     A.   I don't understand your question.

Page 184

1
2      As I said, I don't know how it differs
3  from what I just described --
4      Q.   Okay.
5      A.   -- can you restate it, please?
6      Q.   Sure.  I will -- I'll give you a
7  little more windup here and try to clarify.
8      A.   Please.
9      Q.   So you would agree that Mr. Seex was
10 not the 100% owner of TML, right?
11     A.   Of course.
12     Q.   Okay.
13     And so insofar as Mr. Seex -- and then
14 his family after he died -- had an ownership
15 interest in TML, that ownership interest was in
16 the form of stock shares that were owned in TML?
17     A.   Well, it is ownership stake.  This is
18 not a publicly-traded company.
19     Q.   I understand.
20     And the form of the ownership stake is
21 --
22     A.   Yes, yes --
23     Q.   -- stock --
24     A.   -- yes.
25     Q.   And so is it your opinion that the

46 (Pages 181 to 184)

ODED SHENKAR, PH.D.

Page 185

```
 1
 2      damages that were experienced due to the death
 3      of Mr. Seex with regard to TML was in the form
 4      of a decreased value of those shares?
 5          A.   The decrease in value was exactly
 6      that.  That is what the value would have been if
 7      Mr. Seex has not passed away --
 8          Q.   Okay --
 9          A.   -- vis-à-vis what it is.
10          Q.   -- okay.
11              Is there any further opinion beyond
12      that that you are offering regarding the impact
13      of Mr. Seex' death on the family's equity in
14      TML?
15          A.   Can you again specify what -- how that
16      is different from what I just answered, just to
17      clarify, please?
18          Q.   So you've identified a decrease in
19      value of the shares.
20              Apart from the decrease in the value
21      of the shares that they owned, is there any
22      other ways in which you are opining that there
23      was an economic loss with regards to the stake
24      in TML?
25          A.   That -- I think, I mean, I really
```

Page 186

```
 1
 2      don't understand the question.  Obviously, I
 3      mean, it sounds to me the same.
 4              Obviously, they have -- he, Jonathan,
 5      had a stake in TML.
 6              My argument is that this share is
 7      worth significantly less today because of his
 8      death.  That's what I'm arguing.
 9              And I'm kind of, you know, repeating
10      it.  I'm not sure if what you are asking is in
11      any way different.
12          Q.   Okay.
13              So I'll put a finer point on it then,
14      just because I want to make sure I'm
15      understanding all the ways in which you are
16      thinking about this --
17          A.   Okay.
18          Q.   -- so you are not offering an opinion,
19      for example, that the Seex family experienced
20      some sort of economic loss because their
21      ownership percentage decreased?
22          A.   I am not giving an opinion on that --
23          Q.   Okay.
24          A.   -- I can understand how it can be part
25      of, you know, deal discussion, or court case, or
```

Page 187

```
 1
 2      whatever.
 3              But I'm not giving an opinion on that.
 4              I guess that -- that's up to you, and
 5      Mr. -- you know, counsel on the other side, and
 6      for the court to decide.
 7              But, no, I'm not passing an opinion on
 8      that.
 9              If you would ask me in general, I
10      would say -- I would think that there could be
11      an impact but I would envision maybe, but I
12      would not ask to look at that.
13          Q.   Okay.
14              So just to be clear that's not within
15      the scope of your assignment?
16          A.   Absolutely.  That, you are correct.
17          Q.   Okay.
18              And you have not been asked to prepare
19      any kind of supplemental or further analysis --
20          A.   No, no --
21          Q.   -- that would address that?
22          A.   -- correct.
23          Q.   Okay.
24              And so bottom line, your opinion,
25      then, is that the Seex' families shares in the
```

Page 188

```
 1
 2      company are less valuable today than they would
 3      have been, had Mr. Seex not passed away and was
 4      able to remain in place as CEO?
 5          A.   Absolutely, yes.
 6          Q.   So I'd like to flesh that out a little
 7      more and understand that.
 8          A.   Hm-hmm.
 9          Q.   Is -- you agree that the Seex family
10      still owns their shares in TML?
11          A.   Yeah.
12          Q.   Okay.
13              So it's your understanding that they
14      have not sold their shares?
15          A.   As I said, I believe I understand that
16      there was maybe change in, you know,
17      shareholding and so forth.  I have not been
18      asked to look at that, and I have not looked at
19      that.
20          Q.   Okay.
21              So for purposes of your analysis, you
22      are not considering any sale of the shares --
23          A.   That is correct.  You are correct.
24          Q.   And sorry.  Just let me finish my
25      question.
```

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 189

1
2      A.    Right.
3      Q.    Your -- for purposes of your analysis,
4   you are assuming that they owned the shares and
5   they still own the shares, correct?
6      A.    I did not say that. You are putting
7   words in my mouth.
8            I mean, you know, what I did say --
9   again, I have been asked to look at any
10  significant change -- or any change in the value
11  of those shares -- period.
12           And this is what I have done.
13     Q.    So then I'll ask the question again in
14  a different way.
15           Are you assuming for purposes of your
16  analysis that there is any transaction in which
17  those shares are sold?
18           Or will be sold?
19     A.    I, again, have not looked at that. I
20  am not looking at that.
21           It is not up to me to make a decision
22  whether Mrs. Seex wants to sell her shares,
23  increase her shares, reduce her share, and so
24  forth.
25           I have not looked at that.

Page 190

1
2      Q.    So if I'm understanding what you are
3   saying, then, your analysis is not contingent on
4   the shares being sold at any particular point in
5   time?
6      A.    That is correct.
7            My analysis is what are the value --
8   future value likely to be, had Mr. Seex not
9   tragically passed away; as opposed to the
10  unfortunate situation where we are all in when
11  he has gone to, hopefully, a better place.
12     Q.    So let's flesh that out then a little
13  bit more.
14           What assumptions are you making in
15  your but-for scenario?
16           So in the hypothetical future, where
17  Mr. Seex remains in place as CEO, are there any
18  other assumptions to that scenario that you are
19  making for purposes of your analysis?
20     A.    Of course. I mean, I am looking at
21  the prospect for the business in the sector, in
22  this economy going forward.
23           And I am looking at the role of
24  Jonathan in making that happen, which is why I
25  have -- as you are fully aware -- provided two

Page 191

1
2   different documents: One saying what the value
3   would have been or should have been, and one
4   explaining why these events are causally
5   connected.
6      Q.    Okay.
7            But I think my question was a little
8   bit more precise, because I'm wanting to
9   understand specifically what facts or, you know,
10  what assumptions you are making for purposes to
11  allow you to do that but-for analysis.
12           So let's drill down a little bit more.
13           I think you said you are looking at
14  the prospect for the business in the sector.
15           So what assumptions are you making in
16  your but-for scenario about the prospect for the
17  business in the hospitality sector in Kenya?
18           MR. WISNER: I assume he can look at
19  his report in answering that question? -- or
20  reports?
21           MS. BRENNER: Well, certainly. We've
22  got the report marked --
23           MR. WISNER: No -- in other words.
24           He covers a lot of that in detail in
25  these reports. That's why I'm saying --

Page 192

1
2   BY MS. BRENNER:
3      Q.    Dr. Shenkar, you can go ahead and
4   answer.
5      A.    As I said, I mean, a lot of that is in
6   my report.
7            A lot of that would be, maybe, further
8   explaining it, having read Mr. Dolgoff, you
9   know, position that, you know, either you or the
10  court decided, you know, not to proceed with.
11           But as a business person, as a
12  business and also scholar advisor, I look at
13  both macro and micro factors.
14           I'm looking at national growth. I'm
15  looking at what is happening in the hospitality
16  center -- hospitality sector.
17           And I'm looking at the role and impact
18  of a CEO in that context.
19     Q.    What specific information did you look
20  at regarding the hospitality sector in Kenya in
21  the time period for your but-for here? -- so
22  from 2019 to present?
23     A.    I am looking at the growth rate for
24  hospitality sector. I am looking at such
25  variables factors as investment in hotel

ODED SHENKAR, PH.D.

Page 193

1
2   properties. I'm looking at trends in you, know,
3   visitors, you know, and so forth.
4       So in other words, I am looking at the
5   overall business context, which is exactly what
6   I think anyone should.
7       Q.   Okay.
8       And since you have pointed to your
9   report, can you show me where in your report you
10  set out the assumptions that you are using in
11  your but-for?
12      (Pause)
13      A.   Actually, all you should look at it
14  at the -- in the other report, you know, on
15  a CEO upon their death.  Okay?
16      You will find, as I already mentioned,
17  all the contingency factors.  You will see
18  business phase, sectorial context.  It is all
19  there.
20      And again, I'm happy to provide many
21  more details in response to your expert Mr.
22  Dolgoff on that, although he doesn't mention
23  any.
24      Q.   To be really clear, what I'm trying to
25  understand:  What are the list of assumptions

Page 194

1
2   that you are making in your but-for?
3       MS. BRENNER:  So let's go to the
4   document that we have now marked Exhibit 3, the:
5   CEO/Founder's Death and Company Value.
6       THE WITNESS:  Okay.
7   BY MS. BRENNER:
8       Q.   I see narrative discussing the company
9   history and some other things about CEOs.
10      But can you point out to us where in
11  that report you list out your assumptions?
12      A.   Okay.  So under "Contingency Factors,"
13  as I said, a number of things.
14      You would see demographic.  You would
15  see ownership and management, which
16  automatically tells you that, you know, you tie
17  in, you know, equity, and earnings, and so
18  forth.  You have information on that.
19      I'll draw your attention to one thing,
20  that your expert completely missed, for
21  instance, that what the literature tells us is
22  that the sudden death of a CEO will have not
23  only an immediate impact on stock prices, on
24  value, but also long term.
25      For instance, on innovation --

Page 195

1
2   okay? -- which is basically what will determine
3   company's prospect for the future.
4       Now, if you look, you are tying in
5   knots to what I have described earlier as, you
6   know, Jonathan's plans and so forth.  This is
7   exactly where it comes in.
8       I mean, you know, these opportunities
9   for innovation.  And we know they have not
10  materialized, don't we?  We know that the Shell
11  deal that we have heard about did not proceed.
12  Right?
13      So you can see what is the impact, you
14  know, right here.
15      So obviously, you look into that.  You
16  are looking at business phase.
17      I mean, I wrote it down.
18      You are looking at Kenyan culture.
19      I mean, you know -- and this is really
20  very, very brief summary -- okay? -- because one
21  never knows how much detail you will want on
22  that.
23      I'm happy to provide much more.
24      And if not, I'll provide it at trial.
25      Q.   Okay.

Page 196

1
2       So --
3       A.   All right.
4       Q.   -- for purposes of your scenario where
5   Mr. Seex did not die, where he remained as CEO,
6   are you assuming that the Shell deal that you
7   just referred to would have gone forward and
8   would have been successful?
9       A.   I did not assume it in my estimate,
10  which is why I'm telling you that it was
11  extremely conservative.
12      The reason is that I did not
13  information on that.
14      As may recall, this is something that
15  I said I found out after writing my initial
16  report.  Okay?
17      So this not only confirmed my
18  thinking, but, in a way, it confirmed also that
19  my estimate has been very conservative.
20      Q.   So a moment ago in your testimony when
21  you were talking about assumptions and
22  Jonathan's plans, and you said:  Opportunities
23  for innovation that we know they have not
24  materialized.
25      So what I'm trying to understand is:

ODED SHENKAR, PH.D.

Page 197

1
2   What opportunities for innovation, or what
3   business plans, are you assuming would have gone
4   forward but for Jonathan's death?
5       A.  I'll tell you what I'm assuming.
6       I mean. you know, this is -- this was
7   an additional thing.  It's a huge thing, that is
8   true.  It's a huge thing.
9       But there were other plans.  There
10  were plans for a casino.  There were plans for
11  managing other hotels.  There were plans for
12  expanding the restaurant business going into a
13  particular completely new sector other than the
14  existing one -- you know, Carnivore.  We know
15  that there was a franchise.
16      From my business knowledge and
17  experience, I know that once you have proven the
18  concept of a franchise, you can multiply it many
19  times.
20      So, yes, I know that there is a
21  franchise.  I know that the franchise is
22  successful.  And from that, I can conclude what
23  are the prospects for the business.
24      The Shell 500 -- as you may want to
25  call it -- is if you want the icing on the cake.

Page 199

1
2   actually one of the highest failure rate that
3   there is.
4       But you do have a company here who has
5   very successful record.  They have not failed.
6       Not only that, you have a company that
7   has the potential and understands synergy.
8   Okay?
9       Synergy -- again, completely absent
10  from your own expert -- meaning that when you
11  look at the business from also a broader
12  strategic perspective, you are looking at
13  opportunities to basically leverage one asset
14  vis-à-vis another.
15      So company manages hotels.  They have
16  restaurant.  Classic case:  You can bring the
17  restaurant into the hotel, which is exactly what
18  they are doing.
19      Number two, let me repeat myself
20  again, what the literature tells us about
21  franchises.  Franchise -- the main obstacle is
22  to prove a concept.  Once you prove a concept,
23  you have one franchise, you can expand fairly
24  rapidly.  There is already approval of concept
25  in here.

Page 198

1
2   It is something that, yes, initially I did not
3   have this information.  This information we have
4   received from Nadege later on.  Thank you.
5       Q.   Okay.
6       So just so I've got it right, then,
7   the assumptions that you were making in your
8   original analysis in your but-for scenario was
9   that the plans to expand the restaurants, and
10  build this additional facility, and those other
11  items that you have identified would have gone
12  forward and would have been successful as
13  planned?
14      A.   Nobody knows 100% -- okay? -- for any
15  business if it will be successful.  Otherwise, I
16  guess the entire population would be engaged in
17  that, right?
18      But we do make assumption vis-à-vis
19  success.
20      My assumption is that:  Yes, it has
21  high probability of success.  Okay?
22      Let me explain to you why.  All right?
23      Number one, restaurant business is a
24  high-risk business.  The number of new
25  establishment that fail is significant.  It's

Page 200

1
2       There are plans to expand it.  I am
3   assuming that they have a high probability of
4   success.
5       You are asking about 100%?  There is
6   no such thing in business, maybe not in life at
7   all.
8       Q.   In your but-for scenario where Mr.
9   Seex didn't die and remained a CEO, are you
10  assuming anything about the impact of the
11  COVID-19 pandemic?
12      A.   COVID-19, with all respect, was a
13  temporary blip.  You can see it by all
14  indicators:  National, sectorial, otherwise, not
15  only in Kenya.  Kenya is not different in this
16  case from others.
17      So if you want to look at the U.S.
18  cruise industry in the mid of COVID, of course
19  they have been affected.
20      And, of course, if you want to look at
21  the hotel in Kenya during COVID, you were
22  affected.
23      But when you are looking at long-range
24  prospect for a business, this is immaterial.
25      Q.   So I guess it's a yes-or-no question.

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 201

1
2     Did you consider COVID happening as
3 part of your but-for?
4     A.   COVID, again, was not considered
5 because it is immaterial.  I mean, it's only
6 relevant as far as if you want to look at the
7 number why there is blip in the sector or the
8 economy during that time.
9     Long-range, it is immaterial, and
10 therefore I did not look at it.
11     Q.   I think you said earlier that you
12 reviewed the audited financial statements.
13     A.   Hm-hmm.
14     Q.   Did those statements contain notes
15 discussing the impact of COVID on the business?
16     A.   Ma'am, I do not recall.
17     But I just answered your question.
18 I -- to the extent that COVID had impact on the
19 business -- and COVID had impact on most
20 businesses that you can think of, maybe a
21 positive one, say, if you are Peloton -- but
22 long range, if you want to look at almost any
23 sector in any country for most companies, it did
24 not have a long-range impact.
25     The unfortunate company that maybe

Page 202

1
2 went under during COVID, yes.  But this is not
3 the case before us.
4     Q.   So to be clear, did you look to see
5 whether the COVID pandemic had an impact on
6 TML's expansion plans?
7     A.   I'll repeat it again.
8     COVID did -- had an impact on current
9 situation during COVID times.  Yes, the only
10 impact that you might have is that it will take
11 you, maybe, a bit longer to get in the capital
12 and so forth.  But you if you are going to get
13 an investor putting in the money, that's not an
14 issue.
15     Q.   So you would agree that if COVID
16 resulted in an impact on the hospitality sector
17 in Kenya, an effect of that might have been to
18 delay the implementation of expansion plans?
19     MR. WISNER:  Mischaracterizes his
20 testimony.
21     Objection.
22     A.   As I said in -- definitely not in the
23 medium and long range.
24     I'll say it again.
25     I don't think COVID had any material

Page 203

1
2 impact when you look at value of the business
3 going forward, and therefore I did not consider
4 it.
5     So you can keep asking about COVID,
6 but I will get the same answer.
7     Q.   So I understand you are saying you
8 don't think COVID had a material impact going
9 forward, but I want to understand what analysis
10 you performed.
11     So did you look at the financials and
12 other records from TML to see what impact the
13 pandemic had in actuality on the company's
14 implementation --
15     A.   I already answered that, ma'am, with
16 all respect.
17     I said:  I'm looking at the business
18 going forward.  Okay?
19     I'm not looking at the business going
20 backward, except if I believe that it will have
21 an impact on future plans.
22     Q.   Going forward from what date?
23     A.   Going forward from crash time, but
24 disregarding any temporary blips that COVID may
25 have caused it.  It's immaterial to the prospect

Page 204

1
2 of the business going forward.
3     Q.   Are there any other potential impacts
4 on the business after 2019 that you considered
5 immaterial and therefore didn't analyze?
6     A.   I don't know how to answer such
7 question.
8     You know in the universe, there may be
9 thousands of other things.  And you ask me:
10 What did not have an impact?
11     I mean, I really don't know how to
12 answer that.
13     Q.   I'm asking what things you would
14 consider immaterial.
15     It sounds as though COVID is something
16 you consider and determined it was immaterial,
17 so you didn't include that in your analysis.
18     Is there anything else that you
19 considered, and considered immaterial?
20     A.   I really don't understand your
21 question.
22     Yes, the question of what happened in
23 Spain, in, you know, 2020, I mean, yeah.  It's
24 irrelevant.  There are a million and one things
25 that I did not include.

51 (Pages 201 to 204)

ODED SHENKAR, PH.D.

Page 205

1
2      I'd rather be constructive and tell
3  you what I did include.
4      But, I mean, I don't know.
5      I mean, you can repeat it again and
6  again.
7      I mean, I just don't understand that
8  kind of question.
9      I understand there is a lot of
10 legalese here, maybe, but I just don't get it.
11     To say what I -- anything in the
12 universe that I did not consider, I don't really
13 know how to answer that.  Maybe somebody from a
14 philosophy department can.
15     MR. WISNER:  I have to join an
16 objection.
17     Now you are asking him to prove a
18 negative, and the question is improper.
19     Q.  So my question is:  I'm trying to
20 understand what information and what assumptions
21 you considered and did not consider in framing
22 your but-for scenario.
23     So --
24     A.  I already --
25     Q.  -- so let me finish --

Page 206

1
2      A.  Go ahead.  Go ahead.  Go ahead.
3      Q.  So I understand based on your prior
4  testimony just now that you did not consider
5  COVID because you considered it immaterial.
6      And what I'm trying to understand is:
7  What else, then, did you consider?
8      And is there anything else that you
9  identified as something that you would not
10 consider for some reason?
11     So you gave a specific reason why you
12 considered COVID, I believe, material.
13     But I want to know if there is
14 anything else like that that you also thought
15 about, and considered, and determined was not
16 going to be included in your but-for?
17     A.  The short answer is:  No.
18     Q.  Okay.
19     So drilling down on the assumptions
20 you made, you had talked a bit about business
21 plans and expansion plans.  You also referenced
22 Kenyan culture.
23     Can you tell me specifically what
24 assumptions you made about Kenyan culture?
25     (Pause)

Page 207

1
2      A.  I'll tell you what assumption.
3      And, again, I want you to understand
4  that this is a summary.  Okay?  This is a
5  summary.  It is intended for, you know, the
6  people who, you know, have some knowledge or can
7  interpret it properly.
8      The actual picture, if you ask me, is
9  more complex than that because, you know, there
10 are multiple ethnicity, and so forth, and there
11 is some variation in culture accordingly.
12     But I'll tell you very clearly why it
13 is relevant.
14     And I'm telling you it as one of
15 three -- I was cited as one of probably the
16 three most cited people on culture in the
17 world -- okay? -- just in case you were asking
18 or questioning my expertise on that.
19     Kenya has a very high rate of
20 collectivism.  How does that translate into
21 business?  I will tell you how.  When you have a
22 very high rate of collectivism, that means that
23 the personal network that you have is extremely
24 important.
25     Now, combine that with what we know

Page 208

1
2  about CEOs; and one reason why their demise, one
3  way or another, is problematic, is because you
4  are going to lose this social network.
5      So if you will combine the two, you
6  will realize that -- given this context, or
7  looking at the Kenyan context -- amplifies --
8  okay? -- the loss involved with losing your CEO,
9  because you are losing a CEO that has a network
10 of connection throughout.
11     You are talking about a family that
12 has been in Kenya for generation.  You are
13 talking about a family that was the founder, or
14 co-founder, of TML.  And the fact that you are
15 losing it is a more major blow because of Kenyan
16 culture.
17     I hope I made myself clear.
18     Q.  Okay.
19     So -- but my question is not what
20 assumptions you are making about the impact of
21 the loss.
22     My question is what assumptions are
23 you making in the but-for scenario.
24     So are you saying that you are --
25     A.  What do you mean -- "the but-for

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 209

1
2    scenario"? Just for clarification, what do you
3    mean by that?
4        Q.   The but-for scenario is the scenario
5    where Mr. Seex did not die --
6        A.   Okay.
7        Q.   -- and Mr. Seex remained CEO?
8        A.   All right.  Yeah, yeah, just for
9    clarification.  Yes, please proceed.  I just
10   wanted to clarify.
11       Q.   So can you please clarify your prior
12   answer as to what assumptions you are making
13   about Mr. Seex in his role as CEO in the event
14   that he did not die?
15       A.   Mr. Seex was -- just, again, to remind
16   everyone -- Mr. Seex, again, is the son of the
17   founder.
18           In his previous job before being
19   elevated to CEO, he was head of business
20   development.  That means that this was his
21   responsibility -- to initiate new business.
22           So, again, if you look at the specific
23   of the case, you would see that the assumption
24   in the literature -- that when you lose your
25   CEO, you lose innovation -- is amplified in this

Page 210

1
2    case because you are looking at the one person
3    whose responsibility, even before becoming CEO,
4    was to initiate and launch this new business.
5        Q.   Any other assumptions that you made in
6    your but-for scenario regarding how that
7    alternative future would have proceeded?
8            And how the company would have
9    performed?
10       A.   Not that I think of.  I think they are
11   summarized here.
12           And I'll be happy to provide more
13   information, if asked for, including the
14   supplemental reports that -- apparently that you
15   did not want to see.
16           So we'll leave it at that.
17       Q.   Okay.
18           Well, I'm trying to be very clear
19   because this is my one opportunity to ask you
20   questions --
21       A.   Please, please.
22       Q.   -- about the bases for your opinions
23   before trial --
24       A.   Yes, I understand --
25       Q.   -- and I --

Page 211

1
2        A.   -- I understand.  I already provided
3    you with the information.
4            And if we get to trial, I will do the
5    same when we get to trial.
6        Q.   But I need to understand the full
7    scope of your opinions now as we sit here today.
8            So are there any other assumptions you
9    are making about this but-for scenario for
10   purposes of offering the opinion that you are
11   planning to offer?
12           MR. WISNER: Quickly, objection, asked
13   and answered.
14           He's already told you many times.
15   Look at his reports:  His CEO/Founder's report,
16   his other report on TML value lists all those
17   assumptions.
18           Do you want him to actually go through
19   and explain each one them?
20           He has talked already about Kenya
21   culture.  He can answer about all of them.  Just
22   look at his reports.
23           Asked and answered.
24           MS. BRENNER: Floyd, just to respond
25   briefly, he said repeatedly that there is a lot

Page 212

1
2    of things further that are not in his report.
3    So I'm trying to clarify and nail down exactly
4    what it is that is underpinning the opinion.
5            MR. WISNER: Okay.  But what I'm
6    telling you is that I'm willing to give you --
7    all it is -- the only thing additional is
8    additional citations to literature, which I'm
9    willing to give those to you.
10           But they just confirm what he has
11   already said.
12           You are asking for assumptions.  And
13   those assumptions underlying his opinions are
14   stated clearly in his two reports on this issue.
15           You know, I don't -- that's been asked
16   and answered.
17           It's a very unfair question for you to
18   now say:  What are your assumptions?  Well, they
19   are in the reports.
20           MS. BRENNER: Alright.
21   BY MS. BRENNER:
22       Q.   Dr. Shenkar -- so to be clear, I'm not
23   asking you about citations.  I'm not asking you
24   about what articles you relied on.
25           What I'm really trying to understand

53 (Pages 209 to 212)

ODED SHENKAR, PH.D.

Page 213

```
 1
 2   is your analysis and the logic that underpins
 3   your analysis in the two different scenarios
 4   that you are looking at and you are trying to
 5   understand the difference between them.
 6       So is there anything else as we sit
 7   here today that we haven't already covered that
 8   you consider important to that but-for scenario
 9   in terms of assumptions that you are making?
10   A.   No.
11   Q.   Okay.
12       Now, let's move on.
13       (Pause)
14   Q.   In performing your analysis of the
15   but-for and the difference between what might
16   have happened had Jonathan not died, and instead
17   what you are projecting to happen in the world
18   where he did die, have you considered TML's
19   actual business performance in the five years
20   period that we have from the accident to today?
21   A.   I was asked to look at the business
22   going forward.  That was my focus.  Okay?
23       So I'm looking at how the business was
24   at the time.  And I project from there toward
25   the future.
```

Page 214

```
 1
 2   Q.   Okay.
 3       And when you say "going forward from
 4   that time," you are referring to March 10, 2019?
 5   A.   I'm looking -- what I'm saying, the
 6   focal point, you agree, is March 10, 2019.  All
 7   right?  This is the basically the threshold that
 8   we are looking at.  Okay?
 9       Previous performance has been looked
10   at only to the extent that I found it relevant
11   to project the future.
12       So as in the example that I've given
13   you time and time again:  What we know from the
14   scholarly literature is that if you were able to
15   successfully launch a franchise -- even one --
16   you have a good chance to expand them more.
17       So to that extent, yes.  Beyond it,
18   no.
19   Q.   So just to clarify, when you say
20   "previous performance," are you speaking about
21   TML's performance prior to March 10, 2019?
22       Or are you speaking about TML's
23   performance since 2019, but up to now?
24   A.   No.  I just said that the threshold is
25   2019.  Okay?  I'm looking it definitely going
```

Page 215

```
 1
 2   forward.
 3       But I'm not looking at a year or two
 4   from now, because of what you just asked me
 5   before vis-à-vis about COVID.
 6       Yes, COVID had an impact.  It had an
 7   impact on all of us -- okay? -- as I said
 8   before.
 9       But I'm looking beyond that.  I'm
10   looking medium and long term, as I should,
11   because, again, I see COVID as immaterial for
12   the tasks that are being assigned to come up
13   with.
14   Q.   Okay.
15       So I guess I'll ask it a different
16   way.
17       Because what I'm trying to understand
18   is what information you considered to prepare
19   your going-forward analysis.
20       So did you look at prior financial
21   performance of the company before March 10,
22   2019?
23   A.   I already answered that, ma'am.
24       As I said, I looked at past
25   performance only to the extent that I considered
```

Page 216

```
 1
 2   it relevant for projecting toward the future.
 3   Q.   And what documents specifically did
 4   you look at that represented to the past
 5   performance prior to March 10, 2019?
 6   A.   I guess maybe I didn't make myself
 7   clearly enough.
 8       This is not a question of documents.
 9   I mean, I know that this is one of the
10   first things that you look at -- I mean, what
11   has been the history of the company?  The fact
12   that they have a franchise; the fact that they
13   had a restaurant chain; the fact that they were
14   able to expand into hotel management, and so
15   forth.
16       So these are not documents per se.
17   These are facts.
18       And these facts are what matters, not
19   documents.
20       With all respect to your legal
21   process -- Exhibit A or Exhibit B -- these are
22   facts.  They are not in question.
23       We all know that they have been there
24   and they are of interest to me because in making
25   my projection, they are material.
```

54 (Pages 213 to 216)

ODED SHENKAR, PH.D.

Page 217

```
1
2        Q.  All right.
3            So I understand that you considered
4    the fact that the company had been in existence
5    for some time in the hospitality industry, but
6    my question was about documents.
7            I'm trying to understand what
8    documents you reviewed and analyzed when you
9    were trying to look at and understand the prior
10   financial performance of the company leading up
11   to the accident.
12           And if the answer is, "There aren't
13   any specific documents you looked at," that's
14   fine.
15           But what I'm trying to understand is:
16   What information did you draw from when you were
17   coming up with that analysis?
18           MR. WISNER:  Objection.
19           We have given you, pursuant to the
20   federal rules, a complete list of all the
21   documents he considered.  That's the documents
22   he considered.
23       A.  This is the answer.  I gave you the
24   documents.
25           But again, I mean, try as you are
```

Page 218

```
1
2    saying to look at the broader picture.  This is
3    what I'm trying to do.
4            I know your expert did not do that,
5    but that's what I'm trying to do.  Okay?
6            I'm looking at the business context.
7    This is what material to me.  Okay?  Knowing how
8    business work, knowing the hospitality
9    industry -- this is what material, and this is
10   what I focused on.
11           And, again, list of documents, you
12   already have.
13           And if you want to keep asking me the
14   same question, please go ahead.
15       Q.   So you have been drawing a distinction
16   between what you consider material and
17   apparently what you don't consider material.
18           I want to ask you about materials that
19   have been produced relating to the financial
20   performance of the company after March 2019.
21           So are those things that you have
22   considered and analyzed for purposes of your
23   opinion in this case?
24           Or because of the fact that it is
25   forward looking, did you not consider those?
```

Page 219

```
1
2        A.  I already answered it three times, but
3    we can go ahead.  I mean, I know that the
4    evening going to come in earlier on your side.
5    We can continue with it.
6            I already said:  Financial performance
7    during years after -- around 2020 to 2022 and so
8    forth because of COVID is immaterial.  Every
9    single company that I look at, you will see a
10   blip.  Mostly it's negative blip.  Again, if you
11   are Peloton, it's upward.  If you are Zoom, it's
12   upward.
13           So we are not looking at it when we
14   are projecting for the future, whether it is for
15   TML or for any other company.
16           I think I've already answered that.
17   So here is your answer again.
18           (Pause)
19       Q.  All right.
20           So you have said that you didn't look
21   at anything through 2022.
22           Just to confirm, you also didn't look
23   at the financial performance from the period of
24   2022 to present?
25           MR. WISNER:  Not what he said.
```

Page 220

```
1
2            Objection, mischaracterizes his
3    testimony.
4        A.   I've answered it time and time again.
5            I said I have looked -- I did not rely
6    on any of that information because I thought it
7    was immaterial to the task that I have been
8    given --
9        Q.   Okay.
10       A.   Okay?  Thank you.
11           (Pause)
12       Q.   Okay.
13           So I think I understand that, based on
14   the testimony you provided earlier about your
15   going-forward analysis based on a valuation date
16   of March 10, 2019.
17           So just to be clear, given that, you
18   have not performed any valuation of TML to
19   determine what its actual value is today based
20   on its real-world performance in that time
21   period from 2019 to today?
22       A.   No, ma'am, yet again.
23           I have been tasked to provide an
24   opinion on change in value between what would
25   have been and what actually happened.  All
```

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 221

1
2    right?  This is what I have done.  Okay?
3         (Pause)
4    Q.   Okay.
5         But -- I'm not trying to be difficult
6    here.
7         But my question was whether or not
8    you've performed a valuation of the company as
9    of today based on actual performance.
10        And so the answer to that is:  No?
11        MR. WISNER:  Mischaracterizes.
12        Objection, mischaracterizes his
13   testimony.
14        His report clearly states the value of
15   the company with and without Jonathan Seex as of
16   a date in November 2024.
17        Says it right in the report.  You are
18   mischaracterizing his testimony.
19   A.   I think again -- I mean, I think it's
20   very clear.
21        As I said, I relied on what were
22   available, but my focus is on projecting
23   forward -- okay? -- because I have to look not
24   only from 2029 -- from 2019, not only from 2024,
25   but where the business could have been going to

Page 222

1
2    in the same way -- let me emphasize -- in the
3    same way that you want to look at earnings --
4    right? -- up to -- and I know your expert
5    disagree with that, we can get to that as well,
6    if you want -- but in the same way, I have to
7    look at the impact, you know, going forward.  I
8    have to look at it long range.  Okay?  What is
9    the value.
10        When the unfortunate widow will decide
11   to sell or not -- that's not my business.  And
12   that's not what I've had to do --
13   Q.   So --
14   A.   -- if she were to ask me, yeah, I
15   could give her an estimate of what I think it
16   would be worth at a certain, you know, year, and
17   so forth.
18        But that's not what I have been asked
19   to do, and that's not what I'm doing.
20   Q.   Okay.
21        So you said a minute ago that you have
22   been asked to provide an opinion on change in
23   value between what would have been and what
24   actually happened, correct?
25   A.   Hm-hmm, yeah.

Page 223

1
2    Q.   So what I'm trying to drill down and
3    understand is what you did to arrive at the what
4    actually happened piece of that analysis.
5         So what I think you are saying is that
6    you've performed an analysis that is based on
7    projections that you made from the March 10th,
8    2019 valuation date.
9         Is that right?
10   A.   Yeah.
11   Q.   Okay.
12        And as part of figuring out the delta
13   between those two scenarios, you did not do an
14   independent valuation of the company as it
15   stands today, or as of November 30?
16   A.   There is a valuation -- there is --
17   you know, this case is really interesting,
18   because you actually have a direct evaluation in
19   addition to any technique that you are going to
20   use.
21        And admittedly, there are multiple
22   such techniques in space.  And this is the next
23   letter of intent of 2022.
24   Q.   Okay.
25        But what I'm asking is whether you've

Page 224

1
2    done any valuation based on the actuals to reach
3    that what-actually-happened number.
4         Or is that number based on your
5    valuation as of March 10, 2019?
6    A.   I've done, in a way, both.
7         I mean, you do look at what it is now,
8    even though what it is now is much less
9    relevant.
10        Again, what is relevant, it was in
11   2019, and where it could have been if Jonathan
12   had not died.  Okay?
13        So you must keep that in mind.
14   Q.   Okay.
15        So based on the information that you
16   have, do you have an understanding of what the
17   company is actually worth today?
18   A.   What the company is worth today is
19   what people will pay for it.  Okay?
20        What we know is what the -- what a
21   third party -- an objective third party -- was
22   willing to pay in 2022 vis-à-vis 2020.  Okay?
23        It is actually -- forget everything
24   else you look at.  This is the first case I have
25   ever seen that you have such a direct

56 (Pages 221 to 224)

ODED SHENKAR, PH.D.

Page 225

1
2    indication.
3         Now, it's only for about, you know,
4    maybe, three years.  But it gives you an idea.
5         But, again, you keep forgetting that
6    you are comparing two different things.  I mean,
7    what you are comparing is what is the value
8    today, of which the best indication is what
9    somebody is willing to pay for it.  Okay?
10        Now, the question is:  What would it
11   have been otherwise.
12        And more importantly -- much more
13   importantly -- what it would have been years
14   from now.
15        I mean, after all, Ascent initially
16   wanted; and then later five years, they wanted a
17   five-years window, may well go beyond that.
18        So if, again, you want to look at what
19   had happened two years from now, you have no way
20   to make really an attribution.
21        So you can continue to go around and
22   around.  You'll get the same answer.
23        Q.   Okay.
24        MS. BRENNER:  I believe I have gotten
25   to almost the end of this line of questions.  I

Page 227

1
2    that is based on what we know.  And what we know
3    is what we find in the scholarly literature.
4         So that is my answer.
5         Q.   One quick follow-up on that, then.
6         In determining what could be relevant
7    to your analysis, did you review the notes in
8    the audited financial reports to see what types
9    of business risks or issues were being
10   identified by the board during that time period
11   as material?
12        A.   Ma'am, every company by law -- when
13   you file any public company in the U.S., for
14   instance, must by law reveal all possible risks,
15   even if they are completely farfetched.  Okay?
16        Now, can they capture all of them?  Of
17   course not.
18        Look at the very unfortunate, you
19   know, tragedy of the COO of United Health.  I'm
20   sure it wasn't on anyone's screen, otherwise
21   they wouldn't let him to just go without a
22   bodyguard or something.  Right?
23        But we must, by law, make estimates.
24   Okay?  And we must, by law, list risks, even if
25   they are very much farfetched.

Page 226

1
2    just have one kind of clean up question I want
3    to ask.
4         Then I'd like to take a quick break so
5    we can recalibrate because we have been going
6    about an hour.
7         THE WITNESS:  Please.
8    BY MS. BRENNER:
9         Q.   So just to be clear, apart from the
10   COVID pandemic, is there anything else that you
11   considered but did not incorporate into your
12   analysis in constructing, you know, your but-for
13   scenario versus the actual scenario?
14        A.   Not that I can think of.
15        But, again, you know, when you look
16   long term, they -- yeah, there can be a lot of
17   things that will have an impact.  There could be
18   a revolution tomorrow.
19        I mean, look at this country.  I mean,
20   people changing, everyone now -- getting phone
21   call left and right changing the projection, I
22   mean, after the election.
23        I mean, I don't know what's going to
24   happen tomorrow.
25        But I can give you an educated guess

Page 228

1
2         What we do not have to go by law,
3    including in this country, is to provide
4    probabilities.  Okay?
5         So if I am a U.S. car company --
6    okay? -- yes, I have a material risk now from
7    Chinese competition.  How will it
8    materialize?  I don't know.  It depends if
9    President Trump decide, you know, to proceed or
10   increase the tariffs.  Okay?
11        But everyone has a list of risks.  I'm
12   looking at them, but this is really a routine
13   reporting requirement that you must put in for
14   every company.  So I don't attribute too much to
15   it.
16        Q.   So to be clear -- because it was a
17   yes-or-no question -- did you look at the
18   audited financial reports to see what risks had
19   been identified in determining what might be
20   material to you --
21        A.   Well, I would answer the question:  I
22   would say I have look at what has been provided
23   to me.  Okay?  And I do not judge the risk listed
24   there as what has happened.  These are part of
25   reporting requirement for a public company in

57 (Pages 225 to 228)

ODED SHENKAR, PH.D.

Page 229

1
2     the U.S.  But also in Kenya, everyone has to
3     list them.
4         Even if I think that I am most secure
5     company in the world, I still have do list risk
6     factors.  Okay?
7         So that is my answer.  Thank you.
8     Q.   Is TML a public company in Kenya?
9     A.   No.  It is not.
10    Q.   Is it your understanding that the
11    requirements for public companies apply to
12    private companies in Kenya?
13    A.   They don't necessarily apply.  But as
14    a matter of routine, private companies tend to
15    do that as well.
16    Q.   Okay.
17        MS. BRENNER:  Let's go ahead off the
18    record.
19        THE VIDEOGRAPHER:  We are now going
20    off the record.  The time is 5:26 p.m. Eastern.
21    This ends media unit 4.
22        (Recess from 5:26 p.m. to 5:42 p.m.
23    Eastern Standard Time)
24        THE VIDEOGRAPHER:  We are now going
25    back on the record.  The time is 5:42 p.m., and

Page 230

1
2     this begins media unit 5.
3     BY MS. BRENNER:
4     Q.   All right.
5         MS. BRENNER:  So before we dig back
6     into the questions, I would just like to put on
7     the record that we are objecting to the many
8     answers that we have had that have been
9     nonresponsive to questions that I have been
10    asking.
11        And in light of that pattern, I am
12    reserving the right to keep this deposition
13    open, should it become necessary to cover all of
14    the material that we need to cover today.
15        MR. WISNER:  Well, you obviously have
16    to go to Judge Alonso to get a ruling on that
17    one.  We are never going to agree to that.
18        MS. BRENNER:  Understood.  But I'm
19    hoping that perhaps we can move forward here a
20    bit more efficiently in the remaining time on
21    the record and it won't become necessary.
22        Okay.
23    BY MS. BRENNER:
24    Q.   So moving forward now, I'd like to ask
25    you some questions, Dr. Shenkar, about some more

Page 231

1
2     of the particularities of your analyses,
3     starting with your analysis of the TML stock
4     valuation that we have been talking about.
5         And so if I understood your prior
6     testimony, you are valuing the company as of
7     March 10, 2019 -- or at least that's your
8     starting point for your forecast analysis.
9         And so what I want to understand is,
10    with regards to your future cash flow
11    calculations that you performed, are you using
12    the 2019 fiscal year as your baseline?
13    A.   I'm using 2019.
14    Q.   Okay.
15        And so you would agree that TML uses a
16    fiscal year that ends at the end of September?
17    A.   Yeah, I understand.  I mean --
18    Q.   Okay --
19    A.   -- either way you slice it, you go --
20    Q.   So you'd agree, then, that the
21    accident occurred roughly, or near, the middle
22    of the 2019 fiscal year?
23    A.   More or less.
24    Q.   Okay.
25        Did you do anything in your

Page 232

1
2     calculations to account for that with regards to
3     what information you used to perform your cash
4     flow calculations?
5     A.   We made adjustment.
6         But, again, I don't think that this is
7     material because any way you slice it,
8     information that you will have will be midyear.
9         So, you know, if you take 2018 or
10    2019, you know, you will still not get exact
11    year, unless you have something happens August
12    31 -- or September 31 at the end of the fiscal
13    year, you will always miss something.
14        But I don't think it's material.
15    Q.   So at the beginning of your answer you
16    said you made an adjustment.
17        So what adjustment did you make to
18    account for that?
19    A.   I do not recall now exactly.  I would
20    have to go back to the calculation and see.
21        But, again, this is my answer.  I
22    mean, I don't think it will make much of a
23    difference one way or another.
24    Q.   When you say "your calculations," are
25    you referring to the calculations that were

58 (Pages 229 to 232)

ODED SHENKAR, PH.D.

Page 233

1
2      provided to us as backups that are in Python?
3          A.   I'm talking about the calculation,
4      yes, the calculation.  And you can see at the --
5      also the summary that you received.
6          Q.   Okay.
7               MS. BRENNER:  Could you go ahead and
8      mark this for us, Karishma?
9               (Pause)
10              MS. BRENNER:  I think this should be
11     under tab O.
12              (Exhibit Defendant's Seex_Shenkar 9,
13     Four-page document bearing heading on first
14     page: 1. discounted cash flow (no Bates Nos.),
15     marked for identification)
16              (Pause)
17              MS. BRENNER:  Let me know when you can
18     see a document.
19              THE WITNESS:  Yeah, I see it.
20              MS. BRENNER:  Okay.  So this is a
21     document now that we have marked as, I think,
22     Exhibit 9.
23     BY MS. BRENNER:
24         Q.   Is this the calculations you were
25     referring to?

Page 234

1
2          A.   These are the detail.  I mean, the
3      actual calculation -- I mean, you have what have
4      been provided to you earlier.
5          Q.   Okay.
6               And so I don't want to get all the way
7      into the granular details right now.
8               But my understanding, based on your
9      testimony just now, is that you did make an
10     adjustment to account for the fact that the
11     accident happened partway --
12         A.   That -- that's --
13         Q.   -- through 20 --
14         A.   -- that's what I recall.  Again, I
15     will have to get back to the number.  As you
16     say, it is very granular, and so forth.  That's
17     what I recall.
18              Again, I don't think it would make
19     really a difference.
20         Q.   And your best recollection is that the
21     adjustment that you made would be reflected in
22     the backup materials you've produced from your
23     file?
24         A.   As I said, I do not recall.  I believe
25     we have done it.  If we have done it, it would

Page 235

1
2      be in the backup, yes.
3          Q.   And just, kind of, high level:  In
4      making an adjustment, how would you make an
5      adjustment?
6               Would you simply back out the cash
7      flow that occurred after the accident?
8          A.   Because, again, everything is provided
9      on a budget, you know, on a year basis, you
10     would have to kind of arbitrarily cut it in the
11     middle.
12         Q.   Okay.
13              So to the best of your recollection,
14     that's essentially what you did here?
15         A.   As I said, I do not recall if done it.
16     If we were to do it, it would be in that way.
17     It would be very crude.
18              And in any event, I think it would not
19     be -- it would be immaterial.
20         Q.   Oh, okay.
21              So I think maybe I misunderstood your
22     earlier testimony.  I thought you said that you
23     believe that you did perform an adjustment.
24              But what you are saying is that you
25     are not sure whether you did?

Page 236

1
2          A.   I do not -- I do not recall the
3      detail.
4               And the reason that I do not recall
5      it -- it wouldn't make any significant
6      differences whatsoever.
7          Q.   And then, sort of, moving further,
8      talking about your future cash flow
9      calculations, do you use what we call a WACC --
10     a W-A-C-C -- to perform that calculation?
11         A.   Yes.  So what -- are you telling?  Are
12     you asking?  I don't understand.  Are you
13     asking?
14         Q.   Well, that was just my first question.
15              And you determined that the values for
16     that WACC were reasonable, based on the company
17     information you had available to you?
18         A.   Yeah.  I mean, again, everything is
19     listed there.
20              And I did not use any assumption that
21     I did not think were reasonable.
22         Q.   Okay.
23              MS. BRENNER:  Let go to your report so
24     we can get it in front of us, and maybe that
25     will help orient the conversation.

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 237

1
2         Karishma, if you could go back to the
3    document that we actually marked as Exhibit 1.
4         And let's go to page 4.
5         (Pause)
6         MS. BRENNER: And you can just let me
7    know when you have got it.
8         THE WITNESS: Yeah, yeah, okay.
9         MS. BRENNER: Okay.
10   BY MS. BRENNER:
11        Q.   So I'm looking at your cash flow
12   valuation of TML. And it looks like we've got a
13   discount rate determined by the WACC, and we've
14   got an equation there.
15        And so this WACC -- this -- does this
16   include a cost of equity based on U.S. data?
17        A.   Again, all the assumptions that we
18   made are listed there.
19        Overall, we have list -- we have used
20   U.S. data when there was no, I would say,
21   equivalent Kenyan data.
22        Q.   Okay.
23        So you used U.S. data to determine
24   your cost of equity because you did not have
25   Kenyan data available from which you could

Page 238

1    determine that?
2         A.   Again, I mean, I don't recall all the
3    detail now. I think everything is listed in
4    here.
5         And as you can see, we definitely look
6    at the state of the business. I mean, you can
7    see it very clearly upward trajectory and
8    revenue growth.
9         So we are looking at where the
10   business was, and, yes, we are making a
11   projection as to where the business is going.
12        Q.   Okay.
13        So I want to be clear because my
14   question was: Did you use U.S. data to
15   determine the cost of equity in your
16   calculations here because you did not have
17   Kenyan data that was available to determine
18   that?
19        A.   No, this is not what I said.
20        I said that whenever in general we
21   used U.S. data when we did not have Kenyan data
22   available.
23        In other instances, we used Kenyan
24   data --

Page 239

1
2         Q.   Okay.
3         A.   -- and if you will look both here and
4    also in the calculation for Dr. Guryan, you will
5    see it listed in much detail.
6         Q.   Okay.
7         So -- but speaking of your values that
8    you used in your analysis, I see that you have a
9    variable here which is the market value of
10   equity.
11        And my question is whether that equity
12   was based on U.S. data.
13        And I think your answer was: Yes.
14        Is that: Yes?
15        A.   I -- no, I said I do not recall.
16        I'm not sure even what you are
17   referring it to right now.
18        MS. BRENNER: So I'm referring to the
19   equation here at the bottom of page 4.
20   BY MS. BRENNER:
21        Q.   And you have variables in your
22   equation, and you have defined the variables.
23        And one of the variables is E, the
24   market value of equity.
25        Do you see that?

Page 240

1
2         A.   Yeah, I see that.
3         As I said again, I mean, I'll have to
4    go back to the calculation. But, again, my
5    answer still stands.
6         I mean, we use Kenyan data throughout
7    except where such data were unavailable.
8         Q.   Okay.
9         So without asking you to go back
10   through the fine print of your calculations,
11   fair to say, then, that if you did use U.S. data
12   instead of Kenyan data to come up with your
13   equity cost, it would have been because you
14   didn't have Kenyan data available?
15        A.   I would say, generally speaking, yes.
16        And that's true for other calculations
17   as well.
18        Q.   Okay.
19        Do you recall whether your cost of
20   debt is based on Kenyan data?
21        A.   I believe it is. But, again, I will
22   have to go WACC to the calculation. These are
23   minor detail. I don't remember all of them
24   offhand.
25        Q.   Okay.

60 (Pages 237 to 240)

ODED SHENKAR, PH.D.

Page 241

1
2          Can you point me to any authority that
3   endorses the concept of using data from two
4   different markets in this type of WACC
5   calculation for a DCF analysis?
6          A.   Authority?  I mean, I can definitely
7   find you example, you know, from the scholarly
8   literature.
9          I don't know what you mean by
10  "authority."
11         I would also like, with all respect,
12  to direct your attention to the fact that -- if
13  you don't want me to discuss it -- that these
14  two gentlemen, especially Dr. Guryan, is using
15  U.S. data throughout.  I mean, there is hardly a
16  grain of Kenyan data there.  And this is because
17  Kenyan data are hard to come by.
18         But again, we made a big effort to
19  utilize it whenever available.
20         Q.   Okay.
21         So sitting here today, though, are
22  there any authoritative sources that you can
23  point to that endorse this type of approach of
24  using two different markets in a WACC?
25         A.   I -- yes.  But, you know, if you want

Page 243

1
2   date by which Mr. Seex was supposed to retire.
3          Q.   Okay.
4          But what I'm trying to ask you about
5   is the calculations and analysis that you did to
6   support your opinion that you are offering here.
7          So is my statement as to the
8   calculations you performed of cash flow
9   forecasts from 2019 to 2029 followed by
10  calculations of a terminal value period
11  accurate?
12         A.   Everything that I put in there, I
13  believe it is accurate.
14         And again, if you want additional
15  sources for what we have done here, we'll be
16  happy to provide them.
17         As I said, these can be part of a more
18  detailed, if you will, response to Mr. Dolgoff
19  or otherwise.  You know, you can state your
20  particular concern.
21         But don't ask me now when we are
22  talking to go and find the source.
23         But everything -- I believe that
24  everything that has been done here is accurate,
25  and I'm standing behind it.

Page 242

1
2   me to do that, you have seen that each of my
3   reports has a great number of footnotes.  Okay?
4          You didn't want me to even provide
5   additional ones.
6          I can find and forward it to you if
7   you are interested.
8          Q.   Okay.
9          So we'll just leave that there.
10         And if you have got authority for
11  that that you want to --
12         A.   Okay, fair enough.
13         Q.   -- that's fine.
14         A.   Fair enough.
15         Q.   Okay.  So let's move on now.
16         Looking further here at your cash flow
17  valuation of TML, do you agree that your
18  analysis includes calculations of cash flow
19  forecasts from 2019 to 2029 followed by
20  calculations of a terminal value period?
21         A.   Yeah.  But, again, I mean, you could
22  say that these are, you know, arbitrary.
23         You can definitely take it forward if
24  you want.  And perhaps, you know, we should have
25  gone much further and look at the approximate to

Page 244

1
2          Q.   Okay.
3          So your opinion, based on what you
4   have here in your report, is that the
5   appropriate terminal growth factor that should
6   be applied in the scenario where Mr. Seex died
7   is 3%?
8          THE WITNESS:  I'm not sure what you
9   are referring to right now.
10         MS. BRENNER:  Okay.
11         So here on page 4 of your --
12         THE WITNESS:  -- can you put one
13  page and -- where do you see the 3%?  I --
14         MS. BRENNER:  So on page 4 --
15         THE WITNESS:  Yeah --
16         MS. BRENNER:  -- right above the
17  equation that we were just looking at --
18         THE WITNESS:  -- hm-hmm, hm-hmm --
19         MS. BRENNER:  -- there is a discussion
20  of:  Growth Rate.
21  BY MS. BRENNER:
22         Q.   Do you see that?
23         A.   Yeah.
24         Q.   And it discusses a couple different
25  growth rates there; and one of which is:

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 245

1
2 Terminal growth rate.
3       A.   Okay.
4       Q.   So I'm trying to understand the growth
5 rates that you applied and the terminal growth
6 factor that you applied.
7            And that was 3%, correct?
8       A.   3% terminal growth rate.
9            And, again, if you go up to 2033, as I
10 said, yes, this is debatable.
11           Again, were you following convention
12 here. I can give you sources.
13           But, you know, you can -- you can
14 argue about that, I mean, if you would want.
15           I don't think it would make really a
16 difference -- a material difference -- in the
17 overall numbers -- in the overall result that
18 you will get.
19      Q.   Okay.
20           I guess what I'm trying to pin down
21 here -- are you saying that a different terminal
22 growth rate that was higher here in your
23 calculations would not make an overall
24 difference?
25      A.   Any time you change the assumption, it

Page 246

1
2 would make a difference.
3           I do not believe in here that it will
4 make a material difference.
5           If you want me to run the numbers with
6 a different percentage, I'm happy to do it. But
7 I cannot tell you offhand what it would be.
8           My estimate that the difference would
9 not be huge.
10          But beyond that, I will have to go
11 back and run the numbers again.
12     Q.   And without running the numbers again,
13 can you tell me why you estimate the difference
14 would not be huge?
15     A.   It would not be huge because I think
16 what we're -- what we are using is, number one,
17 reasonable; and number two, it doesn't really
18 depart from convention.
19     Q.   In your view, the 3% does not depart
20 from convention?
21     A.   I think it's highly conservative.
22          Again, I think we have been hugely
23 conservative throughout.
24          When we get -- soon, I suppose -- to,
25 you know, to the earnings, you will see that as

Page 247

1
2 well. I think we have been actually overly
3 conservative.
4       Q.   Do you know what the average inflation
5 has been in Kenya for the time period that you
6 have been measuring here in your analysis?
7       A.   I know, I mean, if it is written down.
8 I can't tell you exactly offhand.
9            But I can tell you that here, and
10 definitely in the much larger number that we get
11 from earnings, we are looking at real numbers
12 that is inflation-adjusted --
13      Q.   Okay --
14      A.   -- okay?
15      Q.   -- so your terminal growth rate here
16 is a real rate of growth, not a nominal rate?
17      A.   We are talking about real.
18           And, again, we are doing the same
19 thing with, you know, the wage growth numbers.
20      Q.   Okay.
21           So your opinion is that the terminal
22 growth rate would be 3% over whatever inflation
23 is in Kenya?
24      A.   That is correct.
25      Q.   Okay.

Page 248

1
2           Can you point out to me where here in
3 your report you explain how you arrived at that
4 3% terminal growth rate number?
5       A.   Again, whatever I have is listed in
6 the report. We have provided you with the exact
7 numbers. I mean, that you asked for the
8 computer files and so forth.
9            And, yes, I also wrote notes
10 pertaining to those technical issues.
11           But, again, I was under the impression
12 that I'll be able to submit those.
13           But apparently, this is not the case.
14 So maybe the judge will decide if we should or
15 should not.
16      Q.   Okay.
17           But what I'm trying to understand is
18 how you calculated the 3% figure that is in your
19 report and what you considered.
20           So just at a high level, can you
21 explain to me what your analysis was that you
22 performed, and what factors you considered, to
23 arrive at that 3%?
24      A.   I repeat: The 3% is simply the most
25 conservative rate that you are going to find.

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 249

1
2  Actually -- actually -- and you can see it in
3  the earning report that we have provided.
4       I mean, following, you know, your
5  expert's report is -- it is hugely conservative,
6  especially for any major market economy.
7       Q.   What do you mean by "conservative"?
8       A.   "Conservative," I mean, that it would
9  be a very low side.  Okay?
10      You always -- you know, we come up
11  with a range.  You always have to make
12  summaries -- I mean, right?  After all we are
13  looking into the future.  Okay?
14      Which is why I reiterate again and
15  again that, given that reality, you know, you
16  want to look at -- maybe you can call it
17  qualitative -- but projection which -- as to
18  where is the sector; where is the business
19  going; where is the national economy going; what
20  are the prospect for this economy based on the
21  experience with other emerging economist.
22      We have provided all of that in the
23  earning, you know, document -- at least the one
24  that we have done in response.
25      And much of it applies here as well.

Page 250

1
2       Q.   Okay.
3       So you've said a couple times about
4  different markets and different sectors.
5       So I guess what I'm trying to
6  understand is:  Where did the 3% figure come
7  from?
8       Is that something you calculated?
9       Or is that a value that's come from
10 other analyses that you've adopted here because
11 you thought it was reasonable?
12      A.   It's mostly because it's reasonable,
13 and it is the most conservative number that I've
14 seen for any emerging market.
15      Q.   Okay.
16      And where did you see that number?
17      A.   This is -- you'll find it all around
18 the scholarly literature.
19      I can provide you with a mountain of
20 sources on that, if you will want.
21      Q.   So is there a particular source that
22 you relied on in this case for that 3% number?
23      Or is that just --
24      A.   No, no, just knowledge for over 40
25 years with dealing with emerging economies.

Page 251

1
2       So, yeah, there are multiple sources.
3  I cannot give you any particular one.
4       But anyone that deal with emerging
5  markets -- okay? -- this is the estimate that --
6  the lowest estimate that I've seen.
7       Otherwise, actually, it's not going to
8  be considered an emerging market.
9       (Pause)
10      Q.   So I would like to talk a little bit
11 more about your variables here in your equation.
12      So we were speaking briefly earlier
13 about the market value of debt variable, and
14 that being based on Kenyan data.
15      MS. BRENNER:  Going to the next page
16 of your report, there is a reference to a
17 "risk-free interest rate."
18 BY MS. BRENNER:
19      Q.   And what do you mean when you say
20 "risk-free" in the context that you are using it
21 here in your report talking with the debt?
22      A.   That means that you don't take into
23 account any particular, you know, serious risk
24 that are involved with a particular enterprise.
25      Q.   Have you reviewed any documents or

Page 252

1
2  information regarding what actual rates TML was
3  paying on its debt leading up to the accident?
4       A.   I cannot recall that.
5       What I can say is that long range, the
6  risk that I would assess is low and the risk
7  that any credit provider would assess are low --
8  other than, again, emergencies such as the one,
9  you know, during COVID where suddenly there is
10 cash flow problem, and this, or that, which,
11 again, I regard as totally temporary.
12      Other than that, there is not high
13 risk.
14      Let me explain to you exactly if I
15 may -- and I think it is actually in one of my
16 reports.  But if not, I'll -- let me add it.
17      I mean, there are a number of very
18 important reasons why the risk is very low.
19      First of all, this is what we call in
20 strategy related diversification.  Okay?
21 Related diversification is where a company
22 expand into related business.  That means that
23 it neither goes into areas that it knows nothing
24 about, but it also ventures beyond its narrow
25 market, therefore opening other opportunities.

63 (Pages 249 to 252)

ODED SHENKAR, PH.D.

Page 253

```
1
2          The scholarly literature is very, very
3    clear on that.
4          And again, if you will want -- I mean,
5    we were going to provide it also as a
6    response -- I will provide you some references
7    on that.
8          And, again, related diversification --
9    very well known to anyone who knows anything
10   about strategy, rather than narrow economics --
11   which I must mention even though it, maybe, does
12   not belong here -- your two experts do not have.
13         Anyone who knows something about
14   strategy knows that related diversification is
15   the least risky, most promising strategy.
16         This is exactly what TML has.  It has
17   hotels.  It has restaurants and related
18   businesses, and therefore it fits very well into
19   that.
20         It is actually -- small as it may be,
21   it is actually a business group.  It is not just
22   an enterprise with one particular business.
23         And, again, it fits very well in terms
24   of related diversification.
25         It also fits very well in terms of
```

Page 254

```
1
2    diversified locations, you know, because Nairobi
3    and Mombasa, if you look closely at the
4    country -- again, your expert did not do --
5    totally different location.  They draw different
6    type of visitors:  Nairobi more business and so
7    forth, Mombasa a very much a leisurely, you
8    know, tourist market and so forth.
9          This is related diversification.
10         The fact that TML has management
11   contract as opposed to equity investment in
12   hotel -- this reduces risk very much.
13         So, okay.  So here is part of
14   definitely your answer.
15         I mean, the reason why you would see
16   in recent years enterprise like Hilton and so
17   forth moving away from strict ownership of
18   hotels through management is because the return
19   is nice, but the risk is really very low.  Okay?
20         Yes, you typically get a percentage
21   and so forth, but it is definitely a classic
22   risk-mitigation strategy.
23         So you add all of this related
24   diversification, risk mitigation, business
25   grouping, sectoral growth -- I can give you, if
```

Page 255

```
1
2    you want, more information on that -- and you
3    look at all of that and yes, you can see why
4    your risk is low.
5          I hope I answered your question, maybe
6    more than what you expected to hear, but --
7    nevertheless.
8       Q.   Okay.
9          So you would agree that the interest
10   rate that a creditor will charge on a debt is an
11   indication of the risk that the creditor has
12   assigned to that debt?
13      A.   It will be correlated with that.
14         It is not a one-on-one relationship.
15   It never is because you have to look at the
16   portfolio of the credit provider as well to
17   answer that question.
18      Q.   And just to be clear, when you were
19   arriving at the cost of equity and the rates
20   that you were using in your calculations here in
21   your report, did you look at what TML was
22   actually paying out in interest on the various
23   debts that it had?
24      A.   For a very simple reason, no, because,
25   again, I mean, you had a very -- if you are
```

Page 256

```
1
2    talking about the year in between, you know,
3    with COVID and so forth, yes, there was
4    additional risk.  I mean, you know, some
5    companies went under.
6          But the proof is in the pudding, as we
7    say.  The TML survived it.
8          But as I said again, the risk also
9    reflects what is the portfolio of credit of the
10   loan provider.  This is -- determined the risk,
11   not less than what is the condition of the
12   enterprise that obtained the credit.
13      Q.   So that's a:  No?
14      A.   Ma'am, I answered it.  You call it yes
15   or no.
16         I told you again -- okay? -- that I
17   don't have information on what is the
18   creditworthiness of the credit provider.  I
19   don't know what is the loan portfolio.  And
20   without that, I cannot give you a very clear
21   answer on that.  Okay?
22         But I did give you, I think, all the
23   information about why -- in my professional
24   judgment -- okay? -- and there are banks
25   sometime who ask me to provide them with that
```

ODED SHENKAR, PH.D.

Page 257

```
1
2    assessment -- why I believe that the risk is not
3    high in this situation.
4        Q.   My question was what information you
5    considered.
6        So I'm trying to just get a clear
7    answer here, because I've asked you now twice.
8    It's a yes-or-no answer --
9        A.   Okay.  I said I have looked at that
10   information, but I think it provides very
11   limited indication.
12       Q.   So you have looked at the interest
13   rates --
14       A.   I -- I recall -- I don't know if it
15   was looking or talking to the chairman about it.
16       But, again, I did not make any further
17   inquiries because I did not think that it was
18   material.
19       Q.   Okay.
20       So if you looked at that information,
21   you didn't rely on it in any case in arriving at
22   the numbers you used here?
23       A.   That's what I recall.
24       Q.   Okay.
25           MS. BRENNER:  So going back to the
```

Page 258

```
1
2    terminal value calculations that you have here
3    in the same section of your -- in the section of
4    your report below on page 5, which I believe we
5    have got up there.
6    BY MS. BRENNER:
7        Q.   For the calculations that you did of
8    cash flow forecasts for this period between 2019
9    and 2029, you only provided one estimate, right?
10       A.   What you see is what you get, ma'am.
11   You know, we have presented to you what we did.
12       Q.   Okay.
13       And so you performed your cash flow
14   calculations to estimate the performance of the
15   company in March 2019 before Mr. Seex died,
16   right?
17       A.   Yeah.
18       Q.   Okay.
19       And you did not do, though, a similar
20   cash flow forecast to estimate the performance
21   of the company in 2019 that took into
22   consideration the scenario where he died?
23       A.   I don't understand your question.
24   What do you mean I didn't look at the scenario?
25       Of course we know that he has died.  I
```

Page 259

```
1
2    mean, therefore scenario -- I simply do not
3    understand your question.  I'm sorry.
4        Q.   No worries.  I'll ask it in a simpler
5    way.
6        A.   Okay.
7        Q.   You did one set of future cash flow
8    calculations, correct?
9        A.   All right.
10       Q.   And then you did your terminal value
11   calculation, right?
12       A.   Are you talking -- okay.  Okay.  And?
13       Q.   And that is the only place where you
14   then did a secondary calculation for your two
15   scenarios?
16       A.   It's the secondary.  But again, you
17   have the summary in my original opinion.
18           (Pause)
19           MS. BRENNER:  Can we go off the record
20   for just a couple minutes? -- take a break?
21           MR. WISNER:  Sure.
22           THE VIDEOGRAPHER:  We are going off
23   the record.  The time is 6:21 p.m.  This ends
24   media unit 5.
25           (Recess from 6:21 p.m. to 6:34 p.m.
```

Page 260

```
1
2    Eastern Standard Time)
3            THE VIDEOGRAPHER:  We are now going
4    back on the record.  The time is 6:34 Eastern.
5    This begins media unit 6.
6    BY MS. BRENNER:
7        Q.   Okay.  So Dr. Shenkar, I'm going to
8    try to ask a tighter question here that will
9    hopefully let us get to the heart of the issue
10   on this terminal growth rate.
11           MS. BRENNER:  So I see in your report
12   reviewing the summary of your analysis here on
13   page 6 -- which I think we can move up there on
14   the screen, but I imagine you also have it in
15   front of you.
16   BY MS. BRENNER:
17       Q.   In summarizing your analysis at the
18   very bottom of page 6 and then going into the
19   beginning of page 7, it seems to me -- if I'm
20   understanding what you are saying here -- that
21   you've got effectively two terminal growth
22   factors that you are applying:  One in the
23   scenario where Mr. Seex did not die, and the
24   business continued on on that trajectory you
25   were describing earlier; and an adjustment in
```

ODED SHENKAR, PH.D.

Page 261

2 the scenario where he does die and the business
3 suffers the effects of the death shock from the
4 death of the CEO.
5 Do I have that right?
6 A. Yeah. I mean -- again, I mean, you
7 have it in the summary. I provided all the
8 explanation.
9 I'm happy to provide you more
10 technical points following your side's, you
11 know, comments.
12 I think that will be way more
13 efficient than getting here to detail after
14 detail.
15 I don't recall everything by heart. I
16 may have to go through my calculation.
17 We provided you with everything,
18 including the computer file on which it was
19 based.
20 So I really don't know where else you
21 want to go with that.
22 Q. Okay.
23 So I think that was a: Yes.
24 And so my follow-up question, then --
25 MR. WISNER: Objection to your

Page 262

2 characterization of that, Alletta.
3 BY MS. BRENNER:
4 Q. My follow-up question, then, is that:
5 Is this the only place in your analysis where
6 you are offering two different numbers for
7 scenario A -- which is the scenario where Mr.
8 Seex does not die -- and scenario B is the
9 scenario where he does die?
10 Do you understand my question?
11 A. I'm not sure that I understand your
12 question.
13 I mean, I performed two different
14 analysis in order to show or calculate the
15 difference -- the difference between, had he
16 lived and, again, the tragic event that actually
17 occurred.
18 This is what this, if you will, trial
19 is all about. Isn't it?
20 Now, I did provide you, for instance,
21 vis-à-vis Mr. -- Dr. Guryan, and otherwise
22 whenever possible, I provide you also with more
23 than one calculation.
24 And this is simply to be rigorous and
25 to show you exactly what the assumptions are.

Page 263

2 Q. Okay.
3 So you agree that you've got two
4 different scenarios, and you've got a
5 calculation that shows you what the value would
6 have been had he lived; and you've got a
7 calculation that shows what the value is, had he
8 not lived.
9 And the difference between the outcome
10 in those two values is driven by these numbers
11 here?
12 Do I have that correctly?
13 MR. WISNER: Objection, asked and
14 answered.
15 He's already talked about all the
16 other factors, too.
17 You can answer, Doctor.
18 A. Yeah, I mean I just explained to you
19 before that you have -- we provided -- you know,
20 again, I gave a very specific explanation.
21 But you must look at the business
22 context. You have to look before -- beyond --
23 okay? -- merely, you know, the death, and so
24 forth.
25 I provided you again and again with

Page 264

2 information on the business plan, on expansion,
3 and so forth. Okay?
4 So what we calculated again, you know,
5 was very, very conservative.
6 And actually, if you would ask me
7 now -- or perhaps when we go to trial -- that
8 will have to add this additional information.
9 Because, for instance, the plan for
10 500, you know, Shell, you know, restaurant --
11 they are going to dramatically change
12 everything -- I mean, the possibility. Is this
13 100%? No, of course. I mean, we are talking
14 always about hypothetical scenario.
15 But, yeah, I would definitely
16 introduce that. And would that result with an
17 even bigger number? Absolutely.
18 Q. My question is -- I'm trying to
19 understand your actual calculations that are
20 driving the numbers that are in your opinion.
21 And so I guess -- the question I'm
22 trying to ask you is a real simple one.
23 I'm trying to ask: What variables
24 drive the difference between scenario A and
25 scenario B?

ODED SHENKAR, PH.D.

Page 265

```
1
2              And my question is whether these are
3   the variables here.
4              These are the numbers that are driving
5   the difference between the value of the shares
6   in TML in the scenario where he does not die,
7   versus he does die.
8       A.   I'll -- again, again, you are going to
9   get the same answer from me.
10             You know, we listed the numbers and
11  the variable that went to the calculation.
12             But you must see it in the context of
13  the business sector and the nation.
14             Otherwise, you are performing a very
15  limited, narrow economic calculation.  And you
16  are missing the all-important context that would
17  have an impact.
18             I've said that and I'll repeat it
19  again and again.
20             (Pause)
21      Q.   All right.
22             Looking at your discussion here in the
23  paragraph that we were just pointing to, you
24  start off that paragraph referencing:  The
25  premature death of a founding member causes a
```

Page 266

```
1
2   42.7% decrease in revenue over the following
3   five years that the firm has been established
4   for more than five years.
5              Then I see you have got a footnote
6   there to the Choi paper.
7              Where specifically does that 42.7%
8   come from?
9              Is that something that you pulled
10  directly from the Choi paper?
11             Or was that a value that you derived
12  based on your own calculations?
13      A.   So again, this comes directly from
14  this man, from this paper.
15             And yes, I am definitely far apart
16  from your expert on that, and I'll be happy to
17  expand on that later.
18             So, yes, it is taken from a particular
19  source that I find the closest to the case.  So,
20  again, it is adopted based on the reality of
21  that case.  Okay?
22             Unlike, say, you know, Mr. Guryan, I'm
23  not using averages.
24             I mean, I'm using the numbers that fit
25  the case, because they are closest in terms of
```

Page 267

```
1
2   their key parameters.
3       Q.   What case are you referring to that
4   you think was the closest to this scenario?
5       A.   Ma'am, there is the case that is --
6   everything is cited here.
7              And all the other cases -- okay? --
8   are listed in a special report that I have
9   provided -- okay? -- on CEO death -- the impact
10  of CEO death.  Everything is there.  There are
11  30 footnotes.  Everything is there.
12             And I am glad any day to put this
13  against the meager summary that your expert has
14  done.
15             (Pause)
16      Q.   Okay.
17             So you cited to the Choi article here
18  in your footnote.  And you also discuss that in
19  your other paper that you have referred to.
20             So --
21      A.   So? --
22             MS. BRENNER:  Let's go ahead and mark
23  the Choi article as an exhibit.
24             (Pause)
25             MS. BRENNER:  And I think we are now
```

Page 268

```
1
2   at Exhibit 10.
3              (Exhibit Defendant's Seex_Shenkar 10,
4   Multipage document entitled: NBER Working Paper
5   Series: Founding Teams and Startup Performance,
6   dated January 2021 (no Bates Nos.), marked for
7   identification)
8              MS. BRENNER:  So I don't want to spend
9   everyone's time going through all of the things
10  in the article.
11  BY MS. BRENNER:
12      Q.   But first off, is this article here --
13  this working paper that we have just marked --
14  the article that you were referring to that you
15  relied on?
16      A.   And again, I have to look at the
17  source.  I have written the source.  What you
18  see is what you get.  My sources are accurate.
19  Okay?
20             We'll get to your expert.  We'll see
21  about what's going on there.
22             But my sources are accurate.
23             So whatever is listed there.
24             If you ask me to remember by heart 38
25  footnotes, I'm sorry that I'm not at that level
```

67 (Pages 265 to 268)

ODED SHENKAR, PH.D.

Page 269

1
2  to remember all of them by heart.
3       But anything that I use, again, it is
4  also put rigorously against what the rest of the
5  literature is saying. I'm not pulling them out
6  of nowhere. Okay?
7       So even if you want to look at any
8  particular study -- and they are listed here
9  meticulously -- you must look at it also against
10 the rest of the literature. Otherwise, you will
11 be doing what we call in the scholarly world
12 cherrypicking. Okay?
13      So that's not what I have done.
14      But, again, every single thing is
15 listed in here.
16   Q.  Okay.
17      So the article that we've marked
18 here -- the Choi paper -- that is the one that
19 you cited in your report.
20      When you say that you selected the
21 case that was most applicable, I'm trying to
22 understand what case you are talking about.
23      So are you talking about applying the
24 Choi article to the facts of this case?
25      Can you please explain?

Page 270

1
2    A.  I'll repeat it again.
3       Yes, I have selected the article that
4  seems to be appropriate for the case at hand.
5  Okay?
6       If you think that there are other
7  article, fine. Your expert actually listed
8  those article. And given the opportunity, I
9  will comment on that.
10      But for now, again, I have listed all
11 the relevant article. And, yes, I'm giving more
12 weight to articles that I think are especially
13 fitting; especially fitting because of specific
14 parameters, or because of, I would say, meeting,
15 a reasonable level of rigor. Okay?
16      Unlike your expert, I'm not using a
17 student paper.
18   Q.  Why --
19   A.  Yeah?
20   Q.  -- did you find the Choi article to be
21 most applicable to this case?
22   A.  Again, I mean, I'll have, you know, to
23 look at it.
24      But because, among other things, it
25 talks about founding members, founding families.

Page 271

1
2  That would be one reason.
3       He talks also about a -- you know,
4  startups. And I would definitely argue that the
5  new ventures that have been contemplated by Mr.
6  Seex fall into the category of startups, and so
7  forth.
8       So here you got two relevant
9  variables.
10      There may be more, but, again, I'll
11 have to revisit it. I don't remember every
12 single source. Between my various report, there
13 are probably 60 footnotes. Do I remember all of
14 them by heart with each and every detail? No.
15      But I've already given you two.
16   Q.  Okay.
17      So what is your definition of a
18 "startup"?
19      And how you are using it?
20   A.  My definition of a startup is the
21 formation of a new business. And this new
22 business, yeah, it can definitely be within an
23 existing business group as well. That would
24 also be a startup, yes.
25   Q.  So you are defining TML as a

Page 272

1
2  startup --
3    A.  No --
4    Q.  -- not --
5    A.  -- no --
6    Q.  -- can you let me finish my question?
7       You are defining TML as a startup for
8  purposes of adhering to the Choi paper,
9  notwithstanding the fact this firm was founded
10 in the 1970s?
11   A.  Let me again explain to you.
12      TML, in and of itself, is not a
13 startup.
14      But business speaking, from any
15 strategic entrepreneurial perspective, when a
16 firm -- can be an existing firm -- launch into
17 new businesses, which they imply a segment that
18 they have not been before, then they have strong
19 startup elements.
20   Q.  Did the businesses that were studied
21 in the Choi paper have those characteristics?
22      Were they established businesses that
23 were launching new initiatives?
24      Or were they businesses that had been
25 newly formed?

ODED SHENKAR, PH.D.

Page 273

1
2      A.   Possibly newly formed.
3      But again, I don't remember.  I do not
4  remember 60 footnote by heart.  This is why I
5  provided you with a source and everything is
6  listed there.
7      But, again, what I am telling you --
8  that the business convention, including in the
9  consulting world, is to treat those as startups.
10      And yes, I treat it as a startup.
11      And when it come to trial, definitely.
12      Will I be looking at enterprise such
13  as the 500 gas station as a startup?  100%, yes.
14  Okay?
15      So I think I've been pretty
16  conservative.  And going forward, I'll probably
17  go beyond that with new information that I
18  receive later.
19      Q.   Are you considering Jonathan Seex as a
20  founder?
21      A.   He's a descendant of a founder.  This
22  literature is very clear on that that there is a
23  lot of similarity.  He is not a founder.  He is
24  a descendant of the founder.  So it is a
25  quasi-family firm with -- being run -- I mean,

Page 275

1
2      Q.   Is it your understanding that Chris
3  Seex is no longer living?
4      A.   That's my understanding.
5      Q.   Do you have an understanding of when
6  he passed away?
7      A.   I don't recall the exact year.
8      I don't see how it would be relevant.
9      But no, I don't recall the exact year.
10      Q.   If Chris Seex was a founder and he
11  died at some point while he was still involved
12  in the company, would you consider that to be a
13  death shock as defined in the Choi article?
14      A.   It -- again -- again and again, I'll
15  repeat, you know, the same thing.  It depends on
16  whether -- also, you know, what were, you know,
17  his plan for the future were for the business.
18  Okay?  He's -- this is exactly how it is defined
19  in the literature -- that Jonathan was a direct
20  descendant of the founder.
21      You are asking me a very hypothetical
22  question, so this is the only answer I can give
23  you.
24      Q.   Well, I don't think it's hypothetical.
25      We know that Chris Seex was a founder,

Page 274

1
2  until, again, the unfortunate crash -- by a
3  descendant -- a direct descendant of the
4  founder, who was groomed to succeed him.
5      Q.   When did Chris Seex stop serving in
6  the role of CEO?
7      A.   Can you repeat that?
8      Q.   When did Chris Seex stop serving the
9  role as CEO?
10      A.   I don't remember the exact date.
11      But obviously Jonathan was groomed to
12  be a successor.  Otherwise, why would he be
13  sent, you know, to a hospitality, you know,
14  school and so forth? -- you know, to learn
15  everything?
16      Why would he be appointed first as
17  business development manager before being
18  elevated, you know, to the CEO?  Because a
19  descendant inherit many of the social network
20  that I explained to you about.  That is, first
21  of all, very important in hospitality
22  industry -- more so than other sectors;
23  especially important in the context of Kenya
24  because of the culture and the society that it
25  is embedded in, and so forth.

Page 276

1
2  and that he was at the helm of the company.  And
3  that we know that he has since passed away.
4      And so I'm asking:  Applying the
5  criteria set forth in the Choi article, would
6  that also constitute a death shock?
7      A.   So first of all, yes.
8      I'm sorry to disagree with your man,
9  but this is strictly hypothetical because you
10  ask me, had he not lived -- and he did live, he
11  did die, right?  So this is the definition of a
12  hypothetical.
13      Having said that, I'll repeat again:
14  It depends also -- the shock would have depended
15  also on what were his plan for the company.
16      Yeah, if he were in the midst of a
17  radical uplift, dramatic growth, and so forth, I
18  assume, yes, there would be a shock.
19      Beyond that, I'll direct you to the
20  literature that is in the report that I provided
21  you.
22      And this literature says exactly what
23  are the demographics that would make a
24  difference; for instance, CEO being young, yes,
25  it makes a difference.

69 (Pages 273 to 276)

ODED SHENKAR, PH.D.

Page 277

1
2         So in this respect less -- it would
3     have been less of a shock because it makes a
4     difference, the literature tells us, whether the
5     CEO was young or not.
6         Mr. Dolgoff apparently is not aware of
7     such variation in differences, but I am.
8         Q.  Do you recall the discussion in the
9     Choi article about how companies that survive
10    death shock can be more resilient when faced
11    with subsequent shocks?
12        A.  I cannot recall any detail in any --
13    or in all of those article.  I have already made
14    that point.
15        Q.  Okay.
16        So fair to say, then, that that was
17    not an aspect of the article that you considered
18    in your analysis for this case?
19        A.  Again, I do not recall.  I have read
20    all of those articles, but it doesn't mean that
21    I remember any minor detail that appears in
22    them.  This is why I listed them and provided
23    you with the exact sources.
24        Q.  My question is not whether you can
25    recall every single detail in the article.

Page 278

1
2         I'm just trying to ascertain whether
3     that was an aspect of their analysis that you
4     considered in applying the article to this case.
5         And it sounds like the answer is: No?
6         A.  I think I've answered it.  I'm sorry.
7     I think I answered it very clearly.
8         I do not recall that particular
9     detail.
10        Every article can mention or can
11    speculate on whether, for instance, you know,
12    that would make a company more or less
13    resilient.
14        I'm focusing on what they have tested
15    and what they have found.
16        Q.  Okay.
17        And we had started out this discussion
18    talking about the 42.7% number that you cite in
19    your report specifically, and so I am trying to
20    understand how you arrived at that figure.
21        And so is that a specific figure that
22    was cited somewhere in Choi?
23        Or is that a number that you
24    calculated based on the information --
25        A.  No, I did not -- I did not calculate

Page 279

1
2     those numbers.
3         Again, I will reiterate:  I mean, I
4     have taken a number from the article, or from
5     other article as needed, but only when placed in
6     the right context.
7         Q.  Okay.
8         So I'll admit that I spent some time
9     going through the Choi article, and I could not
10    find that figure.
11        And so if you can --
12        A.  You could not find --
13        Q.  -- let us know --
14        A.  -- that number.  I'll have to look
15    again.  It's possible that, you know, we have
16    it -- the working number and not in the
17    published version.  But I can assure you it is
18    not invented.
19        Q.  But just to get, I guess, to the nub
20    of my question:  To the best of your
21    recollection, that is a number that came from
22    Choi?
23        And that's not a value that you
24    calculated?
25        A.  It is not -- for surely not -- just a

Page 280

1
2     value that I calculated.
3         Q.  Okay.
4         (Pause)
5         Q.  All right.  I'd like to change gears
6     here.
7         A.  Hm-hmm.
8         MS. BRENNER:  Before we do that, I
9     just want to check and make sure whether you
10    need to take a break, or whether you are good to
11    continue.
12        THE WITNESS:  I really want to be done
13    with it.  I mean, with all respect, forget age,
14    I mean, maybe we'll talk now about retirement
15    age and this and that in relation to Mr. Guryan.
16    But I really want to get it over with, so I'll
17    appreciate if you can accelerate it.  I can
18    contribute my little bit by giving up the breaks
19    on my side, if it is okay with all the other
20    humans on this call.
21        MS. BRENNER:  Okay.
22        THE WITNESS:  Okay?  Fair enough?
23        MS. BRENNER:  Okay.
24        So let's move forward, then.  I'd like
25    to switch gears here and talk a little bit about

70 (Pages 277 to 280)

ODED SHENKAR, PH.D.

Page 281

1
2    your lifetime earnings opinion.
3        And --
4        THE WITNESS:  Okay.
5        MS. BRENNER:  -- let's go ahead -- we
6    previously marked that report.
7        Let's go ahead and put Exhibit 2 back
8    up, Karishma.
9        (Pause)
10        MS. BRENNER:  Okay.  Let me know when
11    you are ready.
12        THE WITNESS:  Yes, I am ready.  I'm
13    just kind of, you know, preparing -- looking for
14    the different files that I have here, a million
15    and one, and so forth.  That's fine.  Yeah,
16    yeah, you can proceed.
17        MS. BRENNER:  Okay.
18    BY MS. BRENNER:
19        Q.  So what was the assignment given to
20    you in preparing this report?
21        A.  The assignment was similar, in
22    essence, in the sense that I have been asked to
23    compare what would have been the lifetime
24    earning of Mr. Seex, had he lived -- okay? --
25    to -- I mean, obviously he did not -- so what --

Page 282

1    what was lost, in other words, because of his
2    premature death.
3        Q.  Okay.
4        And we spoke about this hours ago at
5    the very beginning of the deposition with
6    regards to your opinion on that.
7        A.  Yeah.
8        Q.  When we spoke about that, you had said
9    something about how his 2019 earnings were a
10    proxy.
11        So I wanted to follow up on that --
12        A.  Okay --
13        Q.  -- see if I can understand it a little
14    bit more.
15        A.  -- sure.
16        Q.  So a proxy -- a proxy for what?
17        A.  A proxy for -- okay.  So let me
18    explain.  Okay?
19        Typically, we are looking at three
20    elements when we are looking at lifetime
21    earnings.  Okay?
22        We are looking at wages -- you know,
23    wages and benefit, if you will, or so-called
24    compensation.
25

Page 283

1        We are looking at wealth -- that is,
2    what a person accumulates over time.
3        And we are looking at business income.
4    Okay?
5        So there are three legs to it.
6        Now, in this case, we have information
7    on wages -- admittedly not complete.  And
8    actually, I can tell you in hindsight, lower
9    bias; because as I said, there were compensation
10    element -- important ones, such as the pension
11    plan, and so forth -- that we did not see
12    because they were not listed in the document
13    that we have had.  And we found it out only when
14    you talked with -- you know, with Martin.  Okay?
15        Now, having said that, I did not have
16    information -- or, I would say, well-defined
17    information -- on wealth.  I didn't know about,
18    you know, savings and, you know, what he would
19    be saving over time, and so forth; what was his
20    saving approach.
21        Because we have different calculation
22    based on what you invest in, and so forth.
23        And we did not know what would be the
24    income from the business.  Okay?
25

Page 284

1        Therefore, we used wages and we used
2    pre-'19 earnings for wages as a proxy for wealth
3    and business.  Okay?
4        We have prepared -- which I believe
5    this is something that we have shared with
6    you -- what would be the calculation, had we
7    included those or make assumption on those.
8        Because, yes, we are -- obviously, you
9    are talking about assumption.  Okay?  Everything
10    here is indeed -- I mean, I guess you don't like
11    the word -- is hypothetical, because we don't
12    know what would have happened had Mr. Seex, you
13    know, lived.
14        So we make reasonable assumption that
15    are fairly common in the literature.
16        And to be very rigorous, we actually
17    provided you with more than one scenario on
18    that.  Okay?
19        Actually, even in the original report,
20    we try to be very rigorous by providing you
21    different number based on retirement age.
22        I can tell you, again, we were super
23    conservative because we have not gone with what
24    I would believe -- specially continuously
25

71 (Pages 281 to 284)

ODED SHENKAR, PH.D.

Page 285

1
2       reading into the literature -- what would be
3       more realistic; for instance, retirement age,
4       which would be the higher number that is listed
5       there.
6               So I hope that I've answered your
7       question.
8               If not, feel free to continue, I
9       guess. The night is still long.
10      Q.   So you said that the pre-2019 wages or
11      earnings in your analysis were a proxy for
12      wealth and business.
13              Do you mean wealth and -- so wealth,
14      as in money that would have been earned from
15      investments?
16      A.   Correct. I mean --
17      Q.   Okay --
18      A.   -- we -- after all, we don't presume
19      that in the hypothetical -- right? -- the
20      hypothetical scenario that Mr. Seex would have
21      died impoverished and wouldn't have, you know,
22      any money.
23              And again, this was before we found
24      out, as I disclosed, that there is pension plan;
25      there is Social Security. I mean, we did not

Page 286

1
2       even include those because we didn't have
3       information on that.
4       Q.   I just want to stop you there because
5       I want to drill down to see what you are
6       including.
7               So you say: Wealth from investments.
8               Are these investments that Mr. Seex
9       had prior to March 2019?
10      A.   Not necessarily.
11              But again, we are projecting what
12      would happen from 2019 forward, had Mr. Seex
13      lived. The assumption is that he would
14      accumulate some investment. But, again, we used
15      a proxy because we did have information on that.
16      Q.   So you said: Not necessarily.
17              So does the wealth that you are trying
18      to use those pre-2019 earnings as a proxy for
19      include wealth from investments that Mr. Seex
20      already had at the time of his death?
21      A.   As I said, I have no idea what he had
22      prior to his death.
23              I assume that he had at least some.
24              And I know for sure that, with this
25      level of pay and as a responsible person, he

Page 287

1
2       would have accumulated savings.
3               I think it's a very reasonable
4       assumption when you look at the general
5       population; definitely at the higher-net
6       individual.
7       Q.   And would those accumulated savings be
8       savings from his earnings?
9       A.   Some of that could be from his
10      earnings. Otherwise, you know, maybe something
11      else.
12              But definitely there is the assumption
13      that, you know, portion of his earnings would --
14      you know, would be -- you know, would be saved.
15      Q.   Okay.
16              So anything else apart from investment
17      earnings that you are including within that
18      category of wealth as you define it?
19      A.   As I said, these various
20      investments -- it could include stocks, bonds,
21      cash, whatever.
22              There is obviously variation in how
23      much people are saving; variation in what would
24      be the rate of return if they are risk takers or
25      not, and so forth -- which is why the other

Page 288

1
2       document that we provided you -- that you did
3       not want, apparently -- we also provide the
4       alternative where we are making some assumption
5       based on what's fairly common at this level of
6       earnings.
7       Q.   Okay.
8               Now I want to briefly ask you about
9       the second category that you identified of
10      business --
11      A.   Hm-hmm --
12      Q.   -- earnings -- or rather business
13      income --
14      A.   Right.
15      Q.   -- that you are also using that
16      pre-2019 earnings as a proxy for.
17              What is included within that business
18      income?
19      A.   Any profit that would come from the
20      business; for instance, if the -- if there were,
21      you know, profit-sharing plan; if they decided
22      tomorrow to list it on the, you know, stock
23      exchange; and, you know, you will, you know,
24      receive, you know, direct dividends as a
25      shareholder, and so forth.

72 (Pages 285 to 288)

ODED SHENKAR, PH.D.

Page 289

1
2        Anything -- any income that should
3   come by virtue of being a part owner of the
4   enterprise.
5        I have to say, again:  I mean, given
6   that, yes, we are thinking that this enterprise
7   under Jonathan were on the cusp of considerable
8   growth -- which is why Ascent was interested --
9   and this is why Ascent was making such an
10  assumption on the return that it would make from
11  that investment.
12       Q.   Okay.
13       And so I just want to be clear for the
14  record here because you have been talking about
15  "the enterprise."
16       You are talking about TML?
17       A.   I'm talking about TML.
18       I should add, but, you know, it can --
19  being conservative, we didn't include it.
20       Actually, Jonathan has a small
21  percentage of the holding company.
22       Holding company had also real estate,
23  and this, and that.
24       But because it was a small share, we
25  did not include it.

Page 290

1
2        Q.   Okay.  So I want to clarify what you
3   are referring to there.
4        So when you say "business income,"
5   talking about the business income specifically
6   that you are including the pre-'19 earnings for
7   as a proxy, you are talking about business
8   income from the TML holding company?
9        A.   No.  I'm talking about TML.
10       As I said -- I will repeat -- being --
11  trying to provide a very conservative estimate,
12  I did not add the share that Jonathan had in the
13  holding company of TML.
14       Q.   Okay.
15       So the business income that you are
16  talking about here is just --
17       A.   From TML, correct --
18       Q.   -- TML --
19       A.   -- correct --
20       Q.   -- any other businesses?
21       A.   Not that I know of.  But, again, TML
22  is a group.  It has a variety of businesses.
23       Q.   And so, just to be clear, when we are
24  talking about TML, we are talking about the same
25  business that we were just discussing the

Page 291

1
2   valuation --
3        A.   That is correct --
4        Q.   -- you did --
5        A.   -- that is correct.
6        Q.   So I guess this may be sort of a dumb
7   question.
8        But why not just include some
9   additional amount of projected earnings from
10  those sources in your post-2019 time period?
11       So, for example, add a premium for an
12  additional percentage on top of his earnings for
13  business income or wealth income?
14       A.   It is -- it's not a dumb question.
15       You know, whenever you use a proxy --
16  and, you know, in science, including sciences
17  that are way more advanced than economics -- we
18  are -- you know, we are always using proxies, so
19  forth.
20       The idea was that, given that we did
21  not have, you know -- sufficient information, it
22  would be better to take an actual number
23  pertaining to, you know, to earning.
24       And, again, this is being very
25  conservative, given low earnings before 2019,

Page 292

1
2   and so forth.
3        Well -- so -- so that's basically what
4   the approach -- it is very common.
5        And actually I can cite or send you.
6   I mean, in the sciences, it's becoming more and
7   more accepted to do that.  I have various
8   citation, I mean, on that and so forth.
9        This is basically what we call in
10  scholarship decision making under uncertainty.
11  So this is the reason that we have done it.
12       When we saw that there was kind of a
13  push back, we provided, you know, this
14  alternative calculation, which is just an
15  alternative; and comes up with really very
16  similar numbers.
17       Q.   Okay.
18       But just to be clear you are saying in
19  your original analysis, setting aside any
20  further supplemental information that you
21  prepared, the pre-2019 income that you have
22  included as part of your total number is a proxy
23  for income from these other two streams.
24       And that that was always the intended
25  purpose of that pre --

ODED SHENKAR, PH.D.

Page 293

1
2      A.  Yes --
3      Q.  -- 2019 --
4      A.  The short answer is:  Yes.
5      Q.  Okay.
6          And can you point me to where in your
7   report you explained that this?
8      A.  There are lots of things that are not
9   explained because I take them, you know, really
10  for granted.  Okay?  This is true for that.
11  Definitely it is true.
12         I never dreamed of someone, you know,
13  who will be using the average of a school
14  teacher in Illinois as a proxy for this case.
15  Had I known that, I would have provided more
16  information.  Okay?
17         And indeed, I tried to provide more
18  information on that.
19         But what you have, I think, is a very
20  rigorous presentation.
21         And, yes, they are assumptions that I
22  make that the reader -- be a lawyer, a company,
23  definitely another expert -- would be aware of
24  that.  It's really a fairly common practice.
25     Q.  Why did you start your earnings

Page 295

1   question.
2          Would it change your analysis, then,
3   if it turned out that he wasn't working until,
4   let's say, 1999?
5      A.  So two answer.
6          First of all, that's not what I said.
7   I said:  I do not recall exactly.
8          But I believe that there was a reason
9   to choosing that, knowing what -- I mean, with
10  additional information, I wasn't use the proxy
11  at all, especially once I have seen, you know,
12  the push back that I think is unwarranted.
13         But, you know, I thought that it's
14  well understood.
15         I would definitely have used the
16  wealth business and earnings combination.
17     Q.  Okay.
18         So I'm -- I want to understand the
19  question that you just gave.
20         So are you saying now that as you sit
21  here with all the information you have, you are
22  planning to redo your analysis to not use this
23  proxy at all?
24     A.  I have, again, provided you with an

Page 294

1
2   analysis in 1995 as the working age start?
3      A.  Again, I look for a proxy.  I looked
4   for a time when you can expect to have, you
5   know, some reasonable earnings.  And that's --
6   that's what I used.
7      Q.  When did Jonathan Seex graduate from
8   college?
9      A.  I'll have to go back.  Again, I have a
10  pile in the other office of you know, exact --
11  and so forth. We looked at those -- all this
12  information.  And that's when we have decided,
13  you know, to use it.
14         But, again, when you look at the
15  proxy, it's basically an arbitrary decision.
16         I want to go back.  I'm pretty sure
17  that what we did at the time is to look at when
18  he was trying to get some income, and so forth.
19     Q.  Okay.
20         So it's your testimony you selected
21  1995 because that's when he was starting to earn
22  income.
23         Would --
24     A.  It --
25     Q.  -- it change -- let me finish my

Page 296

1   alternative.
2          You pushed back against the
3   alternative.
4          It is not up to me now.  It will be up
5   to the court to decide -- okay? -- if I can add
6   more information of the sort that Mr. Dolgoff
7   did -- again, out of the blue.
8          Again, I said I couldn't read it.  I
9   just got it yesterday night.  So that will be a
10  decision.
11         If I am allowed, I mean, having the
12  additional information that I have, I would go
13  with the alternative.
14         But again, the alternative comes up
15  with very much the same number, the same range,
16  that the proxy did.
17         So that's basically tell you that the
18  proxy was reasonably accurate.
19     Q.  In this alternative that you are
20  referencing, are there any other variables that
21  you've changed compared to your original
22  calculations?
23     A.  No.  These are, again, the three
24  alternatives and vis-à-vis that.

ODED SHENKAR, PH.D.

Page 297

```
 1
 2          And also, I need to decide whether to
 3   provide a detailed answer -- answer, you know,
 4   to Mr. Dolgoff.
 5          Sure, I mean, in the way this has been
 6   played, if you will, yeah.  I mean, I would, you
 7   know, provide more detailed information on that,
 8   supported by, you know, footnoted scholarship,
 9   and so forth.
10      Q.   Okay.
11          So I want to be clear here about what
12   you are saying, and there is a lot packed in
13   there.
14          So let me back up and ask a couple
15   questions.
16      A.   Okay.
17      Q.   So my first question, based on your
18   response a few minutes ago, is:  All else equal,
19   setting aside any procedural questions, or
20   timing, or what the court says you can or cannot
21   do -- just all else equal, if you had all the
22   information that you have available to you now
23   today, and you were seeking to do this type of
24   analysis, where you are including the lost
25   income from these three different streams, would
```

Page 298

```
 1   you use a proxy?
 2      A.   I, quite possibly, would have used
 3   both.
 4          I think in academia what we aim to
 5   do -- and not only in academia, whenever we
 6   consult -- we always strive to do something
 7   that, again, your own expert did not do.  We
 8   call it triangulation.
 9          Triangulation means that we always
10   strive to have more than one point of data.  We
11   always aim to have -- to do more than one
12   analysis; and present them partly to show if
13   there is a reliability -- I mean, across the
14   two, which we have been two; but also to provide
15   a broader context.
16          So most likely, this is what I would
17   be doing.
18          Again, you are asking a hypothetical
19   question, but I gave you an answer.
20      Q.   Okay.
21          My next question is:  Based on your
22   comment a moment ago about three alternatives, I
23   assume you are referring to the alternative
24   calculations that you prepared in your response
25
```

Page 299

```
 1   to Dr. Guryan?
 2      A.   Yes.
 3
 4          But again, I mean, my understanding is
 5   that you don't want that included, and you don't
 6   want to refer to there.
 7          So I don't know, I mean, what Mr., you
 8   know, Wisner, I mean, think about all of it.
 9          I mean, on the one hand, you are
10   rejecting it.  You are saying I'm not allowed.
11   You are, you know, asking the court to strike it
12   out.
13          On the other one, you want to discuss
14   it.
15          I mean, I don't get it.  Maybe Mr.
16   Wisner has something to say about it.  I'm not a
17   lawyer.
18          I mean, I work a lot with lawyers, but
19   I am not a lawyer myself.
20          It doesn't seem okay to me to do it
21   both ways.
22          But --
23      Q.   Okay --
24      A.   -- maybe Mr. Wisner can comment on
25   that.
```

Page 300

```
 1
 2          But to me --
 3      Q.   I am going to --
 4      A.   -- it doesn't seem reasonable.
 5      Q.   -- I'm going to move on for now --
 6      A.   Okay.
 7      Q.   -- on that topic.
 8          I have some follow-up questions here
 9   regarding your assumptions and the facts that
10   relate to this proxy that we have been
11   discussing.
12      A.   Please.  Please.
13      Q.   So the first question I have for you
14   is whether Jonathan Seex received profit sharing
15   as part of his employment for TML.
16      A.   I don't know if you call it profit
17   sharing.  I don't know if he received it.
18          Again, this is again a private
19   company, and it can change any time.
20          As I said, the new information that
21   was received included a pension plan that we did
22   not know about that could have been tied also to
23   profitability.  It included a variety -- it
24   included Social Security, which we did not know
25   if there is a deduction for.  Because, as in the
```

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 301

1
2     U.S., there are limitations to how much you can
3     contribute, and who -- at what, you know,
4     earning level you are allowed to contribute, and
5     what is exactly the formula to receive it, and
6     so forth.
7          So this is new information.
8          We got new information as far as
9     benefit, which basically suggested that his
10    earning were considerably higher than the one
11    that you have used -- that we have used.
12         So going back -- forgive me if I go
13    back for a second to your previous question.
14         And, yes, if I had the opportunity, I
15    would basically suggest that based on
16    supplemental information, the number, you know,
17    that we provided was ultra conservative.
18    Q.   Okay.
19         So my question was not about
20    conservative.
21         And my question was not:  What is all
22    the supplemental information you have received?
23         My question was very simple.
24         Yes-or-no, did Jonathan get profit
25    sharing?

Page 302

1
2     A.   I don't know.
3     Q.   Okay.  Next question.
4          Have you seen any evidence of
5     dividends being paid out to the shareholders of
6     TML?
7          And that's a yes-or-no question.
8     A.   I did not see it.
9     Q.   Okay.
10         Have you seen any evidence of other
11    types of compensation being provided to Mr. Seex
12    that you would consider falling within the
13    umbrella of business income?
14    A.   I think that many of the benefits fall
15    under that.  They are related to the business.
16    They depend on the business.  They are for the
17    purpose of the business.
18         So if you are getting a car,
19    everything included, if you are getting, you
20    know, an expense allocation that's fairly
21    generous, this all relates also to the business.
22         And obviously, it also depends on how
23    well the business is doing.
24         But let me say something.  I mean, I
25    understand you want me to answer yes or no.  And

Page 303

1
2     this is fine.  That is your job.
3          But let me again -- you are taking
4     things out of context.  I want to remind you,
5     for the record -- okay? -- we are talking about
6     the CEO that was newly appointed CEO.  Okay?
7          Not everything, I believe has been
8     determined.  I am pretty sure that, going
9     forward, there will be income coming.
10         Until I know that -- and I'm not
11    assuming at this point that I know that -- I
12    rely on common convention in the -- in the
13    world -- in the scholarly world -- about what
14    would be the proportion of business, wealth, and
15    earnings in total earning.  Thank you.
16    Q.   So for the record, that was testimony
17    that was not responding to the question I
18    answered -- excuse me -- that I asked.
19         My question that I'm trying to get at
20    is:  What are you considering business income
21    for purposes of the proxy?
22         Is it your testimony that you were
23    considering the employment benefits that Mr.
24    Seex received as an employee of TML a form of
25    business income?

Page 304

1
2     A.   Absolutely.
3          I think you are confusing two things
4     here.
5          I considered prior earning as an
6     employee -- okay? -- as a proxy for business and
7     wealth income, for which we did not have
8     information.
9          And I'll reiterate that when performed
10    separate analysis removing any pre-2019
11    earnings, but adjusting for common assumption
12    vis-à-vis wealth and business income, we got
13    more or less a similar number --
14    Q.   Okay.
15         Since --
16    A.   -- okay?  So I hope that answers your
17    question.
18    Q.   Well, yeah.
19         MS. BRENNER:  Since you have continued
20    to bring that up and want to talk about these
21    calculations, let's go ahead and mark that,
22    Karishma.
23         It's going to be --
24         THE WITNESS:  Again, if you don't mind
25    my comment, I'll leave it to Mr. Wisner.

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 305

```
1
2          I find it, maybe as an outsider to the
3    process -- I mean, I don't know how to say it --
4    on the one hand rejecting it and saying you want
5    to strike it out, not letting us submit
6    something similar vis-à-vis the earning part;
7    and then you want to use it at the same time.
8          I mean, to me, it's simply
9    unacceptable.
10         But again, I'm not the lawyer.
11         But I just want to draw Mr. Wisner's
12   attention to that and see what he thinks about
13   it.
14         MR. WISNER:  Oh, I'm well aware
15   that Dr. Shenkar will raise it in the court.
16         THE WITNESS:  Thank you.
17         MS. BRENNER:  Okay.  So I'm now
18   marking a document -- Karishma, it should be
19   under tab E.
20         (Pause)
21         MS. BRENNER:  Okay.  And this document
22   has now been marked as Exhibit 11.
23
24
25
```

Page 306

```
1
2          (Exhibit Defendant's Seex_Shenkar 11,
3    Multipage document entitled: Response to Mr.
4    Guryan, dated January 29, 2025 (no Bates Nos.),
5    marked for identification)
6          MS. BRENNER:  I understand this is
7    your response to Mr. Guryan.
8          And I just want to say here for the
9    record that I am marking this in order to be
10   able to respond to the points that the witness
11   has previously raised.
12         We preserve all objections with
13   regards to this report, and whether or not it is
14   admissible.
15         MR. WISNER:  Well, let me just
16   interject since you said that.
17         I agree with my friend, Dr. Shenkar --
18   even though he's not a lawyer -- that you can't
19   have it both ways; that if you want to ask him
20   about it, then you are making a concession that
21   it is relevant.  It is admissible.
22         If you want to maintain your position
23   that it's improper, then don't ask about it.
24         We gave it to you to give you a
25   heads-up because I thought you would want to
```

Page 307

```
1
2    know so you would be able to question.
3          You apparently want to put your head
4    in the sand and don't want to know about it --
5    you know, see no evil, hear no evil, speak no
6    evil.
7          If that's your position, then don't
8    ask him about this.
9          But if you use it and you are going to
10   ask him questions about it, you can bet I am
11   going to say to Judge Alonso:  They knew about
12   it weeks ahead of his deposition.  They even
13   marked it as an exhibit and asked about it.
14         So that's our position.
15         (Pause)
16         MS. BRENNER:  So again, we have marked
17   the document.
18         I have marked it so that I can follow
19   up on the issues that the witness has repeatedly
20   raised and insisted on speaking about, because I
21   want to ask a very specific question to follow
22   up on his position.
23         And again, we've already spent a bunch
24   of time on the record saying that we preserved
25   our objections.
```

Page 308

```
1
2          I understand we disagree on that.
3          I'd like to now go to the very end of
4    this report where you have included a number of
5    calculations.
6          And I want to make sure I'm
7    understanding what you have been referring to
8    just now in your testimony, Dr. Shenkar, because
9    you repeatedly referred to these calculations
10   and these alternative scenarios.
11         And it's unclear to me what it is you
12   are referring to in your testimony that you have
13   offered.
14   BY MS. BRENNER:
15         Q.   So with regards to the alternative
16   scenarios that you have been referring to, can
17   you please clarify?
18         Are you referring to the scenarios
19   here at the bottom of page 7 and on to page 8?
20         A.   No.  No.
21         They are -- let me again explain to
22   you.  And, you know, you deal with a legal
23   issue, which, again, I found pretty bizarre in
24   here.
25         Okay.  So let me say a couple of
```

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 309

```
 1  things in terms of different scenario.
 2          First of all, as a rigorous academic,
 3  whenever possible, I provide scenarios.  Okay?
 4  You may think it's a weakness.  I think it's a
 5  strength.  It means rigor.  Okay?  You can see
 6  how I got to those number, and what are the
 7  alternatives.  Okay.
 8          So there are a number of -- you know.
 9  One of them is -- has to do with the
10  calculation -- with the retirement age.  Right?
11  We are providing you -- okay? -- we are
12  providing you with alternatives.
13          As I said, I believe we had been very
14  conservative.
15          And you can see it in the response
16  that you may -- or maybe you don't want to
17  see -- because I definitely think that the
18  response really put in a huge question mark on
19  Dr. Guryan's report.  So retirement age is one.
20  Okay?
21          Now, bear with me.  I hope it doesn't
22  sound too complicated.
23      Q.   Can I please stop you there?
24  I'm not asking you to walk through
25
```

Page 310

```
 1
 2  your scenarios here.
 3          I'm just asking you simply if the
 4  alternative scenarios or alternative
 5  calculations that you were referring to earlier
 6  in your testimony are these same ones in your
 7  report, or whether you are referring to
 8  something else.
 9      A.   I'm trying to explain to you, and you
10  don't let me.  Okay?
11          If we are going to stay here light at
12  night, at least can you let me finish, please?
13  Okay?
14          So I'm trying to say -- okay? -- that
15  the first -- the -- scenario -- there are three
16  scenarios.  Okay?
17          The first scenario that I'm referring
18  to appears in the original opinion.  Right?  And
19  it has to do with retirement age.  Okay?  Okay.
20          Then there are two other scenarios
21  that have to do with two direction.
22          One of them has to do with, again,
23  removing the proxy and getting into
24  consideration of business, saving -- business,
25  wealth, and earnings.  Okay?
```

Page 311

```
 1
 2          And then -- then there is one more
 3  thing that is listed in here at the end of this
 4  response that you keep want to come back to at
 5  the same time that you want to kick it out.
 6          And this takes into account the wage
 7  growth rate of emerging markets.  Okay?
 8          And yes, this is in response to the
 9  argument of your expert that we should use the
10  U.S. one.  U.S. is a mature economy, much lower
11  growth rate.
12          So I give -- I give three option,
13  again, to be rigorous.
14          I could just say:  Choose the China
15  one.  I did not.
16          I mean, I provided you with three
17  different one.  Okay?
18          And this appears at the end of the --
19  my response that -- again, I don't know.  I
20  mean, at some point you have to decide:  Include
21  it or you don't include it.
22          Definitely I'm going to raise it in
23  trial.
24          And I'll tell you what else I'm going
25  to raise in trial.  I can already give you a
```

Page 312

```
 1
 2  heads-up that actually there is a fourth one
 3  that I can do, adjusting for the higher wage.
 4          There are two -- two other element of
 5  a wage growth rate that I did not even include.
 6          One of them is per sector and the
 7  other one is per managerial level.  Okay?
 8          This is all part of scholarship.  This
 9  is what we deal with.
10          I understand you want yes and no, but
11  I not going to provide you a yes or no to an
12  answer that is not even -- to a question that to
13  me is not even clear and doesn't cover the
14  entire spectrum.  Thank you.
15      Q.   Okay.
16          So not to belabor the point, the
17  alternative scenarios you were referring to in
18  your testimony about 10 minutes ago now are the
19  scenarios here in this response that you have
20  just walked us through in detail.
21      A.   I have provided an original opinion.
22  I stand by it.  I think it is supported by any
23  alternative, but this has been provided.
24          Until and unless I hear -- because you
25  already say -- I can't imagine why -- that you
```

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 313

1
2  don't want to see the responses -- to be the
3  response included -- until once I hear
4  clearly -- I suppose by now it's going to be by
5  the court -- whether I can introduce this or
6  not, then I will get into all these alternative
7  scenarios.
8          Until now, I have provided you
9  information.
10         And I stand by what I wrote in the
11  original report.
12         I'm just adding that this is an
13  ultra-conservative valuation.
14     Q.   Okay.
15         And in addition to these scenarios
16  that you have just included here, you've now
17  identified additional alternative scenarios that
18  you have prepared and that you intend to offer
19  at --
20     A.   There are --
21     Q.   -- trial?
22     A.   -- alternative.
23         Again, I'm not going to offer anything
24  beyond that, until and unless I hear that this
25  is admissible.  Okay?

Page 314

1
2          Otherwise, we are going to spend not
3  only the night, but also, maybe, a few other
4  days.
5          So that would be once I hear, you
6  know, what the court decide -- between me, and
7  counsel, and your side, you know -- what we want
8  to introduce, why, and where, and so forth --
9  that, I suppose, will all come up in the trial.
10         But I think I've stated my position
11  clearly enough.
12     Q.   Okay.
13         As part of your analysis and
14  preparation of this lifetime earnings
15  calculation, did you review Mr. Seex' CV?
16     A.   Yes, I have.
17     Q.   Okay.
18         And are there other educational
19  information that you reviewed regarding Mr.
20  Seex?
21     A.   I reviewed -- are you talking about
22  other than the scholarly literature attesting to
23  that?
24         Because there is -- again, I must
25  emphasize, and I apologize if it sounds

Page 315

1
2  repetitive to you -- you cannot really
3  distinguish between the two because I focus on
4  scholarship as it applies to Mr. Seex.
5          Yes, this is a direct relationship
6  there between this and the CV.
7          You may want to separate it.  I know
8  that definitely law -- it makes it easier, but
9  there is no way to separate it.
10         Because, for example, unlike Dr.
11  Guryan, I do take into account his position in
12  the firm.  I do take into account his education.
13  Okay?  This is part of the information that I'm
14  soliciting.
15         So this is information that I take
16  from the scholarly literature.
17         But as it applies to Mr. Seex, your
18  own expert -- with all respect -- did not do
19  that.
20         I do it, I think, as a matter of being
21  rigorous.
22     Q.   Okay.
23         MS. BRENNER:  So I would like to go
24  off the record really quickly.
25         THE WITNESS:  Okay.  Again, I hope we

Page 316

1
2  are not going to spend an --
3          THE VIDEOGRAPHER:  Doctor, just a
4  moment.
5          We are going off the record.  The time
6  is 7:46 Eastern.  This ends media unit 6.
7          (Recess from 7:46 p.m. to 7:54 p.m.
8  Eastern Standard Time)
9          THE VIDEOGRAPHER:  We are now going
10  back on the record.  The time is 7:54 p.m.
11  Eastern.  This begins media unit 7.
12  BY MS. BRENNER:
13     Q.   Okay.  So before the break, we were
14  talking about what information you have
15  reviewed.
16         And just to be clear, everything that
17  you reviewed and relied on for your opinion
18  regarding Mr. Seex' lifetime earnings is
19  included within your reports?
20     A.   It's included in the report.
21         Again, there is the scholarly one, and
22  there is -- you have a list of exhibit and so
23  forth that I have seen.
24     Q.   Okay.
25         And so my next question is --

ODED SHENKAR, PH.D.

Page 317

1
2          MR. WISNER: Excuse me just a mine.
3    I'm sorry to interrupt you.
4          But when you said "reports," I want to
5    make sure we are talking about the same thing
6    and in the response to which you object.
7          You know what I mean?
8          MS. BRENNER: So --
9          MR. WISNER: Or are we talking about
10   different things?
11         MS. BRENNER: Well, he's got several
12   reports here that he's provided. We have been
13   talking about them in singular and plural --
14         MR. WISNER: Yeah --
15         MS. BRENNER: -- I just want to --
16         MR. WISNER: -- and we used the term
17   "reports" and "response."
18         I want to make sure we -- you know,
19   I'm including -- when he says, and I say,
20   "reports," we are talking about the response to
21   Guryan, too, which we gave you and to which you
22   object.
23         So just so we are clear, "reports"
24   means that, too.
25         MS. BRENNER: Let's be very specific,

Page 318

1    then.
2          MR. WISNER: Yeah.
3          MS. BRENNER: Going to the document
4    that we marked as Exhibit 2, which contains your
5    discussion of lifetime earnings analysis for
6    Jonathan Seex.
7    BY MS. BRENNER:
8          Q.  I understand that you -- your position
9    that you have shared with me a few minutes ago
10   was that your opinion that you have offered as
11   to the lost earnings has not changed, and that
12   you stand behind it.
13         Are all of the documents and different
14   things that you relied on in arriving at that
15   opinion that you are standing on contained
16   within your report that's marked here as Exhibit
17   2?
18         A.  Again, as I said, the -- what I relied
19   on appears there.
20         There is obviously the other document
21   about the impact -- okay? -- of, you know, CEO
22   death.
23         And there is the response, which,
24   again, you are objecting to.

Page 319

1
2          And then there are exhibit of what I
3    have seen.
4          You already asked me, and I said, yes,
5    for instance, that whether I've seen his CV.
6    Yes, I have. Okay?
7          So obviously, whatever was relevant to
8    the determination of value here, I have used.
9          Q.  And you've provided a list of all of
10   the case documents and other materials of that
11   nature, factual documents, and material --
12         A.  That's --
13         Q.  -- discovery that you have relied on?
14         A.  That is correct.
15         But, again, you know, please remember,
16   unlike your experts, I was one person dealing
17   with two or maybe, you know, three issues. The
18   list is comprehensive.
19         It does not mean that every exhibit is
20   relevant for each of these opinions. Okay?
21         Q.  Okay.
22         So delving now into your analysis a
23   little bit further --
24         A.  Hm-hmm --
25         Q.  -- I want to make sure I'm

Page 320

1    understanding --
2          A.  Okay --
3          Q.  -- what income that you are
4    calculating and counting in your analysis.
5          And so I want to understand, when you
6    say "lifetime earnings" here, are you talking
7    about taxable income?
8          A.  I'm talking about taxable income
9    because tax rate itself, you know, can change;
10   and IFP, if you want.
11         Also to refer to Dr. Guryan question
12   about, you know, personal expenses, and so
13   forth.
14         Q.  Okay.
15         So I'm not sure that that's responsive
16   to the question that I asked.
17         I'm trying --
18         A.  I think I answered it.
19         I said: Taxable. Okay?
20         Because there is -- tax rates vary,
21   and there is also other income.
22         By the way -- okay? -- when you
23   mentioned wealth earnings, I should note -- and
24   this is information that, again, I got after

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 321

1
2    submitting my initial opinion -- that there is
3    also rental income that Mr. Seex has been
4    receiving.
5         So, you know, more than that, and that
6    would more than probably off offset, you know,
7    any tax liability.
8         But, again, if you want to talk more
9    about that, about personal expenses, anything,
10   please ask.
11        Q.   Okay.
12        Well, I'm trying to ask you one
13   question at a time.
14        And --
15        A.   Please --
16        Q.   -- we have little time left.
17        So --
18        A.   Okay --
19        Q.   -- if you could stick to answering the
20   questions I am asking?
21        A.   Okay.
22        Q.   The first question I was asking was I
23   was trying to understand: What are the
24   components of lifetime earnings that you are
25   calculating here?

Page 322

1
2         So it sounds as though you are
3    including taxable income.
4         Are you saying you are also including
5    some nontaxable benefits?
6         A.   Yes.  Because not all benefits are
7    taxable.  You know, health insurance, for
8    instance, usually is not and so forth.  So, yes,
9    it's a mix of taxable and un-taxable items.
10        Q.   Okay.
11        Then are you also including some other
12   types of nontaxable income, aside from benefits?
13        A.   Not in the initial report.
14        Q.   Okay.
15        But you have included additional
16   income in the second report, or response report
17   that you prepared?
18        Is that what you are saying?
19        A.   No.  I said that I did not.
20        We have learned about it, I would say,
21   more recently.
22        As I said, I gave you the time frame
23   between the report -- the initial -- time of the
24   initial report and today.
25        This is information that came to our

Page 323

1
2    knowledge.
3         Q.   Okay.
4         And a moment ago you just said:
5    Rental income.
6         Are you including rental income --
7         A.   I did not -- let me again -- listen
8    carefully -- as I said, I did not include it but
9    it is information that came to our knowledge.
10        And should there be a discussion -- I
11   mean, when we get to court, and so forth --
12   yeah, I mean, I think it is definitely
13   relevant -- you know, may be relevant
14   information.
15        Q.   Okay.
16        But that's not part of the opinion
17   that you've offered?
18        A.   It is not.  It is not.  And not
19   included.  Not included.
20        Q.   So you mentioned personal consumption.
21        A.   Hm-hmm.
22        Q.   In your analysis here -- your analysis
23   that we have marked and that's up here on the
24   page of Exhibit 2 -- are you including a
25   deduction for Mr. Seex' personal consumption?

Page 324

1
2         A.   This is excellent point, because Dr.
3    Guryan is raising it.
4         Point is, he is completely absolutely
5    wrong.
6         I will explain to you why.  Okay?
7         He is taking roughly 18% or so for --
8    in personal expenses.  Okay?
9         But what he does not tell you is that
10   those are always, always adjusted per income;
11   also per number of kids.
12        For high earners, where he falls, that
13   number I can tell you -- because I deal with
14   this regularly, I mean, in the scholarly
15   world -- is not 18 to 20% as he suggests.
16        It is between 8 and 8-1/2%.  Okay?
17        We just started with that.
18        But bear with me, please.  Okay?
19   Because this is part of the answer.  All right?
20        So it's not 18%.  We are down to
21   8-something percent.
22        Now, wait a second.  Cost of living in
23   Kenya is 60% of what it is in the U.S.  Okay?
24        So go on now, we take this 8% which is
25   a U.S. norm, and you are -- you have now got to

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 325

maybe 5%. Okay?
Now, let's look at the other component. All right?
If you look at cost of living analysis as we usually do, all right, 33% is housing. He has no housing expenses. Actually, he has housing income. This is one reason why I mentioned it.
This one -- he is not paying for transportation because he's getting a free car with all expenses, yes, you name it. Okay? This is 11% on cost of living calculation. Okay?
Food and beverage -- he has a special allocation for food and beverage, not to mention -- not to mention that -- again, based on what I know from hospitality sector -- I mean, come on, for the CEO is in charge of hotel manager, I mean, you breath air with your family, and so forth.
And wait a second. One more thing on housing which is the biggest component on cost of living, there is no property tax in Kenya. Okay? So it is a complete wash.

Page 326

There are no personal expenses. And your expert is 100% wrong.
And this is why it was not included.
I did not know that the person who would read it would have no knowledge and no interest in exploring the reality in Kenya. I guess it's understandable for somebody whose main record is dealing with schoolteachers in Peoria, Illinois. Okay.
Sorry that it was such a long-winded answer, but that answer your question why personal expenses have not been included.
So the short answer is: No.
The long answer is: There was every reason not to deduct.
Q. So you did not include personal consumption in your analysis in --
A. That is correct.
Q. -- Exhibit 2 --
A. -- that is correct .
Q. -- because in your opinion Mr. Seex would have had no personal consumption, given his benefits?
A. I just explained to you, it's a

Page 327

combination of his benefit. It is combination of his situation as a house owner. It's a combination of being in a lower cost of living country.
So you cannot take a U.S. salary, or translate it to U.S. dollar, and then use U.S. cost of living when he has nothing to do in the U.S. I mean, he is living in Kenya. Okay?
Add all of these factors that I just gave you, and you will understand why it is --
Q. Was Mr. Seex living in the same country as his wife and children at the time of the accident?
A. Mr. Seex, at the time of the accident -- this is my understanding from the discussion with the counsel -- is that his wife -- now widow, unfortunately -- has been in France temporarily.
Temporarily because of all their father very old, approaching, I think, 90 years of age, and so forth. Father -- I kind of get emotional, sorry, because I have been in that situation myself -- has been sick or possibly close to death, and so forth. She was there

Page 328

temporarily for that purpose.
She intended to go back to Kenya where essentially she had a job and she could easily have a job.
And that's a loss of earning that, again, I did not include, just showing you how conservative my estimate of the damage that has been done here has been.
Q. Did they buy a home in France?
A. I have no idea. I don't see how it's relevant, but, no, I simply don't know.
Q. So you don't know whether at the time of the accident they were maintaining two separate households in France versus in Kenya?
A. All I know -- I mean, as I said, you ask and I told you I did not talk to her directly -- all I know she was there temporarily to be by the side of her ailing father.
Q. And when she was living in France with her children at the time of the accident, is it your understanding that those expenses in France would have been paid for with income from Mr. Seex?
A. I have no idea about that. Maybe her

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 329

1
2      father supported.  I guess, maybe they stayed in
3      his house.
4          You already ask me if I know.  I don't
5      know the circumstances.
6          All I know is what I've heard that she
7      was there temporarily and intended to come back
8      with the kids to Kenya to be together with her
9      husband; because they have discovered -- what,
10     again, I can a from experience as well -- that
11     this is not easy for a husband and wife to live
12     apart.
13         And I would leave it at that.  This is
14     the information I have.
15         Q.  So to be clear, then, apart from the
16     benefits information that you spoke about a few
17     minutes ago with regards to expenses that were
18     reimbursed or provided by the company, do you
19     have any information that you reviewed regarding
20     Mr. Seex' personal expenditures?
21         A.  No.  I gave you all the information I
22     have.
23         But, again, I am looking at the
24     industry norm -- okay? -- based on what you
25     might call -- what we call forensic economics,

Page 330

1
2      which very closely look into that.
3          And I am looking or choosing the
4      information that is most relevant for Mr. Seex,
5      including his wage level, number of kids, and so
6      forth.
7          Q.  So to be clear, then, you are not
8      aware that the family had household staff that
9      were being paid in Kenya to provide services
10     such as a gardener, a chef, or housekeepers?
11         A.  I have no knowledge of that.
12         As I said, you asked me, and I said I
13     have not been there.  I am not privy to that
14     information.
15         All I can say that, having lived in
16     Africa, that if there were such an information,
17     the cost of this is very, very extremely low.
18         MS. BRENNER:  And so going back to
19     your report here that's been marked as Exhibit
20     2.
21     BY MS. BRENNER:
22         Q.  You set out several assumptions.
23         And then on page 2, you've got a
24     formula.
25         Without walking through the

Page 331

1
2      particulars of exactly what you have got stated
3      here -- because I don't want to spend time on
4      the record reading it, or have you read it -- I
5      just want to ask you whether this reflects your
6      full methodology in how you arrived at the
7      values in your report; or whether there are any
8      steps that methodology that are missing here
9      that you haven't already spelled out for us.
10         A.  Not -- not that I can think.  It's
11     really pretty straightforward.
12         Q.  Okay.
13         So moving forward --
14         A.  Hm-hmm.
15         Q.  -- I understand that, based on the
16     information here in your report -- and it says
17     this if we go back to page 1 under
18     "Compensation" -- the value that you say that
19     you have here for 2099 is $202,800.
20         Do you see that?
21         THE WITNESS:  I'm not sure what you
22     are referring to now.  This is from the earnings
23     report, just -- you know, direct me to -- I'm
24     not sure what you have posted there.
25         MS. BRENNER:  Page 1.  Yeah, I think

Page 332

1
2      we've just blown it up for you on the screen.
3          Do you see that?
4          THE WITNESS:  Yeah, okay.  Okay.
5      Yeah, I thought you were still talking about
6      expenses or whatever.  All right, yeah, I see
7      that, yeah.
8      BY MS. BRENNER:
9          Q.  And so I want to be clear about what's
10     included here and where this number came from,
11     because this seems a little different than what
12     you were saying earlier.
13         It says her: Compensation:  All
14     components are counted, including bonus,
15     pension, expenses, etc.
16         So does that include these benefits
17     that you've just been talking about?
18         A.  No, that included only the benefit
19     that we were aware of.  Okay?
20         So, again, I looked at what is common
21     in the industry.
22         I have been overly conservative.
23         For example, I did not know at the
24     time that there would be, you know, special
25     provision, if you will for, you know, food and

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 333

1
2  beverages because, again, my experience has been
3  that the hospitality CEO will have that anyway.
4  Okay?  I didn't know it would be a formal part
5  of the compensation.
6          And again, there were -- there was --
7  not everything was listed in the offer of
8  employment, and so forth.
9          My guess is that, again, because there
10 are things that were common, but in a way that
11 they did not need to be listed, such as, again,
12 I mean, Social Security, and so forth.
13     Q.  Okay.
14         And we don't need to run over all of
15 the testimony you have already given.  I'm just
16 trying to be really efficient here and ask
17 you --
18     A.  I appreciate that, Alletta --
19     Q.  --
20     A.  -- I appreciate it.
21     Q.  Okay.
22         So you described for us what you have
23 included and didn't include within compensation
24 as you have defined it here --
25     A.  Uh-huh, uh-huh --

Page 335

1  number.
2          But again, there are elements such
3  as -- you know, that are not like in any country
4  that are typically nontaxable.
5          That includes, for instance, health
6  insurance.
7          That includes, for instance, elements
8  that are considered part and parcel of doing
9  one's job.  Okay?
10         So think about it, I mean, even in an
11 American context.  Okay?
12         If I'm a salesman, all right, and I'm
13 driving around the Midwest, say, selling my
14 wares, I don't think the IRS will have any
15 problem with -- recognizes that as a legitimate
16 expense.  So whatever I will be paid for that
17 would be nontaxable.  Okay?
18     Q.  Okay.
19     A.  But there are situations that, as we
20 all know, IRS may question and say:  Do you
21 really need it?
22         I think in this case, it's very
23 straightforward.
24     Q.  Okay.  So I'd like to move on now from

Page 334

1
2      Q.  The value that you have listed in your
3  report is $202,800, and it says 2019.
4          What do you mean by that?
5      A.  What I mean?  That this is the value,
6  you know, when you monetize, you know, the
7  benefits.  What we call compensation in the
8  field is a combination of wages and benefits.
9  So we always quantify what the benefits are.
10     Q.  Okay.
11         So the $202,800 in 2019 here -- is
12 that your estimate of what that income would
13 have been in 2019 comprised of wages and
14 benefits that you are building your model on?
15     A.  Exactly.
16         And again -- I will say it again -- we
17 were conservative, because we were unaware of
18 certain elements, such as, you know, a pension
19 fund.
20     Q.  Okay.
21         And what nontaxable income is included
22 in this number here in addition to the taxable
23 income in the form of wages and benefits that
24 would be taxable?
25     A.  Again, I'll have to go back to my

Page 336

1
2  the lifetime earnings analysis, and I'm going to
3  jump around really quick to close the loop on a
4  couple other items.
5      A.  Okay.
6          MS. BRENNER:  So I'd like to draw your
7  attention back to your report that we first
8  marked as Exhibit 1 regarding the TML valuation.
9          THE WITNESS:  Okay.
10         MS. BRENNER:  Here we are.  And I know
11 you have got it in front of you.
12         THE WITNESS:  Well, I probably
13 have it.  As I said, I have a couple of
14 different files here, so bear with me on that.
15 I can --
16         MS. BRENNER:  We can put it up on the
17 screen and we can blow it up.
18         THE WITNESS:  Let me just look quickly
19 if I have it in front.  If not, I can just read
20 what's on the screen.
21         But give me a minute if you don't
22 mind.
23         Yeah, let me -- okay, I can just read
24 from you.  It's very small print, but again so
25 many document here -- okay.

ODED SHENKAR, PH.D.

Page 337

1
2      So what would you like to ask me
3  about, please?
4      MS. BRENNER:  Okay.  So I would like
5  to direct your attention to page 4.
6      THE WITNESS:  Okay.
7  BY MS. BRENNER:
8      Q.   And on page 4, there is a couple
9  paragraphs here under:  Cashflow Valuation of
10 TML.
11      There is one growth rate here that I
12 neglected to ask you about that I wanted to ask
13 you about.
14      So we talked about the terminal growth
15 rate, I think, at some length.
16      But we did not talk at all about the
17 15% growth rate that you have highlighted
18 there -- or put in bold, rather -- in paragraph
19 1.
20      Do you see that?
21      A.  Yeah.
22      Q.   And so I'd like you just to explain
23 for me briefly where that 15% growth rate that
24 you are using comes from?
25      A.   We are looking at it's based -- you

Page 338

1
2  could call it arbitrary, I mean, but all numbers
3  are, you know, hypothetical.
4      I mean, we are looking at, as you can
5  say here, number 1, emerging market growth rate.
6  Okay?  And we are looking at position, if you
7  will, in high-end restaurant and hotel.
8      This is what I have been with you
9  already a couple of times.
10     I mean, you know, we take -- we put
11 things in context.  Okay?
12     We look at strategic positioning,
13 whether a company is well positioned to take
14 advantage of a growth in the economy, and in its
15 sector, should such a growth exist.
16     In this case, it does.  And, yes, we
17 assume that it is well positioned to do that.
18     I have already given you the
19 information as to why its strategic positioning
20 is good in terms of related diversification;
21 that all the strategy evidence is this is best
22 way to profitability over the long run.
23     Q.  Okay.
24     And so this 15% more specifically --
25 is that a number that you calculated based on

Page 339

1
2  the financials that were provided to you?
3      Or was that a number that you pulled
4  from some other source?
5      A.   It is not pulled from a particular
6  source.
7      It is based on the factor that I just
8  described to you.
9      Q.   Okay.
10      So when you say it's based on the
11 factors that you've just described, what did you
12 calculate that 15% based on, then?
13      Because you have spoken about broad
14 concepts about, you know, an economy being an
15 emerging market, and all of that --
16      A.   I am trying to --
17      Q.   -- I'm trying to get specifically --
18      A.   Yeah, yeah.  Go ahead.
19      Q.   -- where that number came from?
20      A.   Okay.  So as I said, we are
21 basically -- you call it an arbitrary -- this is
22 my best professional estimate.  It is based on
23 three layers.  Okay?
24      And my assumption, whether we ever
25 read it, you know, we would be familiar with

Page 340

1
2  those issues.
3      It is a national layer:  What's
4  happening in the economy, and the prospect, in
5  particular, going forward; what's happening in
6  the sector; and then what's happening in the
7  particular firm.
8      Let me tell you one more thing since
9  you have raised it.  Okay?  I know that we have
10 been through earnings, but it is highly relevant
11 to what we have been discussing, and not only
12 here.  Okay?
13      The hospitality sector in Kenya is on
14 the cusp of dramatic growth.
15      If you want, I could give I the
16 number.  I thought it would be obvious that the
17 person would really -- would know something
18 about emerging market and about Africa.  But I
19 can give you a number on growth in hotel room,
20 in visitors, in anything that you want.
21      So I am looking at that.
22      I'm looking at whether a company is
23 well positioned to take advantage of that.
24      And last but not least -- okay? --
25 unlike Mr. Dolgoff, I am looking at how all this

85 (Pages 337 to 340)

ODED SHENKAR, PH.D.

Page 341

1
2    is connected to Mr. Seex.  Okay?
3          I've already explained why in the
4    hospitality sector and in Kenya, given its
5    culture, and social network, and so forth, his
6    loss would, you know, make -- would amplify the
7    damage that we otherwise tend to see, which is
8    substantial in its own right.
9          So, yes, it's not pulled from
10   anywhere.  It is my best professional judgment
11   based on the factor that I have just described.
12       Q.   Okay.
13          And so these three factors that you've
14   described -- the national economy, the sector,
15   and then Mr. Seex specifically -- what's the
16   split between those three factors in terms of
17   how they are feeding into your 15%?
18       A.   It is not a three factors.
19          These are three layers.  Okay?
20          Each of these layer contain multiple
21   factors, and they are intertwined.
22          So no, I mean, it would be artificial
23   to divide them into two, or into three, and so
24   forth.
25          They are intertwined.  Think about it

Page 342

1
2    the Russian doll.  Okay?  It's a company, within
3    a sector, within a nation.
4          Now, we are looking at multiple
5    variable.
6          For instance, when we look at the
7    sector, I am looking also at competitors.  I
8    would do, say, a competitor analysis, except
9    that, again, I mean, you probably will question
10   the validity of that as well.
11          But it's a range of variable based on
12   where a company is in its sector, in a
13   particular country.
14          This is why we do industry analysis.
15   We do a competitive analysis.  We have through
16   all of that.
17          These represent my best professional
18   judgment.
19          If somebody want to question it, fine.
20       Q.   Okay.
21          So sitting here today -- I'm just
22   trying to understand -- you have given a pretty
23   complicated answer here about where this number
24   came from.
25          Am I understanding you correctly that

Page 343

1
2    this 15% is not the product of a mathematical
3    calculation, but it is a number that you
4    selected in your judgment based on these various
5    factors you've described?
6        A.   Yes, ma'am.
7        Q.   Okay.
8           And you are not able to tell me what
9    parts of that 15% number comes from the factors
10   you've described.
11          So what is the big driver of the
12   various things that you have identified, for
13   example?
14       A.   I think I've already answered that.
15          I think it would be completely
16   arbitrary to tear what -- tear it apart into
17   two, or three, or whatever you find it easier to
18   deal with.
19          As I said, it is intertwined.  I'm
20   talking about the company, in a sector, in a
21   country.  They are all connected to each other.
22   Okay?
23          That's -- that's the way it is.
24          And yes, that does present my best
25   personal judgment.

Page 344

1
2           And yes, I have made a judgment
3    before, for example, to the financial industry.
4           And yes, what happens then?  You make
5    a projection.  You know, you have -- at the end
6    of the day, you have to quantify it.  Okay?
7           So you quantify it whenever possible.
8           By the way, they were there
9    quantification based -- and they are always
10   based on certain assumption.
11          Unlike like, again, your expert,
12   whenever possible I gave a number of
13   possibilities, a number of scenarios.
14          So, yeah, this is my best professional
15   judgment.  And I think I am absolutely, 100%
16   qualified to make the judgment.
17       Q.   Okay.  So I think that's all the
18   questions I have about that growth rate.
19          I want to spend a couple minutes here
20   trying to really nail down and understand the
21   scope of the opinions that you are planning to
22   offer, as you sit here today.
23          Because you've frequently referred to
24   various other things that are outside the
25   written reports that you initially provided for

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 345

1
2    this case.
3        So let me just start with that.
4        Are you offering any opinions
5    regarding the economic loss of the Seex family
6    beyond that which you have already articulated
7    here today?
8        A.   You really need to clarify.
9        First of all, I didn't really
10   understand your long introduction as to what you
11   are going to -- asking about what I have been
12   providing that is before the report that is not
13   the report. I'm sorry. I did not understand
14   that.
15       And I don't understand also the
16   question that you are asking now.
17       So please rephrase it, and I'll do my
18   best to see if I understand where you are going
19   with that, and I'll do my best to answer.
20       But I really need to understand it.
21   I'm sorry, but I don't.
22       Q.   What I'm trying to pin down and
23   understand --
24       A.   Okay.
25       Q.   -- is the scope of the opinions that,

Page 346

1
2    as you sit here today, you are offering in this
3    case.
4        So I understand that you have prepared
5    several -- what we have called -- reports
6    relating to the valuation of TML, Founder/CEO
7    death, and lifetime earnings from Mr. Seex.
8        And so are the opinions that you are
9    offering for Mr. Seex' family on this question
10   of economic loss fully contained within those
11   three documents that I have just described, and
12   in the testimony --
13       A.   I --
14       Q.   -- that you have provided today?
15       A.   I'm sorry, ma'am. I cannot answer
16   that.
17       Let me tell you, first of all, you
18   need to define really what you mean by "scope,"
19   because we use "scope" all the time in business,
20   and we use it in a very different way.
21       But, again, having said that, I
22   presented to you an opinion -- okay? -- that I
23   stand behind. All right?
24       I then -- the -- the report that is
25   titled "CEO Death" and so forth is not a

Page 347

1
2    valuation in and of itself. But it is, of
3    course, very closely related. It is the
4    background, without which you cannot understand
5    either of the two reports, the earning valuation
6    and equity valuation.
7        Because if there is no causal
8    relationship between the death of the CEO, of
9    Jonathan Seex, and the value of the business,
10   for instance -- as Mr. Dolgoff amazingly
11   argues -- we don't need to do a valuation
12   because there is no impact. Okay?
13       So this is what have been provided --
14   three reports, okay?
15       The response we have been already
16   through that with Mr. Wisner. I don't know.
17       I mean, I provided you with a response
18   to Mr. Guryan argument. I can do the same, you
19   know, with Mr. Dolgoff.
20       I'm not going to do it when you tell
21   me that, you know, you are asking that to be
22   striked out.
23       So do you want it in? Or you don't
24   want it in?
25       As Mr. Wisner said, it is not an

Page 348

1
2    exhibit.
3        So I don't know where you are pushing
4    me.
5        Again, I have provided two reports,
6    and a background report that underlies them
7    both. I fully stand behind them. Okay? --
8        Q.   Okay --
9        A.   -- if it is that.
10       Q.   So your testimony today -- just so I
11   understand it and what you just said -- is that
12   you are not going to answer any further
13   questions about this response report and
14   anything that is in that, or outside these
15   reports that you have just identified, until the
16   court rules that that testimony will be allowed?
17       MR. WISNER: No, I --
18       A.   No, I said --
19       MR. WISNER: -- objection,
20   mischaracterizes the testimony. That's not what
21   he said.
22       He's been answering questions about
23   it.
24       Go ahead, Doctor.
25       A.   No, no. I have answered all the

87 (Pages 345 to 348)

ODED SHENKAR, PH.D.

## Page 349

1  question.  Let's be fair.
2        What I did say is I find it -- I don't
3  want to say bizarre -- completely -- almost
4  hypocritical whether it's acceptable to the
5  court or not that, you know, you keep pushing on
6  information from this.
7        I provided you with a report.  On the
8  one hand, you strike it out.  And the other
9  hand, you keep attacking me on it.
10       So either it counts or it does not
11 count.  You cannot have it both way.  I'm sorry.
12       If I am wrong, the court decide
13 otherwise, then it's fine.
14       I reserve the right -- as your expert
15 knows, I reserve the right to continue and
16 collect supplemental information, should that
17 become available.  Okay?
18       And the rest of it, I suppose we can
19 discuss in the court of justice.
20    Q.   Okay.
21       So we only have a few minutes left
22 here, and so I'm going to try a put a bow on
23 this.
24    A.   Yeah.

## Page 350

1        And I understand that Mr. Wisner also
2  needed a few minutes, so just --
3     Q.   All right --
4     A.   -- don't leave him out in the cold,
5  please --
6     Q.   Well -- so I'm trying to understand
7  the scope of the opinions that you are offering
8  here.
9        I understand that you have a response
10 report that you have provided; and that you
11 are -- that there is a dispute, I guess, as you
12 are characterizing it -- as to whether or not
13 that is going to be allowed.
14       What I am trying to understand is
15 whether there are any other opinions that you
16 are offering in this case beyond those which you
17 have already stated here today here in your
18 deposition, and those laid out in your three
19 reports that we've talked about at length that
20 were marked as exhibits.
21    A.   No.  That's about it -- again, with
22 the exception of whatever either the court and
23 Mr. Wisner choose to ask as part of the legal
24 process.

## Page 351

1     Q.   Okay.
2        MS. BRENNER:  So given that we are
3  right up against time now -- and I understand
4  that counsel has questions and is not going to
5  let us go a minute over the 7 hours -- I'm just
6  going to say on the record here that there are
7  many, many questions which I have been asking
8  that the answers have been nonresponsive and
9  there is a lot that we have not been able to get
10 to.
11       So I'm just going to reiterate the
12 objection that I made earlier on the record that
13 we are objecting to that nonresponsive
14 testimony.
15       And we reserve it right to hold the
16 deposition open -- understanding that maybe
17 counsel is going to disagree with that -- in
18 order to allows you to get the answer the to the
19 questions that we need answered --
20       THE WITNESS:  Understand your --
21       MS. BRENNER:  -- because we are at 7
22 hours, I'm going to stop here.  And I'm going to
23 turn the mic over to opposing counsel.
24       And we are just going to have to leave

## Page 352

1  it at that.
2        But we are holding it open.
3        Okay.
4        THE WITNESS:  I will just say one or
5  two sentences.
6        I understand you are the counsel.  You
7  have the right, you know, to do whatever you
8  want.
9        I completely disagree, and I would say
10 even resent, your characterization of the
11 process we have had.  I think you are distorting
12 it.
13       But I would leave it at that and let
14 the court decide.
15       Mr. Wisner -- Mr. Wisner, I'm sorry --
16 I'm getting tired, you can see.
17       MR. WISNER:  I know.  Dr. Shenkar, I
18 won't keep you too much more.
19 EXAMINATION
20 BY MR. WISNER:
21    Q.   I just want to cover, I think, one
22 basic thing.
23       MR. WISNER:  Do you have Mr. Dolgoff's
24 report in front of you?

88 (Pages 349 to 352)

ODED SHENKAR, PH.D.

Page 353

1
2       THE WITNESS:  I do.
3       MR. WISNER:  Would you look at page 29
4   of his report?
5       THE WITNESS:  Yes.
6   BY MR. WISNER:
7       Q.   You see it's Table 3:  Average Value
8   Changes Following Sudden Death of CEO.
9       Right?
10      A.   Correct.
11      Q.   Do you understand that to be Mr.
12  Dolgoff's recitation of the seven articles that
13  he relies upon for his opinions from his review
14  of the literature in this area?
15      A.   Yeah.  These are the seven article
16  that he has cherrypicked, you know, for that
17  purpose.  So I assumed it would be, kind of, a,
18  you know, biased selection.
19      Q.   Did you look at each on these seven
20  articles?
21      A.   I did.
22      Q.   Does any one of them -- any one of
23  them -- support Mr. Dolgoff's opinions in this
24  case?
25      A.   No.

Page 354

1
2       THE WITNESS:  Give me a few minutes,
3   if I may --
4       MR. WISNER:  Please.
5       THE WITNESS:  -- just go --
6       MS. BRENNER:  I could just lodge an
7   objection here before you continue.
8       If we are going to be talking about a
9   specific document, and references in a specific
10  document, it needs to be marked as an exhibit --
11      MR. WISNER:  Oh, okay.
12      MS. BRENNER:  -- I'm happy to have
13  Karishma do that --
14      MR. WISNER:  -- all right --
15      MS. BRENNER:  -- but I don't want to
16  be having a conversation here about specifics in
17  a report that we don't have in the record.
18      MR. WISNER:  Yeah, that's fair enough.
19      Let's mark this -- this would be --
20  what? -- 12?
21      MS. BRENNER:  I think so.
22      Karishma, are you able to put Mr.
23  Dolgoff's report up for us as Exhibit 12?
24
25

Page 355

1
2       (Exhibit Defendant's Seex_Shenkar 12,
3   Multipage document entitled: Expert Rebuttal
4   Report of Aaron Dolgoff, dated January 15, 2025
5   (no Bates Nos.), marked for identification)
6       MS. SHAH:  Yes, I'm just uploading it
7   to the deposition right now.  It will be up in,
8   like, 30 seconds.
9       MS. BRENNER:  Sorry, I don't mean to
10  delay things, but --
11      (Pause)
12      THE WITNESS:  Due process is
13  important.
14      MR. WISNER:  Let me know when we are
15  ready.
16      THE WITNESS:  I'm ready.
17      MR. WISNER:  Okay.
18  BY MR. WISNER:
19      Q.   Now, have you had a chance to look at
20  that -- those --
21      A.   Yeah, yeah --
22      Q.   -- seven articles?
23      A.   -- so again, I mean, I don't want to
24  take too much.  I'll go very quickly.  I mean,
25  there are seven, you know --

Page 356

1
2       Q.   Take your time.
3       Tell me if you have read all seven of
4   them.
5       A.   Yes.
6       Q.   All right.
7       Are you ready for your questions about
8   it?
9       A.   Yeah.
10      Q.   All right.
11      Going with the -- well, first, let me
12  ask you again, then, after you have now had a
13  chance to look at that:  From your reading of
14  the seven articles on which Mr. Dolgoff relies,
15  does any one of them support his arguments in
16  this case?
17      A.   The said answer is:  None.
18      And I could very quickly go through
19  the seven and explain to you why --
20      Q.   Okay --
21      A.   -- none --
22      Q.   -- be --
23      A.   -- out of the seven that I read
24  personally.  Okay?
25      So if you look at Borokhovich, for

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 357

```
 1
 2    instance, article, it includes senior executives
 3    that are not CEOs.  He admits it himself.  So it
 4    is no bearing on what we are looking at.
 5          Okay.  The Neilsen article -- it's not
 6    about the focal firm that has lost the CEO.  It
 7    is about how other companies are impacted by
 8    lass of another CEO.  Is this what we are
 9    looking at?  No.  Absolutely not.
10          Okay.  Go on.
11          Limbach and Sonnenburg -- they studied
12    CEO.  They not only had a very small sample, but
13    they looked at whether they were fit.  And how
14    did they charge if they were fit?  Whether they
15    were running a marathon.
16          You tell me if it has any relationship
17    whatsoever to what we are looking at, you know,
18    which is exactly why I have listed also all the
19    demographic, all the other document that
20    underlies everything here.
21          Go on.
22          Sincerre 2021 -- I'm reading from the
23    abstract:  I show that market reaction to these
24    events have had a negative impact in terms of
25    stock price reaction over time -- okay? -- and
```

Page 359

```
 1
 2    article, it does not reflect what's happening
 3    today.
 4          Okay.  And what we are talking
 5    about -- the statistically-significant impact
 6    refers to change in impact, not in value.  Okay?
 7          So that captures also if there is an
 8    increase, and so forth.
 9          So this is completely out.
10          The next one -- okay? -- number six,
11    Zhang, Y.  Okay.  Never mind, this is -- really
12    a graduate student paper or thesis with 18
13    executives -- okay? -- which actually does find,
14    again, a negative impact.  But again, it shows
15    negative impact.
16          Okay.  Last one.  Jenter, which is a
17    paper that I've already mentioned.  It is a
18    working paper which I mentioned, I mean, as
19    well.
20          But here is what it says.  I'll read
21    it to you, and we'll end with that.
22          The abstract acknowledge that -- I am
23    quoting now:  The evidence suggests the CEOs are
24    important.
25          Okay?
```

Page 358

```
 1
 2    contingency factor which is again why I have
 3    listed them.
 4          And I know Alletta sometime did not
 5    like my long question, but this underlies
 6    everything.  Okay?
 7          So if you look at this article, the
 8    abstract says that when -- you got a positive
 9    impact on stock market, yes, when the CEO was
10    older, not when he was young.
11          We are not talking about an old CEO.
12    Mid-40s is very young for a CEO.  So if you
13    average across, you are going to get a very
14    small impact.
15          But this is fundamentally wrong.  I
16    would return it to any student of mine who would
17    submit that.
18          Go on.  Okay.
19          Quigley and company 2017 -- okay? --
20    we provided robust evidence that's individual
21    CEO -- the death of them -- is increasingly
22    impactful over a 60-year time.
23          So this relationship that I'm talking
24    about is getting stronger and stronger.
25          So if you are going to use an older
```

Page 360

```
 1
 2          This abstract add that -- I'm quoting
 3    again:  Many CEO reduce shareholder value.
 4          But now read carefully:  These average
 5    returns that he is citing hide wide variations.
 6    The large heterogeneity is, in part, explained
 7    by CEO and firm characteristic, such as CEO age,
 8    tenure, and firm size.
 9          This is exactly why I have noted
10    those.
11          And again, and again, I tried -- and
12    Alletta said I did not answer question -- yes,
13    because she didn't like I brought it again, and
14    again, and again.
15          But these are the variable that make a
16    difference.  Okay?
17          So it's -- and finally also from the
18    that -- okay? -- or, actually two more.
19          Stock prices tend to fall sharply when
20    the deceased CEOs are young.  Again, this is a
21    young CEO of 45.  Okay?
22          And finally:  Stock prices are
23    negative in firms which the CEOs are likely to
24    be more important or difficult to replace.
25          There is why we do triangulation.
```

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 361

1
2    This is exactly what's supported --
3        Q.   Let me --
4        A.   -- counsel, you have seven
5    cherrypicked papers that supposed to -- Mr.
6    Dolgoff know -- they are all wrong.  Not a
7    single one of them would have been accepted.
8    And if we have to go to court to finally show
9    it, that is fine with me.
10       Q.   All right --
11       A.   I will stop at that.  Sorry if I --
12       Q.   No, that's okay --
13       A.   -- get emotional here.  I guess I'm
14   getting tired, as well.  So apologies for all of
15   you.
16       Q.   Not at all.
17           MR. WISNER:  That's all I have.
18           MS. BRENNER:  Okay.  I recognize that
19   we are over seven, but I had one question I
20   wanted to ask about the answer that was just
21   provided, if counsel will allow me.
22           MR. WISNER:  Go ahead, please.
23   EXAMINATION
24   BY MS. BRENNER:
25       Q.   So is it your testimony that the

Page 362

1
2    articles that are reflected here in Table 3 on
3    page 29 of Mr. Dolgoff's report are not relevant
4    to the facts of this case?
5        A.   I'd say that halfway -- at least three
6    are not relevant -- and the other -- at least
7    the other three out of four show the exact
8    opposite of what he is arguing.
9            Yes, this is the point that I'm
10   making.
11           And I will be happy to defend it
12   further when the time allows.  Obviously, we did
13   have too much time today --
14       Q.   Okay.
15           And I'm not looking for a defense.
16           But I just want to clarify, which
17   three are you saying are not relevant?
18       A.   I think we went through that.
19           But again, let me mention, the first
20   three -- Borokhovich, Neilsen, and Limbach --
21   are completely irrelevant.
22           I suppose it may be tomorrow that
23   we'll be in discussion, but that's not my job.
24       Q.   Okay.
25       A.   Okay?  Thank you.

Page 363

1
2            MR. WISNER:  That's it, Alletta?
3            MS. BRENNER:  That's all I have on
4    redirect.
5            Like I said, I've got lots of other
6    questions I'd like to ask, but I understand that
7    we are not going beyond the seven hours, as you
8    previously stated.
9            MR. WISNER:  Yeah.  Okay.  We'll
10   reserve signature.
11           THE VIDEOGRAPHER:  Counsel, am I safe
12   to close out the video record for today?
13           MR. WISNER:  Yeah.
14           THE VIDEOGRAPHER:  Very well.  We are
15   now going off the record.  The time is 8:46 p.m.
16   Eastern, and this concludes today's testimony of
17   Dr. Oded Shenkar.
18           Thank you everybody, and have a great
19   night.
20               *   *   *
21       E N D   O F   P R O C E E D I N G
22   Time noted 8:46 p.m. Eastern Standard Time
23               *   *   *
24
25

Page 364

1
2       A C K N O W L E D G M E N T
3
4    I, ODED SHENKAR, Ph.D., hereby certify that I have
5    read the transcript of my testimony taken under oath
6    in my deposition of February 11, 2025; that the
7    transcript is a true and complete record of my
8    testimony; and that the answers on the record as given
9    by me are true and correct.
10
11   _____
             ODED SHENKAR, Ph.D.
12
13
14
15   Signed and subscribed to before me,
16   this _____ day of _____, 2025.
17
18
19   _____
             (NOTARY PUBLIC)
20
21   My Commission expires:
22
23
24
25

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 365

1
2         INDEX OF EXAMINATION
3
4
5     Witness:
6     Oded Shenkar, Ph.D.
7
8
9     Examination:
10    By Ms. Brenner...............................Page 10
11    By Mr. Wisner................................Page 352
12    By Ms. Brenner..............................Page 361
13
14
15    Discovery Requests.........................Page 366
16
17
18    Index of Exhibits...........................Page 367
19
20
21
22
23
24
25

Page 367

1
2         INDEX OF EXHIBITS
3
4     Defendant's Seex_Shenkar 1 .........................23
5     Multipage document entitled: Evaluating Tamarind
6     Management Limited (TML) & the Impact of Mr. Seex'
7     Death, dated November 30, 2024 (no Bates Nos.)
8
9     Defendant's Seex_Shenkar 2 .........................26
10    Three-page document entitled: Lifetime Earnings
11    Analysis for Jonathan Seex, dated November 30, 2024
12    (no Bates Nos.)
13
14    Defendant's Seex_Shenkar 3 .........................44
15    Three-page document entitled: Lifetime Earnings
16    Analysis for Jonathan Seex, dated November 30, 2024
17    (no Bates Nos.)
18
19    Defendant's Seex_Shenkar 4 .........................58
20    Single-page document entitled: Federal Rule 26
21    Statement Re Report of Dr. Oded Shenkar (no Bates No.)
22
23    Defendant's Seex_Shenkar 5 .........................74
24    Multipage document bearing heading on first page: Oded
25    Shenkar (no Bates Nos.)

Page 366

1
2         DISCOVERY REQUESTS
3
4     By Ms. Brenner...............................Page 16
5     Any notes by the witness that relate to the
6     calculations and the opinions in the report
7
8     By Ms. Brenner...............................Page 62
9     All the applicable rates charged by the witness for
10    expert witness services
11
12    By Ms. Brenner..............................Page 122
13    Communications to the witness containing factual
14    information relied on by the witness
15
16    By Ms. Brenner..............................Page 161
17    Any written information provided to the witness
18    providing underlying facts for the witness' analysis
19
20
21
22
23
24
25

Page 368

1
2     Defendant's Seex_Shenkar 6 .......................163
3     Four-page letter from Ascent Capital MGT Africa Ltd.
4     to Phil N. Gutsche, dated March 30, 2019 (no Bates
5     Nos.)
6
7     Defendant's Seex_Shenkar 7 .......................170
8     Document Bates stamped Seex_Shenkar 000496 through
9     498, three-page letter from Ascent Capital Africa II
10    Ltd. to Tamarind Management Ltd., dated July 2, 2020
11
12    Defendant's Seex_Shenkar 8 .......................180
13    Document Bates stamped Seex_000282 through 284,
14    three-page letter fro Ascent Capital Africa II Ltd. to
15    Tamarind Management Ltd., dated June 20, 2020
16
17    Defendant's Seex_Shenkar 9 .......................233
18    Four-page document bearing heading on first page: 1.
19    discounted cash flow (no Bates Nos.)
20
21    Defendant's Seex_Shenkar 10 ......................268
22    Multipage document entitled: NBER Working Paper
23    Series: Founding Teams and Startup Performance, dated
24    January 2021 (no Bates Nos.)
25

92 (Pages 365 to 368)

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

## Page 369

```
1
2         Defendant's Seex_Shenkar 11 .......................306
3   Multipage document entitled: Response to Mr. Guryan,
4   dated January 29, 2025 (no Bates Nos.)
5
6         Defendant's Seex_Shenkar 12 .......................355
7   Multipage document entitled: Expert Rebuttal Report of
8   Aaron Dolgoff, dated January 15, 2025 (no Bates Nos.)
9
10
11
12
13
14
15
16
17
18            (All exhibits were provided
19          electronically to the reporter.)
20
21
22
23
24
25
```

## Page 371

```
1
2               C E R T I F I C A T E
3
4   STATE OF NEW YORK      )
                           :ss
5   COUNTY OF ORANGE       )
6
7         I, BRANDON RAINOFF, a Federal Certified
8   Realtime Reporter and Notary Public within and for the
9   State of New York, do hereby certify:
10        That ODED SHENKAR, Ph.D.., the witness
11  whose deposition is hereinbefore set forth, was duly
12  sworn by me and that such deposition is a true record
13  of the testimony given by the witness.
14        I further certify that I am not related to
15  any of the parties to this action by blood or
16  marriage, and that I am in no way interested in the
17  outcome of this matter.
18        IN WITNESS WHEREOF, I have hereunto set my
19  hand this 11th day of February, 2025.
20
21
22  _____
23        BRANDON RAINOFF, RPR, FCRR, RMR, CRR
23
24
25
```

## Page 370

```
1
2               C E R T I F I C A T E
3
4   STATE OF NEW YORK      )
                           :ss
5   COUNTY OF ORANGE       )
6
7         I certify that, I, BRANDON RAINOFF,
8   have collected everyone's agreement at the
9   commencement of this deposition that I would be
10  the swearing officer and court reporter remotely
11  out of state and that I may record the testimony
12  stenographically and swear in the deponent even
13  though I am not in the physical presence of the
14  deponent, and that there is no objection to that
15  at this time, nor will there be an objection to
16  it at a future date.
17        IN WITNESS WHEREOF, I have hereunto
18  set my hand this 11th day of February, 2025.
19
20
21  _____
       BRANDON RAINOFF, RPR, FCRR, RMR, CRR
22
23
24
25
```

## Page 372

```
1
2         ERRATA SHEET FOR THE TRANSCRIPT OF:
3   Case Name: In re: Ethiopian Airlines Flight ET 302
    Crash, relating to Case No. 1:19-cv-03392
4   Deposition Date: 2-11-2025
    Deponent: Oded Shenkar, Ph.D.
5   Place: Remote Videoconference Deposition
6
7                   CORRECTIONS
8   PAGE LINE  FROM        TO         REASON
9        |    |       |          |
10       |    |       |          |
11       |    |       |          |
12       |    |       |          |
13       |    |       |          |
14       |    |       |          |
15       |    |       |          |
16       |    |       |          |
17       |    |       |          |
18       |    |       |          |
19       |    |       |          |
20       _____
    Date            ODED SHENKAR, Ph.D.
21
22  Subscribed and sworn before me
23  this_____day of _____, 2025.
24  _____
    (Notary Public)
25  My Commission expires:
```

93 (Pages 369 to 372)