# EXHIBIT E

My docs: W-N-VALUATION

# EVALUATING TAMARIND MANAGEMENT LIMITED (TML) & THE IMPACT OF MR. SEEX'S DEATH

Oded Shenkar, PhD

## INTRODUCTION
In a separate document (#*CEO/ Founder's Death and Company Value*), I provided evidence concerning the significantly negative impact of the sudden death of a CEO and or founder on firm's value (Jonathan was not a founder per se, but was the son of TML's founder and the natural successor). In this document, I assess the value of the group and monetize the hit to that value that Jonathan's death has likely triggered. This is not a simple exercise. It requires careful consideration of, and adjustment for, the idiosyncrasies of the case before us. It does *not* cover losses stemming from the lifetime earnings potential of the deceased CEO, which is provided separately, nor to Jonathan's share in the holding company.

## ASSESSING COMPANY VALUE
Assessing the value of a business is complex. In addition to a multitude of evaluation models, there are multiple contingency factors that impact assessed value, including, but not limited to, variations across sectors, countries, and business phase. Additionally, each of a business' component parts may face a different competitive landscape, with the total value not necessarily the sum of the parts. Contracted (i.e., non-equity) elements (e.g., management contracts, franchise agreements) are still more difficult to value, but their results are reflected in the consolidated financial statements used to compute company value.

     Valuation methods can be grouped into categories. The first includes *asset-based* models, starting with book value, and continuing with book value adjustments (e.g., net assets), liquidation value (the value of assets if a company were to be terminated), and replacement value (how much it would cost to replace existing assets). The second group is based on *income* or revenue, led by discounted cash flow analysis, and includes, among other variants, discounted future earnings and or dividends. How these are calculated also varies, and may produce divergent results. A third valuations group is *comparison-* based (also called market-based or relative valuation). In this mode, a focal company is compared to a comparable firm(s), for which value has been determined. The matching of the focal and comparison firms is based on variables such as size, industry, nation/region, sector, and financials and or transaction type. For instance, one can use the price paid for an acquired company for assessing the adjusted value of the focal firm. There are also *mixed* modes, e.g., average cost (weighted average), which divides the total cost of goods by their number (less applicable in a service, like hospitality), or the Swiss model, which looks at future cash flow, taking into account such factors as inflation. Newer, less common methods include, among others, modes based on Options theory, which take into account, among other variables, the volatility and the interest rates during a future period, using formulas such as Black-Scholes or Monte-Carlo simulation. Qualitative approaches, e.g., based on strategic analysis, may be used as a supplement.

**SELECTING A VALUATION METHOD**
Selecting a valuation mode is a vital part of the valuation process.[1] The selection is important because the value produced by different modes can differ.[2] The choice, and the decision leading to it, is influenced by a number of subjective factors.[3] Data availability is an important factor, for instance, if a company is unlisted, as is the case here, a direct price/earnings valuation cannot be used, and utilizing the weighted average cost of capital (WACC) is only feasible for firms whose debt and equity are publicly traded. Even for listed companies, calculating future cash flows is inherently notional, given the uncertainty surrounding key elements such as interest rates and growth.[4] Using a listed company as a base is an option, but this too depends on market efficiency and other factors.

Value may be transaction-dependent. For instance, it is a common adage that value and price are not necessarily compatible. M&A transactions almost invariably involve premiums over book value. It is not uncommon for an acquirer to continue and increase the offered price in the face of opposition from the target's board and management, who claim that an initial offer undervalues the company. Price trends higher when there is a bidding war, especially where competitors vie to buy the company. At the same time, there can be a 'fire sale' where a buyer offers less than book value to take advantage of dire circumstances. Most of those contingencies also impact an investor.

A target may represent a different value to different buyers. For example, a buyer may offer a higher price because it wishes to rapidly expand into a promising market, preempt a competitor's move, and/ or sees a potential for synergies, that is, the expectation that the acquisition will also increase the value of the acquirer (the so-called 1+1=3 assumption). Potential buyers may also vary on whether they wish to control and or integrate a potential target, and their assessment of the challenges involved in such integration (e.g., cultural due diligence.[5]). For an investor, an offering price reflects an assumption of undervaluation, and expectation of a rising value due to intervention (e.g., change of management) or as a function of a perceived rising tide in an industry or a market. An investor who does not seek to intervene in the firm's management has trust in the CEO and the top management team. At times, the investor or buyer may insist on a CEO remaining in place as a condition for the deal, and may put in place a mechanism, say contingent payout, as a condition. [6]

**Choosing an Evaluation Method for TML**
The inherent limitations of each of the aforementioned valuation approaches, the variable outcomes produced, and the sketchy availability of data, suggest that, when possible, it is advisable to use more than one valuation approach. The selection needs to be done with appropriate care, with attention paid to the idiosyncrasies of each case, e.g., national and regional context and the sector in which the firm operates.

---

[1] Miciula, I., Kadlubek, M. & Stepien, P. Modern methods of business valuation. *Sustainability*, 12, 2020, 1-2
[2] Damodaran, A. *Investment valuation: tools and techniques for determining the value of an asset.* NY: Wiley
[3] See, for instance, Dale, S. Heuristics and biases: The science of decision-making. *Business Information Review*, 32, 2, 2015, 93-99
[4] Cifuentes, A. The discounted cash flow (DCF) method applied to valuation: Too many uncomfortable truths. Working Paper, Columbia University, October 2016; see also Majumdar, R., Valuation of hotel property: issues and challenges. *Worldwide Hospitality and Tourism Themes,* 11, 4, 2019, 418-428
[5] e.g., Lim, J., Makhija, A. & Shenkar, O. The asymmetric relationship between national cultural distance and target premiums in cross-border M&A. *Journal of Corporate Finance*, 41, 2016, 542-571
[6] Reuer, J.J., Shenkar, O. & Ragozzino, R. Mitigating risk in international mergers and acquisitions: the role of contingent payouts. *Journal of International Business Studies*, 35, 2004, 19-32

2

The literature offers recommendations regarding the valuation modes for hospitality businesses, ranging from cashflows and assets to a comparative approach, replacement cost, and income capitalization, among others.[7] When it comes to hotels, for example, analysts have been reported to use the income present value approach or the comparative sales approach.[8] Still, the cashflow approach is by far the most accepted and rigorous overall, including in the hospitality sector. This is the approach that we use here, however we are employing a number of its variants to enhance reliability. Below, we explain why other valuation approaches have not been adopted in the case before us.

*Asset-based Valuation* has not been selected because the valuation of tangibles such as land and in sub-Saharan Africa and specifically in Kenya has proved problematic, among other reasons due to immature property markets.[9] Indeed, variations among valuations of the same properties have been found to be significantly higher than the international norm.[10] Add to that the fact that TML does not own the land and the buildings that its businesses sit on, and it becomes clear that the valuation of tangible assets would not make much sense. An increasingly important portion of a firm's value and likely the main asset of a hospitality group is its brand, an intangible that is part of an asset group that is especially important for the valuation of hospitality businesses.[11] The problem here is that we lack an independent valuation of brand value by a third party such as a tax authority, public markets, auditors, or consultancies, that would provide a unbiased measure of "goodwill" (the accounting term), reputation, or prestige.[12]

The *Comparable Transactions Valuation* has not been selected despite being popular in the hospitality industry[13] for a number of reasons. First, the Kenyan market has a limited number of buyers and sellers, limited information, low liquidity, and an underdeveloped market structure.[14] Second, TML's portfolio is diverse and includes different levels and types of restaurants, and a mix of going businesses and contractual elements, the latter including hotel management agreements of a different type and in different locations (Mombasa and Nairobi). Finding a comparable match under those circumstances is next to impossible, and even a comparison of individual components would still be hampered by limited data availability and the aforementioned market imperfections.

The *strategic Valuation* approach provides a picture of the strategic positioning of a company, taking into account such variables as competitive landscape, vertical and horizontal integration, and synergies among component parts, which together can serve as a basis for valuing the business. The problem here is the lack of a commonly accepted procedure pertaining to the quantification of conceptual

---

[7] Majumdar, R., Valuation of hotel property: issues and challenges. *Worldwide Hospitality and Tourism Themes,* 11, 4, 2019, 418-428

[8] Majumdar, R., Valuation of hotel property: issues and challenges. *Worldwide Hospitality and Tourism Themes,* 11, 4, 2019, 418-428

[9] Cheloti, I. & Mooya, M. Valuation problems in developing countries: A new perspective. *Land*, 10, 2021, 1352

[10] Awuha, K.G., Provers, D., Lamond, J., Gyamfi-Yeboah, F., Eriksson, C. & Arnold, A. 2016. An evaluation of property valuation practice in sub-Saharan Africa: A case study of Ghana. London, UK: RICS.

[11] Du, R., Li, Y. & Singal, M. Intangible asset valuation in the hospitality industry. *The Journal of Hospitality Financial Management,* 27, 2, 2019, 72-84

[12] Shenkar, O. & Yuchtman-Yaar, E. Reputation, image, prestige and goodwill: An interdisciplinary approach to organizational standing. *Human Relations*, 50, 11, 1361-1381; Baumert, T, & Obesso, M.M. Brand antiquity and value perception: Are customers willing to pay more for older brands? *Journal of Business Research,* 123, 2021, 241-254

[13] Majumdar, R., Valuation of hotel property: issues and challenges. *Worldwide Hospitality and Tourism Themes,* 11, 4, 2019, 418-428

[14] Cheloti, I. & Mooya, M. Valuation problems in developing countries: A new perspective. *Land*, 10, 2021, 1352

and qualitative elements, something that can lead to arbitrary dollar figures, whereas the whole idea behind valuation is to have a methodology that would allow different judges to reach a similar conclusion.

To allow as much variety in evaluative methods within the aforementioned constraints, a number of different cashflow models will be used: Discounted Cash Flow (DCF), EV/EBITDA, and M/B Ratio. Each will be explained as we go through the actual calculation. The only supplemental information that will be provided, at the tail end of this document, are the investment intent offers submitted by Ascent Capital.

This leads us to the final point before commencing the actual evaluation. What you will see below begins with a calculation of TML's value, but continues with another task that is germane to the case before us, namely assessing the value of the company under two different scenarios: one assuming that the CEO were still with us, the other assuming that the CEO is no longer with the group. To see the logic and evidence for pursuing that course, I refer the reader again to the separately filed document attesting to the impact of a CEO's sudden death on a firm's value.

**CASHFLOW VALUATION OF TML**
We used discounted cash flow (DCF) methods to value TML. The currency unit is Kenya Shilling (KES). The valuation is based on financial information provided in annual reports. We start with 2014 based on data availability and because this is the approximate time when growth levels in emerging markets have started to level off following several years of decline in the aftermath of the 2008 financial crisis. With a sudden death of CEO, below are the key assumptions:

1. **Growth Rate**: From 2014, the revenue for each year is as follows: 1,103,853,719; 1,017,528,383; 1,130,689,259; 1,179,491,605; 1,351,331,387; 1,323,343,704; 679,628,622; 592,808,651; 1,144,318,549; 1,423,683,969. The average growth rate over this period is **8.46%**, which is reasonable for a restaurant and hospitality firm. Observing the trend before the COVID-19 period, there was an upward trajectory in revenue growth. Additionally, given Kenya's status as an emerging market and TML's position in operating high-end restaurants and hotels, an optimistic outlook is justified. Therefore, we apply a **15% growth rate** for the next 10 years (to 2033) and a **3% terminal growth rate** to evaluate potential upside scenarios.

2. Discount rate: It's determined by WACC (Weighted Average Cost of Capital). The formula is

3. 
$$\text{WACC} = \frac{E}{E+D} \cdot r_e + \frac{D}{E+D} \cdot r_d \cdot (1 - T_c)$$

   E is the market value of equity, D is the market value of debt, $r_e$ is the cost of equity, $r_d$ is the cost of debt, and $T_c$ is the tax rate (30% based on the annual report).

   We use CAPM (Capital Asset Pricing Model) to estimate the cost of equity.

   $$r_e = R_f + \beta(\text{Market Risk Premium})$$

4

$R_f$ represents the risk-free interest rate, which we assume to be 8.5% in the long run, consistent with the estimation used in the lifetime earnings section. The performance of the Nairobi 20 Index from 2014 to 2019 is as follows: 5112.6, 4040.8, 3186.2, 3711.9, 2833.8, 2654.4, with an average annual return of -11.12%. This negative return leads to a negative cost of equity, a result driven by the poor performance of the Kenyan stock market in recent years. To address this issue, we adopted the U.S. cost of equity for the hotel industry as a benchmark, which is 10.06%. This number is based on Aswath Damodaran, a Finance professor at NYU Stern School of Business[15].

Then, we compute the cost of debt after tax. It's a simple formula by risk-free interest rate multiplying $(1 - T_c)$, which is 8.5% * (1-0.3) = 5.95%.

Finally, we use the balanced sheet in 2019 as the benchmark of the capital structure of the firm, with equity value 99957376 (from shareholder's equity) and debt value 110342080 (from the total borrowing).

The WACC or the discount rate is 6.97%. Considering it's a private firm in an emerging market, this should be higher to 8.97% with 2% additional risk premium.

**Discounted Cash Flow**

The free cash flow is computed by the operating cashflow minus capital expenditures. We used 2019 free cash flow 14255288 as a base to compute the future 10-year cash flow with a growth rate of 15% in a general condition:

$$\text{Projected FCF}_t = \text{FCF}_{\text{base year}} \times (1 + \text{Growth Rate})^t$$

We then compute the terminal value which represents the value of the firm beyond the explicit projection period, calculated using the perpetual growth model with terminal growth rate 3.0%.

$$\text{Terminal Value (TV)} = \frac{\text{FCF}_{\text{final year}} \times (1 + \text{Terminal Growth Rate})}{\text{Discount Rate} - \text{Term Growth Rate}}$$

Then, we compute the discount FCF values and TV values.

$$\text{Discounted FCF}_t = \frac{\text{Projected FCF}_t}{(1 + \text{Discount Rate})^t}$$

$$\text{Discounted Terminal Value} = \frac{\text{Terminal Value}}{(1 + \text{Discount Rate})^n}$$

Finally, we compute the enterprise value by the sum of the discounted FCF and TV.

---

[15] https://pages.stern.nyu.edu/~adamodar/New_Home_Page/datafile/wacc.html

$$\text{TEV} = \sum_{t=1}^{n} \text{Discounted FCF}_t + \text{Discounted Terminal Value}$$

Using an optimistic assumption with a growth rate of 15% and a terminal growth rate of 3%, the value of the firm is estimated at 615,455,379.38 KES, equivalent to 4,754,285.10 USD as of Nov 22, 2024.

**CEO Adjustment DCF**

In this section, we estimate the firm's value assuming the CEO's continuous operation. We apply the Discounted Cash Flow (DCF) method, as changes in cash flow growth or revenue growth without the CEO are directly reflected in DCF valuations.

The sudden death or emergency event of a CEO can significantly affect firm performance. For example, the divorce of a CEO in a family business had a profound negative financial impact, with revenues down 58%, gross profit down 56%, profitability down 65%, working capital down 65%, and total equity down 68%.[16] Similarly, the stock price of firms dropped by 1%–3% in the short-term following the sudden death of an executive board member.[17]

The influence of the founder's effect on firm performance is profound. On average, founders have a positive effect on the success of their firm, and the advantages of founder control are consistently supported by the scholarly literature. This effect extends more broadly to founding-family ownership, where the presence of family leadership can enhance firm outcomes. By analyzing a large dataset of U.S. listed firms that experienced a sudden CEO death during the 1979–2002 period, the consequences of replacing a deceased founder with a professional manager, that is, not a family member, are quite significant: Innovation, as measured by patent count, falls by an astonishing 43.8%.[18] This dramatic decline underlines the specific added value that founders and family members can bring: Intimate knowledge of the business, long-term commitment, and the ability to align innovation with the strategic vision of the firm, something difficult to replicate by external managers. Loss of this type of leadership not only disrupts continuity but also the innovative capabilities of the firm, underlining the crucial role of family-controlled leadership in maintaining and enhancing firm performance.

Furthermore, the premature death of a founding member causes a 42.7% decrease in revenue over the following five years if the firm has been established for more than five years.[19] Based on this, we assume such an event would result in a 50% reduction in the terminal growth rate (calculated as 42.7%/5/2=4.27%). Conversely, if the CEO continues to lead the firm, leveraging their social network and knowledge, we assume they could potentially achieve double or higher growth for the firm. Combined with the fact that descendant-controlled firms are more efficient than founder-controlled firms, this assumes a base growth rate of 3% and a spread of 0.75%, resulting in an 8.02% growth rate based on

---

[16] Galbraith, C.S. 2003. Divorce and the financial performance of small family business: An exploratory study. *Journal of Small Business Management,* 41, 3, 296-330
[17] Johnson, W.B., Magee R.P., Nagarajan, N.J., Newman, H.A. 1985. An analysis of the stock price reaction to sudden executive deaths: Implications for the managerial labor market. *Journal of Accounting and Economics,* 7, 1-3, 151-174
[18] Lee, J.M., Kim, J. & Bae, J. Founder CEOs and innovation: Evidence from CEO sudden deaths in public firms. *Research Policy,* 49, 1, 2020, 103862
[19] Choi, J., Goldschlag, N., Haltiwanger, J. & Kim, J.D. 2019. Founding teams and startup performance, Working Paper, NBER.

the prior CEO adjustment in the DCF analysis. The corresponding enterprise value is 2,971,576,552.16 KES, equivalent to 22,954,908.84 USD as of Nov 22, 2024.

**Summary**

This report provides an estimate of the value of TML with and without its CEO, highlighting the long-term value that the CEO contributes to the Company. Based on the discounted cash flow valuation, the estimated values of TML with and without the reigning CEO are, respectively, 4,754,285.10 USD and 22,954,908.84 USD, representing a value gap of 18.2 million USD (at the 100% level, rounded) or **4.9 million USD** (at the 26.87% level, rounded).

**Appendix: Letters of Intent**

As a final note, I should mention the letters of intent that TML received from Ascent Capital. The first letter was by March 06, 2019, was submitted shortly before the Ethiopian Airlines crash. It offered US$6 million for a 54.3% stake, which translates into a group value of $11 million. A March 30, 2019 amendment made the offer contingent on finding a CEO of Jonathan's caliber, which TML failed to do. A June 2020 offer put a value of KS565 million (including 100 million for the Carnivore brand) or about $5,480,000 (using the prevailing exchange rate at the time) for a 68% stake, which would value TML at roughly $7.25 million, a sharp decline of $3,750,000 from the initial offer. The plaintiff's share of 26.87% of that amount would be about $1,008,000. Some of the decline may be attributed to Covid (although lockdowns started in March and the offer had likely been written earlier), but mostly reflects the lack of an equivalent CEO replacement, which is made explicit in the post-crash offers and is very much consistent with the scholarly evidence detailed here and in the separate document concerning the financial outcome of a CEO's sudden death. The nominally lower sums (compared to those obtained in the cashflow calculation), are easily explained by a number of factors. First, Ascent's explicit, contractual time horizon is five years, which is a typical time window for private equity (as opposed to the much longer time horizon used in the cashflow calculation). Second, as an investor, Ascent seeks to make as large a profit as possible, so it is in its interest to offer as low a price as possible. As any investor, Ascent would not price an offer at a level it believed would not generate a considerable profit, with a healthy safety margin tacked on. Third, the Ascent offers have been made in the context of a no-bid situation, where it did not need to compete with other bidders, something which would naturally increase the offering price.

*Oded Shenkar*

Oded Shenkar, PhD, November 30, 2024