# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NADEGE DUBOIS-SEEX, Individually, Co-
Personal Representative of the heirs of
JONATHAN SEEX, deceased, and as Next
Friend A.S. (a minor), NISHANT LAKHANI,
Co-Personal Representative of the heirs of
JONATHAN SEEX, deceased, and BRITT
MARIE SEEX, Individually,

      Plaintiffs,

         v.

THE BOEING COMPANY, a Delaware
Corporation,

      Defendant.

No.: 1:19-cv-03392

Expert Rebuttal Report of Aaron Dolgoff

January 15, 2025

# Table of Contents

I.     **INTRODUCTION AND SCOPE OF WORK** ........................................................... 2

II.    **QUALIFICATIONS** ............................................................................................................ 2

III.   **SUMMARY OF OPINIONS** ............................................................................................ 3

IV.   **BACKGROUND** ................................................................................................................ 4

    A.    Factual Background ............................................................................................. 4

    B.    Overview of Dr. Shenkar's Methodology ..................................................... 6

        1.    Dr. Shenkar's calculation of the value of TML without Mr. Seex ............................. 7

        2.    Dr. Shenkar's calculation of the value of TML with Mr. Seex .................................... 9

        3.    Summary of Dr. Shenkar's valuations and estimate of value loss. ........................... 10

V.    **ANALYSIS OF DR. SHENKAR'S METHODS AND ASSUMPTIONS** ................................. 11

    A.    Dr. Shenkar's Valuation Methodology is Applied Incorrectly and is Based on Unsupported Assumptions ........................................................................................... 12

        1.    Dr. Shenkar's methodological errors ........................................................................ 12

        2.    Dr. Shenkar's unsupported and contradicted assumptions ....................................... 17

        3.    Dr. Shenkar's inflated valuations are contradicted by a reliable indication of TML's value ...................................................................................................................... 20

    B.    Dr. Shenkar's Assumptions Regarding the Impact of Mr. Seex's Death Are Speculative and Contradicted by Widely Accepted Economic Literature and the Evidence in This Case ....... 23

        1.    Improper application of the economic literature to the DCF assumptions ............... 24

        2.    Dr. Shenkar's flawed application of the wider economic literature on the impact of CEO deaths .......................................................................................................... 27

VI.   **THE EVIDENCE DOES NOT SHOW DIMINUTION IN VALUE OF TML AS A RESULT OF MR. SEEX'S DEATH** ............................................................................................... 33

VII.  **CONCLUSION** ............................................................................................................... 35

## I. INTRODUCTION AND SCOPE OF WORK

1. Charles River Associates ("CRA") and I have been retained by Winston & Strawn LLP ("Counsel") on behalf of The Boeing Company ("Defendant"), to prepare this expert report and provide expert testimony (if necessary) on certain topics and issues related to this proceeding. The scope of my assignment is to respond to the certain opinions expressed in the November 30, 2024, expert reports of Dr. Oded Shenkar ("TML Report" and "CEO Report").[1] Specifically, I have been asked to respond to Dr. Shenkar's calculation of damages related to the value of Jonathan Seex's ownership interest in Tamarind Management Limited ("TML").

2. I have prepared my report to state my opinions and describe the bases for those opinions, including the reasons for them and supporting facts, data, and documents. I express no legal opinions in this report.

3. Appendix A contains a list of documents I considered in forming my opinions. I will review, evaluate, and analyze additional facts, data, or other information as and if they become available.

4. CRA is being compensated at the rate of $965 per hour for my time in this matter. CRA's compensation is not dependent on the outcome of this matter.[2]

5. I have been provided available information relevant to my analysis. I reserve the right to revise or supplement my opinions based on information that may become available to me later, including, but not limited to, further information learned or produced, or in response to opinions raised in any other reports or testimony.

## II. QUALIFICATIONS

6. I am a Vice President in CRA's Finance practice. I have worked as a consultant at CRA for over 20 years. My consulting work is focused on expert testimony related to damages in a variety of areas including valuation disputes, compensation and employment disputes, commercial disputes, securities litigation, and regulatory matters.

---

[1] Expert Report of Oded Shenkar, Ph.D. (Evaluating Tamarind Management Limited (TML) & The Impact of Mr. Seex's Death), November 30, 2024 ("TML Report"); Expert Report of Oded Shenkar, Ph.D. (CEO/Founder's Death and Company Value), November 30, 2024 ("CEO Report").

[2] CRA staff working at my direction bill at rates ranging from $480 to $880.

7. From 1997 to 2003, I was a consultant at Monitor Group, where I advised corporations on matters related to corporate finance, compensation, strategy, and marketing. I have a B.S. in Economics and a B.A. from the University of Pennsylvania and an M.A. in International Economics from the Johns Hopkins School of Advanced International Studies. I am a Chartered Financial Analyst® charterholder. I am co-author of a book, *Outperform with Expectations-Based Management*™, and have published articles in journals such as the *Review of Accounting Studies*, *Journal of Applied Corporate Finance*, *Journal of International Arbitration*, and *World Arbitration and Mediation Review*.

8. My consulting and testifying experience includes cases in which I have analyzed issues related to valuation and damages, including cases involving valuation of companies in emerging markets and privately held companies. My curriculum vitae, including a list of prior cases for which I have appeared as an expert witness, is attached as Appendix B.

## III. SUMMARY OF OPINIONS

9. Dr. Shenkar's valuation analyses are unreliable due to methodological errors and his reliance on unsupported assumptions. Dr. Shenkar's valuation of TML with Mr. Seex (i.e., assuming Mr. Seex had not died) is unreasonably high and contradicted by reliable contemporaneous indications of TML's value in 2019 from the letters of intent submitted to TML by an investor. The significant flaws in Dr. Shenkar's valuation methods and assumptions result in an unreliable and upwardly biased estimate of Plaintiffs' loss of TML equity value resulting from Mr. Seex's death.

10. In developing the assumptions used in his valuation analysis, Dr. Shenkar relies on a highly flawed application of the economic literature on the value impact of a CEO's death. The majority of the literature finds the sudden death of a CEO has only a small (if any) impact on a company's value. Dr. Shenkar ignores this, and instead appeals to studies finding larger effects. However, in doing so, Dr. Shenkar relies on unsupported assertions and assumptions about Mr. Seex, ignores that some of those larger effects are still rather small, and ignores that the studies finding the largest effects are not applicable to Mr. Seex or TML.

3

11. The letters of intent submitted to TML by an investor in 2019 provide reliable contemporaneous evidence that there was no diminution of value as a result of Mr. Seex's death.

## IV. BACKGROUND

### A. Factual Background

12. Mr. Seex was one of the passengers aboard Ethiopian Airlines flight ET 302 who lost his life when it crashed on March 10, 2019.[3] Mr. Seex "was the CEO of a hotel and restaurant business, Tamarind Management Ltd ('TML') in Kenya."[4] Plaintiffs in this matter are Mr. Seex's wife (Nadege Dubois-Seex), on behalf of his estate and heirs, and his mother (Britt Marie Seex).[5]

13. At the time of his death, Mr. Seex "owned 26.87% of the total shares of TML, or 200,000 shares."[6]

14. TML was part of Tamarind Group, which was co-founded in 1972 by Mr. Seex's father, Mr. Chris Seex.[7] Tamarind Group owns and operates over 10 properties in the lodging, restaurant, catering, events, and entertainment business in Kenya.[8]

15. Mr. Seex became TML's chief executive officer ("CEO") in January 2018.[9] His primary role was to "grow and strengthen the organisation through strategic planning and improvements of the organisations [sic] existing organisation as well as diversification of the company's core functions by developing new business ventures in the hotel and

---

[3] *Dubois-Seex, et al., v. The Boeing Company*, Complaint, No. 1:19-cv-02170 (N.D. Ill., May 30, 2019) (the "Complaint"), ¶ 12.

[4] Plaintiffs' Supplemental Answers and Objections to Defendant the Boeing Company's First Set of Damages Interrogatories, June 10, 2024, p. 2.

[5] Complaint, ¶¶ 12-13.

[6] Plaintiffs' Supplemental Answers and Objections to Defendant the Boeing Company's First Set of Damages Interrogatories, June 10, 2024, p. 5.

[7] Tamarind Management Ltd. Information Memorandum, November 2018 (Seex_000002-000058), at 006; Plaintiffs' Supplemental Answers and Objections to Defendant the Boeing Company's First Set of Damages Interrogatories, June 10, 2024, p. 2; https://www.businessdailyafrica.com/bd/lifestyle/profiles/hands-on-hotelier-with-cheery-face-takes-a-bow-2242572, last accessed January 14, 2025.

[8] Tamarind Management Ltd. Information Memorandum, November 2018 (Seex_000002-000058), at 008, 017.

[9] Seex CV, p. 2.

leisure sector."[10]   Prior to becoming TML's CEO, Mr. Seex was TML's Director of Business Development.[11]

16.   On March 6, 2019, before Mr. Seex's death, a private equity investor, Ascent Capital ("Ascent"), submitted a letter of intent ("LOI") valuing TML at 6.0x 2018 "normalized sustainable" earnings before interest, tax, depreciation & amortization ("EBITDA", a commonly used measure of earnings).[12]   This LOI proposed other terms to a potential transaction (e.g., a profit sharing split with TML shareholders, and investment of $4 to $5 million of new capital), but did not propose terms of the percentage ownership associated with this investment.[13]   On March 30, 2019, after Mr. Seex's death, Ascent sent an updated LOI reiterating the 6.0x valuation multiple, clarifying the relevant transaction EBITDA of about 129.1 million Kenyan Shillings ("KES") to which that multiple would apply, that Ascent would invest $6 million, and that after the transaction, Ascent would own 54.3% interest and the estate of Mr. Seex would own 12.4%.[14]

17.   Ascent also provided an LOI on June 20, 2020 ("2020 LOI").[15]   The 2020 LOI valued the company's equity at KES 116 million, or about $1.1 million based on the exchange rate that day.   This valuation was premised on an enterprise valuation of KES 329 million ($3.1 million) at a ~5.0x valuation multiple of 2019 normalized sustainable EBITDA of KES 66 million ($0.6 million).[16]   The 2020 LOI further specified Ascent would invest KES 565 million, or $5.3 million, for a 68% stake in the business.

---

[10] Tamarind Management Ltd. Information Memorandum, November 2018 (Seex_000002-000058), at 020.

[11] Seex CV, p. 2.  In my experience, business development typically focuses on investment activities such as new lines of business, expansion opportunities, and acquisitions or other transactions.

[12] Ascent Capital Letter of Intent, March 6, 2019, p. 1.

[13] Ascent Capital Letter of Intent, March 6, 2019.

[14] Ascent Capital Letter of Intent, March 30, 2019 (Seex_000278-000281), at 278-279.

[15] Ascent Capital Letter of Intent, June 20, 2020 (Seex_000282-000284).

[16] This EBITDA is about half the EBITDA used in the March 2020 LOI.  Neither LOI specifies how Ascent calculated normalized sustainable EBITDA.  There is insufficient information to know whether the decrease relates to performance during 2019 (i.e., pre-covid), or adjustments made to 2019 EBITDA to reflect covid conditions in place as of June 2020.

B. **Overview of Dr. Shenkar's Methodology**

18.    Dr. Shenkar calculates the loss in the value of Plaintiffs' shareholdings in TML. Specifically, he calculates the "actual" value of TML given Mr. Seex's death ("Value of TML without Mr. Seex") and compares that to a calculation of the hypothetical value of TML but-for Mr. Seex's death ("Value of TML with Mr. Seex").    For comparability purposes, these two valuations are as of the same date, which appears to be March 10, 2019, when Mr. Seex died.[17]    Each of the valuations is based on the discounted cash flow ("DCF") valuation method, described in more detail below.    The DCF method calculates the value of a company as the present value of the cash flows that the company is expected to generate in the future.[18]    Dr. Shenkar's analysis, therefore, is based on two sets of forecasted cash flows, (i) the future cash flows TML was expected to generate given Mr. Seex's death (i.e., without Mr. Seex as CEO), and (ii) the future cash flows TML was expected to generate had Mr. Seex not died (i.e., with Mr. Seex as CEO). Dr. Shenkar provides both sets of forecasted cash flows based on his own analysis and assumptions, rather than any contemporaneous forecasts from 2019.    The forecasts for each scenario (i.e., TML with and without Mr. Seex) are as of the valuation date (i.e., March 10, 2019).    That is, the forecasts reflect what could have been expected for the business considering information available as of March 2019.    Thus, Dr. Shenkar's method purports to provide a measure of the immediate loss in value of shares in TML at the time of Mr. Seex's death.

19.    Dr. Shenkar's method does not measure the current value of TML shares nor what the current value would have been but-for Mr. Seex's death.[19]    Both the current value and

---

[17] Dr. Shenkar's TML Report does not state the valuation date for his analysis.  His calculations imply a valuation date in March 2019.  For example, Dr. Shenkar's valuation analysis discounts TML's expected cash flows for the year 2020 by one year, implying a valuation in 2019.  Given the company's fiscal years end in September, the one-year discounting from 2020 is consistent with a valuation date of March 10, 2019, assuming the commonly used convention of mid-year discounting applied in DCF valuations.

[18] A common definition of the value of a company, or of its fair market value, is the cash equivalent of what a willing buyer and seller would agree to when neither is compelled to act and both have reasonable knowledge of the relevant information.  As a principle of economics, "value" is necessarily forward-looking: assets have value because the investor believes the asset will generate cash flows in the future (either through generating income such as dividends or through the ability to sell the asset in the future).  Holthausen, Robert W, and Mark E. Zmijewski, *Corporate Valuation: Theory, Evidence & Practice*, Second Edition, Cambridge Business Publishers, 2020 ("Holthausen and Zmijewski"), Chapter 1, pp. 4-5 and 10-11.

[19] I am not aware of any documents produced by Plaintiffs with a current valuation of TML.

the current value but-for Mr. Seex's death would have been impacted by intervening events between the time of Mr. Seex's death and today. Dr. Shenkar's analysis assumes the relevant measure of loss is determined as of the date of Mr. Seex's death, rather than as of today, notwithstanding my understanding that Plaintiffs have not sold any of their shares of TML since Mr. Seex's death.[20]

20. Dr. Shenkar calculates the Value of TML with Mr. Seex and the Value of TML without Mr. Seex in local currency terms, i.e., in Kenyan shillings. Although Dr. Shenkar's valuations in KES are measured as of March 2019, he converts them to U.S. dollars using the exchange rate as of date of his expert report in November 2024. Dr. Shenkar then measures Plaintiffs' loss as their proportion of TML's shares (26.87%) multiplied by the difference between the Value of TML with Mr. Seex and the Value of TML without Mr. Seex. The sections below provide more detail on Dr. Shenkar's methods.

### 1. Dr. Shenkar's calculation of the value of TML without Mr. Seex

21. Dr. Shenkar purports to perform a DCF valuation. The DCF method is a commonly accepted and appropriate valuation method, provided it is applied reliably. There are several steps to a DCF valuation. First, the valuation analyst obtains a forecast for the company's cash flows for a particular forecast period. Second, the analyst calculates what is called a "terminal value," which represents the value of the cash flows into perpetuity after the explicit forecast period. Third, the analyst calculates an appropriate discount rate, which reflects the risk of the forecast cash flows and is used to convert the forecasts into present values as of the valuation date. Fourth, the analyst sums the present values and adjusts, as needed, for non-operating factors not included in the cash flow forecast, such as the company's debt. The resulting equity value is attributable to the company's shareholders. Finally, this equity value may be further adjusted, for example,

---

[20] Plaintiffs allege that their percentage ownership of TML was diluted from 26.87% to 16.4% by the issuance of shares in 2020 and 2021. While the current percentage ownership would be relevant to the current value of Plaintiffs' shares, the dilutive share issuances would not by themselves be a source of harm to Plaintiffs as long as they were priced at fair market value. Plaintiffs' Supplemental Answers and Objections to Defendant the Boeing Company's First Set of Damages Interrogatories, June 10, 2024, p. 5; Tamarind Management Limited, Annual report and financial statements for the year ended September 30, 2020 (Seex_000319-000479), at 386, 394; Tamarind Management Limited, Annual report and financial statements for the year ended September 30, 2021 (Seex_000319-000479), at 411, 419.

for the value impact due to lack of marketability of the shares for a privately held company whose shares are not readily sold.

22. Dr. Shenkar's methodology and assumptions for these steps are summarized below.

### i.    Forecast cash flows

23. Dr. Shenkar forecasts cash flows for the DCF valuation as follows. First, he calculates "free cash flow" for 2019 as operating cash flow less capital expenditures.[21] Second, Dr. Shenkar forecasts TML's cash flows for the years 2020 through 2029 assuming a 15% annual growth rate.

### ii.    Terminal value

24. The terminal value represents the present value (as of the termination of the explicit forecast period) of all future cash flows from that point forward. Dr. Shenkar uses a standard perpetuity formula to calculate the terminal value. The perpetuity formula requires an assumption of long-term cash flow growth and a discount rate. For the long-term growth rate, Dr. Shenkar assumes 3%. The discount rate is 8.97%, as discussed below. Based on these inputs, Dr. Shenkar's terminal value is equal to the forecast cash flows in 2029 multiplied by 17.25.[22]

### iii.    Discount rate

25. Dr. Shenkar uses a discount rate of 8.97% based on his estimate of TML's weighted average cost of capital ("WACC"). Dr. Shenkar's WACC is based on (i) a cost of equity of 10.06%, based on the U.S. cost of equity for the hotel industry, (ii) a cost of debt of 8.5%, based on the purported "risk-free" interest rate in Kenya, (iii) a corporate tax rate of 30% for the tax-deductibility of interest on debt, and (iv) weightings between debt and equity based on values on the balance sheet. These inputs result in a WACC of 6.97%.

---

[21] For exposition purposes, I use the terms "cash flow" and "free cash flow" interchangeably in this report. Free cash flow is the after-tax cash flow available to all investors—a concept that is not reported in most accounting financial statements—and reflects the after-tax cash flows generated by operations less cash used for investments. Holthausen and Zmijewski, Chapter 1, p. 11.

[22] $17.25 = (1 + 3\%) / (8.97\% - 3\%)$, with rounding.

Dr. Shenkar revised this WACC upward to 8.97% because TML is a "private firm in an emerging market."[23]

### iv.    Adjustments for debt and other non-operating factors

26.    Dr. Shenkar does not adjust his valuations for the company's debt, or other non-operating items that are not reflected in the cash flow forecasts.

### v.    Marketability

27.    As noted above, Dr. Shenkar increases his discount rate from 6.97% to 8.97%, or a 2% risk premium, because TML "is private firm in an emerging market."[24]   The 2% risk premium adjustment is based on Dr. Shenkar's assumption rather than any analytical method or other basis.

\*            \*            \*

28.    Based on the above methods and assumptions, Dr. Shenkar calculates the Value of TML without Mr. Seex as of March 10, 2019, to be KES 615.5 million.[25]   He converts this to U.S. dollars using the exchange rate on November 22, 2024, resulting in a value of $4.8 million.[26]

### 2.   Dr. Shenkar's calculation of the value of TML with Mr. Seex

29.    Dr. Shenkar's method and assumptions for the Value of TML with Mr. Seex are, with a single exception, the same as his method and assumptions for the Value of TML without Mr. Seex.   The only change Dr. Shenkar made is to his calculation of the terminal value.

30.    In calculating the Value of TML with Mr. Seex, Dr. Shenkar adjusts the terminal value by applying a long-term growth rate to cash flows after the explicit forecast period of 6.52% or 8.02% (compared to long-term growth rate of 3% for the Value of TML without Mr. Seex).

---

[23] TML Report, p. 5.

[24] TML Report, p. 5.

[25] TML Report, p. 6 and tamarind_valuationv9, p. 4.

[26] TML Report, p. 6 and tamarind_valuationv9, p. 4.

31. To arrive at these alternative growth rates, Dr. Shenkar purports to rely on the findings of a study by Choi, et al. (2019),[27] which he claims finds that the premature death of a founding member leads to a 42.7% decline in revenue over the subsequent five years for firms that have been established for more than five years.[28]

32. Dr. Shenkar converts the 42.7% decline to an annual revenue reduction of 8.54% (= 42.7% / 5). Dr. Shenkar then assumes the long-term growth rate without Mr. Seex decreases by half of this annual reduction, or 4.27% (= 8.54% / 2). Therefore, according to Dr. Shenkar, the 3% long-term growth rate without Mr. Seex is 4.27% lower than it would have been with Mr. Seex, which would be 7.27% (= 3% + 4.27%). Dr. Shenkar then applies an adjustment of + / - 0.75% to 7.27%, resulting in a range of growth rates of 6.52% to 8.02% for the Value of TML with Mr. Seex. Using these growth rates, the terminal values for the Value of TML with Mr. Seex are equal to the forecast cash flows for 2029 multiplied by 43.5 (for the 6.52% growth rate) and 113.7 (for the 8.02% growth rate).[29]

33. Based on a 6.52% long-term growth rate, Dr. Shenkar calculates the Value of TML with Mr. Seex as of March 10, 2019 to be KES 1,256.1 million, and with a 8.02% long-term growth rate, KES 2,971.6 million.[30] He converts these values to U.S. dollars using the exchange rate on November 22, 2024, resulting in a value ranging from $9.7 million (6.52% long-term growth rate) to $23.0 million (8.02% long-term growth rate).[31]

### 3. Summary of Dr. Shenkar's valuations and estimate of value loss.

34. Table 1 summarizes Dr. Shenkar's findings for TML's Value of TML with Mr. Seex, Value of TML without Mr. Seex, and the difference in value, i.e., the loss in value. It

---

[27] Choi, J., Goldschlag, N., Haltiwanger, J. & Kim, J.D. 2019. Founding teams and startup performance, Working Paper, NBER. *See* TML Report, p. 6. There is a more recent version of the paper from 2021. I found no substantive differences in the later version compared to the earlier one. *See* Choi, J., Goldschlag, N., Haltiwanger, J. & Kim, J.D. 2021. Founding teams and startup performance, Working Paper, NBER.

[28] TML Report, p. 6.

[29] 43.5 = (1 + 6.52%) / (8.97% - 6.52%); 113.7 = (1 + 8.02%) / (8.97% - 8.02%). Both amounts are rounded.

[30] tamarind_valuationv9, p. 4.

[31] tamarind_valuationv9, p. 4.

also shows the amount of such values and losses that Dr. Shenkar attributes to Plaintiffs' 26.87% interest in TML equity.

*Table 1: Summary of Dr. Shenkar's Valuations*

| All amounts in millions | Value of TML with Mr. Seex | Value of TML without Mr. Seex | Value Loss |
|---|---|---|---|
| Value in KES as of 3/10/2019 | 1,256.1 – 2,971.6 | 615.5 | 640.6 – 2,356.1 |
| 26.87% share in KES | 337.5 – 798.5 | 165.4 | 172. 1 – 633.1 |
| Value in U.S. $ (fx rate as of 11/22/2024) | 9.7 – 23.0 | 4.8 | 4.9 – 18.2 |
| 26.87% share in U.S. $ | 2.6 – 6.2 | 1.3 | 1.3 – 4.9 |

## V.   ANALYSIS OF DR. SHENKAR'S METHODS AND ASSUMPTIONS

35.   In this section, I analyze Dr. Shenkar's approach and explain how methodological errors and his reliance on assumptions that are unsupported (or are contradicted by available evidence) result in unreliable valuations.

36.   Most fundamentally, Dr. Shenkar's loss analysis assumes Mr. Seex's death resulted in diminished value of TML equity.  However, he does not establish that such a loss occurred.  For example, he has not analyzed changes in TML's operating or financial performance after Mr. Seex's death, changes in its investment activity, or changes in budgets, plans, and forecasts.  Having not analyzed any of those changes, Dr. Shenkar cannot say whether the company sustained any losses as a result of Mr. Seex's death. While the impact of covid on the business may complicate such analysis, Dr. Shenkar did not even assess whether there was any negative impacts on operations, investment activity, or financial performance in the year between Mr. Seex's death in March 2019 and the start of covid's impact on operations in March 2020.[32]  Dr. Shenkar's report does not discuss any lost investment opportunities and whether, if any such losses occurred, factors other than Mr. Seex's death contributed to such lost opportunities.

---

[32] It is my understanding that the timing of covid's impact on the economy in Kenya was similar to that in other countries.  Tamarind Management Limited, Annual Report and Financial Statements for the Year Ended 30 September 2019, Note 2a) and Report of the Independent Auditor to the Members of Tamarind Management Limited, Audited Financials 2018-2023 (Seex_000319-000479), at 364 and 358.

37. Furthermore, I show that Dr. Shenkar's valuation conclusion is contradicted by available evidence of a contemporaneous assessment of the firm's value in 2019 showing a substantially lower valuation than Dr. Shenkar's calculated value of TML with Mr. Seex.

## A. Dr. Shenkar's Valuation Methodology is Applied Incorrectly and is Based on Unsupported Assumptions

38. The DCF method is a commonly used and appropriate valuation method. However, Dr. Shenkar's application of the DCF method is unreliable because (i) it is applied incorrectly, and (ii) relies on unsupported assumptions. The sections below elaborate on the methodology errors and unsupported assumptions.

39. Dr. Shenkar's incorrect methods and unsupported assumptions result in significant upwardly biased valuations of TML that are contradicted by available evidence. Upwardly biased valuations inflate Plaintiffs' damage claim because the difference between the two valuations is proportional to the level of the valuations (i.e., larger valuations correspond to larger losses).

### 1. Dr. Shenkar's methodological errors

40. The sections below discuss Dr. Shenkar's methodology errors by categories corresponding to the different elements of the DCF valuation method: (1) general methodology errors, (2) cash flow forecast errors, (3) discount rate errors, and (4) other errors.

#### i. General methodology errors

41. Because the company value is premised on forward-looking assessments, Dr. Shenkar's valuation is improperly premised on information that was not available as of the valuation date in March 2019 to make such forward-looking assessments. Specifically, Dr. Shenkar's projections of cash flows for 2020 and following years are based on growth rates applied to cash flows for the fiscal year of 2019.[33] However, as of the valuation date on March 10, 2019, the full year of FY 2019's cash flows would not yet have been

---

[33] TML's fiscal year ("FY") ends September 30 of each calendar year. *See, e.g.*, Tamarind Management Limited, Annual report and financial statements for the year ended September 30, 2019, Report of the Directors, (Seex_000319-000479), at 355.

known, and Dr. Shenkar provides no analysis or basis to believe that the full year's cash flows would have been knowable.[34]   This error is substantial because cash flows in the prior year (FY 2018) were negative (using Dr. Shenkar's calculation of free cash flow).[35] Had Dr. Shenkar started his calculations using cash flows available as of Mr. Seex's death, it is likely he would have calculated substantially lower valuations.

42.    Available evidence suggests TML ceased paying Mr. Seex's compensation after his death, which would have increased the company's cash flows in FY 2019 above where they would have been absent his death.[36]   For the Value of TML with Mr. Seex, Dr. Shenkar does not adjust downward the 2019 cash flows to reflect the compensation Mr. Seex would have been paid but for his death.  As a result, Dr. Shenkar double-counts damage claims between the Plaintiffs' claim for Mr. Seex's lost compensation and the claim for the lost value of equity.  Dr. Shenkar also does not adjust any of his cash flow forecasts for the Value of TML without Mr. Seex to reflect the compensation that would be paid to a replacement CEO.

### ii.    Cash flow forecast errors

43.    Dr. Shenkar's valuation omits cash flows from fiscal year 2019 that would have occurred after the March 10, 2019 valuation date.  Specifically, the cash flow forecast should have included cash flows from March 10, 2019, through the fiscal year end of September 2019.

44.    Dr. Shenkar's calculation of free cash flow is based on operating cash flows from the financial statements instead of "debt-free" cash flows that omit the impacts of financing and excess cash on operating income.  Dr. Shenkar should have removed the effects of

---

[34] Dr. Shenkar does not rely on any interim-period financial statements that would allow assessment of TML's cash flows using information available as of March 2019.

[35] Specifically, free cash flows in fiscal year 2018 using Dr. Shenkar's calculation of operating cash flow less capital expenditures is KES -18.9 million, compared to KES 14.3 million in FY 2019. Tamarind Management Limited, Annual report and financial statements for the year ended September 30, 2019, Statement of Cash Flows (Seex_000319-000479), at 362.

[36] Mr. Seex's 2019 tax return included KES 4.567 million of employment income.  Jonathan Seex tax return 2015-2019, p. 5.  Assuming that compensation was paid through March 10, 2019, and assuming that compensation would continue at the same rate throughout the year, his annualized income would be about KES 24.2 million.  Thus, from March 11, 2019, through the end of the fiscal year on September 30, 2019, TML would have saved KES 13.5 million or KES 9.5 million after 30% corporate tax.  Adjusting 2019 free cash flow downward for this amount would reduce Dr. Shenkar's valuations of TML by about 66%.

financing from the cash flows because they are otherwise reflected in the WACC used as a discount rate.[37]

### iii. Discount rate errors

45. As discussed, Dr. Shenkar's WACC is based on (i) a cost of equity of 10.06%, based on the U.S. cost of equity for the hotel industry, (ii) a cost of debt of 8.5%, based on the purported "risk-free" interest rate in Kenya, (iii) a corporate tax rate of 30% for the tax-deductibility of interest on debt, and (iv) weightings between debt and equity based on values on the balance sheet. These inputs result in a WACC of 6.97%. Dr. Shenkar increases this WACC by 2% to 8.97% to account for private company and emerging market risk.

46. Dr. Shenkar does not use valid methods to calculate TML's WACC. Indeed, Dr. Shenkar's calculation of the WACC is incorrect for each step of the calculation, as detailed in the paragraphs below.[38]

47. First, Dr. Shenkar's cost of equity is improperly based on the cost of equity for the hotel industry in the U.S. This measure reflects expected inflation in the U.S., which is substantially lower than expected inflation in Kenya.[39] The cost of capital should reflect the inflation expectations for the currency being used in the valuation method (here,

---

[37] Holthausen and Zmijewski, Chapters 1 and 5, pp. 16 and 210.

[38] Dr. Shenkar also errs in not adjusting the valuation to reflect the firm's capital structure. Specifically, Dr. Shenkar purports to use his DCF valuation to measure what is known as "entity value" which is the combined value of both debt and equity claimants on firm value. Dr. Shenkar does not deduct the value of debt before arriving at the value of the equity in the firm. Based on the debt amount Dr. Shenkar used in his calculation of the WACC, the valuations are inflated by about $0.8 million (KES ~110.342 million converted at Dr. Shenkar's exchange rate of 129.4528 as of November 2024). Because this error applies to both the Value of TML with Mr. Seex and the Value of TML without Mr. Seex, it does not impact the calculation of the loss of value attributable (assuming the entire loss of value is attributable to shareholders and none to lenders).

[39] For example, between January 2005 and 2024, Kenya's inflation rate averaged 7.4%, while that of the U.S. averaged 2.5% over a similar period. *See* International Monetary Fund, Inflation Rate, Average Consumer Prices, Annual Percent Change, available at https://www.imf.org/external/datamapper/PCPIPCH@WEO/KEN/USA, last accessed last accessed January 9, 2025.

Kenyan shillings).[40]  A reasonable estimate for the difference in expected inflation in the U.S. versus Kenya as of 2019 is about 4.5%.[41]

48.  Furthermore, a U.S. cost of equity would reflect equity market risk in the U.S., which is typically lower than equity risk in an emerging market, given the latter can include substantial country risk.  Dr. Shenkar adds 200 basis points (2%) to his WACC because it's a "private firm in an emerging market."  However, 200 basis points is arbitrary and unsupported by any accepted methodology for measuring incremental risk of investing in emerging markets.  There are a number of methods that valuation practitioners use to reflect emerging markets risks.[42]  For illustrative purposes, I obtain an estimate of Kenya's country risk premium from Professor Damodaran (the source used by Dr. Shenkar for his U.S. cost of equity).  Professor Damodaran provides an estimate of Kenya's country risk premium as of year-end 2018 of 7.64%.[43]  Thus, Dr. Shenkar underestimates TML's cost of equity by more than half, comparing his measure of about 10% to the more than 22% that would be appropriate after adding an additional 4.5% inflation premium and 7.6% country risk premium.[44]

49.  Second, Dr. Shenkar used an inappropriate measure for the company's cost of debt.  His analysis purports to use a "risk-free rate" of 8.5%, which appears to be measured as the average interest rate in Kenya from 1994 to 2020.[45]  The appropriate measure for the

---

[40] McKinsey & Company Inc., Tim Koller, Marc Goedhart, and David Wessels, *Valuation: Measuring and Managing the Value of Companies*, Seventh Edition, Wiley, 2020, pp. 698-700; Holthausen and Zmijewski, Chapter 17, p. 888.

[41] Per data from the Kenyan Central Bank, Kenya's average inflation rate in the five years ending February 2019 is about 6.59% (based on monthly observations of annual average inflation rate) (https://www.centralbank.go.ke/inflation-rates/, last accessed January 15, 2025).  As of March 2019, long-term inflation expectations for the U.S. were about 2.1% (based on estimates from the Federal Reserve Bank of Cleveland, 30-year time horizon forecast) (https://www.clevelandfed.org/indicators-and-data/inflation-expectations, last accessed January 15, 2025).  Thus, the inflation premium is about 4.5% (= 6.6% - 2.1%).

[42] *See, e.g.*, Damodaran, Aswath. "Estimating risk parameters." (1999).  A complete review of these methods is outside the scope of opinions provided here.

[43] Based on a sovereign ratings-based default spread of 6.21% adjusted upward by 23% for emerging markets equity volatility.  *See* https://pages.stern.nyu.edu/~adamodar/pc/archives/ctryprem18.xlsx, last accessed January 10, 2025.

[44] This assumes the inflation premium and country risk premiums are additive, and that the country premium is not modified by industry-specific exposure to country risk.

[45] For his lifetime earnings analysis, Dr. Shenkar calculates an average interest rate of 8.59%.  He does not specify which specific interest rate was averaged, though it appears to be Kenya's central bank's lending rate, which is not a commercial rate of interest.  Lifetime Earnings Report at p. 2; Central Bank of Kenya https://www.centralbank.go.ke/uploads/interest_rates/2082348623_Central%20Bank%20Rates.csv, last accessed January 12, 2025.  The Lifetime Earnings Report states the interest rate is measured between 1994 and 2020.  The

company's cost of debt is its actual borrowing rate, which will necessarily be significantly higher than a "risk-free" rate because lenders require compensation for TML's default risk.[46] As of March 2019, the typical commercial lending rate in Kenya for business borrowings of over five-year terms was about 13%.[47] TML's own borrowing rate in FY 2018 was 14%.[48]

50. Finally, Dr. Shenkar's WACC is incorrectly based on weightings between debt and equity using on the accounting values ("book values") from TML's financial statements.[49] The proper weights should be based on market value weights, which, in many cases, gives more weight to equity than using book values.[50, 51] Because the cost of equity is necessarily higher than the cost of debt, under-weighting equity leads to an underestimate of the WACC.[52]

---

series with the average rate from 1994 to 2020 that is closest to 8.59% is the repo rate, which is the interest rate at which a central bank lends money to commercials banks for short-term borrowing.

[46] Even if one were to wrongly use a risk-free interest rate as TML's cost of debt, it would be inappropriate to measure that based on an average from 1994 to 2020 rather than as the prevailing market interest rate as of the valuation date.

[47] https://www.centralbank.go.ke/commercial-banks-weighted-average-rates/, last accessed January 12, 2025.

[48] Tamarind Management Limited, Annual report and financial statements for the year ended September 30, 2018, Note 19, Risk Management Objectives and Policies, Audited Financials 2018-2023 (Seex_000319-000479), at 348.

[49] Tamarind Management Limited, Annual report and financial statements for the year ended September 30, 2019, Statement of Financial Position, Audited Financials 2018-2023 (Seex_000319-000479), at 362. Shareholders' funds = KES 99,957,376; Borrowings = KES 110,342,080 (20,302,072 + 90,040,008).

[50] Holthausen and Zmijewski, Chapter 11, p. 491. Practitioners recognize an endogeneity problem (the weights should reflect the market value that is being estimated) and therefore either use iterative calculation methods or use weights based on an estimate of the firm's target capital structure.

[51] This is likely to be the case for TML as a growth firm, as the market value of growth firms will reflect the value of future opportunities that are not reflected in the book value of equity (the latter reflects only the amount of capital raised via equity, accumulated past profits, less any share repurchases and dividends). For example, TML's pre-money valuation of $5 million implied by Ascent's March 30, 2019, LOI, is greater than the book value of TML's equity of $0.6 million (converting FY 2018 year-end shareholder equity of 64,934,932 to U.S. dollars at an exchange rate of 100.75 as of March 30, 2019).

[52] Given the other significant flaws in Dr. Shenkar's calculations, I do not provide a specific adjustment, illustrative or otherwise, to the weightings used by Dr. Shankar.

*Table 2: Illustrative Correction of Dr. Shenkar's WACC*

|                | Dr. Shenkar | Adjusted |
|----------------|-------------|----------|
| Cost of Equity | 10.1%       | 22.2%    |
| Cost of Debt   | 8.5%        | 13.0%    |
| WACC           | 8.97%       | 15.3%    |

51. As shown in Table 2, for illustrative purposes, if TML's cost of equity were 22.2% and pre-tax cost of debt were 13%, without correction of Dr. Shenkar's weighting error, the WACC would be 15.3%. Applying this WACC to Dr. Shenkar's DCF valuations would decrease the Value of TML with Mr. Seex by 75% to 88% and decrease the Value of TML without Mr. Seex by 58%, resulting in a 92% to 96% decrease in loss of value.[53] With the estate's 26.87% interest in TML, the amount of damages would be reduced from a range of $1.3 million to $4.9 million using Dr. Shenkar's incorrect WACC to a range of $0.1 million to $0.2 million using the adjusted WACC.[54]

## 2. Dr. Shenkar's unsupported and contradicted assumptions

52. Dr. Shenkar's DCF valuations are unreliable due to their reliance on unsupported and contradicted assumptions. I discuss these assumptions under the following categories: (1) cash flow forecast assumptions, (2) terminal value assumptions, and (3) marketability discount assumptions.

### i. Cash flow forecast assumptions

53. Dr. Shenkar assumes the base year of 2019 cash flows are appropriately normalized for projecting into the future. However, Dr. Shenkar does not present any analysis or discussion that he examined 2019 cash flows to determine they were not affected by transitory factors that would not persist into the future. This is important given the significant change in the company's free cash flow from FY 2018 to FY 2019. If any of that increase was due to transitory factors, then Dr. Shenkar's valuations would be biased upward.

---

[53] Exhibit 1. Because this analysis does not consider other errors and other unsupported assumptions in Dr. Shenkar's analysis, the valuations with adjusted discount rates are not reliable for purposes of determining damages.

[54] Exhibit 1.

54. Dr. Shenkar also assumes that cash flows will grow smoothly after 2019. This is contradicted by the company's own plans to invest for growth.[55] Such investment would result in expectations that cash flows would decline in the short-term as investments are made prior to revenues realized from such investments. It is typical and generally recommended, therefore, that analysts project free cash flows by forecasting the components (i.e., revenues, expenses, capital expenditures, and working capital investments) for an explicit forecast period until the business is expected to be in a "steady-state" where free cash flows represent a normalized level that can be used for further projections.[56] Indeed, Ascent's LOIs referred to valuations based on "normalized sustainable EBITDA," indicating adjustments were made to TML's actual EBITDA in order to better represent the company's going-forward earnings capacity.

55. Dr. Shenkar's assumption of 15% growth for the first 10 years of the DCF cash flow forecasts is unreliable for several reasons. First, he cites to historical revenue growth rate of 8.46% which reflects the average annual growth for the years 2015 to 2023 – i.e., including information for years after the 2019 valuation that was not available as of the valuation date and that was affected by large swings in revenues due to covid. Second, Dr. Shenkar claims there was a "upward trajectory" in revenue growth before covid, but he does not consider whether that growth reflected one-time events such as the acquisition of Kengeles in 2018.[57] Finally, Dr. Shenkar claims the 15% growth is supported by Kenya's status as an emerging market and TML's "position in operating high-end restaurants and hotels." However, Dr. Shenkar does not assess the expected growth in Kenya's economy, the market for high-end restaurants and hotels, or TML's growth plans.

### ii. Terminal value assumptions

56. Dr. Shenkar assumes the DCF terminal value based on a long-term growth rate of 3% for the Value of TML without Mr. Seex. Dr. Shenkar provides no basis for this assumption.

---

[55] Tamarind Management Ltd. Information Memorandum, November 2018 (Seex_000002-000058), at 043-052.

[56] McKinsey & Company Inc., Tim Koller, Marc Goedhart, and David Wessels, *Valuation: Measuring and Managing the Value of Companies*, Seventh Edition, Wiley, 2020, pp. 259-260 and Holthausen and Zmijewski, Chapter 4, p. 159.

[57] Tamarind Management Ltd. Information Memorandum, November 2018 (Seex_000002-000058), at 007.

Absent other factors affecting the long-term prospects for a business, it is common to assume a long-term growth rate by considering long-term expected inflation and economic growth. The 3% growth assumption implies that into perpetuity the company would be unable to keep pace even with Kenya's inflation rate of about 6.5%, thus unreasonably assuming that from 2030 onward the company would not be able to raise prices in line with costs because of the death of its CEO more than 10 years earlier.

57. For the Value of TML with Mr. Seex, Dr. Shenkar assumes a "spread" of 0.75% to derive a range of terminal value growth rates from 6.52% to 8.02%. Dr. Shenkar provides no basis for this spread. This spread implies substantial differences in value. Table 1 shows that Dr. Shenkar's calculation of the Value of TML with Mr. Seex ranges from $9.7 to $23.0 million (after converting to U.S. dollars). That is, the high end of this range is more than double the value at the low end of this range. It is unreasonable that a single, unsupported, and arbitrary "spread" assumption results in such a wide variance in the measured value.[58]

### iii. Marketability discount assumption

58. Because TML is privately held, it is appropriate to consider a discount to its value for the lack of marketability of its shares. Dr. Shenkar addresses this by assuming a 2% risk premium added to the company's WACC appropriately discounts for the fact that TML "is private firm in an emerging market."[59] Dr. Shenkar does not provide any basis for the 2% risk premium, and his assumption that it is sufficient to account for *both* the risks of an emerging market and its status as private company is incorrect.[60] Above, I cite a 7.64% premium for Kenya country risk.

59. Valuation practitioners typically apply a discount to the calculated equity value to account for lack of marketability, rather than adding a risk premium to the discount rate.

---

[58] The sensitivity to this spread assumption is a result of the long-term growth rate being close to Dr. Shenkar's discount rate (WACC) of 8.97%. The denominator of the perpetuity formula is the discount rate less the growth rate. As the growth rate approaches the discount rate, the value increases exponentially. Thus, this problem is a by-product of Dr. Shenkar's incorrect and underestimated calculation of TML's WACC.

[59] TML Report, p. 5.

[60] Although the 2% additional risk premium may decrease Dr. Shenkar's valuations by large percentages, its impact is dependent on Dr. Shenkar's other unsupported assumptions, particularly his assumptions about cash flow growth both during the explicit forecast period and in the terminal value.

Larger discounts may be appropriate for companies with more volatile earnings, risks due to their size or industry, limited pools of potential buyers, lower expected dividends, or diminished control rights due to size of position or other factors.[61] For a minority interest in a private company, practitioners may apply discounts in the range of 30% to 50%, though such discounts could be reduced for lower risk / low growth / stable companies.[62] Given TML's plans for growth and Plaintiffs' minority ownership interest, a large discount could be appropriate. Dr. Shenkar does not consider any of the factors that would be relevant to such a determination, though he does state there was a limited market for company transactions in Kenya, which suggests a limited pool of potential buyers for equity interest in TML.[63]

### 3. Dr. Shenkar's inflated valuations are contradicted by a reliable indication of TML's value

60. Dr. Shenkar calculates the Value of TML with Mr. Seex as of 2019 at between $9.7 million and $23.0 million (converted using 2024 exchange rates). These values are substantially larger than – and, therefore, contradicted by – a contemporaneous indication of TML's value based on the LOIs provided by Ascent to TML in March 2019.

61. An LOI is typically provided by an acquirer to a seller after the acquirer has had an opportunity to perform initial due diligence.[64] Although an LOI is nonbinding, it provides the seller important elements of transaction terms that the acquirer is offering.[65]

---

[61] Internal Revenue Service, *Discount for Lack of Marketability Job Aid for IRS Valuation Professionals*, September 25, 2009, pp. 5-7, available at https://www.irs.gov/pub/irs-lbi/dlom.pdf, last accessed January 10, 2025; Shannon P. Pratt and Alina V. Niculita, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies*, 5th edition, McGraw-Hill, 2008, Chapter 17.

[62] Internal Revenue Service, *Discount for Lack of Marketability Job Aid for IRS Valuation Professionals*, September 25, 2009, pp. 9-10, available at https://www.irs.gov/pub/irs-lbi/dlom.pdf, last accessed January 10, 2025; Shannon P. Pratt and Alina V. Niculita, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies*, 5th edition, McGraw-Hill, 2008, Chapter 17.

[63] TML Report, p. 3.

[64] Stout Risius Ross, *The M&A Buy Side Process: An Overview for Acquiring Companies*, August 2013 and Aktas, N. and Boone, A., 2024. The private deal process in mergers and acquisitions. *Handbook of Corporate Finance*, pp. 323-344.

[65] Stout Risius Ross, *The M&A Buy Side Process: An Overview for Acquiring Companies*, August 2013; Aktas, N. and Boone, A., 2024. The private deal process in mergers and acquisitions. *Handbook of Corporate Finance*, pp. 323-344; and https://corporatefinanceinstitute.com/resources/valuation/letter-of-intent-loi-template/, last accessed January 9, 2025.

Because it is in the interest of the buyer to provide terms that are likely to result in continued negotiation toward a transaction that is acceptable to both parties, even though additional negotiation and due diligence may alter transaction terms, it is unlikely the LOI's terms will be very far from fair market value. As a result, an LOI can provide a reasonable indication of the value of the target company (subject to case-specific contexts).

62. Based on the terms of the March 30, 2019, LOI, the valuation of the business inclusive of the $6 million Ascent would invest was $11.0 million (= $6 / 54.3%).[66] This is known as a "post-money" valuation as it includes the value of new cash invested. The "pre-money" valuation would therefore be $5 million ($11 million less $6 million new money).[67] Based on this LOI, the value of Mr. Seex's estate's interest would be either 12.4% of the $11 million post-money valuation ($1.37 million) or 28.4% of the pre-money valuation of $5 million ($1.43 million).[68] The difference between these two valuations relates to dilution caused by issuing 2% of shares to an employee stock ownership plan, or ESOP, for the post-money valuation but not the pre-money valuation.

63. Ascent's March 30, 2019, LOI provides a reliable indication of TML's value in March 2019 of about $5 million, which is substantially lower than Dr. Shenkar's calculations of between $9.7 million and $23.0 million for the Value of TML with Mr. Seex.[69]

64. Dr. Shenkar disagrees that Ascent's LOI provides a reliable indication of value, providing three reasons for this view. First, he argues that Ascent's investment time

---

[66] The $11 million implied valuation is approximate as it does not adjust for the proposed profit sharing that Ascent offered to the existing TML shareholders if its profits exceeded a 25% internal rate of return.

[67] This assumes the new capital provided by Ascent is invested and expected to earn a fair rate of return. If it was expected that the new capital would create additional value beyond the amount invested, then the pre-money valuation could be lower. The pre-money valuation is lower than the value implied by applying the valuation multiple to the normalized sustainable EBITDA due to adjustments for debt – i.e., consistent with approach described in Ascent's June 2020 LOI, it is reasonable to assume Ascent's valuation multiple was used to derive an entity value rather than equity value.

[68] 28.4% = 12.4% / (1-54.3%-2%). Produced documents indicate that Mr. Seex owned 26.87% of TML as of March 10, 2019. I do not have sufficient information to reconcile the 26.87% ownership to the 28.4% implied by Ascent's LOI.

[69] As discussed in Section VI below, it is my opinion that the March 30, 2019, LOI provides a valuation that applies to both the Value of TML with Mr. Seex and the Value of TML without Mr. Seex because Ascent did not revise its valuation approach between its March 6, 2019, LOI (before Mr. Seex died) and the LOI after his death. For this reason, I compare Dr. Shenkar's calculation of Value of TML with Mr. Seex to the valuation implied by the March 30, 2019, LOI.

horizon is "five years … as opposed to the much longer time horizon used in the cashflow calculation."[70]  Second, he argues that Ascent's "interest [is] to offer as low a price as possible" and that "Ascent would not price an offer at a level it believed would not generate a considerable profit, with a healthy safety margin tacked on."[71]  Third, Dr. Shenkar argues that Ascent's offer was "in the context of a no-bid situation, where it did not need to compete with other bidders."[72]

65.  Dr. Shenkar's three reasons for dismissing Ascent's LOI as a reliable indication of value are incorrect.  First, Ascent's offer is for a share of the equity, not a share of only the next five years of cash flows.  At the end of the five-year period, Ascent will seek to realize its investment by selling its shares, at which point the buyer will pay Ascent for cash flows after the five-year period to which Ascent would otherwise be entitled based on its ownership.  Second, there is nothing unusual in a buyer seeking to pay the lowest price acceptable.  Private equity investors do not earn profits by buying at less than fair market value, but instead by taking risks and seeking profits through active management to improve the value of the acquired company.[73]  To complete a transaction, private equity investors must offer sellers a fair price.  Finally, it is not clear that Ascent's offer was in the context of a no-bid situation, and, even if it were, it would be in Ascent's interest to make an offer sufficiently high that TML's existing owners would agree to sell their shares.[74]  In fact, the March 30, 2019, LOI has language indicating that some of the transaction terms were agreed to in cooperation between Ascent and TML ("the parties have agreed…").[75]

66.  Dr. Shenkar might have mitigated the inconsistency between his DCF valuations and the lower valuations of Ascent's LOI had he conducted reasonableness checks on his valuations.  Dr. Shenkar's report states, "To allow as much variety in evaluative methods

---

[70] TML Report, "Appendix: Letters of Intent."

[71] TML Report, "Appendix: Letters of Intent."

[72] TML Report, "Appendix: Letters of Intent."

[73] https://corporatefinanceinstitute.com/resources/career/private-equity-vs-investment-banking/; https://pages.stern.nyu.edu/~adamodar/pdfiles/eqnotes/privateequity.pdf, both last accessed January 9, 2025.

[74] TML's preparation of an information memorandum is an indicator that the company likely opened the process to other potential bidders or was prepared to do so.

[75] Ascent Capital Letter of Intent, March 30, 2019 (Seex_000278-000281).

within the aforementioned constraints, a number of different cashflow [sic] models will be used: Discounted Cash Flow (DCF), EV/EBITDA, and M/B Ratio."[76] Notwithstanding this statement, Dr. Shenkar uses only the DCF method and, therefore, has no secondary methods to corroborate the validity of his methods and assumptions (i.e., his report does not contain any valuations based on EV/EBITDA or M/B ratios). The lack of such reasonableness checks is concerning in light of the sensitivity of Dr. Shenkar's valuations to his unsupported assumptions. Moreover, a valuation multiples analysis could have alerted him to unreasonably high valuations, particularly for the Value of TML with Mr. Seex. For example, Dr. Shenkar's higher end of the Value of TML with Mr. Seex is about KES 3.0 billion, which is ~29x its operating profit in FY 2019 (~746x its operating profit in FY 2018), and ~30x the book value of equity in FY 2019 (~46x its book value of equity in FY 2018). These multiples are extremely high for an established business, let alone a company in an emerging market, even with substantial growth plans. There is no evidence the company would ever have been able to be sold at such valuation multiples.

B. **Dr. Shenkar's Assumptions Regarding the Impact of Mr. Seex's Death Are Speculative and Contradicted by Widely Accepted Economic Literature and the Evidence in This Case**

67. Dr. Shenkar's assumptions about the impact of Mr. Seex's death on the value of TML are speculative and contradicted by the evidence. First, Dr. Shenkar assumes that whoever TML finds to replace Mr. Seex would not contribute similar skills, connections, reputation, or other factors that contributed to Mr. Seex's success at the firm. To the extent a suitable replacement brought similar skills, experience, or other factors, it is reasonable to assume the value impact to TML from Mr. Seex's death would be limited to the costs necessary to find such a replacement. Such costs are likely to be relatively small – for example, search costs and any incremental compensation costs (beyond

---

[76] TML Report, p. 4. I assume Dr. Shenkar's reference to EV/EBITDA and M/B ratios indicated an intention to use what is known as the "market approach" to valuation, in which a valuation multiple is obtained either from publicly traded comparable companies or from comparable transactions. Such valuation methods are considered an alternative approach to the "income approach" which encompasses the DCF method. Holthausen and Zmijewski, Chapter 1, p. 17 and https://pages.stern.nyu.edu/~adamodar/New_Home_Page/lectures/approach.html, last accessed January 9, 2025.

Mr. Seex's compensation level as CEO) necessary to recruit, retain, and incentivize such a replacement. To the extent Mr. Seex's death posed a significant risk to TML's value, TML's owners and board of directors had incentives to mitigate any losses by finding a suitable replacement as rapidly as possible.

68. Further, Dr. Shenkar improperly applies the purported findings of a single study on the effects of a CEO's death to adjust his methodology for estimating the Value of TML with Mr. Seex. Dr. Shenkar also makes speculative assertions about the applicability of findings from the economic literature on the value impact of the loss of a CEO and ignores that the main findings of such literature indicate much smaller value effects, if any, than Dr. Shenkar assumes for TML.

### 1. Improper application of the economic literature to the DCF assumptions

69. Dr. Shenkar's assumptions regarding the impact of Mr. Seex's death on TML's value ultimately rest on his application of the findings of a single study by Choi, et al. (2019).[77] Dr. Shenkar claims that Choi, et al. (2019) finds that the premature death of a founding member leads to a 42.7% decline in revenue over the subsequent five years for firms that have been established for more than five years.[78] Dr. Shenkar uses these purported findings to inform an adjustment to his DCF terminal value growth rates for the Value of TML with Mr. Seex (*see* overview in Section IV.B.2.). There are three significant flaws in Dr. Shenkar's application of Choi, et al. (2019) which undermine the reliability of his entire analysis of the impact of Mr. Seex's death on TML's projected cash flows.

70. First, the Choi, et al. (2019) study is not applicable to the case at hand. The paper studies the impact of the loss of founders on the performance of startup companies – where the loss occurs within the first five years of the company's existence.[79] TML was not a

---

[77] Choi, J., Goldschlag, N., Haltiwanger, J. & Kim, J.D. 2019. Founding teams and startup performance, Working Paper, NBER.

[78] TML Report, p. 6. Contrary to Dr. Shenkar's assertion, the study's sample includes only firms where a founder dies within the first five years of operation. Choi, J., Goldschlag, N., Haltiwanger, J. & Kim, J.D. 2019. Founding teams and startup performance, Working Paper, NBER, p. 17.

[79] Choi, J., Goldschlag, N., Haltiwanger, J. & Kim, J.D. 2019. Founding teams and startup performance, Working Paper, NBER, p. 17.

startup company in 2019, it was not in the first five years of its existence,[80] and Mr. Seex was not a founder.[81]

71. Second, Dr. Shenkar's adjustment of the long-term growth rate in the DCF terminal value is not supported by the findings of Choi, et al. (2019). I was unable to find the 42.7% reduction in revenues in Choi, et al. (2019).[82] Even so, the 42.7% represents a level effect – i.e., that the level of revenues five years from the founder's death would be 42.7% lower than what would be predicted based on benchmark firms without a founder's death. Dr. Shenkar improperly takes this level effect and applies it to his assumptions regarding growth rates. Choi, et al. (2019) does not study growth rates, and, although one might infer short-term (five-year) growth rate effects from the level effects, the paper provides no data on long-term growth. Furthermore, even if one assumed the five-year level effect were permanent (an assumption not supported by any data in the paper) that would not imply a permanent reduction in growth rate as Dr. Shenkar assumed.[83]

72. Third, Dr. Shenkar's method of implementing the effects from Choi, et al. (2019) is illogical. He assumes that the loss of the CEO has no impact on the projected cash flows of the business for 10 years (2020 to 2029). This is inconsistent with the cited research finding short-term impacts. It is also opposite what one would expect: if the loss of the CEO were important to business operations. That is, one would expect the impact to affect the company's financial performance shortly after the loss of the CEO rather than delayed by 10 years.[84]

73. Moreover, this illogical assumption is inconsistent with TML's financial performance which improved in the fiscal year 2019 as compared to the prior year. The company's

---

[80] Tamarind Management Ltd. Information Memorandum, November 2018 (Seex_000002-000058), at 006.

[81] https://www.howwemadeitinafrica.com/quitting-is-never-an-option-says-kenyan-restaurant-entrepreneur/23842/#:~:text=The%20Tamarind%20Group%20goes%20back,and%20two%20of%20Asian%20origin., last accessed January 2, 2025.

[82] I also reviewed the 2019 version of the paper and did not find the 42.7% effect.

[83] With the five-year horizon studied by Choi, et al. (2019), a 42.7% decline in the level of revenues implies a negative 10.5% impact on growth rate, where $-10.5\% = (1 - 42.7\%)^{1/5} - 1$. Even if one assumed (without evidence) that the level effect remains fixed at 42.7% permanently, the differential in growth rate declines with the time horizon considered. As the time horizon approaches a perpetuity, consistent with Dr. Shenkar's application to the terminal value in his DCF valuation, the differential in growth rate approaches 0%.

[84] One would also expect the effect to fade over the forecast time horizon, as the impact of the loss of the CEO is mitigated by replacing the CEO with a similarly skilled manager.

operating cash flow increased from 5.6mm KES to 62.6mm KES from the FY ending September 2018 to the FY ending September 2019.[85] Although capital expenditures also increased, free cash flow (as measured by Dr. Shenkar) increased from KES -18.9 million to KES 14.3 million.[86] Although interim period financial information is not available to me, the FY ending September 2019 includes about 6 months of performance after Mr. Seex's death. In spite of that death, TML's full-year financial performance in 2019 far exceeded its performance in 2018.[87] Dr. Shenkar provides no analysis or evidence showing that TML's financial performance absent Mr. Seex's death in 2019 would have been even higher than it actually was with his death.

74. Finally, Dr. Shenkar's assumption that the impact of Mr. Seex's death is a permanent reduction in TML's growth rate is not supported by the economic literature he cited. That literature largely studies short-term impacts (i.e., a few years after the CEO's death), or short-term market price reactions for publicly traded companies. The small value effects found by the literature looking at market price reactions (discussed below) are consistent with the expectation that the impact on the business would be temporary.[88] For the case

---

[85] Tamarind Management Limited, Annual report and financial statements for the year ended September 30, 2019, Statement of Cash Flows, Audited Financials 2018-2023 (Seex_000319-000479), at 363.

[86] Dr. Shenkar calculates free cash flows as operating cash flows less capital expenditures. For the year ended September 30, 2018, TML's free cash flows per Dr. Shenkar's calculation were KES -18.9 million (KES 5.6 million operating cash flows less KES 24.5 million capital expenditures). For the year ended September 30, 2019, TML's free cash flows per Dr. Shenkar's calculations were KES 14.3 million (KES 62.6 million operating cash flows less KES 48.3 million capital expenditures). *See* financial_summary_2015-2019, tab "Sheet 1." *See also* Tamarind Management Limited, Annual Report and Financial Statements for the Year Ended 30 September 2019, Statement of Cash Flows, Audited Financials 2018-2023 (Seex_000319-000479), at 363. A portion of the improvement in free cash flow may relate to TML ceasing payment of Mr. Seex's compensation after his death. Also, if the increase in capital expenditures in 2019 as compared to 2018 occurred after Mr. Seex's death (or did not diminish with his death), that may be evidence that Mr. Seex's death did not impact investments for growth already underway.

[87] It would be inappropriate to compare to TML's performance in the FY ending September 30, 2020, due to the impact of covid starting in March 2020. If interim information were available, one could consider financial performance in FY 2020 prior to March 2020.

[88] One exception is a paper finding that some firms go out of business following a CEO's death, a clearly permanent effect. However, this paper is not applicable because its focus is on the death of firm owners, rather than CEOs, and its sample comprises pass-through profit businesses, which TML is not. The paper notes that typical firms in their study are single-establishment firms in professional services (e.g., consultants, lawyers, tradespeople) or health services (e.g., physicians, dentists). Smith, Matthew, Danny Yagan, Owen Zidar, and Eric Zwick. "Capitalists in the twenty-first century." *The Quarterly Journal of Economics* 134, no. 4 (2019). Efendioglu and Muscat (2009) also examines the impact of death on a family business and find that out of 14 cases where the CEO died, five firms were closed or sold. However, this study's results were not tested for statistical or economic significance (and the sale of the firm does not indicate a loss in value). Efendioglu, A. & Muscat, E. 2009. Internal disruptions in family business succession: Death, divorce, and disability. *The Journal of Industrial Relation and Human Resources*, 11, 1, Tables 1 and 4.

at hand, there is evidence to suggest that it was expected a replacement CEO with similar skills could be found.[89]

### 2. Dr. Shenkar's flawed application of the wider economic literature on the impact of CEO deaths

75. In this section I describe flaws in Dr. Shenkar's review and application of the economic literature on the value impact of CEO deaths.[90] Below I show that (1) Dr. Shenkar ignores that the literature largely finds very small or no value impact from the death of a typical CEO, (2) Dr. Shenkar relies on unsupported assertions and assumptions to fit the case of Mr. Seex to certain literature finding larger effects, and (3) that the literature finding very large effects does not apply to the case at hand.

### i. The literature finds small or no value impacts from the death of a typical CEO

76. Dr. Shenkar considers economic literature studying the impact of the death of a CEO on firm value. In doing so, he disregards that the studies that most directly measure the impact of the sudden death of a CEO on firm value—through studies of stock price reactions to news of the death—find that the average effect is economically insignificant and likely not statistically significant.[91] Table 3 compares the average value impact found by the papers cited by Dr. Shenkar (and an additional paper I identified) to Dr. Shenkar's calculated value impact of Mr. Seex's death. The small value effects found in the literature are consistent with the idea that in typical cases, a replacement CEO can be found with skills similar to the skills of the CEO that died with limited impact on firm

---

[89] Ascent's March 30, 2019, LOI referenced finding a replacement CEO with suitable skills, and the company's audited financial statements in 2021 indicate TML's board's intention to find a replacement CEO. *See* Ascent Capital, Letter of Intent, March 30, 2019; Tamarind Management Limited, Annual report and financial statements for the year ended September 30, 2021, Note 2, Audited Financials 2018-2023 (Seex_000319-000479), at 413.

[90] In addition to the flaws discussed in this section, I also noted flaws in the literature cited by Dr. Shenkar, including studies with small sample sizes, unpublished studies, and at least one study (Zhang 2015) of particularly poor quality that appears was written by a student (this paper is not a doctoral dissertation that would have gone through the typical reviews of such studies).

[91] Dr. Shenkar uses the word "significant" without indicating whether he is using it in the economic sense (i.e., whether the economic effect is large) or statistical sense (i.e., whether the effect is statistically distinguishable from no effect considering typical, random variation). It is not possible to evaluate the validity of Dr. Shenkar's claims without clarification of his use of undefined technical terms.

value.  Dr. Shenkar's analysis is wildly at odds with the average impact of a sudden CEO death on firm value.

*Table 3: Average Value Changes Following Sudden Death of CEO[92]*

| | Average Value Change from Sudden Death of CEO (%) | Comments |
|---|---|---|
| Dr. Shenkar[93] | -51.0% to -79.3% | |
| Zhang (2015)[94] | -1.25% | No statistical test, n = 18. |
| Borokhovich, et al. (2006)[95] | 1.80% | n = 161, sample includes senior executives that are not CEOs. |
| Sincerre (2021)[96] | -0.25% to -0.74% | No statistical test, n = 232, 31% - 61% positive value impact. |
| Nielsen & von Meyerinck (2018)[97] | -0.10% to -0.11% | n = 42, average value change for firms connected to deceased CEO, not the firm that lost its CEO. |
| Jenter, Matveyev and Roth (2018)[98] | -1.02% | Not statistically significant, n = 145, 43% positive value impact. |
| Limbach and Sonnenburg (2015)[99] | -0.34% | n = 50, estimate for change in value for firms where the deceased CEO is classified as "non-fit." |
| Quigley, Crossland, and Campbell (2017)[100] | -0.31% | n = 240, no statistical test, 42% positive value impact. |

---

[92] Dr. Shenkar also cites the example of the death of Micron's CEO, which he claims resulted in a 6% decline in the company's stock price. Information available to me indicates the price declined only 2.7% (based on stock price data from LSEG).

[93] -51.0% = ($4,754,285.10 - $9,702,889.52) / $9,709,889.52; -79.3% = ($4,754,285.10 - $22,954,908.84) / $22,954,908.84. *See* tamarind_valuationv9, p. 4.

[94] Zhang, Y. 2015. *How does untimely death of an executive affect stock prices and company performance?* All Graduate Plan B and other Reports, Table 1.

[95] Borokhovich, Kenneth A., Kelly R. Brunarski, Maura S. Donahue, and Yvette S. Harman. "The importance of board quality in the event of a CEO death." *Financial Review* 41, no. 3 (2006), Tables 3 and 4. This study was not cited by Dr. Shenkar.

[96] Sincerre, B.P. 2021. Unexpected CEO death and its consequences for firm performance. São Paulo, Brazil: University Getulio Vargas (doctoral dissertation), Table 3.3 and Table 3.4.

[97] Nielsen, K.T. & von Meyerinck, F. 2018. Managerial networks and shareholder value: evidence from sudden deaths. Working Paper on Finance #2018/21, University of St. Gallen/ Swiss Institute of Banking and Finance (S/BF-HSG), Table 3.

[98] Jenter, D., Matveyev, E. & Roth, L. 2018. *Good and bad CEOs*, Working Paper, HBS EMC Conference, Table 2.

[99] Limbach, P. & Sonnenburg, F., *Does CEO fitness matter?* Center for Financial Research, University of Cologne, CFP Working Paper # 14-12, 2015, Table 5 and p. 18.

[100] Quigley, Timothy J., Craig Crossland, and Robert J. Campbell. "Shareholder perceptions of the changing impact of CEOs: Market reactions to unexpected CEO deaths, 1950–2009." *Strategic Management Journal* 38, no. 4 (2017), Table 6.

ii. **Dr. Shenkar makes unsupported assertions and assumptions to connect Mr. Seex to the economic literature finding larger value impacts**

77. Dr. Shenkar cites economic literature that indicates that certain attributes can amplify the value loss associated with a CEO's death. He claims that, in the case of Mr. Seex, factors such as his descendant-CEO status, age, tenure, educational background, fitness, social connections, success, and TML's sector imply a greater value loss than typical. However, Dr. Shenkar's claims rely on unsupported assertions and assumptions regarding Mr. Seex. Further, Dr. Shenkar assumes that the economic literature he reviewed is directly applicable to this case, though some of the studies do not address value loss at all, and those that do, report effects that are not large.

78. Below are illustrations of several unsupported assertions and speculative assertions by Dr. Shenkar:[101]

- **Descendant-CEO status:** Dr. Shenkar cites a paper that finds descendant-controlled firms are more efficient than founder-controlled firms.[102] While the father-to-son succession from Mr. Chris Seex to Mr. Seex may have been successful, this is irrelevant to the analysis. Setting aside the fact that Dr. Shenkar's assertion ignores the fact that Mr. Seex's father died nearly ten years before Mr. Seex became CEO, the relevant issue is whether Mr. Seex's death led to a loss of value for TML rather than whether the succession was successful and whether TML was run efficiently. A large value impact would not apply if a replacement CEO were also able to run the company efficiently.

- **Age and tenure:** Dr. Shenkar cites studies that find higher value impacts of a CEO's death for firms with younger, non-founder and short-tenured CEOs.[103] However, the cited literature does not find very large effects even for younger /

---

[101] These illustrations are not intended to be a comprehensive list of all such unsupported assertions and speculative assumptions.

[102] CEO Report, p. 5, citing McConaughy, D.L., Walker, M.C., Henderson, G.V. & Mishra, C.S. 2000. Founding family-controlled firms: Efficiency and value, *Review of Financial Economics,* 7, 1, 1-19.

[103] CEO Report, p. 4, citing Jenter, D., Matveyev, E. & Roth, L. 2018. *Good and bad CEOs*, Working Paper, HBS EMC Conference and Combs, J., G., Ketchen, J, Perryman, A.A. & Donahue, M.S. 2007. The moderating effect of CEO power on the board composition-firm performance relationship. *Journal of Management Studies*, 44, 8, 1299-1323.

shorter-tenure CEOs. For example, Jenter, Matveyev and Roth (2018) find mean four-day cumulative abnormal returns of -1.02% following the announcement of a CEO's sudden death. For firms with younger, non-founder and short-tenure CEOs, the authors find mean four-day cumulative abnormal returns ranging from -2.39% (for CEOs with tenure less than 8 years) to -3.69% (for non-founder CEOs).[104]

- **Educational background:** Dr. Shenkar claims the literature finds "robust CEO effects for relatively young and highly educated CEOs…."[105] Although Mr. Seex was well-educated, Dr. Shenkar has not shown that Mr. Seex's education added value in a way that his loss would result in a significant impact that could not be mitigated by a replacement CEO with similar educational background.

- **Fitness:** Dr. Shenkar cites a study purporting to show that the value impact of a sudden CEO death is more negative when the CEO was physically fit. Dr. Shenkar then claims that "we can assume, at least by judging by age and activity level, that this was the case for [Mr. Seex]."[106] While Dr. Shenkar provides no specific evidence of Mr. Seex's fitness, assuming that he was physically fit in the way studied by the paper (completion of a marathon), the paper does not find very large effects (about 3% to 5%).[107]

- **Company sector:** Dr. Shenkar argues that TML's status in the high-end restaurant and hotel business make it labor-intensive and subject to "management by walking around" and that, therefore, the loss of a leader would be "of greater importance."[108] However, Dr. Shenkar has shown no evidence that Mr. Seex managed TML's operations, and the company's description of his primary responsibilities indicates

---

[104] Jenter, D., Matveyev, E. & Roth, L. 2018. *Good and bad CEOs*, Working Paper, HBS EMC Conference, p. 45 (Table 3).

[105] CEO Report, p. 4.

[106] CEO Report, p. 4.

[107] Limbach, P. & Sonnenburg, F., *Does CEO fitness matter?* Center for Financial Research, University of Cologne, CFP Working Paper # 14-12, 2015, 1-58, Table 5.

[108] CEO Report, p. 8.

that he was focused on organizational improvement and investing in growth opportunities rather than managing operations.[109]

### iii. The literature finding large effects is not applicable to the case at hand

79. Dr. Shenkar does cite some studies finding much larger effects. For example, Smith, Yagan, Zidar and Zwick (2019) find that profits fall by 75% after retirement or premature death of owners of pass-through profit firms.[110] However, Dr. Shenkar fails to consider that the studies that find large impacts focus on situations that are not applicable to TML, such as startups,[111] CEOs that were founders,[112] and pass-through profit firms. In such situations the company's success may be more dependent on the CEO (or owner) either due to their situation as a startup without an established business or because the profits derive directly from the owner's own labor.

- TML is not a startup –it was founded in 1972, making it nearly 50 years old at the time of Mr. Seex's death.[113] TML's business model and growth trajectory were different from that of a typical startup. TML had already experienced substantial growth by acquisition (purchase of Kengeles), which is different than organic growth of a startup, and its growth plan included opening additional locations of existing brands.[114]

---

[109] TML's informational memorandum described Mr. Seex's role as focused on strategic planning, improving the organization, and diversifying through new business ventures. Others at TML had more primary responsibility for operations, such as Mr. Gacheru (Director of Operations), Mr. Misumi (Chairman, responsible for Carnivore's operations), Mr. Muhia (GM of Carnivore), and Mr. Kelliher (Pre and Post Hotel Opening General Manager). Tamarind Management Ltd. Information Memorandum, November 2018 (Seex_000002-000058), at 020-021.

[110] Smith, M., Yagan, D., Zidar, O. & Zwick, E. 2019. Capitalists in the twenty-first century, *The Quarterly Journal of Economics, 1-72;* CEO Report, p. 4.

[111] For example, Becker, S.O. & Hvide, H.K. 2022. Entrepreneur death and startup performance, *Review of Finance*, 163-185.

[112] For example, Choi, Joonkyu, Nathan Goldschlag, John C. Haltiwanger, and J. Daniel Kim. *Founding teams and startup performance.* National Bureau of Economic Research, 2021; Becker, S.O. & Hvide, H.K. 2022. Entrepreneur death and startup performance, *Review of Finance*, 163-185; and Campa, D., Torchia, C.D., Marceselli, C.R.C. & Sargneti, P. 2020. Founder succession and firm performance in the luxury industry. *Corporate Ownership & Control,* 17, 2, 88-96.

[113] Tamarind Management Ltd. Information Memorandum, dated November 2018 (Seex_000002-000058), at 006.

[114] Tamarind Management Ltd. Information Memorandum, November 2018 (Seex_000002-000058), at 006.

- Mr. Seex was not a founder CEO. TML was co-founded by his father in 1972, and his father died in 2009. Mr. Seex assumed the CEO role in 2018. Mr. Seex became CEO more than 45 years after TML's founding, making his status closer to a professional CEO than a founder (entrepreneur) CEO.[115] Unlike a founder CEO, a professional CEO takes on the leadership of an already established business.

- Pass-through entities are often smaller single-establishment businesses where the CEO or owner typically plays a more significant role in day-to-day operations and decision-making and whose own labor may be an important source of firm revenues (e.g., consultants, lawyers, tradespeople, doctors, dentists). The loss of an owner of such a business can create significant loss of value. However, TML is not a pass-through entity / sole proprietorship.[116] At the time of Mr. Seex's death, the company had a board of directors and a senior management team that oversaw various aspects of the business. This organizational structure provided a level of continuity and oversight that is absent from many pass-through entities / sole proprietorships. Furthermore, TML's profits derive mainly from revenues from restaurant, hotel, or catering rather than the CEO or owner's own direct labor.

## VI. THE EVIDENCE DOES NOT SHOW DIMINUTION IN VALUE OF TML AS A RESULT OF MR. SEEX'S DEATH

80. Ascent's March 30, 2019, LOI did not revise the valuation method of Ascent's March 6, 2019, LOI, i.e., 6.0x times 2018 normalized sustainable EBITDA.[117] This provides contemporaneous evidence from a third-party investor that there was not expected to be any loss of business value as a result of Mr. Seex's death. Thus, based on the March 30, 2019, LOI, there are no damages attributable to diminution in value of Plaintiffs' shares in TML.

---

[115] https://www.howwemadeitinafrica.com/quitting-is-never-an-option-says-kenyan-restaurant-entrepreneur/23842/#:~:text=The%20Tamarind%20Group%20goes%20back,and%20two%20of%20Asian%20origin., last accessed January 2, 2025.

[116] TML is subject to corporate income tax, whereas a pass-through entity is not, as it passes profits to owners. *See, e.g.*, Tamarind Management Limited, Annual report and financial statements for the year ended September 30, 2018, Note 7 (Tax) and Note 24 (Country of Incorporation). Audited Financials 2018-2023 (Seex_000319-000479), at 339 and 349.

[117] Ascent Capital Letter of Intent, March 6, 2019; Ascent Capital Letter of Intent, March 30, 2019 (Seex_000278-000281).

81. Plaintiffs' response to interrogatories claims that the March 30, 2019, LOI offer was contingent on finding a replacement for Jonathan Seex with the "same skills, abilities and experience," that TML was not able to find such a replacement, and that the transaction with Ascent did not proceed.[118] I have not seen any evidence of all of the factors that might have led to the transaction not closing, nor any evidence for the reasons a suitable CEO replacement was not found. Regardless of whether the transaction did not close due to failure to find a suitable CEO replacement, the 2019 LOIs do not provide any evidence of any expected loss in value due to Mr. Seex's death. The fact that the valuation based on 6.0x 2018 EBITDA was not modified provides evidence that, as of Dr. Shenkar's valuation date on March 10, 2019, the parties involved believed that a suitable replacement CEO could be obtained without affecting firm value. Even if the transaction were not completed due to failure to obtain a replacement CEO, that does not provide information sufficient to calculate any lost value due to Mr. Seex's death, as the reasons for such a failure to find a replacement would be relevant to assessing whether there was any loss in value related to Mr. Seex's death from other factors that may have intervened in preventing hiring a replacement CEO.

82. Dr. Shenkar claims that Ascent's 2020 LOI provides evidence of loss in value due to Mr. Seex's death.[119] The 2020 LOI valued the company's equity in June 2020 at about $1.1 million, which appears to be a pre-money valuation.[120] This value is significantly lower than the pre-money valuation of about $5 million as of the March 30, 2019, LOI.

83. Dr. Shenkar argues that the decline in value between the March 2019 LOI and the June 2020 LOI "mostly reflects the lack of an equivalent CEO replacement."[121] Dr. Shenkar is incorrect and provides no basis for this opinion. Dr. Shenkar provides no evidence for why a replacement CEO was not found between March 2019 and June 2020. Absent

---

[118] Plaintiffs' Supplemental Answers and Objections to Defendant the Boeing Company's First Set of Damages Interrogatories, June 10, 2024, p. 4. The March 30, 2019, LOI specified that that the parties to the agreement would "work closely together … to identify and agree on a suitable CEO to be appointed latest on signing of the transaction documents." However, finding a suitable CEO was not listed as a "condition precedent" to the transaction. Ascent Capital Letter of Intent, March 30, 2019 (Seex_000278-000281), at 279.

[119] TML Report, Appendix: Letters of Intent", p. 8.

[120] The pre-money valuation implied by Ascent's 68% proposed stake is higher than $1.1 million; however, that may reflect expected value enhancement from Ascent's capital infusion.

[121] TML Report, Appendix: Letters of Intent", p. 8.

such evidence, it is not possible to determine whether any loss in value related to the loss of Mr. Seex or other factors. Dr. Shenkar also provides no evidence supporting his assertion that the 2020 LOI "had likely been written" before covid.[122] To the contrary, one would expect a sophisticated investor would not ignore the significant impact of covid in proposing transactions. TML itself noted the significant impact of covid on the business in its FY 2019 financial statements.[123] Finally, Dr. Shenkar's view that the decline in value is "mostly" related to the lack of an equivalent CEO ignores the fact that the 2020 LOI does not contain any discussion at all, let alone any transaction contingencies, related to finding a replacement CEO.

## VII.    CONCLUSION

84.    Dr. Shenkar's valuation analyses are unreliable due to methodological errors and his reliance on unsupported assumptions. Dr. Shenkar's valuation of TML with Mr. Seex is unreasonably high and contradicted by reliable contemporaneous indications of TML's value in 2019 based on Ascent's letters of intent. The significant flaws in Dr. Shenkar's valuation methods and assumptions result in an unreliable and upwardly biased estimate of Plaintiffs' loss of TML equity value resulting from Mr. Seex's death.

85.    Dr. Shenkar relies on a highly flawed application of the economic literature on the value impact of CEO death in developing his DCF forecast assumptions. Dr. Shenkar's analysis is at odds with the majority of the literature finding small (if any) value impacts from the sudden death of a CEO. His appeal to studies finding larger effects rests on unsupported assertions and assumptions about Mr. Seex, ignores that some of those larger effects are still rather small, and ignores that the studies finding the largest effects are not applicable to the case of Mr. Seex and TML.

---

[122] TML Report, Appendix: Letters of Intent", p. 8.

[123] "Whilst the virus is still in its early stages in Kenya, the effect of the virus globally is being felt on the company which has since seen significant scaling down of its operations due to cancellations." The FY 2019 financial statements are dated September 25, 2020. TML's auditors noted that "the company's trading activities have been seriously disrupted subsequent to the year-end by the effects of the outbreak of COVID-19" and that such conditions indicate a material uncertainty casting doubt on the ability of TML to continue as a going concern. Tamarind Management Limited, Annual Report and Financial Statements for the Year Ended 30 September 2019, Note 2a) and Report of the Independent Auditor to the Members of Tamarind Management Limited, Audited Financials 2018-2023 (Seex_000319-000479), at 364 and 358.

86.  Ascent's LOIs in 2019 provide reliable contemporaneous evidence that there was no diminution of value as a result of Mr. Seex's death.


_____

Aaron Dolgoff

**Appendix A: Documents Considered**

**Case Documents**

1. Complaint At Law in re Nadege Dubois-Seex, et al., v. The Boeing Company, 1:19-cv-02170 (United States District Court for the Northern District of Illinois, Eastern Division), filed May 30, 2019 (the "Complaint")
2. Expert Report of Oded Shenkar, Ph.D. (CEO/Founder's Death and Company Value), November 30, 2024 ("CEO Report")
3. Expert Report of Oded Shenkar, Ph.D. (Lifetime Earnings Analysis for Jonathan Seex), November 30, 2024, ("Lifetime Earnings Report")
4. Expert Report of Oded Shenkar, PhD (Evaluating Tamarind Management Limited (TML) & The Impact of Mr. Seex's Death), November 30, 2024 ("TML Report)
5. Plaintiffs' Supplemental Answers and Objections to Defendant the Boeing Company's First Set of Damages Interrogatories, June 10, 2024

**Additional Discovery Documents**

6. Ascent Capital Letter of Intent, June 20, 2020 (Seex_000282-000284)
7. Ascent Capital Letter of Intent, March 30, 2019 (Seex_000278-000281)
8. Ascent Capital Letter of Intent, March 6, 2019
9. financial_summary_2015-2019
10. Jonathan Seex tax return 2015-2019
11. Seex CV
12. Tamarind Management Limited, Annual report and financial statements for the year ended September 30, 2018, Audited Financials 2018-2023 (Seex_000319-000479)
13. Tamarind Management Limited, Annual report and financial statements for the year ended September 30, 2019, Audited Financials 2018-2023 (Seex_000319-000479)
14. Tamarind Management Limited, Annual report and financial statements for the year ended September 30, 2020, Audited Financials 2018-2023 (Seex_000319-000479)
15. Tamarind Management Limited, Annual report and financial statements for the year ended September 30, 2021, Audited Financials 2018-2023 (Seex_000319-000479)
16. Tamarind Management Ltd. Information Memorandum, November 2018 (Seex_000002-000058)
17. tamarind_valuationv9

## Research Articles and Textbooks

18. Aktas, N. and Boone, A., 2024. The private deal process in mergers and acquisitions. Handbook of Corporate Finance

19. Becker, S.O. & Hvide, H.K., 2022. Entrepreneur death and startup performance, Review of Finance

20. Borokhovich, Kenneth A., Kelly R. Brunarski, Maura S. Donahue, and Yvette S. Harman., 2006. The importance of board quality in the event of a CEO death. Financial Review 41, no. 3

21. Campa, D., Torchia, C.D., Marceselli, C.R.C. & Sargneti, P. 2020. Founder succession and firm performance in the luxury industry. Corporate Ownership & Control, 17, 2

22. Choi, J., Goldschlag, N., Haltiwanger, J. & Kim, J.D. 2021. Founding teams and startup performance, Working Paper, NBER

23. Choi, J., Goldschlag, N., Haltiwanger, J. & Kim, J.D. 2019. Founding teams and startup performance, Working Paper, NBER.

24. Combs, J., G., Ketchen, J, Perryman, A.A. & Donahue, M.S. 2007. The moderating effect of CEO power on the board composition-firm performance relationship. Journal of Management Studies, 44, 8

25. Damodaran, Aswath, 1999. Estimating risk parameters, Working Paper

26. Efendioglu, A. & Muscat, E. 2009. Internal disruptions in family business succession: Death, divorce, and disability. The Journal of Industrial Relation and Human Resources, 11, 1

27. Holthausen, Robert W, and Mark E. Zmijewski, 2020. Corporate Valuation: Theory, Evidence & Practice, Second Edition, Cambridge Business Publishers

28. Internal Revenue Service, 2009. Discount for Lack of Marketability Job Aid for IRS Valuation Professionals

29. Jenter, D., Matveyev, E. & Roth, L., 2018. Good and bad CEOs, Working Paper, HBS EMC Conference

30. Limbach, P. & Sonnenburg, F., 2015. Does CEO fitness matter? Center for Financial Research, University of Cologne, CFP Working Paper # 14-12

31. McConaughy, D.L., Walker, M.C., Henderson, G.V. & Mishra, C.S., 2000. Founding family-controlled firms: Efficiency and value, Review of Financial Economics, 7, 1

32. McKinsey & Company Inc., Tim Koller, Marc Goedhart, and David Wessels, 2020. Valuation: Measuring and Managing the Value of Companies, Seventh Edition, Wiley

33. Nielsen, K.T. & von Meyerinck, F., 2018. Managerial networks and shareholder value: evidence from sudden deaths. Working Paper, University of St. Gallen/ Swiss Institute of Banking and Finance (S/BF-HSG)

34. Quigley, Timothy J., Craig Crossland, and Robert J. Campbell, 2017. Shareholder perceptions of the changing impact of CEOs: Market reactions to unexpected CEO deaths, 1950–2009." Strategic Management Journal 38, no. 4

35. Shannon P. Pratt and Alina V. Niculita, 2008. Valuing a Business: The Analysis and Appraisal of Closely Held Companies, 5th edition, McGraw-Hill

36. Sincerre, B.P., 2021. Unexpected CEO death and its consequences for firm performance. São Paulo, Brazil: University Getulio Vargas (doctoral dissertation)

37. Smith, Matthew, Danny Yagan, Owen Zidar, and Eric Zwick, 2019. Capitalists in the twenty-first century. The Quarterly Journal of Economics 134, no. 4

38. Stout Risius Ross, 2013. The M&A Buy Side Process: An Overview for Acquiring Companies

39. Zhang, Y., 2015. How does untimely death of an executive affect stock prices and company performance? All Graduate Plan B and other Reports. 454


## Websites and Other Sources

40. Central Bank of Kenya https://www.centralbank.go.ke/uploads/interest_rates/2082348623_Central%20Bank%20Rates.csv, last accessed January 12, 2025

41. https://www.businessdailyafrica.com/bd/lifestyle/profiles/hands-on-hotelier-with-cheery-face-takes-a-bow-2242572, last accessed January 14, 2025

42. https://www.clevelandfed.org/indicators-and-data/inflation-expectations, last accessed January 15, 2025

43. https://corporatefinanceinstitute.com/resources/career/private-equity-vs-investment-banking/, last accessed January 9, 2025

44. https://corporatefinanceinstitute.com/resources/valuation/letter-of-intent-loi-template/, last accessed January 9, 2025

45. https://pages.stern.nyu.edu/~adamodar/New_Home_Page/lectures/approach.html, last accessed January 9, 2025

46. https://pages.stern.nyu.edu/~adamodar/pc/archives/ctryprem18.xlsx, last accessed January 10, 2025

47. https://pages.stern.nyu.edu/~adamodar/pdfiles/eqnotes/privateequity.pdf, last accessed January 9, 2025

48. https://www.centralbank.go.ke/commercial-banks-weighted-average-rates/, last accessed January 12, 2025

49. https://www.centralbank.go.ke/inflation-rates/, last accessed January 12, 2025

50. https://www.howwemadeitinafrica.com/quitting-is-never-an-option-says-kenyan-restaurant-entrepreneur/23842/#:~:text=The%20Tamarind%20Group%20goes%20back,and%20two%20of%20Asian%20origin., last accessed January 2, 2025

51. International Monetary Fund, Inflation Rate, Average Consumer Prices, Annual Percent Change, available at https://www.imf.org/external/datamapper/PCPIPCH@WEO/KEN/USA, last accessed last accessed January 9, 2025

52. LSEG



**Appendix B**

## AARON DOLGOFF
Vice President

M.A., The Johns Hopkins University, School of Advanced International Studies

B.S.E., University of Pennsylvania, Wharton School of Business

B.A., University of Pennsylvania, College of Arts & Sciences

Mr. Dolgoff is a Vice President in CRA's Financial Markets practice based out of the Charlotte metro area and CRA's Boston office. Mr. Dolgoff focuses on litigation matters requiring specialized securities valuation and corporate finance expertise. His experience includes both securities litigation analysis of damages, loss causation as well as general valuation, economic, and financial analysis. In his prior work at Monitor Group, Mr. Dolgoff specialized in corporate finance and its application to corporate and business unit strategy, investment, and organization.

Mr. Dolgoff has been a Chartered Financial Analyst (CFA) charterholder since 2007.

### EXPERTISE

### Securities Litigation / Class Certification, Damages, and Loss Causation

Consulting and expert witness support related to class certification, loss causation, damages, and related issues. Selected case experience:

- Analysis of damages and loss causation claims related to defamation and tortious interference claims arising out of news broadcasts about an agricultural product.

- Analysis of damages and loss causation claims related to civil RICO and breach of contract claims in complex commercial dispute.

- Analysis of foreign exchange transactions for regulatory investigation of broker-dealer related to allegations of collusion manipulation in foreign exchange markets.

- Damages analysis and opinions in several auditor malpractice suits, including claims by stockholders, bondholders, and corporate entities;

- Market efficiency opinions for class certification in 10b-5 securities suits;

- Assessment of materiality of information disclosures in insider trading matters;

- Valuation of emerging markets gold mine projects in international arbitrations of alleged expropriation (two separate arbitration proceedings);

- Valuation of preferred shareholder claims in going-private real estate investment trust (REIT) transactions;

- Regulatory investigation of alleged market manipulation claims by municipal issuer of auction rate securities during credit crisis;

- Litigation related to executive compensation and employee stock options:

  o Class action and related derivative lawsuit on behalf of auditor defendant in options backdating matter;

  o Damages related to executive stock options exchanged in merger transaction;

  o Analysis of alleged compensation-related incentives for management to misstate earnings;

  o Damages for lost compensation related to dismissal of hedge fund manager.

  o Damages for lost compensation related to dismissal of private equity fund investor relations officer.

Related areas of expertise:

- Corporate securities valuation (stock, bonds, bank loans)

- Derivatives securities valuation (e.g., forwards, swaps, futures, options)

- Cost of capital

- Market efficiency

- Real options valuation

- Securities price inflation and valuation of financial statement misstatements and omissions

- Portfolio and investment performance analysis

## Business Consulting in Strategy and Financial Analysis

Consultant on variety of projects related to strategic and corporate finance issues. Selected experience includes:

- Creation of financial executive information system for major diversified agribusiness

- M&A analysis for truck OEM considering a JV, divestiture and acquisition options.

- Application of real options to assess business exit decision for aerospace business.

- Valuation of goodwill for asset impairment tests under FASB 141/142.

- Redesign executive compensation plan for European pharmaceutical company.

- Evaluation of growth options for low margin, low growth healthcare supplies distributor.

## EXPERIENCE

2015–Present    *Vice President*, Charles River Associates

2003–2015    *Principal*, Charles River Associates

> Manage projects and analytical research in support of litigation expert witness reports and testimony related to securities fraud, damages estimation, compensation disputes, financial markets issues, and commercial disputes.  Provide valuation analysis related to corporate entities and financial securities.  Specific experience valuing employee stock options and corporate-issued securities including stock, preferred stock, convertible securities, bonds and other debt securities, and derivative claims.

1997–2003    *Consultant, Monitor* Group, Cambridge, MA

> Founding member and co-leader of Monitor Corporate Finance with lead responsibility for resource allocation, recruitment, training and performance evaluations.  Performed original research and developed finance products, methodologies and tools in the areas of shareholder value management, investment valuation, real options applications, compensation design, and financial analysis. Project team leader for consulting projects related to corporate and business unit strategy, M&A and investment choices, corporate finance and organizational effectiveness.  Designed and led Monitor's global corporate finance training program.

1993–1996    *Senior Project Manager*, Strategic Management Group, Philadelphia, PA

> Project manager and lead developer of business simulations used as case study in corporate training and development seminars.  Developed system dynamics modeling techniques to improve realism of business simulations.  Designed and co-authored overhaul of strategy and finance curricula; lectured on wide finance and strategy topics.

## CERTIFICATIONS

Chartered Financial Analyst – 2007 to present

## EXPERT WITNESS

Expert rebuttal report submitted in private, confidential arbitration on behalf of respondent, November 22, 2024.  *Opinions related to the value of equity compensation payable to claimant after employment termination.*

Expert report submitted in private, confidential arbitration on behalf of claimant, August 30, 2024; supplemental report September 16, 2024; deposition September 18, 2024; hearing testimony September 28, 2024.  *Opinions related to the value of an allocation of private equity fund carried interest in a dispute related to alleged breach of an employment contract.*

Jeffrey Qiuhong Yang v. Global Win Capital Corporation, et al, Superior Court for the State of California, County of Los Angeles, Case No. 20STCV45192, deposition, April

19, 2024. *Rebuttal opinions related to alleged damages from forfeited stock appreciation rights.*

United States of America v. Ramkumar Rayapureddy, U.S.DC for the Western District of Pennsylvania, 2:22-cr-00285, expert disclosure submitted, December 13, 2023. *Opinions related to alleged material nonpublic information in insider trading case.*

Square Robot, Inc. v. Eric Levitt, Superior Court of the Commonwealth of Massachusetts, Suffolk, C.A. No. 2284-CV-02620, expert report and hearing testimony, December 6, 2023. *Opinions related to valuation of defendant's shares.*

Tiago Anes v. Setra Systems, Inc., Superior Court of the Commonwealth of Massachusetts, Middlesex, C.A. No. 2181-CV-0153, expert reports, November 6, 2023, and August 9, 2024. *Opinions related to alleged lost compensation.*

FS Medical Supplies, LLC v. Tanner Pharma UK Limited, et al., U.S.D.C for the Western District of North Carolina, Charlotte Division, 3:23-cv-00598-GCM-SCR, expert declaration, September 15, 2023; supplemental expert declaration October 5, 2023; expert report, September 11, 2024; expert reply report, November 12, 2024; deposition December 5, 2024. *Opinions related to breach of contract damages and solvency of defendant at times of dividend distributions.*

United States of America v. Christopher Jordan, U.S.D.C for the Northern District of Illinois, Eastern Division, 19-cr-00669, expert declaration, July 25, 2023. *Rebuttal opinions during sentencing phase related to quantification of investor losses from alleged "spoofing" in precious metals futures.*

Oklahoma Firefighters Pension & Retirement System, derivatively on behalf of Cannae Holdings, Inc. v. William P. Foley, et al., In the Court of Chancery of the State of Delaware, C. A. No. 2020-08-01-KKSJM, expert affidavit, May 4, 2023. *Opinions related to the value of certain settlement terms.*

WBC Extrusion Products, Inc. v. Wolf Jachimowicz and Christian Ganser, Superior Court of the Commonwealth of Massachusetts, Suffolk, C. A. No. 2077-CV-00909, expert report, December 9, 2022; reply report, March 2, 2023; deposition April 13, 2023. *Opinions related to damages resulting for alleged breach of representations in a merger dispute.*

Expert report submitted in private, confidential arbitration on behalf of claimant, September 14, 2022. *Opinions related to impact on prospects for obtaining board positions arising from alleged wrongful denial of promotion in a pharmaceutical company.*

Chee Lee v. Academy Ltd., 113th Judicial District Court of Harris County, TX, 2020-73370, expert rebuttal report, August 29, 2022. *Rebuttal opinions related to alleged lost value of employee stock options.*

Expert rebuttal report submitted in private, confidential arbitration on behalf of respondents, February 18, 2022. *Rebuttal opinions related to damages from employment termination of a private fund investment manager.*

Expert rebuttal report submitted in private, confidential arbitration on behalf of respondents, March 29, 2021. *Rebuttal opinions related to damages from alleged defamation.*

Northrop Grumman Innovation Systems, Inc. v. Zurich American Insurance Company, et al., Superior Court of the State of Delaware, C. A. No. N18C-09-210 PRW CCLD, expert report submitted October 14, 2020; deposition January 21, 2021. *Rebuttal opinions related to reasonableness of securities litigation settlement.*

Expert report submitted in private, confidential arbitration on behalf of respondent, May 2020. *Opinions related to the impact of the announcement of a pharmaceutical company executive's employment termination on the company's capital raise.*

The People of the State of New York v. Laurence G. Allen, et al., Supreme Court of the State of New York, 452378/2019, testimony at preliminary injunction hearing, February 3, 2020; affidavit and expert rebuttal report, January 7, 2021; deposition January 8, 2021; trial testimony January 13, 2021. *Opinions related to the valuation of investments that defendant directed private funds to make in a related broker-dealer business.*

Securities and Exchange Commission v. Gregory Lemelson, Lemelson Capital Management, LLC and the Amvona Fund, LP, U.S.D.C for Massachusetts, 1:18-cv-11926-PBS, expert report submitted January 17, 2020, deposition May 27, 2021. *Opinions related to price impact of alleged misstatements.*

Arbitration related to 1040, Inc., et al. v. Jackson Hewitt Inc., Superior Court of New Jersey, Docket. No. HUD-L-005179-17, expert report submitted November 13, 2019 and arbitration testimony December 9, 2019. *Opinions on behalf of plaintiffs related to cost accounting under franchising agreement.*

Christopher Ashton and Natasha Ashton v. Fetch Inc., et al, In the Court of Chancery of the State of Delaware, C.A. No. 2018-0743-KSJM, expert report submitted February 18, 2019, deposition March 4, 2019, and trial testimony April 26, 2019. *Opinions on behalf of plaintiffs related to damages due to alleged violation of plaintiffs' consent rights over certain corporate actions.*

Barrett Financial of North Jersey and Edward P. Barrett v. New England Life Insurance Company, U.S.D.C for New Jersey, 14-cv-3316, expert report submitted June 9, 2017, deposition November 15, 2017, and trial testimony February 14, 2019. *Rebuttal opinions related to business valuation in dispute related to breach of a managing partner agreement; jury awarded no damages related to plaintiff's claims for lost business value.*

Patrick F. Downing v. Omnicare, Inc., et al, U.S.D.C for Massachusetts, 1:15-cv-11853-PBS, expert report submitted December 8, 2017. *Opinions related to lost compensation.*

Benjamin Marzouk v. CIT Group Inc. and James Hudak, Supreme Court of the State of New York, 652515/2012, expert report submitted July 22, 2016 and deposition August 19, 2016. *Rebuttal opinions related to alleged lost compensation.*

Jennifer Furlonge v. Boston Medical Center, et al, U.S.D.C. for Massachusetts, 1:14-cv-10389, expert report submitted May 27, 2015. *Rebuttal opinions related to alleged lost compensation.*


## PUBLICATIONS

Copeland, Tom, Aaron Dolgoff, and Alberto Moel, "The Role of Expectations in Explaining the Cross-Section of Stock Returns," *Review of Accounting Studies,* v. 9, no. 2-3 (2004) (Presented at the Review of Accounting Studies 2003 Conference).

Copeland, Tom, and Aaron Dolgoff, "Expectations-Based Management," *Journal of Applied Corporate Finance*, v. 18, no. 2 (2006).

Outperform with Expectations-Based Management™, Tom Copeland and Aaron Dolgoff, New Jersey: John Wiley & Sons (2005).

Dolgoff, Aaron and Tiago Duarte-Silva, "Event Studies Using Forward-Looking Information," working paper (2013).

Dolgoff, Aaron and Tiago Duarte-Silva, "Fund Performance Indicators the SEC May be Watching," Law360 (May 2014).

Dolgoff, Aaron and Tiago Duarte-Silva, "Event Studies Using Contemporaneous Forward-Looking Information," Securities Litigation, American Bar Association Section of Litigation, vol. 25, no. 4 (2015).

Dolgoff, Aaron and Tiago Duarte-Silva, "Prejudgment Interest: An Economic Review of Alternative Approaches," *Journal of International Arbitration*, vol. 33, no. 1 (2016).

Dolgoff, Aaron and Tiago Duarte-Silva, "Fund Performance Indicators the Securities and Exchange Commission May Be Watching," *ABA Business and Commercial Litigation Journal* (Summer 2016).

Dolgoff, Aaron and Tiago Duarte-Silva, "Prejudgment Interest and the Fallacy of the Invalid Round Trip," *World Arbitration and Mediation Review*, vol. 10, no. 3 (2016).

Dolgoff, Aaron and Tiago Duarte-Silva, "Prejudgment Interest: What is a 'Normal Commercial Rate'?" *Kluwer Arbitration Blog* (February 2017).

Walker, Melanie E., Nicholas K. Tygesson, and Aaron Dolgoff, "Section 11 Damages and Stock-for-Stock Acquisitions: Legal and Economic Considerations," Bloomberg Law (October 2019).

Duarte-Silva, Tiago, Aaron Dolgoff, and Julian DiPersio, "Pre-Award Interest: The Appropriate Spread on Interest Rate Benchmarks," *Journal of Damages in International Arbitration*, vol. 7, no. 2 (2022)

Dolgoff, Aaron, Tiago Duarte-Silva, and Julian DiPersio, "The End of Libor: Which Benchmark Rate for Pre-Award Interest?" Institute for Transnational Arbitration, *ITA In Review*, vol. 4, no. 3 (2023)

*CRA Insights*

- Litigation Implications of the Auction Rate Security Market Freeze (May 2008)
- Securities Litigation Settlement Costs if Large Shareholders Opt Out (June 2013)
- Halliburton v. Erica P. John Fund: Potential Impacts on Expert Analysis (April 2014)
- The Municipal Bankruptcy Crisis: Lessons from Detroit (July 2014)
- Price Impact of Disclosures Before, During, or After a Trading Day: Implications for Event Studies (August 2014)
- Measuring Price Impact with Investors' Forward-looking Information (August 2014)
- "Commercial rates" as prejudgment interest in international arbitration (September 2015)
- Implementation issues in setting prejudgment interest (March 2016)
- Factors affecting variations in securities class action claims rates (October 2020)
- Section 11 damages computation for direct listings (May 2022)
- Pre-award interest: Is LIBOR+2% a reasonable commercial rate? (June 2022)

- The end of LIBOR: Which benchmark rate for pre-award interest? (June 2022)
- Slack v. Pirani: Will the Section11 tracing requirement lead to more direct listings? (June 2023)
- Tesla Board compensation derivative suit settlement (January 2024)

## SPEECHES AND PRESENTATIONS

"Fundamentals of Event Studies," Guest Speaker, United States Securities and Exchange Commission (SEC), Division of Enforcement, Chicago, Illinois, June 25, 2012.

"Defeating Class Certification by Attacking Plaintiffs' Classwide Damages Models," panelist for Strafford CLE webinar, December 22, 2015.

"Opposing Class Certification by Attacking Plaintiffs' Classwide Damages Methods," panelist for Strafford CLE webinar, December 20, 2016.

"The Role of Risk in Equity Compensation Disputes," New York State Management Attorneys Conference, Spring Meeting, May 5, 2019.

**Exhibit 1**
**Impact on Value from Discount Rate (WACC) Adjustment**
(currency as indicated)

| | | Value at Dr. Shenkar WACC [a] | Value at 15.3% WACC [b] | Difference [c] | % Difference [d] |
|---|---|---|---|---|---|
| | Value in Kenyan Shillings (KES) | | | | |
| | *Value of TML* | | | | |
| [1] | Value of TML with Mr. Seex (8.02% growth rate) | 2,971,576,552 | 346,607,900 | (2,624,968,652) | -88% |
| [2] | Value of TML with Mr. Seex (6.52% growth rate) | 1,256,065,933 | 309,027,967 | (947,037,966) | -75% |
| [3] | Value of TML without Mr. Seex | 615,455,379 | 256,832,394 | (358,622,985) | -58% |
| | | | | | |
| | *Plaintiffs' 26.87% Share* | | | | |
| [4] | Value of TML with Mr. Seex (8.02% growth rate) | 798,462,620 | 93,133,543 | (705,329,077) | -88% |
| [5] | Value of TML with Mr. Seex (6.52% growth rate) | 337,504,916 | 83,035,815 | (254,469,101) | -75% |
| [6] | Value of TML without Mr. Seex | 165,372,860 | 69,010,864 | (96,361,996) | -58% |
| | | | | | |
| | Value in U.S. Dollars ($), at exchange rate used by Dr. Shenkar | | | | |
| [7] | Value of TML with Mr. Seex (8.02% growth rate) | 22,954,909 | 2,677,485 | (20,277,423) | -88% |
| [8] | Value of TML with Mr. Seex (6.52% growth rate) | 9,702,890 | 2,387,187 | (7,315,703) | -75% |
| [9] | Value of TML without Mr. Seex | 4,754,285 | 1,983,985 | (2,770,300) | -58% |
| | | | | | |
| | *Plaintiffs' 26.87% Share* | | | | |
| [10] | Value of TML with Mr. Seex (8.02% growth rate) | 6,167,984 | 719,440 | (5,448,544) | -88% |
| [11] | Value of TML with Mr. Seex (6.52% growth rate) | 2,607,166 | 641,437 | (1,965,729) | -75% |
| [12] | Value of TML without Mr. Seex | 1,277,476 | 533,097 | (744,380) | -58% |
| | | | | | |
| | *Change in Value of Plaintiffs' Shareholdings* | | | | |
| [13] | Change in Value from Value of TML with Mr. Seex at 8.02% growth rate | 4,890,508 | 186,343 | (4,704,164) | -96% |
| [14] | Change in Value from Value of TML with Mr. Seex at 6.52% growth rate | 1,329,690 | 108,340 | (1,221,350) | -92% |

Notes and Sources:
Values in KES are calculated in Exhibit 1.1.
U.S. dollar values are converted at an exchange rate derived from Dr. Shenkar's valuation conclusions comparing U.S. $ to KES values (approx. 129.45)

**Exhibit 1.1**
**Valuations at Alternative Weighted Average Cost of Capital (WACC)**
(KES)

| | | Total | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | Terminal Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | [a] | [b] | [c] | [d] | [e] | [f] | [g] | [h] | [i] | [j] | [k] | [l] | [m] |
| | **Value of TML with Mr. Seex (8.02% growth rate)** | | | | | | | | | | | | | |
| | *Value at 8.97% WACC* | | | | | | | | | | | | | |
| [1] | Free cash flows and terminal value | | 14,255,288 | 16,393,581 | 18,852,618 | 21,680,511 | 24,932,588 | 28,672,476 | 32,973,347 | 37,919,349 | 43,607,252 | 50,148,340 | 57,670,591 | 6,557,449,686 |
| [2] | Discount factor | | | 0.918 | 0.842 | 0.773 | 0.709 | 0.651 | 0.597 | 0.548 | 0.503 | 0.462 | 0.424 | 0.424 |
| [3] | Present Values | 2,971,576,552 | | 15,044,123 | 15,876,610 | 16,755,163 | 17,682,333 | 18,660,808 | 19,693,429 | 20,783,191 | 21,933,256 | 23,146,962 | 24,427,830 | 2,777,572,848 |
| | *Value at 15.3% WACC* | | | | | | | | | | | | | |
| [4] | Free cash flows and terminal value | | | 16,393,581 | 18,852,618 | 21,680,511 | 24,932,588 | 28,672,476 | 32,973,347 | 37,919,349 | 43,607,252 | 50,148,340 | 57,670,591 | 855,711,154 |
| [5] | Discount factor | | | 0.867 | 0.752 | 0.652 | 0.566 | 0.491 | 0.426 | 0.369 | 0.320 | 0.278 | 0.241 | 0.241 |
| [6] | Present Values | 346,607,900 | | 14,218,197 | 14,181,203 | 14,144,304 | 14,107,502 | 14,070,796 | 14,034,185 | 13,997,669 | 13,961,249 | 13,924,923 | 13,888,691 | 206,079,181 |
| | **Value of TML with Mr. Seex (6.52% growth rate)** | | | | | | | | | | | | | |
| | *Value at 8.97% WACC* | | | | | | | | | | | | | |
| [7] | Free cash flows and terminal value | | 14,255,288 | 16,393,581 | 18,852,618 | 21,680,511 | 24,932,588 | 28,672,476 | 32,973,347 | 37,919,349 | 43,607,252 | 50,148,340 | 57,670,591 | 2,507,376,047 |
| [8] | Discount factor | | | 0.918 | 0.842 | 0.773 | 0.709 | 0.651 | 0.597 | 0.548 | 0.503 | 0.462 | 0.424 | 0.424 |
| [9] | Present Values | 1,256,065,933 | | 15,044,123 | 15,876,610 | 16,755,163 | 17,682,333 | 18,660,808 | 19,693,429 | 20,783,191 | 21,933,256 | 23,146,962 | 24,427,830 | 1,062,062,229 |
| | *Value at 15.3% WACC* | | | | | | | | | | | | | |
| [9] | Free cash flows and terminal value | | | 16,393,581 | 18,852,618 | 21,680,511 | 24,932,588 | 28,672,476 | 32,973,347 | 37,919,349 | 43,607,252 | 50,148,340 | 57,670,591 | 699,666,437 |
| [10] | Discount factor | | | 0.867 | 0.752 | 0.652 | 0.566 | 0.491 | 0.426 | 0.369 | 0.320 | 0.278 | 0.241 | 0.241 |
| [11] | Present Values | 309,027,967 | | 14,218,197 | 14,181,203 | 14,144,304 | 14,107,502 | 14,070,796 | 14,034,185 | 13,997,669 | 13,961,249 | 13,924,923 | 13,888,691 | 168,499,248 |
| | **Value of TML without Mr. Seex** | | | | | | | | | | | | | |
| | *Value at 8.97% WACC* | | | | | | | | | | | | | |
| [12] | Free cash flows and terminal value | | 14,255,288 | 16,393,581 | 18,852,618 | 21,680,511 | 24,932,588 | 28,672,476 | 32,973,347 | 37,919,349 | 43,607,252 | 50,148,340 | 57,670,591 | 994,986,740 |
| [13] | Discount factor | | | 0.918 | 0.842 | 0.773 | 0.709 | 0.651 | 0.597 | 0.548 | 0.503 | 0.462 | 0.424 | 0.424 |
| [14] | Present Values | 615,455,379 | | 15,044,123 | 15,876,610 | 16,755,163 | 17,682,333 | 18,660,808 | 19,693,429 | 20,783,191 | 21,933,256 | 23,146,962 | 24,427,830 | 421,451,675 |
| | *Value at 15.3% WACC* | | | | | | | | | | | | | |
| [14] | Free cash flows and terminal value | | | 16,393,581 | 18,852,618 | 21,680,511 | 24,932,588 | 28,672,476 | 32,973,347 | 37,919,349 | 43,607,252 | 50,148,340 | 57,670,591 | 482,932,588 |
| [15] | Discount factor | | | 0.867 | 0.752 | 0.652 | 0.566 | 0.491 | 0.426 | 0.369 | 0.320 | 0.278 | 0.241 | 0.241 |
| [16] | Present Values | 256,832,394 | | 14,218,197 | 14,181,203 | 14,144,304 | 14,107,502 | 14,070,796 | 14,034,185 | 13,997,669 | 13,961,249 | 13,924,923 | 13,888,691 | 116,303,675 |

Notes and Sources:
Free cash flows for 2020 through 2029 are based on 15% growth applied to 2019 free cash flow, as calculated by Dr. Shenkar.
The terminal values are equal to 2029 free cash flow * (1 + growth rate) / (WACC - growth rate). The growth rates are 8.02% (as indicated), 6.52% (as indicated), and 3% (for the value of TML without Mr. Seex).