# EXHIBIT 4

# In The Matter Of:
# ETHIOPIAN AIRLINES FLIGHT ET 302 CRASH-
# DAMAGES

_____

# AARON DOLGOFF
February 12, 2025

_____

## *TC REPORTING, INC.*
### *1 DEERFIELD EAST - 1850*
### *QUOGUE, NY.  11959*

AARON DOLGOFF - Vol. I

AARON DOLGOFF

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE ETHIOPIAN AIRLINES
FLIGHT ET 302 CRASH

This document relates to: 1:19-cv-3392

Honorable Jorge L. Alonso
Magistrate Judge Weisman

ZOOM DEPOSITION OF
AARON DOLGOFF

February 12, 2025
9:00 A.M.

Lee Ann Barnes, CCR-1852B, RPR, CRR, CRC

## Page 3

```
1            INDEX OF EXAMINATION
2    WITNESS:  AARON DOLGOFF
3    EXAMINATION                    PAGE
     By Mr. Wisner              7
4    By Ms. Johnson             99
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 2

```
1            APPEARANCES OF COUNSEL
2          (All appearances via Zoom)
3
4    On behalf of Plaintiff:
5      FLOYD WISNER, ESQ.
       WISNER LAW FIRM
6      161 North Clark Street
       Suite 1600
7      Chicago, Illinois 60601
       312-216-5168
8      faw@wisner-law.com
9    On behalf of the Defendant:
10     JULIA MANO JOHNSON, ESQ.
       BAILEY BRANDON, ESQ.
11     WINSTON & STRAWN
       35 W. Wacker Drive
12     Chicago, Illinois  60601-9703
       312-558-5600
13     jmjohnson@winston.com
       bbrandon@winston.com
14
15   Also Present:
16     Chelsea Gilchrist, TC Videoconference Monitor
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1            INDEX TO EXHIBITS
2    Plaintiff's
     Exhibit      Description        Page
3
4    Exhibit Seex-Dolgoff 1     7
         Documents Considered by Dr. Shenkar
5
6    Exhibit Seex-Dolgoff 2     8
         Expert Rebuttal Report of Aaron Dolgoff
7        Dated January 15, 2025
8    Exhibit Seex-Dolgoff 3     10
         Supplemental Report of Aaron Dolgoff
9        Dated February 10, 2025
10   Exhibit Seex-Dolgoff 4     24
         Report entitled "CEO/Founder's Death
11       and Company Value"
12   Exhibit Seex-Dolgoff 5     25
         Document Entitled "Evaluating Tamarind
13       Management Limited (TML) & the Impact of
         Mr. Seex's Death"
14   Exhibit Seex-Dolgoff 6     59
         Letter of Intent Dated March 6, 2019
15
16   Exhibit Seex-Dolgoff 7     60
         Letter of Intent Dated March 30, 2019
17   Exhibit Seex-Dolgoff 8     94
         Article Entitled "Weaponizing
18       Economics:  Big Oil, economic consultants,
         and climate policy delay"
19
20
21       (Original exhibits are attached to the
22   original transcript.)
23
24
25
```

1 (Pages 1 to 4)

AARON DOLGOFF

## Page 5

1          Deposition of AARON DOLGOFF
           February 12, 2025

2

3          (Reporter disclosure made pursuant to
4      Article 8.B of the Rules and Regulations of the
5      Board of Court Reporting of the Judicial
6      Council of Georgia.)
7          VIDEOCONFERENCE MONITOR:  Good morning.
8      This is Videoconference Monitor Chelsea
9      Gilchrist speaking.  We are going on the record
10     at 9:00 a.m. Central time on Wednesday
11     February 12, 2025.
12         This is the deposition of Mr. Aaron
13     Dolgoff in the matter of ET 302 damages filed
14     in the United States District Court for the
15     Northern District of Illinois Eastern Division,
16     Case Number 1:19-CV-3392.
17         The court reporter is Lee Ann Barnes.  She
18     will be participating remotely from her own
19     location via videoconference.  We are from
20     TC Reporting, Inc.
21         I would like to do a roll call for the
22     list of law firms appearing remotely today.
23     After I announce each firm, members of counsel
24     please state your full name on the record so we
25     may note your appearance accordingly.

## Page 6

1          Wisner Law Firm.
2          MR. WISNER:  Floyd Wisner.
3          VIDEOCONFERENCE MONITOR:  Winston &
4      Strawn.
5          MS. JOHNSON:  Julia Johnson and Bailey
6      Brandon.
7          VIDEOCONFERENCE MONITOR:  Is there anyone
8      appearing that has not previously stated their
9      appearance today?
10         (No response.)
11         VIDEOCONFERENCE MONITOR:  I will certify
12     that I will be appearing for tech support and
13     videoconference services for all remote
14     participants.
15         Before we proceed, I will ask that lead
16     counsel for today's deposition to stipulate on
17     the record that we are proceeding according to
18     the Federal Rules of Civil Procedure and that
19     this deposition officer may swear in the
20     deponent even though she is not in the physical
21     presence of the deponent and that there is no
22     objection to this at this time nor will there
23     be an objection to it at any future date.
24         Plaintiff's lead counsel, are you in
25     agreement?

## Page 7

1          MR. WISNER:  Yes.
2          VIDEOCONFERENCE MONITOR:  Defendant's lead
3      counsel, are you in agreement?
4          MS. JOHNSON:  Agreed.
5          VIDEOCONFERENCE MONITOR:  Thank you.
6      Lee Ann, you can swear in the witness.
7          AARON DOLGOFF, having been first duly sworn,
8      was examined and testified as follows:
9          EXAMINATION
10     BY-MR. WISNER:
11     Q.  Mr. Dolgoff, good morning.  My name is
12     Floyd Wisner.  I represent the Seex family in this
13     manner.
14         MR. WISNER:  Chelsea, would you pull up
15     that document that -- I think I've labeled it
16     "Documents Considered by Dr. Shenkar."
17         Do you have that one?
18         VIDEOCONFERENCE MONITOR:  I do.  I will
19     mark this as Exhibit 1.
20         MR. WISNER:  Dolgoff Exhibit 1.  Actually,
21     I kind of like what counsel did yesterday.
22     Let's call it Seex-Dolgoff Number 1.
23         (Plaintiff's Exhibit Seex-Dolgoff 1 was
24     marked for identification.)
25         THE WITNESS:  Will that come up on here?

## Page 8

1          VIDEOCONFERENCE MONITOR:  That should be
2      available now.
3          MS. JOHNSON:  So if you just click on
4      that.  And are you able to navigate?
5          THE WITNESS:  Possibly.  It's a little
6      clunky but I can navigate.
7      BY MR. WISNER:
8      Q.  Mr. Dolgoff, I'll represent to you what's
9      in front of you and we've marked as Seex-Dolgoff
10     Exhibit Number 1 is a list of the documents that I
11     provided to counsel for Boeing of documents
12     considered by our expert, Dr. Oden Shenkar.  Okay?
13         I'd like you now to look at your report
14     which we'll mark as Seex-Dolgoff Exhibit Number 2,
15     and particularly I think it's Appendix A to that
16     report.
17         MS. JOHNSON:  And just to be clear, I
18     handed him a copy of his report dated
19     January 15, 2025.
20         MR. WISNER:  Yeah, that's good.
21         THE WITNESS:  Okay.  I have that.
22         (Plaintiff's Exhibit Seex-Dolgoff 2 was
23     marked for identification.)
24     BY MR. WISNER:
25     Q.  And am I correct that at Appendix A

2 (Pages 5 to 8)

AARON DOLGOFF

Page 9

1    there's a list of case documents and then additional
2    discovery documents and then recent articles and
3    textbooks, right, and websites and other sources?
4    Right, Mr. Dolgoff?
5        A.  Yes, that's correct.
6        Q.  And what I'd like to do, is I -- oh, let
7    me ask you this.
8            A couple of days ago you understand that
9    counsel for Boeing provided us with an additional
10   report from you; right?
11       A.  Yes.
12       Q.  And I've objected to that on the basis of
13   timeliness, but I do want to ask you, you did state
14   in that additional or supplemental report, whatever
15   you call it, that you reviewed some additional
16   documents; right?
17       A.  Yes.
18       Q.  All right.  Now, my question, then, sir,
19   is if you look at my list of the documents I
20   provided to -- that Dr. Shenkar considered, excuse
21   me, and compare that to your list of documents that
22   you considered both in your original report and this
23   alleged supplemental report, I'd like to compare
24   those if you can and confirm for me that you did not
25   consider all the documents that Dr. Shenkar

Page 10

1    considered.
2            MS. JOHNSON:  Floyd, should we mark his
3    supplemental report as Exhibit 3?
4            MR. WISNER:  We can do that as long as you
5    preserve my objections to it.  I'm not going to
6    ask him any questions about it other than have
7    him look at the documents, and I object to the
8    timeliness of it.  But I'm happy to do that.
9    It might make that easier we'll mark that as
10   Seex-Dolgoff Exhibit 3.
11           VIDEOCONFERENCE MONITOR:  I'm not sure I
12   have that, Counsel.
13           MR. WISNER:  You probably have a hard copy
14   of it, Julia.
15           MS. JOHNSON:  I do.  I have a hard copy of
16   the February 10 report which I will hand to
17   Mr. Dolgoff now and which we've marked as
18   Exhibit 3.
19           (Plaintiff's Exhibit 3 was marked for
20   identification.)
21           MR. WISNER:  And we can send it on to
22   Lee Ann and Chelsea later.
23   BY MR. WISNER:
24       Q.  Mr. Dolgoff, do we have all three
25   documents in front of you?

Page 11

1        A.  I do, yes.
2        Q.  And sorry to put you to this task, but if
3    you could just confirm to me that you did not
4    consider all the documents Dr. Shenkar considered in
5    his reports.
6            MS. JOHNSON:  Object to form.
7            THE WITNESS:  That's incorrect.
8    BY MR. WISNER:
9        Q.  Okay.
10       A.  What I see now is, Appendix A of my
11   January 15 report is missing documents.  I think I
12   understand how this happened, but what I see in what
13   you've marked as Exhibit 1, there's certain
14   documents such as the TML Management contract, the
15   hotel sales information, I do recall reviewing
16   those.  I did consider them.  They're not listed in
17   my Appendix A.
18           But that was an oversight which I believe
19   was due to my staff mistakenly listing things that I
20   directly cited in my report and exhibits and not
21   considering the full list of documents I had looked
22   at.
23       Q.  You're throwing your staff under the bus?
24       A.  I'm just telling you how I think it
25   happened.

Page 12

1        Q.  I'm kidding you, Mr. Dolgoff.
2            So I was going to ask you about did you
3    consider Jonathan Seex's CEO contract?
4        A.  Yes, I -- I saw that contract, yes.
5        Q.  And did you consider what I'm terming, I
6    think you are too, there's a brochure about hotel
7    sales.
8            Have you seen that, too?
9        A.  I recall one or two different hotels.  Or
10   one was maybe a hotel; another was maybe a
11   residential property.  I'd have to go refresh my
12   memory looking at them, but yes, I recall a
13   brochure.
14       Q.  Okay.  And then there was another
15   document, Mr. Dolgoff, which I would characterize as
16   Tamarind Management Limited projects.
17           Do you remember seeing that?
18           I can give you a Bates number if you'd
19   like, but I'm just asking if you recall seeing
20   something like that.
21       A.  I -- I don't recall.  I'd have to see the
22   document to tell you whether I looked at it before
23   or not.
24       Q.  Okay.  Do you remember seeing -- or did
25   you consider Jonathan Seex's share certificates or

3 (Pages 9 to 12)

AARON DOLGOFF

## Page 13

1  documents showing his ownership interest?
2      A.  I did -- I did see the share certificates
3  and other schedules that related to that.
4      Q.  You did see that, sir?
5      A.  I did, yes.
6      Q.  Okay.  And did you see Tamarind Management
7  Limited company tax returns, as opposed to financial
8  statements, tax returns?
9      A.  That, I don't recall seeing, but if we
10  open up a copy, I can tell you if I reviewed it or
11  not.
12      Q.  Okay.  And I note from your Appendix A of
13  your report, it looks like you considered audited
14  financial statements from 2018 to 2021.
15      Did you consider any financial statements
16  before or after that period?
17      A.  I did review, I think, financial
18  statements going back as far as I believe fiscal
19  2014.  I don't recall receiving anything later than
20  fiscal 2023.
21      Q.  But you're -- let me ask you about that,
22  then.
23      Your Appendix A to your report says you
24  reviewed audited financial statements from 2018 to
25  2021.

## Page 14

1      I'm asking you if you reviewed financial
2  statements subsequent to 2021.
3      A.  Oh, subsequent to 2021?  Yes, I -- I
4  reviewed 2022 and 2023.
5      Q.  Okay.  Even though it's not listed on your
6  appendix?
7      A.  That's correct.
8      Q.  All right.  And you believe that's for --
9  the reason's just an error; correct?
10      A.  Just an omission, yes.
11      Q.  All right.  Good enough.
12      Now, if you turn to your report which --
13  what did we do? -- we marked as Seex-Dolgoff
14  Number 2, I guess.
15      A.  Okay.
16      Q.  All right.  Will you look at page 1?
17      Maybe I've got that wrong.  Let's see.
18  I'm sorry.  Let me strike that and ask you something
19  else, sir.
20      I understand your report, Mr. Dolgoff, to
21  conclude that the scholarly evidence shows that the
22  sudden death of a CEO to have little, if any, effect
23  on the value of a firm; correct?
24      That's basically one of your opinions?
25      A.  Correct.  For the typical CEO.

## Page 15

1      Q.  Okay.  Well, let me ask you.
2      Wouldn't you agree that if that's true,
3  then why we here?  Why are you here?  Or why -- why
4  make any valuation because any valuation, because
5  any valuation, Dr. Shenkar's or yours, would be
6  random.  It's totally irrelevant.
7      Wouldn't you agree?  If -- if there's
8  little, if any, effect, why are we going further?
9      MS. JOHNSON:  Objection.
10      THE WITNESS:  I can answer why I'm here.
11      I am here because I was asked to respond to
12  Dr. Shenkar's report opinions.
13  BY MR. WISNER:
14      Q.  Okay.  Let me ask a better question.
15      If you are correct that there's little, if
16  any, effect on the value of a firm and no causal
17  connection between the death of a CEO and impact on
18  that firm, then tell me the reason for any other
19  opinions in your report.
20      MS. JOHNSON:  Objection.
21      THE WITNESS:  You're misstating what my
22  opinion was with that question.
23  BY MR. WISNER:
24      Q.  All right.  Tell me your opinion about
25  the -- well, strike that.

## Page 16

1      I thought you agreed with me that your
2  basic opinion is there is little, if any, effect on
3  the value of a firm in the death of a CEO.
4      Isn't that basically your opinion?
5      MS. JOHNSON:  Objection to the extent that
6  misstates prior testimony.
7  BY MR. WISNER:
8      Q.  You can answer.
9      A.  It's my opinion for the case of the
10  typical CEO.
11      Q.  All right.  And that's your opinion for
12  Jonathan Seex and Tamarind Management, isn't it?
13      A.  No, that's incorrect.
14      Q.  Oh, so you believe there is an effect on
15  Tamarind Management Limited from the death of
16  Jonathan Seex?
17      A.  No, I haven't made that determination.
18  I've only responded to Dr. Shenkar's analysis.
19      Q.  Okay.  Well, are you prepared today to
20  tell us whether there is, in your opinion, any
21  effect on the value of TML from the death of
22  Jonathan Seex?
23      A.  I have not seen sufficient evidence to say
24  that that's been the case.
25      Q.  Okay.  Well, let's assume that -- that --

4 (Pages 13 to 16)

AARON DOLGOFF

Page 17

1     a conclusion that there is no evidence of any effect
2     on the value of TML from the death of Jonathan Seex.
3             Is it necessary to go any further, then,
4     to consider any other opinions in your report?
5             MS. JOHNSON:  Objection.
6             THE WITNESS:  If you don't want to discuss
7     the opinions in my report, then that's fine,
8     we -- I don't have to continue, but I'm happy
9     to answer any questions you have about my
10    report.
11    BY MR. WISNER:
12        Q.  Well, I appreciate that.
13            But I'm asking you to tell me why any of
14    your other opinions are relevant if there is no
15    evidence of any causal connection between the death
16    of Jonathan Seex and the impact on the value of TML,
17    Tamarind Management.
18            MS. JOHNSON:  Object to form.
19            THE WITNESS:  I offer many other opinions
20    particularly with regards to the reliability of
21    Dr. Shenkar's methods and analysis and
22    assumptions.
23            (Simultaneous speakers - unclear.)
24    BY MR. WISNER:
25        Q.  I know -- I know you do.  But --

Page 18

1         A.  May I finish my answer, please?
2         Q.  Oh, I'm sorry.  I thought you did.
3     Forgive me.  Go ahead.
4         A.  And that would be relevant to this
5     proceeding to the extent that the Court or fact
6     finders would find it relevant to evaluating his
7     opinions.
8         Q.  Okay.  Are you familiar with the concept
9     known in the scholarly world known as fatal flaw?
10        A.  That does not sound to be a technical
11    term.
12        Q.  And I'll -- I'll define it for you and you
13    can either accept it or reject it as a fatal flaw
14    being an error that cannot be corrected and should
15    rule you out an entire thesis.
16            Are you familiar with that definition?
17        A.  I'll accept that as your definition.  I --
18    if you want to use that definition, that's fine.
19        Q.  Okay.  All right.  Would you turn to your
20    report, please, on page 3, paragraph 10,
21    Mr. Dolgoff?
22        A.  Okay.
23        Q.  You'll see -- tell me, first, if I just
24    read this correctly.  Paragraph 10.
25            "In developing the assumptions used in his

Page 19

1     valuation analysis, Dr. Shenkar relies on a highly
2     flawed application of the economic literature on the
3     value impact of a CEO's death."
4             Did I read that correctly?
5         A.  You did.
6         Q.  And am I correct that you did a systematic
7     review of all the economic literature on the value
8     impact of a CEO's death?
9         A.  No.  Primarily I reviewed papers that
10    Dr. Shenkar cited.  I believe I identified one
11    additional one that he had omitted from his review.
12    I didn't endeavor to see if I could identify the
13    entire literature on CEO deaths.
14        Q.  All right.  So all you did in reaching
15    this conclusion that Dr. Shenkar relies on a highly
16    flawed application of the economic literature on the
17    value impact of a CEO's death is to look at
18    Dr. Shenkar's sources?
19        A.  Primarily, yes.
20        Q.  Well, primarily or did you look at any
21    yourself?  Did you do any review at all?
22        A.  Well, I -- as I said in my earlier answer,
23    I identified one additional paper that didn't change
24    the overall opinions at all.  I -- I did not look at
25    any other papers besides those cited by Dr. Shenkar

Page 20

1     and that one additional.
2         Q.  All right.  Would you look at your report
3     at Appendix A?
4         A.  Yes, sir.
5         Q.  Okay.  Under -- under "Research Articles
6     and Textbooks," do you see that?
7         A.  I do.
8         Q.  There's research articles and textbooks
9     numbered from number 18 all the way through
10    number 39.
11            Are those all from Dr. Shenkar?
12        A.  No.
13        Q.  Which ones are not?
14        A.  Let's see.  Number 25 is not.
15            (Simultaneous speakers - unclear.)
16        Q.  Okay.  Any others?  I'm sorry.
17        A.  Number 27 is not.  28 is not.  32 is not.
18    Number 20 I skipped over; that one is not.
19    Number 18 is not.  31 is not.  And 35, I don't know
20    if I said that one or not already.
21            So the best of my recollection, those are
22    the ones that -- that are not cited by Dr. Shenkar.
23        Q.  So getting back to what you said earlier,
24    you did look at some articles and textbooks yourself
25    that were not cited by Dr. Shenkar?

5 (Pages 17 to 20)

AARON DOLGOFF

Page 21

1    A.  Yes.  The distinction I was making earlier
2  was with regard to the literature on CEO deaths.
3    Q.  Oh.
4    A.  Most of these additional sources relate to
5  other things in the valuation and finance
6  literature.
7    Q.  Okay.
8    A.  So, for example, the McKinsey textbook,
9  number 32, that's a valuation textbook.  The Pratt
10  book, number 35, is a valuation textbook.  Number
11  28, Internal Revenue Service, is a -- is a bulletin
12  the IRS puts out on the research on marketability
13  discounts for valuations and so forth.
14    Q.  All right.  Thank you for that
15  clarification.
16      So your earlier testimony is correct that
17  you did not look at any articles, publications,
18  textbooks about the impact of the death of a CEO on
19  a company other than the ones cited by Dr. Shenkar?
20    MS. JOHNSON:  Objection.  It misstates
21    prior testimony.
22    THE WITNESS:  Other than item 20 on this list,
23    the Borokhovich article that he did not cite.
24  BY MR. WISNER:
25    Q.  Other than that one, that statement is

Page 22

1  correct; right?
2    A.  I believe so.
3    Q.  All right.  Now, looking further on your
4  report, Mr. Dolgoff, it says "Websites and Other
5  Sources."
6      Do you see that at number 40 through 52?
7    A.  Yes.
8    Q.  Do any of those concern the impact of a
9  death of a CEO on a company?
10    A.  No.  These are primarily sources of data
11  or other factual information.
12    Q.  In preparing your report, did you review
13  any documents, any research articles and textbooks
14  other than stated in your Appendix A?
15    A.  With respect to the CEO death literature?
16    Q.  Just in general, sir.
17    A.  Not that I recall.  I -- I don't -- I'd
18  have to doublecheck given that my staff clearly had
19  omitted a couple documents that I earlier identified
20  I considered.  But nothing comes to mind, sitting
21  here today.
22    Q.  All right.  And looking at websites and
23  other sources on your Appendix A in your report, did
24  you consider any websites and other sources for any
25  part of your report other than listed under that

Page 23

1  heading?
2    A.  Not that I recall.
3    Q.  All right.
4    A.  If I may amend that.  With the exception
5  that if -- if searching for some data and, for
6  example, a search takes me to a page that was
7  clearly -- doesn't have the data, I'm -- I'm not
8  counting that as considering the page.
9    Q.  I'm sorry.  I didn't catch all that.
10      Would you tell -- tell me that again,
11  Mr. Dolgoff.
12    A.  So, for example, if I were looking for
13  data on Kenya's inflation rate and say I did a
14  Google search and it took me to a website first that
15  did not have the data, I'm not counting that as a
16  website considered.  I only considered the website
17  once I found one that actually had the data.
18    Q.  Okay.  Thanks for that clarification.
19      Mr. Dolgoff, did you, in preparing for
20  your report -- in preparing your report, review a
21  report by Dr. Shenkar entitled "CEO Founder"?
22    A.  I don't recall what the title of the
23  reports were.
24    Q.  Okay.
25    A.  One was -- one was called a CEO report.

Page 24

1    MR. WISNER:  Okay.  Chelsea, do you have
2  that one on Agile?
3    VIDEOCONFERENCE MONITOR:  I believe I do.
4  Seex CEO Report.  I will mark that as Exhibit
5  Seex-Dolgoff 4 in one moment.
6    MR. WISNER:  Okay.  And Julia, do you have
7  that before you?
8    MS. JOHNSON:  I believe I can give him a
9  hard copy.  Is it the report entitled
10  "CEO/Founder's Death and Company Value"?
11    MR. WISNER:  That's the one.
12    MS. JOHNSON:  Okay.  And it's going to be
13  Exhibit 4?
14    MR. WISNER:  Yes.
15    MS. JOHNSON:  Okay.  I'm handing
16  Mr. Dolgoff a hard copy.
17    MR. WISNER:  Okay.  Lee Ann and Chelsea,
18  are you ready?
19    VIDEOCONFERENCE MONITOR:  Yes, I have that
20  marked.
21    (Plaintiff's Exhibit 4 was marked for
22    identification.)
23  BY MR. WISNER:
24    Q.  Okay.  Mr. Dolgoff, I'm showing you what
25  we've marked as Seex-Dolgoff Exhibit Number 4.

6 (Pages 21 to 24)

AARON DOLGOFF

Page 25

1    Have you seen that before?
2    A.  Yes, I have.
3    Q.  Did you review that in preparation for
4  your deposition?
5    A.  Yes.
6    Q.  And now I'd like to show you a separate
7  document which we've marked as Seex-Dolgoff
8  Exhibit Number 5 which I believe is entitled
9  "Evaluating Tamarind Management Limited (TML) & the
10  Impact of Mr. Seex's Death."
11    Have you seen that before?
12    VIDEOCONFERENCE MONITOR:  I am marking
13  that now as Exhibit 5.  One moment while that
14  shows up.
15    (Plaintiff's Exhibit Seex-Dolgoff 5 was
16  marked for identification.)
17    MS. JOHNSON:  I'll hand Mr. Dolgoff a hard
18  copy of that.
19    THE WITNESS:  Yes, I've seen this before.
20  BY MR. WISNER:
21    Q.  Okay.  And forgive me if I've asked you
22  this already, but am I correct that you reviewed all
23  the publications, studies, sources referenced by
24  Dr. Shenkar in both of those reports, Seex-Dolgoff
25  Exhibit Number 4 and Seex-Dolgoff Exhibit Number 5?

Page 26

1    A.  I did not review every single publication
2  cited in Exhibit Number 4.  There -- my focus was on
3  a particular study that's related to quantification
4  of effects of the CEO death and how it might relate
5  to his valuation opinions, but he cites a number of
6  other papers for more general principles that I
7  didn't go -- go to review.
8    Q.  Well, let's limit it to Dr. Shenkar's
9  citations or references to articles, publications,
10  studies, other sources on the impact on a company of
11  a CEO death.
12    I believe you reviewed all his
13  references -- or sources on that topic?
14    A.  I believe so but we'd have to consider
15  them one by one to see if I've missed any.  I
16  believe so, yes.  I recall there was one reference
17  that was, I think, to a book that was not available
18  to me, but I don't believe it dealt with the fact of
19  CEO deaths.
20    Q.  Do you remember what that book was, sir?
21    A.  Not off the top of my head.  I'd have to
22  go through these various cites to see if I can
23  identify it.
24    Q.  Okay.  Would you look -- I'm sorry.
25    Are you through, Mr. Dolgoff?

Page 27

1    A.  Yes.
2    Q.  Would you look at page 3 of your report
3  which is Seex-Dolgoff Exhibit Number 2?
4    I'm looking at page 3, paragraph 10.
5    A.  Yes.
6    Q.  That states -- and tell me first whether I
7  read this correctly.  I may have read it to you
8  already.
9    But it says "In developing the assumptions
10  used in his valuation analysis, Dr. Shenkar relies
11  on a highly flawed application of the economic
12  literature on the value impact of a CEO's death."
13    Did I read that correctly?
14    A.  Yes.
15    Q.  That statement is based upon your review
16  of Dr. Shenkar's sources on that issue; correct?
17    A.  Correct.  Plus the additional paper.
18    Q.  Yes, that's right.
19    The -- what's that called, Borokhovich?
20    A.  Yes.
21    Q.  All right.  Now, then in paragraph 10 you
22  go on to state "The majority of the literature finds
23  the sudden death of a CEO has only a small (if any)
24  impact on a company's value."
25    Did I read that correctly?

Page 28

1    A.  Yes.
2    Q.  And, again, that's based upon your review
3  of the sources cited on that issue by Dr. Shenkar?
4    A.  Yes.
5    Q.  And by "that issue" I mean the impact of
6  the death of a CEO on a company's value; okay?
7    A.  Yes.  Yes.
8    Q.  All right.  In the -- near the end of that
9  paragraph 10 you say that Dr. Shenkar ignores "that
10  the studies finding the largest effects are not
11  applicable to Mr. Seex on TML."
12    Did I read that whole sentence.  I'm
13    A.  You didn't read the whole sentence.  I'm
14  just trying to see where you're --
15    Q.  Well, to be fair, I'll read it, then.
16    Let me strike that and ask you this:  Does
17  your report on page 3, paragraph 10, state in part
18  "However, in doing so, Dr. Shenkar relies on
19  unsupported assertions and assumptions about
20  Mr. Seex, ignores those larger effects that are
21  still rather small, and ignores that the studies
22  finding the largest effects are not applicable to
23  Mr. Seex or TML."
24    Did I read that correctly?
25    A.  Yes, you did.

AARON DOLGOFF

Page 29

1      Q. Now, looking at the last part of that
2 sentence referring to the studies "finding the
3 largest effects are not applicable to Mr. Seex or
4 TML," are the studies to which you're referring the
5 studies referenced by Dr. Shenkar?
6      A. Yes. Those are additional studies not on
7 the impact of CEO death but on the impact of founder
8 death and/or proprietor death in the case of
9 pass-through profit enterprises, startup company
10 situations. Those are the papers I'm referring to
11 there, not the papers on just CEO deaths.
12      Q. Okay. Thanks.
13      And in any event, those studies are
14 studies referenced by Dr. Shenkar on those issues?
15      A. Yes.
16      Q. Those are not any studies that you found
17 or you reviewed; correct?
18      A. Correct.
19      Q. Okay. I want to get back to something you
20 said a moment ago. I want to be sure I understand
21 you correctly.
22      You're not offering any opinion here or in
23 any of your reports as to what amount, if any, was
24 the impact on the value of Tamarind Management
25 Limited by the death of Jonathan Seex; is that

Page 30

1 correct?
2      A. That's correct.
3      Q. All right. Now, moving on, would you look
4 at --
5      A. May I amend that answer?
6      Q. Sure.
7      A. So it is correct with one limitation that
8 I am offering opinions that there's certain evidence
9 from the letters of intent in the record that would
10 be consistent with no loss of value.
11      Q. Okay. Other than the evidence you believe
12 is presented by the letters of intent, my statement
13 about your opinions is correct; right?
14      A. (Audio interference.)
15      Q. I didn't get that answer, sir.
16      A. Yes.
17      Q. All right. Now would you look at page 24
18 of your report on paragraph 68? You ready,
19 Mr. Dolgoff?
20      A. Yes, I'm there.
21      Q. The second sentence, tell me if I read
22 this correctly.
23      "Dr. Shenkar also makes speculative
24 assertions about the applicability of findings from
25 the economic literature on the value impact of the

Page 31

1 loss of a CEO and ignores that the main findings of
2 such literature indicate much smaller value effects,
3 if any, than Dr. Shenkar assumes for TML."
4      Did I read that correctly?
5      A. Yes, you did.
6      Q. And am I correct again in understanding
7 that the economic literature that you're referring
8 to and the, quote, main findings of such literature,
9 unquote, that you're referring to is Dr. Shenkar's
10 sources?
11      A. Yes.
12      Q. Nothing from you that you found yourself;
13 correct?
14      A. Other than the Borokhovich article,
15 correct.
16      Q. That's right.
17      Now, again, would you look at page 26 of
18 your report, Mr. Dolgoff, paragraph 74?
19      A. Yes.
20      Q. Going to the third sentence, tell me if I
21 read this correctly, please.
22      "The small value effects found by the
23 literature looking at market price reactions
24 (discussed below) are consistent with the
25 expectation that the impact on the business would be

Page 32

1 temporary."
2      Did I read that correctly?
3      A. You did, yes.
4      Q. And the literature you're referring to in
5 that sentence that's the literature cited by
6 Dr. Shenkar; right?
7      A. Yes.
8      Q. Nothing that you found; correct?
9      A. Other than the Borokhovich article.
10      Q. Yes.
11      And if you'll turn to page 27 at
12 paragraph 75, tell me if I read this correctly,
13 please.
14      You state "In this section I describe
15 flaws in Dr. Shenkar's review and application of the
16 economic literature on the value impact of CEO
17 deaths"; correct?
18      A. Yes.
19      Q. And that economic literature you're
20 talking about is the literature cited by
21 Dr. Shenkar; right?
22      A. Yes.
23      Q. The only possible addition of anything you
24 refer to would be the Borokhovich article; right?
25      A. Correct.

8 (Pages 29 to 32)

AARON DOLGOFF

Page 33

1          Q.   Continuing on in that paragraph,
2    Mr. Dolgoff, it says "Below I show that (1)
3    Dr. Shenkar ignores that the literature largely
4    finds very small or no value impact from the death
5    of a typical CEO," and then -- excuse me, number
6    "(2) Dr. Shenkar relies on unsupported assertions
7    and assumptions to fit the case of Mr. Seex's to
8    certain literature finding larger effects, and (3),
9    that the literature finding very large effects does
10   not apply to the case at hand."
11          Did I read that correctly?
12          A.   You did.
13          Q.   And all those references in that sentence
14   to literature are the sources cited by Dr. Shenkar;
15   right?
16          A.   Yes.
17          Q.   Nothing that you found with the possible
18   exception of the Borokhovich article; correct?
19          A.   Correct.
20          Q.   All right.  Mr. Dolgoff, in preparation
21   for your report, did you see an article by Owenga,
22   O-w-e-n-g-a, J., Mutinda, M-u-t-i-n-d-a, R., and
23   Mapelu, I., M-a-p-e-l-u, entitled the "Impact of
24   Related Diversification Strategies in Organizational
25   Performance Among the Star-Rated Hotels and the

Page 34

1    Kenyan Coast" from the Journal of Hospitality
2    Tourism 2023 at pages 75 to 92?
3          Did you ever see that article?
4          A.   I don't.  I don't recall reviewing that
5    article.
6          Q.   Okay.  Do you recall in preparation for
7    your report seeing information about a sale in 2015
8    of the Zehneria, Z-e-h-n-e-r-i-a, Nairobi Hotel for
9    $10.72 million to the Indian Hospitality Group,
10   Sarobar, S-a-r-o-b-a-r, Hotels and Resorts, do you
11   recall seeing anything about that?
12          A.   I don't recall, but if you show me a
13   document, I'll let you know if I've seen it before
14   or not.
15          Q.   Okay.  The references to an Eikon,
16   E-i-k-o-n, database.
17          Have you seen that?
18          MS. JOHNSON:  Objection?
19          THE WITNESS:  I'm familiar with the Eikon
20   database.  It's --
21   BY MR. WISNER:
22          Q.   Have you -- I'm sorry.
23          A.   It's been renamed LSEG.  It was acquired
24   by another company.
25          Q.   Are you aware, Mr. Dolgoff, that this

Page 35

1    Zehneria Nairobi hotel is a three star hotel with 45
2    suites, compared with 160 rooms including 15 suites
3    at the Tamarind Tree Hotel, and unlike the Tamarind
4    Tree Hotel, it cannot accommodate conferences and
5    large gatherings.
6          Are you aware of that?
7          MS. JOHNSON:  Objection.
8    BY MR. WISNER:
9          Q.   You can answer, sir.
10          A.   Not specifically, but it would not
11   surprise me that there's multiple hotels in Kenya of
12   varying sizes and qualities and values.
13          Q.   Well, did you consider any of that
14   information about multiple hotels in Kenya varying
15   in size and value in doing your report?
16          A.   It wasn't necessary for the opinions I was
17   offering.  I was reviewing Dr. Shenkar's valuation
18   method and applications and he never actually used
19   any comparable transactions such as what you just
20   described in doing his valuation, so I would not --
21   if he had used such transactions as part of his
22   valuation method, I would have gone and reviewed the
23   transactions.
24          Q.   All right.  Let me continue on a little
25   bit.

Page 36

1          Do you know that the room rates at the
2    Zehneria Nairobi hotel are about one third of those
3    at the Tamarind Tree?
4          MS. JOHNSON:  Objection.
5    BY MR. WISNER:
6          Q.   You can answer.
7          A.   I don't know the room rates of any
8    specific hotel in Kenya.
9          Q.   Okay.  In doing your report, did you know
10   that in 2023, the Muthu, M-u-t-h-u, family acquired
11   four premium hotels from the Sun Africa Hotels for
12   an estimated $50 million, and I'm going to tell you
13   the cite for that is Business Empires Africa from
14   March 18, 2024.
15          Were you aware of that?
16          MS. JOHNSON:  Objection.
17          THE WITNESS:  I didn't go looking for
18   additional transactions that didn't enter into
19   Dr. Shenkar's analysis.  He conducted the
20   valuation as of 2019, so any transaction that
21   occurred, I think you said, in 2023 would be
22   irrelevant.  It wouldn't have been knowable
23   back in 2019.
24   BY MR. WISNER:
25          Q.   Okay.  Were you aware in preparing your

9 (Pages 33 to 36)

AARON DOLGOFF

Page 37

1  report that in 2024 the Kenyan government sold a
2  stake in five premium hotels, and the reference for
3  that is the Nations Media Group of March 19, 2024.
4        MS. JOHNSON:  Objection.
5        THE WITNESS:  Same answer as the previous
6  one.  The 2024 transaction wouldn't -- would
7  not have been relevant to my review and
8  analysis of Dr. Shenkar's valuations.
9  BY MR. WISNER:
10       Q.  In preparing your reports, were you aware
11  that in 2022, Actis, A-c-t-i-s, bought City Lodge
12  Hotels, and in 2024 the Swiss-Bel Hotel
13  International acquired the Safari Club Hotel?
14       Are you aware of that?
15       MS. JOHNSON:  Objection.
16       THE WITNESS:  Not to my recollection, no.
17  BY MR. WISNER:
18       Q.  And the reference to that is from Meda-,
19  M-e-d-a, -frica, f-r-i-c-a, Times of July 28, 2022.
20       Same answer?
21       A.  Same answer.  It doesn't enter into
22  Dr. Shenkar's valuation analysis.  There'd be no
23  reason to have written such a valuation.
24       Q.  Were you aware in preparing your report
25  that in 2022, the Kenyan competition authority

Page 38

1  approved the sale of a controlling interest in
2  S-KR-185 by Madison Hotels and Resorts and that the
3  Crowne Plaza Hotel in Nairobi was acquired for about
4  $39 million?
5        And that's from that same source, the
6  Medafrica Times in July 28, 2022.
7        Are you aware of that?
8        MS. JOHNSON:  Objection.
9        THE WITNESS:  Same answer.  I'm not aware
10  of that and would not need to be aware of it
11  for purposes of responding to Dr. Shenkar's
12  analysis.
13  BY MR. WISNER:
14       Q.  Okay.  Let me ask you this, Mr. Dolgoff.
15  Were you aware in preparing the report
16  that the growth rate in the Kenyan hospitality
17  sector is expected to be on average 6.89 percent and
18  the number of guests is expected to reach
19  $2.4 million with the source of that being Statista,
20  S-t-a-t-i-s-t-a.
21       Are you aware of that?
22       A.  As of what date?
23       Q.  As of -- projecting to 2029.
24       A.  From when?  What date is the documents as
25  of.

Page 39

1        Q.  Well, from the date of Dr. Shenkar's
2  report, let's say 2024.
3        MS. JOHNSON:  Objection.
4        THE WITNESS:  Are you saying Dr. Shenkar
5  had reviewed that data?
6  BY MR. WISNER:
7        Q.  Yeah, that's what I'm saying, but I'm
8  asking you about it.
9        A.  Dr. Shenkar doesn't cite any such data in
10  his report.
11       Q.  Well, I'm asking you about it.  I'm
12  entitled to ask you about it.
13       I'm asking have you considered that?
14       A.  I considered the data and documents that
15  he disclosed that he relied on.  If there's
16  additional data and documents that he relied on that
17  he hasn't disclosed, I will take that under
18  consideration and further supplement my report
19  additionally.  If there's additional documents and
20  data that would affect my opinions that he did
21  consider, I'd like to know that.
22       Q.  Okay.  That's good.
23       Are you aware of the fact that -- strike
24  that.
25       Are you aware that in 2020 according to an

Page 40

1  article from Statista, Faira, F-a-i-r-a, J., on
2  February 9, 2022, that Kenyan startups had raised
3  about $220 million and that the number of startups
4  raising funds increased to 87 versus 59 in 2019?
5        Are you aware of that?
6        A.  I didn't --
7        MS. JOHNSON:  Objection.
8        THE WITNESS:  I didn't follow all the
9  data.  You jumped around between years.
10       (Simultaneous speakers - unclear.)
11  BY MR. WISNER:
12       Q.  Let me break it down for you.  Let's put
13  it this way.
14       Are you aware an article from
15  February 9, 2022, by a Faria J., F-a-r-i-a, J., and
16  Statista, S-t-a-t-i-s-t-a, stating that Kenyan
17  startups have raised about $220 million and that in
18  2021 alone the number of startups raising funds
19  increased to 87 versus 59 in 2019?
20       MS. JOHNSON:  Objection.
21       THE WITNESS:  I'm not aware nor would I
22  see how that's relevant to Dr. Shenkar's
23  analysis as he presented it.
24  BY MR. WISNER:
25       Q.  Okay.  Are you aware of an article by

10 (Pages 37 to 40)

AARON DOLGOFF

Page 41

1  Markides, M-a-r-k-i-d-e-s, C.C., and Williamson,
2  P.J., entitled "Related Diversification, Core
3  Competence, and Corporate Performance" in the
4  Strategic Management Journal of 1994 at pages 149 to
5  165?
6          MS. JOHNSON: Objection.
7          THE WITNESS: I may have been aware of it
8      at some point in my career. It would be
9      relevant to M & A analysis, for example.
10 BY MR. WISNER:
11     Q. Are you aware of a concept in the economic
12 literature known as related diversification?
13     A. Yes.
14     Q. And would you agree that the advantages of
15 related diversification are well documented in the
16 literature?
17     A. Advantage relative to what?
18     Q. Excuse me?
19     A. Advantage relative to what? You have to
20 define what you mean by advantage.
21     Q. Okay. Advantages relevant to the impact
22 of a company on the death of a CEO.
23     A. I don't see how it's relevant to that
24 question. It's relevant to other questions.
25     Q. Okay.

Page 42

1          A. May I just clarify? My question was not
2  what is it relevant to. It's what is it relative
3  to. That was my question.
4          Q. Oh, okay?
5          A. Advantageous relative to some other
6  alternative. That's what I'm questioning.
7          Q. Okay. Does related diversification make
8  companies more resilient because of their
9  correlation with higher performance, improving their
10 competitive advantages, and increasing their value
11 to investors?
12          MS. JOHNSON: Objection.
13          THE WITNESS: Again, you'd have to define
14     the comparison set of what you're comparing it
15     to, and how you're -- you've also given
16     multiple criteria of judging it in that
17     question. So we'd have to unpack each piece
18     and then compare it to what's the alternative
19     that you're comparing it to.
20 BY MR. WISNER:
21          Q. Okay. Well, are you aware that Tamarind
22 Management has locations in Nairobi and Mombasa,
23 Kenya?
24          A. Yes.
25          Q. And would you agree that Nairobi is more

Page 43

1  of a business climate, Mombasa is more tourism?
2          A. I'll take that representation, yes.
3          Q. Okay. Would that be an example of related
4  diversification of a business?
5          A. Related diversification refers to the
6  concept that you're going to take your existing
7  business and branch out varying on one dimension but
8  not others.
9          So, for example, it may be that you -- for
10 example, a car manufacturer might offer a coupe, a
11 sedan, and a full-size. Those are all different
12 versions of cars and they're -- but they're related
13 in the sense that they're all cars.
14          Or here you may have diversification, as
15 you say, geographically. So we'll have one -- you
16 can have a hotel in Mombasa. We can have one in
17 Nairobi. They're both hotels. They may or may not
18 be the same hotel. They may be different hotels.
19 So they're related in the sense that it's the same
20 business.
21          But there's lots of different types of
22 related diversification. You could have
23 diversification related by customer not by product
24 or service. So you might offer new products and new
25 services to existing customers. There's a lot of

Page 44

1  different ways to think about related
2  diversification.
3          Q. Okay. Would you agree that Tamarind
4  Management Limited was a diverse company involving
5  hotels, casinos, restaurants, dining, boats, that
6  type -- fast food restaurants, formal restaurants?
7          A. I don't believe it had a casino yet, but I
8  may be mistaken on that. I believe there may have
9  been plans for a casino. The boat sounds new to me.
10 I don't recall them having a boat.
11          Q. Dhows. They're called Dhows in Kenya,
12 D-h-o-w-s.
13          A. Is that the restaurant that's shaped like
14     a boat?
15          Q. Yes, sir, on a boat.
16          A. Does it sail?
17          Q. That, I don't know.
18          A. Okay. That, I don't know either.
19          But back to your question, are they
20 diversified? Well, they have different ventures.
21 They are diversified in some regards, but they're
22 also not diversified in other regards.
23          Q. Okay.
24          A. For example, they're subject to the risks
25 of a downturn in the Kenyan economy that might

11 (Pages 41 to 44)

AARON DOLGOFF

Page 45

1  affect people's desire to spend money on outside
2  meals.
3      Q.  All right.  Mr. Dolgoff, in preparing your
4  report, were you aware that a study of investments
5  in Africa found out that private equity investors
6  tended to retain higher post-IPO ownership in
7  business groups as opposed to independent companies?
8      And the source for that being an article
9  by Hearn, H-e-a-r-n, B., Oxelheim, O-x-e-l-h-e-i-m,
10 L., and Randoy, R-a-n-d-o-y, T., entitled "The
11 Institutional Determinants of Private Equity
12 Involvement in Business Groups - The Case of Africa"
13 in the Journal of World Business from 2018?
14     MS. JOHNSON:  Objection.
15     THE WITNESS:  I don't recall that paper
16 nor do I see how it's relevant.
17 BY MR. WISNER:
18     Q.  All right.  We'll get to these letters of
19 intent in a moment, Mr. Dolgoff.  I just want to ask
20 you a quick question in advance about that.
21     Would you agree that the various letters
22 of intent from Ascent Capital for Cameron Management
23 reflected that buyer's valuation, not necessarily
24 Tamarind Management Limited's intrinsic value?
25     A.  You're making two distinctions there.

Page 46

1      Q.  Okay.
2      A.  So I'm having a hard time answering that
3  question.
4      Q.  Well, break it down for me if you need to.
5      A.  So you referenced a buyer's valuation
6  which I assume you mean as opposed to a seller's
7  valuation.
8      Q.  Yes.
9      A.  At least -- at least in one of those
10 letters I would disagree because there is some
11 language in the -- in the letter that suggests there
12 was some discussion and agreement between the
13 sellers and the buyers prior to that letter being
14 written.
15     The second question you posed, you used
16 the term "intrinsic value" which in valuation
17 practice has a particular meaning, and that's the
18 inherent value of the business and you might
19 distinguish it from a transaction value or even a
20 fair market value.
21     So that's not what I would expect to be
22 reflected there.  So someone may think that there's
23 more intrinsic value or less intrinsic value than
24 what it would transact at at a fair market value
25 setting.  So the buyer and seller valuations may or

Page 47

1  may not differ much in value.
2      Q.  Are you aware of an article by Ljungqvist,
3  L-j-u-n-g-q-v-i-s-t, Alexander, entitled "The
4  Economics of Private Equity:  A Critical Review"
5  from February 12, 2024, by the Swedish House of
6  Finance Research Paper Number 24-07.
7      Are you aware of that one?
8      MS. JOHNSON:  Objection.
9      THE WITNESS:  I believe I am.  I reviewed
10 a lot of private equity literature for a case
11 last year, and I believe I reviewed that paper.
12 I'd have to see it to recall if I did
13 specifically.  I'm familiar with that
14 researcher who's done many significant papers
15 in the area of finance.  So whether I did
16 review that specific paper or not, I can't say
17 with certainty, but I believe I did.
18     We've been going about an hour, could we
19 take a short break?  Is that okay?
20     MS. JOHNSON:  Floyd, are you okay with
21 taking a break?
22     VIDEOCONFERENCE MONITOR:  Mr. Wisner, are
23 you still there?
24     MR. WISNER:  I am.  I'm sorry, everyone.
25 I had to make a quick little break to deal with

Page 48

1  something here.  Can we take -- would now be a
2  good time?  Let me see if --
3      MS. JOHNSON:  Yeah.  Floyd, we were just
4  asking if we could take a break.
5      MR. WISNER:  Sorry to run out on you, but
6  I'm back.  Take a break.
7      VIDEOCONFERENCE MONITOR:  All right.  I'll
8  take us off the record.  We are going off the
9  record.  The time is 10:00 a.m.
10     (Off the record.)
11     VIDEOCONFERENCE MONITOR:  We are going
12 back on the record.  The time is 10:09 a.m.
13 BY MR. WISNER:
14     Q.  You ready, Mr. Dolgoff?
15     A.  Yes.
16     Q.  Okay.  I just want to go through a little
17 bit more of this about articles you may or may not
18 have seen or been aware of.
19     In preparing your report, were you aware
20 of an article entitled "Does the CEO effect on
21 performance differ in private versus public firms"
22 by Timothy Quigley and others?
23     MS. JOHNSON:  Objection.
24     THE WITNESS:  There is a Quigley paper
25 that Dr. Shenkar cited.  I don't recall if it's

12 (Pages 45 to 48)

AARON DOLGOFF

Page 49

1  that paper or a different paper.
2  BY MR. WISNER:
3      Q.  Okay.  The one that I'm referring to,
4  Mr. Dolgoff, states that the CEO effect on return on
5  assets was 23.8 percent in private firms versus 16.6
6  at public firms.
7      Do you recall that?
8      MS. JOHNSON:  Objection.
9      THE WITNESS:  I don't even know what that
10  means, so I --
11  BY MR. WISNER:
12      Q.  Well -- well, let me put it a different
13  way.
14      I'll represent to you that the conclusion
15  of that paper was that CEOs in privately held firms
16  had a more substantial effect on firm performance
17  than in public companies.
18      Are you aware of that article?
19      MS. JOHNSON:  Objection.
20      THE WITNESS:  I don't recall that article,
21  no.
22  BY MR. WISNER:
23      Q.  Okay.  Do you recall an article entitled
24  "The King Is Dead.  Long Live Who?  A Family and
25  Firm Embeddedness on Succession after the

Page 50

1  CEO-Owner's Sudden Death."  And that's by
2  Kimberly A. Eddleston, E-d-d-l-e-s-t-o-n, and
3  others.
4      Do you recall that article?
5      MS. JOHNSON:  Objection.
6      THE WITNESS:  The title sounds
7  interesting.  I think I would have recalled it
8  but, no, I don't recall that one.
9  BY MR. WISNER:
10      Q.  Okay.  Do you recall any conclusion from
11  that report or others that the full financial impact
12  of a CEO's death takes time to materialize and
13  recover?
14      MS. JOHNSON:  Objection.
15      THE WITNESS:  I don't have the paper in
16  front of me, so I can't tell you whether that's
17  an accurate representation or not.
18  BY MR. WISNER:
19      Q.  You don't recall seeing a paper with that
20  conclusion in it?
21      MS. JOHNSON:  Objection.
22      THE WITNESS:  Not as I sit here today, no.
23  BY MR. WISNER:
24      Q.  Okay.  Do you recall seeing a paper
25  entitled "Do CEOs matter?  Evidence from

Page 51

1  Hospitalization Events" by Morten, M-o-r-t-e-n,
2  Bennedsen, "Bennedsen" and others?
3      MS. JOHNSON:  Objection.
4      THE WITNESS:  No.
5  BY MR. WISNER:
6      Q.  Okay.
7      A.  I don't recall that paper.
8      Q.  Do you recall specifically a finding in
9  that paper or any other that you saw that the effect
10  of a CEO hospitalization on profitability is
11  significantly more for firms with younger CEOs
12  compared to those with CEOs past retirement age?
13      MS. JOHNSON:  Objection.
14      THE WITNESS:  I don't recall that paper,
15  so I can't say if I recall that.  I do recall
16  one of the papers that I did review looked at
17  not only CEO deaths, but also illnesses and may
18  have addressed that.  I don't recall that
19  findings.  I was focused on the CEO deaths, not
20  CEO illnesses.
21  BY MR. WISNER:
22      Q.  Okay.  Do you recall a statement or a
23  finding in that article I just cited to you or any
24  other article you've seen that a CEO loss in a
25  family-controlled firm leads to larger and more

Page 52

1  persistent declines in profitability than other
2  types of companies --
3      MS. JOHNSON:  Objection.
4  BY MR. WISNER:
5      Q.  -- and that the effect is greater than
6  300 percent?
7      Do you recall that?
8      MS. JOHNSON:  Objection.
9      THE WITNESS:  300 percent of what?
10  BY MR. WISNER:
11      Q.  300 percent difference between a
12  family-controlled firm and a nonfamily-controlled
13  firm.
14      A.  Percentage is always relative to a base.
15  I don't understand what the base is.
16      Q.  Okay.  Well, let's take out that
17  300 percent and ask you the question.
18      Do you recall a statement in that article
19  I just cited to you or in any other article that a
20  CEO loss in a family-controlled firm leads to a
21  larger and more persistent decline in profitability
22  than in a public firm?
23      MS. JOHNSON:  Objection.
24      THE WITNESS:  I don't recall that, no.
25

13 (Pages 49 to 52)

AARON DOLGOFF

Page 53

1    BY MR. WISNER:
2        Q.   Do you recall seeing an article by
3    Cziraki, C-z-i-r-a-k-i, and Groen-Xu, that's
4    G-r-o-e-n hyphen x-u, about a drop in the return of
5    assets from the death of a CEO ranging from
6    21.6 percent to 48 percent?
7            Do you recall seeing that?
8        A.   No.  And, again, I'm not sure what you
9    mean by those percentages, whether that's percentage
10   points or percentage change or --
11       Q.   I'm talking about --
12           (Simultaneous speakers - unclear.)
13       Q.   Sorry.  I'm talking over you again.  I
14   apologize.
15           I'm talking about a drop in profitability,
16   return of asset drop, of 21.6 percent to 48 percent
17   because of a death of a CEO.
18       A.   I still don't understand what is meant by
19   those percentages because there are different ways
20   to think about percentage when you speak about
21   return on assets.
22           So return on assets itself is a
23   percentage, so I don't know if that's a percent
24   change in a percent change or whether that's a
25   change in a percent change.

Page 54

1        Q.   Fair enough.
2            Do you recall seeing any article about
3    that, no matter what -- how you would apply it right
4    now, but referring to drop in return of asset of
5    21.6 percent to 48 percent?
6            MS. JOHNSON:  Objection.
7            THE WITNESS:  I don't recall, sitting here
8    today.
9    BY MR. WISNER:
10       Q.   Going back to your report, Mr. Dolgoff, on
11   page 3 --
12       A.   Okay.
13       Q.   -- paragraph 9, tell me if I read this
14   correctly.
15           Dr. Shenkar's -- it's the second sentence,
16   Mr. Dolgoff.  Sorry.
17           Tell me if I read this correctly.
18   "Dr. Shenkar's valuation of TML with Mr. Seex (i.e.,
19   assuming Mr. Seex had not died) is unreasonably high
20   and contradicted by reliable contemporaneous
21   indications of TML's value in 2019 from the letters
22   of intent submitted to TML by an investor"; right?
23       A.   Yes, you read that correctly.
24       Q.   And the investor you're referring to there
25   is Ascent Capital; right?

Page 55

1        A.   Yes.
2        Q.   And the reliable contemporary indications
3    of TML's value refers to whatever's stated in those
4    letters of intent by Ascent Capital; correct?
5        A.   Correct.
6        Q.   Now, have you ever talked to anyone from
7    Tamarind Management Limited?
8        A.   No, I have not.
9        Q.   Have you ever talked to anyone from Ascent
10   Capital?
11       A.   No.
12       Q.   Have you ever talked to anyone from
13   Sasema, Phil Gutsche or anyone else from Sasema?
14       A.   No.
15       Q.   Have you ever -- I'm assuming you never
16   talked to my client, Nadege Seex; correct?
17       A.   Correct.
18       Q.   But you've read her deposition transcript;
19   right?
20       A.   Portions of it, yes.
21       Q.   All right.  Am I correct you read the
22   portions concerning these letters of intent?
23           MS. JOHNSON:  Objection.
24           THE WITNESS:  I believe so, yes.
25

Page 56

1    BY MR. WISNER:
2        Q.   All right.  Would you go to page 34 of
3    your report and specifically your footnote 118,
4    Mr. Dolgoff?
5        A.   Yes, I see that.
6        Q.   Tell me if I read they correctly.  It's
7    the second sentence in your footnote 118.
8            "The March 30, 2019, LOI specified that
9    the parties to do the agreement would work closely
10   together," what do they call that, three dots, "to
11   identify and agree on a suitable CEO to be appointed
12   latest on signing of the transaction documents."
13   Correct?
14       A.   Correct.
15       Q.   Let me back up for a second.
16           There was -- well, let's strike that?
17           MR. WISNER:  Can we -- do we have the
18   letters of intent marked yet?  I don't think we
19   do, do we?
20           VIDEOCONFERENCE MONITOR:  I don't believe
21   we do, Counsel.  I'm also not certain I have
22   those documents.  I only have one further
23   document that we haven't used and I'm not
24   confident that's what it is.
25           MR. WISNER:  Okay.  No problem, then.

14 (Pages 53 to 56)

AARON DOLGOFF

## Page 57

```
 1          Julia, do you happen to have those in
 2    front of you?
 3          MS. JOHNSON:  No.
 4          MR. WISNER:  No?
 5          MS. JOHNSON:  No.
 6          MR. WISNER:  No problem with that.
 7    BY MR. WISNER:
 8          Q.  You are aware, are you, Mr. Dolgoff, that
 9    there was a March 6, 2019, letter of intent; right?
10          A.  Yes.
11          Q.  And that concerned the possible investment
12    by Ascent Capital in Tamarind Management Limited;
13    right?
14          A.  Yes.
15          Q.  Was it your understanding that Tamarind
16    Management Limited as of March 6, at least, did not
17    want to take over operation of -- excuse me, that
18    Ascent Capital did not want to take over operation
19    of Tamarind Management; right?
20          MS. JOHNSON:  Objection.  Let me just say
21    to the extent you're going to be asking
22    questions about the details of the letters of
23    intent, I think we should mark them as exhibits
24    and do what we need to do to make that happen.
25          MR. WISNER:  Well, I'm not going to be
```

## Page 58

```
 1    asking about details.
 2          MS. JOHNSON:  Okay.  Mr. Dolgoff, feel
 3    free to let us know if you need to see the
 4    exhibit to answer any question.
 5          MR. WISNER:  That's a good point.
 6    BY MR. WISNER:
 7          Q.  Let's go on and if you need to see them,
 8    fine, we'll pull them up.  I think you, me, Julia
 9    and everybody's familiar with them, at least to a
10    large extent.
11          Let me ask you, sir, go back to my
12    question.  Is it your understanding that on March 6,
13    2019, Ascent did not intend or want to take over
14    actual operation of Tamarind Management Limited in
15    return for its investment?
16          MS. JOHNSON:  Objection.
17          THE WITNESS:  I don't recall.  I would
18    need to see the letter again.
19          MR. WISNER:  Okay.  Let's pull up the
20    letter, then.  I'm going to send it to you,
21    Chelsea, and maybe you can put it on Agile.
22          VIDEOCONFERENCE MONITOR:  Yes, I can give
23    you the best email address to send it to.  I'm
24    not sure if we want to go off the record so
25    Lee Ann doesn't have to write all of this.
```

## Page 59

```
 1          MR. WISNER:  Yeah, we can go off the
 2    record.
 3          VIDEOCONFERENCE MONITOR:  We are going off
 4    the record.  The time is 10:23 a.m.
 5          (Off the record.)
 6          VIDEOCONFERENCE MONITOR:  We are going
 7    back on the record.  The time is 10:32 a.m.
 8    BY MR. WISNER:
 9          Q.  Okay.  Mr. Dolgoff, I think -- do you have
10    in front of you now or let's put in front of you the
11    letter of intent from March 6, 2019, which we will
12    mark as Seex-Dolgoff exhibit number what, Lee Ann?
13          VIDEOCONFERENCE MONITOR:  The next exhibit
14    in sequence will be 6.
15          MR. WISNER:  All right.
16          VIDEOCONFERENCE MONITOR:  And can you
17    repeat, Counsel, which document this is
18    specifically?  I'm sorry.
19          MR. WISNER:  Letter of intent on March 6,
20    2019.
21          VIDEOCONFERENCE MONITOR:  Thank you.
22          (Plaintiff's Exhibit Seex-Dolgoff 6 was
23    marked for identification.)
24    BY MR. WISNER:
25          Q.  Tell me when you have that in front of
```

## Page 60

```
 1    you, Dr. Dolgoff, please.
 2          A.  I have it.
 3          Q.  My question to you, sir, was do you agree
 4    that Ascent Capital in exchange for its investment
 5    did not want to actually operate Tamarind Management
 6    Limited?
 7          A.  By operate you mean be line management?
 8          Q.  Yes.
 9          A.  It's not stated explicitly, but I believe
10    it's implicit in how the letter is structured.
11          Q.  Okay.  And, similarly, do you agree that
12    Tamarind Management Limited -- I mean, excuse me,
13    that Ascent Capital did not want to bring in its own
14    management team to operate Tamarind Management, it
15    wanted to keep the management team headed by
16    Jonathan Seex as CEO; correct?
17          A.  This letter doesn't specify that.
18          Q.  Do you have any information to the
19    contrary?
20          A.  No.
21          Q.  All right.  Now, let's pull up the next
22    letter of intent which is of March 30, 2019, and
23    we'll mark that as Seex-Dolgoff Exhibit Number 7.
24          (Plaintiff's Exhibit Seex-Dolgoff 7 was
25    marked for identification.)
```

15 (Pages 57 to 60)

AARON DOLGOFF

Page 61

```
1    BY MR. WISNER:
2        Q.  Tell me if you're ready, Mr. Dolgoff.
3        A.  I'm ready.
4        Q.  And you'll see language that I think I
5    read to you from your report in that footnote 118,
6    let's see, at -- give me a second, please.
7            It's on page -- I think the document
8    before you, Mr. Dolgoff, would have a Bates number
9    in the bottom right of Seex 000010.
10           Do you see that, sir?
11       MS. JOHNSON:  Our copy doesn't have Bates
12   numbers.  The hard copy.
13       MR. WISNER:  Oh, sorry.
14   BY MR. WISNER:
15       Q.  Would you look under number 2,
16   "Investment," Mr. Dolgoff?
17       A.  Yes.
18       Q.  And then under the little block, the
19   second paragraph under that, tell me if I read this
20   correctly.
21           "The parties agree to work closely
22   together during the due diligence phase to identify
23   and agree on a suitable CEO to be appointed latest
24   upon signing of the transaction documents."
25           Did I read that correctly?
```

Page 62

```
1        A.  Yes.
2        Q.  Would you agree with me that both TML and
3    Ascent Capital wanted this deal to go through?
4        MS. JOHNSON:  Objection.
5        THE WITNESS:  I think that's a valid
6        inference.  They're working together.  The
7        parties agreed on various things prior to this
8        letter, so yes, that would be a reasonable
9        assumption.
10   BY MR. WISNER:
11       Q.  Okay.
12       A.  Subject to various things that still had
13   to be done and including completion of the due
14   diligence.  So something may come up during due
15   diligence that would cause someone to change that.
16       Q.  Okay.  Are you aware that according to
17   Lucas Kranck of Ascent, that Ascent had concluded
18   its due diligence investigation by the date of this
19   letter, in fact, by the date of the March 6 letter
20   of intent?  Are you aware of that?
21       MS. JOHNSON:  Objection.
22       THE WITNESS:  I'm not aware that that
23       individual has said that.  It's inconsistent
24       with what's stated in the letter which is that
25       there's additional due diligence to be
```

Page 63

```
1        completed.
2    BY MR. WISNER:
3        Q.  Okay.  Are you aware that Lucas Kranck
4    said that Ascent was ready to go ahead with this
5    investment before the crash of this -- that we're
6    here about today on March 10, 2019?
7            Are you aware of that?
8        MS. JOHNSON:  Objection.
9        THE WITNESS:  No, I'm not aware of any
10       testimony or deposition of -- how do you
11       pronounce his name, Mr. Kranck?
12   BY MR. WISNER:
13       Q.  K-r-a-n-c-k, Lucas Kranck, principal of
14   Ascent Capital; okay?
15       A.  No, I'm not aware of what he said.
16       Q.  You are aware that the investment by
17   Ascent Capital into Tamarind Management did not go
18   forward; correct?
19       A.  Yes.
20       Q.  Do you know why?
21       MS. JOHNSON:  Objection.
22       THE WITNESS:  No.  The only thing I've
23       seen is the deposition testimony of Mrs. Seex
24       who related that it was due to not finding a
25       replacement for Jonathan Seex.
```

Page 64

```
1    BY MR. WISNER:
2        Q.  Are you aware that Martin Dunford the CEO
3    of Tamarind Group also said that this deal did not
4    go forward because the parties could not find a
5    suitable replacement to Jonathan Seex as CEO?
6            Are you aware of that?
7        MS. JOHNSON:  Objection.
8        THE WITNESS:  I'm not.
9    BY MR. WISNER:
10       Q.  Are you aware that Lucas Kranck the
11   principal of Ascent Capital, the other party to this
12   letter of intent, also had stated that the
13   investment deal did not go forward because the
14   parties were unable to find a suitable replacement
15   for Jonathan Seex as CEO?
16           Are you aware of that?
17       MS. JOHNSON:  Objection.  And object,
18       assumes facts not in evidence?
19   BY MR. WISNER:
20       Q.  You can answer.
21       A.  I'm aware -- I'm aware of what Mrs. Seex
22   said about her discussion with Mr. Kranck.
23       Q.  I'm asking you whether you're aware that
24   Lucas Kranck actually said that himself.
25       A.  I've not spoken with Mr. Kranck, and I've
```

16 (Pages 61 to 64)

AARON DOLGOFF

Page 65

1   seen no testimony of his.
2       Q.  Okay.  Well, let me ask you, if you assume
3   that -- if we assume that as true, that Lucas Kranck
4   said that, regarding whether it's legally admissible
5   or anything, isn't that important to your opinion?
6       MS. JOHNSON:  Objection.
7   BY MR. WISNER:
8       Q.  You can answer.
9       A.  You could inform it.  I would need to know
10  more information.
11      Q.  Okay.  Well, let me give you this
12  information.  Please accept this as true for the
13  purpose of this question.
14      Please consider this:  That both Martin
15  Dunford and Lucas Kranck said that this investment
16  deal did not go forward because the parties could
17  not find a suitable replacement for Jonathan Seex as
18  CEO.
19      Assuming those facts are true, would that
20  not make a difference to your opinion in this case?
21      MS. JOHNSON:  Objection.  Incomplete
22  hypothetical.  Calls for speculation.  Assumes
23  facts not in evidence.
24  BY MR. WISNER:
25      Q.  You can answer, sir.

Page 66

1       A.  Still insufficient information.  I would
2   want to know why they were not able to find a
3   replacement, whether it had to do with there not
4   being any such person or whether there was such
5   person but they could not come to agreement between
6   themselves or whether there was such a person but
7   they were not offered sufficient compensation or
8   other value to induce them to accept an offer.
9   There's more that needs to be said about the why,
10  and I don't have that information based on what
11  you've represented to me so far.
12      Q.  Okay.  Let me add to it, then, because I
13  have additional information which I would like you
14  to consider.
15      Assume for the purpose of this question
16  that both Martin Dunford CEO of Tamarind Management
17  Limited -- Tamarind Management Group and Lucas
18  Kranck the principal of Ascent Capital have stated
19  that the investment by Ascent Capital to Tamarind
20  Management Limited did not go forward because of the
21  inability of both parties to find a replacement for
22  Jonathan CEO as -- John Seex as CEO, not find any
23  replacement for him, not just that they found
24  someone who wasn't agreeable, could not find any
25  replacement for him and regardless of how much they

Page 67

1   wanted to pay and because of Jonathan Seex's unique
2   abilities and capabilities.  Assuming all those
3   facts.
4       Now, would that not make a difference in
5   your opinion here?
6       MS. JOHNSON:  Objection.  Asked and
7   answered.  Incomplete hypothetical.  Calls for
8   speculation.  Assumes facts -- many facts not
9   in evidence.
10  BY MR. WISNER:
11      Q.  You can answer.
12      A.  Well, I need you to clarify.
13      Which opinion of mine would you want me to
14  consider whether it would change or not?
15      Q.  Whether the impact of Jonathan Seex's
16  death -- whether Jonathan Seex's death had an impact
17  on the value of Tamarind Management Limited.  That's
18  what I want you to know -- what I want to ask you.
19      MS. JOHNSON:  Same objections.
20  BY MR. WISNER:
21      Q.  You can answer, sir.
22      A.  I still don't have enough information.  So
23  you've given me information that if I take all of
24  your representations as true, and I don't know them
25  to be true, but let's accept them as true, the only

Page 68

1   thing that establishes is that the transaction with
2   Ascent didn't go forward because of not being able
3   to find a replacement for Mr. Seex.  That doesn't
4   address directly the question of value.
5       We know from the letters of intent that at
6   least as of March, Ascent did not change its
7   valuation methodology based on Mr. Seex's death.
8   Now, I recognize that the transaction not going
9   through may change the question of what valuation
10  you'd need.  But that's the -- a further question
11  that needs to be asked and answered, and
12  Dr. Shenkar's done no analysis of that.
13      Someone could make such inferences, but
14  there's more information that still should be
15  considered such as that, to the best of my
16  knowledge, the company still has not replaced
17  Mr. Seex with an alternative CEO and yet they've
18  been able to operate for many years without a CEO,
19  which begs the question what are the specific skills
20  that are lacking and whether the existing
21  management, existing board, were able to fill the
22  gap.
23      Q.  You don't know anything about the specific
24  skills of Jonathan Seex, do you?
25      A.  No.

AARON DOLGOFF

## Page 69

```
 1          MS. JOHNSON:  Objection.
 2   BY MR. WISNER:
 3          Q.  And let me ask you, sir, assume that what
 4   I'm telling you is correct, that that letter of
 5   intent of March 30, 2019, even though it doesn't use
 6   the words "conditions present" but was conditioned
 7   specifically on finding a suitable replacement for
 8   Jonathan Seex and assuming furthermore that despite
 9   their best efforts, neither party could obtain any
10   replacement for Jonathan Seex, wouldn't that not
11   mean that the valuation stated in that March 30
12   letter is worthless, it's zero?  Isn't that true?
13          MS. JOHNSON:  Object to the form.
14   BY MR. WISNER:
15          Q.  The condition if it is conditioned on
16   something that was not -- the condition was not
17   being able to be fulfilled, that offer is zero.
18   It's not any kind of value.
19          True?
20          MS. JOHNSON:  Object to form.
21          Just let me make a couple more objections.
22   Incomplete hypothetical.  Calls for
23   speculation.  Assumes facts not in evidence.
24          THE WITNESS:  Can I answer?
25          MS. JOHNSON:  If you can.
```

## Page 70

```
 1          THE WITNESS:  The value -- I will agree
 2   with you that it indicates that this deal is
 3   off the table if what you say is true, that it
 4   was a condition present but not listed as such
 5   and that was the reason.
 6          That does not mean the value is zero, as
 7   your question phrased it, although your
 8   phrasing changed during the question so it was
 9   a little hard to follow.
10          And then none of this matters because
11   Dr. Shenkar doesn't value the change in the
12   value of the company as a result of losing this
13   deal.  That's just not what he's done.
14   BY MR. WISNER:
15          Q.  No.  But you do.
16          You do in part, don't you?
17          A.  I --
18          Q.  You say -- let me finish, sir.
19          You say that part of your opinion about
20   the -- being no difference in value is because the
21   offer -- the amount of the offer is the same -- for
22   March 6 is the same for March 30.  And I'm asking
23   you to you assume that there was a condition for
24   that March 30 letter of intent which made that
25   letter of intent zero.  And that takes away that
```

## Page 71

```
 1   part of the basis for your valuation opinion, does
 2   it not?
 3          MS. JOHNSON:  Object to form.
 4          THE WITNESS:  It does not because
 5   Dr. Shenkar's valuation exercise is conducted
 6   as of March which is when this letter was
 7   dated.  I don't know when the deal fell
 8   through.  How long it took.  At a different
 9   point in time the value might have changed.
10          And all my opinion says is that this
11   letter as of that time in March provides
12   evidence there was a belief that if they could
13   find a replacement, that it would not have
14   affected the formula used to determine value.
15   BY MR. WISNER:
16          Q.  If they could find a replacement; correct?
17          A.  Yes.  But that doesn't imply -- that
18   doesn't lead to the conclusion that absent the
19   replacement, the value of the firm has changed on a
20   pre-money basis which is the important question.
21          Q.  However, Mr. Dolgoff, if that March 30
22   letter of intent is conditional, as I have
23   represented it to you, then it is no offer at all.
24          Isn't that true?
25          You can't even use it as comparison
```

## Page 72

```
 1   because there's no offer.
 2          True?
 3          MS. JOHNSON:  Object to form.  Objection.
 4   It assumes facts not in evidence.  Calls for
 5   speculation.
 6          THE WITNESS:  There's -- there's clearly
 7   an offer --
 8   BY MR. WISNER:
 9          Q.  You can answer.
10          A.  -- and it's -- and it's conditional.  Many
11   offers are conditional.  This was conditional on
12   other things beyond that; hence, the conditions
13   precedent clause.
14          Q.  Are you aware that shortly after the
15   crash, Nadege Seex met personally with Lucas Kranck
16   of Ascent in which Lucas Kranck said he would only
17   be willing to proceed with the deal if they could
18   find a suitable replacement for Jonathan Seex the
19   CEO or Tamarind?
20          Are you of that?
21          MS. JOHNSON:  Objection.  Assumes facts
22   not in evidence.
23          THE WITNESS:  I don't recall the specifics
24   of her testimony, whether that was at a
25   particular meeting or some other time.
```

18 (Pages 69 to 72)

AARON DOLGOFF

Page 73

1  BY MR. WISNER:
2      Q.  Okay.  Have you seen an email from Lucas
3  Kranck to Nadege Seex confirming that they had met
4  and the date of meeting?
5      Are you aware of?
6      MS. JOHNSON:  Objection.  Assumes facts
7  not in evidence and, I believe, refers to a
8  document that's not been produced to us.
9      MR. WISNER:  Not true.  It's been
10  produced.
11      MS. JOHNSON:  Can you cite me a Bates
12  number?
13      MR. WISNER:  Sure.
14  BY MR. WISNER:
15      Q.  Have you seen any such email?
16      MS. JOHNSON:  Same objection.
17      THE WITNESS:  I don't recall seeing that
18  such email.
19  BY MR. WISNER:
20      Q.  Okay.  And are you aware that Lucas Kranck
21  of Ascent Capital said that, quote, We were buying
22  the jockey, unquote.
23      Are you aware of any statement to that
24  effect?
25      MS. JOHNSON:  Objection.  Assumes facts

Page 74

1  not this evidence?
2      THE WITNESS:  I'm not aware of that.
3  BY MR. WISNER:
4      Q.  You're not aware of that?
5      Are you aware that Ascent Capital deemed
6  the continued leadership of Jonathan Seex
7  specifically to be a specific condition of this
8  deal?
9      Are you aware of that?
10      MS. JOHNSON:  Objection.  Assumes facts
11  not in evidence?
12      THE WITNESS:  Which deal?  The one before
13  his death or the one shaped after his death?
14  BY MR. WISNER:
15      Q.  The one after his death, Mr. Dolgoff,
16  obviously.
17      MS. JOHNSON:  Same objection.
18      THE WITNESS:  Well, then it would be
19  impossible because Mr. Seex was not alive in --
20      (Simultaneous speakers - unclear.)
21      THE WITNESS:  -- so I don't know why they
22  would condition --
23      (Simultaneous speakers - unclear.)
24      THE WITNESS:  -- and meaning that.
25

Page 75

1  BY MR. WISNER:
2      Q.  Well, they're saying, Mr. Dolgoff, and
3  assume this is true, that Mr. Kranck has said,
4  "Look, I only wanted the deal because I wanted to
5  buy the jockey, Mr. Seex.  And once that jockey
6  died, I'm not interested in the deal unless you can
7  find me a jockey of similar capabilities."
8      Are you aware of that?
9      MS. JOHNSON:  Objection.  Assumes facts
10  not in evidence.  Incomplete hypothetical.
11  Form.
12      THE WITNESS:  I'm not aware of any
13  specific statement by Mr. Kranck.
14  BY MR. WISNER:
15      Q.  Wouldn't you like to be aware of all these
16  additional facts, Mr. Dolgoff, before you give an
17  opinion saying that an important evidence for you
18  about the value of the impact of the death of
19  Jonathan Seex on Tamarind Limited was this letter of
20  intent, wouldn't you like to have all the facts
21  behind that before making that opinion?
22      MS. JOHNSON:  Objection.
23      Given that Mr. Dolgoff's opinion is based
24  on the information that was provided to us by
25  plaintiffs.

Page 76

1  BY MR. WISNER:
2      Q.  Yeah.  What --
3      (Simultaneous speakers - unclear.)
4      A.  I would like to have had all the
5  information that was provided to Dr. Shenkar prior
6  to his formulating his opinions expressed in his
7  original report.  If any of that was provided to him
8  before that, I would have loved to have seen that
9  prior to issuing my rebuttal.  None of that
10  information was referenced in Dr. Shenkar's report,
11  so I had not even any inclination that such
12  information existed.
13      Q.  Well, now I'm giving you the information.
14  I'm giving you the opportunity as an expert bound by
15  ethical considerations to consider that information
16  in revising your opinions.
17      MS. JOHNSON:  That's totally improper.
18  BY MR. WISNER:
19      Q.  Do you want --
20      (Simultaneous speakers - unclear.)
21      A.  I will consider it and I will get back to
22  you at a later date once I've fully considered it.
23      Q.  Okay.  That's fair enough.
24      Would you -- strike that.
25      Do you understand, Mr. Dolgoff, that

19 (Pages 73 to 76)

AARON DOLGOFF

Page 77

1   Mr. Seex was in excellent health?
2       A.  I understand that that's been -- that's in
3   the record -- discussed in the record, yes.
4       Q.  Okay.  And do you understand that -- well,
5   strike that.
6           You understand that the parties, TML and
7   Ascent Capital, actually even used a headhunter,
8   corporate headhunter to try to find a replacement
9   for Jonathan Seex?
10          MS. JOHNSON:  Objection.  Assumes facts
11  not in evidence.
12          THE WITNESS:  I'm not aware of it, but I'm
13  not surprised by that in that that would be the
14  appropriate way to search for someone who would
15  take a CEO role.
16  BY MR. WISNER:
17      Q.  And as you have pointed out, they
18  obviously didn't find one because they haven't even
19  replaced him as CEO for the last six years; correct?
20          MS. JOHNSON:  Object to form.
21          THE WITNESS:  I don't know if they
22  continued looking at what points in time and
23  whether the effort's been abandoned for periods
24  of time or not.  I just don't know the full
25  chronology.

Page 78

1   BY MR. WISNER:
2       Q.  Okay.  Have you any information as to any
3   reason why this deal did not go forward other than
4   the inability to find a replacement for Jonathan
5   Seex?
6           MS. JOHNSON:  Object to form.
7           THE WITNESS:  No, I do not.
8   BY MR. WISNER:
9       Q.  Are you aware -- well, I'm going to try to
10  find something.  Just a second.
11          Are you aware that Jonathan Seex was the
12  largest single shareholder in Tamarind Management?
13      A.  If by single you mean an individual
14  person --
15      Q.  Yes.
16      A.  -- I believe that's the case, but I
17  believe the parent company had a larger holding.
18  And I don't know the ownership structure of the
19  parent company to say if by implication somebody
20  else effectively had a larger share or not.
21      Q.  Do you remember recall seeing a document
22  entitled "Action Plan" or "Plan of Action" in which
23  the board of Tamarind Management referred to
24  Jonathan Seex taking the company to the next level?
25          Do you remember seeing anything like that?

Page 79

1       A.  I don't recall the phrase "taking it to
2   the next level."  I do recall a document with the
3   phrase "Action Plan" on it.
4       Q.  Okay.  Are you aware of the ages of the
5   current executives of Tamarind Management, the board
6   and the executives?
7       A.  No.
8       Q.  I was trying to find, because I thought
9   you said somewhere in your report, that Jonathan
10  Seex was sort of a big picture type of guy,
11  concerned with strategy and growth.
12          Do you remember saying something to that
13  effect in your report?
14          MS. JOHNSON:  Object to form.
15          THE WITNESS:  I was citing to an
16  information memorandum that described his role
17  in those terms.
18  BY MR. WISNER:
19      Q.  Okay.  Now, but you don't have any real
20  particular information as to what Jonathan Seex did
21  as CEO of Tamarind Management; right?
22      A.  What he did day to day, no.
23      Q.  Do you know, for example, that he was not
24  an in-your-office type of CEO, that he routinely
25  patrolled every part of Tamarind Tree Hotel and the

Page 80

1   restaurants?
2           Do you know that?
3           MS. JOHNSON:  Object to form and assumes
4   facts not in evidence.
5           THE WITNESS:  What do you mean by
6   routinely?
7   BY MR. WISNER:
8       Q.  Like every day.  Every day he would walk
9   through that hotel and the restaurants and see what
10  was going on, even to the point of stopping at
11  tables and arranging the silverware around the
12  plates.
13          Are you aware of that?
14          MS. JOHNSON:  Objection.  Assumes facts
15  not in evidence.
16  BY MR. WISNER:
17      Q.  You can answer.
18      A.  I'm not aware of that.  Did he go every
19  day to both cities and multiple locations or just
20  one hotel?
21      Q.  I'm assuming -- I'm asking you to assume
22  he would go to other locations, but I'm assuming on
23  a daily basis -- asking you to assume on a daily
24  basis that hotel, Tamarind Tree Hotel in Nairobi,
25  and the nearby Carnivore Restaurant.  He was there

20 (Pages 77 to 80)

AARON DOLGOFF

Page 81

1  on a daily basis watching everything when he was in
2  town.
3          Are you aware of that?
4          MS. JOHNSON:  Objection.  Assumes facts
5  not in evidence.
6          THE WITNESS:  I don't even know what you
7  mean by watching everything.
8          (Simultaneous speakers - unclear.)
9  BY MR. WISNER:
10   Q.   You're the one that said he's a
11  big-picture guy.
12          I'm asking you to assume that he was not,
13  that he was very much a hands-on CEO overseeing
14  every part of that operation.
15          Are you aware of that?
16          MS. JOHNSON:  Same objection.
17          THE WITNESS:  Am I aware that you're
18  asking me to assume something?
19  BY MR. WISNER:
20   Q.   No, no, no.
21   A.   How can you -- sir, may I answer the
22  question --
23   Q.   Yeah.
24   A.   -- before you cut me off?
25   Q.   Yeah, if you'd answer it, I'd be happy for

Page 82

1  you to do that.
2          I'm asking you, sir, are you aware that
3  this was the type of CEO Johnson Seex was, he was
4  very much hands-on type of guy?  Define that however
5  you want.
6          MS. JOHNSON:  Objection.  Assumes facts
7  not in evidence.
8          THE WITNESS:  I don't know how to define
9  that.  All I know is Dr. Shenkar in his report
10  described something about management by walking
11  around, and I don't even know what that means
12  beyond that, of course, managers will check in
13  on operations perhaps daily, perhaps not.  That
14  doesn't necessarily mean they're taking
15  specific managerial control over that.  They
16  may just be wanting information.  There's
17  nothing wrong with that, for a CEO to want such
18  information.
19  BY MR. WISNER:
20   Q.   Mr. Dolgoff, I think you said for the last
21  20-something years you've been working for -- what's
22  the name of your company? -- CRA; right?
23   A.   Charles River Associates, yes.
24   Q.   Yeah.  Thank you.
25          And you say on page 2 of your report under

Page 83

1  "Qualifications," Mr. Dolgoff -- tell me if I read
2  this correctly -- "I have worked as a consultant at
3  CRA for over 20 years"; right?
4          Did you find that?
5   A.   Yes.
6   Q.   And then you continue to say, same
7  paragraph, "My consulting work is focused on expert
8  testimony related to damages in a variety of areas
9  including valuation disputes, compensation and
10  unemployment disputes, commercial disputes,
11  securities litigation, and regulatory matters";
12  right?
13   A.   Yes.
14   Q.   So your consulting work is as an expert
15  witness; right?
16   A.   Not exclusively but primarily.
17   Q.   You're primarily a professional expert
18  witness; correct?
19          That's who you are?
20   A.   I think at this point it's more than half
21  of my time.  Other time it may be supporting other
22  witnesses, so I will be called a consultant, and
23  other times on projects that are not dispute related
24  at all.
25   Q.   Well, how much of your time is spent

Page 84

1  consulting on projects that are not dispute related.
2   A.   It varies.  Over the last -- last week,
3  for example, I think I spent more than half of my
4  time on something that's not dispute related.  Other
5  times it's a hundred percent of my time.
6          (Simultaneous speakers - unclear.)
7   Q.   How about on a yearly basis, how much of
8  your time is spent as an expert witness consulting
9  other witnesses in dispute-related matters?
10   A.   Probably 90-plus percent on average.
11   Q.   Do you have any information, Mr. Dolgoff,
12  regarding either Tamarind Management Limited or
13  Jonathan Seex other than what is stated in the
14  factual part of your report which is on page 4 all
15  the way to 6 under "Background," "Factual
16  Background"?
17          MS. JOHNSON:  Objection.
18          THE WITNESS:  Can you repeat the question?
19  I didn't -- I didn't catch the beginning part.
20  BY MR. WISNER:
21   Q.   Sure.
22          Do you have any information, other than
23  what you stated today and as what is stated in your
24  report on pages 4 and 5 under "Background," "Factual
25  Background," about Tamarind Management Limited or

TC Reporting, Inc.
(516) 795-7444

AARON DOLGOFF

Page 85

1  Jonathan Seex?
2        MS. JOHNSON:  Objection.
3        THE WITNESS:  Well, I've considered
4  additional documents that bear on that
5  including, for example, the projections that --
6  the five-year plan, projections that I
7  reference in any supplemental report.
8  BY MR. WISNER:
9     Q.  Anything else?
10    A.  We talked earlier about documents that I
11 considered that I think bear on some of these facts
12 that were omitted from my "Documents Considered"
13 list, but they're not referenced in this section of
14 the report.
15    Q.  Okay.
16    A.  And, of course, there are facts in the
17 documents cited in this section of the report, the
18 section that the report itself doesn't bring to
19 light, but they are in the documents themselves.
20    Q.  Well, can you tell me what you're talking
21 about there?
22    A.  For example, the information memorandum
23 has multiple pages describing the different
24 restaurants, the different hotels, the growth
25 opportunities, management, the structure of the

Page 86

1  company, some financial projections.  The audited
2  financial statements contain significant amounts of
3  information about who's on the board of directors,
4  the auditors' opinions, going concern opinions, the
5  performance over time, details about operating
6  performance including as it affects the financial
7  statements.  Taxes are mentioned in the financial
8  statements.  Those are long documents with many
9  facts in them.
10    Q.  Okay.  Let me restrict that a little bit.
11       Do you have any additional information
12 about Jonathan Seex other than what you've testified
13 to today and other than what's in the -- your report
14 on page 4 to 5 under "Factual Background"?
15       MS. JOHNSON:  Objection.
16       THE WITNESS:  I know what Dr. Shenkar has
17 claimed in his report and where there was
18 anything provided of evidence of that, I would
19 have reviewed it and there are things that he
20 claimed that there was not evidence.  I know,
21 for example, he claimed in his report about
22 Mr. Seex' fitness or activity level.  I can't
23 remember the exact phrasing.  He provided no
24 backup to that, but I'm also aware of
25 Mrs. Seex's testimony that when he could, he

Page 87

1  would I think go to the gym at the country club
2  and/or bike 50 kilometers, or whatever the case
3  may be.  So I'm aware of other facts that are
4  in the record.
5  BY MR. WISNER:
6     Q.  Okay.  Would you look to page 3 of your
7  report, the last sentence?
8     A.  Okay.
9     Q.  You see where it says "However, in doing
10 so, Dr. Shenkar relies on unsupported assertions and
11 assumptions about Mr. Seex, ignores that some of
12 those larger effects are still rather small and
13 ignores that the studies finding the largest effects
14 are not applicable to Mr. Seex or TML."
15       Did I read that correctly?
16    A.  Yes.
17    Q.  I just want to ask you about the first
18 thing, unsupported assertion and assumptions about
19 Mr. Seex.
20    A.  There's a section in my report that
21 elaborates on that.  We can go to that section and
22 we can go through it together.
23    Q.  Yeah, please.
24       Would you show me that one about Mr. Seex?
25    A.  Section starting on page 30.

Page 88

1     Q.  Okay.  All right.  Ready.
2     A.  And what you'll see, paragraph 78
3  discusses several topics and under --
4       (Court reporter clarification.)
5     A.  Paragraph 78 discusses where Dr. Shenkar
6  made assertions or unsupported assertions or
7  speculative assertions.  And by that I mean that he
8  had references to things in his report without any
9  reference to any basis for them, either speaking to
10 someone, notes from a meeting, documents in the
11 record.
12       And so I was reacting to things that are
13 in his report that had no cited basis to them, and I
14 would expect an expert report to include not just
15 the opinions, but the bases for all the opinions.
16       So I was pointing out Dr. Shenkar makes
17 certain assertions.  And some of these are about
18 Mr. Seex.  Some of them are about the implications
19 of Mr. Seex's status for valuation which is a little
20 different than assertions as him as an individual.
21       So if you'd like, we can go through these
22 one by one and read through them, but that's a
23 summary of what that section is about.
24    Q.  Okay.  I appreciate that.
25       But what I'm getting at is not the

TC Reporting, Inc.
(516) 795-7444

AARON DOLGOFF

Page 89

1  implications. I'm looking at the unsupported
2  assertions and speculative assertions.
3          I'm looking for errors that you believe
4  were made by Dr. Shenkar in his report about the
5  different things you set forth in your bullet point
6  under paragraph 78.
7          For example, sir, you mention that
8  Mr. Seex's father died nearly ten years before
9  Mr. Seex became CEO, and then you go on to talk
10  about whether that's a relevant issue, therefore
11  without impact.
12          I understand that. But is there anything
13  factually incorrect in any of these bullet points?
14          MS. JOHNSON: Object to the form.
15          THE WITNESS: Factually incorrect by whom?
16  BY MR. WISNER:
17      Q.  By Dr. --
18          (Simultaneous speakers - unclear.)
19      A.  The assertions and unsupported assertions
20  and speculative assertions are not necessarily about
21  facts.
22          So, for example, age and tenure, I think
23  those are well established what Mr. Seex's age was
24  when he died and his tenure as CEO. We know when he
25  was appointed as CEO. Those facts are well

Page 90

1  established.
2          As far as educational background, the fact
3  of Mr. Seex's educational background is well
4  established. There is some speculative assertions
5  by Dr. Shenkar about whether that particular
6  education fits how the literature evaluates
7  education and whether that applies in the context of
8  valuing the impact of that on the firm.
9          Fitness, at the time I wrote my report, I
10  was not privy to any information by Mrs. Seex's
11  testimony about Mr. Seex's activity level. So to me
12  at that time it was -- it was an assertion that was
13  unsupported or speculative. I didn't know whether
14  Dr. Shenkar actually knew Mr. Seex's activity level
15  or fitness. All I knew is he made a blanket
16  statement about it without a footnote telling me how
17  he knew such information. That's what I mean by
18  unsupported information.
19      Q.  I see.
20      A.  Things can be unsupported and yet still be
21  facts. He just didn't provide the support to
22  establish them as facts.
23      Q.  That's what I'm getting at.
24          I'm looking for any information you have
25  that any statements by Jonathan Seex by Dr. Shenkar,

Page 91

1  particularly in paragraph 78 in the bullet points,
2  are not true factually.
3          MS. JOHNSON: Objection.
4          THE WITNESS: I don't know whether some of
5  these are -- like the company sector point is
6  important in that --
7          (Simultaneous speakers - unclear.)
8          THE WITNESS: May I finish my answer,
9  please?
10  BY MR. WISNER:
11      Q.  Sure, go ahead.
12      A.  We talked earlier about how -- this
13  management by walking around. You asked me
14  questions about that.
15          I still don't have, beyond your
16  representations, any factual evidence of what he
17  actually did and what does that mean in terms of how
18  would that affect the value of the company with him
19  not being there. Walking around is a vague term.
20  It's -- it's not a technical term of economics.
21  It's just a general managerial style, but it doesn't
22  help inform Dr. Shenkar's valuation in any
23  quantitative, tangible way.
24          And I don't know how to bridge the gap
25  between his assertions that it matters to his

Page 92

1  valuation analysis in which he does some
2  calculations untethered to what he's -- particular
3  observations that he's made.
4      Q.  Would you agree with me, then, that Nadege
5  Seex would have the best information as to her
6  husband's health to begin with?
7          MS. JOHNSON: Objection.
8          THE WITNESS: I will accept that as a
9  possibility. I don't know what every husband
10  and wife share with each other.
11  BY MR. WISNER:
12      Q.  Okay. Would you agree with me that Nadege
13  Seex would have information as to what Jonathan Seex
14  did on a daily basis at Tamarind Management?
15          MS. JOHNSON: Objection.
16          THE WITNESS: She may have some
17  information. I would have to hear all of it to
18  evaluate whether that would inform
19  Dr. Shenkar's valuation in any quantitative or
20  any other way.
21  BY MR. WISNER:
22      Q.  Do you know -- sorry.
23          (Simultaneous speakers - unclear.)
24      A.  And I haven't seen any such testimony,
25  that I recall, that was specific enough that it

AARON DOLGOFF

Page 93

```
 1    could be used to inform a valuation opinion.
 2        Q.  Well, you would agree with me that maybe
 3    it wasn't asked at a deposition but could be used at
 4    trial?
 5        Do you agree with that?
 6        MS. JOHNSON:  Objection.  Calls for a
 7    legal conclusion.
 8    BY MR. WISNER:
 9        Q.  Go ahead, sir.
10        A.  It could be, yes.  There's certainly
11    evidence that could be brought at trial that has not
12    been put on the record yet.
13        I would expect Dr. Shenkar, to the extent
14    he would rely on such information prior to issuing
15    his opinions, that he would have identified the
16    information that he expects would be provided at
17    trial that would support his opinions.  He didn't do
18    so.
19        MR. WISNER:  Okay.  Chelsea, would you
20    pull up that you document I sent you, that
21    article?
22        VIDEOCONFERENCE MONITOR:  One moment.
23        Could you identify the name of the
24    document, sir?
25        MR. WISNER:  "Weaponizing Economics."
```

Page 94

```
 1        Do you see that?
 2        VIDEOCONFERENCE MONITOR:  Oh, I see that.
 3    Thank you.  One moment, please.  This will be
 4    marked as Exhibit 8 in one moment.
 5        (Plaintiff's Exhibit Seex-Dolgoff 8 was
 6    marked for identification.)
 7        VIDEOCONFERENCE MONITOR:  That should be
 8    available now as Exhibit 8.
 9    BY MR. WISNER:
10        Q.  Are you ready now, Mr. Dolgoff?
11        A.  I'm bringing it up.
12        Q.  I'm showing you what's been marked as
13    Seex-Dolgoff Exhibit Number 8 for identification.
14        Do you recognize this as an article
15    entitled "Weaponizing Economics:  Big Oil, economic
16    consultants, and climate policy delay"?
17        A.  I recognize there is a 15-page document
18    here with that title.
19        Q.  Okay.  And you are vice president of
20    Charles River Associates; right?
21        A.  Yes.
22        Q.  I presume you've seen this document
23    before?
24        A.  Not to the best of my recollection.
25        Q.  You have not?
```

Page 95

```
 1        A.  I just answered that.  I don't recall.
 2        Q.  Okay.  I thought I didn't hear you right.
 3        Okay.  You see under "Abstract"?
 4        A.  I see "Abstract," yes.
 5        Q.  The second sentence -- and I'll represent
 6    to you that when they refer to economist, they're
 7    referring to Charles River Associates.
 8        And tell me if I read this correctly.
 9    "The role of economists" -- I'm asking you to assume
10    that means Charles River Associates -- "however, has
11    received less attention.  Here, I trace the history
12    of an influential group of economic consultants
13    hired by the petroleum industry from the 1990s to
14    the 2010s to estimate the costs of various proposed
15    climate policies.  The economists used models that
16    inflated predicted costs while ignoring policy
17    benefits, and their results were often portrayed to
18    the public as independent rather than
19    industry-sponsored.  Their work played a key role in
20    undermining numerous major climate policy
21    initiatives in the US over a span of decades,
22    including carbon pricing and participation in
23    international climate agreements."
24        Did I read that correctly?
25        MS. JOHNSON:  Objection.
```

Page 96

```
 1        THE WITNESS:  No.  Because you inserted
 2    the phrase Charles River Associates.
 3    BY MR. WISNER:
 4        Q.  All right.
 5        A.  I don't see that.
 6        Q.  I agree with you.
 7        Let me just say economists, and let me
 8    just represent to you, and you can read through the
 9    whole document if you'd like, that they're talking
10    about Charles River Associates.
11        So I'd like for you to assume that for the
12    purposes of that question.  We can just say it
13    means -- it says what it says, the economist.  Okay?
14        Let's go on to -- I hope you have this
15    paginated.  I think you do.  It's on page 10.  It's,
16    like, the first full paragraph.  It says
17    "Discussion."
18        You ready, sir?
19        A.  No.
20        Q.  Okay.  Page 10.
21        A.  I see a paragraph starts with the word
22    "Discussion."
23        Q.  All right.  Tell me if I read this
24    correctly.
25        "Charles River Associates" -- and that's
```

24 (Pages 93 to 96)

AARON DOLGOFF

Page 97

1  your firm; right?
2      A.  It is.
3      Q.  -- "played a key role in weakening,
4  defeating, and delaying US climate policy for
5  decades.  The group's industry-funded reports
6  provided economic talking points used by fossil fuel
7  companies and the broader climate change
8  counter-movement, often in combination with science
9  denial, to oppose restrictions on carbon emissions."
10      Did I read that correctly?
11      A.  You read it correctly.
12      Q.  Okay.  Let me ask you that -- did you and
13  your colleagues at Charles River Associates follow
14  the process here of taking the conclusion that
15  Boeing wanted you to reach, that there was little or
16  no impact on TML of the death of Jonathan Seex and
17  then came up with whatever you could to try to reach
18  that conclusion?
19      Isn't that the process you followed here
20  just like the process followed by your colleagues in
21  the oil industry; correct?
22      MS. JOHNSON:  Objection.
23      THE WITNESS:  Can I read this entire
24  article before you represent to me what process
25  Charles River Associates followed before I

Page 98

1  answer any questions agreeing or not agreeing
2  to whether I followed the process in this case?
3  BY MR. WISNER:
4      Q.  You sure can.
5      A.  Okay.  It's going to take a while.
6      Q.  You know what --
7      A.  It's a long article.
8      (Simultaneous speakers - unclear.)
9      Q.  -- let the article speak for itself, and
10  that's all the questions I have for you.
11      A.  On that document?
12      Q.  Yep.  On everything.  I'm through with
13  you.
14      A.  Okay.  Thank you.
15      MS. JOHNSON:  All right.  Let's take a
16  short break and I'll see if I have any
17  questions.
18      MR. WISNER:  Okay.
19      VIDEOCONFERENCE MONITOR:  Wonderful.  We
20  are going off the record.  The time is
21  11:23 a.m.
22      (Off the record.)
23      VIDEOCONFERENCE MONITOR:  We are going
24  back on the record.  The time is 11:28.
25

Page 99

1      EXAMINATION
2  BY-MS. JOHNSON:
3      Q.  Mr. Dolgoff, before our last break,
4  plaintiff's counsel was questioning you about
5  Exhibit 8.
6      Do you remember that?
7      A.  Yes.
8      Q.  Had you ever seen that article before
9  Mr. Wisner showed it to you?
10      A.  No, I did not.
11      Q.  Have you had anything to do with that
12  work?
13      A.  No, nothing at all to do with that.  From
14  the abstract, it seems to relate to climate policy,
15  and I have not done any work whatsoever about
16  climate policy.
17      Q.  Have you ever provided any research on
18  behalf of the petroleum industry?
19      A.  No.
20      Q.  And did counsel, more specifically with
21  reference to this case, did counsel for Boeing or
22  anyone at Boeing or anyone ask you to reach any
23  particular conclusions in this case involving the
24  Seex family?
25      A.  No.  I was never asked to reach any

Page 100

1  particular conclusion.  The only instruction asked
2  of me was to review Dr. Shenkar's report and provide
3  my opinions about it.
4      Q.  Thank you.
5      MS. JOHNSON:  I have no further questions.
6      MR. WISNER:  Nothing else.  Thank you,
7  Mr. Dolgoff.
8      THE WITNESS:  Thank you.
9      VIDEOCONFERENCE MONITOR:  I'll just take
10  us off the record for the day.
11      We are going off the record at 11:30 a.m.
12  Central time, and this concludes today's
13  testimony given by Aaron Dolgoff.
14      (Deposition concluded at 11:30 a.m.)
15      (Pursuant to Rule 30(e) of the Federal
16  Rules of Civil Procedure and/or O.C.G.A.
17  9-11-30(e), signature of the witness has been
18  reserved.)
19
20
21
22
23
24
25

25 (Pages 97 to 100)

AARON DOLGOFF

## Page 101

```
1          C E R T I F I C A T E
2
3
   STATE OF GEORGIA:
4
   COUNTY OF FULTON:
5
6
7      I hereby certify that the foregoing transcript was
       taken down, as stated in the caption, and the
       questions and answers thereto were reduced to
8      typewriting under my direction; that the foregoing
       pages represent a true, complete, and correct
9      transcript of the evidence given upon said hearing,
       and I further certify that I am not of kin or
10     counsel to the parties in the case; am not in the
       regular employ of counsel for any of said parties;
11     nor am I in anywise interested in the result of said
       case.
12
13
14
15
16
       LEE ANN BARNES, CCR B-1852, RPR, CRR, CRC
17
18
19
20
21
22
23
24
25
```

## Page 102

```
1      COURT REPORTER DISCLOSURE
2
3      Pursuant to Article 10.B. of the Rules and
       Regulations of the Board of Court Reporting of the
4      Judicial Council of Georgia which states: "Each
       court reporter shall tender a disclosure form at the
5      time of the taking of the deposition stating the
       arrangements made for the reporting services of the
6      certified court reporter, by the certified court
       reporter, the court reporter's employer, or the
7      referral source for the deposition, with any party
       to the litigation, counsel to the parties or other
8      entity. Such form shall be attached to the
       deposition transcript," I make the following
9      disclosure:
10
11     I am a Georgia Certified Court Reporter. I am here
       as a representative of TC Reporting. TC Reporting
12     was contacted to provide court reporting services
       for the deposition. TC Reporting will not be taking
13     this deposition under any contract that is
       prohibited by O.C.G.A. 9-11-28 (c).
14
15
       TC Reporting has no contract/agreement to provide
16     reporting services with any party to the case, any
       counsel in the case, or any reporter or reporting
17     agency from whom a referral might have been made to
       cover this deposition. TC Reporting will charge its
18     usual and customary rates to all parties in the
       case, and a financial discount will not be given to
19     any party to this litigation.
20
21
22
       LEE ANN BARNES, CCR B-1852B, RPR, CRR, CRC
23
24
25
```

## Page 103

```
1      DEPOSITION ERRATA SHEET
2      WITNESS NAME:  Aaron Dolgoff
3      I, the undersigned, do hereby certify that I have
       read the transcript of my testimony, and that
4
5      ____ There are no changes noted.
6      ____ The following changes are noted:
7
8      Pursuant to Rule 30(7)(e) of the Federal Rules of
       Civil Procedure and/or OCGA 9-11-30(e), any changes
9      in form or substance which you desire to make to
       your testimony shall be entered upon the deposition
10     with a statement of the reasons given for making
       them.  To assist you in making any such corrections,
11     please use the form below.  If additional pages are
       necessary, please furnish same and attach.
12     Page ____Line ____Change to:_____
13     _____
14     Reason for change:_____
       Page ____Line ____Change to:_____
15     _____
16     Reason for change:_____
       Page ____Line ____Change to:_____
17     _____
18     Reason for change:_____
       Page ____Line ____Change to:_____
19     _____
20     Reason for change:_____
       Page ____Line ____Change to:_____
21     _____
22     Reason for change:_____
       Page ____Line ____Change to:_____
23     _____
24     Reason for change:_____
       Page ____Line ____Change to:_____
25     _____
       Reason for change:_____
```

## Page 104

```
1      Page ____Line ____Change to:_____
2      _____
       Reason for change:_____
3      Page ____Line ____Change to:_____
4      _____
5      Reason for change:_____
       Page ____Line ____Change to:_____
6      _____
7      Reason for change:_____
       Page ____Line ____Change to:_____
8      _____
9      Reason for change:_____
       Page ____Line ____Change to:_____
10     _____
       Reason for change:_____
11     Page ____Line ____Change to:_____
       _____
12     Reason for change:_____
       Page ____Line ____Change to:_____
13     _____
       Reason for change:_____
14     Page ____Line ____Change to:_____
15     _____
       Reason for change:_____
16     Page ____Line ____Change to:_____
17     _____
       Reason for change:_____
18     _____
19     _____
20     DEPONENT'S SIGNATURE
       Sworn to and subscribed before me this ____ day
21     of _____, 20__.
22     _____
23     Notary Public
24     My commission expires_____
25
```

26  (Pages 101 to 104)