# EXHIBIT 5

# In The Matter Of:
# ETHIOPIAN AIRLINES FLIGHT ET 302 CRASH-DAMAGES

_____

## ODED SHENKAR, PH.D.
February 11, 2025

_____

## *TC REPORTING, INC.*
*1 DEERFIELD EAST - 1850*
*QUOGUE, NY. 11959*

ODED SHENKAR, PH.D. - Vol. I

ODED SHENKAR, PH.D.

Page 13

1
2  sense.
3      A.  I promise not to be shy about it.
4      Q.  Good.  All right.
5          Last few little housekeeping items
6  here.
7          Is there anything at all that could
8  prevent you from giving your most complete and
9  accurate testimony as you sit here today?
10     A.  No.
11     Q.  Okay.
12         So just to confirm, no medications or
13 medical issues that might impact your testimony?
14     A.  Thankfully not.
15     Q.  Of course, you realize that your
16 testimony today in this deposition is just the
17 same as if you were giving testimony in court
18 under penalty of perjury?
19     A.  I do.
20     Q.  Okay.
21         I don't know if you've got a virtual
22 background there or not.
23         Is there anyone in the room with you
24 today?
25     A.  No.

Page 14

1
2      Q.  And do you have any physical documents
3  with you today?
4      A.  Any documents?
5      Q.  Yes, physical papers and --
6      A.  Yes, yes, I do.
7      Q.  Okay.
8          Could you just tell me real briefly
9  what you have with you?
10     A.  I basically have the -- my original
11 report.
12         I have the reports of Messieurs Guryan
13 Dolgoff.
14         I have a couple of notes, article, and
15 so forth that are part of what I have been doing
16 here.
17     Q.  And so let just break that down really
18 quickly.
19         The notes -- are those, sort of, your
20 handwritten working notes that are in your
21 expert file?
22     A.  Yes.
23     Q.  Okay.
24         And then when you say "articles," are
25 those articles that are cited in your report?

Page 15

1
2      A.  Yes.
3      Q.  Okay.
4          Do you have any articles with you that
5  were not cited in your report?
6      A.  Not that I can think of.
7      Q.  Okay.
8          And then the notes -- the working
9  notes that are part of your preparation of your
10 analysis -- do you know whether those materials
11 have been produced?
12     A.  Did you ask where?  Or when?
13     Q.  Whether.
14     A.  What do you mean?  Of course, if I
15 have a note, they have been produced.
16         I don't understand whether you are
17 asking where they have been produced, or when
18 they have been produced.
19     Q.  Sorry.  I'll clarify.
20         Do you know whether they have been
21 provided to counsel as part of your expert file?
22     A.  You mean in my own notes?
23     Q.  Yes.
24     A.  Not -- I mean, not that I can think
25 of.

Page 16

1
2      Q.  Okay.
3  ------------------------
   DISCOVERY REQUEST
4  ------------------------
5          MS. BRENNER:  So I'll just make a
6  request on the record for any notes that relate
7  to the calculations and the opinions in the
8  report --
9          MR. WISNER:  Yes --
10         MS. BRENNER:  -- okay.
11         MR. WISNER:  -- we can do that,
12 Alletta.
13         MS. BRENNER:  Okay.  Thanks.
14 BY MS. BRENNER:
15     Q.  So let's go ahead.
16         So that's great if you have to the a
17 copy of your report with you.
18         As you know, we've got the AgileLaw up
19 here, and there may be documents that we mark as
20 exhibits that will be up on the AgileLaw.
21         So far as it is easier for you to look
22 at your hand -- not your handwritten report --
23 your physical printed report that you have, that
24 is fine with me.
25         We'll just need to make sure that we

4 (Pages 13 to 16)

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 17

1
2  are checking that we are, in fact, looking at
3  the same document and that --
4      A.  Absolutely.  Yeah, it may be easier
5  for me.  And again, we can definitely check that
6  we are looking at the same thing.
7      Q.  Okay.  Fantastic.
8          MR. WISNER:  And Alletta, sorry to
9  interrupt you, but you also agree that he can
10 look at his notes in answering your questions,
11 because they might have things like citations to
12 articles and that that he's never going to
13 remember off the top of his head, but he can
14 look at them and tell you.
15         Is that fair?
16         MS. BRENNER:  That's fair, so long as
17 we get the notes produced.  And we might need to
18 talk a little bit about what he's got in his
19 notes, depending on --
20         MR. WISNER:  Sure --
21         MS. BRENNER:  -- what the question and
22 answer is.
23         MR. WISNER:  -- sure, because I think
24 there may be some citations to publications that
25 are not in his reports themselves that he might

Page 18

1
2  have before him.  So we will get you those --
3          MS. BRENNER:  Yes and --
4          MR. WISNER:  -- I'm not sure about
5  that, but there may be.
6          MS. BRENNER:  Okay.  Yeah, I
7  appreciate your alerting me to that.  And
8  definitely we want to make sure that we're all
9  operating from the same information.  Okay.
10 BY MS. BRENNER:
11     Q.  So moving on to a few more just kind
12 of preliminaries here.
13         You understand that you have been
14 retained as an expert witness by the plaintiffs
15 in the Seex case?
16     A.  I do.
17     Q.  Okay.
18         And you've prepared an expert report
19 dated November 30, 2024 setting forth the
20 opinions that you intend to offer to the jury if
21 you testified?
22     A.  I produced, as you are saying, report
23 or reports.
24     Q.  Okay.  So let's try to break those
25 down a little bit and understand a little bit

Page 19

1
2  better the opinions that you plan to give in
3  this case.
4          So kind of at a high level, the
5  opinions -- fair to say that the opinions you
6  intend to offer are about the economic loss to
7  Mr. Seex' family resulting from his death?
8      A.  That is correct.
9          I should add that I'm looking at this
10 case as I would look at any such case from a
11 business perspective, which includes not only
12 economics, but also related fields.
13     Q.  Got it.  Okay.
14         And so drilling down a little bit
15 more, fair to say that that loss that you are
16 offering an opinion on comprised of impacts both
17 on the value of stock that was owned by Mr. Seex
18 as well as lost compensation that he may have
19 received from his working? -- from his job?
20     A.  I would again divide it into two that
21 correspond to the two experts that you have
22 brought forward.
23         So we have Mr. Guryan -- or Dr. Guryan
24 looking at earnings.  Right?  And that's what,
25 you know, would be indeed one part.

Page 20

1
2          And then you have Mr. Dolgoff that
3  provided an opinion on any losses pertaining to
4  the equity that Mr. Seex had in the enterprise.
5      Q.  Okay.  Thank you for that
6  clarification.
7      A.  Sure.
8      Q.  So just to confirm, then, you are not
9  offering an opinion on lost income or economic
10 loss from any other sources, apart from these
11 two you've just identified?
12     A.  I am not sure what you mean by "other
13 sources."
14     Q.  So you've identified two components to
15 your opinion.
16         It looks like the first one is looking
17 at earnings?
18     A.  Right.
19     Q.  The second one is losses pertaining to
20 equity that Mr. Seex had in the business?
21     A.  That is correct, Alletta.
22         I presume -- I don't know what else
23 you would be looking at, but I presume if you
24 are looking at such things as, you know,
25 suffering and so forth, no, that's not something

ODED SHENKAR, PH.D.

Page 21

```
 2   that I have been asked to do, and it is not
 3   something that I'm an expert on.
 4       Q.   Okay.
 5           Setting aside those sorts of what we
 6   call noneconomic damages --
 7       A.   Right, right.
 8       Q.   -- are there any other economic
 9   damages apart from the two categories you just
10   identified that you are also offering an opinion
11   on?
12       A.   I think that these two categories, you
13   know, would basically cover it, unless there is
14   something that, maybe, relates on the interface
15   between them, and so forth.  But I would say,
16   you know, kind of thinking about it, I think
17   these were the two main issues.
18       Q.   Okay.
19           MS. BRENNER:  So let's go ahead and
20   mark an exhibit.  This first one, I guess, we
21   can call it for shorthand, maybe, "the TML
22   report."  And --
23           THE WITNESS:  Just again -- sorry to
24   interrupt, Alletta.
25           It will help me if you say -- if you
```

Page 22

```
 2   are going to start with the -- now that we
 3   divided it into earnings and equity, which one
 4   do you want to start with?
 5           MS. BRENNER:  Yes.  So I've got
 6   several documents here in front of me --
 7           THE WITNESS:  Okay --
 8           MS. BRENNER:  -- I want to start with
 9   the business --
10           THE WITNESS:  -- okay, okay --
11           MS. BRENNER:  -- and the title on this
12   document is:  Evaluating Tamarind Management
13   Limited (TML) & the Impact of Mr. Seex' Death.
14           And I believe it should be popping up
15   on the AgileLaw here so you can compare and see
16   what document I'm referring to.
17           THE WITNESS:  Yes, yes --
18           MR. WISNER:  Alletta, are you going to
19   mark this.  And if so, how should we mark it?
20   Should we mark it as Shenkar number 1?
21           MS. BRENNER:  Yeah, so we are going to
22   mark it.  And I think that -- yeah, that's what
23   we are -- it says on there -- it's small:
24   Seex_Shenkar number 1.
25
```

Page 23

```
 2           (Exhibit Defendant's Seex_Shenkar 1,
 3   Multipage document entitled: Evaluating Tamarind
 4   Management Limited (TML) & the Impact of Mr.
 5   Seex' Death, dated November 30, 2024 (no Bates
 6   Nos.), marked for identification)
 7           MR. WISNER:  Sounds good.
 8           THE WITNESS:  Let me just clarify that
 9   the things to what you have asked before about
10   report or reports --
11           MS. BRENNER:  Sure.
12           THE WITNESS:  -- these two reports go
13   together -- that is, the one that is titled
14   "CEO/Founder's Death and Company Value" and the
15   actual evaluation of the impact.
16           MS. BRENNER:  Okay.  So this --
17           THE WITNESS:  Just want to emphasize
18   that.
19           MS. BRENNER:  Okay.  So the document
20   we have just marked goes together with the
21   document that's titled:  CEO/Founder's Death and
22   Company Value?
23           THE WITNESS:  That is correct --
24           MS. BRENNER:  Okay, got it --
25           THE WITNESS:  -- the two obviously are
```

Page 24

```
 2   closely related, except --
 3           MS. BRENNER:  Understood --
 4           THE WITNESS:  -- except that the
 5   "CEO/Founder Death" is more of a summary of what
 6   we know in the field about that relationship.
 7           And then the other is specific to the
 8   case.
 9           But there is a relationship, of
10   course, between the two.
11           MS. BRENNER:  Okay.  Thank you for the
12   clarification.
13           I think we are going to mark them as
14   separate exhibits here just because they have
15   separate pagination and we got them as two --
16           THE WITNESS:  No problem --
17           MS. BRENNER:  -- documents --
18           THE WITNESS:  -- no problem.  I'm just
19   saying, you know, for us, it's very important to
20   see that relationship.
21           MS. BRENNER:  Okay.  Thank you.
22           All right.  So let's now go to page 7
23   of this document we have just marked.
24           And I'll draw your attention to the
25   "Summary" that you have at the very bottom --
```

ODED SHENKAR, PH.D.

Page 25

1
2       THE WITNESS: Yeah --
3       MS. BRENNER: -- at the top of the
4   page, at the end of page 7.
5       (Pause)
6   BY MS. BRENNER:
7       Q. So is it your opinion that based on a
8   discounted cash flow valuation of TML that the
9   Seex family experienced a loss of approximately
10  $4.5 million in the value of their TML equity
11  due to Mr. Seex' death?
12      MR. WISNER: Objection, just for a
13  second, Alletta. You might have misread that.
14  I have 4.9. Do you have 4-point --
15      MS. BRENNER: Yeah, I said 4.9.
16      MR. WISNER: Oh, I thought you said
17  4.5. Sorry to interrupt you.
18      MS. BRENNER: Yeah, no worries.
19      MR. WISNER: My hearing is bad.
20      A. As I say, based on the analysis and
21  the particulars of the case -- okay? -- that has
22  been my opinion, yes.
23      Q. Okay.
24      And does that remain your opinion
25  today?

Page 26

1
2       A. That remains my opinion.
3       I should add that this is a
4   conservative estimate. And the reason that I
5   say that is that there were some additional
6   material that have been provided in between my
7   writing of this opinion and today.
8       MS. BRENNER: So let's move on now.
9       I'm going to go ahead and mark another
10  document. And this one will be Exhibit 2.
11      And the title on this document is:
12  Lifetime Earnings Analysis for Jonathan Seex.
13      (Exhibit Defendant's Seex_Shenkar 2,
14  Three-page document entitled: Lifetime Earnings
15  Analysis for Jonathan Seex, dated November 30,
16  2024 (no Bates Nos.), marked for identification)
17      THE WITNESS: Okay. So we are moving
18  now to Dr. Guryan, correct?
19      MS. BRENNER: No, we are moving to
20  your analysis on lifetime earnings for Jonathan
21  Seex.
22      THE WITNESS: Yeah, but that's
23  basically what he was referring to. If --
24  again, to clarify -- if I understand correctly,
25  you have had two experts, right? One of them

Page 27

1
2   focusing on the earnings, right? And the other
3   focusing on the equity. Okay?
4       Am I right?
5       MS. BRENNER: That's correct.
6       THE WITNESS: Okay. So I -- just
7   again, for looking at and seeking the right
8   report on my part, that helps.
9       So now you are talking about earnings,
10  right?
11      MS. BRENNER: Yes.
12      THE WITNESS: Okay. That helps me.
13  Thank you.
14      MS. BRENNER: And it is up on the
15  AgileLaw for you if you want to see which report
16  we are talking about --
17      THE WITNESS: No, no, it's okay. It's
18  okay. No, no, no, I have it. I mean, so long
19  as you clarify, it's even easier for me to look
20  at the files. Thank you.
21      (Pause)
22      THE WITNESS: So have you asked me
23  anything about it? Or are you going to ask me
24  about it? I'm just --
25      MS. BRENNER: Sorry. I was waiting

Page 28

1
2   for you to get your --
3       THE WITNESS: No, I got them. I got
4   them.
5       MS. BRENNER: Okay. Okay. Sorry.
6       THE WITNESS: Okay, okay.
7       MS. BRENNER: I'll ask you next time
8   right away whether you --
9       THE WITNESS: No, no, no, we are not
10  in a rush here. I just wanted to clarify. We
11  are all good --
12      MS. BRENNER: Okay --
13      THE WITNESS: -- yes, please.
14  BY MS. BRENNER:
15      Q. So my first question with regards to
16  this part of your analysis is: Is it also your
17  opinion that the Seex family suffered economic
18  losses in the form of lost earnings from Mr.
19  Seex?
20      A. Yes.
21      Q. Okay.
22      And are you also offering an opinion
23  within that on the loss of support that the Seex
24  family would have received, but for Mr. Seex'
25  death?

7 (Pages 25 to 28)

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 121

1
2  Seex' deposition testimony?
3      A.  Again, I have not read her deposition.
4          But I have absolutely no reason to
5  question the information that I -- that I
6  received.
7      Q.  So apart from this information that
8  you received regarding the restaurants -- and
9  how did you receive that?
10         Was it written notes?
11         Or was it conveyed to you verbally?
12     A.  My understanding -- it was conveyed to
13 me from Mr. Wisner.
14         My understanding is that that was in
15 the text and in the paper that were found after
16 the tragic crash on the site.
17     Q.  Were those documents provided to you?
18     A.  No, I have not seen it, no.  Again, I
19 have no reason to question it.  But, no, I have
20 not seen it firsthand, no.
21     Q.  So if you have not seen the documents
22 firsthand, I will go back to my question a
23 minute ago.
24         How was that information conveyed to
25 you?

Page 122

1
2          Was it conveyed to you verbally?
3          Or did you receive some writing that
4  provided these facts?
5      A.  Either -- again, I mean, you know, I
6  wouldn't remember now, or I can go and check it.
7          I believe that I received it in an
8  email from Mr. Wisner --
9      Q.  Okay.
10         And --
11     A.  -- that's my best recollection.
12     Q.  And you have saved all of the
13 communications in which you received factual
14 information as part of your expert file?
15     A.  Factual information, yeah, I should
16 have it.
17     Q.  Okay.
18 -------------------------
   DISCOVERY REQUEST
19 -------------------------
20         MS. BRENNER:  So to the extent that's
21 not contained within my prior request on the
22 record, any documents in the file that contained
23 underlying facts that were relied on are being
24 requested.
25         MR. WISNER:  Okay.  Let me just

Page 123

1
2  respond after a minute, Alletta --
3          MS. BRENNER:  Yeah.
4          MR. WISNER:  I think if Dr. Shenkar
5  looks at his email, he will see that I sent him
6  those text messages and the documents from the
7  ledger found at the crash site.
8          And those are included in the list of
9  documents that he relied upon in doing his
10 updated reports.
11         He did get those documents.  I think
12 if he checks, he'll see that.
13         THE WITNESS:  Yeah, yeah.  As I said,
14 I don't recall every detail.
15         I focus -- I mean, you as a lawyer, I
16 guess, focus on that.
17         I focus on the underlying business
18 information, and that was my focus.
19         And when I received this information,
20 yes, that immediately raised important question,
21 and it was an important indication that -- and
22 again, whenever I see an indication, I go and I
23 follow up.
24         I mean, I look at more closely, again,
25 at the sector in Kenya, and in other countries.

Page 124

1
2  I'm looking at what, you know, the sector
3  situation is in Kenya, and other countries, and
4  so forth.
5          So I focus on that.
6          MR. WISNER:  Alletta --
7          MS. BRENNER:  Okay --
8          MR. WISNER:  -- Alletta, in response
9  to your request, without waiving the rule that
10 we normally don't have to disclose
11 communications with an expert, I will send you
12 my email to Dr. Shenkar where I also direct him
13 and show him the documents we're talking
14 about -- the text messages and the ledger.  I'll
15 send that to you.
16         MS. BRENNER:  Okay.  Thank you.
17 BY MS. BRENNER:
18     Q.  And so -- just to be clear, Dr.
19 Shenkar, until counsel spoke up here on the
20 record regarding what information he believes he
21 sent you, you didn't have any recollection of
22 actually reviewing the text messages or
23 notebook?
24     A.  That is not correct.
25         I review -- I reviewed the message, as

31 (Pages 121 to 124)

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 125

1
2  I said, as a summary.
3       I cannot look at, you know, or recall
4  every particular detail.
5       But I recall receiving this
6  information, so I guess I may have glanced at
7  the actual document.
8       But please understand, when I look at
9  that, I will look closely at the document, which
10 I very often do when I have a reason to question
11 whether it is accurate or not.
12      That was not the case here.
13   Q.   And just to be clear, you have never
14 spoken with Mrs. Seex directly?
15   A.   That is correct.
16   Q.   Now, apart from this information about
17 the future development of the business that
18 you've spoken about at length, are there any
19 other types of information that you had
20 requested for your analysis in this case that
21 you had not received?
22   A.   Not that I can think of offhand.
23   Q.   Okay.
24      And you referenced benefits
25 information and future development information.

Page 126

1
2       Is all of that information that you
3  had requested and didn't initially receive
4  information that you have now received?
5    A.   I believe so.
6       Again, let me emphasize that when I
7  start such a search, sometime I don't even know
8  what may be missing. Okay?
9       A company, a sector, you know, can
10 have something that is very peculiar, for
11 example -- okay? -- and that initially you may
12 not, you know, even think about it.
13      As I said, I officially -- I was not
14 sure if the company even have a pension plan
15 and, you know, and so forth.
16      So I requested it.
17      I believe that I now have most, if not
18 all, the pertinent information.
19      Have I missed something? Possibly.
20   Q.  Okay.
21      Of all of the documents that you've --
22 were provided in this case, did you review all
23 of them as part of your analysis?
24   A.   I am not sure what document you were
25 provided.

Page 127

1
2       As I said, I'm doing my best to look
3  at document that I received.
4       Understandably, I focus more and spend
5  more time on those that I judge to be pertinent,
6  or I have a reason to question, you know, their
7  authenticity, so forth.
8    Q.  So let's drill down on that, then.
9       Are there documents that you were
10 provided for this case that you didn't consider
11 pertinent to your analysis?
12   A.   I'm trying to think. There are -- I'm
13 not sure what document you would, you know, be,
14 you know, referring to.
15      There could be some that were
16 repetitive, for instance, vis-à-vis, you know,
17 benefits that have been mentioned already and
18 think things of the sort.
19      So, yes, if something were repetitive,
20 I already knew it, I did not consider it
21 pertinent.
22   Q.  Okay.
23      I think we can drill down further on
24 that as we talk more about the particulars of
25 your analysis.

Page 128

1
2    A.  Please.
3    Q.  Moving on really quickly a little bit
4  further.
5       So I understand that this is the first
6  case in which you have offered an expert opinion
7  in a wrongful death case.
8       Have you ever performed a calculation
9  of lost lifetime earnings in the context of
10 where someone died before this case?
11   A.   I have done of calculation of earnings
12 for someone who argued that his contract has
13 been abrogated, and that would continue for a
14 long time. It was not wrongful death, no, but
15 it was, call it, wrongful termination with
16 somewhat similar consequences, which meant the
17 loss of earnings for a long period.
18      (Pause)
19   Q.  And in that other case, though, the
20 individual had not died?
21   A.   That is correct.
22   Q.  Okay.
23      And in that other case, did the loss
24 of earnings include both earnings from wages and
25 from business income?

Page 157

```
 1
 2       Q.   So you don't know what information
 3   regarding the future performance or forecast of
 4   the business performance that Ascent was relying
 5   on in projecting that 20% rate of return?
 6       A.   Of course not.
 7            And I would say nobody else other than
 8   a principal of Ascent would have known that or
 9   would have revealed that.  I mean, they would
10   have known, but they would not have revealed
11   their analysis.
12       Q.   Okay.
13            So you had this information that was
14   conveyed to you from counsel from Ascent
15   Capital.
16            Any other information that you
17   received in any form from Ascent Capital beyond
18   what we have already discussed?
19       A.   Not --
20            MR. WISNER:  Objection.
21       A.   -- no, with the exception of the
22   letters that -- of intent that I did see, yeah.
23       Q.   Okay.
24       A.   But nothing else from Lucas beyond
25   what I mentioned.
```

Page 158

```
 1
 2            MR. WISNER:  Well, let me object,
 3   quickly.  This mischaracterizes his testimony
 4   because he did say there were two points and
 5   you've only asked him about the one.
 6            But you can answer it if there is
 7   another question.
 8            THE WITNESS:  You mean the intent?
 9            MR. WISNER:  Yeah, that's what I'm
10   getting at.
11       A.   No, no.  Of course, that is true --
12            MR. WISNER:  -- that's the letter --
13       A.   -- I answered, actually, about the
14   second one.
15            I put it the first one was the intent
16   because what we wanted to know, and actually to
17   confirm -- I mean, there was strong implication
18   of that also from Martin.
19            But we wanted to confirm whether the
20   letter of intent was withdrawn because of the
21   crash.
22            And the answer -- the answer very
23   clearly was "yes" that Ascent gave TML an
24   opportunity to find somebody -- a replacement of
25   his caliber, and they could not find one.
```

Page 159

```
 1
 2            So they -- I'm not sure even -- I
 3   mean, the way they might have said something
 4   about the jockey rather than the horse, and so
 5   forth.
 6            But it was crystal clear that they saw
 7   Jonathan as such an important asset to TML that
 8   they did not -- they did not continue with the
 9   offer because of his unfortunate death.
10            So these were really the two points of
11   information.
12            I actually put the intent as first,
13   but you were asking about the second point which
14   was the expectation in -- of increase in value.
15            (Pause)
16       Q.   Okay.
17            So that was the next thing I was about
18   to ask you about, so let's talk a little bit
19   more about it.
20            So you've referred to the information
21   that was provided to you in response to your
22   question about the LOI.
23            What specifically did you ask?
24       A.   My question -- the question that I,
25   again, forward, you know, Mr. Wisner to ask --
```

Page 160

```
 1
 2   was specifically:  Why was the letter of intent
 3   withdrawn.
 4            Keep in mind exactly the timeline.  It
 5   just so happened that the letter of intent was
 6   submitted days actually before the crash.  Okay?
 7            And it seemed to me just by following
 8   the sequence of events, you have a letter of
 9   intent before the crash, and suddenly it's
10   withdrawn right after the crash.
11            I mean, it seems obvious to me why,
12   but I wanted a confirmation.  And we did receive
13   a confirmation.  The death was the reason.
14       Q.   Okay.
15            And so -- and when you say "we
16   received a confirmation that that was the
17   reason," what exactly was conveyed?
18       A.   What was conveyed was that they saw
19   Mr. Seex as, call it again, the jockey as a very
20   important part and parcel of the company; so
21   much so that once he passed away, they were not
22   willing to proceed except if TML were to find
23   somebody equivalent.
24            They did not find somebody
25   equivalent -- which, by the way, should also
```

ODED SHENKAR, PH.D.

Page 161

1  tell you something about the earnings. Right?
2      I mean, you have here someone with
3  what we call in the field scarce and valuable
4  capabilities that are very difficult to
5  replicate.
6      So we got a confirmation of that.
7  Q. How was this information conveyed to
8  you?
9  A. You have asked me -- as I said, it was
10 conveyed to me by Mr. Wisner after he talked to
11 him.
12     Whether it was in the form of an
13 email, or a phone call, or both, I do not
14 recall.
15     I can look for it, but it will take
16 time.
17 Q. Okay.
18 -------------
19 DISCOVERY
20 -------------
21     MS. BRENNER: So sort of standing
22 request that we've already made: Insofar as
23 there was any written information provided to
24 you providing underlying facts for your
25 analysis, we're requesting those.

Page 162

1
2  BY MS. BRENNER:
3  Q. Fair to say based on your prior
4  testimony that you don't have written notes of
5  this information that was provided to you about
6  what was shared by Mr. -- by Lucas?
7  A. Yeah.
8  Q. Okay.
9      Now --
10     MR. WISNER: Alletta, if I may
11 interject, I will -- if we agree on not waiving
12 the privilege between a lawyer and an expert,
13 I'll be happy to send you the information that
14 Mr. Kranck gave me.
15     MS. BRENNER: Thank you.
16     MR. WISNER: May be some redactions,
17 but otherwise I'll give that to you.
18     MS. BRENNER: Okay. Thank you.
19 BY MS. BRENNER:
20 Q. All right. So I have a couple
21 follow-up questions here.
22     First question: When is it your
23 understanding that that 2019 offer and letter of
24 intent was withdrawn?
25 A. I don't have the exact day, but it was

Page 163

1  shortly after the crash.
2  Q. So you are referring to a condition
3  that was referenced in the second letter of
4  intent, in March 30, 2019?
5  A. In March 2019?
6  Q. March 30 of 2019?
7      MR. WISNER: Can you show him the
8  letter of intent? And point him --
9      MS. BRENNER: Let's go ahead and mark
10 it.
11     (Pause)
12     MR. WISNER: Okay. It is going to be
13 exhibit 6 I think?
14     MS. BRENNER: Exhibit 6.
15     (Exhibit Defendant's Seex_Shenkar 6,
16 Four-page letter from Ascent Capital MGT Africa
17 Ltd. to Phil N. Gutsche, dated March 30, 2019
18 (no Bates Nos.), marked for identification)
19     MS. BRENNER: Okay. What I want to
20 draw your attention to --
21     THE WITNESS: Okay.
22     MS. BRENNER: -- are the discussion in
23 this document about the requirements.
24     And so if you go -- I'm afraid there

Page 164

1  is no page numbers here.
2      But on the second page --
3      THE WITNESS: So --
4      MR. WISNER: Alletta, can you identify
5  for the record that's the March 30 form?
6      MS. BRENNER: Yes, that is the March
7  30, 2019 letter of intent, and we've just marked
8  it as Exhibit 6.
9      MR. WISNER: Okay.
10     MS. BRENNER: And I would like to draw
11 your attention to the second-to-the-last
12 paragraph on page 2 of the letter.
13     THE WITNESS: Second-to-last. Can you
14 scroll down and -- the parties agree?
15     MS. BRENNER: Yes.
16 BY MS. BRENNER:
17 Q. And I'll just read this into the
18 record really quick.
19     The parties agree to work closely
20 together during the Due Diligence phase to
21 identify and agree on a suitable CEO to be
22 appointed latest on signing of the transaction
23 documents.
24     Did I read that correctly?

ODED SHENKAR, PH.D.

Page 221

1
2  right? This is what I have done. Okay?
3      (Pause)
4  Q.  Okay.
5      But -- I'm not trying to be difficult
6  here.
7      But my question was whether or not
8  you've performed a valuation of the company as
9  of today based on actual performance.
10     And so the answer to that is: No?
11     MR. WISNER: Mischaracterizes.
12     Objection, mischaracterizes his
13 testimony.
14     His report clearly states the value of
15 the company with and without Jonathan Seex as of
16 a date in November 2024.
17     Says it right in the report. You are
18 mischaracterizing his testimony.
19 A.  I think again -- I mean, I think it's
20 very clear.
21     As I said, I relied on what were
22 available, but my focus is on projecting
23 forward -- okay? -- because I have to look not
24 only from 2029 -- from 2019, not only from 2024,
25 but where the business could have been going to

Page 222

1
2  in the same way -- let me emphasize -- in the
3  same way that you want to look at earnings --
4  right? -- up to -- and I know your expert
5  disagree with that, we can get to that as well,
6  if you want -- but in the same way, I have to
7  look at the impact, you know, going forward. I
8  have to look at it long range. Okay? What is
9  the value.
10     When the unfortunate widow will decide
11 to sell or not -- that's not my business. And
12 that's not what I've had to do --
13 Q.  So --
14 A.  -- if she were to ask me, yeah, I
15 could give her an estimate of what I think it
16 would be worth at a certain, you know, year, and
17 so forth.
18     But that's not what I have been asked
19 to do, and that's not what I'm doing.
20 Q.  Okay.
21     So you said a minute ago that you have
22 been asked to provide an opinion on change in
23 value between what would have been and what
24 actually happened, correct?
25 A.  Hm-hmm, yeah.

Page 223

1
2  Q.  So what I'm trying to drill down and
3  understand is what you did to arrive at the what
4  actually happened piece of that analysis.
5      So what I think you are saying is that
6  you've performed an analysis that is based on
7  projections that you made from the March 10th,
8  2019 valuation date.
9      Is that right?
10 A.  Yeah.
11 Q.  Okay.
12     And as part of figuring out the delta
13 between those two scenarios, you did not do an
14 independent valuation of the company as it
15 stands today, or as of November 30?
16 A.  There is a valuation -- there is --
17 you know, this case is really interesting,
18 because you actually have a direct evaluation in
19 addition to any technique that you are going to
20 use.
21     And admittedly, there are multiple
22 such techniques in space. And this is the next
23 letter of intent of 2022.
24 Q.  Okay.
25     But what I'm asking is whether you've

Page 224

1
2  done any valuation based on the actuals to reach
3  that what-actually-happened number.
4      Or is that number based on your
5  valuation as of March 10, 2019?
6  A.  I've done, in a way, both.
7      I mean, you do look at what it is now,
8  even though what it is now is much less
9  relevant.
10     Again, what is relevant, it was in
11 2019, and where it could have been if Jonathan
12 had not died. Okay?
13     So you must keep that in mind.
14 Q.  Okay.
15     So based on the information that you
16 have, do you have an understanding of what the
17 company is actually worth today?
18 A.  What the company is worth today is
19 what people will pay for it. Okay?
20     What we know is what the -- what a
21 third party -- an objective third party -- was
22 willing to pay in 2022 vis-à-vis 2020. Okay?
23     It is actually -- forget everything
24 else you look at. This is the first case I have
25 ever seen that you have such a direct

ODED SHENKAR, PH.D.

Page 225

1
2  indication.
3         Now, it's only for about, you know,
4  maybe, three years.  But it gives you an idea.
5         But, again, you keep forgetting that
6  you are comparing two different things.  I mean,
7  what you are comparing is what is the value
8  today, of which the best indication is what
9  somebody is willing to pay for it.  Okay?
10         Now, the question is:  What would it
11  have been otherwise.
12         And more importantly -- much more
13  importantly -- what it would have been years
14  from now.
15         I mean, after all, Ascent initially
16  wanted; and then later five years, they wanted a
17  five-years window, may well go beyond that.
18         So if, again, you want to look at what
19  had happened two years from now, you have no way
20  to make really an attribution.
21         So you can continue to go around and
22  around.  You'll get the same answer.
23      Q.  Okay.
24         MS. BRENNER:  I believe I have gotten
25  to almost the end of this line of questions.  I

Page 226

1
2  just have one kind of clean up question I want
3  to ask.
4         Then I'd like to take a quick break so
5  we can recalibrate because we have been going
6  about an hour.
7         THE WITNESS:  Please.
8  BY MS. BRENNER:
9      Q.  So just to be clear, apart from the
10  COVID pandemic, is there anything else that you
11  considered but did not incorporate into your
12  analysis in constructing, you know, your but-for
13  scenario versus the actual scenario?
14      A.  Not that I can think of.
15         But, again, you know, when you look
16  long term, they -- yeah, there can be a lot of
17  things that will have an impact.  There could be
18  a revolution tomorrow.
19         I mean, look at this country.  I mean,
20  people changing, everyone now -- getting phone
21  call left and right changing the projection, I
22  mean, after the election.
23         I mean, I don't know what's going to
24  happen tomorrow.
25         But I can give you an educated guess

Page 227

1
2  that is based on what we know.  And what we know
3  is what we find in the scholarly literature.
4         So that is my answer.
5      Q.  One quick follow-up on that, then.
6         In determining what could be relevant
7  to your analysis, did you review the notes in
8  the audited financial reports to see what types
9  of business risks or issues were being
10  identified by the board during that time period
11  as material?
12      A.  Ma'am, every company by law -- when
13  you file any public company in the U.S., for
14  instance, must by law reveal all possible risks,
15  even if they are completely farfetched.  Okay?
16         Now, can they capture all of them?  Of
17  course not.
18         Look at the very unfortunate, you
19  know, tragedy of the COO of United Health.  I'm
20  sure it wasn't on anyone's screen, otherwise
21  they wouldn't let him to just go without a
22  bodyguard or something.  Right?
23         But we must, by law, make estimates.
24  Okay?  And we must, by law, list risks, even if
25  they are very much farfetched.

Page 228

1
2         What we do not have to go by law,
3  including in this country, is to provide
4  probabilities.  Okay?
5         So if I am a U.S. car company --
6  okay? -- yes, I have a material risk now from
7  Chinese competition.  How much will it
8  materialize?  I don't know.  It depends if
9  President Trump decide, you know, to proceed or
10  increase the tariffs.  Okay?
11         But everyone has a list of risks.  I'm
12  looking at them, but this is really a routine
13  reporting requirement that you must put in for
14  every company.  So I don't attribute too much to
15  it.
16      Q.  So to be clear -- because it was a
17  yes-or-no question -- did you look at the
18  audited financial reports to see what risks had
19  been identified in determining what might be
20  material to you --
21      A.  Well, I would answer the question:  I
22  would say I have look at what has been provided
23  to me.  Okay?  I do not judge the risk listed
24  there as what has happened.  These are part of
25  reporting requirement for a public company in

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

Page 353

1
2          THE WITNESS: I do.
3          MR. WISNER: Would you look at page 29
4    of his report?
5          THE WITNESS: Yes.
6    BY MR. WISNER:
7       Q.   You see it's Table 3: Average Value
8    Changes Following Sudden Death of CEO.
9          Right?
10      A.   Correct.
11      Q.   Do you understand that to be Mr.
12   Dolgoff's recitation of the seven articles that
13   he relies upon for his opinions from his review
14   of the literature in this area?
15      A.   Yeah.  These are the seven article
16   that he has cherrypicked, you know, for that
17   purpose.  So I assumed it would be, kind of, a,
18   you know, biased selection.
19      Q.   Did you look at each on these seven
20   articles?
21      A.   I did.
22      Q.   Does any one of them -- any one of
23   them -- support Mr. Dolgoff's opinions in this
24   case?
25      A.   No.

Page 354

1
2          THE WITNESS: Give me a few minutes,
3    if I may --
4          MR. WISNER: Please.
5          THE WITNESS: -- just go --
6          MS. BRENNER: I could just lodge an
7    objection here before you continue.
8          If we are going to be talking about a
9    specific document, and references in a specific
10   document, it needs to be marked as an exhibit --
11         MR. WISNER: Oh, okay.
12         MS. BRENNER: -- I'm happy to have
13   Karishma do that --
14         MR. WISNER: -- all right --
15         MS. BRENNER: -- but I don't want to
16   be having a conversation here about specifics in
17   a report that we don't have in the record.
18         MR. WISNER: Yeah, that's fair enough.
19         Let's mark this -- this would be --
20   what? -- 12?
21         MS. BRENNER: I think so.
22         Karishma, are you able to put Mr.
23   Dolgoff's report up for us as Exhibit 12?
24
25

Page 355

1
2          (Exhibit Defendant's Seex_Shenkar 12,
3    Multipage document entitled: Expert Rebuttal
4    Report of Aaron Dolgoff, dated January 15, 2025
5    (no Bates Nos.), marked for identification)
6          MS. SHAH: Yes, I'm just uploading it
7    to the deposition right now.  It will be up in,
8    like, 30 seconds.
9          MS. BRENNER: Sorry, I don't mean to
10   delay things, but --
11         (Pause)
12         THE WITNESS: Due process is
13   important.
14         MR. WISNER: Let me know when we are
15   ready.
16         THE WITNESS: I'm ready.
17         MR. WISNER: Okay.
18   BY MR. WISNER:
19      Q.   Now, have you had a chance to look at
20   that -- those --
21      A.   Yeah, yeah --
22      Q.   -- seven articles?
23      A.   -- so again, I mean, I don't want to
24   take too much.  I'll go very quickly.  I mean,
25   there are seven, you know --

Page 356

1
2       Q.   Take your time.
3          Tell me if you have read all seven of
4    them.
5       A.   Yes.
6       Q.   All right.
7          Are you ready for your questions about
8    it?
9       A.   Yeah.
10      Q.   All right.
11         Going with the -- well, first, let me
12   ask you again, then, after you have now had a
13   chance to look at that:  From your reading of
14   the seven articles on which Mr. Dolgoff relies,
15   does any one of them support his arguments in
16   this case?
17      A.   The said answer is:  None.
18         And I could very quickly go through
19   the seven and explain to you why --
20      Q.   Okay --
21      A.   -- none --
22      Q.   -- be --
23      A.   -- out of the seven that I read
24   personally.  Okay?
25         So if you look at Borokhovich, for

ODED SHENKAR, PH.D.

Page 357

1
2  instance, article, it includes senior executives
3  that are not CEOs. He admits it himself. So it
4  is no bearing on what we are looking at.
5      Okay. The Neilsen article -- it's not
6  about the focal firm that has lost the CEO. It
7  is about how other companies are impacted by
8  lass of another CEO. Is this what we are
9  looking at? No. Absolutely not.
10     Okay. Go on.
11     Limbach and Sonnenburg -- they studied
12 CEO. They not only had a very small sample, but
13 they looked at whether they were fit. And how
14 did they charge if they were fit? Whether they
15 were running a marathon.
16     You tell me if it has any relationship
17 whatsoever to what we are looking at, you know,
18 which is exactly why I have listed also all the
19 demographic, all the other document that
20 underlies everything here.
21     Go on.
22     Sincerre 2021 -- I'm reading from the
23 abstract: I show that market reaction to these
24 events have had a negative impact in terms of
25 stock price reaction over time -- okay? -- and

Page 358

1
2  contingency factor which is again why I have
3  listed them.
4      And I know Alletta sometime did not
5  like my long question, but this underlies
6  everything. Okay?
7      So if you look at this article, the
8  abstract says that when -- you got a positive
9  impact on stock market, yes, when the CEO was
10 older, not when he was young.
11     We are not talking about an old CEO.
12 Mid-40s is very young for a CEO. So if you
13 average across, you are going to get a very
14 small impact.
15     But this is fundamentally wrong. I
16 would return it to any student of mine who would
17 submit that.
18     Go on. Okay.
19     Quigley and company 2017 -- okay? --
20 we provided robust evidence that's individual
21 CEO -- the death of them -- is increasingly
22 impactful over a 60-year time.
23     So this relationship that I'm talking
24 about is getting stronger and stronger.
25     So if you are going to use an older

Page 359

1
2  article, it does not reflect what's happening
3  today.
4      Okay. And what we are talking
5  about -- the statistically-significant impact
6  refers to change in impact, not in value. Okay?
7      So that captures also if there is an
8  increase, and so forth.
9      So this is completely out.
10     The next one -- okay? -- number six,
11 Zhang, Y. Okay. Never mind, this is -- really
12 a graduate student paper or thesis with 18
13 executives -- okay? -- which actually does find,
14 again, a negative impact. But again, it shows
15 negative impact.
16     Okay. Last one. Jenter, which is a
17 paper that I've already mentioned. It is a
18 working paper which I mentioned, I mean, as
19 well.
20     But here is what it says. I'll read
21 it to you, and we'll end with that.
22     The abstract acknowledge that -- I am
23 quoting now: The evidence suggests the CEOs are
24 important.
25     Okay?

Page 360

1
2      This abstract add that -- I'm quoting
3  again: Many CEO reduce shareholder value.
4      But now read carefully: These average
5  returns that he is citing hide wide variations.
6  The large heterogeneity is, in part, explained
7  by CEO and firm characteristic, such as CEO age,
8  tenure, and firm size.
9      This is exactly why I have noted
10 those.
11     And again, and again, I tried -- and
12 Alletta said I did not answer question -- yes,
13 because she didn't like I brought it again, and
14 again, and again.
15     But these are the variable that make a
16 difference. Okay?
17     So it's -- and finally also from the
18 that -- okay? -- or, actually two more.
19     Stock prices tend to fall sharply when
20 the deceased CEOs are young. Again, this is a
21 young CEO of 45. Okay?
22     And finally: Stock prices are
23 negative in firms which the CEOs are likely to
24 be more important or difficult to replace.
25     There is why we do triangulation.

90 (Pages 357 to 360)

TC Reporting, Inc.
(516) 795-7444

ODED SHENKAR, PH.D.

## Page 361

1
2  This is exactly what's supported --
3      Q.  Let me --
4      A.  -- counsel, you have seven
5  cherrypicked papers that supposed to -- Mr.
6  Dolgoff know -- they are all wrong.  Not a
7  single one of them would have been accepted.
8  And if we have to go to court to finally show
9  it, that is fine with me.
10     Q.  All right --
11     A.  I will stop at that.  Sorry if I --
12     Q.  No, that's okay --
13     A.  -- get emotional here.  I guess I'm
14 getting tired, as well.  So apologies for all of
15 you.
16     Q.  Not at all.
17         MR. WISNER:  That's all I have.
18         MS. BRENNER:  Okay.  I recognize that
19 we are over seven, but I had one question I
20 wanted to ask about the answer that was just
21 provided, if counsel will allow me.
22         MR. WISNER:  Go ahead, please.
23 EXAMINATION
24 BY MS. BRENNER:
25     Q.  So is it your testimony that the

## Page 362

1
2  articles that are reflected here in Table 3 on
3  page 29 of Mr. Dolgoff's report are not relevant
4  to the facts of this case?
5      A.  I'd say that halfway -- at least three
6  are not relevant -- and the other -- at least
7  the other three out of four show the exact
8  opposite of what he is arguing.
9          Yes, this is the point that I'm
10 making.
11         And I will be happy to defend it
12 further when the time allows.  Obviously, we did
13 have too much time today --
14     Q.  Okay.
15         And I'm not looking for a defense.
16         But I just want to clarify, which
17 three are you saying are not relevant?
18     A.  I think we went through that.
19         But again, let me mention, the first
20 three -- Borokhovich, Neilsen, and Limbach --
21 are completely irrelevant.
22         I suppose it may be tomorrow that
23 we'll be in discussion, but that's not my job.
24     Q.  Okay.
25     A.  Okay?  Thank you.

## Page 363

1
2          MR. WISNER:  That's it, Alletta?
3          MS. BRENNER:  That's all I have on
4  redirect.
5          Like I said, I've got lots of other
6  questions I'd like to ask, but I understand that
7  we are not going beyond the seven hours, as you
8  previously stated.
9          MR. WISNER:  Yeah.  Okay.  We'll
10 reserve signature.
11         THE VIDEOGRAPHER:  Counsel, am I safe
12 to close out the video record for today?
13         MR. WISNER:  Yeah.
14         THE VIDEOGRAPHER:  Very well.  We are
15 now going off the record.  The time is 8:46 p.m.
16 Eastern, and this concludes today's testimony of
17 Dr. Oded Shenkar.
18         Thank you everybody, and have a great
19 night.
20              *   *   *
21         E N D   O F   P R O C E E D I N G
22     Time noted 8:46 p.m. Eastern Standard Time
23              *   *   *
24
25

## Page 364

1
2          A C K N O W L E D G M E N T
3
4  I, ODED SHENKAR, Ph.D.., hereby certify that I have
5  read the transcript of my testimony taken under oath
6  in my deposition of February 11, 2025; that the
7  transcript is a true and complete record of my
8  testimony; and that the answers on the record as given
9  by me are true and correct.
10
11      _____
              ODED SHENKAR, Ph.D.
12
13
14
15 Signed and subscribed to before me,
16 this _____ day of _____, 2025.
17
18
      _____
19         (NOTARY PUBLIC)
20
21 My Commission expires:
22
23
24
25