**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **IN RE: ETHIOPIAN AIRLINES FLIGHT ET 302 CRASH** | | **Case No. 19 C 2170 (Consolidated)** |
| | | **Hon. Jorge L. Alonso** |

|  |  |  |
|---|---|---|
| MICHAEL STUMO and NADIA MILLERON, as personal representatives of the ESTATE OF SAMYA STUMO, deceased, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | This Order Relates to: Case No. 19 C 2281 |
| v. | ) ) | Hon. Jorge L. Alonso |
| THE BOEING COMPANY, ROSEMOUNT AEROSPACE, INC., and ROCKWELL COLLINS, INC., | ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This case is one of dozens brought by family members or other representatives of passengers who were killed in the tragic airplane crash of Ethiopian Airlines ET 302 on March 10, 2019. Plaintiffs, Michael Stumo and Nadia Milleron, as personal representatives of the estate of their deceased daughter Samya Stumo, assert claims against the Boeing Company ("Boeing"), the manufacturer of the aircraft, as well as two of Boeing's suppliers, Rosemount Aerospace, Inc. ("Rosemount"), and Rockwell Collins, Inc. ("Rockwell") (collectively, "Suppliers"), and two of Boeing's former CEOs, Dennis Muilenburg and David Calhoun. Boeing has admitted liability for compensatory damages, and the other defendants now move to dismiss the claims against them. For the following reasons, their motions are granted.

## I.    Background

The following is a brief summary of the allegations of the operative First Amended Complaint (ECF No. 1326) that are material to the present motions.

The ET 302 aircraft was a Boeing 737 MAX 8, one of a family of airplanes that Boeing began to develop in 2011. To speed the process of obtaining Federal Aviation Administration ("FAA") approval, Boeing essentially reused the same 737 design it had been using for decades, but it developed new engines that were more fuel-efficient.

Because the new engines were larger, the 737 MAX 8 handled differently than its 737 predecessors. To avoid the inevitable delays that would come from either redesigning the product or retraining pilots, Boeing developed the Maneuvering Characteristics Augmentation System ("MCAS"), a flight-control system that altered the 737 MAX 8's handling to mimic that of previous versions of the 737. The MCAS system incorporated software code written by Rockwell and sensors supplied by Rosemount. When the sensors detected that the nose of the aircraft pitched upward, as it sometimes did due to the aerodynamic instability caused by the larger engines, the system automatically pushed the nose of the aircraft back down in order to stabilize the aircraft.

On October 29, 2018, Lion Air Flight 610, a flight operated by a Boeing 737 MAX 8, crashed into the Java Sea shortly after takeoff from an Indonesian airport. In the days after the crash, Indonesian authorities released black-box data showing that the aircraft's nose dipped twenty-four times during the short flight. The plane's sensor had malfunctioned, feeding erroneous pitch data to the MCAS system, which unnecessarily forced the plane's nose down at low altitude. The pilots struggled to regain control, but they were unable to prevent the crash.

Muilenburg contacted the Boeing Board of Directors, of which Calhoun was then a member, on November 5, 2018, to discuss the crash. By the following day, the FAA had conducted a safety assessment concluding that the erroneous sensor data causing the plane repeatedly to pitch downward was a "likely significant contributing factor" in the crash. (Am. Compl. ¶ 210, ECF No. 1326.)

Calhoun stated that the Board viewed the crash as an anomaly. Muilenburg stated in a FOX Business TV interview that information about the MCAS system was available to pilots and air carriers, and the 737 MAX 8 could be flown safely. Plaintiffs assert that these statements were false: they claim that the Board knew that the MCAS system was defective and it was a matter of time before there was another accident, and Muilenburg knew that Boeing had not been forthcoming with extensive information about the MCAS system, fearing that doing so might jeopardize FAA approval and spook customers. Muilenburg and the Board took no actions to ground the 737 MAX 8, and, according to Plaintiffs, they treated news stories about the aircraft and its MCAS system as nothing more than a "public-relations problem." (Am. Compl. ¶ 242.) They continued to resist any suggestion that the 737 MAX 8 could not be flown safely, until the FAA grounded the fleet months later, in the wake of the ET 302 crash.

Ms. Stumo was one of the passengers on ET 302, which experienced problems similar to those that had caused the Lion Air crash months earlier. A damaged sensor caused the MCAS system to trigger unnecessarily, pushing the nose of the plane downward shortly after takeoff from Addis Ababa, Ethiopia. The pilots struggled to regain control of the aircraft, but they were unsuccessful, and the plane crashed after traveling only approximately thirty miles. All passengers and crew were killed in the crash. Plaintiffs filed this case soon after. In January 2020, during the pendency of this case, Calhoun became CEO of Boeing.

## II. Procedural History

The cases arising out of the ET 302 crash have been consolidated before the undersigned judge. The plaintiffs initially asserted products liability claims against Boeing, Rosemount, and Rockwell. In November 2021, the parties in almost every case stipulated to Boeing's liability for any duly proven compensatory damages and to dismiss the Suppliers. (*See* Agreed Stipulation of the Parties, ECF No. 1217-1; Agreed Order, ECF No. 1220.) This case is one of only a couple in which the plaintiffs abstained from the stipulation.

In February 2022, Plaintiffs sought leave to file an amended complaint to add claims against the CEOs. Boeing responded by filing a motion asking the Court to accept its election not to contest liability in this case, even absent any stipulation. If the Court granted the motion, Boeing argued, then it followed that the Court should bar any discovery or proceedings addressing liability, dismiss the claims against the Suppliers as moot, and deny Plaintiffs leave to amend the complaint to assert claims against the CEOs. Plaintiffs opposed the motion, arguing, in pertinent part, that Boeing's concession as to liability for compensatory damages did not resolve Plaintiffs' proposed claims against the CEOs, nor did it resolve their claims for punitive damages against the Suppliers or any other defendants.

The Court granted Boeing's motion as to the request that Plaintiffs be precluded from taking discovery or presenting evidence on Boeing's liability, ruling that there was no genuine controversy over the issue due to Boeing's concession. The ruling was based in part on the Court's conclusion that the law of either Illinois (the state in which Boeing was headquartered) or Washington (the state of Boeing's principal place of business) applies to the issue of Boeing's punitive damages, and neither state permits punitive damages under the circumstances of this case. Because punitive damages are not available to Plaintiffs, the Court reasoned, no purported pursuit

of punitive damages provides any proper basis for Plaintiffs to develop and present evidence of Boeing's liability. However, the Court denied Boeing's motion as to dismissal of the claims against the Suppliers, reasoning that the Suppliers are domiciled in states—Minnesota and Iowa—where punitive damages are available, and Boeing had not demonstrated that the law of those states could not possibly apply to the Suppliers on that issue. The Court also denied Boeing's motion as to amending the complaint to add claims against the CEOs, explaining that Boeing had not yet shown that any claims against them would certainly be futile. However, the Court stated, the CEOs would be "welcome" to file a motion to dismiss in response to any amended complaint, if they believed the complaint did not state a claim. (Jun. 14, 2022 Order at 7, ECF No. 1325.)

Plaintiffs promptly filed their First Amended Complaint, which asserts products liability claims of negligence, breach of warranty, strict liability, and failure to warn against Boeing, the CEOs, and the Suppliers. The complaint also asserts a civil conspiracy claim against Boeing, the CEOs, and Rockwell.

The Court deferred proceedings in this case for a time to allow Boeing to resolve other ET 302 cases that were readily amenable to settlement. The case is now back before the Court on the present motions to dismiss.

## III.    Legal Standard

Federal Rule of Civil Procedure 12(b)(6) permits defendants to assert by motion that the complaint fails to state a claim upon which relief may be granted. *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). A complaint survives such a motion if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S.at 556). The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. In assessing whether the complaint meets this standard, the Court must "construe the complaint in the light most favorable to plaintiff, accept all well-pleaded facts as true, and draw reasonable inferences in plaintiff's favor." *Taha v. Int'l Bhd. of Teamsters, Loc. 781*, 947 F.3d 464, 469 (7th Cir. 2020). However, it need not "accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (cleaned up). The Court may consider, "in addition to the allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

## IV.   CEOs' Motion to Dismiss

The First Amended Complaint asserts five claims against Muilenburg and Calhoun: negligence (Counts II and III); breach of warranty (Count IV); strict liability (Count V); failure to warn (Count VI); and civil conspiracy (Count XIII). In response to the CEOs' motion to dismiss, Plaintiffs state that they are abandoning all but the negligence claims. (Pls.' Mem. in Opp'n at 10 n.8, ECF No. 2198.)

The CEOs argue that the negligence claims must be dismissed because the CEOs are not alleged to have personally participated in the alleged negligence. Instead, they argue, the allegations against them amount to no more than "merely directing the business of the corporation[]" of which they were officers, which is not enough to support personal liability. *See Browning-Ferris Indus. of Illinois, Inc. v. Ter Maat*, 195 F.3d 953, 956 (7th Cir. 1999).

"[I]n most instances, the law immunizes corporate officers from corporate liabilities." *People ex rel. Madigan v. Tang*, 805 N.E.2d 243, 250 (Ill. App. Ct. 2004).[1] "Generally, a corporate director or officer is not liable for the negligence of the corporation unless he actively participated in the wrongful conduct or had sufficient knowledge thereof" to give rise to liability. *Cooke v. Maxum Sports Bar & Grill, Ltd.*, 109 N.E.3d 811, 829 (Ill. App. Ct. 2018). Although the corporate form does not shield him from liability for "torts . . . in which he actively participates," he is "not liable for the corporation's torts simply by virtue of his office." *Nat'l Acceptance Co. of Am. v. Pintura Corp.*, 418 N.E.2d 1114, 1117 (Ill. App. Ct. 1981). Nor is he liable "for a tortious act in which he himself did not participate but [that he] was nonetheless negligent in failing to prevent." *Zahl v. Krupa*, 927 N.E.2d 262, 280 (Ill. App. Ct. 2010), *abrogated on other grounds by Doe v. Coe*, 135 N.E.3d 1 (Ill. 2019). He is liable, on the other hand, for his own "personal acts" that create a foreseeable risk of danger to someone. *Tang*, 805 N.E.2d at 251. Thus, for example, "[i]f an individual is hit by a negligently operated train, the railroad is liable in tort to him but the president of the railroad is not. Or rather, not usually; had the president been driving the train when it hit the plaintiff, or had [he] been sitting beside the driver and ordered him to exceed the speed limit, he would be jointly liable with the railroad." *Browning-Ferris*, 195 F.3d at 956.

To the extent it is possible to distill a claim asserted in such sprawling allegations to any gist (*see* Pls.' Mem. in Opp'n at 14 (summarizing the claim in two sentences and then citing to two ranges of 155 total paragraphs)), the gist of the claims against the CEOs seems to be that, based

---

[1] The Court notes that *Tang* and *Browning-Ferris*, cited above, do not directly address common-law negligence claims; both cases address whether officers are personally liable for corporate violations of environmental protection statutes. But both cases rely on general "principles underlying corporation law." *Tang*, 805 N.E.2d at 250. In their briefs, both sides cite *Tang*, which relied on *Browning-Ferris*, so the Court will assume the parties agree that these cases are relevant to this dispute, although the claims are not identical.

on the evidence of the Lion Air crash, the CEOs must have known that the 737 MAX 8 was not safe, but they took no actions to eliminate, mitigate, or warn of the danger. But the above-cited principles of Illinois law demonstrate that the Court cannot infer from their position alone that the CEOs must have known that the 737 MAX 8 was not safe; there must be facts demonstrating that they had "sufficient knowledge" to give rise to liability for the claimed tort. *See Cooke*, 109 N.E.3d at 829 (citing *McDonald v. Frontier Lanes, Inc.*, 272 N.E.2d 369, 377 (Ill. App. Ct. 1971)). To put the requirement in terms of the federal pleading standard, Plaintiffs must be able to point to "factual content" in the complaint that "allows the court to draw the reasonable inference" that the CEOs had sufficient knowledge of the danger to give rise to liability for negligence. *See McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (citing *Iqbal*, 556 U.S. at 678).

It is not self-evident that the true causes of the Lion Air crash—and the implication that the 737 MAX 8 was unsafe—were immediately understood within Boeing, particularly by personnel such as the CEOs, who were in business-administration roles and are not alleged to have been intimately involved in the engineering underlying the MCAS system or its incorporation into the 737 MAX 8. Even in a case such as this one that requires the plaintiffs to make allegations about certain defendants' mental state, a difficult task for which courts must make some allowances, Plaintiffs must still "'provid[e] some specific facts' to support the legal claims asserted in the complaint." *McCauley*, 671 F.3d at 616 (quoting *Brooks*, 578 F.3d at 581). "The required level of factual specificity rises with the complexity of the claim." *Id.* at 617 (citing *Swanson v. Citibank, N.A.*, 614 F.3d 400, 403-04 (7th Cir. 2010)). This is a complex case, indeed, and "[m]any of the alleged 'facts' are actually legal conclusions or elements of the cause of action, which may be disregarded on a motion to dismiss." *Id.* There is not enough specific factual content about the CEOs' knowledge and participation in the alleged misconduct to nudge the claim against the CEOs

across the line from conceivable to plausible. *See Iqbal*, 556 U.S. at 683; *see also Doe v. Bd. of Educ. of City of Chicago*, 611 F. Supp. 3d 516, 529 (N.D. Ill. 2020) ("[T]he complete *absence* of factual allegations cannot form the basis of a reasonable inference in the Plaintiffs' favor.").

The Court agrees with the CEOs that Plaintiffs have not pointed to sufficient allegations of the CEOs' active participation in Boeing's negligence or supporting a reasonable inference of knowledge sufficient to give rise to liability, so the CEOs' motion to dismiss is granted. Because the Court rules that Plaintiffs fail to state a claim against the CEOs, it need not address the issue of whether punitive damages are available against them. Defendants ask for a denial with prejudice, but in circumstances like these Plaintiffs are entitled to at least one opportunity to cure the defective pleading. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Ind.*, 786 F.3d 510, 519-20 (7th Cir. 2015) ("Unless it is *certain* from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend after granting a motion to dismiss.") (internal quotation marks omitted).

## V. Suppliers' Motion to Dismiss

The Suppliers argue that the claims against them should be dismissed because there is no basis for Plaintiffs to obtain any relief against them. The Court has already ruled, as explained above, that Plaintiffs are bound to accept Boeing's election not to contest liability, which means that Boeing will pay all of Plaintiffs' duly proven compensatory damages. Because Plaintiffs cannot obtain a double recovery of compensatory damages from the Suppliers or anyone else, the only remaining controversy as to the Suppliers is whether they are liable to Plaintiffs for punitive damages.[2] The Court has already ruled that either Illinois or Washington law applies to the issue

---

[2] Plaintiffs purport to dispute whether the Court has already ruled on the question of whether their claims for compensatory damages against the Suppliers can proceed, suggesting that the Court's June 14, 2022 Order left the question open. But Plaintiffs misread that ruling, in which the Court

of whether Plaintiffs can obtain punitive damages from Boeing, and, under the law of those states, punitive damages are not available. (*See* Jun. 14, 2022 Order at 4-6, ECF No. 1325.) The Suppliers argue that the same reasoning should apply to them: the Court should apply Illinois or Washington law to the punitive damages issue and rule that Plaintiffs cannot obtain punitive damages from the Suppliers. Because that would leave Plaintiffs with no possibility of obtaining any relief against them, the Suppliers argue, the claims against them must be dismissed. *See Liston v. King.com, Ltd.*, 254 F. Supp. 3d 989, 1002 (N.D. Ill. 2017) (explaining that a defendant may obtain dismissal under Rule 12(b)(6) by showing that "none of the legal theories [the plaintiff] has advanced, or any other, plausibly establishes a right to recover damages"); *see generally Dunn v. Peabody Coal Co.*, 855 F.2d 426, 429 (7th Cir. 1988) (granting motion to dismiss for failure to state a claim where law did not permit recovery of damages or other relief under the circumstances); *see also Alvarez v. Smith*, 558 U.S. 87, 93 (2009) (no justiciable controversy remained where plaintiffs had no valid claim for damages or other relief).

In response, Plaintiffs argue that the Court should apply Iowa and Minnesota law to Rockwell and Rosemount, respectively, because those are the states where the Suppliers' principal places of business are located.

---

stated that there was "no basis to dismiss the claims against [the Suppliers] at [that] early stage" only because "no party ha[d] [yet] established that [they could] []not be liable for punitive damages." (Jun. 14, 2022 Order at 7, ECF No. 1325.) The Court clearly considered (and still considers) the question of compensatory damages to have been settled: they are not available from any other defendants because Boeing has already agreed to pay them. Plaintiffs also argue that the Court should permit them to proceed against the other defendants because there is no guarantee that Boeing will remain solvent long enough to be able to pay the compensatory damages it claims it will pay. The Court is not inclined to indulge this speculation at this point. Boeing has already settled the vast majority of the ET 302 cases for many millions of dollars, and no other plaintiffs have raised any such concerns.

In this diversity case, the forum state's choice-of-law principles dictate the applicable substantive law. *Kaczmarek v. Allied Chem. Corp.*, 836 F.2d 1055, 1057 (7th Cir. 1987). For tort cases, Illinois has adopted the approach of the Restatement (Second) of Conflict of Laws (1971) ("Second Restatement"). *See Townsend v. Sears, Roebuck & Co.*, 879 N.E.2d 893, 898 (Ill. 2007) (citing *Ingersoll v. Klein*, 262 N.E.2d 593 (Ill. 1970)).

The Second Restatement sets forth a number of "factors relevant to the choice of the applicable rule of law," which comprise the following: "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied." Second Restatement § 6.

The Second Restatement's general rule for tort cases is that "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has ***the most significant relationship*** to the occurrence and the parties under the principles stated in § 6." *Id.* § 145(1) (emphasis added). Further, it sets forth certain "[c]ontacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue," which comprise the following: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Id.* § 145(2). In Illinois, courts are to begin the analysis by "identif[ying] the four contacts listed in section 145(2) and then appl[y] the general principles of section 6 to those contacts" to determine which state has the most significant relationship to the

parties and the occurrence. *Townsend*, 879 N.E.2d at 905. Importantly, the Second Restatement prescribes an issue-by-issue approach to choice of law (known as "depecage"). *See id.* at 901.

## A. Defendant-by-Defendant Approach and Depecage

The parties' choice-of-law dispute boils down to their different conceptions of how to apply the principle of depecage. The Suppliers argue that depecage requires an issue-by-issue approach, not a defendant-by-defendant approach, and the Court has already analyzed choice of law for the punitive damages issue, and it need not repeat the task as to each defendant. *See Gregory v. Beazer East*, 892 N.E.2d 563, 580 (Ill. App. Ct. 2008). In response, Plaintiffs argue that depecage requires performing a different choice-of-law analysis for different issues, and claims against different defendants are different issues. They point to two cases, *Jaurequi v. John Deere Co.*, 986 F.2d 170, 173 (7th Cir. 1993), and *In re Air Crash Disaster Near Chicago, Illinois on May 25, 1979*, 644 F.2d 594, 617 (7th Cir. 1981) ("*In re Chicago Air Crash*"), in which the Seventh Circuit took a defendant-by-defendant approach to choice of law.

Both sides argue that their cases are "controlling." "[C]ontrolling authority is the governing, binding law in a given jurisdiction." *Oliva v. Blatt, Hasenmiller, Leibsker & Moore LLC*, 864 F.3d 492, 505 (7th Cir. 2017) (Manion, J., dissenting). For a federal court sitting in diversity, the question of what authority is "controlling" is not always straightforward. The Court's "duty is to answer any question of state law in the same way (as nearly as [it] can tell) as the state's highest court would." *Newman v. Metro. Life Ins. Co.*, 885 F.3d 992, 1000 (7th Cir. 2018). "In the absence of conclusive authority from that court, [federal courts] follow decisions of intermediate appellate courts unless there is reason to believe that the highest state court would reach a different conclusion." *Id.*; *see Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002). "This safeguard is anchored in the very reasonable notion that a state's intermediate appellate courts

engage in constant dialogue with the state's highest court and therefore have a sophisticated idea of the jurisprudential vectors that its high court is setting." *Green Plains Trade Grp., LLC v. Archer Daniels Midland Co.*, 90 F.4th 919, 928 (7th Cir. 2024); *see id.* at 928 n.11 (citing cases).

However, as this Court has recently recognized, "where a state appellate court decision disagrees with a Seventh Circuit ruling, the Seventh Circuit ruling remains binding on a federal district court." *Citizens Ins. Co. of Am. v. Mullins Food Prods., Inc.*, 719 F. Supp. 3d 822, 829 (N.D. Ill. 2024) (citing *Luna v. United States*, 454 F.3d 631, 636 (7th Cir. 2006)); *see Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004) (explaining that "decisions of intermediate state courts," which are themselves "just prognostications," do not "liberate district judges from the force of" an interpretation of state law in a binding decision of the United States Court of Appeals). The Suppliers flatly state that "[t]he Seventh Circuit cannot create Illinois state law precedent." (Suppliers' Reply Br. at 5, ECF No. 2216.) This may be true, vis-à-vis an Illinois circuit court, but it is all but untrue, vis-à-vis this Court. The Seventh Circuit's interpretations of state law are binding on this Court unless and until the Illinois Supreme Court or the Seventh Circuit rules differently; this Court is not free to depart from them based only its reading of more recent Illinois Appellate Court decisions. *See Reiser*, 380 F.3d at 1029. Given this Court's place in the judicial hierarchy, it is required to look first to *In re Chicago Air Crash* and *Jaurequi*, and then it may turn to *Gregory*—but it may follow *Gregory* only if it is not inconsistent with the Seventh Circuit decisions.

Ultimately, as the Court will explain below, these cases are all reconcilable. Neither *In re Chicago Air Crash* nor *Jaurequi* directly held, as a matter of Illinois law, that courts must take a defendant-by-defendant approach to choice of law under the principle of depecage. Therefore, the Court can—and does—follow *Gregory*.

13

First, in *In re Chicago Air Crash*, applying Illinois's choice-of-law rules, the Seventh Circuit performed a separate analysis of choice of law for the punitive damages issue as to each of the defendants—namely, the airline, which allegedly improperly maintained the aircraft, and the aircraft manufacturer, for defects in design and production. 644 F.2d at 604-05, 613-16, 620-21. But the court never discussed or apparently considered any alternative approach, nor did it cite any authority specifically directing or supporting a defendant-by-defendant approach. And, in any event, the court reached the same conclusion as to each defendant: Illinois law applied because it was the law of the state in which the injury occurred. *Id.* at 616, 620-21. The Seventh Circuit recognized that the states of the defendants' principal places of business and in which their injury-causing conduct took place had powerful interests in seeing their law of punitive damages applied, but these were four different states—Missouri (where the manufacturer had its principal place of business), California (where the defective plane was manufactured), New York (where the airline had its principal place of business), and Oklahoma (where the airline performed the allegedly negligent maintenance). *Id.* at 613-14, 620-21. Because each state's interests in applying its law to the issue of punitive damages were essentially equal, the Seventh Circuit concluded that none of these states could be said to have the *most* significant relationship to the dispute. Therefore, the court defaulted to the law of the place of the injury under section 146 of the Second Restatement, applying Illinois law. *See id.* at 616, 620-21.

In *Jaurequi*, a products liability case involving an allegedly defective piece of harvesting equipment known as a "corn head," the Seventh Circuit agreed with the plaintiff that a proper application of depecage required a defendant-by-defendant approach, reasoning that the issues in dispute were different for each of the two defendants under consideration. 986 F.2d at 173-74. One defendant was alleged to have negligently manufactured and designed the corn head, which was

14

produced in 1974 and initially sold in 1975; the other defendant subsequently purchased and modified the corn head in 1986. *Id.* at 174 n.7. The negligence claims against the separate defendants stemmed from different alleged misconduct taking place in different time periods, with eleven years between them. The Seventh Circuit applied the choice-of-law rules of Texas, the case having been transferred to Illinois from Texas, which has adopted the Second Restatement. The court expressed skepticism about whether Texas state courts themselves generally "adhere to the principle of conducting separate conflicts analysis for each defendant," as the plaintiff claimed. *Id.* at 173. Its conclusion that a defendant-by-defendant approach was necessary in that case was highly factbound, and the case does not hold that a defendant-by-defendant approach is necessary in all circumstances as a matter of Texas law, much less Illinois law.

In *Gregory*, in contrast with *Jaurequi*, the court concluded that a defendant-by-defendant approach was not appropriate because the claims against the separate defendants did not present sufficiently different issues. The plaintiff sued numerous defendants for negligence in failing to warn of the dangers of exposure to asbestos, to which her decedent was exposed at various worksites in Illinois and Indiana, resulting in his death from mesothelioma. The trial court applied the law of Indiana, the state where the decedent resided. On appeal, the plaintiff argued that the court should have separately analyzed choice of law as to the different defendants, rather than "lump[ing] all the defendants and all [the decedent's] exposures together." *Gregory*, 892 N.E.2d at 577. The Illinois Appellate Court disagreed, explaining that, while the Second Restatement requires depecage, "it is the issues presented in a case to which depecage applies, not the different defendants in a case." *Id.* at 580 (citing *Townsend*, 879 N.E.2d at 901-02 ("[S]ection 145 explicitly refers to a selective, issue-oriented approach to determining choice-of-law for a particular issue presented in a tort case. 'Each issue is to receive separate consideration if it is one which would be

resolved differently under the local law rule of two or more of the potentially interested states.'" (quoting Second Restatement § 145 cmt. d))). Because the suit was "a multidefendant tort case asserting one singular injury," in which the defendants were "all alleged . . . to have done the same thing," namely, negligently failing to warn the plaintiff's decedent of dangerous products that caused his death, it was a "misapplication" of the principle of depecage to "separate out each defendant." *Id.* at 580-81. Instead, courts "should focus on issues, not parties," in keeping with precedent suggesting that "'the entire litigation must be considered in assessing which forum has the more significant contacts with the litigation.'" *Id.* at 580-81 (quoting *Vickrey v. Caterpillar Tractor Co.*, 497 N.E.2d 814, 818 (Ill. App. Ct. 1986)).

*In re Chicago Air Crash* and *Jaurequi* do not prevent this Court from following *Gregory*, as they are not based on any contrary interpretation of Illinois law. Nor is *Gregory* inconsistent with *Jaurequi*, which held that a defendant-by-defendant approach is appropriate where the different defendants are connected to the occurrence by different *issues*, or *In re Chicago Air Crash*, which tacitly confronted that sort of situation. This case is more like *Gregory* than *In re Chicago Air Crash* or *Jaurequi* because the gist of Plaintiffs' claims, as in *Gregory*, seems to be that Defendants are responsible for a "singular injury" caused by similar misconduct: they are alleged to have negligently failed to warn Plaintiffs' decedent of a product's dangerous condition, namely, the unreliable MCAS system integrated into Boeing's 737 MAX 8 aircraft, or take other actions to eliminate or mitigate the danger that resulted in the deaths of the ET 302 passengers. (*See* Pls.' Mem. in Opp'n to Suppliers' Mot. at 4, ECF No. 2201.) Defendants are connected to the occurrence by similar issues—in contrast to *Jaurequi*, which presented different issues as to the different defendants due to the eleven-year separation between the time periods in which they were involved with the dangerous product. Additionally, *Gregory*'s explicit reliance on the Illinois

Supreme Court's decision in *Townsend* gives the Court confidence that it represents an accurate prediction of how the Illinois Supreme Court would rule on the question. *Gregory*, 892 N.E.2d at 580; *see Green Plains*, 90 F.4th at 928. The Court therefore follows *Gregory* and analyzes choice-of-law issue by issue, rather than defendant by defendant, keeping "the entire litigation" in view as it does so. *See Gregory*, 892 N.E.2d at 580.

### B. Choice of Law Analysis

Having dealt with the parties' arguments about the proper application of the principle of depecage, the Court is now positioned to make a choice of law. As Plaintiffs seem to recognize by devoting most of their brief to the defendant-by-defendant question, the Court's decision on that issue makes the result all but a foregone conclusion, given the Court's previous choice-of-law decision. Nevertheless, for completeness, and in an abundance of caution, because the earlier decision did not expressly address the Suppliers' contacts, the Court will perform the analysis afresh.

The Court begins by identifying the contacts listed in Second Restatement section 145(2). The first contact is the place of injury, which is in Ethiopia. Under section 146 of the Second Restatement, there is a general presumption in favor of the law of the place where the injury occurred, but all parties seem to agree that, because the location of the injury in Ethiopia was fortuitous, the presumption should not apply. *See* Second Restatement § 146 cmt. c.

The second contact is the place where the injury-causing conduct occurred, which is primarily Washington, the state of Boeing's principal place of business and where the 737 MAX 8 was designed and manufactured. Plaintiffs emphasize that Rosemount and Rockwell, during operations at their principal places of business in Minnesota and Iowa, learned of problems with

the MCAS system, to which they had contributed their own products, and took no action to attempt to warn anyone about the defective system or mitigate the defect.

Third are the domiciles, places of business, and places of incorporation of the parties. Ms. Stumo was domiciled in Massachusetts. Boeing was headquartered in Illinois at the time of the accident, with its principal place of business in Washington. Rockwell is an Iowa corporation with its principal place of business in Iowa, and Rosemount is a Minnesota corporation with its principal place of business in Minnesota.

The fourth contact is the place where the relationship between the parties is centered. This factor "does not play a role here since there was no relationship" between Ms. Stumo and any of the defendants, *Gregory*, 892 N.E.2d at 583; Ms. Stumo's relationship was with Boeing's customer, Ethiopian Airlines, not directly with Boeing or the Suppliers.[3] Thus, based on the relevant contacts, the candidates are Illinois, Washington, Iowa, Minnesota, and Massachusetts, with Washington leading the pack, given that it is the principal place of business of the principal defendant and the place of the most central injury-causing conduct.

Before drawing a conclusion, the Court must apply the general principles of section 6 to these contacts to determine the state with the most significant relationship to the "occurrence and the parties." *See Townsend*, 879 N.E.2d at 901. The most relevant principles in a "personal injury tort case" are (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, and (e) the basic policies underlying the particular field of law. *See Gregory*, 892 N.E.2d at 583 (citing

---

[3] Based on Comment e of the Second Restatement § 145, the "relationship" between the "parties" mentioned in this factor refers to the relationship between the plaintiff and the defendants, not the relationships of the defendants among themselves. *See Jones ex rel. Jones v. Winnebago Indus., Inc.*, 460 F. Supp. 2d 953, 971-72 (N.D. Iowa 2006).

*Townsend*, 879 N.E.2d at 906-07) (explaining that the other factors are "not implicated" in personal injury tort cases).

As the Court previously explained when it considered choice of law for the punitive damages issue as to Boeing, "the key principles underlying the most-significant-relationship determination here have to do with the policies and interests of the relevant jurisdictions—and the policies underlying the relevant area of law generally—with respect to the issue of punitive damages" for the products liability claims Plaintiffs have raised. (*See* Jun. 14, 2022 Order at 5, ECF No. 1325.) And punitive damages are "primarily concerned . . . with the state's 'regulation of conduct' by the defendants and others in similar positions." (*Id.* at 6 (quoting *In re Chicago Air Crash*, 644 F.2d at 617).) Here, the injury-causing conduct took place primarily and most centrally in Washington, where Boeing has its principal place of business and where the 737 MAX 8 was designed and made, and Washington has a strong interest in regulating the conduct of manufacturers within its borders. Additionally, Boeing's headquarters during the relevant time period was in Illinois, and Boeing is the central defendant in this case, as the manufacturer of the dangerous product at issue and the entity around which all the other defendants' actions and relationships revolved.

Some of the injury-causing conduct may have taken place in Iowa and Minnesota, to the extent that Rockwell and Rosemount knew that the MCAS system did not function properly and made the 737 MAX 8 unsafe, but took no mitigating action. But the Court fails to see how either of those states could have a *more* significant relationship to the occurrence and the parties than Washington, where all Defendants' injury-causing conduct was coordinated and congealed into the actions and inactions that produced the defective product and caused the accident. On balance, the weightiest, most significant of the injury-causing conduct took place in Washington, where the

737 MAX 8 and the MCAS system were designed and manufactured, and where the Suppliers' components were integrated into the aircraft. *See Mitchell v. Lone Star Ammunition, Inc.*, 913 F.2d 242, 250 (5th Cir. 1990) (applying law of Texas, the state where the defective product was manufactured and "placed into the stream of commerce," although manufacturer and supplier defendants were organized in different states); *Jones ex rel. Jones v. Winnebago Indus., Inc.*, 460 F. Supp. 2d 953, 959, 970 (N.D. Iowa 2006) (applying Iowa law, where fatal accident was caused by "slide out" mechanism incorporated into an RV designed and manufactured in Iowa, and noting that although the "slide out" component was manufactured by a Washington company operating in Oregon, it was built for the Iowa company with the help of the latter company's engineers); *see also Holiday v. Ford Motor Co.*, 2006-Ohio-284, ¶ 16 (noting that the parties "d[id] not dispute that Michigan law should be applied to the products liability claim" arising out of malfunctioning seat belt in Ford Explorer because the vehicle—not the seat belt—was designed and tested in Michigan). (*See* Am. Compl. ¶¶ 20-21 (describing the Suppliers' relationship with Boeing and alleging that it involved "airplane component parts, including sensors, . . . that were specifically designed for Illinois-based Boeing's 737 MAX 8 airplanes"), ¶¶ 66-68, 187-201 (describing Suppliers' relationship with Boeing and role in production of the MCAS system).)

In accord with the reasoning of the Seventh Circuit in *In re Chicago Air Crash*, the Court recognizes the powerful interests of the states where Boeing was headquartered, where it had its principal place of business, and where the injury-causing conduct took place, in regulating manufacturing activity or the conduct of manufacturers operating within their borders. *See In re Chicago Air Crash*, 644 F.2d at 613-16. Iowa and Minnesota have similar interests in regulating the conduct of corporations based in those states, but, on balance, either Washington or Illinois has the most significant relationship to the occurrence and the parties, given the primacy of the injury-

causing conduct that occurred in those states and the centrality of the party (Boeing) based in those states.

Because there is no conflict as to the law of punitive damages as between those two states, the Court need not go farther and choose which of the two has the more significant relationship. It is enough to conclude that Washington or Illinois has the most significant relationship to the punitive damages issue in this case, and the law of one of those states must apply to the punitive damages issue, even as to Rockwell and Rosemount. Therefore, punitive damages are unavailable against the Suppliers. Based on Boeing's stipulation to compensatory damages, there remains no relief Plaintiffs can obtain from the Suppliers, so the claims against them are dismissed, without prejudice to reinstatement if the circumstances surrounding Boeing's election not to contest liability change.

## CONCLUSION

For the foregoing reasons, the CEOs' motion to dismiss [2147] is granted. The Suppliers' motion to dismiss [2153] is granted. The memorandum in support of their motion [2154], which is improperly docketed as a motion, is denied as moot. Defendants' motion to seal [2218] is granted, as the Court did not rely on the exhibits that are the subject of the motion in reaching its decision. *See Baxter Int'l v. Abbott Lab'ys*, 297 F.3d 544, 546 (7th Cir. 2002). Plaintiffs may file an amended complaint, if desired, by 4/30/25.

SO ORDERED.                                        ENTERED: March 21, 2025


_____
**HON. JORGE ALONSO**
**United States District Judge**