```
1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3    IN RE:  ETHIOPIAN AIRLINES       ) Lead Case No. 19 CV 2170
     FLIGHT ET 302 CRASH              )
4                                     )
                                      )
5                                     ) Chicago, Illinois
                                      ) April 2, 2025
6                                     ) 11:06 a.m.

7        TRANSCRIPT OF PROCEEDINGS - FINAL PRETRIAL CONFERENCE
              BEFORE THE HONORABLE JORGE L. ALONSO
8

9    APPEARANCES:

10   For Plaintiff          CLIFFORD LAW OFFICES, P.C.
     Dieci                  BY: MR. ROBERT A. CLIFFORD
11                               MR. KEVIN P. DURKIN
                                 MR. JOHN V. KALANTZIS
12                               MS. TRACY A. BRAMMEIER
                             120 North LaSalle Street, Suite 3600
13                           Chicago, Illinois 60602

14
     For Plaintiff          ROMANUCCI & BLANDIN, LLC
15   Lewis:                 BY: MR. ANTONIO M. ROMANUCCI
                             321 North Clark Street, Suite 900
16                           Chicago, Illinois 60654

17
     For Plaintiff          MARK LINDQUIST LAW
18   Belanger:              BY:  MR. MARK LINDQUIST
                             100 South 9th Street
19                           Tacoma, Washington 98402

20                          BARTLETT CHEN, LLC
                             BY:  MR. AUSTIN BARTLETT
21                           77 West Wacker Drive, Suite 4500
                             Chicago, Illinois 60601
22

23

24

25
```

```
 1    APPEARANCES (Cont'd):

 2

      For Defendant:           WINSTON & STRAWN LLP
 3                             BY: MR. DAN WEBB
                                   MR. CHRISTOPHER B. ESSIG
 4                                 MS. JULIA JOHNSON
                                   MR. SAM ZUIDEMA
 5                                 MR. BRIAN NISBET
                                   MS. SANDRA EDWARDS
 6                             35 West Wacker Drive
                               Chicago, Illinois 60601
 7
                               PERKINS COIE
 8                             BY:  MS. ALLETTA BRENNER
                                   MR. CHRISTOPHER LEDFORD (Via Phone)
 9                             1120 Northwest Couch Street, 10th Floor
                               Portland, Oregon 97209-4128
10

11
      ALSO PRESENT:            DENNIS MARTINEZ, INTERPRETER
12

13    Court Reporter:          ANGIE PHIPPS, RMR, CRR, FCRR
                               Official Court Reporter
14                             219 S. Dearborn Street, Room 1902
                               Chicago, Illinois 60604
15                             312.818.6683
                               angela_adessophipps@ilnd.uscourts.gov
16

17

18

19

20

21

22

23

24                                   *  *  *

25              PROCEEDINGS REPORTED BY STENOTYPE
          TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION
```

1      (Proceedings heard in open court:)

2          THE CLERK:  All rise.

3          THE COURT:  Thank you.  Be seated, please.

4          THE CLERK:  This Court resumes in session.

5          Case 19 CV 2170, In re:  Ethiopian Airlines Flight

6 ET 302.

7          THE COURT:  Good morning, and welcome.  Let's begin by

8 having the attorneys identify themselves for the record.  Let's

9 start with Mr. Clifford.

10          MR. CLIFFORD:  Thank you, Your Honor.  Good morning,

11 sir.  At counsel table, we have Robert Clifford, Tracy

12 Brammeier, and Kevin Durkin from Clifford Law.

13          Also, Mr. Antonio Romanucci.  Also, Mr. Austin

14 Bartlett and Mr. Mark Lindquist.

15          THE COURT:  And for purposes of the three trials that

16 are slated for next week, Mr. Clifford, Clifford represents

17 Dieci.

18          MR. CLIFFORD:  Dieci.  Mr. Romanucci represents the

19 Lewis family, and Mr. Lindquist and Bartlett represent

20 Belanger.

21          THE COURT:  All right.  And I'm told that we have an

22 interpreter who's assisting us today.

23          MR. CLIFFORD:  Thank you, Your Honor.  I should -- I

24 apologize.

25          INTERPRETER:  Good morning, Your Honor.

 1          MR. CLIFFORD:  And in court today, we have Mrs. Dieci

 2   and her sister-in-law, who flew in from Italy and will be here

 3   throughout the case.

 4          THE COURT:  All right.  Mr. Martinez, thank you, and

 5   you are interpreting for those individuals on that case.

 6          And for the defense.

 7          MR. WEBB:  Yes, Your Honor.  For Boeing, Dan Webb from

 8   Winston & Strawn.  Also here in the courtroom with me from

 9   Winston & Strawn is Sandra Edwards, Chris Essig, Julia Johnson,

10   Sam Zuidema, and Brian Nisbet.

11          And also from the Perkins firm Alletta Brenner is here

12   in the courtroom, and I believe also Chris Ledford from the

13   Perkins firm is on the phone.

14          So those are the Boeing lawyers that are

15   participating, Your Honor.

16          THE COURT:  Correct, Mr. Ledford?

17          MR. LEDFORD:  Yes.  Good morning, Your Honor.

18   Thank you.

19          THE COURT:  All right.  Good morning.  And as I

20   stated, we're set for trial.  The backup case is the Lewis

21   case.

22          Anything to report in terms of efforts to resolve the

23   matter or settle the matter?

24          MR. CLIFFORD:  Mr. Webb and I have had some ongoing

25   discussions that may continue throughout the day and the

1    ensuing days.  I don't know that we could say or should say

2    more than that.

3           MR. WEBB:  I think that's -- I would say this, that

4    the parties have had some significant discussions, and Judge

5    O'Connell has been involved, as you are aware.

6           And so we are involved in settlement discussions.  The

7    three cases that are left are not resolved, and I think it's

8    fair to say we're going to try to continue discussions.

9           THE COURT:  And those discussions involve all three of

10   the cases?

11          MR. WEBB:  Yes.

12          MR. CLIFFORD:  With the qualifier being the most

13   active conversation has been on Dieci and Belanger because they

14   are 1A, 2A; but Mr. Romanucci and Mr. Webb, I'm sure, will be

15   -- the three of us will --

16          MR. WEBB:  I agree with that.  That's a fair

17   statement.

18          MR. CLIFFORD:  We will, obviously, keep the Court very

19   posted if there are any developments.

20          THE COURT:  Mr. Lindquist, Mr. Bartlett, anything you

21   want to add to that?

22          MR. LINDQUIST:  Thank you, Your Honor.  Nothing

23   to add.

24          THE COURT:  Mr. Romanucci?

25          MR. ROMANUCCI:  No, Your Honor.  I think that was

1    accurately stated.

2         THE COURT:  Obviously, the parties will let me know if

3    the cases that are actually going change.  Right now, those

4    cases, as has been stated, are Belanger and Dieci.

5         There are multiple motions that are pending.

6         Most recently, there was the motion regarding the

7    testimony of Ms. Dieci.  She's here today.  But, Mr. Clifford,

8    you filed a motion for her to appear remotely?

9         MS. BRAMMEIER:  Judge, that motion was regarding

10   Ms. Elena Dieci, who is a niece of Ms. Maria Luisa Dieci.

11        THE COURT:  All right.  I misunderstood.  That is not

12   Maria Luisa.  And that motion states that Boeing does not

13   object?

14        MR. WEBB:  That's correct.

15        MR. CLIFFORD:  And then if I may add a supplement when

16   you're ready.

17        THE COURT:  Let me get the number of that motion.

18   That is number 2498.  That is granted without objection.  The

19   attorneys will make sure that they master the tech and are

20   ready to present that testimony remotely.  Again, without

21   objection, 2498 is granted.

22        Mr. Clifford.

23        MR. CLIFFORD:  Yes.  And on that tech, Judge, both

24   sides are working very cooperatively to set the tech up in the

25   room.  There are plans in place for that.

1        Regarding the supplement, Dr. Maria Luisa is in court.

2  We did, however, take her deposition.  I took her deposition so

3  that, in the event that there are obstacles to her being able

4  to testify, that I could go into it at an appropriate time; we

5  have her testimony available.  The preference, of course, is

6  live; but if she can't for reasons that are unique to her, we

7  would be able to play the dep.  So we have not withdrawn her

8  deposition as a designated deposition, but she's here.

9        MR. WEBB:  Your Honor, in that regard, because we

10  don't object to that motion -- well, let me ask.  We don't want

11  to get off on this topic.  I'll leave it.  But we're coming in

12  on Friday to help set up the courtroom for the trial on Monday.

13  We did that for earlier trials, and we've worked with your

14  staff.  Always been very cooperative.

15        One issue that's come up, because we have these small

16  screens, are you opposed to if we had one big screen that would

17  be back here that would not block so that -- but it would be a

18  bigger screen that people could look at.

19        So in other trials, I've found that be to be helpful

20  because sometimes the jurors would look at their small screen;

21  sometimes they'll look at the big screen.  I believe

22  logistically these courtrooms can accommodate that.  We're

23  going to come here on Friday, but I thought maybe I should

24  raise with you, do you have any objection in concept to that

25  idea?

1          THE COURT:  This has not come up in prior rounds of

2     trial settings?

3          MR. WEBB:  No.  We didn't talk about it.  Maybe it

4     slipped our mind.   It was presented to me the other day.  Then

5     I realized we're also playing live testimony, which might be --

6     on a bigger screen people could look at.  I thought it might --

7     Anyway, I'm raising the issue.  We're going to come and talk to

8     the staff about it on Friday to make sure logistically it can

9     be done, but I thought I might raise it with you.

10          MR. CLIFFORD:  We would have no objection to that.

11     That's the first time hearing about it.  Mr. Webb didn't ask me

12     if it was in the budget, but I think we can accommodate the

13     idea.

14          MR. WEBB:  This came up this morning, Mr. Clifford,

15     and I thought I should raise it.

16          MR. CLIFFORD:  I think it's a good idea.

17          THE COURT:  All right.  So keep in mind that the two

18     screens that are here, they've never been called "small"

19     before, but I guess they could be bigger.

20          MR. CLIFFORD:  I've been in your court.  I

21     deliberately came at times when the Court has been on trial to

22     see.  The big screens, as I recall, there was one here and the

23     one over there, and they're pretty good.  Maybe you need to do

24     a test --

25          THE COURT:  Keep in mind, the screens that are here

1    will face the audience so that the audience can see.  As both

2    parties know, each juror will have a small monitor in front of

3    them, but I think when -- or I know that, when testimony is

4    introduced remotely, that comes with separate equipment,

5    including a screen that will be off to my right.

6            MR. CLIFFORD:  Right.

7            THE COURT:  Near the jury.

8            MR. CLIFFORD:  I mean, when I was last here and saw

9    it, I thought it was adequate.

10           THE COURT:  Okay.  I am not averse to it.  If you can

11   make it work with our people here and we don't sacrifice the

12   screens that are facing the audience, then you are free to try

13   to work something out if you still think it's a good idea after

14   seeing the entire setup.  And, again, it might be more

15   complicated during the remote testimony.

16           MR. WEBB:  We understand.  Thank you, Your Honor.

17           MR. ROMANUCCI:  Your Honor, may I?

18           Your Honor, we have a similar motion for the testimony

19   of Brent Longnecker -- it's number 2476 -- presenting him live.

20   I don't know if there has been any opposition to that.

21           MS. JOHNSON:  We don't oppose, Your Honor.

22           MR. ROMANUCCI:  Thank you.

23           MR. WEBB:  We don't oppose.

24           THE COURT:  But, of course, there's a motion to bar

25   his testimony.

1      MS. JOHNSON:  Correct.  Yes, subject to our motion to

2  bar his testimony.

3      THE COURT:  All right.  So there are, obviously,

4  multiple motions, motions in limine, that are filed.  Anything

5  before I address those motions?

6      MR. CLIFFORD:  There is one matter pertaining to --

7  well, I have matters pertaining to jury selection and opening

8  statement when the Court is ready, in whatever order you wish.

9      THE COURT:  All right.  And, Mr. Clifford, again,

10 we've been on the eve of trial multiple times here in this

11 case.  What do the discussions look like?

12     I know that plaintiff prefers 10 jurors.  I am going

13 to, as I did in the past, pick 8 jurors.  But beyond that, what

14 was communicated regarding jury selection?

15     MR. CLIFFORD:  Well, the first issue on jury selection

16 that we wanted to raise was that you previously noted that you

17 were likely to allow three peremptory challenges.  We at least

18 want to float the idea with you that each side, because there

19 are two plaintiffs and one defendant, each side would get a

20 total of four so that each plaintiff's counsel theoretically

21 has two and you don't have to debate over the one.  That's an

22 idea that we're asking you to consider.

23     I have not discussed deliberately with -- not

24 "deliberately."  I haven't had a chance to raise this with

25 Mr. Webb.

1      MR. WEBB:  We haven't talked about that issue.

2  I thought you ruled there were going to be three, and I

3  accepted that ruling, but I'm not opposed to four for each

4  side.

5      THE COURT:  All right.  That motion is granted without

6  objection.  So four for each side.

7      MR. CLIFFORD:  Okay.

8      THE COURT:  Two and two, and the parties will figure

9  out how to exercise those two plus two.

10     MR. CLIFFORD:  Thank you, sir.  On the jury selection,

11 that's it.

12     MR. WEBB:  On jury selection, there's still one issue

13 I just want to be certain about, okay?  We talked in November

14 about the fact that we have a jury --

15     THE COURT:  Questionnaire.

16     MR. WEBB:  Questionnaire.  And I don't want to repeat.

17 You may already know this.  You decided for November, and I

18 hope you decide for this trial, we will all -- we'll all have

19 the questionnaires filled out by the jurors on Monday morning,

20 and we will then have our jury consultants be able to review

21 those questionnaires.

22     The parties will meet and confer because my experience

23 is that the benefit of those questionnaires is that there will

24 be jurors identified potentially and probably most certainly

25 for hardship and bias that the parties may stipulate to.  In

1   other words, we may come and see you on Tuesday morning and say

2   there's eight jurors -- and you'll decide it, but we'll tell

3   you, from our review of the questionnaires, which jurors may be

4   agreed upon as having either bias or hardship, which then you

5   wouldn't need to voir dire them.

6          So we plan on doing that process, so I just wanted to

7   confirm that's the process you're still going to follow for

8   this trial, and we'll pick the jury on Tuesday morning.

9          MR. CLIFFORD:  Well, that's where we have an issue.

10         Mr. Webb and I discussed this yesterday.  We certainly

11  don't object to a pause between the juror questionnaires being

12  completed and the actual jury selection.  We can certainly meet

13  and confer.  However, we do not agree to opening statements

14  taking place Tuesday morning.

15         We would ask you to consider the fact that they've

16  designated at least three experts, maybe four.  The holiday of

17  Easter is coming.  Good Friday is in the mix here.  So if you

18  look at the mechanics of our trial, our trial time

19  availability, we think it's tight and, therefore, we don't

20  disagree with a pause after the forms are completed, but we

21  think that the Court should go right into opening statements

22  because, otherwise, you run the risk of, at the back end of the

23  second week, having a problem.

24         I think the last thing any of us want is to ask the

25  jury to come back the day after Easter.  I don't even know if

1   the Court -- I don't remember the calendar -- if the Court is

2   open on Good Friday or not or if it's a full day or not.  I

3   don't think you've addressed that.

4           So that's a consideration that we think needs to be

5   openly discussed.  That's part one of the jury selection that

6   is open.

7           MR. WEBB:  Well, on that issue, two things,

8   Your Honor.  We had agreed upon this the last time.  I don't

9   want to make all the arguments why, but the idea that we can

10  get all that done on one day, get through all jury selection,

11  get a jury in the box, and do opening statements -- which, by

12  the way, when we get to opening statements, I was going to

13  suggest 90 minutes per side.

14          MR. CLIFFORD:  Well, let's not --

15          MR. WEBB:  Let me just finish on this issue.

16          MR. CLIFFORD:  Go ahead.  I'm sorry.

17          MR. WEBB:  You'll decide that later, but it takes time

18  for these opening statements.

19          And in addition to that, there's not going to be a

20  problem on time because, Judge, we have one witness.  I mean, I

21  have one witness.  So this case is not going to have a problem

22  getting tried in two weeks.

23          MR. CLIFFORD:  Well --

24          MR. WEBB:  It's just not.

25          MR. CLIFFORD:  I'm sorry.  Are you done?

1        He might have one witness.  That's the first time he's

2    telling us.  The current record shows they have multiple

3    witnesses.  That's number one.

4        Number two, there was no agreement with the parties at

5    this table.  The last case, you'll recall, when we were getting

6    into the nitty-gritty of this, was the one trial with Counsel

7    Elizabeth Crawford from the Kline & Specter firm, and they may

8    well have agreed, a single case, they had no time problem.  We

9    envision this time problem with the number of witnesses that

10    he, of current record, has.

11        So all I'm saying is that, if the Court has these

12    forms filled out by the noon hour, there's no reason why we

13    can't make opening statements that day, in our humble opinion.

14        MR. WEBB:  But, Judge, we're doing jury -- after we

15    got the questionnaires done, you described to us your jury

16    selection process, which you described in some detail at the

17    last meeting, which we understand, which you said, because of

18    the nature of this case, that's going to take a little -- you

19    were going to do one -- one-on-one back in the jury room, you

20    said.

21        So there's no physical way we could get through all of

22    that and do opening statements on Monday.  That's physically

23    impossible.  So I respectfully would ask that we do the same

24    thing we agreed to do in November and get all the opening --

25    get all the jury questionnaires filled out.  They're lengthy,

 1    and there's a lot there, and I do believe if the parties have
 2    time to meet and confer, after we had -- we have to get
 3    consultants to evaluate them, analyze them, talk to us.  We
 4    meet and confer, I believe, that evening probably by the time
 5    we get to it.  And we will probably agree on excusing jurors.
 6    You'll make that decision the next day.  But trying to cram all
 7    that in.  Plus, Mr. Clifford says we're going to get in opening
 8    statements that day.  That's not physically possible on
 9    one day.

10             THE COURT:  All right.  That is not realistic.

11             MR. CLIFFORD:  Okay.

12             THE COURT:  To do opening statements.

13             MR. CLIFFORD:  One of them?

14             THE COURT:  The question is -- Mr. Webb is saying
15    let's not even start picking the jury until the next day.  I
16    agree with the plaintiff there.  We will pause, obviously, so
17    that the attorneys can consider the questionnaires and have
18    time to make decisions.  So it will be a long lunch for the
19    jurors, but we'll get to work in the afternoon.  It will be a
20    working lunch for the lawyers, a long lunch for the jurors, and
21    we'll get to work in the afternoon.

22             Exactly what that looks like, we'll see, but hopefully
23    we'll get the questionnaires through the lawyers by 10:30,
24    11:00, and come back at 1:00 or 2:00 in the afternoon,
25    hopefully pick the jury and start with opening statements first

1    thing Tuesday, the 8th.

2           Mr. Clifford, what's your sense regarding the length

3    of opening statements?

4           MR. CLIFFORD:  I suggested to Mr. Webb yesterday --

5    and I take it from his remark that he agrees -- that each side

6    be given 90 minutes.

7           And that brings me, then, to the subject of how the

8    plaintiffs are requesting to be allowed to present their one

9    opening statement.

10          We are in severe disagreement about that.  Mr. Webb

11   describes what I'm about to tell you as four opening statements

12   or three.

13          This is a consolidated case that a major part of it

14   was worked up by committee, Plaintiffs' Executive Committee.

15   And then the major part that was worked up by that committee

16   was the survival action evidence.

17          The record is crystal clear that, on balance, the

18   lawyers handling individual cases such as Mr. Lindquist and

19   Bartlett and Mr. Romanucci did not do the legwork that was

20   necessary -- because the committee did it -- for those four

21   common experts.

22          Indeed, going back to your November trial, we spent a

23   lot of time -- once those other cases settled and

24   Ms. Crawford's case had not, the committee spent a lot of time

25   with Ms. Crawford and those witnesses to help her develop the

1   presentation and the outlines.  The offer was on the table for

2   the committee to present those witnesses if they liked.  They

3   chose not to, which was fine, but we helped them do their

4   outlines.

5        Here, you have Dieci and Belanger.  The vision that

6   we've had is -- all within the 90 minutes -- is that I would

7   make a five- to ten-minute introduction of the case, then call

8   upon Ms. Brammeier to give her an opportunity to make an

9   opening statement on behalf of Dieci.

10        She would then pass it to Mr. Lindquist to make the

11   opening statement of the evidence to be presented on behalf of

12   the Belanger family.

13        And then I would come back and speak about the

14   survival action.

15        None of it would be cumulative.  None of it would be

16   overlapping.  It would be very structured in the presentation,

17   and we would have it done in 90 minutes or less.

18        Mr. Webb doesn't like that.  Boeing doesn't like that.

19        So you basically have two cases with just three

20   different lawyers presenting that opening statement.  It's a

21   case being tried -- two separate death cases.  There has to be

22   some way of doing it.

23        It would not be fair to require Mr. Lindquist to

24   present the remarks about the evidence for the four common

25   experts.  And I suppose I could make the introductory remarks,

1    go into Dieci, turn it over to him on Belanger, and then come

2    back on the survival action, what the committee did.  But I'm

3    trying to give Ms. Brammeier the opportunity to make the

4    opening statement.

5              We would maintain there's no prejudice there; there's

6    no overlap.  And it's something that we would ask the Court to

7    consider and permit.

8              THE COURT:  Mr. Webb.

9              MR. WEBB:  Your Honor, I strenuously object to that.

10   Mr. Clifford and I talked about it.  I've told him I'll say to

11   the Court I've never heard of, in a case I've been on, civil or

12   criminal, each party gets to make an opening statement.  So I

13   only get to make one opening statement.  I'm one party.  I'm

14   going to do it, okay?  And they have two plaintiffs, and each

15   plaintiff gets to give one opening statement.  It could very

16   well be that often plaintiffs or defendants will split issues

17   up between themselves the way they want.  If they decide

18   between the two they want someone to more emphasize the

19   survival action or some reason for that or to emphasize the

20   circumstances of the action, they get to decide that among

21   themselves, but they don't get to give four different

22   presentations.

23             Each party -- in this case each plaintiff -- should be

24   given one presentation, Mr. Dieci and Mr. Belanger; and they

25   can do it as they want within the 90 minutes and split the

1    issues up the way they want.

2           But for us to have to respond to four different

3    presentations with Mr. Clifford kind of giving an opening and

4    then a closing with, in the middle, two other lawyers going,

5    that's unfair to Boeing, and I object to it.

6           MR. CLIFFORD:  And it's not a closing.  It's a

7    separate and distinct issue.

8           Neither Ms. Brammeier nor Mr. Lindquist are going to

9    discuss the elements and proof to be offered in the survival

10   action.  It's an entirely different and distinct cause of

11   action and count in the master complaint that was developed by

12   the committee, not developed by either one of -- again, it's

13   coincidence Ms. Brammeier is -- but let's pretend it's

14   Romanucci and Lindquist.  If it was Romanucci and Lindquist,

15   would he not have the committee through Clifford or Durkin or

16   Brammeier talk about the survival action?  That's not fair to

17   them.  That's very prejudicial to them.

18          They openly went along with, as they should have, the

19   committee working up those common experts, and I have filed

20   separate appearances in these cases.

21          And this Court is not going to allow me to be

22   cumulative or overlapping.  That's for sure.

23          And in our work thus far, we have deliberately been

24   mapping out the remarks to be told to the jury about what the

25   evidence will be to make sure that we're not overlapping.

1          So I don't see -- we don't see the prejudice.  It's

2     three different lawyers in two cases.  I mean, help me out.

3     And the one lawyer, myself, would be only talking about the

4     survival action technically in terms of the substantive proof

5     of that.  And the jury is certainly entitled to hear an

6     introduction about the case.

7               MR. WEBB:  Your Honor --

8               THE COURT:  In opening statement.

9          Mr. Webb, what about the treatment of the survival

10    action?  What's your position regarding that?

11              MR. WEBB:  They've got two claims, wrongful death and

12    survival, and they've got expert witnesses.  Each party gets to

13    give an opening statement and talk about, as much as they want,

14    the common experts or not.  But they clearly can't say that

15    they don't know what the testimony is.  It's my job as a trial

16    lawyer to understand the evidence and put it into a concise

17    presentation called an "opening statement."

18              They don't have -- no matter if you had 12 counts, if

19    they have two claims here but they don't split them up, each

20    lawyer can decide if one wants to emphasize survival versus

21    wrongful death; but they don't get a separate lawyer to get up

22    to give a total of four presentations.  It's their job to put

23    it together the way they want to.

24              And to say that other lawyers cannot understand what

25    the common experts have to say as it applies to their case,

1    that's true of every case. We have to learn the totality of

2    the evidence and decide how to summarize it.

3            So splitting it up into four different presentations,

4    I think, is very prejudicial to us. I've never seen it done

5    before.

6            MR. CLIFFORD: Well, I've seen it done before from the

7    perspective that this is a case that has a committee that

8    worked up the file on the liability and on the survival action.

9            And I could hear him objecting now. If Ms. Brammeier,

10   for an example, talked about the survival action and then

11   Mr. Lindquist gets up and talks about the survival action,

12   "objection; cumulative, already stated to the Court and jury."

13           We're not talking about that. It's not a mass tort,

14   but it was a mass action that was consolidated, and that's a

15   unique case that was worked up by a committee. None of those

16   lawyers who have come before you that weren't on the

17   committee -- by the way, Mr. Romanucci wasn't on the committee

18   that did the workup of that. Mr. Lindquist was not on the

19   committee that did the workup of that, those common experts.

20   And they know it, and that's the way it should have been.

21   There was a committee that did that work.

22           And, in fact, we did it without any common benefit.

23   As this Court knows, a lot of times in these cases, that

24   committee would petition for a common benefit fee for doing

25   that work. It happens all the time in these mass torts.

1    Our committee waived that.  We did none of that.  We

2  did all the work, but they were assessed -- each of these

3  clients throughout the entire case, with your permission, had

4  been assessed the cost of all of these experts to empower the

5  committee to go out and gather that evidence and do the work.

6    And so now they want to deny these families the right

7  to have that committee that did all that work present that

8  evidence in a noncumulative way.  We think that's unfair.

9    THE COURT:  Mr. Clifford, a question.  What if we wind

10  up proceeding going to trial on Dieci and Lopez?  What happens

11  in terms of the PEC?

12    MR. CLIFFORD:  I'm sorry.  I misunderstood, sir.

13    THE COURT:  I'm sorry.  What if Dieci settles and we

14  wind up going to trial on Belanger and Lopez?  What's your

15  position?

16    MR. CLIFFORD:  Then I will still be here asking you

17  for the privilege to present the initial introductory remarks

18  and the survival action.

19    THE COURT:  Mr. Webb, what about that scenario?

20    MR. WEBB:  No, because -- wait a minute.  I'm not

21  going to object on -- they have a right to use their 90 minutes

22  the way they want.  I'm not objecting to -- I will never be

23  objecting on grounds of cumulative.  If they decide to overlap

24  each other, they have a right to do that because they have

25  separate clients.  So there's no possibility I would object on

cumulative or that you would sustain it.

Number two, each lawyer understands the whole case. Ms. Crawford in the last trial, remember we settled everything but Ms. Crawford's case. She was going to give one opening statement, which she could do and was going to do. She wasn't going to try to divide her opening statement up and have someone else come in and do this or someone else come in and do that.

She was giving one opening statement for her client, which is the way it should be here for whatever two clients go because we don't know right now who's going to trial. We just don't know for sure.

But splitting this into multiple parts I strenuously object to. They should get -- each get to give their own opening statement, say whatever they want to say, and they have a right to do that for their clients. They don't have a right to multiple opening statements.

THE COURT: And what about that scenario if Belanger and Lopez were proceeding --

MR. CLIFFORD: Lewis.

THE COURT: -- for whatever reason and not Dieci? Does that change?

MR. WEBB: No, it doesn't change. Belanger will give his opening statement, and Mr. Lewis will give his opening statement, just like Ms. Crawford was going to do.

1    MR. CLIFFORD:  And he says he won't object when

2 whoever goes second is talking about the four common experts.

3    MR. WEBB:  Yes, I'm not going to object.  No, I'm

4 not object-- you have a right to --

5    THE COURT:  Mr. Webb, even if you did object, as I

6 stated, I wouldn't sustain the objection, right?

7    MR. WEBB:  That's correct.  You would not.

8    THE COURT:  I would not.

9    All right.  So the parties do agree on the fair length

10 of the closing arguments.  So that will be the order.  The --

11    MR. CLIFFORD:  Opening statements.

12    THE COURT:  90 minutes?

13    MR. CLIFFORD:  Opening statements, 90 minutes,

14 yes, sir.

15    THE COURT:  What did I say, closing?

16    MR. CLIFFORD:  You did.

17    THE COURT:  All right.  Opening statements will be

18 90 minutes.  I agree with Mr. Webb; I have not seen it done.

19 And it occurs to me there are very good reasons why I haven't

20 seen it done the way Mr. Clifford suggests it should be done.

21 So I'm going to sustain the objection to Mr. Clifford's motion.

22    Each side will have 90 minutes, and the plaintiff can

23 divide that up in any way that they want with two attorneys.

24 Hopefully, Ms. Brammeier, but the motion to divide the opening

25 into four openings is going to be denied at this point.  We

1   will have 90 minutes per side, and the plaintiff can divide

2   that up however they see fit, and there will not be any

3   objections for cumulative arguments, but, obviously, the

4   attorneys will confer and try to avoid that from a strategic

5   standpoint.

6           Okay.  So that's the nature of openings.  That's the

7   length of openings.

8           Again, we will have the questionnaire.  The point of

9   the questionnaire is to give the attorneys time to contemplate

10  the answers on the questionnaire.  So we will have a pause.

11  I'll figure out how exactly to schedule my opening remarks to

12  the jury.  But in any case, there will be a pause built in so

13  that the attorneys can contemplate those questionnaires and

14  also, as Mr. Webb points out, so the attorneys can confer with

15  the idea of possibly agreeing regarding motions for cause.

16          And if that's the case, obviously, I will have to -- I

17  will have to authorize those strikes.  But if the parties can

18  agree, that makes sense.  I'll figure out what the pool will

19  be.  Did we talk about that in the past, the number of

20  potential jurors?

21          MR. WEBB:  I was going to ask you that question.

22          MR. CLIFFORD:  You didn't, I don't believe.

23          MR. WEBB:  In other, I've been told -- I was going to

24  ask you two questions really.  How many are you bringing to the

25  courtroom, and do we at least when we start -- well, I guess

1    now on Monday, because we're going to start picking the jury on

2    Monday.  Do you give us the list of what the juror numbers --

3    in other words, the jurors will have a number, right?  And so I

4    think they're going to have to fill that number in on their

5    questionnaire.  And so when the jurors get here on -- doesn't

6    the clerk send you so many jurors, whatever, or do you tell

7    them how many --

8            THE COURT:  It typically depends on whether it's

9    criminal or civil.  We get a bigger pool in criminal cases

10   because there are many, many more peremptory strikes.

11   Typically, the civil pool is very small, less than 20, but we

12   will request 40 in this case.

13           MR. WEBB:  I would suggest that only because there are

14   issues in this case, as you've noted in the last hearing, which

15   is why you were going to do voir dire in the jury room, is

16   because there's a lot of publicity about this case.

17           THE COURT:  Right.  Right.  When you say the nature of

18   the case, obviously a very important case to everyone, but from

19   a jury selection standpoint, the relevant issue is the

20   publicity.  Right?  So it's important --

21           MR. WEBB:  And it's going to take more jurors than you

22   normally are going to have.

23           THE COURT:  All right.  We will see if I can get 40 or

24   more.  And in terms of one individual questioning, technology

25   will give us an assist, and I'll be able to talk to each juror

1  individually with the use of the headphones.  They will sit in

2  the witness box, which will save some time.

3         MR. WEBB:  Will they have a jury number -- when we

4  come here Monday morning, there will be a list we get with

5  their names and juror numbers?

6         THE COURT:  Yes.  They will come down here in the

7  random order that they were selected in, and we will address

8  them in that same random order.  I don't remember if the piece

9  of paper literally has the number.

10        Lesley, do you remember?

11        THE CLERK:  Yes, there's a number.  They have a

12  number.

13        THE COURT:  So, yes, it will have the number, I'm told

14  by my courtroom deputy.

15        MR. WEBB:  Okay.

16     (Brief pause.)

17        THE COURT:  Okay.  I'm reminded by my courtroom deputy

18  that I have requested 50 jurors.

19        MR. CLIFFORD:  Can I go back to the opening statement

20  for a minute just so the question -- so we'll have two lawyers.

21  Would you permit that one -- again, this survival action is

22  unique, and I hear what Mr. Webb is saying, but I don't agree

23  with him.  Okay?

24        The idea of having two lawyers overlap on talking

25  about the common experts is, respectfully, a mistake.  Would

1    you permit one lawyer -- whether it's myself or Ms. Brammeier

2    or Mr. Durkin, it doesn't matter -- making the introduction of

3    the case going into Dieci in terms of the evidence of the

4    wrongful death, allowing Mr. Lindquist then to talk about the

5    evidence of wrongful death in the Belanger case, and then that

6    same lawyer who made the remarks about Dieci then speaking to

7    the common survival action evidence as it pertains to both?  So

8    you still have two lawyers.  You just have a pause with

9    Belanger being presented on the wrongful death so that it keeps

10   the death cases separate, distinct, the jury hearing about them

11   all at one time, and then followed by an ending with the

12   survival action.  I'm asking you to consider --

13          THE COURT:  Within 90 minutes?

14          MR. CLIFFORD:  Absolutely.  Of course.

15          THE COURT:  Mr. Webb, we've gone from three lawyers

16   and four statements to two lawyers and three statements.

17          MR. WEBB:  And three statements.  And I object to that

18   for the same principle, the same exact reasons.  They can

19   decide among themselves if one of them is going to talk more

20   about the survival action than the other.  But they don't need

21   someone to come in and give a closing argument who gave the

22   same introductory -- that's just unfair.

23          MR. CLIFFORD:  What's unfair about it?

24          MR. WEBB:  They get two opening statements, one for

25   each side, and they could decide how to split it; and they

1    should not have three.

2           MR. CLIFFORD:  And it's not unfair, he argues, for the

3    two lawyers who are talking about the death case claims to then

4    be forced to commingle and step on one another in the

5    presentation of the survival comments as distinguished from

6    keeping it very clear, which will be ultimately what a jury

7    does, keeps it very clear.

8           You've got the same lawyer doing it.  It's just,

9    "Folks, you'll also hear there's going to be evidence now about

10   the passenger experience.  We call it a 'survival action.'"

11          THE COURT:  Okay.  It's unorthodox, as we say, but

12   I'll allow it.  Two lawyers.

13          MR. CLIFFORD:  Yes, sir.

14          THE COURT:  I won't explain to the jury what they're

15   about to hear.

16          Obviously, to Mr. Webb's concern, it's not a closing

17   argument.  It's not argument at all.  Right?  All of the rules

18   apply.  It is an opening statement with all of the usual

19   restrictions.  But over Boeing's objection, you will be allowed

20   to proceed in that way.  I won't explain that.

21          MR. CLIFFORD:  Okay.

22          THE COURT:  And the attorneys are free to explain --

23          MR. CLIFFORD:  Thank you, sir.

24          THE COURT:  -- why it's going to proceed in that way.

25          And, again, it's 90 minutes, and the lawyers will

1   figure out how to split that up, the lawyers for the plaintiff.

2          And, again, Mr. Webb, it does make sense in this case

3   based on publicity to make sure that we are speaking to each

4   juror, potential juror, individually, especially when we're

5   talking about what they may have seen or heard.

6          So I will do that on an individual basis, but because

7   of the technology that we have, we will not leave the room.

8   The lawyers will be able to hear everything.  The rest of the

9   jurors won't.  And we will talk to one juror at a time from the

10  witness stand.

11         MR. CLIFFORD:  New subject?  Just as an FYI, we're

12  having a meet and confer this afternoon to -- there is a

13  schedule in place, of course, for, you know, exchanging

14  designations, exchanging exhibits.

15         We're trying to take advantage of extra time that

16  maybe we have to get some efficiencies there and see if we can

17  work out any of our objections either side has, whether it's

18  exhibits or designations.  We're going to start that process

19  this afternoon as opposed to waiting the day before and then

20  flooding you with a bunch of decisions in the mornings.  We've

21  agreed to do that.

22         MR. WEBB:  Yes, we have.  In fact, what's built into

23  the pretrial order and has been for three years, which everyone

24  has agreed to, but I just will preview it with Your Honor,

25  we've got a system in place where -- well, I'll just take

1   witnesses.  What happens in the -- under the pretrial order,

2   whoever is in this case the plaintiff going first, they have to

3   give us two days' notice what witnesses are coming up.  Let's

4   say on Monday, they have to tell us who's coming up on

5   Wednesday.

6           The system we have in place is that, I think it's at

7   4:00 p.m. on Monday --

8           THE COURT:  3:00 p.m.

9           MR. WEBB:  3:00 p.m.  You've got it right there.

10          THE COURT:  Right.

11          MR. WEBB:  They give us the name and the exhibits

12  they're going to use with that witness.

13          And then we have -- is it an hour or two hours -- to

14  object to the exhibits, and then we have a meet-and-confer that

15  night because we don't want to flood you with -- we want to try

16  to resolve objections to exhibits.  And only those that we

17  can't reach an agreement on will get presented to you the first

18  thing the following morning as to those witnesses for that day.

19          And so we're meeting and conferring, I think -- I'm

20  not a hundred percent sure.  We'll meet and confer to try to

21  streamline this and make it as efficient as possible.  But that

22  pretrial order is in place in order to be efficient to be able

23  to find a way to resolve exhibits and not flood you with

24  unnecessary objections.

25          So that's that system, and that's in the pretrial

1    order now.

2            THE COURT:  And that relates to exhibits,

3    designations, but also witnesses in general, right?

4            MR. WEBB:  That's correct.

5            THE COURT:  Right.

6            MR. WEBB:  Like opening statement, opening statement,

7    on Sunday, the day before opening statements, each side has to

8    show the other side, distribute to them, anything they're going

9    to put up on the screen as to, you know, PowerPoint,

10   demonstratives, exhibits, anything going up on the screen; and

11   then the other side can object that night, and we can meet and

12   confer that night so that, when we get up here for opening

13   statements, if that's going to be on Monday, we will present to

14   you objections so that we don't interrupt opening statements by

15   having unnecessary objections.

16           So that pretrial order is in place to try to make

17   things more efficient, I guess.

18           MR. CLIFFORD:  And I agree with that.  I'm only

19   smiling because what we're trying to do by starting today is to

20   lessen that load --

21           MR. WEBB:  That's fine.

22           MR. CLIFFORD:  -- and start the conversation early.

23   And Webb told me he wasn't using a PowerPoint, so I don't have

24   to worry about that.

25           MR. WEBB:  I told you what?

1          THE COURT:  No PowerPoint?

2          MR. CLIFFORD:  No, I'm kidding.

3          THE COURT:  All right.  And the parties have

4   referenced the pretrial order, and the parties agree that the

5   order is going to control the course of the trial, including

6   those agreed-upon disclosure deadlines during the trial and

7   before the trial.

8          I applaud the lawyers for coming to these agreements

9   in order to streamline and to make the trial more efficient for

10  the jurors.

11         Let me get the lawyers some answers on the motions

12  that are pending.

13         The parties reached out and let me know that the Seex

14  case, 19 CV 3392, had settled in principle and was not

15  proceeding.

16         There are motions that are pending regarding that

17  matter, and those motions are going to be denied because they

18  are moot at this point.  Those are number 2396, 2397, 2400, and

19  2401.  They are denied as moot.

20         Let me turn to Boeing's motions.

21         Boeing has filed a motion to exclude evidence of the

22  manner of death.  This is 2398 on the docket.  The plaintiff

23  has responded.  In 2460, that's the plaintiffs' response on the

24  docket.  And in that response, plaintiffs confirm that they

25  intend to follow my prior rulings on this issue and do not

1    intend to repeat the questioning that concerned Boeing in the

2    deposition of Expert Witness Rawson Wood.

3         So, based on that response, with that understanding,

4    I'm going to deny that motion as moot, again with that

5    understanding.  All parties understand and appear to understand

6    that plaintiffs can mention the cause and manner but cannot go

7    overboard with detailed cumulative evidence on that issue.  So

8    2398 is denied as moot with that understanding.

9         Boeing's motion, the second motion, is a motion to

10   exclude evidence regarding unbelted passengers.  This is 2399.

11   2399, this motion raises issues like the last motion that have

12   been covered before in the prior rounds of trials and trial

13   preparation.

14        And, again, based on plaintiffs' response, which is in

15   2461, the parties seem to mostly, for the most part, be on the

16   same page.  Plaintiffs understand that they cannot ask

17   questions about the effects of the plane's rapid descent and

18   crash on unbelted seatbelts because there is no evidence that

19   any passengers were unbelted.

20        Again, to address Boeing's concerns, I am going to

21   grant the motion.  To the extent that the earlier ruling

22   applied to one expert, I'm going to grant it to make clear that

23   it applies to other experts, as well.  The same reasoning

24   applies to other experts.  So that motion is going to be

25   granted.  That's 2399.

1      The next Boeing motion, number 3, is the motion to bar

2   the expert witness, Expert Longnecker.  This applies to the

3   Lewis case, and this is motion 2402.

4      Mr. Longnecker proposes to testify about the amount of

5   money that the decedent, the captain, Captain Lewis, would have

6   made assuming that he did leave military service, leave his

7   military career, in 2022 to pursue a lucrative career as a

8   logistics executive.

9      The response to the motion is in 2469, and it does

10  present or mention some evidence, slight evidence, to support

11  Mr. Longnecker's assumptions; but I find that it is not enough

12  to provide a sufficiently solid foundation for the proffered

13  opinion testimony.

14     At most, Captain Lewis had vague plans to go into the

15  field of logistics after his military career ended, whenever

16  that might be.  But there is little or no evidence that he

17  would leave the military in 2022 and had any firm plans to

18  pursue a second career in logistics in the private sector.

19     Mr. Longnecker, his opinion is based on what amounts

20  to speculation.  His proposed expert testimony does not fit the

21  facts in the case and is not based on sufficient facts, and it

22  does not reflect a reliable application of his methodology to

23  the facts.

24     I agree that it should be excluded.  So that motion is

25  going to be granted.  That is Boeing's motion 2402 related to

1    the Lopez trial.  And despite what the parties represented

2    earlier today, that motion moots the motion to allow

3    Mr. Longnecker to appear remotely.  So 2476 is that motion, and

4    that motion is going to be denied as moot.

5            Next is Boeing's motion to bar testimony of the expert

6    witness Robert Johnson.  This, again, is related to the Lewis

7    trial, and this is the motion that is in 2403.

8            Mr. Johnson proposes to opine on the present value of

9    the sums Captain Lewis would have earned in his post-military

10   logistics career according to Mr. Longnecker.  Because I have

11   ruled that Mr. Longnecker's testimony is going to be excluded,

12   Mr. Johnson's proposed testimony is, likewise, excluded.

13           So I'm going to grant that motion as to Robert

14   Johnson, that is, 2403.

15           All right.  Next is the motion to bar the opinion

16   testimony of mental health providers as to plaintiffs' grief.

17   This is 2411 and 2416 (Redacted).  I'm going to deny this

18   motion.

19           Boeing claims that the Court should bar treating

20   mental health providers from testifying about the plaintiffs'

21   grief based on the fact, in part, that I had barred the

22   testimony of expert thanatologists or grief experts in an

23   earlier round of pretrial motion decisions.

24           But I do not agree that mental health problems for

25   which psychotherapists and other mental health care providers

provide treatment are the same as grief experts. Although they may share some commonalities, perhaps a common origin, grief is something, as I ruled earlier, that everyone who has ever suffered a loss can understand. Mental health issues require an assessment by someone with particular professional training and experience.

Boeing also argues in that regard the treating mental health providers did not conduct a sufficiently rigorous analysis to meet the requirements of *Daubert* and 702. But I agree with plaintiffs that the case of *Cooper v. Carl A. Nelson & Co.*, Seventh Circuit case from the year 2000, shows otherwise.

In *Cooper*, 211 F.3d 1008, the Seventh Circuit emphasized that the purpose of the *Daubert* inquiry is simply to make sure that, when experts testify in court, they adhere to the same standards of intellectual rigor that are demanded in their professional work. And the Seventh Circuit warned district courts against adopting "an overly demanding gatekeeping role." As long as the expert applies a clinical methodology that is appropriate according to the standards of his field, the possibility that extraneous factors might have affected his conclusions if he had known more or known more facts is a subject that is susceptible to exploration on cross-examination by opposing counsel rather than a basis for excluding the testimony.

1    In accord with the Seventh Circuit's dictate in

2 *Cooper*, I believe that excluding the testimony of the mental

3 health providers here would be to adopt an overly demanding

4 gatekeeping role.

5    The mental health providers can testify about what

6 they observed and concluded while treating the plaintiffs.

7    I will point out one caveat; that is, witnesses have

8 to stick to opinions they formed during the course of treatment

9 and not in preparation for litigation*. EEOC v. AutoZone, Inc.*,

10 Seventh Circuit case from 2013; 707 F.3d 824.

11    So the plaintiff is on notice that I will sustain

12 objections that violate that dictate if the testimony veers too

13 far afield from the witness' own treatment during questioning.

14    Next is Boeing's motion to bar testimony of Expert

15 Witness Cockerill.  These are motions 2426 and 2427 (Redacted).

16 And this also relates to the Lewis trial.  This motion is going

17 to be denied.

18    Although Boeing did raise some persuasive arguments

19 against the doctor's proposed testimony as to what caused PTSD

20 suffered by the plaintiff widow, Ms. Yalena Lopez-Lewis, I

21 believe these objections go to weight rather than

22 admissibility.

23    The doctor's report reflects a reliable application of

24 a professional methodology to the facts and data, and they are

25 sufficient to support his opinion.

1          So this motion is going to be denied.  Again, it's

2    2426, 2427 (Redacted).

3          There may be some force to Boeing's argument raised in

4    its reply at 2494 that other events, other traumatic events,

5    may have caused or contributed to her PTSD, but I do not find

6    that it follows that this witness' analysis is not reliable

7    under *Daubert* or Rule 702.

8          These are arguments that go to weight, and the jury is

9    entitled to take that opinion for what it is worth and decide

10   whether it is convinced or moved by his testimony or, on the

11   other hand, Boeing's argument that the doctor had tunnel vision

12   in coming to his opinions.

13         Next is Boeing's request for judicial notice.  I was

14   notified Boeing is withdrawing that request without prejudice

15   at this time.  So 2463 is withdrawn without prejudice.

16         Turning to plaintiffs' motions, beginning with

17   Belanger, plaintiff's motion to bar evidence regarding the

18   plaintiff's relationship status, this motion is at 2407 and

19   2410 (Redacted).  The motion is going to be denied.

20         As Boeing explains in its response at 2444, the fact

21   that the plaintiff is in a frame of mind to begin to date again

22   and has gotten engaged is relevant to her grief and, perhaps,

23   to what amount is necessary to compensate her for that grief.

24         The plaintiff cites case law here, but that case law

25   is not contrary because it focuses on whether such evidence

cuts off damages for loss of society even when the decedent's
widow has not yet remarried.

Boeing wants to ask about the status, if you will,
about dating and relationship status for a different purpose,
and plaintiff has not established that that evidence is
irrelevant or inadmissible for that purpose.

So with that understanding, with that limitation, the
motion is going to be denied. Again, that's 2407, 2410.

All right. That is the motion related to Belanger.
Next are the motions related to the Lewis case. The Lewis case
is 19 CV 4964.

And the first motion is the motion to bar evidence of
plaintiff's interest in dating. This is at 2412. The motion
is similar to the one regarding the widow's engagement status
in Belanger. And I'm going to deny it for the same reason.

Evidence of plaintiff's interest in dating may be
irrelevant to loss of society damages, but it is relevant to
her grief and admissible for that reason. So that motion is
going to be denied, 2412.

Next are three motions. The motion to bar evidence of
prior incidence of self-harm is at 2413 and 2422. The motion
to bar evidence of prior traumatic events is at 2414 and 2423.
And the plaintiff's motion to bar evidence or argument that
other events caused plaintiff's PTSD is at 2415 and 2424.
These three motions are related, and I'm going to deny them for

1     the same reason.

2          As Boeing explains in its response at 2453, if the

3     plaintiff calls Dr. Cockerill to testify that plaintiff is

4     suffering from PTSD because she lost her husband in this crash,

5     then Boeing should be permitted to ask the expert about other

6     traumatic events that may have caused or contributed to her

7     PTSD.

8          So I find that plaintiff, by putting mental health at

9     issue, specifically PTSD, opens the door and makes this an

10    appropriate area, or permissible area, for Boeing to explore if

11    it chooses.  So those motions are denied.

12         Next is the fifth motion regarding the Lewis trial.

13    That's the motion to bar evidence that the decedent's trucking

14    business failed.  This is at 2417.

15         Boeing in its response indicates it does not intend to

16    adduce evidence or argue that the captain's trucking business

17    failed, although it does intend to argue that the fact that he

18    voluntarily stopped operating the business and returned to

19    military service undercuts any assumption that he was likely to

20    reverse that transition anytime soon.

21         I believe that's permissible.  So assuming that I have

22    properly interpreted the parties' position, I'm going to grant

23    the motion with that understanding.  And, again, with that

24    understanding, it does not put Captain Lewis' trucking business

25    entirely or questions about his trucking business

1     out-of-bounds.

2            Next is the motion to bar evidence of plaintiff's

3     racehorses.  This is 2418.

4            In Boeing's response at 2453, Boeing argues that the

5     evidence is relevant to plaintiff's grief in that it tends to

6     indicate that plaintiff is taking an interest in socially and

7     economically productive activities.

8            Plaintiff is concerned and argues that it's unduly

9     prejudicial because the mention of racehorses will communicate

10    to the jury that the plaintiff is rich, so rich that she does

11    not need a substantial award of compensatory damages.

12           But I don't believe that's a realistic danger if the

13    evidence is presented in its full context, including, of

14    course, the fact that the plaintiff is only a partial owner.

15    Over objection, I find that the probative value outweighs any

16    risk of prejudice.  And Boeing, again, is not going to make

17    such an argument.  So that motion is denied.  Again, that's

18    2418.

19           Next is plaintiff's motion to bar the testimony of the

20    rebuttal expert Guryan.  This is at 2419.

21           Mr. Webb, is this still an issue at this point?

22           MS. JOHNSON:  Your Honor, Dr. Guryan is going to

23    testify in rebuttal to Mr. Johnson and Mr. Longnecker.  So I

24    think this may be mooted by your ruling on those witnesses.

25           THE COURT:  Okay.  So I'm going to grant the motion

 1   without objection.

 2          MS. JOHNSON:  Well, Your Honor, I don't know if we

 3   want it granted.

 4          THE COURT:  What do you suggest, Counsel?

 5          MS. JOHNSON:  Can you deny it as moot?

 6          THE COURT:  Mr. Romanucci?

 7          MR. ROMANUCCI:  Your Honor, I think the motion should

 8   be granted.  I mean, if Longnecker and Johnson are not

 9   testifying, then Guryan has no role.  So if you deny it as

10   moot, they can reraise it.  So I think the appropriate ruling

11   is it's granted.

12          THE COURT:  All right.  It is --

13          MS. JOHNSON:  Your Honor, just on the substance, I

14   think that granting the motion is problematic.  I think

15   Dr. Guryan is qualified to offer the opinions he offered.  He

16   applied a reliable methodology and used reliable data.  So I

17   think granting the motion is problematic for us in that

18   respect.

19          THE COURT:  Okay.  I think this is semantics.  I will

20   grant the motion over objection.  Again, to the extent that

21   Longnecker and Johnson's testimony are barred, this expert's

22   testimony should also be barred.  I understand the concern, but

23   that's not the basis for granting the motion.  The basis is

24   what I've just stated.  With that understanding, 2419 is

25   granted.

1          And 2420 is the motion to bar certain evidence.

2     Again, that's 2420.  This motion is unopposed on the

3     understanding that Boeing reserves the right to introduce the

4     evidence involved if plaintiff opens the door.

5          So with that understanding, 2420 is going to be

6     granted.

7          MR. ROMANUCCI:  Your Honor, may I speak for a moment?

8          THE COURT:  Yes, Mr. Romanucci.

9          MR. ROMANUCCI:  Could I have clarification on 2417?

10    My understanding is -- and if I've got this wrong -- that the

11    motion is granted in that Boeing will not mention the word

12    "failing," but they have the opportunity to examine witnesses

13    on his trucking business; is that correct, Your Honor?

14         THE COURT:  Yes.  They do not intend to adduce

15    evidence that it failed, but they can introduce evidence that

16    he voluntarily -- I'm looking for the words here --

17    voluntarily --

18         MR. ROMANUCCI:  Went back into the military?

19         THE COURT:  Voluntarily stopped operating the business

20    and returned to the military.

21         MR. ROMANUCCI:  Thank you, Your Honor.

22         MS. BRENNER:  Your Honor, if I may.

23         THE COURT:  Ms. Edwards -- I'm sorry.

24         MS. BRENNER:  Ms. Brenner.

25         THE COURT:  Your witness, I assume.

1          MS. BRENNER:  Just to clarify that point very quickly,

2     Boeing would take the position, however, if plaintiff was to

3     introduce testimony talking about the success of the business

4     or the like, that Boeing should be permitted to cross-examine

5     on that, of course.

6          THE COURT:  Mr. Romanucci, sounds fair?

7          MR. ROMANUCCI:  Yeah.  I think I understand what

8     Ms. Brenner is saying.  Just for context, Your Honor, during

9     the examination of one of the economics experts, I believe it

10    was Ms. Brenner who introduced the word that Mr. Lewis'

11    business "failed."  That's where the word "failure" came out

12    of, and that's the basis for our motion.

13         So that he stopped working and went back into the

14    military, I think that's fair.  I understand Your Honor's

15    ruling.  And what else did you want to go into?

16         THE COURT:  She says if you open the door by saying it

17    was a huge success, he was making millions of dollars, that

18    opens the door and then she can get into failure, or aspects of

19    failure.

20         MR. ROMANUCCI:  Understood.

21         MS. BRENNER:  Thank you, Your Honor.

22         THE COURT:  So with that understanding, those are the

23    rulings.

24         MS. EDWARDS:  Your Honor, apologies.  May I seek

25    clarification on one motion?

1          THE COURT:  Sure.

2          MS. EDWARDS:  May I approach the microphone.

3          This is the motion regarding Dr. Cockerill at 2426.  I

4     understand your ruling.  There were three opinions that we had

5     challenged as undisclosed separate and distinct from the

6     alleged diagnosis and the cause of the diagnosis.

7          The first one was the occupational and social

8     impairment that Dr. Cockerill testified for the first time that

9     those would be lifelong issues that were not raised in his

10    report.  That was not an extension of his report.  That was an

11    undisclosed opinion.

12         The second was the opinion that changed from his

13    testimony to plaintiffs' opposition brief where Dr. Cockerill

14    intends to opine that individuals exposed to acute stress may

15    experience structural loss of brain volume.  Again, an

16    undisclosed opinion.

17         As we said in our reply, speculation about theoretical

18    future harm is also not appropriate, and it's inadmissible.

19         And the third undisclosed opinion was that her PTSD is

20    not chronic; it is, in fact, permanent.

21         So seeking clarification on the extent of your order,

22    Your Honor.

23         THE COURT:  Response.  This is as to the Lewis case.

24    Mr. Romanucci.

25         MR. ROMANUCCI:  Yes, Your Honor.  So I was getting the

1   motion, but in reverse order -- actually, in totality, I think

2   all three of those opinions go to weight.

3          These are opinions that he disclosed in his

4   deposition.  They were questioning him about -- he testified as

5   to the issue of loss of brain volume, that PTSD can be a

6   competent cause for loss of brain volume, and he was questioned

7   on it.

8          And with regard to the other two issues, I don't have

9   them in front of me because I'm looking at the motion, but I

10  think they all go to --

11         THE COURT:  Permanent versus chronic.

12         MR. ROMANUCCI:  Permanent versus chronic, I mean, that

13  is complete 100 percent semantics.  The definition of "chronic"

14  is it's lifelong lasting.  "Lifelong lasting" means it's

15  permanent until the day you die.  I don't know how else you can

16  explain that.

17         So I don't know how you cannot intertwine the word

18  "chronic" with something permanent, because you're going to

19  have to explain to the jury:  "Ladies and gentlemen, the word

20  'chronic,' if I ask the question, 'chronic,' Dr. Cockerill,

21  does that mean that it's lifelong lasting?"

22         "Yes, Mr. Romanucci."

23         "And does lifelong lasting for this particular

24  patient -- or this particular person, Yalena Lopez-Lewis, does

25  that mean permanent?"

1          "Yes, it does."

2          I mean, that is a hundred percent semantics.  So I

3     don't know how the chronic versus permanent can be excluded.

4          The brain loss volume, that's an opinion that he

5     holds.  That's what the literature says.  Now, is he going to

6     say that Ms. Lopez-Lewis has a loss of brain volume?  Well, we

7     know that's not possible because he hasn't been able to explore

8     her brain.  She's alive.  But he can say that chronic PTSD is a

9     competent cause for loss of brain volume.  That's an opinion

10    that he holds within a reasonable degree of psychiatric

11    certainty.

12         THE COURT:  And, Ms. Edwards, the first opinion you

13    were concerned with, the lifelong issues, remind me.

14         MS. EDWARDS:  Yes, Your Honor.  And to be clear, we're

15    not suggesting these issues go to weight.  We're saying this is

16    a Rule 26 issue:  That if Dr. Cockerill had intended to offer

17    these opinions, he should have offered them in his report.

18         His report actually only says, on the chronic versus

19    permanent issue for PTSD, that PTSD lasting for more than

20    three months tends to be chronic.

21         Nowhere in his report does he use the word

22    "permanent."  The DSM, as we said in our brief, also says

23    "chronic" simply means symptoms lasting for six months or

24    longer.

25         It's not a matter of semantics, Your Honor.  It's a

1    report that -- it's an opinion that was not disclosed.

2    The first issue I raised was his undisclosed opinion

3    that Ms. Lopez-Lewis will have lifelong issues with impairment.

4    When asked during my questioning, he agreed that that was not a

5    statement that was in his report.

6    On the loss of brain volume, again, in the opposition,

7    plaintiffs merely say that he will be opining that people with

8    chronic PTSD may or may not suffer loss of brain volume,

9    Your Honor.

10    That's not -- that's not an opinion that I believe the

11    jury should hear.  It's too theoretical.  It's also not in his

12    report.

13    THE COURT:  Mr. Romanucci?

14    MR. ROMANUCCI:  Yes, Your Honor.  Mr. Clifford was

15    good enough to hand me the common definition of "chronic," and

16    there are multiple, multiple definitions of "chronic," from

17    long-lasting to, you know, permanent, to rooted, to subtle.  I

18    mean, there's so many interpretations of the word "chronic"

19    that I think it's an impossible leap of faith not to suggest

20    that "chronic" does not mean lifelong lasting and/or permanent

21    or some of the other common definitions of "chronic."

22    With regard to the opinions of Dr. Cockerill that were

23    disclosed, on page 8 of his report under summary of opinions,

24    specifically number 3, he says in his report Ms. Lopez's

25    symptoms, which are moderate to severe, are associated with

1   moderate social and occupational functional impairment which

2   has adopted a chronic course.  He discloses the word "chronic."

3           THE COURT:  All right.  That is my ruling.  The motion

4   is denied.  I think that all three of these issues that are

5   raised that are couched in terms of undisclosed opinions are

6   more properly addressed on cross-examination.  They go to

7   weight.  They are not undisclosed opinions.  So, again, that

8   motion is denied.  That is 2426, 2427 (Redacted).

9           MR. BARTLETT:  Judge, if I may for a minute?

10          Thank you very much.  Austin Bartlett for plaintiff

11  Amie Belanger.

12          I know that we had the motion in limine number 1 on

13  the dating/engagement issue.  I listened very carefully to the

14  Court's ruling, and obviously the Court put a lot of thought

15  into it.

16          I did want to highlight for the Court the Seventh

17  Circuit's decision in 1998 in *McClain v. Owens Corning* at

18  139 F.3d 1129, where the Seventh Circuit -- in that case, Your

19  Honor, the plaintiff was *McClain*.  And the Court said that the

20  fact that the plaintiff *McClain* maybe finding some comfort in

21  her new companion does not negate the loss she incurred as a

22  result of her husband's death; *Owens Corning's* argument that

23  her loss should in some way be offset by the companionship she

24  receives from Gaddey is unpersuasive.

25          Now, in this case, the grief and sorrow -- and under

1    the Illinois Wrongful Death Act is a relatively new damages

2    element, "new" being about 10 or 12 years.  And so there hasn't

3    been as much case law to percolate up on that issue.  But

4    Boeing is essentially trying to drive a bus through a newer

5    damages category.

6            But what we contend, Your Honor, is that Seventh

7    Circuit opinion, that that same rationale would apply with the

8    same force to the grief and sorrow.

9            So I just wanted to raise that case with Your Honor.

10           THE COURT:  And was that authority that you raised --

11   I don't have the boxes of motions in front of me.

12           MR. BARTLETT:  It was, Judge.

13           THE COURT:  Okay, and considered.

14           Any response from Mr. Zuidema?

15           MR. ZUIDEMA:  Yes.  Thank you, Your Honor.

16           This was cited in both sides' briefs, and I think we

17   explained very clearly in our brief.  He mentioned that the

18   decision came out in 1998.  That was nine years before the

19   Wrongful Death Act allowed for recovery of damages for grief,

20   sorrow, and mental suffering.

21           If you read that case closely, counsel just said it,

22   that the Court stated the loss she incurred by her husband's

23   death, that was loss of consortium.  If you read the opinion,

24   you'll see over and over and over it was referring to a loss of

25   consortium claim.  And so that's the only loss it was talking

1     about.

2          So for that reason, we submit, the *McClain* decision

3     doesn't say anything about grief, sorrow, or mental suffering.

4     Neither does any other case they cite.

5          So we're not trying to drive a bus through anything.

6     What we're trying to do is -- no Illinois case holds the way

7     that opposing counsel is arguing, and, therefore, we're just

8     relying on Rule 401 and 403 and making a straightforward

9     argument about what's relevant.

10         One last point.  Loss of consortium, as that case

11    explains, is unique to the marital relationship.  By

12    definition, that's what it entails.  So naturally, if you get

13    remarried, the basis for that damages goes away at that point.

14    That's clearly not the case with grief, sorrow, and mental

15    suffering.

16         And so for those reasons, we submit that the Court

17    should affirm its ruling, I guess, to deny the motion.

18    Thank you.

19         THE COURT:  All right.  For the reasons stated, the

20    motion is going to be denied.  That is 2407, 2410 (Redacted).

21         All right.  The parties still have some work to do in

22    terms of witnesses, exhibits, designations.  I don't believe

23    that another court date ahead of the jury trial on Friday would

24    be helpful.

25         MR. CLIFFORD:  We agree, sir.

1    THE COURT:  So the next court date is going to be

2    Monday.  Let's have everyone here at 8:30, and we will bring

3    down the jury as soon as we can and begin the process of the

4    jury filling out the questionnaire.

5    MS. JOHNSON:  Your Honor, I apologize.  I just wanted

6    to revisit the Guryan motion one more time, the motion to

7    exclude our expert, Dr. Guryan.

8    And the reason I'm bringing it up is I'm just

9    concerned that having a motion to exclude him granted is going

10   to have consequences for him as an expert witness going

11   forward.  And if the reason it's being granted is because he

12   was a responsive expert and there's no need for him to be

13   responding to Mr. Longnecker and Mr. Johnson anymore --

14   THE COURT:  That is the reason.

15   MS. JOHNSON:  So I am just wondering if we can come up

16   with an alternative, such as denied with moot, or we could,

17   perhaps, withdraw Dr. Guryan and plaintiffs could withdraw

18   their motion.  I would like to see if there's something else

19   that we could do here, Your Honor.

20   MR. ROMANUCCI:  I don't know what else we can do other

21   than stand on Your Honor's ruling right now.  I mean, he's been

22   barred before.  I should say the motion to bar Dr. Guryan has

23   been granted by this court, by this Northern District, before.

24   So I don't think there's any prejudice to him at all.  And so I

25   don't know what it is that Ms. Johnson is asking for.  What

1   sort of relief?

2          THE COURT:  Ms. Johnson, would language help you if

3   you were to submit a proposed order reflecting language, of

4   course, the reason that the motion is granted, I've been clear,

5   has nothing to do with the merits, has nothing to do with the

6   substance?

7          MS. JOHNSON:  Yes, Your Honor.

8          THE COURT:  It is because the other -- he does not

9   need to rebut opinions, correct?  So if you submit proposed

10  language --

11         MS. JOHNSON:  Yes.  Thank you.

12         THE COURT:  Run it by Mr. Romanucci.  Submit it to the

13  proposed order box, and I can enter that order to make it

14  clear.

15         MS. JOHNSON:  Okay.  Thank you, Your Honor.

16         MR. ROMANUCCI:  Thank you, Your Honor.

17         THE COURT:  Thank you.

18         MR. ZUIDEMA:  Your Honor, if I may, this will be

19  quick.  One final issue that touches on openings, but they're

20  related to the jury instructions.

21         One of them is simply -- this doesn't touch on

22  openings so much, but to help us prepare accordingly, when does

23  the Court typically like to do the charge conference during

24  trial?

25         THE COURT:  It would be in the second week, but we

1    will have to figure out exactly how long the trial will last.

2    I think there's a difference of opinion about how long the

3    trial is going to go.

4           Obviously, the lawyers will have the answers they need

5    before closing arguments.  But based on the nature of some of

6    the legal questions, I would wait until the second week, unless

7    for some reason it becomes clear that the jury trial will be

8    wrapped up in the first week.  So, obviously, ahead of closing

9    arguments, and I will try not to wait until the last day before

10   closing arguments, the last day of evidence.

11          MR. ZUIDEMA:  Understood.  Thank you.

12          One final question.  This does affect opening

13   statements.  I don't think there's going to be any dispute

14   that -- our understanding is that agreed instructions -- we

15   submitted instructions, as you know -- agreed instructions 1

16   through 3, I think, would be read before opening statements.

17   Those are the preliminary instructions.  Theoretically, they

18   could affect what's said in opening.  So I wanted to make sure

19   there's no dispute about that and see if the Court --

20          THE COURT:  It's not my practice.  I would ask the

21   lawyers to remind me.  You will have an opportunity to remind

22   me.  If that's the way the parties want to proceed and it will

23   be helpful to the jury, that's the way we will proceed.

24          MR. ZUIDEMA:  And you could tell us how you would like

25   to resolve this particular issue, but, again, these are agreed

1    instructions.  There's an extremely narrow dispute about,

2    essentially, one word in agreed instruction number 2.  And so

3    if that's read before opening, I think that's the only dispute

4    that would probably make sense to be resolved before the charge

5    conference.  And I have copies here if --

6              THE COURT:  Mr. Durkin, I've got the word "corporate."

7              MR. DURKIN:  I just want to make sure -- I've got it.

8    Judge, I think what we're talking about is the ones the Court

9    normally reads to the jury at the start of the case, you know.

10             THE COURT:  Preliminary instructions.

11             MR. DURKIN:  Yes, the preliminary instruction.  Of

12   course, that's what you would do in any case.  I think -- I'm

13   willing to argue if he wants an agreed instruction -- it's not

14   really an agreed instruction.  There's one word they want to

15   put in that's out of nowhere, and I think that it can wait

16   until the closing argument.  They want to add -- there's an

17   implied bias instruction that's in the state court and the

18   federal court.

19             THE COURT:  "Corporate"?

20             MR. DURKIN:  Well, they want to add the word

21   "corporate," which has never been used.  They -- that implies

22   bias, such as gender, race, religion.  There's another

23   instruction that says corporations are entitled to be treated

24   like any plaintiff, they're a party, and specific on that.

25   It's in the agreed instructions otherwise.

 1              THE COURT:  It's also in the voir dire questions.

 2              MR. DURKIN:  It is.  This is just adding somehow a

 3       status to corporations about assumed bias, which has just never

 4       been contemplated either under the IPI or the ones we looked

 5       at, the Seventh Circuit.  It's new.

 6              THE COURT:  Okay.  We will take that up at the

 7       appropriate time.

 8              MR. ZUIDEMA:  Could I add one more thing, Your Honor?

 9              THE COURT:  Yes.  So is that correct that you were

10       talking about preliminary instructions as opposed to --

11              MR. ZUIDEMA:  That's correct.

12              THE COURT:  -- instructions before closing arguments?

13              MR. ZUIDEMA:  Correct.  There's a whole lot more

14       instructions before closings that I'm sure we'll resolve

15       later on.

16              MR. DURKIN:  Sure, Judge, bias.

17              MR. ZUIDEMA:  These are just ones that will be read

18       before opening, the preliminary type instructions.

19              THE COURT:  I took it to mean that both sides were

20       asking that I give some instructions to the jury before closing

21       arguments and then charge them at the end of closing arguments.

22              MR. DURKIN:  I didn't understand that.  I understand

23       you were going to give the preliminary you would do in any case

24       that we've agreed on, and then we would have a jury conference,

25       and then those could be used in closing.

1          THE COURT:  Like every other case.

2          MR. DURKIN:  That's how I interpret it.

3          THE COURT:  I misunderstood.

4          MR. DURKIN:  Okay.

5          MR. ZUIDEMA:  The last point I just wanted to make was

6    that we don't add that word out of nowhere.  The IPI 1.08

7    instructs to insert any other impermissible forms of bias, so

8    what's in the instruction is not exhaustive.  And I think it's

9    very clear that bias against corporation is not permissible.

10   So that's why we added it.

11         THE COURT:  A prequel to that discussion regarding

12   that jury instruction.

13         MR. ZUIDEMA:  Thank you, Your Honor.

14         THE COURT:  All right.  Thank you.  And, again, that's

15   a preliminary jury instruction, so we will have to have that

16   conversation --

17         MR. WEBB:  Before openings.

18         MR. ZUIDEMA:  Whenever Your Honor would like before

19   openings.

20         MR. DURKIN:  Judge, we have it in the pretrial order.

21   We'll make sure --

22         THE COURT:  And that is unusual, so you will remind

23   me, and perhaps the parties will even agree.  Okay?

24         MR. DURKIN:  Okay.

25         MR. ZUIDEMA:  Thank you, Your Honor.

1          THE COURT:  All right.  So, Mr. Clifford.

2          MR. CLIFFORD:  Just one last thing, if I may,

3    Your Honor.  Plaintiffs request a point of clarification from

4    Boeing.

5          THE COURT:  Before I forget, Mr. Martinez has been

6    doing yeoman's work.  We do need the official interpreter here

7    for the trial.

8          MR. CLIFFORD:  And we will have that.  We just made

9    arrangements for today for the ladies from Rome.

10         THE COURT:  Okay.  But we do need an Italian

11   interpreter for the trial.

12         MR. DURKIN:  Yes.

13         MR. CLIFFORD:  Yes, Your Honor.

14         Just a point of clarification we're asking from

15   Boeing.  Mr. Webb earlier today told us that they only had one

16   witness notwithstanding the state of the record.  We just need

17   to know who that is or who they're withdrawing so that we can

18   prepare because we don't know that clearly.  We think it's

19   Mr. Wood, but we're not certain.

20         MR. WEBB:  Well, I don't -- I tried to share with

21   Your Honor that, as far as the length of the trial, we are only

22   calling one expert.  We will disclose that expert as provided

23   for in the pretrial order at the time.  Okay?  So I don't have

24   any obligation to tell him now --

25         THE COURT:  Can't blame a guy for trying, right?

1         MR. CLIFFORD:  You know what?  And that's okay.  But

2  it's disingenuous because it's -- does this help people try

3  cases?  I guess that's how we try cases in the big law firms.

4         MR. WEBB:  I don't even know who your first

5  witness is.

6         MR. CLIFFORD:  And you will know.

7         MR. WEBB:  I know that, but that is the pretrial

8  order.

9         MR. CLIFFORD:  I've been trying to have a meeting with

10  you to tell you that, and you keep saying no, there's a

11  pretrial order, that we've got to schedule.

12         THE COURT:  All right.  The parties are not asking --

13  in prior rounds of trial setting, the parties have asked me to

14  enter an order directing the parties to explore settlement and

15  even addressing Judge O'Connell.  That's not a request that's

16  being made.

17         MR. CLIFFORD:  We're not making the request, but no

18  objection to that order.

19         MR. WEBB:  I have no objection to that order.

20         THE COURT:  Would the parties submit it?

21         MR. WEBB:  We'll submit it.

22         THE COURT:  Okay.  All right.  Thank you, everyone.

23         Anything else, Mr. Webb?

24         MR. WEBB:  No -- well, wait a minute.  Am I missing

25  anything?  The answer is no.

1      MR. ROMANUCCI:  Maybe one last thing.  I know that you

2   have a meet and confer set with Mr. Clifford's office today.

3   What about with the other two remaining cases?

4      MR. CLIFFORD:  You're invited.

5      MR. WEBB:  Mr. Clifford asked for the meeting so --

6      MR. CLIFFORD:  I asked for the meeting.  It's 3:00.

7   Zoom.

8      MR. ROMANUCCI:  So it's all of us?

9      MR. CLIFFORD:  It's all of us.  You can come to my

10  office, or we'll Zoom into yours.  Either one.

11     MR. WEBB:  Bring your lunch buckets.  We'll all get

12  together.

13     MR. CLIFFORD:  No, you're buying lunch.  You've got a

14  chef at Winston & Strawn.  We can come over for lunch.

15     THE COURT:  All right.  Thank you, everyone, for your

16  patience and your attention.  We were a bit disorganized, but

17  we've got some answers.  We'll see everybody back here on

18  Monday at 8:30 for trial beginning at 9:00 on April 7th.

19     MULTIPLE COUNSEL:  Thank you, Your Honor.

20     THE COURT:  Court is adjourned until 2:00.

21     THE CLERK:  All rise.

22     (Concluded at 12:34 p.m.)

23  \ \

24

25

* * * * *

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.


/s/ ANGIE PHIPPS                                        April 2, 2025
ANGIE PHIPPS, RMR, CRR, FCRR
Official Court Reporter