1           IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3    IN RE:  ETHIOPIAN AIRLINES      ) Lead Case No. 19 CV 2170
     FLIGHT ET 302 CRASH             )
4                                    )
                                     )
5                                    ) Chicago, Illinois
                                     ) June 18, 2025
6                                    ) 1:03 p.m.

7        TRANSCRIPT OF PROCEEDINGS - PRETRIAL CONFERENCE
            BEFORE THE HONORABLE JORGE L. ALONSO
8
     APPEARANCES:
9
     For Plaintiff:          CLIFFORD LAW OFFICES, P.C.
10                           BY: MR. ROBERT A. CLIFFORD
                                 MR. KEVIN P. DURKIN
11                               MR. JOHN V. KALANTZIS
                                 MS. TRACY A. BRAMMEIER
12                               MR. MATTHEW D. MOYER
                             120 North LaSalle Street, Suite 3600
13                           Chicago, Illinois 60602

14   For Defendant:          WINSTON & STRAWN LLP
                             BY:  MR. DAN K. WEBB
15                               MS. JULIA JOHNSON
                                 MR. CHRISTOPHER ESSIG
16                               MR. SAMUEL M. ZUIDEMA
                             35 West Wacker Drive
17                           Chicago, Illinois 60601

18                           WINSTON & STRAWN LLP
                             BY:  MS. SANDRA EDWARDS
19                           101 California Street, 21st Floor
                             San Francisco, CA  94111-5891
20

21

22

23

24

25

```
 1    APPEARANCES (Cont'd):

 2    For Defendant:          PERKINS COIE
                              BY:  MR. CHRISTOPHER LEDFORD (Via Phone)
 3                            1120 Northwest Couch Street, 10th Floor
                              Portland, Oregon 97209-4128
 4

 5    ALSO PRESENT:           MR. PAUL NJOROGE, PLAINTIFF

 6

 7

 8    Court Reporter:         ANGIE PHIPPS, RMR, CRR, FCRR
                              Official Court Reporter
 9                            219 S. Dearborn Street, Room 1902
                              Chicago, Illinois 60604
10                            (312) 818-6683

11

12

13

14

15

16

17

18

19

20

21

22

23

24                                  *  *  *

25              PROCEEDINGS REPORTED BY STENOTYPE
           TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION
```

1       (Proceedings heard in open court:)

2               THE CLERK:  All rise.

3               THE COURT:  Thank you.  Please be seated.

4               THE CLERK:  This Court resumes in session.

5               19 CV 2170, In re:  Ethiopian Airlines.

6               THE COURT:  Okay.  Good afternoon.  Let's have the

7       attorneys identify themselves for the record.  Let's start with

8       Mr. Clifford.

9               MR. CLIFFORD:  Thank you, Your Honor, and good

10      afternoon to you, sir.

11              Your Honor, in court today Robert Clifford, liaison

12      counsel Tracy Brammeier, partner Kevin Durkin, partner John

13      Kalantzis, and new counsel, if I can see him, Matthew Moyer,

14      formerly an AUSA, sir, who finally came to a plaintiff's side

15      as opposed to those defense guys.

16              THE COURT:  All right.  Mr. Moyer is back.

17              MR. CLIFFORD:  Thank you, Your Honor.

18              THE COURT:  For the defense, Mr. Webb.

19              MR. WEBB:  Yes, Your Honor.  On behalf of Boeing,

20      present in court right now Dan Webb.  Also present is

21      Sam Zuidema, Chris Essig, and Sandra Edwards and Julia Johnson.

22      And, Mr. Ledford, I think, may be on the phone.

23              THE COURT:  Mr. Ledford?

24              MR. LEDFORD:  Good afternoon, Your Honor.  Chris

25      Ledford on the phone.

1          MR. CLIFFORD:  Your Honor, if I may add, as I always

2     have alerted the Court, in court today is Mr. Paul Njoroge, the

3     plaintiff in the action for July 14.

4          THE COURT:  All right.  Mr. Njoroge is present.

5          MR. CLIFFORD:  One thing lastly, if I may, sir.  When

6     we get to motions and when you get to any of the motions

7     pertaining to the infant, if you would give us a heads-up,

8     Mr. Njoroge would prefer to be out of the courtroom for that

9     discussion.

10          THE COURT:  Okay.

11          MR. CLIFFORD:  Thank you, sir.

12          THE COURT:  I will let you know, and we will take that

13     up last.  There are four pending motions.  We'll take that one

14     up last.

15          We are set for trial in less than a month.  We're set

16     for a trial that begins on July 14th.  The parties filed the

17     final pretrial order, and the parties continue to believe that

18     the trial will last five to seven days.  Again, it starts on

19     the 24th -- I'm sorry -- on the 14th.

20          All right.  I do have a flight on the 25th, so that

21     should give us sufficient time.  That gives us nine court

22     dates.

23          We have been here before on other trials and I have

24     made rulings regarding jury selection, the composition of the

25     jury.  Over the defendant's objection, the defendant does

1    acknowledge my previous rulings regarding the number of jurors.

2    We'll have eight jurors in the case.  And, again, we have been

3    here before, and I have made rulings on many issues.

4          Mr. Webb, from your standpoint, any specific issues

5    that should be revisited at this point based on the particulars

6    of this particular case which --

7          MR. WEBB:  I'm not asking you to revisit anything.

8    But jury selection, we talked about it in other hearings; and

9    you had, after a lot of discussion, made the decision that we

10   would pick the jury the afternoon of the day the trial starts.

11   And I had explained I thought that created some complexities;

12   but you made that decision, and we accepted it.

13         There has been a change, though, in the pretrial

14   order.  And let me explain to you what happened, okay, because

15   what I'm reraising with you is whether we should pick the jury

16   Monday afternoon on July 14th or whether we should pick it the

17   next day, on Tuesday morning.  That's the issue.  And the

18   reason I'm raising it is because of what happened in the April

19   trial.

20         When we were all getting ready, scrambling around to

21   get ready for trial, the following happened.  So Sunday night

22   before the Monday morning trial was starting in April, the

23   pretrial order had ordered us to -- I think at 5:00 in the

24   afternoon, we were to exchange all the slides we would use

25   during opening statement for both sides.  We would then

1    exchange objections two hours later.  I think it was like at

2    7:30 at night.

3          Then at 8:30 at night on Sunday night, we were to meet

4    and confer to get through all the objections so that we had --

5    at least I had envisioned that there wouldn't be that many

6    objections and we would have to present them to you sometime

7    Monday.

8          But what happened is the following:  The parties, when

9    we met and conferred that night, we had a lot of objections to

10    the respective slides.  I can go through them all, but I don't

11    need to.  There's a lot, a lot on both sides, and multiple

12    objections to the same slide.

13          And we didn't resolve, I think, anything, or almost

14    nothing was resolved in our meet-and-confer.  I had talked to

15    Mr. Clifford because I looked at the next day and said, the

16    next day, Monday afternoon, you had said we would pick the

17    jury, okay?  But at the same time, in order to give opening

18    statements on Tuesday morning, the whole -- we'd have to argue

19    all these objections what looked like for two or three hours

20    Monday afternoon, and I did not think we could do both, okay?

21    On Monday afternoon.  We could not pick the jury.

22          You had planned that we would complete the jury

23    questionnaires on Monday morning.  Your staff would work very

24    hard to get them all distributed as fast as possible, but it

25    might be 11 or -- whatever.  And then we would have a long

1       lunch and come back and pick the jury in the afternoon.  It

2       looked to me that was going to be a difficult challenge, but it

3       didn't matter because we settled the cases Sunday night at

4       11:00 at night.

5               So we came in the next day, and Mr. Clifford raised

6       with you -- and I have a quote here, but he raised with you at

7       that time on Monday morning, look, this is going to be a tough

8       day because we thought we were coming in here to do, you know,

9       to do -- get the questionnaires copied and do it -- pick the

10      jury in the afternoon.  And then we'd have to give you what he

11      called "a lot of meaty issues" that related to opening

12      statement, which I agreed with, that that was going to be

13      challenging as to how to do that.

14              But we didn't need to face it.  So what the parties

15      did -- actually, what the plaintiff did, which, I think, was

16      appropriate, we changed the pretrial order to avoid the

17      problem.  In other words, we changed the pretrial order for

18      this trial so that three days before the trial we have to

19      exchange these opening statement slides, we then have a

20      meet-and-confer two days before, and then we basically will be

21      ready to present them to you on the morning of the trial.

22              And so the reason I'm raising this is that the issue I

23      see is that, by the time you get to the afternoon, Monday

24      afternoon on the 14th of the trial, to be able to pick a jury

25      that afternoon and go through the process of picking it in this

1    case, it's going to take several hours.  It's going to take

2    time to get that jury selected.

3          Then we're going to start -- we have to then argue

4    opening statement slides for, I don't know, two hours or

5    three hours, until 8:00.  It's going to take time to do.

6          And so what I think has happened, which is no one's

7    fault, is that because we've changed the pretrial order, that

8    we can't get everything done Monday afternoon.

9          I think, realistically and most efficiently, my

10   suggestion is that Monday afternoon we argue all the objections

11   to the slides because we can't give the opening statement the

12   next day until we have time to correct the slides, because you

13   make rulings, we're going to correct slides, we're going to

14   change our scripts so we don't mess up, and we would be ready

15   to do the opening statement the next day.  But it takes time to

16   do that.

17         So we have to argue the opening statement slides, I

18   believe, Monday afternoon.  That does not leave time, and the

19   jury is just going to be sitting here, I guess.

20         I respectfully suggest the most efficient way to deal

21   with this is just move jury selection -- first of all, we need

22   time to prepare for jury selection, and I've done this for so

23   many years.  And we have jury researchers, consultants we've

24   all hired we've paid money to, both sides.  And getting the

25   questionnaires back at noon and having two hours to get ready

1       is challenging, but we were going to do it, okay?  But now I

2       don't think on Monday afternoon you can do both.  And we have

3       to argue the opening statement slides.

4              So, respectfully, I'm asking you to think about that

5       issue, and I respectfully am asking to move the jury selection

6       until Tuesday morning.

7              THE COURT:  Mr. Webb, we are talking about

8       efficiencies, and we did talk about this on the last court

9       date.  We talked about all the unresolved issues, meaty issues,

10      that would still remain pending after jury selection, before

11      opening statements.  It occurs to me that nothing will change

12      regarding opening statements.  All the issues will be there the

13      week before.  So anything that we can do not on the jury's time

14      is efficient from the jury's standpoint.

15             So I know the parties will be exploring settlement and

16      doing a million other things.  But is there any reason we can't

17      come in the week before and specifically deal with this issue

18      of the slides, the scripts, and opening statement and, again,

19      even talk about the exhibits at that point, deposition

20      designations, et cetera?

21             Of course, it is not efficient from the Court's

22      standpoint to resolve issues that may be resolved, especially

23      if the case is resolved; but, again, it's not on the jury's

24      time, which is more important from my standpoint.

25             MR. CLIFFORD:  Thank you, Your Honor.  Yes.  That's

1  actually one of the reasons why.  And Dan and I talked about

2  this forthrightly and in good faith.  We view it differently

3  because we think that, for an example, as it relates to these

4  slides -- and it's music to our ears to hear you talk about the

5  week before.

6          THE COURT:  Assuming it's available.

7          MR. CLIFFORD:  Assuming it's available.

8          But, for an example, we could have been talking about

9  the slides while the jurors are filling out the cards.  That's

10  one example.

11         Secondly, our fear is that, okay, you have them fill

12  out the cards and you pick the jury the following day.  Well,

13  then you're bringing the same people back for two days, and we

14  don't think that's efficient at all.

15         We set up this program about an early disclosure of

16  these slides and a meet-and-confer.  We thought that solved the

17  problem, and what we really think this is about from Boeing's

18  perspective is that they want more time to be looking at these

19  juror cards.

20         And Dan, counsel, is right that both sides have their

21  consultants, and we know from the work we've been doing that

22  we've got enough time during that noon-hour period to do

23  whatever we want to look at extra so that we could be prepared

24  for the jury selection that afternoon.

25         You do that, you pick the jury in one day, because I

1  think Your Honor made it very clear about how you are

2  approaching jury selection.  You're going to -- at least I've

3  been saying you're doing the heavy -- most of the work, and you

4  allow us to supplement, or add on, on a non-repetitive basis.

5           We've been coming to court.  I think you've seen that.

6  You're trying other cases.  We're seeing how you're doing it.

7           And so we see the jury being picked that day; and if

8  there's more work to talk about on the slides the night before,

9  then that's what lawyers do.  They work late at night on that

10 Monday night, and then we come in early for you on Tuesday

11 morning.

12          That's how we see it.  We think it can be done.  And

13 we would love the opportunity, if your schedule permits, to

14 come in the week before to talk to you not only maybe about

15 these issues, but also deposition designations.  There might be

16 some issues there, I believe.

17          And so that's our position.  Thank you, sir.

18          MR. WEBB:  But, Your Honor, actually, under the

19 pretrial order that Mr. Clifford had amended, which we agreed

20 to, we don't even -- under that order, we don't even submit to

21 you the unresolved objections until --

22          THE COURT:  8:30 in the morning.

23          MR. WEBB:  Yes.

24          THE COURT:  The day of, right.  Section 10, 10a, would

25 need to be resolved, would need to be amended, right?  Right

1   now, it says by 3:00 p.m. three days before, each party will

2   provide the slides.  But there's no reason not to move

3   everything up by a couple of days.  Again, the evidence is not

4   going to change.

5             MR. CLIFFORD:  Correct.

6             THE COURT:  The opening statements shouldn't change.

7   Mr. Webb is not as optimistic.

8             MR. CLIFFORD:  Hypothetically, you tweak your opening

9   statement a bit in light of some things, but that's what

10  lawyers do.

11            And counsel is right.  Yes, we have an order about the

12  deposition designations, but that's assuming -- you know, at

13  the time you did all this and we did all this, you know, we

14  were following how folks have already done pretrial orders in

15  other cases.  But now if the opportunity exists for us to spend

16  some time with you on these designations, we welcome that, and

17  we would be grateful for it.

18            THE COURT:  And Mr. Webb is not as optimistic as usual

19  about the ability of the lawyers to work through some of these

20  disagreements regarding jury selection -- I'm sorry --

21  regarding the slides.

22            MR. WEBB:  Well, we hadn't experienced -- what

23  happened is that none of us knew -- I'm sorry -- Sunday night,

24  in good faith, we went through all of the objections.  There

25  were objections to -- I think they objected to 16 of our

1   slides, and we objected to -- we objected to 16 of theirs.

2   They objected to 14 of ours.  We then talked for two hours, and

3   we resolved almost nothing.  Just so you know what happened.

4          And no one is trying to be in bad faith.  And that's

5   what led Mr. Clifford the next morning to say to you this would

6   have been a tough day, okay, because trying to get all that

7   done and have time to -- and then readjust all our opening

8   statements was going to be challenging.

9          Your Honor, I'll do whatever you want.  I think it's a

10  major issue I wanted to raise as far as -- and getting the

11  parties enough time to prepare for jury selection is a big

12  deal, but whatever you decide we accept, of course.

13         MR. CLIFFORD:  Are you available the week before,

14  Judge?

15         THE COURT:  Yes.  I've got a sentencing the Friday

16  before at 10:30 in the morning.  I could set the case for the

17  continuation of the pretrial conference in the afternoon at

18  2:00.

19         MR. CLIFFORD:  On Friday, the 11th?

20         THE COURT:  Friday, the 11th, specifically to address

21  these issues.  And there may be no issues.  Any objections to

22  the opening statement slides and deposition designations, any

23  objections to those, as well as exhibits.

24         On the issue of jury instructions, I'm going to ask

25  the parties to -- again, running the risk that this work is put

1    in and the case settles, but at that point, by two days before

2    the July 11th 2:00 hearing, I direct the parties to re-examine

3    jury instructions, take a look at the disputes, and regarding

4    the disputed instructions, I would ask the opposing party to

5    give me a little more in terms of an explanation as to their

6    position.  It's just not clear to me in all cases whether the

7    opponent is saying that the instructions should not be given at

8    all, should be given with modification, or should be refused in

9    favor of a competing instruction.

10          So I'd ask the parties to submit something, provide

11   more clarification, a couple of days before the July 11th

12   hearing, by July 9th.  And I'll set that date out.

13          Mr. Webb, from your standpoint -- we had spoken about

14   divided opening statements.  What's the defendant's position at

15   this point?

16          MR. WEBB:  On what issue?  I'm sorry?

17          THE COURT:  Mr. Clifford wanted to divide up opening

18   statements.  Does that apply now?  We've got one law firm,

19   right?

20          MR. CLIFFORD:  Just one law firm, and Mr. Durkin and I

21   divided it up, the opening statement, and not overlapping at

22   all.  I think that's where we're at with your permission.

23          MR. WEBB:  Before, they had multiple -- now they've

24   got one client for this trial.

25          MR. CLIFFORD:  One client and four deaths.

1      MR. WEBB:  I understand that, but they've got one

2  client.  I objected before, and you said because they had

3  multiple plaintiffs, that they could split it up.  But now

4  we've got the same lawyer, same law firm.  We're giving one

5  argument for Boeing.  And I think the plaintiff has the right

6  to one lawyer and not two, and I do object to that.

7      MR. CLIFFORD:  And Mr. Clifford is prepared to share

8  opportunity with his partners to do things and not be so needy

9  that I have to do everything.  Only I say that in jest.  But in

10  fairness, Mr. Durkin has done, and they know, hands-on every

11  day with these experts on the survival action.  Our firm has.

12  It's a lot to present four wrongful death claims at one time on

13  the compensatory damages side of it for the issues associated

14  with the wrongful death instructions and argument and

15  presentation.  And I just don't see the prejudice.  I mean, he

16  doesn't like two people talking from the same law firm about

17  the same case, four clients?

18      THE COURT:  Mr. Webb, one more time.

19      MR. WEBB:  Well, Your Honor, again, I just don't think

20  it's fair.  I argued it before last time, and I just don't

21  think it's fair.  They have one party.  They have four deaths.

22  The facts are not going to change, and I don't think either

23  side should have more than one lawyer making an opening

24  statement.

25      THE COURT:  All right.  Mr. Clifford, that is the

1  usual practice, and I don't see any reason to stray from it.

2  The rationale for permitting the bifurcated or multiple, if you

3  will, opening statements no longer applies in this case.  I

4  understand your point, but I'm going to agree with Mr. Webb,

5  and we'll have one attorney for each side, whoever the

6  attorneys decide, deliver opening statements.

7          MR. CLIFFORD:  We are talking, just to be clear -- I

8  mean, it's not overlapping.  Mr. Durkin would be discussing the

9  survival action, and I would be discussing the wrongful death

10 component.  I mean, that's -- just to be clear.

11         THE COURT:  All right.  Over objection, the request to

12 proceed in that fashion is going to be denied.  We'll have one

13 attorney deliver opening statements.

14         MR. CLIFFORD:  Understood.  No problem.  Got it.

15         THE COURT:  We talked about a 90-minute opening

16 statement.

17         MR. CLIFFORD:  Yeah, maximum.

18         THE COURT:  All right.  Let me turn to the motions in

19 limine.

20         MR. CLIFFORD:  Thank you, sir.

21         MR. WEBB:  Thank you, Your Honor.

22         THE COURT:  Thank you.

23         And, again, one of those motions is being withdrawn.

24 That is Boeing's motion to bar evidence and argument regarding

25 Carolyne's mother, Anne Karanja.  Boeing had filed a motion.

1    It's number 2555 on the docket.  And I am told that Boeing is

2    withdrawing that motion to exclude evidence and argument

3    regarding Ms. Karanja, and, instead, Boeing is requesting the

4    Court provide a limiting instruction, and then Boeing does

5    provide some language.

6         Mr. Clifford, have you had enough time to consider

7    that limiting instruction, which, I assume, would be given in

8    trial as well as after trial?

9         MS. BRAMMEIER:  Yes, Your Honor.  We did receive

10   notice of the withdrawal and the proposed limiting instruction

11   about an hour before this conference.

12        The plaintiff really does not believe that any special

13   instruction is necessary with regard to the plaintiff's

14   mother-in-law, and the proposed instructions by the parties

15   will be sufficient and clear on what the issues are to be

16   considered.

17        That said, we do understand a limiting instruction is

18   completely within the Court's discretion.  We would like an

19   opportunity to discuss amongst ourselves the language that was

20   proposed by Boeing if Your Honor is inclined to give such an

21   instruction.

22        THE COURT:  All right.  I believe there is a risk here

23   and that the last sentence or something like the last sentence

24   should be given.  The parties can continue to consider the

25   wording of the instruction, but I believe that it is

1 appropriate to give an instruction reminding the jury that --

2 Ms. Brammeier is right. There will be specific instructions.

3 But I believe that there is a risk, and it does make sense to

4 give an additional instruction informing the jury that they

5 cannot consider -- they cannot award damages for the death of

6 Ms. Karanja.

7     And the parties will remind me before the trial?

8     MR. CLIFFORD: Yes, sir.

9     THE COURT: All right. So that motion is withdrawn.

10     There's also Boeing's motion to exclude evidence

11 regarding Mr. Njoroge's charitable endeavors. This is 2554.

12 The motion is fully briefed. And, again, in terms of

13 background, in 2021, the plaintiff created a charitable

14 foundation; and through that foundation, he's provided funding

15 and support to schools and students in Kenya, Ethiopia, and

16 Canada in memory of his children. In addition to that, the

17 foundation is also constructing a memorial park in their honor.

18     Boeing has moved to exclude evidence about the

19 foundation's work, arguing that it is irrelevant to damages for

20 grief and sorrow, and any probative value is minimal, and it is

21 outweighed by the risk of prejudice.

22     According to Boeing, the jury might be induced to

23 award damages for an improper purpose for the purpose of

24 funding the work of the foundation rather than to compensate

25 plaintiff for his grief and suffering.

1     Boeing is seeking to exclude the testimony of Jane

2   Ndung'u, the foundation's project coordinator concerning the

3   work of the foundation.  Boeing argues that this testimony is

4   not relevant.  It is also seeking to exclude plaintiff's own

5   testimony about the foundation, arguing that even if there is

6   some relevance, it is only minimally probative of his grief and

7   sorrow and that minimal probative value is substantially

8   outweighed by the risk of prejudice to Boeing, a risk that the

9   evidence would improperly induce the jury to decide the case on

10   an emotional basis.

11     I've reviewed the proffered testimony of Ms. Ndung'u,

12   and I agree with Boeing the details of the foundation, the work

13   of the foundation are of limited probative value; and I agree

14   that dwelling on the details of the work of the foundation by

15   calling Ms. Ndung'u to testify risks undue confusion of the

16   issues, but I am not convinced that the plaintiff should be

17   barred regarding his own testimony about the foundation to the

18   extent that it is offered to show that he started the

19   foundation in order to keep the memories of his wife and

20   children alive, as he put it in his deposition.

21     Plaintiff explains that the evidence about the

22   foundation "directly relates to how the death of his loved ones

23   has impacted the plaintiff and changed his life."

24     So the jury can find that the foundation is an

25   expression of his grief and sorrow, and they can take that into

1    account in awarding damages.

2           So the motion is going to be granted in part as to

3    Ms. Ndung'u's testimony, but it is denied in part as to the

4    plaintiff's own testimony.  That is the ruling as to 2554.

5           Turning to the plaintiff's motion --

6           MR. ZUIDEMA:  Your Honor, may I ask a few points of

7    clarification on that motion?

8           THE COURT:  Sure.

9           MR. ZUIDEMA:  Ms. Ndung'u's testimony was, as the

10   Court noted, exclusively about the foundation and its programs

11   and its initiatives, and that went on for her entire

12   deposition.

13          The plaintiff's deposition, by my count, there's about

14   four pages that discuss the foundation.  And based on

15   Your Honor's ruling -- which we understand and accept, but I am

16   concerned that, of course, we don't know everything he might

17   say about the foundation; we don't know everything they might

18   ask about the foundation.  And to me, there's a risk that much

19   of the testimony that was brought out in Ms. Ndung'u's

20   deposition could be brought out in trial, just through a

21   different witness.

22          And so I just want to clarify whether the substance of

23   the testimony that was elicited from Ms. Ndung'u in her

24   deposition would not be admissible even through the plaintiff

25   himself as opposed to the issue turning on the witness who's

1    testifying, if the Court understands.

2         MS. BRAMMEIER:  And, Judge, the plaintiff does

3    understand your ruling and the limitations or the

4    considerations you're putting around which testimony is going

5    to be admissible based on your rulings.  So I don't think that

6    there's going to be an issue here.

7         MR. CLIFFORD:  We hope not.  We would be willing to

8    meet and confer with them about it.  But to be clear, there's

9    four pages of testimony because that's what they asked.  And,

10   you know, if they choose in the deposition to -- I don't mean

11   this the wrong way, but just not deeply get into things that

12   are otherwise relevant to this gentleman's circumstance and

13   what he does now with his time and his days.

14        I mean, we understand the spirit of what you're

15   saying, but we don't think it's fair to the plaintiff

16   to handcuff him because counsel for Boeing didn't ask the kind

17   of questions now maybe they think they should have.

18        THE COURT:  All right.  So Ms. Brammeier and

19   Mr. Clifford both acknowledge that they understand the spirit

20   of what I'm saying.  It's not simply that she cannot testify

21   and he can testify about it.  It does go to the substance.

22   Plaintiff will not be permitted to go into the details of the

23   work that the foundation does but will be able to get into the

24   establishment and why he established it.

25        MR. CLIFFORD:  Okay.

1          MR. ZUIDEMA:  Thank you, Your Honor.  One final point

2     on that.

3          THE COURT:  Yes.

4          MR. ZUIDEMA:  We'll likely submit a limiting

5     instruction on that issue, as well.  We don't need to discuss

6     or decide it now, but we can bring that to the Court's

7     attention closer to trial, and we will submit it with our

8     instructions.

9          THE COURT:  Sure.

10          MR. ZUIDEMA:  Thank you.

11          THE COURT:  You will figure out if you want to do that

12     or not, and I will consider it, of course.

13          Next is plaintiff's motion.  It is related to the

14     memorial in Ethiopia -- this is 2556 -- at the crash site.

15     There is now a memorial to the ET 302 victims.  Plaintiff

16     himself participated in a committee related to its

17     construction, and Boeing contributed funds.

18          Plaintiff is moving to bar mention of Boeing's

19     contribution to the memorial, arguing that it is irrelevant to

20     plaintiff's grief and it may induce the jury to conclude that

21     Boeing is entitled to a credit based on that contribution.

22          Boeing responds in 2565 that it does not intend to

23     bring up its contribution to the memorial, although it reserves

24     the right to do so if plaintiff opens the door in some way,

25     depending on how he testifies at trial about his own

1    involvement in the memorial and how it contributed to or arose

2    out of his grief.

3              Boeing argues that, without knowing what plaintiff's

4    evidence on this subject will be, one could imagine several

5    ways in which he could open the door to additional evidence

6    necessary to ensure a fair and accurate record.

7              Again, difficult to figure out exactly what the

8    testimony is going to be and, therefore, what Boeing's concerns

9    will be.

10             So based upon what I know at this point and the need

11   to consider this issue in the context of the trial and on the

12   testimony on the issue, I'm going to deny the motion at this

13   point without prejudice; and Boeing will approach the Court if,

14   in fact, it believes the door is open and it wants to get into

15   these issues.

16             With that understanding, that motion is going to be,

17   respectfully, denied at this point.  That, again, is

18   plaintiff's motion at 2556.

19             And that does take us to the remaining motion in

20   limine.  That's Boeing's motion to exclude the expert testimony

21   regarding Rubi.

22        (Mr. Njoroge exited the courtroom.)

23             MR. CLIFFORD:  Thank you, sir.

24             THE COURT:  Thank you.

25             This is Boeing's motion to exclude expert testimony

regarding infants.  This is 2553.

As the parties have stated, the plaintiff's wife and three young children died in the crash.  His youngest daughter, Rubi, was a nine-month-old at the time.  She was traveling as a lap child on the flight.

Boeing seeks to exclude any expert testimony about lap infants and the forces that might have been exerted on them as the plane climbed and plummeted.  Boeing argues that no expert opinion on any such matter was disclosed.

Boeing does recognize that the experts disclosed opinions on how such forces might have been experienced by adult unbelted passengers, but it argues that these opinions do not extend to infants or lap infants.

Further, Boeing argues that there's no evidence that Rubi was totally unrestrained and whether an adult could have restrained Rubi during the crash; given the g-forces exerted on the passengers is at least a "complex scientific question that the experts did not directly address."

Plaintiff states in its response that the experts have disclosed opinions about the forces that were exerted on the passengers during the crash.

I disagree with Boeing on that issue of nondisclosure. I do not see why the experts should not be permitted to offer these opinions as to Rubi if they could offer these opinions as to the adults.

1    Boeing does not to my satisfaction explain the

2    difference, or the distinction, and I don't see any.  It seems

3    that the same principles, scientific principles, apply to

4    people of any size or, indeed, "any object that has mass," as

5    investigator, Boeing's investigator, Simon Lie, put it.

6    It is true that I have ruled that the plaintiffs

7    cannot introduce graphic evidence about the effects of the

8    plane's rapid descent on unbelted passengers because there is

9    no evidence that any passengers were actually unbelted.

10   So I did rule that Dr. Jenkyn can testify generally

11   that the forces passengers were subjected to were strong enough

12   to throw them out of their seats, but I also ruled that,

13   because there was no evidence that any passengers were actually

14   unbelted, Dr. Jenkyn's animated exhibit showing a hypothetical

15   unbelted passenger being thrown from his seat and against the

16   ceiling was unduly prejudicial and inadmissible.

17   Although this does leave some question about how or

18   whether these rulings apply to nine-month-old Rubi given that

19   she did not have her own seat or seatbelt, I agree with Boeing

20   that Rubi's should not be treated any differently unless

21   plaintiff can point to some evidentiary basis for doing so.  As

22   with the other passengers, plaintiff cannot assume that Rubi

23   was unrestrained without indulging in speculation.  Perhaps she

24   was being held by her mother, her mother-in-law, or was

25   strapped into a carrier or wrap.  There is no evidence.

1          So even though Rubi had no seatbelt, plaintiff will

2     not be permitted to elicit graphic expert testimony about how

3     she might have experienced the effects of the forces exerted on

4     her differently from the belted passengers at least in terms of

5     being thrown about the cabin.

6          Plaintiff will be permitted to mention that Rubi was

7     traveling as a lap child -- I believe that's one of the

8     uncontested facts -- who had no assigned seat and, therefore,

9     no seatbelt of her own; and plaintiff can elicit testimony in

10    accordance with the expert testimony that the forces exerted on

11    the passengers were strong enough to throw unrestrained

12    passengers from their seat; but plaintiff will not be allowed

13    to go further based on the lack of evidence on that issue.

14         So Boeing's motion asks the Court to "bar expert

15    testimony about lap infants onboard ET 302."  I will deny the

16    motion to the extent that the basis for it appears to be that

17    plaintiff did not disclose any opinions concerning the forces

18    exerted on infants as opposed to adults but Boeing hasn't

19    established that the distinction matters.  But also I admonish

20    the plaintiff that they will not be permitted to assume that

21    Rubi was totally unrestrained.  To the extent that there is no

22    evidence to support that assumption, that's speculation.

23         MR. DURKIN:  Your Honor, first --

24         THE COURT:  So that motion is going to be denied at

25    this point --

1          MR. DURKIN:  I'm sorry, Judge.  I thought you were

2     done.  I apologize.

3          THE COURT:  -- with that understanding.

4          MR. DURKIN:  For clarification, when you're ready,

5     Your Honor.

6          THE COURT:  Yes.  Mr. Durkin.

7          MR. DURKIN:  Judge, I just want to make sure of a

8     couple things.  Some of the rulings -- the ruling about that

9     exhibit where you didn't want us -- you ruled against it, that

10    was when the evidence was an adult who was belted, okay, on

11    takeoff, okay?  So that was a -- I think that's a different

12    ruling than you made before about anyone else because those

13    were in different cases where there was no infant involved.

14    All right?  So we didn't really contest that because we -- we

15    knew -- we had no evidence the people were unbelted.

16          Here, we do know from Paul's testimony that she had

17    been held in the arms of her mother, okay?  Or his

18    mother-in-law, right across the aisle.  But I want to make sure

19    we understand -- you've already said we could talk about the

20    effects of gravitational forces that occurred to everyone and

21    everything of mass on the aircraft, that it would have pulled

22    them towards the roof and made them feel like they're hanging

23    upside down.  We've already gotten through that already.  I

24    just want to make sure there's no limitation on that.  Do I

25    understand it correctly?  You're saying we don't know if the

1     mother was able to hold her hard enough?

2              THE COURT:  Right.

3              MR. DURKIN:  Okay.  I mean, there's other implications

4     for that, too, Judge.  I hope we can at least talk about that,

5     you know, because one of the things that our expert Jenkyn said

6     was that these were unexpected, hard to anticipate these drops,

7     okay?

8              MR. CLIFFORD:  Judge, there is no evidence whatsoever

9     that Boeing can point to that it or the carrier supplied to any

10    passenger with a child who was fare-paying -- by the way, there

11    was a price associated with her being on this airplane.  A

12    ticket was paid for this, and it was part of the record that

13    we've given to the Court.  There is no evidence that Boeing or

14    the carrier supplied some other alternative means for this

15    child to be restrained.  So the clear presumption should be

16    that she's in the hands of one of the adults, mother or

17    grandmother.

18             And then couple that with the uncontradictable

19    evidence about the impact and forces of the g-forces on those

20    adults while they're presumably holding this child.

21             So for Boeing to suggest -- and then to bar us from

22    suggesting -- that this child was always at all times safely

23    restrained by a parent or grandparent is an unfair inference

24    that is prejudicial to that claim and then the damages that are

25    associated with it.

1     We don't want to run afoul of you, but by the same

2     token, in fairness to this client, it may be a terrible,

3     terrible fact for the whole circumstance of this case that this

4     child is airborne, but that's the reality of what occurred that

5     day.  And the evidence is against Boeing as it relates to the

6     ability of one of the adults who have constantly held onto this

7     child.  That's speculative as anything, and the evidence is

8     against that.  The evidence is that that couldn't have

9     occurred, that one of them would have lost control of this

10    child.  That's the evidence.

11          THE COURT:  Mr. Webb, is that fair?  Is that the

12    evidence?

13          MR. ESSIG:  Your Honor, this is Mr. Essig.  I'll be

14    arguing the motion.

15          THE COURT:  Sure.

16          MR. ESSIG:  It's not fair.  Boeing agrees with your

17    ruling.  And to be clear, Boeing was not asking for any

18    different treatment with respect to this passenger as to the

19    rulings that you had made prior, which is that, consistent with

20    Dr. Jenkyn, their biomechanical engineer, his assumption that

21    everybody was seat-belted or restrained on the flight -- and he

22    had no evidence to the contrary -- that's what should happen

23    here.

24          There shouldn't be a dispute in terms of speculative

25    opinions or analyses after the disclosure of reports about

whether or not Rubi Pauls' mother had sufficient strength to
hold her, the amount of strength that would have been required
to hold her, whether or not she would have been restrained or
not. That's speculation. It was never disclosed in their
reports. They had years to do that or supplement.

And this particular issue came up in the deposition of
Dr. Jenkyn that I took, and the reason we filed the motion was
because of this back-and-forth. Mr. Durkin asked questions of
his expert, Dr. Jenkyn, about Rubi Pauls after I finished
deposing Dr. Jenkyn and elicited testimony about whether or not
her mother could have held her. And Dr. Jenkyn specifically
says: I don't have any data specifically about how the mother
held the baby.

And then he speculated about if she had sufficient
force or not. But he didn't know, and he said outright he
didn't have data to opine on that.

And so they should not be able now, later, after
discovery and after their experts' opinions have been tendered,
to have their expert speculate about that question. This case
should operate the same way that the other cases have, which is
that they should absolutely be able to talk about the forces
that the passengers were subjected to on the flight as a matter
of Newton's law, as a matter of physics, that they would have
during times below zero G been pulled up towards the ceiling.
All those things should be fine. They should apply that

1    description of those physical forces, Newton's laws, to every

2    passenger equally, the same way, but they shouldn't be able to

3    speculate if somebody was belted or if somebody was restrained.

4         The fact that Rubi Pauls didn't have a seat and was a

5    lap child, that's a fact the jury will consider and will know

6    and can make inferences themselves.  Speculative testimony by

7    their experts is not going to assist the jury in determining

8    whether or not she held on or didn't, and they didn't do an

9    analysis to assist the jury in that way.

10        And so just like your ruling prior that they can't

11   show adult images of people going to the ceiling, that should

12   be the same for infants.  And they can't opine about likelihood

13   of injury; that should be the same for the lap child.

14        And so that, essentially, Boeing agrees with your

15   ruling.  And we don't agree that there is a new opinion here

16   about the restraint or the ability to restrain for their

17   experts that should be deployed in this trial different from

18   any other.

19        MR. DURKIN:  Judge, they're saying there's no data

20   about what occurred.  Of course, there's data.  We don't know

21   what this mother did while this plane is going down at

22   600 miles an hour in trying to save her three children, okay?

23        No one knows, right, because we don't have a camera.

24   But we do know what a mother would do, okay?  If you have it

25   the way they want, she would have to hold her so tight she

1    would be breaking bones of her.  So do they want it that way?

2            And I don't mean to be -- to say no data, it's because

3    they were -- everyone was killed.  No one was there to tell you

4    what occurred to this infant.  But we do know Newton's law

5    applies to this infant and this baby would have been thrown up

6    to the ceiling.  Yes, the mother may have been able to hold

7    her.  But I do believe the expert should be able to talk about

8    that.  Okay?  I think that's what -- we can do that; am I

9    correct?

10           MR. CLIFFORD:  And the expert wasn't speculating.

11           MR. DURKIN:  Yes.

12           MR. CLIFFORD:  He uses the word "speculation," and

13   that word doesn't exist anywhere.  Whenever these people want

14   to nail somebody down about, "You're speculating about that,

15   aren't you," they ask that question.

16           This expert specifically said, when he was talking

17   about, relative to this child, was very similar to what we saw

18   with an unrestrained passenger, so during a period of

19   negative Gs, the baby would have been accelerated straight up

20   out of the mother's arms until it was impacted with probably

21   the ceiling or the bin bottom.

22           I mean, that's what the evidence is and the testimony

23   is that was given by this expert.  He wasn't speculating.

24   They're making that up.

25           MR. DURKIN:  Just one other thing.  I want to make

1    sure we're not -- might as well talk about it now.  There is

2    plenty of evidence in the counseling records.  Mr. Njoroge has

3    seen many counselors.  We actually have a psychiatrist.  They

4    haven't filed -- they didn't file any motion to bar.  But he

5    gets nightmares every day about what happened to his children,

6    specifically Rubi, because he's a very intelligent man, okay?

7    He knows about gravitational forces.  This is his life, okay?

8    "What happened to my baby, Rubi," when that plane went to

9    negative 2Gs, which military pilots don't experience.  Military

10   pilots don't experience.

11              THE COURT:  All right.  Neither side is going to be

12   able to be allowed to speculate about what happened.  The

13   treatment is going to be the same even though Rubi -- there's

14   no question -- did not have her own seatbelt in her own seat.

15   I don't believe that the approach should be any differently,

16   and the parties are aware of the previous ruling as to what

17   Dr. Jenkyn can testify about, the fact that the animation or

18   one like it will not be permitted.  But he can testify, as

19   Boeing concedes, about the forces that passengers were

20   subjected to and the effect of those forces without suggesting

21   whether anyone was actually restrained in any way or unbelted

22   in the case of the adults -- or the seated passengers, I

23   should say.

24              So that motion is denied with that understanding.

25              So those are the rulings on the motions in limine.

1        Anything else?  In the past, the parties have asked

2    that I enter an order regarding mediation.  Anything to report

3    in that regard?

4        MR. CLIFFORD:  Yes, sir.  Mr. Webb and Judge O'Connell

5    and I and Boeing have been actively and in good faith

6    entertaining mediation discussions about not only this case,

7    but others.

8        In fact, we have, I believe, this morning made

9    progress on one of them, and we'll be reporting a resolution to

10   you.  Not the trial case.

11       And Mr. Webb and I will be talking even later today

12   about the trial case and those others, and our conversations

13   will continue, and as in the past, we will promptly report any

14   important status to you as soon as we possibly can with a call

15   to chambers.

16       THE COURT:  All right.  I'm inclined to continue,

17   enter and continue or commence and continue the final pretrial

18   conference until July 11th at 2:00.  The parties are going to

19   take another look at the disclosure deadlines in Section

20   No. 10 to accommodate for the hearing on July 11th, and the

21   parties are contemplating a limiting instruction regarding the

22   plaintiff's mother-in-law.

23       Anything else to report regarding any other cases?

24       Ms. Brammeier, aside from the Abdalla situation, there

25   were a couple of other cases with some confusion.   Anything

1  else?

2          MS. BRAMMEIER:  I was under the impression from the

3  other counsel that those were being resolved with your office,

4  but if that's not accurate, I'm happy to go back to them.

5          THE COURT:  Do you happen to remember which case

6  it was?

7          MS. BRAMMEIER:  It was a case with the Beasley Allen

8  law firm, Yakob.

9          THE COURT:  Yakob, 19 CV 3965.  So, yes,

10  Ms. Brammeier, if you could reach out again to see if the

11  confusion can be cleared up.

12          Mr. Webb, anything else today?

13          MR. WEBB:  I don't think so, Your Honor.

14          THE COURT:  Mr. Clifford, anything else today?

15          MR. CLIFFORD:  No, sir.

16          THE COURT:  All right.  We'll see everybody back here

17  July 11th at 2:00.  Thank you.

18          MR. CLIFFORD:  Thank you, Your Honor.

19          THE COURT:  Thank you.

20          MR. WEBB:  Thank you, Your Honor.

21          THE COURT:  Thank you.

22          Court is in recess until 2:30.

23      (Concluded at 1:58.)

24                          *  *  *  *  *

25

1        I certify that the foregoing is a correct transcript of the

2    pretrial conference in above-entitled matter.

3

4    */s/ ANGIE PHIPPS*                          *June 20, 2025*
     ANGIE PHIPPS, RMR, CRR, FCRR
5    Official Court Reporter